IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA

v.

BRIAN HARTLINE
BARRY BEKKEDAM

Crim. No. 14-548 (CDJ)

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' JOINT, SUPPLEMENTAL MOTION TO DISMISS COUNTS ONE THROUGH FOUR OF THE INDICTMENT DUE TO POST-INDICTMENT REVELATIONS BY DEPARTMENT OF THE TREASURY

Defendants Barry Bekkedam and Brian Hartline were charged in Counts One and Two of the Indictment of conspiring to and committing TARP Fraud (18 U.S.C. §§ 371, 1031). The conspiracy, the Indictment alleges, ran from May 2009 through January 2010,[2] with most if not all of the allegedly false statements to the Department of the Treasury ("Treasury") occurring in December 2009. Counts Three and Four charge defendants with violations of 18 U.S.C. § 1001 for making these same allegedly false statements to Treasury.

The U.S. Attorney's Office, when it indicted Bekkedam and Hartline in October 2015, could not have known – *because Treasury had not yet admitted* – that Treasury treated "smaller TARP banks ... [in a manner that] differed markedly from its treatment of the largest TARP banks[ ]" when it came to the Capital Purchase Program ("CPP"), and that the Treasury Department had, as early as December 9, 2009 – before, according to the Indictment, Defendants had completed their allegedly fraudulent acts – the CPP was "effectively closed." *See* Special Inspector General –Troubled Asset Relief Program, *Quarterly Report to Congress: The Legacy*

---

[2] Indictment, at Counts One and Two, ¶ 12.

1

*of TARP's Bank Bailout Known as the Capital Purchase Program* (January 28, 2015[3]), at 1-2, 10 ("*SIG-TARP Report*") – attached as *Exhibit 1*.

This recent *SIG-TARP Report* reveals that – to the extent that CPP even remained in existence at the time Defendants were carrying out their alleged fraud – it was operated with no consistent standards throughout – treating banks differently and "on an *ad hoc* and inconsistent basis"[4] regarding their acceptance into the program, their treatment while in the program, and the manner in which they exited the program.[5] Because there were no standards, there could be no material deception through acts committed by one bank when, as applied to another bank, the standard or rule did not apply at all.

I.  **TREASURY APPLIED DIFFERENT AND MORE RIGOROUS STANDARDS FOR ADMISSION TO CPP AS WELL AS TO CAPITAL RATIO REQUIREMENTS ACCORDING TO A BANK'S SIZE.**

   A. **The Information Defendants Provided That Allegedly Was Materially False in NOVA's Application for CPP Funds Was Not Required of Larger Banks that Received CPP Money. In Fact, Many Larger Banks Did Not Have to Do Anything to Apply or Qualify at All.**

As set forth in Defendants' opening briefs, the Government alleges in Counts One and Two (the "TARP Fraud Counts") that the Defendants made materially false statements to Treasury in pursuit of CPP funds by telling TARP that NOVA Bank had received an infusion of capital sufficient to make NOVA TARP-worthy by virtue of investments by three individuals – "G.L.", "C.G.", and "A.B." The deceit, the Indictment alleges, is that NOVA – through Defendants – had loaned these three wealthy individuals the money each used to invest in bank stock, and therefore it was a material lie to call it "capital." This, the Indictment alleges, was an

---

[3] The Government unsealed the Indictment just 11 days earlier, on January 17, 2015.
[4] *SIG-TARP Report*, at 12.
[5] Interestingly, the report concedes that the program has essentially placed smaller banks similar to Nova at the mercy of hedge funds in the process.

2

attempt by Defendants to make NOVA appear more financially sound that it actually was after finding out that NOVA had been provisionally approved for CPP funds in mid-2009, contingent on NOVA's ability to raise an additional $15 million in capital.[6]

By contrast, while the small community bank, NOVA, was being forced to jump through these hoops in order to *qualify* for CPP funds, larger banks not requirements; indeed, many if not all were not even required to apply in order to receive CPP funds. As the SIG-TARP Report sets forth:

> Treasury continued its active role, only this time as an investor in the largest CPP institutions. ... Secretary Paulson made phone calls to the CEOs of nine institutions on October 12, 2008, and requested that they come to Washington, DC the next day. The next day, Secretary Paulson, then-FRBNY President Geithner, and others told the CEOs that they needed to accept a collective $125 billion in capital injections for the "good of the country." ... The CEOs agreed with their banks becoming the first CPP recipients. ... Treasury then announced that CPP would be available to a broad array of qualifying financial institutions that were deemed healthy and viable by Federal regulators and Treasury. This would require Treasury to learn confidential information about CPP banks.

