**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| **v.** | **:** | **CRIMINAL NO. 14-548 (CDJ)** |
| **BRIAN HARTLINE** | **:** | |
| **BARRY BEKKEDAM** | | |
| | **:** | |

**MEMORANDUM IN SUPPORT OF
<u>DEFENDANT BARRY BEKKEDAM'S MOTION FOR NEW TRIAL</u>**

Michael J. Engle
m.engle@gpeff.com
Greenblatt Pierce Engle Funt Flores
123 South Broad St. Suite 2500
Philadelphia, PA 19109
(215) 985-4275
 Fax: (888) 495-7377
 *Counsel for Barry Bekkedam*

Joel D. Schwartz
Russell D. Duncan
Allison Baker Shealy
Renee B. Kramer
jschwartz@shulmanrogers.com
rduncan@shulmanrogers.com
ashealy@shulmanrogers.com
rkramer@shulmanrogers.com
Shulman Rogers Gandal Pordy Ecker, P.A
12505 Park Potomac Ave., 6th Floor
Potomac, MD 20854
Tel: (301) 945-9240
Fax: (301) 230-2891

**TABLE OF CONTENTS**

STANDARD OF REVIEW ......................................................................................................... 3

ARGUMENT ............................................................................................................................... 5

I.    GROUNDS FOR RELIEF TRIAL APPLICABLE TO COUNTS ONE THROUGH FOUR .......... 5

    A.    The Jury Convicted Mr. Bekkedam of Misleading Regulators With Whom He had No Contact, by Working through a Bank via Conduct the Government's Witnesses Said was Arms-Length and Appropriate, and of which the Jury Determined to be Void of Wrongdoing 5

    B.    The Government Engaged in Misconduct by Mischaracterizing Evidence and Misled the Jury by Using Irrelevant Evidence to Stand in for the Absence of Probative Evidence of Guilt 8

    C.    Compounding the Error, Highly Prejudical and Inadmissible Evidence Was Presented to the Jury. ...................................................................................................................... 21

    D.    The Ability of Mr. Bekkedam to Challenge the Government's Misleading Approach to Proving Its Case Was Undermined by His Being Prevented From Receiving a "Theory of Defense" Instruction. .................................................................................................... 27

    E.    The Government Failed to Prove Aiding or Abetting Liability – And Instead Achieved a Conviction For Counts Two Through Four By Improperly Replacing It With and Arguing Conspiracy Evidence. .................................................................................................... 28

II.    GROUNDS FOR RELIEF APPLICABLE TO COUNT ONE, ONLY ......................................... 36

    A.    The Government Failed to Introduce Evidence Sufficient to Prove A Conspiracy Between Mr. Hartline and Mr. Bekkedam Alleged in Count One of the Indictment, and the Jury's Verdict is Against the Weight of the Evidence ......................................................... 37

    B.    The Court May Not Conclude that a Unanimous Verdict was Reached on the Conspiracy Charge ................................................................................................................................ 44

III.    GROUND FOR RELIEFE APPLICABLE TO COUNT TWO, ONLY ..................................... 45

    A.    The Failure to Instruct the Jury on Willfulness for Count Two – TARP Fraud – was Error – Particularly as it Applied to Mr. Bekkedam in the Position of Alleged Aider/Abbetor and the Instruction He Received for 18 U.S.C § 2 ........................................................... 45

    B.    Based on the Instruction it Received, the Jury Could Not Have Convicted Mr. Bekkedam on Count Two. ....................................................................................................................... 47

IV.    GROUNDS FOR RELIEF APPLICABLE TO COUNTS THREE AND FOUR - 18 U.S.C. § 1001 - ONLY .............................................................................................................................. 49

    A.    Per Se Impermissible Constructive Amendment of the Indictment: The Indictment Charged Mr. Bekkedam with a "False Statements" Case, But the Government Prosecuted Him on a "Concealment" Case Theory, While Simultaneously Enjoying the Lower Standards of Proof Required for a "False Statements" Charge .......................................................... 49

    B.    The Government Failed to Prove Actus Reus with Regard to Counts Two, Three and Four 65

    C.    Failure to Instruct the Jury on the Specific False Statements Charged in the Indictment Means They Could Not Have Reached a Unanimous Verdict About Them ............................ 70

**D.** **Moreover, the Same Failure to Instruct on Specific Statements Resulted in Multiplicative Convictions in Both Counts Three and Four, as Well.** ..................................................72

**V.** GROUNDS FOR RELIEF APPLICABLE TO COUNT THREE, ONLY .....................................73

**A.** **The False Statement Alleged in Count Three Fails on Duplicity Grounds** ..........................74

**B.** **The Government Presented No Evidence of the Alleged False Statement.** ..........................74

**C.** **Even If Such a Statement Was Made, It Was Not False – Despite the Government's Mischaracterization of it As Such.** ...............................................................................................76

**D.** **Even If Such A Statement Did Occur, The Government Failed to Prove That It Was Material to Treasury Because There was No Evidence That Any Such Statement Ever Was Transmitted to Treasury.** ............................................................................................................77

**E.** **Even if the Statement was Made, There was No Evidence of Intent as Required by 18 U.S.C. § 1001.** ...........................................................................................................................77

**F.** **There Was No Evidence That Mr. Bekkedam Aided and Abetted the Making of Such a Statement on June 30, 2009.** ...................................................................................................79

**VI.** GROUNDS FOR RELIEF APPLICABLE TO COUNT FOUR, ONLY ....................................80

**A.** **The Government's Argument that the Statement Alleged in Count Four was Material was Misleading According to Its Own Evidence, and in Contravention of the Weight of the Evidence.** ...................................................................................................................................80

**CONCLUSION** ......................................................................................................................................81

Mr. Bekkedam has pending motions before this Court for judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure, and he maintains his position that this relief is merited.  He is innocent of all charges.  In the alternative, through undersigned counsel, he files the instant Motion for New Trial pursuant to Rule 33(a) of the Federal Rules of Criminal Procedure.  He asks this Court to consider this New Trial motion after and to the extent that the Court does not grant relief – *i.e.*, acquittal – pursuant to Rule 29.  If such relief is not granted under Rule 29, a new trial is warranted for Counts One through Four (the counts for which the jury returned a guilty verdict) pursuant to Rule 33.

## STANDARD OF REVIEW

Under Rule 33, the district court may grant a new trial based on the evidence in the trial record should the "interest of justice" require it.  Fed. R. Crim. P. 33(a).  Unlike motions brought pursuant to Rule 29, where the Court must consider the evidence in "the light more favorable to the prosecution[,]" *United States v. Bobb,* 471 F.3d 491, 494 (3d Cir.) (2006),[1]  the Court must conduct its review for Rule 33 under a more balanced standard.  Specifically, "when a district court evaluates a Rule 33 motion it *does not* view the evidence favorably to the Government, but instead exercises its own judgment in assessing the Government's case."  *United States v. Johnson*, 302 F.3d 139, 150 (3d Cir. 2002) (emphasis added); *accord United States v. Brennan*, 326 F.3d 176, 188-89 (3d Cir. 2003).  Therefore, the Court has the sound discretion to "set aside the verdict and order a new trial."  *United States v. Zimmerman*, No. CRIM. A 99-781-2, 2001 WL 706256, at * 3 (E.D. Pa. June 21, 2001), *aff'd*, 80 F. App'x 160 (3d Cir. 2003).

Within that context, there are a number of specific grounds upon which a district court may grant a new trial pursuant to Rule 33, the following of which are applicable to Mr. Bekkedam's case:

---

[1] *Accord United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005) (same).

- *Miscarriage of Justice* – The "interests of justice" require a new trial pursuant to Rule 33 if the district court determines "that the verdict constitutes a miscarriage of justice." *United States v. Rhines*, 143 F. App'x 478, 484 (3d Cir. 2005). If there is "a serious danger that a miscarriage of justice occurred, *i.e.,* that an innocent person has been convicted[,]" then a new trial should be ordered. *United States v. Favato*, 533 F. App'x 127, 131 (3d Cir. 2013).[2]

- *Trial Error* – If there is a reasonable probability that trial error or errors "had a substantial influence on the jury's verdict," this, too, is a sufficient basis for a new trial. *See, e.g., United States v. Davis*, 233 F. Supp. 2d 695, 698 (E.D. Pa. 2002), *aff'd*, 397 F.3d 173 (3d Cir. 2005).[3]

These standards have been applied to grant Rule 33 relief for reasons such as: failure to give an appropriate jury charge, *see, e.g., United State v. Vicaria*, 12 F.3d 195, 198-199 (11th Cir. 1994); introduction of inadmissible evidence, *e.g., United States v. Schmick*, 904 F.2d 936, 943 (5th Cir. 1990); government misconduct, *e.g.*, *United States v. Twigg*, 588 F.2d 373, 377 (3d Cir. 1978); *United States v. Brodie*, 268 F. Supp. 2d 420, 425-435 (E.D. Pa. 2003); and the verdict being against the weight of the evidence, *e.g., United States v. Phifer*, 400 F. Supp. 719, 722 (E.D. Pa.

---

[2] *Accord United States v. Parker*, No. 05-CR-702, 2006 WL 1648953, at *1 (E.D. Pa. June 9, 2006) (the court should grant a Rule 33 motion "where the failure to do so would result in a miscarriage of justice.").

[3] *Accord United States v. Bansal*, No. CRIM.05-193-11, 2006 WL 2246203, at *10 (E.D. Pa. Aug. 1, 2006), *aff'd*, 663 F.3d 634 (3d Cir. 2011) (miscarriage of justice or substantially influencing trial error merits Rule 33 relief); *United States v. Cephas*, No. CRIM.A. 08-163-01, 2009 WL 1587587, at *2 (E.D. Pa. June 4, 2009), *aff'd*, 410 F. App'x 528 (3d Cir. 2011) ("Additionally, the court must grant a new trial if errors occurred during the original trial, and it is reasonably possible that such errors substantially influenced the jury's decision."); *United States v. Davis*, 233 F. Supp. 2d 695, 698 (E.D. Pa. 2002), *aff'd*, 397 F.3d 173 (3d Cir. 2005) ("A new trial is warranted if trial errors had a substantial influence on the jury's verdict."); *United States v. Siam*, No. CRIM. A. 00-126, 2000 WL 1130084, at *4 (E.D. Pa. Aug. 9, 2000) (considering "whether there is a reasonable probability that error infecting the [trial] could have had a substantial influence on the jury's decision.").

1975), *aff'd sub nom. Smith, Appeal of*, 532 F.2d 747 (3d Cir. 1976); *accord United States v. Flemming*, No. 03-CR-148, 2004 WL 1965035, at *5 (E.D. Pa. Aug. 11, 2004), *aff'd,* 256 F. App'x 453 (3d Cir. 2007) ("A verdict against the weight of the evidence is a permissible reason to grant a new trial under Rule 33.").

While the insufficiency of the evidence is addressed in greater detail in Mr. Bekkedam's Rule 29-related pleadings (*see* ECF 175 *and* ECF 191), which are herein adopted by reference, each of the other above-noted types of error also arose during Mr. Bekkedam's trial, with regard to Counts One through Four, and are addressed in detail, below.

## ARGUMENT

I.      **GROUNDS FOR RELIEF TRIAL APPLICABLE TO COUNTS ONE THROUGH FOUR**

A.      **The Jury Convicted Mr. Bekkedam of Misleading Regulators With Whom He had No Contact, by Working through a Bank via Conduct the Government's Witnesses Said was Arms-Length and Appropriate, and of which the Jury Determined to be Void of Wrongdoing**

Error infected the verdicts for Counts One through Four, and a new trial should granted. Mr. Bekkedam was charged with seven counts, and these four remain.   Each of these counts is related to NOVA Bank's interactions with the United States Department of the Treasury ("Treasury") and the federal regulatory surrogates it used for the purpose of implementing the Capital Purchase Program ("CPP"), a sub-program of the Troubled Asset Relief Program ("TARP"). TARP was created as part of the Emergency Economic Stabilization Act and was a $700 billion program which was enacted on October 3, 2008,[4] after being first proposed by the

---

[4] Emergency Economic Stabilization Act of 2008, Pub. L. No. 110-343, 122 Stat. 3765 (effective Oct. 3, 2008).

Department of Treasury on the weekend of September 20, 2008,[5] passed by the Senate eleven

days later on October 1, 2008,[6] and by the House two days later on October 3, 2008.[7]

The evidence clearly demonstrated that Mr. Bekkedam never had any direct or indirect

contact with – let alone influence over – any of the regulatory surrogates.[8]  He was convicted of

acting as a conspirator with Bank president Brian Hartline (Count One), and as an accomplice of

Mr. Hartline (Counts Two, Three, Four) in Mr. Hartline's interaction with regulators, which

largely was conducted through NOVA Bank employees.

However, not only did these NOVA Bank employees work almost entirely independently

of Mr. Hartline in carrying out their respective duties *vis a vis* the CPP/TARP process,[9]  not one

---

[5] *See* Department of Treasury, Legislative Proposal for Treasury Authority to Purchase Mortgage-Related Assets (Sep. 20, 2008). *See also* Department of Treasury, Press Release HP-1175, FACT SHEET: Proposed Treasury Authority to Purchase Troubled Assets (Sep. 20, 2008), *available at* https://www.treasury.gov/press-center/press-releases/Pages/hp1150.aspx.

[6] Engrossed Amendment Senate, 2007 Cong. U.S. H.R. 1424, 110th Congress, 2d Session (as passed by Senate, Oct. 1, 2008).

[7] Enrolled Bill, 2007 Cong. U.S. H.R. 1424, 110th Congress, 2d Session (as enacted Oct. 3, 2008).

[8] *See* Trial. Tr. 76: 17-24 (Mar. 29, 2016) (Schaffner); Trial Tr. 118:19-119:5 (Mar. 29, 2016) (Bertsch); Trial Tr. 59-60 (Mar. 30, 2016) (Quill confirming that Mr. Bekkedam's name does not appear on NOVA Financial's TARP application and that he did not "factor into the equation at all" as he was considering NOVA Financial's TARP application); Trial Tr. 73:9 and 74:7-8 (Mar. 30, 2016) (Koch identifying her "main points of contact regarding the TARP application" and who she spoke with when she contacted the bank, none of whom included Mr. Bekkedam); Trial Tr. 129:1-9 (Apr. 6, 2016) (Fuir); Trial Tr. 49:1-24 (Apr. 8, 2016) (Hunter); Trial Tr. 113:4-10 (Apr. 8, 2016) (Course); *see also* Trial Tr. 69:23-70:23 (Apr. 8, 2016) (Rutkowski); Trial Tr. 26:17-27:17 (Apr. 12, 2016) (Zentner).

[9] Trial Tr. 33:23-34:6 (Apr. 7, 2016) (Hanuscin testifying that Mr. Hartline never pressured Hanuscin or asked him to alter reports to make the Bank look well-capitalized in or around March 2009 when Nova's TARP application was in play); Trial Tr. 49:17-20 (Apr. 7, 2016) (Hanuscin testifying that Mr. Hartline never told Hanuscin to send information to Ms. Koch that was untruthful or inaccurate); Trial Tr. 171:5-13; 177:17-19 (Apr. 4, 2016) (Madiany testifying that Mr. Hartline never asked Madiany to do anything "improper" with respect to the Levin loan or otherwise); Trial Tr. 40:13-15 (Apr. 12, 2009) (Loughney testifying that no one at Nova Bank told her to withhold documents from auditors); Trial Tr. 19:3-5 (Mar. 30, 2016) (Knott testifying that Mr. Hartline never told her to withhold documents from auditors); Trial Tr. 17:7-14, 24:7-12 (Apr. 5, 2016) (Poliski testifying that he did not recall any pressure from Mr. Hartline to ever approve the Levin loan for presentation to the loan committee); Trial Tr. 40:6-41:14 (Apr. 5, 2016) (Poliski testifying that Mr. Hartline never asked him to hide a file from Merit Partners, KPMG or the bank examiners); Trial Tr. 73:25-74:13 (Apr. 5, 2016) (Dietrich testifying that Mr. Hartline never pressured him to approve the Levin, Gallub or Bonomo loans; rather, Dietrich approved the loans based on his own judgment); Trial Tr. 151:7-21 (Apr. 7, 2016) (Patterson stating his belief that in June 2009, several people at Nova knew Mr. Levin's loan was for investment purposes including Mr. DiMarcantonio, Mr. Madiany, Mr. Poliski and Mr. Hanuscin, each of whom voted to approve it).

of them testified that Mr. Bekkedam had any contact with – let alone input or influence over – him or her.[10]  This is true not only with regard to the Bank employees' work on the TARP application process, but it was also true with regard to the processes by which George Levin and Anthony Bonomo obtained each of his loans from NOVA Bank that the Bank then offered as part of the capital raise.[11]  No one can deny that, at every turn, Mr. Bekkedam was many steps removed from the TARP decision making process.

Indeed, to the extent that the jury was asked, it determined that Mr. Bekkedam's conduct with regard to the Bank – both directly and indirectly – was entirely appropriate.  For instance, in Count Seven, he was accused of aiding and abetting the commission of Bank Fraud by entering a consulting agreement with NOVA to recruit investors for NOVA.  But he was acquitted.  It accused him of defrauding the Bank by working with Hartline to make NOVA effectuate the Bonomo loan.  Yet, this did not cause him to be convicted.  (Count Five, though charging Mr. Bekkedam with investor fraud, entailed some of the same conduct with the Bank – and he was acquitted there, too.[12])  Count Seven even accused Mr. Bekkedam of working with Mr. Hartline to defraud the Bank by working a scheme to get George Levin the $5 million he used to invest in NOVA Financial.  Yet, Mr. Bekkedam still was acquitted on Count Seven.

---

[10] Trial Tr. 73:5-7 (Apr. 7, 2016) (Hanuscin) (testifying that Mr. Bekkedam never told him how the bank should classify capital); *see also* Trial Tr. 23:19-27:19 (Mar. 30, 2016) (Knott); Trial Tr. 40:25-41:19 (Apr. 12, 2016) (Loughney).

[11] Trial Tr. 179:13-20 (Apr. 4, 2016) (Madiany indicating no contact with Bekkedam at all during Madiany's time at NOVA Bank); Trial Tr. 184:4 - 21 (Apr. 4, 2016) (Madiany indicating that Bekkedam was not on loan committee and had no say in whether or not to approve Levin loan); Trial Tr. 196:5 - 25 (Apr. 4, 2016) (Madiany indicating that Bekkedam had no influence regarding Bonomo loan); Trial Tr. 45:17-46:4, 47:11-47:16, 49:3-6 (Apr. 5, 2016) (Poliski indicating that neither Bekkedam nor anyone at Ballamor Capital Management ever attempted to influence NOVA Bank loan decisions); Trial Tr. 84:13-23 (Apr. 5, 2016) (Dietrich indicating that Bekkedam never attempted to exert influence over Dietrich's decisions at NOVA Bank and neither Bekkedam or his clients received any special treatment); Trial Tr. 174:5-175:3 (Apr. 7, 2016) (Patterson testifying that Ballamor Capital clients did not receive any preferential treatment).

[12] The Count Six allegations were so unsupported by the evidence that the Court did not even permit them to reach the jury – dismissing it on April 19, 2016.

If the only connection between Mr. Bekkedam and Treasury was through the Bank, and each the witness from the Bank and the jury's verdicts on Counts Five and Seven vindicate his conduct *vis a vis* the Bank, then there is no connection that would justify Mr. Bekkedam's conviction for conduct allegedly having the capacity to affect Treasury – either at an intent or *actus reus* level, either as a principal, a conspirator, or an aider/abettor.

**B. The Government Engaged in Misconduct by Mischaracterizing Evidence and Misled the Jury by Using Irrelevant Evidence to Stand in for the Absence of Probative Evidence of Guilt**

1. *The Government repeatedly improperly attributed actions by NOVA Bank and NOVA Financial personnel who were not alleged to be co-conspirators - to Mr. Hartline and Mr. Bekkedam.*

The Government made clear on more than one occasion that Mr. Bekkedam and Mr. Hartline were the *only* members of the conspiracy; none of the other employees of NOVA Bank or NOVA Financial were alleged or considered by the Government as co-conspirators. Despite this acknowledgement, the Government presented numerous themes of what they alleged to be false or misleading evidence involving NOVA Bank and NOVA Financial personnel, which they improperly attributed to Mr. Hartline and Mr. Bekkedam, even though there was no evidence linking the purportedly false information to Mr. Hartline or Mr. Bekkedam. These themes include: (1) the purportedly false statements in the Risk Assessment Summaries ("RAS"); (2) the creation of the purportedly "fake" second RAS for the Levin loan; and (3) statements by Jeff Hanuscin to government regulators, when he was not alleged to be a co-conspirator.

Mr. Bekkedam may not be held accountable and certainly may not be convicted for statements of non-conspirators that he had no involvement in and did not even know occurred. Only the statements and acts of co-conspirators done in furtherance of the conspiracy may be attributed to members of the conspiracy. *See United States v. Gigante*, 166 F.3d 75, 83 (2d Cir.

1999) (district court erred by admitting and allowing inferences to be drawn against defendant for statements by third-party, who was not shown to be a member of the conspiracy charged, and where the statements at issue were not in furtherance of a specific criminal purpose in furtherance of that conspiracy).  In *United States v. Russo*, the Second Circuit expounded on how a person's general affiliation with organized crime is not sufficient for everyone so affiliated to be deemed "conspirators" for the purpose of attribution and, consequently: guilt:

> Where evidence is offered against a defendant consisting of a declaration by an alleged co-conspirator in furtherance of some criminal act, we explained that the court 'in each instance must find the existence [between the defendant and the declarant] of a specific criminal conspiracy [to do that criminal act.]'  The 'general existence of the Mafia' does not suffice.  We observed that the district court's expansive rationale 'would allow the admission of any statement by any member of the Mafia regarding any criminal behavior of any other member of the Mafia [against the latter].'  This was unacceptable when the speaker and the defendant were not jointly engaged in the criminal venture that was being advanced by the speaker.

