### IN THE UNITED STATES DISTRICT COURT

### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIMINAL NO. 14-548-1,2 |
| BARRY BEKKEDAM | : | |

### UNITED STATES' CONSOLIDATED RESPONSE TO DEFENDANTS'<br>MOTIONS FOR A JUDGMENT OF ACQUITTAL AND FOR A NEW TRIAL

The United States of America, by and through its attorneys, Zane David Memeger, United States Attorney, and David J. Ignall and Jennifer Chun Barry, Assistant United States Attorneys, respectfully submits its opposition to defendant Brian Hartline's and defendant Barry Bekkedam's motions for judgments of acquittal and motions for a new trial. The motions ask the Court to add additional elements to the offenses, ignore much of the evidence presented, and interpret other evidence in a light favorable to the defense. As shown below, the evidence presented is sufficient to prove each element of the offenses charged, and the verdicts were not against the weight of the evidence. Moreover, there were no errors during the proceedings that require a new trial.

## I.  BACKGROUND

On April 27, 2016, the jury found defendants Barry Bekkedam and Brian Hartline guilty of conspiracy to defraud the United States, in violation of 18 U.S.C. § 371; Troubled Asset Relief Program ("TARP") Fraud, in violation of 18 U.S.C. § 1031; and two counts of making false statements to the federal government, in violation of 18 U.S.C. § 1001. The jury acquitted both defendants of bank fraud, in violation of 18 U.S.C. § 1344, and acquitted defendant Bekkedam of one count of wire fraud, in violation of 18 U.S.C. § 1343. The charges stem from

the defendants' deliberate and knowing misrepresentations and omissions to bank regulators regarding the health of the bank, which prevented regulators from learning that NOVA was financing its own capital to meet a $15 million contingency to receive TARP funds.

## II. THE EVIDENCE WAS SUFFICIENT AS TO EACH OF THE FOUR COUNTS OF CONVICTION AND THE VERDICTS WERE NOT AGAINST THE WEIGHT OF THE EVIDENCE

### A. Legal Standards

Under Fed.R.Crim.P. 29, the Court must "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed.R.Crim.P. 29(a). The standard is whether there is sufficient evidence in the record, viewed in the light most favorable to the prosecution, from which a "rational trier of fact could have found the defendant guilty beyond a reasonable doubt and if the verdict is supported by substantial evidence." *United States v. Bobb*, 471 F.3d 491, 494 (3d Cir.2006) (citing *United States v. Coyle*, 63 F.3d 1239, 1243 (3d Cir.1995)). The Court must examine "the totality of the evidence, both direct and circumstantial." *United States v. Sparrow*, 371 F.3d 851, 852 (3d Cir.2004) (internal quotation marks omitted).  In viewing the evidence in the context of Rule 29, the Court may not weigh the credibility of witnesses and the evidence. *United States v. Brodie*, 403 F.3d 123, 133 (3d Cir.2005). Thus, a judgment of acquittal is appropriate only "when the record contains no evidence, regardless of how it is weighted, from which the jury could find guilt beyond a reasonable doubt." *United States v. Mussare*, 405 F.3d 161, 166 (3d Cir.2005); *United States v. Smith*, 294 F.3d 473, 477 (3d Cir.2002) (only "where the prosecution's failure is clear" can a court grant a motion for acquittal.) (quoting *United States v. Leon*, 739 F.2d 885, 891 (3d Cir.1984)).

Under Fed. R. Crim. P. 33, "the court may grant a new trial to that defendant if the interests of justice so require." Unlike an insufficiency of the evidence claim under Rule 29, when a district court evaluates a Rule 33 motion, "it does not view the evidence favorably to the Government, but instead exercises its own judgment in assessing the Government's case." *United States v. Brennan*, 326 F.3d 176, 189 (3d Cir. 2003) (citing *United States v. Lacey*, 219 F.3d 779, 783–84 (8th Cir.2000); *United States v. Ashworth*, 836 F.2d 260, 266 (6th Cir.1988)). However, "[a] district court can order a new trial on the ground that the jury's verdict is contrary to the weight of the evidence only if it "believes that 'there is a serious danger that a miscarriage of justice has occurred—that is, that an innocent person has been convicted.'" *United States v. Johnson*, 302 F.3d 139, 150 (3d Cir. 2002) (quoting *United States v. Santos*, 20 F.3d 280, 285 (7th Cir.1994)). Thus, "[m]otions for a new trial based on the weight of the evidence are not favored. Such motions are to be granted sparingly and only in exceptional cases." *Government of Virgin Islands v. Derricks*, 810 F.2d 50, 55 (3d Cir.1987) (citing *United States v. Martinez*, 763 F.2d 1297, 1312-13 (11th Cir. 1985); *United States v. Indelicato*, 611 F.2d 376, 387 (1st Cir.1979)). "The court may not reweigh the evidence and set aside the verdict simply because it feels some other result would be more reasonable." *Martinez*, 763 F.2d at 1312-13.

**B.      Count One (conspiracy)**

1.      Elements

To establish a violation of 18 U.S.C. § 371, the government had to prove the following elements beyond a reasonable doubt:

(1)      That two or more persons agreed to defraud the United States or to commit an offense against the United States, specifically major fraud against the United States, as charged in the indictment;

3

(2)     That the defendant was a party to or member of that agreement;

(3)     That the defendant joined the agreement or conspiracy knowing of its objective and intending to join together with at least one other alleged conspirator to achieve that objective; that is, that the defendant and at least one other alleged conspirator shared a unity of purpose and the intent to achieve a common goal or objective, to defraud the United States or to commit an offense against the United States; and

(4)     That at some time during the existence of the agreement or conspiracy, at least one of its members performed an overt act in order to further the objectives of the agreement. Third Circuit Pattern Jury Instruction 6.18.371A, B.

Evidence of a conspiracy is sufficient if it would have allowed a reasonable fact finder to conclude beyond a reasonable doubt that the defendant and at least one other person shared a "unity of purpose" or the intent to "achieve a common goal" and an agreement to "work together toward the goal." *United States v. Applewaite*, 195 F.3d 679, 684 (3d Cir. 1999) (citations omitted). The government is not required to prove the existence of an express or formal agreement; "a tacit understanding is sufficient." *Ianelli v. United States*, 420 U.S. 770, 777 n.10 (1975). Further, proof of the existence of an agreement may be established entirely by circumstantial evidence. *United States v. McKee*, 506 F.3d 225, 238 (3d Cir. 2007). Conspiracy law merely requires that the inferences drawn have a logical and convincing connection to the evidence. *Applewaite*, 195 F.3d at 684. "[J]uries are free to use their common sense and apply common knowledge, observation, and experience gained in the ordinary affairs of life when giving effect to the inferences that may reasonably be drawn from the evidence." *United States v. Ramirez*, 954 F.2d 1035, 1039 (5th Cir. 1992).  Indeed, "common sense suggests, and experience confirms, that illegal agreements are rarely, if ever, reduced to writing or verbalized with the

precision that is characteristic of a written contract. Rather, the illegal agreement can be, and almost always is, an implicit agreement among the parties to the conspiracy." *McKee*, 506 F.3d at 238.

Because the crime of conspiracy requires only an agreement to violate the law, *Iannelli* 420 U.S. at 777, success is immaterial. Third Circuit Pattern Jury Instruction 6.18.371G; *Salinas v. United States*, 522 U.S. 52, 65 (1997) (the agreement is "a distinct evil," which "may exist and be punished whether or not the substantive crime ensues."). And impossibility of success, if unknown to the conspirators, is also irrelevant to whether the conspirators have violated the law. *United States v. Jimenez Recio*, 537 U.S. 270, 275 (2003) (citing 2 W. LaFave & A. Scott, Substantive Criminal Law §6.5, p. 85 (1986) ("[i]mpossibility" does not terminate conspiracy because "criminal combinations are dangerous apart from the danger of attaining the particular objective")).

### 2.   The evidence proved each element

The evidence is more than sufficient to show that both defendants engaged in a conspiracy to defraud the United States and to defraud the TARP program. By engineering loans from NOVA to three individuals to "invest" back into NOVA's holding company, the defendants intended to make NOVA appear more financially sound than it was in order to get funding through the TARP program. Although the motions suggest that there may be innocent reasons for the defendants to orchestrate these transactions, the jury could infer simply from the nature of the transaction in which the bank's own money is used to "invest" back in the bank that the defendants were engaged in fraudulent scheme. *See United States v. Aubin*, 87 F.3d 141, 146 (5th Cir. 1996) ("the very structure of the transaction would allow a reasonable inference of an intent to defraud"). Indeed, there is no obvious innocent reason for these defendants to have suggested

to "investors" that they borrow money from NOVA to invest back into the bank.  Moreover, a particular transaction, when done with intent to defraud, may be evidence of fraud even if it could have been done for a lawful purpose. Fraud is "a crime of extraordinary variety, limited only by human imagination." *United States v. Rybicki*, 354 F.3d 124, 155 (2d Cir. 2003) (citing *United States v. Altman*, 48 F.3d 96, 102 (2d Cir.1995) (holding that fraud needs no definition: "it is as old as falsehood and as versable as human ingenuity")).  As discussed below, the evidence at trial shows that the defendants arranged these transactions in an effort to defraud the United States.

3.     <u>NOVA's application for TARP Funding</u>

As part of the Troubled Asset Relief Program ("TARP"), the United States Department of the Treasury set up what was known as the Capital Purchase Program ("CPP").  [Tr. 161[1] (Bertsch, 3/29, 84)].  The CPP was a program to allow the Treasury to make investments in viable banks to support the banks' ability to continue lending during the financial crisis. [Tr. 161 (Bertsch, 3/29, 84)].  A viable bank was one that was likely to survive the financial crisis without assistance from the Treasury. [Tr. 241 (Quill, 3/30, 34)].  The director of the CPP program testified that in order to make a determination about whether a bank was viable, the Treasury relied on information from the bank's primary regulator. [Tr. 112 (Schaffner, 3/29, 35)].  In cases in which the CPP program director and his staff had concerns about the viability of a given bank, they would refer the application to the CPP Council. [Tr. 113 (Schaffner, 3/29, 36)].  The CPP Council had four members, a senior member from each of the primary bank regulators. [Tr. 113 (Schaffner, 3/29, 36)].  An application needed to have a majority support from the CPP Council

---

[1]     For clarity, the government has created a master transcript collection that is sequentially numbered all the way through the trial. This master transcript is attached as an appendix to this response.

before the application could go to Treasury's Investment Committee for final approval.  [Tr. 115 (Schaffner, 3/29, 38)].  If the CPP Council wanted additional information regarding an applicant, it sought that information from the bank's primary regulator.  [Tr. 114 (Schaffner, 3/29, 37); Tr. 164-165 (Bertsch 3/29, 87-88)].

NOVA applied for TARP/CPP Funding from the United States Treasury in October 2008.  Exhibit 6.  The Treasury forwarded NOVA's application to the CPP Council for review. [Tr. 166 (Bertsch, 3/29, 89)].   As early as February 2009, as defendant Hartline knew, the CPP Council was concerned about the bank's capital levels. See Exhibit 11. Capital, according to a member of the CPP Council, is "a cushion that's available to absorb losses and assets." [Tr. 166 (Bertsch, 3/29, 89)].  The CPP Council initially considered NOVA's application in April 2009. [Tr. 197 (Bertsch, 3/29, 120)].  The Council deferred action and  requested additional information from the bank via the FDIC, the bank's primary regulator. [Tr. 166-167, 198 (Bertsch 3/29, 89-90, 121)].  In particular, the CPP Council wanted to see evidence that NOVA would be able to meet its obligation to pay back the CPP investment. [Tr. 167 (Bertsch, 3/29, 90)].

