UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | 14-CR-0548 |
| | ) | |
| vs. | ) | |
| | ) | |
| BRIAN HARTLINE and | ) | |
| BARRY BEKKEDAM, | ) | Philadelphia, PA |
| | ) | March 29, 2016 |
| Defendants. | ) | 10:05 a.m. |

TRANSCRIPT OF OPENING STATEMENTS
BEFORE THE HONORABLE C. DARNELL JONES, II
UNITED STATES DISTRICT JUDGE

APPEARANCES:

| | |
|---|---|
| For the Government: | DAVID J. IGNALL, ESQUIRE<br>ASSISTANT UNITED STATES ATTORNEY<br>UNITED STATES ATTORNEY'S OFFICE<br>615 Chestnut Street, Suite 1250<br>Philadelphia, PA 19106 |
| For the Defendant<br>Brian Hartline: | PATRICK J. EGAN, ESQUIRE<br>FOX ROTHSCHILD LLP<br>2000 Market Street, 10th Floor<br>Philadelphia, PA 19107 |
| For the Defendant<br>Barry Bekkedam: | MICHAEL J. ENGLE, ESQUIRE<br>GREENBLATT, PIERCE, ENGLE,<br>FUNT & FLORES<br>123 South Broad Street, Suite 2500<br>Philadelphia, PA 19109 |
| | RUSSELL D. DUNCAN, ESQUIRE<br>SHULMAN, ROGERS, GANDAL,<br>PORDY & ECKER, PA<br>12505 Park Potomac Avenue<br>Potomac, MD 20854 |
| Audio Operator: | CARL HAUGER |
| Transcribed by: | DIANA DOMAN TRANSCRIBING, LLC<br>P.O. Box 129<br>Gibbsboro, NJ 08026<br>Office: (856) 435-7172<br>Fax:    (856)  435-7124<br>Email:  dianadoman@comcast.net |

Proceedings recorded by electronic sound recording; transcript
produced by transcription service.

2

1                          I N D E X

2

3    OPENING STATEMENTS:                              PAGE

4    FOR THE GOVERNMENT

5         Mr. Ignall                                    3

6    FOR THE DEFENDANTS

7         Mr. Egan                                     26

8         Mr. Duncan                                   49

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (The following requested portion, opening statements

2          of counsel, was heard in open court at 10:05 a.m.)

3               MR. IGNALL:  Good morning, ladies and gentlemen.

4               THE JURY:  Good morning.

5               MR. IGNALL:  As the Judge just indicated to you,

6     this case involves fraud.  It involves fraud against the

7     Government, it involves fraud against investors, and fraud

8     against a bank.  The bank in this case is called Nova Bank.

9               Fraud simply means lying or hiding the truth in

10    order to get money, and that's what these two defendants,

11    Brian Hartline and Barry Bekkedam did.  They engaged in fraud

12    against the United States Government; they engaged in fraud

13    against a bank, Nova Bank, and Mr. Bekkedam engaged in fraud

14    against investors.

15              This all had to do with a bank called Nova Bank, a

16    bank that by 2008 was struggling and ultimately failed.  This

17    has to do with both of these defendants trying to prop up that

18    bank to make it look like it was stronger than it was so that

19    they could get money from the United States Government and, in

20    the case of Mr. Bekkedam, get money from investors.

21              Let's go back to the beginning here.  You're going

22    to learn that in about 2002, these two defendants and others

23    took over another bank and started what they called Nova Bank.

24    You're going to hear that Mr. Hartline used to be a CPA, and

25    he's the one who ran the bank.  Originally, Mr. Bekkedam was

Ignall - Opening Statement                                4

1    the chairman of both the bank and what we call the bank

2    holding company, the company that owned the bank.

3            You're going to hear that Mr. Bekkedam was also a

4    sophisticated financial person.  He had a degree in

5    accounting, and he owned an entity called Ballamor Capital.

6    That was an investment advisory firm that Mr. Bekkedam owned

7    where he had clients and he advised them on what to invest in.

8    You're going to hear that even though starting in 2007 Mr.

9    Bekkedam was no longer the chairman of the bank or the holding

10   company, he still wielded significant influence over this

11   bank.  He did so because Ballamor Capital clients owned more

12   than half of the bank.

13           You're going to learn that what these two defendants

14   did was that they tried to make the bank seem stronger, and

15   the way they did that is they engineered and orchestrated

16   loans where the bank loaned money to individuals to supposedly

17   invest in the bank, when in fact what happened was the bank's

18   money got sent right back to the bank to make it look like

19   there was $8 million of outside investor funds in the bank

20   that would help keep the bank strong in case it was losing

21   money.  But in fact that money came straight from the bank

22   itself.

23           That's the fraud.  The fraud is concealing from bank

24   regulators, concealing from investors, and in some cases

25   you'll see concealing from individuals at the bank what the

Ignall - Opening Statement                              5

1   purpose of these loans was, indeed just the existence of these

2   loans, when Mr. Bekkedam had people working for him,

3   representing to investors that the bank was strong, and

4   failing to inform bank regulators who were considering whether

5   to provide funding to the bank, whether to provide $13 million

6   to the bank, concealing from those people that $8 million of

7   supposedly new money into the bank actually came from the bank

8   itself.

9           Now, you're going to learn that fortunately, at

10  least with respect to the Treasury, these defendants didn't

11  get the $13 million.  But it wasn't for lack of trying.  It

12  turned out there were other reasons that the Treasury didn't

13  want to give Nova Bank the money.  But these defendants still

14  engaged in a scheme to defraud.  They engaged in a scheme to

15  lie to regulators, to lie to the bank, and Mr. Bekkedam

16  engaged in a scheme to lie to investors.

17          This all goes back to the financial crisis of 2008.

18  The United States Treasury created something called the

19  Troubled Asset Relief Program or TARP.  And you're going to

20  hear a lot of acronyms and abbreviations, and one of the other

21  ones you might hear is the Capital Purchase Program or CPP.

22  You don't need to remember all the specific letters.

23          But what this program was, was a way during the

24  financial crisis for the federal government to invest in

25  certain banks, not to keep them afloat if they're going to go

Ignall - Opening Statement                                6

1   under, but to allow them to keep operating and to keep lending

2   money in the community to individuals and banks -- individuals

3   and businesses during the financial crisis so that those banks

4   could keep doing what they're designed to do.  But you're

5   going to learn that this wasn't a gift.  This wasn't a

6   donation from the federal government using public money.  This

7   was an investment, that the bank had to pay it back and to pay

8   it back with dividends.

9           So, therefore, the Department of the Treasury, using

10   bank regulators -- and look up there you see the FDIC and the

11   Federal Reserve.  Those are two bank regulating entities from

12   the Government that regulated Nova Bank and the business --

13   the holding company that owned the bank.

14           You're going to learn that the way this TARP program

15   worked was that it required that the bank provide truthful and

16   accurate information to the FDIC and the Federal Reserve, so

17   that those Government entities could provide information to

18   people at the Department of the Treasury to decide whether

19   Nova Bank was a good enough bank, whether it was viable,

20   whether it was likely to survive even without Government

21   funding.  The idea is not to send public money into a bank

22   that's going to fail anyway, but to put public money into a

23   bank that's going to succeed, to give it the opportunity to

24   continue to operate and to continue to lend money.  But this

25   program required honest information.

1          Well, Mr. Bekkedam and Mr. Hartline had a

2     significant incentive to get funding from the TARP program.

3     The bank was struggling.   The bank did not have as much

4     capital, as much money in the bank that it could use to offset

5     losses as it needed to keep on going, at least as it -- to

6     keep on going without restrictions from the Federal government

7     in terms of what it could go because of its financial state.

8     And these defendants thought that by getting the TARP funding

9     and getting funding from other individuals, they could keep

10    this bank afloat.

11         This bank was Mr. Hartline's job.   He was the CEO.

12    He ran the bank.   His wife worked at the bank.   But this bank

13    was also very important to Mr. Bekkedam.   You're going to

14    learn, as I mentioned before, that his clients owned a

15    majority of the bank.   You're also going to learn that his

16    clients borrowed money from the bank that they could use to

17    invest with Mr. Bekkedam.   You're going to know that Mr.

18    Bekkedam still wielded significant influence over the bank to

19    the extent that he told individuals even after he was no

20    longer the chairman that Nova Bank was his bank.

21         Well, how did this work?   In June of 2009, Nova --

22    I'm sorry, in October of 2008, Nova Bank applied to the

23    Troubled Asset Relief Program for funding.   This went through

24    a committee, it went through a number of people within the

25    Treasury and within the banking regulating community, to

Ignall - Opening Statement                    8

1   determine whether Nova was healthy enough.   Initially, the

2   Treasury people didn't think Nova was healthy enough, but

3   eventually a council, a group of four different regulators

4   agreed to recommend that Nova get funding, more than $13

5   million.   But there was a contingency; there was something

6   that Nova Bank had to do.   They had to raise $15 million of

7   outside money in order to make the bank strong enough that it

8   wasn't going to fail, whether or not it got money from the

9   Treasury.

10          Well, that's where the scheme comes in.   These

11   defendants tried to raise money.   It's June 10th of 2009 when

12   they learned from the FDIC that the Treasury had conditionally

13   approved them, but they have to raise $15 million.   And the

14   Treasury came up with that $15 million number because Mr.

15   Hartline, on behalf of the bank, had told the Treasury that

16   there was an investor, a man named George Levin, who was going

17   to put up $15 million.

18          Well, come the end of June, after Mr. Hartline and

19   Mr. Bekkedam know that they need to come up with $15 million,

20   they try to get something, they try to raise money.   They try

21   to get money from Mr. Levin, but Mr. Levin doesn't want to put

22   up his own money.   Mr. Levin has already invested in something

23   called Banyon, an investment he thinks is very lucrative.

24   That's a business deal that he has involvement with Mr.

25   Bekkedam in, that a lot of Mr. Bekkedam's clients are invested

1   in Banyon as well.

2            So Mr. Levin wants -- Mr. Bekkedam plans to invest

3   in Banyon, and Mr. Bekkedam wants Mr. Levin to invest in the

4   bank.  But Mr. Levin doesn't want to put up his own money.  So

5   come the end of June, the first part of the scheme goes into

6   place.  That's where these two defendants arranged for Nova

7   Bank to loan Mr. Levin $5 million that he would send right

8   back to the bank.  And you're going to see emails and other

9   documents showing both of these defendants talking about

10  loaning money to Mr. Levin for one purpose and one purpose

11  only, to send it back to the bank.   And that's in fact

12  exactly what happened.

13           On June 30th, at the end of a quarter, a time period

14  when the bank is going to report its capital, how much money

15  it has, to federal regulators, on June 30th itself, these two

16  defendants arranged for Mr. Levin to borrow $5 million and

17  send it right back to the bank.  And you're going to see that

18  the money went from the bank to Mr. Levin, two hours later

19  it's back at the bank.  The purpose of this loan was to make

20  it look like the bank had more money than it did.

21           You're going to learn that these defendants did that

22  twice more involving a person named Anthony Bonomo and Charles

23  Gallub, two more people that Mr. Bekkedam introduced to the

24  bank, who borrowed money for one purpose, to send it right

25  back to the bank so the bank could make it look like they had

1    gotten at this point a total of $8 million, when in fact that

2    $8 million came from the bank itself.  That way, come December

3    of 2015, Mr. Hartline could represent to the FDIC that the

4    bank had met the contingency.

5              But the fraud here is that Mr. Hartline concealed

6    the truth.  He hid from the regulators that $8 million of that

7    15 million was the bank's own money.  Mr. Hartline did that

8    because he knew that if the regulators found out that the

9    money came from the bank itself, that didn't make the bank any

10   stronger.  That's something they would want to know, and

11   that's what makes this fraud.

12             What makes this a fraud is concealing the truth from

13   regulators.  What makes this a fraud is Mr. Bekkedam

14   concealing the truth from investors that he and people who

15   were working for him were soliciting to invest in the bank by

16   making it seem that it was stronger than it was.

17             And you're going to learn from people at the

18   Treasury, people who were on this CPP council working for the

19   Treasury, that when they said $15 million, they meant $15

20   million.  They didn't mean send out a loan and get an IOU and

21   hope that someone will pay $8 million later.  They wanted $15

22   million of actual money in the bank so the bank would be

23   stronger, the bank could loan more money, but more importantly

24   the bank could absorb losses.  If people didn't pay money back

25   on their loans, the bank had a cushion.  An IOU doesn't

1   provide a cushion.

2          Let's talk about Mr. Levin's loan.  Not only was

3   this for one purpose, to send it back to the bank, but it

4   wasn't a normal loan for Nova Bank itself.  This was the

5   biggest loan in the bank.  This was right at the bank's

6   lending limit.  This was a loan that the bank turned around in

7   one day; it's a loan that had no security, no collateral, just

8   Mr. Levin's promise to pay it back because he seemingly was

9   very wealthy, and we'll get to that in a minute as to how

10  wealthy he turned out to actually be.

11         This was a loan that only certain members, people at

12  the bank knew what it was for.  Mr. Hartline knew what it was

13  for.  The chief loan officer, who you'll find out was later

14  convicted of a different fraud while working at the bank, knew

15  what it was for.  But if you were to look at the bank

16  paperwork, nothing in Mr. Levin's loan file would show that

17  this $5 million was meant to be sent back to Nova Financial

18  Holdings to buy Nova Financial Holdings stock.  A bank

19  regulator could look high and low and would never see that.

20  The bank documents say that it was either for investment, or

21  another bank document said it was for business purposes.

22         You're going to find out that members of the loan

23  committee, who had to approve this loan, did not know what the

24  purpose of Mr. Levin's loan was.  You're going to learn that

25  the underwriter at the bank, the person who puts together the

Ignall - Opening Statement                           12

1   package to decide whether loans should be made or not, wanted

2   additional information about Mr. Levin's finances and the

3   businesses that he was invested in to make sure he was

4   creditworthy.  But you're going to find out that Nova Bank

5   closed on this loan, even though the underwriter didn't get

6   all the documentation he was looking for.  Why is that?

7   That's because these defendants wanted to conceal the purpose

8   of the loan from the bank and then ultimately from bank

9   regulators, to make sure they wouldn't know that the bank's

10  own money was being used here to prop up the bank.

11         Mr. Levin also had to be screened by the state and

12  federal government to potentially own a certain amount of the

13  bank.  Well, you're going to hear that the concealment

14  continued to the Pennsylvania Department of Banking and the

15  Federal Reserve when it came to Mr. Levin's application, that

16  one of the questions that the bank regulators asked was,

17  where's your money coming from to invest in the bank?  We have

18  to make sure that you have the financial ability to make this

19  investment.

20         Well, there's a lot of communication between the

21  bank and Mr. Levin and somebody who works for him,

22  communication with Mr. Bekkedam about answering those

23  questions, but at no point does anyone at the bank tell -- or

24  ask Mr. Levin to tell a bank regulator that in fact Mr. Levin

25  had borrowed $5 million to make his first supposed purchase of

Ignall - Opening Statement                                    13

1     the bank stock.

2                Well, after Mr. Levin engaged in his first

3     transaction -- which you're going to hear he did as a favor to

4     Mr. Bekkedam because they had a lot of business dealings going

5     on.  This was not something he was very eager to do; it wasn't

6     something he was looking to borrow money and then maybe at

7     some other point invest in Nova Bank.  He did this whole

8     transaction as a favor to Mr. Bekkedam because of their

9     ongoing business relationship.

10               Mr. Bekkedam wanted Mr. Levin to invest money or

11    maybe even borrow money to invest in Nova Bank, but Mr. Levin

12    was not very enthusiastic about that.  You're going to hear

13    that in July, Mr. Hartline tried to get a loan from another

14    bank to Mr. Levin so he could invest in Nova Bank.

15               Now, that's a little bit different, ladies and

16    gentlemen, you're going to hear, than Nova Bank loaning the

17    money itself, because if Nova Bank makes the loan, all they

18    get in return is an IOU.  So if Mr. Levin pays it back, then

19    they have money.  If Mr. Levin doesn't pay it back, they don't

20    have any more money.  If another bank, in this case it's a

21    bank called ACBB, were to make a loan, then the bank, Nova

22    Bank has the money.  If Mr. Levin can't pay it back, that's on

23    ACBB.

24               Well, ACBB in this case decided that they weren't

25    willing to give Mr. Levin a loan, that they didn't think he

Ignall - Opening Statement                              14

1    was creditworthy enough to get a loan for up to $9 million.

2    So Mr. Levin was not enthusiastic about putting in any more

3    money.  So that's when these two defendants needed to try to

4    raise money from another source, and that's where you're going

5    to hear that Mr. Bekkedam was working to raise money from

6    investors, raise money from people who were clients of

7    Ballamor Capital, but also raise money from other people that

8    he knew.

9           You're also going to hear about how urgent things

10   became in October of 2009 when these defendants thought there

11   was a deadline, and you're going to hear that the Treasury

12   kept extending the deadline for Nova to meet this contingency.

13   They moved it to October, ultimately moved it to December.

14          But you're going to see email exchanges involving

15   Mr. Hartline and Mr. Bekkedam in October of 2009 where Mr.

16   Bekkedam is eager to try and get money from Mr. Levin, where

17   he says if Mr. Levin will come up with $5 million more, the

18   bank will send it back to him.  He just needs to be able to

19   show some money from Mr. Levin to get this TARP funding.  And

20   you're going to see the role that each of these defendants

21   plays.

22          You're going to see emails where Mr. Bekkedam says

23   that Brian has the regulators killing him, meaning Brian

24   Hartline.  You're going to see Mr. Bekkedam sending an email

25   to somebody who worked for Mr. Levin saying you have to help

Ignall - Opening Statement                               15

1    me so that I can manage Brian, who's managing the regulators;

2    how important it was to make it look like the bank had more

3    money than it did so they could get this TARP funding.

4           So in October, Mr. Bekkedam and Mr. Hartline come up

5    with another person, Anthony Bonomo.  Mr. Bonomo is a client

6    of Ballamor, a client of Mr. Bekkedam, someone who was

7    introduced to the bank by Mr. Bekkedam.  Just like with Mr.

8    Levin, these defendants orchestrate a loan to Mr. Bonomo.  In

9    this case it's a loan for $4.5 million.

10          This loan actually has two purposes; one is to put

11   money into this Banyon investment, the investment that Mr.

12   Levin and Mr. Bekkedam have -- that they worked on together,

13   and $2 million is going to go into Banyon, $2.5 million is

14   going to go right back to Nova Bank to make it look like Mr.

15   Bonomo has invested $2.5 million, when in fact this is money

16   that started with the bank.  Just like with Mr. Levin, you

17   could look high and how in the bank paperwork, you will never

18   see anything that shows the true purpose of this loan.  The

19   purpose of the loan in the bank paperwork shows that he's

20   going to invest -- not just an investment, but specifically an

21   investment in Banyon.  Not one word about Nova Financial

22   Holdings.

23          So, ladies and gentlemen, the question then is, why?

24   Why is the bank paperwork silent on this?  The reason, you're

25   going to learn, is because that way bank regulators would have

1    a much more difficult time figuring out what the purpose of

2    that loan was, to realize that Mr. Bonomo's $2.5 million is

3    not something that should count as new money in the bank, as

4    money that qualified for that $15 million contingency to get

5    funding from the federal government.

6            Well, a few days later, the end of October, there's

7    another problem.  This Banyon investment, that Mr. Levin, as

8    you'll find out, was basically more than 100 percent invested

9    in, not only did he have his own money in it, but he was

10   guaranteeing the returns for other people.  You're going to

11   find out that around Halloween of 2009, Mr. Levin, as well as

12   these defendants, learned that the Banyon investment was

13   basically worthless.  So Mr. Levin's financial situation, he's

14   not worth $400 million, he's worth a whole lot less.

15           So at this point Mr. Levin is not going to invest

16   any of his own money because he really doesn't have much money

17   to invest, and at this point he's really not very likely to

18   pay off that $5 million interest-only unsecured loan.  He's

19   been paying the interest up to this point, but now his

20   financial circumstances are such that he's very unlikely to

21   pay that back.

22           But the TARP deadline has continued to be extended

23   and now it's in December.  That's when these defendants

24   orchestrate the third loan.  This is a loan to a man named

25   Charles Gallub.  Mr. Gallub is someone else who was introduced

Ignall - Opening Statement                    17

1    to the bank through Mr. Bekkedam.  He's a real estate

2    developer.  He's someone who has a lot of loans, business

3    loans with the bank.

4           Well, Mr. Hartline approaches him to get him to

5    invest in the bank, as Mr. Hartline had done a year earlier in

6    2008, when Mr. Gallub had also supposedly invested in the

7    bank.  But in both times, Mr. Gallub simply borrowed money

8    from Nova Bank to send it back to Nova Bank.  And you're going

9    to hear that Mr. Gallub did that because he simply wanted to

10   keep up his relationship with the bank.  He had a lot of loans

11   with the bank; he wanted to keep the bank happy.  And again,

12   just like with Mr. Levin, just like with Mr. Bonomo, you could

13   search high and low in the bank records and you won't see any

14   evidence that Mr. Gallub's loan was meant to be sent right

15   back to Nova Bank.

16          You're going to see with the December 2009 loan to

17   Mr. Gallub for $500,000, that the purpose of that loan was

18   working capital.  What does that mean?  That means money for

19   Mr. Gallub's real estate business.  It doesn't say one word

20   about circling it back round.

21          Well, right around this time, now the defendants

22   have orchestrated $8 million of loans to people to send right

23   back to the bank so they can represent $8 million in new money

24   to meet this contingency.  Around this same time, you're going

25   to hear that Nova Bank paid Mr. Bekkedam $250,000 for his

Ignall - Opening Statement                          18

1    efforts in fund raising on behalf of the bank.

2              You're going to hear that right around that time, on

3    December 15th, Mr. Hartline wrote to the FDIC, and that's

4    where the information -- that's when he gave the information

5    to and have it go up to the Treasury that Nova had met the

6    contingency, that they had raised all $15 million.  But what

7    does he conceal?  He conceals that $8 million of that is money

8    that came from the bank itself.  He conceals from the bank

9    that the $5 million loan to Mr. Levin, which maybe seemed like

10   it was a good idea back in June, maybe didn't, well, now Mr.

11   Levin is not really in a position to pay that back.

12   Nonetheless, he represents to the Treasury that they've raised

13   all $15 million, concealing the truth from the Treasury.

14             Well, it turns out that because of other problems at

15   Nova Bank, the Treasury denied the application.  Not because

16   they found out about this fraud, but because even if Nova had

17   really raised $15 million from the outside, people at the

18   Treasury were concerned that Nova was not strong enough to

19   survive.  And as you'll find out, ultimately in 2012, Nova did

20   not survive.

21             But that, ladies and gentlemen, is the crux of the

22   fraud, and you're going to learn that a loan, even to someone

23   who appears to be rich, is not the same thing as money in the

24   bank.  You're going to hear from the bank regulators why it's

25   important for them to know if the bank is loaning its own

Ignall - Opening Statement                               19

1    money to fund its own investment rates.

2              But, in particular, you're going to find out that

3    Mr. Levin never paid the $5 million back.  You're going to

4    find out that Mr. Bonomo went into a lawsuit to try not to pay

5    back the loan that he took out to circle back to Nova.  You're

6    going to find out that in 2010, Mr. Gallub did pay back both

7    of his loans, but he did so at the urging and pressure of Mr.

8    Hartline.  And he paid both loans back, even though he had a

9    lot of other loans with the bank that he could have paid back

10   instead.  That's why a loan is not the same as money in the

11   bank.

12             Well, even though in December of 2009 the United

13   States Treasury determined that Nova was not going to get the

14   funding despite this fraud, the concealment by these two

15   defendants didn't end.  You're going to hear from a gentleman

16   named Todd Howard.  He's someone who worked for Mr. Bekkedam.

17   You're also going to hear that he used to be in the United

18   States Army, and as he told Mr. Bekkedam when he was applying

19   for a job there, that he had been discharged from the Army

20   because he had claimed more pay for his wife than he was

21   entitled to.

22             You're going to hear that Mr. Howard worked for Mr.

23   Bekkedam and was trying to sell people on the idea of buying

24   Nova Bank shares, selling people on the idea that Nova Bank

25   and indeed the Nova Bank Holding Company were good

1    investments.  Well, Mr. Howard discovered something in

2    December that troubles him a lot.  He discovers that George

3    Levin has borrowed $5 million and then supposedly invested in

4    the bank.  You're going to hear that to Mr. Howard that made

5    him very concerned about a) him investing his own money in

6    Nova Bank, and b) him representing to clients that Nova Bank

7    was a good investment, because he didn't know that Mr. Levin

8    didn't put money in, but in fact the bank put its own money

9    in.

10          So that's when Mr. Howard contacts Mr. Bekkedam, and

11   you're going to see the email where he says we need to have a

12   heart to heart; I'm very troubled.  You'll learn that they had

13   a conversation and that Mr. Bekkedam tried to placate Mr.

14   Howard, but never gave him any answers.

15          You're going to hear that Mr. Howard was still

16   concerned, so concerned that he went to Mr. Hartline at the

17   bank and said, I need to understand what happened here.  You

18   need to make me feel better that this was nothing illegal.

19   About a month goes by; he doesn't hear from Mr. Hartline, so

20   he sends Mr. Hartline another email.  In this email, Mr.

21   Howard is more direct and says, if I don't get some answers

22   from you, I'm going to go to financial regulators.  I need

23   some opinion that nothing was wrong here.

24          Well, that gets Mr. Hartline's attention.  You're

25   going to hear that shortly thereafter, Mr. Hartline contacted

Ignall - Opening Statement                                      21

1    the bank's attorney to try and get an opinion from the bank's

2    attorney that he could use to get back to Mr. Howard to stop

3    Mr. Howard from going to financial regulators.

4              Now, although -- and you're going to hear from the

5    bank's attorney.  And although the bank's attorney did not

6    work on what to disclose or not to disclose to the Treasury in

7    terms of the TARP application, and in fact in his opinion

8    letter wasn't asked to describe what the bank should have told

9    or not told bank regulators when applying for the TARP, his

10   letter was only about whether the loan violated Pennsylvania

11   law.  And as we discussed before, the loan itself is not the

12   fraud, it's concealing the loan, concealing the source of the

13   funds that Mr. Levin used to invest supposedly in the bank

14   that's the fraud.

15             Well, you're going to hear from the bank's lawyer

16   that he got a number of documents and got information from Mr.

17   Hartline.  And you're going to hear that when communicating

18   with the bank's lawyer, Mr. Hartline concealed the true

19   purpose of Mr. Levin's loan.

20             You're going to hear that Mr. Hartline told the

21   bank's lawyer that this loan was not to invest in Nova Bank,

22   but this loan was just a coincidence, that Mr. Levin wanted

23   some money to pay back funds he had used to fix up a house in

24   Devon, and just by coincidence the same day he happened to

25   decide that's the day I want to buy some Nova Financial

Ignall - Opening Statement                          22

1    Holdings stock.

2          You're going to see a document that Mr. Hartline

3    sent to the bank's lawyer.  It's called a risk assessment

4    summary, and that's a document the bank uses to decide whether

5    someone should get a loan or not.  It has a lot of information

6    on it.  One of the pieces of information on this risk

7    assessment summary is the purpose of the loan.

8          Ladies and gentlemen, you're going to see two

9    different risk assessment summaries for Mr. Levin.  The first

10   one, the one I talked about earlier, that's in the bank

11   records that was made at the time of Mr. Levin's loan that

12   shows that it's for investment purposes.  It doesn't say Nova,

13   but it says investment purposes.

14         Well, in early 2010, when Mr. Hartline is getting

15   this opinion letter from the bank's lawyer, he sends a second

16   risk assessment summary.  This one is consistent with the

17   concealment.  This one says the purpose of the loan is to

18   replace funds that Mr. Levin had spent fixing up his house in

19   Devon.

20         Well, the letter, the opinion, the information that

21   Mr. Hartline gave to the bank's lawyer is not the end of the

22   concealment here.  You're going to find out that in 2010,

23   there's a firm called KPMG, they're an accounting firm, and

24   they come in to audit the bank's financial records.  And

25   you're going to learn, not through Mr. Hartline, but through

Ignall - Opening Statement                    23

1    someone who is an internal auditor at the bank, the accounting

2    firm found out about Mr. Levin's loan and then supposed

3    purchase of bank stock.

4            When the auditor found out about that, the auditors

5    went in, in May of 2010, and met with Mr. Hartline and other

6    members of the bank and said, you can't count that as money in

7    the bank.  You can count that as money in the bank when and if

8    Mr. Levin pays the loan back.  But as long as it's a loan and

9    just a hope, an IOU, you can't count that as capital.  You

10   can't count that as shareholders' equity.

11           Mr. Hartline doesn't like that answer, so he sends a

12   letter to the auditor.  And at this meeting the auditor said,

13   I want information, not just about Mr. Levin, but about any

14   other supposed investor who also had a loan from the bank at

15   around the same time.  So that's how the auditor finds out

16   about Mr. Gallub and finds out about Mr. Bonomo.

17           Well, Mr. Hartline, as I said, didn't like that

18   answer, so Mr. Hartline sent a letter, and you're going to get

19   to see this letter, to the auditor where Mr. Hartline

20   continues the same concealment, that these loans were somehow

21   totally independent and just a big coincidence that it's the

22   same day; that Mr. Levin just wanted money to pay back what he

23   had spent to fix up a house in Devon.  Mr. Levin was looking

24   to borrow money from the bank months earlier and that Mr.

25   Levin really wanted to invest in Nova Bank and they weren't

Ignall - Opening Statement                          24

1    connected.

2            You're going to be able to compare what Mr. Hartline

3    said in this letter with the emails and the documents you're

4    going to see from the time of these loans that make it clear

5    the loans had one purpose, to send the money right back to

6    Nova Bank.  You're also going to see and hear sworn testimony

7    from Mr. Hartline after the fact, where again he continues to

8    say that the loan to Mr. Levin was not connected to sending

9    the money right back to Nova Bank.  And you're going to see

10   that he even acknowledges that that would be a problem if the

11   bank were to loan money to someone to send it right back, that

12   there's an accounting rule, you can't do that.

13           Ladies and gentlemen, at the end of this trial, you

14   will have seen and heard a lot of evidence.  You're going to

15   see documents that underlie the transactions.  You're going to

16   see email communications that involve Mr. Hartline and Mr.

17   Bekkedam.  You're going to listen to witnesses who have

18   knowledge.  You're going to listen to Mr. Levin, Mr. Bonomo,

19   and Mr. Gallub, and listen to people who were Ballamor

20   clients.  You're going to look at what these two defendants

21   did and ask yourselves why, why engage in these transactions,

22   and why conceal these transactions from regulators and from

23   investors.

24           Ladies and gentlemen, this isn't, and you can be

25   happy to know, about accounting or bank regulations or

Ignall - Opening Statement                          25

1   something that would make everyone's eyes glaze over.  This is

2   about fraud.  This is about whether these two defendants knew

3   what they were doing was wrong, knew what they were doing was

4   something that bank regulators would want to find out about

5   and made an effort to conceal that; whether Mr. Bekkedam knew

6   that investors would want to know that the bank's own money

7   was being used to make it seem healthier and whether he tried

8   to conceal that as well.

9          Ladies and gentlemen, it's like taking water from

10  one glass into another and making it seem like there's twice

11  as much water simply because someone has promised to fill that

12  first glass.  The question is, why did these two defendants do

13  this?  Were they trying to conceal the truth from regulators,

14  from the bank, and with respect to Mr. Bekkedam, from

15  investors?

16         When you consider all the evidence in this case,

17  when you listen to the witnesses, you see the documents, you

18  see the emails, when you listen to the Court's instructions on

19  the law, you're going to come to one conclusion, that both of

20  these defendants are guilty on each of the counts in which

21  they are charged.  Thank you.

22      (Pause)

23         THE COURT:  You can stand up and stretch your legs,

24  if you wish.

25      (Transcriber change)

1          THE COURT:  All right.  Mr. Egan, do you wish to

2    give an opening statement at this time for Mr. Hartline?

3          MR. EGAN:  Yes, Your Honor.  Thank you very much.

4          THE COURT:  You may proceed.

5          MR. EGAN:  And if Your Honor doesn't mind, I -- I

6    might move this a tiny bit closer.  Thank you.  I'm older than

7    him.  I can't see as well.  Thanks.

8          Ladies and gentlemen of the jury, there is no crime

9    here.  I'm going to repeat that.  There is no crime here.

10   Brian Hartline hid nothing.  Brian Hartline deceived no one.

11   Brian Hartline lied to no one.

12         In order to be deceived, you have to actually ask

13   the question in the first place, and in order to lie, you have

14   to have a fact that isn't true, and in order to deceive, you

15   have to know that the other side is interested in facts that

16   the other side never asks you about, because there is no law,

17   no regulation, no law, and Mr. Ignall pointed to no regulation

18   and no law in his opening statement that makes the

19   transactions that underlied the capital that was invested in

20   Nova Bank illegal.  None, zip, zero.  You didn't hear a single

21   one, and you won't.

22         What you'll hear is that KPMG, the auditing firm, in

23   2010, long after the regulators had decided to give Nova no

24   money, came in and did an audit and said these loans shouldn't

25   count as capital.  And those last few things you heard about

Egan - Opening Statement                    27

1    Mr. Hartline's alleged coverup was -- he didn't use the words,

2    but that's what he's alleging.  They were merely the bank's

3    efforts to convince KPMG that they should count it as capital,

4    because they disagreed with KPMG.  The letter that was

5    described to you at the very end there, you're going to get to

6    see it, and I'm glad you're going to get to see it, because it

7    doesn't quite read the way the Government suggests.  Ladies

8    and gentlemen, when you're said and done, when we're all

9    finished here, what you're going to find out is there was no

10   crime.

11          Now, ladies and gentlemen, you are here to do a

12   solemn duty.  This is the most solemn duty that any citizen,

13   any citizen can be called to do.  It's as important as serving

14   in the military.  It's as important as voting.  You've been

15   chosen to be jurors to judge another citizen, a human being,

16   Brian Hartline.

17          Brian Hartline is a banker.  He always wanted to be

18   a banker.  He grew up outside Boyertown, Pennsylvania on is

19   grandparents' farm.  Can see he was pretty well fed, and he

20   wanted to become a banker because his grandfather in bad years

21   used to go to the local community bank and borrow money to get

22   through the year.  You can sit down, Brian.

23          So he went to college.  He went to Shippensburg

24   State or Millers -- I got it wrong -- Millers State, Millers -

25   - one of those State colleges, and he got a degree in

1    accounting.  Yeah.  They said he's a CPA.  He was an

2    accountant for four years before he started banking, before he

3    went into banking, and ultimately, by 2002, he managed to

4    become the head of a community bank, a bank called Nova Bank.

5         Now, we're not talking about New York City bankers

6    here.  We're not talking about Wells Fargo.  We're not talking

7    about Citibank.  We're talking about Nova Bank, a community

8    bank, a bank that gives loans to small businesses to buy

9    equipment so they can keep going, a bank that gives loans to

10   folks like you and me to buy our houses.  So when you think

11   about banks, don't think about Citibank.  Don't think about

12   Wells Fargo, because when we get into the regulators, we're

13   going to talk a little bit about that as well.  When we get

14   into the regulators, they're two different realities.  We're

15   talking about a community bank.

16        Nova Bank had about 15 branches.  It was fairly

17   successful.  I like the use of the language by Mr. Ignall.  He

18   said he took over a bank in 2002.  Yes.  He and some other

19   investors rescued a bank in 2002 that probably would have had

20   to have been taken over by the Government, and they made that

21   bank into Nova Bank, and between 2002 and 2008 and '09 when

22   the events that formed the basis for this case started, they

23   went out and they raised capital many times.  You'll learn

24   they raised capital at least four times, pretty much every

25   other year, because you have to raise capital to run a bank,

Egan - Opening Statement                         29

1    and you'll also find that when they raised capital in those

2    years before 2008, it was not unusual whatsoever for

3    individuals who wanted to invest in Nova Bank to take out

4    loans from Nova Bank and use the proceeds to invest them in

5    the loans, because the Government wants to call that taking

6    Nova Bank's money and giving it right back to Nova Bank and

7    taking it out of one glass and putting it into the other

8    glass, but guess what.  They're just flat out wrong about

9    that, because when a bank makes a loan, that loan goes to a

10   third party, and that third party has independent free will to

11   do whatever they want with that money, and that third party

12   then has an obligation to the bank, which they have to pay on,

13   and then if they choose and they want to use that money to

14   invest in the bank, they can then invest in the bank, and the

15   bank then has that money as an investment.

16           And what you're going to hear from the regulators

17   when we get to them is that there's a certain limit that you

18   can lend up to, and then there's a certain amount of capital

19   that you have, and if you lend money -- and if you just think

20   about it.  It's common -- common sense.  If you owned a bank

21   and I come to you and I want to borrow money and you lend me

22   money, would you rather that I went and spent that money at

23   the beach on a good time, or would you rather that I invested

24   that money in your bank?  I'll be more interested in the

25   success of your bank if I invest that money in your bank.  Now

Egan - Opening Statement                                30

1   you've got two things, not one thing.  You've got my debt,

2   which isn't an IOU.  It's a loan, a documented loan that I owe

3   duty on, a legal duty to pay, and you have my investment, and

4   that's really all that took place in this case.

5        Now, the Government wants to talk about subterfuge.

6   The Government wants to talk about hiding things.  There is no

7   subterfuge.  There is no hiding things, and the very evidence

8   of that will come from their witnesses.

9        Ladies and gentlemen, before I get to that, I need

10  to do a little bit about why we're here and what we're doing

11  here.  Now, I'll bet when you all sat out there couple weeks

12  ago bored out of your minds hoping please don't pick me, I

13  would be willing to bet that none of you was thinking that

14  when you got up here and sat here, that the Government would

15  get up and tell you that this is a fraud case where the

16  defendant has got no money and the Government lost nothing,

17  but guess what.  It is.  I bet you were sitting there thinking

18  what did that greedy guy do; must have done something pretty

19  serious; we're going to be here for a month; holy cow.

20       What did he do, and what did he have to gain from

21  this?  You know what he had to gain from this?  His job, his

22  salary, and even there, in 2010 when the Board of Directors

23  wanted to give him a raise, he refused it because other folks

24  were getting laid off.  You'll hear that.

25       And who will you hear from?  You'll hear from the

Egan - Opening Statement                    31

1    witnesses who worked at the bank.  And you know what those

2    witnesses are going to say?  Number one, they're going to say

3    Brian Hartline never told me to lie to anybody.  Number two,

4    they're going to say Brian Hartline never hid anything from

5    me.  They talk about the purpose of the loan and oh, they

6    didn't know the purpose of the loan.  Well, guess what, it

7    wasn't important.

8              If you're going to lend money to a restaurant and

9    the payments for that loan, what's going to come back to you

10   in that loan is coming from the funds that the restaurant

11   generates, then the purpose of the loan is pretty important,

12   because you want to make sure that the restaurant is going to

13   be successful, or you're not getting paid back.  If you're

14   lending money to a guy who's worth $300 million and has a

15   bunch of it in other investments that show up on his bank

16   statements from TD Bank, you don't care what he does with it,

17   because that's not where your payment is coming back from, and

18   you're going to hear the people who reviewed that loan tell

19   you that.

20             In this case, the evidence comes from the witness

21   stand.  The Government has the burden of proof, and they have

22   to prove Brian Hartline guilty beyond a reasonable doubt, and

23   His Honor has told you an indictment means nothing.  Brian is

24   as innocent sitting there as I am, as anybody in this

25   courtroom is.  Anybody.  They must prove from the witness

Egan - Opening Statement                              32

1    stand beyond a reasonable doubt that he's guilty, and he is

2    presumed innocent unless and until they do that.

3          And ladies and gentlemen, there are so many

4    reasonable doubts in this case.  There is no way they will be

5    able to do that mostly because there was no law that was

6    broken, and there was no deception.  The regulators were not

7    deceived, and what the regulators will tell you is -- and this

8    is great.  In April of 2000 -- well, let's talk a little bit

9    about the regulators, because they're going to be first.

10         The CPP was created in the big crisis of October

11   2008.  We all remember it.  It was a huge crisis.  We had to

12   save the country.  The banks were going south.  So they

13   created the CPP.  They create this application for banks to

14   apply to get these TARP funds.  Well, not all banks, because

15   remember, two kinds of banks?  Citibank, Wells Fargo, Chase,

16   they didn't even have to fill the thing out.  Basically just

17   gave them money, hey, you know, you're too big to fail.  It

18   was the community banks and the small banks that had to fill

19   out this application.  Well, wait until you see this

20   application.  You couldn't apply for a car loan with less

21   information.  Two pages.  Two pages.

22         And you'll learn it was not Brian Hartline who

23   filled out the application.  It was the CFO of Nova Bank, Jeff

24   Hanuscin.  He's going to testify.  Nice guy.  He's going to

25   testify he filled out the application.  He provided the

1    financials.  He's the one who interfaced with the regulators

2    for the first several months.  Well, guess what.  They file

3    the application.  They hear nothing.  Months go by.  Around

4    April, they start hearing from the FDIC -- from the CPP about

5    whether or not they could give them the -- the funds.  They

6    have a whole lot of questions.  They want to see all the

7    balance sheets.  So everything gets sent to them.

8              Well, now, ladies and gentlemen, we're talking about

9    a bank that is regulated by the Federal Government here at

10   Nova Bank.  So not only does Nova Bank have an auditor in

11   KPMG.  They've got another company called Merit Partners that

12   comes in and reviews all of their loans.  They have the

13   Pennsylvania Department of Banking coming in every year and

14   looking at all of their books and records.  They've got the

15   FDIC coming all the time and looking at their books and

16   records.  They are inspected 16 ways to Sunday.

17             And this isn't a situation where they say hey, can

18   you tell us about what it is we should look at it.  When KPMG

19   or the FDIC or the Pennsylvania Department of Banking comes to

20   a bank to do an investigation and inspection, they send a

21   letter and they say we want all of these documents, and the

22   bank has to provide them all to them.  So basically, they're

23   being inspected -- every one of these loans is being inspected

24   by the Federal Government while this process is going on.

25             And this is not a situation where the bank gets to

Egan - Opening Statement                                  34

1    pick and choose.  These auditors come in and they sit there

2    for three to five weeks.  You'll hear from the witnesses.

3    They sit there for three to five weeks, and they say I want

4    this, I want that, I want this, I want that.

5            Now, they're going to tell you that a guy, some 50

6    years old, never got in trouble for spitting on the sidewalk

7    is going to hide this nonsense when he knows he's being

8    inspected by four different people?  The fact is he didn't

9    know there was anything wrong it, and the reason he didn't

10   know there was anything wrong with it, because there's no law

11   that says there's anything wrong with it.  So there's just no

12   crime.

13           I want to talk about the transactions themselves,

14   because that's what really important here.  The Government

15   wants to say took one hand, put it in the other hand, it's the

16   same money.  That's just not the way it works.  First of all,

17   there's three loans.  Actually, there's four loans.  Mr.

18   Golleb actually did this twice, and it's interesting.  The

19   Government doesn't seem to want to talk about the first time

20   he did it, because the first time he did it, he applied for

21   the loan before TARP existed, and he invested in the bank

22   about two days after TARP came into being.  So clearly, that

23   has nothing to do with any alleged conspiracy, but it's the

24   exact same behavior.  He borrowed money.  He invested in the

25   bank.

Egan - Opening Statement                          35

1              And guess what.  That was in the fall of 2009 --

2        '08.  KPMG came in in 2009 and audited the books and said

3        nothing about it.  They didn't say well, that loan is a

4        problem.  Merit Loan Partners, who's another independent

5        review people, come in and look at all the loans.  They came

6        in and looked at all the loans in 2009.  They didn't say

7        anything about it.  They didn't say there's a problem.  How's

8        he supposed to know this is a problem if his auditors aren't

9        telling him?

10             Then Mr. Golleb does that, borrows the money, but

11       they want to make it sound like oh, Brian Hartline said lend

12       them the money, we'll just lend them the money, it happens

13       right away, there's no issue here.  That's not the way it

14       works.  He has to file an application.  The application goes

15       to the bank.  The underwriter, which the Government spoke

16       about, Mr. Madiany, another really nice guy you'll get to meet

17       -- Mr. Madiany is the underwriter.  He's not the credit

18       manager.  He's not in charge of credit.  He just reviews the

19       loan to see whether certain documents are there and certain

20       documents aren't, and the underwriter then sends it to the

21       credit manager.

22             The credit manager is a guy named Mark Poliski.

23       He's critical in this case.  Now, as His Honor has explained

24       to you, the Government has the burden of proof.  The

25       Government decides who they're going to call and who they're

Egan - Opening Statement                        36

1    not going to call, but I suspect you will hear from Mr.

2    Poliski, and I certainly hope you do, because Mr. Poliski is

3    the credit manager, and Mr. Poliski is actually the guy who

4    had to determine whether Mr. Golleb, Mr. Levin, and Mr. Bonomo

5    were creditworthy and deserved these loans, and what Mr.

6    Madiany is going to tell you is yeah, I sent the thing up to

7    him with some questions, but it's not my job to tell Mr.

8    Poliski whether he should or he shouldn't approve it, you

9    know, I work for him.

10        So it went up with the questions, and Mr. Poliski

11   approves it.  It doesn't even reach a loan committee unless

12   Mr. Poliski approves it, and you know what you're not going to

13   hear, I guarantee you?  You're not going to hear that Brian

14   Hartline ever went to Mark Poliski and said you better approve

15   this loan, this is a big deal, you've got to approve this

16   loan, don't tell anybody what it's about, this is a big

17   secret, we're hiding this from the Government.  No, sir.  No

18   way.  That never happened.

19        Mr. Poliski looked at the stuff and said hey, this

20   is a businessman with a really good business who has plenty of

21   money, why don't we lend it to him.  Good idea.  That's how

22   banks make money, by lending people money.  That's how they

23   make income.  Another thing they get out of the loan, which

24   the Government wants to say they get nothing out of making out

25   of making a loan, but I don't know.

1          Anyway, Poliski approves the loans.  First, Golleb.

2     Later, Levin and Bonomo and Golleb again.  Then it goes to a

3     loan committee.  Not to Brian Hartline, a loan committee, five

4     different people.  Dave Deitrich, Jeff Hanuscin, the CFO,

5     Poliski himself, Brian and another who escapes me right now.

6     They all have to vote on it.  They have to approve the loan as

7     well, and not a single one of them is going to come in and say

8     to you that this man ever put pressure on them or told them

9     they had to approve that loan or ever hid anything from them.

10          They didn't ask about the purpose of the loan for

11    the reasons I just told you, because in certain cases, it

12    doesn't really matter that much.  Some of them knew.  Some of

13    them didn't.  Makes no difference.  They want to make a big

14    deal out of that, but it's just not a big deal.

15          Anyway, Levin -- so that's the first Golleb loan, as

16    I told you, is reviewed.  In the fall -- in the spring,

17    there's this guy, George Levin.  He meets Mr. Bekkedam.  He's

18    apparently a very wealthy man.  By all intents and purposes,

19    everyone believed he was worth a minimum $300 million in the

20    spring of 2009, and he is in Florida, but he has a house in

21    PA.  I guess he grew up around here.  He's got family around

22    here, whatever.  He's got this big house in Devon, big fancy

23    place, and he lives in Florida, and he has all of this money,

24    this $300 million involved in this investment thing that he's

25    got going on, and it -- it's all in TD Bank, and he would like

Egan - Opening Statement                                    38

1    to not be in TD Bank.  He'd like to be in a bank that was

2    friendlier than him, so him and -- and Bekkedam get to

3    talking, and the idea -- and Mr. Levin I'm sure will say this

4    -- was that Nova might actually expand and go into Florida,

5    and Levin could then use the bank and have his money in the

6    bank and give a better deal.

7            He signed a subscription agreement.  That is an

8    agreement to buy $18 million worth of Nova stock, and he

9    signed it before -- early in June of 2009.  That is a legally

10   binding commitment to buy that stock.

11           What does Brian Hartline do?  He tells the

12   regulators, yeah, we've got this guy, he's coming to buy

13   $15 million of stock.  There's no lie there.  It's truth.  He

14   did commit to do it, and he probably would have done it except

15   for his investments ended up going south.  Regardless, it's

16   not a lie.

17           Now, most rich folks don't really like to spend

18   their own money or invest their own money, because what they

19   like to do is leverage it.  So if I can borrow money from you

20   at seven percent and invest it and get ten percent, I got more

21   money.  That's how people get rich.  I should have learned

22   this when I was younger, but in any event, that's what Levin

23   is doing here.  He just wants to borrow the money from Nova so

24   that he can leverage it and make more money on it, because his

25   investments are paying more money.  Probably why they

Egan - Opening Statement                          39

1   ultimately failed, and, you know, I guess they were probably -

2   - you know, they -- they were -- probably couldn't sustain

3   that.  I don't know.  That's not an issue here, but he's

4   thinking I can make more money off that money.  So let me get

5   the money from Nova, and then I'll have my money to use on my

6   things.  There is nothing wrong with that.  Nothing.  It's

7   completely legal.  The Government concedes the loans are

8   completely legal.

9            The only question is whether the capital that Nova

10  Bank represents to the Government is appropriately considered

11  capital, and guess what that comes down to.  You'll like this.

12  Comes down to something called EITF85-1, which is an Emerging

13  Issues Task Force recommendation or something that is made to

14  auditors to apply gap to the bank's finances.

15           And what you're going to hear from the accountant at

16  KPMG, the expert who comes in, is that right around the time

17  that he finds out about these loans when he's examining the

18  place in 2009 -- 2010, he learns of this EITF85-1 and decides

19  to apply it.  Now, how Brian Hartline is supposed to know

20  about that in June of 2009 is beyond me, and you won't hear

21  any evidence that he knew about it.  What you'll hear is he

22  disagreed with the guy from KPMG when he came up with that.

23  What you'll hear from the CFO when he comes and testifies,

24  Jeff Hanuscin, is he still disagrees with it.  He still

25  doesn't think there's any problem here.  Yet, they want you to

Egan - Opening Statement                              40

1    convict this man based on KPMG's auditor's judgment.  That's

2    all they've got.  That's it.

3           Talk a little bit about the transaction where the

4    investment takes place.  I told you there's an investment --

5    there's a subscription agreement that has to be signed.  Well,

6    guess what.  There's also an actual transaction there too,

7    because you buy stock, you get stock.  Guess what.  Mr. Levin,

8    Mr. Bonomo, Mr. Golleb, they all got stock for their

9    investments.  They voted that stock.  The Government wants to

10   call this what's -- and they didn't use the term in the

11   opening.  I'm a little surprised.  They want to call it

12   roundtrip or a circular loan.

13          A roundtrip or a circular loan requires that the

14   people you lend the money to who send it back be under your

15   control, right?  Did you hear him say that Bonomo, Levin, and

16   Golleb were co-conspirators?  Did you hear him say that they

17   were in on this deal?

18          Now, they want to say these guys had a conspiracy to

19   loan money to these guys to get money back in the bank.  Well,

20   when the money gets to those guys, they don't have to send it

21   back.  How can that be a conspiracy?  How can that be an

22   agreement?  It can't.  It's just not there.

23          Now, I want to talk about the purported coverup,

24   because the Government said something really interesting.

25   They said Todd Howard discovered -- I wrote it down -- he

Egan - Opening Statement                                41

1    discovered that this went on.  Guess how Todd Howard

2    discovered that this went on.  Brian Hartline told him.  He

3    told him in a conversation.  He said hey -- after Levin's

4    investments started going bad, he said, you know, we loaned

5    him money, this is a problem, you know, we're worried if he's

6    going to pay us back or not.  He has an obligation to pay us.

7    He was still paying, by the way.  Levin paid on this for more

8    than a year after he went south, but Golleb paid all of his

9    loans back.

10          So I'd like to know that.  Just take a side.  I want

11   to go back to Todd Howard, but I can't -- ask yourselves this.

12   If Charles Golleb borrowing money for Nova, to invest in Nova

13   is only one thing and it's not -- it doesn't -- you know, it

14   does -- the bank has nothing more, Charles -- and it's part of

15   some conspiracy, why does Charles Golleb pay it back?  He paid

16   back the entire loan.  Not only that, he made a second

17   investment after they'd been denied TARP already.  Golleb

18   makes a second -- makes -- borrows the second money in -- I

19   think it was in November of 2009.  No.  December, 2009.  We're

20   told on December 15th you're not getting TARP.  The letter he

21   wants to talk about is Brian writing to the regulators

22   basically saying hey, man, you've been stringing us along for

23   a year and you're not giving us this money; we did everything

24   you asked us to and you're still not giving us this money.

25   And you know what you're going to find out?  The reason they

Egan - Opening Statement                              42

1    didn't give them the money in December, they knew already in

2    April.  This guy from the Federal Reserve Bank is going to

3    come in here, and he's going to tell you I looked at this

4    thing in April, and I said this thing was dead on arrival.  My

5    words, not his.  Something along those lines.  And then

6    they're going to say that in December, we denied it for the

7    very reasons we told you in April we weren't going to give it

8    to you for.  Yet, that -- they're going to say that those

9    folks were deceived, that they were defrauded.

10          Anyway, back to Todd Howard.  Todd Howard found out

11   from Brian Hartline about these transactions, and he said I'd

12   like a letter from a lawyer.  So Brian said sure.  I mean, he

13   didn't jump on it, do it the very next day.  No.  It took like

14   a month before he started to do it.

15          Now, Mr. Ignall says that Brian Hartline sends a

16   different document over to Mr. Schwartz, the lawyer, than was

17   in the file.  First of all, Mr. Hartline didn't send Mr.

18   Schwartz anything.  Other people at the bank sent it.  Second

19   of all, there's a very good reason why that second document

20   was created, because later in the year, Mr. Levin wanted to

21   borrow more money, and the folks at Nova said we can't lend

22   him any more money unless it's secured this time, and so

23   therefore, they created another risk assessment summary

24   involving the house.  And that's why a second risk assessment

25   summary existed, not because anybody made it to fool anybody.

Egan - Opening Statement                    43

1    It just happened to be there.

2            Along with that risk assessment summary was every

3    other document related to this loan, and when you read the

4    letter that the lawyer wrote, it says -- I think I -- I have

5    to quote it, because I don't want to misquote it.  It says,

6    "Contemporaneously with obtaining the line of credit, Mr.

7    Levin made an equity investment."  What's hidden here?  The

8    same time he borrowed the money, he made an investment.  Oh,

9    and by the way, this lawyer says there's no issue with it.

10           Ladies and gentlemen, they have to prove beyond a

11   reasonable doubt that Brian Hartline intended to lie to the

12   Government, that he schemed to lie to the Government, and in

13   order to do that, they need some evidence.  The only evidence

14   they have is two or three documents cherry picked from

15   thousands of documents that were at the bank that relate more

16   to trying to get KPMG to still count it as capital, because

17   they wanted to succeed going forward, because they'd forgotten

18   about TARP long ago because the Government denied it for

19   different reasons six months ahead of this.

20           And guess what.  They did succeed.  In spite of all

21   this, Nova Bank stayed in business until 2012, and under the

22   weight of other -- other issues and other financial concerns

23   failed.  So they didn't fail because of anything that was done

24   here.  The Government lost no money because of anything that

25   was done here.  Brian Hartline got nothing out of anything

1    that was done here, because there was no crime here.   There

2    was no crime.

3           Now, at the end of the day -- taking too much of

4    your time already.   We're going to take way too much of your

5    time over the next few weeks, but at the end of the day when

6    all of this evidence comes in, when you get to listen to what

7    the witnesses actually say and hear the cross-examination of

8    the witnesses, remembering their burden of proof, I'm going to

9    come back and ask you for the only possible verdict, because

10   Brian Hartline is not guilty.   Thank you.

11          THE COURT:   Once again, if you wish to stand up and

12   stretch your legs for a moment.

13          MR. DUNCAN:   Your Honor, may we approach?

14          THE COURT:   Yes, sir.

15      (Sidebar begins)

16          THE COURT:   Yes, sir?

17          MR. DUNCAN:   Don't know what the proper term is, but

18   a point of personal privilege.   Could I have about a two-

19   minute break, Your Honor, right now?

20          THE COURT:   Sure.

21          MR. DUNCAN:   Thank you.

22          THE COURT:   Sure.

23      (Sidebar ends)

24          THE COURT:   Let's actually take about a ten-minute

25   break before the last.   All right.

1          (Record off/on)

2                    THE COURT:  -- opening.  When you point out a couple

3     things on the screen over there, nothing came up on mine.  So

4     now we got to --

5                    MR. IGNALL:  Okay.

6                    THE COURT:  -- including --

7                    UNIDENTIFIED COUNSEL:  I made that happen, Judge,

8     because I didn't want you to have to see that.

9                    THE COURT:  Oh, okay.  In that case --

10                   MR. IGNALL:  All right.  Just for our scheduling

11    purposes, is the Court going to take a lunch recess?

12                   THE COURT:  We have to.

13                   MR. IGNALL:  I just -- when our first witness should

14    be here.

15                   THE COURT:  Well, at this point, assuming that Mr.

16    Duncan is going to be half an hour or so, like everyone else,

17    I could conceivably work from 11:30 to 12:30.  Is there an

18    issue with that?

19                   MS. SHEALY:  If we're taking a ten-minute break now,

20    then that's 11:15.  So then we're not finished until closer to

21    11:45 or so.

22                   THE COURT:  Okay.  In that case, we'll go ahead and

23    take a lunch break.

24                   MR. IGNALL:  Okay.  So I just wanted to know when to

25    have a witness here.  Okay.

1         MR. EGAN:  And is it Bertsch or Schaffner.

2         MR. IGNALL:  Schaffner.

3         MR. EGAN:  William?

4         A FEMALE SPEAKER:  Yes.

5         MR. IGNALL:  Yes.  William Schaffner.

6         A FEMALE SPEAKER:  William Schaffner.

7         MR. IGNALL:  Okay.

8         MR. EGAN:  Thanks, Your Honor.

9         THE COURT:  Okay.

10         MR. IGNALL:  Thank you.

11      (Recess taken, 11:03 a.m. to 11:13 a.m.)

12         MR. IGNALL:  Your Honor, can we approach?

13         THE COURT:  Surely.  Yes, sir.

14         MR. IGNALL:  Brief sidebar.

15         THE COURT:  Madam.

16      (Sidebar begins)

17         THE COURT:  Yes, sir?

18         MR. IGNALL:  I instructed the agents and I followed

19   this rule too, that we should not go to the bathroom on this

20   floor so we don't run into jurors.  We went one floor down,

21   and I do not believe I said anything substantive other than

22   someone said good job.  I said yeah, I wish I was more -- you

23   know, I didn't use a script at all.  Turned out one of our

24   jurors was down in the bathroom on 14.  I don't think I said

25   anything substantive.

1              MR. EGAN:  13.

2              MR. IGNALL:  On 13, one floor below.  I don't know

3    if it's worth colloquying him, but I just want to bring it to

4    the Court's attention.  I brought it to counsel's attention.

5              MR. EGAN:  I have no issue.

6              THE COURT:  I think it's no harm, no foul --

7              MR. EGAN:  Yeah.

8              MR. IGNALL:  I think --

9              THE COURT:  -- right now.

10             MR. IGNALL:  -- my concern about it.

11             THE COURT:  Make a deal out of it, make something

12   out of it --

13             MR. IGNALL: Yeah.

14             THE COURT:  -- that isn't.

15             MR. IGNALL:  Yeah.

16             THE COURT:  However, we'll make sure that the jurors

17   go here on this floor --

18             MR. IGNALL:  Okay.

19             THE COURT:  -- and --

20             MR. IGNALL:  All right.

21             THE COURT:  -- (inaudible).

22             MR. IGNALL:  All right.

23             THE COURT:  Okey-dokey.

24             MR. IGNALL:  Thank you.

25             THE COURT:  Thank you very much.  Appreciate the

1    integrity.

2         (Sidebar ends)

3              THE COURT:  So we'll just tell our jurors to stay on

4    this floor.

5              And counsel, if you could impart to your respective

6    witnesses the same thing to other floors other than this one.

7              MR. EGAN:  Okay.

8              MR. IGNALL:  Yes, sir.

9              THE COURT:  Thanks.  Are we ready?  Are we ready?

10             COUNSEL:  Yes, Your Honor.

11             COUNSEL:  Yes, Your Honor.

12             COUNSEL:  Yes, Your Honor.

13             THE COURT:  Am I going to be able to see this on my

14   screen, Mr. Duncan?

15             MR. DUNCAN:  I hope so, Your Honor, but I'm not the

16   technical person.  If I could ask Sean or Peggy, just let me

17   know.

18             UNIDENTIFIED SPEAKER:  Do you mind if I come up and

19   take a peek?

20             THE COURT:  No, please.  How you been?

21             UNIDENTIFIED SPEAKER:  Pretty good.  How about

22   yourself?

23             THE COURT:  Okay.  How's everything?  Good to see

24   you again.

25             UNIDENTIFIED SPEAKER:  Good.  See you --

1          THE COURT:  All right.  Okay.  Thank you very much.

2    Okay.  We're going to get the jury.

3      (Transcriber change)

4          THE COURT:  All rise.

5      (Jury in)

6          THE COURT:  You may be seated.  Thank you.

7          Mr. Duncan, do you wish to address the jury at this

8    time, sir?

9          MR. DUNCAN:  Thank you very much, Your Honor.

10          THE COURT:  You may proceed.

11          MR. DUNCAN:  May it please the Court, Ms. Barry, Mr.

12    Ignall, counsel, Mr. Hartline, ladies and gentlemen of the

13    jury, good morning.

14          THE JURY:  Good morning.

15          MR. DUNCAN:  Mr. Bekkedam and I have waited a long

16    time to get to talk to you, and on behalf of Mr. Bekkedam --

17    Barry, could you please stand up for the jury?  This is our

18    client, Barry Bekkedam.  You'll be hearing a lot about him

19    over the next few days.

20          But I want to thank you on behalf of Mr. Bekkedam --

21    thank you, Barry, you can sit down -- thank you on behalf of

22    Mr. Bekkedam and his family and all of us working here today

23    -- Allison, Joel, Mike -- we want to thank you for your

24    services and your attention.

25          The Government has alleged that this is a case where

Duncan - Opening Statement                          50

1    Brian and Barry conspired, that is they agreed to attempt to

2    defraud the Troubled Asset Relief Program, TARP, but the

3    evidence will show that is not what this case is about.

4           The evidence will show that this is a case about

5    Government investigators trying relentlessly, obsessively for

6    over five years to come up with evidence of a crime where no

7    crime was committed.

8           This is a case where the facts do not match the

9    crime that the Government said took place.  And as you will

10   see over the next few weeks and as you will hear, and the

11   evidence I'm about will make this clear, this evidence

12   matters.

13          And this evidence will speak to you about facts, and

14   those specific facts matter, and I ask you to listen very

15   carefully to the facts for the dates when those facts

16   occurred, what occurred on those dates, why they occurred on

17   those dates.

18          So if there is no crime, why are we here?  What the

19   Government says Barry did -- allegedly did amounts to this, in

20   2009 Barry's wife introduced him to a man named George Levin

21   -- I'll speak a little bit more for you, but for now the

22   evidence will show that in 2009 George Levin was a fabulously

23   wealthy person.

24          The estimates vary.  I heard Mr. Egan say 300

25   million.  I've heard 400 million.  But everybody agrees, he's

Duncan - Opening Statement                          51

1    worth someplace north of $100 million -- $100 million.  Once

2    you get to that level, how much further you get I'll leave to

3    you all.

4              And the evidence is going to show that this

5    incredibly wealthy person wanted to invest some of that wealth

6    in a bank for a very legitimate reason, for the reason wealthy

7    people do things, he wanted to make more money.

8              In June of 2009 this incredibly wealthy person,

9    George Levin, signed a subscription agreement -- you heard

10   about the subscription agreement, here it is, you're going to

11   see this in evidence.  Levin signed the subscription agreement

12   in which he agreed he was going to put $18 million into Mr.

13   Hartline's bank, Nova, a little Community Bank up in Berwyn,

14   Pennsylvania.

15             Mr. Ignall will tell you he was doing a favor for

16   Barry Bekkedam.  Some favor, $18 million.  We all need to have

17   friends like that.  You heard a lot about Mr. Levin's other

18   investments, and they're going to become important, but

19   they're important right now for this fact.

20             Mr. Egan, I'm sorry -- I'm going to have to repeat a

21   few of the things Mr. Egan told you because I think they're

22   important and I want to tell you about them for Mr. Bekkedam's

23   part.  Mr. Levin wanted to move the money he had in TD Bank

24   and that Banyon Fund where he didn't have any control over TD

25   Bank.

1          He wanted to move that money into a bank where he

2     had some control, and you're going to hear evidence about

3     that, ladies and gentlemen.  He wanted to do that for a couple

4     of reasons.  One, the money is in that bank and he has control

5     of that bank, he's getting the interest money, all those

6     deposits in that bank.

7          Second, you're going to hear a lot about Mr. Levin

8     leveraging his money.  You've already heard a little bit about

9     that, but if he gets control over the bank, he's going to be

10    able to go to that bank very easily and get a loan, so those

11    are the two reasons Mr. Levin wanted to invest in the bank.

12         Mr. Egan told you -- I'm going to emphasize it here,

13    rich people don't like to use their own money.  They like to

14    leverage their money.  They like to use their money to get

15    more money.  You're going to hear that this incredibly wealthy

16    guy, George Levin, already had one line of credit at another

17    bank, Mellon Bank.

18         He had $5 million in credit at Mellon Bank.  But he

19    doesn't want to use his own money, he wants to use somebody

20    else's money to make more money so he applied for another

21    loan.  And what you didn't hear in any great detail from the

22    Government is he went to two banks.

23         We've heard a little bit about this but that's a

24    very important fact that as you hear the evidence, and as I

25    recounted to you, pay attention to that fact -- two banks.

Duncan - Opening Statement                    53

1    One of the banks was Nova, and just like Mellon Bank, Nova was

2    more than happy to give this really rich guy a loan.

3            Levin then used that $5 million and there's no

4    question about this at all, ladies and gentlemen, he used that

5    $5 million to invest in Nova Bank, but that, ladies and

6    gentlemen, was because he promised he would.  He signed that

7    subscription agreement.

8            The Government's theory is that Barry knew about

9    this loan and the Government's theory is because Barry did not

10   tell any of the bank regulators in charge of the TARP program

11   or any of the other investors in Nova Bank that George Levin

12   had obtained a loan before he invested in the bank.  It's

13   because of this omission, Barry's failure to mention this fact

14   -- that's what the Government says Barry did wrong.  That's

15   it.  Not that Barry lied to anyone, but that he did not tell

16   anyone about that simple little fact, that George Levin, this

17   very rich people (sic), had done this thing that rich people

18   do all the time.

19           You're going to hear a little bit more about one of

20   the rich people, one of the Government's witnesses, he did it

21   too.  That pretty ordinary fact that rich people get loans,

22   that's what the Government says Barry did wrong.

23           But the evidence will show that Barry never did any

24   such thing, nor did he ever intend in any way, shape or form

25   to deceive anybody.  You're going to hear a lot of testimony

Duncan - Opening Statement                              54

1    and you're going to see a lot of evidence over the next few

2    weeks, and I'll not have an opportunity to speak to you like

3    this again until the end of the case, so I'll ask you to

4    please focus on three things.

5           As you listen to the testimony and as you see the

6    exhibits and consider whether the Government has met its

7    burden of proof of proving beyond a reasonable doubt that

8    because my client didn't say that this really wealthy person

9    had gotten a loan, he's guilty of crimes.

10          The three things you're going to learn about is

11   what's missing from the Government's case.  First, you will

12   not hear any testimony, you will not see any evidence that any

13   Government dollars were ever given by Nova -- given to Nova by

14   TARP or that any Government dollars or taxpayer money was ever

15   lost or that Barry Bekkedam ever got one dollar out of that.

16          Sean?

17          No money obtained or received by Nova from the

18   Government.  That's fact number one I want you to remember.

19   Second, regarding this supposed agreement between Brian and

20   Barry, you will not see any evidence, no document, no email,

21   no letter showing that Barry Bekkedam and Brian Hartline

22   agreed, conspired or even thought about defrauding the

23   Government of TARP funds, none.

24          Sean?

25          No agreement.  And if there's no agreement, there's

Duncan - Opening Statement                              55

 1    no conspiracy.

 2              MR. IGNALL:  Your Honor, may I see you at sidebar?

 3              THE COURT:  Surely.

 4         (Sidebar begins)

 5              MR. IGNALL:  Your Honor, I don't believe these

 6    slides -- I don't believe these were the slides that I saw

 7    that Mr. --

 8              MR. DUNCAN:  They're actually less than the slides

 9    you saw.  They're the exact same slides, we just actually took

10    out of the points, even less.  I'm sorry, I'm happy to -- to

11    do, but they're the exact same -- exact same --

12              UNIDENTIFIED COUNSEL: This is (inaudible) slide and

13    we all agreed --

14              MR. IGNALL:  Well no, no, they're something

15    different.

16              THE COURT:  Keep your voices down, please.

17              MR. IGNALL:  I don't remember seeing that.

18              THE COURT:  Keep your voice down.

19              MR. IGNALL:  I remember the calendar with different

20    dates, about what happened on different dates.

21              MR. DUNCAN: Yesterday, Your Honor, we asked -- you

22    said take out the top part.  Go with all the pictures below

23    and we could use the top part.  They specifically audited,

24    that's what these are.

25              THE COURT:  But I thought you all had agreed on this

Duncan - Opening Statement                          56

1    today.

2              MR. DUNCAN:  We agreed --

3              MR. IGNALL:  I --

4              MR. DUNCAN:  We agreed to that yesterday, Your

5    Honor.

6              THE COURT:  Okay.

7              MR. IGNALL:  All right, I didn't realize that he was

8    going to use what he mentioned yesterday.  That's fine if

9    that's all it is I have no objection.  I'm sorry.

10             THE COURT:  Thank you.

11        (Sidebar ends)

12             MR. DUNCAN:  May I proceed, Your Honor?

13             THE COURT:  You may continue.

14             To the jury, counsel just wanted to make sure that

15   this is accurately agreed upon, and it was.

16             You may continue.

17             MR. DUNCAN:  Sean, put number two back up, please.

18             Very important, there's no agreement.  There's no

19   agreement, there's no conspiracy.

20             Third, you will see no evidence, no document, no

21   letter, no email, no text, nothing, not one single piece of

22   evidence that Mr. Bekkedam -- Barry, every communicated,

23   called, wrote, emailed, text or anything with the Government

24   regulators, nothing.

25             He had nothing to talk to the Government regulators

1    about -- TARP, banking regulations or anything.  Nothing.  And

2    as you listened to the two opening statements you might have

3    noticed that there wasn't a whole lot about Barry, and there

4    sure wasn't a whole lot about Barry with bankers because Barry

5    doesn't have anything to do with the bankers, nothing to do

6    with bank regulation.

7          Point number three that I want you to remember,

8    Barry never communicated with these regulators.  The

9    Government has said that the evidence will show that Barry and

10   Brian agreed to commit this attempted fraud in May of 2009,

11   however, the evidence will show that the Government is wrong

12   not only about Barry and Brian conspiring to commit this fraud

13   in May, 2009, the evidence is going to show it was impossible.

14   They couldn't have done it.

15         Why?  The Government has said that Barry and Brian

16   entered into this conspiracy in order to meet a requirement by

17   the Treasury Department.  Treasury is the Government agency

18   that ran the TARP program.  Treasury told Nova Bank to raise

19   $15 million dollars.

20         I'm going to refer to that as the 15 million

21   contingency but there's a problem with that, which I'll get to

22   in just a moment.  The evidence will show that Barry and Brian

23   couldn't have agreed to defraud the Government by lying about

24   this information in order to meet the contingency in May of

25   2009 because no such contingency existed in May of 2009, none.

1          The Government's own evidence, their own exhibits

2     will show you this.  Mr. Ignall mentioned it.  The CPP, that

3     -- I forget the acronym now but the Government agency that was

4     voting on this, they didn't even vote until June 10th, so how

5     could they do it in May of 2009?  No contingency existed in

6     May.  It didn't exist until June.

7          And this -- this document -- one more thing, this

8     document, this is a Treasury document -- this document never

9     went to Barry Bekkedam.  Barry Bekkedam never saw this.

10    Nobody told Barry Bekkedam about this.  He didn't have any way

11    of knowing that Treasury had done this.

12         So in June it was just impossible for them to

13    conspire -- or in May to conspire about that contingency, and

14    how do we know that?  What other evidence are you going to see

15    that's going to show you that?  It's really important.  TARP

16    wasn't approved for Nova -- again, you'll see it in evidence

17    the TARP letter, August 25th, 2009.

18         So how can Barry and Brian be conspiring in May to

19    defraud the Government out of TARP funds by lying about a

20    contingency that doesn't even exist until August?

21         One of the things that Judge Jones told you, and I

22    want you to really remember this -- it's obviously he'll tell

23    you a lot of good things but you bring nothing more to us more

24    important than your common sense.  How can you do this if it

25    doesn't even exist?

1          One other little thing.  Remember I told you there

2     was a little problem with that $15 million contingency?

3     You'll get to see it in evidence and you'll hear witnesses

4     talk about it, there never was a $15 million contingency.

5     TARP cut it to $10 million, and you're going to hear back and

6     forth ten, 15.

7          It won't really matter in terms of what you

8     determine, but think about that in terms of what the

9     Government is saying.  They're saying it's $15 million but

10    it's only ten.  That's a $5 million difference.  They got that

11    wrong too.  The dates are important.

12         They will help explain to you why something happened

13    and what happened, so as you listen to this evidence, I ask

14    you to think about that, and the evidence will show the

15    Government investigators got this so wrong and the evidence

16    will show that Barry Bekkedam is not guilty.

17         So what did happen?  What did happen?  Why are we

18    here?  I won't go over it in as much detail as Mr. Egan did

19    but it's important.  It's about Nova Bank, it's a small

20    community bank in Berwyn, Pennsylvania.

21         Barry and Brian, way back in 2002, worked together

22    in order to make sure that this bank didn't fail, as Mr. Egan

23    told you, so that the bank could be successful and give loans

24    to people in that community.  The story could begin in many

25    places, but let me go back before Brian and Barry ever even

1   met.

2          You've already heard about Mr. Egan's (sic)

3   background and let me tell you a little bit about Mr.

4   Bekkedam's background.  Barry first came to Philadelphia in

5   the 1980s to go to high school at Archbishop Carroll and then

6   after that to play basketball at Villanova.

7          After his college career ended he didn't get drafted

8   by the NBA, but he played professionally for a little while.

9   He went overseas and knocked around there, and then he came

10  back to Philadelphia.  He got married, started to raise his

11  family and now has six children.  And he didn't start at the

12  top.  He started at the bottom.

13         He worked in real estate development.  But this is

14  what the real estate did that Barry worked in, he was the

15  construction guy.  He was filling the dumpsters.  He was

16  helping put together the real estate properties.  He was

17  maintaining, he was doing the painting.  That's what Barry

18  did.

19         But Barry wanted to do a little bit more so he

20  eventually got into finance and became a money manager and a

21  fundraiser and got his own company, Ballamor Capital.  You

22  heard about that.  One thing you're going to hear that Barry

23  was very, very good at, he was very good at raising money and

24  helping other people put together business skills.

25         Former athlete, local fame, he was very good at

Duncan - Opening Statement                                    61

1    that.  But he owned his own capital and he worked -- own

2    company and he worked really hard at Ballamor Capital, and

3    you're going to hear a lot about Ballamor Capital and you may

4    hear about some of their former employees.  You heard about

5    one earlier, Todd Howard.

6          Ballamor Capital was a registered investment

7    advisory firm.  Those are people who help people manage their

8    money.  Maybe you have someone.  I have one.  It's not a bad

9    idea.  It's a good thing to have happen.  And this is how

10   Brian and Barry first sort of got together, because of Barry's

11   money raising abilities and his ability to put together deals.

12         You heard that there was this bank, U.S. Bank Shares

13   here in Pennsylvania, it was failing.  Brian Hartline went to

14   Barry Bekkedam and talked to him about raising money and Barry

15   had the clients at Ballamor Capital who could do that, who

16   they put together some money, raised the money, offered it to

17   the bank and helped purchase the bank and save the bank.  You

18   heard the bank was later called Nova, Mr. Hartline became the

19   President.

20         This is Barry's role at the bank.  Barry served as

21   the unpaid Chairman of Nova Financial Holdings Company, that's

22   the company that owns Nova actually -- all that corporate

23   stuff.  He also served you're going to hear on the Nova Bank

24   board, both jobs without compensation.  He didn't get paid a

25   dime.

1        You're going to hear -- Sean, calendar, please --

2   next one, please -- Barry Bekkedam left the Nova Bank board in

3   2004.

4        Next one, Sean, please.

5        He left the holding company board in 2007.  We're

6   going to be talking about things happening in 2009.  The

7   evidence will show that 2007 was the last date that Barry

8   Bekkedam had any kind of control over Nova Bank.

9        He still had influence with Nova Bank, don't get me

10  wrong.  He had a lot of clients who had invested in Nova Bank.

11  It was his baby.  He had helped put it together, so sure he

12  cared about it, but no formal influence, no contact with the

13  bank regulators, nothing at all.

14        Let me go back just a minute to George Levin.

15  George Levin's bank, this business you heard about his being

16  in, it's basically this.  It's a settlement fund.  People get

17  settlements in cases, they get paid out over time.  People

18  don't want to wait over time so they sell the settlements at a

19  discount, they make some money right away.

20        The investors in the Banyon Fund, they make some

21  money because they sold it at a discount, but they're going to

22  get all the cash in going forward.  And that's what Banyon

23  was.  What is Barry good at?  He's good at fund-raising.  He's

24  good at money.  He's good at putting together business deals.

25        George Levin is raising money to fund the

Duncan - Opening Statement                           63

1    settlements, so when he and Barry meet back in 2009 it's a

2    perfect match for them.  Barry has his Ballamor clients who

3    could invest in this Banyon Fund, make money.  He knows about

4    Nova Bank, and he knows, as you've heard, George Levin wanted

5    to buy a bank or get involved with the bank.

6          And he was looking down in Florida, and Mr. Egan

7    told you, maybe Nova was going to be down in Florida.  But

8    Barry had a different idea.  Barry saw something that was a

9    win-win for his two friends, George Levin and Brian Hartline.

10   Barry though well, why don't we bring that money up here to

11   Nova and put it in the Nova Bank.

12         You to use that money to expand?  Maybe we'll expand

13   down to Florida where you are.  George Levin lived in Florida,

14   but you already heard that.  That fabulous fortune he made, he

15   made it here in Pennsylvania, so he has significant ties here.

16   He grew up here.  He has two daughters still living here.  He

17   owns that house you heard about, that house in Devon.  Common

18   sense makes sense -- Barry putting together deals.  This is

19   what happens.

20         And remember, George isn't doing this because he

21   Barry's friend, George is doing this because he wants to make

22   money.  Sign that subscription agreement, a legally binding

23   document.  I'm going to do that, I'm going to invest $18

24   million into Nova Bank and I'm going to become the largest

25   shareholder.

Duncan - Opening Statement                    64

1          Okay, if I'm not there already, I'm going to get

2    real lawyerly and boring on you.  This is something you need

3    to know a little bit about though.  It's called a Change in

4    Control.  It's a bank regulation.  So if you want to take over

5    a bank or invested a lot of money in a bank, you've got to

6    have a Change in Control thing done.

7          You can own 9.9 percent of the bank without doing a

8    Change in Control, but once you go over that, you've got to

9    get the Federal Reserve Board to come in and approve you.  Why

10   $5 million invested in Nova Bank?  Why not the whole 18

11   million right in?  He was going to go over the 909 percent.

12         If he invests 5 million, then he's going to be at 9

13   percent so he doesn't need the Change in Control done yet, so

14   that's why he invested the 5 million in June of 2009.  What's

15   the Change in Control process?  It's just what it sounds like.

16   You fill out an application -- and you're going to see that

17   application -- Mr. Levin fills it out on June 30th, 2009,

18   sends it into the Federal Reserve Board, the Pennsylvania bank

19   regulators.

20         He has to publish notice in papers that he's doing

21   this and let everybody know if anybody has an objection.  He

22   gets fingerprinted.  He's got to get investigated by the FBI

23   to see if there's anything in his background that they should

24   know about, and hopefully he gets approved by the regulators.

25   He puts the $18 million in.  Everything's fine.  So that's why

Duncan - Opening Statement                              65

1    5 million in June.  Got it?  That's it.

2              You heard a little bit about this other loan I

3    mentioned, the two loans.  It's going to become important to

4    you and I'll -- you'll hear more about it in the testimony, I

5    won't get into it in great detail, but it's important to know

6    when it happens.  Remember when I said dates matter?

7              Sean, could you do the next one, please?

8              So on May 28th, 2009 -- remember, before CPP even

9    gets a chance to talk about contingency -- and you're going to

10   see the evidence, loan being applied for at Atlantic Community

11   Bankers Bank, not at Nova Bank, Atlantic Community Bankers

12   Bank, and remember that as you're listening to the testimony.

13   It's going to become important, and if I get back here in

14   closing, I'll tell you why.

15             Why June 30th?  Well, there are a couple of reasons.

16   Why does the money have to go in June 30th?  You're going to

17   hear testimony like Nova's a company, they have quarterly

18   endings -- March, June, September, December.  Like a lot of

19   public companies, they have to answer to where they are at the

20   end of a quarter.

21             So June 30th is coming up, Atlantic Community

22   Bankers Bank has not yet acted in the loan application, Mr.

23   Hartline has a bank, Mr. Levin applies for a loan, and they

24   grant the loan.  Rich people get loans all the time.

25             You're going to hear the bank people come in, the

Duncan - Opening Statement                          66

1    people from Nova Bank, the Chairman of Nova Bank, they're

2    going to come in and tell you we loan money to rich people all

3    the time.  It's really a good deal.  It's a great investment.

4    Nothing unusual, nothing criminal about it.

5            Sean, could you give me the next date, please?

6            The June 10th, that purchase program, they vote on

7    it on June 10th but nothing to Mr. Bekkedam.

8            Next one, please?

9            June 30th, the Levin loan, end of the -- end of the

10   quarter, Change in Control application also going in.  They're

11   going to put $18 million into the bank -- George Levin is

12   going to put that $18 million to the bank.

13           Next one, Sean.

14           July 25th -- 21st, Levin's Change in Control

15   application actually goes to the regulators.  That's the first

16   time that goes.  It gets sent into them and then what happens?

17   As my kids say, crickets.  Nothing.  Nothing happens.  Nothing

18   happens in late June -- late -- early June -- July, nothing

19   happens in mid July, nothing happens in August until late

20   August.

21           Why?  Because everybody is just waiting for the Fed

22   to act on the Change in Control application.  Once the Fed

23   acts on the Change in Control application, George can put the

24   money in.  What else are they waiting for?  The TARP, TARP

25   still hasn't decided.  We know -- next one, Sean, please -- we

Duncan - Opening Statement                           67

1    know TARP doesn't even act for another month, so everyone's

2    just waiting.

3            That's all they're doing.  And what you're going to

4    hear about Barry Bekkedam -- crickets.  Nothing.  Barry's not

5    involved in any of this, they're not raising money right now.

6    That's not what Barry's -- Barry doesn't have anything to do

7    with these bankers.

8            A JUROR:  Can I --

9            THE COURT:  I'm sorry, it would have to be directly

10   funneled through me and then I would have to decide.  Would

11   you write it down, please?  And, counsel, I would suggest that

12   you apprize the jury of each of the acronym's meanings,

13   because we have at least three there.

14           MR. DUNCAN:  Okay.  I'm going to -- I'm going to

15   forget the first one.  ACCB -- so that's Atlantic Community

16   Bankers Bank.  CPP -- Capital Purchase Program, that's what

17   that one is.  Levin's CIC -- Change in Control.

18           THE COURT:  Counsel, just one second, please.

19       (Pause in proceedings)

20           MR. DUNCAN:  I'm sorry to get a drink.  I get a

21   little dry when I talk.

22           Okay, so now what happens?  You're going to know

23   what's going to happen, it's August 25th, TARP's approved it,

24   money's got to be raised.  What's going to happen?  You're

25   going to hear about Barry Bekkedam again because money needs

Duncan - Opening Statement                                    68

1    to be raised and that's what Barry does.

2              You're going to see in evidence what Barry does, and

3    you're also going to see what Barry knows about bank

4    regulations and bank regulators and what needs to be done with

5    TARP.  On August 29th, 2009 Brian Hartline writes a detailed

6    -- lots of things -- a detailed description to Ed

7    DiMarcantonio, that's the Chairman of Nova Bank, and Barry

8    Bekkedam, who's going to be raising funds, saying this is what

9    we need to do in order to meet the TARP program.

10             Everything above board, everything right out in the

11   open.  This is what Barry Bekkedam says.  You'll see what he

12   says, it's written right here.  In response to Brian

13   Hartline's detailed explanation, Barry is asking Brian a lot

14   of questions -- what, what's this all about?  He's essentially

15   clueless about what's going on with the TARP regulations.  In

16   his response to Brian Hartline, and it's quite literally --

17   it's right here in the document -- "Wow."  He didn't know.  He

18   didn't know anything about this.

19             This is evidence.  You're going to see this

20   evidence, ladies and gentlemen.  There's no conspiracy if

21   there's no agreement and how can there be a conspiracy if

22   Barry doesn't even know what's going on?  "Wow" indeed.

23             All through September, nothing much going on,

24   they're still waiting for Fed to make a decision on the Change

25   in Control application, Barry's out there doing what Barry

Duncan - Opening Statement                    69

1    does, raising money, working for his clients.  You heard about

2    Anthony Bonomo.

3           And I -- I'm sorry if I'm trying your patience but

4    you need to hear this.  This is very important, who is Anthony

5    Bonomo?  He's not just some guy off the street.  Anthony

6    Bonomo was Barry's biggest client.  Going to hear a lot about

7    Mr. Bonomo and you're probably going to hear him testify.

8           Mr. Bonomo owned a medical insurance company of New

9    York in the mid 2000s, 2003, 2004.  He actually worked there

10   but he wanted to own it so who does he come to see?  His

11   financial advisor, the guy who raises money.  Mr. Bonomo wants

12   to buy that company so where does he go?  He goes to Barry

13   because Barry knows how to raise money.

14          The company is called PRI, Professional Response

15   Insurance -- I'm sorry, Your Honor, something like that.

16   You'll hear it in testimony.  Barry helps him raise $40

17   million -- 40 million, that's a lot -- to buy the company.

18   Mr. Bonomo buys the company.  Mr. Bonomo already had a lot of

19   money but now he has a real lot of money.

20          And you're going to hear the testimony that Anthony

21   Bonomo, in addition to being Barry's very good friend, his

22   best client, his company then with all their money comes into

23   -- one of Barry's clients.  What does Barry do?  He advises

24   his clients on how to make money.

25          So around October, 2009 Barry calls Anthony Bonomo,

1  his good friend and client and says hey, I've got this great

2  deal, this guy, George Levin's got this great deal down in

3  Florida, this Banyon thing, a lot of my clients are getting

4  into it, Anthony, you should get into it, and you're going to

5  hear that Anthony Bonomo agrees to that.

6         And why does Anthony Bonomo agree to that?  Because

7  he's -- Barry's already make him rich.  He wants to be richer.

8  Barry's recommending something so he says invest in Banyon.

9  And you're going to see this -- Mr. Bonomo, just like George

10 Levin, doesn't want to use his own money.  He's got his money

11 tied up in wealth.  He needs a loan.

12        So Barry says hey, rich guy -- Anthony Bonomo

13 already has his mortgage at Nova Bank, he already owns shares

14 in Nova Bank, he knows Nova Bank.  Why don't you go to Nova

15 Bank and see if we can get you a loan there?  A rich person

16 goes to a bank, he gets a loan.  No surprise.  He gets it at

17 4.5 million instead of 5 because he already has some other

18 loans from Nova, that mortgage and other stuff, so he can't

19 get the full 5.

20        But all he's being asked to do by Barry is invest in

21 the Banyon Income Fund, and Mr. Bonomo agrees to that.

22        Sean, next one, please.  Okay now skip October 19th.

23 I'll come back to that in just a moment.

24        So on October 21st -- actually 22nd, Anthony Bonomo

25 gets a $4.5 million loan.  He doesn't invest it in Nova

Duncan - Opening Statement                          71

1    because that's not what Barry told him to do.  He said he

2    invested it in Banyon.  And you'll see, he's got a signed

3    letter.  He says send $2 million to Banyon.  Where does the

4    other $2.5 million go?

5             Right in Anthony's bank account.  Mr. Egan told you,

6    it's his money, he can do whatever he wants with it.  It's a

7    loan.  You get a loan, you have an obligation to pay it back,

8    but you can do with that loan whatever you want once it's in

9    your bank account, and that's what Anthony Bonomo does.

10            Barry also tells him after that, hey, what are you

11   going to do with that 2.5?  Why don't you invest in Nova?

12   Nova's about to get this big investment from George Levin,

13   this $13 million to complete his $18 million subscription

14   agreement.  Nova's going to take off, why don't you put some

15   money in there?  You already have some money in there,

16   Anthony, put some more in there, and Anthony agrees.  And

17   you'll see that.

18            Sean, please?

19            Anthony Bonomo does the same thing George Levin

20   does, he signs a subscription agreement, a legally binding

21   document to invest the money.  There's no conspiracy.  There's

22   nothing hiding here.  Barry's doing what Barry's doing, he's a

23   advising his clients about how to invest money.

24            And what's really interesting is the Government says

25   -- the Government says well, Mr. Bonomo got fooled by Barry

Duncan - Opening Statement                          72

1    because Barry didn't tell him that a rich guy got a loan to

2    invest in a bank, which is exactly what Anthony Bonomo's

3    doing.  Why would Barry think Anthony Bonomo needs to know

4    that rich guys get loans to invest in things?  Anthony

5    Bonomo's doing it too.

6            The Government says Mr. Bekkedam defrauded one of

7    his best friends and his biggest clients.  It makes no sense.

8    Remember what the Judge said to you -- common sense.  It makes

9    no sense.  Why would you do that?  He didn't.  Mr. Bonomo knew

10   what he was doing at every step of the way and Mr. Bekkedam

11   didn't deceive him in any way, shape or form.  Wait until you

12   hear what Mr. Bonomo has to say.

13           Okay, skipped over one and I'll get -- I'm almost

14   done.  October 19th the Change in Control gets approved.

15   That's the Fed comes in and says, George Levin, you're good to

16   go, put your $13 million in.  And then there's some back and

17   forth.  It's now late October.  And what do we know from what

18   Mr. Egan -- what Mr. Ignall told us?

19           On Halloween, October 35th -- 31st, for reasons that

20   really don't really apply to this case but at this point is

21   relevant, something goes wrong with George Levin's big

22   investments down in Florida and he's not going to be able to

23   meet his subscription agreement so George Levin is off the

24   board.

25           They've still got to raise the money though if

Duncan - Opening Statement                    73

1    they're going to meet the TARP contingency.  They're raising

2    some money but they need to raise more money.  You need to

3    raise money, who do you go to?  Barry Bekkedam.

4            Barry Bekkedam, who has been the biggest fundraiser

5    for Nova for years, never took a dime, did it because it

6    helped his clients and because he cared about the bank, never

7    took a dime, he's going to raise these funds, he asked -- I

8    think you should pay me.

9            Nova's going to have to pay somebody to help raise

10   these funds because Nova's got to meet this TARP contingency

11   and the deadline is growing short.  So he wants someone to

12   help him, Barry agrees to do it and that's all it is.

13   Completely above board.  Approved by the bank.

14           Barry's getting paid to do what Barry does, raise

15   funds.  He did it for free for a number of years, he's not

16   going to do it for free this time.  I don't have to go into

17   this.  Mr. Ignall's told you about it, Mr. Egan's told you

18   about it.

19           One more, Sean.

20           So on December 18th -- Pat and I may disagree about

21   this, I think it's December 18th and he thinks it's December

22   15th, it doesn't matter, it's sometime in December -- TARP

23   gets denied, and that's it.  TARP gets denied, the fund-

24   raising is done, you don't hear anything more about Barry

25   Bekkedam, except for one small thing, which I'll get to in

Duncan - Opening Statement                        74

1    just a second.

2            Mr. Ignall said Barry Bekkedam was involved in the

3    Charles Gallub loan, which as Mr. Egan tells you, happens

4    after TARP gets denied.  They will not be able to prove that

5    because it's false.

6            There's not one shred of evidence, not one fact,

7    nothing to show that Barry Bekkedam was in any way involved in

8    the Gallub loan because they don't need to raise money.  It's

9    after the TARP deadline.  If they're not raising money,

10   Barry's not involved.

11           That last little thing and I'm almost done.  Todd

12   Howard.  Okay, you're going to hear from Todd Howard.  Who's

13   Todd Howard?  Todd Howard was someone Barry hired to help him.

14   Todd Howard, he made some claims about what he could do and

15   you'll hear about that, so Barry hires him.  I've got a job,

16   you have a job, even the Judge has a job.  What do you do when

17   you have a job?  You answer to your boss.  You don't go tell

18   your boss what to do.

19           So what happens?  Mr. Ignall tells you it's part of

20   the coverup.  Todd Howard goes to Barry Bekkedam, his boss,

21   and says hey -- and what you didn't hear, as Mr. Egan told you

22   -- or Mr. Ignall -- Todd Howard finds out Brian Hartline made

23   the loan to George Levin from Brian Hartline.  Coverup?  What

24   coverup?

25           Barry's supposedly now involved in this coverup,

Duncan - Opening Statement                    75

1   according to the Government.  His employee goes to him and

2   says Barry, I'm -- I don't know what -- what happened?

3   Barry's not a banker, he's not a lawyer.  What does Barry do?

4   You'll hear he tells Todd Howard, hey Todd, we've got this

5   lawyer in the company, Larry Roven, go talk to Larry.  Go talk

6   to Brian.

7          I don't know about banking, I don't know about law.

8   That's somebody else.  Coverup to send your employee to the

9   lawyer, you're sending your employee to the banker who the

10  banker is going to have to pay another lawyer to give an

11  opinion?  This is the coverup that Barry's supposedly involved

12  in?

13         He doesn't shut down Todd Howard and say, Todd, you

14  work for me.  We're not talking about coverup.  No, go figure

15  it out, go talk to people and make yourself satisfied.  You're

16  going to hear from Todd Howard.  You determine whether this is

17  any sort of coverup.  Barry's not concealing anything.  Okay,

18  other coverup, the David Schwarz letter -- Mr. Egan talked to

19  you about that.  KPMG, the auditor, EITF 85-1, whatever that

20  is.

21         You won't hear a word about Barry Bekkedam involved

22  in that because that's not what Barry Bekkedam does.  He's not

23  involved in banking, he's not involved in accounting, he's not

24  involved in any of that.  EITF 85-1?  I'm not sure Barry could

25  spell it let alone know what it is because he's not involved.

1           And what happens after 2010, after everything's

2   done?  We know it, it's all over on December 18th, so what

3   happens in 2010 about Barry Bekkedam?  Nothing.  2011?

4   Nothing.  12, 13, 14?  Nothing.

5           Finally in late October, 2014 the Government brings

6   these charges and now more than six years after Nova applied

7   for TARP, and five years after all the facts were known to

8   everybody -- you heard about KPMG, they knew about everything

9   and they've told everybody about everything, all the facts

10  were known to the Government but we're still here today.

11          But as the evidence is going to show you, the

12  Government has got it all wrong because the intent matters.

13  What Barry thought matters.  The facts -- those facts are

14  stubborn things.  Ask the Government how they're going to

15  prove this if the facts don't match what they say happened.

16  No Government dollars were lost.  The Levin loan was legal.

17  The Bonomo loan was legal.

18          Maybe the Gallub loan was legal, I'm not any part of

19  that, I don't know what that's about.  No Government dollars

20  were lost.  No crimes were committed.  And Barry Bekkedam

21  never intended by not telling somebody that rich guys got

22  loans to conceal anything or to deceive anyone or to defraud

23  anyone.  There's no evidence of it.

24          After you've heard all this evidence, ladies and

25  gentlemen, we're going to ask you to return the only verdicts

1    consistent and supported by this evidence and the absence of

2    evidence.  Using your common sense, we ask you to return

3    verdicts of not guilty on every count.  Thank you.

4            (This concludes the requested opening statements at

5    11:57 a.m.)

6                              * * *

7                    C E R T I F I C A T I O N

8            We, Roxanne Galanti, Maureen Emmons and Diane

9    Gallagher, the court approved transcribers, certify that the

10   foregoing is a correct transcript from the official

11   electronic sound recording of the proceedings in the above-

12   entitled matter.

13   Roxanne Galanti    Digitally signed by Roxanne Galanti
                        DN: cn=Roxanne Galanti, o, ou,
                        email=dianadoman@comcast.net, c=US
14                      Date: 2016.05.05 10:21:14 -04'00'

15   ROXANNE GALANTI

16   Maureen            Digitally signed by Maureen Emmons
     Emmons             DN: cn=Maureen Emmons, o, ou,
                        email=dianadoman@comcast.net, c=US
17                      Date: 2016.05.05 10:21:28 -04'00'

18   MAUREEN EMMONS

19   Diane              Digitally signed by Diane Gallagher        March 29, 2016
     Gallagher          DN: cn=Diane Gallagher, o, ou,
                        email=dianadoman@comcast.net,
20                      c=US
                        Date: 2016.05.05 10:21:42 -04'00'

21   DIANE GALLAGHER                              DATE

22   DIANA DOMAN TRANSCRIBING, LLC

23

24

25

0077

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | 14-CR-0548 |
| | ) | |
| vs. | ) | |
| | ) | |
| BRIAN HARTLINE and | ) | |
| BARRY BEKKEDAM, | ) | Philadelphia, PA |
| | ) | March 29, 2016 |
| Defendants. | ) | 11:57 a.m. |

TRANSCRIPT OF TRIAL TESTIMONY (DAY 1)
BEFORE THE HONORABLE C. DARNELL JONES, II and JURY
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:          DAVID J. IGNALL, ESQUIRE
                            JENNIFER CHUN BARRY, ESQUIRE
                            ASSISTANT UNITED STATES ATTORNEYS
                            UNITED STATES ATTORNEY'S OFFICE
                            615 Chestnut Street, Suite 1250
                            Philadelphia, PA 19106

For the Defendant           PATRICK J. EGAN, ESQUIRE
Brian Hartline:             FOX ROTHSCHILD LLP
                            2000 Market Street, 10th Floor
                            Philadelphia, PA 19107

For the Defendant           MICHAEL J. ENGLE, ESQUIRE
Barry Bekkedam:             GREENBLATT, PIERCE, ENGLE,
                            FUNT & FLORES
                            123 South Broad Street, Suite 2500
                            Philadelphia, PA 19109

                            RUSSELL D. DUNCAN, ESQUIRE
                            SHULMAN, ROGERS, GANDAL,
                            PORDY & ECKER, PA
                            12505 Park Potomac Avenue
                            Potomac, MD 20854

                            JOEL D. SCHWARTZ, ESQUIRE
                            SHULMAN ROGERS GANDAL PORDY ECKER
                            12505 Park Potomac Avenue, 6th Floor
                            Potomac, MD 20854

Audio Operator:             CARL HAUGER

2

Transcribed by:                    DIANA DOMAN TRANSCRIBING, LLC
                                   P.O. Box 129
                                   Gibbsboro, NJ 08026
                                   Office: (856) 435-7172
                                   Fax:    (856) 435-7124
                                   E-mail:  dianadoman@comcast.net

Proceedings recorded by electronic sound recording; transcript
produced by transcription service

3

1                          I N D E X

2   WITNESSES:           DIRECT      CROSS      REDIRECT       RECROSS

3   FOR THE GOVERNMENT:

4   Theodore Schaffner   33(Bar)    41(Ega)    77(Bar)

5                                   68(Dun)

6   Kevin Bertsch        82(Ign)    96(Ega)    120(Ign)

7                                   118(Dun)

8                                   121(Ega)   129(Ign)

9   EXHIBITS:                                  I.D.       RECEIVED

10  G-30  Voting Sheet, Nova Bank               38          39

11  G-75  Preliminary Approval Letter           41          42

12  G-6   Application for TARP CPP              47          48

13  G-142 Recordation of Telephone Conversation 61          81

14  G-155 TARP Case Memo                        64          81

15  G-34  Letter, 6/17/09, from FRB            104         ---

16  G-139 E-mail, 12/14/09 from Course         109         110

17  G-150 E-mail, Course to Bertsch            112         112

18  G-16  Recordation of Meeting               120         ---

19

20

21

22

23

24

25

4

```
1        (The following portion of trial testimony was heard in
2    open court at 11:57 a.m.)
3            THE COURT:  All right.  Now, your question.  Do you
4    still wish me to consider what you've written to me?
5            JUROR:  Yes, please.
6            THE COURT:  All right.  Now, I'm not certain exactly
7    what it was that you meant.  Could you be more specific in
8    drafting it, please?
9            JUROR:  Write -- write it out --
10           THE COURT:  Please.
11           JUROR:  -- for you.
12           THE COURT:  Thank you.  Take your time.
13       (Pause)
14           THE COURT:  Thank you.
15           Counsel, may I see you, please.
16       (Sidebar begins)
17           THE COURT:  Okay.  For the record the question is,
18   is the list of dates supposed to be chronological, and then
19   she recorded May 27, 2009, June 10, 2009, June 30, 2010 with a
20   question mark, July 21, 2010 with a question mark, August 25,
21   2009, and then she says all the rest of the dates are 2009.
22           UNIDENTIFIED ATTORNEY:  It's a -- it's a typo in the
23   recitation.
24           MS. BARRY:  It's a typo, Your Honor.
25           UNIDENTIFIED ATTORNEY:  I didn't even notice it.  I
```

5

1    guess it was supposed to be 2009.

2              THE COURT:  Okay.  That's all I need to know.

3              Now, I have listed this as Juror Number 9, March 29,

4    2016, noon, Jury Exhibit Number 2 -- Juror Exhibit Number 2.

5    The other one, which I didn't understand, was Juror Exhibit

6    Number 1 that wasn't as specific as this.  Okay.  That'll be

7    incorporated into the record.

8              The rule simply applies the juror a response to her

9    question.

10             UNIDENTIFIED ATTORNEY:  And also, may reiterate that

11   it's not evidence in any event.

12             THE COURT:  Oh, absolutely.

13             UNIDENTIFIED ATTORNEY:  Thank you, Your Honor.

14             THE COURT:  Thank you.

15             UNIDENTIFIED ATTORNEY:  Thank you, Your Honor.

16        (Sidebar ends)

17             THE COURT:  The inquiry was simply whether or not

18   the dates that were on the PowerPoint slide were to be

19   chronological.  The answer is it was a typo.  All right.

20             Now we're going to recess for lunch, but the Court's

21   admonitions continue, one, in terms of the statements of

22   counsel, and these opening statements are not evidence,

23   notwithstanding what was put on the slides.  It's still not

24   evidence.  The evidence has to come from the witness stand

25   once we start the actual trial of the case in terms of

Colloquy                                6

1    evidence presented.

2              Two, also, as I mentioned at the outset several

3    weeks ago, please do not affronted -- be affronted if you

4    should run into us around the building or in the hallway and

5    we turn and walk the other day.  We simply are not allowed to

6    have any contact with the jury whatsoever.  We, meaning the

7    Court, the counsel, the witnesses and people who are directly

8    involved in this case.

9              We are going to restrict this floor for restroom use

10   by the jury.  Everyone else who is involved in the case, the

11   witnesses, counsel, everyone else will go to other floors.  So

12   if you would please restrict yourselves to the restrooms on

13   this floor, we won't have any kind of incident or run ins or

14   things like that.

15             We're going to recess at this time until 1:20 this

16   afternoon, 1:20 this afternoon.

17             Please do not discuss the opening statements or

18   anything about the case.  Enjoy your lunch.  We'll see you at

19   1:20 this afternoon right back here.

20             All rise.

21          (Jury out, 12:01 p.m.)

22             THE COURT:  All right.  You're excused.  Thank you.

23             ALL ATTORNEYS:  Thank you, Your Honor.

24             MR. IGNALL:  Well, Your Honor --

25             THE COURT:  Yes, sir.

1          MR. IGNALL:  There -- there's one issue I'd like to

2     raise before our first two witnesses --

3          THE COURT:  Yes, sir.

4          MR. IGNALL:  -- come up.

5          It came up in Mr. Egan's opening where he mentioned

6     something about CitiBank, Wells Fargo and bank being too big

7     to fail and treated differently.

8          I was under the impression that the Court had

9     already ruled that that type of evidence was not admissible.

10    I understand from Mr. Egan that he would like to inquire with

11    the Government's first witnesses about that.  So I think we

12    need to raise that before those witnesses testify.

13         THE COURT:  Could -- could you refresh my

14    recollection as to the specific motion and order wherein I did

15    that?

16         MR. IGNALL:  I will dig through -- it's a

17    Government's motion in limine, and I believe it was -- may

18    have been at the last hearing where I thought there was an

19    agreement -- or at least the Court, because I -- it was at the

20    last hearing, the Government's motion in limine was that it's

21    inappropriate to use some sort of blame the victim or that

22    this is a bad program.

23         At the last --

24         THE COURT:  I recall that, but my recollection about

25    that, while it's directed at a specific lack of inquiry by the

Colloquy                                                  8

1    regulators and that there was no obligation on the part of the

2    defendants to come forward with the information and not being

3    able to argue the lack of -- the fact that it wasn't asked

4    didn't mean that they weren't culpable.

5          MR. IGNALL:  Yes, I understand that was the -- but

6    it's all part of the blame the victim was effectively what we

7    were arguing, and I may have misunderstood.

8          If I did, I'm not sure if the Court has ruled

9    specifically then about whether it's appropriate to say that

10   Nova Bank was treated differently from other banks, because I

11   don't think that's relevant.

12         THE COURT:  I don't recall it, but, again, look at

13   the record and give me some specifics as to exactly what

14   presumably the Government's motion was.

15         MR. IGNALL:  I can -- I can find the motion, and I

16   believe --

17         THE COURT:  And I can tell you what the ruling was.

18         MR. IGNALL:  -- and I believe the resolution was at

19   the last hearing.  I don't believe we have a transcript from

20   the last hearing.  So I'm not sure I'm going to be able to

21   point the Court to a transcript.

22         THE COURT:  Well, at least bring up the -- the

23   motion.

24         MR. IGNALL:  Okay.

25         THE COURT:  All right.

Colloquy                                          9

 1          MR. IGNALL:  I can do it.  One moment, Your Honor.

 2          THE COURT:  And I'll review my notes about it.

 3          MR. EGAN:  And, Your Honor, I can respond at that

 4   point, but the fact is that the CPP program did have two sides

 5   to it.  One involved large banks; one involved small banks.

 6   It's a fact, not a question of blaming the victim.  It's an

 7   important fact for the jury to understand the way things took

 8   place.

 9          THE COURT:  Well, let me just stop you there.  I

10   don't recall in the context of blaming the victim that there

11   was any exclusion of being able to argue that the banks were

12   treated differently.

13          I specifically recall you arguing that at some point

14   in this pretrial process, but I don't think it was in the form

15   of a motion to bar him from saying that.  It was just part of

16   his presentation to the Court.

17          MR. EGAN:  Correct, Your Honor.  It was in our

18   motion to dismiss.

19          THE COURT:  Which was denied by the Court.

20          MR. IGNALL:  Yes, and then we -- and we responded

21   that anything that was part of the motion to dismiss should

22   not be before the jury, that if there's -- this is a bad --

23          THE COURT:  That's pretty broad.  I don't --

24          MR. IGNALL:  Well, no, no.  The -- the -- that

25   there's some misconduct, that this is a bad Government

Colloquy                                                    10

1   program, and, therefore, you can't defraud a bad program

2   because big banks just got the money, small banks had to go

3   through these hoops.  I think this goes --

4            THE COURT:  All right.  Let's just do this.  Find

5   exactly the motion --

6            MR. IGNALL:  Okay.

7            THE COURT:  -- and we'll address it.  Let's come

8   back about -- in one hour.

9            MR. IGNALL:  Okay.

10           THE COURT:  Ten after.

11           MR. IGNALL:  That'd be great.  Thank you, Your

12  Honor.

13           MR. EGAN:  Thank you, Your Honor.

14           THE COURT:  Okay.  Thank you.

15       (Luncheon recess taken, 12:05 p.m. to 1:10 p.m.)

16                    AFTERNOON SESSION

17           THE COURT:  Mr. Ignall, did you find what it was --

18           MR. IGNALL:  I think we did.

19           THE COURT:  -- we were referring to?

20           MR. IGNALL:  And if I may approach the podium, I'll

21  try and address what I found.

22           MR. DUNCAN:  Your Honor, may I -- may I be excused

23  for a moment?  I'm not involved in this.

24           THE COURT:  Yes, sir.

25           MR. DUNCAN:  Mr. Engle's here.

                            Colloquy                        11

1            THE COURT:  Surely.

2            MR. IGNALL:  Your Honor, it looks like the motion,

3    better yet, the memorandum is what we initially filed on

4    October 25th.  It's --

5            THE COURT:  Give Mr. -- I apologize, Counsel.  I'd

6    looked up, and I didn't notice that you weren't there.  I

7    apologize.

8            MS. BARRY:  It's all right.

9            UNIDENTIFIED ATTORNEY:  Beg your pardon.

10           THE COURT:  Yes, sir.  I'm sorry.

11           MR. IGNALL:  It looks like we first raised this in a

12   memorandum and docket, item 94, on October 26th we raised it.

13   We mentioned it again in Docket Number 131 on February 23rd in

14   a footnote.  And then I've just looked through the transcript

15   and thank Mr. Schwartz for helping me find the page.  I have

16   to find the transcript, oh, here it is, from the March 7th

17   hearing.  I think the Court did address it there, and I

18   believe it's at page 180 through 181.

19           And here, Mr. Egan says, "What should be considered

20   fair game is that we know from internal documents the decision

21   to give money to banks the size of Nova, decision had been

22   made not to give money to banks the size of Nova quite some

23   time before Nova got its rejection notice."

24           And he earlier talked about different tiers of

25   banks.

1       And then I said, "That's exactly the kind of thing

2   we're trying to exclude is evidence that has nothing to do

3   with this case, that his is a bad program.  They weren't going

4   to give them the money, anyway."

5       And the Court said, "I agree with that."

6       So I think we did address it in that context.

7       THE COURT:  In terms of relevancy.

8       MR. IGNALL:  Yes.

9       THE COURT:  And Mr. Egan in his statement made or --

10  yes.

11      MR. IGNALL:  Yeah, my -- my concern was that this

12  goes to more of a jury nullification argument that banks like

13  Nova weren't treated fairly by the Treasury.

14      THE COURT:  Understood.

15      MR. IGNALL:  So.

16      THE COURT:  Ergo, if you let the CitiBanks of the

17  world get away with it, why would you not let our client get

18  away with it or something to that effect.

19      MR. IGNALL:  It could be or just that, you know, big

20  banks got treated better than little banks.

21      THE COURT:  Mr. Egan.

22      MR. EGAN:  Those are two entirely different issues,

23  Your Honor.  Number one, I would not argue, did not argue and

24  have no intention of arguing that this is a bad program

25  because of the way they treated two different types of banks.

Colloquy                                13

1          But as a factual matter they did treat the two

2     different bank types differently, and it's an important and

3     relevant fact of the case.  Because what happens in the case

4     is Nova's application is in October, they take no action on it

5     until April.  And the reason they take no action on it until

6     April is because, not that it's anything negative or some

7     inference that there's something bad about the program, they

8     dealt with the big banks first.  And they dealt with the big

9     banks under a different standard.

10          I'm not going to argue that the fact that they had

11    dealt with the big banks under a different standard means that

12    the standard they applied to Nova is somehow bad or wrong.

13    It's just a fact that the jury needs to know as to what

14    happened between October and April, number one.

15          Number two, it is a fact, and it's not -- it's one

16    thing to say we can't blame the victim.  I'm certainly not

17    going to get up in argument and say it's -- it's TARP's fault,

18    and they didn't, you know, that this -- my client is sitting

19    here.  That's not what this is about at all.

20          It's just the fact, and it's as plain as the fact

21    that, you know, whether it's sun shining out today or not.

22    It's absolutely relevant and material.

23          MR. SCHWARTZ:  Can Mr. Bekkedam be heard on this,

24    Your Honor?

25          THE COURT:  Surely.

                                Colloquy                          14

1          MR. SCHWARTZ:  Thank you, sir.  Your Honor, I

2    started this mess back in October so just want to make sure.

3          The situation is this.  Your Honor, during that

4    hearing on March 7, said you can't blame the regulators for

5    mistakes they made, but we can ask the regulators if there was

6    a checklist made.

7          And if we can establish through the regulators that

8    there was no checklist and there was no rules because

9    everybody was treating -- treated differently, that means that

10   there's nothing material that they could have said.  And if

11   there's nothing material, there can't be material falsehoods,

12   and that's why this is fair game.

13         It's not to blame, you know, the Secretary of the

14   Treasury or how it was run.  It's a fact.  The fact is there

15   were no rules.  If there were no rules, no statements could be

16   material.  There could be no material omissions or falsehoods.

17   That's the purpose for introducing that evidence or producing

18   evidence.

19         THE COURT:  All right.  Mr. Ignall.

20         MR. IGNALL:  I think those are two different things.

21   In terms -- if Mr. Egan can elicit from a witness that there

22   is a reason that the Treasury didn't act on the application

23   for six months, that's fine, insofar as the jury might be

24   wondering.  I think that's fine.

25         But in terms of there's a different standard applied

1   to big banks versus small banks, I don't see what that gets

2   to, other than the inference that Nova was somehow treated

3   unfairly.

4            THE COURT:  All right.  I think that it would be

5   relevant in terms of the disparity and treatment, if you will,

6   if, for example, Nova's personnel relied on information that

7   was not given by the big banks, assuming that the big banks

8   were not in trouble as a result of not giving that

9   information.  So Nova gave the same kind of information or did

10  not give the same kind of information, and, therefore, there's

11  a problem with what Nova did.  They would be arguing as a

12  defense, we relied on what we saw going on.

13           MR. IGNALL:  Well, it --

14           THE COURT:  That's not -- then that would be

15  relevant.  I don't see that that's the situation here because

16  there's no evidence I've heard thus far or arguments thus far

17  that there was the kind of reliance on actions by the -- the

18  TARP personnel toward the big banks by Nova.

19           On the other hand, as counsel has indicated, the

20  delay is a fact, and there can be no objection to that because

21  it's in fact presumably what occurred.

22           Short of that, it would require the Court giving a

23  limiting instruction as to the evidence.

24           Now, first of all, let me back up a second as I've

25  discussed earlier, it is a fact, but by the same token there

Colloquy                                    16

1    was no objection when Mr Egan said it at the time, unlike

2    something else had happened with Mr. Duncan's PowerPoint

3    presentation.

4              So to that extent, quote, unquote, the cat's out of

5    the bag, no harm no foul.  It's just moving along with a lot

6    of other minutiae, frankly, that the jury heard this morning

7    in all of the opening statements that were given combined, not

8    that there's no substance to it, but it was a lot of

9    information.

10             So here we are now.  Counsel is indicating that he's

11   not going to use the information or -- or even ask the

12   questions in such a way that they would elicit either jury

13   nullification or any other irrelevant basis for its

14   introduction.

15             MR. IGNALL:  If -- if that's the case, then I have

16   no objection.  I generally don't like to object during opening

17   statements.

18             THE COURT:  But you did with Mr. Duncan.

19             MR. IGNALL:  I did just because perhaps we didn't

20   have quite the same meeting of the minds as I understood about

21   what we're using, but in terms of something that came up.  I

22   am only raising it because Mr. Egan raised it in opening.  I

23   have a concern that it was going to come up with the first two

24   witnesses who were going to take the stand today.

25             THE COURT:  And -- and appropriately right, no

Colloquy                                              17

1    question about it.  But what I'm suggesting is I cannot go

2    back now --

3            MR. IGNALL:  Oh --

4            THE COURT:  -- and unring that bell.

5            MR. IGNALL:  And I -- I'm not asking the Court to do

6    that.

7            THE COURT:  All right.

8            Now, Mr. Egan.

9            MR. EGAN:  I intend to ask the first witness about

10   the fact that the program started in October, and that between

11   October and April, when they finally got around to doing

12   anything with Nova's application, they were busy dealing --

13   yeah, he was hang -- flying around during my opening -- they

14   were dealing with the bigger banks, and that when they were

15   dealing with the bigger banks, they applied a standard to the

16   bigger banks that was not the same that they applied to the

17   smaller banks.  That's it.  No further.

18           THE COURT:  If the application of a different

19   standard would cause the time to elongate, that's relevant,

20   conceivably, and probative.  But just to say it for the jury

21   to hear it and opine erroneously that there is this disparate

22   treatment which requires a nullification verdict herein

23   because of that disparate treatment, I don't -- I think that's

24   what Mr. Ignall is -- is arguing against.

25           MR. EGAN:  I can get that he -- he's -- says I

1    should not argue for that, and I understand.  I'm not going to

2    argue with that.

3           But the fact is we haven't even heard any of this

4    evidence yet, and there's very likely to become material what

5    they ask which person because one of the problems is --

6           THE COURT:  Which is person versus -- in terms of --

7           MR. EGAN:  A big bank versus small bank.

8           THE COURT:  All right.  Go ahead.

9           MR. EGAN:  Because one of the problems is they

10   didn't communicate.  We have all these communications between

11   these regulators.  The vast majority of them never got

12   communicated over to Nova.

13          The Government is implying that Nova knew all of

14   these things, but when you look at the documents, it's pretty

15   obvious they never got told, and that's all part of this

16   process.  And it's clearly relevant and will handcuff the

17   defense if we're not able to go into that issue.

18          I don't plan to dwell on it.  It's just a fact.  I'm

19   going to cover it.  But I'm not going to argue that it means

20   it's a bad program or they were treating Nova unfairly.

21   That's -- I'm just -- it's a fact.

22          THE COURT:  How is it relevant?

23          MR. EGAN:  It's relevant because Nova didn't know

24   what the Government wanted from them, the very reason Your

25   Honor stated.

Colloquy                                           19

1          THE COURT:  And is the lack of knowledge because

2     everyone was treated by the same standard of lack of

3     information, or is it because the big banks received

4     information that Nova did not?

5          MR. EGAN:  It's because everybody was hearing

6     different things from everybody else in the community, and

7     nobody knew exactly what the deal was.

8          THE COURT:  Is there someone from the big bank?

9          MR. EGAN:  There's someone from Nova Bank who will

10    testify to that, and the Government's going to call them.

11         THE COURT:  Well, no.  But in terms of -- of what

12    happened in the big banks, that would be hearsay.  Is -- is

13    someone from the big bank to be here?

14         Lord, this thing is getting me.

15         MR. EGAN:  In terms of what Nova's understanding of

16    what was being asked and what the -- how the TARP was being

17    applied, there will be relevant testimony from Government

18    witnesses who are at Nova as to confusion and -- and lack of

19    understanding of what's being asked of them.

20         And that -- part of that big picture includes the

21    fact that big banks didn't get asked anything, got given all

22    this money, and now here we are, we're getting asked all these

23    questions, what do they want -- really want to know, and

24    that's --

25         THE COURT:  Again, I understand what you're saying

Colloquy                                    20

1    but I've got a problem with it because I see no reliance by

2    Nova and, quote, unquote, "the small banks" upon the

3    information that was either given to or withheld from the big

4    banks.

5                MR. EGAN:  Well, Your Honor, that's because we

6    haven't heard all the evidence.  Your Honor, you're being

7    asked to rule in a vacuum, and we're being -- we're basically

8    being handcuffed by this -- by this request.  And I -- and I

9    think it's inappropriate under these circumstances.  Want to

10   talk about no reliance, we've got a situation with the

11   Government, no reliance on any of the things that are

12   allegedly a crime.

13               So I mean, really.

14               THE COURT:  Let me hear from Mr. Ignall one more

15   time.

16               MR. IGNALL:  If Mr. Egan can elicit information from

17   someone at Nova about what Mr. Hartline understood or didn't

18   understand about what the Treasury wanted, totally relevant.

19               THE COURT:  Including, for example, if that

20   information that was to -- brought to Mr. Hartline's attention

21   came from the quote, unquote, "big banks"?

22               MR. IGNALL:  It -- whatever source it comes from, if

23   it goes to Mr. Hartline's intent, I think that's relevant.

24               THE COURT:  That's what I'm saying.  I think it's

25   admissible for that purpose.

Colloquy                          21

1          My problem is, is that in a vacuum, as you're
2   suggesting, without having any ability to link it up by just
3   simply saying, hey, these guys were treated unfairly because
4   these guys got more information, that in of itself is not
5   really relevant to the question in this case as to whether or
6   not there's culpability by reason of violation of a statute.
7   That's all I'm saying.
8          MR. EGAN:  And I would agree that that's improper
9   argument, Your Honor, and I would not --
10          THE COURT:  I'm sorry.
11          MR EGAN:  I would agree that that's improper
12   argument, and I would not make that argument.
13          THE COURT:  Then fine.
14          MR. IGNALL:  But my objection is to questioning the
15   first two Government witnesses about was there a different --
16   and they may -- truth be told, may not actually know the
17   answer, they may, were larger banks treated differently from
18   the way banks of Nova's size were treated?
19          That's what I don't think is relevant to get from
20   the -- these first two witnesses who don't have any connection
21   to Mr. Hartline, telling Mr. Hartline yes, by the way, big
22   banks do this, smaller banks do that.
23          Without that connection I don't think it's
24   appropriate to ask these witnesses.
25          MR. EGAN:  Your Honor, he's putting on the head of

Colloquy                                    22

1    the CPP from Washington, D.C. as his first witness.  Am I

2    going to bring him back here after the Government's finished

3    their case so that I can then tie this together?

4            I mean if we're going to do that, we're going to

5    have to recall --

6            THE COURT:  All right.

7            MR. EGAN:  -- every one of their witnesses.

8            THE COURT:  I'm going to do this.  I'm going to

9    allow you to conduct your questioning.  If, however, you cross

10   that line that I think we are all in agreement that you should

11   not cross, then I'm going to be obliged to give a cautionary

12   instruction to the jury regarding what they can now consider,

13   after it's all said and done, or what they cannot consider

14   after it's all said and done, and I would not want to undercut

15   or undermine your case, but you run that risk if the cat jumps

16   out of the bag inappropriately.

17           MR. EGAN:  Understood, Your Honor.

18           THE COURT:  All right.

19           MR. EGAN:  Thank you.

20           THE COURT:  All right.

21           Yes, sir.

22           MR. SCHWARTZ:  Just one additional issue if I may.

23           Respectfully, I believe that the Government amended

24   the indictment during its opening statement.  It said that the

25   deadline for letting CPPs and TARP know about information --

                              Colloquy                          23

 1    about money that was raised, capital that was raised, was

 2    extended beyond October into December.  And that may be true,

 3    but it's not what's the indictment.

 4              We have litigated and moved to exclude any testimony

 5    about statements made by the defendants or their proxies to

 6    the Government after October 21st because the indictment

 7    alleges that the crime was committed by October -- by or

 8    before October 21st; therefore, that's all that's admissible.

 9              The Government, I think, has responded to our

10    arguments by now saying in its opening statement, well, things

11    got extended into December.

12              That may be true, Your Honor, but that doesn't

13    matter in terms of what my clients and Mr. Hartline are

14    charged with.  They're charged with committing a crime by or

15    before October 21st; therefore, by definition, anything after

16    that date is outside of what the indictment says has to be

17    proven.

18              So we would renew our objection, based on this

19    improper amendment of the indictment, to preclude the

20    Government from producing any testimony from its witnesses

21    that either defendant, directly or by their proxies, made

22    statements to the CPP after October 21st.

23              THE COURT:  Did you not argue that there was -- it

24    would be permissible to introduce evidence of a continuation

25    of a cover-up?

Colloquy                                24

1          MR. IGNALL:  But that -- yes, but that's not even

2     the answer to this, Your Honor.

3          THE COURT:  All right.

4          MR. IGNALL:  Certainly the cover-up, even if it's

5     after the time period of the charged indictment is relevant to

6     consciousness of guilt.

7          But we've been through this a number of times where

8     I'm not really following how counsel's reading the indictment.

9     The indictment is quite clear for the conspiracy between in or

10    about May 2009 and in or about January 2010.

11         Counsel seems to hang their hat on an interim

12    deadline that is one of the allegations in the indictment that

13    when the defendants understood there was an October 21st

14    deadline, there are things they did.  The indictment continues

15    to outline conduct that continued through January of 2010.

16         So we've been through this multiple times.  I'm not

17    sure why we're going through this again.

18         MR. SCHWARTZ:  This is not -- respectfully, sir,

19    this is not about a cover-up.  It's nothing introduced for

20    purpose of a cover-up.

21         The crime in the indictment says that they had to

22    say by October 25th -- 21st that we have raised $15 million or

23    $10 million.  We've met contingency.

24         If they said it by or before October 21st, that's

25    evidence of guilt.  If on December 15th they said we met the

Colloquy                                    25

1    contingency, doesn't matter because it doesn't show they were

2    guilty of -- it doesn't show that they said by or before

3    October 21st.  If they said it in 2014, it wouldn't matter.

4           The only way a lie is material, if it's in fact a

5    lie, is if it's done by the time that it has the capacity to

6    affect a decision.  And what is said in the indictment?  The

7    grand jury decided the deadline for the criminal act was, was

8    October 21st.

9           Did -- did anybody --

10          THE COURT:  So what's the January date in the

11   indictment?

12          MR. SCHWARTZ:  The -- the January date is the

13   conspiracy itself, but it's not the -- there are at least,

14   first of all, three counts that don't involve the conspiracy,

15   but there's nothing about a statement made in December, hey,

16   we've met the contingency.  (Inaudible)  Great news.  We've

17   met the contingency.

18          That doesn't affect the ability of TARP to grant or

19   not grant the money by October 21st.  That's what the grand

20   jury said the crime is.

21          THE COURT:  Are you suggesting simply that the dates

22   that go into January affect a different crime but still one

23   that's named in the indictment?

24          MR. SCHWARTZ:  I don't think they affect any crime,

25   Your Honor.  The only crime that could possibly affect, I

1    think the Government believes, is it's showing a consciousness

2    of guilt.  It's not a statement made in December.  It's not

3    going to affect the consciousness of guilt that a statement I

4    made in -- before October 21st was dishonest.

5              The dishonest statement, if one existed, had to be

6    made to TARP by October 21st and --

7              THE COURT:  And this is even though the -- there is

8    argument, for example, from Mr. Egan that the -- they didn't

9    get to them until later on.

10             MR. SCHWARTZ:  That is an unfortunate result or

11   consequence of what the Government asked the grand jury to

12   charge.  The Government said here's our indictment.  We

13   wrote -- remember, it's like a contra -- you know, they the

14   language.  They didn't ask the grand jury to write the

15   language.  They said do we convince you that these people

16   should be charged with committing a crime by or before October

17   21st?

18             And the grand jury said yeah, go ahead, prosecute

19   them for that.  They didn't say go ahead and prosecute them

20   for something they did in December.

21             THE COURT:  Give me a second.  Let me look at the

22   indictment, please.

23        (Pause)

24             MR. SCHWARTZ:  I believe it's paragraph 22, Your

25   Honor.

Colloquy                                27

1          THE COURT:  I'm sorry?

2          MR. SCHWARTZ:  I believe it's paragraph 22, which is

3  unnumbered at -- or maybe I numbered it.  It's after -- it

4  says "Bekkedam and Hartline orchestrate other circular

5  transactions to secure TARP money."

6          THE COURT:  Let me ask it this way because I'm not

7  following it the way you're directing me at the moment.

8          I'm looking at page four on the indictment.  This is

9  document number one, page four of 17.  It's headed "The

10 Conspiracy" at the top of the page.

11         Are you with me, Mr. Schwartz?

12     (No audible response)

13         THE COURT:  Did you find it, Mr. Schwartz?

14         MR. SCHWARTZ:  I'm just -- mine -- mine is printed

15 funny, Your Honor.  Sorry.  I'm sorry.

16         THE COURT:  That's all right.

17         MR. IGNALL:  Which paragraph, Your Honor?  Which

18 paragraph?

19         THE COURT:  This would be number 12 --

20         MR. SCHWARTZ:  Let me see what the --

21         THE COURT:  -- under the conspiracy.  Document one,

22 filed October 2, 2014, page --

23         MR. IGNALL:  Got it, Your Honor.

24         THE COURT:  -- page four.

25         MR. IGNALL:  Yes, sir.

Colloquy                                          28

1            THE COURT:  All right.  That under the hearing in

2    bold "The Conspiracy," --

3            MR. SCHWARTZ:  Uh-huh.

4            THE COURT:  -- item 12.

5            MR. SCHWARTZ:  Yes, sir.

6            THE COURT:  Between in or about May 2009 and in or

7    about January 2010 it addresses conspiracy.

8            MR. SCHWARTZ:  Understood.

9            THE COURT:  Now, jumping forward in Count 2 on page

10   11 the grand jury further charges that, and then item two,

11   "Between in or about May 2009 and in or about December 2009 it

12   apprises that the -- each defendant executed a scheme with the

13   intent to defraud."

14            Now, what I'm trying to understand from what you're

15   arguing where in this says that the Government can't do what

16   the Government's trying to do?

17            MR. SCHWARTZ:  It's page -- it's paragraph 22, Your

18   Honor, which is page six of the Indictment.  I'm sorry --

19   yeah.

20            "The Department of the Treasury" --

21            THE COURT:  One second.

22            MR. SCHWARTZ:  I beg your pardon.

23            THE COURT:  Okay.  The bold heading is "Bekkedam and

24   Hartline orchestrate other circular transactions" --

25            MR. SCHWARTZ:  Yes.

Colloquy                                    29

1          THE COURT:  -- to the secure TARP money."

2          MR. SCHWARTZ:  Yes.

3          THE COURT:  And then Item 22, quote, "The Department

4   of the Treasury told Nova it had until October 21, 2009 to

5   raise the money necessary to be eligible to receive the 13.5

6   million in TARP funds.  However, by October 21, 2009 Nova

7   still had not raised sufficient capital."

8          MR. SCHWARTZ:  Yes, sir.  And what I am suggesting,

9   respectfully, Your Honor, is that the lie has to occur -- the

10  lie or omission has to occur by October 21st.  It didn't.

11         That's why we moved to dismiss the indictment

12  because it couldn't be proven, but the -- the simple fact is

13  that the grand jury said that -- Treasury said tell us whether

14  you've raised enough capital by October 21st.

15         If they lied about it by or before October 21st,

16  then they could be convicted of making a materially -- a false

17  and material statement.

18         Any statement after October 21st saying we've raised

19  the money, we've raised the money, we've raised the money is

20  past that deadline, and, therefore, with all due respect, it

21  can't be a crime as defined in the Indictment.

22         THE COURT:  Now let me hear from Mr. Ignall.  Thank

23  you.

24         MR. IGNALL:  Thank you, Your Honor.

25         I was not aware we were going to litigate this

Colloquy                                          30

1    again, Your Honor, and I don't actually have our response and

2    their original motion to dismiss where they seem to think that

3    paragraph 22 limits the Government to prove so that it can't

4    introduce evidence of things that are in, for example,

5    paragraph 23, paragraph 25, paragraph 26, paragraph 27.

6         The grand jury delineated the time period as going

7    through January 2010 for the conspiracy.  The conduct alleged

8    in the indictment go through January 2010 in the conspiracy.

9         Count 2 goes through December of 2009.  Count 4

10   takes place on December 15, 2009.

11        I don't understand -- I didn't understand the

12   argument before.  I don't understand it now.

13        Yes, the Department of Treasury said we'd like you

14   to raise the money by October 21st, but the evidence will show

15   that the Treasury extended that deadline.

16        THE COURT:  And that's the critical point here.

17        MR. IGNALL:  It actually -- although it is a

18   critical point, as a matter of law it's not even the critical

19   point.

20        The critical point is did these defendants engage in

21   a scheme or a conspiracy beyond that point, that as we

22   explained, I believe, in our response to the motion to

23   dismiss, even if it were impossible to get the money,

24   impossibility doesn't make it legally impossible to commit the

25   crime.

Colloquy                                    31

1          THE COURT:  All right.  Now, what was your request

2     for relief?

3          MR. SCHWARTZ:  Your Honor, my request was that the

4     Government not ask its -- adduce evidence from Government

5     witnesses about statements that either Mr. Hartline or Mr.

6     Bekkedam or their proxies made to them about leaving the

7     contingency after October 21st because that can't possibly be

8     material according to the Indictment.

9          They drew a line in the sand and said if you tell --

10    if you tell me we met the contingency by October 21st, then

11    you can get the TARP money.  Therefore, if you lie about

12    meeting the contingency by October 21st, you lied about

13    something material.  Materiality is defined in the indictment

14    by October 21st.

15         I appreciate the Court hearing me on this.  I know

16    we've talked about it before, but I think the -- the

17    Government has made clear where it's going now in its opening

18    statement, and it's contrary to both the indictment and the

19    trial memo.

20         THE COURT:  I don't see it that way.

21         MR. SCHWARTZ:  Very well, sir.

22         THE COURT:  All right.  You have an exception.

23         MR. SCHWARTZ:  Thank you.  Then, Your Honor, the --

24    just to make -- so I understand the Court's terminology,

25    "exception" means a standing objection so we don't have to

Colloquy                                              32

1    renew this?

2                  THE COURT:  Absolutely.

3                  MR. SCHWARTZ:  Thank you, sir.

4                  THE COURT:  Mr. Engle.

5                  MR. ENGLE:  Your Honor, since I think we're going to

6    actually start some testimony at some point --

7                  THE COURT:  You sure?

8                  MR. ENGLE:  -- I would make a formal motion for

9    sequestration pursuant to Federal Rule of Evidence 615.

10                 THE COURT:  Granted.  And those who will not be

11   testifying momentarily and who have to leave the room cannot

12   discuss their testimony with anyone else who was either on the

13   witness stand or comes from the witness stand.

14                 MR. IGNALL:  I don't -- I don't believe there's

15   anyone subject to sequestration who is the courtroom right

16   now.

17                 THE COURT:  All right.

18                 MR. ENGLE:  I don't know whether or not Agent Lyons

19   is.  I mean --

20                 MR. IGNALL:  I think we reached an agreement

21   yesterday that he's not subject to sequestration.

22                 MR. ENGLE:  Oh, okay.  Understood.  That's what

23   happens when you miss Court.

24                 THE COURT:  All right.  Are we ready?

25                 MS. BARRY:  Yes, Your Honor.

1          THE COURT:  All right.

2      (Pause)

3          THE CLERK:  All rise.

4      (Jury in, 1:40 p.m.)

5          THE CLERK:  Ladies and gentlemen, we are back on the

6  record.

7          THE COURT:  Good afternoon.  You may be seated.

8          The Government may call its first witness.

9          MS. BARRY:  Thank you, Your Honor.

10          The United States calls Ted Schaffner.

11      THEODORE SCHAFFNER, GOVERNMENT'S WITNESS, SWORN

12          THE CLERK:  Thank you.  Please state and spell your

13  name for the record for me.  You can have a seat.

14          THE WITNESS:  My legal name or --

15          THE CLERK:  Yes.

16          THE WITNESS:  It's Theodore Schaffner.  That's

17  spelled S-C-H-A-F-F-N-E-R.

18          THE CLERK:  Thank you.

19          MS. BARRY:  May I proceed, Your Honor?

20          THE COURT:  You may proceed.

21          MS. BARRY:  Thank you.

22                    DIRECT EXAMINATION

23  BY MS. BARRY:

24  Q    Good afternoon, Mr. Schaffner.

25  A    Good afternoon.

1    Q    Mr. Schaffner, are you currently working?

2    A    I'm currently retired.

3    Q    And prior to your retirement where were you working?

4    A    I worked at the U.S. Treasury.

5    Q    And while you -- U.S. Treasury, what did you do there?

6    A    I was the Director of the Capital Purchase Program.

7    Q    And is the Capital Purchase Program sometimes referred to

8    as CPP?

9    A    Yes.

10   Q    Would you please tell the ladies and gentlemen of the

11   jury what the purpose of the Capital Purchase Program was?

12   A    The purpose of the Capital Purchase Program was to invest

13   additional equity capital in banks that were viable without

14   additional funding.

15   Q    And when you say "viable," what did that mean?

16   A    It meant that we felt that even with the difficulties

17   that were occurring in the economy at that time that these

18   banks could survive with the level of capitalization and the

19   book that the -- book of loans that they had.

20   Q    Okay.  And so did that mean that they were viable without

21   receiving any investment from the CPP?

22   A    That is correct.  They had to be viable without our

23   investment.

24   Q    And was the CPP part of a larger program?

25   A    It was part of the Troubled Asset Program, sometimes

1    called TARP.

2    Q    Now, can you just tell the members of the jury, please,

3    what did your department do or what did you oversee?

4    A    We wanted to provide this funding to these banks promptly

5    so we felt that we didn't -- that -- that to do traditional

6    due diligence would be very time-consuming and require a much

7    bigger staff.

8         So we decided that we would rely on -- primarily on

9    the recommendation of the primary bank regulator who oversaw

10   the bank because we felt they were very knowledgeable about

11   these institutions.

12   Q    Okay.  So in terms of reviewing applications that were

13   coming into the CPP was the information provided to the CPP by

14   the primary regulator?

15   A    Yes.

16   Q    Now, was part -- if you could, just a little bit, if you

17   wouldn't mind, describe the process of an application coming

18   into the CPP.

19   A    The application was a one-page recommendation or one-page

20   form that we developed that had information, plus a short

21   write-up.  And in that write-up -- and it would come from the

22   primary bank regulator of the institution, and in that

23   write-up we needed the primary bank regulator to say that the

24   institution was viable without our funds.

25   Q    Okay.  And then did you have a department that took in

1   those applications and reviewed them?

2   A      Yes.   There were people with bank -- bank regulator

3   experience on my staff, and every application that came in

4   would be reviewed by at least two of those bank regulators and

5   comment about them.

6   Q     And can you tell the members of the jury what happened

7   from that review process with the applications?

8   A      If we were comfortable with the material we received, we

9   could go directly ahead to make a preliminary indication

10  that -- that we would fund.

11          If we were worried about some aspect of the

12  application, we would discuss it with the primary regulator,

13  and if we still had questions about the institution, we would

14  refer it to a council.

15  Q     Okay.   And is that Council sometimes referred to as the

16  CPP Council?

17  A      Yes.

18  Q     And who comprised or made up the CPP Council?

19  A      The CPP Council had four members, a senior member from --

20  one from each of the primary bank regulators.   So one from the

21  Fed, one from the Office of the Comptroller of Currency, one

22  from the Office of Thrift Supervision and one from the FDIC,

23  the Federal Deposit Insurance Corporation.

24  Q      And would the CPP Council then do a more thorough review

25  of the institution if there were concerns?

1   A    There would be a discussion at the Council discussing

2   the -- the various aspects of it.  Sometimes the

3   institution -- the -- the primary regulator of the institution

4   of the -- that was being discussed, sometimes they would come

5   in and provide additional information.

6          But there -- then there would be a discussion within

7   the -- within the Council and a vote as to whether or not it

8   should be funded or not, what their recommendation was.

9   Q    Was the CPP Council able to acquire additional

10  information about a financial institution?

11  A    They could ask for more information from the primary

12  regulator, yes.

13  Q    Okay.  And, again, the -- all of the information that's

14  coming in to the CPP Council and then ultimately to the

15  Treasury would be from the primary regulator.

16  A    Yes.

17  Q    Now, in order to get approval from the CPP Council did

18  there need to be a -- well, let me ask you this.

19         How did -- how did a bank's application that went to

20  CPP Council come out of CPP Council?  How -- how could -- how

21  did that happen?

22  A    If there was a recommendation from CPP Council or if

23  there was a bank that -- that we thought didn't need to go to

24  CPP Council that we were comfortable with, the -- the matter

25  would then be taken to an Investment Committee that was made

Schaffner - Direct (Bar)                                    38

1    up of members of Treasury.

2    Q    From the CPP Council you -- you said that there were

3    four -- there were representatives from the four regulating

4    bodies, is that -- is that right?

5    A    Correct.

6    Q    And so to come out of CPP Council would there be a --

7    need to be a majority vote for approval?

8    A    Correct.  If there were not a majority vote, we would not

9    take it to the -- to the Investment Committee.

10   Q    Okay.  Sir, I would like you to take a look at what's

11   been marked as Government's Exhibit 30.

12        And if you could just take a look on your screen,

13   hopefully, it -- it shows up there.  And if it doesn't, please

14   let me know.

15   A    It --

16   Q    Do you see --

17   A    Yes.

18   Q    -- Government's Exhibit 30?

19   A    I do.

20   Q    And looking at Government's Exhibit 30 can you describe

21   what that is?

22   A    This is a voting sheet that would be completed after a

23   discussion on a bank.

24   Q    Okay.

25   A    This particular one says Nova Bank.  It's dated June 10,

Schaffner - Direct (Bar)                              39

1    2009, and it indicates approval by FDIC, the Office of the

2    Comptroller of Currency, the OCC, the Office of -- Office of

3    Thrift Supervision, and it shows that the member from the

4    Federal Reserve Bank did not recommend approval.

5    Q      Okay.

6    A      At the bottom there's an indication that -- that the --

7    the approval is based on -- it -- contingent on capital

8    injection of $15 million.

9              MS. BARRY:  Your Honor, the Government would move

10   for the admission of Government's Exhibit 30.

11             MR. SCHWARTZ:  No objection.

12             THE COURT:  Admitted.

13             MS. BARRY:  If we could please display that to the

14   jury.

15             MS. BARRY:  Okay.

16   BY MS. BARRY:

17   Q      So looking at Government's Exhibit 30, which is the first

18   page of a three-page document, if we could look particularly

19   at the -- you're saying that there were votes by each of the

20   members of the Council, is that -- is that right?

21   A      Correct.

22   Q      Okay.  And star -- there's an asterisk at the bottom.

23             MS. BARRY:  And if we could blow that up, please.

24   Okay.

25   BY MS. BARRY:

Schaffner - Direct (Bar)                                40

1    Q    And the approval was contingent in capital injection of

2    $15 million.  Is that what the Council recommended?

3    A    Their approval was based on a capital injection of $15

4    million.

5              MS. BARRY:  And, again if we could -- if you don't

6    mind, making the whole page show again, please.  Thanks.

7    BY MS. BARRY:

8    Q    Again, this was for an institution called Nova Bank at a

9    Council meeting dated June 10, 2009.

10   A    Correct.

11   Q    Okay.  Now, up until this point did you personally or

12   even at this point have any direct communication or -- with

13   Nova Bank?

14   A    No.

15   Q    Who would have the direct communication with Nova Bank?

16   A    The primary regulator.

17   Q    And who was the primary regulator for Nova Bank?

18   A    I believe FDIC.

19   Q    Okay.  Now, the CPP Council made this recommendation,

20   and, again, coming out of CPP Council is the recommendation

21   made based on the fact that the bank would be viable without

22   TARP fundings?

23   A    Yes.

24   Q    Okay.  Now, at some point in time do you know whether or

25   not Nova Bank received a formal preliminary approval letter

1   from the Treasury?

2   A    Yes.  They did receive a preliminary approval from

3   Treasury.

4   Q    Okay.  And I'd like you to take a look now, please, at

5   Government's Exhibit 75.

6              MS. BARRY:  And if we could just show that to the

7   witness at this point.

8   BY MS. BARRY:

9   Q    Do you have what's been marked as Government's Exhibit 75

10  on the screen before you, sir?

11  A    I have page one of it, yes.

12  Q    Okay.  And what is Government's Exhibit 75?

13  A    When a -- an institution had gone to the Investment

14  Committee and had received a positive vote at the Investment

15  Committee, we would send a letter to the institution

16  indicating preliminary approval and providing some information

17  about how they -- what they needed to do to proceed through a

18  process where funding would occur.

19  A    Okay.

20             MS. BARRY:  And if we could just please show the

21  witness page two of that letter.

22  BY MS. BARRY:

23  Q    Sir, is this a letter that was signed by you?

24  A    Yes.

25             MS. BARRY:  The Government would move for the

Schaffner - Direct (Bar)                              42

1   admission of Government's Exhibit 75, please.

2              MR. SCHWARTZ:  No objection.

3              THE COURT:  Admitted.

4              MS. BARRY:  And if we could please publish page one

5   to the jury.  Okay.

6   BY MS. BARRY:

7   Q     Now, looking at page one of Government's Exhibit 75 does

8   this -- is this a letter being sent to a Jeffery Hanuscin at

9   Nova Financial Holdings?

10  A     Yes.

11  Q     Okay.  And within this -- if we could focus in on the

12  second full paragraph.  Okay.

13             In that paragraph what is -- what are you telling

14  Mr. Hanuscin and his -- his bank?  And the bank, Nova, at that

15  time.

16  A     Well, it indicates that our consideration and the

17  recommendation of the applicant's primary bank regulator, it

18  indicates that there's preliminary approval at the dollar

19  amount that we were prepared to invest and a condition that

20  $10 million of additional equity be obtained prior to closing.

21             MS. BARRY:  And -- and if we could, I don't know if

22  it's -- we're going to test Agent Boyer's capabilities here --

23  can we highlight the sentence:

24             "Based on its review and relying on the information

25             provided to it on August 20, 2009 Treasury preliminarily

Schaffner - Direct (Bar)                                        43

1       approved the application in the amount of $13,472,000

2       with the express condition that 10 million in additional

3       equity is obtained prior to closing?"

4              And is that what was stated to Nova Bank in that

5    letter?

6    A    Yes.

7    Q    Okay.  Now, in terms of the $15 million contingency on

8    June 10, 2009, did that contingency change at all?

9    A    I don't believe it did.

10   Q    And this says 10 million of additional equity.

11   A    The discrepancy between the 15 million and the 10

12   million, I don't have a current recollection, you know, as far

13   as --

14   Q    Did you --

15   A    -- how that occurred.

16   Q    -- change it?  Would you have changed that?

17   A    We would not have changed it on our own.

18   A    Okay.  Now, in terms, again, any information that came to

19   you regarding Nova Bank would be from it's primary regulator?

20   A    Yes.

21              MS. BARRY:  May I have one moment, Your Honor?

22              THE COURT:  Surely.

23       (Pause)

24   BY MS. BARRY:

25   Q    Now, back in June of 2009 when that -- when the CPP

Schaffner - Cross (Ega)                                44

1    Council approved Nova Bank with the $15 million contingency,

2    do you know whether the FDIC had advised Nova that the CPPC

3    Council had approved it with the $15 million contingency?

4    A    I don't have first-hand information on that.

5    Q    Thank you.

6              MS. BARRY:  Oh, one more question, Your Honor.

7              THE COURT:  Surely.

8    BY MS. BARRY:

9    Q    And in terms of what Nova Bank told the FDIC do you have

10   any -- do you know whether or not Nova told the FDIC that it

11   had raised five million of the $15 million contingency?

12             MR. SCHWARTZ:  Objection; leading.

13             THE COURT:  Sustained.

14   BY MS. BARRY:

15   Q    Do you know what Nova Bank told the FDIC about its

16   contingency?

17   A    I don't.

18   Q    Okay.

19             MS. BARRY:  No further questions.

20             THE COURT:  You may cross-examine.

21             MR. EGAN:  Thank you, Your Honor.

22                          CROSS-EXAMINATION

23   BY MR. EGAN:

24   Q    Good afternoon Mr. Schaffner.

25   A    Good afternoon.

1   Q    In -- you're retired now?

2   A    Yes, I am.

3   Q    Nice.  In 2009 you were the head of the CPP, basically,

4   right?

5   A    I was the Director of the program, yes.

6   Q    And that was the -- you were the most senior person in

7   that program, correct?

8   A    Yes.  I mean I obviously reported to more senior people,

9   but yes.

10  Q    Well, you -- to the Treasury Secretary, right?

11  A    To an Assistant Secretary.

12  Q    And as the person in charge, needless to say, you had a

13  whole lot of people, and I'm -- I don't mean to suggest you

14  had, you know, thousands of them, but you had people who

15  reported to you and who dealt with the day-to-day operations

16  of that particular program, correct?

17  A    Yes.

18  Q    And it would be fair to say that you pretty much relied

19  on them to provide you the information you needed to make the

20  important decisions that you were making.

21  A    I certainly relied on them to do their job, but our

22  primary -- the primary thing I relied on for purposes of

23  taking things to the investment committee was the

24  recommendation of the primary regulator with the input that I

25  got from my staff.

1    Q     Right.  And so -- and that was actually not somebody who

2    worked for you on CPP, but that would be one of the other

3    agencies that happened to be the primary regulator of that

4    particular institution, right?

5    A     We're talking about the recommendation?

6    Q     Yeah.

7    A     Yes.

8    Q     Okay.  So let's just talk a little bit about the CPP

9    itself.

10           It came to be because of the financial crisis in

11   2008, right?

12   A     Yes.

13   Q     And in -- it was a bit of an emergency?

14   A     Yes.

15   Q     And a very high priority with the Government?

16   A     Yes.

17   Q     And when it was first instituted was in October of 2008,

18   right?

19   A     Right, approximately.

20   Q     And when it was first instituted, one of the things it

21   did was to seek banks who are interested in taking advantage

22   of the program, right?

23   A     Yes.

24   Q     And one of the things it did was to provide an

25   application to those banks to fill out so that they might get

Schaffner - Cross (Ega)                                    47

1   this lending, right?

2   A      Yes, I -- the one reason I hesitate, I think it was all

3   provided through the primary bank regulators.

4   Q      Okay.

5          MR. EGAN:  If we could have Government 6.

6   BY MS. BARRY:

7   Q      Sir, there's a document in front of you, and it's

8   Government's Exhibit 6.  It's called an Application for TARP

9   Capital Purchase Program.

10         Are you familiar with that?

11  A      Yes.

12  Q      And that is a document that the Government created so

13  that banks could provide whatever information the Government

14  sought so they could begin this process, is it not?

15  A      Yes.

16  Q      Now, I guess what you're saying is this was not something

17  that CPP did, it was, rather, something that was done by one

18  of the other various regulators?

19  A      I'm not certain how we -- how we distributed that.

20  Q      In any event, what it is, is it's an application that

21  went out to banks so they could fill out to apply for these

22  funds, right?

23  A      Yes.

24  Q      And this particular one --.

25         MR. EGAN:  Oh, and Your Honor, I would move for the

1    admission of Government Exhibit 6.

2              THE COURT:  Any objection?

3              MS. BARRY:  No objection, Your Honor.

4              THE COURT:  Admitted.

5              MR. EGAN:  And we could publish it for the jury?

6              THE COURT:  Admitted, and he can publish it.

7              MR. EGAN:  Thank you, Your Honor.

8    BY MR. EGAN:

9    Q    So this is your application for TARP Capital Purchase

10   Program, correct?

11   A    Right.

12   Q    And this particular one is that of Nova Financial

13   Holdings?

14   A    Correct.

15   Q    And the primary contact is a Jeffrey Hanuscin?

16   A    Correct.

17   Q    Right.  Now, you never spoke to Jeffrey Hanuscin, did

18   you?

19   A    No.

20   Q    You -- did you know he was the CFO of Nova Bank?

21   A    I don't know.  I'm not sure I would have concerned myself

22   with it.

23   Q    Of course.  And under -- there's a secondary contact.

24   That's Brian Hartline.

25   A    Correct.

1    Q     And you never spoke to Brian Hartline, either, right?

2    A     No.

3              MR. EGAN:   And then if we could go to the second

4    page, and if we could just make that a tiny bit bigger so the

5    jury can maybe read it a little better.

6    BY MR. EGAN:

7    Q     This is all of the information that was requested of the

8    applicant bank with regard to applying for this program,

9    correct?

10   A     Yes.

11   Q     So the application that we're speaking of really only

12   asks like five questions.

13   A     Right.

14   Q     Okay.  And you never reviewed this application, did you?

15   A     It was probably part of the package.

16   Q     Now, at the time that TARP -- then this was filed on

17   October -- I'm sorry to do this, but October 27, 2008 is the

18   date that this was signed, right?

19   A     Well, that's the date indicated on the --

20   Q     Okay.

21   A     -- document.

22   Q     So that's the date that Nova Bank's application hits

23   TARP, and probably your department or probably FDIC.

24   A     It -- that's where I don't remember for sure.  It may

25   have come directly to us.

1    Q    Okay.  But in any event what you would do, if it did come

2    directly to you, is you would ask the primary regulator to

3    take a look at that bank and then give you information so that

4    a decision could be made in the process that you described on

5    your direct.

6    A    Correct.  It was decided that we didn't have the staffing

7    or the time to do our own due diligence.  So, instead, we

8    relied on the knowledge of the primary bank regulator who

9    regularly, you know, visits these banks and evaluates them.

10        And we would rely on the work that they had done and

11   their statement that the bank was viable without our funding.

12   Q    And there was a good reason for that, because that

13   primary regulator is the one that inspects the bank regularly,

14   right?

15   A    The primary regulator inspects the bank and has fairly

16   detailed knowledge of the bank.

17   Q    And certainly their examiners are the ones that go out

18   and go into the bank and do the examinations.

19   A    Yes.

20   Q    And they're the ones who have the ability to look at the

21   balance sheets of the bank and look at all the paperwork at

22   the bank so they can figure out what's actually going on.

23   A    They have very extensive information on these banks.

24   Q    Now, I'm a little confused here because the FDIC you've

25   identified as the primary regulator.

1          Nova Financial Holdings is actually the holding

2     company for the bank.  Were you familiar with that?

3     A    That's not a surprising thing --

4     Q    Right.

5     A    -- in -- in banks.

6     Q    Yes, but aren't they regulated by the Federal Reserve

7     Board and not by the FDIC?

8     A    How they divvy that up, you'd really do better talking

9     with -- with them.  I think it depends on several factors.

10    Q    Okay.  But in any event, this one came to the FDIC.

11    A    Right.

12    Q    Now, at the same time this was filed in October of 2008

13    you were also -- your program was also dealing with much

14    larger banks, correct?

15    A    I joined the program in January of 2009.

16    Q    Oh, so you were not at the CPP when the -- this

17    application was received?

18    A    Correct.

19    Q    Okay.  And you -- were you not at the CPP when the

20    funding was provided to the -- the Wells Fargos and the

21    CitiBanks of the world?

22    A    Correct.  I was not there.

23    Q    So you don't know what took place with regard to the way

24    that was done.

25    A    I have no first-hand knowledge of that.

1  Q    But you do know that they had been funded before you even

2  got there, right?

3  A    I was aware from what I read in the newspaper, yeah.

4  Q    Okay.  In any event, there is a process here, and that is

5  that the primary regulator, who we've determined for some

6  reason was the FDIC in this case, makes a recommendation,

7  correct?

8  A    Uh-huh.

9  Q    That recommendation, if it seems completely no issues

10 whatsoever, you would approve without the CPP Council vote?

11 A    Correct.

12 Q    And that would be determined because that was a

13 particularly robust bank?

14 A    Correct.

15 Q    And you would make that determination based upon the

16 financial materials that are presented to your office?

17 A    Correct.

18 Q    Did you actually really participate in any of this

19 decision making, or were you more like the people below you

20 said, hey, this is the deal, and you would write the letter?

21 I don't mean to say that in a negative way.

22 A    I was -- I was present at every -- pretty much

23 everything, most of the meetings of the Investment Committee

24 when -- and I would have the people who are bank regulators

25 present each one of these banks.

1          If there were issues, they could -- they could

2    discuss them with me.  That would generally occur prior to

3    that time.

4    Q    Okay.  And then you would make --

5    A    And -- and --

6    Q    -- the final call.

7    A    And -- yes.  And then at the -- I also tried to attend

8    all.  If not, I certainly attended most of the meetings of

9    the -- of the Council so I could participate in the discussion

10   and also provide the benefit of that dialog to the Investment

11   Committee.

12   Q    Okay.  So for -- for Nova Bank we know that at some point

13   FDIC passes on to the Council, correct?

14   A    They passed it on to us.  We had concerns about it.  So

15   we took it to the Council.

16   Q    Okay.  And the concerns that you had was whether or not

17   Nova would be viable without TARP funds, correct?

18   A    Correct.

19   Q    And that was based on its historical earnings, I assume?

20   A    Yeah.  I think it was -- it was based also in part on its

21   capitalization and, you know, the -- its book of business, how

22   it had been marked by the -- or how it had been evaluated by

23   the primary regulator.

24   Q    And --

25          MR. EGAN:  If we could have Government's 30 back.

Schaffner - Cross (Ega)                                    54

1    BY MR. EGAN:

2    Q    You were shown this on direct examination.

3    A    Uh-huh.

4    Q    This is the actual Council review decision sheet,

5    correct?

6    A    Right.

7    Q    And do you remember being at this meeting?

8    A    You know, I --

9    Q    A long time ago.

10   A    It was a long time ago.  I do not have a primary

11   recollection of this meeting.  I have seen something that

12   indicates that I was at this meeting.

13   Q    Okay.  But you don't really remember -- off the top of

14   your head you don't remember what --

15   A    Off the top of my head.  It wasn't memorable enough for

16   me to have kind of kept it in mind to this date.

17   Q    And you'll note that the Federal Reserve Bank disapproved

18   the --

19   A    Correct.  They did not recommend.

20   Q    And the Federal Reserve Bank's disapproval certainly,

21   ultimately would have had some impact on your thinking about

22   it, right?

23         I mean you -- you'd consider what they thought,

24   right?

25   A    Yes.

1    Q     Now, if you'll --

2    A     But -- but three other regulators did approve it.

3    Q     Of course.  Now if you'll turn to page three of this

4    document, and if you go down to the bottom of that paragraph

5    where it says, "Mr. Bertsch stated his belief."

6             Now, Mr. Bertsch is the Federal Reserve Bank

7    regulator, correct?

8    A     He is a part of the Fed, yes.

9    Q     He -- well, he was the Fed's representative on this

10   committee.

11   A     He was the Fed's representative on the --

12   Q     And he was the one who voted no?

13   A     -- CPP Council.  Correct.

14   Q     And it says there that Mr. Bertsch corrected his earlier

15   statement that a review of the HC, I assume that's holding

16   company, was pending, noting that Ms. Course had informed him

17   that the FRB, that's the Federal Reserve Bank, had recently

18   completed an inspection of the holding company.

19             So I guess that's where I took that the Federal

20   Reserve Bank was the one actually overseeing the holding

21   company, but neither here nor there.

22             Will be rating it a three.

23   Q     Now, you are familiar with Camels ratings, correct?

24   A     Yes.

25   Q     And a three's not particularly great, right?  Not

1    terrible, not --

2    A    I think they go from one to five, so it's --

3    Q    Correct.  So it's kind of in the middle.

4         And is planning to impose dividend restrictions on

5    the holding company.

6    A    Right.

7    Q    That means that the holding company can't pay dividends

8    to its stockholders, correct?

9    A    Yes.

10   Q    And the TARP program basically would have made the CPP a

11   stockholder in Nova, right?  Isn't it the way it worked?

12   A    I believe that's correct.

13   Q    And as a stockholder in Nova the way the TARP program got

14   paid back would be by paying dividends to the CPP.  That's the

15   way it was set up, right?

16   A    Right.

17   Q    So the fact that Nova couldn't pay those dividends would

18   certainly be a very valid basis for a refusal of this

19   application, correct?

20   A    It would depend on what the dividend restrictions were.

21   Q    And -- but certainly you would -- it would be certain

22   circumstances where that would clearly be a reason not.

23   A    It'd be a reason to have in consideration.

24   Q    Yes.  Certainly.  Just like all of the other factors.

25        In any event, Mr. Bertsch -- Mr. Bertsch's concerns

1    were outvoted by his colleagues, correct?

2    A    Right.

3    Q    And a contingence -- it says contingent on capital

4    injection of 15 million, and this was then passed on to you?

5    A    Correct.

6    Q    Okay.  That's June 10th of 2009.

7    A    Right.

8    Q    Now, if we could go to the Government's Exhibit 75, which

9    has already been admitted so you can publish it, that is what

10   I believe you called a preliminary approval letter?

11   A    Correct.

12   Q    And the reason it's a preliminary approval letter is

13   because it's not a final approval?

14   A    Correct.

15   Q    And the final approval isn't going to take place until

16   all the I's are dotted and all the T's are crossed, correct?

17   A    Correct.

18   Q    Now, this letter's dated August 25, 2009, right?

19   A    Yes.

20   Q    And it's signed by you?

21   A    Correct.

22   Q    And were you aware that between June 10th of 2009 and

23   August 25th of 2009 that there was an -- a banking inspection

24   taking place at Nova?

25   A    I'm not sure that I was aware of that.

Schaffner - Cross (Ega)                                    58

1    Q    Okay.  But certainly there's a banking inspection

2    basically every year, depending on the strength of the

3    financial institution.  Could be less, could be more, correct?

4    A    Right, and I think depending on size there's --

5    there's -- the primary regulators are -- they're more or less

6    frequently.

7    Q    And this whole program, the way you set this up, was so

8    that the primary regulators' inspections would be kind of the

9    main basis upon which you would decide what you wanted to do?

10   A    Correct.

11   Q    So no one was stopping any primary regulators from coming

12   to Nova and inspecting it during this period of time, correct?

13   A    Certainly we weren't.

14   Q    Of course not.  So Ms. Barry showed you a -- a sentence

15   in here about this being based upon a $10 million contingency,

16   right?  That's one of the things that had to happen before you

17   would give the money.

18   A    Correct.

19   Q    But there's a whole bunch of other stuff, too, isn't

20   there?

21         If we could go right below there, it says, "Closing

22   of the transaction" -- thank you.

23         "Closing of the transaction is subject to

24   satisfaction as determined by Treasury in its sole discretion

25   of all the conditions of the Act and the following

1    condition -- additional conditions," correct?

2    A    Correct.

3    Q    So this thing is not only requiring 10 million more in --

4    in capital, it's requiring quite a few other things, right?

5    A    Yes.

6    Q    And in fact if we go to the next page, the third

7    paragraph from the last, it starts, "We note that Treasury" --

8    "We note that Treasury may require additional representations,

9    warranties or covenants," that's more things that Treasury may

10   ask for in the future, right?

11   A    Uh-huh.

12   Q    "And based upon the outcome of further business and legal

13   due diligence."

14        So in other words, Treasury was going to continue to

15   inspect and examine, or somebody was going to on your behalf

16   before you would be giving out this -- the Government's money,

17   correct?

18   A    Yeah.  We had the right to do that, and we would always

19   check back with the primary bank regulator to -- to make sure,

20   when we were about to fund, that they continued to have their

21   recommendation.

22   Q    Of course.  And so basically up until the very day that

23   you would have funded this application you were going to be

24   checking and making sure that everything checked out, right?

25   A    We had the right to do it, but, again, we -- we relied on

1  the primary bank regulator and mostly -- and -- and the -- the

2  thing that -- so we'd kind of stay advised if there were

3  developments that they wanted to tell us about, and we would

4  check back with them before we funded.

5  Q    And what you relied on, I think you said it a couple

6  times, you relied on the primary regulator, right?

7  A    Correct.

8  Q    You didn't rely on Brian Hartline?

9  A    (No audible response)

10 Q    You never talked to him, did you?

11 A    I did not talk to him.

12 Q    Now, going to the next paragraph, begins with "Neither,"

13 "Neither this letter nor any other oral or written statement

14 or representation by Treasury constitutes a binding

15 obligation."

16       So basically you're not -- you don't have to do

17 anything at this point?

18 A    With the preliminary approval, correct.

19 Q    Correct.  And it goes on and on about bad things that

20 could happen between now and then that would cause this to not

21 go through.  Right?

22 A    Right.

23 Q    And we all know this never did go through, correct?

24 A    I've learned that recently.

25 Q    Okay.  Now I want you to take a look at Government

1    Exhibit 142.  And this has not been admitted yet, so.

2              And this is a recordation of a telephone

3    conversation.  And if you just take a moment to read it.

4              And, really, if you could focus, sir, on the second

5    to last paragraph.

6    A    Okay.  Let me just kind of read the whole thing.

7    Q    Oh, sure.  Please do.

8    A    Okay.

9    Q    Now, this is a recording -- a recordation of a telephone

10   conversation between some folks at the Federal Reserve Bank,

11   Joe Wilcox and Cindy Course and Brian Hartline, correct?

12   A    And you're saying Joe and Cindy were FDIC?

13   Q    They're -- they're -- I think they're Federal Reserve, to

14   be honest with you.

15   A    Federal Reserve?

16   Q    Oh, no.  They are FDC.  I apologize.

17             MS. BARRY:  Objection.

18             MR. EGAN:  Well --

19             THE COURT:  Sustained.

20   BY MR. EGAN:

21   Q    I'm not supposed to answer your questions.

22             In any event, they're people who work for the

23   Government, obviously, correct?

24   A    I --

25   Q    You don't know.  I'm sorry.

Schaffner - Cross (Ega)                                    62

1    A    I kind of remember Cindy's name, but I don't -- I can't

2    place exactly who she is right now.

3    Q    And maybe we'll meet them.  Who knows?

4    A    Okay.

5    Q    I want to focus on the fourth -- the last -- second to

6    last paragraph.

7    A    Uh-huh.

8    Q    And all I want to ask you is that's consistent with your

9    understanding of the way the CPP works, correct?

10   A    What -- what's going on here is that the FDC says that it

11   will not recommend an application for a bank to be adequately

12   capitalized if it's got this restriction.

13   Q    In other words --

14   A    It sounds to me like that's an FDIC restriction.

15   Q    Okay.  So that FDIC is telling Brian Hartline on December

16   of 2009 that if you can't pay dividends on your stock, we're

17   not going to recommend you, correct?  That's what they're

18   saying.

19   A    That appears to be what -- what's being said here.

20   Q    It is exactly what Mr. Bertsch said in June of 2009 at

21   the meeting, isn't it?

22   A    I'd have to go back and look.  I think --

23   Q    Well, we can do that.

24   A    -- that he was -- I think he was --

25   Q    If we go back to Government 30.

Schaffner - Cross (Ega)                                              63

1    A    I think he said he was concerned about that.

2    Q    Well, he said they're not going to be able to pay

3    dividends on their stock.

4    A    Okay.

5    Q    Correct?  If we go to the --

6    A    But the --

7    Q    -- third page.

8    A    But they were under -- but they were under review, right?

9    Q    Right.  And then he voted against it.

10   A    Uh-huh.

11              THE COURT:  You have to say yes or no, please, sir.

12              THE WITNESS:  Oh, I'm sorry.

13   BY MR. EGAN:

14   Q    And then he voted against it?

15   A    Yes, he voted against it.  Sorry.

16   Q    So basically all of this stuff that took in -- in

17   between, didn't change that at all, did it.

18              MS. BARRY:  Objection.

19              THE COURT:  Sustained.

20   BY MR. EGAN:

21   Q    All right.  If we could go to Government's 155, and, sir,

22   are you familiar with this document?

23   A    Yes.

24   Q    Okay.  And this is a TARP Capital Purchase Program case

25   decision memo, correct?

Schaffner - Cross (Ega)                          64

1    A      Correct.

2    Q      And just -- you're familiar with it, correct?

3    A      Yes.

4             MR. EGAN:  Is there any objection to the admission

5    of this document?

6             MS. BARRY:  I think -- let's establish that he's

7    seen it and has a chance to look at it, has he --

8             THE COURT:  Counsel, you can --

9             MR. EGAN:  Your Honor, may I approach?

10            THE COURT:  Lay a foundation, could you, please.

11            MR. EGAN:  I'd rather -- if I give him the paper it

12   will be a lot easier than for him to roll through.

13            THE COURT:  I'm sorry.

14            MR. EGAN:  It would be easier for him to look at it

15   on paper than to go through all this -- the pages.

16            THE COURT:  Any objection?

17            MS. BARRY:  I just -- Your Honor, we withdraw

18   objection.

19            THE COURT:  All right.  You may approach.

20            MS. BARRY:  Yeah, it's okay to publish it, Judge, if

21   it makes things go faster for --

22            THE COURT:  Thank you.

23   BY MR. EGAN:

24   Q    If you could, sir, just page through that document.  I

25   just -- I just want to make sure it's -- that you're familiar

1   with it, you've seen it before.

2   A      The -- the one thing that I'm not sure about on this

3   document is, you know, if you go back to the CPP Council where

4   there was the discussion of the contingency for the extra, you

5   know, 15 million, I asked them to republish this paper.

6          So I'm not sure if this is the one prior to or the

7   one subsequent to the -- to the -- to reflect the capital

8   injection.

9              MR. EGAN:  May I approach again, Your Honor?

10             THE COURT:  Yes, sir.

11             THE WITNESS:  Just trying to --

12             MR. EGAN:  I'm going to take it from you.  I can't

13  ask questions about it if I don't have it.

14  BY MR. EGAN:

15  Q      See the handwriting up here at the top?

16  A      Yes.

17  Q      Says December 18, '09, IC meeting, number two agenda

18  item.  Does that refresh your recollection?

19  A      December 18th?

20  Q      Do you -- it's okay.  If you have no --

21  A      I --

22  Q      -- it's okay.

23  A      I --

24  Q      Don't worry about it.  I'll withdraw the question.

25             You said a few times on direct examination that TARP

Schaffner - Cross (Ega)                                          66

1    funds would not be given to a bank in order to make it viable.

2    It would have to be viable without the TARP funds.

3    A     Correct.

4    Q     You never communicated that to Mr. Hartline or Nova Bank,

5    correct?

6    A     We never spoke directly to the banks.

7    Q     And you don't know, sitting there, whether anyone else

8    ever communicated that directly to him?

9    A     I don't have any personal knowledge about that.

10   Q     And other than the fact that this application was

11   ultimately denied and no money was given to Nova Bank, you

12   don't really have much of a recollection about this at all,

13   correct?

14   A     It was one of quite a few that --

15   Q     That got denied.

16   A     -- passed through my office.

17          MR. EGAN:  May I have a moment, Your Honor?

18          THE COURT:  Yes, sir.

19   (Pause)

20   BY MR. EGAN:

21   Q     The decisions of the CPP Council and their deliberations,

22   that's not something that was made public, correct?

23   A     Correct.

24   Q     And in fact there was a reason for that, right?

25   A     (No audible response)

1    Q    Well, the bank wanted to -- or, the bank, excuse me.

2              The Government wanted to be able to have those

3    deliberations in a way that they could do them soberly and

4    thoughtfully without necessarily being scrutinized, correct?

5    A    Our goal was -- was to try and help fund these good

6    banks.  We didn't want to do anything that hurt a bank.

7              So if a bank was recommended by its primary

8    regulator and they said they thought it was viable, we would

9    have been very uncomfortable releasing any information

10   suggesting that we didn't think it was viable, fearing that

11   that could cause a run on the bank.

12             So it was confidential, like all bank examination

13   information, for a very, very good reason.

14   Q    Oh, right, and I'm not -- I'm not suggesting any way,

15   shape or form it's not a good reason, but the fact is there

16   were reasons why this was all pretty much done in secret, for

17   lack of a better way of putting it.

18   A    Yes.  And that was for the benefit of the banks.

19   Q    Indeed.  And even the banks themselves were not told a

20   lot of what was going on in a lot of the decision-making

21   process, correct?

22   A    Yeah, the primary regulator had some discretion as far as

23   what to discuss with banks, but, you know, I think that they

24   probably used their discretion, as well.

25   Q    It wouldn't surprise you if the primary regulator said we

1    can't talk to you about that, would it.

2              MS. BARRY:  Objection.

3              THE COURT:  Sustained.

4              MR. EGAN:  Very well.  I have nothing further, Your

5    Honor.

6              THE COURT:  Is there redirect?

7              MR. DUNCAN:  Your Honor, may I?

8              THE COURT:  Oh, I apologize, Counsel.  Go ahead.

9              MR. DUNCAN:  I know I can be quiet over here.

10                       CROSS-EXAMINATION

11   BY MR. DUNCAN:

12   Q    Good afternoon, sir.

13   A    Good afternoon.

14   Q    Sir, where are you from?  Where are you from?

15   A    That's a -- sometimes an easier question to answer,

16   sometimes harder.

17             I split my time between Illinois and Arizona.

18   Q    When -- how long have you been retired?

19   A    I retired right after I left, so five or six years.

20   Q    Okay.  Back in 2009 where were you working?  Where was

21   your physical office?

22   A    It started off in the Treasury building, then we moved to

23   an auxiliary office in --

24   Q    That's --

25   A    -- D.C.

Schaffner - Cross (Dun)                                          69

1   Q      -- down in Washington.

2   A      Yeah.

3   Q      Okay.  Thank you.

4          Sir, how long had you worked at the Treasury at the

5   time you were involved in the CPP program?

6   A      I came to the Treasury for purposes of being part of that

7   program.

8   Q      So right around that time, January 2009?

9   A      January, right.

10  Q      What were you doing before?

11  A      I had just retired from a career.  I had worked for a

12  corporation.

13  Q      And what kind of work did you do?

14  A      Corporate development.

15  Q      Do you have any sort of legal background?

16  A      Yes.

17  Q      What is your legal background?

18  A      I have a law degree.

19  Q      And did you ever practice law?

20  A      Yes.

21  Q      What was your area of practice?

22  A      Various things.  Securities, finance, that type of stuff.

23  Q      During the course of Ms. Barry's examination of you you

24  said that the purpose of the CPP program was to invest equity

25  capital, correct?

1  A     Correct.

2  Q     And you've told people that you're not actually a expert

3  on bank regulations, are you.

4  A     Correct.

5  Q     So you don't really know too much about what all the bank

6  regulations are with respect to equity capital, do you, sir.

7  A     That's correct.

8  Q     But you're in charge of the program that's giving out

9  equity capital to banks, but you don't know what it is?

10 A     You know, I think that the question that we were asking

11 was whether they were viable, which means to me whether or not

12 the money was good, which really doesn't turn on bank

13 regulation.

14 Q     My question was more directed.

15       You're running this program --

16 A     Right.

17 Q     -- and you need to know a lot of stuff about the program,

18 right?

19 A     I need to know if the bank's viable.

20 Q     And one of the things you didn't know anything about were

21 specific bank regulations, even though you worked with the

22 program, correct?

23 A     Correct.

24 Q     Sir, have you -- do you know what EITF85-1 is?

25 A     I don't.

Schaffner - Cross (Dun)                                          71

1    Q     Did you testify that you were -- I'm sorry if I -- if I
2    misheard it.
3          But did you testify you don't even know what
4    happened to the Nova TARP application?  Is that correct?
5    A     My -- I did not recall it before seeing some of these
6    documents.
7    Q     Okay.  When did you see some of these documents, sir?
8    A     In preparation for testifying.
9    Q     And when was that?
10   A     Some today, some last several weeks.
11   Q     First time you ever spoke to anybody in the prosecutor's
12   office was approximately October 9th of 2015, is that correct?
13   A     That sounds approximately right.  I'm -- don't have an
14   agenda.
15   Q     I --
16   A     That isn't marked, so --
17   Q     I won't hold you to the date.
18   A     -- it's -- yeah.
19   Q     I have the documents, so I --
20   A     Okay.
21   Q     -- I got a little bit of advantage on you.
22   A     Good, good.
23   Q     But, yeah, that's about right.
24         And you told the prosecutors you were not an expert
25   in bank regulations, right?

Schaffner - Cross (Dun)                                72

1    A     Correct.

2    Q     Sir, prior to being interviewed by the prosecutors in

3    October of 2015 had you even thought about Nova Bank since

4    2009?

5    A     No.

6              MR. DUNCAN:  Could we put back up the CPP 30,

7    please?

8    BY MR. DUNCAN:

9    Q     Do you have it in front of you, sir?

10   A     Not yet.

11   Q     Okay.

12   A     It's up now.

13   Q     You all set?

14   A     It's here, yeah.

15   Q     Okay.

16             MR. DUNCAN:  Sean, could you go to page two?

17   BY MR. DUNCAN:

18   Q     Sir, you've read this document, correct?

19   A     Yes.

20   Q     And to the best of your knowledge this records the

21   statements made by members of the Capital Purchase Program

22   Council back on June 10, 2009 when they were reviewing the

23   Nova application, correct?

24   A     Correct?

25             MR. DUNCAN:  And, Sean, could you put -- put up

1    paragraph two and highlight it?

2    BY MR. DUNCAN:

3    Q    Sir, this states that the holding company is in the

4    process of consolidating the two subsidiary banks.

5              Do you know what they're referring to there?

6    A    At this point I can't say for sure.

7    Q    Okay.  You note that it says, also, the next line,

8    "Earnings have improved in March 2009 largely because of the

9    recently acquired insurance subsidiary."

10             Do you see that?

11   A    Correct.

12   Q    Do you know who the recently acquired insurance

13   subsidiary is?

14   A    I don't know, but --

15   Q    When it says that the earnings have improved, they're

16   talking about the earnings of the holding company, correct?

17   A    I think so.

18   Q    Okay.

19             MR. DUNCAN:  Go down, Sean, if you would, to the

20   last.  It's four lines from the bottom of that paragraph.  It

21   begins, "A private investor..."

22             And if you highlight the whole thing, please, Sean.

23   Thank you.

24   BY MR. DUNCAN:

25   Q    Sir, this says that a private investor has proposed to

Schaffner - Cross (Dun)                                      74

1    invest a minimum of $15 million in the holding company.

2              Do you see that?

3    A    Yes.

4    Q    To the best of your knowledge, that was true, correct?

5    A    Yes.

6    Q    And the number was not 15 million, but a minimum of 15

7    million, right?

8    A    Correct.

9    Q    Could have been as much as 18 million, right?

10   A    Correct.

11   Q    And up to a $40 million total, correct?

12   A    Correct.

13   Q    Okay.  This big investor putting that money in would have

14   returned the bank to a well-capitalized status, correct?

15   A    That's what it says, yeah.

16   Q    Okay.  And make the investor a ten percent shareholder,

17   correct?

18   A    Correct.

19   Q    What does that mean?  Why is that significant that it

20   would make him a ten percent shareholder?

21   A    One of the things that I learned that bank regulators

22   consider when looking at a bank is whether there's a source of

23   strength in one of the investors in a bank.  So that's

24   something that is taken into account.

25   Q    Are you familiar with the process known as the Change in

1   Control process?

2   A    I know a little bit about that but not much.

3   Q    Probably no more than I do so we'll -- we'll stay away

4   from that, both of us.

5        It says down there that Mr. Bertsch gets quoted.  He

6   gets quoted a lot here.  It says --

7        MR. DUNCAN:  Sean, if you go down to the third

8   paragraph, please?  It's fifth line down.  And then it begins,

9   "He noted..."

10  BY MR. DUNCAN:

11  Q    Sir, it says, "He noted that if the bank receives a --

12  the $15 million capital injection, the depreciated securities

13  could be charged off, and the bank would still be well

14  capitalized."

15       Now the $15 million capital injection there, we're

16  still talking about that big investor, right?

17  A    I believe so.

18  Q    Okay.  Do you know what the rest of that means?

19  A    It means I -- what I take this to mean is that with that

20  injection and with a write-off of certain assets they would

21  still meet the financial ratio that allows the bank to be

22  considered as well capitalized.

23  Q    And that's a good thing, right?

24  A    Yes.

25  Q    That's what you were looking for in the banks that you

1    were considering, correct?

2    A     We were looking for viability.

3    Q     Sir, Mr. Egan asked you a few questions about the

4    deliberation process.  You said the deliberation process

5    was -- effectively was secret, correct?

6    A     (No audible response)

7    Q     Within the -- within the bank, you know, wasn't -- I

8    couldn't read about it in the Wall Street Journal?

9    A     Correct.

10   Q     You wouldn't tell me about it, --

11   A     Correct.

12   Q     -- right?   Do you know who Barry Bekkedam is?

13   A     I'm -- I'm not sure I do.

14   Q     It's Barry Bekkedam right over here.  Have you ever met

15   him?

16   A     No.

17   Q     Have you ever even heard his name before?

18   A     Not to my recollection.

19   Q     To the best of your knowledge nobody from the CPP ever

20   sent Mr. Bekkedam this information that was in Government

21   Exhibit 30, correct?

22         Just to the best of your knowledge, sir.

23   A     They -- they shouldn't have.  To the best of my knowledge

24   they didn't.

25         MR. DUNCAN:  No further questions, Your Honor.

Schaffner - Redirect (Bar)                          77

1    Thank you.

2              MS. BARRY:  A few brief questions, Your Honor.

3              THE COURT:  All right.

4                        REDIRECT EXAMINATION

5    BY MS. BARRY:

6    Q    Information about a bank, it -- the bank itself, is not

7    kept confidential is it, if you're -- if it's the own -- it's

8    own institution?

9    A    I'm a little confused by that question.

10   Q    I'm just -- I guess my point is if Nova Bank is providing

11   information to the CPP Council, that's not confidential to

12   Nova Bank, is it?

13             MR. DUNCAN:  Objection; leading.

14             THE COURT:  No, overruled to that question.

15   BY MS. BARRY:

16   Q    You may answer.

17             THE COURT:  You may answer that question.

18             THE WITNESS:  So the information that -- that Nova

19   Bank provides to --

20   BY MS. BARRY:

21   Q    The primary regulator.

22   A    -- its primary regulator, is that confidential with the

23   primary regulator?

24   Q    No.  As to Nova Bank, if it gives the --

25   A    Oh, no.  It's a -- it's -- they are obviously privy to

1   their own information, yes.

2   Q     Okay.  That's just -- I just wanted to clarify that.

3          If we could take a look at Government's Exhibit 6,

4   just -- just wanted to make sure that we were clear.

5          And, again, this is the application, TARP

6   application, and if -- Nova Bank's TARP application.

7          MS. BARRY:  If we could just put that up on the

8   screen, Agent Boyer, for the jury, and to the second page,

9   just --

10  BY MS. BARRY:

11  Q     And looking at the second page, who signs on behalf of

12  Nova Bank?  That signature on the bottom, if we could

13  highlight it.

14  A     Brian M. --

15  Q     Look like Hartline?

16  A     -- Hartline.  If you went back to the first page, I'm

17  sure I could have said that.

18  Q     Yes.

19  A     It's -- some signatures are a little idiosyncratic, so

20  it's --

21  Q     Now, in terms of your work with the CPP Council, were you

22  reviewing hundreds upon hundreds of banks?

23  A     At the TARP -- at my organization we were reviewing

24  hundreds of banks.  The CPP Council would have been a smaller

25  group.

Schaffner - Redirect (Bar)                                       79

1    Q    Okay.  But the number of banks that you saw come across

2    your desk in terms of review were --

3    A    A large number.

4    Q    -- a large number.

5         Would you -- how many would you say, approximately?

6    A    Hundred, 700, 800.

7    Q    And, again, is the money that's coming from the Capital

8    Purchase Program free money or a gift or a grant?

9    A    No.  It was our expectation that the money would be

10   repaid to -- to the Government, that the preferred shares

11   would be redeemed.

12        And in fact we've received back more money than we

13   invested in -- under this program.

14   Q    And I just wanted to clarify one other thing on

15   Government's Exhibit 30, please.

16        MS. BARRY:  If we could show that, and to the second

17   page.

18   BY MS. BARRY:

19   Q    And in that third paragraph, "just wanted to be clear

20   that it was not Mr. Bertsch, but Mr. Hunter replied that he

21   cannot say there will be -- not be further declines in value,

22   but the bank's analysis is sound.

23        He noted that if the bank receives the 15 million

24   capital injection, the depreciated securities could be charged

25   off."

Schaffner - Redirect (Bar)                               80

1    A     Okay.  That's --

2    Q     So that was Mister --

3    A     That's -- that -- Mister -- that -- that says it's Mr.

4    Hunter, correct.

5    Q     Not Mr. Bertsch, right?

6    A     That's correct.

7    Q     Do you know who Mr. Hunter was?

8    A     I'm not sure.  He may have been the -- a person from FDIC

9    who was presenting the matter to the Council.

10   Q     Okay.

11              MS. BARRY:  May I have a moment, Your Honor?

12              THE COURT:  Surely.

13              MS. BARRY:  No further questions.  Thank you.

14              MR. EGAN:  No recross.

15              MR. DUNCAN:  No, thank you, Your Honor.

16              THE COURT:  Thank you, sir.  You may step down.

17   Watch your step, please.

18              THE WITNESS:  Thank you very much.

19              THE COURT:  Let's take our 15-minute afternoon break

20   at this time, please.

21              Reconvene at 3:00.  Thank you.

22        (Jury out, 2:40 p.m.)

23        (Recess taken, 2:41 p.m. to 3:10 p.m.)

24              THE COURT:  Counsel, do you have a master exhibit

25   list so that I can just check admitted, not admitted, as we go

Schaffner - Redirect (Bar)                          81

1    along?  Is it in this -- oh.

2             MR. IGNALL:  Yeah, I believe we filed one yesterday,

3    Your Honor.

4             THE COURT:  Oh, okay then.  Fine.

5             MR. IGNALL:  Maybe Karen put it in there.

6             THE COURT:  I got it.  Thank you.

7             MR. IGNALL:  Oh, Karen, my legal assistant, is

8    awesome.  She probably put one in the binders.

9             THE COURT:  Yes.

10            MS. BARRY:  Your Honor, just as a brief housekeeping

11   matter.  We have agreed that Government's Exhibit 142 and 155,

12   which Mr. Egan was using, we have no objection to it being

13   admitted.

14            THE COURT:  All right.  That will be reflected in

15   the record.  Thank you.

16            MS. BARRY:  Thank you.

17            THE COURT:  Uh-huh.

18            THE CLERK:  All rise.

19       (Jury in, 3:12 p.m.)

20            THE CLERK:  Ladies and gentlemen, we are back on the

21   record.

22            THE COURT:  You may be seated.  Good afternoon.

23   Thank you.

24            You may call your next witness.

25            MR. IGNALL:  Government calls Kevin Bertsch.

1        KEVIN BERTSCH, GOVERNMENT'S WITNESS, SWORN

2            THE CLERK:  Thank you.  Please sit.  State and spell

3    your name for the record, please.

4            THE WITNESS:  I'm sorry?

5            THE CLERK:  State and spell your name into the

6    record, please.

7            THE WITNESS:  Kevin Bertsch.  It's K-E-V-I-N, Kevin,

8    and Bertsch, B-E-R-T-S-C-H.

9            THE COURT:  You  may proceed.

10           MR. IGNALL:  Thank you, Your Honor.

11                        DIRECT EXAMINATION

12   BY MR. IGNALL:

13   Q    Mr. Bertsch, what do you do for a living?

14   A    I work for the Federal Reserve Board.  I'm an Associate

15   Director of the Division of Banking Supervision and

16   Regulation.

17   Q    And what does that mean?

18   A    That means that I -- I'm responsible for overseeing the

19   programs of our supervision of regional and community banks,

20   including savings and loan holding companies, so it's

21   basically to oversee the examination programs for banks that

22   are of a certain size.

23   Q    And how long have you worked for the Federal Reserve?

24   A    I've worked for the Federal Reserve for 25 years.

25   Q    And what other jobs have you had with the Federal

1  Reserve?

2  A      I started my working at the Federal Reserve as an

3  examiner in the Federal Reserve Bank of Boston, and then I

4  moved to the Federal Reserve Board in Washington where I

5  worked as a policy analyst.

6           I then became the manager of the Offsite Monitoring

7  Group and then -- and then got responsibility for community

8  banks and then added regional banks in the most recent job I

9  have.

10  Q      All right.  And in terms of bank supervision what is the

11  role of the Federal Reserve?

12  A      The Federal Reserve is the primary regulator of

13  state-chartered banks that are members of the Federal Reserve

14  system, and we also are the primary regulator for bank holding

15  companies and savings and loan holding companies.

16  Q      What is a bank holding company?

17  A      A bank holding company is a -- is a financial company

18  that is formed to basically hold an ownership interest in a

19  insured depository subsidiary or a bank.

20  Q      And what's the relationship between the bank and the bank

21  holding company?

22  A      The -- the bank is owned by the bank holding company, and

23  our role in supervising the bank holding company is to ensure

24  that it's operated in a safe and sound manner, and that it

25  does not operate in a way that harms the bank or puts

Bertsch - Direct (Ign)                                        84

1   depositors at risk from actions taken at the holding company

2   level.

3   Q    Are you familiar with something -- it was called or is

4   still called, I guess, the Troubled Asset Relief Program?

5   A    Yes, I am.

6   Q    And generally what was that?

7   A    The -- the part of the Troubled -- the part of the TARP

8   that I'm most familiar with is the Capital Purchase Program,

9   which was a program that the Treasury Department set up to

10  make investments in -- in viable banks with the idea that it

11  would support the banking system and bank's ability to lend.

12  Q    And what do you mean, "support bank's ability to lend"?

13  A    So to provide them with capital resources that they --

14  and -- and cash resources that they could on lend to borrowers

15  and, therefore, support economic activity during the time of

16  the crisis.

17  Q    And you said something about viable banks.  What do you

18  mean by that?

19  A    Viable in the sense that they were going to remain

20  profitable, and they were going to -- going to -- be able to

21  remain in operation.

22  Q    And did you have any role in this Capital Purchase

23  Program?

24  A    I did.  I was on -- I represented the Federal Reserve on

25  the Capital Purchase Program Interagency Council, which was a

1    group that was put together to review or to provide advice to

2    the Treasury on proposed investments of banks that had -- that

3    presented a higher level of risk than other applicants in the

4    program.

5    Q    And are you familiar with how the application process

6    worked?

7    A    Yes, I am.

8    Q    All right.  And for an individual bank to apply did the

9    bank apply directly to the Treasury or through some other

10   means?

11   A    The banks applied -- the -- the banking agencies worked

12   with the Treasury to provide a way to collect the application.

13        So the applications would go to the regulator or the

14   lead bank in the -- in the group.

15        And then the Federal Reserve also received an

16   application if there was a holding company in the structure,

17   if there was a bank holding company.

18   Q    All right.  And did the bank regulator have any role in

19   recommending whether a given bank should be approved or not?

20   A    The bank regulator would do an analysis of the bank

21   according to the criteria that was provided by the Treasury

22   Department, and they would indicate to the Treasury Department

23   whether they thought that that bank met the criteria and

24   should receive an investment or did not.

25   Q    And then who ultimately made the decision about whether a

Bertsch - Direct (Ign)                                    86

1   bank got this Capital Purchase Program investment?

2   A    Ultimately, the decision was made by the Treasury

3   Department.  It was a Treasury Department program, the TARP

4   and the CPP, and the Treasury would take whatever input they

5   got from the regulators, and they would make a decision about

6   whether to invest or not in the institution.

7   Q    You mentioned earlier you're part of an interagency

8   council.

9            Can you describe to us what met and who -- meant and

10  who was on that?

11  A    Yes.  The Council had representatives from all of the

12  banking agencies, so it included representatives of the Office

13  of Thrift Supervision which existed at that time, the Office

14  of the Comptroller of the Currency, which supervises national

15  banks, the Federal Reserve, which I've already explained our

16  responsibilities, and the Federal Deposit Insurance

17  Corporation.

18  Q    And do you know what applications went to your Council,

19  as opposed to the ones that didn't go?

20  A    The ones that went to the Council either tripped a

21  threshold that -- that suggested a higher potential risk, a

22  threshold that was established by the Treasury Department or

23  had a potential rating or a part of a supervisory rating,

24  Camels rating, that was higher risk than a typical bank.

25  Q    Higher risk for what?

1    A    A higher risk of -- of insolvency.

2    Q    And -- and what, just to to --

3    A    So basically of -- so the -- the regulators assign a

4    rating to each bank when they do an examination.  One is a

5    good rating, five is a bad rating.  Five suggests that a bank

6    is in imminent danger of failing or having to cease operating,

7    go out of business, and if -- and in between.

8            If a bank had a rating on one of the components of

9    the Camels rating system that suggested a higher level of

10   risk, such as a three or a four, then that bank would be a

11   type of bank that would go to the Council.

12   Q    And what was the Council's role when reviewing the

13   application of that type of bank?

14   A    The Council's role was -- was, again, to review work that

15   had done -- been done by whatever regulator provided the

16   application and to basically come to a secondary discussion of

17   whether the -- the bank qualified as an investment or not,

18   according to the -- to the standards that Treasury set.

19   Q    And did members of the Council ever deal directly with

20   someone at the bank?

21   A    We did not.

22   Q    All right.  Did the Council ever ask for more information

23   regarding a bank?

24   A    The Council would frequently ask to receive more

25   information from the primary regulator of the bank.

1          The -- the communication with the bank was all

2    handled by the primary regulator, whoever happened to regulate

3    that bank.

4    Q    All right.  Now, when you sat in on -- do you participate

5    in Council meetings reviewing bank applications?

6    A    I did.

7    Q    And what kind of information did you review at those

8    meetings to determine if a bank was viable?

9    A    So we would have a decision, a case decision memo, which

10   basically laid out the ratios that the Treasury had asked us

11   to look at and then also would have an analysis prepared by

12   the primary regulator that would give a sense of the -- of the

13   condition of the bank and the prospects going forward.

14   Q    When you say "ratios," what do you mean by that?

15   A    What I mean by that would be, for example, a ratio that

16   indicated the level of -- of weaker assets to total assets or

17   past -- past due or problem loans to total capital, those

18   types of ratios.

19   Q    And when you say "capital," what do you mean by that?

20   A    Capital is a -- basically the amount by which your assets

21   exceed your liabilities, and it's in -- in banking supervision

22   circles it's essentially the cushion that's available to

23   absorb any unexpected losses that a bank might have, either

24   because a loan goes bad or they have an operational loss or

25   anything of that nature.

1    Q    Now, in bank terms isn't a loan an asset?

2    A    A loan is an asset, yes, that's correct.

3    Q    But is that one of the assets that you're talking about

4    when you're including capital?  You're saying about a loan

5    going bad.

6    A    A loan -- a loan -- basically, a loan can go bad and have

7    to be marked down to a lower value, and to adjust for that on

8    the liability side of the balance sheet you have to basically

9    take that out of capital.

10        So capital's a cushion that's available to absorb

11   losses and assets.

12   Q    All right.  When you were a member of this -- and is the

13   CPP Council still in existence?

14   A    No.

15   Q    Okay.  When you were a member of this Council, did you

16   review an application for Nova Bank?

17   A    I did.

18   Q    All right.  And do you remember if the Council sought

19   more information regarding Nova Bank when it first got the

20   application?

21   A    Yes.  The Council did seek additional information on Nova

22   Bank.

23   Q    And what kind of information did the Council want before

24   considering Nova Bank?

25   A    The Council wanted to have better insight into the

1    investment portfolio of the bank.    The bank had some

2    investments that were in some -- that seemed to be weak, and

3    we wanted to understand better whether they were valued

4    adequately.

5           We also wanted to understand the earnings prospect

6    for the organization and whether they were going to be able to

7    demonstrate the ability to repay their current obligations and

8    also the additional obligations they would be taking on with

9    the TARP investment.

10   Q    Do you remember approximately when it was that the

11   Council sought more information regarding Nova Bank?

12   A    So the -- the Council, when it first discussed the

13   initial application, it asked for some additional information

14   on the investment portfolio.  So it would have been the first

15   time it was discussed at the Council.

16   Q    And I'm going to bring -- we've marked as Exhibit 30.

17   It's already been admitted, and we have to look at that date

18   there.

19   A    Yes.

20   Q    What is Exhibit 30?

21   A    That is a Council review decision sheet, and the date on

22   that is June 10, 2009.

23   Q    Was this decision taken after the Council asked for more

24   information?

25   A    There was -- there was an initial meeting where they

Bertsch - Direct (Ign)                                91

1   were -- the -- the FDIC was asked to bring more information

2   back.

3          They brought more information back at a subsequent

4   meeting, and once all the information was provided and it was

5   discussed, then the Council made a decision.  So it wasn't at

6   the initial meeting.

7   Q    And do you remember how -- how long before this meeting

8   the Council had asked for that more information?

9   A    I don't recall specifically, but I believe it was a

10  matter of a couple of months.

11  Q    All right.  Now, were you a participant in the meeting

12  when the Council voted on Nova's application?

13  A    I was.

14  Q    And was there a discussion at this meeting about how much

15  capital Nova Bank had?

16  A    Yes.

17  Q    And did you or other members of the Council have concerns

18  about the amount of capital that Nova had?

19  A    I think all people -- all the members of the Council had

20  concerns about the level of capital and whether there was an

21  adequate amount of capital to conclude with confidence that

22  the bank was going to be viable.

23  Q    And did you have any information from the bank regulator

24  about whether Nova Bank was going to be able to raise

25  additional capital?

1    A    The FDIC indicated that there was an ability to raise

2    additional capital to put into the -- to the institution.

3    Q    And did the Council vote on whether to approve Nova?

4    A    It was -- yes.  The Council voted after the FDIC

5    indicated there would be a additional capital available.

6    Q    And what was the vote?

7    A    The vote, as indicated on this exhibit, was three

8    agencies voted to approve, contingent on investment of $15

9    million in capital, and one disapproved that.

10   Q    All right.  And we'll get to who that is in a minute.

11        But was there a discussion at Council about this

12   contingency?

13   A    Yes, there was.

14   Q    Okay.  Who was the one voting no?

15   A    That was me.

16   Q    And what was your concern?

17   A    My concern was that I didn't think even with $15 million

18   in additional capital that -- that it was clear that this

19   institution was going to be viable and be able to repay the

20   Treasury the investment that was on the table.

21   Q    But were you out-voted?

22   A    Yes.

23   Q    And was Nova's application then forwarded to the Treasury

24   as a result of this?

25   A    Yes.  The -- the decision sheet as shown here would have

1   been forwarded to the Treasury's Investment Counsel, and they
2   would have gone through their own consideration, considering
3   all the views, including mine, which was different from the
4   majority, they would have taken into consideration.
5   Q    And based on your discussions within the Council what was
6   the contingency?  What did it mean to have an injection of
7   15 -- to have a capital injection of $15 million?
8   A    It was that the -- that the bank would receive -- that
9   their equity capital would be increased, essentially, through
10  an investment of $15 million which would improve the financial
11  condition and the financial ratios of the bank and lead them
12  to be eligible for meeting the Treasury standards in a TARP
13  investment.
14  Q    And what did the members of Council mean by "capital"?
15              MR. EGAN:  Objection
16              THE COURT:  Overruled.
17              You may answer.
18              THE WITNESS:  Okay.   The -- by "capital," the --
19  the agencies would -- would mean regulatory capital that would
20  come into the bank that would be available to stand ready to
21  take any unanticipated losses.  That would be a cushion.
22  BY MR. IGNALL:
23  Q    All right.  Did you ever hear whether Nova Bank was going
24  to loan any money to this investor?
25  A    I did not.

1   Q     Is that something you would remembered [sic]?

2   A     I would have remembered, yes.

3   Q     Why is that?

4   A     Because if -- for regulatory capital there are rules

5   stipulating what can qualify for capital, and the rules

6   stipulate that a bank cannot be a source of the capital and

7   cannot, directly or indirectly, lend the -- the money that

8   becomes capital.

9   Q     And why is that?

10  A     And that is -- that's because it does -- if it doesn't

11  come from outside of the bank, it doesn't add any strength to

12  its capital.

13        It doesn't really -- it's not really available to

14  absorb losses because they haven't received the actual capital

15  injection.

16  Q     And what if an investor borrows money from a different

17  bank?

18  A     They -- they can -- they can do that, but the -- but the

19  capital transaction that is separate from that because the

20  capital would go into the bank and there would be no way for

21  the lender to get that out of the bank.  That's already there

22  in the bank as capital and would be available to absorb

23  losses.

24  Q     And did you have any -- let me actually turn your

25  attention to the second page.

1          MR. IGNALL:  And if we go down to that third

2    paragraph, we could blow that up.

3    BY MR. IGNALL:

4    Q    Was there discussion at the Council meeting about whether

5    this $15 million capital injection would improve how well

6    capitalized the bank was?

7    A    Yes, there was.

8    Q    All right.  And did you still have a concern about that?

9    A    I still had a concern in that I didn't feel that the 15

10   million was sufficient.

11         And I also, as -- as is pointed out in this

12   paragraph, noted as information that would be important for

13   the Treasury to know, that the Federal Reserve had downgraded

14   the holding company and had questions about whether the

15   holding company would be in a position -- whether we would

16   approve them making dividend payments on the TARP investment.

17   Q    Did you have any involvement in the supervision and,

18   indeed, of the application of Nova Bank after this June

19   meeting?

20   A    No.

21   Q    Were -- was any of the Federal Reserve involved in

22   supervising the Nova Bank holding company?

23   A    Yes.  The Federal Reserve Bank of Philadelphia would have

24   handled the supervision of the holding company.

25   Q    And after this recommendation got referred to Treasury to

1    allow Nova Bank's TARP application to go forward did, as far

2    as you know, the Council ever reduce that $15 million capital

3    contingency?

4    A    No.  I only have what was voted on on the day, as you see

5    here.  That would have been the -- the number I understood.

6              MR. IGNALL:  One moment, Your Honor.

7              THE COURT:  Yes, sir.

8              MR. IGNALL:  No further questions.  Thank you.

9              THE COURT:  You may cross examine.

10             MR. EGAN:  Thank you, Your Honor.

11                        CROSS-EXAMINATION

12   BY MR. EGAN:

13   Q    Good afternoon, Mr. Bertsch.

14   A    Hi.

15   Q    So in 2009, or '08 and '09 is when all this went on, you

16   were in what position?

17   A    I was a Deputy Associate Director with responsibility for

18   community banks and off-site monitoring at the Federal

19   Reserve.

20   Q    So when you went through your experience, you now have a

21   new job where you have more responsibility.

22   A    I'm sorry, I'm not --

23   Q    You had said you were -- you covered something along with

24   community banks now, but that -- that's after this date.

25   A    I'm not sure I -- I had -- I was responsible for

Bertsch - Cross (Ega)                                    97

1    community bank supervision at the time I was working on -- on

2    this.  My responsibilities have changed since then.

3    Q    And they -- and they're no longer community banks, or

4    they're community banks --

5    A    They include --

6    Q    -- and something else?

7    A    -- community banks, and they include regional banks.

8    They no longer include the off-site monitoring.

9    Q    I see.

10   A    That's the change.

11   Q    And community banks are basically smaller banks, right?

12   A    That's correct.

13   Q    Not like Wells Fargo, CitiBank, they're not community

14   banks, right?

15   A    That's correct.

16   Q    And as the Federal Reserve Board you oversaw the holding

17   company, Nova Financial Holding Company.

18   A    That's correct.

19   Q    And before you had your present job, I believe you said

20   you started out as a bank examiner, correct?

21   A    That's correct.

22   Q    And as a bank examiner you were one of the people on the

23   ground who go into banks and do examinations.

24   Q    Yes, that's correct.

25   Q    And in fact those examinations are done regularly,

1    correct?

2    A    They are, yes.

3    Q    And a bank examiner goes into a bank once a year, once

4    every nine months, depending on the health of the bank, right?

5    A    It's, yeah, once a year or once every 18 months or more

6    frequently in certain cases.

7    Q    And the bank examiner is given access to all the bank

8    records and books, correct?

9    A    Yes, they are.

10   Q    And they have basically more than one person on the

11   scene.

12   A    That's correct.

13   Q    And they have access to the bank personnel to ask them

14   questions about where documents are and what they need,

15   correct?

16   A    That's correct.

17   Q    And do you recall that during the period of time when

18   this application was under review that there was a bank

19   examination of Nova?

20   A    I was aware that the, yeah, that there was a holding

21   company inspection of Nova.

22   Q    And in fact that holding company inspection was one of

23   the reasons that you voted against this particular TARP

24   approval, correct?

25   A    The -- the findings that had some bearing, yes.

1    Q    And the reason they had some bearing was because as a

2    result of that inspection, which took place before June 10th

3    of 2009, as a result of that inspection the holding company's

4    going to be downgraded to a three, right?

5    A    Yes.

6    Q    And that meant they couldn't pay dividends.

7    A    It didn't mean they couldn't pay dividends.  They -- they

8    were -- they were placed under an enforcement action that

9    would have required them to get approval to pay dividends from

10   the Federal Reserve.

11           MR. EGAN:  We could go back to Government 30, and if

12   we could go to the third --

13   BY MR. EGAN:

14   Q    And that, sir, is obviously the minutes from this

15   meeting.

16   A    Uh-huh.

17   Q    This was not the first meeting that you had with regard

18   to Nova Bank, correct?

19   A    Yes, that's correct.

20   Q    There was a meeting that was had back in like April.

21   A    I believe that's correct.

22   Q    And there would have been a very similar document to this

23   from that meeting in April, correct?

24   A    I don't believe we voted in that meeting in April.

25   Q    You did.  You abstained, and -- or you decided to ask for

Bertsch - Cross (Ega)                                    100

1   more information.

2   A     Okay.

3   Q     Right?  That's your recollection, isn't it?

4   A     My recollection is we did, but I don't know if we filled

5   out this form.  That's all I'm telling you.

6   Q     Good point.  But before you even get to this form, the

7   FDIC has already come to a conclusion and recommended it

8   themselves, correct?

9   A     Before we get to this form?

10  Q     Yeah.

11  A     Yeah, they prepared a case decision member that -- memo

12  that suggested that it could be approved as an investment.

13  Q     Right.  So there's a case decision memo that's prepared

14  by the FDIC, and that then goes to Treasury, right?

15  A     Correct.

16  Q     And then if Treasury doesn't look at it and say approve

17  it right away, they say they want this group to look at it,

18  right?

19  A     Correct, yeah.

20  Q     And that case decision memo, which was done by FDIC

21  before the first meeting in April, right, already recommended

22  approval, did it not?

23  A     Yes.

24  Q     So that recommendation that FDIC made for approval prior

25  to April of 2009 was not based on anything having to do with

1    any capital injection, correct?

2    A    I'm sorry.  Could you repeat that?

3    Q    Sure.  It was a long question.

4            That approval of the FDIC, the recommendation to you

5    to approve this, that you looked at in April of 2009 when you

6    had your meeting, that was not based on anything having to do

7    with a capital injection, correct?

8    A    Yes, that's correct.

9    Q    So basically the FDIC's already on board at that point,

10   right?

11   A    I can only go by what they said in the memo.  Yes, they

12   were on board.

13   Q    Okay.  Fast forward to June, right, we have a meeting.

14   You're at it, correct?

15   A    Yes.

16   Q    And at that meeting you are the person who says we should

17   not do this, correct?

18   A    I was -- yes, that's correct.

19   Q    Right.

20           MR. EGAN:  And then now if we could go to page three

21   of this document

22   BY MR. EGAN:

23   Q    And the last sentence of that paragraph, it says, "After

24   conferring with Ms. Course, Mr. Bertsch corrected his earlier

25   statement that a review of the holding company was pending,

Bertsch - Cross (Ega)                              102

1    noting that Ms. Course had informed him that the FRB...,"

2    that's the Federal Reserve Board, right?

3    A     Yeah, Federal Reserve --

4    Q     You guys.  "...had recently completed the inspection of

5    the holding company and will be rating it a three..."

6            Now, a three doesn't mean they're going to fail

7    tomorrow, right?

8    A     That's correct.

9    Q     Three means they're kind of like not doing the greatest.

10   A     That's correct.

11   Q     All right.  "... and is planning to impose dividend

12   restrictions on the holding company," correct?

13   A     Correct.

14   Q     And by imposing dividend restrictions on the holding

15   company you would then make it not possible for that holding

16   company to pay its stockholders' dividends.

17   A     It could.  It -- it could be that they would be approved,

18   or it could be that they wouldn't be approved.  They just have

19   to ask for approval.

20   Q     And based on your understanding of this examination and

21   your understanding of the condition of that bank, your

22   expectation, sir, would be that that approval would not be

23   given, correct?

24   A     Repeat that for me, please.

25   Q     I'll put it this way.

1          If it was up to you to give that approval, you

2     wouldn't be giving that approval, would you?

3     A    I think I indicated that I didn't give that approval.

4     Q    Right.  So your concern here is obviously that if the

5     TARP funds are invested, the way that the TARP gets paid back

6     is by these dividends, correct?

7     A    That's correct.

8     Q    And if they can't pay dividends, they can't pay back the

9     TARP, correct?

10    A    They -- yeah that's correct.  They --

11    Q    And obviously that's a pretty good reason not to give it

12    to them, I would think, right?

13    A    That would be the Treasury's decision, but that could be

14    the decision they come to.

15    Q    And it was certainly your opinion.

16    A    It was my opinion after listening to the information that

17    was provided.

18    Q    And that was your opinion on June 10th before any capital

19    was injected into the bank.

20    A    That's correct, although I did listen to the arguments

21    for --

22    Q    Sure.

23    A    -- including the capital and listened to the additional

24    information.

25    Q    Of course.  And at the end of the day in December when

```
 1   Treasury denied TARP funds to the bank, you're aware, are you
 2   not, that the basis was, among other things, that the bank
 3   couldn't pay dividends because of that restriction?
 4   A    That could have been the basis.  I'm not sure exactly
 5   what the basis was that that decision was made.
 6   Q    Well, we can look at that in a minute.
 7              MR. EGAN:  If we could have Government Exhibit 34,
 8   please, and just for the witness, please.
 9   BY MR. EGAN:
10   Q    Sir, could you take a look at Government Exhibit 34?  And
11   that is a letter dated June 17, 2009.
12              Are you familiar with that?
13   A    I -- this -- I recognize this as a letter, but I'm not
14   familiar with this particular letter.
15   Q    Well, it's from the Federal Reserve Bank, correct?
16   A    It is.
17              MR. EGAN:  And if we could go to page two for the
18   witness, please.
19   BY MR. EGAN:
20   Q    And it's signed by a guy named A. Reid Raymond.
21              Do you know him?
22   A    Yes, I do.
23   Q    And who's he?
24   A    He's a Vice President at the Federal Reserve Bank of
25   Philadelphia.
```

1   Q    Right, and that's the same bank that you're -- you work

2   for, as well, right?

3   A    I work for the Federal Reserve Board.

4   Q    Oh, you know, I -- I'm sorry.  I apologize.  I get these

5   things confused.

6          Anyway, if you go up to paragraph three there, see

7   it, redemption of stock, that's what you were just talking

8   about, right, that NFH, Inc. shall not directly or indirectly

9   purchase or redeem any shares of its shock -- stock without

10  the prior written approval of the Reserve Bank, correct?

11  A    That's -- no.  That's not what I'm saying.

12  Q    You know what.  I'm wrong.  You want to go to paragraph

13  one on page one.  I'm -- I apologize.

14          That's what you're talking about, the dividends.

15  And that was your concern, was it not?

16  A    That was my concern, but that was not -- that was not

17  incompletely my concern, nor was it the only -- was it not --

18  the TARP Council itself had concerns about the capitalization

19  of the bank.

20  Q    Right.

21  A    So there were -- there were multiple issues involved.

22  The dividends were one of them, and in the -- in the case --

23  we were bringing to the attention of the Treasury that there

24  was a dividend -- potential dividend restriction in place.

25  Q    And you --

1          MR. EGAN:  Thank you.  You can take that down.

2     BY MR. EGAN:

3     Q     And you were also concerned about the fact that the bank

4     was not well capitalized, right?

5     A     Yes.

6     Q     And in fact an inspection -- or, actually, there was an

7     action that was taken as a result of some securities that had

8     been invested.  The bank had -- had on its balance sheet that

9     caused it to not -- no longer be well capitalized.

10          You're familiar with that?  Remember that?

11    A     Somewhere in the sequence there was a -- the FDIC went

12    back and looked at the securities and found some accounting

13    issues that they needed to be -- that needed to be addressed

14    that resulted in some losses and, I believe, had that effect

15    on the capital.

16    Q     And those weren't securities in Nova Bank.  Those were

17    securities that Nova Bank had on its balance sheet that

18    belonged to other people, correct?

19    A     Those -- those were investments of the bank.

20    Q     In other companies.

21    A     In other companies.

22    Q     Correct.  And it wasn't anything having to do with the

23    raising of capital or anything like that, but it was, rather,

24    the fact that these securities were downgraded that caused

25    Nova to become no longer well capitalized, right?

1   A    It's my understanding that those were the primary issue.

2        I believe there were also some other asset quality

3   issues that surfaced at that time.

4   Q    And none of that had anything to do with this capital

5   injection, correct?

6   A    No.

7   Q    But that was another reason why you were opposed to

8   voting for it.

9   A    I was concerned about whether the degree of problems had

10  been identified and whether the institution would ultimately

11  be viable.

12  Q    Now, you testified on direct about regulatory capital,

13  and in your testimony you said that regulatory capital can not

14  include funds that come from a loan that the bank has made

15  because there are rules that stipulate that that can't be.

16  A    That's correct.

17  Q    Do you want to point us to where those rules are?

18  A    Sure.  They're in the Regulatory -- the Regulatory

19  Capital Rules under the definition of "capital."

20  Q    And that, sir, is published in what?

21  A    That would be published in examination materials, in

22  regulations that are promulgated by the agency.

23       So the FDIC promulgates a capital rule, as does the

24  Federal Reserve.  And those capital rules are substantially

25  the same, and they indicate that a bank cannot directly or

1    indirectly be the source of -- fund the source of capital.

2    Q    And that is in -- in conjunction with a note, correct?

3    A    I'm sorry?

4    Q    And that's in conjunction with a note, correct?

5    A    That's in conjunction with the -- the bank itself should

6    not ultimately be the source of a capital.  It can't create

7    the capital.  Capital has to come from outside the bank.

8    Q    And, indeed, when an investor invests in the bank money

9    that the investor has borrowed, that is his money, correct?

10   A    Not -- not if he received the money from the bank he's

11   investing it in.

12   Q    And you --

13   A    It would -- it would not qualify as regulatory capital.

14   Q    And that is not a statue, correct?

15   A    That is a regulation, a capital rule that was set out

16   for public comment.

17        It would be a part of Regulation H for state member

18   banks, and the FDIC would have their own regulation on it.

19   Q    Now, sir, when you reviewed this application, this TARP

20   application, did you have any knowledge or any concern about

21   that issue?

22   A    I had no knowledge of it.  All -- the only information I

23   had was what you saw on the -- on the document that said this

24   was approved by some Council member's contingent on injection

25   of 15 million in capital.  That's all the information I had.

1    Q    And your denial was not based in any way, shape or form

2    on that capital injection.

3    A    It -- it was not based -- I basically, as -- as the

4    minutes were indicate, concluded that it -- 15 million would

5    help, but I wasn't sure it was enough.

6    Q    And the denial that you entered or that you voted for in

7    June of 2009 ultimately turned out to be the basis for the

8    denial of the Treasury.

9    A    I don't believe that's the case because I believe,

10   ultimately, the FDIC conducted a later exam and came to the

11   conclusion that there were some concerns about the bank, and

12   they had a vote, I believe, in December to ultimately withdraw

13   the application.

14            MR. EGAN:   If we could have Government 139, please.

15   BY MR. EGAN:

16   Q    Sir, if you look at the lower part of that e-mail, it's

17   from a Cynthia Course -- and you're familiar with her,

18   correct?

19   A    Yes, I know Cynthia.

20   Q    And you're copied on it?

21   A    Yes, I am.

22   Q    And that e-mail states that the -- and we're talking

23   December 14th of 2009, "I understand from the Reserve Bank

24   that Nova Bank has called the FDIC plan for this afternoon to

25   discuss its capital raising, vis-à-vis its TARP application."

Bertsch - Cross (Ega)                    110

1          See that?

2    A    Uh-huh.

3          THE COURT:  Yes or no, please.

4          THE WITNESS:  I see it, yes.

5          MR. EGAN:  And can we publish this?

6          MR. IGNALL:  I don't think it's been admitted, but

7    we have no objection to admitting it.

8          MR. EGAN:  I move the admission of 139.

9          THE COURT:  Admitted.

10   BY MR. EGAN:

11   Q    And, sir, if you look at it, it says, "On June 10, 2009

12   the Interagency Council approved Nova's TARP application,

13   contingent on a 15 million capital raise."

14          See that?

15   A    I see it.

16   Q    And it says, "Treasury has confirmed that Nova raised the

17   capital this year, and they now need to raise just ten --

18   earlier this year, and they now need to raise just ten

19   million."

20          Now, if you go down to the second paragraph in bold,

21   it says, "Nova has been deferring interest payments on its

22   trust-deferred securities so currently would not be allowed to

23   pay dividends on any TARP CPP security issue."

24          So that means that you would not -- they would not

25   be able to pay dividends.

Bertsch - Cross (Ega)                    111

1    A    It does not mean they -- that does not necessarily mean

2    that as -- as Cynthia goes on to explain that the Reserve Bank

3    cannot opine on whether it would allow them to pay interest

4    without additional information on how the capital would affect

5    the bank.

6    Q    But, sir, you would agree with me that they're not going

7    to give TARP funds if they don't know if they're going to be

8    able to pay dividends.

9    A    They may or they may not.  That decision was not up to

10   me.  Certainly, I would -- I would imagine that would weigh

11   into Treasury's decisions, but I don't know that it -- I don't

12   know that it would ultimately decide.

13           MR. EGAN:  And if we could have Government 142,

14   please.  It's already been admitted.

15   BY MR. EGAN:

16   Q    And this is between Joe Wilcox and Cindy Course?  And

17   they're Government employees, correct?

18   A    They're Federal Reserve Bank employees, Federal Reserve

19   Bank of Philadelphia.

20   Q    And if you see paragraph four, last paragraph in the

21   bottom, "The FDIC will not recommend that Treasury fund the

22   TARP application for an adequately capitalized bank that is

23   already restricted from servicing the dividend on their

24   investment."

25   A    I see that, yes.

1    Q     And that's the issue that you raised in June, correct?

2    A     That is an issue that I raised in June, yes.

3    Q     And is basically saying here the FDIC will not recommend

4    the bank because of that, correct?

5    A     Well, it says that, but the FDIC had previously

6    recommenced the bank under exact same circumstances.

7    Q     And in spite of the fact that the $15 million had been

8    raised, denied it on that basis, anyway, correct?

9    A     I'm not sure if this is the definitive explanation for

10   why the FDIC did not approve it.

11   Q     Okay.

12          MR. EGAN:  If we could have Government 150, please.

13   BY MR. EGAN:

14   Q     And, sir, if you could look at that.  It's an e-mail that

15   is from Cynthia Course to you, correct?

16   A     That's correct.

17   Q     And you're familiar with this document, obviously?

18   A     Yes.

19   Q     Okay.

20          MR. EGAN:  Move for the admission of 150.

21          MR. IGNALL:  No objection.

22          THE COURT:  Admitted.

23          MR. EGAN:  Publish it, please.

24   BY MR. EGAN:

25   Q     And Ms. Bertsch -- Ms. Course, excuse me, writes to you,

1   "Kevin, this is a notational vote to deny Nova's financial

2   TARP CPP application," correct?

3   A     Correct.

4   Q     So it's dated December 17th, and they are telling you

5   this is being denied, correct?

6   A     I'm sorry?

7   Q     It's a e-mail to you telling you the application's being

8   denied, correct?

9   A     That's not exactly what it is.  It's a -- it's a --

10  Cynthia is letting me know that -- that the Treasury has asked

11  for a notational vote on this transaction.  She's explaining

12  what the -- the vote, given -- bringing me up to date on

13  information.

14        And she's noting here that the situation with the

15  capital, as you described, but she's also indicating that the

16  bank's condition has deteriorated since approval, which was

17  frequently a reason for -- for banks to not receive TARP

18  investment if the FDIC's preliminary exam ratings are three

19  four two four three two three (phonetic) in an MOU as

20  contemplated.

21        So that would be -- and as it -- goes on to indicate

22  that the FDIC was preparing a new decision memo to present

23  their new view on the -- on the investment where they were

24  recommending denial.

25        All of us would have had to fill out a notational

1    vote, so all of the agencies, there would have to be a

2    document that would show each of the agencies' perspectives on

3    why they denied the vote --

4    Q    Right.

5    A    -- or why they --

6    Q    And the reason she's --

7    A    -- why they took the position.

8    Q    -- telling you this is 'cause now there's going to have

9    to be another vote, but they've pretty much already decided

10   it's going to be a vote to deny, correct?

11   A    Well, they haven't decided anything, other than the fact

12   that the FDIC has indicated that it's going to recommend

13   denial, which, typically, if the primary regulator was going

14   to recommend denial, would result in people voting to deny.

15   Q    Let's read the first sentence.

16          "This is a notational vote to deny Nova's financial

17   TARP CPP application."

18          That does not say this is a vote to deny?

19   A    That does say that, yes.

20   Q    Okay.  What, you're saying that's wrong?

21   A    I'm -- I'm saying that my reading of this is that we were

22   asked to prepare a notational vote that the FDIC was

23   recommending a denial, and that's probably why Ms. Course

24   wrote to deny the application.

25          Because, typically, if the primary regulator was not

1   supportive of it, it would be rare for all the other agencies

2   to support it, as well.

3   Q    So now FDIC, who was supportive to begin with, before any

4   mention of any raise of capital, nine or ten months later is

5   now no longer supportive.  It's what this is telling you.

6   A    Yes.  And it indicates that the FDIC conducted a

7   preliminary examination --

8   Q    Right.

9   A    -- and it's seen additional deterioration.

10   Q    And it's telling you why.  I have no -- no quibble with

11   that.  It's telling you why they've changed their mind, right?

12   A    Yes.

13   Q    And they've changed their mind for a couple reasons.

14   One, the bank examiners, like we discussed earlier, have gone

15   in and examined and decided things don't look all that great.

16   They have got worse ratings now so let's deny them.  That's a

17   reason, right?

18   A    Right.

19   Q    It's --

20   A    Yes.

21   Q    -- talking about what you raised from day one, they're

22   not going to be able to pay any of these dividends, correct?

23   A    Yes, and that would be because of the condition of the

24   bank.

25   Q    Right.  And all of these reasons that it raises, saying

Bertsch - Cross (Ega)                              116

1    we're not going to give them this money, every single one of

2    them, right?

3           None of them have anything to do with the $15

4    million capital raise, do they.

5    A    I -- not that I can see in this --

6    Q    No.  It's in spite of the $15 million capital raise we're

7    not going to give them any money, isn't it?

8    A    It -- it -- the 15 million is not entering into the

9    decision here.

10   Q    Correct.  So basically the decision to deny these funds

11   was completely unrelated to the $15 million capital raise.

12   Right?

13   A    I -- could you repeat again what you're --

14   Q    Sure.  The decision to deny TARP to Nova that you just

15   read about right here, and we can read the next one, too, if

16   you want, had nothing to do with the $15 million capital

17   raise.

18   A    Well, the 15 million -- what confuses me about the

19   question is the $15 million mitigates the negative issues to

20   some degree.  So it would have been a positive.

21          It didn't enter in as a --

22   Q    Correct.  It didn't --

23   A    -- as a --

24   Q    -- enter in to the decision.

25   A    It didn't enter in.

1    Q    Your words.  Didn't enter in to the decision.

2    A    Well, it didn't -- it didn't offset the negative factors

3    that raised questions about it meeting the Treasury's

4    investment criteria.

5         MR. EGAN:  If we could have Government 155, please.

6    BY MR. EGAN:

7    Q    And, sir, are you familiar with that document?

8    A    Yes.  This is a case decision memo for Nova Bank.

9    Q    And up in the right it says December 18, 2009, correct,

10   in handwriting?

11   A    Yes, it does.

12   Q    An IC meeting, number two agenda item.  That means on

13   December 18, 2009 you got together and -- and had a meeting

14   about this, correct?

15   A    I'm not sure what that means.  I -- IC would be

16   Investment Committee.  I wasn't on the Investment Committee.

17   Q    Okay.  But if you could go to page three, and you see

18   where it says, "Recommendation is denial."

19         Explains all the reasons why they're denying this,

20   correct?

21   A    Yes.

22   Q    And basically says it's despite the positive information

23   received from management, correct?

24         MR. IGNALL:  I'm going to object to asking this

25   witness to count on a document that he didn't have any

Bertsch - Cross (Dun)                                    118

1    participation --

2                THE COURT:  Sustained.

3                MR. IGNALL:  -- in preparing.

4                THE COURT:  Sustained.

5                MR. EGAN:  Very well.

6                May I have a moment, Your Honor?

7                THE COURT:  Surely.

8         (Pause)

9                MR. EGAN:  No -- nothing further, Your Honor.

10               MR. DUNCAN:  I'll be brief, Your Honor.

11                          CROSS-EXAMINATION

12   BY MR. DUNCAN:

13   Q    Good afternoon, sir.

14   A    Good afternoon.

15   Q    Sir, where is your office located?

16   A    Washington, D.C.

17   Q    And you've been there since -- did you say 1993?

18   A    Yes.

19   Q    During all the time you've worked for the Federal

20   Government have you ever met Barry Bekkedam?

21   A    No, I have not.

22   Q    Have you ever spoken to Barry Bekkedam?

23   A    No, I have not.

24   Q    Ever communicated in any way with Barry Bekkedam?

25   A    No, I have not.

1    Q    You -- you told the Government when they asked you during

2    one of your interviews, you'd said that you'd never even

3    spoken directly with any representatives of Nova, is that

4    correct?

5    A    That's correct.

6    Q    Sir, what's a notational vote?

7    A    What's a notational vote?

8    Q    Yeah, I've always wanted to know.  I just don't know.

9    A    It -- it's -- it's a vote when the material --

10   information is provided to you, and then you indicate whether

11   you vote yes or no in writing, and then that's provided to a

12   collector of votes, and they tally up the votes and decide how

13   the folks voted.

14   Q    Sort of like a caucus?

15   A    No.  I mean I don't -- I don't know exactly, but no.

16   It's basically each person individually voting based on a same

17   package of information.

18   Q    Okay.  Thank you very much, sir.

19             MR. DUNCAN:  No further questions.  Have a good day.

20             MR. IGNALL:  Like to show -- this is just for the

21   witness, Agent Boyer, Exhibit 16.

22                     REDIRECT EXAMINATION

23   BY MR. IGNALL:

24   Q    And do you see that on your screen?  I don't see it on

25   mine yet, so --

Bertsch - Redirect (Ign)                    120

1   A    Yes.

2   Q    All right.  Do you recognize what Exhibit 16 is?

3   A    This -- this looks like it's a file copy of notation

4   votes for the April 10th cases of the TARP Council, TARP TPP

5   Council.

6   Q    All right.  And if we'd flip to the second page, can you

7   tell whether Nova was one of the banks you considered on April

8   10th?

9   A    Yes.

10  Q    All right.

11          MR. IGNALL:  At this point Government moves into

12  evidence 16.

13          MR. EGAN:  No objection.

14          THE COURT:  You may proceed.

15  BY MR. IGNALL:

16  Q    If I could flip you to -- it looks like it's probably

17  the -- I think it's the fifth page.

18  A    No.

19  Q    The page that ends in 5-4, so probably would be the fifth

20  page.

21          Do you -- do you remember what the day was now that

22  the Council requested more information regarding Nova's

23  application?

24  A    Do -- do I recall the date?

25  Q    Yes.  Does this help refresh your recollection?

1   A    Yeah, it does refresh my recollection in that -- in the

2   initial notation vote on whether this should go to Council.

3          I raised several questions, as I believe some of the

4   other agencies did, as well, asking for more information.

5   There was then a meeting, and it was -- and even additional

6   information was requested after that.

7   Q    And when you and other members of the Council asked for

8   additional information after this April 10 meeting, who'd

9   you -- who'd you seek the information from?

10  A    The FDIC.

11  Q    All right.

12          MR. IGNALL:  One moment, Your Honor.

13          THE COURT:  Yes, sir.

14          MR. IGNALL:  I have nothing further.  Thank you,

15  Your Honor.

16          MR. EGAN:  May I briefly, Your Honor?

17          THE COURT:  Surely.

18          MR. EGAN:  Thank you.

19                    RECROSS-EXAMINATION

20  BY MR. EGAN:

21  Q    Mr. Bertsch, I'm going to stay on that document,

22  Government 16.

23          This document is the -- basically the recordation of

24  the meeting you and I discussed, which was the first meeting

25  where they put off the decision, correct?

1    A     That -- that -- I believe in my understanding, yes.

2    Q     Right.  And if you go --

3    A     That -- that -- the sequence of events was a little --

4    there -- there was an initial review of the case decision memo

5    as I recall -- I mean of the case decision memo which was a

6    notation vote which did not necessarily involve a face-to-face

7    meeting.

8          Then there was a face-to-face meeting where we had

9    requests for -- where we had a presentation by the FDIC, could

10   listen to the information they provided, and there was a

11   request for some additional information.  And I believe there

12   was one or two other meetings, and I apologize.

13         I get -- it's been a long time.  I get confused

14   between what meeting was what meeting.

15   Q     And it has been a long time.

16         And certainly your Council didn't have to all be in

17   the same room to have a meeting, right.  I mean you could --

18   you could vote, talk over the phone and -- I mean they didn't

19   have to bring everybody to Washington every time you guys

20   wanted to deal with something, right?

21   A     No.  We -- we tended to meet -- when we discussed the

22   most difficult cases, we did meet face to face, but we did a

23   lot of initial viewing of the information through notation

24   vote.

25   Q     Sure, understood, and that's what -- so that's what this

1    is.  That's why the confusion.  There wasn't actually a

2    meeting, is that --

3    A    Yes.

4    Q    -- what you're saying?  Okay.  Got it.

5         But -- but there was a review and a discussion and a

6    notational vote on April 10th of 2009, right, 'cause that's

7    what this says.

8    A    Yes.

9    Q    All right.

10        MR. EGAN:  So we go to page five, please.

11   BY MR. EGAN:

12   Q    And once again, this is after the FDIC's already said we

13   ought to do this, right?

14   A    Yes.

15   Q    And --

16   A    The FDIC had prepared a first case decision memo where

17   they said yes, they recommended approval.

18   Q    And by the way, their recommendation, that doesn't really

19   accomplish anything because until the Treasury signs off we're

20   actually doing this, the whole thing is basically contingent.

21   A    Yeah, it's a recommendation to Treasury, and then

22   Treasury has its own process where they made a decision about

23   whether to invest.  And it was a Treasury program, so Treasury

24   was the ultimate decider of --

25   Q    Right.

1    A    -- the criteria and ultimately what was invested in and

2    what was not.

3    Q    Right.  And so actually these were all just

4    recommendations.

5    A    Yes.

6    Q    Until December when they said no.

7    A    Well, the -- the Council would have recommended denial.

8    The Treasury would have ultimately had to deny.

9    Q    I see.  If we go to this page, this is your -- what you

10   have to say, right?

11   A    That's correct.  That's my initial --

12   Q    And --

13   A    -- question.

14   Q    And April 16th, again, you said deny, correct?

15   A    I said -- as -- as you see, basically, if you indicated a

16   denial, if you see that asterisk up above, it says cases with

17   deny or need more information will be referred to CPP Council.

18   Q    Right.

19   A    That means there would be a meeting, face-to-face

20   meeting.

21   Q    All right.  But --

22   A    So indicating deny would be indicating I need more

23   information to understand this.  Without other information I

24   would recommend deny.

25   Q    So you're saying deny doesn't mean deny?

1    A    Well, it -- it means deny.

2    Q    Oh, that's what I thought.

3    A    But it -- but it -- but basically if they brought

4    information that -- that supported the viability of the

5    institution and answered the questions that I had to a

6    satisfactory basis, then I might have approved.  And in some

7    cases some were approved.

8    Q    Well, I don't know.  Wouldn't you call that changing your

9    mind?

10   A    I would call that reacting to new information --

11   Q    Right.

12   A    -- that wasn't provided in the case decision memo.

13   Q    Of course.  Nothing -- nothing wrong with that, just --

14   but if you say deny today and you say approved tomorrow,

15   that -- that means something changed your mind, right?

16   A    That means you received additional information, and --

17   and that changed your understanding of the circumstances.

18   Q    Got it.  And you deny -- you -- you recommended deny on

19   this document.  That's what it says, right?

20   A    Yes.

21   Q    And you gave a brief explanation, and all of those

22   reasons that you gave as explanations were known to you in

23   April of 2009, correct?

24   A    Yes.

25   Q    Based on the examinations that your group had done and

1   the FDIC had done and everything you had read, correct?

2   A    Based on the information provided by the FDIC and based

3   on, you know, things like the Uniform Bank Performance Report

4   and information that was provided on the bank, this is what I

5   saw.

6   Q    And -- and nothing changed your mind about that

7   throughout this whole process.  You always stayed deny.

8   A    I always did, yes.

9   Q    Right.  Now, I asked you a question about where you found

10  the -- the rule that -- that you talked about with regard to

11  capital, and I think you said in the Examination Manual,

12  correct?

13  A    It would be in -- it would be in, as I said, for state

14  member banks it would be in Regulation 8 -- H in the Capital

15  Adequacy Guideline.

16  Q    And that's an Examination Manual, correct?

17  A    The Examination Manual would reference Regulation H.

18  Q    Right.  And the Examination Manual is an internal FDIC

19  document, correct?

20  A    The Federal Reserve -- I can't speak for the FDIC's,

21  although I believe their FDIC manual is public.  The Federal

22  Reserve's Examination Manual is a public document, as is

23  Regulation H.

24  Q    It's a manual that's for the examiners, correct?

25  A    It's for the examiners, but it's also available for

1    bankers, so bankers understand how we approach examinations

2    and how we would -- what we would be looking at.  It's

3    basically a matter of transparency.

4              And the same thing with regulations.  Regulations

5    would have to be available to the public for the banks to be

6    able to -- to follow them, and so they're -- they've always

7    been public, so --

8    Q    Your testimony is that the Examination Manual is not a

9    private FDIC document.

10   A    I said I can't speak to the --

11   Q    You don't know.

12   A    -- FDIC.  I work for the Federal Reserve.

13             But it's my understanding that the FDIC manual is

14   public.  I believe you could go on the FDIC website --

15   Q    Sir --

16   A    -- and find it.

17   Q    -- my question is do you know whether or not it is or

18   not.

19   A    I don't.  I'm just --

20   Q    Thank you.

21   A    But I do know --

22             MR. EGAN:  I have no further questions, Your Honor.

23             THE WITNESS:  I do know the Federal Reserve's is

24   public.

25             MR. IGNALL:  May I follow up on one thing -- or Mr.

Bertsch - Further Redirect (Ign)                    128

1   Duncan --

2            MR. DUNCAN:  Oh, no, nothing further.  Thank you,

3   Your Honor.

4            THE COURT:  All right.  Yes, sir.

5                 FURTHER REDIRECT EXAMINATION

6   BY MR. IGNALL:

7   Q    At the time of that April 16th meeting that Mr. Egan just

8   spoke about did the Council have any information about an

9   additional investor injecting new capital into the bank?

10  A    No, that was a later development.

11  Q    Okay.

12           MR. IGNALL:  No further questions.  Thank you.

13           MR. EGAN:  Nothing further, Your Honor.

14           MR. DUNCAN:  No, thank you, Your Honor.

15           THE COURT:  Anything further?

16           UNIDENTIFIED ATTORNEY:  No, Your Honor.  Thank you.

17           THE COURT:  All right.

18           Thank you, sir.  You may step down.  Watch your

19  step, please.

20           All right.  It is approximately 4:15, and kind of

21  like those very first days of school, you want to get out a

22  little early.  Let's get out a little early.

23           Please keep in mind that you cannot discuss the

24  testimony you've heard amongst yourselves nor with anyone

25  else.  Don't do any investigation or research on your own and

Bertsch - Further Redirect (Ign)                    129

1    avoid us like the plague.

2                Have a good evening.  We'll see you tomorrow morning

3    at 9:15.  Thank you.

4                THE CLERK:  All rise.

5         (Jury out, 4:11 p.m.)

6                THE COURT:  We are adjourned.  Thank you.

7                ALL ATTORNEYS:  Thank you, Your Honor.

8         (Proceedings concluded, 4:12 p.m.)

9                          *  *  *  *  *

1                    C E R T I F I C A T I O N

2

3

4           I, Tara Martin, court-approved transcriber, certify

5   that the foregoing is a correct transcript from the official

6   electronic sound recording of the proceedings in the

7   above-entitled matter.

8

9   Tara Martin   Digitally signed by Tara Martin
                  DN: cn=Tara Martin, o, ou,
10  _____   email=dianadiana@comcast.net, c=US   _____
                  Date: 2016.04.11 15:54:21 -04'00'

11  TARA MARTIN                          DATE

12  DIANA DOMAN TRANSCRIBING, LLC

13

14

15

16

17

18

19

20

21

22

23

24

```
                    UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA       )    14-CR-0548
                               )
      vs.                      )
                               )
BRIAN HARTLINE and             )
BARRY BEKKEDAM,                )    Philadelphia, PA
                               )    March 30, 2016
              Defendants.      )    9:30 a.m.

                  TRANSCRIPT OF TRIAL (DAY 2)
      BEFORE THE HONORABLE C. DARNELL JONES, II and JURY
                  UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:        DAVID J. IGNALL, ESQUIRE
                           ASSISTANT UNITED STATES ATTORNEY
                           UNITED STATES ATTORNEY'S OFFICE
                           615 Chestnut Street, Suite 1250
                           Philadelphia, PA 19106

For the Defendant          PATRICK J. EGAN, ESQUIRE
Brian Hartline:            FOX ROTHSCHILD LLP
                           2000 Market Street, 10th Floor
                           Philadelphia, PA 19107

For the Defendant          MICHAEL J. ENGLE, ESQUIRE
Barry Bekkedam:            GREENBLATT, PIERCE, ENGLE,
                           FUNT & FLORES
                           123 South Broad Street, Suite 2500
                           Philadelphia, PA 19109


                           RUSSELL D. DUNCAN, ESQUIRE
                           SHULMAN, ROGERS, GANDAL,
                           PORDY & ECKER, PA
                           12505 Park Potomac Avenue
                           Potomac, MD 20854

Audio Operator:            CARL HAUGER

Transcribed by:            DIANA DOMAN TRANSCRIBING, LLC
                           P.O. Box 129
                           Gibbsboro, NJ 08026
                           Office: (856) 435-7172
                           Fax:    (856) 435-7124
                           Email:  dianadoman@comcast.net



Proceedings recorded by electronic sound recording; transcript
produced by transcription service.
```

```
1                         I N D E X

2     WITNESS          DIRECT      CROSS      REDIRECT        RECROSS

3     Ms. Knott          8/Bar     17/Ega      29/Bar

4                                  22/Eng

5     Mr. Quill         31/Ign     45/Ega      61/Ign

6                                  56/Eng

7     Ms. Koch          66/Bar    169/Ega

8     EXHIBIT                                               ID    EVID

9     G-2        PowerPoint presentation 7/16/08                  11

10    G-1        Meeting minutes 7/16/08                          12

11    G-8        Nova call report 12/31/08                        72

12    G-13       Nova call report 3/31/09                         72

13    G-54       Nova call report 6/30/09                         72

14    G-93       Nova call report 9/30/09                         72

15    G-164      Nova call report 12/31/09                        72

16    G-10       TARP application                                 76

17    G-11       Emails 2/9/09                                    78

18    G-21       Emails 5/26/09                                   84

19    G-22       Email 5/26/09                                    87

20    G-28       Email 6/2/09                                     92

21    G-29       Email 6/4/09                                     97

22    G-31       Email 6/10/09                                    99

23    G-57       Email 7/2/09                                    102

24    G-61       Email string                                    108

25    G-61A      Email 6/17/09                                   109
```

| | EXHIBIT | | ID | EVID |
|---|---------|--|----|------|
| 1 | | | | |
| 2 | G-62 | Email 7/17/09 | | 110 |
| 3 | G-17 | Memo 5/1/09 | | 117 |
| 4 | G-19 | Email 5/18/09 | | 118 |
| 5 | G-200 | Voice mail 8/19/09 | | 166 |
| 6 | G-77 | Email 8/26/09 | | 120 |
| 7 | G-90 | Emails 9/22/09 | | 124 |
| 8 | G-97 | Email 10/4/09 | | 126 |
| 9 | G-120 | Emails 10/30/09 | | 127 |
| 10 | G-125 | Emails 11/11/09 | | 131 |
| 11 | G-133A | Letter 11/10/09 | | 134 |
| 12 | G-201 | Voice mail 12/14/09 | | 166 |
| 13 | G-202 | Voice mail 12/15/09 | | 166 |
| 14 | G-203 | Voice mail 12/15/09 | | 166 |
| 15 | G-140 | Emil 12/15/09 | | 139 |
| 16 | G-204 | Voice mail 12/15/09 | | 166 |
| 17 | G-144 | Email 12/16/09 | | 147 |
| 18 | G-145 | Email 12/16/09 | | 149 |
| 19 | G-146 | Email 12/16/09 | | 151 |
| 20 | G-147 | Email 12/16/09 | | 153 |
| 21 | G-151 | Email 12/17/09 | | 154 |
| 22 | G-152 | Email 12/17/09 | | 155 |
| 23 | G-156 | Email 12/18/09 | | 159 |
| 24 | G-157 | Email 12/18/09 | | 161 |
| 25 | G-160 | Email 12/20/09 | | 163 |

4

```
1            (The following was heard in open court at 9:30 a.m.)
2                 THE COURT:  May I see counsel at sidebar?
3            (Sidebar Conference)
4                 THE COURT:  Good morning.
5                 COUNSEL:  Good morning.
6                 THE COURT:  All right.  Go ahead.
7                 UNIDENTIFIED COUNSEL:  Oh we just wanted to call the
8       Court's attention to there was a --
9                 THE COURT:  No kidding?
10                UNIDENTIFIED COUNSEL:  Yeah.  You mean you saw it?
11                THE COURT:  Slightly.
12                MS. BARRY:  I got conked out.
13                THE COURT:  I did too, I wasn't going to mention it
14      but that's okay.
15                UNIDENTIFIED COUNSEL:  The good looking guy at the
16      front of room (inaudible).
17                THE COURT:  Well, frankly, as you all know, there's
18      no way in the world you're going to gag the press.  They have
19      a right to publish it, it's the First Amendment, obviously.
20      As long as there is nothing in it that is in any way going to
21      create bias, then there's nothing I can do about it.  I can't
22      tell them not to (inaudible) it.  And I can certainly admonish
23      the jury not to read anything that they see that might be a
24      headline.  And we also know that we are sure --
25                UNIDENTIFIED COUNSEL:  Don't think about pink
```

5

1    elephants, Your Honor.

2            THE COURT:  But the bottom line is, is that we've

3    gone though this in the opening.  And I will reiterate it.  If

4    you wish me to voir dire the jurors individually as to what

5    they've read, and whether or not that's going to impede or

6    impair their ability to be fair, if you request it, I'll hear

7    argument on it, and I may or may not do that.

8            I've read the article over and again.  It appears to

9    be a report.  It's relatively balanced in terms of what

10   happened in Court yesterday.  And such is life.  The jury, I

11   don't think read anything -- well, no, I take that back.

12   There were other things obviously regarding the outside

13   activities.

14           That's what, if you're going to make an argument

15   about, I'll hear you.

16           UNIDENTIFIED COUNSEL:  Mike --

17           MR. ENGLE:  Yeah.  The only concern we had obviously

18   Your Honor was that the article mentions a number of times the

19   the (inaudible).

20           THE COURT:  Right.

21           MR. ENGLE:  Which we've been trying to delegate --

22   we dance around during the course of the trial.  But I think

23   at this point my sense has always been the jurors take the

24   Court's instructions very seriously.  I think that if the

25   Court reiterates that issue very clearly this morning, --

1              THE COURT:  I'll do that.

2              MR. ENGLE:  -- that I think is as far as we would

3    want you to go at this point.

4              THE COURT:  Okay.

5              MR. ENGLE:  I would not ask for a individual voir

6    dire.

7              THE COURT:  All right.

8              MR. ENGLE:  I think it just draws attention and

9    highlights an issue that we don't want to draw any more

10   attention to.

11             MR. EGAN:  And I concur in that, Your Honor.

12             THE COURT:  All right.

13             MR. EGAN:  We have one other matter.

14             THE COURT:  Yes, sir.

15             MR. EGAN:  Just very briefly.  In anticipation of

16   Mr. Preve testifying today, he refers repeatedly through his

17   reports to the FBI about Mr. Bekkedam's divorce.  And unless

18   there's some reason why it would be relevant, we would ask

19   that he be instructed not to talk about the divorce.

20             MR. IGNALL:  I don't anticipate any question that

21   would get to that.

22             MR. EGAN:  Yeah.

23             THE COURT:  But could you go a step further --

24             MR. IGNALL:  I will instruct him --

25             THE COURT:  -- and tell him not to volunteer.

7

1          MR. IGNALL:  I'll tell him not to volunteer it.

2          THE COURT:  Okay.

3          MR. EGAN:  Okay.  Thank you. That's not relevant.

4     Thank you.

5          THE COURT:  All right.  Now, lastly, in terms of the

6     instructions regarding any publications, I won't highlight

7     this at the beginning of the testimony, I'll wait at an

8     appropriate time in the day to apprise the panel.

9          UNIDENTIFIED COUNSEL:  Thank you, Your Honor.

10          THE COURT:  It's possible that some read it and some

11    did not, however, and that makes me kind of lean towards

12    saying something before they go out at the first break --

13          UNIDENTIFIED COUNSEL:  That makes sense.

14          THE COURT:  -- about (inaudible).  All right?

15          UNIDENTIFIED COUNSEL:  Thank you, Your Honor.

16          THE COURT:  Thank you all.

17       (Sidebar Ended)

18          MR. IGNALL:  Your Honor, may I have one moment to

19    ask Agent Lyons something?

20          THE COURT:  Sure.

21       (Pause)

22          MR. IGNALL:  Thank you, Your Honor.

23          THE COURT:  Whenever you're ready, counsel.  You

24    said you needed a minute.  Any time you're ready.

25          MR. IGNALL:  Oh, I'm ready.  Thank you, Your Honor.

1    I'm sorry about that.

2              THE COURT:  All right.

3        (Pause)

4              THE CLERK:  All rise.

5        (Jury Enters)

6              THE COURT:  Good morning.  Good morning.  Be seated.

7              JURORS:  Good morning.

8              THE COURT:  Counsel, you may call your next witness.

9              MS. BARRY:  Thank you, Your Honor.  The Government

10   calls Eileen Knott.

11        EILEEN KNOTT, GOVERNMENT WITNESS, SWORN

12             THE CLERK:  Please sit down.  State and spell your

13   name for the record, please?

14             THE WITNESS:  My name is Eileen Knott, K-N-O-T-T.

15             MS. BARRY:  May I proceed, Your Honor?

16             THE COURT:  You may proceed.

17             MS. BARRY:  Thank you.

18                       DIRECT EXAMINATION

19   BY MS. BARRY:

20   Q    Good morning, Ms. Knott.

21   A    Good morning.

22   Q    Ms. Knott, are you currently working?

23   A    No.

24   Q    Are you retired?

25   A    Yes.

Knott - Direct/Bar                                9

1    Q     And prior to your retirement, what line of work were you

2    in?

3    A     I was in banking.  I did auditing and accounting.

4    Q     And how long was your career in banking?

5    A     I started in banking in 1970.

6    Q     Okay.  And did you have any kind of educational

7    background that led to your career in banking?

8    A     Yes.  I had an undergraduate degree in accounting and

9    management, and a masters in business administration.  I was

10   also certified in auditing, but that has expired since I

11   retired.

12   Q     Okay.  And, ma'am, during your career in banking, did you

13   ever work at a bank called Nova Bank?

14   A     Yes, I did.

15   Q     And could you please tell the members of the jury the

16   time period that you worked at Nova?

17   A     I think it was 2006 to 2008.

18   Q     And what was your position there?

19   A     I was in charge of the Compliance and Audit Departments.

20   Q     And so what did that entail?

21   A     We were responsible to ensure that the bank was in

22   compliance with all the regulations and regulatory

23   requirements, and also that audits were being performed on the

24   various areas to ensure the compliance.

25   Q     Now as part of your position, did you also provide the

1    board of directors of the bank training?

2    A    Yes.

3    Q    Okay.  And do you know approximately how often the board

4    was being trained, at least from the time period you were at

5    the bank?

6    A    It was quarterly.

7    Q    Okay.  Ma'am, I'd like to show you what's been marked as

8    Government's Exhibit 1 -- I'm sorry Government's Exhibit 2.  I

9    apologize.  Government's Exhibit 2.

10             MS. BARRY:  And if that could just be shown to the

11   witness at this time?  Thank you.

12   BY MS. BARRY:

13   Q    And this is the first page of Government's Exhibit 2.

14   And what is that?

15   A    It's a PowerPoint slide presentation on training of the

16   Camel's Ratings.

17   Q    Okay.  And is your name on the front page of this

18   training?

19   A    Yes.

20   Q    And approximately -- does it give a date for the

21   training?

22   A    Yes.

23   Q    And what is that date?

24   A    July 16, 2008.

25             MS. BARRY:  Your Honor, the Government moves for the

1    admission of Government's Exhibit 2.

2                    MR. ENGLE:  No objection.

3                    MR. EGAN:  No objection.

4                    THE COURT:  Admitted.

5                    MS. BARRY:  Okay.  May it be published, Your Honor?

6                    THE COURT:  Certainly.

7                    MS. BARRY:  If we could please just publish that

8    first page?

9    BY MS. BARRY:

10   Q    And, again, you indicated that this is -- this was a

11   PowerPoint that you prepared, or was prepared at your

12   direction, relating to quarterly board training on July 16,

13   2008, regarding the Uniform Financial Institution's Rating

14   System, the Camel's rating, right?

15   A    Yes.

16   Q    Okay.

17                   MS. BARRY:  And if we could please turn to page 16

18   of that training?

19        (Pause)

20                   MS. BARRY:  Okay.  If we could blow that up, please?

21   BY MS. BARRY:

22   Q    And so the board was told, when it comes to capital,

23   there is this definition of capital, correct?

24   A    Yes.

25   Q    Okay.  And can you just read the first two sentences?

1    A    (Reading)

2            "Bank capital serves the same purpose as capital in

3    any other business.  It is the cushion that protects a bank

4    against unanticipated losses and sustains it through poor

5    economic times."

6    Q    Okay.  Now if you -- in terms of providing that training,

7    I'd like you to now take a look at Government's Exhibit 1.

8            MS. BARRY:  And if that would just be shown to the

9    witness, please?

10   BY MS. BARRY:

11   Q    And what is Government's Exhibit 1?

12   A    It's the board of directors minute from the meeting held

13   on July 16th, 2008.

14   Q    Okay.  And looking at the individuals that attended this

15   meeting, are you listed as one of those people?

16   A    Yes, I am.

17   Q    Okay.

18           MS. BARRY:  Your Honor, the Government would move

19   for the admission of Government's Exhibit 1.

20           MR. EGAN:  No objection.

21           THE COURT:  Admitted.

22           MS. BARRY:  May it be published, Your Honor?

23           THE COURT:  Granted.

24           MS. BARRY:  Thank you.  If we could show that first

25   page?

1    BY MS. BARRY:

2    Q    And, again, so does that correspond to the date that you

3    actually provided the training --

4    A    Yes.

5    Q    -- that is in the PowerPoint?

6    A    Yes.

7    Q    Okay.  And looking at the directors that were present at

8    the time, is Brian Hartline listed as being present?

9    A    Yes, he is.

10   Q    Okay.  And who was Brian Hartline?

11   A    He was the president of the bank.

12   Q    Okay.  And did you know Mr. Hartline?

13   A    Yes.

14   Q    Okay.  Do you see him here today?

15   A    Yes.

16   Q    And can you point him out, please?

17   A    There.

18   Q    Okay.

19          MS. BARRY:  Your Honor, let the record reflect that

20   the witness has identified the defendant Brian Hartline.

21          THE COURT:  The record shall so reflect.

22          MS. BARRY:  Thank you.

23   BY MS. BARRY:

24   Q    And just to be more specific, when it comes to this

25   training on page 11 of the board minutes --

1          MS. BARRY:  If we could turn to that, please?

2     BY MS. BARRY:

3     Q    And looking at quarterly board training, if you could

4     read that first sentence?

5     A    (Reading)

6          "Mr. Hartline advised that Eileen Knott is now going

7     to present the quarterly board training, which will be the

8     topic of Camel's ratings."

9     Q    Okay.  And would you please read the second sentence?

10    A    He added that he asked her to focus on liquidity and

11    capital, which are two of the top concerns in the banking

12    industry today."

13    Q    Okay.

14         MS. BARRY:  May I have a moment, Your Honor?

15         THE COURT:  Certainly.

16    (Pause)

17    BY MS. BARRY:

18    Q    All right.  If we just stay on this page, and I guess for

19    the benefit of the jury, and I should have gone over this with

20    you, what is CAMELS?

21    A    CAMELS are the various ratings that the bank is rated on

22    by the Government, either the FDIC, if it's a state bank, or

23    the OCC if it's a Federal bank.  And its Capital, Assets,

24    Management, Equity, Liability and Sensitivity.

25    Q    Okay.  So CAMELS is what we call like an acronym for

1   those areas that regulators are going to examine a bank?

2   A    Yes.

3   Q    On.  Okay.  And if you look at that third paragraph, I

4   think it's the second sentence that you explain something

5   related to the director's responsibilities.  Can you just read

6   that particular sentence, please?

7   A    (Reading)

8         "She explained that it's each director's

9   responsibility, as well as management's, to make sure that the

10  bank's capital is adequate for safe and sound operations,

11  which is why Mr. Hartline presents all of those reports at the

12  board meetings."

13  Q    Okay.  So, again, this training is being provided so that

14  the board of directors understands the importance of CAMELS,

15  and in particular Mr. Hartline is pointing out that capital is

16  one of the major concerns?

17  A    Yes.

18  Q    Okay.  And if we could, I'd just like to point one more

19  thing out based on Government's Exhibit 2, and if we go back

20  to page 16 where you do discuss CAMELS in the PowerPoint.

21        MS. BARRY:  If we could blow that up, please?

22  BY MS. BARRY:

23  Q    You had read for us the first two sentences.  And if you

24  wouldn't mind reading the next two sentences?

25  A    (Reading)

1              "Since capital represents the shareholders'

2    investment and appreciation in that investment from successful

3    operations, it is also the shareholders' stake put at risk,

4    lessening incentives for taking unwarranted or uncompensated

5    changes in operating the bank."

6    Q    Okay.

7    A    (Reading)

8              "Different industries have varying needs for

9    capital --"

10   Q    Okay.

11   A    (Reading)

12             "-- relative to non-financial businesses.  Banks and

13   other financial services provide or operate with small amounts

14   of capital.  Today the average equity capital to asset ratio

15   for bank hovers near 9.1 percent."

16   Q    Okay.  So in terms of capital, the necessity for it is to

17   make sure that you don't put the shareholders at risk, that

18   you have some cushion for losses -- unanticipated losses?

19   A    Yes.

20   Q    Okay.

21             MS. BARRY:  No other questions, Your Honor.  Thank

22   you.

23             THE COURT:  You may cross-examination.

24             MR. EGAN:  Thank you, Your Honor.

25                           CROSS-EXAMINATION

1   BY MR. EGAN:

2   Q    Good morning, Ms. Knott.

3   A    Good morning.

4   Q    You worked at Nova, I believe you said from sometime in

5   2006 to 2008, correct?

6   A    If I remember correctly, yes.  I know I left in 2008.

7   Q    Okay.  And obviously before you went to Nova you had a

8   lot of experience in banking?

9   A    Yes.  I've been in banking since 1970.

10  Q    And you've been in accounting, and you're in -- been in

11  compliance?

12  A    Yes.  And auditing.

13  Q    And -- I'm sorry.

14  A    And auditing.

15  Q    And auditing.  So the job that you had when you started

16  at Nova Bank and the job you had when you left Nova Bank were

17  different, correct?

18  A    I don't remember.

19  Q    Do you remember that you were promoted at one point and

20  put into --

21  A    Yes, I was.  To a higher -- senior officer.

22  Q    Right.  And you became basically in charge of compliance?

23  A    Yes.

24  Q    And you were promoted essentially by Mr. Hartline,

25  correct?

1    A    Yes.

2    Q    And the purpose of that was so that you could have a

3    better oversight of the compliance functions at the bank,

4    correct?

5    A    Yes.

6    Q    And when you were doing your job there at the bank, you

7    were the person who was responsible for all these issues,

8    correct?

9    A    Yes.

10   Q    Compliance and auditing.  And you have a lot of folks

11   working underneath you?

12   A    I had two or three people working for me.

13   Q    And they were doing the auditing and the other matters?

14   A    Actually, at one point in time, the auditing was being

15   done by an outside accounting firm.

16   Q    And that was McGladrey (phonetic), right?

17   A    Yes.

18   Q    But you had to obviously interface with them and helped

19   them to get the documents they needed?

20   A    Correct.

21   Q    And actually, using an outside auditing firm, that's a

22   common practice for a bank that size, correct?

23   A    Yes.

24   Q    And during that period of time, whatever documents those

25   auditors requested or any bank examiner requested, you

1    provided to them, correct?

2    A    Yes.

3    Q    Mr. Hartline never said, hey, don't give any auditors

4    those documents, did he?

5    A    No.

6    Q    And you never had any issues with the way that that was

7    handled, did you?

8    A    No.

9    Q    This presentation to the board, it was Mr. Hartline who

10   asked you to do it, correct?

11   A    I don't remember, to be honest with you.

12   Q    Okay.  Well the minutes seemed to indicate that you were

13   invited there by him, would that be accurate?

14   A    Yes.

15   Q    Okay.  And the whole point of it was, because the

16   directors are actually really in charge of the bank, isn't

17   that true?

18   A    Yes.

19   Q    And Brian Hartline reports to the directors?

20   A    Correct.

21   Q    And among those directors, there's a gentleman by the

22   name of Wayne Leevy?

23   A    Yes.

24   Q    Do you remember him?

25   A    I vaguely remember him, yes.

1   Q    And he was the chair of the audit committee, right?

2   A    Correct.

3   Q    And the audit committee oversees for the board all of

4   these activities as well, correct?

5   A    Yes.

6   Q    And, in fact, the auditors at the bank and the people who

7   do your job, are free to report any issues directly to Mr.

8   Leevy and the audit committee without even talking to Mr.

9   Hartline, because that's a safeguard, right?

10  A    Correct.

11  Q    Now you never had felt the need to go do that while you

12  were there, did you?

13  A    Not that I can remember.

14  Q    Well you would remember that, wouldn't you?

15  A    Hopefully.

16  Q    Yeah, I would think so.  I would, anyways.  Okay.  So you

17  went to the board and you presented this training, and

18  obviously this is a good thing, isn't it?

19  A    Yes.

20  Q    Because we want to try to try an get the board to be as

21  educated as possible so they can do a better job in managing

22  the bank?

23  A    Correct.

24  Q    And you did read from page 16, and I'm not going to pull

25  up the document again, but that's just the very first page of

1    a very long section on Capital, correct?

2              Do you want to look at it?

3    A    It probably is.

4              MR. EGAN:  May I approach, Your Honor?

5              THE WITNESS:  I mean, I remember --

6              MR. EGAN:  It would be easier to do it from there.

7              THE COURT:  Sure.

8              THE WITNESS:  I remember that it was a pretty long

9    presentation, when I looked at it.

10   BY MR. EGAN:

11   Q    I'm sorry I missed it, to be honest with you.  Page 16,

12   it starts "Capital."  And Capital's a C in CAMELS, right?

13   A    Yes.

14   Q    And A seems to start Assets.

15   A    Yes.

16   Q    So from 16 to 31, all that stuff is about Capital, right?

17   A    Correct.

18   Q    And you would agree with me this is a very high level

19   summary of Capital, and this isn't -- on the details.

20   A    Correct.

21   Q    Someone would have to be an auditor, like you, a very

22   experienced person?

23   A    Or an accountant.

24   Q    To really understand all the details.

25   A    Probably.  I know I wouldn't know definitely to be able

1    to say yes or no on that one.

2    Q    Of course.  I'm sorry.  I'll withdraw the question.

3         You left Nova to take another position, correct?

4    A    Yes.

5    Q    You didn't leave because of any issue anything was wrong,

6    or anything bad there, right?

7    A    No.

8         MR. EGAN:  I have nothing further, Your Honor.

9         MR. ENGLE:  May I, Your Honor?

10        THE COURT:  Yes, sir.

11                      CROSS-EXAMINATION

12   BY MR. ENGLE:

13   Q    Good morning, Ms. Knott

14   A    Good morning.

15   Q    Ms. Knott, you said that you came to Nova in 2006.  Am I

16   correct about that?

17   A    I think that's when I started there.  But I'm not

18   positive.

19   Q    Roughly.  Okay.  And you departed Nova in sometime in

20   2008?

21   A    Yes.

22        THE COURT:  Let's don't use departed.

23   BY MR. ENGLE:

24   Q    No longer worked at Nova as of 2008?

25   A    Yes.

1    Q    Fortunately, she's here, we know she has not departed.

2    And during the roughly two years that you were there, did you

3    get to know individuals who were members of the board of

4    directors for the bank?

5    A    Probably the ones that I knew the best were the members

6    of the audit committee.

7    Q    Okay.  And you had opportunities on certain occasions to

8    attend board meetings, is that right?

9    A    Yes.

10   Q    Was that a frequent occurrence?

11   A    I really don't remember, to be honest with you.

12   Q    Okay.  But we certainly know that you attended the

13   meeting in July of 2008?

14   A    Yes.

15   Q    All right.  And to your recollection, were there other

16   times where you gave similar trainings?

17   A    If I remember correctly, we used to give that training

18   quarterly.

19   Q    Understood.  Now during your time when you first got to

20   Nova, did you ever meet a gentleman by the name of Barry

21   Bekkedam?

22   A    Yes.

23   Q    Okay.  And did you meet him -- in what context did you

24   meet him?

25   A    Mr. Bekkedam was -- I think he was the chairman of the

1    board.

2    Q    Okay.  So when you first --

3    A    I really didn't have a lot of contact with him.

4    Q    All right.  When you first got to Nova in 2006, you were

5    aware that Mr. Bekkedam was the chairman of the bank board?

6    A    Yes.

7    Q    As you said, you didn't have a lot of contact with him,

8    would that mean during the course of your day-to-day work at

9    the bank, you wouldn't be on the phone with Mr. Bekkedam?

10   A    No.

11   Q    You wouldn't be getting a bunch of emails from Mr.

12   Bekkedam?

13   A    No.

14   Q    He wouldn't be asking to see you for a meeting?

15   A    No.

16   Q    All right.  And you're aware of the fact that at a

17   certain point in 2007, Mr. Bekkedam left his position on the

18   bank board, correct?

19   A    I don't remember.

20   Q    Okay.  Would you agree with me that he did in fact leave

21   the bank board, even if you don't remember exactly when it

22   was?

23   A    Yes, he did leave.

24   Q    All right.

25           MR. ENGLE:  And if we could call up Government

1    Exhibit 1, please?

2    BY MR. ENGLE:

3    Q    Ms. Knott, do you see what was shown to you on direct

4    examination as Government Exhibit 1?

5    A    Yes.

6    Q    And do you agree with me that that's the document that

7    records the minutes of the board of directors meeting for July

8    16th, 2008?

9    A    Yes.

10   Q    Okay.  And it would be your experience from having worked

11   at this bank and other banks, that when there's a board

12   meeting, someone is responsible for taking down what occurs at

13   that meeting?

14   A    Correct.

15   Q    And one of the things that you would do is to first note

16   who is actually present at that meeting, is that correct?

17   A    Yes.

18   Q    All right.

19        MR. ENGLE:  Sean, could we highlight the top portion

20   of that document that says "The following directors were

21   present?"

22   BY MR. ENGLE:

23   Q    Ms. Knott, do you see that list there?

24   A    Yes.

25   Q    And that's the list that the minutes record of all the

Knott - Cross/Eng                                    26

1    individuals who were present as members of the board of

2    directors on July 16, 2008, do you agree with me?

3    A    That's what the list is, yes.

4    Q    Okay.  And do you agree with me that Barry Bekkedam's

5    name is not there?

6    A    Yes.

7    Q    All right.

8         MR. ENGLE:  Now could be go down, Sean, to the next

9    group that says "The following guests were present?"

10   BY MR. ENGLE:

11   Q    And, Ms. Knott, do you see that there were a number of

12   individuals who were not actual directors of the bank, but

13   people that had been invited to participate in this meeting,

14   is that right?

15   A    Yes.

16   Q    And your name appears there on that list?

17   A    Yes.

18   Q    Because you were presenting that day.

19   A    Yes.

20   Q    And the other names on that list, were they individuals

21   who worked at the bank?

22   A    Yes.

23   Q    And you agree with me that Mr. Bekkedam's name is not

24   present on that list as a guest at the meeting on July 16th of

25   2008?

1    A     Yes.

2    Q     And would you agree with me that it would be uncommon for

3    the bank to invite an outsider, a person who's not on the

4    board or doesn't work within the bank, to one of these

5    quarterly trainings?

6    A     I'm sorry?

7    Q     You wouldn't just invite some guy off the street to come

8    sit in because it would be interesting?

9    A     No.

10   Q     All right.  And based upon what we've looked at with

11   respect to those individuals who were present at the board

12   meeting on July 16th, 2008, fair to say that Mr. Bekkedam was

13   not present for this presentation that you gave on various

14   issues involving the CAMELS rating system?

15   A     Yes.

16   Q     So he was not there, unfortunately, to see the nice

17   PowerPoint presentation that we see in Government Exhibit 2,

18   correct?

19   A     Correct.

20   Q     All right.  Now, ma'am, at a certain point in time, you

21   were contacted by individuals from the Government about

22   testifying here today, and gathering information about what

23   you remembered about Nova Bank, is that right?

24   A     Yes.

25   Q     Do you recall that you were first contacted on October

1    29th of 2015, does that sound about right to you?

2    A    It was back -- because the original hearing was scheduled

3    for like November 29th, if I remember correctly.

4    Q    Okay.  That makes sense then.  So you would agree with me

5    that after departing Nova Bank in 2008, you weren't contacted

6    by any Government investigators in 2009?

7    A    No.

8    Q    You weren't contacted by any Government investigators in

9    2010?

10   A    No.

11   Q    You weren't contacted by any Government investigators in

12   2011?

13   A    No.

14   Q    Same thing, no one in twelve?  Correct?

15   A    Correct.

16   Q    No one contacted you in thirteen?

17   A    No.

18   Q    No one in fourteen?

19   A    No.  It wasn't until nearly the end of 2015 before you

20   heard from anyone in the Government about this investigation?

21   A    Correct.

22   Q    All right, now do you recall that during the time when

23   you were talking to the agents and other individuals from the

24   Government on October 29th of 2015, you were discussing some

25   issues about bank stock and the purchase of bank stock?

1          MR. EGAN:  Your Honor, may I have -- may we see you

2     at sidebar?

3          THE COURT:  Surely.

4        (Sidebar Conference)

5          MR. EGAN:  (Inaudible) --

6          THE COURT:  Okay.

7          MR. EGAN:  -- involvement down the line.

8          THE COURT:  Sure.

9          MR. EGAN:  Thank you, Your Honor.

10         THE COURT:  You're quite welcome.

11       (Sidebar Ended)

12         MR. ENGLE:  I'm sorry, Ms. Knott, one second.

13    Actually those are all the questions I have for you, thank

14    you.

15         THE WITNESS:  Okay.  Thank you.

16         THE COURT:  I just wanted to -- excuse me.

17         THE WITNESS:  Oh, I'm sorry.  I'm sorry, I thought I

18    was done.

19                    REDIRECT EXAMINATION

20    BY MS. BARRY:

21    Q    Just briefly, Ms. Knott.  Do you know whether or not Mr.

22    Hartline has an accounting background?

23    A    Yes, he does have an accounting background.

24    Q    Okay.  And what do you know about that?

25    A    If I remember correctly, and -- I think Brian was a CPA.

1   Q    Okay.  And what does CPA stand for?

2   A    Certified Public Accountant.

3   Q    And what do you need to do in order to be a CPA?

4   A    You have to work in public accounting for a period of

5   time, and then you have to pass an examination.

6   Q    Okay.  And were you a CPA?

7   A    No.  I was a certified internal auditor.

8   Q    Okay.  And is it fair to say that you left Nova Bank in

9   and around 2008, correct?

10  A    That's correct.

11  Q    All right.  And did you have anything to do with Nova's

12  TARP application?

13  A    No.

14  Q    Were you -- do you think you were even at the bank when

15  Nova applied for a TARP?

16  A    I don't remember being there, no.

17  Q    Okay.

18           MS. BARRY:  Those are all the questions I have, Your

19  Honor.  Thank you.

20           MR. EGAN:  No recross, Your Honor.

21           MR. ENGLE:  Nothing, Your Honor.  Thank you.

22           THE COURT:  Now you may step down.  Thank you.

23           THE WITNESS:  Thank you, sir.

24           THE COURT:  Watch your step, please.

25       (Pause)

1            THE COURT:  You may call your next witness.

2            MR. IGNALL:  The Government calls John Quill.

3            THE CLERK:  Please raise your right hand.

4        JOHN QUILL, GOVERNMENT'S WITNESS SWORN

5            THE CLERK:  Please state your full name for the

6    record, please?

7            THE WITNESS:  John Quill.

8            THE CLERK:  Please spell your last name?

9            THE WITNESS:  I'm sorry?

10           THE CLERK:  Please spell your last name?

11           THE WITNESS:  Q-U-I-L-L.

12           THE CLERK:  Thank you.

13           THE COURT:  You may proceed.

14           MR. IGNALL:  Thank you, Your Honor.

15                      DIRECT EXAMINATION

16   BY MR. IGNALL:

17   Q    Good morning, Mr. Quill.

18   A    Good morning.

19   Q    What do you do for a living right now, Mr. Quill?

20   A    I'm an external consultant with an International Monetary

21   Fund.

22   Q    And how long have you been a consultant with the IMF?

23   A    Well I worked for the IMF for two years full-time, and I

24   retired.  And so now I do occasional assignments for the IMF.

25   But I worked in the IMF from June of 2013 to June 2015

Quill - Direct/Ign                                    32

1   full-time, and since I've done periodic assignments.

2   Q    And did you work for anyone else before the IMF?

3   A    Yes.  I worked for the Office of Controller of the

4   Currency for 32 years.

5   Q    And what is the Comptroller of the Currency?

6   A    It's a regulator of national charter banks.

7   Q    Is that a Federal Government organization?

8   A    Yes.  The Office of Controller of the Currency is a

9   bureau of the Treasury Department.

10  Q     And you said you worked there 32 years.  What job did

11  you have within the Controller of the Currency?

12  A    Well I had a variety of jobs over those 32 years.  I was

13  a field examiner for about half of the time.  After that, I

14  was a manager of the Washington field office.  And then for

15  the last seven years I was Deputy Controller for a special

16  supervision, that's the OCC's Office of Controller of the

17  Currency's Problem Bank Division.

18  Q    All right.  And what does it mean to be a field examiner?

19  A    You go in and examine banks, and go from bank-to-bank

20  examining banks.

21  Q    What are you looking for as a field examiner?

22  A    You're looking for the condition of the bank, to assess

23  the condition of the bank, looking at its asset quality and

24  evaluating its asset quality, its earnings, evaluating capital

25  and liquidity, and management.

1             And you assign an overall rating for the bank.

2    Q    And does that rating reflect how financially healthy the

3    bank is?

4    A    Yes.

5    Q    Okay.  Are you familiar with something called the

6    Troubled Asset Relief Program?

7    A    I am.

8    Q    And do you know anything about Capital Purchase Program?

9    A    Yes, I'm familiar.

10   Q    All right.  So what is the -- are they related to each

11   other in some way?

12   A    Yes.  The Capital Purchase Program was part of the

13   overall Troubled Asset Relief Program.

14   Q    And in particular, did you have some involvement with the

15   Capital Purchase Program?

16   A    I did.

17   Q    And what as your involvement with that?

18   A    Well the four federal banking agencies at that time

19   formed a council to consider applications for TARP funds.  And

20   I was chair of that interagency council.

21   Q    And what was the Capital Purchase Program?

22   A    It was a program for the U.S. Treasury to invest in

23   preferred stock of banks.

24   Q    And was that money that would go to any bank, or were

25   there criteria that the Treasury set up to decide what banks

1    to invest in?

2    A    Yes, there was criteria set up.  Did you --

3    Q    Well let me go through -- as part of this council, did

4    you review applications of banks seeking funding under this

5    program?

6    A    Yes, I did.

7    Q    And what criteria were you looking at when evaluating

8    these bank's applications?

9    A    Well ultimately we were looking at if the bank was

10   viable.

11   Q    And what does viable mean?

12   A    That means that it could continue operations on a

13   sustained basis, be a profitable bank.

14   Q    And viable with or without the additional funding from

15   the Treasury?

16   A    Our rule was that it has to be viable without the

17   funding.

18   Q    Okay.  And then this council, did you make

19   recommendations to any other body within the Government?

20   A    In regards to TARP?

21   Q    In regards to the -- yeah, the TARP funding.

22   A    Well, yeah, the council would make a recommendation to

23   the investment committee at the U.S. Treasury Department.

24   Q    All right.  And who had the final say as to whether a

25   bank received funding under this Capital Purchase Program?

1    A    That was the investment committee, the U.S. Treasury.

2    Q    But in your experience, if your council did not at least

3    by a majority recommend a bank for approval, was that bank

4    likely to be approved?

5    A    No.

6    Q    Okay.  Now when a bank applied for funding in this

7    program, did that application go directly to the United States

8    Treasury?

9    A    No, it would go through the individual Federal banking

10    agency responsible for that particular bank.

11    Q    And if you, as part of the council, had a question about

12    a bank, who did you go to to get information?

13    A    Well we would -- we -- the Federal banking agency

14    responsible would present some information on the bank.  If I

15    or other council members had questions, we would ask the

16    Federal banking agents responsible for the bank, and they

17    would go back and get additional information.

18    Q    Did you ever have any contact directly with anyone at the

19    bank that was applying for TARP funding?

20    A    No.

21    Q    And did the Treasury put banks in different categories as

22    to whether they were reviewed by your council?

23    A    Yes.

24    Q    So what were those categories?

25    A    Well there were basically three categories.  One category

1   of if they were rated one or two, and didn't trip certain

2   other performance criteria, could go through the Federal

3   banking agency and to the investment committee without going

4   through the council.

5   Q    And what does one or two mean?

6   A    One and two is the best ratings of banks.  One means the

7   bank is very well-run and very sound bank.  A two is a

8   satisfactory rating as well.

9   Q    All right.  So that's category one.  What's the next

10  category?

11  A    So the next category were three rated banks, but also two

12  rated banks that tripped one of the performance categories

13  that we set up.  So even though it was two rated, if it

14  exceeded certain performance category set up, it would need to

15  go through the council.

16  Q    Okay.  And what's the third category?

17  A    The third category were basically banks rated four and

18  five, and they were presumed denial.

19  Q    And what does a four or five mean in the rating?

20  A    Four -- a five means failure is fairly imminent.  A four

21  means bank failure is probable, unless they change something

22  significantly in the bank.

23  Q    So let's focus on the middle category then.  If it went

24  to the council, what were you and other members of the council

25  looking at to decide whether to recommend approval?

1   A     Individual council members would do work ahead of the

2   council meeting, looking at the bank's performance.  I would

3   pull something called a Uniform Bank Performance Report for

4   all the banks that we considered.  It had various financial

5   information on there.  But then we would also of course

6   consider the write-up presented by the Federal Baking Agency

7   responsible for the bank.

8   Q     Do you recall ever reviewing an application from a bank

9   known as Nova Bank?

10  A     I did not independently recall it.  But I -- when I saw

11  material my memory was refreshed, yes.

12  Q     Okay.  So having reviewed materials in preparation for

13  trial --

14  A     Yes.

15  Q     -- do you recall whether you and the members of the

16  council reviewed an application for Nova Bank?

17  A     Yes.

18  Q     Okay.  And let me show you what we've marked as Exhibit

19  16.  It's going to come up on your screen.

20            MR. IGNALL:  And may I approach, Your Honor?

21            THE COURT:  Yes, sir.

22  BY MR. IGNALL:

23  Q     It's a multi-page document --

24  A     My screen is dark.

25  Q     -- hopefully it will become light shortly.  But you can

1    also look at the -- it's a multi-page document.  Do you

2    recognize --

3              MR. IGNALL:  And it's already been admitted, Your

4    Honor.  May we publish it to the jury?

5              THE COURT:  Yes, sir.

6    BY MR. IGNALL:

7    Q    Please flip through that and tell me if you recognize

8    this document?

9    A    Yes, I recognize the document.

10   Q    And what is Exhibit 16?

11   A    This is, because we had a lot of cases going through the

12   council, we set up a system where we could do a notation --

13   what we called a notational vote.  So if the Federal banking

14   agency proposing this thought there wouldn't be much in the

15   way of issues to the bank, they would just distribute the

16   information, and we would mark whether we approved or denied,

17   or whether we needed additional information and that had to go

18   through the council for discussion.

19   Q    And does Exhibit 16 reflect whether there was a

20   notational vote on Nova's application?

21   A    Yes, it does.

22   Q    And when was that?

23   A    On April 10th, 2009.

24   Q    And what was the result of this notational vote?

25   A    There was -- there was a vote, one approved by the

1   banking agency sponsoring it.   One denying, and two remanding

2   it to the council.

3   Q    And so what did that mean happened to the application?

4   A    It meant that it had to go to the council to be

5   discussed.

6   Q    And did you or any other member of the council request

7   additional information as a result of this notational vote?

8   A    Yes.

9   Q    And what kind of information were you looking for?

10  A    So we requested information -- so I asked whether the

11  FDIC had verified securities.   Banks have to analyze those

12  securities for other than temporary impairment, and I asked if

13  the FDIC had verified the bank's analysis on how much of the

14  $18 million capital was put into a bank that they acquired.

15  We were --

16  Q    All right.   Let me stop you there.   Did you have some

17  understanding about the bank having already raised a certain

18  amount of capital?

19  A    Yes.   It was my understanding that they had already

20  raised $18 million of capital for the acquisition of another

21  bank.

22  Q    Okay.   And was the amount of capital in the bank one of

23  your concerns in terms of approving or not approving Nova's

24  application?

25  A    Oh, absolutely.

Quill - Direct/Ign                                            40

1    Q    And why is that?

2    A    Well it's a concern -- I mean, it's an issue that we want

3    to look at in every bank's case that applied for TARP.  Again,

4    that was to make sure that the bank was -- or to assess

5    whether the bank was viable.

6    Q    And what's the benefit of having more capital in terms of

7    the bank being viable?

8    A    Well the more capital, the more, you know, you can absorb

9    future losses, and the more likely you are viable.

10   Q    And when you say losses, what possible losses are out

11   there that a bank could sustain?

12   A    Well a bank could have losses on its security portfolio.

13   During the time that this was taking place there were a lot of

14   losses in bank's loan portfolios.

15   Q    When you say there's a loss in a loan portfolio, what

16   does that mean?

17   A    That means that the loan is probably not collectible in

18   full, or maybe at all.

19   Q    So a loss could be, a borrower doesn't pay back the money

20   to the bank?

21   A    Correct.

22          MR. EGAN:  Objection

23          THE COURT:  Sustained.

24   BY MR. IGNALL:

25   Q    Okay.  All right.  So as a result of this meeting, did

1    the council get additional information about Nova Bank?

2    A    Yes.

3    Q    And did the council have a full meeting regarding Nova

4    Bank's application?

5    A    Yes, we did.

6    Q    All right.  I'd like to turn your attention, it's going

7    to come up on the screen, I hope, to Exhibit 30.

8              MR. IGNALL:  Which has also already been admitted,

9    Your Honor.

10             THE WITNESS:  Yes.

11   BY MR. IGNALL:

12   Q    All right.  Do you recognize Exhibit 30?

13   A    Yes, I do.

14   Q    What is Exhibit 30?

15   A    Exhibit 30 reflects the vote of the council as a result

16   of this meeting on June 10th.

17   Q    Okay.  And were you present for this vote?

18   A    Yes.

19   Q    All right.  And at this point, had you gotten any

20   additional information about Nova Bank?

21   A    Yes, we did.

22   Q    What additional information had you gotten about Nova

23   Bank -- let me ask you this, did you vote to approve Nova

24   Bank's -- or recommend approving Nova Bank?

25   A    I did, based on certain contingency.

1    Q     And had you gotten information from the bank that changed

2    your mind from remand to yes?

3    A     As presented through the FDIC, yes.

4    Q     From the FDIC, did you get information from the bank?

5    A     Yes.

6    Q     And what was that information?

7    A     That they would raise $15 million in additional new

8    capital.

9    Q     All right.  And what did you understand new capital --

10   raising $15 million in new capital to mean?

11   A     That means investors would bring in new -- new capital to

12   the bank, invest $15 million into the bank.

13   Q     Did you understand whether the bank would be loaning the

14   investor any part of that?

15   A     No.  I -- I -- I assumed they wouldn't, because it's

16   prohibited by law.

17   Q     And that was -- would that have been the capital you were

18   looking for, if it was loaned by the bank?

19   A     No.  It wouldn't count as capital.

20   Q     All right.  So if I could turn your attention back to the

21   first page here, is your vote noted somewhere here?

22   A     Yes, it is.

23   Q     Where is that?

24   A     It's noted on the line that says "OCC approved JQ," and

25   it's got an asterisk.

1    Q    All right.  And then if we go down, what's the asterisk

2    say?

3    A    (Reading)

4           "Contingent on capital injection of $15 million."

5    Q    And do you know who wrote that down?

6    A    I did.

7    Q    Okay.  And do you know at this point whether the bank was

8    considered by the FDIC to be well capitalized?  And if you

9    could flip your attention to the second page, that might help

10   refresh your recollection.

11          MR. IGNALL:  And, Your Honor, it might be easier --

12   BY MR. IGNALL:

13   Q    Would you like to look at the paper copy?

14          MR. IGNALL:  May I approach?

15          THE COURT:  You may.

16          THE WITNESS:  No, it was not well capitalized.

17   BY MR. IGNALL:

18   Q    And when you and the other members of the council agreed

19   to the contingency, was that in any way to address how

20   well-capitalized or not the bank was?

21   A    Yes.  It was to address that.

22   Q    All right.  And when looking at the viability of Nova

23   Bank, for example, you said something about looking at asset

24   quality.

25   A    Right.

1    Q    When you're looking at asset quality, does it matter

2    whether -- is a loan an asset that you're talking about

3    potentially?

4    A    Yes, a loan is an asset of the bank.  Yes.

5    Q    All right.  But are you looking at how risky some of

6    these loans are?

7    A    Yes.

8    Q    Okay.  And does it make a difference whether the loan is

9    secured or unsecured?

10   A    Yes.

11           MR. EGAN:  Objection.

12           THE COURT:  Overruled.

13   BY MR. IGNALL:

14   Q    And why does it make a difference?

15   A    Well if it's secured, and depending upon the value of the

16   collateral, you may collect all of the loan eventually through

17   seizing the collateral and stalling the collateral of the

18   bank.  Or you may collect part of the loan.

19   Q    And if it's unsecured?

20   A    If it's unsecured, and it's a non-performing loan, you

21   may not collect any.

22   Q    After the council recommended approval to the Department

23   of the Treasury, do you know if Nova Bank's application was

24   ultimately approved?

25   A    It's my -- I didn't know at the time, it's my

1    understanding now that it -- it -- I don't -- I'm not sure

2    what you mean by that.

3    Q    Let me ask differently.

4    A    Okay.

5    Q    After the council recommended to the Treasury approval

6    with this contingency of raising $15 million in new capital,

7    do you -- would you have been directly involved in

8    communications the bank would have about whether it raised

9    that money or not?

10   A    No, I would not have been.

11   Q    Okay.

12            MR. IGNALL:  No further questions.

13            MR. EGAN:  May I inquire?

14            THE COURT:  Yes, sir.

15                        CROSS-EXAMINATION

16   BY MR. EGAN:

17   Q    Good morning, sir.

18   A    Good morning.

19   Q    You were on the council, correct?

20   A    Yes.

21   Q    And then there was something you mentioned called the

22   investment council.

23   A    The investment committee.

24   Q    The investment committee.

25   A    Yes, at the U.S. Treasury.

1    Q    Now the council you were on, doesn't actually approve the

2    loan, in terms of finally approving it, so that -- the TARP

3    investment, in terms of finally approving it so the people get

4    the money, correct?

5    A    That's correct.

6    Q    You're making a recommendation?

7    A    That's correct.

8    Q    So it's interesting, because you said that -- Mr. Ignall

9    asked you a question at the end about whether something was

10   approved, and you were kind of, it depends on what approved

11   meant.  Do you remember that?

12   A    Yes.  So --

13   Q    Well just let me ask a question, please.  Approved means

14   approved, right?

15   A    Yes.

16   Q    Okay.  So what did you men by it depends on what approved

17   meant?

18   A    Well I wasn't sure, frankly, what he was asking.  Whether

19   he meant the investment committee approved the inject -- the

20   investment of Treasury funds into the bank, or whether he

21   meant, you know, it actually went to the bank.

22   Q    And ultimately, whether those funds are invested -- or

23   invested in the bank, I guess we can call it that, by the

24   TARP, is a decision that is made by this investment council?

25   A    That's correct.

1    Q    You're not on the investment council?

2    A    No.

3    Q    You didn't have anything to do with that?

4    A    No.  I didn't.

5    Q    Don't have any --

6    A    Well the only thing I had to do with is make the

7    recommendation to it.

8    Q    And you don't really know how they made their decision,

9    or what decision they made?

10   A    I don't.

11   Q    Okay.  Do you know who's on the investment committee?

12   A    I knew at the time, I can't recall now.

13   Q    Okay.  But we had a gentleman over here yesterday by the

14   name of Mr. Schaffner, did you know him?

15   A    I don't recall him.

16   Q    Okay.  But he wasn't on the investment committee, was he?

17   A    I don't know.

18   Q    So ultimately an application comes in, right?

19   A    Yes.

20   Q    Okay.  That application would have been submitted

21   sometime in October of 2008, correct?

22   A    I'm unsure of when it would have been submitted.

23            MR. EGAN:  Can we have Government 6, please?

24   BY MR. EGAN:

25   Q    Did you actually review applications?

1          THE COURT:  Counsel, do you wish it to be on the

2     screen?

3          MR. EGAN:  Well I was just going to ask a question

4     while it was coming up.

5          Could I have Government 6, please?  It's been

6     published.

7     BY MR. EGAN:

8     Q    Thank you.  Are you familiar with this document?

9     A    Yes.

10    Q    Okay.  Did you review these?

11    A    I -- so it depends -- for OCC banks, I would have

12    reviewed these, for other banks it depends upon whether this

13    was included in the package or not.

14         MR. EGAN:  If we could have page two?

15    BY MR. EGAN:

16    Q    If I represent to you this is all the information that

17    was asked in this application, is that how you recall it?

18    A    Um-hum.

19    Q    Okay.

20         THE COURT:  Yes or no, please.

21         THE WITNESS:  Yes.

22    BY MR. IGNALL:

23    Q    And so, obviously, this application is not enough

24    information for you to make any kind of an informed decision

25    about whether or not you should recommend that this be

1    approved, correct?

2    A    Correct.

3    Q    And what you really want to do is look at all of the

4    examination reports, and the call reports, and those types of

5    documents, correct?

6    A    So on the council, we would not be able to look at the

7    other Federal banking agency's reports of examinations.   We

8    would depend upon them presenting the results of it.

9    Q    Understood.   So you couldn't actually look at the report,

10   but the -- in this case it was the FDIC.

11   A    Right.

12   Q    They would prepare a summary of that report with all of

13   the pertinent information in it, correct?

14   A    Correct.

15   Q    And that certainly would be something that you would rely

16   on in making your determination?

17   A    Correct.

18   Q    And if that report were to change substantially by, say,

19   lowering the rating on a bank, that would be something that

20   would clearly affect your determination, correct?

21   A    Yes.   It could.

22   Q    Now I want to take you to Government 16, please.   And

23   this is the notation from the meeting where you asked for more

24   information.   Remember that?

25   A    Yes, but I don't have anything on my screen.

1    Q    Yeah, I'm sorry, it will be up in a sec, hopefully.

2         (Pause)

3    Q    Thank you.  And if we go to page nine, which is Mr.

4    Coyle's (phonetic) page.

5              MR. EGAN:  And if you could enlarge that so he can

6    see it better?

7    BY MR. EGAN:

8    Q    You're basically saying here, I don't have enough

9    information, I need more, right?

10   A    Yes.

11   Q    And you ask about two things.  The first thing you ask

12   about is, has FDIC verified OTTI analysis?  And I believe you

13   testified on direct examination that that had to do with

14   securities that the bank owned from other institutions that

15   you wanted to know the viability of, correct?

16   A    Yes.

17   Q    And the concern there is that, so many institutions were

18   having problems in that period of time, that those securities

19   may have been -- not be worth what they originally believed

20   them to be, correct?

21   A    Yes.

22   Q    And in fact, FDIC did do a further analysis of that,

23   didn't they?

24   A    I believe they did.

25   Q    And in fact they determined that those securities weren't

1   worth what was originally believed to be -- they were

2   originally believed to be worth, and there was a downgrade as

3   a result of that, correct?

4   A    Correct.

5   Q    And that downgrade substantially affected the position of

6   the bank?

7   A    Could I correct my statement?

8   Q    Sure.

9   A    So they get through review of that, and there were

10  additional losses in the securities portfolio.  I -- I don't

11  recall at the moment whether there was a downgrade or not.

12  Q    You don't really remember that.  Because after this June

13  vote, that's the last you had to do with this, right?

14  A    Yes.

15  Q    So we can speak to other witnesses about that, sir.  The

16  next thing you want to talk about is how much of the 18

17  million capital was put into PBB, correct?

18  A    Yes.  That's the question.

19  Q    Now PBB, to refresh your recollection, that's the

20  Pennsylvania Business Bank?

21  A    Yes.  I believe so.

22  Q    And that was a bank that Nova actually acquired late in

23  2008, correct?

24  A    It was one they acquired, I take it.

25  Q    So this 18 million in capital, this is money that had

1    been raised prior to April of 2009, correct?

2    A    Yes.

3    Q    And money that had been used to buy, basically purchase

4    another bank?

5    A    Yes.

6    Q    So that's got nothing to do with this other 15 million

7    that you're talking about?

8    A    No, it doesn't have anything to do with it.

9    Q    That's money they raised the year before that?

10   A    Yes.

11   Q    And ultimately --

12         MR. EGAN:  If we could have Government 30, please?

13   BY MR. EGAN:

14   Q    -- there's another meeting in June, correct?

15   A    I'm sorry, what was the question?

16   Q    There's another meeting in June.

17   A    Yes.

18   Q    And that's the one where you vote?

19   A    Yes.

20   Q    And if I could direct your attention to page three.  It

21   says:

22         " Mr. Quill asked whether the injection is

23   contingent upon the receipt of TARP funds.  And Mr. Hunter

24   replied in the affirmative."

25         Do you see that?

1   A    Yes.

2   Q    And that obviously is an important issue for you at that

3   point, correct?

4   A    Yes.

5   Q    Because as you said on direct, TARP funds can't be used

6   to make the bank viable, the bank has to be viable without the

7   TARP funds?

8   A    That was our -- yeah, that was --

9   Q    That's something that everybody on the council believed,

10   correct?

11   A    Yes.

12   Q    Do you know whether that was communicated to the bank?

13   A    I do not know.

14   Q    And the fact that the investment was contingent on

15   receiving the TARP funds, that would be a potential problem

16   for you, correct?

17   A    Yes.  I was somewhat concerned about the condition of the

18   bank, so that's why I would want to be sure that they raised

19   additional capital.

20   Q    Okay.  And do you remember that Mr. Birch voted against

21   this?

22   A    Yes, I do.

23   Q    And do you remember what his reason for voting against it

24   was that the bank -- or one of his reasons was that the bank

25   was about -- or the holding company, excuse me, was about to

1    be downgraded by the FRB?

2    A    I recall that, yes.

3    Q    Okay.  So when you voted to approve this, you're

4    basically saying to the people at the next level, this

5    investment committee that we yet to find out who they are, you

6    are basically saying to them, this thing's okay in my view, if

7    they get this money, right?

8    A    Yes.

9    Q    But it would be fair to say that that was a fairly

10   tentative position?

11   A    I don't know what you mean by fairly tentative.

12   Q    In other words, there are a whole lot of other variables

13   out there that could go wrong between now and when this

14   council would ultimately make a determination?

15   A    Possible.

16   Q    And during that period of time, as always, there would be

17   more bank examinations?

18   A    That depends upon the Federal banking agency.

19   Q    But you would expect that within a period of six to nine

20   months there would be more bank examinations, correct?

21   A    Not necessarily.  It could be 12 months out, it could be

22   18 months out --

23   Q    Well if I had to represent to you that there was one, you

24   wouldn't be surprised, would you?

25   A    No.

1   Q    And clearly, the decision that was ultimately made by

2   this council would have taken that into effect as well?

3   A    I don't know that.  Of the council, or the investment

4   committee?

5   Q    Yeah.  The investment committee, excuse me, I'm sorry.

6   A    I don't know that.

7   Q    Okay.  Well you talked a little bit about -- Mr. Ignall

8   asked you if a loan --

9   A    Mister who?

10   Q    The prosecutor.

11   A    Oh, I'm sorry.

12   Q    Yeah, it was Mr. Ignall.  This guy here.  He asked you

13   about whether a loan was an asset.  Correct?

14   A    Yes.

15   Q    And a loan is an asset, isn't it?

16   A    Yes.  Yes.

17   Q    And in fact a loan can be put on a balance sheet,

18   correct?

19   A    Yes.

20   Q    And there are various factors to determine whether that

21   loan is a risky loan or a not risky loan, correct?

22   A    Correct.

23   Q    And while collateral is certainly one, there are many

24   other factors as well?

25   A    Yes, absolutely.

1    Q    The strength of the borrower?

2    A    Yes.

3    Q    If you have a borrower who said he's worth $300 million,

4    that's probably a better loan than if I borrowed it, right?

5    A    It depends upon other factors but --

6    Q    Right.  But there are lots and lots of factors.

7    A    Yes.

8    Q    But you don't disagree at all that a loan is an asset

9    that a bank can put on a balance sheet?

10   A    No, that's true.

11   Q    Okay.

12          MR. EGAN:  If I could have a moment, Your Honor.

13       (Pause)

14          MR. EGAN:  Nothing further.

15          MR. ENGLE:  May I, Your Honor?

16          THE COURT:  Yes, sir.

17          MR. ENGLE:  Thank you.

18                       CROSS-EXAMINATION

19   BY MR. ENGLE:

20   Q    Good morning, Mr. Quill.

21   A    Good morning.

22   Q    Take your time.  Mr. Quill, I just have a few questions

23   for you.  You indicated that during the process of engaging in

24   your work on the CPP council, you would not have direct

25   contact with anyone at the bank, is that correct?

1    A    That's correct.

2    Q    Okay.  You would, however, receive information from the

3    primary regulator about what the bank was doing, information

4    that was relevant to your decisions, is that correct?

5    A    That's correct.

6    Q    All right.  And in this particular instance with Nova

7    Bank, the primary regulator would have been the FDIC?

8    A    Correct.

9    Q    And during the time that you were considering the

10   application of Nova for TARP funds and you were performing

11   your work on the CPP council, you received certain information

12   and communications from that primary regulator, the FDIC?

13   A    Yes.

14   Q    And you would rely upon that information in helping you

15   make your assessment and recommendation to the investment

16   council, which was the next step down the line, am I right?

17   A    Yes.

18   Q    Okay.  Now during the time frame that you were receiving

19   information from the primary regulator, the FDIC, at any point

20   in time did you receive information about a man named Barry

21   Bekkedam?

22   A    I do not recall that.

23   Q    You never even heard that name?

24   A    No.

25   Q    Never received any information whatsoever relating to a

1    guy that worked in the financial industry named Barry

2    Bekkedam?

3    A    I don't recall that.

4    Q    So during the entire time that you were processing the

5    information from the primary regulator, and considering how to

6    recommend to the investment council whether Nova Bank got TARP

7    funds or didn't, Barry Bekkedam didn't factor into the

8    equation at all for you?

9    A    That's correct.

10   Q    Okay.  Now during the time that you were indicating, I

11   think that you didn't have a direct recollection of this

12   particular application when you were first asked about it, is

13   that right?

14   A    Correct.

15   Q    Okay.  Now you were contacted by agents of the Government

16   in early November of 2015.  Does that sound right to you?

17   A    I guess that's right.  I don't recall specifically when,

18   but, yes.

19   Q    Certainly the contact came several months ago?

20   A    Yes.

21   Q    Okay.  From 2009, when you finished up dealing with the

22   issue of Nova Bank and the work that you had to do on the CPP

23   council, the application of Nova Bank for TARP funds was not

24   on your mind at all until the agents contacted you in November

25   of 2015, would that be fair to say?

1    A    That's fair to say.

2    Q    And that's why it's fair that you needed your

3    recollection refreshed by seeing certain documents?

4    A    Yes.

5    Q    Okay.

6         MR. ENGLE:  Now could we call up Government Exhibit

7    6, please?

8    BY MR. ENGLE:

9    Q    Do you see that there, Mr. Quill?

10   A    Yes.

11   Q    All right.  Mr. Egan showed you that and asked you a few

12   questions about it during his cross-examination.  This is the

13   application that was submitted by Nova to start the process of

14   seeing whether they could get TARP funds, right?

15   A    Yes.

16   Q    Okay.  And from what you can see on the screen, on page

17   one it asks for a primary contact and a secondary contact?

18   A    Yes.

19   Q    Are either one of those names Barry Bekkedam?

20   A    No.

21   Q    Okay.

22        MR. ENGLE:  Could we go to the last page, please?

23   I'm sorry, the second to last page.

24   BY MR. ENGLE:

25   Q    There's a place where someone's supposed to sign the

1    application that's dated October 27, 2008?

2    A    Um-hum.

3    Q    That doesn't say Barry Bekkedam, is that right?

4    A    It does not.

5    Q    Okay.  So nowhere on the application from Nova to the

6    TARP program, Barry Bekkedam doesn't appear anywhere on that

7    document, is that right?

8    A    That's right.

9    Q    Okay.  Now I believe you said that -- or let me ask you

10   this, actually.  Your background, in terms of your degree, is

11   in finance, am I right about that?

12   A    That's correct.

13   Q    Okay.  And, in fact, you're not in accounting, and you

14   don't have an accounting background?

15   A    Well in finance you have some accounting background, yes,

16   but I'm not a CPA.

17   Q    Right.  And you don't have a degree in accounting?

18   A    That's correct.

19   Q    And you never worked directly in accounting?

20   A    Well an examiner in a bank is involved in accounting of

21   the bank.

22   Q    Understood.  But I'm saying, you never worked as a CPA or

23   anything that a traditional account would do?

24   A    That's correct.

25   Q    Okay.  Ever heard of EITF85-1?

1    A    I'm sorry, what?

2    Q    Ever hear of EITF85-1?

3    A    I don't recall it specifically.

4    Q    Okay.  Thanks.

5            MR. ENGLE:  Nothing further.

6            MR. IGNALL:  A couple of questions.

7                    REDIRECT EXAMINATION

8    BY MR. IGNALL:

9    Q    Mr. Egan asked you if a loan is an asset that can be on

10   the balance sheet, do you remember that?

11   A    Yes.

12   Q    If it's an asset on the balance sheet, is that the same

13   as capital?

14   A    No.  It's not the same as capital.

15   Q    Why is it not the same?

16   A    Well because capital is the difference between all of the

17   assets and the liabilities.  It's capital.

18   Q    So -- but if it's an asset, how is that different from

19   capital in terms of -- especially when you're looking for an

20   injection of capital?

21   A    Well if I'm looking for an injection of capital, that

22   would be new money invested into the bank which would increase

23   both the asset side, depending on whatever it's in, cash or

24   invested in loans, or securities, or whatever.  And then the

25   liability.  So the capital increases.

1   Q    And I believe Mr. Egan asked you that you didn't know

2   what the loan -- the investment committee might do after your

3   recommendation, is that right?

4   A    I did not know what they would do?

5   Q    Yeah.  If something changed, for example.

6   A    Oh, if something changed, no, I don't know.

7   Q    But do you know what the investment committee would have

8   done had Nova Bank not met the contingency of the capital

9   injection?

10             MR. EGAN:  Objection.

11             THE COURT:  Sustained.

12   BY MR. IGNALL:

13   Q    Let me ask it differently.  In your experience as the

14   chair of the CPP Council, was the council recommendation

15   necessary for the investment committee to approve an

16   application?

17   A    Yes.

18   Q    All right.

19             MR. IGNALL:  Nothing further.

20             MR. EGAN:  No recross.

21             MR. ENGLE:  Nothing, Your Honor.  Thank you.

22             THE COURT:  Thank you, sir, you may step down.

23   Watch your step, please.

24             THE WITNESS:  Thank you.

25        (Pause)

1                  THE COURT:  All right.  Ladies and gentlemen of the

2       jury, we're going to take our morning recess at this time.

3       However, before you go back into the jury room, I want to

4       raise one matter.  And that is, we are all acutely aware of an

5       article that appeared in the news media regarding this trial.

6                  If you have not read it, I instruct you not to read

7       it.  If you have read it, I instruct you to disregard it.  And

8       from this time forward, as I've indicated all along, please

9       avoid any newspaper articles, radio broadcasts, or anything

10      else on the internet or public media about this case.

11                 The case can only be decided by you based upon what

12      you hear from the witness stand, or entered into the record by

13      counsel.  All right?   Thank you very much.  See you in about

14      15 minutes.

15           (Jury Exits)

16                 THE COURT:  All right.  15 minutes, please.

17           (Court in recess 10:42 a.m. to 11:15 a.m.)

18                 MR. IGNALL:  One item, Your Honor.

19                 THE COURT:  Yes, sir.

20                 MR. IGNALL:  Before Ms. Koch takes the stand, I want

21      to read in one of the stipulations that we've agreed to.

22                 THE COURT:  You all may be seated then.

23                 MR. IGNALL:  And if the Court wanted to instruct the

24      jury as to what the stipulation is before I read it.

25                 THE COURT:  Sure.

1          MR. IGNALL:  Okay.  And the others we'll read later,

2     but we've agreed on this one to read before the next witness.

3          THE COURT:  All right.

4        (Pause)

5          THE COURT:  The stipulation is to her testimony?

6          MR. IGNALL:  No, no.  It's a stipulation -- it's

7     just about the bank being a Pennsylvania State Chartered Bank

8     that had deposits insured by the FDIC.  The stipulation that I

9     was going to read is that:

10          "At all relevant times of the Indictment Nova Bank

11    was a Pennsylvania State Chartered savings bank that had

12    deposits insured by the Federal Deposit Insurance

13    Corporation."

14          THE COURT:  Okay.  Thank you.

15          MR. EGAN:  Could we say at all relevant times,

16    without the Indictment?

17          MR. IGNALL:  Say that again?

18          MR. EGAN:  Could we just say at all relevant times,

19    without emphasizing at all relevant times in the Indictment? I

20    don't know if in the Indictment adds anything to the mix.

21          MR. IGNALL:  I'm fine with that, Your Honor.

22          MR. EGAN:  Thank you, Your Honor.  Thank you.

23        (Jury Enters)

24          THE COURT:  You may be seated.  Thank you.  Members

25    of the jury, at the outset, I instructed you that during the

1    course of a trial the attorneys may enter into stipulations,

2    and you are going to hear a stipulation at this point in time.

3    It is nothing more than an agreement by all attorneys

4    representing their respective clients that what is read to you

5    at this point in time is accurate, true, and is not contested.

6              You may proceed.

7              MR. IGNALL:  Your Honor, the stipulation is:

8              "That at all relevant times, Nova Bank was a

9    Pennsylvania State Chartered Savings Bank that had deposits

10   insured by the Federal Deposit Insurance Corporation."

11             THE COURT:  So stipulated?

12             MR. EGAN:  Yes, Your Honor.

13             THE COURT:  All right.  You may continue.

14             MS. BARRY:  Your Honor, at this time the United

15   States would call Lisa Koch.

16             THE CLERK:  Please raise your right hand.  Please

17   remain standing.

18        LISA KOCH, GOVERNMENT WITNESS, SWORN

19             THE CLERK:  Please state and spell your name.

20             THE WITNESS:  Okay.  My name is Lisa Koch, K-O-C-H.

21             THE CLERK:  Thank you.

22             THE COURT:  You may proceed.

23             MS. BARRY:  Thank you, Your Honor.

24   BY MS. BARRY:

25   Q    Good morning, Ms. Koch.

Koch - Direct/Bar                                      66

1    A    Good morning.

2    Q    Would you please tell us where you work?

3    A    I work at the FDIC as an examiner.

4    Q    Okay.  And how long have you been with the FDIC?

5    A    Twenty-four years.

6    Q    And what does the FDIC do?

7    A    They insure bank deposits.  And we also regulate some of

8    the banks.

9    Q    And as part of the FDIC's regulation of banks, does it

10   conduct periodic examinations of the banks?

11   A    Yes.

12   Q    And approximately how often is a bank examined?

13   A    It depends on the size of the bank.  It's either every 12

14   months or every 18 months.

15   Q    Okay.  And I -- just to be clear, what does FDIC stand

16   for?

17   A    Federal Deposit Insurance Corporation.

18   Q    Now are you familiar with Nova Bank?

19   A    Yes.

20   Q    And was Nova Bank FDIC insured?

21   A    Yes.

22   Q    And, therefore, was Nova Bank regulated by the FDIC?

23   A    Yes.

24   Q    Was Nova Bank regulated by any other agencies?

25   A    Yes, it was the Pennsylvania Department of Banking.

1   Q    And did Nova Bank have a parent holding company called

2   Nova Financial Holdings?

3   A    Yes.

4   Q    And was Nova Financial Holdings regulated by any agency?

5   A    Yes, it was regulated by the Federal Reserve.

6   Q    Now did the different agencies that regulated the bank,

7   as well as the holding company, communicate with each other?

8   A    Yes, quite often.

9   Q    And were you the case manager for Nova Bank from

10  approximately 2008 to 2010?

11  A    Yes.

12  Q    And what were your duties as a case manager?

13  A    Well I would review the different reports when they came

14  in, get them ready, send them out to the bank.  And then I'd

15  also process applications.

16  Q    Okay.  So when you say different reports, what kind of

17  reports are you talking about?

18  A    Reports of examination.

19  Q    Okay.  And so that would be when the bank was examined by

20  the FDIC, is that right?

21  A    Or the State, or the Fed.  We would get all the reports.

22  Q    And what is the purpose for an examination?

23  A    To assess how much risk the bank is taking.

24  Q    And how -- in an exam, how is a bank rated?

25  A    Okay.  It's called a CAMELS rating, and it's rated on six

1  components, and then an overall composite rating is assigned

2  to the bank.

3  Q    Okay.  And those six components, is that what CAMELS is

4  an acronym for?

5  A    Yes.

6  Q    Okay.  And what are those six components?

7  A    Capital, Asset quality, Management, Earnings, Liquidity

8  and Sensitivity to market risk.

9  Q    Okay.  And as part of an exam, would examiners ask to

10  look at certain loans?

11  A    Yes.

12  Q    Do they look at every single loan that the bank has?

13  A    No, we sample them.

14  Q    And is part of the examination to look at what the

15  purpose of the loan is?

16  A    Yes.

17  Q    And is that important?

18  A    Yes, it is.

19  Q    Okay.  And why?

20  A    Well it might make a difference as to how the loan is

21  risk weighted, for example.

22  Q    Okay.  Now in the time that you were the case manager,

23  was it ever brought to your attention that any purpose for any

24  loan that was being reviewed was to purchase Nova stock?

25  A    No.

1   Q    If such an example had come up during any of the exams,

2   would that require additional review?

3   A    Yes.  We would likely review that.

4   Q    Now was the purpose of an exam to then match up loans to

5   investors, was that part of the exam?

6   A    No.

7   Q    You mentioned that there are obviously six areas where a

8   bank is examined, and one of them is in the CAMELS rating, is

9   the C for Capital?

10  A    Right.

11  Q    And what is Capital?

12  A    Capital is funds that are invested into the bank and they

13  protect the bank against any losses they might have.

14  Q    And are there certain levels that in which a bank is --

15  has their capital levels determined?

16  A    Yes, at the time there were three ratios.  Three primary

17  ratios, and there's minimums for each one.

18  Q    Okay.  And were there sort of descriptions for meeting

19  those ratios, such as well capitalized, adequate --

20  A    Yes.

21  Q    -- capitalized, and under capitalized?

22  A    Yes.

23  Q    Okay.  And so those words also matched up to certain

24  ratios that the bank had to maintain?

25  A    Yes.

1  Q     Now in addition to examinations that the FDIC would

2  periodically do, as well as the Pennsylvania Department of

3  Banking on Nova Bank, or for any financial institution, are

4  they also -- are there also -- is there also self-reporting

5  requirements?

6  A     Yes.  There is.

7  Q     And what does that mean, that may be self-explanatory,

8  but what does self-reporting mean?

9  A     It's a report that they submit to us quarterly.

10  Q     Okay.

11  A     And it has various, you know, different numbers outlined.

12  Q     Okay.  And in this -- what are these self-reports called?

13  A     It's called a call report.

14  Q     Okay.  And is that the bank actually putting forth the

15  information that it has?

16  A     Yes.

17  Q     And how often are call reports prepared by a bank?

18  A     Quarterly.

19  Q     Okay.  And when you say quarterly, can you tell the jury

20  please what those dates are?

21  A     Yes.  It's March 31st, June 30th, September 30th and

22  December 31st of every year.

23  Q     And are call reports kept in the normal course of

24  business at the FDIC, once they're prepared by a financial

25  institution?

Koch - Direct/Bar                                      71

1   A    Yes.

2   Q    And are -- is the information within a call report, some

3   of that information made public?

4   A    Yes.

5   Q    All right.  I'd like to show you what's been marked as

6   Government's Exhibits 8, 13, 54, 93 and 164.

7           MS. BARRY:  And, Your Honor, if I may bring up hard

8   copies to the witness?

9           THE COURT:  Yes.  Could you repeat those numbers?

10          MS. BARRY:  Yes, Your Honor.  Eight, 13, 54, 93 and

11  164.

12          THE COURT:  Thank you.

13  BY MS. BARRY:

14  Q    If you take a look at those exhibits, what is

15  Government's Exhibit 8?

16  A    It's the Nova Bank's call report for December 31st, 2008.

17  Q    And how about Government's Exhibit 13?

18  A    It's Nova Bank's call report for March 31st, 2009.

19  Q    How about Government's Exhibit 54?

20  A    It's the bank's call report for June 30th, 2009.

21  Q    And exhibit 93, what is that please?

22  A    The bank's call report for September 30th, 2009.

23  Q    And finally, Government's Exhibit 164 what is that,

24  please?

25  A    That's Nova Bank's call report for December 31st, 2009.

1          MS. BARRY:  Your Honor the Government would move for

2    the admission of Government's Exhibit 8, 13, 54, 93 and 164 at

3    this time.

4          MR. EGAN:  No objection.

5          THE COURT:  It is admitted.

6          MS. BARRY:  Okay.

7    BY MS. BARRY:

8    Q    And, again, these call reports are information -- contain

9    information that is made available to the public, is that

10   right?

11   A    Some of it, yes.

12   Q    Now in 2008, were you aware of the Trouble Asset Relief

13   Program?

14   A    Yes.

15   Q    And was the Trouble Asset Relief Program?

16   A    I was where the Government was injecting capital funds

17   into the bank, if they wanted them.

18   Q    Okay.

19   A    To help strengthen them.

20   Q    Okay.  And was that part of TARP, known as the Capital

21   Purchase Program?

22   A    Yes.

23   Q    Now do you know whether or not Nova Bank submitted a TARP

24   application to receive TARP money under the CPP?

25   A    Yes, they did.

1    Q    And approximately when did you become involved with

2    Nova's TARP application?

3    A    Towards the end.  I guess September -- well over the

4    summer and September -- the last part of the year, of '09.

5    Q    Okay.  And in 2008 and 2009, who was the bank president?

6    A     Brian Hartline.

7    Q    And who was your main points of contact regarding the

8    TARP application?

9    A    It was CFO, Jeff Hanuscin, and president Hartline.

10   Q    During the course of the TARP application process, was

11   there a time period where you were having more communication

12   with Mr. Hartline than Mr. Hanuscin?

13   A    Yes, towards the end.

14   Q    Okay.  And, again, when you say towards the end, are you

15   -- if the application as submitted in October of 2008, when

16   you say towards the end, you're talking about sometime from,

17   what, in 2009?

18   A    Yes.

19   Q    Okay.  Now did you -- were you the primary person

20   responsible for gathering information from Nova Bank that

21   would be considered for the TARP application?

22   A    Yes.

23   Q    And once you received -- well who told you what kind of

24   information was being requested from TARP, or the CPP council?

25   A    Well I had a counterpart in Washington, Chuck Hunter, and

Koch - Direct/Bar                                    74

1    he would tell me what they -- what kind of information they

2    needed.

3    Q    Okay.

4    A    And I would then contact the bank and obtain it.

5    Q    Okay.  And when you contacted the bank, who did you speak

6    with?

7    A    Either Mr. Hartline, Jeff Hanuscin, or sometimes Kim

8    Hartline.

9    Q    And who is Kim Hartline?

10   A    She's the bank's secretary.

11   Q    And is she also married to Mr. Hartline?

12   A    Yes.

13   Q    Now from the time that Nova's applications began to be

14   processed, do you know whether or not the CPP Council had

15   concerns about the application?

16   A    Yes, they did.

17   Q    Okay.  I'd like to show you what's been marked as

18   Government's Exhibit 10.

19           MS. BARRY:  And if this could please be displayed

20   just to the witness at this time?  And if we could just make

21   that a little larger for Ms. Koch to be able to see.  Okay.

22   BY MS. BARRY:

23   Q    Looking at Government's Exhibit 10, what is this

24   document?

25   A    This is where Chuck Hunter was relaying concerns that the

1    TARP Council had with the bank.

2    Q    Okay.  And so is this an email?

3    A    Yes.

4    Q    And let me ask you this, during -- when you work

5    currently and back in 2009, was email communication a normal

6    way that you conducted business?

7    A    Yes.

8    Q    And what is the date of this email?

9    A    February 9th, 2009.

10   Q    Okay.  And what is -- and, again, it's from Chuck Hunter?

11   A    Um-hum.

12   Q    And it's relating --

13              THE COURT:  Please say yes or no.

14              THE WITNESS:  Yes.

15              THE COURT:  Thank you.

16              THE WITNESS:  I'm sorry.

17   BY MS. BARRY:

18   Q    And it's -- the subject matter is Nova Financial

19   Holdings, Inc., Nova Bank in Pennsylvania business TARP

20   application.

21   A    Right.

22   Q    Is that the subject line?

23   A    Yes.

24              MS. BARRY:  Your Honor the Government would move for

25   the admission of Government's Exhibit 10.

Koch - Direct/Bar                                          76

1                MR. EGAN:  No objection.

2                THE COURT:  Admitted.

3                MS. BARRY:  Okay.  May it be published, Your Honor?

4                THE COURT:  Yes.

5     BY MS. BARRY:

6     Q    Now looking at this email from Chuck Hunter, and, again,

7     he's the person who is going to relay the information you

8     receive from the bank to the CPP Council, correct?

9     A    Yes.

10    Q    So he works for the FDIC too?

11    A    Yes.

12    Q    And looking at these -- looking at the first sentence,

13    what does he say to you?

14    A    (Reading)

15              "Capital levels throughout the organization --"

16    Q    No, no.  I'm sorry, the first sentence, if you could just

17    read that, please.

18    A    Oh.

19              "Treasury has a number of issues with Nova's TARP

20    application."

21    Q    Okay.  And it's, unfortunately, Treasury has some --

22    A    Unfortunately.

23    Q    Okay.  And then looking at the three bullet points, is it

24    fair to briefly summarize that the three areas they're

25    concerned about are capital levels, the lead bank asset

Koch - Direct/Bar                                      77

1    quality earnings and liquidity ratings, and the classified

2    asset ratios for both financial institutions?

3    A    Yes.

4    Q    And when they're talking about both financial

5    institutions, did you know at that time, or in and around that

6    time that Nova Bank had purchased another bank called

7    Pennsylvania Business Bank?

8    A    Yes.

9    Q    Okay.  So now the combination of these two banks has

10   raised concerns, is that fair to say?

11   A    Yes.

12   Q    Now once you receive this email in February -- on

13   February 9th of 2009, did -- what did you do?

14   A    I contacted the bank to see if they could give me updated

15   -- they wanted updated capital ratios and items like that.

16   Q    Okay.  So you contacted the bank, correct?

17   A    Yes.

18   Q    And who did you speak with about these initial concerns

19   in February of 2009?

20   A    I believe it was Brian Hartline.

21   Q    Okay.  And I'd like to show you now what's been marked as

22   Government's Exhibit 11.

23           MS. BARRY:  And if this would just be shown to the

24   witness at this time?

25   BY MS. BARRY:

1    Q    Looking at Government's Exhibit 11, what is this

2    document?

3    A    It is where the bank is giving me more information to

4    relay to Washington so they can relay it to the TARP Council.

5    Q    Okay.  Is this a series of emails?

6    A    Yes.

7    Q    Okay.  And, again, are these -- is this in response to

8    Mr. Hunter's February 9, 2009 email?

9    A    Yes.

10   Q    Okay.

11            MS. BARRY:  Your Honor, the Government would move

12   for the admission of Government's Exhibit 11.

13            MR. EGAN:  No objection.

14            THE COURT:  Admitted.

15   BY MS. BARRY:

16   Q    Okay.  And if we could just take a look at the second

17   email which is from you to Chuck Hunter, do you see that

18   portion of the --

19            MS. BARRY:  And, I'm sorry, Your Honor, may it be

20   published?

21            THE COURT:  Granted.

22            MS. BARRY:  Thank you.

23   BY MS. BARRY:

24   Q    Looking at that February 13th, 2009 email to Chuck

25   Hunter, it's that portion above there --

1   A    Right.

2   Q    -- do you see that?  And so what do you say in response

3   to his initial email?

4   A    That I got additional information that the council could

5   consider.

6   Q    And who did you get the additional information from?

7   A    Mr. Hartline.

8   Q    Okay.  And looking now at the body, or the second -- the

9   majority of the email, is this now the bullet point that was

10  from Mr. Hunter's original email, and then an explanation that

11  follows?  So, for example, under the bullet point, capital

12  levels throughout the organization, which was the -- in the

13  original Chuck Hunter email, is there now a response to that

14  particular concern?

15  A    Yes.  In the following paragraph after the bullet point.

16  Q    And, again, is this information that you put in as a

17  response, based on your conversation with Mr. Hartline?

18  A    Yes.

19  Q    Okay.  And when it discusses the capital, addressing the

20  capital level concerns, is there -- did Mr. Hartline tell you,

21  at least in paragraph -- I'm sorry, in the fourth sentence:

22          "The additional capital contributed to the banks was

23  enough to keep them both well capitalized and resulted in

24  12/31/08 tier one leverage."

25          And then it gives a number of ratios, all of which

1    appear to make the bank well capitalized, is that correct?

2    A    That's right.

3    Q    And that most of the capital was used to purchase

4    Pennsylvania Business Bank, correct?

5    A    Yes.

6    Q    And, again, if we can look now to the next bullet point

7    with "Lead asset quality earnings and liquidity ratings were

8    of concern."  Again, there's an explanation that's underneath

9    that bullet point, correct?

10   A    Um-hum.  Yes.

11   Q    And, again, who provided you with that information?

12   A    Mr. Hartline.

13   Q    And going further, to the third point, "The classified

14   asset ratios of both financial institutions were of concern."

15   Again, is there an explanation addressing the concerns that

16   the CPP Council has?

17   A    Yes.

18   Q    Okay.  And who provided you with that information?

19   A    Mr. Hartline.

20   Q    Okay.  And, again, you relayed this to Chuck Hunter in

21   order -- did you relay to Chuck Hunter, all of this

22   information?

23   A    Yes.

24   Q    Okay.  And what was your expectation by relaying it to

25   Mr. Hunter?

Koch - Direct/Bar                                    81

1   A      That he would report it to the council, the TARP Council.

2   Q      Now at the time that the TARP application was pending,

3   was there something that you became aware of that happened at

4   the holding company, Nova's holding company, or parent company

5   Nova Financial Holdings, that affected the bank's capital?

6   A      Yes.

7   Q      And what happened to Nova's well capitalized status?

8   A      Well there was a bunch of securities which had fallen

9   below investment grade, which required them to hold more

10  capital.

11  Q      Okay.  And because they had to hold more capital, what

12  happened to the capital levels at the bank?

13  A      They fell below well capitalized.

14  Q      Okay.  So did the bank then go from well capitalized to

15  adequately capitalized as the TARP application was pending?

16  A      Yes.

17  Q      And did the bank actually have to reflect this change in

18  capital in its March 2009 call report?

19  A      Yes.

20  Q      And was the fact that the bank had gone from well

21  capitalized to adequately capitalized, going to affect it's

22  TARP application?

23  A      Yes.  Because they were only giving money out to banks

24  that were well-capitalized before they got the additional

25  capital funds.

1  Q    Did you have conversations with Mr. Hartline about the

2  fact that the bank had fallen from well-capitalized to

3  adequately capitalized?

4  A    Yes.

5  Q    And was he concerned?

6  A    Yes.

7  Q    And was he concerned about that fact because he knew it

8  may affect their TARP application?

9              MR. EGAN:  Objection.

10             THE COURT:  Sustained.

11 BY MS. BARRY:

12 Q    Did he -- did Mr. Hartline tell you whether or not he

13 knew that the -- that the new capital levels would affect his

14 TARP application?

15             MR. EGAN:  Same objection.

16             THE COURT:  Overruled.  You may answer that

17 question, ma'am.

18             THE WITNESS:  Okay.  Thank you.  Yes.

19 BY MS. BARRY:

20 Q    So he knew?

21 A    Yes.

22 Q    Did Mr. Hartline advise you about the bank's response to

23 the fact that it had fallen to only adequately capitalized

24 versus well capitalized?

25 A    Well he said he had a large investor that could put in an

1    additional 15 million -- minimum of 15 million to bring the

2    bank back to well capitalized.

3    Q    Okay.  Now I'd like to show you what's been marked as

4    Government's Exhibit 21.  And what is Government's Exhibit

5    21?

6    A    It's a May 26, 2009 email from Chuck Hunter to myself

7    asking for additional information on the sub investment

8    quality securities, and a status of the bank's efforts to

9    raise capital.

10   Q    Okay.  So when Mr. Hartline told you that one of the ways

11   they could address the bank's capital was a large investor, is

12   that fair to say?

13   A    Yes.

14   Q    Okay.  And so did you relay that information to Mr.

15   Hunter?

16   A    Yes.

17   Q    Had Mr. Hunter -- well let me ask you this.  Looking at

18   Government's Exhibit 21, does that first mail at the bottom

19   from you to Mr. Hunter, is that you relying the information

20   about the investor, this potential investor Mr. Hartline told

21   you about?

22   A    Some general information, yes.

23   Q    Okay.

24          MS. BARRY:  Your Honor the Government would move for

25   the admission of Exhibit 21.

1              MR. EGAN:  No objection.

2              THE COURT:  Admitted.

3              MS. BARRY:  May it be published, sir?

4              THE COURT:  It may.

5              MS. BARRY:  Thank you.

6    BY MS. BARRY:

7    Q    So if we take a look at that -- the bottom email in this

8    email chain, what do you write to Mr. Hunter on May 26, 2009?

9    A    That Mr. Hartline had relayed that he had a large

10   investor who could -- who was interested in investing $15

11   million into the bank.

12   Q    Well do you ask whether or not they need -- "how are you

13   with the TARP application," is that what you write?

14   A    Yes.  And if they need anything else.

15   Q    Okay.  And, by the way, can you read what you say?

16   A    (Reading)

17            "By the way, president Hartline left me a message

18   that they have an individual who wants to invest 15 million

19   into the bank.  Unfortunately, it's not in escrow yet."

20   Q    Now at this point, they have fallen to -- their capital

21   levels had changed?

22   A    Yes.

23   Q    Okay.  And so once you relay that information to Mr.

24   Hunter, does he respond to your email later that same day on

25   May 26, 2009?

1    A    Yes.  He outlined some additional information we would

2    need.

3    Q    Okay.  And if you could, the second bullet point, would

4    you read that, please?

5    A    (Reading)

6         "He was looking for the status of the bank's efforts

7    to raise capital, including as much information as possible on

8    the likely investors, the type of instruments likely to be

9    issued, et cetera?"

10   Q    And looking at the next sentence, what does he say?  If

11   you can read it.

12   A    (Reading)

13        "I will phone you or email you tomorrow with more

14   specifics.  But in the interim it would be in the bank's best

15   interest to provide as much information on the $15 million

16   investor as possible."

17   Q    And can you just read the rest of the email there?

18   A    Sure.

19        "If we can present strong evidence that the bank has

20   attracted that much in private capital, all other issues

21   become more manageable.  For example, with an additional $15

22   million in capital, proper risk weighing of the seven

23   investments would not cause a capital deficiency, the

24   adversely classified ratio could decline, earnings ability to

25   service TARP plus TPS could become less of an issue, et

1    cetera."

2    Q    Okay.  So to the extent that Mr. Hartline knew that TARP

3    funding would not be given to a bank that was not well

4    capitalized, this $15 million was seen as a solution?

5              MR. EGAN:  Objection.

6              THE COURT:  Sustained.

7    BY MS. BARRY:

8    Q    Was this $15 million -- did he tell you that this was a

9    solution to the fact that they had become only adequately

10   capitalized?

11             MR. EGAN:  Objection.  It's still leading, Your

12   Honor.

13             THE COURT:  Sustained.  Counsel, please.

14   BY MS. BARRY:

15   Q    What did Mr. Hartline tell you about this $15 million?

16   A    He thought it would bring them back to well capitalized.

17   Q    Okay.  And according to this email from Mr. Hunter, that

18   was very important, because any concerns from CPP council

19   could be addressed?

20   A    Yes.

21   Q    Once  Brian Hartline told you that there was this

22   potential investor that would give -- invest at least $15

23   million into the bank, did you advise him of any steps that

24   needed to be taken by the bank in order for him to make that

25   kind of investment?

1    A    Oh, yes, they had to file a change in control application

2    with the Fed and with the State of Pennsylvania.

3    Q    And did you tell Mr. Hartline that they needed to do

4    that?

5    A    Yes.

6    Q    Now I'd like to show you what's been marked as

7    Government's Exhibit 22.

8           MS. BARRY:  And if this would just be shown to the

9    witness, please?

10   BY MS. BARRY:

11   Q    And what is Government's Exhibit  22?

12   A    It's a May 26, 2009 email from Mr. Hartline to myself.

13   Q    And is that email in response to an email that you had

14   sent earlier that day?

15   A    Yes.

16   Q    Okay.

17          MS. BARRY:  Your Honor, the Government moves for the

18   admission of Exhibit 22.

19          MR. EGAN:  No objection.

20          THE COURT:  Admitted.

21          MS. BARRY:  May it be published?

22          THE COURT:  Yes.

23          MS. BARRY:  Thank you.

24   BY MS. BARRY:

25   Q    Now if we could focus on the first email that you sent,

Koch - Direct/Bar                                        88

1   I'm sorry, the first email that Ms. Koch sent.  So this is May

2   26, 2009, right?

3   A    Yes.

4   Q    Okay.  And this is to  Brian Hartline?

5   A    Yes.

6   Q    And who is copied on this email?

7   A    Kim Hartline.

8   Q    And would you please read the first two paragraphs?

9   A    (Reading)

10          "Hi, Mr. Hartline, I received your message today.

11  This is great news of a potential private investor.  If the

12  investment is in the holding company, then you would not need

13  to send an application to the FDIC, but the Federal Reserve

14  should get a change in control application."

15          Continue?

16  Q    Yes, please.

17  A    (Reading)

18          "I spoke to Chuck Hunter, the person in D.C. who is

19  presenting your application to the TARP Committee.  He

20  indicated that it would be in your best interest to forward

21  whatever information you could pass along about the private

22  investor would be helpful.  However, you may not be at the

23  point where you feel comfortable sharing that information."

24  Q    Okay.  And how about that last sentence on this page?

25  A    (Reading)

1          "Chuck informed me that he will not be going to

2    committee this week as planned, but early next week."

3    Q    And so this information -- were you gathering this

4    information so that Mr. Hunter could present everything to the

5    CPP Council related to Nova Bank and addressing all of its

6    concerns?

7    A    Yes.

8    Q    And so did Mr. Hartline then respond to this email from

9    you?

10    A    Yes.

11    Q    Okay.  And let's take a look at what Mr. Hartline told

12    you.  Okay.  And could you please read the first couple of

13    sentences of that first full paragraph?

14    A    (Reading)

15          "Good afternoon, Lisa.  Thanks for your response.

16    Please find attached the personal financial statements for the

17    potential investor.  I am providing you this information so

18    you understand this investor is real and can offer this level

19    of investment.  I would prefer this information go no further

20    until I get a firm understanding how much he will invest."

21          Continue?

22    Q    Sure.

23    A    (Reading)

24          "We are speaking with the Fed and State Banking

25    Department on the process to get him approved.  After we

1    explain everything involved in the process, he may change his

2    mind and stay under 9.9 percent."

3    Q    Okay.  And then in the next sentence, does he say his

4    original thought was to invest 15 million, which would take

5    him to approximately a 16.5 percent ownership?

6    A    Yes.

7    Q    Okay.  And so with this email, did he attach information

8    about this potential investor?

9    A    I believe so.

10   Q    Okay.  And if we could take a look at the third page of

11   Exhibit 22?  And who -- what information did he attach?

12   A    Biography on Mr. George Levin.

13   Q    Okay.  And so is Mr. Levin now being identified as the

14   investor who is going to make this $15 million investment?

15   A    Yes.

16   Q    Okay.  And does he also attach Mr. Levin's financial

17   statements?

18   A    I believe so.

19   Q    Okay.  And if we look at the last page, that's his -- Mr.

20   Levin's financial statements, and it indicates total assets of

21   approximately $364,334,369.39?

22   A    Yes.

23   Q    Okay.  Do you relay this information to Chuck Hunter?

24   A    Yes.

25   Q    And what is your expectation that Mr. Hunter is going to

1   do with this information?

2   A    That he would share it with the TARP Council.

3   Q    Okay.  Now I'd like you please to take a look at what's

4   been marked as Government's Exhibit 28.  Do you have that in

5   front of you?

6           MS. BARRY:  If you could please show that just to

7   the witness?

8   BY MS. BARRY:

9   Q    And what is Government Exhibit 28?

10  A    It is an email I believe from Jeff Hanuscin who was the

11  CFO of Nova Bank.

12  Q    Okay.  And who was it to?

13  A    Me.

14  Q    And when is it dated?

15  A    June 2nd, 2009.

16  Q    And what is it regarding?

17  A    Their investments --

18  Q    I'm sorry, in the subject --

19  A    TARP application.

20          MS. BARRY:  Your Honor, the Government moves for the

21  admission of Government's Exhibit 28.

22          MR. EGAN:  No objection.

23          THE COURT:  Admitted.

24          MS. BARRY:  May it be published, Your Honor?

25          THE COURT:  Yes.

1    BY MS. BARRY:

2    Q    All right.  Looking at this memo to you from Jeff

3    Hanuscin, in the first paragraph can you read what he writes

4    to you?

5    A    That they've analyzed their investment --

6    Q    Excuse me.  I'm sorry.  Can you just read that first

7    paragraph, please?

8    A    (Reading)

9         "Per your request, we have analyzed our investment

10   portfolio as of March 31st, 2009 for direct credit substitutes

11   for investments not eligible for the ratings based approach.

12   Item one.  Based on the results, it appears that Nova has

13   understated its March 2009 risk weighted assets by 58.4

14   million.  Therefore, reducing risk weighted capital to 8.82

15   percent from 10.24 percent as reported on the call report."

16   Q    Okay.  Can you continue reading the next paragraph?

17   A    (Reading)

18        "Management believes the adequate capital level

19   should be short lived with the anticipated private capital

20   raised projected to close prior to June 30th, 2009.

21   Currently, an individual has expressed interest to invest $15

22   million in Nova Financial Holdings.  The investment is

23   dependent upon regulatory approval of his investment, the

24   Treasury Department approving Nova to sell preferred stock

25   through the TARP program, and the approval of the DVFG

1    transaction."

2    Q    Okay.  So, again, as -- does Mr. Hanuscin tell you that

3    the bank will address the adequately capitalized levels with

4    this private investor?

5              MR. EGAN:  Objection.

6              THE COURT:  Counsel, could you rephrase?

7    BY MS. BARRY:

8    Q    Looking at the first sentence, does Mr. Hanuscin tell you

9    management believes the "adequate capital" levels should be

10   short lived with the anticipated private capital raised

11   projected to close prior to June 30, 2009?"

12   A    Yes.

13   Q    And currently an individual has expressed interest to

14   invest $15 million in Nova Financial Holdings?

15   A    Yes.

16   Q    And, again, at this point, you are aware of who that

17   investor is, correct?

18   A    Yes.

19   Q    And who is the investor?

20   A    George Levin.

21   Q    Okay.  Now in this memo, Mr. Hanuscin provides several

22   attachments, correct?  If you need the hard copy this is --

23   I'm happy to provide it to you.

24   A    No, I don't need it.  Thanks.  Yes, he does.

25   Q    Okay.  Let's look at the -- let's just go back to that

1    first page and read the second to last sentence.  Where it

2    starts, "I enclose."

3    A    (Reading)

4              "Enclosed for your review are copies of DVFG's first

5    quarter unaudited financial statements to reflect that they

6    continue to perform well in this economic environment.  I also

7    enclose a copy of a letter from Ballamor Capital Management

8    which sets forth their capital raising intentions."

9    Q    Okay.  And if we could then go to the second page of

10   Government's Exhibit 28.  And who is this letter from?

11   A    Ballamor Capital Management.

12   Q    And who is this letter to?

13   A    To Mr. Hartline.

14   Q    Okay.  And at the end, who signs this letter?

15   A    Barry Bekkedam.

16   Q    And had you -- and did you know who Barry Bekkedam was?

17   A    At one time I believed he was a director of the holding

18   company.

19   Q    Okay.  Now looking at the letter that Mr. Hanuscin

20   provides to you, and can you read after "Dear Brian" what that

21   first paragraph says?

22   A    (Reading)

23             "I would like to confirm that one or more investment

24   advisory clients of Ballamor Capital Management, Inc., are

25   prepared to invest 15 million into Nova Financial Holdings,

1   Inc. initially, and to broaden that investment up to $40

2   million in 2009."

3   Q    Okay.  Can you read the second paragraph, please?

4   A    Our investors have committed to us that they wish to

5   participate in the Nova investment at the present time,

6   provided that Nova's current application for TARP funding is

7   approved and the pending DVFG transaction is also approved.

8   We feel the proposed transactions will provide additional

9   capital and significant ongoing revenue to make the investment

10  in Nova an anticipated success."

11  Q    And to the extent that Ballamor has this $15 million to

12  invest in Nova Financial Holdings, does Mr. Bekkedam represent

13  when they hope to have the funds in escrow?

14            MR. EGAN:  Object to the form of the question,

15  Ballamor.

16            THE COURT:  Sustained.

17  BY MS. BARRY:

18  Q    If we could go to the end of this letter from Mr.

19  Bekkedam, please?

20  A    Okay.

21  Q    And what does -- can you just read the last part of the

22  last sentence -- actually, just read that whole sentence,

23  please, the last sentence, "I will keep you."

24  A    (Reading)

25            "I will keep you apprised of our progress,

1    understanding that we are shooting to have funds in the escrow

2    account by June 30th, 2009."

3    Q    Okay.  And very -- yours truly, and what -- who signs it?

4    A    Barry Bekkedam.

5    Q    Okay.  And who's copied on this letter?

6    A    Larry Rovin.

7    Q    Okay.  And the information that Mr. Hanuscin provides to

8    you, what do you do with it?

9    A    I provide it to Chuck Hunter.

10   Q    And what is your expectation on providing this

11   information to Chuck Hunter?

12   A    That he's going to present it to the TARP Council.

13   Q    Okay.  And I'd like you to look at what's been marked as

14   Government's Exhibit 29, please.  What is Government's Exhibit

15   29?

16   A    It's an email from myself to Chuck Hunter on June 4th,

17   2009.

18   Q    Okay.  And then is there also a reply to your email?

19   A    Yes.

20   Q    Okay.

21        MS. BARRY:  Your Honor, the Government moves for the

22   admission of Government's Exhibit 29.

23        MR. EGAN:  No objection.

24        THE COURT:  Admitted.

25        MS. BARRY:  May it be published?

1         THE COURT:  Yes.

2    BY MS. BARRY:

3    Q    If we take a look please at the email that you sent to

4    Mr. Hunter.  And can you read that first paragraph, what do

5    you write?

6    A    (Reading)

7              "Chuck, I spoke with Brian Hartline he just wanted

8    to reiterate that despite the setback with the risk based

9    capital the bank is moving forward with a capital raise.

10   They've explained the set back to the large $15 million

11   investor, and he is still interested in making the

12   investment."

13   Q    Okay.  And does he also indicate that they will amend

14   their 3/31/09 call report?

15   A    Yes.

16   Q    And does Mr. Hunter then respond to this email?

17   A    Yes.

18   Q    Okay.  And what -- what does he say to you?  If you could

19   just read it, it's a pretty short email.

20   A    (Reading)

21             "Thank you, Lisa.  That is more good news about

22   reducing the broker deposits, anyway.  I'm hoping to be

23   familiar with the bank's capital calculations after adjusting

24   for those investments accounted for as direct credit

25   substitutes.  That way I can discuss what their capital ratios

Koch - Direct/Bar                                      98

1    will be after they get the 15 million.  So if you can please

2    have the bank send whatever -- what they used to calculate the

3    ratios they provided yesterday."

4    Q    Okay.  If we go back to -- and so Mr. Hunter's responding

5    to what you wrote to them?

6    A    Yes.

7    Q    Okay.  And looking at your email again, and after

8    providing this information about what you talked about with

9    Mr. Hartline, what do you write in the last sentence?

10   A    (Reading)

11           "Based on the above, I think this institution would

12   make a good candidate for a TARP approval, contingent on them

13   raising capital, since a capital raise is presently in the

14   works."

15   Q    Okay.  And did you have conversations with Mr. Hartline

16   about a potential contingency on approval for TARP?

17   A    Yes.

18   Q    Okay.  And I'd like you to take a look now at

19   Government's Exhibit 31.  Again, you had had and not -- this

20   isn't related to this particular exhibit, but you had had --

21   did you have conversations with Mr. Hartline about a

22   contingency for the TARP application -- for the TARP approval?

23   A    Yes.

24   Q    Okay.  And did these discussions come about based on Mr.

25   Hartline's representations to you that there was an individual

1    who could inject $15 million of capital?

2                MR. EGAN:  Objection to leading.

3                THE COURT:  Sustained.

4    BY MS. BARRY:

5    Q    Was -- how did those conversations come about with

6    respect to a contingency?

7    A    Because they had an investor lined up that was going to

8    put 15 million into the bank.

9    Q    Okay.  And if you take a look at Government's Exhibit 31,

10   what is Government's Exhibit 31?

11   A    It's an email from myself to my boss Julie Howland.

12   Q    Okay.  And what are you discussing with Ms. Howland?

13   A    That Chuck got approval for Nova Bank's TARP application,

14   provided they raise 15 million in capital.

15   Q    All right.

16               MS. BARRY:  Your Honor, the Government would move

17   for the admission of Government's Exhibit 31.

18               MR. EGAN:  No objection.

19               THE COURT:  It's admitted.

20               MS. BARRY:  May it be published, Your Honor?

21               THE COURT:  Yes.

22               MS. BARRY:  Thank you.

23   BY MS. BARRY:

24   Q    All right.  Looking at this portion of the email, if you

25   could -- now what is the date of this email?

1    A    June 10th, 2009.

2    Q    And if you could just read, it's a short email, what you

3    say to your boss?

4    A    (Reading)

5         "Hi, Julie.  I spoke to Chuck Hunter.  He presented

6    Nova's application for TARP to the committee today.  They

7    voted to approve with a contingency that the bank raise a

8    minimum of $15 million in capital.  Chuck indicated it still

9    has to go through a review process at the Treasury, but it's

10   likely to get the nod."

11   Q    Okay.  And if we look at the email above that one, what

12   does -- does Ms. Howland respond?

13   A    (Reading)

14        "Good news.  Not sure what Nova will say."

15   Q    Okay.  And when -- what do you understand her to mean?

16   A    Whether they could meet the contingency.

17   Q    Okay.  And do you respond to that email?

18   A    Yes.

19   Q    And what do you say in response to it?

20   A    (Reading)

21        "They will be fine with it.  As I was gathering

22   additional information for Chuck, I spoke to Mr. Hartline

23   about the possibility of Chuck presenting it as a contingency

24   if it looked like it was going to be declined, and they were

25   okay with that, because they are raising capital as we speak,

1   with one large investor wanting to invest at least 15

2   million."

3   Q    Okay.  Did you have any conversations with Mr. Hartline

4   after CPP Council had approved with the $15 million

5   contingency?

6   A    I probably waited for them to get the final approval,

7   because it had to go through one more layer.

8   Q    Okay.  So you had no -- once you knew that CPP Council

9   had agreed to the contingency, did you have any conversations

10  with Mr. Hartline about it?

11  A    Yes.  I assume -- I'm sure I did.

12  Q    Well did Mr. Hartline keep you updated on whether or not

13  any of the $15 million for that contingency was being raised?

14  A    Yes.

15  Q    Okay.  So what did he tell you about raising that $15

16  million?

17  A    Well he said that they had 5 million.

18  Q    Okay.

19  A    That was put in escrow.

20  Q    Okay.  And when did he tell you that the bank had

21  received $5 million of the 15 million contingency?

22  A    I'm not sure of the date.

23  Q    Okay.  Well let me show you what's been marked as

24  Government's Exhibit 57.  And what is Government's Exhibit

25  57?

1   A    It's letting Chuck know that they got $5 million in

2   capital.

3   Q    Okay.

4   A    On June 30th, '09.

5          MS. BARRY:  Your Honor, the Government moves for the

6   admission of Government's Exhibit 57.

7          MR. EGAN:  No objection.

8          THE COURT:  Admitted.

9          MS. BARRY:  May it be published, sir?

10         THE COURT:  Yes.

11  BY MS. BARRY:

12  Q    Okay.  So this is from you?

13  A    Yes.

14  Q    And to Chuck Hunter?

15  A    Yes.

16  Q    And dated Thursday, July 2nd, 2009, correct?

17  A    Yes.

18  Q    All right.  And what's the one line?

19  A    (Reading)

20         "Chuck, I just wanted to let you know that Nova got

21  a $5 million capital infusion on June 30th, '09."

22  Q    Okay.  And what is your expectation of giving this

23  information to Mr. Hunter?

24  A    That he would relay it to the TARP Council.

25  Q    Okay.  Because -- because there was a $15 million

1    contingency?

2              MR. EGAN:  Objection.

3              THE COURT:  Sustained.

4    BY MS. BARRY:

5    Q    Well why would you -- why would he relay it to TARP?

6    A    Well, you know, they were getting the 15 million, and I'm

7    not sure, but the 5 million may have put them back above well

8    capitalized.

9    Q    Okay.  So --

10   A    I don't remember.

11   Q    But Mr. Hartline is letting you know that, that they

12   raised 5 million?

13             MR. EGAN:  Objection.  Letting know what?

14             MS. BARRY:  That he raised -- that the bank had

15   raised $5 million.

16             THE WITNESS:  Yes.

17   BY MS. BARRY:

18   Q    Okay.  When Mr. Hartline told you that the bank had

19   raised $5 million as of June 30th, 2009, did he ever tell you

20   that any of the $5 million was borrowed?

21   A    No.

22   Q    Did he ever tell you that any of the $5 million of this

23   new capital was money borrowed from the bank?

24   A    No.

25   Q    June 30, 2009, is that the end of a quarter?

1    A     Yes.

2    Q     And so if they could report additional capital by the end

3    of the quarter, would that effect the call report?

4              MR. EGAN:  Objection.

5              MS. BARRY:  She's an FDIC employee.

6              THE COURT:  I'll overrule it.

7              MR. EGAN:  It's still leading, Your Honor.

8              THE COURT:  I understand.  Overruled.

9              MS. BARRY:  I'll rephrase, Your Honor.  I'm happy to

10   do that.

11             THE COURT:  All right.

12   BY MS. BARRY:

13   Q     Is -- what is the -- what's significant about the date,

14   June 30th?

15   A     Because it's the quarter end.

16   Q     Okay.  And in previous emails, had it been indicated that

17   Nova Bank was hoping to get the $15 million, or to be well

18   capitalized by June 30th?

19   A     Yes.

20   Q     Okay.  Is June 30th, that is the end of a quarter, also a

21   time when Nova Bank would be filing its call reports?

22   A     Yes.

23   Q     And, again, are the call reports information -- some of

24   the information from the call reports made public so that

25   individuals could look up the state of Nova Bank?

1    A    Yes.

2              MS. BARRY:  May I have a moment, Your Honor?

3              THE COURT:  Sure.

4         (Pause)

5    BY MS. BARRY:

6    Q    If the -- I had asked you if Mr. Hartline told you that

7    any of this $5 million, whether it was borrowed, or borrowed

8    from the bank, and he never told you that, did he?

9    A    No.

10   Q    Okay.  If he had told you that, is that something you

11   would have told Mr. Hunter?

12             MR. EGAN:  Objection.

13             THE COURT:  Just don't, please -- sustained.

14   BY MS. BARRY:

15   Q    Any information that Mr. Hartline gave you related to

16   this $5 million, would you have forwarded that information to

17   Mr. Hunter?

18   A    Yes.

19   Q    All right.  If we could now take a look at Government's

20   Exhibit 61.

21             And what is Government's Exhibit  61?

22   A    It's an email from my boss Julie Howland to myself.

23   Q    Okay.  And is this a series of emails?

24   A    Yes.

25   Q    Okay.  And are you asked for information based on these

Koch - Direct/Bar                                        106

1    series of emails, in the second email?

2              If you'd like to look at the paper copy with

3    multiple pages, I'm happy to show it to you.

4    A    No.  I guess they were -- my boss was asking me the

5    status of the capital raise.

6    Q    Okay.  The capital raise at Nova?

7    A    Yes.

8    Q    Okay.

9              MS. BARRY:  Your Honor, the Government moves for the

10   admission of Exhibit 61.

11             MR. EGAN:  Your Honor, may we have a sidebar on that

12   issue?

13             THE COURT:  Surely.

14        (Sidebar Conference)

15             THE COURT:  Yes, sir.

16             MR. EGAN:  Your Honor, my objection to this is that

17   this is a -- there's series of emails that she's not on.  It

18   goes on for quite some time actually, a couple of pages.

19             THE COURT:  You said that she's not on.

20             MR. EGAN:  She's not on.  Not only --

21             THE COURT:  Ms. Barry is not -- hold on, let me

22   understand what you're saying, she's not on.

23             MR. EGAN:  Ms. Koch.

24             THE COURT:  Okay.

25             MR. EGAN:  So there's a series of emails.  She comes

Koch - Direct/Bar                           107

1    up at the last -- she gets a couple of these emails.  But

2    there's one from (inaudible) to Mr. Baxter, one from Ms.

3    Course to Mr. Baxter.  One from Mr. Glugert to Ms. Course.

4    These are not emails that go to her.

5              Your Honor, there's been no indication that these

6    emails are going to her, and we would object to them being --

7    this exhibit.

8              MS. BARRY:  Your Honor, she -- it's an email string

9    where they have put her on an email to respond, and so the

10   email contains all of those emails.  I'm not going to go into

11   all of the emails.  I'm going to go to what she responded.

12             MR. EGAN:  I still have the same objection to the

13   rest of those emails coming in without these witnesses being

14   available for us to cross on what those subjects were.

15             UNIDENTIFIED SPEAKER:  I don't have any objection to

16   what (inaudible).

17             THE COURT:  I would suggest that ultimately, in the

18   event the jury needs to see these things, that you redact it

19   in impertinent part, because they certainly are competent

20   evidence in terms of this witness.

21             MR. EGAN:  Absolutely, Your Honor.

22             MS. BARRY:  Okay.

23             THE COURT:  We'll do that in the event we need to.

24   Let me just ask you one more question, I'm sorry.  It's 12:20

25   now, how much more do you have to go with this witness?

1          MS. BARRY:  We have a little bit more to go.  But I

2     thought I was just coming to a natural end after about the

3     next two emails.  And I'll just indicate to you, and it will

4     be about 12:30 I think when we stop.

5          THE COURT:  Thank you.

6        (Sidebar Ended)

7          THE COURT:  If you hear a stomach growling, it's

8     mine, don't worry about it.  We'll get lunch very shortly.

9          MS. BARRY:  I'll try to make this quick.  If we,

10    Your Honor, may we publish just the first page of Government's

11    Exhibit  61.

12         MR. EGAN:  No objection, Your Honor.

13         THE COURT:  Granted.

14    BY MS. BARRY:

15    Q    And if we could just focus in on your email, which is

16    that second email.

17    A    Okay.

18    Q    And you're writing to Bill Baxter?

19    A    Yes.

20    Q    And whose Bill Baxter?

21    A    He was the Washington office representative in charge of

22    the TARP Program.

23    Q    Okay.  And so what do you write to Mr. Baxter?

24    A    (Reading)

25         "I was out sick most of the week and Julie sent this

1   forward yesterday regarding Nova's TARP application.  I just

2   wanted to clarify that the bank did receive a $5 million

3   capital injection on June 30th.  I believe it was from the

4   large investor, I'm trying to clarify that now.  I will

5   forward details when I receive them."

6   Q    Okay.  And looking at Government's 61A.  Do you follow up

7   with a confirmation on the information you received?

8   A    Yes, Mr. Baxter.

9            MS. BARRY:  And, Your Honor, the Government moves

10  for Government's Exhibit 61A.

11           MR. EGAN:  No objection.

12           THE COURT:  Granted.

13  BY MS. BARRY:

14  Q    So looking at Government's Exhibit 61A, and that's the

15  same day July 17, 2009?

16  A    Yes.

17  Q    Okay.  And what do you write?

18  A    (Reading)

19           "Hi Bill, I did confirm with the bank that Mr.

20  Levin, the large investor, is still interested in making the

21  investment.  He did make the bulk of the $5 million

22  investment, which occurred on June 30th, '09.  He is committed

23  to a total of 15 million.  He's waiting for the bank to get

24  approval for TARP before he makes his remaining $10 million

25  investment.  The capital will be is to bring the bank back to

Koch - Direct/Bar                                                110

1    well capitalized and for future growth plans."

2    Q    And so who did you speak -- did you speak with anyone at

3    Nova Bank in order to confirm this -- the information related

4    to Mr. Levin and the $5 million he put in as of June 30th,

5    2009?

6    A    Yes.  I would have spoken to the bank.

7    Q    And who did you speak to?

8    A    I don't remember, it may have been Brian or Jeff.

9    Q    Okay.  So -- and I'd like you now to take a look at

10   what's been marked as Government's Exhibit 62.  What is

11   Government's Exhibit 62?

12   A    It's an email from Kim Hartline to myself on July 17th,

13   2009, with a cc to Mr. Hartline.

14   Q    Okay.  And what is the subject?

15   A    Levin's subscription agreement.

16   Q    Is that the subject or the attachment?

17   A    Nova investor, I'm sorry.

18           MS. BARRY:  Your Honor, the Government moves for the

19   admission of Government's Exhibit 62.

20           MR. EGAN:  No objection.

21           THE COURT:  It's admitted.

22           MS. BARRY:  May it be published?

23           THE COURT:  Yes.

24   BY MS. BARRY:

25   Q    Okay.  Let's take a look -- again this is from Kim

1   Hartline?

2   A     Yes.

3   Q     Okay.  And what is her role as you understand it at the

4   bank?

5   A     She's Brian's secretary.

6   Q     Okay.  And is it dated July 17th, 2009, which is the same

7   date from the previous exhibit 61 and 61A?

8   A     I don't know.  I'd have to go back to it.

9   Q     Okay.

10          MS. BARRY:  If you could just go back to 61A for a

11  moment, please?

12  BY MS. BARRY:

13  Q     Okay.  What's the date?

14  A     Yes.  The same date.

15  Q     Same day?

16  A     July 17th.

17  Q     So you had spoken with Mr. Hartline on that day, correct?

18  A     I spoke with somebody from the bank.

19  Q     Okay.  And then you receive an email on that same day

20  from Mrs. Hartline?

21  A     Yes.

22  Q     And if you would please read what Mrs. Hartline says to

23  you in this email?

24  A     (Reading)

25          "Brian asked me to send you the attached copy of Mr.

1    Levin's subscription agreement, $5 million of his investment

2    was received by us on June 30th.  The balance of the

3    investment, 13 million, will be provided on Mr. Levin's

4    approval by the Fed and the Pennsylvania Department of

5    Banking, and our approval of TARP funds.  Even if the approval

6    is contingent on his capital, as previously discussed."

7    Q    Okay.  And so does she then, the second page is an

8    attachment of Mr. Levin's subscription agreement?  Is that

9    supposed to be what it is?

10   A    Yes.

11   Q    Okay.  And in this email, or in the subscription

12   agreement, does Mrs. Hartline tell you that any of the $5

13   million from George Levin that was received on June 30th, 2009

14   was borrowed?

15   A    No.

16   Q    Does she tell you in this email, or any attachment to

17   this email, whether or not the $5 million from George Levin

18   received on June 30th, 2009 was money that was borrowed from

19   the bank?

20   A    No.

21   Q    Up until this point, July 17, 2009, did anyone, Mr.

22   Hanuscin, Mr. Hartline, Mrs. Hartline, anyone from the bank

23   advise you that the $5 million investment from George Levin

24   received by the bank on June 30th, 2009 was borrowed?

25   A    No.

1   Q    Did anyone tell you that the money was borrowed from the

2   bank?

3              MR. EGAN:  Objection, asked and answered.

4              THE COURT:  Sustained.

5              MS. BARRY:  May I have a moment, Your Honor?

6              THE COURT:  Surely.

7        (Pause)

8   BY MS. BARRY:

9   Q    Was it important for you to know whether or not the money

10  was borrowed?

11             MR. EGAN:  Objection.

12             THE COURT:  Overruled.

13  BY MS. BARRY:

14  Q    You may answer.

15  A    Oh.  Okay.  Yes, that would be important.

16  Q    Okay.  Was it important for you to know whether any of

17  the money was borrowed from the bank?

18  A    Yes.

19  Q    Any information that you knew about the loan from -- or,

20  I'm sorry, the investment from Mr. Levin to the bank, would

21  you forward that to Chuck Hunter or someone in D.C.?

22  A    Yes.

23  Q    And do you know whether or not that information would be

24  used to assess the TARP application?

25             MR. EGAN:  Objection.

Koch - Direct/Bar                           114

1          THE COURT:  Overruled.

2          THE WITNESS:  Yes.

3          MS. BARRY:  Your Honor, at this point, I think it

4    would be a good time to take a break, if it's amenable to the

5    Court?

6          THE COURT:  All right.  We will reconvene at 1:45,

7    1:45 this afternoon.  Again, avoid any newspaper accounts,

8    television accounts, radio accounts, if they even exist.

9    Enjoy your lunch.  We'll see you at 1:45.  Thank you.

10         (Jury Exits)

11         THE COURT:  All right.  You may step down.  Watch

12   your step, please.

13         THE COURT:  Counsel, you may be seated.  And the

14   audience as well.  We're still in session.

15         MR. EGAN:  This will be brief, Your Honor.  The

16   repeated leading is reaching the point where I have to

17   interject continuously.  I don't want to be obstreperous in

18   front of the jury, but I would just ask that the Court say

19   something to the Government about it because --

20         THE COURT:  You just did.

21         MR. EGAN:  -- they know what they're doing.

22         MS. BARRY:  Thank you, Your Honor.

23         THE COURT:  All right.  Thank you.

24         MR. EGAN:  Thank you.

25         THE COURT:  All right.

1              (Court in recess 12:26 p.m. to 1:59 p.m.)

2                   THE COURT:  Are you ready?

3                   MR. EGAN:  Yes, Your Honor.

4                   MS. BARRY:  Your Honor, when the jury returns, we've

5     come to an agreement on certain exhibits, stipulations for the

6     voice mail messages that are going to be played this

7     afternoon.

8                   THE COURT:  All right.

9                   MS. BARRY:  So may I read those out to the jury

10    prior to returning to my direct examination?

11                  THE COURT:  Your pleasure.

12                  MS. BARRY:  Thank you.

13                  THE CLERK:  All rise.

14         (Jury Enters)

15                  THE COURT:  Good afternoon.

16                  JURORS:  Good afternoon.

17                  THE COURT:  Counsel, you may proceed.

18                  MS. BARRY:  Thank you, Your Honor.  The parties have

19    reached the following stipulations.  That Government's Exhibit

20    200 is a voice mail message received on August 19th, 2009 at

21    5:38 p.m.  That Government's Exhibit 201 is a voice mail

22    message received on December 14th, 2009 at 2:17 p.m.  That

23    Government's Exhibit 202 is a voice mail message received on

24    December 15th, 2009 at 9:31 a.m.  That Government's Exhibit

25    203 is a voice mail received on December 15, 2009 at 1:58 p.m.

Koch - Direct/Bar                           116

1   That Government's Exhibit 204 is a voice mail message received

2   on December 15th, 2009 at -- also at 1:58 p.m.  And that

3   Government's Exhibit 205 is a voice mail message received on

4   December 16, 2009 at 4:30 p.m.

5           THE COURT:  So stipulated?

6           MR. EGAN:  Yes, Your Honor.

7           MR. ENGLE:  Yes, Your Honor.

8           THE COURT:  All right.  You may continue.

9           MS. BARRY:  Thank you, Your Honor.  We would ask Ms.

10  Koch to return to the stand.

11      (Pause)

12          MS. BARRY:  May I proceed, Your Honor?

13          THE COURT:  Yes.

14          MS. BARRY:  Thank you.

15  BY MS. BARRY:

16  Q    Ms. Koch, prior to the lunch break we ended with Exhibit

17  62, which was a July 17th email from Mrs. Hartline regarding

18  the $5 million that was received as capital on June 30th,

19  2009.

20  A    Right.

21  Q    And so what I'd like to do at this point, is just

22  actually go back to May of 2009, and I'd like you please to

23  take a look at Government's Exhibit 17.  And do you see

24  Government's Exhibit 17?

25  A    Yes.

1    Q    And is this a memo to you?

2    A    Yes.

3    Q    And from who is the memo?

4    A    Jeff Hanuscin.

5    Q    And what is it regarding?

6    A    Information that -- additional information that we

7    requested for the TARP application.

8    Q    Okay.  And what is the date?

9    A    May 1st, 2009.

10   Q    Okay.  And --

11         MS. BARRY:  Your Honor, the Government moves for the

12   admission of Government's Exhibit 17.

13         MR. EGAN:  No objection.

14         THE COURT:  It's admitted.

15         MS. BARRY:  And may it be published, Your Honor?

16         THE COURT:  Yes.

17   BY MS. BARRY:

18   Q    And just briefly, again, this is regarding response to

19   information requested for TARP application?

20   A    Yes.

21   Q    Okay.  And, again, who is this from?

22   A    Jeff Hanuscin, who is the CFO of Nova.

23   Q    Okay.  Now if you would please take a look at

24   Government's Exhibit 19.  And what is Government's Exhibit 19?

25   A    It's a email from Chuck Hunter to me requesting an update

1   on Nova's status to raise the additional capital.

2   Q    Okay.  And is -- does it appear that that top email is

3   the last one in a series of emails?

4   A    Yes.

5   Q    Okay.

6        MS. BARRY:  Your Honor, the Government moves for the

7   admission of Government's Exhibit 19.

8        MR. EGAN:  No objection.

9        THE COURT:  Granted.

10       MS. BARRY:  And may it be published?

11       THE COURT:  Yes.

12       MS. BARRY:  Thank you.

13  BY MS. BARRY:

14  Q    Okay.  And just looking at the top email from Mr. Hunter

15  to you, and this is dated May 18th, 2009, is that the date on

16  the email?

17  A    May 18th, 2009.

18  Q    And could you just read what Mr. Hunter -- the

19  information Mr. Hunter is seeking on May 18th, 2009?

20  A    (Reading)

21       "Who are the potential investors, what type of

22  instruments will be offered, and any outside assistant such as

23  a consulting firm to be used to help raise the capital?"

24  Q    Thank you.  Now I'd like to go back to where we left off

25  before the break, which was sometime in July of 2009.  During

1    that time period in that summer, would you hear from Mr.

2    Hartline?

3    A    Yes.

4    Q    Okay.

5              MS. BARRY:  And I'd like now, Your Honor, to play

6    Government's Exhibit 200, which is one of the voice mails that

7    was stipulated to, a voice mail received on August 19th of

8    2009.

9              THE COURT:  You may proceed.

10             MS. BARRY:  Thank you.

11        (Audio played 2:07 p.m. to 2:08 p.m.)

12   BY MS. BARRY:

13   Q    And who is calling you and leaving you a message in this

14   voice mail?

15   A    Mr. Hartline.

16   Q    Okay.  And would Mr. Hartline periodically leave you

17   voice mail messages?

18   A    Yeah, most of my bankers do.  Yes.

19   Q    Now you had mentioned before, and I believe we saw it in

20   one of the emails, that you advised Mr. Hartline that they

21   needed -- the bank needed to file a change in control

22   application regarding Mr. Levin's full investment in the bank.

23   Do you recall that?

24   A    Yes.

25   Q    Okay.  And what is a change in control application?

1    A    If somebody is going to own over 10 percent of the bank's

2    stock, it has to go through an approval process.

3    Q    Okay.  And did you have any understanding whether or not

4    Nova Bank had indeed filed a CIC application?

5    A    I -- yes, at one point they did.

6    Q    Okay.  And do you know whether or not it was an

7    application that was filed -- well who was the application

8    filed with?

9    A    The State of Pennsylvania Banking Department and the

10   Federal Reserve.

11   Q    Okay.  So now I'd like to show you what's been marked as

12   Government's Exhibit 77, please.  And looking at Government's

13   Exhibit 77, what is this?

14   A    It's an email from myself to Tyler Bland, he had wanted

15   an update.

16   Q    Okay.

17           MS. BARRY:  And, Your Honor, the Government moves

18   for the admission of Government's Exhibit 77.

19           MR. EGAN:  No objection.

20           THE COURT:  All right.

21           MS. BARRY:  May it be published, Your Honor?

22           THE COURT:  Granted.

23   BY MS. BARRY:

24   Q    Okay.  Now if we take a look at Government's Exhibit 77,

25   the bottom email, or what I will refer to as the first email,

1    okay, and you're writing to Tyler Bland -- who is Tyler Bland?

2    A    He's the field supervisor for the Philadelphia area

3    office.

4    Q    Okay.  And then there are several individuals who are

5    copied, including Mr. Hunter, is that fair to say?

6    A    Yes.

7    Q    Okay.  And what is the date of your email?

8    A    August 26, 2009.

9    Q    And would you please -- and what is the subject of the

10   email?

11   A    Nova Bank TARP.

12   Q    And would you please read what you wrote to these

13   individuals?

14   A    (Reading)

15            "Tyler I just received a call from Jeff Hanuscin of

16   Nova Bank.  He wanted me to know that the bank got approved

17   for TARP funds, conditioned on the bank receiving the full 15

18   million investment from Mr. George Levin.  An application for

19   a change in control is with the Fed now."

20   Q    Okay.  And if we look now at the very first email on this

21   chain, this is from an individual -- who is it, the very top

22   email?

23   A    Joe Moretz (phonetic).

24   Q    Okay.  And are you copied on this email?

25   A    Yes.

1    Q    And what does Mr. Moretz write in is email?

2    A    That they also had a change in control application

3    pending for Mr. Levin.

4    Q    Okay.  And what does the Pennsylvania Department of

5    Banking refer to its change in control application?

6    A    Section 112.

7    Q    Okay.  During the -- during the following time period

8    after receiving these -- the emails -- these emails which are

9    dated, and, I'm sorry, this one from Mr. Moretz, what is the

10   date on that?

11   A    Tuesday September 1st, 2009.

12   Q    Okay.  In and around September and thereafter, are you --

13   is anyone from the bank providing you with information on the

14   bank's raising of capital?

15   A    I would ask the bank periodically if Washington wanted to

16   know the status.

17   Q    Okay.  And why would Washington want to know the status?

18   A    Because they had an approved application that the funds

19   had not been disbursed yet.

20   Q    Okay.

21   A    They wanted to know if they had achieved the contingency.

22   Q    Now I'd like you to take a look at what's been marked as

23   Government's Exhibit 90.  What is Government's Exhibit 90?  A

24        It's a series of emails.

25   Q    Okay.  I'm sorry.

1    A    From September 22nd, 2009.

2    Q    Okay.

3              MS. BARRY:  Your Honor, the Government --

4    BY MS. BARRY:

5    Q    And are you the recipient or the author of some of these

6    emails?

7    A    Yes.

8              MS. BARRY:  Your Honor, the Government moves for the

9    admission of Government's Exhibit 90.

10             MR. EGAN:  No objection.

11             THE COURT:  Granted.

12             MS. BARRY:  May it be published?

13        THE COURT:  Yes.

14   BY MS. BARRY:

15   Q    Now if we can take a look at the third email on this page

16   from Tyler Bland.  And what is the subject line say?

17   A    "U.S. Treasury 606 Nova Financial Holdings and capital

18   raise."

19   Q    Okay.  And what is -- what does Mr. Bland ask you?

20   A    He wants me to confirm that the bank had received the

21   additional 10 million.

22   Q    Okay.  And does he also say, "We'll need something in

23   writing from the bank to confirm?"

24   A    Yes.

25   Q    Okay.  And do you respond to this email?

1   A    Yes.

2   Q    Okay.

3        MS. BARRY:  And if we focus in on the reply email

4   from you.

5   BY MS. BARRY:

6   Q    And, again, there's several, it's back to Tyler Bland.

7   Who is copied on this email?

8   A    Edwin Lloyd, Jim Watkins, Bill Baxter and Kevin Glugert.

9   Q    And who are these individuals?

10  A    Ed Lloyd is the ARD for Pennsylvania.  He was.

11  Q    And what is -- I'm sorry, what does ARD stand for?

12  A    Oh, assistant regional director.

13  Q    Okay.

14  A    Jim Watkins is somebody from Washington, as well as Bill

15  Baxter.  And Kevin Gluckert was heading the TARP applications

16  in the New York Regional Office.

17  Q    Okay.  And so what do you write to these individuals, if

18  you could just read your email, please?

19  A    That they haven't received the capital yet, because they

20  were still waiting for the change in control.

21  Q    Ms. Koch, can you please read the email that you wrote?

22  A    Oh, sure.

23       "Hi Tyler, I just spoke to  Brian Hartline, the bank

24  has not received the capital yet.  They are waiting for the

25  Fed to approve Mr. Levin under a change in control

1  application.  The Fed indicated they have not yet gotten the

2  background check back from the FBI.  Once he is approved, the

3  capital will be invested.  Brian indicated that he spoke to

4  Treasury and they are fine with the delay.  They are drawing

5  up all the paperwork for when the approval is received."

6  Q    Okay.  So, again, this information that you were relaying

7  came from Mr. Hartline, based on this email?

8  A    Yes.

9  Q    And when Mr. Bland asked to confirm that Nova has in fact

10 received the 10 million in outside matching capital, did you

11 understand that to mean the additional 10 million for the 15

12 million contingency?

13 A    Yes.

14 Q    Now I'd like you please to take a look at what's been

15 marked as Government's Exhibit 97.  And what is Government's

16 Exhibit 97?

17 A    It's an email advising Edwin Lloyd that the TARP was

18 approved but it has not yet been disbursed.

19 Q    Okay.  And, again, is Government's Exhibit 97 a series of

20 emails, or what sometimes are referred to as email string, or

21 email chain?

22 A    Yes.

23 Q    Okay.  And are you the recipient, or the author of -- of

24 these emails?

25 A    Some of them, yes.

1    Q    Okay.  So -- and specifically the first three emails on

2    Government's Exhibit 97, page one?

3    A    Yes.

4    Q    Okay.

5         MS. BARRY:  Your Honor, the Government moves for the

6    admission of Government's Exhibit 97.

7         MR. EGAN:  Your Honor, with the same exception we

8    had previously, I think Ms. Barry's addressed it by just

9    saying page one.

10        THE COURT:  All right.  Thank you very much.

11        MS. BARRY:  Thank you, Your Honor.  And may it be

12   published?

13        THE COURT:  Yes.

14   BY MS. BARRY:

15   Q    Would you please read the email that you wrote to Mr.

16   Edwin Lloyd, which it looks like it's the second email in the

17   -- on that page.

18   A    (Reading)

19        "Hi, Ed.  Nova Bank has received approval of their

20   TARP conditional on them receiving another 10 million in

21   capital.  They have a large investor who has already placed 5

22   million in the bank, but the bank is waiting for FRB approval

23   for a change in control application to receive the other 10

24   million from the investor.  Last I heard, the FRB did not have

25   a problem, they were just processing the application.  I will

Koch - Direct/Bar                                                    127

1    get in touch with them on Monday when I get back to see where

2    the application is."

3    Q    Okay.  And when did you write this email?

4    A    October 14th, 2009.

5    Q    And the information that you passed along to Edwin Lloyd,

6    where did you receive that information?  Or from whom, I guess

7    the better question is.

8    A    I think it was just information that I already knew.

9    Q    From whom?

10   A    From Mr. Hartline.

11   Q    Okay.  Now I'd like you to take a look at Government's

12   Exhibit 120.  And what is Government's Exhibit 120, please?

13   A    It's an email string again.

14   Q    Between whom?

15   A    Between myself and Ray Harper from the Pennsylvania

16   Department of Banking.

17   Q    Okay.

18            MS. BARRY:  And, Your Honor, the Government would

19   move for the admission of Government's Exhibit 120.

20            MR. EGAN:  No objection.

21            THE COURT:  Granted.

22   BY MS. BARRY:

23   Q    Now if we could please take a look at your email that you

24   authored, which is the bottom email, or the first email in

25   that string?

1    A    All right.

2    Q    And what is the subject of the email?

3    A    Nova.

4    Q    Okay.  And, again, what is the date of this email?

5    A    October 30th, 2009.

6         MS. BARRY:  I'm sorry, if we could look at the

7    bottom email -- or -- yeah, the first one in time, please.

8    The first email, "Hi, Ray."  Could we blow that part up?  I'm

9    sorry, it's the email dated on Friday October 30th to Ray

10   Harper from Lisa Koch.  The bottom email, please?  Yes.  Thank

11   you so much.  Okay.

12   BY MS. BARRY:

13   Q    And what are you -- what do you tell Ray?

14   A    I told him I projected forward if they got the additional

15   capital what their new capital ratios would be.

16   Q    Okay.  And so did somebody assist you with preparing

17   these capital ratios?

18   A    I'm not sure.  It may have been Jeff from the bank.

19   Q    Okay.  And when you say Jeff from the bank?

20   A    Jeff the CFO, Hanuscin.

21   Q    Okay.  And so you specifically -- what do you

22   specifically say?  "Hi, Ray," and what's the next sentence?

23   A    (Reading)

24         "I did some calculations based on their 9/30/09 call

25   report."

1   Q    Okay.  So let me just stop you right there about that.

2   Okay.  So based on their 9/30/09 call report, so that would be

3   information that the bank has put on their call report related

4   to all of the assets, loans, capital, whatever they have that

5   they would report on the call report?

6   A    Yes.

7   Q    Okay.  And then it says, what do you say next?

8   A    (Reading)

9         "With 10.3 million in additional capital, the ratios

10  would be tier one leverage 8.87, tier one risk based 8.91,

11  total risk base 10.16, which is well capitalized."

12  Q    Okay.  So these ratios, do they base -- do they include

13  the $5 million that was received as capital on June 30th,

14  2009?

15  A    Yes.  They were already included.

16  Q    And then there's another calculation that's done if the

17  $13 million in TARP funds is added on, is that right?

18  A    Yes.

19  Q    Okay.  And then those levels would keep it at well

20  capitalized?

21  A    Yes.

22  Q    Okay.  So the 10.3 additional capital is being -- I'm

23  sorry, let me withdraw the question.

24  A    Okay.

25  Q    Now, again, this email's October 30, 2009?

1    A    Yes.

2    Q    Okay.  And when it came to the $5 million that was

3    included in capital to prepare these ratios, did anyone at the

4    bank tell you that any of that money had been borrowed?

5              MR. EGAN:  Objection.  Asked and answered.

6              THE WITNESS:  No.

7              THE COURT:  Sustained.

8    BY MS. BARRY:

9    Q    Now around this time period of October to November of

10   2009, do you know whether or not there was any kind of

11   downgrade of the bank?

12   A    There was -- I'm not sure of the exact date, but there

13   was a state -- the State Banking Department was in there and

14   they had downgraded it.

15   Q    Okay.  And I'm going to ask you to look at what's been

16   marked as Government's Exhibit 125.  And when we talk -- and

17   we may have been just kind of assuming that the word is -- is

18   self-evident, but what does downgrade mean?

19   A    Well the banks are rated, all the components are rated

20   from one to five.  And one being the strongest and five being

21   the weakest.  And so that probably meant that the composite

22   rating, the overall rating in the bank had gone down.

23   Q    Okay.  So if you're at a one and then you become a two,

24   that's a downgrade.

25   A    Yes.

1    Q    And if you're two to three, a downgrade, and so forth?

2    A    Yes.

3    Q    Okay.  And because one is the best and five is the worst?

4    A    Yes.

5    Q    And when it comes -- when you're talking about these

6    composite ratings, is that what's determined based on the

7    CAMELS, what we talked about before?

8    A    The CAMELS component.

9    Q    Okay.  If we take a look at Government's Exhibit  125,

10   what is 125?

11   A    It's an email string between myself and Ray Harper.

12   Q    Okay.  And what is the date of these emails?

13   A    November 11th, 2009.

14   Q    Okay.

15           MS. BARRY:  And, Your Honor, the Government would

16   move for the admission of Government's Exhibit 125.

17           MR. EGAN:  No objection.

18           THE COURT:  Granted.

19           MS. BARRY:  Okay.

20   BY MS. BARRY:

21   Q    Now looking at your email that you authored, you're

22   referring to a meeting, what meeting was that?

23   A    It was the exit meeting for the State -- the State's

24   examination.

25   Q    Okay.  And were you invited to that meeting?

1   A     Yes.

2   Q     Okay.  Was Mr. Hartline in attendance at that meeting?

3   A     Yes.

4   Q     And you write -- can you read the first sentence of the

5   second paragraph?  Or the first full paragraph.

6   A     On the bottom?

7   Q     Yes, it says "However."

8   A     (Reading)

9          "However, the president did not mention that Mr.

10  Levin was no longer going to invest.  All he said was that

11  they needed 3 million more.  I hope he shared that with the

12  EIC prior to the meeting.  However, I have a feeling he did

13  not, because she had it capital rated at two.  The bank is

14  under capitalized, and they need to raise more money before

15  they can secure the TARP funds.  There's no way that's a two,

16  unless they get the funds in before the report of examine is

17  finished processing."

18  Q     Okay.  Just your take?

19  A     Yes.

20  Q     Okay.  So when you say the president, who are you

21  referring to?

22  A     Mr. Hartline.

23  Q     And November 11th, at least at the meeting that you

24  attended, he did not mention that Mr. Levin was not going to

25  invest?

1    A    No.

2    Q    Did you have any conversations with Mr. Hartline that

3    they needed more capital to secure the TARP funds?

4    A    Well it was understood.

5    Q    Okay.  At this meeting in -- that you attended on

6    November 11th, 2008, did Mr. Hartline mention anything about

7    Mr. Levin's financial condition?

8    A    I don't think so.

9    Q    I'd like you please to take a look at what's been marked

10   as Government's Exhibit  133A.  And what is Government's

11   Exhibit 133A?

12   A    This is a standard letter that we provide the banks when

13   they're being downgraded to a three, four or five.  And that's

14   just to let them know that they shouldn't make any large

15   changes in the balance sheet of the bank before they get their

16   report of exam.

17   Q    Okay.  And what is the date of this letter?

18   A    November 10th, 2009.

19   Q    And who is the person it's addressed to?

20   A    Mr. Hartline.

21   Q    And are you mentioned in the letter itself?

22   A    Yes, at the end I'm mentioned as a contact for the bank.

23   Q    Okay.

24   A    In case he has any questions.

25              MS. BARRY:  And, Your Honor, the Government moves

Koch - Direct/Bar                                    134

1    for the admission of Government's Exhibit 133A.

2              MR. EGAN:  No objection.

3              THE COURT:  Granted.

4              MS. BARRY:  And may it be published, Your Honor?

5              THE COURT:  Yes.

6    BY MS. BARRY:

7    Q    So, again, looking at this letter, the date is -- what's

8    the date?

9    A    November 10th, 2009.

10   Q    Okay.  And it's from what institutions?

11   A    It's from the FDIC and the State Banking Department.

12   Q    Okay.  And, again, if we take a look at the letter, the

13   second paragraph.  And what does that first sentence say?

14   A    (Reading)

15              "This letter documents and memorializes that your

16   institution has been tentatively given a composite rating of

17   three, representing a downgrade from the prior examination."

18   Q    Okay.  Did you have any conversations with Mr. Hartline

19   about the fact that the bank had been downgraded?

20   A    Well that's what the meeting was about.

21   Q    Did you have any conversations with Mr. Hartline about

22   how the downgrade may affect their pending TARP -- the

23   disbursement of their TARP funds?

24   A    I don't remember.

25   Q    Okay.  Do you know whether or not a downgrade may effect

1  the disbursement of their funds?

2  A    Yes.

3  Q    Okay.

4         MS. BARRY:  And now I'd like to play Government's

5  Exhibit 201 which was stipulated to as a voice mail message

6  from December 14th, 2009 at approximately 2:17 p.m.

7         (Audio played 2:32 p.m. to 2:32 p.m.)

8  BY MS. BARRY:

9  Q    And who was that voice mail from?

10  A    Mr. Hartline.

11  Q    Okay.  And in the voice mail he asked -- he said -- he

12  asked about the process to validate capital.  What did you

13  understand that to mean?

14  A    That they -- that the Treasury wanted the documentation

15  that all the capital funds were in the bank before they would

16  release the TARP funds.

17  Q    Okay.  And was that the contingent -- the $15 million

18  contingency?

19  A    Yes.

20  Q    Now I'd like you to take a look at what's been marked as

21  Government's Exhibit 139.  And what is Government's Exhibit

22  139?

23  A    It's an email from Federal Reserve, Cynthia Course to

24  Bill Baxter.

25  Q    Okay.  Are you one of the recipients of this email?

Koch - Direct/Bar                                                    136

1   A     I'm sorry, Bill Baxter forwarded it to me afterwards.

2   Q     I'm not sure if this has been moved.

3         MS. BARRY:  May I please publish it then, Your

4   Honor.  It has already been admitted.

5         THE COURT:  Yes, it's been admitted.

6         MS. BARRY:  Okay.

7   BY MS. BARRY:

8   Q     So just a reminder that this is -- what is the date of

9   this email?

10  A     December 14th, 2009.

11  Q     Okay.  And, again, the voice mail message was also dated

12  December 14th, 2009.  So that would be the same day, is that

13  fair to say?

14  A     Yes.

15  Q     Okay.  And you were forwarded this email from Cynthia

16  Course, is that right?

17  A     Yes.

18  Q     Okay.

19  A     Bill Baxter.

20  Q     And if we could just look at that -- the first paragraph

21  to Bill, in that next sentence.  Okay.  And so what -- in the

22  forwarded email from Cynthia Course to Bill Baxter, what does

23  she write?

24  A     (Reading)

25         "I understand from the reserve bank that Nova Bank,

Koch - Direct/Bar                                137

1    Nova Financial Holdings has a call with the FDIC plan for this

2    afternoon to discuss its capital raising vis-a-vis its TARP

3    CPP application.  On June 10, 2009, the interagency council

4    approved Nova's TARP CPP application, contingent on a $15

5    million capital raise.  Treasury has confirmed that Nova

6    raised part of the capital earlier this year, and they now

7    need to raise just 10 million."

8    Q    Okay.  And what's the next sentence say?

9    A    (Reading)

10            "Nova is tentatively scheduled to close on its TARP

11   CPP on December 22nd, 2009."

12   Q    Okay.  Now if we could --

13            THE COURT:  Why don't we let the jurors stand up and

14   take a --

15            MS. BARRY:  Oh, sure.

16            THE COURT:  -- leg stretch break?

17            MS. BARRY:  Yes, Your Honor.

18        (Pause)

19            THE COURT:  All right.

20            MS. BARRY:  Thank you, Your Honor.  May I proceed?

21            THE COURT:  Yes, ma'am.

22            MS. BARRY:  Thank you.  Now I'd like to play

23   Government's Exhibit 202, which is a voice mail message dated

24   December 15, 2009 at approximately 9:32 a.m.  Which has been

25   stipulated to.

1           (Audio played 2:37 p.m. to 2:38 p.m.)

2    BY MS. BARRY:

3    Q    And this voice mail message that was from Mrs. Hartline

4    on December 15, 2009, clearly she is asking what else you need

5    in terms of receiving -- getting the disbursement of TARP

6    funds, which is planned for December 22nd, 2009, based on the

7    previous email.

8    A    Yes.

9    Q    Okay.

10          MS. BARRY:  Now if we could play Government's

11   Exhibit 203, which is a voice mail message dated December

12   15th, 2009, at approximately 1:49 p.m.?

13          (Audio played 2:38 p.m. to 2:39 p.m.)

14   BY MS. BARRY:

15   Q    This particular -- or this voice mail from Mr. Hartline,

16   did he follow up with information to support that they're a

17   well capitalized institution?

18          MR. EGAN:  Objection.

19          THE COURT:  Sustained.

20   BY MS. BARRY:

21   Q    Do you know whether or not he followed up with you with

22   any information on whether or not this was a well capitalized

23   institution?

24          MR. EGAN:  Objection.

25          MS. BARRY:  If she knows.

Koch - Direct/Bar                                    139

1              MR. EGAN:  Your Honor, the question's, what if any

2      information did he provide?

3              THE COURT:  I understand.  I understand.  Just

4      modify the question, please.

5              MS. BARRY:  Yes, Your Honor.

6      BY MS. BARRY:

7      Q    I'd like to show you what's been marked as Government's

8      Exhibit 140.  And what is Government's Exhibit  140?

9      A    It's an email from Mr. Hartline dated December 15th, cc

10     Jeffrey Hanuscin, they were sending additional information to

11     I guess prove that they had gotten $10 million in capital.

12     Q    Okay.  And so what is the date of this email?

13     A    December 15, 2009.

14     Q    At what time?

15     A    6:00 p.m.

16     Q    And so was this email something that came after you

17     received the voice mail?

18     A    I believe so.

19     Q    Okay.

20             MS. BARRY:  And, Your Honor, the Government moves

21     for the admission of Government's Exhibit 140.

22             MR. EGAN:  No objection, Your Honor.

23             THE COURT:  Admitted.

24     BY MS. BARRY:

25     Q    So if we can take a look at the email itself --

1               MS. BARRY:  And, I'm sorry, I don't know if I asked

2       for it to be published.  Did I, Your Honor?

3               THE COURT:  You did not.

4               MS. BARRY:  Okay.  May it please be published?

5               THE COURT:  Granted.

6               MS. BARRY:  Thank you.

7       BY MS. BARRY:

8       Q    Can we first -- I'm sorry -- look at the from/to portion

9       of the email?  Okay.  And who is the email from?

10      A    Mr. Hartline.

11      Q    And who is it to?

12      A    Me.

13      Q    And what is the date?

14      A    December 15th, 2009.

15      Q    At what time?

16      A    6:00.

17      Q    And is anyone copied?

18      A    Jeff Hanuscin.

19      Q    And what is the subject?

20      A    Nova.

21      Q    And is -- are there attachments to this email?

22      A    Yes.

23      Q    Okay.

24              MS. BARRY:  And if we could now move to the body of

25      the email?

1  BY MS. BARRY:

2  Q    And so the first paragraph, Mr. Hartline says:

3          "Sorry for the delay in getting this information to

4  you."

5          Right?

6  A    Yes.

7  Q    Okay.  And what does the first sentence of the second

8  paragraph say?

9          MS. BARRY:  And if we could highlight that.

10          THE WITNESS:  (Reading)

11          "Nova has met the contingency requirement by raising

12  over $10 million of capital."

13  BY MS. BARRY:

14  Q    Okay.

15  A    (Reading)

16          "Nova has demonstrated that it has regained its well

17  capitalized status through its own capital generation, and

18  that the CPP funding will enhance Nova's capital levels and

19  allow us to continue to meet the credit needs of the

20  communities we serve."

21  Q    Now looking at just this email, does Mr. Hartline advise

22  you anywhere that this 10 million of capital was -- any

23  portion of it was borrowed?

24  A    No.

25  Q    Does he mention in this email whether any portion of this

1    $10 million was borrowed from the bank?

2    A    No.

3    Q    Would that be an -- is that an important fact?

4    A    Yes.

5    Q    Okay.  And why is it important?

6    A    Well capital funds are funds that come from outside the

7    bank.  The only way you can generate capital from the bank

8    itself is through retained earnings.

9    Q    And if we could please now take a look at the second page

10   of Government's Exhibit 140?  And is the second page appears

11   -- well is this a letter?

12   A    Yes.

13   Q    And to -- who is this letter from?

14   A     Brian Hartline.

15   Q    Okay.  And who is the letter to?

16   A    Myself.

17   Q    Okay.  And can you please read the first sentence?

18            MS. BARRY:  And if we could highlight that?

19            THE WITNESS:  (Reading)

20            "As you are aware, Nova Financial Holdings, Inc. --"

21   BY MS. BARRY:

22   Q    Oh, I'm sorry.  I'm sorry, it's not being published.

23   Okay, if you could -- I'm sorry, if you could read that?

24   A    (Reading)

25            "As you are aware, Nova Financial Holdings, Inc. has

Koch - Direct/Bar                                    143

1   completed raising over $10 million of common equity, thus

2   achieving the Treasury Department's contingency for Nova to

3   receive its Capital Purchase Program funding."

4   Q    Okay.  And then is there a description of several

5   attachments to this letter?

6   A    Yes.

7   Q    Okay.  And attachment five, what is that attachment?

8   A    A list of investors that put in the 10.2 million.

9   Q    And if we could go to the second page?  And would you

10  please read those -- the first paragraph there?

11  A    (Reading)

12          As a result of conversations held today with the

13  Federal Reserve Bank, it was brought to my attention that in

14  order to qualify for CPP funds, an institution is required to

15  be well capitalized.  Please note that Nova and Nova Bank was

16  well capitalized when its application was submitted in October

17  2008, and excluding the calculation for direct credit

18  substitutes for securities below investment grade Nova and

19  Nova Bank would be considered well capitalized."

20  Q    And then what -- how about the next sentence?

21  A    (Reading)

22          "At this time Nova has raised an appropriate amount

23  of capital to regain its well capitalized status prior to our

24  receipt of CPP funding."

25  Q    And now if we could please turn to attachment five, which

Koch - Direct/Bar                                        144

1  is page ten of Government's Exhibit 140?  Okay.  And

2  attachment five was a list of the investors that -- that make

3  up the $10.2 million in new capital?

4  A    Yes.

5  Q    Okay.  And if we take a look at the section -- the first

6  section is subtotal capital raised through September 30, 2009

7  and deposited with HC approximately -- or it says

8  $2,551,902.02.

9  A    Yes.

10 Q    Okay.  And then you see the next section, which is the

11 subtotal escrow deposit to receive by October 2009?

12 A    Yes.

13 Q    Okay.  And do you see the individual, Anthony Bonomo

14 capital raise October 30, 2009, $2,500,000?

15 A    Yes.

16 Q    Anywhere in the attachments, in the letter or in the

17 email, does Mr. Hartline advise you that this $2.5 million was

18 borrowed?

19 A    No.

20 Q    Does he advise you anywhere in the attachments in the

21 letter or in the email whether or not that $2.5 million was

22 borrowed from the bank?

23 A    No.

24 Q    Would that be an important fact?

25 A    Yes.

Koch - Direct/Bar                                      145

1    Q    Why would that be an important fact?

2    A    Because it wasn't external funds invested in the bank.

3    Q    Okay.  If you knew that fact, would you pass it along to

4    the people in Washington?

5    A    Yes.

6    Q    If we look at the second page of that attachment, and it

7    says it's the subtotal escrow deposits received December 2009.

8    And at the bottom there's an individual, Charles Gallab for

9    $500,000, can you --

10           MS. BARRY:  I don't know, Agent Boyer, if you could

11   highlight that just to make it easier for the jurors?

12   BY MS. BARRY:

13   Q    Anywhere in this -- in the letter, in the email, or in

14   the attachments does Mr. Hartline advise you that this

15   $500,000 was borrowed from the bank?

16   A    No.

17   Q    Would that be an important fact?

18   A    Yes.

19   Q    Is that a fact that you would have made known to

20   individuals in Washington considering the TARP?

21   A    Yes.

22           MS. BARRY:  I'd like to play just now what's been

23   marked as Government's Exhibit 204.  And it's a voice mail

24   from December 15th, 2009 at approximately 1:49 p.m.  And it's

25   been stipulated to.

Koch - Direct/Bar                                    146

1              (Audio played 2:50 p.m. to 2:52 p.m.)

2    BY MS. BARRY:

3    Q     Now this voice mail that you received, after receiving

4    it, did you contact the bank based on the concerns that Mr.

5    Baxter had?

6    A     Yes.

7    Q     Okay.  And so we showed -- I showed you what was marked

8    as Government's Exhibit 140.  Was that in response to some of

9    the concerns you raised with Mr. Hartline about concerns that

10   folks in Washington had about the TARP application?

11   A     Yes.

12   Q     Okay.  Now I'd like you to take a look at what's been

13   marked as Government's Exhibit 144.  And looking at

14   Government's Exhibit 144, what is that?

15   A     It's an email from Mr. Hartline to myself, and it's cc'd

16   Jeff Hanuscin.

17   Q     Okay.  And what is the date of this email?

18   A     December 16th.

19   Q     Okay.  So it's the following day?

20   A     Yes.

21   Q     Okay.  At what time?

22   A     7:23 a.m.

23           MS. BARRY:  Your Honor, the Government would move

24   for the admission of Government's Exhibit 144.

25           MR. EGAN:  No objection.

1            THE COURT:  Granted.

2            MS. BARRY:  May it be published?

3            THE COURT:  Yes.  144?

4            MS. BARRY:  Yes, sir.

5   BY MS. BARRY:

6   Q    And this email, again, who is it from?

7   A    Mr. Hartline.

8   Q    When was it sent?

9   A    December 16, 2009.

10  Q    At what time?

11  A    7:23 a.m.

12  Q    And is it --who is it to?

13  A    Me.

14  Q    And who is copied?

15  A    Jeff Hanuscin.

16  Q    And what is the subject?

17  A    Follow up.

18  Q    And are there also attachments to this email?

19  A    Yes.

20  Q    Okay.  And so if you would please read the first sentence

21  and then the first sort of paragraph of -- on this email from

22  Mr. Hartline?

23  A    The first paragraph?

24  Q    Oh, the first sentence, and then the first paragraph.

25  A    (Reading)

1          "I just received word from our attorney that our CPP

2     closing set for December 22nd has been put on hold."

3     Q     Okay.  And then if you could read the next section?

4     A     (Reading)

5          "I am very concerned by the recent events.  Nova has

6     only done things to improve its position since being approved

7     for CPP funds.  Nova raised 18 million of tier one capital in

8     2008, and raised an additional 15.1 million of tier one

9     capital in 2009.  10 million as the contingency requirement to

10    receive the CPP funds.  We've raised our coverage ratio and we

11    have improved our liquidity position."

12    Q     In this -- in this email, does Mr. Hartline, and if we

13    could -- you can look at the whole email.  Does Mr. Hartline

14    tell you that any of the 15.1 million of tier one capital, 10

15    million as the contingency requirement to receive the CPP

16    funds, was borrowed?  Any portion of that was borrowed?

17    A     No.

18    Q     Did he say any portion of that was borrowed from the

19    bank?

20    A     No.

21    Q     Would that be an important fact?

22    A     Yes.

23    Q     Is that information you would have passed along to

24    Washington?

25    A     Yes.

1    Q    Why is that an important fact?

2    A    Because the bank can't loan money to invest in its own

3    capital.

4    Q    Okay.  And now if you could please take a look at

5    Government's Exhibit 145.  And what is Government's Exhibit

6    145?

7    A    It's an email from Jeff Hanuscin to myself, and cc Mr.

8    Hartline.

9    Q    Okay.

10            MS. BARRY:  Your Honor, the Government --

11   BY MS. BARRY:

12   Q    And is there an attachment to it?

13   A    Yes.

14            MS. BARRY:  Your Honor, the Government would move

15   for the admission of Government's Exhibit 145.

16            MR. EGAN:  No objection.

17            THE COURT:  Admitted.

18            MS. BARRY:  May it be published, Your Honor?

19            THE COURT:  Granted.

20   BY MS. BARRY:

21   Q    All right.  If we take a look at the email, again, who is

22   this from?

23   A    Jeff Hanuscin.

24   Q    And when was it sent?

25   A    December 16th, 2009.

1    Q    At what time?

2    A    3:45 p.m.

3    Q    And are you the recipient?

4    A    Yes.

5    Q    And what is the one line that Mr. Hanuscin says in his

6    email?

7    A    (Reading)

8         "Lisa, here's most of the support for cash received.

9    The remainder will follow shortly."

10   Q    Okay.  And looking at the second page on cash received.

11   Do you see that?  What is the total?

12   A    2.850 million.

13   Q    Okay.  Now if we could please take a look at what's been

14   marked as Government's Exhibit 146.  Looking at Government's

15   Exhibit 146, what is this?

16   A    It's an email from Mr. Hartline to me.

17   Q    And what's the date?

18   A    December 16th, 2009.

19   Q    At what time?

20   A    9:05 p.m.

21   Q    Okay.  And what is the subject?

22   A    Approval letter.

23        MS. BARRY:  Your Honor, the Government moves for the

24   admission of Exhibit 146.

25        MR. EGAN:  No objection.

1          THE COURT:  Granted.

2          MS. BARRY:  May it be published, Your Honor?

3          THE COURT:  Yes.

4    BY MS. BARRY:

5    Q    Taking a look at what's been marked as Government's

6    Exhibit 146, again, this is an email from who?

7    A    From Mr. Hartline to myself.

8    Q    And what is the date?

9    A    December 16th, 2009.

10   Q    At what time?

11   A    9:05 p.m.

12   Q    Okay.  And reading the first two -- the first sentence,

13   what does he say?

14   A    (Reading)

15        "As noted yesterday, I'm very perplexed by the

16   current situation Nova is in."

17   Q    Okay.  And if you could read, please, the next little

18   paragraph?

19   A    (Reading)

20        "Nova has done everything that has been requested of

21   them to date.  We have completed all the paperwork, we have

22   raised 10 million of common equity and we have answered all

23   questions."

24   Q    Okay.  In this email, does Mr. Hartline tell you that any

25   of the $10 million of this common equity was money that was

Koch - Direct/Bar                                   152

1    borrowed from the bank?

2    A     No.

3    Q     Would that be an important fact?

4              MR. EGAN:  Objection.  Your Honor, it's been

5    testified five times.

6              THE COURT:  No comments, just objection.  The

7    objection's sustained.

8    BY MS. BARRY:

9    Q    Now if we could please take a look at what's been marked

10   as Government's Exhibit 147.

11             MS. BARRY:  I'm sorry. if I could just have a

12   moment. Your Honor?

13             THE COURT:  Surely.

14       (Pause)

15   BY MS. BARRY:

16   Q    Government's Exhibit 147, what is Government's Exhibit

17   147?

18   A    It's an email from Mr. Hartline to myself.

19   Q    Okay.  And what is the date?

20   A    December 16, 2009.

21   Q    At what time?

22   A    11:24 p.m.

23   Q    Okay.  So is it fair to say it's two hours later from the

24   Government's Exhibit 146?

25   A     Yes.

1    Q    Okay.

2              MS. BARRY:  And, Your Honor, the Government moves

3    for the admission of Government's Exhibit 147.

4              MR. EGAN:  No objection.

5              THE COURT:  Admitted.

6              MS. BARRY:  May it be published?

7              THE COURT:  Granted.

8    BY MS. BARRY:

9    Q    Looking again at the to/from line of the email 147, who

10   is this from?

11   A    Mr. Hartline.

12   Q    When was it sent?

13   A    December 16th, 2009.

14   Q    At what time?

15   A    11:24 p.m.

16   Q    And are there attachments to this email?

17   A    Yes.

18   Q    Okay.  And, again, what does Mr. Hartline say in the

19   second sentence?

20   A    (Reading)

21             "Nova has done everything that has been requested of

22   it to date.  We have completed all paperwork, we have raised

23   10 million of common equity, and we have answered all

24   questions."

25   Q    Okay.  So he's reiterating that?

1    A    Yes.

2    Q    Okay.  Now I'd like you to take a look at what's been

3    marked as Government's Exhibit 151.  And what is Government's

4    Exhibit 151?

5    A    It's an email.

6    Q    From whom?

7    A    From Mr. Hartline to myself.

8    Q    Okay.

9         MS. BARRY:  Your Honor, the Government moves for the

10   admission of Government's Exhibit 151?

11        MR. EGAN:  No objection.

12        THE COURT:  Granted.

13   BY MS. BARRY:

14   Q    And, again, from Mr. Hartline you said to you.  What is

15   the date?

16   A    December 17th, 2009.

17   Q    At what time?

18   A    5:02 p.m.

19   Q    And what is the subject?

20   A    Any final updates.

21   Q    Okay.  And when he says any final updates, what do you

22   understand that to mean?

23   A    I thought if we had enough information on the capital

24   raise.  But at some point myself and Amy Monegro, who was

25   sitting in for my boss, had spoken to Mr. Hartline on the

1    phone and we said that we were going to write the

2    recommendation for a denial.

3    Q    Okay.  Let's take a look at Government's Exhibit 152.

4    And what is Government's Exhibit  152?

5    A    An email.

6    Q    Okay.  And is it an email chain?

7    A    Yes.

8    Q    And what's the date of the chain?

9    A    December 17th, 2009, 5:08 p.m.

10   Q    Okay.  And is this between you and -- well who is it

11   between?

12   A    It was from Mr. Hartline to myself.

13   Q    Okay.

14          MS. BARRY:  Your Honor, the Government moves for the

15   admission of Government's Exhibit 152.

16          MR. EGAN:  No objection.

17          THE COURT:  Admitted.

18          MS. BARRY:  May it be published, Your Honor.

19          THE COURT:  Granted.

20   BY MS. BARRY:

21   Q    Okay.  Now looking at the first email in this chain,

22   which would be that bottom of the page, is this what we looked

23   at as the first email in the chain which was Government's

24   Exhibit 151, any final updates?

25   A    Yes.

1    Q     Okay.  And do you respond?

2    A     Yes.

3    Q     Okay.  And what do you respond in the next email in the

4    chain?

5    A     I say that:

6               "We really don't have an update."

7               I just got back, I think I was at a meeting or

8    something.

9               "So I'm starting to analyze all the information you

10   provided.  I need to provide D.C. with a memo by tomorrow

11   morning with a recommendation.  The recommendation will likely

12   be denial, but I also want to provide all the updated

13   information that you and Jeff gave me so that they can fairly

14   assess that.  I'll probably be working pretty late tonight.  I

15   will put in all the points you included in your emails."

16   Q     Okay.  So when you are talking about "I also wanted to

17   provide all the updated information that you and Jeff gave me

18   so that they can fairly assess that," what are you referring

19   to?

20   A     All the information that -- the attachments and stuff he

21   provided the day before.

22   Q     Okay.  That Mr. Hartline had provided to you?

23   A     Yes.

24   Q     And did that also include information that Mr. Hanuscin

25   provided to you?

1    A    Yes.

2    Q    And now if you could look at the email response from Mr.

3    Hartline?  To your email.

4    A    (Reading)

5         "Thanks, Lisa.  I hate to put you through all of

6    this.  I know you're working hard on this.  Do you know if we

7    will have a final answer tomorrow?  I have investors funds,

8    and if we don't get approved, I don't want to hold them longer

9    than I have to.  I'm sure I will have enough fun explaining

10   what happened as it is.  Thank you for of your and Amy's help

11   on this."

12   Q    Okay.  And so when he's saying Amy, is that -- who is

13   that referring to?

14   A    That's the woman that was sitting in for Julie Howland,

15   who is my immediate supervisor.

16   Q    Okay.  And did you just mention her before, was that Amy

17   Monegro?

18   A    Yes.

19   Q    Okay.  And then do you respond to what Mr. Hartline said?

20   In the next email in the chain.

21   A    Then I said:

22        "Well the recommendation will go to the council and

23   they will make the final decision.  I would assume in the next

24   week or so then either they or I will get back to you.  I

25   wouldn't give back any investor funds until that time.  Did

1   you get all the funds in today?  I would like to be able to

2   include that."

3   Q    Okay.  And when you say, "did you get all the funds in

4   today," what did you mean?

5   A    Well when he sent me the -- they sent me copies of the

6   wires and stuff, and it wasn't complete.  So I needed the rest

7   of the documentation for those.

8   Q    Okay.  And is that information that you were going to

9   provide to Washington --

10  A    Yes.

11  Q    -- on the decision of whether to disburse TARP funds?

12  A    Yes.

13  Q    And then does Mr. Hartline send you a reply to what you

14  said?

15  A    Yes.

16  Q    And can you read Mr. Hartline's email back to you?

17  A    (Reading)

18          "Amy said she didn't think you guys could convince

19  FDIC Washington to recommend this to council.  She said that

20  she would get back to me after your letter was sent to

21  Washington.  I thought this was a short term and an imminent

22  no decision.  If the FDIC is not going to recommend, I would

23  like to know ASAP so I can return funds."

24  Q    Okay.  So at this point you have on December 17th, 2009

25  there's -- you think -- you've -- have you advised Mr.

1    Hartline one way or another about what you thought the

2    recommendation would be?

3    A    Yes.  I believe Amy spoke to him and said that it was

4    going to recommend for denial.  And I had said it in one of my

5    emails.

6    Q    Were you still going to provide information to Washington

7    to make sure that they had all the information to make the

8    decision?

9    A    Yes.

10   Q    And from whom were you receiving information about

11   whether or not Nova had raised the contingency?

12   A    From Jeff Hanuscin and Mr. Hartline.

13   Q    Okay.  And now I'd like you to take a look at what's been

14   marked as Government's Exhibit 153.  And what is Government's

15   Exhibit 153?

16   A    It's an email from Mr. Hartline to myself and the subject

17   is, any updates.

18   Q    Okay.  And what is the date of that email?

19   A    December 18th, 2009.

20   Q    And what is the time of that email?

21   A    9:12 a.m.

22   Q    Okay.

23        MS. BARRY:  And, Your Honor, the Government moves

24   for the admission of Government Exhibit 153.

25        MR. EGAN:  No objection.

1          THE COURT:  Admitted.

2          MS. BARRY:  May it be published?

3          THE COURT:  Granted.

4    BY MS. BARRY:

5    Q    So looking at the email, the first email in this chain

6    from  Brian Hartline to you, please read the first sentence.

7    A    (Reading)

8          "Lisa and Amy, has the FDIC New York finished its

9    recommendation?"

10   Q    Please read the second sentence.

11   A    (Reading)

12         "I still hold firm that Nova is the poster child for

13   CPP funding.  And we should be awarded the funds."

14   Q    If we go to the next page of Government's Exhibit 153.

15   And if we could -- if you look at that first -- I'm sorry, the

16   sentence that starts "As you also know, Nova has been able to

17   raise."

18   A    (Reading)

19         "As you also know Nova has been able to raise

20   capital during the last two years.  Most recently $10 million

21   was raised to meet the contingent obligation for Nova to

22   receive it's CPP funding."

23   Q    Does  Brian Hartline mention whether any of that money

24   any portion of that money was borrowed from the bank?

25   A    No.

1    Q    And if we look at the next email in the chain from you to

2    Bill Baxter, what do you say to Mr. Baxter?

3    A    I said:

4              "Hi, Bill, not sure if you're interested, but here's

5    management's plea."

6    Q    Okay.  And when you say management's plea, management's

7    plea to what?

8    A    To get the funding.

9    Q    Okay.

10   A    For the TARP.

11   Q    Now I'd like you to take a look -- and, again, this was

12   December -- this email from Mr. Hartline was December 18th,

13   2009 at 9:12 a.m.?

14   A    Yes.

15   Q    Okay.  Now I'd like you to take a look at Government's

16   Exhibit 156.  What is Government's Exhibit 156?

17   A    It's an email from Mr. Hartline.

18   Q    When is it dated?

19   A    December 18th.

20   Q    At what time?

21   A    12:11 p.m.

22             MS. BARRY:  Your Honor, the Government moves for the

23   admission of Government's Exhibit 156.

24             MR. EGAN:  No objection.

25             THE COURT:  Admitted.

1    BY MS. BARRY:

2    Q    And so looking at this email, is it just -- what does it

3    say in the subject?

4    A    (Reading)

5         "Sorry I forgot to confirm this but Nova does have

6    all the funds in."

7    Q    Now if we take a look at what's been marked Government's

8    Exhibit 157.  And what is 157, please?

9    A    An email from Mr. Hartline to myself.

10   Q    And when is it dated?

11   A    December 18th, 2009.

12   Q    At what time?

13   A    4:54 p.m.

14        MS. BARRY:  The Government moves for the admission

15   of Government's Exhibit 157.

16        MR. EGAN:  No objection.

17        THE COURT:  Granted.

18   BY MS. BARRY:

19   Q    And looking at this email, what's the date?

20   A    December 18th, 2009.

21   Q    Okay.  At what time?

22   A    4:54 p.m.

23   Q    Okay.  Is this the third email you're receiving on that

24   day from Mr. Hartline?

25   A    Possibly.

1    Q    Okay.  And what -- what is the subject line?

2    A    (Reading)

3         "I need to run, here is my cell phone number if you

4    hear anything."

5    Q    Okay.  Now I'd like you to take a look at Government's

6    Exhibit 160.  Now at this point in time on December -- well on

7    December 18th, 2009 has there been any official word from

8    Washington whether or not Nova was going to be receiving a

9    disbursement of the funds from TARP?

10   A    I don't know.  I don't think so.

11   Q    Okay.

12   A    At that point.

13   Q    And I'd like you now to take a look at what's been marked

14   as Government's Exhibit 160.  And what is Government's Exhibit

15   160?

16   A    It's an email from myself to Mr. Hartline.

17   Q    Okay.  And what's the date?

18   A    Sunday December 20th, 2009.

19   Q    Okay.  And is it more than one email?  It's an email

20   string or a chain?

21   A    Yes.

22         MS. BARRY:  Your Honor, the Government moves for the

23   admission of Government's Exhibit 160.

24         MR. EGAN:  No objection.

25         THE COURT:  Granted.

Koch - Direct/Bar                                    164

1    BY MS. BARRY:

2    Q    And your email to Mr. Hartline, that first email, or the

3    bottom email, again, what's the date?

4    A    December 20th, 2009.

5    Q    Okay.  And what are you advising Mr. Hartline?

6    A    That I got an email from Chuck Hunter, and he told me

7    that he'll know by Tuesday afternoon what the final decision

8    is.

9    Q    Okay.  So as of December 20th, there's been no final

10   decision made?

11   A    No.

12   Q    And now does looking at the first email, or the last

13   email on that chain, who is that from?

14   A    Mr. Hartline.

15   Q    Okay.  And what's the date?

16   A    December 21st, 2009.

17   Q    Okay.  And what time is the email sent approximately?

18   A    12:04 p.m.

19   Q    Okay.  And what does Mr. Hartline say?

20   A    (Reading)

21          "Do you know where we are in the process?  Is the

22   application still within the FDIC, or is it going to approval

23   council?"

24   Q    Can you read the next sentence, please?

25   A    (Reading)

Koch - Direct/Bar                                    165

1              "I'm still hopeful that Nova will be approved based

2     on our past actions, current performance, and current economic

3     trends, and Nova is planning accordingly."

4     Q    Okay.  Can you read the next sentence, please?

5     A    (Reading)

6              "I will be getting on a plane at 5 a.m. on Wednesday

7     for a ski vacation.  The vacation has been booked for months,

8     so I'm getting all the required information signed today and

9     tomorrow before I leave."

10    Q    Okay.  And when he says "getting all the required

11    information signed today and tomorrow before I leave," what is

12    your understanding of what he's telling you there?

13    A    I think he's --

14              MR. EGAN:  Objection.  Unless --

15              THE COURT:  Sustained.

16    BY MS. BARRY:

17    Q    Do you know what the required information would be that

18    he would have sign?

19    A    I'm not sure what he would have to sign.  Maybe --

20              MR. EGAN:  Objection.

21              THE COURT:  Sustained.

22              MS. BARRY:  Okay.

23    BY MS. BARRY:

24    Q    Only if you know.

25              THE COURT:  You cannot speculate.  Next question,

1    counsel.

2              MS. BARRY:  Yes, Your Honor.

3    BY MS. BARRY:

4    Q    Do you know whether or not Nova Bank received any TARP

5    funding?

6    A    No, they didn't.

7    Q    Okay.

8              MS. BARRY:  May I have a moment, Your Honor?

9              THE COURT:  Yes.

10        (Pause)

11             MS. BARRY:  Your Honor, just -- while there was a

12   stipulation to Exhibits 200, 201, 202, 203 and 204, we'd ask

13   that they be moved into evidence -- admitted into evidence.

14   I'm not sure if I technically moved them into evidence.

15             THE COURT:  They will be, as redacted as we

16   indicated earlier in terms of the string.  Is that correct?

17             MS. BARRY:  No.  These are the voice mail messages.

18             THE COURT:  The voice mail, okay.  Fine.

19             MR. EGAN:  We have no objection.

20             THE COURT:  All right.  They are admitted.

21             MS. BARRY:  And I would also like to, if I failed to

22   do that move -- formally move for the admission of

23   Government's Exhibit 160.

24             THE COURT:  Any objection?

25             MR. EGAN:  No, Your Honor.

1            THE COURT:  All right.  Admitted.  Thank you.

2            MS. BARRY:  May I have one moment?

3            THE COURT:  Surely.

4            MS. BARRY:  No further questions at this time.

5      Thank you.

6            THE COURT:  All right.  Let's take our mid-afternoon

7      break.

8          (Jury Exits)

9            THE COURT:  You may step down.  Counsel, let me see

10     you at sidebar, please?

11         (Sidebar Conference)

12           THE COURT:  I have been eyeing juror number 12.

13     I've been taking some random sample observations and,

14     unfortunately, the overwhelming majority of time he appears to

15     be dozed off.  I'm going to speak with him, with your

16     approval.  But I'm leaning toward taking him off of this jury

17     because he's already missed, to me, a significant portion of

18     the testimony and the other exhibits in this case.

19           I can do it now or I can wait and give him a

20     opportunity, it's up to you.

21           UNIDENTIFIED COUNSEL:  Your Honor, I think you

22     should give him the opportunity, personally.

23           THE COURT:  All right.

24           UNIDENTIFIED COUNSEL:  Your Honor, I think he should

25     be afforded a opportunity to explain whether or not he's an

1  individual who is listening with his eyes closed or not.

2  There's no offense to Ms. Barry, but the last examination was

3  not exactly the most exciting one in the world.

4            MS. BARRY:  What?

5            UNIDENTIFIED COUNSEL:  I was waiting the IV coffee

6  to drop over there.

7            THE COURT:  Now, now.  All right.  You're doing a

8  fine job.

9            MS. BARRY:  Thank you, Your Honor.

10            UNIDENTIFIED COUNSEL:  It was a fine job.

11            UNIDENTIFIED COUNSEL:  You drew the short straw.

12            UNIDENTIFIED COUNSEL:  I wouldn't mind -- I have not

13  really noticed, but I haven't really been looking in that

14  direction.

15            THE COURT:  Yes.  I have to check that to maintain

16  the --

17            UNIDENTIFIED COUNSEL:  I have seen it, though.

18            THE COURT:  All right.

19            MS. BARRY:  Thank you.

20            UNIDENTIFIED COUNSEL:  Thank you, Your Honor.

21       (Sidebar Ended)

22       (Court in recess 3:21 p.m. to 3:37 p.m.)

23            THE COURT:  Are we ready?

24            MR. EGAN:  Yes, Your Honor.

25       (Jury Enters)

 1           THE COURT:  All right.  You may be seated.  Thank

 2   you.

 3                        CROSS-EXAMINATION

 4   BY MR. EGAN:

 5   Q    At the time that TARP came into existence, you were

 6   working for the FDIC, correct?

 7   A    Yes.

 8   Q    And you were working as a case manager, I believe you

 9   said?

10   A    Case manager.

11   Q    And a case manager has a lot of responsibility, I assume?

12   A    Yes.

13   Q    And you're essentially the case manager for a number of

14   banks?

15   A    Yes.

16   Q    And is that a regional thing, they're all in this area?

17   A    Yeah, most of my banks are in Philly.

18   Q    Okay.  And they were mostly banks of the same size?  Were

19   they all community banks, or did you have them from the big

20   ones down to the little ones?

21   A    I had some big ones and some little ones.

22   Q    Okay.  So it would be fair to say that when TARP came

23   into existence you were already basically working full-time?

24   A    Yes.

25   Q    And that TARP created a whole another layer of work for

1   you to do?

2   A     Yes.

3   Q     And as the case manager, you became sort of the person

4   who had to sort of be the go between, between the bank and

5   this council, that hopefully we'll figure out who they were at

6   some point.

7   A     Yes.

8   Q     Right?  And as such you -- for the banks that you were

9   the regulatory agency, you would be the individual who would

10  first get the ball started to begin the case decision memo?

11  A     Well I had a big case at the time, and I had some people

12  come in, and one of those people started the ball with this

13  Nova application.

14  Q     Okay.  But in general, the case decision memo for the

15  banks you were responsible --

16  A     Yes.

17  Q     -- for, you were the person to do them?

18  A     Yep.

19  Q     And what you're telling us is you had some help on Nova,

20  because you were busy with some other banks?

21  A     Yes.

22  Q     And Nova wasn't the only bank you were dealing with who

23  was applying for TARP funds, correct?

24  A     No.

25  Q     And you say you dealt with some bigger banks?

1    A    A few.

2    Q    Did you deal with like the real big guys, like Wells

3    Fargo?

4    A    No.

5    Q    Okay.  Because they didn't have to file one of these at

6    all, right?

7    A    I don't think so.

8    Q    They just got their money.

9    A    I guess.  I don't know.

10    Q    Anyway, the way the ball starts rolling is by you doing

11    -- not you personally, but like the FDIC person who happens to

12    be in your position preparing this case decision memo which

13    goes down the road to the CPP for consideration, correct?

14    A    Yes.

15    Q    And if the FDIC doesn't take the position that the bank

16    should be eligible for CPP funds, I guess we'll call them, in

17    the first instance, then the case decision memo never goes to

18    the CPP, correct?

19    A    I don't think so, no.

20    Q    Okay.  So the first decision, really a long, many trail

21    of decisions that we're going to have to cover here, is a

22    decision by the FDIC that, hey, maybe these people deserve

23    TARP?

24    A    Yes.

25    Q    Now correct me if I'm wrong, but the Government was

1   actually kind of trying to find folks a loan in TARP, right?

2   A    Yes.  In the beginning.

3   Q    Right.  And, in fact, at your agency, you were being told

4   hey, see if your banks want or need this, right?

5   A    Yes.

6   Q    Okay.  And also there was no precedent for this whole

7   thing, right?

8   A    No.

9   Q    This was never done before?  So it would be fair to say

10  it was kind of getting made up on the fly?

11          MS. BARRY:  Objection.

12          THE COURT:  Sustained.

13  BY MR. EGAN:

14  Q    Well there was no protocol in place when it started,

15  correct?

16  A    No.

17  Q    And so some protocol had to be made up, basically on the

18  fly?

19          MS. BARRY:  Objection.

20          THE COURT:  Counsel, why don't you use a

21  different --

22          MR. EGAN:  Sure.

23  BY MR. EGAN:

24  Q    Basically the program was created without any precedent,

25  we already covered that.

Koch - Cross/Ega                    173

1   A     Yes.

2   Q     So they had to come up with a way to do this?

3   A     Yes.

4   Q     Now, obviously, you didn't -- that wasn't your job,

5   right?

6   A     No.

7   Q     People way up in there in Washington did that, right?

8   A     Yes.

9   Q     And as I understand it, and correct me if I'm wrong, once

10  the FDIC came to the conclusion that they should send it down

11  the road to the CPP, and they would then create this case

12  decision memo, right?

13  A     Yes.

14  Q     And that case decision memo would say on it approved for

15  funds, right?

16  A     Well it would be a recommendation for approval.

17  Q     Good point.  Let's --

18          MR. EGAN:  Could we have 155, it's already been --

19  Government's Exhibit 155 is already in evidence.

20          Now I'm going to start at the end and work my way

21  back -- or actually circle around to the front, but you have

22  before you Government's Exhibit 155.  You haven't testified

23  about this, but this is a case decision memo, correct?

24  A     Yes.

25  Q     And it's about Nova Bank, right?

1    A    Yes.

2    Q    And up in the right-hand corner it says, "December 18th

3    '09 IC meeting number two agenda item," do you see that?

4    A    Yes.

5    Q    And now the IC, that's the investment committee, right?

6    A    I don't know.

7    Q    You don't know what the investment committee is?

8    A    No.

9    Q    Okay.  Do you know what the TARP Council is?

10   A    Yes.

11   Q    Okay.  Now when you would -- well let me go back to the

12   question I asked when I brought up the exhibit.  If we could

13   go to page -- strike that.

14          When you would make your recommendation for it to go

15   to the next level, right?

16   A    Yes.

17   Q    It would then go to the Treasury, correct?

18   A    No, it would go to our Washington Office.

19   Q    And then your Washington office would also review it?

20   A    Yes.  They would review it and present it to the TARP

21   Council.

22   Q    And they're the ones who would take it to the council?

23   A    Yes.

24   Q    And the council would then have a vote on it, correct?

25   A    Yes.

Koch - Cross/Ega                                    175

1    Q    But that actually wouldn't mean it was approved, correct?

2    A    No, there was a -- I think there was one final step afer

3    that.

4    Q    And that was, it doesn't refresh your recollection, this

5    investment committee?

6    A    No.

7    Q    If you could look at this document on page -- fourth

8    page.  The very bottom.  It says:

9             "To investment committee December 18th, '09.

10   Investment committee decision 3/0 denial.  Contingent on 4/0

11   denial from council, and FDIC's change in viability."

12            Do you see that?

13   A    Yes.

14   Q    That's about the fact that on December 18th, '09 the

15   investment committee decided not to approve this application,

16   correct?

17   A    It looks that way.

18   Q    And so does that in any way refresh your recollection

19   that they're the folks who actually made the decision?

20   A    No.

21   Q    You don't really know who made the decision, do you?

22   A    No.

23   Q    Join the crowd.

24            MS. BARRY:  Objection.

25            THE COURT:  Sustained.

1    BY MR. EGAN:

2    Q    Okay.  It says here, "Contingent on the 4/0 denial from

3    council and FDIC's change in viability."  Now this came up --

4    was brought to your attention because when FDIC's change in

5    viability would be something that would be addressed to you,

6    right?

7    A    No.

8    Q    So you really don't remember any discussion in relation

9    to this December 18th decision to deny the funds?

10   A    No.

11   Q    Now towards the end of your examination, which we just

12   heard a few minutes ago, you were asked a lot of questions

13   about communications that were between you and Mr. Hartline --

14   A    Yes.

15   Q    -- in December of 2009, correct?

16   A    Yes.

17   Q    And it would be fair to say that while you were fielding

18   those communications from Mr. Hartline, you were aware that

19   this application was going nowhere, correct?

20   A    Not the whole time.  Just towards the end.

21   Q    Okay.  And certainly the last couple of days?

22   A    Yes.

23   Q    And, in fact, the communications that he sent to you on

24   December 18th and after that, they came after you had already

25   been told by people in Washington that this was going to be a

1    denial, right?

2    A    I don't remember.

3    Q    Okay.  Well we can address that, but that's kind of a

4    tough position to be in, isn't it?

5    A    Well --

6    Q    Well, I mean, there's people in D.C. are saying, tell

7    these folks they're not getting their funding, and you got to

8    be the one who tells them, right?

9    A    Oh, yeah.

10   Q    It wasn't any fun.

11   A    No.

12           MR. EGAN:  If we can have Defense Exhibit 81?

13   BY MR. EGAN:

14   Q    Do you recognize that document?

15   A    Yes, it's email traffic.

16   Q    And it's between you and Bill Baxter?

17   A    Yes.

18   Q    And Kevin Glugert, I hope I'm not mispronouncing that.

19   And it's related to Nova Bank, correct?

20   A    Yes.

21   Q    And like all email trials, it starts at the bottom.  So

22   if we could go to the second page.  And on the second page,

23   there is a December 17th email from Bill Baxter to you, Amy

24   and Kevin --

25   A    Right.

1    Q     You recognize this document, right?

2    A     I haven't seen it recently, but probably.

3    Q     Well it's from the same time as all the ones you just

4    testified --

5    A     It's got my name on it.

6    Q     -- right.  It's yours.

7              MR. EGAN:  I move for the admission of D-81 --

8    strike that.  I just want to ask a question about it.  In this

9    email Mr. Baxter says:

10             "Given the four components for AQ and earnings, I

11   don't see this getting approved."

12             Correct?

13   A     Yes.

14   Q     (Reading)

15             "We will take it back to council if the region wants

16   to pursue this, but since the bank hasn't been -- never been

17   profitable, the TRUPs are deferred, that's the payment of --

18   A     Interest.

19   Q     -- interest, right.

20             "And the FRB opposes, this has little chance."

21             Correct?

22   A     Correct.

23   Q     (Reading)

24             "And, frankly, I don't support this either. given

25   the fact pattern."

1           Correct?

2    A    Correct.

3    Q    So basically this is telling you on December 17th at 7:11

4    a.m., that this is not happening, correct?

5    A    Well the bank could have withdrawn the application and we

6    talked to them about it, but they wanted to pursue it.

7    Q    And --

8    A    So we sent the memo forward.

9    Q    Right.  And so you recall those conversations where you

10   said to the bank, why don't you withdraw the application?

11   A    Yes.

12   Q    Because you're not going to be granted anyway?

13   A    I think my supervisor, Amy, had spoken to Mr. Hartline

14   about that.

15   Q    And we saw some emails on your direct examination about

16   that, and there was -- Mr. Hartline says they have people's

17   funds who are contingent on getting the TARP, and he wants to

18   send it back in case they're denied, remember that?

19   A    I remember some -- some email like that.

20   Q    Yeah.  And you said, don't send them back yet, maybe --

21   you know, wait and see?

22   A    Well we had to get the official denial from Washington.

23   Q    Right, understood.  But you understand the reason they

24   didn't want to withdraw it is, because they had represented to

25   folks that they were going to get it?

1                   MS. BARRY:  Objection.

2                   THE COURT:  Sustained.

3    BY MR. EGAN:

4    Q    So going back to the decision on December 18th by the

5    council --

6    A    Right.

7    Q    -- you weren't told the council made the decision on

8    December 18th?

9    A    I didn't -- no.  I don't remember when I was officially

10   told.  I think it was the twentieth, it was like Tuesday

11   after.

12                  MR. EGAN:  Can we go to 160, Government's 160, it's

13   already admitted.  And if we can blow that up?  Thank you.

14   BY MR. EGAN:

15   Q    And the one below is an email from you to Mr. Hartline,

16   correct?

17   A    Yep.  Yes.

18   Q    And it says:

19                  "I finally got an email from my contact in

20   Washington.  He indicated he will know by Tuesday afternoon.

21   I'm sorry, I was told they would tell us Friday."

22                  Correct?

23   A    Right.

24   Q    And what you are doing here is you're telling him you

25   don't have final official word?

1   A    Right.

2   Q    But you already knew that your boss was saying no,

3   correct, Mr. Baxter?  Not your boss but the guy in FDIC --

4   A    Right.

5   Q    -- who was in charge?

6   A    Right.  It was a weak case.

7   Q    It was a weak case.  Well it was a weak case from day

8   one, wasn't it?

9   A    The bank deteriorated along the way.

10  Q    And, indeed, that mostly had to do with the securities

11  that the bank had on its balance sheet, correct?

12  A    Well then asset quality deteriorated, yes, because those

13  securities were included in the asset quality rating.

14  Q    Right.  So when they applied in October of 2008, they

15  were doing okay, even though they had just taken over this

16  other bank and raised $18 million.  You knew all about that

17  right?

18  A    Yes.

19  Q    And they were well capitalized at that point --

20  A    Yes.

21  Q    -- when they applied.  And what caused them to no longer

22  be well capitalized was this downgrading of the securities

23  that really they owned, but had nothing really to do with

24  them, right?

25  A    Yes.  That as the first part.

1    Q    Okay.  And once those securities were downgraded, Nova

2    became adequately capitalized, correct?

3    A    Yes.

4    Q    And it never became well capitalized again, correct?

5    A    I'm not sure.

6    Q    Well we'll walk through that in more detail.  You

7    testified on direct examination that you became involved in

8    this matter late in '09, do you remember that?

9    A    Yes.

10   Q    Way back many hours ago?  And you would agree with me,

11   would you not, that we saw quite a few emails that were

12   actually from the spring of '09?

13   A    Yes.

14   Q    So let's face it, I mean, this is how long ago, six

15   years, right?

16   A    Yes.

17   Q    So obviously it's hard to remember all this stuff?

18   A    Yes.

19   Q    So for the most part, your memory is being refreshed by

20   all of these documents, correct?

21   A    Yes.

22   Q    And reading the emails is reminding you what happened and

23   you're sort of filling in the pieces along the way?

24   A    Yes.

25   Q    So it would be fair to say, now that you've been here all

1    day testifying about this, that in reality you became involved

2    earlier in the year, not in late 2009.

3    A    Well I said approximately in the second half of the year.

4    Q    Right.  Well the first email that you were shown by the

5    Government, which is Government's 10.

6              MR. EGAN:  If we could have that?

7    BY MR. EGAN:

8    Q    That's actually February, right?

9    A    Yes.

10   Q    So we're really talking pretty early in the year.  Right?

11   A    Yes.

12   Q    Okay.  And this -- at this point, there's an application

13   that's been sent down to Treasury, right?

14   A    Yes.

15   Q    But no ones taken any action on it?

16   A    No.

17   Q    Other than FDIC having approved it to go to Treasury in

18   the first place?

19   A    Yes.

20   Q    And that FDIC approval to go to Treasury was not based on

21   any capital raise in 2009?  That wasn't even discussed at that

22   point, correct?

23   A    Well they had a large investor.

24   Q    Well that came in May, but I'm talking in February.  In

25   February of 2009, when the initial recommendation was sent

1    down to Washington to prove -- or to recommend Nova for TARP

2    funds --

3    A    Yes.

4    Q    -- there had been no talk of a new capital raise or new

5    investor, correct?

6    A    I don't remember when that started.

7    Q    Well we'll get to that.  But at this point in time, if

8    you look at Government Exhibit 10, the questions that are

9    being asked here relate to capital levels throughout the

10   organization, correct, the first bullet point?

11   A    Yes.

12   Q    The lead bank asset quality earnings and liquidity

13   ratings, correct?

14   A    Yes.

15   Q    Second bullet point.  And the classified asset ratios,

16   third point.

17   A    Right.

18   Q    And the asset quality, that's one of the CAMELS factors,

19   isn't it?

20   A    Yes, it is.

21   Q    And earnings is a CAMELS, factor?

22   A    Yes.

23   Q    And liquidity is a CAMELS factor?

24   A    Yes.

25   Q    As is capital, correct?

1    A    Yes.

2    Q    So basically all of CAMELS, except for management is

3    covered by these concerns, correct?

4    A    Except for sensitivity.

5    Q    Sensitivity.

6    A    Yes.

7    Q    But basically the vast majority of them are covered?

8    A    Yes.

9    Q    And so Treasury was not just concerned about raising

10   capital, they were concerned about all these issues, right?

11   A    Yes.

12   Q    And when you went to get answers for this, you got those

13   answers you said you believe from Brian Hartline?

14   A    Brian or Jeff.

15   Q    Right.  And isn't it true that at the start of the

16   process when you're exchanging numbers and getting like

17   financial data about the bank, that most of it came from Jeff?

18   A    Yeah, I'm sure early in the process it did.

19   Q    And that's because he was the CFO, right?

20   A    Yes.

21   Q    So he would be the one who did the math in determining

22   some of these things and actually provided you with the data?

23   A    Yes.

24   Q    And I believe at one point you said you had asked Jeff

25   questions on five or six occasions, and he always provided you

1   the answers you requested, correct?

2   A    I don't remember saying that.  I know he provided some of

3   the information.

4   Q    And whenever you reached out to him and asked for

5   information, he gave it to you?

6   A    Yes.

7   Q    He didn't withhold anything from you?

8   A    No.

9   Q    Now if we go to Government 11, this is where you get the

10  answers to these questions, correct?

11  A    Yes.

12              MR. EGAN:  And if we could blow up the --

13  BY MR. EGAN:

14  Q    Right.  And so you did -- you basically cut and pasted

15  them in, right?

16  A    Yes.

17  Q    To the questions.  Now the Government focused on the

18  first one, which it questioned capital levels, right?

19  A    Right.

20  Q    And with regard to that you say:

21              "CEO Brian Hartline indicted he would go out -- back

22  out for more capital later in the year to bolster capital."

23              Right?

24  A    Yes.

25  Q    So there's nothing in here about a $15 million investor

1    or anything of that nature, correct?

2    A    No.

3    Q    And you go on to say:

4             "Mr. Hartline has a good solid history of raising

5    capital when it is needed."

6             And that was accurate, right?

7    A    Yes.

8    Q    They had just raised $18 million the year before?

9    A    Yes.

10   Q    And then you have to answer the questions about asset

11   quality, correct?

12   A    Yes.

13   Q    And you also had to answer questions about liquidity?

14   A    Yes.

15   Q    And earnings.  And all of this information that you used

16   to answer this, this is information that would also be

17   included in the call reports for the most part?

18   A    Some of it.

19   Q    It would be included also in FDIC examination reports?

20   A    Yes.  Some of it.

21   Q    Or in PADOB examination reports?

22   A    Yes.

23   Q    And during this period of time, Nova was being examined

24   both by the PADOB and the FDIC, correct?

25   A    I don't know when the examination was.

Koch - Cross/Ega                              188

1   Q    Okay.  Well can get to that later, because the

2   examination clearly impacted the decision that was made by

3   whoever made it, right?

4            MS. BARRY:  Objection.

5            THE COURT:  Sustained.

6   BY MR. EGAN:

7   Q    Well isn't it true that at the end of the day the

8   downgrading that was done by the PADOB is the main basis for

9   the -- that decision to deny the TARP funds?

10  A    I'm not sure, I didn't make that decision.

11  Q    Okay.  Well did you -- you read what you sent to Mr.

12  Hartline, correct?

13  A    Yes.

14  Q    And what you sent was what was described to you by the

15  folks in D.C., correct?

16  A    Yes.

17  Q    Okay.  But it would not be unusual for the Pennsylvania

18  Department of Banking to do an examination during the year

19  when this was going on, correct?

20  A    No, it was routine.

21  Q    Yeah, they were done all the time.  And when the

22  examination takes place, the examiners go into the bank,

23  right?

24  A    Yes.

25  Q    And there's a couple of them at least?  Sometimes a

1   bunch?

2   A     Yes.

3   Q     And they sit there for however long it takes, right?

4   A     Right.

5   Q     They ask for all the records, correct?

6   A     Yes.

7   Q     And among the things they ask for is loan records?

8   A     Yes.  We sample loans.

9   Q     Sample loans.  But the bank doesn't pick them, do they?

10  A     No, we do.

11  Q     Right.  Because you're going to sample them to make sure

12  you get a representative sample?

13  A     Right.

14  Q     Okay.  And you also look at all these other factors,

15  assets, liquidity, the whole thing, right?

16  A     Yes.

17  Q     And the regulators clearly rely on those examination

18  reports to determine the health of the bank, correct?

19  A     Yes.

20  Q     And certainly that would be a factor in whatever decision

21  was made by the CPP with regard to providing TARP funds to

22  Nova?

23  A     Yes.

24  Q     Okay.  Now in April of 2009 is when the issue comes up

25  about the securities, correct?

1    A     Yes.

2    Q     And the issue is raised to you in the first instance as a

3    concern that the CPP has about whether the securities are

4    properly valued?

5    A     Whether they were properly risk weighted.

6    Q     Okay.  And that risk weighting is essentially what caused

7    the bank to become adequately capitalized?

8    A     Yes.

9    Q     And in order for that analysis to be done, you had to

10   work with Mr. Hanuscin, correct?

11   A     Yes.

12   Q     To do the math, figure it out?

13   A     Yes.

14   Q     And Mr. Hanuscin didn't fight you with regard to what

15   needed to be done, did he?

16   A     No.

17   Q     They followed the FDIC's instructions?

18   A     I don't know who instructed them, but I don't think it

19   was us.

20   Q     Okay.  Well they certainly --

21   A     One of the regulators.

22   Q     One of the regulators instructed them.  And they

23   certainly, to your knowledge, followed all their instructions

24   right?

25            MS. BARRY:  Objection.

1          THE COURT:  Sustained.

2     BY MR. EGAN:

3     Q    You don't have to answer that.  I want to direct your

4     attention to Government Exhibit 17.  And you were shown this

5     on your direct examination.  Now this is a May 1st, 2009 email

6     from Jeffrey Hanuscin to you?

7     A    Yes.

8     Q    And it's a response to information requested for the TARP

9     application, correct?

10    A    Yes.

11    Q    And it is basically a summary of his answers to a number

12    of questions that you posed?

13    A    Yes.

14    Q    And one of them has to do with this OTTI analysis,

15    correct?

16    A    Yes.

17    Q    And these were all questions that were meaningful and

18    important for you to get so you could pass the information to

19    the CPP?

20    A    Yes.

21    Q    But you don't know which of these they relied on in

22    making their decision, correct?

23    A    No.

24    Q    If we could go to Government 21?  This is an email from

25    you to Mr. Hunter, correct?

Koch - Cross/Ega                                        192

1   A     No, from Mr. Hunter -- oh, yes, at the bottom.

2   Q     Yes, at the bottom.

3   A     Yes.

4   Q     And basically you're asking Mr. Hunter if he needs

5   anymore information from you?

6   A     Yes.

7   Q     And you just mentioned:

8         "By the way, president Hartline left me a message

9   that they have an individual who wants to invest 15 million

10  into the bank."

11  A     Yes.

12  Q     (Reading)

13        "Unfortunately, it is not in escrow yet."  Correct?

14  A     Correct.

15  Q     (Reading)

16        "But I just thought I'd pass that on."  Correct?

17  A     Yes.

18  Q     So he'd not asked you about that at that point, correct?

19  You're volunteering that information?

20  A     Well it's part of the capital component.  Any information

21  like that would be important.

22  Q     Well I'm not suggesting you shouldn't have, but I'm just

23  saying this is you volunteering it to him, it's not a question

24  he asked you?

25  A     Okay.  No.

1  Q    Right?  Okay.  And then he goes back and says:

2              "I'm not going to take this case before the council

3  this week."

4              Correct?

5  A    Yes.

6  Q    Now did you know at this point that the council had

7  already met once and basically decided that they weren't sure

8  if they were going to approve this thing or not?

9  A    I'm not sure.

10 Q    Okay.  Did you -- when did you -- how did you get

11 information about what the council did and didn't do?

12 A    Through Chuck Hunter.

13 Q    Okay.  And when you talked to Chuck Hunter, you didn't

14 talk directly to the council ever?

15 A    No.

16 Q    Okay.  And did you even know who was on the council?

17 A    No.

18 Q    And this investment council, you didn't even know they

19 existed?

20 A    Nope.  No.

21 Q    Okay.  Now that was kind of on purpose, right?  There was

22 some secrecy around this whole thing?

23 A    I don't know --

24 Q    Did anybody in the council or at the CPP, or any of your

25 contacts in Washington say that this was information that

1    shouldn't be shared, what was being done in these meetings?

2    A    No.

3    Q    Okay.  So you never heard that?

4    A    I don't remember hearing it.

5    Q    All right.  But in any event, when you pass information

6    on to Chuck Hunter, you don't really know for sure what he did

7    with it, right?

8    A    I assumed it was presented to the council.

9    Q    You assumed, but you really don't know.

10   A    Correct.

11   Q    It would be Chuck Hunter's decision what he would or

12   wouldn't tell them?

13   A    Yes.

14   Q    So your job is basically, I'm going to give Chuck Hunter

15   all the information I get, and he's going to do with it what

16   he wants to do, correct?

17   A    Well he was supposed to present it to the council.

18   Q    Well and you're saying that as if there's some authority

19   to that effect.  It was Chuck Hunter's decision what to do,

20   correct?

21   A    I guess.

22   Q    Okay.  But anyway, you did pass this on to him, and then

23   he had some questions for you.  He says:

24            "The big issues to be resolved are the sub

25   investment quality securities."

1            And that's this issue we were just talking about,

2    right?

3    A    Yes.

4    Q    And as of May that had not been resolved?

5    A    No.

6    Q    And indeed, that was never resolved, was it?  They had to

7    be downgraded?

8    A    They re-filed their March call report.

9    Q    Right.  They agreed with the regulators and lowered their

10   standing, for lack of a better way of putting it, right?

11   A    I would call that resolved.

12   Q    Okay.  Well, yes, it was resolved, but it was resolved

13   unfavorably to the bank, really, when you get right down to

14   it, correct?

15   A    Well, yes.

16   Q    Okay.  And they went along with that, right?

17   A    So capital regulations.

18   Q    I'm sorry?

19   A    It's the banking capital regulations.

20   Q    Right.  And then the second is:

21            "The bank's effort to raise capital.  Including as

22   much information as possible on the likely investors, the type

23   of instruments likely to be issued, et cetera."

24            Correct?

25   A    Correct.

1  Q    And you then were going to go down the road to the bank

2  and ask for more information on the investor?

3  A    Yes.

4  Q    And you did ask for that information, correct?  And

5  that's when you received George Levin's biographical?

6  A    Yes.

7  Q    And George Levin's financial statement?

8  A    Yes.

9  Q    And other information about George Levin?

10 A    Yes.

11 Q    Now at the time Mr. Hunter writes this email to you, he

12 writes:

13         "I will phone you tomorrow."

14         And then in the second sentence there he says:

15         "If we can present strong evidence that the bank has

16 attracted that much in private capital."

17         So he wasn't sure whether that could be done or not,

18 correct?

19 A    Correct.

20         MR. EGAN:  Your Honor, is this a good time to break?

21         THE COURT:  Sounds good.  Members of the jury, we're

22 going to adjourn for the day.  Again, do not discuss this

23 testimony that has been elicited thus far.  Avoid any radio,

24 television, or any other media broadcast about the case.  Be

25 mindful that there is no Court on Friday so, you're welcome.

1           We'll see you tomorrow morning at 9:15.  Thank you.

2       (Jury Exits)

3       (Proceedings concluded at 4:13 p.m.)

4                       * * * * *

5                C E R T I F I C A T I O N

6   I, Josette Jones, court approved transcriber, certify that the

7   foregoing is a correct transcript from the official digital

8   audio recording of the proceedings in the above-entitled

9   matter.

10  Josette Jones   Digitally signed by Josette Jones
                    DN: cn=Josette Jones, o, ou,
                    email=dianadoman@comcast.net, c=US
                    Date: 2016.04.11 15:53:55 -04'00'

11  ------------------------------        --------------------

12  JOSETTE JONES                                 DATE

13  DIANA DOMAN TRANSCRIBING, LLC

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,      )   14-CR-0548
                               )
     vs.                       )
                               )
BRIAN HARTLINE and             )
BARRY BEKKEDAM,                )   Philadelphia, PA
                               )   March 31, 2016
               Defendants.     )   9:38 a.m.

TRANSCRIPT OF JURY TRIAL (DAY 3)
BEFORE THE HONORABLE C. DARNELL JONES, II
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:           JENNIFER CHUN BARRY, ESQUIRE
                              DAVID J. IGNALL, ESQUIRE
                              ASSISTANT UNITED STATES ATTORNEYS
                              UNITED STATES ATTORNEY'S OFFICE
                              615 Chestnut Street, Suite 1250
                              Philadelphia, PA 19106

For the Defendant            PATRICK J. EGAN, ESQUIRE
Brian Hartline:              FOX ROTHSCHILD LLP
                              2000 Market Street, 10th Floor
                              Philadelphia, PA 19107

For the Defendant            MICHAEL J. ENGLE, ESQUIRE
Barry Bekkedam:              GREENBLATT, PIERCE, ENGLE,
                              FUNT & FLORES
                              123 South Broad Street, Suite 2500
                              Philadelphia, PA 19109

                              RUSSELL D. DUNCAN, ESQUIRE
                              JOEL D. SCHWARTZ, ESQUIRE
                              SHULMAN, ROGERS, GANDAL,
                              PORDY & ECKER, PA
                              12505 Park Potomac Avenue
                              Potomac, MD 20854

Audio Operator:              CARL HAUGER

Transcribed by:              DIANA DOMAN TRANSCRIBING, LLC
                              P.O. Box 129
                              Gibbsboro, NJ 08026
                              Office: (856) 435-7172
                              Fax:    (856) 435-7124
                              Email:  dianadoman@comcast.net

Proceedings recorded by electronic sound recording; transcript
produced by transcription service.

2

```
 1                          I N D E X

 2    WITNESSES:           DIRECT     CROSS     REDIRECT      RECROSS

 3    FOR THE GOVERNMENT

 4    Lisa Koch                       3 (Ega)  104 (Bar)   114 (Ega)

 5                                   67 (Dun)              116 (Dun)

 6    Frank Preve         140 (Ign)

 7    EXHIBITS:                                      I.D.   EVID.

 8    G-64 Letter from Nova Financial Holdings to

 9         Federal Reserve Bank                             106

10    G-198 Plea Agreement                           152

11    G-14 Email from Bekkedam to Preve and Levin    162

12    G-15 Email from Bekkedam to Preve and Levin    164    164

13    G-40 Email from Rovin to Preve and Hartline    183    183

14    G-40A Email from Hartline to Preve, Rovin,

15         Bekkedam and Patterson                    185

16    G-40B Email from Preve to Hartline, Rovin,

17         Bekkedam                                  187

18    G-40C Email from Hartline to Preve, Rovin,     188    188

19         Bekkedam and Patterson

20    G-42  Email from Patterson to Preve            190

21    G-46  Email from Preve to Patterson            191    191

22    G-47  Email from Preve to McMahon & S. Levin   194

23    G-64  (Previously admitted)                           198

24    G-28  (Previously admitted)

25    G-73  Email from Rovin to Preve                201
```

Koch - Cross (Ega)                                    3

1          (The following was heard in open court at 9:38 a.m.)

2                 THE CLERK:  Court is now in session.  The Honorable

3     C. Darnell Jones, II presiding.

4                 THE COURT:  Good morning.  Good morning.  You may be

5     seated.

6                 ALL:  Good morning.

7                 THE COURT:  Be seated.

8                 MR. EGAN:  May I proceed, Your Honor?

9                 THE COURT:  Yes, sir.

10                              (Pause)

11                THE COURT:  Madam, you're still under oath.

12     Counsel, you may proceed.

13                MR. EGAN:  Thank you, Your Honor.

14          LISA KOCH, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN

15                      CROSS-EXAMINATION CONTINUED

16     BY MR. EGAN:

17     Q    Good morning, Ms. Koch.

18     A    Good morning.

19     Q    Yesterday afternoon when we were -- when I was

20     questioning you, --

21     A    Um-hmm.

22     Q    -- we talked about the fact that you didn't have a great

23     memory of these facts outside of the emails, is that right?

24     A    Well, it was about, what -- it was a while ago.

25     Q    Sure.  I mean, it was 2009 mostly, right?

Koch - Cross (Ega)                                        4

1    A     Right.

2    Q     Some 2008, but mostly 2009.

3    A     Um-hmm.

4    Q     Certainly I don't --

5          THE COURT:  Again, Ms. --

6    A     Yes.  I'm sorry.

7    Q     I have no idea what I was doing in 2009, so I totally

8    understand that.  But I think what we'll do is, we'll try to

9    walk through the emails so that we can help refresh your

10   recollection.

11   A     Sure.

12   Q     And that way we can be sure we get your best recollection

13   of what happened.  As I recall, you said that you received

14   some information from Mr. Hartline, --

15   A     Yes.

16   Q     -- and some information from Mr. Hanuscin?

17   A     Yes.

18   Q     And that it was pretty much a mix of both.  Would that be

19   a good way of putting it?

20   A     Yes.

21   Q     So it would be fair to say, would it not, that the emails

22   that came from Mr. Hanuscin were -- were the things that Mr.

23   Hanuscin told you, right?  And the emails that came from Mr.

24   Hartline were mostly the things that Mr. Hartline told you?

25   A     Yes.  But I believe both cc'd the other when they sent me

1   things.

2   Q     Of course.  But the information was coming directly from

3   that person?

4   A     Right.

5   Q     So I want to direct you to D-18, which will appear on

6   your screen in a sec.  And this is in March of 2009.  And it's

7   an email from you to Mr. Hanuscin.  Do you see that?  At least

8   the --

9   A     Yes.

10  Q     -- top part.  And it's actually -- excuse me -- it's

11  April 17th, 2009.  And you're asking him some questions,

12  right?

13  A     Yes.

14  Q     And you're asking him to get you a lot of information,

15  correct?

16  A     Yes.

17  Q     And the information is information that you basically

18  need for the TARP application?

19  A     Yes.

20  Q     Now, these are questions obviously that somebody

21  forwarded to you, right?

22  A     Yes.

23  Q     Okay.  And if you go to the second paragraph, you say

24  their areas of concern are leverage at the holding company,

25  right?

```
 1   A    Yes.

 2   Q    Earnings and asset quality, correct?

 3   A    Yes.

 4   Q    Now, earnings is one of those acronyms in the Camels,

 5   correct?

 6   A    Yes.

 7   Q    And asset quality, that's one of the acronyms in the

 8   Camels?

 9   A    Yes.

10   Q    And neither of those are related whatsoever to capital,

11   correct?

12   A    Earnings is.

13   Q    Well, earnings obviously makes capital, --

14   A    Right.

15   Q    -- but there's a whole -- there's a -- put it this way,

16   on the Camels system, there's a basket that's called capital?

17   A    Yes.

18   Q    And then there's a basket that's called earnings?

19   A    Right.

20   Q    So this is a separate basket?

21   A    Right.

22   Q    They obviously affect one another; --

23   A    Yes, they do.

24   Q    -- they all interplay in --

25             THE COURT:  Counsel, don't -- no comment, just --
```

1          MR. EGAN:  I'm sorry, Your Honor.  My bad.

2

3          THE COURT:  -- state the question, please.

4    BY MR. EGAN:

5    Q    They -- they all interplay, right?

6    A    Yes.

7    Q    Okay.  But these two particular ones they're interested

8    in are not specifically capital?

9    A    No.

10         MR. EGAN:  And if we can now go to G-17.  And I

11   believe this is already admitted.

12         MR. MORGAN:  Yes.

13         MR. EGAN:  You may publish it to the jury.

14   BY MR. EGAN:

15   Q    This is an -- excuse me -- an email from Mr. Hanuscin to

16   you, correct?

17   A    Yes.

18   Q    And it contains a whole lot of information, right?

19   A    Yes.

20   Q    And these are essentially the answers to the questions

21   that you were asking in the email we just looked at?

22   A    Yes.

23   Q    Okay.  And so obviously he answers to the best of his

24   ability your questions about asset quality, right?

25   A    Yes.

1    Q    And he also answers your questions about the OTTI

2    analysis?

3    A    Yes.

4    Q    And that's this issue having to do with these securities

5    that the bank owned that ended up getting downgraded, right?

6    A    Somewhat, yes.

7    Q    It's all complicated, but that's really it, right?

8    A    Yeah.  Yes.

9    Q    Okay.  And then if you turn to page 2, there's a question

10   about what is the cash position of the holding company.  Do

11   you see that?

12   A    Yes.

13   Q    And he answers you with how much money is there and says

14   currently 2.5 million has been raised of potential capital.

15   Now, this is before anything having to do with Mr. Levin's

16   investment, correct?

17   A    Yes.

18   Q    So that's 2.5 million that would have already been raised

19   from other people?

20   A    Yes.

21   Q    And then he goes on to say these funds were partly raised

22   in connection with the DVFG acquisition?

23   A    Yes.

24   Q    Do you remember the DVFG acquisition?

25   A    It was Delaware Valley Financial Group, I believe.

1    Q     Yeah.  It was an insurance company, right?

2    A     I'm not sure.

3    Q     Okay.  But you remember they were talking about acquiring

4    another company --

5    A     Yes.

6    Q     -- and adding it to the bank's portfolio?

7    A     Yes.

8    Q     And that was this thing called DVFG?

9    A     Yes.

10   Q     Okay.  And so basically what he's saying here is some of

11   that 2.5 is tied to that, right?

12   A     Yes.

13   Q     And then the last question is, what debt service

14   requirements are at the holding company.  And this relates to

15   the issue of whether the holding company can pay its

16   dividends, right?

17   A     Yes.

18   Q     And that became a very big issue, did it not?

19   A     Yes, it did.

20   Q     And, in fact, the holding company's inability to pay its

21   dividends turned out to be a big factor in the TARP -- the

22   whole TARP analysis?

23   A     Yes.

24   Q     And then obviously, we won't go through them, but there's

25   a whole lot of financial data attached to this exhibit.

1    You're not seeing --

2    A      Yes, there is.

3    Q      -- because you have --

4    A      There was.

5    Q      -- a copy like that.  All right.  So if we can now turn

6    to D-29.  And once you have it, I'll ask you a question or

7    two.

8              This is a -- an email back and forth between you and

9    a gentleman named Gregory M. Quint, correct?

10   A      Yes.  Yes.

11   Q      And Gregory Quint, I assume, is another FDIC employee?

12   A      Yes.

13   Q      And Gregory Quint is the individual who ended up doing

14   the analysis of the securities we've been talking about,

15   right?

16   A      I believe so, yes.

17   Q      And that's actually kind of a complicated area, correct?

18   A      It is.

19   Q      Okay.  So he was maybe a specialist in that kind of

20   stuff?

21   A      Capital market specialist.

22   Q      Okay.  So if we go down to the bottom, Mr. Quint is

23   actually writing to a Chuck Hunter?

24   A      Yes.

25   Q      And Chuck Hunter is one of these guys in Washington,

1  right?

2  A    Yes.

3  Q    And he's higher up at the FDIC, I guess?

4  A    I don't know.

5  Q    But he was one of the people that you would -- you had

6  some back and forth with regarding --

7  A    Yes.

8  Q    -- all of these issues?  And Chuck is -- has asked Mr.

9  Quint some questions about the -- the securities, correct?

10 A    Yes.

11 Q    And in response to that, you write to Mr. Quint just

12 above there --

13         MR. EGAN:  If we can go there to the next email

14 up.

15 Q    You write to Mr. Quint and say basically I'll be back in

16 the office Friday, can we talk then, right?

17 A    Yes.

18 Q    Because you were going to give him whatever information

19 you had about this so he could make a good analysis, correct?

20 A    Yes.

21 Q    Because you're the case manager?

22 A    Yes.

23 Q    So it's kind of your bank, basically, for lack of a

24 better way of putting it.

25         MS. BARRY:  Objection.

1          THE COURT:  Sustained.

2          MR. EGAN:  Withdrawn.

3   BY MR. EGAN:

4   Q    So -- and then if we can go up to the next email, he

5   says:  "I'm out tomorrow afternoon and Friday, is Tuesday too

6   late?"  And then if we go up to the one before that -- or

7   above that, I'm sorry, you write back and you say:  "I would

8   try and call Chuck tomorrow to determine exactly what he

9   wants."

10         So from the prior discussion, you weren't really 100

11  percent sure what it was Chuck was concerned about, I guess?

12  A    Yes.

13  Q    Okay.  And then you write:  "My understanding of what he

14  wanted does not seem to be right per his email."  Correct?

15  A    Yes.

16  Q    So basically you're still -- you're kind of trying to

17  figure this out?

18  A    Yeah, I didn't understand what he needed.

19  Q    Okay.  And then you say:  "I'm sorry he seems somewhat

20  condescending to you in his email; that's my take."  So that's

21  -- you're just basically being polite, right?

22  A    Yes.

23  Q    Okay.  And then if we can go up to the top one.  Mr.

24  Quint writes back to you and he says:  "No problem, I didn't

25  want to open up a can of worms, but I felt compelled to at

Koch - Cross (Ega)                                    13

1   least bring up the possibility of a risk waiting issue for

2   some of these securities."  So this is Mr. Quint saying, hey,

3   there might be an issue here?

4   A    Yep.  Yes.

5   Q    And this is basically the first anybody knows about this

6   issue, isn't -- isn't -- or really focused on it was in May?

7   A    I believe so, yes.

8   Q    And this is after the FDIC sent its original approval --

9   or recommendation of approval down to the TARP council back in

10  January, right?

11  A    I believe that -- yeah, I'm not sure when it was sent.

12  Q    Well, we already had an April meeting where the council

13  said they wanted more information, so that would have to mean

14  necessarily that the FDIC had sent it down before then, right?

15  A    Yes.

16  Q    Okay.  So if you go to the last sentence of that email,

17  it says:  "The FEIC guidance put out within the last month or

18  so walks through some examples."  Do you see that?

19  A    Yes.

20  Q    Now, FFIEC guidance, do you know what that is?

21  A    It's the Federal Financial Institution's -- I'm not sure

22  what EC stands for.

23  Q    But what it is, is it's some kind of guidance coming from

24  someone who's tied to the regulatory agencies about how to

25  handle these kind of issues, right?

1    A    Yes.

2    Q    And it's not unusual for that guidance to come out

3    continuously -- or not -- but frequently?

4    A    It comes out all the time.

5    Q    It comes out all the time.  Thank you.  Much better put.

6    And it comes out all the time because issues change, right?

7    A    Yes.

8    Q    And conditions change?

9    A    Yes.

10   Q    And in 2008 and 2009, conditions were changing, weren't

11   they?

12   A    They had changed a lot.

13   Q    Indeed.  And so what had been okay and maybe made sense

14   to a bank in 2008, in 2009 maybe not so much?

15              MS. BARRY:  Objection.

16              THE COURT:  Sustained.

17   BY MR. EGAN:

18   Q    If we could go to D-24 then.  And that last email was on

19   Thursday, May 21st at 7:19.  This email is on Thursday, May

20   21st at 11:42.  And if you go to the bottom, Mr. Quint writes

21   you and he says:  "Hello, Lisa.  Chuck instructed me to call

22   the bank."  Correct?

23   A    Yes.

24              MS. BARRY:  Objection.

25              MR. EGAN:  Basis?

1          MS. BARRY:  Hearsay.

2          THE COURT:  Overruled at this point.

3    BY MR. EGAN:

4    Q    And he says:  "I was a bit reluctant to do so."  And he

5    says I was a bit reluctant to do so because it's your bank,

6    basically, right?

7    A    It was in my caseload.

8    Q    Right.  And that's not -- you wouldn't be calling up

9    somebody else's bank without talking to them first?

10   A    I was the primary contact.

11   Q    Right.  But I mean you yourself wouldn't call up somebody

12   else's bank without letting them know first, I would imagine?

13   A    No.

14   Q    Yeah.  But you were away, --

15   A    Yes.

16   Q    -- and Chuck wanted to know apparently right away.  And

17   you respond and you write to him:  "Thanks, Greg.  I'm really

18   sorry I'm not around to do so.  Jeff is very nice.  He has put

19   up with all the TARP questions.  I think there have been like

20   five rounds of questions for them."

21        So at this point in time, you're basically saying to

22   Mr. Quint --

23   A    Yes.

24   Q    -- that the bank's giving you whatever information you

25   ask and you've had a lot of questions?

1    A     Yes.

2    Q     And you say:  "Thanks again.  Sorry I got you into this

3    mess.  But you were just being polite, basically?

4    A     Yes.

5    Q     And he writes back to you and he says:  "No problem.

6    Just don't want to step over my bounds, particularly with a

7    TARP application.  Wait until he reads the guidance; his head

8    is going to spin."  And that says to you this guidance is

9    pretty complicated?

10   A     It's complicated.

11   Q     In fact, it would make most people's head spin.

12              MS. BARRY:  Objection.

13              THE COURT:  Sustained.

14   BY MR. EGAN:

15   Q     Well, a lot of the guidance that comes out of these

16   regulatory agencies with regard to these types of issues is

17   pretty complicated, right?

18   A     Yes.  Some of them.

19   Q     Now, turning to D-33, you write back to Mr. Quint on May

20   28th and you say:  "The guidance you sent to Nova, when did

21   this come into play; is it new?"  Correct?

22   A     Yes.

23   Q     And that's actually just you want to know because you've

24   got to deal with a lot of other banks, right?  You want to

25   have that information?

1    A    Yes.

2    Q    And he responds to you.  And in the last sentence of his

3    response he says:  "I think the FFIEC found it necessary to

4    issue guidance given the recent applicability of the issue and

5    some confusion out there."  Do you see that?

6    A    Yes.

7    Q    And that's why they issue guidance, right?

8    A    Yes.

9    Q    They issue guidance because a lot of times on these

10   evolving issues or emerging issues, there's confusion in the

11   banking industry?

12   A    Yes.

13   Q    Now, if we could go to Government-22, please.

14            MR. MORGAN:  Is this admitted?

15            MR. EGAN:  It is admitted, so it may be published.

16   BY MR. EGAN:

17   Q    And apparently -- do you remember testifying yesterday

18   that you got a voicemail from Brian Hartline saying that they

19   had a potential investor?

20   A    Yes.

21   Q    And he was going to put a lot of money into the bank?

22   A    Yes.

23   Q    Okay.  So if you look at the bottom email on this page,

24   it's from you to Brian, and it's dated May 26th.

25   A    Yes.

1   Q    And it says, hi, Mr. Hartline, I received your message

2   today.  That is great news of a potential private investor.

3          So this would be contemporaneous with receiving that

4   voicemail, correct?

5   A    I believe so.

6   Q    Okay.  And then the next paragraph says:  "I spoke to

7   Chuck Hunter, the person in D.C. who is presenting your

8   application to the TARP committee.  He indicated it would be

9   in your best interest to forward whatever information you

10  could pass along about the private investor."  Correct?

11  A    Yes.

12  Q    So this is you telling Mr. Hartline that Mr. Hunter has

13  asked you to get a bunch of information?

14  A    Yes.

15  Q    Now, do you remember an email you were shown yesterday by

16  Ms. Barry that had like sort of a more detailed list of stuff

17  that Mr. Hunter wanted you to ask?

18  A    I don't know which email.  There's a lot of emails.

19  Q    There's a lot of emails.  That's true.

20  Q    But you would agree the way you put it to Mr. Hartline

21  was, whatever information you can pass along, correct?

22  A    Yes.

23  Q    And in that same email, you also get back to this issue

24  we were just talking about, which is these investments.  And

25  you say:  "I do need to get some information regarding the

1    subinvestment quality investments."  Correct?

2    A    Yes.

3    Q    And you say you will contact Jeff about that later today,

4    right?

5    A    Yes.

6    Q    Now, Mr. Hartline responds about the investor at the top

7    of this email and he says a couple things.  First he says:

8    "Please find attached the personal financial statements for

9    the potential investor."  Right?

10   A    Yes.

11   Q    And if we could go to page 4 of this document.  That is

12   the personal financial statement of George Levin, correct?

13   A    Yes.

14   Q    And it's signed, isn't it?

15   A    Yes.

16   Q    And it's signed by George Levin?

17   A    Yes.

18   Q    And by his wife, Gayla Sue.

19   A    Yes.

20   Q    Now -- so Mr. Hartline is just providing you with the

21   financial statement that was given to him apparently or

22   prepared by Mr. Levin, correct?

23   A    Yes.

24   Q    And I believe yesterday the Government showed the jury --

25            MR. EGAN:  If we could again on page 5.

1  Q    -- that he's apparently worth $364 million and a number

2  that ends in 39 cents, correct?

3  A    Yes.

4  Q    39 cents is important there.  Now -- and that's Mr.

5  Levin's financial statement, right?

6  A    Yes.

7  Q    Not the bank's financial statement?

8  A    No.

9  Q    Now, going back to the first page, he also says to you:

10  "I would prefer this information go no further until I get a

11  firm understanding how much he will invest."  Correct?

12  A    Yes.

13  Q    So basically he's saying this is for you and whoever you

14  got to give it to in the Fed, but -- or in the FDIC, but, you

15  know, don't disseminate it to anybody else, right?  I mean,

16  you didn't see that as saying you couldn't share it with

17  Chuck?

18  A    No.

19  Q    Yeah, of course.  Now, it also says there, though, until

20  I get a firm understanding how much he will invest, correct?

21  A    Yes.

22  Q    So he's not sure even how much this guy is giving yet,

23  correct, on May 26th?  Or investing, I should say; he's not

24  giving anything.

25  A    Well, Mr. Levin had said he -- his original thought was

Koch - Cross (Ega)                                        21

1    to invest 15 million.

2    Q     Right.  He's saying he might.

3    A     Right.

4    Q     But he also says right above that he may change his mind

5    and stay under 9.9 percent, correct?

6    A     Yes.

7    Q     And then if you go to the bottom of the paragraph that

8    starts with his original thought, he says:  "If he doesn't

9    want to go through the application process and stay at 9.9

10   percent, the capital investment would be reduced."  Correct?

11   A     Yes.

12   Q     So at this point, we're not sure if Mr. Levin is going to

13   go through this process.  And we talked about it yesterday and

14   we'll talk about it a little more today, it's the changing

15   control thing, right?

16   A     Yes.

17   Q     Because that's kind of an elaborate process?

18   A     It involves a lot of information.

19   Q     Yeah, and it's Mr. Levin that has to provide that

20   information?

21   A     Exactly.

22   Q     Yeah.  So Mr. Hartline's not sure of that, so he's

23   saying, hey, this guy said he's going to invest; hopefully it

24   will be the 15, but it might not.  Right?

25   A     Yes.

1   Q     Okay.

2              MR. EGAN:  And now if we can go to Government 28,

3   which I know has been admitted.

4   Q     And this is dated June 2nd.  Now, we're going to get to

5   Government 30 next, and that indicates that the regional -- or

6   the CPP council made their recommendation on June 10th, right?

7   It's not on here, but --

8   A     Oh, it's not on there.

9   Q     But if I represent to you that the council

10  recommendations says it's on June 10th, you wouldn't dispute

11  that, right?

12  A     I -- I don't know the exact date.

13  Q     I'll show it to you in a minute.

14  A     Okay.

15  Q     All right.  But June 2nd is the day you get this email

16  from Jeffrey Hanuscin, correct?

17  A     Yes.

18  Q     And in this email, he says a number of things to you.

19  Number one, he talks first about the -- this OTTI investment

20  problem that has come up, correct?

21  A     Yes.

22  Q     And he basically says as a result of this new guidance

23  analysis and what we've had to go through here, we're no

24  longer well capitalized, correct?

25  A     Yes.

1    Q    And that's something basically everybody had kind of come

2    to the understanding of at that point, was Nova was no longer

3    going to be well capitalized?

4    A    Yes.

5    Q    And, by the way, amending a call report, there's nothing

6    wrong with that, right?

7    A    No.

8    Q    In fact, you guys -- the FDIC likes it if you amend a

9    call report to fix things after the fact --

10   A    If -- if there's something wrong in the call report, you

11   should amend --

12   Q    Right.  When you find out, hey, we did this wrong, you

13   amend the call report?

14   A    Yes.

15   Q    So -- so that covers that issue.  And then paragraph two,

16   he writes the following:  "Management believes that the

17   adequate capital levels should be short-lived."  Correct?

18   A    Yes.

19   Q    So he's not saying they definitely won't be short-lived,

20   he's saying they should be, correct?

21   A    Yes.

22   Q    And then he goes on to say:  "An individual has expressed

23   interest to invest 15 million."  Right?

24   A    Yes.

25   Q    But he then says:  "The investment is dependent upon

1  regulatory approval of his investment," --

2  A    Yes.

3  Q    -- that would be the change in control, right? --

4  A    Yes.

5  Q    -- "the Treasury Department approving Nova to sell

6  preferred stock through the TARP program," meaning the

7  Treasury Department giving TARP funds to Nova, right? --

8  A    Yes.

9  Q    -- "and the approval of the DFG transaction."  Correct?

10 A    DF -- DVFG.

11 Q    I'm sorry, yes, DVFG.

12 A    Yes.

13 Q    And that's this insurance company we just talked about a

14 few minutes ago?

15 A    Yes.

16 Q    So basically what this says is, this guy's not giving us

17 his money unless all this stuff happens?

18 A    Yes.

19 Q    Okay.  And then he goes on and tells you a little bit

20 more about the DVFG transaction, that it would be more capital

21 and then things would be better, right?

22 A    Yes.

23 Q    So then if you go to the two paragraphs below that which

24 starts, with the expected, right?

25 A    Yes.

1    Q     That says:  "With the expected new capital levels,"

2    meaning they're expecting that, "they don't know for sure it's

3    going to happen."  Right?

4    A     Yes.

5    Q     Management feels -- in other words, they kind of -- their

6    hope, they feel.  They feel.

7    A     Yes.

8    Q     "Feel pretty good that Nova will be in a better position

9    to handle the economic turmoil."  Correct?

10   A     Yes.

11   Q     And then he encloses for you DVFG's financial statements.

12   Now, he did that, I assume, so you could see that -- or

13   whoever was going to do the actual, you know, close look, that

14   DVFG's got some assets, too; that it's worthwhile?

15   A     Yes.

16   Q     Because if DVFG's not worthwhile, then this whole thing

17   falls apart, right?

18              MS. BARRY:  Objection.

19   A     I don't know.

20              THE COURT:  Just -- all right.

21   BY MR. EGAN:

22   Q     Okay.  If we go to the second page of this, this is a

23   letter that was attached to there that you were shown by the

24   Government, and this is the letter from Ballamor Capital,

25   correct?

1    A    Yes.

2    Q    And if we go to the second paragraph, it says:  "Our

3    investors have committed to us that they wish to participate

4    in the Nova investment."  Correct?

5    A    Yes.

6    Q    And then on the second line it says:  "Provided that

7    Nova's current application for TARP funding is approved."

8    Correct?

9    A    Yes.

10   Q    "And the pending DVFG transaction is also approved."

11   Correct?

12   A    Yes.

13   Q    So all that's contingent as well, correct?

14   A    Yes.

15   Q    Now if we could go to the Government 30, and this is what

16   I was just talking to you about, the CPP council review

17   decision sheet.  And you're familiar with this, right?

18   A    No, I had never seen that.

19   Q    You never got this?

20   A    No.

21   Q    Well, you were told at the -- at some point you were told

22   -- well, let me just ask a few questions about that.  You were

23   the FDIC's main contact for the information to go to the TARP

24   folks?

25   A    Yes.

1    Q    And the CPP council, they're part of the TARP folks,

2    right?

3    A    Yes.

4    Q    You didn't know -- like they didn't send you their

5    results?

6    A    I don't think so.  I think Chuck just told me.

7    Q    Okay.  So -- well, let's -- let's talk about that a

8    little.  So you only hear what Chuck tells you, right?

9    A    Yes.

10   Q    And Chuck only hears what you tell him, right?

11   A    Yes.

12   Q    And you don't know what Chuck tells the council, right?

13   A    No.

14   Q    So you don't know what, if anything, of what you passed

15   to Chuck actually got to this council?

16   A    No.

17   Q    All righty.  Well, if you haven't seen this, then I won't

18   -- I won't spend our time going over it with you.

19        MR. EGAN:  If we could go to G-31 then.  And I don't

20   know if G-31's been admitted.

21        MR. MORGAN:  It has.

22        MR. EGAN:  It has?  Thank you.  Sorry.  I should

23   have brought a chart up, Your Honor.

24   BY MR. EGAN:

25   Q    So G-31 is Chuck -- well, actually it's Julie Howland

1   writing to you.

2   A    Yes.

3   Q    Julie Howland is someone else at FDIC?

4   A    She was my supervisor.

5   Q    Okay.  And she's writing to you and she tells you that

6   she spoke to Chuck Hunter, who presented the application to

7   the TARP committee today.  Correct?

8   A    No.  I spoke to Chuck Hunter.

9   Q    Oh, I'm sorry, I got it backwards.  From you to her.  I'm

10  sorry.  Thank you.  So you're writing to her and you're saying

11  -- you're saying you spoke to Chuck Hunter.  So this is just

12  what you told me, Chuck Hunter called you and said that --

13  A    Yes.

14  Q    -- you've been approved.  So you say:  "I spoke to Chuck

15  Hunter.  He presented Nova's application for TARP to the

16  committee today."  Right?

17  A    Yes.

18  Q    "They voted to approve with a contingency that the bank

19  raise a minimum of 15 million in capital."  Right?

20  A    Yes.

21  Q    Now, you don't know if in there they -- there's anything

22  about this DVFG pending transaction, right?  Whether that was

23  in their consideration?

24  A    No.

25  Q    Basically what they're saying is, if they come up with 15

1    million bucks, you know, maybe we'll give them this thing,

2    right?

3    A    Right.

4    Q    And, in fact, Chuck indicated it still has to go through

5    a review process at Treasury, meaning those guys don't even

6    really make the decision, correct?

7    A    I don't know.

8    Q    All right.

9            MS. BARRY:  Objection.

10   Q    Well, we talked yesterday --

11           THE COURT:  Sustained.

12   Q    -- about this investment committee.

13           MS. BARRY:  Objection.

14           THE COURT:  Counsel, the objection's sustained.

15           MR. EGAN:  Sorry.

16   BY MR. EGAN:

17   Q    We talked yesterday about this investment committee?

18   A    Yes.

19   Q    Okay.  You don't know who's on the investment committee,

20   right?

21   A    No.

22   Q    They're the ultimate deciders, right?

23   A    I don't know.

24   Q    Okay.  All righty.  But anyways, he indicates it still

25   has to go through more process, so this is --

1              MS. BARRY:  Objection.

2              THE COURT:  Counsel, may I see you, please?

3         (Sidebar begins)

4              THE COURT:  What's the basis for your objection?

5              MS. BARRY:  He's -- he was referring to the email.

6    It's not from Chuck Hunter, and that was the basis of my first

7    objection, that he's saying I don't think we moved on.  He's

8    not talking about an email.  The email that he's presenting

9    does not have anything from Chuck Hunter on there.  So I was

10   just -- you know, if there's an email where Chuck says

11   something to her, I'm -- I'm fine with that.  But --

12             MR. EGAN:  Your Honor, it might be my fault for

13   confusing things, but --

14             MS. BARRY:  Yeah, that's --

15             MR. EGAN:  -- it's her -- if I could -- it is her

16   email where she's talking about a conversation with Chuck

17   Hunter.  So I don't know why that's not permitted.

18             MS. BARRY:  I think I maybe misheard.  But my

19   initial objection was he was saying something about the email,

20   and I didn't see that in the email.  So I -- I'm not clear on

21   where he's going when he's referring to the email or what he's

22   referring to, so I'm not sure that the witness would

23   understand what he's referring to.  That was the basis of my

24   objection.

25             MR. EGAN:  I'll clear it up, Your Honor.  Thank you.

1        (Sidebar ends)

2    BY MR. EGAN:

3    Q    So let's go back to the first -- oh, it's here already.

4    Great.  This email is from you to Julie, --

5    A    Yes.

6    Q    -- and basically you're telling your boss what's going

7    on, right?

8    A    Yes.

9    Q    And you're saying, hey, Julie, here's what's going on.

10   And what you say is:  "I spoke to Chuck Hunter."

11   A    Yes.

12   Q    Okay.  So what you say after this is all what Chuck

13   Hunter told you, right?

14   A    Yes.

15   Q    Okay.  And what Chuck told you is, it still has to go

16   through a review process, right?

17   A    Yes.

18   Q    And that they approved it on a contingency that they

19   raise $15 million in capital?

20   A    Yes.

21   Q    But you don't have any recollection of him telling you

22   about whether the DVFG had to be approved or any of that

23   stuff?

24   A    No.

25   Q    Okay.  And -- now if we can go to the next one up.  Julie

```
 1    writes back and says:  "Good news.  Not sure what Nova will

 2    say."  Right?

 3    A    Right.

 4    Q    So you respond to that, and in your response you say:

 5    "They will be fine with it.  As I was gathering additional

 6    information for Chuck, I spoke to president Hartline about the

 7    possibility of Chuck presenting it as a contingency."

 8              So, in other words, when you spoke to Hartline about

 9    it, that hadn't already been done, right?  In other words,

10    your conversation was before you heard from Chuck?

11    A    (No response)

12    Q    Well, let's go over it more carefully.

13    A    Yeah.

14    Q    You say as I was gathering additional information for

15    Chuck.  So that would have been before the meeting, I would

16    assume?

17    A    Yes.

18    Q    Okay.  I spoke to president Hartline?

19    A    Yes.

20    Q    So that means before the meeting?

21    A    Apparently, yes.

22    Q    Okay.  And you told him that they might present it --

23    they might, the possibility he might present it as a

24    contingency?

25    A    Yes.
```

1    Q    And he said, it's okay, we're raising capital as they

2    speak -- as we speak.  Correct?

3    A    Yes.

4    Q    And one -- one other large -- one large investor wanting

5    to invest at least 15 million.  Correct?

6    A    Yes.

7    Q    Okay.  So this is the state of Mr. Hartline's knowledge

8    on June 10th, correct?  Because no -- you're the one who

9    communicates to him, right?

10   A    Yes.

11   Q    Okay.  Now I want to go to D-40, please.  And this is an

12   email from you to Tyler Bland?

13   A    Yes.

14   Q    And I assume he's another FDIC person?

15   A    Yes.

16   Q    And what -- who's he?  Do you remember?

17   A    Tyler?

18   Q    Yeah.  What does he do, I mean.

19   A    He's following up on --

20   Q    No, I mean what's his position?

21   A    Oh.  He's a field supervisor for the Philly area office.

22   Q    Okay.  So he's one -- he works with you basically, or do

23   you work -- is he a supervisor?

24   A    Yes, he's a supervisor.

25   Q    So he's at a higher level than you?

1    A     I don't know what grade he is.

2    Q     That's okay.  I'm just trying to find out who he is.

3    Anyway, you say to him:  "Hi, Tyler.  I finally spoke to Eric

4    Sonnheim from FRB."  That's the Federal Reserve Board, right?

5    A     Yes.

6    Q     "And he wanted to let us know that they downgraded the

7    BHC," which means the holding company, correct?

8    A     Yes.

9    Q     "To a three."  And you put in parens, I already knew

10   that.  Right?

11   A     Yeah.

12   Q     So as of June 19th, you knew that the holding company had

13   been downgraded?

14   A     Yes.

15   Q     And you go on to say, he also wanted to let us know they

16   placed restrictions and that they need approval to request

17   dividends from the bank to the holding company and a few

18   others.  Correct?

19   A     I'm sorry, what was the question?

20   Q     This next sentence.  It says:  "He also wanted to let us

21   know they placed restrictions and that they need approval to

22   request dividends from the bank to the holding company."

23   Correct?

24   A     Yes.

25   Q     So he's telling -- basically Sonnheim's saying to you

1    they can't pay dividends, correct?

2    A     Yes.

3    Q     And we already talked about the fact that they're not

4    paying dividends; there's a problem getting TARP, right?

5    A     Yes.

6    Q     And you go on to say:  "However, the most disturbing

7    thing he relayed was that when he was talking to Brian

8    Hartline, he asked if they could be well capitalized again by

9    June 30th, and Mr. Hartline indicated that if they do not get

10   the TARP money in, they could drop below 8 percent total RBC."

11   And that means they would not be well capitalized, correct?

12   A     Yes.

13   Q     So Mr. Hartline is here saying that they're not going to

14   be well capitalized on June 30th, correct?

15   A     Right.

16   Q     Eric said, as the conversation progressed, it became

17   apparent to him that Mr. Hartline did not understand PCA and

18   it's restrictions.  Isn't that what it says?

19   A     That is what Eric said.

20   Q     So basically he didn't understand this stuff?

21   A     He didn't think so.

22   Q     "Now, when I had spoken to him earlier and it was

23   apparent that they were adequately capitalized, I had focused

24   on broker deposits and he seemed to understand that much."

25   And that's about if you're only adequately capitalized, you

1    can't have broker deposits, right?

2    A    Right.

3    Q    Totally separate issue.  "However, I think we need to

4    have a chat with him to go over all the PCA restrictions."

5    Correct?

6    A    Yes.

7    Q    In other words, as of at least June 19th, Mr. Sonnheim

8    felt Mr. Hartline didn't understand these capital rules and

9    you --

10                MS. BARRY:  Objection.

11                THE COURT:  Sustained.

12   Q    -- were pretty sure you agreed with him.

13                MS. BARRY:  Objection.

14                THE COURT:  Sustained.  Sustained.

15   BY MR. EGAN:

16   Q    After talking to Mr. Sonnheim, --

17   A    Yes.

18   Q    -- you weren't sure Mr. Hartline understood these rules

19   either, were you?

20                MS. BARRY:  Objection.

21                THE COURT:  Sustained.

22                MR. EGAN:  If we could go to D-128, please.

23   BY MR. EGAN:

24   Q    Now, this is an email from you on June 25th to Mr.

25   Hartline, subject: TARP.

1    A    Yes.

2    Q    And apparently he's been asking you what's going on

3    because you say:  "Hi, Mr. Hartline.  They did follow up on

4    the TARP application, but the answer they got was that it was

5    moving through Treasury's review process."  Correct?

6    A    Yes.

7    Q    So, in other words, this still hadn't been figured out?

8    A    Yes.

9    Q    "Our people do expect that it will get approved; however,

10   I would not put it in a prospectus in this environment."  So

11   you're basically telling him don't tell people you definitely

12   got this yet, right?

13   A    Yes.

14   Q    Which, of course, is a good thing to say because they

15   didn't already have it?

16   A    Right.

17   Q    And then you go on to say:  "I would give it a week or

18   two."  Correct?

19   A    Yes.

20   Q    And this is June 25th, right?

21   A    Yes.

22            MR. EGAN:  So if we go to D-41, please.

23   Q    And on that same date, at the bottom, there's an email

24   from a Bill Baxter.  He's another FDIC guy, right?

25   A    Yes.

1    Q    And he sends this to Chuck Hunter and copies you?

2    A    Yes.

3    Q    And he basically says:  "Could you please provide an

4    update on UST Case 606."  That was the Nova case number,

5    right?

6    A    Yes.

7    Q    "It was approved by council, but not yet moved forward."

8    Correct?

9    A    Yes.

10   Q    So, in other words, it's got to go through more hoops.

11   And then the next email up is again from a Shanelle Davis, and

12   she's actually at Treasury, right?

13   A    Yes.

14   Q    And Treasury, they're the ones that are actually --

15   somebody there is making this decision, right?

16   A    Yes.

17   Q    She writes:  "Bill, this application has been approved by

18   council and is currently moving through the standard CPP

19   review phases."  Now, you don't really know what those are,

20   right?

21   A    No.

22   Q    Okay.  "Please let me know if you have additional

23   questions."  Correct?

24   A    Yes.

25   Q    And then Bill writes back to you and he says:  "Short

1    answer, Treasury's invest committee has not yet approved this

2    application for participation.  Tell the bank to be patient.

3    Give it a few more weeks."  Correct?

4    A    Yes.

5    Q    Now, this email is at 11:41 on June 25th, and the one you

6    just looked at from you to Brian is on June 25th, same day, at

7    12:12.  So, basically, would it be fair to say that you were

8    checking on this for Mr. Hartline and you got an answer like

9    we'll get back to you in a couple weeks, and so that's what

10   you told him?

11   A    I don't know.  I --

12   Q    Okay.  But I mean, that's -- the one email is right

13   before the other, so -- well, put it this way, you told Mr.

14   Hartline it would be a couple weeks because Mr. Baxter told

15   you it would be a couple weeks?

16   A    Probably.

17   Q    Okay.  And this is June 25th, right?

18   A    Yes.

19   Q    Okay.

20          MR. EGAN:  If we could go to D-1327.

21   BY MR. EGAN:

22   Q    And this is to you -- from you to a Tyler Bland again and

23   a bunch of other folks, and the subject is Nova Bank, correct?

24   A    Yes.

25   Q    And basically you're telling them that on June 25th, that

1    same day we just talked about, "The bank amended its call

2    reports to correctly reflect the subordinate subinvestment

3    quality investments."  So, in other words, meaning that they

4    did what they were supposed to with the call reports,

5    straightened them out, because they weren't really well

6    capitalized because these investments aren't worth what they

7    thought they were, right?

8    A    They amended their call reports --

9    Q    Right.

10   A    -- for the --

11   Q    And then you go on to say:  "On a positive note, the bank

12   received 5 million in capital on June 30th, which they don't

13   think will be enough to bring them back to well capitalized,

14   but it's a start."  Right?

15   A    Yes.

16   Q    So clearly Nova's not telling you that this 5 million is

17   making them well capitalized, correct?

18   A    No.

19   Q    All right.  Now, Mr. Singleton responds to you, and he is

20   a supervisory examiner with the Philadelphia FO.  What's that?

21   A    The Philadelphia field office.

22   Q    Okay.  So is that FDIC?

23   A    Yes.

24   Q    Okay.  Sorry.  Anyway, he writes back to you and says:

25   "Thanks.  The state is scheduled to commence the 2009 exam on

1    10/5/09."  So what that means is, in October there's going to

2    be an examination?

3    A    Yes.

4    Q    And that examination's going to look into all this stuff

5    anyway, correct?

6    A    Yes.

7    Q    And then we'll find out what their capital is at that

8    point, right?

9    A    That's not what he said.  He just --

10   Q    No, but I mean --

11   A    -- let me know when the exam was going to occur.

12   Q    Yeah.  He didn't say that, but what I'm saying to you is,

13   when they do that examination, obviously you're going to go in

14   there and look at everything and determine what their capital

15   is, right?  That's one of the reasons you do it --

16   A    That's part of the Camels, yes.

17   Q    Right.  Okay.

18        MR. EGAN:  And now if we can go to -- let me skip

19   that one -- G-64.  Has this been admitted?

20        MR. MORGAN:  No.

21        MR. EGAN:  Okay.  So don't publish this.

22   BY MR. EGAN:

23   Q    G-64 is a letter from Cheryl Kim Hartline to the Federal

24   Reserve Bank, correct?

25   A    Yes.

Koch - Cross (Ega)                                    42

1    Q    And it is the letter that contains the application for

2    change of control of Mr. Levin, correct?

3    A    Yes.

4    Q    And just while we're on it, Cheryl Kim Hartline, she's

5    the corporate secretary, correct?

6    A    Yes.

7    Q    Yesterday I think you said she was Brian's secretary?

8    A    Yeah, I think she was the corporate secretary.

9    Q    Right.  It was a little bit -- little bit more of a job

10   than that, right?

11   A    Yes.

12   Q    And you -- you know Ms. Hartline, correct?

13   A    I had talked to her on the phone.

14   Q    Okay.  Anyway, you got a copy of this thing, right?

15   A    I'm not sure if I did.

16   Q    Okay.

17          MR. EGAN:  If we could have D-1148.

18   BY MR. EGAN:

19   Q    And this is an email from Jeff Hanuscin to you?

20   A    Right.

21   Q    And it's dated Wednesday, July 29th, correct?

22   A    Yes.

23   Q    And the attachment is the 7/29/09 FED application of

24   Levin?

25   A    Yes.  Then I did get it.

1   Q    So you did get it?

2   A    Um-hmm.

3   Q    Which I wouldn't remember either, so -- anyway, if we

4   look at this document --

5            MR. EGAN:  If we can go back to 64.  Sorry about

6   that.

7   BY MR. EGAN:

8   Q    It's re: George G. Levin, correct?

9   A    Yes.

10  Q    And it contains seven copies of an inter-agency

11  biographical and financial report and inter-agency change in

12  control with a copy of Mr. Levin's personal financial

13  statements, correct?

14  A    Yes.

15  Q    And that's Mr. Levin's personal financial statements,

16  correct?

17  A    Yes.

18  Q    And this is not the bank's application, this is Mr.

19  Levin's application, isn't it?

20  A    Yes.

21  Q    And Mr. Levin's the one who signs this application?

22  A    I don't know.

23  Q    Well, we'll get there.  Okay.  Anyway, if we could go to

24  page 6, you were asked a bunch of questions yesterday about

25  whether anybody ever told you if Mr. Levin borrowed any money

1   in order to make his investments, correct?

2   A    Yes.

3   Q    And you said that was an important issue for you?

4   A    Yes.

5   Q    And that was something you would have shared with whoever

6   it was -- with Mr. Hunter, right?

7   A    Yes.

8   Q    And maybe he would have shared with other people?

9   A    Yes.

10            MR. EGAN:  Anyway, if we can go to the top of there

11  and blow up that first balloon there.

12  BY MR. EGAN:

13  Q    It says provide the following information, and it's the

14  name of the acquirer or transferee.  And in the last column is

15  the source and amount of funds.  See that?

16  A    Yes.

17  Q    And it says -- well, why don't you read it.

18  A    "Half from personal finances and half from borrowed

19  funds."

20            MR. EGAN:  And if we could go to page 8.

21  Q    This is a certification for this application, correct?

22  A    Yes.

23  Q    And it says:  "I certify this information is correct."

24  Right?

25  A    Yes.

1  Q    And it says:  "I acknowledge that this final action is,"

2  and then on and on and on with a bunch of stuff, right?

3  A    Yes.

4  Q    And it's signed by whom?

5  A    It says George Levin.  I --

6  Q    Well, yeah, you don't know his signature.  Good point.

7  A    The signature's a little --

8  Q    Okey-doke.  If we could go to page 12.  That's an inter-

9  agency biographical financial report?

10 A    Yes.

11 Q    And that person it's for is George Levin, correct?

12 A    Yes.

13 Q    And if we could go to page 110 -- page 19, I guess it is.

14 That's a financial report of George Levin, correct?

15 A    Yes.

16 Q    And this says he's worth $400 million bucks, correct?

17 A    Yes.

18 Q    And if we go to page -- sorry about that -- 26.  It's

19 signed by Mr. Levin, correct?

20 A    Yes.

21 Q    Okay.  Now, I want to take you back real quick to June

22 25th.  And why don't we go to D-41.  And this is the email

23 from Mr. Baxter to Mr. Hunter copied to you that says,

24 basically, tell the bank to be patient and give it a few more

25 weeks, right?

Koch - Cross (Ega)                                    46

1    A     Yes.

2    Q     And that's what you did, right, because you're just

3    basically communicating back and forth?

4    A     Yes.

5              MR. EGAN:  So if we could now play tape 200.

6              MR. MORGAN:  The August tape?

7              MR. EGAN:  And there's -- if I can have a moment,

8    Your Honor?

9              THE COURT:  Yes, sir.

10        (Pause)

11             MR. EGAN:  And I believe, Your Honor, there's a

12   stipulation that this tape took place on August 19th.  Thank

13   you.

14        (Audiotape played)

15   BY MR. EGAN:

16   Q     And that is a tape of a call that Mr. Hartline made to

17   you, correct?

18   A     Yes.

19   Q     And it's August 19th, correct?

20   A     Yes.

21   Q     So it's been more than one or two weeks?

22   A     From -- I don't remember the last date.

23   Q     June 25th.

24   A     June 25th, yes.

25   Q     Now, obviously if anybody told you anything, you would

1    have told Mr. Hartline, right?

2    A     Yes.

3    Q     You're sort of in the same boat he is; you -- you don't

4    know what's going on and nobody's telling you, right?

5    A     Yes.

6    Q     Well, lo and behold, August 25th, G-75.  We have -- and

7    this has been published -- this is the letter from Mr. Shatner

8    -- no, not Shatner, Schaffner, which is some kind of a

9    conditional approval of the loan, correct -- of the TARP?

10   A     Yes.

11   Q     And he basically says that we're going to give you the

12   TARP if you do a bunch of other things, including raise

13   another 10 million bucks?

14   A     Yes.

15   Q     And if we go to page 2, it says in the middle paragraph

16   we note -- if we could have that -- "We note Treasury may

17   require additional representations," -- that means more

18   information from you, right, from the bank?

19   A     Yes.

20   Q     -- "warranties or covenants based on the outcome of

21   further business and legal due diligence," -- meaning if

22   anything changes, we want to know about it, right?  It might

23   affect us?

24   A     Yes.

25   Q     -- "disclosures made to Treasury by the applicant,

1   pursuant to the SPA" -- do you know what that is?

2   A     No.

3   Q     Me either.  -- "or the discovery of additional

4   information regarding the applicant."  Correct?

5   A     Yes.

6   Q     And one of the ways you would get discovery of additional

7   information would be through examinations, correct?

8   A     Yes.

9   Q     And there was an examination scheduled for October,

10  wasn't there?

11  A     Yes.

12  Q     Because we just talked about that.

13  A     Yes.

14  Q     And that -- that examination that took place in October

15  didn't go real well, did it?

16  A     They got downgraded.

17  Q     And that takes us to Government 121, which I believe is

18  published.

19              MR. MORGAN:  No.

20              MR. EGAN:  No?  I'm sorry.  Then Government 121 for

21  the witness only, please.

22  BY MR. EGAN:

23  Q     And I'm not going to go through this whole thing, but if

24  you want to look at the first page, read those two.

25          (Pause)

Koch - Cross (Ega)                                    49

1    Q    The upshoot is, they get downgraded to a three, right?

2    A    Yes.

3    Q    As of November 11th, 2009, right?

4    A    Yes.

5    Q    So there's a meeting that you had with them about that,

6    right?

7    A    Yes.

8    Q    And actually you're not the bearer of the bad news, the

9    examiners are, but you're there because it's your bank?

10   A    Right, and I was going to deliver that letter to the

11   bank.

12   Q    Oh, you were the bearer of the bad news.

13   A    No, they -- they gave all the results of the --

14   Q    Okay.

15   A    -- exam.

16   Q    And the letter is the letter that puts even more

17   restrictions on them, correct?

18   A    Yes.

19   Q    Okay.  So now it's November 11th and there's a meeting,

20   and at that meeting the examiners tell the bank they're

21   downgrading them, correct?

22   A    Yes.

23   Q    The holding company was downgraded in June, correct?

24   A    Yes.

25   Q    The holding company hasn't been able to pay dividends

1  since June, correct?

2  A     I'm not sure.

3  Q     Well, there was a restriction put on that they couldn't

4  pay --

5  A     Yeah.  I don't know what the date was.

6  Q     Okay.  Well, if I represent to you that it was June,

7  since we covered it a while ago, do you have a problem with

8  that?

9  A     Yes -- no, I don't have a problem.

10  Q     Thanks.  Anyway, yet this TARP application has still not

11  been considered by this investment council, correct?

12  A     I don't know.

13  Q     Well, they made their decision on December 18th.

14  A     Okay.

15  Q     But you don't really know what the heck they were doing?

16  A     No, I didn't know what was going on.

17  Q     That's fine.  Anyway, the Government showed you Exhibit

18  125, so I'd like to talk about it a little bit.  And the

19  bottom email is an email from you to Ray Harper.

20  A     Yes.

21  Q     He's a state guy, right?

22  A     Yes.

23  Q     And it says -- apparently he wasn't at the meeting; I

24  guess his examiners were.  He's like a higher-up guy?

25  A     I don't believe he was at the meeting because I told him

1    the examiners did a good job presenting their findings.

2    Q    Oh, so you went to the meeting by yourself?

3    A    With the examiners.

4    Q    Oh, okay.  Oh, right.  I'm sorry.  Okay.  All right.  So,

5    anyhow, you tell him the meeting went well; the examiners did

6    a great job presenting the findings.  In other words, they

7    made it very clear why they downgraded the bank and they did

8    it in a very appropriate way, and you felt that they had

9    acquitted themselves professionally, right?

10    A    Yes.  And you then go on to say:  "However, the president

11    did not mention that Mr. Levin was not (sic) longer going to

12    invest.  All he said was they needed 3 million more."

13    Correct?

14    A    I don't see that part of the letter.

15    Q    Oh, I'm sorry, I'm on the wrong -- we have to go to the

16    lower email.

17         MR. EGAN:  The lower email, please.  Yeah, there you

18    go.

19    BY MR. EGAN:

20    Q    Right?

21    A    Yes.

22    Q    "However, the president" -- okay.  You said:  "All he

23    said was that they needed $3 million more."  Correct?

24    A    Yes.

25    Q    Now, Mr. Levin was supposed to put in $15 million, right?

1   A    Yes.

2   Q    And if Mr. Levin had put in his $10 million, they

3   wouldn't have needed $3 million more, would they have?

4   A    I don't know.  Maybe they got other investors.

5   Q    Well, they did.  I'm going to ask you about it in a

6   little bit.  But, I mean, if Mr. Levin had put in his 10

7   million, that would have been the whole 10 million, right?

8   A    Yes, because he had already put five in.

9   Q    Right, so they wouldn't have needed three more?

10  A    Right.

11  Q    In any event, at the bottom you say:  "There's no way,

12  there's a two, unless they get the funds in before the ROE is

13  finished processing."  So, in other words, there's no way this

14  thing is getting changed, correct?

15  A    I didn't think so.

16  Q    And truth be told, obviously you don't make the

17  decisions, but at this point in time with the inability to pay

18  dividends, the downgrade of the holding company, the downgrade

19  of the bank, there's no way they're getting TARP?

20  A    Probably not, if they weren't well capitalized.

21  Q    So now I'm going to take you to December 15th and

22  Government's 142.  And that says -- well, first of all, it's a

23  restricted -- it's a Federal Reserve document, correct?

24  A    Yes.

25  Q    And you're not in the Federal Reserve?

1   A     No.

2   Q     But do you remember some of the conversations with Mr.

3   Hartline that he had finally in December called the Federal

4   Reserve?

5   A     I don't remember.

6   Q     Well, this is a memorialization of a phone call between

7   Mr. Hartline and the Federal Reserve.

8   A     Right.

9   Q     So you weren't any party to this, right?

10  A     I don't think so, no.

11  Q     Okay.  I'll --

12            MR. EGAN:  Let's get this exhibit, and we'll go to

13  Government 147, which I believe has been admitted.

14  BY MR. EGAN:

15  Q     Well, this is dated December 16th and it says:  "I am

16  very perplexed by the current situation that Nova is in."

17  Correct?

18  A     Yes.

19  Q     So now Mr. Hartline's gone from confused to perplexed,

20  right?

21  A     Yes.

22  Q     And the second paragraph says:  "Yesterday a concern was

23  raised by the Federal Reserve Bank that Nova Financial

24  Holdings, Inc. couldn't make the debt service payments.  The

25  Federal Reserve Bank issued a letter dated June 17th noting

1  that the company could not make its trust preferred interest

2  payments without their prior consent.  Their letter was issued

3  well before Nova was approved for CPP funding on August 25th,

4  2009.  I am not sure why this concern is being raised now when

5  these facts existed at the time Nova received its CPP funding

6  approval."  Correct?

7  A    Yes.

8  Q    So he's kind of frustrated, right?

9  A    Yes.

10  Q    And he's basically saying you guys knew this in June, why

11  didn't you just tell me, right?

12  A    Yes.

13            MS. BARRY:  Objection.

14            THE COURT:  Sustained.

15            MR. EGAN:  If we can have 201, please.  Play tape

16  201.

17       (Pause)

18            MR. EGAN:  And this is dated December 14th.

19       (Audiotape played)

20  BY MR. EGAN:

21  Q    So in this call, he's basically saying, sounds like they

22  want more info and I'm not really sure who to send it to, but

23  you're -- tag, you're it, right?

24  A    Yes.

25  Q    Okay.  And so as a result of that, shortly after there --

1          MR. EGAN:  If we could have Government's 140, which

2     was published.

3     Q     -- he sends you this email, right?

4     A     Yes.

5     Q     And he says:  "Dear Lisa, sorry for the delay in getting

6     this information to you.  Please find the attached letter of

7     explanation and attachments as discussed this afternoon.

8     Please let me know if there's anything further I can send to

9     you.  We appreciate your assistance getting this to whomever

10    needs to review it and provide our approval."

11         So this is the information that he thought he was

12    supposed to be sending, based on whatever conversation you had

13    with the Fed, right?

14    A     Yes.

15    Q     And he's basically saying to you, whomever it needs to go

16    to.  He has no clue who it needs to go to, right?

17    A     Yes.

18    Q     And actually you don't even really know who it needs to

19    go to, do you?

20    A     I would send it up through Chuck Hunter.

21    Q     And you have no idea what he did with it?

22    A     No.

23    Q     Now, that's a bunch of information about the bank and its

24    -- and its state, correct?

25    A     (No audible response)

Koch - Cross (Ega)                                    56

1  Q    And it was sent to you on December 15th at 6 p.m.

2  A    Yes.

3           MR. EGAN:  So now if we could have 204 played,

4  please, which is December 15th.

5      (Audiotape played)

6  BY MR. EGAN:

7  Q    So he says a couple things in there.  One, he says

8  several times that if they can't pay the dividends, there will

9  be no approval, correct?

10 A    The dividends for the TARP.

11 Q    Yeah.

12 A    Yes.

13 Q    And he also says it's all the Fed's fault.  He's

14 basically saying that the -- blame it on the Reserve, right?

15 A    Well, I --

16           MS. BARRY:  Objection, Your Honor.

17           THE COURT:  The objection is --

18           MR. EGAN:  I'll withdraw it.

19           THE COURT:  -- sustained.  I think it's time for us

20 to take our morning recess, please.

21           THE WITNESS:  Thank you.

22      (Jury out at 10:39 a.m.)

23           THE COURT:  You may step down.  Thank you.  I'm just

24 contemplating my discussion with --

25           MR. EGAN:  Oh.  Our sleeping juror?

1              THE COURT:  All right.

2              MR. EGAN:  I'm a little insulted.

3              THE COURT:  Thank you.  15 minutes, please.

4              MR. EGAN:  Thank you, Your Honor.

5              MS. BARRY:  Thank you.

6         (Recess at 10:40 a.m. to 11:11 a.m.)

7              THE COURT:  Ready, counsel?

8              MR. EGAN:  Yes, Your Honor.

9              MS. BARRY:  Yes, Your Honor.

10             THE CLERK:  All rise.

11        (Jury in at 11:13 a.m.)

12             THE COURT:  Thank you.  You may be seated.  We'll

13   make the adjustments or attempt to make the adjustments on the

14   monitor over the luncheon recess.

15             MS. BARRY:  Thank you.

16             THE COURT:  Thank you.

17             MR. EGAN:  May I proceed?

18             THE COURT:  You may proceed, counsel.

19             MR. EGAN:  Thank you, Your Honor.

20   BY MR. EGAN:

21   Q    Hi, Ms. Koch.

22   A    Hi.

23   Q    Right before the break we were talking about what was

24   going on in December of 2009, right?

25   A    Yes.

1    Q    And at that point, we heard a voicemail from Mr. Baxter,

2    correct?

3    A    Yes.

4    Q    And basically what he's saying is, this thing isn't going

5    to happen, right?

6    A    Yes.

7    Q    Okay.  And you don't know exactly when the council met

8    and what the -- what the council's decision was based on,

9    correct?  We've already --

10   A    No.

11   Q    -- established that.  But you do know that as a result of

12   that, you had to write up a basis for denial.  Do you remember

13   that?

14   A    Yes.

15   Q    Okay.  And you were writing up that basis for denial

16   because the council just wanted it essentially for its files

17   or, you know, to finish the process, for lack of a better way

18   of putting it?

19   A    I don't know why they wanted it.

20   Q    You don't know why they wanted it.  But they asked you to

21   write it up?

22   A    Yes.

23   Q    And before they -- and that basically took from around

24   the 15th to the 22nd, there was a back and forth that -- I got

25   to show you emails?

Koch - Cross (Ega)                                          59

1    A    Sure.

2    Q    Okay.

3         MR. EGAN:  If we could have D-81.  And if we could

4    go to the bottom of page 2.  And actually that's not -- you're

5    not on the bottom.  On the second one up, I'm sorry.

6    BY MR. EGAN:

7    Q    And that's from Bill Baxter to Amy Monegro?

8    A    Yes.

9    Q    And Amy Monegro is another FDIC person, correct?

10   A    Yes.

11   Q    And he writes Friday, correct?

12   A    Yes.

13   Q    And that's the day, I assume -- this is Thursday,

14   December 17th.  That's the day, I assume, they want your --

15   well, let's read it.  "Given the four components for AQ and

16   earnings" -- AQ is asset quality, correct?

17   A    Yes.

18   Q    And earnings, those are those two things in the Camels we

19   talked about?

20   A    Yes.

21   Q    They're different buckets than the capital, right?

22   A    Yes.

23   Q    "Given the four components for those, I don't see this

24   getting approved."  Correct?

25   A    Yes.

1    Q    Right.  And then he talks about maybe we could go back to

2    council, but then he says:  "Frankly, I don't support it

3    either, given this fact pattern."  Correct?

4    A    Yes.

5    Q    Okay.  And so essentially, if we could go down to the

6    email below, and -- and just read that to yourself.  Does that

7    refresh your recollection as to when this denial had to be

8    written up by?

9    A    Well, in the previous email, he said Friday.

10   Q    Correct.  So that would be Friday, December 18th,

11   correct?

12   A    Right.

13   Q    Okay.  So by Friday, December 18th, they wanted you to

14   write up a denial, correct?

15   A    Yes.

16   Q    And you did write up a denial, right?

17   A    Yes.

18          MR. EGAN:  And if we could go D-83, please.

19   BY MR. EGAN:

20   Q    And that is an email from Amy Monegro to you, correct?

21   A    Yes.

22   Q    And she basically says:  "CDM needs to go to WO today."

23   Case decision memo, I assume?

24   A    Yes.

25   Q    WO is?

1  A     The Washington office.

2  Q     Washington office.  Okay.  And then the first line is:

3  "Lisa, as you know, we have to write this as a denial

4  recommendation."  Correct?

5  A     Yes.

6  Q     "And it needs to go down to Baxter today."

7  A     Yes.

8  Q     And then there's a bunch of reasons why, and they had

9  pretty much the reasons we've already discussed, correct?

10  Deferred trust payments, that's the dividends, right?

11  A     Yes.

12  Q     Adequately under-capitalized position, correct?

13  A     Yes.

14  Q     Bank's history.  Proposed three composite.  That's the --

15  the composite from the October examination by the Pennsylvania

16  Department of Banking, correct?

17  A     Yes.

18  Q     Okay.  And the proposed for AQ&E, that's those two other

19  buckets besides capital, right?

20  A     Yes.

21  Q     Okay.  And so you wrote it up, as you were instructed to,

22  right?

23  A     Yes.

24  Q     Okay.  Now, right before all of that, we heard from Mr.

25  Hartline on his voicemail saying, hey, they've asked me for a

Koch - Cross (Ega)                                          62

1   bunch of information and I'm not sure where to send it, but

2   apparently I'm supposed to send it to you, correct?

3   A    I don't remember.

4   Q    Well, we just listened to it right before lunch.

5   A    I don't remember.

6   Q    Okay.  Well, do you remember the voicemail we listened to

7   right before lunch where Mr. Hartline said he was going to

8   send you more information?

9   A    About the wires?

10  Q    Yeah, about where the money was coming from.

11  A    Yes.

12  Q    Okay.  Yeah, that's all I want to talk about.  And as a

13  result of that, Mr. Hanuscin did send you information,

14  correct?

15  A    Yes.

16  Q    You looked at it yesterday; we talked about it a bunch,

17  right?

18  A    Yes.

19  Q    Okay.

20            MR. EGAN:  If we could have Government's 145,

21  please.  And I believe this is published.  It is published.

22  BY MR. EGAN:

23  Q    And this is an email from Mr. Hanuscin to you on the

24  16th, right?

25  A    Yes.

1    Q    And it says:  "Here is most of the support for the cash

2    received.  The remainder will follow shortly."  Correct?

3    A    Yes.

4    Q    So this is the information that the Government was asking

5    you about that he sent you that you -- I believe you sent on

6    to whomever in D.C.?

7    A    I sent to Chuck.

8    Q    Okay.  And this is also the same day as Chuck's call to

9    you, correct, --

10   A    I don't remember.

11   Q    -- that we listened to?  Okay.  Well, that's okay.  We

12   don't have to go back to that.  Anyway, if you could go to

13   page 2 and to the bottom of the list -- page 2 of 145.

14           MR. EGAN:  Again, if we can have the last three

15   names on that list of investors.  Can you make that a little

16   bigger?  Thank you.

17   BY MR. EGAN:

18   Q    You see a gentleman by the name of Alan S. Fellheimer,

19   correct?

20   A    Yes.

21   Q    And it indicates that he's making a $100,000 investment,

22   correct?

23   A    Yes.

24   Q    And -- and then Edward DiMarcantonio, and then Mr.

25   Hartline himself is actually investing, correct?

Koch - Cross (Ega)                                    64

1    A    Yes.

2    Q    So on December 16th, he's -- he's still investing in --

3    in this bank, correct?

4    A    Yes.

5    Q    Now, if we could go to page 36 of this document.  Now,

6    one of the things that they -- they thought they had been

7    asked for was support for where the money was coming from,

8    right?

9    A    Yes.

10   Q    And so all of these pages, and there's 47 of them, is

11   that support, correct?

12   A    Yes.

13   Q    Okay.  And this is the support for Mr. Fellheimer's

14   investment, and you see that there?  And it's an email from

15   Mr. Hartline to Mr. Fellheimer and apparently his spouse, and

16   it says:  "From where to pull the funds for your investment.

17   I understand you'll be out of the office tomorrow."  Do you

18   see that?

19   A    Yes.

20   Q    And above that, Mr. Fellheimer says:  "My credit line."

21   A    Yes.

22   Q    Now, Mr. Fellheimer is telling Mr. Hartline, who works at

23   Nova Bank, to pull it from his credit line, correct?

24   A    Yes.

25   Q    And Mr. Hartline certainly couldn't pull it from his

Koch - Cross (Ega)                                          65

1    credit line anywhere other than Nova Bank, correct?

2    A    I don't know.

3    Q    And this information that Mr. Fellheimer was using his

4    credit line from Nova Bank to fund his investment was provided

5    to you, correct?

6    A    Yes, it was like 30 -- 47 pages --

7    Q    Right.  But it's --

8    A    -- of information.

9    Q    You got it, right?

10   A    Yes.

11   Q    So certainly if he was hiding the fact that it came from

12   his credit line, he wouldn't have sent you that, would he?

13             MS. BARRY:  Objection.

14             THE COURT:  Sustained.

15   BY MR. EGAN:

16   Q    Now, ultimately we all know no TARP were -- were ever

17   given to the bank, correct?

18   A    No.

19             MR. EGAN:  You can take that down.

20   Q    And you again don't know why that decision was made,

21   right?

22   A    I guess it was based on --

23   Q    Don't guess.  You don't really know --

24   A    All right.  I don't know, no.

25   Q    Right.  Because you don't even know what they considered?

Koch - Cross (Ega)                                    66

1  A     Right.

2  Q     But the bank didn't stop operating in December of 2009,

3  did it?

4  A     No.

5  Q     And in fact you supervised the bank for some time going

6  forward from then, didn't you?

7  A     In January, I went to another job and I stopped

8  supervising the bank.

9  Q     So you moved to a different region?

10  A     I moved to New Jersey out in the field.

11  Q     Now, we heard a lot of talk yesterday from other

12  witnesses about one of the bases for determination of TARP

13  being the sustainability of the bank.  Basically, they want to

14  make sure they were going to stick around, right?

15             MS. BARRY:  Objection.

16             THE COURT:  Sustained.

17  BY MR. EGAN:

18  Q     Well, are you familiar with -- are you aware that one of

19  the criteria that was considered was the sustainability of the

20  bank?

21  A     I -- yes.

22  Q     Okay.  And that was -- and that basically meant are they

23  going to make it through this financial crisis and still be

24  around for a while, right?

25  A     Yes.

Koch - Cross (Dun)                                        67

1    Q     And you're aware or you are not that Nova was actually in

2    existence until October of 2012?

3    A     No.

4              MR. EGAN:  Nothing further, Your Honor.

5              THE COURT:  All right.  Counsel?

6              MR. DUNCAN:  Thank you, Your Honor.

7         (Pause)

8              MR. DUNCAN:  May I proceed, Your Honor?

9              THE COURT:  Yes, sir.

10                       CROSS-EXAMINATION

11   BY MR. DUNCAN:

12   Q     Good morning again, Ms. Koch.

13   A     Good morning.

14   Q     Ms. Koch, other than our brief conversation yesterday in

15   the witness room and then saying hello this morning, you and I

16   have never spoken before, have we?

17   A     No, not that I -- I don't think so.

18   Q     You wouldn't remember me?

19             MS. BARRY:  Objection.

20   Q     Ma'am --

21             MR. DUNCAN:  I'll withdraw that.

22             THE COURT:  Sustained.

23   BY MR. DUNCAN:

24   Q     Ma'am, you first spoke to the Government investigators on

25   March 7th, 2013, is that correct?

Koch - Cross (Dun)                                    68

1    A    Yes.

2    Q    That was almost four years after Nova put in their TARP

3    application?

4    A    Yes.

5    Q    The next time you spoke to them was in May of 2014.

6    That's more than a year after you spoke to them the first

7    time, right?

8    A    I don't remember the exact dates.

9    Q    But that sounds about right, right?

10   A    Maybe, yeah.

11   Q    If I had a document in my hand showing -- actually, I

12   believe this is Defense 238.

13            MR. DUNCAN:  May I approach, Your Honor?

14            THE COURT:  Yes, sir.

15            MS. BARRY:  Objection, Your Honor.

16            THE COURT:  May I see you, please?

17       (Sidebar begins)

18            THE COURT:  All right.  Counsel?

19            MS. BARRY:  Your Honor, this is not a statement of

20   the witness.  It -- and he's not -- is he impeaching her with

21   something at this point and she's never seen these reports?

22            MR. DUNCAN:  She doesn't remember.  I'm saying did

23   -- does this refresh your recollection as to the date?  The

24   answer will be that it will or it won't.

25            THE COURT:  All right.  As to the date --

1            MS. BARRY:  Yeah.

2            THE COURT:  -- or the content?

3            MS. BARRY:  Yeah.

4            MR. DUNCAN:  Just the date, Your Honor.

5            THE COURT:  All right.  It seems to me you can do

6    that.

7        (Sidebar ends)

8            THE COURT:  You may continue.  Overruled.

9            MR. DUNCAN:  May I proceed?  Thank you, Your Honor.

10   May I approach the witness, Your Honor?

11           THE COURT:  Yes, sir.

12   BY MR. DUNCAN:

13   Q    Ms. Koch, --

14   A    Yes.

15   Q    -- let's take a moment.  I would -- actually, I think I

16   got it wrong.  I said you met with him.  You actually had a

17   telephone conference with him, correct?

18   A    It looks like it.

19   Q    And you agree that the date on that is May 28th, 2014?

20   A    Yes.

21   Q    So that refreshes your recollection as to the date?

22   A    Yes.

23   Q    So you would agree you talked to them by telephone on May

24   28th, 2014, 14 months after you first talked to them, right?

25   A    Apparently I did.

1    Q    Okay.  And that's approximately now five years after the

2    TARP application, right?

3    A    Yes.

4    Q    Okay.  The next time you spoke to them was almost a year

5    later, correct?

6    A    I'm not sure.

7    Q    Okay.  Didn't you speak to them in September of 2015,

8    about five, six months ago?

9    A    I don't know the dates.

10   Q    Okay.  But if I said to you that that's probably about

11   right and I have a document in my hand --

12   A    If you had a document, it --

13   Q    Would you like to see it?

14   A    Sure.

15        MR. DUNCAN:  Your Honor, again, may I approach?

16        THE COURT:  Yes, sir.

17        MR. DUNCAN:  This is Defense -- I'm going to need

18   some help for a moment -- this is Defense 231.

19   BY MR. DUNCAN:

20   Q    Ms. Koch, I'm not trying to trick you on the dates, I

21   just want to make sure we both are talking about the same

22   thing.  So you agree it's September 16th, 2015?

23        MS. BARRY:  Objection.

24   A    Yes.

25   Q    (Inaudible 11:28:01) of Lisa Koch, that's you, the senior

1    risk examiner, FDIC?

2    A    Yes.

3    Q    Okay.  So you'd agree that you next spoke to them for the

4    third time six years after the TARP application got put in

5    with the Government investigators, right?

6    A    Yes.

7    Q    And then a couple of -- maybe about four or five weeks,

8    two, three weeks afterwards, you spoke to them for the fourth

9    time, right?

10   A    I'm not certain of the dates.

11   Q    All right.

12   A    And I'm not sure how many times I met with them.

13   Q    If I had -- if I had an exhibit, you'd probably think I'd

14   probably be right, right?

15   A    Perhaps.

16   Q    Okay.  We don't need to go into it.

17            MR. DUNCAN:  Could we see Government's Exhibit 22,

18   which has been entered into evidence and publish that, please?

19   BY MR. DUNCAN:

20   Q    See that, Ms. Koch?

21   A    Yes.

22   Q    Okay.  Government's 22 is an email chain that you're on,

23   correct?

24   A    Yes.

25   Q    You talk in Government's 22 about the various things

1    involving the TARP and the Nova application, correct?

2    A    Yes.

3    Q    And one of the things you talk about is the end of the

4    fiscal quarter, right, June 30th?

5    A    I don't see it, but --

6    Q    Okay.  Well, the end of a fiscal quarter is an important

7    date for regulations, right?

8    A    Yes.

9    Q    Why is --

10   A    Oh, I see it now.  Yes, it is in there.

11   Q    It's there.  There it's June 30th, right?

12   A    Yes.

13   Q    Okay.  And that's an important date because that's the

14   end of a fiscal quarter, right?

15   A    Yes.

16   Q    And in the bank regulatory world and in the public

17   company world, end of quarters are important, right?

18   A    Yes.

19   Q    And why are they important in the bank regulatory world?

20   A    Because that's when they file their call report.

21   Q    And the call report is what?

22   A    A quarterly report that the bank submits us with various

23   information.

24   Q    And that goes to issues like their capital ratio,

25   correct?

1    A    Yes, that's in there.

2    Q    And capital ratio is a very important marking point for

3    bank regulators, correct?

4    A    Yes.

5    Q    So if you get a call report or someone's talking to you

6    about a call report, you realize that's important for your

7    job, right?

8    A    Yes.

9    Q    So if you look at Government's Exhibit 22, one of the

10   things, if you look down at the bottom email -- I'm sorry, the

11   top email, the last paragraph.

12           MR. DUNCAN:  If you could highlight that, Sean,

13   please?  It's the one beginning FYI.

14   BY MR. DUNCAN:

15   Q    So this is Mr. Hartline writing to you and he says:

16   "FYI, today we submitted our application to the Fed to become

17   a financial holding company."  And it goes on and it says --

18   Mr. Hartline tells you:  "We are trying to meet our drop dead

19   date in the DVFG merger agreement of June 30th."  Do you see

20   that?

21   A    Yes.

22   Q    So the June 30th date is a very important date to the

23   bank because it relates to their Delaware Valley Financial

24   Group merger, right?

25   A    Yes.

1  Q     And that's important for you to know and for government

2  regulators to know because you have to determine whether

3  you're going to let them buy Delaware Valley Financial Group,

4  correct?

5  A     I'm not sure if they needed approval for that or not.

6  Q     Okay.  Well, go to the next line.  Mr. Hartline asks you:

7  "Is there anything else you need from Nova pertaining to

8  DVFG?"  Do you see that?

9  A     Um-hmm, yes.

10  Q     So he's asking you if you want to see more information,

11  correct?

12  A     Yes.

13  Q     And one of the reasons they want to see more information

14  is, you regulate banks and you determine whether they're

15  financially sound enough to take on more business or more

16  debt, because they actually have to pay for DVFG, don't they?

17  A     I would assume so.

18  Q     And that's an issue that, since you're regulating federal

19  banks and you're trusting all our money, you want to make sure

20  that they're financially sound enough to get Delaware Valley

21  Financial Group, correct?

22  A     Yes.

23  Q     And the deadline that he's worried about is June 30th for

24  Delaware Valley Financial Group.  There's not a word in there

25  about the TARP application, is there?

Koch - Cross (Dun)                                    75

1    A    No.

2    Q    If you'd look at the email below that, your email to Mr.

3    Hartline, do you see on the first line --

4            MR. DUNCAN:  If you would blow that up, Sean, for

5    me, please.  Just the whole first paragraph there.

6    BY MR. DUNCAN:

7    Q    Mr. Hartline's telling you -- he just told you he left

8    you a message and he says:  "We got great news.  We might have

9    an investor."  Right?

10   A    Right.

11   Q    No guarantee an investor's coming, is there?

12   A    No.

13   Q    He then goes on to tell you that this investor might need

14   something special; he might need a change in control

15   application, correct?

16   A    Yes.

17   Q    And what's that change in control application?  What's

18   the purpose of that?

19   A    It's to own anything over 9.9 percent of the bank stock.

20   Q    That's a decision made by the Federal Reserve Board, not

21   your group, right?

22   A    No.

23   Q    I'm sorry, I complicated that question for you.  It's a

24   decision made by the Federal --

25   A    Yes.

1    Q    -- Reserve Board?  It's not a decision made by the FDIC?

2    A    No.

3    Q    Thank you.  Mr. Hartline says in --

4         MR. DUNCAN:  Again, Sean, I'm sorry to keep doing a

5    yo-yo on you.  Go back up to the top email.  First paragraph.

6    Highlight that all for us, please.

7    BY MR. DUNCAN:

8    Q    Mr. Egan did this, but I want to make a different point

9    here.  If you look at the very last line of the first full

10   paragraph, Mr. Hartline says:  "I would prefer this info go no

11   further until I get a firm understanding how much he will

12   invest."  You would agree at that time Mr. Hartline had no

13   idea exactly how much infor -- how much money this investor,

14   whoever it was, was going to invest, correct?

15        MS. BARRY:  Objection as to what's in Mr. Hartline's

16   mind.

17        THE COURT:  Sustained.

18   BY MR. DUNCAN:

19   Q    Okay.  Well, Mr. Hartline's asking you -- telling you

20   that he doesn't have a firm understanding yet, correct?

21   A    Yes.

22   Q    What did you interpret from that?

23   A    That there were contingencies involved, including him

24   potentially wanting to fill out that application.

25   Q    All right.  What's the contingency?

1    A    Well, if he wanted to invest the 15, he would have to get

2    approved by the Fed and the state.

3    Q    So it's not certain it will ever happen, right?

4    A    No.

5    Q    That's what -- it's true it's not certain it will never

6    happen?

7    A    True.

8    Q    Thank you.

9              MR. DUNCAN:  Could we go to Government's Exhibit 28,

10   please, Sean?

11   BY MR. DUNCAN:

12   Q    Mr. Egan talked to you a little bit about this.  I have a

13   little different purpose again, so I try not to tread too much

14   ground, but he stole a lot of my thunder.  Ma'am, this is an

15   email -- or, I'm sorry, it's a memo, but I guess it probably

16   comes in an email to you?

17   A    I assume it did.

18   Q    Okay.  We don't see the email, but you think it came in

19   an email, right?

20   A    Perhaps.

21   Q    And it comes from Jeff Hanuscin and he's the CFO at Nova

22   Bank, right?

23   A    Right.

24   Q    And he's sending you this information and he doesn't tell

25   you where he got the information, does he?

Koch - Cross (Dun)                                                78

1         (Pause)

2    A    No.

3    Q    So you don't know where it's coming from, it's just

4    coming from him?

5    A    Yes.

6    Q    Okay.  He then says --

7              MR. DUNCAN:  If we could blow up the second

8    paragraph, please?

9    BY MR. DUNCAN:

10   Q    He's telling you that this is now -- he's now talking

11   about a contingency on this investor.  It says:  "The

12   investment is dependent upon regulatory approval of his

13   investment, the Treasury Department approving Nova to sell

14   preferred stock through the TARP program, and the approval of

15   the DVFG transaction."  Right?

16   A    Yes.

17   Q    So if the DVFG transaction is put on there, it's one of

18   the contingencies, right?

19   A    Yes.

20   Q    And we agree that if a contingency isn't met, the thing

21   doesn't happen, right?

22             MS. BARRY:  Objection.

23             THE COURT:  Sustained.

24   BY MR. DUNCAN:

25   Q    Ma'am, did you understand the DVFG transaction to be a

Koch - Cross (Dun)                                              79

1   contingency, based on what Mr. Hanuscin told you?

2   A    Well, no, I'm not sure.

3   Q    Okay.

4              MR. DUNCAN:  Go to the next slide.

5   Q    "The DVFG transaction would be accompanied by

6   approximately $2.9 million of additional capital of which

7   we've already received approximately $2.3 million in escrow

8   and subscription agreements for an additional 700,000."

9              So they've got approximately 300,000 -- I'm sorry,

10  approximately 3 million, someplace around there, to fund the

11  DVFG transaction.  That's what he's telling you, right?

12  A    Yes.

13  Q    When he says it's in escrow, what does that mean?

14  A    It typically mean that it's in a bank account.  I'm not

15  -- not sure whether it's with another bank or this bank.

16  Q    When it's in escrow, it's contingent, right?

17  A    Yes.

18  Q    And the 700,000 in additional subscriptions, what does

19  that mean by a subscription?

20  A    Somebody would agree to potentially invest 700,000.

21  Q    So that's another contingency, right?

22  A    Yes.

23  Q    Okay.  I'm sorry, I just drank water.  Do you have water

24  -- are you okay?

25  A    I'm fine.

1   Q    Okay.  Sorry.  He then --

2              MR. DUNCAN:  If you could go down to the next to the

3   last paragraph, Sean, please, that says enclosed for your

4   review.

5   BY MR. DUNCAN:

6   Q    Mr. Hanuscin writes to you:  "Enclosed for your review

7   are copies of the DVFG's first quarter unaudited financial

8   statements to reflect that they continue to perform well in

9   this economic environment."  You got that, right?

10  A    Yes.

11  Q    Did you review the DVFG financials?

12  A    Yes.

13  Q    What was your opinion of them?

14  A    I don't remember.

15  Q    Did you -- did you tell them this isn't going to work?

16  Do you recall that?

17  A    No.

18  Q    So as far as you know, the DVFG thing was still

19  proceeding, right?

20  A    Yes.

21  Q    Okay.

22             MR. DUNCAN:  If you could go to the next page of

23  this document.

24  BY MR. DUNCAN:

25  Q    Yesterday during your testimony you were asked about this

1    letter, right?

2    A    Yes.

3    Q    Okay.

4              MR. DUNCAN:  If we could go -- Sean, let's go to the

5    top.  Let's start at the very top, Ballamor Capital

6    Management.

7    Q    Do you know who that is?

8    A    I had heard the name before.

9    Q    Did you know who they were?  Back in 2009, did you know

10   who they were?

11   A    I -- I knew it was related to Mr. Bekkedam.

12   Q    What did you know about it?

13   A    Not much.

14   Q    Okay.

15             MR. DUNCAN:  Go down one line, Sean, for me, please.

16   Q    The date of the letter Mr. Bekkedam sent you is June 2nd,

17   right?

18   A    Yes.

19             MR. DUNCAN:  Next line down, please, Sean.

20   Q    He does not send this to you, does he?

21   A    No.

22   Q    He sends it to Nova Financial Holdings, care of Mr.

23   Hartline, right?

24   A    Yes.

25   Q    The only way you got this letter is someone from Nova

1   sent it to you, right?

2   A     Yes, because I don't see a cc for me.

3   Q     You don't have any information that Mr. Bekkedam sent you

4   this letter, do you?

5   A     No.  The bank sent it.

6          MR. DUNCAN:  First line, please, Sean.  Dear Brian.

7   Next down, please.

8   Q     Mr. Bekkedam writes:  "I'd like to confirm that one or

9   more investment advisory clients of Ballamor Capital

10  Management, Inc. are prepared to invest $15 million into Nova

11  Financial Holdings, Inc. initially and to broaden that

12  investment up to $40 million in 2009."

13         Now, you see he says more than one client, right?

14  One or more?

15  A     One or more.

16  Q     So you don't know that's Mr. Levin, Mr. Levin and some

17  other people or -- you just don't know, right?

18  A     No.

19  Q     Okay.  He then says that he's sending it to the Nova --

20  it's going to be invested in the Nova Financial Holdings.

21  That's the holding company that owns Nova Bank, right?

22  A     Right.

23  Q     And that could go up -- that whole investment could go up

24  to $40 million.  It's a possibility, right?

25  A     Right.

1    Q     And that would be good for the bank, right?

2    A     Yes.

3          MR. DUNCAN:  Go to the next slide, please, Sean.

4    Q     "Our investors have committed to us that they wish to

5    participate in the Nova investment at the present time."  So,

6    again, investors could be one, could be more than one, right?

7    A     Yes.

8    Q     And then he puts in a provided:  "Provided that Nova's

9    current application for TARP funding is approved" --

10   A     Yes.

11   Q     -- "and the pending DVFG transaction is also approved."

12   So that's two more contingencies, right?

13   A     Yes.

14   Q     "We feel the proposed transaction will provide additional

15   capital and significant ongoing revenue to make the investment

16   in Nova an anticipated success."  The additional capital is

17   the investment of money, right?

18   A     Yes.

19   Q     And the significant ongoing revenue is the money that

20   Delaware Valley Financial Group's going to bring to the bank,

21   correct?

22          MS. BARRY:  Objection.

23          THE COURT:  Sustained.

24   BY MR. DUNCAN:

25   Q     Do you know, ma'am?

1   A     No, I don't.

2   Q     Okay.

3          MR. DUNCAN:  Go to the next paragraph, please.

4   Q     "Because one such investor would own in excess of 10

5   percent of Nova's Financial outstanding shares of common stock

6   after giving effect to the investment in shares to be issued

7   in the DVFG transaction, the investor is willing to go through

8   the process of completing and submitting all documentation

9   required for regulatory approval."

10         So the first thing there, when it says its

11  outstanding shares of common stock, that's Nova common stock,

12  right, or the Nova Financial Holdings common stock, correct?

13  A     The holding company.

14  Q     Right.  And after giving effect to the investment and

15  shares to be issued, that means because when extra shares are

16  issued, the percentage of what a person owns is going to

17  change.  So what Mr. Bekkedam's saying there is, we don't know

18  exactly how much he's going to be able to invest because the

19  number of shares are going to expand, right?

20         MS. BARRY:  Objection.

21         THE COURT:  Sustained.

22  BY MR. DUNCAN:

23  Q     Okay.  "The investor is willing to go through the process

24  of completing and submitting all documentation required for

25  regulatory approval."  That's the change in control

Koch - Cross (Dun)                                    85

1    application, right?

2              MS. BARRY:  Objection.

3              THE COURT:  Counsel, let me see you briefly, please.

4         (Sidebar begins)

5              THE COURT:  All right.  I recognize that a lot of

6    this line of questioning and answers were given without

7    objection when Mr. Egan conducted his cross-examination.  And

8    now counsel is objecting.  It does not open the door.  This

9    witness is not necessarily competent to answer a lot of the

10   questions that you're asking her by reason of these

11   communications.  So I'm going to be sustaining the objections.

12             MR. DUNCAN:  Thank you, Your Honor.  I can ask her

13   -- I think I should be allowed to ask her does she know --

14   does she know what it is.  If she says no, she -- that's it.

15   If she says she does, then --

16             MR. ENGLE:  Her understanding should be fair game.

17             THE COURT:  I understand that.  But to the extent

18   that counsel is utilizing someone else's written

19   communications and basically getting her to corroborate what

20   someone else is doing, that's -- you can't do that.

21             MR. DUNCAN:  But my question, Your Honor, was only

22   does she know what it is.  If she doesn't know what it is,

23   then we're done.  If she does know what it is --

24             THE COURT:  Even if she knows, a lot of what she's

25   saying is getting into the area of, yeah, I agree with you

1    because that's probably what he's thinking and that's probably

2    right.

3            MR. DUNCAN:  Well, I'm not -- that's not what I'm

4    trying to do.  I'm actually trying to explore her knowledge,

5    Your Honor.  I'm just trying to --

6            THE COURT:  As long as it's relevant and probative,

7    I'll allow it.

8            MR. DUNCAN:  Okay.  That's fine.

9            MR. ENGLE:  I think it would be relevant and

10   probative because what we've established is, the FDIC is the

11   primary regulator.  The FDIC is the primary regulator that the

12   CPP council relied upon for getting information, information

13   that was being provided by the bank to the primary regulator.

14   The primary regulator's understanding of what that information

15   is and how it plays into the TARP application and the bank's

16   efforts to get TARP certainly seems relevant.

17           THE COURT:  It's relevant, but in terms of it only

18   being material if she is not the ultimate decision maker.

19   She's only guessing at -- she's conceding that, yes, this

20   information is important and this information has been

21   communicated.  But ultimately for her to put her informata on

22   its approval or disapproval, she's not competent to say that.

23   She's not -- she's not the ultimate person.

24           MR. ENGLE:  But she would be competent to say

25   whether or not it affected her mindset with respect to the

Koch - Cross (Dun)                                    87

1    recommendations she had to make.

2              THE COURT:  Absolutely.  Absolutely.

3              MR. ENGLE:  That was the only --

4              THE COURT:  If she's making that recommendation,

5    absolutely.

6              MR. DUNCAN:  I hear you, yeah.

7              THE COURT:  Okay.  Thank you.

8              MR. DUNCAN:  Thank you.

9         (Sidebar ends)

10             MR. DUNCAN:  May I proceed, Your Honor?

11             THE COURT:  You may continue.

12             MR. DUNCAN:  Thank you, Your Honor.

13   BY MR. DUNCAN:

14   Q    Ma'am, just looking at that last little part there where

15   it says submitting all documents required for regulatory

16   approval, do you know what that means?

17   A    Change in control application to the state and the Fed.

18   Q    Okay.

19             MR. DUNCAN:  Go to the next paragraph, please.

20   Q    Mr. -- Mr. Bekkedam's letter continues, and I believe it

21   almost concludes.  "It's my further understanding that Nova

22   currently has approximately 2.268 million of escrowed funds

23   and 702,500 in additional subscriptions for other investors

24   that are willing to invest in Nova, only if the pending DVFG

25   transaction is approved and completed."  Do you see that?

1   A     Yes.

2   Q     You understood that as another contingency, correct?

3   A     Yes.

4         MR. DUNCAN:  Go down to the end, please, Sean.  No,

5   just all the way to the end, to Mr. Bekkedam.  Right there.

6   Q     It says yours truly, B.R. Bekkedam, Barry R. Bekkedam,

7   Chairman and CEO.  Do you know whether Mr. Bekkedam signed

8   that?

9   A     I assume he did.

10  Q     Do you know?

11  A     No.

12  Q     Okay.  Do you know who Larry Rovin is?

13  A     No.

14        MR. DUNCAN:  If we could go to -- thank you.  Thank

15  you, Sean.  If we could go to Government's 31.

16        (Pause)

17  BY MR. DUNCAN:

18  Q     And, I'm sorry, just one more question about Mr.

19  Bekkedam's letter.  You didn't receive any more communications

20  from Mr. Bekkedam, even in -- from other people?  Nothing else

21  from Mr. Bekkedam --

22  A     No.

23  Q     -- ever came to the FDIC, did it?

24  A     No, not during the time I was the case manager.

25  Q     Through -- was it January 2010, was that when you left?

1    A    Yes.

2    Q    So in between June 2nd and January 2010, you never heard

3    anything more about Mr. Bekkedam, right?

4    A    No.

5    Q    Okay.  Let's look at this email, please.  So this is an

6    email between I guess your boss -- Ms. Howland's your boss?

7    A    My supervisor.

8    Q    Supervisor.  You and then there's sort of a string

9    through there.

10        MR. DUNCAN:  So if we could go to the bottom one,

11   please.

12   BY MR. DUNCAN:

13   Q    You write to your supervisor:  "Hi, Julie.  I spoke to

14   Chuck Hunter.  He presented Nova's application for TARP to the

15   committee today.  They voted to approve with a contingency

16   that the bank raise a minimum of $15 million in capital.

17   Chuck indicated it still has to go through a review at

18   Treasury, but it's likely to get the nod.  Lisa."  You wrote

19   that, right?

20   A    Yes.

21   Q    So that means on June 10th, that was the first date that

22   you had heard about a specific contingency on the bank raise

23   coming from the CPP, right?

24   A    I'm not sure if it was the first time.

25   Q    Well, the CPP met on June 10th, right?

1    A    I don't know when they met.

2    Q    You say there --

3    A    Oh, yes.

4    Q    -- he presented Nova's application --

5    A    Yes.

6    Q    -- for TARP to the committee today.  Today is June 10th,

7    right?

8    A    Yes.

9         MR. DUNCAN:  Could we go to June -- Exhibit 30,

10   please, Sean.

11   Q    And this is the CPP document we seen earlier.  You said

12   that you had never seen this, but this -- you'll agree this is

13   June 10th, 2009.  That's when they went to the committee,

14   right?

15   A    Yes.

16   Q    And that's what you're reporting back to Ms. Howland from

17   Mr. Hunter.

18        MR. DUNCAN:  Go to the next page, please, Sean.  Go

19   about halfway down, second full paragraph.  So, I'm sorry, go

20   one more -- I'm sorry, Sean, I got it wrong.  Go down to the

21   next line.  Nope.  Keep on going.  Next page, please.

22   BY MR. DUNCAN:

23   Q    This is the June 10th recommendation from council, the

24   council recommendation at the back -- at the end, right?  It's

25   contingent upon a capital injection of $15 million, right?

1   A    Yes.

2   Q    And that's what you're reporting back from Mr. Hunter to

3   Ms. Howland, right?

4   A    Yes.

5   Q    So that's the first time you knew that the CPP was

6   requiring this contingency, right?

7   A    I don't know if --

8   Q    They hadn't required it before then, had they?  That's

9   when they made their recommendation.  There was no requirement

10  before then, right?

11  A    No.

12  Q    So that's the first day, right?

13  A    Yeah, but I think we talked about it.

14  Q    Understood.  Yeah.  You might have been talking about it,

15  but it was not a requirement from any government regulator or

16  any government body until they made a recommendation.  That's

17  the first time a recommendation is made, correct?

18  A    Right.

19  Q    And even then it's not official, right, because it's

20  still got to get approved up the line and then even above that

21  at Treasury, right?

22  A    Yes.

23  Q    And we know as a matter of fact the $15 million

24  contingency was never imposed on Nova, correct?

25  A    No.

Koch - Cross (Dun)                                      92

1           MR. EGAN:  Go to 75, please, Sean.  And if you would

2      blow up the third -- second paragraph down.

3      BY MR. DUNCAN:

4      Q    This is the official Treasury letter saying what the

5      express condition for additional equity, it must be obtained

6      prior to the closing (inaudible 11:52:02), correct?

7      A    Yes.

8      Q    And the number is 10 million, right?

9      A    Yes, because five million had already been put in.

10     Q    This is the only notification Nova got as a formal

11     communication from the Treasury Department as to how much

12     money they had to raise, correct?

13     A    Because they had already raised five --

14     Q    I'm not arguing with you, ma'am, at all.  But that's the

15     -- but that's what they have to do right now.  On August 25th,

16     they've got to get 10 million from August 25th going forward,

17     right?

18     A    Yes.

19     Q    Okay.

20          MR. DUNCAN:  Go back, if you would, to your June

21     10th.  That is 31, Sean, please.  And the second email from

22     Ms. Howland.

23     BY MR. DUNCAN:

24     Q    So your boss doesn't know whether or not Nova is going to

25     want to meet this contingency or what they're going to, right?

Koch - Cross (Dun)                                          93

1    That's what she tells you?

2    A    Right.

3    Q    You write back to her.

4              MR. DUNCAN:  Third email.  Next one up, Sean,

5    please.

6    Q    You write back to her.  "They'll be fine with it.  As I

7    was gathering additional information for Chuck, I spoke to Mr.

8    Hartline about the possibility of Chuck presenting it as a

9    contingency, if it looked like it was going to be declined,

10   and they were okay with that because they're raising capital

11   as we speak."  Right?

12   A    Yes.

13   Q    You knew that they were involved on June 10th in a

14   capital raise, right?

15   A    Yes, I knew they had a potential investor.

16   Q    But they were also -- there was another capital raise.

17   They were raising money for the Delaware Valley Financial

18   Group, right?

19   A    Yes.

20   Q    So they were -- they were involved in raising capital?

21   A    Yes.

22   Q    And they might have another large investor, and we're

23   going to learn later that's probably going to be George Levin,

24   who might invest at least 15 million, right?

25   A    Right.

Koch - Cross (Dun)                                    94

1    Q    And that's what you're communicating to your boss, right?

2    A    Yes.

3    Q    So the first time you knew and your boss knew about the

4    contingency being in place, 15 million coming from the CPP,

5    because Chuck Hunter tells you it came from the CPP and you

6    tell your boss, right, the first day anyone knows that is June

7    10th, right?

8    A    Yes.

9    Q    Okay.

10         MR. DUNCAN:  Go back to Bekkedam's letter, 28.

11   Second page, Sean, please.  Top date, please.

12   BY MR. DUNCAN:

13   Q    June 2nd, right?

14   A    Yes.

15   Q    Mr. Bekkedam could not have known on June 2nd that on

16   June 10th the CPP was going to require a $15 million

17   contingency, could he?

18         MS. BARRY:  Objection.

19         THE COURT:  Sustained.

20   BY MR. DUNCAN:

21   Q    Was the CPP contingency in effect on June 2nd?

22   A    Not officially.

23   Q    Is there some other way that people would know about

24   whether or not a government action is appropriate and you have

25   to follow it other than whether it's official?  Does it have

1    to be official before you have to do it?

2    A    Yes, but we had spoken to the bank about it and -- so I

3    don't know what Mr. Bekkedam knew.

4    Q    But you do know that the official word didn't come down

5    until June 10th, right?

6    A    Right.

7    Q    So unless -- unless Mr. Bekkedam's a mind reader, he

8    couldn't know either?

9              MS. BARRY:  Objection.

10             THE COURT:  Sustained.

11             MR. DUNCAN:  Could we now go to -- can we go back to

12   31 for just a moment, please, Sean.

13   BY MR. DUNCAN:

14   Q    So there's a lot we've heard about capital --

15             MR. DUNCAN:  And if we look at the middle email,

16   Sean.

17   Q    This is July 17th --

18             MR. DUNCAN:  I'm sorry, I'm looking at the wrong

19   one.  I did it again.  Sorry, 61A.  I said 31, but I meant

20   61A.

21   BY MR. DUNCAN:

22   Q    So you're writing to Bill Baxter on July 17th, right?

23   A    Yes.

24   Q    Okay.  So Bill Baxter is who?  I'm sorry.  I think you

25   might have testified to that.  I just forgot.

1    A    He's the man in Washington who was kind of leading the --

2    the TARP process.

3    Q    Is he the guy whose voicemail we heard earlier?

4    A    Yes.

5    Q    Okay.  So you're advising him -- why are you telling him

6    these things?

7    A    Why?  Because I passed along any information that I had

8    to them.

9    Q    So if you have information, you make sure it gets to the

10   right people, correct?

11   A    I give it to Chuck Hunter and then he makes sure.

12   Q    And as Mr. Egan asked you, you don't know what Chuck

13   Hunter did, but you expect he did what --

14   A    I expect that he did.

15   Q    Okay.  That's fair.  So when you say here that:  "I did

16   confirm with the bank that Mr. Levin, the large investor, is

17   still interested in making the investment," what -- why were

18   you needing to confirm it?

19   A    I don't remember.  They were probably asking questions

20   about it.

21   Q    Next line:  "He is waiting for the bank to get approval

22   for TARP before he makes his remaining $10 million

23   investment."  Do you see that?

24   A    Yes.

25   Q    So Mr. Levin's not going to act unless the TARP money is

1    actually granted to Nova, correct?

2    A    Yes.

3    Q    It's another contingency, right?

4    A    Yes.

5         MR. DUNCAN:  If I may have the Court's indulgence

6    for just a moment.

7       (Pause)

8         MR. DUNCAN:  I'm getting closer.  Okay, 62.

9    BY MR. DUNCAN:

10   Q    62 is another email.  This one's from Mrs. Hartline to

11   you with a copy to her husband, Mr. Hartline.  It's dated July

12   17th, 2009, correct?

13   A    Yes.

14   Q    Okay.  And she asks how are you, and then she talks to

15   you about Mr. Levin and she wants to get you informed as to

16   what Mr. Levin's doing.  So she sends you Mr. Levin's

17   subscription agreement, right?

18   A    Yes.

19   Q    Okay.

20        MR. DUNCAN:  Could you go to the next page, Sean.

21   Blow that up for us.  The upper right-hand corner especially.

22   Right there would be great.

23   BY MR. DUNCAN:

24   Q    So we keep hearing it's 5 million, it's 10 million, it's

25   15 million, it's 13 million, it's 5 or 10 or 15 or 13.

Koch - Cross (Dun)                                          98

1           MS. BARRY:  Objection.

2    Q    It's 18 million, isn't it, ma'am?

3           MS. BARRY:  Your Honor, objection.

4    Q    Isn't it 18 million?

5           THE COURT:  Counsel.  Counsel.

6           MR. DUNCAN:  I'm sorry, Your Honor.  I withdraw

7    that.  I was a little confused.

8    Q    He actually said --

9           MS. BARRY:  Objection, Your Honor, --

10           MR. DUNCAN:  I was confused.

11           MS. BARRY:  -- to the side comments.

12           MR. DUNCAN:  I'll stop it, Your Honor.

13           THE COURT:  Thank you.

14           MR. DUNCAN:  Thank you.  My apologies, Ms. Barry.

15    BY MR. DUNCAN:

16    Q    The amount was 18 million, right?

17    A    Yes.

18    Q    So we can agree that no matter what the documents say,

19    it's 18 million that George Levin says he's going to put into

20    Nova Bank, right?

21    A    Yes.  He had said between 15 and 40 million.

22    Q    But this is a subscription agreement.

23           MR. DUNCAN:  Blow the whole thing up, Sean, please.

24    And at the bottom.  I just want to see the whole -- the whole

25    exhibit.  And if you blow up the bottom where Mr. Levin signs

Koch - Cross (Dun)                                        99

1    it.

2    BY MR. DUNCAN:

3    Q    On June 30th, George Levin signed a formal contract

4    saying I will invest $18 million, correct?

5    A    I'm not sure if it's a formal contract.  I'm not --

6    Q    Take my word for it.

7    A    Okay.

8              MS. BARRY:  Objection.

9              THE COURT:  Sustained.

10   Q    Ma'am, do you have any doubt that that's what Mr. Levin

11   was -- said he was going to do?

12   A    No.

13   Q    Okay.  So when we hear the different numbers, we can

14   agree that the real number is 18 million, right?

15   A    According to that contract.

16   Q    And he puts in the 18 million, whether it's 5 plus 13, or

17   it's 18 million, or it's some portion of 10.  He meets the

18   TARP contingency of August 25th, correct?

19   A    Yes.

20   Q    Do you know what a subscription agreement is?

21   A    Yes.  I am not sure if it's an official binding contract

22   or not.

23   Q    Okay.  What's a subscription agreement in the banking

24   world?  Why is that significant?

25   A    It shows that an investor is willing to invest X amount

1    of dollars.

2    Q    So everybody who saw that subscription agreement could

3    reasonably conclude that's what's going to happen, right?

4    A    Yes.

5    Q    And that's what you expected to have happen, correct?

6    A    Yes.

7              MR. DUNCAN:  If we could go back to 21 briefly,

8    Sean.  Bottom email, please.

9    BY MR. DUNCAN:

10   Q    Last line.  This is an email from you to Mr. Hunter.  You

11   say:  "Unfortunately, the money, the $15 million" -- this is I

12   guess before we got the subscription agreement -- "the $15

13   million is not in escrow yet."  Why is that important, Ms.

14   Koch?

15   A    Because that -- that would be the bank having the money

16   available for them to put into capital.

17   Q    And if it's in escrow, though, they don't yet have it

18   available for capital because it's just in escrow, right?

19   A    Well, they didn't have it in escrow yet.

20   Q    But if they had it in escrow, it'd still be -- they'd

21   still have to wait, right?

22   A    Legally, I don't know.

23   Q    Okay.  Yesterday you testified when Mr. Ignall was asking

24   you questions, and I wrote it down, and I tried to quote you

25   exactly, but -- so you tell me if this is what you said.  You

1   testified:  "And Brian Hartline told me they 'had $5 million

2   in escrow.'"  Did you testify to that yesterday?

3   A    Yes, I think.

4   Q    So when Brian Hartline told you they had $5 million in

5   escrow, it's in escrow, right?

6   A    Yes.

7              MR. DUNCAN:  If we could go to Government's Exhibit

8   19, please.  I'm almost done, Your Honor.  And if we could

9   blow up the first third of that or so, Sean.  Just blow up

10  that part to Lisa and Chuck, please.

11  BY MR. DUNCAN:

12  Q    So Chuck's writing to Lisa, "I also need" and he said

13  some things.  And the last thing he wants to know is "Whether

14  there's any outside assistance (consulting) being used to help

15  raise the capital."  Right?

16  A    Right.

17  Q    What's he asking you there?

18  A    If they have a consultant that's helping them find people

19  to invest in the bank.

20  Q    And could you explain that a little bit more?  What do

21  you need a consultant for to help you find people to invest in

22  the bank?

23  A    You don't always need one, but it helps, --

24  Q    And so --

25  A    -- because they have contacts.

1    Q    -- somebody who works in financial areas, they sometimes

2    help banks raise money, right?

3    A    Right.

4    Q    And they frequently get paid for their services, right?

5    A    Yes.

6    Q    Nothing illegal about that, is there?

7    A    No.

8    Q    Ma'am, you have an accounting degree, correct?

9    A    Yes.

10   Q    And from Monmouth College, if I remember?

11   A    Yes.

12   Q    Okay.  And that's from what year -- oh, don't answer

13   that, I'm sorry.  Let me -- let me withdraw that.

14   A    I don't know.

15   Q    In your work -- I'm sorry.

16   A    That's all right.

17   Q    Yeah, it's a long time.  When you're working day to day,

18   does that accounting background help you?

19   A    Sometimes.

20   Q    How does it help you?

21   A    Well, a lot of times accounting issues are discussed

22   during bank examinations.

23   Q    So if you know a little bit about accounting, that's

24   helpful to you, right?

25   A    Yes.

1   Q    So ever hear of an accounting principle called EITF85-1?

2   A    No.

3   Q    But you have an accounting degree, right?

4   A    Yes.

5   Q    But you haven't heard it.  That's okay.  The last thing I

6   wanted to ask you --

7   A    From years ago.  I don't know the numbers by heart.

8   Q    I -- I love accountants because they're so much smarter

9   than I am.  Ma'am, Anthony Bonomo, have you ever heard his

10  name?

11  A    No.

12  Q    Have you ever met Anthony Bonomo?

13  A    No, I don't think so.

14  Q    Anything about Anthony Bonomo in any way influence

15  anything you did with respect to TARP?

16  A    Well, it was one of the names on the list of investors.

17  Q    So did anything about Anthony Bonomo affect any of the

18  recommendations you made, ma'am?

19  A    Well, his -- he was on the list of potential investors.

20  Q    That was a list of potential investors you got on

21  December 16th, 2009, correct?

22  A    Right.

23  Q    That's after basically you're just about to reject Mr.

24  Hartline's bank, right?

25  A    Well, it happened shortly after that, yeah.

1    Q     Two days, right?

2    A     Yes.

3    Q     And your bosses had already been sending you emails

4    saying, you know, Lisa, you got to write up that declination

5    memo or the declination recommendation, right?

6    A     I think I had one day's notice to do that.

7    Q     Yeah.  So 16, 17, 18, but then it happens.  That's the

8    same list that has Mr. Fellheimer's name on it showing him

9    getting his money out of the Nova line of credit, right?

10   A     Yes, but I don't recall seeing that before.

11   Q     Do you recall ever seeing Mr. Bonomo's name on that 47-

12   page document?

13   A     Yes.

14   Q     That one you remember, but you don't remember Mr.

15   Fellheimer's?

16   A     Did you see how long that list was?

17   Q     Yes, I did, ma'am.  It's a lot of information to take,

18   but -- so you did --

19   A     Yes.

20   Q     -- but you saw Mr. Bonomo, but not Mr. Fellheimer?

21   A     I saw his name on the list, yes.

22   Q     But you didn't see he was getting the money out of a line

23   of credit?

24   A     No.

25   Q     Okay.

1          MR. DUNCAN:  Thank you, Your Honor.  Thank you to

2     the court.  That's all I have.

3          THE COURT:  Redirect?

4          MS. BARRY:  Yes, Your Honor.

5       (Pause)

6          MS. BARRY:  May I proceed, Your Honor?

7          THE COURT:  You may proceed.

8          MS. BARRY:  Thank you.

9                    REDIRECT EXAMINATION

10    BY MS. BARRY:

11    Q    Good morning, Ms. Koch.

12    A    Good morning.

13    Q    When there is an exam conducted at a bank or financial

14    institution, are you looking at a period of time, a defined

15    period of time?

16    A    Usually since the last exam occurred.

17    Q    Okay.  So from the last exam to -- is there like a cutoff

18    date?

19    A    Yes.  We establish a cutoff date.

20    Q    Okay.  And does that -- does that date usually correspond

21    with a quarter or it doesn't necessarily?

22    A    Most of the times, yes.

23    Q    Okay.  And when you do an exam, are you looking at every

24    single transaction the bank has done for that time period?

25    A    No.

1    Q    What does PCA stand for?

2    A    Prompt corrective action.

3    Q    And when is prompt corrective action taken?

4    A    When a bank falls below well capitalized.

5    Q    And until 2009, had Nova Bank, to your knowledge, ever

6    fell below well capitalized?

7    A    No.

8    Q    So the first time they're dealing with prompt corrective

9    action is when their -- their capital is downgraded, is that

10   fair to say?

11   A    When they had to amend their March 31st call report.

12   Q    The information that you provided to Mr. Hunter, what was

13   your expectation with what he was going to do with it?

14   A    Provide it to the TARP council.

15   Q    Okay.  And when he asked you for information, what was

16   your expectation of why he was asking you for that

17   information?

18   A    Because the TARP council would need it.

19   Q    Do you know whether or not Nova Bank ever acquired DVFG?

20   A    I don't think so.  But I think it was the holding company

21   that was supposed to.

22   Q    Okay.  But as far as you know, you don't think there was

23   an acquisition?

24   A    I don't think so.

25   Q    Okay.  Did Mr. Hartline tell you that the bank met its

Koch - Redirect (Bar)                    107

1   contingency regarding TARP?

2   A     Yes.

3          MS. BARRY:  If we could please take a look at

4   Government's Exhibit 64.  And, Your Honor, the Government

5   would move for the admission of Government's Exhibit 64.

6          MR. EGAN:  No objection.

7          THE COURT:  Granted.

8          MS. BARRY:  May it be published, Your Honor?

9          THE COURT:  Yes.

10  BY MS. BARRY:

11  Q     Now, looking at this first page of Exhibit 64, and this

12  is a -- this is a -- what is it?  Is this a letter?

13  A     Yes.

14  Q     Okay.  And who is the letter coming from, what

15  institution?

16  A     Nova Bank -- Nova Financial Holdings.

17  Q     And this is going to the Federal Reserve Bank?

18  A     Yes.

19  Q     And do you know whether or not the Federal Reserve Bank

20  regulates Nova Financial Holdings?

21  A     Yes.

22  Q     And can you please read the first sentence?

23  A     "Please be advised that on June 30th, 2009, Mr. Levin

24  invested $5 million of his proposed $18 million investment in

25  Nova Financial Holdings, Inc."

1    Q    And if you could scroll down to the bottom, who did this

2    letter come from?

3    A    Kim Hartline.

4    Q    Okay.  Is it Cheryl Kim Hartline?

5    A    Yes.

6    Q    And she's the corporate secretary?

7    A    Yes.

8    Q    And I believe it was page 36 of this exhibit.

9         MS. BARRY:  If we could go to that.  I'm sorry, not

10   36.

11        (Pause)

12        MS. BARRY:  Six.  Page 6, please.

13   BY MS. BARRY:

14   Q    Okay.  Looking at page 6, it indicates that Mr. Levin is

15   going to make a total purchase price of 18 million, correct?

16   A    Right.

17   Q    Half from personal finances, and half from borrowed

18   funds?

19   A    Right.

20   Q    What is half of 18?

21   A    Nine.

22   Q    So 9 million from personal finances, and 9 million from

23   borrowed funds?

24   A    Yes.

25   Q    Is there any indication that the $5 million investment,

1  monies he's already put in, has been borrowed?

2  A    No.

3  Q    Is there anything about it being borrowed from the bank?

4  A    No.

5  Q    Do you know whether or not Mr. Levin was expecting to

6  borrow $9 million from another bank?

7           MR. EGAN:  Objection.

8           THE COURT:  Overruled.  If she knows.

9  A    I didn't know whether -- I expected it would be from

10  another bank.

11          THE COURT:  The answer is stricken.  That's not the

12  response directly to the question, what she expected.  It's do

13  you know.  All right.

14  A    No, I don't know.

15          MS. BARRY:  If we could please take a look at

16  Government's Exhibit 22.

17  BY MS. BARRY:

18  Q    And when we get there, I just wanted to ask you, do you

19  -- are you a certified public account or CPA?

20  A    No.

21  Q    Okay.  To become a CPA, do you know what you need to do?

22  A    You have to take a four-part test and pass all four.

23  Q    Okay.  So is that a hard thing to do in terms of

24  accounting?

25  A    Yes.

1   Q    It's complicated?

2   A    Yes.

3   Q    Okay.  You have to take a test --

4           MR. EGAN:  Objection.  Leading.

5           THE COURT:  Sustained.

6   BY MS. BARRY:

7   Q    You are not a CPA?

8   A    No.

9           MS. BARRY:  If we could take a look at Government's

10  Exhibit 22.

11  Q    And when it came to Government's Exhibit 22, what was the

12  subject of what you were writing about in the subject line?

13  A    The TARP application.

14  Q    And so Mr. Hartline's response to you is related to what?

15  Questions about the TARP application or something else?

16  A    The TARP application.

17          MS. BARRY:  If we could please take a look at

18  Government's Exhibit 28.

19  BY MS. BARRY:

20  Q    And I -- and this was a -- and what is this?  I know

21  you've said it before, but --

22  A    It's a memo from Jeff Hanuscin about the TARP application

23  providing me with additional information.

24  Q    Okay.

25          MS. BARRY:  And if we could take a look at the last

1    paragraph, please.  I'm sorry, I think I might be looking at

2    the wrong exhibit.  If we could please take a look at

3    Government's Exhibit 75.

4    BY MS. BARRY:

5    Q    And looking at Government's Exhibit 75, what is the date

6    of this letter, please?

7    A    August 25th.

8    Q    Okay.  And is that a date after June 30th?

9    A    Yes.

10   Q    Is this a letter that was written after Mr. Hartline told

11   you that a $5 million investment had been made by George

12   Levin?

13   A    Yes.

14           MS. BARRY:  Can I have a moment, Your Honor?

15           THE COURT:  Sure.

16       (Pause)

17           MS. BARRY:  The Court's indulgence, Your Honor?

18           THE COURT:  Sure.

19       (Pause)

20   BY MS. BARRY:

21   Q    Mr. Duncan asked you about -- whether you knew anything

22   about Anthony Bonomo.  Was that information forwarded to you

23   when both Mr. Hartline and Mr. Hanuscin told you that Nova had

24   met the contingency?

25   A    I'm not sure when it was forwarded to me, but I know it

1   was to meet additional information.

2   Q    Okay.  Was that related to trying to meet the

3   contingency?

4              MR. EGAN:  Objection.

5              MS. BARRY:  I'll look for these.  I didn't want to

6   take the Court's time.

7              THE COURT:  All right.

8              MS. BARRY:  If I could just have a moment to look

9   for --

10             THE COURT:  Go ahead.

11        (Pause)

12             MR. EGAN:  Your Honor, may I speak to counsel --

13             THE COURT:  Go ahead.

14             MR. EGAN:  -- to see if we can resolve it?

15             THE COURT:  Sure.

16        (Pause)

17             THE COURT:  Would you like to stand up and stretch

18   your legs for a moment?

19        (Pause)

20             THE COURT:  I switched chairs myself.

21        (Laughter)

22             THE COURT:  Counsel, you may continue.

23             MS. BARRY:  Thank you for the Court and the jury's

24   indulgence.

25   BY MS. BARRY:

1    Q    I'd like to show you what's been marked as Government's

2    Exhibit 140.

3              MS. BARRY:  And if we could publish that.  It's been

4    admitted and previously published.

5    Q    And looking at Government's Exhibit 40, is this an email

6    from -- who is this an email from?

7    A    Brian Hartline.

8    Q    Okay.  And what is the date?

9    A    December 15th, 2009.

10   Q    Okay.  And is someone copied on this email?

11   A    Jeff Hanuscin.

12   Q    And looking at the first sentence of that second

13   paragraph, what does it say?

14             MS. BARRY:  And if we could highlight it?

15   A    "Nova has met the contingency requirement by raising over

16   $10 million of capital."

17   Q    Okay.  Just -- just that section.  And then in those --

18   in that email, does an attachment follow?

19   A    Yes.

20   Q    Okay.  And if we could turn to the next page, please.

21   And what is the date of this letter, which is an attachment to

22   the email?

23   A    December 15th, 2009.

24   Q    Okay.  And, again, what is the first sentence?

25   A    "As you are aware, Nova Financial Holdings, Inc. has

1  completed raising over $10 million of common -- common equity,

2  thus achieving the Treasury Department's contingency for Nova

3  to receive its CPP funding."

4  Q    Okay.  And if we take a look at the second to last page,

5  at the bottom, Anthony Bonomo, $2.5 million, correct?  Is that

6  on -- is that on the attachment that was sent to you on

7  December 15th, --

8  A    Correct.

9  Q    -- 2009?  Okay.

10        MS. BARRY:  May I have a moment, Your Honor?

11        THE COURT:  Yes.

12     (Pause)

13  BY MS. BARRY:

14  Q    Now, when it came to Mr. Bonomo in the information that

15  was provided to you, were you given any related to the source

16  of Mr. -- the funding for Mr. Bonomo?

17  A    No.

18  Q    Okay.

19        MS. BARRY:  And if we could go to the next page,

20  please.

21  Q    And if you see Charles Gallab?

22  A    Yes.

23  Q    For 500,000?

24  A    Yes.

25  Q    Did Nova Bank -- anyone at Nova Bank provide you with any

1    information on the source of Mr. Gallab's funding --

2    A      No.

3    Q      -- of buying stock?

4    A      No.

5              MS. BARRY:  No further questions.  Thank you.

6              MR. EGAN:  Very briefly, Your Honor.

7              THE COURT:  Yes, sir.

8                          RECROSS-EXAMINATION

9    BY MR. EGAN:

10   Q      You were -- you were asked on redirect about

11   examinations, and basically I think the question was, you

12   essentially are looking at a period that has a defined end,

13   correct?

14   A      Well, sometimes we take in subsequent events into

15   consideration.

16   Q      Exactly.  That was my next question.  Once you're on

17   site, you ask for more current data, don't you?

18   A      Typically.

19   Q      So it's not just that as of date or that last date of the

20   prior quarter that you're interested in, you're also

21   interested in more recent data?

22   A      Yes.

23   Q      And in terms of what you actually examine when you go in,

24   the bank doesn't pick that, right?

25   A      No.

1    Q    You pick it?

2    A    Yes.

3    Q    Now, during this entire period of time, and what I'm

4    talking about, all of 2009, when all of this is going on, Nova

5    is never in -- in anywhere near failing, right?

6    A    No.

7    Q    And, in fact, they were never threatened with being taken

8    over during that period of time?

9    A    No.

10   Q    Then the last thing I want to ask you about is G-145.

11            MR. EGAN:  Which if we could have up just the first

12   page.

13   Q    And that was the last thing that Ms. Barry asked you

14   about, and that is where the information about Mr. Fellheimer

15   is, as I pointed out to you earlier, remember?

16   A    Yes.

17   Q    And in the email from Mr. Hanuscin it says:  "Here is

18   most of the support for the cash received.  The remainder will

19   follow shortly."  Correct?

20   A    Yes.

21   Q    And that was on December 16th?

22   A    Yes.

23   Q    And that was after you had already heard that this was

24   going to be squashed, correct?

25   A    I don't know.

1    Q    Well, we'll let the -- the jury's recollection.

2              MR. EGAN:  Thank you, Your Honor.

3              MR. DUNCAN:  Very briefly, Your Honor.

4              THE COURT:  Yes, sir.

5              MR. DUNCAN:  Can we have that back up again?  145,

6    please.

7                       RECROSS-EXAMINATION

8    BY MR. DUNCAN:

9    Q    Do you remember when you got this, ma'am?

10   A    Well, it's dated December 16th.

11   Q    And how much after were you writing your denial

12   recommendation?

13   A    A couple days.  I'm not sure how many.

14   Q    Denial was on the 18th, right?

15   A    I'm not sure.

16   Q    Didn't we establish that earlier with -- okay.  The

17   jury's recollection on that.  So when you got this information

18   with this 47 pages of attachments, what did you do with it?

19   A    I had sent it to Chuck.

20   Q    Did you review it yourself?

21   A    Yes.

22   Q    How much time did you spend with it?

23   A    I don't remember.

24   Q    10 minutes, an hour, two hours?

25   A    Well, it's a lot of information.

Colloquy                                         118

1    Q    How much time did you spend with it?

2    A    I don't know.

3    Q    Okay.

4          MR. DUNCAN:  Thank you, Your Honor.  No further

5    questions.

6          MS. BARRY:  Nothing further, Your Honor.  Thank you.

7          THE COURT:  Thank you very much.  You may step down.

8    Watch your step, please.

9       (Pause)

10         THE COURT:  All right.  We're going to take our

11   luncheon recess.  We will recess until 1:45 this afternoon.

12   1:45 this afternoon.  Thank you.

13         THE CLERK:  All rise.

14      (Jury out at 12:25 p.m.)

15         THE COURT:  All right.  We're in recess.

16         MR. IGNALL:  Your Honor, there are two issues with

17   respect to the next witness.

18         THE COURT:  Those in the audience may be seated, or

19   you are excused.  Either one.

20         MR. IGNALL:  Pardon?

21         THE COURT:  I'm just telling those in the audience

22   they can leave, if they wish.  Yes, sir.

23         MR. IGNALL:  There are two issues, and if the Court

24   wouldn't mind, I'd like to resolve them now so that I can talk

25   to the witness over the lunch hour to make sure we don't --

Colloquy                                      119

1           THE COURT:  Sure.  Sure.

2           MR. IGNALL:  The two issues involve -- the next

3   witness is going to be Mr. Frank Preve, who is someone who

4   worked for Mr. Levin.  Mr. Preve has two prior convictions.

5   Issue one revolves around his 1985 conviction.

6           Even though the conviction is, you know, now 30

7   years old, we are not going to fight against the defense

8   cross-examining him on it under Rule 609.  But I believe that

9   cross-examination should be limited to the fact of the

10  conviction, what it was for, and what his sentence was, as

11  well as the date of the conviction.  I understand the defense

12  would like to go into more than that, and I don't think that's

13  appropriate.

14          THE COURT:  In a 609 jury instruction in terms of

15  how they are to weigh it and consider it, does it allow

16  anything else to be admitted?

17          MR. IGNALL:  Rule 609 does not.  And as I believe we

18  outlined in our trial memorandum, if someone has been

19  convicted, I don't believe that Rule 609(b) allows examination

20  as to a prior instance of untruthfulness that later resulted

21  in a conviction.

22          MR. SCHWARTZ:  May I, Your Honor?

23          THE COURT:  Yes, sir.

24          MR. SCHWARTZ:  Joel Schwartz for Mr. Bekkedam.  It's

25  our intention, with the Court's permission, to introduce

Colloquy                                120

1    evidence under Rule 608 as well.

2           What happened in 1985 is that Mr. Preve was the

3    president of a bank and he -- he committed a series of frauds,

4    a series of clearly fraudulent acts.  And the -- the

5    Government was good enough after -- in response to our

6    request, to provide the PSIR from his current conviction,

7    which gave great detail about what happened in 1984.  He

8    committed $3 million worth of fraud, defrauding three sets of

9    people essentially, and he pled guilty to the fraud of one

10   person regarding one entity.  So we would like to ask

11   questions with regard to each of those three, and we think

12   it's admissible under 608.

13          If it would assist the Court, we would be happy to

14   proffer the outline of our 609 cross-examination for the Court

15   to review ex parte to determine if we are overstepping our

16   Rule 608 bounds or not and instruct us.  I have it here

17   prepared and I can give the corresponding documentation, which

18   of course we wouldn't introduce because that would be

19   extraneous evidence, but it would be -- it's the basis -- it's

20   our good faith for asking those questions.

21          THE COURT:  You have it with you now?

22          MR. SCHWARTZ:  I have it right here, sir.

23          THE COURT:  You can hand it up.

24          MR. SCHWARTZ:  Your Honor can mark this as the Court

25   sees fit.  I'm going to hand up four documents.  One is a

Colloquy                          121

 1   document headed 1984 conviction, and that's with regard to

 2   608(b) and 609 questioning.  Just to make sure we cover

 3   everything, here is the 608(b) and 609 questioning from the

 4   2015 conviction as well.  That's the second document.  And

 5   then our good faith basis for each of those is the -- I'm

 6   sorry, one more document.  The agreed motion (ck. 12:29:36) to

 7   extend self-surrender, the sentencing proceedings transcript

 8   for Mr. Preve, and the fifth document, Your Honor, is the

 9   offense conduct report.  Everything in the outline we're

10   handing to the Court marks the pages so the Court won't have

11   to read all of the documents to get where we're going.

12              THE COURT:  All right.  Just give me a moment,

13   please.

14        (Pause)

15              THE COURT:  Counsel, let me just fully understand

16   what you're proffering here.  Let's go first to Rule 608, a

17   witness.  608(a) reads as follows:  Reputation or opinion

18   evidence:  A witness' credibility may be attacked or supported

19   by testimony about the witness' reputation for having a

20   character for truthfulness or untruthfulness, or by testimony

21   in the form of an opinion about that character, but evidence

22   of truthful character is admissible only after the witness'

23   character for truthfulness has been attacked.

24              b) Specific instances of conduct:  Except for a

25   criminal conviction under 609, extrinsic evidence is not

Colloquy                                    122

1    admissible to prove specific instances of a witness' conduct

2    in order to attack or support the witness' character for

3    truthfulness, but the court may, on cross-examination, allow

4    them to be inquired into if they are probative of the

5    character for truthfulness or untruthfulness of the witness.

6    The remainder is inapplicable.

7            Now, of equal importance, the Court points to the

8    notes of the Advisory Committee on Proposed Rules.   In

9    pertinent part, it reads as follows:   Subdivision (a):   In

10   Rule 404(a), the general position is taken that character

11   evidence is not admissible for the purpose of proving that the

12   person acted in conformity therewith, subject however to

13   several exceptions, one of which is character evidence of a

14   witness as bearing upon his credibility.   The present rule

15   develops that exception.   In accordance with the bulk of

16   judicial authority, the inquiry is strictly limited to

17   character for veracity, rather than allowing evidence as to

18   character generally.   The result is to sharpen relevancy, to

19   reduce surprise, waste of time, and confusion, and to make the

20   lot of the witness somewhat less attractive.   And that cite is

21   from McCormick, Section 44.

22           The use of opinion and character evidence as means

23   of proving the character of witnesses is consistent with Rule

24   405(a), while the modern practice has purported to exclude

25   opinion witnesses who testify to reputation, seen in fact

Colloquy                                         123

1   often to be giving their opinions disguised somewhat

2   misleading as reputation.

3           Now, I'll stop there, and this is my concern.  To go

4   beyond the fact that someone was convicted of these offenses,

5   and they certainly can be named, to go to other underlying

6   information about what they did, the extent of plea agreements

7   and things like that, this isn't someone who's testifying in

8   exchange for something.  This man's sentence has already been

9   imposed.  This was 30-some years ago, you indicated.

10          MR. SCHWARTZ:  He -- his sentence was 30 years ago.

11  He definitely is testifying in exchange for something today,

12  sir.  He is testifying to -- to keep himself out of prison and

13  hopefully stay out of prison based on his current cooperation

14  agreement with the Government.  But -- but what happened 30

15  years ago --

16          THE COURT:  Accepting that that's true, that has --

17  that has -- that allows for a different kind of inquiry of the

18  witness in terms of bias.

19          MR. SCHWARTZ:  That's correct, and that's the second

20  document I handed Your Honor about the 2015 conviction.  The

21  reason we wish to inquire under Rule 608(b) with regard to the

22  1985 conviction is that the evidence that Mr. Preve provided

23  to the Government gives very short shrift as to what happened

24  in 1985, and we would like to adduce under Rule 609 what he

25  pled guilty to, and then under Rule 608, not that he got -- so

Colloquy                                             124

1    much that he got a deal, but that he committed three very

2    fraudulent acts as the president of a bank.

3           His guilty plea reflects only one set of acts.  He

4    stole $850,000.  He defrauded the bank out of $850,000 by

5    approving a loan -- by faking approval of a loan for his

6    brother.  That's the thing he pled guilty for and was

7    convicted of.

8           The PSIR, which the Government provided us, showed

9    that he did two other very large acts of theft, one involving

10   $610,000 and one involving $1.6 million.  He stole $2.3

11   million from other bank investors.  That's the 608(b)

12   evidence.  That's the other bad acts.

13          Respectfully, Your Honor, we're going to assert that

14   this man is untruthful.  He is untruthful in his business

15   conduct.  That is completely relevant to our cross-examination

16   in impugning his credibility about what he did when he was

17   acting as the agent for Mr. Levin.

18          He was -- this man's history is, he worked at a bank

19   from 1970 to 1983.  George Levin was a client of his.  Took a

20   little break because he committed a bunch of crimes and had to

21   deal with that.  In 1985, he comes back, can't get a job at a

22   bank anymore, so he goes to work for Mr. Levin full time to

23   2010 where, lo and behold, he gets convicted of another fraud

24   crime.  That's his history.  That's completely relevant to

25   what the jury should know about the truthfulness of what comes

Colloquy                        125

1    out of this gentleman's mouth.

2            In order to give the full flavor of that, to say,

3    oh, you pled guilty to false issuance of a document and got

4    five years probation in 1985, would completely obliterate the

5    fact that he was the president of a bank when he did that, and

6    that he actually committed three acts of larceny involving --

7    in the position of a bank president, and then kind of

8    continued on a career of dishonesty, all of which was tied up

9    with Mr. Levin.  All of which -- and it's my belief based on

10   proffers by the Government and by discovery from the

11   Government, they're essentially offering him as the cog in the

12   wheel of these transactions between Mr. Levin on one end, Mr.

13   Bekkedam on the other, and the third corner Nova Bank.  If we

14   can cut off one of the legs of that three -- three-legged

15   stool, that helps our case.

16           THE COURT:  Let me hear from the Government on this,

17   please.  Thank you.

18           MR. IGNALL:  We're just talking about the 1985

19   conviction here right now.

20           THE COURT:  Yes.

21           MR. IGNALL:  We could, I think, have moved to

22   exclude it altogether.  It's a --

23           THE COURT:  I think so, too.

24           MR. IGNALL:  It's a 30-year-old conviction.  It's

25   not clear to me how the probative value necessarily, because

1    of its age, outweighs the potential for confusion of the jury

2    and unfair prejudice.  But we decided not to do that.  We're

3    willing to let the jury understand the full background of Mr.

4    Preve.  But I have not heard anything from counsel as to why

5    conduct, and even if it's relevant conduct that underlies a

6    prior conviction, is appropriate under Rule 608(b) or why that

7    wouldn't be barred by Rule 403 as confusing the issues or

8    being an undue waste of time.

9            My understanding is Rule 609 is clear that the

10   defense may use extrinsic evidence to prove a prior

11   conviction, unlike under 608(b).  But when there is a prior

12   conviction, the defense is limited to the fact of the

13   conviction, what it's for, when it was, and what the sentence

14   was.  I haven't heard anything that goes beyond that, other

15   than they would like to make Mr. Preve look like he's a bad

16   guy, which I understand why they want to do that.  It's not

17   clear to me how Rule 609 and Rule 608(b) allow that.

18           THE COURT:  I don't see it either, counsel.

19           MR. SCHWARTZ:  608 allows it, Your Honor.  It's to

20   go to his reputation -- or, I'm sorry, if it's probative of

21   his truthfulness.  This man has a history of being a liar.

22           THE COURT:  So where would you stop?

23           MR. SCHWARTZ:  I would stop where -- I would ask him

24   things where I didn't have good faith evidence; that the FBI,

25   vetted by the United States Probation Office, concluded that

Colloquy                    127

1    he committed three acts of theft in the position of a bank

2    officer.  He pled guilty to one of them.  He was sentenced to

3    five years probation for pleading guilty to one of them and

4    ordered to pay $850,000 in restitution.  He paid $40,000 of

5    that.  The man is -- he's a dishonest man.

6              THE COURT:  What if he denies -- what if he starts

7    to deny some of these things?

8              MR. SCHWARTZ:  If he denies it, I cannot introduce

9    extrinsic evidence.

10             THE COURT:  Correct.  You're stuck.

11             MR. SCHWARTZ:  I think that's an ethical issue and

12   I'm stuck.  But I get to ask him that and the jury gets to

13   judge him.  That -- that there's a limit, and there's been a

14   lot of literature about whether there should be a limit, on

15   what I can do with 608(b) evidence, --

16             THE COURT:  I --

17             MR. SCHWARTZ:  -- but it does say I get to ask

18   him --

19             THE COURT:  I'm the trial judge.  I have to do what

20   they tell me to do.

21             MR. SCHWARTZ:  And what the -- respectfully, I

22   believe what the rule instructs the district -- United States

23   District Court to do is to allow me to ask the question of --

24   of acts, of specific incidents.  We have a very good faith

25   basis for it.  The Government provided the information to us.

Colloquy                                    128

1    It was in a presentence investigation report that talked about

2    what the FBI found out and was vetted by the U.S. Probation

3    Office.  That's as good --

4                  THE COURT:  All right.  Now, counsel, --

5                  MR. SCHWARTZ:  -- that's gold information.

6                  THE COURT:  The best that I can do is read this

7    while I eat my soup.

8          (Laughter)

9                  THE COURT:  All right?

10                 MR. SCHWARTZ:  That's fine.  And if you spill soup

11   on it, I got no problem with it.

12                 THE COURT:  Thank you.

13                 MR. IGNALL:  There's a second issue, Your Honor, --

14                 THE COURT:  Yes, sir.

15                 MR. IGNALL:  -- that goes to his more recent

16   conviction.  And we obviously have no objection to the defense

17   inquiring about the fact of that conviction.  We also, and

18   I'll introduce it on direct examination, have no objection to

19   impeachment for potential bias because Mr. Preve had a

20   cooperation agreement with the Southern District of Florida.

21   Although he's already been sentenced, he will testify that he

22   is hoping that he will get a Rule 35 as a result of this.  So

23   I think that's totally permissible for bias.

24                 THE COURT:  And who will explain Rule 35?

25                 MR. IGNALL:  Well, I'm not going to say Rule 35, but

```
 1    just -- what I will ask him is --
 2              THE COURT:  I'm talking obviously to the jury.
 3              MR. IGNALL:  Right.
 4              THE COURT:  I'm talking about obviously to the jury
 5    in terms of --
 6              MR. IGNALL:  Well, I think we would just have to
 7    craft a slight change to the standard cooperation agreement,
 8    that he's hoping for leniency --
 9              THE COURT:  All right.
10              MR. IGNALL:  -- in some way.  I don't think that
11    should be too much of a challenge.
12              THE COURT:  Okay.
13              MR. IGNALL:  Our concern here is because the Court
14    has instructed the Government not to introduce any evidence of
15    the Rothstein investment being a Ponzi scheme or a fraud, if
16    we go into any details of Mr. Preve's conduct, and I think a
17    lot of it is going to be relevant to understanding his
18    background, how he knows about Mr. Levin and Mr. Bekkedam, we
19    run the risk of getting into he pleaded guilty to a crime that
20    was connected to the Rothstein Ponzi scheme.  So if we go into
21    the details of what he did and what he was convicted of, I'm
22    not sure how to, you know, sanitize the Rothstein Ponzi scheme
23    from that.
24              MR. SCHWARTZ:  Thank you, Your Honor.  Joel Schwartz
25    again.  I appreciate the Government writing my cross-
```

Colloquy                                    130

1    examination for me, but what we want to say, Your Honor, is

2    that this man is cooperating and he continues to cooperate.

3    We proffered the proposed cross-examination to Your Honor to

4    review because we knew that it was getting very close to the

5    Rothstein/Ponzi issue.

6              Invariably, during the course of this gentleman's

7    direct examination, the Rothstein issue is going to come up

8    and we will follow the phraseology that the Government uses to

9    refer to the Rothstein or Banyon deals.  But there's nothing

10   in there that says you were convicted of the Rothstein Ponzi

11   scheme.  It talks about when he was convicted and -- and that

12   he committed fraud and what the -- the dates of the acts of

13   his fraud were.  And I proffered the testimony -- or the

14   questioning, and if Your Honor wants to red line it, of course

15   we'll follow the Court's instructions.

16             THE COURT:  All right.  Let me jump back one second

17   to the 19 -- is it '85 conviction?

18             MR. SCHWARTZ:  That's correct, sir.

19             THE COURT:  In all of this compendium that you've

20   submitted to the Court, is there a Third Circuit Court of

21   Appeals case on this issue of allowing more than the

22   conviction, the date, and the place?

23             MR. SCHWARTZ:  It's just Rule 608, Your Honor.  It's

24   a -- it's a -- it's an existing fact that we have a good faith

25   belief in, that we know.  All those things I gave Your Honor

Colloquy                          131

1    was to show Your Honor what our good faith basis is.  We are

2    not going to cross-examine or stand up here and read from a

3    document acting like we know something to make sure he

4    testifies accurately.

5              THE COURT:  But, nevertheless, I'm simply asking, is

6    there Third Circuit guidance on this issue in terms of going

7    beyond the conviction, the date, and the place?

8              MR. SCHWARTZ:  I'd have to look it -- look it up.

9    Mr. Ignall approached us about this this morning before trial.

10   What we're trying -- the going beyond the date of conviction,

11   that's Rule 609.  The going beyond is what's covered by Rule

12   608(b).  That's our -- that's our authority for going beyond.

13             THE COURT:  By two additional incidents.

14             MR. SCHWARTZ:  Yes.

15             THE COURT:  That did or did not result in

16   convictions?

17             MR. SCHWARTZ:  Did -- well, it did not result in a

18   conviction.  The FBI conducted an investigation of his conduct

19   at the bank.  They found out that he did three things wrong.

20   He pled guilty to one of them.  Don't know if he got a deal;

21   don't know if it got knocked out.  But there are clear

22   findings in the PSIR, which is handed up to Your Honor,

23   enunciating exactly what he did.  And I tried to, in kind of

24   one or two sentences, get the -- the sine qua non, the

25   essential piece of each one.

Colloquy                               132

1         I mean, I said, well, you were convicted for a crime

2    involving issuing a false loan document to a company that your

3    brother was a principal of; I know you hid that information.

4    The FBI also investigated you for two other acts, one was

5    ripping off a gentleman named Mr. Patrecca (phonetic), I

6    believe, for $610,000.  And the second was for misapplication

7    of funds of a gentleman named Mr. Vetroni (phonetic), I

8    believe, for $1.6 million.

9         There's three or four pages of information and I

10   tried to just extract something that characterized what he did

11   without making this a long story that would distract the jury.

12   It's frankly, Mr. Preve, you were a bank manager; you abused

13   your position; you committed three acts of theft against your

14   -- against your customers; caused the bank to lose 2.3 to $3

15   million, that's an FDIC bank, and you were ordered to pay back

16   $850,000 and you paid back $40,000 of it.  That's in a

17   nutshell the cross-examination that covers the 608 part.  And

18   the 609 part is, for those acts, you pled guilty to the

19   (inaudible 12:47:38), the first of those three crimes.  Here

20   are the two counts, both of them were felonies, but instead of

21   going to jail, you got five years probation concurrent on each

22   and ordered to pay 850 grand and, oh, by the way, you never

23   paid back most of the 850 grand.  That's in a nutshell the

24   whole cross of him with regard to the 1985 conviction.

25         THE COURT:  And other acts.

Colloquy                    133

1          MR. SCHWARTZ:  And other acts, that's correct.  The

2     1985 -- the events that led to the charging in 1985.

3          THE COURT:  All right.

4          MR. SCHWARTZ:  And that's laid out word for word,

5     and of course your edits are the ones that will govern.

6          THE COURT:  All right.  I'll hold it under

7     advisement.

8          MR. SCHWARTZ:  Thank you.

9          THE COURT:  And, again, there's no Third Circuit

10    case on the issue, correct?

11         MR. SCHWARTZ:  I can go look for it right now.

12    Mr. --

13         THE COURT:  I strongly suggest you do.

14         MR. SCHWARTZ:  Okay.  Thanks.

15         THE COURT:  All right.  Mr. Ignall?

16         MR. IGNALL:  And, Your Honor, we have it -- it's on

17    page 21 of the Government's trial memorandum that we filed in

18    October.  There's an unpublished Third Circuit case that cites

19    a hornbook about permissible questioning typically limited to

20    the number of convictions and the nature, time, and date of

21    each.  I'm not aware of any authority that allows 608(b)

22    questioning.  And what I think Mr. Schwartz has said is the

23    conduct he wants to inquire about was at most relevant conduct

24    underlying the conviction and what he pleaded guilty to and

25    what he was sentenced for, because the source of this is --

Colloquy                                                      134

1              THE COURT:  Which -- which presumably was not raised

2    at that time.  I don't know whether it was or not.

3              MR. IGNALL:  I don't know why or he -- why he was --

4    you know, pleaded guilty to one count versus another.  It

5    certainly appears to me from reading the presentence report

6    that this looks to be included as relevant conduct because

7    it's included in the offense conduct for this prior

8    conviction.

9              THE COURT:  All right.  Anything further?  You'll

10   get me the case?

11             MR. SCHWARTZ:  While you eat soup, I'll eat salad

12   and we'll see where we get to.

13             THE COURT:  All right.  Fair enough.

14             MR. IGNALL:  All right.  Thank you, Your Honor.

15             THE COURT:  Thank you all.

16        (Recess at 12:49 p.m. to 2:13 p.m.)

17        (Transcriber change)

18        **(AFTERNOON SESSION BEGINS AT 2:14:21 P.M.)**

19             THE COURT:  All right.  Counsel, let's proceed with

20   the motion regarding the testimony of Mr. Preve.

21             MR. SCHWARTZ:  Who do you want to hear from first,

22   Your Honor?

23             UNIDENTIFIED SPEAKER:  Yeah.

24             THE COURT:  You're going to hear from me.

25             MR. SCHWARTZ:  Okay.  I got you.  There we go.

1          THE COURT:  All right.  Now, I've reviewed what

2     you've submitted, I've read the, I think, pertinent case law.

3     The most recent one that Mr. Schwartz submitted, I read that

4     too, involving a defendant, however, as opposed to involving a

5     witness.  And, I think that there is a distinction wherein a

6     defendant is even entitled to more protection considering 403

7     than a witness, but nevertheless 403 still limits the

8     presentation of evidence when it is confusing and otherwise

9     irrelevant in addition to other factors.

10          Now, my concern is this.  Counsel submitted a

11     proposal of what counsel -- or at least an outline of what

12     counsel was looking at in terms of arguing.  Now, I can, with

13     specificity tell you what I would not allow from this or I

14     will not do that, it's your prerogative, but I will, in other

15     words, as an alternative tell you what my decision is

16     regarding the two convictions.

17          First of all, the conviction that is the most recent

18     of the two, it's open, it's fair game for everything that you

19     can utilize to impeach his testimony.  The more problematic is

20     the 1985 conviction.  You will be allowed to impeach by the

21     nature of the conviction, the date of the conviction.  And, to

22     the extent the nature would include the basic facts of that

23     conviction, I will allow it.  I will not allow, however, to go

24     beyond the basic facts of the conviction to what the FBI

25     learned and what they did or even the other matters involved,

Colloquy/Motion                               136

1    because it was 1985.  It's too remote in time in my opinion to

2    satisfy 403 and the balancing test.

3              Any questions?

4              MR. SCHWARTZ:  Just so I make sure I don't make a

5    mistake.

6              THE COURT:  Yes, sir.

7              MR. SCHWARTZ:  So, the facts connected, just

8    accepting my posit that there were three events --

9              THE COURT:  Excuse me.  He had one conviction.

10             MR. SCHWARTZ:  Right.  But the conviction -- so the

11   acts surrounding --

12             THE COURT:  That conviction.

13             MR. SCHWARTZ:  So those facts, the $850,000 issue?

14             THE COURT:  If it was $850,000 that was a loss, you

15   can bring that out.  The crime, specifically, by statute if

16   you choose to do that.  And, the 850 would be the loss

17   incurred to the victim at the date of that conviction.

18             And, then you have the most recent conviction to do

19   what you will.

20             MR. SCHWARTZ:  Just so I'm clear, Your Honor, I

21   don't want to run afoul of Your Honor's order.  The -- there

22   were three separate events.  I understand events number two

23   and events number three connected to 1985 are out?

24             THE COURT:  Yes, sir.

25             MR. SCHWARTZ:  With regard to the 608 issue, not the

1    609 issue, the 608 issue, may I ask the questions I outlined

2    about the effect of event number one in 1985?

3             THE COURT:  Let me hear from the Government.  I

4    don't see why you could or how you could.

5             MR. IGNALL:  No.  I think under 609 it is clear that

6    if there was a conviction there could be extrinsic evidence

7    but the cross-examination is limited to that.

8             And, I just -- to clarify for the record, I spoke to

9    Mr. Preve after we had our initial discussion about this, and

10   my understanding from Mr. Preve is that the first count he

11   pleaded guilty to included the conduct that is outlined for

12   all three.  Although, I will say that if there were an inquiry

13   he would say that although that was part of the conviction,

14   he's not acknowledging that he did those but he did plead to

15   it.  But I don't think that it's appropriate to get into

16   anything other than he was convicted of this.

17            THE COURT:  And, you can enumerate the amount of

18   loss in its totality if you wish, but to go into the

19   individual sub facts, I won't allow it.

20            MR. SCHWARTZ:  All right.

21            THE COURT:  All right.  You have an exception.

22            MR. IGNALL:  There is one other issue.  I believe

23   Mr. Schwartz said he wanted to inquire about the restitution

24   that Preve didn't pay.  (A) I'm not sure how that goes to

25   truthfulness or untruthfulness, and (B) I'll just let the

Colloquy/Motion                                    138

1    Court and counsel know I've spoken to Mr. Preve and he will

2    say that he did pay it and that there's simply not a rec --

3    and indeed, the presentence investigation report shows that

4    there's no records left 20 years later to say one way or the

5    other about that.

6              So, I am just -- but I don't -- even if he had not

7    paid it, I don't know how that goes to truthfulness.

8              MR. SCHWARTZ:  Respectfully, Your Honor, I would

9    like another exception and I don't believe the prosecutor

10   should have spoken to the witness about this.

11             THE COURT:  I didn't hear you.

12             MR. SCHWARTZ:  I don't believe the prosecutor should

13   have spoken to the witness about this.  And, I'm sorry --

14             THE COURT:  Well, no, no, no, no, we're definitely

15   not going to go there, counsel.

16             MR. SCHWARTZ:  Well, Your Honor --

17             THE COURT:  No, I'm not going to do that.

18             MR. SCHWARTZ:  All right.

19             THE COURT:  All right.  The issue before the Court

20   the Court has ruled upon.  Is there anything further?

21             MR. SCHWARTZ:  No, Your Honor.

22             MR. IGNALL:  Oh, I'm sorry, one more thing.

23             THE COURT:  Yes, sir.

24             MR. IGNALL:  I think there is a zero percent chance

25   that we're going to be done with Mr. Preve today.  I might not

Colloquy/Motion                                    139

1    even be done with my direct.  He's going to have to come back

2    Monday, regardless.  He lives in Florida and he has a 6 p.m.

3    flight, so is it possible we could agree to adjourn around

4    4:15 if there's a logical stopping point so Agent Lyons can

5    take him to the airport?

6                THE COURT:  Sure.

7                MR. IGNALL:  And, I've spoken to counsel, they have

8    no objection to that.

9                MR. SCHWARTZ:  We have no objection, Your Honor.

10                THE COURT:  Now, is that going to be included in

11   your cross-examination --

12                UNIDENTIFIED SPEAKER:  Everything from Mr. Schwartz,

13   Your Honor.

14                THE COURT:  -- that he's getting special favors,

15   special treatment.  Along that line, can I speak with counsel

16   ex parte, please, since he gave me this to be seen in camera,

17   Mr. Schwartz?

18        (Sidebar conference)

19                MR. SCHWARTZ:  Here are the bankruptcy rules, Your

20   Honor.

21                THE COURT:  That's fine.  Now, the reason why I'm

22   doing this ex parte is because I'm not going to publically

23   talk about this.  All right, that's out.  There's too much of

24   a potential inference that he's going to be in South

25   Philadelphia eating dinner.  He's down there with the mob.

Colloquy/Motion                    140

1        UNIDENTIFIED COUNSEL:  That's a fair point.

2        THE COURT:  Okay.

3        UNIDENTIFIED COUNSEL:  North Philly.

4        UNIDENTIFIED COUNSEL:  Barbeque.

5        THE COURT:  Thank you.

6        UNIDENTIFIED COUNSEL:  Thank you, Your Honor.

7        THE COURT:  Yes, sir.

8     (Sidebar ends)

9        THE COURT:  All right.  Give me the high sign.  And,

10   by the way, I've indirectly had the conversation.  My jury is

11   still out.  I will see by either 4:00 today whether we will

12   alter the composition of the jury since there will be no court

13   tomorrow.

14       MR. IGNALL:  Oh, yeah.  I -- okay.  Thank you, Your

15   Honor.

16       THE COURT:  All right.  Thank you.

17       COUNSEL:  Thank you, Your Honor.

18     (Jury enters at 2:22:17 p.m.)

19       THE CLERK:  All rise.  Ladies and gentlemen, we are

20   back on the record.

21       THE COURT:  Good afternoon.  You may be seated.

22   Thank you.  You may proceed.

23       MR. IGNALL:  The Government calls Frank Preve.

24      FRANK PREVE, GOVERNMENT'S WITNESS, SWORN

25       THE CLERK:  Please sit and state and spell your name

1    for the record for me.

2            MR. PREVE:  My name is Frank James Preve, P-R-E-V-E.

3                        DIRECT EXAMINATION

4    BY MR. IGNALL:

5    Q    Good afternoon,  Mr. Preve.

6    A    Good afternoon, sir.

7            MR. IGNALL:  May I proceed, Your Honor?

8            THE COURT:  You may proceed.

9    BY MR. IGNALL:

10   Q    Mr. Preve, in what city and state do you currently live?

11   A    I live in Coral Springs, Florida.

12   Q    And, at least continuously, how many years have you lived

13   in Florida?

14   A    Since 1999.

15   Q    And, how old are you currently?

16   A    72.

17   Q    Have you had any education after high school?

18   A    Yes.  I graduated from the University of Nebraska in

19   Omaha in 1968, and I graduated from the University of Florida,

20   Gainesville, with a Master's Degree in Latin American studies

21   and International Economics in 1969.

22   Q    And, after you got your Master's Degree, what business

23   did you work in?

24   A    I went into international banking.

25   Q    And, did you work for more than one bank?

1    A    Yes, I did.

2    Q    And, what bank did you work for?

3    A    I originally worked for Citizens and Southern National

4    Bank in Atlanta, Georgia.  Then I worked for Citizens Southern

5    International Bank in Miami, Florida.  And, then the third

6    bank was the International Bank of Miami in Miami, Florida.

7    Q    And, when did you work for this International Bank of

8    Miami?

9    A    I started there in 1979.

10   Q    And, how long did you work there?

11   A    I worked there approximately two -- a little more than

12   two years.

13   Q    Were you ever charged with a crime related to your work

14   at the International Bank of Miami?

15   A    Yes, I was.

16   Q    And, were you ever convicted of a crime?

17   A    Yes, I was.

18   Q    And, what were you convicted of?

19   A    I was -- I pled guilty to two counts.  One count was

20   making a false entry in the record of a national bank and the

21   second was making a false statement to a national bank.

22   Q    And, when were you convicted?

23   A    The incidents occurred in 1981, I was convicted in 1985.

24   Q    And, were you sentenced?

25   A    Yes, I was.

1    Q    And, in what -- was it in Federal Court?

2    A    Yes, it was in the Southern District of Florida.

3    Q    And, what was your sentence?

4    A    Proba -- three years probation, a fine and restitution.

5    Q    When you were working at this International Bank of

6    Miami, did you have an occasion to meet someone named George

7    Levin?

8    A    Yes.  Actually, I met Mr. Levin several years before

9    while I was with C&S International Bank.  He was a customer of

10   that bank and became a customer in the International Bank of

11   Miami as well.

12   Q    And, what type of business or businesses was Mr. Levin

13   in?

14   A    Mr. Levin was a very dynamic entrepreneur who was in a

15   number of businesses, a lot of real estate, but also in the

16   kit car business (phonetic).

17   Q    At any point did you work for Mr. Levin?

18   A    Yes.

19   Q    And, did you work for Mr. Levin more than once?

20   A    Yes, I did.

21   Q    And, when was the first time?

22   A    The first time would have been from 1983 to -- through

23   1988.

24   Q    And, what type of work did you do for Mr. Levin?

25   A    I was as an independent consultant.  I did consultancy

1  work for him primarily as a project manager of various

2  investments that he had.

3  Q    And, what does it mean to be a project manager of various

4  investments?

5  A    It -- being a project manager would mean that I would do

6  the due diligence on a prospective investment and if it were

7  approved normally I would take over that investment until it

8  was brought in to fruition.  For instance, I rehabbed a hotel

9  in Atlantic City for Mr. Levin in 1985.  And, when that was

10  done I turned it over to a general manager who actually

11  operated the property.

12  Q    And, you said you worked for Mr. Levin a second time.

13  When was that?

14  A    I worked for Mr. Levin from mid-1999 through mid-2010.

15  Q    And, where were you living at that point?

16  A    I was living in South Florida.

17  Q    And, where was Mr. Levin living?

18  A    Mr. Levin also was living in South Florida.

19  Q    And, the second stint working for Mr. Levin, what type of

20  work did you do for him?

21  A    Mr. Levin's scope of companies had expanded significantly

22  since the first time I had been employed by him, so he had

23  approximately 35 different companies.  And, I -- and they were

24  not highly organized from a financial perspective so my

25  primary job was to coordinate the financial reporting of all

1    the entities so that they would be on a common footing.

2         I also did extensive due diligence for him for -- on new

3    investments.

4    Q    What do you mean by due diligence on new investments?

5    A    Due diligence is the process by which a prospective

6    investment is actually analyzed to see if it meets the

7    investment standards that Mr. Levin would set.

8    Q    And, did you analyze financial data at all on behalf of

9    Mr. Levin?

10   A    Yes, I did.

11   Q    And, what did that entail?

12   A    Normally, an analysis of the financial statements, the

13   profit and loss statement, the balance sheets.  Over a period

14   of time analyzing the cash flows, both historic and the

15   forecasted cash flows from a prospective investment.

16   Q    And, was this in any way involved in deciding whether to

17   advise Mr. Levin about making an investment?

18   A    Yes, it would.

19   Q    Are you familiar with any companies that Mr. -- or

20   partnerships or other entities of any kind that included the

21   name Banyon?

22   A    Yes.

23   Q    And, were they affiliated with Mr. Levin in any way?

24   A    Yes.

25   Q    All right.  And, just generally, what did this Banyon

1   group of entities do?

2   A     The Banyon group of entities were formed to handle a

3   specific type of investment that Mr. Levin was making and that

4   was in the acquisition of confidential settlement --

5   settlement agreements.

6   Q     Okay.  And, the name Banyon, do you know where that came

7   from originally?

8   A     Yes.  Mr. Levin initially, in 2007, made these settlement

9   purchases in his own personal name, but quickly decided that

10  he needed the protection of an LLC.  And, the only LLC that he

11  had available was named -- that wasn't being used for other

12  purposes was Banyon 103032, LLC.  It happened to be -- that's

13  the name of a condominium project in the Bahamas that Mr.

14  Levin was going to use that LLC to acquire, but he did not do

15  so, so that was just sitting on the shelve, as we say.

16  Q     Do you know when Mr. Levin first became involved in any

17  of these Banyon investments, as we'll call them.  What year?

18  A     The first investments were made in July 2007.

19  Q     All right.  Are you familiar with someone named Scott

20  Rothstein?

21  A     Yes, I am.

22  Q     Do you know if Mr. Levin -- let me ask it differently.

23  Was Mr. Rothstein involved at all in these Banyon investments?

24  A     Yes.

25  Q     And, do you know how Mr. Levin first met Mr. Rothstein?

1    A    Mr. Levin was introduced to Mr. Rothstein by a common

2    friend of both or common business associate of both Mr.

3    Rothstein and Mr. Levin.  And, Mr. Levin did some -- did a

4    trip to the West Coast of Florida to look at the prospect of

5    going on a Board of Directors of a company for which Mr.

6    Rothstein was the general counsel.

7    Q    And, at some point did Mr. Levin talk to you about a

8    different investment that Mr. Rothstein had proposed, this

9    Banyon type investment?

10   A    Yes.

11   Q    Without going into the details.  Okay.  And, did you and

12   Mr. Levin talk about investing in these Banyon -- what we

13   later will call the Banyon type investments?

14   A    Well, Mr. Levin actually made the decision to invest

15   without talking to me initially and -- but after he made the

16   initial investment, we then discussed extensively the type of

17   investment that these confidential settlements represented.

18   Q    All right.  And, without going into the details, but is

19   this an investment that Mr. Levin believed would yield a high

20   return?

21   A    Absolutely.

22   Q    Okay.  And, were you at all involved in setting up any

23   entities associated with this investment?

24   A    I was involved in setting up the business practices of

25   the various Banyon entities.

1    Q    Were you personally aware of whether Mr. Levin invested

2    any money himself in these Banyon type investments?

3    A    Yes.

4    Q    And, do you know how much he invested in say early on in,

5    you know, 2007 into early 2008?

6    A    Could you repeat the question, please?

7    Q    Do you know how much Mr. Levin initially invested with

8    Mr. Rothstein through these Banyon investments?

9    A    He personally and through his bank borrowings, probably

10   invested 20 to $30 million in the first six, seven months of

11   operation.

12   Q    At some point did Mr. Levin open up these investments to

13   people he knew to participate?

14   A    Yes, he did.  At the end of 2007 he started a program

15   that he called Friends and Family, in which he -- he issued

16   promissory notes to those people to help finance the

17   acquisition of the settlements.

18   Q    So, was Mr. Levin in any way guaranteeing a return to

19   these friends and family?

20   A    He gave his unconditional personal guarantee for the

21   promissory notes.

22   Q    And, did Mr. Levin ultimately open up this investment to

23   people outside friends and family?

24   A    Yes, he established a financial arrangement with a number

25   of hedge funds from New York that provided external capital

1    for the acquisitions of the settlements.

2    Q    And, let me stop you there.  When you say the "hedge

3    funds" what does that mean?

4    A    A hedge fund is a privately owned financial organization

5    that does specialty financing or specialty investments.

6    Q    And, did Mr. Levin guarantee returns to these hedge

7    funds?

8    A    He guaranteed the principal of all his borrowings from

9    the hedge funds.  The hedge funds who were actually acting

10   very similar to banking institutions.

11   Q    And, were they -- did Mr. Levin promise them a certain

12   return on whatever they gave him?

13   A    Well, he actually executed promissory notes and the

14   promissory notes carried a very high rate of interest.  And,

15   so he had personally guaranteed that rate of interest.

16   Q    And, do you know what Mr. Levin's source was to pay that

17   interest or to pay back the principal?

18   A    The primary source would have been the collection of the

19   discounted settlement paper that he purchased from Mr.

20   Rothstein.

21   Q    And, was it just from whatever the proceeds were of this

22   Banyon investments?

23   A    Yes.

24   Q    Okay.  Did you ever do any work for Mr. Rothstein?

25   A    Yes, I did.

1    Q     And, were you ever paid by Mr. Rothstein for any work you

2    did?

3    A     Yes, I was paid.

4    Q     Now, with respect to these Banyon companies, was there

5    more than one Banyon entity that you helped set up?

6    A     Yes.

7    Q     And, why was there more than one?

8    A     Initially there was more than one because the hedge funds

9    or the New York finance houses required what we call a

10   "captive organization" to handle just their business.  This

11   was a bankruptcy protection that a lot of financial

12   institution implement.  And, in this particular case there

13   were three hedge funds, so there were three additional Banyons

14   in -- in addition to the initial Banyon organization.

15   Subsequent to that, there were other types of financing

16   created to acquire their settlements and they each had their

17   own Banyon entity as well.

18   Q     But did they all have the word Banyon in the name?

19   A     Yes, they did.

20   Q     So, is it okay for shorthand we just call them Banyon

21   investments?

22   A     Yes, sir.

23   Q     If I want to be more specific, I'll ask a more specific

24   question.

25   A     Yes, sir.

1    Q    But in connection with these Banyon investments were you

2    ever charged with a crime?

3    A    Yes.

4    Q    And, what crime were you charged with?

5    A    I was charged with one count of conspiracy to commit wire

6    fraud.

7    Q    And, without going into the details, what was the -- were

8    you accused of failing to do something?

9    A    Exactly.  I failed to inform prospective investors of a

10   deviation from the investment document which -- on which they

11   invested.

12   Q    And, have you pleaded guilty to that crime?

13   A    Yes, I have.

14   Q    And, where did you plead guilty to that crime?

15   A    I pled guilty in Federal Court in the Southern District

16   of Florida.

17   Q    And, have you been sentenced for that crime?

18   A    Yes, I have.

19   Q    And, what was your sentence?

20   A    Forty-two months.

21   Q    And, have you served that 42 months yet?

22   A    No, I have not.

23   Q    And, when are you scheduled to begin serving that

24   sentence?

25   A    May 31st, 2016.

1    Q    Do you have a plea agreement with the Southern District

2    of Florida in connection with that case?

3    A    Yes, I do.

4    Q    All right.  I would like to bring up, just for the

5    witness, Exhibit 198.  Do you recognize Exhibit 198?

6    A    Yes, I do.

7    Q    Okay.  And, if you want a hard copy I can probably get

8    you one too, but maybe not as easily as I thought.  What is

9    Exhibit 198?

10   A    Exhibit 198 is the plea agreement which I executed with

11   the U.S. Attorney's Office in the Southern District of

12   Florida.

13   Q    And, did you make an agreement with the Southern District

14   of Florida to cooperate with law enforcement?

15   A    That is one of the -- one of the aspects of the agreement

16   that I agreed to, yes.

17   Q    Even though you've already been sentenced, as you sit

18   here today do you have any hope for leniency off of that 42

19   month sentence?

20   A    Yes, I do.

21   Q    And, what is your understanding of what you could do that

22   might get you some leniency on the sentence?

23   A    I have cooperated extensively with the U.S. Attorney's

24   Office in South Florida.  And, I have agreed to continue to

25   cooperate with the U.S. Attorney's Office here in Philadelphia

1    to the best of my ability.  And, if -- presumably, if I am

2    honest and fully cooperative, they will make a recommendation

3    to the Court.

4    Q    All right.  Has anyone made you a promise about what

5    might happen to your sentence?

6    A    Absolutely not.

7    Q    Let me move you ahead to 2009.  In 2009, did Mr. Levin

8    have any difficulty raising money from hedge funds to invest

9    in these Banyon investments?

10   A    Yes, he did.

11   Q    And, did you have any discussions with him about seeking

12   other sources of funds to invest in these Banyon investments?

13   A    Yes.  We had extensive discussions.

14   Q    And, did Mr. Levin tell you he had met anyone who might

15   be able to help provide funding?

16   A    Yes, he did.

17   Q    And, who was that?

18   A    He said he had met Barry Bekkedam of Ballamor Capital and

19   that after several months of discussions that he thought that

20   Mr. Bekkedam could be a valuable resource for raising capital

21   to acquire settlements.

22   Q    After talking with Mr. Levin about this, did you

23   personally have an opportunity to meet with Mr. Bekkedam?

24   A    Yes, I did.

25   Q    Approximately, when was that?  I know you might not know

1    the exact day, but --

2    A    I believe my first -- first meeting with Mr. Bekkedam

3    occurred in February of 2009.

4    Q    All right.  Do you see Mr. Bekkedam anywhere here in the

5    court?

6    A    Yes, I do.

7    Q    And, can you identify him by where he is sitting and what

8    he is wearing?

9    A    To my right, second gentleman from my right.

10            MR. IGNALL:  I would like the record to reflect that

11   the witness has identified defendant Barry Bekkedam.

12            THE COURT:  The record shall so reflect.

13   BY MR. IGNALL:

14   Q    All right.  When you met with Mr. Bekkedam, did he ask

15   about how these Banyon investments worked?

16   A    Yes, he did.

17   Q    And, at this point, how much of Mr. Levin's own money did

18   he have invested in various iterations of this Banyon?  Do you

19   know approx -- not to the dollar, but --

20   A    He -- by his own money?  Do you mean including the hedge

21   fund money?

22            MR. EGAN:  Objection.

23   Q    No, let me ask it differently.  How much -- we'll get to

24   how much he was guaranteeing outside, but how much of his own

25   money was invested in -- was it more than $100 million?

1          MR. EGAN:  Objection.

2          THE COURT:  Sustained.  You may rephrase.

3   BY MR. IGNALL:

4   Q    Well, let me ask it differently.  Had Mr. Levin invested

5   any money of his own in these various settlements that were

6   part of the Banyon investments?

7   A    Yes, but most of that money had been repaid to Mr. Levin

8   and most of the money was borrowed money that he had in the --

9   in the settlement business in 2009.

10  Q    And, how much money had he borrowed in one form or

11  another to invest in these Banyon settlements in 2009?

12  A    Close to $300 million.

13  Q    And, had Mr. Levin guarantee amounts even beyond that

14  $300 million to other people who were investing in some way?

15  A    All Mr. Levin's borrowings, in whatever form, were

16  personally guaranteed by him.

17  Q    And, with your meetings with Mr. Bekkedam, was Mr.

18  Bekkedam aware of how much Mr. Levin had borrowed to invest

19  with these Banyon-type companies?

20         MR. EGAN:  Objection to the form of the question,

21  was Mr. Bekkedam aware?

22         THE COURT:  Sustained.

23  BY MR. IGNALL:

24  Q    Well, from meetings that you had with Mr. Bekkedam.

25         MR. EGAN:  Same objection.

1          THE COURT:  Just a moment, please.  You can ask him

2     more directly, leading included, whether or not it was

3     articulated to him specifically --

4          MR. IGNALL:  All right.

5          THE COURT:  -- by Mr. Bekkedam.

6     BY MR. IGNALL:

7     Q    Well, let me ask -- I might try it slightly differently.

8     From any meeting you were in with Mr. Bekkedam present, did

9     anyone at such a meeting discuss how much Mr. Levin had

10    invested with these Banyon entities?

11    A    Yes.  Mr. Bekkedam was provided with financial statements

12    which clearly reflected the liability of Mr. Levin.

13    Q    And, from any meeting you were in or any information you

14    provided to Mr. Bekkedam, do you know if Mr. Bekkedam was

15    aware of the guarantees that Mr. Levin had made to the hedge

16    funds or other people who provided him money?

17         MR. DUNCAN:  Same objection, also compound.

18         THE COURT:  Overruled too compound.  Sustained as to

19    the form.

20    BY MR. IGNALL:

21    Q    Okay.  With respect to the hedge funds, based on what you

22    observed, was Mr. Bekkedam aware of how much Mr. Levin had

23    guaranteed to pay the hedge funds?

24         MR. DUNCAN:  Same objection.

25         THE COURT:  Overruled.

1    A    Yes.

2    BY MR. IGNALL:

3    Q    Same question as to investors other than hedge funds who

4    provided money to Mr. Levin to put into these Banyon-type

5    investments?

6    A    Yes.

7    Q    Do you know what business Mr. Bekkedam had at this time,

8    in February or so of March -- in February or so of 2009?

9    A    Mr. Bekkedam had a registered investment advisory firm.

10   Q    And, do you know the name of that?

11   A    Ballamor Capital.

12   Q    Did Mr. Bekkedam ever tell you how much money he had to

13   advise people -- well, that's a bad way to phrase the

14   question.  Let me try that again.  Did Mr. Bekkedam ever tell

15   you how much money he was managing as part of this company?

16   A    In excess of $4 billion.

17   Q    Did you ever -- let me ask you something else.  Were you

18   involved in any way in setting up a way for Mr. Bekkedam's

19   clients to invest in some type of Banyon investments?

20   A    I assisted in the formation of Banyon Income Fund Limited

21   Partnership.

22   Q    And, what was the per -- purpose of Banyon Income Fund

23   Limited Partnership?

24   A    The purpose of that partnership was to offer an

25   opportunity to Mr. Bekkedam's clients to make an alternative

1   investment as equity partners -- as limited equity partners in

2   the partnership with their capital going to acquire

3   settlement.

4   Q    And, was part of this partnership, did that involve Mr.

5   Levin guaranteeing any part of the investment?

6   A    Mr. Levin guaranteed up to the first $100 million.

7   Q    And, did you participate in any discussion with Mr.

8   Bekkedam where you -- where anyone at this meeting discussed

9   Mr. Levin guaranteeing up to $100 million?

10  A    That issue -- the guarantee was discussed on various

11  occasions in mid-2009.

12  Q    Did you ever deal with anyone else who worked for

13  Ballamor Capital in connection, first, with the Banyon Income

14  Fund?

15  A    I dealt primarily with Mr. Larry Rovin.

16  Q    And, do you know what Mr. Rovin's role was at Ballamor

17  Capital?

18  A    I believe his title was Managing Director and General --

19  Managing Director and General Counsel.

20  Q    And, did you ever participate in any meetings or

21  conversations with Mr. Bekkedam about Mr. Rothstein needing

22  more money to fund these investments?

23  A    Yes.

24  Q    Now, as part of your job advising Mr. Levin, do you know

25  if Mr. Levin had any other business dealings with Mr.

1    Bekkedam?

2    A    Yes, he did.

3    Q    And, do you remember what those business dealings were

4    generally, without going into the details?

5    A    Mr. Bekkedam, through Ballamor Capital, had invested in

6    what I call alternative investments, which were primarily

7    small companies, sometimes turnaround situations, invest in

8    small companies and then he would sell participation in those

9    investments to his clients.

10   Q    Well, no, I'm sorry, I may have asked that poorly.  Are

11   you aware of any particular business deals that Mr. Levin was

12   going to engage in with Mr. Bekkedam?

13   A    Yes.

14   Q    Okay.  Let's -- let me ask maybe a more focused question.

15   Are you aware of any deal that Mr. Levin was going to engage

16   in involving some sort of a revenue bond from Colorado?

17   A    Yes.

18   Q    And, again, without going into details, what generally

19   was that investment?

20   A    That investment was where Mr. Levin would acquire the

21   bonds from Mr. Bekkedam.  I think there was approximately $3.1

22   million in bonds.  And, for $1.1 million in cash and

23   assumption of a $2 million bank loan.

24   Q    And, do you know what bank that loan was from?

25   A    The bank was -- the bank was Nova Bank.

1   Q    And, who owed the $2.1 million originally on that loan

2   that Mr. Levin was going to assume?

3   A    I believe it was Mr. Bekkedam.

4          MR. ENGLE:  Objection to the just belief.

5          THE COURT:  Sustained.

6          MR. IGNALL:  I'm sorry, what --

7          MR. ENGLE:  I believe it was.

8          MR. DUNCAN:    Strike -- strike the answer.  Can we

9   strike the answer, Your Honor?

10         THE COURT:  Yes, sir.  It is stricken.  The jury

11  should disregard that portion of the witness's testimony.

12  BY MR. IGNALL:

13  Q    Do you know from any dealings you had working for Mr.

14  Levin as to who originally owed the money to Nova Bank?  If

15  you don't, that's fine.  I'm not --

16  A    I'm almost positive it was Mr. Bekkedam but my

17  recollection right now, there could have been an LLC involved,

18  so I --

19         MR. DUNCAN:  Objection.  Move to strike.

20         THE COURT:  The answer is -- the objection is

21  sustained.  The answer is stricken.  It has to be by personal

22  knowledge.

23  BY MR. IGNALL:

24  Q    All right.  Do you recall any other business transactions

25  between Mr. Bekkedam and Mr. Levin that you were involved in

1    through about April or May of 2009?  And, let me turn your

2    attention to Exhibit 14, just for the witness, please.

3              MR. IGNALL:  And, may I approach the witness?

4              THE COURT:  Yes, sir.

5    Q    If you could flip through Exhibit 14 and just tell me if

6    that refreshes your recollection about --

7              MR. DUNCAN:  I'm not sure he said he's forgotten

8    anything.  Object to refreshing his recollection if he hasn't

9    forgotten anything.

10             MR. IGNALL:  Strictly speaking, correct.

11             THE COURT:  Do you want to lay a foundation,

12   Counsel?

13             MR. IGNALL:  I will.

14   BY MR. IGNALL:

15   Q    Can you please review Exhibit 14 for a moment.  Do you --

16             MR. DUNCAN:  I object to that process.  If he asks

17   him a question, if he can't remember the answer, that's fine

18   and then he can refresh his recollection, but doing it the

19   other way, it's backwards.

20             THE COURT:  Would you include all the steps of the

21   process, lay the foundation.

22             MR. IGNALL:  I'm not -- I've moved past refreshing

23   recollection.

24             THE COURT:  Very well.

25             MR. IGNALL:  I'm going to ask the witness if he --

1    I'll ask the question once he's taken a look.

2    BY MR. IGNALL:

3    Q    Do you recognize Exhibit 14?

4    A    Yes.

5    Q    What is Exhibit 14?

6    A    Exhibit 2 -- Exhibit 14 is a summary of --

7    Q    Well, let me just ask you.  Is it -- what type of

8    document is it?

9    A    Oh, I'm sorry.  It's an email from Barry Bekkedam to me

10   and a copy to George Levin.

11   Q    And, what is the date of that email?

12   A    April 3, 2009.

13   Q    And, do you recall getting this email on or about April

14   3, 2009?

15   A    Yes, I do.

16           MR. IGNALL:  All right.  The Government moves into

17   evidence Exhibit 14.

18           MR. DUNCAN:  No objection.

19           THE COURT:  Admitted.

20   BY MR. IGNALL:

21   Q    What is Exhibit 14 discussing just generally?

22   A    It is discussing two prospective investments by Mr. Levin

23   to Mr. Bekkedam.

24   Q    And, what are those two investments?

25   A    One are the bonds that we previously -- revenue bonds

1    from Colorado that we previously discussed.  And, the other is

2    a loan to Ballamor Capital.

3    Q    And, what is the loan to Ballamor Capital?  Well, let me

4    ask you, who was going to loan money to Ballamor Capital?

5    A    I'm sorry.  May I restate my answer?

6    Q    Yes.

7    A    There is a third investment and I thought that was number

8    two, but actually number two is a proposal by Mr. Bekkedam for

9    Mr. Levin to make a $10 million to Mr. Bekkedam so Mr.

10   Bekkedam could repay old line investors that he had in

11   Ballamor Capital.

12   Q    All right.  Thank you.  If I could turn your attention to

13   exhibit -- I'm sorry, I don't have a problem with that.

14        If we could turn to Exhibit 15, just for the witness

15   right now.  And, it should be on your screen now, Mr. Preve.

16   Do you recognize Exhibit 15?

17   A    Yes, I do.

18   Q    And, what is Exhibit 15?

19   A    Exhibit 15 is an email from Barry Bekkedam to me with a

20   copy to Mr. Levin in which he is forwarding a copy --

21   forwarding an email from Brian Hartline of Nova Bank.

22   Q    All right.  Let me stop you there.  Do you recall getting

23   this email on or about April 3rd of 2009?

24   A    Yes, I do.

25             MR. IGNALL:  All right.  The Government moves into

1    evidence Exhibit 15.

2              MR. DUNCAN:  No objection.

3              THE COURT:  Admitted.

4              MR. IGNALL:  May we publish that to the jury?

5              THE COURT:  Granted.

6    BY MR. IGNALL:

7    Q    Now, what is the email that Mr. Bekkedam has forwarded to

8    you and Mr. Levin?  If we can scroll down a little bit, Agent

9    Boyer.

10   A    It's an email which outlines what the bank is going to

11   require to allow Mr. Levin to assume the loan that they had

12   extended to Mr. Bekkedam or one of his entities for the

13   Colorado revenue bonds.

14   Q    In addition -- we can take that down -- to the deals

15   we've talked about here, do you know if Mr. Levin was involved

16   in possibly investing in a bank?

17   A    Yes.

18   Q    And, do you know if Mr. Levin had any discussions that

19   you were part of with Mr. Bekkedam about investing in a bank?

20   A    Yes.

21   Q    And, part of your discussions -- decisions you were part

22   of, what were they about in terms of Mr. Levin investing in a

23   bank?

24   A    The initial discussions were the possibility of Mr. Levin

25   investing in a -- in a Pennsylvania bank which would then --

1          MR. ENGLE:  Your Honor, I would like to object at

2     this point.  If the witness is testifying to out-of-court

3     statements that Mr. Levin made, that's hearsay.

4          THE COURT:  Sustained.

5          MR. IGNALL:  I have two responses.  I'm asking about

6     what the witness -- well, let me -- may I address it at

7     sidebar?

8          THE COURT:  Yes.  Yes, sir.

9          MR. IGNALL:  I think it is probably easier to do

10    that?

11         THE COURT:  If you wish to stretch your legs, you

12    can.

13       (Sidebar begins)

14         THE COURT:  Yes, sir.

15         MR. IGNALL:  My first issue is I'm not sure who is

16    objecting during the cross-examination.  We have had more than

17    one defense lawyer object now.

18         THE COURT:  This is true.

19         MR. IGNALL:  But as to this, the objection itself,

20    what I am laying here is what Mr. Levin was going to invest in

21    as well as what dealings he had with Mr. Bekkedam.  So,

22    although there may be some truth to the matter asserted, I am

23    not introducing it for that purpose, only to set the

24    background for the later deals.

25         THE COURT:  But it permits the jury to infer that it

1    came directly from his mouth.  And, I think counsel is

2    objecting to the fact that it is still hearsay no matter

3    what --

4              MR. ENGLE:  Mr. Levin is an available witness.

5              MR. IGNALL:  Well, I'll ask it --

6              MR. ENGLE:  You can ask him.

7              MR. IGNALL:  I'll ask it differently.

8              MR. DUNCAN:  While we are here, Your Honor, just to

9    address, are they suggesting that Mr. Preve is a co-

10   conspirator in this case?

11             THE COURT:  Is that a rhetorical question?

12             MR. DUNCAN:  No, I'm just asking -- just asking at

13   sidebar.  If he's not a co-conspirator, then obviously

14   (inaudible).

15             MR. IGNALL:  We're not seeking to claim Mr. Preve as

16   a co-conspirator for 801D(2)(e) reasons.

17             THE COURT:  Okay.

18             MR. DUNCAN:  Thank you, Your Honor.

19             MS. BARRY:  Are we going to have a decision on who

20   is going to be objecting for Mr. Bekkedam?

21             UNIDENTIFIED SPEAKER:  We're going to arm wrestle.

22   One attorney will --

23             THE COURT:  Thank you very much.

24             UNIDENTIFIED SPEAKER:  He's more photogenic.

25        (Sidebar ends)

1          THE COURT:  You may continue.

2   BY MR. IGNALL:

3   Q    Were you involved in any discussions where Mr. Bekkedam

4   participated about Mr. Levin investing in a bank?

5   A    Yes.

6   Q    All right.  Tell us about any discussion where Mr.

7   Bekkedam was present.

8   A    The initial discussion between Mr. Bekkedam and Mr.

9   Levin, which I attended --

10          MR. ENGLE: Objection, Your Honor.

11          THE COURT:  Just a moment, please.  The objection,

12   assuming it's coming, would be sustained in terms of Mr.

13   Bekkedam being present.

14          MR. IGNALL:  Well, may I approach at sidebar on

15   that.

16          THE COURT:  Yes.

17          MR. IGNALL:  I think -- I might understand slightly

18   differently from what I said previously, Judge.

19          THE COURT:  All right.  Apologies and ask for your

20   forbearance.  Thank you.

21     (Sidebar begins)

22          MR. IGNALL:  The Government --

23          THE COURT:  I have a bad knee.

24          MR. IGNALL:  Oh, sorry.

25          UNIDENTIFIED SPEAKER:  You made me stretch my legs.

1          THE COURT:  Yes, sir.  Let me just, first, you stood

2     up.  What was said?

3          MR. ENGLE:  My objection is that it still calls for

4     a hearsay statement of Mr. Levin.

5          THE COURT:  Correct.

6          MR. ENGLE:  Whether Mr. Bekkedam is present at the

7     hearing --

8          THE COURT:  Exactly.

9          MR. ENGLE: -- has no effect on -- it's an out-of-

10    court statement made by Mr. Levin --

11         THE COURT:  Unless --

12         MR. IGNALL:  -- for the truth of the matter

13    asserted.

14         THE COURT:  -- unless there is test adopted (sic).

15         MR. IGNALL:  No, it goes to the affect on Mr.

16    Bekkedam's part of the process.  So he understands (A) what

17    he's proposing to Mr. Levin and what Mr. Levin is agreeing to.

18    They are all part of the same meeting.

19         THE COURT:  He could have been on his cellphone

20    texting or something at the time, Counsel.

21         MR. ENGLE:  How can Mr. Preve testify what was in

22    Barry's mind as a result of a hearsay statement --

23         MR. IGNALL:  No, he's going to testify --

24         MR. EGAN:  -- for Mr. Levin.

25         THE COURT:  Just one at a time.  First of all, let

1    me just put it this way.  First of all, the fact that Mr.

2    Bekkedam is there is proving nothing other than physically he

3    was present.  It does not mean that he heard it, that he

4    participated, that he accepted or anything else.

5              MR. IGNALL:  Okay.  I can lay that foundation.

6              THE COURT:  And, the fact that it was stated

7    nonetheless is an out-of-court declaration offered for the

8    truth of the matter.  And, if it is not offered for the truth

9    of the matter, to argue that is just to show its affect upon

10   the listener, you have to demonstrate that Mr. Bekkedam was

11   listening and made a reaction or something like that.

12             MR. IGNALL:  Okay.

13             THE COURT:  Or otherwise acknowledged it and didn't

14   say anything, because it's otherwise a tacit admission to --

15             MR. IGNALL:  No, I'm not necessarily suggesting it's

16   a tacit admission, but they are having discussions, all three

17   of them together, about what Mr. Levin wants to do.  So, based

18   on that Mr. Bekkedam's knows what Mr. Levin wants to do.

19             MR. ENGLE:  Only -- except for the fact that you

20   need to establish that through Mr. Levin on the witness stand

21   saying, I said this.  It's his statement.

22             THE COURT:  He's suggesting that it's not offered

23   for the truth of the matter, just the effect upon Mr.

24   Bekkedam.  Now, what effect upon Mr. Bekkedam is relevant

25   here?

1                MR. IGNALL:  Because now he knows what Mr. Levin

2      wants to do.

3                MR. ENGLE:  That goes to his state of mind in terms

4      of --

5                UNIDENTIFIED SPEAKER:  If he heard it.

6                MR. IGNALL:  I'll set -- I'll lay the foundation for

7      what he heard.

8                THE COURT:  Counsel, bring this information via Mr.

9      Levin.  If he testifies I was talking to Mr. Bekkedam, we had

10     a conversation, that's one thing.  But to say that the man was

11     present in and of itself is to allow the jury to infer way too

12     much here.

13               MR. IGNALL:  Well, I think given what Mr. Bekkedam

14     knows is something we need to prove.  Certainly the effect on

15     Mr. -- when it's a defendant is clearly admissible.

16               MR. ENGLE:  Well, you can't prove my client's

17     mindset or intent --

18               MR. IGNALL:  The jury --

19               MR. ENGLE:  -- through Mr. Preve.

20               MR. IGNALL:  Absolutely can.  The jury can infer

21     what they want based on what he's learned.

22               THE COURT:  All right.  Let me put it this way.  Let

23     me try to understand it better.  You have three men present.

24               MR. IGNALL:  Yes.

25               THE COURT:  You have three men present.  They come

1    there with a purpose, presumably.  There could be testimony

2    about something stated by Mr. Bekkedam as to his intent to go

3    to this three person meeting.  Anything that he articulates

4    prior to the meeting or anything he articulates during the

5    meeting or post meeting that indicates that he knew or heard

6    it, that's one thing.  That's competent evidence.  But to just

7    simply say, he's standing there --

8              MR. IGNALL:  Let me try -- let me try and lay that

9    foundation.  All right.  Thank you.

10       (Sidebar ends)

11   BY MR. IGNALL:

12   Q    Would --

13             MR. IGNALL:  I'm sorry, Your Honor.  May I proceed?

14             THE COURT:  You may proceed.

15   BY MR. IGNALL:

16   Q    Were you present at any discussions with Mr. Levin and

17   Mr. Bekkedam both there where all of you discussed Mr. Levin

18   investing in a bank of any kind?

19             MR. ENGLE:  Objection, hearsay.

20             THE COURT:  Overruled.

21   A    Yes.

22   BY MR. IGNALL:

23   Q    Did Mr. Bekkedam himself participate in these

24   discussions?

25   A    Yes.

1    Q    Did Mr. Bekkedam ever suggest to Mr. Levin a particular

2    bank in which Mr. Levin could invest?

3              MR. ENGLE:  Objection to the leading.

4              THE COURT:  It's leading.  Sustained.  Only leading.

5    BY MR. IGNALL:

6    Q    Did Mr. Bekkedam ever say anything about a particular

7    bank?

8    A    Not at that initial meeting.

9    Q    What did he say at the initial meeting?

10   A    The initial meeting was where Mr. Levin outlined his

11   requirements to invest in a bank that could hold Florida Iota

12   Trust accounts.  And, Mr. Bekkedam brought up the name of

13   Flagler Bank in Palm Beach County as prospective candidate to

14   do that sort of thing, but he did not go into any detail on

15   how to acquire the bank at that time.

16   Q    Did Mr. Bekkedam ever suggest a different bank for Mr.

17   Levin to invest in?

18             MR. ENGLE:  Your Honor, I'm still going to object.

19             THE COURT:  Sustained.  Sustained.  Leading for the

20   question, please.

21   BY MR. IGNALL:

22   Q    Were there any other discussions that you had where Mr.

23   -- with Mr. Bekkedam about Mr. Bekkedam suggesting any other

24   banks?

25   A    I was not there for any dis -- any oral discussions about

Preve - Direct                                                 173

1    any other bank.  I was just recip -- I was the recipient of

2    emails concerning the investment in another bank.

3    Q    All right.  Are you familiar with a bank called Nova

4    Bank?  I think we mentioned it a minute ago.

5    A    Yes, I am.

6    Q    And, did you ever have any discussions with Mr. Bekkedam

7    about Nova Bank?

8    A    Yes, I did.

9    Q    And, did Mr. Bekkedam describe his relationship with Nova

10   Bank at any time to you?

11   A    Yes, he did.

12   Q    And, how did he describe Nova Bank?

13   A    He said it was a bank that had a great future, that he

14   owned or he controlled.  He didn't say own, he said he

15   controlled Nova Bank.  And, that he thought it could be

16   utilized as a vehicle to expand into Florida.

17   Q    And, did he act in any way that showed you what control

18   he may or may not have had over Nova Bank?

19            MR. EGAN:  Objection.

20            THE COURT:  Sustained, leading.

21            MR. IGNALL:  Can I ask the basis so I can --

22            THE COURT:  Leading.

23            MR. IGNALL:  Okay.

24   BY MR. IGNALL:

25   Q    Did Mr. Bekkedam -- did you observe how Mr. Bekkedam

1   viewed the bank, Nova Bank?

2            MR. ENGLE:  Objection, Your Honor.

3            THE COURT:  I'm not sure I understand the question,

4   Counsel.  Take a moment please.

5            MR. IGNALL:  Let me try it again.  May we approach

6   at sidebar, Your Honor?

7            THE COURT:  Surely.

8            THE CLERK:  Could this be a good chance for a

9   recess, Your Honor?

10           THE COURT:  I think it would be.

11           MR. IGNALL:  Okay.

12           THE CLERK:  Fifteen minutes, please.

13       (Jury exits at 3:09:43 for recess)

14           THE COURT:  We can do it in open court.  Are you

15   going to give a listening foundation?

16           UNIDENTIFIED SPEAKER:  It's funny at trial I had to

17   do this, totally appreciate the real world when it comes to

18   this, don't look at (inaudible).

19           THE COURT:  Sir, you may step down if you wish.

20           MR. PREVE:  Thank you, Your Honor.

21           THE COURT:  Watch your step, please.

22           MR. ENGLE:  Your Honor, may Mr. Bekkedam be excused

23   for just a moment?

24           THE COURT:  Surely.

25           MR. ENGLE:  Thank you.

1              UNIDENTIFIED SPEAKER:  An actually, Your Honor, I

2     believe if we're going to do this in open court it would be

3     best if the witness was --

4              THE COURT:  That's what I'm saying, he can step

5     down.  There is a sequestration, Counsel, if the both of them

6     are going outside.

7              MR. IGNALL:  I'm sorry, if --

8              THE COURT:  If this gentleman and Mr. Bekkedam are

9     going outside, there's a sequestration.  Their paths should

10    not cross.

11             MR. IGNALL:  Yeah.  John, Agent Lyons, if you could

12    step outside with Mr. Preve.  Agent Lyons will bring Mr. Preve

13    into the witness room.  I think that will solve that.

14        (Pause)

15             UNIDENTIFIED SPEAKER:  Don't --

16             UNIDENTIFIED SPEAKER:  Obviously I've got to wait.

17             THE COURT:  All right.  You may be seated.  Yes,

18    sir.

19             MR. IGNALL:  I need -- I want to -- I would like to

20    respectfully reserve the right to revisit the leading

21    objection.

22             THE COURT:  Yes, sir.

23             MR. IGNALL:  One, I do not believe those questions

24    were leading.  They are questions that could be answered yes

25    or no, but did Mr. Bekkedam suggest a bank, is a yes or no

1    question.  It does not suggest the answer even though it can

2    be answered yes or no.

3            And, two, even insofar as it might be leading, under

4    Rule 104 that would be simply be to develop the witness's

5    testimony so I could ask the next question, what bank is it.

6            MR. ENGLE:  Except for the fact that if you do that

7    with the first question and the second question and the third

8    question, 104 never really kicks in because you're not setting

9    anything up, you're just doing it repeatedly.

10           THE COURT:  That's what I teach my trial ed.

11   (phonetic) student at Penn, but nevertheless, Counsel --

12           MR. IGNALL:  I don't -- I think, did he discuss

13   something is a yes or no question.

14           THE COURT:  My problem, frankly, even with did he

15   discuss something, is suggesting that there was a discussion.

16           MR. ENGLE:  Right.

17           THE COURT:  And, --

18           MR. IGNALL:  The answer could be no.

19           THE COURT:  But the answer could also be was there

20   anything discussed when you met or what, if anything, occurred

21   when you met, better still.

22           MR. IGNALL:  Okay.  I'll try that, but I --

23           THE COURT:  Not was there anything discussed, but

24   better still, you know, what occurred when you were there.

25   And, if he says, we had a discussion, --

1          MR. IGNALL:  Okay.

2          THE COURT:  -- about what?  And, you can go from

3    there.

4          MR. IGNALL:  But even, like, did Mr. Bekkedam ever

5    mention a bank, I'm not sure I develop the witness's testimony

6    without asking a question that includes the word "bank".

7          THE COURT:  But if you are intending to elicit

8    subsequent testimony about a bank or the bank, you've set that

9    up with that initial question.

10         MR. IGNALL:  Okay.

11         THE COURT:  And, that's what I think counsel is

12   objecting to as leading.

13         MR. IGNALL:  Okay.

14         THE COURT:  Mr. Egan?

15         MR. EGAN:  Yes, Your Honor.  What, if anything, is

16   the cure for all ills.

17         THE COURT:  Exactly.  All right.  And, it's a

18   double-edge sword, goes for both sides.

19         MR. IGNALL:  I understand, Your Honor.

20         THE COURT:  Now, on the issue of objections, who is

21   going to be the spokesperson for each --

22         UNIDENTIFIED SPEAKER:  John.

23         MR. ENGLE:  I will be.

24         THE COURT:  Mr. Engle.  And, on this team?

25         MR. EGAN:  Me, Your Honor.

1          THE COURT:  All right.  And, your team counsel, Ms.

2     Barry or --

3          MR. IGNALL:  Well, for this one it is going to have

4     to be me since I'm standing up here.

5          UNIDENTIFIED SPEAKER:  Your Honor, may we vary from

6     witness to witness?  We'll obviously tell the Court and --

7          THE COURT:  If you do that just stick with the same

8     person throughout that witness.

9          UNIDENTIFIED SPEAKER:  Absolutely.  Absolutely, Your

10    Honor.

11         UNIDENTIFIED SPEAKER:  That would be the plan, Your

12    Honor.

13         MR. IGNALL:  And, at sidebar?

14         UNIDENTIFIED SPEAKER:  What's that?

15         MR. IGNALL:  Okay.  Thank you, Your Honor.

16         THE COURT:  Thank you.

17      (Recess at 3:14:04 p.m. to 3:26:27 p.m.)

18         THE COURT:  Counsel ready?

19         COUNSEL:  Yes, Your Honor.

20         THE COURT:  Thank you.  Mr. Ignall, what time did

21    you suggest we end.

22         MR. IGNALL:  4:15 -- 4:15 you think, early enough?

23         UNIDENTIFIED SPEAKER:  I do.

24         MR. IGNALL:  Okay.  4:15 would probably -- if I get

25    to a point at 4:12 that seems like it is a good break, I'll

1  let you know.

2          THE COURT:  Fair enough.

3          MR. IGNALL:  Someone will throw something at me.

4          THE CLERK:  All rise.

5       (Jury in at 3:26:25 p.m.)

6          THE COURT:  Thank you.  You may be seated.  You may

7  continue.

8          MR. IGNALL:  All right.  Thank you, Your Honor.

9                DIRECT EXAMINATION CONTINUES

10  BY MR. IGNALL:

11  Q    Mr. Preve, prior to meeting Mr. Bekkedam have you ever

12  heard of Nova Bank?

13  A    No.

14  Q    At some point, did you become involved in Mr. Levin

15  making sort of an investment in Nova Bank?

16  A    Yes.

17  Q    And, what was your role?

18  A    My role was to marshal the paperwork that Nova Bank or

19  Mr. Bekkedam or Mr. Rovin requested be completed to -- for the

20  investment.

21  Q    Prior to meeting Mr. Bekkedam, had you done anything on

22  behalf of Mr. Levin in terms of investing in Nova Bank?

23  A    No.

24  Q    All right.  At the time -- when did you first start doing

25  some work for Mr. Levin in terms of perhaps investing in Nova

1    Bank?

2    A     At the end of May of 2009.

3    Q     All right.  At that time, were you familiar with Mr.

4    Levin's finances?

5    A     Yes.

6    Q     And, how were you familiar with his finances?

7    A     I was in charge of creating and monitoring his personal

8    finances in the form of annual or semi-annual personal

9    financial statement.

10   Q     And, as of May 2009, did Mr. Levin have much cash

11   available to invest in something?

12   A     No.

13   Q     Okay.  Where was Mr. Levin's wealth at that point?

14   A     Most of his wealth was tied up in either real estate or

15   in the settlement business.

16   Q     Did Mr. Levin ask you to do any due diligence with

17   respect to Nova Bank?

18   A     No.  We both looked at the financial statements but I

19   didn't do any special due diligence on the bank.

20   Q     With respect to the investment Mr. Levin was going to

21   make in Nova Bank, were you involved in putting up any of Mr.

22   Levin's assets, whether it's cash or anything else?  I didn't

23   ask that well.  Let me try that again.

24         Do you know what the source of funds was going to be

25   for Mr. Levin to purchase shares of Nova Bank or Nova

1    Financial Holding stock?

2    A    The initial investment was going to be covered by a loan

3    from Nova Bank.

4    Q    And, between you and Mr. Levin, who dealt primarily with

5    Nova Bank?

6    A    I dealt primarily with Nova Bank.

7    Q    And, from your dealings with Nova Bank, was Mr. Levin

8    looking to borrow money for any purpose other than purchasing

9    Nova Financial Holdings stock?

10   A    Initially there was talk of a line of credit from Nova

11   Bank for the acquisition of the settlements, but that evolved

12   into just a direct loan for purpose of purchasing stock.

13   Q    Was it your role working for Mr. Levin to take care of

14   any loan applications?

15   A    Normally they would pass through my desk.

16   Q    Are you aware of any time Mr. Levin applied for a loan

17   from Nova Bank other than to purchase Nova shares?  Let me

18   back up.  We talked earlier about the Colorado bond debt

19   assumption.

20   A    Yes.

21   Q    Okay.  Other than that, in your role working for Mr.

22   Levin, are you aware of Mr. Levin ever seeking or applying for

23   a loan from Nova Bank other than to purchase Nova Financial

24   Holdings share?

25   A    No, I am not aware.

1    Q    Now, in your work for Mr. Levin, do you know how much Mr.

2    Levin was initially going to -- or let me ask you this.  Did

3    Mr. Levin agree to buy a certain amount of Nova Financial

4    Holdings stock?

5    A    Yes.

6    Q    Do you remember how much that was?

7    A    Approximately $18 million worth.

8    Q    And, did Mr. Bekkedam ever seek from you any part of that

9    before getting the full $18 million?

10   A    Yes.

11   Q    And, how much was the initial amount Mr. Bekkedam sought?

12   A    He was asking for approximately $3 million.

13   Q    All right.  Now, when did Mr. Levin apply for a loan with

14   Nova Bank?

15          MR. EGAN:  Objection, Your Honor.  He's mentioned

16   two loans.  Can we clarify which one he's talking about?

17   BY MR. IGNALL:

18   Q    All right.  With respect to the purchase of Nova

19   Financial Holdings stock, do you know when Mr. Levin first

20   applied for that loan?

21   A    Well, there was not a formal application.  The bank

22   requested certain documents be completed and financial data be

23   provided and we do so.

24   Q    I would like you to look at what we've marked as Exhibit

25   40.  What is Exhibit 40?

1    A    Exhibit 40 is an email from Larry Rovin to me and to

2    Brian Hartline.  The subject is George's financials, dated

3    June 29, 2009.

4    Q    Do you know who Brian Hartline is?

5    A    Brian Hartline was the president of Nova Bank in 2009.

6    Q    And, what is the date of these emails?

7    A    June 29, 2009.

8              MR. IGNALL:  Government moves into evidence Exhibit

9    40.

10             MR. ENGLE:  No objection.

11             MR. EGAN:  No objection.

12             THE COURT:  Admitted.

13   BY MR. IGNALL:

14   Q    Now, Mr. Preve --

15             MR. IGNALL:  May we publish to the jury, Your Honor?

16             THE COURT:  Yes.

17   BY MR. IGNALL:

18   Q    These emails are dated June 29th.  Do you know when the

19   process for getting information to the bank for Mr. Levin's

20   loan started?

21   A    Are you talking about the financial information or --

22   Q    Yes.  Communications with the bank in order to get the

23   information the bank was looking for.  Was it before June

24   29th?

25             MR. EGAN:  Objection.  The last part was leading.

1    He's suggesting an answer.

2                  THE COURT:  All right.

3    BY MR. IGNALL:

4    Q    Was it or was it not before June 29th, if you remember?

5                  MR. ENGLE:  Same objection.

6                  THE COURT:  Overruled.

7    A    The financial information was requested before June 29th.

8    The documents evidencing the loan were sent on June 29th.

9    BY MR. IGNALL:

10   Q    And, did you get a request for information from anyone

11   outside the bank in connection with this loan?

12   A    Both Larry Rovin and Barry Bekkedam requested

13   information.

14   Q    All right.  If we look at the top of these emails, the

15   email from Mr. Rovin to you and Mr. Hartline, can you read the

16   first line?

17   A    "Send to the office, Frank, these are very time

18   sensitive."

19   Q    Did you understand whether this process was indeed time

20   sensitive?

21   A    Yes, it had been so indicated by Nova Bank and by Larry

22   Rovin.

23   Q    And, what was your understanding about why this was so

24   time sensitive?

25   A    It was indicated to me that there was a deadline for

1    applying for TARP funding from the Federal Government.

2    Q     And, who did you hear that from?

3    A     I heard it from Barry Bekkedam, Larry Rovin and Brian

4    Hartline.

5    Q     And, did you have any understanding what this TARP

6    program was?

7    A     Only in a general sense that it was an effort by the

8    Government to recapitalize the banking system.

9    Q     And, from your discussions with Mr. Rovin, Mr. Bekkedam

10   and Mr. Hartline, what did you understand the deadline was?

11   A     The June 30th, 2009 date.

12   Q     All right.  If I could turn your attention to Exhibit

13   40A, just for the witness, please.  What is Exhibit 40A, Mr.

14   Preve?

15   A     It's an email from Brian Hartline to me and to Larry

16   Rovin with copies to Barry Bekkedam and Tom Patterson of Nova

17   Bank.

18   Q     And, if we just look at the date and time of that email,

19   what is it?

20   A     June 29th, 2009 at 4:16 p.m.

21              MR. IGNALL:  The Government moves into evidence

22   Exhibit 40A.

23              MR. EGAN:  No objection.

24              MR. ENGLE:  No objection.

25              THE COURT:  Admitted.

1        MR. IGNALL:  May we publish it, Your Honor?

2        THE COURT:  Yes, sir.

3   BY MR. IGNALL:

4   Q    Could you just read the email, the top email, please.

5   A    "We will need these executed and returned to Nova

6   tomorrow.  Scanned images will work.  The plan is to fund by

7   the end of day.  We will send a package to your office so you

8   can monitor it's receipt.  It should be there at earliest time

9   possible."

10  Q    And, do you recall what it was Mr. Hartline was asking

11  you for here?

12  A    It was a package of loan documents.

13  Q    If I could turn your attention, just for the witness,

14  please, to Exhibit 40B.  Do you recognize Exhibit 40B?  Let's

15  just start at the top if we could, Agent Boyer.

16  A    This is an email from me to Tom Patterson, Brian

17  Hartline, Larry Rovin, with a copy to Barry Bekkedam.

18  Q    And, what is the subject?

19  A    George's financials.

20  Q    And, what is the date and time?

21  A    June 29th, 2009 at 4:32 p.m.

22  Q    And, does this include -- if we can scroll down, other

23  emails that were sent to you earlier?

24  A    Yes, it does.

25        MR. IGNALL:  All right.  The Government moves into

1    evidence Exhibit 40B.

2              MR. EGAN:  No objection.

3              MR. ENGLE:  No objection.

4              THE COURT:  Granted.

5    BY MR. IGNALL:

6    Q    All right.  If we can go to the -- Agent Boyer, blow up

7    the top half of the first page.  All right.  Now, actually, it

8    probably makes more sense to -- I'm sorry, let's go to the

9    second page, top of the second page.  Do you see the email

10   there from 4:14 p.m.?

11   A    Yes, sir.

12   Q    Who wrote that email?

13   A    It's an email from me to Brian Hartline and a copy -- and

14   Larry Rovin, a copy to Tom Patterson and Barry Bekkedam.

15   Q    And, what are you asking there?

16   A    I'm asking if anything that they are sending me in

17   overnight delivery has to be notarized.

18   Q    And, did you get a response?

19   A    Yes, I did.

20   Q    What was the response you got?

21   A    No, it did not have to be notarized.

22   Q    Turn your attention to what we've marked as Exhibit 40C,

23   just for the witness, please.  And, do you recognize Exhibit

24   40C?  Let's just look at the top email.

25   A    Yes.  It's an email from Brian Hartline to me, Larry

1   Rovin, copy to Barry Bekkedam and Tom Patterson at -- June

2   29th, 2009 at 4:32 p.m.

3   Q    And, what is the subject?

4   A    George's financials.

5   Q    And, does this document include some of the emails we've

6   already looked at as part of a string?

7   A    Yes, it does.

8              MR. IGNALL:  Government moves into evidence Exhibit

9   40C.

10             MR. EGAN:  No objection.

11             MR. ENGLE:  No objection.

12             THE COURT:  Admitted.

13             MR. IGNALL:  May it be published, Your Honor?

14             THE COURT:  Granted.

15  BY MR. IGNALL:

16  Q    All right.  And, this top email, is Mr. Hartline

17  responding to an email that you wrote earlier?

18  A    Yes, it is.

19  Q    And, what was the email you wrote earlier?  What did you

20  say or ask?

21  A    I was asking if any of the documents they were

22  overnighting had to be notarized.

23  Q    And, how did Mr. Hartline respond?

24  A    He said, no, we are doing the loan on an unsecured basis.

25  Q    Do you know what an "unsecured basis" means?

1   A    Yes.  It means a loan without collateral.

2   Q    And, how much was this loan for?

3   A    $5 million.

4   Q    Were you at all involved in the transfer of funds on this

5   loan?

6   A    Yes.

7   Q    All right.  And, what was your involvement?

8   A    I was asked by Nova Bank, when they -- to -- upon receipt

9   of the loan proceeds into George's personal account, to wire

10  those funds back to Nova Bank.

11  Q    And, did you have any email communications about that?

12  A    Yes.

13  Q    All right.  I'd like to turn your attention to what we've

14  marked as Exhibit 42 -- I'm sorry.  Do you need a moment or

15  are you okay?

16  A    I'm fine.  Sorry.

17  Q    Okay.  If I can turn your attention to Exhibit 42,

18  please. Do you recognize Exhibit 42?

19  A    Yes, that's an email from Tom Patterson to me, June 30th,

20  2009 at 11:15 a.m.

21  Q    And, does this include, if you scroll down, any

22  additional emails in the string?

23  A    Yes, it does.

24  Q    And, do you recall getting this email from Mr. Patterson

25  on June 30th?

1    A    Yes, I do.

2              MR. IGNALL:  Government moves into evidence Exhibit

3    42.

4              MR. EGAN:  No objection.

5              MR. ENGLE:  No objection.

6              THE COURT:  Admitted.

7    BY MR. IGNALL:

8    Q    All right.  If we could look at the bottom email, please,

9    on that first page.  All right.  Did you write this email?

10   A    Yes, I did.

11   Q    And, what information did you send Mr. Patterson in this

12   email?

13   A    I was sending him George Levin's personal account

14   information for receipt of the loan proceeds.

15   Q    And, why were you doing that?

16   A    Because Nova had to transfer the -- had to give the loan

17   proceeds somewhere and we elected to have it sent to -- Mr.

18   Levin elected to have it sent to his personal account.

19   Q    And, when did you get this email -- when did you send

20   this email to Mr. Patterson?

21   A    June 30th, 2009 at 11:12 a.m.

22   Q    Do you know what role, if any, Mr. Patterson had at the

23   bank?

24   A    I don't have his precise title but I believe he was

25   senior credit officer.

1    Q   And, did Mr. Patterson write back to you after you sent

2    that 11:12 a.m. email?

3    A   Yes, he did.

4    Q   And, at what time did he write back to you?

5    A   At 11:15 a.m.

6    Q   And, what did Mr. Patterson say to you at 11:15 a.m.?

7    A   He says, "Frank, I'm going to wire the funds now.  Can

8    you wire the funds back to Nova Bank," and gave me the account

9    number at Nova Bank.

10    Q   And, why were you going to wire the funds back to Nova

11    Bank?

12    A   The funds were to go into an escrow account in the name

13    of George Levin for the acquisition of Nova Bank stock.

14    Q   I would like to turn your attention, just for the witness

15    now, to Exhibit 46.  Do you recognize Exhibit 46?

16    A   Exhibit 46 is an email from me to Mr. Patterson on June

17    30th, 2009 at 1:31 p.m.

18    Q   And, does it involve -- include any other emails in the

19    string?

20    A   Yes, it does.

21         MR. IGNALL:  All right. The Government moves into

22    evidence Exhibit 46.

23         MR. EGAN:  No objection.

24         THE COURT:  Granted.

25         MR. IGNALL:  May we publish it to the jury, Your

1    Honor?

2             THE COURT:  Yes, sir.

3    BY MR. IGNALL:

4    Q    Let me start at the bottom -- the bottom email there.  Do

5    you recognize the bottom email all the way down?  Is that an

6    email from you?

7    A    Yes, it is.  It's one we previously --

8    Q    Okay.  And, what is the time of that email?

9    A    This email is at 11:12 a.m.

10   Q    All right.  Now, if we could scroll up, what's the next

11   email in the string in terms of -- time wise.  Agent Boyer

12   will hopefully blow it up that we can see it.

13   A    12:0 -- I -- 12:0 -- 12:04 p.m.

14   Q    And, who sent this email?

15   A    From Tom Patterson at Nova Bank to me.

16   Q    And, what did Mr. Patterson say to you at 12:04 p.m. on

17   June 30th?

18   A    He says, "Frank, the wire has been sent and should be at

19   Gibralter.  Confirmed number is X.  Please let me know when

20   the funds have been wired back.  Thanks, Tom."

21   Q    Did you respond to Mr. Patterson?

22   A    Yes.

23   Q    All right.  We can go up to the top email.  What is the

24   time of that top email?

25   A    1:31 p.m.

1   Q    Did you do anything to check to see if any funds had

2   gotten to Mr. Levin's bank account before sending this email?

3   A    Yes.

4   Q    What did you do?

5   A    I would have confirmed that we had a receipt from

6   Gibralter Bank for the amount of the wire.

7   Q    And, how long after confirming that receipt did you send

8   this email to Mr. Patterson?

9   A    Almost instantaneous, I'm sure.

10  Q    And, what time did you send this email to Mr. Patterson?

11  A    1:31 p.m.

12  Q    And, what did you say to Mr. Patterson?

13  A    "Got it.  Sending it back in five minutes."

14  Q    And, did you, in fact, send it back in five minutes?

15  A    We sent it back promptly.  I don't know whether it was

16  five minutes or not.

17  Q    All right.  Let me turn your attention to Exhibit 47,

18  just for the witness.  Do you recognize Exhibit 47?

19  A    Yes.

20  Q    What is Exhibit 47?

21  A    Exhibit 47 is an email from me to Paul McMahon and Susan

22  Levin, subject Levin wire.

23  Q    And, who is Paul McMahon (phonetic)?

24  A    Paul McMahon is the office manager -- personal office

25  manager for George Levin.

1    Q    And, what is the date and time of this email?

2    A    It's June 30th, 2009 at 1:34 p.m.

3         MR. IGNALL:  Government moves into evidence Exhibit

4    47.

5         MR. EGAN:  No objection.

6         MR. ENGLE:  No objection.

7         THE COURT:  Admitted.

8         MR. IGNALL:  May we publish to the jury?

9         THE COURT:  Granted.

10   BY MR. IGNALL:

11   Q    And, what are you saying to Mr. McMahon in this email?

12   A    "Please wire $5 million from George Levin account at

13   Gibralter to Nova Bank."

14   Q    And, how many minutes -- if we -- Agent Boyer, is it

15   possible to put 47 and 46 side by side?

16        MR. EGAN:  Stipulate to how many minutes it was,

17   Your Honor.

18        THE COURT:  All right.  And, that is?

19        MR. IGNALL:  I believe it is three minutes.  Let me

20   double check.

21        MR. EGAN:  Three.

22        MR. ENGLE:  Three sounds good.

23        MR. IGNALL:  All right.  So we'll stipulate that

24   this email was three minutes after you -- after Mr. Preve

25   emailed Mr. Patterson, sending it back in five minutes.

1   BY MR. IGNALL:

2   Q    So, from your dealings with Nova Bank, was this loan

3   ultimately funded?  Did you get the $5 million into Mr.

4   Levin's bank account?

5   A    Yes, we did.

6   Q    Was there any security or collateral connected with this

7   loan?

8              MR. ENGLE:  Objection, asked and answered.

9              MR. IGNALL:  I don't think we asked how it

10  ultimately ended up.

11             THE COURT:  All right.  Overruled.

12  A    No.

13  BY MR. IGNALL:

14  Q    Did you have any phone calls with Mr. Bekkedam regarding

15  other people investing in Nova Bank?

16  A    There were email discussions about Mr. Bekkedam raising

17  additional capital for Nova Bank.

18             MR. ENGLE:  Objection, non-responsive.  Move to

19  strike.

20             THE COURT:  Sustained and stricken.

21  BY MR. IGNALL:

22  Q    All right.  Did you have any communications of any kind

23  with Mr. Bekkedam about him raising money for Nova Bank?

24  A    There were emails from Mr. Bekkedam stating that he was

25  raising funds from other investors as well to recapitalize

1   Nova Bank.

2   Q    After June 30th, did you have an opportunity to review

3   any financial information with respect to Nova Bank?

4   A    The initial review of financial information was right at

5   the last week in June, right before the investment was made.

6   Q    After June 30, did you have any requests from Mr.

7   Bekkedam for Mr. Levin to invest more than the money he had

8   just borrowed from Nova Bank?

9   A    Yes.

10  Q    And, did you recommend to Mr. Levin whether that was a

11  good idea or not?

12  A    There were a number of discussions between Mr. Levin and

13  myself about the quality of the investment in Nova Bank.

14          MR. ENGLE:  Objection, Your Honor.  The response

15  calls for hearsay.

16          THE COURT:  From Mr. Levin.  Sustained.

17  BY MR. IGNALL:

18  Q    Let me ask it slightly -- let me try it again.  Without

19  giving the substance, did you and Mr. Levin ever discuss

20  whether it was a good financial idea for Mr. Levin to invest

21  additional money?  Without going into -- yes or no?

22  A    Yes.

23  Q    And, did you ever provide any advice to Mr. Levin about

24  that?

25  A    Mr. Levin had his own consult.

1   Q    Okay.  That's good enough.  Thank you.  Do you know if,

2   in connection with possibly putting in as much as $18 million

3   into Nova Bank, whether Mr. Levin had to do anything with bank

4   regulators?

5            MR. ENGLE:  Objection as leading.

6            THE COURT:  Sustained.

7   BY MR. IGNALL:

8   Q    Are you familiar with whether or not Mr. Levin ever had

9   to make any application to bank regulators?

10  A    Nova Bank sent us an application.  I believe it was a

11  Federal Reserve application.

12  Q    And, do you remember what the purpose of that application

13  was?

14  A    To be approved by the regulators for acquisition of $18

15  million worth of stock in Nova.

16  Q    Now, as of June 30th, were Mr. Bekkedam and Mr. Levin, as

17  far as you knew from working for Mr. Levin, still involved in

18  getting new investors into the Banyon Income Fund?

19  A    Yes.

20  Q    So, let's go back to the application.  If I could turn

21  your attention to Exhibit 64.  Now, let me take that back.

22            MR. IGNALL:  May I approach, Your Honor?

23            THE COURT:  Yes, sir.

24  BY MR. IGNALL:

25  Q    This has already been admitted.  Let me ask you to flip

1    through that, because my question is going to be if you

2    recognize any or all of that?

3    A    Yes, I do.

4    Q    And, what is this document?

5    A    This is an application to invest in a commercial bank,

6    they call it a Change of Control document.  It's got

7    biographical information and financial information on the

8    would be investor.

9    Q    And, were you involved at all in preparing any part of

10   this document?

11   A    I'm sure I prepared the financial information.

12   Q    And, did you get any -- did anyone at Nova Bank

13   participate in preparing any of this?

14   A    Most of it came to us already filled out.

15   Q    And, what parts were already filled out as best you

16   recall?

17   A    The Change of Control document was already filled out.

18   And, on the biographical information, all the check marks were

19   already made or most of them were already made.

20   Q    Now, if I can turn your attention to what looks to be

21   about the eighth page of this document.

22              MR. IGNALL:  And, we can publish this to the jury,

23   if we can.

24   Q    It should be the fin -- it says, "Financial Report" at

25   the top, it's "N-1080" at the bottom.  I may have the wrong

1    number of pages there.  It could be page 19, I'm sorry.  Do

2    you recognize that as page 19?  It's on the screen now too.

3    It might be easier.

4    A    It's a financial statement of Mr. Levin.

5    Q    Did you have any part in preparing this?

6    A    I prepared the personal financial statement from which

7    this information was taken.

8    Q    And, who did you provide that statement to?

9    A    I would have provided it to Nova Bank.

10   Q    And, if we look at Mr. Levin's assets, at that point were

11   you familiar with Mr. Levin's financial situation?

12   A    Yes.

13   Q    And, what's the date of this financial statement?

14   A    March 31st, 2009.

15   Q    Okay.  So does this financial statement reflect a loan

16   from Nova Bank?

17   A    No.

18   Q    And, if we look at proprietary interest in other

19   securities submitted in $88 million, do you know what that was

20   made up of as of March 31st, 2009?

21   A    That would have been primarily Mr. Levin's investment in

22   operating companies including the Banyon entities.

23   Q    If I could turn your attention to I believe it's Exhibit

24   28 for a moment.  I believe this has been admitted.  Are you

25   familiar with something called DVFG?

1   A    Yes.

2   Q    As of the time Mr. Levin applied for the loan from Nova

3   Bank, did you have any understanding about whether Nova

4   Financial Holdings had any relationship with DVFG?

5   A    Mr. Bekkedam told us that DF -- DVFG was going to be

6   consolidated into Nova Bank.  Into the Holding Company, I'm

7   sorry.  Nova Financial Holding.

8   Q    Now, with respect to the Change in Control application,

9   do you know whether any State or Federal Regulator had any

10  questions about that?

11  A    Yes.

12  Q    And, were you at all involved in answering any of those

13  questions?

14  A    Yes.

15  Q    Let me turn your attention to what we've marked as

16  Exhibit 72, just for the witness, please.  What was your

17  involvement in answering any questions?  Did anyone contact

18  you about getting information to State Regulators or Federal

19  Regulators?

20  A    Yes.

21  Q    And, who contacted you?

22  A    I was contacted by Kim Hartline.  I was contacted by

23  Larry Rovin.  I was contacted by Barry Bekkedam and contacted

24  by Brian Hartline about providing information.  I also had a

25  direct phone call from the Federal Reserve.

1   Q    All right.  Let me turn your attention now to what we've

2   marked as Exhibit 73, for just the witness, please.  Do you

3   recognize Exhibit 73?

4   A    Yes.

5   Q    And, what is Exhibit 73?

6   A    Exhibit 73 is an email from Larry Rovin to me dated

7   August 25th, 2009, subject is Levin.

8   Q    And, are there other emails attached in the string that

9   were part of what you got on August 25th, 2009?

10  A    Yes.

11          MR. IGNALL:  Government moves into evidence Exhibit

12  73.

13          MR. ENGLE:  May we see you at sidebar, Your Honor?

14          THE COURT:  Yes, sir.

15      (Sidebar begins)

16          MR. ENGLE:  I just want to make sure that -- Your

17  Honor, the top part of this email, should be the last email on

18  the string, is an email communication simply between Larry

19  Rovin and Mr. Preve.  It's a statement -- out-of-court

20  statement made by Mr. Rovin.  It's what Mr. Rovin had to say.

21  It's hearsay.

22          THE COURT:  Is it being offered for the truth?

23          MR. IGNALL:  Well, yes and no.

24          MR. ENGLE:  That's hard.

25          MR. IGNALL:  One, it's for the fact that Mr. Rovin

1   is seeking information.  But, two, it is clear from the text

2   of the email that Mr. Rovin is acting as Mr. Bekkedam's agent.

3   Therefore, it's certainly, under 801D, admissible against Mr.

4   Bekkedam.

5          THE COURT:  Do you contest that it's an agency

6   (inaudible)?.

7          MR. EGAN:   They haven't laid it.

8          MR. ENGLE:  They haven't laid that foundation.

9          MR. IGNALL:  (Inaudible) did it earlier, but I'll do

10  it right now.  The text email --

11         THE COURT:  It's five after four.  So do you want to

12  take some time prep that so maybe there won't even be an

13  objection on Monday?

14         MR. ENGLE:  Yes, Your Honor.

15         THE COURT:  Pardon?

16         MR. ENGLE:  Yes, Your Honor.

17         UNIDENTIFIED SPEAKER:  But I think if it was more

18  clearly established that Larry Rovin is the attorney for

19  Ballamor --

20         THE COURT:  You'll have time to work on all that.

21         MR. IGNALL:  Right.  That's one thing.

22         THE COURT:  Bring it on Monday morning.

23         MR. IGNALL:  We don't think we're there yet.

24         MR. ENGLE:  Thank you, Your Honor.

25         MR. IGNALL:  All right.  Thank you.

1        (Sidebar ends)

2                THE COURT:  All right.  Members of the jury, I've

3     got some good news and some bad news.  The bad news is it's

4     going to rain tomorrow when you're off.

5                Please do not discuss the testimony that had been

6     elicited thus far in the trial.  Please don't do any

7     investigation on your own or conduct any kind of research or

8     read any articles or listen to any broadcast about the case.

9                Have a pleasant few days and we'll see you on Monday

10    morning at 9:15.  Thank you so much.

11               THE CLERK:  All rise.

12               THE COURT:  Thank you.

13        (Jury exits at 4:05:34 p.m.)

14               THE COURT:  All right, I'll see you all on Monday.

15               UNIDENTIFIED SPEAKER:  Your Honor?

16               THE COURT:  Yes, sir.

17               UNIDENTIFIED SPEAKER:  How do you plan to deal with

18    one juror who --

19               THE COURT:  So far so good, remainder of this

20    afternoon.

21               UNIDENTIFIED SPEAKER:  Okay, good.  I don't think --

22               THE COURT:  Thank you.

23               COUNSEL:  Thank you, Your Honor.

24               THE COURT:  Thank you all.

25               COUNSEL:  Have a nice weekend.

1          THE COURT:  You too.

2        (Proceedings concluded at 4:04:35 p.m.)

3                    * * * * *

4              C E R T I F I C A T I O N

5    We, Roxanne Galanti and Diana Doman, court approved

6    transcribers, certify that the foregoing is a correct

7    transcript from the official digital audio recording of the

8    proceedings in the above-entitled matter.

9

Roxanne Galanti    Digitally signed by Roxanne Galanti
DN: cn=Roxanne Galanti, o, ou,
email=dianadoman@comcast.net, c=US
Date: 2016.04.11 15:53:22 -04'00'

10   _____          --------------------

11   ROXANNE GALANTI                       DATE

12   Diana Doman    Digitally signed by Diana Doman
DN: cn=Diana Doman, o, ou,
email=dianadoman@comcast.net, c=US
Date: 2016.04.11 15:53:05 -04'00'

13   - - - - - - - - - - - - - - - - - - - - - - -

14   DIANA DOMAN

15   DIANA DOMAN TRANSCRIBING, LLC

```
              UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,     )  14-CR-0548
                              )
        vs.                   )
                              )
BRIAN HARTLINE and            )
BARRY BEKKEDAM,               )
                              )  Philadelphia, PA
          Defendants.         )  April 4, 2016
_____)  9:38 a.m.


             TRANSCRIPT OF EXCEPT OF TRIAL
    BEFORE THE HONORABLE C. DARNELL JONES, II and JURY
             UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Government:        DAVID J. IGNALL, ESQUIRE
                           JENNIFER CHUN BARRY, ESQUIRE
                           ASSISTANT UNITED STATES ATTORNEYS
                           U.S. Attorneys Office
                           615 Chestnut Street, Suite 1250
                           Philadelphia, PA  19106

For the Defendant:         PATRICK J. EGAN, ESQUIRE
Brian Hartline             FOX ROTHSCHILD LLP
                           2000 Market Street, 10th Floor
                           Philadelphia, PA  19107

For the Defendant:         MICHAEL J. ENGLE, ESQUIRE
Barry Bekkedam             GREENBLATT, PIERCE, ENGLE,
                           FUNT & FLORES
                           123 Broad Street, Suite 2500
                           Philadelphia, PA  19109

                           RUSSELL D. DUNCAN, ESQUIRE
                           JOEL D. SCHWARTZ, ESQUIRE
                           SHULMAN, ROGERS, GANDAL,
                           PORDY & ECKER, PA
                           12505 Park Potomac Avenue, 6th Floor
                           Potomac, MD  20854

Audio Operator:            CARL HAUGER
```

```
Transcriber:                    DIANA DOMAN TRANSCRIBING
                                P. O. Box 129
                                Gibbsboro, NJ    08026-0129

                                Telephone: (856) 435-7172
                                Fax:       (856) 435-7124
                                E-mail:  dianadoman@comcast.net


Proceedings recorded by electronic sound recording; transcript
produced by transcription service.
```

3

1                          I N D E X

2     Witnesses            Direct    Cross    Redirect    Recross

3     FOR THE GOVERNMENT:

4     Frank Preve          13(Ign)   47(Ega)  122(Ign)   129(Ega)

5                                    92(Dun)

6     Joseph Madiany       134(Bar)  160(Ega) 196(Bar)   200(Ega)

7                                    176(Eng)            201(Eng)

8

9     EXHIBITS:                                I.D.     Admitted

10    G-40   E-mail, Rovin to Preve, 6/29/09         prior

11    G-41   Nova Bank Loan Committee Minutes, 6/30/09 prior

12    G-41A  List of loans approved by loan committee prior

13    G-43   Nova Risk Assessment Summary, G. Levin   prior

14    G-52   Gibralter bank statement ending 6/30/09  prior      13

15    G-63   Ltr. application from Nova Bank          prior      15

16    G-74   E-mail, Levin to Bekkedam               prior      27

17    G-79   E-mail, Rovin to Preve, 9/4/09          prior      28

18    G-81   E-mail, Preve to Hartline, 9/8/09       prior      29

19    G-82   E-mail, Hartline to Federal Reserve     prior      31

20    G-102  E-mail, Bekkedam to Preve, 10/21/09     prior      33

21    G-109  Nova Risk Assessment Summary, A. Bonomo prior     155

22    G-106  E-mail, Bekkedam to Preve, 10/21/09     Prior      36

23    G-110  E-mail, Rovin to Preve, 10/22/09        prior      34

24    G-114  E-mail, Bekkedam to Preve, 10/23/09     prior      38

25    G-117  Nova Loan Committee Minutes, 10/27/09   prior     157

4

1    G-117A Nova Loan Committee Minutes, 10/20/09    prior    158

2    G-118  E-mail, Madiany to Patterson, 10/6/09    prior    151

3    G-124  E-mail, Patterson to Preve              prior     43

4    G-143  Nova Risk Assessment Schedule, C. Gallab prior    158

5    G-170  E-mail, Bekkedam to Hartline, 2/6/10    prior     45

6

7    *sidebar very low and difficult to hear

8

9

10

11

12

13

14

15

16

17

18

19

(Colloquy)                                    5

1          (Proceedings commence at 9:38 a.m.)

2          MR. DUNCAN:  Your Honor, I have one preliminary

3     issue.

4          THE COURT:  I think I've covered this with Mr. Ignall

5     but, and I think the Government has agreed to this, I just

6     wanted to make sure that this witness doesn't mention

7     Bekkedam's divorce.  It's in one of the e-mails that was

8     entered into evidence but not published, and I believe Mr.

9     Ignall didn't publish it because I had asked him to redact our

10    that portion.  I just wanted to make sure this witness isn't

11    going to volunteer that, though that is part of the witness'

12    potential testimony.

13         THE COURT:  All right.  So you've told him not to --

14         MR. IGNALL:  And I'm not intending to ask any

15    question where it comes up.  I don't know --

16         THE COURT:  You're welcome to speak to him aside and

17    tell him not to mention it.

18         MR. IGNALL:  I've already told him that I didn't want

19    him to volunteer that.

20         THE COURT:  All right.

21         MR. IGNALL:  And if I could ask, Mr. Duncan, which

22    exhibit that was just so I can make sure we have it.

23         MR. DUNCAN:  I think it was 61.  It's your exhibit.

24    I don't have it right in front of me.

25         MR. IGNALL:  Okay.

(Colloquy)                                     6

1       MR. DUNCAN:  But I'm happy -- and I think you

2  deliberately did not publish it, which I appreciate.

3       MR. IGNALL:  Okay.

4       MR. DUNCAN:  Because it had that word in there.

5       THE COURT:  And Mr. Ignall, do you have a copy, a

6  hard copy of that memo?  And did you give it to counsel?

7       MR. IGNALL:  I did give it to counsel.  And may I

8  approach, Your Honor?  (Pause)

9       THE COURT:  Yes, sir.  All right, counsel, is there

10 any need to have any argument on the agency issue?

11      MR. SCHWARTZ:  Your Honor, Mr. Nelson (phonetic) gave

12 this to me this morning.  I have some brief points to make.

13 I'd like to make the brief points and then have -- maybe go

14 outside to look for a case or two to help.

15      THE COURT:  Well let me just ask first of all, is

16 there any issue that this directly impacts?

17      MR. IGNALL:  I don't know whether it does.  It came

18 up on Thursday with respect to Exhibit, I believe it's 73 that

19 Mr. Rovin had sent to Mr. Preve and I had at sidebar said that

20 we were not trying to introduce it as a co-conspirator

21 statement under 801(d)(2)(e), but as a general proposition I

22 said that there are certain statements we would want to

23 introduce on an agency theory under Section (c) or (d).  So

24 that's something I wanted to provide the Courtand counsel with

25 the authority if it should come up again with respect to

(Colloquy)                                                    7

1   whether Mr. Rovin, possibly the bank employee, someone acting

2   at the direction or at the employment of one of the defendants.

3          THE COURT:  Within the scope of the agency and the

4   relationship.  I understand that.  Is there any issue that I'm

5   not hearing or that needs to be raised in limine; that's all I

6   want to know.  It's fundamental in terms of agency.

7          MS. SCHWARTZ:  I think so, Your Honor.  At least as

8   part of this applies, or as the Government's trying to use this

9   through Mr. Rovin.  The first is that I believe that the

10  evidence is planning to introduce this way, although I won't

11  know until we hear it, is subject to agency relationship not

12  between Mr. Rovin and Mr. Bekkedam, but between Mr. Rovin and

13  Ballamor.  And Ballamor is not on trial here, and this is not a

14  case like the food, drug and cosmetic act where the responsible

15  corporate officer doctrine clause.  And so you can not

16  attribute statements of a company, either directly or by an

17  agent, to an individual.  If the company were on trial, that

18  might be a different story.  The company's not charged here;

19  Mr. Bekkedam is.  Essentially Mr. -- and I'm guessing again

20  about what evidence Mr. Ignall is going to produce, but Mr.

21  Ignall is trying to say, Mr. Rovin, you made a statement on

22  behalf of Ballamor for which you are counsel, acting as counsel

23  for Ballamor.  And then Mr. Ignall is saying, use that or

24  attribute that to Barry Bekkedam.  This is not a responsible

25  corporate officer doctrine case, and therefore it can't be used

(Colloquy)                                                8

1    against Mr. Bekkedam.  And so essentially there's a triangle

2    rather than a straight line that's involved here.

3           The second point is that even if the statement itself

4    is not an attorney client privilege communication, the

5    Government has to prove the agency relationship to establish

6    the authority between either Mr. Bekkedam and Ballamor and Mr.

7    Rovin.  And to do that, that may elicit communications, and

8    that was one thing we addressed before.  Minimally I would

9    suggest to the Courtrespectfully that the witness through whom

10   this is going to be used, presumably Mr. Rovin, make this voir

11   dire on questions about authority outside the presence of the

12   jury to see if they can establish, the Government can establish

13   authority without breaching the attorney-client privilege.

14          THE COURT:  Do you have a problem with that, counsel?

15          MR. IGNALL:  I don't have a problem with that.  And

16   with respect to this witness --

17          THE COURT:  You say you do or your don't?

18          MR. IGNALL:  I don't have a problem with that, Your

19   Honor.  And I think we can establish, with respect to Mr.

20   Rovin, the agency relationship under Subsection (c) without Mr.

21   Rovin's testimony, as I believe we actually already have

22   through Mr. Preve and his interactions with Mr. Rovin on behalf

23   of Mr. Bekkedam with respect to specific items.  But I can --

24          THE COURT:  ON behalf of Mr. Bekkedam or on behalf of

25   Ballamor?

(Colloquy)                                    9

1          MR. IGNALL:  On behalf of Mr. Bekkedam.

2          THE COURT:  All right.

3          MR. SCHWARTZ:  Well if I could just have the lunch

4    hour to see if, about that triangle.

5          THE COURT:  Sure.  I assume it won't be coming up

6    before then.

7          MR. IGNALL:  The only issue was I believe there's an

8    objection to part of Exhibit 73.  I don't think there's

9    anything objectionable to the fact that Mr. Rovin sent

10   something to Mr. Preve.  There's no truth of the matter

11   asserted in that.  What I think the e-mail said that I believe

12   Mr. Engle objected to, it said something to the effect of, at

13   Barry's request, please find the following.  So I think the

14   truth of why he was doing it is something that would be

15   admissible under an agency theory.

16         MR. SCHWARTZ:  Only if the Barry there is actually at

17   Ballamor's request because if Mr. Rovin was acting as

18   Ballamor's --

19         THE COURT:  Well again, we'll in limine that in the

20   event we need to do that.  I don't know.  It's already done.

21         MR. IGNALL:  Well there are two issues here.  In

22   terms of the employment agency, Mr. Schwartz may be right about

23   that in terms of Mr. Rovin's role as working for Ballamor.  So

24   therefore it would only be things that he did with the consent

25   or at the direction of Mr. Bekkedam that qualifies under

(Colloquy)                                          10

1    Subsection (c).  With respect to bank employees, I think

2    Subsection (d) may apply more obviously.  But I think with

3    respect to Exhibit 73, I think the circumstantial evidence is

4    sufficient to show that indeed Mr. Rovin did send this e-mail

5    at the direction of Mr. Bekkedam.

6                 MR. SCHWARTZ:  Bekkedam the entity, Bekkedam the

7    person.  Bekkedam the person on trial, Bekkedam as Ballamor not

8    on trial.

9                 MR. IGNALL:  I think that's a distinction without a

10   difference here.

11                THE COURT:  It's not necessarily, but I'm not certain

12   at this point whether the evidence came in or is to come in

13   directly from Mr. Bekkedam or from Ballamor.

14                MR. IGNALL:  This is evidence -- the evidence that

15   we're talking about is an e-mail that Mr. Rovin sent to Mr.

16   Preve.  The evidence has shown whether it's Mr. Rovin as an

17   employee of Ballamor, as an employee of MR. Bekkedam, it

18   doesn't matter.  He's done something at the direction of Mr.

19   Bekkedam, whether he's his boss at Ballamor, or his good

20   friend, his client, and he's doing it with the consent of Mr.

21   Bekkedam.

22                THE COURT:  If you are asserting that it is directly

23   from the mouth of Mr. Bekkedam, --

24                MR. IGNALL:  No, I'm saying that it's --

25                THE COURT:  -- as a direction when you say that?

(Colloquy)                                    11

1       MR. IGNALL:  What I'm saying is -- can we bring up

2    Exhibit 73?  It might be easier to put it on the screen, just

3    use this as an example I think.  May I approach?

4            THE COURT:  Sure.

5        I think it speaks for itself.  He says, Barry asked

6    me to.

7            MR. IGNALL:  It does, and I think under Borgelais the

8    Court may consider that but can't consider that alone

9    necessarily.  I think Borgelais leaves that question open, but

10   for our purposes let's assume that -- I believe this witness

11   already testified about his relationship with Mr. Rovin that is

12   more than enough for the Court to find by a preponderance that

13   this was with the consent or at the direction of Mr. Bekkedam.

14           THE COURT:  Mr. Schwartz?

15           MR. SCHWARTZ:  Two things, Your Honor, if I may.

16   First of all, the Government has not established that the work

17   by Mr. Rovin was done as his counsel for Ballamor or as his

18   counsel for Bekkedam.  And the important thing here is if

19   Ballamor is joining this, then unless there's a responsible

20   corporate officer doctrine here, there's not criminal activity

21   by Mr. Bekkedam.

22           Second, or more important, or preliminary, the

23   Government -- because I guess it couldn't -- couldn't lay the

24   foundation necessary to establish the agency relationship

25   through Mr. Preve.  The person can establish the agency

(Colloquy)                                    12

1    relationship that says Larry is an agent for Barry, or for

2    Bekkedam needs to be established by someone with knowledge.  I

3    don't think Mr. Preve has sufficient knowledge.  For one thing,

4    for example, he couldn't say whether Preve or Mr. Rovin was

5    acting as counsel for Ballamor as the bottom of the exhibit

6    says or as counsel for Mr. Bekkedam.  The only person with

7    knowledge who can do that is either Mr. Rovin or Mr. Bekkedam.

8    Mr. Bekkedam's not talking.  And we can go back to the whole

9    thing about how Mr. Rovin shouldn't either, but somebody has to

10   establish that this is who I'm speaking for.  This is an

11   ambiguous document.  It certainly raises the question, even

12   more clearly than my argument, that this could be Ballamor

13   talking because he's saying, Larry Rovin, managing director and

14   general counsel for Ballamor.

15            MR. IGNALL:  Again, I think it's a distinction

16   without a difference.  The question is just is this a statement

17   that was made either at the direction of Mr. Bekkedam or with

18   his consent?  It doesn't matter whether he's asking -- what

19   happens to Rovin is wearing.   I'm not aware of any authority

20   for that, that if Mr. Bekkedam asked Mr. Rovin to communicate

21   with Mr. Preve, what Mr. Rovin says is admissible against MR.

22   Bekkedam, regardless of why --

23            THE COURT:  All right.  We'll go on.  We'll deal with

24   it.

25            MR. IGNALL:  Are we ready for Mr. Preve?

1          THE COURT:  Everyone ready?

2          MR. DUNCAN:  Yes, Your Honor.

3          MR. SCHWARTZ:  Yes.

4          THE COURT:  Okay.  Thank you.

5          THE COURT:  Good morning, sir.  Sir, you remain under

6     oath.  You may proceed.

7          THE DEPUTY:  All rise.

8          (The jurors enter the courtroom.)

9          THE DEPUTY:  Court is now in session.  The Honorable

10    C. Darnell Jones, II presiding.

11         THE COURT:  Good morning, good morning, welcome back.

12    You may seated.  Thank you.  You may proceed.

13         MR. IGNALL:  Thank you, Your Honor.

14                        DIRECT EXAMINATION

15    BY MR. IGNALL:

16    Q    Let me go back to something we talked about on Thursday,

17    Mr. Preve.  As part of your job working for Mr. Levin, did you

18    ever review his bank statements?

19    A    Bank statements?

20    Q    Statements from any bank where Mr. Levin had an account;

21    is that part of your job?

22    A    Yes.

23    Q    If I could turn your attention to what we've marked as

24    Exhibit 52, do you recognize Exhibit 52?

25    A    Yes, I do.

1    Q      And what is Exhibit 52?

2    A      Exhibit 52 is a copy of a statement from Gibralter Bank in

3    the name of George and Gayla Sue Levin.

4    Q      And for what time period?  Or the period that it ends?

5    A      This would have ended as of June 30, 2009.

6           MR. IGNALL:  At this point the Government moves into

7    evidence Exhibit 52.

8           MR. DUNCAN:  No objection.

9           MS. SCHWARTZ:  No objection.

10          THE COURT:  Admitted.

11          MR. IGNALL:  And may we publish to the jury, Your

12   Honor?

13          THE COURT:  Yes.

14   BY MR. IGNALL:

15   Q      And if we look at that first page near the bottom where it

16   talks about deposits and credits, do you see where it says at

17   the bottom 6-30?  What does it say there?

18   A      6-30 wire transferred in domestic five million.

19   Q      Do you know what that is?

20   A      Yes I do.

21   Q      What is that?

22   A      That is the amount of the loan proceeds from Nova Bank to

23   George Levin personally.

24   Q      If we turn to the second page, about two-thirds of the way

25   down the page, do you see where it says wire transfer out?

Preve - Direct (Ign)                                    15

1   There are two, but the first one on June 30th, do you see what

2   that is?

3   A    Yes.

4   Q    What is that?

5   A    That is a wire transfer out domestic of $5 million.  That

6   was $5 million that was sent to the escrow account at Nova Bank

7   in the name of George Levin.

8   Q    Thank you.  We were talking I think when we left on

9   Thursday about your involvement with state and federal

10  regulators in terms of getting information regarding Mr. Levin.

11  Do you recall those questions?

12  A    Vaguely.

13  Q    Do you remember whether you got information from Nova Bank

14  in terms of being able to respond to state or federal

15  regulators?

16  A    Yes I did.

17  Q    Let me turn your attention, this is just for the witness

18  right now, to Exhibit 53.  Do you recognize Exhibit 53?

19  A    Yes I do.

20  Q    And what is Exhibit 53?

21  A    This exhibit is a letter, a draft of a letter from George

22  Levin to the board of directors of Nova Financial Holdings

23  indicating his interest in seeking approval for 1.36 million

24  shares of common stock of Nova.

25  A    Did you see this document while you were working for Mr.

Preve - Direct (Ign)                                    16

1    Levin?

2    A    I do not recall it.

3    Q    If we could pull up Exhibit 63 please.  And again, this is

4    just for the witness.  It's voluminous, Your Honor, I'm going

5    to approach with a paper copy to make it a little bit easier

6    for the witness.  If you could flip through Exhibit 63 please.

7              May I have a moment with counsel, Your Honor?

8              THE COURT:  Go right ahead.

9              MR. IGNALL:  Your Honor, by agreement I'd like to

10   move Exhibit 63 into evidence at this point.

11             MR. DUNCAN:  No objection.

12             MR. SCHWARTZ:  No objection, Your Honor.

13             THE COURT:  Admitted.

14   BY MR. IGNALL:

15   Q    All right, Mr. Preve, do you recognize or remember seeing

16   any part of Exhibit 63?

17   A    Yes.

18   Q    What parts do you remember seeing?

19   A    I think at some point I've seen all of it, but this is not

20   the full application, as there are a couple of documents from

21   what I recall having seen.

22   Q    And what is this document?

23             MR. IGNALL:  May I publish to the jury, Your Honor?

24             MR. DUNCAN:  No objection.

25             THE COURT:  Granted.

1          THE WITNESS:  The cover letter is a letter from Nova

2    Financial Holdings to the Pennsylvania Department of Banking

3    indicating that George Levin has invested five million of the

4    proposed $18 million in Nova stock.  And it outlines what is

5    included and attached to the letter.

6    BY MR. IGNALL:

7    Q    And is there information -- if we turn to, it's probably

8    the fourth page of this document, do you see that letter?

9    A    This is the letter from George Levin to the Department of

10   Banking dated June 30, 2009.

11   Q    Did you have any part in preparing this letter?

12   A    No.

13   Q    Do you know who did?

14   A    I assume it was --

15          MR. EGAN:  Objection.

16          MR. ENGLE:  Objection.

17          THE COURT:  Sustained.

18   BY MR. IGNALL:

19   Q    Let me ask it differently.  Do you know who did?

20          MR. EGAN:  Objection; same question.

21          THE COURT:  Well I was actually sustaining it to the

22   probably answer with what he was assuming.  Now if there's

23   going to be any different answer, --

24          MR. IGNALL:  I'm going to ask basis for knowledge to

25   see if we can get it.

1          THE COURT:  All right.  Overruled.

2          THE WITNESS:  It came from Nova Bank.

3    BY MR. IGNALL:

4    Q    Did you get the letter filled out from someone at Nova

5    Bank?

6    A    Yes we did.

7    Q    Okay.  And with respect to item (d), do you know what the

8    question -- let's go to page 5 and look at that for a moment.

9    Do you see where it says item (d)?

10   A    Yes.

11   Q    Let's actually start at the top.  I'm sorry.  Can you read

12   -- see at the top where there are different items and it says,

13   the following items are to be answered in a letter addressed to

14   the Department of Banking?  Do you see that?

15   A    Yes, sir.

16   Q    And is the letter we just looked at, is that -- let me ask

17   it differently.  The answers that are in that letter we just

18   talked about, did you prepare those answers?

19   A    No, I did not.

20   Q    Okay.  Did you get the letter filled out from someone

21   else?

22   A    Yes.

23   Q    And do you remember from whom or from where?

24   A    It came from Nova Bank.

25   Q    Okay.  And then what's item (d) asking for?

Preve - Direct (Ign)                          19

1   A     Item (d) is asking for the source and amount of funds or

2   other consideration.

3   Q     And what's it say below that?

4   A     State the source and amount of funds or other

5   considerations used or to be used in making the purchases, and

6   if any part of the purchase price or proposed purchase price is

7   represented by funds or other consideration borrowed or

8   otherwise obtained for the purpose of acquiring, holding or

9   trading the shares, give a description of the transaction and

10  names of the parties thereto.

11  Q     And then if we go back to the previous page, item (d),

12  what's the answer there?

13  A     "(d) It is the applicant's intention to pay the

14  approximately 18 million purchase price with funds currently on

15  deposit in various financial institutions; however, a portion

16  of the purchase price may come from other sources."

17  Q     And if we go back to the first page, what's the date of

18  this letter going to the Pennsylvania Department of Banking?

19  A     On the first page that letter is July 21, 2009.

20  Q     Thank you.  If I could turn your attention back to Exhibit

21  73, and I don't believe this has been admitted yet.  Do you

22  remember having conversations with anyone outside of Nova Bank

23  with respect to answering questions from either state or

24  federal banking regulators?

25  A     I believe that both --

1           MR. ENGLE:  Objection, Your Honor.

2           THE COURT:  Sustained.

3    BY MR. IGNALL:

4    Q    Do you recall if you had any communications of any kind?

5    A    Yes.

6    Q    And what communications do you recall having?

7    A    I recall that both Mr. Bekkedam and Mr. Rovin asked me to

8    either follow-up on missing information or to provide missing

9    information.

10   Q    And if I could turn your attention to Exhibit 73, do you

11   recognize Exhibit 73?

12   A    Yes I do.

13   Q    And what is Exhibit 73?

14   A    Exhibit 73's top e-mail is from Larry Rovin to me dated

15   Tuesday, August 25, 2009 asking for follow-up on the Nova

16   transaction.

17           MR. IGNALL:  The Government moves into evidence

18   Exhibit 73.

19           MR. ENGLE:  Objection, Your Honor, calls for hearsay.

20           THE COURT:  May I see it, please?

21           MR. IGNALL:  Yes.

22       (Sidebar conference)

23           MR. IGNALL:  That's what we looked at earlier, Your

24   Honor.

25           THE COURT:  Could you enlarge on my screen only

1    please?  Okay Mr. Engle, what's your objection?

2               MR. ENGLE:  My objection, Your Honor, is that as

3    we're looking at this, this is an out-of-court -- (these are --

4    must be somebody else out there) this is an out-of-court

5    statement --

6               THE COURT:  You can speak loud enough for everyone

7    else to hear you.

8               MR. ENGLE:  Okay.  It's an out-of-court statement by

9    -- it's Mr. Rovin's out-of-court statement by an individual

10   who's not in court testifying to it as being offered for the

11   truth of the matter asserted.  I understand the Government is

12   offering it as an agency statement.  The fact that it says

13   Barry asked me, it's from Mr. Rovin indicating not as counsel

14   to Barry Bekkedam personally as his personal attorney.  It's

15   sent from his Ballamor Capital e-mail indicating in his

16   capacity as the managing director and general counsel at

17   Ballamor, of which Mr. Bekkedam was the chairman and CEO.  He

18   was an agent of Ballamor himself.  One agent's statement to

19   another agent of the entity that is not on trial here does not

20   constitute a basis for an exception to the hearsay rule.

21               THE COURT:  Why not?

22               MR. ENGLE:  Because there's no -- the agent that he's

23   making the statement on behalf of is not a party to this

24   action.  If Ballamor was charged, totally different issue.  But

25   Ballamor is not; Ballamor is not a party to this.  So he's

1    making the statement as an agent on behalf of an entity that's

2    not a party to this case.  That's why it doesn't satisfy the

3    rule.

4              THE COURT:  But -- go ahead.

5              MR. IGNALL:  We've talked about this before.  One,

6    the only thing that he can argue with as for the truth of the

7    matter asserted is the "Barry asked me to remind you" part,

8    which itself indicates the agency relationship just on the face

9    of the e-mail.  The e-mail itself indicates Mr. Rovin is

10   sending something.  So that alone would establish that Mr.

11   Bekkedam -- at least went to Bekkedam and asked him to do.

12   The witness has already testified that he spoken to Mr. Rovin

13   and Mr. Bekkedam about what happened yesterday (phonetic) --

14             THE COURT:  Okay, let me stop you there.  This

15   statement, "Barry asked me to remind you that it's very

16   important to get the feds the information that it has requested

17   regarding the Nova transaction."  Is it an issue whether or not

18   that statement is truthful?

19             MR. ENGLE:  I don't know because --

20             THE COURT:  Does it become relevant because it's

21   truthful?

22             MR. ENGLE:  We don't know whether it is or it isn't.

23   The person who would know whether or not Barry asked him to do

24   that would be Mr. Rovin.  And Mr. Rovin is a witness for the

25   Government who's going to testify, and this document is most

Preve - Direct (Ign)                    23

1  appropriately put in if it's going to come in through him, who

2  can be cross-examined on what exactly he was being asked to do,

3  when, why.  The other thing is that this says that they needed

4  the documentation together.  This is about the Levin

5  transaction on change in control.  Mr. Levin is a client of

6  Ballamor.

7            THE COURT:  The statement in and of itself isn't

8  being offered for the truth of the matter asserted.  It's the

9  fundamental question.

10           MR. ENGLE:  It certainly is.  It's being offered for

11  the truth that --

12           THE COURT:  That Barry said to do it.

13           MR. ENGLE:  Right, and that means that he has certain

14  knowledge of it or involvement with it.  That's all the truth

15  of it.

16           MR. IGNALL:  I think that's right.  I think that if

17  Barry did indeed ask Mr. Rovin to do it.  All they need for

18  admissibility by a preponderance of the evidence the Court has

19  to determine that there was, that this was either at the

20  direction of Mr. Bekkedam or with his consent, then it's

21  admissible against Mr. Bekkedam 2C--

22           THE COURT:  What case says that the Court has to go

23  behind the various layers if the initial statement is that

24  Barry said to do it?  I don't know of any case that requires

25  that.

1        MR. ENGLE:  The Government cites to a Fourth Circuit

2    case that says the subject must relate to the employee's area

3    of authority.  So the fact is --

4        THE COURT:  (Inaudible).  Go ahead.

5        MR. IGNALL:  As with respect to Subsection (d), we're

6    introducing this at this point under Subsection (c).  It simply

7    is a statement made at the direction of or at the consent of.

8    And the jury can draw that inference even without the substance

9    of the communication simply because Mr. Rovin is sending the

10   document.  There's nothing --

11       MR. ENGLE:  But again, this is a communication from

12   Barry Bekkedam being as an agent of Ballamor Capital.

13       THE COURT:  When is Mr. Rovin going to testify?

14       MR. IGNALL:  He's going to testify but I'd like --

15   anticipate -- and we can hold off on that but the reason I

16   don't think we should --

17       THE COURT:  Accepting that Mr. Rovin is going to

18   testify, the Court can accept this conditionally.  If it can

19   not be linked up the Court can strike it and give a cautionary

20   instruction, limiting instruction, but at this point in time it

21   certainly is admissible conditionally.

22       MR. IGNALL:  I will not show the jury that first

23   part.  We'll show it was forwarded on.

24       COUNSEL:  I intend to use this document so if you're

25   going to redact that would --

Preve - Direct (Ign)                                    25

1          MR. IGNALL:  I don't know --

2          COUNSEL:  I have no issue with that.

3          MR. IGNALL:  I don't plan to redact.  I think it's

4     all admissible.

5          THE COURT:  We'll do it conditionally, but the point

6     is if you're going to use it you can't stop him from using

7     either under the circumstances.

8          MR. ENGLE:  Well, the same objection would apply, but

9     the Court's ruled.

10          THE COURT:  Okay.  It's going to be admitted

11     conditionally.

12          MR. ENGLE:  Understood.

13          THE COURT:  Subject being (inaudible).

14          MR. ENGLE:  Understood.

15          THE COURT:  And, a cautionary instruction, as long as

16     he doesn't testify.

17          COUNSEL:  Thank you, Your Honor.

18       (Sidebar ends)

19          MR. IGNALL:  All right.  Can we just put this back on

20     the screen for the witness right now, Agent Porter?

21          THE COURT:  The objection is overruled.  You may

22     continue.

23     BY MR. IGNALL:

24     Q    And Mr. Preve, if you could take a look at your screen

25     again.  This e-mail from Mr. Rovin to you, did it attach any

1    other e-mails?

2    A    Yes, it forwarded an e-mail.

3    Q    Are there multiple e-mails, in fact?

4    A    Yes, there are.

5    Q    Okay.  Let's start -- may I talk to Agent Porter for a

6    second?  May we have the second page?  And may we publish this

7    for the jury, Your Honor?

8            THE COURT:  Yes, sir.

9    BY MR. IGNALL:

10   Q    Do you see the e-mail there?  What's the date on that e-

11   mail?

12   A    The e-mail on the second page date is August 17, 2009.

13   Q    And do you see who it's from?

14   A    It is from the administrator of the Pennsylvania

15   Department of Banking, Donna Metcalfe.

16   Q    And do you see -- do you know who it's to?

17   A    It is to Kim Hartline with a copy to Joseph Moretz.

18   Q    Do you know who Kim Hartline is?

19   A    Yes.

20   Q    Who is Kim Hartline?

21   A    Kim Hartline was the secretary of Nova Financial Holdings.

22   Q    If we go to the second item there, can you read that?

23   A    The source of funds to be used to purchase the stock, if

24   cash funds are used, provide copies of account statements.  If

25   assets are to be liquidated, list those assets and provide a

1    copy of the documents that can verify the timing of the

2    transaction.  If any portion is borrowed, provide the name of

3    each borrower, name and address of each lender, amount

4    financed, collateral to be pledged, and terms of the

5    transaction, including interest rats, amortization, guarantors,

6    co-makers, and any other arrangement among the parties.

7    Q    All right.  And then if we go back to the first page and

8    we go to the bottom half.  Did you get an e-mail from Ms.

9    Hartline?

10   A    Yes I did.

11   Q    And what e-mail did you get from her?

12   A    This e-mail dated August 17, 2009 to me and copied to

13   Brian Hartline, subject Levin.

14   Q    And if you look above that, do you see any reference to

15   Mr. Hartline sending this e-mail to anyone before it got to you

16   ultimately from Mr. Rovin?

17   A    Yes.

18   Q    To whom did Mr. Hartline send this e-mail?

19   A    He sent it to Barry Bekkedam and a copy to Ed

20   DiMarcantonio.

21   A    And then if we scroll up one more e-mail, does it look

22   like Mr. Bekkedam sent that to anyone?

23   A    Yes.  He sent it to Larry Rovin at Ballamor Capital.

24   Q    And what information was Mr. Rovin asking you for?

25   A    Can I see the top e-mail?

Preve - Direct (Ign)                                    28

1    Q    What is he asking you for?

2    A    He's asking me to get the information to the fed on the

3    Nova transaction.

4    Q    Thank you.  Let me turn your attention back to Exhibit 74.

5    Do you recognize Exhibit 74?

6    A    Yes I do.

7    Q    And what is Exhibit 74?

8    A    Exhibit 74 is an e-mail from George Levin to me and to

9    Barry Bekkedam on the subject of fed follow-up questions.

10   Q    And do you recall getting this e-mail on or about August

11   25, 2009?

12   A    Yes I do.

13   Q    And do you recognize that e-mail to BRB at Ballamor

14   Capital.com?

15   A    Yes.

16   Q    Whose e-mail address was that at the time?

17   A    That is Barry Bekkedam at Ballamor Capital.

18            MR. IGNALL:  The Government moves into evidence

19   Exhibit 74.

20            MR. SCHWARTZ:  No objection.

21            MR. ENGLE:  Objection, Your Honor.  It is a hearsay

22   statement of Mr. Levin.  It's his e-mail.  He's not testifying.

23            MR. IGNALL:  Effect only, Your Honor.

24            THE COURT:  I'll overrule.

25            MR. IGNALL:  May I publish to the jury?

1          THE COURT:  Yes, with exception.

2    BY MR. IGNALL:

3    Q    Did you at any point -- let's look at that middle e-mail.

4    Did you send that to Mr. Levin?

5    A    Yes I did.

6    Q    And what did you say to Mr. Levin?

7    A    I said, I wish we did not open these doors but here are

8    the questions.

9    Q    And what questions are you talking about?

10   A    I am specifically talking about the classic motor

11   carriages issues.

12   Q    Did you forward an e-mail from anyone else to Mr. Levin?

13   A    I forwarded the e-mail from Donna Metcalfe to Kim Hartline

14   and copy to Joseph Moretz, subject Levin.  I forwarded that

15   specific e-mail to Mr. Levin.

16   Q    And then if we go to the top e-mail, did Mr. Levin write

17   back to you and to Mr. Bekkedam?

18   A    Yes he did.

19   Q    And what did he say?

20   A    He says, "Barry, why am I involved in all of this?  I'm

21   trying to help you out.  I could care less about this

22   investment."

23   Q    Let's turn your attention to Exhibit 79.  Just for the

24   witness.  Going to September, were you still -- was anyone

25   asking you to collect information to get to any banking

1    regulator regarding Mr. Levin?

2    A    Yes.

3    Q    And do you recognize Exhibit 79?

4    A    Yes.

5    Q    And what is Exhibit 79?

6    A    It's an e-mail from Larry Rovin to me with a copy to Brian

7    Hartline and Barry Bekkedam.

8    Q    And what's the subject of this?

9    A    Nova approval.

10   Q    And what's the date of this e-mail?

11   A    September 4, 2009.

12            MR. IGNALL:  The Government moves into evidence

13   Exhibit 79.

14            MR. SCHWARTZ:  No objection.

15            MR. ENGLE:  Your Honor, same objection as we

16   previously raised at sidebar with the understanding of the

17   court's ruling.

18            THE COURT:  All right.  With exception, admitted.

19            MR. IGNALL:  And may this be published for the jury?

20            THE COURT:  Yes, sir.

21   BY MR. IGNALL:

22   Q    What is Mr. Rovin asking you for in this e-mail?

23   A    He's asking me for the information that the fed requested.

24   Q    And if we scroll down, do you see an earlier e-mail near

25   the bottom of the page?

1    A    Yes.

2    Q    And -- I'm going to hold off on that.  I turn your

3    attention to Exhibit 81.  Do you recognize Exhibit 81?

4    A    Yes, sir.

5    Q    And what is Exhibit 81?

6    A    Exhibit 81 is an e-mail from me to Brian Hartline, subject

7    George Levin, dated September 8, 2009.

8    Q    And do you recall sending this e-mail to Mr. Hartline on

9    about September 8, 2009?

10   A    Yes I do.

11           MR. IGNALL:  The Government moves into evidence

12   Exhibit 81.

13           MR. DUNCAN:  No objection.

14           MR. ENGLE:  No objection.

15           THE COURT:  Granted.

16   BY MR. IGNALL:

17   Q    And what are you telling Mr. Hartline in this e-mail?

18   A    I'm telling him that I have not sent anything to anyone

19   yet on the fed questions.

20   Q    And what's the next sentence you say there?

21   A    " modified the letter per Barry's comments and also I have

22   included a recent summary of our trust accounts.  If it is

23   okay, please forward to the appropriate individuals."

24   Q    What letter are you talking about?

25   A    I am talking about a letter that explains primarily the

1    sourcing of funding for the Nova investment.

2    Q    And did you receive comments on that letter from anyone?

3    A    I had received comments on the draft of that letter from

4    Barry Bekkedam.

5    Q    And if we could show page, I think it's the fourth page to

6    the jury.  So did you provide a draft of this letter to Mr.

7    Bekkedam?

8    A    I discussed a draft of this letter with Mr. Bekkedam.

9    Q    And what are you telling the Department of Banking in this

10   letter?

11   A    I'm identifying the sourcing of funds for the Levin

12   investment.

13   Q    And at any point do you identify Nova Bank as being the

14   source of any part of that investment?

15   A    No I do not.

16   Q    Turning to the second page, in the middle, do you see an

17   e-mail from Mr. Hartline?

18   A    Yes, I do.

19   Q    And did you get an e-mail from Mr. Hartline on or about

20   September 8, 2009?

21   A    Yes, I did.

22

23   Q    And what did he ask you or say in that e-mail?

24   A    He says "when you say letter, what do you mean?  You're

25   looking for proof, in essence a bank statement or financing,

1    what entity will be providing the financing in terms of

2    financing.  I used the example with Barry that you could

3    advance on Mr. Levin's $ 5 million line of credit with Mellon.

4    If that were the case, I just need to know the loan specifics,

5    rate and term."

6    Q    I'd like to turn your attention to Exhibit 82.

7              MR. IGNALL:  And at this point I'd like to move into

8    evidence Exhibit 82.

9              MR. DUNCAN:  No objection.

10             MR. ENGLE:  No objection.

11             THE COURT:  Admitted.

12   BY MR. IGNALL:

13   Q    If I could turn your attention to the third page.  Is this

14   a letter that you drafted that you spoke to Mr. Bekkedam about?

15   A    Yes it is.

16   Q    And if we could go to the first page, what is the first

17   page of this document?

18   A    The first page is an e-mail from Kim Hartline to Joseph

19   Moretz and William Gahn of the Federal Reserve with copy to

20   myself and Brian Hartline.

21   Q    And did this e-mail include the letter we just looked at?

22   If you scroll down?  May I approach, Your Honor?

23             THE COURT:  Yes, sir.

24             MR. IGNALL:  May we publish this, Your Honor?

25             THE COURT:  Any objection?

1           MR. DUNCAN:  No, Your Honor.

2           THE COURT:  Yes, sir.

3    BY MR. IGNALL:

4    Q    Did this document forward the letter we talked about?

5    A    Yes it did.

6    Q    And this is dated September 8th.  We can take this off the

7    screen now.  After September 8th did you have any

8    communications with Mr. Bekkedam about getting money from Mr

9    Levin to invest in Nova?

10   A    Yes I did.

11   Q    Did Mr. Bekkedam say anything about any kind of deadline

12   to get the TARP funding?

13   A    There were several deadlines mentioned by Mr. Bekkedam.

14   Q    If I could turn your attention to Exhibit 102, do you

15   recognize Exhibit 102?

16   A    Yes I do.

17   Q    What is Exhibit 102?

18   A    Exhibit 102 is an e-mail from Barry Bekkedam to me and a

19   copy to Larry Rovin, subject funding, dated October 21, 2009.

20          MR. IGNALL:  The Government moves into evidence

21   Exhibit 102.

22          MR. ENGLE:  No objection.

23          MR. DUNCAN:  No objection.

24          THE COURT:  Admitted.

25   BY MR. IGNALL:

1    Q    If we could look at that.  What did Mr. Bekkedam tell you

2    in the first paragraph?

3    A    "I really need help with this and need to work closer with

4    you as these dates approach.  We need to put five million into

5    the bank this week.  We're supposed to close today.  The

6    treasurer will not kill us for 24 hours but we need it to

7    stagger in ASAP.  This capital, along with the other five

8    million going in today, allows us to collect 13.5 million of

9    TARP.  This gets us to a position to go after the acquisitions

10   we want.  The low cost TARP is critical and must close this

11   week."

12   Q    And what does he say in the next sentence?

13   A    "A bank will within the next two weeks send back $2

14   million and by 1/15/10 send $3 million dollars back."

15   Q    And then the next paragraph.

16   A    "We had originally budgeted for George's subscription

17   agreement 18 million with 10 million coming in financing from

18   the bank, but it looks as if we will only need 10 million with

19   all of it coming back in financing from the bank.  Not a lot,

20   but it seems to be headed that way."

21   Q    Thank you.  Did you get any other e-mails from Mr.

22   Bekkedam around this time?

23   A    Yes.

24   Q    If I could turn your attention to what we've marked as

25   Exhibit 110, just for the witness at this point.  Do you

1   recognize Exhibit 110?

2   A    Yes I do.

3   Q    And what is Exhibit 110?

4   A    Exhibit 110 is an e-mail from Larry Rovin to me dated

5   October 22, 2009, subject funding.

6   Q    And does it forward any e-mail to you?

7   A    Yes, it forwarded the previous exhibit from Barry

8   Bekkedam.

9         MR. IGNALL:  The Government moves into evidence

10  Exhibit 110.

11        MR. DUNCAN:  No objection.

12        MR. ENGLE:  Your Honor, same objection as before with

13  the understanding of the court's ruling.

14        THE COURT:  All right.  It is admitted conditionally.

15  BY MR. IGNALL:

16  Q    At this time in October were you working on any other

17  projects or other deals with Mr. Bekkedam other than Mr.

18  Levin's investment in Nova Bank?

19  A    Mr. Bekkedam had asked that we take another look at his

20  fire truck company, which we had previously declined to invest

21  in.

22  Q    Let me ask you slightly different.  Were you involved with

23  Mr. Bekkedam at all in terms of Mr. Bekkedam getting investors

24  into the Banyon Income Fund at this time?

25        MR. ENGLE:  Objection to the leading.

1           THE COURT:  Sustained.

2    BY MR. IGNALL:

3    Q    Do you recall whether you had any conversations with Mr.

4    Bekkedam around this time about the Banyon Income Fund?

5    A    We had a number of conversations about Banyon Income Fund.

6    Q    And were those ongoing in October of 2009?

7    A    Absolutely.

8    Q    If I could turn your attention to Exhibit 101.  Do you

9    recognize Exhibit 101?

10   A    Yes I do.

11   Q    And what is Exhibit 101?

12   A    Exhibit 101 is an e-mail from Barry Bekkedam to me with a

13   copy to George Levin and Scott Rothstein, subject Nova, dated

14   October 21, 2009.

15   Q    And does this talk about any investors in the Banyon

16   Income Fund?

17   A    Yes it does.

18   Q    And who's the first name there?

19   A    Anthony Bonomo.

20   Q    And what does the e-mail say about Mr. Bonomo?

21   A    2.5 m, 2.5 million, Anthony Bonomo, Nova Bank sending

22   wire, just need to track him down this morning.

23   Q    Let me turn your attention now to Exhibit 106.  Just for

24   the witness at this point.  Going back to October 21st, was Mr.

25   Bekkedam asking you at this time period about getting money for

1    Mr. Levin for Nova Bank?

2                MR. ENGLE:  Objection; leading.

3                THE COURT:  Sustained.

4    BY MR. IGNALL:

5    Q    Let me turn your attention to Exhibit 106.  Do you

6    recognize Exhibit 106?

7    A    Yes I do.

8    Q    And what is Exhibit 106?

9    A    Exhibit 106 is an e-mail from Barry Bekkedam to me dated

10   October 21, 2009, without a subject.

11               MR. IGNALL:  Government moves into evidence Exhibit

12   106.

13               MR. ENGLE:  No objection.

14               MR. DUNCAN:  No objection.

15               THE COURT:  Admitted.

16   BY MR. IGNALL:

17   Q    And what is Mr. Bekkedam telling you here on October 21st?

18   A    He stated that he felt like --

19   Q    Well can you just read it?  What does it say?  Frank --

20   A    Excuse me?

21   Q    If you could just read the e-mail.  It's fairly short.

22

23               MR. IGNALL:  May we publish for the jury, Your Honor?

24               THE COURT:  Yes.

25               THE WITNESS:  "Frank, I feel like I'm checking around

1    my office about funds being sent to you and you're checking

2    about funds to me, lots of fun.  I appreciate your help with

3    Nova, et cetera.  If you can give me an update of your

4    scheduled timing of fundswise, it would help me manage Brian

5    who is managing his regulators.  Thanks, Barry."

6    BY MR. IGNALL:

7    Q    Let me turn your attention to what we've marked as Exhibit

8    112.  Do you recognize Exhibit 112, at least from like the

9    middle down?

10   A    Yes I do.

11   Q    And what is Exhibit 112, at least the part that you

12   recognize?

13   A    It is an e-mail from Barry Bekkedam to Scott Rothstein,

14   Steve Miller, Frank Preve and a copy to George Levin, subject 2

15   million funding for Banyon II date October 22, 2009.

16   Q    Do you remember having any discussions with Mr. Bekkedam

17   around October 22, 2009 about funding for Banyon II?

18   A    Yes I did.

19   Q    And what do you remember about those discussions?

20   A    That he was going to start sending moneys to Banyon II

21   rather than Banyon Income Fund LP, the original fund that he

22   had set up.

23   Q    Was Banyon Fund designed to do things similar to the

24   Banyon Income Fund?

25   A    It was designed to do exactly the same thing, only without

1    the investor limitation that the original Banyon Income Fund

2    had reached.

3    Q    I turn your attention to Exhibit 114.  Do you recognize

4    Exhibit 114?

5    A    I recognize the second e-mail.

6    Q    And what is the second e-mail?

7    A    The second e-mail is from Barry Bekkedam to Frank Preve

8    dated October 23, 2009, subject miscellaneous.

9              MR. IGNALL:  At this point the Government moves into

10   evidence Exhibit 114.

11             MR. ENGLE:  No objection.

12             MR. DUNCAN:  No objection.

13             THE COURT:  Admitted.

14             MR. IGNALL:  May it be published to the jury, Your

15   Honor?

16             THE COURT:  Yes, sir.  Let's take a brief recess.

17                       (OFF THE RECORD)

18             THE DEPUTY:  Ladies and gentlemen, we are back on the

19   record.

20             THE COURT:  Thank you.  You may be seated.  All

21   right, counsel, you may proceed.

22             MR. IGNALL:  Thank you, Your Honor.

23             MR. IGNALL:  I believe when we had broke we had just

24   introduced Exhibit 114.  May we publish that for the jury, Your

25   Honor?

1          THE COURT:  Any objection?

2          MR. ENGLE:  No, Your Honor.

3          MR. DUNCAN:  No, Your Honor.

4          THE COURT:  Granted.

5   BY MR. IGNALL:

6   Q    Now just for the jury, at least the second e-mail there,

7   who is that to and from?

8   A    The second e-mail is from Barry Bekkedam to Frank Preve

9   dated October 23, 2009, subject miscellaneous.

10  Q    All right.  Let's look at the third paragraph.  Let me

11  blow that up; it's one line.  What does that say?  What's Mr.

12  Bekkedam saying there?

13  A    "I need some guidance from you on Nova, et cetera.  Brian

14  has the regulators killing him.  I just some guidance."

15  Q    Let's turn to the next paragraph.  What does that say?

16  A    "Again, we originally assumed we would raise 50 million to

17  execute on our plan of 18 million being committed by George.

18  Nova would lend George 5 million for the first amount (done),

19  the next amount was 10 million which I raise 5 million (done

20  and funded) and George would fund 5 million which needed to be

21  funded Wednesday.  George will get 2 million back from the bank

22  in one to two weeks and the rest by early first quarter.  Based

23  on the funding this week, we have been granted 13.5 million in

24  TARP.  We have requested an extension from the treasury but can

25  not be guaranteed that we get it (they a bureaucrats not

1  businessmen).  The rest will be raised by us depending on what

2  we need to grow."

3  Q    And on October 23rd did Mr. Levin have other business

4  interests with Mr. Bekkedam other than Nova Bank?

5  A    Yes he did.

6  Q    I'd like to turn your attention to October 31st of 2009.

7  In your role as a consultant for Mr. Levin were you aware of

8  his financial status in late October or early November of 2009?

9  A    Yes I was.

10  Q    And particularly with respect to the Banyon investments,

11  was there any change in Mr. Levin's financial status?

12  A    Yes there was.

13  Q    And did it get better or worse?

14  A    It got worse.

15  Q    All right.  And right around the end of October or early

16  November did you learn whether the Banyon investments had

17  decreased in value?

18  A    Yes I did.

19  Q    And had they decreased significantly?

20  A    Significantly.

21  Q    To the point that you had concerns whether they had any

22  value at all?

23           MR. EGAN:  Objection.  Leading.

24           THE COURT:  Sustained.

25           MR. IGNALL:  Well Your Honor, may I approach at

1    sidebar?

2              THE COURT:  Surely.

3              (Sidebar conference)

4              MR. IGNALL:  That was intentionally leading because I

5    didn't want to go into the area that the Court has asked me not

6    to about the --

7              MR. EGAN:  He doesn't have to go into that.  He

8    doesn't have to suggest the answer.

9              THE COURT:  I don't have a problem with him leading

10   on that one for the stated purpose.

11             MR. EGAN:  Thank you.

12             (In open court.)

13   BY MR. IGNALL:

14   Q    As of early November did you have concerns about whether

15   the Banyon investments had any value at all?

16   A    Yes I did.

17   Q    And were you present at any meetings with Mr. Bekkedam

18   where you or anyone else discussed Mr. Levin's change in

19   financial circumstance?

20   A    Yes.

21   Q    And what were the purpose of those meetings, or the

22   subject of those meetings?

23   A    The subject of the meetings would be how to go forward

24   with the diminished value of the Banyon investments.

25   Q    And was Mr. Levin in a position to put any money into Nova

Preve - Direct (Ign)                                    44

1    Bank at that point?

2              MR. EGAN:  Objection.  Basis.

3    BY MR. IGNALL:

4    Q    Were you familiar with Mr. Levin's finances as of early

5    November 2009?

6    A    Yes I was.

7    Q    And was Mr. Levin in a position to put any money into Nova

8    Bank at that point?

9    A    No he was not.

10   Q    And were you a participant in any discussion where Mr.

11   Bekkedam was present where that subject came up?

12   A    The subject of Mr. Levin's financial condition and his

13   ill-liquidity.  I don't specifically recall at those early

14   meetings whether Nova Bank came up.

15   Q    Was Mr. Levin by November in a position to pay off the $5

16   million loan from Nova Bank?

17   A    Absolutely not.

18   Q    Did you have any discussions with Mr. Hartline about that?

19   A    Yes.

20   Q    And when did those discussions start?

21   A    I recall them starting in mid to late November of 2009.

22   Q    If I could turn your attention to Exhibit 124, just for

23   the witness.  Do you recognize Exhibit 124?  Especially the

24   bottom e-mail?

25   A    Yes I do.

Preve - Direct (Ign)                                45

1    Q     And what is Exhibit 124?

2    A     The bottom part of Exhibit 124 is an e-mail from Thomas

3    Patterson to me, copy to Brian Hartline and Ed DiMarcantonio,

4    subject Mr. Levin's property.

5              MR. IGNALL:  The Government moves into evidence

6    Exhibit 124.

7              MR. ENGLE:  No objection.

8              MR. DUNCAN:  No objection, Your Honor.

9              THE COURT:  Admitted.

10   BY MR. IGNALL:

11   Q     And around this time do you know why -- were you involved

12   in any discussions about Mr. Levin's property with anyone at

13   Nova Bank?

14   A     Yes.

15   Q     Why?

16   A     We were looking to decrease the interest rate, extend any

17   maturity dates by collateralizing the loan.

18   Q     Was there any collateral on the loan at that point?

19   A     No.  It was an unsecured loan.

20   Q     And was this around the time you were having discussions

21   with Mr. Hartline about Mr. Levin's financial situation?

22   A     Yes.

23   Q     Did, at least as far as you know by working for Mr. Levin,

24   Mr. Levin ever provide any collateral for the loan?

25   A     Not to my knowledge.

1    Q     Did you ever discuss with Mr. Hartline the idea of Mr.

2    Levin selling Nova stock?

3    A     Yes.

4    Q     And tell us about that discussion.

5    A     Well initially the discussion was that since we did not

6    have the stock in hand, and if we did not have it in hand I

7    assumed it was not issued.  And so I talked to Mr. Hartline

8    about liquidating the escrow account where I was thinking that

9    the $5 million was still in.  And when Mr. Hartline said the 5

10   million was actually used to increase the bank's capital, and

11   even though we did not have the stock, I asked if he could

12   liquidate the stock at whatever the current market value was

13   and repay the $5 million loan.

14   Q     And what did Mr. Hartline say?

15   A     He did not think that there was a market to sell the stock

16   at that time.

17   Q     Were you involved in any discussions with Mr. Bekkedam

18   about getting collateral for Mr. Levin's loan?  If I could turn

19   your attention to Exhibit 170, just for the witness.  Do you

20   recognize Exhibit 170?

21   A     Yes.

22   Q     And what is Exhibit 170?

23   A     It is an e-mail from Barry Bekkedam to Brian Hartline and

24   DiMarcantonio with a copy to me and to Mr. Levin, subject, can

25   we follow-up conversation of our last conversation ASAP, dated

Preve - Direct (Ign)                    47

1    February 6, 2010.

2    Q    And does this include any other e-mails?  And if I could

3    approach the witness.

4              THE COURT:  Yes, sir.

5              MR. IGNALL:  I'd like to move into evidence Exhibit

6    170.

7              MR. DUNCAN:  No objection.

8              MR. ENGLE:  No objection.

9              THE COURT:  All right.  You may proceed.

10   BY MR. IGNALL:

11        Q    Do you see the second page?  What is the second page?

12             MR. IGNALL:  May I publish to the jury, Your Honor?

13             THE COURT:  Yes, sir.

14             THE WITNESS:  The second page is an e-mail from Barry

15   Bekkedam to George Levin and Larry Rovin with copies to Frank

16   Preve, Barry Hartline and DiMarcantonio, dated February 1,

17   2010.

18   BY MR. IGNALL:

19   Q    And if I could turn your attention to maybe halfway

20   through the first paragraph.  See where it says, the bank is

21   willing?  Could you read that to us?

22   A    Yes.  "The bank is willing, as I understand, to discuss

23   modifications to your loan, for example, lowering your rate as

24   a home equity on Pennsylvania but needs you to call him, answer

25   a few questions and supply some data.  He can not understand

1   why you won't speak with him.  It won't take much time."

2   Q    When did you stop working for Mr. Levin?

3   A    I stopped working for Mr. Levin in April 2010.

4   Q    And through April 2010 were you familiar with Mr. Levin's

5   finances?

6   A    Yes.

7   Q    And as of April 2010 had Mr. Levin paid off that $5

8   million loan to Nova Bank?

9   A    No he had not.

10            MR. IGNALL:  Nothing further.

11            THE COURT:  You may cross-examine.

12            MR. EGAN:  Thank you, Your Honor.

13                      CROSS-EXAMINATION

14   BY MR. EGAN:

15   Q    Good morning, Mr. Preve.

16   A    Good morning, sir.

17   Q    Mr. Preve, you knew Mr. Levin for a very long time,

18   correct?

19   A    Yes, sir.

20   Q    In fact, over 20 years?

21   A    More than 20 years, sir.

22   Q    And you worked for him for a long time as well.

23   A    Yes, sir.

24   Q    I think twice, right?

25   A    Yes, sir.

Preve - Cross (Ega)                                        49

1   Q    So once back in the '90's, would that be correct?

2   A    Once back in the '80's.

3   Q    In the '80's.  And when you worked for him in the '80's,

4   he was a very rich man, correct?

5   A    Yes he was.

6   Q    And then you came back to work for him again in the

7   2000's, right?

8   A    Yes, sir.

9   Q    And when you came back to work for him, he was even

10  richer, right?

11  A    He became richer, yes sir.

12  Q    In fact, I think the words you used were, the scope of the

13  companies he had control of had expanded significantly.

14  A    Yes, sir.

15  Q    And that wealth was not wealth that was created, for the

16  most part, as a result of Banyon, correct?

17  A    Not in the early 2000's, no sir.

18  Q    And indeed, it was created because of all these other

19  companies that he owned and ran.

20  A    Yes, sir.

21  Q    Now I believe you described him as a dynamic entrepreneur,

22  correct?

23  A    Yes, sir.

24  Q    So he had a whole lot of different businesses going on.

25  A    Yes, sir.

                        Preve - Cross (Ega)                    50

1    Q     And he had a whole lot of assets.

2    A     Yes, sir.

3    Q     And you were his business manager, correct?

4    A     Yes, sir.

5    Q     And in doing that you coordinated his financial reporting.

6    A     Yes, sir.

7    Q     So you're very familiar with his financial statements,

8    during that period of time at least.

9    A     Yes, sir.

10   Q     Now another thing you said about Mr. Levin which was

11   interesting was you said that he kept his own counsel.  Do you

12   remember that?

13   A     Not specifically.

14   Q     Well Mr. Ignall asked you about whether you advised him

15   about investing in Nova Bank and your answer was he kept his

16   own counsel.  Remember that?

17   A     Yes, sir.

18   Q     Now by that I assume you mean that he made is own

19   decisions?

20   A     For the most part, yes sir.

21   Q     But that could also mean he had a number of lawyers as

22   well, right?

23   A     It could mean that, yes, but that's not what I was

24   referring to.

25   Q     But he did have a number of lawyers, I assume.

1   A     He had a single attorney that he depended on, yes.

2   Q     And he relied on that lawyer's advice.

3   A     Yes, sir.

4   Q     Now you didn't tell Mr. Levin what he should or shouldn't

5   do for the most part, correct?

6   A     I constantly was giving him advice but that doesn't mean

7   he listened to it constantly.

8   Q     He made his own decisions.

9   A     Yes, sir.

10  Q     And one of the decisions that I believe you said he made

11  that was not on your advice was Banyon itself, correct?

12  A     He started -- he made the first transaction without asking

13  for my consultation.

14  Q     And let's talk a little bit about Banyon.  Mr. Levin

15  himself invested in Banyon to begin with, correct?

16  A     Yes, sir.

17  Q     And he found it to be a fairly good investment?

18  A     Yes, sir.

19  Q     And he was very pleased with his return.

20  A     Very pleased, yes, sir.

21  Q     And do he decided to introduce other people to it as well,

22  correct?

23  A     Yes, sir.

24  Q     Now when he introduced those other people, Mr. Ignall

25  brought up the issue that he guaranteed their investments,

Preve - Cross (Ega)                                    52

1    correct?

2    A    Yes, sir.

3    Q    What he didn't bring up was the reason he guaranteed their

4    investments was so he could make a profit off them, right?

5    A    Yes, sir.

6    Q    Because like most rich people, Mr. Levin liked to make his

7    money using other people's money, correct?

8    A    To an extensive extent, yes sir.

9    Q    So what he really did, rather than say, hey do you want to

10   invest in this, I'll guarantee you the money, what he did was

11   he was getting a rate of one number, right?

12   A    Yes, sir.

13   Q    And he was selling these promissory notes to his investors

14   for a lower number.

15   A    There was an interest rate differential, yes sir.

16   Q    And that was all profit to him.

17   A    On a gross basis, yes sir.

18   Q    But it was also his risk, was it not?

19   A    Absolutely.

20   Q    And in order to understand that, one would have to dig

21   pretty deep down into the financials of his relationship with

22   all of these various investors, correct?

23   A    It was, you wouldn't have to dig very deeply.  It was all

24   on the paperwork.

25   Q    Well you would have to request those agreements so you

Preve - Cross (Ega)                                   53

1    could see what they were, right?

2    A    Yes, sir.

3    Q    You would have to review them or have a lawyer review

4    them, right?

5    A    To determine their interest rate?

6    Q    No, determine what the deal is.  You'd have to do some due

7    diligence on those funds, correct?

8    A    They were very standard.

9    Q    In any event, most of the money that was invested in

10   Banyon in 2009 was not George Levin's money, correct?  It was

11   the money of these other folks he had guaranteed.

12   A    Including the hedge funds?

13   Q    Yes.

14   A    Yes, sir.

15   Q    And indeed, George Levin had a whole lot of money in other

16   places at that point, correct?

17   A    He had other assets besides Banyon, yes sir.

18   Q    Well we're going to go over those in a little more detail,

19   but let's talk about how he became involved in the Nova Bank

20   transaction.  So as I understand it, he met Barry Bekkedam and

21   you weren't there when he met him, but at some point you were

22   told he had this friend, Barry Bekkedam, who was also a

23   financial guy like Mr. Levin, right?

24   A    Yes, sir.

25   Q    And Mr Bekkedam also had someone assisting him by the name

Preve - Cross (Ega)                                    54

1    of Larry Rovin, correct?

2    A    Yes, sir.

3    Q    And most of your back and forth with regard to Ballamor

4    and Mr. Bekkedam was through Mr. Rovin, correct?

5    A    Yes, sir.

6    Q    And Mr. Rovin was counsel to Mr. Bekkedam and Ballamor,

7    correct?

8    A    Among other functions, yes.

9    Q    So he was a lawyer.

10   A    He acted as a chief operating officer in his interface

11   with me.

12   Q    So are you saying he wasn't a lawyer?

13   A    I believe he was genera counsel as well, yes.

14   Q    So he was a lawyer.

15   A    Yes, sir.

16   Q    And were you aware that he had been a lawyer for a bank a

17   few years before that?

18   A    No, sir.

19   Q    IN any event, most of your back and forth was between you

20   and Mr. Rovin, correct?

21   A    A lot of it, yes sir.

22   Q    And early on one of the things that Mr. Bekkedam and Mr.

23   Levin agreed to do together is for Mr. Levin to assume these

24   Colorado bonds, correct?

25   A    Yes, sir.

Preve - Cross (Ega)                           55

1    Q    And that would have taken place in say early 2009, around

2    March, April, correct?

3    A    The actual consideration was paid in April of 2009.

4    Q    So if we could have G-15 please?  And I believe this is

5    already admitted.  Now this is an April 3, 2009 e-mail,

6    correct?  Right?

7    A    Yes, sir.

8    Q    And it's an e-mail from Mr. Bekkedam to you copying Mr.

9    Levin, correct?

10   A    Yes, sir.

11   Q    And it's forwarding an e-mail which is requesting

12   information from Nova Bank, correct?

13   A    Yes, sir.

14   Q    And the first person on there is Brian Hartline at Nova

15   Bank.com.  At this point in time you didn't know who Brian

16   Hartline was, did you?

17   A    No, sir.

18   Q    And in fact, you never met Brian Hartline, did you?

19   A    I do not believe so, sir.

20   Q    So you wouldn't know him if you tripped over him, right?

21   A    No I would not.

22   Q    And there's some other folks on this e-mail.  One is named

23   Mark Poliski and Tom Patterson.  Now Mark Poliski is a senior

24   credit manager at Nova, did you know that?

25   A    No, sir.

1    Q    And Tom Patterson was the loan officer.  Did you know

2    that?

3    A    Yes, sir.

4    Q    And that's because ultimately you ended up dealing with

5    Mr. Patterson a bit, didn't you?

6    A    Yes, sir.

7    Q    In relation to the $5 million loan that Mr. Levin took

8    out, right?

9    A    Among other issues, yes sir.

10   Q    And what it asks for is financial statements for the

11   person or entity that will assume the loan, correct?

12   A    Yes, sir.

13   Q    So basically what you're being told is -- well let me take

14   a step back.  Do you recall that these Colorado bonds were

15   funded through a loan?  Do you remember that?

16   A    They appear to be partially funded by Nova Bank, yes sir.

17   Q    Right.  And the interest on the bonds paid the loan debt?

18   A    Yes, sir.

19   Q    And that's why it was a good deal, right?

20   A    It appeared to be a break-even deal, yes sir.

21   Q    And so Mr. Levin was going to need a loan from Nova Bank

22   in order to -- or he was going to need to be approved by Nova

23   Bank in order to assume the loan, right?

24   A    Yes, sir.

25   Q    And in the course of that he would have sent his financial

1    information back to Nova Bank in April, correct?

2    A    Yes, sir.

3    Q    Now if we could go to D-16, and just for the witness

4    please.  And if you look at the bottom e-mail, sir, that's an

5    e-mail from you to Mr. Hartline, correct?

6    A    Yes it is.

7    Q    And one of the things there in line 3 says, George will

8    provide personal financial statements and tax returns, correct?

9    A    Yes, sir.

10   Q    So in other words, in April fo 2009 that's you saying

11   George is going to provide the personal financial statements

12   and tax returns to Nova.

13   A    In lieu of the borrower, yes sir.

14   Q    Okay.  Now if we could go to Government 64, please.  And

15   this has been admitted.  Now a little while ago Mr. Ignall

16   showed you Government 63, and that was a letter from Mr.

17   Hartline to the Pennsylvania Department of Banking.  Remember

18   that, this morning?

19   A    Yes, sir.

20   Q    Okay.  Could you look at Government 64?  You would agree

21   with me this is essentially the same letter, right?

22   A    It covers the same subject matter, sir.

23   Q    Right.  And it has an attachment.  And if we go to page 2

24   -- strike that.  If we go to page 4, that attachment is the

25   application for change in control that you discussed with Mr.

1   Ignall this morning, correct?

2   A    Yes, sir.

3   Q    And I recall you saying to Mr. Ignall when he showed you

4   number 63, that that was not the whole document that you had

5   seen and reviewed.  Remember that?

6   A    Yes, sir.

7   Q    So I'm going to ask you -- may I approach, Your Honor?

8               THE COURT:  Yes, sir.

9   BY MR. EGAN:

10  Q    Just take a look at tell me is that the complete document?

11              MR. IGNALL:  Your Honor, I object.  I think the

12  question was about Exhibit 63 and now we're in Exhibit 64 so I

13  think the question is unclear.

14              THE COURT:  Correct.

15              MR. EGAN:  I will restate it.

16  BY MR. EGAN:

17  Q    Is Exhibit 64 the complete application as you recall it?

18              MR. IGNALL:  Again Your Honor, I think that assumes

19  that 63 and 64 are the same, which I think assumes a fact not

20  in evidence.

21              THE COURT:  Just back up a steps; that's all.

22              MR. EGAN:  I'll give the witness a chance to review,

23  Your Honor.

24              THE WITNESS:  Well this says it includes the

25  fingerprint, and I don't see the fingerprint in here, but this

1    looks like what I saw last week in court and it appears to be

2    the package without the fingerprinted card.

3    BY MR. EGAN:

4    Q    And you would agree with me, sir, that as far as the

5    financial information on there, that's financial information

6    that you helped prepare and provide, correct?

7    A    Yes, sir.

8    Q    And now I'm going to use the screen because it will be a

9    lot easier for us to move around.  If you could turn to page

10   19.  That appears to include a financial report, correct?

11   A    Yes, sir.

12   Q    And it states that Mr. Levin has cash on hand in

13   depository institutes of over $6.7 million, correct?

14   A    Yes, sir.

15   Q    And it states that he has proprietary interest and other

16   securities of over $388 million, correct?

17   A    Yes, sir.

18   Q    It also says that he has real estate -- well no, we have

19   to go back to the schedule to see that.  He also has retirement

20   funds.  But his total value is $449,135,000, correct?

21   A    Yes, sir.

22   Q    Now if we could go to page 27, and that is the personal

23   financial statement as of March 31, 2009 and it is signed by

24   Mr. Levin and his wife, correct?

25   A    Yes, sir.

Preve - Cross (Ega)                                60

1    Q    And it's dated June 6th, correct?

2    A    Yes, sir.

3    Q    And you had no reason to believe that anything in this was

4    false, correct?

5    A    No, sir.

6    Q    In fact, your belief was that everything in this was true,

7    correct?

8    A    Yes, sir.

9    Q    Because at the time Mr. Levin was worth $400 million,

10   correct?

11   A    Yes, sir.

12   Q    All right.  If we could go to the next page.  Mr. Levin

13   had $6.7 million in the bank, correct?

14   A    That includes consolidating all of his single member LLC

15   cash on hand as well, yes sir.

16   Q    And almost $4 million in unused lines of credit, correct?

17   A    $3.4 million, yes sir

18   Q    And 256 million in closely held securities?

19   A    Yes, sir.

20   Q    And 140 million in real estate, correct?

21   A    Yes, sir.

22   Q    In fact, he had almost 6 million in personal property,

23   artwork and autos, correct?

24   A    Yes, sir.

25   Q    So these are all items -- taking out the closely-held

Preve - Cross (Ega)                                    61

1    securities -- all the rest are all items totally unrelated to

2    the money that he had in Banyon, correct?

3    A    Yes, sir.

4    Q    Now, if we could go to the next page.  And sir, Mr. Levin

5    had a lot of bank accounts, didn't he.

6    A    Yes, understanding that this includes all the single

7    member LLC bank accounts as well.

8    Q    Correct.  Rather than have to go through and count them

9    all, if I were to tell you there are seven different banks

10   where Mr. Levin has his money, you wouldn't quibble with that,

11   would you?

12   A    Probably not, sir.

13   Q    And now if we could go to page 31.  This is all his real

14   estate, right?

15   A    Yes, sir.

16   Q    And if we go down, he owned a medical office building?

17   A    Yes, sir.

18   Q    Two below that, he owned Foxcroft Village, which is a

19   manufactured housing community.

20   A    Yes, sir.

21   Q    A little bit below that, he owned a manufacturing plant in

22   Miami, Florida?

23   A    Yes, sir.

24   Q    And then right below that, stop there, Madison House, do

25   you see that?

Preve - Cross (Ega)                                        62

1    A     Yes, sir.

2    Q     Now Madison House I think you talked about on direct

3    examination, right?

4    A     Yes, sir.

5    Q     And that was a property that he owned in Atlantic City?

6    A     Yes, sir.

7    Q     And you had worked on that way back when, correct?

8    A     Mid 1980's.

9    Q     It's a hotel, right?

10   A     Yes, sir.

11   Q     And you can't see it in this here but maybe you can -- it

12   says here the market value is $50 million, is that correct?

13   A     Yes, sir.

14   Q     And so at the time he had a $50 million interest in a

15   hotel in Atlantic City, correct?

16   A     Yes, sir.

17   Q     Now if we could scroll down and go back over, keep

18   scrolling down, all the way to the second from the bottom.  See

19   that 326 it looks like, South Fairfield, Devon, PA.  Are you

20   familiar with that property?

21   A     I'm aware of the property, sir, yes.

22   Q     That was a home that Mr. Levin owned in Devon, correct?

23   A     Yes, sir.

24   Q     And it was a home that he was spending a lot of money to

25   make nicer, correct?

1    A    Yes, sir.

2    Q    And if we go over to the right about three columns.  $4.5

3    million and then it says new improvements, and that's because

4    there were improvements being done on that property, correct?

5    A    Yes, sir.

6    Q    And if you continue over, it says there's a $1 million 1

7    hundred some dollar mortgage, correct?

8    A    Yes, sir.

9    Q    And $3 million in equity.

10   A    Yes, sir.

11   Q    Now if we could go to the next page.  Mr. Levin also owned

12   a few other items, didn't he.  And just the first three of

13   these are a Citation 3; that's an airplane, right?

14   A    Yes, sir.

15   Q    It's a jet, I assume?

16   A    Yes it is.

17   Q    An 80-foot yacht, correct?

18   A    Yes, sir.

19   Q    And a Gulf Stream Jet.

20   A    Yes, sir.

21   Q    So when Mr. Levin made his application to the fed to be a

22   changing control investor he owned all that stuff, right?

23   A    Yes, sir.

24   Q    And by the way, this is Mr. Levin's application, correct?

25   He signed it, right?

Preve - Cross (Ega)                                    64

1    A    This is Exhibit 64?

2    Q    Yes.  If you go to page 8.

3    A    Yes, he signed it.

4    Q    So that's his Certification, correct?  He's certifying

5    this information has been examined carefully by him and is true

6    and correct.  Right?

7    A    This is the application?

8    Q    Yes.

9    A    As I indicated earlier, I don't believe he completed the

10   application but he did sign it.

11   Q    Well certainly nobody at Nova Bank knew he owned all that

12   stuff.  I mean he had to proved that information, right,

13   through you?

14   A    I'm sorry.  Is this the application or is this the

15   financial statement?

16   Q    Well it's all part of the application, sir.  My question

17   is, all of that information about his finances had to come

18   either from you or Mr. Levin, correct?

19   A    Can I see the Bates number of this?

20   Q    Sure.

21   A    I don't mean to quibble but that -- 1069 is the

22   application to the fed and we've been talking about the

23   financial statement, which is a separate signed document.

24   Q    I understood.  It was attached to the application.

25   A    Yes, sir.

1   Q    And made a part of the application.

2   A    Yes, sir.

3   Q    Understood.  And while we're at it, one last thing on

4   there.  If you could go to page 19, or I'm sorry, not 19, page

5   6.  And this first part, that's the part you said you think

6   Nova filled out, right?

7   A    Yes, sir.  Or somebody filled out.

8   Q    Right, someone provided.  If you could go to paragraph

9   seven, if we could blow that up.  It says, provide the

10  following information, and it says source and amount of funds.

11  Do you see what it says there?

12  A    Yes, sir.

13  Q    It says, half from personal finances and half from

14  borrowed funds, correct?

15  A    Yes, sir.

16  Q    And that was consistent with the original deal, wasn't it?

17  A    I do not understand the question.

18  Q    I'll withdraw it.  Mr. Levin was supposed to put up some

19  of his own money for this, correct, originally?

20  A    I never saw that in any deal, and Mr. Levin did not want

21  to use his own money.

22  Q    Because Mr. Levin never wanted to use his own money,

23  right?

24  A    Philosophically, that tended to be correct, yes sir.

25  Q    One of the reasons Mr. Levin wanted to invest in Nova Bank

Preve - Cross (Ega)                                    66

1    was because Mr. Levin wanted to own a bank in Florida, correct?

2    A    That is the argument that Mr. Bekkedam was making to Mr.

3    Levin, yes sir.

4    Q    That Mr. Levin invested so he obviously agreed with it,

5    right?

6    A    Mr. Levin reluctantly invested in Nova, yes sir.

7    Q    And Mr. Levin wanted to invest in a bank in Florida so he

8    could have a place to put the money from the Banyon fund and

9    pay less fees and et cetera on it, right?

10   A    The purpose was to put the trust funds that were related

11   to the Banyon investments in a bank and they would be very low

12   cost funds and the bank itself would earn a substantial margin

13   on employing those funds and the bank would become very

14   profitable with very little risk.

15   Q    And Mr. Levin would benefit.

16   A    As an owner in the bank, yes sir.

17   Q    So that's why he agreed to do this basically, right?

18   A    That was an incentive for him to do this.  He was doing

19   this as an accommodation to Mr. Bekkedam.

20   Q    An accommodation with an incentive.

21   A    Yes, sir.

22   Q    And indeed, theoretically, if Nova Bank had been able to

23   prosper, they could have expanded to Florida and taken over a

24   bank there, correct?

25   A    I assume that they would have that capability but I don't

1    have that, any knowledge on that capability.

2    Q    And one of the banks that they discussed, at least Mr.

3    Bekkedam and Mr. Levin discussed, was this Flagler Bank, right?

4    A    Yes, sir.

5    Q    As a potential target.

6    A    Yes, sir.

7    Q    So that's why Mr. Levin decided to invest, both as an

8    accommodation to Mr. Bekkedam and because he had this interest

9    in having a Florida bank, correct?

10    A    Yes, sir.

11    Q    Now when Mr. Levin decided to invest he realized, whether

12    he took a loan out or not, that he was making a commitment,

13    correct?

14    A    Are we talking about the subscription agreement, or are we

15    talking about the Nova Bank loan?

16    Q    Let's talk about the subscription agreement.  You are

17    aware that he signed one, correct?

18    A    I don't recall it but I believe he did, yes sir.

19    Q    If we could have G-62 which has already been admitted.

20    And if we could actually go to page 2.  You see this document?

21    A    Yes, sir.

22    Q    Are you able to read it?

23    A    Barely.

24    Q    This is a subscription agreement of Mr. Levin, correct?

25    A    It appears to be, sir, yes.

Preve - Cross (Ega)                                    68

1    Q     And it's for $18 million, correct?  It's up there in the

2    top right corner.  See it?

3    A     Yes, sir.

4    Q     And by signing this, this is Mr. Levin's agreement that

5    he's going to invest $18 million in Nova Bank, correct?

6    A     Yes, sir.

7    Q     And that's a contract, right?

8    A     I'm not a lawyer, sir, but it would appear that it's -- a

9    subscription agreement would be a contract, yes sir.

10   Q     So now Mr. Levin has to buy Nova Bank stock, correct?

11   A     Yes, sir.

12   Q     And in order to buy that stock he wants to borrow the

13   money to do it, right?

14   A     He did not want to use his own funds.

15   Q     Now needless to say, Mr. Levin has a number of different

16   sources from where he could borrow money, correct?  We just

17   looked at a $3 million line of credit from Mellon, correct?

18   A     Well it would depend on whether he had used those funds

19   for another purpose.  The financial statement was dated March

20   of 2009 and the Nova Bank loan took place at the end of June

21   2009 so I don't know what the status of those lines of credit

22   were in June of 2009.

23   Q     Understood.  If we could have Government 301, and this is

24   for the witness only.  And I'm showing you what's been

25   previously marked as Government Exhibit 301.  And I want to

1    represent to you, sir, that it's the loan file essentially for

2    Mr. Levin's loan, and if we could go to page 24, please.  You

3    were asked yesterday whether Mr. Levin ever filled out an

4    application for this loan.  Do you remember that?

5    A    Yes, sir.

6    Q    And you said no.  Do you remember that?

7    A    I do not recall an application.

8    Q    You would agree with me that this is a commercial loan

9    application, correct?

10   A    It does say that at the top.

11   Q    And it's from Nova Bank?

12   A    Yes, sir.

13   Q    And the applicant's name is George Levin, correct?

14   A    Yes.

15   Q    And if we go down to the signature block, that is Mr.

16   Levin's signature, correct?  June 25th '09?

17   A    It does not appear to be a signature to me, sir.

18   Q    Okay.  But you would agree with me it's dated June 25th

19   '09, correct?

20   A    Yes, sir.

21   Q    And the amount requested, $5 million.

22   A    Yes, sir.

23   Q    Now you would agree with me that this all took place seven

24   years ago, six, seven years ago, right?

25   A    Yes, sir.

1    Q     So you're not going to tell us you remember every last

2    thing that happened, right?

3    A     No, I certainly do not remember everything that's

4    happened.

5    Q     Okay.  Now if we could go to G-38.  G-38 is a June 26,

6    2009 -- the lower e-mail -- June 26, 2009 e-mail from you to

7    Larry Rovin, correct?

8    A     Yes, sir.

9    Q     And you write to him, "here are George's financials, tax

10   returns right behind it.  Can you send to Nova?  I don't know

11   who you want to receive this stuff."  Correct?

12   A     Yes, sir.

13   Q     So as of June 26th you didn't even know who at Nova was

14   actually the point of contact.

15   A     Yes, sir.

16   Q     But you did know Larry Rovin was a point of contact for

17   you.

18   A     Yes, sir.

19   Q     And you would agree with me, would you not, that Larry

20   Rovin is aware that you are applying for this loan, correct?

21   Because you're sending him the information to do it.

22   A     Yes.  I mean Larry just sent me an e-mail asking for this

23   information.

24   Q     Right.  And the purpose of the information was to do the

25   loan so that George could invest in Nova, correct?

1    A     Yes, sir.

2    Q     And Mr. Rovin, who's a former banking lawyer, is included

3    in all of this correspondence, correct?

4    A     Much of it, yes, sir.

5    Q     Mr. Rovin never suggested to you there was any problem

6    with any of this, does he?

7              MR. IGNALL:  I'm going to object to the extent this

8    calls for a legal conclusion from Mr. Rovin.

9              THE COURT:  Sustained.

10   BY MR. EGAN:

11   Q     Now if we could go to G-40 please.  And G-40 is again you

12   and Mr. Rovin and now Mr. Hartline is on the chain, correct?

13   A     Yes, sir.

14   Q     And if you go down to the bottom, Monday, June 29th, you

15   have, see my highlighted questions.  Do you see that?

16   A     Yes, sir.

17   Q     And underneath that is an e-mail, on the next page is an

18   e-mail from Mr. Rovin to you asking some questions about the

19   financials of these statements, right?

20   A     Yes, sir.

21   Q     So basically you're being asked to provide more

22   information for purposes of approving this loan, correct?

23   A     Yes, sir.

24   Q     And there's nothing unusual about that, right?  That

25   happens all the time in loan applications.

Preve - Cross (Ega)                                72

1    A    Yes, sir.

2    Q    Now we're all aware Mr. Levin receives the loan, correct?

3    A    Yes.

4    Q    And as a result of that funds are wired from Nova to Mr.

5    Levin, correct?

6    A    Yes, sir.

7    Q    And I believe you used the word on Thursday when asked

8    about what bank account those funds went into, that was the

9    account that Mr. Levin elected the funds to go into.  Do you

10   remember that?

11   A    His personal bank account.

12   Q    Yeah.

13   A    Yes, sir.

14   Q    But you said he elected to put it there, right?

15   A    Yes, sir.

16   Q    That's because he could have elected it to send somewhere

17   else, correct?

18   A    To another personal bank account, yes sir.

19   Q    Sure, one of his other seven banks, right?

20   A    He didn't have personal accounts in seven banks, but he

21   had other banks where he had personal accounts, yes sir.

22   Q    Okay.  And the reason he was able to elect to send it to

23   his personal account is because, having been approved for a

24   loan and receiving the funds, it was now his money, right?

25   A    He was able to choose the bank account because Nova asked

Preve - Cross (Ega)                                73

1    which bank account he wanted it transferred to, and so he gave

2    the Gibralter account.

3    Q    Because now that was his money, right?

4    A    Yes.

5    Q    He put it in his bank account.

6    A    Yes, sir.

7    Q    The decision to send it from his bank account back to Nova

8    was his, correct?

9    A    He did it at the behest of Nova, yes.

10   Q    Well I go to work at the behest of the people I feed, but

11   it was his decision, right?

12   A    He was adhering to the request by Nova Bank, yes sir.

13   Q    So you said it wasn't his decision?

14   A    He made a decision to do what Nova Bank requested him to

15   do, yes sir.

16   Q    Which was --

17   A    Send the money back.

18   Q    -- to return funds that were his.

19   A    Yes, sir.

20   Q    And there was nothing that required him to do that, was

21   there.

22   A    No.  He was doing this on the basis of good faith though.

23   Q    Because he wanted to invest in Nova Bank.

24   A    That was part of the arrangement, yes sir.

25   Q    Correct.

Preve - Cross (Ega)                    74

1    A    So if we could go to Government 52.  We looked at this

2    this morning.  This is his personal bank account, right?

3    A    Yes, sir.

4    Q    And June 5, 75 grand comes in from Banyon, right?  See

5    that?

6    A    Yes, sir.

7    Q    Was that like his monthly, is that what he lived on every

8    month?

9    A    I can't identify the sourcing of the money other than it

10   did come from a Banyon account, sir.

11   Q    This is income basically, right?

12   A    I doubt it but I mean -- I can't tell by this entry what

13   the, why it was transferred from Banyon to him.  It could well

14   have been but I don't know that.

15   Q    But it is his bank account.

16   A    Yes, sir.

17   Q    And his wife's.  And indeed, if we go to Government 47,

18   when you send the wire to Nova to invest, you copy Susan Levin

19   at hotmail, right?

20   A    Yes, sir.

21   Q    Is that his -- that's his wife's e-mail address, I assume?

22   A    Yes, sir.

23   Q    Because you're not going to move 5 million bucks out of

24   his account without at least telling someone in his family that

25   you're doing it, right?

Preve - Cross (Ega)                                    75

1    A    No, that's not the reason.  It's that Susan and Paul were

2    co-signers on that account and they were involved in every

3    transfer out of the personal account, so I would have always

4    copied her on transfer instructions out of the personal

5    accounts.

6    Q    And if she objected, then there would be an issue.

7    A    I imagine so, sir.

8    Q    Because that's their bank account.

9    A    That is their bank account, yes sir.

10   Q    And you were sending their money to Nova Bank.

11   A    Yes, sir.

12   Q    Now going back to G-64, was an application that was filed

13   for change in control, correct?

14   A    It was an application, yes sir.

15   Q    Now were you aware that there was no need for an

16   application if only $5 million was invested?

17   A    I had no understanding of what was required to make an

18   investment.

19   Q    But clearly you knew $5 million had been invested and no

20   application had been filed, right?

21   A    I did not make that conclusion.  I did not know whether an

22   application had been filed or not, sir.

23   Q    But when you're applying, when you're filing this

24   application, or when Mr. Levin is filing this application, he's

25   filing it because he can't invest the rest of the money until

1   he's approved, right?

2   A    I did not understand that.

3   Q    You didn't?

4   A    No, sir.

5   Q    If we could have G-73, please.  Now this is an August 17th

6   e-mail, right?  It's an August 17th e-mail -- do I have G-73?

7   I'm sorry, I'm looking at the wrong document, my bad.  I do

8   want to use this document though.  Your Honor, could I have

9   just a moment?

10          THE COURT:  Surely.

11  BY MR. EGAN:

12  Q    D-51.  Sorry.  Now you see at the top of this e-mail it's

13  an e-mail from Kim Hartline to you, correct?

14  A    Yes, sir.

15  Q    And it says, references Levin, correct?

16  A    Yes.

17  Q    And it says, "Frank, here is the formal request from the

18  P.A. Department of Banking for information.  Please contact Ms.

19  Metcalfe if you have any questions."  Correct?

20  A    Yes, sir.

21  Q    So this is Kim Hartline telling you, please call these

22  people up directly and talk to them about these questions,

23  right?

24  A    She says if I have any questions I should contact them,

25  yes.

Preve - Cross (Ega)                                    77

1    Q     Right.  And she's forwarding you -- and if we could go

2    down now to the e-mail that she forwards.  And I apologize for

3    the confusion.  This is in a Government exhibit; I just

4    couldn't figure out which one.  These are the two questions we

5    looked at this morning, right?

6    A     Yes, sir.

7    Q     And these two questions we looked at this morning, one has

8    to do with this Classic Motor Carriages thing, right?

9    A     Yes.

10   Q     And the other has to do with where the money's coming

11   from.

12   A     Yes, sir.

13   Q     Now Ms. Hartline doesn't say anywhere in this e-mail like

14   don't tell them where the money came from, does she?

15   A     No, she does not.

16   Q     In fact, she gives you the phone number of the person to

17   talk to, doesn't she.

18   A     Yes, sir.

19   Q     Now if we could go to G-72 please.  And 72A, I apologize.

20   Now this is an e-mail between you and George, correct?

21   A     Yes, sir.

22   Q     And the topic is Barry, and there's a whole lot in there

23   about stuff you guys got going on with Barry, right?  See it?

24   A     Yes.

25   Q     And if you go down to the third paragraph, right there.

Preve - Cross (Ega)                                       78

1    Mr. Levin indicates, now I am obligated to buy 24 percent of a

2    bank that under normal circumstances I wouldn't invest a dime

3    in.  So you see that?

4    A    Yes, sir.

5    Q    So this is Mr. Levin now, he's a little bit unhappy, he's

6    got to buy this bank that he agreed to buy, right?  Or buy

7    stock in this bank he agreed to buy.

8    A    Can you repeat that, sir?

9    Q    This is Mr. Levin saying in August that he's unhappy about

10   the fact that he's agreed to invest in Nova Bank.

11   A    He's saying that all along, sir.  He said it on several

12   occasions.

13   Q    Sure.  He said it to you.

14   A    Yes.

15   Q    He never said it to Brian Hartline.

16   A    I'm not aware of him saying it to Brian Hartline.

17   Q    So this is just one of the many times he complained about

18   being stuck in this deal.

19   A    Yes, sir.

20   Q    And what does it mean to be stuck in a deal?  It means

21   he's got to follow through, doesn't it.  Right?

22   A    That could be one interpretation, yes sir.

23   Q    Unless of course something happens to give him an out,

24   right?

25   A    That could be one interpretation, yes sir.

1    Q    And if the change in control isn't approved, that would be

2    an out, wouldn't it.

3    A    Yes, sir.

4    Q    So you don't remember anything about this change in

5    control issue anymore?

6              MR. IGNALL:  Objection.  That's not in evidence.

7              THE COURT:  Sustained.

8    BY MR. EGAN:

9    Q    If we could go to Government 73 please.  If you go to the

10   very top of it, it's from Larry Rovin to you, correct?

11   A    Yes, sir.

12   Q    And it says, "Barry asked me to remind you it's very

13   important to get the fed the information it has requested."

14   Correct?

15   A    Yes, sir.

16   Q    Because obviously if the fed doesn't get the information,

17   the change in control is not getting approved, right?

18   A    Yes, sir.

19   Q    And he's forwarding e-mails from Brian asking for that

20   information, correct?  The string we just looked at, right?

21   A    Yes, sir.

22   Q    Now if we go to Government 74, and this is once again the

23   same string but now you're talking to Mr. Levin, correct?

24   A    Yes, sir.

25   Q    And you call it fed follow-up questions, right?

1    A    Yes.

2    Q    And you say, "I wish we did not open these doors but here

3    are the questions," correct?

4    A    Yes, sir.

5    Q    And that's because you really did not want to get deeply

6    involved in answering a lot of questions from a federal agency

7    now, did you.

8    A    I didn't want to open up the whole Classic Motor Carriages

9    issues again, yes sir.

10   Q    And that was an issue that certainly hadn't been shared

11   with Nova Bank prior to making these applications, correct?

12   A    I did not share it with Nova Bank.  Mr. Bekkedam was aware

13   of Classic Motor Carriages.

14   Q    That wasn't my question, sir.

15              MR. ENGLE:  Objection.

16              THE COURT:  Sustained.

17              MR. ENGLE:  Move to strike.

18              THE COURT:  Stricken.

19              MR. ENGLE:  Thank you,.

20   BY MR. EGAN:

21   Q    If we could go to D-56.  And sir, again this is a series

22   of e-mails and now it's September.  And the first e-mail is

23   from Mr. Hartline to you, correct?

24   A    Yes, sir.

25   Q    And it says, "I was wondering if you heard from either

1    institution," meaning the fed or the state banking department,

2    right?

3    A    Yes.

4    Q    Because he's put them in direct contact with you, hasn't

5    he.

6    A    We were in direct contact with the fed but not with the

7    state banking department

8    Q    And that was -- so if you go up to your e-mail to Mr.

9    Levin in response to this, can you read the -- well first it

10   says, "FYI, the application has been prefilled by Nova and the

11   box that asks if you or any affiliate had been convicted of a

12   crime was already answered in the negative."  That's this

13   Classic Car thing, right?

14   A    Yes, sir.

15   Q    Because they didn't know about it, right?

16   A    I don't know their knowledge, sir.

17   Q    Well you never told them.

18   A    I never told them, sir.

19   Q    And the next sentence says, "perhaps you won't be approved

20   and we won't have to waste 18 million on this boondoggle."

21   Correct?

22   A    Yes, sir.

23   Q    Now this is you and Mr. Levin saying, maybe we'll get

24   lucky and not have to come through on this commitment, right?

25   A    This is me saying that maybe we'll be fortunate enough not

Preve - Cross (Ega)                                     82

1    to have to have an $18 million investment in the bank, yes sir.

2    Q    Correct.  Which he had committed to.  G-87 please.  And if

3    we go to the bottom please.  And how you're hearing directly

4    from the Government, correct?  From a guy named Bill Gaunt.

5    And he wants to talk about this carriage thing, correct?

6    A    Yes, sir.

7    Q    Now you then -- if we could go up to the next e-mail --

8    forward this to Mr. Levin, correct?

9    A    Yes, sir.

10   Q    And you say, "This has become a big deal."  Many, many

11   periods.  "Hopefully they will turn you down and you'll be able

12   to get out of the investment."  Many, many periods.  "Another

13   source said the bank is not doing well."  Many, many periods.

14   And then you write, "never get involved with the feds" with

15   five exclamation points, right?

16   A    Yes, sir.

17   Q    And you have pretty good reason to not want to get

18   involved with the feds, didn't you.

19   A    I thought I did, yes sir.

20   Q    And indeed, you've been involved with the feds before.

21   A    That had nothing to do with my input to Mr. Levin.

22   Q    Okay.  And Mr. Levin writes back, at the top please, "from

23   your mouth to God's ears."  Correct?

24   A    Yes, sir.

25   Q    So you were asked this morning about a conversation that

1    you had via e-mail with Mr. Hartline.  And you were shown a

2    document having to do with where the funds were going to come

3    from.  Remember that?  It's Government's 81 please.  Do you see

4    that?  Now we're in September of 2009, correct?

5    A    Yes, sir.

6    Q    And if we go to the part that the Government highlighted,

7    if we go to the second page, there's an e-mail from Brian

8    Hartline to you.  And the question now is where is the rest of

9    this money going to come from, right?  Where is Mr. Levin going

10   to get the rest of this money, correct?

11   A    I can't really read that clearly.

12   Q    Can we blow that up, please, the middle e-mail, when you

13   say, letter, what do you mean?  Do you see that?  Now the

14   letter was the letter that he needed that had to say where the

15   rest of the money was going to come from, right?

16   A    Yes, sir.

17   Q    And he says, "they are looking for proof, such as a bank

18   statement, or if financing, what entity will be providing the

19   financing," correct?

20   A    Yes, sir.

21   Q    Now you would agree with me that's a forward-looking

22   statement, would you not?

23   A    They use a future term, yes.

24   Q    And in fact, he then goes on to say that, "I use an

25   example with Barry, you could advance on his $5 million line of

Preve - Cross (Ega)                                        84

1  credit with Mellon," right?

2  A     Yes.

3  Q     So what he's really wondering here is where is the rest of

4  the money going to come from, right?

5  A     That's one interpretation, yes sir.

6  Q     And you then respond at the bottom of the page before

7  that, and your answer is, the very bottom one, "Brian, I don't

8  want to bring up the bank lines at this time because they are

9  all up for renewal.  I don't know what the renewing terms will

10 be or even if they will be renewed given the current banking

11 environment.  We are going to have to depend upon our internal

12 generation of cash over the next quarter to fund this but that

13 should not be a problem."  Correct?

14 A     Yes, sir.

15 Q     That's what you told him should go in that letter, isn't

16 it.

17        Are you going to answer that?

18 A     Excuse me?  I don't understand the question.

19 Q     He's asking what to put in the letter and you tell him,

20 our internal generation of cash, right?

21 A     He's not asking me what to put in a letter.  He was

22 suggesting something for me to put in a letter, and I'm telling

23 him that I did not want to put that in a letter because of the

24 unstable banking environment.

25 Q     Right.  And instead he should put, or somebody should put,

Preve - Cross (Ega)                                     85

1    our internal generation of cash.  Right?

2    A    I'm telling him that's what we're going to have to depend

3    upon to fund out the rest of the acquisition.

4    Q    You also tell him it shouldn't be a problem.

5    A    Excuse me?

6    Q    You also tell him it shouldn't be a problem.

7    A    Yes, sir.

8    Q    Now October rolls around.  You saw a lot of e-mails this

9    morning from Mr. Bekkedam basically asking about how is George

10   going to come up with more money, correct?  Remember those?  It

11   wasn't that long ago.

12   A    I'm 72 so.  I saw a lot of e-mails this morning.

13   Q    Okay, well we can look at them, it's not a big deal.  if

14   we could go to 110.  The Government covered these with you this

15   morning talking about these, ideas I guess is the best way to

16   describe them, for ways that Mr. Levin could fund his

17   subscription, correct?

18   A    Yes, sir.

19   Q    And you would agree with me, sir, that Brian Hartline is

20   not on any of these e-mails, is he?

21   A    I do not see him on these two e-mails, sir.

22   Q    Okay, well let's go to 101.  He's not on that one either,

23   is he.

24   A    No, sir.

25   Q    How about 111?  Not on that one, is he.

Preve - Cross (Ega)                                        86

1    A     No, sir.

2    Q     And 114?

3    A     No, sir.

4    Q     Now -- and Your Honor, if this is a good time to break,

5    I'll be a little longer, not too much, about 15 minutes or so.

6              THE COURT:  Ladies and gentlemen, what's your

7    pleasure?  All right.  Thank you.  A little bit longer you

8    said, counsel?

9              MR. EGAN:  Fifteen at the most.

10             THE COURT:  All right.

11   BY MR. EGAN:

12   Q     If we could go to Government's Exhibit 124, and I believe

13   this was admitted; you were shown it this morning.  So now we

14   all know Halloween comes, there's no candy for George Levin, a

15   problem with Banyon, right?  Correct?

16   A     Could you repeat that, sir?

17   Q     Halloween of 2009 Banyon runs into a problem and Mr. Levin

18   now has financial issues, correct?

19   A     Yes, sir.

20   Q     But he's not broke, is he.

21   A     From a cash perspective, yes sir, he is.

22   Q     Okay, but he still owns two airplanes, correct?  Right?

23   A     Yes, I believe some of those were leveraged, but yes.

24   Q     He still owns an 80-foot boat.

25   A     Yes, sir.

Preve - Cross (Ega)                                    87

1    Q    He's got other bank accounts.

2    A    He had no cash, sir.

3    Q    He's got other bank accounts.

4    A    He had bank accounts but there's no cash in them.

5    Q    Got it.  He also owned a house in Devon, correct?

6    A    That was mortgaged, yes sir.

7    Q    Well we was that.  It was mortgaged for 1 million and

8    worth 4.5 at least, correct?

9    A    Well that's what he had put in the house.  That doesn't

10   mean that he could get that out of it, yes sir.  It's real

11   estate in a bad real estate market.

12   Q    And he also owned the Madison House.

13   A    Yes, sir.

14   Q    Now Mr. Ignall asked this morning if he ever gave a

15   security interest in any of his property to the bank.  Do you

16   recall that?

17   A    Yes, sir.

18   Q    You're not aware that he gave a security interest in the

19   Madison House to the bank in the spring of 2010?

20   A    No, sir.  I wasn't aware that that was consummated.  I

21   know there were discussions.

22   Q    So that might have happened after you left his employment.

23   A    It could well have, yes sir.

24   Q    Okay.  But you do know, based on this e-mail, that in

25   November there was talk about using the property in Devon to

Preve - Cross (Ega)                                    88

1    collateralize the loan, correct?

2    A    Yes, sir.

3    Q    And Mr. Levin actually wanted that to happen, correct?

4    A    I assume or else we wouldn't be discussing it, sir.

5    Q    Right.  And the reason he wanted it to happen was because

6    if the collateral was received, then the loan would become

7    cheaper, correct?

8    A    And the maturity would be extended, yes sir.

9    Q    And that's because the original loan being un-

10   collateralized was at a higher rate than it would have been if

11   it was collateralized, correct?

12   A    I'm not sure that that would be the case, but if Mr. Levin

13   is offering additional security, he could definitely be in a

14   position to negotiate a better rate.

15   Q    And so he's still trying to negotiate a better rate with

16   the bank, correct?

17   A    Yes, sir.

18   Q    And he's not saying, I've got nothing, I'm flat broke, I'm

19   out of here, right?

20   A    He is telling them that he has no money.

21   Q    Okay.  You were a party to this discussion?

22   A    Yes, sir.

23   Q    Okay.  But you would agree with me that he tried to post

24   this property, correct?

25   A    Yes.

Preve - Cross (Ega)                        89

1    Q    And there were even papers that went back and forth about

2    possibly posting this property, correct?

3    A    I'm sure there were, sir.

4    Q    And he continued to pay the loan through, past the point

5    where you left his employ, correct?

6    A    I don't recall what the status -- I know that he missed a

7    few of the monthly payments, yes sir.

8    Q    He continued to pay it past April of 2010.  You're not

9    aware of that?

10   A    I know that he was past due on a couple of the payments.

11   I'm not sure that -- maybe they were brought up to date but I'm

12   not aware of that.

13   Q    You weren't involved at that point.

14   A    No, no sir.

15   Q    Sir, you talked when you first took the stand about the

16   fact that you are presently awaiting sentencing, or waiting,

17   going to serve a sentence basically, correct?

18   A    Can you repeat that?

19   Q    Yeah.  It was a bad question.  You're going to go to jail

20   soon, right?

21   A    Yes, sir.

22   Q    And there is a rule called Rule 35 that allows a judge to

23   reduce the amount of time you have to go to jail, correct?

24   A    Yes, sir.

25   Q    And the only way you can get that Rule 35 is if the

Preve - Cross (Ega)                                    90

1    Government chooses to file one on your behalf, right?

2    A    Yes, sir.

3    Q    And in order to receive that, you need to cooperate as

4    much as possible with the Government, correct?

5    A    I agreed to cooperate with the Government.

6    Q    And you're not doing it because you feel like it.  You're

7    doing it in the hopes you'll get a shorter sentence.

8    A    Well that's not entirely true.  I agreed in my acceptance

9    of responsibility to cooperate with everyone, not just the

10   Government, and I have spent thousands of hours cooperating

11   with everybody, defendants and plaintiffs alike, regulatory

12   people, prosecutors, trustees.  I have cooperated on every

13   single level.  I've never refused a single question.

14   Q    You never met with me, did you sir?

15   A    I talked to somebody from your law firm.

16   Q    You never met with me, did you sir?

17   A    No, I never met with you, sir.

18   Q    But you met with them a whole lot it seems.

19   A    I believe I met with the Government side three times prior

20   to last week, yes.

21   Q    And you would agree with me that you're trying to do the

22   best job you can of cooperating, correct?

23   A    I'm trying to cooperate, yes sir.

24   Q    And do the best job you can.

25   A    Yes, sir.

Preve - Cross (Ega)                    91

1   Q     Nothing wrong with that.  And that best job you can do in

2   cooperating is basically what you've said here in court,

3   correct?

4   A     My best job at cooperating is telling the truth, sir.

5   Q     And the truth is what you -- strike that.  In light of

6   your agreement and in light of your decision to assist the

7   Government, you've come in here to this Court and you have

8   provided evidence as part of your cooperation deal, correct?

9   A     Yes, sir.

10  Q     And all the evidence that could provide about Brian

11  Hartline you've provided, correct?

12  A     I haven't provided evidence.  I'm just giving testimony as

13  a fact witness, sir.

14  Q     All I'm trying to get to, sir, is this is all you've got,

15  right?

16  A     Yes, sir.

17            MR. EGAN:  I have no further questions, Your Honor.

18            THE COURT:  All right.  We'll recess for lunch at

19  this time.  It is now 12:30.  We'll reconvene at 1:40 this

20  afternoon, 1:40 this afternoon.  Thank you.

21            THE DEPUTY:  All rise.

22            (The jurors exit the courtroom.)

23            THE COURT:  All right.  Thank you.  1:40 this

24  afternoon.

25            MR. EGAN:  Your Honor?

1        THE COURT:  Yes, sir.

2        MR. EGAN:  I'm going to hand something up.  We don't

3   need to address it this afternoon, but at some point by

4   tomorrow morning if we could.  I've provided it to the opposing

5   counsel and to the co-defendants.  It's a charge that I'm going

6   to ask having to do with separate counts that Your Honor give

7   at some point during the course of trial.

8        THE COURT:  All right.  Thank you very much.  All

9   right, we're at recess.  Thank you.

10            (OFF THE RECORD; LUNCH RECESS)

11       THE COURT:  All right.  Everybody ready to go?  Why

12  don't you have a seat.

13       THE DEPUTY:  All rise.

14       (The jurors enter the courtroom.)

15       THE COURT:  Good afternoon.  You may be seated. Mr.

16  Egan, you may continue.

17       MR. EGAN:  I've completed my cross, Your Honor.

18       THE COURT:  You did?  All right, fine.

19       MR. DUNCAN:  May I proceed, Your Honor?

20       THE COURT:  Yes, sir.

21       MR. DUNCAN:  Thank you, Your Honor.

22                    CROSS-EXAMINATION

23  BY MR. DUNCAN:

24  Q    Good afternoon, Mr. Preve.

25  A    Good afternoon.

1    Q    Mr. Preve, you and I have never met, have we?

2    A    I do not believe so, sir.

3    Q    Sir, you first met Mr. Levin back in the 1970's when he

4    was a customer at a bank you were working at, correct?

5    A    Yes, sir.

6    Q    And you got to know Mr. Levin very well at that time?

7    A    Fairly well, he was a good customer.

8    Q    You even understood way back then that as a businessman he

9    was always looking to leverage his money and get loans whenever

10   he could to make his investments, correct?

11   A    On many occasions, yes sir.

12   Q    You knew Mr. Levin to be a man of honor, correct?

13   A    Yes, sir.

14   Q    And he was someone who honored his contracts, correct?

15   A    As far as I know, sir.

16   Q    And you would know, wouldn't you, sir?

17   A    Well he was a customer of the bank and he always honored

18   what he did with our bank.

19   Q    And in the 25 or so, 30 years you knew him, you always

20   knew him to be a man of honor who honored his contracts,

21   correct?

22   A    He liked to renegotiate things frequently.

23   Q    But then that would be still a contract, correct?

24   A    It was still a contract, yes sir.

25   Q    You also knew that he was a man who liked to get loans,

1    correct?

2    A    Yes, sir.

3    Q    And he, as far as you knew, he always paid back his loans,

4    correct?

5    A    As far as I remember, yes.

6    Q    That's because he had undertaken an obligation and he

7    wanted to honor his obligation, correct?

8    A    When he had a legal obligation, yes sir.

9    Q    Sir, you first met my client, Mr. Barry Bekkedam, back in

10   approximately February of 2009; is that correct?

11   A    Yes, sir.

12   Q    And your first meeting was for about 30 seconds?

13   A    No, I think it was a little longer than that.  I had to do

14   the Banyon review at that time for him so it was probably about

15   30 minutes.

16   Q    That was your second meeting.  You originally met with him

17   very briefly when Mr. Levin just introduced him to you,

18   correct?

19   A    I do not recall that.

20   Q    Sir, do you recall testifying in a matter about the events

21   that we're talking about here today back in January 19, 2012?

22   A    I could well have.  I don't recall it specifically.

23   Q    Okay.  If we could show for the witness Defense Exhibit

24   1342, and if I may approach, Your Honor?

25                 THE COURT:  Yes, sir.

Preve - Cross (Dun)                                    95

1          MR. DUNCAN:  I've provided a copy to Mr. Egan and Mr.
2     Ignall.
3          THE COURT:  All right.
4     BY MR. DUNCAN:
5     Q    It will be easier for you, Mr. Preve, if you would, just
6     take a look at that for a moment and just tell us if that
7     refreshes your recollection as to your testifying in a matter
8     here related somewhat to this in January of 2012.  And my
9     question is just simply, does that refresh your recollection
10    about you testifying?
11    A    I don't recall my testimony in something called Ballamor
12    Capital Management, but I mean it's an official record, I must
13    have done it.  I've given a lot of testimony and a lot of
14    depositions so.
15    Q    Sure.  And every time you've testified you've tried to
16    tell the truth, correct?
17    A    Absolutely.
18    Q    So you told these people when you first met with them, you
19    told them that you had met with Mr. Bekkedam and it was
20    probably for 30 seconds and then Mr. Levin and he went on to
21    another meeting.  Look at page 9, sir.  Look at line 6
22    specifically.
23
24    A    Yes, sir, I see that.
25    Q    Okay, so your first meeting with them was a very casual

1    meeting.  Hi, how are you, introduced, and then he and Mr.

2    Levin, Mr. Bekkedam and Mr. Levin went on to another meeting,

3    correct?

4    A    That is what it says.

5    Q    And that's what you testified to, correct

6    A    Yes.  I just don't recollect it.

7    Q    Oh, I understand.  No, it was what, four years ago now,

8    more than four years ago?

9    A    Yes.

10   Q    Okay.  So you then talk about you did then have a longer

11   subsequent meeting with Mr. Bekkedam, correct?

12   A    I did have a longer meeting with Mr. Bekkedam.

13   Q    And that was for the purpose of explaining to Mr. Bekkedam

14   about the Banyon Income Fund, or the Banyon entities, correct?

15   A    Yes.

16   Q    And that meeting lasted for about 30 to 35 minutes, as you

17   previously testified, right?

18   A    Yes, sir.

19   Q    You knew at that time that Mr. Levin had funds coming into

20   the Banyon Income, coming from hedge funds up in New York,

21   right?

22   A    He had lines of credit with three hedge funds, yes sir.

23   Q    And Mr. Levin used to describe them somewhat derisively as

24   the hotel hedge funds, correct?

25   A    Hotel?

1    Q     Hotel hedge funds, a very expensive place you'd have to go

2    to get your money.

3    A     I hadn't heard that expression.  He described them with

4    very graphic language though.

5    Q     Okay, well we don't need to go there right now.  We'll

6    just stick with hotel for right now.  So he didn't like the

7    hedge funds up in New York, did he.

8    A     That is correct.

9    Q     And he was looking to replace the hedge funds, correct?

10   A     Yes, sir.

11   Q     And he looked at Mr. Bekkedam as a potential source to

12   replace the hedge funds, correct?

13   A     Yes, sir.

14   Q     And that was the purpose for Mr. Levin -- I'm sorry, I

15   think I did this wrong.  Levin, or Levin?

16   A     Levin.

17   Q     Levin, I'm sorry.  That was the purpose for Mr. Levin and

18   Mr. Bekkedam getting together initially, correct?

19   A     That was my understanding, sir.

20   Q     And your role, I think you have testified that you were

21   basically the facilitator or the mechanic, the person who, you

22   know, got the instructions from Mr. Levin and then put his plan

23   into action, correct?

24   A     Yes.

25   Q     And that was the purpose of your first meeting with Mr.

Preve - Cross (Dun)                                    98

1    Bekkedam, to explain to him how the process worked, right?

2    A    Yes, sir.

3    Q    You knew that Mr. Levin was very impressed with Mr.

4    Bekkedam, correct?

5    A    Yes, sir.

6    Q    And the reason he was impressed with Mr. Bekkedam is Mr.

7    Bekkedam seemed to know what he was talking about when he was

8    talking about finances, right?

9         MR. IGNALL:  Your Honor, I object to asking the

10   witness to speculate.

11        THE COURT:  Sustained.

12   BY MR. DUNCAN:

13   Q    Sir, did Mr. Levin ever tell you that?

14   A    Can you repeat the question please?

15   Q    Sure.  Mr. Levin told you that he was impressed with Mr.

16   Bekkedam's knowledge about finance, correct?

17        MR. IGNALL:  I'm going to object.  It sounds like

18   hearsay now.

19        MR. DUNCAN:  I'm not offering it for the proof of the

20   matter asserted, Your Honor, just offering whether he was told

21   it.

22        THE COURT:  Sustained.

23   BY MR. DUNCAN:

24   Q    Sir, you took Mr. Bekkedam up to New York to meet with

25   Standards and Poor, correct?

Preve - Cross (Dun)                                    99

1    A    Mr. Bekkedam volunteered to go to New York to meet with

2    Standard and Poor with some other people, yes.

3    Q    And the purpose of that was to get a better rating for the

4    Banyon funds, correct?

5    A    Yes, sir.

6    Q    And after that meeting you told Mr. Levin about how

7    impressed you were with how Mr. Bekkedam performed at that

8    meeting, correct?

9    A    Yes, sir.

10   Q    And what you were telling him was that Mr. Bekkedam was

11   very good in making these financial presentations, correct?

12   A    He was very good at supporting Banyon's financial

13   presentation.

14   Q    And so a decision was made by Mr. Levin to see if he could

15   get Mr. Bekkedam to raise funds for the Banyon funds, correct?

16   A    Mr. Bekkedam had already convinced Mr. Levin to do that

17   before we went to New York.

18   Q    And that's exactly what Mr. Levin asked Mr. Bekkedam to

19   do, correct?

20   A    I believe Mr. Bekkedam volunteered to raise up to a

21   billion dollars for Mr. Levin's funds, yes.

22   Q    And you understood that's what Mr. Bekkedam was good at,

23   raising money, correct?

24   A    Yes, sir.

25   Q    So one of the things that was done was a prospectus was

1    put together for something called the Banyon Income Fund,

2    correct?

3    A    Yes, sir.

4    Q    That was put together by Mr. Levin's lawyers, correct?

5    A    It was put together by a law firm that Mr. Levin selected

6    and was approved by Mr. Rovin.

7    Q    And Mr. Rovin is Mr. Bekkedam's legal counsel, the general

8    counsel for Ballamor Capital, correct?

9    A    He's the managing director and general counsel, yes sir.

10   Q    The law firm that was chosen was Gerstein Savage, correct?

11   A    Yes, sir.

12   Q    And that prospectus was put together in approximately May

13   of 2009, correct?

14   A    It was supposedly finished on April 30, 2009.

15   Q    I'll give you the day.

16   A    Excuse me?

17   Q    I'll give you the day.  So let's say the end of April.

18   A    Yes.  It was subsequently modified significantly, but

19   still.

20   Q    And it was modified significantly partly on the basis of

21   comments Mr. Rovin had made, Mr. Bekkedam's legal counsel,

22   correct?

23   A    I don't know who had the additions but there were several

24   additions to it, yes.

25   Q    One of the important parts about the Banyon Income Fund is

1     Mr. Levin personally guaranteed the principal funds of every

2     investor in the Banyon Income Fund, correct?

3     A     Ultimately, yes, sir.

4     Q     And that would be a good thing for the investors, right?

5     A     It was an additional layer of security, yes sir.

6     Q     And that was something put in at the request of Mr.

7     Bekkedam and his team, correct?

8     A     Yes, sir.

9     Q     This was all happening in the second quarter of 2009,

10    correct?  This is April 2009.  That's the second quarter of

11    2009, second fiscal quarter.

12    A     Yes, sir.

13    Q     And you testified on direct that Mr. Bekkedam had a number

14    of other deals that he and Mr. Levin were parties to, correct?

15    A     Yes, sir.

16    Q     And these were all very formal deals put together on paper

17    approved by lawyers, correct?

18    A     As far as I recall, yes sir.

19    Q     One of the deals that was put together between Mr.

20    Bekkedam and Mr. Levin was an equity investment of

21    approximately $5 million in Ballamor Capital, correct?

22    A     It was a line of credit to Ballamor Capital secured by

23    some type of membership rights, yes sir.

24    Q     And what -- you refer to it as line of credit, but what it

25    was actually, it was an equity investment by Mr. Levin into

Preve - Cross (Dun)                               102

1    Ballamor Capital for which he was paid dividends, correct?

2    A    That was not my understanding but that could have been the

3    way it evolved, but in fact, it was a facility from which

4    Ballamor or Mr. Bekkedam could draw and repay at any time.

5    Q    Okay.  If you would, could we have Defense Exhibit 1099

6    just for Mr. Preve?  And Mr. Preve, I'm going to show you a

7    hard copy.  If I may approach, Your Honor.

8              THE COURT:  Yes, sir.

9    BY MR. DUNCAN:

10   Q    It's just a little easier for you probably to look at it

11   because it's a long agreement.  Take a moment, take as much

12   time as you need, Mr. Preve, and just tell us, is that this

13   investment vehicle that you're talking about?

14   A    This appears to cover the parties as I recall them that

15   were involved in the credit extension.

16   Q    And it wasn't actually between Mr. Bekkedam and Mr. Levin.

17   It was actually between Banyon Capital and Ballamor Capital

18   Management, correct?

19   A    In the case of the Banyon side, there was no difference

20   between Banyon Capital and Mr. Levin.

21   Q    They were the same entity.

22   A    Yes.

23   Q    Okay.  And Ballamor Capital you understood to be Mr.

24   Bekkedam's company.

25   A    I did understand that, yes sir.

Preve - Cross (Dun)                                    103

1    Q    Mr. Bekkedam had a right through his company to make a

2    call at any time, on Mr. Levin's company, in order to take any

3    part of that $5 million anytime he wanted, correct?

4    A    That's what I understood, yes sir.

5    Q    And in fact, though, Mr. Bekkedam only requested one call

6    ono that of about a million dollars in the third quarter, July

7    of 2009, correct?

8                MR. IGNALL:  Objection.  Relevance.

9                THE COURT:  Counsel?  Relevance?

10               MR. DUNCAN:  It goes to the relationship that, they

11   talk about the relationship between Mr. Bekkedam and Mr. Levin.

12   This is how their relationship was put together.  This is what

13   was extended by Mr. Levin to Mr. Bekkedam.

14               THE COURT:  I'll allow it.

15   BY MR. DUNCAN:

16   Q    You can answer, Mr. Preve.

17   A    Actually I believe the actual call was made right at the

18   end of June of 2009, and I believe there was another request in

19   October but I don't think it was ever funded.

20   Q    And the reason it wasn't funded was because of those

21   problems we heard about, correct?

22   A    Mr. Levin's liquidity issues, yes sir.

23   Q    And it was not unusual for a company like Mr. Bekkedam's

24   to be looking for a way, a facility, a place that they could

25   draw capital, correct?  That's very common for businesses,

1    correct?

2              MR. IGNALL:  Objection.  Relevance.

3              THE COURT:  Sustained.

4    BY MR. DUNCAN:

5    Q    Sir, when you were working for Mr. Levin, you worked with

6    a lot of different companies, correct?

7    A    Levin companies or other companies?

8    Q    Levin companies.

9    A    Yes, sir.

10   Q    And you're aware that a lot of those companies were

11   startup companies, right?

12   A    Some were, yes sir.

13   Q    And startup companies need liquidity, correct?

14   A    They need capital, yes sir.

15   Q    At some point in your relationship with Mr. Levin, he

16   talked to you about investing in a bank, correct?

17   A    Mr. Levin had a skewed sense of the importance of

18   investing in banks, historically.  Many of his early friends

19   were bankers and in the go-go days of commercial banking they

20   made a lot of money and Mr. Levin always thought that he should

21   be able to do the same thing.  I talked him out of it.

22   Q    Okay.  But you would agree that, you previously in fact

23   testified that Mr. Levin was always talking about investing in

24   a bank, correct?

25   A    Yes, sir.

1    Q    And you were always dead set against it, correct?

2    A    Yes, sir.

3    Q    But at some point in the spring of 2009 Mr. Bekkedam and

4    Mr. Levin, Mr. Bekkedam talked to Mr. Levin about that thing

5    Mr. Levin was very interested in, which was investing in a

6    bank, correct?

7    A    Yes, sir.

8    Q    And Mr. Bekkedam discussed with Mr. Levin about raising

9    capital for a bank called Nova Bank, right?

10   A    As it related to inquiring an interest in a Florida bank

11   by Mr. Levin, yes sir.

12   Q    Mr. Levin was very interested in acquiring an interest in

13   an Florida bank, wasn't he.

14   A    Yes, sir.

15   Q    And the reason for that was that he saw all of these

16   deposits sitting over in TD Bank that were a part of the

17   settlement funds and he wanted, Mr. Levin wanted to get control

18   over those funds, correct?

19   A    He wanted to be able to get the benefit of those funds.

20   He didn't need control over the funds.  He wanted the earning

21   capabilities that those funds represented.

22   Q    So this was an idea that Mr. Levin had, correct?

23   A    Yes, sir.

24   Q    This wasn't an idea Mr. Bekkedam came to him with,

25   correct?

Preve - Cross (Dun)                                   106

1   A    No.  The idea that Mr. Levin had was communicated to Mr.

2   Bekkedam and Mr. Bekkedam came up with the idea of Nova Bank

3   acquiring an interest in a Florida bank.

4   Q    And one of those Florida banks was the Flagler Bank in

5   Tampa, correct?

6   A    No.  I believe it was the Flagler Bank in Palm Beach

7   County.

8   Q    Okay, my geography is not as good but I'll take your word

9   for it.  You live there, right?

10  A    Yes, sir.

11  Q    Okay, so let's go with what you say.  So Mr. Bekkedam and

12  Mr. Levin had these discussions, but you got most of your

13  information about what Mr. Bekkedam said from Mr. Levin,

14  correct?

15  A    I believe most of the discussion that I had with -- I mean

16  most of my information about the bank investment came directly

17  from Mr. Bekkedam.

18  Q    The investment in the Nova Bank.

19  A    No, the investment in the Florida bank.

20  Q    The investment in the Florida bank, through Nova.

21  A    Ultimately through Nova.

22  Q    You understood, as someone who knows something about

23  banking, it would be easier for a bank to acquire another bank

24  than for a private individual, correct?

25  A    No, I did not understand that.  I was not up to date with

1    the bank acquisition rules.  They've changed substantially in

2    the last 30 years.

3    Q    Okay.  You testified on direct examination that Mr.

4    Bekkedam, someone from Nova, Mr. Larry Rovin, all talked to you

5    about June 30th being a deadline for TARP, correct?

6    A    About a TARP application, yes sir.

7    Q    About a TARP application but not a TARP deadline?

8    A    As I understood it, it was a deadline to get an

9    application in.

10   Q    Okay.  But you know that Nova had actually applied for

11   TARP back in October of 2008, didn't you?

12   A    No I did not.

13   Q    Okay.  Could we see Government's Exhibit 75 please?  Mr.

14   Preve, I'll represent to you that Government's 75 which is in

15   evidence -- can we show it to the jury too please, with the

16   court's permission?  It's in evidence.

17          This is a letter from the Treasury Department to

18   Jeffrey Hanuscin, who was the CFO at Nova Bank, related to the

19   TARP application that Nova had put in.  Do you understand that?

20          MR. IGNALL:  Your Honor, I'm going to object.

21   There's been no foundation laid for this witness to comment on

22   this document.

23          MR. DUNCAN:  I'm not asking him to comment on it yet,

24   Your Honor.  I'm just telling him that it's a document that

25   relates to the Nova application.  He's testified that he

Preve - Cross (Dun)                              108

1    thought the Nova application had a deadline of June 30th.  The

2    purpose of this is to show that that's not correct.  The

3    application was actually in in October of 2008.

4                THE COURT:  Do you so stipulate, counsel?

5                MR. IGNALL:  We'll stipulate to when the application

6    was.

7                MR. DUNCAN:  Thank you.

8    BY MR. DUNCAN:

9    Q    Okay.  So if you thought that there was a deadline for a

10   TARP application on June 30th, based on the stipulation we just

11   heard you'd be wrong because it had already been in, put in in

12   October of 2008, correct

13   A    I don't know that but that letter there says 2009.

14   Q    Right.  That's the letter, that's the acceptance letter.

15   But Mr. Ignall and I have just stipulated, we've agreed that

16   the application was in 2008.  So if you thought it was in 2009,

17   you'd be wrong, right?

18               MR. IGNALL:  Objection.  It's argumentative.

19               THE COURT:  Sustained.

20   BY MR. DUNCAN:

21   Q    Sir, when you were talking to the Government agency, you

22   knew that this was a case about TARP, correct?

23   A    When I was talking to a Government agent.

24   Q    Right.  The Government agents in this case.  You knew this

25   was a TARP case, right?

Preve - Cross (Dun)                                    109

1    A    No, I did not know it was a TARP case.

2    Q    You did not know that.

3    A    No, sir.

4    Q    Okay.  Sir, --

5    A    I don't know what this case is about, to tell you the

6    truth.  I'm a fact witness.  I did not investigate anything on

7    this case.

8    Q    And I appreciate that, Mr. Preve.  Thank you.  You had

9    previously testified that the June 30th deadline that you knew

10   about was related to the change in control application that the

11   bank was filing, correct?

12   A    I just knew what Mr. Bekkedam, Mr. Rovin and Mr. Hartline

13   said about needing to have the bank capitalized by June 30,

14   2009.

15   Q    Well sir, you've testified previously that you didn't have

16   any specific recollection of why June 30th was an important

17   date.  Isn't that correct?

18   A    I'll repeat, and I am just repeating what was told to me

19   about the June 30, 2009 deadline.

20   Q    Well sir, you were asked back in 2012 whether or not you

21   knew anything specific about what June 30th meant to anybody

22   and you said specifically that you didn't have any

23   understanding of June 30th having any importance.  Isn't that

24   correct?

25   A    I don't recall that, sir.

1    Q     Okay.  Would you look at page 62 of your testimony.  And I

2    direct you specifically to page 62, lines 10 through 15.

3    A     I say again I don't have a specific recollection of why --

4    Q     Okay.  You don't have to read it.  I'm just ask --

5    A     -- the June 30th date was important.  I don't have any

6    specific recollection.

7    Q     And you testified to this four years ago, a time closer in

8    time to the events of 2009 than today, correct?

9    A     Yes.  I will point out again it says that I think it had

10   something to do with the TARP application and that's what I'm

11   saying now, again.

12   Q     Okay, but you didn't have any specific recollection of it

13   though back in 2012, correct?

14   A     Should I read that again?  Because it's very clear what I

15   meant.

16   Q     Certainly.  You said "I think it may have had something to

17   do with the TARP application again, but I really don't have --

18   it may be in the files, but I don't have a specific

19   recollection of somebody saying why June 30th was critical,"

20   correct?

21   A     I don't have a specific recollection four years ago.

22   Q     And you have a specific recollection today?

23   A     I just -- I've been shown a lot of e-mails and I'm sure

24   there's something about TARP in one of those e-mails, can

25   almost guarantee it.

Preve - Cross (Dun)                                    111

1    Q    Do you know which e-mails that was?

2    A    I don't have a specific recollection of a specific e-mail

3    but I've certainly read quite a few e-mails.

4    Q    So at the time that you talked about this back in 2012 you

5    didn't have any deal with the Government, did you.

6    A    Deal with the Government.

7    Q    Correct.  You've made a deal with the Government to

8    testify in order to see if you could get your sentence reduced,

9    correct?

10   A    I've had -- my agreement with the Government is to tell

11   the truth and not to implicate any innocent people.

12   Q    And your deal with the Government happened in 2015,

13   correct?

14   A    Actually, I believe the plea agreement was 2014.

15   Q    Okay.  So it was two years after your original testimony

16   that we just went through where you had no specific

17   recollection, correct?

18   A    Yes.

19   Q    Sir, you've previously testified that you always

20   understood that Mr. Levin was going to invest the $18 million

21   in the holding company of Nova, correct?

22   A    I testified that Mr. Levin was responsible -- did a -- he

23   signed a subscription agreement calling for an $18 million

24   investment in Nova financials, yes.

25   Q    And you believed that those funds would be available

1   because there were some funds related to the Banyon funds that

2   were going to become free in approximately October of 2009,

3   correct?

4   A    Yes, sir.

5   Q    And you believed that that's where all the money, all $18

6   million in order to meet Mr. Levin's subscription agreement,

7   that's where the money was going to come from, correct?

8   A    No, sir.

9   Q    Sir, did you previously testify that you always considered

10  that he was going to make this investment from the Banyon

11  funds?

12  A    The remaining amount of the investment but part of the

13  investment had obviously been covered by a loan and part of the

14  investment Mr. Bekkedam had committed other resources to fund.

15  So to the extent that anything had to be repaid to cover that

16  investment, yes, that would have come from the funds to be

17  released by the Banyon trust funds.

18  Q    So you would have been able to take $18 million from the

19  Banyon Trust Fund, pay off the $5 million loan to Nova Bank,

20  and invest the other 13 million into Nova Bank, correct?

21  A    Yes, sir.

22  Q    Mr. Levin would have been able to.  And that was what the

23  plan was, correct?

24  A    Yes, sir.

25  Q    The problem you had, in addition to having the funds

1    issues, you were also waiting for the Federal Reserve to make

2    their decision as to whether or not the change in control

3    application would be approved, correct?

4    A    Can you repeat the question, please?

5    Q    Sure.  You know what the fed is, right?

6    A    Yes, sir.

7    Q    The fed is the Federal Reserve, correct?

8    A    Yes, sir.

9    Q    And the Federal Reserve had a change in control

10   application in from Mr. Levin in order for him to make his

11   investment in Nova Bank, correct?

12   A    Yes, sir.

13   Q    And you knew that, you believed that the fed had to

14   approve that application before Mr. Bekkedam -- I'm sorry,

15   before Mr. Levin could invest his money, correct?

16   A    I knew that the investment had to be approved by the

17   Federal Reserve.  I don't know about before or after any funds

18   could have been put up in escrow but I knew they had to approve

19   the investment.

20   Q    Okay.  The reason Mr. Levin didn't write a check to Nova

21   to just pay for it is he had all of his liquidity tied up in

22   the Banyon entities, correct?

23   A    Exactly, sir.

24   Q    You were asked, during your questioning earlier this

25   morning you were asked about a letter that was written by you

Preve - Cross (Dun)                                 114

1    to both the Federal Reserve and to Donna Metcalfe at the

2    Pennsylvania Department of Banking, correct?

3    A    Yes, sir.

4    Q    And one of the things you said about that letter was that

5    you put in there you made some modifications based on what Mt.

6    Bekkedam had told you, correct?

7    A    That is what I said in an e-mail, yes sir.

8    Q    And that's true, correct

9    A    As far as I recall it is, yes sir.

10   Q    Sure.  Do you recall specifically what -- you don't recall

11   specifically what Mr. Bekkedam told you, right?

12   A    No I do not.

13   Q    Okay.  Could we show, just for the witness, Defense

14   Exhibit 1172.  So if you would, if you'd look down Defense

15   Exhibit 1172 is an e-mail from Mr. Bekkedam to George Levin

16   with a copy to Mr. Bekkedam's legal counsel, Mr. Rovin.  It's

17   sent on September 3, 2009, correct?

18   A    Yes, sir.

19   Q    And Mr. Levin forwarded that e-mail to you, correct?

20   A    Can I see the rest of the --

21   Q    Sure.  I'm sorry.  Could you just show the top?  I'm

22   sorry, I wasn't trying to hide it from you, it's just the top

23   e-mail.  So this is Mr. Levin forwarding the e-mail to you,

24   correct?

25   A    Yes, sir.

1  Q    And if you would -- and you got this e-mail, right, from

2  Mr. Levin?

3  A    Yes, sir.

4  Q    Okay.  If we could go now to the second page of this

5  document at the very bottom.  So Mr. Bekkedam told you -- or

6  I'm sorry, told Mr. Levin and then Mr. Levin forwarded it to

7  you.  He said with regards to the letter that you needed to

8  write, what you needed as soon as possible was details about

9  the lawsuits George's company had many years ago, correct

10  A    Yes, sir.

11  Q    And what he wrote to you, he said needed details about the

12  lawsuit George's company was involved in many years ago and his

13  involvement.  The disclosure that we put in the PPM of Banyon

14  Income Fund as well as some other information will be passed on

15  to Brian Hartline to accomplish this request.  It may have to

16  actually be sent to them from Frank.  Do you see that?

17  A    Yes, sir.

18  Q    And what he's talking about there is certain disclosures

19  about that Classic Carriage car problem Mr. Levin had had that

20  was put into the Private Placement Memorandum of the Banyon

21  Income Fund, correct?

22  A    Yes, sir.

23  Q    And so what he's suggesting to you there is you could just

24  go into that legal document, pull out the information, and that

25  will answer the question, correct?

Preve - Cross (Dun)                                              116

1    A     Yes, sir.

2    Q     And the second thing he told you was they asked where the

3    potential money would come from and they asked to see the bank

4    statement if it was coming from cash.  And they asked to see

5    what assets would be liquidated, if needed, from the balance

6    sheet, correct?

7    A     Yes, sir.

8    Q     And that's what you're referring to.  That's all that Mr.

9    Bekkedam told you, right?

10   A     That's all he told me about what, sir?

11   Q     About the modifications you should make to the letter.

12   A     It may have been, yes, I don't recall.  But I just know

13   that he saw the letter and made some changes but I don't know

14   what specifically they were.

15   Q     Well those two things we just said, those were two

16   suggestions he had for the letter, correct?

17   A     I'm sure he touched upon both of those, yes sir.

18   Q     And there's nothing wrong about either of those

19   statements, is there?

20            MR. IGNALL:  Objection.  I'm not sure what wrong

21   means.

22            THE COURT:  Sustained.

23   BY MR. DUNCAN:

24   Q     Well is there anything factually incorrect in either of

25   those statements?

1   A    Well the disclosure in the PPM would not have satisfied

2   the fed.  I believe that we had to have the attorney, George's

3   litigator, do a complete summary of the Classic Motor

4   Carriages.  But basically those are the two issues that the fed

5   wanted answered, so you know, they touch on the two issues.

6   I'm not saying that his response would have sufficed with the

7   fed.

8   Q    But there's nothing incorrect, there's nothing factually

9   false in anything he told you, correct?

10  A    Not that I see in those two statements, sir.

11  Q    And then you've actually had to get Mr. Levin's own lawyer

12  on board in order to satisfy the regulators, correct?

13  A    Yes, sir.

14  Q    That wasn't done by Mr. Bekkedam, correct?

15  A    No, sir.

16  Q    We also saw some e-mails this morning in late October of

17  2009.  I know you said you saw a lot of e-mails, but those are

18  the e-mails where Mr. Bekkedam is imploring you to get George

19  to make some investment in Nova Bank, correct?

20  A    Yes, sir.

21  Q    And the reason he was doing that was to -- because Mr.

22  Levin had a subscription agreement and he had agreed to make

23  investments in Nova Bank, correct?

24  A    Yes, sir.

25  Q    He was under an obligation to do so.

Preve - Cross (Dun)                                118

1   A    Is that a question?

2   Q    Yes.  He was under an obligation to do so, correct?

3   A    He had a subscription agreement, yes sir.

4   Q    The funds that you were waiting for were those funds that

5   still weren't coming from the settlement funds, correct?

6   A    Yes, sir.

7   Q    So Mr. Levin told that to Mr. Bekkedam, that the funds

8   still weren't available, correct?

9   A    I'm not aware of that, sir.

10  Q    The funds weren't available though, were they.

11  A    The amount of money being requested could have been gotten

12  from the funds, and in fact I had requested them.

13  Q    You actually requested that the funds release the

14  sufficient amount of money, the 3 million or 5 million in order

15  to meet the commitment, or partially meet the commitment,

16  correct?

17  A    The 3 million, yes sir.

18  Q    So you expected that 3 million to be invested into Nova,

19  correct?

20  A    Yes, sir.

21  Q    Sir, are you familiar with the term an accredited

22  investor?

23  A    Excuse me?

24  Q    Are you familiar with the term an accredited investor?

25  A    Yes, sir.

Preve - Cross (Dun)                                    119

1   Q     An accredited investor is basically a wealthy person who's

2   used to investing, correct?

3   A     Yes, sir.

4   Q     And you agree that Mr. Levin certainly qualified as that,

5   correct?

6   A     Yes, sir.

7   Q     And it was his intention to make an investment into Nova,

8   correct?

9   A     He had agreed to that with the subscription agreement, yes

10  sir.

11  Q     And so that's going to be an investment by Mr. Levin into

12  Nova, correct?

13  A     Yes, sir.

14  Q     You were not aware that the 5 million, the original 5

15  million that was lent to Mr. Levin, that had also already been

16  invested in the holding company.  You weren't aware of that,

17  were you.

18  A     Obviously I knew that the funds had been transferred to an

19  escrow account.  What happened after that I was not aware.

20  Q     But you know now that subsequently there was an actual

21  purchase of stock with that 5 million, correct?

22  A     Actually I was told that but I've never seen the stock

23  certificate so that would usually evidence the finalization of

24  a transaction but I never did see it.

25  Q     You never saw the stock certificates but you don't have

Preve - Cross (Dun)                                120

1    any reason to disbelieve that it actually occurred, right?

2    A    No, I do not.

3    Q    Okay.  Sir, do you know an individual by the name of

4    Douglas Von Allmen?

5    A    Yes I do.

6    Q    And Mr. Von Allmen was someone who also invested in the

7    Banyon Income Fund, correct?

8    A    Yes, sir.

9    Q    However, Mr. Von Allmen was not actually a client of Mr.

10   Bekkedam's, was he.

11   A    I know that it had been, it was a new relationship that

12   centered around Mr. Von Allmen's investment in Banyon Income

13   Fund.  I don't know how familiar each other were with each

14   other.  I don't recall.

15   Q    Mr. Rothstein was also a friend of Mr. Von Allmen's,

16   correct?

17   A    I believe so, sir.

18   Q    And it actually was Mr. Rothstein who approached Mr. Von

19   Allmen about the opportunity of investing in the Banyon Income

20   Fund, correct?

21            MR. IGNALL:  Objection.  Beyond the scope and

22   relevance.

23            THE COURT:  Sustained.

24   BY MR. DUNCAN:

25   Q    The Banyon Income Fund was part Ballamor Capital people

Preve - Cross (Dun)                                    121

1    and part somebody else, correct?

2    A    Are you talking about the equity partners?

3    Q    Yes.

4    A    I thought the equity partners were all Ballamor Capital

5    investors.

6    Q    Douglas Von Allmen was one of those equity partners,

7    correct?

8    A    Yes, sir.

9    Q    You don't know what his status was.  You just don't know.

10   A    I assume that he was signed up by Barry when he made the

11   investment.

12   Q    But you don't know.

13   A    I do not know for a fact.

14   Q    Mr. Preve, you were originally sentenced for that

15   conspiracy to commit wire fraud with relation to these

16   activities back in February of 2015, correct?

17   A    Yes, sir.

18   Q    And you were ordered to report to prison on approximately

19   June 22, 2015, correct?

20   A    I don't recall the date but approximately, yes sir.

21   Q    And you knew at that time your lawyer and the Government

22   lawyers asked that you be allowed to remain free in order for

23   you to testify, correct?

24

25   A    I don't think so.  That was the second extension, but the

1    first extension was based on medical issues I believe.

2    Q     Okay.  So if I have a document that shows the Government

3    agreed to that extension, you wouldn't disagree with me, would

4    you?

5    A     Oh no, the Government agreed to every extension, sir.

6    Q     Okay.  So then you were ordered to report to prison in

7    January of 2016, correct?

8    A     Yes, sir.

9    Q     And again the Government came in and asked that you stay

10   out of prison for a little bit longer so that you could testify

11   in this matter, correct

12   A     One of the reasons, yes sir.

13   Q     And you now have a new reporting date for sometime after

14   this, correct?

15   A     Yes, sir.

16   Q     So based on this you've stayed out of jail for almost a

17   year, a little bit more than a year, correct?

18   A     Yes, sir.

19              MR. DUNCAN:  Your Honor, may I have a moment, please?

20              THE COURT:  Surely.

21              MR. DUNCAN:  Thank you, Your Honor, I appreciate the

22   court's indulgence.  I have no further questions for this

23   witness.

24                        REDIRECT EXAMINATION

25   BY MR. IGNALL:

1    Q     Will you bring up Exhibit 63.  And scroll down.  Let's go

2    to the next page.  I'm sorry, let's look at Exhibit 64.  It

3    should be the 19th page of this.  Do you recall what this was,

4    Mr. Preve?

5    A     Yes, sir.

6    Q     And what was this?

7    A     This is a balance sheet, a statement of condition of Mr.

8    and Mrs. Levin as of March 31, 2009 assets and liabilities and

9    net worth.

10   Q     Do you see where it says Note: table and other loans $5

11   million?

12   A     Yes, sir.

13   Q     Do you know whether that was the loan from Nova Bank we

14   talked about?

15   A     No, sir, it was not.

16   Q     And how do you know that?

17   A     Because the Nova Bank loan occurred on June 30, 2009 and

18   this statement is at March 31, 2009.

19   Q     If we could turn to Exhibit 15.  And if we could publish

20   this to the jury.

21              THE COURT:  Any objection?

22              MR. EGAN:  No, Your Honor.

23              MR. ENGLE:  No, Your Honor.

24              THE COURT:  All right.

25   BY MR. IGNALL:

1    Q    Do you see the discussion here about getting information

2    to Nova Bank?

3    A    Yes, sir.

4    Q    Did this have anything to do with the loan from Nova Bank

5    that we talked about?

6    A    No, sir.

7    Q    How do you know that?

8    A    Because the subject is selling of bonds and assumption of

9    Nova debt.  On April 3rd there wasn't any consideration of a

10   loan from Nova Bank for any other purpose at this time.

11   Q    I'd like to turn you to Government's Exhibit 301 that I

12   believe Mr. Egan asked you about.  If we could go to, I believe

13   it's the last page of this document.  Page 24, I'm sorry.  Are

14   you familiar with what Mr. Levin's signature looks like?

15   A    Yes, sir.

16   Q    And if we look at the bottom of this document, do you see

17   a signature there?

18   A    Yes, sir.

19   Q    Does that look to you like Mr. Levin's signature?

20   A    As I testified to earlier, that is not his signature.

21   Q    I believe, it looks like Exhibit 40.  I'd like to move

22   this into evidence now.

23             MR. ENGLE:  No objection.

24             THE COURT:  Admitted.

25             MR. IGNALL:  May I publish it to the jury?

1        THE COURT:  Yes, sir.

2   BY MR. IGNALL:

3   Q    If we could look at the second page, I believe Mr. Egan

4   asked you a question too about that.  Let's look at the middle

5   of the page.  Do you see an e-mail there from Mr. Rovin?

6   A    Yes, sir.

7   Q    And what's the date at the top of that e-mail?

8   A    6-29 2009 at 2:38 p.m.

9   Q    And what is Mr. Rovin seeking in that e-mail on June 29th?

10  A    He wants a reconciliation between the tax returns and the

11  financial statements, and he wants a cash flow for Mr. Levin.

12  Q    And what date did this loan get funded to Mr. Levin?

13  A    June 30, 2009.

14  Q    Can you bring up Government's Exhibit 64.  Do you have any

15  understanding as to what the amount of money Mr. Levin would

16  have to invest in order to trigger a need for approval from a

17  bank regulator?

18  A    I don't think I know that, sir.

19  Q    In the questions, if we could go to the next page.

20  Actually I take that back.  I'm confused.  I'd like to go to 63

21  please.  If we look at question d, can you read what it says

22  there about the source and amount of funds?

23  A    "State the source and amount of funds or other

24  consideration used or to be used in making the purchases and if

25  any of the purchase price or proposed purchase price is

1    represented by funds or other consideration borrowed or

2    otherwise obtained for the purpose of acquiring, holding or

3    trading of shares, give a description of the transaction and

4    the names of the parties thereto."

5    Q    Does this say anything about only looking for funds that

6    were going to be used prospectively as opposed to those that

7    had already been used?

8              MR. EGAN:  Objection.  Leading.

9              THE COURT:  Overruled.

10             THE WITNESS:  No, sir.

11   BY MR. IGNALL:

12   Q    Do you know whether the State of Pennsylvania and the

13   Federal Reserve ever approved Mr. Levin to be an owner of

14   whatever percentage?

15   A    Yes, sir, they did.

16   Q    And Mr. Egan asked you a number of questions about the e-

17   mails you had where you were hoping that wouldn't happen.

18   Remember those e-mails?

19   A    Yes, sir.

20   Q    But indeed, did the state approve it?

21   A    Yes, sir.

22   Q    And did Mr. Levin invest any more?

23   A    No, sir.

24   Q    You testified a moment ago to some questions by Mr. Duncan

25   about trying to get $3 million from the Banyon Income Fund.  Do

1    you remember that?

2    A    Three million was coming from trust funds to be released

3    by Mr. Rothstein.

4    Q    Yes.  Did you ever get that $3 million?

5    A    No, sir.

6    Q    Let's turn to Government's Exhibit 81.  Do you remember,

7    sir, me asking questions about where the rest of the money was

8    going to come for the $18 million Mr. Levin was going to

9    invest?

10   A    It's been more than five minutes so I don't remember.  I

11   don't recall.

12   Q    All right, well let's turn to Exhibit 110.  Well let's

13   see, what's the date of Exhibit 81?

14   A    September 8, 2009.

15   Q    Did you have any correspondence with Mr. Bekkedam after

16   that?

17   A    I'm sure I did, sir.

18   Q    Let's pull up Exhibit 110.  If you could read that.  Did

19   Mr. Bekkedam say anything here about the source of additional

20   funding from Mr. Levin?

21   A    Do you want me to read it?

22   Q    Well let me ask you this.  Based on your communications

23   with Mr. Bekkedam, did he ever suggest how much money Mr. Levin

24   would have to put into Nova as of October 21?

25   A    I guess it says 10 million.  It's kind of confusing.

Preve - Redirect (Ign)                                    128

1    Q     Can we just read that third paragraph?

2    A     "We had originally budgeted per George's subscription

3    agreement, 18 million, with 10 million coming in financing from

4    the bank, but it looks as if we only need 10 million with it

5    all coming back in financing from the bank.  Not a lot but it

6    seems to be headed that way."

7    Q     Mr. Duncan asked you some questions about Mr. Levin

8    personally guaranteeing the funds of investors who came in from

9    Ballamor.  Do you remember those questions?

10   A     Yes, sir.

11   Q     So if, as turned out to be the case, the Banyon investment

12   lost value, what effect did that have or would that have on Mr.

13   Levin?

14   A     It would have severely crippled his ability to honor his

15   guarantee.

16   Q     Back to Mr. Duncan's questions about Mr. Levin buying a

17   Florida bank.  Do you recall who first brought up the idea of

18   Mr. Levin getting any shares in Nova Bank?

19   A     I'm sure it was Mr. Bekkedam.

20   Q     Do you remember Mr. Levin talking about Nova Bank before

21   he met Mr. Bekkedam?

22   A     Never.

23   Q     Mr. Egan asked you a number of questions about how wealthy

24   Mr. Levin was in June of 2009.  Do you recall that?

25   A     Yes, sir.

1    Q    Was much of his wealth tied up in the Banyon type

2    investments as of that date?

3              MR. EGAN:  Objection.

4              THE COURT:  Sustained.

5    BY MR. IGNALL:

6    Q    Do you know, are you familiar with the source of Mr.

7    Levin's wealth as of June of 2009?

8    A    Yes, sir.

9    Q    And how much of that, if any, was involved in the Banyon

10   investments as we call them?

11   A    Probably around 65 percent, sir.

12   Q    And did that include how much he was guaranteeing to other

13   people?

14   A    Yes, it would have, yes.

15   Q    And Mr. Egan asked you some questions about how after

16   Halloween, he said something to the effect of Mr. Levin wasn't

17   broke.  Do you remember those questions?

18   A    Yes, sir.

19   Q    Well were you familiar with Mr. Levin's finances after

20   that?

21   A    Yes, sir.

22   Q    Was Mr. Levin under any financial strain after that?

23   A    Very much so, sir.

24   Q    Prior to October, was Mr. Levin paying you?

25   A    Yes, sir.

Preve - Recross (Ega)                                    130

1   Q    Did Mr. Levin pay you after October?

2   A    No sir, he did not.

3            MR. IGNALL:  No further questions.

4            MR. EGAN:  Briefly, Your Honor.

5                     RECROSS-EXAMINATION

6   BY MR. EGAN:

7   Q    Good afternoon.

8   A    Good afternoon, sir.

9   Q    I just heard you correctly, right?  You said that 65

10  percent of his worth was tied up in Banyon, give or take?

11  A    Yes, sir.

12  Q    Okay.  So I'm not really great at math but 65 percent of

13  400 million is a pretty big number, isn't it.

14  A    Yes, sir.

15  Q    But 35 percent of 400 million is north of 30 million

16  bucks, isn't it?

17  A    Yes sir, but you'd have to understand what was happening

18  in the national economy at that time that gravely impacted that

19  35 percent.  The real estate market, which primarily was the

20  rest of Mr. Levin's equity, had also been severely impacted.

21  Q    So what we're really talking about is cash, right?

22  A    He had no cash.

23  Q    I heard you.  But what you're basically saying to me is

24  although he was still worth 35 percent of 400 million, he had

25  no cash.

1    A    Precisely, sir.

2    Q    And when you have no cash, at least you still have real

3    estate, right?

4    A    Yes, sir.

5    Q    And I believe you talked about the real estate market

6    going down when I was speaking to you a little while back,

7    right?

8    A    Yes, sir.

9    Q    That actually happened a little earlier than this, didn't

10   it?  Didn't that happen in 2007?

11   A    No.

12   Q    You don't remember real estate started to go down before

13   the big crash of 2008?

14   A    Some types of real estate but most of his equity was in

15   commercial real estate and it really tanked in 2009 severely.

16   Q    Regardless, he's still worth 35 percent of $400 million,

17   correct?  You said it, not me.

18   A    Yeah, I'm talking about, I'm discussing assets and I'm not

19   talking about the leverage that those assets had.  Leverage

20   does not go down.  The value of the real estate goes down.  So

21   his net worth was almost wiped out.

22   Q    Sir, you just testified he was worth 35 percent of $400

23   million and that that was in real estate, did you not?

24   A    Yes, sir.

25   Q    Okay.  And one of those things he owned that was real

Preve - Recross (Ega)                                    132

1   estate was the Madison House, correct?

2   A    Yes, sir.

3   Q    Now, you testified this morning that you didn't know that

4   he had ultimately given a security interest in that Madison

5   House to Nova Bank as part of trying to keep them from

6   foreclosing on his loan.

7   A    That is correct.  I did not know that.

8   Q    But you did know that he had tried to give them an

9   interest in the house in Devon to do that.

10  A    I know he tried to give them interest in the Madison House

11  too.  I'm not saying that.  It wasn't ever consummated when I

12  was around.

13  Q    So in the spring of 2010 after all of this stuff is over,

14  right, before you leave Mr. Levin's employ, Nova is requesting

15  that he give them collateral in Madison House, correct?

16  A    That was one of the proposals that Mr. Levin made to Nova,

17  yes sir.

18  Q    And that's because he still owed them money on his loan.

19  A    He still owed them $5 million, yes sir.

20  Q    Correct.  And one of the things M. Levin wanted to say

21  was, well you've got 5 million of my stock, why don't you sell

22  that.  Correct?

23  A    Yes, sir.

24  Q    And that's because the loan had value, right?

25              MR. IGNALL:  Objection.  Beyond the scope of cross

Preve - Recross (Ega)                                    133

1    and I also think it's argumentative.

2              THE COURT:  Overruled.

3    BY MR. EGAN:

4    Q    Right?

5    A    The loan had value?

6    Q    Yeah, it was worth $5 million.

7    A    Yeah, he owed $5 million to the bank, yes sir.

8    Q    And the stock had value too, right?

9    A    Not every much evidently.

10   Q    Sir, he wasn't asking for it back because it was

11   worthless, was he?

12   A    Asking for it back.  I don't understand --

13   Q    He was asking Nova to sell his stock to pay for part of

14   what he owed, correct?

15   A    Yes, sir.

16   Q    Because the stock had value.  I'm not asking how much; it

17   had value.

18   A    It was worth something.  The bank was not bankrupt, yes

19   sir.

20   Q    So Nova had the stock and the loan, correct?

21   A    Yes, sir.

22   Q    So they were clearly in a better position than if they

23   only had the loan, correct?

24             MR. IGNALL:  Objection.  Argumentative.

25             THE COURT:  Sustained.

1    BY MR. EGAN:

2    Q    Now you said you didn't know that he ever got stock, and I

3    apologize if you were gone.  Could we show him D-123 please.

4    And this is dated April 19, 2010.  Were you still with Mr.

5    Levin at that point?

6    A    No, I left on April 10th.

7    Q    So you wouldn't be aware that he had voted his shares in a

8    proxy at that time.

9              MR. IGNALL:  Objection.

10             THE COURT:  Sustained.

11             MR. EGAN:  Your Honor, may the witness be shown D-119

12   please.

13             THE COURT:  Yes.

14   BY MR. EGAN:

15   Q    And if we could go to page 2.  Did you ever see that

16   before, sir?

17   A    I do not believe so, sir.

18             MR. EGAN:  Nothing further, Your Honor.

19             MR. ENGLE:  No, thank you, Your Honor.

20             MR. IGNALL:  Nothing further from the Government,

21   thank you.

22             THE COURT:  All right.  Thank you, sir, you may step

23   down.  Watch your step please.

24             THE WITNESS:  Thank you, Your Honor.

25             THE COURT:  Ladies and gentlemen, if you want to

Madiany - Direct (BAR)                                 135

1    stand up and stretch your legs, you may do so.  Yes, ma'am.

2            THE JUROR:  May I take a break?

3            THE COURT:  Absolutely.  Let's take our fifteen-

4    minute break.

5            (The jurors exit the courtroom.)

6            THE COURT:  All right.  Fifteen minutes please.

7            MR. ENGLE:  Thank you, Your Honor.

8            MR. IGNALL:  Thank you.

9                     (OFF THE RECORD)

10           THE COURT:  Okay, are we ready?  All right.

11           (The jurors enter the courtroom.)

12   J O S E P H   M A D I A N Y, Government'S WITNESS, SWORN

13           THE DEPUTY:  Please state and spell your name for the

14   record and you may have a seat.

15           THE WITNESS:   My name is Joseph Madiany, J-O-E-S-P-

16   H, the last name is Madiany, —A-D-I-A-N-Y.

17           MS. BARRY:  May I inquire, Your Honor?

18           THE COURT:  You may proceed.

19           MS. BARRY:  Thank you.

20                     DIRECT EXAMINATION

21   BY MS. BARRY:

22   Q    Good afternoon, Mr. Madiany.

23   A    Good afternoon.

24   Q    Where do you currently live?

25   A    I live in Lynwood, Pennsylvania.

Madiany - Direct (BAR)                                        136

1    Q    And what is your country of origin?

2    A    Kenya.

3    Q    And how long have you been in the United States?

4    A    Over 30 years now.

5    Q    And did you go to college?

6    A    Yes.

7    Q    And what did you major in college?

8    A    About the laws of financing and economics.

9    Q    Did you get any post-college degree?

10   A    Yeah, MBA in managerial accounting.

11   Q    And sir, have you been in the banking industry for most of

12   your career?

13   A    Yes.

14   Q    And prior to 2006, what banks did you work for?

15   A    Prior to 2006 I worked for PNC Bank and also First Union.

16   Q    And how many years altogether did you work at those two

17   banks, approximately?

18   A    Those two banks, about 15 years.

19   Q    And in 2006 where did you start working?

20   A    2006 I started working in April at Nova Bank.

21   Q    So April of 2006?

22   A    Yes.

23   Q    And who hired you to work at Nova Bank?

24   A    The chief credit officer by the name of Mr. Joe Lucky.

25   Q    And do you know who Brian Hartline is?

Madiany - Direct (BAR)                          137

1    A    Yes.

2    Q    And who was Brian Hartline?

3    A    He's the CEO, he was the CEO at that time.

4    Q    And did he interview you before you got your job?

5    A    Yes.

6    Q    And do you see Mr. Hartline here today?

7    A    Yes I do.

8    Q    And can you identify where he his?

9    A    Yes.

10        MS. BARRY:  Your Honor, let the record reflect that

11   the witness identified the defendant, Brian Hartline.

12        THE COURT:  The record shall so reflect.

13   BY MS. BARRY:

14   Q    Mr. Madiany, what were you hired to do at Nova Bank?

15   A    I was hired as a senior credit officer, VP.

16   Q    And as a senior credit officer, and you're saying that was

17   a VP.  Do you mean -- what does VP mean?

18   A    Vice president.

19   Q    And what were your duties as a senior credit officer?

20   A    The credit officer's function at that time was to

21   underwrite and also to recommend loans for approval by the loan

22   committee.  What we did was to gather the financial statements

23   from the loan officers, do the due diligence, and work through

24   it, look in the collateral, the cash flow and the guarantee

25   before we make a recommendation for the loan.

Madiany - Direct (BAR)                          138

1    Q     Okay.  So what you described just then is what you would

2    consider the loan process.

3    A     Essentially, yes.

4    Q     And I know you describe it, but just if you could step the

5    jury through the underwriting, what did that entail?

6    A     The underwriting entails gathering all the financial

7    statements which were brought before the underwriter who will

8    look at the business and also look at the individuals to whom

9    the loan will be forwarded to.  We look at the financial

10   strength of the company.  We evaluate the collateral and also

11   the strength of the personal guarantors who are mainly

12   principal owners of the companies.

13   Q     And is looking at all of that information important to

14   know whether or not the bank will get paid back if they make a

15   loan?

16   A     Yes.

17   Q     Now who generally brought the loan application for you for

18   review or your department?

19   A     The loan officer, the relationship manager.

20   Q     And you described all of the information that you would

21   need to assess a loan.  Did that information go onto a

22   particular document at the bank?

23   A     Yes.

24   Q     And what was that document called?

25

Madiany - Direct (BAR)                                139

1    A    The document was called a Risk Assessment Summary.

2    Q    And the Risk Assessment Summary, is that sometimes

3    referred to as the RAS?

4    A    Yes.

5    Q    And just to be clear, if you're going to make a

6    recommendation for approval, what are the three main factors

7    you would look at?

8    A    The three main factors were the performance of the company

9    so to make sure that the bank gets paid.

10   Q    Is that sometimes called the cash flow available to the

11   company?

12   A    Yes.

13   Q    Okay.  I'm sorry, I interrupted you.

14   A    The second part will be to examine the collateral, make

15   sure that at least we have the second way out of the loan.  And

16   the third is to assess the strength of the personal guarantees

17   being provided by the principals of the company.

18   Q    And all of this information goes onto the Risk Assessment

19   Summary?

20   A    Yes.

21   Q    And when you're looking at a loan for approval,

22   approximately how many years of financials are you reviewing?

23   A    Yeah.  The company, the bank policy requires two years of

24   annual performance or tax returns.

25   Q    So two years at least?

1    A    Yes.

2    Q    And is the purpose of the loan relevant to the

3    underwriting?

4    A    Yes.

5    Q    And will you please explain why it's relevant?

6    A    The purpose of the loan normally is the owner would

7    provide it to the bank so at least we know that the money being

8    loaned out is going to fill in that purpose and make sure that

9    purpose is going to be beneficial to the company and for the

10   bank to be paid.

11   Q    So the purpose of the loan is an indication on the

12   strength of being paid back.

13           MR. EGAN:  Objection.

14           THE COURT:  Sustained.

15   BY MR. BARRY:

16   Q    So again, you had mentioned the strength of the company

17   when looking at the purpose of the loan?

18   A    Yes.

19   Q    Okay.  And why was that important?

20   A    That was important because of course, number one, it has

21   to be a purpose which the bank has an appetite for.  And then

22   secondly, to make sure that that purpose is going to benefit

23   the company performance so that eventually the bank will be

24   repaid.

25   Q    Okay.  Who reviewed, at Nova Bank who reviewed the loans

Madiany - Direct (BAR)                                    141

1    and made recommendations for approval?

2    A    The underwriters are the ones who prepared the RAS and

3    then they make the recommendation for approval before it's

4    finally approved by the loan committee.

5    Q    Okay.  So the loan committee makes the final decision?

6    A    Yes.

7    Q    And who was on the loan committee?

8    A    Senior bank management, mostly senior vice presidents.

9    Q    Was Mr. Hartline part of the loan committee?

10   A    Yes.

11   Q    And did you sit on the loan committee?

12   A    Yes, I sat on the loan committee.

13   Q    Did you have any voting authority on the loan committee?

14   A    No.

15   Q    What was your, what were your duties on the loan

16   committee?

17   A    My duties for the loan committee was to bring in the

18   agenda and also to serve as the committee secretary.

19   Q    So when you say serve as the committee secretary, did that

20   mean preparing the minutes for the loan committee?

21   A    Yes.

22   Q    What loans had to go to the loan committee to be approved?

23   A    At the beginning of 2006 any loan beyond, above $750,000.

24   Q    Okay.  So if it was a loan more than $750,000, it would

25   have to go to the loan committee to be approved.

Madiany - Direct (BAR)                                         142

1    A    Yes.

2    Q    If it was under -- what happened with loans that were

3    under $750,000?

4    A    At that point we had approval matrix between the vice

5    president and the senior V.P.

6    Q    And some point in time did all loans have to go before the

7    loan committee?

8    A    Yes.

9    Q    And approximately when did every single loan that the bank

10   was making have to go to the loan committee?

11   A    I don't recall the exact date, but after the economic

12   collapse, recession came in, each and every loan was to be

13   approved by the loan committee.

14   Q    So was that in approximately 2009?

15   A    Approximately, yes.

16           THE COURT:  Could you keep your voice up please, sir.

17           THE WITNESS:  Approximately 2009.

18   BY MS. BARRY:

19   Q    And if you could, if it's easier just to speak right into

20   the microphone, it can make your voice seem louder, sir.

21   A    Okay, thank you.

22   Q    Now did you have anything, or did you have any involvement

23   with the bank's TARP application?

24   A    No.

25   Q    Now in June of 2009 do you recall whether or not the bank

Madiany - Direct (BAR)                                143

1   approved a loan for an individual named George Levin?

2   A     In June of 2009, no, no.

3   Q     May I show you what's been marked as Government's Exhibit

4   43 for the witness please.  And what is Government's Exhibit

5   43?

6   A     That is a Nova Bank Risk Assessment Summary document.

7   Q     And what is the date of this RAS?

8   A     June 30, 2009.

9   Q     And did you underwrite this loan?

10  A     Yeah, I underwrote this loan.

11  Q     Okay.  And who is the individual who the loan is being

12  made to?

13  A     The customer's name in this is George G. Levin.

14  Q     So do you recall that on June 30, 2009 that the bank made

15  a loan to an individual named George Levin?

16  A     The documents were prepared at that time, yeah, it was for

17  this customer, George G. Levin.

18  Q     Okay.  Do you recall doing the underwriting for this Levin

19  loan?

20  A     Yes.

21  Q     And what was the amount of the loan for?

22  A     The amount of the loan was $5 million.

23  Q     Okay.

24        MS. BARRY:  Your Honor, the Government would move for

25  the admission of Government's Exhibit 43.

Madiany - Direct (BAR)                                        144

1        MR. ENGLE:  No objection.

2        MR. EGAN:  No objection.

3        THE COURT:  Admitted.

4        MS. BARRY:  May it be published, Your Honor?

5        THE COURT:  Yes.

6   BY MS. BARRY:

7   Q    Now who brought, who told you that the bank was going to

8   make a loan to George Levin?

9   A    This loan request was made by Thomas Patterson.

10  Q    And who is Thomas Patterson?

11  A    He's the manager of the account at that time.

12  Q    Did Mr. Patterson indicate if there was any kind of timing

13  issue related to this loan?

14  A    It was brought in to be done within a matter of about two

15  days.

16  Q    And what is the date, June 30?

17  A    June 30 was the date of the end of the second quarter of

18  that year.

19  Q    So is that the end of the second quarter is June 30th?

20  A    Yes.

21  Q    Prior to this loan request, had you ever approved a loan

22  for Mr. Levin before?

23  A    No.

24  Q    Now looking at this Risk Assessment Summary, is this a

25  document that you prepared?

Madiany - Direct (BAR)                                    145

1    A    I have to look at it in the entirety.

2              MS. BARRY:  Yes.  May I, Your Honor, approach the

3    witness?

4              THE COURT:  Yes.

5    BY MS. BARRY:

6    Q    Mr. Madiany, I'm showing you a hard copy of Government's

7    Exhibit 43.  Please take your time and look through that

8    document.

9    A    Yes, this was the document.

10   Q    Okay.  So did you prepare what's been marked as

11   Government's Exhibit 43?

12   A    Yes.

13   Q    And as far as the information on the individual receiving

14   the loan, if we can, just that first portion, if we can go to

15   the first page and just highlight that first, make that the

16   first top portion large.  Thank you.  Okay, again, looking --

17   is your name on here as the analyst?

18   A    Yes.

19   Q    And again, who is the individual receiving this loan?

20   A    George G. Levin.

21   Q    And if you look at the requested loan amount, -- I'm

22   sorry, if you go back to that top portion.  And what's the

23   requested loan -- I'm sorry.  That's the requested commitment.

24   If we go down further to the second -- what is the proposed

25   amount of the loan?

Madiany - Direct (BAR)                                    146

1    A     $5 million.

2    Q     And what is the purpose of the loan?

3    A     Financial investment.

4    Q     And if we go down and look at the collateral, is this loan

5    secured by any collateral?

6    A     It's unsecured.

7    Q     Now in your experience at Nova was this the largest

8    unsecured loan that was approved?

9    A     Yes.

10   Q     And so what was this loan based on, approving this loan?

11   A     This loan was based on the performance based on the amount

12   which is being requested and also the guarantees provided by

13   the individual and also by other companies which the individual

14   was an interest or owned.

15   Q     If we could look at the second page please.  If we look at

16   the top portion, and the purpose of the loan was for investment

17   purposes.  Is that what you understood the purpose to be?

18   A     Yes.

19   Q     Okay.  And looking at transaction comments facility one.

20   Do you see that?

21   A     Yes.

22   Q     And what is the first sentence, first two sentences say?

23   A     Mr. George G. Levin, borrower, is requesting $5 million

24   non-revolving commercial line of credit from Nova Bank.  The

25   loan would be used by Mr. Levin for investment purposes.

Madiany - Direct (BAR)                    147

1    Q    And did those investment purposes, anywhere were you ever
2    told that it was going to be used to purchase Nova Bank stock?
3    A    No.
4    Q    Were you ever told that as you were preparing the
5    underwriting for this loan?
6    A    No.
7    Q    Now did other individuals have access to this Risk
8    Assessment Summary?
9    A    Yes.
10   Q    Who else had access to the Risk Assessment Summary?
11   A    This was an unprotected document, meaning other
12   underwriters and also loan officers could access it.
13   Q    Okay.  So did Mr. Patterson have access to it?
14   A    Yes.
15   Q    Did Mr. Hartline have access to it?
16   A    Yes.
17   Q    Now as the secretary of the loan committee, you take
18   meeting minutes; is that right?
19   A    Right.
20   Q    And I'd like you to take a look at what's been marked as
21   Government's Exhibit 41.  And what is Government's Exhibit 41?
22   A    That is the minutes of the loan approved on June 30, 2009.
23            MS. BARRY:  And Your Honor, the Government moves for
24   the admission of Government's Exhibit 41.
25            MR. ENGLE:  No objection.

Madiany - Direct (BAR)                                      148

1        MR. EGAN:  No objection.

2        THE COURT:  Admitted.

3   BY MS. BARRY:

4   Q    And looking at the loan committee minutes meeting of June

5   30, 2009, did you record the members of the committee who were

6   present at the meeting?

7   A    Yes.

8   Q    And is Mr. Hartline, did he attend that meeting?

9   A    Yes.

10  Q    And if you could take a look at the body of the meeting

11  minutes, is there any mention of the George Levin loan of $5

12  million unsecured?

13  A    No mention.

14  Q    I'd like to show you now what's been -- well let me ask

15  you this.  In the second, number two, item number two, what's

16  item number two?

17  A    It says the committee reviewed and performed ratification

18  of loans approved report for Nova Bank for June 2009 on a

19  motion by G. Patterson, seconded by J. Hanuscin, the report was

20  approved.

21  Q    So now I'd like you to take a look at what's been marked

22  as Government's Exhibit 41A.  And looking at 41A, what is 41A?

23  A    41A is a documentation that kind of summarizes all the

24  loans which were performed during that month and approved.

25  Q    And so are those the ones that the committee approved in

Madiany - Direct (BAR)                          149

1    item two from the previous exhibit 41?  And I can show you a

2    hard copy if it makes it easier.

3    A    Yes, please.  Let me see a hard copy.

4              MS. BARRY:  May I approach, Your Honor?

5              THE COURT:  Surely.

6              MS. BARRY:  I'm providing the witness with a hard

7    copy of Government's Exhibit 41 and 41A.

8    BY MS. BARRY:

9    Q    And if you would just review item number two.  And is 41A

10   a list of the loans that were approved at that meeting?  Is 41A

11   the list of the loans for June 2009 that were approved at the

12   June 30, 2009 meeting?

13   A    Yes.

14   Q    Okay, thank you.  And having looked at Government's

15   Exhibit 41A, which was the list of the loans, is the George

16   Levin $5 million unsecured loan listed on 41A?

17   A    I don't see it; it's not listed.

18             MS. BARRY:  Your Honor, if I failed to do this, I

19   request for the admission of 41A.

20             MR. EGAN:  No objection.

21             MR. ENGLE:  No objection.

22             THE COURT:  Actually you did, I believe.  I thought

23   you did.

24             MS. BARRY:  Okay, thank you.

25   BY MS. BARRY:

Madiany - Direct (BAR)                                       150

1   Q     Now do you know whether or not the George Levin loan was
2   approved?
3   A     At that point I didn't know.
4   Q     Okay.  As of June 30th at the meeting you didn't know.
5   A     No, I didn't know.
6   Q     Were you expecting additional information related to the
7   George Levin loan?
8   A     Yes.
9   Q     And what information were you waiting for?
10  A     I was waiting for additional support, supporting financial
11  statements from the other companies that Mr. Levin owned so
12  that we can see the financial strength that they provide in
13  order for us to assess the strength of the guaranty.
14  Q     And at some point did you learn that the Levin loan for $5
15  million was approved without you receiving that information you
16  were waiting for?
17  A     Yes.
18  Q     And in your experience underwriting loans, was that
19  unusual?
20  A     Yes, it was unusual because we had to receive the
21  documents which were requested for us to be able to move
22  forward with the loan.
23  Q     And again, was the Levin loan the largest unsecured
24  personal loan that you had seen at the bank?
25          MR. ENGLE:  Objection.  Asked and answered.

Madiany - Direct (BAR)                                         151

1           THE COURT:  Sustained.

2     BY MS. BARRY:

3     Q     Now I'd like you to take a look at what's been marked as

4     Government's Exhibit 118.  And to make it easier for the

5     witness, Your Honor, I'd like to provide him with a hard copy.

6     May I approach?

7           THE COURT:  Yes, ma'am.

8     BY MS. BARRY:

9     Q     And what is Government's Exhibit 118?

10    A     That is an e-mail.

11    Q     And who is the e-mail from?

12    A     It says from Joseph, that's from me.

13    Q     And who are you sending it to?

14    A     To Thomas J. Patterson.

15    Q     And what is the subject?  In the subject line, what does

16    it say?

17    A     2009 Levin, George G. RAS, 6-30 2009, approval.

18    Q     So did you attach the RAS to an e-mail to Mr. Patterson?

19    A     I don't remember.

20    Q     Looking at Government's Exhibit 118, the first sheet is

21    the e-mail?  Is that right?  And then if you look at the

22    attachment, is that a RAS?

23    A     Yes.

24    Q     Okay.

25          MS. BARRY:  Your Honor, the Government moves for the

1   admission of Government's Exhibit 118.

2              MR. EGAN:  No objection.

3              MR. ENGLE:  No objection.

4              THE COURT:  Admitted.

5              MS. BARRY:  May it be published, Your Honor?

6              THE COURT:  Yes.

7   BY MS. BARRY:

8   Q    So if we could go ahead and take a look at that e-mail,

9   which is the first page of Government Exhibit 118, if we could

10  highlight that please.  And again, you're saying this is an e-

11  mail from you, Joseph O. Madiany?

12  A    Yes.

13  Q    And what's the date that you sent this e-mail?

14  A    October 6, 2009.

15  Q    And you're sending it to Tom Patterson; is that right?

16  A    I did so many e-mails I can not specifically recall but it

17  seems like I'm sending it to Tom Patterson.

18  Q    Okay.  Is that what it says, to, right?  To Thomas J.

19  Patterson?

20  A    Yes.

21  Q    Okay.  And what do you say in your e-mail.  If you can

22  just read that sentence that you write to Mr. Patterson.

23  A    "Tom, per your request, RAS, thanks."

24  Q    And so now if we could take a look at the second page of

25  Government's Exhibit 118.  And looking at the second page of

Madiany - Direct (BAR)                                    153

1    118, this is a Risk Assessment Summary, and what is the date?

2    A    The date is still 6-30 2009.

3    Q    Okay.  And if we go further down, is this -- who is this a

4    RAS, for what, for who is this loan made to?

5    A    George G. Levin.

6    Q    And what is the amount of the loan?

7    A    The amount of the loan is $5 million.

8    Q    So does it appear to be the RAS from, that you prepared on

9    June 30, 2009?

10   A    Yeah, it is the one that I prepared and I already

11   forwarded to the relationship manager.

12   Q    Is it the same, or is it different?

13   A    It is different.

14   Q    And how is it different?

15   A    First of all, the purpose of this loan had been changed

16   from investment purposes to bridge loan for improvements to

17   property.

18   Q    Okay.  And right now, if we could Agent Boyer, if it's

19   possible, if we could do a side by side of page one of

20   Government's Exhibit 43 and page two of Government's Exhibit

21   118.  And if you do the comparison, does it appear that

22   everything is the same except the purpose of the loan?

23   A    The purpose is different and also another thing, the

24   guarantor, the guaranty.

25   Q    Did you make those changes?

Madiany - Direct (BAR)                          154

1    A    I don't recall.

2    Q    Well did you prepare the first one or did you prepare the

3    second one?

4              MR. EGAN:  Objection.

5              THE COURT:  Just a moment, please.  What was the

6    answer to the first question?  He did not recall?  What was the

7    first question?

8              MS. BARRY:  The first question is, did you prepare --

9    I think I said the RAS.  I'm not sure I specified which one.

10             THE COURT:  Counsel?

11             MR. EGAN:  I think it was, did you prepare the second

12   one, Your Honor, and he said, I don't know.

13             THE COURT:  All right.  And then the next question

14   was?

15             MR. BARRY:  Did you prepare this first RAS or the

16   second one?

17             THE WITNESS:  The first one.

18             THE COURT:  All right.  Overruled.

19   BY MS. BARRY:

20   Q    Do you know who made changes to Government's Exhibit 43?

21   The first RAS.

22   A    No, no idea.

23   Q    And if we could take a look at the second page of

24   Government's Exhibit 43 and the third page of Government's

25   Exhibit 118.  If we could compare those.  So looking now at

1    what's been written in the section, transaction comments,

2    originally transaction comments in Exhibit 43, which is what

3    you wrote, can you read that again, what you had originally?

4    On the left side.  I don't know if you can read it.  It's

5    Government's Exhibit 43.

6    A    The transaction comment on the first RAS, George G. Levin,

7    borrower, is requesting $5 million non-revolving commercial

8    line of credit from Nova Bank.  The loan will be used by Mr.

9    Levin for investment purposes.

10   Q    And I'd like you now to look at Government's Exhibit 118

11   and look at the third page, which the transaction comments.

12   And if you could read now the first two or three sentences.

13   A    "Mr. George G. Levin, borrower, is requesting $5 million

14   non-revolving commercial line of credit from Nova Bank.  The

15   loan will be used by Mr. Levin for a short term bridge loan.

16   The borrower will use these funds to replace funds that were

17   used to purchase and improve real estate in Devon, Montgomery

18   County."

19   Q    Now that transaction comment, do you ever recall that

20   while you were underwriting the George Levin loan?

21   A    No.

22   Q    I'd like to turn your attention now to another loan.  If

23   we could take a look at Government's Exhibit 109 for the

24   witness please.  And do you recall a loan for an individual

25   named Anthony Bonomo?

Madiany - Direct (BAR)                                      156

1    A     Yes.

2    Q     And did you underwrite that loan as well?

3    A     Yes.

4    Q     And taking a look at Government's Exhibit 109, is this a

5    Risk Assessment Summary that you prepared for a loan to Anthony

6    Bonomo?

7    A     Yes.

8              MS. BARRY:  Your Honor, the Government moves for the

9    admission of Government's Exhibit 109.

10             MR. EGAN:  No objection.

11             MR. ENGLE:  No objection.

12             THE COURT:  Admitted.

13             MS. BARRY:  May it be published, Your Honor.

14             THE COURT:  Yes.

15   BY MS. BARRY:

16   Q     And looking at Government's Exhibit 109, what's the date?

17   A     The date of this loan, the date of the RAS is October 21,

18   2009.

19   Q     And looking now at the second portion, who is the

20   borrower?

21   A     Anthony Bonomo and Maryellen Bonomo.

22   Q     And what is the purpose of the loan?

23   A     Financial investment.

24   Q     And what is the proposed amount of the loan?

25   A     4.5 million.

Madiany - Direct (BAR)                                157

1    Q    If we can turn to the second page please.  And looking at

2    the transaction comments, if you would could you please read

3    the first three sentences.

4    A    "Mr. Anthony Bonomo, borrower, is requesting $4.5 million

5    commercial balloon loan from Nova Bank.  As indicated above,

6    the loan will be used by Mr. Bonomo for financial investment

7    purposes.  Borrower indicated plans to invest in funds in the

8    Banyon Group through Ballamor Capital Management."

9    Q    Is there any -- well let me ask you this.  Did you know

10   who owned Ballamor Capital Management?

11   A    Yes.

12   Q    Who owns that?

13   A    Mr. Barry Bekkedam.

14   Q    And at the time that you underwrote this loan did you know

15   that any of the loan proceeds were going to be invested in Nova

16   Bank stocks?

17   A    No.

18   Q    And is that anywhere in the Risk Assessment Summary?  Was

19   that anywhere in the Risk Assessment Summary, that there would

20   be an investment in Nova stocks?

21   A    No.

22   Q    Now I'd like to turn your attention -- I'd like you to

23   take a look at what's been marked as Government's Exhibit 117.

24   And just for the witness please.  And the second page of 117.

25   And looking at Government's Exhibit 117, what is 117?

Madiany - Direct (BAR)                                    158

1    A    That again is loan committee minutes for October 27, 2009.

2    Q    And looking at 117 --

3           MS. BARRY:  Well Your Honor, the Government moves for

4    the admission of 117.

5           MR. ENGLE:  No objection.

6           MR. EGAN:  No objection.

7           THE COURT:  Admitted.

8    BY MS. BARRY:

9    Q    And looking at Government's Exhibit 117, is there any

10   mention of the Bonomo loan?

11   A    No, ma'am.

12   Q    And I'd like you now to take a look at Government's

13   Exhibit 117A.  And Your Honor, this unfortunately is not on the

14   computer.  May I approach, the witness?

15          THE COURT:  Surely.

16   BY MS. BARRY:

17   Q    And what is Government's Exhibit 117A?

18   A    It is the minutes of the loan committee for October 20,

19   2009.

20   Q    And in looking at Government's Exhibit 117A --

21          MS. BARRY:  And Your Honor, the Government would move

22   for the admission of 117A.

23          MR. ENGLE:  No objection.

24          MR. EGAN:  No objection.

25          THE COURT:  Admitted.

Madiany - Direct (BAR)                              159

1    BY MS. BARRY:

2    Q    Is there any mention of the $4.5 million Bonomo loan on

3    October 20th of 2009?

4    A    No.

5    Q    Now I'd like to turn your attention please to another loan

6    for an individual named Charles Gallab.  And if you could

7    please take a look at what's been marked as Government's

8    Exhibit 143, just for the witness please.  Now what is

9    Government's Exhibit 143?

10   A    That is again a Nova Bank Risk Assessment Summary

11   document.

12   Q    And is it one that you prepared as the underwriter?

13   A    Yes.

14        MS. BARRY:  And Your Honor, the Government moves for

15   the admission of Exhibit 143.

16        MR. EGAN:  No objection.

17        MR. ENGLE:  No objection.

18        THE COURT:  Admitted.

19   BY MS. BARRY:

20   Q    Taking a look at Government's Exhibit 143, who's the

21   contact name for this loan?

22   A    The contact name is Thomas Patterson.

23   Q    I'm sorry, I'm looking at contact name.  Does that say

24   Charles Gallab?

25   A    Oh, sorry.  Yeah, the contact name is Charles Gallab.

Madiany - Direct (BAR)                                    160

1    Q     Okay.  And what is the date of this loan?

2    A     December 15, 2009.

3    Q     And who is the borrower?

4    A     Ballamor Creek, LLC.

5    Q     And what is the loan amount?

6    A     Five hundred thousand.

7    Q     And what is the purpose of the loan.  And if we could

8    highlight that, the purpose of the loan, please.

9    A     This was for working capital.

10   Q     And if we could please turn to the second page of the Risk

11   Assessment Summary.  And looking at the transaction comments,

12   would you just read that first sentence.

13   A     "Ballamor Creek, LLC, borrower, requests $500,000

14   commercial line of credit for working capital purposes."

15   Q     Okay, working capital purposes.  Is there any mention that

16   any of the loan proceeds will be used to purchase Nova Bank

17   stock?

18   A     No.

19              MS. BARRY:  May I have a moment, Your Honor?

20              THE COURT:  Yes.

21   BY MS. BARRY:

22   Q     If we could just go back briefly to Government's Exhibit

23   118.  And if we could publish that please, I believe it was

24   previously published.  And if we could go to the second page of

25   that please.  And if we look at that top portion, Mr. Madiany,

1    where it says date of RAS revision date, what is the date

2    there?

3    A    There is no revision date?

4    Q    So the date that's -- what is the date that is still on

5    the RAS?

6    A    June 30, 2009.

7              MS. BARRY:  No further questions, Your Honor.

8              MR. EGAN:  May I, Your Honor?

9              THE COURT:  You may proceed.

10                        CROSS-EXAMINATION

11   BY MR. EGAN:

12   Q    Good afternoon, Mr. Madiany.

13   A    Good afternoon, sir.

14   Q    At the time you were hired by Nova you had some

15   significant banking experience, correct?

16   A    Yes, sir.

17   Q    You had been at PNC, right?

18   A    Yes.

19   Q    And I believe you said, what was the other one?  Wachovia?

20   A    Wachovia, yes.  It used to be First Union.

21   Q    Right, and First Pennsylvania before that.  And going to

22   Nova was a new experience for you, correct?

23   A    Yeah, it was a new experience, yes.

24   Q    And it was a bit of a step up, right?  You had more

25   responsibility.

Madiany - Cross (EGA)                                    162

1    A     Yes.

2    Q     So it was a better job basically than the other two

3    places.

4    A     Yes.

5    Q     And part of that more responsibility was you were now

6    going to be running a small group of underwriters for a small

7    community bank as opposed to just being another one of the

8    underwriters at one of these huge banks, right?

9    A     Yes.

10   Q     And when you applied for that job you interviewed with Mr.

11   Hartline, correct?

12   A     Can you repeat that?

13   Q     When you applied for the job you interviewed with Brian,

14   Mr. Hartline, right?

15   A     Yes.

16   Q     And you got the job.  When you got the job, you made a

17   number of changes to the way things were run in that

18   department, correct?

19   A     Correct.

20   Q     And in fact, you made a number of improvements to the way

21   things were run, correct?

22   A     Correct.

23   Q     And you were supported by management in all of those

24   improvements, correct?

25   A     Yes.

1   Q    And one of those improvements was actually this RAS

2   document we've been talking about, right?

3   A    Yes.

4   Q    And in fact, the RAS -- and if we could put up Government

5   43 just so we can talk about it a little -- the RAS is actually

6   something you kind of came up with, right?

7   A    Yes.

8   Q    So prior to you creating this Risk Assessment Summary, the

9   way that Nova actually kept track of this information was a lot

10  less organized.

11  A    Yes.

12  Q    And this was your way of sort of putting all of the

13  important info in one place, right?

14  A    Yes.

15  Q    And this was something that you suggested to management,

16  correct?

17  A    Yes.

18  Q    You suggested it to Mr. Hartline, correct?

19  A    Yes.

20  Q    And they agreed it was a good idea.

21  A    Yes.

22  Q    So this is not like a Government form they send to the

23  bank and say you have to fill this out, right?

24  A    It's not.

25  Q    It's an internal form.

Madiany - Cross (EGA)                               164

1   A     Yes.

2   Q     And every bank does this slightly differently.

3   A     Yes.

4   Q     Okay.  Now you were the head underwriter basically, right?

5   A     Yes.

6   Q     But you weren't in charge of the decision whether or not

7   credit should be given, correct?

8   A     I was not in charge of that.

9   Q     Because you had people above you that made those

10  decisions.

11  A     Yes.

12  Q     And I forget the name of the person who was there when you

13  were hired, but that person was ultimately replaced by a guy

14  named Mark Poliski, correct?

15  A     Yeah, he was -- Joseph Lachte was replaced by Kevin Powell

16  then Mark Poliski.

17  Q     Okay, so you had Joseph Lachte, then another person and

18  then ultimately Mark Poliski became the senior --

19  A     Chief Credit Officer.

20  Q     -- Chief Credit Officer.  So he was essentially the person

21  who would decide whether or not a loan should be going to loan

22  committee, correct?

23  A     Yes.

24  Q     So you would present your information to Mr. Poliski and

25  he would review it, and if he wasn't satisfied, he would ask

Madiany - Cross (EGA)                                    165

1    you, he would say to you, this isn't good enough to go, right?

2    A    Yes.

3    Q    And he would maybe sometimes agree or maybe he'd ask for

4    more information, but it was different, based on that

5    particular loan, right?

6    A    A few but not so many.

7    Q    Yes.  And just because a loan made it to loan committee

8    didn't mean it was approved, right?

9    A    No.

10   Q    So we're talking about June of 2009 here.  Would it be

11   fair to say that you don't remember everything that happened

12   back then?

13   A    It's been a while but I remember some.

14   Q    Sure.  And the things you remember, a lot of them are

15   being helped by looking at these documents to refresh your

16   recollection, right?

17   A    Yes.

18   Q    And so you've looked at Government's 43 a number of times,

19   correct?  I mean over the past couple years, you've been shown

20   it by the Government a number of times, haven't you?

21   A    Yes.

22   Q    And that reminded you that you were the underwriter on

23   this particular loan, correct?

24   A    Yes.

25   Q    But absent reviewing this and talking about it with the

1    Government, do you have any independent recollection of this

2    stuff, what was going on around this loan?

3    A    First of all, the loan size, because you know makes you

4    think because it was a very large size.  The other thing which

5    came close to my mind was the urgency that was involved.

6    Q    Right, that they wanted it to be done quickly.

7    A    They wanted delivery of it by 6/30.

8    Q    So let's talk about that.  This loan, you were asked to do

9    this in a couple of days, right?

10   A    Yes.

11   Q    Now this isn't the only loan you were ever asked to do in

12   a quick period of time, right?

13   A    No.

14   Q    In fact, Nova kind of prided itself on being able to

15   deliver credit fast, right?

16   A    I would say so.

17   Q    And indeed, they even had a procedure for loans that were

18   going to be approved in between loan committee meetings where,

19   rather than have a full meeting, the loan papers would actually

20   just be presented individually to each of the loan committee

21   members, correct?

22   A    Yes.

23   Q    And they call that walking the loan around, right?

24   A    Yes.

25   Q    And that's something that happened on several occasions,

1    correct?

2    A    Yes.

3    Q    And in spite of the fact that the loan was being walked

4    around, it was still reviewed by each of those loan committee

5    members before they would sign off, right?

6    A    Yes.

7    Q    And in order for that to even happen Mr. Poliski would

8    have to agree that it should be sent around to them, correct?

9    A    Yes.

10   Q    So on this particular loan you were asked questions about

11   a loan committee meeting and I believe that was Government's

12   41.  Do you see that?

13   A    Yes.

14   Q    And do you remember being asked about that and that the

15   loan itself doesn't show up on page 2 where the long list of

16   loans is, right?

17   A    Yes.

18   Q    Now that meeting, at the very bottom, if we could blow up

19   the bottom part of that.  It says, the meeting was adjourned at

20   10:15 a.m., correct?

21   A    Yes.

22   Q    Now that would be pretty early on June 30th, right?

23   A    Yes.

24   Q    So if a loan wasn't approved until after 10:15 in the

25   morning, it would show up at the next meeting, correct?  In

Madiany - Cross (EGA)                                            168

1    other words, on that long list that you approve every time you

2    show up.

3    A     On the list, yes.

4    Q     Would that be right?  It would show up next week?

5    A     It would show up on that monthly report.

6    Q     Okay.  So if we could  have D-47 please.  All right Mr.

7    Madiany, this is also a loan committee minutes, but if we cold

8    blow up the top, can you state the date of that one?

9    A     This one's July 7, 2009.

10   Q     Okay.  And paragraph 2, that's where you guys reviewed and

11   approved the report for June, correct?

12   A     Yes.

13   Q     Okay.  And if we could go to page 2.  And if we could blow

14   up real big the bottom three loans and the top section and turn

15   it on its side.

16            MR. EGAN:  Can I just approach, Your Honor?  It would

17   be faster.

18            THE COURT:  Sure.

19            MR. EGAN:  Thanks.

20   BY MR. EGAN:

21   Q     If you can see this, sir, do you see right there?

22   A     Yes.

23   Q     And who's the name on there?

24   A     Levin, George.

25   Q     And how much is the money?

Madiany - Cross (EGA)                                        169

1    A     $5 million.

2    Q     Now you were asked a lot of questions abut the purpose of

3    the loan, right?

4    A     Yes.

5    Q     And you were asked that the purpose of the loan is pretty

6    important to you as the underwriter, correct?

7    A     Yes.

8    Q     But there are circumstances where the purpose of the loan

9    is a lot more important than others, aren't there?

10   A     Indeed, yes.

11   Q     And that would be when the payments on the loan were

12   coming from whatever it was being used for, correct?

13   A     Can you rephrase that?

14   Q     Yeah, I probably should.  So if I was borrowing money to

15   start a restaurant and I was going to pay you back with the

16   proceeds of the restaurant, that would be pretty important to

17   know, right?

18   A     Yes.

19   Q     Because you want to know if I know how to cook, right?

20   A     Yes.

21          MS. BARRY:  Objection.

22          THE COURT:  Sustained.

23   BY MR. EGAN:

24   Q     But if I have say $400 million and I'm going to pay you

25   out of my funds, is the purpose of the loan as important under

1    those circumstances?  It's not, is it?  In other words, the

2    funds are not coming from the purpose of the loan; the funds

3    are coming from my cash flow.  That makes the purpose of the

4    loan much less important, does it not?

5    A    In some cases, yes.

6    Q    And what you're really looking at as an underwriter is

7    where is the money coming from to pay for this loan, correct?

8    A    Yes.

9    Q    That's the key thing.

10   A    Now you were asked about unsecured loans, and this indeed

11   was an unsecured loan, correct?

12   A    Yes.

13   Q    Unsecured loans are not unusual for Nova Bank, correct?

14   A    Not unusual.

15   Q    And they would be unsecured if there were other, if the

16   personal guarantees and the cash flow were sufficient to pay

17   the loan, correct?

18   A    Right.

19   Q    Now you presented your RAS to Mr. Poliski in this case,

20   correct, when you finished it?

21   A    Yes, but with some conditions.

22   Q    Right.  And you never heard back from him about what

23   happened with those conditions, did you.

24   A    No.

25   Q    But it would be his decision whether or not to push the

Madiany - Cross (EGA)                                    171

1    loan forward without meeting those conditions, not yours,

2    right?

3    A    The Chief Credit Officer and myself were mostly on the

4    same page, but you're right, ultimately he can push it.

5    Q    Now when you were asked to do your investigation, your

6    underwriting for this particular loan, did Brian Hartline ever

7    come to you and ask you to ignore any facts?

8    A    No.

9    Q    Did he ever ask you to put something in there that wasn't

10   right?

11   A    No.

12   Q    Did he ever ask you to do anything about this loan?

13   A    No.

14   Q    In fact, it was Tom Patterson that came to you and talked

15   to you about this loan, right?

16   A    Yes.

17   Q    Now I want to talk a little bit about G-118.  And I

18   believe that's been admitted so we can publish it.  This, Mr.

19   Madiany, is an e-mail from you to Mr. Patterson, correct?

20   A    Yes.

21   Q    And it has an attachment on it, correct?  See attachments?

22   A    Yes.

23   Q    And it says 2009 Levin, George G. RAS 063009.docx,

24   correct?

25   A    Yes.

Madiany - Cross (EGA)                                            172

1    Q    Okay.  And if you turn to the next page, this is indeed a

2    June 30, 2009 RAS for Mr. Levin, correct?

3    A    Yes.

4    Q    And it's the attachment that you sent to Mr. Patterson,

5    correct?

6    A    This one I can not specifically remember; I'm not very

7    sure.

8    Q    Well it's attached to the e-mail.  So if it's attached to

9    the e-mail, we can assume it's the attachment you sent him,

10   right?

11   A    I don't want to assume, but it looks like that, yeah.

12   Q    Yes.  And I believe you testified on direct that you don't

13   know who put any other information into this document that made

14   it different from the original one, correct?

15   A    Yes.

16   Q    And you don't know why they would have done that, correct?

17   A    No.

18   Q    But indeed, an individual who was working on a loan

19   application could go into a Risk Assessment Summary and change

20   the information, correct?

21   A    Into an open document, yes.

22   Q    And you could -- say you had to update it, right?

23   A    Yes.

24   Q    So if there were discussions about using Mr. Levin's

25   property for security for the loan or for further loans, that

Madiany - Cross (EGA)                                    173

1    would be something that could be put into this document,
2    correct?
3              MS. BARRY:  Objection.
4              THE COURT:  Sustained.
5    BY MR. EGAN:
6    Q    If we could have D-48 please.  Mr. Madiany, I'm showing
7    you an e-mail chain that involves you, Mr. Poliski and Mr.
8    Patterson.  And if you could take a moment to -- do you
9    recognize that document?  The bottom appears to be an e-mail
10   from you to Mr. Poliski and Mr. Patterson, correct?
11   A    Yes.
12   Q    And it is dated Thursday, July 16th, correct?
13   A    July 16, 2009.
14   Q    Right.  And it says, "Mark and Tom, attached is the
15   updated RAS for the subject borrower based on our prior
16   discussions."  Correct?
17   A    That's what it says, yes.
18   Q    Now you don't really remember at all what this was about,
19   do you?
20   A    Like I said initially, it has been quite a while and I was
21   getting so many e-mails at that time too.
22   Q    Sure, of course.  But basically it's some communication
23   from you to Mr. Poliski and Mr. Patterson in July of 2009
24   updating the RAS, for lack of a better way of putting it,
25   right?

Madiany - Cross (EGA)                                    174

1    A    It says something about business financial statements.

2    Q    Yes.

3    A    Yes.

4    Q    So in other words, even in July there was information

5    going back and forth between you and Mr. Poliski about this

6    RAS, correct?

7    A    Like I say, it's been a while, because this is the first

8    time I'm looking at this document, this specifically.

9    Q    Sure.  Didn't see that before with the Government?

10   A    That's why I'm taking my time.

11   Q    Take your time, sir, I'm sorry.

12   A    Yeah, it looks like there are some communications.

13   Q    And it's between you and Mr. Poliski and Mr. Patterson and

14   it's about Mr. Levin's loan, correct?  Or about his RAS, excuse

15   me.

16   A    Correct.

17   Q    And they're making some modifications in July, correct?

18   A    Yes.

19   Q    And you probably don't really remember at all what that

20   was about, right?

21   A    I see there's modifications but I don't know which part of

22   the RAS would have been modified.  The place which could have

23   been involved in modifying the RAS probably would have been the

24   financial statements and doing the analysis.

25   Q    Okay.  So this would be some of maybe that more

Madiany - Cross (EGA)                                    175

1   information you were talking about earlier.

2   A    I can not say for sure which one.

3   Q    Of course.

4   A    Because like I said, this document was an open document

5   whereby even other people had access.

6   Q    Right, and could be amended for all sorts of appropriate

7   reasons, correct?

8   A    Yes.

9   Q    Now you were asked a number of questions about a loan to

10  Mr. Bonomo.  Do you recall that?

11  A    Yes.

12  Q    And do you remember much about that loan at all?

13  A    That loan, essentially because it was secured by Ballamor

14  Capital account, it was pretty much straightforward.

15  Q    Well you know who Mr. Bonomo was, didn't you?

16  A    I've heard of his name.

17  Q    And you knew that his company had a relationship with Nova

18  Bank and that he had a number of accounts there?  Or you don't

19  remember that?

20  A    I don't specifically recall.

21  Q    That's okay.  I don't think we need to go into that.  You

22  were shown a document, and this is one we just received today,

23  and apologies Your Honor.  117A, do you still have that?  It

24  was handed to you in paper form.

25  A    Yes I do.

Madiany - Cross (EGA)                                    176

1    Q    And you were asked -- this is the loan committee meeting

2    of October 27th, which was around the time that the Bonomo loan

3    was approved, correct?

4    A    Yes.

5    Q    Now first of all, the minutes show who is there and who

6    isn't, right?

7    A    Yes it does.

8    Q    And Mr. Hartline was actually absent at this meeting,

9    correct?

10   A    His name is there.

11   Q    And doesn't it say absent right after it?  Or am I missing

12   that?

13   A    No.

14   Q    Can I see yours?

15   A    117A, right?

16             MR. EGAN:  Your Honor, may I have a moment?  I need

17   to speak to the Government.

18   BY MR. EGAN:

19   Q    If we could have 117 put on the screen.  And if we could

20   have page 1 of 117.  There is no page 1 of 117.  All right,

21   this is Government Exhibit 117, and if you see, if we could

22   blow up the very top, it's loans approved in October, correct?

23   A    October 1st to 31st, 2009.

24   Q    Okay.  And then if you could get rid of that and if we go

25   down to line 6, who's there on line 6?

Madiany - Cross (ENG)                                177

1    A     Anthony and Maryellen Bonomo.

2    Q     So that would have been on the list of loans that were

3    sent to be approved based upon October 1st to 31st, correct?

4    A     Yes.

5    Q     And you were asked about some loans with regard to Mr.

6    Gallab?

7    A     Yes.

8    Q     And nothing unusual about those loans in your view?

9    A     There's nothing unusual about that.

10   Q     And you're aware that his company also had a large

11   relationship with Nova Bank?

12   A     Yeah, he had the companies which he holds with the loans,

13   yes.

14   Q     Yes.  They had a relationship close to $5 million with the

15   bank, correct?

16   A     I'm not very sure about the amount.

17   Q     Now at any time in any of this process did Brian Hartline

18   ever ask you to do anything improper?

19   A     No.

20              MR. EGAN:  That's all I have, Your Honor.

21              MR. ENGLE:  May I, Your Honor?

22              THE COURT:  Yes, sir.

23                          CROSS EXAMINATION

24   BY MR. ENGLE:

25   Q     Good afternoon, Mr. Madiany.

Madiany - Cross (ENG)                                    178

1    A      Good afternoon, sir.

2    Q      Mr. Madiany, you came to Nova Bank in April of 2006 and

3    you were there until approximately October of 2012; is that

4    right?

5    A      Yes.

6    Q      Okay.  And that was after you had banking experience at

7    other banks such as PNC; is that correct?

8    A      Yes.

9    Q      But you would agree with me that different banks generate

10   their own criteria for how they decide whether they do or they

11   do not want to give loans to people under various

12   circumstances.

13   A      Correct.

14   Q      And different banks will agree more often to give

15   unsecured loans than certain other banks.  Is that also

16   correct?

17   A      Yeah, it is correct.

18   Q      And amounts of loans can differ based upon which bank

19   you're talking about as well.  Is that also correct?

20   A      Yeah, based on my experience, yes.

21   Q      And the risk assessment that a bank goes through in

22   determining whether or not to take the risk on loaning a

23   particular individual money, those assessments are different at

24   all different banks.  Isn't that also correct?

25   A      It is correct because underwriting is not a science.  It

1   can be very subjective.

2   Q    Right, not an exact science, it's more of an art form,

3   correct?

4   A    Right.

5   Q    Okay.  Now you were aware when you arrived at Nova Bank in

6   April of 2006 that Mr. Barry Bekkedam had a relationship with

7   the bank as a member of the board.  Is that correct?

8   A    Yes.

9   Q    All right.  And you also were aware during your time at

10  the bank that Mr. Bekkedam then left the board in approximately

11  2007.  Isn't that also correct, sir?

12  A    Yes.

13  Q    Okay.  Now, during the time that Mr. Bekkedam was on the

14  board you didn't frequently see Mr. Bekkedam at Nova Bank's

15  offices, did you.

16  A    No.

17  Q    He wasn't coming there telling people, this is my bank and

18  I run the show.  He wasn't doing that, was he.

19  A    He was at different locations.

20  Q    Okay.

21  A    How about your location?  Did he ever show up there and

22  say, hey, Nova Bank, my bank, I run the show?

23  A    No.

24  Q    No.  And you didn't, during the time when Mr. Bekkedam was

25  on the board for the bank, receive many e-mail communications

Madiany - Cross (ENG)                                    180

1    from him, did you?

2    A    No.

3    Q    You didn't receive any e-mail communications from him, did

4    you.

5    A    During my time over there, none.

6    Q    None.  And you wouldn't receive phone calls from him

7    saying, I want you to approve a particular loan, or recommend

8    that we're going to approve a particular loan.  He didn't do

9    that either, did he.

10   A    No.

11   Q    No.  And after Mr. Bekkedam left the board in 2007, you

12   didn't see him at the bank.

13   A    To tell you the truth, I never met him.

14   Q    You've never even met him.

15   A    Yeah.

16   Q    Okay.  That's Mr. Bekkedam over there, Mr. Madiany, okay?

17   So in working at Nova Bank for about six years you never met

18   Mr. Bekkedam, let alone received e-mails or phone calls from

19   him, right?

20   A    Right.

21   Q    Okay.  And you would agree with me that, as you said, the

22   George Levin loan was unsecured and that's not an unusual

23   thing, correct?

24   A    For that amount it's a little bit unusual.

25   Q    A little bit unusual for the amount but not that it was --

Madiany - Cross (ENG)                                    181

1    that an unsecured loan was approved was not unusual.

2    A    That's not unusual.

3    Q    All right, now the amount may have been different because

4    that was, you said, one of the higher amount loans that Nova

5    had ever approved.  Is that right?

6    A    Yes.

7    Q    Okay.  Now Mr. Levin, however, was an unusual individual

8    in that he was a person with a net wealth in 2009 of upwards of

9    $400 million, wasn't he?

10   A    I'm not sure about the amount but he was a wealthy

11   individual.

12   Q    He was really wealthy, wasn't he?  He had millions of

13   dollars in assets, isn't that right?

14   A    Yes he had.

15   Q    Okay.  So he wasn't the typical customer either, was he.

16   A    Very few of them.

17   Q    Right.  A small community bank like Nova didn't have uber

18   rich multimillionaires walking in every day applying for loans.

19   A    Right.

20   Q    So the circumstances of the size of the loan relative to

21   the man's wealth was not really all that strange or unusual,

22   was it, Mr. Madiany.

23   A    I guess not.

24   Q    Okay.  Now the Levin loan itself, no one came to you and

25   said, we need to get this done fast because Mr. Levin is

1    associated with Mr. Bekkedam.  No one ever said that to you.

2    Am I right about that?

3    A    Not directly.

4    Q    Well no one said that to you at all, did they?

5    A    No one said that.

6    Q    Right.  And the fact is that it needed to be done quick

7    because you were getting the information a day or two before

8    the quarter was about to end.  Is that right?

9    A    Right.

10   Q    And to get the money onto the balance sheets or onto the

11   books, it's got to get done before the quarter ends, correct?

12   A    Correct.

13   Q    All right.  So, the loan committee had a meeting that

14   morning and it ended quite early, as you were asked by Mr.

15   Egan, and the loan was still being processed; is that correct?

16   A    Right.

17   Q    Okay.  Can we bring up please Government Exhibit 43.  And

18   Your Honor, this has been published before.  May we publish it

19   again?

20             THE COURT:  Yes, sir.

21             MR. ENGLE:  Thank you.

22   BY MR. ENGLE:

23   Q    Mr. Madiany, do you have Government 43 there in front of

24   you on the screen?

25   A    Yes.

Madiany - Cross (ENG)                                183

1   Q    All right.  This is the Risk Assessment Summary, or RAS,

2   that you had prepared for Mr. Levin's loan, correct?

3   A    Yes.

4   Q    And this is where we saw that he was getting an interest

5   rate of prime plus one percent with a seven percent floor?  If

6   we go down one section, Sean.  Do you see that, where it says

7   rate?

8   A    Yes.

9   Q    And that wasn't any kind of special rate.

10  A    No it was not.

11  Q    Okay.  And even though we said that there's no collateral

12  securing the loan, there was a lot of guarantee there, isn't

13  that also correct.

14  A    Yes.

15  Q    All right.  Now can we go to -- this is page 1 of 8.  Can

16  we go to page 8 of 8 please.  Do you see that there, Mr.

17  Madiany?

18  A    Yes.

19  Q    All right.  This is a form that Nova Bank has that lists

20  the name of the borrower, right?

21  A    Yes.

22  Q    This is attached to the Risk Assessment Summary.

23  A    Yes.

24  Q    So after the Risk Assessment Summary is presented to the

25  individuals who get to vote on it from the loan committee, they

1  either sign off on it saying that they approve it or they

2  don't, correct?

3  A    Yes.

4  Q    And in this instance this loan for George Levin of $5

5  million says that it was approved on the 30th day of June,

6  2009, and it's signed by a number of individuals.  Is that

7  correct?

8  A    Yes.

9  Q    And it's signed by all the members of the loan committee.

10  A    Yes.

11  Q    They're the people that were the senior management of the

12  bank, right?

13  A    Yes.

14  Q    Mr. Bekkedam's name doesn't appear there on a signature

15  line, does it?

16  A    It does not.

17  Q    Because he had absolutely no authority whatsoever to grant

18  or deny the loan at the bank.  Isn't that also right.

19  A    He was not a member.

20  Q    Right.  So he couldn't say one way or another, could ne.

21  A    No.

22  Q    No.  And we talked about the fact that it wasn't unusual

23  that a loan would be walked around to these different people if

24  there wasn't a meeting available to do it, correct?

25  A    Correct.

Madiany - Cross (ENG)                                    185

1    Q    That morning when you had the early loan committee meeting
2    there wasn't enough time to present the RAS to the entire
3    committee at that point, correct?
4    A    Correct.
5    Q    So the RAS was then taken to these five individuals for
6    their assessment, correct?
7    A    Yes.
8    Q    And based upon your work experience with those
9    individuals, they all took their fiduciary responsibilities to
10   the bank very seriously, did they not?
11               MS. BARRY:  Objection.
12               THE COURT:  Sustained.
13   BY MR. ENGLE:
14   Q    Would you agree with me that in your experience with these
15   individuals, that when you presented them with information in a
16   RAS they would want to read it.
17               MS. BARRY:  Objection.
18               THE COURT:  Sustained.
19   BY MR. ENGLE:
20   Q    Nevertheless, you're aware they signed off in it.
21   A    Yes.
22   Q    Okay.  Now with respect to the Levin loan, if we go back
23   to the second page, and the top part, transaction comments,
24   Sean, thank you.  Mr. Madiany, do you see that?
25   A    Yes.

Madiany - Cross (ENG)                                  186

1    Q    You were asked about this before by the Government where

2    it indicates in the body of that text that the loan was going

3    to be used by Mr. Levin for investment purposes; is that right?

4    A    Yes.

5    Q    And what that would mean is if that loan is approved and

6    funded, the money would go to Mr. Levin.  Is that correct?

7    A    If it's approved, yes.

8    Q    Right.  We know this loan was approved, right?

9    A    The document, yeah.

10   Q    Yeah.  You saw the signatures.  It was approved by the

11   loan committee?

12   A    Yes.

13   Q    Then it would be funded and the money would be sent to the

14   customer, correct?

15   A    Correct.

16   Q    $5 million would be sent to Mr. Levin, and at that point

17   he said that the purpose was for investment, correct?

18   A    Right.

19   Q    Now he could invest in a business, right?

20   A    Yes.

21   Q    He could invest in real estate.

22   A    Yes.

23   Q    He could invest in anything he wanted to.  It's his money

24   at that point, right?

25   A    Yeah, it is his money.

Madiany - Cross (ENG)                              187

1    Q     Yeah.  So when he gets the money, then Mr. Levin has to

2    make the independent decision for himself who or what he's

3    going to invest in.  Right?

4    A     You're right, yep.

5    Q     And at a certain point in time, whether it was before the

6    loan was approved, or shortly after the loan was approved, you

7    were told by Mr. Patterson who brought this loan to you that

8    Mr. Levin intended to invest in Nova Holding Company stock,

9    right?  You came to learn that.

10   A     Can you repeat that question again?

11   Q     You came to learn, either slightly before or somewhat

12   after the loan was approved on June 30, 2009, that the purpose

13   was for Mr. Levin to invest by purchasing Nova Holding Company

14   stock; isn't that right?

15   A     I did not learn about the purpose for investment in Nova

16   Bank.

17   Q     Ever?

18   A     Never.

19   Q     Never.

20   A     Yeah.

21   Q     Okay.  You've met with the Government agents on a number

22   of occasions prior to this trial, haven't you?

23   A     Yes.

24   Q     Okay.  Now do  you recall meeting with Government agents

25   on or about October 1, 2015?  So this past October, first day.

1    A    Yes I did.

2    Q    All right.  And you were being asked about issues

3    involving the Levin loan documents.  Do you recall that?

4    A    Right.

5    Q    And you indicated to the agents -- let me just make sure I

6    get this right -- that you believed that Patterson told you

7    that the funds were used by Levin to invest in the bank.

8    Remember that?

9    A    I remember that, but that was an error.

10   Q    That was an error.

11   A    Yeah.

12   Q    Okay.  And then do you remember that during this interview

13   with the Government agents they questioned your recollection

14   about this issue because you had not previously mentioned that

15   during prior interviews or during your grand jury testimony.

16   Do you remember that?

17   A    Yes.

18   Q    And you stated that you may be making an assumption that

19   you were told about the funds being used to purchase the bank

20   stock because you later learned about Mr. Levin purchasing the

21   stock in the bank, right?

22   A    No, it could have been a miss work (sic) because since

23   2009 and 2015, or whatever year was that, a lot has passed

24   through, and what I was telling to the agent at that point was

25   it could because I was thinking about it because, but nobody

Madiany - Cross (ENG)                                    189

1    actually told me that it was for that purpose.

2    Q    Well how would you have it in your mind to say to the

3    agents that you were aware that Mr. Levin used the money to

4    invest in Nova stock if no one ever said that to you?

5    A    It was mostly because of the timing.

6    Q    The timing.

7    A    Of the approval itself.  But nobody outright came out and

8    said, no.

9    Q    How about, do you remember meeting with the agents on St.

10   Patrick's Day of this year, March 17th?

11   A    Yes.

12   Q    And you remember telling them that you were not absolutely

13   certain that you were told by Tom Patterson at the time the

14   Levin loan was funded that the loan was for Levin to purchase

15   Nova stock but you were certain that you learned about how the

16   funds were used sometime after the loan was funded on June 30,

17   2009.  Do you remember telling agents that just a couple weeks

18   ago?

19   A    That last portion is one which I don't want to admit to

20   because nobody -- probably what I was doing was just assuming,

21   but the only thing which triggered me to that is the 6-30

22   approval date, that's all.

23   Q    Okay.  Let me ask you something.  Did you say to the

24   agents on March 17, 2016 that you weren't absolutely certain

25   that Mr. Patterson told you at the time the loan was approved

Madiany - Cross (ENG)                                    190

1    that it was for Mr. Levin to purchase stock, but that you were

2    certain you learned about how the funds were used sometime

3    after June 30th.  Did you say that to the agent?

4    A    I said that to the agent but I did not learn anything

5    about the usage of the loan.

6    Q    Okay.  So in October of 2015 you told the agents that you

7    knew about the loan's purpose, you said that same thing again

8    to them March 17th of this year, but now, today, when you're

9    testifying in court, that's just not the case.

10   A    No, we discussed that issue, the agents, in 2015, in 2016,

11   sorry, but as far as saying with certainty that I learned, how

12   could I -- I had no way of learning because I was away from the

13   bank all that time so there was no certainty involved.

14   Q    So it's your sworn testimony that Mr. Patterson never told

15   you, either before or after the Levin loan was being approved,

16   that it was for him to invest in Nova stock.

17   A    Yes.

18   Q    Okay.  Even though you said all that to the agents.

19   A    Yeah, because we had the discussion about that.

20   Q    Okay.  Now you never spoke to Mr. Bekkedam about the Levin

21   loan whatsoever; is that right?

22   A    No.

23   Q    He never came to you and said, I need you to give Mr.

24   Levin special treatment?

25   A    No.

Madiany - Cross (ENG)                    191

1    Q     He never contacted you about the details

2    A     No.

3    Q     And the RAS document that you were talking about earlier,

4    you said it's an open document and other people would have

5    access to it?

6    A     Yes.

7    Q     An open document would require that you have access to the

8    bank system; is that right?

9    A     Yes.

10   Q     When this document, the Levin RAS, was created and that we

11   were talking about it during June and then later in October,

12   Mr. Bekkedam didn't have any association with the bank and

13   therefore would not have had any access to it; is that correct?

14   A     That's correct.

15   Q     Now if we can pull up Government Exhibit 41.

16          THE COURT:  Counsel, about how much longer?

17          MR. ENGLE:  I'm going to try to wrap this up in five

18   minutes if I can, Your Honor.  Unless the Court would like me

19   to stop.

20          THE COURT:  No, no, you can go right ahead.

21          MR. ENGLE:  Okay, thank you.

22   BY MR. ENGLE:

23   Q     Those are the loan committee minutes for June 30th of

24   2009?

25   A     Correct.

1    Q     It indicates various members of the loan committee that

2    were present, correct?

3    A     Right.

4    Q     And that there were various guests who were permitted to

5    be present at that meeting.  Is that also correct?

6    A     Correct.

7    Q     Mr. Bekkedam's name isn't there, is it?

8    A     No.

9    Q     Okay.  Now you were asked some questions about whether or

10   not the Levin loan showed up in connection with any of the loan

11   committee minutes.  Do you remember that, when the Government

12   was asking you questions?

13   A     Yes.

14   Q     And then Mr. Egan showed you Government 117 where the

15   Levin loan did, in fact, show up, correct?  We went over that?

16   A     It showed up not on the minutes but on the report.

17   Q     Right.  And the Government had asked you whether or not

18   anything showed up on the report of the June 30th meeting.

19   Remember that?

20   A     Yes.

21   Q     And it wouldn't have show up and it couldn't have show up

22   on those meeting minutes because the meeting happened early in

23   the morning and the loan wasn't approved until later in the

24   day, right?

25   A     It was walked around.

Madiany - Cross (ENG)                                    193

1    Q     Right.  So it wouldn't show up in that document.

2    A     No.

3    Q     But it did show up in the other meeting minutes that we

4    saw recently, correct?  And can we call up Government 59?  Do

5    you recognize that document, sir?  Is that loan committee

6    minutes for July 14th of '09?

7    A     Yes.

8    Q     Okay.  And again, that's a meeting where if you look at

9    the members and the guests that were present, Mr. Bekkedam

10   wasn't there, right?

11   A     He wasn't.

12   Q     And if we go to the next page, do you see that again we

13   have the ratification of the loans approved document?

14   A     Yes.

15   Q     All right.  Your Honor, may I approach?  It will be a

16   little bit faster if I do.

17            THE COURT:  Yes, sir.

18            MR. ENGLE:  Thank you.

19   BY MR. ENGLE:

20   Q     In looking at that, do you see down here as you go down

21   I've highlighted one?

22   A     Yes.

23   Q     What name is there?

24   A     George Levin.

25   Q     What's the date of the loan?

1   A    6-30 2009.

2   Q    What's the amount?

3   A    Five million.

4   Q    Okay.  So when it was suggested during your direct

5   examination that that loan was just never reported anywhere,

6   that wouldn't be accurate now, would it?

7            MS. BARRY:  Objection.

8            THE COURT:  Overruled.

9   BY MR. ENGLE:

10   Q    It's not accurate because it's reported in what I just

11   showed you; isn't that correct?

12   A    Can you repeat the question again please?

13   Q    It would not be accurate to state that the George Levin

14   loan was never reported on any loan committee documents because

15   I just showed you documents that report the loan.

16   A    Right

17   Q    Right.  And similarly, do you remember being asked on

18   direct examination about the reporting of the Anthony Bonomo

19   loan?

20   A    Yes.

21   Q    And you were asked questions that were suggesting that the

22   Bonomo loan wasn't reported either, correct?

23            MS. BARRY:  Objection, Your Honor.

24            MR. ENGLE:  It's his recollection.

25            THE COURT:  Well let's just stick with the one that

1  you just questioned about, not Mr. Bonomo's loan.  You

2  demonstrated by the exhibit.

3  BY MR. ENGLE:

4  Q    Right, okay.  Do you remember being asked questions on

5  direct examination about Government Exhibit 117A?

6  A    Yes.

7  Q    Do you have that in front of you?

8  A    Yep.

9  Q    And you remember being asked questions, and that there was

10  testimony given that the Bonomo loan didn't show up there.

11  A    Yeah, I remember being asked the questions.

12  Q    Right.  May I approach, Your Honor?

13        THE COURT:  Yes.

14  BY MR. ENGLE:

15  Q    In looking at Government 117A, these are the loan

16  committee minutes for October 20th of '09, right?  Am I right

17  about that?

18  A    Yes.

19  Q    Okay.  Here's the ratification of loans for the period

20  October 1 through October 31st of '09.  Do you see that?

21  A    Yes.

22  Q    Number six, that's Bonomo, correct?

23  A    Yes.

24  Q    That's the $4.5 million loan.

25  A    Yes.

1   Q    So in fact it was reported there, correct?

2   A    Correct.

3   Q    To suggest otherwise would be in correct, am I right?

4   A    You're right.

5   Q    Okay.  Now with respect to the Bonomo loan, Mr. Bekkedam

6   never contacted you in any way, shape or form to say, I want

7   you to approve that loan, did he?

8   A    No.

9   Q    He never suggested that Mr. Bonomo was a client, or a good

10  friend, or someone that he wanted to be given preferential

11  treatment at the bank.

12  A    No.

13  Q    He never contacted you in any way, shape or form about the

14  loan to Mr. Gallab, did he.

15  A    No.

16  Q    During all your time at the bank, Mr. Bekkedam was never

17  present at any of the loan committee meetings.

18  A    He was not.

19  Q    And he never contacted you to ever try to put pressure on

20  you as to what went in to a Risk Assessment Summary, correct?

21  A    Correct.

22  Q    And he never called you or communicated with you in any

23  way, shape or form to try to influence your recommendation for

24  anyone that might be getting a loan that he knew.

25  A    No.

Madiany - Redirect (BAR)                              197

1   Q    He never did that.

2   A    He never did that.

3              MR. ENGLE:  Thank you, sir.  I have nothing further.

4              THE COURT:  In deference to the fact that we're going

5   to start a little later tomorrow, I will let counsel go forward

6   at this time.

7              MS. BARRY:  I'll be brief, Your Honor.  Thank you.

8                        REDIRECT EXAMINATION

9   BY MS. BARRY:

10  Q    Mr. Madiany, there were several questions about Mr. Levin,

11  and that he was a person that had a lot of wealth, that he was

12  a very wealthy person.  Do you remember those questions?

13  A    Yes I do.

14  Q    And do you recall that when you reviewed Mr. Levin's tax

15  returns that he had a negative gross income?

16  A    Yes.

17  Q    And for a person who had ostensibly a ton of money, did it

18  concern you that his tax returns showed a negative gross

19  income?

20  A    It didn't concern me so much because we see that a lot

21  with the wealthy individuals showing negative net worth and

22  negative income for the year.

23  Q    And to follow up on whether hor not you should be

24  concerned or not, did you want more information related to his

25  companies?

Madiany - Redirect (BAR)                                    198

1    A     Yes.

2    Q     And when you were looking and assessing Mr. Levin, you

3    needed two years worth of financials; is that right?

4    A     Right.

5    Q     And so if you were assessing him within a few days at the

6    end of June of 2009, would the previous two years be 2008 and

7    2007?

8    A     Yes.

9    Q     There were many, many questions that were asked of you

10   regarding the loan committee meetings and the minutes.  I was

11   specifically asking you about the minutes of each meeting, and

12   just explain what are the purpose of meeting minutes?

13   A     The meeting minutes purpose is to encapsulize the approval

14   of all loans which have been presented to the loan committee by

15   managers.  In fact, if you look at the meetings, the principal

16   on the left side, the loan officer presenting the loans on the

17   right side.  Those are the guests so to speak.

18   Q     So in looking at Government's Exhibits, I believe it was

19   41, and in those meeting minutes, just the minutes themselves,

20   is there any discussion on the George Levin $5 million

21   unsecured loan?

22   A     No.

23   Q     And I'm not sure if you have Defense Exhibit 47 in front

24   of you or not.  Do you have that there?

25              MR. EGAN:  We would stipulate there's no discussion

Madiany - Redirect (BAR)                              199

1    in the minutes, Your Honor.

2              THE COURT:  Agreed?

3              MS. BARRY:  Okay, agreed.

4              THE COURT:  Thank you.

5    BY MS. BARRY:

6    Q    So there was no discussion in the meeting, the subsequent

7    meeting on the $5 million unsecured George Levin loan.

8    A    No.

9    Q    So when they talk about walking the loan around, when does

10   a loan get walked around typically?

11   A    Normally the senior management they had their offices in

12   another location, in Berwyn, Pennsylvania and that's where the

13   senior management had their offices, so sometimes they would

14   just talk among themselves and walk the loan documentation

15   around to the offices.

16   Q    And it would make sense that those walk-arounds would

17   happen in between meetings.

18   A    Yes.

19   Q    So if there's a meeting on the day a loan is going to be

20   approved, then is it typical, in your experience, that the loan

21   would be discussed at the meeting?

22   A    Yes.

23   Q    And there was no discussion on June 30, 2009, correct?

24   A    Not about that loan.

25   Q    And again, in looking at the meeting minutes on

Madiany - Redirect (BAR)                                        200

1    Government's Exhibit 117 and 117A, just the meeting minutes
2    themselves, and 117 is from October 27th, right?  So this is
3    the meeting on October 27, 2009.
4    A    Yes.
5    Q    Is there any discussion on the Anthony Bonomo $4.5 million
6    loan?
7    A    No.
8    Q    And if we go back and you take a look at Government's
9    Exhibit 117A, which is the meeting minutes from October 20,
10   2009, is there any discussion about the Anthony Bonomo $4.5
11   million loan in that meeting?
12   A    No.
13   Q    And looking at Government Exhibit, I believe it's 109, the
14   RAS for the Anthony Bonomo loan.  Do you have that in front of
15   you?  What is the date that that loan was approved?
16   A    On page 1 it doesn't show the approval date.  It just says
17   --
18   Q    Oh, well as far as the date of the RAS, I'm sorry.
19   A    It's October 21, 2009.
20   Q    And so there's no discussion between the meetings on
21   October 20th and October 27th about that loan.
22   A    Not to the loan committee.
23   Q    And you were asked questions about whether or not an
24   unsecured loan was unusual.  A $5 million unsecured loan, was
25   that a usual occurrence at Nova Bank?

Madiany - Recross (EGA)                                    201

1    A     No, that's unusual, unsecured.

2               MS. BARRY:  May I have a moment, Your Honor?

3               THE COURT:  Surely.

4               MS. BARRY:  No further questions, Your Honor.

5               MR. EGAN:  Very briefly, Your Honor?

6               THE COURT:  Very.

7                        RECROSS-EXAMINATION

8    BY MR. EGAN:

9    Q     Loan committee minutes, they're like a summary of the

10   meeting, right?

11   A     Yes.

12   Q     They're not everything that happened there, correct?

13   A     It's a summary of the loans presented on that day.

14   Q     Yeah, the highlights.

15   A     Yes.

16   Q     And the other loans there on that sheet and then paragraph

17   2 says those were the ones that were approved.

18   A     Yes.

19   Q     That doesn't mean they weren't also discussed, correct?

20   A     Normally what is in the minutes were discussed.  The ones

21   we show in that report are the ones that we compiled by the

22   administrative assistants.

23   Q     And that would include the ones that had been walked

24   around.

25   A     Yes.

1    Q    And you obviously couldn't take a loan to the loan

2    committee if all the paperwork wasn't done, right?

3    A    No.

4    Q    So if the paperwork wasn't done by the time of the meeting

5    you'd have to do it later that day by walking it around, right?

6    A    Right.

7              MR. EGAN:  That's all I have, Your Honor.

8              MR. ENGLE:  Very briefly, Your Honor?

9              THE COURT:  Oh, you can do it from your table if it's

10   going to be that brief.

11             MR. ENGLE:  Sure.

12                        RECROSS-EXAMINATION

13   BY MR. ENGLE:

14   Q    Just taking a quick look at Government 117.  And we can go

15   to the first page, second page, I'm sorry.  You see paragraph

16   two, don't you, sir?

17   A    Yes.

18   Q    Part of the activity at the loan committee meeting was to

19   ratify the loan approved report, correct?

20   A    Yes.

21   Q    And that loan approved report is the report with all those

22   names that we showed you earlier, right?

23   A    Yes.

24   Q    And so for this particular example in October of 2009 when

25   the Bonomo loan was going through, the committee reviewed the

Madiany - Recross (ENG)                        203

1   ratification of loan approval report, right?

2   A    Right.

3   Q    And that's the report I showed you earlier that says the

4   Bonomo loan, and it was $4.5 million.

5   A    Yes.

6   Q    Okay.  So that was business that was taken up at the loan

7   committee, correct?

8   A    Yeah, that language covers the report.

9   Q    Right.  And on the issue of the unusual circumstances of

10  an unsecured $5 million loan, the loan to Mr. Levin had

11  guarantees from those companies that were worth a lot of money

12  back on June 30th of 2009, right?

13  A    Yes, that's what we were waiting to review.

14  Q    Right.  And there's nothing in your Risk Assessment

15  Summary that indicated that the loan committee should turn down

16  that loan because it was so unusual, correct?

17  A    No.

18  Q    Right.  So you did not state because of anything being so

19  wildly unusual the loan committee should not approve it.  You

20  never did that.

21  A    No, that's not that language.

22  Q    Okay.  In fact, in the RAS, Government 43, if we could

23  bring that up briefly, the next page, the fifth page.  When you

24  go down to part F, you go through an entire assessment of the

25  strengths and potential weaknesses for the loan, right?

Madiany - Recross (ENG)                                    204

1   A    Right.

2   Q    And below that -- if we can go down a little bit, Sean --

3   it says, mitigated reasons, it says both weaknesses mitigated

4   by credit strengths especially business experiences noted above

5   including the key man life insurance police on the principle,

6   right?

7   A    Right.

8   Q    That was your assessment of the strengths and weaknesses

9   and ultimately the strengths outweighed the weaknesses, didn't

10  they,

11  A    Yes, but we were still waiting for the documentation from

12  the other companies.

13  Q    I understand that.  But the bottom line is that based upon

14  the information that you had at the time, your position was the

15  strengths outweighed the weaknesses, correct?

16  A    Right.

17  Q    And then the loan committee agreed with you and they

18  signed off on it, right?

19           MS. BARRY:  Objection.

20           THE COURT:  Sustained, counsel.

21           MR. ENGLE:  Nothing further.

22           MR. BARRY:  Nothing further, Your Honor.  Thank you.

23           THE COURT:  All right.  At 4:50 we're going to

24  adjourn for the day.  We will resume tomorrow morning at 10.

25  Be careful out there.  It is important that you not discuss the

(Colloquy)                                    205

1    testimony.  Please, please, please avoid any news reports about

2    this case.  I did see a reporter in the courtroom; I don't mind

3    saying that.  And you will be looking at the papers about the

4    game tomorrow but don't let your eyes stray.  Thank you very

5    much.  We'll see you tomorrow morning.

6              THE DEPUTY:  All rise.

7              (The jurors exit the courtroom.)

8              THE COURT:  You may step down, sir.  Thank you.  We

9    are adjourned.  Thank you.

10             MS. BARRY:  Your Honor, just one matter please.  It's

11   not for the witness.

12             THE COURT:  Yes, ma'am.

13             MS. BARRY:  Your Honor, the Government would just

14   like to note that the predicate questions that are coming from

15   defense counsel on the Government's suggesting is what's

16   objectionable.  The Government's not suggesting anything.  The

17   Government is asking questions and the witness is answering.

18   To ask a question that the Government suggested what the answer

19   was is inappropriate and objectionable.

20             THE COURT:  I agree.

21             MS. BARRY:  And I would request that there's an

22   admonishment to defense counsel on continuing use of Government

23   suggested.

24             THE COURT:  Counsel, Government's counsel is correct.

25   I did not hear an objection articulated on that basis, however,

(Colloquy)                                    206

1    but she is correct, and to that extent the objection from this

2    point forward would be sustained and I would ask that you not

3    do that.  On the other hand, keep in mind that counsel may have

4    stated what the Government suggested and intended to suggest

5    what the Government would want you to infer from what we said

6    or what was testified to.  There's a big distinction.  But

7    nevertheless, the objection as it was stated is sustained.

8            MS. BARRY:  Thank you, Your Honor.

9            THE COURT:  All right.

10           MR. EGAN:  And Your Honor, the other issue we have is

11   the continued difficulties with knowing the lineup.

12           THE COURT:  Okay.  Today?

13           MR. IGNALL:  I had indicated who we're likely to have

14   for tomorrow as of last week.  We have Mr. Poliski and Mr.

15   Deitrich will probably be the first two witnesses because Mr.

16   Poliski is the one we need to get in and out.  Our next witness

17   would be Mr. Levin who we did not get to today.  I doubt we'll

18   get past that.  I anticipate the next witness we would try to

19   get here would be Mr. Patterson, and I'd be surprised if we got

20   through all that.  I've already indicated that I anticipate

21   having Ms. Musser here on Wednesday.  I really don't know who

22   else we would have.  I don't know how far we're going to get,

23   but we can get an idea of who we'd likely come up with and let

24   them know.  But it's very difficult for us to, you know, herd

25   the cats because some witnesses have travel issues and on

(Colloquy)                                    207

1    certain dates we can slide them in.  Like Mr. Poliski --

2               THE COURT:  But with Mr. Levin, is he a definite?

3               MR. IGNALL:  Yes, he is here, he is in Philadelphia,

4    he will go on as our third witness tomorrow.  And I'm hoping

5    we're done with him tomorrow but I'm not sure if we will or

6    will not be done with him.

7               MR. EGAN:  What we're hearing, Your Honor, is maybe

8    through half of the day Wednesday.  And with all due respect,

9    that's pretty short notice.  I mean generally, I agree with Mr.

10   Engle, that with trials of this nature we get who's coming this

11   week.

12              THE COURT:  Can you do that, counsel?

13              MR. IGNALL:  Not easily, no, Your Honor.  I'm not

14   aware of that being a standard practice and I even found an

15   example of the trial of Mr. Engle where he asked for the next

16   day and counsel gave it to him.  We'll do the best we can.  If

17   I give a name just because I think it's someone we might want

18   to get to, that's I think worse than useless because we get to

19   that person or we don't.  Counsel knows who the potential

20   witnesses are.  If I can give them some idea of who's going to

21   be here Wednesday, I'll let them know, but I don't know who's

22   going to be here Wednesday.  I don't know who's going to be

23   here Thursday.

24              MR. ENGLE:  Your Honor, my experience has been that

25   obviously the Government knows pretty much how they book travel

(Colloquy)                                          208

1   schedules.  Either their legal assistants or the agents are

2   handling that stuff.  Every trial that I've done that's been

3   week trials we've been given a week's worth of witnesses.  Now

4   that didn't mean that the Government was held to a witness on

5   that week had to be called on Thursday as opposed to Friday or

6   Wednesday as opposed Thursday.  That's not what we're talking

7   about.

8           THE COURT:  I understand.  Is there the ability,

9   counsel, to give them a general idea as to the remainder of

10  this week?

11          MR. IGNALL:  I will do what I can, Your Honor, but it

12  may turn out to be less than useful if I have to shift around.

13          THE COURT:  Well let's cross that bridge if it's not

14  useful, but at least give it to them and then see where we go

15  from there.

16          MR. IGNALL:  Okay, because Ms. Musser is the only

17  travel we've set up for a witness for this week.

18          THE COURT:  All right, so then there should be some

19  other people obviously between now and Friday who will testify,

20  and they're here.

21          MR. IGNALL:  Yes, and we will work tonight now that

22  we know how far we've gotten today to see who we try to get

23  here for Wednesday or later.

24          THE COURT:  All right.  Just give it to the defense.

25          MR. IGNALL:  Okay.

(Colloquy)                                209

1          MR. ENGLE:  Thank you, Your Honor.

2          THE COURT:  Thank you every much.  We're adjourned.

3          MR. IGNALL:  Thank you.

4          (Proceedings concluded at 4:53 p.m.)

5                          *       *       *

6

7

8

210

1                     C E R T I F I C A T I O N

2

3          I, Anne Yowell, court approved transcriber, certify

4     that the foregoing is a correct transcript from the official

5     electronic sound recording of the proceedings in the above-

6     entitled matter.

7

8     Anne Yowell
      _____          Date:  April 14, 2016
9

10    ANNE YOWELL

11    DIANA DOMAN TRANSCRIBING, LLC

12

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | 14-CR-0548 |
| | ) | |
| vs. | ) | |
| | ) | |
| BRIAN HARTLINE and | ) | |
| BARRY BEKKEDAM, | ) | Philadelphia, PA |
| | ) | April 5, 2016 |
| Defendants. | ) | 10:26 a.m. |

TRANSCRIPT OF EXCERPT OF TRIAL
BEFORE THE HONORABLE C. DARNELL JONES II and JURY
UNITED STATES DISTRICT JUDGE

APPEARANCES:

| | |
|---|---|
| For the Government: | DAVID J. IGNALL, ESQUIRE |
| | JENNIFER CHUN BARRY, ESQUIRE |
| | ASSISTANT UNITED STATES ATTORNEYS |
| | UNITED STATES ATTORNEY'S OFFICE |
| | 615 Chestnut Street, Suite 1250 |
| | Philadelphia, PA 19106 |
| | |
| For the Defendant | PATRICK J. EGAN, ESQUIRE |
| Brian Hartline: | FOX ROTHSCHILD LLP |
| | 2000 Market Street, 10th Floor |
| | Philadelphia, PA 19107 |
| | |
| For the Defendant | MICHAEL J. ENGLE, ESQUIRE |
| Barry Bekkedam: | GREENBLATT, PIERCE, ENGLE, |
| | FUNT & FLORES |
| | 123 South Broad Street, Suite 2500 |
| | Philadelphia, PA 19109 |
| | |
| | RUSSELL D. DUNCAN, ESQUIRE |
| | SHULMAN, ROGERS, GANDAL, |
| | PORDY & ECKER, PA |
| | 12505 Park Potomac Avenue |
| | Potomac, MD 20854 |
| | |
| | JOEL D. SCHWARTZ, ESQUIRE |
| | SHULMAN ROGERS GANDAL PORDY ECKER |
| | 12505 Park Potomac Avenue, 6th Floor |
| | Potomac, MD 20854 |
| | |
| Audio Operator: | CARL HAUGER |

2

```
Transcribed by:              DIANA DOMAN TRANSCRIBING, LLC
                             P.O. Box 129
                             Gibbsboro, NJ 08026
                             Office: (856) 435-7172
                             Fax:    (856) 435-7124
                             E-mail:  dianadoman@comcast.net
```

Proceedings recorded by electronic sound recording; transcript
produced by transcription service

3

1                          I N D E X

2    WITNESSES:          DIRECT       CROSS       REDIRECT       RECROSS

3    FOR THE GOVERNMENT:

4    Mark Poliski        4(Bar)      16(Ega)      49(Bar)

5                                    41(Dun)

6

7    David Dietrich     56(Bar)      67(Ega)      84(Bar)

8                                    78(Dun)

9

10   George Levin       86(Ign)     129(Ega)

11                                  160(Dun)

12

13   EXHIBITS:                                   I.D.    RECEIVED

14   G-4   9/30/2008 Risk Assessment Summary     Prev.        51

15   G-5   9/30/2008 Loan Committee Meeting Minutes Prev.     49

16   G-55  Investment Application                Prev.       128

17   G-67  Bank Document                         Prev.       181

18   G-80  9/3/2009 E-mail                       Prev.       117

19   G-98  10/15/2009 E-mail                     Prev.       120

20   G-310 6/2009 Nova Bank Loan Paperwork       Prev.       106

21

22

23

24

25

Poliski - Direct (Bar)                                    4

1          (The following was heard in open court at 10:27 a.m.)

2          (Jury enters at 10:27:49 a.m.)

3               DEPUTY:  All rise.

4          (Pause)

5               DEPUTY:  Court is now in session.  The Honorable C.

6     Darnell Jones II presiding.

7               THE COURT:  Good morning, good morning, you may be

8     seated.

9               COUNSEL:  Good morning, Your Honor.

10              THE COURT:  Well, how about those Sooners -- I mean,

11    Wildcats?  Next time.

12              COUNSEL:  Next time.

13              THE COURT:  Counsel, you ready to go?

14              MS. BARRY:  Yes, Your Honor.

15              THE COURT:  You may proceed.

16              MS. BARRY:  Thank you, Your Honor.  The United

17    States calls Mark Poliski.

18    M A R K   P O L I S K I, GOVERNMENT WITNESS, SWORN.

19              THE CLERK:  Please state and spell your name for the

20    record for me.

21              THE WITNESS:  Mark Poliski, P-O-L-I-S-K-I.

22              MS. BARRY:  May I inquire, Your Honor?

23              THE COURT:  You may proceed.

24              MS. BARRY:  Thank you.  Good morning, Mr. Poliski.

25              THE WITNESS:  Good morning.

1                        DIRECT EXAMINATION

2      BY MS. BARRY:

3      Q     Would you please tell the ladies and gentlemen of the

4      jury where you work.

5      A     I currently work at Santander Bank.

6      Q     And what is your position at Santander?

7      A     I'm a credit officer.

8      Q     And how long have you been in banking, sir?

9      A     Been in banking since 1987.

10     Q     And prior -- did you go to college?

11     A     Yes, I did.

12     Q     And did you get any particular kind of degree?

13     A     Yes, I got a Bachelor of Science in Accounting.

14     Q     Okay.  Did you bec -- or, are you a CPA?

15     A     I am not.

16     Q     Okay.  Mr. Poliski, were you ever employed by a bank

17     called Nova Bank?

18     A     Yes, I was.

19     Q     And how long did you work at Nova Bank?

20     A     A little over three years.

21     Q     And can you tell -- tell us, please, what time-frame that

22     covers, those three years?

23     A     Yes, from the early part of 2008 until April of 2011.

24     Q     And who hired you?

25     A     Brian Hartline.

1    Q    And do you see Brian Hartline here today?

2    A    Yes, I do.

3         MS. BARRY:  Your Honor, the Government would request

4    that the witness has identified the defendant, Brian Hartline.

5         THE COURT:  Well, he says he sees him.

6         MS. BARRY:  Okay.

7    BY MS. BARRY:

8    Q    Would you please identify -- can you identify where he

9    is, please?

10   A    Yes, that's Brian, seated right over there.

11        THE COURT:  Record shall so reflect.

12        MS. BARRY:  Thank you, Your Honor.

13   BY MS. BARRY:

14   Q    And when you were hired at Nova Bank, what were you hired

15   to do?

16   A    I was hired to be the Chief Credit Officer of the bank.

17   Q    And can you explain what the Chief Credit Officer -- what

18   his duties would be?

19   A    Chief Credit Officer is responsible for the credit

20   quality, credit approval, credit administration, loan

21   documentation of the -- of the loans in the bank.

22   Q    And as the Chief Credit Officer, did you sit on any

23   committees at the bank?

24   A    Yes, I sat on -- yes.

25   Q    What committees?

1    A    I sat on the loan committee, the asset liability

2    committee, the audit committee, and senior management team.

3    Q    And what -- what happened at the loan committee?

4    A    Loan committee's primary responsibility was to assess

5    loans that were being presented for approval, and approve or

6    deny their -- the loans.

7    Q    Where -- there were times that loans that were not

8    discussed at the loan committee were walked around?

9    A    Yeah -- walked around, as in not approved at loan

10   committee?

11   Q    Or not presented, or not approved, loans that may not

12   have been approved at the committee, yes.

13   A    There were times when loans were approved with signature

14   authority, yes, --

15   Q    Okay.

16   A    -- outside of loan committee.

17   Q    Any loans that didn't go to loan committee, would they

18   subsequently be presented -- would they end up on a loan

19   ratification sheet that would subsequently go to the

20   committee?

21   A    As I recall, there was a loan -- loans approved list that

22   was presented routinely at committee.

23   Q    Okay.  So, if a loan had been walked around, or didn't

24   get approved at committee, would those end up on the list if

25   they had been approved?

Poliski - Direct (Bar)                                    8

1    A    They should have been, yes.

2    Q    When you were at Nova Bank, who did you report to?

3    A    I reported to Brian Hartline for a period of time, and

4    reported to John Golding for another part of my tenure there.

5    Q    Okay.  And I -- I may have asked you this, but what was

6    Brian Hartline's position at the bank?

7    A    He was the President and CEO.

8    Q    Did you know an individual named Barry Bekkedam?

9    A    I knew of him, knew of the name, yes.

10   Q    And how did you know the name Barry Bekkedam?

11   A    I knew that he was previously affiliated with the bank, I

12   believe one of the founders of Nova Bank.  I think he was on

13   the board, as I recall.  Not while I was at the bank, but I

14   remember hearing that.

15        And he often referred clients to the bank.

16   Q    Okay.  And were you familiar with a company called

17   Ballamor Capital Management?

18   A    Yes.

19   Q    And what was Bar -- what was Ballamor Capital Management?

20   A    That was a company that Barry owned, or was affiliated

21   with in some way, and also was a customer of the bank.  The

22   bank had loans out to Ballamor Capital.

23   Q    Okay.  In addition to loans out to Ballamor Capital, do

24   you know whether or not the lo -- the bank made loans to

25   clients of Ballamor Capital?

1    A    Yes, the bank did.

2    Q    Do you know if Mr. Bekkedam personally had any loans with

3    Nova Bank?

4    A    He did.

5    Q    Do you recall any of the clients that had loans with Nova

6    Bank from Ballamor Capital?

7    A    If you mention names, I would probab -- I would recall

8    them, yes.

9    Q    Okay.  Well, let's talk about an individual named George

10   Levin.

11              Do you recall whether or not George Levin had a loan

12   with Nova?

13   A    Yes, he did.

14              MS. BARRY:  Okay.  And if we could, please 103442 --

15   and this has already been admitted, Your Honor, and -- if we

16   could just publish it?  It's Government's Exhibit 43.

17              THE COURT:  All right.

18   BY MS. BARRY:

19   Q    I'm looking at Government's Exhibit 43.  Is this -- does

20   this represent the risk assessment summary, or is this the

21   risk assessment summary for the George Levin loan?

22              And I have a hard copy, if that's easier for you,

23   sir.

24   A    Yes, if you have a hard copy, that --

25   Q    Yes.

 1   A    -- would be helpful, thank you.

 2              MS. BARRY:  May I approach the witness?

 3              THE COURT:  Yes, ma'am.

 4                        (Brief pause.)

 5              THE WITNESS:  Yes, this is the risk assessment

 6   summary for that loan.

 7   BY MS. BARRY:

 8   Q    Okay.  And what was the amount of that loan?

 9   A    Five-million dollars.

10   Q    At the time, was that the largest personal loan that you

11   saw at the bank?

12   A    If it wasn't the largest, it was one of the largest.

13   Q    Okay.  And in terms of whether or not this loan was

14   secured, could you -- can you tell what --

15   A    It was unsecured.

16   Q    It was an unsecured loan?

17   A    Yes.

18   Q    Was this the largest unsecured loan that you had seen at

19   the bank?

20   A    And if not, it was one of the largest.  I don't recall if

21   it was, specifically, but it would have would -- would have

22   been one of the largest, if not the largest.

23   Q    Okay.  And looking at the purpose of the loan, what does

24   it indicate?

25   A    Financial investment.

Poliski - Direct (Bar)                                11

1    Q     And were you ever told that the loan was going to be used

2    to purchase Nova Bank stock?

3    A     No, I wasn't.

4    Q     Do you recall whether or not there was any outstanding

5    information that you were waiting for with respect to this

6    loan before it was approved?

7              MR. EGAN:  Objection to leading, Your Honor.

8              THE COURT:  Sustained.

9    BY MS. BARRY:

10   Q     Looking at the last page of this -- of Government's

11   Exhibit 43, and if we could turn to that, please.  Looking at

12   this last page, does your signature appear on this page?

13   A     Yes, it does.

14   Q     Okay.  And based on the number of signatures here, does

15   it indicate that the loan to Mr. Levin was approved?

16   A     It does, yes.

17   Q     Prior to the approval, was there any information you were

18   waiting on?

19   A     Prior to approval?

20   Q     Yes, do you recall?

21   A     Well, we -- we request information from borrowers to

22   assess their creditworthiness.

23              So, sure, we waited for information and -- I'm not

24   sure if you're asking were we waiting for information when

25   it -- at the time it was approved?

Poliski - Direct (Bar)                                    12

1   Q    After it was -- well, at the time that it was approved,

2   were you waiting on any additional information?

3   A    I don't recall.

4   Q    Okay.  Do you recall whether or not this loan was one

5   that was walked around?

6   A    I don't recall, no.

7   Q    Do you know an individual named Anthony Bonomo?

8   A    I know of the name.

9   Q    Okay.  And how do you know the name Anthony Bonomo?

10  A    I remember him being a borrower of Nova Bank.

11  Q    Okay.  Do you recall whether or not he was a client of

12  Ballamor Capital Management?

13  A    I believe he was.

14  Q    And do you recall whether or not the bank made a loan to

15  Mr. Bonomo in the amount of $4.5 million?

16  A    I don't recall specifically.

17  Q    Okay.  Do you recall any discussion at any loan committee

18  about the Anthony Bonomo $4.5 million loan?

19  A    I don't.

20  Q    Do you recall anyone telling you that Mr. Bonomo's

21  loan -- a portion of those proceeds would be used to purchase

22  Nova Bank stock?

23  A    No, I don't.

24  Q    Mr. Poliski, did you have any involvement with reporting

25  the bank's capital to regulators?

1    A    No, I did not.

2    Q    Were you familiar with an individual named Charles

3    Gallub?

4    A    The name is -- does sound familiar, yes.

5    Q    And why does the name sound familiar?

6    A    As a customer of Nova Bank.

7    Q    And do you know whether or not Mr. Gallub had any loans

8    with Nova Bank?

9    A    I believe he did.

10   Q    Do you recall a $500,000 loan to Mr. Gallub in December

11   of 2009?

12   A    I don't specifically recall.

13   Q    Okay.  Do you recall whether Brian Hartline or anyone

14   else told you that the bank -- that the loan would be used to

15   purchase Nova Bank stock?

16   A    I don't recall.

17   Q    (Brief pause.)

18        Mr. Poliski, were you aware that the bank had

19   applied for TARP funding?

20   A    Yes, I was aware.

21   Q    And what did -- what were you told?

22   A    That we had -- the bank did -- the bank did make an

23   application for TARP funding, and that a condition of the

24   funding was that the bank raise a certain amount of level of

25   capital in order for the TARP funding to take place.

1    Q    Okay.  And as part of the senior management team, were

2    you at -- were you advised about this TARP funding?  Is that

3    how you knew?

4    A    Yes.

5    Q    And was Mr. Hartline somebody who advised the senior

6    management team?

7    A    Yes, he was.

8    Q    And as far as raising the capital contingency for the

9    TARP funding, did you have anything to do with that?

10   A    No, I did not.

11   Q    Did you have anything to do with telling any regulator

12   about the capital contingency related to the TARP funding?

13   A    No, I did not.

14   Q    In or about May of 2010, do you recall whether or not the

15   bank's outside auditor had any issues with the capital at the

16   bank?

17   A    I recall there being some discussion about the bank's

18   capital level, yeah.

19   Q    Okay, and --

20   A    Don't remember the timing of it.

21   Q    And what was the issue on the bank's capital level at the

22   time?

23   A    That the -- in general, that the capital level was low,

24   was too low.

25   Q    Okay.  And do you recall whether or not the capital

1   issues and the low levels were related at all to the treatment

2   of any loans that the bank had?

3           MR. EGAN:  Objection, leading.

4           THE COURT:  Sustained.

5   BY MS. BARRY:

6   Q    Do you know what, if anything, affected the capital

7   levels at the time of the audit?

8   A    I know the bank -- as I recall, some of the bank's

9   investments were downgraded, and some of the loans that were

10  troubled loans, that were -- had to be charged off.

11          That impacts the bank's capital.

12  Q    Okay.  Do you know whether or not Mr. Levin's $5 million

13  loan had to be charged off?

14  A    Yes.

15  Q    Okay.  And at any point in time did Brian Hartline

16  discuss with you that the Levin loan for $5 million, the $4.5

17  million Bonomo loan, or the $500,000 Gallub loan, that any of

18  that -- any of the proceeds of those loans had been used to

19  purchase Nova Bank stock?

20  A    I don't recall that, no.

21          MS. BARRY:  May I have a moment, Your Honor?

22          THE COURT:  Surely.

23          MS. BARRY:  No further questions, thank you.

24          THE COURT:  Any questions?

25          MR. EGAN:  Yes, Your Honor.

Polinski - Cross (Ega)                                    16

1                        (Brief pause.)

2              MR. EGAN:  Morning, Mr. Poliski.

3              THE WITNESS:  Good morning.

4                        CROSS-EXAMINATION

5    BY MR. EGAN:

6    Q    Safe to say this all happened over six years ago, right?

7    A    Yes.

8    Q    And your memory of it is probably fairly faded?

9    A    Probably.

10   Q    But you do remember that there was a loan to Mr. Levin,

11   correct?

12   A    Yes.

13   Q    Now, let's talk a little bit about your job.  You were

14   the Chief Credit Officer at Nova Bank?

15   A    Correct.

16   Q    And as the Chief Credit Officer, you were, essentially,

17   in charge of all the underwriters?

18   A    Correct.

19   Q    And, so, Mr. Madiany reported to you?

20   A    Yes, he did.

21   Q    And Mr. Madiany's job was to present to you a loan in a

22   position where you could accurately determine whether or not

23   you were going to approve it to go onto the loan committee,

24   correct?

25   A    Correct.

1   Q    And no loan could actually go to the loan committee,

2   without your approval, isn't that correct?

3   A    That is correct.

4   Q    And particularly not a loan like -- such as the one of

5   Mr. Levin?

6   A    Correct.

7   Q    So, before anybody on the loan committee voted to approve

8   this loan, you would have had to have already said it was okay

9   by you, right?

10  A    Yes.

11  Q    And when you made that decision, whether it was okay by

12  you to go to the loan committee, Brian Hartline didn't put any

13  pressure on you, did he?

14  A    Not that I recall, no.

15  Q    Now, I want to just talk a little bit about the loan

16  process itself.

17          Essentially, a borrow is requested to send in

18  certain information, correct?

19  A    Yes.

20  Q    And that request is made by an individual who is

21  actually -- I guess they call them a loan -- the manager, the

22  loan manager, or a --

23  A    A loan officer, or a loan --

24  Q    Loan officer?

25  A    Yes.

1    Q    And that was Mr. Patterson's job, right?

2    A    He was one of the loan officers, yes.

3    Q    All right.  And in -- and this particular loan -- Mr.

4    Patterson was the -- was the loan officer, correct?

5    A    Yes.

6    Q    And --

7    A    You're speaking of the Mr. Levin loan?

8    Q    Yeah.

9    A    Yes.

10   Q    And you're looking at G-43 there, correct?

11   A    That's correct.

12   Q    And it does say Thomas Patterson as the relationship

13   manager?

14   A    Yes.

15   Q    So, that means that the information that was provided to

16   you would have been information that came from him?

17   A    Yes.

18   Q    Now, you talked a little bit about the purpose of the

19   loan.  Remember being asked about that?

20   A    Yes.

21   Q    And in this particular one it's --

22             MR. EGAN:  And if we could have 43 up for the jury?

23   And if you could blow-up the middle section there?  Yeah,

24   right there.

25   BY MR. EGAN:

1    Q    The purpose for the loan is financial investment,

2    correct?

3    A    Yes.

4    Q    Now, the reason that's on there is because sometimes the

5    purpose of the loan is important, correct?

6    A    Yes.

7    Q    And that would be if the proceeds of the loan -- if the

8    loan was going to be paid off based upon whatever it was the

9    individual was -- was doing with it, right?

10   A    Correct.

11   Q    So, in other words, if I was running a business and I

12   needed the money to run my business, you might want to know if

13   my business is going to succeed, correct?

14   A    Correct, that's correct.

15   Q    But in other instances it's not nearly as important, is

16   it?

17   A    It's -- correct, it's a case-by-case basis.

18   Q    And, so, in an individual where the money that was going

19   to be paying back the loan was coming from an individual's

20   personal wealth, what they were going to do with the money

21   would not be very important, would it?

22   A    That's correct, yes.

23   Q    And in -- you would agree with me that a financial

24   investment is a pretty vague statement about what's going to

25   be done with the money, right?

Polinski - Cross (Ega)                                    20

1    A    I would agree, yes.

2    Q    And, essentially, it could have meant a financial

3    investment in anything, right?

4    A    Sure, yes.

5    Q    Including Nova Bank, right?

6    A    Yes.

7    Q    Now, I want to take a look at some of the details of this

8    document.

9             And if you like, you can use the one in front of

10   you, or the screen, whatever's -- makes you more comfortable.

11            Right below where it says it's for financial

12   investment, you see the rate?

13   A    Yes.

14   Q    It says, "Wallace (phonetic) at WSJ prime, plus one-

15   percent, seven-percent floor?"

16   A    Yes.

17   Q    That -- that's not an unusual rate, correct?

18   A    I can't recall at the time, then -- I'm assuming that it

19   was not an unusual rate at the time.

20   Q    Well, you don't remember there being anything out of line

21   with the rate of the loan, correct?

22   A    No, no.

23   Q    And if you go down below, a little bit, where it says,

24   "unsecured," right?

25   A    Yes, yes.

1    Q     Below that is the guarantee, and it lists a number of

2    different investment sources.  Those are guarantors of the

3    loan, correct?

4    A     Correct.

5    Q     And, so, the cash that they have would be important to

6    the loan, correct?

7    A     Correct.

8    Q     Now, if we could turn to Page 3.  You see that?

9              MR. EGAN:  If we could blow-up the top two sections

10   there?

11   BY MR. EGAN:

12   Q     It says there the primary source of repayment is business

13   cash flow, correct?

14   A     Yes.

15   Q     And that would be the cash flow from these Banyon Funding

16   and other businesses that Mr. Levin has?

17   A     I'm assuming so, yes.

18   Q     And the next one was personal cash flow, right?

19   A     Yes.

20   Q     And that means, basically, how much money Mr. Levin has?

21   A     Yes.

22   Q     Now, do you remember Mr. Levin was an extremely wealthy

23   man?

24   A     I remember him having a high net worth, and -- I don't

25   remember specifics about his income, but I knew he was -- to

1    qualify for a loan like this he would have had to have been.

2    Q     Right.  So, if we go down below, do you see where it says

3    "debt" -- or, no, the very next box, thank you -- "debt

4    service cover ratio?"

5    A     Yes.

6    Q     That's an important factor, correct?

7    A     Very important, yes.

8    Q     And in this case, Mr. Levin's debt service coverage ratio

9    was extremely good, correct?

10   A     Yes, 3.3.

11   Q     And that would have been one of the main reasons why you

12   approved this loan, wouldn't it?

13   A     Yes.

14          MR. EGAN:  And, if we can go into the next box?

15   Thank you.

16   BY MR. EGAN:

17   Q     It says that your analysis -- or, the analysis is

18   actually Mr. Madiany's analysis, correct?

19   A     (No verbal response given.)

20   Q     But you're --

21   A     Yes.

22   Q     Yeah, but you're accepting what he's telling you?

23   A     Yes.

24   Q     It's based on financial statements for two years,

25   correct, '07 and '08?

1    A    Yes.

2    Q    They're reviewed by an independent accounting firm,

3    correct?

4    A    Yes.

5    Q    And, if you go down to the next paragraph, it says --

6    showed net income of $105.3 million, correct?

7    A    Yes.

8    Q    And, if we go down to the paragraph below, it says his

9    ballad sheets -- balance sheet assets, fiscal year '08, showed

10   $370.7 million, right?

11   A    Yes.

12   Q    Eight-point-eight million in cash, right?

13   A    Yes.

14   Q    Three-hundred-forty-point-three in receivables, correct?

15   A    Yes.

16   Q    And then, the next line down, 5.1 million value of

17   aircraft, correct?

18   A    Yes.

19   Q    And, 3.7 million in an office condominium?

20   A    Yes.

21   Q    So, those are the reasons you approved this loan, right?

22   Because this guy has a lot of money?

23   A    Essentially, yes.  Yeah.

24   Q    And when you approved this loan, you didn't have -- I

25   mean, you approved it because you thought it was the right

1   thing to do, right?

2   A     Right.

3   Q     Now, we -- just go to the last page.

4         And that is, indeed, your signature at the bottom,

5   correct?

6   A     Yes, it is.

7   Q     And, so, in addition to recommending the loan go to

8   committee, you also signed that you approved of the loan?

9   A     That's correct.

10  Q     And you have no -- no recollection of Brian Hartline ever

11  putting any pressure on you to do that, correct?

12  A     No, I do not.

13  Q     Now, you were asked a little bit about the minutes of the

14  loan committee meetings, right?  Remember that?  Or maybe you

15  weren't.

16        You were asked about the loan committee meetings,

17  correct?

18  A     Yes.

19  Q     And, minutes were taken at the loan committee meetings,

20  correct?

21  A     Yes.

22  Q     And those minutes that were taken at the loan committee

23  meeting, were they, like, everything that got said at the loan

24  committee?

25  A     I don't recall.  But I would -- I don't recall

1    specifically.

2    Q    Well, do you remember that if loans were discussed and

3    not approved, that they -- they would not show up in the

4    minutes, that they'd be deferred to a later date?

5    A    I don't recall specifically, but I believe if a loan was

6    discussed, then it would have been reflected in the minutes.

7    Q    Okay.

8    A    And the action taken, whether it was approved, tabled,

9    deferred, would have been reflected in the minutes.

10   Q    All right.  But you did remember that there was a list of

11   loans presented that had been approved in-between meetings,

12   and they would be ratified, correct?

13   A    There -- there was a list of approved loans that was

14   presented to each loan committee, yes.

15   Q    And if -- if we could show you D-47, it will be on your

16   screen there -- in a second.

17        Do you recognize that document, sir?  We can blow it

18   up so you can see a little better.

19   A    Thank you.

20   Q    Sorry about that.  You see that?

21   A    Yes, that is the --

22   Q    That's --

23   A    -- loan committee meeting minutes from --

24   Q    And, the date is July 7, 2009, correct?

25   A    Correct.

1    Q    And not -- you've seen the loan committee meeting

2    minutes, that -- that's -- this is what they look like, right?

3    A    That's the format as I recall them, yes.

4    Q    Okay.  And, if you -- first of all, if you notice

5    "members," Brian Hartline, it says "absent," correct?

6    A    Yes.

7    Q    So, that means he wasn't even at this meeting, right?

8    A    Correct.

9    Q    And, if we go to paragraph two, it says, "The committee

10   reviewed and approved ratification of the loans approved

11   report for Nova Bank for June 2009," do you see that?

12   A    Yes.

13   Q    Do you remember that's something you did at all of these

14   meetings?

15   A    I believe that was done at each meeting, yes.

16   Q    All right.  And now if we could go to Page 2 of this

17   exhibit, which we're going to have to -- oh, we got it

18   together already.

19          MR. EGAN:  If we could blow-up that top part?

20   BY MR. EGAN:

21   Q    And if you note the third one from the bottom there, you

22   see that?

23   A    Yes.

24   Q    And -- and that's George Levin, correct?

25   A    Yes.

1    Q    For $5 million, correct?

2    A    Yes.

3    Q    And it's -- Mr. Patterson was the relationship manager,

4    correct?

5    A    Yes.

6    Q    And it's for financial investments?

7    A    (No verbal response given.)

8    Q    Now, you were asked on direct examination about Mr.

9    Bonomo.

10          Do you have, really, any independent recollection of

11   the loan to Mr. Bonomo?

12   A    I don't.

13   Q    But if you approved that loan to go to the loan

14   committee, it would have been based upon the strength of his

15   financial records, correct?

16   A    Yes.

17   Q    And, you were aware that Mr. Bonomo also had a

18   longstanding relationship with lo -- with Nova Bank?

19   A    I believe so, yes.

20   Q    And that he had another company that had money at Nova

21   Bank?

22   A    I don't recall that specifically.

23   Q    And with regard to Mr. Gallub, you -- you also don't

24   really remember that one either, right?

25   A    That's correct.

Polinski - Cross (Ega)                                    28

1    Q     But you do remember who Mr. Gallub is?

2    A     I remember the name.

3    Q     And you do remember that he --

4              THE COURT:  Excuse me, let's take a break, counsel.

5    One second, please.

6              MR. EGAN:  Sure.

7              THE COURT:  Let's take a brief recess.

8                 (Whereupon the jury exits the courtroom.)

9              THE COURT:  You may step down, sir.  Fifteen

10   minutes, please.

11             MR. EGAN:  Thank you, Your Honor.

12                  (Proceedings adjourned at 10:56 a.m.)

13                            (Recess.)

14                 (Proceedings continued at 11:14 a.m.)

15                        (Jury not present.)

16             DEPUTY:  All rise.

17                 (Whereupon the jury enters the courtroom.)

18             DEPUTY:  Ladies and gentlemen, we are back on the

19   record.

20             THE COURT:  All right, you may be seated.  Thank

21   you.  You may continue.

22             MR. EGAN:  Thank you, Your Honor.

23   BY MR. EGAN:

24   Q    Now, Mr. Poliski, do you have any recollection of being

25   involved in a prior application that Mr. Levin made to borrow

Polinski - Cross (Ega)                                    29

1    money in the spring of 2009?

2    A    I don't recall.

3    Q    This would be before the June date.

4    A    I don't recall.

5            MR. EGAN:  If -- could we have Government's 15,

6    please?

7    BY MR. EGAN:

8    Q    And, sir, if you could just take a quick look at that,

9    the bottom e-mail is an e-mail from Brian to Mr. Bekkedam,

10   yourself, and Mr. Patterson.

11           And it appears to be about obtaining some tax

12   returns and information from Mr. Levin in order for him to

13   assume -- sell some bonds and assume some Nova debt.  Do you

14   see that?

15   A    Yes.

16   Q    Does that refresh your recollection at all that Mr. Levin

17   had previously supplied information to the bank in the fall --

18   the spring of 2009?

19   A    Only to the extent I see what's here in the e-mail.  I

20   don't recall any specifics of that loan.

21   Q    Okay.  And would that be because it would be up to Mr.

22   Patterson and Mr. Madiany to work that up before it got to

23   you, probably?

24   A    That's possibly the case, yes.

25           MR. EGAN:  You can take that down.

1   BY MR. EGAN:

2   Q    Now, after the loan was -- was issued to Mr. Levin, that

3   was on June 30th of 2000 -- 2009, correct?

4   A    Yes.

5   Q    You testified on direct that you had -- don't recall at

6   all being told that Mr. Levin was investing money into Nova

7   Bank, is that correct?

8   A    That's correct.

9            MR. EGAN:   Okay.   If we could have Government's 48,

10  please?

11  BY MR. EGAN:

12  Q    And, sir, if you take a look at that, if we can blow-up

13  the e-mail, that is an e-mail from a Dina Gaskins.   She worked

14  at Nova Bank, right?

15  A    Yes.

16  Q    And you are a recipient of this e-mail, correct?

17  A    Yes.

18  Q    And the subject is "Incoming Wire?"

19  A    Yes.

20  Q    And it says, "I want to let you know the wire of $5,000

21  has come in from George and Gayla Sue Levin."

22           Does that refresh your recollection at all as to

23  whether you might have known that he was investing the funds

24  in the bank?

25  A    I guess it -- it would, but I don't -- I don't recall

1   specifically, but this indicates that that was -- the money

2   came in for something.

3   Q    And, certainly, you're on this e-mail, so you're being

4   told about the money coming in, correct?

5   A    Yes.

6   Q    So, Mr. Hartline's not hiding the fact that this money's

7   coming in from you, correct?

8   A    No.

9   Q    Now, after the loan takes place, there's -- well, let me

10  ask you this question, when -- when a loan is amended, and

11  there are new terms that are developed, it -- it requires a

12  whole new process, correct?

13  A    Whole new approval process?

14  Q    Yeah.

15  A    If the terms -- yes, if the terms are more favorable to

16  the bank, then certainly the -- that process is not as

17  stringent.

18          But, for example, if -- if we wanted to increase an

19  interest rate, or if we wanted to shorten a term of a loan,

20  that wouldn't necessarily require the same level of scrutiny

21  or approval as if we were giving up collateral or reducing an

22  interest rate.

23          You know, if you understand the distinction between

24  more favorable to the bank or more favorable to the borrower.

25  Q    Sure.  And all I'm really getting at is you don't just

Polinski - Cross (Ega)                                        32

1   change the terms of the loan without going through some

2   process, one process or another?

3   A    That's correct, yes.

4   Q    And part of that would probably require some work to be

5   done -- I should strike the probably -- part of that would

6   require some work to be done with regard to the risk

7   assessment summary, correct?

8   A    Yes.

9              MR EGAN:  I want to show you what's been marked as

10  D-48 -- and if we can blow-up the top one?

11  BY MR. EGAN:

12  Q    Do you recognize this document, sir?

13  A    Do I recall it, is that the --

14  Q    Well, let me just add, it's a e-mail from Joe Madiany --

15  A    Mm-hmm.

16  Q     -- to you on July 16, 2009, correct?

17  A    Yes.

18  Q    And it's after the loan was approved, correct?

19  A    Yes.

20  Q    And it talks about an updated RAS?

21  A    Yes.

22  Q    So, this would indicate, would it not, that at some point

23  after June you received another --

24              THE COURT:  Excuse me -- excuse me, one second --

25              MR. EGAN:  -- iteration of the RAS, with some

1    updates?

2              THE COURT:  Counsel?  Counsel?  Excuse me one

3    second.  Let's take another recess.  We'll take a brief

4    recess.

5                   (Proceeding adjourned at 11:19 a.m.)

6                             (Recess.)

7                   (Proceeding continued at 11:21 a.m.)

8                        (Jury not present).

9              DEPUTY:  All rise.

10             (Whereupon the jury enters the courtroom.)

11             THE COURT:  All right, thank you, you may be seated.

12   I will write her a thank you note and tell her that I know

13   that she's really a secret, closet North Carolina fan.

14             But you may continue.

15             MR. EGAN:  Thank you, Your Honor.

16   BY MR. EGAN:

17   Q    So, Mr. Poliski, you don't have any independent

18   recollection of this document, correct?

19   A    That's correct.

20   Q    But it's not unusual, is it, to have a RAS go through a

21   couple of different iterations, correct?

22   A    It's happened.  It happens, yes.

23             MR. EGAN:  Okay.  You can take that down.  If we

24   could go to Government's 118?

25   BY MR. EGAN:

Polinski - Cross (Ega)                                      34

1    Q    Now, you see that document, sir?  That's another

2    e-mail from Mr. Madiany to you, correct?

3    A    No, it's to Tom Patterson.

4    Q    Oh, I'm sorry.  You are -- I stand corrected.

5         All right, we can take that down.

6         You were aware, were you not, sir, that there was an

7    attempt to alter the terms of Mr. Levin's agreement so that

8    his loan would be collateralized, do you remember that?

9    A    I don't recall specifically.

10   Q    Do you remember that Mr. Levin wanted to get better terms

11   for his loan, and in return Nova Bank sought

12   collateralization?

13   A    I don't recall.

14        MR. EGAN:  If we could have Defense 93, please?  And

15   if we could do the top e-mail?

16   BY MR. EGAN:

17   Q    And this is an e-mail from Mr. Patterson in March of

18   2010, correct?

19   A    Yes.

20   Q    And it's to a -- a Frank Preve.  Did you ever speak with

21   a Frank Preve?

22   A    No, never.

23   Q    But you are copied on it, correct?

24   A    Yes.

25   Q    And it says, "Thanks for the information and the phone

1    call.  In an effort to lower that rate, Nova would like to

2    file a mortgage on the Madison (phonetic) house."

3              Do you remember anything about that?

4    A    I don't, no.

5    Q    Okay.  But it would be consistent with bank policy that

6    if they were going to lower a rate, they would want to get

7    collateral, correct?

8    A    Want to get something, yes.

9    Q    And, indeed, if there were issues, potentially, with

10   regard to collecting a loan collateral, adding collateral

11   would be a good idea, right?

12   A    Sure, yes, that's correct.

13             MR. EGAN:  And if I could go to D-137, then?

14                      (Brief pause.)

15             MR. EGAN:  May I approach, Your Honor?

16             THE COURT:  Yes, sir.

17   BY MR. EGAN:

18   Q    Sir, I'm going to show you what's been marked previously

19   as D-137.

20             Apparently we don't have it on the screen.

21             MR. EGAN:  May I inquire from here, Your Honor?

22             THE COURT:  Yes, sir.

23             MR. EGAN:  Thank you.

24   BY MR. EGAN:

25   Q    Sir, it says -- this is a memo, correct?

Polinski - Cross (Ega)                                    36

1    A     Yes.

2    Q     On Nova Bank letterhead?

3    A     Yes.

4    Q     And it's signed by you, correct?

5    A     Yes, it is.

6    Q     And it contains a security agreement for Mr. Levin?

7    A     Yes.

8    Q     And it relates to Mr. Levin's loan and a security

9    interest in a Madison house, correct?

10   A     Sure.

11   Q     If you want, you can turn to the attachment, which is the

12   security agreement itself.

13          MS. BARRY:  Your Honor, I'm not certain that the

14   Government has a copy of the Government's exhibit.

15          MR. EGAN:  I think there's been, Your Honor, a

16   numbering issue.  I think it's actually D-95 was the one you

17   provided me with.

18          UNIDENTIFIED SPEAKER:  I apologize.

19          THE COURT:  Thank you.

20          MS. BARRY:  May I just look to make sure that that's

21   the --

22          THE COURT:  Absolutely, certainly.

23          MR. EGAN:  And if we can get it on the screen, I can

24   lead Mr. --

25          THE WITNESS:  Sure.

1              MR. EGAN:  -- Poliski.

2                 (Side comments off the record.)

3              MR. EGAN:  All right, now we have on the screen D-

4    95.  Does the Government have a copy?

5              MS. BARRY:  Yes, thank you.

6    BY MR. EGAN:

7    Q    And the attachment to that, sir, is, indeed, a security

8    agreement, is it not?

9    A    Yes.

10   Q    And, that's an agreement that was sent to Mr. Levin by

11   the bank, correct?

12   A    Yes.

13   Q    And, that was to secure his -- his loan that he had taken

14   out in June?

15   A    Correct.

16   Q    And, the security is in a property known as the "Madison

17   house," correct?

18   A    Looks like the collateral is a -- a note executed by

19   Madison house, and the bank -- looks like the bank took an

20   assignment or a security interest in a -- in a note.

21   Q    Okay.

22   A    It's a little blurry on the screen, that's probably my

23   eyes.

24   Q    Now, I just want to go back now to Mr. Gallub.

25            And, I want to show you what's been marked as

1    Government's Exhibit 5.  It's not been entered into evidence.

2              And Government's Exhibit 5 is loan committee meeting

3    minutes from September 30th of 2008, correct?

4    A    Yes.

5    Q    And September 30th of 2008, this is some seven months

6    before June of 2009, correct?

7    A    Yes.

8    Q    And paragraph two, again, speaks of the ratification of

9    loans, correct?

10   A    Yes.

11   Q    Now, are you familiar with Mr. Gallub's company, Bellmawr

12   Creek?

13   A    I -- I recall the name, but I -- that's what I recall

14   about it.

15   Q    And if we go to the third page of this document, the last

16   loan down -- in the first section, I'm sorry.  It is a

17   $250,000 loan to Bellmawr Creek, correct?

18   A    Yes.

19   Q    Do you have any recollection as to whether Mr. Gallub

20   invested that money into Nova Bank?

21   A    I do not.

22   Q    Now, as a credit manager, you were responsible for

23   assisting when various examinations took place, correct?

24   A    Correct.

25   Q    And Nova Bank actually was audited by KPMG, correct?

Polinski - Cross (Ega)                                    39

1    A    Yes.

2    Q    And in addition, Nova Bank's loan portfolio was reviewed

3    by a company called Merit Partners, do you remember that?

4    A    That's correct, yes.

5    Q    And when Merit Partners would come in to do a loan

6    review, they would come in, basically, and say, "We want to

7    see X number of loans," right?

8    A    Yes, they took a sample of loans, yes.

9    Q    And they would pick the loans?

10   A    Yes.

11   Q    And then they would look at the -- all of the loan

12   documentation, correct?

13   A    Underwriting documents, yes.

14   Q    And they would then write a report, and either say

15   there's something wrong with this, or not, to the bank,

16   correct?

17   A    Yes.

18   Q    And KPMG as part of its process would also look into the

19   lending portfolio, would it not?

20   A    Correct.

21   Q    And the same thing, KPMG would come into the bank, right?

22   A    Yes.

23   Q    They would bring a bunch of folks with them?

24   A    Yes.

25   Q    They would ask for a whole lot of documents?

1    A     Yes.

2    Q     And they would get whatever they asked for?

3    A     Yes, that's correct.

4    Q     Certainly from you, right?

5    A     Yes.

6    Q     Now, when Merit Partners came in, or KPMG came in, did

7    Brian Hartline ever ask you to hide a file and not show it to

8    those people?

9    A     Not that -- no, not that I recall.

10   Q     Now, on top of that, bank examiners came in as well,

11   correct?

12   A     That's correct.

13   Q     And when they came in, they would do the same thing,

14   right?

15   A     Yes, they would.

16   Q     They would open up the files and ask to see whatever they

17   wanted to see?

18   A     Yes.

19   Q     And one of the things they would review would be loans,

20   correct?

21   A     That's correct.

22   Q     Also one of the things they would review, I would assume,

23   is investments, right?

24   A     Yes.

25   Q     Same thing with KPMG?

1   A      I assume so, yes.

2   Q      You're familiar with something called Reg. O, right?

3   A      Yes.

4   Q      And that has to do with loans to shareholders?

5   A      Yes.

6   Q      Nova was never once cited for any problem with Reg. O

7   with regard to any of these loans, was it?

8   A      Not that I recall.

9           MS. BARRY:  Objection, Your Honor.

10          THE COURT:  Sustained.

11  BY MR. EGAN:

12  Q      And same thing with examiners, Mr. Hartline never asked

13  you to hide any document from any examiner, did he?

14  A      Not that I recall, no.

15          MR. EGAN:  I have no further questions, Your Honor.

16          MR. DUNCAN:  May I, Your Honor?

17          THE COURT:  Yes, sir.

18          MR. DUNCAN:  Thank you.

19          MR. DUNCAN:  Good morning, Mr. Poliski.

20          THE WITNESS:  Morning.

21                      CROSS-EXAMINATION

22  BY MR. DUNCAN:

23  Q      How are you today?

24  A      Good.

25  Q      Good.  Mr. Poliski, your title was Chief Credit Officer,

Polinski - Cross (Dun)                                        42

1    do I have that correct?

2    A    Correct.

3    Q    And that was a pretty high position at the bank, at the

4    time?

5    A    Yes.

6    Q    And, sir, you were first interviewed by the Government

7    agents in this matter in August of 2012, is that correct?

8    A    I -- I don't -- it may have been, it was a while ago.  I

9    don't recall the -- the month or date.

10   Q    If you saw a copy of the report that the Government

11   agents made, would that refresh your recollection?

12   A    Yes, I assume so.

13            MR. DUNCAN:  Could we see Defense Exhibit 273,

14   please?  And it's easier, I have a copy, if I may approach,

15   Your Honor.

16            MS. BARRY:  Your Honor, we'll stipulate to the date.

17            THE COURT:  All right, thank you.

18            MR. DUNCAN:  Thank you.  Thank you, Ms. Barry.

19   BY MR. DUNCAN:

20   Q    So, the first time you were interviewed by the Government

21   agents were approximately three years after George Levin's

22   loan was authorized by Nova Bank?

23   A    Yes.

24   Q    And then you didn't speak to the Government investigators

25   again until October of 2015, is that correct?

Polinski - Cross (Dun)                                            43

1    A    That's correct.

2    Q    And that was almost six years after the loan, is that

3    correct?

4    A    Yes.

5    Q    Sir, you were very involved in the approval of the loan

6    to Mr. Levin on June 30, 2009, correct?

7    A    Yes.

8    Q    And you know that the loan was for $5 million, right?

9    A    Yes.

10   Q    And one of the people at the bank who also worked on that

11   loan was Thomas Patterson, correct?

12   A    Yes.

13   Q    And who's Mr. Patterson?

14   A    He was the Chief Lending Officer of the bank.

15            MR. DUNCAN:  Could we see Government's Exhibit 48

16   again, please?  And could we have that published to the jury?

17   I believe it's in evidence, Your Honor.

18            THE COURT:  Any objection?

19            MS. BARRY:  No, Your Honor.

20            THE COURT:  Granted.

21            MR. DUNCAN:  Thank you, Your Honor.

22            THE COURT:  Yes, sir.

23   BY MR. DUNCAN:

24   Q    So, Mr. Egan asked you a little bit about this.  I have

25   just a couple of other questions about it.

1          So, this is an e-mail that was sent from Dina

2    Gaskins to you and five other people at Nova Bank, correct?

3    A    Yes.

4    Q    And, who's Dina Gaskins?

5    A    I don't recall what her role was at the bank.  I know

6    she -- remember her working at the bank, but I don't remember

7    what her role was.

8    Q    And clearly, she wanted you to know that this $5 million

9    wire had come in from George and Gayla Sue Levin, correct?

10   A    Yes.

11   Q    And the other five people, they all got the same notice

12   you got, right?

13   A    Yes.

14   Q    Nobody was hiding the information that a loan had gone

15   out to Mr. Levin on June 30th, and then a wire had come back

16   in for the exact same amount on the exact same day, correct?

17   A    No, that's correct.

18   Q    You testified earlier that Nova's heavily regulated by

19   bank regulators, correct?

20   A    Yes.

21   Q    And any of the records of the bank, including your

22   e-mails, would be available to the bank regulators, correct?

23   A    Yes.

24   Q    Sir, you testified, I believe, when Ms. Barry was asking

25   you questions, that you'd never met our client, Barry

Polinski - Cross (Dun)                                        45

1    Bekkedam, correct?

2    A    Correct.

3    Q    He had resigned from the board of Nova Holding Companies

4    long before you even got a job there, right?

5    A    Correct.

6    Q    You never spoke to Mr. Bekkedam, did you?

7    A    I -- I did speak with him on the phone on a couple of

8    occasions.

9    Q    And -- and pleasant conversations?

10   A    Yes, as I recall.

11   Q    You never saw him around the offices, did you?

12   A    No, never.

13   Q    He has a company called Ballamor Capital, correct?

14   A    Yeah.

15   Q    Or, he had a company?

16   A    Yes.

17   Q    Sorry.  Nobody from Ballamor Capital ever tried to

18   influence any of your banking decisions, did they?

19   A    Never, no.

20   Q    You testified on direct that many of Mr. Bekkedam's

21   clients at Ballamor Capital had loans with Nova Bank, correct?

22   A    Yes.

23   Q    Some of those loans were just mortgages on their houses,

24   right?

25   A    As I recall.

1   Q    Mr. Bekkedam never called you or communicated with you in

2   any way to try to influence any of your decisions on making

3   loans to any of his clients, correct?

4   A    That's correct.

5   Q    And you knew -- you knew Mr. Bekkedam had approximately

6   150 clients, is that correct?

7   A    I don't know how many clients he had.

8   Q    Okay, you didn't know all their names, right?

9   A    That's correct.

10  Q    You know -- you testified on direct that Mr. Levin got a

11  loan -- you know that Mr. Levin was not a client of Mr. Bal --

12  of Mr. Bekkedam, correct?

13  A    I -- I'm not aware of if he was or wasn't.

14  Q    Okay.  But Mr. Bonomo was a client of Ballamor Capital,

15  correct?

16  A    I do recall that, yes.

17  Q    Okay.  You were asked questions about the -- Mr. Bonomo's

18  loan, but you weren't involved in Mr. Bonomo's loan, were you?

19  A    I don't recall being --

20  Q    The $4.5 million loan.

21  A    Yeah, I don't recall being -- I knew he had loans with

22  us, or a loan with us, but I don't recall being involved in

23  it.

24  Q    One of his loans was for the mortgage on his house,

25  right?

Polinski - Cross (Dun)                                47

1   A    I don't recall.

2   Q    Okay.  Do you know his company, PRI?

3   A    No.

4   Q    Sir, Mr. Gallub, you don't know if Mr. Gallub was a

5   client of Mr. Bekkedam's, do you?

6   A    I don't recall.

7   Q    Sir, when you met with the Government investigators, you

8   were asked questions about Mr. Bekkedam's -- excuse me -- Mr.

9   Bekkedam's clients, correct?

10  A    I believe so, yes.

11  Q    And you told the Government that Mr. Bekkedam's clients

12  went through the normal credit review and approval process,

13  correct?

14  A    That's correct.

15  Q    And that's true, right?

16  A    Yes.

17  Q    You also told them that while you were Chief Credit

18  Officer, nobody at Ballamor Capital, or Mr. Bekkedam, received

19  any special treatment, is that correct?

20  A    That --

21              MS. BARRY:  Objection, Your Honor.

22              THE COURT:  Sustained.

23  BY MR. DUNCAN:

24  Q    Did you tell that to the Government investigators?

25              MS. BARRY:  Objection, Your Honor.

Polinski - Cross (Dun)                                    48

1          THE COURT:  Counsel, may I see you, please?

2          MR. DUNCAN:  Sure.

3                    (At sidebar.)

4          THE COURT:  Okay, I just want the record to be

5   clear.  The basis for your objection?

6          MS. BARRY:  There's no predicate for these

7   questions.  I don't know that -- there's no -- this -- these

8   are hearsay, and, Your Honor, there's been no impeachment.

9          I mean, he's just reading from the report now, and

10  it's -- I mean, we had an agreement on the terms of

11  impeachment.

12         But if we're going to get into this whole

13  discussion, that this is a report of the agent, it is not a

14  statement of the witness.

15         MR. DUNCAN:  I think I can rephrase it, Your Honor,

16  and I can ask him while you were there, they never received

17  any special treatment.

18         MS. BARRY:  Okay, that's fine.

19         MR. DUNCAN:  Okay.

20                    (End of sidebar.)

21         THE COURT:  All right, the objection is sustained.

22  You may rephrase.

23         MR. DUNCAN:  Thank you, Your Honor.

24  BY MR. DUNCAN:

25  Q    Sir, you took your position as Senior Credit Officer very

Polinski - Redirect (Bar)                                    49

1    seriously, correct?

2    A     Yes.

3    Q     And while you were there, nobody, including Mr. Bekkedam

4    or any of his Ballamor clients, received any special treatment

5    while you were the Senior Credit Officer, correct?

6    A     That's correct.

7              MR. DUNCAN:  Thank you, Your Honor.  I have no

8    further questions.

9                        (Brief pause.)

10                   REDIRECT EXAMINATION

11   BY MS. BARRY:

12   Q     Mr. Egan asked you about Government's Exhibit 5, I

13   believe.

14             MS. BARRY:  And, Your Honor, the Government would

15   move for the admission of Government's Exhibit 5, and ask that

16   it be published.

17             MR. EGAN:  No objection.

18             MR. DUNCAN:  No objection.

19             THE COURT:  All right, granted as to each request.

20             MS. BARRY:  Okay.

21   BY MS. BARRY:

22   Q     Now, looking at Government's Exhibit 5, what is

23   Government's Exhibit 5?

24   A     Loan committee minutes from September 30, 2008.

25   Q     Okay.  And if you would, take a look -- and, again,

1    looking at the members of -- of the loan committee, is Mr.

2    Hartline's name included?

3    A    Yes, it is.

4    Q    Okay.  And looking at the minutes themselves, if you

5    could take a -- I know you took a look at it before, but is

6    there any mention or discussion of a $250,000 loan to Charles

7    Gallub or his company, Bellmawr Creek?

8    A    Not on this page, no.

9    Q    Okay.  And then Mr. Egan asked you to take a look at -- I

10   believe it was Page 3 -- or is it -- I'm sorry, is that -- are

11   there only two pages?

12           THE CLERK:  It's three pages.

13   BY MS. BARRY:

14   Q    Okay, Page 3, and he asked you is there a loan there in

15   the amount of $250,000 for Bellmawr Creek?

16   A    Yes, there is.

17   Q    Okay.

18           MS. BARRY:  Now, if we could, and this not -- has

19   not been moved into evidence yet, Your Honor, but if we could

20   show the witness Government's Exhibit G-4?

21           And does the witness have G-4 in front -- thank you.

22   BY MS. BARRY:

23   Q    All right, looking at Government's Exhibit G-4, what is

24   G-4?

25   A    G-4 is the risk assessment summary for Bellmawr Creek.

Polinski - Redirect (Bar)                                    51

1    Q    And what is the loan amount?

2    A    Two-hundred-fifty-thousand dollars.

3         MS. BARRY:  Okay, and I'm sorry, if we can scroll to

4    the top again, just so we can see the date of the RAS?

5         THE WITNESS:  September 30, 2008.

6         MS. BARRY:  Okay, Your Honor --

7    BY MS. BARRY:

8    Q    And if you could take a look at the last page of this --

9    of this exhibit?  And is this a RAS for a $250,000 loan in

10   September of 2008 that you approved?

11   A    Yes, it is.

12        MS. BARRY:  Okay, Your Honor, the Government moves

13   for the admission of Government's Exhibit 4.

14        MR. EGAN:  No objection.

15        MR. DUNCAN:  No objection.

16        THE COURT:  Admitted.

17        MS. BARRY:  And if we could just -- may we publish

18   Page 1, just the loan request portion, to the jury?

19        THE COURT:  Yes.

20   BY MS. BARRY:

21   Q    Okay.  And, again, the date of the RAS is September 30,

22   2008?  Is that right?

23   A    Yes, it is.

24   Q    Okay.  And, if you look on the lefthand column, "Contact

25   Name," whose name is listed?

1    A     Charles Gallub.

2            MS. BARRY:  Okay.  And, if we could scroll down to

3    the loan request section, please?  Okay.

4    BY MS. BARRY:

5    Q     And looking at the original purpose, what is the purpose

6    that's given?

7    A     Investment purposes.

8    Q     Okay.  And, what is the amount?

9    A     Two-hundred-fifty-thousand dollars.

10           MS. BARRY:  Okay.  And, if we could please go to

11   Page 2 of this exhibit?

12           And, if we can just show the "transaction comments,"

13   the first paragraph, please?

14   BY MS. BARRY:

15   Q     Okay.  Looking at "transaction comments," would you

16   please read the first two sentences related to this loan?

17   A     "Bellmawr Creek, LLC, Nova Savings Bank existing

18   borrower, requests a $250,000 commercial demand loan at Wall

19   Street Journal prime for a 24-month term.

20           "Proceeds will be used for investment purposes in

21   another project."

22   Q     Okay.  Is it indicated that this $250,000 would be used

23   to purchase Nova Bank stock?

24   A     No.

25           MS. BARRY:  And we can take that down, please.

Polinski - Redirect (Bar)                    53

1  BY MS. BARRY:

2  Q    Mr. Egan asked you questions about the guarantee for the

3  Levin $5 million unsecured loan -- about the guarantee, and

4  that the guarantee for that loan were multiple Banyon

5  companies.

6           Do you recall that?

7  A    Yes.

8  Q    Okay.  And do you know whether or not Mr. Madiany had

9  requested additional information on those Banyon companies

10  prior to the loan being approved?

11  A    I don't recall.

12  Q    Do you recall -- well, did you do the underwriting for

13  the loan, itself?

14           Who prepared the underwriting for that George Levin

15  loan?

16  A    I don't recall.  I assume it was Joe Madiany.

17  Q    Okay, and would that be indicated --

18  A    He's listed as an --

19  Q    -- on the --

20  A    As the analyst --

21  Q    Okay.

22  A    -- on the risk assessment summary.

23  Q    Okay.  So, what details on the Banyon companies that were

24  providing the guarantee being important to assess this loan

25  and to approve it?

Polinski - Redirect (Bar)                                    54

1    A    It could be if that was a primary source of repayment --

2    Q    Okay.

3    A    -- for the loan.

4    Q    And, I know you walked through that with Mr. Egan that

5    the primary source of repayment would be cash flow from these

6    companies, and if -- you could take a look at that if that

7    would help you.

8    A    Sure.

9         Yes, or other business entities.

10   Q    Okay.

11   A    Yes.

12        MS. BARRY:  If we could, please, take a look at

13   Government's Exhibit 48, and I believe that it was published

14   previously, and may it be published again, Your Honor?

15        THE COURT:  Yes.

16        MS. BARRY:  Okay.

17   BY MS. BARRY:

18   Q    Now, look at Government's Exhibit 48, what is the time

19   that this e-mail was sent?

20   A    Two-forty-four p.m.

21   Q    And, was that after the loan was approved?  The Levin

22   loan?  If you know.

23   A    I don't know specifically.  Typically, loan committees

24   were held in the morning, but I can't -- I can't say with

25   certainty.

Polinski - Redirect (Bar)                                    55

1    Q     Okay.   Is there anything on this e-mail that indicates

2    that this $5 million wire from George and Gayla Sue Levin is

3    going to be used to purchase Nova Bank stock?

4               MR. EGAN:   Objection.   Leading.

5               THE COURT:   Sustained.

6    BY MS. BARRY:

7    Q     Would you please read the e-mail?

8    A     "I wanted to let you all know that the wire for $5

9    million has come in from George and Gayla Sue Levin."

10   Q     Is there any additional information on this e-mail?

11   A     No.

12   Q     Any additional information about what this $5 million is

13   going to be used for?

14   A     No.

15   Q     Mr. Egan asked you multiple questions about Mr. Levin and

16   his wealth, do you recall that?

17   A     Yes.

18   Q     And, he asked you questions about some kind of collateral

19   on this loan at some future date.

20   A     Yes.

21   Q     Do you recall that?   Okay.

22               So, was this Levin loan for $5 million that was

23   unsecured, was that at loan that was charged off?

24   A     As I recall, yes.

25   Q     And, what does "charged off" mean?

Dietrich - Direct (Bar)                                      56

1    A    It means that the bank reserves for potential loan losses

2    in the future, and when the loan is charged off, it's -- it

3    impacts the bank's balance sheet and the bank's income

4    statement.

5    Q    Okay.

6    A    The bank's capital.

7    Q    So, did he -- did he pay the $5 million?

8    A    I don't recall.  Oftentimes, loans are charged off, and

9    borrowers pay after a loan's charged off.

10   Q    Okay.

11   A    I don't recall whatever happened with any or all of those

12   proceeds.

13   Q    Okay.

14           MS. BARRY:  May I have a moment, Your Honor?

15           THE COURT:  Yes, ma'am.

16           MS. BARRY:  No further questions.  Thank you.

17           MR. EGAN:  I have no further questions, Your Honor.

18           MR. DUNCAN:  No, thank you, Your Honor.

19           THE COURT:  Thank you, sir, you may step down, and

20   watch your step, please.

21           THE WITNESS:  Thank you.

22           MS. BARRY:  Your Honor, the United States calls

23   David Dietrich.

24                         (Brief pause.)

25   D A V I D   D I E T R I C H, GOVERNMENT WITNESS, SWORN.

1           THE CLERK:  Please state and spell your name for the

2    record.

3           THE WITNESS:  My name is David Dietrich.  D-I-E-T-R-

4    I-C-H.

5           MS. BARRY:  May I proceed, Your Honor?

6           THE COURT:  You may proceed.

7           MS. BARRY:  Thank you.

8                      DIRECT EXAMINATION

9    BY MS. BARRY:

10   Q    Good morning, Mr. Dietrich.

11   A    Good morning.

12   Q    Mr. Dietrich, are you currently working?

13   A    I'm working part-time.  I'm retired, but work part-time.

14   Q    Okay, and what's your part-time line of work right now?

15   A    I'm working for a non-profit housing agency in Reading,

16   Pennsylvania.

17   Q    And, prior to -- prior to your retirement, what line of

18   business were you in?

19   A    Banking for 42 years.

20   Q    And, did you go to college, sir?

21   A    Yes, I did.

22   Q    And, where -- what -- did you get any kind of degree?

23   A    Bachelor's of Science and Math.

24   Q    Okay.  Did you get any post-college degree?

25   A    I had two coll -- post-college -- or, actually, they're

1    certificates, professional certificates.

2    Q     Okay.

3    A     One --

4    Q     Go ahead.

5    A     Graduate school in Retail Bank Management in the

6    University of Virginia.  And, the Stonier Graduate School of

7    Banking.

8    Q     Okay.  And, were you a CPA, sir?

9    A     No, I am not.

10   Q     And, what's the last bank that you worked for?

11   A     Nova Bank.

12   Q     And, what time period did you work for Nova Bank?

13   A     I think it was 2002 to 2012.

14   Q     And, who hired you?

15   A     Mr. Hartline.

16   Q     And, do you see Mr. Hartline here in the courtroom today?

17   A     Yes, I do.

18   Q     And, can you point him out to us, please?

19   A     He's the gentleman right there.

20   Q     Okay.

21              MS. BARRY:  Your Honor, --

22              THE COURT:  The record shall so reflect.

23              MS. BARRY:  Thank you, Your Honor.

24   BY MS. BARRY:

25   Q     Now, prior to working at Nova Bank, had you worked with

1   Brian Hartline before?

2   A    Yes, I did.

3   Q    And, where was that?

4   A    I was at Main Street Bank Corp.

5   Q    Okay.  And, when you were hired by Nova Bank, what were

6   you hired to do?

7   A    I was hired as head of Retail Banking.

8   Q    And, as the head of Retail Banking, did you sit on any

9   committees?

10  A    Yes, I did.

11  Q    And, what committees did you sit on?

12  A    I sat on the pricing committee and the loan committee.

13  Q    Okay.  And, on the loan committee, can you just tell us

14  what does -- what did the loan committee do?

15  A    The loan committee would review loans for approval.

16       In some cases, they would -- well, they reviewed the

17  loans for the loan committee and then made approvals.

18  Q    Okay.  Now, who did you report to when you worked at

19  Nova?

20  A    Mr. Hartline.

21  Q    And, do you know an individual named Barry Bekkedam?

22  A    Yes, I do.

23  Q    And, how do you know Mr. Bekkedam?

24  A    Mr. Bekkedam was the Chairman of the Board for the first

25  few years at Nova Bank.

Dietrich - Direct (Bar)                                          60

1    Q     Okay, and did you have any interactions with him?

2    A     Not really.

3    Q     Okay.  Did you ever meet him?

4    A     Yes.

5    Q     And, do you recognize him here today?

6    A     Yes, I do.

7    Q     Okay.  And, can you point him out, please?

8    A     Yes, he's the gentleman over on the right -- I mean, the

9    picture.

10          MS. BARRY:  Okay.  Your Honor, let the record

11   reflect that the witness has identified Defendant Barry

12   Bekkedam.

13          THE COURT:  The record shall so reflect.

14   BY MS. BARRY:

15   Q     Now, do you know whether or not Mr. Bekkedam had any

16   companies?

17   A     Yes.

18   Q     And, what was that company called?

19   A     It was Ballamor Capital, I believe.

20   Q     And, do you know what Ballamor Capital was?

21   A     Well, --

22   Q     What kind of company it was?

23   A     I have a general idea, yes.

24   Q     Okay, and what general idea?

25   A     He did investment.  Provided investment banking for

Dietrich - Direct (Bar)                                    61

1   people and, you know, personal financial.

2   Q    Okay.

3   A    Management.

4   Q    And so, were any of his clients also customers of the

5   bank?

6   A    Yes.

7   Q    Was Barry Bekkedam a customer of the bank?

8   A    Yes.

9   Q    Was the -- was his company, Ballamor Capital, a customer

10  of the bank?

11  A    Yes.

12  Q    Do you recall an individual named George Levin and a loan

13  that was made to him?

14  A    Yes.

15  Q    Okay.  Did you -- well, I'd like to show you what's been

16  marked as Government's Exhibit 43, and I believe it's in front

17  of you.  It will be on the screen, and it -- also, a hard-

18  copy.  Whichever's easier for you to look at.

19           And, this loan to George Levin, how much was it for?

20  A    Five-million dollars.

21  Q    Okay.  And, do you -- do you recall if this was -- a $5

22  million loan was at the upper limits of the bank's lending?

23  A    I can't recall the top lending --

24  Q    Okay.

25  A    -- limit of the company.

Dietrich - Direct (Bar)                                    62

1   Q    All right.

2   A    Yeah.

3   Q    Do you -- was this one of the largest personal loans that

4   you recall the bank making?

5   A    I believe it's one of the largest I recall.

6   Q    Okay.  And, if you look, is this loan secured or

7   unsecured?

8   A    It is unsecured.

9   Q    Okay.

10  A    That's collateral.

11  Q    And, was this one of the largest unsecured loans that you

12  saw at the bank?

13  A    Yes.

14  Q    Okay.  And, if you look at the last page, and if we could

15  just publish this last page, please?

16  A    Mm-hmm.

17              MS. BARRY:  And, may it be published, please?

18              THE COURT:  Yes.

19              MS. BARRY:  Thank you.

20  BY MS. BARRY:

21  Q    And, looking at the last page, did you sign off on this

22  loan?

23  A    Yes, that's my signature.

24  Q    Okay.  And, looking at the Government's Exhibit 43, the

25  risk assessment summary, what was the purpose of the loan?

Dietrich - Direct (Bar)                                     63

1    A    (Brief pause.)

2              Financial investment.

3    Q    Okay.  Were you ever told that the $5 million from Mr.

4    Levin's unsecured loan was going to be used to purchase Nova

5    Bank stock?

6    A    Yeah, I don't remember that conversation.

7    Q    Now, do you recall an individual named Anthony Bonomo?

8    A    I recall the name.  I remember the name.

9    Q    And, do you recall whether or not Nova Bank made a loan

10   to Mr. Bonomo in the amount of approximately $4.5 million?

11   A    I do remember seeing the document in an investigation.

12             MS. BARRY:  May I please -- I believe it's move into

13   evidence, Government's Exhibit 109.

14             THE WITNESS:  Is that --

15             MS. BARRY:  And, may it be published to the jury,

16   Your Honor?

17             THE COURT:  Yes.

18   BY MS. BARRY:

19   Q    Would you like a hard-copy, sir?  Would that be easier

20   for you to look at --

21   A    It would be easier for me, yeah.

22   Q    -- a hard-copy.

23   Q    Okay.

24             MS. BARRY:  May I approach the witness, Your Honor?

25             THE COURT:  Certainly.

1                    (Brief pause.)

2   BY MS. BARRY:

3   Q     And, looking at Government's Exhibit 109, what's the date

4   on this risk assessment summary?

5   A     The date is December -- oh, I'm sorry.  Excuse me.

6   October 21, 2009.

7   Q     And, if we scroll down, please, what is the purpose of

8   the loan?

9   A     The purpose is financial investment.

10  Q     Okay, and what is the proposed amount of the loan?

11  A     Four-point-five-million dollars.

12  Q     Okay.  Were you ever told by Mr. Hartline or anyone else

13  at the bank that the proceeds -- any of the proceeds from this

14  $4.5 million loan would be used to purchase Nova Bank stock?

15  A     I really don't remember.

16  Q     Okay.  And, looking at Page 2, --

17  A     Page 2?

18  Q     -- sir, yes, if you look at Page 2 and look at the

19  transaction --

20  A     Mm-hmm.

21  Q     -- comments regarding the loan, is there any mention

22  there if the money would be used to purchase Nova Bank stock?

23  A     No.

24  Q     Okay.  And, if we could take, I'm not sure if it's the

25  last page, but the signature page of this document.

Dietrich - Direct (Bar)                                    65

1          I might -- I believe it's -- yes.

2          And, looking at the signature page, are you one of

3    the three people who signed off on this loan?

4    A    That is my signature, yes.

5    Q    Okay.  And, looking at the other two names that are

6    listed, but there is no signature, could a loan be approved

7    without all five signatures?

8    A    I believe they could, depending on the amount of the

9    loan, but I don't recall what the Levins were.

10   Q    Now, you -- we -- as far as an individual names Charles

11   Gallub, were you familiar with a loan to him in the amount of

12   $500,000?

13   A    I was not.

14   Q    Okay.

15   A    No.

16   Q    And, I'd like to show you what's been marked as

17   Government's Exhibit 143.

18          MS. BARRY:  And, I believe that this has been moved

19   into evidence, and may it be published, Your Honor?

20          THE COURT:  Yes.

21   BY MS. BARRY:

22   Q    Looking at Government's Exhibit 143, what is the date on

23   this RAS, please?

24   A    12/15/2009.

25   Q    And, looking at the contact name on the left-hand side,

1   who is listed as the contact name?

2   A     Charles Gallub.

3   Q     Okay.  And, if we scroll down to the loan request, who's

4   the borrower?

5   A     Bellmawr Creek, LLC.

6   Q     And, what is the purpose of the loan?

7   A     Working capital.

8   Q     And, what is the proposed amount of the loan?

9   A     Five-hundred-thousand.

10  Q     And so, were you ever told by Mr. Hartline that this

11  money was going to be used to purchase Nova Bank stock?

12  A     I'm -- I'm not aware of that, no.

13  Q     Were you aware that the bank had applied for TARP

14  funding?

15  A     I was aware that they were going to.

16  Q     Okay.  And, who told you that?

17  A     I think it was discussed with Mr. Hartline in a

18  management meeting.

19  Q     Okay.  And, what were you told about the TARP funding?

20  A     Well, I don't recall the amount we were going for.  I do

21  remember that there was a required amount we had to raise in

22  addition to what they were going to provide.

23  Q     Okay.

24  A     I don't recall the -- the amounts.

25  Q     And, were you involved in any raising of any amounts for

Dietrich - Cross (Ega)                                      67

1    the TARP?

2    A     No.

3              MS. BARRY:  May I have a moment, Your Honor?

4              MR. EGAN:  I'm not sure 143's been admitted, but if

5    Ms. Barry is done with it, perhaps we could take it down?

6              MS. BARRY:  Yes, I am.

7              THE COURT:  Certainly.  It has been.

8              MR. EGAN:  My mistake.

9              MS. BARRY:  May I have a moment, Your Honor?

10             THE COURT:  Yes, ma'am.

11                        (Brief pause.)

12             THE COURT:  Yes, sir.  Could we have some water for

13   the witness, please.

14                   (Side comments off the record.)

15   BY MS. BARRY:

16   Q    Mr. Dietrich, I just have a quick question.

17             Did you rely on the information on the risk

18   assessment summary or the RAS to approve a loan?

19   A    I used that to, yes.

20   Q    Okay.

21   A    To -- to make the decisions.

22             MS. BARRY:  No further questions, thank you.

23             THE COURT:  Do you need some more water, sir?

24             THE WITNESS:  I have some, thank you.  I'm fine,

25   thank you.

1          THE COURT:  You may cross-examine.

2          MR. EGAN:  Thank you, Your Honor.

3                       CROSS-EXAMINATION

4    BY MR. EGAN:

5    Q    Good afternoon, Mr. Dietrich.

6    A    How are you?

7    Q    Good, thank you.

8          Sir, I believe you said you were at Nova Bank from

9    2002 to 2012, correct?

10   A    That's what I said, yeah.  Did I get the starting date

11   wrong?

12   Q    You got me.  That's a long time, huh?

13   A    Yes.

14   Q    So, before that, you had been in banking for a long

15   time, --

16   A    Right.

17   Q    -- as well, correct?  So, you were a very experienced

18   banker.

19   A    Correct.

20   Q    And, when Brian Hartline hired you, he hired you to do

21   what?

22   A    The retail banking component.

23   Q    And, the retail --

24   A    The branches.

25   Q    -- banking component --

1    A     The branches.

2    Q     -- is the branches, correct?

3    A     (No verbal response given.)

4    Q     And, Nova had several branches, --

5              THE COURT:  He has to answer out loud.  It's a yes

6    or no.

7              THE WITNESS:  Oh, I'm sorry.

8    BY MR. EGAN:

9    Q     Nova had several branches?

10   A     Yes.

11   Q     And, indeed, from 2002 to 2009, at least, they grew

12   branches, correct?

13   A     Yes.

14   Q     They added a number of branches.

15   A     Yes.

16   Q     And so, your job was to deal with the day-to-day people

17   who came in and run those various branches.

18   A     Correct.

19   Q     And, I want to talk a little bit about 2009.

20              Do you recall you were asked about the TARP

21   application, right?

22   A     Correct.

23   Q     And, you remember that Nova made a TARP application,

24   correct?

25   A     Correct.

1    Q    But, at the time that Nova made the TARP application, it

2    was actually of still attempting to expand, correct?

3    A    Yes.

4    Q    And, in fact, it had just acquired Pennsylvania Business

5    Bank?

6    A    Correct.

7    Q    And, it was interested in acquiring an insurance company

8    called DVFG, do you remember that?

9    A    Yes.

10   Q    And, it was even going to add another branch as a result

11   of that, correct?

12   A    Yes.

13   Q    And, you were deeply involved in looking into that new

14   branch.

15   A    Yes.

16   Q    And, you did a lot of work on trying to lay the

17   groundwork so that it could be opened.

18   A    Yes.

19   Q    So, in 2009, Nova was not, in your view, in any way,

20   shape, or form in -- in jeopardy of failing, correct?

21   A    Correct.  Yes.

22   Q    And, in fact, you stayed until 2012.

23   A    Correct.

24   Q    And, that was long after these TARP funds were not

25   provided to the bank.

1    A    Yes.

2    Q    Now, because of your senior role in the bank and your

3    experience, you were on the loan committee, correct?

4    A    Yes.

5    Q    And, I assume that's a responsibility you took very

6    seriously?

7    A    Yes.

8    Q    And, when a loan was presented to you, you would review

9    whatever was provided to you to make your decisions, correct?

10   A    Correct.

11   Q    And, that would generally be the RAS, right?

12   A    Yes.

13   Q    And then, any back-up information that might be provided.

14   A    Correct.

15   Q    Now, you were asked about collateral for the Levin loan,

16   do you remember that?

17   A    (No verbal response given.)

18   Q    Whether it was collateralized?

19   A    It was unsecured.

20   Q    Right.  And, collateral can be an important --

21   A    Right.

22   Q    -- factor, correct?

23        However, it's not the only factor in determining

24   whether to approve a loan, correct?

25   A    Correct.

1    Q     Now, you're familiar with debt service?

2    A     Yes.

3    Q     And, debt service is a pretty important factor, as well,

4    is it not?

5    A     Yes.

6    Q     And, that has to do with the amount of cash that the

7    borrower has?

8    A     Yes.

9    Q     And, the amount of money they have to pay back their

10   debts.

11   A     Correct.  Yes.

12   Q     And, debt service of one was considered sufficient,

13   correct?

14   A     Maybe a little over one, but --

15   Q     Like, 1.2 or --

16   A     One-point-two --

17   Q     -- something like that?

18   A     -- or something like that, correct.

19   Q     But, debt service over three would be considered

20   extremely good, correct?

21   A     Correct.

22   Q     And, I don't want to bring it back up again, but if we

23   were to look at Mr. Levin's RAS, and you have it.

24   A     Mm-hmm.

25   Q     In fact, let's do that.  Government's 43, please.

1          And, if we could have the page with -- if you could

2     blow up the top section of that.

3          Now, sir, that shows the amount of the loan,

4     correct?

5     A    Correct.

6     Q    And, the date of the RAS, correct?

7     A    Correct.

8     Q    And, it says it's for $5 million.

9     A    Correct.

10    Q    And now, if we could go to Page 2, please.

11         Page 3, pardon me.

12         MR. EGAN:  And, if we could blow up those top two

13    sections.

14    BY MR. EGAN:

15    Q    Now, the second section, "Financial Analysis," you see

16    that?

17    A    Correct.

18    Q    So, you were good, 1.2 is what's required, right?

19    A    Correct.

20    Q    And, Mr. Levin had 3.3-percent.

21    A    Yes.

22    Q    Now, sir, is that, sort of, the main reason why you

23    approved this loan?

24    A    At that time, yes.

25    Q    And, when you approved this loan, Brian Hartline didn't

1  come to you and say, "You better do this," right?

2  A     No.

3  Q     He never put any pressure on you to do this.

4  A     No.

5  Q     You did it of your own judgment, for lack of a better

6  word.

7  A     Correct.  Yes.

8  Q     And, for Mr. Bonomo and Mr. Gallub, to the extent you

9  voted on those loans, it was the same thing, right?

10  A     Yes.

11  Q     You never received any pressure from anyone to approve

12  any of these loans.

13  A     No, I did not.

14  Q     Okay.  Now, sir, you're familiar with -- if we go back to

15  Page 1, here, at the very top.  Thank you.

16        The individual who is the R.M., "R.M.," that means

17  "Relationship Manager," right?

18  A     Yes.

19  Q     That's a guy by the name of Thomas Patterson, --

20  A     Yes.

21  Q     -- correct?

22  A     Mm-hmm.

23  Q     And, that means that he's the person who actually, sort

24  of, started this ball rolling, right, ba -- for lack of a

25  better way of putting it?

1   A     He would have been the one to pro -- to gather the

2   information and present it to the credit committee for the

3   analysis.

4   Q     Okay.  Now, you knew Mr. Patterson, correct?

5   A     Correct.

6   Q     And, he worked at the bank for quite some time, correct?

7   A     Correct.

8   Q     And, there came a time when he no longer worked the bank,

9   correct?

10  A     Yes.

11  Q     And, the reason that he no longer worked for the bank was

12  because the bank uncovered some activity that he engaged in

13  that was improper, correct?

14  A     Correct.

15  Q     And, you were the person who was put in charge of

16  investigating that activity, correct?

17  A     Yes.

18  Q     And, Mr. Hartline asked you to do that, didn't he?

19  A     Yes.

20  Q     And, I don't want to get into too much detail, but

21  essentially, Mr. Patterson had basically moved money from

22  places where it belonged to places where it didn't, correct?

23  A     Correct.

24  Q     And, it -- to the tune of many hundreds of thousands of

25  dollars?

1   A    Yes.

2   Q    And, he had done that without your approval, correct?

3   A    Correct.

4   Q    He had done that without the bank's approval.

5   A    Yes.

6   Q    He had done that without Mr. Hartline's approval.

7   A    Yes.

8   Q    And, you actually confronted him about that, didn't you?

9            MS. BARRY:  Objection.

10           THE COURT:  Sustained.

11           MR. EGAN:  Your Honor, could we see you at sidebar?

12           THE COURT:  Surely.

13           MR. EGAN:  Thank you.

14                      (At sidebar.)

15           MR. EGAN:  Thank you.  Mr. Dietrich was in charge of

16   running an investigation of Mr. Patterson which ultimately led

17   to his --

18       (Positioning the microphone)

19           THE CLERK:  Okay.  Sorry.

20           MR. EGAN:  It ultimately led to his being brought

21   down on federal charges, and --

22           THE COURT:  Excuse me, one second.

23       (Side comments off the record regarding microphone.)

24           MR. EGAN:  And, it's important that I be able to

25   develop two facts.  One, that Mr. Dietrich interviewed Mr.

1    Patterson, and he was not truthful to him.  And, two, that Mr.

2    Hartline encouraged Mr. Dietrich to take his information to

3    the federal government because this was at a time in this

4    investigation, after the loan to Levin had taken place, and

5    certainly, the jury could infer that if an individual is

6    willing to send somebody from a bank down to the Feds for an

7    investigation, when he allegedly committed (inaudible) this

8    crime, that's evidence of lack of guilty knowledge.

9            MS. BARRY:  Your Honor, this is completely extrinsic

10   evidence.  Mr. Patterson is going to be testifying, and to the

11   extent that whatever he did in the investigation is extrinsic

12   to what is relevant here, and it's also hearsay.

13           THE COURT:  Okay.  Your response?

14           MR. EGAN:  I'm only going to ask him if Mr.

15   Patterson was truthful to him about the amount of money that

16   was taken, and then, whether Mr. Hartline supported the

17   decision to go to the government with the facts.

18           MS. BARRY:  That's --

19           THE COURT:  All right, I will --

20           MS. BARRY:  -- completely extrinsic.

21           THE COURT:  -- permit -- and, keeping in mind that

22   when he's testifying, to some extent, it's hearsay, even in

23   terms of his extrajudicial statements.

24           It seems to me, first of all, what you're suggesting

25   here is relevant and probative evidence.  It is, indeed,

Dietrich - Cross (Ega)                              78

1    relevant and probative.

2              But, it has to come in a proper way.

3              Now, if Mr. Patterson, himself, is going to

4    testify, --

5              MS. BARRY:  Yes.

6              THE COURT:  -- he can testify to what he did.  This

7    witness can testify to what he did, and some -- but, without

8    the hearsay, excuse me.  Without the hearsay.

9              MR. EGAN:  Very well, Your Honor.

10             MS. BARRY:  Particularly as to what Mr. Hartline

11   told him to do with Mr. Patterson, because that is completely

12   extrinsic.  It's hearsay, and it has no relevance in terms of

13   this particular -- of the issues in this case.

14             MR. EGAN:  No, Mr. Hartline --

15             MS. BARRY:  It is not against interest.  It is for

16   interest.  You can't use it that way.

17             MR. EGAN:  Right, it could have been against his

18   interest, who knows?

19             THE COURT:  Okay.  The objection's sustained.

20             MS. BARRY:  Thank you, Your Honor.

21             THE COURT:  Okay.

22                       (End of sidebar.)

23             MR. EGAN:  May I proceed, Your Honor?

24             THE COURT:  You may proceed.

25   BY MR. EGAN:

Dietrich - Cross (Ega)                                      79

1   Q     So, Mr. Dietrich, this -- the work you did with regard to

2   Mr. Patterson's situation, it took place the year after or in

3   the years after this Levin loan took place, correct?

4   A     Yes.

5   Q     And, you did whatever work you needed to do, correct?

6   A     Yes.

7   Q     And, you reported that to bank management?

8   A     Yes.

9   Q     And, along with bank management, you made the decision to

10  report it to the authorities, correct?

11  A     Yeah, well, Mr. Hartline reported it to the authorities,

12  yes.

13            MS. BARRY:  Objection.

14            MR. EGAN:  No further --

15            THE COURT:  Overruled.

16            MR. EGAN:  -- questions, Your Honor.

17            THE COURT:  Overruled.

18            MR. EGAN:  Nothing further.

19            THE COURT:  All right.  You may proceed.

20                      CROSS-EXAMINATION

21  BY MR. DUNCAN:

22  Q     Good afternoon, Mr. Dietrich.

23  A     Hi.

24  Q     Mr. Dietrich, you were first interviewed by the

25  Government about this matter back on August 3, 2012, is that

Dietrich - Cross (Dun)                                     80

1    correct?

2    A    About that time.  I don't remember --

3    Q    Sure.

4    A    -- the date.

5    Q    Then, you didn't speak to him for almost three years, and

6    then you spoke to them recently, again, in October of 2015, is

7    that correct?

8    A    I believe.

9    Q    Sir, you worked at Nova Bank for almost ten years?  A

10   little more than ten years?

11   A    Yes.

12   Q    And, you are very familiar with banking procedures?

13   Banking information?  Things about banking?

14   A    Probably more on the retail side, yes.

15   Q    Sir, you don't -- you don't know very much about -- well,

16   you know that Nova was trying to raise capital pretty much all

17   the time you were there, right?

18   A    Yes.

19   Q    But, you're not very familiar with the rules on bank

20   capital, are you?

21   A    No.

22   Q    But, you're an experienced banker, right?

23   A    I guess, yes.

24   Q    I've read the rules, I don't get them either, so.

25            MS. BARRY:  Objection.

1        THE COURT:  Sustained.

2        MR. DUNCAN:  It's -- I'll withdraw, Your Honor.

3   BY MR. DUNCAN:

4   Q    Sir, you've met Barry Bekkedam, right?

5   A    Yes, sir.

6   Q    And, you were basically there at the start when Mr.

7   Bekkedam was there, right?

8   A    Yes.

9   Q    And, he was on the Board for approximately five years,

10  right?

11  A    I don't know the exact length, but --

12  Q    At some point, maybe about in the middle of your service,

13  Mr. Bekkedam left the Board?

14  A    Correct.

15  Q    Okay.  And, after that, you didn't have any contact with

16  Mr. Bekkedam, did you?

17  A    No, sir.

18  Q    We heard a little testimony about the Delaware Valley

19  Financial Group.  Do you remember that entity?

20  A    Yes.

21  Q    In fact, you were involved in doing some of the inter --

22  planned integration of the Delaware Valley Financial Group

23  into Nova, correct?

24  A    Correct.

25  Q    And, you, in fact, even made a presentation to the Board

Dietrich - Cross (Dun)                                              82

1   at various times about the Delaware Financial -- Delaware

2   Valley Financial --

3   A    I don't recall them, but --

4   Q    You'd not be surprised if there was a record that you

5   did.

6   A    There might be a record, yes.

7   Q    Sure.

8   A    I mean, it was part of the retail.

9   Q    And, this started to happen in late 2008, correct?

10  A    I can't -- I'm not comf -- I don't know the date, but,

11  yes.

12  Q    If I said it did, you wouldn't have any reason to

13  disagree with me, --

14  A    Okay.

15  Q    -- right?

16        And, that would have been before George Levin ever

17  came to the bank for a loan, correct?

18  A    (No verbal response given.)

19  Q    Because that happened in June of 2009, --

20  A    Right.

21  Q    -- is that correct?

22  A    Correct.

23  Q    You know the plan -- part of Nova's plan with the

24  Delaware Valley Financial Group was that they had businesses

25  down in Florida, so Nova was looking to possibly expand into

Dietrich - Cross (Dun)                                          83

1    Florida, correct?

2    A    I don't know that I knew that detail.

3    Q    Did you know that Nova was looking to identify a bank

4    down in Florida to help with the DVFG transaction?

5    A    I was not aware.  I don't recall that conversation.

6    Q    It could have happened, you just don't recall it?

7    A    I don't recall it.

8    Q    Okay, that's fine.

9             Sir, you know that Mr. Bekkedam had a group of

10   clients at Ballamor Capital, correct?

11   A    Correct.

12   Q    And, you know that Mr. Bekkedam was a customer of Nova

13   Bank, correct?

14   A    Yes.

15   Q    He was a customer of Nova Bank when he was a Board member

16   at Nova Bank, right?

17   A    Yes.

18   Q    You'd think it's pretty unusual if a Board member wasn't

19   also a customer of the bank, wouldn't you?

20   A    Yes.

21   Q    Sir, in fact, all the Board members were customers of

22   Nova Bank, weren't they?

23   A    I believe so, yes.

24   Q    Ed DiMarcantonio, he was a member of the Board, he was a

25   customer, correct?

Dietrich - Cross (Dun)                                    84

1   A    Right.  Correct.

2   Q    Wayne Leevy, he was a member of the Board, he was a

3   customer.

4   A    Yes.

5   Q    Mr. Dennis Marlo, he was a member of the Board, he was a

6   customer?

7   A    Yes.

8   Q    Okay.  All of them were, as far as you know.

9   A    Mm-hmm.  As far as I know.

10  Q    Sir, you took your duties very seriously at Nova Bank,

11  correct?

12  A    Correct.

13  Q    And, Mr. Bekkedam never called you and tried to exercise

14  any influence or any undue influence in making any of your

15  decisions with regard to banking procedures you were involved

16  with?

17  A    No.

18  Q    You never gave any special treatment to Mr. Bekkedam, did

19  you, sir?

20  A    No.

21  Q    And, you never gave any special treatment to any of Mr.

22  Bekkedam's clients, did you?

23  A    No.  No.

24       MR. DUNCAN:  Thank you, Your Honor.  I have no

25  further questions.

Dietrich - Redirect (Bar)                    85

1            Thank you, Mr. Dietrich.

2                         (Brief pause.)

3                    REDIRECT EXAMINATION

4    BY MS. BARRY:

5    Q    You were asked questions by both defense counsel about

6    this alleged investment or acquisition of DVFG?

7    A    Yes.

8    Q    Okay.  Did Nova Bank ever acquire DVFG?

9    A    Pardon?

10   Q    Did Nova Bank ever acquire DVFG?

11   A    No.

12   Q    You were asked about the new branch that you were looking

13   into.

14            Was the new branch ever opened?

15   A    No.

16   Q    You were -- well, let me ask you this.

17            Do you know if Mr. Levin ever paid his $5-million

18   loan back?

19   A    I don't believe so.  I don't believe he did.

20            MS. BARRY:  May I have a moment, Your Honor?

21            THE COURT:  Yes.

22            MS. BARRY:  No further questions, thank you.

23            MR. EGAN:  No questions, Your Honor.

24            MR. DUNCAN:  No questions, Your Honor.

25            THE COURT:  Thank you, sir, you may step down.

Dietrich - Redirect (Bar)                              86

1   Watch your step, please.

2              All right, we will recess until 1:30 this afternoon,

3   1:30 this afternoon.  Thank you.

4              DEPUTY:  All rise.

5              (Whereupon the jury exits the courtroom.)

6                (Proceedings adjourned at 12:17 p.m.)

7                    (Luncheon recess.)

8              (Proceedings continued at 1:46 p.m.)

9              DEPUTY:  All rise.

10             (Whereupon the jury enters the courtroom.)

11             THE CLERK:  Ladies and gentlemen, we are back on the

12  record.

13             THE COURT:  Good afternoon, you may be seated.  Is

14  it warm to you?

15             THE CLERK:  It's great.

16             THE COURT:  Okay.

17                (Side comments off the record.)

18             THE COURT:  Okay.  Counsel, you may proceed.

19             MR. IGNALL:  The Government calls George Levin.

20                    (Brief pause.)

21  G E O R G E   L E V I N, GOVERNMENT WITNESS, SWORN.

22             THE CLERK:  Please state and spell your name into

23  the record, and you can have a seat.

24             THE WITNESS:  George Levin, L-E-V-I-N.

25             THE COURT:  You may proceed.

1              MR. IGNALL:  Thank you, Your Honor.

2                    DIRECT EXAMINATION

3    BY MR. IGNALL:

4    Q    Mr. Levin, from what city and state are you originally

5    from?

6    A    Right here in Philadelphia.

7    Q    Did you move away from Philadelphia at any point?

8    A    Yes.

9    Q    And, when did you move away?

10   A    Some time in the late 70's.

11   Q    And, where did you move to?

12   A    Florida.

13   Q    All right.  And, what -- were you involved in any

14   businesses while you were in Florida?

15   A    Yes.

16   Q    What businesses were you involved in?

17   A    Quite a few.  Real estate and active businesses.

18   Q    What was the last part?  Active business?

19   A    Active businesses, yeah.

20   Q    Like, what kind of businesses did you have?

21              Did -- are these businesses you owned or had a --

22   A    Yes.

23   Q    Okay.

24   A    I did.

25   Q    And, what types of businesses did you own?

Levin - Direct (Ign)                                    88

1    A     A mobile home park in New York, a hotel in Palm Beach, a

2    hotel in Atlantic City.

3              Active businesses, real estate businesses, mostly.

4    Q     Let me turn your attention to about 2007,  were you still

5    living in Florida?

6    A     Yes.

7    Q     And, were you involved in the types of businesses we just

8    talked about in 2007?

9    A     Yes.

10   Q     And, not to get too personal, had you accumulated a

11   significant amount of wealth at that point?

12   A     Yes.

13   Q     All right.  And, did you have any wealth that was liquid

14   or available for you to invest or spend?

15   A     Yes.

16   Q     All right.  Do you remember roughly how much you might

17   have had around 2007 that was available to invest or spend?

18   A     Asset-wise?  Not all liquid or so forth?  Over 200

19   million.

20   Q     All right, how about liquid?

21   A     Liquid?  Probably 40, 50 million.

22   Q     All right.  In or around 2007, do you recall whether you

23   met someone named Scott Rothstein?

24   A     Yes.

25   Q     And, how did you meet Mr. Rothstein?

Levin - Direct (Ign)                                        89

1   A    He was an attorney in Fort Lauderdale that was introduced

2   to me, and he called me one day and asked me if I would like

3   to go -- if I could go with him to see a company he

4   represented on the west coast of Florida, a public company.

5   Q    All right, and did you go on that trip with Mr.

6   Rothstein?

7   A    Yes, I did.

8   Q    All right.  And, without going into the details of that

9   investment, at the end of that trip, did Mr. Rothstein suggest

10  any other type of investment to you?

11  A    Yes.

12  Q    And, just generally, what was that investment?

13  A    That was investment in some -- buying legal settlements

14  that he had for clients that he represented.

15  Q    And, how is it that you were going to make money on that?

16  A    It was similar to, I guess, the best way I can explain it

17  is if you win the lottery, and you want to take cash today,

18  where these payments were due out over a period of time, and

19  the individuals who had them would like to get cash for them

20  up front.

21  Q    And, --

22  A    Immediately.

23  Q    And, if you invested, what role would you play in that?

24  A    We would supply the funds.

25  Q    Did you speak to anyone who worked with you about whether

1    to invest in what Mr. Rothstein was proposing?

2    A    Many people.

3    Q    Okay.  Was there anyone in particular who worked for you

4    to provide financial advice to you around that time?

5    A    Well, I had my in-house right-hand CEO, would be Frank

6    Preve, and then I had a good relationship with our bankers.

7    Q    All right.  What was Mr. Preve's role with respect to you

8    and your companies?

9    A    He was my right-hand.

10   Q    Did you rely on him at any time to take care of financial

11   matters for you?

12   A    All the time.

13   Q    Did you and Mr. Preve get involved in setting up any kind

14   of an entity through which to invest with Mr. Rothstein?

15   A    Yes.

16   Q    And, do you remember the name of that first entity?

17   A    Banyon Investments.

18   Q    Okay.  And, starting in 2007, did you invest any money

19   with Mr. Rothstein?

20   A    Yes.

21   Q    And, through about 2007, do you recall how much you

22   personally invested?

23   A    That was in the beginning.  I imagine it was somewhere in

24   the neighborhood of 20 million.

25   Q    All right.  And, what type of return were you hoping to

1    get on that money?

2    A    Somewhere in excess of 20-percent.

3    Q    All right.

4    A    Thirty-percent.

5    Q    At some point, did you open up this investment to other

6    people beside yourself?

7    A    The business kept growing, and it got to a point where it

8    opened it up to family and friends.

9    Q    And, --

10   A    Initially.

11   Q    And, for family and friends who invested, what was your

12   role in that?

13   A    Well, I guaranteed their investments and --

14   Q    And, what do you mean by "guaranteed their investments?"

15   A    I personally guaranteed their investment.

16   Q    So, what does that mean?

17   A    That means if anything went wrong, I would pay them.

18   Q    All right, and did you pay them a set percent return?

19   A    Yes.  They were not inve -- they invested in Banyon, but

20   they got a fixed return.

21   Q    And, where did the funds from Banyon go?

22   A    Into Rothstein's --

23   Q    All right.

24   A    -- investments.

25   Q    And, were you hoping to get a higher return than what you

Levin - Direct (Ign)                                    92

1   were paying the people who invested with you?

2   A    Oh, yes.

3   Q    But, if something was not favorable with Mr. Rothstein's

4   investment, what did that mean for you that you guaranteed the

5   friends and family?

6   A    I would pay them back out of my assets.

7   Q    What -- going forward, once you opened this up to friends

8   and family, did you ever open up investment in this Banyon

9   entity or something related to people beyond friends and

10  family?

11  A    Yes, it got to a point where we brought in some funds out

12  of New York, and -- to invest.

13  Q    And, how was that investment set up?

14  A    It was set up whereby they also got a fixed rate of

15  return.

16  Q    And, did you provide any kind of guarantee?

17  A    Yes.

18  Q    All right, and again, if something went wrong with the

19  Rothstein investment, what did that mean for you with respect

20  to these funds in New York?

21  A    A big problem.

22  Q    But, what -- what kind of problem do you mean?

23  A    Having to pay it all back.

24  Q    Did you have any role with respect to Mr. Rothstein in

25  terms of finding funding for these settlements?

1   A     Yes.

2   Q     What was your role?

3   A     We were actually out getting money to invest for

4   Rothstein.

5   Q     And, did Mr. Rothstein say whether he had significant

6   needs for funding for these settlements?

7   A     He said he had expanded his business in a big way, and

8   depending upon us funding him.

9   Q     Have you ever met someone named Barry Bekkedam?

10  A     Oh, yes, yes.

11  Q     And, when did you first meet Mr. Bekkedam?

12  A     Oh, I met Mr. Bekkedam sometime in 2009.  I think the

13  beginning of the year.

14  Q     And, how did you meet Mr. Bekkedam?

15  A     Through another associate that we both knew.

16  Q     And, who was that?

17  A     Howard Gruverman.

18  Q     And, do you see Mr. Bekkedam anywhere here in the

19  courtroom?

20  A     Oh, yes.  Right here.

21  Q     Can you identify him by where he's sitting and what he's

22  wearing?

23  A     He's second from the end there in a suit.

24  Q     Okay.

25  A     I guess.

Levin - Direct (Ign)                                    94

1          MR. IGNALL:  May the record reflect that the witness

2    has identified Defendant, Mr. Bekkedam.

3          THE COURT:  The record shall so reflect.

4    BY MR. IGNALL:

5    Q    And, do you know what business Mr. Bekkedam was in when

6    you first met him?

7    A    Investment banking, I believe.

8    Q    Do you know if he had a business that he owned or ran?

9    A    Yes.  Ballamor Capital.

10   Q    And, do you know what kind of business that was?

11   A    An investment firm.

12   Q    All right.  Did Mr. Bekkedam ever talk to you about

13   whether you could become a client of Ballamor?

14   A    Oh, yes.

15   Q    And, what did he ask you or say?

16   A    I don't recall.  That's how first met.  I think that was

17   what it was about.  He wanted me to become a client of

18   Ballamor.

19   Q    And, did you become a client of Ballamor?

20   A    I don't think I ever did, no.

21   Q    All right.  Did Mr. Bekkedam ever describe what his firm

22   did?

23   A    Yes.

24   Q    And, what did he tell you his firm did?

25   A    Made investments.  And, he had the authority to make

Levin - Direct (Ign)                                          95

1    investments in different --

2    Q     Authority --

3    A     -- companies.

4    Q     -- on behalf of whom?

5    A     His investors.

6    Q     And, did he tell you how much money he had from

7    investors?

8    A     Substantial.

9    Q     Did he tell you -- give you a number?

10   A     I don't recall, but I think it was about, you know, a

11   billion, something like that.

12   Q     Did you at any point discuss the Rothstein settlements

13   with Mr. Bekkedam?

14   A     Oh, yes.

15   Q     And, what discussions did you have with Mr. Bekkedam

16   about them?

17   A     Eventually, he invested with us.

18   Q     Well, what -- did you discuss what the settlements were

19   with him?

20   A     Yes.  Of course.

21   Q     And, you said, when "he invested with us."

22         What do you mean by that?

23   A     He raised funds to invest with us.

24   Q     And, do you know from whom he was raising funds?

25   A     At the time, I beli -- they were his clients.

Levin - Direct (Ign)                                        96

1   Q     Did Mr. Bekkedam ever tell you if he's be able to raise

2   funds for these settlements?

3   A     Yes.

4   Q     Did he say how much the thought he could raise?

5   A     Yes.

6   Q     And, what did he tell you?

7   A     I think it was a couple hundred million.  I think

8   something like that.

9   Q     Did you set up any particular entity to work with Mr.

10  Bekkedam on funding these settlements?

11  A     Eventually, we did, yes.

12  Q     And, what was the name of that entity?

13  A     I don't recall.

14  Q     Did -- do you know if it had the word, "Banyon," in the

15  name?

16  A     Probably.

17  Q     Have you ever heard of something called the Banyon Income

18  Fund?

19  A     Yes.

20  Q     And, what is that?

21  A     That's the fund.

22  Q     All right.  Do you remember roughly when you set that up?

23  A     Sometime in 2009.

24  Q     All right.  And, with respect to this Banyon Income Fund,

25  did you have any role in guaranteeing investments?

1    A    I think I did.

2    Q    Did Mr. Bekkedam talk to you about having you guarantee

3    investments?

4    A    Yes.

5    Q    And, did he ask you whether -- did he ask you to do that?

6    A    Yes.

7    Q    All right.  And, what did it mean that you guaranteed the

8    investments?

9    A    We guaranteed the funds that were coming in.

10   Q    And, were you paying a fixed return, or how were inve --

11   A    A fixed return, yes.

12   Q    And, what does a "fixed return" mean?

13   A    A fixed return is a set percentage --

14   Q    Okay.

15   A    -- on the investment dollars.

16   Q    Did you around the same that you were setting up the

17   Banyon Income Fund have any other business deals with Mr.

18   Bekkedam?

19   A    Yes.

20   Q    All right, and if I could turn your attention to Exhibit

21   14?

22           MR. IGNALL:  Is that -- has that been admitted?  All

23   right.

24           All right, I believe this has been admitted.  And, I

25   can -- now, I can approach with a hand-copy, Your Honor?  May

1   I?

2              THE COURT:  All right.  Yes, sir.

3   BY MR. IGNALL:

4   Q    You can look at the screen, Mr. Levin, or I can hand you

5   a hard copy.

6   A    Thank you.

7              The screen's easier.

8   Q    Okay.  Does this e-mail -- who's this e-mail from?

9   A    It's from Barry.

10  Q    And, who's it to?

11  A    Frank Preve.

12  Q    And, is anyone copied on this?

13  A    I am.

14  Q    Okay.  Is that your e-mail address?

15  A    Yes.

16  Q    And, was that the address you were using in 2009?

17  A    Yes.

18  Q    All right.  Looking at this, does Mr. Bekkedam talk about

19  any other business deals you had together around April of

20  2009?

21  A    In the --

22  Q    It might be easier if you look at the hard-copy just --

23  just for --

24  A    Yes.

25  Q    What deals did you have, just generally, with Mr.

Levin - Direct (Ign)                                    99

1   Bekkedam then?

2   A    This was a bond investment that Barry was involved in

3   whereby --

4   Q    Go ahead.

5   A    -- he wanted to become liquid from the investment.

6        So, I believe we had made an arrangement that I was

7   going to buy for cash his portion of it.  He had a loan with

8   the bank.

9   Q    What bank?  Do you know?

10  A    I'm trying to think.  It's --

11       (Brief pause.)

12  Q    Well, I might be able to show you some documents.

13  A    Mr. Hartline's bank, I'm not sure.

14  Q    Does the name, "Nova Bank," sound familiar?

15  A    "Nova," I'm sorry, yes.

16  Q    All right.  And, were you going to do anything with

17  respect to the loan that Mr. Bekkedam had from Nova Bank?

18  A    Nova was supposed to transfer the loan to us.  To me.

19  Q    Did that ever happen?

20  A    No.

21  Q    All right.  Did you provide any information to Nova Bank

22  to try to assume that loan?

23  A    I'm sure I did.

24  Q    All right.

25  A    I'm sure my people did.

1  Q    All right.  And, when you say, your "people," who would

2  that include?

3  A    That would be Frank.

4  Q    All right.  And, looking at Exhibit 14, did you have any

5  other business deals with Mr. Bekkedam around this April 2009

6  time period?

7  A    This was in the, I think, the investment in the bank.

8  Q    Well, is it -- did you -- look at Item number 2.

9  A    Mm-hmm.

10 Q    Did you talk with Mr. Bekkedam at all about you investing

11 in some way in Ballamor Capital?

12 A    It's possible, yes.

13 Q    All right.  Did you agree to provide any funding to Mr.

14 Bekkedam with respect to Ballamor Capital?

15 A    I don't know if we did, but we never -- if we came to

16 agreement or not, we never invested.

17 Q    Did Mr. Bekkedam ever ask you to invest in Ballamor

18 Capital?

19 A    I don't recall.

20 Q    Did you ever talk to Mr. Bekkedam about Nova Bank?

21 A    Yes.

22 Q    Do you know what role, if any, Mr. Bekkedam had at Nova

23 Bank?

24 A    At the time, no, I did not.

25 Q    Did he say what his role was at Nova Bank at any time?

1    A    An advisor.

2    Q    All right.

3    A    I think he said he was on the Board at one point, but --

4    Q    Did you ever have any discussions with Mr. Bekkedam about

5    investing in a bank in general?

6    A    Yes.

7    Q    What were those discussions?

8    A    It was Nova Bank, and he was going to do certain things

9    with it.  There was a TARP loan.

10    Q    Let me stop --

11    A    Oh.

12    Q    -- you.

13          Did you have any discussions with Mr. Bekkedam about

14    purchasing a bank other than Nova Bank?

15    A    No.

16    Q    All right.  Did you have any interest in purchasing a

17    bank in general?

18    A    At the time?

19    Q    Yeah.

20    A    No.

21    Q    Were you interested at all in finding a place for the

22    settlement funds to be invested?

23    A    Made since, yeah.

24    Q    Okay.  And, we mentioned Nova Bank.

25          Who first mentioned Nova Bank as a possible

1    investment for you?

2    A    Well, it had to be Barry because I didn't know Nova Bank

3    before then.

4    Q    Okay.  Did Mr. Bekkedam tell you whether any of his

5    clients had any involvement with Nova Bank?

6    A    I don't recall.  No.

7    Q    Do you know if he ever talked to you about whether anyone

8    in -- any Ballamor client had ever invested in Nova?

9              MR. EGAN:  Objection.  Leading.

10             THE COURT:  Sustained.

11   BY MR. IGNALL:

12   Q    Do you recall any discussions with Mr. Bekkedam about

13   Ballamor clients in general?

14   A    Yes.

15   Q    Do you recall a discussion about whether any Ballamor

16   client was invested in Nova Bank?

17   A    I don't recall.

18   Q    Okay.  With respect to Nova Bank, did Mr. Bekkedam seek

19   an investment from you?

20   A    Yes.

21   Q    All right.  What did he tell you about Nova Bank?

22   A    That I think they had a TARP loan.

23   Q    Do you know what -- did you know what that was at the

24   time?

25   A    Yes.

1    Q    What was that?

2    A    That was the government was lending banks money be --

3    during that period of time, 2008 was a tough time.

4    Q    All right.  What else did he tell you about Nova Bank?

5    A    That Nova was about to take over a company, I think, in

6    Conshohocken, if I recall.

7              And, I think it might have been an insurance

8    company, might have been another bank.  I don't recall what it

9    was.

10             And that there were great things on horizon for the

11   bank.

12   Q    Did he tell you if the bank needed to do anything in

13   order to get this TARP funding from the government?

14   A    They needed to raise some funds.

15   Q    All right.  Now, did Mr. Bekkedam tell you what the bank

16   was going to do if it got this TARP funding?

17   A    It was going to do -- go ahead and do this.  I think they

18   were even going to do something in Florida, take over some

19   banks.

20   Q    Did you ask anyone who worked with you to look into

21   investing in Nova Bank?

22   A    Yes.

23   Q    Who'd you ask to look into it?

24   A    Frank Preve.  I was -- I wasn't there at the time, I had

25   moved to Saint Thomas.

1    Q    All right.  You mentioned a minute ago that Mr. Bekkedam

2    said the bank needed to raise capital to get the TARP.  Did

3    Mr. Bekkedam ever tell you if he had been raising capital from

4    other people?

5    A    Yes.

6    Q    What did he tell you?

7    A    That he had other investors.

8    Q    Did you tell Mr. Bekkedam that you had any interest in

9    making an investment in Nova Bank?

10   A    I think in -- along the lines of the capital that we were

11   handling at the time, it made sense.

12   Q    Did you tell him whether getting the TARP made any

13   difference to you?

14           MR. EGAN:  Objection, leading.

15           THE COURT:  Sustained.

16   BY MR. IGNALL:

17   Q    Do you recall any discussions with Mr. Bekkedam about the

18   effect of the TARP on your willingness to invest?

19   A    It was an important factor.

20   Q    And did you tell Mr. Bekkedam that?

21   A    I'm sure I did.

22   Q    And why was that important to you?

23   A    Gave the bank the capital it needed to do the things he

24   wanted to do.

25   Q    Did you -- you have any discussion with -- I withdraw

1    that.

2              Did you have any discussion with Mr. Bekkedam about

3    how much he wanted you to invest in Nova Bank?

4    A    Yes.

5    Q    And do you remember how much that was?

6    A    Initially, I think it was somewhere around 12, 15

7    million, something like that.

8    Q    All right.  And was there an amount of money you were

9    going to put up initially as part of that larger amount?

10   A    Yes.

11   Q    And do you remember how much that was?

12   A    Five million.

13   Q    All right.  Did you have discussion with Mr. Bekkedam

14   about what the source of that $5 million would be?

15   A    Well, it was very plain amongst all of us that --

16   Q    Well, who's included in "all of us?"

17   A    Would be myself, would be Frank, would be any of my

18   people.

19   Q    Okay.

20   A    That I wanted to keep all the cash we possibly could in

21   the investment with Rothstein.

22   Q    And did you tell that to Mr. Bekkedam?

23   A    Yes.

24   Q    And did Mr. Bekkedam come up with a suggestion?

25   A    Yes.

1    Q    What was that suggestion?

2    A    That the bank would lend us the five million.

3    Q    For what purpose?

4    A    To replace the five million we're going to invest.

5    Q    And did you ever have any discussion with Mr. Hartline

6    about that?

7    A    Initially?

8    Q    At any point prior to the loan?

9    A    I'm not sure I did.

10   Q    As of June 30, had you -- let me ask it differently.

11        Did you at some point apply for a loan from Nova

12   Bank?

13   A    Yes.

14   Q    And do you remember roughly when that was?

15   A    I think it's around that date, around June somewhere.

16   Q    Did Mr. Bekkedam ever have any discussion with you about

17   any meeting to the June 30 date?

18   A    I don't recall.

19   Q    Was it -- do you recall if there was any urgency to get

20   this done?

21             MR. EGAN:  Objection.

22             MR. DUNCAN:  Objection.

23             THE COURT:  Sustained.

24   BY MR. IGNALL:

25   Q    With respect to the specifics, in terms of getting this

Levin - Direct (Ign)                    107

1    loan applied for, did you handle that, or did you have anyone

2    else handle that on your behalf?

3    A    Frank handled the whole thing.

4    Q    So, did you at some point apply for a loan from Nova Bank

5    in June of 2009?

6    A    Yes.

7              MR. IGNALL:  All right.  I'd like to show you what

8    we've marked as Exhibit 301.  I believe by stipulation I'm

9    going to move this into evidence right now.

10             MR. DUNCAN:  No objection.

11             MR. EGAN:  No objection.

12             MR. IGNALL:  And the easiest thing might be, if

13   you're looking on your screen -- and I could turn your

14   attention to the -- the page, then, is 017, Agent Boyer.  It's

15   probably -- probably about the 28th page, if my math is right.

16                  (Brief pause.)

17             MR. IGNALL:  All right.  If we could maybe publish

18   this to the jury, Your Honor?

19             THE COURT:  Any objection?

20             MR. EGAN:  No objection.

21             MR. DUNCAN:  No objection, Your Honor.

22             THE COURT:  Granted.

23             MR. IGNALL:  All right, why don't you put the whole

24   page on the screen, please, Agent Boyer, for now?

25   BY MR. IGNALL:

1   Q    Looking at this, Mr. Levin, do you recognize this

2   document at all?

3   A    Could you blow it up again, please?  Yes.

4   Q    And what is this?

5   A    This would be the loan document for the 500 -- five

6   million.

7   Q    All right.  And if we can go all the way down to the

8   bottom, do you see a signature there?

9   A    Yes.

10  Q    Do you recognize that signature?

11  A    Yes.

12  Q    Whose signature is that?

13  A    That's mine.

14  Q    Do you know who prepared this document?

15  A    No.

16  Q    All right.  Did you sign a number of documents?

17  A    Yes.

18  Q    All right.  And, do you remember who gave them to you to

19  sign?

20  A    Probably Frank.

21  Q    Let me turn your attention three pages earlier.  Well --

22  yes, should end in 14.

23       It says, "Nova Bank Commercial Loan Application."

24  A    Okay.

25  Q    You see that?

1    A    Yes.

2    Q    And is that your name at the top?

3    A    Yes.

4    Q    And what city and state were you living in then?

5    A    Florida.

6    Q    And what city were you living in?

7    A    Fort Lauderdale.

8    Q    All right.  And the business phone there, do you

9    recognize that phone number?

10   A    That would have been the -- yeah, the business.  That

11   would have been Banyon's.

12   Q    All right.  Did you fill out this form?

13   A    No.

14   Q    You see a signature at the bottom?

15   A    Yes.

16   Q    Is that your signature?

17   A    No.

18   Q    When you borrowed the $5 million in June, do you know

19   where that money went?

20   A    Exactly where it went?

21   Q    Well, let me ask it differently.  Were you involved in

22   either receiving -- were you involved in determining where

23   that money went when it left the bank?

24   A    No.

25   Q    Who was involved in that?

Levin - Direct (Ign)                        110

1   A    Frank.

2   Q    And were you involved in directing where the money should

3   go after it was distributed from the bank?

4   A    No.

5   Q    Who was involved in that?

6   A    Frank.

7   Q    All right.  Was there any purpose for this loan, other

8   than to invest in Nova Bank?

9   A    It was the capital itself, as I said, from before.  We

10  never wanted to deplete the amount of monies we were investing

11  with Rothstein.

12         So, therefore, we made the loan to make -- to invest

13  in the bank.

14  Q    Do you recall if there was any requirement for you to get

15  approved by a regulatory agency, either in the state or

16  federal government, with respect to Nova Bank?

17  A    Yes.

18  Q    What was your understanding?

19  A    Because we would have wound up owning over five or

20  ten-percent of the bank.  We had to be approved for that

21  investment.

22  Q    And did you prepare any paperwork to send to the state or

23  federal government?

24  A    Frank did all that, he took care of that.

25  Q    All right.  If I could turn your attention to Exhibit 55.

Levin - Direct (Ign)                                          111

1    Do you recognize Exhibit 55?

2    A    Yes.

3    Q    And what is Exhibit 55?

4    A    That was the application to the authorities --

5    Q    All right.

6    A    -- to get approval to make the investment.

7    Q    Did you draft this yourself?

8    A    No.

9    Q    Do you know who drafted it?

10   A    I don't.

11   Q    Is that your signature at the bottom?

12   A    Yes, it is.

13   Q    All right.  Do you know whether or not you ever got a

14   version of this document without your signature?

15   A    I don't --

16   Q    Or, phrased differently, it -- you said that's your

17   signature.  Did someone else provide this document to you

18   without a signature on it?

19             MR. EGAN:  Objection.

20             THE COURT:  Overruled.

21             THE WITNESS:  I don't recall.

22   BY MR. IGNALL:

23   Q    Okay.  After June, did you have an opportunity to review

24   any financial information regarding Nova Bank?

25   A    Yes.

Levin - Direct (Ign)                           112

1    Q    And based on that review of financial information, what

2    was your view about investing any money into Nova Bank, that

3    18 million or whatever number it was?

4    A    Well, I think you need to know that at the same time I

5    was, as I said, going to Saint -- moved to Saint Thomas to

6    establish residency there, and open Banyon in Saint Thomas for

7    tax planning purposes.

8              And I left it up to Frank, since he was an ex-banker

9    back way when, to vet the investment and take a look at it.

10   And --

11   Q    Mr. Levin, not to cut you off, my question was at some

12   point --

13   A    I'm sorry.

14   Q    -- did you -- did you look at the financials?

15   A    Eventually, yes.

16   Q    And what effect did that have on your desire to invest

17   any more money in the bank?

18   A    I didn't want to.

19   Q    All right.  Did you have any concerns at the time about

20   the price of the stock that you paid?

21             MR. EGAN:  Objection, leading.

22             THE COURT:  Overruled.

23             THE WITNESS:  Yes.

24   BY MR. IGNALL:

25   Q    And did you discuss those with anyone at the bank?

1   A    Mr. Hartline, yes.

2   Q    And in person, on the phone, how did you -- how did you

3   have the discussion?

4   A    On the phone.

5   Q    And how many times do you recall speaking to Mr. Hartline

6   on the phone?

7   A    Quite a few.

8   Q    And what were the -- what's the gist of your

9   conversations with Mr. Hartline?

10  A    That the way that the transaction had been structured and

11  executed was not fair and equitable, in that we didn't have

12  a -- a lockup on -- or, an anti-dilution clause in the

13  documents, and they were out selling more stock on top of us.

14        The interest -- the interest rate on the loan

15  itself, the $5 million loan, and there were quite a few things

16  like that.

17  Q    And did you raise with Mr. Hartline your concerns about

18  investing any more money with Nova as it was structured?

19  A    I don't think we got in -- I didn't get into that

20  conversation with him.

21  Q    With respect to the state and federal regulators, do you

22  recall whether you got any questions from them?

23  A    I'm sure we did.

24  Q    All right, if I could turn your attention to Exhibit 74.

25  And I believe this is in evidence.

Levin - Direct (Ign)                                    114

1              MR. IGNALL:  May I publish this to the jury, Your

2      Honor?

3              THE COURT:  Any objection?

4              MR. EGAN:  No, Your Honor.

5              MR. DUNCAN:  No objection.

6              THE COURT:  Granted.

7                   (Side comments off the record.)

8      BY MR. IGNALL:

9      Q    And if I could ask you to look at Exhibit 74, do you

10     recognize this document?

11     A    Yes.

12     Q    And what is this document?

13     A    It's an e-mail from me to Frank Preve, and to Barry.

14     Q    All right.  And if we go down to the bottom e-mail, do

15     you see that?

16             Was it -- do you recall getting this bottom  e-mail

17     as part of the string we just looked at?

18     A    (No verbal response given.)

19             MR. IGNALL:  May I approach with a hard copy, Your

20     Honor?

21             THE COURT:  Yes, you may.

22             MR. IGNALL:  It might be easier if you look at

23     the -- all the e-mails --

24             THE WITNESS:  Okay.

25             MR. IGNALL:  -- together in the hard copy.

1           THE WITNESS:  Thank you.

2                           (Brief pause.)

3           THE WITNESS:  Yes.

4    BY MR. IGNALL:

5    Q    Do you recall, at this point, whether anyone had asked

6    you to provide information to either the state or federal

7    government in connection with Nova Bank?

8    A    I'm sure they did, yes.

9    Q    And read item number two.  What is Ms. Metcalfe asking in

10   item number two?

11   A    The source of funds -- do you want me to read it, or

12   just --

13   Q    Well, just read the first line.  What does it say?

14   A    "Source of funds to be used to purchase the stock."

15   Q    All right.  And if we go back to the top e-mail, what's

16   the subject line there?

17   A    Want me to read it?

18   Q    Yes.

19   A    "Barry."

20   Q    No, what does the subject line say?

21   A    Oh, subject line says, "Fed Follow-up Questions."

22   Q    All right.  And did you -- after you got this -- these

23   questions from the Fed, did you e-mail Mr. Bekkedam?

24   A    Yes.

25   Q    And what did you tell Mr. Bekkedam?

1   A    I wasn't happy about all this going on, to make this

2   investment.  Because by this time, as I said prior, I was not

3   happy with it.

4   Q    And what did you tell Mr. Bekkedam, can you read that?

5   A    That I was going through with it simply because --

6   Q    Well, can you read it?  What does it say?

7   A    Oh, I'm sorry.

8        "Barry, why am I involved in all this?  I am trying

9   to help you out.  I could care less about this investment."

10  Q    What do you mean you're trying to help him out?

11  A    Well, with the bank.  Yeah, raising funds for the bank,

12  and so forth.

13  Q    (Brief pause.)

14       Now, after this -- this was August 25 -- what's the

15  date of this e-mail?  I'm sorry.

16  A    August 25th.

17  Q    All right.  After August 25th, did you have any intent to

18  put any money into Nova Bank?

19            MR. EGAN:  Objection.

20            THE COURT:  Sustained.

21            MR. IGNALL:  May I ask for the basis, so I can --

22            MR. DUNCAN:  Leading, Judge.

23  BY MR. IGNALL:

24  Q    After -- as of August 25th, had you decided one way or

25  another what you thought about further investment in Nova

1    Bank?

2    A    I'm not sure it even came up at this point.

3    Q    All right.  As of August 25, 2009, did you have any other

4    business deals going with Mr. Bekkedam?

5    A    We had the unfinished deal on the bonds, where --

6    Q    All right.

7    A    -- we had sent him the money.

8    Q    What about the Banyon Income Fund, was that still

9    ongoing?

10   A    Yes.

11   Q    At this point, do you recall any discussions with Mr

12   Bekkedam about the TARP funding?

13              And maybe I can help, let me -- let me show you what

14   we've marked as Exhibit 80, and I do not believe this is in

15   evidence yet.

16                        (Brief pause.)

17   BY MR. IGNALL:

18   Q    Just from looking at the top, what is Exhibit 80?

19   A    It's from Barry Bekkedam to me, with a carbon copy to

20   Larry Rovin.

21   Q    And what's the date of this e-mail?

22   A    Thursday, September 3, 2009.

23   Q    And what's the subject line?

24   A    "Miscellaneous To-Dos."

25   Q    And is that your e-mail address in the "To" line?

Levin - Direct (Ign)                          118

1    A    Yes.

2              MR. IGNALL:  All right.  The Government moves into

3    evidence Exhibit 80.

4              MR. EGAN:  No objection.

5              MR. DUNCAN:  No objection.

6              THE COURT:  Granted.

7              MR. IGNALL:  May I publish to the jury?

8              THE COURT:  Yes, you may.

9    BY MR. IGNALL:

10   Q    All right.  Does this e-mail discuss more than one topic?

11   A    (No verbal response given.)

12             MR. IGNALL:  Again, Your Honor, may I approach with

13   a hard copy?  That might be easier.

14             THE COURT:  Yes, sir.

15             MR. IGNALL:  Take a look.  I'll direct you to

16   something in particular momentarily.

17             THE WITNESS:  Okay.

18   BY MR. IGNALL:

19   Q    Mr. Bekkedam describe -- discussed more than one topic in

20   this e-mail?

21   A    It seems to be, yes.

22   Q    All right.

23             Let me turn your attention to the bottom of the

24   page, where it starts with, "Lastly, Nova Bank."

25   A    Yes?

Levin - Direct (Ign)                    119

1    Q     What does Mr. Bekkedam say right there?

2    A     Want me to read that aloud?

3    Q     Yes, please.

4    A     "Lastly, Nova Bank needs you to respond to a couple of

5    questions for the state regulatory approval by next week, or

6    we are in difficult position.

7          "We have been approved for low-cost TARP of 13

8    million, which enhances the projections for the bank.  We are

9    forming the Florida bank holding company, and have identified

10   three prospective banks.

11         "The end result, as discussed, is" --

12   Q     All right, and let's -- we can scroll down, what are one

13   and two for the end result?

14   A     "One, George Levin has no cash in by mid-2010, as lending

15   limits from the bank continues to increase replacing invested

16   capital.

17         "Two, equity valuable is enhanced by Florida, low

18   cost of capital currently housed entirely at TD."

19   Q     All right.  And let's go -- did he -- what does he say

20   next?

21   A     "What we need as soon as possible" -- "ASAP" --

22   Q     And what -- what is that, if we go to the next page?

23         MR. IGNALL:  Let's see if we can -- Agent Boyer will

24   blow that up for us.

25         THE WITNESS:  Okay.

Levin - Direct (Ign)                    120

1   BY MR. IGNALL:

2   Q     What does that say?

3   A     "Details about the lawsuit George's company was involved

4   in many years ago, and his involvement.

5         "The disclosure that we put in the PPM of Banyon

6   Income Fund, as well as some other information, will be passed

7   on to Brian Hartline to accomplish this request.

8         "It may have to actually be sent to them from Frank.

9         "Two" --

10  Q     And what does item two say?

11  A     "Two, they asked where the potential money would come

12  from.  They asked to see the bank statement, if it was coming

13  from cash.

14        "They asked to see what assets would be liquidated,

15  if needed, from the balance sheet."

16        Want me to continue?

17  Q     No.

18  A     Okay.

19  Q     Thank you.  What's the next line say?  I'm sorry.

20  A     "I can't do anything without getting state approval

21  first.  I need this information yesterday.  We will reconvene

22  together for me to walk you through specific timing, IRR

23  projections, impact of deposits, et cetera, next week, or the

24  follow week.

25        "All the best, let's keep going, B."

1    Q    Did you ever tell Mr. Bekkedam you would liquidate assets

2    to invest in Nova Bank?

3    A    I don't believe so.

4    Q    At some point during the regulatory approval process --

5    well, let me ask this differently.

6         During the regulatory approval process, how

7    enthusiastic were you about getting approved so you could

8    invest in Nova Bank?

9    A    Well, this would be after I had done my due diligence on

10   the bank, and statements, and so forth.  I was not exactly

11   happy.

12   Q    Let me turn your attention to Exhibit 98, which I do not

13   believe is in evidence yet.

14        MR. IGNALL:  May I approach, Your Honor, with a hard

15   copy?

16        THE COURT:  Yes, sir.

17               (Brief pause.)

18   BY MR. IGNALL:

19   Q    What -- what is Exhibit 98?

20   A    It's from Barry, dated Thursday, October 15, 2009, to me.

21   Q    And is it an e-mail?  What type of document is it?

22   A    Must be an e-mail, it's my e-mail address.

23   Q    Is that your e-mail address, in the "To" line?

24   A    Yes, mm-hmm.

25   Q    And was that your e-mail address as of October 15, 2009?

Levin - Direct (Ign)                    122

1    A    Yes.

2              MR. IGNALL:  The Government moves into evidence

3    Exhibit 98.

4              MR. EGAN:  No objection.

5              MR. DUNCAN:  No objection.

6              THE COURT:  Admitted.

7              MR. IGNALL:  May it be published, Your Honor?

8              THE COURT:  Yes, sir.

9    BY MR. IGNALL:

10   Q    All right.  Flipping through it, what -- let me ask you

11   about this.  In -- on October 15, 2009, did you still have any

12   dealings with Mr. Bekkedam with respect to the Banyon

13   investment?

14   A    Yes.

15   Q    And what relate -- what dealings did you have with him

16   then?

17   A    We were ongoing, raising capital.

18   Q    Raising capital from whom?

19   A    From Barry's people, and --

20   Q    All right.

21   A    -- outside of Barry's people, also.

22   Q    Let me turn your attention to the second page, where it

23   says, "bank."

24              Can you read to us what it says after "bank?"

25   A    "Bank capital is due next week, Thursday, which is very

1  important to me, and allows us to pursue the three Florida

2  banks we have identified, along with the Continental Bank

3  opportunity.

4         "Thirteen-point-five million TARP approved, and

5  we'll close next week.  Ten million G. Levin (seven million

6  Nova is lending to G.L., five million done unsecured, and two

7  million Banyon collateral, and three million in cash).

8         "Three million management (done), 23,750,000 BCM

9  Florida Acquisition, et cetera (2.5 million draw)" -- "drawn,"

10 I'm sorry.

11        "I just need Frank to focus on bank docs, or

12 anything Brian Hartline needs early next week, and a wire for

13 three million.

14        "You signed a commitment for 18 million, but looks

15 like we only need ten million, with three million from you out

16 of pocket to execute the long-range plan."

17 Q    All right.  And at that point had you already borrowed

18 any money from Nova Bank for this?

19 A    The five million, yes.

20 Q    All right.  What does the next sentence say?

21 A    "Legal lending limit will continue to go up, and the

22 opportunity to capitalize on all your own deposit activity

23 makes total sense.

24        "As you know, I expect to fold BCM and Delaware

25 Valley Financial Group into the bank, as well."

1    Q    All right, did you, after this e-mail, invest any more

2    money with -- with -- into Nova Bank?

3    A    No.

4    Q    Did you apply to borrow any money from Nova Bank?

5    A    Not at this time, no.

6    Q    Let me turn your attention to Exhibit 114, which I do not

7    believe is in evidence.  Well, it is in evidence, I'm sorry.

8             If we could turn your attention to the top of that,

9    what is this document?

10             MR. IGNALL:  May I publish to the jury, Your Honor?

11             THE COURT:  Yes, sir.

12             THE WITNESS:  From Barry Bekkedam, Friday, October

13   23, 2009, to George Levin, my e-mail.  Subject is

14   "Miscellaneous."

15   BY MR. IGNALL:

16   Q    All right.  As of October 23, 2009, do you know if Mr.

17   Bekkedam had raised funds for Nova Bank from any other source?

18   A    I don't recall.

19   Q    All right.

20             If we look at the body of this e-mail, and we go to

21   the -- the paragraph that starts with "again" -- you see where

22   it says, "Again, we originally assumed we would raise 50

23   million to execute on our plan, with 18 million being

24   committed by George?"

25   A    Yes.

1   Q    Do you know what that 18 million is?

2   A    That was the original amount.

3   Q    All right.

4        And it says, "Nova will lend George five million for

5   the first amount done."

6        At that point had you borrowed money from Nova?

7   A    Yes.

8   Q    And how much was that?

9   A    Five million.

10  Q    All right.

11       "The next amount was ten million, which I raised.

12  Five million done and funded, and George would fund five

13  million, which needs to be funded Wednesday."

14       Do you recall any discussions with Mr. Bekkedam

15  about him raising money from other sources for Nova Bank?

16  A    I know he was out looking for money, yes.

17  Q    Okay, you see next it says, "George will get two million

18  back from the bank in one-to-two weeks, the rest by early

19  first quarter?"

20  A    Yes.

21  Q    All right.  Do you remember any discussions with Mr.

22  Bekkedam about you getting money back if you put it into the

23  bank?

24  A    Not at this time.

25  Q    All right.  What does the next sentence say after that?

1    A    "Based on the funding this week, we have been granted

2    13.5 million in TARP.  We have requested an extension from the

3    Treasury, but cannot be guaranteed that we get it (they" --

4    "they are bureaucrats, not businessmen).

5         "The rest will be raised by us, depending on what we

6    need to grow."

7    Q    All right.  And did Mr. Bekkedam talk about any other

8    deals in this e-mail?

9    A    No, this -- if you can blow it up I'll take a look.

10   Q    Yeah, or you could look at the paper copy if you want,

11   also.

12   A    Oh, okay.  Is it this one that I'm looking at?

13   Q    It's 114.

14   A    Yeah, I don't have it.  It's okay, that's fine.

15   Q    Did I not give you 114?  It's possible.

16   A    I don't think so.

17   Q    You -- we'll blow it up, it's blown-up on your screen

18   now, Mr. Levin.

19   A    Okay, not a problem.  Want me to read this?

20   Q    Well, there are -- did you -- was Mr. Bekkedam discussing

21   any other deals with you in this e-mail?

22   A    Another company, yes.

23   Q    And did you have anyone who worked for you that you

24   entrusted to deal with Mr. Bekkedam on various deals?

25   A    It would be Frank.

1   Q    And what's Frank's last name, again?

2   A    Preve.

3   Q    All right.  And is that -- and if we look at the e-mail,

4   kind of, address near the top, F-P-R-E-V-E at AOL.COM, do you

5   know who that is?

6   A    That -- that's Frank.

7   Q    All right.  Let me turn your attention to around

8   Halloween of 2009.  After Halloween of 2009, did you learn

9   about any change in the value of your investments with Mr.

10  Rothstein?

11  A    Yes.

12  Q    And was that change positive, or negative?

13  A    Negative.

14  Q    How negative?

15  A    Extremely negative.

16  Q    All right.  After Halloween of 2009, were you in a

17  financial position to invest any money in Nova Bank?

18  A    No.

19  Q    Were you in a financial position to pay off on the

20  guarantees you made to investors?

21  A    No.

22  Q    And were you in a financial position to pay off your

23  guarantees with respect to Mr. Bekkedam's investors?

24  A    No.

25  Q    Did you ever discuss with Mr. Bekkedam about that, after

Levin - Direct (Ign)                                    128

1    Halloween of 2009?

2    A     I don't recall that.

3    Q     Did you ever tell any of this to Mr. Preve?

4    A     About --

5              MR. DUNCAN:  Objection.  Relevance, Your Honor?

6              MR. LEVIN:  Well, the --

7              THE COURT:  Just a moment, please, sir.

8    BY MR. IGNALL:

9    Q     Let me ask the follow-up question, and we'll come back to

10   that.

11             Did you ever designate Mr. Preve to talk to Mr.

12   Bekkedam about your finances?

13   A     I don't recall.

14   Q     All right.  After your investment lost its value, were

15   you ever involved in a bankruptcy?

16   A     Yes.

17   Q     And when did that bankruptcy start?

18   A     I think it was about May of 2010.

19   Q     And how did you end up in bankruptcy?

20   A     The -- some of the guarantees were called.

21   Q     And were you in a position to pay those guarantees?

22   A     No.

23   Q     And were you paying the interest on the loan to Nova

24   Bank, up to that point?

25   A     I believed I paid it up through December, January,

Levin - Direct (Ign)                          129

1   something like that, '09 to '10 -- to January '10.

2   Q     At some point after you declared -- or, you were in

3   bankruptcy, did you stop paying the interest?

4   A     Yes.

5   Q     Did you ever pay the $5 million loan back?

6   A     No.

7   Q     As we stand here -- sit here today, have you paid back

8   that $5 million loan?

9   A     It has not -- it has not been paid back.

10              MR. IGNALL:  May I have one moment, Your Honor?

11              THE COURT:  Yes, sir.

12                          (Brief pause.)

13              MR. IGNALL:  Your Honor, I'd like to move into

14   evidence Exhibit 55, apparently I neglected to do that.

15              MR. EGAN:  No objection.

16              MR. DUNCAN:  No objection.

17              THE COURT:  Granted.

18              MR. IGNALL:  One moment?

19              THE COURT:  Yes, sir.

20              MR. IGNALL:  All right, no further questions.  Thank

21   you.

22              THE COURT:  Let's take 15 minutes.

23              (Whereupon the jury exits the courtroom.)

24              THE COURT:  You may step down, sir.  We're in

25   recess.

1          (Recess at 2:39 p.m. to 2:58 p.m.)

2                    (Jury not present.)

3              DEPUTY:  All rise.

4          (Whereupon the jury enters the courtroom.)

5              THE COURT:  All right, you may be seated.  Good

6    afternoon.

7              MR. EGAN:  Proceed?

8              THE COURT:  You may proceed, counsel.

9              MR. EGAN:  Thank you, Your Honor.  Good afternoon,

10   Mr. Levin.

11             THE WITNESS:  Good afternoon.

12                     CROSS-EXAMINATION

13   BY MR. EGAN:

14   Q    Mr. Levin, my name's Patrick Egan, I represent Brian

15   Hartline.  We've never met before, right?

16   A    No.

17   Q    And, in fact, you -- you've never met Mr. Hartline

18   either, correct?

19   A    Not personally, no.

20   Q    And the vast majority of your discussions back in 2009

21   about investing in Nova Bank were not with Mr. Hartline,

22   correct?

23   A    Would be with Barry Bekkedam.

24   Q    And you also had a -- an assistant, I believe you call

25   them your business manager, Mr. Preve?

1   A     Correct.

2   Q     And he had conversations, but you weren't party to all of

3   those, correct?

4   A     Correct.

5   Q     But he was what we would call your agent, right?

6   A     Yes.

7   Q     So, he had authority to act on your behalf?

8   A     He did.

9   Q     And when he did so, he did so with -- if he acted on your

10  behalf, it was pretty much same as you doing it, right?

11  A     Yes.

12  Q     Now, did you -- you met a man by the name of Larry Rovin,

13  right?

14  A     Yes.

15  Q     And, you know Mr. Rovin was Mr. Bekkedam's counsel,

16  correct?

17  A     Yes.

18  Q     And you know he had been a bank counsel prior in his

19  career, or did he tell you that?

20  A     I didn't know that.

21  Q     But you discussed these transactions with him, correct,

22  at some point?

23  A     Yes.

24  Q     Now, we can agree, right, that in 2009 you had a lot of

25  money?

Levin - Cross (Ega)                                      132

1   A    Yes.

2   Q    And some folks have said 300 million, someone said 400

3   million, it starts to be numbers that are --

4   A    If you -- if you take the investments, it was quite

5   substantial if those investments had come to fruition.

6   Q    And, indeed, that -- you're talking about the Banyon

7   investments?

8   A    Yes.

9   Q    Okay.  But we don't -- you can set those aside for now.

10  You had a lot of money other than that, too, didn't you?

11  A    Oh, yes.

12  Q    You had cash?

13  A    Yes.

14  Q    You had airplanes?

15  A    Yes.

16  Q    Three, I think?

17  A    Yes.

18  Q    You had a boat?

19  A    Yes.

20  Q    A lot of property?

21  A    This is all before, yes.

22  Q    Yeah, that's what we're talking about.

23  A    Absolutely.

24  Q    It's kind of, in your life, I assume, there's sort of

25  before Halloween 2009 and after, right?

1   A    Correct.

2   Q    And things were pretty nice up until then, and not so

3   much after?

4   A    Correct.

5   Q    And decisions you made before Halloween 2009 certainly

6   were different than the decisions you would make after 2009 --

7   Halloween 2009?

8   A    Yes.

9   Q    I think you also testified that you had a good

10  relationship with your bankers?

11  A    Yes.

12  Q    And those are not Nova bankers, those are your bankers,

13  right?

14  A    Yes, correct.

15  Q    You're talking about TD Bank?

16  A    No, I'm talking about Florida banks that I had done

17  business with prior to, nothing to do with TD.

18  Q    Okay.  And, actually, I went through this with Mr. Preve,

19  but you had, like, seven different banks in 2009, right?

20  A    No, I'm not aware.  I don't know.

21  Q    Okay, well, we can go out -- we can go over it in detail.

22  But you had made most of this money prior to Banyon through a

23  whole lot of other entrepreneurial activities?

24  A    Yes.

25  Q    And you were very good at it?

Levin - Cross (Ega)                          134

1   A    Okay.

2   Q    You were very successful, right?

3   A    Yes.

4   Q    Okay.  And when you got involved in Banyon, you first did

5   it on your own, right?

6   A    Yes.

7   Q    And it was very successful, correct?

8   A    Yes.

9   Q    You were getting this 20-percent return?

10  A    More than that.

11  Q    More than 20-percent return.  And then you decided that

12  you should expand this, and give it to -- or, offer it to

13  family and friends, correct?

14  A    Yes.

15  Q    But -- and that just meant people that you knew you were

16  close to, right?

17  A    It was exactly what I said, family and friends.

18  Q    Family and friends.  But even though they were family and

19  friends, you didn't give it to them for free, did you?

20  A    What -- I don't understand what that means.

21  Q    Well, when you invited them to invest, they invested at

22  one rate, and you got a return at a different rate?

23  A    Yes, I gave them a guaranteed rate.

24  Q    And their guaranteed rate was lower than your rate?

25  A    Oh, yes, absolutely.

Levin - Cross (Ega)                                    135

1   Q    And the point of --

2   A    They all knew that.

3   Q    Wasn't suggesting they didn't.  But the point of it was

4   that you could make even more money that way?

5   A    Correct.

6   Q    And that was very successful?

7   A    Yes.

8   Q    So, you decided to open it up to general public

9   investors?

10  A    It became -- there became a time for the need, the

11  investment was growing and growing and growing, exponentially.

12  Q    Sure.  And every time you brought in more investors, you

13  could make more money off of the difference between the

14  guarantee and what you were being paid, correct?

15  A    It didn't work out totally that way.

16  Q    That was that plan?

17  A    We were -- we were trying to grow the business, so at one

18  point when we went with the funds, we actually were giving the

19  funds all of the return.

20  Q    But it was the plan, that's the reason you did it?

21  A    Was the plan to continue to grow it.

22  Q    And you said something on direct, when -- when you were

23  asked by Mr. Ignall about investing in the bank, and whether

24  you wanted to use your own cash, and you said, "I wanted to

25  keep all the cash I could in Banyon," correct?

1    A    Invested, yes.

2    Q    Because it was making more money?

3    A    It was making good money, yes.

4    Q    Right.  So, if you were to invest -- if you were to take

5    cash out of Banyon, right, and put it in Nova Bank, it would

6    return a lower amount for you?

7    A    Yes.

8    Q    And, so, instead of taking the $5 million out of Banyon

9    and putting it into Nova Bank, where it would return a lower

10   amount, what you said on direct is you replaced the $5 million

11   you were going to invest with the loan, correct?

12   A    Yes.

13   Q    But you had the $5 million, had you wanted to pull it

14   out?

15   A    Yes.

16   Q    Now, do you rec -- you were shown a --

17            MR. EGAN:  Can we have G-15, please?

18   BY MR. EGAN:

19   Q    You were shown a document, G-14, on direct -- and this is

20   the document right after that, G-15 -- and you see this?

21   A    Yes.

22   Q    And it's an e-mail from Mr. Bekkedam to Mr. Preve and

23   yourself, correct?

24            THE COURT:  Preve.

25            MR. EGAN:  Preve, pardon me.

1          THE WITNESS:  Yes, thank you.

2     BY MR. EGAN:

3     Q    Mr. Preve and yourself?

4     A    Yes.

5     Q    And it's about selling of bonds and assumption of Nova

6     debt, correct?

7     A    Yes.

8     Q    So, that's the Colorado bond deal we talked about?

9     A    Yes.

10    Q    And also you were talking about assuming some other debt,

11    correct?

12    A    In the Colorado -- you want me to read this?

13    Q    You don't have to read it.

14    A    I was read -- I was assuming the debt that Barry had with

15    the bank.

16    Q    And that was at a point at which Mr. Preve would have

17    provided financial information to the bank for this deal,

18    correct?

19    A    Yes.

20    Q    Now, if we could go to Government's G -- oh, before we do

21    that, you were asked a bunch of questions about whether you

22    were interested in investing in a bank in Florida, remember

23    that?

24    A    Yes.

25    Q    And, indeed, you did see the va -- the wisdom in

Levin - Cross (Ega)                                    138

1    investing in a bank in Florida, correct?

2    A    Yes, because of our huge amounts of bank funds we kept.

3    Q    Right, you had all this cash.  And if you had it in a

4    bank where you had a --

5    A    Correct.

6    Q    -- you were an investor, you'd get a better deal?

7    A    Not so a better deal, but it would be helpful to

8    whichever bank it was, making investments.

9    Q    Right, and then if you were invested in that bank, then

10   you would make more money?

11   A    Correct.

12   Q    And, so, that's what kind of made sense about investing

13   in a bank?

14   A    Yes.

15   Q    And you also thought, at the time, that Nova might be

16   able to become involved with a bank in Florida and become that

17   bank, right?

18   A    Yes.

19   Q    And that's one of the reasons why you agreed to buy Nova

20   stock?

21   A    Correct.

22            MR. EGAN:  Now, if we could have Government's 62?

23   And if we could go to Page 2?

24   BY MR. EGAN:

25   Q    Can you read that, sir?

Levin - Cross (Ega)                               139

1    A      You need to blow it up a little bit.

2              MR. EGAN:   If we can blow up the top part, please?

3              THE WITNESS:   Okay.

4    BY MR. EGAN:

5    Q      It's a signature page for subscriptions by individuals,

6    correct?

7    A      Yes.

8    Q      And this is your subscription to buy $18 million worth of

9    Nova stock, correct?

10   A      Yes.

11   Q      And that's because you did agree to buy $18 million worth

12   of Nova stock?

13   A      In the beginning, yes.

14   Q      In the beginning, but once you had agreed to it, it was

15   kind of like a contract, right?

16   A      I would believe so.

17   Q      So, you were obligated to invest the $18 million,

18   correct?

19   A      Would be so.

20   Q      And the only way you wouldn't have to invest the $18

21   million is if some other contingency occurred that would cause

22   you to not have to do so, correct?

23   A      Well, I -- if -- if you could make the investment, you

24   should make the investment.   It's a contract.

25   Q      And what ended up happening was you couldn't make the

1    investment, because your money that you invested with Mr.

2    Rothstein, that investment failed?

3    A    Yes.

4    Q    Absent that, you would have been obligated to make the

5    investment, correct?

6    A    Correct.

7    Q    Now, I believe you testified that Mr. Preve kind of

8    looked into this for you, and you didn't really look into it

9    until after the fact, is that your testimony?

10   A    That is correct.

11   Q    Okay, so, you relied on Preve's recommendations as to

12   whether this was a good bank to buy or not?

13   A    Right, he was an ex-banker, so --

14   Q    Okay.

15   A    -- I figured he knew how to look at a bank.

16   Q    All right.  And, so, you've committed yourself to buy $18

17   million of bank stock without investigating whether it was a

18   good investment?

19   A    The way it was explained to me verbally was not what I

20   saw when I saw the documents.

21   Q    Okay.  And -- but you still, because of your commitment,

22   and because you're an honorable man and honor your

23   commitments, you were going to see it through, right?

24   A    To a certain extent, yes.

25   Q    Sure.

1   A     Sometimes you enter into a contract that doesn't turn out

2   right.

3           And then, you wind up with lawyers, such as

4   yourself.

5           MR. EGAN:  If I could have Government 64, please?

6   BY MR. EGAN:

7   Q     And, I assume you have had quite a few of those over the

8   years, Mr. Levin?

9   A     Not quite a few, but my share, I'm sure.

10  Q     Okay.  Government 64, if we could blow that up, you see

11  that that is a letter to the Federal Reserve Bank?  See that?

12  A     Yes.

13  Q     And, it contains a change in control application, and

14  that's your change in control application to be approved to

15  buy more than $5 million worth of Nova stock, right?

16  A     That's what it says.  I've never seen this before.

17  Q     Okay, well, we'll go through it.  I think there will be

18  parts that you'll recognize.  But before we do that, you had

19  already invested $5 million on July 21st, correct?

20  A     Yes.

21  Q     And that $5 million didn't require this application,

22  because it didn't make you a change in control investor,

23  correct?

24  A     That is correct.

25  Q     So, it was the $13 million that you were going to, but

Levin - Cross (Ega)                                        142

1   never invested, that would make you a change in control

2   investor, correct?

3   A    Yes, correct.

4   Q    And so, when you were asked questions, and we'll get to

5   some of the questions, about where your funding was going to

6   come from to provide that $13 million, you were speaking to

7   the $13 million, correct?

8   A    Yes.

9   Q    Now, if we could go to Page 8 of this document -- and,

10  sir, you see the certification there?

11  A    Yes.

12  Q    And you see the signature there?

13  A    Yes.

14  Q    Now, that's your signature, is it not, sir?

15  A    Yes, it is.

16  Q    Okay.  So, this certification basically says that you

17  certify that all the information contained in this notice is

18  true and accurate, correct?

19  A    Yes.

20        MR. EGAN:  Okay.  Now, if we could go back two pages

21  to Page 6?

22        And, if we could have that top box blown up?  And,

23  could we publish it to the jury?  This was admitted.

24        THE COURT:  Yes, sir.

25  BY MR. EGAN:

Levin - Cross (Ega)                                        143

1   Q      And, sir, you see here it says, "Provide the following

2   information, name and acquirer or transferee," that's you,

3   right, George Levin?

4   A      Yes.

5   Q      And the total of $18 million, correct?

6   A      Yes.

7   Q      And it says, "Half from personal finances and half from

8   borrowed funds," correct?

9   A      Yes.

10  Q      Now, you didn't fill this out, did you?

11  A      No.

12  Q      You relied on Mr. Preve to pr -- to handle these matters?

13  A      Yes.

14         MR. EGAN:  Now, if we could go to Page 12 of this

15  document?  Twelve, please?

16  BY MR. EGAN:

17  Q      You see that personal information, biographical report?

18  See that?

19  A      Yes.

20  Q      That's -- that's your name, right?

21  A      Yes.

22  Q      And that's your city?

23  A      Yes.

24  Q      And you were born in Philly in 1940?

25  A      Yes.

1  Q    So, this is your information here?

2  A    Yes.

3           MR. EGAN:  So, if we could go to Page 19?

4  BY MR. EGAN:

5  Q    That's your financial report, correct?

6  A    Appears to be so, yes.

7  Q    And, again, this is something Mr. Preve would have

8  probably prepared?

9  A    Yes.

10  Q    But he would have prepared it, basically, because he had

11  access to all of your records?

12  A    Absolutely, certified --

13  Q    And certainly you trust --

14  A    -- statements and everything else.

15  Q    Yeah, and just -- I mean, just generally, it's

16  449,593,000 in March of 2009, does that sound about right?

17  A    Yes.

18           MR. EGAN:  Okay.  And now if we could go to Page 26?

19  BY MR. EGAN:

20  Q    And once again, sir, there at the bottom certification,

21  is that -- that's your signature, correct?

22  A    Appears to be so, yeah.

23  Q    Okay.  So, basically, what you're saying is all of this

24  stuff about your finances is true, right?

25  A    Yes.

1   Q    And the reason you're saying it's all true, because it

2   was true, correct?

3   A    Correct.

4   Q    Because at that point in time you had $400 million or so

5   in -- in net worth, right?

6   A    Yes.

7   Q    And you were investing some funds from your own funds,

8   and borrowing some funds to put into Nova Bank, correct?

9   A    Yes.

10   Q    And that was the plan?

11   A    (No verbal response given.)

12           MR. EGAN:  So, now, if we could go to Government's

13   47?

14   BY MR. EGAN:

15   Q    And, sir, you are not on this e-mail.  However, it does

16   talk about you.  So, I just -- if you could look at it

17   yourself there.

18           It appears to be an e-mail from a Frank Preve to a

19   Paul McMahon and Susan Levin at Hotmail.com.

20           Susan Levin at Hotmail.com, that's your wife's

21   address, correct?

22   A    Yes.

23   Q    And Paul McMahon, who's he?

24   A    He runs the house --

25   Q    Okay, he was, like, your guy who ran your house?

1   A    He ran a lot of different accounts.

2   Q    Was he, like, your butler?

3   A    Personal accounts.

4   Q    Like a butler, or like --

5   A    No, no, he's an office --

6   Q    Okay.  But he worked for you?

7   A    Yes.

8   Q    And, so, he had your authority to do things?

9   A    Yes.

10  Q    And your wife, obviously, is a cosigner on your account

11  at Gibraltar, right?

12  A    I'm not --

13  Q    Or was?

14  A    I'm not sure.

15  Q    Okay.  But in any event, Mr. Preve is -- wants them to

16  know that he's sending this e-mail, correct?

17  A    Yes.

18  Q    Okay, and this e-mail says, "Please wire $5 million from

19  George Levin's account at Gibraltar to Nova Bank," correct?

20  A    Yes.

21  Q    Now, you had an account at Gibraltar, right?

22  A    Yes.

23  Q    And all the money in that account belonged to you, right?

24  A    Yes.

25  Q    So, when Mr. Preve says I'm going to wire Mr. Levin's

1   funds to Nova Bank, that's your money he's wiring, right?

2   A    Yes.

3   Q    And that's why he's telling your wife and Mr. McMahon?

4   A    Yes.

5   Q    And, certainly, if you didn't want Mr. Preve to wire $5

6   million, you would not have allowed him to, correct?

7   A    He had the authority to do it, but --

8   Q    Because you had given it to him?

9   A    Yes.

10  Q    Now, sir, when you wired that $5 million, it was to

11  purchase stock, correct?

12  A    Yes.

13  Q    And, in fact, you got stock, didn't you?

14  A    Yes.

15  Q    In fact, you got a stock certificate, didn't you?

16  A    I don't know if I ever saw them, but I imagine they were

17  issued.

18          MR. EGAN:  Okay, if we could have D-119?  And the

19  jury is -- this is not admitted.  May I approach, Your Honor?

20          THE COURT:  Yes, sir.

21          MR. EGAN:  Oh, I don't need to, they can see it

22  there.  I'm sorry.

23  BY MR. EGAN:

24  Q    Now, Mr. Levin, I'm showing you what's been previously

25  marked as D-119.  You see that?

1   A     Yes.

2   Q     And that's a letter to you, correct?

3   A     (No verbal response given.)

4   Q     Right?

5   A     Yes.

6   Q     That's your address?

7   A     Yes.

8         MR. EGAN:  And if we could go to Page 2?

9   BY MR. EGAN:

10  Q     And that is a Nova stock certificate, is it not, sir?

11  A     Yes.

12  Q     And it is dated on the bottom June 30, 2009, is it not?

13  A     Yes.

14  Q     And the purpose of this letter is actually because there

15  was a stock split that took place after -- a couple years

16  after all this, right?

17  A     It was a reversal, was not a -- it was a stock reversal.

18  Q     There's a difference, I guess.  But the purpose was to

19  tell you --

20  A     Oh, yeah, there's a big difference.

21  Q     There was a purpose to -- was to tell you about it,

22  right?

23  A     Yeah, this is a big difference.

24  Q     Okay.  This is your stock, right?

25  A     Yes.  Can you go back to the first one a minute?

1    Q    Sure.

2    A    I'd like to see something.  Can you blow that up for me?

3    Q    Yeah.

4    A    Thank you.  Yeah, it's a one-for-five --

5    Q    Right.

6    A    -- reverse stock split.

7    Q    Right.  So, now you're getting -- well, actually, yeah,

8    we don't need to get into that.

9              But, basically, there's been a decision made by the

10   bank to change the way the stock is set up, and now you're

11   getting -- it's been split somehow, reversely?

12   A    Correct.  You're getting one chair for every five that

13   you didn't have.

14   Q    Okay.  So, it's --

15   A    Yes.

16   Q    -- been devalued is what you're saying, right?

17   A    Right.

18   Q    Along with the ownership of that stock came voting

19   rights, did it not?

20   A    Yes.

21   Q    And, in fact, you exercised those voting rights at one

22   point, didn't you?

23   A    No, I don't recall.

24   Q    Well, if we could show Mr. Levin D-123, please?

25             All right, sir, do you see that document there?

1    A    Yes.

2    Q    And, it's a special meeting of the shareholders, correct?

3    A    Yes.

4    Q    And, you would vote by -- I guess by fax to vote,

5    correct?

6    A    Yes.

7    Q    Okay, and down at the bottom, that's -- there are two

8    proposals.  Do you see those?  In the middle?

9    A    Thank you.

10        Yes.

11   Q    And, you voted for them, --

12   A    Yes.

13   Q    -- apparently.

14   A    Yes.

15   Q    And, that's your signature there, correct?

16   A    Yes.

17   Q    On April 14, 2010.

18   A    Correct.

19   Q    So, you basically now had an investment in Nova Bank of

20   $5 million, which you owned, correct?

21   A    Yes.

22   Q    Five-million dollars worth of stock.

23   A    Right.

24   Q    And, you had a loan to Nova Bank where you owed them $5

25   million, correct?

Levin - Cross (Ega)                          151

1    A    Correct.

2    Q    And, those are both legal, binding obligations, correct?

3              MS. BARRY:  Objection.  Based on what legal --

4    BY MR. EGAN:

5    Q    Those are both binding obligations?

6    A    Yes.

7    Q    Okay.  And, but as you discussed with Mr. Ignall, after

8    some time after June, you looked at the bank more carefully

9    and decided you weren't really that big a fan, right?

10   A    That was '09, yes.

11   Q    Yeah.  We're going back to '09 now.

12             So, you had filed the change of control, you agreed

13   to do that, but along come the regulators, and they've got

14   some questions, right?

15   A    Yes.

16   Q    Now, if we could go to Government's 64 -- oh, no, never

17   mind.  Don't go to Government's 64.  My bad.

18             If we could go to Government's 74, and I believe

19   this is an e-mail that Mr. Ignall discussed with you, correct?

20   A    Yes.

21   Q    "Fed follow-up questions?"

22   A    Yes.

23   Q    All right, so if you go down to the bottom, this is all

24   being forwarded to you -- this has been forwarded to you, and

25   now you're writing to Barry about it.

Levin - Cross (Ega)                          152

1    A    Yes.

2    Q    If you go down to the bottom, this is what was forwarded

3    to you, correct?

4    A    (No verbal response given.)

5    Q    And, it's from a Donna Metcalfe at the State of

6    Pennsylvania, right?

7    A    Yes.

8    Q    And, it's to Kim Hartline.

9    A    Yes.

10   Q    You never met her either, right?

11   A    No.

12   Q    And, it's a couple of questions that the federal -- that

13   the regulators have, correct?

14   A    Yes.

15   Q    One has to do with classic motor carriages.  We don't

16   need to get into that.

17   A    Okay.

18   Q    The other has to do with the source of the funds, right?

19   A    Yes.

20   Q    And, it says, "The source of the funds to be used to

21   purchase the stock," correct?

22   A    Yes.

23   Q    So, basically, what they're asking here is, "Where's the

24   rest of the money coming from," right?

25   A    Right.

Levin - Cross (Ega)                                    153

1    Q    And, the number for this regulator is put down at the

2    bottom there for anybody who wants you to call, correct?

3    A    Correct.

4    Q    So, certainly, if you wanted to, you could have called

5    those people up, right?

6    A    Yes.

7    Q    And, Mr. Hartline never told you what you should or

8    shouldn't say to them, did he?

9    A    Me directly?  No.

10   Q    Now, you're not too happy about this, so you say, "Barry,

11   why am I involved in this?  I'm trying to help you out,"

12   correct?

13   A    Correct.

14   Q    But, you were trying to help Barry out not out of the

15   goodness of your heart, but because Barry was supposed to be

16   doing some things for you, as well, correct?

17   A    No, Barry, in this particular investment, he had

18   convinced me that it was a good investment.

19   Q    Right, but you had said on direct, I believe, that one of

20   the reasons you didn't want to complain about this was because

21   you were still hoping that he would come through with more

22   funds for Banyon.

23   A    I never said that.

24   Q    No?

25   A    No.

Levin - Cross (Ega)                          154

1    Q      Maybe I misheard you, sir, I'm sorry.

2           All right, if we could go to Government's 80.

3           And, you were shown this on direct.  And, there's a

4    discussion down at the bottom about Nova Bank and, you know,

5    how you might be able to put in more money, correct?

6    A      I don't think --

7    Q      Oh, that's not Government's 80.

8    A      Oh.

9    Q      It's 80.

10   A      Eighty.

11   Q      I'm sorry.  My bad.

12   A      If you could blow that up for me, I'd appreciate it.

13   Q      Sure.  See that down at the bottom?  There's a discussion

14   about Nova Bank?

15   A      (No verbal response given.)

16   Q      And, kind of, what you could or couldn't do?  Or,

17   basically, Mr. Bekkedam's trying to get you to still put the

18   money in, isn't he?

19   A      (Brief pause.)

20          Yes.

21   Q      And then, he says, "And, Brian needs something from you,

22   too," and that is these two questions on the next page.

23   A      I don't see that.

24   Q      Well, we're going to get -- if we could go to the next

25   page down, please?

1           (Brief pause.)

2           See that?

3    A    Yeah.

4    Q    And, these are basically the same two questions that you

5    were asked --

6    A    By --

7    Q    -- that's on the prior e-mail, right?

8    A    By the regulators, yes.

9    Q    Yeah.  And, question two says, they ask where the

10   potential money would come from, correct?

11   A    Yes.

12   Q    Okay.

13   A    If they --

14   Q    Now, --

15   A    I'm sorry.

16   Q    Just going back to the top of the e-mail, --

17   A    Mm-hmm.

18   Q    -- just the -- we just need the header.

19           Brian Hartline's not on this e-mail, is he?

20   A    No.

21   Q    Now, if we could have D-56?

22           (Brief pause.)

23           And sir, -- if we could blow up the top, please?

24           This is an e-mail from Frank Preve to you, correct?

25   A    Yes.

Levin - Cross (Ega)                                    156

1   Q    And, the subject is, "Have you heard from the Fed or the

2   State Banking Department."

3           But, it's forwarded, correct?

4   A    Right.

5   Q    And, below it is an e-mail from Mr. Hartline to Mr. Preve

6   that he's forwarding, right?

7   A    (No verbal response given.)

8   Q    And, basically, he's just asking, "Hey, if you hear from

9   the Fed or the State Banking Department, could you please let

10  us know," right?

11          MR. IGNALL:  I'm going to object to --

12          THE WITNESS:  Yeah, it's the same question --

13          MR. IGNALL:  -- reading --

14          THE WITNESS:  -- as before.

15          MR. IGNALL:  -- from a document that's not in

16  evidence.  I don't believe this witness has --

17          THE COURT:  Sustained --

18          MR. IGNALL:  -- first-hand knowledge.

19          THE COURT:  Sustained.

20          MR. EGAN:  Very well.

21  BY MR. EGAN:

22  Q    Then, if we could just go to the top e-mail.

23          That one's to you, right?

24  A    Yes.

25  Q    And, Mr. Preve says to you, "Perhaps you won't be

1    approved, and we won't have to waste 18 million on this

2    boondoggle," right?

3    A    Yes.

4    Q    So, you guys want out at this point.

5    A    It was September 15, 2009.

6    Q    Right.  And, you continued to want out until Halloween,

7    right?

8    A    Correct.

9    Q    And then, on Halloween, a lot of other things became a

10   whole lot more important.

11   A    Yes.

12   Q    The failure of Mr. Rothstein's investments or your

13   investments through Mr. Rothstein had a very significant

14   impact on you financially, correct?

15   A    Yes.

16   Q    But, it didn't mean you had nothing, did it?

17   A    Correct.

18   Q    You still had airplanes?

19   A    Those airplanes belonged to the companies.

20   Q    Okay.

21   A    Okay.  They weren't my airplanes.  They were a company --

22   the company's airplanes.

23   Q    The companies that you owned's airplanes.

24   A    Yes.

25   Q    Okay.  So, the companies you owned still had airplanes.

1   A    Yes.

2   Q    You still had real estate holdings.

3   A    Yes.

4   Q    You still had this -- I guess it's a manufactured home in

5   New York's --

6   A    Yeah.

7   Q    New York development?

8   A    Yes.

9   Q    You still had the Madison house.

10  A    Yes.

11  Q    And, you still had a house in Devon, Pennsylvania, right?

12  A    Yes.

13  Q    And, that house in Devon, Pennsylvania is a house that

14  you had bought during the good times, right?

15  A    Yes.

16  Q    And, you were spending a lot of money to fix up.

17  A    Yes.  It was restored.  It was being restored.

18  Q    And, it's a very beautiful home, and --

19  A    Yes.

20  Q    -- it's --

21  A    Yeah.

22  Q    You spent a lot of money to restore it.

23  A    Yes.  It's a certified --

24  Q    And, one of the reasons you were looking for more cash

25  flow during this period of time was because a lot of cash went

1    into that property, right?

2    A    (Brief pause.)

3            I'm not so sure about that.

4    Q    You don't really remember, or --

5    A    I think that -- it's a certified historic structure, and

6    we gutted it.

7            So, but there was a mortgage on it already.

8    Q    Right.  A mortgage of about --

9    A    Well, --

10   Q    -- $1 million.

11   A    How much?

12   Q    One million dollars.

13   A    I think it was a little more, but okay.

14   Q    And, the home was worth close to $5 million, right?

15   A    No.  It could have been valued at $5 million.  But,

16   that's not what it eventually went for because it never got

17   finished.

18   Q    But, it was valued -- it was valued at close to $5

19   million.

20   A    It could have been.  If it was finished.

21   Q    Now, after Halloween, when you no longer were in the same

22   position as you'd been previously been, but you still had

23   assets, you needed to try to restructure your assets to

24   protect what you had, right?

25   A    I tried to.

1    Q    And, one of the things you wanted to do was reduce the

2    amount of payment you were making on this loan you had taken

3    out with Nova, correct?

4    A    I'm not sure of the timing, but I know that yes, I

5    definitely was --

6    Q    And, you wanted to get the loan reduced by putting up

7    some collateral so you didn't have to pay so much per month,

8    right?

9    A    I think that's the way it eventually worked out.

10   Q    And, eventually, you did give them a security interest in

11   something coming out of Madison house, right?

12   A    Well, yes, that's right.  Yes.

13   Q    But, in the meantime, you also explored giving them a

14   security interest in the home in Devon.

15             Do you remember that, too?

16   A    I don't recall that.

17   Q    That was the house at 326 South Fairfield Road, correct?

18   A    That is correct.

19   Q    And now, sir, you testified on direct examination that

20   you filed for bankruptcy.  Do you remember that?

21   A    I didn't file.

22   Q    You were forced into bankruptcy.

23   A    Yes.

24   Q    You were forced into bankruptcy by your creditors.

25   A    A group of creditors, yes.

1    Q    And, you testified this morning or earlier that you

2    thought that was in May of 2010.

3    A    I don't recall the exact date.  It could have been June,

4    it could have been, you know, --

5    Q    Well, how about August?  How does that sound?

6    A    Sounds right.

7    Q    Okay, so if I were to represent to you that the docket

8    indicates it was filed in August of 2010, that would be

9    correct?

10   A    Then that's what it would be.

11   Q    And, when you file for bankruptcy, you have to do a big

12   schedule of everything you own and everything you owe, right?

13   A    Yes.

14   Q    And, one on the one column is everything you own, that's

15   assets.

16   A    Yes.

17   Q    And, the other column is everything you owe, liabilities.

18   A    Yes.

19   Q    One of the assets that you brought up in your bankruptcy

20   was Nova stock, correct?

21   A    Probably.

22   Q    And, one of the liabilities you brought up was the Nova

23   loan, correct?

24   A    Yes.

25            MR. EGAN:  I have no further questions, Your Honor.

1        THE COURT:  You may proceed.

2                    CROSS-EXAMINATION

3   BY MR. DUNCAN:

4   Q    Good afternoon, Mr. Levin.

5   A    Good afternoon.

6   Q    Mr. Levin, I believe you testified that you were born

7   here in PA?

8   A    Yes.

9   Q    And, that was a little while ago, we won't ask about the

10  years.

11            But, your children still live here, don't they?

12  A    Yes.

13  Q    How many children do you still have living here in

14  Pennsylvania?

15  A    In Pennsylvania, I have one daughter and one grandchild.

16  Q    Okay.  And, Mr. Egan talked to you a moment ago about

17  that house?  That nice house that was purchased in Devon?  You

18  purchased that in 2008, is that correct?

19  A    That is correct.

20  Q    And, you had your daughter actually supervise the

21  renovation project, right?

22  A    Yes.

23  Q    And, she was good at it wasn't she?

24  A    Yes.

25  Q    You've lived in Florida since approximately 197, right?

Levin - Cross (Dun)                           163

1    A    Yes.

2    Q    And, in 2009, you were trying to establish residency in

3    St. Thomas in the U.S. Virgin Islands, --

4    A    Yes.

5    Q    -- is that correct?  And, that was for tax purposes?

6    A    Yes.

7    Q    And, you -- you previously stated you spent time from --

8    basically from June of 2009 all the way to the end of 2009,

9    most of the time in St. Thomas, correct?

10   A    Till October 31st, --

11   Q    Okay.

12   A    -- yeah.

13   Q    And, the reason you were doing that was for tax liability

14   issues, right?

15   A    We were establishing a residency in St. Thomas.

16   Q    And, your plan was to move the Banyon Income Fund

17   business down there, correct?

18   A    Yes.

19   Q    And, that would help you from a tax perspective, correct?

20   A    Yes.

21   Q    Okay.  While you were doing that, you were traveling back

22   and forth on your -- was it your Gulfstream?  Which airplane

23   did you use?

24   A    Depending on what I was doing, I was trying to get back

25   on the weekend, I would come here -- if you -- any part of the

Levin - Cross (Dun)                                    164

1    day that you spend in St. Thomas, whether it was an hour or

2    not, you got credit for being there.

3              So, I would leave there early on a Monday morning

4    and spend maybe Monday and Tuesday here and be back by Tuesday

5    night so I didn't lose anytime.

6    Q    So, while you were traveling, you were a little harder to

7    get in touch with, correct?

8    A    Yes.

9    Q    And, that was one of the issues you and Mr. Bekkedam had.

10   He was trying to get in touch with you, but it was on some of

11   the e-mails --

12   A    True.

13   Q    -- he couldn't quite reach you.  Correct?

14   A    Yeah.

15   Q    So then, he would talk to Mr. Preve, correct?

16   A    Yes.

17   Q    Okay.  Sir, in 2007, 2008, you believed you were worth

18   roughly $150 and $200 million.  That's without the Banyon,

19   right?

20   A    That's true.

21   Q    And, about -- of that time, you had something between $10

22   million and $20 million cash?  Liquid assets?

23   A    Probably so.

24   Q    While you were dealing with Banyon, you initially started

25   using your own money, correct?

1   A    Yes.

2   Q    And, at some point, you went to some hedge funds up in

3   New York, correct?

4   A    Correct.

5   Q    So, you had originally had all of the money from the

6   settlement funds in your personal bank at Gibraltar, correct?

7   A    Yes.

8   Q    And, the hedge funds wanted you to move that money out of

9   the Gibraltar Bank into TD Bank, correct?

10  A    That is correct.

11  Q    And, you didn't like dealing with those hedge funds, did

12  you?

13  A    Not after we got going.  Of course not.

14  Q    And, the reason you didn't like dealing with them is they

15  were constantly putting extra requirements on you.

16  A    Yes.

17  Q    And, they were constantly trying to get as much money for

18  themselves as they could, correct?

19  A    Well, they were entitled to whatever they were entitled

20  to.  The deal they struck was a very tough deal.

21  Q    And, the deal they struck meant that you had to give them

22  more than you wanted to give them, correct?

23  A    Yes.

24  Q    In fact, you referred to them as the "hotel hedge funds,"

25  because they were expensive like going to a fancy hotel,

1   right?

2   A    Well, I never heard that before, no.

3   Q    Okay.  Maybe I -- maybe I just imagined it.

4              MS. BARRY:  Objection, Your Honor.

5              THE COURT:  Sustained.

6              MR. DUNCAN:  I'll withdraw, Your Honor.

7   BY MR. DUNCAN:

8   Q    So, when they made you switch it to TD Bank, that was

9   2008?  Is that when that happened --

10  A    Yes, when we -- they didn't think that Gibraltar was big

11  enough for the business, and they were correct.

12  Q    At that time, you were looking for your own bank because

13  you wanted to have some control over the assets, correct?

14  A    I thought it made a good -- would make a good marriage

15  because we had huge amounts of cash.

16  Q    So, you were personally looking for your own bank down

17  there in Florida, correct?

18  A    Not really.  I had a couple of opportunities.  I didn't

19  do it.

20  Q    You had a couple of opportunities.  One of them was a,

21  sort of, a distressed bank, right?

22  A    I don't recall.

23  Q    Okay, you had -- you looked at a bank in Florida called

24  Flagler Bank?

25  A    I don't recall that.  But, I had a couple of friends who

1   started banks that I just didn't get involved with.

2   Q    And, basically, throughout your career, you were always

3   interested in banks, weren't you?

4   A    Well, I guess everybody's interested in banks, one way or

5   another.

6   Q    So, Mr. Preve testified yesterday that you were also

7   talking to him about investing in banks, and he was always

8   talking you out of it.

9        You wouldn't disagree with that, would you?

10       MS. BARRY:   Objection.

11       THE COURT:   Sustained.

12  BY MR. EGAN:

13  Q    Sir, did you talk to Mr. Preve frequently about investing

14  in banks?

15  A    It wasn't a major subject, that's for sure.

16  Q    What was Mr. Preve's position?  It was -- he was against

17  you investing in banks, correct?

18  A    Absolutely.

19  Q    At some point, late 2008, 2009, you met our client, Barry

20  Bekkedam, correct?

21  A    Yes.

22  Q    And, you met him basically indirectly through his wife,

23  Diane, right?

24  A    I don't know if it was through Diane.  I'm not sure.  I

25  think it's --

1  Q    Diane had a relationship with Mr. Gruverman, and

2  that's --

3  A    Yeah, right.  That's correct.  That's correct.

4  Q    Mr. Bekkedam, you know he was involved in some sort of

5  financial business, right?

6  A    Yes.

7  Q    And, if I told you that was a registered investment

8  advisory business, you wouldn't disagree with me, would you?

9  A    No.

10  Q    And, a registered investment advisor basically advises

11  high net worth people on how to invest their money, correct?

12  A    Correct.

13  Q    And, that's what was Mr. Bekkedam's business, right?

14  A    Yes.

15  Q    In 2008, you were a high net worth individual, weren't

16  you?

17  A    Yes.

18  Q    2009, you were a high net worth individual.

19  A    Yes.

20  Q    Mr. Bekkedam came to you specifically after his wife had

21  arranged that introduction to see if he could get you as a

22  client of Mr. Levin, right?

23  A    Correct.

24  Q    You liked Barry Bekkedam when you met him, didn't you?

25  A    Sure did.

Levin - Cross (Dun)                              169

1   Q    You were very fond of him, weren't you?

2   A    Yes.

3   Q    And, you were fond of him both personally and as a

4   professional, correct?

5   A    Yes.

6   Q    You were very impressed with Mr. Bekkedam's professional

7   demeanor as it related to his business, correct?

8   A    Yes.

9   Q    You were so impressed with that business, that you

10  entered into a number of business deals with Barry Bekkedam,

11  correct?

12  A    Yes, I guess you would say.

13  Q    All of those deals you entered into with Mr. Bekkedam,

14  you had Mr. Preve help you with, correct?

15  A    Always, correct.

16  Q    And, all of those deals were properly documented by

17  written agreements drafted by lawyers and reviewed by lawyers,

18  correct?

19  A    Yes.

20  Q    You thought Mr. Bekkedam's business had great growth

21  potential, correct?

22  A    Yes.

23  Q    And so, you were interested personally in being involved

24  with Barry in making sure that his Ballamor business grew,

25  correct?

1    A    I would have liked to see that happen, yes.

2    Q    One of the things that you also did with Mr. Bekkedam was

3    you created a special Banyon fund specifically to address Mr.

4    Bekkedam's client's needs, correct?

5    A    Yes.

6            MR. DUNCAN: And, if we could just pull up for a

7    moment,  Government's -- I'm sorry, Defense Exhibit 1066, and

8    don't publish it to the jury.

9            It will come on your screen.  Just a moment, Mr.

10   Levin.

11   BY MR. DUNCAN:

12   Q    And, do you see Defense Exhibit 1066?

13   A    Yes.

14   Q    And, this is the offering memorandum, a confidential

15   offering memorandum, for the Banyon Income Fund, LP, correct?

16   A    Yes.

17   Q    You were the general partner for that income fund,

18   correct?

19   A    Yes.

20   Q    The general partner is the person who's responsible for

21   all of the legal things.  You're basically running the fund,

22   correct?

23   A    Correct.

24   Q    Among the things that Mr. Bekkedam insisted, you had to

25   get a law firm to create this document, correct?

1    A    Yes.

2    Q    And, you got the Gersten Savage law firm to do it,

3    correct?

4    A    That is correct.

5    Q    And, Mr. Rovin, Barry's general counsel at Ballamor, they

6    also -- he also was involved in the legal parts of this,

7    correct?

8    A    Yes.

9    Q    You stayed out of the legal parts, didn't you?

10   A    One-hundred-percent.

11   Q    Sir, in this document, if you would -- could we go to

12   Page 18, please, of the document?  It's D-1066-024.

13           And, if you could blow up the third paragraph there

14   at the bottom, please?  Under -- there you go.

15           And, just take a moment and read that to yourself,

16   Mr. Levin, and tell me when you're ready.

17   A    (Brief pause.)

18           Correct.

19   Q    Okay.  That summarizes some of the business deals you had

20   with Mr. Bekkedam, correct?

21   A    Yes.

22   Q    And, it was produced in the legal documents for the

23   review of anybody who received this prospectus, correct?

24   A    Yes.

25   Q    And, among the things that you said in there is that you

Levin - Cross (Dun)                          172

1   and Mr. Bekkedam were going to get together so that you could

2   make an equity investment and help Mr. Bekkedam's business

3   grow, correct?

4              MR. IGNALL:  Objection.  This document's not

5   evidence.

6              MR. DUNCAN:  I'm not offering it in evidence, I'm

7   asking him a question.

8              MR. IGNALL:  The question is asking him to agree

9   with what's in the document.

10             THE COURT:  All right.  Sustained as to that

11  reference.

12             MR. DUNCAN:  I'll rephrase, Your Honor.

13             THE COURT:  All right.

14  BY MR. DUNCAN:

15  Q    Sir, you agreed to make an equity investment in Mr.

16  Bekkedam's company, correct?

17  A    Yes.

18  Q    Okay.  You testified that Mr. Bekkedam's clients were

19  going to be in this fund, right?

20  A    Yes.

21  Q    And, one of the things Mr. Bekkedam insisted to protect

22  his clients was that those clients get the same guarantee that

23  your friends and family and other people got in the Banyon

24  funds, correct?

25  A    Correct.

1    Q     And, that's a good thing for Mr. Bekkedam's clients,

2    you'd agree.

3    A     Yes.

4    Q     The percentage you were paying Mr. Bekkedam's clients,

5    though, was substantially less than the percentage of money

6    you were making on the investment, correct?

7    A     When you use the word, "substantially," --

8    Q     Yeah, let me -- that's probably -- that's a little

9    unfair.

10          Let me -- let me use the numbers.  So, you were

11   paying Mr. Bekkedam's clients on the average of 12 to

12   15-percent, and you were getting on the average of 20 to

13   30-percent in returns, correct?

14   A     That's correct.

15   Q     You agreed that Mr. Bekkedam would not receive any

16   commission on any of the people -- any of his clients he put

17   into the fund, correct?

18   A     That is correct.

19   Q     He didn't earn a dime on this deal, did he?

20   A     Correct.

21   Q     Mr. Preve handled all the legal parts of this for you,

22   correct?

23   A     Yes, with the law firm.

24   Q     At the time, did you know that Mr. Pr -- you did not know

25   that Mr. Preve had a side deal with Scott Rothstein, did you?

Levin - Cross (Dun)                                    174

1    A     No.

2    Q     In fact, he had a side deal whereby Scott Rothstein was

3    paying him approximately $50,000 a month, correct?

4              MR. IGNALL:  Objection.

5              THE COURT:  Just a moment, please.  May I see you,

6    please?

7                       (At sidebar.)

8              THE COURT:  The basis for the objection?

9              MR. IGNALL:  My objection is relevance.

10             THE COURT:  (Inaudible)?

11             MR. DUNCAN:  Well, Mr. Preve -- this witness had a

12   lot of conversations with Mr. Preve, this is how reliable this

13   wit --

14             THE COURT:  Preve.

15             MR. DUNCAN:  Preve, thank you, Your Honor.  How

16   reliable Mr. Preve is, whether he was deceiving his -- his

17   patron, and this is what we want to find out about.  It goes

18   to Mr. Preve's credibility.

19             THE COURT:  It does.

20             MR. IGNALL:  Well, but I'm not sure it's the

21   appropriate way to challenge Mr. Preve's credibility.  It

22   doesn't go to reputation, it doesn't --

23             THE COURT:  Well, if the jury finds through his

24   questioning on any actual issue that Mr. Preve -- that this

25   witness is more credible and believable, and Mr. Preve said

1    something that was wholly different from that, it affects Mr.

2    Preve's credibility.

3                MR. IGNALL:  It may, but it's not an appropriate way

4    to challenge Mr. Preve's credibility.  This is trying to use

5    extrinsic evidence to something that Mr. Preve may have done,

6    and this is not an appropriate way to attack character for

7    truthfulness.

8                THE COURT:  The difference here is that Mr. Preve

9    has testified about certain matters.  He can impeach the

10   testimony with Mr. Levin's version of the facts of those

11   situations.

12               MR. IGNALL:  He can, he just can't -- this is not

13   about Mr. Preve's testimony to a fact that's in issue here.

14               This is something collateral, whether Mr. Preve was

15   truthful with respect to Mr. Rothstein.

16               MR. DUNCAN:  It's --

17               MR. IGNALL:  It's 608B, Your Honor.

18               THE COURT:  One at a time.

19               MR. IGNALL:  608(b) that you can't attack the

20   witness's credibility with extrinsic evidence this way.

21               MR. DUNCAN:  I'm not doing it on extrinsic evidence,

22   Your Honor.  I'm asking him a question.  He can testify to his

23   impressions of what Mr. Preve told him.

24               If he denies it, then of course--

25               THE COURT:  The specific --

1          MR. IGNALL:  That's extrinsic -- I'm sorry -- to Mr.

2     Preve.

3          THE COURT:  That's all right.  The specific subject

4     matter of this question relates to what?

5          MR. DUNCAN:  It goes to whether or not Mr. Preve's

6     honesty (inaudible) come on through this witness, and whether

7     or not his word can be trusted with respect to a lot of the

8     things he said.

9          Mr. Preve -- this is key, one of the key events in

10    this case, Your Honor, is (inaudible) last week so, basically

11    deception of all of those people which just be (inaudible)

12    again toward this witness.  If he says that Mr. Preve is a

13    trustworthy man, if he says of Mr. Preve, he couldn't trust

14    (inaudible).

15         THE COURT:  I will allow it.  I'm going to allow it.

16         MR. DUNCAN:  Thank you.

17                   (End of sidebar.)

18         MR. DUNCAN:  Thank you, Your Honor.

19    BY MR. DUNCAN:

20    Q    You can answer my question: did Mr. Preve tell you that

21    he had a side deal with Mr. Rothstein, in which Mr. Rothstein

22    was paying him approximately $50,000 a month?

23    A    No.

24    Q    So, he hid that fact from you, correct?

25    A    Yes.

1  Q    He lied to you, didn't he?

2  A    Yes.

3  Q    At some point, Mr. Bekkedam came to you and talked to you

4  about investing in a bank here in Philadelphia -- in the

5  Philadelphia area known as Nova Bank, correct?

6  A    Yes.

7  Q    You would agree that made sense to you, because you were

8  a Philadelphia guy, right?

9  A    Yeah, from West Philly.

10 Q    Okay.  And your children and grandchildren are here?

11 A    Yes, here in South Jersey.

12 Q    And, you're building a house here -- or, you're

13 renovating a house here?

14 A    Yes.

15 Q    So, your having contacts here in Philadelphia made sense,

16 right?

17 A    Yes.

18 Q    The idea ultimately was to move the Banyon Income Funds

19 into that bank, or bank acquired by Nova in Florida, correct?

20 A    Yes.

21 Q    Mr. Bekkedam proposed that you invest $18 million in --

22 in Nova Bank, right?

23 A    Correct.

24 Q    And, that would be a capital investment, that's

25 investment of capital into Nova Bank, right?

1   A    Yes.

2   Q    You knew that Nova Bank was interested in expanding,

3   correct?

4   A    Yes.

5   Q    And, they were planning to acquire that company, that

6   Delaware Valley Financial Group, the insurance broker you

7   talked about in PA, right?

8   A    Yes.

9   Q    And, you knew that Delaware Valley Financial Group also

10  had an interest in Florida, correct?

11  A    Yes.

12  Q    And, Nova even had an interest in Florida.  They were

13  interested in expanding to purchase a bank down in Florida,

14  correct?

15  A    I didn't know that at the time, though.

16  Q    You did learn that, correct?

17  A    Yes.

18  Q    Your issue at the time, when you were deciding whether to

19  invest in Nova Bank, was your liquidity issues, correct?

20  A    Yes.

21  Q    At the time, you had, basically, all of your funds,

22  liquid funds, tied up in the Banyon -- in Banyon investments,

23  right?

24  A    More than.

25  Q    And, you were reluctant to take any money out of those

1   funds, because in doing so you would be taking money away from

2   a good investment, right?

3   A    Yes.

4   Q    So, you decided that the best way to do that would be to

5   obtain a loan in the first instance, in order to make your

6   initial investment in Nova, correct?

7   A    Correct.

8   Q    And that's called leveraging your money, right?

9   A    Yes.

10  Q    Leveraging your money is when you borrow at a lower rate,

11  but you're able to use that same -- that replacement money, as

12  it were, at a higher rate, correct?

13  A    Yes.

14  Q    You're much better at finance than I am, but that's the

15  basic principle, correct?

16  A    I'm not sure of that, but that's okay.

17  Q    Fair enough.  You were used to taking out loans in order

18  to leverage your investments, right?

19  A    I did it all the time.

20  Q    Right, you did it -- all those real -- every real estate

21  deal you ever did was --

22  A    Correct.

23  Q    -- that way, correct?

24  A    Correct.

25  Q    You funded them through financing, through loans, right?

1    A    Yes.

2    Q    So, there was nothing unusual when you did this with

3    relation to Nova Bank, correct?

4    A    Correct.

5    Q    You had no qualms, no uneasiness, no issues in doing it,

6    did you?

7    A    No.

8    Q    At the time, in fact, you already had other lines of

9    credit, didn't you?

10   A    Substantial lines of credit.

11   Q    You had one line of credit substantially above $5 million

12   at the Mellon Bank, right?

13   A    It was $25 million.

14   Q    You had -- you had $5 million, and then you actually a --

15   one on top of that one, that's the $25 million?

16   A    Correct.

17   Q    It's approximately, give or take, $28 million?

18   A    They were personal lines of credit.

19   Q    Personal to George Levin, you could do whatever you

20   wanted with those lines of credit, right?

21   A    Yes.

22   Q    In fact, you had also financed some of your lines of

23   credit in the -- used some of your lines of credit to finance

24   the Banyon Income Fund, hadn't you?

25   A    Yes, yes.

Levin - Cross (Dun)                    181

1   Q    And, you were worth $400 million at the time, so getting

2   a loan was no big thing to you?

3   A    No.

4   Q    But you were not involved in the details of getting the

5   loan, were you?

6   A    No.

7   Q    You left all of that up to Frank Preve, correct?

8   A    Yes.

9   Q    Mr. Egan showed you some documents earlier, and those

10  were documents which related to stock certificates from Nova

11  Bank, correct?

12  A    Yes.

13  Q    So, the money that you used when you got that loan, you

14  actually used that to buy stock in Nova Bank, correct?

15  A    Yes.

16  Q    You would agree that as a matter of right, once the bank,

17  Nova Bank, granted you that loan and sent the money down to

18  your bank in Gibraltar, that money was yours to do whatever

19  you wanted with, correct?

20  A    Absolutely.

21  Q    But the understanding was, obviously, that you were going

22  to invest it into Nova Bank, correct?

23  A    I was going to invest $5 million into Nova.

24  Q    But as a matter of right, you could have done whatever

25  you wanted with that money?

Levin - Cross (Dun)                                    182

1    A    Yes.

2    Q    Assuming Mrs. Levin agreed, right?  She was on the

3    account, correct?

4    A    I'm not -- as I said, I don't know.  I'm --

5    Q    Okay, I'll withdraw that.

6           MR. DUNCAN:  Could we have the Court's indulgence

7    for just a moment?

8           THE COURT:  Yes, sir.

9           MR. DUNCAN:  Could we have Government's 67, please?

10          (Side comments off the record.)

11          MR. DUNCAN:  Do you have any objection to my showing

12   it to the witness?

13          MR. IGNALL:  We have no objection to this being

14   admitted.

15          MR. DUNCAN:  Okay, good.  Your Honor, with

16   stipulations, if Mr. Egan's okay, we'd admit 67.

17          (Side comments off the record.)

18          MR. DUNCAN:  With the Court's indulgence?

19          THE COURT:  Go right ahead.

20          MR. DUNCAN:  Thank you, Your Honor.

21          THE COURT:  Yes, sir.

22   BY MR. DUNCAN:

23   Q    Have you ever heard of a bank called the Atlantic

24   Community Bankers Bank?

25   A    Sure.

Levin - Cross (Dun)                                    183

1   Q     That's here in the Philadelphia area, correct?

2   A     The one I'm thinking of was in Florida.

3   Q     Okay, well, perhaps -- perhaps, then, I may be mistaken.

4   Mr. Egan showed you a subscription agreement you signed with

5   Nova Bank.

6              MR. DUNCAN:  And we can take down 67 now.

7   BY MR. DUNCAN:

8   Q     Mr. Egan showed you a subscription agreement, which you

9   signed, with -- with Nova Bank, correct?

10  A     Yes.

11  Q     You've signed lots of contracts in your life, haven't

12  you, Mr. Levin?

13  A     Yes.

14  Q     Generally, you want to honor your contracts, don't you?

15  A     Always did.

16  Q     Okay, fair enough.  And if you wanted to renegotiate, you

17  could, but the idea was you -- you signed a document, your

18  word was your bond, right?

19  A     If they were renegotiated, there was a reason for it.

20  Q     Okay.  The $5 million capital contribution you made to

21  Nova back in 2009, that came out of -- resulted from that

22  subscription agreement, correct?

23             MR. IGNALL:  Objection to the predicate, Your Honor.

24             THE COURT:  Sustained.

25  BY MR. DUNCAN:

Levin - Cross (Dun)                    184

1   Q     Did you tell the agents in this case that you had -- that

2   the $5 million capital contribution you made was part of the

3   $18 million subscription agreement with Nova?

4              MR. IGNALL:  Same objection.

5              MR. DUNCAN:  We have the MOI, Your Honor.

6              THE COURT:  Overruled.

7   BY MR. DUNCAN:

8   Q     You can answer the question.

9   A     Would you say it again for me?

10  Q     Sure, you told the agents in this case that -- I'll

11  quote, that, "The $5 million capital contribution was paid of

12  an $18 million subscription agreement with Nova," correct?

13  A     (No verbal response given.)

14  Q     That's yes, right?

15  A     Yes.

16  Q     The regulatory approval you needed, that was not

17  something you'd ever gone through before, is it, Mr. Levin?

18  A     That's correct.

19  Q     So, you left that all to Mr. Preve, right?

20  A     Yes.

21  Q     But the documents we've seen, admitted into evidence

22  here, all have your signature on as they relate to the change

23  in control, correct?

24  A     Yes.

25  Q     So, you had an opportunity to review them, correct?

1    A    There was one signature that wasn't mine, but --

2    Q    Sure.  You had an opportunity to review that document,

3    correct?

4    A    Yes.

5    Q    And if you wanted to change anything, you could?

6    A    I could have, yes.

7    Q    You saw the exhibit when Mr. Egan was asking you

8    questions.  I don't need to pull it back up, but it said half

9    of the money was going to come from cash, and half of the

10   money was going to come from a loan, correct?

11   A    Yes.

12   Q    The cash money you were talking about, that was going to

13   come from the Banyon investments, correct?

14   A    At that point in time everything was coming from Banyon.

15   Q    At that point in time, in July of 2009, though, there was

16   a problem with getting money out of the Banyon Income --

17   Banyon investments, wasn't there?

18   A    Yes.

19   Q    In fact, the money had stopped coming to you out of the

20   Banyon Income Funds back in July of 2009, correct?

21   A    No, not entirely.

22   Q    It slowed down considerably, correct?

23   A    It slowed down.

24   Q    So, at that point you did not have the funds to take out

25   of the Banyon Income Fund, July of 2009, in order to make the

1   rest of the investment you had committed to, correct?

2   A    No, that's not true.

3   Q    So, you did have the money, correct?

4   A    Yes.

5   Q    But you were reluctant to pay the money at that point,

6   correct?

7   A    Yes, correct.

8   Q    If I could take you to late -- sort of more middle part

9   of October of -- of 2009.

10          MR. DUNCAN:  You know, Your Honor, actually, I'm

11   going to move into another area, I've probably got a good half

12   hour or so, if this is a convenient place.

13          THE COURT:  It would be, thank you.

14          MR. DUNCAN:  Okay, thank you, Your Honor, Mr. Levin.

15          THE COURT:  Members of the jury, we're going to

16   recess for the day.  Again, do not discuss the testimony

17   amongst yourselves, nor do any research of any kind regarding

18   the issues in this case.

19          Have a pleasant evening, I'll see you tomorrow

20   morning at 9:15.  Thank you.

21          (Whereupon the jury exits the courtroom.)

22          THE COURT:  You may step down, sir.  We are

23   adjourned, thank you.

24          (Proceeding adjourned at 3:55 p.m.)

25

1                          *  *  *  *  *

188

1 **C E R T I F I C A T I O N**

2

3 I, Elena Zoniadis, court approved transcriber, certify that

4 the foregoing is a correct transcript from the official

5 electronic sound recording of the proceedings in the above-

6 entitled matter.

7

8

9

10 Elena          Digitally signed by Elena Zoniadis          April 11, 2016
   Zoniadis       DN: cn=Elena Zoniadis, o, ou,
                  email=dianadoman@comcast.net,
11                c=US
                  Date: 2016.04.15 12:30:11 -04'00'          _____

12 ELENA ZONIADIS                              DATE

13 DIANA DOMAN TRANSCRIBING, LLC

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,  )   14-CR-0548
                           )
        v.                 )
                           )
BRIAN HARTLINE and         )
BARRY BEKKEDAM,            )   Philadelphia, PA
                           )   April 6, 2016
              Defendants.  )   10:05 a.m.

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE C. DARNELL JONES, II
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:        DAVID J. IGNALL, ESQUIRE
                           JENNIFER CHUN BARRY, ESQUIRE
                           ASSISTANT UNITED STATES ATTORNEY
                           UNITED STATES ATTORNEY'S OFFICE
                           615 Chestnut Street, Suite 1250
                           Philadelphia, PA 19106

For the Defendant          PATRICK J. EGAN, ESQUIRE
Brian Hartline:            FOX ROTHSCHILD LLP
                           2000 Market Street, 10th Floor
                           Philadelphia, PA 19107

                           JOHN C. FULLER, ESQUIRE
                           FOX ROTHSCHILD LLP
                           2000 MARKET ST 20TH FL
                           PHILADELPHIA, PA 19103

For the Defendant          MICHAEL J. ENGLE, ESQUIRE
Barry Bekkedam:            GREENBLATT, PIERCE, ENGLE,
                           FUNT & FLORES
                           123 South Broad Street, Suite 2500
                           Philadelphia, PA 19109

Audio Operator:            CARL HAUGER

Transcribed by:            DIANA DOMAN TRANSCRIBING, LLC
                           P.O. Box 129
                           Gibbsboro, NJ 08026
                           Office: (856) 435-7172
                           Fax:    (856) 435-7124
                           Email:  dianadoman@comcast.net

Proceedings recorded by electronic sound recording; transcript
produced by transcription service.

APPEARANCES (Cont'd):

For the Defendant          RUSSELL D. DUNCAN, ESQUIRE
Barry Bekkedam:            SHULMAN, ROGERS, GANDAL, PORDY &
                          ECKER, PA
                          12505 Park Potomac Avenue
                          Potomac, MD 20854

                          JOEL D. SCHWARTZ, ESQUIRE
                          SHULMAN ROGERS GANDAL PORDY ECKER
                          12505 PARK POTOMAC AVE 6TH FL
                          POTOMAC, MD 20854

3

**I N D E X**

WITNESS FOR THE GOVERNMENT                                PAGE

HILLARY GRINKER MUSSER

  Direct Examination by Mr. Ignall                    46

  Cross Examination by Mr. Schwartz                   55

  Cross Examination by Mr. Fuller                     71

4

1                THE COURT:  Good morning.

2                MR. EGAN:  Good morning, Your Honor.

3                MR. IGNALL:  Good morning, Your Honor.

4                MS. BARRY:  Good morning, Your Honor.

5                MR. SCHWARTZ:  Good morning, Your Honor.

6                MR. FULLER:  Good morning, Your Honor.

7                THE COURT:  You may be seated.  All right, counsel, I

8   understand that there's something that needs to be addressed.

9                MR. EGAN:  Yes, Your Honor.  We've been advised by

10  the Government that one of their witnesses for today is an

11  individual by the name of William Sayre, S-a-y-r-e.  Patrick

12  Egan on behalf of Mr. Hartline.  We would ask for an offer of

13  proof with regard to Mr. Sayre.  Mr. Sayre is a -- as I

14  understand it, works for a bank called ACBB.  Mr. Levin applied

15  for a loan at ACBB and that loan was denied.  I don't know how

16  that's at all relevant, other than as a judgment on whether the

17  credit decision at Nova was a proper credit decision.  We've

18  already had testimony from Mr. Poliski that that credit

19  decision largely rested in his lap.  And we could bring in 17

20  different banks and ask them all whether they would have given

21  Mr. Levin a loan.  I don't see it as relevant to the charges in

22  this case.

23                THE COURT:  All right, thank you.  Good morning.

24                MS. BARRY:  Good morning, Your Honor.  Jennifer Barry

25  for the United States.  Your Honor, a couple things.  One,

5

1   there's already been mention of ACBB several times during the

2   trial.   I believe there was possibly an exhibit related to ACBB

3   in May.   I also believe that yesterday Mr. Duncan brought up

4   Government's Exhibit 67 and was about to ask questions of Mr.

5   Levin about an ACBB doc.   And I think what's relevant, Your

6   Honor, in Government-67 is that the request to ACBB for Mr.

7   Levin was made on or about July 24, 2009, and what's

8   significant about that is they forward him the CI -- they

9   forward -- first of all, there was no communication between the

10  borrower, Mr. Levin, and ACBB.   It was actually direct

11  conversations with Brian Hartline and ACBB regarding Mr. Levin.

12

13          And what's significant is that they send ACBB the CIC

14  application or the Change in Control Application that was filed

15  with the Federal Reserve.   And in that what's significant is

16  Mr. Levin is to borrow $18 million or is going to purchase $18

17  million worth of Nova stock, and if you look, and they've made

18  a point of showing it several times, half of it from owned

19  funds, half of it borrowed.   Well half of 18 is nine and the

20  request being made from ACBB is $9 million.

21          So it's significant that they were going out and

22  trying to find a bank to provide a loan for Mr. Levin and that

23  loan was denied.   And it also goes to show that they knew that

24  Mr. Levin, as of August of 2009, was unable to get a loan, at

25  least from another bank.   And I think that's relevant, Your

6

1  Honor, in order to show, one, that they had to resort to going

2  to themselves, that they were the only option for the loan,

3  that they couldn't replace the money with some other borrowed

4  funds from another bank, and that they knew that once they were

5  on the hook for the $5 million, and calling it capital, that

6  they were going to have to continue to conceal it from the

7  regulators.

8            THE COURT:  Now, the first -- or several witnesses

9  have already testified, Government witnesses, that it is

10 appropriate to borrow monies from another bank to purchase

11 stock from Nova, correct?

12           MS. BARRY:  Yes, Your Honor.

13           THE COURT:  Additionally, Mr. Levin himself testified

14 that it was his custom to use OPM, as we used to say in law

15 school, and what's wrong with that?

16           MS. BARRY:  There's nothing technically wrong with

17 that and that's the root that the -- Mr. Hartline was trying to

18 go, Your Honor, in July of 2009.  What happens is ACBB --

19           THE COURT:  But doesn't that cut both ways is my

20 point.  What's the probative value of the information?

21           MS. BARRY:  The probative --

22           THE COURT:  And I understand the potential inference,

23 but the inference based upon the testimony thus far has been

24 that's just the way he did business and a lot of wealthy people

25 do business.  A lot of poor people do business that way.

1          MS. BARRY:  Well, it's the way that the bank was

2    planning on having his investment work out, was to have -- try

3    to get the money borrowed from another bank.

4          THE COURT:  But what's wrong with that?

5          MS. BARRY:  There's nothing wrong with that, Your

6    Honor, except that this -- except that it didn't happen.  They

7    did not -- he got denied.

8          THE COURT:  Well I'm saying, nothing beats a failure

9    but to try, counsel, so what.  I mean, he tried to do it, it

10   didn't happen.  So again, what's the probative value of it is

11   all I'm asking?  I understand the inference that you'd like to

12   have here, but if it's going to be either way, based upon what

13   the Government's witnesses have testified to thus far, what's

14   the necessity of having this information, the probative value?

15         MS. BARRY:  That he was unable to get a loan from

16   another bank, Your Honor, and that the only way to fund the

17   portion of Mr. Levin's investment was through Nova Bank itself.

18         THE COURT:  That's the only way, arguably.  But, for

19   example, when I look at this net worth list of all of the

20   properties he had a lot of money that he could have gotten

21   otherwise to do this if he really, really wanted to do it, not

22   just necessarily from this bank.  He could have liquidated some

23   other things if he really, really wanted it.  So if he would

24   rather do it by borrowing money, if a bank said no, others

25   could have said yes.  Sure, take your time.

1          MS. BARRY:  But, Your Honor, the issue is that the

2   loan is not disclosed.  That's the issue.

3          THE COURT:  He didn't get it.

4          MS. BARRY:  No, no, no, the loan with Nova Bank is

5   not disclosed.

6          THE COURT:  Okay.  All right.  I follow you.

7          MS. BARRY:  That's the issue.  If the money is -- if

8   they've got the money from ACBB, great, no --

9          THE COURT:  The loan from Nova Bank, that preexisted?

10         MS. BARRY:  Yes, Your Honor.

11         THE COURT:  And was not disclosed in the application?

12         MS. BARRY:  Anywhere, yes.

13         THE COURT:  All right.  Now let me hear from you

14   then.  Thank you.

15         MR. EGAN:  If we could clarify what application Ms.

16   Barry is talking about there.

17         THE COURT:  I'm assuming she's talking about the

18   first loan.

19         MR. EGAN:  No, no, but when you said not disclosed in

20   the application --

21         THE COURT:  Oh.

22         MR. EGAN:  -- I'm not sure what application she's

23   talking about.

24         MS. BARRY:  In the ACBB application, the application

25   to ACBB that he had already borrowed $5 million from Nova Bank,

9

1 anywhere in any paperwork to any regulator that he had borrowed

2 the $5 million from Nova Bank.  Instead they're saying oh, this

3 half borrowed funds and they're trying to get it from ACBB in

4 the application to the Fed, instead of saying well, he got five

5 million from us and hopefully he'll get another four million

6 from another bank.  But they don't disclose it because they're

7 hoping that he'll get the whole nine million from this other

8 bank and then, you know, the five million that he borrowed from

9 Nova Bank that they're calling capital, you know, won't be an

10 issue for them any more.  Right now they have to hide it.

11            THE COURT:  All right.

12            MR. EGAN:  That's an incredible stretch, Your Honor.

13 But in addition, the issue here is whether the probative value

14 of this person's testimony outweighs the prejudicial value.

15 And really the only reason they're calling this guy is to say

16 that Mr. Levin was denied a loan by this other bank, so

17 therefore, you can question why Nova gave the bank -- we have

18 all this testimony about whether --

19            THE COURT:  No, no, if counsel has, by reason of my

20 questioning, narrowed down her proffer as the basis for the

21 evidence, which is that it was not disclosed, let me hear your

22 argument on that.

23            MR. EGAN:  Well, Your Honor, if Mr. Sayre is going to

24 come in and testify and his testimony is simply going to be we

25 received an application from Nova Bank to obtain nine million

1 dollar loan to purchase stock and in that application it does
2 not say anything about the five million dollar loan that Mr.
3 Levin had already taken out, then I would withdraw my
4 objection.  But I doubt very seriously that's as far as the
5 Government intends to go here.
6           THE COURT:  That's as far as the Government's going
7 to go.
8           MR. EGAN:  That's acceptable to the defense, Your
9 Honor.
10          THE COURT:  All right.
11          MS. BARRY:  Your Honor, may we revisit at the break
12 and ask you to reserve judgment on it because I believe that
13 that would prejudice the Government?
14          THE COURT:  Tell me why.
15          MS. BARRY:  Well, Your Honor, there's a couple of
16 things.  One, we have an issue the loan at -- first, the first
17 issue is Mr. Levin's loan that Nova Bank made that it did not
18 disclose to regulators was going to be used to purchase Nova
19 Bank stock.  I think the one issue is that  Mr. Levin would not
20 be approved for a -- was not creditworthy based on a number of
21 factors from another bank.  And the issue we have is Mr.
22 Madiany had indicated that he wanted more information on the
23 underwriting and it wasn't provided and so this loan went
24 through.  Now, that's one issue.
25          THE COURT:  But, counsel --

1            MS. BARRY:  The more significant --

2            THE COURT:  Counsel, just a second.  Again, Mr. Levin

3 is not on trial here.

4            MA. BARRY:  No, he's not.

5            THE COURT:  And we're talking about what Nova did or

6 did not do.

7            MS. BARRY:  Yes, Your Honor.

8            THE COURT:  What was Nova's obligation to disclose

9 anything in terms of what Mr. Levin was trying to do to ACCB

10 (sic)?

11           MS. BARRY:  They --

12           THE COURT:  Did Nova have an obligation to contact

13 them and say, by the way, we understand this man's borrowing

14 money from you, did he tell you that he has an outstanding five

15 million loan with us, do they have that obligation?

16           MS. BARRY:  Well, yes, Your Honor.

17           THE COURT:  Where?

18           MS. BARRY:  The liabilities that the individual has

19 when applying for another loan --

20           THE COURT:  No, no.  Does Nova have the obligation to

21 affirmatively contact ACCB and say, by the way, we're aware of

22 Mr. Levin is trying to borrow money from you, let me tell you

23 what he's doing over here?

24           MS. BARRY:  Well, the issue is, Judge, that it was

25 Nova Bank directly who contacted ACBB to request the loan on

1 behalf of Mr. Levin.

2          THE COURT:  All right.

3          MS. BARRY:  They were in control of all

4 communications with ACBB, including all of the information

5 that was sent regarding Mr. Levin and his ability to get this

6 $9 million loan.  They did not disclose that Mr. Levin had

7 purchased or had borrowed from them $5 million to purchase

8 their stock.

9          THE COURT:  So now, you would include hat in the

10 evidence that you would proffer?

11          MS. BARRY:  Yes, Your Honor.

12          THE COURT:  And that's it?

13          MS. BARRY:  Just one moment, Your Honor.

14          THE COURT:  Go right ahead.

15          MR. EGAN:  Can I speak to that?

16          THE COURT:  Just one second.

17                    (Pause)

18          MS. BARRY:  Judge, there's a couple of things.  One

19 is Mr. Hartline is telling the regulators that his ability to

20 raise the contingency still rests with Mr. Levin and he

21 continues on with that into October.  And as of August he knows

22 that Mr. Levin is not in any kind of position, even without the

23 Ponzi or the Rothstein issues, that he's going to have a

24 difficult time getting the funds from Mr. Levin because, one,

25 it goes to the fact that Mr. Levin isn't going to put in any of

1 his own money, and two, that another bank isn't going to make a

2 loan to Mr. Levin.  If that's the way Mr. Levin likes to do

3 things, the issue is at this point banks aren't giving him

4 loans that are going to assist with the plans of the defendants

5 here, which is to give -- get them -- get the capital in so

6 that they can get the TARP funds.

7          THE COURT:  At what point does Mr. Hartline learn of

8 the demise of Rothstein?

9          MS. BARRY:  Sometime after October 31st, Your Honor.

10          THE COURT:  But what you're talking about predates

11 that time, correct?

12          MS. BARRY:  Yes, that he new as of August that Mr.

13 Levin was not going to be in a position to even get a loan, and

14 that's an issue going forward and his good faith

15 representations to the regulators that Mr. Levin is still going

16 to put in this money.

17          THE COURT:  And if Mr. Levin had chosen to --

18 Rothstein demise notwithstanding -- to go ahead and get up off

19 of his own assets by liquidation if he chose to do so, then

20 what?

21          MS. BARRY:  But that's irrelevant because he wasn't

22 going to do that and so that --

23          THE COURT:  Well, I don't think that that's the basis

24 for -- well, first of all, I heard Mr. Levin testify and I

25 heard he was reluctant to do certain things and how he did

1 business, but to say that he's not going to do something or he

2 would not have done something when it was his free will to

3 choose to do whatever he chose to do, I mean, there's a reason

4 how he got to $400 million.

5          MS. BARRY:  Well, that's another issue that we have,

6 Judge, that we're going to be raising about that $400 million,

7 which I think is a mischaracterization of his wealth.

8          THE COURT:  Well he said three -- two to three.

9          MS. BARRY:  No, but regardless, Your Honor.

10          THE COURT:  You know, interesting.  Let me just say

11 this to you, as I'm looking through this list, as all this was

12 going on, I have two problems.  One is Mr. Poliski, who was on

13 the witness stand from ten o'clock in the morning until well

14 later, and the crux of his testimony was I don't recall.  And

15 I'm just concerned here in terms of the evidence that's being

16 presented that it needs to be direct, focused, relevant, and

17 probative of material issues in this case and not really just a

18 waste of time.

19          MS. BARRY:  Your Honor, Mr. Poliski's testimony was

20 relevant and probative to a very important issue in this case.

21          THE COURT:  Well, if it took him all that time to do

22 one thing we need to do -- consider this in terms of the

23 remainder of the witnesses that the Government is going to

24 present.  Additionally, as again, I went through this as the

25 testimony was going forward, the vast amount of investments and

1  I don't mind saying the green bear jumped out the page at me.

2  I'm a golfer, what can I tell you.

3                        (Laughter)

4          THE COURT:  But in that county in West Virginia,

5  which is the third largest county in West Virginia, that

6  property is incredibly valuable.  If he chose to liquidate that

7  asset alone, for example, and he chose to invest or liquidate

8  other assets, there's no question in my mind that he  could

9  have raised sufficiently high amounts of money that he could

10 have procured a loan, had he wanted to do that.  But that

11 depended upon his state of mind at the time.  The way he chose

12 to do business could have varied from one day to the next.  He

13 didn't even know whether his wife participated in certain

14 things.  I just don't want to go out on this limb in terms of

15 the evidence that the jury has to consider, which is voluminous

16 already, in deciding a very important issue here by improper

17 inferences.

18         MS. BARRY:  I don't know why nondisclosure is an

19 improper inference when that is the crux of the case, Your

20 Honor, is the nondisclosure.

21         THE COURT:  Well again, you're -- but you started out

22 -- that's not how this began, okay.  And in questioning we're

23 focusing down and narrowing down what the Government can

24 present.  And I understand what you're trying to present at

25 this point in time and I'm willing to allow that.

1          MS. BARRY:  Thank you, Your Honor.

2          THE COURT:  But I'm putting parameters on that,

3    restrictions on that, not to go outside of the probative value

4    of the information.  Now let me just hear from Mr. Egan.

5          MR. EGAN:  Well, Your Honor, the fact of the matter

6    is is the application is signed by Mr. Levin and it's Mr. Levin

7    who asserts to the truth of the information on the application.

8          THE COURT:  And I -- midway through my process I --

9    that's where I was, but for the Government's counsel to say

10   that it was Mr. Hartline who basically initiated this and tried

11   to facilitate this -- because my questioning was what

12   obligation would Nova have to disclose anything and the

13   Government's representation is that this was more Mr. Hartline

14   and Nova, if not as much as them, as it was Mr. Levin in trying

15   to obtain this loan.

16         MR. EGAN:  And it will certainly be that he was

17   facilitating it by putting Mr. Levin in touch with ACBB and by

18   providing information to ACBB so that they can make a decision.

19   And --

20         THE COURT:  So my question initially was what

21   obligation does Nova have, because my understanding was Mr.

22   Levin could go anywhere in the world he wanted to borrow money

23   and make that attempt.  However, if the Government's response

24   is accepted, and I have to, that of all the banks in the world

25   it was this one and that's because Nova contacted them through

1 Mr. Hartline, then that's different.  It's probative.  It isn't

2 dispositive, but it's probative.   It's relevant evidence.

3           MR. EGAN:   But I would argue that what ACBB

4 ultimately did is not probative or relevant and, in fact, is

5 more prejudicial than relevant in terms of their decision not

6 to provide a loan.

7           THE COURT:   I don't know that I disagree with that.

8 Let me hear from the Government.

9           MR. IGNALL:   Your Honor, this actually goes into --

10           MR. EGAN:   I thought we weren't two-teaming.

11           MR. IGNALL:   Pardon?

12           MR. EGAN:   I thought we weren't two-teaming.

13           MR. IGNALL:   We are -- I'm going to two-team on this

14 one because this I think goes into the issue I wanted to raise

15 with Mr. Levin.

16           THE COURT:   All right.

17           MR. IGNALL:   But if the Court wants to one-team it on

18 this one I'm happy to sit back down.

19           MR. EGAN:   No, that's all right.

20           MR. IGNALL:   The argument -- this one piece about

21 ACBB denying the loan I think goes into a concern I have after

22 the cross examinations of Mr. Purvey (phonetic) and Mr. Levin

23 about the Rothstein investment, that we were very careful not

24 to call it a fraud, not to call it a Ponzi scheme based on the

25 Court's ruling.  The cross examination, I'm afraid, has left a

1 misleading impression with the Court -- not with the -- well,

2 perhaps with the Court, obviously not, but with the jury that

3 this was a great investment and then, you know, something

4 happened on October 31st and it was not valuable any more, that

5 we've had questions about how much money Mr. Levin was making,

6 how much money he was making on the spread, what a great thin

7 this was, how rich Mr. Levin was, which is I think where this

8 ties back in to ACBB.

9       The only relevance I can see of the questions about

10 how rich and how lucrative all this was are to go to the intent

11 of Mr. Hartline and Mr. Bekkedam, meaning we've already had the

12 bank regulators say we want to know -- if money's borrowed we

13 want to know that it's borrowed from the bank because that's

14 relevant to our decision about whether that counts as new

15 capital.  We would not have considered that.  But that's not

16 enough for the Government to sustain its burden of proof.

17       We have to prove beyond a reasonable doubt that these

18 defendants had an intent to defraud, that they weren't just

19 mistaken in good faith.  And what I take from these questions

20 is we think Mr. Levin is so rich he's good for the money, so it

21 wouldn't occur to me that I'd have to tell a federal regulator

22 that Mr. Levin borrowed the money from Nova Bank, even though

23 it later turns out that they should have.  During the time that

24 Mr. Hartline was making representations to the federal

25 regulators he did not have any intent to defraud, he thought

1 this was totally fine.

2          Insofar as that relies on Mr. Hartline's and Mr.

3 Bekkedam's understanding of Mr. Levin's wealth, I think the

4 jury has a misleading impression right now, that he was

5 super-duper wealthy and something happened, when in fact, he

6 wasn't super-duper wealthy on June 30th.  He thought he was,

7 but in fact, his hundreds of millions of dollars were in a

8 Ponzi scheme.

9          THE COURT:  But if he thought he was how could Mr.

10 Hartline  know otherwise?

11          MR. IGNALL:  That's where I think it ties back in to

12 ACBB, that ACBB looks at the financials and even though they

13 see that he's worth hundreds of millions of dollars, they're

14 not willing to make a loan to him.  So that means any

15 representation that Mr. Hartline makes after he learns that, he

16 now has additional knowledge about how creditworthy Mr. Levin

17 is.

18          THE COURT:  Is there evidence that Mr. Hartline spoke

19 with ACBB's persons to -- who are in charge of, for example, a

20 loan committee, as to why they rejected Mr. Levin's loan?

21          MR. IGNALL:  I believe that's true.  That's more Ms.

22 Barry's issue.  But my understanding --

23          THE COURT:  I'm still trying to figure out how

24 somebody with a 709 credit score can borrow $5 million, but

25 hey.

1           MR. IGNALL:  But ACBB, as I understand it, only deals

2  with other banks.  It's -- you and I could not go to --

3           THE COURT:  Okay.

4           MR. IGNALL:  -- ACBB and get a loan.  Nova Bank has

5  to go to ACBB.

6           THE COURT:  Does the jury know that right now?

7           MR. IGNALL:  The jury does not know that.  There's

8  been some talk of ACBB in a couple documents --

9           THE COURT:  Correct.

10           MR. IGNALL:  -- that we've discussed before the jury.

11

12           THE COURT:  Correct.

13           MR. IGNALL:  But I think the only issue that sounds

14  like it's left to resolve is the decision of ACBB to deny a

15  loan to Mr. Levin, which I think goes back to -- it does go to

16  his creditworthiness in July or August and it goes to what

17  these defendants know after that.  It is not dispositive, but

18  it's certainly probative, it's certainly relevant.  And then

19  the question becomes is there some danger of unfair prejudice

20  that substantially outweighs that probative value?  And --

21           THE COURT:  Does the Government feel that it does not

22  need to pare the evidence and present it in such a way that if,

23  for example, the loan was denied for some other reason the jury

24  could not wrongfully infer that it was denied for the reason

25  that the Government wants it to believe?

1          MR. IGNALL:  I'm not sure I'm following.

2          THE COURT:  Did I say wrongfully?  Wrongly.  Excuse

3 me.

4          MR. IGNALL:  I'm not sure I'm following, Your Honor.

5 I apologize.

6          THE COURT:  What if the people who are on the loan

7 committee at ACBB decided, for reasons other than what you're

8 suggesting, that they don't want to loan him this money?

9          MR. IGNALL:  Well, I think Ms. Barry should address

10 that because I think she's more familiar with that.

11          THE COURT:  All right.

12          MR. IGNALL:  I was just trying to tie this back in to

13 --

14          THE COURT:  Let me, before I hear Ms. Barry --

15          MR. IGNALL:  -- Mr. Levin.

16          THE COURT:  -- which I will, let me hear from Mr.

17 Egan, please.

18          MR. EGAN:  This wouldn't be admissible in a civil

19 case.  It's basically another entity looking at a situation and

20 making a decision based on its parameters.  It's completely

21 irrelevant to whether -- why Nova --

22          THE COURT:  Which is why I said I may be inclined to

23 allow some of the information to come out, but not all of it,

24 and specifically that they rejected the loan, because that

25 doesn't necessarily mean that they rejected it on that basis.

1 We all know that.

2         MR. EGAN:  Thank you, Your Honor.

3         THE COURT:  Now, unless they're going to testify and

4 you have witnesses to say this is exactly why, it's different.

5 Let me just hear from Mr. Duncan.  Yes, sir?

6         MR. DUNCAN:  Your Honor, briefly.  And this is not

7 really our issue, but I do want to make sure that the facts are

8 clear.  Mr. Levin has testified that even after the Ponzi blew

9 up we thought he was worth -- Mr. Egan's math was a little bit

10 off -- we thought he was worth $140 million still.  He had all

11 of these assets.  Why -- I agree completely with what the Court

12 has just said.  Look, when I went to refinance my house with

13 the same bank that had my mortgage they took me over the coals

14 to say this or that and I said to them, you know, I've already

15 got my mortgage with you.  You know, banks make decisions for

16 all sorts of strange reasons.  And to give the inference that

17 somehow Mr. Levin is not creditworthy from this person, Mr.

18 Sayre, coming in and saying on he denied him the loan.  Well,

19 did you talk to each one of the committee members?  Did they

20 say why?  Is there something relevant?  Is it relevant to --

21 did you know he was worth $140 million even if he didn't have

22 the money from the Ponzi?  It creates that inference that

23 somehow, as Mr. Egan has said, that Mr. Levin was not

24 creditworthy and Mr. -- well, other people should not have

25 relied on the idea that he was rich.  Even the Government

1  regulators believed Mr. Levin was worth that amount of money.

2  They all -- you have all the e-mails back and forth, they've

3  got this very rich guy.  Everybody through October 31st,

4  including Mr. Levin, thought he was worth a tremendous amount

5  of money.

6          THE COURT:  All right, I understand that.  Again --

7          MR. DUNCAN:  And even afterwards, he was worth 140

8  million.

9          THE COURT:  I appreciate that.  Again, my concern is

10 simply this.  Looking at the elements of the crime, is the

11 inference you want the jury to draw directly affecting the

12 element of the crime in terms of intent?  And my concern is

13 because I don't know at this juncture by reason of any proffer

14 that you give or any pretrial motions for that matter, the

15 basis for the rejection, one, and two, that that basis was

16 articulated directly to Mr. Hartline.  And it seems to me if

17 you cannot the evidence shouldn't be out there for them to

18 speculate as to what this is all about.

19         MS. BARRY:  Your Honor, we would not have a

20 speculation as to why the loan was rejected.  We have direct

21 evidence, not only from testimony, but Government's Exhibit 71

22 states why it was rejected.

23         THE COURT:  What does it state?

24         MS. BARRY:  It says the requested loan amount exceeds

25 the parameters of the loan program, the amount size of the

24

1 existing direct and contingent liability, and the negative

2 adjusted gross income.

3          THE COURT:  And from that the jury can conclude guilt

4 beyond a reasonable doubt?

5          MS. BARRY:  We're not asking them to decide guilt

6 beyond a reasonable doubt.  The fact is there's a specific

7 reason why the loan is rejected.

8          THE COURT:  Well, there's several reasons.  And it

9 seems to me, as educated as I am, that I would need an

10 explanation for what those things are really saying.

11          MS. BARRY:  Well, Mr. Sayre is here to explain what

12 those are.  It wasn't -- it's not going to be unknown why they

13 rejected the loan.  It's not going to be a speculation.  Mr.

14 Sayre is going to be able to look at the notice of action taken

15 by his bank on rejecting the loan and there's going to be an

16 explanation on the rejection of the loan and he's going to be

17 able to explain what those are.

18          THE COURT:  That the man's broke.

19          MS. BARRY:  That's not what it's saying, that the man

20 is broke, because this is in August of 2009.  What they're

21 saying is the bank is essentially going to say based on the

22 financials that they observed and the business that he was

23 heavily invested in, they did not provide him with a loan.

24          THE COURT:  Yes.  Okay.

25          MS. BARRY:  And so then it goes to the intent of the

1 defendant.  As of August of 2009, they knew, despite the fact

2 that he's got all of this money, how could he possibly be

3 rejected from any bank, he's got all of this money.  But guess

4 what?  He did.  And so they knew that there may be a problem

5 going forward with him giving them the investment based on any

6 loan from any other bank, and not only that, Your Honor --

7         THE COURT:  Counsel, I'm sorry, but I have a real

8 problem with, given how banks are or can be from one loan

9 committee to another, how you can conclude that if one bank

10 said no, that every other bank in the world would say no to Mr.

11 Levin.

12         MS. BARRY:  Well that's not the argument, that every

13 other bank in the world would say no.  This is --

14         THE COURT:  But, you're saying that the jury has --

15 can conclude that if ACCB said no then Mr. Hartline had to

16 conclude that he was worthless financially and we're going to

17 loan him money anyway, hide that from the Government and,

18 therefore they're guilty beyond a reasonable doubt.

19         MS. BARRY:  No, Your Honor, that is -- that's not the

20 -- that's not what we're asking the jury to do.  But he is on

21 -- both defendants are on notice that ACBB, Your Honor, and I

22 think it has to be brought out what kind of bank ACBB is.  And,

23 in fact, in May of 2009 Mr. Hartline wrote to all of the board

24 members saying if you want to purchase Nova stock as a board

25 member, go through ACBB, they have a program where you can

1  purchase bank stock.  And that's a specific way that they are

2  touting among each other to do the stock purchase.

3          And, Your Honor, I think it's important to know that

4  ACBB is not your normal -- is not a bank that any other

5  depositor could go to, only people who have a vested interest

6  and ownership in other banks.  It's a banker's bank.  It's not

7  for the average Joe to walk in and say, hey, I'd like a loan.

8          They are a different kind of bank and I think it's

9  important for the jury to know that they had gone out, sought

10 the half investment.  They had already -- Your Honor, they had

11 already hidden the loan from the regulators.  They had already

12 hidden that they provided a loan to Mr. Levin.  They need to

13 get out of trying to hide that and so they went to ACBB and

14 said, you know, we want -- please give him half of the $18

15 million which is nine and that way it's not a lie, it's not a

16 lie that we told the regulators he was going to borrow half

17 because we're going to ACBB and we're going to get half.

18         But the problem is, Judge, he doesn't get the half.

19 He doesn't get the $9 million loan that they were planning on.

20 And once the plans start to unravel, it goes further and

21 further to what was up here and what they were thinking and,

22 Judge, that is relevant.  It's not relevant as to whether or

23 not George Levin could have gotten his own money and invested.

24 That's not the point.  The point is what are these defendants

25 doing knowing that George Levin is not going to put in his own

1  money?

2         MR. EGAN:  Your Honor, there's no evidence that they

3  didn't know what George Levin was going to do.  We've heard

4  George Levin's testimony that he could have done and knew he

5  was on the hook to do up as late as October.  All this is is an

6  attempt to get evidence in from another bank that they denied

7  Mr. Levin credit.  It's all it is.  And its prejudice far

8  outweighs its probative value and apparently the Government

9  doesn't ever take a ruling as a ruling and we'll argue until

10 noon about this but the bottom line is they can't change the

11 facts.

12         And the facts are they're calling this person to say

13 we were asked about this loan, we received an application and

14 by the way, it's not Mr. Hartline's application, it's signed by

15 George Levin and the information is provided by George Levin.

16 They received the loan and they denied the loan.  And Your

17 Honor asked what were the reasons.  The first reason is

18 requested loan amount exceeds the parameters of the loan

19 program.  That has nothing to do with anything we're here

20 about.

21         THE COURT:  Just stop right there.  What does that

22 mean?

23         MS. BARRY:  Mr. Sayre would testify, Your Honor, that

24 Brian Hartline contacted him for a $9 million loan and he was

25 advised at that time by Mr. Sayre $9 million is a little more

1 than, you know, we would give and Mr. --

2            THE COURT:  Why?

3            MS. BARRY:  Pardon me?

4            THE COURT:  Why is $9 million a little more than we

5 would give?

6            MS. BARRY:  I think their loan amount may have been

7 four or five million at the excess -- at the upper limits of

8 what they would lend.  But Mr. Hartline --

9            THE COURT:  All right, now just stop right there.

10 Just stop right there please.  Nine is how much more than they

11 would normally lend?

12            MS. BARRY:  Your Honor, I would have to go back to

13 see exactly what -- I believe it was above whatever their

14 lending limit was.

15            THE COURT:  All right, now, accepting that as true,

16 he wanted nine.  They could only go to four.  Is there evidence

17 that there was an exchange between Mr. Sayre, Mr. Levin and

18 presumably Mr. Hartline the most we could do is four?  Now

19 let's begin the discussion.

20            MS. BARRY:  Yes.

21            THE COURT:  There is evidence of that?

22            MS. BARRY:  Yes.

23            THE COURT:  Conversation?

24            MS. BARRY:  Yes.

25            THE COURT:  And then after that four was

1 communicated, are we talking about the remainder of the reasons

2 for denial what you've articulated based on a $4 million

3 application or a $9 million application?

4          MS. BARRY:  Your Honor, I believe the evidence will

5 be that Mr. Hartline, when Mr. Sayre told Mr. Hartline that

6 nine exceeded their lending limit, Mr. Hartline said well,

7 maybe -- whatever you can do.

8          THE COURT:  All right.

9          MS. BARRY:  Whatever you can do.

10          THE COURT:  All right.

11          MS. BARRY:  If it's a million, if it's two, it's

12 three, if it's a four, just whatever you can do.  So they

13 didn't actually readjust the requested amount but they asked,

14 you know, look at him and just provide what -- the loan amount

15 that you would give him.

16          THE COURT:  And then they came back and said we won't

17 even give him $5?

18          MS. BARRY:  Correct.

19          THE COURT:  Because?

20          MS. BARRY:  Because --

21          THE COURT:  Four million downward to five, the reason

22 why is?

23          MS. BARRY:  The amount size of existing, direct and

24 contingent liabilities and the negative adjusted gross income.

25          MR. EGAN:  You missed the first part of the answer

1  which is the requested loan amount exceeds the parameter of the

2  loan program.

3              MS. BARRY:  No, he said --

4              THE COURT:  No, that's

5              MR. EGAN:  That's on rejection.

6              THE COURT:  No, no, I know that.  We've already

7  passed that.  So, therefore, their determination that he was

8  not credit worthy for $4 million, not nine because nine is out

9  of the question anyway, but for $4 million is communicated to

10 Mr. Hartline.  Does Mr. Hartline (1) have any obligation to

11 reveal that to the regulators?

12             MS. BARRY:  The information from -- about his non

13 creditworthiness?

14             THE COURT:  Yes.

15             MS. BARRY:  I don't think he has an obligation to

16 advise the regulators of the non creditworthiness.  I think --

17             THE COURT:  That's question number 1.  Question

18 number 2 is accepting that Mr. Hartline now knows that a bank

19 has said he is not credit worthy, it's the Government's

20 position that now Mr. Hartline has what obligation toward the

21 regulators or TARP?

22             MS. BARRY:  He's on notice, Your Honor, that Mr. --

23 that they are more than -- that it's becoming more of a

24 possibility that Mr. Levin is not going to make this investment

25 but he continues to tell the regulators that they're expecting

1   this investment from Mr. Levin.

2          THE COURT:  And that conversation eliminates any

3   possibility of Mr. Hartline continuing to try to develop some

4   other alternative with Mr. Levin?

5          MS. BARRY:  Well, I think he stops doing that, Your

6   Honor, once Mr. Levin it's clear that he does not have -- the

7   Ponzi scheme is uncovered so he goes to other sources and then

8   they start doing loans with other individuals.

9          THE COURT:  Was that permissible?

10         MS. BARRY:  No.  Well, it's permissible to give him a

11  loan.  It's not permissible to call it capital and tell the --

12         MR. EGAN:  Your Honor, that's not been established.

13         THE COURT:  Counsel, wait a minute please.

14         MR. EGAN:  I'm sorry.

15         THE COURT:  She's on the floor.  Go right ahead.

16         MS. BARRY:  Your Honor, the issue in this case is

17  that they made loans to individuals who then used it to

18  purchase stock and they did not disclose that it was the bank's

19  own money that it was being used to purchase stock and capital.

20         THE COURT:  Patently clear.  My only question is in

21  terms of what you're proffering regarding Mr. Sayre --

22         MS. BARRY:  Yes.

23         THE COURT:  -- is it acceptable, admissible pursuant

24  to 403 based upon everything that I know about this case at

25  this point in time so as not to confuse the jury, allow for

1  improper inferences toward guilt beyond a reasonable doubt?
2  The chips fall where they may.  The evidence is the evidence.
3  If they're found guilty, jury says they're guilty by competent
4  evidence, so be it.  But they are both entitled to a fair
5  trial.
6          MS. BARRY:  Absolutely, Your Honor, and so is the
7  Government.
8          THE COURT:  Absolutely.
9          MS. BARRY:  And so this is evidence -- we did not say
10  this evidence is dispositive but it is relevant, it is
11  probative and to the extent there is no misimpression on the
12  jury that of why the loan was denied and to the extent that
13  this was the only bank that they sought for Mr. Levin to get a
14  loan, then you can argue -- it could be argued any way -- any
15  inference can be made from that.
16          THE COURT:  All right, this is what I'm going to do.
17  Let me just hear from Mr. Egan.  Then I'm going to tell you
18  what I'm going to do.  Mr. Egan?
19          MR. EGAN:  Barely relevant and far more prejudicial
20  than probative.
21          THE COURT:  All right, Mr. Duncan?
22          MR. DUNCAN:  Your Honor, just if I may?  I'm not in
23  any way impugning anything that's been said here but I've been
24  reading through the 302s or the memorandums.  There's nothing
25  about a conversation with Mr. Hartline and Mr. Sayre about

33

1  well, let's reduce it to 4.5.  And, Your Honor, as a matter of
2  logic, it's not there because they're rejecting a $9 million
3  loan.  The loan was never in any way modified.  They're saying
4  this $9 million loan is outside our parameters.  There's
5  nothing about oh, well, what about 4.5, what about one?
6  There's nothing about that at all, Your Honor.
7          THE COURT:  That was my last area to cover and that
8  is I will allow it but it's going to be conditioned upon it
9  being pared in such a way that the jury would have an accurate,
10 and I mean accurate understanding of the parameters here, the
11 ceiling.  If he's trying to get nine million and the rule is
12 you can't get more than four, then that five million is wholly
13 irrelevant.  It's wholly irrelevant.  And unless you're going
14 to suggest that there is a direct conversation between Mr.
15 Hartline and whomever is at ACCB, that hey, don't worry about
16 the ceiling, we want nine because, if you can't do that, then
17 it can't come in.
18          Additionally, look exactly what is going to be said
19 by the witnesses, to be what I've questioned you about.  That's
20 what is going to be admissible.  The kitchen sink being thrown
21 in will not be allowed and improper inferences will not be
22 allowed.
23          MS. BARRY:  Yes, Your Honor, I understand your
24 position and I guess just for our edification, what is the
25 improper inference?

1          THE COURT:  Well, if you want to start with he tried

2  to get $9 million and the $9 million was rejected because he

3  was not credit worthy I think is an improper inference about

4  why the loan was rejected if you're ultimately are going to

5  argue that the loan was rejected because he was not credit

6  worthy and that Mr. Hartline knew that and then the snowball

7  starts to run down the hill about Mr. Hartline's intent.  If

8  there's a ceiling that says you can't borrow more than $4

9  million and then there's negotiation around four and below,

10  that's different.

11          MS. BARRY:  Yes, Your Honor.

12          THE COURT:  But you're talking about adding up

13  cumulatively all the monies that they're going to need to be

14  sufficiently capitalized and that five million is off the

15  table.  It's improper to consider that.  I mean if there's a

16  ceiling on a credit card and you try to charge more, you can't

17  charge more, period.

18          MR. IGNALL:  Your Honor, I think we understand the

19  question.  I just want to make sure with respect to Mr. Levin's

20  redirect that I'm not going to go beyond the Court's ruling.

21          THE COURT:  Well, I want to go back to what Mr.

22  Duncan mentioned in terms of the Government's ability to have a

23  witness testify to this not -- well, because -- I appreciate

24  the proffer.  I can't imagine that somebody was going to be

25  asking in the MOI questions like I've just asked with that kind

1  of specificity, but if you got witnesses who can say those

2  things, so be it.  I think that's what Mr. Duncan was

3  suggesting.

4           MR. DUNCAN:  My point, Your Honor, is there's nothing

5  in the MOI about a conversation between Mr. Hartline --

6           THE COURT:  That's my point.

7           MR. DUNCAN:  It just isn't there.  Now, maybe they're

8  going to -- he's going to say Brian tried to negotiate it down

9  but we ought to hear that in the proffer --

10          THE COURT:  Agreed.

11          MR. DUNCAN:  -- Mr. Hartline, I'm sorry.

12          THE COURT:  Agreed.

13          MR. IGNALL:  Your Honor, I think we'll talk to Mr.

14  Sayre before he goes on and we can raise that with the Court.

15  My concern is with Mr. Levin's redirect --

16          THE COURT:  All right.

17          MR. IGNALL:  -- and I want to make sure that -- well,

18  there are two things, but this is -- it kind of goes slightly

19  together.  With respect to ACBB, my concern is we've seen -- I

20  believe Mr. Egan showed it and Mr. Duncan may have Exhibit 64

21  to Mr. Levin.

22          UNIDENTIFIED SPEAKER:  67.

23          MR. IGNALL:  I'm talking about Exhibit 64.  And if we

24  could bring that up on the screen, Agent Blair (phonetic)?

25  It's, I believe, the sixth page.  That page.  If we can blow up

1 the top?  There are questions about this.  The inference, I

2 think, that the defendants wanted the jury to draw was that

3 there's no misleading of regulators because here it says half

4 the funds are borrowed.

5          As it stands without any mention of ACBB, that would

6 leave a misleading impression.  I understand the Court's ruling

7 but I think it's also important regardless of the reason to

8 show that that half from borrowed funds is the nine million

9 that Nova Bank requested from ACBB and that Mr. Levin did not

10 get.  So this does not include loans from Nova Bank.  So I just

11 want to make sure that if I get Mr. Levin to say --

12          THE COURT:  But the half --

13          MR. IGNALL:  -- I didn't get the loan because there

14 was --

15          THE COURT:  The half borrowed funds, that's nine

16 million.

17          MR. IGNALL:  Yes, and that's exactly the amount of

18 the ACBB loan request.

19          THE COURT:  All right.  That's already in evidence,

20 is it not?

21          MR. IGNALL:  No.  There was -- I think -- I don't

22 remember which defense lawyer showed Exhibit 67 to Mr. Levin

23 which is the application in which part of the application to

24 ACBB --

25          MR. EGAN:  That question was withdrawn, Your Honor.

1          MR. DUNCAN:  That's correct, Your Honor.  That was me
2  and I did withdraw the question.
3          MR. IGNALL:  But that -- those go together because
4  the inference here I think would be --
5          THE COURT:  Was the question answered?
6          MR. DUNCAN:  No, it was not, Your Honor.
7          THE COURT:  So --
8          MR. IGNALL:  Okay, the questions have been out there
9  about this half borrowed and I think I need to make it clear
10  with Mr. Levin the only loan he had was from Nova Bank for five
11  million and that he did make an application for nine million
12  through Nova Bank to ACBB and that he didn't get it and it's --
13          THE COURT:  Without the inference that he was not
14  credit worthy?
15          MR. IGNALL:  That's where I -- I anticipated that
16  with Mr. Sayre we would get into the evidence about credit
17  worthiness for a different reason.
18          MR. EGAN:  Your Honor, may I -- I hate to do this but
19  I think I may have solved the problem.
20          THE COURT:  You what?
21          MR. EGAN:  I think we may have solved the whole
22  problem here.
23          THE COURT:  Great.
24          MR. EGAN:  I mean if Mr. Levin speaks -- if Mr. Levin
25  says yes, I applied for a loan to ACBB for nine million, I

1 didn't get it, then the evidence that he applied for the loan
2 of nine million is in.  It's admissible, it's relevant and he
3 didn't get it is in and that's admissible and relevant I
4 suppose.  And we don't need Mr. Sayre to testify about any of
5 the reasons why or wherefor because they're all irrelevant.

6          THE COURT:  Ms. Barry?

7          MR. IGNALL:  Well, no, I was going to say for our
8 purposes of Mr. Levin, I think we could agree to ask those
9 questions and then reserve -- because I understand the Court's
10 ruling with that there are other areas that we could talk to
11 Mr. Sayre about and then after Mr. Levin testifies, revisit how
12 far -- after we talk to Mr. Sayre, we propose to go.

13          THE COURT:  It sounds reasonable.  After he
14 testifies, we'll talk about it again.  We'll revisit it.

15          MR. EGAN:  Fine, Your Honor.

16          THE COURT:  All right.  All right, give me -- yes,
17 sir?

18          MR. IGNALL:  I have one other -- I was standing up
19 not just to step on Ms. Barry's toes but because it segued back
20 into the issue I want to raise with Mr. Levin.

21          THE COURT:  Okay.

22          MR. IGNALL:  And this is all I think tied together
23 about how fabulously wealthy Mr. Levin was as of June 30 that I
24 think the jury has been left with a misleading impression
25 because we've been very careful not to use the words Ponzi

1  scheme or fraud with respect to the Rothstein investment.

2          THE COURT:  Do you believe, not the jury, but do you

3  believe that Mr. Levin was credible when he reduced the amount

4  by correcting counsel's question as to his net worth at or

5  about that time when he talked about (1) it wasn't that much

6  when counsel asked something about 400 million and (2) he said

7  he spoke to liquidated assets, he spoke to investments and he

8  spoke to, as I recall, a variety of income sources on a balance

9  sheet if you will and that it wasn't all like it looked?  But

10 in the end I thought he said approximately 100, 125 million was

11 his worth.  Am I wrong or right about that?

12          MR. IGNALL:  I don't remember the exact number.

13          MR. DUNCAN:  Your Honor, he said that he was asked by

14 Mr. Egan how much he said he lost about two-thirds of it and

15 then we did the math and Mr. Egan came up with 30 million, but,

16 you know --

17          THE COURT:  All right.

18          MR. IGNALL:  That's a different issue.  There are two

19 issues here.  But that I'm going to clarify and redirect

20 regardless.  Because of the guarantees that Mr. Levin had, it

21 actually wiped him out and he ended up in bankruptcy so

22 whatever assets he had he was going to lose in bankruptcy

23 because of demands on those guarantees.  So I think effectively

24 he's probably in for more than 100 percent when it went bad or

25 when -- my concern is about the inference as of June 30th as to

40

1  how fabulously wealthy he is.  We were going to leave it with
2  he understood that he had this investment, but the more
3  detailed questions we've had to make it look like he's this
4  super rich guy I think leaves a misleading impression.
5          THE COURT:  I understand your point and I agree.
6          MR. IGNALL:  So I would like to be able to inquire
7  about, and this may be tricky, maybe the best way to do it is
8  to have Mr. Levin on the stand and we can instruct him in terms
9  of the parameters because I don't want to be speaking to Mr.
10 Levin while he's in cross examination or after cross
11 examination without counsel present, that we could maybe get
12 on to and I could fashion my questions that in fact although he
13 thought he had $300 million, he later learned that it wasn't
14 worth much of anything on June 30th.
15         THE COURT:  As long as you can demonstrate that
16 there's a nexus between that amount of money and what was in
17 Mr. Hartline or Mr. Bekkedam's mind.
18         MR. IGNALL:  Well, yes and no, Your Honor.  The
19 problem with that is when we left it at he was invested in this
20 thing and it turned out not to be valuable on October 31st,
21 that was that.  But when we have questions about --
22         MR. EGAN:  I'm sorry, Your Honor --
23         MR. IGNALL:  I don't know that I was done.
24         THE COURT:  Mr. Egan, no, absolutely not.  He has the
25 floor.  He's addressing the Court.

1          MR. EGAN:  I apologize, Your Honor.

2          THE COURT:  That's all right.  Go ahead.

3          MR. IGNALL:  I'm sorry, Your Honor.  I was a little

4  snippy there.  When we left it at that, that's where we left

5  it.  When we had questions about his planes and his, you know,

6  fabulously wealthy lifestyle and specific questions about how

7  valuable this investment was, that he's making this great

8  spread on the investment, he's promising, you know, people 12

9  percent, he's getting 20 percent back himself, he's

10  guaranteeing that 12 percent so when, in fact --

11          THE COURT:  Excuse me one second.

12              (Court spoke on another matter)

13          THE COURT:  I'm sorry, counsel.

14          MR. IGNALL:  -- when, in fact, and this is where it

15  gets misleading, because Mr. Levin had guaranteed all this if

16  this indeed this turned out to be as it was a Ponzi scheme, Mr.

17  Levin is potentially worth less than zero.  So we've left a

18  misleading impression that he has this $300 million asset and

19  he's getting this tremendous, you know, spread on the return.

20          THE COURT:  So why could you not ask him that?

21          MR. IGNALL:  I think I should be able to ask him

22  that.  My concern was the Court has already ruled that we can't

23  introduce evidence that the Rothstein investment was a Ponzi

24  scheme and I understand that.

25          THE COURT:  Well, his testimony has gotten so close

1  to that, I think the jury can infer that that was, you know, a

2  jumping off the cliff if you will.  I don't see that there is a

3  problem whether it's through cross or redirect to simply

4  demonstrate from the witness' own mouth that at the end of the

5  day at a time certain, that's very important, at a time certain

6  that's relevant to the potential loans and what should be

7  disclosed to regulators in this case, he had a net worth of X.

8  And he doesn't have to say too much more than that from what's

9  already come out in the case.

10         MR. EGAN:  May I now, Your Honor?

11         THE COURT:  No.  Mr. Ignall is not totally done in

12  terms of this exchange.

13         MR. IGNALL:  Yeah, I think there are two different

14  issues here.

15         THE COURT:  All right.

16         MR. IGNALL:  And one, I think, I was going to get

17  into on redirect, just what he understood he was worth --

18         THE COURT:  All right.

19         MR. IGNALL:  -- after October 31st.

20         THE COURT:  All right.

21         MR. IGNALL:  I'm going back to June 30th.  I just

22  want to be able to correct -- and the jury may have already

23  inferred what seems to be worth all this money on one day and

24  is worth nothing another.

25         THE COURT:  But you have a right -- you have a right

43

1 to clear that.

2          MR. IGNALL:  But I want to make it clear that Mr.

3 Levin understood he had $300 million but he later found out

4 that he didn't really as of June 30th.

5          THE COURT:  You could do that too.  Yes, sir?

6          MR. DUNCAN:  Your Honor, if I may and maybe I'm

7 missing the point, but the relevant things are what in the

8 defendants' mind and everybody else's mind as to what they

9 believed.

10          THE COURT:  I've been saying that all along.

11          MR. DUNCAN:  Mr. Levin, if we did an accounting on

12 him on October 31st, I don't know what we would find but we

13 know what he believed on October 31st and there's no evidence

14 that anybody else didn't also believe that he was still

15 fabulously wealthy even after the Ponzi crumbled.  Later that

16 the guarantor showed that, you know, he had owed other money is

17 completely irrelevant after October 31st.

18          THE COURT:  I don't know what Mr. Ignall is going to

19 elicit from the witness.  His proffer is he wants to be able to

20 on recross, redirect, excuse me, to clear up any

21 misunderstanding as to the witness' testimony on direct or

22 cross in response to what were you worth at a point in time and

23 he's allowed to do that.  And he can, independent of that

24 witness' testimony, he can if he has the evidence, link it up

25 if you will in terms of what's in the defendants' mind.

44

1          MR. DUNCAN:  Understood.

2          THE COURT:  If he doesn't, he doesn't.  And you

3 obviously are going to argue that to the jury.

4          MR. DUNCAN:  Understood.

5          THE COURT:  All right, now, Mr. Egan?

6          MR. EGAN:  And my concern, Your Honor, is based on

7 Mr. Ignall's argument, the sense I get is what he's trying to

8 show is that in June of 2009 Mr. Levin wasn't really worth that

9 much money and there isn't a shred of evidence that any time

10 before October or even after October 31st but certainly not

11 before October 31st that there's any reason why my client had

12 any reason to believe that he was not worth what he says he is

13 on those pieces of paper.  And to infer otherwise when Mr.

14 Ignall knows quite well that otherwise is not true is improper.

15          THE COURT:  Let me just hear his response.

16          MR. IGNALL:  And that may have been a fine argument

17 before we had all these questions about how rich Mr. Levin was.

18 Those were never tied back to Mr. Hartline knowing that so now

19 we've left a misleading impression.

20          THE COURT:  All right, I'll allow it.  If the

21 Government wishes to pursue that in that manner, the defense is

22 certainly not going to be precluded from arguing the net worth

23 of that information against the backdrop of knowledge, notice

24 to the defendants and why would we argue and present it if it

25 had anything to do with anything.  You know, I know, but I

1 don't want to teach you.  I'm saying that just simply for the

2 record and why the Court's allowing the evidence is admissible

3 but the weight of the evidence is going to be up to the jury to

4 decide.

5          MR. EGAN:  Thank you, Your Honor.

6          MR. IGNALL:  And just so I don't step on anything

7 that I'm going to regret later, may I ask for a -- maybe excuse

8 the jury after Mr. Levin's cross so that perhaps I can inquire

9 with counsel present just so we can agree on that area?

10          THE COURT:  It would be very wise to do that.

11          MR. IGNALL:  Okay.

12          THE COURT:  All right.

13          MR. IGNALL:  Thank you, Your Honor.

14          MR. DUNCAN:  Your Honor, before we bring the jury in,

15 could I have two minutes?

16          THE COURT:  Absolutely.

17          MR. DUNCAN:  Thank you.

18          THE COURT:  Take three.

19          MR. DUNCAN:  Thank you, Your Honor.  May I be

20 excused?

21          THE COURT:  Yes, sir.

22          MR. DUNCAN:  Thank you, Your Honor.

23                    (Audio off)

24          THE COURT:  You may continue.

25          MR. IGNALL:  Thank you.  The Government calls Hilary

Musser - Direct/Ignall                    46

1   Musser.

2              COURTROOM DEPUTY:  Please raise your right hand.

3               HILARY MUSSER, GOVERNMENT'S WITNESS, SWORN

4              COURTROOM DEPUTY:  Please be seated.

5              THE WITNESS:  Thank you.

6              COURTROOM DEPUTY:  Please state your full name and

7   spell your last name for the record.

8              THE WITNESS:  My name is Hilary Grinker Musser,

9   M-u-s-s-e-r.

10             THE COURT:  You may proceed.

11             MR. IGNALL:  Thank you, Your Honor.

12                          DIRECT EXAMINATION

13  BY MR. IGNALL:

14  Q    Ms. Musser, in what city and state do you currently live?

15  A    West Palm Beach, Florida.

16  Q    And how long have you lived in Florida?

17  A    Approximately ten years.

18  Q    And where did you live before you moved to Florida?

19  A    Bryn Mawr, Pennsylvania.

20  Q    When you were living in Bryn Mawr, Pennsylvania, did you

21  at any point meet someone known as Barry Bekkedam?

22  A    Yes.

23  Q    Approximately when did you meet Mr. Bekkedam?

24  A    Somewhere around possibly the late 90s, early 2000.

25  Q    Do you see Mr. Bekkedam here in the courtroom?

1  A    I do.

2  Q    And can you identify him by where he's sitting and what

3  he's wearing?

4  A    He's sitting to the third to the -- with the gentlemen

5  over there and he's wearing a light blue tie and a dark gray

6  suit.

7        MR. IGNALL:  May the record reflect that the witness

8  has identified Mr. Bekkedam?

9        THE COURT:  The record shall so reflect.

10 Q    All right, when you first met Mr. Bekkedam, did you have

11 any discussions with him about what business he was in?

12 A    I knew he was in the investment business basically.

13 Q    And did you know what the name of his business was?

14 A    Ballamor Capital Management.

15 Q    At some point did you talk -- did Mr. Bekkedam talk to you

16 about investing with Ballamor?

17 A    Yes.

18 Q    Do you remember approximately when that was?

19 A    Yes, around 2005.

20 Q    All right, and did you have money to invest at that point?

21 A    I did.

22 Q    About how much money did you have?

23 A    About $5 million.

24 Q    Okay, and did you speak with Mr. Bekkedam about investing

25 that with Ballamor?

Musser - Direct/Ignall                    48

1  A     Yes, I did.

2  Q     Did Mr. Bekkedam tell you about whether he had -- how much

3  money he had under management?

4  A     Yes, he did.

5  Q     What did he say?

6  A     Two to $3 billion.

7  Q     And did you, in fact, invest with Mr. Bekkedam?

8  A     Yes, I did.

9  Q     And did Mr. Bekkedam have any discretion over where to

10 invest that money?

11 A     He had 100 percent discretion.

12 Q     After you invested that first $5 million did Mr. Bekkedam

13 ever seek any further investments from you?

14 A     Yes, he did.

15 Q     Going back to about 2005, did you have a line of credit at

16 any bank?

17 A     Yes, I did.

18 Q     And what bank was that at?

19 A     I was with PNC Bank in Philadelphia.

20 Q     And did you have a discussion with Mr. Bekkedam about that

21 line of credit?

22 A     Yes, I did.

23 Q     What was that discussion?

24 A     I did not want to transfer my funds over to him unless he

25 could also extend the same line of credit that I had at the

Musser - Direct/Ignall                    49

1  same interest rate.

2  Q    Did you talk to Mr. Bekkedam about using the line of

3  credit to invest with Ballamor?

4  A    Well, I wanted to use the line of credit just as a safety

5  net for anything but he said I should use the line of credit to

6  invest because it would be an arbitrage.

7  Q    Did he tell you what that meant?

8  A    Yeah, I had to ask that question, so yes, he did, that I

9  would -- he would earn more money than the interest rate so it

10 would be a good idea to use the line of credit and give it to

11 him to invest.

12 Q    And did he talk to you about moving the line of credit

13 from PNC to anywhere else?

14 A    Yes, he did.  He didn't talk about it.  He insisted.

15 Q    Where did he suggest that you move it?

16 A    To Nova Bank.

17 Q    And what did he -- how did he describe his relationship

18 with Nova Bank at that time?

19 A    That he owned it.

20 Q    Did he talk to you about what influence he had over Nova

21 Bank at that time?

22 A    He said on many occasions that he controlled the bank.

23 Q    Did you move your line of credit?

24 A    Yes, I did.

25 Q    And did that line of credit stay open at Nova through 2009

Musser - Direct/Ignall                    50

1 or later?

2 A    Yes, it did.

3 Q    Did Mr. Bekkedam ever tell you what official role he had

4 at the bank?

5 A    Yes, he did.  He said he was the chairman.

6 Q    At some point did he tell you whether he stopped being the

7 chairman?

8 A    Many years later he mentioned in passing that he was no

9 longer the chairman for this or that reason but that he still

10 controlled the bank so it didn't matter.

11 Q    Going to about 2008 or 2009 did Mr. Bekkedam ever suggest

12 to you that you invest in Nova Bank itself?

13 A    He had asked me to invest in Nova Bank, yes.

14 Q    And did Mr. Bekkedam talk about whether or not he was

15 raising money from other investors into Nova Bank?

16 A    Yes, he did.

17 Q    And what did he say about that?

18 A    That he needed to raise capital for the bank to prop it up

19 so that the deposits were big enough so that he could receive

20 the TARP funds.

21 Q    Did he tell you what the TARP funds meant?

22 A    Well, I didn't know what that meant either so he did

23 explain it to me.

24 Q    As best you recall, how did he explain what the TARP funds

25 meant?

1 A    Government assisted money to help keep the bank running,

2 that there were funds available for banks to keep them going.

3 Q    Did he say whether there's anything that he needed to do

4 in order to get that funding?

5 A    Yeah, he needed to get the assets of the bank up to a

6 certain level, therefore, he was looking for investors in the

7 bank and looking at me and other Ballamor clients to put money

8 in.

9 Q    Did he ever say anything about whether or not there were

10 any deadlines to meet with respect to this TARP funding?

11 A    Yes, he did.

12 Q    And what did he say?

13 A    Well, I know that at the time he was on a short leash.  It

14 was a matter of a couple of months or a few weeks.  It

15 depended.  He talked to me about it several times so the time

16 frame changed as he got closer.

17 Q    And did he ever talk to you about whether or not there

18 were any government requirements in particular that the bank

19 had to meet?

20 A    Yes.

21 Q    And what did he say about that?

22 A    As best I can recall, balance between the assets and the

23 bank and the amount of money they were getting.  Not being in

24 the banking industry, I'm not sure I totally understand it but

25 I do recall specifically him saying that the balance sheet had

1  to look at certain way for them to receive the funds.

2  Q    Did you ever invest in Nova Bank?

3  A    I did not.

4  Q    Have you ever heard of someone named George Levin?

5  A    I have.

6  Q    Let me back up.  Did Mr. Bekkedam ever say whether other

7  Ballamor clients were investing in Nova Bank?

8  A    Yes, he did.

9  Q    Have you ever heard of someone named George Levin?

10  A    Yes, I have.

11  Q    And from whom did you first hear about George Levin?

12  A    Mr. Bekkedam.

13  Q    And what business did you understand Mr. Levin to be

14  involved in?

15  A    He was described as a wealthy investor who had started

16  some kind of a fund that was investing in legal settlements.

17  Q    Do you remember the name of that fund?

18  A    I do.

19  Q    And what was the name of that fund?

20  A    The Banyon Income Fund.

21  Q    And did you speak to Mr. Bekkedam about the Banyon Income

22  Fund?

23  A    Yes, I did.

24  Q    And did he recommend that you invest in that?

25  A    More than once.

1 Q    Not the specifics, did you end up investing in the Banyon

2 Income Fund?

3 A    Yes.

4 Q    Did you ever learn whether Mr. Levin had any relationship

5 with Nova Bank?

6 A    Yes, I did.

7 Q    And did you ever discuss that with Mr. Bekkedam?

8 A    Yes, I did.

9 Q    And what is it you discussed with Mr. Bekkedam?

10 A    He said that George Levin was making a sizable investment,

11 $5 million, in the bank and that was going to I believe get

12 them to the goal line of being propped up enough to get their

13 TARP funds.

14 Q    Who used, if anyone, the term propped up?

15 A    He did.

16 Q    And how did he say that?  How did that come up?

17 A    Propped up --

18 Q    Okay.

19 A    -- in the context of the conversation that this money

20 needed to come into the bank to put up the balance sheet, prop

21 up the balance sheet to be at a number that was whatever number

22 you had to reach in order to get these government-assisted

23 funds.

24 Q    Did he ever talk to you about why Mr. Levin was doing

25 this?

1  A      To help him because they were good friends.

2  Q      And at some point did you learn whether or not Mr. Levin

3  had a borrowing relationship with the bank?

4  A      I do not believe that Barry personally told me but I read

5  it at a later date.

6  Q      And did you discuss that with Mr. Bekkedam after you read

7  that?

8  A      I did.

9  Q      And tell us about that discussion.

10 Q      It was in one of the documents for the Banyon Income Fund

11 and I called him because it looked -- it was --

12             MR. ENGLE:  Objection, Your Honor.  The witness --

13             THE COURT:  Sustained.

14             MR. ENGLE:  Thank you.

15 Q      Did you have a discussion with Mr. Bekkedam about Mr.

16 Levin borrowing money from the bank?

17 A      Yes.

18 Q      And what did you discuss with Mr. Bekkedam about Mr. Levin

19 borrowing the money?

20 A      I asked him why.

21 Q      And what did he say?

22 A      That this was the transaction he did in order to get the

23 TARP funds.

24             MR. IGNALL:  May I have one moment, Your Honor?

25             THE COURT:  Yes.

1          MR. IGNALL:  Nothing further.  Thank you.

2                    CROSS EXAMINATION

3 BY MR. SCHWARTZ:

4 Q    Good afternoon, Ms. Musser.

5 A    Good afternoon.

6 Q    All right, today you are telling us that -- first off all,

7 you never invested any money in Nova Bank, is that correct?

8 You never bought any stock?

9 A    No, but my ex-husband did.

10 Q    He bought it in 2002 when the bank was formed through

11 Ballamor?

12 A    I don't recall the year.

13 Q    Did you personally ever buy any stock in Nova Bank?

14 A    No, I did not.

15 Q    Okay, and you wouldn't buy stock in Nova Bank because you

16 weren't going to invest in a bank that was lending money to

17 you, is that correct?

18 A    Well, there were several reasons why I didn't.

19 Q    And one of the reasons that you didn't invest in Nova Bank

20 is that you were borrowing money from Nova Bank and you weren't

21 ever going to invest in a bank that you were borrowing money

22 from, is that fair to say?

23 A    The main reason I didn't invest is because my ex-husband

24 told me not to.

25 Q    Ma'am, did you not invest in Nova Bank because you weren't

1  going to invest in a bank that was already lending you money?

2  A    Well, I'm sure that was one of the things that passed

3  through my mind but it wasn't the main reason.

4  Q    Well, it was one of the things you told the federal agents

5  when they met with you in October of 2015, isn't that correct?

6  A    I just said it was one of the reasons but there were many

7  reasons.

8  Q    The only reason that you told the federal agents about why

9  you didn't invest in Nova Bank is that you were not going to

10 invest in a bank that was going to lend you money, that was

11 lending you money?

12 A    Well, that is one of the reasons.  I'm answering your

13 question.

14 Q    And that's the only reason you told the federal agents

15 when they interviewed you, is that correct?

16 A    I don't recall every word that I said on an interview many

17 years ago but that would have been one of my reasons, correct.

18 A    All right, and now today you're saying that even though

19 you didn't invest in the bank, today you're saying that Barry

20 Bekkedam talked to you about investing in the bank, is that

21 right?

22 A    (No audible response).

23 Q    It's your testimony that he asked you to invest in Nova

24 because he needed to raise capital in order to meet the TARP

25 fund requirements, is that it?

1 A    Well, not only did he ask me to invest in the bank, but I

2 received all of his information as all his other clients did

3 about investing in the bank.

4 Q    Well, I'm not asking what all the other clients did,

5 ma'am.  I'm asking you did Barry Bekkedam speak -- your

6 testimony today is that Barry Bekkedam spoke to you about

7 investing in Nova Bank, is that correct?

8 A    He asked me if I wanted to invest, yes.

9 Q    Okay.  Now, back in 2012 you had a meeting in Philadelphia

10 with your lawyer present and prosecutors and a number of

11 federal agents, is that correct, ma'am?

12 A    In 2012?

13 Q    Yeah.  You and your lawyer, Mr. Coren --

14 A    Yes.

15 Q    -- came to Philadelphia and you met with a number of law

16 enforcement agents and a prosecutor named David Axelrod, is

17 that correct?

18 A    So there were about 12 people in the room four years ago.

19 If David Axelrod was one of them, then I'm sure you seem to

20 know, but I don't recall his name.

21 Q    So there were federal law enforcement agents there, yes?

22 A    Yes.

23 Q    Okay, your lawyer, Steve Coren, was there?

24 A    Yes.

25 Q    And some lawyers from the Government were there, is that

1  correct?

2  A    I believe so.  There were a lot of government people in

3  the room.  I don't have a list of who they are, their cards.

4  Q    Okay, so there were government lawyers in the room, there

5  were government agents in the room and it was your lawyer in

6  the room, is that right?

7  A    Yes.

8  Q    Okay, and you came in and you sat down with them in a room

9  and they started asking you a bunch of questions, is that fair

10 to say?  They started interviewing you about Mr. Bekkedam and

11 your dealings with Mr. Bekkedam and Ballamor Capital, is that

12 fair to say?

13 A    Yes.

14 Q    Okay, and during that interview some of the agents were

15 taking notes, is that correct?

16 A    I don't recall.

17        MR. IGNALL:  Objection.

18        THE COURT:  Answered.  She does not recall.

19 Q    And during that interview you very clearly said to the

20 government people in the room that Mr. Bekkedam never tried to

21 get you to invest in Nova Bank, isn't that what you said to

22 them?

23 A    I have no recollection of saying that Mr. Bekkedam never

24 tried to get me to invest in Nova Bank.  That's a different

25 question than did he ever speak to me about it.

Musser - Cross/Schwartz                          59

1 Q    Well, so my question is is did you tell the government
2 agents and the people in the room that Mr. Bekkedam never tried
3 to get you to invest in Nova Bank?
4 A    He never pushed Nova Bank on me, but he did speak to me
5 about it.  There is a difference.
6 Q    Did he ever try to get you to invest in Nova Bank?
7 A    He asked me in the very beginning and I said no.
8 Q    In the very beginning of what, ma'am?
9 A    When he was first raising money for the bank.
10 Q    And so you're saying when he was first raising money for
11 the bank, was that in 2005, 2006, 2007?  When was that?
12 A    I have no idea.  I had about 20 different investments with
13 Mr. Bekkedam through Ballamor Capital Management.  I was never
14 in any deep discussions with him about anything because he had
15 discretion over everything.  He didn't push Nova Bank on me.  I
16 don't know why.  But we did discuss it.  He didn't push Nova
17 Bank like he pushed the other investments.  I --
18        THE COURT:  Counsel, next question please.
19 Q    So noted.  Ma'am, was it in 2005 when you first started
20 investing with him?  Is that when he offered -- asked you to
21 invest in Nova Bank?
22 A    No, not that early, no.
23 Q    Was it in the year after?  When would you say that was?
24 A    Somewhere during the period of years that I was with him.
25 It's 2016, sir.

1 Q    I understand that, ma'am, and what I'm asking as best as

2 you understand, as best as you remember when was it that Mr.

3 Bekkedam asked you to invest in Nova Bank?

4 A    I am under oath.  I am answering your questions as well as

5 I can recall and with complete candor.  I do not recall the

6 year.  It was somewhere after 2005 and prior to the time that I

7 was no longer a client and I don't even know exactly what year

8 that was.

9 Q    All right, and in 2012 when you met with the government

10 agents with your lawyer in the room and the government lawyers,

11 you told them that Mr. Bekkedam never tried to get you to

12 invest in Nova Bank, is that correct?

13 A    He asked me.  The answer was no.  He didn't push it.

14 There is a difference.  If you want to try --

15 Q    All right.

16        THE COURT:  Ma'am, ma'am, just a moment please.  Next

17 question please, counsel.

18 Q    All right, now, ma'am, you said that there was talk about

19 a Mr. Levin, is that correct?

20 A    Yes.

21 Q    Okay, Mr. Levin was a person who was a wealthy investor

22 who was involved in Banyon, is that correct?

23 A    Banyon?

24 Q    Banyon.  You were involved in an investment with Mr.

25 Levin?

Musser - Cross/Schwartz                        61

1  A    Are you asking me about the Banyon Income Fund?

2  Q    No, I'm asking you about whether Mr. Levin started a fund

3  called Banyon that you were recommended to invest in and that

4  you invested in, was that your --

5  A    What's your question?  Please clarify.

6  Q    Was it your testimony earlier, ma'am, that you were told

7  by Mr. Bekkedam about a man named Mr. Levin who had started a

8  fund called Banyon and that Mr. Bekkedam recommended that you

9  invest in it?

10 A    I want to clear up your record.  It's the Banyon Income

11 Fund.  And yes, he did tell me about Mr. Levin and he did ask

12 me to invest in it.

13 Q    And Mr. Levin asked you -- Mr. Bekkedam asked you to

14 invest in the Banyon Income Fund, the fund that Mr. Levin was

15 running, is that correct?

16 A    Correct.

17 Q    Okay, and that's when he told you all about who Mr. Levin

18 was, is that fair to say?

19 A    Yes.

20 Q    And it was the Levin investment that he was trying to get

21 you to invest in 2009, is that fair to say?

22 A    At that time, yes.

23 Q    Okay, that's what he was talking to you about?

24 A    Well, there were many others during that same period of

25 time, not just the Banyon Income Fund.

1 Q    But with regard to Mr. Levin, the conversations you had

2 with Mr. Bekkedam about Mr. Levin pertained to the Banyon

3 Income Fund, is that fair to say?

4 A    In terms of my investing, yes.

5 Q    Okay, that's why you talked to Mr. Bekkedam about Mr.

6 Levin?

7 A    Yes.

8 Q    Okay.

9         MR. SCHWARTZ:  Could I have a moment, Your Honor?

10        THE COURT:  Yes, sir.

11 Q    Ma'am, you've met with federal agents and federal

12 government lawyers a number of times over the last couple of

13 years, is that fair to say?

14 A    Yes.

15 Q    One time they came to your home and spoke to FBI agents,

16 is that right?

17 A    Yes.

18 Q    Okay, and then in 2012 you and Mr. Coren came and met them

19 in Philadelphia, is that right?

20 A    I don't recall the year, but yes.

21 Q    Okay, and then twice last year, first in May of 2015 and

22 then in October 2015 you met with government agents and talked

23 about Mr. Bekkedam, is that fair to say?

24 A    I can't clarify the months but I have met with them on

25 multiple occasions, yes.

1 Q    Okay, you met with them on multiple occasions.  And you

2 met with government agents and Mr. Ignall just a couple of

3 weeks ago on the 15th of this month or the 15th of last month,

4 is that fair to say?

5 A    I did not meet with Mr. Ignall on the 15th of the month.

6 I met with other agents, not him.

7 Q    You met -- you didn't -- so on the 15th of this month you

8 did not meet with either of the two prosecutors behind me, Mr.

9 Ignall or Ms. Barry?

10          MR. IGNALL:  Your Honor, may we approach?

11          THE COURT:  Sustained.  I would ask that you, please.

12                    (At Sidebar)

13          MR. IGNALL:  All right.  Inappropriate, too.  I

14 didn't say anything in person to Mr. Axelrod because he's not

15 at the government table, anything appropriate to bring

16 government attorneys into this about a meeting.  I always ask

17 if agents have been involved because I don't want that Ms.

18 Barry or I would be a witness.  I don't want the jury to get

19 the idea that we're vouching for a witness.  I don't want the

20 jury to get the idea that we're somehow covering up something

21 that we knew and didn't ask the witness anything appropriate to

22 mention about attorneys -- did you ask if the government asked

23 you this, did you say that?  Perfectly permissible.

24          MR. SCHWARTZ:  I'm asking about a fact.  The

25 Government produced an MOI that said Mr. Axelrod, I'm sorry,

1 Mr. Ignall and Ms. Barry had a teleconference, my mistake, had

2 a teleconference with Ms. Musser on March 15th, 2016.  That's a

3 fact.  I'm not guessing.  I'm not fishing.

4           UNIDENTIFIED SPEAKER:  Didn't we have a

5 teleconference?

6           MR. IGNALL:  The agents were in Florida.  Ms. Barry

7 and I were in Philadelphia on the phone.  I'm not quarreling

8 the accuracy of us being there.  I think it's inappropriate to

9 raise to the jury that were there because that puts us in your

10 situation of vouching for the witness because now we're aware

11 of what her prior inconsistent statements or prior inconsistent

12 statement might have been or it puts in the position of looking

13 like we're intentionally putting something incorrect in front

14 of the jury.

15           THE COURT:  And your question was?

16           MR. SCHWARTZ:  My question was did she -- actually, I

17 said meet with and I should have said spoke with -- did she

18 speak with two prosecutors and a number of agents on March

19 15th, 2016 which is true and I have a good faith basis to ask

20 it.

21           THE COURT:  Where are you going with this?

22           MR. SCHWARTZ:  I'm going to ask her whether she ever

23 told them at that time that Mr. Levin was promoted as a reason

24 to invest in TARP, that he was putting money into TARP because

25 it's not there.

1          THE COURT:  Well, let me say this to you, that when

2  she says, I don't what I said to -- with this document or when

3  she even mentioned the document and said, I believe she didn't

4  recall seeing it.  She hadn't been called.  But you have not

5  laid a foundation to get her to even say this is why I said

6  it's in writing at this point in time.  And to suggest to her

7  that you're cross examining her from a document that she hasn't

8  even adopted is improper.  If you want to ask her whether or

9  not she spoke with them, she can say yes or no and I agree with

10  counsel for the Government.  It's easier as long as it's not

11  going to trip you up or undermine your case.  Just simply say

12  did you speak to the government investigators about this and

13  ask her is that the way that you're asking her the question,

14  not looking at the paper to impeach her with it; that's

15  improper.

16          MR. SCHWARTZ:  Very well, Your Honor.

17          THE COURT:  All right?

18          MR. SCHWARTZ:  All right.

19          MR. IGNALL:  Thank you, Your Honor.

20          MR. SCHWARTZ:  Thank you.

21              (Conclusion of Sidebar)

22          MR. SCHWARTZ:  May I proceed, Your Honor?

23          THE COURT:  You may proceed.

24  Q     Are you ready, ma'am?

25  A     Yes.

1 Q    Okay, great.  March 15th, 2016 you spoke to some

2 representatives of the government, some agents and some

3 lawyers, is that correct?

4 A    It was a couple of weeks ago.

5 Q    Yeah.

6 A    I don't remember the exact date.

7 Q    And at that time you did not tell the agents or lawyers

8 that Mr. Levin had invested money in TARP, did you?

9 A    Excuse me?

10 Q    I'm sorry, I'll rephrase that.

11 A    I don't think that's a correct statement.

12 Q    I'm going to ask another question.

13 A    Mr. Levin invested in TARP.

14 Q    Okay, I'm going to ask another question instead, okay,

15 ma'am?  When you spoke to the agents and the lawyers on March

16 15th, you made no mention of the fact that Mr. Bekkedam had

17 told you that Mr. Levin had invested $5 million in the bank for

18 the purpose of propping up the bank to get TARP funds, you did

19 not tell them that at that time, did you, ma'am?

20 A    Excuse me?

21 Q    When you spoke to the agents and the lawyers on the phone

22 on March 15th, 2016, you did not tell them that Mr. Bekkedam

23 had told you about Mr. Levin investing in Nova for the purpose

24 of TARP, did you?

25 A    I had many conversations with them over the last five

1  years that this has been going on verifying that statement over

2  and over again.

3  Q    So are you telling us that every time you spoke to the

4  agents when they came and met with you, you told them that Mr.

5  Bekkedam promoted the Nova TARP investment by telling you that

6  Mr. Levin was also investing in Nova for the purpose of TARP?

7  A    If they asked me that question, yes, that is the way I

8  answered it each time.

9  Q    Each time.

10 A    With them directly.

11 Q    And so when you met with them in -- at your home a couple

12 of years ago, your testimony is is that you told the agents

13 that Mr. Bekkedam talked to you about investing in Nova and

14 used the fact that Mr. Levin was investing in Nova as a reason

15 to induce you to invest in Nova, is that what you're saying?

16           MR. IGNALL:  Objection.  I don't think that's what

17 the witness' testimony was.  May we approach again, Your Honor?

18           THE COURT:  Surely.

19                     (At Sidebar)

20           MR. SCHWARTZ:  I can simplify the questions, Your

21 Honor, I'm sorry.

22           THE COURT:  My recollection is that she said if they

23 asked me -- let me hear --

24           MR. IGNALL:  That's where I'm going.  There are two

25 things I'm concerned about.  One, I don't think it's

1 appropriate to mention government attorneys being there.  That

2 again brings us back into government attorneys being witnesses

3 which I think is inappropriate.  But moreover, this is not an

4 appropriate impeachment.  If the impeachment is on this date

5 you told them X but you're saying you didn't tell them this on

6 the date, that leaves a misleading impression because she met

7 with the Government a number of times.  And the Court said you

8 didn't say it on this day.

9        MR. SCHWARTZ:  All right, I'll ask one each day.

10 Will that be permissible?

11        MR. IGNALL:  I don't think that's appropriate.

12        THE COURT:  But she even said, I don't have a

13 specific recollection and says if they asked, that's what I

14 would have told them.  To ask her on each individual date when

15 she's already said I don't have any opinion on any of these

16 days, there were so many and so long ago so I won't allow you

17 to ask it that way.

18        UNIDENTIFIED SPEAKER:  The jury is asking that Mr.

19 Schwartz speak up with his questions.  They're struggling with

20 hear him.

21        MR. SCHWARTZ:  Okay, thank you.

22        THE COURT:  Mr. Schwartz, the jury has indicated that

23 you're almost inaudible when you're asking your questions.

24 Please speak up.

25        MR. SCHWARTZ:  Okay, thank you, Your Honor.

1               (Conclusion of Sidebar)

2          THE COURT:  You may proceed.

3 Q    Ma'am, is it your testimony that at some time during the

4 various interviews you had with government agents over the

5 years that you told them that Mr. Bekkedam talked to you about

6 Nova trying to get TARP funds and that Mr. Levin was investing

7 with Nova to get TARP funds as well?  Is that your testimony?

8 A    I don't think you said it quite right, but could you

9 clarify exactly what your question is?  You've asked me just

10 three questions in one.

11 Q    Okay.  You've spoken to the agents a number of times about

12 this matter, is that fair to say?

13 A    Correct.

14 Q    Okay, at least four times?

15 A    A number of times.

16 Q    Okay, and during one of those times is your testimony that

17 during one or more of those times you told them that Mr.

18 Bekkedam talked to you about investing in Nova, is that right?

19 A    Correct.  That does not include a conversation about TARP

20 funds at the time.

21 Q    We'll get to that in a second.

22 A    Thank you.

23 Q    So --

24 A    Yes, I know he asked me to invest in Nova because I then

25 proceeded to call Pete Musser who I was -- I don't know if I

1  was divorced yet, and asked him if I should and he said no.  So

2  I know for sure that I was asked, sir.

3  Q    You were asked by government agents about -- you were

4  asked by -- I'm sorry.  When you met with government agents,

5  you told them that Mr. Bekkedam asked you to invest in Nova for

6  the purposes of TARP?

7  A    No, I didn't say that.

8  Q    Well --

9  A    You're mixing up the conversations and I'm not going to

10  allow you to do it.

11  Q    Ma'am, when you met with the government agents, at any

12  time did you tell them that Mr. Bekkedam tried to get you to

13  invest in Nova for the purpose of raising money -- for the

14  purpose of obtaining TARP funds?

15  A    That is not what I said.

16  Q    So the answer is no?

17  A    I didn't say he tied my investing in Nova for the purpose

18  of TARP funds.  I said he told me Mr. Levin invested in Nova as

19  a favor as his friend for the purposes of propping up the bank

20  so that the bank could get the bank funds.  That had nothing to

21  do with him asking me to invest in Nova.  You're tying the two

22  together and that's not the way it happened.

23  Q    So is it your testimony that you told the federal agents

24  during one or more of your meetings with them that Mr. Bekkedam

25  told you that Mr. Levin was investing in Nova for the purpose

1 of getting TARP funds?

2 A    Correct.

3 Q    Okay, thank you, ma'am.

4         MR. SCHWARTZ:  May I step back, Your Honor?

5         THE COURT:  Surely.

6         MR. SCHWARTZ:  Nothing further at this time, Your

7 Honor.

8         THE WITNESS:  Thank you.  One more round.

9                    CROSS EXAMINATION

10 BY MR. FULLER:

11 Q    Good afternoon, Ms. Musser.

12 A    Good afternoon.

13 Q    Just a couple of questions.

14 Prior to 2011 you had never met Mr. Hartline, is that correct?

15 A    I don't think I met him in 2011 either, but --

16 Q    So after 2011 or --

17 A    I don't remember when but I never met him when I was a

18 client of the bank.

19 Q    Fair enough.  So it would follow that -- and you've never

20 spoken with him during any of that period while you were a

21 client of the bank?

22 A    Not that I recall, no.

23 Q    So it follows that Mr. Hartline was not present for any of

24 the conversations we've been discussing in which Mr. Bekkedam

25 discussed investing in Nova Bank, is that correct?

1  A      No, he was not.

2  Q      And I think we've been over this but you never invested in

3  Nova Bank, is that correct?

4  A      Personally, no.

5           MR. FULLER:  Nothing further, Your Honor.

6           MR. IGNALL:  No redirect, Your Honor.

7           THE COURT:  Thank you, ma'am.  You may step down.

8  Watch your step please.

9           THE WITNESS:  Thank you.

10                      * * * * *

11              **C E R T I F I C A T I O N**

12           We, LORI AULETTA and MARY POLITO, THE court approved

13  transcribers, certify that the foregoing is a correct

14  transcript from the official electronic sound recording of the

15  proceedings in the above-entitled matter.

16

17  **Lori Auletta**  Digitally signed by Lori Auletta
                      DN: cn=Lori Auletta, o, ou,
                      email=dianadoman@comcast.net,
                      c=US
                      Date: 2016.04.08 15:45:52 -04'00'

18  LORI AULETTA

19

20  **Mary Polito**  Digitally signed by Mary Polito
                     DN: cn=Mary Polito, o, ou,
                     email=dianadoman@comcast.net, c=US
                     Date: 2016.04.08 15:46:00 -04'00'

21  MARY POLITO

22  DIANA DOMAN TRANSCRIBING, LLC       DATE:  April 8, 2016

23

24

25

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

```
UNITED STATES OF AMERICA    )    14-CR-0548
                            )
        vs.                 )
                            )
BRIAN HARTLINE and          )
BARRY BEKKEDAM,             )
                            )    Philadelphia, PA
                            )    April 6, 2016
                Defendants. )    10:05 a.m.
```

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE C. DARNELL JONES, II
UNITED STATES DISTRICT JUDGE AND JURY

APPEARANCES:

For the Government:          DAVID J. IGNALL, ESQUIRE
                             JENNIFER CHUN BARRY, ESQUIRE
                             ASSISTANT UNITED STATES ATTORNEY
                             UNITED STATES ATTORNEY'S OFFICE
                             615 Chestnut Street, Suite 1250
                             Philadelphia, PA 19106

For the Defendant            PATRICK J. EGAN, ESQUIRE
Brian Hartline:              FOX ROTHSCHILD LLP
                             2000 Market Street, 10th Floor
                             Philadelphia, PA 19107

                             JOHN C. FULLER, ESQUIRE
                             FOX ROTHSCHILD LLP
                             2000 MARKET ST 20TH FL
                             PHILADELPHIA, PA 19103

For the Defendant            MICHAEL J. ENGLE, ESQUIRE
Barry Bekkedam:              GREENBLATT, PIERCE, ENGLE,
                             FUNT & FLORES
                             123 South Broad Street, Suite 2500
                             Philadelphia, PA 19109

Audio Operator:              CARL HAUGER

Transcribed by:              DIANA DOMAN TRANSCRIBING, LLC
                             P.O. Box 129
                             Gibbsboro, NJ 08026
                             Office: (856) 435-7172
                             Fax:    (856) 435-7124
                             Email:  dianadoman@comcast.net

Proceedings recorded by electronic sound recording; transcript
produced by transcription service.

```
APPEARANCES (Cont'd):

For the Defendant          RUSSELL D. DUNCAN, ESQUIRE
Barry Bekkedam:            SHULMAN, ROGERS, GANDAL, PORDY &
                           ECKER, PA
                           12505 Park Potomac Avenue
                           Potomac, MD 20854

                           JOEL D. SCHWARTZ, ESQUIRE
                           SHULMAN ROGERS GANDAL PORDY ECKER
                           12505 PARK POTOMAC AVE 6TH FL
                           POTOMAC, MD 20854

                                 -  -  -
```

<u>I N D E X</u>

<u>WITNESSES FOR THE GOVERNMENT:</u>                                    <u>PAGE</u>

GEORGE LEVIN

  Cross Examination by Mr. Egan                                 5

  Redirect Examination by Mr. Ignall                          23

  Recross Examination by Mr. Egan                             51

  Recross Examination by Mr. Duncan                           56

  Further Redirect Examination by Mr. Ignall                  62

  Further Recross by Mr. Egan                                 62

GEORGE G. LEVIN (Outside the presence of the Jury)

  Direct Examination by Mr. Ignall                            38

  Cross Examination by Mr. Egan                               39

  Cross Examination by Mr. Duncan                             40

WILLIAM SAYRE

  Direct Examination by Ms. Barry                             76

  Cross Examination by Mr. Egan                               91

  Cross Examination by Mr. Engle                              99

  Redirect Examination by Ms. Barry                          101

GLENN ALLEN FUIR

  Direct Examination by Ms. Barry                            102

  Cross Examination by Mr. Egan                              114

  Cross Examination by Ms. Shealy                            127

JEFFREY THOMAS HANUSCIN

  Direct Examination by Ms. Barry                            130

4

I N D E X (Cont'd)

PAGE

| EXHIBITS | | ID. | EVD. |
|---|---|---|---|
| Government 67 | Documents | -- | 82 |
| Government 67(a) | Documents | -- | 82 |
| Government 18 | Outline of Stock Loan Program | -- | 90 |
| Government 32 | Letter | -- | 107 |
| Government 33 | E-mail | -- | 110 |
| Government 60 | 7/15/09 Letter | -- | 112 |
| Government 6(a) | E-mail to Mr. Gaunt | -- | 133 |
| Government 116 | E-mail from Mrs. Schwartz | -- | 149 |

1          (The following are the requested excerpted portions of

2                              the proceedings.)

3              MR. EGAN:  Everybody's back whenever you're ready,

4      Your Honor.

5              THE COURT:  Okay.  Are we ready?

6              UNIDENTIFIED ATTORNEY:  Yes, Your Honor.

7              UNIDENTIFIED ATTORNEY:  Yes, Your Honor.

8              UNIDENTIFIED ATTORNEY:  Yes, Your Honor.  Thank you.

9              MR. IGNALL:  Should we bring the witness back in,

10     Your Honor?

11             THE COURT:  Please.  Thank you.

12              GEORGE LEVIN, WITNESS, PREVIOUSLY SWORN

13             THE COURT:  Ready?  All right.  Good morning, sir.

14             COURTROOM DEPUTY:  All rise.  Court is now in

15     session, the Honorable C. Darnell Jones, II presiding.

16                              (Jury in)

17             THE COURT:  Good morning.

18             THE JURY:  Good morning.

19             THE COURT:  You may be seated.  Counsel, you may

20     proceed.

21             MR. EGAN:  Thank you, Your Honor.  Good morning.

22                          CROSS EXAMINATION

23     BY MR. EGAN:

24     Q    Good morning, Mr. Levin.

25     A    Good morning.

1    Q    Levin (pronouncing), sorry.  Hope you had a nice night

2    last night.  Thanks for coming back.

3    A    My pleasure.

4    Q    Thank you.  Thank you.

5              MR. EGAN:  Sir, could we have on the screen just for

6    the witness Government's Exhibit 67, please?

7    Q    Mr. Levin, I'd like you to look at Government's Exhibit

8    67, states at the top this is an addendum to a personal

9    financial statement, it says the applicant's name is George G.

10   Levin, is that you?

11   A    Yes.

12   Q    And if you look down at the bottom of the page in the

13   lower lefthand corner there's a signature, that's your

14   signature, correct?

15   A    Yes.

16   Q    And if you look at -- if you go to the second page,

17   please, the second page has a personal financial statements of

18   George G. Levin and Gayla Sue Levin as of March 31, 2009,

19   again, is that your signature, sir?

20   A    Yes.

21   Q    And is that your wife's signature below it?

22   A    Yes.

23   Q    Sir, if you look to the lower right-hand corner there

24   seems to be some initials, those are your initials, aren't

25   they?

1    A    I don't know.  It looks like it, but I don't -- I'm not

2    sure.

3    Q    But if you look at it, if you could go -- just scroll

4    through the pages --

5    A    Sure.

6    Q    -- Pages 3, 4, 5, 6 through 12, you see in the lower

7    lefthand corner or maybe it's the upper right-hand corner on

8    what you're looking at, the signature?

9    A    Yeah, it looks like mine.

10   Q    Your initials?

11   A    Yes.

12   Q    So you initialed each one of the financial statements

13   confirming that you had read them and they were correct?

14   A    I would do that, yes.

15   Q    And that was as of March 31st, 2009, correct?

16   A    Yes.

17   Q    Thank you.

18        MR. EGAN:  If we could go to Government's Exhibit

19   89, please.  Okay.

20   Q    Do you see Government's Exhibit 89?

21   A    Yes.

22   Q    Government's Exhibit 89 is an e-mail from Ms. Hartline to

23   Mr. Preve and it has some information there about the G. Levin

24   revised biographical and financial report PDF as of September

25   20th, 2009, do you see that, sir?

1    A    Yes.

2    Q    And could you go to the second page, please?  Sir, what's

3    -- the second page is a letter from George G. Levin on your

4    stationery dated September 18th, 2009, is that correct?

5    A    Yes.

6    Q    And then there's a -- there's text in the letter and then

7    at the bottom of the letter there's your signature, correct?

8    A    Yes.

9    Q    And this was information that you were providing as a

10   supplement to the Government regulators at the Federal Reserve

11   Board and at the Pennsylvania Department of Banking regarding

12   the change in control application, correct?

13   A    Yes.

14   Q    And what you're telling them is about that classic cars

15   -- that kit car thing, right?

16   A    Yes.

17   Q    Everything you say in this letter is true, correct?

18   A    Yes.

19   Q    So as of -- and this letter's dated, if we go back to the

20   top, please -- this letter is dated September 18th, 2009?

21   A    Yes.

22   Q    Sir, we saw yesterday there were some e-mails between you

23   and Mr. Preve in which you expressed some reluctance, some

24   unhappiness with the fact that you were making this investment

25   in Nova, correct?

1    A    Yes.

2    Q    But this letter is September 18th, 2009, after those

3    e-mails with Mr. Preve, in which you're still committing to

4    make the investment, correct, sir?

5    A    This was -- we had made the investment already in June

6    and we were just following through with what we had said.

7    Q    This was your commitment to provide the other 13 million,

8    assuming that the change in control application was granted by

9    the Federal Reserve Board and by the Pennsylvania Department

10   of Banking, correct?

11   A    We were going through it, yes.

12            MR. EGAN:  The Court's indulgence just for a moment.

13            THE COURT:  Yes, sir.

14   Q    Now, if you could go to Government's Exhibit 100, please.

15   Government's Exhibit 100 is also a letter, isn't it, Mr.

16   Levin?

17   A    Yes.

18   Q    And it's a letter addressed to you, correct?

19   A    Yes.

20   Q    That's you, George --

21   A    Gerson (phonetic) Levin.

22   Q    -- Gerson  Levin.  Thank you, Mr. Levin.  And that's your

23   home city address, Fort Lauderdale, Florida?

24   A    Yes.

25   Q    And the date of the letter is October 19th, 2009,

1    correct?

2    A    Yes.

3         MR. EGAN:  And if we go down into the text of the

4    letter, please.  Actually, if you go just up just to the re

5    (sic) line, please.

6    Q    Sir, this is a notification to George Gerson Levin with

7    respect to your request to acquire up to 24.2 percent of the

8    shares of Nova Financial Holdings in Berwyn, Pennsylvania,

9    correct?

10   A    Yes.

11   Q    This is pursuant to the bank Change in Control Act,

12   correct?

13   A    Yes.

14   Q    This is the letter responding to your application to be

15   allowed to be a participant in the change in control process

16   at Nova Bank, correct?

17   A    Yes.

18   Q    And what the letter says --

19        MR. EGAN:  If you go to the first paragraph, please.

20   Q    What the letter says is good news, we're not going to

21   oppose your purchase of this stock, correct?

22   A    Yes.

23   Q    So now at this point the Federal Reserve Board has said

24   -- the Federal Reserve Bank has said that you're okay to go

25   forward with the rest of your $13 million investment, correct?

1   A    Correct.

2              MR. EGAN:  Now, if you'd go to Government's Exhibit

3   100(a).

4   Q    This is also a letter dated October 19th, 2009, this is

5   from the Pennsylvania Department of Banking and again it's

6   addressed to you, right, Mr. Levin?

7   A    Yes.

8   Q    And this again is with respect to your application, this

9   is the state's approval of you becoming a change in control

10  person at Nova Bank, correct?

11  A    Yes.

12  Q    So these are the approvals you and Mr. Preve were hoping

13  not to get, correct?

14  A    That's not correct at all.

15  Q    Okay.  You were hoping to be able to make the rest of

16  your investment, correct?

17  A    We were negotiating all during this time with Mr.

18  Hartline and Barry, certain things that were untenable to me,

19  but we had just kept moving forward.  In fact, I kept moving

20  forward with the bank until the very end, very end sometime in

21  2010.  I kept paying interest on the loans and everything

22  else.

23  Q    You were keeping your commitment, correct?

24  A    Yes.

25  Q    Okay.  Sir, you know that at this point you're under an

1    obligation to put $13 million into the bank, correct?

2    A    Yes.

3    Q    Now, Mr. Preve had told you as part of this process that

4    there had been a TARP approval contingent on a $10 million

5    infusion of capital, correct?

6    A    I'm not sure exactly how much it was.  I know there was a

7    TARP approval.

8    Q    Okay.

9         MR. EGAN:  If we could go to Government's Exhibit

10   114, please, just for the witness.  Okay.  And if you could

11   blow up the text, please.

12   Q    This is an e-mail October 23rd, 2009, it's from Mr.

13   Bekkedam to Mr. Preve, and then Mr. Preve forwards it -- or

14   I'm sorry, Mr. Bekkedam then forwards it to you, correct?

15   A    Yes.

16   Q    So you got this e-mail.

17        MR. EGAN:  And if you go down into the text, let's

18   go into the second paragraph, please --  I'm sorry, the --

19   it's actually the fourth paragraph, please.  And I believe 114

20   is in evidence.

21        UNIDENTIFIED ATTORNEY:  I believe it is, Your Honor.

22        MR. EGAN:  Could we show that to the jury, please?

23        THE COURT:  Yes, sure.

24        MR. EGAN:  Thank you, Your Honor.

25   Q    So this is the email that gets forwarded to you by Mr.

1    Bekkedam in which -- it may be a little hard to follow through

2    the math, but let's just go through it for a moment.  So Mr.

3    Bekkedam writes we originally assumed we would raise $50

4    million to execute on pour plan with $18 million being

5    committed by George.  That's you, right, Mr. Levin?

6    A    Yes.

7    Q    And the 50 million plan is the -- sort of the grander

8    plan to invest in banks in Florida and other things, correct?

9    A    I would imagine so.

10   Q    And what Mr. Bekkedam is doing is he is now going through

11   what exactly is happening.  He says in the second line Nova

12   would lend George $5 million for the first amount and then he

13   writes done, because that's the $5 million loan you got from

14   Nova, correct?

15   A    Yes.

16   Q    Then he says the next amount was the $10 million and

17   that's the TARP contingency, that's the money that TARP is --

18   Treasury has said has to be put into the bank, correct?

19          MR. IGNALL:  Objection, assumes a fact not in

20   evidence.

21   Q    Well do you know whether that's what it is, sir?

22   A    I don't, no.

23   Q    Okay.  In any event, Mr. Bekkedam writes he's raised $5

24   million, done and funded, and then he says and you are going

25   to, George would then fund the next five million which needed

1    to be funded by Wednesday, correct?

2    A    Yes.

3    Q    And that's five million of the money that you have agreed

4    to invest in Nova out of the 13 million, correct?

5    A    Correct.

6    Q    And it says it needs to be funded by Wednesday.

7              MR. EGAN:  And if we could go back to the top of

8    this e-mail.

9              THE COURT:  Counsel, let me just stop you here.

10             MR. EGAN:  Sure, Your Honor.

11             THE COURT:  Ladies and gentlemen, we have some

12   students who have come to view a portion of the trial.  You

13   may continue.

14             MR. EGAN:  Thank you, Your Honor.

15   Q    Sir, so this --- the e-mail that Mr. Bekkedam sends to

16   you is dated Friday, October 23rd, 2009, correct?

17   A    Yes.

18             MR. EGAN:  So going back down to the text, please,

19   and the fourth paragraph, please.

20   Q    So Mr. Bekkedam says and George would fund the five

21   million, which needed to be funded Wednesday.  So you would

22   agree if it's Friday, October 23rd, Wednesday would be

23   Wednesday, October 21st, correct?

24   A    Say that again.

25   Q    Sure.

1   A      Twenty-third.

2   Q      Yes.

3   A      This is -- it wouldn't be -- seven days from this would

4   be the 30th.

5   Q      The previous Wednesday, which needed to be funded, past

6   tense.

7   A      Oh, I see what you're saying.  Yeah, okay.

8   Q      So that would be October 21st, correct?

9   A      Yeah.

10          MR. EGAN:  Mr. Bekkedam, if we can go down to the

11  last two lines, please.  No, I'm sorry, the last two lines in

12  the paragraph, please.  Nope.  I'm sorry, I'm confusing you.

13  The fourth paragraph, last two lines.

14  Q      So Mr. Bekkedam writes that an extension for Treasury,

15  since the deadline was Wednesday, has been asked for, but it

16  can't be clear that it's going to happen, so we need to get

17  the rest of the money in now, correct?

18  A      I don't -- it reads, it begins bank in -- two weeks and

19  the rest by early first quarter.

20  Q      Okay.

21  A      Then it goes on and it says based on the funding this

22  week we have granted 13.5 million in TARP.

23  Q      Right.  So based on the funding, being the ten million,

24  the five million Mr. Bekkedam's raised and the five million

25  you're going to be put in, based on that funding, the 13.5

1  million in TARP has been granted, correct?

2  A    That's what it says.

3  Q    Okay.

4  A    It says we have requested an extension from the Treasury,

5  but cannot guarantee that we get it.  They are bureaucrats,

6  not businesspeople.

7  Q    So it's not clear whether Treasury is going to extend the

8  deadline, but he's still asking you to put the money in now,

9  right?

10 A    I guess he is.  I'd need to read the whole thing.  This

11 is just taking a piece out of it.

12 Q    Sure.

13 A    I'd like to read the whole letter.

14 Q    Sure.  Take your time.

15 A    Can you blow it up?

16          MR. EGAN:  Yeah, could we show the whole letter,

17 please?

18 A    Yes, okay, it says again we originally assumed we would

19 raise -- this was the assumptions.

20 Q    Yeah.  So what Mr. Bekkedam's telling you, this -- if

21 we're going to get to do what we want to do we're going to

22 need you to put in your five million, right?

23 A    Yes.

24 Q    And you testified yesterday that, in fact, you had access

25 to $5 million at that point, correct?

1   A     Yes.

2   Q     And but you wanted to remain liquid because if Scott

3   Rothstein called you and said I had another settlement to fund

4   you wanted to be able to have ready cash to put into the

5   Banyan income -- the Banyan Funds, correct?

6   A     We always had money going in and out.

7   Q     So, but that's what you wanted, you wanted to -- you at

8   that point were thinking about your liquidity, weren't you,

9   Mr. Levin?

10  A     There were some rumblings at this point about the

11  investment itself failing.

12  Q     So this is about seven, eight days before you found out

13  what happened on Halloween, correct?

14  A     That is correct.

15  Q     But at this point you're still thinking I'm going to have

16  to put in at least $5 million, correct?

17  A     Yes.  If we continued with this.  As I said, there was a

18  great many things that were not written down that I spoke to

19  Mr. Hartline about.

20  Q     Sure.  There's a lot --

21  A     One of those would be the reverse stock split we talked

22  about and --

23  Q     Sure.

24  A     -- the other one would be there was no -- let's see how

25  -- there was no anti-dilution clause in the documents that

1    were signed, that I signed, that I thought were standard.  We

2    never did a private placement or bought private stock in

3    anything that we didn't have an anti-dilution clause.

4    Q    Certainly.

5    A    And I had questioned Mr. Hartline about this several

6    times and his comments to me were that he couldn't do it

7    because after we made the investment there were a couple of

8    other people who stepped in and he gave us some extra stock

9    and stuff like that, but it was a lot of negotiation going on

10   in this period of time.

11   Q    So like you said to us yesterday, as a businessman if you

12   don't quite like the deal you're in you try to negotiate,

13   right?

14   A    Sure.

15   Q    Sir, you know a person by the name of Douglas Von Allmen,

16   don't you?

17   A    Oh, yeah.

18   Q    Mr. Von Allmen, he's a neighbor of Scott Rothstein?

19   A    He was, yes.

20   Q    And Mr.  Von Allmen was someone who also invested in the

21   Banyan Income Funds, is that correct?

22   A    That is correct.

23   Q    If I could just take you back for a moment.

24        MR. EGAN:  I'd like to go to -- excuse me, Your

25   Honor -- Government's Exhibit 27, please.

1  Q    Mr. Levin, I'll represent to you that Government's

2  Exhibit 27 is a letter from Mr. Bekkedam to Nova Financial

3  Holdings, do you see that, sir?

4  A    Yes.

5           MR. EGAN:  And if you could blow up the whole letter

6  please or show the whole letter.

7  Q    Have you ever seen this letter before?

8  A    No, I have not.

9  Q    Okay.  If you could read down into the text of it Mr.

10 Bekkedam is saying that Ballamor Capital has an investor who

11 may be willing to put up to $15 million into Nova Financial

12 Holdings.  You believe that's you, sir, don't you?

13 A    I would think so, yes.

14 Q    And in the letter Mr. Bekkedam says that there are a

15 couple of things this investor, you, are going to want to know

16 about, you're going to want to know whether TARP funding has

17 been granted --

18           MR. EGAN:  If you go to the third paragraph, blow

19 that up, please.

20 A    Mm-mm.

21 Q    -- whether TARP funding has been granted and you'll also

22 want to know about this Delaware Valley Financial Group deal,

23 correct?

24 A    I just lost that.

25 Q    Yeah, sure, it's a little hard.  It's in the third

1    paragraph there, which now I got the text there in front of

2    you.

3              MR. EGAN:  Could we show this to the jury, Your

4    Honor?  It's been admitted into evidence.

5              THE COURT:  Any objection?

6              MR. IGNALL:  I don't think it's been admitted, but

7    we have no objection to --

8              MR.  EGAN:  Well then let's not show it to the jury.

9    We'll wait til it's admitted, Your Honor.

10             THE COURT:  Very well.

11   Q    But you see that there and those are two things that Mr.

12   Bekkedam says that this very wealthy investor wants to now

13   about, the current TARP application funding and the pending

14   DVFG transaction, correct?

15   A    Yes.

16   Q    And those are things that Mr. Bekkedam had discussed with

17   you, correct?

18   A    Yes.

19   Q    So those were a couple of contingencies for you before

20   you invest, right?

21   A    Yes.

22   Q    What Mr. Bekkedam's doing here is he's protecting you the

23   investor by saying he might want to invest, but we need to see

24   that these things happen first, correct?

25             MR. IGNALL:  Objection, calls for speculation.

1                THE COURT:  Sustained.

2    A    I --

3                THE COURT:  Sustained.

4    A    As I said, I've never seen --

5                THE COURT:  Don't answer it.

6                MR. EGAN:  You don't -- you could -- you don't have

7    to answer the question.

8                THE WITNESS:  I'm sorry.  I'm sorry.

9                MR. EGAN:  I'll withdraw the question, Your Honor.

10   Q    So, sir, when you negotiate business deals you frequently

11   did put contingencies on before you would make your

12   commitment, correct?

13   A    It would be called due diligence.

14   Q    Very good.  Thank you.  Sir, you originally went to Mr.

15   Bekkedam -- when you originally met Mr. Bekkedam one of the

16   things that most impressed you about Mr. Bekkedam was what you

17   believed was his ability to raise funds, correct?

18   A    Yes.

19   Q    And you testified that you were impressed by what you

20   heard about his company Ballamor Capital, correct?

21   A    Yes.

22   Q    And you know that Mr. Bekkedam wanted you to become a

23   client of Ballamor Capital, correct?

24   A    On and off, yes.

25   Q    And you finally decided not to become a client of

1    Ballamor Capital because you had different investment ideas,

2    correct?

3    A    Yes.

4    Q    But you did decide to become a business partner with Mr.

5    Bekkedam on a number of different ventures, didn't you?

6    A    Several, yes.

7    Q    And you believed the most important thing for you that

8    Mr. Bekkedam would be very good at raising funds for the

9    Banyan Funds, correct?

10   A    Oh, yes.

11   Q    Sir, is it fair to say tat you like to do business with

12   people you like?

13   A    I think that's a natural thing.

14   Q    Sure.  And you liked Mr. Bekkedam, didn't you?

15   A    Sure did.

16   Q    And it's even better if you do business with people you

17   like who can also help you make money, correct?

18   A    That would be fine.

19   Q    And that's what you thought Mr. Bekkedam could do for you

20   too, he could help you make money, correct?

21   A    I thought we could make money for each other.

22   Q    Sure.  So those are the two reasons you -- you liked him

23   and you believed he could make you money, that's why you did

24   business with Mr. Bekkedam, correct?

25   A    I don't see -- if the deals were fine I don't see any

1    reason not to.

2              MR. EGAN:  Thank you, Your Honor.  I have no further

3    questions of this witness.

4              MR. IGNALL:  Your Honor, may we address the issue I

5    mentioned earlier before redirect, outside the presence of the

6    jury?

7              THE COURT:  Yes.  Let's take a brief recess at this

8    time, please.

9              COURTROOM DEPUTY:  All rise.

10                        (Jury out)

11             THE COURT:  You may be seated.

12             MR. IGNALL:  I think we want the witness here for

13   this.  This is -- I was going to inquire briefly to make sure

14   we're all on the same page.  May I, Your Honor?

15             THE COURT:  Yes, you may.

16                    REDIRECT EXAMINATION

17   BY MR. IGNALL:

18   Q    All right.  Mr. Levin, I just want to ask you a couple

19   questions outside the jury so that you understand the

20   limitations of what I'm asking you, okay?

21   A    Okay, sure.

22   Q    On October 31st or roughly, what did you learn about the

23   Rothstein Investments?

24   A    That they were a fraud.

25   Q    Okay.  And more specifically, did you learn whether the

1   money was actually invested in these settlements?

2   A    Yeah.  We had a very -- we didn't know exactly at that

3   moment, but we found out very shortly thereafter.

4   Q    That there was --

5   A    The funds disappeared.

6   Q    -- there were no settlements?

7   A    Correct.

8   Q    Okay.  So as of June 30, when you thought you were worth

9   -- how much did you think you were worth on June 30th, I mean

10  roughly?

11  A    If you take in the Rothstein Investments --

12  Q    Yes.

13  A    -- it was quite substantial.  It was all cash too.  It

14  was not -- it was mostly cash.

15  Q    But when you thought you thought you -- it might have

16  been 300 million --

17  A    Four hundred million, something like that.

18  Q    Did that include --

19          THE COURT:  Sorry.  Four hundred million?

20          THE WITNESS:  Yes.

21  Q    Did that include what you thought the Rothstein

22  Investments were worth?

23  A    Yes.

24  Q    All right.  And did you later learn that they, even as of

25  June 30th, weren't worth that?

1   A    June 30th I didn't realize it.

2   Q    No, no, but did you later learn that you were --

3   A    Oh, June --

4   Q    -- mistaken as of June 30th?

5   A    I see what you're saying.  Yes.  We had audited certified

6   statements.

7   Q    I'm not going to ask you that.  So what I'd like to ask

8   is after October 31st --

9        MR. IGNALL:  I'm asking it in a leading way, Your

10  Honor.  Let me try it right now.

11       THE COURT:  You can -- I'm going to permit it.  Go

12  ahead.

13       MR. IGNALL:  We'll see if there's an objection to

14  how I'm going to try and say it.

15  Q    After June -- after October 31st, 2009, did you learn

16  something new about these investments with Mr. Rothstein?

17  It's just a yea or no.

18  A    Yes.

19  Q    And did you learn about whether these investments were

20  actually worth anything as of June 30th?

21  A    It's a difficult question to answer.  If we --

22       THE COURT:  Let me just stop you there.  Would you

23  rephrase the question to specifically address what he knew as

24  of June 30th and then phrase the other question at what point

25  in time did he learn otherwise.

1          MR. IGNALL:  Okay.  As of June 30th did you have an

2     understanding about how valuable the Rothstein Investments

3     were?

4     A     Yes.

5     Q     At sometime later did you learn that even as of June 30th

6     they weren't worth anything?

7     A     Yes.

8          MR. IGNALL:  How about that?

9          THE COURT:  All right.

10         MR. EGAN:  Your Honor, I still don't see the

11    relevance of this --

12         THE COURT:  Well, let's just go --

13         MR. EGAN:  -- if Mr. Hartline doesn't know it.

14         THE COURT:  Well, we get -- that's the next

15    question.  Let me ask it.  Was there any communication between

16    you, sir, and Mr. Hartline, after June 30th regarding what you

17    had learned about the Rothstein Investments?  And if there's

18    an objection by all means lodge it, please.

19         THE WITNESS:  I don't think -- I didn't know until

20    October 31st.

21         THE COURT:  That's when you learned?

22         THE WITNESS:  Yes.

23         THE COURT:  All right.

24         MR. IGNALL:  But that's as far as I want to go with

25    that.  It's not -- could we discuss this at sidebar, perhaps,

1    Your Honor?

2            THE COURT:  Sure.  Can he step down?

3            MR. IGNALL  Yes.

4            THE COURT:  Sir, you can step down.

5                    (Sidebar begins at 11:00:04)

6            MR. EGAN:  Your Honor, I'm sorry about the

7    contesting.

8            THE COURT:  I appreciate that.  Been there, done

9    that.

10           MR. IGNALL:  Testing response, too.

11           THE COURT:  I'm never that way.

12                        (Laughter)

13           THE COURT:  With my kids.  All right.

14           MR. IGNALL:  I don't understand the point.  If Mr.

15   Hartline doesn't -- if he doesn't know until October 31st,

16   obviously Mr. Hartline doesn't know until October 31st.  What

17   is the relevance?

18           THE COURT:  If he wants to elicit that, do you have

19   a problem with that?

20           MR. EGAN:  The problem with it seems to be that they

21   want to elicit the testimony to say you -- this is what we're

22   getting -- he thinks it's worth $400 million on June 30th and

23   there's no reason to believe that the money that's invested in

24   Banyan is fiction.  And it's not until Halloween that he

25   learns it was a fiction.  All that is fine.  It's then asking

1    him the next question to go back and say so then on Halloween
2    you learned that in reality you weren't worth anything back on
3    June 30th because then they want to say somehow that Mr.
4    Hartline and Mr. Bekkedam should have been omniscient and
5    known that.
6              THE COURT:  Well, I just asked him if he knew and
7    did he communicate with Mr. Hartline and he said no.
8              UNIDENTIFIED ATTORNEY:  Right.
9              THE COURT:  You got a problem with that?
10             UNIDENTIFIED ATTORNEY:  I don't have a problem --
11             THE COURT:  -- in terms of inferences?
12             UNIDENTIFIED ATTORNEY:  I don't have a problem with
13   that answer, no.  But the problem is is that why is it
14   relevant to go back and say now you realize that you weren't
15   worth anything on June 30th.  There's no probative value to
16   that fact.  The fact is is that if he believed and he
17   communicated to the defendants that he was worth 400 million
18   and by all intents and purposes everyone believed he was worth
19   400 million.  And the most important person that believed that
20   would be him.  That's the relevant fact as to the actions that
21   were taken by the bank and actions that were taken by Mr.
22   Bekkedam.  They relied upon that information and everyone had
23   a reasonable belief to do so.  Going back and then saying well
24   once we learn on Halloween that those investments are a fraud
25   -- and I think there's some prejudice there in saying fraud or

1    Ponzi or whatever it may be --

2              THE COURT:  Well, you can address that question.

3              UNIDENTIFIED ATTORNEY:  It then leaves in the jury's

4    mind that, you know, there's something that everyone should

5    have known about those investments, that they should have

6    known they were of no value.  And that leads to the inference

7    that I should have figured it out, Mr. Bekkedam should have

8    figured it out, Mr. Levin should have figured it out.

9              THE COURT:  I think I'm missing something here.

10   What is it that you intended to prove here by asking those

11   questions?

12             MR. IGNALL:  I'm trying to clarify something.  And

13   it may be my fault for not objecting earlier.  The questions

14   that went to Mr. Levin were not about did you tell Mr.

15   Hartline of Mr. Bekkedam that you were making this big spread,

16   that you have, you know, 12 yachts and 14 different private

17   jets, I understood those questions to be elicited so that the

18   defense could argue to the jury Mr. Levin's fabulously

19   wealthy, so how could my client know that loaning him money is

20   not the same as money in the bank to a regulator.

21             THE COURT:  Well that's not going to be any

22   different if he answers the questions that he just put to him,

23   right?

24             MR. IGNALL:  Well, no, but they -- the point is the

25   defendants didn't know that and --

1          MR. EGAN:  Actually, the information that I cross

2     examined on is information that was provided to Mr. Hartline,

3     so indeed it was told to Mr. Hartline, which is why I went

4     into it.  The financial statements were provided to Mr.

5     Hartline.

6          THE COURT:  I don't --

7          MR. EGAN:  He was told through those financial

8     statements that the guy was worth all that.

9          THE COURT:  No, no.  Yes, I'm saying, but at this

10     point in time what I'm just trying to understand is -- I

11     understand what you're saying was conceivably a misperception

12     and to go back now and correct that misperception still leaves

13     him with a situation where Mr. Hartline, Mr. Bekkedam

14     believed, as did Mr. Levin, that he's worth $400 million.

15          UNIDENTIFIED ATTORNEY:  I believe that he believed

16     that, yes.

17          THE COURT:  And if the jury otherwise didn't hear

18     this specific information, hadn't learned what they've

19     learned, had questions about it to start passing

20     (indiscernible) notes during deliberation, why not deal with

21     that now by letting him do what he wants to do because it's a

22     fact?

23          UNIDENTIFIED ATTORNEY:  It's going to confuse the

24     issue, Your Honor.

25          THE COURT: I think it -- I'm confused with the

1   issue, quite frankly.

2          UNIDENTIFIED ATTORNEY:  Well again, it's asking

3   people to basically unring a bell.  Nobody knew.  So the fact

4   that now that in retrospect we can all go back and say you

5   were wrong as of June 30th, but that's not relevant, nobody

6   knows that.

7          THE COURT:  But they --

8          UNIDENTIFIED ATTORNEY:  Nobody knows that.

9          THE COURT:  This information has come to the jury at

10  this point in time just in a different kind of way.  Remember

11  he did testify that he was bankrupt.

12         UNIDENTIFIED ATTORNEY:  But he was forced into

13  bankruptcy eventually, yeah.

14         THE COURT:  Right.  So all this is just clarifying

15  --

16         UNIDENTIFIED ATTORNEY:  But that didn't happen for

17  awhile.

18         THE COURT:  I know, but it's just clarifying to me

19  what the jury should have a good clear understanding about.

20  And it's not prejudicial, frankly, to either side, quite

21  frankly.

22         UNIDENTIFIED ATTORNEY:  Well, I guess the question

23  is if it's going to clarify the point and it's going to be

24  permitted later on to argue to the jury that because Banyan

25  really wasn't worth anything that's evidence that they can

1    consider that the defendant should have known all that.

2              THE COURT:  If Banyan did not know or if defendants

3    did not know about Banyan's worthlessness --

4              UNIDENTIFIED ATTORNEY:  Right.

5              THE COURT:  -- until October --

6              UNIDENTIFIED ATTORNEY:  Right.

7              THE COURT:  -- then how is that going to prejudice

8    the defendants?

9              UNIDENTIFIED ATTORNEYS:  Well, that's where I think

10   they want to go.

11             THE COURT:  If you want to argue that then you guys

12   would have a field day.

13             UNIDENTIFIED ATTORNEY:  They shouldn't have known,

14   Your Honor.  That's the -- they shouldn't have.  There's no

15   reason that they should have known, so --

16             THE COURT:  And you can't argue that to the jury?

17             UNIDENTIFIED ATTORNEY:  Yeah.  But what they're

18   going to do is they're going to get confused, Your Honor.  I'm

19   confused right now about whether or not they're going to be

20   able to say that well, obviously these guys weren't doing

21   their proper due diligence.  And there's no evidence of that.

22             THE COURT:  There's no evidence in terms of the

23   defense having any knowledge, any more than Mr. Levin.  It

24   seems to me that that enures to the benefit of the defendant.

25   So why would the jury not have a right to know that?

1          UNIDENTIFIED ATTORNEY:  Only one thing, Your Honor,

2     and that is if the inference is that that business was a fraud

3     and was always a fraud.  The defendants reliance on the

4     (indiscernible) business that might be called into question

5     because jurors get confused easily.  So what he's inferring is

6     it was always a fraud.

7          UNIDENTIFIED ATTORNEY:  They're relying on fraud.

8          UNIDENTIFIED ATTORNEY:  I think it also creates the

9     scenario, it begs the question of is the jury going to start

10    saying well then Mr. Bekkedam didn't do enough due diligence

11    or the bank didn't do enough due diligence, which is not fair

12    for them to say under the circumstances because no one could

13    have done that due diligence to figure it out.

14         THE COURT:  Do you think he's going to object when

15    you stand up and say that to the jury?

16         UNIDENTIFIED ATTORNEY:  I don't know.  He might

17    object to a lot of things I say to the jury.

18         THE COURT:  And I would say overruled.

19         UNIDENTIFIED ATTORNEY:  Your Honor, I think this --

20    I don't even understand the point he's trying to make.

21         THE COURT:  Mr. Ignall, help me here.

22         MR. IGNALL:  I was happy to leave it be before we

23    had cross examination questions that went beyond what someone

24    at the bank knew.  I don't remember any testimony that Mr.

25    Levin talked about, you know, his plane, talked about the

1    spread he was making on this investment --

2              THE COURT:  Right.

3              MR. IGNALL:    -- with anyone at the bank in order to

4    get the loan.  And if I missed that then --

5              MR. EGAN:  The documents that say those things were

6    provided to the bank, therefore, the bank looked at them.

7              MR. IGNALL:  The document says he's worth -- that he

8    has X in assets.  If that's where it ended I wouldn't be

9    standing here.

10             THE COURT:  But when he asked these questions about

11   the plane and some of the other holdings, he was referring to

12   the exhibit.  Like I said, that's what I was looking at.

13             MR. IGNALL:  No, no, I --

14             THE COURT:  These things are old -- the bank knew

15   that.

16             MR. IGNALL:  I'm sorry.  I may be unclear.  What I

17   was talking about is you were borrowing money from, you know,

18   investors in Banyan, paying them --

19             THE COURT:  One second.

20             MR. IGNALL:   -- paying them 12 percent so you can

21   make 25 percent and you were making millions and millions of

22   dollars on this investment.  I don't remember any testimony

23   telling that back to either defendant's knowledge at the time.

24   I understood that to mean you're super rich period.

25             MR. ENGLE:  Well, the -- but remember, the

1    Government had raised the issue about the fact that this was

2    an unsecured loan and what personal guarantees were being

3    given and what assurances were being given and it was the

4    personal guarantees that were at issue.  And all of that was

5    elicited on direct examination.  And the documents that back

6    up the assets that are assuring all of these things are the

7    documents that the bank got, the bank examined, the bank

8    relied upon.  Obviously Mr. Bekkedam is not even in that mix.

9           THE COURT:  Does the jury know by reason of Mr.

10   Levin's testimony yesterday that as of Halloween he was broke?

11          MR. ENGLE:  No.  No, because he wasn't broke.

12          THE COURT:  Well, does the jury -- did the jury

13   receive from his mouth yesterday that as of Halloween -- it's

14   Mr. Duncan's questioning, I believe, yesterday -- who raised

15   the issue about the bankruptcy?

16          UNIDENTIFIED ATTORNEY:  Mr. Egan.

17          MR. EGAN:  I did.

18          THE COURT:  Okay.

19          MR. EGAN:  He was forced in August.  Well he

20   testified on direct it was May, so I clarified it was August.

21          THE COURT:  And did he testify as to why he filed

22   bankruptcy?

23          MR. EGAN:  He was forced in those creditors.

24          MR. IGNALL:  The creditors include the guarantee --

25   can I try to write out a question?

```
 1              THE COURT:  Please.

 2              MR. IGNALL:  If I can eliminate the jury.

 3              THE COURT:  Okay.

 4                  (Court spoke on another matter)

 5              MR. IGNALL:  All right.  I probably want to bring

 6  Mr. Levin in first just to make sure that --

 7              THE COURT:  Okay.

 8              MR. IGNALL:  But, I would say on October 31st, on or

 9  about, did you learn anything about the Rothstein Investment.

10  I think we've already been through that.  Did you

11  --

12              UNIDENTIFIED ATTORNEY:  I ask he be instructed not

13  to say they were a fraud.

14              THE COURT:  Okay.

15              MR. IGNALL:  Well, let me say the question.  Did you

16  learn on October 31st that the Rothstein Investment was not

17  worth anything?

18              UNIDENTIFIED ATTORNEY:  Okay.

19              MR. IGNALL:  Did you learn that it had not been

20  worth anything as of -- all along -- is there a date?  Did you

21  learn that it had not been worth anything all along or on June

22  -- pick a day.  I don't think --

23              UNIDENTIFIED ATTORNEY:  I don't think we're going to

24  finalize you the 30th.

25              MR. IGNALL:  All along, how about that?
```

```
 1                UNIDENTIFIED ATTORNEY:  If you're going to ask it
 2    that way at least it's --
 3                MR. IGNALL:  Yeah.
 4                THE COURT:  Okay.
 5                UNIDENTIFIED ATTORNEY:  -- more generic.
 6                MR. IGNALL:  Yeah.  I think that's better than June
 7    30th.
 8                THE COURT:  All right.  Now, is there any question
 9    that you would want to ask based on that question?
10                MR. EGAN:  Surely.  You never told Mr. Hartline.
11                THE COURT:  Is there a problem with that?
12                UNIDENTIFIED ATTORNEY:  No.  No, sir.
13                THE COURT:  That was my point all along.
14                UNIDENTIFIED ATTORNEY:  Never --
15                MR. EGAN:  And then we're going to probably want to
16    ask him all the way up until Halloween if you believed that it
17    was --
18                THE COURT:  Again, we're talking facts here.
19                UNIDENTIFIED ATTORNEY:  That's fine.  I agree.
20                THE COURT:  All right.  Fair enough.
21                MR. IGNALL:  If I can bring Mr. Levin in before the
22    jury --
23                THE COURT:  Absolutely.
24                MR. IGNALL:  -- just to make sure that he's limited
25    to the --
```

1          THE COURT:  Yes or no answers.

2          MR. IGNALL:  Okay.  Okay, thank you.

3          UNIDENTIFIED ATTORNEY:  Thank you, Your Honor.

4          THE COURT:  Thank you all.

5                  (Sidebar ends at 11:14:11)

6          MR. IGNALL:  Let me ask a more mundane question.

7   Is it necessary for a break now or to --

8          THE COURT:  Yes.  Yes.

9          MR. IGNALL:  Okay, I'll be right back, Your Honor.

10         THE COURT:  Counsel, you can have five minutes here

11  too --

12         UNIDENTIFIED ATTORNEY:  Oh, thank you, Your Honor.

13         THE COURT:  -- since you wasted yours.  Not wasted,

14  I mean since --

15                  (Laughter)

16                  (Pause)

17         THE COURT:  Okay.

18         MR. IGNALL:  May I inquire?

19         THE COURT:  Yes, sir.

20  BY MR. IGNALL:

21  Q    Mr. Levin, when we get back before the jury I'm going to

22  ask these questions and based on an agreement with counsel and

23  a ruling by the Court if you can answer it yes or no please

24  do.  So let me try it right now.  On October 31st of 2009 or

25  about then did you learn anything about the Rothstein

1   Investments?

2   A    Yes.

3   Q    Did you learn on or about October 31st that the Rothstein

4   Investment was not worth anything?

5   A    Yes.

6   Q    Did you learn at about October 31st that it had not been

7   worth anything all along?

8   A    Yes.

9   Q    All right.  And that -- don't elaborate, if those are

10  questions I ask just answer -- if you can answer it yes please

11  do so.

12  A    Okay.

13          THE COURT:  Would the defense wish to tender the

14  question now so you'll know or not?

15          MR. EGAN:  Sure, it can't hurt.

16                      CROSS EXAMINATION

17  BY MR. EGAN:

18  Q    Sir, you never told the -- do it this way -- you believe

19  until October 31st that those investments were worth what they

20  said they were, correct?

21  A    Yes.

22  Q    And you certainly never told Brian Hartline that they

23  weren't worth what you believed they were worth?

24  A    Up until the 31st, yes.

25  Q    Correct.

1  A     Yes.

2             THE COURT:  All right.  Mr. Duncan?

3             MR. DUNCAN:  One moment, Your Honor.

4             THE COURT:  This is a rehearsal.

5                      (Laughter)

6             MR. DUNCAN:  We don't usually get that.  You're the

7  star of the play.

8                   CROSS EXAMINATION

9  BY MR. DUNCAN:

10  Q    Sir, you had good reason to believe as of October 31st,

11  2009 that the Rothstein Investments were a good investment,

12  correct?

13  A    Up until then?

14  Q    yes.

15  A    Til a few days before, you know, it was --  I came back

16  from St. Thomas because of it.

17  Q    So, well just the October 31st time frame --

18  A    Yes.

19  Q    -- up until those few days right around there --

20  A    Yes.

21  Q    -- you believed it was a good one?  And you had a good

22  reason to believe it, correct?

23  A    Oh,  yes.

24  Q    And the good reason was that you had audited financials

25  regarding this, correct?

Levin - Cross/Duncan                              41

1    A    Oh, yes.

2    Q    And you had people in TD Bank telling you that the money

3    was there, correct?

4    A    Yes.

5    Q    And that's what you told Mr. Bekkedam too, correct?

6    A    Of course.  Yes.

7    Q    So Mr. Bekkedam had no reason to believe that the

8    Rothstein Investments weren't any good?

9              THE COURT:  That question I won't allow.

10             MR. DUNCAN:  All right, Your Honor, I understand.

11             THE COURT:  The last one.

12             MR. DUNCAN:  Okay.

13             THE COURT:  All right.  If you could add some from

14   some other source.

15             MR. DUNCAN:  I'll figure some other way to try to do

16   it, Your Honor.  Thank you

17             THE COURT:  Very well.  All right.  Any remaining

18   issues in that regard, counsel?

19             MR. EGAN:  No, Your Honor.

20             MR. IGNALL:  No, Your Honor.

21             THE COURT:  All right, we can bring the jury back

22   in.  Thank you.

23             COURTROOM DEPUTY:  All rise.

24                        (Jury in)

25             COURTROOM DEPUTY:  Ladies and gentlemen, we are back

1    on the record.

2                    THE COURT:  Thank you.  You may be seated.

3                    MR. IGNALL:  May I proceed, Your Honor.

4                    THE COURT:  You may proceed.

5    BY MR. IGNALL:

6    Q    Mr. Levin, do you remember being asked questions on cross

7    examination by Mr. Egan about the applications to both the

8    state and federal government for the change in control?

9    A    Yes.

10   Q    All right.  If I could bring your attention to Exhibit

11   64.  Let me bring your attention to Exhibit 63.  I'm sorry.  I

12   believe this as already been admitted.  If I could turn your

13   attention to the fourth page.  It could end in 997 -- of

14   Exhibit 63.

15   A    Okay.

16   Q    I'm sorry, 63, please.  Is that your signature at the

17   bottom?

18   A    Yes.

19   Q    Do you know what this is?

20   A    It's addressed to the Department of Banking.  If you

21   could blow it up I could see it better.  Yes, it's -- I wonder

22   who it's addressed to, it's now -- who sent this.  I guess I

23   signed it, so --

24   Q    Yes.  Did you draft this letter?

25   A    No.

Levin - Redirect/Ignall                                    43

1  Q    Let me go to the next page and we'll come back to this.

2  You see where it says -- the next page says Section 112

3  application questionnaire?

4  A    Yes.

5  Q    And it says the following items are to be answered in a

6  letter?

7  A    Yes.

8  Q    Was the letter I just showed you the response to those

9  questions, do you know?

10 A    It seems to be, yes.

11 Q    And let's look at Question D.

12       MR. IGNALL:  If you could blow that up.

13 Q    Does it say state the source and amount of funds or other

14 consideration used or to be used in making the purchases?

15 A    Yes.

16 Q    Do you know if that question was asking for just funds

17 put in going forward or funds that you may have already put

18 in?

19       MR. EGAN:  Objection.

20       THE COURT:  Overruled.

21 A    I would have to say that this is the application, so I

22 would imagine it was the funds to be put in.

23 Q    Does it say used or to be used, what do you understand

24 that to mean?

25 A    (No audible response).

1   Q    Let me put it back -- we can go back to the previous

2   page.

3              MR. EGAN:  Objection.  He's answered the question.

4              THE COURT:  No.  Overruled.

5   Q    Let me go back to the previous page.  Is Item D in your

6   letter your response to that question?

7   A    Okay.  Yes.

8   Q    And it says it is the applicant's intention to pay the

9   approximately $18 million purchase price with funds currently

10  on deposit in various financial institutions, however, a

11  portion of the purchase price may come from other sources, do

12  you see that?

13  A    Yes.

14  Q    And does that $18 million include the $5 million you had

15  borrowed already from Nova Bank?

16  A    Yes.

17  Q    At some point after June 30th did you apply for financing

18  from another bank to purchase Nova stock?

19  A    Not to my knowledge.

20  Q    Have you ever heard of a bank called ACBB or Atlantic

21  Central Bankers Bank?

22  A    I don't recall.

23  Q    All right.

24             MR. IGNALL:  If I could bring up Exhibit 67 for the

25  witness right now.

1    Q    Do you recognize that document?  In particular, if we

2    just go to the bottom, do you recognize the signature at the

3    bottom there?

4    A    Yes, that's mine.

5    Q    All right.  Do you recognize this document at all?

6    A    No.

7    Q    All right.  Let me turn your attention back to Exhibit

8    64.

9              MR. IGNALL:  If we could go to the sixth page of

10   Exhibit 64 and blow up the top of that.

11   Q    I believe Mr. Egan asked you about this.  You see where

12   it says name of acquirer, George G. Levin?

13   A    Well, that's -- you just have the one piece here, but --

14   Q    Do you see that, the piece on the top there?

15   A    It just says provide the following information.

16   Q    And you see the box below that?

17   A    It says name of each acquirer, George G. Levin, yes.

18   Q    Yes.  Do you remember Mr. Egan asking you questions about

19   this?

20   A    Yes.

21   Q    All right.  And I assume -- George G. Levin, is that you?

22   A    Yes.

23   Q    All right.  What's the total purchase price there?

24   A    Eighteen million.

25   Q    Does that include the $5 million you had borrowed from

1    Nova Bank?

2    A     Yes.

3    Q     When it says source and amount of funds, what does that

4    say?

5    A     Half from personal finances, half from borrowed funds.

6    Q     Do you recall whether Nova Bank ever made an application

7    on your behalf to borrow funds?

8    A     I don't recall.

9    Q     Going back to Exhibit 67, is that your signature?

10   A     Yes.

11   Q     All right.  Do you remember one way or another whether

12   you made an application to Atlantic Central Bankers Bank?

13   A     I don't recall it, no.

14   Q     But you believe that's your signature?

15   A     Yes, it's definitely my signature.

16   Q     You discussed with Mr. Egan that you had gotten stock

17   certificates for Nova Bank?

18   A     Yes.

19   Q     Had you ever talked to Mr. Hartline about selling that

20   stock?

21   A     Probably did, yes.

22   Q     And do you remember what Mr. Hartline said?

23   A     Obviously it never happened, so --

24         MR. IGNALL:  Can we bring up D-56?  I may have to

25   ask defense to do that.

1    Q    I believe Mr. Egan asked you about this as well.  Do you

2    recall being asked about this e-mail from Mr. Preve to you?

3    A    Yes.

4    Q    And what's the subject?

5    A    Subject is about a company that I owned that had a

6    problem.

7    Q    What's the subject line say?

8    A    Oh, the subject line, I'm  sorry.  Have you heard from

9    the Fed or State Banking Department?

10   Q    All right.  Do you see where Mr. Preve says the

11   application had been pre-filled by Nova, you see that?

12   A    Yes.

13   Q    Do you know what that means?

14   A    I would be guessing, but I --

15   Q    I don't want you to guess.  Did you ever fill out an

16   application yourself that went to the Federal reserve or the

17   State Banking Department?

18   A    It was done and I signed it.

19   Q    Mr. Duncan asked you if you had lines of credit outside

20   of Nova Bank, do you remember those questions?

21   A    Yes.

22   Q    Did you ever use any of those lines of credit to buy Nova

23   stock?

24   A    No.

25   Q    On October 31st did you learn anything about the

1   Rothstein Investments that you had?

2   A    Yes.

3   Q    And did you learn on October 31st that the Rothstein

4   Investments were not worth anything all along?

5   A    Yes.

6   Q    After October 31st, did you ever tell Mr. Bekkedam that

7   your financial situation had changed?

8   A    After October 31st?

9   Q    Yes.

10  A    Yes.

11  Q    Did you ever tell Mr. Hartline your financial situation

12  had changed?

13  A    Yes.

14  Q    And how did your financial situation change, how much did

15  you think you were worth before October 31st, approximately?

16  A    About 400 million plus.

17  Q    After October 31st, were you worth anywhere close to

18  that?

19  A    No.

20  Q    Were you worth more than zero necessarily?

21  A    Yes.

22  Q    Did -- were there creditors asking for money after that?

23            MR. EGAN:  Objection, leading.

24            THE COURT:  Leading, sustained.  The objection is

25  sustained as to the --

Levin - Redirect/Ignall                              49

1        MR. IGNALL:  I understands, Your Honor, but --

2        THE COURT:  If I may, sir, in your mind based upon

3   what you knew at that point in time, what were you worth?

4        THE WITNESS:  It's difficult, but I would say

5   somewhere between 50 to a hundred million.

6        THE COURT:  Thank you.

7   Q    Did you end up in bankruptcy?

8   A    In a -- yes, a Chapter 11 reorganization.

9   Q    Had you made guarantees to investors in these various

10  Banyan Funds?

11  A    Yes.

12  Q    And were any of those investors seeking you to pay off on

13  those guarantees?

14  A    Yes.

15  Q    Did you have the funds available to pay those guarantees?

16  A    No, but eventually everybody got paid back a hundred

17  percent.

18  Q    Did you have the funds --

19  A    Except me.

20  Q    Did you have the funds after October 31st easily

21  available to pay those guarantees?

22  A    No.

23        MR. EGAN:  Objection, leading.

24        THE COURT:  Sustained.

25  Q    Did you discuss with Mr. Hartline or, I'm sorry, with Mr.

1    Bekkedam whether you had the ability to pay back on your

2    guarantees after October 31st?

3    A    I don't think we discussed that.  I don't remember

4    discussing that.  I -- he knew what the problems were.  And as

5    I said, I kept paying the interest on these loans.

6    Q    No, I -- not the loans.  I'm talking about guarantees to

7    Banyan investors.

8    A    I don't know if --

9         MR. EGAN:  Your Honor, I would just ask that the

10   last response be stricken.  It's nonresponsive to Mr. Ignall's

11   question.

12        THE COURT:  It is stricken.  The jury is to

13   disregard that last response.

14   Q    My question was with respect to Mr. Bekkedam did you ever

15   have a conversation about your ongoing ability to pay on the

16   guarantees?

17   A    I'm not sure that subject ever came up, to be honest with

18   you.

19   Q    Did the subject of your change in financial situation

20   come up with Mr. Bekkedam?

21   A    Oh, sure, yes, of course.

22   Q    Okay.

23        MR. IGNALL:  No further questions.

24        THE COURT:  All right.

25        MR. EGAN:  May I proceed, Your Honor?

1            THE COURT:  Yes, sure.

2                        RECROSS EXAMINATION

3   BY MR. EGAN:

4   Q    Good morning, Mr. Levin.

5   A    Good morning.

6   Q    Let's start where you ended there.  So as I understand

7   your answer to the Court's question, after October 31st you

8   believed you were worth in the neighborhood of 50 to a hundred

9   million dollars, correct?

10  A    I had that -- probably.

11  Q    Prior to October 31st you believed you were worth $400

12  million?

13  A    Correct.

14  Q    And you believe that basically -- well, that's prior.  So

15  when you were applying for a loan at Nova Bank in June of

16  2009, you believed you were worth $400 million, correct?

17  A    Yes.

18  Q    And you certainly never told Brian Hartline any time

19  before October 31st that you weren't worth $400 million,

20  correct?

21  A    That's correct.

22  Q    Because you believed it?

23  A    Yes.

24  Q    So, and after October 31st, in spite of the fact that you

25  were no longer worth $400 million,  you still had assets?

1   A    Yes.

2   Q    And you were basically in a position were you had to

3   figure out how to best take care of your creditors, right?

4   A    Correct.

5   Q    And protect assets, if you could?

6   A    Yes.

7   Q    So you were basically sorting it out, correct?

8   A    Absolutely.

9   Q    And I would assume that that type of a mess took quite

10  awhile to sort out?

11  A    Yes.

12  Q    So certainly in October of 2009 you were in no position

13  to figure out exactly where you stood vis-a-vis the situation?

14  A    The 31st of October, right?

15  Q    Yeah.  Let's just talk November, December because that's

16  what's relevant.

17  A    All right.  Fine.  Yes.

18  Q    In November of 2009 you probably weren't sure what you

19  were worth, right?

20  A    Correct.

21  Q    You were still trying to figure it out?

22  A    Yes.

23  Q    But while you were doing that you were still paying the

24  Nova loan, correct?

25  A    That is correct.

Levin - Recross/Egan                          53

1    Q      And while you were still doing it you hadn't told Mr.

2    Hartline I will not invest in Nova stock, correct?

3    A      He knew that long before that, I think.

4    Q      Well, let's talk a little bit about that, sir, because we

5    talked yesterday and you had said that in October of 2009 you

6    knew that you were still committed to pay the 18 -- to invest

7    the $18 million in Nova, correct?

8    A      You're talking about a signed contract.

9    Q      Right.

10   A      We're talking about reality.

11   Q      Well, I want to talk about your obligation, sir.

12   A      Okay.  There was a --

13   Q      And reality is you --

14   A      There was a contract, yes.

15   Q      And reality is you had an obligation, correct?

16   A      According to the contract, yes.

17   Q      Yes, according to the contract.  And you, in fact,  were

18   hoping -- in spite of what you said to Mr. Duncan this

19   morning, you were hoping not to be approved so that you

20   wouldn't have to fulfill the contract, correct?

21          MR. IGNALL:  Objection, beyond the scope of

22   redirect.

23          THE COURT:  Sustained.

24   A      As I said from the --

25          THE COURT:  Just a moment, sir.

1131

1          THE WITNESS:  I'm sorry.

2          THE COURT:  That's all right.  Sustained.

3   Q    Mr. Levin, you raised some points this morning about

4   having discussed reverse stock split with Mr. Hartline,

5   correct?

6   A    Yes.

7   Q    And I think with --

8          MR. IGNALL:  Objection, beyond the scope of

9   redirect.

10         THE COURT:  No, he testified about that.

11         MR. IGNALL:  Not on redirect.  Maybe during Mr.

12  Duncan --

13         THE COURT:  Okay, fine.  Nevertheless, he's allowed

14  to go with it.  Go ahead.

15  Q    Correct?

16  A    Please say that again.

17  Q    Sure.  You talked about basically wanting to get out of

18  your deal, correct?

19  A    You're saying that I wanted to get out of the deal from

20  the first day?

21  Q    Yes.  From the day you --

22  A    First day that I looked at the -- really examined the

23  documents.

24  Q    Right.  So basically, what you told us previously was you

25  didn't really look at this carefully until long after you had

1   committed to it?

2   A     I was in St. Thomas when all this went done.

3   Q     Right.  Trying to --

4   A     We were --

5   Q     -- not pay taxes basically?

6   A     No, that's not true.  We were trying to -- there's a much

7   --

8   Q     Establish residence.

9   A     -- establish residency because there's a much lower tax

10  base there and my tax advisor had advised me to go down there

11  --

12  Q     Right.

13  A     -- and do that.

14  Q     So you'd pay less taxes?

15  A     So there would be -- I think it was ten percent instead

16  of 30.

17  Q     If I could show you Government's Exhibit 175.  Sir, this

18  is a letter dated March 26th, 2010 from Nova Financial

19  Holdings to you, correct?

20  A     Yes.

21  Q     And this letter addresses the issue you were talking

22  about, wanting to sell your stock, correct?

23  A     That's what it is.

24  Q     And that's in March of 2010?

25  A     Yes.

1    Q    Does that refresh your recollection as to when it was you

2    had discussions about selling your stock with Mr. Hartline?

3    A    Probably before this, but this was the letter that came

4    out afterwards, sure.

5    Q    So it was --at some --

6    A    Around that time.

7    Q    It was right around that time.

8              MR. EGAN:  May I have a moment, Your Honor?

9              THE COURT:  Yes, sir.

10             MR. EGAN:  I have no further questions.

11             MR. DUNCAN:  Very briefly, Your Honor.

12             THE COURT:  Yes, sir.

13                        RECROSS EXAMINATION

14   BY MR. DUNCAN:

15   Q    Hello again.

16   A    Hi.

17   Q    Sir, Mr. Ignall showed you --

18             MR. DUNCAN:  Could we bring up Government 64,

19   please, and publish it to the jury?  I believe it's been up

20   during his redirect.

21   Q    This is a letter related to your change in control

22   application dated July 21st, 2009, you saw this just a few

23   moments ago with Mr. Ignall, right?

24   A    Yes.

25   Q    In this letter you said about half your money is going to

1  come from your cash and about half your money is going to come

2  from loans in order to make the $18 million investment in

3  Nova, correct?

4  A    I don't know if this one -- I don't think this --

5  Q    Yeah, go to Page 6, please.

6  A    Okay.  This one --

7  Q    Yeah, sure.  It's a lot of documents, I know.  We've

8  gotten to play with them for a long time.  Page 6.  You said

9  half from your personal finances, that's your own cash,

10  right?

11 A    Correct.

12 Q    And then half from borrowed funds, right?

13 A    Correct.

14 Q    And that's as of July 21st, 2009, correct?

15 A    Yes.

16        MR. DUNCAN:  Can we go now to Government's 82, and

17 if we could go to the second page of this?

18 Q    This is a letter from Mrs. Hartline on September 8th,

19 2009, it's to Pennsylvania Department of Banking, this relates

20 to the change in control application, right?

21 A    Yes.

22 Q    And if you go to the next page, three, this is a letter

23 on your George G. Levin stationery, right?

24 A    Yes.

25 Q    And it's written by --

1           MR. DUNCAN:  If you go all the way down and show the

2    whole letter.

3    Q    It's signed by Mr. Preve, correct?

4    A    Yes.

5    Q    Mr. Preve is your agent acting in your behalf, correct?

6    A    Yes.

7    Q    And what he tells Ms. Metcalf (phonetic) is --

8           MR. DUNCAN:  And we could go to the next to the last

9    paragraph.

10          MR. IGNALL:  I object.  I believe this is beyond the

11   scope of redirect.

12          MR. DUNCAN:  He asked him about the source of the

13   loans, Your Honor, about whether it was half from loans or

14   half from finances.  This is in response to the exhibit we

15   just saw, 64, that he put up there.

16          THE COURT:  I'll allow it.

17          MR. DUNCAN:  Thank you, Your Honor.  So, blow up

18   that last full big paragraph, please.

19   Q    So Mr. Preve tells the Pennsylvania regulators that

20   things had now changed, the bottom line is that we expect our

21   factoring business to consume less cash in Fiscal Year 2009.

22   The factoring business, that's the settlement funds, right?

23   A    That would be the settlement funds.

24   Q    That it had in previous years, thus converting

25   approximately $82 million in receivables to cash, right?

1   A    Correct.

2   Q    So you're now going to have $82 million in cash, correct?

3   A    Correct.

4   Q    And that's out of a total portfolio of approximately $450

5   million, correct?

6   A    Correct.

7   Q    So, and then you say or Mr. Preve says on your behalf,

8   this free cash flow will be utilized to cover the Nova Bank

9   investment as well as other short term investments.  You can

10  pay the whole 13 million out of cash now, can't you?

11  A    That says all of which matures in less than 12 months,

12  and you're correct, we could have paid it.

13  Q    You didn't need the loan any more, did you?

14  A    No.  Never needed it.

15  Q    So, I'm sorry, I know this is a sore subject for you, but

16  let's go back to late October 2009.  You testified previously

17  you had good reason to believe that the Rothstein Settlement

18  funds were legitimate, correct?

19  A    Yes.

20            MR. DUNCAN:  And if we could keep -- if we could

21  keep that exhibit up, please.

22  Q    One of the reasons you believed -- that you had good

23  reason to believe this is that you had audited financials of

24  these settlement funds, correct?

25  A    Our company and the other company, Rothstein's company.

Levin - Recross/Duncan                                      60

1   Q     And by audited financials that means you had

2   professionals come in, do their due diligence, and then tell

3   you the money is there in TD Bank, correct?

4   A     We even had the same firm to make sure that was true.

5   Q     And so the answer to my question is yes, right?

6   A     Yes.

7   Q     Okay.  And you also had people in TD Bank who confirmed

8   for you that the funds were in TD Bank, correct?

9              MR. IGNALL:  Objection.  I'd like to be heard at

10  sidebar.

11             THE COURT:  You may approach.

12                  (Sidebar begins at 11:44:08)

13             THE COURT:  Yes, sir?

14             MR. IGNALL:  My understanding was the question would

15  be whether audited financials would hold back Mr. Bekkedam so

16  there wouldn't be an inference that Mr. Bekkedam didn't know

17  better.  We go into the details now, we're leading into a

18  story that I think is irrelevant and indeed --

19             THE COURT:  I agree.

20             MR. IGNALL:  And indeed someone at TD Bank was

21  prosecuted for this.

22             THE COURT:  And you can end up opening doors that

23  you don't want to open up.  I'll hear you, counsel.

24             MR. DUNCAN:  It goes to his due diligence, Your

25  Honor, that he had a good faith reason to believe that the

1    money was there.  It wasn't just his idea.

2            THE COURT:  He has testified, in my opinion,

3    unequivocally, that he didn't know.  He relied on the other

4    people who were professionals.  Any more to do?  Anything else

5    you need to put in?

6            MR. DUNCAN:  I wanted to show him the actual

7    document.

8            THE COURT:  Okay.

9            MR. DUNCAN:  Can we have a second, Your Honor?

10           THE COURT:  Go right ahead.

11           MR. DUNCAN:  Your Honor, I'll agree with the court.

12   We'll stop right there.

13           THE COURT:  Mr. -- just have a couple -- two more,

14   maybe, maybe two more.  Two more questions.

15                 (Sidebar ends at 11:45:31)

16           MR. DUNCAN:  Thank you, Your Honor. May I proceed,

17   Your Honor?

18           THE COURT:  Yes, sir.

19   BY MR. DUNCAN:

20   Q    Mr. Levin, you communicated to Mr. Bekkedam the due

21   diligence you had done with respect to the settlement funds,

22   correct?

23   A    Yes.

24   Q    So he knew what you knew, correct?

25   A    Yes.

Levin - Further Redirect/Ignall/Further Recross/Egan     62

1          MR. DUNCAN:  Thank you.  I have no further

2    questions, Your Honor.

3          MR. IGNALL:  One moment, Your Honor.  One question,

4    Your Honor.  May I?

5          THE COURT:  Yes, sir.

6                    FURTHER REDIRECT EXAMINATION

7    BY MR. IGNALL:

8    Q    Mr. Egan on recross asked you if after October 31st you

9    still had assets, do you remember those questions?

10   A    Yes.

11   Q    Did you ever sell any of those assets to pay off the Nova

12   loan?

13   A    No.

14   Q    Did you ever pay off the Nova loan?

15   A    No.

16         MR. IGNALL:  Okay.  No further questions.

17         THE COURT:  Anything further?

18         MR. DUNCAN:  I'm good, Your Honor.  Thank you.

19         MR. EGAN:  If I may, Your Honor.

20         THE COURT:  Yes.

21                    FURTHER RECROSS EXAMINATION

22   BY MR. EGAN:

23   Q    We covered this, but the Nova loan was put into your

24   bankruptcy petition, correct?

25   A    Yes.

Levin - Further Recross/Egan                                    63

1   Q    And so you had it discharged in bankruptcy, correct?

2   A    I don't know if it was discharged.  That's still open.

3             MR. EGAN:  No further questions, Your Honor.

4             MR. IGNALL:  Nothing further, Your Honor.

5             THE COURT:  Thank you, sir.  You may step down.

6             THE WITNESS:  Thank you.

7             THE COURT:  Watch your step, please.  All right.

8   We're going to take our luncheon recess at this time until one

9   o'clock this afternoon.  One o'clock this afternoon.  Thank

10  you.

11            COURTROOM DEPUTY:  All rise.

12                       (Jury out)

13            THE COURT:  All right, one o'clock.  Thank you.

14            UNIDENTIFIED ATTORNEY:  Thank you, Your Honor.

15            UNIDENTIFIED ATTORNEY:  Thank you, Your Honor.

16            UNIDENTIFIED ATTORNEY:  Thank you, Your Honor.

17            UNIDENTIFIED ATTORNEY:  Thank you, Your Honor.

18                       (Recess)

19            THE COURT:  Ready?

20            UNIDENTIFIED ATTORNEY:  Yes, Your Honor.

21            MR. SCHWARTZ:  Your Honor, we have one matter to

22  address with regard to this witness before the jury.

23            THE COURT:  All right.

24            MR. SCHWARTZ:  Your Honor, Joel Schwartz for the

25  defense.

64

1          THE COURT:  You may be seated.

2          MR. SCHWARTZ:  Your Honor, we've had a great deal of

3     litigation with regard to Ms. Musser and the relevance of her

4     testimony and Your Honor has made some limiting instructions

5     and the Government and the defense have talked about that.

6     But in light of what the jury has heard and all of the

7     complicated information that has come to its attention about

8     loans and propriety of loans and the loans that are at issue

9     with regard to these charges, we would ask the Government for

10    an offer of proof with regard to the continuing relevance of

11    Ms.  Musser.  The fact of the matter is, Your Honor, it seems

12    like it's kind of a very prejudicial attempt to tie Mr.

13    Bekkedam to the bank by adducing evidence about her experience

14    with a line of credit, a loan, that has nothing to do with the

15    charges and that occurred in 2005.

16          Now, the -- you have seen all that the just has had

17    to deal with in terms of getting information from lay

18    witnesses and from regulators and from bankers about these

19    particular loans that are at issue.  Now the jury is going to

20    hear about yet another loan that is not contemporaneous with

21    the activity ands has nothing to do with TARP or any of the

22    charges.  So, if there is still any relevance with regard to

23    Ms. Musser we respectfully would ask the Government to proffer

24    it.

25          THE COURT:  Counsel?

1              MR. IGNALL:  Your Honor, I thought we had already

2    been through this with the motion in limine, so I'm not sure

3    --

4              THE COURT:  I frankly don't recall, so refresh my

5    recollection if you don't mind, as to Ms. Musser.

6              MR. IGNALL:  Yeah.  And I'm not sure what's changed

7    during the course of the trial, but I'm certainly happy to

8    address that, Your Honor.  My examination of Ms. Musser I

9    intend to be rather brief.

10             THE COURT:  What's her first name, please?

11             MR. IGNALL:  Hilary.

12             THE COURT:  Two L's?

13             MR. IGNALL:  I believe --

14             THE COURT:  One L?

15             MR. IGNALL:  -- it's one L.  There are two S' in

16   Musser.

17             THE COURT:  She's not running for president then, I

18   guess.

19                      (Laughter)

20             THE COURT:  All right.  Yes, sir?

21             MR. IGNALL:  I do anticipate her -- asking her about

22   the line of credit she had with Nova Bank for a couple of

23   reasons.  First of all, that line of credit extended into

24   2009.  It was still open at that point.  But moreover, it goes

25   to Mr. Bekkedam's motive and his relationship with the bank,

66

1 which is what we explained during the motion in lime argument,

2 that we heard during the opening statement that Mr. Bekkedam

3 did not have any official role at the bank after 2007, and

4 that, in fact, he did not deal with any regulators, which I

5 think are both true.

6    Ms. Musser, I anticipate, will testify that she was

7 a Ballamor client.  We're -- we've agreed we're not going to

8 get into how much money she lost -- I think that was really

9 the crux of the motion in limine -- but that she did invest

10 with Mr. Bekkedam and she did so out of a line of credit and

11 then Mr. Bekkedam got her to move the line of credit from PNC

12 Bank to Nova Bank.  She'll talk about --

13    THE COURT:  In what year?

14    MR. IGNALL:  I believe that was 2005.  But that's a

15 line of credit that remained open through 2009.  And that --

16 she will talk about how Mr. Bekkedam described his

17 relationship with the bank even after he was no longer the

18 chairman in 2007.  Now the line of credit is relevant to show

19 that Mr. Bekkedam has some influence over the bank.  It also

20 goes to show his motive and incentive to get the $13 million

21 in TARP funding to keep Nova afloat.  If he has current --

22 then current clients who have lines of credit with the bank he

23 certainly would like to keep the bank afloat for his clients'

24 benefit, which would derivatively benefit him.

25    I don't know what -- the confusion or any unfair

1    prejudice that would come from that.  If there's a limiting

2    instruction that the defense wishes to have the Court read to

3    the jury I'd certainly be willing to talk about something to

4    agree to.  But I don't see any risk of unfair prejudice and I

5    think it allows the jury to understand Mr. Bekkedam's role.

6    And then we'll talk about what conversations Ms. Musser had

7    with Mr. Bekkedam in 2009 about raising money for Nova Bank,

8    about the TARP, and about Mr. Levin.

9              THE COURT:  All right, thank you.  Counsel?

10             MR. SCHWARTZ:  Of all the Ballamor clients whom the

11   Government could have brought in, they chose to bring in a

12   woman who is furious with Mr. Bekkedam, had sued Mr. Bekkedam

13   and has been sued by the bank for failing to pay that line of

14   credit.  All of those --

15             THE COURT:  Is that admissible, any of those three?

16             MR. SCHWARTZ:  No, but it's --

17             THE COURT:  One second.  One second.  Accepting that

18   they're not admissible, is the Government going to attempt  to

19   introduce those?

20             MR. IGNALL:  No.  That was part of the motion in

21   limine as well and we reached an agreement that we were not

22   going to go into Ms. Musser's bias.  I understood that defense

23   counsel was not going to because her bias would necessarily

24   elicit information that the defense is concerned would, you

25   know, impugn Mr. Bekkedam's integrity in some way.  So I do

1    not anticipate asking her any questions that would go to her

2    bias --

3                THE COURT:  All right.

4                MR. IGNALL:  -- and I've instructed her so.

5                THE COURT:  All right.  Yes, counsel?

6                MR. SCHWARTZ:  If Ms. Musser is going to talk about

7    how she was driven to invest in Ballamor or to keep her loan

8    from Nova in order to make investments in Ballamor this is

9    going to be about her anger with Mr. Bekkedam about what he

10   and his people at Ballamor did in terms of advising her with

11   regard to her money.  This is going to be a trial about the

12   quality of the Ballamor Capital Group as investment advisors.

13   That is completely distracting from the jury.

14               THE COURT:  Accepting that none of that information

15   is going to come before the jury by reason of the Government's

16   proffer and accepting that a number of the things that counsel

17   for the Government has proffered which would result in yes or

18   no answers to a number of questions, I would assume --

19               MR. IGNALL:  Your Honor, I'm happy to bring Ms.

20   Musser in before the jury and we can instruct her not to

21   express her opinion about what she thought about Mr. Bekkedam

22   --

23               THE COURT:  You can tell her that in private.

24               MR. IGNALL:  Which I already have.

25               THE COURT:  She's sitting right there behind you.

```
1              MR. IGNALL:  Okay.
2              THE COURT:  Or public for that matter.
3              MR. IGNALL:   No, I don't think she's in the
4    courtroom, Your Honor.
5              THE COURT:  Okay.  All right.  My apologies.
6    Someone was very animated out in the audience.  I thought it
7    was her.  My apologies.  All right.
8              MR. IGNALL:  No, I don't see her here, Your Honor.
9              THE COURT:  All right.  You can go out and tell her.
10             MR. IGNALL:  I've already spoken to her.  I didn't
11   know if the Court wanted that on the record.  I already told
12   her that.
13             THE COURT:  No, not necessarily.
14             MR. IGNALL:  Okay.
15             THE COURT:  I'm satisfied.  You're an officer of the
16   Court.
17             MR. IGNALL:  Okay.
18             THE COURT:  Counsel?
19             MR. EGAN:  Yes, Your Honor.  The instruction that I
20   requested the other day, the parties have agreed that it would
21   be appropriate to read it at this point.
22             THE COURT:  All right.  Just a moment.
23             MR. EGAN:  I have another copy in case you need it.
24             THE COURT:  No.  I better have it.  Yes.  Font's a
25   little small, but I --
```

 1              MR. IGNALL:  Just to be double, triple safe, may I

 2    go speak to Ms. Musser for a minute right now?

 3              THE COURT:  Go right ahead.

 4              UNIDENTIFIED ATTORNEY:  Apologies, Your Honor.

 5                        (Pause)

 6              MR. EGAN:  Thank you.  I'll make the next one

 7    bigger.

 8              THE COURT:  Thank you. It's a secret only she and I

 9    know.

10              MR. IGNALL:  Thank you, Your Honor.  I re-reminded

11    her.

12              THE COURT:  All right.  Thank you.  Okay.  Are we

13    otherwise ready?

14              UNIDENTIFIED ATTORNEY:  Yes, Your Honor.

15              UNIDENTIFIED ATTORNEY:  Yes, Your Honor.

16              MR. DUNCAN:  Just --

17              THE COURT:  Yes, sir?

18              MR. DUNCAN:  We're going to go first, so when Mr.

19    Ignall is done we'll take over the cross examination first.

20              THE COURT:  Very well.

21              MR. DUNCAN:  Thank you, Your Honor

22              THE COURT:  Fine.  Okay.

23              COURTROOM DEPUTY:  All rise.

24                        (Jury in)

25              COURTROOM DEPUTY:  Ladies and gentlemen,  we are

1    back on the record.

2            THE COURT:  Good afternoon.  You may be seated.

3    Members of the jury, at the outset of this trial I informed

4    you that I would give instructions and the law to you at the

5    close of the case, but also during the course of the trial.

6    I'm going to give you an instruction at this time, which is

7    nothing more at this point than a reminder of the law

8    applicable to the evidence in this case, and I will certainly

9    repeat this instruction at the conclusion of the trial.

10            Mr. Bekkedam and Mr. Hartline are charged with some

11   offenses in common, however, Mr. Bekkedam is also charged in

12   five and -- in Counts 5 and 6 with wire fraud.  Mr. Hartline

13   is not charged with wire fraud.  At various points throughout

14   the trial you will hear evidence that relates only to the wire

15   fraud charge against Mr. Bekkedam.  I instruct you that you

16   should not consider this evidence against Mr. Hartline in any

17   way.  The evidence is not relevant to the charges against Mr.

18   Hartline and it would be improper for you to consider it when

19   you evaluate whether the prosecution has proven Mr. Hartline

20   guilty beyond a reasonable doubt as to the charges against

21   him.  All right.  You may continue.

22            MR. IGNALL:  Thank you.

23         (1:28:17 to 1:59:29 previously transcribed)

24            MS. BARRY:  Your Honor, the United States calls

25   William Sayre.

1          MR. IGNALL:  Your Honor, I believe this next witness

2     needs a moment.  He should be here shortly.

3          THE COURT:  Surely.

4          MS. BARRY:  Oh, sorry about that.

5          MR. EGAN:  And, Your Honor, could we see you during

6     that moment?

7          THE COURT:  Certainly.

8               (Sidebar begins at 2:00:22)

9          MR. EGAN:  Your Honor, this is the witness about

10    whom we had the lengthy discussion this morning.

11         THE COURT:  Yes, sir.

12         MR. EGAN:  And I just want to make sure before the

13    Government proceeds that we understand how far they're going

14    and whether -- -and what Your Honor's ruling was.

15         THE COURT:  Can you give us a proffer?

16         MS. BARRY:  Yes, Your Honor.  Mr. Sayre is going to

17    say that they had a loan request coming in for $9 million,

18    which was consistent with their advertisement about providing

19    financing for the purchase of stock, which would be up to 50

20    percent, and that's why it makes sense that the $18 million --

21    they were asking for a $9 million loan because they sent the

22    information that he was going to be investing $18 million, so

23    that's consistent with the $9 million request.  The witness is

24    going to say he had a conversation with Mr. Hartline and said,

25    you know, $9 million is above the lending limit, but Mr.

1    Hartline said please consider the loan anyway for whatever

2    amount he will be approved for.

3              THE COURT:  And can I just as --

4              MR. BARRY:  Yes?

5              THE COURT:  You're going from the advertisement?

6              MS. BARRY:  Yes, there is --

7              THE COURT:  How much?

8              MS. BARRY:  Fifty percent of any investment for

9    stock options.

10             THE COURT:  And if that 50 percent exceeded nine

11   million -- and if that 50 percent exceeded five million it

12   couldn't be possible -- it wouldn't be possible?

13             MS. BARRY:  No, no, the -- their lending limit was

14   around seven.

15             THE COURT:  Okay.  So if 50 percent of anything was

16   seven or below it's okay, it could be considered?

17             MS. BARRY:  It could be, right.  Yes.

18             THE COURT:  Okay.  All right.

19             MS. BARRY:  Yes.  So they advised Mr. Hartline that

20   the $9 million was larger than what they may consider and he

21   said please consider it anyway.

22             THE COURT:  Okay.

23             MS. BARRY:  So they went on to evaluate the loan.

24   I'm going to ask what did they review and not ask specifics

25   about his conversations necessarily about the results of

1    those.  He reviewed the condition of the bank because the

2    stock would be the collateral for the loan and then he

3    reviewed the financial condition of the borrower.  And based

4    on the review of those two things they denied the loan.  And

5    I'm not going to go into the specifics of him being

6    uncreditworthy.

7              THE COURT:  Okay.

8              MR. EGAN:  And their denial of the loan to me, Your

9    Honor, is irrelevant and prejudicial.

10             UNIDENTIFIED ATTORNEY:  Your Honor, if everyone else

11   is done --

12             THE COURT:  Just one second.  Let me just hear your

13   response to it.

14             MS. BARRY:  How is it prejudicial that he was denied

15   the loan?

16             MR. EGAN:  Because the -- well, the jury will infer

17   from they denied the loan that he might not be creditworthy.

18             MS. BARRY:  Well, either we can specify all of the

19   reasons or we can just not specify all the reasons.  I thought

20   it would be less prejudicial to --

21             THE COURT:  Did it come out thus far that he did not

22   secure a loan from ACCB (sic)?

23             UNIDENTIFIED ATTORNEY:  No, it did not.

24             THE COURT:  It has not come out at all?

25             UNIDENTIFIED ATTORNEY:  No.

1          THE COURT:  Okay.  When he was asked the question

2    was there an objection to the question?

3          UNIDENTIFIED ATTORNEY:  About applying, no, because

4    --

5          THE COURT:  So he could have answered it?

6          UNIDENTIFIED ATTORNEY:  -- of their discussion this

7    morning.

8          UNIDENTIFIED ATTORNEY:  Yes.

9          THE COURT:  Okay.  I'm going to allow it.

10         MS. BARRY:  Thank you.

11         UNIDENTIFIED ATTORNEY:  Your Honor, may I --

12         THE COURT:  Yes, sir.

13         UNIDENTIFIED ATTORNEY:  -- just be heard on one more

14   point?  Mr. Levin has now testified that after the time of

15   this loan that he had (indiscernible) in cash coming in and

16   that he wasn't going to use any loan proceeds in order to pay

17   it.  It had no relevance this morning and it has much less

18   relevance now.

19         THE COURT:  It's something he testified to.  The

20   jury can accept that testimony or they can reject that

21   testimony, they can believe it or they can disbelieve it.  If

22   they accept it and they disbelieve what's coming on now, then

23   the ball goes back in your favor.

24         UNIDENTIFIED ATTORNEY:  Thank you, Your Honor.

25         THE COURT:  That's what the jury's for.

1        MS. BARRY:  Your Honor, just a request that it's one

2   lawyer that will speak on behalf of each party.  Is that still

3   the rule?

4        THE COURT:  It wasn't violating this rule I was --

5   my law clerk has been here --

6        UNIDENTIFIED SPEAKER:  I was the one taking notes.

7        THE COURT:  Okay.

8               (Sidebar ends at 2:04:28)

9        COURTROOM DEPUTY:  Please raise your right hand.

10              WILLIAM SAYRE, WITNESS, SWORN

11       COURTROOM DEPUTY:  Please state your name and spell

12  your last name for the record.

13       THE WITNESS:  William H.  Sayre, S, as in Sam,

14  a-y-r-e.

15       MS. BARRY:  May I proceed, Your Honor.

16       THE COURT:  You may proceed.

17       MS. BARRY:  Thank you.

18                  DIRECT EXAMINATION

19  BY MS. BARRY:

20  Q    Good afternoon, Mr. Sayre.  Would you please tell the

21  members of the jury where you work?

22  A    I work for Atlantic Community Bankers Bank.

23  Q    And what is Atlantic Community Bankers Bank?

24  A    Atlantic Community Bankers Bank, which I may also refer

25  to as ACBB for brevity's sake, is a bank for banks, so

1    effectively we act as a -- our customers are community banks

2    throughout the Mid-Atlantic States.

3    Q    Okay.  So you provide banking services for banks

4    themselves?

5    A    Yes.

6    Q    Okay.  And so is an average person someone who would have

7    deposits with ACBB?

8    A    No, we're prohibited by charter and by law from taking

9    deposits or making loans to the regular public.

10   Q    Okay.  But, are there certain individuals to whom you may

11   make loans?

12   A    Yes, we can make loans and do make loans to executives,

13   significant shareholders or directors of community banks

14   typically secured by the stock of the community bank that they

15   would be affiliated with.

16   Q    And, sir, what is your position with ACBB?

17   A    I'm an executive vice president and chief credit officer.

18   Q    And how long have you been with ACBB?

19   A    I joined the bank August 8th of 2005, so I guess, what,

20   ten-and-a-half years.

21   Q    Okay.  And what are your duties as the chief credit

22   officer?

23   A    I'm in charge of the risk and managing the risk for the

24   bank as it relates to loans and loan products.

25   Q    And I'd like to turn your attention to Government's

1    Exhibit 18.

2              MS.  BARRY:   And if it may just be shown to the

3    witness, please.

4    Q    And specifically, the second page of Government's Exhibit

5    18.  Do you recognize what this document is?

6    A    Yes, that would be a summary of our bank stock loan

7    program, so essentially it would outline the general

8    parameters and conditions under which we would offer this

9    particular type of loan product.

10   Q    Okay.  And to whom was -- is this being -- was this

11   advertised in some way?

12   A    No.  We would typically distribute this to our client

13   banks, to the executives or -- who work for those client banks

14   to see if there was a need or interest from either their

15   directors or executive management for this type of product.

16   Q    Okay.  So would this type of product be something where a

17   large investor or somebody -- or a director of a community

18   bank, if they wanted to purchase stock, could use, is this a

19   product they could use?

20   A    Yes.

21   Q    Now, according to the -- this particular product from

22   ACBB, what percentage would ACBB provide in terms of a loan?

23   A    Fifty percent or half of the amount of the value of the

24   stock purchase price.

25   Q    Okay.  And was this a product that was available in or

Sayre - Direct/Barry                                        79

1   about June or July of 2009?

2   A     Yes.

3   Q     Now, are you familiar with a bank called Nova Bank?

4   A     Yes.

5   Q     And how are you familiar with Nova Bank?

6   A     They were a client bank of ACBB's and then they purchased

7   Pennsylvania Business Bank, which had been also another client

8   bank of ACBB's, and we had had an extensive relationship with

9   ACBB, including a number of loan participations back and

10  forth, as well as a stock loan to one of the executives with

11  Pennsylvania Business Bank.

12  Q     So you were familiar then with Nova Bank as one of the

13  correspondent banks that you worked with at ACBB?

14  A     Yes.

15  Q     Now, in or around June or July of 2009, do you recall

16  whether or not Nova Bank made a loan request from ACBB?

17  A     Yes.

18  Q     And what was the loan request?

19  A     The loan request was to provide a loan of -- ideally of

20  $9 million secured by Nova Bank stock to a substantial

21  investor by the name of George Levin.

22  Q     And did information related to this loan request come to

23  ACBB?

24  A     Yes.

25  Q     And I'd like to turn your attention, please, to what's

1    been marked as Government's Exhibit 67.

2                MS. BARRY:   And if I may approach, Your Honor, it

3    may be easier for the witness to have the full document.

4                THE COURT:   Surely.

5    Q    And if you take a look at Government's Exhibit 67 and it

6    may make sense to start at the last page of that exhibit.  And

7    what are -- what is Government's Exhibit 67?

8    A    There's a cover letter from Nova Bank that outlines the

9    information that's attached and enclosed with respect to a

10   loan request, as stated on this cover letter, of $9 million

11   for Mr. George Levin.  And then the first page of the exhibit

12   is an Atlantic -- and you'll notice that it says Atlantic

13   Central Bankers Bank.  We changed our name from Atlantic

14   Central Bankers Bank to Atlantic Community Bankers Bank

15   several years ago.  But this is one of our internal forms, an

16   addendum to the personal financial statement, and this is

17   filled out.  And then there is a personal financial statement

18   as it's titled George and Gayla Levin.

19   Q    Okay.  And so looking at that last page, does it indicate

20   the information that is being provided to ACBB to consider a

21   $9 million loan to George Levin?

22   A    Yes.

23   Q    Okay.  And the different bullet points, is -- does the

24   that -- are those the documents that were sent for ACBB's

25   review?

Sayre - Direct/Barry                                          81

1    A    Yes.

2    Q    Okay.  And did you, in fact, receive those documents?

3    A    Yes.

4         MS.  BARRY:  And I'd like to approach, Your Honor,

5    with Government's Exhibit 67(a).

6

7         THE COURT:  Surely.

8    Q    And looking at Government's Exhibit 67(a) what are those

9    documents?

10   A    The first page is a biographical sketch of George Levin.

11   There is a -- the tax return of Mr. Levin for 2006.  At some

12   point in time it breaks to 2007, that would be at the end of

13   Page 48, I guess.  There's a 2007 tax return for Mr. Levin.

14   Q    And it may help you to look at Page 99.

15   A    There's a copy of his extension for 2008 where it's just

16   a form that says you've extended your taxes.  And then there

17   is -- starting on Page 99 of 138, there's a change in control

18   notice, which is provided to the bank regulators when someone

19   is making a substantial investment in a bank or bank holding

20   company.  I believe it's in excess of 9.9 percent that

21   requires the approval of the regulatory authorities.

22   Q    And so are the documents that are within Government's

23   Exhibit 67 and 67(a) consistent with what was sent to ACBB by

24   Nova Bank on or about July 24, 2009?

25   A    Yes.

Sayre - Direct/Barry                82

1      MS. BARRY:  Your Honor, the Government moves for the

2  admission of Government's Exhibit 67 and 67(a).

3      UNIDENTIFIED ATTORNEY:  No objection.

4      UNIDENTIFIED ATTORNEY:  No objection.

5      THE COURT:  Admitted.

6      MS. BARRY:  And, Your Honor, if the last page of

7  Government 67 may be published to the jury.

8      THE COURT:  Yes.

9      UNIDENTIFIED ATTORNEY:  No objection.

10      UNIDENTIFIED ATTORNEY:  No objection.

11  Q    So looking at this letter, what is the date of this

12  letter, please?

13  A    July 24th, 2009.

14  Q    And who is Bernadette Kibe?

15  A    Bernadette Kibe worked for me and was in charge of our

16  direct stock loan program.

17  Q    Okay.  And looking at the bullet points of the

18  information that was provided to you or provided to ACBB, is

19  that information consistent with the request -- is that

20  information consistent with the information from Government's

21  Exhibit 18, the second page, of the information required for

22  the bank stock loans?

23  A    Yes.

24  Q    Now, did you have any conversations with anyone at Nova

25  Bank about this borrower, George Levin, making -- or trying to

1    receive a loan of $9 million?

2    A     Yes, I did.

3    Q     And who did you have a conversation with?

4    A     Brian Hartline.

5    Q     Okay.  And who is Brian Hartline?

6    A     Brian Hartline was the president and chief executive

7    officer of Nova Bank.

8    Q     And when you first received the application or early on,

9    died you have a conversation with him?

10   A     Yes.

11   Q     And what was that conversation about?

12   A     We discussed the fact that the loan amount of $9 million

13   was in excess of ACBB's legal lending limit and we certainly

14   could not entertain a loan of that size nor was it likely that

15   we could find a partner that would consider a loan of that

16   request, of that size.  It was also in excess of our in-house

17   limit.  The -- at that point in time the largest loan that we

18   probably had made to any individual borrower would have been

19   just over approximately $5 million.  In addition, we had a

20   discussion relative to the financial condition of Mr. Levin.

21   Q     Okay.

22         MS. BARRY:  And if we could, please, and if it could

23   be published, Government's Exhibit 67(a), it would be Page 103

24   of 138.

25   Q     And, sir, you could take a look at that also.

1           MS. BARRY:  And if that may be published, please.

2           THE COURT:  Certainly.

3   Q    Do you have that in front of you?

4   A    I do.

5   Q    And let's just wait for Agent Boyer (phonetic) to get us

6   to Page 103.  And is Page 103 part of the application to the

7   federal regulators about a change in control for Mr. Levin

8   making the stock purchase?

9   A    It is.

10  Q    Okay.  And looking at that application, what is the

11  purchase price of these stocks that Mr. Levin is going to

12  borrow -- or, I'm sorry, is going to make of Nova Bank's

13  stock?

14  A    Eighteen million dollars.

15  Q    And so is that consistent -- looking at the next line,

16  half from personal finances, half from borrowed funds, is the

17  $9 million request consistent with that?

18          MR. EGAN:  Objection, leading.

19          THE COURT:  Sustained.

20  Q    Looking at the application,  although the -- do you know

21  where the $9 million request came from based on the

22  information that was sent to you from Nova Bank?

23  A    It corresponds to 50 percent of the proposed purchase

24  price for the stock.

25  Q    Okay.  And is that also consistent with Government's

Sayre - Direct/Barry                                    85

1    Exhibit 18, Page 2 of the stock loan that ACBB had told its
2    correspondent's banks it would  make?
3              MR. EGAN:  Objection, leading.
4              THE COURT:  Sustained.
5    Q    Was that consistent with Page 2 of Government's Exhibit
6    18?
7    A    Yes.
8              MR. EGAN:  Same objection.
9              THE COURT:  Go right ahead.
10   A    Yes, our stock loan has a 50 percent advance rate
11   parameter contained in it and that is consistent with that
12   advance rate.
13   Q    Now, when you advised Mr. Hartline that $9 million was
14   beyond the lending limit for ACBB what did he say in response
15   to that?
16   A    He understood that that amount was in excess of what we
17   could accommodate, but suggested that we do what we could and
18   consider what we could within the parameters that we had to
19   deal with.
20   Q    Okay.  And so did you go through the process then of
21   reviewing the information for the loan?
22   A    Yes.
23   Q    And when you were reviewing information to make this loan
24   approval what are the things that you would consider?
25             MR. EGAN:  Objection.

1          THE COURT:  Sustained.  Counsel, may I see you,

2    please?

3                    (Sidebar begins at 2:21:11)

4          THE COURT:  Okay.  Now we are in the area where she

5    needs to lead or else it goes outside of our --

6          MS. BARRY:  That's what I was trying to do.

7          MR. EGAN:  We are already in the area where we were

8    outside our instruction, Your Honor, his consideration and

9    what he looked at to consider is, I thought, outside the

10   limits, which is why I mad the objection.  I think the only

11   question left is, did he get the loan.

12         MS. BARRY:  No, Your Honor, I'm going to -- the

13   issue was why was he denied the loan because he wasn't

14   creditworthy.  I'm not asking questions about whether or not

15   he was creditworthy.  I'm going to ask what does -- what are

16   the things that the loan review entails, review of the bank,

17   review of the borrower, and was he given the loan?  No.

18         MR. EGAN:  And that implies the answer, Your Honor.

19         MS. BARRY:  And also, most significantly, whether or

20   not he was told by anyone at the bank that on June 30th that

21   Nova Bank had made a loan of $5 million to Mr. Levin for the

22   purchase of stock.

23         THE COURT:  We'll take a brief recess at this time,

24   please.

25         COURTROOM DEPUTY:  All rise.

1                         (Jury out)

2              UNIDENTIFIED ATTORNEY:  Thank you, Your Honor.

3              THE COURT:  Sir, you could step down.  Do you want

4    to just dismiss the --

5              UNIDENTIFIED ATTORNEY:  No problem.

6              THE COURT:  We're going to take a ten-minute recess.

7    All right, sorry.

8              UNIDENTIFIED ATTORNEY:  Should we go back to our

9    battle stations or stay here, if it's okay?

10             THE COURT:  Now, keeping brevity in mind, let's go

11   back over what the parameters were before we go for lunch

12   today regarding this issue.

13             UNIDENTIFIED ATTORNEY:  My understanding, Your

14   Honor, is that they're not ask as to why he did not receive

15   the loan.

16             THE COURT:  Do you disagree or agree with that?

17             MS. BARRY:  I'm not asking why he was -- why the

18   loan was not -- we're not asking him why.

19             THE COURT:  Okay, now, what counsel is arguing is is

20   that if that's accepted, then to ask him the other questions

21   that you wish to ask, the jury can infer why he was denied the

22   loan.

23             MS. BARRY:  Well, I think we --

24             THE COURT:  Even though there's one speaking, you

25   can confer, or you can say this privately.

Sayre - Direct/Barry                                    88

1                (Court spoke on another matter)

2            MS. BARRY:  Your Honor?

3            THE COURT:  Yes, ma'am?

4            MS. BARRY:  My next question would be, I would like

5    to lead -- have a little leeway for leading.

6            THE COURT:  Sure.

7            MS. BARRY:  Were there a number of things that you

8    considered in reviewing the loan?

9            UNIDENTIFIED ATTORNEY: (indiscernible).

10           UNIDENTIFIED ATTORNEY:  Your Honor, I'm fine if Mr.

11   Ignall wants to speak.

12           THE COURT:  Go ahead.

13           MR. IGNALL:  I don't want Ms. Barry to kick me if I

14   say something she doesn't like.

15           UNIDENTIFIED ATTORNEY:  We might like it if she did.

16           UNIDENTIFIED ATTORNEY:  I told him I was going to

17   buy him shin guards for the trial.

18           THE COURT:  You're trying to put words in my mouth,

19   counsel.

20               (Court spoke on another matter)

21           THE COURT:  Yes, ma'am?

22           MS. BARRY:  Okay, the next three questions will be

23   did anyone at Nova Bank give you information on this loan

24   which I think is yes.  Did anyone from Nova Bank tell you

25   there was a $5 million loan to Mr. Levin to buy Nova stock?

Sayre - Direct/Barry                                    89

1    The answer will be no.  Was he given the loan?  No.

2                THE COURT:  Accepted?

3                UNIDENTIFIED ATTORNEY:  Yes, Your Honor.

4                THE COURT:  Good, because I was going to shove it

5    down your throat.  I try to be smarter than that.

6                MS. BARRY:  Thank you.

7                UNIDENTIFIED ATTORNEY:  Could we be excused now,

8    Your Honor?

9                THE COURT:  Yes, sir.

10                          (Recess)

11                COURTROOM DEPUTY:  All rise.

12                          (Jury in)

13                COURTROOM DEPUTY:  Ladies and gentlemen, we are back

14   on the record.

15                THE COURT:  Good afternoon.  You may be seated.

16   Thank you.  You may proceed.

17                MS. BARRY:  Thank you, Your Honor.

18   Q    Mr. Sayre, did you ever have a conversation with the

19   borrower, George Levin, about his loan?

20   A    No.

21   Q    In your experience was that unusual?

22   A    Yes.

23                MS. BARRY:  Your Honor, the Government moves for the

24   admission of Government's Exhibit 18 and I believe that

25   there's an agreement.

1        UNIDENTIFIED ATTORNEY:  No objection.

2        UNIDENTIFIED ATTORNEY:  No objection.

3        THE COURT:  All right, admitted.

4        MS. BARRY:  And, Your Honor, if Page 2 may be

5   published to the jury?

6        THE COURT:  Granted.

7   Q    Mr. Sayre, looking at Page 2 of Government's Exhibit 18,

8   and you testified about it -- about this briefly before, and

9   just can you explain what this is again?

10  A    This essentially was an outline of our bank stock loan

11  program so it would outline the parameters under which we

12  would structure such a loan facility and the information that

13  would be required for us to consider such a facility.

14  Q    Okay, and looking right on loan amount, again, is that

15  where it's indicated that the loan would not exceed 50

16  percent?

17  A    Yes.

18  Q    And do you know whether or not Mr. Hartline knew the

19  guidelines of the ACBB bank stock loans program?

20  A    I believe he did.

21  Q    Now, when it came to this loan for Mr. Levin, did you

22  receive information from Nova Bank?

23  A    Yes.

24  Q    And did anyone from Nova Bank tell you that Mr. Loan --

25  that Mr. Levin had a $5 million loan from Nova Bank to

1    purchase Nova stock?

2    A     No.

3    Q     Did you or anyone at ACBB approve a loan to George Levin?

4    A     No.

5              MS. BARRY:  No further questions, Your Honor.

6              THE COURT:  Counsel, you want to proceed?

7              MR. EGAN:  Thank you, Your Honor.

8                         CROSS EXAMINATION

9    BY MR. EGAN:

10   Q     Good afternoon, Mr. Sayre.

11   A     Good afternoon.

12   Q     You are -- I'm sorry, your title is what?

13   A     Executive vice president.

14   Q     And there was more to it.

15   A     Chief credit officer.

16   Q     Chief credit officer.  And you talked about a Bernadette,

17   am I correct?

18   A     Bernadette Kibe, correct.

19   Q     Bernadette Kibe.  And Bernadette Kibe is the -- was what

20   was her role?

21   A     She worked for me and was the person directly in charge

22   of our direct stock loan program as well as other bank

23   services.

24   Q     She was like a loan officer, right?

25   A     Yes.

1    Q    And part of her job was to sell these loans, correct?

2    A    Not really, no.

3    Q    Well, part of her job was she was the contact point for

4    people who were interested in these loans, correct?

5    A    Yes.

6    Q    And that was because, I mean sell is a poor choice of a

7    word, but I mean you did market these loans, correct?

8    A    To a limited degree, yes.

9         MR. EGAN:  Yeah, if we could have 18, Page 2 again?

10   Q    I mean the whole purpose of 18, Page 2 is to explain this

11   program to potential people who would take out the loans,

12   right?

13   A    Yes.

14   Q    And that's because banks make -- I mean the way banks

15   make money is by making loans, right?

16   A    That's one of the ways they make money, yes.

17   Q    And it certainly is one of the ways you made money,

18   right,  at your bank, right?

19   A    As well as lost it, but yes.

20   Q    Well, your job is to make sure that doesn't happen,

21   right?

22   A    Yes, sir.

23   Q    Okay, in any event, you would agree with me this is a

24   flyer of sorts explaining this to anybody who might be

25   interested in taking advantage of this program, correct?

1    A    Anyone who's qualified.

2    Q    Well, of course.  I mean well, the advertisement is

3    something you might be interested, and then you decide if

4    you're going to do it or not, right?

5    A    This program is not, as I've testified to earlier, this

6    program is not available to the general public nor would it be

7    available to anyone who was not a significant shareholder,

8    director or officer of the client bank.

9    Q    Understood.  And you therefore only would provide this

10   information to other banks basically, right?

11   A    Yes.

12   Q    Okay, and if you go down to the bottom, we could blow up

13   the very bottom of that.

14   A    To -- well, let me clarify my answer -- to other banks,

15   directors of other banks, executive officers of other banks or

16   people affiliated with those banks.

17   Q    Sure because they're the people who could conceivably

18   take out one of these loans?

19   A    Correct.

20   Q    And it says at the bottom please contact Bernadette Kibe,

21   AVP commercial bank and officer and de novo banking

22   specialist, right?

23   A    Yes.

24   Q    Because she was the point person for these things?

25   A    Yes.

1           MR. EGAN:  And if we could then go to -- but before
2    we leave this rather than go back and forth, could we go up to
3    the information required section and blow that up?
4    Q    In order to apply for one of these loans, whomever was
5    applying needed to provide these things that are listed here,
6    correct?
7    A    Some of the -- certainly -- for instance, Number 4 and 5
8    might not be applicable in certain circumstances and certainly
9    there could be other information that was required but yes,
10   those are -- that lists information that generally would be
11   required for such a request.
12   Q    Well, so what you're saying is as you go down the road,
13   you might ask for more things but for a start, this is what
14   you're saying you need, right?
15   A    Correct, with a clarification that, for instance, if
16   someone already owned the shares, they would -- there would
17   not be a stock subscription and there wouldn't be an offering
18   circular so those would not be applicable.
19   Q    Understood.  And Number 3 says borrowers and co-borrowers
20   (if applicable), current (within six months) signed personal
21   financial statement, correct?
22   A    Yes.
23   Q    And so one of the things you wanted was the borrower's
24   financial statement within six months?
25   A    Yes.

1    Q    Now, while we're on that subject, the borrower is not

2    Nova Bank, right?

3    A    Correct.

4    Q    The borrower is George Levin?

5    A    Correct.

6    Q    So the applicant is not Nova Bank, right?

7    A    Correct.

8    Q    The applicant is George Levin?

9    A    Correct.

10         MR. EGAN:  All right now, if we could go to

11   Government 67 please?

12   Q    And essentially the first page of this is kind of I guess

13   what you'd call the application, right?  I mean it has to have

14   a lot of documents with it but this is sort of your form to,

15   you know, have somebody sign and say this is all true and

16   correct, right?

17   A    The latter portion of your statement I would concur with.

18   This is what it says.  It's an addendum to the personal

19   financial statement that indicates that part of the purpose is

20   to indicate whether they're applying for individual credit or

21   joint credit.  So in Mr. Levin's case would he be the borrower

22   himself or potentially he and his wife would be the borrower.

23   Q    Right.

24   A    So that's part of the purpose.  It also provides the

25   ability for the bank to pull credit and covers things from a

1    regulatory perspective but it's an addendum to the personal

2    financial statement.

3    Q    Right, and it's signed by Mr. Levin, correct?

4    A    Yes.

5    Q    And it's dated June 30th, correct?

6    A    I can't read whether that's a 20 or a 30 but yes.

7    Q    And so he's certifying that everything in here is true,

8    right?

9    A    Yes.

10   Q    And what's attached to it at Page 2 is his financial

11   statement, correct?

12   A    Yes.

13            MR. EGAN:   Okay now, if we could go to the last page

14   of this exhibit.

15   Q    And you've looked at this before, sir.  That is a letter

16   from Nova Bank to Bernadette Kibe, correct?

17   A    Correct.

18   Q    And it would have gone to Bernadette Kibe because she's

19   the person who Nova Bank would have known to deal with because

20   she's the one who's on the thing they were provided, right?

21   A    Well, there's a simpler answer to that.  It's who it's

22   addressed to.

23   Q    Sure.  And it's signed by Tom Patterson, you see that?

24   A    Yes.

25            MR. EGAN:   And if we could just go down a tiny bit

1  more?

2  Q    He is a senior vice president at Nova Bank, correct?

3  A    That's what it says.

4  Q    All right, and so he's the one who's providing all of

5  this information, right?

6  A    That's who signed the letter.

7  Q    Okay, and one of the things he's sending is the personal

8  financial statement for George and Gayla Sue Levin, correct?

9  A    That's what the letter says.  We received a personal

10 financial statement for George and Gayla Levin.

11 Q    Right, it's the thing we just looked at, right?

12 A    That is correct.

13 Q    Okay, and it's from March of 2009, correct?

14 A    That is the date of it.

15 Q    And that is within six months of the application just

16 like you guys required, right?

17 A    That is within the six-month parameter that's outlined in

18 the summary of the stock loan program.

19 Q    And correct me if I'm wrong, but you couldn't put a loan

20 that you took out in June on a March financial statement,

21 could you?

22 A    Could you repeat the question please?

23 Q    Sure.  Mr. Levin took out a loan from Nova Bank in June

24 of 2009.  That would not be on his March 2009 financial

25 statement, correct?

1   A      Correct.

2   Q      Now, you never met Brian Hartline, did you?

3   A      Yes, I have met him.

4   Q      All right, and when was that?

5   A      I could not recall the specific date but I -- he's

6   familiar.  He's sitting over there.  I know who he is.

7   Q      Is he the guy with the blue tie on?

8   A      The -- no, that's not Mr. -- no, he's the man in the

9   purple tie.

10  Q      That guy there?

11  A      Yes.

12  Q      Okay, did you ever meet Tom Patterson?

13  A      No.

14  Q      Now, you --

15  A      Not that I recall.

16  Q      Okay, you would agree with me that it's been a long time

17  since 2009?

18  A      Yes.

19  Q      And your conversations with Mr. Hartline in regard to

20  this loan were fairly brief?

21  A      Yes.

22  Q      And they were on the phone?

23  A      Yes.

24  Q      Any possibility you have him confused with Mr. Patterson

25  and those conversations took place with Mr. Patterson?

Sayre - Cross/Engle                                99

1    A     No.

2              MR. EGAN:  No further questions, Your Honor.

3              MR. ENGLE:  May I cross examine?

4              THE COURT:  Yes, sir.

5                        CROSS EXAMINATION

6    BY MR. ENGLE:

7    Q     Good afternoon, Mr. Sayre.

8    A     Good afternoon.

9    Q     For the record, I am not Brian Hartline.  My name is

10   Michael Engle.  I'm an attorney representing Barry Bekkedam,

11   the gentleman seated over there in the blue tie.  Have you

12   ever seen him before?

13   A     No.

14   Q     Ever met Mr. Bekkedam before?

15   A     No.

16             MR. ENGLE:  Can we call up Government Exhibit 67

17   please and go to the last page please?

18   Q     You just went over this letter a couple of moments ago

19   with Mr. Egan.  This is the letter from Mr. Patterson to one

20   of your colleagues at the bank, correct?

21   A     Could you repeat the question please?

22   A     This is a letter to one of your colleagues at ACBB from

23   Mr. Patterson at Nova Bank, correct?

24   A     Yes.

25             MR. ENGLE:  Okay, can we go back to the full shot of

1    the letter?

2    Q    At the bottom of the letter do you see anywhere that

3    anyone is cc'd or carbon copied on the letter?

4    A    No.

5    Q    In fact, it does not indicate that a carbon copy would

6    have gone to Mr. Bekkedam, correct?

7    A    Correct.

8    Q    At no point in time while you were considering whether or

9    not you were going to give this loan to George Levin did Mr.

10   Bekkedam ever call you to try to influence your decision, am I

11   correct about that?

12   A    You are correct.

13   Q    At no time while you were considering whether or not to

14   give a loan to Mr. Levin you never received an e-mail from Mr.

15   Bekkedam imploring you to give him the loan?

16   A    No.

17   Q    Mr. Bekkedam at no time during this process ever

18   communicated with you in any way whatsoever to provide you

19   with information in support of this loan application, am I

20   also correct about that?

21   A    No, I never spoke with or received any correspondence or

22   had any contact with Barry Bekkedam at all.

23   Q    Thank you very much, sir.

24            MR. ENGLE:  No further questions, Your Honor.

25                        REDIRECT EXAMINATION

Fuir - Direct/Barry                                        101

1    BY MS. BARRY:

2    Q    Mr. Sayre, when you had conversations with Mr. Hartline

3    about the request for the $9 million George Levin loan, were

4    those conversations on the phone?

5    A    Yes, they were.

6    Q    Do you have a good memory of what Mr. Hartline looks

7    like?

8    A    No.

9            MS. BARRY:  No further questions, Your Honor.

10           UNIDENTIFIED ATTORNEY:  No recross, Your Honor.

11           MR. ENGLE:  Nothing, Your Honor, thank you.

12           THE COURT:  Thank you, sir.  You may step down.

13   Watch your step please.

14           MS. BARRY:  Your Honor, the United States calls

15   Glenn Fuir.  May I retrieve the exhibits, Your Honor?

16           THE COURT:  Surely.

17           MS. BARRY:  Thank you.

18           COURTROOM DEPUTY:  Please raise your right hand.

19               GLENN ALLEN FUIR, WITNESS, SWORN

20           COURTROOM DEPUTY:  Please be seated.  Please state

21   your full name and spell your last name for the record.

22           THE WITNESS:  My name is Glenn Allen Fuir, F-u-i-r.

23           MS. BARRY:  May I proceed, Your Honor?

24           THE COURT:  You may proceed.

25           MS. BARRY:  Thank you.

1                          DIRECT EXAMINATION

2    BY MS. BARRY:

3    Q     Good afternoon, Mr. Fuir.  Where do you work, sir?

4    A     The Federal Reserve Bank in Philadelphia.

5    Q     And how long have you been with the Federal Reserve Bank

6    of Philadelphia?

7    A     Eighteen years.

8    Q     And what is your position with the Federal Reserve?

9    A     I'm a manager in the credit risk management function.

10   Q     And is that the same or a different position that you

11   held in 2009?

12   A     Different.

13   Q     And what was your position in 2009?

14   A     I was a manager over the exam function for safety and

15   soundness and trust examiners.

16   Q     And are you familiar with Nova Financial Holding?

17   A     Yes.

18   Q     And as part of the position you were in in 2009 did that

19   include inspecting or reviewing financial institutions under

20   the -- that regulated certain financial institutions?

21   A     For bank holding companies, yes.

22   Q     So is Nova Financial Holding Company an institution that

23   was regulated by the Federal Reserve?

24   A     Yes.

25   Q     Now, was Nova Financial Holdings Company a parent or the

1   parent to Nova Bank?

2   A    Yes.

3   Q    Do you recall whether or not in April of 2009 that you

4   conducted a review of Nova Financial Holdings?

5   A    I did.

6   Q    And what was -- what's the purpose just generally for a

7   review?

8   A    So I think Nova was under the what we call the small

9   shell bank holding company program based on the fact that the

10  size of the consolidated organization was less than a billion

11  dollars in total assets.  So for those institutions we would

12  not do a full bank holding company inspection with a team of

13  examiners on site but do a limited review.

14  Q    And was the -- what was the purpose of the review?

15  A    To assess the parent company, well, I guess you could say

16  the consolidated organization and issue ratings.

17  Q    And would that be to assess it with regard to safety and

18  soundness?

19  A    Yes.

20  Q    And who was your primary contact at Nova Financial?

21  A    Mr. Hartline.

22  Q    And have you met Mr. Hartline before?

23  A    Yes.

24  Q    And do you recognize him here today?

25  A    I do.

1    Q    And can you identify him please?

2    A    At the table, middle of the table.

3         MS. BARRY:  Okay, Your Honor, let the record reflect

4    that the witness has identified defendant Brian Hartline.

5         THE COURT:  The record shall so reflect.  You may

6    continue.

7         MS. BARRY:  Thank you.

8    Q    And was this review on site or off site?

9    A    There was a portion that was conducted at the

10   institution.

11   Q    Now, prior to going to the institution did you ask for

12   certain things that you wanted to look at while you were

13   conducting your review?

14   A    Yes.  We typically issue what's known as a first day

15   letter that has a list of items that the examiner will review

16   on site.

17   Q    At the time -- and when you did this review, did you meet

18   with defendant Hartline?

19   A    I did.

20   Q    At the time of your review did you know whether or not

21   Nova had applied for TARP funding?

22   A    Yes.

23   Q    And who told you that?

24   A    Mr. Hartline.

25   Q    And what did he say about the TARP funding?

1    A    Well, I don't recall the details of the conversation.

2    Q    Did he just tell you generally they were expecting to get

3    TARP funding?

4    A    They did.

5              MR. EGAN:   Objection.

6              THE COURT:   Sustained.

7    Q    What do you recall, if anything?

8    A    That they applied for TARP funding.

9    Q    And did their -- and at the time you did the review had

10   there been any kind of approval for TARP funding as far as you

11   knew?

12   A    Not at that time.

13   Q    Did your review include anything related to TARP funding

14   as far as the safety and soundness of the institution?

15   A    I don't understand the question.

16   Q    When you did your review, did Mr. Hartline tell you that

17   they were or they had applied for TARP funding?

18   A    Yes.

19   Q    The fact that they had applied for TARP funding, did that

20   affect your review at all?

21   A    No.

22   Q    Now, after your review, what was -- actually, what was

23   the result of your review of the holding company?

24   A    So following the inspection of the holding company, we

25   generate a brief letter explaining what the ratings were that

1    were issued for that particular supervisory event.

2    Q    Okay.  So I'm sorry, I was calling it a review.  Is it

3    better to -- you use the word inspection?

4    A    Inspection.

5    Q    Okay, so after your inspection of the holding company,

6    was there -- what action, if anything, was taken?

7    A    So like I said, we generated this report that

8    communicated the ratings for the holding company and that was

9    a downgrade from the prior rating.

10   Q    Okay, so based on your inspection, the holding company

11   was downgraded?

12   A    Yes.

13   Q    I'd like you to take a look please at what's been marked

14   as Government's Exhibit 32 and just for the witness please.

15   And looking at Government's Exhibit 32, what is it please?

16   A    So this is the letter that we issued to the institution

17   communicating the ratings.

18   Q    Okay, and communicating the downgrade?

19   A    I don't know if it says specifically in there that it was

20   a downgrade from the prior inspection, but the ratings for

21   this time were certainly highlighted there, the risk

22   management rating of 3 and composite rating of 3.

23   Q    And did you know at that time that that was a downgrade

24   of the holding company?

25   A    Yes.

1    Q    And did you have a hand in reviewing or drafting this

2    letter?

3    A    I did, yes.

4         MS. BARRY:  Your Honor, the Government moves for the

5    admission of Government's Exhibit 32.

6         UNIDENTIFIED ATTORNEY:  No objection.

7         UNIDENTIFIED ATTORNEY:  No objection.

8         THE COURT:  Admitted.

9         MS. BARRY:  May it be published, Your Honor?

10        THE COURT:  Yes.

11   Q    And what is the date of this letter?

12   A    June 10th, 2009.

13   Q    And looking at the upper third portion, bank holding

14   company rating system and the ratings there, risk management

15   rating and composite rating are 3, and is that from 1 to 5?

16   A    Yeah, the scale is 1 to 5 with the 1 being the strongest

17   rating, the 5 being the weakest.

18   Q    Okay, and so the 3 is a downgrade from a 2?

19   A    Yes.

20   Q    And would you please read the sentence that follows

21   composite rating?

22   A    Sure.  There is growing supervisory concern about the

23   institution's consolidated financial condition due in part to

24   continual net operating losses and capital levels that are not

25   commensurate with the risk profile of the organization.

1    Q    And would you please read the next sentence?

2    A    As of March 31st, 2009 the total risk based capital ratio

3    of Nova Bank was revised to 8.82 percent after credit related

4    other than temporary impairments were recognized in the bank's

5    trust preferred securities investments.

6    Q    So while -- you're not regulating the bank, correct?

7    A    Correct.

8    Q    But you do know who regulates the bank?

9    A    Yes.

10   Q    And what agency regulates the bank?

11   A    So the federal regulator would have been the FDIC and the

12   State would have regulated it as well.

13   Q    And do you understand what the 8.82 percent meant as far

14   as the bank's capital levels?

15   A    Right, so the capital levels are in these different

16   categories based on a prompt corrective action.  Designations,

17    well capitalized is the top category and with the total risk

18   based capital ratio dropping below ten percent and that would

19   have put the institution into an adequately capitalized

20   category.

21   Q    Now, based on this downgrade and the bank going from well

22   capitalized to adequately capitalized, do you -- were there

23   any, at least from the holding company perspective, were there

24   any restrictions now on the holding company?

25   A    Well, one of the factors I think that was relevant at the

Fuir - Direct/Barry                                    109

1    time is they were looking to become a financial holding

2    company to have an acquisition of I think it was an insurance

3    company so in order to qualify for a financial holding

4    company, you'd have to have institutions under the umbrella of

5    the parent that are all well capitalized and well managed.  So

6    not being able to qualify for that financial holding company

7    designation would have negatively impacted their ability to

8    acquire this institution which was in the insurance industry.

9    Q    Okay, does the name DVFG sound familiar?

10   A    That's the one, yes.

11   Q    Now, do you recall after this letter went out with the

12   downgrade of the holding company if you had a conversation

13   with defendant Hartline?

14   A    I did, yes.

15   Q    And I'd like you to take a look at Government's Exhibit

16   33 please.  And when did you have a conversation with Mr.

17   Hartline?

18   A    Right, so this would have been on the morning of June

19   12th, 2009.

20   Q    And did you memorialize your conversation with Mr.

21   Hartline?

22   A    In this e-mail message to my boss, yes.

23           MS. BARRY:  Your Honor, the Government moves for the

24   admission of Government's Exhibit 33.

25           MR. EGAN:  No objection.

1        MR. ENGLE:  No objection.

2        THE COURT:  Admitted.

3        MS. BARRY:  And may it be published, Your Honor?

4        THE COURT:  Yes.

5   Q    So based on your conversation with Mr. Hartline, what was

6   your impression of his emotion with relation to the downgrade?

7   A    Well, I called to apologize for not having a conversation

8   ahead of the receipt of the communication you just shared so

9   he was not happy that the rating came out to be 3 for those

10  two components we just mentioned.

11  Q    Okay, so he was not happy?

12  A    Correct.

13  Q    And could you please read the first sentence there

14  regarding your conversation?

15  A    Yes.  This is, again, to Eric, my boss.  I spoke with

16  Brian Hartline for 40 minutes this morning and he was most

17  concerned about the impact of the ratings on his TARP

18  application and the DVFG acquisition.

19  Q    And why don't you please read that entire first

20  paragraph?

21  A    He also commented that management has never been rated

22  below a 2.  Brian said he thought our ratings decision was

23  made in a vacuum because we did not consider the pending TARP

24  funds as well as another $15 million he is arranging with a

25  private investor (possibly in connection with the DVFG

1   acquisition).

2   Q    And is this conversation the rest of your e-mail to, and

3   I'm sorry, who is this e-mail to?

4   A    So this is Eric Sonnheim would have been my boss at the

5   time.

6   Q    And the rest of the conversation, and I know it's

7   memorialized and written there, but are you basically

8   explaining the reasons for the downgrade and Mr. Hartline is

9   arguing his points?

10  A    Yes.

11             MR. EGAN:  Objection.  It's a characterization of

12  what Mr. Hartline is doing.

13             THE COURT:  Overruled.

14  Q    You may answer.

15  A    Yes.

16  Q    Now, was there a conversation -- did you have any other

17  conversations with Mr. Hartline after this one on June 12,

18  2009?

19  A    No, I did not.

20  Q    Do you know if Mr. Hartline provided any kind of response

21  to the June 10, 2009 letter?

22  A    Yes, so we would have asked for an official response from

23  the institution.

24  Q    And did you see that official response from the

25  institution?

Fuir - Direct/Barry                                    112

1    A    I did.

2    Q    And I'd like you to take a look now at it's been marked

3    as Government's Exhibit 61(a).

4             MS. BARRY:  With the Court's indulgence, Your Honor,

5    I've put down the wrong exhibit number.  Can we try 60?  I

6    apologize, I had 61(a).  It's 60 please, Your Honor.  Thank

7    you.

8    Q    If you'd take a look at what's been marked as

9    Government's Exhibit 60 and do you recognize what this is?

10   A    Yes, this would have been the response.

11   Q    Okay.

12            THE COURT:  Could you keep your voice up a little

13   bit, sir?

14            THE WITNESS:  A little louder?

15            THE COURT:  Yes, sir.

16            THE WITNESS:  That's the response.

17            THE COURT:  Thank you.

18            MS. BARRY:  Your Honor, the Government moves for the

19   admission of Government's Exhibit 60.

20            MR. EGAN:  No objection.

21            MR. ENGLE:  No objection.

22            THE COURT:  Admitted.

23            MS. BARRY:  May it be published, Your Honor?

24            THE COURT:  Granted.

25   Q    Looking at Government's Exhibit 60, what is the date of

1    this letter?

2    A     July 15th, 2009.

3    Q     Okay, and looking at the first line, is this a letter in

4    response to the Federal Reserve's June 10, 2009 letter and a

5    subsequent meeting on June 24, 2009?

6    A     Yes.

7    Q     Now if you could please turn to Page 3 of that letter.

8    And would you please read the paragraph that begins as part of

9    Nova's CPP application?

10   A     Sure.  As part of Nova's CPP application, Nova has been

11   in constant contact with the FDIC and in the latter part of

12   May 2009 provided the FDIC with its asset quality trends and

13   its adjusted capital ratios through March 31st, 2009.  On June

14   10th, 2009 Nova was informed that the FDIC's counsel had

15   approved Nova's TARP/CPP application and was submitting it to

16   the Treasury Department for final approval.  Nova would be

17   eligible to receive approximately $14 million of CPP funds

18   contingent upon Nova raising $15 million of common equity.

19   This amount of capital would allow Nova to regain its well

20   capitalized status and the TARP funds would allow Nova Bank to

21   continue to support the credit needs of the communities we

22   serve during these difficult times.

23   Q     And looking at the end of the letter, who are the

24   signatories to this letter?

25   A     I don't know if I can pronounce it, Edward DiMarcantonio

1    who's the chairman and Brian Hartline, president and chief

2    executive officer.

3              MS. BARRY:  May we have a moment, Your Honor?

4              THE COURT:  Yes.

5              MS. BARRY:  No further questions.  Thank you.

6              MR. EGAN:  May I proceed, Your Honor?

7              THE COURT:  You may proceed.

8                        CROSS EXAMINATION

9    BY MR. EGAN:

10   Q    Good afternoon, sir.

11   A    Hello.

12   Q    Sir, in 2009 you were I believe you said an examiner was

13   one of your jobs?

14   A    I was a manager over a team of examiners, yes.

15   Q    You were a manager of a team of examiners.  And what you

16   said took place at Nova Bank in March or I guess subsequent to

17   March 30 -- as of March 31st, 2009 was an inspection, correct?

18   A    Yes.

19   Q    And that inspection involved yourself, correct?

20   A    Just me.

21   Q    Just you.  The physical inspection, actually going out

22   and meeting with the folks at the bank was just you, correct?

23   A    That is correct.

24   Q    But there was also a team of individuals that assisted

25   back at the office on it or did you do the whole thing

1    yourself?

2    A    No, it was me.

3    Q    You did the whole thing yourself, okay.  But you're not

4    the only, as you testified on direct, agency that inspects

5    Nova Bank, correct?

6    A    The bank is -- that's correct, not the bank.

7    Q    Right, because we have the holding company which is one

8    entity and that's what you're responsible for, the Federal

9    Reserve Board, right?

10   A    Correct.

11   Q    And then we have the bank which is what the FDIC is

12   responsible for, correct?

13   A    As well as the State Department.

14   Q    As well as the State, correct.  And so your examination

15   or inspection -- your inspection is separate and apart from

16   the inspections that they also conduct?

17   A    Correct.

18   Q    And that's routinely done?  I assume you do that once a

19   year?

20   A    The inspections?

21   Q    Yeah.

22   A    I think they were on like a two-year cycle.

23   Q    Okay, but it was a regularly scheduled inspection?

24   A    Correct.

25   Q    And before you even go out there, you said you sent what

1    you call a first day letter, right?

2    A    That is right.

3    Q    And that first day letter asks essentially for the

4    holding company to provide all sorts of information to you,

5    correct?

6    A    There was a list of several items, yes.

7    Q    Right.  The Board of Directors meeting minutes, correct?

8    A    Uh-huh.

9    Q    Any information packets provided to the Board of

10   Directors, correct?

11   A    Yes.

12   Q    The corporate organization chart, correct?

13   A    Uh-huh.

14   Q    The internal audit risk assessment?

15   A    Yes.

16   Q    The audit plan schedule?

17   A    Yes.

18   Q    The most recent audit findings?

19   A    If it's on the letter.  I don't remember.

20   Q    It's on the letter.  And then also a copy of the most

21   recent strategic plan, capital plan and budget, correct?

22   A    Yes.

23   Q    So that's a lot of stuff that you have to go look at?

24   A    I mean it's several items, yes.

25   Q    It was a big -- I mean it's a big and important job,

1    right?

2    A     Uh-huh.

3    Q     Yes?

4    A     Yes.

5    Q     And the one the FDIC does is actually even more

6    extensive, right?

7    A     Yes, that would be a full examination.

8    Q     And the Pennsylvania Department of Banking is even more

9    extensive, correct?

10   A     Than what we do, yes.

11   Q     Now, you went and did this in March, correct, because

12   your letter is March 24, 2009?

13   A     April 1st.

14   Q     April 1st.  But you didn't write your letter with your

15   downgrade findings until June of 2009, correct?

16   A     Correct.

17   Q     And that was one of the things that Mr. Hartline was a

18   little bit unhappy about, right?

19   A     That I didn't communicate to him before he received the

20   letter.

21   Q     Right, and also that maybe the letter had taken a little

22   longer than it typically did?

23   A     I don't recall that, no.

24   Q     Okay well, we can go to that in a minute.  You, sir, you

25   didn't have any role in the TARP process, correct?

1    A    I did not.

2    Q    And you didn't communicate to the CPP at all?

3    A    No.

4    Q    You don't have any idea who makes the decisions down

5    there, right?

6    A    No, I do not.

7    Q    But you did as a result of your inspection downgrade,

8    write a letter and I assume you had to get approval from

9    somebody to actually do the downgrade but --

10   A    Yes.

11   Q    And that would have been this Mr. Sonnheim is it?

12   A    Sonnheim.

13   Q    He's the guy you sent the e-mail to --

14   A    Right.

15   Q    -- your boss?

16   A    He would have been my boss.

17   Q    So you would have to say to your boss hey, this is what I

18   found, can you take a look at it, is it okay to go, is that

19   part of the process?

20   A    Well, it may not be that simple.  We talk about it.  I

21   have to document all the information accumulated during this

22   review in a set of work papers that he would review.

23   Q    Right.  All I was trying to establish is that you can't

24   just make the decision yourself.  You need his approval?

25   A    That's correct.

1    Q    Okay, so in June you send a letter and that letter on

2    June 10th basically says that as of March 31st, 2009 the --

3    you have downgraded two of the ratings, the risk management

4    rating and the composite rating, correct?

5    A    Yes.

6    Q    And basically that's -- even though it's as of March

7    31st, it would be reported as of March 31st, this is not

8    anything that Nova's been finding out in March.  They don't

9    find out til June when you sent the letter?

10   A    Right, so we have to pick an as of date --

11   Q    Sure.

12   A    -- financially.

13   Q    Makes sense.  And when you downgraded the bank, that

14   caused the Federal Reserve to place a restriction on the

15   ability of Nova to pay dividends, correct?

16   A    So we downgraded the holding company, not the bank.

17   Q    Right, I'm sorry.  I keep getting those confused.

18   A    Yeah.  And the -- you asked if there were -- the outcome

19   was a restriction on the payment of dividends.

20   Q    Correct.

21   A    Right, so that would have been an enforcement action that

22   came out of this.

23   Q    Okay, and then you're aware that that's what took place

24   as a result of your downgrade, right?

25   A    Yes.

1           MR. EGAN:  Okay, and if we could go to Government's

2    Exhibit 33 please?  And if we could go to the second paragraph

3    from the bottom.  Not a major point but -- no, the one that

4    starts with Frank finally, the very next one.  Yeah.

5    Q    Finally, I explained to Brian that our letter was delayed

6    at the end of my time line because of a heavy workload, right?

7    Does that refresh your recollection that he was a little but

8    upset about how long it took?

9    A    No actually it doesn't to be honest.

10   Q    Okay.  Well, you are saying that it was delayed, right?

11   A    Yes.

12   Q    And then you say frankly, I think the delay worked to our

13   advantage because of the OTI issue that came to light

14   following Nova's annual audit which was conducted after my

15   visit on April 1st, correct?

16   A    Yes, that's what it says.

17   Q    And that has to do with the securities issue that you

18   really weren't involved in that investigation or that

19   examination, correct?

20   A    No, I was not.

21   Q    But you had been told by one of your -- one of the other

22   regulatory agencies about that issue?

23   A    Yes.  I don't remember how the information came to me but

24   I was aware of it.

25   Q    Okay, and that's another factor that would impact your

Fuir - Cross/Egan                                      121

1   rating of the holding company, correct?

2   A    Yes.

3        MR. EGAN:  Now, if you could go back to the -- oh,

4   and just to the next paragraph down.

5   Q    Brian remains frustrated due to the lack of communication

6   prior to receiving the letter.  So it would be normal for you

7   to call up the bank and say hey, you're about to get a letter

8   and that's not good news?  Would that be like more typical?

9   A    Yes, we would be more proactive in our communication with

10  the institution.

11  Q    And you were just real busy so you didn't get a chance to

12  do that?

13  A    That's right.

14  Q    Okay, and you're sending this to your boss because you

15  basically know he's going to be calling him up and talking to

16  him too?

17  A    After my conversation with Brian, I expected Brian to

18  call Eric, yes.

19  Q    And that's why you wrote this long explanation, correct?

20  A    Yes.

21       MR. EGAN:  Now, if you could go to the paragraph

22  that begins during our discussion which is two up?

23  Q    The last sentence of that says if I interpreted the

24  statement correctly, then he missed my point.  You see that?

25  A    I do.

1    Q    So your feeling when you hung up the phone with Mr.

2    Hartline was he didn't quite understand what you were trying

3    to communicate to him?

4    A    So this is in reference to the parent bank holding

5    company serving as a source of financial strength --

6    Q    Right, and you're saying --

7    A    -- for the bank subsidiaries.

8    Q    And you're basically saying you don't think he quite

9    understood what you're trying to say to him, right?

10   A    About the purpose of capital.

11   Q    Right.

12   A    Yes.

13   Q    Okay.  Now, this also mentions this DVFG quite a bit,

14   correct?

15   A    It's in there, yes.

16   Q    And you're familiar with the fact that Nova wanted to

17   take over this insurance company called DVFG?

18   A    Yes.

19   Q    And they were in the process of trying to do that during

20   2009?

21   A    Yes.

22   Q    And that would have been an expansion, correct?

23   A    I believe it was, yes.

24   Q    And you rated Nova as a holding company of 3, correct?

25   A    Yes.

1    Q    Now, it goes from 1 to 5?

2    A    That's the scale.

3    Q    So 5 would be an imminent danger of being taken over,

4    correct?

5    A    Yes, that's the weakest rating.

6    Q    Okay, and 4 would mean a little bit closer to being taken

7    over?

8    A    Mm-mm.

9    Q    And 3 means not doing fantastic but it doesn't mean

10   they're in any danger of imminent failure, correct?

11   A    That's right, less than satisfactory.

12   Q    Because if you were going to say they were in imminent

13   danger of failure, you would have put a higher rating on it?

14   A    Lower rating.

15   Q    Lower rating.  Higher number, lower rating.

16            MR. EGAN:  Now, if we could go to Government 60?

17   Q    And this is a letter that you were shown by Ms. Barry and

18   it is a letter from Nova to the Federal Reserve Bank, correct?

19   A    Yes, it is.

20   Q    And it went to Mr. Sonnheim.  Did you actually receive

21   this back when it was sent or have you just seen it later?

22   A    No, I saw it earlier.

23   Q    And it's a very long letter, right?

24   A    A couple of pages.

25   Q    And it has a whole lot of reasons why Nova disagrees with

Fuir - Cross/Egan                                    124

1    being downgraded, correct?

2    A    Yes.

3    Q    And among those are that it's provided ample evidence of

4    its ability to serve as a source of financial strength,

5    correct?  If you want to go to Page 2 --

6    A    I don't recall that specifically.

7              MR. EGAN:  Sure, let's go to Page 2 of 3.

8    Q    And if we start the Paragraph finally, it's finally Nova

9    Bank believes that it has provided ample evidence of ability

10   to serve as a source of financial strength to Nova Bank via

11   its ability to raise capital over the years, right?

12   A    Yes.

13   Q    And during the examiner's visitation Nova communicated it

14   had just begun a capital raise with an offering document dated

15   March of 2009, correct?

16   A    Yes.

17   Q    And then it talks about all the times that they had

18   raised capital over the years, correct?

19   A    Yes.

20   Q    And that was all true, right?

21   A    It was.

22   Q    They had raised capital on all those occasions?

23   A    Yes.

24   Q    Unfortunately, the last thing they did with the capital

25   the year before was buy Pennsylvania Business Bank, correct?

1   A    Right, so they -- I think that acquisition was financed

2   by the reissue of trust preferred securities that had been

3   previously retired.

4   Q    Right, and buying Pennsylvania Business Bank was one of

5   the things that had a major impact on their balance sheet,

6   wasn't it?

7   A    It increased the size of the organization, yes.

8   Q    Okay now, going to the last page that you were shown by

9   Ms. Barry, as part of Nova's CPP application paragraph, in the

10  part that you were asked to read on June 10th, 2009 Nova was

11  informed that FDIC's counsel had approved Nova's TARP/CPP

12  application, right?

13  A    Mm-mm.

14  Q    And was submitting it to the Treasury Department for

15  final approval, correct?

16  A    Yes, that's what it says.

17  Q    So at this point there is no approval, correct?

18            MS. BARRY:  Objection.

19            THE COURT:  Sustained.

20  Q    It says submitting it to the Treasury Department for

21  final approval, correct?

22  A    Yes.

23  Q    And then it goes on to say Nova would be eligible to

24  receive approximately 14 million of CPP funds contingent upon

25  Nova raising 15 million of common equity, correct?

126

1    A    Correct.

2    Q    And it then says this amount of capital would allow Nova

3    to regain its well capitalized status, correct?

4    A    Yes.

5    Q    So what they're telling you, Mr. DiMarcantonio and Mr.

6    Hartline, is that if they get the 14 million plus the 15

7    million, they will be well capitalized, correct?

8              MS. BARRY:  Objection.

9              THE COURT:  Sustained.

10   Q    This amount of capital in the sentence below 14 and 15

11   million, that refers to the sentence before, does it not?

12   A    Yes.

13             MS. BARRY:  Objection.

14             THE COURT:  Counsel, okay, could I see you please?

15                        (At Sidebar)

16             THE COURT:  What's the nature of the objection?

17             MS. BARRY:  Your Honor, it says and.  He's saying

18   that this total.  That's not what -- regardless, it's not --

19   he can't say what it means.

20             THE COURT:  Wait a minute.  Go ahead.  I'm sorry.

21             MS. BARRY:  I'm sorry.  If he would clarify and.

22   It's this amount of capital would regain Nova's -- regain its

23   well capitalized status and the TARP funds would allow for

24   Nova capital to increase.  So we'd just like to make sure of

25   the clarification.

1          THE COURT:  So the solution to the problem would be

2     if you read verbatim, would that be acceptable as opposed to

3     paraphrasing it in a question?

4          MS. BARRY:  That's fine, Your Honor, yes.

5          MR. EGAN:  And, Your Honor, I'll withdraw it because

6     I was trying to save time by paraphrasing.

7                    (Conclusion of Sidebar)

8          THE COURT:  All right.

9     Q    And then it goes on to say that this amount of capital

10    would allow Nova to regain its well capitalized status and the

11    TARP funds would allow Nova Bank to continue to support the

12    credit needs of the communities we serve during these

13    difficult times, correct?

14    A    Yes, it does.

15    Q    So what they're basically saying to you is if all of this

16    happens, we'll able to continue to serve the community,

17    correct?

18    A    Yes.

19    Q    And Mr. DiMarcantonio, he is chairman -- he's the

20    chairman of the board of Nova Financial Holdings, correct?

21    A    I believe so.

22    Q    And the president would report to the chairman of the

23    board, correct?

24    A    Yes.

25          MR. EGAN:  I believe that's all I have, Your Honor.

1          MS. SHEALY:  Can I just briefly?

2                    CROSS EXAMINATION

3    BY MS. SHEALY:

4    Q    Good afternoon, Mr. Fuir.  I'm Allison Shealy.

5    A    Hello.

6    Q    I represent Barry Bekkedam, the tall gentleman in the

7    blue tie over there.

8    A    Uh-huh.

9    Q    (Coughing) Excuse me.  During your direct examination I

10   believe you characterized your review of the Nova Financial

11   Holdings Company as a limited review or a limited inspection,

12   is that correct?

13   A    Yes.

14   Q    And it's limited based on the size and type of holding

15   company that Nova was, right?

16   A    Right.  We call it a small shell.

17   Q    Okay, and Mr. Egan, he identified a number of items that

18   you asked for as part of your first day letter, is that

19   correct?

20   A    Yes.

21   Q    And you were provided all of those items, weren't you?

22   A    Yes.

23   Q    You were given access to anyone that you wanted to talk

24   to at the holding company or even at the bank, is that right?

25   A    That's correct.

Fuir - Cross/Shealy                    129

1    Q    And during all of that information you never spoke to my

2    client, Barry Bekkedam, did you?

3    A    I did not.

4    Q    You never communicated with Mr. Bekkedam in any way, via

5    e-mail, telephone, in person, did you?

6    A    No.

7    Q    In fact, you never met or saw Mr. Bekkedam before today,

8    is that right?

9    A    That is correct.

10             MS. SHEALY:  No further questions, Your Honor.

11             MS. BARRY:  No questions.  No redirect.

12             THE COURT:  All right.  Sir, you may step down.

13   Thank you.

14             THE WITNESS:  Thank you.

15             MS. BARRY:  Your Honor, the United States calls

16   Jeffrey Hanuscin.

17             THE COURT:  Ladies and gentlemen, I have to share

18   with you that I've been doing this, like I said, about 30

19   years now and I was in the state court for 21 years before

20   coming here.  I recall both as an attorney and as a judge for

21   that 21 period of time no one ever had anything to drink in

22   the jury box.  And I look out today and everyone has to be

23   hydrated and it's an important thing to do but I just thought

24   you might appreciate the fact that history has changed

25   dramatically.

1          COURTROOM DEPUTY:  Please raise your right hand.

2            JEFFREY THOMAS HANUSCIN, WITNESS, SWORN

3          COURTROOM DEPUTY:  Please be seated.  Please state

4     your full name and spell your last name for the record.

5          THE WITNESS:  Jeffrey Thomas Hanuscin,

6     H-a-n-u-s-c-i-n.

7          MS. BARRY:  May I proceed, Your Honor?

8          THE COURT:  You may proceed.

9          MS. BARRY:  Thank you.

10                    DIRECT EXAMINATION

11    BY MS. BARRY:

12    Q    Good afternoon, Mr. Hanuscin.  Mr. Hanuscin, where do you

13    work?

14    A    Currently I work with Prudential Savings Bank.

15    Q    And what's your position there?

16    A    Vice president/comptroller.

17    Q    And prior to Prudential where did you work?

18    A    Nova Bank.

19    Q    What's the time frame that you worked for Nova?

20    A    April 2008 to October 2011.

21    Q    And what was your position at Nova Bank?

22    A    Senior vice president/chief financial officer.

23    Q    So CFO?

24    A    Yes.

25    Q    And at Nova Bank who did you report to?

1    A    Brian Hartline.

2    Q    And who was Brian Hartline?  What was his position?

3    A    He was the chief executive officer/president.

4    Q    And do you see Brian Hartline here today?

5    A    Yes, I do.

6    Q    And would you point him out to us please?

7    A    He's at the table there next -- in the middle.

8           MS. BARRY:  Okay, Your Honor, the Government

9    requests that the record reflect that the witness has

10   identified defendant, Brian Hartline.

11          THE COURT:  The record shall so reflect.

12   Q    Now, while you were at Nova Bank do you recall if the

13   bank applied for TARP funding?

14   A    Yes, they did.

15   Q    And how do you know that?

16   A    I filled out the application.

17   Q    Okay, and do you recall whether or not you had seen the

18   program?  Were you the first one to see the program?

19   A    I'm not sure what you're asking.  Were we aware of the

20   program?

21   Q    Yes, how did you become aware of the program?

22   A    It was publicized.

23   Q    Okay.  And who brought it to Nova Bank's attention that

24   there was this TARP funding?

25   A    I believe I did.

1  Q    And I'd like to show you what's been moved into evidence

2  as Government's Exhibit 6.

3          MS. BARRY:  And if we may publish that?

4          THE COURT:  Granted.

5  Q    And looking at Government's Exhibit 6, do you recognize

6  what this is?

7  A    Yes, I do.

8  Q    And what is that?

9  A    It's the TARP application.

10 Q    And you indicated -- well, who filled this TARP

11 application out?

12 A    I did.

13 Q    Okay, and did you fill the TARP application out following

14 any instructions that were given from Treasury on how to fill

15 it out?

16 A    No.  We were just sent an informational package that

17 provided us this application and what to fill out.

18 Q    Okay, so were there instructions and you followed them?

19 A    Yes.

20 Q    Now I'd like to show you what's been marked as

21 Government's Exhibit 6(a) and just for the witness please.

22 And looking at Government's Exhibit 6(a), what is this?

23 A    It's an e-mail sent by myself to Mr. William Gaunt

24 (phonetic).

25 Q    Okay, and who is William Gaunt?

1    A    I believe he was with the Pennsylvania Department of

2    Banking.

3    Q    Okay, was he -- why did you send it to William Gaunt?

4    A    I don't recall.

5    Q    Okay.  Did you advise him about anything in your e-mail?

6    A    I attached a copy of the application that was sent to the

7    FDIC.

8            MS. BARRY:  Okay, the Government moves for the

9    admission of Government's Exhibit 6(a).

10           MR. EGAN:  No objection.

11           MR. ENGLE:  No objection.

12           THE COURT:  Granted.

13           MS. BARRY:  And may it be published?

14           THE COURT:  Yes.

15   Q    And looking at Government's Exhibit 6(a), that -- who is

16   the e-mail from?

17   A    Myself.

18   Q    And when was this e-mail sent?

19   A    October 27, 2008.

20   Q    Okay, and is that the same day that you filled out the

21   application for TARP?

22   A    I don't recall the exact date of the TARP application.

23           MS. BARRY:  May I approach, Your Honor?

24           THE COURT:  Yes.

25           MS. BARRY:  I've provided the witness with a copy of

1    Government's Exhibit 6.

2    Q    Just -- does it refresh -- does it have a date on there?

3    A    Yes, it does.

4    Q    And is it the same date as what is on this e-mail?

5    A    Yes, it is.

6    Q    And what is that date?

7    A    October 27, 2008.

8    Q    Okay, and what do you write?  And if you could just read

9    it -- read the first two lines.

10   A    Okay, attached is a copy of the TARP application I sent

11   to Lisa Coke (phonetic) of the FDIC.  If you should have any

12   further questions, please do not hesitate to contact me.

13   Q    Okay, so at this point the FDIC and Lisa Coke -- who is

14   Lisa Coke?

15   A    She was our field rep, representative.

16   Q    And was -- who was your point of contact at the FDIC with

17   regard to any information on the TARP application?

18   A    Lisa Coke.

19   Q    And were -- and you sent the TARP application to William

20   Gaunt.  Is he another regulator?  Is that why you sent it?

21   A    Yes.

22   Q    Did you provide Ms. Coke with any information that was

23   needed on the TARP application?

24   A    No, I just filled out the application.

25   Q    I'm sorry, regarding the TARP funding, if there was any

1  information that was needed from -- well, let me rephrase

2  this.  Once the TARP application was submitted, at some point

3  in time did you have conversations with Ms. Coke about

4  additional information that was needed in order to fund your

5  TARP request?

6  A    Yes.  This was the original start of the process and then

7  the process continued over time.

8  Q    Okay, and when Ms. Coke asked you for information, what

9  was your understanding on who was requesting the information?

10 A    I believe the FDIC was requesting the information.

11 Q    Okay, and was it Ms. Coke herself or did you have an

12 understanding it was FDIC in Washington who was dealing with

13 the funding?

14 A    My --

15         MR. EGAN:  Objection, leading.

16         THE WITNESS:  I'm sorry.  My understanding is I

17 working through --

18         THE COURT:  Just a moment please, sir.  There was an

19 objection to leading?

20         MS. BARRY:  Yes, Your Honor.

21         THE COURT:  Rephrase please.

22         MS. BARRY:  Yes, Your Honor.

23 Q    When Ms. Coke asked for information about the TARP

24 funding, what was your understanding on who other than Ms.

25 Coke was asking for the information?

1    A    The FDIC would handle the application process.  I worked

2    through Ms. Coke to provide information.

3    Q    Did Ms. Coke ever tell you that other people wanted this

4    information?

5                MR. EGAN:  Objection.

6                THE COURT:  Overruled.

7                THE WITNESS:  I don't believe she mentioned anybody

8    specific but she did -- made it known that the FDIC, whoever

9    the aboves were, were reviewing and handling the application.

10   Q    Okay, so the aboves, when you say the --

11   A    Her superiors.

12   Q    Okay.  And I'd like to show you what's been marked as

13   Government's Exhibit 17 and I'm not sure that this has been

14   admitted into evidence yet.

15               MS. BARRY:  It has?  Okay.  May it be published,

16   Your Honor?

17               THE COURT:  Yes.

18   Q    Looking at Government's Exhibit 17, what is Government's

19   Exhibit 17?

20   A    This is a memo prepared by myself to Ms. Coke of the

21   FDIC.

22   Q    Okay, and what does the re line say?

23   A    Response to information requested for TARP application.

24   Q    Okay, so if Ms. Coke asked for information, you provided

25   it?

1    A    Yes.

2    Q    Okay, and so looking at Government's Exhibit 17, you were

3    responding to various requests on information, correct?

4    A    Yes.

5    Q    Okay.  Now --

6              MS. BARRY:  And we can take Government's Exhibit 17

7    down.

8    Q    Mr. Hanuscin, while Nova's TARP application was being

9    considered, what happened to Nova's capital levels around May

10   or June of 2009?

11   A    We were informed that a treatment of certain investments

12   was going to be changed and the impact was that we were going

13   to reduce our risk base capital rating to below well

14   capitalized.

15   Q    Did you have any discussions with Brian Hartline about

16   how the change in your capital levels would affect the TARP

17   application?

18   A    Yes.

19   Q    And what did you talk about with Mr. Hartline?

20   A    Well, the criteria to be approved for TARP required that

21   the institution be classified as well capitalized.

22   Q    Okay, so if it was no longer well capitalized and

23   adequately capitalized, do you know whether that would have an

24   effect on the application?

25   A    Yes.

1  Q    At the time that you learned that the capital levels for
2  Nova were being changed from well capitalized to adequately
3  capitalized, was Nova Bank in a capital raise?
4  A    Specifically to that day, no, but we were involved in a
5  number of capital raises during my tenure there.
6  Q    Okay, and what is a capital raise?
7  A    We were a privately held company so we would solicit
8  ownership privately, not go through normal terms because the
9  SEC publicly traded.  We would put together a private offer
10 and document and submit it to investors and try to raise the
11 capital that way.
12 Q    Now, based on the capital levels changing for Nova Bank,
13 did you have to amend the call reports in any way?
14 A    Yes, we did.
15 Q    Okay, and what call report had to be amended?
16 A    I do recall March of that year call report but I don't
17 remember if I had to go back to December.
18 Q    Okay, and when you say March call report, what would be
19 the day?  Is it the end of the second quarter?
20 A    March 31st would be the end of the first quarter --
21 Q    I'm sorry.
22 A    -- calendar quarter.
23 Q    Okay, and so that's March 31st, 2009?
24 A    Yes.
25 Q    Now I'd like to show you, and I believe it's been moved

Hanuscin - Direct/Barry                                    139

1   into evidence, Government's Exhibit 28.

2              MS. BARRY:  And may it be published, Your Honor?

3              THE COURT:  Yes.

4   Q     Looking at Government's --

5              MS. BARRY:  Oh, thank you.  And if it could be

6   published please?

7   Q     Looking at Government's Exhibit 28, what is this

8   document?

9   A     This is a memo to Ms. Coke from myself.

10  Q     Okay, and what is the re line?

11  A     TARP application.

12  Q     Okay, and so looking at the first paragraph, can you read

13  that please?

14  A     Sure.  Per your request, we have analyzed our investment

15  portfolio as of March 31st, 2009 for direct credit substitutes

16  for, excuse me, for investments not eligible for the risk

17  rating base approach item one.  Based on the results, it

18  appears that Nova has understated its March 2009 risk rated

19  assets by 15.4 million, therefore, reducing risk weighted

20  capital to 8.82 percent from 10.24 percent as reported on the

21  call report.

22  Q     And so that is where the capital levels have changed from

23  10.24 percent which was well capitalized and now it's 8.82

24  percent to being adequately capitalized?

25  A     Yes.

1    Q    Is that what that letter said?

2    A    Yes.

3    Q    Is that what it says?  Okay.  And can you read the next

4    sentence please?

5    A    (Coughing) Excuse me.  Management believes that adequate

6    capital levels should be short lived with the anticipated

7    private capital raise projected to close prior to June 30th,

8    2009.  Currently an individual has expressed interest to

9    invest $15 million in Nova Financial Holdings.

10   Q    Okay.

11   A    The -- that's it?

12   Q    Thank you.  Now, regarding an individual that has

13   expressed interest to invest $15 million in Nova Financial

14   Holdings, did you have any conversations with Brian Hartline

15   on who this individual was?

16   A    Yeah.  He disclosed the gentleman.

17   Q    Okay, and in fact do you -- who was that person?

18   A    George Levin.

19   Q    And where did -- do you know how George Levin came to be

20   an investor with or a potential investor with Nova Bank at

21   this point in time?

22   A    I believe he was referred to by Barry Bekkedam.

23   Q    Okay, and who is Barry Bekkedam?

24   A    He -- at the time I was employed he was a consultant with

25   the bank.

1   Q    And did Mr. Bekkedam have a company or an investment

2   firm?

3   A    Yes, he did.

4   Q    And what was that investment firm called?

5   A    Ballamor Capital.

6   Q    And as a consultant, what was defendant Bekkedam's role

7   as a consultant with Nova Bank?

8   A    I believe he aided Mr. Hartline with his capital raises.

9   Q    Now, when you -- attached to this memo there are several

10  different attachments --

11             MS. BARRY:  And, Your Honor, if I may provide the

12  witness with this hard copy so -- or a hard copy of

13  Government's Exhibit 28 so that he can look through it?

14             THE COURT:  Surely.

15             MS. BARRY:  May I approach, Your Honor?

16             THE COURT:  Yes.

17  Q    With this memo did you provide several attachments to

18  that memo?

19  A    Yes.

20  Q    And I'd like you to turn to the first attachment please.

21             MS. BARRY:  And if we may publish that please?

22             THE WITNESS:  I'm sorry?

23             MS. BARRY:  I'm just asking if we can publish that.

24             THE COURT:  Yes.

25             MS. BARRY:  Thank you.

1    Q    All right, looking at the second page, what is -- what

2    are we looking at here, the second page of Government's

3    Exhibit 28?

4    A    It's a letter from Barry Bekkedam to Brian Hartline.

5    Q    And would you please read the first sentence?

6    A    I would like to confirm that one or more investor clients

7    of Ballamor Capital, Inc., are prepared to invest $15 million

8    in Nova Financial, Inc., initially and to broaden that

9    investment up to $40 million in 2009.

10           MS. BARRY:  And if could just -- if we could make

11   the letter larger -- see the whole letter please?

12   Q    And what's the date of this letter?

13   A    June 2nd, 2009.

14   Q    Okay, and so is it the same date as your memo?

15   A    Yes.

16   Q    Okay, and do you recall receiving this letter from

17   defendant Bekkedam?

18   A    Me personally I didn't receive it.  It was sent to Brian.

19   He forwarded me a copy to attach.

20   Q    And so this letter is something that you sent to Lisa

21   Coke regarding your TARP application?

22   A    Yes.

23   Q    And your conversations with Mr. Hartline about the fact

24   that Nova Bank was only adequately capitalized, did you have

25   any conversations about how to get back to well capitalized in

Hanuscin - Direct/Barry                                    143

1    order to get the TARP funds?  How were you going to do that?

2    A    Brian and myself had a number of conversations on how the

3    bank needed to get back to well capitalized --

4    Q    Okay.

5    A    -- not just one specific thing.

6    Q    Okay well, in this memo to Lisa Coke when you provide the

7    information on a $15 million investor or investors from

8    Ballamor Capital Management, was that based on some of your

9    discussions or consistent with your discussions with Mr.

10   Hartline?

11   A    Yes.

12   Q    Were you involved with any discussions that defendant

13   Hartline had with defendant Bekkedam on this $15 million

14   potential investor?

15   A    No, I wasn't.

16   Q    Now, do you know whether there was a contingent approval

17   on the TARP funds in and around June 10th of 2009?

18   A    Yes.

19   Q    And what was your understanding?

20   A    We had conditional approval if we raised an additional

21   $15 million.

22   Q    And who told you that?

23   A    I believe we were informed by the FDIC.

24   Q    And do you recall a loan to an individual named George

25   Levin?

1    A    Yes.

2    Q    And again, when you heard the name George Levin, was that

3    also an investor that defendant Hartline told you about?

4    A    I'm not sure of the timing.  I was told eventually that

5    we were going to apply with the Federal Reserve Bank that Mr.

6    Levin would be considered or applied for to be an investor.

7    Q    Okay.  Now, this loan for Mr. Levin --

8          MS. BARRY:  And if we could please show the witness

9    Government's Exhibit 43?

10   Q    And what's Government's Exhibit 43?

11   A    This is a loan request writeup.  We call it a risk

12   assessment summary.

13   Q    And who's the borrower?

14   A    George G. Levin.

15   Q    And what's the amount?

16   A    $5 million.

17   Q    And if we go to the last page, is your signature --

18          MS. BARRY:  And if we could publish this please,

19   this last page?

20          THE WITNESS:  Yes, that's my signature.

21   Q    Were you told what the purpose of this loan was for?

22   A    My recollection of the loan was that the proceeds were

23   used to renovate a house that he had on the main line and that

24   he was going to use some other funds for investment purposes.

25   Q    Okay, so --

1    A    But the majority of it was for renovation.

2            MS. BARRY:  Okay, so if we could please look at the

3    first page of the raz (phonetic) and if we go to purpose of

4    the loan?

5    Q    And what does it say here on purpose of the loan?

6    A    Financial investment.

7            MS. BARRY:  Okay, and if we go to the second page

8    and go to the transaction comments?

9    Q    What does it say there, Mr. Hanuscin?

10   A    Mr. George Levin borrows, requests in a $5 million non-

11   revolving commercial line of credit from Nova Bank.  The loan

12   will be used by Mr. Levin for investment purposes.

13   Q    Okay.

14   A    The loan will be a 12-month line of credit.  The payments

15   will be interest only with a rate of prime plus one with a

16   floor of seven percent.  The loan will be unsecured but will

17   have the corporate guarantee of all Banyan Group of companies

18   as shown above.

19   Q    Okay now, and I failed to ask you this, as CFO what

20   committees did you sit on?

21   A    I sat on the loan committee and the Alco (phonetic)

22   committee.

23   Q    So as a member of the loan committee, was part of your

24   duties obviously to approve loans?

25   A    Yes.

1    Q    Okay, and was this Levin $5 million unsecured loan

2    approved?

3    A    Yes.

4    Q    And were you ever told that this $5 million loan was

5    going to be used to purchase Nova stock?

6    A    No.

7    Q    And would that be important for you to know?

8    A    At the time if the loan was originated if its stated

9    purpose that it was used for -- used to purchase stock, we

10   would have to look at it for accounting purposes treatment.

11   Q    So you would have to have done something knowing that it

12   was being used to purchase stock?

13   A    Yeah, we would have to review the transaction to make

14   sure that it qualifies.

15   Q    Now at some point in time do you know that whether or not

16   Mr. Levin actually makes a $5 million investment to purchase

17   Nova stock?

18   A    Yes.

19   Q    Okay.  And at the time did you put the loan and the

20   investment together at the time you were told that Mr. --

21   A    At the time I was told, no.  It was brought to my

22   attention from our accounting firm that they were looking at

23   the transactions when I put the two together.

24   Q    Okay, and was that at least almost a year later?

25   A    Yes.

1    Q    When -- who told you that Mr. Levin made an investment of

2    $5 million in Nova stock?

3    A    Who told me specifically that he -- I would think Brian

4    would have mentioned it.  Brian was responsible for

5    shareholder activity.

6    Q    And when you knew that a $5 million investment had been

7    made, did you add that as CFO to the bank's capital levels?

8    A    Yes.  Originally we did but, again, the loan was -- the

9    timing of the loan and the contribution or when I determined

10   that the capital was there, it was some time apart.

11   Q    Okay, so you didn't put the two together.

12   A    I didn't immediately put the two together, no, I did not.

13   Q    Sure.  And adding that -- at the time with this

14   investment when you added it to the bank's capital levels, did

15   that improve the bank's capital levels?

16   A    Yes, it did.

17   Q    Now, were you aware that George Levin was going to --

18   A    (Coughing) Excuse me.

19   Q    -- invest additional monies?

20   A    Yes, I was aware of it.

21   Q    And do you know whether or not he had to file a change in

22   control application with the Federal Reserve?

23   A    Yes, I was aware.

24   Q    Now, at some point do you recall -- you mentioned that

25   there was as of June 10th, 2009 you knew there was approval

1    with a contingency of $15 million, correct --

2    A     Yes.

3    Q     -- for the TARP --

4    A     Yeah.

5    Q     -- I'm sorry, for the TARP money?  Did you receive --

6    well, I'd like to show you what's been marked as Government's

7    Exhibit 75.

8             MS. BARRY:  And may it be published?  I believe it's

9    been admitted, Your Honor.

10            THE COURT:  Any objection?

11            UNIDENTIFIED ATTORNEY:  No objection.

12            THE COURT:  Granted.

13   Q     And what is Government's Exhibit 75?

14   A     It's a letter from the Treasury, U.S. Department of

15   Treasury to myself.

16   Q     And what is this letter about?

17   A     This letter is to inform us that we got conditional

18   approval for TARP with the condition that we raise an

19   additional $10 million of capital.

20   Q     Okay.  And is -- have you already raised $5 million as

21   far as you knew?

22   A     Yes.

23   Q     Okay.  Now, do you -- were you involved with

24   conversations with Mr. Hartline about trying to raise the

25   additional $10 million of capital?

Hanuscin - Direct/Barry                                    149

1  A    Yeah, I had conversations with him, plus I assisted in

2  the preparation of the private placement offering document.

3  Q    And do you know whether or not at this point in August of

4  2009 whether the -- your expectation was that Mr. Levin was

5  going to put in the additional 10 million?

6  A    Yes.

7  Q    And I'd like to show you what's been marked as

8  Government's Exhibit 116 and just for the witness please.  And

9  looking at Government's Exhibit 116, what is Government's

10 Exhibit 116?

11 A    It's an e-mail from -- it's an e-mail, original e-mail

12 from David Schwartz (phonetic) to Brian Hartline and myself

13 and Michael Lininger (phonetic).

14 Q    And then is there a reply e-mail above it?

15 A    Yes, there's a reply from Brian to David copied to

16 myself.

17        MS. BARRY:  Your Honor, the Government moves for the

18 admission of Government's Exhibit 116.

19        MR. EGAN:  No objection.

20        MR. ENGLE:  No objection.

21        THE COURT:  Granted.

22        MS. BARRY:  And if we could just show that -- the

23 first e-mail in the string from David Schwartz?  Oh, I'm

24 sorry, Your Honor, may it be published?

25        THE COURT:  Yes.

1          MS. BARRY:  The first e-mail from David Schwartz in

2     time.

3          THE WITNESS:  This one is from Brian.

4          MS. BARRY:  The first e-mail from David Schwartz

5     please.  Okay, thank you.

6     Q    And, Mr. Hanuscin, who is David Schwartz?

7     A    He was our counsel that we used for regulatory matters.

8     Q    Okay, and what's the date of this e-mail please?

9     A    October 26, 2009.

10    Q    And again, to whom is this e-mail going?

11    A    To Brian M. Hartline and myself.

12    Q    And what is the subject?

13    A    TARP/CCP.

14    Q    And what does Mr. Schwartz write to you and Brian

15    Hartline?

16    A    Treasury counsel just called and told me that she had

17    been told by Treasury that you expect to close on the

18    remaining necessary equity (Levin) this Friday.  She said that

19    the Treasury had spoken to someone at the bank.  That being

20    the case, she moved our tentative closing to the following

21    Friday, November 6.  Let me know if any of this is wrong.

22    Thanks, David.

23    Q    Okay, so when you're talking -- what did you understand

24    the closing to be?

25    A    To receive TARP, you had to go through a closing process

Hanuscin - Direct/Barry                                    151

1    because equity was going to change hands.

2    Q    Okay, so at this point when you're talking about closing

3    and the necessary equity from Levin, is that the $10 million

4    that you were expecting from Mr. Levin?

5              MR. EGAN:  Objection.  Leading.

6              THE COURT:  Sustained.

7              THE WITNESS:  No.  My belief is --

8              THE COURT:  Just a moment please.

9              THE WITNESS:  I'm sorry.

10   Q    When -- what did you understand remaining necessity

11   equity (Levin) to mean?

12   A    I'm sorry, can you repeat that?

13   Q    In the e-mail from David Schwartz what did you understand

14   the remaining necessary equity (Levin) this Friday?

15   A    Oh, I'm sorry, yeah, I believe that's the remaining

16   commitment that Mr. Levin made of $10 million.

17             MS. BARRY:  And so if we can go to the e-mail above

18   that --

19   Q    What does Mr. Hartline say in response?

20   A    We are trying to get five million in this week from

21   George to correspond with the investor list I gave you last

22   week.  At this point I'm not sure of the specific date of when

23   the funds will come in but I will keep you informed -- keep

24   everyone informed.

25   Q    Was any subsequent investment by Mr. Levin made other

1  than the $5 million in June of 2009?

2  A    No.

3           MS. BARRY:  Your Honor, I'm going onto another area.

4  I don't know if you'd like me to continue.  I'm happy to do

5  that.

6           THE COURT:  No.  We're going to adjourn.

7           MS. BARRY:  Okay, thank you.

8           THE COURT:  All right, ladies and gentlemen, we're

9  going to adjourn for the day.  Again, do not discuss the

10  testimony nor conduct any kind of investigation or research on

11  your own.  We'll see you tomorrow morning at 9:15.  Thank you.

12           COURTROOM DEPUTY:  All rise.

13                        (Jury out)

14           THE COURT:  You may step down, sir.  We're

15  adjourned.

16           MR. IGNALL:  Well, Your Honor, may I raise one thing

17  on the record?

18           THE COURT:  Yes, sir.

19           MR. IGNALL:  Mr. Egan raised a concern with respect

20  to a number of exhibits that the Government -- some of which

21  the Government has introduced and some that the Government

22  will introduce because the Government located them on a laptop

23  that was seized from Mr. Hartline during a search back in I

24  think 2012.  I looked through them.  I've spoken with Mr.

25  Egan.  I don't think we need the jury to know that those

1    documents came from Mr. Hartline's laptop.

2           The issue that Mr. Egan raised was that the Bates

3    number range we put on there where it came from, it says

4    Hartline laptop and then a number, I believe we have an

5    agreement with Mr. Egan and with counsel of Mr. Bekkedam.

6    What I'd like to do is I'd like to move these in by

7    stipulation, that they'll agree that they're admissible,

8    therefore, we won't have to bring in anyone to say they came

9    from Mr. Hartline's laptop and as a result, I will ask one of

10   our litigation support people to renumber them so when they

11   get on the screen, they won't say Hartline laptop.

12          MR. ENGLE:  That's correct, Your Honor.

13          MR. IGNALL:  And if I could just read off the list

14   and make sure we have an agreement, I'd like to move -- some

15   of these may already be in but I'm just going to do them all.

16   It's Exhibit 4, 70, 86, 91, 92, 99, 116, 118, 119, 123, 124,

17   124(a), 163, 167, 171, 191(a), 191(b), 192 and 196.

18          MR. EGAN:  That's correct.

19          THE COURT:  All right.

20          MR. IGNALL:  May they be admitted --

21          UNIDENTIFIED ATTORNEY:  Agreed.

22          MR. IGNALL:  -- with the stipulation that we will

23   change the Bates number?

24          THE COURT:  Yes, sir.

25          MR. EGAN:  And can I raise my favorite question?

154

1            THE COURT:  Sure.

2            MR. EGAN:  Could we have the lineup?

3            MR. IGNALL:  I will send an e-mail this afternoon

4    once I know.  I believe Mr. Patterson will be next.  We'll

5    have to see who we can get here for tomorrow and I'll let the

6    defense know.

7            MR. EGAN:  Thank you.

8            THE COURT:  All right, thank you.

9                         *  *  *  *  *

10                  **C E R T I F I C A T I O N**

11           We, LORI AULETTA and MARY POLITO, the court approved

12   transcribers, certify that the foregoing is a correct

13   transcript from the official electronic sound recording of the

14   proceedings in the above-entitled matter.

15   *Lori Auletta*  Digitally signed by Lori Auletta
                      DN: cn=Lori Auletta, o, ou,
16                    email=dianadoman@comcast.net,
                      c=US
                      Date: 2016.04.15 16:23:47 -04'00'

17   LORI AULETTA

18   *Mary Polito*   Digitally signed by Mary Polito
                      DN: cn=Mary Polito, o, ou,
19                    email=dianadoman@comcast.net, c=US
                      Date: 2016.04.15 16:23:57 -04'00'

20   MARY POLITO

21   DIANA DOMAN TRANSCRIBING, LLC      DATE:  April 15, 2016

22

23

24

25

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,       )    14-CR-0548
                                )
        vs.                     )
                                )
BRIAN HARTLINE and              )
BARRY BEKKEDAM,                 )    Philadelphia, PA
                                )    April 7, 2016
              Defendants.       )    9:44 a.m.

TRANSCRIPT OF JURY TRIAL (DAY 7)
BEFORE THE HONORABLE C. DARNELL JONES, II
UNITED STATES DISTRICT JUDGE

APPEARANCES:

| | |
|---|---|
| For the Government: | JENNIFER CHUN BARRY, ESQUIRE |
| | DAVID J. IGNALL, ESQUIRE |
| | ASSISTANT UNITED STATES ATTORNEYS |
| | UNITED STATES ATTORNEY'S OFFICE |
| | 615 Chestnut Street, Suite 1250 |
| | Philadelphia, PA 19106 |
| | |
| For the Defendant | PATRICK J. EGAN, ESQUIRE |
| Brian Hartline: | FOX ROTHSCHILD LLP |
| | 2000 Market Street, 10th Floor |
| | Philadelphia, PA 19107 |
| | |
| For the Defendant | MICHAEL J. ENGLE, ESQUIRE |
| Barry Bekkedam: | GREENBLATT, PIERCE, ENGLE, |
| | FUNT & FLORES |
| | 123 South Broad Street, Suite 2500 |
| | Philadelphia, PA 19109 |
| | |
| | ALLISON BAKER SHEALY, ESQUIRE |
| | JOEL D. SCHWARTZ, ESQUIRE |
| | RUSSELL D. DUNCAN, ESQUIRE |
| | SHULMAN, ROGERS, GANDAL, |
| | PORDY & ECKER, PA |
| | 12505 Park Potomac Avenue |
| | Potomac, MD 20854 |
| | |
| Audio Operator: | CARL HAUGER |
| | |
| Transcribed by: | DIANA DOMAN TRANSCRIBING, LLC |
| | P.O. Box 129 |
| | Gibbsboro, NJ 08026 |
| | Office: (856) 435-7172 |
| | Fax:   (856) 435-7124 |
| | Email: dianadoman@comcast.net |

Proceedings recorded by electronic sound recording; transcript
produced by transcription service.

2

```
 1                          I N D E X

 2

 3     WITNESSES:              DIRECT    CROSS    REDIRECT   RECROSS

 4     FOR THE GOVERNMENT

 5     Jeffrey Hanuscin      3 (Bar)  27 (Ega)  79 (Bar)  83 (Ega)

 6                                    67 (Dun)

 7     Thomas Patterson     89 (Ign) 141 (Ega) 201 (Ign)

 8                                   168 (Eng)

 9

10     EXHIBITS:                                     I.D.   EVID.

11     G-129   Nova Bank checking account             7      10

12     G-163   Email from Brian Hartline to Wayne

13             Leevy and Thomas Martell              20      20

14     G-180   Email from Jeffrey Hanuscin to

15             Harold Shaw                           24      25

16     G-23    Memo to Larry Rovin from Brian Hartline 98    99

17     G-24    Memo to Brian Hartline from Thomas

18             Patterson                            100     100

19     G-119   Disbursement request and authorization

20             form                                 117     117

21     G-304   Loan documents                              124

22     G-99    Email from Brian Hartline to Thomas

23             Patterson                            125     125

24     G-96    Memorandum by Mr. Patterson re:

25             Mr. Gallub                           140     140
```

1        (The following was heard in open court at 9:44 a.m.)

2              THE COURT:  Good morning.

3              ALL:  Good morning, Your Honor.

4              THE COURT:  My apologies.  I had to deal with the

5    other 250 cases on my docket inventory.  Are we ready, or do

6    you need to see me about anything?

7              MR. EGAN:  Not to my knowledge, Your Honor.

8              MR. IGNALL:  I think we're ready.

9              MS. BARRY:  No, Your Honor.

10       (Pause)

11             THE CLERK:  All rise.

12       (Jury in at 9:44 a.m.)

13             THE CLERK:  Court is now in session.  The Honorable

14   C. Darnell Jones, II presiding.

15             THE COURT:  Good morning.  Good morning.  You may be

16   seated.

17             THE JURY:  Good morning.

18             THE COURT:  You may proceed.

19             MS. BARRY:  Thank you, Your Honor.

20        JEFFREY HANUSCIN, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN

21                         DIRECT EXAMINATION

22   BY MS. BARRY:

23   Q    Good morning, Mr. Hanuscin.

24   A    Good morning.

25   Q    You -- did you communicate with the FDIC in providing

1    information related to the TARP funding?

2    A     Yes.

3    Q     Do you know whether or not Brian Hartline also provided

4    information to the FDIC regarding TARP funding?

5    A     I'm aware that -- that I started the process, and as the

6    process went on, Brian got more involved.

7    Q     Okay.  So do you know whether or not he was speaking with

8    Lisa Koch?

9    A     Yes.

10   Q     Okay.  Now, do you know an individual named Anthony

11   Bonomo?

12   A     I'm familiar with the name.

13   Q     Okay.  And how are you familiar with that name?

14   A     I understand it was a loan customer of ours or a

15   customer.

16   Q     Okay.  Do you know how he came to the bank or through

17   whom he came to the bank?

18   A     No, I do not.

19   Q     Okay.  Do you know whether or not he was a customer of

20   Ballamor?

21   A     No, I do not.

22             MR. ENGLE:  Objection to the leading.

23             THE COURT:  Sustained.

24   BY MS. BARRY:

25   Q     Do you know whether or not a $4.5 million loan was

1    approved for Mr. Bonomo at the bank?

2    A    Yes.

3    Q    Okay.  And were you ever made aware by Brian Hartline

4    that any part of that $4.5 million loan would be used to

5    purchase Nova stock?

6    A    No.

7    Q    Was there a time where Brian Hartline told you that Mr.

8    Bonomo was making a $2.5 million investment in the bank?

9    A    I eventually became aware.

10   Q    Okay.  And when you learned that information, did you add

11   that $2.5 million to the bank's capital levels?

12   A    I included it into the capital calculation, yes.

13   Q    And did that addition of the $2.5 million improve the

14   bank's capital levels?

15   A    Yes.

16   Q    And if you had known that the money had come from a loan

17   from Nova Bank, would you have treated it differently?

18              MR. ENGLE:  Objection.

19              MR. EGAN:  Objection.

20              MR. ENGLE:  It calls for speculation.

21              THE COURT:  Sustained.

22   BY MS. BARRY:

23   Q    Now, do you know an individual named Barry Bekkedam?

24   A    I heard of him.

25   Q    Okay.  And how -- what did you know about him?

1    A    I knew he was one of the original founders of Nova bank

2    shares with Brian.

3    Q    Okay.  And do you know whether or not he was involved

4    with the bank in capital raise?

5    A    Yes.

6    Q    And I believe you said yesterday that you understood that

7    he maybe had been a consultant, or is that --

8    A    I believe he was -- he was under agreement to be a

9    consultant --

10   Q    Okay.

11   A    -- or engaged to be a consultant.

12   Q    Okay.  And do you know whether or not Mr. Bekkedam was

13   ever paid by the bank as a consultant?

14   A    Yes.

15   Q    Okay.  And how much was he paid?

16   A    I believe it was $250,000.

17   Q    Okay.  I'd like to turn your attention, please, to

18   Government's Exhibit 129.  In looking at Government's Exhibit

19   129, what is this, sir, please?

20   A    This is a printout of a checking account statement that

21   was held in Nova Bank.

22   Q    Okay.  And I'm going to show you the hard copy --

23             MS. BARRY:  If I may approach, Your Honor?

24             THE COURT:  Yes.

25             MS. BARRY:  Because I --

1    BY MS. BARRY:

2    Q    In looking at the hard copy of Government's Exhibit 129,

3    is this -- this is a checking account at Nova Bank?

4    A    Correct.

5    Q    All right.  And whose checking account is it?

6    A    I believe that the address stated here is the office of

7    Ballamor Capital or Barry Bekkedam.

8    Q    Okay.  And I know that it's kind -- it's hard to see at

9    the top, it's a little bit cut off, but -- but what does --

10   does it appear to say Barry Bekkedam -- I mean -- yes.

11   A    You can -- you can make -- yes, you can make out that

12   it's Barry Bekkedam.

13   Q    All right.

14        MS. BARRY:  Your Honor, the Government moves for the

15   admission of Government's Exhibit 129.

16        MR. EGAN:  No objection.

17        MR. ENGLE:  May we approach?

18        THE COURT:  Surely.

19   (Sidebar begins)

20        MR. ENGLE:  Your Honor, I don't have any -- I don't

21   have an objection to the admission of the document for the

22   purpose that I believe the Government is using it for, which

23   is to show the deposit of $250,000.  I just wanted to make

24   sure that if we're then going to publish it to the jury, we're

25   not showing them the rest of it because the issue of gambling

1   proceeds --

2                    THE COURT:  Right.

3                    MR. ENGLE:  -- you in limined out would come up if

4   they saw the entire document.  So if you keep it on the

5   screen, just to the $250,000 deposit, I don't have a problem

6   with it.  But the rest of it shouldn't be admissible.

7                    THE COURT:  It's not relevant anyway.

8                    MR. ENGLE:  It's not relevant.

9                    MS. BARRY:  Well, I'm going to -- may we revisit

10  that, Your Honor?

11                   MR. ENGLE:  You weren't --

12                   MS. BARRY:  Not to the gambling.  Not to the

13  gambling, no.  There's no -- I don't even know what's on there

14  that says -- related to gambling.

15                   MR. ENGLE:  Why don't we show it to the witness

16  right now.

17                   MS. BARRY:  No, we'll show that portion.  Okay.

18  We'll show that portion.

19                   THE COURT:  All right.  It's only the witness' on my

20  screen.

21                   MS. BARRY:  Yes.

22                   MR. ENGLE:  Right.

23                   THE COURT:  So you just need to tell the jury.

24                   MS. BARRY:  Yes.

25                   THE COURT:  Okay.

1          MS. BARRY:  Yeah.

2          THE COURT:  Well, the only question I have is, is it

3     not possible to simply redact it?

4          MS. BARRY:  Oh, the gambling we could.

5          THE COURT:  Well, everything -- I mean, there's

6     nothing else --

7          MR. ENGLE:  What's the probative value of the rest

8     of it?

9          THE COURT:  And the other stuff on there.  There's

10    different charges on there.  And the only thing he's talked

11    about now is the $250,000.

12         MS. BARRY:  Yes, Your Honor.  There is a payment to

13    Mr. Bonomo on there.

14         THE COURT:  Okay.  But you haven't covered that.

15         MS. BARRY:  No, not yet.  So I'm fine with just

16    showing him that portion now.

17         THE COURT:  All right.

18         MS. BARRY:  That's fine.

19         MR. ENGLE:  Yeah, what's up on the screen now is

20    what --

21         MS. BARRY:  Yeah.

22         MR. ENGLE:  -- the issue --

23         THE COURT:  Yeah, everything is on the screen now,

24    yeah.

25         MR. ENGLE:  Yeah.

1          THE COURT:  Thank you.

2       (Sidebar ends)

3          MS. BARRY:  Your Honor, the Government moves for the

4    admission of Government's 129.

5          MR. ENGLE:  No objection, Your Honor.

6          THE COURT:  Admitted.

7          MS. BARRY:  Okay.  And, Agent Boyer, if you could

8    please just show the top portion of -- please publish just the

9    top portion and down to what is the entry for 11/19, please.

10   And may it be published, Your Honor?

11         MR. EGAN:  No objection.

12         MR. ENGLE:  No objection.

13         THE COURT:  May I see you briefly, please?

14         MR. ENGLE:  Yes, Your Honor.

15      (Sidebar begins)

16         THE COURT:  Now, let me just get something clear.

17   This is his personal credit card bill or the company's?

18         MS. BARRY:  This -- it's under the name Barry

19   Bekkedam.  It's a personal bank statement.

20         THE COURT:  Okay.  And it came through this witness?

21         MS. BARRY:  Yes, because he -- he recognized that it

22   was a checking account statement from Nova Bank, because it

23   has a specific routing number that is specific to the bank so

24   it identifies the bank.

25         THE COURT:  And on the other side of that line is

1   $316,000.  That's not in issue?

2            MS. BARRY:  No.

3            MS. SHEALY:  That could be redacted also.

4            MR. ENGLE:  We would prefer it was redacted.

5            MR. IGNALL:  I think we can (inaudible).  I think we

6   can do it.

7            MS. BARRY:  Okay.

8       (Sidebar ends)

9            MS. BARRY:  Your Honor, we're looking at the screen

10  now.

11           THE COURT:  All right.

12           MS. BARRY:  May this be published to the jury?

13           THE COURT:  Any objection?

14           MR. ENGLE:  No objection, Your Honor.

15           MR. EGAN:  No, Your Honor.

16           THE COURT:  Yes.

17           MS. BARRY:  And may it be published to the jury now?

18           THE COURT:  Yes.

19  BY MS. BARRY:

20  Q    Now, I know the -- the top portion on the screen is

21  redacted because I believe there was a specific address, but

22  whose account is this at Nova Bank, please?

23           MR. ENGLE:  Your Honor, we'll stipulate that it's

24  Mr. Bekkedam's account.

25           THE COURT:  All right.

1   BY MS. BARRY:

2   Q     And looking at Government's Exhibit 129, is that the

3   consulting fee that's from Nova Bank?

4   A     Yes.

5   Q     Okay.  And what is the date of that?

6   A     November 19th.

7   Q     Okay.  And is that 2009?

8   A     I'm looking for it on the statement.  Yes.

9   Q     Okay.  Now, was there -- did Nova Bank meet the

10  contingency requirement for the TARP funding in October of

11  2009?

12  A     I believe we had to raise 15 -- or an additional $10

13  million.  As of October '09, I don't believe we completed the

14  $10 million.  We raised some money towards it, but not

15  sufficient; not the 10 million.

16  Q     Okay.  As of November of 2009, had Nova Bank raised the

17  full amount of the contingency?

18  A     No, not as of November.

19  Q     Okay.  Now, going into December of 2009, do you know

20  whether or not there were communications between Brian

21  Hartline and Lisa Koch regarding the contingency?

22  A     I don't personally know if there was any specific

23  communications, but I'm sure there was.

24              MR. ENGLE:  Objection.

25              THE COURT:  Sustained.

Hanuscin - Direct (Bar)                                        13

1    BY MS. BARRY:

2    Q    Let's take a look at what's been admitteed, I believe, as

3    Government's Exhibit 140.

4             MS. BARRY:  And if we could please publish that to

5    the jury, Your Honor.

6             THE COURT:  To the jury?

7             MS. BARRY:  Yes --

8             THE COURT:  To the jury?

9             MS. BARRY:  Yes, Your Honor.

10            THE COURT:  Yes.

11            MS. BARRY:  Okay.

12   BY MS. BARRY:

13   Q    And so looking at Government's Exhibit 140, who is this

14   an email from?

15   A    Brian Hartline.

16   Q    And who is it to?

17   A    Lisa Koch.

18   Q    And who is copied?

19   A    I was copied.

20   Q    Okay.  And if you read the first sentence of the second

21   sort of paragraph there, Nova has met, can you read that,

22   please?

23   A    "Nova has met the contingency requirement by raising over

24   $10 million for capital.  Nova" --

25   Q    Okay.  And did he attach information to Ms. Koch about

1    the capital that was raised?  And I can give you a hard copy

2    if that would help you.

3    A    Yes, please.

4            MS. BARRY:  May I approach, Your Honor?

5            THE COURT:  Yes.

6        (Pause)

7    A    Yes.

8    Q    Okay.  So in this statement, Nova has met the contingent

9    -- contingency requirement by raising over 10 million of

10   capital.  If we take a look at pages 10 and 11 of Government's

11   Exhibit 140, is this the capital that he is referring to?

12   A    Yes.

13   Q    Okay.

14           MS. BARRY:  And if we could please publish, Your

15   Honor, page 10 of 11, which is the second to the last page,

16   please.

17           THE COURT:  Any objection?

18           MR. EGAN:  No, Your Honor.

19           MR. ENGLE:  No, Your Honor.

20           THE COURT:  Granted.

21   BY MS. BARRY:

22   Q    And so if we look at that first page, do you see subtotal

23   capital raised through September 30, 2009 and deposited with

24   HC, $2.551 million?

25   A    (No verbal response)

1    Q    So do you know whether or not that was money that was in

2    escrow at the time?

3    A    Yes.

4    Q    Okay.  And then if we look at the next subtitle heading

5    or sub -- at the bottom of the page, subtotal escrow deposits

6    received October 29 and deposited with HC some $2.7 million.

7    Was that money that was in escrow or at -- with -- physically

8    with the holding company or bank at that point?

9    A    Yes.

10   Q    Okay.  And so this money, had it been included in the

11   bank's capital levels?

12   A    Yes.

13   Q    And looking at the Anthony Bonomo investment there of

14   $2.5 million, at this time on December 15th, 2009, were you

15   aware that this investment had come from a loan from the bank,

16   Nova Bank?

17   A    I did not make that connection.

18   Q    Okay.  And was that indicated anywhere in the information

19   that was provided to Lisa Koch?

20   A    Well, this insert or attachment was provided to Lisa

21   Koch.

22   Q    Okay.  In this -- anywhere in this insert, and take your

23   time to look at it, is there any indication that the $2.5

24   million investment from Anthony Bonomo came from a loan from

25   Nova Bank?

1       (Pause)

2   A    Based on the memo -- or letter dated December 15th, 2009,

3   Attachment 2 says that the 2. -- one moment --

4       (Pause)

5   A    Attachment 2 just specifically talks about September, but

6   doesn't discuss October.

7   Q    Okay.  And we're looking at Attachment 5.  Is there

8   anything in Attachment 5 that indicates that the --

9   A    Attachment 5 is -- is a list of investors that represent

10  $10.2 million of common -- common equity raised.

11  Q    Okay.  And is there anything in the letter from -- to Ms.

12  Koch from Brian Hartline that is part of Government's Exhibit

13  140 where he indicates that the $2.5 million investment from

14  Anthony Bonomo is money borrowed from the bank?

15  A    No.  I don't see anything where it says --

16  Q    Okay.

17  A    -- for the funds that was loaned to him.

18  Q    Okay.  And if we take a look at the next page of the

19  attachment, number 5 from Government's Exhibit 140, and

20  looking at subtotal there, subtotal escrow deposits received

21  December 2009, some $4.945 million.  Do you see that?

22  A    Yes.

23  Q    Okay.  And looking at the column, it says -- there's a --

24  there are names and then it says capital raise, and then

25  there's a date on that next column.  Do you see that?  And

1   then the amounts that are going to be invested or are

2   invested?  I don't know.  Can you explain what the 18 December

3   '09 means?

4   A    Speaking for myself, because my name is on this list,

5   that was a commitment made by myself to invest.

6   Q    Okay.

7   A    I do know that I was using funds from an IRA to make the

8   investment, so it took me some time to have the cash

9   transferred to the bank.

10  Q    Okay.  So is December 18, 2009 a date after December 15,

11  2009?

12  A    Yes.

13  Q    Okay.  So is this sort of the money that's expected to be

14  in by December 18, 2009?

15  A    Yes.

16  Q    Okay.  And then there is a total there of 10.249 million,

17  and is that the total of all of the subtotals that we looked

18  at --

19  A    Yes.

20  Q    -- on this attachment?  Okay.  Did you prepare this

21  document?

22  A    No, I did not.

23  Q    Who prepared this document?

24  A    This looks like a document that was prepared by Brian.

25  Q    Okay.  Now, if we could take a look, sir, at Government's

1    Exhibit 145.

2              MS. BARRY:  And may I approach, Your Honor?

3              THE COURT:  Yes.

4              MS. BARRY:  It's a multi-page document.

5              THE COURT:  Yes.

6              MS. BARRY:  And this has been moved into evidence.

7    And may it be published, Your Honor?

8              THE COURT:  Yes.

9    BY MS. BARRY:

10   Q    So if we just take a look at the first page of

11   Government's Exhibit 145, who -- who is this email from?

12   A    The email -- email is from my -- myself.  Excuse me.

13   Q    And when was it sent?

14   A    Wednesday, December 16th, 2009.

15   Q    And who is the email to?

16   A    Lisa Koch.

17   Q    And do you have attachments to this email?

18   A    Yes, I do.

19   Q    And what are the attachments?

20   A    List of capital raises and supporting documents.

21   Q    Okay.  And so what do you write to Ms. Koch?

22   A    Here is the -- here is most of the support for cash

23   received.  The remainder will follow shortly.

24   Q    Okay.  And if we could look at the next page.  And

25   looking at this -- what would you call this document?  A

1    spreadsheet or something else?

2    A    It's a spreadsheet to detail expected or accepted --

3    received and expected capital.

4    Q    All right.  And did you prepare this spreadsheet?

5    A    No, I did not.

6    Q    Who prepared this spreadsheet?

7    A    I would believe Brian Hartline.

8    Q    And looking at the number there, some $2.85 million, is

9    that a number that's different than 10?  10 million?

10   A    Yes.

11   Q    Okay.  And so when it says clearing date documented, do

12   you know what he meant when he put that in there?

13   A    No, I do not.

14   Q    And as far as the -- the other pages of this exhibit, did

15   you pull those pages?

16   A    I'm sorry, can you repeat the question?

17   Q    The other pages that follow this spreadsheet, did you put

18   that together?

19   A    No, I did not.

20   Q    Okay.  Were you given this information by someone at the

21   bank?

22   A    Yes.  Brian Hartline.

23   Q    Okay.  And did he tell you to forward it to Lisa Koch?

24   A    He gave it to me to go along with the attachment, yes.

25   Q    Okay.

1    A     Part of the email.

2    Q     Now, do you know whether or not Nova Bank ever received

3    the TARP funding?

4    A     No.  It was turned down.

5    Q     Okay.  And I'd like you to take a look at Government's

6    Exhibit 163.

7              MS. BARRY:  And this is just for the witness,

8    please.

9    BY MS. BARRY:

10   Q     Looking at Government's 163, what's 163?

11   A     It's an email, original email from Brian Hartline to

12   Wayne Leevy and Thomas Martell (phonetic).

13   Q     Okay.  And are you copied on that email?

14   A     Along with Beth Martin, yes.

15   Q     Okay.  And then do you respond to that email?  Do you

16   reply to that email?

17   A     Yes.

18   Q     Okay.  And what is the date of the first email from Brian

19   Hartline?

20   A     December 22nd, 2009.

21   Q     Okay.

22             MS. BARRY:  Your Honor, the Government moves for the

23   admission of Government's Exhibit 163.

24             MR. EGAN:  No objection.

25             MR. ENGLE:  No objection.

1          THE COURT:  Granted.

2          MS. BARRY:  May it be published?

3          THE COURT:  Yes.

4          MS. BARRY:  And if we could look at the first email

5     from Brian Hartline.

6     BY MS. BARRY:

7     Q    And, again, who is this email from?

8     A    Brian Hartline.

9     Q    And when was it sent?

10    A    December 22nd, 2009.

11    Q    Okay.  And what is the first line of that email?

12    A    "I just wanted to let you know Nova has been officially

13    turned down to receive its CPP funding."

14    Q    Okay.  So is that, to the best of your recollection, the

15    day that Nova was turned down from TARP?

16          MR. EGAN:  Objection.  Leading.

17          THE COURT:  Sustained.

18    BY MS. BARRY:

19    Q    Prior to December 22nd, did you receive any email or

20    communication with Brian Hartline that the CPP funding had

21    been turned down?

22    A    No.

23    Q    And then in the upper email, what do you say in response

24    to the CPP funding being turned down officially at this point?

25    A    "As I mentioned to you yesterday, I will keep my

1    commitment."

2    Q    Okay.  Okay.  Now, after -- after December of 2009, at

3    some point was there an audit of the bank by an outside -- by

4    its outside auditor, KPMG?

5    A    Can you repeat the question?

6    Q    Sometime after December of 2009, was there an audit

7    conducted by the bank's outside auditor, KPMG?

8    A    Yes.

9    Q    Okay.  And according to that audit, what, if anything,

10   came into question related to the bank's capital?

11   A    During -- during the audit process, the accounting firm

12   raised the question of whether Levin -- Mr. Levin's

13   contribution could count as capital.

14   Q    Okay.  Because at that point, had you counted it as

15   capital?

16   A    Yes.

17   Q    Okay.  And do you know why there was a question on

18   whether or not it could be counted as capital?

19   A    They raised the question because of the timing of the

20   loan.

21   Q    Okay.  And at that point -- the timing of the loan to Mr.

22   Levin?

23   A    Yes.

24   Q    Okay.  And did other -- did other -- did additional

25   capital also come into question based on the audit?

Hanuscin - Direct (Bar)                                23

1   A    They originally brought up Mr. Levin's loan, and then

2   they asked us to go back and review any capital raises that

3   were near a specific date to loans, any loans issued.

4   Q    Okay.  And do you know what other investments came into

5   question?

6   A    I believe there was three others.

7   Q    Okay.  And do you recall what they were at this point?

8   A    Mr. Bonomo is one of them, but I don't recall the other

9   two names.

10  Q    Okay.  And because -- well, what -- what were you told

11  about -- about that?

12            MR. EGAN:  Objection.

13            THE COURT:  By?

14  BY MS. BARRY:

15  Q    Did Mr. Hartline tell you what the issue was with respect

16  to that capital?

17  A    I'm not sure of your question.

18  Q    Okay.  Was there any kind of meeting where that was

19  discussed?

20  A    Once the accounting firm brought it up, it was discussed

21  amongst management.

22  Q    Okay.  And so did you attend a meeting where KPMG

23  presented the issue?

24  A    My recollection is that it was brought up by the manager

25  on -- on site.  It really wasn't brought up to an issue until

1    the partner brought it up at the board meeting.

2    Q    Okay.  And what was -- what, if anything, did Mr.

3    Hartline say about this capital?

4    A    At first, he didn't agree with their -- their judgment.

5    Q    Okay.  And that was these loans could not be called

6    capital -- or could not count as capital?

7    A    Mr. Hartline believed that the -- they could be included

8    -- or be included as capital and we had to research the issue.

9    Q    Okay.  And what did the bank ultimately decide?

10   A    Well, the bank, because they -- the accounting firm did

11   not budge on their position, had to agree with it.

12   Q    Okay.  And what -- what did the bank have to do with

13   regard to those -- that money that the bank had previously

14   counted as capital?

15   A    They had to reduce their capital.

16   Q    Okay.  And I'd like you to take a look at what's been

17   marked as Government's Exhibit 180.  And if we could take a

18   look at the first email and time, which I believe is from you,

19   and what is -- what is 180?

20   A    It's an email from myself to Harold Shaw (phonetic).

21   Q    Okay.  And who's -- who is that?

22   A    I believe he was Lisa Koch's replacement.

23   Q    Okay.  And so is he with what agency?

24   A    FDIC.

25   Q    Okay.  And is that the agency who was regulating Nova

Hanuscin - Direct (Bar)                                    25

1    Bank?

2    A      Yes.

3    Q      Okay.  And who is copied on this email?

4    A      Brian Hartline.

5    Q      Okay.

6           MS. BARRY:  And, Your Honor, the Government moves

7    for the admission of Government's Exhibit 180.

8           MR. EGAN:  No objection.

9           MR. ENGLE:  No objection.

10          THE COURT:  Admitted.

11   BY MS. BARRY:

12   Q      And if you could just please --

13          MS. BARRY:  And may it be published, Your Honor?

14          THE COURT:  Yes.

15   Q      Okay.  And if you could just read the sentence that

16   starts Nova Bank, and Nova Bank is actually underlined.

17   A      "Nova Bank will amend the December 2009, March 2010, and

18   June 2009 call reports to reflect the reduction of regulatory

19   capital of $8.3 million related to loans to existing

20   shareholders."

21   Q      Okay.  And can you read the next sentence, please?

22   A      "The effect of this adjustment will cause Nova to fall

23   below adequately capitalized -- adequately capital to un --

24   under capitalized for the risk-based capital ratio of 6.33

25   percent at 12/31/10, and 6.70 at June 30th, 2010."

1    Q     Okay.

2              MS. BARRY:  May I have a moment, Your Honor?

3              THE COURT:  Surely.

4         (Pause)

5    BY MS. BARRY:

6    Q     Mr. Hanuscin, did you personally ever tell anyone at the

7    FDIC that Mr. Levin had a $5 million loan with the bank?

8    A     I don't recall, but I must have.

9    Q     During the TARP process, did you ever tell Lisa Koch that

10   Anthony Bonomo had a $2.5 million loan with Nova Bank?

11   A     I'm -- what time frame -- throughout the whole process?

12   Q     Not the whole process.  In any time prior to December

13   15th of 2009, did you ever tell Lisa Koch or anyone else from

14   the FDIC that Anthony Bonomo had a $2.5 million loan with Nova

15   Bank?

16   A     I don't recall having that conversation.

17   Q     Okay.  Prior to December of 2009, did you ever tell Lisa

18   Koch or anyone else at the FDIC that Charles Gallub had a

19   $500,000 loan with Nova Bank?

20   A     I don't recall the name.

21   Q     Okay.  And, again, prior to December of 2009, did you

22   ever tell Lisa Koch or anyone else at the FDIC that George

23   Levin had a $5 million loan with Nova Bank?

24   A     Prior to December 2015?  I don't recall.

25   Q     Okay.

1          MS. BARRY:  No further questions, Your Honor.

2          THE COURT:  You may cross-examine.

3          MR. EGAN:  Thank you, Your Honor.

4                        CROSS-EXAMINATION

5    BY MR. EGAN:

6    Q    Good morning, Mr. Hanuscin.

7    A    Good morning.

8    Q    We'll go into this in all the detail, but before we do, I

9    want to just ask you about an answer you gave just a few

10   minutes ago.  You said to the prosecutor that when KPMG

11   brought up this issue of whether these loans counted as

12   capital, I tried to write down your answer exactly, you wrote

13   -- you said, "Mr. Hartline believed that they could be counted

14   as capital and he didn't agree with it," correct?

15   A    Correct.

16   Q    And so now we are talking about April 2010, right?  You

17   have to say yes or no.

18   A    Yes.  Sorry.

19   Q    And in April 2010, when KPMG said these couldn't count as

20   capital, Mr. Hartline did not believe they were correct?

21   A    Correct.

22   Q    You didn't believe they were correct either, did you?

23   A    Correct.

24   Q    All right.  We're going to get back to that.  You went to

25   work at Nova Bank in 2008?

1    A    Correct.

2    Q    And you had been the CFO at Royal Bank?

3    A    Yes.

4    Q    And you had worked in banking for 15 years, I think you

5    said, at that point?

6    A    Since 1986.

7    Q    So give or --

8    A    Excess of 20.

9    Q    -- give or take.  And you had been the CFO at Royal?

10   A    Yes.

11   Q    And you were hired to be the CFO at Nova because they

12   were expanding, correct?

13   A    Correct.

14   Q    And one of the things they were doing was taking over

15   another bank or buying another bank called Pennsylvania

16   Business Bank?

17   A    Yes.

18   Q    And you were going to be the CFO of that as well, right?

19   A    Yes.

20   Q    And at first, and it's a little complicated, but there's

21   a period of time during which the two entities exist sort of

22   both at the same time, right?

23   A    Yes.

24   Q    And during that time, you had to be the CFO of both?

25   A    Yes.

1    Q    And then after that you became the CFO of the combined

2    entity?

3    A    Yes.

4    Q    And obviously you had plenty of experience to do that

5    job, correct?

6    A    Yes.

7    Q    Now, as the CFO, your main issues are looking over --

8    making sure the accounting is basically straight, right?

9    A    Yes.

10   Q    And that all of the regulatory reports that are given to

11   the Government are accurate and truthful, correct?

12   A    Yes.

13   Q    And you gave regulatory reports, I think we call them

14   call reports, to the government basically?  And when I say the

15   government, maybe we should clarify that.  So you were not --

16   the bank now I'm talking about, not the holding company.  The

17   bank was not overseen by the Federal Reserve Bank, correct?

18   A    Correct.

19   Q    And that's because they were a state chartered bank?

20   A    Correct.

21   Q    And so the regulations of the Federal Reserve Bank

22   weren't the ones that applied to the -- to Nova Bank, correct?

23   A    Yes.

24   Q    So the regulatory agencies that you reported to were not

25   the Federal Reserve Bank, but the Federal -- the FDIC and the

1    Pennsylvania Department of Banking, right?

2    A     Yes.

3    Q     And you had to make reports to both of them?

4    A     Yes.

5    Q     And these were these things called call reports we've

6    talked about?

7    A     Yes.

8    Q     Okay.  And both of them would inspect, correct?

9    A     Yes.

10   Q     And in all your time at Nova, when you -- when you made

11   those reports, you always made them truthfully and accurately,

12   correct?

13   A     Yes.

14   Q     And Brian Hartline was your boss, right?

15   A     Yes.

16   Q     In all that time, he never once pressured you to change

17   anything to satisfy them, to make things look better, did he?

18   A     No, he didn't.

19   Q     Never asked you to do anything like that?

20   A     No.

21   Q     Now, one of the things we were talking about a bit

22   yesterday is the acquisition of DVFG.  Do you remember that?

23   A     Yes.

24   Q     And that was another thing that Nova was going to

25   undertake in 2009?

1   A    Yes.

2   Q    And you were intimately involved in that as well, were

3   you not?

4   A    Yes.

5   Q    In fact, you provided some information for what was, I

6   guess they call them, private placement memos?

7   A    Yes.

8   Q    And a private placement memo is when the bank -- the

9   holding company actually is trying to raise capital, right?

10  A    Yes.

11  Q    They have to send out this private placement memo and

12  tell folks about what their plans are and such, right?

13  A    Yes.

14  Q    And in Dec -- or in January of 2009 -- or actually it was

15  by March, Nova sent out one of those private placement memos

16  asking for funds to acquire DVFG, correct?

17  A    Yes.

18  Q    And that private placement memo didn't speak to anything

19  about TARP, did it?

20  A    Can you repeat the date?

21  Q    March 2009.

22  A    March?  No.

23  Q    That was just about DVFG.

24  A    Right.

25  Q    Because right then we had -- Nova had applied for TARP,

 1   but its real concern was on acquiring DVFG, correct?

 2   A    Correct.

 3   Q    And do you recall, you had to prepare a lot of documents

 4   to -- to try and close the DVFG deal, right?

 5   A    I didn't prepare the documents.  I -- I was more involved

 6   in preparing financial statements for them.

 7   Q    That would become part of those documents?

 8   A    That would become part of those documents.

 9   Q    And -- and do you recall that the closing date for DVFG

10   was supposed to be June 30th?  Do you remember that?

11   A    Yes.

12   Q    That closing didn't occur, correct?

13   A    No.

14   Q    And that was in large part because of a number of issues

15   having to do with DVFG, right?

16   A    Yes.

17   Q    Now, in addition to the DVFG acquisition, you were also

18   responsible in 2009 for issues related to opening a new

19   branch, right?

20   A    Yes.

21   Q    And Nova did indeed open -- indeed did open a new branch

22   in the winter of 2009?

23   A    Yes.

24   Q    And so essentially as we reach March of 2009, Nova is

25   well capitalized, correct?

1   A      Um-hmm.

2   Q      You have to say yes or no.

3   A      Yes.  I'm sorry.

4   Q      Okay.  But something comes up that causes Nova to no

5   longer be well capitalized, correct?

6   A      Yes.

7   Q      And that something was this OTTI security issue, correct?

8   A      Yes.

9   Q      And that was something that basically you were told by

10  Lisa Koch, or somebody from the FDIC, that Nova had certain

11  securities that it owns that needed to be downgraded?

12  A      Yes.

13  Q      And as a result of that, you had to do an analysis?

14  A      Yes.

15  Q      And in that analysis, you, -- applying the new regulation

16  or basically the new standard that had been given to you by

17  the government, right? --

18  A      Yes.

19  Q      -- you then did those calculations and you came up with

20  the math and it turned out that Nova was no longer well

21  capitalized, correct?

22  A      Correct.

23  Q      And when you were doing those calculations that caused

24  Nova to go from well to adequately capitalized, did Brian

25  Hartline put any pressure on you to change the numbers?

1  A    No.

2  Q    Did he ever ask you, like, make it look a little better

3  because we kind of need to be well capitalized?

4  A    No.

5  Q    And so you changed them to the best of your ability, --

6  A    Yes.

7  Q    -- right?

8  A    Yes.

9  Q    And you provided that information to the government?

10  A    Yes.

11  Q    And that was obviously during the time that the TARP --

12  the TARP application was in play, correct?

13  A    Yes.

14  Q    Okay.  Now, let's talk a little bit about the TARP

15  application itself.  You were actually the person who kind of

16  first learned of this, right?

17  A    Yes.

18  Q    And that's because as a CFO you keep up on what's going

19  on in your field, right?

20  A    Yes.

21  Q    And it came to your attention that there was this TARP --

22  these TARP funds that might be a good thing for the bank,

23  right?

24  A    Yes.

25  Q    Now, as a CFO, you couldn't make the decision to apply

1    for TARP funds, could you?

2    A    No.

3    Q    And, in fact, even as the CEO, Brian Hartline couldn't

4    make the decision to apply for TARP funds, could he?

5    A    No.

6    Q    In fact, that was a decision that had to be made by the

7    board of directors?

8    A    Yes.

9    Q    And so when you got this information about the TARP

10   program, you provided it to the board of directors, correct?

11   A    Yes.

12   Q    And the reason you provided it to the board of directors

13   was so that they could review it and make a decision whether

14   it was worth doing?

15   A    Yes.

16   Q    And do you recall that there was some discussion about

17   that with the board?

18   A    Yes, I do.

19   Q    And there were some members of the board who weren't sure

20   they even wanted to do it, right?

21   A    Yes.

22   Q    And -- and there was a guy by -- Ed DiMarcantonio, he's

23   the president of the board, right, or chairman of the board?

24   A    Chairman.

25   Q    And so he's actually the boss, right?

1   A    Yes.

2   Q    That's who Mr. Hartline has to report to?

3   A    Well, he reports to the board and he sat on the board.

4   Q    Right.  And there's also a gentleman by the name of Wayne

5   Leevy on the board, correct?

6   A    Yes.

7   Q    And Mr. Leevy is himself a financial guy, right?

8   A    Yes.

9   Q    In fact, he was the head of the audit committee?

10  A    Yes, he was.

11  Q    And the audit committee oversees all of those financial

12  functions that you're sort of responsible for, correct?

13  A    Yes.

14  Q    So if there was something going on at the bank that you

15  thought was improper, you could go directly to the audit

16  committee and talk to them about it, right?

17  A    Yes.

18  Q    And the whole point of that is, you wouldn't have to go

19  through Mr. Hartline, who happens to be your boss, right?

20  A    Correct.

21  Q    Now, in your whole time there, you never went to the

22  audit committee and said that Mr. Hartline ever did anything

23  improper, did you?

24  A    No, I didn't.

25  Q    Now, one of the reasons the board was debating whether or

1    not they should get involved with TARP was because they were a

2    little concerned about how it would look, right?   Remember

3    that?

4    A    I remember there was discussion at one of the points was

5    that -- wasn't sure what the government was going to demand

6    because it was the early stages.

7    Q    Right.

8    A    That's one of their concerns.

9    Q    And you were -- you along with Mr. Hartline were

10   basically the people who communicated back and forth with the

11   FDIC during this whole period, correct?

12   A    Yes.

13   Q    And we're not going to look at the application again, but

14   you remember the application is like a two-pager?

15   A    Yes.

16   Q    And then they asked for a whole lot more information,

17   correct?

18   A    Correct.

19   Q    And every time they asked you for information, you

20   provided it, right?

21   A    Sure.   Yes.

22   Q    Anything they asked for, you told them?

23   A    I'm sorry?

24   Q    Anything they asked for, you gave them?

25   A    Yes, I did.

1    Q    And they never -- would it be fair to say that it was not

2    the most transparent process?

3    A    Yes.

4              MS. BARRY:  Objection.

5              THE COURT:  Sustained.

6    BY MR. EGAN:

7    Q    Well, put it this way, were you confused at all about

8    what the heck they wanted?

9    A    At the time we applied for TARP, the government really

10   didn't know how to handle private companies, so they were not

11   providing information for us.  We were a privately held

12   company.

13   Q    So there was a long period of time where you weren't sure

14   what they even wanted?

15   A    Yes.

16   Q    And other than Lisa Koch, do you have any idea like how

17   the decision was made at TARP?

18   A    Yeah.  We were told that the regional FDIC would give us

19   first approval, then it would go to the national, and then the

20   U.S. Treasury would have final approval.

21   Q    Right.  So there were three levels?

22   A    Yes.

23   Q    But you never talked to anybody but the FDIC, right?

24   A    No, I didn't.

25   Q    So you don't have any idea who ultimately made the

1    decision?

2    A     No, I don't.

3    Q     And you don't have any idea what information they used to

4    make that decision?

5    A     No, I do not.

6    Q     Now, it would be fair to say, would it not, Mr. Hanuscin,

7    that the events of 2009 are a long time ago?

8    A     Yes.

9    Q     And that your independent recollection of them is perhaps

10   not perfect?

11   A     Yes.

12   Q     But with the use of documents, you can essentially have

13   that memory refreshed, right?

14   A     Yes.

15   Q     And you would also say, sir, that -- you would agree with

16   me, would you not, that you have met with the Government a few

17   times over the last few years to talk about this?

18   A     Yes.

19   Q     And when you met to talk with -- when you met with them

20   to talk about it, they were mostly focused on these loans,

21   correct?

22   A     Yes.

23   Q     They didn't ask you about things like earnings?

24             MS. BARRY:   Objection.

25             THE COURT:   Sustained.

Hanuscin - Cross (Ega)                                40

1    BY MR. EGAN:

2    Q    Were you ever asked by the Government about the bank's

3    earnings?

4             MS. BARRY:  Objection.

5             THE COURT:  Counsel, may I see you, please?

6             MR. EGAN:  Sure.

7             THE COURT:  Let's take our morning break at this

8    time, please.

9         (Jury out at 10:28 a.m.)

10        (Sidebar begins)

11            THE COURT:  All right.  Basis for the objection?

12            MS. BARRY:  Your Honor, there's been no prior

13   inconsistent statement, so I'm not sure what -- what this line

14   of questioning is -- how this is appropriate.

15            THE COURT:  Counsel?

16            MR. EGAN:  I'm developing the fact that his memory

17   of this thing is highlighted by the fact that all they would

18   talk about was the loans and the other stuff he's kind of

19   forgotten about.

20            MS. BARRY:  Your Honor, that's --

21            THE COURT:  Okay.  But relevant --

22            MS. BARRY:  I don't --

23            MR. EGAN:  Forgive me for trying, Judge.

24            THE COURT:  Relevancy is more my concern.  All

25   right.  The objection is sustained.

1          MR. EGAN:  Very well.

2          MS. BARRY:  Thank you.

3          MR. EGAN:  How long do we have?

4          THE COURT:  15 minutes.  Maybe an hour.

5       (Sidebar ends)

6          THE COURT:  We're in recess.

7          MR. IGNALL:  Thank you, Your Honor.

8       (Off the record/on the record)

9          THE COURT:  -- still here?

10          UNIDENTIFIED COUNSEL:  Yes, sir.

11          THE COURT:  All right.

12          MR. IGNALL:  Yeah, one moment.

13          THE COURT:  Surely.  He wants to put something on

14   the record.

15          MR. IGNALL:  Oh, okay.

16          MR. EGAN:  Your Honor, my client may be excused,

17   correct?

18          THE COURT:  Sure.

19       (Pause)

20          THE COURT:  Yes, sir.

21          MR. SCHWARTZ:  Thank you, Your Honor.

22          MR. IGNALL:  Your Honor, I have spoken to Mr.

23   Schwartz.  He raised a concern about Ms. Musser's testimony

24   and what he believes is -- I don't know if it's a prior

25   inconsistent statement or a lack of a prior statement, and he

Colloquy                                           42

```
 1   requested --
 2               THE COURT:  I'm sorry, who?
 3               MR. IGNALL:  Ms. Musser, who testified yesterday.
 4               MR. SCHWARTZ:  Would you like us to come up to
 5   sidebar?  Would that be easier?
 6               THE COURT:  It doesn't matter.  I'm just trying to
 7   understand if we're talking about somebody who's already
 8   testified, that's all.
 9               MR. IGNALL:  Yes, we're talking about somebody who's
10   already testified.  I'll let Mr. Schwartz raise his issue and
11   I'll give you my response.
12               THE COURT:  All right.
13               MR. SCHWARTZ:  Good morning, Your Honor.
14               THE COURT:  Good morning.
15               MR. SCHWARTZ:  We've approached the Government about
16   getting the rough notes from the interviews of Ms. Musser.
17   There were five of them.  Four were conducted by agents who
18   are in the building now, and then one conducted in 2010 we're
19   trying to identify and locate that -- that agent.
20               I've asked the Government to produce them to us
21   because we believe that there are inconsistencies with Ms.
22   Musser's testimony either contained or a lack of evidence of
23   statements that she made in -- in the rough notes.  And so
24   we'd like to see the rough notes to compare them to what's in
25   the -- the final MLIs and, if need be, we've subpoenaed the
```

1    agents who were responsible for those MLIs and presumably for

2    those rough notes as well, and we've asked the Government for

3    them.

4          MR. IGNALL:  And, Your Honor, I don't believe

5    there's anything that's inconsistent, but pursuant to Ramos,

6    what I'd like to do is, if I could ask one of your court

7    staff, I have a copy of each of the -- there are four reports

8    that agents in this case prepared.  The fifth one that Mr.

9    Schwartz is talking about was involved, I believe, in the

10   Rothstein case.  I don't have any access to rough notes, if

11   any exist in that.

12         But what I'd like to do is, if we could, ask one of

13   your court staff perhaps to make a copy of the report

14   interview, and I have the rough notes behind it, and then if

15   the Court wants to compare to make sure they're consistent, I

16   think that's appropriate under Ramos.

17         THE COURT:  Consistent with her testimony of --

18         MR. IGNALL:  No, no, no, no.  The only question is,

19   are the rough notes consistent with the written --

20         THE COURT:  MLI?

21         MR. IGNALL:  -- the typed report that Mr. Schwartz

22   has.

23         THE COURT:  All right.

24         MR. SCHWARTZ:  Thank you, Mr. Ignall.  Your Honor,

25   it's our position that the best party to review any evidence

Colloquy                                    44

1    for exculpatory materials of course is the defense, and we

2    would ask that the rough notes be turned over directly to us.

3    But, that said, I do appreciate Mr. Ignall's compromise.

4    However, it's our position that the rough notes should be

5    produced to us in this particular instance when there were

6    particular challenges to -- to Ms. Musser's testimony.

7              THE COURT:  Recognizing that a trial court does not

8    review the nature of this kind of written recordation, as

9    opposed to any kind of recordation, with the eye of an

10   advocate, what does Ramos say in terms of who has the

11   authority to review?

12             MR. IGNALL:  Ramos says that it's the Court that

13   would review it in camera.  The only issue here is whether

14   there's something -- it's not a matter of whether there's

15   something inconsistent in the typewritten report with what Ms.

16   Musser said.  But if Mr. Schwartz wants to call one of the

17   agents and say, assuming he's laid the predicate, did Ms.

18   Musser tell you X, that's fine.

19             What Mr. Schwartz is asking were the handwritten

20   notes that the agents took, and the only question under Ramos

21   is, is there some reason to think there's something different

22   between the handwritten notes and the typewritten report, or

23   is there something exculpatory that's not contained in the

24   typewritten report.  I'm not aware of either of those.  But

25   under Ramos, I believe it's appropriate for the Court to

Colloquy                                    45

1    review that in camera and then make that determination.  I

2    realize it's adding an extra burden to the Court.

3            THE COURT:  Well, I'm just -- I just want to focus

4    on exactly my responsibility in this under Ramos.

5            MR. IGNALL:  And I believe there are two -- and

6    maybe I'll let Mr. Schwartz say, I believe there are two items

7    that Mr. Schwartz raised with -- with Ms. Musser.  One was a

8    statement that Ms. Musser said something to the effect of, Mr.

9    Bekkedam never approached her to invest in Nova.  That's in

10   the, I believe, 2012 written -- typewritten report.  And as

11   the Court will see, it's in the agent's handwritten notes.

12   The other I believe was about -- I'll let Mr. Schwartz say it.

13   I don't want to say it wrong.  I only remember two.

14           MR. SCHWARTZ:  Your Honor, --

15           THE COURT:  Mr. Schwartz, let me suggest this before

16   you do.  If you would, please, reduce the two areas with

17   specificity to the writing, serve it upon the Government, and

18   then discuss it, and then submit it to me.

19           MR. IGNALL:  Okay.

20           THE COURT:  I think it would be more helpful.

21           MR. IGNALL:  Okay.  We can do that, Your Honor.

22           THE COURT:  All right.

23           MR. SCHWARTZ:  I'll send a letter to the Government

24   this evening --

25           THE COURT:  I'm sorry?

Colloquy                                    46

1          MR. SCHWARTZ:  I will send a letter to the

2     Government this evening identifying specific --

3          THE COURT:  That's fine.

4          MR. IGNALL:  And then we can provide whatever MLI is

5     attached to that.

6          THE COURT:  Great.

7          MR. IGNALL:  Okay.  We can do that.  Thank you, Your

8     Honor.

9          THE COURT:  All right.  Surely.

10          MR. SCHWARTZ:  Thank you.

11     (Recess at 10:35 a.m. to 10:56 a.m.)

12     (Audio resumes as follows)

13     BY MR. EGAN:

14     Q    -- Hanuscin, I was asking you about the fact that this

15     was a long time ago and that your memory of these events has

16     obviously, like everything, faded with time?

17     A    Yes.

18     Q    And in that regard, you've spoken a lot on direct

19     examination about capital and its interplay with the TARP

20     process, correct?

21     A    Yes.

22     Q    But you would agree with me, would you not, that there

23     were other factors in play with regard to the TARP

24     application?

25     A    (No response)

Colloquy                                           47

1    Q    Well, let me show you something.

2    A    Yeah.

3              MR. EGAN:   Could we have D-18 for the witness only?

4    And if we could just blow up the top section of that.

5    BY MR. EGAN:

6    Q    Sir, that's an email from Lisa Koch to you, correct?

7    A    Yes.

8    Q    And it's dated April 17th, 2009?

9    A    Yes.

10   Q    And it's regarding TARP, correct?

11   A    Yes.

12   Q    Now, if we could go down to the second paragraph, it

13   says:  "Their areas of concern are leverage at the holding

14   company, earnings and asset quality."  Correct?

15   A    Yes.

16   Q    Now, you're familiar with Camels, right?

17   A    Yes.

18   Q    And that's an acronym for a whole bunch of important

19   stuff for the bank, right?

20   A    Yes.

21   Q    And earnings is one of the letters in Camels, correct?

22   A    Yes.

23   Q    And earnings and capital are two separate buckets?

24   A    Yes.

25   Q    Asset quality, similarly, is another bucket, right?

Colloquy                                    48

1    A    Yes.

2    Q    So Ms. Koch is asking you about these three items for

3    information for the TARP process, correct?

4    A    Correct.  Excuse me.  Correct.

5    Q    Okay.  And obviously so they had other interests besides

6    just capital, correct?

7    A    Correct.

8              MR. EGAN:  Now, if we could go to G-17.  And I

9    believe this has been admitted.

10             MS. BARRY:  Yes.

11             MR. EGAN:  So it can be published.

12   BY MR. EGAN:

13   Q    And, Mr. Hanuscin, are you able to see that?

14   A    Yes.

15   Q    And that is an email from you to Ms. Koch, correct?

16   A    Correct.

17   Q    And it contains a whole lot of information, does it not?

18   A    Yes.

19   Q    And among those things it contains are financial

20   statements and results of operation, correct?

21   A    Correct.

22   Q    And projections?

23   A    Yes.

24   Q    And updated asset quality information, correct?

25   A    Yes.

1    Q     So you're responding to the questions that you're being

2    asked about the bank?

3    A     Yes.

4    Q     And all the information you're providing her is truthful

5    and accurate, correct?

6    A     Yes.

7    Q     Now, the last -- if we go to the last paragraph on the

8    page, this is:  "Has an OTT analysis been -- 3/31/09."  This

9    is the issue we've been talking about that caused the bank to

10   become not well capitalized, right?

11   A     Yes.

12   Q     Okay.  And, once again, you provided whatever information

13   they asked for?

14   A     Yes.

15   Q     And all of it was truthful and accurate, correct?

16   A     Yes.

17   Q     And Brian Hartline certainly never told you to send

18   anything that wasn't truthful or accurate?

19   A     No, he did not.

20   Q     All right.  Now, just a very brief side journey here.

21             MR. EGAN:  If we could have D-134 for the witness,

22   please.

23   BY MR. EGAN:

24   Q     You were asked a number of questions about an agreement

25   that Barry Bekkedam had for consulting fees.  Do you remember

Colloquy                                                    50

1   that?

2   A    Yes.

3   Q    Now, as a CFO, you were involved in capital raises,

4   correct?

5   A    Yes.

6   Q    And you're -- you're --

7            MR. EGAN:  Excuse me.  This is D-134, please.

8   That's 133.

9   BY MR. EGAN:

10  Q    You're familiar that in order to raise capital,

11  oftentimes banks need to hire outside people, correct?

12  A    Yes.

13  Q    And when banks hire outside people, they usually hire

14  what's called investment bankers, right?

15  A    Yes.

16  Q    And investment bankers charge a fee for what they do, do

17  they not?

18  A    Yes, they do.

19  Q    So it's not unusual for an institution that's trying to

20  raise funds to go and seek an outside consultant to help raise

21  funds, right?

22  A    Correct.

23  Q    Now, you were asked a number of questions by Ms. Barry

24  about the bank hiring Mr. Bekkedam.  Do you remember those?

25  A    I'm sorry, can you repeat?  I coughed.

1   Q    You were asked a number of questions by Ms. Barry about

2   the bank hiring those -- the consultant, Barry Bekkedam,

3   right?

4   A    Yes.

5   Q    Okay.  If you could just go to page 2 of this, and the

6   very top paragraph, and read it to yourself.

7        (Pause)

8   Q    Does this refresh your recollection as to who actually

9   hired Mr. Bekkedam?

10  A    The holding company.

11  Q    Right.  So -- because the holding company's actually the

12  entity that raises assets, correct?

13  A    Yes.

14  Q    So it would be the holding company that would hire Mr.

15  Bekkedam, correct?

16  A    Yes.

17  Q    And that would be a decision that the holding company

18  board would be involved in, correct?

19  A    Yes.

20  Q    And so what this is, is the agreement between the holding

21  company and Mr. Bekkedam to help raise funds, right?

22  A    Yes.

23  Q    All right.  Now I want to talk about Mr. Levin's loan.

24  You are the CFO, right?

25  A    Yes.

1    Q    And as the CFO, you have a whole lot of responsibility?

2    A    Yes, I do.

3    Q    But one of the things you do as the CFO is sit on the

4    loan committee, correct?

5    A    Yes.

6    Q    And Mr. Hartline is the CEO, correct?

7    A    Yes.

8    Q    He has a lot of responsibility, too?

9    A    Yes.

10   Q    But one of the things he does is sit on the loan

11   committee, correct?

12   A    Yes.

13   Q    But it would be fair to say, would it not, sir, that the

14   creditworthiness of a lender is -- a borrower is not your

15   specific area of concern, correct?

16   A    Yes.

17   Q    And that's why you have a credit department?

18   A    Yes.

19   Q    And that that credit department was headed up by a guy by

20   the name of Mark Poliski?

21   A    Yes.

22   Q    Remember him?  And that it was his job to determine

23   whether or not a borrower was creditworthy, correct?

24   A    Yes.

25   Q    So when you would come to the loan committee, you would

1    essentially read whatever was presented to you, because that's

2    your duty, correct?

3    A    Yes.

4    Q    And make an analysis of what was presented to you and

5    decide whether to vote yes or no, correct?

6    A    Yes.

7    Q    But obviously it would be very important to you if Mr.

8    Poliski had said a loan was not -- was inappropriate, right?

9    A    Right.

10         MR. EGAN:  So if we could go to Government's Exhibit

11   43.  And if we could blow up the -- well, blow up the top

12   section first.  And this has been admitted, so you can publish

13   it.

14   BY MR. EGAN:

15   Q    And this is the risk assessment summary for the loan to

16   Mr. Levin, correct?

17   A    Yes.

18   Q    And this would have been part of the package that was

19   presented to you before you went to the loan committee to vote

20   on this loan, correct?

21   A    Yes.

22   Q    Now, it's a loan for George Levin, right?

23   A    Yes.

24   Q    And it's for $5 million?

25   A    Yes.

1    Q    Okay.  Now, it says analyst, Joe Madiany.  So that --

2    that's the underwriter, right?

3    A    Yes.

4    Q    So he -- he actually reviews it even before Mr. Poliski

5    gets it?

6    A    Yes.

7              MR. EGAN:  And then if we could go down to the lower

8    section and just blow up the top half of that.

9    BY MR. EGAN:

10   Q    And under the purpose, it says financial investment,

11   correct?

12   A    Yes.

13   Q    Now, at the time you appeared before the loan committee,

14   you were provided with this risk assessment summary, you were

15   judging this as an issue having to do with Mr. Levin wanting

16   to borrow money for a financial investment, correct?

17   A    My recollection of the -- of the loan is that he was

18   using the proceeds to renovate a property that he owned in --

19   in the Main Line, in addition to financial purposes.

20   Q    Okay.  And -- and we can address that in a minute.  But

21   as -- it's been a long time since June 30th, correct?

22   A    Yes.

23   Q    This was the document you had before you when you made

24   your decision, correct?

25   A    Yes.

Colloquy                                                    55

1    Q    And this says financial investment, correct?

2    A    Yes.

3    Q    Now, there may have been discussion about a house at some

4    other time, but you don't remember any discussion at the loan

5    committee about this house, do you?

6    A    Not specifically, no.

7    Q    Okay.  Now, the date of this is June 30th?

8    A    Yes.

9    Q    Okay.

10            MR. EGAN:  Now, if we could go to G-48, please.  And

11   this has been admitted as well.  And if you could blow up the

12   top, just the -- well, actually you can blow up just the part

13   that's real as opposed to the big white space.  Thank you.

14   BY MR. EGAN:

15   Q    This is an email from Dina Gaskins to a whole lot of

16   people at the bank, correct?

17   A    Yes.

18   Q    And among those people are yourself, right?

19   A    Yes.

20   Q    Mr. Poliski?

21   A    Yes.

22   Q    Mr. Patterson?

23   A    Yes.

24   Q    And Mr. Hartline?

25   A    Yes.

1    Q     And what this is, is Dina Gaskins, she worked in -- what

2    did she do?

3    A     She was like -- the main office was a pseudo branch and

4    main office, and she handled the branch part of it.

5    Q     Right.  And she handled the wires?

6    A     Right.

7    Q     Okay.  So this is an email from her telling you on June

8    30th, 2009 that a $5 million wire is coming in from George

9    Levin?

10   A     Yes.

11   Q     So certainly nobody's hiding from you that George Levin

12   is wiring $5 million into Nova Bank on June 30th, are they?

13   A     No.

14   Q     Now, you were shown an Exhibit G-116.

15         MR. EGAN:  And if we could have G-116.  And if we

16   could just blow up the top section.

17   BY MR. EGAN:

18   Q     Now, G-116 is an email from Brian Hartline to David

19   Swartz and yourself, correct?

20   A     Yes.

21   Q     And Mr. Hart -- Mr. Swartz is outside counsel to the

22   bank, right?

23   A     Yes.

24   Q     He's with a law firm called Stevens & Lee?

25   A     Yes.

1    Q    And he worked for the bank a lot?

2    A    Yes.

3    Q    And the bank often referred to Stevens & Lee for their

4    opinion on a number of issues?

5    A    Yes.

6    Q    And their advice?

7    A    Yes.

8    Q    And Mr. Hartline is responding to a request -- a question

9    from Mr. Swartz, correct?

10   A    Yes.

11   Q    And the question has to do with Treasury counsel calling

12   him and asking about whether the funds were coming in or not,

13   correct?  You were asked about that for Mr. Levin?

14   A    Yes.

15   Q    Okay.  And Mr. Hartline responds that he's trying to get

16   the funds in, but he's not sure that they're going to come in,

17   correct?

18   A    Yes.

19   Q    And this communication is because Mr. Swartz wants to get

20   back to the folks at Treasury and tell them what's going on,

21   right?

22   A    Yes.

23        MR. EGAN:  Now if we can have Government's 122 for

24   the witness only.

25   BY MR. EGAN:

Colloquy                                          58

1   Q    And, sir, do you recall whether or not Mr. Swartz told

2   the Treasury that Mr. Levin was no longer going to invest?

3   A    I don't recall if Mr. Swartz had that conversation.

4   Q    Okay.  Well, does reading this email from Mr. Swartz to

5   this Jennifer Graham refresh your recollection?

6        (Pause)

7   A    This is a correspondence that says that he's advising

8   Jennifer Graham that --

9             MS. BARRY:  Objection.

10  A    -- there will be no closing.

11            MS. BARRY:  Objection.

12            THE COURT:  Sustained.

13  BY MR. EGAN:

14  Q    That doesn't refresh your recollection?

15  A    No.

16            MR. EGAN:  Now if we go to G-145, please.

17  Q    And, sir, you would agree with me that after Mr. Levin no

18  longer could make his investment, the bank had -- or the

19  holding company, actually, had to turn to a number of other

20  sources to try and come up with the $10 million, right?

21  A    Yes.

22  Q    And so basically they went out with a request for more

23  people to invest?

24  A    Yes.

25  Q    And they even asked you to invest?

Colloquy                                    59

1    A    Yes.

2    Q    And essentially they were trying to get as many people

3    who could invest as possible to come up with $10 million,

4    correct?

5    A    Yes.

6    Q    And at the same time, the TARP, which had originally been

7    talked about in June and then talked about in August, still

8    hadn't been fully approved, correct?

9    A    I'm sorry, can you repeat that?

10   Q    It still hadn't been fully approved?

11   A    Right.

12   Q    So in the middle of December, there was a lot of back and

13   forth between you and Ms. Koch about trying to get this

14   together and make this happen, right?

15   A    Yes.

16   Q    And you were showed some of those emails by the

17   Government, correct?

18   A    Yes.

19   Q    Do you know who a guy named Joe Petrone is?

20   A    Yes, I do.

21   Q    He was your comptroller, right?

22   A    Yes.

23   Q    And he would be the kind of guy who would run reports?

24   A    Yes.

25   Q    And so if you wanted a big, long list of everybody who

1   was investing, you -- you would ask him to do the report for

2   you, correct?

3   A    I would ask him to, if there was an escrow account that

4   the funds would be held, I'd ask him to run that.

5   Q    Right.  So if we could go -- well, first of all, let's do

6   the cover page.  This is an email from yourself to Ms. Koch,

7   correct?

8   A    Yes.

9   Q    And it's dated December 16th, 2009, correct?

10  A    Correct.

11  Q    Now, do you recall conversations with Mr. Hartline about

12  the government saying at this point they were going to put

13  this application on hold?

14  A    Yes.

15  Q    And that they were likely not going to approve it?

16  A    Yes.

17  Q    And you knew several days prior to December 21st that it

18  was likely that the government was not going to approve this,

19  correct?

20  A    Yes.

21  Q    And -- but you were trying to send all the information

22  that the government asked for in hopes that they might change

23  their mind, right?

24  A    Yes.

25  Q    Okay.  Now, if we could turn to page 2, this is a list of

1    a whole bunch of investors, right?

2    A    Yes.

3    Q    Now, if you wanted to get a list like this, you would ask

4    Joe Petrone for it, not Brian Hartline, right?

5    A    This looks like a spreadsheet of a reconcile on an escrow

6    account.

7    Q    Right.  It's the kind of thing you would get from your

8    comptroller?

9    A    I could, yes.

10        MR. EGAN:  Now, if we could down to the -- blow up

11   the last three investors.  Last three lines of that.

12   BY MR. EGAN:

13   Q    Do you see a gentleman there by the name of Alan

14   Fellheimer?

15   A    Yes.

16   Q    And Alan Fellheimer was someone you knew, correct?

17   A    Yes.

18   Q    And he had accounts at Nova Bank, correct?

19   A    Yes.

20   Q    And he had a line of credit at Nova Bank, correct?

21   A    I -- I don't recall specifically, but he was a customer

22   of the bank.

23   Q    Right.  And it says here -- you're telling Ms. Koch he's

24   putting $100,000 in, correct?

25   A    Yes.

Colloquy                                                62

1           MR. EGAN:  And if we can go to page 36 of this

2      exhibit.

3      BY MR. EGAN:

4      Q    Now, this was stuff that you sent to Ms. Koch because she

5      wanted some backup for some of these investments, right?

6      A    Yes.

7      Q    And at the time, you were basically trying to throw

8      everything together and get it down to her, right?

9      A    Yes.

10     Q    Okay.  And even it says the remainder will follow; this

11     isn't all of it, it's just some of it?

12     A    Yes.

13          MR. EGAN:  If you could blow up that email.  And the

14     bottom half first.

15     BY MR. EGAN:

16     Q    Now, this email that you sent to Ms. Koch is from Mr.

17     Hartline to Mr. Fellheimer and it says:  "From where should I

18     pull the funds for your investment?"  Correct?

19     A    Yes.

20          MR. EGAN:  And if we could go to the top section.

21     Q    It says:  "My credit line."  Correct?

22     A    Yes.

23     Q    So Mr. Fellheimer is telling Mr. Hartline, take the

24     $100,000 out of my credit line at Nova Bank, correct?

25     A    Yes.

1    Q    Which is effectively a loan to Mr. Fellheimer, is it not?

2    A    Yes.

3    Q    And you didn't have any problem telling the -- Ms. Koch

4    about that, right?

5    A    No.

6              MS. BARRY:  Objection.

7              THE COURT:  Overruled.

8              MR. EGAN:  All right.  If we could go to G-163 then.

9    BY MR. EGAN:

10   Q    And G-163 is an email that you received from Mr.

11   Hartline, correct?

12   A    Yes.

13   Q    And it's actually a forward of an email -- oh, no, I'm

14   sorry, you're copied on it.  And it basically says:  "It's

15   official, we're turned down."  Correct?

16   A    Yes.

17   Q    And it goes on to say:  "Treasury is becoming more

18   concerned about providing funding to small community banks."

19   Correct?

20   A    Yes.

21   Q    And then in the second paragraph it says:  "We are now in

22   the process of calling back all investors and giving them the

23   option to keep their capital in the bank and providing them

24   anti-dilution rights to our next capital offering, or have

25   their funds returned to them."  Correct?

1    A    Yes.

2    Q    And this is because a lot of people who invested were

3    told that if -- that the TARP funds were likely and they made

4    their investment only if TARP was approved, right?

5    A    Yes.

6    Q    And actually you, if you wanted to, could have said I

7    want my money back, but you, because you believed in the

8    strength of the bank, agreed to keep your commitment?

9    A    Yes.

10   Q    And that's because at this point the bank, in spite of

11   not getting these TARP funds, was still a viable institution,

12   correct?

13   A    Yes.

14   Q    Now, let's talk a little bit about May of 2010, when KPMG

15   comes into play.  Prior to May of 2010, had you ever heard of

16   anything called EITF 85-1?

17   A    No.

18   Q    And 15 years at Royal Bank, right?

19   A    Yes.

20   Q    You had been a CFO, right?

21   A    Yes.

22   Q    CFO at Nova Bank?

23   A    Yes.

24   Q    And you had never seen or heard of anything called EITF

25   85-1?

Colloquy                                                  65

1    A    Correct.

2    Q    And the first time that you ever heard of that was when

3    Mr. Shubin at KPMG brought it up in May of 2010?

4    A    Yes.

5    Q    And at the time he sent to you a copy of EITF 85-1,

6    right?

7    A    Yes.

8    Q    And that was so you could take a look at it?

9    A    Yes.

10   Q    And I believe you testified on direct examination that

11   you disagreed with him that it was applicable, correct?

12   A    Yes.

13   Q    And Mr. Hartline also agreed with him (sic) that it was

14   -- was not applicable?

15   A    Yes.

16   Q    And as a result, your belief was Nova should have been

17   able to count the capital, correct?

18   A    Yes.

19   Q    And Mr. Hartline's belief was that Nova should have been

20   able to count the capital --

21             MS. BARRY:  Objection.

22             THE COURT:  Sustained.

23   BY MR. EGAN:

24   Q    Did Mr. Hartline tell you that he believed that Nova

25   should have been able to count the capital?

1    A    Yes.

2    Q    But KPMG is your auditor, right?

3    A    Yes.

4    Q    And they're a big, big company, right?

5    A    Yes.

6    Q    And there aren't many KPMGs in the world, are there?

7    A    No.

8    Q    And, in fact, for a bank such as yours, to have its

9    financial statements audited, you only have a few choices,

10   correct?

11   A    Yes.

12   Q    Basically the big four?

13   A    Yeah, it's a big four firm.

14   Q    And KPMG costs a lot of money, don't they?

15   A    Yes.

16   Q    And they charge a lot of money to do these audits,

17   correct?

18   A    Yes.

19   Q    So if you wanted to get somebody on KPMG's footing to

20   disagree with KPMG, you would have to go out and hire one of

21   these other big four auditing firms, correct?

22   A    Correct.

23   Q    And that would have cost the bank hundreds of thousands

24   of dollars, correct?

25   A    Yes.

1    Q     And at the end of the day, even if that company disagreed

2    with KPMG's version of conclusions, that wouldn't necessarily

3    be accepted, correct?

4    A     Correct.

5              MS. BARRY:  Objection.  Relevance.

6              THE COURT:  Overruled.

7    BY MR. EGAN:

8    Q     So when -- you ultimately agreed with KPMG, correct?  I

9    mean, you had to, right?

10   A     Yeah, we had to.

11   Q     Because if you didn't, you wouldn't have had audited

12   financials?

13   A     Correct.

14   Q     And that would have been bad for the bank?

15   A     Correct.

16   Q     And it would have been bad for the shareholders?

17   A     Correct.

18   Q     So although you did it, you didn't really think they were

19   right?

20   A     Correct.

21             MR. EGAN:  I have nothing further, Your Honor.

22             MR. DUNCAN:  May I inquire, Your Honor?

23             THE COURT:  Yes, sir.

24             MR. DUNCAN:  Thank you.

25                           CROSS-EXAMINATION

1    BY MR. DUNCAN:

2    Q    Good morning again, Mr. Hanuscin.

3    A    Good morning.

4    Q    Sir, the first time you were interviewed by the

5    Government about any of the events related to your testimony

6    today was back in June of 2012, correct?

7    A    I believe that's correct.

8    Q    That would have been about three years after the George

9    Levin loan, correct?

10   A    Yes.

11   Q    And the next time you were interviewed by the Government

12   was three years after that, correct?

13   A    It seems to be the right time frame, yes.

14   Q    And that would be almost six years after the events,

15   correct?

16   A    Yes.

17   Q    Sir, you were shown on -- during Mr. Egan's cross-

18   examination Defense Exhibit 134.

19         MR. DUNCAN:  Could we have that up for the witness

20   again, please.

21   BY MR. DUNCAN:

22   Q    Okay.  The first page of that, what's that, Mr. Hanuscin?

23   A    This is an email from Beth Martin to myself copied to Joe

24   Petrone.

25   Q    And the date of it is November 19th, 2009, about 4:00,

1  correct?

2  A     Yes.

3  Q     And Beth Martin was working at the business center for

4  Nova, correct?

5  A     Yes.

6  Q     And this all relates to the $250,000 consulting payment

7  that was made to Mr. Bekkedam in order to help the bank with

8  certain of its financial needs, correct?

9  A     Yes.

10           MR. DUNCAN:  And if you would, go to page 2 of that

11  agreement, or page 1 of the agreement, the second page of the

12  Defense Exhibit 134.  And if you could go down to the

13  description of services, please, and blow that up for the

14  witness.

15  BY MR. DUNCAN:

16  Q     Do you see that there, the description of services, Mr.

17  Hanuscin?

18  A     Yes, I do.

19  Q     The description of services says that the company --

20  that's the Nova Holdings, the parent company, correct?

21  A     Correct.

22  Q     -- they acknowledge that the consultant -- that's Mr.

23  Bekkedam, correct?

24  A     Yes.

25  Q     -- had for a period of years provided services to the

1    holding company, correct?

2    A    Yes.

3    Q    And during that time, Mr. Bekkedam wasn't paid for those

4    services, was he?

5    A    I'm not aware.

6    Q    Okay.  You would agree that the last paragraph or last

7    part of the services paragraph says that the company

8    acknowledges that the consultant has provided services similar

9    to the services the company has for an extended period of time

10   prior to the date of this agreement, and that the purpose of

11   this agreement is in part to recognize and formalize the

12   relationship and compensate the consultant for such services,

13   correct?

14   A    Correct.

15   Q    Those are the past services, right?

16   A    Yes.

17   Q    This agreement was a two-year agreement, correct?

18        MR. DUNCAN:  If you go down --

19   A    I believe so.

20        MR. DUNCAN:  -- go down to termination, 3.1.  If you

21   could blow up that last little part for us, please.

22   BY MR. DUNCAN:

23   Q    So the agreement is going to terminate in December 31st,

24   2011, correct?

25   A    Correct.

1    Q    And this is as of November 2009, correct?

2    A    Yes.

3    Q    So it's a two-year agreement, right?

4    A    Yes.

5    Q    So Mr. Bekkedam is being paid for his past services and

6    then his future services approximately $125,000 a year,

7    correct?

8    A    Yes.

9    Q    And you testified when Mr. Egan was asking you questions

10   that banks frequently hire outside consultants to help them

11   with these things, correct?

12   A    Yes.

13   Q    And they hire investment bankers, correct?

14   A    Yes.

15   Q    And investment bankers aren't cheap, are they?

16   A    No, they're not.

17   Q    So you'd consider this was a good deal for the bank,

18   right?

19   A    Yes, I would believe so.

20   Q    And this is a corporate record of Nova Holdings Company,

21   correct?

22   A    Yes.

23   Q    All of your corporate holdings records are available to

24   any bank regulator that wants to see them, correct?

25   A    Yes.

1    Q     So there was nothing hidden about this, was there?

2    A     No.

3    Q     The person who's involved in raising or helping the bank

4    raise capital would be called like a fund raiser, would that

5    be fair?  Capital raiser?

6    A     Capital raiser is --

7    Q     Okay.

8    A     -- is more appropriate.

9    Q     The person who raises capital, that's what they do, they

10   raise the capital, right?

11   A     Yes.

12   Q     And then the capital goes into the bank holding company,

13   correct?

14   A     Yes.

15   Q     And how the bank holding company classifies that capital

16   is a decision made by the bankers, the holding company,

17   correct?

18   A     Yes.

19   Q     So if it's tier 1 capital, and I'll -- I'll get the terms

20   wrong -- but risk-based capital, those are all decisions made

21   by the bankers, correct?

22   A     Yeah.  They all go into a general capital account.  The

23   tiers and risk-based are calculations of that -- that balance.

24   Q     The outside fund raiser like Mr. Bekkedam, he has nothing

25   to do with determining how the capital is termed, does he?

1    A      No, he doesn't.

2              MS. BARRY:  Objection.

3              THE COURT:  Sustained.

4    BY MR. DUNCAN:

5    Q      Did Mr. Bekkedam ever tell you how you should at the bank

6    classify your capital?

7    A      No.

8    Q      You testified earlier a little bit about the Delaware

9    Valley Financial Group.  Do you remember that?

10   A      Yes.

11   Q      And you actually -- when you were hired, that was one of

12   your principal responsibilities, correct?

13   A      Yes.

14   Q      In late 2008, Nova was negotiating a deal to acquire that

15   insurance company, correct?

16   A      Yes.

17   Q      And you spent basically the first few months of your job

18   working on the proposal for acquiring the Delaware Valley

19   Financial Group, correct?

20   A      Correct.

21   Q      And it was taking up a lot of your time and it was

22   important because it was important to the bank, right?

23   A      Yes.

24   Q      Mr. Egan asked you, and I just want to just make sure

25   that we all understand this, he said that the Delaware Valley

Hanuscin - Cross (Dun)                                          74

1    Financial Group thing was supposed to close on June 30th,

2    correct?

3    A     Yes, I believe so.

4    Q     That's June 30th of 2009, correct?

5    A     Yes.

6    Q     About a little more than a year after you started?

7    A     Yes.

8    Q     So you were working on that for almost a year to try to

9    get that deal to come to completion, correct?

10   A     Yes.

11   Q     You understood that the bank had to be well capitalized

12   in order to get regulatory approval for Nova to acquire the

13   Delaware Valley Financial Group, correct?

14   A     Yes.

15   Q     And Nova's regulators were the FDIC, right?

16   A     Yes.

17   Q     And so you were in communication with Ms. Koch about

18   Delaware Valley Financial Group, correct?

19   A     I was not responsible for the communications for the

20   approval.

21   Q     Right.  But you were -- you were giving her information?

22   A     I would -- yeah, any information that she requested, I'd

23   provide.

24         MR. DUNCAN:  Could we see Government's Exhibit 28

25   and have it published, Your Honor?  It's in evidence.

1          THE COURT:  Yes, sir.

2          MR. DUNCAN:  Thank you, Your Honor.  If you'd go to

3     the second page, and then the third page, please.  I'm sorry,

4     just go to the third page.  That's where the information shows

5     up.

6     BY MR. DUNCAN:

7     Q    So this is information you're sending to Ms. Koch,

8     correct?

9     A    Yes.

10    Q    And it's the Delaware Valley Financial Group and it's

11    their balance sheet, right?

12    A    Yes.

13    Q    You're providing her this information so the FDIC, who's

14    the regulator for the bank, can understand why Nova wants to

15    acquire the bank, correct -- or acquire the company, correct?

16    A    Yes.

17         MR. DUNCAN:  And if we could stay with Government's

18    Exhibit 28 just for a moment.  And if we could go back to the

19    first page, please.

20    BY MR. DUNCAN:

21    Q    So this is an email from you, Mr. Hanuscin, to Ms. Koch,

22    correct?

23    A    It's a memo.

24    Q    Memo.  June 2nd, 2009.  But you actually sent it to Ms.

25    Koch, correct?

Hanuscin - Cross (Dun)                                      76

1    A     Yes.

2    Q     In your email, among the things you're talking about, is

3    the fact that Nova has the possibility of getting a big

4    investor, correct?

5    A     Yes.

6    Q     And in your memorandum to her, you specify that this

7    investment by this large investor was contingent on certain

8    events, didn't you?

9          (Pause)

10         MR. DUNCAN:  If we could go down, just go down to

11   the second paragraph, please, and blow that up for the

12   witness, please.

13   BY MR. DUNCAN:

14   Q     So you see that the investment is dependent upon

15   regulatory approval of the investment, correct?

16   A     Yes.

17   Q     And it's also contingent on the Treasury Department

18   actually granting the TARP funds to Nova, correct?

19   A     Yes.

20   Q     And it's also contingent on that thing that you're

21   working on, the Delaware Valley Financial Group, correct?

22   A     Yes.

23   Q     So there were at least three contingencies that you

24   advised the FDIC about regarding whether or not this person

25   would actually invest in Nova Bank, correct?

1    A    Yes.

2    Q    So it wasn't a sure thing, was it?

3    A    No.

4    Q    You regularly communicated with Ms. Koch, correct?

5    A    Yes.

6    Q    You never withheld any information that she asked for,

7    did -- did you?

8    A    No.

9    Q    But she never wrote back to you and asked you anything

10   more about this investor, did she?

11   A    Not that I recall.

12            MR. DUNCAN:  Could we see Government's Exhibit 75

13   and publish it, Your Honor?  It's in evidence.

14            THE COURT:  Yes, sir.

15            MR. DUNCAN:  And if we could go down and blow up the

16   second paragraph, please.

17   BY MR. DUNCAN:

18   Q    So this is the TARP letter to you, Mr. Hanuscin, correct?

19   A    Yes.

20   Q    And you would agree that if you look at that second

21   paragraph, the only thing the letter requires that Nova do is

22   to raise $10 million in capital after August 25th, 2009?

23   A    Yes.

24   Q    And that's what you believed on August 25th, 2009, isn't

25   it?

Hanuscin - Cross (Dun)                                      78

1   A    Yes.

2   Q    And to the best of your knowledge, that was true?

3   A    Yes.

4            MR. DUNCAN:  Can we see Government's Exhibit 180,

5   which I believe was admitted while -- with this witness.  And

6   about halfway down the page where Nova Bank is underlined, if

7   you'd blow that up for the witness, please.  Can you make it a

8   little larger?

9   BY MR. DUNCAN:

10  Q    Okay.  So this is an email communication that you had

11  with Harold Shaw, correct?

12  A    Yes.

13  Q    And this was back in August of 2010, correct?

14  A    Yes.

15  Q    Mr. Shaw was one of the regulators at the FDIC, correct?

16  A    Yes.

17  Q    And you told Mr. Shaw that Nova Bank will have to amend

18  its December 2009, March 2010, and June 2009 call reports to

19  reflect the reduction of regulatory capital of $8.3 million

20  related to the loans to existing shareholders, correct?

21  A    Yes.

22  Q    That's all that stuff about what KPMG told you to do,

23  right?

24  A    Yes.

25  Q    And you reluctantly agreed to do it, correct?

1    A    Yes.

2    Q    So on behalf of Nova Bank, you voluntarily disclosed this

3    information and these facts to the banking regulators, didn't

4    you?

5    A    Yes.

6         MR. DUNCAN:  No further questions, Your Honor.

7    Thank you.  Thank you, Mr. Hanuscin.

8         THE COURT:  Redirect?

9         MS. BARRY:  Yes, Your Honor, briefly.

10                    REDIRECT EXAMINATION

11   BY MS. BARRY:

12   Q    Mr. Hanuscin, you were asked if you met with the

13   Government.  Do you recall that?

14   A    Yes.

15   Q    And did you also have an opportunity to meet with

16   representatives of the defendants?

17   A    Yes.

18   Q    Now, Mr. Egan asked you questions about asset quality and

19   earnings and things that the CPP council may have had

20   questions about.  Do you recall that?

21   A    Yes.

22   Q    Do you know whether or not you could have received --

23   that Nova Bank could have received the TARP funds if it was

24   not well capitalized?

25   A    No, they would not give -- provide it to banks that were

1    not adequate -- or well capitalized or above.

2    Q     Okay.  So you --

3    A     Excuse me.

4    Q     -- had to be well capitalized?

5    A     You had to be well capitalized, yes.

6    Q     Okay.  And you also -- could you acquire DVFG if the bank

7    or the holding company were not well capitalized?

8    A     No, we couldn't acquire it.

9    Q     So on June 30th of 2009, could you acquire DVFG?

10   A     No.

11   Q     Mr. Egan asked you about I think a Joe Petrone, who was

12   the comptroller?

13   A     Yes.

14   Q     Do you recall that?  Was Mr. Petrone involved in capital

15   raising for the bank?

16   A     No, he was not.

17   Q     Was Mr. Petrone involved in anything related to TARP?

18   A     No.

19   Q     You mentioned that you had communications with Ms. Koch

20   in the beginning, and then did somebody else take over

21   communications with Ms. Koch?

22   A     Yes.

23   Q     And who was that?

24   A     Brian.

25   Q     And do you know every single time Mr. Hartline spoke with

1  Ms. Koch?

2  A    No.

3  Q    You were asked questions by Mr. Egan on Mr. Fellheimer

4  having a line of credit.  Do you know if that line of credit

5  was opened for the purpose of investing in Nova Bank or --

6              MR. EGAN:  Objection.  Leading.

7              MS. BARRY:  Whether or not.

8              THE COURT:  Overruled.

9  BY MS. BARRY:

10  Q    Do you know whether or not that line of credit was opened

11  for the purpose of investing in Nova Bank?

12  A    No, I do not.

13  Q    Do you know whether or not that line of credit was

14  preexisting before the request was made to invest in Nova

15  Bank?

16  A    I don't recall the terms or the conditions of the -- the

17  note.

18              MS. BARRY:  I believe it was Government's Exhibit

19  140.  I'm sorry, 145.  And if we could just publish this for

20  the jury, please, again.

21  BY MS. BARRY:

22  Q    Now, this was an email -- is this an email that you sent

23  to Ms. Koch?

24  A    Yes.

25  Q    And, again, the information that was provided in the

1   email, did you prepare that personally or did you receive that

2   from someone else?

3   A    I -- I received it from someone else.

4   Q    And who was that someone else?

5   A    I believe Brian.

6           MS. BARRY:  May I approach the witness, Your Honor?

7           THE COURT:  Yes.

8   BY MS. BARRY:

9   Q    You were shown Defense Exhibit 134.  And could you just

10  look at 134, and is that the consulting agreement between Nova

11  Holding Company and Barry Bekkedam?

12  A    Yes.

13  Q    Okay.  And what is the date of that agreement?

14  A    November 19th, 2009.

15  Q    Do you know -- you said something that the Levin loan

16  should -- you agreed that it should count as capital?

17  A    I'm sorry?

18  Q    Did you say -- mention something to Mr. Egan that you

19  thought the Levin loan should count as capital?

20  A    I -- I said that I didn't necessarily agree with KPMG's

21  position on the transaction.

22  Q    Okay.  At the time that the investment was made, did you

23  know that the money had been borrowed from the bank?

24  A    No.

25  Q    Okay.  And do you know whether or not Mr. Levin's loan

1   was ever paid off?

2   A     To the best of my knowledge, it was not.

3   Q     Okay.  So it was just charged off?

4   A     I don't know specifically if it was charged off.

5   Q     Okay.  But --

6   A     But during my employment, it was not -- it was not paid

7   off.

8              MS. BARRY:  May I have a moment, Your Honor?

9              THE COURT:  Certainly.

10             MS. BARRY:  No further questions.  Thank you.

11             THE COURT:  Is there recross?

12             MR. EGAN:  Very briefly, Your Honor.

13             If we could go back to Exhibit 145.  And if we could

14   have page 36, please.  Wait, stay on page 1 for a second.

15                      RECROSS-EXAMINATION

16   BY MR. EGAN:

17   Q     You were asked a question on redirect when Mr. Hartline

18   took over communications with the FDIC.  Do you recall that?

19   A     Yes.

20   Q     You were never precluded from communicating with the FDIC

21   by Mr. Hartline, were you?

22   A     No.

23   Q     And, in fact, this email of December 16th is from you to

24   FDIC, not from Mr. Hartline, right?

25   A     Yes.

1    Q    So he didn't stop you from doing it; he didn't take it

2    over and say don't do it anymore?

3    A    No.

4    Q    Okay.

5         MR. EGAN:  So if we could go to page 36.

6    BY MR. EGAN:

7    Q    And this is this Fellheimer credit line.  The date of the

8    request to take it from the credit line is December 11th,

9    correct?

10   A    Yes.

11   Q    And the investment is made on December 16th, correct?  If

12   you go back to page 2, you'd have to look at it, but --

13   A    Okay.  Yes.

14   Q    So that's pretty much contemporaneously, correct?

15   A    Yes.

16        MR. EGAN:  And if we could go to 180, please.  And

17   if we could --

18   BY MR. EGAN:

19   Q    This is a document Mr. Duncan asked you some questions

20   about.

21        MR. EGAN:  If we could blow up the bottom section

22   and get it out a little bit more.

23   Q    Now, you were asked questions about Nova Bank amending

24   its December 2009, March 2010, and June 2009 call reports.  Do

25   you remember that?

1    A    Yes.

2    Q    And those are the call reports that had to be amended

3    because of what KPMG determined, correct?

4    A    Yes.

5    Q    Now, the TARP was officially denied in December of 2009,

6    correct?

7    A    Yes.

8    Q    So none of those amended call reports could possibly have

9    been part of their discussion, could they have?

10   A    No.

11   Q    So the reports that were changed because of KPMG were all

12   after that, correct?

13   A    Yes.

14             MR. EGAN:  I have nothing further, Your Honor.

15             MR. DUNCAN:  No, thank you, Your Honor.

16             MS. BARRY:  No further questions, Your Honor.

17             THE COURT:  All right.  Thank you, sir.  You may

18   step down.  Watch your step, please.

19             MR. IGNALL:  May I proceed, Your Honor?

20             THE COURT:  Do we need to stop for lunch now or

21   shall we continue?  Continue?  Great.  Thank you.

22             MR. IGNALL:  The Government calls Thomas Patterson.

23   And, Your Honor, just for clarification, because I know where

24   might be a good time to break, with respect to the Court's

25   schedule and counsels' schedule, is there a time that would

Patterson - Direct (Ign)                                    86

1    make the most sense?

2                    THE COURT:  Did we say?

3                    MR. EGAN:  12:30, Your Honor.

4                    THE COURT:  12:30?

5                    MR. EGAN:  Yeah.

6                    THE COURT:  Or any -- before that or just at 12:30?

7                    MR. EGAN:  Five -- five minutes longer.

8                    MR. IGNALL:  All right.  If we get close to 12:30

9    and there's a time that -- from that then is a good time to

10   break, I'll let you know, Your Honor.

11                   THE COURT:  That's fine.  Thank you.

12                   MR. EGAN:  Thank you, Your Honor.

13                   THE COURT:  Yes, sir.

14                   MR. IGNALL:  If we're done, then that would be a

15   good time.

16                   THE CLERK:  Please raise your right hand.

17            THOMAS PATTERSON, GOVERNMENT'S WITNESS, SWORN

18                   THE CLERK:  Please state and spell your name to the

19   record for me, and you can have a seat.

20                   THE WITNESS:  Thomas Patterson, T-H-O-M-A-S, P-A-T-

21   T-E-R-S-O-N.

22                   THE COURT:  You may proceed.

23                   MR. IGNALL:  Thank you, Your Honor.

24                            DIRECT EXAMINATION

25   BY MR. IGNALL:

1    Q    Mr. Patterson, in what city and state do you currently

2    live?

3    A    Limerick, Pennsylvania.

4    Q    And what do you do for a living right now?

5    A    I have two jobs.  I work at a trophy place in sales and

6    marketing, and I also drive for a limousine company.

7    Q    And prior to the jobs you have now, did you ever work in

8    the banking industry?

9    A    Yes, I did.

10   Q    And for how long did you work in banking?

11   A    Basically from 1973 till 2010.

12   Q    And do you have a bachelor's degree?

13   A    Yes, I do.

14   Q    And where did you get that degree?

15   A    St. Joseph's University.

16   Q    And what was your degree in?

17   A    Finance.

18   Q    And while you were working in banking, were you ever --

19   did you ever work for a bank called Nova Bank?

20   A    Yes, I did.

21   Q    And when did you work for Nova Bank?

22   A    2006 till 2010.

23   Q    And what was your job that you were hired to do at Nova

24   Bank?

25   A    Senior loan officer.

Patterson - Direct (Ign)                                    88

1   Q     And what did that mean?

2   A     Generating loans for the bank and overseeing a staff of

3   lenders.

4   Q     And what does it mean to generate loans?

5   A     To go out and seek customers who wanted to borrow money

6   from the bank.

7   Q     And who hired you at Nova Bank?

8   A     Mr. Hartline.

9   Q     And what is Mr. Hartline's first name?

10  A     Brian.

11  Q     Do you see him here in court today?

12  A     Yes.

13  Q     And can you identify him where -- by where he's sitting

14  and what he's wearing?

15  A     He's wearing a tie, white shirt, blue blazer.

16  Q     And where is he sitting because it --

17  A     Right there.

18  Q     Can you tell -- just for the record --

19            MR. EGAN:  Your Honor, we'd -- we'd stipulate --

20            MR. IGNALL:  Okay.

21            MR. EGAN:  -- that he's identified Mr. Hartline.

22            THE COURT:  Thank you.

23  BY MR. IGNALL:

24  Q     And when you were the senior loan officer, to whom did

25  you report at Nova Bank?

Patterson - Direct (Ign)                                          89

1    A    Mr. Hartline.

2    Q    And when did you leave the bank?

3    A    2010.  I believe it was August.

4    Q    All right.  Have you been charged with a crime related to

5    your time at the bank?

6    A    Yes, I was.

7    Q    And what crime were you charged with?

8    A    Misuse of bank funds.

9    Q    And what did that -- what does that mean, misuse of bank

10   funds?

11   A    I basically used bank funds to deposit into a borrower's

12   account while I was working on doing a loan to replace those

13   funds.

14   Q    And did you plead guilty to that crime?

15   A    Yes, I did.

16   Q    And in what court did you plead guilty?

17   A    The Federal Court, Pennsylvania.

18   Q    Here -- was it here in Philadelphia?

19   A    Yes, it was.

20   Q    And roughly when did you plead guilty?

21   A    January, I guess, 2011.

22   Q    All right.  And did you have a plea agreement with the

23   Government?

24   A    Yes, I did.

25   Q    And did you personally profit from the crime you pleaded

1    guilty to?

2    A      No, I did not.

3    Q      And did you have a plea agreement with the Government?  I

4    think I asked you that.

5    A      Yes.

6           MR. IGNALL:  Just for the witness, if we could bring

7    up Exhibit 199.

8    BY MR. IGNALL:

9    Q      Now, as part of that plea agreement, did you have any

10   obligation to cooperate with the Government?

11   A      I agreed to cooperate with the Government.

12   Q      Was that part of your plea agreement?

13          MR. IGNALL:  May I -- may I approach with a hard

14   copy, Your Honor?

15          THE COURT:  Yes, sir.

16          MR. IGNALL:  It's a multi-page document.  It might

17   be easier to do it that way.

18      (Pause)

19          MR. IGNALL:  May I approach, Your Honor?

20          THE COURT:  Yes, sir.

21   BY MR. IGNALL:

22   Q      If you could flip through that and see if that refreshes

23   your recollection about whether your plea agreement contained

24   an agreement to cooperate.

25      (Pause)

1    A    No, it does not.

2    Q    All right.  Did you agree to cooperate, even though it's

3    not in your plea agreement?

4    A    Yes.

5    Q    And did you cooperate with the Government?

6    A    Yes, I did.

7    Q    And did you cooperate with the Government in the

8    investigation of this case?

9    A    Yes, I did.

10   Q    All right.  Have you been sentenced for your crime?

11   A    Yes, I was.

12   Q    And when were you sentenced?

13   A    This January -- no, I went -- November 2011, I believe.

14   Q    Do you remember if the Government made a recommendation

15   for a reduced sentence because of your cooperation?

16   A    Yes, they did.

17   Q    And what sentence did you receive?

18   A    I received eight months.

19   Q    And have you served that sentence yet?

20   A    Yes, I have.

21   Q    As you testify here today, are you hoping for any

22   benefit?

23   A    No.

24   Q    Have you been subpoenaed to testify here today?

25   A    Yes, I have.

1   Q    When you worked at Nova Bank, how many people worked for

2   you approximately?

3   A    Approximately 10.

4   Q    And what did these individuals do?

5   A    They were lenders that generated loans for the bank, went

6   out and found customers that wanted to borrow money.

7   Q    And were there any particular type of customers the

8   lending department was looking for?

9   A    Just business customers looking for business loans.

10  Q    All right.  Were you involved in deciding whether a

11  customer who applied for a loan was creditworthy?  Was that

12  part of your department?

13  A    That was the credit department that underwrote the loan.

14  Q    And what does it mean to underwrite the loan?

15  A    The credit department would do a write-up for the loan,

16  take into account credit, credit history, ability to pay,

17  those types of things.

18  Q    Did you have any involvement in approving loans?

19  A    I was part of loan committee which approved loans, yes.

20  Q    And what did that mean, to be part of the loan committee?

21  A    There were five people on loan committee, and loans went

22  to loan committee to be approved.

23  Q    Starting around 2008 or so, did you have any

24  understanding of whether Nova Bank had applied for TARP

25  funding?

1    A    Yes.

2    Q    Were you at all involved in the TARP application?

3    A    No.

4    Q    Did you have any understanding about whether there were

5    any contingencies that -- or conditions that Nova had to meet

6    to get the funding?

7    A    My understanding was that the bank had been approved for

8    TARP pending the ability to raise capital.

9    Q    And do you know anything more specific than that?

10   A    No.

11   Q    Okay.  While you were at the bank, were you aware of

12   anyone at the bank or the holding company trying to raise

13   capital?

14   A    Yes.

15   Q    Was that common, uncommon?

16   A    No, it was common.

17   Q    All right.  Did anyone ever ask you to invest?

18   A    Yes.

19   Q    Who asked you?

20   A    Mr. Hartline.

21   Q    Do you know someone named Barry Bekkedam?

22   A    Yes, I do.

23   Q    And how do you know Mr. Bekkedam?

24   A    Mr. Bekkedam was chairman of the holding company when I

25   went to work for the bank.

1    Q    Was he the chairman of the holding company the whole time

2    you worked at the bank?

3    A    No.

4    Q    All right.  Do you know if Mr. Bekkedam had a business

5    other than being the chairman of the holding company?

6    A    Yes.

7    Q    And what was the name of that business?

8    A    Ballamor Capital Management.

9    Q    And do you know what that business was?

10   A    It managed the funds of wealthy people or investment for

11   wealthy people.

12   Q    Do you know if any Ballamor clients were ever clients of

13   Nova Bank while you were there?

14   A    Yes.

15   Q    And do you know if any of those Ballamor clients ever

16   borrowed money from the bank?

17   A    Yes, they did.

18   Q    And if a Ballamor client sought a loan, did you treat

19   that -- was that processed in any way differently?

20   A    No.  I mean --

21   Q    Let me ask -- let me rephrase that.  I think I asked that

22   poorly.

23            MR. EGAN:  May the witness be allowed to answer the

24   question, Your Honor?

25            THE COURT:  He did.

1           MR. IGNALL:  I think he did.

2    BY MR. IGNALL:

3    Q    Let me rephrase that.  Did loans to Ballamor clients come

4    in from a source that might be different from other loans?

5    A    Well, typically they came in through someone at Ballamor

6    who referred the customer to the bank for a loan.

7    Q    Okay.  Did loans to Ballamor customers often come through

8    your staff?

9    A    No.

10   Q    Did you ever talk to Mr. Hartline about Ballamor clients

11   getting loans from the bank?

12   A    Yes.

13   Q    Do you remember anyone named George Levin?

14   A    Yes.

15   Q    And who was Mr. Levin?

16   A    Mr. Levin was a customer who was introduced to the bank

17   by Mr. Bekkedam.  My understanding was he was going to be an

18   investor in the bank.

19   Q    All right.  Did you ever see Mr. Levin at the bank?

20   A    Yes.

21   Q    And approximately what year did you first learn of Mr.

22   Levin being a bank customer?

23   A    2009.

24   Q    All right.  Let me show you a document --

25           MR. IGNALL:  Let's -- Exhibit 15, which I believe is

1   already in evidence.

2   BY MR. IGNALL:

3   Q    Do you recognize Exhibit 15, and in particular if we look

4   down at the second email there?

5   A    Yes.

6   Q    And what is Exhibit 15, that email that we're looking at

7   right now?

8   A    It's an email from Mr. Hartline to Mr. Bekkedam, cc'd

9   myself and Mark Poliski.

10  Q    And what's this email about?

11  A    It's about Mr. Levin assuming a loan of Mr. Bekkedam's.

12  Q    All right.  And were you at all involved in that?

13  A    I don't -- I guess -- I don't remember.

14  Q    Do you remember if Mr. Levin ever actually assumed that

15  loan?

16  A    I don't know.

17  Q    Do you know whether -- did you ever have a discussion

18  with anyone about whether Mr. Levin was going to invest in the

19  bank or more specifically the holding company?

20  A    Yes.  My understanding was he was going to invest.  The

21  bank was seeking approval because his investment was --

22  Q    Well, let --

23  A    Oh, okay.

24  Q    Let me --

25  A    Okay.

1    Q    -- stop you.

2    A    Okay.

3    Q    Did you speak to anyone about that, or had -- from whom

4    did you first learn that Mr. Levin was going to invest?

5    A    Mr. Hartline.

6    Q    All right.  And what did Mr. Hartline tell you?

7    A    That Mr. Levin was going to invest in -- in the bank.

8    Q    And did Mr. Hartline tell you how much?

9    A    I want to -- I want to say 15 million comes to mind.

10   Q    All right.  And did Mr. Hartline tell you who brought Mr.

11   Levin to the bank as a possible investor?

12   A    Mr. Bekkedam.

13   Q    Let's go to June of 2009.  Do you know if up to that

14   point Mr. Levin had made any investment in Nova or the holding

15   company?

16   A    My understanding is no, he had not.

17   Q    And just so we're clear, was his investment going to be

18   in the holding company, in the bank; do you understand how

19   that was going to work?

20   A    I believe it was the holding company.

21   Q    All right.  At some point in June, did you have a

22   conversation with anyone at Nova Bank about lending money to

23   Mr. Levin?

24   A    Yes.

25   Q    Who did you first talk to about that?

Patterson - Direct (Ign)                                98

1   A      Mr. Hartline.

2   Q      And what did Mr. Hartline say?

3   A      That Mr. Levin needed a loan.

4   Q      And did Mr. Hartline say what the purpose of the loan

5   was?

6   A      It was for investment in the bank, investment of capital

7   in the bank.

8   Q      And what do you mean investment of capital in the bank?

9   A      He was going to invest -- well, in the holding company.

10  Q      Do you know whether you were involved in any efforts to

11  get Mr. Levin a loan from a different bank?

12  A      I believe we tried to participate it or maybe even farm

13  it out to a different bank.

14  Q      What does participate mean?

15  A      A partner.

16  Q      And if I could turn your attention to Exhibit 23, --

17          MR. IGNALL:  And I do not believe this is in

18  evidence yet.

19  Q      -- do you recognize Exhibit 23?

20  A      Yes.

21  Q      What is Exhibit 23?

22  A      It's asking us to look into finding a participant for a

23  loan.

24  Q      Well, let -- what -- is it a -- what type of document is

25  this?

1    A    It's a memo from Mr. Hartline.

2    Q    To whom?

3    A    To Larry Rovin at Ballamor Capital.

4    Q    And is anyone copied on this?

5    A    Copied to Kim Hartline and myself.

6    Q    All right.  And what's the date of this memo?

7    A    May 27th, 2009.

8              MR. IGNALL:  The Government moves into evidence

9    Exhibit 23.

10             MR. DUNCAN:  No objection.

11             MR. EGAN:  No objection.

12             THE COURT:  Admitted.

13             MR. IGNALL:  May it be published to the jury, Your

14   Honor?

15             THE COURT:  Yes, sir.

16   BY MR. IGNALL:

17   Q    All right.  And can you read the first paragraph of this

18   email from Mr. Hartline to Mr. Rovin?

19   A    "Barry would like Nova to look into participating a loan

20   for Banyon.  Can you please send me the documents that explain

21   the deal so I can show it to other banks and we can perform

22   due diligence."

23   Q    And were you at all involved in this process?

24   A    I believe I contacted the Atlantic Central Banker's Bank

25   to see if they wanted to participate.

1    Q    I may come back to this, but let me show you to -- turn

2    your attention to Exhibit 24.

3              MR. IGNALL:  Just for the witness, at this point.

4    BY MR. IGNALL:

5    Q    Do you recognize Exhibit 24?  And take a moment to look

6    at it.

7              (Pause)

8    A    It's a memo from --

9    Q    Let's go to the bottom email.

10   A    Okay.

11   Q    Do you recognize that?

12   A    It's a memo from myself to Mr. Hartline.

13   Q    And what's the date of that?

14   A    May 27th, 2009.

15             MR. IGNALL:  The Government moves into evidence

16   Exhibit 24.

17             MR. ENGLE:  No objection.

18             MR. EGAN:  No objection.

19             THE COURT:  Granted.

20             MR. IGNALL:  And may this be published to the jury?

21             THE COURT:  Yes, sir.

22   BY MR. IGNALL:

23   Q    What is this memo about -- the email about?

24   A    It's a request to Atlantic Central Banker's Bank.

25   Q    And you just -- is that the bank you mentioned a moment

1    ago?

2    A    Yes, it is.

3    Q    And what type of bank was Atlantic Central Banker's Bank?

4    A    It's a conglomerate of banks.  They're headquartered out

5    in Harrisburg.  They have member banks that belong to the

6    Atlantic Central Banker's Bank.

7    Q    And why was -- why were you talking about getting a loan

8    from ACBB for Mr. Levin?

9    A    They have the ability to piece the loan out to various

10   banks who would be interested in taking a piece of the loan.

11              MR. IGNALL:  Let me go back to Exhibit 23, please.

12   Q    Can you read the second paragraph, please?

13   A    "FYI, Barry is looking for Mr. Levin to invest 15 million

14   into Nova, which will make him 16.5 percent investor and he

15   needs to get approval from the Fed and state."

16   Q    Okay.  That -- thank you.  And then what does the third

17   paragraph say?

18   A    "We are working on getting a loan to finance a half of

19   this purchase from the ACBB.  Tom is working on that as we

20   speak and will contact you if we need anything."

21   Q    By the middle to the end of June, do you recall whether

22   ACBB had agreed to loan any money to Mr. Levin?

23   A    No, they did not.

24   Q    So again to June, do you recall if Mr. Levin applied for

25   a loan after your conversation with Mr. Hartline?

1  A    At the -- at the very end of June.

2  Q    All right.  And do you remember if there was any time

3  constraint on getting this loan approved?

4  A    My understanding was that the loan needed to be in place

5  by June 30th.

6  Q    And as of June 30th, had you had any conversations with

7  Mr. Hartline about anything the bank needed to do to qualify

8  for TARP?

9  A    No, just that we need to raise -- we needed to raise --

10  the bank needed to raise capital to qualify for TARP.

11  Q    And had you had that conversation with Mr. Hartline prior

12  to the end of June?

13  A    Yes, it was an ongoing conversation.

14  Q    Do you recall how much this loan was going to be for in

15  June for Mr. Levin?

16  A    $5 million.

17  Q    And in your experience at the bank, do you recall any

18  loans bigger than that to an individual?

19  A    No, I do not.

20  Q    And do you remember how quickly the bank turned around

21  the loan from when it got the application?

22  A    That day.

23  Q    Do you know if there was any collateral or any security

24  with --

25  A    No.

1    Q    -- with respect to Mr. Levin's loan?

2    A    The loan was unsecured.

3    Q    Was that unusual for a loan of that size in your

4    experience at the bank?

5    A    For a loan that size.

6    Q    And if I could turn your attention to Exhibit 40A, which

7    I believe is already in evidence, were you involved in any

8    email exchanges at the end of June regarding Mr. Levin's loan?

9    A    I'm sure I was.

10   Q    And if we look at Exhibit 40A, do you recognize this

11   email, and start at the top.  Are you included on that email?

12   A    It's from Brian to Frank Preve, Larry Rovin -- yes, I am

13   cc'd on it.

14   Q    And that tpatterson@novabank.com, was that your email

15   address in June of 2009?

16   A    Yes, it is.

17   Q    What does the first line say?

18   A    "We will need these executed and returned to Nova

19   tomorrow.  Scanned images will work.  The plan is to fund by

20   the end of day."

21   Q    And what time of day is this email from Mr. Hartline?

22   A    4:16 p.m.

23   Q    If I could turn your attention to Exhibit 40B.

24        MR. IGNALL:  Which I believe is also in evidence,

25   Your Honor.  May I publish this to the jury, Your Honor?

1              THE COURT:  Yes, sir.

2    BY MR. IGNALL:

3    Q    And do you know who fpreve@aol.com is or was?

4    A    He worked with -- my understanding is he worked with Mr.

5    Levin.

6    Q    And did you have email correspondence with Mr. Preve?

7    A    Yes.

8    Q    All right.  And, in fact, did you get this email that we

9    have as 40B?

10   A    Yes.

11   Q    And what time did you get that email?

12   A    June 29th at 4:32 p.m.

13   Q    And do you remember any correspondence with Mr. Preve

14   about whether documents, as part of Mr. Levin's application,

15   had to be notarized?

16   A    I don't believe they were.

17   Q    And do you recall why they didn't have to be notarized?

18   A    No.

19   Q    If I could turn your attention to Exhibit 40C --

20             MR. IGNALL:  Which I also believe is in evidence.

21   May this be published to the jury?

22             THE COURT:  Yes, sir.

23             MR. EGAN:  No objection.

24             MR. ENGLE:  No objection.

25   BY MR. IGNALL:

1   Q    And this appears to be an email, June 29th, from Mr.

2   Hartline to a number of people cc'ing you.  Do you see that?

3   A    Yes.

4   Q    Do you recall whether Mr. Hartline said anything about

5   why the documents did or did not have to be notarized?

6   A    No, I do not.

7   Q    What does Mr. Preve say in the previous email?

8   A    "Does anything have to be notarized?"

9   Q    And how does Mr. Hartline respond?

10  A    "No, we are doing a loan on an unsecured basis."

11  Q    Now, did anyone tell you about a date by which this loan

12  had to be approved?

13  A    My understanding was June 30th.

14  Q    And who told you that?

15  A    Mr. Hartline.

16  Q    Did Mr. Hartline say why?

17  A    That was the date that we needed to have the capital

18  raised in order to qualify for TARP.

19  Q    You mentioned earlier a loan committee.  Do you know how

20  often the loan committee met?

21  A    Once a week, is my --

22  Q    Do you remember what day of the week that was generally?

23  A    No, I don't.

24  Q    All right.  Let me show you what we've marked as Exhibit

25  41, which I believe is in evidence.  Do you recall if there

1  was a loan committee on June 30th?

2  A     According to this document, there was.

3  Q     And were you present at the loan committee meeting on

4  June 30th?

5  A     Yes.

6  Q     And this is the day after those emails we just talked

7  about.  So do you recall if you were at a loan committee

8  meeting the next day?

9  A     Yes.

10  Q     And do you recall roughly when the meeting took place?

11  A     When?

12  Q     Yeah.  What time of day?

13  A     The meeting was called to order at 9:45 a.m.

14  Q     Is that consistent with your recollection of when a loan

15  committee meeting --

16  A     Yes.

17  Q     -- was often held?

18  A     Um-hmm.

19  Q     And with respect to Mr. Levin's loan, do you recall

20  whether that loan came up at the loan committee?

21  A     I don't believe it did.

22  Q     Was there another way to get loans approved other than

23  going to a loan committee meeting -- loan committee meeting?

24  A     Yes.

25  Q     And what was that?

Patterson - Direct (Ign)                                    107

1    A    You could walk them around to the individual loan

2    committee members to seek their approval.

3    Q    And were these the loan committee members who were

4    present at the meeting?

5    A    Yes, they're loan committee members.

6    Q    And with respect to Mr. Levin's loan, did you do the

7    physical walking around?

8    A    I believe I did.

9    Q    All right.  And did you do that after the loan committee

10   met on June 30th?

11   A    Yes.

12   Q    And do you recall how long -- and let me ask a follow-up

13   before I get to that.  For loans that were walked around, did

14   any document go to the loan committee later to reflect such a

15   loan?

16   A    I believe they were generally written into the minutes

17   afterwards.

18   Q    And was that after the loan had already been approved?

19   A    Yes.

20   Q    With respect to Mr. Levin's loan on June 30th, do you

21   recall how long -- let me change that.  Do you recall when it

22   was you walked that loan around to members of the loan

23   committee?

24   A    The exact time, no, I don't.

25   Q    But do you recall if it was after the loan committee

1    meeting?

2    A    Yes.

3    Q    Let me turn your attention to Exhibit 42, which I also

4    believe is in evidence.  Do you recognize Exhibit 42?

5    A    Yes.

6    Q    And what is Exhibit 42?

7    A    It's a memo from myself to Frank Preve.

8    Q    And what is this about?

9    A    It's about a wire transfer of the loan proceeds.

10          MR. IGNALL:  And may this be published to the jury,

11   Your Honor?

12          THE COURT:  Yes, sir.

13   BY MR. IGNALL:

14   Q    And do you recall sending this email to Mr. Preve?

15   A    I'm sure I did.

16   Q    But do you remember sending the email to Mr. Preve about

17   the wiring of funds?

18   A    Yes.

19   Q    All right.  And what's the time of this email?

20   A    11:15 a.m.

21   Q    And what did you tell Mr. Preve at 11:15 a.m. on June

22   30th?

23   A    "I'm going to wire the funds now.  Can you then wire the

24   funds back to," and it gives wiring instructions.

25   Q    So as of 11:15 a.m., had you walked the loan around to

1    the loan committee members?

2    A    Yes.

3    Q    So had the loan committee members approved the loan as of

4    11:15 a.m.?

5    A    Yes.

6    Q    All right.  If we can go back to Exhibit 41 and look at

7    the bottom.  At what time did the loan committee meeting

8    adjourn?

9    A    10:15.

10   Q    When you walked the loan around to the members of the

11   loan committee, did you discuss with them the purpose of the

12   loan as you understood it?

13   A    Yes, I believe so.

14   Q    Do you have a specific recollection of whether --

15            MR. EGAN:  Objection.

16            THE COURT:  Just a moment, please.  The objection is

17   sustained, but you can ask the follow-up question.

18            MR. IGNALL:  Okay.

19   BY MR. IGNALL:

20   Q    Do you have a specific recollection, one way or the

21   other, about whether you discussed the purpose of the loan?

22   A    No, I don't.

23   Q    And if we could turn you to Exhibit 43, I believe.  Do

24   you recognize Exhibit 43?

25   A    It's a risk assessment summary.

1    Q    And what is a risk assessment summary?

2    A    It's basically the credit department does a write-up for

3    each loan.  This -- so this is a risk assessment summary for

4    Mr. Levin's loan.

5    Q    And does it say what the purpose of the loan is there?

6    A    Financial investment.

7    Q    If we can go to the last page, what is the last page?

8    A    It's the signature page for the approvals.

9    Q    And did you physically get those individuals on this page

10   to sign the document?

11   A    Yes.

12   Q    And is your signature one of the signatures there?

13   A    Yes, it is.

14   Q    Let me turn your attention back to Exhibit 42.  Why were

15   you wiring funds to Mr. Preve?

16   A    We were not wiring to Mr. Preve.

17   Q    Or, I'm sorry, why were you telling Mr. Preve you were

18   about to wire funds?

19   A    Because that was the instructions, to wire the funds to

20   Mr. Levin.

21   Q    And what funds were you wiring?

22   A    The loan proceeds.

23            MR. IGNALL:  May I have one moment, Your Honor?

24            THE COURT:  Yes, sir.

25        (Pause)

1    BY MR. IGNALL:

2    Q    If I could turn your attention to Exhibit 46 -- I'm

3    sorry, if I could turn your attention to Exhibit 46, I

4    believe.

5             MR. IGNALL:  And I believe this is in evidence.  May

6    it be published to the jury, Your Honor?

7             THE COURT:  Yes, sir.

8    BY MR. IGNALL:

9    Q    All right.  Do you see an email -- do you recognize these

10   emails, Mr. Patterson?

11   A    It's an email from Mr. Preve to myself.

12   Q    All right.  And if you go below it, do you see an email

13   from you to Mr. Preve?

14   A    Yes.

15   Q    And what is -- what's the time and date of that email?

16   A    Tuesday, June 30th, 11:12 a.m.

17             MR. IGNALL:  I'm sorry, if we go up to the top line.

18   If we -- if we scroll down a little bit.  I think the -- can

19   we scroll down?

20   BY MR. IGNALL:

21   Q    Let's look at the bottom of the email.  It's an email

22   from Mr. Preve, --

23   A    Preve to myself.

24   Q    -- do you see that?

25   A    Yes.

Patterson - Direct (Ign)                    112

1    Q    What's the time of day?

2    A    11:12 a.m.

3    Q    And what is -- what information, if any, is Mr. Preve

4    giving you in this email?

5    A    The bank wire info.

6    Q    All right.  And then did you write back to him based on

7    the information you had gotten?

8          MR. IGNALL:  Let's look at the next email forward.

9          (Pause)

10   A    Okay.

11   Q    And what -- what did you tell Mr. Preve, and at what time

12   do you think this was?  Compound question.  What was -- what

13   was the time of this email?

14   A    12:04.

15   Q    So at 12:04, what did you tell Mr. Preve?

16   A    "The wire has been sent and should be at Gibraltar.  The

17   confirmation number is.  Please let me know when the funds

18   have been wired back."

19          MR. IGNALL:  And if we go to the top email.

20   Q    And what does the top email -- what's the time of the top

21   email?

22   A    1:31.

23   Q    And what does Mr. Preve tell you at 1:31?

24   A    "Got it.  Sending back in five minutes."

25   Q    And why did you instruct Mr. Preve to send -- send it

1  back?

2  A     My understanding was the loan proceeds were coming back

3  to the bank.

4  Q     For what purpose?

5  A     Capital investment.

6  Q     Was this common at Nova Bank to have loan proceeds be

7  wired out to an account and then wired back to the bank?

8  A     No, I wouldn't say it was common.

9  Q     Had you seen it at any other time at Nova Bank?

10  A     No, I don't believe so.

11  Q     And in terms of funds being wired out from the bank and

12  back to the bank on the same day, had you seen that at any

13  other bank where you worked?

14  A     No.

15  Q     And who instructed you to wire the funds to Mr. Preve?

16  A     The borrower gave us wiring instructions.

17  Q     But who instructed -- did anyone at the bank instruct you

18  to wire the money to the borrower to have it wired back?

19             MR. EGAN:  Objection.

20             THE COURT:  Overruled.

21  A     Mr. Hartline.

22             MR. IGNALL:  Your Honor, if this is a good time?  I

23  can go for a few more minutes or I can --

24             THE COURT:  No, this is a good time, I think.

25             MR. IGNALL:  Okay.  All right.

Colloquy                           114

1          THE COURT:  All right.  We're going to recess for

2    lunch.  We're going to reconvene this afternoon at 1:45.  1:45

3    this afternoon.

4          Now, a couple of announcements.  In deference to the

5    fact that you have been so diligent about being good and loyal

6    jurors, I'm going to give you the day off on Friday, April

7    15th, just in case somebody needs to do anything at the last

8    minute.  I'm also going to have court on Monday, April 18th,

9    only in the morning.  You'll be off on Monday afternoon, April

10   18th.  And, lastly, Friday, April 22nd, there will be no

11   court.  All right.  Enjoy your lunch.  Thank you.

12         THE CLERK:  All rise.

13      (Jury out at 12:15 p.m.)

14         THE COURT:  Sir, you may step down.  Watch your

15   step, please.  Counsel, let me remind you about the need to

16   get those jury instructions in as soon as you can, please, if

17   you haven't already.

18         MR. EGAN:  Your Honor, I --

19         MR. IGNALL:  I believe we did.

20         MR. EGAN:  Yeah, I think we're at a point where

21   there are just some disputed ones that we'll need to go over

22   with the Court.

23         THE COURT:  All right.  All right.  Fair enough.

24         MR. IGNALL:  And I believe we may have done it in

25   October, I believe, Your Honor.

Colloquy                                      115

1            THE COURT:  Okay.  Good enough.  All right.  Enjoy

2    your lunch.  Thank you.

3            MR. EGAN:  Thank you, Your Honor.

4            MR. IGNALL:  Thank you, Your Honor.

5         (Luncheon recess at 12:16 p.m. to 1:56 p.m.)

6            MR. EGAN:  This morning, at about a half hour before

7    the end of the morning session, one of my client's character

8    witnesses came down and came into the courtroom.  I didn't --

9    I didn't even recognize him.  He's only a character witness.

10   The Government has asked that he be sequestered.  In my

11   experience, it's not required of character witnesses, but I

12   just bring it to the Court's attention.

13           THE COURT:  I've never sequestered a character

14   witness because no one's ever said anything about a character

15   witness.

16           MR. IGNALL:  That's fine, Your Honor.

17           THE COURT:  Because the testimony isn't going to

18   affect their reputation evidence or opinion.

19           MR. IGNALL:  If that's the Court's pleasure, that's

20   fine with us, Your Honor.

21           THE COURT:  All right.

22           MR. EGAN:  Thank you, Your Honor.

23           THE COURT:  And that goes -- well, any time that --

24   that's not an issue.  All right.  Thank you.

25           MR. IGNALL:  All right.  Can we get the witness as

Colloquy                                         116

1    well?

2              THE COURT:  Please.  Thank you.

3         (Pause)

4              THE COURT:  I would not allow a question of, "Now

5    you heard what was said from the witness stand, so therefore

6    does that change anything?"  I wouldn't allow that.

7              MR. EGAN:  Understood, Your Honor.

8              MR. IGNALL:  Okay.  Well, may we approach at sidebar

9    on that, Your Honor?

10             THE COURT:  Sure.

11        (Sidebar begins)

12             MR. IGNALL:  I don't know if this witness is going

13   to be a reputation or opinion character witness, but they're

14   different permissible areas of cross-examination, obviously,

15   some of it could involve asking about the facts of this case.

16             MR. EGAN:  Well, I do not intend that whatsoever,

17   Your Honor.  You know people in (inaudible) reputation for

18   being law binding and truthful.

19             MR. IGNALL:  Dates and reputation as opposed --

20             MR. EGAN:  Yeah.

21             MR. IGNALL:  -- to opinion?  Okay.  Thank you.

22             THE COURT:  Thank you.

23        (Sidebar ends)

24        (Pause)

25             THE CLERK:  All rise.

Patterson - Direct (Ign)                    117

1     (Jury in at 2:00 p.m.)

2          THE CLERK:  Ladies and gentlemen, we are back on the

3     record.

4          THE COURT:  Good afternoon.  You may be seated.

5     Counsel, you may continue.

6          MR. IGNALL:  Thank you, Your Honor.

7                    DIRECT EXAMINATION (cont.)

8     BY MR. IGNALL:

9     Q     All right.  Mr. Patterson, I'd like to bring your

10    attention back to the loan to Mr. Levin that we were talking

11    about before lunch.  And I'd like to ask you to look at

12    Exhibit 119 on your screen, which I do not believe is in

13    evidence yet.  Do you recognize Exhibit 119?

14    A     Yes.

15    Q     And what is Exhibit 119?

16    A     It's a disbursement request and authorization form.

17    Q     And what is a disbursement request and authorization?

18    A     It basically instructs us what to do with the --

19          THE COURT:  Could you keep your voice up higher,

20    please?

21          THE WITNESS:  Yes.

22    A     It instructs us what to do with the proceeds of the loan.

23    Q     All right.  And whose loan does this involve?

24    A     George Levin.

25          MR. IGNALL:  All right.  The Government moves into

Patterson - Direct (Ign)                     118

1    evidence Exhibit 119.

2              MR. EGAN:  No objection.

3              MR. ENGLE:  No objection.

4              THE COURT:  Granted.

5    BY MR. IGNALL:

6    Q    All right.  And if we look at Exhibit 119, what's the

7    principal amount of this loan?

8    A    $5 million.

9    Q    And what's the date of the loan?

10   A    7/1/2010.  Oh, that's the maturity.  I'm sorry.

11   6/30/2009.

12   Q    Okay.  And if we go down to disbursement instructions,

13   what are the disbursement instructions, kind of in the middle

14   of the page?

15   A    $5 million outgoing wire.

16   Q    And if we look at above that, primary purpose of loan, do

17   you see what it says?  It says the primary purpose of the loan

18   is.  What does it say there?

19   A    Business, including real estate investment.

20   Q    At this time, what did you understand Mr. Levin's loan

21   was going to be used for?

22   A    To invest in the capital of Nova Financial Holdings.

23   Q    All right.  If I could turn your attention back to

24   Exhibit 43.  And what is -- again is Exhibit 43?

25   A    It's a risk assessment summary.

1   Q    And is that a document you reviewed prior to signing off

2   on Mr. Levin's loan?

3   A    Yes.

4   Q    All right.  Do you know -- are you familiar with how that

5   document was prepared at Nova Bank?

6   A    It's prepared by the credit department.

7   Q    And do you know who in the credit department prepared

8   this document?

9   A    It says J. Madiany.

10   Q    Do you know who that is?

11   A    Yes, he was a credit officer at the bank.

12   Q    And what was his first name, do you remember?

13   A    Joseph.

14   Q    All right.  And do you know if that's a document that

15   other people at the bank could access?

16   A    Yes.

17   Q    Let me turn your attention to Exhibit 118.

18        MR. IGNALL:  Which I believe is in evidence.

19        AGENT BOYER:  Yes.

20        MR. IGNALL:  And may we publish this to the jury,

21   Your Honor?

22        THE COURT:  Yes, sir.

23   BY MR. IGNALL:

24   Q    Do you recognize Exhibit 118?

25        MR. IGNALL:  You might want to scroll up a little

1   bit, Agent Boyer.

2   A    Yes.

3   Q    What is Exhibit 118?

4   A    It's an email from Mr. Madiany to myself.

5   Q    And what -- is it including anything or providing

6   anything to you?

7   A    It says:  "Per your request, the RAS.  Thanks."

8   Q    Do you recall requesting a RAS from Mr. Madiany on or

9   about October 8th of 2009? -- October 6th, I'm sorry.

10  A    Not off the top of my head, no.

11  Q    All right.  But if we can go to the next page, do you see

12  what -- what this RAS is, for whose loan that is?

13  A    It's Mr. Levin's loan.

14  Q    All right.  And is this the same amount as the loan that

15  you talked about earlier?

16  A    Yes, it is.

17  Q    And what's the date of this RAS?  Towards the top.

18  A    It says revision date, 6/30/09.

19  Q    And if we go to about halfway down to the purpose, what

20  does it say?

21  A    Bridge loan for improvements to property.

22  Q    Do you recall ever reviewing a loan to Mr. Levin for a

23  bridge loan for improvements to property?

24  A    No.

25  Q    Do you recall ever asking anyone to change a risk

1    assessment summary to reflect the loan to Mr. Levin for a

2    bridge loan for improvements to property?

3    A    I don't remember.

4    Q    Do you remember Mr. Levin ever applying for a loan, for a

5    bridge loan for improvements to property?

6    A    No.

7    Q    Was Mr. Levin's property ever a discussion back in June

8    of 2009 when you were approving his loan?

9    A    No, I don't believe so.

10   Q    Do you know any reason why the bank would have two

11   different risk assessment summaries?

12              MR. EGAN:  Objection.

13              THE COURT:  Sustained.

14   BY MR. IGNALL:

15   Q    Are you -- in your experience at the bank, were you

16   familiar with any time when there were two risk assessment

17   summaries for the same loan?

18   A    No.

19   Q    If -- in your experience at the bank, if there were a

20   change in terms of a loan, would there be a new risk

21   assessment summary or a change in the old one or neither?

22              MR. EGAN:  Objection.

23              THE COURT:  Overruled.

24   A    There would be a new risk assessment done.

25   Q    Do you recall ever making a change to the risk assessment

1    summary for Mr. Levin?

2    A     No.

3    Q     All right.  Now I'd like to turn your attention to

4    Exhibit 301.

5          MR. IGNALL:  Which I believe is already in evidence.

6    And may I approach, Your Honor?  I think it's easier with a

7    hard copy.

8          THE COURT:  Yes, sir.

9    BY MR. IGNALL:

10   Q     Do you recognize Exhibit 301?

11   A     It's a loan checklist.

12   Q     Well, just -- you can look at the hard copy that I put in

13   front of you.

14   A     Okay.

15   Q     Just flip through it.  Do you know generally what that

16   is?

17   A     It's a checklist and the documents.

18   Q     Is that the type of document maintained by Nova Bank?

19   A     Yes.

20   Q     All right.  Let me turn your attention and see how

21   (inaudible), on the page that starts 32014.  Put Agent Boyer's

22   math skills to the test here.

23         MR. IGNALL:  And may it be published to the jury,

24   Your Honor?

25         THE COURT:  Yes, sir.

Patterson - Direct (Ign)                              123

1    BY MR. IGNALL:

2    Q     Do you recognize what this document is?

3    A     It's a commercial loan application.

4    Q     And is this a document that you've seen before while

5    working at the bank?

6    A     Yes.

7    Q     And then if we look at it, whose name is this in?

8    A     George Levin.

9    Q     All right.  And what's the date on this?

10   A     It looks like 6/25/09.

11   Q     Do you recall whether you saw this document on June 25th

12   of 2009?

13   A     I -- I don't recall.

14           MR. IGNALL:  Can you flip to the next page?  Thank

15   you.

16   BY MR. IGNALL:

17   Q     Do you remember if there were any discussions about

18   securing capital -- securing collateral for Mr. Levin's loan

19   after it was disbursed?

20   A     No.  My understanding, it was an unsecured loan.

21   Q     Do you know if there were any discussions about getting

22   Mr. Levin to provide some security after the fact?

23   A     I don't recall.

24   Q     All right.  Do you recall someone named Anthony Bonomo?

25   A     Yes.

1    Q     And we're done -- we're done with that exhibit, so you

2    don't have to --

3    A     Okay.

4    Q     And who is or was Mr. Bonomo?

5    A     Mr. Bonomo was a customer of the bank.

6    Q     And do you know if Mr. Bonomo had any association with

7    Ballamor Capital?

8    A     My understanding, he was also a Ballamor Capital client.

9    Q     All right.  Do you know if Mr. Bonomo ever applied to

10   borrow money from the bank while you were a loan officer?

11   A     Yes.

12   Q     And, in particular, I want to turn your attention to

13   October 2009.  Do you recall if Mr. Bonomo applied for a loan

14   in October of 2009?

15   A     Not off the top of my head.

16   Q     Are there any documents that might help refresh your

17   recollection?

18   A     There would be loan documents.

19   Q     Okay.

20          MR. IGNALL:  May I approach with what we've marked

21   as Exhibit 304?

22          THE COURT:  Yes, sir.

23          MR. IGNALL:  I don't believe it's in evidence, but

24   I'd like to move it into evidence now.  I believe we have a

25   stipulation.

1          UNIDENTIFIED COUNSEL:  So stipulated.

2          MR. EGAN:  Agreed.

3          THE COURT:  Very well.

4    BY MR. IGNALL:

5    Q    And actually let me show you something -- before we get

6    to that, maybe I can try something else.  If I could bring

7    your attention to the screen to Exhibit 99.

8          MR. IGNALL:  Which I do not believe is in evidence

9    yet.

10         AGENT BOYER:  No.

11   Q    Do you recognize Exhibit 99?

12   A    It's an email from Mr. Hartline to myself.

13   Q    And what's this email about?

14        (Pause)

15   A    It's information we will need to --

16   Q    But does this reflect -- refer to a particular borrower?

17        (Pause)

18   Q    Do you see the middle email?  Let me try this.  Do you

19   recall having email conversations with Mr. Hartline on or

20   about October 19th of 2009?

21   A    It's for Mr. Bonomo.  I see it at the bottom.

22   Q    But do you remember having an email exchange with Mr.

23   Hartline about Mr. Bonomo?

24   A    Yes.

25        MR. IGNALL:  I'd like to move Exhibit 99 into

Patterson - Direct (Ign)                          126

1    evidence.

2              MR. EGAN:  No objection.

3              UNIDENTIFIED COUNSEL:  No objection.

4              THE COURT:  Granted.

5    BY MR. IGNALL:

6    Q    Looking at this document, do you recall about when Mr.

7    Bonomo applied for a loan with Nova Bank?

8         (Pause)

9    A    Not the exact date, no.

10   Q    But you know what month it was?

11   A    It was in October.

12   Q    All right.  Do you know who brought Mr. Bonomo's

13   application to your attention?

14   A    Mr. Hartline.

15   Q    Did Mr. Hartline tell you what the purpose of Mr.

16   Bonomo's loan was?

17   A    I believe he was refinancing real estate, plus there was

18   some additional funds to invest in the bank.

19   Q    All right.  Do you know if he was going to invest in

20   anything else other than the bank?

21   A    Not that I'm aware of.  Not that I remember.

22   Q    All right.  Let me turn your attention to Exhibit 109.

23             MR. IGNALL:  And is this in evidence already?

24             AGENT BOYER:  Yes.

25             MR. IGNALL:  All right.  This is already in

1    evidence.  And may this be published, Your Honor?

2              THE COURT:  Yes, sir.

3    BY MR. IGNALL:

4    Q    Do you recognize Exhibit 109?

5    A    Yes.

6    Q    And what is Exhibit 109?

7    A    It's a risk assessment form for --

8    Q    For whom?

9    A    For a loan to Anthony Bonomo.

10   Q    And were you someone at the bank who reviewed this loan

11   at the time?

12   A    I reviewed the RAS, yes.

13   Q    All right.  And is this the document you reviewed in

14   October?

15   A    Yes.

16   Q    All right.  And if we look at the second page -- let me

17   go back to the first page.  I'm sorry.  What's the amount of

18   the loan that Mr. Bonomo is seeking here?

19   A    4,500,000.

20   Q    And what does it say about the purpose on the first page?

21   A    Financial investment.

22             MR. IGNALL:  And let's go to the next page.  If we

23   could bring up the transaction comments, please.

24   BY MR. IGNALL:

25   Q    What -- can you read the first, you know, three

Patterson - Direct (Ign)                                    128

1    sentences.  What do they say?

2    A    "Mr. Anthony Bonomo, the borrower, is requesting a

3    $4,500,000 commercial balloon loan from Nova Bank as indicated

4    above.  This loan will be used by Mr. Bonomo for financial

5    investment purposes.  Borrower indicated plans to invest the

6    funds in the Banyon Group through Ballamor Capital

7    Management."

8    Q    Do you recall at the time you reviewed the loan whether

9    Mr. Hartline said anything about the Banyon Group as being a

10   purpose for the loan?

11   A    I don't remember.

12   Q    Do you know what the Banyon Group was?

13   A    My understanding was an investment group.

14   Q    Do you know who put that together?

15   A    Mr. Bekkedam, --

16   Q    All right.

17   A    -- is my understanding.

18   Q    Now, at the time you reviewed this risk assessment

19   summary, had you had a conversation with Mr. Hartline about

20   whether Mr. Bonomo was going to use any of this money to

21   invest in Nova?

22   A    I believe there was a portion that was going to be

23   invested in Nova.

24   Q    And is that reflected anywhere in this risk assessment

25   summary?

Patterson - Direct (Ign)                          129

1    A    Not that I'm aware of.

2    Q    All right.  Did you ever have -- let's go back to the

3    first page.  And who was the credit analyst who prepared this?

4    A    Joseph Madiany.

5    Q    Do you recall whether you had any conversations with Mr.

6    Madiany about whether any of these loan proceeds were going to

7    be used to purchase Nova stock?

8    A    No, I don't remember.

9    Q    Let me turn your attention now to Exhibit 304.

10            MR. IGNALL:  And if we could go to page 32148.

11        (Pause)

12   BY MR. IGNALL:

13   Q    Do you know what this document is?

14   A    Yes.  It's a disbursement request and authorization form.

15   Q    And who's it for?

16   A    Anthony and Mary Ellen Bonomo.

17   Q    And what's the amount of the loan?

18   A    4,500,000.

19   Q    And what's the date of this loan?  And it's shaded in up

20   at the top.

21   A    Oh.  Loan date, 10/22/09.

22   Q    And what's the maturity date?

23   A    11/1/2019.

24            MR. IGNALL:  Let's go back to the document.

25   Q    And what's the primary purpose of the loan?

Patterson - Direct (Ign)                         130

1    A    Business, including real estate investment.

2    Q    If we go to disbursement instructions, what's the

3    instruction for $2.5 million?

4    A    Amount paid to borrower directly, deposited to account

5    33016049.

6    Q    All right.  And what are the instructions for the $2

7    million?

8    A    Outgoing wire to the Banyon Group.

9    Q    All right.  Do you know what happened to the funds that

10   went into the account that ends in 6049?

11   A    No, not off the top of my head.

12   Q    Would there be bank records that would reflect what

13   happened?

14   A    There should be.

15   Q    All right.  Let's look at page 32250.  Do you recognize

16   this document?

17   A    Yes.

18   Q    And what is this document?

19   A    It's a request for initial loan disbursement.

20   Q    And what does this indicate that happened with the $2.5

21   million?

22   A    It says account to be credited, 33016049.

23   Q    And is that your signature there?

24   A    Yes, it is.

25              MR. IGNALL:  If we can go two more -- I believe two

1    pages -- I'm sorry, 55, so five pages later.

2    BY MR. IGNALL:

3    Q    And do you recognize this document?

4    A    Yes.

5    Q    And what is this document?

6    A    It's instructions for a wire.

7    Q    All right.  And where is that wire going?

8    A    Banyon, account number, LLC operating account.

9    Q    And who is this addressed to?

10   A    It's addressed to me.

11   Q    And what's the date?

12   A    October 21st, 2009.

13   Q    Okay.

14           MR. IGNALL:  May I approach the witness, Your Honor?

15           THE COURT:  Yes, sir.

16   BY MR. IGNALL:

17   Q    Mr. Patterson, are you familiar with someone named

18   Charles Gallub?

19   A    Yes.

20   Q    And who is Mr. Gallub?

21   A    Mr. Gallub was a customer of the bank.

22   Q    And did Mr. Gallub have any businesses who were also

23   customers of the bank?

24   A    No, I don't believe so.

25   Q    All right.  What business was Mr. Gallub in, as best you

1    recall?

2    A     Real estate development.

3    Q     All right.  Do you know if Mr. Gallub ever purchased Nova

4    Financial Holdings stock?

5    A     I believe he did.

6    Q     All right.  And why do you believe that?

7    A     Because that's -- that's what I was told.

8    Q     Who told you that?

9    A     Hal Schaffer, who was a gentleman that handled --

10   Q     Did you -- let me ask a different question.  Did you have

11   a discussion with Mr. Hartline about that?

12   A     I believe so, yes.

13   Q     Let me turn your attention to Exhibit 4.

14              MR. IGNALL:  Which I believe is in evidence.

15              MS. BARRY:  Yes.

16              MR. IGNALL:  May we publish this to the jury?

17              THE COURT:  Yes, sir.

18   BY MR. IGNALL:

19   Q     Do you recognize Exhibit 4?

20   A     It's a risk assessment summary.

21   Q     And who's the borrower?

22   A     Charles Gallub.

23   Q     Well, if you look -- what's the name of the borrower, if

24   you go a bit further?

25   A     I'm sorry.

Patterson - Direct (Ign)                    133

1    Q     So if we go a little bit farther down, about halfway down

2    the page.

3    A     I'm sorry.   Borrower, Bellmawr Creek, LLC.

4    Q     Do you remember the name Bellmawr Creek, LLC?

5    A     It was one of Mr. Gallub's companies.

6    Q     And what's the amount of this loan?

7    A     Facility one, 250,000.

8    Q     Yes, facility -- what does facility mean?

9    A     Loan.   It was a specific loan.

10   Q     What's the date of this risk assessment summary?

11   A     September 30th, 2008.

12   Q     And what does it say the purpose of the loan is for

13   facility one?

14   A     Investment purposes.

15        MR. IGNALL:   If we could go to the next page.   And

16   go to transaction comments for facility one.

17   BY MR. IGNALL:

18   Q     What does it say in the first two sentences there?

19   A     Bellmawr Creek, LLC requests a $250,000 commercial demand

20   loan at prime for a 24-month term.   The proceeds will be used

21   for investment purposes in another project.

22   Q     When it says NSB existing borrower, do you know what that

23   means?

24   A     Nova Savings Bank existing borrower.

25   Q     And what does that mean, to be an existing borrower?

1   A     He was an -- he was an existing customer of the bank,

2   borrowing customer of the bank.

3   Q     Did that mean that he had loans with the bank already?

4   A     Yes.

5   Q     All right.  Let me turn your attention to Exhibit 143.

6              MR. IGNALL:  Which I'm not sure is in evidence yet.

7              MS. BARRY:  It is, yes.

8              MR. IGNALL:  It is.  May this be published, Your

9   Honor?

10             THE COURT:  Yes, sir.

11             MR. IGNALL:  All right.

12  BY MR. IGNALL:

13  Q     Do you recognize Exhibit 143?

14  A     Yeah.  It's a risk assessment summary.

15  Q     And who's the borrower here?

16  A     Bellmawr Creek, LLC.

17  Q     And who's the contact name?

18  A     Contact name is Charles Gallub.

19  Q     And what's the date of this risk assessment summary?

20  A     12/15/2009.

21  Q     And who's the -- what's the -- what does RM say at the

22  top?

23  A     Relationship manager.

24  Q     And what does that mean?

25  A     That's the loan officer who has that customer.

1    Q      And who is that in this case?

2    A      That is myself.

3    Q      All right.  And how much is this loan for?

4    A      500,000.

5    Q      Do you know what the purpose of this loan was?

6    A      Working capital.

7    Q      Do you know if that was the -- what Mr. Gallub used the

8    funds for?

9    A      Probably.  I mean he had numerous --

10            MR. EGAN:  Objection.

11            THE COURT:  Sustained.

12   BY MR. IGNALL:

13   Q      Do you know?

14   A      No.

15   Q      All right.  Is this a document you reviewed?

16   A      Yes.

17   Q      Okay.  And were you part of the loan committee that

18   approved this loan?

19   A      Yes.

20            MR. IGNALL:  May I have one moment --

21            THE COURT:  Yes, sir.

22            MR. IGNALL:  -- for them to publish that.

23        (Pause)

24   BY MR. IGNALL:

25   Q      Do you know if there were any firms outside of Nova Bank

1    that were involved in raising capital or raising funds for the

2    holding company?

3    A    Any firms?

4    Q    Any business -- any outside company or entity that was

5    involved in raising money, raising -- getting people --

6    seeking people to invest in Nova Holdings?

7    A    Besides Ballamor?

8    Q    Well, --

9    A    Ballamor Capital was one.

10   Q    Okay.  Are you aware of any other firms?

11   A    I think Delaware Valley Financial Group was a company.

12   Q    All right.  Do you know whether the bank ultimately was

13   approved for funds from the TARP program?

14   A    My understanding is they were not.

15   Q    And who told you that?

16   A    Mr. Hartline.

17   Q    Do you remember approximately when that was?

18   A    No.

19   Q    All right.  Do you know if the bank was audited on a

20   regular basis?

21   A    Yes, they were.

22   Q    And do you know how often that was?

23   A    No, not off the top of my head.

24   Q    Do you -- but was it every year?

25   A    I believe so.

1   Q    Okay.  Do you remember whether you had any conversations

2   with Mr. Hartline about the audit for 2009, and in particular

3   any conversations about the loan to Mr. Levin --

4              MR. EGAN:  Objection to the leading, Your Honor.

5              THE COURT:  Sustained.

6   BY MR. IGNALL:

7   Q    Do -- do you recall whether you had any conversations

8   with Mr. Hartline about the audit for the year 2009?

9   A    Yes.

10  Q    And at any point did the topic of Mr. Levin's loan come

11  up in that conversation?

12  A    Yes.

13  Q    Please -- what did Mr. Hartline say about the auditors

14  and Mr. Levin's loan?

15  A    I just believe the auditors were questioning Mr. Levin's

16  loan.

17  Q    And did he tell you what the question was or --

18  A    No.

19  Q    Okay.  Did Mr. Hartline tell you whether he had spoken to

20  the auditors?

21  A    Yes.

22  Q    And what did he tell you he told the auditors about the

23  Levin loan?

24  A    I don't -- I don't know.  He just said they questioned

25  him about it.

Patterson - Direct (Ign)                         138

1  Q     Did he -- did you talk to him about whether there was any

2  relationship between Mr. Levin's loan and the investment in

3  the bank?

4              MR. EGAN:  Objection.  Leading.

5              THE COURT:  Overruled.

6  A     Yes.

7  Q     And did he tell you whether he had spoken to the auditors

8  about that?

9  A     Yes.

10 Q     And what did he say he spoke -- told the auditors?

11 A     I don't know that he told me what he told the auditors,

12 just that they had a conversation.

13             MR. EGAN:  Objection.

14             THE COURT:  No, he said just -- he said what he said

15 all along.

16             MR. IGNALL:  All right.

17 BY MR. IGNALL:

18 Q     Do you -- was there any conversation with Mr. Hartline

19 about -- with -- and I'm focused just on any conversations

20 about the audit.  Did the topic of Mr. Levin borrowing money

21 for property renovations come up?

22             MR. EGAN:  Objection, Your Honor.

23             THE COURT:  That's sustained.

24 BY MR. IGNALL:

25 Q     What, if anything, did Mr. Hartline tell you that he

Patterson - Direct (Ign)                    139

1    discussed with the auditors in connection with the purpose of

2    Mr. Levin's loan?

3              MR. EGAN:  Objection.  Asked and answered.

4              THE COURT:  Overruled.

5    A    I'm sorry, could you repeat that?

6    Q    I'll try.

7    A    Sorry.

8    Q     What, if anything, did Mr. Hartline tell you that he

9    discussed with the auditors --

10   A    Right.

11   Q    -- about the purpose of Mr. Levin's loan?

12   A    I believe it was that the actual purpose of the loan was

13   to do renovations to a property located in Malvern.

14   Q    And did he tell you whether he said that to the auditors?

15   A    I believe he did, yes.

16   Q    Okay.  Did you know whether that was indeed the purpose

17   of the loan at the time you had this conversation with Mr.

18   Hartline?

19   A    I did not.

20   Q    And did you question Mr. Hartline about that?

21   A    No, I did not.

22   Q    Why not?

23   A    Because he's the boss.

24             MR. IGNALL:  One moment, Your Honor.

25             THE COURT:  Yes, sir.

1       (Pause)

2              MR. IGNALL:  Nothing further.  Thank you, Your

3    Honor.

4       (Pause)

5              MR. IGNALL:  Sorry about that.  I spoke too soon.

6    May I?

7              THE COURT:  Yes, sir.

8              MR. IGNALL:  We have one more document just I

9    overlooked.  Can we show just to the witness Exhibit 96.

10   BY MR. IGNALL:

11   Q    Do you recognize Exhibit 96?

12   A    Yes.

13   Q    And what is Exhibit 96?

14   A    It's a memorandum from myself in reference to Mr.

15   Gallub's loans.

16   Q    And what are you recounting here in Exhibit 96?

17   A    It was just a call I met -- I made to Mr. Gallub.

18   Q    All right.  And what are you describing in this

19   memorandum?

20   A    His various loans.

21   Q    And --

22   A    His various projects.

23   Q    And does this memorandum reflect the various loans that

24   Mr. Gallub had with the bank as of October 12th, 2009?

25   A    Yes.

Patterson - Cross (Ega)                    141

1          MR. IGNALL:  The Government moves into evidence

2     Exhibit 96.

3          MR. EGAN:  No objection.

4          UNIDENTIFIED COUNSEL:  No objection.

5          THE COURT:  Admitted.

6          MR. IGNALL:  All right.  Thank you.  No further

7     questions.  Thank you.

8          MR. EGAN:  May I inquire, Your Honor?

9          THE COURT:  You may proceed.

10                        CROSS-EXAMINATION

11    BY MR. EGAN:

12    Q    Good afternoon, Mr. Patterson.

13    A    Good afternoon.

14    Q    You were a loan officer, correct?

15    A    Yes, sir.

16    Q    And essentially a loan officer is someone who originates

17    loans, right?

18    A    Correct.

19    Q    And, in fact, you get paid for originating loans, right?

20    A    Yes.

21    Q    It's kind of a sales job?

22    A    Yes.

23    Q    And in that role, one of your -- one of your main

24    functions is to interface with the customer, correct?

25    A    Yes.

1    Q    And to get the information from them that's necessary so

2    that you can get everything you need to get the loan approved,

3    right?

4    A    Correct.

5    Q    And, needless to say, it's in your best interest to have

6    more loans approved than not, right?

7    A    Yes.

8    Q    And that's because you're paid based upon your

9    production, correct?

10   A    No, I was not on commission.  I was on base salary.

11   Q    But there was a consideration of your production that

12   went into your total comp?

13   A    There were production goals.

14   Q    Sure.  And in terms of the actual credit analysis as to

15   whether a loan was creditworthy, that wouldn't really be your

16   end of things, right?

17   A    Correct.

18   Q    That was something for Mr. Madiany?

19   A    It was the credit department.

20   Q    Right.

21   A    Some -- someone in credit.

22   Q    Mr. Poliski?

23   A    Yes.

24   Q    And it was those two -- or actually Mr. Poliski who would

25   decide whether a loan was creditworthy enough to go before the

Patterson - Cross (Ega)                                  143

1   loan committee, correct?

2   A     Yes.

3   Q     And with regard to audits, did you have a role in audits?

4   A     No.

5   Q     So basically the whole auditing function was something

6   that didn't really touch on you?

7   A     Correct.

8   Q     So when KPMG audited Nova Bank, you weren't really

9   involved in the discussions, correct?

10  A     That's correct.

11  Q     Now, I want to talk about the beginning of the

12  relationship that you had with Mr. Levin, that the bank had

13  with Mr. Levin.  You were shown a document a little earlier

14  today that showed that he had begun his relationship sometime

15  around April, correct?

16  A     Correct.

17  Q     And that was an effort to become involved in a loan that

18  had to do with some Colorado bonds or some such thing,

19  remember that?

20  A     Yes.

21  Q     And in order to assess that loan, you would have needed

22  some financial materials from Mr. Levin, right?

23  A     Correct.

24  Q     And you also saw some information presented to you by the

25  Government about a loan that was an assumption loan, I believe

Patterson - Cross (Ega)                    144

1    it's called, that was to take place in May, correct?

2    A    Correct.

3    Q    And you would have needed his financials to assess that

4    as well, correct?

5    A    Correct.

6    Q    So by the time June came around and you were introduced

7    to the possibility of Nova lending money to Mr. Levin, you

8    were already fairly familiar with his financial situation?

9    A    Correct.

10   Q    And you knew that he was an extremely wealthy man,

11   correct?

12   A    Correct.

13   Q    Well, we've heard upwards of $300 million.  Is that about

14   what you heard?

15   A    I guess.  I don't remember off the top of my head, --

16   Q    You don't really remember.

17   A    -- but he was a very wealthy individual.

18   Q    This was a long time ago?

19   A    Yes, it was.

20   Q    And it's kind of hard to remember everything, correct?

21   A    Yes.

22   Q    In any event, Mr. Levin applied for a loan, correct?

23   A    Correct.

24          MR. EGAN:  And if we could have Government's 301.

25   BY MR. EGAN:

1    Q    And you were shown this document by Mr. Ignall, right?

2    A    Yes.

3    Q    And this is basically most of the loan documents for the

4    case, correct?

5    A    Correct.

6    Q    For his loan?

7    A    Correct.

8         MR. EGAN:  And if we could go to page 24.

9    Q    You were shown that by Mr. Ignall, correct?

10   A    Correct.

11        MR. EGAN:  And if you could blow that up.

12   Q    That is the commercial loan application, correct?

13   A    Yes, it is.

14   Q    And it indicates that the loan was applied for on June

15   25th?

16   A    Yes.

17   Q    And the handwriting that's filling in the boxes, that's

18   your writing, isn't it?

19   A    Yes, it is.

20   Q    Okay.  So you obviously -- I believe you said to Mr.

21   Ignall you didn't remember seeing this document, but clearly

22   you must have seen it, right?

23   A    Yes.

24   Q    Because you filled it out, correct?

25   A    Yes.

1    Q    And at the time you filled it out, you had been advised

2    that the reason that Mr. Levin wanted to borrow this money was

3    because he was going to invest in Nova Bank, correct?

4    A    Correct.

5    Q    And you put into the application form all of the

6    information that was then passed down the line to Mr. Madiany,

7    correct?

8    A    Correct.

9         MR. EGAN:  Now, if we could go to the next page and

10   blow that up.

11   Q    And that is basically an assessment, correct?

12   A    Correct.

13   Q    And you fill in all those -- those are all your -- that's

14   all your handwriting, right?

15   A    Correct.

16   Q    And then you sign it at the bottom?

17   A    Correct.

18        MR. EGAN:  And if we could just blow up the very

19   top, sort of gray section.  The very top above the line.

20   Q    And that's the information that you passed on to Mr.

21   Madiany, correct?

22   A    Correct.

23   Q    All right.

24        MR. EGAN:  Now, if we could just go to the next

25   page, and if we could have the bottom section, starting at

1    payment calculation down.  And then go down to the bottom.

2    Thanks.

3    BY MR. EGAN:

4    Q    Okay.  So this -- these are the terms of the loan,

5    correct?

6    A    Correct.

7    Q    And it's a one year loan?

8    A    Yes.

9    Q    And he's supposed to pay 7 percent?

10   A    Yes.

11   Q    Okay.

12            MR. EGAN:  Now, if we could go down to the box there

13   at the bottom.

14   Q    That shows the finance charges, right?

15   A    Yes.

16   Q    And so by making this loan, Nova stood to get a profit of

17   $177,000 in a year, correct?

18   A    Correct.

19   Q    And that's why banks make loans, right?

20   A    Yes.

21   Q    To make money?

22   A    Yes.

23            MR. ENGLE:  Your Honor, may I have a moment with Mr.

24   Egan?

25            THE COURT:  Surely.

1    (Pause)

2            MR. ENGLE:  Sorry, Your Honor.  Thank you.

3            THE COURT:  Yes, sir.

4            MR. EGAN:  Mr. Engle advises me that I should be

5    having this published because it's already in evidence.  So if

6    we could publish it, that would be -- that would be good.

7            THE COURT:  Granted.

8    BY MR. EGAN:

9    Q    So that shows the $177,916.63 that the bank would make in

10   a year if this -- off this loan, correct?

11   A    Yes, sir.

12   Q    Okay.  And I know you're not the nuts and bolts guy in

13   terms of the whole credit thing, but you know basically what

14   standard terms were at the time, right?

15   A    Yes.

16   Q    And this loan, based on the type of loan it was, was

17   completely standard terms, correct?

18   A    Yes.

19   Q    Now, you were asked some questions about what you told

20   other folks on the loan committee about the purpose of the

21   loan when you walked it around.  Do you remember that?

22   A    Yes.

23   Q    And I believe you said you didn't really remember if you

24   told them that it was to invest in the bank or not, is that

25   correct?

1    A    Correct.

2    Q    But you certainly weren't hiding the fact that it was to

3    invest in the bank from them, were you?

4    A    No.

5    Q    And if any of them had asked that question, you certainly

6    would have told them the truth, correct?

7    A    Yes.

8    Q    And Mr. Hartline never told you to hide that fact from

9    anybody, did he?

10   A    No, he didn't.

11   Q    And, in fact, it was -- and I want to get this right --

12   was not a well kept secret that this was a loan to Mr. Levin

13   so that he could invest in the bank, correct?

14          MR. IGNALL:  Objection.  Argumentative.

15          THE COURT:  Sustained.

16   BY MR. EGAN:

17   Q    Well, sir, do you remember testifying in a civil matter

18   about this case?

19   A    A civil matter?

20   Q    Yeah.  It was a deposition.  Do you remember that?

21   A    No.

22          MR. EGAN:  May I approach, Your Honor?

23          THE COURT:  Yes, sir.

24          MR. EGAN:  I have D-212 and I'm at page 24.

25   BY MR. EGAN:

Patterson - Cross (Ega)                    150

1    Q    Sir, I'm showing you what's been marked D-212, and it's a

2    deposition in a lawsuit.  It's Nova Bank v. Hilary Musser.

3    A    Okay.

4    Q    And it's -- that's you, Thomas Patterson, right?

5    A    Yes.

6    Q    Do you recall this now?  You were under oath?

7            MR. IGNALL:  Your Honor, my objection was not to

8    whether this witness had said it before, but that the question

9    itself is argumentative, whether it's before or now.

10           THE COURT:  May I see you, please?

11       (Sidebar begins)

12           THE COURT:  What's your objection?

13           MR. IGNALL:  Well, my first objection was that it's

14   argumentative.  I don't doubt that this witness in a prior

15   deposition said it was not a well kept secret.  But just

16   because an argumentative question was answered in a prior

17   setting doesn't make it admissible here.  If Mr. Egan wants to

18   ask who else knew about it, that's perfectly fine.

19           MR. EGAN:  How can an answer to a question be

20   argumentative?

21           MR. IGNALL:  The question can be argumentative.

22           THE COURT:  I sustained the objection because he

23   asked this witness whether it was a well kept secret and as

24   gatekeeper that meant nothing to me, and I don't think it

25   meant anything to the jury.  But you can hone your question to

1    something specific that would be meaningful, probative, and

2    relevant.

3              MR. EGAN:  Thank you, Your Honor.

4              MR. IGNALL:  Okay.  Thank you.

5         (Sidebar ends)

6    BY MR. EGAN:

7    Q    Mr. Patterson, the fact is that in June of 2009, it's

8    your belief that there were several people at the bank who

9    knew that this loan was for an investment, correct?

10   A    Yes.

11   Q    And they included Ed DiMarcantonio?

12   A    Yes.

13   Q    Who was the chairman of the board?

14   A    Correct.

15   Q    And they included Mr. Madiany, correct?

16   A    Correct.

17   Q    And they included Mr. Poliski and Mr. Hanuscin as well,

18   correct?

19   A    Correct.

20   Q    And everyone voted to approve this loan, correct?

21   A    Yes.

22   Q    Now, you were asked some questions about the minutes,

23   about the timing of the board meeting, --

24   A    Yes.

25   Q    -- remember that?  And you were shown that the board

1    meeting ended that morning at about I think 10:00, somewhere

2    in that neighborhood, right?

3    A    Yes.

4    Q    And that this loan was then ultimately approved around

5    11:00 or 11:15, correct?

6    A    Correct.

7    Q    Now, obviously if all of the paperwork wasn't together to

8    take to the board -- to the loan committee meeting, you would

9    then walk it around after the meeting was over, correct?

10   A    Yes.

11   Q    But when you walked it around, you went to every one of

12   these individuals, right?

13   A    Yes.

14   Q    And you presented the documents to every one of them,

15   right?

16   A    Yes.

17   Q    And they all made an independent decision to vote yes,

18   correct?

19   A    Yes.  Correct.

20   Q    And you then funded the loan, right?

21   A    Correct.

22   Q    Now, you were shown a document on direct which was wiring

23   instructions.  Do you remember that?

24   A    Yes.

25   Q    And you were asked about who gave you those wiring

1  instructions.  Do you remember that?

2  A    Yes.

3  Q    And I believe your answer was the borrower would give the

4  instructions as to where the loan -- the funds would go,

5  right?

6  A    Correct.

7  Q    That's because they're his funds, right?

8  A    Correct.

9  Q    And Mr. Ignall pressed on and said, well, wasn't it Mr.

10  Hartline who told you that?  But it's not up to Mr. Hartline

11  to decide where the borrower's funds go, is it?

12  A    No.

13  Q    It's up the borrower?

14  A    Correct.

15  Q    And indeed the borrower signed off on that document and

16  elected to have those funds sent to that particular bank,

17  correct?

18  A    Yes.

19  Q    Now, those funds were the proceeds of the loan, correct?

20  A    Correct.

21  Q    And they're wired to the borrower's bank?

22  A    Correct.

23  Q    The borrower then has possession of those funds, correct?

24  A    Yes.

25  Q    The borrower can decide whether they want to send them

1    back or not, correct?

2    A    Correct.

3    Q    It's entirely their decision?

4    A    Correct.

5    Q    Their decision whether they want to invest in Nova Bank

6    or not, correct?

7    A    Correct.

8    Q    But the bank at that point has a loan, correct?

9    A    Yes.

10   Q    And that loan is of value to the bank, is it not?

11   A    Yes, it is.

12   Q    It's an asset, isn't it?

13   A    Yes, it is.

14   Q    And the borrower, in this case Mr. Levin, agreed to

15   invest in the holding company, correct?

16   A    Yes.

17   Q    He doesn't really actually invest in the bank, he invests

18   in the holding company, right?

19   A    Correct.

20   Q    And he had his agent, instructed his agent to wire those

21   funds to the holding company, correct?

22   A    Correct.

23   Q    And after that, it really wasn't any of your issue,

24   right?

25   A    Correct.

1    Q    Because now you're on to your next loan?

2    A    Correct.

3    Q    Now, you were asked a number of questions about whether

4    there was a reason to revisit the RAS in this case.  Do you

5    remember that?

6    A    Yes.

7    Q    So I want to show you a document -- oh, wait.  Excuse me.

8              MR. EGAN:  Could we have G-59, please?  And if we

9    could have like the top -- paragraph two blown up.

10   BY MR. EGAN:

11   Q    Do you recognize this document, sir?

12   A    It's the loan committee minutes from July 14th, 2009.

13             MR. EGAN:  And I believe it's in evidence, correct?

14   No?  Okay.

15   Q    And the loan committee minutes would be from the meeting

16   -- the regular weekly loan committee meeting, right?

17   A    Correct.

18   Q    And paragraph two -- you were asked about how loans that

19   were approved by walking around became part of the loan

20   committee minutes.  Do you remember that?

21   A    Right.  Yes.

22   Q    And paragraph two says:  "The committee reviewed and

23   approved the ratification of loans approved report for Nova

24   Bank for July 2009."  See that?

25   A    Yes.

1    Q     And on a motion by you, they were approved, correct?

2    A     Yes.

3          MR. EGAN:  And if we go to page 2, and on the bottom

4    part of the top section, if you could blow that up as big as

5    possible, right above the break where it says proved.  There

6    you go.

7    BY MR. EGAN:

8    Q     And I don't know if you can see that well enough, but if

9    you look three lines up from the bottom, that says George

10   Levin, right?

11   A     Yes, it does.

12   Q     And that's the $5 million loan that we previously

13   discussed?

14   A     Yes, it is.

15   Q     So it's brought to the attention of the loan committee at

16   the next meeting or shortly thereafter, correct?

17   A     Correct.

18   Q     Now, in November, do you recall --

19         MR. EGAN:  And you can take that down.

20   Q     Do you recall that Mr. Levin ultimately didn't invest his

21   money in Nova Bank, the rest of it?  Were you aware of that?

22   A     Yes, he did not.

23   Q     And that Mr. Levin was looking for new terms for his loan

24   later on?  Do you remember that?

25   A     No, I don't.

1    Q    Okay.  I'm going to show you a document, once I can find

2    it, from November of 2009.

3              MR. EGAN:  If I can have a moment, Your Honor?

4              THE COURT:  Yes, sir.

5         (Pause)

6    BY MR. EGAN:

7    Q    First I want to show you Defense 48.  And you see that,

8    sir, is an email --

9              MR. EGAN:  And if we could blow up the top, please.

10   Q    -- and it is from Mr. Madiany to you, correct, and Mr.

11   Poliski?

12   A    Correct.

13   Q    And it speaks about a correction on the first page on --

14   paragraph on page 3 of the Levin RAS, correct?

15   A    Correct.

16   Q    Is that right?

17   A    Correct.

18   Q    Now, you didn't -- you didn't remember this at all, did

19   you?

20   A    No, not off the top of my head, no.

21   Q    But it's not unusual for a RAS to ultimately be revised

22   at some point, correct?

23   A    It's not unusual.

24   Q    And if indeed Mr. Levin was seeking to put real estate as

25   collateral for this loan, the RAS would need to be revised to

1    reflect that, wouldn't it?

2              MR. IGNALL:  Objection.  Calls for speculation.

3              THE COURT:  You can rephrase.

4    BY MR. EGAN:

5    Q    When a RAS -- when a loan is going to be amended, the RAS

6    gets revised, correct?

7    A    Correct.

8    Q    And one of the reasons you would revise the RAS would be

9    because someone was putting real estate up as collateral,

10   correct?

11   A    That could be a reason, yes.

12   Q    And it would -- because it would change the terms of the

13   loan, right?

14   A    It wouldn't necessarily change the terms, but it would

15   change the collateral.

16   Q    And in -- good point.  And indeed if that were the case,

17   the RAS would have to be revised?

18   A    Correct.

19   Q    And that would be something that would be done in the

20   credit department, correct?

21   A    Correct.

22   Q    And it could be done by anybody in the credit department,

23   correct?

24   A    Correct.

25   Q    But it's not something you would do?

Patterson - Cross (Ega)                              159

1   A    No.

2   Q    And you never altered any RAS in this case, correct?

3   A    I don't believe so, no.

4        MR. EGAN:  Now if we could go to Government's 118,

5   please.

6   BY MR. EGAN:

7   Q    And do you recognize this document, sir?

8   A    It's from Mr. Madiany to myself.

9   Q    And it is a -- once again attaching a RAS, correct?

10  A    Correct.

11  Q    And it's a -- the George Levin RAS, correct?

12  A    Correct.

13  Q    And if we could go to page 2 of this document, I believe

14  you were shown it by Mr. Ignall, this is the RAS that talks

15  about the real estate, correct?

16  A    Yes.

17  Q    Now, you have no -- this doesn't refresh your

18  recollection about Mr. Levin wanting to put up the real estate

19  as collateral later on in the day?

20       (Pause)

21  A    No, I don't -- I didn't -- I don't believe the real

22  estate was offered as collateral.

23       MR. EGAN:  If we could have Defense 68, please.

24  Q    And this is an email to yourself, correct?

25  A    Yes, it is.

1    Q    From Mr. Preve, correct?

2    A    That is correct.

3    Q    And he was Levin's business manager, right?

4    A    Correct.

5    Q    And it's dated November 13th, 2009, correct?

6    A    Yes.

7    Q    And you're asking him for the operating agreement and

8    formation documents for 326 South Fairfield, LLC.  Do you

9    remember that?

10   A    Yes.

11   Q    And that was the operating group that owned the real

12   estate, correct?

13   A    I believe so, yes.

14   Q    And the real estate was at 326 South Fairfield, and

15   that's why it was called that, right?

16   A    Yes.

17   Q    Does that refresh your recollection about Mr. Levin

18   wanting to use that real estate as collateral for the loan?

19   A    Yes, I guess he did.

20   Q    But absent seeing that, you don't really remember any of

21   this at all, do you?

22   A    No, I don't.

23   Q    And this was your job, right?  This is like what you were

24   working on, correct?

25   A    What do you mean by that?

Patterson - Cross (Ega)                    161

1   Q    I mean putting these loan packages together to go to the

2   credit department, that was your job, right?

3   A    Yes.

4   Q    That's why you're asking for this information?

5   A    Right, so I can take it to the credit department.

6   Q    Right.  It's the nuts and bolts of what you did in 2009?

7   A    Um-hmm.

8   Q    Right?

9   A    Yes.

10  Q    But you didn't really have anything to do with audits,

11  correct?

12  A    Correct.

13  Q    Now, let's talk just a little bit about Mr. Bonomo.  Mr.

14  Bonomo was a longstanding customer of the bank, correct?

15  A    Correct.

16  Q    His company was a customer of the bank; do you remember

17  that?

18  A    No.

19  Q    API or something like that?

20  A    Yes.

21  Q    Yes.  A very big customer, right?

22  A    Yes.

23  Q    Mr. Bonomo was a very wealthy man as well, correct?

24  A    Correct.

25  Q    And you were asked to prepare the documents to start his

1    loan, correct?

2    A    Correct.

3    Q    And you were told what the purpose of the loan was,

4    correct?

5    A    Correct.

6    Q    You didn't have any issue with that, did you?

7    A    No.

8    Q    You did the work and you prepared the documents, correct?

9    A    I didn't actually prepare them, but, yes.

10   Q    You moved the ball forward?

11   A    Yes.

12   Q    The credit department reviewed the loan and approved it,

13   correct?

14   A    Yes.

15   Q    And you voted at loan committee to approve it?

16   A    Correct.

17   Q    And, once again, you knew at the time what the purpose of

18   the loan was?

19   A    Yes.

20   Q    And Mr. Gallub, same thing?

21   A    Yes.

22   Q    And actually now that you've seen the documents, Bellmawr

23   Investments or Bellmawr, you remember they were a big customer

24   of the bank, too?

25   A    That was one of Mr. Gallub's companies.

1    Q    Correct, --

2    A    Yes.

3    Q    -- and they were a bank customer as well?

4    A    Correct.

5    Q    And Mr. Gallub's whole relationship with the bank, we can

6    get the RAS back up, it was around $5 million itself, wasn't

7    it?

8    A    Somewhere around there.

9    Q    And you were asked about a loan Mr. Gallub took out in

10   2008.  Do you remember that?

11   A    Yes.

12   Q    And that was a loan that he used to invest in the bank,

13   correct?

14   A    Correct.

15   Q    And that would have been in 2008 before the KPMG audit of

16   2009, correct?

17   A    Correct.

18   Q    So that there had been an audit by KPMG of that loan

19   before the loan to Mr. Levin occurred, correct?

20           MR. IGNALL:  Objection.  Calls for speculation.

21           THE COURT:  Counsel, rephrase it.

22   BY MR. EGAN:

23   Q    The loan took place in 2008, right?

24   A    Correct.

25   Q    KPMG audits in 2009, correct?

1    A    Correct.

2    Q    They audit in the spring of 2009, correct?

3    A    Correct.

4    Q    The loan to Mr. Levin doesn't occur until June of 2009,

5    correct?

6    A    Yes.

7    Q    June is after the spring, correct?

8    A    Correct.

9    Q    Mr. Patterson, you had a bit of a problem with -- or got

10   into a little trouble with the bank, right?

11   A    Correct.

12   Q    And that issue had to do with you basically moving money

13   from one person's account to another, right?

14   A    Yes.

15   Q    And the way you did that was by creating false loan

16   documents, right?

17   A    No.

18   Q    Well, maybe you can tell us how you did it.

19   A    I drew off a customer's line of credit and deposited it

20   into another customer's account.

21   Q    Okay.  And as I understand it, that's because that other

22   customer thought he was getting a loan, right?

23   A    Correct.

24   Q    And they didn't get the loan, right?

25   A    Correct.

1   Q   But you had led them to believe they were going to get

2  the loan?

3   A   Correct.

4   Q   And basically you lied to them?

5   A   Correct.

6   Q   And as a result, you didn't want that -- them to know

7  that you had lied to them, right?

8   A   Um-hmm.  Correct.

9   Q   So you took money from somebody else and you put it into

10  their account?

11   A   Correct.

12   Q   And that somebody else is then out their money, right?

13   A   Yes.

14   Q   And that was discovered not by the Government, but by the

15  bank, correct?

16   A   I assume so, yes.

17   Q   Well, you remember Mr. Deitrich?

18   A   Yes.

19   Q   He's the one who came and talked to you about it;

20  remember that?

21   A   Yes.

22   Q   Okay.  And all of that took place has nothing to do with

23  anything we talked about today, right?

24   A   Correct.

25   Q   And it all took place after all of these events we've

Patterson - Cross (Ega)                                166

1    talked about today, right?

2    A    Correct.

3    Q    And Nova Bank went to the Government and gave them that

4    information, didn't they?

5             MR. IGNALL:  Objection.  Foundation.

6    A    I don't know.

7    Q    Well, you ended up being --

8             THE COURT:  If he knows.

9    Q    -- you ended up being prosecuted, correct?

10   A    Yes, I was.

11   Q    And that was after Mr. Deitrich spoke with you, right?

12   A    Yes.

13   Q    And after the investigation?

14   A    Yes.

15   Q    And when you came down to -- you got charged, right?

16   A    Correct.

17   Q    Came down here and you pled guilty?

18   A    Yes, I did.

19   Q    And when you plead guilty in a criminal case in this

20   building, one of the things that's in your best interest is to

21   cooperate with the Government, right?

22   A    Correct.

23   Q    And by cooperating with the Government, that means

24   meeting with agents, right?

25   A    Yes.

1    Q    It means answering their questions?

2    A    Yes.

3    Q    And it means coming in to court and testifying like

4    you're doing today?

5    A    Correct.

6    Q    And you got a shorter sentence for doing that, right?

7    A    I don't know.  I got a shorter sentence.  Was it because

8    of that?  I don't know.

9    Q    Well, the Government got up and told the judge you were

10   cooperating, didn't they?

11   A    Yes, they did.

12   Q    Okay.  Your lawyer didn't tell you that was going to get

13   you a shorter sentence?

14   A    No, he didn't promise me anything.

15        MR. IGNALL:  Objection.

16   Q    I didn't ask if he promised you.

17        THE COURT:  Sustained.  Sustained.

18   Q    Sustained to that question.  In any event, that's why

19   you're here, right?

20   A    I'm here because I was subpoenaed to be here.

21   Q    And you also agreed to cooperate?

22   A    Yes.

23        MR. EGAN:  I have nothing further, Your Honor.

24        THE COURT:  Let me instruct the jury that that

25   matter did not occur before this Court.  I have no vested

1    interest in that, so don't be persuaded by that in terms of

2    me.  Thank you.  You may continue.

3              MR. ENGLE:  Thank you, Your Honor.

4         (Pause)

5              MR. ENGLE:  May I, Your Honor?

6              THE COURT:  Yes, sir.

7                       CROSS-EXAMINATION

8    BY MR. ENGLE:

9    Q    Good afternoon, Mr. Patterson.

10   A    Good afternoon.

11   Q    Mr. Patterson, you came to the employ of Nova Bank around

12   2006; that was your testimony?

13   A    Correct.

14   Q    And you basically had the same position as a senior

15   lending officer the entire time, am I correct about that?

16   A    Yes.

17   Q    And were you on the loan committee the entire time?

18   A    Yes.

19   Q    Okay.  And when you came to work for Nova Bank -- and

20   just so that we're clear, there's Nova Bank and there's Nova

21   Holding Company, right?

22   A    Correct.

23   Q    Two separate entities?

24   A    Correct.

25   Q    And you did not work for Nova Holding Company, you worked

1    for Nova Bank?

2    A    Yes.

3    Q    All right.  Now, when you came to work for Nova Bank, you

4    came to know of Barry Bekkedam, right?

5    A    Correct.

6    Q    And at that time, I believe your testimony on direct

7    examination was that Mr. Bekkedam was the chairman of the

8    board of the holding company, correct?

9    A    Correct.

10   Q    Not the bank?

11   A    Correct.

12   Q    All right.  And it was a short time later from when you

13   started in 2006, in 2007 that Mr. Bekkedam stepped down as the

14   chairman of the holding company, am I right?

15   A    Correct.

16   Q    And it was your understanding that Mr. Bekkedam was busy

17   with his business, Ballamor Capital, right?

18   A    Correct.

19   Q    Okay.  Now, during the time when -- or after Mr. Bekkedam

20   stepped down as the chairman of the holding company, you

21   didn't have much interaction with him at all during your time

22   at Nova, correct?

23   A    Not much, no.

24   Q    Occasional phone call?

25   A    Occasional phone call; occasional meeting.

1    Q     See him every once in a while?

2    A     Yes.

3    Q     Okay.  You certainly weren't receiving regular emails

4    from him?

5    A     No.

6    Q     Weren't receiving regular phone calls?

7    A     No.

8    Q     He wasn't regularly contacting you about what you needed

9    to do and whether or not a loan was going to be processed and

10   approved, correct?

11   A     Correct.

12   Q     All right.  Now, you also indicated that there were times

13   when Mr. Bekkedam would send over a Ballamor client to the

14   bank?

15   A     Correct.

16   Q     All right.  Now, we've heard some -- some testimony about

17   George Levin.  I'm sure you recall what we've been talking

18   about today.

19   A     Yes.

20   Q     Mr. Levin was not, in fact, a client of Ballamor, but he

21   was an individual that Mr. Bekkedam introduced to Nova Bank,

22   correct?

23   A     That's my understanding, yes.

24   Q     All right.  But there were other occasions where there

25   were other clients that were referred to the bank to have an

1    account there sometimes, right?

2    A    Yes.

3    Q    And there were a handful of people that got a loan of

4    some sort?

5    A    Yes.

6    Q    Could be a mortgage on their home?

7    A    Yes.

8    Q    Okay.  And was it your understanding that during the time

9    that you were at Nova Bank from 2006 until 2010, there were

10   really only four Ballamor customers that had obtained a loan

11   of some kind from Nova Bank, right?

12   A    Um --

13   Q    There was a Hilary Musser, right?

14   A    Right.

15   Q    That's one.

16   A    Um-hmm.

17   Q    How about Mr. and Mrs. Orendorff (phonetic)?

18   A    Yes.  Correct.

19   Q    That's two, right?

20   A    Um-hmm.

21   Q    Steven --

22            THE COURT:  Please say yes or no.

23   A    Yes.

24   Q    Steven Seagal?

25   A    Yes.

1    Q    The actor, right?

2    A    Yes.  Correct.

3    Q    Okay.  So that's three.  And Anthony Bonomo?

4    A    Yes.

5    Q    Four.

6    A    Okay.

7    Q    Can you think of any others?

8    A    Not off the top of my head, no.

9    Q    All right.  So during your four years, there were four

10   Ballamor clients that were referred to the bank that had some

11   kind of lending relationship with the bank?

12   A    Yes.

13   Q    Now, you also knew that Mr. Bekkedam was doing work for

14   the holding company by raising capital for the holding

15   company, correct?

16   A    Yes.

17   Q    And that was something that was commonly occurring during

18   the time that you were employed by the bank for those four

19   years, correct?

20   A    Yes.

21   Q    Because the holding company needed to consistently raise

22   capital?

23   A    Correct.

24   Q    That's just part of the industry, right?

25   A    Yes.

1    Q    And that industry will then have people outside of the

2    holding company go out and try to find people who are willing

3    to invest in that holding company, isn't that also correct?

4    A    Yes.

5    Q    And for Nova Holding Company, that was Mr. Bekkedam?

6    A    Yes.

7    Q    And he had been raising capital for the holding company

8    all during the time that you worked there?

9    A    Correct.

10   Q    And it was your understanding that he was attempting to

11   get people to invest in the bank at the -- or in the holding

12   company, excuse me, at the holding company's direction, isn't

13   that right?

14   A    Yes.

15   Q    And that would be from the direction of the members of

16   the board of the holding company, right?

17   A    Correct.

18   Q    Now, all during that time that Mr. Bekkedam is raising

19   capital for the holding company, Mr. Bekkedam himself did not

20   own any stock in the holding company, am I also right about

21   that?

22   A    I believe you are, yes.

23   Q    Okay.  So he had no, zero ownership interest in Nova

24   Holding?

25   A    Correct.

Patterson - Cross (Eng)                                     174

1    Q    When these four Ballamor clients were referred to you and

2    you acted as the relationship manager, is that -- am I correct

3    about that?

4    A    Yes.

5    Q    When you were dealing as the relationship manager for

6    these four Ballamor clients who had some kind of lending

7    connection with Nova, Mr. Bekkedam was not pressuring you to

8    approve the loans, was he?

9    A    No.

10   Q    He wasn't trying to pay you off to do that, was he?

11   A    No.

12   Q    He didn't do anything improper during the course of that

13   process?

14   A    Correct.

15   Q    Now, it's also your position that Ballamor clients, the

16   four of them, did not receive any form of preferential

17   treatment at Nova Bank when their loans were being considered,

18   right?

19   A    Correct.

20   Q    Their loans were approved because, like any other person

21   who was worthy of the loan, they were worthy of the loan,

22   correct?

23   A    Correct.

24   Q    They were not given special consideration because anyone

25   at the bank came into your office or to the loan committee and

1    said, look, this is one of Barry's people, so we have to fudge

2    things; that never happened?

3    A    No.

4    Q    Let's talk a few moments about Mr. Levin's loan

5    application.  You've indicated that you were aware when the

6    loan application was being processed that Mr. Levin was going

7    to be an investor in the holding company, right?

8    A    Correct.

9    Q    Okay.  Now, we know that there was a process, and we've

10   talked a little bit about it, where information was gathered

11   to create that RAS that we've seen?

12   A    Correct.

13   Q    Right.  And we've seen it up on the screen a million

14   times.  I'm going to spare the jury from doing that again.

15   That document was put together with certain underlying

16   information that was provided from the borrower to the bank?

17   A    Correct.

18   Q    Okay.  You had Mr. Levin's tax returns, for example,

19   correct?

20   A    Correct.

21   Q    You had his personal financial statements, right?

22   A    Correct.

23   Q    And obviously a credit check would have been run on him,

24   like any other individual?

25   A    Correct.

1    Q    And at the end of that, the loan package is all of this

2    information that the bank has put together, was taken around

3    for the individual consideration of the people who were going

4    to make the decision that were on the loan committee; am I

5    right about that?

6    A    Yes.

7    Q    And the loan committee were the five individuals that

8    we've seen their names before on -- on the RAS, and they

9    ultimately sign off on it, correct?

10   A    Correct.

11   Q    And you were one of the individuals on the loan committee

12   and you reviewed the information and you signed off on it?

13   A    Correct.

14   Q    And you reviewed all the information and you signed off

15   on the loan, knowing full well that the purpose of the loan

16   was for investment?

17   A    Correct.

18   Q    And you reviewed all of that and you approved the loan,

19   knowing full well that it was for investment in Nova Financial

20   Holding Company, right?

21   A    Correct.

22   Q    There was nothing about the fact that George Levin was

23   applying for a $5 million loan with the intent to ultimately

24   invest that money in Nova Financial Holding that was a secret

25   at the bank, right?

1          MR. IGNALL:  Objection.  I think that's awfully

2    vague.

3          THE COURT:  You can rephrase.

4          MR. ENGLE:  Sure.

5    BY MR. ENGLE:

6    Q    The -- there was absolutely nothing about the fact that

7    George Levin was known to be someone that was going to invest

8    in the holding company; there was -- there was no secret about

9    that, right?

10   A    Correct.

11   Q    No one was trying to say, don't tell certain people

12   around the bank about that; that never happened?

13         MR. IGNALL:  Objection.  This witness can --

14         THE COURT:  Sustained.

15         MR. IGNALL:  -- testify to what he did.

16         THE COURT:  Sustained.

17   BY MR. ENGLE:

18   Q    Anyone ever tell you that that issue of Mr. Levin being

19   an investor in Nova Financial Holding, subsequent to receiving

20   a $5 million loan from the bank, needed to be kept a secret?

21   A    No.

22   Q    Okay.  And, in fact, the way this process worked is, the

23   bank approved the loan, right?

24   A    Yes.

25   Q    The bank was given instructions by the borrower, Mr.

1    Levin, correct?

2    A    Correct.

3    Q    Those instructions came from him alone; am I right about

4    that?

5    A    Correct.

6    Q    Okay.  So you didn't get the instructions about how he

7    was going to get his money from Mr. Bekkedam?

8    A    No.

9    Q    You got it from Mr. Levin himself?

10   A    Correct.

11   Q    Okay.  And it was Mr. Levin himself who says, I want that

12   money wired from the bank to my account at Gibraltar Bank, or

13   whatever it was called, right?

14   A    Correct.

15   Q    And that was to his personal account?

16   A    Correct.

17   Q    Actually an account that he had with his wife as well, is

18   that your understanding?

19   A    Yes, I guess.  I don't -- I'd have to look at it, but, --

20   Q    Okay.

21   A    -- yes.

22   Q    We'll look at that in a moment.  So the choice of where

23   the money was going to go was totally up to Mr. Levin?

24   A    Correct.

25   Q    Just like the choice of what he was going to do with that

1    money after he received it was totally up to him?

2    A    Correct.

3    Q    So the transaction, the way that it worked, the -- the

4    money's here with the bank and the loan's approved, right?

5    A    Yes.

6    Q    The money gets wired over here to George Levin's account,

7    correct?

8    A    Correct.

9    Q    George Levin then does not wire the money back here to

10   the bank, right?

11   A    Correct.

12   Q    Because the account that it came from at the bank landed

13   with Mr. Levin and then Mr. Levin, of his own accord, sent it

14   to the holding company's escrow account, right?

15   A    Correct.

16   Q    Which is a completely separate location from Nova Bank,

17   where the money came from?

18   A    Correct.

19   Q    Okay.  And during the course of June 30th, 2009, after

20   the loan was approved, one of your responsibilities was to

21   make sure that the wire went out, right?

22   A    Correct.

23   Q    And you were then getting instructions from Mr. Preve

24   that they were going to wire the money to the holding account?

25   A    Correct.

1          MR. ENGLE:  And if we could bring up Government

2     Exhibit 42.  And, forgive me, has that been admitted into

3     evidence?

4          UNIDENTIFIED SPEAKER:  Yes.

5          MR. ENGLE:  Is it admitted?  Thank you.  Can we

6     publish it?

7          THE COURT:  Yes, sir.

8          MR. ENGLE:  Thank you, Your Honor.

9     BY MR. ENGLE:

10    Q    All right.  You see here with Government 42 --

11         MR. ENGLE:  Lou, can we highlight the lower email

12    first?

13    Q    Mr. Patterson, you see that on June 30th at approximately

14    11:12 in the morning, you get an email from Mr. Preve?

15    A    Correct.

16    Q    About the bank wire?

17    A    Correct.

18    Q    These are the wiring instructions, along with that other

19    form that we saw that Mr. Levin signed saying he wanted the

20    money wired to a particular place, right?

21    A    Yes.

22    Q    So this is another communication from Mr. Levin's agent,

23    Mr. Preve, if you will, right?

24    A    Yes.

25    Q    And he gives you specific instructions about the bank,

1    Nova Bank wiring the information to Gibraltar Bank & Trust in

2    Fort Lauderdale, Florida?

3    A    Yes.

4    Q    And there's routing information, and there was an account

5    number that was given to you?

6    A    Yes.

7    Q    All right.

8         MR. ENGLE:  Lou, can we go up to the top email,

9    please.

10   BY MR. ENGLE:

11   Q    Your response then is that you're going to wire the

12   funds, and then you give instructions about what you believe

13   to be the intent of Mr. Levin, right?

14   A    Correct.

15   Q    Now, there was no one down in Florida with a gun to Mr.

16   Levin's head to make sure that he wired the money back to Nova

17   Financial escrow that you're aware of, right?

18        MR. IGNALL:  Objection.  Argumentative.

19        THE COURT:  Sustained.

20   BY MR. ENGLE:

21   Q    Now, based upon your understanding, he was going to

22   invest in the holding company, correct?

23   A    Correct.

24   Q    So you provided the Nova Financial escrow account for the

25   holding company, correct?

1    A    Yes.

2              MR. ENGLE:  Thank you.  We can take down Government

3    42.  May the witness be shown Defense 1125, just for the

4    witness, please.

5    BY MR. ENGLE:

6    Q    Okay.  First, Mr. Patterson, do you see the first email

7    on here?  Do you see that, sir?

8    A    Yes.

9    Q    And that was an email from Dina Gaskins on Tuesday, June

10   30th, 2009 at approximately 2:44 p.m.?

11   A    Yes.

12   Q    And it was to a number of individuals at the bank, is

13   that right?

14   A    Yes.

15   Q    Lisa Schmoke?

16   A    Yes.

17   Q    Who is she?

18   A    Treasurer.

19   Q    Treasurer of the bank.  Okay.

20   A    Correct.

21   Q    Brian Hartline?

22   A    Yes.

23   Q    You?

24   A    Yes.

25   Q    Mr. Hanuscin?

1    A    Yes.

2    Q    Mr. Poliski?

3    A    Yes.

4    Q    Of the individuals on that list, which ones were on the

5    loan committee and signed off on the approval for Mr. Levin's

6    loan?

7    A    Mr. Hartline, myself, Jeff, and Mark.

8    Q    Okay.  So those individuals all reviewed the loan

9    documents and approved the loan in the morning, correct?

10   A    Correct.

11   Q    So as of the morning, the decision had been made by all

12   the members of the committee that a loan of $5 million was

13   going to be made to Mr. Levin, right?

14   A    Yes.

15   Q    That same day, those individuals that were on the loan

16   committee who had approved the loan then received an email

17   from someone working at the bank that a wire had been coming

18   in from Mr. and Mrs. Levin, right?

19   A    Correct.

20   Q    Okay.

21        MR. ENGLE:  Now, can we go to the second page?  And

22   in the middle of the page, Lou, can we blow up for Mr.

23   Patterson the middle of the page.  Down a little -- down more,

24   please.  Perfect.

25   BY MR. ENGLE:

1    Q    Do you see that, Mr. Patterson?

2    A    Yes.

3    Q    All right.  And what we have here is, there's an email

4    from June 30th, 2009 where you write to Mr. Preve, right?

5    A    Yes.

6    Q    And you indicate that the wire had been sent and should

7    be at the Gibraltar account that had been designated, correct?

8    A    Yes.

9    Q    And you gave a confirmation number?

10   A    Correct.

11   Q    And you're asking for him to let you know when the funds

12   are going to be wired to the holding company's escrow account,

13   right?

14   A    Yes.

15   Q    And then above that, there's a response from Mr. Preve to

16   you, is that right?

17   A    Yes.

18   Q    And he says that he's got it; he confirmed receipt of the

19   wire, correct?

20   A    Yes.

21   Q    And indicated that he would be sending it back in five

22   minutes?

23   A    Correct.

24   Q    And by sending it back, it wasn't being sent back to the

25   bank, it was going to the holding company, correct?

1    A    Correct.

2              MR. ENGLE:  Now, can we go above -- Lou, can we

3    highlight the email now above that in the string, the top of

4    the page.

5    BY MR. ENGLE:

6    Q    The string of emails that we just talked about where it

7    says that the wire had gone out to Gibraltar and the money was

8    going to be wired to the holding company in five minutes, you

9    forwarded that to other people at the bank, right?

10   A    Yes.

11   Q    You forwarded it to Mr. Hartline?

12   A    Right.

13   Q    To Lisa Schmoke, the treasurer, right?

14   A    Right.

15   Q    And to Dina Gaskins?

16   A    Correct.

17   Q    Okay.  So then the purpose of that was for you to let

18   them know what was going on with all of this?

19   A    Correct.

20   Q    All right.  During the time that you sat on the loan

21   committee, Mr. Bekkedam didn't come to the loan committee to

22   pitch the loans for anyone related to Ballamor?

23   A    No, he did not.

24   Q    He was not involved in the process of deciding whether

25   someone got or did not get a loan?

1    A    Correct.

2    Q    Now, with respect --

3         MR. ENGLE:  The Court's indulgence.

4    (Pause)

5    BY MR. ENGLE:

6    Q    I think you were asked some questions before about the

7    issue of a loan being approved and funded in a one-day

8    turnaround.  Do you recall that?

9    A    Yes.

10   Q    Okay.  That didn't happen every day, right?

11   A    No.

12   Q    But it did happen before George Levin got his $5 million

13   loan?

14   A    Yes.

15   Q    You would do that for other customers of the bank, right?

16   A    Yes.

17   Q    You would do that whether it was a big loan or a little

18   loan?

19   A    Correct.

20   Q    Because sometimes there were timing issues that created a

21   necessity for a loan to be turned around fast?

22   A    Correct.

23   Q    Just because a loan needed to be turned around fast

24   didn't mean that you cut corners on the due diligence, did it?

25   A    No.

Patterson - Cross (Eng)                                    187

1    Q    But in order to accommodate customers under certain

2    circumstances, you and others at the bank involved in the loan

3    process made sure that loans were turned around in a day?

4    A    Correct.

5    Q    And you were also asked about the fact that this

6    particular loan, where the money was wired out and then a

7    short time later the person decided to wire it to the holding

8    company for purposes of investing in Nova stock, that wasn't

9    something that happened every day either, right?

10   A    No.

11   Q    It was a little unusual?

12   A    Yes, it was.

13   Q    But it wasn't something that you were aware of during

14   this entire process that made you concerned, did it?

15   A    No.

16   Q    No one raised an issue about it of the loan committee

17   people?

18   A    No.

19   Q    It wasn't a concern when the loan was being approved,

20   right?

21   A    Correct.

22   Q    It wasn't a concern after everyone found out that the

23   5 million had been wired to the holding company escrow

24   account?

25   A    Correct.

Patterson - Cross (Eng)                         188

1    Q    Nobody at any point in time questioned the propriety of

2    that transaction, correct?

3    A    Correct.

4    Q    Now, the loan for Mr. Bonomo, let's talk about that just

5    for a few minutes.

6              MR. ENGLE:  Can we bring up Government Exhibit 109,

7    please.  And may I ask if -- am I correct that that is in

8    evidence?

9              UNIDENTIFIED SPEAKER:  Yes.

10             MR. ENGLE:  May we publish it, Your Honor?

11             THE COURT:  Yes, sir.

12             MR. ENGLE:  Thank you.  And, Lou, can we blow up the

13   middle portion of that document.

14   BY MR. ENGLE:

15   Q    Mr. Patterson, you see with Government 109, I know you

16   were asked some questions about this before, but the borrower

17   is Anthony Bonomo and his wife, Mary Ellen?

18   A    Yes.

19   Q    And the purpose that is stated is financial investment,

20   right?

21   A    Correct.

22   Q    And you saw this on Government 43 when you were shown the

23   RAS for Mr. Leven (sic) -- Levin's loan, correct?

24   A    Yes.

25   Q    And the purpose, when it was known that someone was going

Patterson - Cross (Eng)                              189

1    to use it for some type of financial investment, meant they

2    could use it to invest in a whole bunch of different things,

3    right?

4    A    Correct.

5    Q    They could invest in a business?

6    A    Correct.

7    Q    They could invest in a restaurant?

8    A    Correct.

9    Q    Invest in Nova Financial Holding Company?

10   A    Correct.

11   Q    So it's their choice what they wanted to invest it in,

12   correct?

13   A    Yes.

14   Q    And the approval of the loan is not tied to the nature of

15   the investment, correct?

16   A    Correct.

17   Q    So if I decide that I want the loan and I'm creditworthy

18   and I have enough money and you decide that I'm a good

19   candidate for the loan, if I want to invest it in a pizza shop

20   or I want to invest it in stock of, you know, IBM, that

21   doesn't matter, right?

22   A    As long as it's for legal purposes.

23   Q    Okay.  And here, in fact, with Mr. Bonomo's loan, that

24   was $4.5 million, correct?

25   A    Yes.

1   Q    And it was your understanding that part of that $4.5

2   million was going to be used to invest in Nova Financial

3   Holding Company stock, correct?

4   A    Correct.

5   Q    And just like with the circumstance with Mr. Levin's

6   loan, that was not something that you were told to keep hushed

7   up around the bank?

8   A    Correct.

9   Q    This was something that was discussed openly, correct?

10  A    Yes.

11  Q    To your knowledge, it was information that was available

12  and known to the other members of the loan committee?

13          MR. IGNALL:  Objection.  Foundation.

14          THE COURT:  Sustained.

15  BY MR. ENGLE:

16  Q    You were present when there was a meeting approving this?

17  A    Yes.

18  Q    Other people on the loan committee were there?

19  A    Yes.

20  Q    Other people on the loan committee signed off on it?

21  A    Yes.

22  Q    At least three out of five had to agree that he should

23  get the loan, right?

24  A    Correct.

25  Q    At least three out of five did, correct?

1    A     Correct.

2              MR. ENGLE:  Can we go to the last page of this

3    document, Lou.  Maybe it's not the last page of the document.

4    I apologize.

5    BY MR. ENGLE:

6    Q     But you know that this got signed off on, right?

7    A     Correct.

8    Q     And based upon the discussions that occurred within the

9    loan committee about this, you were personally aware of the

10   fact that the other loan committee members were aware that Mr.

11   Bonomo was going to invest a portion of that money in Nova

12   Financial Holding stock, correct?

13             MR. IGNALL:  Objection.  I think that's somewhat

14   compound.

15             THE COURT:  Sustained.

16   BY MR. ENGLE:

17   Q     You were aware from your activities at the loan committee

18   that the other members of the loan committee had it known to

19   them that Mr. Bonomo was going to invest part of that money in

20   Nova Holding stock, right?

21             MR. IGNALL:  Objection.  I still don't think there's

22   a foundation for that.

23             THE COURT:  Counsel, why don't you just ask

24   specifically if.

25   BY MR. ENGLE:

1   Q     You knew that, right, Mr. Patterson?

2   A     Correct.

3   Q     It was discussed in the loan committee?

4   A     Correct.

5   Q     There were other human beings that were on the loan

6   committee there when it was discussed?

7   A     Yes.

8   Q     Okay.  So --

9                MR. ENGLE:  Let's go to Government Exhibit 304,

10  please.  And I believe this was also put into evidence?

11               MR. IGNALL:  Already admitted, Your Honor.

12               THE COURT:  I'm sorry?

13               MR. IGNALL:  I believe it's been already admitted in

14  evidence.

15               MR. ENGLE:  May we publish?

16               THE COURT:  Yes.

17               MR. ENGLE:  Thank you, Your Honor.

18  BY MR. ENGLE:

19  Q    And you saw this a little earlier, Mr. Patterson.  The

20  first page of this is the promissory note for Mr. and Mrs.

21  Bonomo for their $4.5 million dollar loan?

22  A     Yes.

23  Q     Okay.  Mr. and Mrs. Bonomo did not get this loan simply

24  because they were clients of Ballamor Capital, right?

25  A     Correct.

1    Q    And they got it because they were worthy of it, correct?

2    A    Correct.

3          MR. ENGLE:  Now, Lou, can you highlight the top

4    portion of it, please.  Perfect.  All right.

5    BY MR. ENGLE:

6    Q    We see who it says the borrower is, the Bonomos, correct?

7    A    Correct.

8    Q    And then the lender indicates it's Nova Bank?

9    A    Correct.

10   Q    Not Nova Financial Holdings, right?

11   A    Correct.

12   Q    Okay.

13         MR. ENGLE:  Can we go to page 56 of the 213 pages of

14   this exhibit, please, Lou.  And can we blow that up as much as

15   we -- there we go.  All right.

16   BY MR. ENGLE:

17   Q    Now, do you see, Mr. Patterson, where it indicates that

18   the purpose is for business, and that would include

19   investment, right?

20   A    Correct.

21   Q    And it says for a business investment, correct?

22   A    Correct.

23   Q    And it was known to you and it was your understanding

24   that a portion of this was going to be invested in the Banyon

25   fund, correct?

1   A    Correct.

2   Q    And that was the $2.5 million that we see that was -- or,

3   I'm sorry, the $2 million that says other disbursements above

4   it?

5   A    Correct.

6   Q    And it says outgoing wire to the Banyon Group, correct?

7   A    Correct.

8   Q    And to your knowledge, that was a business investment

9   that the Bonomos were making?

10  A    Correct.

11  Q    And the other amount of money, the 2.5 million, that says

12  deposited to account number, and it lists an account number,

13  right?

14  A    Correct.

15  Q    That was the Bonomos' account at Nova Bank, correct?

16  A    I assume so.

17  Q    Well, you were aware that they had an account --

18  A    Yes.

19  Q    -- at Nova, --

20  A    Yes.

21  Q    -- correct?

22  A    Yes.

23  Q    And this didn't say that the money needed to be wired to

24  some external account?

25  A    No.

1    Q    And by it being deposited, the only bank that you would

2    have the ability to deposit to would be your own, correct?

3    A    Correct.

4    Q    Okay.  So you're fairly confident that in looking at

5    this, that the 2.5 million went into Mr. and Mrs. Bonomo's

6    account at Nova?

7    A    Correct.

8    Q    All right.  And all of this happened on October 22nd,

9    2009?

10   A    Correct.

11   Q    Is it your understanding then at some point after October

12   2nd, 2009 (sic), Mr. and Mrs. Bonomo made the decision to buy

13   Nova Financial Holdings stock?

14            MR. IGNALL:  Objection.  Foundation.

15            MR. ENGLE:  If he knows.

16   BY MR. ENGLE:

17   Q    Do you know that?

18   A    No.

19   Q    Okay.  You were just aware of the fact that that's what

20   was supposed to happen?

21   A    Correct.

22   Q    Did you hear later that in fact the Bonomos did invest

23   the 2.5 million into Nova Holding stock?

24   A    I believe they did, yes.

25   Q    And you learned of that subsequent to the funding of this

1    loan, right?

2    A    Correct.

3    Q    And you learned of that weeks later?  Days later?

4    A    I'd say days later.

5    Q    Days later.

6    A    Yeah.

7    Q    Not same day?

8    A    Not to my knowledge, no.

9    Q    Understood.

10        MR. ENGLE:  Thank you, Lou.  You can take that down.

11   Q    Now, with respect to --

12        MR. ENGLE:  Actually, can we go to -- I'm sorry, can

13   we bring up Government 304 again.  I forgot one thing.  And

14   can we go to page 163 of 213.  And can you blow that up,

15   please.  Thanks, Lou.

16   BY MR. ENGLE:

17   Q    Mr. Patterson, you see the letter here that's part of

18   this exhibit, correct?

19   A    Yes.

20   Q    And it's dated October 21st, 2009, is that right?

21   A    Correct.

22   Q    And it's to you at the bank?

23   A    Yes.

24   Q    And it is one day before the loan was funded to Mr. and

25   Mrs. Bonomo that we just saw on October 22nd of 2009, correct?

1  A    Yes.

2  Q    And there's instructions that are being given to you in

3  this letter, is that correct?

4  A    Correct.

5  Q    An instruction is:  "Please wire today the $2 million

6  from my line of credit to the following today."  Correct?

7  A    Yes.

8  Q    That's referring to the line of credit that was extended

9  to the Bonomos, right?

10  A    Yes.

11  Q    And that full line of credit was 4.5 million, correct?

12  A    Correct.

13  Q    So only a portion of it then is being asked to be sent to

14  the Banyon operating account in Fort Lauderdale, Florida,

15  right?

16  A    Correct.

17           MR. ENGLE:  And if you go down, please, Lou.

18  Q    That came from Anthony Bonomo himself?

19  A    Correct.

20  Q    That letter wasn't drafted or sent to you by Barry

21  Bekkedam, was it?

22  A    No.

23  Q    So the election of where that money that was being funded

24  to a line of credit to Mr. Bonomo was purely his decision and

25  his instructions to you?

1          MR. IGNALL:  Objection.

2          THE COURT:  Overruled.  He can answer if he knows

3    it.  If he knows.

4    A    Yes.

5    Q    Okay.  Now, you also were asked some questions about a

6    loan to a Mr. Gallub, is that correct?

7    A    Yes.

8    Q    Mr. Gallub was not a client of Ballamor Capital?

9    A    Correct.

10   Q    Mr. Gallub was not an individual that was referred to the

11   bank by Barry Bekkedam, correct?

12   A    Correct.

13         MR. ENGLE:  Your Honor, if I may just check here,

14   but I believe I'm -- I don't have any further questions.  May

15   I have a moment?

16         THE COURT:  Surely.

17     (Pause)

18         MR. ENGLE:  Your Honor, I have no further questions.

19   Thank you very much.

20         THE COURT:  All right.  Let's take our mid-afternoon

21   break at this time.

22     (Recess at 3:30 p.m. to 3:50 p.m.)

23         THE COURT:  Good afternoon.

24         ALL:  Good afternoon, Your Honor.

25         THE COURT:  Mr. Engle, do you have a motion?

Colloquy                                    199

1          MR. ENGLE:  I do, Your Honor.  Your Honor, it gives

2    me great pleasure to move the admission of Meredith Lowry.

3    Meredith is a first-year associate at my firm.  I have come to

4    know Ms. Lowry both through her work and her demonstration of

5    her professional ethics, and she is an individual who will

6    serve the bar of this Court very well, and I would

7    respectfully submit to the Court that she is an outstanding

8    candidate to be a member of the bar of this Court, and I would

9    ask the Court to admit her at this time.

10         THE COURT:  Ms. Lowry, do you agree with that?

11         MS. LOWRY:  I do agree with that.

12      (Laughter)

13         MR. ENGLE:  Always agree with your boss.

14         THE COURT:  It is an equally pleasurable experience

15   for me to do this because you are a graduate of Drexel Law

16   School, where I am on the advisory board.  Congratulations.

17         MS. LOWRY:  Thank you.

18         THE COURT:  I can't wait to tell everybody else

19   about this.

20      (Laughter)

21         THE COURT:  Would you please raise your right hand?

22   State your full name.

23         MS. LOWRY:  Meredith A. Lowry.

24         THE COURT:  And repeat after me.  I swear or affirm.

25         MS. LOWRY:  I swear or affirm.

Colloquy                                    200

1          THE COURT:  That I will conduct myself uprightly.

2          MS. LOWRY:  I will conduct myself uprightly.

3          THE COURT:  And according to law.

4          MS. LOWRY:  And according to law.

5          THE COURT:  As an attorney.

6          MS. LOWRY:  As an attorney.

7          THE COURT:  In the United States District Court.

8          MS. LOWRY:  In the United States District Court.

9          THE COURT:  For the Eastern District of

10   Pennsylvania.

11         MS. LOWRY:  For the Eastern District of

12   Pennsylvania.

13         THE COURT:  And that I will support and defend.

14         MS. LOWRY:  And that I will support and defend.

15         THE COURT:  The Constitution of the United States.

16         MS. LOWRY:  The Constitution of the United States.

17         THE COURT:  So help me God, or I do so affirm.

18         MS. LOWRY:  So help me God.

19         THE COURT:  Congratulations.  Welcome aboard.

20         MS. LOWRY:  Thank you.

21     (Applause)

22         MR. ENGLE:  Thank you, Your Honor.

23         THE COURT:  Thank you, sir.

24         MS. LOWRY:  Thank you, Your Honor.

25         MR. ENGLE:  Much appreciated.

1          THE COURT:  You're welcome.  Thank you.  Good luck

2     to you.

3          MS. LOWRY:  Thank you.

4       (Pause)

5          THE CLERK:  All rise.

6       (Jury in at 3:55 p.m.)

7          THE CLERK:  Ladies and gentlemen, we are back on the

8     record.

9          THE COURT:  Good afternoon.  You may be seated.  You

10    may continue.

11         MR. IGNALL:  Thank you, Your Honor.

12                    REDIRECT EXAMINATION

13    BY MR. IGNALL:

14    Q    Mr. Patterson, a few minutes ago Mr. Engle asked you

15    about the importance of the purpose of the loan in evaluating

16    it.  Do you remember those questions?

17    A    Yes.

18    Q    Is the purpose of the loan something that's on every risk

19    -- was on every risk assessment summary at Nova Bank?

20    A    Yes.

21    Q    Does the purpose ever matter to the loan committee when

22    evaluating a loan?

23    A    Yes.

24    Q    And with respect to the three loans in particular, Mr.

25    Gallub, Mr. Bonomo, and Mr. Levin, did you ever disclose the

1    purpose of any of those loans to anyone at the FDIC?

2    A    No.

3    Q    Did you ever personally disclose the purpose of any of

4    those loans to the bank's auditor?

5    A    No.

6            MR. IGNALL:  And let's bring up Exhibit 109.

7    Q    Mr. Engle asked you about Mr. Bonomo's loan.

8            MR. IGNALL:  I believe this is in evidence.  If we

9    go to the second page.

10   Q    Does this description actually specify a particular

11   investment?

12   A    No.  Well, it says -- yes.  Invest the funds in the

13   Banyon Group.

14   Q    Mr. Engle asked you and Mr. Egan I think both asked you

15   questions about discussions you had with other people at the

16   bank concerning the purpose of -- let's start with the Levin

17   loan.  Do you remember those questions?

18   A    Yes.

19   Q    Do you have any specific recollection of -- and I'm

20   talking about up to the time the loan was approved, June 30th

21   -- having a discussion with Mr. Poliski about Mr. Levin

22   investing in Nova Bank with the proceeds of the loan?

23   A    I don't remember.  I'm sure I discussed it with everybody

24   for approval.

25   Q    Did you discuss the purpose of the loan?

1    A    Yes.

2    Q    That it was being used for Nova Financial Holding stock?

3    A    Yes.

4    Q    Let me turn your attention to Exhibit 42.

5              MR. IGNALL:  If we could blow up the top part of

6    this.

7    BY MR. IGNALL:

8    Q    Remember Mr. Engle asking you about once Mr. Levin had

9    the money, he could do whatever he wanted with it?

10   A    Yes.

11   Q    As of the time that the loan committee approved Mr.

12   Levin's loan, did you understand it was for any purpose other

13   than to send it back to Nova Financial Holdings?

14   A    No.

15   Q    And in this email at 11:15 a.m., did you send that email

16   to Mr. Preve before disbursing the funds into Mr. Levin's

17   account?

18   A    Yes.

19   Q    And did you provide Mr. Preve with instructions on what

20   to do with the funds before you sent them out?

21   A    Yes.

22   Q    You talked to Mr. Engle about Mr. -- about Ballamor

23   clients.  Do you remember that?

24   A    Yes.

25   Q    And what happened with their loans.  Do you remember

1    that?

2    A    Yes.

3    Q    If I could turn your attention to Exhibit 129.

4           MR. IGNALL:  Just for the witness at this point.

5    BY MR. IGNALL:

6    Q    Do you know whether Mr. Bekkedam or anyone else ever made

7    a payment for Mr. Bonomo's loan on Mr. Bonomo's behalf?

8           MR. ENGLE:  Objection, Your Honor.  Beyond the scope

9    of cross.

10          THE COURT:  Sustained.

11          MR. IGNALL:  May I approach?

12          THE COURT:  Sure.

13       (Sidebar begins)

14          MR. IGNALL:  Mr. Engle went into great detail about

15   Ballamor clients and how they were treated by the bank and

16   whether Mr. Bekkedam had any influence on the bank.  I

17   certainly think this is relevant and follows on what Mr. Engle

18   asked on cross.

19          MR. ENGLE:  Mr. Bekkedam paid Mr. Bonomo's loan out

20   of friendship for him.  That's not the bank extending a

21   benefit to Mr. Bonomo, that's Mr. Bekkedam extending a benefit

22   to Mr. Bonomo.  It has nothing to do with what I asked on

23   cross.

24          MR. IGNALL:  Which there were certainly questions

25   about Mr. Bekkedam's role with the bank, did he ask him to do

Patterson - Redirect (Ign)                    205

1    anything.

2              MR. EGAN:  I don't think he's got any knowledge of

3    this whatsoever.  I don't think there's any foundation for

4    this testimony.

5              MR. IGNALL:  Well, I can ask --

6              THE COURT:  Well, I don't want -- the question is

7    already in front of the jury and -- and I don't want you to go

8    into that, laying a foundation at this point, because I

9    frankly agree with Mr. Engle at this point.

10             MR. ENGLE:  Thank you, Your Honor.

11             THE COURT:  The objection is sustained.

12        (Sidebar ends)

13             THE COURT:  Objection sustained.  You may continue.

14   BY MR. IGNALL:

15   Q    Let me turn your attention to what Mr. Egan showed you

16   actually as Defense Exhibit 212.  And turn your attention to

17   page --

18             MR. IGNALL:  May I approach, Your Honor?

19             THE COURT:  Yes, sir.

20   Q    -- 24.  Remember Mr. Egan asking you questions about

21   testimony you gave previously?

22   A    Yes.

23   Q    And about who you told about the purpose of Mr. Levin's

24   loan?

25   A    Yes.

Patterson - Redirect (Ign)                              206

1    Q     If you look at page 24, I --

2                MR. EGAN:  Your Honor, objection.

3                THE COURT:  Could I see the exhibit only at this

4    point?  Is that the one you're referring to?

5                MR. IGNALL:  I don't -- it's a defense exhibit, so I

6    don't have it on --

7                MR. ENGLE:  I have an extra copy, Your Honor.

8                MR. EGAN:  I have one, too, Your Honor.

9          (Sidebar begins)

10               THE COURT:  Let's go back to -- what was the

11   question, please?

12               MR. IGNALL:  My question -- all right, let me --

13   I'll explain the context and get to the question.  I think Mr.

14   Egan -- if I'm on the same one, the questions were, did you

15   testify that various people knowing about the loan in the

16   context of having testified to that before, and he never

17   mentioned Mr. Poliski or Mr. Deitrich in that testimony.  And

18   Mr. Egan asked specifically in the context of his prior

19   testimony if he had said that Mr. Deitrich and Mr. Poliski

20   knew the purpose of the loan.

21               MR. EGAN:  Actually, Your Honor, Mr. Ignall objected

22   to my using that and I took it away and asked him the

23   questions directly and not using the transcript.  That's my

24   objection.  He objected to me using the transcript and you

25   sustained it and I moved on.

1          MR. ENGLE:  And he also said he didn't remember

2     testifying at deposition.

3          MR. IGNALL:  I'll move on then.  May I have one

4     moment, Your Honor?

5          THE COURT:  Certainly.

6       (Sidebar ends)

7       (Pause)

8          MR. IGNALL:  Let me bring up Exhibit 301, Government

9     Exhibit 301, page 24.  And that's already been admitted, Your

10    Honor.  And if we can go to page 24.

11    BY MR. IGNALL:

12    Q    Do you remember this document?

13    A    Yes.

14          MR. IGNALL:  One moment, Your Honor.

15          THE COURT:  Yes, sir.

16       (Pause)

17    BY MR. IGNALL:

18    Q    Now, I believe you've said that that was your -- is that

19    your handwriting?

20    A    Yes.

21    Q    Did you sign this document?

22    A    No.

23    Q    Do you know who signed that?

24    A    No.

25    Q    With respect to the loan to Mr. Gallub for $500,000, at

Patterson - Redirect (Ign)                          208

1    the time of the loan were you aware of any purpose for that

2    loan other than to invest in Nova Financial Holdings?

3    A    No.

4    Q    With respect to Mr. Bonomo's loan, were you, at the time

5    of the $4.5 million loan, aware of any purpose for that loan

6    other than to put $2 million into Banyon and $2.5 million into

7    Nova Financial Holdings?

8    A    No.

9    Q    Do you know what Mr. Hartline or anyone else at the bank

10   told the FDIC about those loans?

11   A    No.

12   Q    Were you at all involved in the bank's TARP application

13   process?

14   A    No.

15   Q    Mr. Engle asked you questions about funds that were sent

16   to the Nova Financial Holdings.  Do you remember those

17   questions?

18   A    Yes.

19   Q    At what bank was the Nova Financial Holdings account

20   held?

21   A    Nova Bank.

22   Q    Let me turn your attention to what I believe you were

23   shown on cross is Defense Exhibit 48.

24            MR. IGNALL:  And if I could ask the defense to bring

25   that up.  We don't have it on our system.

Patterson - Redirect (Ign)                    209

1   BY MR. IGNALL:

2   Q     Do you see that document on your screen?

3   A     Yes.

4   Q     Do you remember questions about correcting a RAS for Mr.

5   Levin?

6   A     Yes.

7             MR. IGNALL:  And if we can flip to the next page.

8   Q     Is the amount of the loan the same as it was originally?

9   A     Yes.

10  Q     And is the purpose of the loan the same?

11        (Pause)

12  Q     If you like, we can --

13            MR. IGNALL:  What might be easier, can I bring a

14  copy of Exhibit 43 up?

15            THE COURT:  Yes, sir.

16  A     It says financial investment.

17            THE COURT:  Just a moment, please.

18            MR. IGNALL:  Hold on, I can do it this way.  I've

19  got it.  May I approach, Your Honor?

20            THE COURT:  Yes, sir.

21            MR. IGNALL:  If you could flip open to Exhibit 43.

22  So just so the record is clear, I'm asking the witness to look

23  at Government Exhibit 43 and Defense Exhibit 48 on the screen.

24  And if we go to the second page of Exhibit 48, Defense Exhibit

25  48.  I'm looking at Defense 48.  And just Defense 48 is fine.

Patterson - Redirect (Ign)                    210

1    I don't know if you can -- can you do it side by side with

2    Government 43?  I don't know how legible that will be, but we

3    can try that.  And go to the second page of 48, please.  I'm

4    sorry, it's probably the third page.

5    BY MR. IGNALL:

6    Q    Is the purpose on Defense 48 the same as on Government

7    43?

8    A    Yes.

9    Q    All right.  And is --

10          MR. IGNALL:  If we can go to the next page, where it

11   says the transaction comments.

12   Q    Are those the same on both documents?

13          (Pause)

14   A    Yes.

15   Q    All right.  Now I'd like to turn your attention to

16   Exhibit -- Government's Exhibit 118.

17          MR. IGNALL:  And if we can ask Agent Boyer to --

18   thank you.

19   BY MR. IGNALL:

20   Q    Do you remember getting questioned on cross-examination

21   about Exhibit 118 from Mr. Egan?

22   A    Yes.

23   Q    Do you remember discussions about whether Mr. Levin was

24   going to post some sort of security for his $5 million loan?

25   A    Yes.

Patterson - Redirect (Ign)                    211

1    Q    Do you remember those questions in the context of why you

2    might want to create a new risk assessment summary?

3                MR. EGAN:  Objection.

4                THE COURT:  Basis.

5                MR. EGAN:  Characterization of the testimony.

6                THE COURT:  As testimony?

7                MR. EGAN:  I'll withdraw, Your Honor.

8                THE COURT:  All right.

9    BY MR. IGNALL:

10   Q    Do you remember those --

11   A    Yes.

12   Q    -- in the context of -- of coming up with a new RAS?  And

13   let me turn your attention to Exhibit 118.

14                MR. IGNALL:  If we could turn to the second page.

15   Q    First, is the purpose different from the risk assessment

16   summary that you approved in June?

17   A    Yes.

18   Q    All right.  Let's go down to collateral.  Does this risk

19   assessment summary talk about any collateral for this loan as

20   of October 6th, 2009?

21   A    No.

22   Q    Do you remember Mr. Egan asking you about Defense Exhibit

23   -- I'm sorry, loans making money for the bank?

24   A    Yes.

25   Q    Do you remember questions about how much the interest was

1    going to be on Mr. Levin's loan?

2    A    Yes.

3    Q    And do you remember Mr. -- whether Mr. Egan asked if that

4    was money that the bank might make on Mr. Levin's loan?

5    A    Yes.

6    Q    Do you know if the bank actually made any money on Mr.

7    Levin's loan?

8    A    I don't know.

9    Q    Do you know if Mr. Levin ever paid his loan?

10   A    I do not know.

11   Q    Do you remember meeting with Government agents on October

12   19th, 2015?

13              MR. EGAN:  Objection.

14   Q    I'm sorry, on October 14th, 2015?

15              MR. EGAN:  May we see Your Honor at sidebar?

16              THE COURT:  Yes, sir.

17        (Sidebar begins)

18              THE COURT:  Basis?

19              MR. EGAN:  I think he's about to present his own

20   witness with their MLI, which are the Government's notes of a

21   meeting, and I -- before he goes down that road, I want a

22   proffer because I don't think it's proper.

23              MR. IGNALL:  I'm going to impeach him with the prior

24   inconsistent statement to set it up for potentially calling

25   the Government agent as a witness.

1          UNIDENTIFIED SPEAKER: So you us to call him

2     (inaudible)?

3              MR. IGNALL: I'm sorry?

4              MR. EGAN:  You're going to impeach your own witness?

5              MR. IGNALL:  Absolutely.

6              THE COURT:  Okay.  All right.

7              MR. EGAN:  Okay.

8              THE COURT:  All right.

9         (Sidebar ends)

10             THE COURT:  All right.  Counsel, would you repeat

11    your foundational question, please?

12             MR. IGNALL:  Yes.

13    BY MR. IGNALL:

14    Q    Do you recall meeting with investigating agents from the

15    Government on or about October 14th of 2015?

16    A    Yes.

17    Q    And do you remember meeting with Government agents

18    sometime in October?  I'm not going to hold you to the day.

19    A    Okay.

20    Q    Do you?

21    A    Yes.

22    Q    Okay.  Do you remember discussing with Government agents

23    that you had walked Mr. Levin's loan around to the loan

24    committee?

25    A    Yes.

Patterson - Redirect (Ign)                    214

1   Q    Do you recall telling Government agents that you could

2   not recall whether loan committee members were told that the

3   loan was to invest in bank stock?

4              MR. EGAN:  Your Honor, I'm going to renew my

5   objection.  This is improper.

6              THE COURT:  Sustained.

7              MR. IGNALL:  May I approach at sidebar, Your Honor?

8              THE COURT:  Yes.  Apologies, ladies and gentlemen.

9        (Sidebar begins)

10             THE COURT:  Let me ask you this in two different

11  scenarios.  On the one hand, has he said in any way that he

12  does not have an instant recollection?

13             MR. IGNALL:  This is not to refresh the

14  recollection.

15             THE COURT:  I know that.  I'm just asking has he

16  said that.

17             MR. IGNALL:  He -- on direct he did.  On cross, he

18  went from no recollection to yes, they definitely knew.

19             THE COURT:  During your examination, has he said it,

20  or have you asked him that question?

21             MR. IGNALL:  On my examination just now, he did say

22  the loan committee members knew the purpose of the loan.

23             THE COURT:  In terms of the direct, I don't

24  particularly recall, on your examination.

25             MR. IGNALL:  As I remember it, on direct he said he

1    did not remember doing it.  On cross he said, yes, he did.

2    And then I believe when I asked him on redirect --

3              THE COURT:  Let's -- we're going to stop for the day

4    on this one.

5              MR. IGNALL:  Okay.

6              THE COURT:  There's too many --

7              MR. IGNALL:  Okay.  Well, I'll -- all right.

8              THE COURT:  You can either withdraw the question and

9    wait, or we can go ahead and stop now for the day and you can

10   do this --

11             MR. IGNALL:  This will be -- this is all I have,

12   that's why I didn't want to --

13             MR. EGAN:  Your Honor, this is a very significant

14   issue and he's attempting to do what --

15             THE COURT:  I understand.

16             MR. EGAN:  -- what he's basically been trying to

17   stop us to do the whole time, which is cross people with their

18   prior inconsistent statements.

19             THE COURT:  I just want to make sure -- I just want

20   to make sure that we're totally accurate in terms of evidence.

21             MR. IGNALL:  That's fine.

22             THE COURT:  So we have to stop now.

23             MR. IGNALL:  I understand.  Fine, Your Honor.  Thank

24   you.

25             THE COURT:  Okay.

Patterson - Redirect (Ign)                                     216

1        (Sidebar ends)

2                THE COURT:  All right.  We are going to adjourn for

3    the day.  Now, what time is the parade tomorrow?

4                UNIDENTIFIED SPEAKER:  1 p.m., Your Honor.

5                THE COURT:  1:00?  Oh, we'll be well underway at

6    that point in time.  So we'll see you tomorrow morning at

7    9:15.  Thank you very much.

8                THE CLERK:  All rise.

9        (Jury out at 4:16 p.m.)

10               THE COURT:  All right.  You may be seated.  Sir, you

11   may step down.  All right.  Since you'll have overnight to

12   think about this, which would include the laying of a proper

13   foundation and responses to the attempt to do this, apprise me

14   first thing tomorrow morning where you want to go with this.

15   If you can work something out, you can work something out.

16   All right?

17               MR. IGNALL:  Yes, Your Honor.

18               THE COURT:  Okay.  Thank you.  We'll see you

19   tomorrow morning.  Now, let's convene tomorrow morning --

20   since the jury's going to be here at 9:15, let's convene at

21   9:10 at the latest, okay, --

22               MR. EGAN:  Yes, Your Honor.

23               THE COURT:  -- and try to get this one resolved.

24               MR. IGNALL:  Thank you, Your Honor.

25               THE COURT:  All right.

1          MR. ENGLE:  Yes, sir.  Your Honor, can we just -- I

2     don't know if the Government knows right now because it didn't

3     go quite the way we expected today, but do we have some sense

4     of the plan for tomorrow?

5          MR. IGNALL:  We don't.  I think one of the witnesses

6     I was going to call we're probably going to put off till

7     Monday.  There will probably be some variant of who we told

8     you yesterday, but we're going to scramble when we get in the

9     hallway and try and figure it out.

10         MR. ENGLE:  Shoot us an email?

11         MR. IGNALL:  I will send you an email, absolutely.

12         MR. ENGLE:  Thank you.

13         MR. DUNCAN:  Your Honor, I know Mr. Engle's also

14    driving to Villanova, so can we get an extra long lunch hour

15    around that 1:00 game time?

16         THE COURT:  That's why they invented television and

17    DVRs.

18         MR. ENGLE:  A couple of us here that are Villanova

19    grads.

20         THE COURT:  All right.  Thank you very much.

21         ALL:  Thank you, Your Honor.

22         MR. ENGLE:  And, Your Honor, thank you for swearing

23    in Ms. Lowry.  I greatly appreciate it.

24         THE COURT:  My pleasure.

25        (Proceedings concluded at 4:18 p.m.)

218

1                          * * * * *

2                  C E R T I F I C A T I O N

3          I, Roxanne Galanti, court approved transcriber,

4    certify that the foregoing is a correct transcript from the

5    official electronic sound recording of the proceedings in the

6    above-entitled matter.

7
     Roxanne Galanti   Digitally signed by Roxanne Galanti
                       DN: cn=Roxanne Galanti, o, ou,
                       email=dianadoman@comcast.net, c=US
8                      Date: 2016.04.18 13:57:28 -04'00'          December 23, 2015

9    ROXANNE GALANTI

10   DIANA DOMAN TRANSCRIBING, LLC

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                    UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,        )   14-CR-0548
                                 )
        vs.                      )
                                 )
BRIAN HARTLINE and               )
BARRY BEKKEDAM,                  )   Philadelphia, PA
                                 )   April 8, 2016
                Defendants.      )   9:31 a.m.


                TRANSCRIPT OF EXCERPT OF TRIAL
        BEFORE THE HONORABLE C. DARNELL JONES, II and JURY
                UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Government:          DAVID J. IGNALL, ESQUIRE
                             JENNIFER CHUN BARRY, ESQUIRE
                             ASSISTANT UNITED STATES ATTORNEYS
                             UNITED STATES ATTORNEY'S OFFICE
                             615 Chestnut Street, Suite 1250
                             Philadelphia, PA 19106

For the Defendant            PATRICK J. EGAN, ESQUIRE
Brian Hartline:              FOX ROTHSCHILD LLP
                             2000 Market Street, 10th Floor
                             Philadelphia, PA 19107

For the Defendant            MICHAEL J. ENGLE, ESQUIRE
Barry Bekkedam:              GREENBLATT, PIERCE, ENGLE,
                             FUNT & FLORES
                             123 South Broad Street, Suite 2500
                             Philadelphia, PA 19109

                             RUSSELL D. DUNCAN, ESQUIRE
                             ALLISON BAKER SHEALY, ESQUIRE
                             SHULMAN, ROGERS, GANDAL,
                             PORDY & ECKER, PA
                             12505 Park Potomac Avenue
                             Potomac, MD 20854

                             JOEL D. SCHWARTZ, ESQUIRE
                             SHULMAN ROGERS GANDAL PORDY ECKER
                             12505 Park Potomac Avenue, 6th Floor
                             Potomac, MD 20854


Audio Operator:              CARL HAUGER
```

2

```
Transcribed by:              DIANA DOMAN TRANSCRIBING, LLC
                             P.O. Box 129
                             Gibbsboro, NJ 08026
                             Office: (856) 435-7172
                             Fax:    (856) 435-7124
                             E-mail:  dianadoman@comcast.net


Proceedings recorded by electronic sound recording; transcript
produced by transcription service
```

3

```
1                          I N D E X

2   WITNESSES:            DIRECT      CROSS       REDIRECT      RECROSS

3   FOR THE GOVERNMENT:

4   Thomas Patterson                              16(Ign)      19(Eng)

5   Chuck Hunter          23(Bar)     35(Ega)                  91(Bar)

6                                     47(Dun)

7   Mary Rutkowski        52(Bar)     61(Ega)     71(Bar)      71(Ega)

8                                     68(Sch)

9   Ms. Course            74(Bar)     95(Ega)     114(Bar)

10                                    113(Dun)

11  Mr. Gaunt             116(Bar)    129(Ega)    147(Bar)

12                                    143(She)

13  Mr. Moretz            151(Bar)    167(Ega)    191(Bar)

14                                    143(She)

15

16  EXHIBITS:                                     I.D.      RECEIVED

17  G-61B  E-mail from Hunter to Treasury & CPP   31          31

18  G-95   PADOBS 6/30/09 Examination             54          ---

19  G-34   Letter to Nova re:  Enforcement Action 82          ---

20  G-61   Series of E-mails began by Fuentes     87          88

21  G-66   7/23/09 emails                                     123

22  G-100  Approval letter signed by Gaunt                    128

23  G-89   Email with attachments                             149

24  G-100A Conditional approval letter                        166

25
```

Colloquy                                        4

1          (The following was heard in open court at 9:31 a.m.)

2               THE COURT:  Counsel, let's go on on the record.

3               I am in receipt of the letter brief filed by the

4     Government, Mr. Ignall, regarding the 607 impeachment of a

5     witness, including by one calling one's own witness to do

6     that, or one's own witness do that.

7               I have -- that's basic and fundamental.  My question

8     simply was what exactly is it that he testified to that you

9     wished to impeach him with?  And I wanted to make sure that

10    the record was clear as to what that was so I could make a

11    ruling.

12              MR. IGNALL:  Yeah.  May I -- may approach, Your

13    Honor?

14              THE COURT:  Please.  And does defense -- or did

15    defense submit anything or do you wish to submit anything?

16              UNIDENTIFIED ATTORNEY:  No, Your Honor.

17              UNIDENTIFIED ATTORNEY:  No, Your Honor.

18              UNIDENTIFIED ATTORNEY:  What we submitted --

19              THE COURT:  Thank you.

20              UNIDENTIFIED ATTORNEY:  --is an accurate statement

21    of the law.

22              THE COURT:  I'm sorry.

23              UNIDENTIFIED ATTORNEY:  What was submitted is an

24    accurate statement of the law.

25              THE COURT:  Yes.  Okay.

Colloquy                                          5

1                MR. IGNALL:  May I have one moment, Your Honor?

2                THE COURT:  Yes, sir.  Is this the MOI?

3                MR. IGNALL:  Yes, that is the, I think, the 302 in

4      FBI terms.

5                THE COURT:  Okay.  Right.

6                MR. IGNALL:  So that's -- let me make sure I have my

7      copy in front of me.

8                And I've asked Agent Lyons to step out while we have

9      this discussion.

10               THE COURT:  Thank you.  Give me -- give me just a

11     moment, please.

12               MR. IGNALL:  Okay.

13          (Pause)

14               THE COURT:  All right.  Now -- and you all obviously

15     have a copy of this.

16               MR. IGNALL:  Yes, Your Honor.

17               UNIDENTIFIED ATTORNEY:  Yes, Your Honor.

18               THE COURT:  What was it that he said that's

19     inconsistent with this?

20               MR. IGNALL:  Well, it's -- on direct examination my

21     recollection was he said I don't have a specific recollection

22     of telling the other Loan Committee members the purpose of the

23     loan, being to buy Nova Financial Holding stock --

24               THE COURT:  And where -- where in --

25               MR. IGNALL:  -- when they were approving it --

1           THE COURT:  Where in this did he say otherwise?

2           MR. IGNALL:  He didn't.

3           THE COURT:  Okay.

4           MR. IGNALL:  What he said on direct was consistent

5    with what's in the 302.

6           THE COURT:  Okay.

7           MR. IGNALL:  On cross-examination, however, he said

8    at one point that a number of people knew, including Mr.

9    Poliski and Mr. Deitrich.

10          He also said that it was common knowledge that

11   everyone knew, and that he told the whole Loan Committee the

12   purpose of the loan at the -- at the time the loan was walked

13   around.

14          THE COURT:  And you wish to impeach him with

15   these -- this statement.

16          MR. IGNALL:  With this statement to say -- ask him,

17   and he can agree or -- or disagree that he said that, and then

18   if he disagrees, we can choose to call Agent Lyons if we wish

19   to complete the impeachment solely for the point of impeaching

20   the witness' testimony on that particular item.

21          THE COURT:  All right.  Change your mind overnight

22   or is --

23          MR. ENGLE:  Your Honor, I'm going to -- I think that

24   they can confront him with does he remember being interviewed

25   on the particular day of that report.  If he does not recall,

1    I think for the limited purpose of trying to refresh his

2    recollection they could show him the top portion of the

3    report, see if it refreshes.

4          If it does and -- or he does acknowledge that he

5    remembers being interviewed that day, they could ask him did

6    you say this to the agents, and if he says yes, then

7    impeachment has been completed.

8          If he says no, then the Government would need to

9    take the next step to complete the impeachment by calling the

10   agent.

11         THE COURT:  All right.  Disagree with that?

12         MR. IGNALL:  That sounds like -- sounds like we're

13   in agreement, yes.

14         THE COURT:  All right.  Now, yesterday I just

15   thought that there was an objection to this.

16         MR. ENGLE:  Well, there was -- think there was an

17   objection to we hadn't laid a proper foundation for the fact

18   that he even recalled being interviewed on the date.

19         It seemed like Mr. Ignall was jumping to --

20         THE COURT:  All right.

21         MR. ENGLE:  -- you made the following statement

22   before we had gotten the predicate --

23         THE COURT:  Okay.

24         MR. ENGLE:  -- that he even agreed he had been

25   interviewed at that particular time.

1           THE COURT:  All right.  I --

2           MR. EGAN:  Yeah, the objection was to the manner in

3   which was being done.

4           THE COURT:  Gotcha.

5           MR. IGNALL:  Right.

6           THE COURT:  All right.

7           MR. IGNALL:  I think we're in agreement.  Thank you,

8   Your Honor.

9           THE COURT:  No harm, no foul.

10          MR. IGNALL:  All right.  I'm going to ask Agent

11  Lyons to stay outside for the rest of --

12          THE COURT:  Fine.

13          MR. IGNALL:  -- the examination of Agent Patterson

14  in case he is called as a witness.

15          MR. EGAN:  And, Your Honor, I do have another

16  issue --

17          THE COURT:  Yes, sir.

18          Carl, can I had this back to you for Mr. Engle,

19  please.

20          MR. EGAN:  -- before we bring the jury in.

21          THE COURT:  I'm sorry.  I'm sorry.  Thank you.

22          Yes, sir.

23          MR. EGAN:  Your Honor, today we are going to have a

24  parade of -- we're not going to have a parade of Villanova,

25  we're going to have a parade of regulators.  I believe at

Colloquy                                    9

1    least four, if not five regulators are going to testify today.

2            And none of those individuals were individuals that

3    were involved in the decision of the Investment Committee to

4    deny the TARP funds that was ultimately made in December of

5    2009.

6            THE COURT:  Did they give those persons information?

7            MR. EGAN:  Two of them did and three of them did

8    not.

9            THE COURT:  All right.

10           MR. EGAN:  To the extent that they are individuals

11   who were not involved in the ultimate determination, the

12   question whether they would have wanted to know if the money

13   that was invested was borrowed is irrelevant and improper.

14           THE COURT:  Counsel.

15           MS. BARRY:  Your Honor, the -- the regulators who

16   are coming, two specifically gave information to CPP Council.

17   In fact, two of them attended the June 10, 2009 CPP Council

18   meeting, and it's obviously relevant as to what was being

19   presented and what the Council decided, based on the

20   information that it received and what was meant by the $15

21   million injection of new capital.

22           So I think that's highly relevant and probative, and

23   they should be asked the appropriate questions about --

24           THE COURT:  Again, that's why I asked the question,

25   did they give information.

Colloquy                                     10

1          MS. BARRY:  Yes.

2          THE COURT:  I don't think that's an issue.  I think

3   that what counsel is really talking about here are the ones

4   who didn't participate.

5          MS. BARRY:  Well, then --

6          UNIDENTIFIED ATTORNEY:  Correct, Your Honor.

7          MS. BARRY:  Your Honor, then there's been testimony

8   elicited during the trial about Mr. Levin and his change in

9   control, and I think the application has been shown multiple

10  times.

11         And what we have established through testimony is

12  that while there are agencies that are the primary regulators

13  for the bank and then a primary regulator for the holding

14  company, that they are in communication with each other.

15         And to the extent that the concealment continues

16  with the CIC application, that is, the Change in Control

17  application, it's highly relevant about what they are telling

18  the regulators related to whether or not any of Mr. Levin's

19  funds are borrowed from the bank, and it's significant.

20         THE COURT:  It would not be prohibited for those

21  persons to say they were not apprised of that fact.

22         MS. BARRY:  Yes.

23         THE COURT:  On the other hand, to ask them would you

24  have wanted to know that, is the problem.

25         UNIDENTIFIED ATTORNEY:  That's correct, Your Honor.

Colloquy                                    11

1        THE COURT:  And I think that's inadmissible, quite
2    frankly.
3        MS. BARRY:  Well, Your Honor, to the decision of
4    whether or not they would provide -- they would have approved
5    the CIC application it's extremely relevant.
6        The information was not on any of the applications
7    for Change in Control and --
8        THE COURT:  But they didn't approve it.
9        MS. BARRY:  They did approve it.  The Change in
10   Control was approved by both the Federal Reserve and the
11   Pennsylvania Department of Banking.
12       THE COURT:  The regulators who would be called to
13   testify?
14       MS. BARRY:  Yes, they --
15       THE COURT:  Who did not participate?
16       MS. BARRY:  They --
17       MR. EGAN:  No, Your Honor, it's two different
18   things.
19       MS. BARRY:  Right, there's two different --
20       THE COURT:  All right.
21       MS. BARRY:  There are two different issues.  One is
22   CPP Council and the TARP funding --
23       THE COURT:  Okay.
24       MS. BARRY:  -- and the other is the entire
25   investment that Mr. Levin was going to make required a

1    submission, an application, separate application, with the

2    regulators, both the Federal Reserve and the Pennsylvania

3    Department of Banking.

4            And within those documents and representations made

5    there was no disclosure of the $5 million loan --

6            THE COURT:  Now, if the question is --

7            MS. BARRY:  -- and there was an approval.

8            THE COURT:  And I apologize for the interruption.

9    But if the question is had you known this factor, would you

10   have voted to approve?

11           Is that going to happen?

12           MS. BARRY:  No.  I'm not asking them if they were

13   going -- voting to approve the TARP funding.  That's -- that's

14   not the question.

15           The question is in determining your approval of Mr.

16   Levin to take 24.2 percent, or whatever, control of the -- the

17   bank, then would you have wanted to -- was the $5 million that

18   he borrowed from the bank an important fact that you would

19   have wanted to know.

20           It's a specific question --

21           THE COURT:  As opposed -- as opposed to --

22           MS. BARRY:  Your Honor, the source of funding to

23   take that control of the bank was significant and important,

24   and they asked specific questions as to the source of the

25   funds that Mr. Levin had in order to purchase $18 million --

Colloquy                                    13

1          THE COURT:  I understand --

2          MS. BARRY:  -- worth of stock.

3          THE COURT:  -- that.  I'm only trying to get to that

4    question which you have, and it seems to me --

5          MS. BARRY:  Well --

6          THE COURT:  -- that if it was that probative and

7    that important, that they could easily say had I know that, it

8    would not have been approved.

9          MS. BARRY:  Well, I think the question is going to

10   be did anyone disclose that a loan was made to purchase 5

11   million --

12         MR. EGAN:  And --

13         MR. IGNALL:  -- of the $18 million.  The answer will

14   be no.

15         MR. EGAN:  And, Your Honor, to your point, the next

16   question is a hypothetical --

17         THE COURT:  That's --

18         MR. EGAN:  -- which is would you have known --

19         THE COURT:  That's where -- that's all I'm focusing

20   on.  That's all I'm --

21         MR. EGAN:  And it is entirely hypothetical because

22   none of them are going to say what their decision would be one

23   way or the other --

24         THE COURT:  That's my --

25         MR. EGAN:  -- had they known.

Colloquy                                    14

1        THE COURT:  That's where -- that's all I'm focusing

2   on, is that hypothetical, because everything else I think is

3   admissible.

4        MR. SCHWARTZ:  Your Honor --

5        THE COURT:  Yes.  Excuse me.  Yes, sir.

6        MR. SCHWARTZ:  I beg your pardon.  Two factual

7   points and two little questions with regard to that.

8        The factual points are the attendance of this -- the

9   June 10th meeting shouldn't matter or make these witnesses

10  relevant because it wasn't until June 30th that the

11  information about Mr. Levin's loan came into play, I believe.

12       Secondly, all this talk about getting -- putting on

13  witnesses about the Change in Control is only going to confuse

14  the jury because there's no -- the Government, I don't

15  believe, has introduced evidence that the information about

16  the Change in Control application was ever communicated to the

17  TARP decision makers, the -- the CPP or the Investment

18  Committee in the CPP.

19       So the more we go down the road, the more the jury's

20  going to be thinking, well, wait a minute.  What are we

21  talking about, whether the -- the Change in Control

22  documentation was done correctly or whether the -- the TARP

23  application was done correctly, and --

24       THE COURT:  As I did.

25       MR. SCHWARTZ:  I'm sorry?

                              Colloquy                        15

1              THE COURT:  As I just did.

2              UNIDENTIFIED ATTORNEY:  As I just did.

3              MR. SCHWARTZ:  Right.  I mean it's -- and I'm sorry,

4    I didn't mean to point out -- and the -- it's very confusing

5    and -- and --

6              THE COURT:  You're an advocate.  You better do your

7    job.

8              MR. SCHWARTZ:  Well, but the -- the less we get into

9    that and the less we get into what's extraneous information,

10   the easier it is going to be for the jury to decide.

11             The legal points are --

12             THE COURT:  So go back -- going back to the

13   hypothetical, which is his counsel's point, let me just ask

14   counsel for the Government and perhaps shortcut this.

15             That one question, I'm not going to allow you to

16   have an exception.  All right.

17             MS. BARRY:  Thank you, Your Honor.

18             MR. IGNALL:  Thank you, Your Honor.

19             MR. SCHWARTZ:  Your Honor, does -- does that --

20             THE COURT:  You won, Counsel.

21             MR. SCHWARTZ:  I'm sorry.

22             MR. EGAN:  Yeah, that means stop.

23             MR. SCHWARTZ:  Very well.  Thank you, Your Honor.

24             THE COURT:  All right.  Thank you.

25             Are we ready?  All right.

1          MR. IGNALL:  Your Honor, can we ask for a

2     two-minute --

3          THE COURT:  Sure.

4          MR. IGNALL:  -- break, and we'll be right back?

5          THE COURT:  Absolutely.

6          MR. IGNALL:  And we'll bring the witness in right

7     now.

8        (Pause)

9          MS. BARRY:  Thank you, Your Honor.

10          THE COURT:  All right.  Okay.  Ready?

11          THE CLERK:  All rise.

12        (Jury in, 9:47 a.m.)

13          THE COURT:  Good morning.  You may be seated.

14          Counsel, you may continue.

15          MR. IGNALL:  Thank you.

16          THOMAS PATTERSON, GOVERNMENT'S WITNESS, PREVIOUSLY

17          SWORN

18                 CONTINUED REDIRECT EXAMINATION

19     BY MR. IGNALL:

20     Q    Good morning, Mr. Patterson.

21     A    Good morning.

22     Q    Mr. Patterson, do you remember if you were interviewed by

23     Government agents in -- sometime in October of last year,

24     2015?

25     A    Yes.

1    Q    All right.   And do you remember talking about the

2    approval of the loan to Mr. Levin when you were talking to

3    Government agents?

4    A    Yes.

5    Q    All right.  And, in particular, did you tell Government

6    agents during that interview that you could not recall if the

7    Loan Committee members were told that the loan was for Mr.

8    Levin to invest in bank stock?

9    A    Yes.  I --

10   Q    Did you -- do you recall saying that?

11   A    I -- yes.

12   Q    And do you recall telling Government agents that you had

13   no first-hand knowledge if anyone else at the bank knew the

14   purpose of the loan to Mr. Levin?

15   A    Correct.

16   Q    Do you recall saying that?

17   A    Yes.

18   Q    And do you recall saying that you thought that David

19   Deitrich may have known the purpose of Mr. Levin's loan, but

20   you couldn't be sure?

21   A    Correct.

22   Q    All right.  And you did say that?

23   A    Yes.

24   Q    And is that still true today?

25   A    Well, I believe all of the Loan Committee knew of the

1    loan to Mr. Levin for the purchase of -- to invest capital in

2    the holding company.

3    Q    But is it true that you told Government investigators

4    back in October that you could not say for sure if anyone knew

5    about the purpose --

6    A    Yes.

7    Q    -- of Mr. Levin's loan?

8    A    Yes.

9    Q    You were asked some questions on cross-examination about

10   Mr. Levin potentially assuming a loan of Mr. Bekkedam's.  Do

11   you remember those questions?

12   A    Yes.

13   Q    Do you know if Mr. Levin ever assumed that loan?

14   A    I don't -- I don't remember.

15   Q    Do you know if Mr. Levin ever got a loan from Nova Bank,

16   other than the June 30th loan we've talked about?

17   A    I don't believe so.

18   Q    You remember me asking some questions about that Mr.

19   Bonomo could use the loan funds for anything he wanted?

20   A    Yes.

21   Q    Do you -- did you have any discussions with Mr. Bonomo

22   about that?

23   A    No.

24   Q    Do you have any first-hand knowledge about what Mr.

25   Bonomo's intentions were?

1   A    No.

2              MR. IGNALL:  All right.  Nothing further.

3              MR. EGAN:  I have no further questions, Your Honor.

4              MR. ENGLE:  May I briefly?

5              THE COURT:  Yes, sir.

6                        RECROSS-EXAMINATION

7   BY MR. ENGLE:

8   Q    Good morning, Mr. Patterson.

9   A    Good morning.

10  Q    Mr. Patterson, you were asked a couple questions on

11  redirect yesterday about where the Nova Financial Holding

12  Company had its escrow account.

13           Do you recall that?

14  A    Yes.

15  Q    And they had it at Nova Bank, right?

16  A    Yes.

17  Q    Nova Financial Holding Company was like any other

18  customer of the bank.  They had an account there, right?

19  A    Yes.

20  Q    And whatever money was put into that account didn't

21  belong to Nova Bank, it belonged to Nova Financial Holding

22  Company, correct?

23  A    Correct.

24  Q    And the bank couldn't access and do anything with that

25  money in an inappropriate way like any other customer's

1   account, right?

2   A     Correct.

3   Q     Okay.  Now, you were also asked about a conversation you

4   had with Government agents this past October, right?

5   A     Yes.

6   Q     And that was an interview where you were there by

7   yourself?

8   A     Correct.

9   Q     Didn't have a lawyer there with you.

10  A     No, I did not.

11  Q     And you were there as part of the ongoing cooperation

12  that you were engaged in with the Government, is that right?

13  A     Correct.

14  Q     And you knew what information the Government wanted to

15  hear from you, right?

16              MR. IGNALL:  Objection.

17              MR. ENGLE:  Well --

18              MR. IGNALL:  Beyond the scope of the redirect.

19              MR. ENGLE:  Your Honor, they just inquired into the

20  statement that was made and what he --

21              THE COURT:  All right.

22              MR. ENGLE:  -- told the agents.  I believe it's

23  appropriate.

24              THE COURT:  Overruled.

25  BY MR. ENGLE:

Patterson - Recross (Eng)                    21

1    Q    You knew what the Government was looking for when they

2    were talking to you, right?

3    A    Yes.

4    Q    You knew what they were trying to prove in this case,

5    correct?

6    A    Yes.

7    Q    And you were telling them what they wanted to hear, isn't

8    that right?

9    A    I was telling what I knew.

10   Q    Okay.  And yesterday you were in Court under oath in

11   front of this jury, right?

12   A    Correct.

13   Q    And you knew what that oath meant, correct?

14   A    Correct.

15   Q    You swore an oath to tell the truth, subject to the

16   penalties of perjury?

17   A    Correct.

18   Q    You knew that lying would subject you potentially to

19   prosecution for perjury?

20   A    Yes.

21   Q    That would be separate and apart from what you've already

22   been prosecuted for, correct?

23   A    Correct.

24   Q    And you don't want to go back to jail, right?

25   A    No, I do not.

Patterson - Recross (Eng)                                    22

1    Q     You certainly were not going to lie to this jury

2    yesterday.

3    A     Correct.

4    Q     So when I asked you all those questions about the Loan

5    Committee people knowing the purpose of Mr. Levin's loan to

6    invest in Nova Financial Holding Company, you were telling the

7    truth then, weren't you?

8    A     Yes.

9    Q     And when you were asked on redirect by Mr. Ignall that

10   same question and you gave him the same answer, you were

11   telling the truth then, weren't you?

12   A     Yes.

13   Q     And you're telling the truth here today that that is in

14   fact what happened?

15   A     Yes.

16   Q     The Loan Committee members knew?

17   A     Correct.

18   Q     Thank you.

19              MR. IGNALL:  Nothing further, Your Honor.

20              THE COURT:  Thank you, sir.  You may step down.

21   Watch your step, please.

22              THE WITNESS:  Thank you.

23              THE COURT:  You may call your next witness.

24              MS. BARRY:  Thank you, Your Honor.

25              United States calls Chuck Hunter.

1               CHUCK HUNTER, GOVERNMENT'S WITNESS, SWORN

2               THE CLERK:  Please state and spell your name for the

3    record.

4               THE WITNESS:  Chuck Hunter, C-H-U-C-K  H-U-N-T-E-R.

5               THE CLERK:  Thank you.

6               THE COURT:  You may proceed.

7               MS. BARRY:  Thank you, Your Honor.

8                          DIRECT EXAMINATION

9    BY MS. BARRY:

10   Q    Good morning, Mr. Hunter.

11   A    Hi.

12   Q    Where do you work?

13   A    The Federal Deposit Insurance Corporation.

14   Q    And is that sometimes referred to as the FDIC?

15   A    Yes.

16   Q    And how long have you been with the FDIC?

17   A    For about 26 years.

18   Q    And what is your current position?

19   A    I'm a senior financial analyst.

20   Q    And in and around 2008 or 2009 were you detailed to any

21   specific area for the FDIC?

22   A    Yes, I was.  I was detailed to our efforts in association

23   with TARP, Troubled Asset Purchase Program.

24   Q    Okay.  And what was your role in the Troubled Asset -- or

25   TARP or the -- is it the Capital Purchase Program?

1    A    Capital Purchase Program, yes.

2    Q    Okay.  And so what was your role?

3    A    I was a intermediary between regional offices and banks

4    and TARP CPP, Capital Purchase Council.

5    Q    Okay.  And what was the CPP?  Who comprised or made up

6    the CPP?

7    A    A senior representative from each of the federal banking

8    agencies, of the four federal banking agencies at that time,

9    and one representative from the U.S. Treasury Department.

10   Q    Now, in and around 2009 do you know whether or not a bank

11   called Nova Bank made an application for CP -- to the CPP for

12   TARP funding?

13   A    Yes, I'm aware of that.

14   Q    Okay.  And do you know who the primary regulator for Nova

15   Bank was?

16   A    The FDIC.

17   Q    Okay.  So did you have a role in the application process

18   or in the CPP decision making for Nova Bank?

19   A    I had a role in forwarding information from our regional

20   offices and/or the bank to the CPP Council.

21   Q    Okay.  And as an intermediary if CPP Council had any

22   questions about Nova Bank, would you relay that -- those

23   questions to the field office?

24   A    Yes, I would, to the regional office staff.

25   Q    And who was your main contact for the regional office

1    related to Nova Bank?

2    A     Lisa Koch, who was the acting case manager, I believe.

3    Q     Now, once -- from the outset did CPP Council have

4    concerns about Nova Bank?

5    A     Yes, they did.

6    Q     Okay.  And in terms of your understanding on monies or

7    funds that would be provided by TARP or investments that TARP

8    was going to make into these banks that came before the CPP

9    Council what was one of the important things that the CPP

10   Council wanted to establish about the bank itself?

11   A     That the bank was viable without TARP funds.

12   Q     Okay.  And the initial issues that CPP Council had with

13   Nova Bank, did you communicate those concerns with Lisa Koch?

14   A     Yes, I did.

15   Q     And in response did Lisa Koch provide you information to

16   address those concerns?

17   A     Yes, she did.

18   Q     And where -- where did you believe she was receiving that

19   information?

20   A     I thought she was receiving the information from the --

21   from the bank.

22   Q     Okay.  And was it your expectation that the bank was

23   providing true and accurate information?

24   A     That was my assessment, yes.

25   Q     Now, during the time that CPP Council was considering

1    Nova Bank's TARP application do you know whether or not there

2    were issues with Nova Bank's capital levels?

3    A    Yes, there were.

4    Q    Okay.  And did you -- did you tell Lisa Koch what those

5    concerns were?

6    A    Yes, I did.

7    Q    And did she provide information responding to those

8    concerns?

9    A    Yes, she did.  She provided the bank's plan for raising

10   capital.

11   Q    Okay.  Now, I believe that this has been previously --

12   previously admitted into evidence, Government's Exhibit 21.

13              THE CLERK:  Yes.

14              MS. BARRY:  May it be published, Your Honor?

15              THE COURT:  Yes.

16   BY MS. BARRY:

17   Q    If you take a look at Government's Exhibit 21, the bottom

18   e-mail from Lisa Koch to you, do you see that?

19   A    Yes, I do.

20   Q    And in this e-mail what does she say in the second

21   sentence that starts with "By the way"?

22   A    "By the way" --

23   Q    If you could -- you can go ahead and read it.

24   A    "By the way, President Hartline left me a message that

25   they have an individual who wants to invest $15 million into

1    the bank, ultimately."

2    Q     Okay.  And --

3            MR. ENGLE:  Your Honor, I'm sorry.  We're having a

4    little --

5            UNIDENTIFIED ATTORNEY:  Our monitors aren't -- if we

6    just --

7            THE COURT:  Sure, take your time.

8            UNIDENTIFIED ATTORNEY:  -- fix that before we move

9    on .

10           THE COURT:  Yes.

11           UNIDENTIFIED ATTORNEY:  Sorry for that.

12       (Pause)

13           UNIDENTIFIED ATTORNEY:  Thank you, Your Honor.

14           THE COURT:  You may continue.

15   BY MS. BARRY:

16   Q     Okay.  And this information about the $15 million -- or

17   the investor who would invest 15 million into the bank, was

18   that a way to address the issues the CPP Council had with Nova

19   Bank's capital levels?

20   A     Yes.  That is what I represented to the Council.

21   Q     Okay.  And so in response to Ms. Koch, do -- what do you

22   say in terms of information about this individual who wants to

23   allegedly invest $15 million?

24   A     I'm sorry, I don't quite understand.

25   Q     If you could, just, if you would, please, read what you

1   wrote in the second bullet point there.  Well --

2   A    "The status of the bank's -- the status of the bank's

3   effort to raise capital, including as much information as

4   possible on the likely investor, the types of instruments

5   likely to be used, et cetera."

6        I'm -- I'm asking Lisa to provide me more

7   information on the investor.

8   Q    Okay.  And how about if you read the -- the paragraph

9   below the bullet points?

10  A    "I will phone or e-mail you tomorrow with more specifics,

11       but in the interim it will be in the bank's best interest

12       to provide as much information on the $15 million

13       investor as possible.  If we can present strong evidence

14       that the bank has attracted that much in private capital,

15       all other issues become more manageable.  For example,

16       with the additional 15 million in capital proper risk

17       rating of the sub-investments would not cost the capital

18       deficiency.  The ACC, that is, adversely classified

19       ratio, could decline earnings ability to service TARP,

20       plus trust preferred securities could become less of an

21       issue."

22  Q    Okay.  And so this information to the CPP Council was

23  important to get before them in approving the TARP?

24            MR. EGAN:  Objection, leading.

25            THE COURT:  Sustained.

1    BY MS. BARRY:

2    Q    Was this information important to get to the council, in

3    your -- in your role as an intermediary?

4    A    Yes, it was essential.

5    Q    Okay.  And in fact you write in that first sentence, "I'm

6    not going to take this case before Council this week, rather,

7    I'm hoping to be ready by Friday so the case can be presented

8    next week."

9              So what -- what did you mean there?

10   A    There I meant just give me as much information, and we

11   could take it to the next Council --

12   Q    Okay.

13   A    -- principally because with the condition of the

14   application at that point I didn't think it would be approved

15   by TARP -- by the CPP.

16   Q    Now, when you presented the information to the CPP

17   Council on June 10, 2009, what was the decision that was --

18   was made at the time?

19   A    The decision was that the application could be approved,

20   contingent upon the bank securing the $15 million capital

21   investment.

22   Q    And at that -- at that Council meeting did you provide

23   information that Nova Bank had an individual who was willing

24   to invest at least $15 million?

25   A    Yes, I did.

1    Q    Now, were you made aware at any point in time that after

2    June 10, 2009, so after CPP approved with the $15 million

3    contingency, that new capital had come into the bank?

4    A    Yes.  I got an e-mail sometime thereafter, before June

5    30, I believe, saying that five million of the 15 million had

6    been acquired.

7    Q    All right.  And if --

8             MS. BARRY:  This, I believe, has been moved into

9    evidence, Your Honor, and if it may be published, Government's

10   Exhibit 57.

11            THE COURT:  Granted.

12            MS. BARRY:  Okay.  And if we could just blow it up

13   so it's a little easier to read.  Okay.

14   BY MS. BARRY:

15   Q    And so who is sending you this e-mail?

16   A    Lisa Koch sent me this e-mail.

17   Q    And what does she say?

18   A    She says she just wanted to let me know that Nova got

19   five million of the capital infusion on June 30, 2009.

20   Q    And did there come a time where you passed along

21   information about this -- about the $5 million coming in to

22   this -- to Treasury?

23   A    Yes.

24   Q    Okay.  And I'd like you now --.

25            MS. BARRY:  And if it could just be to the witness,

1   and may I approach the witness with a hard copy, Your Honor?

2             THE COURT:  Yes.

3   BY MS. BARRY:

4   Q    Like to show you what's been marked as Government's

5   Exhibit 61B.

6             And, Mr. Hunter, what is 61B?

7   A    This is an e-mail from myself to Bill Baxter, who was one

8   of our representatives on the Council, Mario Fuentes, who is

9   with Treasury Department, I believe, and to the CPP

10  management.

11  Q    Okay.  And is this in response to an e-mail that was

12  forwarded to you?

13  A    Yes.

14  Q    Okay.

15            MS. BARRY:  Your Honor, the Government moves for the

16  admission of Government's Exhibit 61B.

17            UNIDENTIFIED ATTORNEY:  No objection.

18            UNIDENTIFIED ATTORNEY:  No objection.

19            THE COURT:  Granted.

20            MS. BARRY:  Okay.  And if we could publish that,

21  Your Honor.

22            THE COURT:  Granted.

23  BY MS. BARRY:

24  Q    Okay.  And if we could please turn to the second page of

25  61B.

1            And were you forwarded the bottom e-mail from Mario

2    Fuentes?

3    A    Yes.

4    Q    Okay.  And let's take a look at the e-mail from Mario

5    Fuentes.

6    A    Okay.

7    Q    Okay.  And can you read what -- what Mr. Fuentes says

8    there?

9    A    He says, The CPP team is in the process of reviewing the

10   TARP application for Nova Financial Holding Company, Inc. --

11            THE COURT:  Sir, I'm sorry.  Could you read into the

12   microphone.

13            THE WITNESS:  I'm sorry.

14            "The CPP team is in the process of reviewing the

15       TARP application for Nova Financial Holding Companies,

16       Inc.  As part of that review it was revealed that the

17       bank holding company was in the process of obtaining a

18       new investor who preliminarily committed to invest up

19       to -- oh, excuse me -- invest -- of an investment of at

20       least 15 million and as much as 40 million."

21   BY MS. BARRY:

22   Q    Okay.  And if we could go -- scroll down.  And what is

23   that, the first request there at the bullet point?

24   A    "Please confirm if the bank holding company has received

25   the above-referenced investment, including" --

1    Q    And if we can go to the next page, please.

2    A    -- "the amount of the investment, the date of the

3    investment, how much of investment has been injected to the

4    subsidiary bank.  Describe the organization's capital plans

5    with respect to the above investment."

6    Q    Okay.

7              THE COURT:  With receipt of the above investment.

8              THE WITNESS:  Yes, I'm sorry.

9    BY MS. BARRY:

10   Q    "And then to please forward the responses to CPP

11   management," right?

12   A    Yes.

13   Q    Okay.  And so you were forwarded this e-mail.

14           And then did you respond to that e-mail with the

15   information that you had at the time?

16   A    Yes, I did.

17             MS. BARRY:  And may we go to the first page, please?

18   BY MS. BARRY:

19   Q    And so what did you write in response to the information

20   that was being sought by Treasury?  And if you could read it,

21   please.

22   A.   "The investor purchased five million in common stock of

23        Nova Financial Holding, and 100 percent of the -- and 100

24        percent was injected into Nova Bank as of June 30, 2009,

25        returning the bank to well-capitalized.  The remainder of

1          the 15 million will be purchased upon notice of

2          contingent TARP CPP approval for -- from Treasury.

3          Management plans to inject 70 percent of the investor's

4          capital into the bank and retain more -- no more than 30

5          percent at the holding company for debt servicing.

6          Between TARP and the investor's contribution --

7          investor's contribution and the bank holding company

8          capital levels are expected to be strong.  As the growth

9          is expected to be moderate after -- after the 2008

10         acquisition of Pennsylvania Business Bank which has been

11         merged into Nova Bank, no other bank acquisitions are

12         currently planned.  Capital raising efforts are being

13         performed with the assistance of Ballamor Capital

14         Management, Radnor, PA."

15    Q    Okay.  Did anyone advise you that the $5 million that had

16    been injected into the bank was money that was borrowed from

17    the bank?

18    A    No.

19    Q    Is that information that you would have shared with CPP

20    Council or with Treasury?

21    A    Yes, I would have -- I would have shared that

22    information.

23              MS. BARRY:  Can I have a moment, Your Honor?

24              THE COURT:  Surely.

25         (Pause)

1    BY MS. BARRY:

2    Q    And looking at Government's Exhibit 61B, what is the date

3    of your e-mail?

4    A    Sent July 17, 2009.

5    Q    Okay.

6             MS. BARRY:  No further questions,  Your Honor.

7             THE COURT:  You may cross-examine.

8             MR. EGAN:  Thank you, Your Honor.

9                         CROSS-EXAMINATION

10   BY MR. EGAN:

11   Q    Good morning, Mr. Hunter.

12   A    Hi.

13   Q    Mr. Hunter, you are -- let's focus in on the -- the dates

14   and -- that matter here.

15            You were in the year 2009, I think you said, tasked

16   to the CPP project, would that be a good way of putting it?

17   A    Detailed, so yes.

18   Q    Detailed.  That was the word.  Thanks.

19            And your job, as I understand it, was to take the

20   information that you got from the field office and pass that

21   information on to the CPP Council, correct?

22   A    That would be correct.

23   Q    Okay.  And after -- so basically -- let me see if I got

24   it straight -- information goes from the bank to the field

25   office, right?

1    A    Generally, yes.

2    Q    Then from the field office to you.

3    A    Yeah -- yes.

4    Q    Then from you to the CPP Council.

5    A    Yes.

6    Q    And now, these are these folks who met on June 10th and

7    had their -- gave their recommendation, right?

8    A    Yes.

9    Q    Okay.  And then from them it goes on to Treasury.

10   A    By -- what -- what do you mean by information?  What

11   information are we talking about here?

12   Q    Okay.

13   A    The information from me or information -- the application

14   has got a lot more information than just what I pass on to the

15   Council.

16          So Treasury gets the information actually much

17   sooner than -- than it comes from me.

18   Q    Okay.  Are you talking about the TARP application?

19   A    I'm talking about the application, yes.

20   Q    The application itself.

21   A    That's right.

22   Q    And that had more information than you passed on to --

23   A    That has financial information of the bank's condition at

24   the time of the initial application.

25   Q    Okay.  Right.  And I'm just trying to sort of get the

1    chain of how this flows right now.  Okay?

2    A     Uh-huh.

3    Q     So you give your information -- you summarize your

4    information.  You go to basically a meeting of the CPP Council

5    and summarize your information, isn't that what happened?

6    A     Yes, that's -- that's typically true.

7    Q     Okay.  So there's a meeting.  The four people who are

8    going to make a decision whether to recommend this goes

9    further up the chain are there, right?

10   A     Yes.

11   Q     You come on behalf of the FDIC to present this --

12   basically the situation to them, right?

13   A     Generally that's true.

14   Q     Right?  Then they make a vote whether to recommend that

15   it goes on to Treasury, right?

16   A     Yes.

17   Q     And then Treasury has to also then make a decision

18   whether they want to do it, right?

19   A     I believe that is the case, yes.

20   Q     Okay.  You don't really know what happens at Treasury?

21   A     I don't know everything that happens at Treasury, no.

22   Q     Okay.  So do -- you're not familiar with something called

23   the Investment Committee?

24   A     I'm -- I'm familiar that there is such a thing.

25   Q     Okay.  And you know the Investment Committee makes the

1    ultimate decision whether approve or not?

2    A    I don't know who makes the ultimate decision.

3    Q    Okay.  And you don't really have any idea what

4    information actually got to that Investment Committee, do you?

5    A    I'm on the committee with the information that I sent to

6    the CPP Council, and I believe that information was sent on to

7    Treasury.

8    Q    But you don't actually know that, correct?

9    A    Actually, I do, because one of the e-mails that we just

10   went over has Treasury representatives on there.  So I'm -- I

11   do know that they got the information that I presented.

12   Q    I'm not suggesting that Treasury didn't get the

13   information, but you don't know what information after

14   Treasury got it they ultimately presented to the Investment

15   Council, correct?

16   A    No.  That's true.

17   Q    That's all I was trying to establish.

18        So this is a little bit like whispering down the

19   lane, isn't it?

20   A    I don't know what that means.

21   Q    Okay.

22        UNIDENTIFIED ATTORNEY:  Some of us are just older.

23        MR. EGAN:  If we could have Government's Exhibit 10,

24   and I believe this has been admitted.

25        THE WITNESS:  I don't have Government's --

1    BY MR. EGAN:

2    Q    It's going to show up in a second.

3    A    Okay.

4    Q    That's an e-mail from you to Lisa Koch, correct?

5    A    Yes.

6    Q    And this is back in February, right?

7    A    Yes.

8    Q    And Lisa is the person who was funneling information to

9    you, right?

10   A    That would be right.

11   Q    And you have three questions here, right?

12   A    Yes.

13   Q    And they're --

14   A    Have three bullet points there.

15   Q    You're relaying back to her the three things that you

16   were told were important to the people at the CPP on this

17   Council?

18   A    I was relating to Council's concerns, yes.

19   Q    Right.  And those concerns are, one is capital,

20   obviously, right?

21   A    Yes.

22   Q    And the other two -- well, the next one is asset quality,

23   earnings and liquidity, correct?

24   A    Yes.

25   Q    And you're familiar with this Camels rating.

1   A     Fairly so.

2   Q     And those are all buckets in the Camels rating, right?

3   A     Asset quality, earning and liquidity are Camel ratings.

4   Q     Right.  And then the last one has to do has to with asset

5   ratios?

6   A     Yes.

7   Q     So you ask these questions of her, and you got a response

8   on all of them, didn't you.

9   A     (No audible response)

10  Q     Well, if we could have Government's 11 --

11  A     The pivotal -- the pivotal concern was to --

12  Q     Well, sir, just -- we're getting the Government's 11 up.

13  A     Okay.

14  Q     And my only question to you was did you get an answer to

15  your questions.

16         And I think if you see Government's 11, you'll see

17  that you did, right?

18  A     Okay.  I got a response on capital.  I needed to read a

19  little further.

20  Q     Sure.  And -- and --

21         MR. EGAN:  Can I approach, Your Honor?

22         THE COURT:  Yes, sir.

23         THE WITNESS:  You can have this hard copy and just

24  look through it quick

25  BY MR. EGAN:

1   Q    All I really wanted to ask you was just she answered all

2   your questions?

3   A    Okay.  Yes, I agree.

4   Q    Okay.  And then, obviously, there were more questions,

5   right, because the Council didn't -- that was back in

6   February.  The Council didn't meet and recommend approval

7   until June, right?

8   A    Yeah.  Well, essentially, I would describe the

9   circumstance as this information was not sufficient to address

10  the Council's concerns.

11  Q    Okay.  So they wanted more information.

12  A    They wanted a stronger indication that the bank would

13  remain viable.

14  Q    Right, because that's what really this is about, is the

15  bank and it remain viable, right?

16  A    That's right.

17  Q    They want them to be around for a couple more years so

18  that they can pay back the TARP, right?

19  A    That would be a good thing.

20  Q    So they would want them around till like at least 2012 so

21  they could pay back the TARP, right?

22           MS. BARRY:  Objection.

23           THE COURT:  Sustained.

24  BY MR. EGAN:

25  Q    If we could turn to Government's 21.  You were shown this

1   on direct.

2          And this is where Lisa Koch sends you an e-mail and

3   says, "By the way, President Hartline left me a message that

4   they have an individual who wants to invest 15 million into

5   the bank."

6          You see that?

7   A    I do.

8   Q    And that's May 26, 2009.

9          And you say in response, "It would be in the bank's

10  best interest to provide me as much info on that $15 million

11  investor as possible," correct?

12  A    I do.

13  Q    And then you go on to talk about the things that that

14  would help out at the bottom, proper risk weighting of the

15  sub-investments would not cause a capital deficiency.

16         That's this OTTI issue that came up, right?

17  A    That's right.

18  Q    The ACACR could decline.  See all that?

19  A    Yes.

20  Q    Okay.  Now, you're not sitting there with a financial

21  analysis of the bank in front of you when you're writing this

22  e-mail, correct?

23  A    I don't know exactly what I was looking at at the time.

24  Q    Well, you certainly weren't like plugging in $15 million

25  and crunching numbers and saying this is going to be exactly

1    how it turns out, right?  I mean you're just basically saying

2    15 million's going to help.

3    A    Actually, I'm saying a little more than that.  I'm saying

4    that based on the ratios that currently exist if you plug $15

5    million of additional capital into those ratios, here's what

6    the ratios would be.

7    Q    Right.

8    A    Or their ratios would be at least put the bank into a

9    bucket that would make their capital appear viable.

10   Q    Okay.  And Lisa Koch sends you information about the

11   investor, doesn't she?

12   A    Yes, that's -- that -- yes, she did.  She --

13   Q    And among the information she sends you --.

14         MR. EGAN:  And if we could have G-22.

15   BY MR. EGAN:

16   Q    If you could take a look at this e-mail, sir.

17         MR. EGAN:  And if we could blow up the top part.

18   BY MR. EGAN:

19   Q    Do you know if Lisa Koch ever forwarded this to you?

20         I don't have a -- an e-mail evidencing that she did.

21   So could you take a look at it and let me know?

22   A    This appears to be information I'm familiar with or that

23   I had seen.  I don't know if this particular e-mail was

24   forwarded to me or not.

25   Q    Okay.  So you knew -- and this was May 26th.  And on May

1    26th you were told that he was -- wanted to invest 15 million,

2    correct?

3    A    That's what this e-mail says, yes.

4    Q    Right.  But that it had to do with this DVFG thing,

5    right?  You see that?

6    A    I'm reading it now.

7    Q    Do you remember that?

8    A    I do not remember that.

9    Q    Okay.  Do you remember there were a number of

10   contingencies involved on this $15 million?

11   A    The only contingency that I was familiar with is that the

12   investor wanted contingent TARP approval, was the only

13   contingency that I was aware of.

14   Q    So Lisa Koch didn't tell you that the $15 million

15   investment was contingent upon a DVFG closing?

16   A    I don't -- I'm not aware that she did, no.  But the -- it

17   is in this e-mail, so --

18   Q    Okay.  So -- and that would explain --

19         MR. EGAN:  If we could to Government's 30.

20   BY MR. EGAN:

21   Q    When you appeared at the -- oh, and, sir, I'm sorry.

22         Government's 30, do you recognize that?

23   A    Yes, that's the Council meeting minutes.

24   Q    Right.  And it's the meeting minutes so basically it's

25   kind of what happened there, right?

1    A    Yes.

2    Q    Okay.  And you see there, it says, "Council member

3    recommendation?"

4    A    Yes.

5    Q    Right.  And that's -- that's because this isn't really a

6    final approval.  It's a recommendation to the next level,

7    right?

8    A    That is right.

9    Q    And if you go to -- you notice that the Federal Reserve

10   Board voted against.  Do you remember that?

11   A    I do.

12   Q    Okay.

13            MR. EGAN:  If you go page two of this, and if we

14   could blow up the first two paragraphs.

15   BY MR. EGAN:

16   Q    This, sir, is a summary of what you told this Council,

17   correct?

18   A    That's correct.

19   Q    And it says here that you told them, the last two

20   sentences of the second paragraph, "A private investor has

21   proposed to invest a minimum of 15 million into the HC -- that

22   means the holding company, right?

23   A    That's right.

24   Q    And up to $40 million, total, correct?

25   A    That's right.

1    Q    "This injection," and I assume that means the whole 15,

2    "would return the bank to well-capitalized and make the

3    investor a ten percent shareholder," correct?

4    A    That's right.

5    Q    "The investor is reportedly very strong with a $300

6    million net worth."

7    A    Yes.

8    Q    Correct?  Now, sir, it doesn't reflect in here at all

9    that you told them that his investment was contingent on a

10   DVFG deal, does it?

11   A    It does not.

12   Q    And that's 'cause you didn't tell them, right?

13   A    That would be correct, yes.

14   Q    Now, after that Council meeting your role becomes

15   somewhat less -- you don't have that much to do with this

16   anymore, right?

17   A    That would be true.

18   Q    You were asked one question by the Treasury 'cause they

19   wanted to find out if any of the money was in the bank yet.

20   A    That's right.

21   Q    And you told them $5 million has been invested.

22   A    That's right.

23   Q    Okay.

24            MR. EGAN:  I have no further questions, Your Honor.

25            MR. DUNCAN:  Thank you, you know.  May I proceed?

1           THE COURT:  Yes, sir.

2                        CROSS-EXAMINATION

3     BY MR. DUNCAN:

4     Q    Good morning again, Mr. Hunter.

5     A    Hi.

6     Q    Other than a brief pleasant chat about D.C. yesterday out

7     in the hallway, you and I have never met, have we?

8     A    To my knowledge that's true.

9     Q    The first time you were interviewed by the Government

10    agents in this case was last October, is that correct?

11    A    I suppose.

12    Q    Well, if we could --

13           MR. DUNCAN:  If -- just for the witness could we see

14    D-226.

15    BY MR. DUNCAN:

16    Q    See if this refreshes your recollection, Mr. Hunter.

17           MS. BARRY:  Your Honor, Government will stipulate to

18    the day that they met.

19           MR. DUNCAN:  Thank you, Ms. Barry.

20           THE COURT:  All right.  Thank you.

21           MR. DUNCAN:  We'll take that stipulation, Your

22    Honor.

23           THE COURT:  Thank you.

24    BY MR. DUNCAN:

25    Q    So that was about six months ago, correct?

1   A      Roughly, yeah.

2   Q      And you were interviewed by telephone, is that correct?

3   A      My initial conversations with the Government was by

4   telephone.

5   Q      And you were in your offices at the FDIC in the

6   Washington, D.C. area, correct?

7   A      That's right.

8   Q      And you don't know where the Government agents were, do

9   you?

10               MS. BARRY:  Objection.

11               THE COURT:  Sustained.

12  BY MR. DUNCAN:

13  Q      You were actually surprised to be contacted about this,

14  weren't you, Mr. Hunter?

15               MS. BARRY:  Objection.

16               THE COURT:  Sustained.

17  BY MR. DUNCAN:

18  Q      Sir, had you thought about Nova at all in the last six

19  years?

20  A      I was always concerned about what happened to the banks

21  that I represented for TARP funds, but I was not concerned

22  about Nova in particular.

23  Q      So you don't -- you didn't have anything to do with it

24  over the last several years, correct?

25  A      That's true.

1    Q    Okay.  Mr. Hunter, this is our client, Barry Bekkedam,

2    gentleman here in the middle.

3           Have you ever met him?

4    A    To my knowledge, no.

5    Q    Did you ever have any communications with him about

6    anything to do with Nova's TARP application?

7    A    It's possible, but I don't recall.

8    Q    You don't recall ever talking to him, do you.

9    A    I do not recall talking to him.

10   Q    So to the best of your knowledge nothing about Mr.

11   Bekkedam had anything to do with any of the information you

12   provided on the TARP application to the CPP, correct?

13          MS. BARRY:  Objection.

14          THE COURT:  Sustained.

15   BY MR. DUNCAN:

16   Q    Sir, did you provide the -- did you provide any

17   information about Mr. Bekkedam to the CPP?

18   A    I don't recall providing information about Mr. Bekkedam

19   to the CPP, but it's possible if his name was mentioned in the

20   information that I received from my regional office, I would

21   have forwarded that information to the Council.

22   Q    So you just don't -- you don't remember one way or the

23   other, correct?

24   A    I don't remember one way or the other, sir.

25   Q    Thank you very much, Mr. Hunter, very nice to have met

1    you.

2    A      Thank you.

3                          REDIRECT EXAMINATION

4    BY MS. BARRY:

5    Q      Mr. Hunter, when the CPP Council made its recommendation,

6    what was the only contingency CPP Council was concerned with?

7                 MR. EGAN:   Objection.

8                 THE COURT:   Sustained.

9    BY MS. BARRY:

10   Q      You attended the meeting at CPP Council?

11   A      I did.

12   Q      And what was the contingency that went with the

13   recommendation?

14   A      That Nova Holding Company raise 15 million in capital.

15   Q      Okay.   And from your time at that meeting was that the

16   most important contingency?

17                 MR. EGAN:   Objection.

18                 THE COURT:   Overruled.

19                 THE WITNESS:   By far, definitely.   Was the only

20   consideration.

21                 MS. BARRY:   Now, I don't -- not sure if we can do

22   this, but, Agent Boyer, if you could, try to do a side-by-side

23   of Government Exhibit 10 and Government's Exhibit 21.   Okay.

24   BY MS. BARRY:

25   Q      So, Mr. Hunter, looking at the left side of the screen,

1   which is Government's Exhibit 10, these were concerns that CPP

2   Council had initially, is that -- is that right?

3   A    Yes, those were.

4   Q    Okay.  And looking after, in May of 2009, once Ms. Koch

5   advised you that defendant Brian Hartline told you about

6   this -- told her about this $15 million investment by an -- an

7   investor, an individual, and you say, "If we can present

8   strong evidence that the bank has attracted that much private

9   capital, all issues become much more manageable."

10        And when you -- when you say this, did that include

11   issues that CPP Council had had from the beginning?

12   A    Yes.  Capital is very important to a bank, as you might

13   imagine.

14        It provides liquidity, which was a concern.  It

15   reduces the adversely classified asset ratios, which was a

16   concern, and it provides a buffer between the bank's capital

17   and -- and additional losses.

18            MS. BARRY:  No further questions.  Thank you.

19            MR. EGAN:  No questions.

20            MR. DUNCAN:  No, thank you, Your Honor.

21            THE COURT:  Thank you, sir, you may step down.

22            MS. BARRY:  Your Honor, may we just make sure that

23   our -- who we expect to call is -- is here?

24            THE COURT:  By all means.

25        (Pause)

1        MS. BARRY:  We are going to call, Your Honor, the --

2   United States calls Mary Rutkowski.

3        MARY RUTKOWSKI, GOVERNMENT'S WITNESS, SWORN

4        THE CLERK:  Please have a seat.  Please state and

5   spell your last name for the record.

6        THE WITNESS:  Mary Rutkowski, R-U-T-K-O-W-S-K-I.

7        MS. BARRY:  May I proceed, Your Honor?

8        THE COURT:  Yes, ma'am.

9        MS. BARRY: Thank you.

10                    DIRECT EXAMINATION

11  BY MS. BARRY:

12  Q    Ms. Rutkowski, where do you work?

13  A    I work for the Pennsylvania Department of Banking and

14  Securities.

15  Q    And how long have you been with the -- and does it -- is

16  it sometimes referred to as PADOB, I guess --

17  A    S.

18  Q    -- S.  Okay.

19  A    Ten years.

20  Q    Okay.  And what is your position there?

21  A    I'm the Eastern Region Field Supervisor.

22  Q    And what does the PADOB do?

23  A    We examine state-chartered financial institutions for

24  various components and prepare a report.

25  Q    Okay.  And does the PODOB work with other agencies?

Rutkowski - Direct (Bar)                                        53

1    A    Yes.  We work with the FDIC and the Federal Reserve Bank.

2    Q    And in 2009 what was your position?

3    A    I was the Senior Financial Institution Examiner.

4    Q    Okay.  And, ma'am, what -- can you just tell the jury

5    what your educational background, is, please?

6    A    Sure.  I have an associate's degree in banking from

7    Lucerne County Community College.  I attended the American

8    College for two years for financial planning, and I have ten

9    years as an officer of a financial institution.

10   Q    Okay.  And were you -- in 2009 were you involved in an

11   exam -- examination of Nova Bank?

12   A    Yes.

13   Q    And what was your role in the examination?

14   A    I was the examiner in charge, responsible for preparing

15   the report.

16   Q    Now, prior to the examination do you make any request

17   from the bank before -- ahead of time?

18   A    Yes.  All of our institutions receive what's called the

19   first day letter with a list of all the items that we will

20   need in order to complete our examination.

21   Q    Okay.  And do some of the things that you ask for include

22   loans?

23   A    Yes.

24   Q    Okay.  And do you request to examine each and every loan

25   that the bank has at the time?

1    A    No.  We do a sample of loans, typically anything that's

2    classified, any loan that's late or non-accruing and a random

3    sample of large relationships.

4    Q    Okay.  Now, your particular exam, did it have a certain

5    time period that the examination was going to look at?

6    A    It would be a point in time examination as of 6/30/2009.

7    Q    Okay.  So if the loan was made on 6/30/2009, would that

8    be one that would come up for the examination?

9    A    No.

10   Q    Now, I'd like to --

11              MS. BARRY:  And if I may, Your Honor, approach the

12   witness with -- it's a multi-page document.

13              THE COURT:  Surely.

14   BY MS. BARRY:

15   Q    I'd like to show you what's been marked as Government's

16   Exhibit 95.

17              And do you recognize what Government's Exhibit 95

18   is?

19   A    Yes.  This is the examination from 6/30/2009.

20   Q    Okay.  And this is of Nova Bank?

21   A    Yes.

22   Q    Okay.  And during the examination -- well, let me ask you

23   this.

24              What was the result of the examination?

25   A    There was significant deterioration in the condition of

1    the bank, and we had to downgrade several of the components of

2    the examination, which would be like capital, asset quality,

3    earnings --

4    Q    Okay.

5    A    -- individual areas we review.

6    Q    Okay.  And the areas that you review, is it sometimes

7    referred to as Camels?

8    A    Yes.

9    Q    Okay.  And the Camels, and I guess C is capital.  Can you

10   just --

11   A    Sure.

12   Q    -- tell the jury what Camels stands for?

13   A    C is capital, A is asset quality, M is management, E is

14   earnings, L is liquidity, S is sensitivity to market rate

15   risk, and then we have an overall composite rating.

16   Q    Okay.  And when you're -- in your experience with

17   examinations do the different areas affect one another?

18   A    Yes.  They're all interrelated.

19   Q    Now, what were the conclusions about the bank's capital

20   after the examination?

21   A    Capital was downgraded to less than satisfactory.

22   Q    Okay.  And when it came to capital, did you have a

23   conversation with Mr. Hartline about the bank's capital?

24   A    Yes.

25   Q    And what did Mr. Hartline say?

Rutkowski - Direct (Bar)                                56

1    A    That they were anticipating receiving approximately $10

2    million from a private investor, as well as $17 million in

3    TARP funds.

4    Q    Okay.  And --

5            MS. BARRY:  Your Honor, the Government would move

6    for the admission of Exhibit 95.

7            MR. EGAN:  No objection.

8            UNIDENTIFIED ATTORNEY:  No objection.

9    BY MS. BARRY:

10   Q    And if we could, please, take a look and it --

11           MS. BARRY:  And it may it be published, Your Honor.

12           THE COURT:  Granted.

13           MS. BARRY:  And if we could please take a look at

14   page three of 43.  Okay.  And if we can look at that top

15   portion.

16   BY MS. BARRY:

17   Q    And so what is -- what are we looking at here?  Is this

18   part of the examination?

19   A    Yes.  This is the actual Camels ratings from the prior

20   two examinations, as well as the 6/30 examination.

21   Q    And in your summary that follows is there a sort of

22   discussion as to each of the areas that were examined?

23   A    Yes.

24   Q    Okay.  And, again, what is the scale that the ratings are

25   on?

1   A    One is strong, two is satisfactory, three is less than

2   satisfactory, four is deficient, and five is critically

3   deficient.

4   Q    And looking at the results of the examination we see that

5   a three is -- stands for that the capital is --

6   A    Less than satisfactory.

7   Q    -- less than satisfactory.

8        And -- and looking, asset quality, as a four, what

9   does that mean?

10  A    That it was deficient.

11  Q    Okay.  And what about earnings for the bank?

12  A    That would be deficient, as well.

13  Q    Okay.  And so based on these ratings was there an overall

14  composite downgrade, as you say?

15  A    That's correct.  The risk management composite was

16  downgraded from a two, which is satisfactory, to a three,

17  which is less than satisfactory.

18  Q    Okay.  If we take a look at page -- well, did you have --

19  who is Brian Hartline?  I'm not sure if I asked you that.

20  A    He was the President and CEO of the company.

21  Q    Okay.  And did you have a conversation or did you -- did

22  you discuss the results of the exam with him?

23  A    Yes.

24  Q    Okay.

25  A    Yes, we would have had a formal exit meeting where we

1    would sit down with senior management and go over all the

2    ratings.

3    Q    Okay.  And looking at page seven of 43, please.

4              And if we look at capital, can you just read --

5    is -- what is the italicized portion?

6    A    That is management's response.  Any time a rating is a

7    three, four or five we need to provide a response from

8    management in our report.

9    Q    Okay.  And what was the response from management on the

10   downgrade of the capital to less than satisfactory?

11   A    That they were waiting to receive money from a private

12   investor and -- and TARP funds.  Would you like me to read it?

13   Q    Yes, please.

14   A    Okay.

15             "According to the President and Chief Executive

16        Officer, Brian M. Hartline, the bank will receive $10.3

17        million from a private investor and TARP CPP funds of

18        approximately $17 million.  The bank is working with

19        other investors which would approximate an additional

20        500 -- that would be thousand -- that will be received by

21        the end of the year.  With the above capital proceeds

22        Nova anticipates a RWC ratio of approximately 12 percent

23        and a tier one capital ratio of approximately nine

24        percent by December 31, 2009."

25   Q    Okay.  And on page 35 of 43, at the bottom there, where

1    did this information come from?

2    A    That information would have been provided by management.

3    Q    Okay.  And what did management advise?  And if you could

4    read it.

5    A    "The bank has applied for and will receive $17 million

6    under the TARP CPP prior to year end.  The bank opted to

7    participate in the TLGP."

8    Q    And what's the TLGP?

9    A    The Temporary Liquidity Guarantee Program.

10   Q    And does management or does the bank provide information

11   on their directors and trustees?

12   A    Yes.

13   Q    Okay.

14   A    Yes.  That is provided when we request -- it's on the

15   list in the first day letter.

16   Q    Okay.  And I'd like to show you, please, what's been --

17   page 39 of 43.  Okay.

18        And what does it say about Mr. Hartline?

19   A.   "After serving as the Executive Vice President, Chief

20        Operating Officer and CFO for USA Bankshare, Inc. from

21        1998 to 2000 Mr. Hartline left the bank to work as

22        President and CEO of Main Street Bank Corp., Inc.,

23        Reading.  Upon his return in 2002 he was named President

24        and CEO of both the bank and the holding company.  Mr.

25        Hartline is responsible for the oversight of the bank.

1          He is also a certified public accountant."

2                MS. BARRY:  May I have a moment, Your Honor?

3                THE COURT:  Surely.

4          (Pause)

5                MS. BARRY:  Now, if we could take a look at the

6     first page of the -- of Government's Exhibit 95.  Okay.

7     BY MS. BARRY:

8     Q    Okay.  And looking at the first page, the -- you said

9     that -- what is the time again?  You said this was at -- in a

10    date and time.  Can --

11    A    That's correct.

12    Q    Can you explain sort of what --

13    A    Sure.

14    Q    -- the timing of what you're looking at and when you did

15    the exam?

16    A    Sure.  A point in time is at the specific date.  It's

17    typically one of the four quarters of the year.  This was as

18    of close of business June 30, 2009.

19                It takes a few months to generate that data.  So we

20    start the examination on October 5, 2009.

21    Q    Okay.  And do you recall when the exit meeting was?

22    A    It -- it should be documented in -- the exit meeting took

23    place November 10, 2009.  It's located on page seven.

24    Q    Okay.

25                MS. BARRY:  No further questions, Your Honor.

1          THE COURT:  You may proceed.

2                        CROSS-EXAMINATION

3    BY MR. EGAN:

4    Q     Good morning, Ms. Rutkowski.

5    A     Morning.

6    Q     How you doing?

7    A     I'm fine.  And you?

8    Q     Good, thanks.

9          So you're -- at the time you were an inspector,

10   right?

11   A     An examiner?

12   Q     Examiner, I'm sorry.  And you were the chief examiner for

13   this group, right?

14   A     I was the examiner in charge, yes.

15   Q     Examiner in charge.

16   A     Correct.

17   Q     And an examiner in charge, there were folks to be in

18   charge of, I assume?

19   A     Yes.

20   Q     And on this particular examination you had a number of

21   your colleagues who assisted, correct?

22   A     Correct.

23   Q     And just ballpark, like about six?

24   A     Between six and eight.

25   Q     Between six and eight.  So yourself and between six and

1    eight people.

2              It says exam began on October 5th.  You come into

3    the bank on October 5th, right?

4    A    Correct.

5    Q    And this exit meeting was in early November, right?

6    A    That's correct.

7    Q    And so basically from October 5th until -- for a couple

8    weeks at a minimum or late October you're in there examining,

9    right?

10   A    Typically it's four weeks.

11   Q    Four weeks.  So for a whole month.

12   A    Correct.

13   Q    And while you're there, you kind of have free run of the

14   place, right?

15   A    We're provided with documentation that we request a month

16   ahead of time, and then we speak to various people that are

17   provided by management for us to talk to about the

18   documentation.

19   Q    Right.  And the people that are provided by management to

20   you are the people who are in charge of that specific area of

21   the bank, right?

22   A    Usually, yes.

23   Q    So do you recall whether the person you talked to about

24   the lending and the credit was Mr. Poliski?  Remember him?

25   A    I do not.

1    Q    Okay.  You don't really remember any of the people that

2    well?

3    A    Well, I remember Mr. Hartline because he was my direct

4    contact there.

5    Q    Right.

6    A    But each of the examiners would have been responsible for

7    different sections.

8    Q    Okay.

9    A    So asset quality would have been covered by one of our

10   loan specialists --

11   Q    I --

12   A    -- who would have met with whoever was in charge of

13   loans.

14   Q    So the loan specialist would meet with the credit

15   manager, who we know at this point was a Mr. Poliski --

16   A    Okay.

17   Q    -- and ask him all the questions you wanted to ask,

18   right?

19   A    Yes.

20   Q    Okay.  And same thing for folks who are looking at who

21   the investors are?

22   A    That's correct.

23   Q    Somebody does that, as well.

24   A    Yes.

25   Q    And you're in charge.

Rutkowski - Cross (Ega)                                    64

1    A     That's correct.

2    Q     Great.  You said that it was as of June 30th, correct?

3    A     That's correct.

4    Q     But when you come in in October, you are able to and

5    often do look at information that comes in later than June

6    30th, don't you?

7    A     It -- it depends on what kind of information it is and if

8    it's provided to us by the bank.

9    Q     Right.  If you could go to page --.

10             MR. EGAN:  Oh, could we have, back up, Government's

11   Exhibit 95?  And if we could go to page 33.

12             I'm sorry, it's -- it's page 33 or 43.  Actually,

13   page 31 in the report, but page 33 or 43 down in the lower

14   left.

15             And if we could blow up -- no, next one down, scope

16   of the examination.

17   BY MR. EGAN:

18   Q     Now, I guess what you're telling us is you aren't really

19   the person who reviewed the loans?

20   A     No, I did not.

21   Q     Okay.  But whoever reviewed the loans would have put

22   this -- this in here, right?

23   A     That's correct.

24   Q     And then you sign off on the whole thing 'cause they're

25   your people, and you're in charge.

1    A    That's correct.  We verify the information that we sign

2    off on, and as of August 31st was the loan dated date --

3    Q    Right.

4    A    -- but the bank generates --

5    Q    So let me just ask -- I've got a question for you.

6    A    Okay.

7    Q    Okay.  It says here, does it not, that an independent

8    examination commenced on October 5, 2009, right?  Says that?

9    A    Yes.

10   Q    Says, "Utilizing financial data as of June 30, 2009,"

11   right?

12   A    Yes.

13   Q    And loan data as of August 31, 2009, right?

14   A    Correct.

15   Q    That's what it says.

16   A    Yes.

17   Q    Okay.  Now, if we go down about five lines, there's a

18   sentence that says, "Loan relationships in excess of 1.664

19   million," I guess that is --

20   A    Uh-huh.

21   Q    -- "were reviewed," right?

22   A    That's correct.

23   Q    So all loan relationships in excess of 1.664 million were

24   reviewed.

25   A    That's correct.

1    Q     And it says, "Along with all past due non-accrual and

2    internally classified loans, correct?

3    A     Correct.

4    Q     Now, if we could go to page 41 of 43.

5            And you didn't -- were you the person who did the

6    shareholders part, or did someone else do that, too?

7    A     I'd have to see which part you're --

8    Q     Oh, I'm sorry.

9    A     -- referring to.

10   Q     So the very bottom of that page, if you blow it up,

11   starting at "principal shareholders"?  See that?

12   A     Yes.

13   Q     Okay.  Was this something that you did personally, or is

14   this something somebody else did?

15   A     The bank would have provided us a list of their

16   shareholders, and we would have put it into the report.

17   Q     Right.  So the bank -- so you're reviewing the loan

18   portfolio at the bank as part of this examination, correct?

19   A     Correct.

20   Q     And the bank's providing you with the name of the

21   shareholders, correct?

22   A     Correct.

23   Q     And the bank provides you with the name.  The third name

24   down there is who?

25   A     The D1183 Trust, Thomas K. Glenn.

1    Q    Oh, the one above that, I'm sorry.

2    A    Levin, George G.

3    Q    George G. Levin, right?

4    A    Uh-huh.

5    Q    And it has 454,545 shares, I guess that is, right?

6    A    Yes.

7    Q    And he's not actually the biggest shareholder, is he?

8    A    No.

9    Q    Okay.  So when you're finished this examination, you have

10   a meeting with management, right?

11   A    Correct.

12   Q    And they're not real happy 'cause things have been

13   downgraded, right?

14        You have to say yes or no.

15   A    Yes.

16   Q    And so they are allowed to present information to try

17   and, you know, make you think maybe that's not quite correct,

18   right?

19   A    Right, that's correct.

20   Q    Didn't change your rating at all, did it.

21   A    No.  Typically the replies included in our report

22   italicized after the component ratings --

23   Q    Right.

24   A    -- and the composite ratings, so --

25   Q    But it doesn't have any impact on what you actually

Rutkowski - Cross (She)                                    68

1   decide?

2   A     Typically, no.

3   Q     And what's in that little paragraph there?

4         That's a paraphrasing of what you were told, right?

5   I mean you don't pass this out to Mr. Hartline to fill it out,

6   do you?

7   A     No.

8   Q     So you had a meeting with him, right?

9   A     Right.

10  Q     He told you some things at that meeting, right?

11  A     That's correct.

12  Q     You went -- after the meeting you went back to your

13  office, and you wrote down what you recall that he told you.

14  A     I usually take notes at the meeting, but yes.

15             MR. EGAN:  I have no further questions, Your Honor.

16             MS. SHEALEY:  May I proceed?

17             THE COURT:  Sure.

18                        CROSS-EXAMINATION

19  BY MS. SHEALEY:

20  Q     Good morning, Ms. Rutkowski.

21  A     Morning.

22  Q     If we could -- if you could turn to Government Exhibit

23  95, the same exhibit, to page -- I believe it's 35.

24         Do you have a hard copy?

25  A     I do.

1   Q    Okay.  Great.  And if you could take a look for -- well,

2   it's page 38, I'm sorry, of the document.

3         If you could take a look at the list of directors,

4   trustees starting on page 38, and then going through the list

5   of officers who are not directors or trustees on to -- on

6   pages -- starting on page 40 and going through 41.

7         And as you're looking through that list of names,

8   can you tell me if my client, Barry Bekkedam, is anywhere on

9   that list?

10  A    No.

11  Q    And throughout your examination you're generally familiar

12  with the officers and directors of Nova Bank, right?

13  A    Yes.

14  Q    And -- and you would agree that it's not a typo.  Mr.

15  Bekkedam is neither an officer or a director of Nova Bank, is

16  he?

17  A    Not to my knowledge.

18  Q    Okay.  And you were provided access to people at the bank

19  to ask questions during your exam, right?

20  A    Yes.

21  Q    You didn't ask any questions of Mr. Bekkedam, did you?

22  A    No.

23  Q    Okay.  During your examination of Nova you would have

24  noted if an outside individual like Mr. Bekkedam had exercised

25  any control over the lending decisions at the bank, wouldn't

1   you?

2   A     Yes, if we knew.

3   Q     If you knew.  There's nothing like that in this report,

4   is there?

5   A     No.

6   Q     Similarly, during your -- excuse me, during your

7   examination of the bank if you had identified any instances of

8   an outside person like Barry Bekkedam influencing how the bank

9   conducted its capital calculations, you would have noted that

10  in your report, wouldn't you?

11  A     Yes.

12  Q     And you didn't notify -- notice anything like that in

13  your report, did you?

14  A     No.

15  Q     Again, I mean in looking through the report, I realize

16  it's lengthy, but you're generally familiar with it, right?

17  A     Yes.

18  Q     There's no mention of Barry Bekkedam at all, is there?

19  A     No.

20  Q     And other than possibly the fact that Mr. Bekkedam was a

21  customer of Nova, Barry Bekkedam didn't come up at all

22  anywhere in your exam, did he?

23  A     Not that I recall.

24  Q     No.  And I realize this has all been a long time ago.

25        The first time you were interviewed in this case by

1    the Government, that was last summer, is that right?

2    A    I believe so.

3    Q    Okay.

4    A    Last summer, last fall.  I'm not really sure when.

5    Q    Thank you.

6         MS. SHEALEY:  No further questions, Your Honor.

7         THE COURT:  Thank you.

8         MS. BARRY:  If we could please put up and publish,

9    Your Honor, page 41 of 43, which is Government's Exhibit 95,

10   the report of examination?

11        I'm sorry.  It's 41 of 43.  Okay.  And if we go to

12   the bottom portion that Mr. Egan showed the witness.

13                    REDIRECT EXAMINATION

14   BY MS. BARRY:

15   Q    Did your exam involve tracing the source of funds for all

16   of these individuals or entities?

17   A    No.

18        MS. BARRY:  No further questions, Your Honor.

19        MR. EGAN:  May I, Your Honor?

20                    RECROSS-EXAMINATION

21   BY MR. EGAN:

22   Q    Now, you're familiar with Regulation O, correct?

23   A    Yes.

24   Q    And that involves loans to shareholders?

25   A    That's correct.

Rutkowski - Redirect (Bar) - Recross (Ega)            72

1    Q    So you would be investigating loans to shareholders,

2    correct?

3    A    It's part of our review, yes.

4    Q    And -- and you didn't note anything about any violation

5    with regard to that, did you?

6              You can go look.

7    A    There is no violation of Reg O at this examination.

8    Q    And Mr. Levin was a shareholder, correct?

9    A    He's listed on the page as a shareholder, yes.

10   Q    Thank you.

11             MR. EGAN:  Nothing further, Your Honor.

12             MS. SHEALEY:  We have no further questions of this

13   witness.

14             MS. BARRY:  Nothing further, Your Honor.

15             THE COURT:  Thank you.  You may step down.  Watch

16   your step, please.

17             Fifteen minutes.

18        (Recess taken, 11:02 a.m. to 11:26 a.m.)

19             THE COURT:  Okay.

20             MR. EGAN:  Yes, Your Honor.

21             UNIDENTIFIED ATTORNEY:  Yes, Your Honor.

22        (Jury in, 11:28 a.m.)

23             THE CLERK:  All rise.

24             THE COURT:  You may be seated.  Thank you.

25             MS. BARRY:  Your Honor, the United States calls

1    Cynthia Course.

2              CYNTHIA COURSE, GOVERNMENT'S WITNESS, SWORN

3              THE CLERK:  Please state -- have a seat.  State and

4    spell your name for the record.

5              THE WITNESS:  Cynthia Course, C-Y-N-T-H-I-A

6    C-O-U-R-S-E.

7              THE CLERK:  Thank you.

8              THE COURT:  You may proceed.

9         MS. BARRY:  Thank you, Your Honor.

10                        DIRECT EXAMINATION

11   BY MS. BARRY:

12   Q    Good morning, Ms. Course.

13   A    Good morning.

14   Q    Where do you work?

15   A    I work for the Federal Reserve Bank of San Francisco.

16   Q    And how long have you been with the -- and you said the

17   Federal Reserve Bank of San Francisco.

18             How long with San Francisco?

19   A    Coming on five years.

20   Q    Okay.  And have you been working for the Federal Reserve

21   Bank, whether San Francisco or other places, for a certain

22   period of time?

23   A    Yes, I have.

24   Q    And what time period is that?

25   A    Twenty-two years, total.  Coming on 22 years with the

1    Federal Reserve system.

2    Q    Okay.  And did you go to college, ma'am?

3    A    Yes, I did.

4    Q    And what was your degree?

5    A    I have a joint degree in accounting and law enforcement.

6    Q    Okay.  And do you have any post-college degrees?

7    A    Yes, I have a master's in business administration.

8    Q    Okay.  And are you also a CPA?

9    A    Yes, I am.

10   Q    Okay.  And did you ever work in -- at the Federal Reserve

11   Bank of Philadelphia?

12   A    Yes, I did.

13   Q    And what time period was that?

14   A    From 1994 till 2011.

15   Q    Okay.  And in 2009 what was your position with the -- the

16   Federal Reserve in Philadelphia?

17   A    I was an assistant vice president in the banking

18   supervision area with responsibility over enforcement and

19   administration.

20   Q    Okay.  And do you recall whether the Philly Fed regulated

21   an entity called Nova Financial Holding Company?

22   A    Yes, it did.

23   Q    Okay.  And what was the holding company's largest asset?

24   A    At the time Nova's -- Nova Financial Holding's largest

25   asset was its lead subsidiary bank, Nova.

1    Q    Now, at some point in time were you detailed to

2    Washington, D.C.?

3    A    Yes, I was.

4    Q    And what was that detail?

5    A    From December 2008 to December 2009 I was on a detail to

6    the Board of Governors in Washington, D.C. to work on the TARP

7    Capital Purchase Program.

8    Q    Okay.  And what was your role?

9    A    Generally, my role was to handle a lot of the

10   administrative aspects, the organizational aspects as the

11   Federal Reserve reviewed applications for the TARP Capital

12   Purchase Program.

13        Occasionally I also performed analysis of the

14   applications and made recommendations to the Federal Reserve's

15   representative as to whether an application should be approved

16   or denied.

17   Q    Okay.  And when information for an -- for an institution

18   that was applying for funds via the Capital Purchase Program,

19   who -- who would be responsible for gathering the information?

20   A    The way the program was established the federal regulator

21   who supervised the lead bank of the organization would be the

22   one who would do the majority of the investigative work on the

23   application.

24   Q    Okay.  And can you just maybe walk us through the process

25   of when an application went into -- was sent up for -- for

1    TARP approval or for CPP approval?

2           It would go -- would the application go to the

3    institution's primary regulator?

4    A    Yeah.  The application would be filed initially with the

5    primary regulator of the subsidiary bank.  The Federal

6    Reserve, if there was a company that owned the bank, would

7    also receive a copy of the application, but the primary

8    regulator of the bank would receive and process the -- the

9    main application.

10   Q    Okay.  And how did it make its way to CPP counsel, if --

11   if you know?

12   A    After the primary regulator of the bank finished its

13   review of the application.  It would decide whether it was

14   going to recommend the application for approval or was going

15   to need to work with the institution on -- on the denial.

16          If they were recommending it for approval, they

17   would submit it to the CPP Council for the Council's review of

18   the application.

19   Q    Okay.  And then what happens after CPP Council makes a

20   recommendation?

21   A    After the CPP Council made a recommendation on the

22   application, the application would be forwarded to the U.S.

23   Treasury where the Treasury's Investment Committee would then

24   do an independent assessment taking into consideration the

25   recommendation of the primary regulator and the Council.

1    Q    Would the Treasury ever request additional information

2    from CPP Council or the primary regulator?

3    A    Typically they would make the request for additional

4    information from the primary regulator.

5    Q    Now, when you were detailed to the CPP Council, do you

6    recall whether or not Nova Bank had submitted an application

7    for funds pursuant to the CPP program?

8    A    Yes, I recall that it did.

9    Q    Okay.  And if I could turn your attention, please, to --

10   well, let -- let me ask you this before I get there.

11          And during the time that Nova Bank's application was

12   being processed do you recall whether or not there was any

13   adjustment to its capital levels?

14   A    I'm -- I'm sorry.  I'm not sure I understand the

15   question.

16   Q    While the -- do you -- do you know whether or not there

17   were any issues related to Nova Bank's capital?

18   A    Yes.

19   Q    Okay.  And what were the issues if you -- if you know?

20   A    While -- before the application came to the Council, Nova

21   Bank filed an amended call report, which is the financial

22   statement that it files with its regulators, that indicated

23   that its capital levels had declined, and they were now going

24   to be an inadequately capitalized position, as opposed to a

25   well-capitalized position.

1    Q     And how would that affect the approval process?

2    A     One of the criteria to be eligible to receive funds under

3    the TARP Capital Purchase Program was that the institution be

4    considered to be viable without the TARP funds.  And one of

5    the tests of viability related to their capital levels.

6    Q     Okay.  Now, I'd like to turn your attention to what's

7    been marked as Government's Exhibit 30.

8              MS. BARRY:  And I believe this is in evidence, Your

9    Honor, and may it be published?

10             THE COURT:  Yes.

11   BY MS. BARRY:

12   Q     Now, before we get --

13             MS. BARRY:  I'd like to look at the second page

14   first, if -- if that's possible.  Okay.

15   BY MS. BARRY:

16   Q     Now, looking at the first sentence, it states, "This case

17   was submitted for notational vote on April 10th and deferred

18   from the CPP Council meeting on May 13th."

19             What -- what does that mean?

20   A     The first time that the FDIC, which was the primary

21   regulator for Nova, the subsidiary bank, submitted the TARP

22   application, it came through what we called a notational vote.

23             There was no face-to-face discussion of the

24   application among the members of the TARP CPP Council, but

25   each reviewed the application and the FDIC's recommendation on

1    their own in their offices and made an initial recommendation

2    about it.

3    Q    Okay.  And what was that recommendation?

4    A    The Federal Reserve recommended denial of the

5    application.  The OCC and the OTS recommended that the

6    application be deferred to the Council for discussion at a

7    future meeting and raised several questions that they felt

8    needed to be answered.

9    Q    Okay.  And when it came to those questions that needed to

10   be answered, who did they look to to provide their response?

11   A    The Council expected the FDIC, the primary regulator of

12   the bank, to provide the response.

13   Q    Okay.  Now, at this meeting of the Council on June 10,

14   2009 were -- was the bank's capital something that was

15   discussed?

16   A    Yes.

17   Q    And what did the FDIC's representative say with respect

18   to the -- the capital?

19   A    The FDIC's representative advised the Council that Nova

20   Financial Holdings was in the process of raising additional

21   capital that would be injected into the bank.

22   Q    Okay.  And so -- and how -- and so based on -- on the

23   information from the FDIC what was the results of that

24   meeting?

25   A    At the June 10th meeting the Federal Reserve still

1    recommended denial of the application.   The OCC, the OTS and

2    the FDIC recommended approval of the application, contingent

3    upon a capital injection from external sources of $15,000.

4    Q    Okay.   And so when the CPP Council -- and you see on

5    page -- on the -- on this first page of 30, the three agencies

6    that did approve, there's an asterisk, and it says,

7    "Contingent on capital injection of 15 million."

8              What did that mean?

9    A    That meant that they only were recommending approval of

10   the application if an additional $15 million was raised from

11   outside sources and injected into the company before the TARP

12   funds were invested.

13   Q    And when you say "outside sources," do you mean new money

14   or not?

15   A    Yes, new money.

16   Q    Now, do you know if there was an inspection or review of

17   Nova Financial Holding Company in and/or about April of 2009?

18   A    Yes, there was.

19   Q    And what was the result of that inspection?

20   A    The inspection was conducted by the Federal Reserve Bank

21   of Philadelphia, and it determined that Nova Financial

22   Holdings was in less than satisfactory financial condition,

23   and it resulted in a rating of three --

24   Q    Okay.

25   A    -- which was less than satisfactory.

1    Q    And I'd like to show you --

2          MS. BARRY:   And I believe it's already been moved

3    into evidence, Your Honor, Government's Exhibit 32.  And may

4    it be published?

5          THE COURT:  Yes.

6    BY MS. BARRY:

7    Q    And looking at Government's Exhibit 32, what is this?

8    A    This is the letter that the Federal Reserve Bank of

9    Philadelphia sent to Nova Financial Holdings advising it of

10   the results of the inspection and the fact that it was being

11   issued a risk management and a composite rating of three.

12   Q    Okay.  And what's the date of this letter?

13   A    June 10, 2009.

14   Q    And based -- as a result of this inspection was there any

15   other action taken by the Federal Reserve?

16   A    Yes.

17   Q    And what was that?

18   A    When an inspection concludes that a company is in less

19   than satisfactory condition, a recommendation gets made to the

20   enforcement area of the Federal Reserve Bank of Philadelphia

21   to take enforcement action or to compel the company to take

22   action to get itself back into satisfactory condition.

23   Q    Okay.  And I'd like to show you, and I believe just for

24   the witness at this point, Government's Exhibit 34.

25          And do you recognize what is Government's Exhibit

1    34?

2    A    Yes.

3    Q    And what is that?

4    A    This is the letter that was sent to Nova Financial

5    Holdings advising it that it was being put under an

6    enforcement action.

7    Q    Okay.  And did you see this letter before it went out?

8    A    Yes.

9    Q    Okay.  And are you referenced in this letter?

10   A    Yes.

11        MS. BARRY:  Your Honor, the Government moves for the

12   admission of Exhibit 34.

13        UNIDENTIFIED ATTORNEY:  No objection.

14        UNIDENTIFIED ATTORNEY:  No objection.

15        MS. BARRY:  Okay.  May it be published?

16        THE COURT:  Yes.

17        MS. BARRY:  Okay.

18   BY MS. BARRY:

19   Q    And -- and what is the date of this letter?

20   A    June 17, 2009.

21   Q    Okay.  And based -- is this letter a result of the

22   downgrade of the holding company

23   A    Yes, it is.

24   Q    And what kind of supervisory action was -- was taken or

25   there -- yes.

1            I mean what kind of supervisory action if any, was

2    taken.

3    A    This letter was called a supervisory letter, and it

4    placed restrictions on Nova Financial Holding's ability to pay

5    dividends, to issue debt and to redeem its stock.

6    Q    Okay.  And was there any way for Nova Bank to get out

7    from under these restrictions?

8    A    Well, the restrictions were on Nova Financial Holding

9    Company, not the bank.  So --

10            MR. EGAN:  Objection to the rest.

11            THE COURT:  I'm sorry?

12            MR. EGAN:  The question was it put restriction on

13   the bank, and she said it was on the holding company, not the

14   bank.  So whatever else she says won't be about the bank.

15            THE COURT:  Overruled, but could she explain.

16   BY MS. BARRY:

17   Q    Okay.  Go ahead.

18   A    There were ways that the holding company could get out of

19   these restrictions.

20   Q    Okay.  And what -- and how was that?

21   A    There were two ways.  The first is that the holding

22   company could ask permission of the Federal Reserve Bank of

23   Philadelphia to pay dividends, to issue debt or to redeem its

24   stock.

25            The second way as to the dividends only would be for

1    the holding company to ensure -- to put the bank in a

2    well-capitalized position where the bank itself was considered

3    well-capitalized under Government rules, and then the dividend

4    restrictions would no longer apply.

5    Q    Okay.  So the holding company -- Nova Financial Holding

6    Company, what was its primary responsibility at -- at -- in

7    June of 2009?

8    A    From a regulatory perspective the primary role of a

9    holding company is to serve as a source of strength to the

10   subsidiary bank.

11   Q    Okay.  And if an outside investor wanted to invest in the

12   bank in the setup that -- that we have here -- and do you know

13   whether this is called a small shell?

14   A    Yeah, Nova Financial Holding Companies would have been

15   considered a small shell holding company --

16   Q    Okay.

17   A    -- because of its size.

18   Q    Okay.  And with its primary asset being the -- the bank?

19   A    Correct.

20   Q    Okay.  So if an outside investor wanted to invest in the

21   bank, what shares would it -- that outside investor actually

22   hold?

23   A    The bank -- the holding company, Nova Financial Holdings,

24   owned all of the stock of the bank.  An outside investor who

25   wanted to invest in the organization would be purchasing

1    shares of Nova Financial Holdings.

2    Q    Okay.  And then what would happen with the money that

3    purchased -- that was used to purchase the -- the stock in the

4    holding company?

5    A    When stock in the holding company was purchased, the

6    holding company would then decide what it would use the

7    proceeds from, whether it would be investing it in the

8    subsidiary bank or use it for other corporate purposes.

9    Q    So that it would be -- is it fair to say it would be

10   downstreamed to the bank?

11             MR. EGAN:  Objection; leading.

12             THE COURT:  Sustained.

13   BY MS. BARRY:

14   Q    Is there a term that you're familiar with called

15   downstreaming?

16   A    Yes.

17   Q    Okay.  And so would that -- would an investment from an

18   outside investor, if they wanted to invest in Nova Bank,

19   purchase Nova Financial Holding stock?

20   A    That -- that could be one way to put it, yes.

21   Q    Okay.  And do you know whether or not the money then

22   would be downstreamed to the bank?

23   A    If Nova Financial Holdings were to choose to downstream

24   the funds to the bank to create additional capital at the

25   bank, that would be one use of the funds.

1    Q    Okay.  Now, do you know whether anyone at Treasury

2    followed up on this $15 million contingency that needed to be

3    met prior to issuing TARP funds?

4    A    Yes.

5    Q    Okay.  And I'd like to show you what's been marked as

6    Government's Exhibit 61.

7              MS. BARRY:  I'm not sure if this has been moved into

8    evidence.

9              UNIDENTIFIED ATTORNEY:  61 is in.

10             MS. BARRY:  Okay.  If I may publish this, Your

11   Honor?

12             THE COURT:  Yes.  What number again?

13             MS. BARRY:   And it's Government's Exhibit 61.

14             THE COURT:  Any objection?

15             UNIDENTIFIED ATTORNEY:  Your Honor --

16        (Pause)

17             UNIDENTIFIED ATTORNEY:  Can we see you at sidebar,

18   Your Honor?

19             UNIDENTIFIED ATTORNEY:  Well, in this --

20             THE COURT:  Surely.  You can approach, please.

21        (Sidebar begins)

22             MS. BARRY:  Yeah, she has -- so I'll -- I'll lay the

23   foundation if you -- Your Honor, I believe previously this

24   e-mail was limited to a certain section, but she's on some

25   other of the e-mails in 61.  So I will make sure that we talk

1    about that if they put that on the record before publishing

2    it.

3              MR. EGAN:  Okay.  That's fine.  Just wanted to

4    check.

5        (Sidebar ends)

6              THE COURT:  You may continue.

7              MS. BARRY:  Thank you, Your Honor.  And may I

8    approach the witness with a hard copy?  May be easier.

9              THE COURT:  Yes.

10   BY MS. BARRY:

11   Q    Ms. Course, I'm showing you what's been marked as

12   Government's Exhibit 61.

13             And what is Government's Exhibit 61?

14   A    This is a series of e-mails that started with a gentleman

15   named Mario Fuentes.

16   Q    Okay.  And were you forwarded the e-mail from Mario

17   Fuentes.

18   A    Yes, I was.

19   Q    Okay.

20             MS. BARRY:  Your Honor, the Government moves for the

21   admission of Government's Exhibit 61.

22             MR. EGAN:  No objection.

23             UNIDENTIFIED ATTORNEY:  No objection.

24             MS. BARRY:  Okay.

25             THE COURT:  Granted.

1          MS. BARRY:  And if we could please publish 61, Your

2    Honor?

3          THE COURT:  Yes.

4          MS. BARRY:  And, Agent Boyer, if you would please

5    show page three.

6    BY MS. BARRY:

7    Q    And looking at the mail from Mario Fuentes -- who is

8    Mario Fuentes?

9    A    Mario Fuentes, who's one of the individuals who was

10   detailed to Treasury to work on the TARP Capital Purchase

11   Program.

12   Q    Okay.  And in looking at this, what is the date of Mr.

13   Fuentes' e-mail?

14   A    July 13th.

15   Q    Okay.  So is that a date that is after the June 10, 2009

16   CPP Council meeting?

17   A    Yes.

18   Q    Okay.  And what is Mr. Fuentes asking for, just

19   generally, in -- in his e-mail?

20   A    He's asking for confirmation of whether the $15 million

21   that was a condition of the TARP Capital Purchase Program

22   approval by the Council had been injected into the holding

23   company and, if so, details around that.

24   Q    Okay.  And who forwarded this e-mail to you?

25   A    An individual from the FDIC.

1   Q     Okay.  And did you respond -- and who is that individual

2   who -- who forwarded it to you?

3   A     Bill Baxter.

4   Q     Okay.  And how did -- how did you know -- oh, did you

5   know Bill Baxter?

6   A     Yes, I did.

7   Q     Okay.  And how did you know him?

8   A     Bill was occasionally the FDIC representative on the TARP

9   CPP Council, and so I would meet him at Council meetings.

10  Q     Okay.  And did you respond to his e-mail?

11  A     Yes, I did.

12           MS. PERRY:  And if we could take a look at that,

13  please.

14  BY MS. BARRY:

15  Q     And what -- what do you say to him?  And you can read

16  that.

17  A     "To avoid having both agencies," and by that I meant the

18  FDIC and the Federal Reserve, "contact the institution,"

19  meaning Nova Financial Holdings, "to ask the same question I

20  was going to hold off on contacting them until the FDIC

21  reached out to them."

22           But at the same time in this e-mail I notified the

23  FDIC that the Philadelphia Fed had placed the parent under an

24  enforcement action, a supervisory letter, in conjunction with

25  the three rating, and I provided a copy of that letter to Mr.

1   Baxter with the FDIC.

2   Q    Okay.  Now, in -- in -- sometime in December of 2009, and

3   we could take that down, please, did you have a conversation

4   with Brian Hartline?

5   A    Yes, I did.

6   Q    And who is Brian Hartline?

7   A    The President and CEO of Nova Financial Holdings.

8   Q    Okay.  And do you know if he has those same titles with

9   Nova Bank?

10  A    I believe he does.

11  Q    And what was this conversation about?

12          And I'll turn your attention to Government's Exhibit

13  142, which has already been moved into evidence.

14  A    By this time, December 15th, I had concluded my primary

15  rotation at the Board in Washington, and I was back in my role

16  of the Philadelphia Fed as the officer over enforcement.

17          I was working with my enforcement manager, Joe

18  Wilcox, who joined me on a call with Mr. Hartline to discuss

19  whether or not Nova Financial Holdings was in compliance with

20  the June 2009 supervisory letter.

21  Q    Okay.

22          MS. BARRY:  If we can publish 142, please.  Thank

23  you.

24  BY MS. BARRY:

25  Q    Okay.  So the purpose -- what was the purpose of calling

1    Mr. Hartline?

2    A    One of the criteria in the June supervisory letter was

3    that Nova Financial Holdings was not to pay any dividends on

4    its stock or interest on its trust-preferred securities unless

5    its subsidiary bank was well-capitalized.

6         Because the bank wasn't well-capitalized, we were

7    calling Mr. Hartline to confirm that they had in fact not paid

8    any dividends or interest during the period since the

9    enforcement action had been in place.

10   Q    Okay.  And during this conversation with defendant

11   Hartline what -- did he bring up anything related to TARP?

12   A    Yes, he did.

13   Q    And what did he say?

14   A    He said that he had had a disturbing conversation with

15   the FDIC where he learned that the institution's TARP

16   application might not be approved after all.

17   Q    And what was your response to that?

18   A    We explained the impact that the enforcement action would

19   have on the TARP application.

20   Q    And what was that?

21   A    Because Nova Financial Holdings was not allowed to pay

22   interest on it -- on its subordinated debt or dividends on its

23   stock as a result of the enforcement action, it also meant

24   that they would not be able to pay dividends on any TARP

25   Capital Purchase Program stock that they may have received

1    from the -- or issued to the Treasury.

2              And there would be implications for the Treasury if

3    they were to make an investment knowing they would not be able

4    to receive dividends on it.

5    Q    Okay.  And do you know whether or not additional capital

6    into the bank would have any impact on its ability to pay

7    dividends?

8              MR. EGAN:  Objection.

9              MS. BARRY:  If she knows.

10             THE COURT:  If you know.

11             THE WITNESS:  If the institution became

12   well-capitalized, then under the supervisory letter it would

13   be allowed to resume -- the holding company would be allowed

14   to resume paying dividends.

15   BY MS. BARRY:

16   Q    And do you know whether or not Nova Bank was -- was

17   provided or was approved for final TARP funding?

18   A    No, they were not.

19   Q    Okay.  I'd like to show you what's been marked as

20   Government's Exhibit 150.

21             MS. BARRY:  And -- and may it be published, Your

22   Honor?

23             THE COURT:  Yes.

24   BY MS. BARRY:

25   Q    Okay.  And looking at this -- this top e-mail from you,

1   and what is -- what is this e-mail?

2   A    This e-mail is a notification from me to the officer at

3   the Board who was the primary representative on the TARP CPP

4   Council for the Federal Reserve, Kevin Bertsch, updating him

5   on the status of Nova Financial's TARP CPP application.

6   Q    Okay.  And what -- what do you say?

7   A    I had received information from the FDIC and what's --

8   I'll call --

9   Q    If you could just read it.  You can just read the e-mail.

10  A    Okay.

11  Q    If you can read it.  Is it -- can you make it out on the

12  screen?

13  A    I can make it out.

14           So I'm summarizing that the application was

15  originally presented to the Interagency Council on June 10th

16  of 2009 and received a three to one vote with the FRB

17  recommending denial, that the -- I note that the approval

18  votes were contingent on raising 15 million in outside

19  capital, and although the institution has reportedly received

20  the capital, some of it was contingent on receiving TARP

21  funds.  Further, the parent has deferred the interest on its

22  trust-preferred securities as the bank is only adequately

23  capitalized, and the bank's condition has deteriorated since

24  approval, and the FDIC had conducted a subsequent exam, and

25  the preliminary exam ratings were three four two four three

1    two three (phonetic), which means the bank would be less than

2    satisfactory, and the MO -- the FDIC is contemplating a -- an

3    enforcement action, a memorandum of understanding.

4            All of this -- I was giving Mr. Bertsch a heads up

5    that all of this information was going to be summarized in a

6    decision memo that Mr. Baxter from the FDIC would be sending

7    this afternoon -- that afternoon, recommending denial --

8    Q    Okay.

9    A    -- of the application.

10   Q    And what is the date of this e-mail?

11   A    December 17th.

12   Q    Okay.  And based on the information that you had did

13   you -- were you ever made aware that any part of the $15

14   million contingency was money that was borrowed from the bank?

15   A    No, I did not have that information.

16   Q    Would that be information that was important to the CPP

17   Council?

18            MR. EGAN:  Objection.

19            THE COURT:  Sustained.

20   BY MS. BARRY:

21   Q    Do you know whether or not the CPP Council ever

22   considered that any part of the $15 million contingency was

23   money that was borrowed from the bank?

24            MR. EGAN:  Objection.

25            THE COURT:  Overruled.

1        THE WITNESS:  The CPP Council did not explicitly

2   discuss that because, as supervisors, we would have expected

3   that would not have occurred.

4        MS. BARRY:  No further questions, Your Honor.

5        THE COURT:  You may cross examine.

6        MR. EGAN:  Thank you, Your Honor.

7                      CROSS-EXAMINATION

8   BY MR. EGAN:

9   Q    Afternoon, Ms. Course

10  A    Good afternoon.

11  Q    You explained this process -- and I hate to do this

12  again, but I just want to make sure we've got it straight.

13       So the application is filed, right, for TARP funds.

14  A    Yes.

15  Q    To the CPP, correct?

16  A    The application is filed with the primary regulator of

17  the bank and the holding company in this case.

18  Q    Okay.  And that's like this two-page application.  You've

19  seen it, right?

20  A    Yes.

21  Q    And then it's up to the FDIC whether they want to

22  recommend that that go to the CPP Council for approval,

23  correct?

24  A    Yes.

25       (Transcriber change)

1    Q    And in this case the FDIC made that decision to recommend

2    that it go to the CPP Council before -- sometime around

3    February of 2009, correct?

4    A    I don't have knowledge about when they made the decision

5    to make a recommendation.

6    Q    Well if there was information that the CPP Council's

7    first consideration was in February, it would have had to have

8    been before then, right?

9    A    I believe the CPP Council's first consideration was the

10   notational vote in April.

11   Q    Okay.  And -- that's fine.  A notational vote, that's

12   where people who aren't in the same room vote about something,

13   right?

14   A    That's correct.

15   Q    So the information they need to make that decision is

16   presented to them, and they make this decision based on that

17   information that's presented to them, right?

18   A    Based on that information and other information they may

19   have.

20   Q    Right.  But they're in their office at the time?

21   A    Correct.

22   Q    They're not all in the same room?

23   A    Correct.

24   Q    Just kind of like walking about the approval?

25        MS. BARRY:  Objection.

1           THE COURT:  Sustained.

2    BY MR. EGAN:

3    Q    At that time they said we don't have enough information,

4    right?  In April.

5    A    In April the Federal Reserve recommended denial, and the

6    other agencies asked for additional information.

7    Q    Well the Federal Reserve always recommended denial,

8    didn't they?

9           MS. BARRY:  Objection.

10          THE COURT:  Sustained.

11   BY MR. EGAN:

12   Q    Well, okay, there was a notational meeting in April and

13   the Federal Reserve recommended denial, correct?

14   A    Of this application, yes.

15   Q    I only meant this application.  I'm sorry.

16   A    Um-hum.

17   Q    In June of 2009, June 10th, there was a meeting, which I

18   believe you were at, right?

19   A    Yes.

20   Q    And the Federal Reserve recommended denial then, correct?

21   A    Yes.

22   Q    And no matter what about this capital, they didn't care,

23   it didn't make a difference to you, correct?

24   A    Even considering the fact of the potential capital

25   injection, the Federal Reserve felt that the application

1   merited denial.

2   Q    And in fact, the capital was moot to your decision,

3   wasn't it?

4   A    Kevin Bertsch, the associate director of the board was

5   the one making the final decision.  So I can't speak to what

6   may have been critical in his mind.

7   Q    Well, do you remember meeting with agents in this case?

8   A    I spoke with agents.

9   Q    Yeah, on November 18th of 2015.  Do you remember that?

10  A    I don't recall if it was November 8th, but --

11  Q    But you remember you met with them.

12  A    I had conversations with them.

13  Q    And do you remember telling them that the capital was

14  moot to you on the decision to recommend denying Nova Bank?

15  A    I don't recall mentioning that.

16  Q    But it didn't make any difference to you, did it?

17  A    If the institution had raised sufficient capital to

18  address all of the weaknesses at the bank, that definitely

19  would have made a difference to us.

20  Q    Well, sure, if they raised $200 million of capital that

21  would have made a difference, right?

22  A    I don't know whether 200 million would have been

23  sufficient.

24  Q    But $15 million was not going to change the Federal

25  Reserve's mind, correct?

1   A    15 million, correct, was not sufficient to the Federal

2   Reserve to warrant anything other than denial.

3   Q    So if you were to say it was moot, that would be an

4   accurate statement, correct?

5   A    I suppose so.

6   Q    Now we're in the process -- I want to get back to that.

7   A    Okay.

8   Q    So the CPP Council then meets, right?  And they -- first

9   they have their notational meeting, as you call it.

10  A    Correct.

11  Q    And then they have a real live meeting where they sit in

12  the same room, right?

13  A    Correct.

14  Q    And at that meeting, they make a recommendation, correct?

15  A    Which meeting are you referring to?

16  Q    Let's have Government 30.  I was trying to do it without

17  exhibits to move it a little quicker.

18  A    Okay.

19  Q    But I guess we're going to need them.

20       MR. EGAN:  If we could have G-30, please?

21       THE WITNESS:  Okay.

22  BY MR. EGAN:

23  Q    You recognize that, right?

24  A    Yes.

25  Q    That's the CPP Council review decision sheet, correct?

1    A    Yes.

2    Q    Right?

3    A    Yes.

4    Q    And that's from June 10th, 2009?

5    A    Um-hum.

6    Q    Correct?

7    A    Correct.

8    Q    And it says:

9            "Council member recommendation."

10           Correct?

11   A    Correct.

12   Q    So what sometimes is being called an approval here is

13   actually just a recommendation, right?

14   A    Correct.  A recommendation for approval to the Treasury

15   Investment Committee.

16   Q    Right.  Because the CPP doesn't have the -- yeah, the CPP

17   Council doesn't have the authority to make this decision,

18   correct?

19   A    The final decision on the investment is made by

20   Treasury's Investment Committee.

21   Q    And that's a decision that wasn't made until December of

22   2009, correct?

23   A    Correct.

24   Q    Now at this meeting on June 10th, 2009, you had

25   information that some of the other people didn't have,

1   correct?

2   A    Correct.

3   Q    And that information was that the holding company was

4   about to be downgraded, correct?

5   A    Was downgraded that day, yes.

6   Q    Was downgraded that very -- the very day they make this

7   approval, the holding company was downgraded?

8   A    Yes.

9   Q    And you pass that on to Mr. Bertsch, correct?

10   A    Yes.

11   Q    And you knew at that point that that meant they weren't

12   going to be able to pay dividends, right?

13   A    We had not yet -- the Federal Reserve Bank of

14   Philadelphia had not yet issued the enforcement action, but we

15   knew that it was likely.

16   Q    But you knew that that was going to be issued, right?

17   A    I knew that it was likely that it was going to be issued,

18   yes.

19   Q    Sure.  And in order to pay back the TARP, you have to pay

20   dividends, right?

21   A    Paying back TARP wasn't contingent on paying dividends on

22   TARP.

23   Q    Okay.  I'm not going to get into the weeds of that one.

24   A    Okay.

25   Q    In any event, it was very important, and in fact it was

1    one of the reasons that you ultimately recommended that this

2    be denied, correct?

3    A    Yes.

4    Q    And that's why Mr. Bertsch voted to disapprove that very

5    day, correct?

6    A    Yes.

7    Q    And that fact never changed once during this entire

8    process, did it?

9    A    His disapproval vote in June was consistent with his

10   disapproval vote at the April notational vote.

11   Q    No, I mean, they were never able to pay dividends during

12   the entire time either.

13   A    The bank remained less than adequately capitalized, and

14   did not ask permission of the Federal Reserve to pay any

15   dividends.

16   Q    So they couldn't?

17   A    So they could not.

18   Q    And what -- that's the whole -- we were talking about the

19   holding company there, because that's what you guys regulate,

20   right?

21   A    Um-hum.

22   Q    The FDIC regulates the bank.

23   A    Yes.

24   Q    And the FDIC regulates the bank so issues at the bank

25   itself are covered by FDIC regulations, right?

1    A    Yes.

2    Q    And the holding company has issues there covered by your

3    regulations?

4    A    Yes.

5    Q    So regulations that Mr. Bertsch were to speak to, they

6    would apply to the holding company, right?

7    A    Yes.

8    Q    But they wouldn't apply to the bank?

9    A    Correct.

10   Q    I want to just quote you here, because on direct

11   examination, and this refers to the bank, you mentioned the

12   fact that Nova filed a report indicating that it was going to

13   be -- have to become less well capitalized because of this

14   OTTI issue, remember that?

15   A    Yes.

16   Q    So Nova's the one who told -- they filed a call report

17   telling the Government that, right?

18   A    Correct.

19   Q    You also said:

20           "Council relied on what the FDIC told it."

21           Correct?

22   A    Yes.

23   Q    And at this meeting, the FDIC had a representative there,

24   right?

25   A    Yes.

1    Q    It's Mr. Hunter, he was here in the hallway a little

2    earlier, you saw him?  Maybe, maybe not.  Okay.  Do you know

3    Mr. Hunter?

4    A    I haven't seen him for six years.

5    Q    It was a long time ago this all happened, right?  But Mr.

6    Hunter makes this presentation, correct?

7    A    Um-hum.

8    Q    And all -- and this recommendation that came out June

9    10th is based on what he says, right?

10   A    And other information that the council members may have.

11   Q    Right.  And he talked about an investor investing $15

12   million, a proposed investment of $15 million, right?

13   A    Um-hum.

14   Q    But he never said anything about it being contingent on

15   the acquisition of an insurance company named DVFG, did he?

16   A    I don't have any recollection of a statement such as

17   that.

18   Q    Now I'll fast-forward quite a bit to December.

19            MR. EGAN:  And if we could have Government Exhibit

20   142.

21   BY MR. EGAN:

22   Q    This is your record of a phone call that you had with Mr.

23   Hartline, correct?

24   A    Yes.

25   Q    And Mr. Hartline had found out essentially that day that

1    the TARP funds were not going to be forthcoming, correct?

2    A    I don't know if it was that day.  I believe he said

3    recently.

4    Q    Well actually the hold was placed on the fourteenth,

5    right?

6    A    Not --

7              MS. BARRY:  Objection.

8              THE COURT:  Just a moment, please.

9              MR. EGAN:  May I have a moment?

10             THE COURT:  Yes, sir.

11       (Pause)

12             MR. EGAN:  The Court's indulgence.

13             THE COURT:  Yes, sir.

14       (Pause)

15   BY MR. EGAN:

16   Q    Well let me ask you this question.  You know what a hold

17   is, right?

18   A    In this context, I'm not sure.

19   Q    You don't recall that a hold was placed on this

20   application prior to the actual rejection?

21   A    I know of the hold process as it relates to the TARP

22   Program, but I don't know if or when a hold was placed on this

23   application.

24   Q    But you do know that by December 15th Mr. Hartline had

25   been advised that the -- it was highly unlikely that he was

1   getting these -- that his bank was getting -- that Nova Bank,

2   excuse me, was getting these TARP funds?

3   A    Yes.

4   Q    And he calls, and he's not happy about it, obviously,

5   correct?

6   A    Well we called him.

7   Q    I'm sorry, yeah, you called him.  But he wasn't happy

8   about it?

9   A    He was concerned, yes.

10          MS. BARRY:  Objection.

11          THE COURT:  Sustained.

12          MR. EGAN:  He was concerned -- your word, he was

13   concerned.

14   BY MR. EGAN:

15   Q    And what you explained to him, right, first of all, you

16   had to briefly discuss the eligibility requirements for TARP,

17   correct?

18   A    I don't know whether we had to, but we did.

19   Q    And specifically, that a bank can't use the TARP funds to

20   become well capitalized, it has to already be well

21   capitalized?

22   A    Yes.

23   Q    So that was something you had to explain to him at that

24   point?

25   A    I don't know whether we had to, but we chose to.

1    Q    Well you felt the need to.

2    A    Um-hum.

3    Q    Correct?

4    A    Yes.

5    Q    And then you pointed out that under the current

6    supervisory letter they can't pay TPS interest, correct?

7    A    Correct.

8    Q    And that was another reason why the application would be

9    denied?

10             MS. BARRY:  Objection.

11             THE COURT:  Sustained.

12   BY MR. EGAN:

13   Q    Well if we go down to the sentence that begins "Given."

14             "Given the pari passu status of these instruments,

15   in order to service the TARP interest all the TPS payments

16   must be current."

17             Correct?

18   A    Yes.

19   Q    That means if those payments aren't current, you're not

20   going to be able to get TARP funds, right?

21   A    It means that they would not be allowed to pay the TARP

22   dividends unless all of the trust preferred securities

23   payments were current, and it would be up to the Treasury to

24   make the decision on whether or not they wanted to invest

25   knowing that that restriction exists.

1   Q    Well you were involved in this process quite a bit,

2   right?

3   A    I was involved in the council, I wasn't involved in any

4   of the Treasury Investment Committee's discussions.

5   Q    So you don't really know what the Treasury Investment

6   Committee discussed?

7   A    I was not involved in their discussions, no.

8   Q    You don't really know what basis they used to deny this

9   application?

10  A    The ultimate denial of this application I believe was

11  based upon the FDIC's recommendation to the council on

12  December 17th that the application be denied.

13  Q    And that recommendation actually was asked for by the

14  council, wasn't it?

15  A    I don't have any direct --

16          MS. BARRY:  Objection.

17          THE WITNESS:  -- knowledge that the council asked

18  for a recommendation.

19  BY MR. EGAN:

20  Q    If you don't know, that's fine.  But in any event, you

21  were shown Government Exhibit 150, right?

22          MR. EGAN:  And if we could see that?

23          THE WITNESS:  Yes.

24  BY MR. EGAN:

25  Q    And on December 17th, you entered a notational vote to

1    deny the application, correct?

2    A     On December 17th, I advised Mr. Bertsch that the request

3    for the notational vote was going to be coming and gave him

4    the background.  I didn't have the authority to enter a

5    notational vote on behalf of the Fed.

6    Q     Okay.  So this is your telling Kevin this is what's going

7    on, and this is what your recommendation to him basically?

8    A     I gave him the background and advised him that the FDIC

9    would be sending a decision memo recommending denial.

10   Q     Okay.  And then if you look at that sentence that says:

11              "Although the institution has reportedly received

12   the capital, some of it was contingent on receiving TARP

13   funds."

14              Do you see that?

15   A     Yes.

16   Q     That was your understanding of the circumstances at that

17   point?

18   A     Based in part upon my discussion with Mr. Hartline two

19   days prior.

20   Q     And based also on information from the FDIC?

21   A     Yes.

22   Q     Okay.  And essentially you point out here that there was

23   recently an exam and the bank was downgraded, correct?

24   A     Yes.

25   Q     And that was -- the reason you're providing this

1    information is so he knows what he needs to know to make his

2    own vote?

3    A    I'm giving him this context in an abbreviated format, and

4    he would receive the recommendation from the FDIC, which would

5    have more detail.

6    Q    Okay.  I want to talk a little bit about, you were asked

7    a number of questions about the holding company?

8    A    Yes.

9    Q    The holding company is a separate entity, correct?

10   A    Separate from Nova Bank.

11   Q    From the bank.

12   A    Yes.

13   Q    And in fact the holding company can own more than one

14   thing, correct?

15   A    Yes, they can.

16   Q    And, indeed, there was a period of time where Nova

17   holding company owned both Nova Bank and Pennsylvania Business

18   Bank, correct?

19   A    Correct.

20   Q    And when funds are invested in Nova holding company, the

21   board of directors has to make a decision as to where to put

22   that money, correct?

23   A    Correct.

24   Q    And that's ultimately a decision that's made by the board

25   by a vote, correct?

1    A    Yes.

2    Q    And they could decide to send the money to Nova Bank,

3    which is one of their subsidiaries, correct?

4              MS. BARRY:  Objection.

5              THE COURT:  Just a moment, please.  Basis?

6              MS. BARRY:  Speculation.

7              THE COURT:  If she would know.

8        (Pause)

9    BY MR. EGAN:

10   Q    Right?

11   A    That's one decision they could make, yes.

12   Q    And they can decide to keep it at the holding company?

13   A    Yes.

14   Q    And in fact, you would have preferred that they kept more

15   money at the holding company, right?

16   A    With our expectation for the holding company to serve as

17   a source of strength for the bank, our preference is that they

18   do what would need to be done to put the bank back in a well

19   capitalized and satisfactory financial condition.

20   Q    So your preference would be that, if the holding company

21   were to receive an investment, that they provide it to the

22   bank?

23   A    To get the bank back in a satisfactory financial

24   condition, yes.

25   Q    Thank you.

1          MR. EGAN:  I have no further questions, Your Honor.

2          MR. DUNCAN:  May I have a moment, Your Honor,

3   please?

4          THE COURT:  Surely.

5          MR. DUNCAN:  Thank you, Your Honor.  May I proceed?

6          THE COURT:  Yes, sir.

7          MR. DUNCAN:  Very briefly.

8                    CROSS-EXAMINATION

9   BY MR. DUNCAN:

10  Q    Good afternoon, Ms. Course.

11  A    Good afternoon.

12  Q    My name's Russell Duncan.  I represent Mr. Barry Bekkedam

13  over here.  Ma'am, would it be fair to say that you have

14  substantial experience in the area of banks?

15  A    Yes.

16  Q    Back in the period 2008, 2009 that you're testifying

17  about, you'd agree that a lot of banks had a lot of issues,

18  right?

19  A    That's correct.

20  Q    But the first time anyone from the Government ever spoke

21  to you about Nova Bank for this investigation was back in

22  January of 2013, correct?

23          MS. BARRY:  Objection.

24          THE COURT:  Basis?

25          MS. BARRY:  Relevance.

1            THE COURT:  Overruled.

2            THE WITNESS:  Yes.

3    BY MR. DUNCAN:

4    Q    Our client, Mr. Bekkedam, you've never met him, have you?

5    A    No, I've never met him.

6    Q    Have you ever spoken to him?

7    A    No, I have not spoken with him.

8    Q    Have you ever communicated with Mr. Bekkedam in any way

9    regarding Nova Bank's TARP application?

10   A    No, I haven't.

11           MR. DUNCAN:  Thank you.  Very nice to meet you.

12               REDIRECT EXAMINATION

13   BY MS. BARRY:

14   Q    Ms. Course, is the viability of the bank what CPP Council

15   reviewed?

16   A    Yes, it is.

17   Q    Okay.

18           MS. BARRY:  No further questions.

19           MR. EGAN:  No recross.

20           MR. DUNCAN:  No, thank you, Your Honor.

21           THE COURT:  Thank you.  Madam, you may step down.

22   Watch your step, please.

23           THE WITNESS:  Thank you.

24           THE COURT:  We will recess for lunch until 1:50 this

25   afternoon.  1:50 this afternoon.

1          THE CLERK:  All rise.

2      (Jury Exits)

3          THE COURT:  Counsel, could you submit your proposed

4   points of charge in Microsoft Word format, please?

5          ALL COUNSEL:  Yes, Your Honor.

6          UNIDENTIFIED COUNSEL:  By Monday good enough?

7          THE COURT:  Fine.  Thank you.

8          MS. BARRY:  Thank you.

9          THE COURT:  We're adjourned.

10     (Court in recess 12:21 p.m. to 1:56 p.m.)

11         THE COURT:  Ready?

12         UNIDENTIFIED COUNSEL:  One second.

13         UNIDENTIFIED COUNSEL:  May we approach at sidebar

14  briefly, off the record?

15         THE COURT:  Yes, sir.

16     (Sidebar Conference off the Record)

17         THE COURT:  You all may be seated.

18     (Pause)

19         THE CLERK:  All rise.

20     (Jury Enters)

21         THE CLERK:  Ladies and gentlemen, we are back on the

22  record.

23         THE COURT:  Good afternoon, you may be seated.

24         MS. BARRY:  Your Honor, the United States calls

25  William Gaunt.

1          WILLIAM GAUNT, GOVERNMENT WITNESS, SWORN

2          THE CLERK:  Please state and spell your name for the

3     record?

4          THE WITNESS:  William Gaunt.

5          THE CLERK:  Spell your last name for the record.

6          THE WITNESS:  G-A-U-N-T.

7          THE COURT:  You may proceed.

8          MS. BARRY:  Thank you, Your Honor.

9                     DIRECT EXAMINATION

10    BY MS. BARRY:

11    Q    Good afternoon, Mr. Gaunt.

12    A    Good afternoon.

13    Q    Are you currently working?

14    A    I'm retired.

15    Q    Okay.  And where were you working before your retirement?

16    A    The Federal Reserve Bank of Philadelphia.

17    Q    And how long were you with the Federal Reserve Bank of

18    Philadelphia?

19    A    1999 through the end of 2010.

20    Q    And in 2009, what was your position with the Federal

21    Reserve Bank of Philadelphia?

22    A    I was an officer, assistant vice president with

23    responsibility for applications that were filed with the

24    Reserve Bank, and also for structure reporting.

25    Q    Okay.  And were you familiar with an institution called

1   Nova Financial Holdings?

2   A     Yes.

3   Q     Okay.  And was that -- do you recall whether or not that

4   was an institution that was regulated by the Federal Reserve

5   Bank of Philadelphia?

6   A     At the holding company level, yes.

7   Q     Okay.  And do you know if Nova Financial Holdings was the

8   parent to Nova Bank?

9   A     That sounds correct.

10  Q     Okay.  And do you know what agency regulated Nova Bank?

11  A     I believe both the Commonwealth of Pennsylvania

12  Department of Banking and the FDIC.

13  Q     Okay.  And did the agencies share information?

14  A     Yes.

15  Q     Okay.  And I'd like to show you what's been marked as

16  Government's Exhibit 6A.

17            MS. BARRY:  And I believe this has been moved into

18  evidence.  May it be published, Your Honor?

19            THE COURT:  Yes.

20  BY MS. BARRY:

21  Q     And looking at 6A --

22  A     Okay.

23  Q     -- and if you look at the bottom email, is this an email

24  to you, William Gaunt?

25  A     Actually, it looks like it's from me to Jim DePowell

1    (phonetic)?

2    Q    I'm sorry, the bottom email, sir.

3    A    Oh, I'm sorry.  Yes.

4    Q    Okay.

5    A    Yes.

6    Q    And who was that from?

7    A    A man by the name of Jeffrey Hanuscin, I guess it is.

8    Q    Okay.  And what information is he providing to you?

9    A    A TARP application.

10   Q    And is this his -- and so are you on notice at this point

11   on October 27, 2008 that Nova has filed a TARP application?

12   A    Correct.

13   Q    And then do you forward this email to some of the folks

14   in your office?

15   A    Yes, it would have circulated broadly in the office.

16   Q    Okay.

17            MS. BARRY:  If we could take that down, please?

18   BY MS. BARRY:

19   Q    Now did you have any involvement with Nova Bank's TARP

20   application?

21   A    The unit that I was responsible for would have been

22   involved in processing part of it.

23   Q    Okay.  Did you have any involvement with that?

24   A    As the person with responsibility for the unit, I would

25   of.

Gaunt - Direct/Bar                                          118

1    Q    Okay.  And do you have responsibility for change in

2    control applications?

3    A    Yes.

4    Q    And do you know whether Nova Bank applied for a change in

5    control on -- in about July of 2009?

6    A    I believe they did.

7    Q    Okay.  And I'd like to show you what's already been moved

8    into evidence, Government's Exhibit 64.

9              MS. BARRY:  And may it be published?

10             THE COURT:  Yes.

11             MS. BARRY:  Okay.  And may I bring the witness a

12   hard copy?  It may be easier.

13             THE COURT:  Very well.

14             MS. BARRY:  Thank you, Your Honor.

15   BY MS. BARRY:

16   Q    Okay.  And so looking at Government's Exhibit 64, is this

17   -- what is this?

18   A    We're being advised of the status of the investment that

19   Nova is making, it looks to me.

20             THE COURT:  Could you keep your voice up, sir?

21   Speak more to the microphone, please.

22             THE WITNESS:  I'm sorry?

23             THE COURT:  Speak more into the microphone, please.

24             THE WITNESS:  Yes, sir.

25             THE COURT:  Thank you.

Gaunt - Direct/Bar                                      119

1    BY MS. BARRY:

2    Q    Well is it -- the change in control application attached

3    to this letter?

4    A    Yes.  It looks like, and supported by the interagency

5    biographical and financial information.

6    Q    Okay.  And let's just take a look at the letter that was

7    forwarded with the information.  Could you -- what is the date

8    of this letter, please?

9    A    July 21, 2009.

10   Q    Okay.  And is this letter to your attention?

11   A    Yes.

12   Q    Okay.  And can you please read the first paragraph of

13   this letter?

14   A    (Reading)

15          "Dear Mr. Gaunt, please be advised that on June 30,

16   2009 Mr. Levin invested $5 million of his proposed 18 million

17   investment in Nova Financial Holdings, Inc.  His current

18   percentage of investment is 9.01 percent.  The additional 13

19   million investment will put Mr. Levin's percentage at

20   approximately 24.2 percent, which requires the approval of the

21   Federal Reserve Bank."

22   Q    Okay.  And so is this $18 million investment going to

23   make Mr. Levin's percentage approximately at 24.2 percent

24   ownership of the company?

25   A    That's the way I would read that.

1    Q    Okay.  And who signed this letter?

2    A    Cheryl Kim Hartline, corporate secretary of Nova

3    Financial Holdings, Inc.

4    Q    Now if we could please take a look at the change in

5    control application, and specifically page six of 35.

6    A    Okay.

7    Q    And if we could -- item seven, what is one of the -- well

8    does the change in control application request the source of

9    the funds from the investor?

10   A    Yes.

11   Q    Okay.  And who is the investor here?

12   A    George G. Levin.

13   Q    And so is he the applicant for the change in control

14   application?

15   A    I guess you could say that, yeah.

16   Q    Okay.  And what is the total purchase price?

17   A    $18 million.

18   Q    Okay.  And what's indicated as far as the source and

19   amount of funds?

20   A    One-half from personal finances, and one-half from

21   borrowed funds.

22   Q    Okay.  And if we go down to Section B there, can you read

23   what Section B says if -- regarding any portion of these

24   funds?

25   A    (Reading)

Gaunt - Direct/Bar                              121

1         "If any portion of the funds or other consideration

2    for the acquisition will be borrowed, indicate the name of

3    each borrower, name and address of each lender, amount

4    financed, collateral to be pledged, and terms of the

5    transaction, including interest rates, amortization

6    requirements, guarantors, endorsers, co-makers, and any other

7    arrangements, agreements and understandings between and among

8    the parties, if applicable, submit a copy of any loan

9    commitment letter."

10   Q    Okay.  And why was the source of funds -- well let me ask

11   you this.  Was the source of funding by the investor to make

12   the purchase of this $18 million, was that important for the

13   Federal Reserve to know?

14   A    Yes.

15   Q    And why?

16   A    It has to do with the, you know, the integrity of the

17   investor, and it's one of the things we would -- we would

18   certainly look at carefully.

19   Q    Okay.  Now in processing these change in control

20   applications, did you have staff that helped you with

21   processing them?

22   A    Yes.

23   Q    Okay.  And was there a manager sort of overseeing the

24   processing of the applications?

25   A    Yes, there was.

1    Q    And who was that?

2    A    Jim DePowell.

3    Q    And did Mr. DePowell keep you informed and updated as to

4    the change in control applications that were being processed?

5    A    Yes.

6    Q    Okay.  And I'd like you to turn your attention to

7    Government's Exhibit 66.  And looking at 66, the bottom email,

8    is that an -- well what is it?

9    A    It's an email that Jim sent to Michael Sextant (phonetic)

10   at the Board of Governors in Washington.

11   Q    And are you copied on that?

12   A    Yes.

13        MS. BARRY:  Your Honor, the Government moves for the

14   admission of Government's Exhibit 66.

15        MR. EGAN:  No objection.

16        MR. DUNCAN:  No objection.

17        THE COURT:  Admitted.

18        MS. BARRY:  And may it be published, Your Honor?

19        THE COURT:  Yes.

20   BY MS. BARRY:

21   Q    Looking at this -- at this email, what is the date of the

22   email, please?

23   A    July 23, 2009.

24   Q    Okay.  So does this appear to be about the same time as

25   the change in control application submission?

1    A    Yes.

2    Q    And if you read the long story short paragraph, what does

3    that say?

4    A    It says:

5            "The bank has issues but is viable and needs more

6    capital.  An existing large shareholder, George Levin, has

7    filed to increase his investment from $5 million to $18

8    million, or approximately 24.2 percent.  He has a net worth in

9    excess of $400 million, and we have initiated a name check.

10   We do not think this is worthy of Board Action, but

11   technically the target is rated a "3."  And we thought we

12   should run it past you.  Let us know.  Thanks."

13   Q    Okay.  And is that because -- what does that mean, the

14   target is rated a three?

15           MS. BARRY:  Take that down, please.

16           THE WITNESS:  That's the overall safety and

17   soundness grading that has been assigned by a regulator.

18   BY MS. BARRY:

19   Q    And is that -- is three less than satisfactory?

20   A    It's my recollection.

21   Q    Okay.  Now were you provided information from the bank

22   about George Levin's source of funding?

23   A    Yes.

24   Q    Okay.  And I'd like to show you what's been marked as

25   Government's Exhibit 82.

1          MS. BARRY:  And I believe it's been admitted, Your

2     Honor, so may it be published?

3          THE COURT:  Yes.

4          MS. BARRY:  Okay.

5     BY MS. BARRY:

6     Q    And looking at Government's Exhibit 82 --

7          MS. BARRY:  And may I approach, Your Honor, just to

8     make it easier for the witness?

9          THE COURT:  Certainly.

10         MS. BARRY:  It's a multi-paged document.

11         THE COURT:  Certainly.

12    BY MS. BARRY:

13    Q    Is -- what is 82?  And you can look at the whole

14    document.

15    A    It looks like a copy of an email.

16    Q    Okay.  And are there attachments to that email?

17    A    Yes.

18    Q    Okay.  And so let's take a look at the email itself,

19    please?

20    A    Okay.

21    Q    And who is this email from?

22    A    Kim Hartline.

23    Q    Okay.  and what does it state her title is?

24    A    Corporate Secretary/Administrator.

25    Q    And what does that say underneath that Nova?

Gaunt - Direct/Bar                                    125

1    A    Nova Bank.

2    Q    Okay.  And what is the date of this email, please?

3    A    September the 8th, 2009.

4    Q    Okay.  And can you please read the second paragraph that

5    says "Please be advised?"

6    A    (Reading)

7         "Please be advised that Nova has received formal

8    approval of our CPP application from the U.S. Treasury for a

9    minimum of $13.5 million, contingent upon our raising a

10   minimum of $10 million of common equity.  Nova is currently

11   working under a tentative schedule to close a capital

12   investment of $13 million for Mr. Levin by September 24th,

13   provided he receives regulatory approvals, and close on our

14   CPP funding on September 25th, the last Friday of September."

15   Q    So this receives regulatory approval, do you know whether

16   or not that means the change in control?  Was that your

17   understanding, I guess?

18   A    I'm not clear that that would be the case.

19   Q    Okay.  But was there a change in control pending for Mr.

20   Levin?

21   A    Yes.

22   Q    And looking at the third page of this --

23   A    Just if I can stop you, because I'm not sure I know what

24   the acronym CPP stands for.

25   Q    Okay.

1          THE COURT:  Stipulation, counsel?

2          MR. EGAN:  His knowledge is what we're --

3          THE COURT:  All right.

4          MS. BARRY:  Okay.

5    BY MS. BARRY:

6    Q    Looking at the third page of this exhibit, which is an

7    attachment to the email, what is this letter referencing?  Why

8    don't you just read the first sentence?

9    A    It says:

10          "Gentlemen, please see information that was provided

11   to us --"

12   Q    No, I'm sorry, the third page.

13   A    Oh, the third page?

14   Q    And if you could read the first paragraph there?

15   "Reference" --

16   A    (Reading)

17          "Reference your email dated August 17, 2009,

18   requesting that we identify the sourcing of funds for the

19   Levin investment in Nova Financial Holdings, Inc."

20   Q    Okay.  And so is this a -- does it go on to explain what

21   the source of the funding is for the change in control?

22   A    It appears to be the case, yes.

23   Q    Okay.  In that explanation, is there anything about Mr.

24   Levin's investment, any portion of it being borrowed from Nova

25   Bank?

Gaunt - Direct/Bar                          127

1    A    I don't see anything referencing that.

2    Q    And did you -- did the Federal Reserve Bank give approval

3    for Mr. Levin to acquire up to 24.2 percent of the shares of

4    Nova Financial Holding?  Did you approve the change in control

5    application?

6    A    I believe we did.

7    Q    Okay.  I'd like to show you what's been marked as

8    Government's Exhibit 100.  And what is Government's Exhibit

9    100?

10   A    It is an approval letter.

11   Q    Okay.  And whose -- and if we go to the second page, who

12   signed it?

13   A    I did.

14   Q    Okay.

15            MS. BARRY:  The Government moves for the admission

16   of Government's Exhibit 100.

17            MR. EGAN:  No objection.

18            MR. DUNCAN:  No objection.

19            THE COURT:  Admitted.

20            MS. BARRY:  May it be published, Your Honor?

21            THE COURT:  Yes.

22   BY MS. BARRY:

23   Q    What is the date of this letter?

24   A    October 19, 2009.

25   Q    Okay.  And what is in the re line?

Gaunt - Cross/Ega                               128

1   A     I'll read it.  It says:

2              "Notification by George Gershen (phonetic) Levin to

3   acquire 24.2 percent of the shares of Nova Financial Holdings,

4   Inc., Berwyn, PA pursuant to the Change in Control Act of 1978

5   in Section 225.41 of Regulation Y."

6   Q     Okay.  Mr. Gaunt, before sending out this letter, were

7   you ever made aware that any portion of Mr. Levin's investment

8   to purchase 24.2 percent of the shares of Nova Financial

9   Holdings was money that was borrowed from Nova Bank?

10  A     I was not aware of that.

11  Q     Okay.  Would that be something that you would remember?

12  A     I believe I would.

13             MS. BARRY:  No further questions, Your Honor.

14             THE COURT:  You may cross-examination.

15             MR. EGAN:  Thank you, Your Honor.

16                         CROSS-EXAMINATION

17  BY MR. EGAN:

18  Q     Good afternoon, sir.

19  A     Good afternoon.

20  Q     I believe you testified on direct examination that you

21  oversaw some people that were involved in the TARP approval

22  process, correct?

23  A     That's correct.

24  Q     But other than your oversight of them, you had no direct

25  involvement in the TARP approval process as it pertained to

Gaunt - Cross/Ega                                    129

1    Nova Bank, correct?

2    A     Well I had -- I was the person who executed the approval

3    letter, so it officially came under may signature as the head

4    of the unit.

5    Q     If Nova had been approved by the Federal Reserve for TARP

6    funds, you would have signed the --

7    A     Oh, no, I'm sorry, you said TARP.

8    Q     Yeah.

9    A     Oh, no, I would not have been involved in the TARP.  We

10   did -- we were involved in the process of moving paper and

11   applications, but it was being handled by other folks.

12   Q     Right.  So you had basically nothing to do with that?

13   A     Correct.  Sorry about that.  Yes.

14   Q     No worries.  So all of the information that you received

15   and that you just discussed with Ms. Barry, none of that went

16   to the people who had anything to do with approving TARP,

17   correct?  As far as you know.

18   A     Of our application?

19   Q     Yeah.

20   A     I'd have to go back and check.  It went to the FDIC

21   certainly, and the Commonwealth of Pennsylvania.  But I'd have

22   to check.  It doesn't make sense that it would, at first blush

23   at least.

24   Q     So to your knowledge it didn't go there?

25   A     To my knowledge, yeah.

Gaunt - Cross/Ega                                    130

1   Q     Okay.  That's all I was asking.  Now but you were

2   involved in this change in control process?

3   A     True.

4   Q     And a change in control needs to be filed when an

5   investor goes over a certain level of ownership of stock,

6   correct?

7   A     Yes.

8   Q     So if I owned 9 percent of the stock, I don't need to

9   file a change in control application, right?

10  A     Well it would depend who --it's a little more complicated

11  than that.

12  Q     But there is a line there somewhere?

13  A     There is a line, yes.

14  Q     And in this case it was about 10 percent, right?

15  A     I believe so, yeah.

16  Q     So if in this case I own 9 percent of the stock, I

17  wouldn't have to file one of these, would I?

18  A     You know, it would depend.  I mean, it's -- it's -- a lot

19  of it depends on who the other investors are and the

20  relationship to the primary investor.

21  Q     Understood.

22           MR. EGAN:  Why don't we get up Government's 64,

23  please?  And if it could be published?

24  BY MR. EGAN:

25  Q     And you have that in front of you I believe, sir?

1    A     Yeah.  I'm not -- it's not showing up on the screen, but

2    let me find it.  Yes.  I have 64 in front of me.

3    Q     Well just wait a second while the -- we've go one of

4    those fun computer things happening.

5    A     Okay.

6    Q     There we go.  So if it's easier for you to look at the

7    paper copy, please, by all means do.

8    A     Okay.

9    Q     This is a letter that contains an application for change

10   in control, correct?

11   A     Yes.

12   Q     And that application for change in control is the

13   application of George Levin, correct?

14   A     Yes.

15   Q     And it says in the letter, that his -- and I'm looking

16   specifically at the second sentence, his current percentage of

17   investment is 9.01 percent, correct?

18   A     Yes.

19   Q     "The additional $13 million investment will put Mr.

20   Levin's percentage at approximately 24.2 percent, which

21   requires the approval of the Federal Reserve Bank."

22            Do you see that?

23   A     Um-hum.

24   Q     So you would agree with me that his 9.1 percent didn't

25   need the approval?

1    A    I mean, that's almost a legal conclusion, given the

2    complexity of these applications.

3    Q    I see.  But clearly the person who submitted this

4    believed that the change from nine to 24 is what required the

5    approval, correct?

6              MS. BARRY:  Objection.

7              THE COURT:  Sustained.

8    BY MR. EGAN:

9    Q    This application when it was submitted was to increase --

10   for permission to increase his ownership from nine percent to

11   24 percent, correct?

12   A    Well I don't know whether it was in increments or what,

13   but that seems to be the case.

14   Q    Well let's go over it.  The first sentence says:

15              "Please be advised that on June 30th, 2009, Mr.

16   Levin invested 5 million of his proposed $18 million

17   investment."

18              Correct?

19   A    Right.

20   Q    (Reading)

21              "His current percentage is 9.01 percent."

22              Correct?

23   A    Right.

24   Q    (Reading)

25              "The additional $13 million investment will put his

1    percentage at approximately 24.2 percent."

2            Correct?

3    A    Yes.

4    Q    So that would be -- I think we were -- it just was

5    increments, right?  Maybe only two, but it's two increments,

6    correct?

7    A    Yeah.

8    Q    Okay.  So they're filing this because he's putting $13

9    million more in, which is going to make him a change in

10   control investor.  Correct?

11   A    I struggle with that a little bit, because there are

12   instances where even over five percent would require an

13   application.  It's a very technical --

14   Q    I understand, sir.  And I'm not trying to get you to get

15   into the technicalities.  But at least on the face of it,

16   that's what's happening here, right?

17   A    On the face of it, that's what I would say.

18   Q    Okay.  I'm not looking for any legal conclusions, don't

19   worry.

20   A    Okay.

21   Q    If you could turn to page six, which you were shown by

22   Ms. Barry, in that first box.

23   A    Um-hum.

24   Q    You're being told that this application, right, that the

25   investment is going to be half from personal finances and half

1    from borrowed funds, correct?

2    A    That's what it says.

3    Q    Okay.  And I believe Ms. Barry asked you if that was an

4    important issue for the Federal Reserve, correct?

5    A    Yes.

6    Q    And you said it was, because you wanted to know the

7    strength of the purchaser, correct?

8    A    Yeah.

9    Q    And when you submit one of these applications, it starts

10   a process, does it not?

11   A    Yes.

12   Q    And the applicant, that is Mr. Levin, by submitting the

13   application is agreeing to the process, correct?

14   A    Yes.

15   Q    He's basically saying, I want to be a change in control

16   investor, right?

17   A    Right.

18   Q    Therefore, you, Federal Reserve Board, you may now have

19   the right to investigate me so you can figure out if I deserve

20   to be one.  Correct?

21   A    Yes.

22   Q    And the Federal Reserve Board takes that very seriously,

23   correct?

24   A    It does, yeah.

25   Q    They have investigators they send out in the field to do

1    investigations, right?

2    A    May or may not.  I'm not aware of this situation but --

3    Q    Okay.  But they certainly have --

4    A    The integrity of the documents is of the utmost

5    importance.

6    Q    Understood.  But you also do an investigation, correct?

7    A    I -- as an analyst who would be considering the

8    application.  Whether there's actually an investigation, I'm

9    not sure I'd call it an investigation.  There might be a

10   careful look in connection with the examination process that

11   would happen later as part of it.

12   Q    And part of that careful look is to run a criminal

13   background check, right?

14   A    There is, actually, yes.

15   Q    And a credit check?

16   A    Yes.

17   Q    A credit check to see what loans they have out?

18   A    I'm not aware.  I was not the analyst on this case.

19   Q    So it's safe to say you don't know precisely what the

20   analyst did in this case?

21   A    Well I know generally what would have been done, but I

22   was not the analyst and I was not the manager supervising the

23   analyst.

24   Q    Understood.  So you're not the person doing it, or that

25   person's boss?

1    A    Correct.

2    Q    You're that person's boss's boss?

3    A    Correct.

4    Q    Okay.  However, you do know that they have all of the

5    information of this applicant to reach out to them and ask

6    them any questions they want to, right?

7    A    Yes.

8    Q    And in fact in this case you actually did reach out to

9    the applicant and have discussion with them, correct?

10   A    I am not aware.

11   Q    Okay.

12          MR. EGAN:  Well if we could have Government's

13   Exhibit 87, please?  And this has been admitted, so you can

14   publish it.  And if we could blow up the bottom email?

15   BY MR. EGAN:

16   Q    And it's from you?

17          UNIDENTIFIED SPEAKER:  It's not admitted.

18          MR. EGAN:  It's not admitted?  Can you un-publish

19   it, please?  My apologies, Your Honor.

20   BY MR. EGAN:

21   Q    That's an email from you to Frank Preve, right -- or F.

22   Preve at AOL.  You probably don't remember him.

23   A    Yes.  What institution is he with?

24   Q    You don't remember who he is, right?

25   A    This is a while ago.  Six years ago, amongst many, many

1   applications.

2   Q    Fair to say, other than reading this stuff, you don't

3   really remember anything about this?

4   A    About this, what's contained in this email?

5   Q    About the whole -- this whole matter.  Other than reading

6   what you've read to prepare for Court and talking to the

7   Government, do you really remember anything about this

8   process?

9   A    About the specific --

10  Q    About the Nova Bank --

11  A    -- process as opposed --

12  Q    Yeah.

13  A    -- not particularly, to be honest with you.

14  Q    Thank you.  Anyway it is from you, right, the email?

15  A    Yes.

16  Q    And to this F. Preve, who we don't know who it's to.

17  It's also carbon copied to some other folks, a Bill Lenny,

18  (phonetic) William Lenny, at Federal Reserve, right?

19  A    Yeah.  Yes.

20  Q    Jim DePowell at Federal Reserve, you just talked about

21  him?

22  A    My guess is actually that Mr. Lenny's the author of this,

23  but he -- it was -- but I sent it.  He was the analyst on this

24  case.

25  Q    Okay.  Well let's read it then, because I don't -- I

Gaunt - Cross/Ega                                        138

1    don't want -- let's read it, sir.  It says:

2               "Mr Preve, this will confirm our telephone

3    conversation today in which you advised Mr. Levin will be

4    filing a second interagency biographical and financial

5    report."

6               See that?

7    A    Um-hum.  Yes.

8    Q    And at the bottom it says, "Bill Gaunt."

9    A    Yes, but we -- I would not have been calling Mr. Preve by

10   myself.  There probably would have been a conference call, and

11   included on that call would have been Mr. Lenny, Mr. DePowell,

12   and probably this third person, Linda Tucker.

13   Q    Okay.  So what you're telling me is, you think that four

14   people from the Federal Reserve Board called up Mr. Preve?

15   A    Yeah.  I don't know who Mr. Preve is.

16   Q    Well, sir --

17   A    Why don't you refresh my recollection of who he is?

18   Q    Well I'm not sure I can do that, sir.  But if I would

19   represent to you that he was Mr. Levin's business manager,

20   would that refresh your recollection?

21   A    It sounds right.

22   Q    Okay.  All I'm trying to establish here, sir, is that the

23   agency had direct contact with Mr. Levin and his agent.

24   Correct?

25   A    That looks like we needed more biographical information.

1    Q    Right.  And --

2    A    And financial information.

3    Q    And you reached out to him and asked for it.

4    A    That sounds correct.

5    Q    Okay.  And after that conversation, which is on Thursday,

6    September 17th, you received Government's Exhibit 89.

7             MR. EGAN:  And if we go to page two of Government's

8    Exhibit 89.  And you did admit this, correct?  No?  Okay.

9    BY MR. EGAN:

10   Q    That's a letter from Mr. Levin to the Federal Reserve

11   Bank, correct?

12   A    Yes.

13   Q    And it is an updated interagency biographical financial

14   report, correct?

15   A    Yes.

16   Q    Which is what you guys were asking for in the phone call

17   from the day before, correct?

18   A    That sounds right.

19             MR. EGAN:  Now if we could go back to Government's

20   82.

21   BY MR. EGAN:

22   Q    And you were shown this on direct examination, correct?

23   A    Yeah.

24   Q    That's an email from Kim Hartline to Mr. Moretz and you?

25   A    Right.

1    Q    This F. Preve is also copied?

2    A    Right.

3    Q    And it says:

4              "Nova is --"

5              And we're in the second paragraph, the second

6    sentence.  It says:

7              "Nova is currently working under a tentative

8    schedule to close a capital investment of 13 million for Mr.

9    Levin."

10             Correct?

11   A    A minimum of 13 million.  Yeah.

12   Q    Right.  So what you're being told here is, we're going to

13   close another 13 million for Mr. Levin?  Right?

14   A    Right.  Understand that just because I'm copied on this,

15   I mean, as the official head of the department, correspondence

16   really has to come to me, then it's disseminated to the people

17   who actually work on it.

18   Q    So you're saying you might not have read it?

19   A    Exactly.

20   Q    Well when Ms. Barry showed it to you, did you say you

21   might not have read it?  I missed that.

22   A    I don't know if I was asked that question or not.

23             MR. EGAN:  Well if we could go to page two --

24   BY MR. EGAN:

25   Q    See in page three, which is the one you were shown?  This

Gaunt - Cross/Ega                                                      141

1    is a letter and we discussed -- you discussed with Ms. Barry.

2    This is a letter from this Frank Preve, correct?

3    A    Yes.

4    Q    And it's on George Levin's letterhead?

5    A    Yes.

6    Q    And he's telling you, correct, where he expects the money

7    to come from to pay for the change of control, right?

8    A    Well it's sent to the Pennsylvania Department of Banking,

9    but --

10   Q    Well he's copying Bill Lenny, so --

11   A    Right.  Yeah.  Let me just read it.

12        (Pause)

13   A    He's explaining the sources of cash, as far as I can tell

14   from this.

15   Q    Right.  He's telling you where the cash is going to come

16   from.

17   A    Right.

18   Q    And that's Mr. Preve telling you that, right?

19   A    Right.

20   Q    And then attached to that is another two pages.

21        MR. EGAN:  And if we could go to the next one.

22   BY MR. EGAN:

23   Q    He sends you a TD Bank statement, right?  See that?

24   A    Okay.

25   Q    And it shows a number of accounts with available

1    balances, correct?

2    A     It looks that way, yeah.

3    Q     And one of those accounts has an available balance of

4    $329 million, does it not?

5    A     Yes.  Trust number three, it says.

6    Q     And the others are pretty big too, huh?

7    A     Yeah.

8              MR. EGAN:  May I have a moment, Your Honor?

9              THE COURT:  Yes, sir.

10   (Pause)

11             MR. EGAN:  No further questions.

12                        CROSS-EXAMINATION

13   BY MS. SHEALY:

14   Q     Good afternoon, Mr. Lenny (sic), I'm Allison Shealy.  I

15   think that the gist of your earlier testimony is that you're

16   being asked about things that happened in 2009, right?

17   A     (No verbal response)

18   Q     I'm sorry, you have to answer verbally yes or no.

19   A     Yes.

20   Q     Thank you.  And we're in 2016 now, so that was a long

21   time ago, right?

22   A     About six years ago, yes.

23   Q     Six years ago.  And 2009 at the Federal Reserve was a

24   very busy time, wasn't it?

25   A     Reasonably busy, yeah.  It's always busy.

Gaunt - Cross/She                          143

1   Q     A lot going on in the economy, a lot of things effecting

2   the Federal Reserve?

3   A     A little more in 2008, but it was busy, sure.

4   Q     It was busy.

5   A     Particularly with the TARP side of things, things were

6   busy.

7   Q     Okay.  And you were copied, we've seen a number of emails

8   and you were copied on those emails, essentially because you

9   were the guy in charge of a pretty large group within the

10  Federal Reserve, right?

11  A     Yeah.  Well about eight or nine people, yeah.

12  Q     Eight or nine people who had responsibility for a lot of

13  different areas, is that fair to say?

14  A     Well they were -- there were two areas, but on the

15  application side of things, there were analysts.  The analysts

16  would be assigned a case, they would work it, and then it

17  would work its way up to the manager, and there would be a

18  process -- there would be discussion all along, and then a

19  decision would be made on the application.

20  Q     But I believe your testimony was that, although you were

21  copied on some of the emails, you don't really have a specific

22  recollection of the information that is included in those

23  emails, is that fair to say?

24  A     I guess it's fair to say, yeah.

25  Q     Okay.  And a few seconds ago, Mr. Egan asked you

Gaunt - Cross/She                                    144

1    questions about whether or not the change in control

2    application for Mr. Levin was triggered when he got to 10

3    percent or more as an investor.  Do you remember being asked

4    those questions?

5    A    Yeah.

6    Q    And you said it's very, very technical.  Was that your

7    testimony?

8    A    Yes.

9    Q    And that it requires a legal conclusion as to when those

10   types of applications actually have to be filed, is that

11   right?

12            MS. BARRY:  Objection.

13            THE COURT:  Just a moment, please.  Let me hear your

14   basis, please -- her basis for the objection.  Counsel, do you

15   wish to -- you can come up -- you can approach, either way.

16            MS. BARRY:  Well just that she's requesting for him

17   to give a legal conclusion.

18            THE COURT:  You can rephrase.

19   BY MS. SHEALY:

20   Q    Was it your testimony earlier today, sir, that it would

21   require a legal conclusion as to whether or not a change in

22   control application was required for a 10 percent or more

23   investor at Nova Financial Holdings?

24   A    Well I might have said that.  Another word would have

25   been a technical analysis done.  The reason I said that is the

Gaunt - Cross/She                                    145

1    regulation is -- is rather long, and you have to, if you're

2    investing with your wife, or you're investing with your

3    brother-in-law, that could be included.

4            So the way you look at this is, you have to sort of

5    gather a lot of facts.

6    Q    It's complicated, is that fair to say?

7    A    I thought it was.

8    Q    You thought it was.  I'm sorry, how many years were you

9    at the Federal Reserve?

10   A    Twelve.

11   Q    Twelve.  And before that, you had experience in banking

12   as well?

13   A    I have been in banking, yes.

14   Q    Yes.  It's complicated.  Is there some other form for

15   realizing it may not exactly be 10 percent, but for investors

16   who are really small in a bank, like a one percent investor in

17   a bank, is there any form that requires disclosure by those

18   types of investors as to the source of their funds in

19   investment -- and I said bank, but I actually mean an

20   investment in a bank holding company.

21   A    I can't think of one.

22   Q    So it's only once the investor reaches that threshold

23   where they become a change in control type investor, that they

24   have to put on the form the source of the funds that they

25   intend to put into the bank holding company, is that correct?

1    A    That sounds right.

2    Q    Okay.  A couple of more questions.  And that is, my

3    client is Mr. Barry Bekkedam the tall gentleman in the blue

4    tie over there.  Do you see him?

5    A    Um-hum.

6    Q    Have you ever met Mr. Bekkedam before?

7    A    I don't believe so.

8    Q    The documents, and realizing your recollection is not the

9    greatest, but do you recall at all ever seeing his name come

10   up in any of the materials that came to you?

11   A    I don't have a recollection if that was the case.

12   Q    Okay.

13        MS. SHEALY:  No further questions.  Thank you, sir.

14                     REDIRECT EXAMINATION

15   BY MS. BARRY:

16   Q    Mr. Gaunt, Government's Exhibit 89.

17   A    Okay.

18   Q    I'd like to try to get you a hard copy --

19   A    I have it.

20   Q    Oh, you have it.  Okay.

21   A    No, I'm sorry, I have 82.

22        (Pause)

23        MS. BARRY:  May I approach, Your Honor?  I'll show

24   him my copy.

25             THE COURT:  Yes.

1          MS. BARRY:  Government's Exhibit 89.

2     BY MS. BARRY:

3     Q    I'm showing you Government's Exhibit 89.

4     A    Okay.

5     Q    And what is the first page of this -- of Government's

6     Exhibit 89?  What is the first page, sir?

7     A    First page is --

8     Q    Do you know if it's an email --

9     A    -- just a cover email, it looks like.  Yeah.

10    Q    Okay.  And is information being forwarded to several

11    individuals, or not?

12    A    Yes.

13    Q    Okay.  Are you one of those individuals?

14    A    I am.  Yeah.

15    Q    Okay.  And -- and attached to this email, are there a

16    number of documents --

17    A    Yes, there are.

18    Q    -- including a revised interagency biographical and

19    financial report?

20    A    Yes.

21    Q    Okay.  And is the interagency biographical and financial

22    report part of the information that is provided along with the

23    CIC application?

24    A    Yes.

25    Q    Okay.

1    MS. BARRY:  Your Honor, the Government moves for the

2    admission of Government's 89.

3    MR. EGAN:  No objection.

4    THE COURT:  Admitted.

5    MS. BARRY:  If we could please take a look -- and if

6    it may be published, Your Honor, I believe it's Government's

7    Exhibit --

8    THE COURT:  Granted.

9    MS. BARRY:  -- 64.  Page six, I believe.

10   BY MS. BARRY:

11   Q    Now here it says, again, looking at item seven.

12   A    Um-hum.

13   Q    In the change in control application, the source and

14   amount of funds.  What does it say there?

15   A    "One-half from personal finances, one-half from borrowed

16   funds."

17   Q    And if we look at Subsection B for -- of that.  "If any

18   of the portion of the funds for the acquisition will be

19   borrowed --"

20        Does it -- what does it say, indicate what?

21   A    Well name and address for each borrower, name and address

22   of each lender, amount financed, collateral to pledged, terms

23   of the transaction including interest rates, amortization

24   requirements, guarantors, endorsers, co-makers, and any other

25   arrangements, agreements and understandings between and among

Gaunt - Redirect/Bar                                    149

1    the parties.

2              So we want everything.

3    Q    Okay.  Thank you.

4              MS. BARRY:  No more questions.

5              MR. EGAN:  No recross.

6              MS. SHEALY:  No further questions.

7              THE COURT:  Thank you, sir, you may step down.

8    Watch your step, please.

9              THE WITNESS:  Thank you, Your Honor.

10        (Pause)

11             MS. BARRY:  The United States calls Joseph Moretz.

12   And may I approach the witness stand to --

13             THE COURT:  Certainly.

14             MR. IGNALL:  Your Honor, could we perhaps take a

15   one-minute stretch break.  I understand from Agent Lyon he

16   might need that to locate -- I think the witness has taken a

17   stretch break himself.

18             THE COURT:  Let's take ten minutes, if you don't

19   mind.  But don't look at the parade.

20        (Jury Exits)

21        (Court in recess 2:47 p.m. to 2:58 p.m.)

22             THE CLERK:  All rise.

23        (Jury Enters)

24             THE CLERK:  Ladies and gentlemen, we are back on the

25   record.

1           THE COURT:  You may be seated.  Thank you.

2           MS. BARRY:  Your Honor, the United States calls

3    Joseph Moretz.

4           THE CLERK:  Please remain standing.  Raise your

5    right hand.

6        JOSEPH MORETZ, GOVERNMENT WITNESS, SWORN

7           THE CLERK:  Please state and spell your name for the

8    record.

9           THE WITNESS:  Joseph Moretz.  It's J-O-S-E-P-H

10   M-O-R-E-T-A.

11          MS. BARRY:  May I inquire, Your Honor?

12          THE COURT:  You may proceed.

13          MS. BARRY:  Thank you.

14                      DIRECT EXAMINATION

15   BY MS. BARRY:

16   Q    Good afternoon, Mr. Moretz.

17   A    Good afternoon.

18   Q    Where do you work?

19   A    I work with the Pennsylvania Department of Banking and

20   Securities.

21   Q    And how long have you been with the Pennsylvania

22   Department of Banking and Securities?

23   A    Slightly over 29 years.

24   Q    And in 2009 what was your position with -- and is that

25   sometimes referred to PADOB, or PADOBS?  The Pennsylvania

1    Department of Banking and Securities?

2    A     Yeah, it is -- it was Pennsylvania Department of Banking

3    previously.

4    Q     And in 2009 was it the Pennsylvania Department of

5    Banking?

6    A     It was.

7    Q     Okay.  And what was your position, sir, in 2009?

8    A     I was manager of corporate applications.

9    Q     Okay.  And are some of the applications for change in

10   control -- or some of those applications for a change in

11   control that you -- you supervised?

12   A     Yes.

13   Q     Okay.

14   A     Those would be Section 112, is what we call it.

15   Q     Okay.  And so the change in control application, is that

16   a -- the formal term for the Federal -- what the Federal

17   Reserve uses in -- for a Section 112 application?

18   A     Yeah.  They're substantially equivalent.

19   Q     Okay.  So in PADOB language, a change in control would be

20   a 112 application is that -- or not?

21   A     Yes.

22   Q     Okay.  And what -- what is a change in control, or

23   Section 112 application?

24   A     That's when an applicant proposes to acquire 10 percent

25   or more of an existing State bank.

1    Q    Okay.  And why is there -- why does there need to be

2    regulatory approval for someone to own more than ten percent?

3    A    The ten percent threshold is considered to be a control

4    threshold, so the idea is to try to limit, or I should say

5    restrict or -- those who hold more than ten percent or more of

6    a bank's stock.

7    Q    Okay.  And does PADOB work with other regulators?

8    A    Yes.

9    Q    And what are the other regulators?

10   A    Federal Reserve -- well Federal Reserve in general, but

11   Philadelphia is mostly who we work with.  And the FDIC.

12   Q    And so is there communication among the agencies?

13   A    Yes.

14   Q    Now were you aware of an institution called Nova Bank in

15   2009?

16   A    Yes.

17   Q    And do you know whether or not Nova Bank had a parent

18   holding company?

19   A    They did.

20   Q    And what was that called?

21   A    I believe Nova Holdings, Inc.

22   Q    Okay.

23   A    I think.  I'm not sure if that's exactly right.

24   Q    And do you know whether the holding company -- let me --

25   strike that.

1             Do you know at any point in time in 2009 whether

2    there was going to be a change in control -- if a Section 112

3    application was filed for Nova Financial Holdings?

4    A     There was, yes.

5    Q     And I'd like to show you what's been marked as

6    Government's Exhibit 63.

7             MS. BARRY:  And I believe that has been moved into

8    evidence, Your Honor.

9             THE COURT:  All right.

10            MS. BARRY:  If it may be published?

11            THE COURT:  Yes.

12   BY MS. BARRY:

13   Q     And, Mr. Moretz, at any time, if you prefer a hard copy

14   of the exhibit, you can let me know that.

15   A     Okay.

16   Q     So looking at Government's Exhibit 63, what is the date

17   of this letter?

18   A     July 21st, 2009.

19   Q     And the letterhead says what institution is sending this?

20   A     You mean the reference?

21   Q     No, the letterhead.

22   A     Oh, Nova, I'm sorry.  Yeah.  I'm sorry.

23   Q     Okay.  Nova Financial Holdings?

24   A     Yes.

25   Q     Okay.  And if you would, please, read the first -- first

Moretz - Direct/Bar                                    154

1    few sentences of the first paragraph?

2    A     (Reading)

3           "Please be advised that on June 30th, 2009 Mr. Levin

4    invested $5 million of his proposed 18 million investment in

5    Nova Financial Holdings, Inc.  His current percentage of

6    investment is 8.24.  The additional 13 million investment will

7    put Mr. Levin's percentage at approximately 24.4, which

8    requires approval of the Federal Reserve and the Pennsylvania

9    Department of Banking."

10   Q     Okay.  And so what was the investment that Mr. Levin was

11   making?

12   A     Total 18 million.

13   Q     Okay.  And what percentage then would he acquire of the

14   -- of ownership in Nova Financial Holdings?

15   A     24.4.

16   Q     Okay.

17          MS. BARRY:  And if we could, please, turn to page

18   five of 16?

19   BY MS. BARRY:

20   Q     And looking at page five of 16 -- I'm sorry, page five of

21   Government's Exhibit 63, what is this?

22   A     That's the application questionnaire we give for

23   individuals investing -- filing a 112 application.

24   Q     Okay.  So are these the questions that need to be

25   answered for the Section 112 application, or not?

1    A    Yes.

2    Q    Okay.  And in looking at question D, can you read that

3    please, sir?

4    A    (Reading)

5         "Source and amount of funds or other consideration.

6    State the source and amount of funds or other consideration

7    used or to be used in the making the purchases, and if any

8    part of the purchase price or proposed purchase price is

9    represented by funds or other consideration, borrowed or other

10   obtained for the purpose of acquiring, owning or trading the

11   shares, give a description of the transaction and the names of

12   the parties thereto."

13   Q    Okay.  And so looking at that, again, it says funds used

14   or to be used, correct?

15   A    Yes.

16   Q    Okay.  And in response to question D of the Section 112

17   application, if we take a look now at page four of the -- of

18   Government's Exhibit 63, what is the response to question D?

19   A    (Reading)

20        "It's the applicant's intention to pay the

21   approximately 18 million purchase price with funds currently

22   on deposit in various financial institutions.  However, a

23   portion of the purchase price may come from other sources."

24   Q    Okay.  Now this particular response to question D, do you

25   know whether or not the Pennsylvania Department of Banking had

Moretz - Direct/Bar                                      156

1    follow up questions related to the response to question D?

2    A    Yes, we did.

3    Q    And I'd like you now to take a look at Government's

4    Exhibit --

5              THE COURT:  Counsel, excuse me one second.

6              MS. BARRY:  Yes.

7              THE COURT:  Thank you very much.

8         (Pause)

9              THE COURT:  I didn't want to take a chance, that was

10   really unstable.  Let's take a recess, please.

11        (Pause)

12             THE COURT:  You can move down.

13        (Pause)

14             THE COURT:  All right.  We're -- well wait until it

15   comes back -- Carl comes back for that machine.

16        (Pause)

17             THE COURT:  I think we're going to be okay.  Thank

18   you.

19             MS. BARRY:  May Mr. Moretz be seated again?

20             THE COURT:  Yes, sir, you may be seated.  You may

21   continue.  Thank you.

22             MS. BARRY:  Thank you, Your Honor.

23   BY MS. BARRY:

24   Q    If we could take a look --

25             MS. BARRY:  And I believe Government's Exhibit 74

1    has been moved into evidence.  And if we could please just

2    take a look at the bottom email.  If we blow that up?  And may

3    we publish this, Your Honor?

4              THE COURT:  Yes.

5    BY MS. BARRY:

6    Q    Looking at Government's Exhibit 74, who's Donna Metcalfe?

7    A    Donna Metcalfe was an administrator that worked with me

8    at that time.

9    Q    Okay.  And what is the date of this email?

10   A    August 17th, 2009.

11   Q    Okay.  And who is the -- is she sending the email to?

12   A    Kim Hartline.

13   Q    Okay.  And are you copied on this email?

14   A    Yes.

15   Q    And looking at the additional information with regard to

16   Mr. Levin, item number two, do you know whether or not that

17   was a follow up to the response that was provided to question

18   D of application -- of this 112 application?

19   A    Yes, it was.

20   Q    Okay.  And so what does -- and if you can read it, what

21   is Ms. Metcalfe asking?  What additional information is she

22   asking for from Kim Hartline?

23   A    (Reading)

24              "The source of funds to be used to purchase this

25   stock.  If cash funds are used, provide copies of account

Moretz - Direct/Bar                                    158

1    statements.  If assets are to be liquidated, list those assets

2    and provide a copy of the documents that can verify the timing

3    of the transaction.  If any portion is borrowed, provide the

4    name of each borrower, name and address of each lender, amount

5    financed, collateral to be pledged in terms of the

6    transaction, including interest rate --"

7           It should say rates.

8           "-- amortization, guarantors, co-makers, and any

9    other arrangements among the parties"

10   Q    And do you know whether or not a subsequent response was

11   provided to PADOB from the requests Ms. Metcalfe made on

12   August 17th, 2009?

13   A    Yes, there was.

14   Q    Okay.  And I'd like you to take, please, a look at what's

15   been marked as Government's Exhibit 82, which I believe has

16   been moved into evidence.

17          In looking at Government's Exhibit 82, is this first

18   page an email containing -- I'm sorry, is Government's Exhibit

19   82 an email with attachments to it?  And I can give you a hard

20   copy, if that makes it easier.

21   A    I believe it is, yes.

22   Q    Okay.

23   A    Yes.

24          MS. BARRY:  And if we could publish that, please?

25          THE COURT:  Yes.

1    BY MS. BARRY:

2    Q     And so this is -- who is this email from?

3    A     Kim Hartline.

4    Q     And what is the date of the email?

5    A     September 8th, 2009.

6    Q     Okay.  And are you one of the recipients of this email?

7    A     Yes.

8    Q     Okay.  And looking at the first sentence, she writes:

9          "Gentlemen, please see information that was provided

10   to us this evening from Mr. Preve.  He asks that I forward it

11   to both agencies.  Can you please forward the information to

12   Donna Metcalfe and Mr. Lenny?"

13         And so are you the person she's asking to forward to

14   Donna Metcalfe, is that your understanding?

15   A     Yes.

16   Q     And could you please read the second paragraph?

17   A     (Reading)

18         "Please be advised that Nova has received formal

19   approval of our CPP application from the U.S. Treasury for a

20   minimum of 13.5 million, contingent upon our raising a minimum

21   of 10 million of common equity.  Nova is currently working on

22   a tentative schedule to close a capital investment of 13

23   million from Mr. Levin by September 24th, provided he receives

24   regulatory approvals, and close on our CPP funding on

25   September 25th, the last Friday of September."

1    Q    Okay.  And what is your understanding of the information

2    she's giving to you here?

3    A    That the institution has, you know, been approved for

4    what we call a TARP funding, CCP application from the U.S.

5    Treasury.

6    Q    Okay.  And when she writes "The tentative schedule to

7    close a capital investment of 13 million from Mr. Levin by

8    September 24th, provided he receives regulatory approvals,"

9    what was your understanding of that?

10   A    That they -- their desire was to close that transaction

11   September 24th.

12   Q    Okay.  Do you know -- in order for him to make that

13   transaction that they want, the investment, did he need to

14   have his Section 112 application approved?

15   A    Yes.

16   Q    Okay.

17              MS. BARRY:  If we can take a look at the second

18   page?

19   BY MS. BARRY:

20   Q    Okay.  And is this a letter to you?

21   A    Yes.

22   Q    Okay.  And can you please read the first paragraph?

23   A    (Reading)

24              "In connection with the pending application, Mr.

25   Levin has provided a printout of the trust account statements

Moretz - Direct/Bar                                    161

1    from TD Bank, which documents in excess of 630 million of

2    available funds for his proposed investment in Nova Financial

3    Holdings, Inc.  Mr. Preve has also provided a brief funding

4    explanation memo.  I am forwarding these documents to you

5    herein."

6    Q    Okay.  And does it then say:

7             "In accordance with the request received from Donna

8    Metcalfe."

9             And then:

10            "Other information is also being provided."

11   A    Yes.

12   Q    Okay.  And who is this letter from?

13   A    Kim Hartline.

14   Q    Okay.  Who was your main point of contact at Nova?  Who

15   did you mostly speak with, if anyone?

16   A    Kim Hartline.

17   Q    Okay.

18            MS. BARRY:  If we take a look at the third page.

19   BY MS. BARRY:

20   Q    And who is this letter to?

21   A    Donna Metcalfe.

22   Q    Okay.  And looking at the first sentence, what does that

23   say?

24   A    (Reading)

25            "Reference your email dated August 17th, 2009

1    requesting that we identify the sourcing of funds for the

2    Levine investment in Nova Financial Holdings, Inc."

3    Q    Okay.  And so is this a response from the email Ms.

4    Metcalfe had previously sent on August 17th, 2009 to Kim

5    Hartline?

6    A    Yes.

7    Q    Okay.  And in looking at the explanation for the source

8    of funding, does it indicate there that any portion of Mr.

9    Levin's $18 million investment was from money borrowed from

10   Nova Bank?

11            MR. EGAN:  Objection.

12            THE COURT:  Overruled.

13            MR. EGAN:  There's nothing on this letter about $18

14   million, Your Honor.

15            THE COURT:  I'm sorry?

16            MR. EGAN:  There's nothing in this letter about $18

17   million.

18            THE COURT:  Counsel, your question again was?

19            MS. BARRY:  Is there anything in this letter

20   regarding the $18 million investment from Mr. Levin that

21   indicates the source of funding, any portion of it came from

22   monies borrowed from Nova Bank?

23            THE COURT:  The objection's sustained.

24   BY MS. BARRY:

25   Q    Okay.  Ms. Metcalfe's email of August 17th, 2009, what

1    did it request in item number two?  And we can go back to

2    that, if we need to, which is Government's Exhibit 74.

3    A     Yeah, maybe we should.

4           MS. BARRY:  Thank you for doing the side-by-side

5    here.

6    BY MS. BARRY:

7    Q     Okay.  Looking at Government's Exhibit 74 on the right,

8    what is item number two requesting?

9    A     Well it's a source of funds, and specifically if any of

10   that -- the source of funds are from borrowed money.

11   Q     And, again, is this a follow up to question D from the

12   Section 112 application regarding the $18 million investment

13   from Mr. Levin?

14   A     Yes.

15   Q     Okay.  And in response -- in the response that was

16   forwarded to PADOB by Kim Hartline, this letter from Mr.

17   Preve, does it indicate in that letter --

18          MS. BARRY:  If we could put it back up?  Just the

19   letter is okay.

20   BY MS. BARRY:

21   Q     Does it indicate in that letter whether any of the funds

22   for the $18 million investment was borrowed from Nova Bank?

23   A     No.

24   Q     Why was the source of funding important to the

25   Pennsylvania Department of Banking?

1    A    Well the reason we look at the source of funds, we want

2    to determine that the individual investing has the financial

3    ability to make the investment without causing undue stress to

4    him financially.

5    Q    Okay.  And is there -- is the source of funding, is that

6    important to know to protect the safety and soundness of the

7    bank?

8              MR. EGAN:  Objection.

9              THE COURT:  Sustained.

10   BY MS. BARRY:

11   Q    What other reasons is the source of funding important?

12   A    Well we want to -- like I said, we want to make sure that

13   there was not going to be any financial strain, so we don't

14   want this person to be dependent on dividends, or a sale of

15   the bank, or some other -- or doing something to the bank that

16   would be detrimental to the bank.

17   Q    All right.  Did the Pennsylvania Department of Banking

18   approve Mr. Levin's proposed acquisition of up to 24.9 percent

19   of common stock in Nova Financial Holdings?

20   A    Yes.  24.99, I think.

21   Q    And I'd like to show you what's been marked as

22   Government's Exhibit 100A.

23              MS. BARRY:  Just for the witness, please.  Thanks.

24   BY MS. BARRY:

25   Q    And have you seen this letter before?

Moretz - Direct/Bar                              165

1    A    Yes.

2    Q    Okay.  And are you referenced in this letter?

3    A    Yes, I believe I am at the bottom.

4         MS. BARRY:  Your Honor, the Government moves for the

5    admission of Government's Exhibit 100A.

6         MR. EGAN:  No objection.

7         MR. DUNCAN:  No objection.

8         THE COURT:  Admitted.

9         MS. BARRY:  And may it be published?

10        THE COURT:  Yes.

11   BY MS. BARRY:

12   Q    In looking at Government's Exhibit 100A, what is this?

13   A    That's a conditional approval letter for the Section 112

14   application filed by George Levin to buy 24.99 percent of the

15   common stock of Nova Financial Holdings, Inc.

16   Q    Okay.  And the 24.99 percent is that -- does that reflect

17   the $18 million investment?

18   A    It's -- it's -- the 18 million may be slightly more.

19   Q    Okay.

20        MS. BARRY:  May I have a moment, Your Honor?

21        THE COURT:  Yes, ma'am.

22        (Pause)

23   BY MS. BARRY:

24   Q    If we could just stay with Government's Exhibit 100A for

25   a moment.  If we go to the second page, please?  Whose copied

1    on this letter?

2    A    William Gaunt, Assistant Vice-President Federal Reserve

3    Bank, and Cheryl Kim Hartline, Corporate Secretary, Nova

4    Financial Holdings, Inc.

5    Q    Okay.  And as of the date of this letter, October 19th,

6    2009, were you aware that any portion of Mr. Levin's $18

7    million investment in Nova Financial Holdings was money that

8    was borrowed from Nova Bank?

9    A    I was not aware of that.

10        MS. BARRY:  No further questions, Your Honor.  Thank

11   you.

12        MR. EGAN:  May I inquire?

13        THE COURT:  Yes, sir.

14                         CROSS-EXAMINATION

15   BY MR. EGAN:

16   Q    Good afternoon, sir.

17   A    Good afternoon.

18   Q    You're with the Pennsylvania Department of Banking,

19   right?

20   A    Well it's the banking and securities now, but, yes.

21   Q    And we're mostly talking about 2009 here, unfortunately.

22   A    Correct.

23   Q    It was the Pennsylvania Department of Banking then,

24   right?

25   A    It was.

1   Q     And that is one of the entities that regulated Nova Bank,

2   correct?

3   A     Yes.

4   Q     And along with the FDIC?

5   A     FDIC, yes.

6   Q     And the Federal Reserve Board, they regulated Nova

7   Financial Holdings, correct?

8   A     Yes.

9   Q     Now in order to have a change of control approved, there

10  had to be an application with both your institution, the

11  Pennsylvania Department of Banking, and the Federal Reserve

12  Board, correct?

13  A     Yes.

14  Q     So essentially, the application had to be filed in two

15  places?

16  A     Yes.  We have essentially the same application.

17  Q     Not quite -- not identical, but pretty close?

18  A     Yes.

19  Q     Which means that two different institu - two different

20  regulators, for lack of a better way of putting it, would now

21  be investigating Mr. Levin to see if he was appropriate to

22  become a change in control investor, correct?

23  A     Yes.

24  Q     And this investigation is not about the bank. Right?

25  A     Well the investigation's --

1    Q    It's of Mr. Levin.

2    A    Yes.

3    Q    And the application is not the bank's application,

4    correct?

5    A    It's not.

6    Q    It's Mr. Levin's application?

7    A    Yes.

8    Q    He signs it?

9    A    Um-hum.

10   Q    His personal information is provided?

11   A    Yes.

12   Q    And your -- your group, the Pennsylvania Department of

13   Banking, has direct contact with the applicant to find out the

14   answers to your questions, correct?

15   A    We -- I don't know how much direct contact we had with

16   Mr. Levin, he worked mostly through others.

17   Q    Right.  Mr. Preve?

18   A    Like Mr. Preve and Ms. Hartline.

19   Q    And you spoke to Mr. Preve, correct?

20   A    I did not.

21   Q    But you know other people in your department spoke to

22   him?

23   A    I would presume that they did.

24   Q    And, obviously, they're going to ask him any follow up

25   questions that they have, correct?

Moretz - Cross/Ega                                   169

1    A     Yes.  We'll follow up.

2              MR. EGAN:  And if we could go to the application

3    itself, which is Government's 63.  And take a look at the

4    cover letter.  Thanks.

5    BY MR. EGAN:

6    Q     Now I believe you said on direct examination that a

7    change in control application is not necessary until you get

8    to 10 percent of an interest, correct?

9    A     Yes.  In most cases.

10   Q     Right.  And in this case, that was the way it was?

11   A     I think so, yes.

12   Q     So there wasn't any need to file an application until he

13   reached over 10 percent, correct?

14   A     That's right.

15   Q     And at the time the application was filed, he had already

16   invested $5 million, correct?

17   A     Yes.  Well that's what we were -- that's what was told to

18   us.

19   Q     Right.  And so, he was investing an additional $13

20   million, which required your approval?

21   A     Yes.

22   Q     Now at page four of this document, is the answer to the

23   question about the source of the funds right?

24   A     Yes.

25   Q     And this is a document that's signed by Mr. Levin,

1    correct?

2    A    Yes.

3    Q    And it's --if we go up to the top, it's on his

4    letterhead, correct?

5    A    Yes.

6    Q    So it's Mr. Levin answering your questions, correct?

7    A    Yes.

8    Q    And he says:

9              "It is the applicant --"

10             That's him, right?  The applicant, that's George

11   Levin?

12   A    Yeah.

13   Q    (Reading)

14             "It is the applicant's intention to pay the

15   approximately $18 million purchase price with funds currently

16   on deposit in various financial institutions.  However, a

17   portion of the purchase price may come from other sources."

18             Correct?

19   A    Yes.

20   Q    Now that wasn't enough detail to be satisfactory to your

21   department, correct?

22   A    That's right.

23   Q    So of course you're going to follow up and ask more

24   questions, right?

25   A    Yes.

Moretz - Cross/Ega                                    171

1    Q    And, indeed, if we could go to Government's 74, which you

2    just looked at.  Now the bottom of that is an email from Donna

3    Metcalfe to Ms. Hartline, correct?

4    A    Yes.

5    Q    And it asks two questions of her.

6    A    Yes.

7    Q    And those questions are, number one, about this classic

8    car motor carriage, which we're not going to get into.

9         And number two about the source of the funds.

10   A    Yes.

11   Q    Now you would agree with me that that sentence number

12   two, the very first sentence there says:

13        "The source of the funds to be used to purchase the

14   stock."

15        Correct?

16   A    Yes.

17   Q    And this was sent on August 17th, 2009, correct?

18   A    Yes.

19   Q    And at that time $5 million of stock had already been

20   purchased, correct?

21   A    That's what we were told, yes.

22   Q    Yes.  And 13 million was still to be purchased, correct?

23   A    Yes.

24   Q    Now Ms. Hartline doesn't answer that question, does she?

25   A    I'm sorry?

1  Q    Ms. Hartline doesn't answer that question, does she?

2  A    No.  I don't think she does, no.

3            MR. EGAN:  If we could have Government's 73, please,

4  which is already admitted.  If we could go to page two.

5  BY MR. EGAN:

6  Q    See that email?  That's an email that we just looked at,

7  right?  Same one.

8  A    Yes.

9  Q    And it has Ms. Metcalfe's phone number on it, right?

10  A    Yep.

11  Q    So basically saying, hey, call -- anybody can call me and

12  give the answers to this would be helpful, right?

13  A    Yeah, I think she's just trying to make herself

14  available.

15  Q    Of course.  Now if we could go to the page before the

16  bottom email.  That's Kim Hartline to F. Preve.  That's Frank

17  Preve, right?

18  A    Yeah, I don't know him, but yes.

19  Q    And it says:

20            "Frank, here is the formal request from the PA

21  Department of Banking for information, please contact Ms.

22  Metcalfe if you have any questions."

23            Correct?

24  A    Yes.

25  Q    So she's telling Mr. Preve, hey you need to answer these

Moretz - Cross/Ega                                    173

1  questions, call up Ms. Metcalfe.

2           MS. BARRY:  Objection.

3           THE COURT:  Sustained.

4           MR. EGAN:  Now if we could go to Government's 82,

5  please?

6  BY MR. EGAN:

7  Q    And this is an email from Ms. Hartline to yourself,

8  correct?

9  A    Yes.

10 Q    It copies Mr. Preve?

11 A    Um-hum.  Yep.

12 Q    And Mr. Gaunt from the Federal Reserve, right?

13 A    Right.  Well it's two --

14 Q    Right.  And it says:

15          "Gentlemen, please see the information that was

16 provided to us this evening from Mr. Preve."

17          Correct?

18 A    Yes.

19 Q    And in the second paragraph it says:

20          "Nova is currently working under a tentative

21 schedule to close a capital investment of $13 million from Mr.

22 Levin."

23          Correct?

24 A    Yes.

25 Q    And then at page three --

1          MR. EGAN:  If we can have that?

2    BY MR. EGAN:

3    Q    -- that's the letter you were shown from Mr. Levin,

4    correct?

5    A    Yes.

6    Q    Now it never says anything in this letter about $18

7    million, does it?

8    A    No specific mention of the amount.

9    Q    No.  It's attached in an email that talks about $13

10   million, though, doesn't it?

11   A    Is that the previous?

12   Q    Yeah, the one we just looked at.

13   A    I think so.  I mean, I'd have to see it again.

14   Q    Well if you want, we can go back to page one.

15        MR. EGAN:  You're going in the wrong direction

16   there, Sean.

17   BY MR. EGAN:

18   Q    See that, 13 million down in the second paragraph?

19   A    Yes.

20   Q    All right.  This came with that, right?

21   A    Yes.

22   Q    And --

23        MR. EGAN:  And now if we can go back to three.

24   BY MR. EGAN:

25   Q    This letter telling you where the money's coming from,

1    it's on George Levin's letterhead, right?

2    A    Yes.

3    Q    It's signed by Frank Preve, right?

4    A    Yes.

5    Q    And that would be what you would expect, because Levin's

6    the applicant, correct?

7    A    Levin is the applicant.  Yes.

8    Q    He's the guy you're asking for the information?

9    A    Um-hum.  Yes.

10   Q    Now I believe you were asked if you approved this

11   application, correct?

12   A    Yes.  I was asked that.

13   Q    And you did approve the application?

14   A    We did.

15   Q    And in approving the application, you looked at a lot of

16   other things besides the source of the funds, didn't you?

17   A    We looked at the entire application.

18   Q    Yes.  You looked at Mr. Levin's financial statements?

19   A    Yes.

20   Q    Saw that he was worth $400 million, give to take?

21   A    Yeah.  That's --

22   Q    That probably had some impact on your decision, I

23   imagine?

24   A    Financial wherewithal is very important.

25   Q    Right.  Which is also the reason why -- the main reason

1    why you ask for the source of the funds, right?

2    A     Yeah, we wanted to where the money was coming from.

3    Q     And you want to make sure the guy has the money to -- or

4    person has the money to invest, right?

5    A     Yes.

6    Q     That's the main point.

7    A     The main issue is -- yeah, that he has the ability.

8    Q     Okay.

9              MR. EGAN:   I have no further questions, Your Honor.

10                        CROSS-EXAMINATION

11   BY MS. SHEALY:

12   Q     Hi, Mr. Moretz.   I'm Allison Shealy.

13   A     Hello.

14   Q     I have a question about your earlier testimony.   I want

15   to make sure that I understand it correctly.   And that is that

16   the -- I'm sorry, the Section 112 application, that's the

17   Pennsylvania Department of Banking and Securities version of a

18   change in control application, correct?

19   A     It's similar.

20   Q     Very similar.   And that the threshold at which one has to

21   file that type of application, that's at ten percent, is that

22   accurate?

23   A     Yeah, ten percent is the general rule.

24   Q     And there's no other form for the Pennsylvania Department

25   of Banking that requires disclosure as to an investor's source

1   of funds if that investor is less than ten percent, is that

2   accurate?

3   A     Yeah, we don't -- under ten percent we generally do not.

4   Q     Because you're focused on the ten percent or more

5   investors, because you want to make sure that they're not

6   going to put any type of undue influence on the bank, is that

7   correct?

8   A     Right.  Any financial stress of any type.

9   Q     Okay.

10          MS. SHEALY:  If we could pull up Government Exhibit

11   63, which was previously admitted?

12   BY MS. SHEALY:

13   Q     Do you have it on your screen now?

14   A     I do.

15   Q     The cover letter identifies the various information that

16   was provided to you as part of Mr. Levin's Section 112

17   application, correct?

18   A     Yes.

19   Q     And did you in fact receive all of the information

20   identified in those bullet points?

21   A     I would presume that we did.

22   Q     In particular, it says two copies of the interagency

23   biographical and financial report, and interagency change in

24   control with a copy of Mr. Levin's personal financial

25   statements which were filed with the Federal Reserve Bank.

1    Did you receive those materials?

2    A     I believe that we did.

3    Q     Okay.  And do you have a copy of Exhibit 63 there in

4    front of you?

5    A     Um -- I don't have a physical copy, but I have what he

6    has up on the screen.

7                 MS. SHEALY:  Your Honor, may I approach?

8                 THE COURT:  Sure.

9                 THE WITNESS:  Thank you.

10   BY MS. SHEALY:

11   Q     Can you just flip through that document?

12                MS. SHEALY:  And, actually, may I approach, Your

13   Honor, with a second document as well?

14                THE COURT:  Yes.

15   BY MS. SHEALY:

16   Q     So, Mr. Moretz, I just handed you two documents, one

17   which is marked Government Exhibit 63, and another which has

18   been marked as Government Exhibit 64.

19   A     Yep.

20   Q     Do you see those two?

21   A     I do.

22   Q     And would you agree that perhaps with the exception of

23   the cover letter attached to Government Exhibit 64, that the

24   information behind that cover letter includes interagency

25   notice of change in control, and interagency biographical and

1    financial report that was submitted to the Federal Reserve?

2    A    Yes.

3    Q    And that information, even though it is not attached to

4    the application we have as Government Exhibit 63, was

5    information that was provided to you for your consideration in

6    Mr. Levin's Section 112 application?

7    A    Yes.  I think we did.

8    Q    Okay.  So the -- in both of those documents, Exhibit 63

9    and Exhibit 64, the information that is provided and signed by

10   Mr. Levin, it's all dated on June 30th, 2009, is that correct?

11   A    (No verbal response)

12   Q    Let me rephrase that.  The signature pages for those

13   documents by Mr. Levin, they were dated as of June 30th, 2009,

14   correct?

15   A    This one is.  Yes.

16   Q    Okay.  So the information that is being provided in the

17   underlying applications by Mr. Levin, he's representing that

18   that information is accurate as of June 30th, 2009, correct?

19   A    Yes.

20        MS. SHEALY:  And if we could pull up on the screen

21   for the jury Government Exhibit 63, at page four, I believe.

22   BY MS. SHEALY:

23   Q    And in response to Paragraph D, which is the request to

24   Mr. Levin as to the source of his funds, he indicates in

25   response to the Pennsylvania application in particular that

1    the source of his approximately 18 million, which was the full

2    amount he was going to eventually invest, was going to come

3    from deposits in various financial institutions, and from

4    other sources, is that correct?

5    A    Yes.

6    Q    He also provided information about the source of funds in

7    the federal application, which was provided to you, didn't he?

8    A    I --

9          MS. SHEALY:  If we could pull up Exhibit 64, I

10   believe it's page six.

11          THE WITNESS:  Okay.

12          MS. SHEALY:  Government Exhibit 64.  And if I could

13   direct you to the top of the page paragraph seven.

14   BY MS. SHEALY:

15   Q    Do you see there where it indicates that Mr. Levin, the

16   source and the amount of funds that he's going to provide,

17   half of the funds from personal finances and half from

18   borrowed funds?

19   A    I do.

20   Q    And that's as of June 30th, the date that Mr. Levin signs

21   the application, correct?

22   A    Yes.

23   Q    But the cover letter transmitting the application, you

24   didn't actually get the application until mid-July, is that

25   right?

Moretz - Cross/She                                    181

1    A    Yes.  July 21st.

2    Q    And so as of July 21st that cover letter lets you know

3    that, hey, Mr. Levin has put 5 million into the bank, right?

4              MS. BARRY:  Objection.

5              THE COURT:  Sustained.

6    BY MS. SHEALY:

7    Q    Does the cover letter indicate to you that Mr. Levin had

8    invested 5 million in Nova Financial Holdings?

9    A    That's what it indicates.

10   Q    That's what it indicates.  And the financial statements

11   which are provided as part of the change in control

12   application, if you can flip to those.  Those are dated as of

13   March 31st, 2009, is that right?

14   A    Financial statements, did you say?

15   Q    Yes.

16   A    I think I remember that, but I'll make sure.

17   Q    It should be at the back of Exhibit 64.  They're rather

18   lengthy.

19   A    Um-hum.  March 31st.

20   Q    Yes.  So they're as of March 31st.  So you were provided

21   information as to Mr. Levin's financial state as of March

22   31st, correct?

23   A    Yes.

24   Q    And then you were provided information as of June 30th as

25   to how he planned to pay for his investment in Nova Financial

1   Holdings, correct?

2   A     Yes.

3   Q     And then on July -- I think it's the seventeenth, you are

4   provided the actual application.  I think it's July 17th --

5   A     Twenty-first.

6   Q     I'm sorry, thank you.  July 21st.  You provided the

7   actual application with a cover letter indicating that Mr.

8   Levin has now put in 5 million into Nova Financial Holdings,

9   correct?

10  A     Yep, that's what it indicates.

11  Q     So at that point, it's pretty clear that the materials in

12  the application are not completely up-to-date, is that fair to

13  say?

14  A     Say that again?

15  Q     Ms. Barry asked you if there was anything in the

16  materials that were provided to you indicating that Mr. Levin

17  had invested -- received a loan from Nova Bank?  Do you recall

18  her asking you that?

19  A     Oh, yeah, sure.

20  Q     And the materials -- and she -- let me rephrase.  The

21  materials that were provided to you provided the information

22  from Mr. Levin were from before that time period, is that fair

23  to say?

24  A     Before -- yeah, before July 21st you're saying, yes.

25  Q     And so there came a time at which --

1    A    Or dated it before July 21st.

2    Q    Thank you.  And there came a time at which someone in

3    your agency asked questions about the source of Mr. Levin's

4    funds, is that right?

5    A    Yes.

6    Q    And that was Ms. Metcalfe?

7    A    That was.

8    Q    And I believe you described Ms. Metcalfe as an

9    administrator, is that right?

10   A    That's her title -- was he title.

11   Q    Was her title.  Was Ms. Metcalfe the one actually

12   responsible for the analysis of the application?

13   A    Yes.

14   Q    And were you her supervisor?

15   A    Yes.

16   Q    So it was Ms. Metcalfe's responsibility --

17        MS. SHEALY:  I'm sorry, you can take the exhibit

18   down.

19   BY MS. SHEALY:

20   Q    -- to review the materials and the application and to ask

21   any follow up questions that she might have, is that correct?

22   A    Yes.

23   Q    Did you review her analysis?

24   A    I reviewed it, yes.  I have to review it.

25   Q    Did she write any sort of memo, or provide underlying

1    documentary evidence to you as to the substance of her

2    analysis?

3    A    Yes, she -- we write memos on all the applications.

4    Q    Did you provide those memos to the United States in this

5    matter?

6              MS. BARRY:  Objection.

7              THE COURT:  Overruled.

8              MS. SHEALY:  I'll -- let me rephrase my question.

9    BY MS. SHEALY:

10   Q    You would agree with me that information as -- that the

11   best evidence as to what was provided, or not provided to the

12   Pennsylvania Department of Banking in connection with Mr.

13   Levin's application would be in those materials, is that

14   correct?

15             MS. BARRY:  Objection.

16             THE COURT:  Basis counsel?

17             MS. BARRY:  Argumentative, Your Honor.

18             THE COURT:  I don't consider it argumentative, but

19   you can rephrase for a more specific question, please.

20   BY MS. SHEALY:

21   Q    You indicated that you reviewed Ms. Metcalfe's analysis,

22   is that correct?

23   A    I do -- I did.

24   Q    Isn't it true that those documents have since been

25   destroyed?

1   A     Not -- I don't know what's been destroyed.

2   Q     You were interviewed by the Government last October, is

3   that correct?

4   A     2015?

5   Q     October of 2015.

6   A     I don't know the date.

7   Q     Do you remember being interviewed in October of last

8   year?

9   A     Oh, yes.  Yes.

10  Q     And was that the first time that you were contacted by

11  the Government in connection with this matter?

12  A     I don't know if it's the first time.

13  Q     Were you contacted multiple times by the Government in

14  connection with this matter?

15  A     It's been more than one -- two times.

16  Q     Pardon me?

17  A     I don't know the dates, but it's two times.

18  Q     Two times.

19          MS. SHEALY:  Your Honor, may we approach for a

20  minute?

21          THE COURT:  Surely.

22      (Sidebar Conference)

23          MS. SHEALY:  I believe we were only --

24          THE COURT:  One second.  Okay.

25          MS. SHEALY:  We were only provided with one

1    memorandum and interview for this witness.

2                THE COURT:  Okay.

3                MS. SHEALY:  Dated as of October 26th, 2015 and

4    (inaudible) memorandum and the documents of Pennsylvania

5    Department of Banking had been destroyed.

6                UNIDENTIFIED ATTORNEY:  (Inaudible).

7                MR. IGNALL:  The Government's practice is if

8    anything doesn't say new or different than a subsequent

9    interview we don't write anything up.  So I don't think -- so

10   that may be why there's only one memorandum.  But I think it's

11   inappropriate to ask this witness if the documents were

12   destroyed.  They're trying to create an inference with the

13   jury that there was something exculpatory or helpful to the

14   defense, under the predicate laid that anything was destroyed

15   in bad faith might be appropriate to get before the jury.

16               THE COURT:  It's already done.  It's already done.

17               MR. IGNALL:  I don't think -- he said he didn't

18   know.

19               THE COURT:  Okay.  But I'm just saying that the

20   question's already out there, and I've told the jury on

21   countless occasions, questions are not evidence.

22               MR. IGNALL:  Yes, but I don't think it's appropriate

23   to follow up --

24               THE COURT:   I agree.  But just in terms of this

25   sidebar conference, do you accept the representation and the

1    explanation that --

2              MS. SHEALY:  That it was not done in bad faith?

3              THE COURT:  That there was nothing else done and

4    stated -- nothing was stated differently so therefore, there

5    would be no need to have a second --

6              MS. SHEALY:  You mean with respect to the interview?

7              THE COURT:  Yes.

8              MS. SHEALY:  That's fine.

9              MR. DUNCAN:  And, Your Honor, can she ask

10   (inaudible) --

11             THE COURT:  I'm sorry?

12             MR. DUNCAN:  Can she ask this question, did he give

13   this (inaudible)?

14             THE COURT:  She is still entitled to impeach if that

15   is appropriate to do.  The question is right now --

16             MS. SHEALY:  Your Honor, am I permitted to ask him

17   (inaudible) in this case and now clients are on trial because

18   they were unable to provide information to Government

19   regulators?  We don't know what (inaudible) provided to the

20   Pennsylvania Department of Banking because those records were

21   destroyed.

22             THE COURT:  You asked that question.

23             MS. SHEALY:  Yes, Your Honor.

24             UNIDENTIFIED COUNSEL:  (Inaudible).

25             THE COURT:  Well at this point, based upon what I'm

Moretz - Cross/She                                    188

1    hearing at sidebar, there's no need to go into that at this

2    point in time.

3        (Sidebar Ended)

4            MS. SHEALY:  The Court's indulgence, please?

5            THE COURT:  Take your time.

6        (Pause)

7            MS. SHEALY:  If we could bring up Government 82,

8    please?

9    BY MS. SHEALY:

10   Q    Ms. Metcalfe was the person responsible for asking follow

11   up questions, is that correct?

12   A    Yes.

13   Q    And the materials that were provided to Ms. Metcalfe,

14   that's the materials that are represented in Government

15   Exhibit 82, is that correct?

16   A    Eighty-two?  Yeah -- oh, the follow up?

17   Q    Yes.

18   A    Yes.

19   Q    And those materials and the information that is provided,

20   they relate to the 13 million that Mr. Levin had not yet

21   invested in Nova Financial Holdings, is that correct?

22   A    I think it deals with the 13 million.

23   Q    Okay.  And this document refers to a CPP application.

24   Did you have any communications with anyone at the CPP Council

25   regarding Mr. Levin's application, Section 112 application?

1    A    Not that I recall.

2    Q    Did you have any communications with anyone at the

3    Treasury Investment Committee regarding Mr. Levin's Section

4    112 application?

5    A    Not that I recall.

6    Q    Did you speak with anyone at the bank -- I think you

7    testified you did speak with some people at the bank regarding

8    Mr. Levin's Section 112 application, is that correct?

9    A    Yes.

10   Q    Did you ever speak with my client, Mr. Barry Bekkedam,

11   regarding anything related to Mr. Levin's change in control

12   application?

13   A    No.

14   Q    Did you ever speak with Mr. Bekkedam regarding anything

15   at all?

16   A    No.

17   Q    Did you see his name on any of the documents that you

18   reviewed in connection with Mr. Levin's change in control

19   application?

20   A    I don't remember seeing it.

21   Q    Okay.

22        MS. SHEALY:  No further questions, Your Honor.

23                    REDIRECT EXAMINATION

24   BY MS. BARRY:

25   Q    Mr. Metcalfe (sic), in this process for the Section 112

1    application, were you asking for the source of funding for the

2    entire $18 million?

3                MR. EGAN:  Objection, leading.

4                THE COURT:  Just a moment please -- Metcalfe.

5                MS. BARRY:  I'm sorry.

6                MR. EGAN:  It's Moretz.

7                THE WITNESS:  It's Moretz.

8                MS. BARRY:  -- Mr. Moretz.  Pardon me, sir, I

9    apologize.

10               THE WITNESS:  It's okay.

11   BY MS. BARRY:

12   Q    Mr. Moretz, in this process, were you asking for the

13   source of funds for all $18 million, or not?

14   A    I believe that we wanted to know the source of the funds

15   for the entire investment.

16   Q    The entire amount?

17   A    Right.

18               MS. BARRY:  No more questions, Your Honor.  Thank

19   you.

20               MR. EGAN:  No further questions, Your Honor.

21               MS. SHEALY:  No further questions.

22               THE COURT:  Thank you, sir, you may step down.

23   Watch your step, please.

24               THE WITNESS:  Thank you.

25        (Pause)

Colloquy                                    191

1          THE COURT:  Are there other witnesses this

2     afternoon?

3          MR. IGNALL:  Your Honor, I think we mentioned that

4     at sidebar earlier.

5          THE COURT:  I just want to confirm.

6          MR. IGNALL:  Yes.  I'm confirming.

7          THE COURT:  All right.  We are going to adjourn for

8     the day.  Again, you are reminded that you're not to discuss

9     the testimony amongst yourselves, nor with anyone else.  Do

10    not do any investigation or research on your own.  Avoid any

11    radio, television or other media broadcast about the case.

12          And also be reminded that on Monday we will start at

13    9:00 Monday morning, because we'll only have half a day Monday

14    in the morning, and we'll be --

15          UNIDENTIFIED COUNSEL:  Your Honor, that's the week

16    after --

17          THE COURT:  Oh, I apologize.

18          UNIDENTIFIED COUNSEL:  -- that's the eighteenth.

19          THE COURT:  Pardon me?

20          UNIDENTIFIED COUNSEL:  That's the eighteenth, Your

21    Honor.

22          THE COURT:  Oh, come anyway.  No.  Okay.  My

23    apologies.  I was trying to get you a day off.  One second.

24    Ah, yes.  Okay.  Monday the 18th.  I guess we'll be here all

25    day.  9:15.  You all have a nice weekend as well.  Thank you.

Colloquy                                           192

1          (Jury Exits)

2               THE COURT:  We're adjourned.  Sorry about that.

3               UNIDENTIFIED COUNSEL:  Thank you, Your Honor.

4               THE COURT:  Thank you.

5               UNIDENTIFIED COUNSEL:  Have a good weekend.

6               THE COURT:  You too, thank you.

7          (Proceedings concluded at 3:54 p.m.)

8                         *  *  *  *  *

9

1          C E R T I F I C A T I O N

2    We, Josette Jones and Tara Martin, court approved transcriber,

3    certify that the foregoing is a correct transcript from the

4    official digital audio recording of the proceedings in the

5    above-entitled matter.

6    Tara Martin    Digitally signed by Tara Martin
                    DN: cn=Tara Martin, o, ou,
                    email=dianadiana@comcast.net, c=US
7    _____Date: 2016.04.15 16:25:09 -04'00'_____

8    TARA MARTIN

9

10   Josette Jones   Digitally signed by Josette Jones
                     DN: cn=Josette Jones, o, ou,
                     email=dianadoman@comcast.net, c=US
11   _____Date: 2016.04.15 16:25:28 -04'00'_____     _____

12   JOSETTE JONES                                    DATE

13   DIANA DOMAN TRANSCRIBING, LLC