*Report,* at 6-7. So while smaller, community banks like NOVA were forced to bare their souls to qualify for CPP, the larger banks did not even have to ask for the money!

### B. Smaller Community Banks Also Were Treated Less Favorably With Respect to Capital Requirements than Larger National and International Banks.

Central to the Government's case is the supposed false statements NOVA made about its capitalization. The Indictment asserts that NOVA was under-capitalized and was at a "risk of failure" and therefore, Treasury required NOVA to raise an additional $15 million.[7] The Indictment, in turn, implies that these financial pressures caused Defendants to lie and say they successfully did raised capital.

---

[6] *See, e.g.*, Indictment, Counts One and Two, ¶¶ 15, 22.
[7] *See, e.g.*, Indictment, Counts One and Two, ¶¶ 14, 22. Despite the Indictment's assertions that NOVA was in dire straits, NOVA bank was "adequately capitalized" during the relevant period and continued to operate until the fall of 2012.

SIG-TARP, reveals, however, that Treasury was much harder on all small banks, not merely NOVA, when it came to capital requirements than it was on the big ones.

> [T]he Government held smaller TARP banks **to stricter capital and other standards**, even though community banks faced challenges raising capital to repay TARP. *** One officer of a small community bank ... told SIGTARP that the bank did not want to be auctioned and had tried to work with Treasury and its banking regulator to raise capital to exit TARP. ... Treasury and the banking regulators put restrictions on that capital raise that made it difficult. In the end, ... Treasury auctioned the bank.

*SIG-TARP Report*, at 2, 14 (emph. added). By contrast,

> Treasury's approach to Citigroup was extraordinary[.] ... Despite Treasury's concerns over market reaction that the Government would be nationalizing a bank, Treasury converted its preferred stock to common stock **to help Citigroup's capital ratios** and planned a careful and orderly exit of its stake in Citigroup over an extended period of time. *** [T]he largest institutions were permitted to repay TARP without meeting the Government's TARP exit criteria[.]

*SIG-TARP Report*, at 2, 10 (emph. added). As SIG-TARP concludes,

> Treasury was treating banks differently based on size. Unlike the **largest banks that were able to exit TARP with less capital** than the regulators and Treasury had set as criteria for a TARP exit, **and with less strong types of capital** than regulators and Treasury had discussed, **smaller TARP banks were held to strict capital standards** by Federal banking regulators in order to repay TARP. Unlike Citigroup and others, Treasury did not restructure or exchange its stock beyond a small number (5% of 707 original CPP banks) of banks.

*SIG-TARP Report,* at 13 (emph. added). Though these statement were made in the context of how much capital the banks needed to have to *exit* CPP/TARP, rather than to enter it, the core proposition is the same – that different rules applied to small community banks such as NOVA, and that they were pressured with regard to raising capital in a manner that was both oppressive and unfair.

The unfortunate result of these and other instances of differential treatment of smaller

4

banks,[8] SIG-TARP concluded, was that the purpose of the CPP lost its way:

> Treasury gave up oversight of the financial health of these institutions and of being able to impact most of the communities in which these banks play important roles to ensure that the other purposes of TARP are met of providing liquidity, preserving life savings and college savings, preserving homeownership, and promoting jobs and economic growth.

*SIG-TARP Report*, at 14.

Accordingly, the implication in the Indictment that NOVA's contingency requirement was the direct result of its alleged financial troubles is ill-informed or disingenuous as all small banks were being held to exacting capital requirement standards.

## II. BY THE TIME BEKKEDAM AND HARTLINE MADE ALLEGEDLY FALSE STATEMENTS TO TREASURY– IN DECEMBER 2009 – TREASURY HAD, FOR ALL INTENTS AND PURPOSES, SHUTTERED CPP.

Despite averring that the deadline for NOVA to raise $15 million in "new" capital was October 21, 2009,[9] the facts alleged in the Indictment reveal Defendants did not, nor where they in a position to, tell Treasury that NOVA had raised the "new" capital until December 2009.

Count One, ¶ 26 asserts that Hartline did not tell Treasury that the $2.5 million from A.B. and the $500,000 from C.G. "represented new capital invested in the bank" until "following – [ *i.e., after* –] the loans to A.B. and C.G." Significantly, the loan to C.G. did not take place until "in or about December 2009." Count One, ¶ 25.