 302 F.3d 37, 44 (2d Cir. 2002) (quoting *Gigante*, 166 F.3d at 82-83; bracketed material in original; internal citations omitted).

### a.   Abuse of testimony about the RASs

The Government introduced witness after witness to testify about contents of the RAS for each the Levin, Bonomo, and Gallub loans.  Patterson, Madiany, Poliski, Dietrich, and Hanuscin each was asked to review the portion of the RAS for each of the Levin, Bonomo, and Gallub loans and confirm that the RAS failed to indicate that the loan was for the purpose of investing in NOVA Financial.[13]  However, none of those witnesses indicated that Mr. Hartline had any role in determining what information should or should not be included in the RASs.  Quite the

---

[13] Trial Tr. 146:15-147:3, 156:16-157:21, 159:20-160:18 (Apr. 4, 2016) (Madiany); Trial Tr. 9:19-11:3, 51:21-52:24 (Apr. 5, 2016) (Poliski); Trial Tr. 62:24-64:15, 65:22-66:12 (Apr. 5, 2016) (Dietrich); Trial Tr. 144:11-146:6 (Apr. 6, 2016) (Hanuscin); Trial Tr. 120:11-21, 127:16-129:1, 134:13-134:14 (Apr. 7, 2016) (Patterson); *see also* Trial Tr. 71:20-72:2, 74:12-75:8 (Apr. 12, 2016) (Gallub); Trial Tr. 15:21-16:11, 18:2-9 (Apr. 13, 2016) (Swartz); Trial Tr. 66:14-67:12, 74:8-10, 76:10-77:7, 78:9-79:9 (Apr. 13, 2016) (Shubin).

contrary.  Patterson, who was aware of the purpose of each of the loans and who provided the information for each of the RASs in question, testified that he was not directed in anyway by Mr. Hartline to hide or obfuscate the purpose of the loans.[14]  Of greater significance, none of the witnesses indicated that they had been directed by Mr. Bekkedam or anyone acting on Mr. Bekkedam's behalf to hide or in any way obfuscate the purpose of the loans either.[15]

Since Mr. Hartline and Mr. Bekkedam were the only members of the conspiracy and neither Mr. Hartline nor Mr. Bekkedam played any role in providing, preparing or even suggesting the content for the Levin, Bonomo, or Gallub RASs, any information that was or was not included in the RASs cannot be attributed to Mr. Hartline or Mr. Bekkedam.  It was improper for the Government to present evidence to the jury about the content of these RASs and imply that such information was false or fraudulent and should somehow be attributed to Mr. Bekkedam and Mr. Hartline.  It was improper to imply that the RASs in anyway related to NOVA Financial's TARP application or could somehow demonstrate a guilty intent with respect to NOVA Financial's TARP application.  And it was also improper for the Government to argue that RASs in anyway related to NOVA Financial's TARP application or could somehow demonstrate a guilty intent with respect to NOVA Financial's TARP application,[16] when neither Mr. Hartline nor Mr. Bekkedam participated in any way in the preparation of any of the RASs.

---

[14] Trial Tr. 148:19 – 149:10 (Apr. 7, 2016) (Patterson).

[15] Trial Tr. 72:24-24, 73:1 – 7 (Apr. 6, 2016) (Hanuscin) (Mr. Bekkedam was not involved in nor exercised any influence over the loan process for Levin, Bonomo or Gallub); Trial Tr. 179:13-20 (Apr. 4, 2016) (Madiany) (indicating no contact with Mr. Bekkedam at all during Madiany's time at NOVA Bank); Trial Tr. 184:4-21 (Apr. 4, 2016) (Madiany) (indicating that Mr. Bekkedam was not on loan committee and had no say in whether or not to approve Levin loan); Trial Tr. 196:5-25 (Apr. 4, 2016) (Madiany) (indicating that Mr. Bekkedam had no influence regarding Bonomo loan); Trial Tr. 45:17-46:4, 47:11-47:16, 49:3-6 (Poliski) (indicating that neither Mr. Bekkedam or anyone at Ballamor Capital Management ever attempted to influence NOVA Bank loan decisions); Trial Tr. 174:5 -175:3 (Apr. 7, 2016) (Patterson) (no influence by Mr. Bekkedam).

[16] Trial Tr. 18:8 – 19:20 (Apr. 19, 2016) (Gov. Closing Argument).

### b.  Abuse of Jeff Hanuscin Testimony

The Government also improperly attributed to Mr. Hartline and Mr. Bekkedam statements Jeff Hanuscin made to government regulators and knowledge held by Hanuscin, even though Hanuscin was not alleged to be a conspirator.[17]  For example, Hanuscin testified that he was regularly in contact with Lisa Koch and that he provided information to Koch about NOVA Bank's capital.[18]  The Government also attributed to Mr. Hartline and by default to Mr. Bekkedam, a December 15, 2009 email from Hanuscin to Koch providing back-up documentation for the capital raised, GV 145, and faulted Mr. Hartline and Mr. Bekkedam for failing to disclose that Levin, Bonomo, and Gallub obtained loans from NOVA Bank at the same time as their investments in NOVA Financial, even though Hanuscin testified that Mr. Hartline never told him to send inaccurate information to the regulators.[19]

### c.  Cumulative effect of misattribution of acts of non-conspirators

While improper attribution of a single document or a single statement may not amount to reversible error, the improper attributions in this case infected the entire trial.  The Government

---

[17] Trial Tr. 11:1 – 4 (Apr. 19, 2016) (Gov. Closing Argument) (implying that Mr. Bekkedam and Mr. Hartline should have been aware of TARP criteria because "as Mr. Hanuscin said, and as all the regulators who were involved with TARP said, they were not going to give money to a bank that was only adequately capitalized"); *id.* at 10:18-25 (referring to original TARP application, which was submitted by Hanuscin); GV 28 (memo from Hanuscin to Koch, attaching a June 2, 2009 letter from Mr. Bekkedam to Mr. Hartline regarding a potential investor, and making representations about  NOVA Bank's capital was displayed or referenced during the Government's closing argument).

[18] GV 6 (Hanuscin listed as Primary Contact in TARP Application); Trial Tr. 134:13-24 (Apr. 6, 2016) (Hanuscin) (testifying that he completed the TARP application and that Lisa Koch was his point of contact at the FDIC); Trial Tr. 37:9-25 (Apr. 7, 2016) (Hanuscin) (testifying that he and Mr. Mr. Hartline were the two individuals who spoke with the FDIC and further testifying that anything the FDIC asked for, he gave them).

[19] Trial Tr. 37:9-25 (Apr. 7, 2016) (Hanuscin) (testifying that he and Mr. Mr. Hartline were the two individuals who spoke with the FDIC and further testifying that anything the FDIC asked for, he gave them); Trial Tr. 29:24-30:20 (Apr. 7, 2016) (Hanuscin) (testifying that Hanuscin was responsible for the completion reports to the FDIC and Pennsylvania Department of Banking and that Mr. Mr. Hartline never pressured him into modifying the reports, which were submitted truthfully and accurately; Trial Tr. 49:1-19 (Apr. 7, 2016) (Hanuscin) (testifying that he provided truthful answers to all regulator questions).

elicited testimony about the purpose of the loans as set forth in the RASs from at least eight witnesses at trial.[20]   The Government, throughout the course of the trial and in particular throughout its closing argument repeatedly referred to "they" on so many occasions that it became impossible to determine at times whether the Government was referring to Mr. Bekkedam and Mr. Hartline, employees of NOVA Bank, NOVA Financial, Levin and Preve as discussed *infra*, or some combination of the various groups.[21]   The Government's actions in presenting information about the acts and statements of non-conspirators and attributing them *with blame* to Mr. Bekkedam and Mr. Hartline so infected the trial and confused the jury and the Court, that it amounts to a serious miscarriage of justice that resulted in the conviction of two innocent men.

---

[20] Trial Tr. 146:15-147:3, 156:16-157:21, 159:20-160:18 (Apr. 4, 2016) (Madiany); Trial Tr. 9:19-11:3, 51:21-52:24 (Apr. 5, 2016) (Poliski); Trial Tr. 62:24-64:15, 65:22-66:12 (Apr. 5, 2016) (Dietrich); Trial Tr. 144:11-146:6 (Apr. 6, 2016) (Hanuscin); Trial Tr. 120:11-21, 127:16-129:1, 134:13-134:14 (Apr. 7, 2016) (Patterson); Trial Tr. 71:20-72:2, 74:12-75:8 (Apr. 12, 2016) (Gallub); Trial Tr. 15:21-16:11, 18:2-9 (Apr. 13, 2016) (Swartz); Trial Tr. 66:14-67:12, 74:8-10, 76:10-77:7, 78:9-79:9 (Apr. 13, 2016) (Shubin).

[21] *See, e.g.*, Trial Tr. at 8:9-13 (Apr.19, 2016) (Gov. Closing Argument) (asking the jury to question "How did *they* cheat? *They* cheated by trying to make a struggling bank look healthier than it really was.  And how did they try to make it look stronger and healthier?"); *id.* at 9:11-13 ("So how could that possibly have been new money in the bank at the time *they* were making those representations to the regulators, to the bank . . ."); *id.* at 10:1-2 ("that's what *they* wanted the regulators to believe"); *id.* at 10:19-25 ("from the beginning of the time when TARP -- when the banks' TARP application was being considered, that there were already issues with *their* capital as early as February. And you know that there are issues with their capital because in May 2009, their capital levels go from well capitalized to adequately capitalized."); *id.* at 11:1-8 ("Mr. Hannison [sic] said, and as all 2 the regulators who were involved with TARP said, *they* were not going to give money to a bank that was only adequately capitalized.  So how in the world were *they* going to get -- the defendants, how were *they* going to get their money, *their* hand on that TARP money? *They* had to address the capital issue."); *id.* at 11:15 - 19 (*They* knew that information about George Levin was going -- was something they wanted to use to sway the regulators' opinion about giving them the TARP money. And *they* knew they were on to something."); *id.* at 12:24 - 13:6 ("it actually  works. It actually convinces the CPP counsel, that *they* should get the TARP money contingent upon a capital injection, injection, ladies and gentlemen, from the outside in of $15 million. And where did *they* come up with this $15 million capital contingency? Where did *they* even come up with this number?"); *id.* at 13:10 -19 ("when TARP is deciding on the health of a bank, truthful information, truthful information, ladies and gentlemen, it's no different whether you're . . . try to get $13.5 million in public money, you have to provide truthful information. And that's what *they* were relying on, and the TARP -- the CPP counsel says, this should go up to Treasury to give *them* the $13.5 million as long as *they* make that contingency").

2. *The Government Improperly Attributed the Actions of Levin and Preve, Who Were Not Co-Conspirators, to Mr. Bekkedam, and Improperly Attributed the Change-in-Control Process as Evidence of Fraud in the TARP Application*

Just as the Government improperly attributed the acts and statements of NOVA Bank and NOVA Financial personnel to Mr. Hartline and by implication to Mr. Bekkedam, so, too, did it attribute acts and statements by George Levin and Frank Preve to Mr. Bekkedam and, by further implication, Mr. Hartline.

The Government presented evidence regarding Levin's Change-in-Control application purportedly as evidence of Mr. Bekkedam's and Mr. Hartline's concealment of the Levin loan. Numerous witnesses were asked about it by the Government.[22]  And in closing, the Government (repeatedly) drove home its misleading theme: first referring to the Levin Change-in-Control application by stating that "there's nothing more powerful" as evidence of Mr. Bekkedam's and Mr. Hartline's "deliberat[e] conceal[ment] "[23] – and then, in rebuttal argument, making a link and a leap that just did not exist:

> Why conceal the truth from regulators?  The difference is that regulators would care. You heard Mr. Baxter's voice mail where they want cash in the bank, not cash from the bank. So then the question comes -- becomes why be so cute about answering questions, why be so cute about the source of fundings, the change in control application for Mr. Levin. You know that both Mr. Hartline and Mr. Bekkedam were involved in that. You know there were questions on Exhibit 63 and 64 about the source of all the funds, is any of it borrowed and from where.
> ***
> But then you see the answers. If we can bring up Exhibit 81, page 2. Why is Mr. Hartline suggesting a different answer? Why is he answering a different question? As opposed to where all the funds are coming from, why be a little bit too cute and answer the question, well, where are the other funds coming from, the additional 13 million?[24]

---

[22] Trial Tr. 87:1-2, 119-120  (Mar. 30, 2016) and Trial Tr: 108 (Mar. 31, 2016) (Koch); Trial Tr. 197-200 (Mar. 31, 2016) and 16-19, 123 (Apr. 4, 2016) (Preve); Trial Tr. 42-43 (Apr. 6, 2016) (Levin); Trial Tr. 84 (Apr. 6, 2016) (Sayre); Trial Tr. 118-122, 127-128, 148 (Apr. 8, 2016) (Gaunt); Trial Tr. 151-155 (Apr. 8, 2016) (Moretz).

[23] Trial Tr. 21:22 – 25 (Apr. 19, 2016).

[24] Trial Tr. 36:4-23 (Apr. 20, 2016).

Notwithstanding the argument, George Levin and George Levin alone was responsible for the accuracy of the contents of the Change-in-Control application – not Mr. Bekkedam or Mr. Hartline. Only Levin signed the Change-in-Control application.[25] The subsequent amendments to the Change-in-Control application were signed by Levin's agent, Frank Preve.[26] The only evidence of Mr. Bekkedam's involvement is that he and Larry Rovin encouraged and/or reminded Levin and Preve to respond to the government's inquiries in a timely manner.[27] There was no evidence that Mr. Bekkedam encouraged Levin or Preve in any way to hide the fact that Levin had obtained a loan from NOVA Bank. Therefore, any purported "concealment" in connection with the Levin Change-in-Control application cannot be attributed to Mr. Bekkedam.

That said, there was no concealment. At the time that Levin completed the original application, he had not yet finalized his loan and investment. This fact is evident from the Change-in-Control application itself. In response to Question 4 on the Change-in-Control application, GV 64 at p.5, Levin indicates that he currently owns "0" shares of NOVA Financial. He also indicates his intent to fund his investment with borrowed funds. GV 64 at p.6 (indicating in response to Question 7 regarding the source of his investment that he will use "1/2 from borrowed funds"). Therefore, nothing was concealed at the time of the original application. When Levin responded to additional questions from regulators in September, he responded to the specific question asked, which sought the "source of funds *to be used* to purchase the stock," and

---

[25] GV 64 (Change-in-Control application submitted to Federal Reserve signed by Levin); GV 63 (Section 112 application submitted to PADOB signed by Levin).

[26] GV 82.

[27] GV 80 (Bekkedam reminding Preve to respond to the questions posed by the PADOB); GV 73 (Rovin reminding Preve to respond to questions regarding change in control application); GV 78 (same); Trial Tr. at 19:19 - 20:16, 27:12 - 28:3 (Apr. 4, 2016) (Preve) (discussing GV 73 and indicating that Rovin asked him to respond to the questions posed by the Federal Reserve).

indicated his intended funding for the remaining $13 million investment.[28]  Once again, the information relating to the June 30th loan to Levin was not responsive to the question asked.

Moreover, the contents of the Levin Change-in-Control application had no relevance whatsoever to the TARP application.  The substantial evidence the Government presented regarding the Change-in-Control application had the effect of confusing the jury and the Court.  The Change-in-Control application was submitted to the Federal Reserve and reviewed by William Gaunt.  Gaunt specifically testified that the information in the Change-in-Control application would not have been provided to the persons responsible for considering NOVA Financial's TARP application.[29]  Similarly, the corresponding "Section 112" application was submitted to the PADOB, which played no role in considering NOVA Financial's TARP application.[30]

Therefore, the contents of the Change-in-Control application could not have influenced any of the TARP decisionmakers.  These facts, however, did not in any way impede the Government from affirmatively seeking to conflate what took place during the Change-in-Control process with what could or could not have been material to the TARP decision makers.  Indeed, the Government even asserted during a colloquy:

> The question is in determining your approval of Mr. Levin to take 24.2 percent, or whatever, control of the – the bank, then would you have wanted to -- was the $5 million that he borrowed from the bank an important fact that you would have wanted to know.

---

[28] GV 73, Email from Metcalf to Mr. Hartline (Aug. 17, 2009) (emphasis added).

[29] Trial Tr. 128:24-129:25 (Apr. 8, 2016) (Gaunt) (testifying that information received related to Change-in-Control application would not have been provided to the persons responsible for approving TARP).

[30] Trial Tr. 167:9-16 (Apr. 8, 2016) (Moretz) (testifying that a Change-in-Control application is submitted to PADOB and Federal Reserve).

Trial Tr. 12:15-18 (April 8, 2016).  Here the Government is saying that what was or was not said to the Change-in-Control reviewers somehow would be probative of what would be material to an entirely different set of regulators – the TARP reviewers.  After days of testimony geared toward that improper and highly prejudicial end, the Court directly questioned the admissibility of "that hypothetical," *id.*, 14:1-3, and suggested that there was no valid link between the two. As shown, however, this did not stop the Government from arguing as much to the jury.

> 3. *The Government improperly attributed actions defendants took and statements made toward other government agencies as actions and statements to the Department of Treasury when there was no evidence of Treasury involvement, resulting in a variance or even a constructive amendment to the Indictment.*

At their most basic level, Counts One through Four of the Indictment allege that Mr. Bekkedam and Mr. Hartline entered into a conspiracy and scheme to defraud TARP through false statements to Treasury.  Repeatedly, the Indictment speaks of a scheme to defraud Treasury and statements made to Treasury.[31]  That was carried forward in the jury charge when, for instance, the fifth element of Counts Three and Four requiring that the Government prove that the statements were "within the jurisdiction of the government of the United States Department of the Treasury."[32]

The evidence at trial, however, demonstrated that neither Mr. Bekkedam, Mr. Hartline, nor anyone from NOVA Bank or NOVA Financial ever communicated directly with anyone from Treasury – or that communications made to other agencies ever reached or were intended to

---

[31] Indictment at Count One, ¶¶ 20, 26, 28, Overt Act No. 9, Count Three, Count Four.

[32] Trial Tr. 104:25 – 105:17 (Apr. 20, 2016) (court charging jury with respect to elements of Counts Three and Four); *id.* at 107:13 – 23 (court charging jury with respect to the fifth element of the crime of false statements alleged in Counts Three and Four and advising the jury that "the statement or representation be made with regard to a manner within the jurisdiction of the Government of the United States. The Department of the Treasury is a department of the United States Government. There is no requirement that the statement be actually directed to or given to the Department of the Treasury. All that is necessary is that you find that it was contemplated, that the statement was to be utilized in a manner which was within the jurisdiction of the Department of the Treasury.").

reach Treasury.[33]   Notwithstanding, the Government prejudiced Mr. Bekkedam by improperly leading the jury to believe that statements to *any* government regulator, whether they be to Treasury or not and whether they be in connection with the TARP application or not, could constitute the materially false statements to Treasury charged in the Indictment.

Specifically, all of the allegedly false statements were instead made to the Federal Deposit Insurance Corporation ("FDIC").[34]   The Government argued that since the FDIC primary regulator was responsible for gathering information from NOVA Bank and NOVA Financial, false statements to the FDIC are the same as false statements to Treasury.  The result was an entire misconstruction of the Indictment.  For instance, Count One, alleges that,

> [f]ollowing the loans to A.B. and C.G., defendant Brian Hartline represented to the *Department of Treasury* that the $2.5 million loaned to A.B. and the $500,000 loaned to C.G. represented new capital invested in the bank.

and

> [o]n or about December 15, 2009, defendant Brian Hartline advised the *Department of Treasury* that NOVA had 'completed raising over $10 million,' including $2.5 million from A.B. and $500,000 from C.G.  Defendant Hartline failed to inform the *Department of Treasury* that NOVA had loaned A.B. and C.G. the money for these investments.

and again in Count Four of the Indictment, which alleges that Mr. Hartline,

> [Hartline] told the *Department of Treasury* that NOVA had raised $10 million of new capital, including a $2.5 million investment by A.B. and a $500,000 investment by C.G.

---

[33] Trial Tr. 40:11 – 14 (Mar. 29, 2016) (Schaffner) (testifying, as the only witness from Treasury and Director of the Capital Purchase Program, that he had no contact with NOVA Bank – only the primary regulator would have direct contact).

[34] The Government also presented evidence of what it asserted were false statements or omissions in the Levin Change-in-control application, which was submitted to the Federal Reserve and PADOB, but the Change-in-control application was not a part of the TARP application, nor were its contents ever transmitted to the TARP decisionmakers.  As discussed *supra*, this information was only introduced in order to confuse the jury and could not have established any of the elements of the crimes charged.

The Government's only evidence at trial was an email to Koch at the *FDIC* indicating that NOVA Financial had met the contingency, without any reference to "new capital," and attaching spreadsheets indicating that funds from Bonomo and Gallub were in escrow and thus still contingent and that other listed funds had come from loans from NOVA.  *E.g.,* GV 140.[35]

Similarly, Count Three alleges that the False Statement at issue was Mr. Hartline telling and having his employees "tell … Treasury NOVA had raised $5 million of new capital[.]"  Yet the only testifying Treasury employee, Schaffner, indicated that he never had direct contact with TARP applicants.[36]  Instead, the Government argued in closing that the evidence of this statement was an internal email, dated July 2, 2009, between two FDIC employees, Lisa Koch and Chuck Hunter that simply stated, "NOVA got a $5 million capital infusion on 6-30-09."  GV 57.[37]  There was no evidence presented that this statement by Koch was even relayed to Treasury.