In May 2009, while the CPP application was pending before the CPP Council, the bank fell from well capitalized to adequately capitalized.  [Tr. 288 (Koch, 3/30, 81); Tr. 1215 (Hanuscin, 4/6(1), 137)] This meant that the bank had less cushion to withstand losses.  Jeffrey Hanuscin, the bank's chief financial officer, and all of the regulators testified that TARP funds would not be extended to a bank that was not well capitalized. [Tr. 1215 (Hanuscin, 4/6(1), 137); Tr. 1311-1312 (Hanuscin, 4/7, 79-80); Tr. 112 (Schaffner, 3/29, 35); Tr. 161 (Bertsch, 3/29, 84); Tr. 241, 247 (Quill, 3/30, 34, 40); Tr. 288 (Koch, 3/30, 81); Tr. 1528 (Course, 4/8, 78)] Hartline addressed these capital concerns by telling the regulators on May 26, 2009, about George Levin,

a business associate of Barry Bekkedam's, potentially investing $15 million. See Exhibit 21. The bank forwarded information about Levin to the regulators, which included a letter from defendant Bekkedam. See  Exhibit 28. Lisa Koch from the FDIC communicated regularly with Hartline about the bank's application.  [Tr. 295-296, 308-309, 342, 399 (Koch, 3/30, 88-89, 101-02, 135, 192)]  She told Hartline in an email that it would be in the bank's best interest to get information about this investor to the CPP Council.  Exhibit 22.  Members of the CPP Council learned from the FDIC that NOVA could raise additional capital. [Tr. 169 (Bertsch, 3/29, 92)]. On June 10, 2009, the impact of the information about Levin clearly swayed CPP Council to recommend TARP funding "contingent on capital injection of $15 million," the amount Hartline told the regulators Levin would invest. See Exhibit 30.  The CPP wanted "regulatory capital that would come into the bank that would be available to stand ready to take any unanticipated losses. That would be a cushion."  [Tr. 170 (Bertsch, 3/29, 93)].  Money that NOVA loaned to the investor would not count as the capital that the Council sought because it would not add any strength to the bank.  [Tr. 171 (Bertsch, 3/29, 94); Tr. 249 (Quill, 3/30, 42)].

Had George Levin invested $15 million of outside funds into NOVA (through NOVA's holding company, NOVA Financial Holdings), NOVA would have satisfied the CPP contingency and there would have been no fraud. But Levin declined to invest any of his own funds.  [Tr. 923-924, 941-942, 945 (Levin, 4/5, 105-06, 123-24, 127); Tr. 673, 676 (Preve, 4/4, 65, 68)].  And Hartline's efforts to get Levin a loan from an outside source, specifically Atlantic Central Bankers Bank ("ACBB"), had not succeeded by late June 2009.  [Tr. 1333 (Patterson, 4/7, 101); Tr. 1169 (Sayre, 4/6, 91)]  The end of the quarter was June 30, a date on which NOVA would have to report its capital levels to the FDIC. [Tr. 277-278 (Koch, 3/30, 70-71)]  So in late June, the defendants agreed on a plan to defraud the United States by having NOVA loan $5

8

million to George Levin to make it appear that the bank had gotten an infusion of new capital.
On June 29, 2009, Bekkedam wrote an e-mail to Hartline, Edward DiMarcantonio, the chairman
of the bank, and Larry Rovin, managing director and in-house counsel for Ballamor, the
investment firm owned by Bekkedam.  In this e-mail, Bekkedam stated that he was always
planning on having the bank loan the funds to Levin and asked if they could get it done by June
30, asking specifically, "is this the plan?"  [Exhibit 39]   The defendants may wish that the jury
drew a different conclusion from this evidence, but "it is the task of the jury, not the court, to
choose among competing inferences." *United States v. Martinez*, 54 F.3d 1040, 1043 (2d Cir.
1995).

The evidence showed the concerted efforts by both defendants to engineer the scheme to
defraud the government. On June 29, 2009, defendant Bekkedam introduced the idea of having
the bank fund Levin's investment. *See* Exhibit 39a. In that e-mail, Bekkedam said, "It was clear
to at least me that we were getting George approved for a loan of 5M to invest in NOVA."
Hartline agreed and stated that they needed to close on capital by the end of the following day.
There was then a frenzy of activity among the bank, Ballamor (Bekkedam's firm), and Frank
Preve, George Levin's assistant, to put together an unsecured $5 million loan within 24 hours.
*See* Exhibits 40, 40a, 40b, and 40c.  The funds were disbursed to Levin and wired back to the
bank in less than two hours.  [Tr. 1343-1344 (Patterson, 4/7, 111-12)]. The loan was funded even
though the loan officer was waiting for additional information on the borrow. [Tr. 758 (Madiany,
4/4, 150:6-22)].  Hartline then congratulated Bekkedam and others for the $5 million of capital
raised. [Exhibit 50]

Hartline kept Lisa Koch at the FDIC updated on the bank's progress toward raising the
funds needed to secure the TARP investment. [Tr. 308 (Koch, 3/30, 101:12-14)].  Having

9

engineered the loan to Levin, Hartline then told Lisa Koch at the FDIC that the bank had raised $5 million of the needed $15 million.  [Tr. 308 (Koch, 3/30, 101:15-19)].  Lisa Koch then told Chuck Hunter, the FDIC liaison with the CPP Council, that NOVA had gotten the first $5 million needed to fulfill the contingency. [Exhibit 57].

In his motion for a new trial, Bekkedam alleges that the government failed to prove a fraud against the Treasury because all communication went through the FDIC.  As to the conspiracy count, the government did not need to prove any communication with the Treasury or any other agency, merely an agreement to defraud the Treasury and an overt act in furtherance. But even in cases charging a false statement to a particular agency, "it is well-settled that the false statement need not be made directly to a federal agency to sustain a § 1001 conviction as long as federal funds are involved." *United States v. Baker*, 626 F.2d 512, 514 (5th Cir. 1980). Moreover, both defendants were aware that the information they provided went through the FDIC to the Treasury. [Exhibits 102, 140]

4.    The defendants' intent to defraud

The events and concealment surrounding Levin's loan provided more than sufficient circumstantial evidence to prove that both defendants acted with an intent to defraud. "[T]he very nature of the crime of conspiracy is such that it often may be established only by indirect and circumstantial evidence." *United States v. Brodie*, 403 F.3d 123, 134 (3d Cir. 2005). Evidence demonstrating that a defendant actively concealed his operations from the regulatory scrutiny shows intent to defraud.  *See United States v. Ellis*, 326 F.3d 550, 555 (4th Cir. 2003); *United States v. Aubin*, 87 F.3d 141, 147 (5th Cir. 1996) ("The evidence clearly indicates that the parties knew they had to conceal the true nature of the transaction from federal regulators if the scheme was to succeed."); *see also United States v. Prows*, 118 F.3d 686, 692 (10th Cir.1997)

(intent to defraud may be inferred from evidence that defendant attempted to conceal activity) (cited in *United States v. Bryant*, 655 F.3d 232, 249 (3d Cir. 2011)).

Thomas Patterson testified that George Levin was a customer brought to the bank by defendant Bekkedam. [Tr. 1327 (Patterson, 4/7, 95:15-16)].  As part of the underwriting process for the Levin loan, Joseph Madiany, a senior credit officer, prepared a Risk Assessment Summary (RAS).  Exhibit 43.  The RAS is a document the bank used to determine whether a borrower was credit worthy. [Tr. 746-747 (Madiany, 4/4, 138-39)].  The purpose of the loan is one of the key items that credit officers reviewed.  [Tr. 748 (Madiany, 4/4, 140)] Mr. Madiany, however, did not know that the purpose of the Levin loan was to buy NOVA Financial Holdings stock . [Tr. 795, 798 (Madiany, 4/4, 187, 190)]  Thus, the RAS, which defendant Hartline signed, did not state that the purpose of the loan was to invest in NOVA. *See* Exhibit 43.  On June 30, 2009, despite the loan committee meeting that very morning, there was no open discussion of the largest, unsecured loan at the bank whose funds were disbursed an hour later and communicated to Bekkedam. *See* Exhibits 41 and 49.  Three members of the loan committee testified that they did not know the purpose of the Levin loan. [Tr. 1224 (Hanuscin, 4/6(1), 146); Tr. 829, 833 (Poliski, 4/5, 11, 15); Tr. 881 (Dietrich, 4/5, 63)].  The jury could infer from this that Hartline did not want any documents available to the FDIC that would show the true purpose of the loan because the FDIC could share that information with the individuals making the CPP funding decision. *See United States v. Vosburgh*, 602 F.3d 512, 537 (3d Cir. 2010) ("the jury is entitled to draw reasonable inferences from the trial evidence").

The evidence shows that both Hartline and Bekkedam continued to ensure that no bank regulator would learn of the source of the funds Levin used to purchase NOVA stock.  After telling the FDIC that NOVA had raised $5 million in new capital, Hartline never disclosed to any

regulator that the $5 million of capital from Levin was financed by the bank, a fact that every regulator involved with TARP testified would be important for them to know in their decision about TARP. [Tr. 310, 318-319, 347-349, 366-367 (Koch, 3/30, 103, 111-12, 140-42, 159-60); Tr. 512-513 (Koch, 3/31, 108-09); Tr. 1484 (Hunter, 4/8, 34); Bertsch, 94:1-23; Tr. 246, 247, 249 (Quill, 3/30, 39:22-25, 40:1-9, 42:1-16)]

The regulators all knew that Levin, because of the size of potential investment, filed change of control (CIC) applications with the Federal Reserve and PA DOB.  [Tr. 327-329 (Koch, 3/30, 120-22)]  The agreement to conceal that the bank financed the $5 million investment from Levin continued with the simple question from the regulators on the source of the funds for Levin to make the investment. For example, in the application to the Pennsylvania Department of Banking, Kim Hartline attached a letter from George Levin stating his "intention to pay the approximately $18 million purchase price with funds currently on deposit in various financial institutions." Exhibit 63, p. 4.  Frank Preve testified that he got this letter already filled out by someone at NOVA.  [Tr. 626 (Preve, 4/4, 18:4-5)]  As the applications reflect, NOVA submitted Levin's CIC for approximately 24.4% of the bank, or a total $18 million investment. Emails between and among Hartline, Bekkedam, and Preve about how to respond to this simple question, of which the borrowed funds were never disclosed, was further evidence of the conspiracy and the defendants' knowledge that they were concealing a material fact from the regulators. *See* Exhibits 73, 74, 79, 80, 81, 82, and 86.  The jury could quite reasonably infer that Hartline and Bekkedam did not want any financial regulator to know that NOVA had loaned any portion of the funds that Levin was supposedly investing in the bank. *See United States v. Davis*, 183 F.3d 231, 238 (3d Cir.), amended, 197 F.3d 662 (3d Cir. 1999) ("The jury may make

12

reasonable inferences from the evidence presented; the evidence need not unequivocally point to the defendant's guilt as long as it permits a finding of guilt beyond a reasonable doubt.").