---

[8] Among the additional ways in which the *SIG-TARP Report* says smaller banks were treated differently are that : (1) while Treasury itself directly monitored "the health of the remaining largest TARP institutions" and Treasury "engaged in a slow and controlled exit of its stake of these institutions[,]", Treasury "only relied on the decision of the Federal banking regulator as to whether" Treasury would be withdrawing its stake in smaller banks and thereby allowing them to exit the program (or be auctioned off) (*SIG-TARP Report* at 13); and (2) unlike the larger institutions, when it came to the decision to auction off smaller banks, "Treasury didn't take into consideration whether these small community banks were healthy and stable[,] … or whether the purpose of TARP had been met [for those banks and the communities they served]." – *SIG-TARP Report* at 14.

[9] Indictment, ¶ 22. In his sufficiency motion, Mr. Bekkedam argues that the failure – as alleged – of defendants to make statements to Treasury before December is independent grounds for dismissing Counts One through Four.

Similarly, Overt Act 9 avers that this communication took place "[o]n or about December 15, 2009," when Hartline advised Treasury that NOVA had "'completed raising over $10 million,' including $2.5 million from A.B. and $500,000 from C.G." In addition, in Count Four, the Indictment alleges that on December 15, 2009, that, "Brian Hartline told the Department of Treasury that NOVA had raised $10 million of new capital[.]" Indictment, at 12 (Counts Three and Four, ¶ 2 (Table)). In short, the allegedly fraudulent statements were not made to TARP until months after the October deadline for NOVA to meet the "new" capital raise that was the contingent requirement for getting the funds.

According to the new *SIG-TARP Report*, however, these December statements were – by edict of no less than the Secretary of the Treasury himself – falling on deaf ears. Therefore, such statements could not have been material, even if they were falsehoods. As stated in the SIG-TARP Report:

> On December 9, 2009, Secretary Geithner sent a letter to Speaker of the House Nancy Pelosi stating, "The Capital Purchase Program, through which the majority of TARP investments in banks have been made, is effectively closed." *** On December 23, 2009, Treasury announced that it hired asset managers to manage its portfolio "in the wind-down phase of" CPP. *** CPP was not closed, but Treasury's efforts were in "wind-down" mode focused on disposing of the TARP shares.

*SIG-TARP Report*, at 10-11.[10] In other words, by all appearances, Treasury was not approving any new applications by December 2009. Therefore, despite allegedly meeting the contingency, Treasury denied NOVA application for CCP funds because the program was effectively shut down .

---

10 It is a fair assumption that the decision Secretary Geithner announced on December 9, 2009 and the decision to begin the wind-down on the December 23, 2009 took place in advance of dates on which the respective decision were announced.

6

### III. PROSECUTING THE DEFENDANTS UNDER THESE CIRCUMSTANCES VIOLATES THE DUE PROCESS AND EQUAL PROTECTION CLAUSES OF THE UNITED STATES CONSTITUTION – AS THIS PROSECUTION AMOUNTS TO A CASE OF SELECTIVE *CRIMINALIZATION*.

In short, it was not possible for a bank such as NOVA to obtain CPP funds in December 2009. Moreover, the idea that NOVA could have violated Treasury Department standards through its statements about capitalization is similarly implausible because Treasury had no "standards" by which banks were uniformly evaluated.

When it came to the CPP, the *SIG-TARP Report* reveals that Treasury made it up as it went along. For instance, non-Treasury regulators administered parts of the CPP for small community banks, whereas Treasury itself managed those same administrative tasks for the larger banks participating in TARP.[11] Further, as discussed above,, many larger institutions did not even have to apply for CPP funds. Therefore, unlike NOVA, larger banks were not subject to the review or scrutiny of the FDIC, the Federal Reserve, or state banking agencies. The Indictment alleges that it was to these agencies, as much or more than to Treasury itself, that Defendants allegedly made the "false" statements.[12] As larger banks never even had to run that gauntlet – questions arise as to whether it is constitutional to treat statements to those other agencies as statements to Treasury for the purpose of Counts One through Four.[13]

Even if statements to these agencies can be considered statements to Treasury, the statements remain entirely immaterial. Materiality is measured in terms of the ability of a

---

[11] *See, supra*, n. 6.