The problem here is that *the FDIC is not a part of Treasury*.  Rather, the FDIC is "[a]n independent agency of the federal government [which . . .] receives no Congressional appropriations."[38]  In his *Motion to Dismiss Each Count of the Indictment for Legal Insufficiency or, In the Alternative, To Strike Surplusage*, Mr. Bekkedam asserted that references to agencies such as FDIC, the Federal Reserve, and PADOB posed a threat of improper confusion of the jury, citing, for example*, United States v. Vastola*, 670 F. Supp. 1244, 1256-57 (D.N.J. 1987), for

---

[35] Koch testified that funds in "escrow" are contingent, Trial Tr. at 79:13 – 17 (Mar. 31, 2016), and are "available for them to put into capital."  Trial Tr. at 100:10 – 101:6 (Mar. 31, 2016) (Koch).  Thus, they are not yet capital.

[36] Trial Tr. at 40:11 – 14 (Mar. 29, 2016) (Schaffner); Trial Tr. at 42:11 – 43:15 (Mar. 29, 2016) (Schaffner) (indicating that he had no recollection of how the amount of the contingency changed from June 10, 2009, when the CPP Council made its recommendation, until August 20, 2009, when Treasury issued its preliminary approval); *id.* at 43:25 – 44:4 (Schaffner indicating that he did not know if the FDIC advised NOVA Financial of the original proposed $15 million contingency); *id.* 44:9 – 44:17 ("Q: Do you know what NOVA Bank told the FDIC about its contingency? A: I don't.").

[37] Trial Tr. 20:15 – 21:2 (Apr. 19, 2016) (Gov. Closing Argument).

[38] https://www.fdic.gov/about/learn/symbol.

the proposition that leaving such surplusage in "'may encourage the jury to draw inferences that the defendants are believed to be involved in (illegal) activities not charged in the indictment.'") (internal citations omitted).  ECF 41-1 at 37-38.  This is precisely what happened in Mr. Bekkedam's trial.

The result of this is an impermissible and unconstitutional variance of the Indictment by the Government.  A variance occurs when the charging terms of the Indictment remain the same, but when the evidence presented at trial proves facts materially different from those alleged in the Indictment.  *United States v. Daraio*, 445 F.3d 253, 259 (3d Cir. 2006); *accord Stirone v. United States*, 361 U.S. 212, 217 (1960) (variance "destroy[s] the defendant's substantial right to be tried only on charges presented in an indictment returned by a grand jury") (*relying on Ex parte Bain,* 121 U.S. 1 (1887)).

In Mr. Bekkedam's case, the variance skewed the element of materiality that is necessary for convictions under Counts Two, Three, and Four.  That is, in pleading a scheme to defraud by false statements or omissions,[39] the substance of the statement and to whom it is said (or delivered to) matters because false statements or omissions give rise to criminal liability only when they have a "natural tendency to influence and [are] capable of distracting *those* officials," to which the statement is intended. *United States v. Adekanbi*, 675 F.3d 178, 182 (2d Cir. 2012) (emphasis added).

Statements made to a government agency that is not the subject of the indicted offense is error on materiality grounds.  For example, in *United States v. Kwiat*, the court overturned a conviction under §1001 for misleading the FDIC where the defendant made statements on HUD

---

[39] The Indictment charges Mr. Bekkedam with false statements, but during the trial the Government impermissibly recharacterized its case as an omissions or concealment case.  *See* discussion *supra*.  While there are some important differences in the elements of a false statements charge as opposed to an omissions or concealment charge, the element of materiality is the same for both.

forms and at trial no witness from the FDIC testified to reviewing the HUD forms containing the false statements.  817 F2d. 440, 444 (7th Cir. 1987).  Hence there was insufficient evidence to support a finding of materiality.  *Accord United States v. Ismail*, 97 F. 3d 50, 60-61 (4th Cir. 1996) (Government failure to present evidence of the materiality of false statements to a matter within the jurisdiction of the FDIC, where the only evidence presented was that defendant used false personal identification information on his bank account but presented no witnesses or documents at trial that the FDIC could have been influenced by the statements.); s*ee also Adekanbi*, 675 F. 3d at 183 (commenting that *Kwiat* and *Ismail* were appropriately decided because both instances "involved false statements made to one agency when the government had to show the statements were material to a different agency.").

Like *Kwiat* and *Ismail*, the Indictment in this case alleged false statements to a particular government agency – Treasury, but the only witness to testify from Treasury, Theodore Schaffner, had no contact with Mr. Bekkedam, Mr. Hartline or anyone from NOVA Bank or NOVA Financial, and he had no recollection of ever receiving the allegedly false statements.[40] Therefore, the false statements alleged in each of the remaining four counts could not have been material because they were not made or even definitively communicated to the relevant agency, the agency charged in the Indictment, Treasury, and Mr. Bekkedam's rights under the Grand Jury Clause of the Fifth Amendment were violated.

Indeed, while what occurred was, at a minimum, an unconstitutional variance, when the variance from the Indictment resulted in a material change to the jury instruction, the

---

[40] Trial Tr. at 40:11 – 14 (Mar. 29, 2016) (Schaffner) (indicating he had no direct contact with NOVA Bank or NOVA Financial); Trial Tr. at 42:11 – 43:15 (Mar. 29, 2016) (Schaffner) (indicating that he had no recollection of how the amount of the contingency changed from June 10, 2009, when the CPP Council made its recommendation, until August 20, 2009, when Treasury issued its preliminary approval); *Id.* at 43:25 – 44:4 (Schaffner indicating that he did not know if the FDIC advised NOVA Financial of the original proposed $15 million contingency); 44:9 – 44:17 ("Q: Do you know what NOVA Bank told the FDIC about its contingency? A: I don't.").

Government's misdirection may well have risen to the level of an unconstitutional amendment to the Indictment. That is, a constructive amendment occurs when there has been a "modification in the elements of the crime charged." *United States v. Somers*, 496 F.2d 723, 744 (3d Cir. 1974). If the elements of the crime have been modified, then an amendment has occurred and the Third Circuit finds a *per se* violation of the defendant's Fifth Amendment rights. *Id.*

With respect to the elements of the false statements charged in Counts Three and Four of the Indictment, the jury was instructed that, contrary to the Indictment which specifically alleged false statements to Treasury:

> As I have told you, the fifth element that the Government must prove beyond a reasonable doubt is that the statement or representation be made with regard to a manner within the jurisdiction of the Government of the United States. The Department of the Treasury is a department of the United States Government. *There is no requirement that the statement be actually directed to or given to the Department of the Treasury.* All that is necessary is that you find that it was contemplated, that the statement was to be utilized in a manner which was within the jurisdiction of the Department of the Treasury.

Trial Tr. 107:11 – 23 (Apr. 20, 2016) (emphasis added). Therefore, adopting the charge the Government urged, the instruction substantively changed the elements of the Indictment. The jury, which never saw the Indictment charging these specific false statements *to Treasury*, was improperly instructed that statements to any government regulator who testified was acceptable. This was a *per se* violation of Mr. Bekkedam's Fifth Amendment rights to held accountable on charges actually returned by the grand jury via an Indictment and be given fair notice of the charges against him. *Oyler v. Boles*, 368 U.S. 448, 462 (1962) (Harlan, J. concurring).

### C. Compounding the Error, Highly Prejudicial and Inadmissible Evidence Was Presented to the Jury.

*1. The Video Deposition of Defendant Hartline Should Have Been Excluded and the Prejudice to Mr. Bekkedam Could Not Have Been and Was Not Cured by a Limiting Instruction – as Shown by the Government's Willingness to Abuse that Limitation*

21

Toward the close of the Government's case, over objection and extensive colloquy, the Government played for the jury excerpts of a videotaped deposition of Brian Hartline from separate civil litigation, *Nova Bank v. Hilary G. Musser* (Court of Common Pleas of Montgomery County), pertaining to a dispute unrelated to the matters involved in this prosecution.  It is undisputed that Mr. Bekkedam was not a party to this lawsuit, was not present (in person or through counsel) at the deposition, and otherwise had no opportunity to question or object to the questioning or scope of this deposition.  The deposition was taken on April 13, 2012, a date well beyond what any party would assert was the termination of the conspiracy or other events alleged in this prosecution.

Before it was played, during a colloquy, Mr. Bekkedam opposed the introduction of the video.  He argued that it was not a statement by him nor a "statement of a co-defendant" because when the statement was made, it could not have been made in furtherance of the alleged conspiracy – per *Bruton v. United States*, 391 U.S. 123 (1968).  He argued that it was inadmissible because it violated his Sixth Amendment Confrontation Clause and his Fifth Amendment Due Process Clause rights, as he had no opportunity to cross-examine Mr. Hartline at the deposition – per *Crawford v. Washington*, 541 U.S. 36 (2004).  And most importantly, he argued that severance or a second jury was required, because of clear Supreme Court precedent that, under these circumstances, no limiting instruction could cure or separate out Mr. Bekkedam from this testimony such that it would only be considered against Mr. Hartline – as warned about in *Bruton*:

> [T]here are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored. Such a context is presented here, where the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial....

22

391 U.S., at 135–136 (citations omitted).   That request was denied, as was Mr. Bekkedam's request to cause other parts of the deposition to be played in order for the jury to get a full and fair context of what was being said, particularly as it may have pertained to Mr. Bekkedam, as a sort of proxy method of curing the *Crawford* issue.[41]   The Government argued repeatedly that the evidence would not be offered against Mr. Bekkedam.[42]   As a result, the Court instead said it would (and later did) read a limiting instruction directing that the deposition not be considered for evaluating Mr. Bekkedam's guilt or innocence.

Thereafter, not only was this deposition excerpt played during trial, the Government referenced and replayed it during its closing argument – arguing that because Mr. Hartline had "lied" previously he had to maintain and continue the lie years later in the deposition.[43]   The second time the Government brought up the deposition during closing – despite promises to the Court to the contrary – it went so far as to link Barry Bekkedam to it:

> But, ladies and gentlemen, Mr. Hartline, this defendant, had dug his $13.5 million grave at this point, and you know that as late as April of 2012, he's under oath, he still has to lie about it, he dug that grave, he has to lie in it, and he brings Barry Bekkedam with him, because Barry Bekkedam was instrumental in orchestrating this scheme.[44]

The Government referenced the deposition again during rebuttal.[45]   And then, during deliberations, the jury requested and was shown the deposition video – making it a third time they saw it.

---

[41] Trial Tr. 24:14-33:10 (April 13, 2016).

[42] *E.g.,* Trial Tr. 25:25-26:1; 28:21-24 (April 13, 2016).

[43] *See also* Trial Tr. 19:24-20:14 (April 19. 2016).

[44] See also Trial Tr. 74:10-17 (April 19, 2016)

[45] *See also* Trial Tr. 48:23-49:5; 50:17-51:1 (April 20. 2016).

Hence there can be little question that this videotape had a substantial impact on the jury. Nor can there be any question that the limiting instruction failed. Minimally, it failed to reign in the Government – as it chose during closing argument to, link the Hartline statements in the deposition to the alleged role of Mr. Bekkedam in the scheme – *viz.*, "and he brings Barry Bekkedam with him." The failure to let *Bruton* do its job and keep the evidence out of the earshot of a jury deciding Mr. Bekkedam's fate is alone sufficient for a new trial. *See e.g., United States v. Gordon*, 290 F.3d 539, 544 (3d Cir. 2002) (relief appropriate where "there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution" – in Bekkedam's case, the Fifth and Sixth Amendments).

The Government thumbing its nose at both *Bruton* and the implications of the Court's limiting instruction is quite another, stronger reason to grant relief. For once again, the Government was in a position where it did not have evidence of guilt against Mr. Bekkedam – so it chose sleight of hand with the Court and the jury – creating the appearance of inculpatory facts where there were not any. *E.g., United States v. Newman*, 490 F.2d 139, 147 (3d Cir. 1974) ("[w]hen a prosecutor misstates facts in his closing remarks or states facts outside of the record in such a way as to prejudice a defendant, a new trial is required").

    2.    *In an affront to the Court's ruling, the Government adduced opinion testimony from non-expert government regulators in response to hypothetical questions.*

Prior to trial, Mr. Bekkedam successfully moved *in limine* seeking, *inter alia*, to prohibit the Government from converting lay witness government regulators into experts providing opinion testimony in response to hypothetical questions. ECF No. 93 at 11-13. Mr. Bekkedam argued that only witnesses qualified by the Court as experts should be permitted to answer hypothetical questions. *See, e.g., Wilburn v. Maritrans GP Inc.*, 139 F.3d 350, 356 (3d Cir. 1998) ("The essential difference between Rule 701 and 702 testimony is that a qualified expert

24

may answer hypothetical questions.");[46]   Even government regulators who may be "fact witnesses of a unique sort," are not permitted to answer hypothetical questions about how they theoretically would have acted under different circumstances because such testimony would be speculation at best.[47]   This Court agreed and granted Mr. Bekkedam's motion *in limine* thereby prohibiting the Government from posing hypothetical questions to bank regulators.   ECF No. 126.

Despite this Court's explicit prohibition, the Government asked hypothetical questions of lay banking regulator witnesses.   It asked federal banking regulator witnesses Bertsch, Koch, Hunter, Course, and Quill – none of whom was qualified by the Court as an expert – whether it would have been "important" to them to know that part of the capital raised by NOVA Financial was funded by loans to investors from NOVA Bank.[48]

The Government then used this in closing argument in support of a finding of materiality of the allegedly false statements that were the basis of Counts One through Four, *e.g.*,

---

[46] *Asplundh Mfg. Div., a Div. of Asplundh Tree Expert Co. v. Benton Harbor Eng'g*, 57 F.3d 1190, 1213 (3d Cir. 1995) ("[T]he essential difference between lay and expert opinion evidence is that the expert may answer hypothetical questions, whereas the lay witness may testify only from facts perceived by him, not those "made known to him at or before the hearing").*See also AVM Technologies, LLC v. Intel Corp.*, 927 F. Supp. 2d 139, 146 (D. Del. 2013) (finding inadmissible witness's testimony regarding events that "would have" occurred); *In re Bistrian*, 184 B.R. 678, 685 (E.D. Pa. 1995) (finding that the bankruptcy court erred when it allowed a lay witness to answer hypothetical question).

[47] *Phillips v. Duane Morris, LLP*, No. 13-CV-01105-REB-MJW, 2015 WL 72336, at *2 (D. Colo. Jan. 5, 2015) (prohibiting accountant witness from answering hypothetical questions with a "speculative estimation of how she might have reacted under different circumstances").

[48] Trial Tr. 93:23-25 (Mar. 31, 2016) (Bertsch); Trial Tr. 113:9-18 (Mar. 30, 2016) (Koch); Trial Tr. 34:15-22 (Apr. 8, 2016) (Hunter); Trial Tr. 94:12-95:3 (Apr. 8, 2016) (Course); *Cf.* Trial Tr. 42:13-19 (Mar. 30, 2016) (Quill) (indicating that he did not believe that the capital came from loaned funds because he did not believe such funds would have counted as capital).  Notably, the only federal banking regulator involved in any way in the TARP application review that the Government did *not* ask a hypothetical question was Theodore Schaffner, who was employed by the Department of Treasury as Director of the CPP.   In other words, the only federal regulator that the Government did not ask whether it would have been "important" to know about the loans was the one federal regulator who could have potentially been in a position to make the final decision regarding NOVA Financial's TARP application because he was the only person from Treasury to testify.

And, ladies and gentlemen, whether or not these loans were made again for the people in TARP, this is an important fact that would influence their decision, whether or not to give the defendant this money.[49]

That the Government would take advantage of this so blatantly is yet more unforgiveable because none of the government regulators who testified that it would have been "important" indicated that he or she was actually on the Treasury's Investment Committee – the entity responsible for the ultimate decision whether or not to grant TARP funds to NOVA Financial – or otherwise was in a position to make the ultimate decision whether or not to approve NOVA Financial's TARP application.[50]   So it is unclear how statements that were or were not made to these non-decisionmakers could be capable of influencing a decision on the TARP application, much less be material.   That did not seem to slow down the Government, however.

These questions, the resulting testimony, and the argument never should have been presented to the jury, and its admission was highly prejudicial to Mr. Bekkedam.   When considering whether improperly admitted evidence had a prejudicial effect requiring a new trial, courts must determine whether, after excluding the inadmissible evidence, there is still sufficient evidence to support the verdict.   *United States v. Johnson*, 618 F.2d 60, 62 (9th Cir. 1980). These improperly admitted statements were the *only* evidence of materiality presented by the Government.   Materiality was an element of each of Counts Two, Three and Four.   Therefore, Mr. Bekkedam should be granted a new trial on this basis alone.

---

[49]   Trial Tr. 65:17-21 (April 19, 2016).*Accord* Trial Tr. 33:21-34:5 (April 20, 2016) (rebuttal) ("So then ask yourselves would the people involved in making a decision about whether to invest in Nova Bank want to know that Levin borrowed $5 million as opposed to simply investing it. Which would make the bank seem stronger, Levin taking money that he may or may not have from the outside or Levin getting a $5 million loan that the regulators weren't aware of when they had previously evaluated Nova Bank. Is that something they would want to know?")

[50]   Even Theodore Schaffner, who identified himself as director of the CPP and signed GV 75 notifying NOVA Financial of its contingent approval, he himself did not identify himself as a member of the Treasury's Investment Committee. Trial Tr. 34:3-9 (Mar. 29, 2016) (Shaffner).

**D. The Ability of Mr. Bekkedam to Challenge the Government's Misleading Approach to Proving Its Case Was Undermined by His Being Prevented From Receiving a "Theory of Defense" Instruction.**

The Defendants requested a Theory of the Defense instruction, stating:

It is the theory of the defense in this case the Mr. Hartline and/or Mr. Bekkedam honestly and genuinely believed that the funds invested in Nova were properly considered capital. Accordingly, any and all statements made by Mr. Hartline and/or Mr. Bekkedam reflecting this understanding that the funds were to be considered capital were not knowingly made with the intent to defraud.

In addition, even if Mr. Hartline's and/or Mr. Bekkedam's honest and genuine belief regarding the classification of certain investments as capital was incorrect; his actions amounted to an unintentional mistake and, similarly, lacked the intent to defraud.

If, after considering all the evidence in this case, you have a reasonable doubt about whether [Brian Hartline/]Barry Bekkedam had the intent required for Major Fraud against the United States, Making False Representations, Wire Fraud, or Bank Fraud, because of Mr. [Hartline's/]Bekkedam's honest belief, genuine mistake, or for any other reason, you must find [Brian Hartline/]Barry Bekkedam not guilty of that offense.

The Government opposed and the Court denied this request.

A trial court is "bound to give the substance of a requested instruction relating to any defense theory for which there was *any* foundation in the evidence." *United States v. Blair,* 456 F.2d 514, 520 (3d Cir. 1972)(emphasis added). More specifically, a "defendant is entitled to a theory of defense instruction if: (1) he proposes a correct statement of the law; (2) his theory is supported by the evidence; (3) the theory of defense is not part of the charge; and (4) the failure to include an instruction of the defendant's theory would deny him a fair trial." *United States v. Friedman,* 658 F.3d 342, 352–53 (3d Cir. 2011). Failure to give such an instruction can be the basis for a new trial under Rule 33. *See Vicaria*, 12 F.3d at 198-199.

The Government's efforts to deny Mr. Bekkedam a fair trial in this matter began as early as January 2012, when federal agents showed up at the home of his private and corporate counsel

and terrified him into unilaterally giving up his client's privilege and right of confidentiality.  It continued through the trial when, (as illustrated above,) the Government implemented a trial strategy designed to supplant its absence of valid, probative evidence of wrongdoing with misleading testimony, further mischaracterized through the course of misleading argument.

Ironically, the Third Circuit standard for *denying* a requested instruction is when that denial helps "to avoid diverting the jury by idle speculation and frivolous considerations [ -- a] confused jury can give as improper a verdict as one which has failed to receive some significant instruction." *Blair, supra*.  In Mr. Bekkedam's case, the best way to have avoided diverting the jury from non-probative testimony, would have been *to give* the "theory of defense" instruction. Failure to do so contributed to the manifest injustice that is the jury's verdict.

### E.  The Government Failed to Prove Aiding or Abetting Liability – And Instead Achieved a Conviction For Counts Two Through Four By Improperly Replacing It With and Arguing Conspiracy Evidence.

#### 1.  *The standard for proving conspiracy and the standard for proving aiding or abetting are different and – contrary to the Government's efforts – not interchangeable.*

The Indictment charges Mr. Bekkedam in Counts Two, Three and Four both as a principal and, under 18 U.S.C. § 2, as an aider/abettor.  There is no evidence and the Government does not dispute in its trial presentation that Mr. Bekkedam was a principal.  Rather than proving him to be an aider/abettor, however, the Government sought to show that Mr. Bekkedam was "in on it," so to speak, as a conspirator and, therefore, that was enough to show him to be an aider/abettor.

The jury may not conclude and the Court may not sustain a conclusion that "conspiring" is the equivalent of "aiding or abetting." *See In re Orthopedic Bone Screw Products Liab. Litig*., No. MDL 1014, 1996 WL 482977, at *11 (E.D. Pa. Aug. 22, 1996) ("A claim of aiding and

abetting is separate and distinct from the conspiracy ... claims.") Stated simply, aiding and abetting requires more:

> [Aiding and abetting] has a broader application than conspiracy. … It makes a defendant a principal when he consciously shares in any criminal act whether or not there is a conspiracy. … A defendant may have conspired to do the act without actually aiding in its commission; in other words, the crimes are different.