The evidence at trial showed that both defendants were acting with a unity of purpose, that is to secure the TARP/CPP funding by making the bank appear to regulators to be stronger than it was. Hartline and Bekkedam knew how important the TARP funds were to sustaining their ambitions with the bank. *See* Exhibit 76. Even though he did not communicate with regulators directly, Bekkedam was intimately involved in the TARP process. Even after he no longer had any official role at the bank, Bekkedam described NOVA as being "his bank." [Tr. 1056 (Musser, 4/6, 50); Tr. 643 (Preve, 4/4, 35)]. He communicated with others on how important getting the TARP funding was to Bekkedam. *See* Exhibit 98 ("bank capital is due next week"); 102 ("low cost TARP is critical").

Bekkedam's role in the conspiracy is further demonstrated by his emails to Preve and Levin that they need Levin's investment to "help [Bekkedam] manage Brian who is managing his regulators," *see* Exhibit 106, and that the "the regulators are killing [Hartline]." *See* Exhibit 114. The jury also heard that NOVA Financial Holdings paid Bekkedam a $250,000 consulting fee Bekkedam in November while the bank and holding company were under tremendous pressure to secure the capital for the TARP funds after Levin's financial condition changed dramatically, *see* Exhibit 129. The jury could infer that the payment to Bekkedam was part of the conspiratorial agreement.

And Bekkedam acknowledged to Hilary Musser his role in the fraud. Bekkedam told Musser that even though he was no longer the chairman, he still controlled the bank. [Tr. 1056 (Musser, 4/6, 50:8-10)]. Bekkedam told Musser in 2009 that he was raising money for NOVA so that NOVA could qualify for TARP funding. Specifically, Bekkedam told Musser that he

"needed to raise capital for the bank to prop it up so that the deposits were big enough so that he could receive the TARP funds." [Tr. 1056 (Musser, 4/6, 50:18-20)]  Bekkedam also explained to Musser that he understood that the federal regulators had concerns about the bank's finances. [Tr. 1057-58 (Musser, 4/6, 51:17-52:1)].  Bekkedam told Musser that George Levin was investing $5 million to get NOVA sufficiently "propped up" to qualify for a TARP investment. [Tr. 1059 (Musser, 4/6, 53:10-23)]  And Bekkedam admitted to Musser at a later date that NOVA loaned the money to Levin for him to invest so that NOVA would qualify for TARP funding. [Tr. 1060 (Musser, 4/6, 54:18-23)]  This testimony alone would be sufficient for a reasonable juror to find that Bekkedam participated in the scheme. Thus, although Hartline personally made the misrepresentations to the bank regulators, the jury had more than sufficient evidence to conclude that he did so in furtherance of the conspiracy with Bekkedam. *See United States v. Fullmer*, 584 F.3d 132, 161 (3d Cir. 2009) ("government need not show that each and every member of the conspiracy committed an unlawful act in furtherance of the conspiracy's goals.").

At trial, the jury heard significant evidence that Hartline concealed the true purpose of the Levin loan from the bank's lawyer, the bank's auditor, and a plaintiff in a civil action.  This evidence powerfully showed Hartline's consciousness of guilt.  *See United States v. Berrios*, 676 F.3d 118, 130 (3d Cir. 2012) ("false exculpatory statements may be introduced as evidence of the defendant's consciousness of guilt of the underlying charges, even where such conduct may itself violate the law") (*citing United States v. Kemp*, 500 F.3d 257, 296 (3d Cir.2007); *United States v. Levy*, 865 F.2d 551, 558 (3d Cir.1989)). Hartline argues that his deposition testimony shows that he did not know that the bank could not count the money it loaned to investors as capital until after the audit in 2010. But the jury was entitled to, and did, reject this interpretation and could

14

instead view Hartline's misrepresentations about the purpose of the loans both before and after

the audit as evidence of consciousness of guilt. *E.g., United States v. Bajoghli*, 785 F.3d 957, 966

(4th Cir. 2015) (post-scheme conduct is relevant to proving fraudulent intent and guilty

knowledge).

5.    The Bonomo and Gallub transactions continued the fraud

George Levin never invested any of his own money.  And on October 31, 2009, he

learned that he was the victim of a massive Ponzi scheme. [Tr. 1101-1102 (Levin, 4/6(1), 23-

24)].  After that, Levin was in no position to invest, which both defendants knew. [Tr. 1126

(Levin, 4/6(1), 48)]. Nonetheless, the fraud continued as the defendants sought to satisfy the

contingency that NOVA raise $15 million by engineering loans to two other investors, Anthony

Bonomo and Charles Gallub. In keeping with how important it was to find capital in order to

satisfy the TARP contingency, Hartline advised Bekkedam that  Anthony Bonomo had $4.5

million available to borrow from NOVA to invest in the bank and Banyon (a venture through

which Ballamor clients invested in what turned out to be a Ponzi scheme). *See* Exhibit 91.

Bekkedam then solicited Bonomo to borrow $4.5 million from the bank for an investment.  [Tr.

2055 (Bonomo, 4/12(1), 8)].  Two million dollars of the investment went into Banyon, with $2.5

million going into NOVA Financial Holdings (NFH). [Tr. 2082-84 (Bonomo, 4/12(1), 35-37)]

The $2.5 million that was invested in NOVA was never disclosed on the bank's RAS, signed by

Hartline, which specifically listed Banyon as the investment. *See* Exhibit 109.

In December 2009, the defendants arranged one more loan to an "investor" to satisfy the

contingency.  Charles Gallub, through his business (Bellmawr Creek LLC), borrowed $500,000

from NOVA to purchase NFH stock.  [Tr. 1938-1939 (Gallub, 4/12(2), 74-75)]  Gallub was a

real estate developer, who had one large project financed in part by Ballamor Capital.  [Tr. 1707-

08 (Shaffer, 4/11, p. 64:2-65:5)] Gallub had a number of loans from NOVA for various real

estate projects. Exhibit 96.  In 2008, someone at NOVA suggested to Gallub's consultant, Hal

Shaffer, that Gallub purchase $250,000 of NFH stock. [Tr. 1708 (Shaffer, 4/11, 65:10-23); Tr.

1936-37 (Gallub, 4/12(2), 72-73)].  At the time, Gallub was not in a financial position to put up

his own money to make the purchase.  [Tr. 1934 (Gallub, 4/12, 70:10-13)] Gallub borrowed the

$250,000 from NOVA to make the purchase. [Exhibit 4; Tr. 1935-36 (Gallub 4/12, 71:20-72:1)].

At this time, Gallub did not own stock in any company other than NOVA and agreed to the

transaction because he wanted to maintain a good relationship with the bank from which he had

outstanding loans.  [Tr. 1934-35 (Gallub, 4/12, 70:19-71:15)].

In late 2009, defendant Hartline approached Shaffer to get Gallub to borrow an additional

$500,000 from NOVA to buy NFH stock.  [Tr. 1709-10 (Shaffer, 4/11, 66:9-67:22)].  Hartline

told Shaffer that NOVA was seeking TARP funding and needed investors.  [Tr. 1709-10

(Shaffer, 4/11, 66:25-67:19)].

The jury can reasonably infer that the purpose of arranging loans to Levin, Bonomo, and

Gallub was to prop up the bank to make it appear stronger than it was, just as Bekkedam

described to Hilary Musser.  With respect to Levin and Bonomo, Bekkedam came up with the

idea of having NOVA lend money to them to purchase NOVA Financial stock. [Tr. 919-20

(Levin, 4/5, 101-02); Tr. 2055-56 (Bonomo, 4/12(1), 8-9)].  Levin agreed to the transaction

because Bekkedam arranged the loan and because he had other business deals with Bekkedam he

wanted to continue.  [Tr. 934-35 (Levin, 4/5, 116-17)]  Levin agreed to the NOVA transaction as

a favor to Bekkedam. [Exhibit 74].  Bonomo likewise borrowed from NOVA because Bekkedam

was his investment advisor. [Tr. 2054-55 (Bonomo, 4/12(1), 7-8)]  Gallub, who had never owned

stock of any kind before [Tr. 1935 (Gallub, 4/12(2), 71)], agreed to borrow from NOVA to buy

stock because he had other loans from NOVA that he wanted to maintain. [Tr. 1935, 1937, 1940 (Gallub, 4/12(2), 71, 73, 76)].  The nature of the transactions alone is sufficient for the jury to conclude that the defendants agreed to prop up the bank to secure TARP funding.

      6.      <u>The totality of the evidence shows that there was no miscarriage of justice</u>

Although the defendants have spent dozens and dozens of pages to make this case seem unique and complicated, the evidence proved a straightforward conspiracy and attempt to defraud the United States.  The evidence was uncontroverted that both defendants agreed to have NOVA loan money to individuals to invest in the bank's holding company in order to satisfy the TARP contingency.  Hartline, and individuals working for him, then told the FDIC that these individuals had invested in NFH, but never told any regulator that NOVA loaned the funds to begin with.  The regulators involved in deciding whether to approve NOVA for TARP funding testified that they would have all wanted to know if any of the new "capital" was loaned by NOVA itself.

The only remaining issue for the jury was whether the defendants acted with intent to defraud or whether they were mistaken about whether funds that NOVA loaned to the investor to be routed right back to NOVA could be used to satisfy the TARP contingency that NOVA get a capital injection of $15 million. Proof of criminal intent in conspiracy, "by the very nature of the crime, must be circumstantial." *Direct Sales Co. v. United States*, 319 U.S. 703, 714 (1943); *see also United States v. Klein*, 515 F.2d 751, 754 (3d Cir. 1975) ("Circumstantial evidence is clearly proper to show these elements especially in a conspiracy case where direct evidence is likely to be scant.").  The jury could determine that the transactions have no other purpose beyond making the bank appear to be sounder than it was and that both defendants knew they were making false representations.  Both defendants knew that the TARP decisionmakers had concerns about the

financial health of the bank.  Both defendants knew that after each transaction, NOVA was in no better position to absorb losses than it was before.  The structure of the transactions alone can suggest an intent to defraud. *United States v. Molinaro*, 11 F.3d 853, 857 (9th Cir. 1993).  In this case, however, both defendants further confirmed their intent to defraud by actively working to conceal the truth.

Viewing the evidence in the light most favorable to the government for purposes of Rule 29, the jury had significantly more than enough evidence to convict both defendants of the conspiracy.  And under Rule 33, the weight of the evidence supports the verdict.  The jury simply needed to find that the defendants agreed to defraud the Treasury and that one of them committed an overt act in furtherance of that agreement.  *See United States v. Kelly*, 892 F.2d 255, 259 (3d Cir. 1989) (only one conspirator need perform an overt act).  The overt act itself need not be unlawful.  *Direct Sales Co.*, 319 U.S. at 714-15 ("overt acts consist solely of sales, which but for their volume, frequency and prolonged repetition, coupled with the seller's unlawful intent to further the buyer's project, would be wholly lawful transactions.").  There is thus no basis to for the Court to grant to a new trial, which it should do only in extraordinary circumstances.