[12] *E.g.*, Indictment at Count One, ¶ 20 ("Following NOVA's June 30, 2009 loan to GL, defendant Brian Hartline represented and had other NOVA employees represent *to various bank regulators, including the PADOB, the FDIC,* and the Department of the Treasury that NOVA had raised $5 million in capital through G.L.'s investment."); Count One, Overt Act 5 ("On or about July 21, 2009, NOVA Financial Holdings, Inc., secretary C.H., mailed an application package to the Federal Reserve and PADOB, on behalf of NOVA, stating that G.L. invested $5 million in NOVA Financial Holdings, and intended to invest a total of $18 million.").

[13] Minimally, in terms of relief, the Court should prevent the United States from introducing statements made to the non-Treasury entities in its case-in-chief.

7

statement or omission to have a "natural tendency to influence or [be . . . ] capable of influencing" the recipient of the statements. *United States v. Moyer*, 674 F.3d 192, 214 (3d Cir. 2012) (statement must be "of a type capable of influencing a *reasonable* decisionmaker.") The trouble here is that there were no "reasonable" decisionmakers at CPP because there was no rational decision making process in place. Moreover, by December 2009, no statements were "capable of influencing" TARP to grant new CPP funds to *any* applicant – much less a smaller, community bank. Accordingly, it would offend all standards of fairness to compel Defendants to stand trial for defrauding the TARP when there was no defined process subject to being violated or defrauded.

The Equal Protection and Due Process violations here are something more basic than, for instance, a selective prosecution claim whereby, the Supreme Court has held, "[S]o long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion[,]" *Bordenkircher v. Hayes,* 434 U.S. 357, 364 (1978); *Wayte v. United States*, 470 U.S. 598 (1985) (quoting *Bordenkircher*). This standard is not appropriate here.

For this is not a case of selective *prosecution*, as was *Bordenkircher* and *Wayte*. Rather, it is a case of selective *criminalization*. *See, e.g.,* Andrew Spalding, *The Problem of Deterring Extraterritorial White-Collar Crime*, 17 Chap. L. Rev. 355, 361 (2014) (discussing the problem of applying criminal prohibitions to some corporations within a given jurisdiction, but not to others). The Supreme Court has addressed this issue in the context of the Due Process Clause under the "fair warning" principle – *i.e.,* there is a "basic principle that a criminal statute must give fair warning of the conduct that it makes a crime." *Bouie v. City of Columbia*, 378 U.S.

347, 350 (1963). Interpreting *Bouie,* the Supreme Court has said more recently, "Deprivation of the right to fair warning, … , can result both from vague statutory language and from an unforeseeable and retroactive judicial expansion of statutory language that appears narrow and precise on its face." *Rogers v. Tennessee*, 532 U.S. 451, 457 (2001).

For Mr. Bekkedam and Mr. Hartline, the problem is even more elementary than that. Here it is not the statutes that are vague; it is their application to a series of events that took place in an environment where there were no defined standards whatsoever. That is, while the false statements and TARP fraud statutes maybe be clear on their face, the actions by Treasury of having some CPP applicants face standards that others did not presents the dilemma of whether Defendants can be deemed culpable for statements they allegedly made about the state of the regulatory capitalization of NOVA Bank. Were NOVA not a small, community bank, it never would have been asked these questions in the first place. Therefore, applying rules – and then criminalizing the failure to abide by them – to some people in the community, while not holding others in the community up to the same standards, "offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental" – and thereby is a violation of due process. *See Speiser v. Randall,* 357 U.S. 513, 523 (1958). Defendants' liberty cannot be subject to such whim.

Date: October 9, 2015

Respectfully submitted,

/s/ Patrick J. Egan
Patrick J. Egan, Esquire
John C. Fuller, Esquire
pegan@foxrothschild.com
jfuller@foxrothschild.com
Fox Rothschild LLP
2000 Market Street, 20th Floor

Joel D. Schwartz
Russell D. Duncan
Jacob S. Frenkel
Allison Baker Shealy
jschwartz@shulmanrogers.com
rduncan@shulmanrogers.com

Philadelphia, PA 19103
Tel: (215) 299-2825
Fax: (215) 299-2150

*Counsel for Brian Hartline*

jfrenkel@shulmanrogers.com
ashealy@shulmanrogers.com
Shulman Rogers Gandal Pordy Ecker, P.A
12505 Park Potomac Ave., 6th Floor
Potomac, MD 20854
Tel: (301) 945-9240
Fax: (301) 230-2891

Michael J. Engle
m.engle@gpeff.com
Greenblatt Pierce Engle Funt Flores
123 South Broad St. Suite 2500
Philadelphia, PA 19109
(215) 985-4275
Fax: (888) 495-7377