*United States v. Williams*, 341 U.S. 70, 95 (1951).   By contrast, a conspiracy can be accomplished by an agreement between Mr. Hartline and Mr. Bekkedam combined with an overt act by either one of them. See ECF 174, at 3 (citing applicable law). In other words, the Government should not be permitted to sustain its conviction on Counts Two through Four simply by alleging that Mr. Bekkedam was a party to the agreement to commit a wrong, and otherwise entirely passive, so long as Mr. Hartline was not.

Aiding or abetting requires an affirmative act by the aider/abettor.   The Third Circuit requires "proof that the defendant … *participated in* [the substantive offense] … as in something that he wished to bring about, that he *sought by his action* to make it succeed." *United States v. Garcia*, 238 F. App'x 821, 824 (3d Cir. 2007)(emphasis added).[51] Under Section 2(a) the Government had to prove that Mr. Bekkedam acted with the "specific intent of facilitating the crime" because "mere knowledge of the underlying offense is not sufficient for conviction." *Id.* More specifically, the Government had to prove: "(1) that the substantive crime has been committed; and (2) that the defendant charged with aiding and abetting knew of the commission

---

[51] Indeed, it is unclear what could have motivated Mr. Bekkedam to aid and abet Mr. Hartline in these alleged crimes.  He had no ownership interest in NOVA Financial, Trial Tr. 182:17-19 (Apr. 11, 2016) (DiMarcantonio) (confirming that Mr. Bekkedam was not a shareholder of NOVA Financial), and the consulting agreement, which he entered into in November 2009, was not contingent on him actually raising capital or NOVA Financial obtaining TARP.  *Id.* at 202:2-8 (acknowledging that the purpose of this agreement is in part to recognize and formalize the relationship between NOVA Financial and Bekkedam and to compensate Bekkedam for his past and future services).  Moreover, only four of his more than 150 Ballamor clients even were NOVA Bank customers.  Trial Tr. 170:24-172:12 (Apr. 7, 2016) (Patterson) (testifying that only four Ballamor clients had loans from NOVA Bank and some of those comprised mortgages); Trial Tr. 135:20-23 (Apr. 12, 2016) (Howard) (indicating that Ballamor had between 120 and 150 clients).

of the substantive offense and acted with the intent to facilitate it." *United States v. Soto*, 539 F.3d 191, 194 (3d Cir. 2008).[52]   The inquiry under 18 U.S.C. § 2(a) therefore becomes two questions: i) whether Mr. Bekkedam knew about the crime; and ii) whether he acted with the intent to make it happen.

Under section 2(b), the Government had to prove that Mr. Bekkedam "caused the intermediary" to commit the substantive offense. *See United States v. Curran*, 20 F.3d 560, 569 (3d Cir. 1994) (explaining that to properly charge a defendant under §§ 2(b) and 1001 the prosecution had to prove that defendant knew of the statutory obligation and that he attempted to frustrate the obligation, and that he knew that his conduct was unlawful);[53]   The Third Circuit has read a *scienter* requirement into Section 2(b) – specifically, willfulness. *See United States v. Shearson Lehman Bros.*, 650 F. Supp. 490, 501 (E.D. Pa. 1986) (the "willful" requirement in section 2 eliminates vagueness and provides adequate protection for individuals who might unwittingly stumble into a violation of federal law); *accord United States v. Newman*, 490 F.2d 139, 142-43 (3d Cir. 1974)("Unknowing participation is not sufficient to constitute an offense under the aiding and abetting statute. Rather, the government must prove beyond a reasonable doubt that the defendant participated in a substantive crime with the desire that the crime be accomplished.").

---

[52] *See also United States v. Goodwyn*, 410 F. Supp. 52, 57 (E.D. Pa. 1976), *aff'd*, 547 F.2d 1165 (3d Cir. 1977) ("It is well established that one cannot be convicted of aiding and abetting unless the proof establishes that the substantive crime charged was committed by someone and that the defendant charged had knowledge of the substantive offense and acted with the intent to facilitate the commission of such offense.").

[53] *United States. v. Ame. Inv'rs of Pittsburg, Inc.,* 879 F.2d 1087, 1097 (3d Cir. 1989) (finding that the defendant's willfulness in avoiding the reporting requirement was strong despite the reporting obligation being born by the bank, not the defendant).*Accord United States v. Heyman*, 794 F.2d 788, 789 (2d Cir. 1986) (same); *Brennan v. Cephalon, Inc.*, No. CIV.A. 04-3241 (FLW), 2005 WL 2807195, at *8 (D.N.J. Oct. 25, 2005) (finding that defendant's "willful intent to cause a concealment, combined with a duty to report to the FDA, would constitute the elements of actionable concealment under Section 1001").

It follows that under 18 U.S.C. § 2(b) the Government had the burden of showing not only that Mr. Bekkedam knew of a legal obligation, but also that he knew his conduct affecting that obligation was unlawful.  *See* 18 U.S.C. § 2(b); *United States v. Sokolow*, 91 F.3d 396, 409 (3d Cir. 1996) (interpreting *Curran* to mean that under 18 U.S.C. § 2(b), "it [is] unlawful to *deliberately* cause another person to perform an act that would violate federal criminal law") (emphasis added).  Based on the legal standard for 18 U.S.C. § 2, the Government has failed to prove how Mr. Bekkedam aided and abetted the crimes charged under Counts Two, Three and Four.

### 1.  Mr. Bekkedam did not aid or abet the commission of the crime charged in Count Two, if it in fact occurred.

The substantive crime charged in Count Two is committing a major fraud against the United States – in this case, a scheme to obtain money from the TARP.  Therefore beyond proving that the crime occurred, in order to prevail under 18 U.S.C. § 2, the Government had to prove that Mr. Bekkedam knew that representing loaned funds as capital was not permissible, and that NOVA Financial intended to disregard this rule by accepting investments from individuals who used funds derived from NOVA Bank loans and thereafter representing these investments as capital.

The Government did not prove that Mr. Bekkedam had such knowledge. As discussed in detail, *infra,* no rule prohibits calculating loaned funds as capital for the purpose of the CPP,[54] and to the extent the Government relies on EITF 85-1 for this belief, neither Mr. Bekkedam nor members of NOVA Bank or NOVA Financial were aware of this guidance.[55]  Such aider/abetter

---

[54] Trial Tr. 60:20-61:5, 62:9-14, 81:19-82:2 (Apr. 13, 2016) (Shubin) (testifying that the investments counted as "contra-equity" and his opinion of the capital treatment was based on "auditor's judgment" and interpretation of the guideline); Trial Tr. 61:18-25 (Mar. 25, 2016) (Quill).

[55] EITF 85-1 is not a rule or regulation but rather a piece of guidance issued by the Emerging Issues Task Force (EITF). *See* http://www.gasb.org/jsp/FASB/Page/SectionPage&cid=1218220137512 ("The EITF was designed to

knowledge also required proof that Mr. Bekkedam knew of NOVA Financial's ongoing communications with the regulators, knew what the regulators asked for, and knew what NOVA Financial provided in response, none of which the Government proved.

Moreover, the evidence showed that Mr. Bekkedam did not act in furtherance of any scheme nor had knowledge of such a scheme. Mr. Bekkedam's conduct was limited to introducing NOVA Financial as an investment opportunity to Levin and Bonomo, and he subsequently engaged in some communications with NOVA Bank regarding Levin's and Bonomo's loans from NOVA Bank.[56] Mr. Bekkedam was not privy to the internal operations of the bank, and Mr. Bekkedam did not communicate with the regulators considering NOVA Financial's TARP application.[57] Nor did Mr. Bekkedam have any say in the bank's approval of the NOVA Bank loans to Levin, Bonomo, and Gallub that were used to fund their investments in NOVA Financial.[58] Further, Mr. Bekkedam had no involvement with how NOVA Bank or NOVA Financial calculated their capital levels.[59] As such, it is unfathomable to conclude that Mr. Bekkedam's actions were in furtherance of an offense; rather, they were merely in furtherance of his role with NOVA Financial as a "capital raiser"[60] – a consultant to NOVA

---

promulgate implementation guidance within the framework of the Accounting Standards Codification to reduce diversity in practice on a timely basis.").

[56] Trial Tr. 84:1-5 (Apr. 11, 2016) (DiMarcantontio) (explaining that Bekkedam helped raise capital for NOVA Financial through his clients, friends, family, and contacts).

[57] Trial Tr. 60:5 – 8 (Mar. 30, 2016) (Quill); *see also* Trial Tr. 85:1-7 (Apr. 11, 2016) (DiMarcantonio) (describing the limited scope of DiMarcantonio's conversations with Bekkedam about TARP as "[j]ust the ramifications of what the program was, the pros and the cons, how would it affect capital, how would it affect shareholders).

[58] Trial Tr. 69:23 – 70:23 (Apr. 8, 2016) (Rutkowski); Trial Tr. 26:17 – 27:17 (Apr. 12, 2016) (Zentner); Trial Tr. 196:22 – 25 (Apr. 4, 2016) (Madiany) (confirming that Bekkedam never called him or communicated with him to try to influence his recommendation for anyone applying for a loan).

[59] Trial Tr. 72:12-73:7 (Apr. 7, 2016) (Hanuscin); *see also* Trial Tr. 69:23-70:23 (Apr. 8, 2016) (Rutkowski) (indicating she did not find or note any influence by Bekkedam over NOVA Bank's loan process or capital computation); Trial Tr, 26:17 -27:17 Apr. 12, 2016) (Zentner).

[60] Trial Tr. 72:3-8 (Apr. 7, 2016) (Hanuscin).

Financial who was seeking interested investors.[61]   In other words, the Government failed to distinguish how Mr. Bekkedam's lawful conduct as a consultant helping NOVA Financial raise capital, amounted to an attempt to defraud TARP.

Even under Section 2(b), a finding of aiding abetting is still not viable because the Government neither alleged nor proved that Mr. Bekkedam *caused* the alleged scheme to defraud TARP.  Indeed, NOVA's CFO Jeffrey Hanuscin prepared NOVA Financial's application on his own initiative and thereafter he and Mr. Hartline communicated with the FDIC on their own accord, without any direction from Mr. Bekkedam.[62] As discussed *infra*, to the extent the Government relies on "false statements" to make up the scheme to defraud TARP, Mr. Bekkedam did not cause such statements to be made.

> 2.  *Mr. Bekkedam did not aid or abet the commission of the crime charged in Count Three, if it in fact occurred.*

For Count Three, the evidence showed only that Mr. Bekkedam knew that George Levin borrowed money from NOVA Bank, and Mr. Bekkedam knew that Levin subsequently invested money into NOVA Financial.[63]   However, the evidence did not show that Mr. Bekkedam knew that Mr. Hartline, "told, and directed employees of NOVA to tell, the Department of Treasury that NOVA had raised $5 million of new capital through an investment by G.L." In closing, the Government asserted that Mr. Hartline knew that the information about NOVA getting a $5

---

[61] Trial Tr. 83:2-5 (Apr. 11, 2016) (DiMarcantonio) (stating that Bekkedam's "best function and what he did best for the bank was, again, drive business to the bank much like I was trying to do, but also he was, you know, the primary force of the capital that was raised by the bank"); *id.* at 84:1-5 (explaining that Bekkedam helped raise capital for NOVA Financial through his clients, friends, family, and contacts); *id.* at 89: 15-18 (reading from board minutes, "Mr. Bekkedam has offered the assistance of his newly higher investment specialist in providing Nova with opinions regarding investments."); *see also* Trial Tr. Apr. 5, 2016 (Levin) (responding that Mr. Bekkedam said his role at Nova Bank was "an advisor").

[62] Trial Tr. 4: 5-6 (Apr. 7. 2016) (Hanuscin) (testifying that "I started the process, and as the process went on, Brian got more involved").

[63] Trial Tr. 102:18-19; 104: 8-11; and 106:1-4 (Apr. 5, 2016) (Levin) (testifying that he discussed the investment opportunity with Mr. Bekkedam and that Mr. Bekkedam suggested that NOVA Bank could lend Mr. Levin $5 million to replace the $5 million that he was going to invest in NOVA Financial).

million capital infusion would be passed along to the "TARP folks in D.C.," but there is no evidence that Mr. Bekkedam knew the same.[64] The Government also failed to demonstrate that Mr. Bekkedam *helped* Mr. Hartline tell or direct his employees to do so. Accordingly, Mr. Bekkedam's knowledge about Levin's lending relationship with NOVA Bank and investing relationship with NOVA Financial is insufficient to give rise to a Section 2(a) conviction under Count Three.

The government failed to meet the threshold even under Section 2(b), offering no evidence that Mr. Bekkedam could have *caused* Mr. Hartline to make the statement on June 30, 2009.   The Government tried to show that Mr. Bekkedam exercised some control over NOVA through the testimony of Hillary Musser[65] and Frank Preve,[66] who each said that Mr. Bekkedam claimed to "control" the bank, but neither witness testified that Mr. Bekkedam ever communicated with Mr. Hartline about what to instruct his employees to say to regulators about Levin's $5 million investment in NOVA Financial.  To the contrary, NOVA employees testified that neither Mr. Hartline nor Mr. Bekkedam *ever* dictated what they could say or provide to the regulators.[67]

Under *United States v. DeCavalcante*, 440 F.2d 1264, 1268 (1971), the Third Circuit stated that the guilt under 18 U.S.C § 2(b) is limited to cases where a defendant causes the commission of an indispensable element of an offense by an innocent agent or instrumentality. *See also Inv'rs of Pittsburgh, Inc.*, 879 F.2d at 1095 (explaining that *"*[Section] 2(b) is utilized to extend criminal liability to actors lacking legal capacity who cause intermediaries to commit

---

[64] *See* Trial Tr. 20 (Apr. 19, 2016).

[65] Trial Tr. 49:22 (Apr. 6, 2016) (Musser).

[66] Trial Tr. 173:13-16 (Mar. 31, 2016) (Preve).

[67] *See, e.g.,* Testimony of Eileen Knott (Trial Tr. 19:3-8 (Mar. 30, 2016)); Jeffrey Hanuscin (Trial Tr. 30:16-18 and 73:) (Apr. 7, 2016); Patricia Loughney (Trial Tr. 43:17-23 (Apr. 12, 2016)).

criminal acts where the intermediary, though innocent of the substantive offense, has the capacity to commit that offense."). Yet, the Government has not identified any innocent agent or instrumentality because the Government charged the issuer of the statement, Mr. Hartline, with the underlying crime (18 U.S.C. § 1001).[68] As such, a claim under Section 2(b) is simply improper.[69]

> ### 3.  Mr. Bekkedam did not aid or abet the commission of the crime charged in Count Four, if it in fact occurred.

The Government also failed to demonstrate how Mr. Bekkedam aided and abetted or otherwise willfully caused Mr. Hartline to make a statement on Dec. 15, 2009, regarding NOVA Financial raising $10 million of new capital, as alleged in Count Four.  As outlined above, under accomplice liability, the Government must prove that the defendant aids, abets, counsels, commands, induces, or procures its commission or willfully causes an act to be done.  18 U.S.C. § 2; *see also Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 181 (1994) ("The statute decrees that those who provide knowing aid to persons committing federal crimes, with the intent to facilitate the crime, are themselves committing a crime"). The Government provided no such evidence as to Mr. Bekkedam with regard to Mr. Hartline's statement on December 15, 2009, no evidence that Mr. Bekkedam aided Mr. Hartline in preparing or sending the email, no evidence that Mr. Bekkedam in any way caused Mr. Hartline to make or send the email. Yet, in closing, the Government inaccurately and recklessly stated

---

[68] This does not in any way concede any culpability for Mr. Hartline under Counts Two, Three or Four.

[69] Moreover, as detailed *infra,* the Government has failed to identify any underlying statement or evidence thereof on June 30, 2009, as charged in the Indictment, where Mr. Hartline did indeed direct employees of NOVA to tell the Department of Treasury that NOVA had raised $5 million of "new capital" through an investment of G.L. *See Soto*, 539 F.3d at 194 (explaining that in order to convict the government must show that the substantive crime has been committed).

that "Mr. *Bekkedam* told [a lie] on December 15, 2009 which was that 10 million of common equity was in the bank."[70]

The Government also states in its closing that there are "so many e-mails" about NOVA receiving the $10 million.[71]  But, among those "so many e-mails," not a single one contains a communication between Mr. Bekkedam and Mr. Hartline wherein Mr. Bekkedam aids, abets, or causes Mr. Hartline to communicate to regulators on Dec. 15, 2009, that NOVA Financial raised $10 million.  Indeed, Mr. Bekkedam and Mr. Hartline's last communication before Dec. 15, 2009, is an exchange on Dec. 10, 2009, where Mr. Hartline is supplying Mr. Bekkedam a copy of the offering document to share with potential, interested investors.[72]  This exchange was part of Mr. Bekkedam's legitimate role as a consultant to NOVA Bank—recruiting interested investors for NOVA Financial.  There is simply no indication in the email exchanges between Mr. Bekkedam and Mr. Hartline nor the testimony that Mr. Bekkedam aided, abetted, or otherwise caused Mr. Hartline to thereafter communicate to the Dept. of Treasury that NOVA had raised $10 million on December 15, 2009.

## II.      GROUNDS FOR RELIEF APPLICABLE TO COUNT ONE, ONLY

In addition to the grounds for relief to the conspiracy charge that go to the remaining counts as well, there are separate grounds for relief unique to Count One, as follows.

---

[70] Trial Tr. 61:22-25 (Apr. 19, 2009) (emphasis added).

[71] *Id.* at 62:2-9.

[72] GV137b.

36

A.   **The Government Failed to Introduce Evidence Sufficient to Prove A Conspiracy Between Mr. Hartline and Mr. Bekkedam as Alleged in Count One of the Indictment, and the Jury's Verdict is Against the Weight of the Evidence**

In Count One of the Indictment the Government charged that between May 2009 and January 2010, Mr. Bekkedam and Mr. Hartline conspired to defraud the United States, particularly the TARP, "by making false representations about the assets of NOVA Financial Holdings, Inc., and by arranging bogus financial transactions."   ECF 1 at Count One, ¶13. To obtain a conviction under 18 U.S.C. § 371, the government must prove: (1) the existence of an agreement to achieve an unlawful objective; (2) the defendant's knowing and voluntary participation in the conspiracy; and (3) the commission of an overt act in furtherance of the conspiracy. *United States v. Rigas*, 605 F.3d 194, 206 (3d Cir. 2010)(*en banc*). In order to sustain a conviction under Count I, the Government needed to introduce evidence that:

- Mr. Bekkedam knew at the time the conspiracy allegedly was agreed to in May 2009 that Treasury would only approve NOVA Financial's TARP application if NOVA Financial met Treasury's contingency of obtaining "new capital" investments for NOVA;

- Mr. Bekkedam knew that the Levin and Bonomo investments did not meet the requirement of "new capital" required to meet the TARP contingency because NOVA Bank loaned them the money;

- Mr. Bekkedam knew that the federal bank regulators would want to know that the source of funds for the Levin and Bonomo investments were loans from NOVA bank;

- Mr. Bekkedam had a duty to disclose the source of the investment money to the federal regulators; and

37

- Mr. Bekkedam agreed to conspire with Brian Hartline to conceal the source of the investment money from the federal regulators for the purpose of defrauding the federal government.

However, the evidence introduced by the Government failed completely to prove any of these facts, much less all of them.  As a result, the jury's verdict is against the weight of the evidence.  Accordingly, the Court should grant a new trial because the lack of such evidence of conspiracy presents "a serious danger that a miscarriage of justice occurred, *i.e.*, that an innocent person has been convicted."  *United States v. Favato* 533 Fed. Appx 127, 131 (3d Cir. 2013); *United States v. Brennan* 326 F. 2d 176, 189 (3d Cir. 2003).

In reviewing the lack of evidence of a conspiracy here, the Court need not consider the evidence in the light most favorable to the government and may weigh the evidence and credibility of witnesses, in effect, serving as a thirteenth juror.  *United States v. Phifer*, 400 F. Supp. 719, 722 (E.D. Pa. 1975); aff'd, 532 F.2d 747 (3d Cir. 1970).  Although the Court should set aside the verdict on these grounds only in exceptional circumstances, *id.*, the lack of any credible evidence of a conspiratorial agreement here justifies such relief.

Proof of the conspiracy only could come from testimony showing conversations and an agreement between Mr. Bekkedam and Mr. Hartline or documentary evidence of the agreement. The Government failed to provide proof of either.  First, the Government introduced no testimony regarding any conversations between Mr. Bekkedam and Mr. Hartline regarding the alleged object of the conspiracy.  Second, none of the emails that involved communications between Mr. Bekkedam and Mr. Hartline provide any evidence of a conspiratorial agreement; rather many demonstrated that they had different ideas regarding how NOVA Financial would raise capital and that Mr. Bekkedam fundamentally misunderstood the TARP application

process.  Far from demonstrating a conspiracy, these exhibits demonstrate that Mr. Bekkedam and Mr. Hartline did not agree on what was happening or how it would happen regarding the TARP application process.   Further, the defense presented evidence through its cross-examination of Ed DiMarcantonio regarding an email that further emphasized the lack of agreement between Mr. Bekkedam and Mr. Hartline.

Although the government alleged in the Indictment that the supposed agreement to defraud the Government arose by arranging "circular" loans from NOVA Bank for investment in NOVA Financial, occurred in May 2009, the Government did not present any evidence of communication relating to Levin's NOVA investment between Mr. Bekkedam and Mr. Hartline until June 23, 2009.  *See* GV 36.  Thus, the Government presented no evidence related to the alleged time in May in which the conspiratorial agreement was supposed to have been made.[73] Further, not only is this exhibit devoid of any conspiratorial agreement, it shows the opposite. Specifically, Hartline wrote to Mr. Bekkedam's counsel, Larry Rovin and to NOVA Financial's Chairman, Ed DiMarcantonio:

> Barry can you let me know what to expect in regards to receiving the $5 million of funds [from George Levin] this week as well as the subscription agreement…….Barry today I just dropped 3 presentation booklets and wiring instructions to Larry [Rovin].