**B.      Count Two (major fraud against the United States)**

1.      Elements

To establish a violation of 18 U.S.C. §1031, the government had to prove the following elements beyond a reasonable doubt:

(1)      There was a scheme to obtain money or property by means of materially false or fraudulent pretenses, representations, or promises, as charged in the indictment;

(2)      This scheme took place in a form of Federal assistance, including the Troubled

Asset Relief Program (or "TARP"), an economic stimulus, recovery, or rescue plan provided by

the government, or through the Government's purchase of a troubled asset as defined in the

Emergency Economic Stabilization Act of 2008;

(3)      The defendant executed or attempted to execute this scheme (as set forth in

paragraphs 1 and 2 above) knowingly and with specific intent to defraud; and

(4)      The value of such form of Federal assistance, or any constituent part thereof, was

at least one million dollars ($1,000,000).

*United States v. Litvak*, 30 F. Supp. 3d 143, 151 (D. Conn. 2014), *rev'd in part, vacated in part

on other grounds*, 808 F.3d 160 (2d Cir. 2015).  The court in *Litvak* charged the jury that the

defendant needed to act "willfully" because the definition of "intent to defraud" it used contained

"willfully." *Id.* at 156.  But the term "willfully" does not appear in the statute and is not an

element of section 1031.  *See, e.g., United States v. Nolan*, 223 F.3d 1311, 1314-15 (11th Cir.

2000).  In the third Circuit, "[t]o act with an intent to defraud means to act knowingly and with

the purpose to deceive or to cheat." *United States v. Leahy*, 445 F.3d 634, 644 (3d Cir. 2006).

The government need not prove the defendant had knowledge of the specific regulation

governing the conduct engaged.  *See United States v. Brodie*, 403 F.3d 123, 147 (3d Cir. 2005).

Fraudulent representations "may be effected by deceitful statements of half-truths or the

concealment of material facts and the devising of a scheme for obtaining money or property by

such statements or concealments...." *United States v. Olatunji*, 872 F.2d 1161, 1167 (3d Cir.

1989) (quoting *United States v. Allen*, 554 F.2d 398, 410 (10th Cir.1977)).  A misrepresentation is

material if it is capable of influencing the decision-maker. *Neder v. United States*, 527 U.S. 1, 16

(1999). A misrepresentation is material even if the victim does not actually rely on the

misrepresentation in making its decision. *United States v. Menichino*, 989 F.2d 438, 440 (11th Cir. 1993). Whether a misrepresentation is material is measured by an objective standard - not the subjective view of the victim. *E.g., United States v. Hamilton*, 699 F.3d 356, 362 (4th Cir. 2012) ("it is not germane for purposes of this inquiry whether the false statement actually influenced the agency's decision-making process"). Further, "a statement or omission is 'capable of influencing' a decision even if those who make the decision are negligent and fail to appreciate the statement's significance." *United States v. Rogan*, 517 F.3d 449, 452 (7th Cir. 2008).

      2.     The evidence at trial showed that both defendants engaged in a scheme to defraud the United States

The evidence described above regarding the conspiracy provides more than sufficient evidence for the jury to conclude that both defendants engaged in a scheme to defraud the United States by making NOVA appear more financially sound than it was in order to obtain more than $13 million from the United States.

In his rule 29 motion, defendant Hartline argues that his "alleged statements regarding NOVA Bank's capital were not false because there is no law or regulation which prohibited reporting the investments in NFHI as capital." Br. at 6. But this argument, in addition to being factually inaccurate, adds an element to the offense that does not exist, that there be a specific law or regulation that the defendant violated beyond the fraud statute charged. *See United States v. Bryant*, 655 F.3d 232, 249 (3d Cir. 2011) ("there was no specific statutory or regulatory prohibition against delegating work because 'there was a presumption' by pension administrators 'that the [employee] is doing the work.'"); *see also United States v. Goldblatt*, 813 F.2d 619, 624 (3d Cir. 1987) ("each individual component of the scheme need not be illegal in order to find a

scheme to defraud"). Although "[c]oncealment often is accompanied by an affirmative misrepresentation or a violation of an independent statutory or fiduciary disclosure duty, … neither is 'essential' for actionable fraud. What is essential is proof of a "scheme or artifice to defraud," which can be shown by deceptive acts or contrivances intended to hide information, mislead, avoid suspicion, or avert further inquiry into a material matter." *United States v. Colton*, 231 F.3d 890, 901 (4th Cir. 2000) (citing *United States v. Allen*, 554 F.2d 398, 410 (10th Cir.1977)). The government simply needed to, and did, prove that the defendant made a deceitful statement of half-truth or concealed a material fact as a part of scheme to obtain money. *Olatunji*, 872 F.2d at 1167. As discussed above, the evidence is undisputed that Hartline never disclosed to bank regulators that Levin, Bonomo, or Gallub had borrowed funds from NOVA to invest back in as "capital." This is a classic half-truth and concealment of a material fact. Moreover, the evidence showed that the "investments" by Levin, Bonomo, and Gallub were not "capital" for purposes of meeting the TARP contingency. [Tr. 170-171 (Bertsch, 3/29, 93-94); Tr. 249 (Quill, 3/30, 42); Tr. 2150-52 (Shubin, 4/13(1), 60-62); Tr. 1856-1857 (Zentner, 4/11, 213-14)].[2]

3.    The false representations about the strength of NOVA Bank were material

Defendants argue, without any citation to authority, that the government failed to prove the materiality of any false statement or omission because the government did not present the testimony of any member of the Treasury Department's Investment Committee, the ultimate decision-maker about whether a bank would receive investment under the CPP. But this

---

[2]    Hartline also argues that the government failed to prove that NOVA's quarterly statements were false and that he had no reason to question the quarterly statements. Br. at 10-11. The bank's quarterly call reports were indeed false as shown by the bank's later amendment of the call reports when the FDIC learned of the loans to "investors." [Tr. 1857, 1859 (Zentner, 4/11, 214, 216)]. But more importantly, Hartline is not charged with filing a false report with the FDIC.

argument misstates the test for materiality.  Reliance is not an element of the federal fraud

statutes. *See, e.g., United States v. Pizano*, 421 F.3d 707, 722 (8th Cir. 2005) (the defendant

"misconstrue[d] the materiality element of bank fraud by improperly injecting a reliance

requirement into the analysis."). A false statement or omission is material if it is capable of

influencing a reasonable decision-maker. *Neder*, 527 U.S. at 16; *United States v. McBane*, 433

F.3d 344, 351 (3d Cir. 2005) (language of the materiality standard and the decisions applying

that standard require only that the false statement at issue be of a type capable of influencing a

reasonable decisionmaker).   Because the standard is objective, the government need not show

that the false statement actually influenced the agency decision.  *Hamilton*, 699 F.3d at 362;

*United States v. McLaughlin*, 386 F.3d 547, 554 (3d Cir. 2004) ("an omission can be material

even if no one actually relied on it").

Because reliance is not an element of the offense,  the false statements and concealment

of the source of the funding were objectively material even if a member of the Investment

Committee had testified that he or she would still have approved investing in NOVA knowing

that NOVA had funded its own capital.  Moreover, the evidence at trial was overwhelming that

whether NOVA loaned funds to "investors" was capable of influencing, and would have

influenced, the Treasury, including the members of the Investment Committee.  For example, the

members of the CPP Council testified that they would not consider loaned funds to be the

injection of capital upon which approval of funding was contingent. [Tr. 170-71 (Bertsch, 3/29,

93-94); Tr. 249-50 (Quill, 3/30, 42-43); Tr. 1530, 1544-45 (Course, 4/8, 80, 94-95)].  And

without CPP Council approval, a bank would not be approved by the Treasury's Investment

Committee. [Tr. 269 (Quill, 3/30, 62)].[3]

> 4.   The evidence showed an intent to defraud and that the value of the federal
> <u>assistance the defendants sought exceeded $1 million</u>

As discussed above, there was extensive evidence about each defendant's intent to

defraud. And with respect to the final element, the evidence at trial showed that the value of the

federal assistance the defendants sought was more than $13 million. [Exhibits 82, 102, and 114]

> 5.   <u>Bekkedam is liable for the scheme to defraud</u>

Bekkedam argues in his motion for a new trial that he could not have been convicted of

Count Two because ""the parties do not dispute" that Bekkedam was an aider and abettor with

respect to this count.  Br. at 47.   He further alleges that the jury could not have found him guilty

on Count Two as an aider and abettor because the aiding and abetting instruction referenced only

counts Three and Four.  Bekkedam did not raise an objection at trial. Regardless, as with the

conspiracy, the evidence showed that this assertion is false.

Bekkedam engaged in the scheme to defraud directly.  Bekkedam introduced Levin to

NOVA as the $15 million investor. Exhibit 23. Hartline passed Bekkedam's information about

Levin to the regulators. Exhibit 28. Bekkedam decided that NOVA would loan the initial $5

---

[3]          In his motion for a new trial, Bekkedam cites *United States v. Rigas*, 490 F.3d 208 (2d Cir. 2007)  to
suggest that testimony from the decision-makers in this case that the source of the funds "mattered" to them is not
sufficient to show materiality.  Br. at 69-70.  But the *Rigas* opinion itself shows that it addresses a completely
different factual setting:

> This is a rather unusual bank fraud case; most bank fraud is committed when a defendant makes a
> misrepresentation to a bank in an effort to persuade the bank to make a discretionary decision in a way that
> benefits him. <u>It is clear that any number of misrepresentations made by an applicant for a loan are or can be
> "material."</u> The bank's subjective decision may be influenced by many variables, including inaccurate
> leverage ratios.

*Id.* at 234. (emphasis added).

million initial investment. Exhibit 39a. When Levin was forced to respond to question from PA
DOB about the source of funds for his investment, not only did Bekkedam participate in the
response, but was also chastised by Levin about getting Levin involved with the investment.
Exhibits 74 & 81. Hartline kept Bekkedam fully apprised of the TARP funding and how it would
affect the bank and Ballamor's interests. Exhibits 71. & 92. Bekkedam further participated in
securing the Bonomo loan. Exhibits 91, 99, 107, &107a. He was well aware of the requests the
regulators are making on Hartline about the bank receiving the capital before issuing the TARP
money and how important it was for his own self-interest to secure the TARP funds. Exhibits 98,
106, 111, & 137-137c. The government therefore proved that he participated in the scheme as
principal, not just an aider and abetter. *E.g., United States v. Pflaumer*, 774 F.2d 1224, 1233 (3d
Cir. 1985). And even though the jury was not instructed regarding accomplice liability with
respect to Count Two specifically, the Court instructed the jury that as to Counts Two through
Four, a defendant could be guilty of a substantive offense if done to further the conspiracy. [Tr.
2913 (4/20, 111)]. Thus, the jury had a more than sufficient basis to find Bekkedam liable under
the *Pinkerton* doctrine, as discussed in more detail below with respect to Counts Three and Four.

### C.    Counts Three and Four (false statements)

####    1.    Elements

In order to prove a defendant guilty of making a false statement, in violation of 18 U.S.C.
§ 1001, the government had to establish beyond a reasonable doubt that:

(1) on or about the date specified, the defendant made a statement or representation;

(2) that this statement or representation was material;

(3) the statement or representation was false, fictitious, or fraudulent;

(4) the false, fictitious, or fraudulent statement was made knowingly and willfully; and

(5) the statement or representation was made in a matter within the jurisdiction of the government of the United States.