GV 36.  Although the Government alleged that the Defendants conspired in May to arrange circular loans, Hartline's statements in June here clearly refute this.  As of this June 23, 2009 email, Hartline believes that George Levin will be sending $5 million in funds from his vast assets as the first part of his $18 million investment in NOVA Financial, not obtaining any funds from NOVA Bank to do so.  This logical conclusion is further supported by another statement in this GV 36.  Hartline writes:

---

[73] Indeed the only exhibit from May 2009  involving communications between Mr. Hartline and Mr. Bekkedam, GV 24, was dated May 27, 2009, and related to a planned loan from ACBB, see discussion *infra*.

> We still have not received any information to start underwriting the loan(s).  Tax returns 2007, 2006, and 2008 when available.  Current Financial Statements, March 31, 2009 would be ideal (they need to be within 6 months of application) I have a form that ACBB will need signed.

This statement by Mr. Hartline further shows the lack of evidentiary support for the Government's theory of conspiracy.   Mr. Hartline is discussing another bank, Atlantic Community Bankers Bank ("ACBB") where Levin would obtain additional funding for part of his $18 million investment beyond his initial $5 million cash investment.  That Mr. Hartline believed as of June 23, 2009, that the only loan funds being sought by Mr. Levin were to come from ACBB is shown by GV 24, dated May 27, 2009.  There, Mr. Hartline wrote to Mr. Bekkedam and his lawyer, Larry Rovin, that Levin needed to provide certain information so that "ACBB can start underwriting the $7.5 million margin loan."  GV 24.

This conclusion is further supported by the next email communication regarding Levin's investment between Mr. Hartline and Mr. Bekkedam, on June 29, 2009, GV 39a.  Mr. Bekkedam wrote to Mr. Hartline, Rovin and DiMarcantonio:

> Guys:  It was clear to at least me that we were getting George approved for a loan of 5M to invest into NOVA.  Per my conversation with Brian he thought I was getting a wire tomorrow.  I was always thinking Loan.  I assume we can get the subscription doc's by tomorrow……underwrite George…….then fund the escrow account.  Is this the plan?

Hartline wrote back:

> We need to close on capital tomorrow by the end of the day.  Escrow will not count for capital.

This email further undercuts the Government's conspiracy theory in several ways.  First, it shows that as of June 29, 2009, almost a month after the supposed beginning of the conspiracy in May, 2009, Mr. Bekkedam and Mr. Hartline had directly opposing ideas of where funds for the Levin investment would come:  Mr. Hartline thought Levin would be sending "a wire" - - *i.e.*, cash funds; Mr. Bekkedam believed Levin would be receiving a loan in keeping with

Levin's strategy of leveraging his money.[74]  Thus, it is clear that Mr. Hartline and Mr. Bekkedam did not agree on where Levin's funding would come from, making it impossible for them to conspire to deceive Treasury officials over the source of the investment funds.

This email also clearly evinces Mr. Bekkedam's lack of understanding as to what will constitute bank "capital," contrary to the Government's conspiracy theory that Mr. Bekkedam knew that this Levin investment did not involve a capital investment.  Essential to the Government's conspiracy theory is that Mr. Hartline and Mr. Bekkedam agreed to deceive Treasury as to NOVA's capital-raising status.  However, it is not possible for Mr. Bekkedam to agree to conceal that this Levin investment is not capital from the regulators if Mr. Bekkedam did not even understand what constitutes capital under bank regulations.  Moreover, it is also clear that Mr. Hartline is indicating to Mr. Bekkedam that Mr. Hartline believes this investment *will* count for capital.  This statement belies the Government's theory in two ways:  (1) it shows Hartline believed that the Levin investment could be counted as capital, and (2) that Mr. Bekkedam reasonably relied on Hartline's greater knowledge of what investments could be counted as bank capital.  If they both believed on June 29, 2009, that the Levin loan could count for capital, even if they were mistaken, they could not and would not conspire to keep that information from Treasury officials.

The confusion and disagreement between Mr. Hartline and Mr. Bekkedam continued after Treasury provisionally approved NOVA's application on August 25, 2009.  GV 75.  Both testimony and email exhibits demonstrated both that Mr. Hartline and Mr. Bekkedam continued to disagree about what needed to be done to obtain final Treasury approval and that Mr. Bekkedam still had almost no understanding of the TARP approval process.  GV 76.  On August 29, 2009, Mr. Hartline emailed to Bekkedam and DiMarcantonio his understanding of what

---

[74] Levin testified that this was his central investment strategy.  *See* Trial Tr. 179:19 (Apr. 5, 2016) (Levin).

needed to occur with a detailed schedule.  GV 76.  Central to Mr. Hartline's schedule was Levin's completion of his $18 million subscription agreement.  Further, Mr. Hartline's email demonstrates his belief that NOVA Financial would not need to lend any investor money to invest in NOVA Financial to meet Treasury's contingency.  All that was necessary was "to close on George Levin capital ($13 million) to complete the executed subscription agreement."  GV 76.  In Mr. Bekkedam's response to Mr. Hartline, it is clear that this was the first time that he was made aware of the contingency proposed by TARP[75] to obtain funding, and Mr. Bekkedam questions whether NOVA has been "fully approved."  When Mr. Hartline responds and explains to Mr. Bekkedam that Levin needs to invest ten million dollars to meet the contingency and that this will occur necessarily if Levin fulfills the last thirteen million dollars relating to his subscription agreement, Bekkedam responds in complete surprise: "so we need $18 million from George.  Wow."[76]  This further refutes the Government's conspiracy theory because central to that theory is that Bekkedam was aware in May 2009 that the Treasury intended to impose a contingency that NOVA Financial raise additional capital, and he agreed with Hartline to arrange the June 30, 2009, loan to Levin to meet this contingency.  It is impossible to conspire in May 2009 to meet a contingency that is not even imposed until late August, 2009.

The Government's evidence showed that as late as December 9, 2009, Hartline and Bekkedam still did not agree on how capital should be raised to meet the TARP contingency.  *See* GV 136.  On that date, Hartline wrote to Bekkedam urging him "please don [sic] not talk about investors not investing in NOVA [pursuant to the new subscription agreement.]"  *Id.*  The

---

[75]  *See* Trial Tr. 110:17-19 (Apr. 11, 2016) (DiMarcantonio testifying that "Mr. Hartline kept me informed on TARP. I'm not sure whether he would information Mr. Bekkedam, but I was certainly informed.") and 111-114 (DiMarcantonio reading from GV76 wherein Mr. Hartline sets forth a timeline and advises Mr. Bekkedam to call him with any questions).

[76]  Trial Tr. 197: 11 – 198:2 (April 11, 2016) (DiMarcantonio).

evidence had shown that Bekkedam had expressed concerns to certain of his Ballamor clients about whether to invest in NOVA.[77]   This shows that at almost the end of the time in which the alleged conspiracy existed, Mr. Bekkedam and Mr. Hartline were still not in agreement on whether and how to meet the TARP contingency.

The Third Circuit has stated that the evidence used to prove a tacit agreement in a conspiracy prosecution, such as alleged here, requires close scrutiny.  *United States v. Tyson*, 653 F.3d 192, 206. (3d Cir. 2011)  This is necessary because although a conspiracy charge requires consideration of whether two individuals agreed to the conspiracy, proof of a defendant's guilt must always remain individual and personal. *Id*.  As demonstrated above, the government has completely failed to provide evidence supporting a tacit agreement between Mr. Hartline and Mr. Bekkedam.  Further, this is not a case where a tacit agreement can be inferred from conduct that deviated from established procedures.  *Cf. United States v. Smith*, 294 F.3d 473,478 (2002). (The alleged conspirators' involvement in so many unusual acts in which several police officers deviated from the department's standard operating procedure could lead a reasonable juror to conclude that the officers had at least a tacit agreement to violate the victim's civil rights.).  The evidence showed that Mr. Bekkedam had for years assisted NOVA Financial in raising capital, and this was the extent of his involvement here.  Moreover, the Government failed to present any evidence that Mr. Bekkedam agreed to try to conceal the fact of this loan from federal regulators.

---

[77] See GV 88 (email from Mr. Bekkedam to Doug Von Allmen stating that "the timing of the FDIC vs. the Fed's approval of George and another investor as Bank Holding Company's is killing us" and that the "economics of the TARP has a tremendous impact on us"); GV 137c (email from Mr. Bekkedam to Ira Lubert explaining that he is "between a rock and a hard place" as to raising capital for NOVA Financial and "avoid[ing] a significant impairment"); GV 131 (email from Mr. Bekkedam to Jane Longo explaining that NOVA Financial's "limited contacts to raise capital in this marketplace is reflected in the offering price (way below long term multiples)" and advising that an investment now "would be dilutive to existing shareholders" and "not recommending taking those dollars at $4"); GV 132 (email from Mr. Bekkedam to clients answering questions regarding NOVA Financial's lower offering price, including its dilutive effect on existing shares).

Under these circumstances the jury's verdict is substantially against the weight of the evidence, and the Court should grant Mr. Bekkedam's motion for a new trial on this basis alone.

### B. The Court May Not Conclude that a Unanimous Verdict was Reached on the Conspiracy Charge

The Court expressly instructed the jury that they needed to find that Mr. Hartline or Mr. Bekkedam committed one of the overt acts *in the Indictment*.[78]  The Court further instructed the jury that it needed to "unanimously agree on the overt act that was committed."[79]  Yet at no time was the jury given, nor did it ask for, the Indictment or, more specifically, a list of the overt acts. Nor was a list of the overt acts (or any other part of the Indictment) read to the jury.

Not only as a matter of following instructions, but as a matter of law, there must be unanimity in a verdict in order for it to survive constitutional scrutiny.  Essentially, the result of there being no evidence of a unanimous verdict rendered Count One invalid by virtue of duplicity.  Duplicity is the improper joining of distinct and separate offenses in a single count. *United States v. Haddy,* 134 F.3d 542, 548 (3d Cir. 1998).  It invokes Fifth Amendment issues relating to notice of the charges and double jeopardy. *United States v. Rigas,* 605 F.3d 194, 209-211 (3d Cir. 2010).

Because we do not know whether the jury ever unanimously settled on a single, specific act, the verdict cannot stand.  *See Leary v. United States,* 395 U.S. 6, 31-32 (1965) ("It has long been settled that when a case is submitted to the jury on alternative theories the unconstitutionality of any of the theories requires that the conviction be set aside.").  *Accord United States v. Starks,* 515 F.2d 112, 116-17 (3d Cir. 1975) (noting that the "vice of duplicity is

---

[78] Trial Tr. 87:21-24 (Apr. 20, 2016) (Court) ("The indictment also charges that to further the objective of that conspiracy, one member of the conspiracy committed at least one overt act as alleged in the indictment."); 93:20-94:2 ("…at least one member of the conspiracy performed at least one of the overt acts described in the indictment…"); *id*. at 94:3-4 ("The indictment alleged certain overt acts."); *id*. at 94:9-14 ("…at least one member of the conspiracy committed at least one of the over acts alleged in the indictment…").

[79] Trial Tr. 94:14-15 (Apr. 20, 2016).

that a general verdict for a defendant on that count does not reveal whether the jury found him not guilty of one crime or not guilty of both"). Indeed, since we do not know whether any overt act on which the jury relied is one that was contained in the Indictment, the Court cannot be sure whether the effect of the instruction, in combination with the jury's inactivity, amounted to a passive, constructive amendment of the Indictment. *United States v. McKee,* 506 F.3d 225, 231-32 (3d Cir. 2007) (impermissible amendment when jury instruction allowed conviction for conduct not specifically charged, or by otherwise broadening the *possible* bases for conviction from that which is charged in the indictment). This, too, requires relief, *per se*. *Id.*

### III.    GROUND FOR RELIEFE APPLICABLE TO COUNT TWO, ONLY

#### A.    The Failure to Instruct the Jury on Willfulness for Count Two – TARP Fraud – was Error – Particularly as it Applied to Mr. Bekkedam in the Position of Alleged Aider/Abbetor and the Instruction He Received for 18 U.S.C § 2.

The Defendants were denied their request to include the element of "willfulness" to the intent requirement for the Count Two TARP Fraud charge. That is, the defense sought to have the charge for 18 U.S.C. § 1031 say that the jury had to find that Defendants participated in the scheme to defraud TARP, knowingly, willfully and with the intent to defraud – mirroring the instructions given in the TARP Fraud case, *United States v. Litvak*, 808 F.3d 160, 189 (2d Cir. 2015) (reversing conviction on other grounds but affirming the "willful" instruction given by the trial court). In *Litvak*, under TARP Fraud, the Government had to prove "willful" by showing "that [Litvak] was aware of the generally unlawful nature of his acts." *Id.* Within the Seventh Circuit, willfulness also appears to be a requirement of a § 1031 conviction. *United States v.*

*Masquelier*, No. 96 CR 151-1 1998 WL 773997, *2 (N.D. Ill., Oct. 27, 1998) (*relying on United States v. Moede*, 48 F.3d 238, 241 (7th Cir. 1995)).[80]

       In the context of an aiding/abetting case such as Mr. Bekkedam's, this denial took on even greater significance.  That is, if the willfulness instruction had been given to the jury (who asked for and received a written copy of all the elements), it would have made up for two deficiencies in the 18 U.S.C. § 2 charge, as well.  Specifically, 18 U.S.C. § 2(a) does not have "willful" in its statutory language, but 18 U.S.C. § 2(b).  And while the Government was not forced to elect between those two, the jury charge took the easier path, and did not say anything about willfulness.  Trial Tr. 110:4-11 (April 20, 2016).  Indeed, the instruction improperly lowered the Government's burden even further insofar as aiding and abetting TARP Fraud was concerned:

> If the evidence shows that Barry Bekkedam knew that the offense was being committed or was about to be committed but does not also prove beyond a reasonable doubt that it was Barry Bekkedam's intent and purpose to aid, assist, encourage, *or otherwise associate himself with the offense*, you may not convict Barry Bekkedam guilty of the offenses as an aider or abettor.

*Id.* (emphasis added).

       The cumulative impact of allowing Mr. Bekkedam to be convicted of aiding or abetting TARP fraud: (1) without require a finding that he knew his acts were unlawful; *and* (2) without having his acts rise to a level greater than "otherwise associate himself with the offense" –

---

[80] The Government's argument in response was that "willfully" does not appear in 18 U.S.C. § 1031, nor in the Third Circuit model instructions.  Regarding the latter, the Third Circuit Model Instructions come with a warning label: "These Model Criminal Jury Instructions remain a work in progress. The law develops as time passes." http://www.ca3.uscourts.gov/sites/ca3/files/Introforwebsite.pdf.   In this case,  the common law has passed the instructions by.  Regarding both arguments, the Supreme Court long has dismissed them.  That is, simply because "willful" does not appear in the language of the statutes does not foreclose the court from interpreting the statute to include the element of willfulness. *See, e.g., Neder v. United States*, 527 U.S. 1, 25 (1999) (interpreting the federal mail fraud, wire fraud, and bank fraud statutes to include the element of materiality although not expressly stated in the statutes).  Courts are afforded this discretion because where Congress uses terms that have accumulated settled meaning under the common law, it must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms. *Id.* (citing *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 322 (1992)).

language *not* contained in either prong of 18 U.S.C. § 2 – is that to let stand his TARP Fraud

conviction would amount to a manifest injustice.

> B. **Based on the Instruction it Received, the Jury Could Not Have Convicted Mr. Bekkedam on Count Two**.

The parties do not dispute, and the Government has not ever asserted, that Mr. Bekkedam

was guilty of 18 U.S.C. § 1031 as a principal.   Rather, the Government proceeded on an

aider/abettor theory against Mr. Bekkedam for TARP Fraud pursuant to 18 U.S.C. § 2.

However, the Jury was never instructed on aiding/abetting when it came to Count Two – only

when it came to Counts Three and Four (18 U.S.C. § 1001 charges):

> Going into a different area. A person may be guilty of an offense because he
> personally committed the offense himself or because he aided and abetted another
> person in committing the offense. … In this case, the Government alleges that the
> Defendant, Barry Bekkedam, aided and abetted the Defendant, Brian Hartline, in
> committing the offense of making false statements as charged in Counts III and
> IV of the indictment.[81]

When it came to Count Two, both defendants were only charged as principals.[82]  Nothing

in the instructions for Count Two makes mention of aiding or abetting, or places Mr. Bekkedam

in a different role than Mr. Hartline *vis a vis* 18 U.S.C. § 1031.

A conviction may not be sustained when it is in clear contravention of, or does not follow

the instructions the Court provides.  *See Copeland v. L. Capone Trucking, Inc.*, No. CIV. A. 89-

1350, 1991 WL 25692, at *2 (E.D. Pa. Feb. 25, 1991) (suggesting that where it is apparent from

the verdict that the jury has failed to follow the court's instructions it may be necessary to hold a

new trial such where the trial court is not satisfied that the jury has correctly determined

liability); *see, e.g., Rewis v. United States*, 401 U.S. 808, 813 (1971) (holding that defendant

---

[81] Trial Tr. 108:11-23 (April 20, 2016) (jury charge).

[82] Trial Tr. 98:1-104:24 (April 20, 2016) (jury charge).

could not be convicted as principal under Travel Act because court failed to charge jury that it must find defendant actively sought interstate patronage, which was element of Travel Act charge); *cf. United States v. Syme*, 276 F.3d 131, 149–156 (3d Cir. 2002) (vacating a false claims act conviction where the district court instructed the jury on a fraud theory that was not alleged in that count of the indictment).[83] To do so would permit the jury to convict a defendant of a crime with which he was not charged.[84]

Mr. Bekkedam was charged as a principal under Count Two, but it is fair to assume that the Government does not purport there was any evidence, let alone "beyond a reasonable doubt" evidence presented during trial of his guilt as a principal.  He was prosecuted in Count Two as an accomplice, but he was improperly convicted as a principal.  Elementally, these are different crimes, as § 2 adds elements that a finding of principal liability under § 1831 does not contain, and the Government was relieved of the burden of convincing the jury of those additional/different elements beyond a reasonable doubt.  *See United States v. Gaudin*, 515 U.S. 506, 522-23 (1995) (Fifth Amendment Due Process Clause and Sixth Amendment right to a jury trial deprived when the jury is not required to find every element of a crime charged beyond a reasonable doubt); *Sullivan v. Louisiana*, 508 U.S. 275, 277–278 (1993) ("The prosecution bears the burden of proving all elements of the offense charged and must persuade the factfinder

---

[83] Indeed, the Court instructed the jury to that effect:

> Your second duty is to apply the law that I give you to the facts as you find them to be. My role now is to explain to you in legal jargon somewhat the legal principles that must guide your decision and deliberations in this case. Now you must apply my instructions carefully. Each of the instructions is important and you must apply all of them. You must not substitute or follow your own notion or opinion about what the law is or ought to be.  You must apply the law that I give to you whether you agree with it or not.  Trial Tr. 65:17-66:2 (April 20, 2016) (jury charge).

[84] The content of the jury charge becomes all the more important when the jury does not receive (either orally or in writing) the jury instructions and, as was the case here, when they did receive *only* the instructions (both orally and in writing).

48

'beyond a reasonable doubt' of the facts necessary to establish each of those elements.").  He is therefore entitled to a new trial for the substantive crime of TARP Fraud.

### IV.   GROUNDS FOR RELIEF APPLICABLE TO COUNTS THREE AND FOUR - 18 U.S.C. § 1001 - ONLY

#### A. Per Se Impermissible Constructive Amendment of the Indictment: The Indictment Charged Mr. Bekkedam with a "False Statements" Case, But the Government Prosecuted Him on a "Concealment" Case Theory, While Simultaneously Enjoying the Lower Standards of Proof Required for a "False Statements" Charge

##### 1. *Constructively amending an indictment violates the Grand Jury Clause of the Fifth Amendment .*

The Fifth Amendment requires a defendant only be tried for felony offenses presented to a grand jury and returned by that grand jury in an indictment.  *E.g., Stirone v. United States,* 361 U.S. 212, 217 (1960) ("a court cannot permit a defendant to be tried on charges that are not made in the indictment against him").  Prior to trial, the Government has nearly unfettered authority to supersede an original indictment.  *See, e.g., United States v. Fisher*, 692 F.Supp. 495, 499 (E. D. Pa. 1988)  ("It is well established that the government has wide latitude to obtain a superseding indictment at any time prior to trial, and may then select the indictment under which to proceed at trial.")[85] But to do so, it must go back to the grand jury and ask for an amendment.  *Stirone*, 361 U.S. at 215-16 ("it has been the rule that after an indictment has been returned its charges may not be broadened through amendment except by the grand jury itself").  After trial begins, the Government must live with its indictment.

A constructive amendment of a grand jury's indictment occurs when, in the absence of a formal amendment, the evidence or jury instructions at trial modify essential terms of the charged offense in such a way that there is a substantial likelihood that the jury may have

---

[85]  *Accord United States v. Edwards,* 777 F.2d 644, 649 (11th Cir. 1985) ("Clearly, a prosecutor may seek a superseding indictment at any time prior to trial on the merits, so long as the purpose is not to harass the defendant."); *cert. denied sub nom. Bolden v. United States,* 475 U.S. 1123 (1986).

convicted the defendant for an offense differing from the offense the indictment returned by the grand jury actually charged. *See United States v. Miller,* 471 U.S. 130, 140 (1985) (constructive amendment occurs when defendant is deprived of "substantial right to be tried only on charges presented in an indictment returned by a grand jury"); *Stirone*, 361 U.S. at 217 ("a court cannot permit a defendant to be tried on charges that are not made in the indictment against him"); *United States v. Lee*, 359 F.3d 194, 208 (3d Cir. 2004) (indictment constructively amended when evidence, arguments, or the district court's jury instructions "effectively … broaden[s] the possible bases for conviction from that which appeared in the indictment.").