2 L. Sand, et al, Modern Federal Jury Instructions - Criminal, No. 36-9 (2014).

Section 1001 is a statute of general applicability, designed to protect a "myriad [of] governmental activities." *United States v. Rodgers*, 466 U.S. 475 (1984). A statement or omission is material if it is "of a type capable of influencing a reasonable decision maker." *United States v. McBane*, 433 F.3d 344, 351 (3d Cir. 2005). The false statement need not actually influence the agency to whom it was made. *See, e.g., id.* (agency need not have to believe the truth of the statement); *United States v. Lupton*, 620 F.3d 790, 806 (7th Cir. 2010) ("We do not require the statement to actually influence the agency to which it was directed, or even that the agency rely on the statement in any way") (citations omitted). Indeed, "a false statement can be material even if the agent to whom it is made knows that it is false." *United States v. Whitaker*, 848 F.2d 914, 916 (8th Cir. 1988) (citing *United States v. Goldfine*, 538 F.2d 815, 820-21 (9th Cir. 1976)).

> 2.    The statements were false

There is more than sufficient evidence for the jury to conclude that the statements charged in Counts Three and Four were false. As to Count Three, the evidence shows that on or about June 30, 2009, Brian Hartline told the FDIC that NOVA had raised $5 million of new capital through an investment by George Levin. [Tr. 308 (Koch, 3/30, 101:15-19)]. Exhibits 57, 62. This statement was false as shown by the FDIC's determination, made when it learned of the loan to Levin, that Levin's "investment" could not count as capital. [Tr. 1857, 1859 (Zentner, 4/11, 214, 216)] Likewise, as to Count Four, Hartline told the FDIC that "NOVA has met the

contingency requirement by raising over $10 million of capital." Exhibit 140.  This statement

was false in that $3 million of that $10 million came from investors who borrowed the funds

from NOVA.  Members of the CPP Council, which set the contingency, testified that the

contingency was that NOVA raise outside funds.  Thus, NOVA had not "met the contingency"

that it raise additional capital.  Taking the charged statements in context, they were both was

false.  *See United States v. Milton*, 8 F.3d 39, 45 (D.C. Cir. 1993) (falsity determined only by

considering the term in context, taking into account the setting in which it appeared and the

purpose for which it was used. This was a matter for the jury."); *see also United States v.*

*DeZarn*, 157 F.3d 1042, 1049 (6th Cir. 1998) (the jury must consider evidence of the context of

the questioning which would establish that the Defendant-despite the false premise of the

question-knew exactly what the questions meant and exactly what they were referring to).

3.   The statements were material

As discussed above, these statements were material as they were capable of influencing

the Department of the Treasury.  As also discussed above, Hartline made these statements as part

of scheme to defraud in which he participated with Bekkedam, from which evidence the jury can

conclude that the defendants acted knowingly and willfully.

4.   The statements were within the jurisdiction of an agency of the United States

Finally, the statements were made in a matter within the jurisdiction of the government of

the United States.  Although the false statements were to the FDIC, not directly to the

Department of the Treasury, the evidence showed that the false statements to the FDIC[4] were

forwarded to the Department of the Treasury.  [Tr. 295-96 (Koch, 3/30, 88-89); Tr. 1480-81

---

[4]      The FDIC is an agency of the United States within the meaning of section 1001. *E.g.*, *United States v. Whitaker*, 848 F.2d 914, 917 (8th Cir. 1988).

26

(Hunter, 4/8, 30-31); Exhibit 22]  Hartline himself understood that the information he gave to

Lisa Koch of the FDIC was destined for people considering the bank's TARP application. [*e.g.*,

Exhibit 104: "We appreciate your assistance getting this to whomever needs to review it and

provide our approval."].  Bekkedam also understood that the information about new capital was

destined for the Treasury. In an October 21, 2009, e-mail to Frank Preve, Bekkedam said: "The

Treasury will not kill us for 24 hours."  [Exhibit 102 (emphasis added)]  "It is well settled that a

false statement or representation may pertain to a matter 'within the jurisdiction' of the executive

branch for purposes of § 1001(a) even if it was not made to an agency (or other component) of

the executive branch." *United States v. Starnes*, 583 F.3d 196, 208 (3d Cir. 2009) (collecting

cases). "Indeed, it is enough that the statement or representation pertain to a matter in which the

executive branch has 'the power to exercise authority.'" *Id.* (citing *United States v. Rodgers*, 466

U.S. 475, 479 (1984)); *see also United States v. Baker*, 626 F.2d 512, 514 (5th Cir. 1980) ("it is

well-settled that the false statement need not be made directly to a federal agency to sustain a §

1001 conviction as long as federal funds are involved."). Thus, Mr. Hartline's false statements to

the FDIC were to an agency of the United States.

5.     Bekkedam is liable for the statements made by Hartline

In his motion, Bekkedam correctly asserts that he himself never made any statement to

the regulators.  However, a defendant who engages in a "conspiracy is liable for the reasonably

foreseeable acts of his coconspirators committed in furtherance of the conspiracy." *United States

v. Ramos*, 147 F.3d 281, 286 (3d Cir. 1998) (citing *Pinkerton v. United States,* 328 U.S. 640

(1946)).  "[A] conspiracy need not be charged in order for *Pinkerton's* doctrine to apply." *United

States v. Lopez*, 271 F.3d 472, 480 (3d Cir. 2001).  The false statements charged in counts three

and four were at the heart of the conspiracy charged in Count One. Thus, there is more than

sufficient evidence to find that Hartline's acts were foreseeable to Bekkedam and were indeed in furtherance of the conspiracy.

The jury likewise had sufficient evidence to determine that Bekkedam aided and abetted these offenses. To be liable as an aider and abettor, the defendant must know that the crime charged was to be committed or was being committed, engage in some act for the purpose of aiding the commission of that crime, and act with the intention of causing the crime charged to be committed. *United States v. Kemp*, 500 F.3d 257, 300 (3d Cir. 2007). As discussed in the conspiracy section, Bekkedam knew that Hartline was communicating with the government, he wished Hartline to share false information with the government, and he helped direct Hartline to conceal the true purpose of the loans from NOVA that funded $8 million of NOVA's new "capital."

> 6.     <u>Each defendant acted with intent to defraud</u>

The evidence of intent to defraud is the same, substantial evidence to showed intent to defraud as to Counts One and Two.

## III.   <u>THERE WERE NO ERRORS REQUIRING A NEW TRIAL</u>

Under Fed. R. Crim. P. 33, the Court has the authority to grant a new trial if the interest of justice so requires. If a defendant does not object during trial, however, the Court may grant a new trial only upon a showing of plain error. *United States v. Tiller*, 302 F.3d 98, 105 (3d Cir. 2002) ("Failure to object at trial, absent plain error, constitutes a waiver of the issue for post-trial purposes."). To find plain error, the Court must conclude that (1) there was error; (2) the error was clear or obvious; (3) the error affected the defendant's substantial rights; and (4) the error seriously affected the fairness, integrity, or public reputation of the legal proceeding. *United States v. Tyson*, 653 F.3d 192, 211 (3d Cir. 2011).

### A.       There was no prosecutorial misconduct during closing argument

Defendant Hartline seeks a new trial based on the closing argument of the government. There was an objection to only one of the now challenged arguments, the reference to Hartline's salary.  As to the remaining grounds, the defendant must show plain error. *Tiller*, 302 F.3d at 105.  Regardless of the standard of review, however, no statement made by the government in closing warrants a new trial.

### 1.       Legal Standard

"Improper statements made during summation may warrant a new trial when such statements 'cause[ ] the defendant substantial prejudice by so infecting the trial with unfairness as to make the resulting conviction a denial of due process.'" *United States v. Brown*, 765 F.3d 278, 296 (3d Cir. 2014) (quoting *United States v. Shareef*, 190 F.3d 71, 78 (2d Cir.1999)).  To determine whether the defendant suffered any prejudice, the Court must "consider the scope of the objectionable comments and their relationship to the entire proceeding, the ameliorative effect of any curative instructions given, and the strength of the evidence supporting the defendant's conviction." *United States v. Zehrbach*, 47 F.3d 1252, 1265 (3d Cir. 1995) (en banc) As the Supreme Court has emphasized, "a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context." *United States v. Young*, 470 U.S. 1, 11 (1985) (quoted in *Zehrbach*, 47 F.3d at 1265).

A new trial is appropriate only if the Court finds improper conduct that undermines confidence in the verdict.  A Court may not order a new trial to punish a prosecutor for violating a ruling of the Court.  *United States v. Poole*, 735 F.3d 269, 279 (5th Cir. 2013) ("Rule 33 caselaw cannot be understood except through the lens of avoiding the injustice of a compromised

verdict. Counsel has brought to our attention no case—and we know of none—in which an appellate court affirmed the grant of a Rule 33 motion on grounds of prosecutorial misconduct unrelated to confidence in the jury verdict, merely as a way to punish contemptuous prosecutors.").  And a curative instruction is often sufficient to ameliorate any harm from an improper comment.  *See Donnelly v. DeChristoforo*, 416 U.S. 637, 644 (1974) ("Although some occurrences at trial may be too clearly prejudicial for such a curative instruction to mitigate their effect, the comment in this case is hardly of such character").

2.   <u>The reference to Hartline's salary</u>

During the cross-examination of Edward DiMarcantonio, the former chairman of the board of NOVA Financial Holdings, counsel for Mr. Hartline showed the witness board of director minutes from March 2009 (identified as D-14).  [Tr. 1789 (4/11, p. 146:21)].  From the document, Hartline's counsel asked the following questions regarding Hartline's compensation:

> Q: And that Compensation Committee had recommended that he get a raise in 2009, right?
>
> A: That's correct.
>
> Q: And Mr. Hartline volunteered to give that back, right?
>
> A: That is correct.

[Tr. 1792 (4/11, p. 149:10-14)].  Up to that point, counsel for the government had not introduced any evidence of the amount of Hartline's compensation.  Defense counsel having raised the issue on cross, however, government counsel on redirect asked DiMarcantonio what Hartline's salary was.  [Tr. 1849 (4/11, p. 206:19)].  Hartline's attorney objected on relevance grounds, and the Court sustained the objection. [Tr. 1849 (4/11, p. 206:20-21)].   At a sidebar, the government explained that Hartline's attorney had opened the door to this question and that the amount of

Hartline's salary was relevant. The Court noted that the government had an exception and sustained the objection. [Tr. 1850 (4/11, p. 207:6-21)]. The Court made no other rulings regarding Hartline's salary.

Prior to the close of the government's case in chief, the government offered a number of exhibits into evidence by conditional agreement of the parties. [Tr. 2327-32 (4/13, p. 46-51)] The government agreed that it would not show any of these exhibits to the jury or argue from them until defense counsel had an opportunity to raise an objection to an exhibit. [Tr. 2331 (4/13, p. 50:2-5)]. One of the exhibits the government so introduced was number 126, NFH's private placement memorandum dated November 16, 2009 to investors to raise $8 million, which put Hartline's salary into evidence. There was no objection to this exhibit.