Constructively amending an indictment is a *per se* violation of the Fifth Amendment, and error is, therefore, presumed. *United States v. McKee*, 506 F.3d 225, 229 (3d Cir. 2007).[86]   It also is a violation of the "Sixth Amendment guarantee[ ] that criminal defendants be given sufficient notice of the nature of the charges in order to defend against them." *See United States v. Thomas,* 610 F.2d 1166, 1173 (3d Cir. 1979).

> 2.   *The Government constructively amended Counts Three and Four of the Indictment – the False Statement charges—during trial -- which is reversible error per se.*

In the Indictment, Counts Three and Four charge Mr. Bekkedam (and Mr. Hartline) with violating 18 U.S.C. § 1001 by "knowingly and willfully ma[king two specific] … materially false, fictitious and fraudulent statements and representations[.]"   ECF 1 (Indictment), at 12. This language parrots the statutory language in 18 U.S.C. § 1001(a)*(2).*

However, the Government's evidence – and the Government's argument – allege a completely different crime – false statements by concealment in violation of 18 U.S.C. § 1001(a)*(1)* – which contains different elements and requires different proof.  Caught between the

---

[86] *Relying on  United States v. Syme,* 276 F.3d 131, 154 (3d Cir. 2002), *United States v. Adams,* 252 F.3d 276 (3d Cir. 2001), *and United States v. Castro,* 776 F.2d 1118, 1121-22 (3d Cir.1985).

"rock" of having a concealment/omission case to present and the "hard place" of an indictment charging false statements, mid-trial, the Government tried to "fudge it."  Specifically, it averred the case was *both* "a false statements case" *and* a "concealment/omission" case – arguing that the false statement was calling the Levin, Bonomo and Gallub investments "capital" and the omission was doing so without telling the putative listener – Treasury – that they were funded by NOVA Bank loans.

Not only did the Government's argument to the jury belie that position, but the Government successfully opposed a defense effort to at least have an instruction outlining the statutory and precedential elements of a concealment/omission case.  Moreover, it successfully moved *in limine* to preclude questioning by the defense that would have been probative of a concealment/omission case.  Hence, as set out below: the grand jury indicted on a false statement charge; the Government presented evidence and argued concealment/omission; and the petite jury was instructed on a false statement charge – the latter of which has different and easier elements for the Government to prove.    This collection of errors and misdirection was compounded when – in its first request – the jury asked to see the portion of the jury charge that contained the elements of each offense.

> 3.   *The Government's position on Counts Three and Four advocated concealment and concealment alone.*

Notwithstanding the scope of the Indictment, the Government made clear its intention to present a case involving concealment, rather than false statements – as reflected during argument over motions *in limine*:

> [GOVERNMENT:] So when Mr. Hartline represents to the Treasury – and I believe it's December 15th of 2009 – that Nova has met the contingency, ***he is intentionally omitting a key fact***, which is $5 million of that that came from Mr. Levin may or may not ever come back[.]

*** 

[GOVERNMENT:] ***This really comes down to in a large sense an omission case***, that representing to the Treasury we have $15 million in new capital indicates wow, this bank is healthier -- …

[THE COURT:] Well, that's the theory all along, but what it sounds like –

[GOVERNMENT:] But the omission is I believe $8 million of that $15 million started at Nova Bank, went to the investor, went to Nova Financial Holdings, and came back to the bank. ***Omitting that fact is material***, and if done with an intent to defraud, proves that these defendants are guilty.

*** 

The relevance of that [Allan Shubin's testimony] is it goes to materiality, and this is going to come up I think in one of the later motions, the motion that we filed, that materiality is an objective standard, ***is this concealment***, the fact that the money started with the bank, *something that was capable of influencing a decision maker.* … Therefore, ***if these defendants concealed that fact with an intent to defraud, they're guilty***.[87]

Yet at no time prior to trial did the Government return to the grand jury to supersede the indictment with an 18 U.S.C. § 1001(a)(1) charge such that the evidence it planned to present would match charges a grand jury approved.[88]

During its opening statement, notwithstanding the Indictment, the Government revealed its true intentions to the jury:

You're going to learn that what these two defendants did was that they tried to make the bank seem stronger, and the way they did that is they engineered and orchestrated loans where the bank loaned money to individuals to supposedly invest in the bank, when in fact what happened was the bank's money got sent right back to the bank to make it look like there was $8 million of outside investor funds in the bank that would help keep the bank strong in case it was losing money. But in fact that money came straight from the bank itself.

***That's the fraud. The fraud is concealing from bank regulators***, …, representing to investors that the bank was strong, and ***failing to inform bank***

---

[87] Trial Tr. 65:23-66:2; 67:6-16; 78:18-23; 79:10-11 (Mar. 7, 2016) (emphasis added)

[88] This assertion is based on an assumption.  The defense does not, in fact, know whether the Government did, in fact, seek to supersede against Mr. Bekkedam and was refused by a grand jury.

*regulators* who were considering whether to provide funding to the bank, whether to provide $13 million to the bank, concealing from those people that $8 million of supposedly new money into the bank actually came from the bank itself.[89]

Indeed, the Government directly ties the alleged omission to the specific

allegation in Count 4:[90]

> You're going to hear that right around that time, December 15th, Mr. Hartline wrote to the FDIC, and that's where the information -- that's when he gave the information to and have it go up to the Treasury that Nova had met the contingency, that they had raised all $15 million. ***But what does he conceal? He conceals that*** $8 million of that is money that came from the bank itself. ***He conceals*** from the bank that the $5 million loan to Mr. Levin, which maybe seemed like it was a good idea back in June, maybe didn't, well, now Mr. Levin is not really in a position to pay that back. Nonetheless, he represents to the Treasury that they've raised all $15 million, ***concealing the truth from the Treasury.***[91]

---

[89] Trial Tr. 4:13-5.8 (Mar. 29, 2016) (emphasis added).  The Government continued:

But ***the fraud here is that Mr. Hartline concealed the truth. He hid from the regulators*** that $8 million of that 15 million was the bank's own money. Mr. Hartline did that because he knew that if the regulators found out that the money came from the bank itself, that didn't make the bank any stronger. That's something they would want to know, and that's what makes this fraud. ***What makes this a fraud is concealing the truth from regulators.***

\*\*\*

That's because ***these defendants wanted to conceal the purpose of the loan*** from the bank and then ***ultimately from bank regulators***, to make sure they wouldn't know that the bank's own money was being used here to prop up the bank. ... [Y]ou're going to hear that ***the concealment continued to the Pennsylvania Department of Banking and the Federal Reserve*** when it came to Mr. Levin's application, that one of the questions that the bank regulators asked was, where's your money coming from to invest in the bank?

\*\*\*

Ladies and gentlemen, at the end of this trial, you will have seen and heard a lot of evidence. ... You're going to look at what these two defendants did and ask yourselves why, why engage in these transactions, and ***why conceal these transactions from regulators*** and from investors.

Trial Tr. 10:5-16; 12:7-10, 13-17; 24:13-23 (Mar. 29, 2016) (emphasis added).

[90] Count Four avers that on December 15, 2009, "BRIAN HARTLINE told the Department of Treasury that NOVA had raised $10 million of new capital, including a $2.5 million investment by A.B. and a $500,000 investment by C.G."  ECF 1, at 12.

[91] Trial Tr. 4:13-5:8; 10:5-16; 12:7-10, 13-17 (Mar. 29, 2016) (emphasis added).

Additional commentary in the opening statement about "concealment" pertained to an effort to continue the scheme with a cover-up to the bank's lawyer (*id.,* at 21:15-19) and the bank's auditor (*id.,* at 22:20-24:1).

When the Court, during trial at a break in the Allen Shubin testimony, confronted the Government about how it was proceeding under 18 U.S.C. § 1001, the Government tried to walk away from the fact that it had constructively amended the indictment:

> [THE COURT:] Is it the government's position that the actions here were either omissions or false statements --
>
> [GOVERNMENT:] Yes.
>
> [THE COURT:] -- or both?
>
> [GOVERNMENT:] It's both, actually, Your Honor.[92]

The assertion notwithstanding, the Government's statements during that very colloquy confirm that there was no possible violation of 18 U.S.C. § 1001 without the omission, *e.g*:

> We're arguing to the jury is that these defendants engaged in a scheme to defraud the United States by making the bank -- … appear to be stronger than it was. … ***The question is, did they omit a material fact to the Treasury. … They would have violated the law and how because by failing to disclose to the Treasury*** that $8 million in this new capital was money that the bank had loaned.
>
>         \*\*\*
>
> I think it's quite clear right now that that the ***defendants failed to inform the Treasury of a fact that would be important to the Treasury*** in determining whether the bank is viable. So the real issue in this case is did either defendant have an intent to defraud. ***Was this a mistake*** that I didn't realize that anyone would want to know that? ***Or was there an attempt and an effort to conceal this from regulator[?]***
>
>         \*\*\*
>
> Mr. Hartline reported to the FDIC, we've gotten $5 million of new capital from Mr. Levin. Mr. Hartline reports in December of 2009, "We've met the contingency by raising the additional $10 million." ***What he omits both times***

---

[92] Trial Tr. 117:18-24 (Apr. 13, 2016).

is that $5 million from Mr. Levin was a loan from NOVA Bank and $3 million of the initial 10 million were loans from the bank. The loan itself, regardless of the accounting treatment, is something that the regulator would want to know. … It's something that's capable of influencing their decision.

<center>***</center>

So ***the question now becomes did either defendant have an intent to defraud the Treasury by neglecting and concealing -- neglecting to mention and concealing from regulators*** that Mr. Levin had a $5 million loan.[93]

And the Government continued to pound away at a concealment theory – and exclusively a concealment theory – in its closing argument – *e.g.*:

> ***The bank is trying to conceal*** that it has used its own money to make it healthier. It's like putting lipstick on a pig, you know that old saying, it doesn't make it any better. The bank is not healthier.
>
> <center>***</center>
>
> Now, *when it comes to* ***whether this fact was concealed, deliberately concealed,*** there's nothing more powerful than the change in control applications.

Trial Tr. 9:21-23; 21:22-24 (Apr. 19, 2016) (emphasis added).[94]   And likewise in its rebuttal,

*e.g.*:

---

[93] Trial Tr. 113:3-15, 19-25; 114:11-19; 118:2-14; 118:24-119:3 (Apr. 13, 2016). (emphasis added.)

[94] The Government's argument continued:
> [In discussing the 2012 Hartline deposition:] Because he knows he's already lied about it. He knows ***they already concealed the fact***, the whole purpose of the Levin loan since June of 2009, and now he's got to maintain that lie. He's got to keep concealing it.
>
> <center>***</center>
>
> These are not trick questions. Why is the truth so difficult to respond to on these questions, ladies and gentlemen. Because ***they've already concealed*** the fact that the $5 million loan was made and put back into the bank to invest in NOVA. And they know that all the regulators are keeping track.
>
> <center>***</center>
>
> Ladies and gentlemen, every time they're concealing it, ***every time they make a conscious and deliberate effort to conceal it, that is fraud***. That's fraud. That's a crime.
>
> <center>***</center>
>
> Now again, going back to the concealment and what Mr. Bekkedam knew as they're going and trying to answer this very difficult question from Ms. Metcalf about is any portion borrowed[.] … But after the good news from the Treasury on August 25th, ***they know they have to continue on with the concealment[.]***

Trial Tr. 20:10-14; 23:18-24; 28:7-10; 31:11-21 (Apr. 19,2016) (emphasis added).

<center>55</center>

So the questions for you are what information is capable, it doesn't have to actually influence the decision-maker, but what information, ***what omissions, what half-truths could potentially influence people involved in that decision-making process.*** [95]

> 4. *Constructively amending Counts Three and Four substantially lessened the burden on the Government to prove its case, relieving it of the obligation to prove – among other things—that the Defendants had an affirmative duty to disclose to Treasury that NOVA loaned the investors the funds.*

Both the statute itself and the courts' interpretations of 18 U.S.C. § 1001 have made it clear that § 1001(a)(1) concealment is a very different crime than a § 1001(a)(2) false statement crime.  At its core, "concealment must be accomplished in a particular way: by a 'trick, scheme, or device.'"  *United States v. Safavian*, 529 F.3d 957, 965 n.8 (D.C. Cir. 2008) (relying in part on *United States v. Woodward,* 469 U.S. 105, 108 (1985)); *United States v. Curran*, 20 F.3d 560, 566 (3d Cir. 1994).

Essential here is that, to convict a person on a concealment theory, the Government must prove that the accused had an affirmative "legal duty to disclose" the material facts "at the time he was alleged to have concealed them."  *Curran,* 20 F.3d at 566 (defendant who paid back his employees when they made campaign contributions in their name rather than his had no legal

---

[95] Trial Tr. 33:15-34:5 (Apr. 20, 2016) (emphasis added).The rebuttal continues:
> So then ask yourselves would the people involved in making a decision about whether to invest in Nova Bank want to know that Mr. Levin borrowed $5 million as opposed to simply investing it. Which would make the bank seem stronger, Mr. Levin taking money that he may or may not have from the outside or Mr. Levin getting a $5 million loan that the regulators weren't aware of when they had previously evaluated Nova Bank***. Is that something they would want to know?***
>
> <div align="center">***</div>
>
> Is there any reason to engage in that transaction other than to make the bank look stronger? If this is all open and above board as defense counsel suggests in their closings, why hide it? ***Why conceal the truth from regulators?*** The difference is that the regulators care.
>
> <div align="center">***</div>
>
> Ask yourselves why the bank documents, the risk assessment summaries that the bank uses to make a determination about whether to make a loan don't show the true purpose of any of these loans. If this is all reasonable and maybe these defendants are confused about what the Treasury might want***, why conceal the truth?***

Trial Tr. 16 36:1-5; 37:3-9 (Apr. 20, 2016) (emphasis added).

duty to disclose the source of the contributions to the Federal Election Commission, so no "concealment" liability under § 1001); *see also United States v. Gimbel,* 830 F.2d 621, 626 (7th Cir. 1987) (Currency Transactions Reporting Act Form did not require bank to report the defendant's structured transactions; therefore since there was no duty for the bank to disclose that fact according to the form; defendant could not be convicted of 18 U.S.C. § 1001 by virtue of 18 U.S.C. § 2(b) for "causing the bank to fail to disclose a material fact").[96]

There simply was no such duty for Mr. Hartline, NOVA Bank or NOVA Financial to disclose the fact that the capital investments of Levin, Bonomo, and Gallub were funded, initially, by loans from NOVA Bank. The Government presented no law or regulation, or any special obligation of NOVA to tell Treasury, or its conduits, about the loans in order to win TARP funding.

The Government tried to create the false impression that such a duty existed by proffering EITF 85-1. But cross examination of Mr. Shubin revealed two dispositive, irrefutable conclusions: that EITF 85-1 was a non-mandatory guideline, and to the extent that it created any obligation or duty upon the Bank to disclose, that duty was *to the auditors for the purpose of the audit*, not to Treasury or its conduits *for the purpose of NOVA's TARP application*.[97]   Even the Government admitted to the court – at sidebar – that not following EITF 85-1 "d[id]n't matter" and that violating EITF 85-1 was not tantamount to violating the law. Trial Tr. at 112:21-114:4 (Apr. 13, 2016). Whether the Government intended to do so or not, it made clear that EITF 85-1

---

[96] *Accord, e.g., Safavian,* 529 F.3d at 964-65; *United States v. Varbel,* 780 F.2d 758, 760–63 (9th Cir.1986) (same as *Gimbel*);  *United States v. Von Barta,* 635 F.2d 999, 1006–07 (2d Cir.1980) (non-disclosure not actionable under mail fraud statute absent some duty to disclose).

[97] Trial Tr. at  98:7- 98:23; 102:4- 109:12 (Apr. 13, 2016) (Shubin) (EITFs come from the "Emerging Issues Task Force" of the Financial Accounting Standards Board, and EITF  85-1 is a third level advisory guideline in the hierarchy of the GAAP – Generally Accepted Accounting Principles – and the purpose of GAAP is to assess the quality of an audit of the bank – *i.e.,* "we are auditing to make sure they [NOVA] comply with GAAP."  The point of EITF 85-1 was to show that the investments, because they were from loans, might better have been reported – in the Bank's accounting papers – as a reduction in shareholder's equity.).

did not create a duty to disclose to Treasury or its governmental proxies such that the omissions from the statements alleged in Counts Three and Four were actionable.

Likewise, regardless of whether statements made about the source of the Levin loan in the Change-in-Control application were true or not, the posing of that question in the Change-in-Control process did not create and cannot be seen as direct or circumstantial evidence of a legal duty to disclose the origin of the $5 million Levin investment *in the TARP application process*. And it is within the context of the TARP application process – and that process alone – that the grand jury charged the § 1001 violations to have taken place.

For instance, in *United States v. Safavian*, 529 F.3d 957 (D.C. Cir. 2008), the defendant was charged with a 1001 concealment violation for accepting a free plane flight to Scotland from infamous lobbyist Jack Abramoff.  Safavian, then chief of staff for the General Service Administration, sought an ethics opinion in advance of accepting the gift, and got clearance.  The government accused him of concealment during his communications with the Ethics Office because, while he said Abramoff did not do business with or seek to do business with GSA, the fact was Abramoff had made inquiries about two GSA properties at about the same time as the trip.  The D.C. Circuit reversed the conviction on the grounds that there was no "duty to disclose material facts *on the basis of specific requirements for disclosure of specific information*."  529 F.3d at 964-65 (emphasis added).  The Court explained why:

> There is good reason for demanding such specificity: to comply with Fifth Amendment due process, the defendant must have 'fair notice ... of what conduct is forbidden.... [T]his 'fair warning' requirement prohibits application of a criminal statute to a defendant unless it was reasonably clear at the time of the alleged action that defendants' actions were criminal.

*Id.* The D.C. Circuit concluded in *Safavian* that simply supplying information in the course of seeking an ethics opinion were but "vague standards of conduct for government employees[,]" which did not amount to a "legal duty to disclose." *See* 528 F.3d at 964.[98]

Applied to Mr. Bekkedam's case, if the grand jury had permitted the Government to try this as a concealment case, it would have had to prove that the TARP application process imposed upon NOVA a duty to disclose the source of the Levin, Gallub, and Bonomo investments – and there is no evidence that any such "specific requirement for disclosure of [that] specific information" existed. Relieved of that burden – the Government was permitted to try a "concealment" case using the less onerous elements and standards of proof of a "false statements" §1001 charge.

In doing so, the Government was able to get away with using testimony by government participants in the TARP process showing that they "would have liked to have known" that the source of the Levin, Gallub and Bonomo investments were NOVA loans.[99] Indeed, any doubt

---

[98] Of additional relevance, the *Safavian* court also rejected the Government's theory of concealment that "once one begins speaking when seeking government action or in response to questioning, one must disclose all relevant facts." Rather, the DC Circuit found that,

> The government cites no regulation or form or statute to this effect and the defense maintains that no such general principle exists. … Are we to suppose that once the client starts answering a government agent's questions, in a deposition or during an investigation, the client must disregard his attorney's advice or risk prosecution under § 1001(a)(1)? The government essentially asks us to hold that once an individual starts talking, he cannot stop. We do not think § 1001 demands that individuals choose between saying everything and saying nothing. No case stands for that proposition.

*Id*. By the same token, once the Bank gave information in support of its TARP application, that did not impose upon it a legal duty to disclose the source of the Levin, Bonomo, and Gallub investments.

[99] *See, e.g.*, Trial Tr: 93:23-25 – 94:1-8 (Mar. 29 2016) (Bertsch) (Q: Did you ever hear whether Nova Bank was going to loan any money to this investor/ A: I did not./ Q. Is that something you would remembered[sic]?/ A: I would have remembered, yes./ Q: Why is that?/ A: Because if – for regulatory capital there are rules stipulating what can qualify for capital, and the rules stipulate that a bank cannot be a source of the capital and cannot, directly or indirectly, lend the – money that becomes capital.); Trial Tr. 42:17-19 (Mar. 30, 2016) (Quill) (Q: [W]ould that have been the capital you were looking for, if it was loaned by the bank?/ A: No. It wouldn't count as capital.); Trial Tr. 103:18-24, 105, 113:9-18 (Mar. 30, 2016) (Koch) (Q: Okay. When Mr. Hartline told you that the bank had raised \$5 million as of June 30th, 2009, did he ever tell you that any of the \$5 million was borrowed?/ A: No./ Q; Did he

about the Government's impermissible strategy of trying a "concealment" case by the lower

"false statement" standard should have been erased during a side-bar colloquy during Mr.

Shubin's testimony about the scope of the EITF 85-1 cross, where the Government asserted

> [GOVERNMENT:] The question is[,] would the regulator have been interested in the fact that Mr. Levin borrowed the $5 million.

Trial Tr. 117:2-4 (Apr. 13, 2016).  Had the Government been forced to abide by "concealment"

standards, that would not have been sufficient to obtain a conviction, as "the regulator would

have liked to have known, and therefore Defendants are guilty" is a far cry from, e.g., "NOVA

had a specific duty to tell the regulators, and therefore Defendants are guilty."