During closing argument, counsel for the government argued that both defendants had a motive to engage in fraud to keep NOVA operating. Counsel pointed out that defendant Hartline and his wife both worked there and that they owned 2-3% of NOVA's stock. Counsel also stated, as is shown in Exhibit 126, that Hartline earned $250,000 in 2009. [Tr. 2623-24 (4/19, 38:20-39:2)] At a sidebar, counsel for Hartline objected to the evidence of Hartline's salary and sought a mistrial. [Tr. 2634 (4/19, 49:11-18)]. Counsel stated that he had not noticed that exhibit 126 contained Hartline's salary. [Tr. 2635 (4/19, 50:14-21)]. Although during the sidebar the Court stated that it had excluded evidence of Hartline's salary as "prejudicial," [Tr. 2637 (4/19, 52:5-9)] during the trial, the only objection made on relevance grounds. The Court raised a concern about arguing about evidence that was excluded at one time but admitted elsewhere and also raised the question about whether failure to object to the admission elsewhere was a waiver. [Tr. 2637 (4/19, 52:13-21)] The Court held the motion for a mistrial under advisement to allow the parties to cite to the record where the evidence was admitted and what objection, if any, was

31

raised.  [Tr. 2638 (4/19, 53:8-14)]  Counsel for Hartline then indicated that he did not wish the

Court to give a cautionary instruction.  [Tr. 2638 (4/19, 53:15-17)]

The reference to Hartline's salary in closing was not improper.  The evidence of his

salary was included in a document that was admitted into evidence.[5]  It is inappropriate for a

prosecutor to reference facts not in evidence during closing argument. *E.g., United States v.

LeFevre*, 483 F.2d 477, 479 (3d Cir. 1973).  A prosecutor may argue from evidence admitted at

trial. *See United States v. Saada*, 212 F.3d 210, 225 (3d Cir. 2000) ("The prosecutor did not

engage in vouching because he grounded his comments on the evidence presented at trial.").

With respect to the documents admitted by stipulation pending counsel's opportunity to review

prior to closing argument, defense counsel did raise objections to a number of the documents.

[Tr. 2390; 4/18-1, 48]. But there was no objection to any portion of Exhibit 126.  And there was

no order from the Court prohibiting argument about Hartline's salary.

Even if government counsel should have understood that a sustained objection to

relevance earlier in the case meant that she could not argue something contained in an exhibit

later admitted by agreement, Hartline suffered no unfair prejudice, much less sufficient unfair

prejudice to require a new trial. In determining prejudice, the Court must "consider the scope of

the objectionable comments and their relationship to the entire proceeding, the ameliorative

effect of any curative instructions given, and the strength of the evidence supporting the

defendant's conviction." *United States v. Helbling*, 209 F.3d 226, 241 (3d Cir. 2000) (quoting

---

[5]       Hartline's compensation was relevant to show his motive to commit the fraud.  *See, e.g., United States v.
Quattrone*, 441 F.3d 153, 187 (2d Cir. 2006) (evidence of compensation may be used for the limited purpose of
establishing a motive); *United States v. Logan*, 250 F.3d 350, 369 (6th Cir. 2001) (income evidence had a significant
probative value because it demonstrated what Appellants stood to lose if they properly reported the actual loan
delinquencies); *see also Direct Sales Co. v. United States*, 319 U.S. 703, 713 (1943) ("a 'stake in the venture' which,
even if it may not be essential, is not irrelevant to the question of conspiracy").

*Zehrbach*, 47 F.3d at 1265).  The only possible danger of unfair prejudice would be if the jury were to convict the defendant based on his wealth.  *See Quattrone*, 441 F.3d at 187.  The jury was aware that Hartline was the CEO of the bank and earned a salary. The amount of Hartline's compensation was not so great as to arouse the passions of the jury. Moreover, there was only a comment on the amount of his salary by the prosecution; the jury never saw the exhibit.  The Court cured any possible unfair prejudice when it instructed the jury that the arguments of counsel are not evidence  [Tr. 2872-73 (4/20, p. 70:20-71:1)].  And counsel for Mr. Hartline declined to ask for any further instructions, which further indicates that the jury gave little weight to the prosecutor's reference to his salary.  *See United States v. Golson*, 559 F. App'x 157, 161 (3d Cir. 2014) (not precedential). Thus, when the Court considers the totality of its jury charge and the evidence, there is no reason to believe that this comment had any effect on the verdict.[6]

3.      References to Hartline drafting or disseminating the Risk Assessment
        Summaries

Hartline next alleges that the government "improperly argued that Mr. Hartline drafted or disseminated the Risk Assessment Summaries at issue." Br. at 22.  The only references to the argument of the government in this section are to the opening, during with the government stated that Hartline sent a second RAS for the Levin loan to the bank's attorney which the government indicated would prove concealment and an argument during closing that sending the second RAS was evidence of concealment.  Br. at 24 n. 48.[7]  Counsel for Mr. Hartline did not object to either of these during trial.  Moreover, the evidence at trial supported these statements.

---

[6]      In addition to finding Bekkedam also guilty of Counts One through Four, the jury acquitted both defendants on Count Seven and acquitted Bekkedam on Count Five.  This shows that the jury was able to follow the Court's instructions and consider the admitted evidence on each defendant and each charge separately.  *See, e.g., United States v. Franz*, 772 F.3d 134, 153 (3d Cir. 2014).

[7]      This section of the motion lists a number of questions and answers that the defendant alleges misled the jury.  The motion cites no authority to suggest that a prosecutor asking a question to which there was no objection

33

The evidence at trial showed that Hartline tried to conceal the true purpose of the Levin loan from the bank's attorney.  After Todd Howard, a Ballamor employee, threatened to go to financial regulators regarding the propriety of NOVA lending money to George Levin to invest right back in the bank, [Exhibit 206], Hartline sought an opinion letter from David Swartz, the bank's attorney.  [Tr. 2100 (Swartz, 4/13, p. 10)].  Swartz requested from Hartline a copy of the loan documentation for the Levin loan.  [Tr. 2101 (Swartz, 4/13, 11:5-8)].  Swartz then got an e-mail from Thomas Patterson, the bank's chief loan officer [double check title] containing some of the loan documents.  [Exhibit 169; Tr. 2102 (Swartz 4/13, 12:19-25)].  In the e-mail, dated February 2, 2010, Patterson said: "David, per Brian's request attached are the loan documents for Mr. Levin." [Exhibit 169; Exhibit 171, page 1 (emphasis added)].  This e-mail contained the promissory note and the business loan agreement and a number of other documents signed by Levin [Exhibit 171, 4-18].   On January 29, 2010, Kim Hartline sent an e-mail to Swartz attaching an RAS for the Levin loan. In this e-mail, Mrs. Hartline said: "Brian asked me to send you this document and ask you to call him after you have had a chance to review it." [Exhibit 171, 19-27 (emphasis added)].  The RAS attached to this e-mail differed from the one created at the time of Levin's loan. [Exhibit 43; Exhibit 118; Tr. 760-763 (Madiany, 4/4, 152:24-155:21)].  This RAS falsely claimed that "[t]he borrower will use these funds to replace funds that were used to purchase and improve real estate located in Devon, Montgomery County. The loan will be a 12-month line of credit. This loan will be repaid from permanent financing that the borrower will put in place." [Exhibit 171, 21].

---

constitutes misconduct.  As the motion does not ask the Court to revisit the admissibility of dozens of answers, the government's response is limited to the argument of counsel.

The evidence shows that Swartz asked Hartline for documents underlying the Levin loan. Hartline's wife then sent a different RAS than the one that the bank prepared at the time of the loan. Not only did she do this after Swartz asked Hartline for documents, she specified that she was sending the documents at Hartline's request.  This second RAS falsely stated the purpose of the loan.  The government never introduced any evidence that Hartline himself created this document. But the jury could reasonably infer that he sent the document with false information to the bank's lawyer in an attempt to conceal the true purpose of the loan. Hartline's later concealment of the purpose of the loan to the bank's auditor shows further concealment and consciousness of guilt. Thus, there was nothing improper about the government arguing that Hartline's conduct showed concealment.  *See United States v. Green*, 25 F.3d 206, 210 (3d Cir.1994) ("[T]he prosecutor is entitled to considerable latitude in summation to argue the evidence and any reasonable inferences that can be drawn from that evidence." (quoting *United States v. Werme*, 939 F.2d 108, 117 (3d Cir.1991))); *see also Oliver v. Zimmerman*, 720 F.2d 766, 770 (3d Cir.1983) ("It is not prosecutorial misconduct to ask the jury to draw permissible inferences from anything that appears in the record....").

4.      <u>References to the Change in Control Application</u>

Hartline next challenges that portion of the government's closing argument stating: "when it comes to whether this fact was concealed, deliberately concealed, there's nothing more powerful than the change in control applications." Hartline did not object to this portion of the closing argument. Nonetheless, his argument now is that "the weight of the evidence at trial demonstrated that Mr. Hartline did not have any involvement with or legal responsibility" for the

change in control documents.  Br. at 26.[8]  There was significant evidence to show Hartline's involvement with CIC application. For example, Hartline advised Preve on how to respond to the PADOB and Fed regulators and Hartline personally approved the contents of Levin's 9/8/09 letter intended to provide financial information as a supplement to the pending CIC application [Exhibit 82]. As with the previous contention, there was nothing inappropriate about the government asking the jury to draw an inference from the evidence at trial, even if that is not the same inference the defendant would draw.

        5.     Statements of NOVA employees were attributable to Hartline and <u>Bekkedam</u>

The next challenge Hartline makes in his motion is to the government's use of the pronoun "they" in describing who communicated with financial regulators. According to the motion, the government's argument inappropriately attributed conduct of NOVA employees to Hartline.  Bekkedam makes a similar argument in his motion for a new trial.  Again, there was no objection during trial.  Moreover, there was nothing inappropriate in the government's argument, which was based on the evidence admitted at trial.  Just as with the previous two grounds, the government was permitted to ask the jury to draw inferences from the evidence.

In the motion, Hartline contends, without citation to any legal authority, that the government somehow sought to assign liability to him on a theory of *respondeat superior*, a civil doctrine that determines when employers will be held liable solely for the actions of their employees, *see, e.g, CNA v. United States*, 535 F.3d 132, 146 (3d Cir. 2008).   Bekkedam likewise contends that actions of employees who were not co-conspirators cannot be attributed to him.  There was never any argument to suggest that Hartline (or Bekkedam as a co-conspirator)

---

[8]       If a single investor owned more than 10% in a financial institution, that investor needed permission from the Pennsylvania Department of Banking and the Federal Reserve.  See Exhibits 63, 64.

was liable simply because he was the supervisor of anyone.  The evidence showed that individuals at NOVA acted at Hartline's direction in certain circumstances. [Tr. 1220-21 (Hanuscin, 4/6, 142-43); Tr. 1250-51 (Hanuscin, 4/7, 18-19); Exhibit 62; Exhibit 81; Exhibit 82; Tr. 1345 (Patterson, 4/7, 113)].  A defendant is liable for the actions of those he directs even if the persons directed are themselves innocent.  *E.g., United States v. Haeng Hwa Lee*, 602 F.3d 974, 976 (9th Cir. 2010); *United States v. Gleason*, 616 F.2d 2, 20 (2d Cir. 1979); *United States v. Levine*, 457 F.2d 1186, 1189 (10th Cir. 1972).