> 5. *Had the Government been held to the obligation of proving a concealment/omission case, it would have opened the door for cross-examination that it intentionally – and successfully -- precluded in limine.*

To make matters worse, prior to trial the Government exploited the fact that the

Indictment charged § 1001 as a "false statements" case.  Specifically, it moved *in limine* to

preclude the defense from asking the regulators what they did and did not do in the course of

their evaluating the TARP application, arguing that this improperly would be "blaming the

---

ever tell you have any of the $5 million of these new capital was money borrowed from the bank?/ A: No….//Q: If the – I had asked you if Mr. Hartline told you that any of this $5 million, whether it was borrowed, or borrowed from the bank, and he never told you that, did he?/ A: No./ Okay. If he had told you that, is that something you would have told Mr. Hunter?..../Q; Was it important for you to know whether or not the money was borrowed?/ A: Yes, that would be important./Q: Okay. Was it important for you to know whether any of the money was borrowed from the bank?/ A: Yes.); Trial Tr. 34:15-22 (Apr. 8, 2016) (Hunter) (Q: Okay. Did anyone advise you that the $5 million that had been injected into the bank was money that was borrowed from the bank?/ A: No./ Q: Is that information that you would have shared with CPP Council or with Treasury?/ A: Yes, I would have – I would have shared that information.); Trial Tr. 94:12-25 and 95:1-3 (Apr. 8, 2016) (Course) (Q: Okay. And based on that information that you had did you – were you ever made aware that any part of the $15 million contingency was money that was borrowed from the bank?/ A: No, I did not have that information./ Q: Would that be information that was important to the CPP Council?... Q: Do you know whether or not the CPP Council ever considered that any part of the $15 million contingency was money that was borrowed from the bank?.../ A: The CPP Council did not explicitly discuss that because, as supervisors, we would have expected that would not have occurred.); Trial Tr. 128:6-12 (Apr. 8, 2016) (Gaunt) (Q: Okay. Mr. Gaunt, before sending out this letter, were you ever made aware that any portion of Mr. Levin's investment to purchase 24.2 percent of the shares of Nova Financial Holdings was money that was borrowed from Nova Bank?/ A: I was not aware of that./ Q: Okay. Would that be something that you would remember?/ A: I believe I would.)

victim" for any error the regulators might have made in failing to ask certain questions of NOVA.  ECF 131, at 3-7.  Indeed, the Government specifically argued that the defense be prohibited from

> any evidence or argument that an employee or agent of a financial regulator failed to do the required due diligence to avoid the fraud, such as by asking representatives of NOVA Bank whether NOVA had loaned any money to an investor to buy stock in the holding company … .

*Id.,* at 5.  Under this pretense, the Court granted the Government's motion.  Trial Tr. 178:23-179:2 (Mar. 7, 2016).

Had this been charged *by the grand jury* as a "concealment" case, however, such questions would have been fair game.  That is, if the Government had appropriately shouldered the burden of proving that NOVA had a duty to disclose the source of the Levin investments to the TARP reviewers as part of a true "concealment" case, it would have been completely legitimate to cross-examine the regulators with questions like, "You never directly asked NOVA what the source of the capital was, did you?" and, "Nowhere on the TARP application does it ask for the source, does it?" – and from there, argue to the jury, "how would the defendants know they had a legal duty to disclose that they intentionally avoided when no one ever told them they had a legal duty to disclose?" and the Government never proved that the Defendants had an affirmative duty to disclose the loans to TARP.  In other words, while the Court may have been correct in prohibiting these questions in a "false statements" case as it was charged, it surely would have been permissible in the "concealment" case the Government actually tried.  Yet rather than amending the Indictment before trial to allow a full and fair adjudication of the facts, the Government lay in wait and constructively amended, tying the Defendants' hands.

> 6. *Neither the Shubin testimony nor the Swartz testimony was probative of the issue of concealment, was highly prejudicial, and should have been prohibited <u>in limine</u>.*

61

The Third Circuit makes it clear that the duty to disclose the omitted facts must arise "at the time" the person was alleged to have undertaken the act of concealment. *Curran*, 20 F.3d at 566. Therefore, had the grand jury permitted the Government to prosecute Mr. Bekkedam under a "concealment" theory, it would have had to prove not only did a legal duty to disclose exist, but that it existed on June 30, 2009 (Count Three) and December 15, 2009 (Count Four).

By contrast, Mr. Shubin testified about statements made during an audit "the bulk of" which "would have been [conducted] in the March/April/May time frame of 2010."[100] Mr. Swartz testified that statements or omissions thereto with regard to the source of the Levin loan were made to him in February 2010.[101] Therefore, neither is probative of the Defendants being aware of a legal duty to disclose in June or December of 2009, or of a legal duty being created at the time of the interaction between NOVA/Mr. Hartline and either of these individuals.

Moreover, Mr. Bekkedam moved *in limine* to exclude the testimony of Mr. Shubin with regard to offering testimony as to "whether the Levin, Gallub and Bonomo loan-investments … should have been treated as capital or not, irrespective of whether it was a conclusion he reached in the 2010 time period, or a conclusion he reaches today." ECF 132, at 10. The Government responded,

> the determination by the outside auditor … that these loans should not have been counted in the bank's capital is relevant to show that Mr. Hartline's statements to the FDIC that NOVA had raised additional capital were false.

ECF 134, at 8-9. At argument, The Court denied Mr. Bekkedam's motion with regard to Mr. Shubin. Trial Tr. 85:9-12 (Mar. 7, 2016).

Similarly, Mr. Bekkedam moved *in limine* to prevent Mr. Swartz from testifying for the purpose (as the Government alleged in its Trial Memorandum) of showing Hartline failed to

---

[100] Trial Tr. 71:2-9 (Apr. 13, 2016).
[101] Trial Tr. 10:5-13:24 (Apr. 13, 2016)

"seek an opinion as to whether such a loan and stock purchase would satisfy the TARP contingency.'" ECF 132, at 11-12 (quoting from ECF 83, at 12-13). Specifically, Mr. Bekkedam argued that such testimony

> would create the factually and legally false impression that any failure [by Hartline] to [ask Swartz in February 2010 whether the Levin arrangement would satisfy the TARP contingency]was criminal or otherwise fraudulent.

ECF 132, at 12. In other words, Mr. Bekkedam argued that such testimony from Swartz would create the false impression that there was a duty of Hartline to disclose the source of the Levin loan to Swartz in February 2010.[102] The Government responded,

> the evidence will show that Mr. Hartline was not forthcoming to Mr. Swartz about the purpose of the loan to Mr. Levin, both while the TARP application was pending and when Mr. Hartline later sought an opinion letter.

ECF 134, at 12. The Court denied Mr. Bekkedam's motion with regard to Mr. Swartz.[103]

     With regard to both of these motions, the Government argued that the evidence we sought to exclude was probative of a "false statements" version of § 1001. Had Mr. Bekkedam been given fair notice that the Government actually was proceeding on a "concealment" theory under 18 U.S.C. § 1001(a)(1), the testimony of Shubin and Swartz would have been revealed to be less probative and more prejudicial. Indeed, in its response to the Swartz motion, *the Government admitted as much* – saying that Mr. Hartline's concealment of the purpose of the loans from the auditor "is not admissible against [Mr.] Bekkedam." ECF 134, at 9 n.1. If the Government had sought to amend the § 1001 charges prior to trial, rather than constructively amend during trial, this testimony would have been excluded.

> *7. The Government opposed Mr. Bekkedam's request for an instruction consistent with a charge of violating 18 U.S.C. § 1001 by concealment/omission, and his request was denied.*

---

[102] *See also* Trial Tr. 96:4-13; 103:21-104:5 (Mar. 7, 2016) (hearing on the motion).

[103] Trial Tr. 103:21-104:5 (Mar. 7, 2016).

Citing *Curran,*[104] the defense requested an instruction that covered both the "false statements" and "concealment" approach to § 1001:

> Section 1001 proscribes two different types of conduct: concealment of material facts (also known as omissions) and false representations. ... In order to convict under a Section 1001 concealment charge, the government must show that a defendant had a legal duty to disclose the facts at the time he was alleged to have concealed them.

The Government completed its misleading strategy of constructively amending the § 1001 charges from "false statements" to "concealment" while not simultaneously shouldering the very exacting – and different – burden that conviction for a concealment crime requires by opposing even this request.  The Court agreed.  Despite the fact that, at a minimum, the Government directly told the Court just a few days earlier that it was proceeding as "both" a false statements and an omissions/concealment case[105] the Government refused to let the jury be instructed on a path to acquittal for Mr. Bekkedam.

Failing to give a correct instruction may be a basis for a new trial pursuant to Rule 33 when that failure results in a defendant being tried according to erroneous legal principals, or otherwise threatens a miscarriage of justice.  *E.g., United States v. Patillo,* 431 F.2d 293, 298 (4th Cir. 1970) (incorrect willfulness instruction vitiates conviction for threats against the President).  For instance, in *United States v. Knight*, the defendant was entitled to a new trial because the instruction ran the risk that the jury convicted defendant based on an uncharged false statement – *i.e.,* he was charged with making one false statement, and the instruction was defective because it left room for being convicted for making a different one.  800 F.3d 491, 512 (8th Cir. 2015).  In Mr. Bekkedam's case, he was convicted for one kind of false statement – aiding and abetting a concealment – when he was charged with a different one – aiding and

---

[104] 20 F.3d 560, 566 (3d Cir. 1994)

[105] Trial Tr. 117:18-24 (Apr. 13, 2016)

abetting Mr. Hartline in making affirmative false statements to TARP about raising capital and meeting capital thresholds. This failed instruction alone is sufficient; but coupled with the fact that it came about as the result of a constructively amended indictment, it is error *per se*.

### B.   The Government Failed to Prove Actus Reus with Regard to Counts Two, Three and Four

> *1.   The Government's Failure to Rule Out All Innocent Explanations For Mr. Bekkedam's Alleged Acts Means that it Failed to Prove that the Statements were False.*

Even under a proper (*i.e.,* as-charged) "false statements" theory of 18 U.S.C. § 1001, for both Counts Three and Four, the Indictment charged and the Government argued that to call the Levin/Gallub/Bonomo loan-funded investments "capital" was a lie – a statement that was knowingly (to defendants) false. However, the Government did not present any evidence showing that – for the purpose of qualifying for CPP funds under the TARP – any formal definition of "capital" that excluded an investment funded by a loan from the bank in whose holding company the money was invested. While numerous regulators said it might have been "important" to know that the Levin/Gallub/Bonomo investments were funded by a NOVA Bank loan,[106] no one testified that, as a matter of CPP/TARP "law," this could not count as "capital."

But when an Indictment charges § 1001 using a statement that is not factually, objectively false, but rather is ambiguous and subject to interpretation, the burden is on the Government to rule out any and every reasonable interpretation that would view the statements as true – *i.e.,* not-false:

> In a case where the truth or falsity of a statement centers on an interpretive question of law, the government bears the burden of proving beyond a

---

[106] *E.g.,* Trial Tr. 93:23-25 (Mar. 31, 2015 (Bertsch); Trial Tr. 113:9-18 (Mar. 30, 2016) (Koch); Trial Tr. 34:15-22 (Apr. 8, 2016) (Hunter); Trial Tr. 94:12-95:3 (Apr. 8, 2016) (Course).

reasonable doubt that the defendant's statement is not true under a reasonable interpretation of the law.

*United States v. Whiteside*, 285 F.3d 1345, 1351 (11th Cir. 2002). In *Whiteside*, for instance, the defendants were hospital administrators charged with violating 18 U.S.C. § 1001 by way of 18 U.S.C. § 2 by making false statements to the Medicare program by virtue of how it *characterized a loan* the hospital had taken out, and the effect it had on whether and the extent to which the interest on that loan should be treated as a Medicare-involved-offset or not. That is, if the interest was treated as "*capital related*" Medicare "reimburses [them] in a different manner, and as a result, these costs are more financially beneficial to the provider[ ]" than it would if the interest had been characterized otherwise. *Id.* at 1347 (emphasis added).

The Eleventh Circuit reversed the conviction, finding "the government failed to meet its burden of proving the *actus reus* of the offense." *Id.* at 1352. It concluded, "The government cannot meet its burden in this case because, despite its contention to the contrary, no Medicare regulation, administrative ruling, or judicial decision exists that clearly requires interest expense to be reported in accordance with the original use of the loan" – *i.e.,* as "capital-related." *Id.*[107]

Likewise, in Mr. Bekkedam's case, the Government has failed to show a *TARP* or *CPP* rule saying that the loan-investments could *not* be treated as capital. Quite to the contrary, the

---

[107] *See also United States v. Bryant*, 556 F. Supp.2d 378, 443 (D.N.J. 2008) ("There is case law, albeit not in the Third Circuit, directly supporting the proposition that an ambiguous contract cannot serve as the basis for a criminal prosecution when an element of the offense is predicated on a violation of the contract."); *Accord United States v. Calhoon,* 97 F.3d 518, 526 (11th Cir.1996) (noting that even though the Medicare regulations were clear regarding the royalty fees paid to a related party, the government failed to establish as a matter of *fact* that the fees claimed were actually in excess of what was clearly allowed under the regulations, and thus, had "failed to sustain its burden to prove the claim false by virtue of the non-reimbursable nature of the interest"); *United States v. Migliaccio,* 34 F.3d 1517, 1525 (10th Cir.1994) (holding that the government bears the burden to negate any reasonable interpretations that would make the defendant's statement correct); *United States v. Johnson,* 937 F.2d 392, 399 (8th Cir.1991) (one cannot be guilty of a false statement beyond a reasonable doubt when his statement is a reasonable construction); *United States v. Race,* 632 F.2d 1114, 1120 (4th Cir.1980) (same);*United States v. Barsanti,* 943 F.2d 428, 432 (4th Cir.1991) (following *Anderson* and *Race* ); *United States v. Anderson,* 579 F.2d 455, 460 (8th Cir.1978) (same); *United States v. Dale,* 991 F.2d 819, 832–33 (D.C. Cir.1993) (adopting *Anderson* and *Race* ).

jury heard – from the mouths of government witnesses – evidence suggesting that they possibly, nonetheless *could* be treated as capital for the purposes of TARP and the CPP:

- John Quill, who represented the Office of the Comptroller of Currency on the CPP Council, testified that a loan is an asset that can be put on a balance sheet of the lending bank – Trial Tr. 44: 1-4, 55:15 - 16 (Mar. 30, 2016).

- Kevin Bertsch, who represented the Federal Reserve Board on the CPP Council, testified that a loan is an asset – Trial Tr. 89:1-2 (Mar. 29, 2016).

- KPMG's Allen Shubin acknowledged that "in very limited circumstances when there is substantial evidence of ability and intent to pay within a reasonably short period of time," a note may count as an asset – Trial Tr. 107:20 -109:12, 142:24-146:6 (Apr. 13, 2016). Indeed, these very circumstances seemed to have existed for the loan/investments in question. For each of the loans at issue, the borrowers represented that they each had a net worth well in excess of the amount borrowed (as documented by their financial statements submitted with their loan packages) – *see* GV 301 (Levin loan documents); GV 304 (Bonomo loan documents) – and that they did not intend the loans to be long-term – *see* GV 43 (Levin loan matures in 12 months); GV 143 (second Gallub loan matured within 24 months).

- NOVA CFO Jeff Hanucsin – the man who filled out NOVA's TARP application – testified that *he* thought it should be counted as capital, and that he maintained that position even after KPMG conducted and reported

its audit -- Trial Tr. 131:12-16 (April 6, 2016), 27:8-23; 65:2-12 (April 7, 2016).[108]

- And William Gaunt, the then (in 2009) Assistant Vice President of the Federal Reserve Bank of Philadelphia "with responsibility for applications that were filed with the Reserve Bank" – who received NOVA's TARP application and who was involved in processing part of it, agreed that he thought it was "complicated." Trial Tr. 115:22-24; 116:15-117:25; 145:6-7 (April 8, 2016).

Indeed, even the Government admits that there was no "hard and fast" rule about "capital"– even when EITF 85-1 is (incorrectly) seen as a proxy. During a sidebar about Mr. Shubin's testimony, the Government conceded that at most the EITF shows that not counting the loan as capital is only "*generally* done one way." Trial Tr. 112:10-14 (April 13, 2016) (emphasis added). Even the Government could not point to anything that made NOVA calling the money capital *per se* false – all it could say was that the fact of the loans was something the regulators would have wanted to know, and was thereby material. *See id.* at 113:16-114:14.

The Government was incorrect in stopping there. The Government failed to rule out whether, under any circumstances it would be a reasonable conclusion that – in the eyes of TARP's CPP program – the investments could, in fact, be treated as "capital." This should not come as a complete surprise, because evidence indicated that the TARP was a program without fixed standards against which to measure an application for CPP funds. For instance, Lisa Koch of the FDIC acknowledged that different banks – *e.g.,* big banks versus small banks – faced

---

[108] According to FDIC's Lisa Koch, Hanuscin was one of her two main contacts at NOVA regarding the TARP application process. S*ee* Trial Tr. 73:7-9 (March 30, 2016) (Koch).

different TARP application processes, and that there was no precedent for a program like TARP, with no protocols in place.  Trial. Tr. 170:14-173:3 (March 30, 2016).  Therefore, as a matter of law, the Government failed to prove beyond a reasonable doubt that the statements alleged in Counts Three and Four were false.  As a result,  Mr. Bekkedam could not, as a matter of law, have aided or abetted any false statements.

> 2.   *The Government Failed to Prove that the Statements – False or Not – Were Material – as applied to Counts <u>Two</u>, Three and Four.*

The  Government's  aforementioned  reliance  on  the  testimony  of  certain  federal  bank regulators that it would have been "important" for them to know that the Levin/Gallub/Bonomo investments in NOVA Financial were from NOVA Bank loans to prove materiality – *i.e.,* capable of influencing Treasury – fails on two grounds.

First, of all the federal bank regulators questioned, the only one who was not asked if it would have been "important" to know about the loans was the one whose insight might have mattered.  That is, the question was never posed to Theodore Schaffner, the Department of Treasury's Director of the CPP at the time – and the only regulator from Treasury the Government called to testify.

Second, for the purpose of materiality under both § 1001 False Statements and § 1031 TARP Fraud, that it might have been "important" to these other bank regulators is insufficient. The Second Circuit's opinion in *United States v. Rigas* (a bank fraud case) makes clear that just because a variable "mattered" to a decision-maker, on its own that only makes that variable "relevant" and not necessarily "material" such that a fraud conviction can be obtained.  490 F.3d 208, 234-35 (2d Cir. 2007).  And in its *United States v. Litvak* ruling, the Second Circuit applied this logic to one of the few – if only – published enunciations about "materiality" for TARP

approval purposes, as applied to charges under 18 U.S.C. § 1031.  Litvak was convicted of TARP Fraud and False Statements (among other counts) for a series of acts related to misrepresentations to counter-parties in reverse mortgage-backed securities transactions.  Some of the counter-parties were Public-Private Investment Funds (PPIFs) – another program whose funds came from Treasury and TARP as part of the Emergency Economic Stabilization Act.  *See generally* 808 F.3d 160 (2d Cir. 2015).  Applying *Rigas*, the *Litvak* court found that even if statements might have "mattered" to some of the *non*-Treasury Department partners in the PPIF program, that did not amount to "materiality" *vis a vis* Treasury when the evidence adduced shows that the layers between the statement-making defendant and Treasury constrained and confused what information reached *Treasury* in this decision-making process.  *See id.* at 174. The convictions were reversed.

Considering that "matter" is not necessarily enough for "material," and that the wrong persons were asked the potentially dispositive question, it is clear that the Government once again failed to shoulder its burden, but instead misdirected the Court and the jury into believing that a lesser standard applied.  Therefore, given that the incorrect standard was argued and (presumably) applied, there can be no proof that "materiality" was satisfied, and therefore no conviction on these grounds may stand, as well.

### C. Failure to Instruct the Jury on the Specific False Statements Charged in the Indictment Means They Could Not Have Reached a Unanimous Verdict About Them.

Counts Three and Four of the Indictment charge Mr. Bekkedam with aiding or abetting the making of two very specific false statements to United States government employees pursuant to 18 U.S.C. § 1001:

| COUNT | DATE | DESCRIPTION |
|-------|------|-------------|

| Three | June 30, 2009 | BRIAN HARTLINE told, and directed employees of NOVA to tell, the Department of Treasury that NOVA had raised $5 million of new capital through an investment by G.L. |
| Four | December 15, 2009 | BRIAN HARTLINE told the Department of Treasury that NOVA had raised $10 million of new capital, including a $2.5 million investment by A.B. and a $500,000 investment by C.G.[109] |

Significantly, the Indictment alleges that Mr. Hartline made two specific, separate statements with "each statement or representation constituting a separate count" – and therefore Mr. Bekkedam was charged with two separate counts of aiding or abetting.

The Court's instruction to the jury regarding the elements of a false statement charge similarly indicated that each charge must relate to a specific statement:

> In order to prove the Defendant guilty of the crime charged, the Government must establish beyond a reasonable doubt that, first, on or about the specific date the Defendant made a statement or representation.[110]

The Court's instruction underscored that a charge of false statement must relate to a particular statement made "on or about the specific date."  Moreover, the fact that Mr. Bekkedam was charged with two separate counts of false statements further confirmed that each count must relate to a separate and distinct alleged statement.

But the jury was not instructed as to the specific false statements, nor even with the date of the false statements[111] – and therefore, not of that which Mr. Bekkedam was charged with aiding or abetting.  Thus the risk is that the jury did not convict Mr. Bekkedam of aiding or abetting any of the actual statements charged, or that the jury did not reach a unanimous verdict about which statement was the false one.  This violates Mr. Bekkedam's Due Process and Double Jeopardy rights under the Fifth Amendment.  *See United States v. Starks,* 515 F.2d 112,

---

[109] Indictment, p. 12, para. 2.
[110] Trial Tr. 105:7-11 (Apr. 20, 2016).