The evidence at trial showed that Hartline himself made the false statements charged in Counts Three and Four.  As to Count Three, the false statement on or about June 30, 2009, that NOVA had raised $5 million of new capital through an investment by G.L., Lisa Koch testified that prior to July 2, 2009, Hartline told her that G.L. had invested $5 million into NOVA.  [Tr. 308-09 (Koch, 3/30, 101-02); Exhibit 57].  As to Count Four, Hartline himself sent the e-mail to Lisa Koch saying that NOVA had met the contingency by raising an additional $10 million. [Exhibit 140].  Thus, the defendants' liability in this case is based on their conduct, not from some civil theory of liability never mentioned to the jury.

      6.    <u>References to the declining financial condition of NOVA Bank</u>

Hartline's next challenge is to the government arguing in opening and closing that NOVA was "struggling."  According to the motion, this argument created an appearance of desperation that did not exist.  Br. at 32-33.  But the evidence at trial showed that the bank was indeed struggling. [Tr. 340-41 (Koch, 3/30, 133-34); Exhibit 133A; Tr. 1184, 1186 (Fuir, 4/6(1), 106, 108); Exhibit 32].  As discussed above, in 2009, the bank's financial condition was downgraded by regulators.  By September of 2010, the bank's rating had fallen from a 3 to a 4 (meaning poor condition), with 5 being the worst possible rating.  [Tr. 1855 (Zentner, 4/11,

212:15-17)].  Less than three years after the last overt act in this conspiracy, NOVA failed and

was taken over by the FDIC.  [Tr. 1888-89 (Zentner, 4/12(2), 24-25)].  And the evidence at trial

showed that both defendants were desperate to get TARP funding for NOVA.  [*e.g.*, Exhibits 28,

609, 185].  The government could ask the jury to draw the inference that both defendants were

willing to engage in a fraud to secure funding for the bank.  Thus, there was nothing

inappropriate in this argument.

### 7.    References to Bekkedam's control over the bank

Hartline's next challenge is that the government inappropriately argued that defendant

Bekkedam had control over the bank.  There was no objection at trial. Again, the government

merely asked the jury to draw reasonable inferences from the evidence.  As detailed above,

Bekkedam admitted to others that he controlled the bank.  Bekkedam's own e-mails show his

involvement in the bank's TARP application process. [Exhibit 102; Exhibit 106] And even if no

bank employee testified that he or she was directed by Bekkedam, the evidence showed that

Hartline was.  For example, Bekkedam told Frank Preve in October 2009, that he needed an

update from Preve so that he, Bekkedam, could "manage Brian who is managing his regulators."

[Exhibit 106].  Although the defendants were free to ask the jury to draw a different inference,

the government's argument was entirely appropriate and supported by the evidence.

### 8.    Hartline's solicitation of Gallub

Hartline's final challenge to the government's argument is to the suggestion that Hartline

solicited Gallub to invest in NOVA.  The evidence showed that Hartline approached Hal Shaffer,

who worked for Gallub, to get Gallub to invest.  Shaffer then passed on this request to Gallub.

Thus, the jury could quite reasonably infer, and the government could argue, that Hartline

solicited Gallub even if he did not do so directly.

38

**B.      The Testimony of David Swartz and Allen Shubin was properly admitted**

In his motion for a new trial, Bekkedam contends that the Court erred by not excluding the testimony of David Swartz, the bank's outside counsel, and Allen Shubin, the bank's outside auditor.

As to the testimony of Mr. Swartz, Bekkedam's motion in limine failed to identify what portion of his testimony was inadmissible.  Nonetheless, Swartz's testimony was entirely admissible because Hartline concealed from Swartz the true purpose of the Levin loan.  As discussed above, this was powerful evidence to show guilty knowledge and consciousness of guilt. *E.g., United States v. Bajoghli*, 785 F.3d 957, 966 (4th Cir. 2015).

The testimony of Mr. Shubin was likewise admissible.  First, the determination by the outside auditor once he learned of the facts underlying the loans in question and the agreement by the bank and its primary regulator that these loans should not have been counted in the bank's capital is relevant to show that Mr. Hartline's statements to the FDIC, made in furtherance of the conspiracy, that NOVA had raised additional capital were false.  *See United States v. Clark*, 577 F.3d 273, 288 (5th Cir. 2009) ("evidence [from an IRS audit] was relevant to show the degree of falsity of the returns Clark prepared").  Second, this evidence shows that during the period of the conspiracy, the defendants concealed the purpose of the loans NOVA made to individuals who purchased NOVA Financial Holdings stock.  Evidence that conduct after the conspiracy "differed significantly from the patterns observed during the life of the conspiracy" is relevant to show the existence of the conspiracy. *United States v. Koppers Co.*, 652 F.2d 290, 298-99 (2d Cir. 1981). And third, this evidence is relevant to show that failing to disclose that $8 million of new "capital" was funded by NOVA is capable of influencing the TARP decision makers and thus material. *See Clark*, 577 F.3d at 288; *United States v. Goosby*, 523 F.3d 632, 638 (6th Cir.

2008)  (evidence that taxpayers had been audited or filed amended returns showing additional

taxes due shows that false statements on returns prepared by the defendant were material).

Bekkedam's challenge to Shubin's testimony as having been expert, as opposed to fact,

testimony is equally unavailing because Shubin had first-hand knowledge of the events to which

he testified.  *See United States v. Berry*, 132 F. App'x 957, 963 (3d Cir. 2005) (investigating

detective "was testifying in his capacity as a fact witness, rather than an expert witness"); *see

also United States v. Cuti*, 720 F.3d 453, 457-58 (2d Cir. 2013) ("The Federal Rules of Evidence

allow the admission of fact testimony so long as the witness has personal knowledge, see

Fed.R.Evid. 602, while opinion testimony can be presented by either a lay or expert witness, see

Fed.R.Evid. 704 & 702."); *United States v. York*, 572 F.3d 415, 420 (7th Cir. 2009) ("opinions or

inferences, drawn from facts outside the witness's first-hand knowledge of the case, are

admissible only as expert testimony.") (emphasis added); *United States v. Miranda*, 248 F.3d

434, 441 (5th Cir.2001) (holding agent's testimony about code words used in recorded calls

admissible as lay opinion because it was based on the agent's "extensive participation in the

investigation of this conspiracy, ... [which] allowed him to form opinions concerning the

meaning of certain code words used in this drug ring based on his personal perceptions")

(emphasis added).

### C.      There was no constructive amendment to the indictment

In his motion for a new trial, Hartline alleges that the government constructively

amended the indictment by charging "a false statement theory but [presenting] the alternate

factual theory of an omission." Br. at 38.  Likewise, Bekkedam makes a similar argument in his

motion with respect to Counts Three and Four. Br. at 49-61.  Neither party raised this objection

during trial.  "An indictment is constructively amended when evidence, arguments, or the district

court's jury instructions effectively 'amend[s] the indictment by broadening the possible bases for conviction from that which appeared in the indictment.'" *United States v. McKee*, 506 F.3d 225, 229 (3d Cir. 2007) (quoting *United States v. Lee*, 359 F.3d 194, 208 (3d Cir.2004)). Conviction is appropriate as long as the proof upon which it is "based corresponds to an offense that was clearly set out in the indictment." *United States v. Miller*, 471 U.S. 130, 136 (1985). Thus, there may be flexibility in proof, provided that the defendant was given notice of the "core of criminality" to be proven at trial. *E.g., United States v. Heimann*, 705 F.2d 662, 666 (2d Cir. 1983).

In this case, the indictment charged the defendants with conspiring to defraud the United States through false and fraudulent pretenses, representations, and promises, defrauding the United States engaging in a scheme to defraud the Treasury through false pretenses, representations, or promises, and making false statements to the United States.  In Count One, paragraph 17, the indictment discusses the need for the defendants to conceal the true nature of the transactions at issue: "If the circular nature of the transaction was kept secret to anyone outside of NOVA, it would appear that NOVA had an outside investor putting new capital into the bank, when it did not."  And in paragraph 28, the indictment charges that "[t]hrough their scheme, defendants BARRY BEKKEDAM and BRIAN HARTLINE fraudulently made it appear to the Department of the Treasury and others that NOVA was more financially sound than it actually was because three people had infused new capital totaling approximately $8 million in the bank when, in fact, these were not new investments in NOVA and NOVA had merely received its own money back."  The indictment thus charged that the defendants made false representations and concealed the truth from regulators as part of a scheme to defraud.  As shown above, the evidence at trial proved just that.  A half-truth or a concealment of a material

41

fact constitutes a false statement within the meaning of federal fraud statutes. *Olatunji*, 872 F.2d at 1167 (3d Cir. 1989) ("fraudulent representations, as the term is used in [section] 1341, may be effected by deceitful statements of half-truths or the concealment of material facts and the devising of a scheme for obtaining money or property by such statements or concealments....") (citations omitted).

As to Counts Three and Four, as discussed above, the government had to and did prove that the statements were false as described in the indictment. Thus, there was no constructive amendment of the indictment.

### D.      There were no errors in the Jury Instructions

The Court has broad discretion in fashioning instructions to the jury "as long as it communicates 'the substance of the law' so the jury is not misled or confused." *United States v. Petersen*, 622 F.3d 196, 203 (3d Cir. 2010).  To determine whether there has been a miscarriage of justice necessitating a new trial based on instructions to the jury, "[i]t is well settled that a single jury instruction may not be evaluated in artificial isolation; rather, it must be evaluated in the context of the overall charge. *United States v. Goldblatt*, 813 F.2d 619, 623 (3d Cir. 1987). The Court may grant a new trial on account of its refusal to give a proposed jury instruction "only when the requested instruction was correct, not substantially covered by the instructions given, and was so consequential that the refusal to give the instruction was prejudicial to the defendant." *United States v. Hoffecker*, 530 F.3d 137, 167 (3d Cir. 2008) (citation omitted).  "It is the rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court." *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977).

1.      The Court did not err by not sending the jury a list of the overt acts from
the indictment

Both defendants raise the issue that the jury did not have a list of the overt acts when it

considered the conspiracy charged in Count One.  Not only was there no objection at trial,

counsel requested that the Court refrain from providing the jury with a list of overt acts until the

jury made a specific request.  [Tr. 2935 (4/20, 133:10-13)].  Thus, the defendants can get relief

only upon a showing of plain error.  Given the factual record, however, there was no error at all,

much less a plain error.[9]

The Court properly instructed the jury that it needed to find that one defendant performed

at least one overt act in furtherance of the conspiracy charged in the indictment. [Tr. 2895-96

(4/20, 93:20-94:2)]; *United States v. Nelson*, 852 F.2d 706, 713 (3d Cir. 1988 ); *United States v.*

*Kapp*, 781 F.2d 1008, 1012 (3d Cir. 1986). The Court further instructed the jury that they must

unanimously agree on that overt act.  [Tr. 2895 (4/20, 93:3-15)] The trial court need not identify

the alleged overt acts in order to give a proper jury instruction. *See, e.g., United States v.*

*Williams*, 591 Fed.Appx. 78, 93 (3d Cir. 2014) (non-precedential); *United States v. Norris*, 419

Fed. Appx. 190, 194-95 (3d Cir. 2011) (non-precedential) (citing *United States v. Adamo*, 534

F.2d 31, 38-39 (3d Cir. 1976)).  The government can prove overt acts not listed in the indictment,

so long as there is no prejudice to the defendants thereby. *United States v. Schurr*, 794 F.2d 903,

908 n.4 (3d Cir. 1986).  And a conspiracy may rest on proof of an overt act not alleged in the

indictment. *Adamo*, 534 F.2d at 38.