[111] *But see* Trial Tr. 104:15-108:10 (Apr. 20, 2016).

116-17 (3d Cir. 1975) ("that a general verdict for a defendant on that count does not reveal whether the jury found him not guilty of one crime or not guilty of both"); *accord Leary v. United States,* 395 U.S. 6, 31-32 (1965) ("It has long been settled that when a case is submitted to the jury on alternative theories the unconstitutionality of any of the theories requires that the conviction be set aside.").

> ### D. Moreover, the Same Failure to Instruct on Specific Statements Resulted in Multiplicative Convictions in Both Counts Three and Four, as Well.

Furthering the confusion of the absence of precise jury instructions with regard to Counts Three and Four is that it permitted – in the jury's eyes – Counts Three and Four to look exactly like Counts One and Two. Hence the multiplicity that Mr. Bekkedam warned against in prior pleadings[112] – when a conviction requires proof of the same facts across counts[113] -- was realized, and Mr. Bekkedam's rights under the Double Jeopardy Clause of the Fifth Amendment correspondingly violated. [114]

Specifically, in Counts One and Two the Indictment alleges that the Defendants violated 18 U.S.C. § 1031 by executing a scheme for the purpose of obtaining money for NOVA from TARP. The Indictment alleges that they did so by making false statements about the bank's capitalization. Under the statute, the only recipient of those false statements and omissions that matter for the purpose of Section 1031 is Treasury.

---

[112] *See Defendant Barry Bekkedam's Motion to Dismiss Each Count of the Indictment for Legal Insufficiency.* ECF 41-1, at 21-22.

[113] *See Blockburger v. United States,* 284 U.S. 299, 304 (1932) ("[W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not."). *Eberling v. Morgan,* 237 U.S. 625 (1915); *United States v. Antrobus,* 191 F.2d 969, 972 (3d Cir. 1951) (*Eberling* requires "same evidence" test to determine if one offense has been charged in several counts of an indictment under different criminal statutes).

[114] *See Ball v. United States,* 470 U.S. 856 (1985) (holding that defendant could not suffer multiple convictions or sentences for same set of acts); *United States v. Ogba,* 526 F.3d 214 (3d. Cir. 2008) ("A challenge to multiplicity invokes the Double Jeopardy Clause, which protects against multiple punishments for the same offense.").

In Counts Three and Four, which adopt the factual allegations contained in Count One,[115] the Indictment alleges that the Defendants violated 18 U.S.C. § 1001 by making false statements to the Government in a matter within the jurisdiction of Treasury by telling Treasury that NOVA was capitalized to Treasury's requirements when, in fact, they allegedly knew it was not. Without the specific instructions as to what differentiated Counts Three from Four, there was no differentiation presented to the jury between, on the one hand, Counts Three and Four and, on the other, Counts One and Two.  In short, the Government charged the defendants with the same crime twice, and now has convicted Mr. Bekkedam twice of the same crime.  Counts Three and Four must be stricken.

## V.        GROUNDS FOR RELIEF APPLICABLE TO COUNT THREE, ONLY

Count Three of the Indictment alleges that on or about June 30, 2009,

> Mr. Hartline told, and directed employees of NOVA to tell, the Department of Treasury that NOVA had raised $5 million of new capital through an investment by [Levin].[116]

In addition to the reasons set forth, *supra*, which apply to both Counts Three and Four, the Court also should grant a new trial for Count Three because there was no evidence that the statement alleged in the Indictment ever was made – and certainly no evidence that Mr. Bekkedam aided or abetted the making of such a statement. [117]

---

[115] "Paragraphs One through Eleven and Thirteen through Twenty-Eight and Overt Acts One through Ten of Count One of this indictment are incorporated herein."  Counts Three and Four, ¶ 1.

[116] Indictment (ECF 1), at 12, para. 2.

[117] While the Indictment actually charges both Mr. Hartline and Mr. Bekkedam as both principals and aider and abettors, the jury instructions clarify that the Government was treating Mr. Hartline as the principal and Mr. Bekkedam as the aider and abettor.  Trial Tr. 108:11-109:3 (April 20, 2016).  However logical this rationalization of the Indictment might be, is not for the Court to make, and the Government must live with the imprecise and unconstitutional charging in the Indictment for which it is solely responsible, as challenged pre-trial by the defense. *See* ECF 41-1.  Such a substantive amendment of the Indictment is impermissible and should also be the basis for the acquittal of each Mr. Bekkedam and Mr. Hartline on Count Three.

### A.  The False Statement Alleged in Count Three Fails on Duplicity Grounds

The false statement the Indictment alleges in Count Three actually is *two* (or more) false statements – one alleging that Mr. Hartline told Treasury about $5 million of new capital; "and" a second one alleging that he directed employees to tell Treasury about $5MM.  Because this conjunctive phrase gave the jury two different ways to convict Mr. Bekkedam of aiding or abetting these false statements, there is no way to tell whether the jury reached a unanimous verdict on which one he aided or abetted – violating his Due Process Clause rights.  *United States v. Starks,* 515 F.2d 112, 116-17 (3d Cir. 1975) (noting that the "vice of duplicity Is that a general verdict for a defendant on that count does not reveal whether the jury found him not guilty of one crime or not guilty of both").

### B.  The Government Presented No Evidence of the Alleged False Statement.

While Count Three in the Indictment presented two different ways for the jury to convict on Count Three, the Government did not present evidence of either, yet still obtained a conviction.  Specifically, during the trial phase, the Government:

- did not present a statement made on June 30, 2009 by *anyone* –let alone *both* Mr. Hartline *and* NOVA employees;

- did not present a statement in which *either* Mr. Hartline *or* NOVA employees told *anything* to Treasury – let alone that Mr. Hartline told NOVA employees to say anything to Treasury; and

- did not present a statement in which *either* Mr. Hartline *or* NOVA employees referred to the $5MM being from or related to George Levin, or referring to the money as "capital".

Rather − after the close of evidence − the Government tried to meet its burden by bootstrapping GV 57 in its place.  Presenting a slide of GV 57, with "**Count 3"** super-imposed on it, the Government argued that the

> lie that [Hartline] told went back to June 30th of 2009 when he told Lisa Coke, when Lisa Coke [sic] is told that NOVA got a 5 million capital infusion on 6/30, 2009. It's not capital, ladies and gentlemen, it's a loan.  . . . This . . . is Government's Exhibit 57.[118]

GV 57, however, is not a communication from *either* Mr. Hartline *or* a NOVA employee to anyone − let alone the Treasury.  It is a one-line email from Lisa Koch of the FDIC to Chuck Hunter of the FDIC on July 2, 2009, advising him,

> I just want to let you know that Nova got a $5 million capital infusion on 6-30-09.

The Government presented no evidence of how or when Koch received this information.  Koch testified that at some point, on a date that she could not be sure of, Mr. Hartline told her that "NOVA" had "raised $5 million" and that it was "in escrow".[119]  The Government attempted to refresh her recollection as to the date of the communication with Mr. Hartline, by showing her GV 57.  But Koch never clarified when she had the purported conversation with Mr. Hartline.[120]  Even if Mr. Hartline did communicate to Koch on June 30, 2009, there is no evidence presented that Hartline's statement was about George Levin and, during her testimony, Koch did not say that Hartline had referred to the money as "capital."  Rather, the reference to "capital" was her characterization.  Hence neither GV 57 or the Koch testimony about it amount to the statement alleged in Count Three of the Indictment.

---

[118] Trial Tr. at 20:15 − 21:2 (Apr. 19, 2016) (Gov. Closing Argument).

[119] Trial Tr. at 101:12 − 102:4 (Mar. 30, 2016) (Koch) (indicating that on a date she could not be sure of Mr. Hartline advised her that NOVA Financial had received $5 million from Levin on June 30, 2009, and the funds were in escrow).  Even after reviewing GV 57, Koch provided no testimony of the date on which the alleged statement from Mr. Hartline occurred.

[120] *Id.*

### C. Even If Such a Statement Was Made, It Was Not False – Despite the Government's Mischaracterization of it As Such.

There is no evidence that Mr. Hartline or whomever allegedly communicated this information to Ms. Koch at the FDIC told her it was – or that the Bank was considering it to be – "new capital."  Rather, when Koch was questioned about GV 57, she testified that she had a conversation with Mr. Hartline at an undetermined time and that Mr. Hartline told her that "they had $5 million" and "that it was in escrow."[121]  Koch did not state that Mr. Hartline told her it was "new capital" as alleged in the Indictment – or even that it was "capital" at all.

Nor should the Government have been permitted to tell the Jury that it was, based on further testimony from Ms. Koch.  For according to Koch, funds in escrow, which is how she characterized the Levin funds during her testimony, are "contingent."[122]  The Government failed to present evidence as to whether or not funds in escrow can count as "capital" or "new capital."  Koch described funds in escrow as "available for them to put into capital." [123]  Thus, indicating that they are not likely capital, but Koch indicated that she did not know if "legally" funds in escrow could count as "capital" or not.[124]  So not only did the Government fail to present evidence of the statement alleged in the Indictment, the purported statement that the Government did provide evidence of was not necessarily false and quite possibly literally true.  Literal truth is a defense to a § 1001 false statements charge.  *United States v. Castro*, 704 F.3d 125, 139 (3d Cir. 2013) ("[W]hen a statement is literally true, it is, by definition, not false and cannot be treated as such under a perjury-type statute, no matter what the defendant's subjective state of

---

[121] *Id.*

[122] Trial Tr. at 79:13 – 17 (Mar. 31, 2016) (Koch) (explaining "escrow");

[123] *Id.* at 100:10 – 101:6.

[124] *Id.* at 100:17 – 22.  Notably, Koch, as a seasoned FDIC employee, was not clear about the legal constructs of what could or could not constitute "capital" but Mr. Bekkedam, who lacks the significant training and experience of Ms. Koch is being held criminally liable for allegedly improperly classifying something as "capital."

mind might have been.").  So, too, is it a defense that the Government failed to rule out all reasonable explanations that would make this statement true.  *See* discussion *supra* of *United States v. Whiteside* and its progeny.

> **D.  Even If Such A Statement Did Occur, The Government Failed to Prove That It Was Material to Treasury Because There was No Evidence That Any Such Statement Ever Was Transmitted to Treasury.**

Theodore Schaffner is the only Treasury employee who testified at trial.  And he testified that he had no contact with anyone from NOVA Bank or NOVA Financial.[125]  He also had no recollection of receiving any information from the primary regulator, FDIC (*i.e.*, Lisa Koch's and Chuck Hunter's employer), regarding whether or not NOVA Financial had raised $5 million. The Government asked him several times and in several different ways, but he could not recall any communication from the FDIC indicating that NOVA Financial had raised $5 million.[126]

A statement cannot be "material" – *i.e.*, it cannot "have a natural tendency to influence, or be capable of influencing, the decision making body to which it is addressed," *see, e.g.,United States v. McBane*, 433 F.3d 344, 350 (3d Cir. 2005) --  if the statement never reached Treasury. Thus, the statement could not be material.[127]

> **E.  Even if the Statement was Made, There was No Evidence of Intent as Required by 18 U.S.C. § 1001.**

> *1.  There was no evidence of it being made for the purpose of misleading Treasury.*

---

[125] Trial Tr. at 40:11 – 14 (Mar. 29, 2016) (Schaffner).

[126] Trial Tr. at 42:11 – 43:15 (Mar. 29, 2016) (Schaffner) (indicating that he had no recollection of how the amount of the contingency changed from June 10, 2009, when the CPP Council made its recommendation, until August 20, 2009, when Treasury issued its preliminary approval); *Id.* at 43:25 – 44:4 (Schaffner indicating that he did not know if the FDIC advised NOVA Financial of the original proposed $15 million contingency); 44:9 – 44:17 ("Q: Do you know what NOVA Bank told the FDIC about its contingency? A: I don't.").

[127] *See* discussion *supra* regarding the effect on materiality and the improper variance or amendment to the Indictment when the Government improperly substituted false statements to the Treasury charged in the Indictment with false statements to the FDIC.

The Court instructed the Jury that a false statement had to be made "in a matter within the jurisdiction of the United States Treasury." Trial Tr. 105:15-17 (April 20, 2016). The Government, however, failed to provide evidence that Mr. Hartline, if he did make such a statement to NOVA Bank's primary regulator (FDIC – which is not a part of Treasury), and that it was made on June 30, 2009 – the end of a fiscal quarter – that he did so in order to influence Treasury or NOVA Financial's TARP application.[128] Hence, both as an act and in terms of *mens rea*, the use of GV 57 to satisfy Count Three fails.

> 2.    *There was no evidence that such a statement was made knowingly and willfully.*

Even if this statement by Hartline at a date unknown to a party that was not Treasury for purposes unknown did amount to the statement by NOVA employees alleged in Count Three – hard as all that may be to believe – the Government presented no evidence that this statement was made knowingly and willfully.

To establish a violation of § 1001, the Government must prove beyond a reasonable doubt that the statement was made with knowledge of its falsity. *United States v. Yermian*, 468 U.S. 63, 64 (1984). Setting aside whether that statement could have been false or not, a conviction requires proof of knowledge of the statement's falsity – not just by Mr. Hartline but by Mr. Bekkedam. *See United States v. Maury*, 695 F.3d 227, 261-62 (3d Cir. 2012) (regarding false statements, a defendant has to have "acted willfully, with knowledge of the statement's falsity, as opposed to ... innocently, unintentionally, or even negligently."). As discussed *supra*, rather than showing that Mr. Hartline and Mr. Bekkedam knew the statement to be false, the evidence showed that Mr. Hartline believed that the $5 million from Levin could count as

---

[128] Trial Tr. at 101:12 – 102:4 (Mar. 30, 2016) (Koch).

capital[129] and no evidence was presented to show that Mr. Bekkedam knew that the $5 million

could not count as capital.

### F. There Was No Evidence That Mr. Bekkedam Aided and Abetted the Making of Such a Statement on June 30, 2009.

In order to prove beyond a reasonable doubt that Mr. Bekkedam aided and abetted Mr.

Hartline in directing a NOVA employee to make this alleged false statement, the Third Circuit

requires "proof that the defendant … participated in [the substantive offense] as in something

that he wished to bring about, that he sought by his action to make it succeed." *United States v.*

*Garcia*, 238 F. App'x 821, 824 (3d Cir. 2007).  The Government must prove that Mr. Bekkedam

acted with the "specific intent of facilitating the crime" because "mere knowledge of the

underlying offense is not sufficient for conviction." *Id.*

The Government presented no evidence that Mr. Bekkedam was aware that anyone at

NOVA made a statement to the FDIC – let alone Treasury – on or about June 30, 2009, much

less that he "wished to bring [it] about."  To the contrary, the Government's case presented no

evidence that Mr. Bekkedam even knew of the proposed TARP contingency on or about June 30

2009.   Rather, the Government's evidence showed Mr. Bekkedam did not learn of the

contingency until August 29, 2009.[130]  Mr. Bekkedam could not have participated in something

that he knew nothing about.  For the intent must match the timing of the act for it to be a crime.

The Supreme Court recently affirmed as much in *Rosemond v. United States*, where it required

that a defendant charged with aiding and abetting drug crime involving use of a firearm to have

not just knowledge of a firearm, but

> advance knowledge —or otherwise said, knowledge that enables him to make the
> relevant legal (and indeed, moral) choice. When an accomplice knows beforehand

---

[129] Trial Tr. 22:6-23:9 (Apr. 7, 2016) (Hanuscin); Trial Tr. 156:15-158:22 (Apr. 13, 2016) (Shubin).

[130] GV 76 (email alerting Mr. Bekkedam to contingency and plan for raising additional funds to reach holding company status).

of a confederate's design to carry a gun, he can attempt to alter that plan or, if unsuccessful, withdraw from the enterprise; it is deciding instead to go ahead with his role in the venture that shows his intent to aid an *armed* offense. But when an accomplice knows nothing of a gun until it appears at the scene, he may already have completed his acts of assistance; or even if not, he may at that late point have no realistic opportunity to quit the crime. And when that is so, the defendant has not shown the requisite intent to assist a crime involving a gun.

-- U.S. --, 134 S. Ct. 1240, 1249 (2014).  Because the Government failed to prove that Mr. Bekkedam knew of the contingency requirement in advance of any purported June 30, 2009, statement, the Government failed to prove that Mr. Bekkedam had the requisite intent to aid and abet any such statement.

## VI.        GROUNDS FOR RELIEF APPLICABLE TO COUNT FOUR, ONLY

### A. The Government's Argument that the Statement Alleged in Count Four was Material was Misleading According to Its Own Evidence, and in Contravention of the Weight of the Evidence.

Count Four of the Indictment alleges the following false statement:

BRIAN HARTLINE told the Department of Treasury that NOVA had raised $10 million of new capital, including a $2.5 million investment by A.B. and a $500,000 investment by C.G.[131]

To support this count in trial, the Government relied on GV 140, which is an email from Mr. Hartline to Lisa Koch, copying Hanuscin, sent at 6:00 p.m., on December 15, 2009.  On its face this evidence does not support Count Four, as it was sent to a member of the FDIC, not Treasury. *See supra,* discussions of *Kwiat* and *Ismail*.   Notwithstanding, and without any further evidentiary support, the Government argued that because the statement was made to the FDIC, it eventually made its way to Treasury, and for the purpose of the TARP application -- therefore having the capability of influencing Treasury. [132]

---

[131] Indictment, p. 12, para. 2.

[132] Trial Tr. 41:3-8 (Apr. 19, 2016) (Gov. Closing Argument) ("Brian Hartline sends this false statement to Lisa [Koch]. First, I think it's important to note that he's asking that for her assistance in getting this to whomever needs to review it and prove our arrived, whomever including Treasury, clearly.").

Even accepting that argument, evidence presented through witnesses called by the Government show that Treasury, by and through its Investment Committee, made its decision to deny NOVA's TARP application without relying on Mr. Hartline's email sent on the evening of December 15 – and that the main reason for denying the application, NOVA's inability to pay dividends to investors, existed long before Dec. 15, 2009.[133]

If the email or its contents did not make its way to the decisionmakers, or was not capable of making its way to the decisionmakers, until after a decision was made, then no matter how probative or important a fact may be, it cannot be material, as it was not capable of affecting a decision that already had been made.  *See, e.g. Russell v. United States,* 369 U.S. 749, 769-70 (1962) (statement at issue must be pertinent to subject matter to create criminal violation).

## CONCLUSION

There were numerous errors throughout this lengthy trial which individually and collectively appear to have had a substantial influence on the jury's verdict.  In part because – but even without the benefit of evidence and arguments that should never have been permitted – the guilty verdicts returned against Mr. Bekkedam were the result of a miscarriage of justice. The Government failed to meet its burden in proving beyond a reasonable doubt each element of the crimes alleged.  Therefore, the interests of justice demand relief.

---

[133] *See* GV 204 (voicemail from Bill Baxter delivered before Mr. Hartline's Dec. 15, 2009 email, stating that the Federal Reserve is squashing the bank's application because of Nova's inability to pay dividends and that "Treasury isn't going to approve it if they aren't going to get their dividends"); GV 139 (email from Course dated Dec. 14, 2016 stating that "NOVA has been deferring the interest payments on its trust preferred securities, so currently would not be allowed to pay dividends on any TARP CPP securities issued); GV 142 (12/15/2009 conference call notes from call with Wilcox, Course, and Hartline: "The FDIC will not recommend that Treasury fund a TARP application for an adequately capitalized bank that it already restricted from servicing the dividend on that investment"); GV 30 (As of June 10, 2009, Bertsch states that NOVA Financial is restricted from paying dividends); Trial Tr. 116:10-25, 126:6-8 (Mar. 29, 2016) (Bertsch affirming that the decision to deny NOVA Financial funds was completely unrelated to the $15 million capital raise, but rather had to do with it inability to pay dividends); *see also* Trial Tr. 60:13-15 (Mar. 31, 2016) (Koch interpreting an email exchange dated 12/16/2009-12/17/2009 with Bill Baxter and Amy Monegro and agreeing that she had to write up a denial for NOVA Financial receiving TARP funds by Dec. 18, 2009); Trial Tr. 92:25-94:11 (Apr. 8, 2016) (Course); GV 150 (email dated 12/17/2009 indicating that it was a "notational vote to deny" NOVA Financial's TARP application).

For these reasons and such others as the Court may find, this Court should grant Mr. Bekkedam a new trial pursuant to Rule 33(a) of the Federal Rules of Criminal Procedure.

Date: June 1, 2016

Respectfully submitted,

/s/ _____

Joel D. Schwartz
Russell D. Duncan
Allison Baker Shealy
Renee B. Kramer
jschwartz@shulmanrogers.com
rduncan@shulmanrogers.com
ashealy@shulmanrogers.com
rkramer@shulmanrogers.com
Shulman Rogers Gandal Pordy Ecker, P.A
12505 Park Potomac Ave., 6th Floor
Potomac, MD 20854
Tel: (301) 945-9240
Fax: (301) 230-2891

Michael J. Engle
m.engle@gpeff.com
Greenblatt Pierce Engle Funt Flores
123 South Broad St. Suite 2500
Philadelphia, PA 19109
(215) 985-4275
Fax: (888) 495-7377
*Counsel for Barry Bekkedam*

CERTIFICATE OF SERVICE

I hereby certify that I caused a true and correct copy of the foregoing Memorandum in Support of Barry Bekkedam's Motion for a New Trial to be served by ECF on June 1, 2016, on:

David J. Ignall
Jennifer Chun Barry
Assistant United States Attorneys
Eastern District of Pennsylvania
615 Chestnut Street
Philadelphia, PA 19106
*David.J.Ignall@usdoj.gov*
*Jennifer.Barry@usdoj.gov*

/s/
    Joel D. Schwartz