---

[9]      Because there was no plain error, the Court need not determine whether this argument was waived
altogether. *See United States v. Ozcelik*, 527 F.3d 88, 97 n. 6 (3d Cir. 2008) ("Because Ozcelik made a joint request
in favor of the very instructions he now challenges, he waived his right to raise these instructional issues on appeal
under the invited error doctrine.").

The evidence at trial showed that the government proved each of the first nine overt acts listed in the indictment.[10]  Most notably, overt act nine contains the same conduct that underlies Count Four, a false statement by Hartline on December 15, 2009. Given that the jury convicted the defendants of Count Four, the jurors must have necessarily unanimously agreed on one of the overt acts charged in the indictment.

2.      The jury was properly instructed as to which false statements were <u>charged in the indictment</u>

In his motion for a new trial, Bekkedam alleges that the Court erred when it did not instruct the jury about which specific statement it had to find with respect to Counts Three and Four.  There was no objection.  Regardless, the Court properly instructed the jury that the false statements at issue were made on or about two specific dates as charged in the indictment, June 30, 2009, and December 15, 2009.  As discussed above, the evidence showed that Hartline made false statements to the FDIC on both those dates.  And the government's closing argument made clear which false statements were charged in the indictment.  [Tr. 2605-06 (4/19, 20:15-21:5); Tr. 2625-26 (4/19, 40:24-41:8)]

Bekkedam also alleges that Counts Three and Four are multiplicitous because they involve the same conduct underlying and the conspiracy and the major fraud against the United States. "A multiplicitous indictment charges the same offense in two or more counts and may lead to multiple sentences for a single violation, a result prohibited by the Double Jeopardy

---

[10]       Overt Act 1: Exhibits 23, 25 | Tr. 1331 (Patterson, 4/7, 99) | Tr. 1730 (DiMarcantonio, 4/11,  87)
               Overt Act 2: Exhibit 40 | Tr. 587-88 (Preve, 3/31, 183-84)
               Overt Act 3: Exhibit 46 | Tr. 1340-41, 1344 (Patterson, 4/7, 108-09, 112)
               Overt Act 4: Exhibit 52 | Tr. 622-23 (Preve, 4/4, 14-15)
               Overt Act 5: Exhibit 64 | Tr. 1569 (Gaunt, 4/8, 119); Tr. 1631 (Moretz 4/8, 181)
               Overt Act 6: Exhibit 92
               Overt Act 7: Exhibit 98 | Tr. 941 (Levin, 4/5, 123)
               Overt Act 8: Exhibit 102 | Tr. 642-43 (Preve, 4/4, 34-35)
               Overt Act 9: Exhibit 140 | Tr. 348-49 (Koch, 3/30, 141-42)

Clause." *United States v. Pollen*, 978 F.2d 78, 83 (3d Cir. 1992). As explained in the government's response to the same argument in the motion to dismiss, this claim is without merit because a conspiracy is a separate crime from the substantive offenses. *See Braverman v. United States*, 317 U.S. 49, 54 (1942) ("the allegation in a single count of a conspiracy to commit several crimes is not duplicitous, for 'The conspiracy is the crime, and that is one, however diverse its objects.'"). Likewise, the false statements charges and the fraud charge each required the government to prove elements that the other did not. Accordingly, they are all separate crimes. *See Blockburger v. United States*, 284 U.S. 299 (1932).[11]

        3.      The Court correctly charged the jury that willfulness was not an element
                    of section 1031

Bekkedam alleges that the Court erred when it did not instruct the jury that willfulness was an element of major fraud against the United States in violation of 18 U.S.C. § 1031. While acknowledging that the word "willful" does not appear in the statute, Bekkedam nonetheless asks this Court to write the word in to the statute. Br. at 46. Because "willfully" does not appear in the statute and is not an element of section 1031, *see, e.g., Nolan*, 223 F.3d at 1314-15, the Court's charge to the jury was correct.

        4.      The Court correctly charged the jury as to only 18 U.S.C. §1001(a)(2)

Bekkedam alleges that the Court erred when it refused to give the jury an instruction on the elements needed to convict him under 18 U.S.C. § 1001(a)(1), which prohibits falsifying, concealing, or covering up by trick or scheme any material fact. However, the indictment in this case charged only a violation of 18 U.S.C. § 1001(a)(2), which prohibits making any false,

---

[11]       Even if the Counts were multiplicitous, which they are not, the time to raise the issue is at sentencing, not in a motion for a new trial. *United States v. Kennedy*, 682 F.3d 244, 253 (3d Cir. 2012) ("concerns over multiplicity may be addressed at sentencing.").

fictitious, or fraudulent statement or representation.  Thus, the Court correctly charged the jury solely as to the elements of the crime charged.  And as detailed above, the evidence proved each element of that offense.

     5.     <u>The Court correctly denied a theory of the defense instruction</u>

Bekkedam alleges that the Court erred by not giving him a theory of the defense jury instruction.  The requested instruction merely stated that both defendants lacked intent to defraud.  The Court denied the request because the Court was already going to instruct the jury "at the conclusion of the reading of every statute, every defense that if the Government has not proven beyond a reasonable doubt, you have to find the Defendants not guilty."  [Tr. 2531-32 (4/18 pm, 80:25-81:3)].  The Court's ruling was correct.  A defendant is not "entitled to a judicial narrative of his version of the facts, even though such a narrative is, in one sense of the phrase, a 'theory of the defense.'" *United States v. Hoffecker*, 530 F.3d 137, 176 (3d Cir. 2008) (quoting *United States v. Barham*, 595 F.2d 231, 244 (5th Cir.1979)).  The Court need not give a partisan instruction "'to place the ... defendants' desired factual findings into the mouth of the court.'" *Id.* (quoting *United States v. Paradies*, 98 F.3d 1266, 1287 (11th Cir.1996)).  The Court's instructions accurately reflected the law and required that the government prove intent to defraud and lack of misunderstanding on the part of each defendant.  [Tr. 2815, 4/20, 122:9-21].

     **E.**     **The Hartline Deposition was properly admitted**

In his motion for a new trial, Bekkedam contends that the Court erred in admitting portions of Hartline's deposition over his objection.  But the portions of the deposition that the government played for the jury did not mention Bekkedam directly or even indirectly. Moreover, the Court gave an instruction to the jury that it could consider the deposition testimony only as to defendant Hartline.  A limiting instruction is sufficient even in cases in which the government

46

introduces a confession of a non-testifying co-defendant so long as the confession does not mention the defendant. *E.g., Richardson v. Marsh*, 481 U.S. 200, 211 (1987).  There is no reason to believe that the jury did not follow the Court's limiting instruction. *Id.* at 206 (the almost invariable assumption of the law is that jurors follow their instructions). Indeed, the jury showed that it could separately consider evidence as it acquitted both defendants on some counts. *See Franz*, 772 F.3d at 153.  Thus, there was no error in admitting this testimony.

Bekkedam also contends that the government tied Bekkedam to the Hartline deposition during closing when government counsel mentioned the deposition and then mentioned that Bekkedam orchestrated the scheme.  Br. at 23.  Bekkedam did not object to this argument, so the Court may order a new trial only upon a finding a plain error.  But there was no error at all, much less a plain error.  The argument simply showed that Hartline continued to conceal the truth as late as 2012.  The argument then went on to say that Hartline had dug his own grave and brought Bekkedam in with him. This was merely in the context of explaining the roles of each defendant in concealing the truth from financial regulators.  The government did not ask the jury to disregard the Court's instruction and consider Hartline's deposition as evidence of Bekkedam's intent to defraud.

### F.    The evidence from financial regulators was properly admitted

Bekkedam contends that the Court erred in allowing regulators involved in the TARP application process to testify about whether it would have been important to them to know that any portion of the new "capital" that NOVA reported came from a loan from NOVA itself. According to the motion, this was in violation of the Court's pre-trial ruling on Bekkedam's motion in limine.  But the motion in limine order simply granted the motion "to exclude lay testimony by bank regulators in response to hypothetical questions."  During trial, counsel either

47

did not object [e.g., Tr. 249 (Quill, 3/30, 42); Tr. 1571 (Gaunt, 4/8, 121); Tr. 1613-14 (Moretz, 4/8, 163-64; Tr. 1484 (Hunter, 4/8, 340; Tr. 348-352 (Koch, 3/30, 141-45) or the Court overruled the objection. [Tr. 170 (Bertsch, 3/29, 93:14-16)].  There was no error in allowing this testimony, which was both relevant and admissible. This was not opinion testimony, but testimony relevant to show the materiality of the defendants' false statements and omissions, i.e., whether they were capable of influencing the government.  *See United States v. Cuti*, 720 F.3d 453, 459 (2d Cir. 2013).  The regulators were thus testifying as fact witnesses with first-hand knowledge; they were not providing expert testimony regarding hypotheticals.  *Id.* at 457-58; *United States v. Miranda*, 248 F.3d 434, 441 (5th Cir.2001) (holding agent's testimony about code words used in recorded calls admissible as lay opinion because it was based on the agent's "extensive participation in the investigation of *this* conspiracy, ... [which] allowed him to form opinions concerning the meaning of certain code words used in this drug ring based on his personal perceptions") (emphasis added). The Court did not abuse its discretion in admitting this evidence.

## IV.   <u>CONCLUSION</u>

The defendants' motions for acquittal largely reiterate arguments that they made to the jury, which the jury rejected with respect to Counts One through Four.  In reviewing a motion for a judgment of acquittal due to insufficient evidence pursuant to Federal Rule of Criminal Procedure 29, the Court must apply a "particularly deferential standard [so as]  not to usurp the role of the jury by weighing credibility and assigning weight to the evidence.'" *United States v. Mercado*, 610 F.3d 841, 845 (3d Cir.2010) (quoting *United States v. Boria*, 592 F.3d 476, 480 (3d Cir.2010)). Because the evidence introduced at trial, when viewed in its totality in the light

48

most favorable to the government, is sufficient to prove each element of the crimes charged, the Court should deny the motions for judgments of acquittal.

Likewise, motions for a new trial based on the weight of the evidence also restate arguments that the jury rejected for good reason. There was no miscarriage of justice. Thus, this is not the "exceptional case" necessitating a new trial. *Derricks*, 810 F.2d at 55. And the Court committed no error during the trial that warrants a new trial.  Accordingly, the Court should deny the motions for a new trial.

Respectfully submitted,

ZANE DAVID MEMEGER
United States Attorney


s/ David J. Ignall
DAVID J. IGNALL
JENNIFER CHUN BARRY
Assistant United States Attorneys

## <u>CERTIFICATE OF SERVICE</u>

I certify that a copy of the foregoing was filed electronically and is available for viewing and downloading from the Electronic Case Filing system:

Patrick J. Egan, Esq.
Fox Rothschild LLP
2000 Market Street
Philadelphia, PA 19103-3222

Russell D. Duncan, Esq.
Shulman Rogers Gandal Pordy & Ecker, P.A.
12505 Park Potomac Ave., 6th Floor
Potomac, MD 20854

Date: June 29, 2016                                   s/ David J. Ignall
                                                      DAVID J. IGNALL
                                                      Assistant United States Attorney