UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,  )   14-CR-0548
                           )
          v.               )
                           )
BRIAN HARTLINE and         )
BARRY BEKKEDAM,            )   Philadelphia, PA
                           )   April 11, 2016
              Defendants.  )   9:16 a.m.

TRANSCRIPT OF TESTIMONY OF IRA LUBERT, HAL SHAFFER, EDWARD
DiMARCANTONIO, and HARRY ZENTNER
BEFORE THE HONORABLE C. DARNELL JONES, II
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:        DAVID J. IGNALL, ESQUIRE
                           JENNIFER CHUN BARRY, ESQUIRE
                           ASSISTANT UNITED STATES ATTORNEY
                           UNITED STATES ATTORNEY'S OFFICE
                           615 Chestnut Street, Suite 1250
                           Philadelphia, PA 19106

For the Defendant          PATRICK J. EGAN, ESQUIRE
Brian Hartline:            FOX ROTHSCHILD LLP
                           2000 Market Street, 10th Floor
                           Philadelphia, PA 19107

                           JOHN C. FULLER, ESQUIRE
                           FOX ROTHSCHILD LLP
                           2000 MARKET ST 20TH FL
                           PHILADELPHIA, PA 19103

For the Defendant          MICHAEL J. ENGLE, ESQUIRE
Barry Bekkedam:            GREENBLATT, PIERCE, ENGLE,
                           FUNT & FLORES
                           123 South Broad Street, Suite 2500
                           Philadelphia, PA 19109

Audio Operator:            CARL HAUGER

Transcribed by:            DIANA DOMAN TRANSCRIBING, LLC
                           P.O. Box 129
                           Gibbsboro, NJ 08026
                           Office: (856) 435-7172
                           Fax:    (856)  435-7124
                           E-mail:  dianadoman@comcast.net

Proceedings recorded by electronic sound recording; transcript
produced by transcription service.

2

APPEARANCES (Cont'd):

For the Defendant                RUSSELL D. DUNCAN, ESQUIRE
Barry Bekkedam:                  SHULMAN, ROGERS, GANDAL, PORDY &
                                 ECKER, PA
                                 12505 Park Potomac Avenue
                                 Potomac, MD 20854

                                 JOEL D. SCHWARTZ, ESQUIRE
                                 SHULMAN ROGERS GANDAL PORDY ECKER
                                 12505 PARK POTOMAC AVE 6TH FL
                                 POTOMAC, MD 20854

                                   - - -

3

**I N D E X**

PAGE

**WITNESSES FOR THE GOVERNMENT**
IRA LUPERT
  Direct Examination by Ms. Barry           10
  Cross Examination by Mr. Schwartz         22
  Cross Examination by Mr. Fuller          57

HAL J. SHAFFER
  Direct Examination by Mr. Ignall         60
  Cross Examination by Mr. Egan            68
  Cross Examination by Mr. Duncan          74

EDWARD DiMARCANTONIO:
  Direct Examination by Ms. Barry           78
  Cross Examination by Mr. Egan           139
  Cross Examination by Mr. Duncan        182
  Redirect Examination by Ms. Barry       204
  Recross Examination by Mr. Egan        208

HENRY ZENTNER
  Direct Examination by Ms.  Barry        210

| **EXHIBITS** | | **ID.** | **EVD.** |
|---|---|---|---|
| G-300 | FDIC of loan files | -- | 5 |
| G-301 | FDIC of loan files | -- | 5 |
| G-303 | FDIC of loan files | -- | 5 |
| G-304 | FDIC of loan files | -- | 5 |
| Gvt-137(b) | Series of e-mails between Barry Bekkedam and Ira Lupert | -- | 13 |
| Gvt-137(a) | Series of e-mails between Barry Bekkedam and Ira Lupert | -- | 17 |
| Gvt-137 | Series of e-mails between Barry Bekkedam and Ira Lupert | -- | 19 |
| G-25 | 5/27/09 Minutes of board of directors meetings of Nova Financial Holdings | -- | 87 |
| G-26 | E-mail from Larry Rovin to Barry Bekkedam and Mr. DiMarcantonio | -- | 91 |
| G-35 | 6/22/09 Minutes of the board of directors meeting, Nova Bank | -- | 96 |
| G-36 | 6/23/09 E-mail from Brian to Mr. Bekkedam and Mr. DiMarcantonio | -- | 98 |
| G-39(a) | 8/29/09 E-mail from Mr. Hartline | -- | 100 |
| G-50 | E-mail from Barry to Larry Rovin | -- | 105 |
| G-70 | E-mail from Brian to Barry and Mr. DiMarcantonio | -- | 107 |

4

**I N D E X (Cont'd)**

|                |                                   | PAGE |
|----------------|-----------------------------------|-----------|
| **EXHIBITS**   |                                   | **ID.** | **EVD.** |
| G-76           | E-mail from Mr. Hartline to Barry and Mr. DiMarcantonio | -- | 111 |
| G-103          | E-mail dated 10/21/09             | -- | 115 |
| G-108          | Nova's meeting minutes 10/21/09   | -- | 116 |
| G-124          | E-mail dated 11/6/09              | -- | 120 |
| G-128          | Nova's meeting minutes 11/25/09   | -- | 125 |
| G-136          | E-mail dated 12/9/09              | -- | 128 |
| G-135          | E-mail dated 12/10/09             | -- | 130 |
| G-148          | Nova's meeting minutes 12/16/09   | -- | 133 |
| G-185          | Report of examination             | -- | 211 |
| G-164(a)       | Schedule RCR                      | -- | 218 |

5

```
 1                THE COURT:  You may be seated.
 2                MR. IGNALL:  Your Honor, may I raise two things
 3  before the jury comes in?
 4                THE COURT:  Yes, sir.
 5                MR. IGNALL:  I think we neglected to move to
 6  introduce one of our exhibits that was from the FDIC of the
 7  loan files.  It's Exhibit 303.  We have a stipulation to move
 8  it into evidence.
 9                UNIDENTIFIED ATTORNEY:  That's correct, Your Honor.
10                UNIDENTIFIED ATTORNEY:  Yes.
11                THE COURT:  303?
12                MR. IGNALL:  And -- 303.  And I think that should
13  mean that all four of the loan files in that series, so it
14  should be 300, 301, 303 and 304 should all now be in evidence.
15                UNIDENTIFIED ATTORNEY:  I don't think 300.  But it's
16  the same --
17                MR. IGNALL:  All right.  May we move --
18                UNIDENTIFIED ATTORNEY:  -- stipulation.
19                MR. IGNALL:  Yeah.
20                THE COURT:  I don't have 300 checked either.
21                MR. IGNALL:  Okay.  Then I'd like to move into
22  evidence, Exhibit 300 as well.  I believe there's an agreement.
23                UNIDENTIFIED ATTORNEY:  Yeah, sure.
24                UNIDENTIFIED ATTORNEY:  That's correct, Your Honor.
25                THE COURT:  All right.  Okay.
```

6

```
 1            MR. IGNALL:  And then the other thing was -- and I
 2  apologize, having this two days in a row, but one of our
 3  witnesses, Mr. Gallub, apparently had a medical appointment
 4  today.  So he's not going to be available today.  So I don't
 5  know how far along we're going to get.  But a couple of the
 6  other witnesses, either -- like Mr. Rovin's is not available
 7  today and Mr. Bonomo also had a medical appointment today.  So
 8  hopefully, we'll have everyone ready to go tomorrow.  But I
 9  just wanted to give the Court --
10            THE COURT:  All right.
11            MR. IGNALL:  -- advanced notice of that.  If it
12  helps, we have five witnesses available.  They won't be
13  particularly long, but hopefully we'll get through all of them.
14            THE COURT:  Very well.
15            MR. IGNALL:  Thank you.
16            THE COURT:  Now Mr. Schwartz' request for me to
17  review the in camera --
18            MR. SCHWARTZ:  Yes, Your Honor.
19            THE COURT:  -- matters that matter to him.
20            MR. SCHWARTZ:  Yes.  And then if we move forward on
21  the letter.
22            THE COURT:  All right.
23            MR. IGNALL:  I saw the letter.  And with respect to
24  two items, I think it's quite easy to identify where they are
25  in the memoranda and we'll happily do it for the Court.  But it
```

1   seems like Mr. Schwartz is asking the Court to review all the

2   memoranda and the notes to make sure they're consistent.  And

3   if there's something else he wants to specify, I'm happy to

4   show where it is.

5          But for the two items in particular, which I think

6   were -- and the earliest one was that Ms. Musser said that Mr.

7   Bekkedam never asked her to invest in Nova.  That's in the 2012

8   memorandum I believe.  We can point the Court exactly where

9   that is in Agent Barrett's (phonetic) notes.

10         THE COURT:  Okay.  Because he's talking about the

11  notes?

12         MR. IGNALL:  Yes.  And we can show them that they are

13  consistent and we can point the Court to exactly where that is.

14         THE COURT:  Well, if they are, do I need to see them?

15  You want -- he's not seen them, Mr. Schwartz --

16         MR. IGNALL:  He's not seen it.  And I think under

17  Ramos (phonetic), it is appropriate now that he's raised the

18  issue for the Court to look at it.

19         THE COURT:  Right.

20         MR. IGNALL:  So we'll look at that.  And then it was

21  in 2016 I believe, it was when Agent Boyer (phonetic) was

22  taking -- writing up the report, there's something in the

23  report about Mr. Bekkedam saying something about getting $5

24  million to prop up the bank.  As I understood Mr. Schwartz'

25  concern was that nothing in the memorandum says that it was for

8

1   Mr. Levin.  The notes will say the same thing that it was --
2   the same thing that's in the typewritten report, that he talked
3   about $5 million to prop up the bank because as -- and I was in
4   that interview as well, everyone understood -- and I think she
5   even said it, it's for Mr. Levin,  So I believe that's why
6   Agent Boyer didn't write down Mr. Levin either in his
7   handwritten notes or in the memorandum.
8          But the only issue now is the -- are the handwritten
9   notes consistent with the typewritten memorandum.
10          THE COURT:  Right.
11          MR. IGNALL:  And I can point the Court to exactly
12  where that is as well.
13          THE COURT:  All right.
14          MR. IGNALL:  If there's anything else Mr. Schwartz
15  wants, he can ask the Court to do that.
16          MR. SCHWARTZ:  There are just three factors that came
17  out.  (1) that Mr. Bekkedam supposedly asked Ms. Musser to
18  invest in Nova.  (2) that there was some association with Mr.
19  Levin with regard to that.  And (3) there's the issue of
20  propping up the bank which came out but not connected to Mr.
21  Levin in our March 15th, 2016 memorandum, that's this
22  (indiscernible).
23          THE COURT:  Very well.
24          MR. SCHWARTZ:  Thank you.
25          THE COURT:  All right.

1          MR. IGNALL:  Judge, at some point if the Court wants

2  even just ex parte, I can point exactly where they are in the

3  memorandum, I'm happy to do that, Your Honor.

4          THE COURT:  That would be fine.  Thank you.  All

5  right.  Is there anything else?

6          UNIDENTIFIED ATTORNEY:  No, Your Honor.

7          MR. IGNALL:  We're ready.  Thank you.

8          COURTROOM DEPUTY:  All rise.

9                          (Jury in)

10         COURTROOM DEPUTY:  The court is now in session.  The

11  Honorable C. Darnell Jones, II presiding.

12         THE COURT:  Good morning.  Good morning.

13         THE JURORS:  Good morning.

14         THE COURT:  You may be seated.  Did someone say it's

15  a little chilly over there.

16         UNIDENTIFIED SPEAKER:  Very.

17         THE COURT:  We'll address it ASAP.

18         UNIDENTIFIED SPEAKER:  All right.

19         THE COURT:  All right.  Counsel, you may proceed.

20         MS. BARRY:  Thank you, Your Honor.  Unites States

21  calls Ira Lubert.

22          IRA LUBERT, WITNESS FOR THE GOVERNMENT, SWORN

23         COURT CLERK:  Please state and spell your name for

24  the record.

25         THE WITNESS:  Ira Lubert.  I-r-a.  Last name L-u-b-e-

Lubert - Direct/Barry                              10

1   r-t.

2            MS. BARRY:  May I proceed, Your Honor?

3            THE COURT:  Yes, ma'am.

4            MS. BARRY:  Thank you.

5                        DIRECT EXAMINATION

6   BY MS. BARRY:

7   Q    Good morning, Mr. Lubert.

8   A    Good morning.

9   Q    Where do you work, sir?

10  A    I work for a company called Independence Capital Partners

11  and a series of funds that that holding company has an

12  affiliation with.

13  Q    Okay.  And I know you just kind of described it briefly,

14  so what is Independence Capital Partners?

15  A    It is a holding company for a series of today's six funds

16  which are in the real estate, banking, private equity, life

17  sciences.  It's an array of funds.  We take in money from

18  investors, pension funds, individuals, et cetera.  And we

19  deploy that capital on behalf of them.

20  Q    Okay.  And what is your position with Independence Capital

21  Partners?

22  A    I'm a co-founder and chairman.

23  Q    And prior to becoming Independence Capital Partners, did

24  your firm or your fund have a different name?

25  A    It has several names underneath Independence Capital.

Lubert - Direct/Barry                      11

1  There's a real estate fund called Lubert-Adler.  There's a fund

2  called LEM Capital.  There's a debt fund called LBC.  I can

3  name them all --

4  Q    Okay.

5  A    -- but there are eight at the most at one time.

6  Q    Yes.  And in 2009, was this the same fund that you were

7  running?

8  A    Yes.

9  Q    And do you know the defendant Barry Bekkedam?

10 A    Yes, I do.

11 Q    And how do you know Barry Bekkedam?

12 A    Barry was one of the investors in two of my funds.

13 Q    Okay.  And do you see Mr. Bekkedam here today in court?

14 A    Yes, I do.

15 Q    And would you kindly point him out as to the location of

16 where he is?

17 A    Yes.

18        MS. BARRY:  Okay.  Your Honor, the Government

19 requests that the record reflect that the witness has

20 identified defendant Barry Bekkedam.

21        THE COURT:  Granted.

22 Q    And do you know if Mr. Bekkedam had his own investment

23 firm?

24 A    I do.

25 Q    And what was that called?

Lubert - Direct/Barry                        12

1   A    Ballamor Capital.

2   Q    Now has the defendant Barry Bekkedam ever solicited you

3   for business?

4   A    Yes.

5   Q    And approximately when was that?

6   A    Several years ago, six, seven, eight years ago.

7   Q    Okay.  Well, let me show you what's been marked as

8   Government Exhibit 137(b).  And when he solicited you for

9   business, what was that in?  Prior to looking at the exhibit,

10  what was that in?  What was the --

11  A    It was for an investment in a bank that he had an

12  affiliation with.

13  Q    Okay.  And what bank was that?

14  A    Nova.

15  Q    And do you know whether or not he told you anything about

16  Nova Bank applying for TARP funding?

17  A    I don't recall that.

18  Q    Okay.  Well, let's take a look at Government's Exhibit

19  137(b).  And looking at 137(b), what is that?

20  A    It's an e-mail from Barry Bekkedam to me.

21  Q    Okay.  And is that part of a series of e-mails?

22  A    Yes.

23         MS. BARRY:  Okay.  Your Honor, the Government moves

24  for the admission of Government's Exhibit 137(b).

25         MR. SCHWARTZ:  Your Honor, I believe it's marked as

Lubert - Direct/Barry                    13

1    137(c).  I'll just check with the Government about that.  It

2    was toward the end.

3              MS. BARRY:  I believe it's 137(b).

4              UNIDENTIFIED ATTORNEY:  There's no c.

5              UNIDENTIFIED ATTORNEY:  In the list, it's 137 and

6    then (a), (b).  The exhibits we have are 137(a), (b), and (c).

7    I suppose --

8              MS. BARRY:  I apologize, Your Honor, the actual

9    exhibit must have the wrong exhibit stamp on it.

10              UNIDENTIFIED ATTORNEY:  Okay.

11              THE COURT:  All right.

12              MS. BARRY:  It is 137(b).  And let the record

13    reflect, please, that the Exhibit is 137(b) which is on the

14    exhibit list correctly, but I believe has the wrong exhibit

15    sticker on it, Your Honor.

16              THE COURT:  All right.

17    Q    Okay.  Now taking a look at --

18              MS. BARRY:  Government moves for the admission of

19    137(b), please.

20              UNIDENTIFIED ATTORNEY:  No objection.

21              THE COURT:  Granted.

22              MS. BARRY:  Okay.  May it be published, Your Honor?

23              THE COURT:  Yes.

24    Q    And looking at 137(b) --

25              MS. BARRY:  If we could go to the e-mail which is I

Lubert - Direct/Barry                                    14

1   believe the third e-mail, the one that begins, Ira, colon,  I

2   guess we have an old e-mail in our system.  And if we could

3   blow that up, please?  The whole e-mail please.  Thanks.

4   Q     Okay.  And who is this e-mail from?

5   A     It's from Barry Bekkedam.

6   Q     And is this addressed to you or not?

7   A     Yes, it is.

8   Q     And what is the date?

9   A     November 24th, 2009.

10  Q     And is that approximately when he asked you to invest in

11  Nova?

12  A     Yes.

13  Q     Okay.  And would you please read the e-mail that he sent

14  to you on November 24th, 2009?

15  A     "Ira, I guess we have an old e-mail in our system.  See

16  below.  I thought it was odd that you said you would get back

17  to me Friday and I never heard back.  I'm really between a rock

18  and a hard place.  I have the ability to raise the capital.  I

19  just can't do it by Monday."  Parens, "I may be able to delay a

20  day or so.  I want to capitalize on the 17 million in TARP and

21  avoid a significant impairment of Nova.  With the closing,

22  we'll be fine and are well capitalized.  I've already raised 10

23  million and need 5.250 million more that I can't take out very

24  quickly in meeting quarter -- that I can take out very quickly,

25  Meeting Quarter 1."

Lubert - Direct/Barry                    15

1        New paragraph.  "I really need your help with this?
2   A fund or lending group may not be quick enough.  I would
3   consider this the greatest of personal favors.  Signed, Barry."
4   Q    Okay.  Now when defendant Bekkedam asked you to invest in
5   Nova, what was your response?
6   A    My initial response to Barry was, I couldn't invest
7   because I was a founder and general partner of a fund called
8   Patriot Banking Partners and we invest in middle market banks.
9   And that would have been a conflict of interest in my opinion.
10       MS. BARRY:  And so if we could go to the response e-
11  mail from Mr. Lubert, please, which is the next e-mail there.
12  Q    And is this an e-mail from you, sir?
13  A    Yes, it is.
14  Q    Okay.
15  A    From me to Barry Bekkedam.
16  Q    Okay.  And is this in response to the e-mail that he sent
17  to you?
18  A    Yes, I believe it is.
19  Q    And would you please read it?
20  A    "Barry, I can't do this myself, it must go through Lesser
21  if he can get it done.  I can't and won't violate my GP
22  fiduciary responsibilities for Patriot.  Finally Barry, even if
23  I could do it, I'd have to sell stock or borrow from bank, et
24  cetera."
25  Q    Okay.  Did you have any intention of borrowing money from

Lubert - Direct/Barry                                    16

1    Nova Bank?

2              MR. EGAN:  Objection.  Leading.

3              THE COURT:  Sustained.

4    Q    At the time, do you know whether or not you had any

5    intention of borrowing money from Nova Bank?

6    A    No, I wouldn't.

7    Q    Okay.  And if we look at the next e-mail, and who is this

8    from?

9    A    It's from Barry Bekkedam to me.

10   Q    And is it in response to the e-mail that you just read?

11   A    Yes, I believe it was.

12   Q    And what does it say?

13   A    It just says, "Understood.  Barry."

14   Q    Okay.  Now after you advised Barry Bekkedam that you

15   would not invest in Nova Bank, did he come to you again asking

16   you to invest?

17   A    Well, he asked me if I could help him raise the money.

18   Q    Okay.  And if you would please, take a look at what's been

19   marked as Government's Exhibit 137(a).

20             MS. BARRY:  And this is just for the witness, please.

21   Q    And looking at 137(a), what is this, sir?

22   A    Can you blow this up too?  I'm sorry -- like you did the

23   last one?  Make it larger?

24   Q    Oh, yes.

25   A    Thank you.  Yeah, this is a e-mail from Barry to me.

Lubert - Direct/Barry                               17

1  Q    Okay.  Again, is this a series of e-mails between you and

2  defendant Bekkedam?

3  A    Yes.  Yes, it is.

4         MS. BARRY:  Okay.  Your Honor, the Government moves

5  for the admission of Government's Exhibit 137(a).

6         UNIDENTIFIED ATTORNEY:  No objection.  I mean if it's

7  different pages than what we have, but we have no objection to

8  the document being admitted.

9         THE COURT:  Very well.  Admitted.

10        MS. BARRY:  Thank you.  All right.  If we could,

11 please -- and may it be published, Your Honor?

12        THE COURT:  Yes.

13 Q    Okay.  If we could please, go to the first e-mail which is

14 at the bottom of Page 1 and goes onto Page 2.  And let's start

15 with the bottom of Page 1.  Who is this an e-mail from?

16 A    From Barry Bekkedam to me, dated December 10th.

17 Q    Okay.  And what year is that?

18 A    2009.

19 Q    And what does that e-mail say, please?

20 A    It says, "Ira, I understand that you could not invest in

21 Nova Bank.  We have raised approximately 8.5 million at $4 to

22 close tomorrow."  And then it says, "Anything you can do for

23 the Bank, I would appreciate it.  We are at 1.5 million short.

24 Thanks, Barry."

25 Q    Okay.  And if we could read the next e-mail please.  And

Lubert - Direct/Barry                    18

1   looking at this e-mail, do you know whether or not this is a

2   response from you to Barry Bekkedam's first e-mail?

3   A    I believe it is, yes, it's from me to Barry.

4   Q    And would you please read that?

5   A    Dated December 10th, 2009.  It says, "Barry, I'll make

6   some calls.  Can you mail me a prospectus so that I can give to

7   potential investors I'd like to help?"

8   Q    Okay.  And if we can please look at the next two e-mails

9   together?  And so looking at the bottom of those two e-mails,

10  who is that from?

11  A    It's an e-mail from Brian Hartline to Barry Bekkedam,

12  dated December 10, 2009.  And that says, "Barry attaches the

13  offering document in a subscription agreement.  Let me know if

14  you need anything else."

15  Q    Okay.  And looking at the one on the bottom, who is that

16  from?

17  A    Barry Bekkedam to DiMarcantonio.  It's just his e-mail

18  address and then Brian Hartline.  Two people.

19  Q    And can you -- does it appear that the previous two e-

20  mails were forwarded before Mr. Hartline responded?

21  A    I don't know that.

22  Q    Okay.  And then if we could, please, take a look at the

23  final -- or the first e-mail on this page.  And who is this an

24  e-mail from?

25  A    It's from Barry Bekkedam to me, dated December 10th, 2009.

Lubert - Direct/Barry                              19

1  Q    Okay.  And what time is it?

2  A    6:42 p.m.

3  Q    And what does its say?

4  A    It says, "Ira, here's the offering.  I need some help.

5  Almost there."  With a B for Barry I guess for his name.

6  Q    Now again, looking at this series of e-mails, was it your

7  intention to invest in Nova Bank?

8  A    No, it was not.

9  Q    Okay.  And do you know whether or not after this e-mail

10 was sent if Barry Bekkedam continued to request you to invest

11 in Nova Bank?

12 A    I do not.

13 Q    Okay.  I'd like you to take a look at what's been marked

14 as Government's Exhibit 137.  And what is Government's Exhibit

15 137?

16 A    It's an e-mail from Barry Bekkedam to me dated December

17 11th at 2:13 p.m.

18 Q    Okay.  And is this again a series of e-mails between you

19 and defendant Bekkedam?

20 A    Yes, it is.

21       MS. BARRY:  Okay.  Your Honor, the Government moves

22 for the admission of Government's Exhibit 137.

23       MR. SCHWARTZ:  Subject to the numbering issue we've

24 raised, no objection.

25       THE COURT:  All right.  Admitted.

Lubert - Direct/Barry                                    20

1      MS. BARRY:  May it be published, Your Honor?

2      THE COURT:  Yes.

3   Q    And if we could take a look at the first e-mail in time,

4   but the last e-mail on Page 1.  And who is this an e-mail from?

5   A    Barry Bekkedam to me dated December 11th, 2009.

6   Q    Okay.  And what's the subject?

7   A    Nova.

8   Q    And what does he say?

9   A    "Ira, we're really close.  Anything we can do?"  With a

10  question mark.  "Thanks, Barry."

11  Q    Okay.  And if we look at the next e-mail, please, do you

12  respond to Mr. Bekkedam or not?

13  A    I do respond.

14  Q    And what do you say?

15  A    I say, "I've made two calls.  Waiting to hear."

16  Q    And is there a reply to your e-mail from Mr. Bekkedam?

17  A    Yes, there is.

18  Q    And what does he say?

19  A    He says, "Buddy, I really could use the help with this

20  one.  I need a break.  Thank you.  We just need subscription

21  docs back today.  Wire next week.  I can probably sell next

22  quarter for five or six."  Again, initial B.

23  Q    Okay.  And if we take a look at the next e-mail, do you

24  respond to that?

25  A    Yes.

Lubert - Direct/Barry                        21

1  Q     And what do you say?

2  A     "Okay.   Trying."

3  Q     And let's look at that final e-mail, please.  And does Mr.

4  -- I'm sorry.  If we look at the final e-mail, please?  What

5  does -- is that an e-mail response from Mr. Bekkedam or not?

6  A     Yes, it is.

7  Q     And what does he say?

8  A     I need two fifty with an exclamation mark.

9          MS. BARRY:  Can I have a moment, Your Honor?

10         THE COURT:  Sure.

11 Q     Now after these requests from Barry Bekkedam, did you --

12 do you recall whether or not you ever loaned him money?

13 A     I never loaned the money.

14 Q     Okay.  And do you know whether or not you ever found him

15 an investor to invest in Nova?

16 A     I did not find him an investor.

17         MS. BARRY:  Okay.  No further questions, Your Honor.

18         THE COURT:  All right.

19         MR. SCHWARTZ:  Your Honor, if I could just have a

20 minute with the Government to get the numbers straight?

21         THE COURT:  Surely.

22         MR. SCHWARTZ:  I need some --

23         THE COURT:  Certainly.

24                (Attorney discussion)

25         MR. SCHWARTZ:  Thank you, Your Honor.

Lubert - Cross/Schwartz                    22

1           THE COURT:  Yes, sir.

2           MR. SCHWARTZ:  May I proceed?

3           THE COURT:  Yes, sir.

4                        CROSS EXAMINATION

5  BY MR. SCHWARTZ:

6  Q    Good morning, sir.

7  A    Good morning.

8  Q    My name is Joel Schwartz.  I represent Mr. Bekkedam.  Now

9  sir, just to be clear, you were never a client of Ballamor

10 Capital Management, is that correct?

11 A    That is correct.

12 Q    Okay.  And Barry Bekkedam, he was never your financial

13 advisor, is that correct?

14 A    He was not.

15 Q    Okay.  And when Mr. Bekkedam approached you about Nova and

16 TARP, that was kind of mid-November to early December 2009, is

17 that correct?

18 A    I believe that's right.

19 Q    Okay.  And sir, you're in the financial services industry

20 yourself, is that correct?

21 A    That is correct.

22 Q    You run that company, Independence Capital Partners?

23 A    I'm the chairman of the company.

24 Q    Okay.  And that was what you did back in 2009 as well, is

25 that correct?

1  A     Yes, sir.

2  Q     Okay.  And some of the things that Independence Capital

3  Partners oversees are a bunch of funds, is that right?

4  A     That is right.

5  Q     Okay.  And one of the -- and some of those funds are

6  private equity funds, is that right?

7  A     That is right.

8  Q     They're private equity investment opportunities, is that

9  correct?

10  A     That is correct.

11  Q     Okay.  So investors would put their money into private

12  equity investment opportunities, is that correct?

13  A     Well, they would invest in a blind fund for us.

14  Q     Mm-hmm.

15  A     And then we would deploy that capital, making our own

16  decisions on where that money would be deployed for private

17  equity opportunities.

18  Q     Got it.  And you said there were as many as eight funds

19  under your management -- around 2009, is that fair?

20  A     Yes, eight different categories of funds.

21  Q     Categories of funds.  And --

22  A     There are actually over 20 funds, but if you take as an

23  example, our real estate fund, we are today on our seventh one.

24  So --

25  Q     Got it.  And so you'd have LCB-1 (sic), LCB-2, and so on?

Lubert - Cross/Schwartz                        24

1  A    That's right.  That's exactly right.

2  Q    Okay.  And some of those funds included this Patriot

3  Capital Partners, is that correct?

4  A    That is correct.

5  Q    Another one was LEM Mezzanine Fund, is that correct?

6  A    That is correct.

7  Q    And then there was LEM-1, LEM-2, and so on?

8  A    Yes, sir.

9  Q    Okay.  Thanks.  And LBC Credit Partners, that was another

10 one you mentioned?

11 A    That is right, sir.

12 Q    Okay.  And that's how you know Barry Bekkedam, right?

13 A    That's exactly how I know him.

14 Q    Okay.  And he ran Ballamor Capital Management back in the

15 late 2000s, is that fair to say?

16 A    That is correct.

17 Q    Okay.  And you mentioned for a minute that Barry was an

18 investor in some of your funds, is that what you said?

19 A    I did say that.

20 Q    That's not accurate.  The accurate statement would be that

21 Barry's clients from Ballamor were investors in the fund, is

22 that more --

23 A    That is more of an accurate statement.

24 Q    Okay.  Barry, himself, so far as you can remember never

25 himself put any of his money into the funds, is that correct?

Lubert - Cross/Schwartz                    25

1  A    I'm not sure if he did or didn't.

2  Q    Okay.  Now so Barry, what he would do was he would get his

3  clients and refer them to you and your funds, is that correct?

4  A    That's not right.

5  Q    Well, what would happen?  What would happen between

6  Ballamor clients and ICP?

7  A    We never really met with Ballamor clients ever.  We met

8  with Barry and his staff.  And he would evaluate our funds and

9  he would make a determination on behalf of his clients whether

10 he wanted to invest in our funds.

11 Q    Okay.  And the determination was to invest in a number of

12 your funds, is that fair to say?

13 A    That is fair to say.

14 Q    Okay.  And they invested significant funds, significant of

15 Ballamor clients' funds were invested in various ICP overseeing

16 funds, is that right?

17 A    Well, I don't know how much of Barry's clients' funds in

18 total were invested.  I don't known -- have no idea about his

19 amount of money.  But the amount he invested in two of my

20 funds, I would consider a meaningful amount of money.

21 Q    And when you say, meaningful, was that millions, tens of

22 millions, what would you say?

23 A    Tens of millions.

24 Q    So tens of millions of the funds that Ballamor -- came

25 from Ballamor Capital Management clients went into funds that

Lubert - Cross/Schwartz                    26

1  ICP oversaw?

2  A    Two of my funds, yes.

3  Q    Okay.  And the two of the funds were LEM and LCB, is that

4  correct?

5  A    LBC.

6  Q    Oh, LBC, I'm sorry.  So LBC was one of them and LEM was

7  another of them?

8  A    That's right.

9  Q    Is that right?  All right.  So tens of millions of dollars

10 from Ballamor Capital Management clients ultimately ended up in

11 ICP funds?

12 A    That is correct.

13 Q    And that was all happening -- it all happened before Mr.

14 Bekkedam approached you about investing in Nova Bank, is that

15 right?

16 A    That is correct.

17 Q    Okay.  And back then, that was the 2008, 2009 time period.

18 That was when the market crashed, is that right?

19 A    That is right.

20 Q    Okay.  And even though the market crashed, those Ballamor

21 client investors, they stuck with your funds, isn't that right?

22 A    Well, they were contractually obligated to stick by my

23 fund.

24 Q    They didn't try to pull out, did they?

25 A    Well, some did come to see me and wanted to know more

Lubert - Cross/Schwartz                    27

1  about the funds.  So I had -- I can't remember how many, but a

2  few people did contact us directly and asked to come see us.

3  Q    But ultimately, they remained loyal to you and kept their

4  money there?

5  A    Well, we needed --

6           MS. BARRY:  Objection.

7           THE COURT:  Sustained.

8  Q    Sir, you're experience with Barry during that time was

9  that he was an upstanding businessman, is that correct?

10          MS. BARRY:  Objection.

11 Q    Sir --

12          THE COURT:  Just a moment.  Let me see, please.

13          MS. BARRY:  Objection.  Ask for a sidebar, please.

14                         (At Sidebar)

15          THE COURT:  Okay.  Basis for objection?

16          MS. BARRY:  Your Honor, yesterday, Mr. Schwartz

17 contacted me and asked me about whether or not we were going to

18 go into what Mr. Lubert thought about Barry's investment style,

19 et cetera.  And Mr. Lubert had brought up that he thought that

20 Barry was fast and loose and that there were red flags with the

21 way that he invested.  I said I was not going to go into those.

22 And --

23          MR. SCHWARTZ:  Yes, that's correct.

24          MS. BARRY:  And I did was offer to bring in all of

25 those issues.  To now bring -- ask him to bring up whether or

Lubert - Cross/Schwartz                        28

1  not you know he thought he was good at what he did is you know

2  opening the door to an area that I specifically by agreement

3  said I was not going to go into.

4          MR. SCHWARTZ:  That's correct.  And I'll withdraw the

5  question, Your Honor.  I think that's a fair characterization.

6          UNIDENTIFIED ATTORNEY:  Yes.  While we're up here,

7  can I just raise an issue?  Can we perhaps stop referring to

8  Mr. Hartline and Mr. Bekkedam as defendant Bekkedam and

9  defendant Hartline?

10          MS. BARRY:  Okay.

11          MR. SCHWARTZ:  I'll withdraw the question.

12          THE COURT:  Thank you.

13               (Conclusion of Sidebar)

14          MR. SCHWARTZ:  May I, Your Honor?

15          THE COURT:  Yes, sir.

16  Q    Okay.  I'm going to withdraw that last question, sir.

17  Barry Bekkedam drove tens of millions of dollars to the ICP

18  related funds because that's what he did, right, he was a

19  capital fund raiser, is that fair to say?

20  A    My -- I really can't answer that as a yes or no to be

21  honest with you.

22  Q    Well, he was a --

23  A    I mean my observation of Barry was that he would --

24          THE COURT:  Just one second, please.  Why don't you

25  go to your next question, please?

1          MR. SCHWARTZ:  All right.

2    Q    Sir, in addition to the fact that Ballamor clients

3    invested in some of the funds that ICP dealt with, Mr. Bekkedam

4    also served on the advisory board of directors on one of these

5    funds, is that correct?

6    A    Yes, that's correct.

7    Q    Okay.  And that was the LEM Fund, is that correct?

8    A    The LEM Fund.

9    Q    Okay.  And he had a representative of Ballamor, one of his

10   employees, Mr. Kloppenburg served on the advisory board of

11   directors of another one of the funds, is that correct?

12   A    The LBC Fund, yes.

13          MS. BARRY:  Objection.

14          MR. SCHWARTZ:  Okay.

15          THE COURT:  Just a moment, please.

16          MS. BARRY:  Relevance.

17          THE COURT:  All right.  Counsel?

18          MR. SCHWARTZ:  It's relevant because it shows the

19   degree of involvement between Mr. Bekkedam's people at Ballamor

20   and --

21          THE COURT:  All right.  I'll allow it.

22   Q    Okay.  So the LBC Fund, that was another one of your

23   funds, is that correct?

24   A    Yes, sir.

25   Q    And one of Mr. Bekkedam's employees, Mr. Kloppenburg,

1  served on the advisory board of directors of the LBC Fund, is

2  that correct?

3  A     Yes.  I just want to clarify.  It's an advisory board.

4  It's not a board of directors.

5  Q     They're two different things?

6  A     Yes.

7  Q     Okay.  Thank you.  Okay.  All right.  Now so, Ballamor

8  clients had put tens of millions of dollars into IBC -- sorry,

9  alphabet soup here -- into ICP Managed Funds, is that correct?

10 A     Can we say tens of millions dollars into LEM and LBC?

11 Q     Okay.

12 A     Two funds.

13 Q     Ballamor clients -- Ballamor clients had invested tens of

14 million dollars -- tens of millions of dollars into two of

15 ICP's funds?

16 A     That is correct.

17 Q     Okay.  All right.  And that was before Mr. Bekkedam

18 approached you about investing in Nova Bank, is that correct?

19 A     That is correct.

20 Q     Okay.  And so after years of Ballamor clients investing in

21 your funds, now Mr. Bekkedam was coming to you to see if you

22 would be an investor in something that he was affiliated with,

23 is that correct?

24 A     That is correct.

25 Q     Okay.  And that kind of makes sense, right, that's how

Lubert - Cross/Schwartz                              31

1  people do business?  You look at funds and see if that's

2  something that's viable for your clients?

3  A    Yes.

4  Q    And then in return, not necessarily because you have to,

5  but you say, oh, I'd like to show you something that you'd

6  might be interested in?

7  A    That's right.

8  Q    Okay.  Now what he asked you to look at was Nova Community

9  Bank, is that correct?

10 A    That is correct.

11 Q    Okay.  Now the Patriot Capital Partners Funds, they

12 focused on investing on financial services companies, is that

13 right?

14 A    That is right.

15 Q    As a matter of fact, they focused on investing things like

16 community banks?

17 A    That is right.

18 Q    In fact, Patriot Capital Funds would sometimes even invest

19 in underperforming community banks, is that fair to say?

20 A    Not by design.

21 Q    Sometimes you invested in banks that were underperforming?

22 A    Well, we ended up investing in a bank that was not

23 performing, but we typically -- the design of the fund was to

24 typically invest in growth oriented banks from 800 million to

25 two billion in size.

Lubert - Cross/Schwartz                          32

1  Q    Well, in late 2009, the Patriot Capital Fund actually

2  invested in a bank called Capital Bank Corporation, is that

3  right?

4            MS. BARRY:  Object, Your Honor.

5            THE COURT:  Overruled.

6  Q    Right around the time that Mr. Bekkedam approached you

7  about investing in Nova, the Patriot Capital Fund or Patriot

8  Capital Partners bought a 9.9 percent interest in a bank called

9  Capital Bank Corporation, is that correct, sir?

10 A    It could be.  I don't recall.  I don't run Patriot Bank

11 day-to-day.  So I don't have -- if you gave me a list of their

12 investments, I could verify it, but I don't have that in front

13 of me.

14 Q    Well, if I showed you a Philadelphia Business Journal

15 article about the acquisition, might that help refresh your

16 recollection?

17 A    That might help me.

18            MR. SCHWARTZ:  Okay.  Could you show just the witness

19 exhibit -- Defense Exhibit 1238(a) please.

20 Q    Do you see that up on your screen, sir?

21 A    I do not.

22 Q    Would you like a hard copy?

23            MR. SCHWARTZ:  May I approach, Your Honor?

24            THE COURT:  Yes.

25            THE WITNESS:  It's just not on the screen yet, that's

Lubert - Cross/Schwartz                    33

1   all I'm saying.

2              MR. SCHWARTZ:  Okay.

3              THE COURT:  What's the number, please, counsel?

4              THE WITNESS:  Here it is.

5              MR. SCHWARTZ:  1238(a).

6   Q    Would you prefer a hard copy, sir?

7   A    No, I can read it.

8   Q    Okay.

9   A    It just came up.

10  Q    Okay.  Take a second to look at that.

11  A    I see that.  Thank you.

12  Q    Okay.  Now that's a reprint of an article from

13  Philadelphia Business Journal, is that correct?

14  A    That is correct.

15  Q    And you're familiar with that publication I assume?

16  A    Yes, I am.

17  Q    Okay.  And the date of that article is December 16th,

18  2009?  You see it right under the --

19  A    Yes, I do see it.  Yes, that's right.

20  Q    Okay.  And the title of the article is Patriot Capital

21  Partners, Bullish on 2010?

22  A    That is correct.

23  Q    Okay.  And the first paragraph says, Private equity fund,

24  Patriot Capital Partners --

25             MS. BARRY:  Objection, Your Honor, as to reading

Lubert - Cross/Schwartz                    34

1  this.

2            THE COURT:  Sustained.

3            MS. BARRY:  It's not in evidence.

4            MR. SCHWARTZ:  Okay.

5            THE COURT:  Sustained.

6  Q    Does this -- have you looked at this article, sir?

7  A    I now have reviewed it, yes.

8  Q    Okay.  Does that refresh your recollection as to whether

9  in about the same time that Barry Bekkedam approached you about

10 investing in Nova Community Bank in Philadelphia, your Patriot

11 Capital Partners were purchasing a 9.9 percent interest in a

12 North Carolina Bank called Capital Bank Corporation?

13 A    That is correct.

14 Q    Okay.  So it kind of made sense that if you were investing

15 in community banks in North Carolina that Mr. Bekkedam from

16 Philadelphia would approach a Philadelphia businessman about

17 investing in a Philadelphia area community bank, is that fair

18 to say?

19 A    It's fair to say.

20 Q    Okay.  So that made sense that since he was a guy who had

21 referred business to you, tens of millions of dollars, right,

22 sir?

23 A    Yes.

24 Q    And he was a guy who knew that you and your Patriot

25 Capital Partners looked into and looked at buying things like

Lubert - Cross/Schwartz                    35

1  community banks that he would go up to you and say, hey, here's

2  one right in your neighborhood, would you be interested in

3  investing in it?

4         MS. BARRY:  Objection.  Relevance.

5         THE COURT:  Overruled.

6  Q   Sir, you can answer that.

7  A   Could you repeat the question?  I'm sorry.

8  Q   It's a long one.

9  A   I'm sorry.  I just --

10 Q   Okay.  All right.  So give the fact that Mr. Bekkedam's

11 clients at Ballamor Capital had invested tens of millions of

12 dollars in your funds and given the fact that your Patriot

13 Capital Partners had a history or track record of investing in

14 community banks, would you agree that it made sense for Mr.

15 Bekkedam, a Philadelphia-based business, to approach you, a

16 Philadelphia-based business, about investing in a Philadelphia-

17 based community bank?

18        MS. BARRY:  Objection.

19        THE COURT:  Overruled.

20 A   He approached me personally though, not on behalf of

21 Patriot.

22 Q   I understand that.

23 A   Okay.

24 Q   Because you had -- you were one of the people who ran

25 Patriot Capital Partners.

Lubert - Cross/Schwartz                          36

1  A    I was one of the -- I am one of the founders.  I don't run

2  Patriot on a day-to-day basis, but I am one of the founders of

3  the fund.

4  Q    You were one of the founders.  And you agree that part of

5  the portfolio of Patriot Capital Partners was community banks?

6  A    Yes.

7  Q    And if Patriot Capital Partners didn't want to be involved

8  in community banks -- I'm sorry, I withdraw that question.  If

9  you didn't want Patriot Capital Partners to be involved in

10 community banks, you wouldn't have Patriot Capital Partners

11 involved in community banks, is that fair to say?

12 A    That's fair to say.

13 Q    You had that much say on over what they did?

14 A    That is true.

15 Q    Okay.  All right.  So Barry -- it wouldn't be unreasonable

16 for Barry to know that you personally, Ira Lubert, were

17 interested or had an interest in investing in community banks?

18 A    That's fair to say.

19 Q    Okay.  And that is when he approached you to talk to you

20 about investing in Nova Community Bank in PA?

21 A    That is correct.

22 Q    Okay.  Thank you.  Now when Mr. Bekkedam approached you,

23 that was in mid-2009 -- I mean November 2009, is that correct?

24 A    That's correct.

25 Q    And you looked at a bunch of e-mails that the Government

Lubert - Cross/Schwartz                              37

1  had just showed you earlier this morning, is that correct?

2  A    That is correct.

3  Q    Okay.  In fact, they showed you an e-mail that started on

4  November 24th, but Mr. Bekkedam actually approached you a few

5  days before that, do you recall that?

6  A    I don't recall that.

7           MR. SCHWARTZ:  I ask the witness to be shown Defense

8  Exhibit 1220(a), please.

9  Q    Now sir, that's an e-mail from Barry Bekkedam to L. Lubert

10 at belgravioplp.com?

11 A    It's belgravia --

12 Q    Thank you.

13 A    -- lp.com.

14 Q    Okay.  And it's dated November 19th, yes, sir?

15 A    Yes, it is, 2009.

16 Q    All right.  At 7:50 a.m.

17 A    Yes, sir.

18 Q    Okay.  And he approaches you and says it was good to have

19 dinner with you last night.  Asked if you were able to

20 subscribe or to do a loan to invest in Nova Bank, is that

21 right?

22 A    That's right.

23 Q    Does that refresh your recollection about --

24 A    It does.

25 Q    Okay.

Lubert - Cross/Schwartz                    38

1  A    Yes, it does.   Thank you.

2  Q    So it was around November 18th or 19th of 2009 that he

3  approached you?

4  A    Yes.

5  Q    And he also said to you on that 7:50 a.m. e-mail that he

6  would speak to you on Friday and that Larry Rovin from my

7  office will provide whatever docs we need, is that correct?

8  A    That is correct.

9  Q    Okay.   And that's what he said to you at 7:50 a.m. on

10 November 19th, correct, sir?

11 A    That's correct.

12 Q    Okay.   You wrote back to him right away, didn't you?

13 A    Yes, I did.

14 Q    Okay.   You wrote back to him later that morning, is that

15 fair to say?

16 A    If you'll show me the e-mail, I'll --

17       MR. SCHWARTZ:   Could you please show the witness

18 Defense Exhibit 1220(b), please?

19 A    I recollect -- I recognize it now.

20 Q    Okay.   Does that refresh your recollection?

21 A    Yes.

22 Q    That Mr. Bekkedam writes to you at -- virtually eight

23 o'clock in the morning and before lunch time at 11:36 in the

24 morning, you would get back to him?

25 A    Yes.

Lubert - Cross/Schwartz                    39

1  Q    And what you say to him is, I was unable to -- I was able

2  to get with my lawyer on Patriot.  And as I suspected, I am not

3  allowed to invest or loan to anyone in reference to bank

4  investments to include holding bank stock as collateral, that's

5  what you said to him, is that correct?

6  A    That's what I said.

7  Q    Okay.  So that's your way of saying, I am not permitted to

8  actually invest in Nova Bank, sorry?

9  A    That is my way -- well, I was saying because it would have

10  created what we believed to be a conflict of interest.

11  Q    A conflict of interest, it was a legal thing?

12  A    Yes.

13  Q    Okay.  All right.  And actually, the e-mail that we're

14  looking at there --

15          MS. BARRY:  Objection, Your Honor, as to the legal

16  thing.

17          THE COURT:  Sustained.

18  Q    You were given a legal rationale by your legal advocate

19  that you were prohibited by law from investing in Nova Bank

20  based on contractual obligations you had in your existing

21  business, is that fair to say?

22          MS. BARRY:  Objection.

23          THE COURT:  Overruled.

24  A    I wouldn't -- when you add the term, against the law, I

25  would say the advice I got from my lawyers is it's -- they

Lubert - Cross/Schwartz                                    40

1  believed it was a conflict of interest which you know in some

2  cases can be a little bit subjective.  But their advice to me

3  was it was a conflict of -- a potential conflict of interest

4  and not to pursue it.

5  Q    Better safe than sorry?

6  A    Yes.

7  Q    Fair to say?

8  A    Yes.

9  Q    Okay.  And the lawyer who advised you, his name's at the

10  top of that e-mail, isn't it?

11  A    Let me check and see.

12  Q    Stuart Askot?

13  A    Stuart Askot.

14  Q    Okay.  A-s-k-o-t?

15  A    Yes.

16  Q    So he's the lawyer with whom you checked?

17  A    Yes.

18  Q    And he's the --

19          MS. BARRY:  Objection.

20  A    I assume that's who I checked with.  I -- yeah, that's

21  Stuart, that's --

22          MS. BARRY:  Relevance, Your Honor.

23          THE COURT:  Sustained.

24  Q    Okay.  Now all these e-mails in fact that you've been

25  looking at, Defense (sic) Exhibit 137, Defense Exhibit 137(a),

Lubert - Cross/Schwartz                    41

1  and 137(b), they're all e-mails that Mr. Askot provided you to

2  give to the Government, is that correct, sir?

3  A    That is correct.

4  Q    Okay.  All right.  Now so that very morning at 11:36 a.m.,

5  you immediately get back to Mr. Bekkedam, and you say, sorry,

6  the better side of caution says that I don't invest in Nova

7  Bank, can't do it.

8  A    That's correct.

9  Q    Okay.  All right.  But you also make a unilateral offer to

10 Mr. Bekkedam to help him out, don't you?

11 A    Yes, I do.

12 Q    Okay.  What you say --

13         MS. BARRY:  Objection, Your Honor.  Relevance.

14         THE COURT:  Sustained, counsel

15 Q    You offered to put Mr. Rovin in touch with other people

16 who could invest as well?

17 A    Yes, I did.

18 Q    Okay.  And one of the people that you offered to introduce

19 him to is Larry, it says Lesse, L-e-s-s-e.  But you meant Larry

20 --

21 A    It's spelled wrong.  It's L-e-s-s-e-r, it's Lesser.

22 Q    So Larry Lesser.  You offered to put him in touch with

23 Larry Lesser as a potential investor?

24 A    Yes, I did.

25 Q    Okay.  Okay.  That's what you did on the 19th, all right.

Lubert - Cross/Schwartz                                    42

1  Now regarding Mr. Lesser, you followed up with him, is that

2  correct?

3  A    I believe I did.

4  Q    Okay.  And I'm going to ask you to look at Defense Exhibit

5  1222(b).  And if you don't mind, just look at the bottom e-

6  mail.

7         MR. SCHWARTZ:  If we could blow up the bottom e-mail

8  in the first page for Mr. Lubert?

9  Q    Do you see that, sir.  Have you had a chance to look at

10 it?

11 A    Can I just read it for a second?

12 Q    Of course.

13 A    Yes.

14 Q    Okay.  So this is you, Ira Lubert, writing to Barry

15 Bekkedam and copying Larry Lesser on November 24th, 2009?

16 A    That's correct.

17 Q    Okay.  And what you say is, "Barry, I haven't heard

18 anything from Larry Rovin, nor has he sent me any information."

19 Do you see that, sir?

20 A    Yes, I do.

21 Q    So that's referring back to the November 19th offer by Mr.

22 Bekkedam to have Larry Rovin send you whatever you need, is

23 that correct?

24 A    Yes, sir.

25 Q    And you're getting back to him, and said, it's been five

1  days and I haven't even heard from you yet, is that right?

2  A    That is right.

3  Q    Okay.  So the next thing you say in the e-mail is,

4  however, I just reached out to Larry Lesser to contact you in

5  regard to a loan.  Is that correct?

6  A    Yes, sir.

7  Q    And in fact, that's what you did.  Even though you didn't

8  hear back from Mr. Rovin, even though you Mr. Bekkedam's people

9  didn't follow up with you, you took it on yourself to reach out

10  to Mr. Lesser?

11  A    Yes.

12  Q    Okay.  And you copied Mr. Lesser so you were showing that

13  you were getting in touch with him as maybe a person who could

14  possibly invest instead of you in Nova Bank?

15  A    That is correct.

16  Q    Okay.  And you say about Mr. Lesser, he has sole power to

17  decide if a loan can be done, but he is very acknowledgeable

18  and can move quickly.  That's what you tell him?

19  A    That's right.

20  Q    So you understand that there is a time pressure here that

21  is existing and that you personally have identified a guy,

22  Larry Lesser, who could maybe meet that time pressure, is that

23  right?

24  A    I found -- I introduced him to a guy that potentially

25  might have been an investor.

Lubert - Cross/Schwartz                    44

1  Q    Okay.  And here's where I might have a problem with the

2  numbers and I may need the Government's help.  Could you now

3  turn to Government's Exhibit 137(b)?  Okay, that -- the first

4  contact where you talk about reaching out to Larry Lesser, that

5  was at 1:39 p.m.  And now you get back to Mr. Bekkedam at about

6  two o'clock, 2:45 p.m. on that same day, is that correct, sir?

7  A    (No audible response).

8         MR. SCHWARTZ:  And if you could blow up the 2:45

9  e-mail on 137(b)?

10 Q    Do you see that, it's the second --

11 A    I see it.  It's not blown up.  I can read it though.

12 Q    Okay.  It's 2:45 p.m. on the same day, November 24th.  And

13 you say, Barry, I can't do this myself.  It must go through

14 Lesser if he can get it -- if he can get done.  That's what you

15 tell him?

16 A    I don't believe that says it in these e-mails, I'm sorry.

17 The first one is, here's the offer.

18         MS. BARRY:  This is 137(c) --

19         THE WITNESS:  I have 137(b) here.  Sorry.  Oh, now

20 here's (c).  A new one just came up on the screen.

21 Q    Sorry about that.

22 A    That's okay.

23 Q    Just a number mixup.

24 A    Yeah.

25 Q    All right.  Now we're looking --

Lubert - Cross/Schwartz                    45

1  A    Now I see it.  I got it.

2  Q    Okay.  So Government's Exhibit 137(c) is an e-mail from

3  you, Mr. Lubert, to Mr. Bekkedam that same day, November 24th

4  at 2:45 p.m.?

5  A    Yes.

6  Q    In that e-mail, in Exhibit 137(c) -- I should have brought

7  my glasses -- you say, I can't do it myself, it must go through

8  Lesser if he can get it done.

9  A    That's right.

10 Q    Okay.  So you're saying, I'm out, but maybe Lesser can

11 make things happen fast, is that correct?

12 A    That is correct.

13 Q    All right.  And on December 10th --

14       MR. SCHWARTZ:  You can put that down.  Take that

15 away, please.

16 Q    On December 10th, Barry checks in with you again.  And he

17 says, can you help me out.  And you say, you say you'll make

18 some calls, is that right?

19 A    That is right.

20 Q    Okay.  And then later that day or later the next day on

21 December 11th, you said you've made a couple of calls for him,

22 is that correct?

23 A    Yes, sir.

24 Q    So your trying to help Mr. Bekkedam out to get this deal

25 done to raise money for Nova Community Bank, is that right?

1  A    Yes.

2  Q    And he had told you it was related to TARP, is that right?

3  A    I believe so.  I don't -- I believe so, but I don't know

4  for sure.

5  Q    Okay.  All right.  Now this kind of real fast back and

6  forth, this frenzied movement over a couple of days before a

7  deal closes, that's not unusual in this business, is it, sir?

8  A    That is not unusual at all.

9  Q    It's a very common practice for a capital raising guy like

10 Barry Bekkedam to do that, is that correct?

11 A    That is very correct.

12 Q    And it's not unique to Barry, any capital raising guy when

13 he's running up against a deadline will be moving all over the

14 place trying to get the money in the door that he needs, right?

15 A    Yes, he would.

16 Q    Okay.  So there was nothing inappropriate about him doing

17 that, is there?

18 A    I don't believe so.

19        MS. BARRY:  Objection.

20 Q    Okay.  That could happen with --

21        MS. BARRY:  Objection.

22        THE COURT:  Counsel, slow down.  The objection is

23 sustained.

24 Q    The kind of thing that was going on, the quick back and

25 forth over the couple of days over the closing date, that could

Lubert - Cross/Schwartz                          47

1   happen with any investment closing, is that correct, sir?

2   A    That is not an uncommon practice that I've experienced.

3   Q    You've certainly seen it before?

4   A    I have seen it before.

5   Q    Okay.  All right.  Now sir, you've spoken to the

6   Government a couple of times about this case, is that correct?

7   A    That is correct.

8   Q    The first time you met with Government agents was in

9   August of 2015, last summer, is that correct, sir?

10  A    I couldn't give you the specific date.  It is a matter of

11  record.

12  Q    Late Summer 2015?

13  A    Yes.

14  Q    That was the very first time that the Government

15  approached you about this case, is that correct?

16  A    I believe that's correct.

17  Q    Okay.  Then again, in October, a few months later, you met

18  with the Government again about this case, is that correct?

19  A    That is correct.

20  Q    Okay.  And then just a few weeks ago, in March of 2016,

21  they approached you for the third time, is that correct?

22  A    That is correct.

23  Q    Okay.  Sir, do you remember hearing about Mr. Bekkedam

24  being indicted?

25  A    Yes, I do.

1             MS. BARRY:  Objection.

2             MR. SCHWARTZ:  Okay.

3             THE COURT:  Sustained.

4  Q    Sir, Mr. Bekkedam was indicted in 2014, is that correct,

5  sir?

6             MS. BARRY:  Objection.

7             THE COURT:  May I see you, please?

8             MR. SCHWARTZ:  Yes.

9             THE COURT:  Let's take our morning break.

10            THE WITNESS:  I can get up?

11            THE COURT:  Sir, you may step down.  Watch your step,

12 please.

13                        (Jury out)

14                       (At Sidebar)

15            THE COURT:  Excuse me.  First of all, basis?

16            MS. BARRY:  Your Honor, the defense has previously

17 moved to dismiss this case based on Government misconduct.

18 They have -- they're trying to set up some kind of Government

19 misconduct argument with this line of questioning every time

20 they ask what's the date, what's the date, what's the date.

21 And this is highly inappropriate now going into what this

22 witness knew about the indictment and if he has any idea about

23 what the investigation entailed or anything like that.  And to

24 elicit this kind of information from a lay witness who had only

25 involvement with regard to being requested to invest in Nova is

Lubert - Cross/Schwartz                    49

1   highly inappropriate.

2              And Your Honor, going forward, you know we've been

3   you know stipulating to dates of when they -- when witnesses

4   have met, but I believe that this continued line of questioning

5   and trying to set it up for a government misconduct as if that

6   now they've set up a pattern so they can introduce it in their

7   case is highly inappropriate.  And this is highly

8   objectionable.

9              THE COURT:  Mr. Schwartz?

10             MR. SCHWARTZ:  Sir, in Mr. Duncan's opening

11  statement, which was not objected to by the Government, Mr.

12  Duncan said that this is a case where there was an indictment

13  and then an investigation.  It's completely valid to show that

14  the Government is putting together a case and finding it didn't

15  have a story together and is now trying to pit facts into an

16  indictment that exists.

17             And to -- we have shown repeatedly with witnesses

18  that the Government put out a indictment and then they started

19  investigating this case and getting witnesses together.  And

20  that's a valid argument to show the jury, to tell the jury that

21  this is has never been a case where the facts have fit the

22  theory.

23             And all I'm showing is that through Mr. Lubert who

24  was aware of the date of the indictment and is aware of the

25  fact that he was interviewed after the indictment was that

Lubert - Cross/Schwartz                              50

1  first he learned of the indictment, then he got his lawyer,

2  then he went into meet with the Government three times, and all

3  the meetings were in the last nine months.  Those are valid

4  theories to show.  And I'm sorry it can be as highly as the

5  Government thinks it is, but it's not highly wrong.

6          MR. IGNALL:  Your Honor, I think it's irrelevant

7  because it goes into, is there something appropriate or

8  inappropriate that the Government continued to investigate.

9  And I think it's (indiscernible) going back to the Supreme

10  Court in the 1960s, they said that there's nothing

11  inappropriate about the Government continuing to investigate

12  the --

13          THE COURT:  Well, I've already ruled on that.

14          MR. IGNALL:  Yes.

15          THE COURT:  All right.

16          MR. IGNALL:  So I don't --

17          MR. SCHWARTZ:  That was about a Grand Jury

18  investigation.  I'm not asking about a Grand Jury

19  investigation, Your Honor, I'm asking about the fact that the

20  Government agents didn't even meet this guy until after they

21  indicted my client and (A) his -- first of all, his opinion on

22  what he said to them both in the interview and therefore here,

23  subsequently, like every other witness is -- are affected by

24  the fact they say, hey --

25          THE COURT:  So what's the net result that you're

1  seeking to get from this information?

2          MR. SCHWARTZ:  The net result is that they started

3  putting together this case six months ago and they talked to

4  witnesses --

5          THE COURT:  Six months?

6          MR. SCHWARTZ:  Or not six months ago, nine --

7  whatever August is.  Nine months ago?

8          UNIDENTIFIED ATTORNEY:  Last year.

9          MR. SCHWARTZ:  Thank you.  Last year.  Thank you,

10  ma'am.  And that these witnesses were coming in knowing that

11  Mr. Bekkedam was indicted.  It was already -- they were already

12  influenced.  When Mr. --

13          THE COURT:  Whoa.  Time out.  So what?

14          MR. SCHWARTZ:  Because it shows that it has -- gives

15  a witness predisposition to give certain answers.  Nobody did

16  it better than Mr. Engle.  When he talked to Mr. Patterson and

17  he said without objection from the Government and --

18          THE COURT:  Let me just stop you right there.  It

19  gives the witnesses a predisposition to lie?

20          MR. SCHWARTZ:  No, not to lie.  To shape the

21  responses that they gave at the interviews based on the belief

22  that a person's been indicted.  And once you are locked in,

23  maybe not legally, but you've made a commitment by saying

24  something to the Government in an interview, you're going to be

25  more predisposed to say what you said in the interview, here.

1        And what I'm saying is that this is a case where a

2   lot of witnesses were influenced by the fact that there was an

3   existing indictment.  And they knew they were charged.  And in

4   this case, we have a clear example because frankly I did some

5   investigation myself and I found out that Mr. Lubert knew that

6   Mr. Bekkedam was indicted when he came to talk to these folks.

7        And so the two main points are, (1) that they were

8   still investigating if they indicted which is lawful but it

9   raises a question about the strength of the indictment which

10  the Government -- with which the Jury gets to know about.  And

11  (2) that it can have an effect on what they say during the

12  interview which in turn will have an effect on what they say in

13  the stand.

14        The best example is what Mr. Engle did with Mr.

15  Patterson when he said, when you were meeting with the

16  Government, you knew what they wanted to hear, didn't you, and

17  that's what you told them?  And he said, yup, yup, yup.

18        THE COURT:  All right.  The objection is sustained.

19  You have to accept it.

20        MR. SCHWARTZ:  Thank you.

21                    (Conclusion of Sidebar)

22        UNIDENTIFIED ATTORNEY:  When do you want us back,

23  Judge?

24        THE COURT:  Fifteen minutes, please.

25        UNIDENTIFIED ATTORNEY:  Thank you.

1          MS. BARRY:  Thank you, Your Honor.

2                         (Recess)

3          THE COURT:  Ready?

4          MR. ENGLE:  Yes, Your Honor, just one thing.  I e-

5    mailed the joint proposed juror instructions that have been

6    submitted by both defendants.  We thought it would be easier to

7    submit one defense version of our proposed instructions.  So I

8    e-mailed that to your law clerk and to Ms. Del Shervaz

9    (phonetic) by way of a Word document and copied all counsel.

10         But there's a hard copy of the Government's proposed

11   instructions where we just highlighted in yellow those

12   instructions where we've submitted something that is different

13   than what they're asking for so that the Court knows or Your

14   Honor's clerk knows that when they look at one that's

15   highlighted, that's one to look in the Defense package because

16   there's a substantive difference.

17         THE COURT:  All right.  Now typically, there's a

18   joint one that's submitted where everyone agrees what the

19   instructions are.  And then if there's anything in addition

20   thereto or that's different from that, that's what submitted by

21   either side.

22         MR. EGAN:  And Your Honor, we actually did that

23   before trial.

24         THE COURT:  Okay.

25         MR. EGAN:  And we may be able to do it again.

54

1              UNIDENTIFIED ATTORNEY:  Yeah.

2              MR. EGAN:  But this weekend, we weren't able to put

3    all the heads together.  So we wanted to get something to Your

4    Honor today.  But perhaps we'll talk either after the court

5    today and send something more streamlined.

6              THE COURT:  I appreciate it.  Thank you.

7              MR. IGNALL:  And I think when we submitted ours in

8    October, I think we identified which of our instructions were

9    disagreed and which ones were agreed.

10             THE COURT:  Right.

11             MR. IGNALL:  So we can -- we'll work together.  And

12   maybe there's way we can red line what they did and see what we

13   can agree to, Your Honor.

14             THE COURT:  Okay.

15             MR. EGAN:  And we only had a PDF of there's, so it

16   was kind of --

17             UNIDENTIFIED ATTORNEY:  Right.

18             THE COURT:  Right.

19             UNIDENTIFIED ATTORNEY:  So I had to do it this way.

20             THE COURT:  Right.

21             UNIDENTIFIED ATTORNEY:  Joel, can you hand that up to

22   His Honor?

23             THE COURT:  Thank you very, very much.

24             MR. SCHWARTZ:  May I, Your Honor?

25             THE COURT:  Yes, sir.  Thank you very much.

1          MR. SCHWARTZ:  Thank you, sir.

2          THE COURT:  All right.  Ready?

3          UNIDENTIFIED ATTORNEY:  Yes, sir.

4          MS. BARRY:  Yes, Your Honor.

5                         (Pause)

6          COURTROOM DEPUTY:  All rise.

7                         (Jury in)

8          THE COURT:  All right.  You may be seated.  Thank

9  you.

10         THE JUROR:  Can I have a tissue?  My seat is wet.

11         THE COURT:  I'm sorry?

12         THE JUROR:  My seat is wet.  Can I have a tissue?

13         THE JUROR:  It's raining.  You always have issues.

14         THE COURT:  Is everyone else okay?  Is it leaking?

15         THE JUROR:  I don't know.

16         THE JUROR:  It might have been somebody's water.

17         THE JUROR:  I'll just wipe mine off with my jacket.

18         THE COURT:  Is there water there, in more than one

19  seat?

20         UNIDENTIFIED SPEAKER:  Let me see.

21         THE JUROR:  I'm just wiping that off.

22         UNIDENTIFIED SPEAKER:  There you go.  Thanks, Jerry.

23         THE COURT:  All right.  We'll address it at the next

24  break.  My apologies.  I have no idea on that one.

25         All right.  Counsel, you may proceed.

Lubert - Cross/Schwartz                          56

1        MR. SCHWARTZ:  Thank you, Your Honor.

2             CONTINUED CROSS EXAMINATION

3   BY MR. SCHWARTZ:

4   Q    Good morning again, sir.  Mr. Lubert, Mr. Bekkedam -- you

5   had testified earlier that Mr. Bekkedam approached you to

6   invest your own money in Nova Community Bank, is that correct,

7   sir?

8   A    That is correct.

9   Q    Okay.  Sir, are you familiar with the term, accredited

10  investor?

11  A    Yes, I am.

12  Q    Okay.

13  A    Can you tell the jury just generally what an accredited

14  investor is?

15            MS. BARRY:  Objection.  Relevance?

16            THE COURT:  Sustained.

17  Q    Sir, back in 2009, you were a person of some means, is

18  that fair to say?

19            MS. BARRY:  Objection.  Relevance?

20            MR. SCHWARTZ:  It goes to his ability -- the

21  reasonableness of Mr. Bekkedam asking Mr. Lubert to invest

22  directly in Nova Bank.

23            THE COURT:  I'll hear it.

24  Q    Sir, back in 2009, without getting into hard numbers, you

25  were a person of some means, is that fair to say?

Lubert - Cross/Fuller                                57

1  A    That is fair to say.

2  Q    Okay.  So it wasn't uncommon for you to be approached with

3  certain possible investment opportunities, is that fair to say?

4           MS. BARRY:  Objection.

5           THE COURT:  Overruled.

6  A    That is fair to say.

7  Q    Thank you.

8           MR. SCHWARTZ:  I have no further questions, Your

9  Honor.

10          THE COURT:  All right.

11                    CROSS EXAMINATION

12 BY MR. FULLER:

13 Q    Good morning, Mr. Lubert.

14 A    Good morning.

15          MR. FULLER:  May I inquire, Your Honor?

16          THE COURT:  Yes, sir.

17 Q    I represent Mr. Hartline in this matter.  I understand

18 that you were at no point a customer of Nova Bank, is that

19 correct?

20 A    That is correct.

21 Q    Never took out a loan from Nova Bank?

22 A    Not that I'm aware of.

23 Q    And no checking account, nothing like that?

24 A    Not that I'm aware of.

25 Q    All right.  And you, I believe, testified on direct that

Lubert - Cross/Fuller                                    58

1   you never invested in Nova Bank?

2   A    I did not.

3   Q    There was a period, however, where you were approached

4   about potentially investing in Nova Bank?

5   A    That is correct.

6   Q    And that was in November, December 2009?

7   A    Yes, sir.

8   Q    But Mr. Hartline did not approach you about that

9   investment, is that correct?

10  A    That is correct.

11  Q    And in fact, you've never spoken with Mr. Hartline about

12  investing in Nova Financial Holdings?

13  A    That is correct.  That is correct.

14  Q    But during that period, after you had told Mr. Bekkedam

15  that you were not personally going to invest in Nova Bank, you

16  requested and received a prospectus and a subscription

17  agreement, is that correct?

18  A    Yes, sir.

19  Q    That you intended to forward to other potential investors?

20  A    Yes, sir.

21  Q    Now the prospectus, that's a document that contains

22  information about the investment, correct?

23  A    That is correct.

24  Q    Okay.  And the subscription agreement, that's the contract

25  that you had signed if you intended to invest?

Lubert - Cross/Fuller                    59

1  A    If you did intend to invest, you would sign that contract.

2  Q    Okay.  And once you signed that, you would be obligated to

3  fulfill the -- your agreement to invest?

4  A    Yes, sir.

5  Q    Okay.  And you -- again, you did not elect to invest in

6  Nova, so you didn't sign the subscription agreement?

7  A    I did not.

8  Q    And none of the other individuals that you sent these

9  materials to invested in Nova?

10  A    I don't believe I ever sent the subscription agreement to

11  anybody else.

12          MR. FULLER:  Okay.  Nothing further, Your Honor.

13          THE COURT:  All right.

14  Q    Thank you, Mr. Lubert.

15          MS. BARRY:  No redirect, Your Honor.  Thank you.

16          THE COURT:  Thank you, sir, you may step down.  Watch

17  your step please.

18          MR. IGNALL:  United States calls Hal Shaffer.

19        HAL SHAFFER, WITNESS FOR THE GOVERNMENT, SWORN

20          COURT CLERK:  Please state and spell your name for

21  the record.

22          THE WITNESS:  Hal J. Shaffer, H-a-l J., last name,

23  S-h-a-f-f-e-r.

24          THE COURT:  You may proceed.

25          MR. IGNALL:  Thank you, Your Honor.

1                      DIRECT EXAMINATION

2   BY MR. IGNALL:

3   Q    Mr. Shaffer, in what city and state do you currently live?

4   A    I live in Hillsboro Beach, Florida.

5   Q    All right.  And before you lived in Florida, where did you

6   live?

7   A    I lived in Haverford, Pennsylvania.

8   Q    And how long did you live in Pennsylvania?

9   A    My entire life, up until a few years ago.

10  Q    Back when you were working -- let me ask you this, did you

11  have any education after high school?

12  A    Yes.

13  Q    What education did you have after high school?

14  A    I went to Penn State for four years and studied finance.

15  And then I went to Temple University School of Law.

16  Q    And did you ever practice as an attorney?

17  A    I did.

18  Q    Did you work in any other businesses?

19  A    Yes.

20  Q    What other businesses did you work in?

21  A    I was involved in the banking business twice.  I was

22  chairman of a bank of called First Bank of Philadelphia.  And

23  then I was chairman of a bank called Interstate Net Bank Cherry

24  Hill, New Jersey.

25  Q    And did you ever practice law?

Shaffer - Direct/Ignall                          61

1  A     I did.

2  Q     And how long did you practice law for?

3  A     For about 15 years full time.

4  Q     And at some point, did you lose your law license?

5  A     I did.

6  Q     And why was that?

7  A     I was out of trust in my trust account in New Jersey.

8  Q     And what does that mean to be out of trust?

9  A     That means that I created an overdraft in my trust account

10 which caused the regulatory people in the State to come take a

11 look at the accounts.  And they said I was out of trust.  And

12 as a result, in New Jersey, if you're out of trust, that's a

13 bright-line rule and you lose your license.

14 Q     And are you allowed to be in banking at the moment?

15 A     No.

16 Q     And why is that?

17 A     At that same time, there was -- that that was going on,

18 the FDIC looked at what, I guess, what I was doing at

19 Interstate Net Bank.  We were trying to sell -- I was trying to

20 sell the Bank at that time.  A couple members of the board did

21 not want the Bank to be sold.  And so they came in, did a

22 regulatory review, and determined that I breached a few

23 regulations.

24 Q     All right.  So after you were not in banking or a

25 practicing attorney, what kind of work did you do?

Shaffer - Direct/Ignall                        62

1  A    I became a consultant for a handful of clients.

2  Q    When you say, consultant, what do you mean?

3  A    Consulting in real estate, and banking, and finance

4  issues.

5  Q    All right.  Are you --

6  A    Privately.

7  Q    Okay.  Are you familiar with someone named Charles Gallub?

8  A    Yes, I am.

9  Q    And who's Mr. Gallub?

10 A    Mr. Gallub, I was introduced I guess briefly when I was at

11 Interstate Net Bank.  He became a lending client.  I didn't

12 know him well.  When my term as chairman you know expired at

13 Interstate and I left the Bank, about a year or two later, he

14 asked me to consult for him.

15 Q    Okay.  And do you remember roughly when that was when you

16 started consulting for him?

17 A    I want to say in the area of '07, '08.

18 Q    And what kind of business was Mr. Gallub in then?

19 A    Mr. Gallub was growing his real estate portfolio basically

20 in the nature of redevelopment efforts, public, private

21 partnerships, and things like that.

22 Q    And what kind of service did you provide to Mr. Gallub?

23 A    You know I wasn't able to practice law, but I was able to

24 obviously give my input on some issues.  And would source

25 capital both in the form of debt and potentially equity.

Shaffer - Direct/Ignall                          63

1  Q    And did you introduce him to any bank from which he could

2  borrow money?

3  A    Yes.

4  Q    And what bank was it?

5  A    A number of banks.

6  Q    Okay.  Was Nova Bank ever one of those banks?

7  A    Yes, sir.

8  Q    All right.  And do you know who ran Nova Bank at the time?

9  A    Day to day?

10 A    Who was -- do you know who was -- who the CEO of the Bank

11 was then?

12 A    I think it was Brian Hartline.

13 Q    Had you known Mr. Hartline before?

14 A    I think I met Mr. Hartline maybe one other time earlier in

15 the decade.

16 Q    All right.  And did Mr. -- were you involved in Mr. Gallub

17 getting any financing for real estate projects from Nova Bank?

18 A    I was.

19 Q    All right.  And do you know if Mr. Gallub had more than

20 one loan from Nova Bank for real estate projects?

21 A    Yes.  Mr. Gallub, I think, became one of their, for lack

22 of a better guess, top ten borrowers of the Bank.

23 Q    All right.  And without getting to the exact dollar

24 amount, are these projects, loans that were above a million

25 dollars total?

Shaffer - Direct/Ignall                    64

1   A    Generally, yes.

2   Q    Do you know someone named Barry Bekkedam?

3   A    I do.

4   Q    And how did you first meet Mr. Bekkedam?

5   A    I believe that I was introduced to Mr. Bekkedam by the

6   chairman of Nova Bank, Ed DiMarcantonio.

7   Q    And what business did you understand Mr. Bekkedam to be

8   in?

9   A    He was an asset manager.

10  Q    And did he have a company that he ran?

11  A    Yes.

12  Q    What was the name of that?

13  A    I think Ballamor Capital I think it was called.

14  Q    Did you ever put Mr. Bekkedam in touch with Mr. Gallub for

15  any purpose?

16  A    I think Mr. DiMarcantonio set up a meeting that I recall

17  amongst Mr. Bekkedam, myself, and Mr. -- and Ed.

18  Q    And did Mr. Bekkedam ever work with you and Mr. Gallub on

19  a project?

20  A    Yes.  Mr. Bekkedam funded a transaction through his

21  company on a project known as Studio Center also known as Logan

22  Square in Norristown, PA.

23  Q    All right.  And do you know if Mr. Bekkedam had clients

24  who invested in that project?

25  A    I wasn't really sure how the money --

Shaffer - Direct/Ignall                        65

1           MR. EGAN:  Objection.

2  Q    If you don't --

3           THE COURT:  Sustained.

4  Q    Do you know if Mr. Bekkedam was involved in providing

5  funds for that project?

6  A    Yes.

7  Q    And do you know was Nova Bank lending any money on that

8  project?

9  A    Not that I'm aware of.

10 Q    Okay.  Do you remember anyone ever approaching you about

11 getting anyone to invest in Nova Bank?

12 A    Yes.

13 Q    And who approached you about that?

14 A    I think it was either Mr. DiMarcantonio or Mr. Hartline.

15 Q    And do you remember --

16          MR. EGAN:  Objection unless he knows, Your Honor.

17          THE COURT:  Sustained.

18 Q    Do you remember when this person approached you?

19 A    Yes.

20 Q    And when was that?

21 A    In 2008.

22 Q    And did you get any documents in connection with this?

23 A    Yes.  Mr. Gallub actually did purchase stock in Nova Bank.

24 Q    And do you recall who provided documents to you in

25 connection with this?

Shaffer - Direct/Ignall                    66

1  A    I don't recall on the first time when he purchased stock,

2  who actually gave me the document.

3  Q    All right.  And do you have any knowledge of what the

4  source of funds was that Mr. Gallub used to purchase this stock

5  in 2008?

6  A    I don't recall.

7  Q    Do you know if he borrowed the money from anywhere?

8  A    He may have.

9  Q    All right.  Did Mr. Hartline ever approach you after that

10 about Mr. Gallub buying more Nova stock?

11 A    Yes.

12 Q    Do you remember when that was?

13 A    I recall having a meeting in Mr. Hartline's office when he

14 asked me specifically whether Mr. Gallub was going to purchase

15 additional stock.

16 Q    And did you relay that request to Mr. Gallub?

17 A    I did.

18 Q    And did you have any discussion with Mr. Hartline about

19 what funds Mr. Gallub would use to make that purchase in 2009?

20 A    Yes.

21 Q    And what was that discussion?

22 A    That there was a loan that was going to be utilized to

23 refinance some property that would enable the purchase to take

24 place.

25 Q    Do you recall discussing with Mr. Hartline anything else

Shaffer - Direct/Ignall                          67

1  about the financial soundness of the Bank?

2  A    I remember Mr. Hartline telling me that they were

3  interested -- the Bank was pursuing TARP monies.

4  Q    Did you have an understanding of what TARP money meant?

5  A    Yes.

6  Q    And what did you understand that to mean?

7  A    That the -- at the time the real estate depression that

8  was going on and the recession that the country was enduring,

9  the federal government was going to lend or finance some

10 additional capital to community and national banks.

11 Q    Did Mr. Hartline tell you whether he had other investors

12 putting money into the bank in addition to the TARP funding?

13 A    Yes.

14 Q    And what did he tell you about that?

15 A    He said that there were a couple large investors that were

16 going to invest in the Bank.

17 Q    Did he give you any idea of the total dollar amount of

18 that?

19 A    I recall a $10 million number being bandied about.

20 Q    And did Mr. Gallub indeed borrow money from Nova Bank to

21 make an investment in Nova stock?

22 A    He did.

23 Q    And do you remember how much that was for?

24 A    It was a number of years ago, I can't give you the exact

25 number, sir.  Sorry.

Shaffer - Cross/Egan                           68

1  Q    And at the time that Mr. Gallub borrowed money in 2009,

2  did he have other loans from Nova Bank at that time?

3  A    He did.

4  Q    And how long did you continue to work for Mr. Gallub?

5  A    I want to say probably within that year.  The next year, I

6  wrapped my consultancy with him.

7  Q    And do you know whether Mr. Gallub still had loans from

8  Nova Bank as of the time you left?

9  A    I think he did.

10          MR. IGNALL:  All right.  One moment.  Nothing

11  further, Your Honor.

12          THE COURT:  You may cross examine.

13          MR. EGAN:  Thank you, Your Honor.

14                    CROSS EXAMINATION

15  BY MR. EGAN:

16  Q    Good morning, Mr. Shaffer.

17  A    Good morning, sir.

18  Q    So Mr. Shaffer, you went to law school?

19  A    Yes.

20  Q    You were a lawyer for 15 years?

21  A    From '83 to 2005.

22  Q    Give or take.  And you were also a banker?

23  A    Yes, sir.

24  Q    And you ran a bank?

25  A    Yes.

1  Q    And you ran up against some issues in running the bank,
2  correct?
3  A    Yes, sir.
4  Q    You weren't prosecuted for any of that, were you?
5  A    No.
6  Q    You weren't prosecuted for bouncing a check or for being
7  out of trust, were you?
8  A    I wasn't.
9  Q    Now in spite of no longer being a lawyer or a banker, I
10 think what you told us a few minutes ago was that you continued
11 to give -- and I'm not saying legal advice -- but consulting
12 advice on the issues of banking and banking regulations, for
13 lack of a better way of putting it, correct?
14 A    I would just state that you know I was not an expert in
15 banking regulations.
16 Q    Understood.  But your field that you were giving advice on
17 was banking, right?
18 A    I was doing more than just advice.  It was literally being
19 involved in the projects, working the projects, understanding
20 the underlying real estate, getting involved in construction
21 management issues, dealing with tenancy issues.  It wasn't just
22 giving just advice.  But yes, I did -- you can't take away you
23 know 15 years of experience.
24 Q    Sure.  And knowledge?
25 A    Yeah, and knowledge.

1  Q    So that was something that your clients found useful,

2  correct?

3  A    Yes.

4  Q    Something that Mr. Gallub found useful?

5  A    Yes, sir.

6  Q    And I believe you testified that you were at a meeting

7  with Mr. DiMarcantonio, and Mr. Bekkedam, and Mr. Gallub,

8  correct?

9  A    Yes.

10 Q    And that was a meeting where Nova Bank was discussed,

11 correct?

12 A    I don't recall Nova Bank being discussed at that meeting.

13 Q    Well, let me ask it this way, the decision for Mr. Gallub

14 to go to Nova Bank, that was a result of Mr. DiMarcantonio's

15 introduction, correct?

16 A    The answer is my relationship -- I thought the question

17 was, when did I first meet Mr. Bekkedam.  And that's the first

18 time that I recall meeting Mr. Bekkedam was in a meeting --

19 dinner meeting.

20 Q    And step back from the meeting.  I thought it might have

21 happened at the meeting, but I'm correct, am I not, that the

22 main reason that your -- that Mr. Gallub decided to become a

23 Nova customer was because of Mr. DiMarcantonio's introduction?

24 That's all I was trying to establish.

25 A    Yes.

1  Q    It had nothing to do with Mr. Hartline?

2  A    At that time, no.

3  Q    Okay.  And Mr. Gallub became a very large client of Nova

4  Bank, right?

5  A    Yes, sir.

6  Q    He was one of their top ten borrowers, correct?

7  A    I couldn't tell you specifically, but he was one of their

8  significant borrowers.

9  Q    Okay.  And that meant that he had a whole lot of different

10  projects going on, right?

11  A    Yes, sir.

12  Q    And in those projects, he used Nova Bank as a bank that

13  could facilitate those projects, correct?

14  A    Yes, among others.

15  Q    So Nova Bank was important to him, correct?

16  A    Yes.

17  Q    And he wanted to see Nova Bank do well?

18  A    Yes.

19  Q    And as a result, he chose to invest in Nova Bank, correct?

20  A    Yes.

21  Q    Now in 2008, he invested in Nova Bank, right?

22  A    Yes.

23  Q    And you didn't know at the time where the source of those

24  funds came from?

25  A    I can't recall where, sitting here today, where they came

Shaffer - Cross/Egan                            72

1   from.

2   Q    Well, at the time, did you know that he had borrowed those

3   funds to invest them?

4   A    I believe that was the case, but I don't know where they

5   actually came from.

6   Q    So basically, you knew that he had borrowed funds --

7   A    Yes.

8   Q    -- and invested contemporaneously, correct?

9   A    Yes.

10  Q    You just weren't sure exactly from what pot of his money

11  the actual investment came, correct?

12  A    I wasn't sure how it actually occurred.  I can't sit here

13  today and tell you.

14  Q    But you would agree with me that when Mr. Gallub borrows

15  money, that then becomes his money, right?

16  A    Yes.

17  Q    And it's his choice where he wants to invest it, correct?

18  A    Yes.

19  Q    And he chose to invest it in Nova Financial Holdings,

20  correct?

21  A    Yes.

22  Q    And again, in 2009, he did the same thing, right?

23  A    He did.

24  Q    And you were involved then.  You knew what was going on,

25  right?

Shaffer - Cross/Duncan                                73

1   A    Yes.

2   Q    So you knew that he was borrowing money from Nova Bank to

3   invest it in Nova Bank, correct?

4   A    Yes.

5          THE COURT:   Counsel, are you interchanging financial

6   and the Bank?

7          MR. EGAN:   I am, Your Honor, and I apologize.

8   Q    He was borrowing money from Nova Bank, correct?

9   A    Yes.

10  Q    He was then taking that money which was now his, right?

11  A    Yes.

12  Q    And decided to invest it in Nova Financial Holdings,

13  correct?

14  A    Yes.

15  Q    And that was something you were totally aware of?

16  A    Yes.

17  Q    And again, you have 15 years of legal experience?

18  A    Yes, sir.

19  Q    You haven't been charged with any crime here, have you?

20  A    Never.

21          MR. EGAN:   Okay.  I have nothing further, Your Honor.

22          THE COURT:   All right.

23          MR. DUNCAN:   Thank you, Your Honor.

24                       CROSS EXAMINATION

25  BY MR. DUNCAN:

Shaffer - Cross/Duncan                              74

1  Q    Good morning, Mr. Shaffer.

2  A    Good morning, sir.

3  Q    Mr. Gallub, he built things, right?

4  A    Yes, sir.

5  Q    And one of the things he built was the Logan Square

6  project, correct?

7  A    Correct.

8  Q    And you testified that Mr. Bekkedam helped raise funds for

9  that Logan Square project, correct?

10 A    Yes, sir.

11 Q    And you went to Mr. Bekkedam because he was good at

12 raising funds, right?

13 A    Well, I didn't go to Mr. Bekkedam directly.  Mr.

14 DiMarcantonio suggested that we have a meeting and see if Mr.

15 Bekkedam would finance the transaction.

16 Q    And you went to Mr. Bekkedam for that purpose, correct?

17 A    Yes, sir.

18 Q    And that happened in about 2007 didn't it?

19 A    About then.

20 Q    So that would be nine years ago, approximately?

21 A    Approximately, yes.

22 Q    Okay.  It happened well before Mr. Gallub went to get

23 loans from Nova Bank, correct?

24 A    Maybe.  I'm not sure.

25 Q    Okay.  You testified about a first purchase that Mr.

1   Gallub made of Nova stock, correct?

2   A    Yes, sir.

3   Q    You never spoke about that purchase with Mr. Bekkedam, did

4   you?

5   A    That's correct.

6   Q    And you talked about a second purchase Mr. Gallub made of

7   Nova stock, correct?

8   A    Correct.

9   Q    And you believe that he obtained a loan in order to do

10  that, correct?

11  A    Yes.

12  Q    And you never spoke to Mr. Bekkedam about that, did you,

13  sir?

14  A    No, I did not.

15          MR. DUNCAN:  Thank you very much, Your Honor.  Good

16  day, sir.

17          MR. IGNALL:  Your Honor, may we approach?

18          THE COURT:  Yes, sir.

19                      (At Sidebar)

20          MR. IGNALL:  I believe the jury can open the door to

21  something that I intentionally did not ask this witness about.

22  Mr. Egan said that in 2009 he knew Mr. Gallub was borrowing

23  from Nova.  He owed 15 --

24          THE COURT:  They -- you're talking really loud.

25          MR. IGNALL:  I'm sorry.  And Mr. Gallub had borrowed

1  from Nova.  He had 15 years of experience.  This witness, in

2  prep, if he remembers what the agent said, that he thought that

3  didn't make sense to him, but he thought maybe Pennsylvania

4  rules were different from New Jersey.  If Mr. Egan is intending

5  to (indiscernible) to the jury that this witness thought it was

6  totally fine based on that question.  I think that opens the

7  door to me asking that question.  If Mr. Egan will represent

8  that he's not going to make that argument to the jury, then I

9  won't followup with that.

10      MR. EGAN:  Well, I purposely stopped the questioning

11 at that point, and all I asked him was he ever charged, so I

12 never went into that issue or opened the door.

13      MR. IGNALL:  Well, I haven't heard that he's saying

14 he's not going to argue to the jury that because Mr. Shaffer

15 was never charged and never raised the issue, then this must be

16 fine in Mr. Shaffer's opinion.

17      MR. EGAN:  Two different things.  The fact that he's

18 never charged, I would argue the fact he never raised the

19 issue.  I would not because he's not a lawyer and his opinions

20 are not as --

21      THE COURT:  Right.

22      MR. EGAN:  I mean, I wasn't going to bring up that he

23 was a lawyer, you brought it up.

24      THE COURT:  All right.  Then we'll address what's

25 appropriate for closing later, but at this point I'm not taking

DiMarcantonio - Direct/Barry                    77

1  any questions.

2          MR. EGAN:  Thank you, Your Honor.

3          THE COURT:  Yes.

4                  (Conclusion of Sidebar)

5          MR. IGNALL:  No redirect.  Thank you, Your Honor.

6          THE COURT:  All right.  Thank you, sir.  You may step

7  down.  Watch your step please.

8          THE WITNESS:  Thank you, Your Honor.

9          MS. BARRY:  Your Honor, The United States calls

10 Edward DiMarcantonio.

11         COURT CLERK:  Raise your right hand.

12           EDWARD J. DiMARCANTONIO, WITNESS, SWORN

13         COURT CLERK:  State and spell your name into the

14 record.

15         THE WITNESS:  Edward J. DiMarcantonio.

16         COURT CLERK:  Spell your last name for us.

17         THE WITNESS:  D-i Capital M-a-r-c-a-n-t-o-n-i-o.

18         MS. BARRY:  May I proceed, Your Honor?

19         THE COURT:  Yes.

20         MS. BARRY:  Thank you.

21                     DIRECT EXAMINATION

22 BY MS. BARRY:

23 Q    Good morning, Mr. DiMarcantonio.

24 A    Good morning.

25 Q    Where do you work, sir?

DiMarcantonio - Direct/Barry                    78

1  A    I work for my own company, Axis Realty Partners.

2  Q    And where's that located?

3  A    In Radnor, Pennsylvania.

4  Q    And so what is your position if you are an owner?  Is

5  that, is there a title?

6  A    Owner, Broker of Record.  We have a license through the

7  State of Pennsylvania.

8  Q    Okay.  And do you know an individual named Barry Bekkedam?

9  A    Yes.

10 Q    And how do you know Mr. Bekkedam?

11 A    I met Mr. Bekkedam back in the early 90s.  We've been good

12 friends ever since.

13 Q    And do you know whether or not Barry Bekkedam owns an

14 investment firm?

15 A    He did.  He used to own a firm called Ballamor Capital.

16 Q    And do you know whether or not you are, your company Axis

17 Realty and Mr. Bekkedam and his company Ballamor Capital were

18 involved in projects together?

19 A    Yes.

20 Q    And would you describe the business relationship with Mr.

21 Bekkedam as a significant one?

22 A    Over the years, yes, not recently.

23 Q    But at least in the 2008/2009 time frame, was that a

24 robust business relationship?

25 A    Yes.

1  Q    And in terms of -- and can you just kind of describe the

2  -- what kind of work you did for Barry Bekkedam?

3  A    Oh, several different things.  I represented Barry as

4  individual, on a purchase of a couple of real estate properties

5  that he had owned and managed.  I also, through his company

6  Ballamor Capital, worked with some of the private equity deals

7  that they had done representing either on the board position or

8  an advisory position, an administration or consulting position.

9  Q    And in terms of some of Mr. Bekkedam's projects, were you

10 hired to manage some of them?

11 A    Yes.

12 Q    Okay.  And did you receive substantial compensation at

13 least in 2008 and 2009 for the work you did with Mr. Bekkedam?

14 A    Yes.  I was compensated for almost all the deals we did.

15 Yes.

16 Q    Now you mentioned that you have, you've been a close

17 personal friend of Mr. Bekkedam since the early 90s, is that

18 fair, is that something that you would agree to or not?

19 A    That is correct.

20 Q    And in terms of the closeness of your relationship, is it

21 -- did you share any special relationship with each other's

22 children?

23 A    Yes.  I'd like to think so, yes.

24 Q    Okay.  And what role did you have, special role did you

25 have in the life of any child of Mr. Bekkedam's?

DiMarcantonio - Direct/Barry                    80

1  A    Our families were very close over the years.  I am the

2  godfather of Barry's son.  He is the godfather of my daughter.

3  Q    Okay.  And so do you still maintain a very close personal

4  relationship with Mr. Bekkedam today?

5  A    We haven't since the indictment.  No.

6  Q    Okay.  You are no longer close with him or you don't speak

7  with him?

8  A    Well we haven't had any, very little contact.

9  Q    Now do you know whether or not Mr. Bekkedam started a bank

10 sometime in and around 2002?

11        MR. EGAN:  Objection.  Started, Mr. Bekkedam started.

12        THE COURT:  Rephrase.

13 Q    Do you know whether or not Mr. Bekkedam was involved with

14 a bank in 2002?

15 A    Yes.

16 Q    And what bank was that?

17 A    That was Nova Savings Bank.

18 Q    Okay.  And do you know how -- whether or not Mr. Bekkedam

19 was involved with purchasing that bank, well, purchasing the

20 bank that became Nova?

21 A    Barry was, Barry and Ballamor were instrumental in raising

22 the capital to purchase the assets of the bank.  It was

23 formerly known as Bank U.S.A. I believe.

24 Q    And who else was involved with the purchase of that bank

25 before it became Nova, if you know?

1  A    Well, of course Brian Hartline was.

2  Q    Now do you know whether or not Mr. Bekkedam sat on the

3  board of directors for the bank?

4  A    Yes, he did.

5  Q    And do you know whether or not Mr. Bekkedam sat on the

6  board of directors for the holding company?

7  A    Yes, he did.

8  Q    And do you know whether or not the bank had a parent

9  holding company called Nova Financial Holdings?

10 A    Yes, it did.

11 Q    Now did you also sit on the boards for both the bank and

12 the holding company?

13 A    Yes, I did.

14 Q    And how did you get a seat on those boards?

15 A    Brian and Barry asked me to go on the board of the bank

16 after the purchase was completed.

17 Q    Okay.  And do you recall whether or not Mr. Bekkedam

18 called you his eyes and ears on the boards?

19            MR. EGAN:   Objection.

20            MS. BARRY:   If he knows.

21            THE COURT:   Sustained.

22 Q    Okay.  Why did Mr. Bekkedam want you on the board?

23 A    I think there was a couple reasons.  One reason was,

24 again, being a local real estate broker.  A lot of the business

25 the community banks do is driven in based on local real estate

DiMarcantonio - Direct/Barry                          82

1  deals.  So Barry and Brian thought that I would be a good
2  person to have on the board to help drive business to the bank.
3  I think they also believed, as I had done for several of the
4  Ballamor investments, that I would, you know, be an honest
5  person to be on that board to keep an eye on what was going on
6  with the bank.
7  Q    Do you know whether or not any of Mr. Bekkedam's clients
8  at Ballamor were invested in Nova Bank?
9  A    Yes.
10 Q    And were you compensated for sitting on both the bank and
11 Nova Financial Holdings boards?
12 A    Yes.
13 Q    Now, at some point, do you know whether or not Mr.
14 Bekkedam stepped down from the board of the bank?
15 A    Yes.  That's correct.
16 Q    And a few years later, did he also step down from the
17 board of the holding company?
18 A    That's correct.
19 Q    And why did Mr. Bekkedam step down from the board of the
20 holding company?
21 A    I think there was two reasons.  The biggest reason, I
22 think, was his time.  The board meetings had gotten to be very
23 lengthy and really wasn't the best use of Barry's time.  And I
24 also think there was a perceived conflict, so he stepped down
25 for both reasons.

DiMarcantonio - Direct/Barry                          83

1   Q    And what was the perceived conflict?

2   A    Well, Barry's you know, best function and what he did best

3   for the bank was, again, drive business to the bank much like I

4   was trying to do, but also he was, you know, the primary force

5   of the capital that was raised by the bank.

6   Q    While he was a board member of Nova Financial Holdings,

7   was he compensated for bringing capital into the holding

8   company or bank?

9   A    No.

10  Q    Is that what the perceived conflict would be?

11  A    No.

12  Q    Now were all the board members -- well, let me ask you

13  this.  When Barry Bekkedam stepped down as chairman of the

14  board of the holding company, who took his place?

15  A    I did.

16  Q    Now, do you know whether or not all of the members on the

17  board for the holding company, also, sat on the board of the

18  bank?

19  A    Could you repeat that?

20  Q    Do you recall whether or not all of the members that were

21  on the board of the holding company, also, sat on the board of

22  the bank?

23  A    The board changed several times, but I believe all of the

24  board members of the holding company are also always on the

25  bank board also.

DiMarcantonio - Direct/Barry                    84

1  Q    Okay.  And you may have said this before, but do you know

2  whether or not Mr. Bekkedam had raised capital for the bank?

3  A    Yes, he did.

4  Q    And how did he raise capital?

5  A    Through his clients, friends, family, contacts.

6  Q    Okay.  And those clients that invested in the bank, did

7  they also, some of them also become customers of the bank?

8  A    Yes.

9  Q    Okay.  And was Hilary Musser a client of Ballamor Capital?

10 A    Yes.

11 Q    And was Hilary Musser also a client of Nova Bank?

12 A    Yes.

13 Q    A customer of Nova?

14 A    She was a customer of the Bank.  She was not a

15 shareholder, just a customer.

16 Q    What -- was an individual named Anthony Bonomo a client of

17 Ballamor?

18 A    Yes.

19 Q    And was Anthony Bonomo also a customer of Nova Bank?

20 A    Yes.

21 Q    At some point in time, were you aware that the bank had

22 applied for TARP funding?

23 A    Yes.

24 Q    And how do you know?  How did you know that?

25 A    It was a board decision to make that application.

DiMarcantonio - Direct/Barry                    85

1  Q    Okay.  And did you have any discussions with Barry

2  Bekkedam about the bank applying for TARP Funding?

3  A    Yes.

4  Q    And what were those discussions?

5  A    Just the ramifications of what the program was, the pros

6  and the cons, how would it affect capital, how would it affect

7  shareholders.

8  Q    Now I'd like to take you, if you would, please take a look

9  at what's been marked as Government's Exhibit 18, and, Your

10 Honor, this has already been moved into evidence and may it be

11 published at this time?

12        THE COURT:  Yes.

13 Q    Mr. DiMarcantonio, do you have Government's Exhibit 18 in

14 front of you?

15 A    I can't see the top, so how would I know it's Number 18?

16 Q    Okay.  Here you go.

17 A    Oh, there it is, down the bottom, yes.

18 Q    Okay.  And what is Government's Exhibit 18?

19 A    Looks like an e-mail from Brian to the bank board with the

20 subject of capital rates.

21 Q    And in the first few paragraphs what is Mr. Hartline

22 advising the bank board about.

23 A    He is advising us of a corresponding bank called ACBB that

24 will use Nova stock as collateral.

25 Q    Okay.  And why is he providing you this information, why

DiMarcantonio - Direct/Barry                              86

1  is he providing this information to the bank board?

2  A    This was a corresponding bank that would use the bank's

3  collateral to lend money, so I think he was letting the board

4  members know that this type of program was out there and

5  available.

6  Q    Okay.  And if we could just take a look at the second page

7  and we could make that a little larger.  So, and this is an

8  attachment to the e-mail and is this giving the specifics about

9  the program, the bank stock, for bank stock loans?

10 A    Seems so, yes.

11 Q    Now if we could back to the e-mail itself and could you

12 please read the section TARP update?

13 A    Nova answered many questions regards to our top

14 application, but yet have not gotten approval.  They're

15 concerned with the increase and nonperforming assets.  The last

16 request was how much capital we have raised in our current

17 offering, based upon the next time the treasury committee

18 meets.  We have a week or so to increase the amount raised.

19 I'm sure they would be impressed to see our board investing in

20 the current round.

21 Q    Nonperforming assets, are loans assets of the Bank?

22 A    Yes.

23 Q    Now I'd like you to take a look at Government's Exhibit 25

24 and this is just for the witness, please.  And let me ask you

25 this before we get to the exhibit.  Did you take advantage of

DiMarcantonio - Direct/Barry                    87

1 the ACBB stock loan in order to purchase any, make any

2 investment with Nova Bank?

3 A    I did not.

4 Q    Now if we could please take a look at what's been marked

5 as Government Exhibit 25, and what is Government's Exhibit 25

6 and if any time, Mr. DiMarcantonio, you would prefer to see a

7 hard copy, I'm happy to provide that to you.

8 A    That's okay.  This is a, Exhibit 25 is the minutes of

9 board of director's meetings of Nova Financial Holdings dated

10 May 27th, 2009.

11        MS. BARRY:  Okay.  Your Honor, the Government moves

12 for the admission of Government's Exhibit 25.

13        UNIDENTIFIED ATTORNEYS:  No objection.

14        THE COURT:  Admitted.

15        MS. BARRY:  May it be published, Your Honor?

16        THE COURT:  Yes.

17 Q    Okay.  And if we could just look at the top of

18 Government's Exhibit 25, with the date and then who was at this

19 meeting, please.  Okay.  And so, again, what is Government's

20 Exhibit 25?

21 A    Yeah, it's the minutes of the Nova Financial Holdings

22 board meeting held on the 27th of May, 2009.

23 Q    Okay.  And looking at the directors, who are the directors

24 of the holding company?

25 A    That would be myself as chair, Brian Hartline, Wayne Levy

DiMarcantonio - Direct/Barry                    88

1    (phonetic) and Dennis Marlow (phonetic).

2    Q    Okay.  And do you have, it shows a guest, who is that

3    first guest?

4    A    Dave Swartz, counsel from Stevens & Lee and Mark Smith and

5    Tom Schirmer from DVFG.

6    Q    Okay.  And who is David Swartz?

7    A    Dave Swartz was our, the bank's counsel for some legal

8    issues with the bank.

9    Q    Now if we go towards the bottom part of that first page,

10   is there a discussion about TARP?

11   A    Yes.

12   Q    Okay.  And if we can go to the second page, please.

13   Underneath that redacted portion, can you please read the first

14   two sentences.

15   A    Mr. Hartline reviewed the capital calculations as of March

16   31st, 2009.  Nothing that Nova Bank -- noting, I'm sorry, that

17   Nova Bank is well capitalized at 10.3 percent.  He noted that

18   if required to follow the calculations known in the FDIC link

19   our risk based capital would fall to approximately eight

20   percent.

21   Q    Okay.  And if it fell to eight percent, do you know what

22   that meant as far as the bank's capital?

23   A    It changes your designation from well, to I believe,

24   adequate.

25   Q    And if we could go to the third page, please.  And in the

1  first kind of paragraph, the last line, last two lines, if we

2  get TARP, can you just read that, please?

3  A    If we get TARP, we have no more breathing room and -- we

4  have more breathing room, and can get back on track with our

5  budget.  The board discussed the various options and their

6  effect on Nova.

7  Q    And if we go to the next page, please.  There's just a

8  little discussion, if you go to the second sort of paragraph

9  and Mr. DiMarcantonio, can you just highlight that.

10  A    Sure.

11  Q    And what are you discussing now in the board meeting?  If

12  you can just read that first two sentences.

13  A    Mr. DiMarcantonio discussed the idea of forming an

14  investment committee as a result of the recent discussions he

15  had with Mr. Bekkedam from Ballamor Capital.  Explain that Mr.

16  Bekkedam has offered the assistance of his newly higher

17  investment specialist in providing Nova with opinions regarding

18  investments.

19  Q    Okay.  So this is, you would bring to the board ideas that

20  -- well is this an idea that you got from Mr. Bekkedam?

21  A    Yes.

22  Q    Okay.  And if we could, please, go to the bottom of this

23  page and where it says Mr. Hartline then discussed.  Okay.  And

24  would you please read that paragraph, Mr. Hartline then

25  discussed which also finishes on the next page, please.

DiMarcantonio - Direct/Barry                    90

1   A    Sure.  Mr. Hartline then discussed the capital rates

2   knowing that Mr. Bekkedam has identified an investor who's

3   willing to invest at least $15 million.  Mr. Hartline explained

4   that the 15 million would make the investor a sixteen percent

5   investor, so we need to be approved by the Federal Reserve

6   Bank.  Mr. Hartline explained that Ms. Hartline has put

7   together a package of all the filings that would need to be

8   completed and forwarded into Ballamor.  He also noted that the

9   Federal Reserve Bank is requiring the investor be

10  fingerprinted, so they are trying to schedule that as well.

11  Q    So this $15 million investor that Mr. Hartline is talking

12  about with the board, that Mr. Bekkedam has identified you, do

13  you know who this person was?

14  A    Yes.  I believe this was a gentleman named George Levin.

15  Q    And what did Mr. Bekkedam ever say to you about George

16  Levin?

17  A    Barry, well several months prior to this, I had introduced

18  the idea of Mr. Levin, who he had met in Florida.  Mr. Levin

19  was a high net worth individual who was looking to buy a bank.

20  Barry suggestion to Mr. Levin, he looked at Nova as investing

21  as opposed to buying, because at the time -- or starting a bank

22  I should say.  Because at that time in 2009 starting banks was

23  very difficult.

24  Q    Okay.  Now did you ever meet Mr. Levin?

25  A    Yes.  I met him one time for about a minute.

DiMarcantonio - Direct/Barry                    91

1  Q   Okay.  And I'd like to turn your attention, please, to

2  Government's Exhibit 26, just for the witness, please.  And

3  looking at Governments's Exhibit 26, what is this?

4  A   It's an e-mail from Larry Rovin to Barry Bekkedam and

5  myself.

6  Q   Okay.  And if -- this is a multi-page document and if we

7  could just allow the witness to kind of see the different

8  pages, does this appear to be an e-mail string?

9  A   Yes.

10        MS. BARRY:  Okay.  Your Honor, the Government moves

11 for the admission of Government's Exhibit 26.

12        MR. EGAN:  No objection.

13        UNIDENTIFIED ATTORNEY:  No objection.

14        THE COURT:  Admitted.

15 Q   Now if we could please take a look at the first e-mail in

16 time, which would be on the third page.  And if we could -- may

17 we publish, Your Honor?

18        THE COURT:  Granted.

19 Q   And who is this e-mail from?

20 A   It's from Brian to Barry with a copy to myself.

21 Q   Okay.  And what's the date of this e-mail?

22 A   June 1st, 2009.

23 Q   And if the board meeting was on May 27th, 2009, would this

24 be approximately two days later, three days later?

25 A   Yes.  Four days later, I think, but yes.

1  Q    And would you please read what Mr. Hartline says in this

2  e-mail?

3  A    Are you with George?  Where can I get the documents we

4  need signed?  Can I publish a notice saying that he's buying

5  the shares?  There's a 30-day waiting period -- is required if

6  we publish the notice.

7  Q    So when he's referring to George, who is that?

8  A    I believe that's George Levin.

9  Q    And if we can go to the next e-mail in time, which is on

10 the second page, and do you respond to Brian Hartline's e-mail?

11 A    Yes, I do.

12 Q    Okay.  And what do you say?

13 A    I'm waiting for Barry to call me.  If you want me to get

14 the stuff, that would be great, but it would be better to take

15 it to his office.

16 Q    Okay.  And is Mr. Bekkedam on that e-mail that you sent?

17 A    It appears so, correct.  Yes.

18 Q    Okay.  And so does he then respond?

19 A    Yes.

20 Q    And what does he say and is this to you, this e-mail?

21 A    It is to me.

22 Q    Okay.  And what does he say?

23 A    We're not signing today.  I will talk to you both when I

24 see Ed at George's house at ten thirty'ish.

25 Q    Okay.  And let's take a look at the next e-mail, please,

DiMarcantonio - Direct/Barry                     93

1  and who is this an e-mail from?

2  A     From me to Barry.

3  Q     Okay.  And what do you say?

4  A     Have you landed?  Do you want me to come to the house at

5  10:30 or wait for you to call?

6  Q     And does Mr. Bekkedam then respond to you in the next

7  e-mail?  In the next e-mail -- no, the next -- I'm sorry.

8  A     Yes.  He responds, says, yes, I'll be at the house at

9  10:40.  George will be joining Larry, you and I for lunch at my

10 office 1:00 to 1:30.  I have Brian on standby.  He's not talk

11 specifics, but generalize about the banking at 50,000 feet.

12 Q     Okay.  And in that e-mail, who is that sent to other than

13 yourself?

14 A     A copy to Larry Rovin.

15 Q     Okay.  And who is Larry Rovin?

16 A     Larry was Ballamor's in-house counsel.

17 Q     Okay.  And then is there an e-mail from Larry Rovin to you

18 and Barry Bekkedam in response to that e-mail?

19 A     Larry writes to Barry and myself -- says I have the Nova

20 docs for George.

21 Q     Okay.  So on June 1st, 2009, is that the first time that

22 you met George Levin?

23 A     Yes.

24 Q     Okay.  And were you at any meeting with Mr. Bekkedam and

25 Mr. Levin?

DiMarcantonio - Direct/Barry                94

1  A    No.

2  Q    What Nova docs were you proposing or were being proposed

3  to be signed, but were not signed that day?

4  A    I don't remember.

5  Q    Now around that same time frame, the beginning of June,

6  were you aware that the holding company was downgraded?

7  A    Yes.

8         MS. BARRY:  And this has been moved into evidence

9  already, Your Honor, and if it may be published, it's

10  Government's Exhibit 32?

11         THE COURT:  Any objection?

12         MR. EGAN:  No, Your Honor.

13         THE COURT:  Granted.

14  Q    And what is Government's Exhibit 32?

15  A    Letter from the Federal Reserve Bank of Philadelphia to

16  the board of directors of the holding company dated June 10th,

17  2009.

18  Q    Okay.  And do you recall whether or not this is the letter

19  that the holding company received related to it's downgrade?

20  A    I don't recall, but I have no reason to think it wasn't.

21  Q    When the holding company was downgraded, did you have any

22  discussions about that with Barry Bekkedam?

23  A    Probably.  I don't recall specifically.

24  Q    Now with the TARP funding, do you know whether or not in

25  June the bank was approved with a contingency?

DiMarcantonio - Direct/Barry                    95

1 A    No.  Bank was approved at the State level in late 2008.  I

2 don't remember when we were approved by the higher, the Federal

3 Government.

4 Q    Okay.  So in June of 2009, were you, as a board member of

5 both the holding company and the bank, made aware that a CPP

6 counsel had recommended approval for TARP funds for Nova Bank.

7         MR. EGAN:  Objection.

8         THE COURT:  Basis.

9         MR. EGAN:  Leading.

10         THE COURT:  Sustained.

11 Q    Why don't you take a look at what's been marked as

12 Government's Exhibit 35.  And just for the witness, please.

13 And we go to the second page.  What is Government's Exhibit 35?

14 A    Minutes of the board of directors of Nova Bank, June 22nd,

15 2009.

16 Q    And are you a director who was present at this meeting?

17 A    Yes.

18         MS. BARRY:  Your Honor, the Government moves for the

19 admission of Government's Exhibit 35.

20         UNIDENTIFIED ATTORNEY:  No objection.

21         MR. EGAN:  No objection.

22         THE COURT:  Admitted.

23         MS. BARRY:  And may it be published, Your Honor?

24         THE COURT:  Yes.

25 Q    If we could keep this portion as what we're going to

1  publish to the jury now.  Again, taking a look at this, what is

2  it?

3  A     Minutes of the board of director's meeting, Nova Bank,

4  June 22nd, 2009.

5  Q     Okay.  And what directors are present?

6  A     Myself, Mr. Hartline is chair, Ms. Amor (phonetic), Mr.

7  Martell (phonetic), Mr. Levy (phonetic), Mr. Stams (phonetic),

8  Mr. Grou (phonetic), Mr. Marlow (phonetic), Mr. Felheimer

9  (phonetic), were not present.

10 Q     Okay.  Now if we could just take a look first at Page 1

11 and if we go down to the general section, that last paragraph,

12 last sentence of general, what does it state?

13 A     Starting with --

14 Q     As a result of the securities write down.

15 A     As a result of the securities write down, Nova Bank became

16 adequately capitalized while the holding company remained well

17 capitalized discussions pursued as to the adjustment

18 requirement.

19 Q     Okay.  And if we could, please, take a look at Page 2, in

20 the last paragraph.  And would you please read until the end of

21 the paragraph.

22 A     Mr. Hartline noted that we heard from the FDIC on June

23 10th, 2009 that Nova was approved for the CPP and that they

24 were sending our application to the Treasury for final

25 approval.  He added that the same day Nova Financial Holdings

1  had received notification from the Fed that the holding company

2  was downgraded from a two to a three rating.  He noted that he

3  has contacted the Fed because we strongly disagree with the

4  downgrade and learned that the Fed was in possession of Nova's

5  projections on risk based capital that were submitted to the

6  FDIC as part of the CPP application and the downgrade was the

7  direct result of the Bank falling below well capitalized

8  status.  Mr. DiMarcantonio asked what impact this would have on

9  the TARP application, DVFG, AFC and the Florida expansion

10 plans.  As discussion pursued, Mr. DiMarcantonio asked that the

11 Fed give any credence to the fact --

12 Q    And if you just read the -- finish off that sentence with

13 the next -- you can go to the next page.

14 A    Fact that Nova Financial through Ballamor Capital had been

15 able to raise the capital when needed.

16 Q    And then the next paragraph after further discussion,

17 could you read that please?

18 A    If your further discussions included the best thing we

19 could do is stick with the capital raising plan.  Mr. Stams

20 asked what the chances are that we raise the 20 million we

21 need.  Mr. Hartline commented that Ballamor Capital has

22 identified an individual who's interested investing about 15 to

23 18 million in Nova.  He noted that we should have five million

24 by June 30th.  Mr. DiMarcantonio stated that we should not

25 count on that money if the Fed shuts our plans down 100

DiMarcantonio - Direct/Barry                              98

1  percent.

2  Q    So, again, this investor that Ballamor Capital has

3  identified, who is interested in investing 15 to 18 million in

4  Nova, who is that person?

5  A    That would be Mr. Levin again.

6         MS. BARRY:  And if we could, please take a look at

7  what's been marked as Government's Exhibit 36, just for the

8  witness, please.

9  Q    And what is Government's Exhibit 36?

10 A    E-mail dated Tuesday June 23rd, 2009 from Brian Hartline

11 to Barry, Larry Rovin and myself.

12        MS. BARRY:  Okay.  Now, Your Honor, may -- the

13 Government moves for the admission of Government's Exhibit 36.

14        MR. EGAN:  No objection.

15        UNIDENTIFIED ATTORNEY:  No objection.

16        THE COURT:  Admitted.

17        MS. BARRY:  May it be published, Your Honor?

18        THE COURT:  Yes.

19 Q    Okay.  And so what does Mr. Hartline write to you, Barry

20 Bekkedam and Larry Rovin?

21 A    Barry, can you let me know -- do I read it, just wanted to

22 paraphrase it.

23 Q    Yes, please.

24 A    Can you let me know what to expect in regards to receiving

25 the five million of funds this week, as well as, the signed

1  subscription agreement.  I'm just planning in case you need my

2  help and what days.  If I need to go to -- and if I need to go

3  to Florida.  Barry said he dropped off three presentation

4  booklets and wiring instructions to Larry.  Barry, last Friday,

5  June 19th, I dropped off new subscription documents and

6  application forms for George to sign to, green file folder

7  parenthesis.

8          Larry, please note the Documents Kim sent to you

9  earlier are no longer valid.  Larry, do you still have the

10 fingerprint cards from the Fed.  Anything else I can do?  We

11 still have not received any information to start underwriting

12 the loans, tax returns 2007, six and eight when available,

13 current financial statements March 31st, 2009 would be ideal.

14 They need to be within six months of application.  I have a

15 form that ACBB will need signed.

16 Q    Okay.  And what's the date of this e-mail, please?

17 A    June 23rd, 2009.

18 Q    Now, do you know whether or not Mr. Levin ever got a loan,

19 a five million dollar loan from Nova Bank?

20 A    Yes, he did.

21 Q    And I'd like to show you what's been marked as

22 Government's Exhibit 39(a), and what is Government's Exhibit

23 39(a)?

24 A    E-mail from Brian Hartline dated Monday, June 29th, 2009,

25 Barry Bekkedam, myself, and Larry Rovin.

1  Q    And is there another e-mail that it's responding to?

2  A    Not that I can see from here -- oh, there it is.  I'm

3  sorry.  Yes.

4         MS. BARRY:  Your Honor, the Government moves for the

5  admission of Government's Exhibit 39(a).

6         MR. EGAN:  No objection.

7         UNIDENTIFIED ATTORNEY:  No objection.

8         MS. BARRY:  May it be published, Your Honor?

9         THE COURT:  Yes.

10 Q    And if we could take a look at the first e-mail in time

11 and who is this an e-mail from?

12 A    From Barry to Larry Rovin and Brian Hartline, dated June

13 29th, 2009.

14 Q    Okay.  And what does Barry Bekkedam say in this e-mail if

15 you could read it please?

16 A    Guys, it was clear to at least me that we were getting

17 George's approval for the loan, a five million to invest into

18 Nova per my conversation with Brian.  He thought I was getting

19 it wired tomorrow.  I was always thinking loan.  I assume we

20 get the subscription docs by tomorrow underwrite, George, then

21 fund the escrow amount.  Is this the plan.  Brian, work with

22 Larry to move Frank along.  Barry.

23 Q    And then what is the e-mail above?  What does that say and

24 who is that from, in response?

25 A    The top e-mail then is Brian's response dated Monday June

DiMarcantonio - Direct/Barry                          101

1  29th, 2009.  We need to close on the capital by the end of the

2  day.  Escrow will not count for capital.  We are working with

3  Larry on obtaining all required executed documents.

4  Q    So looking at this e-mail is a Mark Poliski (phonetic) on

5  this e-mail?

6  A    No.

7  Q    Is a David Deitrich (phonetic) on this e-mail?

8  A    No.

9  Q    Is a Jeffrey Hanisen (phonetic) on this e-mail?

10  A    No.

11  Q    So you knew that Mr. Levin was getting a loan.  What

12  collateral was there on the Levin loan?

13  A    Can you clarify which loan you're talking about?

14  Q    Well, was there more than one?

15  A    Well, yeah.  A lot of these e-mails have to do with Levin

16  getting a loan from ABCC, which is different than the loan he

17  got from Nova.

18  Q    Okay.  Do you know whether or not Mr. Levin ever got a

19  loan from ACBB?

20  A    He did not.

21  Q    Okay.  So I'm talking about a loan from Nova Bank, a five

22  million dollar loan from Nova Bank.  Are you aware that he

23  received a --

24  A    Yes.

25  Q    Okay.  And what was the collateral on that loan?

DiMarcantonio - Direct/Barry                    102

1  A     It was real estate collateral.

2  Q     Okay.  There was real estate collateral on the loan that

3  as made to Mr. Levin on June 30th, 2009?

4  A     That's my understanding.  Yes.

5  Q     Okay.  And what was the purpose of Mr. Levin's loan?

6  A     For renovations to a home that he had in Devon

7  Pennsylvania.

8  Q     And who told you that the five million dollar loan to Mr.

9  Levin was for a Devon property?

10  A     That would have come from Brian Hartline.

11  Q     Were you ever told that the five million dollar loan to

12  Mr. Levin from Nova Bank was going to be used to purchase Nova

13  stock?

14  A     No.

15        MS. BARRY:  Your Honor, I'm going to move on to

16  another area.  I don't know if this will be a good time for

17  lunch for if you would like me to continue?

18        THE COURT:  Yes, it would be.  Let's recess for lunch

19  at this time.  We'll reconvene at 1:30 this afternoon, 1:30

20  this afternoon.  You may step down, sir.  One thirty, thank

21  you.

22        MS. BARRY:  Thank you, Your Honor.

23        UNIDENTIFIED ATTORNEY:  Thank you, Your Honor.

24              (Recess)

25        COURTROOM DEPUTY:  All rise.  Ladies and gentlemen,

DiMarcantonio - Direct/Barry                    103

1  we are back on the record.

2            THE COURT:  Good afternoon.  You may be seated.

3                 (Court spoke on another matter)

4            THE COURT:  All right.  You may proceed.

5            MS. BARRY:  Thank you, Your Honor.

6  BY MS. BARRY:

7  Q    Mr. DiMarcantonio, I'd just like to go back to two of our

8  exhibits and Your Honor, if they may be published.  They've

9  been admitted.  Government's Exhibits 25 and Government's

10 Exhibit 35 and just to clarify and I believe that you testified

11 to it, but if you look on the left, is this a, the board

12 minutes from the holding company on May 27th, 2009?

13 A    That's correct.

14 Q    And looking on the right, is this a, the minutes from the

15 board of the bank held on June 22nd, 2009?

16 A    Correct.

17 Q    Okay.  So looking at the directors or the board members of

18 the holding company, those four individuals, which include you,

19 Mr. Hartline, a Wayne Levy and a Dennis Marlowe, do you see

20 that on the left?  Are you, also, all four, also, members of

21 the Nova Bank board of directors?

22 A    Correct.

23 Q    Okay.  And if we could, just turn to the last page of both

24 exhibits.  I know that the left one is not signed, but who is

25 the corporate secretary for the holding company?

1  A    Sheryl Kim Hartline (phonetic).

2  Q    And who was the corporate secretary for the Bank.

3  A    The same.

4  Q    Okay.  And who is Sheryl Kim Hartline?

5  A    She was the corporate secretary and Brian's wife.

6  Q    Okay.  Now if we could just go to Government's Exhibit 35

7  for a moment, please, Page 4.  Now you finished reading that

8  sentence, Ballamor Capital has been able to raise capital when

9  needed.  Would you please, sir, and if we could highlight it,

10 just read that next sentence?

11 A    Mr. Hartline responded that the Fed gave no way to the

12 possibility of raising capital.  They only considered capital

13 actually in house.

14 Q    Okay.  And we could take that exhibit down.  Thank you.

15 Now do you know whether or not George Levin made a five million

16 dollar investment in Nova?

17 A    Yes, he did.

18 Q    And I'd like to show you what's been marked as

19 Government's Exhibit 50 and if that could just be shown to the

20 witness, please.  In looking at Government's Exhibit 50, what

21 is this?

22 A    It's an e-mail from Barry to Larry Rovin.

23 Q    Okay.  And the e-mail before that, who is that from?

24 A    It's from me to Brian and Barry.

25 Q    Okay.  And the next e-mail, who is that from?

DiMarcantonio - Direct/Barry                    105

1  A    From Brian to Barry and myself.

2           MS. BARRY:  Okay.  So Your Honor, the Government will

3  move for the admission of Government's Exhibit 50, please?

4           MR. EGAN:  No objection.

5           THE COURT:  Granted.

6           MS. BARRY:  May it be published?

7           THE COURT:  Yes.

8  Q    So let's start with that first e-mail from Brian Hartline.

9  And sir what is the date of this e-mail?

10 A    June 30th, 2009.

11 Q    Okay.  To whom is this email being sent?

12 A    From Brian to Barry and myself.

13 Q    Okay.  And what is the subject?

14 A    Subject.  Great news, we closed on five million dollars of

15 capital.  Thank you for everyone that participated.

16 Q    Okay.  And is there anyone other than you and Mr. Bekkedam

17 on this e-mail?

18 A    No.

19 Q    Okay.  And if you take a look at the e-mail, what's the

20 time on that e-mail, please?

21 A    Sixteen forty-two, fifteen.

22 Q    Okay.  On --

23 A    On June 30th, 2009.

24 Q    Okay.  So I think that's military time, the 1642.  Do you

25 know what time that is?

DiMarcantonio - Direct/Barry                    106

1   A    So that would be 4:42 in the afternoon.

2   Q    Okay.  And so if we could take a look at the e-mail above

3   that, and who is this e-mail from?

4   A    It says from me to Brian and Barry.

5   Q    Okay.  And what do you respond?

6   A    And with eleven minutes to spare.

7   Q    Exclamation --

8   A    Exclamation, exclamation, exclamation.

9   Q    Okay.  And what did you mean by that?

10  A    The, look at the date being June 30.  Any capital that was

11  going to be counted on in that quarter had to be in by June

12  30th.

13  Q    Okay.  Now do you know whether or not Barry Bekkedam

14  and/or Brian Hartline were trying to secure another loan for

15  George Levin, other than the one for Nova Bank?

16  A    Not that I'm aware of.

17  Q    Well, we could take a look at Government's Exhibit 70, and

18  just for the witness, please.  In looking at Government's

19  Exhibit 70, what is this?

20  A    This is an e-mail from Brian to Barry and myself.

21  Q    Okay.  And what is the date of this e-mail, please?

22  A    August 7th, 2009.

23       MS. BARRY:  Okay.  Your Honor, the Government moves

24  for the admission of Government's Exhibit 70.

25       MR. EGAN:  No objection.

DiMarcantonio - Direct/Barry                    107

1          UNIDENTIFIED ATTORNEY:  No objection.

2          THE COURT:  Admitted.

3          MS. BARRY:  May it be published, please?

4          THE COURT:  Yes.

5   Q    Now again, who is this e-mail from?

6   A    From Brian to myself and Barry.

7   Q    And, again, what is the date of the e-mail?

8   A    August 7th, 2009.

9   Q    Okay.  And if we could go to the bottom portion of the

10  e-mail, if we could.  I would like to also give you an update.

11  Can we make, blowup the last part of the e-mail.  And could you

12  read that line, please, I would also like to give you?

13  A    I would also like to give you an update on George's

14  application for a loan with /A/ACCB in a conversation I had

15  with J. Webber (phonetic) and a Florida bank on rollout plan.

16  Q    Okay.  So do you recall whether or not you had a

17  conversation with Mr. Hartline about George's application for a

18  loan with ACBB?

19  A    No, I don't.

20          MS. BARRY:  Now -- and we could take that down,

21  please.  Thank you.

22  Q    Now does Nova respond to the downgrade of the holding

23  company?  Do you recall whether or not Nova officially

24  responded to the June 10, 2009 downgrade of the holding

25  company?

DiMarcantonio - Direct/Barry                    108

1   A     Yes.  We asked for a meeting directly with the Fed in

2   Philadelphia and I also believe there was a letter written.

3   Q     Okay.  And so I'd like to show you what's been marked as

4   Government's Exhibit 60, and this has already been moved into

5   evidence and may it be published, Your Honor?

6              THE COURT:  Yes.

7   Q     Would you -- do you recognize what Government's Exhibit 60

8   is?

9   A     It's a letter from Nova Financial Holdings to the Federal

10  Reserve Bank of Philadelphia.

11  Q     Okay.  And can you please -- and is this in response to

12  its letter dated June 10?

13  A     I'd have to read the whole thing, but I believe so.

14  Q     Okay.  Just looking at the first paragraph?

15  A     Yes.

16  Q     Okay.  And if we could look at the second paragraph,

17  please, and would you read what was written to the Federal

18  Reserve?

19  A     Please note that the board of directors is dismayed that

20  such a serious event as a downgrading of the holding company's

21  status from satisfactory to below satisfactory did not warrant

22  an inquiry by your office or any conversation with our

23  management team regarding your findings prior to the issuance

24  of our letter -- of your letter, sorry, over your letter.

25  Q     And if we could, please turn to Page 2 of that exhibit.

DiMarcantonio - Direct/Barry                    109

1  Now, and if we could go to the second paragraph, the last

2  sentence, we have also made a recent inquiry.  Could you read

3  that sentence?

4  A    We've also made a recent inquiry of the Federal Reserve

5  Bank regarding the process of getting approval for the

6  shareholder desiring to make a substantial investment, that

7  will make him larger than a 9.9 percent shareholder.

8  Q    Okay.  And who are you referring to here?

9  A    This would have been Mr. Levin.

10 Q    Okay.  And when you say making an inquiry into the Federal

11 Reserve Bank for getting him approval for being able -- make

12 him, because he's going to be larger than a 9.9 percent

13 shareholder, do you know whether or not he filed a change in

14 control application?

15 A    I would believe so.

16 Q    Okay.  And finally, if we could turn to the last page,

17 please, and would you read the second paragraph there?

18 A    As part of Nova's CPP application, Nova has been in

19 constant contact with the FDIC in the later part of May 2009,

20 provided the FDIC, with its asset quality trends and its

21 adjusted capital ratios through March 31st, 2009.  On June

22 10th, 2009 Nova was informed that the FDIC's counsel has

23 approved Nova's TARP/CPP application and was submitting it to

24 the Treasury Department for final approval.  Nova would be

25 eligible to receive approximately 14 million of CPP funds

DiMarcantonio - Direct/Barry                    110

1   contingent upon Nova raising 15 million of common equity.  This

2   amount of capital would allow Nova to regain its well

3   capitalized status and the TARP funds would allow Nova Bank to

4   continue to support the credit needs of the communities we

5   serve during these difficult times.

6   Q    And who signs this letter from Nova Financial Holding,

7   this July 15, 2009 letter?

8   A    That's from, signed by Brian and myself.

9   Q    Now do you know whether or not Mr. Hartline is keeping you

10  and Mr. Bekkedam updated with the timing of how the Bank will

11  be well capitalized and what that would mean for the Bank and

12  any of its acquisitions or goals that it had?

13              MR. ENGLE:  Objection.  Leading and compound.

14              THE COURT:  Sustained.

15  Q    Do you know whether or not Mr. Hartline was keeping you

16  and Mr. Bekkedam informed about TARP?

17  A    Mr. Hartline kept me informed on TARP.  I'm not sure

18  whether he would inform Mr. Bekkedam, but I was certainly

19  informed.

20  Q    Okay.  So let's take a look at Government's Exhibit 76 and

21  what is Government's Exhibit 76?

22  A    It's another e-mail on August, dated August 29th, 2009

23  from Mr. Hartline to Barry and myself.

24  Q    And what is the subject line?

25  A    Subject line is updated schedule.

DiMarcantonio - Direct/Barry                    111

1          MS. BARRY:  Government moves for the admission of

2   Exhibit 76, please.

3          MR. EGAN:  No objection.

4          UNIDENTIFIED ATTORNEY:  No objection.

5          THE COURT:  Admitted.

6          MS. BARRY:  May it be published.

7          THE COURT:  Yes.

8   Q    Okay.  So again, who is this e-mail from?

9   A    It's from Brian.

10  Q    And what is the date?

11  A    Saturday, August 29th, 2009.

12  Q    And to whom is the e-mail being sent?

13  A    It's written to Barry and myself.

14  Q    And, again, what is the subject?

15  A    Updated schedule.

16  Q    And would you please read the first portion of this

17  e-mail?

18  A    Barry, I can only get you the time table today.  I will

19  need to spend time with Jeff, our CFO, on the forecasted

20  earnings.  Jeff has spoke with the Treasury and he explained

21  that we were waiting for the investor approval and asked if

22  time could be extended.  They replied the funds would not stay

23  available indefinitely and they would like us to close on TARP

24  within ten days of getting investor approval.

25          They stipulated that the investor's funds have to be

DiMarcantonio - Direct/Barry                    112

1    in the Bank first.  They wanted us to gather all the documents

2    required to be granted the TARP funds in the mean time.

3    Q    Okay.  Now let's take a look at the first portion, time

4    line for Capital and TARP funds raised, and can you just read,

5    please, what Mr. Hartline wrote?

6    A    Timeline of Capital and TARP funds raised 8/25/09;

7    Treasury approved the TARP funds and gave us 30 days to close.

8    9/12/09 should be the date GL is approved as investors,

9    parenthesis, 60 days from application.  This may be impacted by

10   the questions posed to GL last week.  9/24/09, close on GL

11   Capital, parenthesis, 13 million to complete the executed

12   subscription agreement; 9/25/09, target date to close the TARP

13   funds, parenthesis 30 days from approved letter date; 9/30/09,

14   Nova will be well capitalized.

15   Q    Okay.  So the date, what is the date of this e-mail again?

16   A    August 29th, 2009.

17   Q    Okay.  So is this a timeline for what Mr. Hartline expects

18   in the future?

19   A    Yes.

20   Q    Okay.  And now could we go please to the next section,

21   timeline for upgrading holding company status and, if we could

22   highlight that portion and can you read what, please, what Mr.

23   Hartline wrote?

24   A    Timeline for upgrading holding company status,

25   parenthesis, the timeline is guesses at this point, as the FDIC

DiMarcantonio - Direct/Barry                    113

1  was supposed to be here in August/September.  As of June 30,

2  2009 we haven't gotten 30-day notification yet, end of

3  parenthesis.  10/15/09 FDIC exams begin as of June 30th, 2009

4  scenario -- I'm sorry -- I guess that means across.  Let me try

5  again.  10/15/09 FDIC exams begin as of June 30th, 2009 or

6  11/15/09 FDIC exam begins using September 30, 2009,

7  parenthesis, better scenarios will be well capitalized.

8  Q    Okay, so let's just stop there.  So is it your

9  understanding then, the left side is the scenario if FDIC exam

10  begins, as of June 30th, 2009 and the right side is if begins

11  as of September 30th, 2009.

12  A    Yes.

13  Q    Okay.  And that -- can you please go ahead and read what

14  he wrote?

15  A    Do you mean the next line?

16  Q    Yes, please.

17  A    11/30/09, the FDIC exam ends.  12/31, FDIC exam ends.

18  Q    Okay.  Next line please.

19  A    12/16/09, FDIC presents results to the board; 1/20/10,

20  FDIC presents results to the board.  12/17/09, no request Fed,

21  to Exam HC.  This, it seems, Nova Bank is rated a two bank.

22  1/21/10 Nova requests afterwards F -- Fed, I'm sorry, Fed, to

23  exam HC.  1/15/10 Fed does an onsite review of HC; 2/15/10 Fed

24  does an onsite review of HC; 12/29/10 Fed presents their

25  findings; 3/30/10, Fed presents their findings.

DiMarcantonio - Direct/Barry                    114

1  Q    Sir, does that say 12/29 or 2/29?

2  A    I'm sorry, 2/29.

3  Q    Okay.

4  A    Next line, 3/15/10, Nova submits application for FSC

5  status; 4/15/10, Nova submits application for FSC status;

6  3/30/10, Nova submits application to acquire DVFG; 4/30/10,

7  Nova submits application to acquire DVFG; 5/15/10, Nova gets

8  FSC status approval; 6/15/10, Nova gets FSC status approval.

9  Q    And, sir, what is FSC referring to?

10  A    I don't recall.

11  Q    Okay.

12  A    6/15/10, Nova gets approval to acquire DVFG; 7/15/10, Nova

13  gets approval to acquire DVFG.  7/1/10, Nova closes

14  transaction; 8/1/10, Nova closes transaction.

15  Q    Okay.  And then how does he end this e-mail?

16  A    At the bottom it says, Barry, any questions, give me a

17  call, I will work on updating the forecast of earnings next

18  week with Jack.

19  Q    Now, do you know whether or not Mr. Bekkedam, after --

20  well, if Mr. Bekkedam tries to get Mr. Levin to invest more

21  money in Nova Bank?

22  A    Could you say that again please?

23  Q    Do you know whether or not -- now, Mr. Levin on June 30th,

24  2009 made a $5 million investment with Nova Bank.  And my

25  question is do you know whether or not after that time if Mr.

1  Bekkedam tried to get Mr. Levin to invest more money.

2  A    It was my understanding Mr. Levin was always going to

3  invest about $18 million in the bank.

4  Q    Okay.  And so, I'd like to -- like you to take a look at

5  what's been marked as Government's Exhibit 103.  And what is

6  Exhibit 103?

7  A    It's an e-mail from Barry to Brian --

8  Q    Okay.

9  A    -- copied to me.

10          MS. BARRY:  Your Honor, the Government moves for the

11  admission of Government's Exhibit 103.

12          UNIDENTIFIED ATTORNEY:  No objection.

13          UNIDENTIFIED ATTORNEY:  No objection.

14          THE COURT:  Admitted.

15          MS. BARRY:  May it be published?

16          THE COURT:  Yes.

17  Q    Now, looking at this e-mail, who is it from?

18  A    Again, from Barry.

19  Q    And what is the date of this e-mail?

20  A    October 21st, 2009.

21  Q    And to whom is it being sent?

22  A    To Brian with a copy to myself.

23  Q    And what is the subject?

24  A    Levin wire.

25  Q    And what does Barry Bekkedam say in this e-mail?

1   A    Brian, it looks like we're good with three million worst

2   case.  Frank is putting together the wire ASAP.  He may not get

3   it all together today, as some may straggle in by Friday, but

4   we are good.  He's trying to get us five million by Friday.  I

5   have a sense that he will.  I will be on him all day, B.

6   Q    Do you know whether or not George Levin's change in

7   control application is approved?

8   A    I do not.

9   Q    Okay.

10  A    I do not think it is at this point.

11  Q    All right.  Let's take a look at what's been marked as

12  Government's Exhibit 108.

13         MS. BARRY:  And just for the witness please.

14  Q    And what is Government's Exhibit 108?

15  A    Nova Financial Holdings, minutes of their Board of

16  Directors meeting, 10/21/2009.

17  Q    Okay.  And are you present at this meeting, sir?

18  A    Yes, I am.

19  Q    Okay.

20         MS. BARRY:  Your Honor, the Government moves for the

21  admission of Government's Exhibit 108.

22         UNIDENTIFIED ATTORNEY:  No objection.

23         UNIDENTIFIED ATTORNEY:  No objection.

24         THE COURT:  Admitted.

25         MS. BARRY:  Okay.

1  Q    So, looking at Government's Exhibit 108 would you please

2  just say again what this is?

3  A    Again, it's the minutes of the meeting of the Board of

4  Directors of the Nova Financial Holdings dated October 21st,

5  2009.

6  Q    Okay.  And is that the same day as the date of the e-mail

7  sent on Exhibit 103?

8  A    Yes.

9  Q    Okay.  If we could just go to the bottom of the exhibit,

10 and if we could just start for -- if we could show the portion

11 -- the last two sentences, Mr. Hartline noted when reviewing

12 the capital schedule.  And if, Mr. DiMarcantonio, if you can

13 read from that -- starting at that line, Mr. Hartline noted

14 when reviewing the capital schedule.

15 A    Okay.  Mr. Hartline noted when receiving (sic) the capital

16 schedule that neither the company nor the bank are deemed well

17 capitalized at this time.

18 Q    Please continue reading.

19 A    Continue?

20 Q    Yes, thank you.

21 A    The Board engaged in a discussion regarding capital, and

22 Mr. DiMarcantonio asked, where do we stand with the capital

23 change and the change in control, CIC, investor.

24 Q    Please continue reading.

25 A    Mr. Hartline noted that the investor has now been

1  approved, and the (indiscernible) remaining subscription

2  agreement through the remainder of the year with the five

3  million set to close on October 30th.

4  Q    Okay.

5  A    Mr. Hartline -- continue?

6  Q    Yes, please.

7  A    I'm sorry.  Mr. Hartline reviewed a copy of the approval

8  letter that the change in (indiscernible) investor received

9  from the regulators, and the Board discussed the requirements

10 associated with the investment.

11 Q    Okay.  So, is Mr. Levin approved for the change in

12 control?

13 A    Yes, he is.

14 Q    Okay.  And if we can just go to the -- that second page,

15 and then the next line, Mr. Hartline noted -- if you could read

16 that.

17 A    Mr. Hartline noted that, based upon the funds in escrow

18 and the five million from the CIC investor, Nova will have

19 exceeded its requirement to receive the CPP funding.

20        MS. BARRY:  And we can take that exhibit down, thank

21 you.

22 Q    Now, on or about October 22nd, 2009 do you know whether or

23 not a $4.5 million loan was made to Anthony Bonomo?

24 A    What was the date again, I'm sorry?

25 Q    On or about October 22nd, 2009.

DiMarcantonio - Direct/Barry                 119

1   A     Yes.

2   Q     Okay.  And what was the purpose of that loan?

3   A     I don't recall.  I believe it was for investment purposes.

4   Q     Okay.  Do you know investment in what?

5   A     I do not know.

6   Q     Now, on or about October 31st, 2009 were you aware if

7   something happened to change Mr. Levin's financial position --

8   A     Yes.

9   Q     -- or condition?  Okay.  Now, after that -- well, what

10  happened to Mr. Levin's financial status?  Did it get better,

11  or did it get worse?

12  A     It was in question at that point in time.

13  Q     Okay.  Do you subsequently learn that it gets better, or

14  does it get worse?

15  A     It gets worse.

16  Q     Okay.  Do you know if Nova Bank tried to secure that $5

17  million loan that he had with a piece of property?

18  A     Yes.

19  Q     Okay.  So, I'd like to show you -- and what piece of

20  property was that?

21  A     Initially it was going to be his house or residence in

22  Devon.

23  Q     Okay.

24  A     And then later I believe it was going to be a -- some real

25  estate in Atlantic City.

DiMarcantonio - Direct/Barry                    120

1   Q    Okay.  So, let's take a look at Government's Exhibit 124

2   please.  And what is Government's Exhibit 124?

3   A    It's an e-mail from Brian --

4   Q    Okay.

5   A    -- to Barry dated November 6th, 2009.

6   Q    And what about the bottom e-mail?

7   A    It's an e-mail from Tom Patterson to Fpreve@aol.com with

8   copy to Brian and myself.

9   Q    Okay.

10         MS. BARRY:  The Government moves for the admission of

11  Government's Exhibit 124.

12         UNIDENTIFIED ATTORNEY:  No objection.

13         UNIDENTIFIED ATTORNEY:  No objection.

14         THE COURT:  Admitted.

15         MS. BARRY:  May it be published, Your Honor?

16         THE COURT:  Yes.

17  Q    Okay.  Now, looking at that bottom e-mail, who is Tom

18  Patterson?

19  A    Tom Patterson was a loan officer of Nova Bank.

20  Q    Okay.  And this Fpreve@aol.com, do you know who he is?

21  A    Yes.  He worked for Mr. Levin.

22  Q    Okay.  And who is copied on this e-mail?

23  A    Brian and myself.

24  Q    And what is the subject?

25  A    Mr. Levin's property.

1  Q    And again, what is the date of this e-mail?

2  A    November 6th, 2009.

3  Q    And can you read what Mr. Patterson wrote?

4  A    Frank, I pulled a property search on Mr. Levin's property

5  located at 326 South Fairfield Road, Devon, PA.  The search has

6  come back with the property owner being 326 South Fairfield,

7  LLC.  I want to confirm that, (a) I have the correct address,

8  and (b) if it's owned by the LLC.  Can I please have a copy of

9  the operating agreement?  Thanks for your help.  Tom.

10 Q    Now, in and around this time in November was it important

11 for the Bank to be raising capital?

12 A    Yes.

13 Q    On or about November 10, 2009 and around that time frame

14 were you made aware that the Bank had been downgraded?

15 A    What was the date again?

16 Q    About November 10, 2009 did you know that the Bank had

17 been downgraded?

18 A    I don't recall.

19 Q    Okay.  Do you know that the Pennsylvania Department of

20 Banking had been in to conduct an exam of the Bank?

21 A    I don't recall.

22 Q    Okay.  I'd like to show you what's been marked as

23 Government's Exhibit 95.  And this has been moved into

24 evidence, but do you see what this is?

25 A    Yes.

DiMarcantonio - Direct/Barry                    122

1  Q    Okay.  And were you made aware of the results of this exam

2  as a board member of the Bank?

3  A    I'm sure we will -- were, I'm sorry.

4  Q    Okay.  So, if this indicated that the Bank had been

5  downgraded, is that something that you would have been notified

6  about as a member of the Bank Board?

7  A    Yes.

8  Q    Okay.  Now, on or about November 19, 2009 do you know

9  whether or not Barry Bekkedam received a $250,000 consulting

10 fee from Nova Financial Holdings?

11 A    Can you tell me the date again?

12 Q    November 19, 2009.

13 A    Sounds correct.

14 Q    Now, I'd like to show you what's been marked as

15 Government's Exhibit 127.  And what is Government's Exhibit

16 127?

17 A    An e-mail from Barry dated November 17th, 2009 to Brian

18 with a copy to myself and Larry Rovin.

19 Q    Okay.  And is there an e-mail that -- several e-mails that

20 proceed this?

21 A    Yes.

22 Q    Okay.

23        MS. BARRY:  Your Honor, the Government moves for the

24 admission of Government's Exhibit 127.

25        UNIDENTIFIED ATTORNEY:  No objection.

DiMarcantonio - Direct/Barry                    123

1              UNIDENTIFIED ATTORNEY:   No objection.

2              THE COURT:   Admitted.

3              MS. BARRY:   May it be published, Your Honor?

4              THE COURT:   Yes.

5              MS. BARRY:   Okay.

6    Q    If we could start please with the first e-mail in this

7    chain.  And if we go up, is this an e-mail that is forwarded to

8    you?

9    A    I don't -- can you continue to go up?  It hasn't been

10   forwarded to me yet.

11   Q    Well, if you take a look here.

12   A    Sure.

13   Q    Is that subject forward --

14   A    Yes.

15   Q    -- Nova --

16   A    Yes.

17   Q    -- Bill Paley (phonetic).  Okay.  So, let's go with the e-

18   mail that you were forwarded, and that's the first e-mail in

19   the chain.  And looking at this e-mail do you know who Trisha

20   -- I guess -- Cafcacoogan (phonetic) is?

21   A    Yes.

22   Q    Who is she?

23   A    She was an employee of Ballamor Capital.

24   Q    Okay.  And who is she sending this e-mail to?

25   A    To Barry with a copy to Larry Rovin.

DiMarcantonio - Direct/Barry                    124

Q    Okay.  And what does she say to Barry Bekkedam?

A    Bill Paley just called.  He spoke to Kim Hartline at Nova
in reference to his investment.  She told him the following.
They are going out with a PPM to raise five million additional
capital at a discounted price.  The investor they had in their
pocket for the five million would no longer be invested.  An
information piece will be sent to the current investors from
Nova.  Kim is going to send Bill the information piece and a
PPM.  She told him that Nova has until December 18th to raise
the five million in order to get the TARP money.

Q    Okay.  And if we look at the next e-mail where -- what is
-- who is it from?

A    From Barry to Brian with a copy to myself.

Q    And what does he say?

A    Guys, why is Kim speaking with investors?  Now, we have to
do damage control, B.

Q    Okay.  And now, let's take a look at the next e-mail.  And
who is this from?

A    From Brian to Barry with a copy to myself and Larry Rovin?

Q    Okay.  And I'd like to turn your attention to the line
that says, because I am not sure.  Can we read that please?

A    Because I am not sure we are in the raise.  I have until
11:30 to raise five million or lose 17 of CPP funding and
become sanctioned under regulatory order for not being well
capitalized.  I am trying to raise capital.  To date I have

DiMarcantonio - Direct/Barry                    125

1  zero raised.

2  Q    Okay.  And again, what is the date of this e-mail?

3  A    That would be Tuesday, November 17th, 2009.

4  Q    Okay.  Now, is -- in November is the TARP funding still

5  being discussed with the Board of the Holding Company?

6  A    Yes.

7  Q    Okay.  And I'd like to show you what's been marked as

8  Government's Exhibit 128.  And what is Government's Exhibit

9  128?

10 A    Minutes of the meeting of the Board of Directors of Nova

11 Financial Holdings, November 25th, 2009.

12          MS. BARRY:  Your Honor, I move -- the Government

13 moves for the admission of Exhibit 128.

14          UNIDENTIFIED ATTORNEY:  No objection.

15          UNIDENTIFIED ATTORNEY:  No objection.

16          THE COURT:  Admitted.

17          MS. BARRY:  May it be published, sir?

18          THE COURT:  Yes.

19          MS. BARRY:  Thank you.

20 Q    And if we take a look at Government's Exhibit 128, it goes

21 to a portion in the -- sort of the middle.  It starts, Mr.

22 Hartline reviewed the October financial results, and then it

23 says, he discussed capital.  Can you just read that, what he

24 discussed with the capital?

25 A    Where would you like me to start?

1  Q    He discussed capital --

2  A    Oh, I'm sorry, he discussed capital.  He discussed

3  capital.  Nothing -- noted -- I'm sorry -- that we are still

4  adequately capitalized and our risk-weighted capital has

5  improved to 8.85 percent.  He noted that he will discuss

6  capital later in this meeting.

7  Q    Okay.  So, if we turn to the second page please, and if we

8  go to the second to last paragraph where Mr. Hartline noted

9  with CPP funding.  Would you please read that?

10  A    Mr. Hartline noted that the CPP funding closing is set for

11  December 22nd, and the drop dead date for closing capital is

12  December 18th.  We are shooting to get everyone done by

13  December the 11th to give us a little breathing room.  Mr.

14  Marlow asked if all the paperwork had been completed, and Mr.

15  Hartline responded that we are ready and only need to get the

16  capital in.

17  Q    Okay.

18  A    Continue?

19  Q    No, thank you.

20       MS. BARRY:  We can take that exhibit down.

21  Q    Now, do you know whether or not in December of 2009 the

22  Bank and Mr. Bekkedam are still trying to raise capital?

23  A    Yes.

24  Q    I'd like to show you what's been marked as Government's

25  Exhibit 136.  And I guess in this time period are they still

DiMarcantonio - Direct/Barry                    127

1  trying to receive the TARP funding?

2  A    Yes.

3  Q    Okay.  And what is Government's Exhibit 136?

4            MR. ENGLE:  Your Honor, I'll just ask for a

5  clarification on the they.

6            MS. BARRY:  Mr. Hartline and Mr. Bekkedam.

7  A    Can you repeat the whole question?

8  Q    In December of 2009 are Mr. Hartline and Mr. Bekkedam

9  still trying to get TARP funding?

10 A    Yes.

11 Q    Now, looking at Government's Exhibit 136, what is this?

12 A    Well, let me just clarify.  Mr. Bekkedam is not, the Bank

13 is.

14 Q    Okay.  Let's look at 136 please.  And what is 136?

15 A    It's an e-mail from me dated December 9th, 2009 to Barry

16 and Brian.

17 Q    Okay.

18 A    Copied to Larry and Joe Anamia (phonetic).

19 Q    Okay.  And who is that?

20 A    Joe is my partner in our real estate consulting business.

21 Q    Okay.

22           MS. BARRY:  So, Your Honor, the Government moves for

23 the admission of Government's Exhibit 136 please.

24           UNIDENTIFIED ATTORNEY:  No objection.

25           UNIDENTIFIED ATTORNEY:  No objection.

DiMarcantonio - Direct/Barry                    128

1          THE COURT:  Admitted.

2          MS. BARRY:  Okay.  And may it be published, Your

3    Honor?

4          THE COURT:  Yes.

5    Q    And let's start with the first e-mail.  Is this a series

6    of e-mails or an e-mail chain again?

7    A    Yes.

8    Q    Okay.  And let's start with the first e-mail.  Who is this

9    from?

10   A    From Brian --

11   Q    And --

12   A    -- dated December 9th, 2009 to Barry and myself.

13   Q    And what's the subject?

14   A    Please do not talk about investors not investing.

15   Q    Okay.  And what does Mr. Hartline say?

16   A    Barry, Nova is trying to raise eight million.  Five

17   million is the minimum that we need, and I would like to raise

18   as much as possible and have a little cushion versus always

19   operating at the minimal levels.  Please tell Tom and Mark, who

20   pledged to me 100,000 each, that they should invest.  I am

21   fighting for Nova, and we have a million in escrow two days

22   before a deadline.  No one should be talking of backing out of

23   subscriptions.

24   Q    Okay.  And let's go to the next e-mail.  And who writes

25   this e-mail?

1  A    This is from me to Brian, Barry, Larry Rovin and Joe

2  Anamia.

3  Q    Okay.  And what do you say?

4  A    I agree there's less than 3,000 K in quote, escrow, and

5  less than one million quote, in subscription signed.  Until we

6  get it in it's not in.  Please keep pushing.  Officially

7  there's no word from Porter, no word from Webber and no word

8  from the Paleys.  Joe just got off the phone with the Paleys.

9  They told him they're not rushing because they were told we

10 have the five million in.   Thanks.

11 Q    Okay.  And then does Mr. Hartline respond to your e-mail?

12 A    Yes.

13 Q    And what does he say?

14 A    Who told them that?  That is the farthest thing from the

15 truth.  I got the regulars calling me asking for updates.  They

16 are looking for cash in escrow.  As you noted, I have little to

17 show them.

18 Q    And then do you do a response to that e-mail?

19 A    Yes.

20 Q    And what do you say?

21 A    Let's keep pushing.

22 Q    Now, I'd like to show you what's been marked as

23 Government's Exhibit 135.  And what is Government's Exhibit

24 135?

25 A    It's an e-mail from me to Barry, Larry Rovin, Todd Howard,

DiMarcantonio - Direct/Barry                    130

1    Brian Hartline, Trisha, Bill Dowd (phonetic) and Joe Anamia.

2  Q      Okay.

3           MS. BARRY:  And, Your Honor, the Government moves for

4    the admission of Government's Exhibit 135.

5           UNIDENTIFIED ATTORNEY:  No objection.

6           UNIDENTIFIED ATTORNEY:  No objection.

7           THE COURT:  Admitted.

8           MS. BARRY:  May it be published, sir?

9           THE COURT:  Yes.

10          MS. BARRY:  Thank you.

11  Q      Now, this is an e-mail from you.  What is the date?

12  A      December 10th, 2009.

13  Q      Okay.  And it's to Barry Bekkedam, Larry Rovin, Todd

14  Howard.  Who is Todd Howard?

15  A      Todd worked at Ballamor Capital.

16  Q      Brian Hartline, Trisha Cafcacoogan, and who is Trisha

17  again?

18  A      A Ballamor Capital employee.

19  Q      Bill Dowd, who is Bill Dowd?

20  A      A Ballamor Capital employee.

21  Q      And then Joseph Anamia, and that is your business partner?

22  A      Correct.

23  Q      Okay.  And please read what you wrote to these

24  individuals.

25  A      Dear all, you will see in the papers and on the news today

1  the TARP program has been extended to October 2010 by the

2  Federal Government.  Please let's not have the instant reaction

3  of, great, let's delay this capital raise again.  I talked to

4  Brian last night.  And as soon as we heard this news he put a

5  call into the Treasury to get details, but does not believe

6  we'll get another extension or even an answer in a timely

7  fashion.

8            Let's face it, the Treasury probably will not even

9  return his call from yesterday, let alone give us a decision

10  for a few days.  So, just in case anyone you're talking to

11  today say they heard the program was extended we need to make

12  it clear that this does not apply us and right now our deadline

13  is still tomorrow.  Remember it -- it should be took -- almost

14  eight months to get approval, and we have asked for delays for

15  four months now.

16            Another extension will allow the Treasury to

17  reconsider their approval, ask for to wait to see our full

18  financials and then possibly get turned down.  One more day,

19  let's get this done.  Thanks to all.

20  Q    Now, at this point in time on December 10th, 2009 do you

21  believe that there is a closing for TARP funds?

22  A    Yes.

23  Q    Okay.  And does that closing get put on hold?

24  A    It was never met, so I'm going to try and answer that

25  question.  The TARP funds were never received.

1  Q     Yes, but as of December 10, 2009 were you expecting to get

2  TARP funding?

3  A     Yes.

4  Q     And was there a closing date to get the TARP funding?

5  A     I believe so.

6  Q     Okay.  And so, was that closing date put on hold?

7  A     I don't believe -- I don't recall.

8  Q     Okay.  So, let's take a look at Government's Exhibit 148.

9  And what is Government's Exhibit 148?

10  A     Minutes of the Board of Directors meeting of Nova Bank,

11  December 16th, 2009.

12  Q     Okay.

13         MS. BARRY:  Your Honor, the Government --

14  Q     And are you attending -- have you -- are you in attendance

15  at this December 16, 2009 --

16  A     Yes.

17  Q     -- meeting of the Board of Directors?

18  A     Yes.

19  Q     Okay.

20         MS. BARRY:  Your Honor, the Government moves for the

21  admission of Exhibit 148.

22         UNIDENTIFIED ATTORNEY:  No objection.

23         UNIDENTIFIED ATTORNEY:  No objection.

24         THE COURT:  Granted.

25  Q     If we could please turn to Page 3.

DiMarcantonio - Direct/Barry                    133

1           MS. BARRY:  May it be published, Your Honor?

2           THE COURT:  Yes.

3   Q    And if we could turn to Page 3 please.  And do you see the

4   line that -- the paragraph that starts, Mr. DiMarcantonio asked

5   Mr. Hartline to update the Board on the status of the Bank's

6   TARP application?

7   A    Yes.

8   Q    And then can you read the next sentence?

9   A    Mr. Hartline explained that the Bank has raised the amount

10  of capital to get us beyond our $10 million goal required by

11  the Treasury.

12  Q    Okay.  And what is the last sentence that he states here?

13  A    He then stated that our attorneys e-mailed last night and

14  told us that the Treasury has put our closing on hold.

15  Q    And what does he say in the next sentence, Mr. Hartline

16  stated that Ms. Coche (phonetic)?

17  A    I'm sorry?

18  Q    It starts with Mr. Guerrero (phonetic) --

19  A    Yeah, just need to enlarge.

20  Q    Okay.  And so, what does he say about, Mr. Hartline stated

21  that --

22  A    Mr. Hartline stated that Ms. Coche, our liaison at the

23  FDIC, is working hard on our behalf.

24  Q    Okay.  And can you read the next sentence please?

25  A    Sure.  He has also noted that recent articles regarding

DiMarcantonio - Direct/Barry                    134

1  the failure of banks to repay TARP and the actual failures of

2  banks that receive TARP funding have made the regulars and the

3  Treasury uneasy, and he is concerned that this may have an

4  effect on our funding.

5  Q    Okay.

6        MS. BARRY:  You can take that exhibit down please.

7  Q    Mr. DiMarcantonio, do you know an individual named Charles

8  Gallub?

9  A    Yes.

10 Q    And how did you first meet Mr. Gallub?

11 A    I met Mr. Gallub through a gentleman named Hal Shaffer.

12 Q    Okay.  And why -- what was the purpose of meeting Mr.

13 Gallub through Hal Shaffer?

14 A    Mr. Gallub was looking for a private equity loan for a

15 project that he was working on in Norristown.

16 Q    Okay.  And in addition to meeting with you, who else did

17 Mr. Gallub meet with?

18 A    Initially?  I don't recall.

19 Q    Okay.  Do you know whether or not Mr. Bekkedam met Mr.

20 Gallub based on this project?

21 A    He met him, not at the first meeting.

22 Q    Okay.  Why was Mr. Bekkedam introduced to Mr. Gallub?

23 A    As I said before, Mr. Gallub was looking for a private

24 mortgage on his property, which is something that I thought

25 Ballamor Capital would be interested in doing.  So, I had a

DiMarcantonio - Direct/Barry                    135

1  meeting set up between them.

2  Q    Okay.  And did Mr. -- I'm sorry.  Did Mr. Bekkedam assist

3  with the financing of that deal?

4  A    The Ballamor Capital clients' deed, yes.

5  Q    Okay.  And was that a significant deal?

6  A    Yes.

7  Q    Okay.  And at that time were you on the Board of both the

8  Bank and the Holding Company at the time that this deal was

9  made with Mr. Gallub?

10 A    Yes.

11 Q    And Ballamor Capital was involved with financing or

12 assisting in getting the financing for this deal, is that

13 right?

14 A    Correct.

15 Q    And your company, Axis Realty, also played an important

16 role in the deal, did it not?

17 A    Not the initial stage.

18 Q    Okay, but subsequently?

19 A    Subsequently.

20 Q    Okay.  And at the time that this deal -- when was this,

21 approximately 2007?

22 A    I believe so.

23        MR. ENGLE:  Your Honor, I'm going to object on

24 relevance grounds at this point.

25        MS. BARRY:  May we be heard at sidebar?

DiMarcantonio - Direct/Barry                     136

1              (At Sidebar)

2         MS. BARRY:  The -- Mr. Bekkedam's attorneys have

3    argued that Mr. Bekkedam had nothing to do with Mr. Gallub.

4    And the evidence is going to show first of all that Mr.

5    Bekkedam was on the Board at the time that this deal was

6    consummated.  And then subsequently Mr. Gallub will then

7    testify as to the reasons why he brought a significant deposit

8    relationship to Nova Bank.

9         MR. ENGLE:  First of all we haven't argued anything

10   about Mr. Gallub -- or Mr. Bekkedam having nothing to do with

11   Mr. Gallub.  The Government even stated it drove no big

12   statement, and the evidence has been consistent that Mr. Gallub

13   had no -- that the loan related to investment in Nova had no

14   referral from Mr. Bekkedam and no connection to Mr. Bekkedam.

15   So, what is the relevance of another deal that's completely

16   unrelated to this from 2007, that's prior to the time of the

17   charged indictment?

18        MS. BARRY:  Mr. Gallub will testify that the pressure

19   to invest in Nova Bank was because of the significant credit

20   relationships he had with the Bank, and also knowing that Mr.

21   DiMarcantonio was involved with Nova Bank and the Holding

22   Company, and that their relationship in this large deal was

23   hanging by a thread.  And so, he was -- his -- the reason why

24   he invested in Nova had to do with that relationship as well as

25   all of the credit relationships he had at Nova.  And it's

DiMarcantonio - Direct/Barry                 137

1  relevant as to why Mr. Gallub would have invested in the Bank.

2           MR. ENGLE:  That has nothing to do with Mr. Bekkedam.

3  And they can ask Mr. Gallub that.

4           THE COURT:  Let's ask Mr. Gallub, please.

5           MS. BARRY:  Yes, but the question I have before him

6  is whether or not he knew Mr. Bekkedam was on the Board of Nova

7  Bank.  And I don't --

8           MR. ENGLE:  Well, we knew he was on the Board?

9           MS. BARRY:  Of -- I'm sorry -- the Holding Company.

10          MR. ENGLE:  Whether or not we knew that.

11          MS. BARRY:  Whether or not at the time -- whether at

12 the time that they were doing this Logan Circle deal was Mr.

13 Bekkedam on the Board of Nova Financial.  And he can say yes or

14 no, then I'll move on.

15          THE COURT:  That actually wasn't the question I

16 heard.

17          MS. BARRY:  Okay.  Well, that's the -- I'm sorry if

18 that's not the -- I will frame the question that way.

19          MR. ENGLE:  All right.

20          MS. BARRY:  I'd just like to ask him a question --

21          THE COURT:  I'm going to sustain the objection.

22          MS. BARRY:  Okay.

23          MR. ENGLE:  Thank you.

24                  (Conclusion of Sidebar)

25 Q    Mr. DiMarcantonio, at the time that you met Mr. Gallub,

1  was that approximately 2007?

2  A    Yes.

3  Q    Okay.  And at that time were you on the Board of Nova

4  Bank?

5  A    Yes.

6  Q    And at that time were you on the Board of the Holding

7  Company?

8  A    Yes.

9  Q    At that time were you the chairman of the Board?

10 A    I don't recall.

11 Q    Okay.  Now, after this Logan Circle deal do you know

12 whether or not Mr. Gallub became a customer of Nova Bank?

13 A    Yes, he did.

14 Q    Okay.  And did he bring deposits to Nova Bank?

15 A    Yes, he did.

16 Q    And did he have a significant credit relationship with

17 Nova Bank?

18 A    I'm not sure what you mean by significant, but he had a

19 credit relationship with the Bank.

20 Q    Okay.  Did he have several loans for projects that were

21 over $1 million?

22 A    I don't recall.  I believe so.

23 Q    Now, do you know whether or not Mr. Gallub received -- do

24 you know whether or not in and about December of 2009 Mr.

25 Gallub received a $500,000 loan from Nova Bank?

DiMarcantonio - Cross/Egan                    139

1    A     I don't recall.

2    Q     Okay.  Do you know whether or not Nova Bank ever received

3    TARP funding?

4    A     Nova Bank never did.

5              MS. BARRY:  May I have a moment, Your Honor?

6              THE COURT:  Surely.

7              MS. BARRY:  No further questions.  Thank you.

8              THE COURT:  Okay.

9                      CROSS EXAMINATION

10   BY MR. EGAN:

11   Q     Good afternoon, DiMarcantonio.

12   A     Good afternoon, sir.

13   Q     You were the chairman of the Board of Nova Financial

14   Holdings, correct?

15   A     Correct.

16   Q     And you were also the chairman of the Board of Nova Bank,

17   correct?

18   A     No, I was not the chairman of the Bank.

19   Q     So, you were on --

20   A     Just the Holding Company.

21   Q     Okay.  You were on the Board of the Bank.

22   A     I was on the Board of the Bank.

23   Q     And those are two separate boards.

24   A     Correct.

25   Q     And two separate entities.

DiMarcantonio - Cross/Egan                    140

1  A     Correct.

2  Q     And you were asked a number of questions about the

3  Government about the same people being on the Holding Company

4  Board being on the Bank Board, do you remember those?

5  A     Correct.

6  Q     And indeed the people on the Holding Company Board are on

7  the Bank Board, right?

8  A     That's correct.

9  Q     But, the people on the Bank Board, there's a bunch of

10 other people on that, right?

11 A     Correct.

12 Q     And the people on the Holding Company Board included

13 yourself, correct?

14 A     Correct.

15 Q     And Mr. Marlow?

16 A     Yes.

17 Q     And Mr. Levy (phonetic)?

18 A     Yes.

19 Q     And Mr. Levy was a CPA, correct?

20 A     That is correct.

21 Q     And Mr. Levy was also on the Bank Board, correct?

22 A     Correct.

23 Q     And Mr. Levy was actually the head of the Audit Committee,

24 correct?

25 A     That is correct.

DiMarcantonio - Cross/Egan                    141

1  Q    And you were on the Audit Committee too, weren't you?

2  A    Yes, sir.

3  Q    And the Audit Committee is an independent committee on the

4  Board whose job it is to oversee the audit function and the

5  financial reporting functions of the Bank, correct?

6  A    Correct.

7  Q    And people at the Bank who have an issue with anything

8  that's improper would bring that to the attention of the Audit

9  Committee, correct?

10  A    Yes.

11  Q    And the reason they're able to do that is so that they

12  can't be stopped from talking to the Board by management,

13  right?

14  A    Correct.

15  Q    And that's why that's set up for good governance?

16  A    Correct.

17  Q    Now, you were on the Board of the Bank since its

18  inception, correct?

19  A    Since the Nova Bank inception, yes, sir.

20  Q    And also on the Holding Company Board.

21  A    Correct.

22  Q    And you were aware that there were capital raises

23  frequently between 2002, when it was first begun, and 2009, the

24  events were are talking about today, correct?

25  A    Yes.

1  Q    And, in fact, I believe there was the one in 2002

2  obviously to start the Bank, right?

3  A    Correct.

4  Q    One in 2004?

5  A    Yes.

6  Q    One in 2006?

7  A    I don't remember '06, but okay.

8  Q    And one in 2008, and that's the one that was used to

9  acquire Pennsylvania business banking.

10  A    Correct.

11  Q    Okay.  So, essentially at least every other year from the

12  time it began until the time of 2009 the bank went out and

13  raised capital.

14  A    Correct.

15  Q    Or the Holding Company I should say.

16  A    Correct, the Holding Company, that's correct.

17  Q    And in 2009 we've had a lot of discussion about various --

18  the you know, reports and various states of capital, but the

19  Bank was a healthy bank, correct?

20  A    Correct.

21  Q    And, in fact, it was trying to expand?

22  A    That is correct.

23  Q    It, first of all, had acquired Pennsylvania business bank

24  in late 2008.

25  A    Correct.

DiMarcantonio - Cross/Egan                    143

1  Q    And it was tempting to acquire this entity called DVFG.

2  A    That is correct.

3  Q    And DVFG was an insurance company, correct?

4  A    Yes.

5  Q    And capital was needed to acquire DVFG, correct?

6  A    Yes.

7  Q    So, in early 2009, to be precise, in March of 2009 Nova

8  put out what's called a private placement memorandum.  Do you

9  remember that?

10 A    Correct.

11 Q    And that is a document which is given to people who may be

12 interested in investing in the Holding Company, correct?

13 A    Correct.

14 Q    And the purpose of that 2009 March raise was because of

15 the DVFG acquisition, correct?

16 A    Mostly, that's correct.

17 Q    And, in fact, it was not having to do with raising funds

18 for TARP that that private placement memorandum was sent out,

19 it had to do with DVFG, didn't it?

20 A    Correct.  There was another company whose name I forget, a

21 mortgage company, AFC.  There was two companies we were trying

22 to acquire in that 2009 time frame.

23 Q    Right.  And you had other expansion plans as well,

24 correct?

25 A    Correct.

DiMarcantonio - Cross/Egan                    144

1  Q    And, in fact, after you met with -- after Mr. Levin

2  entered the picture one of the ideas was to expand into

3  Florida, correct?

4  A    That is correct.

5  Q    And you remember that they were looking at acquiring

6  Flagler Bank, a bank down in Florida?  Do you remember that?

7  A    Correct.

8  Q    And, in fact, the -- Mr. Hartline was actually -- the

9  Board approved Mr. Hartline engaging a law firm down in Florida

10 to look into that?

11 A    That's correct.

12 Q    And it was Sandler & Travis, right, remember that?

13 A    That I don't remember, but that sounds like -- I believe

14 it was Sandler O'Neill back then, but you may be correct with

15 that name.

16 Q    Right.  And the idea was if Nova -- if Levin was going to

17 begin a relationship with Nova, Nova could open up branches in

18 Florida and everyone would benefit from that, correct?

19 A    That's correct.

20 Q    Now, all of this time you became chair of the Holding

21 Company when?

22 A    In the '07 time frame.  I don't remember the exact date.

23 Q    All right.  So, basically from 2007 through 2010 or

24 actually through 2012 you as chair of the Holding Company were

25 effectively Mr. Hartline's boss, right?

1  A     Correct.

2  Q     He reported to you?

3  A     Correct.

4  Q     And the Board actually made the final decision on a number

5  of critical matters, correct?

6  A     That's true.

7  Q     It was not Mr. Hartline's decision to apply for TARP

8  funds, it was the Board's decision, correct?

9  A     That is correct.

10 Q     And he needed the Board's approval to do that.

11 A     Correct.

12 Q     And when he wanted to go out and raise funds or when the

13 Bank wanted to go out and raise funds for a capital raise he

14 couldn't do that on his own, right?

15 A     Correct.

16 Q     He had to get the Board's approval.

17 A     Correct.

18 Q     And we're not going to go into the board minutes, but

19 they're pretty thick.

20 A     Yes.

21 Q     And in those board minutes are a lot of different reports,

22 right?

23 A     Yes.

24 Q     And before a board meeting one of your duties is to review

25 those reports and see what's in them, right?

DiMarcantonio - Cross/Egan                    146

1  A    That's correct.

2  Q    And every month in those reports is a report from the Loan

3  Committee, correct?

4  A    Correct.

5  Q    And it speaks of the loans that were approved over the

6  course of the prior year --

7  A    Yes.

8  Q    -- or month.

9  A    We didn't have meetings every month, but I think we had

10  ten a year.

11  Q    Okay.

12  A    I think it was two months that we missed.

13  Q    Sure.  And during the period of time that Brian Hartline

14  -- you were the chairman of the Board and Brian Hartline was

15  basically reporting to you he never misled you about anything,

16  did he?

17  A    Not that I'm aware of.

18        MS. BARRY:  Objection.

19        MR. EGAN:  Okay.

20        THE COURT:  Sustained.

21  Q    Now, I want to turn to D-14 please.  And that's for the

22  witness only.  And, sir, this is an agenda from a board of

23  directors meetings, correct?

24  A    That is correct.

25  Q    And this is basically the overview of what's going to be

DiMarcantonio - Cross/Egan                    147

1  discussed at that board meeting, correct?

2  A    Correct.

3  Q    And it's from March of 2009, right?

4  A    Yes.

5  Q    And on the list of things we're going to talk about there

6  are the M&A activities, right?

7  A    Yes.

8  Q    And that means -- that's your acquiring DVFG and this AFC

9  you just spoke about.

10 A    Yes.

11 Q    And then it also talks about TARP, correct?

12 A    Correct.

13 Q    And then it talks about a capital raise.

14 A    Correct.

15 Q    All right.  Now, if we can go to Page 10, and if we could

16 have the second paragraph -- or actually the first full

17 paragraph -- well, we're not there yet -- blown up for the

18 witness.  Now, in early 2009 that was right after the financial

19 meltdown of late 2008, correct?

20 A    Say that again?

21 Q    Well, in October of 2008 is when the big financial crisis

22 occurred, correct?

23 A    Yeah.

24 Q    So, in early 2009 banks were under a lot of stress, right?

25 A    Correct.

1  Q    But, in spite of that Nova was still looking to expand.

2  A    Correct.

3  Q    However, like everybody else, Nova had to cut some costs

4  at that time too, didn't they?

5  A    That's correct.

6  Q    So, if we look at this paragraph, it says that Mr.

7  Hartline explained that based on the current economic

8  environment real estate issues and now the FDIC special

9  assessment and the over-impact it would have on the Bank's

10  earnings, he is recommending that we begin to aggressively cut

11  expenses.  Do you see that?

12  A    Yes, I do.

13  Q    And the FDIC special assessment, that was a new fee that

14  was being charged by the Government, right?

15  A    Correct.

16  Q    And that was a result of the economic meltdown.

17  A    Correct.

18  Q    And as a result of that he's suggesting that a number of

19  different things be done to try and cut back on costs, right?

20  A    Correct.

21  Q    And now if we could go to four lines from the bottom.  No,

22  no, same paragraph, four lines from the bottom of the

23  paragraph.  See that?

24  A    Okay.

25  Q    It begins, he also commented --

DiMarcantonio - Cross/Egan                    149

1  A    Yes.

2  Q    It says, he also commented that he would voluntarily give

3  back his 2009 merit increase, right?

4  A    Correct.

5  Q    And the increase in his car allowance.

6  A    Correct.

7  Q    So, there was a Compensation Committee that determines

8  what Mr. Hartline makes, right?

9  A    Yes.

10 Q    And that Compensation Committee had recommended that he

11 get a raise in 2009, right?

12 A    That's correct.

13 Q    And Mr. Hartline volunteered to give that back, right?

14 A    That is correct.

15 Q    Now, if we could go a little further down on the same

16 page, the very second from the bottom.  It says, Mr. Marlow

17 asked for an update on the TARP application, correct?

18 A    Correct.

19 Q    And it says that Mr. Hartline stated he and Mr. Hanisen

20 (phonetic) had been in communication, and they've recently

21 answered additional questions the Treasury had about the

22 application, correct?

23 A    That is correct.

24 Q    But, to date we've received no decision.

25 A    Correct.

DiMarcantonio - Cross/Egan                          150

1  Q    And this is in March of 2009.

2  A    Yes.

3  Q    Now, this morning you were shown G-25, so if we could go

4  to that please.  And that was a board of directors minutes

5  where -- or meeting, excuse me -- where Dave Swartz from

6  Stevens & Lee was asked to come in, right?

7  A    Okay.  It's not on my screen yet, but --

8  Q    Well, do you remember being asked questions about that

9  this morning?

10 A    Yes.

11 Q    Just this morning.  And Dave Swartz of Stevens & Lee, he's

12 outside counsel to the Bank, correct?

13 A    That is correct.

14 Q    And he's a banking lawyer.

15 A    Yes.

16 Q    Like an expert on banking, right?

17 A    Correct.

18        MS. BARRY:  Objection.

19        THE COURT:  Sustained.

20 Q    Well, you were shown this -- these minutes by Mr. -- or by

21 Ms. Barry, and they have a guest, David Swartz, Esq., Stevens &

22 Lee, correct?

23 A    That is correct.

24 Q    And the reason David Swartz of Stevens & Lee was there was

25 because he was going to give a presentation about TARP,

DiMarcantonio - Cross/Egan                    151

1  correct?

2  A    I believe so.

3       MR. EGAN:  And if we could go down to where it says

4  TARP presentation by Stevens & Lee.  And I believe this can be

5  published.  You admitted this, correct?

6       MS. BARRY:  Yes.

7       MR. EGAN:  Okay.

8  Q    Basically the Board asked to hear from Mr. Swartz about

9  the TARP process, correct?

10 A    Correct.

11 Q    Because you wanted to be educated on what needed to be

12 done, correct?

13 A    Correct.

14 Q    And wasn't another reason that you wanted to hear from him

15 was because the Board was getting a little frustrated because

16 we hadn't heard in over six months about what was going on with

17 the TARP?

18 A    Yes.

19 Q    And you sat through that presentation, right?

20 A    Yes.

21 Q    You listened to it.

22       MR. EGAN:  Now, if we could go to Page 3 of 5 and

23 have the very top paragraph.

24 Q    Now, Ms. Barry asked you to read a sentence here.  And I

25 believe it was, Mr. Hartline stated that he felt that if we

1  raised the capital projected and take certain steps as noted to

2  shrink the balance sheet -- oh, I'm sorry.  I apologize, wrong

3  spot.  But, let's just go over that.  Mr. Hartline stated that

4  he felt that if we raised the capital projected and take

5  certain steps as noted to shrink the balance sheet -- that's

6  those cost-cutting things we talked about earlier, right?

7  A    Correct.

8  Q    Or execute certain of the options presented, we will

9  become well capitalized again, and have about a million in

10 excess capital to grow, and then it says, without TARP,

11 correct?

12 A    Correct.

13 Q    So, all during this period of time you kind of had two

14 plans going, didn't you?  One if you got the TARP and one if

15 you didn't?

16 A    Yes.

17 Q    Because you never really knew whether you were going to

18 get the TARP or not, correct?

19 A    Well, yes.  We also never really knew what the TARP terms

20 and conditions were.

21 Q    Right.  You sort of never kind of actually understood

22 exactly what you needed to do to get it, did you?

23 A    That's correct.

24 Q    And clearly Mr. Hartline, at least in May, thought that

25 you might be able to become well capitalized without the TARP.

DiMarcantonio - Cross/Egan                    153

1  A    That's correct.

2  Q    And the reason for that was because you had just found

3  this great investor, right?

4  A    (No audible response).

5  Q    I don't mean you, but the Bank.

6  A    Not me, but yes.

7  Q    And that was Mr. Levin.

8  A    Correct.

9  Q    Now, you spoke about Mr. Levin on direct examination.  And

10  what you said was that he had an $18 million subscription to

11  invest in the Bank, correct?

12  A    Correct.

13  Q    And Mr. Levin signed that subscription, and he sent it in

14  to the Holding Company, correct?

15  A    Yes.

16  Q    And that meant that he was required to invest $18 million

17  in Nova Financial Holdings.

18  A    That is correct.

19  Q    And Mr. Levin certainly did that of his own free will.

20  A    To the best of my knowledge, yes.

21        MS. BARRY:  Objection.

22  Q    Well, you had no --

23        THE COURT:  Sustained.

24        MR. EGAN:  I'll withdraw the question.

25  Q    You had no reason to think that Mr. Levin wasn't going to

1  invest the $18 million, did you?

2  A     Yes.

3  Q     Because he had given every indication that he was going

4  to.

5  A     Correct.

6  Q     Now, if we could go to G-26 please.  You met Mr. Levin

7  when he came to Philadelphia, correct?

8  A     Correct.

9  Q     And we're going to go through these e-mails in a minute,

10 but -- as they're coming up.

11        THE COURT:  Counsel, if you're going to do that,

12 let's take a break now.

13        MR. EGAN:  Oh, sure.

14        THE COURT:  Okay.  We can take a recess at this time.

15                 (Jury out)

16        THE COURT:  You may step down.  Fifteen minutes.

17        THE WITNESS:  Thank you.

18        THE COURT:  Yes, sir.

19                 (Recess)

20        MR. EGAN:  And I don't know how late the Court was

21 planning to go, but I don't know when this witness will be

22 done, but the two witnesses we have left, it would be ideal to

23 get both of them on.  They should both be fairly brief, much

24 briefer than this witness so insofar as we can keep going to as

25 close to 4:30 as the Court will allow, I'd appreciate that.

DiMarcantonio - Cross/Egan                    155

1          THE COURT:  As we say in Oklahoma, til the cows come

2    home.

3          MR. EGAN:  Okay.

4          UNIDENTIFIED SPEAKER:  Good afternoon, Your Honor.

5          THE COURT:  Good afternoon, sir.

6          COURTROOM DEPUTY:  All rise.

7                         (Jury in)

8          THE COURT:  You may be seated.  Good afternoon.  You

9    may continue.  Thank you.

10         MR. EGAN:  Thank you, Your Honor.

11   Q    Mr. DiMarcantonio, before we get into the document that's

12   before you, these events took place in 2009, the ones we've

13   been talking about all day?

14   A    Yes.

15   Q    And it's 2016 now, correct?

16   A    Correct.

17   Q    So it would be fair to say that it's a pretty distant

18   memory?

19   A    Yes.

20   Q    And there may be some things about this situation that you

21   don't remember fully?

22   A    That would be correct.

23   Q    But you're doing your best?

24   A    I'm trying my best.

25   Q    And the documents certainly help?

1  A     Correct.

2  Q     Okay, but one of the things that you remembered this

3  morning was about this house, right?

4  A     Correct.

5  Q     And there's a reason why you remember the house, isn't

6  there?

7  A     Correct.

8  Q     You had known the house most of your life, hadn't you?

9  A     Most of my life, that's correct.

10 Q     It's obviously a really nice house.

11 A     It's a very nice house.

12 Q     And it's in Devon?

13 A     It's in Devon.

14 Q     And I guess what, it was across the street from where you

15 went to school or something?

16 A     Correct.  I went to elementary school right across the

17 street from it.

18 Q     And I guess when you were a little kid it was pretty

19 impressive?

20 A     Right.  It was unique for the neighborhood.  It was kind

21 of a -- more like a Georgian, southern mansion type of lawn

22 columns.  I remember sitting in elementary school staring at

23 this house saying who lives in that house.

24 Q     Right.

25 A     And it was just funny, you know, there it is some 40, 50

DiMarcantonio - Cross/Egan                    157

1    years later and the banks are talking about collateralizing the

2    house.

3    Q    Okay, and so obviously one of the things you remember best

4    about this whole thing is that house?

5    A    Correct.

6    Q    So you actually got to go to that house, didn't you?

7    A    Yes.

8    Q    And that was on June 1st of 2009, wasn't it?

9    A    I don't remember the date.

10   Q    Okay well, let's look at the document.

11   A    Yes.

12          MR. EGAN:  So if we could look -- and I guess we

13   should probably start at the back like the Government did which

14   would be Page 3 and if you could blow that up?

15   Q    And that's an e-mail from Brian to you and Barry, correct?

16   A    Correct.

17   Q    And basically he wants to know if you're with George or

18   not, right?

19   A    Correct.

20   Q    And he's got documents he needs signed, correct?

21   A    Correct.

22   Q    Now, you don't remember what those documents were, do you?

23   A    No.

24   Q    Okay, but he talks about publishing a notice if he's

25   buying -- saying he's buying the shares, right?

DiMarcantonio - Cross/Egan                            158

1   A    Correct.

2   Q    Now, the plan was, was it not, to meet at the house and

3   have George do whatever he needed to do to make this

4   investment, right?

5   A    Correct.

6   Q    Okay, and so you were going to go to the house?

7   A    Yes.

8   Q    And Barry was going to go to the house?

9   A    Barry was -- if I remember correctly, he was flying in

10  with George from Florida and going to the house.

11  Q    Right.

12           MR. EGAN:  And if we could get to the next e-mail

13  which is on the page before that?

14  Q    It says I am waiting for Barry to call me.  If you want me

15  to get me the stuff, that would be great but it would be better

16  to take it to his office, do you see that?

17  A    Correct.

18  Q    And what you're really telling Brian here is rather than

19  me get the stuff, take it to Barry's office and George can sign

20  it there, right?

21  A    Correct.

22  Q    Because the original plan was go to the house and have a

23  meeting there, right?

24  A    Right.

25  Q    And then go to Barry's office?

DiMarcantonio - Cross/Egan                    159

1  A    I was just going to meet him there to pick him up.  The

2  house -- they were building a 20,000 square foot addition.

3  There was major construction going on so I didn't think that

4  was an appropriate place to be sitting down to sign papers.

5  Q    So you knew that Mr. Levin was going to go there.  You

6  were going to meet him there?

7  A    Correct.

8  Q    And then you were going to take him to Barry's office,

9  right?

10  A    I was going to pick up Barry.  Barry and George were going

11  to George's house and I said I'll pick you up at George's house

12  and go from there.

13  Q    Right, and you were going to take him to Barry's office --

14  A    Correct.

15  Q    -- where he was going to -- George was maybe going to sign

16  these documents?

17  A    Yes.

18        MR. EGAN:  Okay, and so then we go to the next one

19  up.

20  Q    It says from Barry to you but not to Brian, right?

21  A    Correct.

22  Q    It says we are not signing today.  I will talk to you both

23  when I see you at George's house at 10:30ish, correct?

24  A    Correct.

25  Q    Okay, so at this point you're still going to the house but

DiMarcantonio - Cross/Egan                      160

1  George is no longer signing the documents?

2  A    Correct.

3  Q    And Brian never goes to the house, does he?

4  A    That's correct.

5  Q    And Brian never goes and meets with George at Barry's

6  office, does he?

7  A    Not to my knowledge.

8  Q    In fact, George never goes to Barry's office, correct?

9  A    Not to my knowledge, correct.

10  Q    You go over to the house.

11  A    Correct.

12  Q    It's probably cool -- kind of cool to go there after all

13  those years, right?

14  A    Right.

15         MS. BARRY:  Objection.

16         THE COURT:  Sustained.

17  Q    And you talk to George for a few minutes, right?

18  A    Right.

19  Q    And this is this rich guy who's going to invest all this

20  money in the bank, right?

21  A    That's correct.

22  Q    And looked like a rich guy to you, right?

23  A    He looked like a regular guy to me, correct.

24  Q    With this very big, nice house?

25  A    Beautiful house, correct.

DiMarcantonio - Cross/Egan                    161

1  Q    Okay, and then if we go to the top e-mail, we hear from --

2  the very top, the very top one, we hear from Larry Rovin,

3  right?

4  A    Yes.

5  Q    And Larry Rovin is Ballamor Capital's general counsel,

6  correct?

7  A    Correct.

8  Q    So he's a lawyer?

9  A    Correct.

10 Q    He's actually got banking experience too, right?

11 A    I believe he does, yes.

12 Q    And he says I have the Nova docs for George, see that?

13 A    Correct.

14 Q    Which means they must have been delivered to the office,

15 right?

16 A    Okay.

17 Q    Okay.

18 A    I agree.

19 Q    So all this goes down on June 1st, right?

20 A    That's correct.

21 Q    And we don't have any signed documents but we know that

22 Mr. Levin is serious and interested in investing in Nova,

23 correct?

24 A    Correct.

25 Q    Didn't give you any indication otherwise?

DiMarcantonio - Cross/Egan                    162

1   A     No, he did not.

2           MR. EGAN:  Okay.  So now if we could go to

3   Government's 35 which we saw on direct.

4   Q     Around about the same time we find out that the holding

5   company has been downgraded, correct?

6   A     That's correct.

7   Q     And that the Federal Reserve has taken the position that

8   the holding company should have a lower rating than the best?

9   A     That's correct.

10  Q     They're not saying it's about to crash and burn.  They're

11  just saying it's not the best?

12  A     Correct.

13  Q     Okay, and so needless to say, the board of directors wants

14  to hear stuff about that, right?

15  A     Of course, yes.

16  Q     Okay, so if we look at this at the very bottom here where

17  it says general, that's talking actually --

18          MS. BARRY:  Objection.

19          THE COURT:  I'm sorry?

20          MS. BARRY:  Is he referring to the holding company or

21  the bank?

22          MR. EGAN:  I was going to clarify that.  Sorry.

23  Q     Actually, I apologize.  This is the bank minutes, right?

24  So we're actually talking about the bank becoming adequately

25  capitalized here, you see that?

DiMarcantonio - Cross/Egan                                163

1   A   Can I just see the top again?

2   Q   Sure.

3   A   You blocked my top.  I can't see it.  Thank you.  Yes,

4   that's the bank.

5   Q   Okay, and we're talking about them becoming adequately

6   capitalized?

7   A   Correct.

8   Q   And that's because of some issue having to do with

9   securities that the bank had on their balance sheets?

10  A   That's correct.

11         MR. EGAN:  Okay, and if we could go to Page 2 and

12  that first small paragraph, discussions.

13  Q   Now, when the board has a meeting management, that is,

14  Brian Hartline, presents to the board information, right?

15  A   Correct.

16  Q   And then all of the board members are allowed to comment

17  and say what they think about it, right?

18  A   That's correct.

19  Q   And then the board makes decisions, right?

20  A   Yes.

21  Q   And then Mr. Hartline executes those decisions?

22  A   That's correct.

23  Q   So a discussion pursued as to what the calculation means

24  to Nova's capital ratios, why the calculation doesn't make

25  sense and what Nova can do about it.  Do you recall that

DiMarcantonio - Cross/Egan                        164

1  discussion?

2  A    I don't.

3  Q    Okay.

4  A    Sorry, I do not.

5  Q    But it had something to do with this downgrade --

6  A    Yes.

7  Q    -- that the bank didn't necessarily agree with?

8       MR. EGAN:  And if we could go two sentences or the

9  next small paragraph, the small one.

10 Q    He says Mr. Hartline explained this calculation was

11 brought to our attention from the FDI staff reviewing our TARP

12 application.  He further noted that not all banks are following

13 this accounting treatment which we believe is unfair.  Do you

14 remember that?

15 A    Again, I don't.

16 Q    You don't remember thinking that the capital treatment

17 that you received had been unfair?

18 A    No, I don't.

19 Q    Okay, and then what you're showed by the Government, the

20 bottom paragraph begins Mr. Hartline, he noted that we've heard

21 from the FDIC on June 10th that Nova was approved for CPP and

22 they were sending our application to Treasury for final

23 approval, you see that?

24 A    Yes.

25 Q    So he indicated to you that Treasury still had to approve?

DiMarcantonio - Cross/Egan                    165

1   A    That's correct.

2   Q    And that was your understanding as well, correct?

3   A    Correct.

4   Q    And then down below you talk about what impact this would

5   have on the TARP application, correct?

6   A    Correct.

7   Q    DVFG, that's the acquisition?

8   A    Correct.

9   Q    AFC, correct?

10  A    Yes.

11  Q    And the Florida expansion plans?

12  A    Correct.

13  Q    And the Florida expansion plans, that was to open these

14  branches that were going to be open because of Mr. Levin?

15  A    That's correct and business we were looking to do down in

16  Florida.

17  Q    Right, and you were trying to raise capital for all that?

18  A    Correct.

19  Q    So now we come to the end of June and it is important, is

20  it not, to obtain some capital by June 30th?

21  A    (No audible response).

22  Q    I mean the goal was to raise capital by June 30th,

23  correct?

24  A    Yes.

25  Q    Okay, and you were shown a whole number of e-mails this

DiMarcantonio - Cross/Egan                               166

1   morning by the Government about this.

2            MR. EGAN:  But let's go to Government's 36 first.

3   And if you just blow up the top?  It's the only e-mail in the

4   chain.

5   Q    This is an e-mail from Brian to Barry, right?

6   A    Yes.

7   Q    Larry Rovin, the lawyer for Ballamor Capital, right?

8   A    Correct.

9   Q    And yourself?

10  A    Correct.

11  Q    And basically it says Barry, can you let me know what to

12  expect in regards to receiving the $5 million, do you see that?

13  A    That's correct.

14  Q    So Brian is still -- he's wondering when and where this

15  five million bucks is coming from, right?

16  A    That's correct.

17  Q    And if we go down to the bottom of it, he says we still

18  have not received any information to start underwriting the

19  loans, do you see that?

20  A    Correct.

21  Q    And that's plural, correct?

22  A    Correct.

23  Q    Okay, so he's talking about more than one loan, correct?

24  A    Yes.

25  Q    Okay.

1           MS. BARRY:  Objection.

2           THE COURT:  Overruled.

3    Q    All right, and he wants information so these loans can be

4    underwrited, correct?

5    A    Yes.

6    Q    Now, this e-mail talks about investing the money this

7    week, correct?

8    A    Correct.

9    Q    And it talks about loans?

10   A    That's correct.

11          MR. EGAN:  Okay.  Now, if we could go to Government's

12   39.

13   Q    And this is another e-mail you were shown this morning,

14   right?

15   A    Yes.

16   Q    And you're on this e-mail, correct?

17   A    That's correct.

18          MS. BARRY:  Excuse me, this is not in evidence, 39.

19          MR. EGAN:  Oh, I'm sorry.  Could you not -- just

20   unpublish it.  Sorry about that.

21   Q    You see that?

22   A    Yes.

23   Q    Okay, and it's from Barry to Larry the lawyer and to you,

24   right?

25   A    Correct.

DiMarcantonio - Cross/Egan                    168

1  Q    And Brian is also on it?

2  A    Correct.

3  Q    And it says guys, it was clear to least me that we were

4  getting George approved for a loan of $5 million, correct?

5  A    Correct.

6  Q    And this is on June 29th, correct?

7  A    That's correct.

8  Q    A day before the loan took place to Mr. Levin, correct?

9  A    Correct.

10 Q    And then if we go down to the next sentence, it says per

11 my conversation with Brian, he thought I was getting a wire

12 tomorrow, right?

13 A    Correct.

14 Q    So he thinks Levin is just wiring the money in.  I was

15 always thinking loan, see that?

16 A    Correct.

17 Q    Now clearly that's connecting both the fact that there's

18 an investment and there's a loan together, is it not?

19 A    Okay, yes.

20 Q    And then it says I assume we can get the subscription docs

21 by tomorrow.  That's the subscription, that's the commitment to

22 buy the stock, right?

23 A    That's correct.

24 Q    Underwrite George, correct?

25 A    Correct.

DiMarcantonio - Cross/Egan                    169

1   Q    And underwriting is something you do to get a loan, right?

2   A    That's correct.

3   Q    And that would be a loan that would be issued by Nova,

4   wouldn't it?

5   A    Correct.

6   Q    Okay.

7           MR. EGAN:   And then if we could go to Government's

8   39(a) and if we blow up just the top section?

9   Q    And it says -- and this is to you, right?

10  A    From Brian to --

11  Q    Right.

12  A    -- Barry and myself, yes, and Larry.

13  Q    And it says we need to close on the capital tomorrow by

14  the end of the day, right?

15  A    Correct.

16  Q    Escrow will not count for capital, correct?

17  A    That's correct.

18  Q    We are working with Larry on obtaining all required

19  executed documents, correct?

20  A    Correct.

21  Q    And this is referring back to the underwriting and the

22  loan from the prior e-mail, correct?

23  A    I would believe so, yes.

24  Q    So, sir, I know it's been a long time but reading these e-

25  mails, it's pretty clear that there's a discussion between

1  yourself, Mr. Rovin, Mr. Hartline and Mr. Bekkedam about

2  getting a loan to fund Mr. Levin's subscription for the bank,

3  correct?

4  A    Okay.

5  Q    Now, you know Mr. Rovin is on these e-mails, right?

6  A    Correct.

7  Q    You know he's a lawyer, right?

8  A    Correct.

9  Q    He never called you up and said hey, there's a problem

10 with doing this, did he?

11 A    No.

12         MS. BARRY:  Objection.

13         THE COURT:  Sustained.

14 Q    Now, sir --

15         MR. EGAN:  You can take that down.

16 Q    You aren't on the loan committee, right?

17 A    That's correct.

18 Q    There's a bunch of other folks on it, right?

19 A    Yes.

20 Q    And they include Mark Poliski (phonetic), right?

21 A    Yes.

22 Q    And Dave Dietrich (phonetic), right?

23 A    I believe so, yes.

24 Q    These names have been brought up to you this morning, you

25 remember them?

DiMarcantonio - Cross/Egan                    171

1   A    Correct.

2   Q    Jeff Hanisen, you remember him?

3   A    Yes.

4   Q    Yeah, they're on the loan committee, right?

5   A    Correct.

6   Q    And the reason you're not on the loan committee is because

7   you're not, you know, credit is not your thing, correct?

8   A    There was no board members on the loan committee.

9   Q    But also you have a credit manager because that's the

10  person who's job it is to see whether or not the loan is

11  creditworthy, right?

12  A    That's correct.

13  Q    That's their job?

14  A    Correct.

15       MR. EGAN:  Now, if we could have Government's 43

16  please?

17  Q    Did you ever see this document, sir?

18  A    Yes.

19  Q    It's a risk assessment summary, right?

20  A    Correct.

21       MR. EGAN:  And if we could blow up the top part?

22  Q    And it says date, June 30th, 2009, you see that the first

23  little box?

24  A    Yes.

25  Q    And if you look down, George G. Levin, you see that?

DiMarcantonio - Cross/Egan                    172

1   A    Yes.

2   Q    And across from that, $5 million, right?

3   A    Yes.

4           MR. EGAN:  Okay now, if we could go down to the lower

5   section and blow that up.

6   Q    Okay, and you see what it says there financial investment,

7   correct?

8   A    Sorry.  Give me a second.

9   Q    It's about maybe eight lines down.  It has a check next to

10  it.

11  A    Yes.

12  Q    So the document that was presented to the loan committee

13  who made the decision says nothing about a house, does it?

14  A    It doesn't appear to.

15          MR. EGAN:  You can take that down.

16  Q    Now, Mr. Levin makes his -- takes out his loan, right?

17  A    Correct.

18  Q    He makes his investment, right?

19  A    Correct.

20  Q    And that doesn't mean -- well strike that.  We still don't

21  hear anything back from the Government for quite some time,

22  correct?

23  A    That's correct.

24  Q    And he files something called a change in control

25  application?

DiMarcantonio - Cross/Egan                    173

1   A    Correct.

2   Q    And in that change in control application the Government

3   has the opportunity to ask questions of people and find out

4   what's going on, right?

5   A    That's correct.

6   Q    Okay, I want to turn your attention to Government 73

7   please and if you blow up the lower e-mail.

8   Q    Now, one of the things that Brian Hartline is supposed to

9   do because you're the chairman of the board and on the -- of

10  the holding company and on the board of the bank is keep you

11  informed about what's going on, right?

12  A    Correct.

13  Q    So on August 21st he forwards an e-mail to you about Mr.

14  Levin, correct?

15  A    The one I have in front of me is August 17th.

16  Q    Yeah.  Oh, I'm sorry, my --

17  A    Are we okay?

18  Q    Yeah.

19  A    I have Exhibit 73 in front of me.

20  Q    Yes.  I'm reading it wrong.  My mistake.  It does -- it is

21  the 17th.

22  A    Okay.

23  Q    It says here's the formal request from the Department of

24  Banking for your information.  Please contact Ms. Metcalf

25  (phonetic), right?

DiMarcantonio - Cross/Egan                    174

1  A    That's correct.  It's from Kim, copy to --

2  Q    That's the confusion.  That's --

3  A    I'm sorry.

4  Q    -- the e-mail that gets forwarded to you.

5  A    Oh, okay.

6  Q    If you go up to the bottom on the first page.

7  A    Yeah, okay, I see it.

8  Q    You see it now?

9  A    Yes, I see it.

10 Q    It was forwarded to you.  So basically what Brian is

11 forwarding to you is information that the Banking Department is

12 asking questions of Mr. Levin, right?

13 A    Correct.

14 Q    About his application for a change in control?

15 A    That's correct.

16 Q    And providing the phone number to them for him to call if

17 there are any questions, correct?

18 A    Correct.

19 Q    And he provided to you as well, right?

20 A    Yes.

21 Q    Now, in the fall in October you were still of the view

22 that Mr. Levin was going to invest his money, right?

23 A    Of 2009?

24 Q    Yeah.

25 A    Yes.

DiMarcantonio - Cross/Egan                          175

1   Q    Because he had committed to do so?

2   A    That's correct.

3   Q    You didn't know where the rest of the money was coming

4   from, did you?

5   A    No, I did not.

6   Q    You were shown a bunch of back and forth this morning and

7   I'm not going through it all but it was basically about trying

8   to get Mr. Moore (phonetic) and Mr. Levin's money in, correct?

9   A    Correct.

10  Q    So I just want to look at one document you were shown

11  which was 103.  Maybe you weren't shown this one but we'll look

12  at it now.  This is an e-mail from Mr. Hartline to Barry

13  Bekkedam, correct?

14  A    From Barry Bekkedam to Mr. Hartline.

15  Q    Oh, I'm sorry.  Got it backwards.

16  A    Yes.

17  Q    And you're copied?

18  A    Yes, I am.

19  Q    And it says Levin wire, right?

20  A    Correct, is the subject.

21  Q    It says it looks like we are good with three million worse

22  case.  Frank is putting together the wire asap, correct?

23  A    That's correct.

24  Q    So basically this is Barry saying we're still expecting to

25  get this money from Mr. Levin?

DiMarcantonio - Cross/Egan                    176

1    A    Correct.

2    Q    But we never got that money, did we?

3    A    That's correct.

4    Q    Because Mr. Levin never sent it?

5    A    Correct.

6    Q    Because Mr. Levin had a little problem with his finances

7    starting on October 31st, correct?

8    A    I believe that was the date, yes.

9    Q    And it took a while to figure out exactly what his status

10   was, right?

11   A    That's correct.

12   Q    And during that period of time he basically went south on

13   his commitment?

14   A    That's correct.

15   Q    Now, one of the things that Mr. Schwartz would do as your

16   lawyer would be communicate to the Treasury, would he not?

17   A    Yes, he would.

18           MR. EGAN:  And if we could have Government's 122.  I

19   don't know if this is -- I don't think this is in evidence so

20   just for the witness please.

21   Q    Do you remember if Mr. Schwartz advised the Treasury that

22   Mr. Levin was no longer going to invest?

23   A    I don't remember, no, sir.

24   Q    Could you look at 122 and see if it refreshes your

25   recollection?  Does that refresh your recollection as to

DiMarcantonio - Cross/Egan                               177

1  whether Mr. Schwartz advised the Treasury?

2  A    Yes.

3  Q    Did he advise the Treasury?

4  A    Yes.

5  Q    Now, you talked about the loan being somehow tied to the

6  house this morning, remember that?

7  A    Yes.

8  Q    There actually came a time, did there not, when there was

9  an effort to secure the loan with the house?

10  A    To the best of my knowledge, there was.

11  Q    And the Government showed you some e-mails about that this

12  morning, didn't they?

13  A    That's correct.

14  Q    Let me show you one they didn't show you.

15        MR. EGAN:  It's D-65 for the witness only please.  Q

16     And this is dated November 2nd and it's from Brian

17  Hartline to you, correct?  It's from you to Brian Hartline.

18  A    It's actually from me to Brian, yes.

19  Q    I get them backwards all day long.  Anyway, it's Monday,

20  November 2nd, right?

21  A    That's correct.

22  Q    And you're writing to Brian and you write Brian, George's

23  house is in Devon, 236 South Fairfield Road, do you see that?

24  A    That's correct.

25  Q    Now, if the bank had -- if the loan back in June had

DiMarcantonio - Cross/Egan                    178

1   anything to do with the house, the bank would know the address

2   of the house, wouldn't it?

3   A    Yes.

4   Q    Okay, now I want to talk about Government's 127.   And

5   essentially after Mr. -- well, let's talk a little first.

6   After Mr. Levin goes south, you still want to try and raise --

7              MS. BARRY:   Objection.

8              THE COURT:   Sustained.

9   Q    After Mr. Levin fails to provide the money, you still want

10  to try and raise it, right?

11  A    That's correct.

12  Q    You still have plans, right?

13  A    That's correct.

14  Q    You still have a viable bank, right?

15  A    That's correct.

16  Q    And your goal is to try and still grow it?

17  A    Yes.

18  Q    You still want to do DVFG, right?

19  A    That's correct.

20  Q    You still want to service your customers?

21  A    That's correct.

22  Q    And the decision is made to continue to try to raise the

23  money, right?

24  A    Correct.

25  Q    And one of the things you had to do to continue to raise

1 the money was now sell the stock at a lower price, correct?

2 A    That's correct.

3 Q    And you were shown Government's 127 this morning and there

4 was a lot of back and forth over it but I'll cut it a little

5 short.  This whole discussion is really about going to the

6 market with a lower share price, isn't it?

7 A    That's correct.

8 Q    And Mr. Bekkedam wasn't real happy about that, was he?

9 A    That's correct.

10 Q    And so he didn't really want to do that, did he?

11 A    Initially he did not.

12 Q    Okay.  But Mr. Bekkedam doesn't make that call, does he?

13 A    He does not.

14 Q    The board of directors makes that call, don't they?

15 A    That's correct.

16 Q    And, in fact, if we look at the bottom section here which

17 is an e-mail from Brian to Barry and you, right?

18 A    Yes, with a copy to Larry, yes.

19 Q    And once again, and Larry the lawyer.

20        MR. EGAN:  And if we go down to the section that says

21 the board of directors.

22 Q    It says the board of directors has allowed me to offer the

23 stock at $4, see that?

24 A    That's correct.

25 Q    Right, because Brian Hartline couldn't decide what to sell

DiMarcantonio - Cross/Egan                    180

1   the stock for, could he?

2   A    That's correct.

3   Q    The board of directors decided?

4   A    Correct.

5   Q    And he's doing what the board of directors asked him to?

6   A    That's correct.

7   Q    Now, you also --

8              MR. EGAN:  You can take that down.

9   Q    You also had some discussions this morning about Mr.

10  Bekkedam's contract, right?

11  A    Yes.

12  Q    And that in November there was a decision to hire Mr.

13  Bekkedam as a consultant, right?

14  A    Correct.

15  Q    And to pay him a flat fee basically of $250,000?

16  A    That's correct.

17  Q    Okay, now you've been -- you're in real estate, right?

18  A    That's correct.

19  Q    And you've been involved in capital raises before, right?

20  A    Yes.

21  Q    And when people raise capital, they have to hire folks to

22  do that, don't they?

23  A    Yes, many do.

24  Q    And you have to pay money for that, right?

25  A    That's correct.

DiMarcantonio - Cross/Egan                    181

1  Q    Now, the board of directors of the financial holdings had

2  to agree for that contract to be signed, correct?

3  A    I believe so, yes.

4           MR. EGAN:  All right, now we're going to go to G-170.

5  Never mind.  We can skip that.  I'm sorry.  Now I want to go to

6  after G-179 which I don't think is in evidence.

7  Q    In the spring of 2010 KPMG raised an issue with --

8  A    Excuse me, 79 or 179?

9  Q    179.

10 A    They both flashed up.

11 Q    I'm sorry.

12 A    Okay.

13 Q    I'm sorry.  My bad.  Before you look at that, I want to

14 ask you a few questions.

15 A    Okay.

16 Q    In the spring of 2010, specifically in May of 2010 KPMG

17 audited the bank, correct?

18 A    Correct.

19 Q    And KPMG took the position that loans that were made

20 within a certain period of time had to be discounted from

21 capital, correct?

22           MS. BARRY:  Objection --

23           THE COURT:  Counsel, may I ask --

24           MS. BARRY:  -- beyond the scope.

25           THE COURT:  I agree.  I agree.

1          MS. BARRY:    Thank you.

2          MR. EGAN:   Very well, Your Honor.   I'll do it with

3   another witness.   I have no further questions.

4          THE COURT:   Thank you.

5          MR. DUNCAN:   May I proceed, Your Honor?

6          THE COURT:   Yes, sir.

7          MR. DUNCAN:   Thank you, Your Honor.

8                     CROSS EXAMINATION

9   BY MR. DUNCAN:

10  Q    Good afternoon, Mr. DiMarcantonio.

11  A    Good afternoon, sir.

12  Q    Mr. DiMarcantonio, in 2009 you were a shareholder in Nova

13  Financial Holdings Company, correct?

14  A    Yes.

15  Q    And you had been for some years, correct?

16  A    Correct.

17  Q    And you know that Mr. Bekkedam was not a shareholder in

18  Nova Financial Holdings, correct?

19  A    That's correct.

20  Q    You testified this morning that Mr. Bekkedam had left the

21  bank board in 2004, correct?

22  A    2007.   I'm sorry, the board in 2004, the holding company

23  in 2007.   You're correct.   My mistake.

24  Q    And you and Mr. Bekkedam are friends, correct?

25  A    Very good friends, yes.

DiMarcantonio - Cross/Duncan                    183

1  Q    And after Mr. Bekkedam left the board you would

2  occasionally talk to Mr. Bekkedam about Nova Bank, correct?

3  A    Of course, yes.

4  Q    But only in a fairly general way, correct?

5  A    Yes.

6         MR. DUNCAN:   Could we see Government Exhibit 25 and

7  can you show that to the jury please?

8  Q    You saw a lot of board minutes of both the holding company

9  and the bank this morning, correct?

10  A    That's correct.

11  Q    And without going -- being too obvious, you would agree

12  that Mr. Bekkedam did not attend the board meetings, correct?

13  A    After he was off the board, that's correct.

14  Q    And if you look at Government's Exhibit 25, this is when

15  the TARP presentation was made down there at the bottom by

16  Stevens and Lee, correct?

17  A    That's correct.

18  Q    And you would agree that Mr. Bekkedam was not present for

19  that presentation?

20  A    Correct.

21  Q    Mr. DiMarcantonio, you've known Mr. Bekkedam for probably

22  25 years?

23  A    Yes.

24  Q    And you first met him when he was a college student at

25  Villanova, correct?

DiMarcantonio - Cross/Duncan                184

1   A    That's correct.

2   Q    And you, in fact, back when he was a college student, you

3   hired Mr. Bekkedam to work at some of your real estate

4   properties, didn't you?

5   A    That's correct.

6   Q    You had Mr. Bekkedam working on construction projects for

7   your real estate projects, correct?

8   A    That's correct.

9   Q    You had him knocking down walls and hauling things to the

10  dumpster, correct?

11  A    Yes.

12  Q    After Mr. Bekkedam graduated from Villanova you continued

13  to have business dealings with him, correct?

14  A    That's correct.

15  Q    But those business dealings changed from the constructions

16  dealings to equity investments, financing, the work that you

17  did, correct?

18  A    Correct, real estate, yes.

19  Q    You've known Mr. Bekkedam from all this time.  Would it be

20  fair to describe him as sort of a big picture guy?

21  A    Yes.

22  Q    And you'd agree that he is not an in the weeds detail guy,

23  is he?

24          MS. BARRY:  Objection.

25          THE COURT:  Sustained.

DiMarcantonio - Cross/Duncan                    185

1  Q    Do you discuss the details of financing with Mr. Bekkedam

2  or do you discuss it with his lawyer?

3            MS. BARRY:  Objection.

4            THE COURT:  Sustained.

5  Q    You testified on direct that you and Mr. Bekkedam have not

6  spoken for about a year, correct?

7  A    That's correct.

8  Q    And you testified that you stopped talking to him after

9  the indictment came down, correct?

10 A    That's correct, or he stopped talking to me, yes.

11 Q    And it was your understanding that the reason that that

12 occurred was out of an abundance of caution you should not be

13 talking to Mr. Bekkedam since you were likely to be a witness

14 in this case, correct?

15           MS. BARRY:  Objection.

16           THE COURT:  Sustained.

17 Q    Why did you stop talking to Mr. Bekkedam?

18 A    My attorney advised me --

19           MS. BARRY:  Objection.

20           THE WITNESS:  -- that probably --

21           MS. BARRY:  Objection.

22           THE COURT:  Just a moment please.  The objection is

23 sustained.  Irrelevant.

24           THE WITNESS:  I'm sorry.

25 Q    Okay.  Are you and Mr. Bekkedam still friends?

DiMarcantonio - Cross/Duncan                      186

1  A    Yes.

2  Q    And the reason you stopped talking to him has nothing to

3  do with the indictment, correct?

4            MS. BARRY:  Objection.

5            THE COURT:  Overruled.

6            THE WITNESS:  I'm sorry, can I answer that?

7            THE COURT:  You can answer that one.

8            THE WITNESS:  Can you repeat it?  I'm sorry.

9  Q    Sure.  The fact that was he indicted, that fact has

10 nothing to do with why you --

11 A    Oh no, yeah, correct.

12           MR. DUNCAN:  If we could go back to Government's

13 Exhibit 25 please?

14 Q    I don't want to take long on this point, Mr.

15 DiMarcantonio, but you testified on both direct examination and

16 Mr. Egan's cross examination about the DVFG deal, correct?

17 A    Correct.

18 Q    Would it be fair to say back in the spring of 2009 the

19 DVFG deal was a big deal for Nova Bank, correct?

20 A    Yes, absolutely.

21 Q    But you were having trouble finalizing that deal, correct?

22 A    That's correct.

23 Q    And you knew that you had --

24           MS. BARRY:  Objection, Your Honor.  This is the

25 holding company?

1          MR. DUNCAN:  Yeah, the holding company of the bank --

2     the holding company going to the bank.

3          THE COURT:  Well, but --

4          MR. DUNCAN:  Yeah, I'll be precise

5          THE COURT:  -- be specific please.

6          MR. DUNCAN:  I'll be precise, Your Honor.

7     Q    So the holding company wanted to have that as one of its

8     assets, correct?

9     A    That's correct.

10    Q    And you knew that the holding company had a deadline of

11    June 30th in order to get the deal done, correct?

12    A    Yes.

13    Q    You believed as the chairman of the board that the

14    Delaware Valley Financial Group would be a good acquisition for

15    the bank because it was going to produce a lot of cash for the

16    bank, correct?

17    A    Correct.  It would be a high profit, low capital

18    investment.

19    Q    But you knew that in order for that deal to be approved,

20    Nova had to be well capitalized, correct?

21    A    Correct.

22    Q    And Nova could not enter -- Nova Financial Holdings could

23    not enter into that deal without regulatory approval of the

24    bank regulators, correct?

25    A    That's correct.

DiMarcantonio - Cross/Duncan                    188

1    MR. DUNCAN:  Could we go to Government's Exhibit 36
2  again and if we could blow up the bottom portion of that
3  please, the -- where -- yeah, last paragraph there?
4  Q    You testified this morning under examination that you said
5  you had been shown a lot of e-mails regarding loans and those
6  were loans that had to do with ACBB, correct?
7  A    Correct.
8  Q    And this document, June 23rd, 2009, this is a document
9  talking about a loan that might be provided by ACBB, correct?
10 A    Correct.
11    MS. BARRY:  Objection.  It's not what it says, Your
12 Honor.
13    THE COURT:  I didn't hear you.
14    MS. BARRY:  Objection.  It's not what it says.
15    THE COURT:  Counsel, be more precise please.
16    MR. DUNCAN:  Sure, yeah, I can be a little more --
17 can you show us the whole e-mail please?
18 Q    So this is an e-mail where you're talking about -- you had
19 testified previously that Mr. Hartline was asking Mr. Bekkedam
20 when he could expect to receive the $5 million of funds.
21 That's funds coming from George Levin, correct?
22 A    Correct.
23 Q    If you go down to the bottom part, you see Mr. Hartline is
24 asking about tax returns.  Those are the tax returns from Mr.
25 Levin, correct?

DiMarcantonio - Cross/Duncan                    189

1  A    Correct, I believe so.

2         MR. DUNCAN:   Could we go to Government's Exhibit

3  39(a) which I believe is in evidence and publish it to the jury

4  please?  So if we could go down to the first e-mail in time?

5  Q    You testified for both direct and cross examination about

6  this e-mail, correct?

7  A    Yes, sir.

8  Q    So I have a couple of different questions to ask you.

9  This is an e-mail from Mr. Bekkedam to Mr. Rovin, his lawyer,

10 you the chairman of the board and Mr. Hartline, correct?

11 A    That is correct.

12 Q    And the subject is Levin capital Nova, correct?

13 A    Correct.

14 Q    Mr. Bekkedam writes in the first line he was expecting

15 that Mr. Levin was going to be approved for a loan to invest in

16 Nova, correct, of $5 million?

17 A    That's what it says, correct.

18 Q    And that was your understanding as well, correct?

19 A    Correct.

20 Q    He then states that per his conversation with Mr.

21 Hartline, Mr. Hartline thought something different, that a

22 wire, that cash money would be wired to the bank, correct?

23 A    Correct.

24 Q    Mr. Bekkedam then says he was always thinking loan,

25 correct?

DiMarcantonio - Cross/Duncan                    190

1  A    Correct.

2  Q    He then writes what he expects to have happen.  He says I

3  assume we can get the subscription documents by tomorrow.

4  Those the subscription documents for the private placement

5  memorandum to invest in the Nova Financial Holdings Company,

6  correct?

7  A    That's correct.

8  Q    That's the document Mr. Levin had to sign in order to

9  undertake his $18 million promise to invest money in Nova,

10  correct?

11  A    Correct.

12  Q    Then says underwrite George, and that's underwriting is

13  underwriting a loan, correct?

14  A    Correct.

15  Q    And then that loan would be used to fund the escrow

16  account, correct?

17  A    Correct.

18  Q    And the escrow account is an escrow account at Nova Bank,

19  correct?

20  A    Correct.

21  Q    And then he writes is this the plan, correct?

22  A    He asked that question, yes.

23  Q    So he's asking what is the plan, correct?

24  A    Correct.

25  Q    He then says that Mr. Hartline will work with Larry Rovin

1  to move Frank along.  He's asking -- he's saying that Mr.

2  Hartline is going to be working with Mr. Bekkedam's lawyer,

3  correct?

4  A    That's correct.

5  Q    And Mr. Prevay (phonetic) is Mr. Levin's right-hand man,

6  correct?

7  A    He worked for him.  I don't know is occupation -- what his

8  job was, but yes.

9          MR. DUNCAN:  Then if we could go up to the top e-mail

10  and blow that up?

11  Q    So this is Mr. Hartline responding to Mr. Bekkedam, to you

12  and to his lawyer, correct?

13  A    Correct.

14  Q    And what he says is that we need to close on capital by

15  tomorrow by the end of the day.  That's the end of the quarter,

16  correct?

17  A    Correct.

18  Q    It is not unusual for businesses to be sort of scrambling

19  to get money in at the end of the quarter, is it?

20  A    Not at all.

21  Q    Mr. Hartline writes escrow will not count for capital,

22  correct?

23  A    Correct.

24  Q    Would you agree with that statement?

25  A    I would agree with that.

1   Q    He's telling that to Mr. Bekkedam, isn't he?

2   A    Yes, he is.

3   Q    Mr. Hartline then says we're working with Mr. Bekkedam's

4   lawyer to obtain all the correct documents, correct?

5   A    Yes.

6           MR. DUNCAN:  Thank you.  We're done with that e-mail.

7           MS. BARRY:  Your Honor, I would raise an objection to

8   paraphrasing what's not in the e-mails.

9           THE COURT:  Sustained.

10          MR. DUNCAN:  I'm asking the witness for his opinion.

11  He can agree or not agree, Your Honor.  That's all --

12          THE COURT:  Sustained.

13          MR. DUNCAN:  Okay, I'll be more precise, Your Honor.

14          THE COURT:  Thank you.

15          MR. DUNCAN:  Sir, if we could go -- if we could see

16  first Government's Exhibit 76.

17  Q    Do you have that before you, Mr. DiMarcantonio?

18  A    Yes, I do.  I'm sorry.

19  Q    So this is an e-mail you were shown by the Government this

20  morning and this is where Mr. Hartline sets out a number of

21  scheduled deadlines, correct?

22  A    Correct.

23  Q    As chairman of the bank you were aware of these deadlines,

24  weren't you?

25  A    That's correct.

DiMarcantonio - Cross/Duncan                    193

1  Q    And Mr. Hartline is advising you and Mr. Bekkedam

2  regarding these deadlines, correct?

3  A    Correct.

4           MR. DUNCAN:  Okay, could we now show Defense-166 just

5  to the witness?  I'm sorry, I gave you the wrong number --

6  1165.  It's Defense Exhibit 1165.  Okay, and can you go to the

7  second page please?

8  Q    Mr. DiMarcantonio, you would agree the second page of what

9  you see is a reproduction of Government's Exhibit 76, the

10 August 29th e-mail from Mr. Hartline to Mr. Bekkedam, you and

11 Mr. Rovin?

12 A    It looks to be.  It's D-1 1165.  Does that matter?

13 Q    It should be D-1165.

14 A    Yes.

15 Q    I had the number wrong.

16           MR. DUNCAN:  Then if you go to the next page please.

17 I'm sorry, you have to go -- it's the first page.  I'm sorry.

18 Q    So if you see there, there's a response from Mr. Bekkedam

19 to you and to Mr. Hartline, correct?

20           MR. DUNCAN:  If you could blow up the bottom portion

21 for the witness please?

22 A    It's from Mr. -- yes, from Barry to Brian and Ed, yes.

23 Q    And this is in response to Mr. Hartline's e-mail, correct?

24 A    Correct.

25 Q    You were not shown this e-mail during the Government's

1 presentation, were you?

2 A    I don't believe so, no.

3 Q    Mr. Bekkedam writes it does not sound like we are

4 approved, correct?

5 A    Correct.

6 Q    What he's doing, he's questioning whether Nova has

7 actually received the TARP approval, correct?

8 A    Correct.

9         MS. BARRY:  Objection.

10         THE COURT:  Sustained.

11 Q    What is he questioning?

12 A    He's questioning were we fully approved for the TARP.

13 Q    The then asks what else needs to be provided to the

14 Government, correct?

15 A    Yes, that's what he says on the next line.

16 Q    He also says that he cannot be put in the position where

17 he's raising capital and then the approval is not given and he

18 can't give the capital back, correct?

19 A    That's correct.

20 Q    And that's because he's making statements to these

21 investors as to what's going to happen and he wants to make

22 sure the investors have the option to send their money back or

23 pull their money back if the approval is not given, correct?

24 A    Correct.

25         MS. BARRY:  Objection.

1          THE COURT:  Overruled.

2   Q    That's correct, right?

3   A    Yes, it's correct.

4   Q    Then Mr. Bekkedam writes in response to Mr. Hartline's

5   e-mail how did George go from $10 to $13 million, correct?

6   A    Yes.

7   Q    And Mr. Bekkedam writes we just spoke Friday, which would

8   be the day before.  This is a Saturday e-mail, correct?

9   A    That is correct.

10  Q    And it was already $5 million already funded plus 10

11  million.  Why is that always a moving target?

12  A    Yes, that's what it says.

13  Q    And then he writes thoughts, question mark?

14  A    Correct.

15          MR. DUNCAN:  If you then go up and if we could

16  highlight the next e-mail above that?

17  Q    Mr. Bekkedam's first e-mail was at -- his response was at

18  6:36 p.m.  Mr. Hartline writes back Saturday, August 29th, at

19  7:01 p.m. again to Mr. Bekkedam and with a copy to you,

20  correct, Mr. DiMarcantonio?

21  A    That's correct.

22  Q    And he says if we go back to the white board, it was 50

23  million, 14 million via  TARP and 36 million from GL, correct?

24  A    Correct.

25  Q    GL you believe is George Levin?

DiMarcantonio - Cross/Duncan                     196

1  A    Yes.

2  Q    And then $18 million was to go to Nova and then $18

3  million for the Florida bank and then $8 million to Grow

4  (phonetic)?

5  A    Correct.

6  Q    And he then tells Mr. Bekkedam Nova has been $16 million

7  from the day that Mr. Levin executed the subscription

8  agreement, correct?

9  A    That's what it says, correct.

10  Q    And Mr. Hartline advises Mr. Bekkedam, not to argue but I

11  tried to correct this $10 million comment for TARP fund to $13

12  million for the subscription agreement, correct?

13  A    Correct.

14  Q    What he's saying there is that the TARP contingency was

15  for $10 million, correct?

16            MS. BARRY:  Objection.

17            THE COURT:  Counsel, if you're specific, the

18  objection is overruled.

19            MR. DUNCAN:  I am.

20            THE COURT:  All right, overruled.  It's cross

21  examination.

22            MS. BARRY:  It's not specific, Your Honor.

23            MR. DUNCAN:  I don't know how to make it more

24  specific, Your Honor.

25            THE COURT:  Either it's on the paper or it isn't.

1          MR. DUNCAN:  It's right there.

2          THE COURT:  All right, read it exactly.

3   Q    But I think I tried to correct the $10 comment for TARP

4   funds, correct?

5   A    (No audible response).

6   Q    Last line, first paragraph.

7   A    I'm sorry, could you ask me the question again?

8   Q    Yes, sure.  Go down to the last line of the first

9   paragraph.

10  A    First paragraph, yes.

11  Q    Mr. Bekkedam, I'm sorry, Mr. Hartline says not to argue,

12  but I think I tried to correct the $10 million comment for TARP

13  funds to $13 million for the subscription agreement?

14  A    Correct.

15  Q    And the ten million is to get the TARP funds, correct?

16  A    That's correct.

17  Q    And the $13 million will fulfill Mr. Levin's subscription

18  agreement because he's already got five million of the 18 in,

19  correct?

20  A    Correct.

21  Q    And even you're better at math.  Eighteen minus five is

22  13, right?

23  A    Yes.

24  Q    And then Mr. Bekkedam, if we could go up to the top e-

25  mail, Mr. Bekkedam writes back to Mr. Hartline with a copy, so

DiMarcantonio - Cross/Duncan                    198

1 | we need $18 million from George.  Wow.  Correct?

2 | A    Correct.

3 |       MR. DUNCAN:  Okay, thank you.  I'm done with that

4 | exhibit.

5 | Q    So I'm just going to move you forward just a little bit,

6 | Mr. DiMarcantonio, in time.

7 | A    Okay.

8 | Q    We're going to get up to the fall of 2009.  So Nova is

9 | still trying to raise the capital, right?

10 | A    Correct.

11 | Q    It has not come in yet, correct?

12 | A    Correct.

13 | Q    Something happens with Mr. Levin, correct?

14 | A    That's correct.

15 | Q    And so in November of 2009 you as chairman of the bank

16 | realize we've got to have a Plan B, don't we?

17 | A    Correct.

18 | Q    And Plan B, another plan to get the money in, correct?

19 | A    That's correct.

20 | Q    And one of the things that Nova Holdings Company comes up

21 | with is they say we're going to hire Mr. Bekkedam to help us

22 | with this capital raise, correct?

23 | A    That's correct.

24 |       MR. DUNCAN:  And if we could go to Defense-134 please

25 | and if we could go to the second page of that please?

DiMarcantonio - Cross/Duncan                    199

1  Q    You recognize this as the consulting agreement that was

2  entered into between Nova Financial Holdings Company and Mr.

3  Barry Bekkedam as of November 19th, 2009, correct?

4  A    That's correct.

5  Q    And you've seen this document before, haven't you, in your

6  position as the chairman of the board?

7  A    Yes, I have.

8  Q    And this was an agreement entered into not by Nova Bank

9  but by the holding company, correct?

10 A    That is correct.

11 Q    This agreement is as of November 19th.  That's about a

12 month before Treasury makes its final decision, right?

13 A    Correct.

14 Q    And you would agree Nova Financial Holdings Company

15 frequently hired outside consultants to help them with

16 projects, correct?

17 A    Yes.

18 Q    And they paid them for those projects, correct?

19 A    Yes.

20 Q    This agreement was reviewed by the Nova Financial Holdings

21 Company's lawyers, correct?

22 A    I would assume so.  I don't recall.

23        MS. BARRY:  Objection, Your Honor.

24 Q    Would you have --

25        THE COURT:  Sustained as to the assumption.

DiMarcantonio - Cross/Duncan                    200

1  Q    Yeah, not to assume.  Would you have given this outside --

2  A    Yes.

3  Q    -- without getting his lawyer -- without getting your

4  lawyer's approval?

5         MS. BARRY:  Objection.

6         THE COURT:  Overruled.

7  Q    The question is would you have done this without getting

8  your lawyer's approvals?

9  A    No.

10 Q    And you know that Mr. Bekkedam had Larry Rovin as his

11 lawyer, correct?

12        MS. BARRY:  Objection.

13        THE COURT:  Overruled.

14 Q    Mr. Rovin was the lawyer for Mr. Bekkedam's --

15 A    That's correct.

16        MR. DUNCAN:  And if we could go down to the first

17 whole paragraph where it describes the description of the

18 services?

19 Q    Do you see that, Mr. DiMarcantonio?

20 A    Yes, sir.

21 Q    Okay now, the company is Nova Financial Holdings, correct?

22 A    That is correct.

23 Q    And in this document Nova Financial Holdings Company as a

24 legal matter recognizes that the consultant, Mr. Bekkedam, has

25 provided for a period of years and during this term of this

1  agreement a number of services for Nova Financial Holdings

2  Company, correct?

3  A    Correct.

4  Q    And among the services he has provided are consulting with

5  respect to capital markets, correct?

6  A    That's correct.

7  Q    Investments?

8  A    Yes.

9  Q    Management?

10 A    Yes.

11 Q    Financial and strategic planning in connection with the

12 operation of the business of the company?

13 A    Correct.

14 Q    And reviewing and advising the company regarding the

15 company's overall progress, correct?

16 A    That's correct.

17 Q    And its needs and conditions?

18 A    Yes.

19 Q    In this document the company acknowledges that Mr.

20 Bekkedam has provided services similar to these services for an

21 extended period of time prior to the date of this agreement,

22 correct?

23 A    That's correct.

24 Q    And he had never been compensated for those services, had

25 he?

DiMarcantonio - Cross/Duncan                    202

1  A    No, he had not.

2  Q    And the company says the purpose of this agreement is in

3  part to recognize and formalize the relationship and compensate

4  Mr. Bekkedam for such services, correct?

5  A    Correct.

6  Q    So he's being compensated both for what he has done and

7  what he's going to do, correct?

8  A    Correct.

9         MR. DUNCAN:  The term of the agreement if you go down

10 to 3.1 at the bottom please?

11 Q    And the term of this agreement was that it should

12 terminate on December 31st, 2011 so it's about a two-year

13 agreement, correct?

14 A    That's correct.

15 Q    Mr. Bekkedam is being paid for his services for two years

16 plus what he's already done?

17 A    Correct.

18         MR. DUNCAN:  If we could go to Government's Exhibit

19 136 please?  Mike, is 136 in?

20         UNIDENTIFIED SPEAKER:  Just a second.

21         MR. DUNCAN:  Excuse me, Your Honor.  With the Court's

22 indulgence.

23         UNIDENTIFIED SPEAKER:  I have it as in.

24         MR. DUNCAN:  Okay, thank you.  Could we publish 136

25 to the jury please?

1  Q    You've seen this before, Mr. DiMarcantonio, correct?

2  A    Yes, sir.

3  Q    We've shown this to you today?

4  A    Yes, sir.

5  Q    You were actively involved in the fund-raising efforts

6  starting in November through December?  You took a very active

7  role, correct?

8  A    Yes.

9  Q    And this e-mail reflects that as well?

10 A    Correct.

11 Q    And basically your position as the chairman of the board

12 was you need to get the capital raised prior to whatever the

13 TARP deadline was going to be in December, correct?

14 A    Correct.

15 Q    And it was basically all hands on deck?

16 A    Yes.

17 Q    Everybody from the bank was working on it?

18 A    Correct.

19 Q    Including you?

20 A    Including me, correct.

21 Q    And including Mr. Bekkedam, correct?

22 A    Yes.  Excuse me, yes.

23 Q    But you never got the funds from TARP, did you?

24 A    We did not.

25 Q    You continued to serve as the chairman of the board for

DiMarcantonio - Redirect/Barry                    204

1   almost three years after that point, correct?

2   A    Correct.

3   Q    Til approximately October 2012?

4   A    Correct.

5        MR. DUNCAN:  Thank you, Your Honor.  I have no

6   further questions for this witness.

7                    REDIRECT EXAMINATION

8   BY MS. BARRY:

9   Q    Mr. Russell, I'm sorry, Mr. Duncan asked you -- talked

10  about you hiring Mr. Bekkedam when he was a student and he was

11  knocking down walls when he worked for you, right?

12  A    Correct.

13  Q    Okay.  When he was paying you for working on his projects

14  for Ballamor Capital was he knocking down walls then?

15  A    (No audible response).

16  Q    Was he doing labor work then?

17  A    No, and he wasn't paying me.  Whoever the deal was would

18  pay me.

19  Q    Right.

20  A    Ballamor never paid me.

21  Q    But the deals that Ballamor put together, correct?

22  A    Correct.

23  Q    All right, so you -- after October 31st, 2009, is it true

24  or not true that Nova Financial Holdings paid Barry Bekkedam

25  $250,000 for his past services that was part of the

DiMarcantonio - Redirect/Barry                    205

1  compensation for the past?

2  A    That was part of the compensation.

3  Q    Now, you were shown Defense Exhibit 1165.

4          MS. BARRY:  And I don't know if the Defense would be

5  so kind as to bring that up for us?

6          UNIDENTIFIED SPEAKER:  Just for the witness, Ms.

7  Barry?

8          MS. BARRY:  Yes, please.

9  Q    In this e-mail from, the middle e-mail from Brian Hartline

10 to Barry Bekkedam and you're copied and you were asked a number

11 of questions and read from the first paragraph of that e-mail,

12 would you read the second paragraph of that e-mail?

13 A    Starting with according?

14 Q    Yes, please.

15 A    According to the Treasury Department letter, we are

16 approved.  I just got to pop up on my screen.  Resolution

17 notice.  Can you get rid of it?  I have a big box on my screen.

18 Thank you.  According to the Treasury Department letter, we are

19 approved contingent on the capital being raised and then the

20 bank.  They want us to close in 30 days.  I am sure we could

21 keep the funds in escrow but if we don't close, we will not be

22 well capitalized at nine thirty, parenthesis, understanding GL

23 needs to be approved by the regulars first).

24          I'm not sure why the Treasury Department would pull

25 their approval after this capital has been raised.  That would

DiMarcantonio - Redirect/Barry                    206

1  make no sense at all.  I hope this is helpful.

2  Q    And looking at the e-mail that is -- that follows, and who

3  responds to this e-mail?

4  A    Barry responds to Brian.

5  Q    Okay, and what does he say?

6  A    Again, so we need 18 million from George?  Wow?  How much

7  can he borrow if nine thirty or nine assuming this all gets

8  done?  B.

9         MS. BARRY:  Thank you.  We can take that down for the

10  witness.

11  Q    Now, Mr. Egan asked you some questions about Mr. Hartline

12  saying he wasn't going to take the raise or something that the

13  board would have to approve or approved him for a raise.

14  A    That's correct.

15  Q    Do you recall those questions?

16  A    Correct.

17  Q    So the board has to approve Mr. Hartline's compensation?

18  A    That's correct.

19  Q    And what was Mr. Hartline's salary?

20         MR. EGAN:  Objection.  It's irrelevant.

21         THE COURT:  Sustained.

22  Q    Were you aware that Treasury had approved Nova Bank for

23  the TARP funding in August of 2009?

24  A    Yes.

25         MS. BARRY:  Can I have a moment, Your Honor?

DiMarcantonio - Redirect/Barry                    207

1              THE COURT:  Surely.

2              MS. BARRY:  Your Honor, may we see you briefly at

3    sidebar?

4              THE COURT:  Surely.

5                         (At Sidebar)

6              MS. BARRY:  Your Honor, with regard to the questions

7    on Mr. Hartline's obligation, there's two things.  One, they

8    opened the door when they went into him not taking a raise.

9    Two, it goes into his motivation.  They're suggesting that he

10   made -- like somehow made some huge sacrifice.  So we need to

11   know if it was a huge sacrifice.  How much was he making?

12   They've opened the door as to what was in Mr. Hartline's mind

13   in saying that he was going to not take that raise and I think

14   it's highly relevant and they've opened the door.  We didn't

15   ask anything.  We stayed away from salary, we stayed away from

16   compensation, asking direct questions about that.  But this has

17   clearly opened the door and I think we're entitled to an answer

18   on how much he was making now that he said that he didn't take

19   his raise.

20             THE COURT:  I have an exception and that is

21   sustained.

22             UNIDENTIFIED ATTORNEY:  Thank you, Your Honor.

23                      (Conclusion of Sidebar)

24   Q    Mr. DiMarcantonio?

25   A    Yes, ma'am?

DiMarcantonio - Recross/Egan                     208

1  Q    Do you know whether or not Mr. Levin ever made his $18

2  million investment in the bank?

3  A    He did not.

4  Q    Do you know whether or not Mr. Levin ever paid on his $5

5  million loan?

6  A    He defaulted on his loan.

7           MS. BARRY:  No further questions.  Thank you.

8           THE COURT:  All right.

9           MR. EGAN:  Very briefly, Your Honor.

10                        RECROSS EXAMINATION

11 BY MR. EGAN:

12 Q    In May of 2010 Mr. Levin was still paying on his loan,

13 correct?

14 A    I believe so, yes.

15 Q    And indeed he paid on that loan until he was forced into

16 bankruptcy by other creditors, correct?

17 A    I believe that was the time he stopped paying, yes.

18 Q    And he claimed that as an asset in his bankruptcy, didn't

19 he?

20           MS. BARRY:  Objection.

21           THE COURT:  Sustained.

22           MR. EGAN:  If he has knowledge?

23           MS. BARRY:  Objection.

24           THE COURT:  Sustained.

25           MR. EGAN:  That's all.  I have nothing further, Your

1  Honor.

2              THE WITNESS:  Thank you.

3              UNIDENTIFIED ATTORNEY:  I have nothing further, thank

4  you.

5              MS. BARRY:  No further questions, Your Honor.  Thank

6  you.

7              THE COURT:  Thank you, sir.  You may step down.

8  Watch your step please.

9              THE WITNESS:  Thank you, Your Honor.

10             MS. BARRY:  Your Honor, the Government calls Henry

11 Zentner.

12             UNIDENTIFIED SPEAKER:  We need three more seconds.

13             MS. BARRY:  Your Honor, I apologize.  I believe we

14 may have timed it at the wrong moment.  Mr. Zentner may be at a

15 --

16             UNIDENTIFIED SPEAKER:  He's coming.

17             COURTROOM DEPUTY:  Please raise your right hand.

18              HENRY ZENTNER, GOVERNMENT'S WITNESS, SWORN

19             COURTROOM DEPUTY:  Please state and spell your name

20 into the record and you can have a seat.

21             THE WITNESS:  Henry Zentner.

22             THE COURT:  Spell your last name please.

23             THE WITNESS:  Oh, Z-e-n-t-n-e-r.

24             THE COURT:  You may proceed.

25             MS. BARRY:  Thank you, Your Honor.

Zentner - Direct/Barry                          210

1                        DIRECT EXAMINATION

2  BY MS. BARRY:

3  Q     Mr. Zentner, where do you work?

4  A     Federal Deposit Insurance Corporation.

5  Q     And how long have you been with the FDIC?

6  A     Forty-three-and-a-half years.

7  Q     And what is your position with the FDIC?

8  A     I'm a senior risk examiner.

9  Q     And what is your role as a senior risk examiner?

10 A     It varies.  It can be in charge of examinations, assisting

11 on examinations, performing special projects.

12 Q     And what is the purpose of an examination?

13 A     Determine the condition of the bank.

14 Q     And does the condition of the bank include the safety and

15 soundness?

16 A     Yes.

17 Q     Now, are you familiar with the bank called Nova Bank?

18 A     Yes.

19 Q     And is that a bank, do you recall whether or not you had

20 examined?

21 A     Yes.

22 Q     And when is the first time that you examined the bank?

23 A     I believe in 2002.

24 Q     And did you subsequently examine the bank?

25 A     Yes, I did.

1  Q    And when was that?

2  A    I think 2010.

3  Q    Who was your primary point of contact at Nova Bank?

4  A    Brian Hartline.

5  Q    And I'd like to show you what's been marked as

6  Government's Exhibit 185.  What is Government's Exhibit 185

7  please?

8  A    That is a copy of the report of examination that was

9  prepared on November 1st, 2010 as of September 30th, 2010.

10          MS. BARRY:  Your Honor, the Government moves for the

11 admission of Government's Exhibit 185.

12          UNIDENTIFIED ATTORNEY:  No objection.

13          UNIDENTIFIED ATTORNEY:  No objection.

14          THE COURT:  Admitted.

15          MS. BARRY:  And, Your Honor, just for ease to the

16 witness, may I approach --

17          THE COURT:  Sure.

18          MS. BARRY:  -- and provide him with a hard copy?

19          THE COURT:  Yes.

20          MS. BARRY:  And may it be published, Your Honor?

21          THE COURT:  Yes.

22 Q    So if we take a look please at Government's Exhibit 185

23 and looking at this report of examination, do you know whether

24 or not this was a joint report of examination?

25 A    Yes, it was.

Zentner - Direct/Barry                          212

1  Q    And who other than the FDIC also conducted the exam at

2  this time?

3  A    The Pennsylvania Department of Banking.

4  Q    And why would there be a joint report of examination or a

5  joint examination?

6  A    Because of the condition of the bank.

7  Q    And so the condition -- well, could you explain what the

8  condition of the bank is in order to have a joint examination?

9  A    Banks are rated on a scale of 1 to 5 with 1 being the

10 strongest and 5 the weakest and banks that are rated 3 or

11 higher are subject to joint examinations.

12 Q    And so at the time that you conducted this examination

13 Nova Bank would -- do you know whether or not it was rated at a

14 3 or higher, meaning 4 or 5?

15 A    I believe it was a 4 at the time the exam started.

16 Q    And what does 4 signify?

17 A    4 is poor condition.

18 Q    And this examination, it says examination as of date

19 September 30, 2010, what does that mean?

20 A    That's the financial as of date.  All the financial

21 information in the report would be as of September 30th.

22 Q    And when did this examination begin?

23 A    November 1st, 2010.

24 Q    Now, in the course of your examination, were the examiners

25 made aware of a report by the bank's external auditor, KPMG?

Zentner - Direct/Barry                    213

1  A    Yes.

2  Q    And the information that was in the KPMG report, did that

3  play into any part of this report of examination?

4  A    Yes.  It impacted the capital ratio.

5       MS. BARRY:  And if we could please, turn to Page 6 of

6  70 here and if we could highlight the second full paragraph --

7  well, highlight capital.

8  Q    And looking at capital and it says capital-5, what does

9  that mean?

10 A    That's the rating that was assigned to capital.  That is

11 the worst rating that could be assigned.

12 Q    And would you please read the first paragraph there?

13 A    Capital levels are critically deficient.  Substantial

14 operating loss is incurred as a result of significant

15 weaknesses in the loan and investment portfolios.  Have you

16 wrote at capital levels in the institution's viability is

17 threatened.  Immediate financial assistance from shareholders

18 or other external sources is imperative.

19 Q    And would you read the next paragraph please?

20 A    Contributing to the declining capital with the requirement

21 by the bank external auditor KPMG to reverse 8.3 million of

22 equity capital retroactive to December 31st, 2009.  8.3 million

23 represents the aggregate balance of four loans of three

24 borrowers granted by the bank in 2009.  Shortly after these

25 loans were made, the borrowers purchased a like amount of

Zentner - Direct/Barry                               214

1  common stock of Nova Financial Holdings, Inc., the bank's

2  parent company, which was then down streamed to the bank as

3  Tier 1 capital.

4          KPMG determined that since the loans were originated

5  during the period in which the holding company was actively

6  seeking to raise capital and are not secured by irreparable

7  letter of credit or liquid collateral, the amount of stock

8  purchased must be recognized as a reduction to shareholders

9  equity until the loans are repaid.  September 28th, 2010 the

10 bank charged off a $5 million shareholder loan when the

11 borrower George Levin filed for bankruptcy protection.  As a

12 result, 3.3 million of shareholder loans remain as a reduction

13 in capital as of September 30th, 2010.

14 Q    Now, were you involved in the bank applying for TARP

15 funding?

16 A    No.

17 Q    Were you aware that Nova Bank had applied for TARP

18 funding?

19 A    Yes.

20 Q    Was the first time the FDIC -- well, was this, the

21 paragraph that you read, the first time that the FDIC was aware

22 of these loans, that these loans to these borrowers were used

23 to purchase Nova stock?

24          MR. EGAN:  Objection.  How does he know?

25          THE COURT:  You can ask him if he has personal

1  knowledge, counsel.

2          MS. BARRY:  Yes.

3  Q    In your exam did you know in the examination, this

4  examination and do you review previous examinations?

5  A    Yes.

6  Q    So the previous examination was conducted by the

7  Pennsylvania Department of Banking in and around November of

8  2009, is that a report of examination you would review prior to

9  your examination?

10 A    Yes.

11 Q    And in reviewing the previous examination and this -- and

12 your examination that you conducted jointly with the

13 Pennsylvania Department of Banking were you made -- previously

14 made aware of these loans by these investors?

15 A    I don't remember if it was in the 2009 report of

16 examinations.

17 Q    Okay, if I showed you that, would you -- would that

18 refresh your memory?

19 A    Yes.

20 Q    And while we're getting that report for you, what does

21 charged off mean?

22 A    Charged off means that a loan is written off the bank's

23 books as uncollectible.

24 Q    And what does down streamed mean?

25 A    That's money that's passed down from the holding company

Zentner - Direct/Barry                    216

1   to the bank.

2           MS. BARRY:  May I approach the witness, Your Honor?

3           THE COURT:  Yes.

4   Q    Were those -- was the first time the FDIC made aware of

5   these loans to these borrowers from KPMG as far as that they

6   had been used to invest in Nova stock?

7   A    You mean KPMG was the one that brought it to our

8   attention?

9   Q    Yes.

10  A    Yes.

11  Q    And so based on the fact that these loan amounts that have

12  been included in capital had to be backed out, what else did

13  the bank need to redo?

14  A    They had to refile the previous three-quarters reports of

15  condition.

16  Q    And would that be called -- referred to as a call report

17  or something different?

18  A    Yes, that would be a call report.

19          MS. BARRY:  And so I believe what's been marked as

20  Government's Exhibit 164 has already been admitted into

21  evidence and may I have a copy for the witness, 164?  With the

22  Court's indulgence, Your Honor?

23          THE COURT:  Sure.

24  Q    This has already been admitted into evidence.  And what is

25  Government's Exhibit 164(a)?

Zentner - Direct/Barry                    217

1  A    That's the call report for the call report quarter ended
2  12/31/2009.
3  Q    And when is it last updated?  What does that say?
4  A    August 27th, 2010.
5        MS. BARRY:  And if we could just publish that first
6  page?
7        THE COURT:  Yes.
8  Q    And I've shown you what's been marked as Government's
9  Exhibit 164(a).  What is 164(a).
10 A    That is Schedule RCR, regulatory capital of the December
11 31st, 2009 call report.
12 Q    Okay, and what's the last updated date on that?
13 A    January 29th, 2010.
14 Q    And is this a record that's kept with the FDIC?
15 A    Yes.
16       MS. BARRY:  Your Honor, the Government moves for the
17 admission of Exhibit 164(a).
18       UNIDENTIFIED ATTORNEY:  No objection.
19       UNIDENTIFIED ATTORNEY:  No objection.
20       THE COURT:  Admitted.
21       MS. BARRY:  And if we could please do a -- if it may
22 be published, Your Honor, and if we could do a side by side of
23 Government's Exhibit 164(a) and Page 54 of Government's Exhibit
24 164?
25       THE COURT:  Yes.

1          MS. BARRY:  Thank you.

2   Q    Okay, 164(a) is last updated on January 29, 2010?

3   A    Yes.

4   Q    And the left side which is 164, that was last updated on

5   August 27th, 2010?

6   A    Yes.

7   Q    Okay, and so looking at 11, Tier 1 capital from 164(a),

8   what is that amount?

9   A    $34,860,000.

10  Q    Okay, and then looking on 164, what is the amount?

11  A    $25,096,000.

12  Q    Okay, and so is that reflecting the amounts that had to be

13  backed out of capital?

14  A    Yes.

15  Q    How did backing this capital out affect the bank's CAMELS

16  ratings?

17  A    It didn't directly affect the CAMELS ratings until we

18  completed our examination but it did decrease their capital

19  ratio to under capitalized position.

20  Q    And based on your examination, what was the condition of

21  the bank?

22  A    It was critically deficient.  It was rated a 5.

23  Q    In your 43 years as an examiner had you ever seen a bank

24  finance its own capital?

25          MR. EGAN:  Objection.

1          THE COURT:  Sustained.

2          MS. BARRY:  One moment, please.

3          THE COURT:  Sure.

4          MS. BARRY:  No further questions, thank you.

5          UNIDENTIFIED ATTORNEY:  I'm going to be 15, 20

6   minutes, Your Honor.  I don't know if you want to --

7          THE COURT:  Okay, we'll stop.  All right, ladies and

8   gentlemen, we're going to recess for the day.  Again, leave

9   your notes here.  Do not discuss the testimony and enjoy your

10  evening.  Thank you very much.  See you tomorrow morning at

11  9:15.

12         COURTROOM DEPUTY:  All rise.

13                       (Jury out)

14         THE COURT:  You may step down, sir.  Adjourned.

15         UNIDENTIFIED ATTORNEY:  Thank you, Your Honor.

16         UNIDENTIFIED ATTORNEY:   Thank you.

17                     *  *  *  *  *

18

19

20

21

22

23

24

25

220

# C E R T I F I C A T I O N

      We, VIDHYA VEERAPPAN, ANNEMARIE DeANGELO, ANDREA FOY
AND MARY POLITO, the court approved transcribers, certify that
the foregoing is a correct transcript from the official
electronic sound recording of the proceedings in the above-
entitled matter.

Vidhya
Veerappan

Digitally signed by Vidhya Veerappan
DN: cn=Vidhya Veerappan, o, ou,
email=dianadoman@comcast.net,
c=US
Date: 2016.04.19 13:24:14 -04'00'

VIDHYA VEERAPPAN

Annemarie
DeAngelo

Digitally signed by Annemarie DeAngelo
DN: cn=Annemarie DeAngelo, o, ou,
email=dianadoman@comcast.net, c=US
Date: 2016.04.19 13:24:49 -04'00'

ANNEMARIE DeANGELO

Andrea Foy

Digitally signed by Andrea Foy
DN: cn=Andrea Foy, o, ou,
email=dianadoman@comcast.net,
c=US
Date: 2016.04.19 13:25:01 -04'00'

ANDREA FOY

Mary Polito

Digitally signed by Mary Polito
DN: cn=Mary Polito, o, ou,
email=dianadoman@comcast.net
, c=US
Date: 2016.04.19 13:25:17 -04'00'

MARY POLITO

DIANA DOMAN TRANSCRIBING, LLC          DATE:  April 19, 2016

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 2                        -  -  -
 3   UNITED STATES OF AMERICA  :  2:14-cr-00548-CDJ-1
                              :  PHILAPDELPHIA, PA
 4       vs.                   :
                              :
 5   HARTLINE, et al.,         :  April 12, 2016
                 Defendants.:  9:00 a.m.
 6
 7           TRANSCRIPT OF JURY TRIAL – DAY 10
          BEFORE THE HONORABLE C. DARNELL JONES, II
 8                UNITED STATES DISTRICT JUDGE
 9
     APPEARANCES:
10
     For the Government: DAVID J. IGNALL, ESQUIRE
11                       U.S. ATTORNEY'S OFFICE
                         615 CHESTNUT STREET
12                       SUITE 1250
                         PHILADELPHIA, PA 19106
13                       215-861-8200
                         Fax: 215-861-8233
14                       Email: David.j.ignall@usdoj.gov
15                       JENNIFER CHUN BARRY, ESQUIRE
                         U.S. ATTORNEY'S OFFICE
16                       615 CHESTNUT STREET
                         SUITE 1250
17                       PHILADELPHIA, PA 19106-4476
                         215-861-8388
18                       Fax: 215-861-8618
                         Email: Jennifer.barry@usdoj.gov
19
20       (Proceedings recorded by electronic sound
     recording, transcript produced by transcription
21   service.)
22           VERITEXT NATIONAL COURT REPORTING COMPANY
                     MID-ATLANTIC REGION
23           1801 Market Street – Suite 1800
                   Philadelphia, PA  19103
24                     (888) 777-6690
25   Transcriber:  Christine M. Aiello
```

Page 1

```
 1    APPEARANCES (continued):
      For the Defendant
 2    Brian Hartline:        PATRICK J. EGAN, ESQUIRE
                             FOX ROTHSCHILD LLP
 3                           2000 MARKET STREET
                             10TH FLOOR
 4                           PHILADELPHIA, PA 19107
                             215-299-2000
 5                           Fax: 215-299-2150
                             Email: Pegan@foxrothschild.com
 6
                             JOHN C. FULLER, ESQUIRE
 7                           FOX ROTHSCHILD LLP
                             2000 MARKET STREET
 8                           20TH FLOOR
                             PHILADELPHIA, PA 19103
 9                           215-299-3815
                             Email: Jfuller@foxrothschild.com
10
      For the Defendant
11    Barry Bekkedam:        MICHAEL J. ENGLE, ESQUIRE
                             GREENBLATT, PIERCE, ENGLE FUNT &
12                           FLORES
                             123 SOUTH BROAD STREET
13                           SUITE 2500
                             PHILADELPHIA, PA 19109
14                           (215) 735-1600
15                           ALLISON BAKER SHEALY
                             SHULMAN ROGERS
16                           12505 PARK POTOMAC AVENUE
                             SIXTH FLOOR
17                           POTOMAC, MD 20854
                             (301) 945-9283
18                           Fax: (301) 230-2891
                             Email: Ashealy@shulmanrogers.com
19
                             RUSSELL DUNCAN
20                           SHULMAN ROGERS
                             12505 PARK POTOMAC AVENUE
21                           SIXTH FLOOR
                             POTOMAC, MD 20854
22                           (301) 945-9283
                             Fax: (301) 230-2891
23                           Email: Rduncan@shulmanrogers.com
24
25
```

Page 2

```
 1    APPEARANCES (continued):
      For the Defendant
 2    Barry Bekkedam:        JOEL D. SCHWARTZ
                             SHULMAN ROGERS
 3                           12505 PARK POTOMAC AVENUE
                             SIXTH FLOOR
 4                           POTOMAC, MD 20854
                             (301) 945-9283
 5                           Fax: (301) 230-2891
                             Email: Jschwatz@shulmanrogers.com
 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    I N D E X
                                              PAGE
2   GOVERNMENT WITNESS:  Mr. Henry Zetner (continued)
         Cross and Recross by Mr. Egan          5, 29
3        Cross-examination by Ms. Baker Shealy     26
         Redirect by Ms. Chun Barry                27
4
    GOVERNMENT WITNESS:  Ms. Patricia Loughney
5        Direct Examination by Ms. Chun Barry      32
         Cross-Examination by Mr. Egan             38
6        Cross-Examination by Mr. Engle            41

7   GOVERNMENT WITNESS:  Mr. Charles Gallub
         Direct and Redirect by Ms. Chun Barry  63, 100
8        Cross-Examination by Mr. Egan             85
         Cross-Examination by Mr. Duncan           99
9
    GOVERNMENT WITNESS:  Mr. Todd Howard
10       Direct and Redirect by Mr. Ignall     103, 154
         Cross-Examination by Mr. Egan            126
11       Cross-Examination by Mr. Schwartz        135

12

13

14

15                 E X H I B I T S
    NUMBER                                  ADMITTED
16  G-37, 49, 73, 78, 110, 111, 131, 132         59
    G-134                                        115
17  G-183                                         82
    G-184                                         81
18  G-206                                        124

19

20

21

22

23

24

25

Page 4

```
 1                            - - -

 2          (Audio recording begins - 09:44:29 a.m.)

 3                            - - -

 4          THE DEPUTY:  All rise.  The Court is now in

 5  session.  The Honorable C. Darnell Jones, the Second,

 6  presiding.

 7          THE COURT:  Good morning, good morning.  You

 8  may be seated.

 9          MR. EGAN:  Good morning.

10          MS. CHUN BARRY:  Good morning.

11          MR. IGNALL:  Good morning.

12          MR. EGAN:  May I proceed?

13          THE COURT:  You may proceed.

14          MR. EGAN:  Thank you, Your Honor.

15                       HENRY ZETNER

16          (A witness produced by the Government, having

17  been previously duly sworn according to law, retakes

18  the witness stand and continues to testify as follows:)

19                     CROSS-EXAMINATION

20  BY MR. EGAN:

21      Q    Good morning, Mr. Zetner.

22      A    Good morning.

23      Q    Sir, you have been an FDIC examiner for 43

24  years?

25      A    Yes.
```

Page 5

1      Q    And you are now what I guess we would call a

2  senior examiner?

3      A    Yeah.

4      Q    And at the time you, I think you said you did

5  an examination Nova on 2003, '02 --

6      A    It was either --

7      Q    -- '03?

8      A    -- 2002 or 2003.

9      Q    Okay.  And they don't use the same examiner

10  every time for a reason, correct?

11      A    Yes, they don't want too much familiarity.

12      Q    Right, they want a new set of eyes on things.

13      A    Right.

14      Q    Somebody else to look at it to make sure that

15  it's being done properly --

16      A    Yes.

17      Q    -- correct?  So you did not come back to Nova

18  again until 2010?

19      A    Yes.

20      Q    Okay.  However in order to do the 2010 exam,

21  you would have had to review the 2009 exam, correct?

22      A    Yes.

23      Q    And I think you were asked a number of

24  questions about that yesterday?

25      A    Yes.

Page 6

1      Q    Now when you go to do an examination, you are

2  the chief examiner, right?

3      A    Right.

4      Q    But you have a lot of other examiners who go

5  with you, correct?

6      A    Yes.

7      Q    In fact, about six to ten; is that about

8  right?

9      A    It varies depending on the size and

10  complexity of the bank.

11      Q    Okay.  But in the case of Nova, did you have

12  about six to ten people with you?

13      A    I think so, I don't recall off, the exact

14  number offhand.

15      Q    Okay.  And you said your point of contact,

16  your main contact was Mr. Hartline, correct?

17      A    Yes.

18      Q    But those other examiners, they each are

19  assigned a different area to work on, right?

20      A    Yes.

21      Q    Because each area requires a fair amount of

22  work?

23      A    Yes.

24      Q    And those examiners, they are put in contact

25  with the bank official who is responsible for that

1    area, correct?

2         A    Yes.

3         Q    So that the examiners who are reporting to

4    you, they don't get their information from

5    Mr. Hartline, right?

6         A    Yes.

7         Q    They get their information from whomever

8    they're speaking to?

9         A    Yes.

10        Q    So for instance, the person who's

11   investigating the loans, they would get their

12   investigation from the chief credit officer, correct?

13        A    Yes.

14        Q    Okay.

15             MR. EGAN:  Now if we could get Government's

16   95, please.

17   BY MR. EGAN:

18        Q    You were asked a number of questions about

19   this document yesterday, sir, and do you recognize that

20   document?

21        A    Yes.  That's the Pennsylvania Department of

22   Banking 2009 report of examination.

23        Q    Right.  So that's the report from the time

24   before you began examining, correct?

25        A    Yes.

1      Q    And that's the one that you told the

2   Government in your direct examination that you had

3   reviewed to prepare?

4      A    Yes.

5      Q    Now on the front it says, as of June 30th,

6   that's the as-of date, correct?

7      A    Yes, that is.

8      Q    And essentially, as I understand it, before

9   you go and do the examination, you ask for a lot of

10  records to be prepared and ready for you to review,

11  right?

12     A    Yes.

13     Q    And you want those as of June 30th, correct?

14     A    Yes.

15     Q    However, if the examination isn't actually

16  commenced until several months later, you also can ask

17  for, and sometimes do ask for, records that happen

18  after June 30th, correct?

19     A    Yes.

20     Q    And that's because there can be developments

21  between June 30th and the date that the examination

22  takes place which may impact your, what you find,

23  right?

24     A    Yes.

25          MR. EGAN:  If we could go to page 33 of the

1    examination, and if we could have the bottom section.

2    BY MR. EGAN:

3         Q    And, sir, as -- as you see there, it says, an

4    independent examination commenced on October 5th, 2009.

5    So that's when they went in and did it, right?

6         A    Yes, that's the start date.

7         Q    And it usually -- utilize -- utilized

8    financial data as of June 30th, right?

9         A    Yes.

10        Q    And --

11             MS. CHUN BARRY:  Objection, Your Honor.

12             THE COURT:  Basis?

13             MS. CHUN BARRY:  This -- this individual did

14   not conduct the exam.

15             MR. EGAN:  He's testified that he reviewed it,

16   Your Honor.

17             THE COURT:  Did you review it?

18             MS. CHUN BARRY:  He can -- he can read from

19   it.  He can't state what happened.  He can read from

20   the document.

21             THE COURT:  The objection is sustained.

22             MR. EGAN:  I was asking what it says, Your

23   Honor.

24             THE COURT:  All right.  You may continue.

25             MR. EGAN:  Okay.

Page 10

1    BY MR. EGAN:

2         Q    It says it's utilizing financial data as of

3    June 30th, 2009, correct?

4         A    Yes.

5         Q    And it says loan data as of August 31st,

6    2009 --

7         A    Yes.

8         Q    -- correct?  And it goes on to say, loan

9    relationships in excess of one million six,

10   1.664 million were reviewed, along with all past due,

11   non-accrual, and internally classified loans, correct?

12        A    Yes.

13        Q    So, sir, you would read that to say that

14   loans up to August 31st over $1.6 million were

15   reviewed, correct?

16             MS. CHUN BARRY:  Objection.

17             THE COURT:  Overruled.

18             MR. ZETNER:  Yes.

19   BY MR. EGAN:

20        Q    Okay.  And it also then says insider loans

21   were also reviewed.  Do you see that?

22        A    Yes.

23        Q    Okay.  Now insider loans, they're loans to

24   shareholders, right?

25        A    Yes, they're considered insiders.

Page 11

1     Q    Okay.

2          MR. EGAN:  Now if we could go to page 41 of

3     43.

4     BY MR. EGAN:

5     Q    And one of the things you review is the

6     shareholder list, right, when you do one of these

7     examinations?

8     A    Yes.

9     Q    And page, at the bottom there we have

10    principal shareholders, not directors or officers.  Do

11    you see that?

12    A    Yes.

13    Q    And one of the shareholders is, there's

14    George G. Levin, correct?

15    A    Yes.

16    Q    Now when you are doing one of these

17    examinations, one of the things you -- you're supposed

18    to do is to cite violations of law and regulation,

19    correct?

20    A    Yes.

21    Q    And so if you find a violation of a law or a

22    regulation when you're doing an examination, you would

23    put that into the report?

24         MS. CHUN BARRY:  Objection.

25         MR. ZETNER:  Yes.

Page 12

1           THE COURT:  Overruled.

2           MR. EGAN:  Now if we could turn to page 13,

3     please, and if we could have the top section, well,

4     there only is the top section.

5     BY MR. EGAN:

6        Q    And this is the section where you would put

7     that, right, violations of law and regulations?

8        A    Yes.

9        Q    And there is nothing in there about

10    Mr. Levin's loan, correct?

11       A    Correct.

12       Q    Now, sir, your examination took place in,

13    well, it's as of September 30th, 2010, right?

14       A    Yes.

15       Q    And it started November 1st, 2010?

16       A    Yes.

17       Q    So that is --

18           MR. EGAN:  Well, strike that.

19    BY MR. EGAN:

20       Q    It's also a joint examination, right?

21       A    Yes.

22       Q    And the reason that it's a joint examination,

23    as you said, is because the bank has had, is basically

24    at a rating that requires it be joint?

25       A    Yes.

1      Q    It's also at a rating, is it not, sir, that

2    requires that it be, have an interim review?

3      A    Yes.

4      Q    Okay.  And that interim review is something

5    that you were involved with, right?

6      A    Me -- me personally?

7      Q    Yeah.

8      A    Oh, no.

9      Q    Okay.

10          MR. EGAN:  Well, if we could go to --

11   BY MR. EGAN:

12     Q    Well, maybe I'm using the wrong terminology.

13          MR. EGAN:  If we could go to page -- well,

14   first of all let's look at the, it's Government's 185.

15   BY MR. EGAN:

16     Q    And, sir, that's the report of examination

17   that you testified about yesterday, right?

18     A    Yes.

19     Q    Okay.  And it's as of September 30th, 2010,

20   right?

21     A    Yes.

22     Q    And it started November 1st, 2010?

23     A    Yes.

24          MR. EGAN:  Now if we could go to page 5, and

25   if we could have the paragraph below that chart right

Page 14

1    there.  Yeah.

2    BY MR. EGAN:

3         Q    All right.  Now the very last sentence of

4    that paragraph, sir, it says, on May 24th, 2010, joint

5    PAD --

6              THE COURT:  March.

7    BY MR. EGAN:

8         Q    -- OB --

9              THE COURT:  March.

10             MR. EGAN:  Oh, no, Your Honor, it's at the

11   last sentence.

12             THE COURT:  Oh, my apologies.

13             MR. EGAN:  No, my, I'm -- I'm sorry I was

14   confusing.

15   BY MR. EGAN:

16        Q    A May 24th, 2010, joint FDIC PADOV visitation

17   found the banks over (inaudible) condition remained

18   poor.  Do you see that?

19        A    Yes.

20        Q    So I had asked you if you -- if you did an

21   interim examination.  Did you -- were you involved in

22   this visitation?

23        A    No.

24        Q    Okay.  So you weren't at the bank in May?

25        A    No.

1        Q    Okay.  The first, when was the first time you

2    came to the bank?

3        A    For the 2010 exam, it would be, well, there's

4    a meeting with management ahead of time --

5        Q    Okay.

6        A    -- four weeks before, but the exam started

7    November 1st.

8        Q    All right.  So other folks from FDIC and

9    PADOB were there in May?

10       A    Yes.

11       Q    Okay.  So you came in, in -- thank you for

12   that.  You came in, in the fall.  And if we could now

13   go to page 6 of your examination, these were questions

14   you were asked yesterday.

15            MR. EGAN:  And if we could have the first full

16   paragraph starting with contributing.  No, the -- yeah,

17   thanks.

18   BY MR. EGAN:

19       Q    Okay.  And, sir, you were asked a number of

20   questions about this, contributing to the decline in

21   capital is the requirement by the bank's external

22   auditor, KPMG to reverse 8.3 million of equity,

23   correct?

24       A    Yes.

25       Q    And basically what this is saying is that

1    KPMG came in and they said that you can't count this

2    equity, correct?

3         A    Yes.

4         Q    Okay.  And if you go further down in the

5    paragraph, it says, shortly after these loans were

6    made, the borrowers purchased a like amount of common

7    stock of Nova Financial Holdings, Inc.  Do you see

8    that?

9         A    Yes.

10        Q    And then KPMG determined that since the loans

11   were originated during a period in which the holding --

12   holding company was actively seeking to raise capital,

13   they are not secured by an irrevocable letter of credit

14   or liquid collateral.  The amount of stock purchased

15   must be recognized as a reduction to shareholders'

16   equity.  Do you see that?

17        A    Yes.

18        Q    That's a determine KPMG made, correct?

19        A    Yes.

20        Q    That's not a determination that the FDIC

21   made, correct?

22        A    Yes.

23        Q    And the bank has to agree to what KPMG says

24   or had to agree to what KPMG said in this case,

25   correct?

Page 17

1       A    Yes.

2       Q    Okay.  Now you had some discussions with

3    Mr. Hartline about that; didn't you?

4       A    Yes.

5       Q    And Mr. Hartline told you that he didn't

6    agree with that; didn't he?

7            MS. CHUN BARRY:  Objection.

8            THE COURT:  Overruled.

9            MS. CHUN BARRY:  Hearsay, Your Honor.

10           THE COURT:  Overruled.

11           MS. CHUN BARRY:  It --

12           MR. ZETNER:  I don't remember his exact words.

13   BY MR. EGAN:

14      Q    Well, do you remember meeting with the

15   Government agents before this case in -- in

16   preparation?

17      A    Yes.

18      Q    And do you remember they asked you a lot of

19   questions?

20      A    Yes.

21      Q    Do you remember them telling them that

22   Hartline did not understand why they had to reverse the

23   loans?

24      A    I don't remember using those words, no.

25      Q    You don't remember telling them that Hartline

1    did not agree, but he did reverse them?

2        A    I may have said that, but like I said, I

3    don't remember my exact words.

4        Q    Do you remember telling them that Hartline

5    was not aware of the requirements involved with the

6    loans as capital?

7            MS. CHUN BARRY:  Objection, Your Honor.

8            THE COURT:  Overruled.

9            MR. ZETNER:  I, again, I -- my -- I don't know

10   if I used those exact words.  I said maybe in my

11   opinion he was not aware.  I don't know.

12   BY MR. EGAN:

13       Q    Okay.  And your opinion of whether he was

14   aware or not was based on your conversation with him,

15   correct?

16       A    Yes.

17       Q    And in that conversation with you he

18   indicated that he didn't agree, right?

19           MS. CHUN BARRY:  Objection, Your Honor.

20           THE COURT:  Sustained.

21   BY MR. EGAN:

22       Q    Now he also mentioned to you this rule that

23   KPMG applied, too; didn't he?

24       A    Yes.

25           MS. CHUN BARRY:  Objection.

1          THE COURT:  Counsel, let me see you, please.

2                   SIDEBAR

3          (Sidebar begins – 09:57:19 a.m.)

4       (Counsel approach the bench where the following

5    ensues:)

6          MS. CHUN BARRY:  Your Honor, this is hearsay,

7    and he cannot testify for Mr. Hartline.

8          THE COURT:  Correct.

9          MS. CHUN BARRY:  So I -- that's what is going

10   on.

11         MR. EGAN:  Your Honor, it's a -- it's a

12   statement by my client.  That (inaudible) for like the

13   last three weeks (inaudible).

14         MS. CHUN BARRY:  Statement against

15   (inaudible).

16         THE COURT:  But -- but the statement has

17   interest though, that's the exception and that's what

18   counsel (inaudible).

19         I'm going to give you some latitude, but

20   don't (inaudible) with a train now, all right?

21         MR. EGAN:  Yes, Your Honor.

22         THE COURT:  Sustained.

23      (Sidebar concluded – 09:57:54 a.m.)

24      (Counsel return to the trial tables where the

25   following ensues:)

Page 20

1    BY MR. EGAN:

2        Q    Now, Mr. Zetner, these conversations that I'm

3    asking you about, they took place in 2010, correct,

4    with Mr. Hartline?

5        A    Yes.

6        Q    And it's now 2016, correct?

7        A    Yes.

8        Q    And you met with the Government in 2015?

9        A    I believe so, yes.

10       Q    And in 2013?

11       A    Yes.

12       Q    And would it be fair to say that your

13   recollection of events in 2013 were better than they

14   are now?

15       A    I guess it would be fair.

16       Q    Now I want to go back to your examination for

17   a minute and talk about the bottom of that paragraph.

18           MR. EGAN:  It starts at -- the very one we

19   just had.  Thank you.

20   BY MR. EGAN:

21       Q    If we could go, on September 28th, 2010, the

22   bank charged off a $5 million shareholder loan when the

23   borrower filed for bankruptcy protection.  Do you see

24   that?

25       A    Yes.

1      Q    And that means that the bank charged off the

2  loan because they filed bankruptcy, correct?

3      A    Yes.

4           MS. CHUN BARRY:  Objection.

5           MR. ZETNER:  They considered the loan

6  uncollectible at that --

7  BY MR. EGAN:

8      Q    Right.

9      A    -- point.

10      Q    But that doesn't mean they couldn't still

11  attempt to collect on it; does it?

12      A    No.

13      Q    Okay.  And the next sentence says, as a

14  result, $3.3 million of shareholder loans remain as a

15  reduction to capital.  Do you see that?

16      A    Yes.

17      Q    Now that means the 5 million for Levin went

18  back into capital, right?

19      A    No.

20      Q    Okay.  I figured I wouldn't understand this.

21      A    No, it -- it could not go back into capital

22  because the loan was not repaid.  The only way it could

23  count as capital is if the loan was repaid.

24      Q    Okay.

25      A    And since it was charged off --

Page 22

1     Q    And that's based on this rule that KPMG
2  showed everybody, right?
3     A    Right.
4     Q    Okay.  The other loans were still not charged
5  off as of September 2010, correct?
6     A    Yes.
7     Q    So they were either still being paid or still
8  being collected, correct?
9     A    Yes.
10    Q    They were not, what do you call it, impaired?
11    A    Yes.
12    Q    Now, sir, if we could go to page 5 of this
13 again and go through, to the summary section.  And the
14 second sentence of that says, the bank's precipitous
15 decline over the last two years is due to persistent
16 weakness in asset quality.  Do you see that?
17    A    Yes.
18    Q    And assets, that's like real estate loans and
19 stuff like that, right?
20    A    That's loans and investments primarily.
21    Q    Okay.
22    A    Yes.
23    Q    In other words, it's things the bank invested
24 in, not the bank, itself?
25    A    Yes.

1      Q    And it's loans that the bank made to people

2  because those count as assets, right?

3      A    Yes.

4      Q    And the problem was that the real estate

5  market was cratering and those loans were no longer

6  worth what they had previously been, correct?

7      A    Yes, that's one of the reasons.

8      Q    Right, because that's what happened --

9  happened in all your banks you're looking at, right?

10     A    Yes.

11     Q    And it then says, goes on to say, this has

12  resulted if significant operating losses and the

13  erosion of capital, correct?

14     A    Yes.

15     Q    And then it says, the local economic

16  conditions have had an adverse effect on the bank's

17  condition, correct?

18     A    Yes.

19     Q    Okay.  So you're listing in here the reasons

20  why they -- they're getting this bad score basically,

21  correct?  Summary, it's kind of the --

22     A    Right.

23     Q    -- main reasons?

24     A    Right.  It's a summary of --

25     Q    Right.  You're write -- but when you're

Page 24

1    writing a summary, you put in the big stuff, right?

2         A    Correct.

3         Q    All right.  No mention in this paragraph

4    whatsoever about these shareholder equity reduction by

5    KPMG; is there?

6         A    No, because that's discussed under the

7    capital (inaudible) --

8         Q    Okay.  But it --

9         A    -- where there was more --

10        Q    -- didn't make the summary?

11        A    No.  The summary is just a snapshot of the

12   condition of the bank.

13        Q    Right, the main points?

14        A    Right.

15        Q    Okay.  And then the last two words -- or

16   actually, no, let's go to like the last four or

17   five words.  It says, financial support is required in

18   order for the bank to remain viable, correct?

19        A    Yes.

20        Q    Now this bank in 2010, while struggling, is

21   still viable, correct?  You haven't deemed it unviable?

22   You haven't deemed it you're going to take it over?

23        A    Correct.

24        Q    And in fact, you were back in 2011 to inspect

25   the bank, right?

1      A    Yes.

2      Q    It was still there; wasn't it?

3      A    Yes.

4      Q    It didn't close until October of 2012; did

5  it?

6      A    I believe that was the date, yes.

7      Q    Okay.

8           MR. EGAN:  Can I have a moment, Your Honor?

9           THE COURT:  Uh-huh.

10          MR. EGAN:  That's all, Your Honor.

11          MS. BAKER SHEALY:  May I proceed?

12          THE COURT:  You may proceed.

13                    CROSS-EXAMINATION

14  BY MS. BAKER SHEALY:

15     Q    Good morning, Mr. Zetner.

16     A    Good morning.

17     Q    In your review of the bank, you identified

18  the officers and directors of the bank -- I'm sorry, in

19  your 10,000 -- 2010 review of the bank, you identified

20  the officers and directors of Nova Bank; is that

21  correct?

22     A    Yes.

23     Q    And it includes the officers and directors of

24  the Nova Financial Holdings, as well; is that right?

25     A    No, that if they were not an officer or

Page 26

1    director of the bank, they would not be in our report.

2         Q    Okay.

3         A    They would be in the holding company.

4         Q    So with respect to the bank, did you identify

5    a gentleman by the name of Barry Bekkedam as one of the

6    officers or directors of the bank?

7         A    No.

8         Q    And there's nothing in your report for 2010

9    indicating that Barry Bekkedam exercised any sort of

10   influence or control over loan decisions at the bank;

11   is that right?

12        A    Yes.

13        Q    And there's also nothing in your report of

14   the 2010 exam indicating that Barry Bekkedam influenced

15   any decisions over how capital treatment might be done

16   at the bank; is that correct?

17        A    Yes.

18             MS. BAKER SHEALY:  No further questions.

19                          REDIRECT

20   BY MS. CHUN BARRY:

21        Q    Good morning, Mr. Zetner.

22        A    Good morning.

23        Q    Sir, were you involved in the 2009 exam

24   conducted by the Pennsylvania Department of Banking?

25        A    No.

1        Q    Do you know if they trace the source of funds

2    for each shareholder?

3        A    No, I do not know.

4        Q    Did you first learn of the Levin loan in your

5    exam of -- in 2010?

6        A    Yes.

7             MS. CHUN BARRY:  If we could please take a

8    look at page 5 of Government's Exhibit 185.  Okay.  And

9    we can highlight the summary again.

10   BY MS. CHUN BARRY:

11       Q    Sir, just so there's no confusion as to what

12   the snapshot of Nova Bank was from your exam, would you

13   please read this summary?

14       A    The --

15            MS. CHUN BARRY:  And may it be -- oh, I'm

16   sorry.  May it be published, Your Honor?

17            MR. EGAN:  No objections.

18            THE COURT:  Yes, ma'am.

19   BY MS. CHUN BARRY:

20       Q    Would you please read it, sir?  Thank you.

21       A    The overall condition of the institution has

22   deteriorated to such an extent that failure is now

23   highly probable without an immediate capital infusion.

24   The bank's precipitous decline over the last two years

25   is due to persistent weakness in asset quality,

1    including a large volume of sub-investment quality

2    securities, which has resulted in significant operating

3    losses and the erosion of capital.  Local economic

4    conditions have had an adverse effect on the bank's

5    condition.

6              Given the overall condition of the bank,

7    liquidity is unsatisfactory and the degree of market

8    risk, primarily interest rate risk taken by the

9    institution is not adequately supported by the current

10   level of earnings and capital.  Although management and

11   the board have taken steps to implement appropriate

12   risk management practices, magnitude and severity of

13   the problems require immediate financial assistance

14   from shareholders or other external sources of

15   financial support is required in order for the bank to

16   remain viable.

17             MS. CHUN BARRY:  May I have a moment, Your

18   Honor?

19             THE COURT:  Go ahead.

20             MS. CHUN BARRY:  No further questions.  Thank

21   you.

22             MR. EGAN:  Briefly.

23                       RECROSS

24   BY MR. EGAN:

25        Q    Sir, as part of your report of 2010, you were

1    asked on redirect about whether or not the Levin loan

2    became known to you during your examination, correct?

3         A    Correct.

4         Q    Okay.  And Mr. Hartline discussed that with

5    you as we talked about earlier, correct?

6         A    Yes, I think he had indicated it was charged

7    off.

8         Q    And I asked you earlier about there's always

9    a section in here for violations of regulation or

10   law --

11        A    Yeah.

12             MS. CHUN BARRY:  Objection, Your Honor.

13   BY MR. EGAN:

14        Q    -- there's nothing --

15             THE COURT:  Just a moment, please.

16             MS. CHUN BARRY:  Beyond the scope.

17             THE COURT:  Just a moment, please.  It is

18   important that the jury appreciate that the violation

19   and the sections of the law do not apply to the TARP,

20   they're not a part of the TARP law and regulation.  Do

21   you agree with that?

22             MR. ZETNER:  Yes, Your Honor.

23             THE COURT:  All right.  Now in terms of the

24   objection, presumably it's relevancy.

25             MS. CHUN BARRY:  Relevancy and beyond the

```
 1   scope, Your Honor, of redirect.

 2             THE COURT:  That's correct.

 3             MR. EGAN:  Withdraw the question, Your Honor.

 4             THE COURT:  All right.  Anything further?

 5             MS. BAKER SHEALY:  No, Your Honor.

 6             THE COURT:  Thank you, sir, you may step down.

 7   Watch your step, please.

 8        (The witness is excused from the stand)

 9             MS. CHUN BARRY:  Your Honor.

10             THE COURT:  Yes, ma'am.

11             MS. CHUN BARRY:  The United States calls

12   Patricia Loughney.

13             MR. ENGLE:  Your Honor, before the witness

14   comes in, may we see you at sidebar?

15             THE COURT:  Surely.

16                       SIDEBAR

17        (Sidebar begins – 10:08:40 a.m.)

18        (Counsel approach the bench where the following

19   ensues:)

20             MR. ENGLE:  (Inaudible).

21             MS. CHUN BARRY:  (Inaudible).

22             MR. ENGLE:  I just want to make sure

23   (inaudible) okay.

24             MS. CHUN BARRY:  (Inaudible).

25             MR. ENGLE:  I just wanted to check.
```

1          THE COURT:  Okay.

2      (Sidebar concluded – 10:09:15 a.m.)

3      (Counsel return to the trial tables where the

4  following ensues:)

5          THE DEPUTY:  Please raise your right hand.  Do

6  you swear and/or affirm that the testimony you shall

7  give in this matter before the Court will be the truth,

8  the whole truth, and nothing but the truth so help you

9  God or you do so affirm?

10          MS. LOUGHNEY:  I do.

11                  PATRICIA LOUGHNEY

12          (A witness produced by the Government, having

13  been duly sworn according to law, takes the witness

14  stand and testifies as follows:)

15          THE CLERK:  Please state and spell your name

16  into the record, and you can have a seat.

17          MS. LOUGHNEY:  Patricia Loughney.

18          THE CLERK:  Spell it for me, please.

19          MS. LOUGHNEY:  L-o-u-g-h-n-e-y.

20          THE CLERK:  Thank you.

21          THE COURT:  You may proceed.

22          MS. CHUN BARRY:  Thank you, Your Honor.

23                  DIRECT EXAMINATION

24  BY MS. CHUN BARRY:

25      Q    Good morning, Ms. Loughney.

1      A     Good morning.

2      Q     Where do you work?

3      A     I currently work at GTM Risk Management.

4      Q     Okay.  And --

5            THE COURT:  Could you please pull the

6   microphone forward?

7            MS. LOUGHNEY:  Sure.

8            THE COURT:  Please, thank you.

9            MS. LOUGHNEY:  GTM Risk Management.

10  BY MS. CHUN BARRY:

11     Q     Okay.  And what do you do for GTM Risk

12  Management?

13     A     I'm an internal audit manager, so I go out

14  and audit, co-source at banks --

15     Q     Okay.

16     A     -- and do their internal operational audits.

17     Q     And as by way of background, do you have any

18  kind of degree?

19     A     Yes.  My degree is in accounting.

20     Q     Okay.  Are you a CPA, ma'am?

21     A     No.

22     Q     Okay.  Now prior to working at GTM Risk

23  Management, did you work at a bank called Nova Bank?

24     A     Yes.

25     Q     And what's the timeframe that you worked at

1    Nova Bank?

2         A     January of 2009 to June of 2010.

3         Q     And what was your position at Nova Bank?

4         A     Director of internal audit.

5         Q     And what did it mean to be the director of

6    internal audit?

7         A     My job was to -- to help provide safety and

8    soundness for the bank by doing operational and

9    compliance audits.

10        Q     Okay.  And as part of your duties, did you

11   also work -- well, let me ask you this first, did Nova

12   Bank have an outside auditor?

13        A     We had a co-source relationship.  They had

14   external auditors --

15        Q     I'm sorry --

16        A     -- as well.  Yes.

17        Q     -- I -- I used the wrong terminology.

18        A     Yes.

19        Q     Did Nova Bank have an external auditor?

20        A     Yes, they did.

21        Q     Okay.  And who was that?

22        A     KPMG.

23        Q     Okay.  Now who hired you to work at Nova?

24        A     The audit committee chairman and the

25   president.

Page 34

1       Q    Okay.  And who was the president?

2       A    Brian Hartline.

3       Q    And do you see Mr. Hartline in the courtroom

4    today?

5       A    Yes, I do.

6       Q    And can you identify him, please?

7       A    Yes, he is sitting at that able.

8       Q    Okay.

9            MS. CHUN BARRY:  Your Honor, the Government

10   request that the record reflects the witness has

11   identified defendant Brian Hartline.

12           THE COURT:  Granted.

13   BY MS. CHUN BARRY:

14      Q    Now when you went to Nova Bank sometime in

15   June of 2009, were you aware that the bank was doing a

16   capital raise?

17      A    Yes.

18      Q    Okay.  Were you involved in any way in doing

19   capital raising for the bank?

20      A    No.

21      Q    Now do you recall whether or not in 2010,

22   the -- the external auditor, KPMG, was preparing to do

23   an audit of the bank?

24      A    Yes, they were in the process.

25      Q    Excuse me.  And as a part of that audit, do

1    you assist -- well, how do you assist, if at all, with

2    preparing for the external, the audit by KPMG?

3         A    I assisted in -- in gathering the documents

4    that they needed for the request list for their audit.

5         Q    Okay.  And do you recall whether or not a

6    request was made to review a loan for a George Levin?

7         A    Yes, it was.

8         Q    Okay.  And prior to KPMG reviewing the loan,

9    did you take a look at the loan?

10        A    Yes, I looked at the documents to be

11   provided.

12        Q    Okay.  And why did you do that?

13        A    We had to make sure that all the right

14   documents were being collected and provided to them.

15        Q    Okay.  And when you reviewed the loan

16   documents, what, if anything -- what, if any,

17   conclusion did you draw at that time?

18             MR. EGAN:  Objection.

19             MS. CHUN BARRY:  Park --

20             THE COURT:  Overruled, overruled.

21             MS. LOUGHNEY:  The loan for Mr. Levin was a

22   $5 million unsecured loan.  At the time we had just

23   been informed that there was also a gentleman named

24   George Levin who had currently invested $5 million with

25   the bank.

1   BY MS. CHUN BARRY:

2      Q    Okay.  And based on your recognition of -- of

3   that information, do you know whether or not you gave

4   that information to KPMG?

5      A    Yes, I did.

6      Q    Okay.  Now when you were at the bank, did you

7   know that the bank was or had applied for TARP funding?

8      A    Yes.

9      Q    Were you involved in any way in the -- in the

10  TARP process?

11     A    No, I was not.

12     Q    Now when you brought this loan and the

13  investment that was made by Mr. Levin to KPMG's

14  attention, do you know whether or not any action was

15  taken by KPMG?

16     A    Yes.

17     Q    And what was that?

18     A    They were investigating it further, looking

19  for additional supporting documentation, and inquiring

20  with bank management.

21     Q    Okay.  And do you know whether or not KPMG

22  determined that the $5 million loan could not be

23  counted as capital of the bank?

24     A    I believe so.

25     Q    Okay.  And did you -- do you recall whether

1    or not you attended a meeting with KPMG and the board

2    of directors or at least, I'm sorry, with the audit

3    committee regarding these issues?

4        A    Yes, I did.

5             MS. CHUN BARRY:  May I have a moment, Your

6    Honor?

7             THE COURT:  Yes.

8             MS. CHUN BARRY:  No further questions, thank

9    you.

10            THE COURT:  Counsel.

11            MR. EGAN:  Thank you, Your Honor.

12                     CROSS-EXAMINATION

13   BY MR. EGAN:

14       Q    Good morning, Ms. Loughney.

15       A    Good morning.

16       Q    So you were hired to be the director of

17   internal audit at Nova, correct?

18       A    Correct.

19       Q    And you were hired, I believe, you said by

20   Mr. Hartline and by the head of the audit committee,

21   correct?

22       A    Correct.

23       Q    And that would be a Mr. Levi?

24       A    Correct.

25       Q    And as the director of internal audit, you

1    reported to Mr. Levi, correct?

2         A    Yes.

3         Q    And the reason you reported to Mr. Levi and

4    not Mr. Hartline is because auditors are supposed to

5    have a direct line to the audit committee, correct?

6         A    Correct.

7         Q    And that's so that you can provide to the

8    audit committee the information you find without

9    management having any influence, correct?

10        A    Correct.

11        Q    Now prior to becoming the director of

12   internal audit, you had worked for one of the outside

13   consultants for the bank, correct?

14        A    Correct.

15        Q    And that would be R -- RSM McGladrey.  Did I

16   get that right?

17        A    No.

18        Q    Okay.  Who was it?

19        A    I worked for KPMG.

20        Q    Oh, I'm sorry, for some reason I thought you

21   were from McGladrey.

22        A    No.

23        Q    McGladrey was also an outside consultant

24   though, correct?

25        A    Yes, they were.

1    Q    And they are also an accounting firm, right?

2    A    Accounting and audit.

3    Q    Okay.  And they do an, they perform an audit

4  function?

5    A    Correct, internal --

6    Q    And they --

7    A    -- audit.

8    Q    -- performed an audit function with Nova,

9  correct?

10   A    Yes.

11   Q    And KPMG performed an audit function with

12  Nova, correct?

13   A    Yes, they did.

14   Q    As did Merit Partners, right?

15   A    Yes.

16   Q    They came in, and they looked at all the

17  loans, right?

18   A    Correct.

19   Q    And you, as the director of audit, you had a

20  couple of people working for you, I assume?

21   A    No, I did not.

22   Q    Okay.  So you were on -- on your own on this,

23  but as the director of audit, you were the person who

24  was supposed to give them all the information they

25  asked for when they were doing these audits, right?

Page 40

1        A    Just to make sure that management was

2    providing the correct documentation.

3        Q    Right.  So you're like a check on the

4    situation to make sure that the important documents go

5    to the auditors?

6        A    Correct.

7        Q    And that's what you did, right?

8        A    Yes, I did.

9        Q    And in this instance that's exactly what you

10   did, you provided the auditors with the information

11   about Mr. Levin, correct?

12       A    Correct.

13       Q    Now nobody came to you and said, don't give

14   those documents to KPMG; did they?

15       A    No.

16            MR. EGAN:  That's all I have, Your Honor.

17            MR. ENGLE:  May I, Your Honor?

18                    CROSS-EXAMINATION

19   BY MR. ENGLE:

20       Q    Good morning, Ms. Loughney.

21       A    Good morning.

22       Q    Ms. Loughney, you said you started at Nova

23   Bank in January of 2009?

24       A    Correct.

25       Q    And at that time in 2009, you were aware that

Page 41

1    Mr. Barry Bekkedam was not one of the officers of the

2    bank, correct?

3          A    Correct.

4          Q    And you were also aware that during that

5    timeframe, Mr. Bekkedam was not one of the officers of

6    the bank, correct?

7          A    Correct.

8          Q    And you were also aware that during that

9    timeframe, Mr. Bekkedam was not one of the members of

10   the board of directors for the bank, correct?

11         A    Correct.

12         Q    Okay.  Have you ever actually met

13   Mr. Bekkedam?

14         A    No, I have not.

15         Q    Okay.  That's -- that's Mr. Bekkedam over

16   there in the blue tie.  During your time at Nova Bank,

17   you never had any interactions with Mr. Bekkedam

18   whatsoever; did you?

19         A    No, I did not.

20         Q    Now you indicated that during the timeframe

21   around June of 2009, you were aware that the bank was

22   involved with raising capital.

23         A    Yes.

24         Q    Okay.  You were asked that on direct

25   examination.

1       A    Yes.

2       Q    And I believe you said you had absolutely

3   nothing to do with the issue of raising capital for the

4   bank; is that right?

5       A    Correct.

6       Q    It was your understanding, however, that

7   Mr. Bekkedam was involved with raising capital for the

8   bank?

9       A    Yes.

10      Q    That was your understanding of what he did as

11  an outside consultant for the bank?

12      A    Yes.

13      Q    And he was, in fact, more specifically

14  raising capital for the holding company; am I right

15  about that?

16      A    Yes.

17      Q    All right.  And while this issue was going on

18  with respect to a capital raise that was going on at

19  Nova, you also said that you were aware of eventually

20  KPMG doing an audit later in 2010; is that right?

21      A    In 2010, yes.

22      Q    Okay.  Now the -- the capital raises, they --

23  they were going on all the time at the bank when you

24  were there; is that right?

25      A    Yes.

1       Q    Banks always want to raise capital?

2       A    Correct.

3       Q    All right.  So when eventually this KPMG

4  audit came up, just like you had nothing to do with

5  capital raising for the bank, Mr. Bekkedam had nothing

6  to do with that audit process, correct?

7       A    Correct.

8       Q    In fact, someone who does not work inside the

9  bank would not be permitted to participate in that

10 process whatsoever; would they?

11      A    Correct.

12      Q    And at no point in time when KPMG was

13 auditing and you were being asked questions about

14 particular loans did Mr. Bekkedam ever call you to try

15 to influence how you were doing your job?

16      A    No.

17      Q    At no point in time did he shoot you an email

18 suggesting that you shouldn't provide certain

19 information to the auditors?

20      A    No.

21      Q    In fact, he never communicated with you in

22 any way, shape, or form while you worked at Nova?

23      A    No, he did not.

24      Q    And during the process of looking at the loan

25 documents for Mr. Levin, I believe you said on direct

Page 44

1    examination, you obviously were aware that there was a

2    $5 million loan?

3         A    Yes.

4         Q    And you had access to documents and

5    information that also made you aware that shortly after

6    getting the loan, Mr. Levin invested $5 million in the

7    holding company, right?

8         A    Correct.

9         Q    That was no secret, correct?

10        A    Correct.

11        Q    Okay.  And the issue of whether or not

12   Mr. Levin's investment in the holding company could

13   count as capital became a question that was raised by

14   KPMG; am I right about that?

15        A    Yes.

16        Q    The decision that the bank made initially to

17   list that as capital was not a decision that an outside

18   consultant who raises capital would have anything to do

19   with; am I right?

20        A    Yes.

21        Q    Mr. Bekkedam had absolutely no role in the

22   decision of whether a bank would or would not count an

23   investment as capital?

24             MS. CHUN BARRY:  Objection.

25             THE COURT:  Overruled.  If you know.

Page 45

1            MS. LOUGHNEY:  I --

2            THE COURT:  If you know.

3            MS. LOUGHNEY:  I don't know.  That's what I

4    was going to say, I don't know.

5    BY MR. ENGLE:

6        Q    Okay.  Were you aware at any point that

7    Mr. Bekkedam made any contact with the bank to say it

8    should count as capital?

9        A    I don't know.

10       Q    Were there any documentation during the

11   course of the KPMG audit that you saw that indicated

12   Mr. Bekkedam having any influence over that decision

13   whatsoever?

14       A    Not that I saw.

15       Q    Thank you.

16           MR. ENGLE:  I have nothing further.

17           MS. CHUN BARRY:  No questions, Your Honor.

18   Thank you.

19           THE COURT:  You may step down.  Thank you.

20       (The witness is excused from the stand)

21           MS. LOUGHNEY:  Thank you.

22           MR. IGNALL:  Your Honor, may we approach --

23   approach at sidebar briefly about the --

24           THE COURT:  Sure.

25           MR. IGNALL:  -- next witness?

1                         SIDEBAR

2          (Sidebar begins – 10:21:30 a.m.)

3        (Counsel approach the bench where the following

4   ensues:)

5          MR. IGNALL:  Our next witness is Anthony

6   Bonomo.  He's (inaudible) from Nova.  He also invested

7   in the Banyon Income Fund.

8          THE COURT:  Who (inaudible).

9          MR. IGNALL:  (Inaudible) far, far away.  Now

10  we already instructed him and his lawyer (inaudible) as

11  agreement (inaudible) I think we can agree now that

12  Defense counsel is not going to ask him about that

13  (inaudible).

14          MR. EGAN:  (Inaudible).

15          THE COURT:  Thank you.

16        (Sidebar concluded – 10:22:45 a.m.)

17        (Counsel return to the trial tables where the

18  following ensues:)

19        (Off the record – 10:22:52 a.m.)

20        (On the record – 01:03:08 p.m.)

21          MR. IGNALL:  No, no, this one you might like,

22  not that you don't like the other ones.  This one, we

23  may be streamlining the case here.  I think, because we

24  had an issue about bringing up Mr. Roven's immunity,

25  we've put our heads together, we have an agreement.

1    There were a handful of documents I was going to show

2    Mr. Roven.  I think we have an agreement that I will

3    just introduce those by stipulation.  I'll show them to

4    the jury, but we will not call Mr. Roven in our case.

5                    THE COURT:  All right.

6                    MR. IGNALL:  The Defendants may choose to call

7    him in their case, but we will not call him in our

8    case, but just when we bring the jury back, I will

9    enter some exhibits, and I will show them on the

10   screen.

11                   THE COURT:  Okay.  Now --

12                   MR. IGNALL:  And -- and I was --

13                   THE COURT:  -- in terms of --

14                   MR. IGNALL:  -- going to, let me talk to

15   Ms. Barry for a second.

16                   THE COURT:  Sure.

17                   MR. IGNALL:  May I have one moment, Your

18   Honor?

19                   MR. EGAN:  We have no problem if you read them

20   there.

21                   MR. IGNALL:  Okay.  I'll just read -- I'll

22   read parts of it then, I guess, instead of --

23                   THE COURT:  Fair enough.

24                   MR. IGNALL:  -- having a witness up there to

25   do responsive reading, we can do that.

Page 48

1            MR. EGAN:  As long as it's not a dramatic

2    reading.

3            MR. IGNALL:  Yes, I'm not that dramatic.

4            THE COURT:  I've had that happen before, but

5    no, that's fine.  And in terms of opening the door, is

6    there any agreement on that just in case?

7            MR. ENGLE:  I'm sorry.

8            THE COURT:  If you're going to limit yourself

9    to that, if Defense counsel, you said if they choose to

10   do otherwise --

11           MR. IGNALL:  If they want --

12           THE COURT:  -- then they --

13           MR. IGNALL:  -- to choose, if they want to

14   call Mr. Roven in their case --

15           THE COURT:  Okay.

16           MR. IGNALL:  -- they're free to do that.

17           THE COURT:  And then you can come back on --

18           MR. IGNALL:  And then -- then what we do on

19   cross is a different issue, and we can --

20           THE COURT:  All right.

21           MR. IGNALL:  -- raise that at the time.

22           THE COURT:  Okay.

23           MR. IGNALL:  But -- but all those issues are

24   now going to be put off until or maybe never, but or

25   until Mr. Roven is called as a Defense witness.

Page 49

```
 1              THE COURT:  Sounds good to me.  Thank you very
 2  much.
 3              MR. IGNALL:  So that will speed things up,
 4  which is good, but our next witness is not supposed to
 5  be here until 1:30, which is not as good, but I think
 6  that --
 7              THE COURT:  In that case you can be seated.
 8              MR. IGNALL:  Yeah.  And I think I can read
 9  things in for a couple of minutes with the documents.
10              THE COURT:  I'm sorry?  No, it's no sense
11  in --
12              MR. IGNALL:  Yeah.
13              THE COURT:  -- just having that kind of gap.
14  I left my MLI notes in my chambers, is that anything
15  we're going to address right now?  I can go get those
16  and --
17              MS. CHUN BARRY:  Yeah.
18              THE COURT:  -- we can --
19              MR. IGNALL:  Sure, yeah.
20              THE COURT:  -- do that.
21              MR. IGNALL:  And -- and I highlighted at least
22  the two things --
23              THE COURT:  Right.
24              MR. IGNALL:  -- I thought Mr. Schwartz --
25              THE COURT:  Right.  All right.  Let me just go
```

Page 50

1    right down, I'll be right back up.

2              MR. IGNALL:  All right, thank you, Your Honor.

3              THE COURT:  Uh-huh.

4              MR. EGAN:  And then, Your Honor, at the close

5    of the day, if we could discuss scheduling issues,

6    we're getting down to the end of the Government's case,

7    we have to lineup witnesses and there's a couple of

8    things at play, so if we could have a conversation

9    about that, it would be appreciated.

10              THE COURT:  Absolutely.

11              MR. IGNALL:  Because we -- at --

12              MR. EGAN:  Thank you.

13              MR. IGNALL:  -- this point we may rest -- rest

14   as early as tomorrow.

15              THE COURT:  Wow, okay.

16              MR. IGNALL:  Okay.

17              THE COURT:  All right.

18              MR. IGNALL:  All right.

19              THE COURT:  Be right back.

20         (Off the record - 01:06:15 p.m.)

21         (On the record - 01:42:29 p.m.)

22              THE COURT:  All right.  For the record I have

23   reviewed the memoranda of investigative activity,

24   pardon me, and compared those MLIs with the handwritten

25   notes of the investigators.  And there was only one

Page 51

1    inconsistency that the Court found, that is in the

2    handwritten notes of Ms. Mesner dated March 15, 2016.

3              It is written in handwriting.  She did not

4    invest in Nova.  X said not to.  That is not reflected

5    in the MLI.  That's the only --

6              MR. IGNALL:  Okay.  And just for

7    clarification --

8              THE COURT:  And she testified that he said --

9              MR. IGNALL:  Yes.

10             THE COURT:  -- and they --

11             MR. IGNALL:  That --

12             THE COURT:  -- that X said, don't invest in

13   them.

14             MR. IGNALL:  But I'd just like to clarify.

15             THE COURT:  Yes, sir.

16             MR. IGNALL:  The way I believe it's written up

17   in the -- in the MLI, if a witness had already told

18   the -- us something, the agent did write that up into

19   the typewritten MLI.

20             THE COURT:  That is recorded in the

21   instructions on the --

22             MR. IGNALL:  Yes, okay.

23             THE COURT:  -- MLI.  Yes.

24             MR. IGNALL:  All right.

25             MR. SCHWARTZ:  Thank you, Your Honor.

Page 52

1               THE COURT:  All right.  So let me give all

2    this back to counsel.

3               MR. IGNALL:  All right.

4               THE COURT:  Unless you wish me to keep it.

5               MR. IGNALL:  You may keep it and leave me

6    an --

7               THE COURT:  All right.

8               MR. IGNALL:  -- extra -- or actually Carl was

9    nice enough to make an extra copy for us.  So --

10              THE COURT:  Very well.  We'll keep it in our

11   file.  So --

12              MR. IGNALL:  All right, thank you, Your Honor.

13              THE COURT:  Okay.

14              MR. IGNALL:  It's probably prudent to keep it

15   as a court file, I think.

16              THE COURT:  Yeah.  All right.  Mr. Schwartz, I

17   think that was the end of that issue.

18              MR. SCHWARTZ:  Yes, sir.

19              THE COURT:  All right.

20              MR. IGNALL:  All right.  So, Your Honor, what

21   I would propose now is I would show a couple of the

22   emails, I'll introduce the email -- the documents we've

23   agreed to.

24              THE COURT:  Okay.

25              MR. IGNALL:  I'll show a few to the jury, and

1    then we'll call the next witness who is here.

2              THE COURT:  All right.

3              MR. IGNALL:  And just so the jury isn't mad at

4    us, is it possible for the Court to instruct the

5    jury --

6              THE COURT:  Take blame?

7              MR. IGNALL:  No, no, not take the blame, but

8    to explain what I think is actually true that we have

9    in this time streamlined the case and we're moving it

10   along.

11             THE COURT:  No problem.

12             MR. IGNALL:  Okay.

13             THE COURT:  Let me just ask you this though,

14   you have what, one witness left for the day; is that

15   what --

16             MR. IGNALL:  We have two more witnesses today.

17   I'd like to get through both of those today.  I think

18   we can.

19             THE COURT:  Okay.

20             MR. IGNALL:  And then we would have two

21   witnesses tomorrow, plus we play a few clips of a

22   deposition.  And that -- and we will, we'll do some

23   housekeeping to make sure we've introduced every

24   exhibit we need to introduce, but that's what I

25   anticipate we have left.

Page 54

1              THE COURT:  All right.  Let me see you very

2     briefly, please, at sidebar.  Thank you.

3                         SIDEBAR

4          (Sidebar begins - 01:45:16 p.m.)

5        (Counsel approach the bench where the following

6     ensues:)

7              THE COURT:  I'm reluctant to tell the jury

8     that we are "almost home" because I would anticipate, I

9     couldn't be sure about this, but I would anticipate

10    that there might be a Rule 29 motion.  If there is,

11    there's going to be an issue of whether or not we need

12    the transcript or whether or not counsel needs

13    additional time, you need time to respond, et cetera,

14    et cetera.  So that the schedule might go on

15    (inaudible) probably the best thing anyway if that's

16    going to happen.

17             So this way I don't have to put them in a

18    position where they're thinking, oh, boy, we're almost

19    done with this case, then we have to have a gap here

20    for me to decide.  You see, that's -- that's coming

21    down.

22             MR. ENGLE:  That -- that is correct, Your

23    Honor, and that's what I wanted to bring up at the end

24    of the day.

25             THE COURT:  Okay.

```
 1              MR. ENGLE:  So but I wasn't sure planning it
 2    out.  If -- if the Government does indeed rest tomorrow
 3    by the end of the day, we would want to be able to have
 4    the time to present something in writing to Your Honor
 5    relative to Rule 29.
 6              THE COURT:  I would suggest that you start
 7    working on it now.
 8              MR. ENGLE:  We may, people --
 9              THE COURT:  But --
10              MR. ENGLE:  -- are.
11              THE COURT:  Right, okay.
12              MR. DUNCAN:  It's been -- it's been started,
13    Your Honor.
14              THE COURT:  All right.  But --
15              MR. ENGLE:  So I'm just --
16              THE COURT:  All I'm saying is just that I
17    would rather not say anything to them about that you're
18    at the end of your case.
19              MR. IGNALL:  Yeah.
20              THE COURT:  Because then they might get
21    these --
22              MR. IGNALL:  Right.
23              THE COURT:  -- expectations that they're going
24    to stop --
25              MS. CHUN BARRY:  Yes, Your Honor.
```

Page 56

```
 1              THE COURT:  -- and --
 2              MR. IGNALL:  Okay.
 3              THE COURT:  Yeah.
 4              MR. IGNALL:  All right.
 5              THE COURT:  So --
 6              MR. IGNALL:  Okay.
 7              THE COURT:  -- okay.
 8              MR. ENGLE:  But since we're on the subject,
 9   Your Honor, would Your Honor want to argue you that
10   Thursday or could we do it --
11              THE COURT:  It depends on --
12              MR. ENGLE:  -- in the morning or --
13              THE COURT:  It depends on what you're going to
14   have submitted in writing.
15              MR. ENGLE:  Uh-huh.
16              THE COURT:  Okay?  Citations and everything --
17              MR. ENGLE:  Right.
18              THE COURT:  -- quotes and authorities and
19   everything.
20              MR. ENGLE:  Yes.
21              THE COURT:  And it will be that I might spend
22   all day on Friday looking at --
23              MR. ENGLE:  That would be --
24              THE COURT:  -- responses and exchanges, quite
25   frankly.
```

1            MR. ENGLE:  That would be our preference.

2            THE COURT:  And take that advantage of our

3     time.

4            MR. ENGLE:  Great.

5            THE COURT:  Okay, all right.

6            MR. ENGLE:  Thank you, Your Honor.

7            THE COURT:  Okay, thank you all.

8         (Sidebar concluded - 01:47:04 p.m.)

9         (Counsel return to the trial tables where the

10    following ensues:)

11           THE COURT:  I'm ready when you are.

12           MR. IGNALL:  We're ready --

13           THE COURT:  Ready?

14           MR. IGNALL:  -- Your Honor.

15           THE COURT:  Okay.

16           THE DEPUTY:  All rise.

17           THE COURT:  Good afternoon.  You may be

18    seated.  All right.

19           MR. IGNALL:  Your Honor, I'd like to introduce

20    a few exhibits by stipulation.

21           THE COURT:  Yes.

22           MR. IGNALL:  And then I'll publish a few of

23    those.

24           THE COURT:  Members of the jury, as I

25    indicated to you at the outset, there are times when

1  evidence will be presented to you by way of

2  stipulation, which simply means that the attorneys have

3  all agreed that what is to be presented to you is not

4  contested and is accurate.

5           You may proceed.

6           MR. IGNALL:  All right.  So I'd like to

7  introduce Exhibits 39 -- I'm sorry -- 37, 49, I believe

8  73 may already be in evidence, but if it's not, I'd

9  like to introduce that, 78.

10          THE COURT:  Counsel, I'm sorry, could you

11 repeat those, please?

12          MR. IGNALL:  Yes.

13          THE COURT:  I apologize.

14          MR. IGNALL:  That's all right.  37, 49, 73,

15 78, 110, 111, 131, and 132.

16          THE COURT:  So stipulated?

17          MR. ENGLE:  Yes, Your Honor.

18          MR. EGAN:  So stipulated.

19     (Government Exhibit Nos. 37, 49, 73, 78, 110, 111,

20 131, and 132 are admitted into evidence)

21          MR. IGNALL:  All right.  If we could, Agent

22 Boyer, bring up Exhibit 37, please for the jury.  And

23 if you could just blow up the top part where it says

24 from Barry Bekkedam to Larry Roven, Friday, June, 26th,

25 Levin financials.  Yeah, so just -- and let's look at

1    the part where it says if, ask if Brian needs anything

2    else and anything signed, B.

3              All right.  And let's look next at exhibit --

4    one moment.  All right.  Now let's look at Exhibit 49.

5    And can you blow up the middle email from Brian

6    Hartline to Larry Roven on June 30th, 2009, re George

7    Levin?  And then can you highlight the first line that

8    says, we've got scanned documents for the loan around

9    lunchtime.  We actually closed the loan and dispersed

10   the funds between 12:00 and 1:00.

11             All right.  Can you now scroll up to the top

12   email, which is a 5:11 p.m. email from Larry Roven to

13   Barry Bekkedam forward George Levin?  And then just

14   highlight where it says FYI, see below.  If we could

15   now look at Exhibit 78, please.  Can we blow up the

16   middle email from Brian Hartline to Larry Roven

17   September 1, 4:31 re George Levin?  And can you

18   highlight the first line that says, I did not receive

19   anything from Frank on the question as to where the

20   funds are coming from, nor the attorney working on the

21   lawsuit response?

22             And then can you now highlight the next line

23   that said, the Fed called me this morning letting me

24   know they haven't heard from Frank?  All right.  And

25   now we can, can we go down a little bit further and

1   say, highlight, to my knowledge, the two outstanding

2   questions are, and let's just highlight number two,

3   they asked where the money was coming from?  Do you see

4   it?

5           And now if you could scroll up to the top

6   email from Larry Roven to Barry Bekkedam on September 1

7   at 4:39 p.m., re forward George Levin, and can you

8   highlight the line, see below, is George trying to back

9   out of this?  Okay.  If you could now pull up Exhibit

10  131, please, and just highlight the top, it's the top

11  portion right to there, from Tricia Kafka-Cougan

12  (phonetic), where it says December second, 2009.  And

13  then can you highlight the cc Barry Bekkedam, Ballamor

14  Capital and Larry Roven, L Roven at Ballamor Capital?

15          All right.  And let's go down to the body of

16  the email and you'll highlight the part where it says,

17  hi, Jane, below is Barry's response to your email.  All

18  right.  Now if you could scroll down to below where it

19  says all.  Can you highlight that first paragraph that

20  says, Nova Bank has been raising capital to bolster its

21  balance sheet and to take advantage of the TARP

22  program, for which it has been approved at

23  approximately 17 M?

24          And now could you just highlight the first

25  two sentences in the next paragraph that say, to date

1    Nova has raised approximately 10.3 M at $11 per share,

2    there's a deadline as it relates to raising the capital

3    $15 M necessary to close on the TARP?

4              May I have one moment, Your Honor?

5              THE COURT:  Yes, sir.

6              MR. IGNALL:  All right.  Those are all the

7    exhibits and stipulations for now, Your Honor.

8              THE COURT:  All right.

9              MS. CHUN BARRY:  Your Honor, the United States

10   calls Charles Gallub.

11             THE DEPUTY:  Raise your right hand.  Do you

12   swear and/or affirm that the testimony you shall give

13   in this matter before the Court is the truth, the whole

14   truth, and nothing but the truth so help you God or you

15   do so affirm?

16             MR. GALLUB:  Yes, I do.

17                        CHARLES GALLUB

18             (A witness produced by the Government, having

19   been duly sworn according to law, takes the witness

20   stand and testifies as follows:)

21             THE DEPUTY:  Have a seat.  State and spell

22   your name for the record.

23             MR. GALLUB:  Charles Gallub, C-h-a-r-l-e-s

24   G-a-l-l-u-b.

25             THE DEPUTY:  Thank you.

1          MS. CHUN BARRY:  May I proceed, Your Honor?

2          THE COURT:  Yes, please.

3          MS. CHUN BARRY:  Thank you.

4                    DIRECT EXAMINATION

5    BY MS. CHUN BARRY:

6          Q    Good afternoon, Mr. Gallub.

7          A    Good afternoon.

8          Q    Where do you live, sir?

9          A    1505 Flat Rock Road, Penn Valley.

10         Q    And what business are you in?

11         A    I'm in the real estate development business.

12         Q    And do you have a company in the -- do you

13   have a particular company that you run?

14         A    Yeah.  We have a real estate development

15   company that has the brand name Develop Com.

16         Q    And how long have you been in real estate

17   development?

18         A    Approximately 15 years.

19         Q    And in your business dealings in real estate

20   development, do you recall whether or not you met an

21   individual named Barry Bekkedam?

22         A    Yes, I did.

23         Q    And how did you meet Barry Bekkedam?

24         A    My recollection is I met Mr. Bekkedam in

25   relation to a project that we were looking to acquire

1    and develop in Norristown.

2         Q    Okay.  And do you recall whether or not that

3    project is referred to as Logan Square?

4         A    Yes, it is.

5         Q    Now what was the purpose of you meeting Barry

6    Bekkedam?

7         A    We were looking for funding for the

8    acquisition and development of that project.

9         Q    And how or what role did you expect Barry

10   Bekkedam to have with the financing of that project?

11        A    Well, our, we had a need for both debt and

12   equity financing, and we understood that he might be

13   able to provide both.

14        Q    Okay.  And how would he be able to provide

15   both?

16        A    Through a loan and an investment of equity.

17        Q    Okay.  And do you recall whether or not he

18   had an investment firm?

19        A    Yes, he did.

20        Q    And what was that firm called?

21        A    I knew it as Ballamor Capital.

22        Q    Okay.  And approximately when did you meet

23   Mr. Bekkedam in relationship to the Logan Square

24   project?

25        A    It was before we started, after we had signed

1    the agreement to purchase and before we had closed.

2         Q    And approximately what year was that, if you

3    can recall?

4         A    I don't have a keen recollection, '06-ish.

5         Q    Okay.  And during the time, and did -- do --

6    do you understand whether or not Barry Bekkedam's firm,

7    Ballamor Capital Management, and its clients would be

8    involved in the financing of your project?

9         A    Yeah.  We ultimately did reach an agreement

10   for both equity and debt for the Norristown project.

11        Q    Okay.  And so was Barry Bekkedam and Ballamor

12   Capital Management instrumental in the financing?

13        A    They were.

14        Q    Okay.  Now in the course of this Logan Square

15   deal, do you recall whether or not you met an

16   individual named Edward DiMarcantonio?

17        A    Yes, I did.

18        Q    And what was the Edward DiMarcantonio's role?

19        A    He was representing the investor group for

20   the Norristown project.

21        Q    Okay.

22        A    He was -- he was the person with whom we

23   interacted on the project.

24        Q    Okay.  Now what, did he also play a

25   significant role in the project?

1          A     Yes, he did.

2          Q     Okay.  At the time that you met Barry

3     Bekkedam and Edward DiMarcantonio, did you learn

4     whether or not they had a relationship with Nova Bank?

5          A     Yes, I did.

6          Q     And what was your understanding of Barry

7     Bekkedam and Edward DiMarcantonio's relationship to

8     Nova Bank?

9          A     My understanding is that they were both

10    involved with the bank, Barry at a higher level than

11    Ed.

12         Q     Okay.  Now this deal, this Logan Square deal,

13    what -- what was the, sort of the amount of the deal?

14    What was the price tag on this deal?

15         A     My recollection is that it was about a

16    $25 million deal, 16 million or so, maybe a little more

17    for acquisition, and the balance for development.

18         Q     Okay.  And for you, was this a significant

19    deal?

20         A     Yes, it was a significant deal.

21         Q     Now after learning, after entering this deal

22    and learning about Barry Bekkedam and Edward

23    DiMarcantonio's relationship to Nova Bank, was there,

24    did there come a time that you began a banking

25    relationship with Nova Bank?

1     A    Yes.

2     Q    Okay.  And who, if anyone, suggested that you

3  should begin a banking relationship with Nova Bank?

4     A    My recollection was that when we closed the

5  loan, the -- the Norristown entity that was the

6  borrower was either required or suggested to have

7  accounts at Nova.

8     Q    Okay.  And so then did you bring account,

9  your accounts over to Nova as well?

10    A    We did.

11    Q    Okay.  And did those include deposits?

12    A    Yes, they did.

13    Q    And did you -- do you recall whether or not

14  you began a significant credit -- a significant credit

15  relationship with Nova Bank?

16    A    We did.

17        MS. CHUN BARRY:  Now this has previously been

18  moved into evidence, and but at this time just show

19  them to the witness though.

20        And if I may approach the witness with a

21  hardcopy, Your Honor?

22        THE COURT:  Yes.

23  BY MS. CHUN BARRY:

24    Q    Mr. Gallub, I'm showing you what's been

25  marked as Government's Exhibit 96, which is a memo from

1    Thomas Patterson dated October 12th, 2009, and it lists

2    several entities.  Are you involved with those

3    entities?

4            MS. CHUN BARRY:  And, Your Honor, if it may be

5    published?

6            THE COURT:  Yes.

7            MS. CHUN BARRY:  Okay.

8            MR. GALLUB:  Yes, I am.

9    BY MS. CHUN BARRY:

10       Q    Okay.

11       A    Yes, I am.

12       Q    And so are these the loans, does this

13   fairly -- does this reflect the loans that you had

14   outstanding with Nova Bank in approximately October of

15   2009?

16       A    Yes, to the best of my recollection.

17       Q    Okay.

18            MS. CHUN BARRY:  And if we can take that down,

19   we can take that down, please.

20   BY MS. CHUN BARRY:

21       Q    Now do you recall whether or not in, in or

22   about September of 2008, you were approached to

23   purchase Nova Bank stock?

24       A    Yes, I recall that there was a request to

25   purchase Nova Bank stock.

1    Q    Okay.  And I'd like to show you what's been

2    marked as Government's Exhibit 4.

3              MS. CHUN BARRY:  I'm not sure if this has been

4    entered into evidence at this point.

5              MR. IGNALL:  It has.

6              MS. CHUN BARRY:  Okay.  And may it be

7    published, Your Honor?

8              THE COURT:  Yes.

9    BY MS. CHUN BARRY:

10    Q    Now looking at Government's Exhibit 4, this

11    is a risk assessment summary from a loan from -- to

12    Belmar Creek LLC.  And, Mr. Gallub, is Belmar Creek LLC

13    one of your entities?

14    A    Yes, it is.

15    Q    Okay.  And looking at the date of the RAS or

16    this risk assessment, it's September 30th, 2008, is

17    that on or about the date that you took out a loan?

18    A    As best I recall, yes.

19    Q    And before we get here, and I'm -- and I'm

20    sorry, when you were asked to purchase Nova Bank stock

21    in September of 2008, who made that request?

22    A    It -- that request came back to me through

23    someone who was working for our company and dealing

24    with Nova on our financial borrowings.

25    Q    Okay.  And who was that person?

1      A     Hal Schaffer.

2      Q     Now at the time that Mr. Schaffer said -- and

3  he -- was it your understanding that he spoke to

4  someone at Nova Bank?

5      A     Yes.

6      Q     Now did Mr. Schaffer work at Nova Bank?

7      A     No, he did not.

8      Q     Who did he work for?

9      A     He worked as a consultant for our -- my

10  company.

11      Q     Now when the request was made for you to

12  purchase Nova Bank stock in September of 2008, was it

13  your desire to purchase Nova Bank stock at that time?

14      A     No, it was something that we, my

15  understanding was --

16            MR. EGAN:  Objection.

17            THE COURT:  Sustained.

18            MS. CHUN BARRY:  His understanding, Your

19  Honor.

20            MR. EGAN:  Basis.

21            THE COURT:  His firsthand knowledge.

22            MS. CHUN BARRY:  Yes, his firsthand knowledge.

23  Why was he purchasing Nova Bank stock.

24            THE COURT:  Counsel?

25            MR. EGAN:  I believe he's going to testify

1   based on conversations with Mr. Schaffer, which would

2   be hearsay.

3          MS. CHUN BARRY:  Your Honor, may -- I'll

4   rephrase the question.

5   BY MS. CHUN BARRY:

6      Q    After you were requested to purchase Nova

7   Bank stock, was your -- what was your initial reaction

8   to that?

9      A    I was not interested in doing it.

10     Q    Okay.  Did you, at the time, in order to

11  purchase Nova Bank stock, were you in a position to use

12  any of your own money to purchase that stock?

13     A    No, I was not.

14     Q    How did you end up purchasing Nova Bank

15  stock?

16     A    There was a loan made to one of my entities,

17  and the proceeds from that loan were used to purchase

18  the stock.

19     Q    Okay.  And why did you purchase the stock?

20     A    We had a significant relationship with Nova

21  Bank, and it was implied to me that it was --

22          MR. EGAN:  Objection.

23          THE COURT:  Sustained.

24          MS. CHUN BARRY:  Okay.

25  BY MS. CHUN BARRY:

Page 71

1      Q      What was your -- well, why did you make the

2    decision to purchase Nova Bank stock?

3      A      Because I was trying to maintain the positive

4    relationship with Nova.

5      Q      And at that point in time in September of

6    2008, did you own any other stock?

7      A      No, I did not.

8      Q      So as of September of 2008, on September 30,

9    2008, the only stock that you owned was Nova Bank

10   stock?

11     A      Other than the owned, the companies that I

12   specifically held, that I created.

13     Q      Okay.  And was it your investment strategy to

14   invest in private stock in other companies?

15     A      No.

16     Q      Now looking at Government's Exhibit 4.

17            MS. CHUN BARRY:  And if we could scroll down

18   to the loan request.

19   BY MS. CHUN BARRY:

20     Q      And if you look at the purpose of the loan,

21   it says investment purposes and the original amount is

22   $250,000.  And is that the amount of the loan?

23     A      To the best of my recollection, yeah.

24     Q      Okay.  And was this loan specifically taken

25   out to purchase Nova Bank stock?

1       A       Yes, it was.

2       Q       Okay.

3               MS. CHUN BARRY:  Now if we could go to page 2,

4       please.

5       BY MS. CHUN BARRY:

6       Q       I'm looking at the transaction comments,

7       would you please read the first two sentences of

8       facility one, underneath facility one?

9       A       Belmar Creek LLC, in parenthesis, NSB,

10      existing borrower in parenthesis, requests a $250,000

11      commercial demand loan at Wall Street WSJ Prime for

12      24-month term.  The proceeds will be used for

13      investment purposes in another project.

14      Q       Okay.  Mr. Gallub, was this $250,000 loan

15      taken out on September 30th, 2008, to be used in

16      another project?

17      A       No.

18      Q       What was the purpose of the loan?

19      A       To purchase the Nova Bank stock.

20      Q       Now --

21              MS. CHUN BARRY:  And if we could take that

22      down, please.

23      BY MS. CHUN BARRY:

24      Q       -- did there come another time in and around

25      December of 2009 where another request was made for you

1    to purchase Nova Bank stock?

2         A    Yes, there did.

3         Q    Okay.  And who made that request?

4         A    Again, my recollection was that it came

5    through Hal Schaffer.

6         Q    Okay.  And again, when you -- when that was,

7    the request was made to you, what, did you want to

8    purchase Nova Bank stock at that time?

9         A    No, that was not something I wanted to do.

10        Q    Okay.  At that time did you have any of your

11   own money to purchase, available to you to purchase

12   Nova Bank stock?

13        A    No, I did not.

14        Q    Did you purchase Nova Bank stock?

15        A    Yes, we did.

16        Q    Why did you purchase Nova Bank stock?

17        A    That was a time during which there was a

18   significant downturn in the economy, and it was very

19   important to me to maintain relationships with banks so

20   that they didn't call my loans.

21        Q    Okay.  Now how did you manage to purchase

22   Nova Bank stock at that time in December of 2009?

23        A    My recollection was that there was an

24   additional borrowing to provide the proceeds to

25   purchase the stock.

1    Q    Okay.  And I'd like to turn your attention to

2   what's been marked as Government's Exhibit 143.

3           THE COURT:  I'm sorry?

4           MS. CHUN BARRY:  143.  May I have just a

5   moment to see if it's admitted?

6           THE COURT:  Sure.

7           MR. IGNALL:  It has.

8           MS. CHUN BARRY:  This has already been

9   admitted into evidence.  And may it be published, Your

10  Honor?

11          THE COURT:  Yes.

12  BY MS. CHUN BARRY:

13   Q    Mr. Gallub, this is another risk assessment

14  summary dated December 15th, 2009.  And if we go down

15  to the loan request, the borrower again is Belmar Creek

16  LLC.  Is this one of your entities?

17   A    Yes, it is.

18   Q    Okay.  And looking at the purpose of the

19  loan, it indicates working capital, and the amount,

20  proposed amount of the loan is $500,000.  Was this loan

21  used for working capital?

22   A    No, it was not.

23   Q    If we go to page 2 of this document and look

24  at the transaction comments, and again, looking -- if

25  you could please read the first section -- sentence

1    after transaction comments.

2         A    Belmar Creek LLC in parenthesis, borrower,

3    requests a 500,000 commercial line of credit for

4    working capital purposes.

5         Q    Again, what was the purpose of this $500,000

6    loan on December 15th, 2009?

7         A    To provide the capital to purchase the Nova

8    Bank stock.

9         Q    Now did you have a conversation at any point

10   in time -- well, let me ask you this, by December of

11   2009, did you have multiple loans with Nova Bank?

12        A    Yes, we did.

13        Q    Now do you recall whether or not in and

14   around this time you had any discussions with Brian

15   Hartline?

16        A    My recollection was that around that time, we

17   began doing portfolio discussions and reviews with

18   Brian.

19        Q    Okay.  And do you recall whether or not Brian

20   Hartline ever made a mention to you about TARP and TARP

21   funding for the bank?

22        A    I don't have a direct recollection of TARP.

23             MR. EGAN:  Objection.

24             THE COURT:  Sustained.

25   BY MS. CHUN BARRY:

1      Q    Do you have any recollection of conversations

2  with Mr. Hartline about the bank's capital?

3      A    There were discussions about the -- the

4  condition of the bank and that there were auditors at

5  the bank.  That's my recollection.

6      Q    And what did Mr. Hartline say to you about

7  the condition of the bank?

8      A    That it needed capital.

9      Q    Okay.  Did -- do you recall whether or not

10 those conversations with Mr. Hartline about the bank

11 needing capital had any influence over your decision to

12 take a loan to purchase Nova Bank stock?

13          MR. EGAN:  Objection.

14          THE COURT:  Overruled.

15          MR. GALLUB:  I don't think the conversation as

16 such did, it was principally geared, the purchase of

17 the stock was principally to maintain a positive

18 relationship with the bank.

19 BY MS. CHUN BARRY:

20     Q    Okay.  And do you recall having conversations

21 with Mr. Hartline about the two loans that were taken

22 to purchase Nova stock sometime in 2010?

23     A    Yes, I do.

24     Q    Okay.  And can you tell us, please, what did

25 Brian Hartline say to you about repaying those two

1    specific loans that were used to purchase Nova stock?

2         A    They needed to be paid off.

3         Q    Okay.  And do you recall whether or not Brian

4    Hartline told you why they needed to be paid off?

5         A    I -- I don't have a good recollection of

6    that, just that they absolutely needed to be paid off

7    and that it was critical.

8         Q    Okay.  Now you had other loans at the bank at

9    that same time?

10        A    We did.

11        Q    And the only two loans that he, Brian

12   Hartline, said were critical to pay off were the two

13   loans used to purchase Nova Bank stock?

14        A    That's correct.

15        Q    At the time that Brian Hartline asked you to

16   pay off your two loans to purchase, that were used to

17   purchase Nova Bank stock, well, what was -- what was

18   your ability to pay off the loans at that time?

19        A    We didn't have the ability, I didn't have the

20   ability to pay them off.

21        Q    Okay.  And what, do -- do you recall whether

22   or not those two loans were paid off in 2010?

23        A    Yes, they were.

24        Q    And how were you -- were you able to manage

25   paying off those two loans?

1        A        They were proceeds generated from a borrowing

2    from an unrelated entity, and I was able to use the

3    capital from that borrowing to pay off the stock loan.

4        Q        Okay.  So was another loan needed to be made

5    in order to pay off your loans?

6        A        Yes, there was.

7        Q        And do you know whether or not who, did Nova

8    Bank provide that loan?

9        A        Yes, they did.

10       Q        And I'd like to show you what's been marked

11    as Government's Exhibit --

12               MS. CHUN BARRY:  Well before we, actually

13    before we get to Government's Exhibit 184, if we could

14    just take a look at Government's Exhibit 300, which,

15    Your Honor, I believe has been moved into evidence.

16               THE COURT:  All right.

17               MS. CHUN BARRY:  And may it be published?

18               THE COURT:  Yes.

19    BY MS. CHUN BARRY:

20       Q        And let's just take a look, this is a

21    promissory note for the $250,000.

22               MS. CHUN BARRY:  If we could highlight the top

23    portion of that, please.  Okay.

24    BY MS. CHUN BARRY:

25       Q        And what is the -- the loan date?  If you can

1    make it out on the screen there.

2        A    The loan date is 09/30/2008.

3        Q    And what is the maturity on the loan?

4        A    It's 05/01/2010.

5            MS. CHUN BARRY:  And now can we take a look,

6    please, at what's been marked as Government's

7    Exhibit 303.

8            And, Your Honor, I believe that this has been

9    moved into evidence, and may it be published?

10           THE COURT:  Yes.

11           MS. CHUN BARRY:  Okay.  And if we could also

12   highlight that top portion of the promissory note from

13   your, from this $500,000 loan.

14   BY MS. CHUN BARRY:

15       Q    What is the loan date?

16       A    The loan date is 12/16/2009.

17       Q    And what is the maturity date on this loan?

18       A    01/01/2012.

19       Q    Okay.  And what did the maturity mean for

20   purpose -- for -- for a loan?

21       A    Maturity was when you were required to pay it

22   off, repay the bank.

23           MS. CHUN BARRY:  And if we could now please

24   take a look at Government's Exhibit 184.  I do not

25   believe that these have moved, been moved into

Page 80

1    evidence, so just for the witness at this point.

2    BY MS. CHUN BARRY:

3        Q    And looking at Government's Exhibit 184, what

4    is this, sir?

5        A    It is a payoff letter.

6        Q    Okay.  And what is the date of this letter?

7        A    October 28th, 2010.

8        Q    And is this the payoff for the $250,000 loan

9    that was taken out in September of 2008?

10       A    It's the payoff letter, yes.

11       Q    Yes.

12            MS. CHUN BARRY:  Your Honor, the Government

13   moves for the admission of Government's Exhibit 184.

14            MR. EGAN:  No objection.

15            MR. ENGLE:  No objection.

16            THE COURT:  Admitted.

17       (Government's Exhibit No. 184 is admitted into

18   evidence)

19            MS. CHUN BARRY:  May it be published, Your

20   Honor?

21            THE COURT:  Yes.

22            MS. CHUN BARRY:  Okay.

23   BY MS. CHUN BARRY:

24       Q    And at the time that this loan was paid off

25   on October 28th, 2010, again, Mr. Gallub, did you have

1    several other outstanding loans with Nova Bank?

2         A    I don't know that it was paid off that date.

3         Q    Okay.

4         A    But as of that date, we did have other loans

5    outstanding.

6         Q    Okay.

7              MS. CHUN BARRY:  Now if we could, please, and

8    just for the witness, show what's been mark as

9    Government's Exhibit 183.

10   BY MS. CHUN BARRY:

11        Q    And what is Government's Exhibit 183?

12        A    It's a payoff letter.

13        Q    Okay.  And is it for the $500,000 loan that

14   was used to purchase Nova stock in December of 2009?

15        A    It is a payoff letter for the $500,000 loan,

16   yes.

17             MS. CHUN BARRY:  Your Honor, the Government

18   moves for the admission of Government's Exhibit 183.

19             MR. EGAN:  No objection.

20             MS. CHUN BARRY:  May it be --

21             THE COURT:  Admitted.

22        (Government's Exhibit No. 183 is admitted into

23   evidence)

24             MS. CHUN BARRY:  May it be published, Your

25   Honor?

Page 82

1          THE COURT:  Yes.

2          MS. CHUN BARRY:  Thank you.

3   BY MS. CHUN BARRY:

4      Q    So the dates for these payoff letters are the

5   same date, October 28, 2010?

6      A    Yes, both letters.

7      Q    And at that time, other than these two loans

8   that were used to purchase Nova Bank stock, did you

9   have other significant loans still outstanding with

10  Nova Bank?

11     A    Yes, we did.

12     Q    When -- when --

13         MS. CHUN BARRY:  We can take that down,

14  please.

15  BY MS. CHUN BARRY:

16     Q    When Brian Hartline told you -- well, did you

17  have a conversation with Brian Hartline about paying

18  off these two particular loans?

19     A    Yes, I did.

20     Q    And what did Brian Hartline say about paying

21  off these two specific loans?

22         MR. EGAN:  Objection, Your Honor, it was asked

23  and answered.

24         THE COURT:  Counsel, has it?

25         MS. CHUN BARRY:  I believe he said that there

1   were -- that he had -- I -- I'd just like to get into

2   more specifics of the conversations.  I think he said

3   that he talked about it.

4           THE COURT:  All right.  Overruled.

5   BY MS. CHUN BARRY:

6       Q    What did Brian Hartline say to you about

7   paying off these two specific loans?

8       A    That these two loans had to be paid off.

9       Q    Okay.  And when Brian Hartline said that

10  these two loans had to be paid off -- paid off, what

11  was your response?

12      A    I don't have the capital to do it.

13      Q    Okay.  And when you advised him that you did

14  not have the capital to do it, what was his response?

15      A    He insisted that they had to be paid off.

16      Q    Okay.  And based on Mr. Hartline's insistence

17  that these two lines had to be paid off, do you recall

18  whether or not you found a way to pay these loans off?

19      A    We did ultimately find a way to pay them off,

20  yes.

21      Q    Okay.  At the time that you were told that

22  these loans had to be paid off, why -- what was in your

23  mind about -- about why they -- about why you should

24  pay them off, even though at that point in time you did

25  not have the capital?

Page 84

1       A     We had quarterly reviews with the bank and

2    there were loans, other loans that had come due that

3    were having to be renewed and rolled over periodically,

4    and I felt that it was important to maintain a positive

5    relationship with the bank in order to not have a

6    problem.

7              MS. CHUN BARRY:  May I have a moment, Your

8    Honor?

9              THE COURT:  Yes.

10             MS. CHUN BARRY:  No further questions, thank

11   you.

12                    CROSS-EXAMINATION

13   BY MR. EGAN:

14       Q     Good afternoon, Mr. Gallub.

15       A     Good afternoon.

16       Q     You had a relationship with Nova Bank for

17   several years in 2008, correct, you'd already had it

18   for a few years?

19       A     I don't have a direct recollection --

20   recollection of when we started the relationship.

21       Q     Well, you met with Mr. DiMarcantonio a few

22   years prior to that, right, on this project, this

23   Norristown project?

24       A     I -- I recall meeting with him.  I don't

25   recall the exact date.

1      Q    You don't remember what year that project

2 took place?

3      A    It was in the '06-'08 era.

4      Q    Okay.  So you had had a relationship with

5 Nova Bank prior to 2008, correct?

6      A    I don't have a direct recollection.

7           MR. EGAN:  Can we have Government's Exhibit 4,

8 please?  Thank you.  And if we could blow up the

9 section, well, let's -- let's just start at the top.

10 Blow up the top section.  Thank you.

11 BY MR. EGAN:

12     Q    This is a risk assessment summary, sir, and

13 you were asked a lot of questions about this by the

14 prosecution, correct?

15     A    Yes.

16     Q    And you never saw this before; did you?

17     A    Not to my recollection, no.

18     Q    This -- this isn't a document that was given

19 to you that you reviewed back when you took out these

20 loans; was it?

21     A    No, I don't believe so.

22     Q    In fact, you didn't really even talk to the

23 bank about these loans, you went through Mr. Schaffer,

24 correct?

25     A    That's correct.

1      Q    And all the information that you have about

2 what was discussed vis-à-vis these loans came from

3 Mr. Schaffer?

4      A    That's correct.

5      Q    Okay.  But it does have your name on there,

6 right, contact name, Charles Gallub?  Do you see that?

7 About five lines down.

8      A    Yes.

9      Q    Okay.  And it also has got a name above that,

10 Thomas Patterson.  Do you see that?

11     A    Yes.

12     Q    Do you remember Mr. Patterson?

13     A    I do.

14     Q    He was the loan officer at the bank, right?

15     A    Yes.

16     Q    You actually did talk to him a couple of

17 times; didn't you?

18     A    I did.

19     Q    And in fact, you spoke to him more frequently

20 than you spoke to Mr. Hartline, correct?

21     A    That's correct.

22     Q    You never spoke to Mr. Hartline until after

23 Mr. Schaffer left, correct?

24     A    I don't recall the exact timing, but it was

25 much later in the relationship.

1      Q    Right.  So this loan was taken out, and the

2  decision to make -- to take this loan was all taken out

3  at a time prior to when you ever spoke to Brian

4  Hartline?

5      A    I -- I don't have a keen recollection, but as

6  I said it was later, much later in the relationship

7  when I first spoke to Mr. Hartline.

8      Q    Correct.

9           MR. EGAN:  And speaking of relationship, can

10  we go down to the next section, please?

11  BY MR. EGAN:

12      Q    And if you see, there's three loans here,

13  right?  Or they're called facilities, right?  You know

14  what a facility is, right?  You're a real estate

15  developer.

16      A    Yes.

17      Q    And that means, it basically means a loan,

18  right?

19      A    Yes.

20      Q    And there's three loans here, correct?

21      A    Correct.

22      Q    And there's Belmar Creek, two of them are

23  Belmar Creek and one of them is Timber Creek, right?

24      A    Correct.

25      Q    And actually we'll get there, but there's two

Page 88

1  more facilities on the next page because you had two

2  more entities that had loans, correct?

3       A    My recollection is we had several different

4  entities.

5       Q    Right.

6       A    Yes.

7       Q    Because you have a lot of projects going on

8  because you're a developer, and you use these loans to

9  facilitate your projects, right?

10      A    We do.

11      Q    Okay.  And you have a lot of different things

12 going on vis-a-vis your various projects correct?

13      A    Yes, we do.

14      Q    Now you would agree me with, sir, that the

15 first loan here, which is the one which the Government

16 asked you about, that says, for investment purposes,

17 right?  That's what it says?

18      A    Yes.

19      Q    Now you don't know who filled this out,

20 right?

21      A    No.

22      Q    You certainly didn't?

23      A    That's correct.

24      Q    Okay.  But it is for 250,000 bucks.  Now you

25 said on direct examination that you didn't have

Page 89

1    $250,000 to buy stock.  Do you remember that?

2         A    Yes.

3         Q    Okay.

4              MR. EGAN:  If we could go to the next page,

5    and there's a little paragraph, towards the bottom,

6    there's a little, yeah, the paragraph right there.

7    Thank you.

8    BY MR. EGAN:

9         Q    Do you see that?

10        A    Yes, I do.

11        Q    That says the borrower maintains $496,866 in

12   combined deposits as of September 29th of '08 at Nova.

13   So on September 29th of '08 you had 500,000 bucks just

14   about in cash at Nova Bank, right?

15        A    Yes.

16        Q    And it goes on to say, the guarantor has

17   strong liquidity.  That means you have got good cash

18   flow, right?

19        A    Well, liquidity, you know, it has different

20   meanings.  I don't --

21        Q    It means liquid?

22        A    Correct.

23        Q    In excess of $6.33 million.  Do you see that?

24        A    I do.

25        Q    Now this was in September of 2008, correct?

Page 90

1       A     Yes.

2       Q     And we all know that October of 2008 wasn't a

3    real good time, right?

4       A     No, it was a really bad time.

5       Q     But September 2008, not quite yet in trouble,

6    right?

7       A     It was getting there.

8       Q     Right, but in September of 2008, when you

9    applied for this loan to invest in Nova stock, you were

10   aware that TARP didn't even exist, correct?

11      A     I have no idea what the timing of TARP was.

12      Q     Well, you do remember the meltdown of

13   October 2008, correct?

14      A     I do.

15            MR. EGAN:  Now if we could go to page 4 of

16   this document and blow up that chart there.

17   BY MR. EGAN:

18      Q     It says there you had $71 million of assets.

19   That's not accurate to you in 2008?

20      A     Yes, that sounds accurate.

21      Q     Okay.  But you didn't have 250 grand?

22      A     I didn't have 250,000 for stock.

23      Q     I see.

24            MR. EGAN:  Now if we can go to Government's

25   300, please, and have the very top section.

 1    BY MR. EGAN:

 2         Q    And that's a promissory note, right, sir?

 3         A    Yes, it is.

 4         Q    And when you signed that promissory note,

 5    that's your agreement to pay back the money that you

 6    borrowed, correct?

 7         A    Yes, it is.

 8         Q    And this is this $250,000 loan we've been

 9    talking about, correct?

10         A    Yes.

11         Q    And the Government showed you those payoff

12    letters, they're from October of 2010, right?

13         A    Correct.

14         Q    And in October of 2010, Mr. Hartline said

15    this loan had to be paid off, correct?

16         A    Correct.

17         Q    Now the maturity date on this loan is May of

18    2010; isn't it?

19         A    Yes, it is.

20         Q    And I believe you said on direct examination

21    that there were a number of different facilities that

22    were coming due, right?

23         A    That's correct.

24         Q    And those other different facilities that

25    were coming due would have to be extended with new

Page 92

1    loans, correct?

2         A    Correct.

3         Q    And what Mr. Hartline told you, did he not,

4    was that this loan had to be paid off because it had

5    matured, correct?

6              MS. CHUN BARRY:  Objection.  Hearsay.

7              THE COURT:  Overruled.

8              MR. GALLUB:  He told us that it had to be paid

9    off.

10   BY MR. EGAN:

11        Q    And it had matured, correct?

12        A    I don't have that keen of recollection of

13   that --

14        Q    Well, you don't --

15        A    -- discussion.

16        Q    -- need a recollection, sir, it's right in

17   front of you.  The maturity date is May 2010; isn't it?

18        A    The maturity date is May of 2010.

19        Q    And the October, and the payoff letter is

20   October of 2010; isn't it?

21        A    That's correct.

22        Q    Now when you borrowed more money from Nova in

23   2010, that was on a new project, correct?

24        A    That was a -- that was a new borrowing,

25   correct.

1     Q    And it had to do with some green, I forget

2     the name, green?

3     A    Sustainable Green.

4     Q    Sustainable Green, which was a very, this was

5     a new project you were involved in, correct?

6     A    It -- it was a new project that a partner of

7     mine was involved in.

8     Q    And you borrowed a fair, a substantial amount

9     of money for that project, correct?

10    A    That's correct.

11    Q    And Nova facilitated your, the development of

12    that project by lending a fairly significant --

13    significant amount of money to it, correct?

14    A    That -- that actually was financing a

15    receivable, not developing a project.

16    Q    Okay.  But --

17    A    As I recall.

18    Q    -- they financed your receivable?

19    A    They did.

20    Q    And it wasn't just $500,000, it was a lot

21    more than that; wasn't it?

22    A    Yes, it was.

23    MR. EGAN:  Now if we could look at Defense

24    Exhibit 116.  And for the jury only, please -- I mean,

25    for the witness only, please.

1    BY MR. EGAN:

2         Q    And, sir, do you see that document?  Do you

3    recognize that?

4         A    I -- I see it.  I don't particularly

5    recognize it, but I do see --

6         Q    Well, it's a signature -- it's a signature

7    page for a subscription agreement.  Do you see that?

8         A    Yes.

9         Q    And it's for $250,000?

10        A    Correct.

11        Q    And that's your name on there, Charles

12   Gallub?

13        A    Yes.

14        Q    That's your address at the time, correct?

15        A    Yes.

16        Q    And down at the bottom you signed it,

17   correct?

18        A    Yes.

19        Q    And it's in September of 2008, correct?

20        A    Correct.

21        Q    And that's when you agreed to buy $250,000

22   worth of Nova stock, correct?  That's what it says,

23   right?

24        A    Correct.

25        Q    Okay.  Now if we go to the next page, do you

1   see that, sir?  That's a check, right?

2        A    Yes.

3        Q    And it's written on your bank account?

4        A    Yes, it is.

5        Q    It says it's for a stock purchase?

6        A    Yes.

7        Q    $250,000?

8        A    Yes.

9        Q    September 30th, 2008, correct?

10       A    Correct.

11       Q    So what really happened here, sir, was you

12  borrowed money from Nova, correct?

13       A    That's correct.

14       Q    Put it in your bank account?

15       A    That's correct.

16       Q    And chose to buy Nova stock with it?

17       A    That's correct.

18       Q    Because you wanted to keep a good

19  relationship with Nova?

20       A    That's correct.

21       Q    There's nothing wrong with that; is there?

22            MS. CHUN BARRY:  Objection.

23            THE COURT:  I'm sorry, the question?

24            MR. EGAN:  I'll withdraw, Your Honor.

25  BY MR. EGAN:

1        Q     And in return for your $250,000 --

2              MR. EGAN:  If we could have D-115.

3   BY MR. EGAN:

4        Q     -- you got a stock certificate, right?

5        A     That's correct.

6        Q     Okay.  Now you did this in 2008 mostly with

7   Mr. Schaffer as your go-between, correct?

8        A     That's correct.

9        Q     And then in 2009, once again the request came

10  to purchase Nova stock, correct?

11       A     That's correct.

12       Q     And you basically did the exact same thing?

13       A     That's correct.

14       Q     And you borrowed money from Nova Bank, right?

15       A     I did, yes.

16       Q     Put the money in your account, right?

17       A     I don't recall the exact mechanism at the

18  time.

19       Q     One of your accounts.  You have a lot of

20  accounts, right?

21       A     I did.

22       Q     And chose to buy Nova stock with that money,

23  correct?

24       A     Yes, that's correct.

25       Q     And that was your decision?

1      A    That's correct.

2      Q    And you paid back the loans to Nova with your

3   money, right?

4      A    I did pay the loans back to money.

5      Q    Right.  And then you borrowed money and --

6   when you borrower money, it becomes yours; doesn't it?

7      A    That's correct.

8      Q    And then you paid back the loans with your

9   money, correct?

10      A    That's correct.

11      Q    And you were asked a lot of questions about

12   conversations you had with Mr. Hartline about paying

13   back these loans.  Do you remember those?

14      A    Yes.

15      Q    You don't really remember when they took

16   place; do you?

17      A    Just that it was later in the relationship.

18      Q    Because when you took out the loans, you

19   never spoke to him at all, right?

20      A    I did not -- do not have a recollection of

21   having spoken to Mr. Hartline when I took the loans

22   out.

23      Q    And as far as those documents that you were

24   shown that say things about the type of loan and the

25   purpose, you have no clue who filled them out?

1        A     I -- I did not fill them out.

2        Q     But at the time if you spoke to anybody at

3   Nova Bank, it would have been Mr. Patterson, correct?

4        A     That's correct.

5              MR. EGAN:  Nothing further, Your Honor.

6              MR. DUNCAN:  May I have a moment, Your Honor?

7              THE COURT:  Sure.

8              MR. DUNCAN:  Thank you, Your Honor.

9                      CROSS-EXAMINATION

10   BY MR. DUNCAN:

11       Q     Good afternoon, Mr. Gallub.

12       A     Good afternoon.

13       Q     Sir, you did not discuss any aspect of your

14   2008 loan from Nova Bank and your subsequent investment

15   in the Nova Financial Holdings company with my client,

16   Barry Bekkedam; did you?

17       A     I have no recollection of having spoken to

18   Barry about that.

19       Q     As far as you know, you did not, correct?

20       A     That's correct.

21       Q     And the same question for 2009, you did not

22   discuss any aspect of your 2009 loan from Nova Bank in

23   your subsequent investment in the Nova Financial

24   Holdings company with my client, Mr. Bekkedam; did you?

25       A     No, I did not.

Page 99

1          MR. DUNCAN:  Thank you, very much, Your Honor.

2     No further questions.

3          Thank you, Mr. Gallub.

4          MS. CHUN BARRY:  If we could please publish

5     Government Exhibit 4.

6                          REDIRECT

7     BY MS. CHUN BARRY:

8     Q     And down in the loan request section,

9     Mr. Egan asked you about these, what these other

10    facilities were, facility two, facility three.  Do you

11    know whether or not these were already preexisting

12    loans that you or your entities had with Nova Bank

13    prior to receiving this $250,000 loan to purchase

14    stock?

15    A     My recollection is that they were existing.

16    Q     Okay.

17         MS. CHUN BARRY:  Now if we could please take a

18    look at Government's Exhibit 303, which is the

19    promissory note for the loan taken out on

20    December 16th, 2009, in the amount of $500,000.  If we

21    could blow up that top section.

22    BY MS. CHUN BARRY:

23    Q     What is the maturity date on this loan,

24    Mr. Gallub?

25    A     01/01/2012.

Page 100

1      Q     Okay.  And when did Mr. Hartline insist that

2   you pay this loan off?

3      A     In 2010, I -- I believe.

4            MS. CHUN BARRY:  May I have a moment, Your

5   Honor?  Nothing further, thank you.

6            MR. EGAN:  No recross, Your Honor.

7            MR. DUNCAN:  No thank you, Your Honor.

8            THE COURT:  Thank you, sir.  You may step

9   down.  Watch your step, please.

10        (The witness is excused from the stand)

11           MR. IGNALL:  May I have one moment with

12   counsel, Your Honor?

13           THE COURT:  Yes, you may.

14           MR. IGNALL:  May we approach at sidebar

15   briefly, Your Honor?

16           THE COURT:  Yes, sir.

17                      SIDEBAR

18        (Sidebar begins - 02:45:55 p.m.)

19        (Counsel approach the bench where the following

20   ensues:)

21           MR. IGNALL:  The next witness is Todd Howard.

22   He -- we had some back and forth about his construction

23   loan.  I understand from counsel they're not going to

24   go into that.  And (inaudible) not going to go into

25   that.

Page 101

1              THE COURT:  All right.  What do you think, how

2    long?

3              MR. IGNALL:  He's going to be direct, 20 or

4    30 minutes I would say.

5              THE COURT:  And same on cross?

6              MR. ENGLE:  (Inaudible).

7              THE COURT:  Okay.

8              MR. IGNALL:  Yes, Your Honor.

9         (Sidebar concluded – 02:46:37 p.m.)

10        (Counsel return to the trial tables where the

11   following ensues:)

12             THE COURT:  We'll take our 15-minute break

13   now.

14        (Off the record – 02:46:43 p.m.)

15        (On the record – 0:3:04:09 p.m.)

16             THE COURT:  You may be seated.  Thank you.

17             You may proceed.

18             MR. IGNALL:  The United States calls Todd

19   Howard.

20             THE DEPUTY:  Please raise your right hand.  Do

21   you swear and/or affirm that the testimony you shall

22   give in this matter before the Court will be the truth,

23   the whole truth, and nothing but the truth so help you

24   God or you do so affirm?

25             MR. HOWARD:  I do.

```
 1                      TODD HOWARD

 2              (A witness produced by the Government, having

 3    been duly sworn according to law, takes the witness

 4    stand and testifies as follows:)

 5              THE DEPUTY:  Thank you, sir.  And you can have

 6    a seat.  And state and spell your name for the record.

 7              MR. HOWARD:  My name is Todd Howard.

 8              THE DEPUTY:  And spell your name for the

 9    record.

10              MR. HOWARD:  T-o-d-d H-o-w-a-r-d.

11              MR. IGNALL:  May I inquire --

12              THE COURT:  You may --

13              MR. IGNALL:  -- Your Honor?

14              THE COURT:  -- proceed.

15                    DIRECT EXAMINATION

16    BY MR. IGNALL:

17        Q    Mr. Howard, where do you currently work?

18        A    I work for Logan Circle Partners here in

19    Philadelphia.

20        Q    And what do you for Logan Circle Partners?

21        A    I am a portfolio manager in their global bond

22    team.

23        Q    And how long have you worked for global --

24    for Logan Circle Partners?

25        A    I started in 2010.
```

Page 103

1        Q     And where did you work before that?

2        A     I worked at Ballamor Capital.

3        Q     And when did you --

4              THE COURT:  Please speak into the microphone.

5    BY MR. IGNALL:

6        Q     -- work at --

7        A     Yes.

8        Q     -- Ballamor Capital?

9        A     From 2009 to 2010.

10       Q     And who hired you to work at Ballamor

11   Capital?

12       A     Barry Bekkedam.

13       Q     And what were you hired to do at Ballamor

14   Capital?  What did Mr. Bekkedam hire you to do?

15       A     To help him on the investment decisions for

16   the firm, mostly focused on the traditional assets,

17   fixed income, equities, mutual funds.

18       Q     And what do you mean by traditional?

19       A     The firm kind of had a balance between

20   private investments and more traditional investments

21   like stocks and bonds, and that was, my background was

22   in more traditional assets, so I was going to help the

23   firm there.

24       Q     So what, when you were hired at Ballamor,

25   what was your job, what did you do there?

1       A    I started looking at different investments,

2   going over different client portfolios, taking some

3   client meetings, helping clients understand some,

4   certainly investments they had, answering client

5   questions when they came in if -- if there was

6   something that I could answer for them.

7       Q    And who was your supervisor when you were at

8   Ballamor?

9       A    Barry Bekkedam.

10      Q    All right.  And do you know if Mr. Bekkedam

11  had discretion over how to invest in client accounts?

12      A    I think -- I think it's different from one

13  client to the next, but I think a lot of clients had

14  given him some discretion to do that, but most

15  investments needed client approval.

16      Q    All right.  And with respect to I guess we're

17  talking the traditional investments, are those

18  investments that are publicly traded, or is there

19  something different about them?

20      A    In traditional investments, most of them are

21  publicly traded or in mutual fund format, which would

22  be just close end of the day, that type of stuff.

23      Q    But were you at all involved with clients who

24  had private --

25      A    I was involved --

1      Q     -- investments?

2      A     -- with the clients that had private

3    investments, but I personally was not involved in doing

4    analysis on private investments other than getting up

5    to speed on the status of the investments at times and

6    explaining them to clients.

7      Q     And these private investments, what type of

8    investments were they?

9      A     They varied from private equity transactions,

10   where someone who would have an equity investment in

11   something to a -- to a debt transaction to a mortgage,

12   but generally speaking it would be a lot of direct or

13   limited partnership investments where the liquidity in

14   the investment and as far as evaluations are hard to

15   determine.

16     Q     What do you mean liquidity is hard to

17   determine?

18     A     Well, they're not over-the-counter traded, so

19   generally speaking you made a longer term commitment to

20   keep your capital locked up in those investments.

21     Q     Have you ever heard of a bank called Nova

22   Bank?

23     A     Yes.

24     Q     When did you first hear of Nova Bank?

25     A     When I started working at Ballamor

Page 106

1    investments, I realized that a lot of the clients had

2    investments in Nova Bank.

3         Q    Was -- was the investment directly in Nova

4    Bank or was it in some other entity?

5         A    I think it was in two different entities, it

6    was equity investments in the bank as well as a trust

7    preferred, which is similar to a debt investment in the

8    bank.

9         Q    But do you know if it was in the bank or was

10   there any other entity associated with the bank?

11             MR. EGAN:  Objection.

12   BY MR. IGNALL:

13        Q    If you know.

14             MR. EGAN:  Asked and answered.

15             THE COURT:  Overruled.

16             MR. HOWARD:  The other was called a USAB trust

17   preferred.

18   BY MR. IGNALL:

19        Q    No, I'm sorry --

20        A    Is that --

21        Q    -- I might have been unclear.

22        A    Yeah.

23        Q    Do you know if clients were investigating in

24   Nova Bank, itself, or was it a holding company or some

25   other kind of entity that they were investing in or do

1    you not know?

2         A    I'm not, I'm actually not sure.

3         Q    Do you know if any Ballamor clients had any

4    banking relationships with Nova Bank while you were

5    there?

6         A    I believe there was a few clients that would

7    use some of the financial services of Nova for a home

8    equity loan, for example.

9         Q    All right.  When you were working there,

10   roughly what -- do you remember what month it was in

11   2009 when you started?

12        A    It was very early in the year, I want to say

13   it was March or April.

14        Q    All right.  So while you were at Ballamor

15   Capital in 2009, did you ever learn whether

16   Mr. Bekkedam was involved in any way in raising capital

17   for Nova Bank?

18        A    Yes.

19        Q    How did you first learn about that?

20        A    You know, it was a very difficult time in the

21   markets.  It was right after the financial crisis where

22   a lot of banks were in trouble.  A lot of investments

23   were in trouble, and, you know, Barry and I would share

24   conversations about client portfolios and Barry would

25   kind of share things that he was working on to try to

1    protect the investments or to try to preserve the value

2    of the investments.

3              And in the case of Nova, he had mentioned

4    that he was, you know, he had a lot of relationships

5    and he was going to use those relationships to try to

6    find investments for the bank.

7        Q    Did he ever talk about any source of funding

8    for the bank other than private investors?

9        A    No.

10       Q    Did he ever talk about any Government

11   investment in the bank?

12       A    Well, he mentioned that -- and it was widely

13   understood at that time that TARP had these financial

14   assistance programs for banks and that you needed to

15   demonstrate to the bank that if you could get your

16   equity capital to a certain level, then the Government

17   would come in and provide you the additional amount of

18   capital the bank needed to be well capitalized.

19             And --

20       Q    And did you --

21       A    -- so he --

22       Q    -- have a discussion with Mr. Bekkedam about

23   that program?

24       A    Yes.

25       Q    And did he talk about Nova applying for that

 1   program?

 2        A    Yes.

 3        Q    Did you ever hear about something called the

 4   Banyon Income Fund?

 5        A    Yes.

 6        Q    And do you know if the Ballamor clients were

 7   invested in that?

 8        A    Yeah, quite -- quite a few.

 9        Q    All right.  Did you ever talk to Mr. Bekkedam

10   about the Banyon Income Fund?

11        A    Yes.

12        Q    All right.  And do you know someone named

13   George Levin?

14        A    Yes.

15        Q    All right.  Did you ever talk to Mr. Bekkedam

16   about what -- what -- whether Mr. Levin had guaranteed

17   any of the Ballamor investments in this Banyon Income

18   Fund?

19        A    Yes.

20        Q    And what did Mr. Bekkedam say?

21        A    Well, it was part of the prospectus for the

22   fund, and it was explained to a lot of clients as they

23   came into the fund that, in addition to having your

24   money guaranteed by deposits at a bank, that it also,

25   the investment was personally guaranteed by George

1   Levin, who was worth at the -- at the time on paper,

2   you know, several hundred million dollars.

3        Q    All right.  And come around Halloween 2009,

4   did you learn about whether there was a downturn in the

5   value of this Banyon Income Fund?

6        A    Yes.

7        Q    And did you learn that it was worth basically

8   nothing at that point?

9        A    Well, the fear was that it was worth --

10       Q    All right.

11       A    -- potentially nothing at that point.

12       Q    Okay.

13       A    There was a lot of discovery that needed to

14   take place.

15       Q    All right.  Do you know if Mr. Bekkedam

16   continued to raise funds for Nova after Halloween of

17   2009?

18       A    I don't know the timing of the fundraising,

19   but I knew that they, we still had that, the threshold

20   to try to achieve.  I think we were still working hard.

21       Q    Threshold to achieve what?

22       A    To -- to get to that point where we could

23   qualify for TARP funding.

24       Q    Okay.  Did you ever meet with anyone at the

25   bank about raising money for the bank?

1        A     Not at the bank, but I met with Brian

2    Hartline.

3        Q     The people from the bank?

4        A     Yes.

5        Q     How about that, it's a better way to phrase

6    it.

7        A     Yeah, I met with Brian Hartline and -- and

8    Edward DiMarcantonio.

9        Q     And what did you talk about when you met with

10   Mr. Hartline and Mr. DiMarcantonio?

11       A     The conversation centered around, because of

12   the status of -- of the Banyon Income Fund and -- and

13   the ability to raise equity capital at that point, that

14   we needed to reach out to existing clients.  Because

15   you know, when you have an investor and an investment

16   and you're going to raise equity for it, if you don't

17   inform them of that, then I would say that's not being

18   very communicative to the client, but it's also, it's

19   going to potentially dilute their investment, so you

20   want to give them the opportunity to let them know that

21   we're going to do this.

22            So the purpose of the meeting was to get a

23   better understanding of the financial status of the

24   bank so that we could communicate the -- the reason the

25   client should consider investing in the bank.

Page 112

1       Q    And at this meeting, did you, with

2  Mr. Hartline, was there any discussion of getting the

3  TARP funding for the bank?

4       A    Yeah, but I -- I -- I don't remember in

5  specific terms.  I think it was very understood by some

6  of the key people at that point that that's one of the

7  reasons we were doing the equity raise.

8       Q    All right.  Did you ever communicate with any

9  Ballamor clients about investing in Nova Bank?

10       A    Yes.

11       Q    And did you have any part in preparing

12  correspondence with Ballamor clients?

13       A    Yes.

14       Q    All right.  I'd like you to look at what

15  we've marked as Exhibit 134.

16            MR. IGNALL:  Just for the witness at this

17  point.

18  BY MR. IGNALL:

19       Q    And do you recognize Exhibit 134?  There are

20  a number of pages.

21            MR. IGNALL:  May I approach, Your Honor?  I

22  think --

23            THE COURT:  Yes, sir.

24            MR. IGNALL:  -- it might make more sense if I

25  show the witness.

1          THE COURT:  Yes, sir.

2          MR. HOWARD:  Yeah, I -- I recall this --

3    BY MR. IGNALL:

4     Q    All right.

5     A    -- correspondence.

6     Q    And -- and what is this?

7     A    Well, the initial status is we were putting

8    together --

9     Q    Well, no, no, I'm sorry.  Is it -- is it --

10    A    It's an email.

11    Q    It's an email?

12    A    Yeah.

13    Q    From whom to whom?

14    A    Well, the first cover is an email from Brian

15   Hartline to myself.

16    Q    All right.  And are there other emails that

17   are part of this string?

18    A    It looks like one email with a couple of

19   follow-on emails with an attachment.

20    Q    Okay.  And is this Todd Howard,

21   THoward@BallamorCapital.com, was that your email

22   address on December 6th, 2009?

23    A    Yes.

24          MR. IGNALL:  The Government moves into

25   evidence Exhibit 134.

1          MR. EGAN:  No objection.

2          MR. ENGLE:  No objection.

3          THE COURT:  Admitted.

4      (Government's Exhibit No. 134 is admitted into

5   evidence)

6          MR. IGNALL:  May it -- may it be published to

7   the jury, Your Honor?

8          THE COURT:  Yes, sir.

9   BY MR. IGNALL:

10     Q    All right.  So when you look at the top email

11   where it says attachment, my versions to Barry's letter

12   this morning, do you know what letter this is,

13   Mr. Hartline is referring to?

14     A    Well, I mean, I wouldn't have remembered

15   without seeing the back of it, but it's the letter that

16   we were putting together with information to send out

17   to investors.

18     Q    And did you discuss this letter with

19   Mr. Bekkedam?

20     A    I most likely did not discuss it with Mr.

21   Bekkedam, but because he was probably in Florida, but I

22   know that there was a lot of email back and forth

23   and -- and he would communicate with -- with our lawyer

24   in-house and we would talk about it periodically.

25     Q    If we look at the middle email from you to

1    Mr. Bekkedam, what's the time of that email?

2         A    It's -- what's the time, it's 10:30 in the

3    morning.

4         Q    All right.  And if we go down to the previous

5    email --

6              MR. IGNALL:  We just need the bottom where it

7    says December 6th.

8    BY MR. IGNALL:

9         Q    -- do you see the time?

10        A    Yeah, that's --

11        Q    No.

12             MR. IGNALL:  If we can scroll down, I'm sorry,

13   Agent Boyer.

14             MR. HOWARD:  Oh, I'm sorry.  Okay.

15             MR. IGNALL:  There we go.

16             MR. HOWARD:  Oh, I see, yeah.

17   BY MR. IGNALL:

18        Q    Did Mr. Bekkedam send you an email to you

19   prior to this 10:33 email we looked at a minute ago?

20        A    Yes.

21        Q    And what time did he send that?

22        A    9:11.

23        Q    And what does he say there?

24        A    He says, guys, here are my changes.  Please

25   make a corrected version and redistribute one more

Page 116

1    time.

2         Q    And what does it say below that?

3         A    Brian, can you please review and add

4    technical -- add technical comments and numbers.

5         Q    All right.

6              MR. IGNALL:  If we can go to the third page.

7    BY MR. IGNALL:

8         Q    Do you recognize this as a draft of a letter

9    that Ballamor was sending out to clients?

10        A    Yes.

11        Q    All right.  Do you --

12             MR. IGNALL:  And if we could blow up the

13   bottom, the -- I'm sorry, let's blow up the first

14   paragraph.

15   BY MR. IGNALL:

16        Q    Can you read the sentence that starts, Nova

17   Financial Holdings, Inc., and its banking subsidiary in

18   the middle of the paragraph?

19        A    Say that again, what --

20        Q    Can you read the sentence that starts, Nova

21   Financial Holdings, Inc., and its banking subsidiary?

22             MR. IGNALL:  I may have to blow it up again.

23   Let's see.  There we go.  (Inaudible).

24             MR. HOWARD:  Yeah, okay.  Nova Financial

25   Holdings, and its banking subsidiary, Nova Bank, has a

1    unique opportunity as a longer term beneficiary of the

2    environment giving the granting of a significant

3    infusion of capital via the capital purchase program, a

4    program within the troubled asset purchase program

5    instituted by the Treasury Department.

6    BY MR. IGNALL:

7         Q    All right.  Was there any discussion in this

8    letter about raising money from investors in order to

9    qualify for this TARP funding?

10        A    Yes.

11        Q    All right.  And was there any discussion

12   about bank capital regulations in this letter?

13        A    Yes.

14        Q    All right.

15             MR. IGNALL:  Will you turn to the next page

16   where it says, next steps?

17   BY MR. IGNALL:

18        Q    What's the first item under next steps?

19        A    Nova Bank needs to raise a minimum of

20   4.7 million of new equity capital prior to December 12,

21   2009, in order to receive the capital from the Treasury

22   before its program expires.

23        Q    All right.  Did you speak to any clients

24   about investing in Nova Bank?

25        A    Yes.

1      Q    I'm going to turn your attention to

2    Exhibit 135.

3          MR. IGNALL:  And this is just for the witness,

4    please.

5       I'm sorry, is this in evidence already?

6    BY MR. IGNALL:

7      Q    Do you --

8          MR. IGNALL:  May it be published?  It's

9    already in evidence, Your Honor.

10          THE COURT:  Yes.

11    BY MR. IGNALL:

12      Q    Do you recall getting any emails from

13    Mr. DiMarcantonio around December of 2009?

14      A    I -- I do.

15      Q    All right.  And was this around the time that

16    you had a meeting with Mr. DiMarcantonio and

17    Mr. Hartline?

18      A    Yes.

19      Q    All right.  And what's the date of this

20    email?

21      A    This email is dated December 10th, 2009.

22      Q    Did you, any time in December, have a

23    discussion with Mr. Hartline about whether he had lined

24    up sufficient investors to qualify for the TARP

25    funding?

1      A     Well, we were, he wasn't really lining up the

2    investors, we were, but the conversation that took

3    place, I periodically would have a conversation with

4    Mr. Hartline and I would give him an update as to the

5    status, because he knew that, you know, between Barry

6    and myself or some other client service officer at the

7    firm, we were reaching out to clients that currently

8    owned Nova shares or the trust preferreds that, see if

9    they wanted to invest in the bank.

10          And then I was giving Brian an update as to

11   who was signing up and where we were on the -- on the

12   attempt to raise the capital.

13     Q     All right.  And I mentioned George Levin a

14   few minutes ago.  At any point did you learn that,

15   whether Mr. Levin had a loan from Nova Bank?

16     A     Yes.

17     Q     Around what time did you learn that?  As best

18   you remember.

19     A     I don't remember the date.  It was an evening

20   I was in my office, probably around 5:00, 5:30 or so

21   and I was on the phone with Mr. Hartline and he made --

22   he made a comment about hoping that George Levin's loan

23   was going to be okay.  Because he was concerned given

24   that he was so exposed to that Banyon Income Fund and

25   now his loan may be -- be in trouble as well.

Page 120

1      Q      And did you have any reaction when you heard

2   that?

3      A      Yes.

4      Q      And what was your reaction?

5      A      I was -- I was very concerned at that point.

6   A, because it made me have less confidence in the --

7   the bank's financial standing that I had been

8   communicating to clients.  And I also knew that he was

9   an equity investor in the bank.

10      Q      And what was your concern about that?

11      A      It did not seem right to me that somebody

12   that had a loan for X amount of dollars invested the

13   same amount of money in the bank.

14      Q      And did you raise that concern with

15   Mr. Hartline when you first learned about Mr. Levin's

16   loan?

17      A      That's my recollection, yes.

18      Q      And what did --

19      A      I asked --

20      Q      What did Mr. Hartline say?

21      A      His response was that the loan was

22   underwritten properly, that Mr. Levin was worth, you

23   know, 300, $200 or $300 million, I don't remember the

24   exact number, and -- and that money is fungible.  You

25   know, meaning that, you know, a loan to him is the same

1    as, of course once he has $5 million, it's $5 million

2    from him, but in a stack of several hundred million, it

3    doesn't matter where it comes from.

4         Q    And did that make you feel more comfortable?

5         A    No.

6         Q    Did you raise your concerns with

7    Mr. Bekkedam?

8         A    Yes.

9         Q    And what did you tell Mr. Bekkedam?

10        A    I said I wasn't sure if it was legal or not.

11        Q    And did you have any more conversations with

12   Mr. Bekkedam about that?

13        A    Yes.  I -- I -- I wrote him an email saying,

14   hey, I'm concerned.  And he immediately called me and

15   said, what are you concerned about.  And we had a

16   conversation and I said that this loan to George Levin

17   and then the subsequent equity investment in the bank,

18   I'm not sure if that's legal.

19        Q    And Barry kind of had the same perspective

20   of, hey, he's worth X amount of money and -- and -- and

21   the -- the loan was underwritten properly and all the

22   paperwork was done in accordance with underwriting

23   standards.  And he's like, but, Todd, I want you to

24   feel comfortable here.  I will make sure next week we

25   get, you know, Brian and whoever from the bank to come

1   down and make sure that you feel comfortable with this?

2   Did that happen?

3       A    No.

4       Q    At some point did you contact Mr. Hartline

5   directly about your continuing concerns?

6       A    I think it came up a couple other times, but

7   ultimately quite a bit of time went by and I didn't

8   have any resolution and I was very concerned that I

9   still didn't have confirmation whether this was legal

10  or not and so I wrote Mr. Hartline an email saying, if

11  I don't get verification that this is legal, then I

12  have no choice but to report you to the authorities.

13      Q    If I could turn your attention to

14  Exhibit 206, please.

15           MR. IGNALL:  Just for the witness.

16  BY MR. IGNALL:

17      Q    Do you recognize Exhibit 206?

18      A    Yeah.

19      Q    What is Exhibit 206?

20      A    It's an email from me to Brian Hartline, and

21  it, the subject is Levin, the George Levin loan.

22      Q    Is this an email we talked about a moment

23  ago?

24      A    Yes.

25           MR. IGNALL:  All right.  Government moves into

Page 123

1   evidence Exhibit 206.

2            MR. EGAN:  No objection.

3            THE COURT:  Admitted.

4       (Government's Exhibit No. 206 is admitted into

5   evidence)

6            MR. IGNALL:  All right.  May we publish to the

7   jury, Your Honor?

8            THE COURT:  Yes, sir.

9   BY MR. IGNALL:

10      Q    All right.  And if we can read that.  What --

11  what do you say in this email?

12      A    Brain, I have never heard back from you

13  regarding the legal nature of this transaction.  I need

14  an answer.  I'm very concerned about this.  I need to

15  move forward knowing this is right.  As I said before,

16  I will report this to financial authorities unless I

17  get a response from you or Nova's counsel in short

18  order that that confirms the transaction's legal

19  nature.

20            Please call with questions.  You have my

21  number.  Regards, Todd Howard.

22      Q    All right.  Were your concerns in any way

23  related to the bank's TARP application?

24      A    Yes.

25      Q    Were you involved in the TARP application

 1    process?

 2          A    No.

 3          Q    All right.  After you sent that email to

 4    Mr. Hartline, did you receive any information back from

 5    him?

 6          A    Not right away, but I think within, I

 7    think -- I kind of, I knew that behind the scenes they

 8    were working to get me something, and I think within a

 9    week or two, probably two weeks I received a memoranda

10    or a letter from a consultant or some --

11          Q    Does --

12          A    -- third-party lawyer that --

13          Q    Does --

14          A    -- for --

15          Q    -- the law firm Stevens & Lee sound familiar?

16          A    That does sound familiar, yes.

17          Q    Did -- is that where you think you got the

18    letter from?

19          A    Yes.

20          Q    All right.

21               MR. IGNALL:  May I have one moment, Your

22    Honor?

23               THE COURT:  Yes.

24               MR. IGNALL:  I have nothing further.  Thank

25    you.

Page 125

1          MR. EGAN:  May I proceed, Your Honor?

2          THE COURT:  You may proceed.

3               CROSS-EXAMINATION

4  BY MR. EGAN:

5      Q    Good afternoon, Mr. Howard.

6      A    Good afternoon.

7      Q    You work for Ballamor?

8      A    Did, yes.

9      Q    For about, well, you started in '09, right?

10  You have to --

11     A    Yes.

12     Q    -- say yes or no.  And you worked there

13  through the fall, correct?

14     A    Correct.

15     Q    And in December, sir, and around November,

16  you were asked to put your energy into helping raise

17  money for Nova Bank, correct?

18     A    Correct.

19     Q    And the reason that you were asked to do that

20  was because Mr. Levin was, it came to look like he

21  might not make the investment he had committed to,

22  correct?

23     A    Correct.

24     Q    And you knew that Mr. Levin had made a

25  commitment to invest $18 million in Nova Bank, correct?

Page 126

1     A    I didn't know the exact dollar amount, but I
2  knew that he was, in equity, was going to fill the
3  equity hole.
4     Q    Right.  You knew the reason that they needed
5  to now seek new financing or new investors was because
6  Mr. Levin was no longer going to do that?
7     A    Correct.
8     Q    You were asked a question about Mr. Levin
9  being, his investments being worthless around
10  Halloween, and your answer was, well, we didn't know
11  because there was still discovery to do, correct?
12     A    Correct.
13     Q    So it's not like all of a sudden on
14  November 1st, we wake up and everybody says, oh,
15  Mr. Levin's broke, it's more, nobody is quite sure how
16  much money he has anymore because his one major
17  investment is no longer valuable?
18     A    Correct.
19     Q    Is that -- so and obviously it's a
20  complicated thing.  It would take a while to unwind
21  that, right?
22     A    Correct.
23     Q    So it would be correct to say that for at
24  least the first half of November, you were still,
25  people were still under the impression that he might

Page 127

1    make his investment, correct, or don't you know?

2        A    I don't know.

3        Q    Okay.  But at some point later in November,

4    you're asked to assist in this project to try and find

5    more investors for Nova, right?

6        A    Correct.

7        Q    And in doing that, you met with

8    Mr. DiMarcantonio and you met with Mr. Hartline,

9    correct?

10       A    Correct.

11       Q    And the purpose of that meeting was so that

12   they could provide you with valuable information so you

13   could pass that onto your investors so that they could

14   make an intelligent decision, right?

15       A    Correct.

16       Q    And the whole purpose of this letter that you

17   were shown, this email with the various changes, was to

18   make sure that that letter was accurate, correct?

19       A    Correct.

20       Q    And you were reviewing it and you were

21   sending it out to people that you wanted to make sure

22   you were not making a misrepresentation to; am I

23   correct?

24       A    That's correct.

25       Q    And you got advice from Mr. DiMarcantonio on

Page 128

1    what to put in there, right?  You certainly discussed

2    what to put in there with him, right?

3         A    I don't think Mr. DiMarcantonio was involved

4    in the letter.

5         Q    Okay.  Well, the meeting with him, wasn't

6    that to set that up, or did I misunderstand that?

7         A    No, he was there, but he was, he was almost,

8    he was much more of a nonparticipant, I mean --

9         Q    Okay.

10        A    -- from my recollection.

11        Q    So he didn't know the nuts and bolts as well?

12        A    Right.

13        Q    And between you and Mr. Hartline, you came up

14   with the, some things that were about the bank to add

15   to the letter that Ballamor was sending to its clients?

16        A    Right.

17        Q    And it also contained some Ballamor -- some

18   Ballamor -- some things Ballamor had to say about the

19   nature of the investment as well, correct?

20        A    That's my understanding.

21        Q    And in December you were trying to get

22   various people to still invest in the bank, correct?

23        A    Yes.

24        Q    And the reason you wanted to get them to

25   invest in the bank was there was a goal to get another

1    four-point-some million dollars raised by

2    December 12th, correct?

3         A    That is correct.

4         Q    And you were reporting back and forth to that

5    to Mr. Hartline, right?

6         A    Yes.

7         Q    And in the course of one of those

8    conversations, he volunteered to you that Mr. Levin had

9    a loan with Nova Bank, correct?

10        A    Yes.

11        Q    You didn't ask him; did you?

12        A    Nope.

13        Q    He volunteered that to you?

14        A    Yes.

15        Q    And you were immediately concerned, correct?

16        A    Yes.

17        Q    And you said to him, hey, I'm concerned,

18   right?

19        A    I don't know exactly what I said to him, but

20   I -- I definitely questioned it.

21        Q    And your response on direct examination was

22   that he told you that it was not a concern because

23   Mr. Levin had plenty of resources to pay the loan,

24   correct?

25        A    That's my recollection.

1      Q    And that money is fungible?

2      A    Correct.

3      Q    And you had no reason to believe it a he

4  didn't actually believe that, correct?

5      A    Correct.

6      Q    In fact, you -- you believed that he believed

7  that; didn't you?

8      A    I did.

9           MR. IGNALL:  Objection.

10          THE COURT:  Sustained.

11  BY MR. EGAN:

12     Q    So you -- but you have a right to be made

13  comfortable with the situation, right?  I mean, you --

14  you -- you asked to have some comfort, and you felt you

15  deserved that, correct?

16     A    Yes.

17     Q    And you had conversations with Mr. Hartline

18  shortly after that phone call about it?

19     A    Not shortly after, probably the following

20  week.

21     Q    Okay.  So now we're like maybe mid-December,

22  correct?

23     A    Yes.

24     Q    And you're aware, of course, that the TARP

25  was never provided to Nova, right?

1      A    Yes.

2      Q    So needless to say there was issues at the

3  bank within, there were very significant issues to deal

4  with at the bank, correct?

5      A    What do you mean by significant issues?

6      Q    Well, it's like, Mr. Hartline, this wasn't

7  the only thing he had to do, right?

8      A    Correct.

9      Q    He had a big bank that he had to run,

10  community bank; am I right?

11      A    Yes.

12      Q    And the TARP had just been denied, right?

13      A    Yes.

14      Q    And didn't we have to now go to investors and

15  some of those investors were entitled to get their

16  funds back, remember that?

17      A    Yes.

18      Q    And we had to have that whole conversation.

19  So it's not like he had nothing else to do, right?

20      A    Yes, he was busy.

21      Q    And Christmas and New Year's is in there,

22  too, right?

23      A    Yes.

24      Q    So around January 10th, you're like, hey, I

25  haven't gotten an answer to my question; have I, right?

1      A      True.

2      Q      So you asked -- you sent your email to

3  Mr. Hartline, and I believe what you said was --

4           MR. EGAN:  If we can have that back.  What

5  number was that?

6           MR. IGNALL:  206.

7           MR. EGAN:  206, please Government's

8  Exhibit 206.  I just want to quote it properly.  Thank

9  you.  And if we can blow that up, because I can't see

10 it.

11 BY MR. EGAN:

12     Q      This is all right, January 28th, towards the

13 end of the month.  I've never back from you regarding

14 the legal nature of this transaction.  I need an

15 answer, right?

16     A      Yes.

17     Q      Unless I get a response from you or Nova's

18 counsel in short order that confirms the transaction's

19 legal nature, I will report this to the financial

20 authorities, correct?

21     A      Correct.

22     Q      And sometime not very long after that, you

23 received a letter from Stevens & Lee, correct?

24     A      Yes.

25     Q      And were you aware that Stevens & Lee was

1    Nova's outside counsel?

2         A    No.

3         Q    Okay.  So you hadn't dealt with them before?

4         A    Correct.

5         Q    All right.  And you received that letter and

6    you were satisfied by that letter, correct?

7         A    I was.

8         Q    Because that letter told you that the

9    transaction was legal, correct?

10        A    It did.

11        Q    Now I just want to ask you about something --

12             MR. EGAN:  You can take that down.

13   BY MR. EGAN:

14        Q    I just want to ask you about something at the

15   beginning of your testimony.  You were asked about

16   whether there was something called Nova Financial

17   Holdings, and you didn't seem to remember that.  Do you

18   remember that?

19        A    I do, but I don't know the terminology of the

20   investment, no.

21        Q    Okay.  But you were aware though that there

22   was a holding company, Nova Financial Holdings, that

23   the people were actually investing in, right?

24        A    Yes.

25        Q    Not actually the bank directly?

1       A     Now that you say that, yes.

2       Q     Okay.

3             MR. EGAN:  That's all I have, Your Honor.

4             MR. SCHWARTZ:  May I, Your Honor?

5             THE COURT:  Yes, sir.

6                   CROSS-EXAMINATION

7  BY MR. SCHWARTZ:

8       Q     Good afternoon, sir.  I'm Joel Schwartz.  I

9  represent Mr. Bekkedam.  So, sir, you started at

10 Ballamor in April 2009 and you left in March 2010; is

11 that right?

12      A     Correct.

13      Q     And when you came to Ballamor, you came there

14 because you got a high position, you became a senior

15 vice president for investments; is that correct?

16      A     That's correct.

17      Q     And that was a better job or a higher job

18 than you had in your prior employer; is that right?

19      A     Yeah.

20      Q     Okay.  And at that time when you worked for,

21 when you went to work for Ballamor, they had what,

22 about 120, 150 clients?

23      A     That sounds about right.

24      Q     Okay.  And you mentioned that there were both

25 private equity investments and more traditional

1    investment opportunities that were being looked at.

2    What would you say in total, between 60 and 100

3    investment opportunities that the clients were involved

4    in at that time?

5         A    Yeah, maybe to the lower end of that, but

6    yeah, quite --

7         Q    Okay.

8         A    -- a few.

9         Q    So closer to 60 than to 100?

10        A    I think so.

11        Q    Okay.  So there were a mixture of different

12   investment opportunities.  There were what, ten people

13   working there at Ballamor at that time?

14        A    Yeah, about right.

15        Q    Yeah.  And you came in and your position,

16   senior vice president for investments, that was a new

17   position, right?

18        A    It was.

19        Q    Okay.  And the -- the office at Ballamor, it

20   was run by -- by Barry Bekkedam and Larry Roven; is

21   that fair to say?

22        A    Yeah.

23        Q    Okay.  Barry was the owner of -- of Ballamor,

24   and Larry was both the managing director and the

25   counsel; is that correct?

1        A     That's my understanding.

2        Q     So he served two roles, he was both the

3   attorney and a managing director?  You've got to say

4   yes or no.

5        A     Yes.

6        Q     Okay, thanks.  All right.  Now Barry

7   Bekkedam, he tended to leave the details to the other

8   folks; is that fair to say?

9        A     Absolutely.

10       Q     Okay.  He was kind of a 50,000-foot kind of

11   guy?

12       A     Yeah, maybe 100,000.

13       Q     Maybe 100,000, that was his management style.

14   So not -- not a micromanager in any way, shape, or

15   form?

16       A     No.

17       Q     Okay.  In fact, he really wasn't around the

18   Philadelphia office very much; was he?

19       A     No.

20       Q     He was mostly in Florida or moving around

21   trying to develop investment opportunities?

22       A     Yes.

23       Q     In fact, you thought maybe he should spend a

24   little more time in Philadelphia; didn't you?

25       A     Perhaps.

1      Q    And that he needed to show a little more

2   hands-on leadership at --

3      A    Perhaps.

4      Q    -- the time?  Okay.  But instead he brought

5   in guys like you and Todd Kellerman; is that fair to

6   say?

7      A    Yeah.

8      Q    So he brought you in to manage the fixed

9   income portfolios for the Ballamor clients; is that

10  right?

11     A    Yes.

12     Q    Okay.  And that, as you said, that was the

13  kind of more traditional asset opportunity or portions

14  of a person's portfolio?

15     A    Yes.

16     Q    And that was about $700 million to oversee;

17  is that fair?

18     A    That's fair.

19     Q    Okay.  And he just gave you the whole thing

20  and he told you to run with it; is that right?

21     A    Yeah.

22     Q    That was your baby?

23     A    Yeah.

24     Q    Okay.  Now the other part of it, that was

25  kind of the private side, the nontraditional

Page 138

1    opportunity; is that fair to say?

2        A    Yes.

3        Q    And he brought in this guy Todd Kellerman to

4    do that; didn't he?

5        A    He did.

6        Q    And Mr. Kellerman, when he came, Barry told

7    him to take the reigns over the private investments

8    department; is that fair to say?

9            MR. IGNALL:  Objection.  Relevance.

10           THE COURT:  Sustained.

11           MR. SCHWARTZ:  Okay.

12   BY MR. SCHWARTZ:

13       Q    Well, sir, Mr. Kellerman, he became the chief

14   financial officer after Ballamor; isn't that right?

15       A    Yes.

16       Q    Okay.  And that also was a new position at

17   Ballamor; wasn't it?

18       A    Yes.

19       Q    Okay.  So you've got Mr. Bekkedam at a

20   100,000 feet and then you've got Mr. Roven and

21   Mr. Kellerman and yourself kind of more at ten feet.

22   Now is that fair to say?

23       A    Yes.

24       Q    In addition to that there were guys like

25   Chris Boyle and Doug Kloppenberg and Mr. Dowd, they had

1    even closer one-on-one client-to-Ballamor-employee

2    relationships; is that right?

3         A    That's correct.

4         Q    And is that a fair description kind of the

5    structure of the hierarchy of Ballamor?

6         A    Yes.

7         Q    Okay, all right.  Now as you testified, you

8    really weren't a private equity guy, but you got

9    involved in this private equity part of Ballamor when

10   the unexpected change in Mr. Levin's ability to bring

11   capital to Nova occurred; is that right?

12        A    That's true.

13        Q    Okay.  And you were brought in to do that and

14   you worked with a number of people including

15   Mr. DiMarcantonio and Mr. Hartline; is that fair to

16   say?

17        A    Yes.

18        Q    Okay.  And you thought the idea of raising

19   money in order to get TARP funds, that was a great

20   idea, right?

21        A    It seemed very rational.  I don't know if

22   I -- yes, it was a good idea.

23        Q    It was a growth opportunity?

24        A    Yes.

25        Q    In fact, if you look at --

 1          MR. SCHWARTZ:  Can we see Government's

 2   Exhibit 134, please?  I'm sorry.

 3   BY MR. SCHWARTZ:

 4      Q    I'm sorry, I better have them put it up on

 5   the screen for you if that makes it easier.

 6      A    No, I know which one.

 7      Q    Okay, okay.  So Government's Exhibit 134 is a

 8   passing around of a draft of a letter that was going to

 9   be sent out to potential investors in Nova; is that

10   correct, sir?

11      A    Yes.

12      Q    Okay.  And on December 6th, at 9:11 in the

13   morning, Mr. Bekkedam, he said, here's my markups,

14   here's my version; is that right, that's the bottom of

15   the --

16      A    Yes.

17      Q    -- first page?

18      A    Yes.

19      Q    But you come back and say, you know, I don't

20   like the idea of using the word survival.  You write, I

21   don't like the statement regarding survival.  It's my

22   understanding that the bank survives without new

23   capital, therefore it comes down to seizing an

24   opportunity to enhance growth or limiting future

25   growth; is that right?

1       A    Yes.

2       Q    Okay.  So you believed that the opportunity

3   to invest in Nova and get the TARP funds was something

4   that was positive, not to save the bank, but to grow

5   the bank.  Is that fair to say?

6       A    That is fair.

7       Q    Okay.  And that was the position and the

8   perspective from which you were promoting this

9   investment opportunity; isn't that right?

10      A    Yeah.

11      Q    Okay.  And so you actually wanted to put kind

12  of more positive spin on what was being presented to

13  investors?

14      A    Yes, based on my conversations with Brian and

15  get an understanding of the financial status of the

16  bank.  And I was personally willing to, for a time

17  period, to invest myself.

18      Q    Okay.  And -- and you looked at it as a

19  serious opportunity; is that --

20      A    Yes.

21      Q    -- fair to say?  Okay, all right.  Now, sir,

22  then during the course of these, this effort to -- to

23  develop more capital for Nova Bank, that's when you

24  found out from Mr. Hartline about -- about the fact

25  that Mr. Levin's investment was connected to a loan he

1    had taken out; is that correct?

2        A    That is correct.

3        Q    And that was the issue of concern for you?

4        A    Yes.

5        Q    Okay.  And that was a conversation you had

6    some Friday in December; is that fair to say?

7        A    Yes.

8        Q    Okay.  And then on Friday you heard about it

9    from Mr. Hartline, and on Saturday morning you brought

10   it up with Mr. Bekkedam; isn't that right?

11       A    That's correct.

12       Q    Okay.  What you did was you called him on

13   Saturday morning at his home in Florida to say, I'm --

14   I'm concerned about something; isn't that right?

15       A    I think I sent him an email --

16       Q    Uh-huh.

17       A    -- and he immediately called me back or said,

18   give me a call.

19            MR. SCHWARTZ:  Yeah, could we look at exhibit,

20   Defense Exhibit 158 just for the -- the witness?  I'm

21   sorry, Government 158.  I apologize.

22   BY MR. SCHWARTZ:

23       Q    Sir, did you have a chance to look at that,

24   please?  I'm going to direct your attention to the

25   bottom most portion of the email.

1        MR. SCHWARTZ:  If you can just control all the

2   way down to that.  I'm sorry, Government 1588.  Could

3   you blow up that for the witness, please?

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   BY MR. SCHWARTZ:

2        Q    So at 10:11 a.m., you write to Mr. Bekkedam,

3   Saturday morning, 10:11 a.m., you write to him, you

4   say, we need to have a heart to heart.  I'm extremely

5   uncomfortable.  Is that right?

6        A    That's correct.

7        Q    And he picks up the phone and he calls you

8   and says, I don't want you to be uncomfortable.  It's

9   Saturday.  Let's get together in the office Monday and

10  we'll talk it all out.  Isn't that right?

11       A    Yeah.

12       Q    Okay.  Not only did he do that, he wrote you

13  an extensive email kind of explaining his position;

14  isn't that correct?

15       A    That's correct.

16       Q    And that's in the middle of Exhibit 158.  Is

17  that fair to say?

18       A    It's in the middle of --

19       Q    The middle of the page on --

20       A    Yes.

21       Q    -- Exhibit 158.  And that's at 10:49 in the

22  morning, just 45 minutes later, he writes -- he writes

23  you to give you some more details.

24       A    Yeah.

25       Q    Okay.  And what he says to you, looking at

1  paragraph one is, I am not a bank professional.  Is

2  that what he says?

3          MR. IGNALL:  Objection.  This is not in

4  evidence yet, Your Honor.

5          THE COURT:  Sustained.

6  BY MR. SCHWARTZ:

7      Q    He writes back to you to try to give you

8  further comfort about what -- what's your concerns.  Is

9  that fair to say?

10     A    That's fair.

11     Q    Okay.  And then right after that, not only

12 does he write to you, at 11:09 a.m., he forwards the

13 email that has your concerns and his answer to Larry

14 Roven; isn't that right?

15     A    That's correct.

16     Q    In other words, at 11:09 on a Saturday

17 morning, he takes your concerns and his response and he

18 sends it to the chief counsel of Ballamor Capital?

19         MR. IGNALL:  Objection.  I'm not sure,

20 Mr. Roven has had more than one role, so I don't know

21 if the witness knows why Mr. Bekkedam was sending it.

22         THE COURT:  Sustained.

23         MR. SCHWARTZ:  All right.

24 BY MR. SCHWARTZ:

25     Q    He, Mr. Roven, you understood this person was

1    a chief counsel at the bank; is that fair to say?

2        A    Correct.

3        Q    Okay.  And he was also the managing director

4    of the bank; is that correct?

5        A    That's my understanding.

6        Q    Okay, all right.  And excuse me, after he

7    sends that email along to Mr. Roven, you get another

8    email, and that is from Mr. Roven, himself; isn't that

9    right?

10       A    Yeah.  It's hard for me to remember, but I --

11   yeah.

12       Q    Okay.  And I'm going to ask you to take a

13   look at Defense Exhibit 1250.

14            MR. SCHWARTZ:  Just for the witness, 1250.

15   BY MR. SCHWARTZ:

16       Q    All right.  Sir, have you had a chance to

17   look at that?

18       A    Give me one sec.

19       Q    Sure.  And start from the bottom, just like

20   every email, if you don't mind.

21       A    Okay.

22       Q    Okay.  So at 11:31 in the morning, that same

23   Saturday morning, Mr. Roven writes to you and says,

24   Barry asked me to address a couple of points.  Is that

25   correct?

1      A    Yes.

2      Q    So that refresh your recollection about

3  Mr. Roven getting back in touch with you with regard to

4  the concerns you had raised just a little more than an

5  hour earlier with Mr. Bekkedam?

6      A    Yes.

7      Q    Okay.  So it's a Saturday morning, and in

8  less than two hours, you've got a response from the

9  chief counsel of Ballamor Capital?

10     A    That's correct.

11     Q    Okay.  And in fact, he doesn't finish there.

12 You write briefly back to him at 11:35, and by

13 12:26 p.m., he says, oh, I hit send too soon.  I've got

14 some more information from you.  Is that correct?

15     A    Yeah.

16     Q    Okay.  I'm looking at the top email there.

17 At 12:26 p.m., Mr. Roven writes to you and he sends, I

18 also accidentally sent the email before I had finished.

19 And then -- is that correct?

20     A    Yes.

21     Q    And then further on he says, if anyone he had

22 said, "We can't do that (which I had heard --

23          MR. IGNALL:  Objection.  It's not in evidence.

24 And now it's hearsay.

25          THE COURT:  Sustained.

 1           MR. SCHWARTZ:  This is information that's

 2    provided to Mr. Roven with regard to what -- or to

 3    Mr. Howard with regard to his understanding of the

 4    situation was and he got comfort with it.  He testified

 5    about this.

 6           THE COURT:  Provided to him to see how he got

 7    comfort with it?

 8           MR. SCHWARTZ:  He was seeking information.  He

 9    got information from an agent, what the Government has

10    agreed is an agent of Mr. Bekkedam, an agent of

11    Mr. Bekkedam who is the chief counsel --

12           THE COURT:  All right.

13           MR. SCHWARTZ:  -- wrote back.

14           THE COURT:  I'll allow it.

15           MR. SCHWARTZ:  Thank you.

16    BY MR. SCHWARTZ:

17      Q    So, sir, looking back at that email, at the

18    top, Mr. Bekkedam's agent, the chief counsel for

19    Ballamor writes back to you and says, if anyone had

20    said, "We can't do that (which I have heard said at

21    various times) then it would have been dropped.  I

22    never heard it said with respect to this."  Do you see

23    that, sir?

24      A    Yes.

25      Q    So when you got that email and you read that

Page 149

1    message from the agent of the chief counsel of

2    Mr. Bekkedam's company, Ballamor Capital, was it your

3    understanding that he was telling you that nobody ever

4    raised it as a problem to him?

5              MR. IGNALL:  I'm going it object.  I don't

6    think -- he's asking for what Mr. Roven meant.

7              MR. SCHWARTZ:  I'm asking for what his

8    understanding --

9              THE COURT:  It speaks --

10             MR. SCHWARTZ:  -- was.

11             THE COURT:  -- for itself.  It speaks for

12   itself.

13             MR. SCHWARTZ:  Very well, all right.

14   BY MR. SCHWARTZ:

15      Q    So you heard from him again at 12:26, and

16   then one more time that day, you hear from Mr.

17   Bekkedam -- or I'm sorry, Mr. Roven again.

18             MR. SCHWARTZ:  And could you please show the

19   witness Exhibit 159 or Government 159?

20   BY MR. SCHWARTZ:

21      Q    Okay.  Please take a look at that, sir.

22      A    Okay.

23      Q    Okay.  So Mr. Roven, who is Mr. Bekkedam's

24   agent and chief counsel says, I've got a little more to

25   say to you; is that correct?

1        A      Correct.

2        Q      And the, one of the additional things he says

3   to you is, as you know by now, Barry is sometimes too

4   creative for his own good.  Do you see that?

5        A      Yes.

6        Q      And that kind of resonated with you because

7   you've been around Barry for almost a year and you've

8   kind of seen that too-creative-for-his-own-good side?

9        A      Yes.

10       Q      Okay.  And but Mr. Roven then goes on to say,

11  sometimes it is necessary to tell him something can't

12  be done, and he takes that advice.  Is that correct?

13              MR. IGNALL:  I'm going to object.  This is

14  offered for the truth.

15              MR. SCHWARTZ:  It's offered for what --

16              THE COURT:  Let me see you, please.

17                          SIDEBAR

18              (Sidebar begins - 03:49:09 p.m.)

19        (Counsel approach the bench where the following

20  ensues:)

21              MR. SCHWARTZ:  Sir, it's my understanding that

22  (inaudible) nature of (inaudible).  My intention is

23  (inaudible) great attention to it and (inaudible).

24              THE COURT:  (Inaudible) email (inaudible) and

25  counsel and (inaudible) for the truth.

1            MR. SCHWARTZ:  If the truth is the party

2    opponent.  And I may introduce --

3            THE COURT:  (Inaudible).

4            MR. SCHWARTZ:  We have a right to introduce.

5            THE COURT:  (Inaudible) it relates to the

6    party opponent?

7            MR. SCHWARTZ:  It relates to a party opponent

8    and (inaudible) of a party and -- and that's not an

9    issue.  (Inaudible).

10            THE COURT:  (Inaudible).

11            MR. SCHWARTZ:  Well, (inaudible).

12            THE COURT:  I think that under the rules that

13    it's prohibited, so I'm going to sustain the objection.

14            MR. SCHWARTZ:  Can I --

15            THE COURT:  It does not mean that he cannot

16    introduce through a witness (inaudible).

17            MR. SCHWARTZ:  (Inaudible) I'm sorry

18    (inaudible).

19        (Sidebar concluded - 03:50:52 p.m.)

20        (Counsel return to the trial tables where the

21    following ensues:)

22            MR. SCHWARTZ:  May I, Your Honor?

23            THE COURT:  You may continue.

24            MR. SCHWARTZ:  All right.

25    BY MR. SCHWARTZ:

Page 152

1      Q    Sir, at no time that weekend did Mr. Bekkedam

2   said, mind your own business and get the heck out of

3   here; did he?

4      A    No.

5      Q    Okay.  At no time did Mr. Roven say, you

6   don't -- we don't work for you, you work for us.  We'll

7   handle this.  Leave it alone.

8      A    Nope.

9      Q    All right.  You were never told to walk away

10  from this; were you?

11     A    No.

12     Q    In fact, when you said you wanted to bring

13  things up with Mr. Hartline, nobody at Ballamor,

14  neither Mr. Roven nor Mr. Bekkedam tried to stop you in

15  any way, shape, or form?

16     A    They did not.

17     Q    Okay.  And when you were dissatisfied with

18  the speed at which things were taking, nobody at

19  Ballamor, neither Mr. Bekkedam nor Mr. Hartline said,

20  cool your jets, hold your horses.  You know, mind your

21  business, mind your place and just, you'll get an

22  answer when you're told -- when you're told?

23     A    No.

24     Q    Okay.  And in no way, shape, or form did

25  Mr. Bekkedam or any of his agents such as Mr. Roven try

1    to impede your ability to get an answer to satisfy your

2    concerns; did they?

3          A     No.

4          Q     Thank you.  Sir.

5                MR. SCHWARTZ:  No further questions.

6                MR. IGNALL:  May I have one moment, Your

7    Honor?

8                THE COURT:  Yes, sir.

9                          REDIRECT

10   BY MR. IGNALL:

11         Q     Mr. Schwartz asked you a number of questions

12   a moment ago about what Mr. Bekkedam or Mr. Roven told

13   you to do or not do to assuage your concerns.  Do you

14   remember those questions?

15         A     Yes.

16         Q     All right.  Did Mr. Roven ever tell you

17   whether he, himself, was familiar with Mr. Levin

18   getting a loan to buy Nova stock?

19         A     I believe in one of his emails, he -- he made

20   a comment that he was not aware initially about the

21   line, but found out after the fact.

22         Q     After -- after the loan, itself?

23         A     Yes.

24         Q     And that's what he told you?

25         A     Yes.

1     Q     All right.

2           MR. IGNALL:  Let me bring back up Exhibit 134.

3     BY MR. IGNALL:

4     Q     And there were some questions about your

5     comment about you think the bank would survive even

6     without the TARP?

7     A     Yes.

8     Q     As of the time you wrote that email, were you

9     aware of Mr. Levin's loan from the bank?

10    A     No.

11    Q     At that time, were you, yourself, prepared to

12    invest?

13    A     Yes.

14    Q     After you learned of Mr. Levin's loan, did

15    you invest in the bank?

16    A     No.

17          MR. SCHWARTZ:  Objection.  Beyond the scope.

18          THE COURT:  Sustained.

19          MR. SCHWARTZ:  Move to strike, Your Honor.

20          THE COURT:  Stricken.  The jury is to

21    disregard that last question and answer.

22    BY MR. IGNALL:

23    Q     Now if we go back to the, this is

24    Exhibit 134, did Mr. Bekkedam make actual substantive

25    edits to the letter as far as you know?

Page 155

1            MR. SCHWARTZ:  Objection.  The document

2    speaks --

3            THE COURT:  I'm sorry --

4            MR. SCHWARTZ:  -- for itself.

5            THE COURT:  -- would you repeat the question,

6    please?

7            MR. IGNALL:  Did -- did Mr. Bekkedam make

8    edits to the letter.

9            THE COURT:  Which letter, counsel?

10           MR. IGNALL:  The -- the letter that's attached

11   to Exhibit 134.

12           MR. SCHWARTZ:  Object, Your Honor.  Any

13   evidence admitted and the document speaks for itself

14   and --

15           THE COURT:  Sustained.

16           MR. SCHWARTZ:  -- (inaudible).

17           MR. IGNALL:  Well, may -- Your Honor, there's

18   a question about --

19           THE COURT:  Was this admitted into evidence?

20           MR. IGNALL:  It's been admitted into evidence.

21           THE COURT:  It speaks for itself.  Next

22   question, please.

23   BY MR. IGNALL:

24       Q    Well, you -- you had got questions about

25   Mr. Bekkedam being at 50,000 feet.  Do you remember

1   those questions?

2       A    Yes.

3       Q    Do you recall whether Mr. Bekkedam ever made

4   substantive edits to a document that was going out to

5   clients?

6           MR. SCHWARTZ:  Objection, Your Honor.  It's

7   general and well beyond the scope.

8           THE COURT:  Sustained.

9           MR. IGNALL:  Well, there were general

10  questions in cross-examination.

11          THE COURT:  Sustained.

12          MR. IGNALL:  All right.

13  BY MR. IGNALL:

14      Q    You had questions about, from Mr. Egan about

15  Mr. Levin's worth after Halloween 2009.  Do you

16  remember those questions?

17      A    Yes.

18      Q    And questions about, it wasn't entirely clear

19  how much Mr. Levin was going to be worth after that.

20  Do you remember those questions?

21      A    Yeah.

22      Q    And that Mr. Hartline volunteered that

23  Mr. Levin had a loan.  Do you remember that?

24      A    Yes.

25      Q    But did Mr. Hartline, when he volunteered

1    that Mr. Levin had a loan, say that he had concerns

2    about Mr. Levin being able to pay that loan back?

3         A    That's my recollection.

4         Q    All right.

5              MR. IGNALL:  Nothing further, Your Honor.

6    Thank you.

7              MR. EGAN:  No recross.

8              MR. SCHWARTZ:  Nothing, sir.

9              THE COURT:  Thank you, sir.  You may step

10   down.  And watch your step, please.  Thank you.

11        (The witness is excused from the stand)

12             MR. IGNALL:  That's the last witness we have

13   for today, Your Honor.

14             THE COURT:  All right.  We're adjourned for

15   the day.  We'll see you tomorrow morning at 9:15.

16   Thank you.

17             THE DEPUTY:  All rise.

18             MR. EGAN:  There's a possibility they will

19   rest tomorrow afternoon.

20             MR. IGNALL:  I -- I think that's a reasonable

21   guess.  We have two witnesses and we're going to play a

22   few excerpts from a deposition.  We'll work on that

23   tonight.  I don't think they'll be very lengthy.

24             THE COURT:  All right.

25             MR. EGAN:  Could we ask which deposition?

Page 158

```
 1                MR. IGNALL:  Mr. Hartline's --

 2                THE COURT:  That's fine.

 3                MR. IGNALL:  -- deposition.

 4                MR. EGAN:  Thank you.  We have witnesses that

 5     we had originally told would, we would need Tuesday.

 6                THE COURT:  Of next week or --

 7                MR. EGAN:  Yeah, of next week.

 8                MR. ENGLE:  Next week, yeah.

 9                MR. EGAN:  One of them is, because we had been

10     under the impression the Government would not rest

11     until the end of this week and Friday we're out and

12     Monday afternoon we're -- we're also off thanks to Your

13     Honor's kindness.  And I could perhaps get some

14     Thursday, but we wish to address both the charging

15     conference and Rule 29.  So I was wondering if, Your

16     Honor, if we could perhaps brief and present the Rule

17     29 motion on -- by Thursday if, and maybe argue it

18     Monday.

19                Is that pushing things too far?  I will

20     advise that the defense case is not going to be long.

21                THE COURT:  I'd rather not drag it out longer

22     than we need to, just because I feel like, one, it's

23     impolite to the jury, but just more selfishly, I like

24     them to remember, you know, more freshly and vividly

25     what's happened, regardless of what it is.  So I don't
```

1    know why we need to go into a more retailed Rule 29

2    than we do in other -- other cases where there's no

3    back and forth and too many written submissions to drag

4    that out, but I understand there will be a Rule 29 and

5    the Court certainly needs to rule on that before we go

6    forward.

7              MR. IGNALL:  Well, we would go into Monday

8    regardless, correct?

9              THE COURT:  I'm sorry?

10             MR. IGNALL:  We would go into Monday

11   regardless, correct?

12             THE COURT:  Well, I -- I suppose if we revolve

13   the Rule 29 on Thursday, assuming we revolve it in a

14   way that allows the case to go forward, then the

15   defense can start putting witnesses on, either later in

16   the day Thursday or on Monday.

17             MR. EGAN:  And we would certainly could be

18   prepared to put them on Monday morning if that was Your

19   Honor's preference.  I just -- and we could maybe

20   discuss this tomorrow.  I just wanted to bring it up so

21   you could have it to think about.

22             MR. ENGLE:  I would just say, Your Honor, Your

23   Honor mentioned the fact that we need to go over some

24   transcripts to get you a brief that is going to cite to

25   what we can with respect to transcripts.  This is not

1  your run-of-the-mill case.  It's a little more

2  complicated.  There's a lot of documents, there's been

3  a lot of testimony.  I would respectfully submit that

4  if the parties can hone the arguments for the Court

5  both in writing so that you have that on Thursday to

6  consider over the course of the weekend, we could make

7  a more effective presentation orally on Monday morning

8  so that the Court can then make a decision.

9          If the Court sees fit that the case is going

10  to move forward to the jury, then we would be prepared

11  to go Tuesday morning.  And as Mr. Egan said, I don't

12  think the defense case is going to take very long.  It

13  could still put us in a position where we would be in a

14  spot where we'd be giving closing arguments on

15  Wednesday.

16          THE COURT:  If you would have your respective

17  motions and answer, let's see, by Thursday.

18          MR. IGNALL:  Well, if the motion is filed on

19  Thursday, I'm not sure how we could answer it on

20  Thursday.

21          THE COURT:  Pardon me?

22          MR. IGNALL:  If their -- if the defense motion

23  is filed on Thursday, I'm not sure how we can answer --

24          THE COURT:  I'm sorry, I stand corrected.  You

25  can have that -- well, we're talking potentially

1    resting tomorrow.

2              MR. IGNALL:  Correct, Your Honor.

3              THE COURT:  All right.  So if you would have

4    yours by Thursday afternoon and you could have yours to

5    me by Friday afternoon, I can let you know -- or better

6    still, let me do it this way, I may or may not need

7    argument on Monday morning.  You can be prepared to

8    argue on Monday morning or I could apprise you of what

9    I need to hear from you on specifically maybe by Friday

10   afternoon.  Be prepared to argue if necessary on Monday

11   morning, but also be prepared to put your witness on --

12             MR. EGAN:  Very well, Your Honor.

13             THE COURT:  -- on Monday.  Is that acceptable?

14             MR. EGAN:  That is, Your Honor.

15             MR. ENGLE:  Your Honor, and we don't, we have

16   not been ordering transcripts, so we're going to have

17   to argue it kind of the -- the old-fashioned way,

18   we'll --

19             THE COURT:  I'm not -- I --

20             MR. ENGLE:  -- just --

21             THE COURT:  Frankly, I -- I, you know, I

22   normally take copious notes, but in a case -- you can

23   sit down -- in a case like this it's impossible, but

24   Mr. Engle, I don't know that you're going to be able to

25   get that kind of turnaround anyway.  I just think that

1    my suggestion initially was for you to take the time to

2    point out in your -- your motion and your response to

3    the motion what is really substantive in terms of the

4    charges in this case.  And not necessarily all the

5    minutia that's in between.

6              MR. ENGLE:  Certainly.

7              THE COURT:  All right.

8              MR. ENGLE:  Understood.

9              THE COURT:  That's what I want to focus on.

10   All right.

11             MR. EGAN:  Very well, Your Honor.  Then we

12   will not have witnesses on Thursday, but we will have

13   them ready for Monday morning.

14             THE COURT:  Correct.

15             MR. EGAN:  Thank you.

16             THE COURT:  All right.

17             MR. IGNALL:  Thank you, Your Honor.

18             THE COURT:  All right, thank you.

19                       - - -

20   (Whereupon, the proceeding was concluded at 4:01 p.m.)

21                       - - -

22

23

24

25

Page 163

1                    C E R T I F I C A T I O N

2

3

4

5

6          I, Christine M. Aiello, transcriber, do hereby

7    certify that the foregoing is a true and correct

8    transcript from the electronic sound recordings of the

9    proceedings in the above-captioned matter.

10

11

12

13

14   April 19, 2016                    _____

15                                      Christine M. Aiello

16

17

18

19

20

21

22

23

24

25

**A**

**ability** 77:18,19,20
  111:13 139:10
  153:1
**able** 34:7 55:3
  63:13,14 77:24
  78:2 157:2 161:24
**above-captioned**
  163:9
**absolutely** 42:2
  44:21 50:10 77:6
  136:9
**acceptable** 161:13
**access** 44:4
**accidentally** 147:18
**account** 66:8 95:3
  95:14 96:16
**accounting** 32:19
  39:1,2
**accounts** 66:7,9
  96:19,20 104:11
**accurate** 58:4
  90:19,20 127:18
**achieve** 110:20,21
**acquire** 62:25
**acquisition** 63:8
  65:17
**action** 36:14
**actively** 16:12
**activity** 50:23
**actual** 154:24
**add** 116:3,4 128:14
**addition** 109:23
  138:24
**additional** 36:19
  54:13 73:24
  108:17 150:2
**address** 49:15
  94:14 113:22
  146:24 158:14
**adequately** 28:9
**adjourned** 157:14
**admission** 80:13
  81:18
**admitted** 3:15
  58:20 74:5,9

80:16,17 81:21,22
  114:3,4 123:3,4
  155:13,19,20
**advantage** 57:2
  60:21
**adverse** 23:16 28:4
**advice** 127:25
  150:12
**advise** 158:20
**advised** 83:13
**affirm** 31:6,9 61:12
  61:15 101:21,24
**afternoon** 57:17
  62:6,7 84:14,15
  98:11,12 125:5,6
  134:8 157:19
  158:12 161:4,5,10
**agent** 51:18 58:21
  115:13 148:9,10
  148:10,18 149:1
  149:24
**agents** 17:15
  152:25
**ago** 115:19 119:14
  122:23 153:12
**agree** 16:23,24 17:6
  18:1,18 29:21
  46:11 88:14
**agreed** 52:23 58:3
  94:21 148:10
**agreement** 46:11
  46:25 47:2 48:6
  64:1,9 91:5 94:7
**ahead** 15:4 28:19
**Aiello** 1:25 163:6
  163:15
**al** 1:5
**ALLISON** 1:15
**allow** 148:14
**allows** 159:14
**AMERICA** 1:3
**amount** 6:21 16:6
  16:14 65:13 71:21
  71:22 74:19,20
  93:8,13 99:20
  108:17 120:12,13
  121:20 126:1

**analysis** 105:4
**and/or** 31:6 61:12
  101:21
**answer** 104:6
  123:14 126:10
  131:25 132:15
  145:13 152:22
  153:1 154:21
  160:17,19,23
**answered** 82:23
  106:14
**answering** 104:4
**Anthony** 46:5
**anticipate** 53:25
  54:8,9
**anybody** 98:2
**anymore** 126:16
**anyway** 54:15
  161:25
**apologies** 14:12
**apologize** 58:13
  142:21
**APPEARANCES**
  1:9 1:1 2:1
**application** 123:23
  123:25
**applied** 18:23 36:7
  90:9
**apply** 29:19
**applying** 108:25
**appreciate** 29:18
**appreciated** 50:9
**apprise** 161:8
**approach** 19:4
  30:18 45:22,23
  46:3 54:5 66:20
  100:14,19 112:21
  150:19
**approached** 67:22
**appropriate** 28:11
**approval** 104:15
**approved** 60:22
**approximately**
  60:23 61:1 62:18
  63:22 64:2 67:14
**April** 1:5 107:13
  134:10 163:14

**area** 6:19,21 7:1
**argue** 56:9 158:17
  161:8,10,17
**argument** 161:7
**arguments** 160:4
  160:14
**Ashealy@shulm...**
  1:18
**asked** 5:23 7:18
  14:20 15:14,19
  17:18 29:1,8
  39:25 41:24 43:13
  60:3 68:20 77:15
  82:22 85:13 88:16
  97:11 99:9 106:14
  120:19 125:16,19
  126:8 127:4
  130:14 132:2
  133:15 146:24
  153:11
**asking** 9:22 20:3
  149:6,7
**aspect** 98:13,22
**assessment** 68:11
  68:16 74:13 85:12
**asset** 22:16 27:25
  117:4 137:13
**assets** 22:18 23:2
  90:18 103:16,22
**assigned** 6:19
**assist** 35:1,1 127:4
**assistance** 28:13
  108:14
**assisted** 35:3
**associated** 106:10
**assuage** 153:13
**assume** 39:20
**assuming** 159:13
**as-of** 8:6
**attached** 155:10
**attachment** 113:19
  114:11
**attempt** 21:11
  119:12
**attended** 37:1
**attention** 36:14
  74:1 118:1 122:13

142:24 150:23
**attorney** 59:20
  136:3
**attorneys** 58:2
**ATTORNEY'S**
  1:11,15
**Audio** 4:2
**audit** 32:13,14 33:4
  33:6,24 34:23,25
  35:2,4 37:2,17,20
  37:25 38:5,8,12
  39:2,3,7,8,11,19
  39:23 42:20 43:4
  43:6 45:11
**auditing** 43:13
**auditor** 15:22
  33:12,19 34:22
**auditors** 33:14 38:4
  40:5,10 43:19
  76:4
**audits** 32:16 33:9
  39:25
**August** 10:5,14
**authorities** 56:18
  122:12 123:16
  132:20
**available** 73:11
**AVENUE** 1:16,20
  2:3
**aware** 18:5,11,14
  34:15 40:25 41:4
  41:8,21 42:19
  44:1,5 45:6 90:10
  130:24 132:25
  133:21 153:20
  154:9
**a.m** 1:5 4:2 19:3,23
  30:17 31:2 46:2
  46:16,19 144:2,3
  145:12

**B**

**B** 3:15 59:2
**baby** 137:22
**back** 5:17 20:16
  21:18,21 24:24
  47:8 48:17 50:1

50:19 52:2 60:8
68:22 85:19 91:5
97:2,4,8,13
100:22 114:15,22
123:12 124:4
129:4 131:16
132:4,13 140:19
142:17 145:7
147:3,12 148:13
148:17,19 154:2
154:23 157:2
159:3
**background** 32:17
103:21
**bad** 23:20 90:4
**Baker** 1:15 3:3
25:11,14 26:18
30:5
**balance** 60:21
65:17 103:19
**Ballamor** 60:13,14
63:21 64:7,11
103:2,8,10,13,24
104:8 105:25
107:3,14 109:6,17
112:9,12 116:9
125:7 128:15,17
128:18,18 134:10
134:13,21 135:13
135:19,23 137:9
138:14,17 139:5,9
145:18 147:9
148:19 149:2
152:13,19
**bank** 6:10,25 12:23
14:24 15:2 16:23
20:22 21:1 22:23
22:24 23:1 24:12
24:18,20,25 25:17
25:18,19,20 26:1
26:4,6,10,16
27:12 28:6,15
32:23,23 33:1,3,8
33:12,19 34:14,15
34:19,23 35:25
36:6,7,20,23
38:13 40:23 41:2

41:6,10,16,21
42:4,8,11,23 43:5
43:9 44:16,22
45:7 60:20 65:4,8
65:10,23,25 66:3
66:15 67:14,23,25
68:20 69:4,6,12
69:13,23 70:7,11
70:14,21 71:2,9
71:25 72:19 73:1
73:8,12,14,16,22
75:8,11,21 76:4,5
76:7,10,12,18
77:8,13,17 78:8
79:22 81:1 82:8
82:10 84:1,5,16
85:5,23 86:14
89:14 95:3,14
96:14 98:3,14,22
99:12 105:21,22
105:24 106:2,4,6
106:8,9,10,24
107:4,17 108:6,8
108:11,15,18
109:24 110:25,25
111:1,3,24,25
112:3,9 116:25
117:12,19,24
119:9,15 120:9,13
121:17,25 125:17
125:25 128:14,22
128:25 129:9
131:3,4,9,10
133:25 140:22
141:4,5,16,23
145:1 146:1,4
154:5,9,15
**banking** 7:22 26:24
65:24 66:3 107:4
116:17,21,25
**bankruptcy** 20:23
21:2
**banks** 14:17 23:9
32:14 43:1 73:19
107:22 108:14
**bank's** 15:21 22:14
23:16 27:24 28:4

76:2 120:7 123:23
**Banyon** 46:7 109:4
109:10,17 110:5
111:12 119:24
**Barry** 1:15 1:11 2:2
3:3,5,7 4:10 9:11
9:13,18 10:16
11:24 17:7,9,11
18:7,19,25 19:6,9
19:14 21:4 26:5,9
26:14,20 27:7,10
27:15,19 28:17,20
29:12,16,25 30:9
30:11,21,24 31:22
31:24 32:10 34:9
34:13 35:19 36:1
37:5,8 41:1 44:24
45:17 47:15 49:17
55:25 58:24 59:13
60:6,13 61:9 62:1
62:3,5,21,23 63:5
63:9 64:6,11 65:2
65:6,10,22 66:17
66:23 67:4,7,9,18
67:20 68:3,6,9
69:18,22 70:3,5
70:24,25 71:17,19
72:3,5,21,23 74:4
74:8,12 75:25
76:19 78:12,17,19
78:22,24 79:5,11
79:14,23 80:2,12
80:19,22,23 81:7
81:10,17,20,24
82:2,3,13,15,25
83:5 84:7,10 92:6
95:22 98:16,18
99:4,7,17,22
100:4 103:12
104:9 107:23,24
119:5 121:19
135:20,23 136:6
138:6 146:24
150:3,7
**Barry's** 60:17
114:11
**based** 18:14 22:1

36:2 70:1 83:16
141:14
**basically** 12:23
15:25 23:20 87:17
96:12 110:7
**Basis** 9:12 69:20
**becoming** 38:11
**began** 7:24 65:24
66:14 75:17
**beginning** 133:15
**begins** 4:2 19:3
30:17 46:2 54:4
100:18 150:18
**Bekkedam** 1:11 2:2
26:5,9,14 41:1,5,9
41:13,15,17 42:7
43:5,14 44:21
45:7,12 58:24
59:13 60:6,13
62:21,23,24 63:6
63:10,23 64:11
65:3,7,22 98:16
98:24 103:12,14
104:9,10 107:16
108:22 109:9,15
109:20 110:15
114:19,21 115:1
115:18 121:7,9,12
134:9 135:20
136:7 138:19
140:13 142:10
144:2 145:21
147:5 148:10,11
149:17 152:1,14
152:19,25 153:12
154:24 155:7,25
156:3
**Bekkedam's** 64:6
148:18 149:2,23
**believe** 20:9 25:6
36:24 37:19 42:2
43:25 51:16 58:7
69:25 78:15 79:8
79:25 82:25 85:21
91:20 100:3 107:6
130:3,4 132:3
153:19

**believed** 130:6,6
141:2
**Belmar** 68:12,12
72:9 74:15 75:2
87:22,23
**bench** 19:4 30:18
46:3 54:5 100:19
150:19
**beneficiary** 117:1
**best** 54:15 67:16
68:18 71:23
119:17
**better** 20:13 111:5
111:23 134:17
140:4 161:5
**beyond** 29:16,25
154:17 156:7
**big** 24:1 131:9
**bit** 59:25 122:7
**blame** 53:6,7
**blow** 58:23 59:5,15
85:8,10 90:16
99:21 116:12,13
116:22 132:9
143:3
**blue** 41:16
**board** 28:11 37:1
41:10
**body** 60:15
**bolster** 60:20
**bolts** 128:11
**bond** 102:21
**bonds** 103:21
**Bonomo** 46:6
**borrowed** 91:6
92:22 93:8 95:12
96:14 97:5
**borrower** 20:23
66:6 72:10 74:15
75:2 89:11 97:6
**borrowers** 16:6
**borrowing** 73:24
78:1,3 92:24
**borrowings** 68:24
**bottom** 9:1 11:9
20:17 89:5 94:16
115:6 116:13

140:14 142:25
146:19
**boy** 54:18
**Boyer** 58:22 115:13
**Boyle** 138:25
**Brain** 123:12
**brand** 62:15
**break** 101:12
**Brian** 1:2 34:2,11
59:1,5,16 75:14
75:18,19 76:25
77:3,11,15 82:16
82:17,20 83:6,9
87:3 111:1,7
113:14 116:3
119:10 121:25
122:20 141:14
**brief** 158:16 159:24
**briefly** 28:22 45:23
54:2 100:15
147:12
**bring** 47:8 54:23
58:22 66:8 139:10
152:12 154:2
159:20
**bringing** 46:24
**BROAD** 1:12
**broke** 126:15
**brought** 36:12
137:4,8 138:3
139:13 142:9
**bucks** 88:24 89:13
**business** 62:10,11
62:19 152:2,21
**busy** 131:20
**buy** 89:1 94:21
95:16 96:22
153:18

_____

**C**

**C** 1:7 1:6 4:5 163:1
163:1
**call** 5:1 22:10 43:14
47:4,6,7 48:14
53:1 73:20 123:20
130:18 142:18
**called** 32:23 48:25

59:23 63:20 87:13
105:21 106:16
109:3 121:14
133:16 142:12,17
**calls** 30:11 61:10
101:18 144:7
**capital** 15:21 16:12
18:6 21:15,18,21
21:23 23:13 24:7
26:15 27:23 28:3
28:10 34:16,19
36:23 41:22 42:3
42:7,14,18,22
43:1,5 44:13,17
44:18,23 45:8
60:14,14,20 61:2
63:21 64:7,12
74:19,21 75:4,7
76:2,8,11 78:3
83:12,14,25 103:2
103:8,11,14
105:20 107:15,16
108:16,18 111:13
117:3,3,12,20,21
119:12 139:11
140:23 141:23
145:18 147:9
149:2
**capitalized** 108:18
**Carl** 52:8
**case** 6:11 16:24
17:15 46:23 47:4
47:7,8 48:6,14
49:7 50:6 53:9
54:19 55:18 108:3
158:20 159:14
160:1,9,12 161:22
161:23 162:4
**cases** 159:2
**cash** 89:14,17
**cc** 60:13
**centered** 111:11
**certain** 43:18
108:16
**certainly** 88:22
104:4 128:1 159:5
159:17 162:6

**certificate** 96:4
**certify** 163:7
**cetera** 54:13,14
**chairman** 33:24
**chambers** 49:14
**chance** 142:23
146:16
**change** 139:10
**changes** 115:24
127:17
**charged** 20:22 21:1
21:25 22:4 29:6
**charges** 162:4
**charging** 158:14
**Charles** 3:7 61:10
61:17,23 86:6
94:11
**chart** 13:25 90:16
**check** 30:25 40:3
95:1
**CHESTNUT** 1:11
1:16
**chief** 6:2 7:12
138:13 145:18
146:1 147:9
148:11,18 149:1
149:24
**choice** 122:12
**choose** 47:6 48:9,13
**chose** 95:16 96:22
**Chris** 138:25
**Christine** 1:25
163:6,15
**Christmas** 131:21
**Chun** 1:15 3:3,5,7
4:10 9:11,13,18
10:16 11:24 17:7
17:9,11 18:7,19
18:25 19:6,9,14
21:4 26:20 27:7
27:10,15,19 28:17
28:20 29:12,16,25
30:9,11,21,24
31:22,24 32:10
34:9,13 35:19
36:1 37:5,8 44:24
45:17 49:17 55:25

61:9 62:1,3,5
66:17,23 67:4,7,9
67:18,20 68:3,6,9
69:18,22 70:3,5
70:24,25 71:17,19
72:3,5,21,23 74:4
74:8,12 75:25
76:19 78:12,17,19
78:22,24 79:5,11
79:14,23 80:2,12
80:19,22,23 81:7
81:10,17,20,24
82:2,3,13,15,25
83:5 84:7,10 92:6
95:22 99:4,7,17
99:22 100:4
**Circle** 102:18,20,24
**Citations** 56:16
**cite** 11:18 159:24
**clarification** 51:7
**clarify** 51:14
**classified** 10:11
**clear** 156:18
**CLERK** 31:15,18
31:20
**client** 19:12 98:15
98:24 104:2,3,4
104:11,13,15
107:24 111:18,25
119:6
**clients** 64:7 104:3
104:13,23 105:2,6
106:1,23 107:3,6
109:6,22 111:14
112:9,12 116:9
117:23 119:7
120:8 128:15
134:22 135:3
137:9 156:5
**client-to-Ballam...**
139:1
**clips** 53:21
**close** 25:4 50:4 61:3
104:22
**closed** 59:9 64:1
66:4
**closer** 135:9 139:1

**closing** 160:14
**clue** 97:25
**collateral** 16:14
**collect** 21:11
**collected** 22:8
35:14
**Com** 62:15
**combined** 89:12
**come** 5:17 48:17
65:24 72:24 84:2
108:17 110:3
121:25 140:19
**comes** 30:14 121:25
140:23
**comfort** 130:14
145:8 148:4,7
**comfortable** 121:4
121:24 122:1
130:13
**coming** 54:20 59:20
60:3 91:22,25
**commenced** 8:16
9:4
**comment** 119:22
153:20 154:5
**comments** 72:6
74:24 75:1 116:4
**commercial** 72:11
75:3
**commitment**
105:19 125:25
**committed** 125:21
**committee** 33:24
37:3,20 38:5,8
**common** 16:6
**communicate**
111:14 112:8
114:23
**communicated**
43:21
**communicating**
120:8
**communicative**
111:18
**community** 131:10
**companies** 71:11
71:14

**company** 1:22
  16:12 26:3 42:14
  44:7,12 62:12,13
  62:15 68:23 69:10
  98:15,24 106:24
  133:22 149:2
**compared** 50:24
**complexity** 6:10
**compliance** 33:9
**complicated** 126:20
  160:2
**concern** 120:10,14
  129:22 142:3
**concerned** 119:23
  120:5 121:14,15
  122:8 123:14
  129:15,17 142:14
**concerns** 121:6
  122:5 123:22
  145:8,13,17 147:4
  153:2,13 157:1
**concluded** 19:23
  31:2 46:16 57:8
  101:9 151:19
  162:20
**conclusion** 35:17
**condition** 14:17
  23:17 24:12 27:21
  28:5,6 76:4,7
**conditions** 23:16
  28:4
**conduct** 9:14
**conducted** 26:24
**conference** 158:15
**confidence** 120:6
**confirmation** 122:9
**confirms** 123:18
  132:18
**confusing** 14:14
**confusion** 27:11
**connected** 141:25
**consider** 111:25
  160:6
**considered** 10:25
  21:5
**construction**
  100:22

**consultant** 38:23
  42:11 44:18 69:9
  124:10
**consultants** 38:13
**contact** 6:15,16,24
  45:7 86:6 122:4
**contained** 128:17
**contested** 88:12,23 89:22,25
**continue** 9:24
  151:23
**continued** 1:1 2:1
  3:2 110:16
**continues** 4:18
**continuing** 122:5
**contributing** 15:16
  15:20
**control** 26:10 143:1
**conversation** 18:14
  18:17 50:8 75:9
  76:15 82:17
  111:11 119:2,3
  121:16 131:18
  142:5
**conversations** 20:2
  70:1 76:1,10,20
  83:2 97:12 107:24
  121:11 129:8
  130:17 141:14
**cool** 152:20
**copious** 161:22
**copy** 52:9
**correct** 5:10,17,21
  6:5,16 7:1,12,24
  8:6,13,18 10:3,8
  10:11,15 11:14,19
  12:10,11 15:23
  16:2,18,21,25
  18:15 19:8 20:3,6
  21:2 22:5,8 23:6
  23:13,17,21 24:2
  24:18,21,23 25:21
  26:16 29:2,3,5
  30:2 37:17,18,21
  37:22,24 38:1,5,6
  38:9,10,13,14,24
  39:5,9,12,18 40:2
  40:6,11,12,24

41:2,3,6,7,10,11
  42:5 43:2,6,7,11
  44:8,9,10 54:22
  77:14 84:17 85:5
  85:14,24,25 86:4
  86:20,21,23 87:8
  87:20,21,24 88:2
  88:12,23 89:22,25
  90:10,13 91:6,9
  91:13,15,16,23
  92:1,2,5,11,21,23
  92:25 93:5,9,10
  93:13 94:10,14,17
  94:19,20,22,24
  95:9,10,12,13,15
  95:17,20 96:5,7,8
  96:10,11,13,23,24
  97:1,7,9,10 98:3,4
  98:19,20 125:13
  125:14,17,18,22
  125:23,25 126:7
  126:11,12,18,22
  126:23 127:1,6,9
  127:10,15,18,19
  127:23,24 128:19
  128:22 129:2,3,9
  129:15,24 130:2,4
  130:5,15,22 131:4
  131:8 132:20,21
  132:23 133:4,6,9
  134:12,15,16
  135:25 139:3
  140:10 142:1,2,11
  144:6,14,15
  145:15 146:2,4,25
  147:10,14,19
  149:25 150:1,12
  159:8,11 161:2
  162:14 163:7
**corrected** 115:25
  160:24
**correspondence**
  112:12 113:5
**counsel** 19:1,4,18
  19:24 30:18 31:3
  37:10 46:3,12,17
  48:9 52:2 54:5,12

57:9 58:10 69:24
  82:24 100:12,19
  100:23 101:10
  123:17 132:18
  133:1 135:25
  145:18 146:1
  147:9 148:11,18
  149:1,24 150:19
  150:25 151:20
  155:9
**count** 16:1 21:23
  23:2 44:13,22
  45:8
**counted** 36:23
**couple** 39:20 49:9
  50:7 52:21 86:16
  113:18 122:6
  146:24
**course** 45:11 64:14
  121:1 129:7
  130:24 141:22
  160:6
**court** 1:1,22 4:4,7
  4:13 9:12,17,21
  9:24 10:17 12:1
  14:6,9,12 17:8,10
  18:8,20 19:1,8,16
  19:22 25:9,12
  27:18 28:19 29:15
  29:17,23 30:2,4,6
  30:10,15 31:1,7
  31:21 32:5,8
  34:12 35:20 37:7
  37:10 44:25 45:2
  45:19,24 46:8,15
  47:5,11,13,16,23
  48:4,8,12,15,17
  48:20,22 49:1,7
  49:10,13,18,20,23
  49:25 50:3,10,15
  50:17,19,22 51:1
  51:8,10,12,15,20
  51:23 52:1,4,7,10
  52:13,15,16,19,24
  53:2,4,6,11,13,19
  54:1,7,25 55:6,9
  55:11,14,16,20,23

56:1,3,5,7,11,13
  56:16,18,21,24
  57:2,5,7,11,13,15
  57:17,21,24 58:10
  58:13,16 61:5,8
  61:13 62:2 66:22
  67:6 68:8 69:17
  69:21,24 70:23
  74:3,6,11 75:24
  76:14 78:16,18
  79:10 80:16,21
  81:21 82:1,24
  83:4 84:9 92:7
  95:23 98:7 100:8
  100:13,16 101:1,5
  101:7,12,16,22
  102:12,14 103:4
  106:15 112:23
  113:1 114:3,8
  118:10 123:3,8
  124:23 125:2
  130:10 134:5
  138:10 145:5,22
  147:25 148:6,12
  148:14 149:9,11
  150:16,24 151:3,5
  151:10,12,15,23
  153:8 154:18,20
  155:3,5,9,15,19
  155:21 156:8,11
  157:9,14,24 158:2
  158:6,21 159:5,9
  159:12 160:4,8,9
  160:16,21,24
  161:3,13,19,21
  162:7,9,14,16,18
  **courtroom** 34:3
  **cover** 113:14
  **co-source** 32:14
  33:13
  **CPA** 32:20
  **cratering** 23:5
  **created** 71:12
  **creative** 150:4
  **credit** 7:12 16:13
  66:14,14 75:3
  **Creek** 68:12,12

72:9 74:15 75:2
87:22,23,23
**crisis** 107:21
**critical** 77:7,12
**cross** 3:2 48:19
101:5
**cross-examination**
3:3,5,6,8,10,11
4:19 25:13 37:12
40:18 84:12 98:9
125:3 134:6
156:10
**current** 28:9
**currently** 32:3
35:24 102:17
119:7
**C-h-a-r-l-e-s** 61:23

**D**

**D** 2:2 3:1
**Darnell** 1:7 4:5
**data** 9:8 10:2,5
**date** 8:6,21 9:6 25:6
60:25 68:15,17
78:25 79:2,15,16
79:17 80:6 81:2,4
82:5 84:25 91:17
92:17,18 99:23
118:19 119:19
**dated** 51:2 67:1
74:14 118:21
**dates** 82:4
**DAVID** 1:10
**David.j.ignall@u...**
1:14
**day** 1:7 50:5 53:14
54:24 55:3 56:22
104:22 149:16
157:15 159:16
**deadline** 61:2
**deal** 64:15 65:12,12
65:13,14,16,19,20
65:21 131:3
**dealing** 68:23
**dealings** 62:19
**dealt** 133:3
**debt** 63:11 64:10

105:11 106:7
**December** 60:12
72:25 73:22 74:14
75:6,10 81:14
99:20 113:22
115:7 117:20
118:13,21,22
125:15 128:21
129:2 140:12
142:6
**decide** 54:20
**decision** 44:16,17
44:22 45:12 71:2
76:11 87:2 96:25
127:14 160:8
**decisions** 26:10,15
103:15
**decline** 15:20 22:15
27:24
**deemed** 24:21,22
**defendant** 1:1,10
2:1 34:11
**Defendants** 1:5
47:6
**defense** 46:12 48:9
48:25 93:23
142:20 146:13
158:20 159:15
160:12,22
**definitely** 129:20
**degree** 28:7 32:18
32:19
**demand** 72:11
**demonstrate**
108:15
**denied** 131:12
**department** 7:21
26:24 117:5 138:8
**depending** 6:9
**depends** 56:11,13
**deposition** 53:22
157:22,25 158:3
**deposits** 66:11
89:12 109:24
**DEPUTY** 4:4 31:5
57:16 61:11,21,25
101:20 102:5,8

157:17
**description** 139:4
**deserved** 130:15
**desire** 69:13
**details** 136:7
144:23
**deteriorated** 27:22
**determination**
16:20
**determine** 16:18
105:15,17
**determined** 16:10
36:22
**develop** 62:15 63:1
136:21 141:23
**developer** 87:15
88:8
**developing** 93:15
**development** 62:11
62:14,17,20 63:8
65:17 93:11
**developments** 8:20
**different** 6:19
48:19 88:3,11
89:19 91:21,24
104:1,2,12,19
106:5 135:11
**difficult** 107:20
**dilute** 111:19
**DiMarcantonio**
64:16 65:3 84:21
111:8,10 118:13
118:16 127:8,25
128:3 139:15
**DiMarcantonio's**
64:18 65:7,23
**direct** 3:5,7,10 8:2
31:23 38:5 41:24
43:25 62:4 75:22
84:19 85:6 88:25
91:20 101:3
102:15 105:12
129:21 142:24
**directly** 106:3
122:5 133:25
**director** 26:1 33:4
33:5 37:16,25

38:11 39:19,23
135:24 136:3
146:3
**directors** 11:10
25:18,20,23 26:6
37:2 41:10
**discovery** 110:13
126:11
**discretion** 104:11
104:14
**discuss** 50:5 98:13
98:22 114:18,20
159:20
**discussed** 24:6 29:4
86:2 128:1
**discussion** 92:15
108:22 112:2
117:7,11 118:23
**discussions** 17:2
75:14,17 76:3
**dispersed** 59:9
**disregard** 154:21
**dissatisfied** 152:17
**DISTRICT** 1:1,1,8
**document** 7:19,20
9:20 74:23 85:18
90:16 94:2 155:1
155:13 156:4
**documentation**
36:19 40:2 45:10
**documents** 35:3,10
35:14,16 40:4,14
43:25 44:4 47:1
49:9 52:22 59:8
97:23 160:2
**doing** 11:16,22
33:8 34:15,18
39:25 42:20 43:15
70:9 75:17 105:3
112:7 127:7
**dollar** 126:1
**dollars** 110:2
120:12 129:1
**door** 48:5
**Doug** 138:25
**Dowd** 138:25
**downturn** 73:18

110:4
**draft** 116:8 140:8
**drag** 158:21 159:3
**dramatic** 48:1,3
**draw** 35:17
**dropped** 148:21
**due** 10:10 22:15
27:25 84:2 91:22
91:25
**duly** 4:17 31:13
61:19 102:3
**Duncan** 1:19 3:8
55:12 98:6,8,10
99:1 100:7
**duties** 33:10
**D-115** 96:2

**E**

**E** 3:1,15 163:1
**earlier** 29:5,8 147:5
**early** 50:14 107:12
**earnings** 28:10
**easier** 140:5
**EASTERN** 1:1
**economic** 23:15
28:3
**economy** 73:18
**Ed** 65:11
**edits** 154:25 155:8
156:4
**Edward** 64:16,18
65:3,7,22 111:8
**effect** 23:16 28:4
**effective** 160:7
**effort** 141:22
**Egan** 1:2 3:2,5,8,10
4:9,12,14,20 7:15
7:17 8:25 9:2,15
9:22,25 10:1,19
11:2,4 12:2,5,18
12:19 13:10,11,13
13:15,24 14:2,7
14:10,13,15 15:15
15:18 17:13 18:12
18:21 19:11,21
20:1,18,20 21:7
25:8,10 27:17

28:22,24 29:13
30:3 35:18 37:11
37:13 40:16 46:14
47:19 48:1 50:4
50:12 58:18 69:16
69:20,25 70:22
75:23 76:13 80:14
81:19 82:22 84:13
85:7,11 87:9,11
89:4,8 90:15,17
90:24 91:1 92:10
93:23 94:1 95:24
95:25 96:2,3 98:5
99:9 100:6 106:11
106:14 114:1
123:2 125:1,4
130:11 132:4,7,11
133:12,13 134:3
156:14 157:7,18
157:25 158:4,7,9
159:17 160:11
161:12,14 162:11
162:15
**either** 5:6 22:7 66:6
159:15
**electronic** 1:20
163:8
**email** 1:14,18 1:5,9
1:18,23 2:5 43:17
52:22 59:5,12,12
59:16 60:6,16,17
113:10,11,14,18
113:21 114:10,22
114:25 115:1,5,18
115:19 118:20,21
121:13 122:10,20
122:22 123:11
124:3 127:17
132:2 142:15,25
144:13 145:13
146:7,8,20 147:16
147:18 148:17,25
150:24 154:8
**emails** 52:22
113:16,19 118:12
153:19
**employer** 134:18

**energy** 125:16
**Engle** 1:11,11 3:6
30:13,20,22,25
40:17,19 45:5,16
48:7 54:22 55:1,8
55:10,15 56:8,12
56:15,17,20,23
57:1,4,6 58:17
80:15 101:6 114:2
158:8 159:22
161:15,20,24
162:6,8
**enhance** 140:24
**ensues** 19:5,25
30:19 31:4 46:4
46:18 54:6 57:10
100:20 101:11
150:20 151:21
**enter** 47:9
**entered** 68:4
**entering** 65:21
**entirely** 156:18
**entities** 67:2,3
68:13 70:16 74:16
88:2,4 99:12
106:5
**entitled** 131:15
**entity** 66:5 78:2
106:4,10,25
**environment** 117:2
**equities** 103:17
**equity** 15:22 16:2
16:16 24:4 63:12
63:16 64:10 105:9
105:10 106:6
107:8 108:16
111:13,16 112:7
117:20 120:9
121:17 126:2,3
134:25 139:8,9
**era** 85:3
**erosion** 23:13 28:3
**ESQUIRE** 1:10,15
1:2,6,11
**essentially** 8:8
**estate** 22:18 23:4
62:11,14,16,19

87:14
**et** 1:5 54:13,14
**evaluations** 105:14
**evening** 119:19
**events** 20:13
**eventually** 42:19
43:3
**everybody** 22:2
126:14
**evidence** 58:1,8,20
66:18 68:4 74:9
78:15 79:9 80:1
80:18 81:23
113:25 114:5
118:5,9 123:1,5
145:4 147:23
155:13,19,20
**exact** 6:13 17:12
18:3,10 84:25
86:24 96:12,17
120:24 126:1
**exactly** 40:9 129:19
**exam** 5:20,21 9:14
15:3,6 26:14,23
27:5,12
**examination** 3:5
5:5 6:1 7:22 8:2,9
8:15,21 9:1,4
11:22 12:12,20,22
13:16 14:21 15:13
20:16 29:2 31:23
41:25 44:1 62:4
88:25 91:20
102:15 129:21
**examinations** 11:7
11:17
**examiner** 4:23 5:2
5:9 6:2
**examiners** 6:4,18
6:24 7:3
**examining** 7:24
**example** 107:8
**exception** 19:17
**excerpts** 157:22
**excess** 10:9 89:23
**exchanges** 56:24
**excuse** 34:25 146:6

**excused** 30:8 45:20
100:10 157:11
**exercised** 26:9
**exhibit** 27:8 53:24
58:19,22 59:3,4
59:15 60:9 66:25
68:2,10 71:16
74:2 78:11,13,14
79:7,24 80:3,13
80:17 81:9,11,18
81:22 85:7 93:24
99:5,18 112:15,19
113:25 114:4
118:2 122:14,17
122:19 123:1,4
132:8 140:2,7
142:19,20 144:16
144:21 146:13
149:19 154:2,24
155:11
**exhibits** 47:9 57:20
58:7 61:7
**exist** 90:10
**existing** 72:10
99:15 111:14
**expect** 63:9
**expectations** 55:23
**expires** 117:22
**explain** 53:8
**explained** 109:22
**explaining** 105:6
144:13
**exposed** 119:24
**extended** 91:25
**extensive** 144:13
**extent** 27:22
**external** 15:21
28:14 33:14,19
34:22 35:2
**extra** 52:8,9
**extremely** 144:4
**eyes** 5:12

_____

**F**

**F** 163:1
**facilitate** 88:9
**facilitated** 93:11

**facilities** 87:13 88:1
91:21,24 99:10
**facility** 72:8,8
87:14 99:10,10
**fact** 6:7 24:24
42:13 43:8,21
85:22 86:19 130:6
136:17,23 139:25
141:24 147:11
152:12 153:21
159:23
**failure** 27:22
**fair** 6:21 20:12,15
47:23 93:8 135:21
136:8 137:5,17,18
138:1,8,22 139:4
139:15 141:5,6,21
142:6 144:17
145:9,10 146:1
**fairly** 67:13 93:12
**fall** 15:12 125:13
**familiar** 124:15,16
153:17
**familiarity** 5:11
**far** 46:9,9 97:23
98:19 105:14
154:25 158:19
**Fax** 1:13,18 1:5,18
1:22 2:5
**FDIC** 4:23 14:16
15:8 16:20
**fear** 110:9
**Fed** 59:23
**feel** 121:4,24 122:1
158:22
**feet** 138:20,21
155:25
**felt** 84:4 130:14
**figured** 21:20
**file** 52:11,15
**filed** 20:23 21:2
160:18,23
**fill** 98:1 126:2
**filled** 88:19 97:25
**financed** 93:18
**financial** 9:8 10:2
16:7 24:17 25:24

28:13,15 68:24
98:15,23 107:7,21
108:13 111:23
116:17,21,24
120:7 123:16
132:19 133:16,22
138:14 141:15
**financials** 58:25
**financing** 63:10,12
64:8,12 93:14
126:5
**find** 8:22 11:21
38:8 83:19 108:6
127:4
**fine** 48:5 158:2
**finish** 147:11
**finished** 147:18
**firm** 39:1 63:18,20
64:6 103:16,19,23
119:7 124:15
**first** 13:14 15:1,1
15:15 27:4 33:11
59:7,18 60:19,24
72:7 74:25 87:7
88:15 105:24
107:19 113:14
116:13 117:18
120:15 126:24
140:17
**firsthand** 69:21,22
**fit** 160:9
**five** 24:17 86:7
**fixed** 117:7 137:8
**Flat** 62:9
**FLOOR** 1:3,8,16
1:21 2:3
**FLORES** 1:12
**Florida** 114:21
136:20 142:13
**flow** 89:18
**focus** 162:9
**focused** 103:16
**folks** 15:8 136:8
**following** 19:4,25
30:18 31:4 46:3
46:18 54:5 57:10
100:19 101:11

130:19 150:19
151:21
**follows** 4:18 31:14
61:20 102:4
**follow-on** 113:19
**foregoing** 163:7
**forget** 93:1
**form** 43:22 136:15
152:15,24
**format** 104:21
**forth** 100:22
114:22 129:4
159:3
**forward** 32:6 59:13
60:7 123:15 159:6
159:14 160:10
**forwards** 145:12
**found** 14:17 51:1
83:18 141:24
153:21
**four** 15:6 24:16
**four-point-some**
129:1
**FOX** 1:2,7
**Frank** 59:19,24
**frankly** 56:25
161:21
**free** 48:16
**frequently** 86:19
**freshly** 158:24
**Friday** 56:22 58:24
142:6,8 158:11
161:5,9
**front** 8:5 92:17
**full** 15:15
**FULLER** 1:6
**function** 39:4,8,11
**fund** 46:7 104:21
109:4,10,18,22,23
110:5 111:12
119:24
**funding** 36:7 63:7
75:21 108:7
110:23 112:3
117:9 118:25
**fundraising** 110:18
**funds** 27:1 59:10

59:20 103:17
110:16 131:16
139:19 141:3
**fungible** 120:24
130:1
**FUNT** 1:11
**further** 16:4 26:18
28:20 30:4 36:18
37:8 45:16 59:25
84:10 98:5 99:2
100:5 124:24
145:8 147:21
153:5 157:5
**future** 140:24
**FYI** 59:14

---

**G**

**G** 11:14
**Gallub** 3:7 61:10
61:16,17,23,23
62:6 66:24 67:8
68:12 72:14 74:13
76:15 80:25 84:14
86:6 92:8 94:12
98:11 99:3,24
**gap** 49:13 54:19
**gathering** 35:3
**geared** 76:16
**general** 156:7,9
**generally** 105:12
105:19
**generated** 78:1
**gentleman** 26:5
35:23
**George** 11:14 35:6
35:24 59:6,13,17
60:7,8 109:13,25
119:13,22 121:16
122:21
**getting** 23:20 44:6
50:6 90:7 105:4
112:2 118:12
147:3 153:18
**give** 19:19 31:7
39:24 40:13 52:1
61:12 101:22
111:20 119:4

142:18 144:23
145:7 146:18
**given** 28:6 85:18
104:14 119:23
**giving** 117:2 119:10
160:14
**global** 102:21,23
**go** 6:1,4 8:9,25 11:2
13:10,13,24 15:13
16:4 20:16,21
21:21 22:12,13
24:16 28:19 32:13
40:4 49:15,25
54:14 59:25 60:15
72:3 74:14,23
87:10 89:4 90:15
90:24 94:25
100:24,24 115:4
115:15 116:6,23
131:14 154:23
159:1,5,7,10,14
159:23 160:11
**goal** 128:25
**God** 31:9 61:14
101:24
**goes** 10:8 23:11
89:16 150:10
**going** 19:9,19 24:22
42:17,18,23 45:4
46:12 47:1,14
48:8,24 49:15
54:11,16 55:23
56:13 69:25 88:7
88:12 100:23,24
101:3 103:22
104:2 108:5
111:16,19,21
118:1 119:23
126:2,6 140:8
142:24 146:12
149:5 150:13
151:13 156:4,19
157:21 158:20
159:24 160:9,12
161:16,24
**good** 4:7,7,9,10,11
4:21,22 25:15,16

26:21,22 31:25
32:1 37:14,15
40:20,21 49:1,4,5
57:17 62:6,7 77:5
84:14,15 89:17
90:3 95:18 98:11
98:12 125:5,6
134:8 139:22
150:4
**gotten** 131:25
**Government** 1:10
3:2,4,7,9 4:16 8:2
17:15 20:8 31:12
34:9 55:2 58:19
61:18 80:12 81:17
88:15 91:11 99:5
102:2 108:10,16
113:24 122:25
142:21 143:2
148:9 149:19
158:10
**Government's** 7:15
13:14 27:8 50:6
66:25 68:2,10
71:16 74:2 78:11
78:13,14 79:6,24
80:3,13,17 81:9
81:11,18,22 85:7
90:24 99:18 114:4
123:4 132:7 140:1
140:7
**go-between** 96:7
**grand** 90:21
**Granted** 34:12
**granting** 117:2
**great** 57:4 139:19
150:23
**green** 93:1,2,3,4
**GREENBLATT**
1:11
**group** 64:19
**grow** 141:4
**growth** 139:23
140:24,25
**GTM** 32:3,9,11,22
**guaranteed** 109:16
109:24,25

guarantor 89:16
guess 5:1 20:15
    47:22 104:16
    157:21
guy 136:11 138:3
    139:8
guys 115:24 137:5
    138:24
G-a-l-l-u-b 61:24
G-134 3:16
G-183 3:17
G-184 3:17
G-206 3:18
G-37 3:16

**H**

H 3:15
Hal 69:1 73:5
half 126:24
Halloween 110:3
    110:16 126:10
    156:15
hand 31:5 61:11
    101:20
handful 47:1
handle 152:7
hands-on 137:2
handwriting 51:3
handwritten 50:24
    51:2
happen 8:17 48:4
    54:16 122:2
happened 9:19
    23:8,9 95:11
    158:25
hard 105:14,16
    110:20 146:10
hardcopy 66:21
Hartline 1:5 1:2
    6:16 7:5 17:3,5,22
    17:25 18:4 19:7
    20:4 29:4 34:2,3
    34:11 37:20 38:4
    59:6,16 75:15,20
    76:2,6,10,21,25
    77:4,12,15 82:16
    82:17,20 83:6,9

86:20,22 87:4,7
    91:14 92:3 97:12
    97:21 100:1 111:2
    111:7,10 112:2
    113:15 114:13
    118:17,23 119:4
    119:21 120:15,20
    122:4,10,20 124:4
    127:8 128:13
    129:5 130:17
    131:6 132:3
    139:15 141:24
    142:9 152:13,19
    156:22,25
Hartline's 83:16
    158:1
head 37:20
heads 46:25
hear 105:24 109:3
    149:16 161:9
heard 59:24 105:21
    120:1 123:12
    142:8 147:22
    148:20,22 149:15
hearsay 17:9 19:6
    70:2 92:6 147:24
heart 144:4,4
heck 152:2
held 71:12
help 31:8 33:7
    61:14 101:23
    103:15,22
helping 104:3
    125:16
Henry 3:2 4:15
hey 121:14,20
    129:17 131:24
hi 60:17
hierarchy 139:5
high 134:14
higher 65:10
    134:17
highlight 27:9 59:7
    59:14,18,22 60:1
    60:2,8,10,13,16
    60:19,24 78:22
    79:12

highlighted 49:21
highly 27:23
hire 103:14
hired 33:23 37:16
    37:19 103:10,13
    103:24
hit 147:13
hold 152:20
holding 16:11,12
    26:3 42:14 44:7
    44:12 106:24
    133:22
Holdings 16:7
    25:24 98:15,24
    116:17,21,25
    133:17,22
hole 126:3
home 54:8 107:7
    142:13
hone 160:4
Honor 4:14 9:11,16
    9:23 14:10 17:9
    18:7,19 19:6,11
    19:21 25:8,10
    27:16 28:18 29:12
    29:22 30:1,3,5,9
    30:13 31:22 34:9
    37:6,11 40:16,17
    45:17,22 47:18
    50:2,4 51:25
    52:12,20 54:23
    55:4,13,25 56:9,9
    57:6,14,19 58:17
    61:4,7,9 62:1
    66:21 67:4 68:7
    69:19 70:3 74:10
    78:15 79:8 80:12
    80:20 81:17,25
    82:22 84:8 95:24
    98:5,6,8 99:1
    100:5,6,7,12,15
    101:8 102:13
    112:21 114:7
    118:9 123:7
    124:22 125:1
    134:3,4 145:4
    151:22 153:7

154:19 155:12,17
    156:6 157:5,13
    158:16 159:22,23
    161:2,12,14,15
    162:11,17
Honorable 1:7 4:5
Honor's 158:13
    159:19
hoping 119:22
horses 152:20
hour 147:5
hours 147:8
housekeeping
    53:23
Howard 3:9 100:21
    101:19,25 102:1,7
    102:7,10,17
    106:16 113:2,20
    115:14,16 116:24
    123:21 125:5
    148:3
hundred 110:2
    121:2
H-o-w-a-r-d
    102:10

**I**

idea 90:11 139:18
    139:20,22 140:20
identified 25:17,19
    34:11
identify 26:4 34:6
Ignall 1:10 3:10
    4:11 45:22,25
    46:5,9,21 47:6,12
    47:14,17,21,24
    48:3,11,13,16,18
    48:21,23 49:3,8
    49:12,19,21,24
    50:2,11,13,16,18
    51:6,9,11,14,16
    51:22,24 52:3,5,8
    52:12,14,20,25
    53:3,7,12,16,20
    55:19,22 56:2,4,6
    57:12,14,19,22
    58:6,12,14,21

61:6 68:5 74:7
    100:11,14,21
    101:3,8,18 102:11
    102:13,16 103:5
    106:12,18 112:16
    112:18,21,24
    113:3,24 114:6,9
    115:6,8,12,15,17
    116:6,7,12,15,22
    117:6,15,17 118:3
    118:6,8,11 122:15
    122:16,25 123:6,9
    124:21,24 130:9
    132:6 138:9 145:3
    145:19 147:23
    149:5 150:13
    153:6,10 154:2,3
    154:22 155:7,10
    155:17,20,23
    156:9,12,13 157:5
    157:12,20 158:1,3
    159:7,10 160:18
    160:22 161:2
    162:17
II 1:7
immediate 27:23
    28:13
immediately
    121:14 129:15
    142:17
immunity 46:24
impact 8:22
impaired 22:10
impede 153:1
implement 28:11
implied 70:21
impolite 158:23
important 29:18
    40:4 73:19 84:4
impossible 161:23
impression 126:25
    158:10
inaudible 14:17
    19:12,13,15,18,20
    24:7 30:20,21,23
    30:24 46:6,8,9,10
    46:11,13,14 54:15

100:24 101:6
116:23 150:22,22
150:23,23,24,24
150:25 151:3,5,8
151:9,10,11,16,17
151:18 155:16
**include** 66:11
**includes** 25:23
**including** 28:1
139:14
**income** 46:7 103:17
109:4,10,17 110:5
111:12 119:24
137:9
**inconsistency** 51:1
**independent** 9:4
**indicated** 18:18
29:6 41:20 45:11
57:25
**indicates** 74:19
**indicating** 26:9,14
**individual** 9:13
62:21 64:16
**influence** 26:10
38:9 43:15 45:12
76:11
**influenced** 26:14
**inform** 111:17
**information** 7:4,7
36:3,4 38:8 39:24
40:10 43:19 44:5
86:1 114:16 124:4
127:12 147:14
148:1,8,9
**informed** 35:23
**infusion** 27:23
117:3
**initial** 70:7 113:7
**initially** 44:16
153:20 162:1
**inquire** 102:11
**inquiring** 36:19
**inside** 43:8
**insider** 10:20,23
**insiders** 10:25
**insist** 100:1
**insisted** 83:15

**insistence** 83:16
**inspect** 24:24
**instance** 7:10 40:9
**instituted** 117:5
**institution** 27:21
28:9
**instruct** 53:4
**instructed** 46:10
**instructions** 51:21
**instrumental** 64:12
**intelligent** 127:14
**intention** 10:22
**interacted** 64:23
**interactions** 41:17
**interest** 19:17 28:8
**interested** 70:9
**interim** 13:2,4
14:21
**internal** 32:13,16
33:4,6 37:17,25
38:12 39:5
**internally** 10:11
**introduce** 47:3
52:22 53:24 57:19
58:7,9 151:2,4,16
**introduced** 53:23
**invest** 51:4,12
71:14 90:9 104:11
119:9 125:25
128:22,25 141:3
141:17 154:12,15
**invested** 22:23
35:24 44:6 46:6
109:7 120:12
**investigating** 7:11
36:18 106:23
**investigation** 7:12
**investigative** 50:23
**investigators** 50:25
**investing** 106:25
111:25 112:9
117:24 133:23
**investment** 36:13
44:12,23 63:16,18
71:13,21 72:13
88:16 98:14,23
103:15 105:10,14

106:3,7 108:11
109:25 111:15,19
121:17 125:21
126:17 127:1
128:19 133:20
135:1,3,12 136:21
141:9,25
**investments** 22:20
103:20,20 104:1,4
104:15,17,18,20
105:1,3,4,5,7,8,13
105:20 106:1,2,6
107:22 108:1,2,6
109:17 126:9
134:15,25 135:16
138:7
**investor** 64:19
111:15 120:9
**investors** 108:8
114:17 117:8
118:24 119:2
126:5 127:5,13
131:14,15 140:9
141:13
**involved** 13:5 14:21
18:5 26:23 34:18
36:9 41:22 42:7
64:8 65:10 67:2
93:5,7 104:22,25
105:3 107:16
123:25 128:3
135:3 139:9
**in-house** 114:24
**irrevocable** 16:13
**issue** 42:3,17 44:11
46:24 48:19 52:17
54:11 142:3 151:9
**issues** 37:3 48:23
50:5 131:2,3,5
**item** 117:18

### J

**J** 1:10 1:2,11
**Jane** 60:17
**January** 33:2 40:23
131:24 132:12
**JENNIFER** 1:15

Jennifer.barry@...
1:18
**jets** 152:20
Jfuller@foxroths...
1:9
**job** 33:7 43:15
103:25 134:17,17
**Joel** 2:2 134:8
**JOHN** 1:6
**joint** 12:20,22,24
14:4,16
**Jones** 1:7 4:5
Jschwatz@shul...
2:5
**JUDGE** 1:8
**June** 8:5,13,18,21
9:8 10:3 33:2
34:15 41:21 58:24
59:6
**jury** 1:7 29:18 47:4
47:8 52:25 53:3,5
54:7 57:24 58:22
93:24 114:7 123:7
154:20 158:23
160:10

### K

**Kafka-Cougan**
60:11
**keen** 64:4 87:5
92:12
**keep** 52:4,5,10,14
95:18 105:20
**Kellerman** 137:5
138:3,6,13,21
**key** 112:6
**kind** 23:21 32:18
49:13 103:19
106:25 107:25
121:19 124:7
136:10,10 137:13
137:25 138:21
139:4 141:11
144:13 150:6,8
161:17,25
**kindness** 158:13
**Kloppenberg**

138:25
**knew** 63:21 110:19
119:5 120:8 124:7
125:24 126:2,4
**know** 18:9,11 27:1
27:3 36:3,7,14,21
44:25 45:2,3,4,9
59:24 78:7 81:2
87:13 88:19 89:19
90:2 98:19 99:11
104:10 106:9,13
106:23 107:1,3,20
107:23 108:4
109:6,12 110:2,15
110:18 111:15,20
114:12,22 119:5
120:23,25,25
121:25 126:1,10
127:1,2 128:11
129:19 133:19
139:21 140:6,19
145:20 150:3
152:20 154:25
158:24 159:1
161:5,21,24
**knowing** 123:15
**knowledge** 60:1
69:21,22
**known** 29:2
**knows** 145:21
**KPMG** 15:22 16:1
16:10,18,23,24
18:23 22:1 24:5
33:22 34:22 35:2
35:8 36:4,15,21
37:1 38:19 39:11
40:14 42:20 43:3
43:12 44:14 45:11
**KPMG's** 36:13

### L

**L** 60:14
**large** 28:1
**Larry** 58:24 59:6
59:12,16 60:6,14
135:20,24 145:13
**latitude** 19:19

**law** 4:17 11:18,21
12:7 29:10,19,20
31:13 61:19 102:3
124:15
**lawsuit** 59:21
**lawyer** 46:10
114:23 124:12
**leadership** 137:2
**learn** 27:4 65:3
107:15,19 110:4,7
119:14,17
**learned** 120:15
154:14
**learning** 65:21,22
**leave** 52:5 136:7
152:7
**Lee** 124:15 132:23
132:25
**left** 49:14 53:14,25
86:23 134:10
**legal** 121:10,18
122:9,11 123:13
123:18 132:14,19
133:9
**lending** 93:12
**lengthy** 157:23
**letter** 16:13 80:5,6
80:10 81:12,15
92:19 114:11,12
114:15,18 116:8
117:8,12 124:10
124:18 127:16,18
128:4,15 132:23
133:5,6,8 140:8
154:25 155:8,9,10
**letters** 82:4,6 91:12
**letting** 59:23
**let's** 13:14 24:16
58:25 59:3,4 60:2
60:15 78:20 85:9
85:9 116:13,23
144:9 160:17
**level** 28:10 65:10
108:16
**Levi** 37:23 38:1,3
**Levin** 11:14 21:17
27:4 29:1 35:6,21

35:24 36:13 40:11
43:25 44:6 58:25
59:7,13,17 60:7
109:13,16 110:1
119:13,15 120:22
121:16 122:21,21
125:20,24 126:6,8
129:8,23 153:17
156:19,23 157:1,2
**Levin's** 12:10 44:12
119:22 120:15
126:15 139:10
141:25 154:9,14
156:15
**limit** 48:8
**limited** 105:13
**limiting** 140:24
**line** 38:5 59:7,18,22
60:8 75:3 153:21
**lined** 118:23
**lines** 83:17 86:7
**lineup** 50:7
**lining** 119:1
**liquid** 16:14 89:21
**liquidity** 28:7
89:17,19 105:13
105:16
**list** 11:6 35:4 44:17
**listing** 23:19
**lists** 67:1
**little** 59:25 65:16
89:5,6 136:24
137:1 147:4
149:24 160:1
**live** 62:8
**LLC** 68:12,12 72:9
74:16 75:2
**LLP** 1:2,7
**loan** 10:5,8 12:10
20:22 21:2,5,22
21:23 26:10 27:4
29:1 35:6,8,9,15
35:21,22 36:12,22
43:24 44:2,6 59:8
59:9 63:16 66:5
68:11,17 70:16,17
71:18,20,22,24

72:11,14,18 74:15
74:19,20,20 75:6
76:12 78:3,4,8,25
79:2,3,13,15,16
79:17,20 80:8,24
81:13,15 86:14
87:1,2,17 88:15
90:9 91:8,15,17
92:4 97:24 98:14
98:22 99:8,13,19
99:23 100:2,23
107:8 119:15,22
119:25 120:12,16
120:21,25 121:16
121:21 122:21
129:9,23 141:25
153:18,22 154:9
154:14 156:23
157:1,2
**loans** 7:11 10:11,14
10:20,23,23 16:5
16:10 17:23 18:6
21:14 22:4,18,20
23:1,5 39:17
43:14 67:12,13
73:20 75:11 76:21
77:1,8,11,13,16
77:18,22,25 78:5
81:1,4 82:7,9,18
82:21 83:7,8,10
83:18,22 84:2,2
85:20,23 86:2
87:12,20 88:2,8
92:1 97:2,4,8,13
97:18,21 99:12
**local** 23:15 28:3
**locked** 105:20
**Logan** 63:3,23
64:14 65:12
102:18,20,24
**long** 48:1 62:16
101:2 102:23
132:22 158:20
160:12
**longer** 23:5 105:19
117:1 126:6,17
158:21

**look** 5:14 13:14
27:8 35:9 58:25
59:3,4,15 71:20
74:23 78:14,20
79:5,24 93:23
99:18 112:14
114:10,25 125:20
139:25 142:19,23
146:13,17 149:21
**looked** 35:10 39:16
115:19 135:1
141:18
**looking** 23:9 36:18
43:24 56:22 62:25
63:7 68:10,15
71:16 72:6 74:18
74:24 80:3 104:1
144:25 147:16
148:17
**looks** 113:18
**losses** 23:12 28:3
**lot** 6:4 8:9 17:18
85:13 88:7,11
93:20 96:19 97:11
104:13 105:12
106:1 107:22,22
108:4 109:22
110:13 114:22
160:2,3
**Loughney** 3:4
30:12 31:10,11,17
31:17,19,25 32:7
32:9 35:21 37:14
40:20,22 45:1,3
45:21
**lower** 135:5
**lunchtime** 59:9
**L-o-u-g-h-n-e-y**
31:19

─────── **M** ───────

**M** 1:25 60:23 61:1
61:3 163:6,15
**mad** 53:3
**magnitude** 28:12
**main** 6:16 23:23
24:13

**maintain** 71:3
73:19 76:17 84:4
**maintains** 89:11
**major** 126:16
**making** 127:22
**manage** 73:21
77:24 137:8
**management** 15:4
28:10,12 32:3,9
32:12,23 36:20
38:9 40:1 64:7,12
136:13
**manager** 32:13
102:21
**managing** 135:24
136:3 146:3
**March** 14:6,9 51:2
107:13 134:10
**mark** 81:8
**marked** 66:25 68:2
74:2 78:10 79:6
112:15
**market** 1:23 1:3,7
23:5 28:7
**markets** 107:21
**markups** 140:13
**matter** 31:7 61:13
101:22 121:3
163:9
**matured** 92:5,11
**maturity** 79:3,17
79:19,21 91:17
92:17,18 99:23
**ma'am** 27:18 30:10
32:20
**McGladrey** 38:15
38:21,23
**MD** 1:17,21 2:4
**mean** 21:10 33:5
79:19 93:24
103:18 105:16
114:14 128:8
130:13 131:5
151:15
**meaning** 120:25
**meanings** 89:20
**means** 21:1,17 58:2

87:17,17 89:17,21
**meant** 149:6
**mechanism** 96:17
**meet** 62:23 63:22
110:24
**meeting** 15:4 17:14
37:1 63:5 84:24
111:22 112:1
118:16 127:11
128:5
**meetings** 104:3
**meltdown** 90:12
**members** 41:9
57:24
**memo** 66:25
**memoranda** 50:23
124:9
**mention** 24:3 75:20
**mentioned** 18:22
108:3,12 119:13
134:24 159:23
**Merit** 39:14
**Mesner** 51:2
**message** 149:1
**met** 20:8 41:12
62:20,24 64:15
65:2 84:21 111:1
111:7,9 127:7,8
**MICHAEL** 1:11
**micromanager**
136:14
**microphone** 32:6
103:4
**middle** 59:5,16
114:25 116:18
144:16,18,19
**MID-ATLANTIC**
1:22
**mid-December**
130:21
**million** 10:9,10,14
15:22 20:22 21:14
21:17 35:22,24
36:22 44:2,6
65:16,16 89:23
90:18 110:2
117:20 120:23

121:1,1,2 125:25
129:1 137:16
**mind** 83:23 146:20
152:2,20,21
**mine** 93:7
**minimum** 117:19
**minute** 20:17
115:19
**minutes** 49:9 101:4
119:14 144:22
**minutia** 162:5
**misrepresentation**
127:22
**misunderstand**
128:6
**mixture** 135:11
**MLI** 49:14 51:5,17
51:19,23
**MLIs** 50:24
**moment** 25:8 28:17
29:15,17 37:5
47:17 59:4 61:4
74:5 84:7 98:6
100:4,11 122:22
124:21 153:6,12
**Monday** 144:9
158:12,18 159:7
159:10,16,18
160:7 161:7,8,10
161:13 162:13
**money** 60:3 70:12
73:11 91:5 92:22
93:9,13 95:12
96:14,16,22 97:3
97:4,5,6,9 109:24
110:25 117:8
120:13,24 121:20
125:17 126:16
130:1 139:19
**month** 107:10
132:13
**months** 8:16
**morning** 4:7,7,9,10
4:11,21,22 25:15
25:16 26:21,22
31:25 32:1 37:14
37:15 40:20,21

56:12 59:23
114:12 115:3
140:13 142:9,13
144:3,22 145:17
146:22,23 147:7
157:15 159:18
160:7,11 161:7,8
161:11 162:13
**mortgage** 105:11
**motion** 54:10
158:17 160:18,22
162:2,3
**motions** 160:17
**move** 123:15
154:19 160:10
**moved** 66:18 78:15
79:9,25,25
**moves** 80:13 81:18
113:24 122:25
**moving** 53:9
136:20
**multiple** 75:11
**mutual** 103:17
104:21

---
**N**
**N** 3:1 163:1
**name** 26:5 31:15
61:22 62:15 86:5
86:6,9 93:2 94:11
102:6,7,8
**named** 35:23 62:21
64:16 109:12
**NATIONAL** 1:22
**nature** 123:13,19
128:19 132:14,19
150:22
**necessarily** 162:4
**necessary** 61:3
150:11 161:10
**need** 53:24 54:11
54:13 63:11 92:16
115:6 123:13,14
132:14 144:4
158:5,22 159:1,23
161:6,9
**needed** 35:4 76:8

77:2,4,6 78:4
104:15 108:14,18
110:13 111:14
126:4 137:1
**needing** 76:11
**needless** 131:2
**needs** 54:12 59:1
117:19 159:5
**neither** 152:14,19
**never** 41:17 43:21
48:24 85:16 86:22
97:19 123:12
130:25 132:13
148:22 152:9
**new** 5:12 91:25
92:23,24 93:5,6
117:20 126:5,5
131:21 135:16
138:16 140:22
**nice** 52:9
**nonparticipant**
128:8
**nontraditional**
137:25
**non-accrual** 10:11
**Nope** 129:12 152:8
**normally** 161:22
**Norristown** 63:1
64:10,20 66:5
84:23
**Nos** 58:19
**note** 78:21 79:12
91:2,4 99:19
**notes** 49:14 50:25
51:2 161:22
**Nova** 5:5,17 6:11
16:7 25:20,24
27:12 32:23 33:1
33:3,11,19,23
34:14 37:17 39:8
39:12 40:22 41:16
42:19 43:22 46:6
51:4 60:20 61:1
65:4,8,23,25 66:3
66:7,9,15 67:14
67:23,25 68:20,24
69:4,6,12,13,23

70:6,11,14,20
71:2,4,9,25 72:19
73:1,8,12,14,16
73:22 75:7,11
76:12,22 77:1,13
77:17 78:7 81:1
81:14 82:8,10
84:16 85:5 89:12
89:14 90:9 92:22
93:11 94:22 95:12
95:16,19 96:10,14
96:22 97:2 98:3
98:14,15,22,23
99:12 105:21,24
106:2,3,24 107:4
107:7,17 108:3,25
110:16 112:9
116:16,20,24,25
117:19,24 119:8
119:15 125:17,25
127:5 129:9
130:25 133:16,22
139:11 140:9
141:3,23 153:18
**Nova's** 123:17
132:17 133:1
**November** 12:15
13:22 15:7 125:15
126:14,24 127:3
**NSB** 72:9
**number** 3:15 5:23
6:14 7:18 15:19
60:2 91:21 112:20
120:24 123:21
132:5 139:14
153:11
**numbers** 116:4
**nuts** 128:11

---
**O**
**O** 163:1
**OB** 14:8
**object** 149:5 150:13
155:12
**objection** 9:11,21
10:16 11:24 17:7
18:7,19,25 21:4

29:12,24 35:18
44:24 69:16 70:22
75:23 76:13 80:14
80:15 81:19 82:22
92:6 95:22 106:11
114:1,2 123:2
130:9 138:9 145:3
145:19 147:23
151:13 154:17
155:1 156:6
**objections** 27:17
**obviously** 44:1
126:19
**occurred** 139:11
**October** 9:4 25:4
67:1,14 80:7,25
82:5 90:2,13
91:12,14 92:19,20
**offered** 150:14,15
**offhand** 6:14
**office** 1:11,15
119:20 135:19
136:18 144:9
**officer** 7:12 25:25
86:14 119:6
138:14
**officers** 11:10
25:18,20,23 26:6
41:1,5
**official** 6:25
**oh** 13:8 14:10,12
27:15 38:20 54:18
115:14,16 126:14
147:13
**okay** 5:9,20 6:11,15
7:14 9:25 10:20
10:23 11:1 13:4,9
13:19 14:24 15:1
15:5,11,19 16:4
17:2 18:13 21:13
21:20,24 22:4,21
23:19 24:8,15
25:7 26:2 27:8
29:4 30:23 31:1
32:4,11,15,20,22
33:10,21,23 34:1
34:8,18 35:5,8,12

35:15 36:2,6,21
36:25 38:18 39:3
39:22 41:12,15,24
42:22 44:11 45:6
47:11,21 48:15,22
50:15,16 51:6,22
52:13,24 53:12,19
54:25 55:11 56:2
56:6,7,16 57:5,7
57:15 60:9 63:2
63:14,17,22 64:5
64:11,14,21,24
65:2,12,18 66:2,8
66:11 67:7,10,17
68:1,6,15,25
70:10,19,24 71:13
71:24 72:2,14
73:3,6,10,21 74:1
74:18 75:19 76:9
76:20,24 77:3,8
77:21 78:4,23
79:11,19 80:6,22
81:3,6,13 83:9,13
83:16,21 85:4
86:5,9 88:11,24
89:3 90:21 93:16
94:25 96:6 99:16
100:1 101:7
110:12,24 113:20
115:14 116:24
119:23 127:3
128:5,9 130:21
133:3,21 134:2,20
134:24 135:7,11
135:19,23 136:6
136:10,17 137:4
137:12,19,24
138:11,16,19
139:7,13,18 140:7
140:7,12 141:2,7
141:11,18,21
142:5,8,12 144:12
144:25 145:11
146:3,6,12,21,22
147:7,11,16
149:21,22,23
150:10 152:5,17

152:24
**old-fashioned**
161:17
**once** 96:9 121:1
**ones** 46:22
**one-on-one** 139:1
**opening** 48:5
**operating** 23:12
28:2
**operational** 32:16
33:8
**opinion** 18:11,13
**opponent** 151:2,6,7
**opportunities**
135:1,3,12 136:21
**opportunity** 111:20
117:1 137:13
138:1 139:23
140:24 141:2,9,19
**orally** 160:7
**order** 5:20 24:18
28:15 70:10 78:5
84:5 117:8,21
123:18 132:18
139:19
**ordering** 161:16
**original** 71:21
**originally** 158:5
**originated** 16:11
**outset** 57:25
**outside** 33:12 38:12
38:23 42:11 44:17
133:1
**outstanding** 60:1
67:14 81:1,5 82:9
**overall** 27:21 28:6
**overruled** 10:17
12:1 17:8,10 18:8
35:20,20 44:25
76:14 83:4 92:7
106:15
**oversee** 137:16
**over-the-counter**
105:18
**owned** 71:9,11
119:8
**owner** 135:23

**P**

**PA** 1:3,12,17,23 1:4
1:8,13
**PAD** 14:5
**PADOB** 15:9
**PADOV** 14:16
**page** 3:1 8:25 11:2
11:9 12:2 13:13
13:24 15:13 22:12
27:8 72:3 74:23
88:1 89:4 90:15
94:7,25 116:6
117:15 140:17
144:19
**pages** 112:20
**paid** 22:7 77:2,4,6
77:22 80:24 81:2
83:8,10,10,15,17
83:22 91:15 92:4
92:8 97:2,8
**paper** 110:1
**paperwork** 121:22
**paragraph** 13:25
14:4 15:16 16:5
20:17 24:3 60:19
60:25 89:5,6
116:14,18 145:1
**pardon** 50:24
160:21
**parenthesis** 72:9,10
75:2
**Park** 1:16,20 2:3
35:19
**part** 28:25 29:20
33:10 34:25 58:23
59:1 60:16 109:21
112:11 113:17
137:24 139:9
**participate** 43:9
**particular** 43:14
62:13 82:18
**particularly** 94:4
**parties** 160:4
**partner** 93:6
**Partners** 39:14
102:18,20,24

**partnership** 105:13
**parts** 47:22
**party** 151:1,6,7,8
**pass** 127:13
**passing** 140:8
**Patricia** 3:4 30:12
31:11,17
**PATRICK** 1:2
**Patterson** 67:1
86:10,12 98:3
**pay** 77:12,16,18,20
78:3,5 79:21
83:18,19,24 91:5
97:4 100:2 129:23
157:2
**paying** 77:25 82:17
82:20 83:7 97:12
**payoff** 80:5,8,10
81:12,15 82:4
91:11 92:19
**Pegan@foxroths...**
1:5
**Penn** 62:9
**Pennsylvania** 1:1
7:21 26:24
**people** 6:12 23:1
39:20 55:8 111:3
112:6 126:25
127:21 128:22
133:23 135:12
139:14
**perform** 39:3
**performed** 39:8,11
**period** 16:11
141:17
**periodically** 84:3
114:24 119:3
**permitted** 43:9
**persistent** 22:15
27:25
**person** 7:10 39:23
64:22 68:25
145:25
**personally** 13:6
105:3 109:25
141:16
**person's** 137:14

**perspective** 121:19 141:8
**Philadelphia** 1:12 1:17,23 1:4,8,13 102:19 136:18,24
**PHILAPDELPH...** 1:3
**phone** 119:21 130:18 144:7
**phonetic** 60:12
**phrase** 111:5
**picks** 144:7
**PIERCE** 1:11
**place** 8:22 12:12 20:3 85:2 97:16 110:14 119:3 152:21
**planning** 55:1
**play** 50:8 53:21 64:24 157:21
**please** 7:16 12:3 19:1 27:7,13,20 29:15,17 30:7 31:5,15,18 32:5,8 34:6 54:2 58:11 58:22 59:15 60:10 62:2 67:19 72:4,7 72:22 74:25 76:24 78:23 79:6,23 81:7 82:14 85:8 87:10 90:25 93:24 93:25 99:4,17 100:9 101:20 103:4 115:24 116:3 118:4 122:14 123:20 132:7 140:2 142:24 143:3 149:18,21 150:16 155:6,22 157:10
**plenty** 129:23
**plus** 53:21
**point** 6:15 21:9 43:12,17 45:6 50:13 68:4 71:5 75:9 80:1 83:24 110:8,11,22

111:13 112:6,17 119:14 120:5 122:4 127:3 162:2
**points** 24:13 146:24
**poor** 14:18
**portfolio** 75:17 102:21 137:14
**portfolios** 104:2 107:24 137:9
**portion** 60:11 78:23 79:12 142:25
**portions** 137:13
**position** 33:3 54:18 70:11 134:14 135:15,17 138:16 141:7 144:13 160:13
**positive** 71:3 76:17 84:4 141:4,12
**possibility** 157:18
**possible** 53:4
**potential** 140:9
**potentially** 110:11 111:19 160:25
**POTOMAC** 1:16 1:17,20,21 2:3,4
**practices** 28:12
**precipitous** 22:14 27:24
**preexisting** 99:11
**preference** 57:1 159:19
**preferred** 106:7,17
**preferreds** 119:8
**preparation** 17:16
**prepare** 8:3
**prepared** 8:10 154:11 159:18 160:10 161:7,10 161:11
**preparing** 34:22 35:2 112:11
**present** 55:4 158:16
**presentation** 160:7
**presented** 58:1,3

141:12
**preserve** 108:1
**president** 33:25 34:1 134:15 135:16
**presiding** 4:6
**presumably** 29:24
**previous** 115:4
**previously** 4:17 23:6 66:17
**price** 65:14
**primarily** 22:20 28:8
**Prime** 72:11
**principal** 11:10
**principally** 76:16 76:17
**prior** 32:22 35:8 38:11 84:22 85:5 87:3 99:13 115:19 117:20 134:18
**private** 71:14 103:20 104:24 105:2,4,7,9 108:8 134:25 137:25 138:7 139:8,9
**probable** 27:23
**probably** 52:14 54:15 114:21 119:20 124:9 130:19
**problem** 23:4 47:19 53:11 84:6 149:4
**problems** 28:13
**proceed** 4:12,13 25:11,12 31:21 58:5 62:1 101:17 102:14 125:1,2
**proceeding** 162:20
**proceedings** 1:20 163:9
**proceeds** 70:17 72:12 73:24 78:1
**process** 34:24 36:10 43:6,10,24 124:1
**produced** 1:20 4:16

31:12 61:18 102:2
**professional** 145:1
**program** 60:22 108:23 109:1 117:3,4,4,22
**programs** 108:14
**prohibited** 151:13
**project** 62:25 63:3 63:8,10,24 64:8 64:10,20,23,25 72:13,16 84:22,23 85:1 92:23 93:5,6 93:9,12,15 127:4
**projects** 88:7,9,12
**promissory** 78:21 79:12 91:2,4 99:19
**promoting** 141:8
**properly** 5:15 120:22 121:21 132:8
**propose** 52:21
**proposed** 74:20
**prosecution** 85:14
**prospectus** 109:21
**protect** 108:1
**protection** 20:23
**provide** 33:7 38:7 43:18 63:13,14 73:24 75:7 78:8 108:17 127:12
**provided** 35:11,14 40:10 130:25 148:2,6
**providing** 40:2
**prudent** 52:14
**publicly** 104:18,21
**publish** 57:22 99:4 123:6
**published** 27:16 67:5 68:7 74:9 78:17 79:9 80:19 81:24 114:6 118:8
**pull** 32:5 60:9
**purchase** 64:1 67:23,25 68:20 69:12,13 70:6,11

70:12,17,19 71:2 71:25 72:19 73:1 73:8,11,11,14,16 73:21,25 75:7 76:12,16,22 77:1 77:13,16,17 81:14 82:8 95:5 96:10 99:13 117:3,4
**purchased** 16:6,14
**purchasing** 69:23 70:14
**purpose** 63:5 71:20 72:18 74:18 75:5 79:20 97:25 111:22 127:11,16
**purposes** 71:21 72:13 75:4 88:16
**pushing** 158:19
**put** 6:24 11:23 12:6 24:1 46:25 48:24 54:17 95:14 96:16 125:16 128:1,2 140:4 141:11 159:18 160:13 161:11
**putting** 113:7 114:16 159:15
**p.m** 46:20 50:20,21 54:4 57:8 59:12 60:7 100:18 101:9 101:14,15 147:13 147:17 150:18 151:19 162:20

---

**Q**

**qualify** 110:23 117:9 118:24
**quality** 22:16 27:25 28:1
**quarterly** 84:1
**question** 30:3 44:13 59:19 70:4 95:23 98:21 126:8 131:25 154:21 155:5,18,22
**questioned** 129:20
**questions** 5:24 7:18

15:13,20 17:19
26:18 28:20 37:8
43:13 45:17 60:2
84:10 85:13 97:11
99:2 104:5 123:20
153:5,11,14 154:4
155:24 156:1,10
156:14,16,18,20
quite 56:24 90:5
109:8,8 122:7
126:15 135:6
quote 132:8
quotes 56:18

**R**

R 38:15 163:1
raise 16:12 31:5
34:16 42:18 43:1
48:21 61:11
101:20 110:16
111:13,16 112:7
117:19 119:12
120:14 121:6
125:16
raised 44:13 61:1
129:1 147:4 149:4
raises 42:22 44:18
raising 34:19 41:22
42:3,7,14 43:5
60:20 61:2 107:16
110:25 117:8
139:18
RAS 68:15
rate 28:8
rating 12:24 13:1
rational 139:21
Rduncan@shul...
1:23
reach 64:9 111:14
reaching 119:7
reaction 70:7 120:1
120:4
read 9:18,19 10:13
27:13,20 47:19,21
47:22 49:8 72:7
74:25 116:16,20
123:10 148:25

reading 47:25 48:2
ready 8:10 57:11
57:12,13 162:13
real 22:18 23:4
62:11,14,16,19
87:14 90:3
realized 106:1
really 85:22 90:4
95:11 97:15 119:1
136:17 139:8
162:3
reason 5:10 12:22
38:3,20 111:24
125:19 126:4
128:24 130:3
reasonable 157:20
reasons 23:7,19,23
112:7
recall 6:13 34:21
35:5 36:25 62:20
63:2,17 64:3,15
66:13 67:21,24
68:18 75:13,19
76:9,20 77:3,21
83:17 84:24,25
86:24 93:17 96:17
113:2 118:12
156:3
receivable 93:15,18
receive 59:18
117:21 124:4
received 124:9
132:23 133:5
receiving 99:13
recognition 36:2
recognize 7:19 94:3
94:5 112:19 116:8
122:17
recognized 16:15
recollection 20:13
62:24 64:4 65:15
66:4 67:16 71:23
73:4,23 75:16,22
76:1,5 77:5 84:19
84:20 85:6,17
87:5 88:3 92:12
92:16 97:20 98:17

99:15 120:17
128:10 129:25
147:2 157:3
record 31:16 34:10
46:19,20 50:20,21
50:22 61:22
101:14,15 102:6,9
recorded 1:20
51:20
recording 1:20 4:2
recordings 163:8
records 8:10,17
recross 3:2 28:23
100:6 157:7
redirect 3:3,7,10
26:19 29:1 30:1
99:6 153:9
redistribute 115:25
reduction 16:15
21:15 24:4
referred 63:3
referring 114:13
reflect 67:13
reflected 51:4
reflects 34:10
refresh 147:2
regard 147:3 148:2
148:3
regarding 37:3
123:13 132:13
140:21
regardless 158:25
159:8,11
Regards 123:21
REGION 1:22
regulation 11:18,22
29:9,20
regulations 12:7
117:12
reigns 138:7
related 123:23
relates 61:2 151:5,7
relation 62:25
relationship 33:13
63:23 65:4,7,23
65:25 66:3,15
70:20 71:4 76:18

84:5,16,20 85:4
86:25 87:6,9
95:19 97:17
relationships 10:9
73:19 107:4 108:4
108:5 139:2
relative 55:5
Relevance 138:9
relevancy 29:24,25
reluctant 54:7
remain 21:14 24:18
28:16
remained 14:17
remember 17:12,14
17:18,21,24,25
18:3,4 85:1 86:12
89:1 90:12 97:13
97:15 107:10
112:4 119:18,19
120:23 131:16
133:17,18 146:10
153:14 155:25
156:16,20,23
158:24
remembered
114:14
renewed 84:3
repaid 21:22,23
repay 79:22
repaying 76:25
repeat 58:11 155:5
rephrase 70:4
report 7:22,23
11:23 13:16 26:1
26:8,13 28:25
122:12 123:16
132:19
reported 38:1,3
reporting 1:22 7:3
129:4
represent 134:9
representing 64:19
request 34:10 35:4
35:6 67:24 68:21
68:22 69:11 71:18
72:25 73:3,7
74:15 96:9 99:8

requested 70:6
requests 72:10 75:3
require 28:13
required 24:17
28:15 66:6 79:21
requirement 15:21
requirements 18:5
requires 6:21 12:24
13:2
resolution 122:8
resonated 150:6
resources 129:23
respect 26:4 42:18
104:16 148:22
159:25
respectfully 160:3
respective 160:16
respond 54:13
response 59:21
60:17 83:11,14
120:21 123:17
129:21 132:17
145:17 147:8
162:2
responses 56:24
responsible 6:25
responsive 47:25
rest 50:13,13 55:2
157:19 158:10
resting 161:1
result 21:14
resulted 23:12 28:2
retailed 159:1
retakes 4:17
return 19:24 31:3
46:17 57:9 96:1
101:10 151:20
reverse 15:22 17:22
18:1
review 5:21 8:10
9:17 11:5 13:2,4
25:17,19 35:6
116:3
reviewed 8:3 9:15
10:10,15,21 35:15
50:23 85:19
reviewing 35:8

127:20
**reviews** 75:17 84:1
**revolve** 159:12,13
**right** 5:12,13 6:2,3
6:8,19 7:5,23 8:11
8:23 9:5,8,24
10:24 11:6 12:7
12:13,20 13:5,17
13:20,25 14:3
15:8 18:18 19:20
21:8,18 22:2,3,19
23:2,8,9,22,24,25
24:1,3,13,14,25
25:24 26:11 29:23
30:4 31:5 35:13
38:16 39:1,14,17
39:25 40:3,7 42:4
42:14,17,20,24
43:3 44:7,14,19
47:5 48:20 49:15
49:23,25,25 50:1
50:1,2,17,18,19
50:22 51:24 52:1
52:3,7,12,16,19
52:20 53:2 54:1
55:11,14,22 56:4
56:17 57:5,18
58:6,14,21 59:3,4
59:11,24 60:11,15
60:18 61:6,8,11
78:16 83:4 84:22
86:6,14 87:1,13
87:13,14,18,23
88:5,9,17,20 89:6
89:14,18 90:3,6,8
91:2,12,22 92:16
94:23 95:1 96:4
96:14,16,20 97:3
97:5,19 101:1,20
104:10,16 107:9
107:14,21 109:9
109:12,15 110:3
110:10,15 112:8
112:14 113:4,16
114:10 115:4
116:5,11 117:7,11
117:14,23 118:15

118:19 119:13
120:11 122:25
123:6,10,15,22
124:3,6,20 125:9
126:4,21 127:5,14
128:1,2,12,16
129:5,18 130:12
130:13,25 131:7
131:10,12,19,22
131:25 132:12,15
133:5,23 134:11
134:18,23 135:14
135:17 136:6
137:10,20 138:14
139:2,7,11,20
140:14,25 141:9
141:21 142:10,14
144:5,10 145:11
145:14,23 146:6,9
146:16 148:12
149:13 151:4,24
152:9 153:16
154:1 156:12
157:4,14,24 161:3
162:7,10,16,18
**rise** 4:4 57:16
157:17
**risk** 28:8,8,12 32:3
32:9,11,22 68:11
68:16 74:13 85:12
**Road** 62:9
**Rock** 62:9
**ROGERS** 1:15,20
2:2
**role** 44:21 63:9
64:18,25 145:20
**roles** 136:2
**rolled** 84:3
**ROTHSCHILD**
1:2,7
**roughly** 107:10
**Roven** 47:2,4 48:14
48:25 58:24 59:6
59:12,16 60:6,14
60:14 135:20
138:20 145:14,20
145:25 146:7,8,23

147:3,17 148:2
149:6,17,23
150:10 152:5,14
152:25 153:12,16
**Roven's** 46:24
**RSM** 38:15
**rule** 18:22 22:1
54:10 55:5 158:15
158:16 159:1,4,5
159:13
**rules** 151:12
**run** 62:13 131:9
135:20 137:20
**run-of-the-mill**
160:1
**RUSSELL** 1:19

---

**S**

**S** 3:15
**safety** 33:7
**satisfied** 133:6
**satisfy** 153:1
**Saturday** 142:9,13
144:3,9 145:16
146:23 147:7
**save** 141:4
**saw** 45:11,14 85:16
**saying** 15:25 55:16
121:13 122:10
**says** 8:5 9:3,22 10:2
10:5,20 14:4 16:5
16:23 21:13 22:14
23:11,15 24:17
58:23 59:1,8,14
59:18 60:12,16,19
60:20 71:21 88:16
88:17 89:11 90:18
94:22 95:5 114:11
115:7,24 117:16
126:14 144:8,25
145:2 146:23
147:13,21 148:19
149:24 150:2
**scanned** 59:8
**scenes** 124:7
**Schaffer** 69:1,2,6
70:1 73:5 85:23

86:3,23 96:7
**schedule** 54:14
**scheduling** 50:5
**Schwartz** 2:2 3:11
49:24 51:25 52:16
52:18 134:4,7,8
138:11,12 140:1,3
142:19,22 143:1
144:1 145:6,23,24
146:14,15 148:1,8
148:13,15,16
149:7,10,13,14,18
149:20 150:15,21
151:1,4,7,11,14
151:17,22,24,25
153:5,11 154:17
154:19 155:1,4,12
155:16 156:6
157:8
**scope** 29:16 30:1
154:17 156:7
**score** 23:20
**screen** 47:10 79:1
140:5
**scroll** 59:11 60:5,18
71:17 115:12
**seat** 31:16 61:21
102:6
**seated** 4:8 49:7
57:18 101:16
**sec** 146:18
**second** 4:5 22:14
47:15 60:12
**secret** 44:9
**section** 9:1 12:3,4,6
22:13 29:9 74:25
85:9,10 87:10
90:25 99:8,21
**sections** 29:19
**secured** 16:13
**securities** 28:2
**see** 9:3 10:21 11:11
14:18 16:7,16
19:1 20:23 21:15
22:16 30:14 34:3
54:1,20 59:14
60:3,8 74:5 86:6

86:10 87:12 89:9
89:23 90:23 94:2
94:4,5,7 95:1
115:9,16 116:23
119:8 132:9 140:1
148:6,22 150:4,16
157:15 160:17
**seeing** 114:15
**seek** 126:5
**seeking** 16:12
148:8
**seen** 150:8
**sees** 160:9
**seizing** 140:23
**selfishly** 158:23
**send** 114:16 115:18
115:21 147:13
**sending** 116:9
127:21 128:15
145:21
**sends** 145:18 146:7
147:17
**senior** 5:2 134:14
135:16
**sense** 49:10 112:24
**sent** 124:3 132:2
140:9 142:15
147:18
**sentence** 14:3,11
21:13 22:14 74:25
116:16,20
**sentences** 60:25
72:7
**September** 12:13
13:19 20:21 22:5
59:17 60:6 67:22
68:16,21 69:12
71:5,8,8 72:15
80:9 89:12,13,25
90:5,8 94:19 95:9
**serious** 141:19
**served** 136:2
**service** 1:21 119:6
**services** 107:7
**session** 4:5
**set** 5:12 128:6
**severity** 28:12

**shape** 43:22 136:14
  152:15,24
**share** 61:1 107:23
  107:25
**shareholder** 11:6
  20:22 21:14 24:4
  27:2
**shareholders** 10:24
  11:10,13 16:15
  28:14
**shares** 119:8
**Shealy** 1:15 3:3
  25:11,14 26:18
  30:5
**sheet** 60:21
**shoot** 43:17
**short** 123:17
  132:18
**shortly** 16:5 44:5
  130:18,19
**show** 47:1,3,9
  52:21,25 66:18
  68:1 78:10 81:8
  112:25 137:1
  149:18
**showed** 22:2 91:11
**showing** 66:24
**shown** 97:24
  127:17
**SHULMAN** 1:15
  1:20 2:2
**side** 137:25 150:8
**sidebar** 19:2,3,23
  30:14,16,17 31:2
  45:23 46:1,2,16
  54:2,3,4 57:8
  100:14,17,18
  101:9 150:17,18
  151:19
**signature** 94:6,6
**signed** 59:2 63:25
  91:4 94:16
**significant** 23:12
  28:2 64:25 65:18
  65:20 66:14,14
  70:20 73:18 82:9
  93:12,13 117:2

131:3,5
**signing** 119:11
**similar** 106:7
**simply** 58:2
**sir** 4:23 7:19 9:3
  10:13 12:12 13:1
  13:16 14:4 15:19
  22:12 26:23 27:11
  27:20 28:25 30:6
  51:15 52:18 61:5
  62:8 80:4 85:12
  88:14 91:2 92:16
  94:2 95:1,11
  98:13 100:8,16
  102:5 112:23
  113:1 114:8 123:8
  125:15 134:5,8,9
  138:13 140:10
  141:21 142:23
  146:16 148:17,23
  149:21 150:21
  152:1 153:4,8
  157:8,9
**sit** 161:23
**sitting** 34:7
**situation** 40:4
  130:13 148:4
**six** 6:7,12 10:9
**SIXTH** 1:16,21 2:3
**size** 6:9
**snapshot** 24:11
  27:12
**somebody** 5:14
  120:11
**soon** 147:13
**sorry** 14:13 25:18
  27:16 33:15 37:2
  38:20 48:7 49:10
  58:7,10 68:20
  74:3 95:23 106:19
  113:9 115:12,14
  116:13 118:5
  140:2,4 142:21
  143:2 149:17
  151:17 155:3
  159:9 160:24
**sort** 26:9 65:13

**sound** 1:20 124:15
  124:16 163:8
**soundness** 33:8
**sounds** 49:1 90:20
  134:23
**source** 27:1 108:7
**sources** 28:14
**SOUTH** 1:12
**speak** 103:4 117:23
**speaking** 7:8 87:9
  105:12,19
**speaks** 149:9,11
  155:2,13,21
**specific** 77:1 82:21
  83:7 112:5
**specifically** 42:13
  71:12,24 161:9
**specifics** 83:2
**speed** 49:3 105:5
  152:18
**spell** 31:15,18
  61:21 102:6,8
**spend** 56:21 136:23
**spin** 141:12
**spoke** 69:3 86:19
  86:20,22 87:3,7
  97:19 98:2
**spoken** 97:21 98:17
**spot** 160:14
**Square** 63:3,23
  64:14 65:12
**stack** 121:2
**stand** 4:18 30:8
  31:14 45:20 61:20
  100:10 102:4
  157:11 160:24
**standards** 121:23
**standing** 120:7
**start** 9:6 55:6 85:9
  146:19 159:15
**started** 12:15 13:22
  15:6 40:22 55:12
  63:25 84:20
  102:25 104:1
  105:25 107:11
  125:9 134:9
**starting** 15:16

**starts** 20:18 116:16
  116:20
**state** 9:19 31:15
  61:21 102:6
**statement** 19:12,14
  19:16 140:21
**States** 1:1,3,8 30:11
  61:9 101:18
**status** 105:5 111:12
  111:23 113:7
  119:5 141:15
**step** 30:6,7 45:19
  100:8,9 157:9,10
**steps** 28:11 117:16
  117:18
**Stevens** 124:15
  132:23,25
**stipulated** 58:16,18
**stipulation** 47:3
  57:20 58:2
**stipulations** 61:7
**stock** 16:7,14 67:23
  67:25 68:20 69:12
  69:13,23 70:7,11
  70:12,15,18,19
  71:2,6,9,10,14,25
  72:19 73:1,8,12
  73:14,16,22,25
  75:8 76:12,17,22
  77:1,13,17 78:3
  81:14 82:8 89:1
  90:9,22 94:22
  95:5,16 96:4,10
  96:22 99:14
  153:18
**stocks** 103:21
**stop** 55:24 152:14
**strategy** 71:13
**streamlined** 53:9
**streamlining** 46:23
**Street** 1:11,16,23
  1:3,7,12 72:11
**Stricken** 154:20
**strike** 12:18 154:19
**string** 113:17
**strong** 89:17
**structure** 139:5

**struggling** 24:20
**stuff** 22:19 24:1
  104:22
**style** 136:13
**subject** 56:8 122:21
**submissions** 159:3
**submit** 160:3
**submitted** 56:14
**subscription** 94:7
**subsequent** 98:14
  98:23 121:17
**subsidiary** 116:17
  116:21,25
**substantial** 93:8
**substantive** 154:24
  156:4 162:3
**sub-investment**
  28:1
**sudden** 126:13
**sufficient** 118:24
**suggest** 55:6
**suggested** 66:2,6
**suggesting** 43:18
**suggestion** 162:1
**Suite** 1:12,16,23
  1:13
**summary** 22:13
  23:21,24 24:1,10
  24:11 27:9,13
  68:11 74:14 85:12
**supervisor** 104:7
**support** 24:17
  28:15
**supported** 28:9
**supporting** 36:19
**suppose** 159:12
**supposed** 11:17
  38:4 39:24 49:4
**sure** 5:14 30:22
  32:7 35:13 40:1,4
  45:24 47:16 49:19
  53:23 54:9 55:1
  68:3 74:6 98:7
  107:2 121:10,18
  121:24 122:1
  126:15 127:18,21
  145:19 146:19

160:19,23
**Surely** 30:15
**survival** 140:20,21
**survive** 154:5
**survives** 140:22
**sustain** 151:13
**Sustainable** 93:3,4
**sustained** 9:21
  18:20 19:22 69:17
  70:23 75:24
  130:10 138:10
  145:5,22 147:25
  154:18 155:15
  156:8,11
**swear** 31:6 61:12
  101:21
**sworn** 4:17 31:13
  61:19 102:3

_____

**T**

**T** 3:15 163:1,1
**tables** 19:24 31:3
  46:17 57:9 101:10
  151:20
**tag** 65:14
**take** 24:22 27:7
  35:9 53:6,7 57:2
  60:21 67:18,19
  72:21 76:12 78:14
  78:20 79:5,24
  82:13 87:2 99:17
  101:12 110:14
  126:20 133:12
  138:7 146:12
  149:21 160:12
  161:22 162:1
**taken** 28:8,11
  36:15 71:24 72:15
  76:21 80:9 87:1,2
  99:19 142:1
**takes** 8:22 31:13
  61:19 102:3
  145:17 150:12
**talk** 20:17 47:14
  85:22 86:16 108:7
  108:10,25 109:9
  109:15 111:9

114:24 144:10
**talked** 29:5 83:3
  122:22
**talking** 91:9 104:17
  160:25
**TARP** 29:19,20
  36:7,10 60:21
  61:3 75:20,20,22
  90:10,11 108:13
  110:23 112:3
  117:9 118:24
  123:23,25 130:24
  131:12 139:19
  141:3 154:6
**team** 102:22
**technical** 116:4,4
**tell** 54:7 76:24
  121:9 150:11
  153:16
**telling** 17:21,25
  18:4 149:3
**ten** 6:7,12 135:12
  138:21
**tended** 136:7
**term** 72:12 105:19
  117:1
**terminology** 13:12
  33:17 133:19
**terms** 29:23 47:13
  48:5 112:5 162:3
**testified** 9:15 13:17
  51:8 139:7 148:4
**testifies** 31:14
  61:20 102:4
**testify** 4:18 19:7
  69:25
**testimony** 31:6
  61:12 101:21
  133:15 160:3
**thank** 4:14 15:11
  20:19 27:20 28:20
  30:6 31:20,22
  32:8 37:8,11
  45:15,18,19,21
  46:15 49:1 50:2
  50:12 51:25 52:12
  54:2 57:6,7 61:25

62:3 82:2 84:10
  85:8,10 89:7 98:8
  99:1,3 100:5,7,8
  101:16 102:5
  124:24 132:8
  148:15 153:4
  157:6,9,10,16
  158:4 162:15,17
  162:18
**thanks** 15:17 136:6
  158:12
**thing** 54:15 96:12
  126:20 131:7
  137:19
**things** 5:12 11:5,17
  22:23 49:3,9,22
  50:8 88:11 97:24
  107:25 128:14,18
  150:2 152:13,18
  158:19
**think** 5:4,23 6:13
  29:6 46:11,23
  47:2 49:5,8 52:15
  52:17 53:8,17
  76:15 83:2 101:1
  104:12,12,13
  106:5 110:20
  112:5,22 122:6
  124:6,7,8,17
  128:3 135:10
  142:15 149:6
  151:12 154:5
  157:20,23 159:21
  160:12 161:25
**thinking** 54:18
**third** 116:6
**third-party** 124:12
**Thomas** 67:1 86:10
**thought** 38:20
  49:24 136:23
  139:18
**THoward@Balla...**
  113:21
**three** 19:13 87:12
  87:20 99:10
**threshold** 110:19
  110:21

**Thursday** 56:10
  158:14,17 159:13
  159:16 160:5,17
  160:19,20,23
  161:4 162:12
**tie** 41:16
**Timber** 87:23
**time** 5:4,10 7:23
  15:1,4 35:17,22
  40:25 41:16 42:23
  43:12,17 48:21
  53:9 54:13,13
  55:4 57:3 64:5
  65:2,24 66:18
  69:2,13 70:10
  71:5 72:24 73:8
  73:10,17,22 75:10
  75:14,16 77:9,15
  77:18 80:24 82:7
  83:21,24 87:3
  90:3,4 94:14
  96:18 98:2 107:20
  108:13 110:1
  115:1,2,9,21
  116:1 118:15,22
  119:17 122:7
  134:20 135:4,13
  136:24 137:4
  141:16 149:16
  152:1,5 154:8,11
  162:1
**timeframe** 32:25
  41:5,9,20
**times** 57:25 86:17
  105:5 122:6
  148:21
**timing** 86:24 90:11
  110:18
**today** 34:4 53:16
  53:17 157:13
**Todd** 3:9 100:21
  101:18 102:1,7
  113:20 121:23
  123:21 137:5
  138:3
**told** 8:1 17:5 51:17
  77:4 82:16 83:21

92:3,8 129:22
  133:8 137:20
  138:6 152:9,22,22
  153:12,24 158:5
**tomorrow** 50:14
  53:21 55:2 157:15
  157:19 159:20
  161:1
**tonight** 157:23
**too-creative-for-...**
  150:8
**top** 12:3,4 58:23
  59:11 60:5,10,10
  78:22 79:12 85:9
  85:10 90:25 99:21
  114:10 147:16
  148:18
**total** 135:2
**touch** 147:3
**trace** 27:1
**traded** 104:18,21
  105:18
**traditional** 103:16
  103:18,20,22
  104:17,20 134:25
  137:13
**train** 19:20
**transaction** 72:6
  74:24 75:1 105:11
  123:13 132:14
  133:9
**transactions** 105:9
**transaction's**
  123:18 132:18
**transcriber** 1:25
  163:6
**transcript** 1:7,20
  54:12 163:8
**transcription** 1:20
**transcripts** 159:24
  159:25 161:16
**Treasury** 117:5,21
**treatment** 26:15
**trial** 1:7 19:24 31:3
  46:17 57:9 101:10
  151:20
**Tricia** 60:11

**tried** 152:14
**trouble** 90:5 107:22
   107:23 119:25
**troubled** 117:4
**true** 53:8 132:1
   139:12 163:7
**trust** 106:6,16
   119:8
**truth** 31:7,8,8
   61:13,14,14
   101:22,23,23
   150:14,25 151:1
**try** 43:14 107:25
   108:1,5 110:20
   127:4 145:7
   152:25
**trying** 60:8 71:3
   128:21 136:21
**Tuesday** 158:5
   160:11
**turn** 12:2 74:1
   117:15 118:1
   122:13
**turnaround** 161:25
**two** 22:15 24:15
   27:24 49:22 53:16
   53:20 60:1,2,25
   72:7 76:21,25
   77:11,12,16,22,25
   82:7,18,21 83:7,8
   83:10,17 87:22,25
   88:1 99:10 106:5
   124:9,9 136:2
   147:8 157:21
**type** 97:24 104:22
   105:7
**typewritten** 51:19
**T-o-d-d** 102:10

_____

**U**

**Uh-huh** 25:9 50:3
   56:15 142:16
**ultimately** 64:9
   83:19 122:7
**unclear** 106:21
**uncollectible** 21:6
**uncomfortable**

144:5,8
**underneath** 72:8
**understand** 8:8
   17:22 21:20 64:6
   100:23 104:3
   159:4
**understanding**
   42:6,10 65:6,9
   69:3,15,18 111:23
   128:20 136:1
   140:22 141:15
   146:5 148:3 149:3
   149:8 150:21
**understood** 63:12
   108:13 112:5
   145:25 162:8
**underwriting**
   121:22
**underwritten**
   120:22 121:21
**unexpected** 139:10
**unique** 117:1
**United** 1:1,3,8
   30:11 61:9 101:18
**unrelated** 78:2
**unsatisfactory** 28:7
**unsecured** 35:22
**unviable** 24:21
**unwind** 126:20
**update** 119:4,10
**USAB** 106:16
**use** 5:9 70:11 78:2
   88:8 107:7 108:5
**usually** 9:7
**utilize** 9:7
**utilized** 9:7
**utilizing** 10:2
**U.S** 1:11,15

_____

**V**

**Valley** 62:9
**valuable** 126:17
   127:12
**value** 108:1 110:5
**varied** 105:9
**varies** 6:9
**various** 88:12

127:17 128:22
   148:21
**verification** 122:11
**VERITEXT** 1:22
**version** 115:25
   140:14
**versions** 114:11
**viable** 24:18,21
   28:16
**vice** 134:15 135:16
**violation** 11:21
   29:18
**violations** 11:18
   12:7 29:9
**visitation** 14:16,22
**vis-a-vis** 88:12
**vis-à-vis** 86:2
**vividly** 158:24
**volume** 28:1
**volunteered** 129:8
   129:13 156:22,25
**vs** 1:4

_____

**W**

**wake** 126:14
**walk** 152:9
**Wall** 72:11
**want** 5:11,12 8:13
   20:16 30:22 43:1
   48:11,13 55:3
   56:9 73:7 107:12
   111:20 121:23
   132:8 133:11,14
   144:8 162:9
**wanted** 30:25 54:23
   73:9 95:18 119:9
   127:21 128:24
   141:11 152:12
   159:20
**wasn't** 25:2 55:1
   90:2 93:20,21
   119:1 121:10
   128:5 131:6
   136:17 138:17
   156:18
**watch** 30:7 100:9
   157:10

**way** 21:22 32:17
   34:18 36:9 43:22
   51:16 54:17 58:1
   83:18,19 107:16
   111:5 123:22
   136:14 143:2
   152:15,24 159:14
   161:6,17
**weakness** 22:16
   27:25
**Wednesday** 160:15
**week** 121:24 124:9
   130:20 158:6,7,8
   158:11
**weekend** 152:1
   160:6
**weeks** 15:6 19:13
   124:9
**went** 9:5 21:17
   34:14 85:23 122:7
   134:21
**weren't** 14:24
   139:8
**we'll** 52:10 53:1,22
   87:25 101:12
   144:10 152:6
   157:15,22 161:18
**we're** 49:15 50:6
   53:9 54:18 56:8
   57:12 104:16
   111:21 130:21
   157:14,21 158:11
   158:12,12 160:25
   161:16
**we've** 46:25 52:22
   53:23 59:8 91:8
   112:15
**whatsoever** 24:4
   41:18 43:10 45:13
**widely** 108:12
**willing** 141:16
**wish** 52:4 158:14
**withdraw** 30:3
   95:24
**witness** 3:2,4,7,9
   4:16,18 30:8,13
   31:12,13 34:10

45:20,25 46:5
   47:24 48:25 49:4
   51:17 53:1,14
   61:18,19 66:19,20
   80:1 81:8 93:25
   100:10,21 102:2,3
   112:16,25 118:3
   122:15 142:20
   143:3 145:21
   146:14 149:19
   151:16 157:11,12
   161:11
**witnesses** 50:7
   53:16,21 157:21
   158:4 159:15
   162:12
**wondering** 158:15
**word** 140:20
**words** 17:12,24
   18:3,10 22:23
   24:15,17 145:16
**work** 6:19,22 32:2
   32:3,23 33:11,23
   43:8 69:6,8
   102:17,18 103:1,6
   103:10 125:7
   134:21 152:6,6
   157:22
**worked** 32:25
   38:12,19 43:22
   69:9 102:23 103:2
   125:12 134:20
   139:14
**working** 32:22
   39:20 55:7 59:20
   68:23 74:19,21
   75:4 105:25 107:9
   107:25 110:20
   124:8 135:13
**worth** 23:6 94:22
   110:1,7,9 120:22
   121:20 156:15,19
**worthless** 126:9
**wouldn't** 21:20
   114:14
**Wow** 50:15
**write** 23:25 51:18

140:20 144:2,3
145:12 147:12
**writes** 144:22,22
145:7 146:23
147:17 148:19
**writing** 24:1 55:4
56:14 160:5
**written** 51:3,16
95:3 159:3
**wrong** 13:12 33:17
95:21
**wrote** 121:13
122:10 144:12
148:13 154:8
**WSJ** 72:11

**X**

**X** 3:1,15 51:4,12
120:12 121:20

**Y**

**yeah** 5:3 13:7 14:1
15:16 29:11 49:8
49:12,17,19 52:16
55:19 56:3 58:25
62:14 64:9 71:23
89:6 106:22 109:8
111:7 112:4 113:2
113:12 115:10,16
116:24 122:18
134:19 135:5,6,14
135:15,22 136:12
137:7,21,23
141:10 142:19
144:11,24 146:10
146:11 147:15
156:21 158:7,8
**year** 64:2 85:1
107:12 150:7
**years** 4:24 22:15
27:24 62:18 84:17
84:18,22
**Year's** 131:21
**yesterday** 5:24 7:19
13:17 15:14

**Z**

**Zetner** 3:2 4:15,21
10:18 11:25 17:12
18:9 20:2 21:5
25:15 26:21 29:22

**$**

**$1.6** 10:14
**$11** 61:1
**$15** 61:3
**$18** 125:25
**$200** 120:23
**$25** 65:16
**$250,000** 71:22
72:10,14 78:21
80:8 89:1 91:8
94:9,21 95:7 96:1
99:13
**$3.3** 21:14
**$300** 120:23
**$496,866** 89:11
**$5** 20:22 35:22,24
36:22 44:2,6
121:1,1
**$500,000** 74:20
75:5 79:13 81:13
81:15 93:20 99:20
**$6.33** 89:23
**$700** 137:16
**$71** 90:18

**0**

**0:3:04:09** 101:15
**01/01/2012** 79:18
99:25
**01:03:08** 46:20
**01:06:15** 50:20
**01:42:29** 50:21
**01:45:16** 54:4
**01:47:04** 57:8
**02** 5:5
**02:45:55** 100:18
**02:46:37** 101:9
**02:46:43** 101:14
**03** 5:7
**03:49:09** 150:18
**03:50:52** 151:19
**05/01/2010** 79:4

**06** 85:3
**06-ish** 64:4
**08** 85:3 89:12,13
**09** 125:9
**09/30/2008** 79:2
**09:44:29** 4:2
**09:57:19** 19:3
**09:57:54** 19:23

**1**

**1** 59:17 60:6
**1st** 12:15 13:22
15:7 126:14
**1.664** 10:10
**1:00** 59:10
**1:30** 49:5
**10** 1:7
**10th** 1:3 118:21
131:24
**10,000** 25:19
**10.3** 61:1
**10:08:40** 30:17
**10:09:15** 31:2
**10:11** 144:2,3
**10:21:30** 46:2
**10:22:45** 46:16
**10:22:52** 46:19
**10:30** 115:2
**10:33** 115:19
**10:49** 144:21
**100** 3:7 135:2,9
**100,000** 136:12,13
138:20
**103** 3:10
**11:09** 145:12,16
**11:31** 146:22
**11:35** 147:12
**110** 3:16 58:15,19
**111** 3:16 58:15,19
**115** 3:16
**116** 93:24
**12** 1:5 117:20
**12th** 67:1 129:2
**12/16/2009** 79:16
**12:00** 59:10
**12:26** 147:13,17
149:15

**120** 134:22
**123** 1:12
**124** 3:18
**1250** 1:12,16
146:13,14
**12505** 1:16,20 2:3
**126** 3:10
**13** 12:2
**131** 3:16 58:15,20
60:10
**132** 3:16 58:15,20
**134** 112:15,19
113:25 114:4
140:2,7 154:2,24
155:11
**135** 3:11 118:2
**143** 74:2,4
**15** 51:2 62:18
**15th** 74:14 75:6
**15-minute** 101:12
**150** 134:22
**1505** 62:9
**154** 3:10
**158** 142:20,21
144:16,21
**1588** 143:2
**159** 149:19,19
**16** 65:16
**16th** 99:20
**17** 60:23
**1800** 1:23
**1801** 1:23
**183** 81:9,11,18,22
**184** 78:13 79:24
80:3,13,17
**185** 13:14 27:8
**19** 163:14
**19103** 1:23 1:8
**19106** 1:12
**19106-4476** 1:17
**19107** 1:4
**19109** 1:13

**2**

**2** 72:3 74:23
**2:14-cr-00548-C...**
1:3

**20** 101:3
**20TH** 1:8
**2000** 1:3,7
**2002** 5:8
**2003** 5:5,8
**2008** 67:22 68:16
68:21 69:12 71:6
71:8,9 72:15 80:9
84:17 85:5 89:25
90:2,5,8,13,19
94:19 95:9 96:6
98:14
**2009** 5:21 7:22 9:4
10:3,6 26:23 33:2
34:15 40:23,25
41:21 59:6 60:12
67:1,15 72:25
73:22 74:14 75:6
75:11 81:14 96:9
98:21,22 99:20
103:9 107:11,15
110:3,17 113:22
117:21 118:13,21
134:10 156:15
**2010** 5:18,20 12:13
12:15 13:19,22
14:4,16 15:3 20:3
20:21 22:5 24:20
25:19 26:8,14
27:5 28:25 33:2
34:21 42:20,21
76:22 77:22 80:7
80:25 82:5 91:12
91:14,18 92:17,18
92:20,23 100:3
102:25 103:9
134:10
**2011** 24:24
**2012** 25:4
**2013** 20:10,13
**2015** 20:8
**2016** 1:5 20:6 51:2
163:14
**206** 122:14,17,19
123:1,4 132:6,7,8
**20854** 1:17,21 2:4
**215** 1:14

**215-299-2000** 1:4
**215-299-2150** 1:5
**215-299-3815** 1:9
**215-861-8200** 1:13
**215-861-8233** 1:13
**215-861-8388** 1:17
**215-861-8618** 1:18
**230-2891** 1:18,22
  2:5
**24th** 14:4,16
**24-month** 72:12
**250** 90:21
**250,000** 88:24
  90:22
**2500** 1:13
**26** 3:3
**26th** 58:24
**27** 3:3
**28** 82:5
**28th** 20:21 80:7,25
  132:12
**29** 3:2 54:10 55:5
  158:15,17 159:1,4
  159:13
**29th** 89:12,13

---
### 3
**30** 71:8 101:4
**30th** 8:5,13,18,21
  9:8 10:3 12:13
  13:19 59:6 68:16
  72:15 95:9
**300** 78:14 90:25
  120:23
**301** 1:17,18,22,22
  2:4,5
**303** 79:7 99:18
**31st** 10:5,14
**32** 3:5
**33** 8:25
**37** 58:7,14,19,22
**38** 3:5
**39** 58:7

---
### 4
**4** 68:2,10 71:16
  85:7 90:15 99:5

**4.7** 117:20
**4:01** 162:20
**4:31** 59:17
**4:39** 60:7
**41** 3:6 11:2
**43** 4:23 11:3
**45** 144:22
**49** 3:16 58:7,14,19
  59:4

---
### 5
**5** 3:2 13:24 21:17
  22:12 27:8
**5th** 9:4
**5:00** 119:20
**5:11** 59:12
**5:30** 119:20
**50,000** 155:25
**50,000-foot** 136:10
**500,000** 75:3 89:13
**59** 3:16

---
### 6
**6** 15:13
**6th** 113:22 115:7
  140:12
**60** 135:2,9
**615** 1:11,16
**63** 3:7

---
### 7
**73** 3:16 58:8,14,19
**735-1600** 1:14
**777-6690** 1:24
**78** 3:16 58:9,15,19
  59:15

---
### 8
**8.3** 15:22
**81** 3:17
**82** 3:17
**85** 3:8
**888** 1:24

---
### 9
**9:00** 1:5
**9:11** 115:22 140:12
**9:15** 157:15

**945-9283** 1:17,22
  2:4
**95** 7:16
**96** 66:25
**99** 3:8

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,  )   14-CR-0548
                           )
     v.                    )
                           )
BRIAN HARTLINE and         )
BARRY BEKKEDAM,            )   Philadelphia, PA
                           )   April 12, 2016
              Defendants.  )   9:16 a.m.

          TRANSCRIPT OF TESTIMONY OF ANTHONY BONOMO
          BEFORE THE HONORABLE C. DARNELL JONES, II
                UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:          DAVID J. IGNALL, ESQUIRE
                             JENNIFER CHUN BARRY, ESQUIRE
                             ASSISTANT UNITED STATES ATTORNEY
                             UNITED STATES ATTORNEY'S OFFICE
                             615 Chestnut Street, Suite 1250
                             Philadelphia, PA 19106

For the Defendant           PATRICK J. EGAN, ESQUIRE
Brian Hartline:             FOX ROTHSCHILD LLP
                             2000 Market Street, 10th Floor
                             Philadelphia, PA 19107

                             JOHN C. FULLER, ESQUIRE
                             FOX ROTHSCHILD LLP
                             2000 MARKET ST 20TH FL
                             PHILADELPHIA, PA 19103

For the Defendant           MICHAEL J. ENGLE, ESQUIRE
Barry Bekkedam:             GREENBLATT, PIERCE, ENGLE,
                             FUNT & FLORES
                             123 South Broad Street, Suite 2500
                             Philadelphia, PA 19109

Audio Operator:              CARL HAUGER

Transcribed by:              DIANA DOMAN TRANSCRIBING, LLC
                             P.O. Box 129
                             Gibbsboro, NJ 08026
                             Office: (856) 435-7172
                             Fax:    (856) 435-7124
                             Email:  dianadoman@comcast.net

Proceedings recorded by electronic sound recording; transcript
produced by transcription service.

APPEARANCES (Cont'd):

For the Defendant          RUSSELL D. DUNCAN, ESQUIRE
Barry Bekkedam:            SHULMAN, ROGERS, GANDAL, PORDY &
                          ECKER, PA
                          12505 Park Potomac Avenue
                          Potomac, MD 20854

                          JOEL D. SCHWARTZ, ESQUIRE
                          SHULMAN ROGERS GANDAL PORDY ECKER
                          12505 PARK POTOMAC AVE 6TH FL
                          POTOMAC, MD 20854

3

# **I N D E X**

WITNESS FOR THE GOVERNMENT                                    PAGE

ANTHONY BONOMO

  Direct Examination by Mr. Ignall                          4

  Cross Examination by Mr. Egan                            28

  Cross Examination by Mr. Duncan                          39

  Redirect Examination by Mr. Ignall                       42


| EXHIBITS | | ID. | EVD. |
|---|---|---|---|
| G-104 | E-mail dated 10/21 | -- | 15 |
| G-400 | E-mail dated 10/22 | -- | 20 |

Bonomo - Direct/Ignall                    4

1              (The following is the requested excerpted portion

2                        of the proceedings.)

3                            (Jury in)

4              MR. IGNALL:  The United States calls Anthony Bonomo.

5              COURTROOM DEPUTY:  Please raise your right hand.

6                   ANTHONY BONOMO, WITNESS, SWORN

7              COURTROOM DEPUTY:  Please state and spell your name

8  into the record, please.

9              THE WITNESS:  Sure.  Anthony Bonomo, B-o-n-o-m-o.

10             THE COURT:  You may proceed.

11             MR. IGNALL:  Thank you, Your Honor.

12                        DIRECT EXAMINATION

13 BY MR. IGNALL:

14 Q    All right.  Mr. Bonomo, what do you do for a living?

15 A    I'm the CEO of an insurance company.

16 Q    And what's the name of that insurance company?

17 A    It's AFP/PRI.

18 Q    And what do you mean /PRI?

19 A    AFP is a management company that runs an insurance

20 company.  So I'm the CEO of AFP.  PRI is just an insurance

21 entity.  It has no employees.

22 Q    And what kind of insurance is that involved with?

23 A    Medical malpractice.

24 Q    All right.  And how long have you worked for AFP/PRI?

25 A    Thirty-three years.

1  Q    And what jobs have you had there?

2  A    I started as an attorney.  Then moved up into the

3  administration.  Then became the president of the company, and

4  then eventually bought the company.

5  Q    And when did you buy the company?

6  A    2006 I believe.

7  Q    All right.  Did you have anyone within helping you with

8  getting investors for you to buy the company?

9  A    Yes.

10 Q    Who was that?

11 A    Barry Bekkedam.

12 Q    And when did you first meet Mr. Bekkedam approximately?

13 A    I'm not sure of the time, but maybe 2004.

14 Q    All right.  Was it before you bought PRI?

15 A    Yes, it was.

16 Q    All right.  And what business did you understand Mr.

17 Bekkedam to be in back when you first met him?

18 A    He was an investment advisor.

19 Q    All right.  And did he ever seek to get you or any entity

20 you're involved with to invest?

21 A    Yes.

22 Q    Tell us about that.

23 A    A mutual friend, another one of an investment advisors,

24 had met with me and had said that, you know, we were looking to

25 do different types of investments other than the plain vanilla

1  bonds and things like that, and he had recommended that Barry

2  would be a good source to help us out.

3  Q    And did you and -- or did your company invest with Mr.

4  Bekkedam?

5  A    Yes, we did.

6  Q    All right.  And do you know about how much money your

7  company had invested with Mr. Bekkedam?

8  A    There were various deals.  I would say 200 million maybe

9  in total.

10 Q    And how did Mr. Bekkedam assist you in buying PRI?

11 A    It's a complex arrangement, meaning PRI and AFP, and so

12 traditional types of financing are not readily available

13 because of the way the company works.  So Mr. Bekkedam had

14 helped me secure a group of private investors to loan money to

15 me to buy the company.

16 Q    And did you ever invest personally with Mr. Bekkedam's

17 firm?

18 A    Yes, I believe I had investments with Mr. Bekkedam's firm.

19 Q    And when do you think you started investing with Mr.

20 Bekkedam's firm?

21 A    Probably the same time around my company started doing it,

22 2004, 2005.

23 Q    And going through, you know, 2007, 2008, do you have a

24 rough idea how much money you personally had invested with Mr.

25 Bekkedam?

1  A     Eight million.

2  Q     And did Mr. Bekkedam have discretion over what to do with

3  -- how to invest the money?

4  A     Yes.

5  Q     All right.  Have you ever heard of a bank called Nova

6  Bank?

7  A     Yes.

8  Q     And when did you first hear of Nova Bank?

9  A     Probably 2004, 2005.

10 Q     And how did you first hear about Nova Bank?

11 A     I think I first heard it I had -- Barry had mentioned that

12 was one of the banks he worked with.

13 Q     And did Mr. Bekkedam ever suggest that you invest in Nova

14 Bank?

15 A     Yes, I think I did buy shares early on.

16 Q     And did --

17 A     Yes, I did.

18 Q     And what did Mr. Bekkedam say about the bank when you were

19 first investing?

20 A     That he knew a lot of the people there, that it was a good

21 bank, it was a sound bank, and that he believed that it was a

22 good investment opportunity.

23 Q     All right.  And did he ever talk to you about investing

24 again after that first time into Nova Bank?

25 A     I don't recall.  I think I did invest a second tranche,

1  but I don't recall when it was.

2  Q    All right.  Do you remember anything called the Banyon

3  Income Fund?

4  A    Yes.

5  Q    And how did you first hear about that?

6  A    Mr. Bekkedam had called me and as he was my investment

7  advisor had recommended that he thought this was a sound

8  investment and that I should consider, you know, putting money

9  into it.

10 Q    Do you remember roughly when that was?

11 A    Sometime in 2009 I would say.

12 Q    All right.  Are there any documents that I could show you

13 that might help you refresh your recollection as to when that

14 was in 2009?

15 A    I'm sure you must have documents.

16 Q    All right.  Okay.

17 A    I don't --

18 Q    Okay.  Well, do you remember how much money Mr. Bekkedam

19 wanted you to invest?

20 A    Yes, it was four and a half million.

21 Q    Did you have four and a half million available to invest

22 at that point?

23 A    I don't know what I had liquid as far as four and a half.

24 I don't believe so because it was arranged that I did it

25 through a loan.

1 Q    And when you say what you had liquid, what do you mean?

2 A    In other words, what my other investments were that had

3 free cash to make an investment.

4 Q    As opposed to selling something?  What -- I'm not sure

5 what you mean.

6 A    Yeah, well, I don't remember what exactly my portfolio was

7 at the time.  So I don't remember if I had four and a half

8 million dollars in liquid assets --

9 Q    Right.

10 A    -- to invest in it.

11 Q    Do you recall about how much you had already had invested

12 with Ballamor prior to this discussion about --

13 A    Yeah.

14 Q    -- borrowing $4.5 million?

15 A    I would say it was six million, five million, yeah.

16 Q    Now, who suggested that you could take a loan to make an

17 investment?

18 A    Mr. Bekkedam.

19 Q    And did he suggest where you could take the loan from?

20 A    Yes.

21 Q    Where did he say?

22 A    Nova Bank.

23 Q    And did he say whether he would be able to assist you in

24 getting that loan from Nova Bank?

25 A    Yes, I think he said he could help me out.

1 Q    All right.  Did you agree to borrow money from Nova Bank?

2 A    Yes.

3 Q    And how much did you agree to borrow?

4 A    I borrowed four and a half million dollars.

5 Q    All right.  Did you have to prepare any paperwork in order

6 to get that loan?

7 A    No.

8 Q    Did you get any paperwork that you had to sign?

9 A    Yes, I remember getting a document that I had to sign.

10 Q    All right.  Let me show you what -- did you get more than

11 one document to sign?  As you sit here today do you remember?

12 A    I don't recall.

13 Q    All right.  Let me show you on the screen what we've

14 marked as Exhibit 99, and if we could blow up just the bottom

15 part there.

16        MR. IGNALL:  All right.  It's already in evidence.

17 May this be published, Your Honor?

18        THE COURT:  Yes, sir.

19 Q    Is that your e-mail address a.bonomo@medmal.com?

20 A    Yes, it is.

21 Q    All right.  Did anyone else have access to that e-mail

22 address back in 2009?

23 A    My secretary.

24 Q    Okay.  Anyone else other than you or your secretary?

25 A    Not that I know of.

1 Q    All right.  And do you see where it says, subject, e-

2 mailing tax return?

3 A    Yes.

4 Q    Do you recall if either you or your secretary sent your

5 tax returns to Mr. Bekkedam in connection with borrowing money?

6        MR. DUNCAN:  Objection to the compound nature of the

7 question, Your Honor.

8        THE COURT:  Sustained.

9 Q    Well, do you recall if you personally sent a tax return to

10 Mr. Bekkedam?

11 A    I don't recall if I personally sent it.

12 Q    Do you recall whether someone in your office was going to

13 send a tax return to Mr. Bekkedam?

14 A    I don't recall, but I'm sure it was sent because that's my

15 e-mail.

16 Q    All right.  And looking at the date here, does that

17 refresh your recollection around about when the time was that

18 Mr. Bekkedam asked you about making this investment?

19 A    October.

20 Q    All right.  Do you remember -- did these discussions go

21 over, you know, many weeks or months or was -- what was the

22 time period?

23 A    No, it was two or three days that I remember.

24 Q    All right.  Did Mr. Bekkedam ever say anything about the

25 need to move quickly?

1 A    Yeah, I remember loosely a conversation just that this was

2 a fund that was going to get a lot of people in it and it was

3 going to close and it was a sound investment.

4 Q    All right.  If I could turn your attention to Exhibit 304,

5 and I believe this is already in evidence.

6         MR. IGNALL:  Your Honor, may it be published?

7         THE COURT:  Yes, sir.

8 Q    If we look at that first page, do you remember getting a

9 promissory note to sign?

10 A    I'm sure I did.

11 Q    And let me flip to the third page.  Let's blow up the top

12 there.  Is that your signature?

13 A    Yes.

14 Q    Is that your wife's signature?

15 A    No.

16 Q    Okay.  Whose signature is that?

17 A    Mine.

18 Q    Okay.  Did you sign for your wife?

19 A    Always do.

20 Q    Do you remember getting documents like a promissory note

21 to sign?

22 A    I'm sure I did.  I mean my signature is on them.  I don't

23 recall it, but I'm sure I did.

24 Q    Do you recall how you got documents to sign?  Were you

25 physically in -- like let me -- were you physically in

1  Pennsylvania to sign any documents?

2  A    No.

3  Q    All right.

4  A    No, I think they came through a fax.

5  Q    If we could turn to page, the Bates number is 32109.  All

6  right.  And do you recognize the signatures at the bottom of

7  this page?

8  A    Yes.

9  Q    And whose signatures are those or signature?

10 A    Mine.

11 Q    For both you and your wife?

12 A    Yes.

13 Q    Okay.  And who filed out that Part 1, is that your

14 handwriting?

15 A    No, that's not.

16 Q    And what does it say with the question, will any part of

17 this credit be used to purchase or carry margin stock, it says,

18 no, what does it say the specific purpose is there?

19 A    Invest in partnership interest of company.

20 Q    And if we look at I think it's the 11th page of this

21 document, did you provide any collateral for this loan?

22 A    Not that I remember.

23 Q    All right.  If we could blow up where it says collateral

24 description and see.  Did you put up any collateral?  Does this

25 refresh your recollection of whether you put up any collateral?

1 A    I guess so.  It's there.

2 Q    And what does it say there the collateral is?

3 A    One million nine three of Ballamor Capital Management

4 portfolio appraisal in the name of Anthony Bonomo and Mary

5 Ellen Bonomo.

6 Q    Was that at the time about the amount of money you had

7 invested with Mr. Bekkedam through Ballamor?

8 A    Probably so.

9 Q    And if we go the 73rd page of this document.  See if we

10 can blow up the part where it says purpose.  Do you see where

11 it says purpose working capital?

12 A    Yeah.

13 Q    Were you looking to borrow any money from Nova Bank for

14 working capital?

15 A    Not that I know of.

16 Q    Was there any purpose in borrowing this money other than

17 investing?

18 A    Not that I know of.

19 Q    And if we could look at the 17th page of this document.

20 This is Exhibit 304, just so the record is clear, and I'm

21 sorry.  We've already looked at that.  I'm sorry.  Let me turn

22 your attention to Exhibit 104.  All right.  If you could take a

23 look at this.  What is this document?

24 A    It's asking for a signature for a wire.

25 Q    What type of document is it?

1    A    It's an e-mail.

2    Q    All right.  And who's it addressed to?

3    A    Me.

4    Q    All right.  And what's the date on this e-mail?

5    A    October 21st.

6    Q    All right.  Is that your e-mail address, a.bonomo --

7    A    Yes, it is.

8    Q    -- @medmal.com.

9    A    I'm sorry.

10           MR. IGNALL:  All right.  Government moves into

11   evidence Exhibit 104.

12           MR. EGAN:  No objection.

13           MR. DUNCAN:  No objection.

14           THE COURT:  Admitted.

15           MR. IGNALL:  May it be published to the jury, Your

16   Honor?

17           THE COURT:  Yes, sir.

18   Q    Were you getting information from anyone at Ballamor

19   Capital in connection with the loan in October 2009?

20   A    Not that I remember other than pages probably to sign.

21   Q    Did you ever get any pages to sign and send back?

22   A    Yes.

23   Q    And what does this document say?  Can you read it to us?

24   A    Sign the attached wire letter from Nova to Banyon and fax

25   it --

1  Q    Read the whole thing.  It says, Hi Anthony.

2  A    Hi Anthony.  Per Barry, please sign the attached wire

3  letter from Nova to Banyon.  Please fax it back to me as soon

4  as you can today.

5  Q    All right.  I need to turn your attention to Exhibit 113,

6  and I believe this is not in evidence yet.  All right.  Do you

7  remember getting any letters to sign regarding transferring

8  funds?

9  A    I don't recall.

10 Q    All right.  Let me see if I can find you a different

11 document.  Let me turn your attention to what is marked as

12 Defense Exhibit 60 for the witness right now.  Do you recognize

13 this document?

14 A    I don't have a --

15 Q    I'm sorry.  Is that --

16 A    -- recollection of the document.  That is my signature on

17 the bottom.

18 Q    All right.

19 A    But I don't have a recollection of it.

20 Q    But do you remember signing documents around this time?

21 A    Yes, I do.

22 Q    And do you remember signing a number of documents around

23 this time?

24 A    Yes, I do.

25 Q    Did you necessarily read each document carefully before

Bonomo - Direct/Ignall                    17

1 you signed it?

2 A     No.

3 Q     All right.  What's the amount of money that you say you're

4 wiring to the Banyon Fund on October 21st?

5           MR. DUNCAN:  Objection.  He says he doesn't recall,

6 Your Honor.

7           THE COURT:  Sustained.

8 Q     Do you remember signing a letter like this?

9 A     It's my signature on the letter.

10 Q    All right.  Do you remember how much you ended up

11 investing in the Banyon Income Fund in October of 2009?

12 A    My recollection was I invested $4.5 million in the Banyon

13 Fund, that the loan I took from Nova was going into the Banyon

14 Fund.  That's my recollection.

15 Q    But do you recall learning at some point that you had not

16 put all $4.5 million into the Banyon Fund?

17 A    Yes.

18 Q    And how much actually went into the Banyon Fund?

19 A    Two million.

20 Q    All right.  Do you recall whether you signed any documents

21 to invest in Nova Bank stock?

22 A    I don't have a recollection of any specific document, but

23 I'm sure I must have signed some.

24 Q    All right.  If I could turn your attention to -- one

25 moment.  Do you recall Mr. Bekkedam suggesting at the same time

1  you were taking this loan that you invest some of it into Nova

2  Bank stock?

3  A    I do not recall that.

4  Q    Do you recall meeting with investigating agents in about

5  2011?

6  A    Yes, I do.

7  Q    Did -- at that time did you tell investigating agents that

8  Mr. Bekkedam arranged for you to borrow four and a half million

9  dollars, two million to be used for Banyon and two and a half

10  million to be used to purchase Nova stock?

11  A    Yes.

12  Q    Did you say that then?

13  A    Yes.

14  Q    Was your recollection of events a little bit better in

15  2011 than it is today?

16  A    I'm sure it was.

17  Q    All right.  As you sit here today, do you remember talking

18  with Mr. Bekkedam about you having invested in Nova Bank stock

19  with this -- part of four and a half million dollar loan?

20  A    No.  My original conversation was after I had found that

21  the Banyon investment was failing.  I had called the office,

22  but I don't believe I spoke with Mr. Bekkedam.  I spoke with

23  someone in the office saying that I thought the investment was

24  failing and I lost the four and a half million dollars.  And I

25  don't remember who it was that said, well, you only lost two

1 because you put two and a half into Nova.

2 Q    And did you ever talk to Mr. Bekkedam about that?

3 A    I may have had a conversation with him about it.

4            MR. IGNALL:  Can I have one moment, Your Honor?

5            THE COURT:  Yes, sir.

6            MR. IGNALL:  Your Honor, I don't have that much time,

7 but can we take the mid-morning break?  I'd like to identify a

8 document.

9            THE COURT:  Certainly.  Let's take our break at this

10 time, 15 minutes, please.  Thank you.  You can step down.  Just

11 one second, please, until the jury -- just let the jury go out.

12                      (Jury out)

13            THE COURT:  Fifteen minutes, please.  Thank you.

14            MS. BARRY:  Thank you.

15            MR. IGNALL:  Thank you.

16            MR. DUNCAN:  Thank you, Your Honor.

17                      (Recess)

18            THE COURT:  Ready?

19            MR. IGNALL:  Yes.

20            THE COURT:  Come on in.

21            MR. IGNALL:  It turned out I had something on two-

22 sided paper.  That's why I couldn't find it.  Trying to save

23 the earth.

24            COURTROOM DEPUTY:  All rise.

25                      (Jury in)

1      THE COURT:  You may be seated.  Thank you.  You may

2 continue.

3      MR. IGNALL:  Thank you.

4 BY MR. IGNALL:

5 Q   I'd like to show you what we're going to pull up on the

6 screen as Government's Exhibit 400, just for the witness.  If

7 we could blow up the top of the e-mail there.  Do you recognize

8 the e-mail address in the "to" line there?

9 A   Yes.

10 Q   And whose e-mail address is that?

11 A   It's mine.

12 Q   And what's the date on this e-mail?

13 A   October 22nd.

14 Q   And what's the subject there?

15 A   Subscription agreement.

16 Q   And was October 22nd around the time that you were getting

17 documents from Nova Bank?

18 A   Yes.

19      MR. IGNALL:  All right.  Government moves into

20 evidence Exhibit 400.

21      MR. DUNCAN:  No objection.

22      THE COURT:  Admitted.

23 Q   All right.  Who is this e-mail from?

24 A   C. Kim Hartline.

25 Q   And what does the e-mail say?  It says, hello, Mr. Bonomo.

Bonomo - Direct/Ignall                    21

1  A    Attached is the subscription agreement signature page for

2  your investment.  Please print out, sign and fax me a copy of

3  the signature page and send the original to me in the mail.  If

4  you have any questions, do not hesitate to contact me.

5  Q    All right.  And if we could look at the next page, what

6  does that say at the top?  What is this?  Well, hold on.

7  A    Signature page for subscription --

8          MR. IGNALL:  May this be published to the jury, Your

9  Honor?

10          THE COURT:  Yes, sir.

11 Q    All right.  I'm sorry.  What does it say at the top?

12 A    Signature page for subscription by individuals.

13 Q    And what's the dollar amount?

14 A    Two million five hundred thousand.

15 Q    All right.  And if we could scroll all the way down just

16 to the signatures and just blow that up, just from the bottom

17 to all the signatures.  Is that your signature?

18 A    Yes, it is.

19 Q    And do you know who signed for your wife?

20 A    Me.

21 Q    All right.  And do you know approximately when you did

22 this?  Is that -- if you look at the date, is that your

23 handwriting above your signature?

24 A    It doesn't look like the date that I dated it, but it

25 could be.

1  Q    All right.  And then what does it say at the bottom?

2  A    Accepted and agreed Nova Financial Holdings.

3  Q    Do you recognize that signature?

4  A    No.

5  Q    So on or about October 30th, did you sign a subscription

6  to purchase two and a half million dollars of Nova Financial

7  Holdings stock?

8  A    I guess I did.

9  Q    Around this time did you sign a number of documents that

10 someone at Nova Bank sent you?

11 A    I'm sure I did.

12 Q    Let's look at Exhibit 304 for a moment, and if we could

13 just start at page -- this has already been admitted into

14 evidence, page that starts 32111, three two one eleven.

15          THE COURT:  This is 304?

16          MR. IGNALL:  Exhibit 304, yes, Your Honor.

17          THE COURT:  All right.  Counsel, the list that I have

18 that was submitted stops at 304.

19          MR. IGNALL:  Yeah, 400, we had an agreement with

20 counsel as to Exhibit 400, so we've added that to the -- it's

21 not on the list the Court has.

22          THE COURT:  All right.  Thank you.

23          MR. IGNALL:  But by agreement we've added it today.

24          THE COURT:  All right.  Thank you.

25 Q    Do you see this where it says irrevocable stock or bond

1  power entitlement order?  Do you see that?

2  A    Yes.

3  Q    Is that your signature?

4  A    Yes.

5  Q    All right.  If we go another three pages to 114, are those

6  your initials there along the sides?  Can you tell one way or

7  the other?

8  A    I can't.

9  Q    All right.  Let's turn to the next page.  Is that your

10  signature?

11  A    Yes, it is.

12  Q    All right.  Now, let's go two more pages, is that your

13  signature?

14  A    That's me signing my wife's name.

15  Q    I'm sorry.  Yes.

16  A    Yes.

17  Q    And then the next page, is that you signing your wife's

18  name?

19  A    Yes.

20  Q    And how about the following page?

21  A    That's my signature, yes.

22  Q    Now, if I could turn your attention to Page 32148, please,

23  in this document, do you see where it says disbursement request

24  and authorization?

25  A    Yes, I do.

1  Q    All right.  Do you recognize the signatures at the bottom?

2  A    Yes, they're mine.

3  Q    All right.  And what's the date of this authorization, if

4  you look kind of two sections above your -- or two paragraphs

5  above your signatures?

6  A    October 22nd.

7  Q    All right.  Let's go up to specific purpose.  Do you see

8  what it says there?

9  A    Yes.

10 Q    All right.  And what does it say the specific purpose is?

11 A    Business investment.

12 Q    And if we go to disbursement instructions beyond there, do

13 you see where it says amount paid to borrower directly?

14 A    Yes.

15 Q    And what does that say?

16 A    Two million five hundred thousand.

17 Q    And then other disbursements, what does that say?

18 A    Two million.

19 Q    And where is that going?

20 A    Banyon Group.

21 Q    And do you recall signing this document on or about

22 October 22nd, 2009?

23 A    Yes.

24 Q    Does that refresh your recollection about whether Mr.

25 Bekkedam had asked you to invest in more than one thing on

1  October 22nd?

2              MR. DUNCAN:  Objection.

3              THE COURT:  Sustained.

4  Q    Does that refresh your recollection about whether you were

5  agreeing to invest in more than one thing on October 22nd --

6              MR. DUNCAN:  Objection.

7              THE COURT:  Overruled as to that one.

8  A    My signature is on it, so.

9  Q    All right.  And did you later learn that you had invested

10 $2 million with Banyon?

11 A    Yes, there came a time where I did learn that.

12 Q    All right.  With the amount paid directly to borrower, did

13 you -- do you know where that went, into what account?

14 A    No.

15 Q    Did you have an account at Nova Bank?

16 A    Probably, yeah.

17 Q    Did that two and a half million dollars ever go into an

18 account other than Nova Bank that you recall?

19 A    Not that I recall.

20 Q    All right.  Do you recall ever doing anything with that

21 two and a half million dollars?

22 A    No.

23 Q    Do you know if that money was in the Nova Bank account

24 what happened to it?

25 A    I know now it was used to buy stock in Nova Bank.

1 Q    Did you make payments on that loan after October of 2009,

2 that four a half million dollar loan?

3 A    Yes.

4 Q    Do you recall if anyone else ever made a payment on your

5 behalf?

6 A    No.

7 Q    All right.  What was the term of that loan, if you

8 remember?

9 A    I don't remember.

10 Q    And if we turn back to Exhibit 304, just the first page,

11 and just blow up the top a couple of lines.  No, why don't we

12 just actually go up to the top, just blow up promissory note.

13 It's probably the better place to do this.  Do you see what the

14 loan date is?

15 A    Yes.

16 Q    And what's the loan date?

17 A    10/22/2009.

18 Q    And what's the maturity?

19 A    11/1/2019.

20 Q    And do you know what that means, maturity?

21 A    When it should be paid off.

22 Q    All right.  And so long was that loan for approximately?

23 A    Ten years.

24 Q    All right.  Did you make any payments on that loan after

25 October 2009?

Bonomo - Direct/Ignall                    27

1  A    Yes.

2  Q    And at some point did you stop making payments on that

3  loan?

4  A    Yes.

5  Q    And were you ever in any litigation over this loan?

6  A    Yes.

7  Q    And was that litigation over whether you should have to

8  pay it back?

9           MR. EGAN:  Objection.

10          THE COURT:  Sustained.

11 Q    What was that -- well --

12          THE COURT:  All right.  Overruled.

13          MR. IGNALL:  I --

14          THE COURT:  Overruled.

15 Q    Was that over whether you should have to pay this loan

16 back?

17 A    Yes.

18 Q    All right.  Did you end up settling that litigation?

19 A    Yes.

20          MR. IGNALL:  One moment, Your Honor.

21          THE COURT:  Yes, sir.

22 Q    If I could turn your attention back to Exhibit 304, first

23 page, and if we blow up maybe the first two paragraphs in the

24 body there.  The payments you're -- what does it say the amount

25 of your regular payment was on this loan?

1  A    Thirty-four thousand five thirty-nine ninety-three.

2  Q    All right.  And do you know was there going to be a larger

3  payment at the end?

4  A    Yes.

5  Q    And how much was the payment going to be at the end?

6  A    Three million twenty-nine five thirty-eight twenty-seven.

7           MR. IGNALL:  Nothing further, Your Honor.

8           THE COURT:  You may cross examine.

9           MR. EGAN:  Thank you, Your Honor.

10                    CROSS EXAMINATION

11 BY MR. EGAN:

12 Q    Good morning, Mr. Bonomo.

13 A    Good morning.

14 Q    In October of 2009 you were a customer of Nova Bank,

15 correct?

16 A    I believe so.

17 Q    Your company is it API/PRI, a combination?  I call it PRI.

18 So we'll call it PRI?

19 A    There's two companies.

20 Q    Right.

21 A    AFP and then PRI.

22 Q    Right.  And PRI was a large customer of Nova Bank,

23 correct?

24 A    I believe so.

25 Q    Had a lot of money there?

1   A    I can't tell you the balances we had.

2   Q    Well, they were large, right?

3   A    Yeah, I guess so.

4   Q    And you personally were also a customer of Nova Bank as

5   well?

6   A    Yes.

7   Q    You had an account there with your wife, right?

8   A    Correct.

9   Q    And it was a joint account?

10  A    Yes.

11  Q    And you were asked by Mr. Bekkedam if you were interested

12  in investing in Banyon Fund, correct?

13  A    Yes.

14  Q    And at the time you were a wealthy man, right?

15  A    I guess so.

16  Q    Well, let's not guess.  If I can have Government's 109,

17  please.  Okay.  And if we could go --

18           MR. EGAN:  And if it could be published, Your Honor?

19           THE COURT:  Yes.

20  Q    And if we could go to Page 2 and blow up the first

21  paragraph under the top box.  And, sir, it says here that --

22  no, no, the first -- we're not on the right page here.  My

23  apologies.  Page 2 of 7.  I have the -- my page must be out of

24  order.

25           MR. EGAN:  May I approach, Your Honor?

1              THE COURT:  Yes, sir.

2  Q     Sir, do you see this summary of your assets?

3  A     Yeah.

4  Q     It says here that you were worth approximately $22 million

5  at the time?

6  A     Correct.

7  Q     Right.  Does that sound about right to you?

8  A     I guess so, yeah.

9  Q     And I mean you would agree with me that's pretty wealthy,

10 right?

11 A     I guess so.

12 Q     And you had made a lot of that wealth through your

13 company, correct?

14 A     Yes.

15 Q     And one of the ways you made that wealth was by

16 leveraging, correct?

17 A     Yes.

18 Q     And leveraging means borrowing money at a low rate and

19 then investing it at a high rate, correct?

20 A     I don't know the definition of leveraging, so.

21 Q     But you know about borrowing money at a low rate and

22 investing at a high rate, right?

23 A     Sure.

24 Q     That's something you did frequently, correct?

25 A     I did some, yes.

1  Q    And that's a great way to make money, isn't it?

2  A    Yes.

3  Q    And when you agreed to invest in Banyon you were worth $22

4  million, right?

5  A    Yes.

6  Q    But you didn't want to take that $22 million and invest it

7  in Banyon, right?

8  A    The $22 million was not cash.

9  Q    Right.  It was invested in a lot of other stuff.

10 A    Right.

11 Q    Yeah.  So you wanted to leverage the money to invest in

12 Banyon, correct?

13 A    I guess so.

14 Q    Yeah, so you borrowed it?

15 A    Yes.

16 Q    And similarly you borrowed the money to invest in Nova,

17 correct?

18 A    Subsequently I learned that, yes.

19 Q    Yeah, we'll talk about it in a bit, but that's what you

20 did, right?

21 A    Yeah.

22 Q    Okay.  And when borrowing the money you took out a loan,

23 right?

24 A    Yes.

25 Q    Mr. Ignall showed you a whole lot of documents with your

1 signature on them, right?

2 A    Yes.

3 Q    And those are documents you had to sign to get this loan,

4 correct?

5 A    Yes.

6 Q    And that was a commitment that you were going to pay the

7 loan back, correct?

8 A    Yes.

9 Q    And you signed your wife's names to a lot of things, but I

10 assume you had her permission to do that, right?

11 A    Still do, yes.

12 Q    Okay.  So together you were agreeing to repay a loan to

13 Nova Bank of $4.5 million, correct?

14 A    Yes.

15 Q    Okay.  Now, that's a lot of money, right?

16 A    Yes.

17 Q    And if we could have Government's 304, and we're going to

18 have to jump around here.  I apologize.  But if we could go to

19 Page 3, those are the signatures you just testified that you

20 signed, correct?

21 A    Yes.

22 Q    And do you see that name, Mr. Patterson?  Do you know who

23 he is?

24 A    No.

25 Q    And this is a promissory note.  It's a promise to pay back

1  this money, right?

2  A    Yes.

3  Q    Okay.  And then behind that, at Page 4, is a business loan

4  agreement, correct?

5  A    Yes.

6  Q    And at Page 10 you signed that, right?

7  A    Yes.

8  Q    And that is an agreement to pay it back?

9  A    Yes.

10  Q    Okay.  And on the next page you sign a commercial pledge

11  agreement, correct?

12  A    correct.

13  Q    Now, Mr. Ignall asked you about the collateral there.

14  It's $1.9 million, give or take, of Ballamor Management

15  portfolio, right?

16  A    (No audible response).

17  Q    That's not all the money you had under management at

18  Ballamor, is it?

19  A    I don't know at that time.

20  Q    If you're -- would I -- would it be correct to say that

21  you had a fair amount of money invested at Ballamor?

22  A    I do not know what I had invested --

23  Q    You don't remember.

24  A    -- at Ballamor at that time.

25  Q    And you don't --

1 A    This is a fair amount of money, yes.

2 Q    And you don't remember whether some of it was in accounts

3 that couldn't be pledged as collateral?  You don't remember any

4 of that?

5 A    I had other investments, but I don't know if they could

6 have been pledged or not.

7 Q    All right.  It's safe to say you didn't really get down in

8 the weeds of this transactions?

9 A    No.

10 Q    Okay.  Now, I also want to look at some documents Mr.

11 Ignall showed you, which are at Page 22, and do you see that,

12 sir, that's a confession of judgement?  Do you see that?

13 A    Uh-huh.

14 Q    You know what that is, right?

15 A    Yeah.

16 Q    That means that if you default the bank can confess

17 judgment against you, correct?

18 A    Correct.

19 Q    And essentially then you have to run into court and try to

20 undo that, correct?

21 A    Yes.

22 Q    And that's one of the reasons that even if you didn't want

23 to pay a loan, if you committed to this, you would probably

24 keep paying it, right?

25 A    Yeah.

Bonomo - Cross/Egan                    35

1  Q    And the fact of the matter is that you paid this loan up

2  and until the time that Nova Bank closed, didn't you?

3  A    I guess so.

4  Q    And, in fact, when you say you had a litigation and you

5  settled that, you didn't settle with Nova Bank, did you?

6  A    No.

7  Q    You settled with the FDIC, didn't you?

8  A    Yes.

9  Q    But up until the day Nova closed, this loan was current

10 and paid, wasn't it?

11 A    To the best of my knowledge, yes.

12 Q    All right.  Now, if we could go to Page 56, you were asked

13 some questions about this by Mr. Ignall, correct?

14 A    Yes.

15 Q    It's a disbursement request and authorization, right?

16 A    Correct.

17 Q    And you signed it, right?

18 A    Yes, I did.

19 Q    You signed it on behalf of your wife?

20 A    Yes.

21 Q    And it says in the middle there that the amount to be paid

22 to you directly is $2.5 million, do you see that?  If you could

23 blow up that top section there.

24 A    Yes, I see it.

25 Q    Okay.  And it goes to an account 33016049.  That's your

1 Nova account, right?

2 A     I do not know.

3 Q     You don't remember?

4 A     Right.

5 Q     But you had a Nova account, correct?

6 A     I believe so, yeah.

7 Q     And to the borrower directly would indicate to your

8 account, correct?

9 A     Yes.

10 Q     And then it says two million is going to the Banyon Group,

11 correct?

12 A     Correct.

13 Q     Now, and it's dated October 22nd, right?  It's way up at

14 the top.  You can't see it there.

15 A     Okay.

16 Q     So on October 22nd, $2.5 million from this loan, this is

17 your signature saying put 2.5 million in my account and the

18 other two to Banyon, correct?

19 A     Correct.

20 Q     Okay.  Now, you were shown Government's 400, if we could

21 have that, and if we could have the -- oh, we don't -- you

22 probably don't have it.

23         MR. EGAN:  Sean, you've got it as D-114.

24 Q     That was a subscription agreement.  You remember that,

25 right?  If we can go to Page 2, please.  Remember this?

Bonomo - Cross/Egan                    37

1  A    No.

2  Q    Well, you just looked at it this morning.  Do you remember

3  --

4  A    Yeah, I remember it --

5  Q    -- being showed it, right?

6  A    -- saying it was my signature, but I don't remember a lot

7  of these documents.

8  Q    Right, yeah.  It's just 2.5 million bucks.  So you have --

9        THE COURT:  Sustained.

10 Q    The amount of money that you're investing here is

11 $2,500,000, correct, sir?

12 A    Yes.

13 Q    And you sign this on October 30th, right?

14 A    Yeah.

15 Q    That's eight days after the money went into your personal

16 account, correct?

17 A    I guess so, yeah.

18 Q    And this is your agreement to take that $2.5 million from

19 your account and invest it in Nova stock, correct?

20 A    I guess so.

21 Q    Nobody forced you to sign this, did they?

22 A    No.

23 Q    And, in fact, you received a stock certificate for your

24 stock, didn't you?

25 A    I don't know.

Bonomo - Cross/Egan                          38

1            MR. EGAN:  Okay.  Could we have D-113, please, just

2    for the witness?  Just for the witness, Sean.  Thank you.

3    Q    Sir, you see D-113?

4    A    Yes, I do.

5    Q    And it's a Nova Financial Holdings stock?

6    A    Uh-huh.

7    Q    It says your name, right?

8    A    Yes, it does.

9    Q    Dated October 30th, 2009?

10   A    Yes.

11   Q    Does that refresh your recollection as to whether you

12   received stock?

13   A    I don't recall ever seeing this.

14   Q    Okay.  If you could go to Page 3, do you know a Mr. May

15   (phonetic)?

16   A    Yes.

17   Q    He's your lawyer, right?

18   A    Uh-huh.

19           THE COURT:  Please say yes or no.

20           THE WITNESS:  Yes.  I'm sorry, Your Honor.

21   Q    And this is a letter in 2011 from your lawyer to Ms.

22   Hartline, correct?

23   A    I can't see who the letter is to.

24   Q    I'm sorry.

25   A    Okay.

Bonomo - Cross/Duncan                                    39

1  Q    My -- can we just have the body, from -- yeah, there you

2  go.  Thanks.  It's from your lawyer and Ms. Hartline, correct?

3  A    Yes.

4  Q    And it's about your stock ownership, correct?

5  A    Yes.

6  Q    Because you bought stock in Nova Financial Holdings,

7  correct?

8  A    Yes.

9  Q    With your money, right?

10 A    Yes.

11        MR. EGAN:  Nothing further, Your Honor.

12        THE COURT:  Mr. Duncan.

13                CROSS EXAMINATION

14 BY MR. DUNCAN:

15 Q    Good morning, Mr. Bonomo.

16 A    Good morning.

17 Q    Sir, you testified that Mr. Bekkedam back in 2006 helped

18 you raise funds in order to buy your company, correct?

19 A    Yes.

20 Q    And you went to Mr. Bekkedam because he was a very good

21 person at raising funds, correct?

22 A    Yes.

23 Q    And he raised you approximately $40 million in order for

24 you to invest in your company?

25 A    Yes.

1  Q    And as a result of his work, you became the owner of that

2  company, correct?

3  A    Yes.

4  Q    Through your relationship with Mr. Bekkedam, you always

5  had a good relationship with him, didn't you?

6  A    Yes.

7  Q    He was someone who advised you and you followed his

8  advice, correct?

9  A    Yes.

10 Q    Sir, you also testified -- you're an attorney, correct?

11 A    Yes.

12 Q    You -- and you're also the CEO of a big company, right?

13 A    Yes.

14 Q    You understand the importance of signing a document, what

15 that means, correct?

16 A    Yes.

17 Q    And the significance is that you're agreeing to whatever

18 you sign, correct?

19 A    Yes.

20 Q    If we could go to Government's 304, Page 56, please.

21      MR. DUNCAN:   And if we could show that to the jury

22 too, please, when you get to Page 56, please.

23 Q    You've seen this earlier during your direct examination

24 with Mr. Ignall and the cross examination with Mr. Egan.  This

25 shows the disbursement of the $4.5 million that was loaned to

1 you by Nova Bank, correct?

2 A    Correct.

3 Q    And you will agree that the money once it was lent to you

4 was your money to do what you wanted, correct?

5 A    I guess so, yeah.

6 Q    Sure.  And then if we could go to Page 163 of this

7 document.  Blow that up, please.  Can we blow up the whole

8 exhibit?  This is a letter.  It's coming from Tom Patterson at

9 Nova Bank, and in it you sign with the direction that Nova Bank

10 should wire $2 million of your --

11          MR. IGNALL:  Your Honor, I do not believe this is in

12 evidence yet.

13          MR. DUNCAN:  Actually it's in Government's 304, Page

14 163.

15          MR. IGNALL:  Oh, I'm sorry.  I apologize.

16 Q    You could go ahead and answer.

17 A    I'm sorry.

18 Q    Yeah, I'm sorry.  Let me try again, Mr. Bonomo.  So this

19 is a letter from Tom Patterson to you, right?

20 A    Yes.

21 Q    And in -- which you direct Mr. Patterson to wire $2

22 million of your money to the Banyon Income Fund, correct?

23 A    Yes.

24 Q    Mr. Bekkedam didn't have you sign this letter, did he?

25 A    No.

1 Q    And then if you would go to Government Exhibit 400, Page

2 2, which is actually Defense 114.  If we could go to Defense

3 114, Page 2, but it's the same exhibit.

4          MR. DUNCAN:  Do you agree, Mr. Ignall?

5          MR. IGNALL:  Yes.

6 Q        Okay.  If we could show that, please.  And, again,

7 you saw this on cross examination and on direct examination.

8 This is your signature of the subscription agreement, correct?

9 A    Yes.

10 Q    And it's a subscription agreement.  It comes to you from

11 Nova Bank, correct?

12 A    I don't recall who sent it to me.

13 Q    It's a Nova Bank document --

14 A    Yes, it is.

15 Q    -- in which you subscribed to Nova Bank stock, correct?

16 A    Yes.

17 Q    And that's what you intended to do, correct?

18 A    At this point, yes.

19          MR. DUNCAN:  Thank you, Your Honor.  No further

20 questions for this witness.

21          MR. IGNALL:  Okay.  One moment, Your Honor.

22                    REDIRECT EXAMINATION

23 BY MR. IGNALL:

24 Q    Mr. Bonomo, in October 2009, did you at any time decide to

25 buy Nova Bank stock?

Bonomo - Redirect/Ignall                    43

1 A    I don't recall deciding to buy Nova Bank stock.

2 Q    Did you -- with respect to how much money Mr. Egan said

3 you were worth back in October 2009, did you liquidate any of

4 that -- any of the assets you had in order to buy Nova Bank

5 stock?

6 A    No, I took a loan.

7           MR. IGNALL:  All right.  Nothing further.  Thank you.

8           MR. EGAN:  No recross, Your Honor.

9           MR. DUNCAN:  Nothing further, Your Honor.  Thank you.

10           THE COURT:  Thank you, sir.  You may step down.

11 Watch your step, please.

12                     *  *  *  *  *

13

14                 **C E R T I F I C A T I O N**

15           I, COLETTE MEHESKI, the court approved transcriber,

16 certify that the foregoing is a correct transcript from the

17 official electronic sound recording of the proceedings in the

18 above-entitled matter.

19

20 Colette Meheski

_Digitally signed by Colette Meheski
DN: cn=Colette Meheski, o, ou,
email=dianadoman@comcast.net, c=US
Date: 2016.04.14 11:18:19 -04'00'_

21 COLETTE MEHESKI

22 DIANA DOMAN TRANSCRIBING, LLC      DATE:  April 14, 2016

23

24

25

Page 1

1                    UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF PENNSYLVANIA
2

    UNITED STATES OF AMERICA      )   2:14-cr-00548-CDJ
3                                 )
                                  )   April 13, 2016
4   vs.                           )   Philadelphia, PA
                                  )
5                                 )   PARTIAL TRANSCRIPT
    BRIAN HARTLINE, et al         )   9:39 a.m. - 1:53 p.m.
6

7                   EXCERPT OF JURY TRIAL DAY 11
          TESTIMONY OF DAVID SWARTZ & ALLEN SHUBIN
8           BEFORE THE HONORABLE C. DARNELL JONES, II
                   UNITED STATES DISTRICT JUDGE
9

    APPEARANCES:
10

    For United States of       DAVID IGNALL, ESQ.
11  America:                    U.S. ATTORNEY'S OFFICE
                                615 Chestnut Street
12                              Suite 1250
                                Philadelphia, PA  19106
13

    For Defendant              PATRICK J. EGAN, ESQ.
14  Brian Hartline:            FOX ROTHSCHILD, LLP
                               2000 Market Street, 10th FL
15                             Philadelphia, PA 19107

16  For Defendant              JOEL SCHWARTZ, ESQ.
    Barry Bekkedam:            RUSSELL D. DUNCAN, ESQ.
17                             SHULMAN ROGERS GANDAL PORDY &
                                 ECKER
18                             12505 Park Potomac Ave 6th FL
                               Potomac, MD 20854
19
                               MICHAEL J. ENGLE, ESQ.
20                             GREENBLATT PIERCE ENGLE FUNT
                                 FLORES
21                             123 S. Broad Street
                               Suite 2500
22                             Philadelphia, PA  19109
23        Veritext National Court Reporting Company
                     Mid-Atlantic Region
24         1801 Market Street – Suite 1800
                  Philadelphia, PA 19103
25                    1-888-777-6690

Page 2

```
 1                    I N D E X

 2              EXCERPT OF JURY TRIAL

 3    WITNESS              DIRECT    CROSS    REDIRECT   RECROSS

 4    David Swartz           3      21, 44      53

 5    Allen Shubin          55        87        162       167

 6

 7

 8

 9                    E X H I B I T S
10
      NO.               IDENTIFICATION                  PAGE
11
      Government's:
12
      171               Loan documents                   12
13    169               E-mail                           13
      122               E-mail                           19
14    178               Document                         64
      187               Document                         83
15    181               Document                         86

16

17    Defendant's:

18    N/A

19

20

21

22

23

24

25
```

Page 3

```
 1                    P R O C E E D I N G S

 2         (Requested excerpt begins at 9:39 a.m.)

 3         (Jury present)

 4                    MR. IGNALL:  The United States calls

 5    David Swartz.

 6                    DAVID SWARTZ, WITNESS, SWORN

 7                    THE CLERK:  Please state and spell your

 8    name for the record.

 9                    THE WITNESS:  My name is David Swartz,

10    S-W-A-R-T-Z.

11                    THE COURT:  You may proceed.

12                    MR. IGNALL:  Thank you, Your Honor.

13                    DIRECT EXAMINATION

14    BY MR. IGNALL:

15         Q.   Mr. Swartz, what do you do for a living?

16         A.   I'm a lawyer.  I'm a partner at Stevens &

17    Lee.

18         Q.   And how long have you been a partner at

19    Stevens & Lee?

20         A.   I've been a partner for 27 years.

21         Q.   All right.  And how long have you worked

22    there overall?

23         A.   It will be 33 years in August.

24         Q.   All right.  And what type of work do you do

25    there?
```

Page 4

1          A.    I'm co-chair of our corporate finance and

2    capital markets group and chair of our financial

3    institutions group, so banking and corporate finance.

4          Q.    So do you ever represent banks?

5          A.    Yes.

6          Q.    All right.  Have you ever represented a bank

7    called Nova Bank?

8          A.    Yes.

9          Q.    When did you first represent Nova Bank?

10         A.    It was, I believe, February of 2008.

11         Q.    And what were you doing for Nova Bank that

12   first time?

13         A.    We were engaged to assist the bank with the

14   acquisition of Pennsylvania Business Bank, so it was a

15   bank merger.

16         Q.    And after that did you provide any other

17   legal services to Nova Bank?

18         A.    Yes, we did.

19         Q.    All right.  Were you ever involved in Nova

20   Bank raising capital?

21         A.    Not directly.  I was aware that they were

22   raising capital.

23         Q.    But did your law firm provide any services

24   in connection with --

25         A.    Not --

1       Q.   -- raising capital?

2       A.   Not directly, no.

3       Q.   Going to around 2008, 2009 do you know

4   whether Nova Bank ever applied for funding under the

5   TARP program?

6       A.   Yes.

7       Q.   Were you at all involved in the TARP

8   application?

9       A.   Yes.  I saw the TARP application that was

10  submitted.

11      Q.   After that were you involved at all in

12  communicating with regulators with respect to the TARP

13  application?

14      A.   I was not -- did not have any direct

15  conversations with any of the regulators on the

16  application.

17      Q.   Who was your primary contact at Nova Bank?

18      A.   It would have been Mr. Hartline, the CEO.

19      Q.   Okay.  And do you see Mr. Hartline in court

20  today?

21      A.   I do.

22      Q.   And can you identify him by where he's

23  sitting and what he's --

24      A.   Yes.  He's --

25      Q.   -- wearing?

Page 6

1        A.   -- sitting at the table there in the middle.

2        Q.   All right.

3             MR. IGNALL:  May the record reflect

4    that the witness has identified Mr. Hartline?

5             THE COURT:  Yes, sir.

6    BY MR. IGNALL:

7        Q.   Did you have any discussions with Mr.

8    Hartline about whether Nova had been accepted into the

9    TARP program?

10       A.   Yes.  In August of 2009 they received a

11   preliminary acceptance letter from the U.S. Treasury.

12       Q.   And did Mr. Hartline say whether there were

13   any conditions on getting --

14       A.   Yeah.  I --

15       Q.   -- the acceptance?

16       A.   -- I saw the letter and there were -- there

17   was a condition that the holding company raise 10

18   million of additional equity.

19       Q.   All right.  At that point do you -- you ever

20   heard of someone named George Levin (ph)?

21       A.   Yes.

22       Q.   And what was your understanding about who

23   Mr. Levin was?

24       A.   Mr. Levin was an investor who was proposed

25   to purchase up to 24.9 percent of the holding company

1    stock --

2         Q.   And had --

3         A.   -- common stock.

4         Q.   -- you discussed Mr. Levin's investment with

5    Mr. Hartline?

6         A.   I was aware of it.  Yes.

7         Q.   And did you discuss it with Mr. Hartline?

8         A.   Yeah.  We saw the applications that were

9    submitted.  We were given copies of them.

10        Q.   And as of the time you saw this letter from

11   the treasury, do you know whether Mr. Levin had

12   invested any funds to by Nova stock?

13        A.   Yes.

14        Q.   And how much did you understood (sic) he

15   invested?

16        A.   He made a $5 million investment.

17        Q.   Okay.  At this time in August did you have

18   any understanding about whether Mr. Levin had borrowed

19   any money from Nova Bank?

20        A.   No.

21        Q.   Did you ever provide any counsel to Nova

22   Bank about whether to loan money to Mr. Levin?

23        A.   Not at the time it was loaned.

24        Q.   All right.  Did you ever provide any counsel

25   to the bank about what to disclose to the FDIC

1    regarding the TARP application?

2          A.    No.

3          Q.    Were you at all involved in Mr. Levin's

4    application to get permission from either State or

5    federal regulators to buy a certain percentage of Nova

6    Financial Holdings?

7          A.    We saw the applications and we did assist

8    with the -- there was one issue that came up on

9    disclosure of some civil litigation which we looked

10   at.

11         Q.    Did you prepare any financial statements for

12   Mr. Levin in --

13         A.    No.

14         Q.    -- connection with that?  Now at some point

15   in 2009 did you learn about whether Mr. Levin had had

16   suffered a financial setback?

17         A.    Yes.

18         Q.    And if I could turn your attention to

19   Exhibit 122.

20         (Pause)

21               MR. IGNALL:  One moment, Your Honor.

22               THE COURT:  Yes, sir.

23         (Pause)

24   BY MR. IGNALL:

25         Q.    If I could turn your attention to the screen

1  you'll see Exhibit 122.  Do you recognize this

2  document?

3       A.   Yes.  This is an e-mail that I sent to the

4  treasury's counsel.

5       Q.   And what -- why were you communicating with

6  treasury -- what's the date of this e-mail, by the

7  way?

8       A.   It is dated November 3rd, 2009.

9       Q.   And why were you communicating with treasury

10 counsel on November 3rd, 2009?

11      A.   We had -- it appears we had a closing

12 scheduled on the TARP application and we were unable

13 to close because of Mr. Levin unable -- being unable

14 to fund.

15      Q.   And did you understand this was because of

16 his financial reversal?

17      A.   Yes.

18      Q.   Okay.  And what was your role with respect

19 to the TARP closing?  What --

20      A.   All the TARP documents were the same

21 essentially for all banks.  So there were certain

22 documents prepared, a stock purchase agreement, stock

23 certificates, those types of things that had to be

24 prepared for closing.

25      Q.   At the time you were communicating with the

1    treasury here in November of 2009 up to -- at that

2    point did you know whether Mr. Levin had borrowed any

3    money from Nova Bank?

4         A.   No.

5         Q.   When's the first time that you learned that

6    Mr. Levin had borrowed any money from Nova Bank?

7         A.   February of 2010.

8         Q.   And how did you learn about that?

9         A.   A call from Mr. Hartline.

10        Q.   And what did Mr. Hartline say?

11        A.   He indicated that someone had raised a

12   question about the propriety of the loan given the --

13   that it occurred contemporaneously with his stock

14   investment in June.

15        Q.   And what -- did he ask you to do anything?

16        A.   Yeah.  He asked me to review it and prepare

17   a -- determine whether or not we thought it was

18   appropriate.

19        Q.   Appropriate in what sense?

20        A.   Legal, you know, not a violation of any law,

21   banking law or regulation.

22        Q.   And were you going to give an opinion about

23   whether -- how that loan should be reported in terms

24   of the bank's accounting?

25        A.   No.  No.

1          Q.    Were you providing an opinion about whether

2     that loan is something the bank should have disclosed

3     as part of its TARP application?

4          A.    No.

5          Q.    And did you get information from Mr.

6     Hartline?

7          A.    Yeah.  I requested a copy of the loan

8     documentation that was used for the loan.

9          Q.    And did you provide an opinion letter to Mr.

10    Hartline?

11         A.    I did.

12         Q.    All right.

13         A.    We did.

14         Q.    I would like to turn your attention to

15    Exhibit 171.

16                   MR. IGNALL:  Just for the witness,

17    please.

18    BY MR. IGNALL:

19         Q.    Do you recognize Exhibit 171?

20         A.    Yes.  That's the letter.

21         Q.    All right.

22                   MR. IGNALL:  And can I see the hard

23    copy?

24                   Your Honor, may I approach?

25                   THE COURT:  Yes.

Page 12

1   BY MR. IGNALL:

2        Q.   Given the volume, it might make sense if you

3   flip through the copy I've placed in front of you.

4        A.   Okay.

5        Q.   So let me know, do you recognize the

6   attachments that are behind the letter?

7        A.   Yeah.   These appear to be the loan

8   documentation -- the loan documents that we requested.

9        Q.   All right.

10               MR. IGNALL:   Government moves into

11   evidence Exhibit 171.

12               MR. EGAN:   No objection.

13               MR. ENGLE:   No objection.

14               THE COURT:   Admitted.

15        (Government's Exhibit No. 171 received)

16               MR. IGNALL:  All right.  Before we get

17   to -- we'll get to that in one moment.

18   BY MR. IGNALL:

19        Q.   Can I turn your attention, just for the

20   witness right now, to Exhibit 169.  Do you recognize

21   Exhibit 169?

22        A.   Yes.  That's an e-mail that was sent to me

23   transmitting the loan documents that were requested.

24        Q.   And who sent the loan documents to you?

25        A.   Thomas J. Patterson.

Page 13

1       Q.   And what's the date?

2       A.   February 2nd, 2010.

3            MR. IGNALL:  Government moves into

4    evidence Exhibit Number 169.

5            MR. EGAN:  No objection.

6            MR. ENGLE:  No objection.

7            THE COURT:  Granted.

8       (Government's Exhibit No. 169 received)

9    BY MR. IGNALL:

10      Q.   And what does the body of the e-mail say?

11           MR. IGNALL:  May it be published to the

12   jury, Your Honor?

13           THE COURT:  Yes.

14   BY MR. IGNALL:

15      Q.   What does the body of the e-mail say?

16      A.   It says, David, per Brian's request attached

17   are the loan documents for Mr. Levin.

18      Q.   All right.

19      A.   Thanks, Tom.

20      Q.   All right.  So what -- and that's February

21   2nd.  Let's go back to Exhibit 171.  What's the date

22   of your letter back to Mr. Hartline?

23      A.   February 11th, 2010.

24      Q.   All right.

25           MR. IGNALL:  May we publish Exhibit 171

Page 14

1    for the jury?

2                    THE COURT:  Yes.

3                    MR. IGNALL:  Can we just blow up the

4    first paragraph?  It actually makes it --

5    BY MR. IGNALL:

6        Q.   If you could start with, in that regard, can

7    you read what you say there in your letter?

8        A.    In that regard we have received from you and

9    have reviewed the following:  One, Nova Bank's risk

10   assessment summary revised as of June 17th, 2009

11   relating to the line of credit; two, a business loan

12   agreement dated June 30, 2009 executed by the bank and

13   the borrower relating to the line of credit; three, a

14   promissory note dated June 30, 2009 executed by

15   borrower in the principal amount of 5 million; three

16   -- there's a typo here.  There are two two's, but this

17   is three, a copy of the customer privacy policy

18   delivered to the borrower in connection with the line

19   of credit; four, a copy of the bank's disbursement

20   request and authorization relating to the line of

21   credit; five, a copy of the loan request summary

22   relating to the line of credit; and, six, a copy of

23   the boarding data sheet relating to the line of

24   credit.

25       Q.   All right.  And after reviewing all the

1    documents did -- do you have any understanding about

2    the timing of when Mr. Levin got his loan?

3         A.   Yes.  June 30.

4         Q.   Right.  And do you have any understanding of

5    when Mr. Levin made an investment in Nova Bank?

6         A.   Yes.

7         Q.   And what was the date of that?

8         A.   The same date, June 30.

9         Q.   All right.  But based on the documents you

10   received did you have an understanding about what the

11   purpose was of Mr. Levin getting the loan from Nova

12   Bank?

13        A.   Yes.  Under the documents the purpose of the

14   loan was to improve some real estate in Malvern,

15   Pennsylvania.

16        Q.   And let me look -- go back to page 1 in

17   particular.  Do you see where it says you reviewed

18   Nova Bank's risk assessment summary revised as of June

19   17th, 2009 relating to the line of credit?

20        A.   Yes.

21        Q.   All right.  Do you know what a risk

22   assessment summary is with respect to Nova Bank?

23        A.   I would take it that it was a summary that

24   would have gone to either a loan committee or a board

25   for -- in connection with a loan approval.

1        Q.    All right.  If I could turn your attention

2    to I believe it's page 20 of this -- and if you want

3    to flip through the hard copy and look.  Is this the

4    risk assessment summary you reviewed in connection

5    with your letter?

6        A.    Yes.

7        Q.    And who is the borrower?

8        A.    George G. Levin.

9        Q.    And if we go down to purpose what does it

10   say the purpose of the loan is?

11       A.    Bridge loan for improvements to property.

12       Q.    All right.  And if we go to the next page

13   and blow up facility one transaction comments.  In

14   banking terms do you know what facility means?

15       A.    To me facility is a -- is the line of

16   credit.

17       Q.    All right.  What does this say in -- under

18   transaction comments?

19       A.    It says, Mr. George G. Levin, borrower, is

20   requesting a 5 million non-revolving commercial line

21   of credit from Nova Bank.  The loan will be used by

22   Mr. Levin for a short term bridge loan.  The borrower

23   will use these funds to replace funds that were used

24   to purchase and improve real estate located in Devin,

25   Montgomery County.  The loan will be a twelve-month

1    line of credit.  This loan will be repaid from

2    permanent financing that the borrower will put in

3    place.  The payments will be interest only with a

4    prime rate -- with a rate of prime plus one percent

5    with a floor of seven percent.  The loan will be

6    unsecured.  The balance sheet of the borrower is very

7    strong and income is more than sufficient to service

8    this debt.  The balance sheet of Mr. Levin's company,

9    Banyon Group, shows over 600 million in liquid assets.

10        Q.   Did you receive more than one risk

11   assessment summary for Mr. Levin when you were

12   preparing your letter?

13        A.   No, not -- at the time that we prepared the

14   letter, no.

15        Q.   I would like to turn your attention to what

16   will come up on the screen as Exhibit 43.

17             MR. IGNALL:  I believe this is already

18   in evidence, Your Honor.  May it be published to the

19   jury?

20             THE COURT:  Yes, sir.

21             MR. IGNALL:  If we could blow this up.

22   BY MR. IGNALL:

23        Q.   Did you ever see this risk assessment

24   summary at the time that you were preparing your

25   letter?

1      A.    Not at the time of the letter, no.

2      Q.    And in this risk assessment summary what

3   does it say the purpose of the loan is?

4      A.    Financial investment.

5      Q.    All right.  At the time you prepared this

6   letter did you have any documents or information from

7   Mr. Hartline that Mr. Levin was using the line of

8   credit to purchase Nova Financial Holdings stock?

9      A.    No.

10      Q.    Have you ever heard of someone named Anthony

11   Benomo (ph)?

12      A.    I've heard the name.

13      Q.    Do you know whether or not he had any loans

14   from Nova Bank?

15      A.    I don't recall.

16      Q.    Do you know anyone named Charles Gallib

17   (ph)?

18      A.    That name is not familiar to me.

19      Q.    Have you ever heard of a business called

20   Belmar Creek?

21      A.    That name I don't recall either.

22      Q.    All right.  If I could turn your attention

23   -- if I could turn your attention to the second page

24   of Exhibit 171.

25      (Pause)

Page 19

1        Q.   Did you review any other loan documents that

2    stated the purpose of the loan?

3        A.   No.

4        Q.   Are all the documents that you reviewed in

5    connection with your letter contained in Exhibit 171

6    as --

7        A.   Yeah.  They --

8        Q.   -- best as you recall?

9        A.   -- appear to be.

10        Q.   And if you want to flip through with what

11    you say in your letter and flip through and see if

12    that appears to be consistent, let me know.

13        (Pause)

14        A.   Yeah.  That looks complete to me.

15            MR. IGNALL:  All right.  May I have one

16    moment, Your Honor?

17            THE COURT:  Yes, sir.

18        (Pause)

19            MR. IGNALL:  All right.  Government

20    moves into evidence Exhibit 122.

21            MR. EGAN:  No objection.

22            MR. ENGLE:  No objection.

23            THE COURT:  All right.  Admitted.

24        (Government's Exhibit No. 122 received)

25    BY MR. IGNALL:

1     Q.   Now Mr. Swartz, was what Mr. Hartline

2  represented to you and what the documents show the

3  purpose of the loan to Mr. Levin was relevant to your

4  opinion letter?

5     A.   Yes.

6     Q.   And what was your understanding of the

7  purpose of Mr. Levin's loan?

8     A.   That they were -- the purpose of the loan

9  was to basically finance improvements to real

10  property.

11     Q.   And at the time you wrote the letter did you

12  understand whether the purpose of the loan was to

13  invest in Nova Financial Holdings stock?

14     A.   No.

15     Q.   Was your letter at all based on an opinion

16  about whether it would be appropriate to have Mr.

17  Levin borrow money from Nova to invest in Nova

18  Financial Holdings stock?

19     A.   No.

20     Q.   And was your letter at all involved in

21  determining how the bank should account for Mr.

22  Levin's investment?

23     A.   No.

24     Q.   Was your letter at all involved in how the

25  bank should report Mr. Levin's investment to federal

Page 21

1    regulators?

2         A.    No.

3         Q.    All right.

4                   MR. IGNALL:   Nothing further, Your

5    Honor.

6                   THE COURT:   You may proceed.

7                   MR. EGAN:   Thank you, Your Honor.

8                   CROSS-EXAMINATION

9    BY MR. EGAN:

10        Q.    Morning, Mr. Swartz.

11        A.    Good morning, Mr. Egan.

12        Q.    Sir, you've been a partner at Stevens & Lee

13   for 27 years?

14        A.    Correct.

15        Q.    And you've been a banking lawyer for most of

16   those, right?

17        A.    Correct.

18        Q.    So you're an expert on banking law and

19   banking regulations?

20        A.    I'm not a regulatory lawyer per se, but I

21   know a lot about bank regulations.

22        Q.    A lot more than I do.

23        A.    Presumably.

24        Q.    And before you were at Stevens & Lee you

25   were at another law firm, right?

1      A.   No.  I've been at Stevens & Lee my entire

2    career.

3      Q.   All right.  You know a guy named Larry Rovin

4    (ph)?

5      A.   Yes.

6      Q.   He was at Stevens & Lee as well, correct?

7      A.   Yes, he was.

8      Q.   And he's also a banking lawyer, right?

9                MR. IGNALL:  Objection.  Beyond the

10   scope.

11               THE COURT:  Sustained.

12   BY MR. EGAN:

13     Q.   You were first hired by Nova to assist in

14   the acquiring of Pennsylvania Business Bank?

15     A.   Correct.

16     Q.   And that was an acquisition that took place

17   in 2008, correct?

18     A.   Correct.

19     Q.   And in order to do that Nova needed to raise

20   capital?

21     A.   Yes.

22     Q.   And when they raised the capital, that

23   capital was raised by the holding company, correct?

24     A.   Correct.

25     Q.   And then the holding company used that money

Page 23

1    to acquire Pennsylvania Business Bank?

2         A.   Correct.

3         Q.   And you being intimately involved in the --

4    I assume in that acquisition are aware that at that

5    point there were two entities under the holding

6    company, Pennsylvania Business Bank and Nova Bank,

7    correct?

8         A.   Correct.

9         Q.   So that capital that went to Nova Financial

10   Holdings at that point could theoretically be used for

11   either one of those two institutions, correct?

12        A.   Correct.

13        Q.   And that's what a holding company is for,

14   right?

15        A.   Yes.  I would say so.

16        Q.   It can have several assets.

17             Now you were asked about Nova's TARP

18   application.

19        A.   Uh-huh.

20        Q.   And you said you reviewed the application

21   itself?

22        A.   I did see it.

23        Q.   And that's the two-page document that's --

24        A.   That's the two-pager, yes.

25        Q.   Okay.  And that was submitted in October of

Page 24

1   2008?

2        A.   It was sometime in the fall of 2008.

3        Q.   Do you remember that in the spring of 2008

4   you were asked to come to the -- make a presentation

5   to the board?

6        A.   Yes.

7        Q.   And do you remember that that presentation

8   was just a general overview of TARP?

9        A.   Yes.

10       Q.   And the purpose of that was to explain to

11  the board and to, I assume to Mr. Hartline who was

12  also there, kind of the way TARP worked, right?

13       A.   Correct.

14       Q.   And certainly that was a 30,000 foot view of

15  TARP, right?

16       A.   It was.

17       Q.   You didn't --

18       A.   Yes.

19       Q.   -- get down into capital requirements and

20  things of that nature?

21       A.   No.  We didn't know at that time that there

22  would be any.

23       Q.   Okay.

24       A.   Yeah.

25       Q.   You didn't even know what the capital

1   requirements would be?

2       A.   Right.  Correct.

3       Q.   Right.  Now Nova Financial Holdings was

4   making another acquisition at that time that -- a

5   company called DVFG.  Do you remember that?

6       A.   I do.

7       Q.   And you would because you worked on that as

8   well, right?

9       A.   I -- one of my partners actually worked on

10  that.

11      Q.   Right.  And acquiring DVFG was central to

12  Nova's overall business plan?

13      A.   I would say so.  Yes.

14      Q.   And do you recall that -- were you ever

15  shown anything that indicated that Mr. Levin's

16  investment was contingent upon DVFG being approved?

17  Do you remember hearing anything about that?

18      A.   I don't recall that.

19      Q.   Okay.

20              MR. EGAN:  If we could have

21  Government's 75, please.

22  BY MR. EGAN:

23      Q.   And you were asked on direct examination

24  about Government's 75.  That's the letter approving

25  the -- giving a contingent approval of Nova's

1    investment, correct?

2          A.   Correct.

3          Q.   And you were then engaged to try and provide

4    or to help Nova with what's called a closing, right?

5          A.   Correct.

6                MR. EGAN:   And if we could blow up the

7    body of that letter.

8    BY MR. EGAN:

9          Q.   And you would agree with me that at the

10   bottom it says, the application in the amount of 13

11   million, whatever that number is, with the express

12   condition that 10 million in additional eqluity is

13   obtained prior to closing, correct?

14         A.   Correct.

15         Q.   So when all -- when treasury gave this

16   conditional approval in August of 2009, it was -- one

17   of the contingencies was raise another 10 million?

18         A.   Correct.

19         Q.   And, in addition, if you look at the letter

20   there are a number of other things that have to be

21   done as well, correct?

22         A.   Correct.

23         Q.   And, in fact, if we blow up that little

24   paragraph there they have to do all these things

25   before they can be approved to get the money, right?

1          A.    Correct.

2          Q.    And if we go to page 2 and blow up the top

3     section these are also things that Nova Bank has to do

4     before they can be given the TARP funding, correct?

5          A.    Correct.

6          Q.    And the failure to do any of these would

7     mean they wouldn't get it, right?

8          A.    Correct.

9          Q.    In addition, if we could go down to the

10    paragraph that starts with, neither.  It says, neither

11    this letter nor any other oral or written statement or

12    representation by treasury constitutes a binding

13    obligation to make a capital purchase or otherwise.

14    Do you see that?

15         A.    I do.

16         Q.    Right.  So this is not a final approval by

17    the CPP, is it?

18         A.    No.  It's a conditional approval.

19         Q.    And if we could go down below it says,

20    treasury's obligate -- the same -- I'm sorry, the same

21    paragraph, just lower down.  My bad.  The treasury's

22    obligation shall also be subject to the satisfaction

23    of business and legal due diligence, right?

24         A.    Correct.

25         Q.    In its sole discretion, right?

1        A.    Correct.

2        Q.    And the satisfaction of the closing

3   conditions set forth in the SPA?

4        A.    Correct.

5        Q.    And that's kind of what you were hired to

6   deal with, right?

7        A.    Yes.

8        Q.    Including the absence of any material

9   adverse change in the condition, financial or

10  otherwise, business, property, operations, prospects,

11  assets or liabilities of the applicant, correct?

12       A.    Correct.

13       Q.    Now you know that banks are regularly

14  inspected, right?

15       A.    Yes.

16       Q.    And you know that if the bank were inspected

17  between the time of this letter and the time of the

18  issuance of the TARP -- final approval for the TARP

19  that would have a material impact on the decision,

20  correct?

21       A.    It could.

22       Q.    Now you did your work, though, right, and

23  you worked towards getting the job done so you could

24  do the closing?

25       A.    Correct.

1        Q.   So now I want to show you Government's 116.

2   And I think this is in evidence?

3               MR. EGAN:  Is it?  One moment, please.

4   Take it down for -- is it in evidence?

5        (Pause)

6               UNIDENTIFIED SPEAKER:  Yes.

7               MR. EGAN:  Okay.  Yes in evidence, so

8   if we could publish it.

9   BY MR. EGAN:

10       Q.   And if you go down to the lower section of

11  that e-mail, the -- if we could highlight the lower

12  one, it's an e-mail from you to Brian Hartline and

13  Jeff Hanison (ph), correct?

14       A.   Correct.

15       Q.   And Michael Linenger (ph).  He's a Stevens &

16  Lee guy, right?

17       A.   He was a former -- he's no longer with us,

18  but he was an associate at that time.

19       Q.   And Jeff Hanison, he's Nova's CFO, right?

20       A.   Correct.

21       Q.   So he's intimately involved in this process,

22  correct?

23       A.   Correct.

24       Q.   So you want Brian and Jeff to know what

25  you've got to tell them, right?

```
 1        A.   Correct.
 2        Q.   All right.  And you say, Brian and Jeff,
 3   treasury counsel just called and told me that she's
 4   been told by treasury that you expect to close on the
 5   remaining necessary equity (Levin) this Friday,
 6   correct?
 7        A.   Yes.
 8        Q.   Now that means that they're waiting for this
 9   $10 million to show up because that's the contingency
10   upon which the deal is based, correct?
11        A.   Correct.
12        Q.   And then she says, treasury has spoken to
13   someone at the bank.  That being the case, she's moved
14   our tentative closing to the following Friday,
15   November 6th.  And that means that if Levin invests on
16   next Friday and all these other things that we've got
17   to do supposedly happen, then we might be able to
18   close on November 6th, correct?
19        A.   Correct.
20        Q.   And you want to forward that to Mr. Hartline
21   and Mr. Hanison so that they know that this is where
22   the treasury is at, right?
23        A.   Correct.
24        Q.   So if we could go to the top, and Mr.
25   Hartline writes back to you and he says, October 26th,
```

1   close to fateful days, we are trying to get $5 million

2   in this week from George to correspond with the

3   investor list I gave you last week.

4         Now that would be -- the investor list would

5   be one of the things that you need to present at the

6   closing, right?

7         A.   Yes.

8         Q.   So at the end of the day at the closing they

9   would want to see where this 10 million bucks came

10   from?

11        A.   Correct.

12        Q.   Right.  At this point I am not sure of the

13   specific date of when the funds will come in, but I

14   will keep everyone informed.  Do you remember that

15   correspondence?

16        A.   Not specifically.

17        Q.   I mean, this is a long time ago.  You don't

18   --

19        A.   Yes.  It was --

20        Q.   -- remember a lot of stuff, do you?

21        A.   -- a while ago.

22        Q.   Yeah.

23        A.   Yeah.

24        Q.   But -- that's okay.  Bottom line is he's

25   telling you here, like, money is supposed to be here

Page 32

1   this week and we will let you know, right?

2        A.   Yes.

3        Q.   Okay.  Now we go to Government's 122 that

4   you were just shown.  Now it's November 3rd, right?

5        A.   Yes.

6        Q.   And you're writing to Jennifer Graham?

7        A.   Correct.

8        Q.   And Jennifer Graham is the lawyer for

9   treasury, right?

10       A.   She's actually outside counsel for treasury.

11  She was at Hughes, Hubbard & Reed.

12       Q.   So treasury hired their own lawyer to deal

13  --

14       A.   For --

15       Q.   -- with the closing?

16       A.   For all the TARP closings.

17       Q.   Okay.  And -- but she's your contact so

18  you're --

19       A.   Yes.

20       Q.   -- telling her so she can tell her clients?

21       A.   Correct.

22       Q.   And by the way you said something about

23  treasury regulating earlier in your direct.  Treasury

24  didn't regulate Nova Bank, right?

25       A.   No.  If I said that I misspoke.

1     Q.   Right.

2     A.   Yeah.

3     Q.   Because they're not a state chartered bank

4  or they are a state chartered bank or something like

5  that.

6     A.   Well, treasury's not a bank regulator.

7     Q.   Right.  Exactly.  So treasury's regulations

8  aren't the ones that apply to Nova Bank?

9     A.   Correct.

10     Q.   Anyway, just wanted to clear that up.

11          You write, Jenny, I am advised that the

12  closing with the large investor did not occur last

13  Friday and, accordingly, Nova will not be in a

14  position to close this Friday.  So you're telling her

15  that you heard that Levin didn't provide his money?

16     A.   Correct.

17     Q.   Based on talking to Nova it appears that the

18  large investor who committed a significant amount of

19  funds, which he had done, correct?  He signed a

20  subscription agreement?

21     A.   Yes, he did.

22     Q.   $18 million I believe?

23     A.   Correct.

24     Q.   May be unable to close in the near future

25  due to liquidity issues, correct?

1        A.    Correct.

2        Q.    So basically you're saying we don't know if

3   this guy is going to come through with the money?

4        A.    Correct.

5        Q.    And then you say, Nova is exploring a

6   substitute for this investor, right?

7        A.    Correct.

8        Q.    Because basically what they told you is if

9   Mr. Levin wasn't going to commit they were going to go

10  out and try to raise the money from other people?

11       A.    Correct.

12       Q.    And then you say, can you advise as to any

13  restrictions on the timing of receipt of the balance

14  of the 10 million so that I can relay that to the

15  company.  So basically you want to be able to tell

16  Nova that if they're going to go find other people to

17  put up this 10 million or if Levin is going to come

18  through with it, there may be a deadline, right?

19       A.    Correct.

20       Q.    You don't have any recollection of the

21  treasury getting back to you on that, do you?

22       A.    I don't.

23       Q.    Okay.

24       A.    Yeah.

25       Q.    Not surprising.

1          MR. IGNALL:  Objection.

2          MR. EGAN:  All right.

3          THE COURT:  Sustained.

4          MR. EGAN:  If we could go to

5    Government's 171 then.

6    BY MR. EGAN:

7       Q.   And this is a letter that you provided to

8    Mr. Hartline and Nova Bank in response to his request

9    about this loan, correct?

10      A.   Correct.

11      Q.   And in this letter -- well, first of all,

12   you reviewed a number of documents to make this

13   determination, correct?

14      A.   Correct.

15      Q.   And I believe you went through them all,

16   kind of looked at all of them on direct.  That's that

17   big pile in front of you, right?

18      A.   Yes, it is.

19      Q.   And you were asked some specific questions

20   about a risk assessment summary, right?

21      A.   Correct.

22      Q.   But there were a lot of other documents in

23   that packet, correct?

24      A.   There were.

25      Q.   That's only about five pages long?

1       A.   Yes.

2       Q.   And, in fact, in your letter you point out

3  everything you looked at in this, correct?

4       A.   Correct.

5       Q.   You point out --

6                 MR. EGAN:   And if we could have the

7  first paragraph blow up.

8  BY MR. EGAN:

9       Q.   You point out you looked at the risk

10 assessment summary as discussed, right?

11      A.   Correct.

12      Q.   You also looked at the business loan

13 agreement, correct?

14      A.   Correct.

15      Q.   And a promissory note?

16      A.   Correct.

17      Q.   And a copy of a customer privacy policy?

18      A.   Correct.

19      Q.   And a copy of the disbursement request?

20      A.   Correct.

21      Q.   And a copy of the loan request summary?

22      A.   Correct.

23      Q.   And a copy of the boarding data sheet?

24      A.   Correct.

25      Q.   Now that's a lot of documents, right?

1        A.    Yeah.

2        Q.    And this morning you didn't really read

3   through them all?

4        A.    Not word for word.

5        Q.    Nah.

6        A.    Yeah.

7        Q.    And I'm not going to ask you to so don't

8   worry.  But I do want to go now to the second page.

9        A.    Okay.

10       Q.    Well, actually, no.  We've got to go to the

11   bottom of the first page.  I'm sorry.

12                MR. EGAN:  And blow up the bottom

13   paragraph.

14   BY MR. EGAN:

15       Q.    Now you had said on direct examination that

16   the funds were used to improve the property and -- or

17   purchase the property.  Do you remember saying that?

18       A.    I did.  Yeah.

19       Q.    Now let's look at the language here.  It

20   says that the loan documents reflect that the line of

21   credit was intended as a short-term bridge loan.  Now

22   one-year, that's short-term, right?

23       A.    I would say that's short-term.

24       Q.    So that's like if you pay back a loan in one

25   year that's like -- some folks might consider that a

Page 38

1    reasonable period of time, right?

2                    MR. IGNALL:  Objection.

3                    THE COURT:  Sustained.

4    BY MR. EGAN:

5         Q.   Anyway, it's short term?

6         A.   Yes.

7         Q.   Or you wouldn't have written that, right?

8    And it says -- it doesn't say to build or improve,

9    does it?  It says to replace funds that were used

10   previously by Mr. Levin --

11        A.   Yes, it does.

12        Q.   -- to purchase and improve real estate.

13        A.   Correct.

14        Q.   And when you were shown page 21 and the

15   second page of that RAS it says -- in there that's

16   what it says, to replace funds that were used, right?

17        A.   I think this language is verbatim from the

18   --

19        Q.   Right.

20        A.   Yeah.

21        Q.   They basically just copied it from there.

22        A.   Yeah.

23        Q.   And in any event that's what you said there.

24   They were used to replace.

25        A.   Uh-huh.

1      Q.   And then if we can go to the second page,

2    top paragraph, blow that up.  The loan documents --

3    and is this -- this is the sentence that starts the

4    loan documents, the loan documents list describe the

5    line of credit as a business line of credit with a

6    specific purpose of "business investment."

7      A.   Uh-huh.

8      Q.   Now I heard you on direct say the only thing

9    you read in all these documents was something about

10   this house, but clearly there's something in there

11   that says business investment, isn't there?

12     A.   There's something on one of the other forms

13   that I think gave you two boxes to -- one -- check one

14   box or the other.

15     Q.   Right.  And it said business investment?

16     A.   Right.

17     Q.   So being a careful lawyer you reviewed this

18   and you wrote business investment?

19     A.   Correct.

20     Q.   Because that was in the documents that were

21   sent to you?

22     A.   Yes, it was.

23     Q.   And by the way, those documents, they were

24   sent by Mr. Patterson, right?

25     A.   Yes, they were.

1       Q.   And specifically provide that the line of

2    credit is not for personal family household purposes,

3    et cetera, et cetera.

4       A.   Uh-huh.

5       Q.   And then it goes on to say, the credit was

6    extended on an unsecured basis, correct?

7       A.   Correct.

8       Q.   So you were aware that it was unsecured when

9    you made your decision?

10      A.   Yes.

11      Q.   Your advice or --

12      A.   Yes.

13      Q.   -- your opinion.  And then it goes on to say

14   on the basis of his personal financial statements

15   which show a total net worth of $443 million as of

16   March 31st, 2009, correct?

17      A.   Correct.

18      Q.   With only 9 million in liabilities?

19      A.   Correct.

20      Q.   That's a pretty good balance sheet.

21      A.   Very nice balance sheet.

22      Q.   And in excess of 198.8 million excluding

23   non-marketable securities, correct?

24      A.   Correct.

25      Q.   And then the next sentence, the line of

Page 41

1    credit was otherwise made on the basis of the bank's

2    customary underwriting standards.  Do you see that?

3         A.   Yes.

4         Q.   So in other words it went through all of the

5    regular processes to underwrite the loan?

6         A.   That was our understanding, yes.

7         Q.   Because there was a sign off by the loan

8    committee, correct?

9         A.   Correct.

10        Q.   And the credit manager had reviewed it,

11   correct?

12        A.   Correct.

13        Q.   Now the -- we can go to the next paragraph,

14   the very first sentence.  Contemporaneously with

15   obtaining the line of credit Mr. Levin made an equity

16   investment on or about June 30, 2009 in Nova Financial

17   Holdings, Inc., correct?

18        A.   Correct.

19        Q.   So when you wrote this letter you knew that

20   on June 30th a $5 million loan went to Mr. Levin,

21   right?

22        A.   Correct.

23        Q.   And on the same day he invested $5 million

24   in Nova Bank?

25        A.   Correct.

1      Q.   Nobody hit that from you?

2      A.   No.

3                THE COURT:  I'm sorry.  What was the

4  question?

5                MR. EGAN:  No one hid that from him.

6  BY MR. EGAN:

7      Q.   And then it goes on to say that this is the

8  first step in a proposed $18 million investment,

9  correct?

10     A.   Correct.

11     Q.   Okay.

12               MR. EGAN:  Now if we could go to page 3

13  and have the second paragraph blown up.

14  BY MR. EGAN:

15     Q.   And it says, based on the foregoing, which

16  included the contemporaneous nature of the investment,

17  correct?

18     A.   Correct.

19     Q.   Including our review of the loan documents,

20  that means the ones that say investment purposes,

21  right?

22     A.   Correct.

23     Q.   And our conversations with you regarding the

24  circumstances, nothing has come to our attention that

25  would cause us to conclude the line of credit was

Page 43

1    extended to the borrower in violation of any law or

2    regulation applicable to the bank, correct?

3         A.   Correct.

4         Q.   And that was your conclusion?

5         A.   Yes, it was.

6         Q.   Now Mr. Ignall asked you some questions

7    about accounting.  You're not an accountant, right?

8         A.   I am not an accountant.

9         Q.   So the timing, that would be an accounting

10   question with regard to whether this should be counted

11   as capital or not?

12        A.   Correct.

13        Q.   Certainly not a legal one?

14        A.   I don't think it's a legal question.  No.

15             MR. EGAN:  May I have a moment, Your

16   Honor?

17             THE COURT:  Yes, sir.

18        (Pause)

19   BY MR. EGAN:

20        Q.   Sir, you were the attorney for Nova Bank

21   throughout 2009, correct?

22        A.   Certainly one of them.

23        Q.   Okay.  And you continued to be the bank

24   attorney for -- after that, correct?

25        A.   Correct.

Page 44

1        Q.   And for two to three more years, correct?

2        A.   Yes.

3        Q.   So the bank didn't close until October of

4   2012, correct?

5        A.   Yes.

6             MR. EGAN:  Nothing further, Your Honor.

7        (Pause)

8             MR. ENGLE:  Your Honor, may I inquire?

9             THE COURT:  Yes, sir.

10            MR. ENGLE:  Thank you.

11                 CROSS-EXAMINATION

12   BY MR. ENGLE:

13       Q.   Good morning, Mr. Swartz.

14       A.   Good morning.

15       Q.   You've indicated that you've been involved

16   as a banking and a corporate finance lawyer for about

17   33 years?

18       A.   Correct.

19       Q.   All right.  And you've had a relatively or

20   had a relatively long standing relationship as an

21   outside attorney or counsel to Nova Bank and its

22   holding company?

23       A.   Since 2008.

24       Q.   Okay.  So 2008 until the bank closed in

25   2012?

1       A.   Correct.

2       Q.   Okay.  And as an outside consultant as it

3  were, you were not responsible for interfacing with

4  the regulators at the FDIC in connection with any

5  information that was provided with respect to the TARP

6  application?

7       A.   Correct.

8       Q.   And, in fact, that wouldn't be your role as

9  an outside consultant, correct?

10       A.   Typically not.

11       Q.   And no other outside consultant would have a

12  role like that to your knowledge, correct?

13       A.   To my knowledge, no.

14       Q.   And it wouldn't be an outside consultant

15  such as yourself role to determine whether or not

16  money invested in the holding company should or

17  shouldn't be put on the balance sheet as capital?

18       A.   Correct.

19       Q.   Because an outside consultant would have

20  nothing to do with those internal determinations.  Am

21  I right about that?

22       A.   I would --

23            MR. IGNALL:  Objection.  This is beyond

24  the scope of direct.

25            THE COURT:  Sustained.

1    BY MR. ENGLE:

2         Q.   Do you know Barry Bekkedam?

3         A.   I know the name.

4         Q.   Never met him?

5         A.   I don't know him.  I never met him, no.

6         Q.   Okay.  That's Mr. Bekkedam over there in the

7    --

8         A.   I figured that might --

9         Q.   -- blue tie.

10        A.   -- be him.  Yeah.

11        Q.   Okay.  During your time as outside counsel

12   to Nova you came across his name?

13        A.   I sure his name.  Sure.

14        Q.   Came across the name of Balamar (ph)

15   Capital?

16        A.   Yes.

17        Q.   Came across the name of the legal counsel to

18   Balamar Capital, Larry Rovin (ph), is that correct?

19        A.   Correct.

20        Q.   You knew Mr. Rovin?

21        A.   I did.

22             MR. IGNALL:  Objection.  Again, beyond

23   the scope.

24             THE COURT:  Sustained.

25             MR. ENGLE:  May we approach?

1                    THE COURT:  Sure.

2                    MR. ENGLE:  Thank you.

3          (Sidebar held off the record)

4     BY MR. ENGLE:

5          Q.   Mr. Swartz, during all the time that you

6     were outside counsel for Nova, was there any

7     communications that you ever saw or any documents that

8     related to Barry Bekkedam or his company?

9          A.   I'm sure I would have seen something.

10         Q.   Was there ever an occasion where any

11    communication that you saw that would have come from

12    Mr. Bekkedam or his company ever give you any concern

13    as the lawyer for Nova Bank?

14         A.   Not that I recall.  No.

15         Q.   Okay.  Now you said that you were aware that

16    Nova Bank at times would engage in raising capital; is

17    that right?

18         A.   Yes.

19         Q.   And you were aware of the fact that Mr.

20    Bekkedam was an outside consultant who was involved in

21    raising capital for the bank?

22         A.   Yes, I was.

23         Q.   And as someone who is very familiar with the

24    banking industry as an attorney who is involved with

25    banking and corporate finance, you're aware of the

1   fact that banks often will raise capital, number one,

2   right?

3        A.   Absolutely.

4        Q.   And number two that they will hire outside

5   consultants to assist them in doing that?

6        A.   Yes.

7        Q.   Because that's a skill set that's separate

8   and apart from what a person inside a bank would do on

9   a daily basis?

10       A.   Yes.

11       Q.   And that type of outside consultant who

12  would raise capital would be an individual that would

13  have absolutely nothing to do with communicating with

14  bank regulators in your experience, right, sir?

15            MR. IGNALL:  Objection.  Argumentative

16  and beyond the scope.

17            THE COURT:  Sustained.

18  BY MR. ENGLE:

19       Q.   Now you, I believe, were asked questions

20  about Government Exhibit 169.

21            MR. ENGLE:  Can we bring that up?

22  BY MR. ENGLE:

23       Q.   Now, sir, this is the e-mail that you

24  received from Mr. Patterson at Nova Bank on February

25  2nd, 2010; is that right?

1      A.   Correct.

2      Q.   And it has attachments to it?

3      A.   Correct.

4      Q.   And those are the materials that you were

5   being provided in order for you to do your assessment

6   and provide an opinion letter on this transaction

7   involving George Levin getting a loan and reinvesting

8   into the holding company?

9      A.   Correct.

10     Q.   Okay.  That e-mail came from Mr. Patterson.

11   It copies Mr. Hartline; is that correct?

12     A.   Correct.

13     Q.   It does not copy Barry Bekkedam, does it?

14     A.   It does not.

15     Q.   It does not copy his attorney, Larry Rovin,

16   does it?

17     A.   Does not.

18     Q.   Doesn't copy anyone at Balamar Capital

19   Investments, does it?

20     A.   It does not.

21     Q.   All right.  In fact --

22          MR. ENGLE:  And we can take that down.

23   Thank you.

24   BY MR. ENGLE:

25     Q.   In fact, you did not receive any information

1    whatsoever from Mr. Bekkedam or anyone associated with

2    Balamar Capital in conjunction with your giving this

3    opinion letter?

4         A.   We did not.

5         Q.   At no time did Mr. Bekkedam or anyone at

6    Balamar Capital contact you in order to try to

7    influence how you were going to right that letter?

8         A.   No.

9         Q.   Mr. Bekkedam never called you up and said,

10   listen, I've got this employee who raised this

11   question and I need you to say this in a way that he's

12   going to feel comfortable?

13        A.   No.

14        Q.   He didn't try to get you to say this was

15   legal?

16        A.   No.

17        Q.   He didn't try to influence you in any way,

18   shape or form, did he?

19        A.   No, he did not.

20        Q.   Now can we go to Government Exhibit 171,

21   please?  This is, in fact, the opinion letter that you

22   wrote.

23        A.   Correct.

24             MR. ENGLE:  Could we go to the last

25   page, please?  I 'm sorry.  The last page of the

1    letter, not of the attachment.  I'm sorry.  Go to the

2    next page, please, and then next -- there we go.

3    BY MR. ENGLE:

4         Q.   You see the signature there?

5         A.   Yes.

6         Q.   That's your signature?

7         A.   It is.

8         Q.   There's no carbon copy or cc to Mr.

9    Bekkedam, is there?

10        A.   There is not.

11        Q.   There's no copy to anyone at Balamar Capital

12   Investments?

13        A.   No.

14        Q.   There's no copy to Larry Rovin, Mr.

15   Bekkedam's attorney?

16        A.   No.

17             MR. ENGLE:  And if we could go to

18   Government Exhibit 116, please?  If we could blow that

19   up just so we can see it a little bit better, Shawn.

20   Thank you.

21   BY MR. ENGLE:

22        Q.   And this is an e-mail first at the bottom

23   that you sent on October 26th, 2009 to Mr. Hartline

24   and Mr. Hanison at Nova Bank; is that right?

25        A.   Correct.

1        Q.    A copy of it went to one of your associates?

2        A.    Yes.

3        Q.    And this is about your communications with

4    the TARP CPP?

5        A.    Correct.

6        Q.    And this is in connection with the efforts

7    that Nova has engaged in to try to get the TARP money?

8        A.    Correct.

9        Q.    You did not copy Mr. Bekkedam on that e-

10   mail?

11       A.    No.

12       Q.    You did not copy anyone at Balamar?

13       A.    No.

14       Q.    You did not copy Mr. Rovin?

15       A.    No.

16       Q.    Because, in fact, none of those individuals

17   had anything to do with the TARP process from your

18   work on it; is that correct?

19       A.    That's correct.

20       Q.    And then the response that you received from

21   Mr. Hartline on October 26th, 2009 came back to you,

22   correct?

23       A.    Correct.

24       Q.    It was still copying Mr. Hanison, right?

25       A.    Correct.

Page 53

1        Q.   And at no point did Mr. Hartline add Mr.

2    Bekkedam or anyone at Balamar Capital to that e-mail?

3        A.   No.

4        Q.   Okay.

5                 MR. ENGLE:  I have no further

6    questions.  Thank you.

7                 MR. IGNALL:  May I have one moment,

8    Your Honor?

9                 THE COURT:  Yes, sir.

10       (Pause)

11                  REDIRECT EXAMINATION

12   BY MR. IGNALL:

13       Q.   You were asked a number of questions on

14   cross-examination about Exhibit 171.  So if we could

15   bring up the 15th page of that.  I think Mr. Egan

16   asked you about this.  Do you see the box that says,

17   business?  What does it say after business?

18       A.   It says business, including real estate

19   investment.

20       Q.   All right.  And is this document signed by

21   the borrower?

22       A.   Yes.

23       Q.   All right.  Does this document in any way

24   say that the borrower is using this -- these funds to

25   buy Nova Financial Holdings stock?

1        A.    No.

2        Q.    Was the purpose of the loan relevant to your

3   letter?

4        A.    Yes

5        Q.    At the time you wrote your letter did you

6   see any document that showed Mr. Levin was buying Nova

7   Financial Holding -- the purpose of the loan was to

8   buy Nova Financial Holdings stock?

9        A.    No.

10                  MR. IGNALL:  Nothing further.

11                  MR. EGAN:  No recross.

12                  MR. ENGLE:  Nothing, Your Honor.  Thank

13   you, sir.

14                  THE COURT:  Thank you, sir.  You may

15   step down and watch your step, please.

16                  THE WITNESS:  Thank you, Your Honor.

17                  MR. IGNALL:  May I have one moment to

18   check on the next witness, Your Honor?

19                  THE COURT:  Yes, sir.

20        (Pause)

21                  MR. EGAN:  Your Honor, while he's out

22   may I approach just to give you an exhibit?

23                  THE COURT:  Yes, sir.

24                  MR. EGAN:  Thank you.

25        (Pause)

1           MR. IGNALL:  He is here.  Thank you.

2           The United States calls Allen Shubin.

3      (Pause)

4           MR. IGNALL:  I thought he was here.

5           THE CLERK:  Please raise your right

6  hand.

7           ALLEN SHUBIN, WITNESS, SWORN

8           THE CLERK:  Please state and spell your

9  name for the record, and you can have a seat.

10           THE WITNESS:  Allen Shubin, A-L-L-E-N

11  S-H-U-B-I-N.

12           THE CLERK:  Thank you.

13           THE COURT:  You may proceed.

14           MR. IGNALL:  Thank you, Your Honor.

15               DIRECT EXAMINATION

16  BY MR. IGNALL:

17      Q.   Mr. Shubin, what do you do for a living?

18      A.   I'm a certified public accountant with KPMG.

19      Q.   And how long have you been an accountant?

20      A.   For just about 30 years.

21      Q.   And do you have a degree in accounting?

22      A.   I do.

23      Q.   And where have you worked since you got your

24  degree in accounting?

25      A.   I worked initially at Arthur Anderson from

Page 56

1    September of 1986 through May of 2002, and since May

2    of 2002 at KPMG.

3         Q.    And do you have a specialty in accounting?

4         A.    I work mostly with financial institutions,

5    including depository institutions.

6         Q.    Does that mean a bank to the lay person?

7         A.    Yes.  A bank.  Yes.

8         Q.    Are you familiar with a bank called Nova

9    Bank?

10        A.    I am.

11        Q.    Did you have any professional involvement

12   with them?

13        A.    I did.

14        Q.    What was that?

15        A.    I was the lead audit engagement partner on

16   that account from 2008, I believe, through 2010.

17        Q.    So what did that mean your role was with

18   respect to the bank?

19        A.    So my role ultimately was to sign the

20   opinion on the financial statements that those

21   financial statements are accurate in all material

22   respects.  And so I would lead a team of individuals

23   on that engagement that would include three or four

24   other folks, a manager with our firm, possibly a

25   senior or two and a couple of staff people.

1      Q.   And what does it mean to sign for the firm?

2  I think that's what you said.

3      A.   Yeah.  So as part of the financial

4  statements which are management's financial statements

5  reporting their financial position and statement of

6  operations, there's a requirement often for an opinion

7  to come from a certified public accounting firm.  So

8  it's a one page opinion that's in the financial

9  statements.  So my sign off or approval of that

10  opinion that would be part of the financial statements

11  would be our ultimate responsibility.

12      Q.   All right.  So were you involved in the

13  audit of Nova Financial Bank for the 2009 year?

14      A.   Yes.

15      Q.   And as part of your audit were you and your

16  auditors reviewing the balance sheet for Nova Bank?

17      A.   Yes.

18      Q.   And what things are included on a balance

19  sheet?

20      A.   The balance sheet would have assets and

21  liabilities and shareholders' equity.  Those are the

22  three I would say main components of a balance sheet.

23  The assets would represent the cash held by the bank,

24  certain investments held by the bank, loans to third

25  parties would be the three main components on the

1  assets side.  On the liability side there would be --

2  generally the couple of main components would be

3  depositors, so the folks that deposit money into the

4  bank as well as any borrowings from either the federal

5  reserve or Federal Home Loan Bank or other outside

6  borrowings.

7       Q.   And then where does the shareholder equity

8  come in?

9       A.   So shareholders' equity would capture the

10  investments made by investors into the bank, so that

11  would be deemed the capital of the bank.  So typically

12  when a bank is started there would be certain

13  investors that invest money in the bank.  The

14  shareholders' equity would then capture any residual

15  profits or losses that would increase or decrease the

16  total shareholders' equity of the bank as well.

17       Q.   All right.  While you were doing the 2009

18  year audit, did you get any information from anyone,

19  an internal auditor at Nova Bank regarding

20  shareholders' equity?

21       A.   Yes.

22       Q.   And what did you learn from the internal

23  auditor at the bank?  Well, first of all, do you

24  remember who that was?

25       A.   Yes.  It was Tricia Loughney.

Page 59

1      Q.   All right.  What did you learn from Ms.

2  Loughney?

3      A.   She pulled us aside one day.  This was in

4  May of 2010.  Indicated that we should take a look at

5  certain capital transactions that occurred.  She

6  referenced one in particular that occurred during the

7  summer of 2009.

8      Q.   And do you remember what -- the name of the

9  person involved?

10      A.   Yeah.  It was a capital transaction and any

11  loan with a Mr. Levin.

12      Q.   After you heard from Ms. Loughney, what did

13  you do with respect to Mr. Levin's loan?

14      A.   We -- as I recall, and it's been a while, we

15  would have rounded up some documents relating to the

16  loan as well as relating to the capital investment

17  made by Mr. Levin.

18      Q.   And did you -- with respect to Mr. Levin,

19  did you identify any issue that you brought to the

20  attention of NOVA management?

21      A.   Yes.

22      Q.   And what did you identify?

23      A.   It appears that the loan which was a $5

24  million unsecured loan had been made on the same day -

25  - on or around the same day that a $5 million capital

1   investment was made into the bank.

2       Q.   And did you raise this as an issue with bank

3   management?

4       A.   Yes.

5       Q.   Do you remember who you spoke to at the

6   bank?

7       A.   It would have been to -- initially to Mr.

8   Hartline.

9       Q.   And did you know Mr. Hartline at that point?

10      A.   Yes, having served on the account.

11  Previously I had.

12      Q.   And did you speak to anyone else at the --

13  any committee at the bank?

14      A.   We would have.  And this would have

15  transpired within a very short period of time since us

16  further learning of the transaction.  We met with the

17  audit committee of the board of directors very --

18  shortly after -- it might have been the next day or a

19  couple days later.

20      Q.   And when you met with Mr. Hartline and the

21  audit committee, what, if anything, did you tell them

22  about whether Mr. Levin's purchase of NOVA stock could

23  count as equity or capital?

24      A.   Yeah.  So when we learned of the transaction

25  and reviewed the transaction versus the accounting

Page 61

1    rules, it became clear to us that that loan that was

2    made to Mr. Levin should be treated as what is called

3    a contra equity item so, in effect, offsetting the

4    capital investment until such time that that loan had

5    been paid off.

6         Q.   And did you tell that to Mr. Hartline?

7         A.   Yes.

8         Q.   And do you remember around how long that was

9    after you first learned from Ms. Loughney of this loan

10   that you told Mr. Hartline this?

11        A.   It was a very, very short period.  It would

12   have been within a day or two, as I recall.

13        Q.   And did you ask Mr. Hartline for any -- or

14   let me ask, did you ask anyone at the bank for any

15   other information with respect to loans to

16   shareholders?

17        A.   That did prompt us to request us some

18   information on all transactions with shareholders to

19   understand the timing of the capital investment versus

20   any loans that would have been made to those

21   shareholders.

22        Q.   When you're doing an audit, do you review

23   every transaction of the bank?

24        A.   No.

25        Q.   All right.  And when you -- were you

Page 62

1    involved in the audit for the year 2008?

2         A.   Yes.

3         Q.   And for the audit of 2008, did you do the

4    same review we just mentioned about trying to identify

5    loans and people who also purchased the NOVA financial

6    holding stock?

7         A.   We did not request that same information in

8    2008.

9         Q.   When you told Mr. Hartline that Mr. Levin's

10   purchase of NOVA financial stock would have to be

11   in a -- like you said to a contrary account?

12        A.   Contrary equity basically offset such that

13   at the end of the day, gives no current capital

14   treatment for the investment that was made.

15        Q.   And did Mr. Hartline agree with you or

16   disagree with you?

17        A.   Initially, there was a disagreement.

18        Q.   Did he talk to you about what the purpose of

19   Mr. Levin's loan was at the time?

20        A.   Yes.

21        Q.   And what did he say?

22        A.   It was asserted to us that the loan was for

23   the principal purposes of building a home in Devon,

24   PA.

25        Q.   After you had this conversation with Mr.

1   Hartline, did he send you a letter in connection with

2   the loan transactions?

3         A.   Yes.

4         Q.   If I could turn your attention to Exhibit

5   178.  And I will provide you with a hard copy if you'd

6   like.  That's --

7                   MR. IGNALL:  May I approach, Your

8   Honor?

9                   THE WITNESS:  Is it -- is it on here?

10  Oh, okay.  I'm sorry.

11                  MR. IGNALL:  It will be in here and it

12  will be on your screen momentarily.

13  BY MR. IGNALL:

14        Q.   All right.  Do you recognize Exhibit 178?

15        A.   I do.

16        Q.   And what is Exhibit 178?

17        A.   This was a letter dated June 9th of 2010

18  that was sent -- addressed to me from Mr. Hartline?

19        Q.   And did you get this sometime around June 9

20  of 2010?

21        A.   Yes.

22        Q.   And are your initials on here anywhere?

23        A.   Yes.

24        Q.   And where are your initials?

25        A.   My initials are at the bottom of the first

Page 64

1    page, the initials that are the furthest to the left.

2         Q.   And is there a date below there?

3         A.   Yes.

4         Q.   And what's the date there?

5         A.   October 13, 2010.

6         Q.   Does that mean that's when you looked at

7    this letter first?

8         A.   No.  I would have looked at it upon receipt

9    which would have been on or shortly after June 9th.

10   The typical process for kind of initialing might be

11   when the work papers are assembled for my final

12   review.

13              MR. IGNALL:  Government moves into

14   evidence Exhibit 178.

15              MR. EGAN:  No objection.

16              MR. ENGLE:  No objection.

17        (Government's Exhibit No. 178 received)

18              MR. IGNALL:  May it be published, Your

19   Honor?

20              THE COURT:  Yes, sir.

21              MR. IGNALL:  All right.  If we could --

22   BY MR. IGNALL:

23        Q.   As of June 9, 2010, had you received any

24   information about other loans the bank made around the

25   same time as that same person invested in NOVA

1   Financial Holdings?

2        A.   Yes.

3        Q.   Okay.  If we could look at the first

4   paragraph.  What does Mr. Hartline say to you there?

5        A.   The first paragraph indicates that --

6        Q.   You could just read it to us.

7        A.   Oh, okay.  "Per your request, please find

8   attached a list of NOVA Bank client relationships

9   (loans and deposits with investors of NOVA Financial

10  Holdings.  As you can see, NOVA Bank has a

11  professional and financial relationship with many of

12  its investors as most community banks do.

13       Q.   All right.  Now let's go to the next

14  paragraph.

15            MR. IGNALL:  If we could blow that up.

16  BY MR. IGNALL:

17       Q.   What does Mr. Hartline say there?

18       A.   "For ease of your review and per your

19  requested, I've highlighted seven loans that closed

20  within two weeks of NOVA Financial Holdings, Inc.

21  closing and capital round since it's first capital

22  raise in 2002."

23       Q.   All right.  Let me stop you there.  Was that

24  the information you requested, the additional

25  information you requested?

1        A.   Yes.

2        Q.   All right.  And prior to your work that you

3    were doing in 2010, had you asked NOVA for that

4    information?

5        A.   Yes.

6        Q.   No, no.  I'm saying --

7        A.   I'm sorry.

8        Q.   -- in previous audit years, had you asked

9    for that --

10       A.   Oh.  In previous audit years, no.

11       Q.   All right.

12       A.   No.

13       Q.   And what does Mr. Hartline say next?

14       A.   "The timing of the closing over the time

15   period and relation to NOVA's substantial capital

16   raising activities during the same time period in

17   excess of 64 million over the time period is

18   coincidental.  All loans originated by NOVA Bank had a

19   specific purpose as identified in the RAS."

20       Q.   Let me stop you there.  Do you know what the

21   RAS is?

22       A.   It's a -- the RAS is a summary of the loan

23   terms that would include the reason for the loan and

24   bar information, et cetera.  I think it might stand

25   for their cases for risk assessment summary.

1        Q.   And did you review risk assessment summaries

2   as part of your audit?

3        A.   We do -- we do in the normal course of our

4   audit.  We would send out -- we would do testing over

5   loan -- certain loan originations and send

6   confirmations to borrowers to ensure that the books

7   and records of the company accurately reflect those

8   loans.

9        Q.   And I may have asked my question inartfully.

10  With respect to this issue about the bank's capital,

11  did you review any risk assessment summaries?

12       A.   We did.

13       Q.   Okay.  And what's the next sentence say?

14       A.   "Please further understand that management

15  does not control the underwriting process, the data

16  collection process or the timing of when a loan has

17  closed."

18       Q.   Let me stop you there.  As part of your

19  audit, do you review internal communications within

20  the bank?

21       A.   We would review -- I'm not sure what do you

22  mean by internal communications.

23       Q.   Well, would you review e-mails between the

24  bank and the borrower necessarily?

25       A.   Not typically between the bank and the

1   borrower to the extent that we -- if we confirm a loan

2   with a third party and we get that confirmation back,

3   we would not then need to take another step.  In

4   certain cases, if we don't get the confirmation back,

5   we do what's called alternative procedures.  In those

6   cases, we may look at certain other items including

7   loan documents, potential e-mails and payment

8   activity, et cetera.

9        Q.   Now let's go to the top of the next

10  paragraph.  What does Mr. Hartline say to you there?

11       A.   "It appears that you are focusing on one of

12  the seven loans, in particular, the $5 million loan to

13  NOVA changing control investor, Mr. George Levin."

14       Q.   All right.  Was that indeed one of the loans

15  you asked Mr. Hartline about?

16       A.   Yes.

17       Q.   All right.

18            MR. IGNALL:  May I have one moment

19  before we go to the next page, Your Honor?

20            THE COURT:  Yes.

21       (Pause)

22            MR. IGNALL:  Could we take a short

23  break?  I just want to make sure --

24            THE COURT:  Yes, sir.

25            MR. IGNALL:  -- I can explain to the

1    Court at sidebar what I'm looking at.

2                    THE COURT:  Let's take a break at this

3    time.

4        (Pause)

5                    THE COURT:  Can the witness step down?

6                    MR. IGNALL:  He may, Your Honor.

7                    THE COURT:  All right.  You may step

8    down, too.

9                    No.  What I was saying, when I was

10   reading --

11                   MR. IGNALL:  Okay.  We can pull that

12   Exhibit 1 -- the first page of 178?

13                   THE COURT:  Yes, sir.

14                   MR. IGNALL:  Yeah.  Can you bring that

15   back up (indiscernible)?  The --

16                   THE COURT:  You all may -- we're taking

17   -- on break at this point.  I don't know if you want

18   to go out.

19                   MR. IGNALL:  Well, let me just put on

20   the record what I was -- just to make sure we're on

21   the same page.

22                   THE COURT:  All right.  Could you

23   highlight that portion, please, which was previously

24   highlighted?

25                   MR. IGNALL:  Yeah.  We'll -- I'll bring

Page 70

1    that momentarily.  But on the second page of this

2    letter, Mr. Hartline talks about the Ponzi scheme.  I

3    just wanted to make sure that whatever goes on the

4    screen we've had that redacted.  I just wanted to make

5    sure that counsel and I can agree that --

6                  THE COURT:  Right.

7                  MR. IGNALL:  -- whatever might come up

8    is appropriate.  That's why I asked for the break.

9                  THE COURT:  Okay.  Thank you.

10                 MR. IGNALL:  But I can bring up -- or

11   would the Court prefer just a hard copy that --

12                 THE COURT:  Yeah.  Let me --

13                 MR. IGNALL:  It still says "back-to-

14   back deposits".  Let me see if we can take that out.

15                 All right.  Thank you, Your Honor.

16                 THE COURT:  All right.  We're on

17   recess.

18        (Recessed at 10:50 a.m.; reconvened at 11:16

19   a.m.)

20                 THE CLERK:  All rise.

21        (Jury in)

22                 THE COURT:  You may be seated.  Good

23   morning again.

24           You may continue.

25                 MR. IGNALL:  Thank you, Your Honor.

Page 71

1              DIRECT EXAMINATION (RESUMED)

2        Q.   Mr. Shubin, I think I forgot to ask you a

3   key preface question here.  During what time period

4   were you conducting the 2009 audit?

5        A.   We would typically do some planning

6   procedures in the fall of 2009, some interim work

7   later that year and -- but the bulk of the procedures

8   would have been in the March/April/May time frame of

9   2010.

10       Q.   All right.  So was the audit already ongoing

11  when you heard from Ms. Loughney about Mr. Levin's

12  loan?

13       A.   Yes.

14       Q.   Let me turn your attention back to Exhibit

15  178.

16            MR. IGNALL:  And may we publish it

17  again, Your Honor?

18            THE COURT:  Yes.

19  BY MR. IGNALL:

20       Q.   And if I can turn your attention, we're

21  talking about Mr. Levin.

22            MR. IGNALL:  Let's go to the second

23  paragraph of page 2, please.  If you could blow that

24  up, Agent Boyer.  Thank you.

25  BY MR. IGNALL:

Page 72

1        Q.   All right.  First things, what does Mr.

2   Hartline say to you in that first sentence?

3        A.   "During the process of the above-noted

4   meeting in the first quarter of 2009, Mr. Levin

5   requested a $10 million from NOVA Bank for general

6   capital purposes and to provide him liquidity to

7   complete a residence he was building in Devon, PA to

8   close by June 30, 2009."

9        Q.   Let me turn your attention now to the last

10  sentence of that paragraph.  What does Mr. Hartline

11  say to you there?

12       A.   "Please note that NOVA Bank closed and

13  funded the above-noted non-revolving unsecured line of

14  credit on June 30, 2009 as requested by the client."

15                MR. IGNALL:  Now if we can go to the

16  next page.

17  BY MR. IGNALL:

18       Q.   What does Mr. Hartline say -- it should be

19  the top of page 3 -- in this paragraph?

20       A.   "I think this understanding of the business

21  relationship and the strength of Mr. Levin's financial

22  position and liquidity is required to understand the

23  approval of the loan as well as the source of the

24  funds for the purchase of NOVA Financial Holding, Inc.

25  common stock."

1      Q.   And what does it say after that?

2      A.   "This was not a situation in which Mr. Levin

3   did not or could not reflect the appropriate amount in

4   liquidity to make the investment.  He clearly does

5   reflect much more than adequate liquidity to make the

6   investment on his March 31st, 2009 personal financial

7   statements.  And he clearly states the source of the

8   funds for the investment in his response to this

9   change in control applications dated September 8th,

10   2008 which was filed with the Federal Reserve Bank."

11      Q.   In this letter, does Mr. Hartline ever say

12   that Mr. Levin borrowed $5 million to purchase NOVA

13   Financial Holding stock?

14      A.   I don't recall seeing that, no.

15      Q.   Did he ever say that to you orally?

16      A.   No.

17      Q.   Turn your attention now to Exhibit 43.  It

18   should come up on your screen hopefully.

19           MR. IGNALL:  And this is already in

20   evidence, Your Honor.  May it be published?

21           THE COURT:  Yes.

22   BY MR. IGNALL:

23      Q.   And that's the whole page up there.  Is this

24   a document that you reviewed as part of the audit?

25      A.   Yes.

1       Q.   And are your initials on here?

2       A.   Yes.

3       Q.   And what is Exhibit 43?

4       A.   This is the so-called risk assessment

5    summary that outlines the background of the loan.

6       Q.   And who's the borrower in this case?

7       A.   Mr. George Levin.

8       Q.   And what does the risk assessment summary

9    say the purpose of the loan is?

10      A.   Purpose says "financial investment".

11      Q.   All right.  Let's go back again --

12               MR. IGNALL:  You can take that down.

13   BY MR. IGNALL:

14      Q.   Did you identify any other loans to

15   individuals who made NOVA Financial Holding purchases

16   around the same time?

17      A.   Around the same time as their capital

18   investment.  Maybe not the same exact time frame as

19   Mr. Levin's transaction.

20      Q.   Yes.  And, I'm sorry, the loan and the

21   investment were at the same time.

22      A.   In or around the same time, yes.

23      Q.   All right.  And does the name Anthony Bonomo

24   sound familiar?

25      A.   Yes.

1        Q.   And what do you remember about Mr. Bonomo?

2        A.   If I remember, that was a two and a half

3   million dollar loan that would have been made on or

4   around the same time that a capital investment was

5   made into the bank.

6        Q.   All right.

7             MR. IGNALL:   And if we go back to

8   Exhibit 178.   And we go to that page 3, the second

9   paragraph.

10  BY MR. IGNALL:

11       Q.   Did Mr. Hartline say anything to you about

12  Mr. Bonomo's loan in this paragraph?

13       A.   Yes.

14       Q.   All right.

15            MR. IGNALL:   If we could go to that

16  kind of in the middle of the paragraph where it starts

17  "During the second quarter"?

18       A.   Right.

19       Q.   What does Mr. Hartline say there?

20       A.   "During the second quarter 2009, Mr. Bonomo

21  requested through Ballamor Capital a loan in the

22  amount of $5 million for investment purposes but

23  primarily to invest in Banyon Capital as noted in the

24  RAS."

25       Q.   All right.   Let me turn your attention now

1    to Exhibit 181.  Let me see if I -- oh, I'm sorry.

2    It's the wrong exhibit.  I'm sorry.  109, please.

3                    MR. IGNALL:  And I believe this is

4    already in evidence.  May it be published to the jury?

5                    THE COURT:  Yes, sir.

6    BY MR. IGNALL:

7         Q.   Do you recognize Exhibit 109?

8         A.   Yes.

9         Q.   And what is Exhibit 109?

10        A.   This is the risk assessment summary for the

11   Anthony Bonomo loan.

12        Q.   And what does it say?  And is this one of

13   the documents you reviewed as part of the audit?

14        A.   Yes.

15        Q.   And is this one of the documents you

16   requested after you learned of the Levin loan from Ms.

17   Loughney?

18        A.   Yes.

19        Q.   If we could turn to the second page, please?

20   And look under "Facilities".  What does it say there

21   under (indiscernible)

22        A.   "Mr. Anthony Bonomo borrower is requesting a

23   4.5 million dollar commercial balloon loan from NOVA

24   bank as indicated above.  The loan will be used by Mr.

25   Bonomo for financial investment purposes.  Borrower

Page 77

1   indicated plans to invest the funds in the Banyon

2   group through Ballamor Capital Management."

3        Q.   Did you as part of your audit see any

4   document that showed that the purpose of Mr. Bonomo's

5   loan, any part of it, was to purchase NOVA Financial

6   Holding stock?

7        A.   No.

8        Q.   All right.  Let me turn your attention now

9   to Bellmawr Creek LLC (ph).  Does that sound familiar?

10       A.   Yes.

11       Q.   What do you remember -- how do you -- let me

12   ask it differently.  Was Bellmawr Creek LLC a borrower

13   whose loan you reviewed as part of the 2009 audit?

14       A.   Yes.

15       Q.   And what were you looking at with respect to

16   Bellmawr Creek LLC?

17       A.   I think that that was -- I know that that

18   was the third of the three loans for which it was

19   determined that the date of the loan and the proceeds

20   was within a time frame that it appeared that the

21   investment was -- the loan was used to make for

22   capital investment purposes or potentially for capital

23   investment purposes.

24       Q.   And were you able to identify -- how many

25   loans for Bellmawr Creek did you identify to review --

Page 78

1        A.   I believe there was two.

2        Q.   All right.  And if I could turn your

3   attention to Exhibit 143, I believe.

4             MR. IGNALL:  And I believe this is

5   already in evidence.  May it be published to the jury,

6   Your Honor?

7             THE COURT:  Yes, sir.

8   BY MR. IGNALL:

9        Q.   And do you recognize Exhibit 143?

10       A.   Yes.

11       Q.   And what is Exhibit 143?

12       A.   This is the risk assessment summary for the

13   Bellmawr Creek LLC loan.

14       Q.   And is this a document you reviewed as part

15   of the 2009 audit?

16       A.   Yes.

17       Q.   Is this a document you requested after

18   learned from Ms. Loughney of the George Levin loan?

19       A.   Yes.

20       Q.   And as part of your audit, did you

21   necessarily look at the risk assessment summary for

22   every borrower at the bank?

23       A.   No.

24       Q.   Was it part of the audit to compare

25   borrowers with a list of investors in the bank every

1   year?

2        A.   It was not our typical test work, no.

3        Q.   So going back to Exhibit 143, who's the

4   borrower?

5        A.   The borrower indicates a contact name as

6   Charles Gullab (sic).

7        Q.   All right.  And what does it say is the

8   purpose of the loan here?

9        A.   Indicates for working capital.

10       Q.   All right.  And if we go way down to the

11  bottom, do you see your initials anywhere on this?

12       A.   Yes.

13       Q.   And where are your initials?

14       A.   The initials to the left.

15       Q.   And again, the date on there, what's the

16  date?

17       A.   October 13, 2010.

18       Q.   Is that the first time you saw that risk

19  assessment summary for Mr. Gallub?

20       A.   I don't believe so, no.

21       Q.   So why does it say October 13th under your

22  initials?

23       A.   The -- in the course of our test work, we

24  may review things but not sign off until they're in

25  our work papers and have gone through the proper

1  procedures.

2      Q.   If I could turn your attention now to

3  Exhibit 4, please, which is also already in evidence.

4  Is this another document you reviewed as part of the

5  audit?

6      A.   I did not see my initials on it.  But it

7  indicates that this is a risk assessment summary for

8  the same borrower.  So it would likely have been that

9  I would have reviewed this.

10     Q.   All right.  Let me turn your attention

11  perhaps now, refresh your recollection, to -- I think

12  it's Exhibit 181.

13              MR. IGNALL:  Just for the witness.

14  It's not in evidence yet.  And may I approach, Your

15  Honor?

16  BY MR. IGNALL:

17     Q.   Do you recognize Exhibit 181?

18     A.   I do.

19     Q.   And what is Exhibit 181?

20     A.   This is a summary of our test work over

21  loans made to investors, specifically loans made in

22  conjunction with test work to determine whether loans

23  were made in conjunction with capital raises.

24     Q.   All right.  And did you -- look at the

25  second page.  Did you review more than one loan to Mr.

1    Gallub or an entity associated with him?

2         A.   Yes.  There were two loans.

3         Q.   All right.  And what was the year of the

4    first loan?

5         A.   October -- 2008.

6         Q.   Now were you involved in an audit for the

7    year 2008?

8         A.   Yes.

9         Q.   Did you identify that loan during the 2008

10   audit?

11        A.   We did not.

12        Q.   When was the first time you became aware of

13   Bellmawr Creek or Mr. Gallub borrowing money around

14   the same time as an identical amount of money was

15   invested by Mr. Gallub into NOVA Financial Holdings?

16        A.   It would have been part of these 2009

17   procedures -- well, procedures performed in 2010 on

18   the 2009 audit.

19        Q.   All right.  So after reviewing all of the

20   documents with respect to Bellmawr Creek, Mr. Bonomo

21   and Mr. Levin, what was your conclusion about how the

22   bank had to account for the capital?

23        A.   Our conclusion on these four loans that

24   totaled 8,250,000 was that they should be treated as a

25   so-called contra equity or the loan not being treated

Page 82

1   as an asset on the balance sheet.  Being treated as an

2   offset to capital in shareholders equity.

3        Q.   And did the bank ultimately make a change to

4   its financial statements?

5        A.   It did.

6        Q.   Does the bank have to make a change?

7        A.   Well, I would say they don't necessarily

8   have to make the change but we would not have been in

9   a position to issue our audit opinion on the financial

10  statements absent that change.

11       Q.   So did the bank make the change?

12       A.   Yes.

13       Q.   And did you sign the financial statement?

14       A.   Yes.

15            MR. IGNALL:  All right.  If I could

16  bring up Exhibit 187, please.

17  BY MR. IGNALL:

18       Q.   Do you recognize Exhibit 187?

19       A.   Yes.

20       Q.   What is Exhibit 187?

21       A.   These are the company's financial statements

22  for the fiscal year 2009.

23       Q.   And did you audit these financial

24  statements?

25       A.   Yes.

1        Q.    And did you sign off on this -- the audit of

2   these financial statements?

3        A.    Yes.

4        Q.    All right.

5              MR. IGNALL:  If we could go to page 41,

6   please.

7              I'd like to move Exhibit 187 into

8   evidence, please.

9              MR. EGAN:  No objection.

10             MR. ENGLE:  No objection.

11             THE COURT:  Admitted.

12   (Government's Exhibit No. 187 received)

13             MR. IGNALL:  All right.  May it be

14   published, Your Honor?

15             THE COURT:  Yes.

16   BY MR. IGNALL:

17        Q.    What is page 41?

18        A.    Page 41 is a required disclosure on the

19   company's regulatory capital requirements and the

20   related ratios of the -- those capital ratio

21   requirements.

22             MR. IGNALL:  And if we could go back

23   and just look at the whole page.

24   BY MR. IGNALL:

25        Q.    And by creating this contra equity account,

1  I believe as you said, what effect did that have on

2  the capital on page 41?

3       A.   To the extent that the capital would not

4  have been corrected, those amounts on -- in the tables

5  relating to the total capital and the related ratios

6  would have been higher by those amounts as a result of

7  those amounts not being adjusted.

8       Q.   Did adjusting the amounts reduce the amount

9  of capital the bank had reported on its financial

10 statements?

11      A.   Correct.

12      Q.   With respect to Mr. Levin's loan, do you

13 know if that was ever paid off?

14      A.   To my knowledge, it was not paid off.

15      Q.   Do you know if it was ever charged off or

16 written off by the bank?

17      A.   Yes.  It was charged off during the

18 subsequent fiscal year.

19      Q.   And what does charged off mean?

20      A.   So the bank would charge off a loan when it

21 is being uncollectable.  Meaning, that you have a loan

22 on your balance sheet.  To the extent that you deem

23 that uncollectable, you record that -- you would write

24 off or charge off that loan and reverse that loaned

25 amount.

Page 85

1       Q.   And what effect does that have on the
2   balance sheet?
3       A.   Typically -- typically -- well, it would
4   reduce your assets on your balance sheet.  Companies
5   would typically estimate what their losses are for
6   their loans.  To the extent that they had reserved for
7   those amounts in the past, it would tend -- absent the
8   fact that this was a contra equity item, had they
9   reserved for it in the past, meaning that they would
10  have recorded a provision through the profit and loss
11  statement and recorded a reserve.  When you charge it
12  off, sometimes it has no effect on --
13      Q.   Let me stop you there.
14      A.   Okay.
15      Q.   What I'm getting at is, did writing off Mr.
16  Levin's loan affect whether the bank could reverse
17  that contra equity entry to then count it as equity?
18      A.   It had no impact on the equity, ultimate
19  equity.
20      Q.   Is that because after your audit, it was not
21  counted as equity?
22      A.   Correct.
23      Q.   All right.
24              MR. IGNALL:  One moment, Your Honor.
25              THE COURT:  Yes, sir.

Page 86

1              MR. IGNALL:  All right.  I'd like to

2    move into evidence Exhibit 181.

3              MR. ENGLE:  I'm sorry?

4              MR. IGNALL:  I'd like to move into

5    evidence Exhibit 181.

6              MR. ENGLE:  No objection.

7              MR. EGAN:  No objection.

8              THE COURT:  Admitted.

9         (Government's Exhibit No. 181 received)

10             MR. IGNALL:  And if we could just bring

11   it up on the screen.

12   BY MR. IGNALL:

13        Q.   And what is Exhibit 181?

14        A.   This would have been our work over the loans

15   made to investors as well as the capital raise

16   activity of the bank over time.

17        Q.   And what's the date of Exhibit 181?

18        A.   The date is October 6, 2010.

19        Q.   Please go to the second page of this and go

20   to "Conclusions".  What's the conclusion you reached?

21        A.   Conclusion was "As a result of the

22   procedures noted above, KP&G concurs with management's

23   conclusion that three capital contributions noted

24   below must be excluded from capital in accordance with

25   EITF 85-1.

1        Q.    (Indiscernible) to Mr. Levin, what's the

2    amount there?

3        A.    Five million dollars.

4        Q.    And was your conclusion that Mr. Levin's

5    capital contribution couldn't be counted as the bank's

6    capital?

7        A.    Correct.

8        Q.    And this document is from October.  Is that

9    the same conclusion you had told Mr. Hartline about

10   back in May?

11       A.    Yes.

12       Q.    And was that a day or two after you heard

13   from Ms. Loughney about the loan?

14       A.    I believe so.

15             MR. IGNALL:  One moment, Your Honor.

16   Nothing further.

17             THE COURT:  You may cross-examine.

18             MR. EGAN:  Thank you, Your Honor.

19                 CROSS-EXAMINATION

20   BY MR. EGAN:

21       Q.    Good morning, Mr. Shubin.

22       A.    Good morning.

23       Q.    I want to start off where you ended with Mr.

24   Ignall 'cause I'm a little confused.

25             A loan is an asset, correct?

1        A.    A loan is typically an asset.

2        Q.    Okay.  So an asset goes on the balance

3    sheet, right?

4        A.    Correct.

5        Q.    Okay.  Then capital is an asset, right?

6        A.    Uhh --

7        Q.    Typically.

8        A.    Well, capital is actually a credit balance

9    in the shareholders equity section.

10       Q.    All righty.  But without getting too deep

11   into the weeds, both of those are on the good side of

12   the chart, right?  The -- what do you have -- what do

13   they call it -- assets and liabilities, right?

14       A.    Right.

15       Q.    So capital and a loan which a bank has if

16   somebody owes them money, they both go over on that

17   side on the left, right?

18       A.    Capital is residual of your assets and your

19   liabilities.  So shareholders equity is actually on

20   the right side of the balance sheet.

21       Q.    Okay.  You would agree with me that capital

22   is good.  It's an asset to the bank, right?

23       A.    Capital is certainly a way to start any

24   corporation.  You need capital, yes.

25       Q.    And so, if people pay $5 million for stock,

1    that goes onto the good side, right?

2         A.   Correct.

3         Q.   Okay.  And when you lend money to people,

4    the loan is an asset as well, correct?

5         A.   The loan is an asset?  Yeah.  You typically

6    give up an asset to make a loan.

7         Q.   Right.

8         A.   So you give up cash which is another asset

9    to make a loan which, obviously, is an asset on the

10   books.

11        Q.   Okay.  Now if I make a loan to someone for

12   $5 million, right, and they use that money for their

13   own purposes such as build a gas station -- it would

14   be a nice gas station -- and they don't pay me back, I

15   have to write that off, right?

16        A.   Correct.

17        Q.   But if I receive $5 million in cash to buy

18   stock, I've still got that $5 million in cash that I

19   bought the stock with, right?

20        A.   Correct.

21        Q.   And that would still be an asset, wouldn't

22   it?

23        A.   That cash would be an asset, yes.

24        Q.   Okay.  We'll get back to that.  Hopefully, I

25   won't slaughter this too bad.

1           You're an accounting expert, right?

2      A.   I like to think of myself as one, yes.

3      Q.   Okay.  KPMG is one of the top four

4 accounting firms in the world, right?

5      A.   Correct.

6      Q.   Call them the Big Four?

7      A.   Yes.

8      Q.   Okay.  And you are a partner at KPMG -- or

9 do you call them members or partners?

10      A.   Partners.

11      Q.   You're a partner at KPMG and you have been

12 for many years.

13      A.   Correct.

14      Q.   And you have seniority over other

15 individuals there?

16      A.   Correct.

17      Q.   And you specialize in -- you called it a

18 couple of other things but really banks, right?

19      A.   Correct.

20      Q.   You've been auditing banks for many, many

21 years?

22      A.   I have been.

23      Q.   And you have had a lot of people working for

24 you auditing banks for many, many years, right?

25      A.   Correct.

1      Q.   Now that's a big difference between that and

2    the guy down at the corner who's got a little CPA

3    sign, right?

4                    MR. IGNALL:  Objection.

5                    THE COURT:  Sustained.

6    BY MR. EGAN:

7      Q.   Now you were in charge of the NOVA audit in

8    2009, correct?

9      A.   Correct.

10     Q.   And you were also in charge of the NOVA

11   audit for 2008, correct?

12     A.   Correct.

13     Q.   And you were also in charge of the NOVA

14   audit for 2010.

15     A.   Correct.

16     Q.   So you -- did you do 2011, too?

17     A.   I don't believe so.  I believe that might

18   have been the year that they had been taken over by

19   the --

20     Q.   No, no.  They didn't close till 2012.

21     A.   We --

22     Q.   But you don't remember doing 2011.

23     A.   We did not complete a 2011 audit --

24     Q.   Okay.

25     A.   -- to my recollection.

1      Q.   All right.  Well, actually, you guys cycle

2  off of the banks, right?  Don't you cycle through

3  some?

4      A.   Not necessarily.

5      Q.   Okay.  But you hadn't done it before 2008.

6      A.   There are certain partner rotation

7  requirements --

8      Q.   That's what I meant, yeah.

9      A.   -- if that's what you mean.

10      Q.   Yeah.  I'm sorry.  In other words, you don't

11  leave the same partner in charge of a bank for too

12  many years because the whole point of having an

13  auditor is they want to be not to cozy with the bank

14  folks.

15      A.   Correct.

16      Q.   And so you cycle off after like three years.

17      A.   No.  It's more like five years for public

18  companies and ten years for private banks unless they

19  are over a certain size for which the SEC rules would

20  apply which would be five years.

21      Q.   Right.  And there's a whole different set of

22  rules for public companies than for private companies,

23  correct?

24      A.   There ware certain different requirements

25  mostly pertaining to disclosure, the nature of the

1    financial statements.  U.S. GAAP may have certain

2    differences between private companies and public

3    companies but they're not typically significant.

4         Q.   Okay.  But the SEC has its own rules, right?

5         A.   The SEC has rules that would be in addition

6    to the FASB or the financial accounting standards

7    board accounting board accounting rules.

8         Q.   Right.  And NOVA was not a public company.

9         A.   NOVA is not a public company.

10        Q.   So SEC rules didn't apply to them, correct?

11        A.   Correct.

12        Q.   Okay.  Now the audit itself that you did --

13   and let's focus on the audit which took place in May

14   of 2010 and was for -- well, took place in the spring

15   of 2010 and had to do with 2009.  You were the head of

16   the team, right?

17        A.   Uh-huh.

18        Q.   And you -- you have to say yes or no.  And

19   you had several people working for you, correct?

20        A.   Yes.

21        Q.   I think you said at least four?

22        A.   There would have been roughly, yes.

23        Q.   Okay.  You had people who were assigned to

24   different projects, right?  Like one person would do

25   the loans; another person would do a different thing?

1     A.   Yes.

2     Q.   And those people who are assigned to those

3  various sections of the audit, they speak to different

4  people in the bank who happen to be in charge of that

5  particular area, right?

6     A.   Correct.

7     Q.   So you guys all come to the bank, right,

8  physically, right?

9     A.   Yes.

10    Q.   You sit there in a conference room for,

11 what, two, three weeks?

12    A.   It can tend to be longer than that.  It

13 depends on the size of the entity.

14    Q.   Okay.  Well, at NOVA, what do you think?  It

15 was a month?

16    A.   It was probably more like a month.

17    Q.   Okay.  So for a month, you've got four

18 people using a conference room doing this audit,

19 right?  Correct?

20    A.   Yes.

21    Q.   And when they want information, they go out

22 to the person and they ask for the stuff to tell him

23 what happened, right?

24    A.   Correct.

25    Q.   And part of this would be, obviously,

1  speaking to the bank's internal auditor to get

2  information from her, correct?

3      A.   Correct.

4      Q.   And that's Ms. Loughney, right?

5      A.   Correct.

6      Q.   And so, it's typical and ordinary that you

7  would ask Ms. Loughney for whatever information she

8  had about whatever.

9      A.   Correct.

10     Q.   So Ms. Loughney bringing these loans to your

11  attention, that's part of the process that you engage

12  in to do a proper audit, correct?

13     A.   Correct.

14     Q.   Now, and you're aware, of course, Ms.

15  Loughney doesn't report to Mr. Hartline, right?

16     A.   Typically, the internal auditor would report

17  directly to the audit committee.

18     Q.   Right.  That's the board.  And there's an

19  audit committee of the board, correct?

20     A.   Correct.

21     Q.   And they're actually Mr. Hartline's bosses,

22  basically, correct?

23     A.   Correct.

24     Q.   And Ms. Loughney brought to your attention

25  the Levin loan, correct?

1          A.    Correct.

2          Q.    Now you spoke on direct about a confirmation

3    process.    And I want to talk about that a little.

4    When you're doing an audit, you also send out letters

5    to the people who borrowed the money who have loans

6    outstanding to ask them for what's called a third

7    party confirmation, right?

8          A.    Correct.

9          Q.    So, in other words, while you're in the bank

10   looking at all the stuff there, you're also sending a

11   letter to Mr. Levin saying, hey, we've got some

12   questions about this loan.    We'd like you to answer

13   them.   Right?

14         A.    Correct.

15         Q.    And the point of that is that you can also

16   get information from him and he can tell you whatever

17   he wants to about it, right?

18         A.    Well, typically, it's a test for existence

19   of loans that the bank has on their balance sheet.

20         Q.    Right.   So you send Mr. Levin a letter and

21   it says, hey, we're the auditors, KPMG, and we want to

22   know some answers to some questions, right?

23         A.    Well, it's typically very -- it's just the

24   terms of the loan is what we are confirming.

25         Q.    Okay.   The terms of the loan.

1        A.   So it's not open-ended.  We provide the

2    terms and ask that individual to indicate to us that

3    they're in agreement.

4        Q.   And you provide them with your contact

5    information.

6        A.   Yes.

7        Q.   And you provide them with the phone number,

8    et cetera, to call if they want to call, right --

9        A.   Umm --

10       Q.   -- or email?

11       A.   Yeah.  They have our -- they have our

12   address.

13       Q.   Okay.

14       A.   I'm not sure if there's a phone number on

15   there.

16       Q.   But clearly, Mr. Levin's free to contact you

17   and say whatever he wants about this, right?

18       A.   Sure.

19       Q.   Now you get told about this loan by Ms.

20   Loughney and you immediately look at it, right, and

21   you want to talk to management about it, correct?

22       A.   Correct.

23       Q.   Now you thought this doesn't look -- this

24   looks like maybe it requires some different accounting

25   treatment than it received, correct?

1      A.   Correct.

2      Q.   And you must think, well, there must be some

3  kind of rule about this, right?

4      A.   Well, certainly, yes --

5      Q.   Right.

6      A.   Yes.

7      Q.   Okay.  Now I want to talk about GAAP.  GAAP

8  is -- what is GAAP?

9      A.   GAAP is generally accepted accounting

10  principles.

11      Q.   Right.  And that's what you're supposed to

12  follow to make your determinations as to how to

13  account for all this stuff, correct?

14      A.   We and the company, yes.

15      Q.   Right.

16      A.   The company first.  And we are auditing to

17  ensure that they comply with GAAP.

18      Q.   Right.  You're the auditors, right?

19      A.   Correct.

20      Q.   And you're the experts, right?

21      A.   Correct.

22      Q.   Okay.  Now I've got the 2016 GAAP guide

23  here.  I assume in 2008 and '9 kind of look the same.

24              MR. IGNALL:  Objection.  Relevance.

25              THE COURT:  May I see you, please?

1                    MR. EGAN:  Sure.

2        (At sidebar)

3                    THE COURT:  He's an expert.  And you

4    are attempting to use what it would mean

5    (indiscernible).

6                    MR. EGAN:  (Indiscernible).

7                    THE COURT:  The rules for GAAP?

8                    MR. EGAN:  Yeah.

9                    THE COURT:  Why would it be an issue to

10   that?

11                   MR. IGNALL:  One, we had qualified him

12   as an expert.  But regardless of that, this is the

13   same point we made when we were looking to exclude

14   defense experts.  What's the relevance?  This seems to

15   be going down the road of, boy, accounting is

16   complicated, therefore my client couldn't have had

17   criminal intent.

18                   THE COURT:  That's for them to decide.

19   Let's see if he proffered that he's going to say

20   something that is tantamount to what they did was

21   proper.

22                   MR. EGAN:  He (indiscernible) implied

23   to come to his determination that EITF 85-1 didn't

24   (indiscernible).  He's bringing it another level down.

25                   THE COURT:  Do you contest that the

1   book is the regs?

2                  MR. IGNALL:  You know, accounting is as

3   much of an art as science.  There are a lot of

4   different pronouncements.  There's a financial

5   accounting standard --

6                  THE COURT:  (Indiscernible) but this is

7   --

8                  MR. IGNALL:  -- but where are we --

9                  THE COURT:  This is the Court's

10  problem.  As you're suggesting, it's not a science per

11  se.  The problem is that these are tantamount to

12  charge with a crime.  The crime is the statute.  Now

13  does what he had to proffer here have any relevancy to

14  the statute?

15                 MR. IGNALL:  That's what I'm saying.

16  No.  'Cause where we're going at is but how totally

17  complicated this is, you know, fourth level

18  accounting.  Therefore, my client couldn't have known

19  that any (indiscernible) the federal government would

20  want to know that there's a loan when counting

21  capital.  And I don't think that's relevant.

22                 MR. ENGLE:  Except you're trying to use

23  the law to show that it should have been treated a

24  particular way and the failure to treat it that way

25  and advise the regulators of such makes me guilty.

1                    MR. EGAN:  (Indiscernible) people

2     (indiscernible) stop.

3                    THE COURT:  Okay.  How many more

4     witnesses do you have?

5                    MR. IGNALL:  This is it.  This is our

6     last witness.  And on that note, this witness has a

7     meeting somewhere later this afternoon, so if there's

8     a --

9                    MR. EGAN:  This is important.  This is

10    very important.  And I tend to differ --

11                   THE COURT:  I'll let you argue it

12    (indiscernible) in detail.

13                   MR. EGAN:  Your Honor, I wasn't going

14    to do a lot with the (indiscernible).  I'm doing a

15    (indiscernible) EITF 85-1 'cause that's the rule that

16    he applied.

17                   THE COURT:  Okay.  So it's still going

18    to come out.

19                   MR. IGNALL:  Well, no.  If we don't go

20    to the book and he wants to say what level of

21    accounting that is, that's fine.  And we can argue

22    later about what's appropriate to argue to the jury.

23                   THE COURT:  (Indiscernible).

24                   MR. IGNALL:  Thank you.

25         (Sidebar concluded)

1                    THE COURT:  You may continue.

2                    MR. EGAN:  Thank you.

3     BY MR. EGAN:

4          Q.   Sir, you would agree the GAAP is lengthy,

5     correct?

6          A.   The GAAP is lengthy, yes.

7          Q.   And it is complicated, correct?

8          A.   It can be complicated.

9          Q.   And when you first learned of this

10    transaction, you asked for one of your partners for

11    information to help you to determine what to do with

12    it, correct?

13         A.   I had a conversation with my concurring

14    partner.  Every engagement would have a second

15    partners that we would call a concurring partner.  So

16    I called relating to the specific loan in question,

17    Mr. Levin's loan --

18         Q.   And I want to ask you some questions about

19    that, sir.  And the good news is now I'm going to put

20    these away.

21                    MR. EGAN:  If we could have Defense

22    Exhibit 96 for the witness only, please.  And if we

23    could blow up the very top part, that's the e-mail

24    body.  There you go.  Thanks.

25    BY MR. EGAN:

1       Q.    Now, sir, this is an e-mail from you to

2    Kevin Frank.  And is that your concurring partner?

3       A.    This is actually from Kevin Frank to me.

4    But, yes, that is my concurring partner.

5       Q.    Right.  So and it's dated Wednesday, May

6    19th, 2010, correct?

7       A.    Correct.

8       Q.    And that would be right around when you

9    discovered that this loan -- or you were told by Ms.

10   Loughney that this transaction took place.

11      A.    Correct.

12      Q.    And he writes to you, "Allen, for what it's

13   worth, copied below is the EITF guidance I was

14   thinking of earlier.  You see that?

15      A.    Yes.

16      Q.    Okay.  And so basically, what he's doing is

17   he's saying, hey, here's that rule I told you about or

18   that EITF that I told you about that applies to this

19   situation, correct?

20      A.    Correct.

21      Q.    So when you first heard about this, you

22   didn't even know that it was EITF 85-1 that applied to

23   the situation, did you?

24      A.    Didn't know the specific guidance, no.

25      Q.    Okay.  So let's talk about -- and the rest

1   of that is just -- e-mail just about some other --

2   that's about some other project, right?  Nuneemay

3   (ph)?

4         A.   Correct.

5         Q.   So it's not relevant to us.

6         A.   Correct.

7         Q.   Okay.  But beneath there is EITF 85-1,

8   correct?

9         A.   Correct.

10             MR. EGAN:  And if we could have the

11   rest of the e-mail, please.

12   BY MR. EGAN:

13        Q.   So this is the thing he sent you that really

14   was the basis for your determination that the

15   accounting treatment here should be changed, correct?

16        A.   Correct.

17        Q.   Okay.  Now before we get to that --

18             MR. EGAN:  And I'm going to ask for

19   that again but -- oh, the jury doesn't have it now

20   anyways.

21   BY MR. EGAN:

22        Q.   But if you could look at me for a bit 'cause

23   we're going to come back there.

24             The GAAP itself is an acronym for generally

25   accepting accounting principles, correct?

1          A.   Yes.

2          Q.   And it encompasses conventions, rules and

3     procedures necessary to define accepted accounting

4     principles, correct?

5          A.   Yes.

6          Q.   Okay.  And actually -- so it's a bunch of

7     stuff from different sources, right?

8          A.   Yes.

9          Q.   And there's something called a hierarchy,

10    correct?

11         A.   Yes.

12         Q.   And that hierarchy says that these rules are

13    the most important rules, right?  And these ones are

14    next important, right?

15              You have to say yes.

16         A.   Yes.

17         Q.   And these next ones are the next important,

18    right?

19         A.   Yes.

20         Q.   Okay.  So the first one is FASB statements,

21    so financial accounting standards.  That's the highest

22    in the hierarchy --

23         A.   Yes.

24         Q.   -- correct?  And then the next one down is

25    technical bulletins if cleared by FASB, right?

1        A.   Yes.

2        Q.   And then the next one down is AICPA

3   accounting standards, correct?

4        A.   Yes.

5        Q.   And then that speaks to somewhere in the

6   middle, "Consensus position of the FASB emerging

7   issues task force", right?

8        A.   Right.

9        Q.   And EITF.  That's emerging issues task

10  force, right?

11       A.   Correct.

12       Q.   So this thing that you -- this EITF that you

13  used to make your determination is in the third level

14  of the hierarchy of the GAAP, correct?

15       A.   Correct.

16       Q.   And not even in that book, right?

17       A.   I'm not sure if it's in that book or not.

18       Q.   Now actually, this whole GAAP thing got a

19  lot cleaned up a bunch in 2009, didn't it?

20       A.   Are you talking the codification?

21       Q.   Yeah.  Before 2009, this stuff wasn't even

22  sort of all in one place, right?

23                 MR. IGNALL:  Objection.  Relevance.

24                 THE COURT:  Sustained.

25                 MR. EGAN:  Well, Your Honor --

1   BY MR. EGAN:

2        Q.   There was a major change to the way the GAAP

3   was presented in 2009, wasn't there?

4                  MR. IGNALL:  Objection.  Relevance.

5        A.   I'm not sure how major.

6                  THE COURT:  Overruled.

7   BY MR. EGAN:

8        Q.   Okay.  Well, major's a bad word.

9        A.   Oh, okay.  I'm not sure how major it was.

10  It was just a reorganization of how the guidance was

11  put forth.

12       Q.   And that was in 2009, right?

13       A.   I don't recall the year.

14       Q.   Okay.  And before that, there were a large

15  number of standards issued by various standards in

16  different forms, weren't there?

17                  MR. IGNALL:  Objection.  Relevance.

18                  THE COURT:  Sustained.

19  BY MR. EGAN:

20       Q.   Now let's look at the EITF 85-1.

21                  MR. EGAN:  And if we could just blow up

22  the very first section that says "Issue".

23  BY MR. EGAN:

24       Q.   Now it says, "An enterprise receives a note,

25  rather than cash, as a contribution to its equity."

1   Right?

2        A.   That's what it says.

3        Q.   So that would be a note -- here's this note.

4   Take this and put it -- consider it to be your equity,

5   right?  Correct?

6        A.   Well, that's -- it's saying that they

7   received a note, right, rather than cash, yes.

8        Q.   Okay.  But if they received cash, it doesn't

9   apply, does it?

10        A.   If you receive cash, correct.

11        Q.   Okay.  And then it goes on to say -- well,

12   then let's go to the next section.  Oh, wait.  No.

13   I'm sorry.  The second sentence there.  "The issue is

14   whether an enterprise should report the note

15   receivable as a reduction of shareholders' equity or

16   as an asset."  Correct?

17        A.   That's what it says.

18        Q.   And ultimately, you decided it should be a

19   reduction of shareholders' equity, correct?

20        A.   Or the loans that were mentioned previously,

21   yes.

22        Q.   Right.  The loans that the bank brought to

23   your attention.

24        A.   Yes.

25        Q.   And -- well, we'll get back to that one.

1            MR. EGAN:  So now -- now we can go to

2      the next section.  "Discussion", please.

3      BY MR. EGAN:

4        Q.   The first sentence there says that "Task

5      force reached a consensus that reporting the note as

6      an asset is generally not appropriate."  You see that?

7        A.   I see that.

8        Q.   That means sometimes it might be, right?

9        A.   I guess so, yes.

10       Q.   "Except in very limited circumstances."

11     Right?

12       A.   Right.

13            MR. IGNALL:  Your Honor, I'm going to

14     object to this.  It's appropriate to ask the witness

15     what he did.  But to comment on the emerging issue

16     task force, I do not think is relevant.

17            MR. EGAN:  Your Honor, this is the

18     standard.

19            THE COURT:  You know what?  We're going

20     to take a luncheon recess at this time.  And we will

21     recess until 1:15 this afternoon.  1:15.

22            THE CLERK:  All rise.

23        (Jury out)

24            THE COURT:  You may step down, sir.

25            All right.  We're still in session with

1    counsel but if everyone else wants to leave, you could

2    feel free to do so.

3                    MR. EGAN:  Your Honor, can I go back to

4    the table?

5                    THE COURT:  Yes.

6                    Counsel may be seated.

7                    MR. IGNALL:  Thank you.

8                    THE COURT:  Now let me hear from Mr.

9    Egan.

10                   MR. EGAN:  Yes, Your Honor.  There is

11   no law and no regulation that says that this could not

12   be counted as capital.  The government wants to impute

13   the fact that my client as a CPA, that he should have

14   known that this treatment was what should have been

15   applied for these transactions in June of 2009.  This

16   guy's coming along in June of 2010, May and June of

17   2010 to say, hey, that's not the case based on this

18   thing even he didn't know what was until his partner

19   sent it to him.  And when you read it, it doesn't even

20   necessarily say what he says it does.  I think I

21   should be allowed to inquire about that.

22                   THE COURT:  Now he is -- he's testified

23   that he followed this?

24                   MR. EGAN:  Yes.

25                   THE COURT:  And this was the basis for

1   his decision that it should not be counted.

2                   MR. EGAN:  Correct.

3                   THE COURT:  Now, Mr. Ignall, why is it

4   not relevant?

5                   MR. IGNALL:  If he did follow that,

6   that's all fine.  What I don't think is fine -- this

7   is why we moved to exclude what I understood the

8   defense experts were going to say, in part, is that,

9   boy, accounting is really complicated.  Therefore, Mr.

10  Hartline couldn't have known that the Treasury would

11  want to know that Mr. Levin borrowed $5 million.

12  Because what we have to remember here is we're not

13  charging these defendants with violating the capital

14  statute.  We're not charging them with violating EITF

15  85-1.

16                  What we've charged them with is a

17  scheme to defraud the United States.  And that scheme

18  largely involves omissions by representing to the

19  Treasury that the bank has obtained new capital

20  without disclosing that $8 million of that new capital

21  were loans from the bank.

22                  THE COURT:  But is this not a specific

23  intent crime?

24                  MR. IGNALL:  They have to have the

25  intent -- well, yes.  So that's why I don't think that

Page 112

1    the idea that accounting is complicated in the

2    abstract has any bearing on whether one of these

3    defendants had an intent to violate the law.

4                THE COURT:  But to the extent that the

5    witness has just testified in response to Mr. Egan's

6    question, it is generally applied in a certain way.

7    Does that not leave some exception?

8                MR. IGNALL:  Well, no.  That would be

9    great if Mr. Hartline said I generally understood it

10   one way versus another.  That's fine.  But this

11   witness, reading about -- reading from the EITF task

12   force that it's generally done one way, this witness

13   has already testified that he immediately knew there

14   was an accounting treatment.  He may not have known it

15   was 85-1 initially.  But that doesn't go to Mr.

16   Hartline's intent.  That -- the argument to the jury

17   that, boy --

18                THE COURT:  If violating 85-1 --

19                MR. IGNALL:  EITF 85 -- the question

20   is --

21                THE COURT:  Let me just ask you.  Is

22   violating that regulation or that rule tantamount to

23   violating the law?

24                MR. IGNALL:  It's not.  What is

25   relevant here --

1          THE COURT:  Isn't that what you're

2    arguing to the jury, though?

3          MR. IGNALL:  No.  We're arguing to the

4    jury is that these defendants engaged in a scheme to

5    defraud the United States by making the bank --

6          THE COURT:  By --

7          MR. IGNALL:  -- by making the bank

8    appear to be stronger than it was.  So when --

9          THE COURT:  And the way they would make

10   it appear to be stronger than it was was violating

11   this rule.

12         MR. IGNALL:  Well, it also violated

13   that rule.  But that's -- whether it violate that rule

14   or not doesn't matter.  The question is, did they omit

15   a material fact to the Treasury.

16         THE COURT:  Let me ask it this way.  If

17   that rule did not exist, would they have violated the

18   law and how?

19         MR. IGNALL:  Yes.  They would have

20   violated the law and how because by failing to

21   disclose to the Treasury that $8 million in this new

22   capital was money that the bank had loaned.  The

23   Treasury would have considered that important in

24   making a decision about whether the bank is viable and

25   thereby a worthy beneficiary of the TARP funding.

```
 1                    THE COURT:  And what rule of law says
 2    that?
 3                    MR. IGNALL:  There doesn't need to be a
 4    rule of law that says that, Your Honor.  The question
 5    is --
 6                    THE COURT:  Then how do you know you
 7    violated the law?
 8                    MR. IGNALL:  You know -- well, that's
 9    where -- that's where we get to a different aspect
10    here and this is where this is not relevant.  It comes
11    to how do we -- I think it's quite clear right now
12    that that the defendants failed to inform the Treasury
13    of a fact that would be important to the Treasury in
14    determining whether the bank is viable.
15                    So the real issue in this case is did
16    either defendant have an intent to defraud.  Was this
17    a mistake that I didn't realize that anyone would want
18    to know that?  Or was there an attempt and an effort
19    to conceal this from regulators.  And that's where, in
20    fact, Mr. Shubin's testimony is most relevant.  It
21    goes to the letter that Mr. Hartline wrote to Mr.
22    Shubin where he does not disclose the true purpose of
23    the loan.  That goes to indicate that he knows that a
24    loan made for the purpose of investing in stock is not
25    going to be something that anyone would consider to be
```

1   new capital that makes the bank stronger regardless of

2   whether it violates EITF 85-1.

3                  But the fact that it does -- EITF 85-1

4   is in existence and is relevant goes to show that this

5   is a material omission.  It goes to show that the

6   accountant said no, you can't count that once the

7   accountant found out about it, which took some effort,

8   and that the FDIC then came to the same conclusion

9   after the accountants did that.

10                  THE COURT:  Would the answers that Mr.

11  Egan seeks to obtain demonstrate how material this is

12  or immaterial it is?

13                  MR. IGNALL:  I don't think it does.

14  "Material" simply means, as an objective standard, is

15  it capable of influencing the decision maker.

16                  THE COURT:  And when you say

17  generally --

18                  MR. IGNALL:  Well, "generally" means it

19  can -- it's capable.  It doesn't mean it would have

20  influenced the decision maker.  And if -- so

21  "generally" doesn't mean yes, doesn't mean no.  So

22  here, the word "generally", it's still capable of

23  influencing the decision maker.  If we have to dig

24  further then it's capable of influencing the decision

25  maker.

```
 1                  THE COURT:  All right.  A lot of what
 2    you are arguing contains -- if Mr. Hartline says --
 3    what I have to decide here is, ultimately, under 29 as
 4    is coming presumably, what the government's case-in-
 5    chief has been -- or is -- as a matter of law.
 6                  MR. IGNALL:  Okay.
 7                  THE COURT:  And to the extent that the
 8    government has the burden of proof, is it not relevant
 9    and probative that which Mr. Egan seeks to ascertain
10    from this witness regarding that regulation?
11                  MR. IGNALL:  I don't see what it
12    intends to prove or disprove other than to try and
13    argue to the jury accounting is complicated.
14    Therefore, my client couldn't have known better.
15    That's what -- I don't see what else is going other
16    than that.
17                  THE COURT:  All right.  Mr. Egan?
18                  MR. DUNCAN:  Your Honor, may I?
19                  The one thing that gets left out of
20    what Mr. Ignall has just said is the very basis of
21    what he alleges our client did wrong, is that they
22    didn't know this was new capital.  How this witness
23    came to the conclusion that this was or was not new
24    capital was by using this exact regulation.  That is
25    the essence of this case.
```

1                THE COURT:  Mr. Ignall?

2                MR. IGNALL:  The question is would the

3     regulator have been interested in the fact that Mr.

4     Levin borrowed the $5 million.  That's pretty clear

5     the answer is yes.  So the next question --

6                THE COURT:  Again, this is where I'm --

7     I have a problem --

8                MR. IGNALL:  Okay.

9                THE COURT:  -- in understanding.  Not

10    in deciding but just in understanding.  Again, where

11    does it say in the statute which they're charged with

12    violating that that's an essential element?

13               MR. IGNALL:  The essential element is,

14    is there a false statement or an omission.  It doesn't

15    have to -- any other fraud doesn't require that there

16    be a specific statute that you violate in terms of the

17    language that's false.

18               THE COURT:  Is it the government's

19    position that the actions here were either omissions

20    or false statements --

21               MR. IGNALL:  Yes.

22               THE COURT:  -- or both?

23               MR. IGNALL:  It's both, actually, Your

24    Honor.

25               THE COURT:  Because it was carried as

1   capital.

2                   MR. IGNALL:  Yes.  And reported to --

3   Mr. Hartline reported to the FDIC, we've gotten $5

4   million of new capital from Mr. Levin.  Mr. Hartline

5   reports in December of 2009, "We've met the

6   contingency by raising the additional $10 million."

7                   What he omits both times is that $5

8   million from Mr. Levin was a loan from NOVA Bank and

9   $3 million of the initial 10 million were loans from

10  the bank.  The loan itself, regardless of the

11  accounting treatment, is something that the regulator

12  would want to know.  It's something that the regulator

13  would want to know.  It's something that's capable of

14  influencing their decision.  When the regulators are

15  looking at the health of the bank, they're not aware,

16  as of the March 31 data, that Mr. Levin, in June, took

17  out a $5 million unsecured loan.  There's certainly a

18  difference between Mr. Levin taking $5 million outside

19  and investing in the bank versus Mr. Levin taking a $5

20  million loan and then investing in the bank.  There is

21  no way that the regulator considers those to be

22  equivalent situations when assessing the viability of

23  the bank.

24                   So the question now becomes did either

25  defendant have an intent to defraud the Treasury by

```
 1   neglecting and concealing -- neglecting to mention and

 2   concealing from regulators that Mr. Levin had a $5

 3   million loan.  It doesn't mat -- and ultimately, it

 4   wouldn't matter what the accounting treatment is

 5   although given that the accounting treatment is you

 6   can't count it, that's further proof that it is

 7   material.  But it certainly -- in assessing the

 8   viability of the bank, it's something that is

 9   important to the regulator to consider.

10             THE COURT:  Okay.

11             MR. IGNALL:  So all we have now is did

12   these defendants have an intent to defraud.  Was this

13   an omission?  They didn't realize I should do that in

14   which case they're not guilty or I did realize and I

15   made an effort to conceal it.

16             THE COURT:  All right.  Thank you very

17   much.

18             Mr. --

19             MR. ENGLE:  Your Honor, may I just make

20   one point?

21             THE COURT:  Let me just Mr. Egan,

22   please.

23             MR. ENGLE:  Sure.

24             THE COURT:  And I will absolutely give

25   you an opportunity to do that.  Let me ask Mr. Egan --
```

Page 120

1                    MR. EGAN:  Yes, Your Honor.

2                    THE COURT:  What more is it that you

3      wish to elicit from this witness regarding the

4      regulation?

5                    MR. EGAN:  I'm going to finish going

6      through it with regard to how unclear it is, at least

7      to me, which, quite frankly, Your Honor, is absolutely

8      relevant to Mr. Hartline's state of mind because they

9      keep talking about the fact he's a CPA and claiming

10     that he should somehow know this stuff which they're

11     doing to impute knowledge to him that he is -- did

12     this on purpose which is this all about -- it's all

13     about whether or not they knew, right, an

14     intentionally hid from the government the facts that

15     these are worth $400 million, filed the 5 million from

16     one thing and put 5 million in another thing and

17     that's somehow this great violation of the law.

18     That's their case.  We haven't gotten to the fact that

19     the people who made the ultimate decision never even

20     heard about it, but that's neither here nor there

21     'cause that's not what we're talking about today.

22                    The fact of the matter is that that is

23     entirely relevant to his state of mind.  He didn't

24     know about this.  And I'm going there next because

25     this guy is the one who sent him this thing on the

1    next day which clearly -- and Mr. Hanuscin who already

2    testified he didn't know about it.  And when they read

3    it, they disagreed with it.  He wants to say, oh, oh,

4    well, he said that it was about the house.  He made

5    this thing up about the house.  It's like all fake

6    about the house.  The house isn't even the issue.

7    This guy's testimony is going to be that he didn't

8    care about the purpose of the loan.  It was the timing

9    of the loan.  And applying EITF to the timing, he

10   determined that, as a capital matter, it should be

11   moved from one column to another column.  And if

12   that's his basis for doing it, if they're putting up

13   as their last witness, and clearly, they put him as

14   the last witness for a reason, to be like the guy to

15   say, hey, this was all wrong, I need to go into why he

16   decided what was wrong.

17              THE COURT:  All right.  Yes, sir.

18              MR. IGNALL:  I don't have a problem

19   with going into why he decided what was wrong.  It's

20   the part about, boy, accounting is complicated that I

21   think is confusing.

22              THE COURT:  Well --

23              MR. IGNALL:  It is complicated.

24              THE COURT:  So is this case.

25              Let me hear from Mr. Engle.

 1                    MR. ENGLE:  Your Honor, what I just
 2    fundamentally don't get is if you had an accounting
 3    principle that said you absolutely did count this as
 4    new capital, we wouldn't be here.  The whole issue is
 5    the fact that there's a question where there's
 6    auditors' judgment about this.  And that's the whole
 7    issue here.  The complexity of the GAAP principles,
 8    the complexity of EITF 85-1, the fact that accounting
 9    is complicated, comes down to the critical issue that
10    we're here because the government's theory is you
11    should have known you can't count this as capital.
12    And to represent it as such is false.  Or the failure
13    to tell the auditors about this issue is a material
14    omission.  That's what the government's saying.
15                    THE COURT:  Well, the government is
16    entitled to present evidence from which the jury can
17    infer criminal conduct.  And that's what they've done
18    in their case-in-chief.  My concern right now simply
19    is, how much latitude to grant Mr. Egan when it comes
20    to this particular regulation inasmuch as this
21    witness, who is an expert, has testified it was
22    critical to his opinion --
23                    MR. ENGLE:  Right.
24                    THE COURT:  -- as to whether or not
25    something was proper or improper in terms of

1    listening.  Not criminal conduct.

2                   MR. ENGLE:  And --

3                   THE COURT:  And that's what I'm

4    inclined to allow the defense to do.

5                   Now my question answered my answer.

6    Clearly, he cannot go outside the bounds in what

7    you're suggesting he would be doing with this

8    information.  He can ask specific questions, elicit

9    specific answers and the jury can infer what they

10   choose to ultimately if it gets that far.  But the

11   question that I have right now is could you not at

12   least meet and decide what would be the majority if

13   not a total questions that would be asked by Mr. Egan

14   in this area.  Let's get to the point and that's the

15   end of that.

16                  MR. EGAN:  That would be fine with me,

17   Your Honor.  All right?

18                  MR. IGNALL:  I'm happy to meet.  I'm

19   not sure if we can agree but we'll try.

20                  THE COURT:  Well, you eat that instead

21   of lunch.

22                  MR. EGAN:  We have another issue,

23   though, Your Honor.

24                  THE COURT:  Yes, sir.

25                  MR. EGAN:  The government is -- are we

Page 124

1    done with that one?

2                    THE COURT:  I'm satisfied if you all

3    are.

4                    MR. EGAN:  The government next intends

5    to introduce my client's deposition.

6                    THE COURT:  Okay.

7                    MR. EGAN:  That deposition was taken in

8    April of 2012.  It was in a civil case and he's being

9    asked questions by a civil lawyer who not so

10   coincidentally (indiscernible) lawyer, Mr. Korn (ph)

11   who this Court may well be familiar with.

12                   They ask questions of him about whether

13   or not there's a regulation or a rule that applies to

14   this situation.  And he says yes.  It's in 2012.  It's

15   entirely irrelevant to his state of mind in 2009

16   because by then this guy has made his determination --

17                   THE COURT:  So are you asking to

18   exclude that --

19                   MR. EGAN:  Yes, Your Honor.  Sorry.

20                   THE COURT:  -- that line of his

21   testimony?

22                   MR. EGAN:  I'm asking to exclude all

23   sorts of his testimony.  And what we are going to do

24   is give the Court a marked up version.  And I have a

25   few cases to hand up on the issue.

1                    THE COURT:  Mr. Ignall, have you

2    received it:?

3                    MR. IGNALL:  I haven't.  Mr. Egan

4    raised this last night.  He's already -- he made a

5    motion last fall that the Court's already denied.  I

6    didn't realize we were going to be revisiting it until

7    last night when Mr. Egan told me about it.

8                    MR. EGAN:  I made the motion when Mr.

9    Ignall told me what pages of the testimony he planned

10   to read.  I didn't know --

11                   MR. IGNALL:  Yes.  But -- yes.  But in

12   our motion in limine, I have -- I can tell you what

13   docket numbers are -- the exact portion that Mr. Egan

14   is now seeking to exclude we cited verbatim in our

15   response.  This issue has already been before the

16   Court.  I'm not saying the Court can't revisit it.

17                   THE COURT:  Well, I'm tempted to

18   revisit it only because now that I've heard the entire

19   case, if he's saying that the statement was made in

20   2012 and it's a yes answer to whether or not it was

21   appropriate to list it, it is --

22                   MR. IGNALL:  Well, no, Your Honor.

23                   THE COURT:  -- inadmissible on that

24   issue.

25                   MR. IGNALL:  The Court needs to see it

1    in context.

2                    THE COURT:  I'm sorry?

3                    MR. IGNALL:  The Court needs to see the

4    answer in context.

5                    THE COURT:  All right.  I'm certainly

6    willing to do that.

7                    MR. EGAN:  And just, Your Honor, I'll

8    read the question:  "Are you aware of any banking

9    rules or regulations which prohibit the bank from

10   lending money to someone for the purpose of purchasing

11   stock in that bank?"  "Yes, I am aware."  In 2012.

12                   MR. IGNALL:  If I may quote from our

13   response.

14                   THE COURT:  The question wasn't were

15   you aware.

16                   MR. IGNALL:  Well, if we keep going.

17                   THE COURT:  Go ahead.

18                   MR. IGNALL:  If we keep going, we do

19   get to the past tense.  And this is all in the context

20   of something that is even more important which is Mr.

21   Hartline continuing to conceal the purpose of Mr.

22   Levin's loan.  And I understand why Mr. Egan wants to

23   exclude that because it is phenomenally prejudicial to

24   his case in a perfectly fair way because this is what

25   we need to do.  But there's no way to get inside the

1   defendants' mind, obviously to go to intent.  But if a

2   false exculpatory statement -- this is, I think, just

3   Hornbook law, shows consciousness of guilt.  So in

4   2012, if Mr. Hartline continues to say that Mr.

5   Levin's loan was for the purpose of fixing up his

6   house in Devon, that's certainly probative of his

7   consciousness of guilt.

8                   So then, in the context of those

9   questions, he's asked if he's aware of any banking

10  regulations.  He says yes, I'm aware.  And then

11  there's a back-and-forth about it's a federal crime,

12  no, it's not.

13                  MR. EGAN:  (Indiscernible)?

14                  MR. IGNALL:  No, sir.  I'm just going

15  through the whole thing.

16                  "Well, you understand the bank

17  regulations?"

18                  "No, I don't understand that."

19                  "Well, did you understand -- well, what

20  did you understand to be the problem of a bank lending

21  money to someone for the purpose of that person buying

22  stock in the bank, what's the problem?"

23                  Answer:  "It's an accounting issue."

24                  The question was what did you

25  understand to be the problem while in the context of

1   misstating the actual purpose of Mr. Levin's loan.  So

2   this shows that while acknowledging he knows there's

3   an accounting rule, he continues to say that Mr.

4   Levin's loan was for a purpose other than investing in

5   NOVA Financial Holding stock.  It is tremendously

6   probative evidence of his consciousness of guilt so I

7   understand why Mr. Egan wants to exclude it.

8                   THE COURT:  So why would you not start

9   at what was your understanding as opposed to what is

10  your understanding -- or do you know?

11                  MR. IGNALL:  We might be able to figure

12  out a way to edit it.  It's just to get the context,

13  it has to be in the context of --

14                  THE COURT:  You're entitled to present

15  the case.  That's not what my concern is.  My concern

16  is what's been represented by Mr. Egan that he's asked

17  a question as to what he knows and it sounds as though

18  he was aware of this back when he says he wasn't aware

19  of it.  That's all.  So it's relevant to me as to what

20  he knew then as opposed to the time of the deposition.

21                  MR. IGNALL:  Yes.  Absolutely, Your

22  Honor.

23                  THE COURT:  So if you all can agree on

24  that, I don't think that's an issue.

25                  MR. IGNALL:  I'm not sure we're going

 1    to be able to agree but I'll (indiscernible) Mr. Egan.

 2                   MR. EGAN:  Your Honor, the problem is,

 3    well, what did you understand to be the problem of a

 4    bank lending money, is not clear when they're talking

 5    about.

 6                   MR. IGNALL:  Well, Your Honor, that can

 7    go to the weight not the admissibility because --

 8                   MR. EGAN:  It's too prejudicial.  The

 9    prejudice so outweighs the probative value.

10                   THE COURT:  Don't talk over each other.

11                   MR. EGAN:  I'm sorry.

12                   THE COURT:  Let him just --

13                   MR. IGNALL:  Your Honor, and it might

14    be helpful -- I mean, we can probably provide -- it

15    might be more (indiscernible) if we provide the Court

16    with the part of the transcript we're talking about.

17    And we can even play the clip if the Court wants just

18    so the Court can see it.  But this is all in the

19    context of talking about Mr. Levin's loan and Mr.

20    Hartline saying he wasn't aware of Mr. Levin borrowing

21    money to purchase NOVA Financial Holding stock.  So I

22    think the jury can certainly --

23                   THE COURT:  All right.  So I understand

24    what you're saying and I'm certainly receptive to

25    listening to it or reading it.  But I still think that

 1    under the circumstances, at least that one line can be

 2    agreed upon as inappropriate to afford the jury to

 3    consider or hear because it is misleading.  Now --

 4                    MR. IGNALL:  Let me see if there's a

 5    way -- let me see if there's a way --

 6                    THE COURT:  That's all.

 7                    MR. IGNALL:  -- to excise this out of

 8    the context.  That's what I'm not sure we can do.

 9                    THE COURT:  That's all I want you to

10    do.

11                    MR. EGAN:  And, Your Honor, just to

12    belabor things but to go back to the other point,

13    another section they want to play is where they ask

14    him if he used to be a CPA.

15                    THE COURT:  Did you used to be a CPA?

16                    MR. EGAN:  Yeah.  Were you a CPA?  And

17    he says he was a CPA and he's wrong about what year he

18    was a CPA.  I've got evidence to prove that he's wrong

19    about it.  But the bottom line is I just want to like

20    dovetail it back to my other argument because,

21    clearly, the reason they're putting that in is to say

22    he was a CPA, he should have known this stuff.

23                    MR. IGNALL:  Absolutely.

24                    THE COURT:  I don't think that there's

25    -- unless somebody is going to have an expert witness

1   who says what somebody should have known at the time

2   that what's required to obtain a CPA certification.

3                    MR. EGAN:  No.  But it's --

4                    THE COURT:  I think someone who's

5   already been on the witness stand and said I don't

6   know everything about this.

7                    MR. EGAN:  Right.  I'm just saying they

8   don't want to let me cross on how complicated it is

9   but they want to keep saying he's a CPA.  It's like

10  they want to have their cake and eat it, too.

11                   THE COURT:  I understand.  Mr. Ignall?

12  And, Mr. Schwartz, let me go to you.

13                   MR. SCHWARTZ:  Thank you.

14                   MR. IGNALL:  I'm not saying that Mr.

15  Egan can't cross on some of the -- the cross I was

16  objecting to is accounting is just generally

17  complicated, who knows.  But I do think it's relevant

18  that Mr. Hartline used to be a CPA, that the more

19  sophisticated he is, the more likely it is he's aware

20  of what he's doing.  It's not dispositive.

21                   THE COURT:  Was there not a witness who

22  testified --

23                   MR. IGNALL:  Yeah.  We've already had

24  that.  I can --

25                   THE COURT:  -- that he was a CPA?

Page 132

1                    MR. IGNALL:  Yes, there is.  So we

2     won't play that (indiscernible).  We'll resolve that.

3                    THE COURT:  All right.

4                    MR. EGAN:  Thank you.  I'll give you

5     the cases in the meantime.

6                    THE COURT:  Thank you.

7                    Mr. Schwartz?

8                    MR. SCHWARTZ:  Thank you, sir.  For Mr.

9     Bekkedam, none of this can come in.  And an imperative

10    instruction is not going to fix it.  This is

11    (indiscernible).

12                   First of all, as Mr. Egan says,

13    certainly because it can't show Mr. Hartline's state

14    of mind at the time of the crime, it definitely cannot

15    show Mr. Bekkedam's state of mind in terms of while he

16    was entering in agreement.

17                   THE COURT:  The deposition?

18                   MR. SCHWARTZ:  What's that?

19                   THE COURT:  The deposition?

20                   MR. SCHWARTZ:  The deposition testimony

21    is from 2012.  What Mr. Hartline was talking about in

22    2012 is not something that requests what his state of

23    mind was in 2009 when the crime was going on.

24                   MR. ENGLE:  Alleged crime.

25                   MR. SCHWARTZ:  The alleged crime was

1   going.  Thank you.

2                   The second --

3                   THE COURT:  I didn't hear that.

4                   MR. SCHWARTZ:  Thank you, sir.

5                   THE COURT:  Just a second.  Thank you.

6                   MR. IGNALL:  Thank you, Your Honor.

7                   MR. SCHWARTZ:  The second thing is, is

8   this was a deposition in a civil suit of NOVA Bank

9   versus Hillary Musser (ph).  Mr. Hartline (a) is not

10  available to testify in this case and we can't cross-

11  examine him without a statement ; and (b) we couldn't

12  cross-examine him back then (indiscernible) a

13  Washington Justice (indiscernible) made it very clear

14  that that can't come in against Mr. Bekkedam at all.

15  The Supreme Court in Richardson

16  v. --

17                  THE COURT:  And when that happens, the

18  Court is obliged to give a cautionary limiting

19  instruction, counsel.

20                  MR. SCHWARTZ:  Two things,

21  respectfully, Your Honor.  The Supreme Court in Bruton

22  said, "[There's] a narrow exception to the general

23  principle that the jury is presumed to follow the

24  court's instructions."  And that's a situation like

25  this.  Here, the Court can say whatever it wants to

1   the jury and the jury is going to ignore the Court's

2   instructions (indiscernible).  If that's what the

3   Supreme Court said in Bruton and if that's the purpose

4   of Richardson v. -- excuse me -- (indiscernible) and

5   Marsh.

6           Anything that mentions Mr. Bekkedam or

7   acknowledges his existence cannot come into evidence

8   against him.  And there cannot be a curative

9   instruction that takes care of that.  In particular,

10  there is one section of the testimony that the

11  government seeks to introduce that talks only about

12  someone who (indiscernible) Mr. Bekkedam and that is

13  with regard to the number of investors that Ballamor

14  had -- Ballamor clients -- the number of Ballamor

15  clients who are investors in NOVA Bank.

16          First of all, none of that goes to Mr.

17  Hartline so it shouldn't come in against Mr. Hartline.

18  If the jury hears that, the only place a jury's mind

19  can go is to point that at Mr. Bekkedam and that

20  absolutely cannot come in.

21          But the fact of the matter is, as

22  you'll see from the marked up testimony that Mr. Egan

23  is going to present to you, much of the rest of it is

24  about Mr. Levin and the Levin loan.  First of all, the

25  Levin loan wasn't even a part of this -- that trial

1   and it was objected to vociferously and continuously

2   throughout the deposition testimony.  So we don't even

3   know if it was admissible in that proceeding.

4              But the Levin loans have been, by the

5   government, inextricably tied to Mr. Bekkedam.  And

6   therefore, we would like that a reference to the Levin

7   loan also is an acknowledgment of the existence and a

8   reference to Mr. Bekkedam by association.  And that

9   can't come in either.

10             So we can't cross on it now, we

11  couldn't cross on it then.  A curative instruction is

12  not going to be sufficient to take care of Mr.

13  Bekkedam.

14             THE COURT:  So your motion is to

15  exclude the deposition altogether?

16             MR. SCHWARTZ:  Entirely.  It can't be

17  used against Mr. Bekkedam.  If this was going to

18  happen, frankly, we needed a second jury to do this.

19             THE COURT:  Thank you.

20             Mr. Ignall?

21             MR. IGNALL:  This seems like a fairly

22  straightforward application of the Bruton rule that we

23  have been very careful not to include in our clips

24  anything that mentions Mr. Bekkedam directly.  And,

25  indeed, United States v. Bell, 1979, 593 F.2d 487.

1   When a co-defendant's extrajudicial statement does not

2   directly implicate the defendant, however, the Bruton

3   rule does not come in to play.

4              So nothing in this deposition will

5   mention Mr. Bekkedam by name.  I'm not even sure that

6   the implication that Mr. Schwartz has said about the

7   jury putting other pieces together to bring it back to

8   Mr. Bekkedam would come into play.  But the cases are

9   pretty clear that if the pieces, if put together, that

10  does not raise a Bruton problem.

11             And I don't know what Mr. Schwartz is

12  concerned about given that, I think, a limiting

13  instruction is appropriate in this case, that it is

14  only admissible against Mr. Hartline.  This is way

15  less inflammatory than a lot of other co-conspirator

16  post-defense admissions that we see.  This isn't a

17  bank robbery.  This isn't, you know, some other guy

18  and I went into a liquor store.  This is simply Mr.

19  Hartline talking about his running of the bank.  I

20  don't even see exactly how that implicates Mr.

21  Bekkedam, even indirectly.  So I don't see why a

22  curative instruction in this case would not be

23  appropriate when it's certainly appropriate in cases

24  where the Bruton issue is much inflammatory testimony.

25             MR. SCHWARTZ:  If I may, Your Honor?

1          THE COURT:  Yes, sir.

2          MR. SCHWARTZ:  First of all, you'll see

3    the pages, in particular, pages 14 and 15, Ballamor,

4    Ballamor, Ballamor, Ballamor, Ballamor, Ballamor,

5    Ballamor is secondary (indiscernible).  So the

6    references to Ballamor can't come in at all because

7    they don't talk about Mr. Hartline at all and the jury

8    can only (indiscernible) in terms of Mr. Bekkedam.

9          Secondly, when you see the deposition,

10   and you see that there -- it was not signed and that

11   there's no errata sheet.  So we don't even know

12   whether it was properly (indiscernible) and whether

13   the fact testimony (indiscernible).  So as a threshold

14   issue, that deposition is invalid as far as coming in.

15          THE COURT:  All right.  May I have the

16   deposition, please?

17          MR. IGNALL:  Yeah.  Let me -- what

18   exhibit is it?  194?  It's in here.

19      (Recessed at 12:30 p.m.; reconvened at 1:21 p.m.)

20   DEBRA 12140

21          THE COURT:  Now, let me first hear from

22   Mr. Egan again regarding the transcript. What's the

23   basis for your objection?

24          MS. BARRY:  194, Your Honor.

25          MR. IGNALL:  194.

1                    THE COURT:  Well, I should have it here

2     then.

3                    MR. IGNALL:  194A.  I'm sorry.  To give

4     you -- the video is 194 and the hard copy is 194A.

5                    And it might make sense, Your Honor, if

6     we would give you the exact portions we are proposing

7     to play.

8                    THE COURT:  That would be better.

9                    MR. IGNALL:  Do you have the lines?

10    Let me see.  I asked -- I sent back to my office --

11        (Pause)

12                   MR. IGNALL:  Your Honor, I have

13    something that looks like -- can I e-mail it to

14    someone in your chambers, Your Honor?  I have -- what

15    I have will have like the -- in green the parts that

16    we're going to play.

17                   THE COURT:  All right.

18                   MR. EGAN:  Can we get a copy of that,

19    too, Your Honor?

20                   THE COURT:  Sure.

21                   MR. IGNALL:  Yeah.  Where should I send

22    this, Your Honor?

23                   THE COURT:  Chambers.

24                   MR. IGNALL:  Okay.

25                   THE COURT:  Or to Ms. Dubrow (ph),

1    either way.  If you have it -- what do you have?

2                    MR. IGNALL:  I think I have Ms. Dubrow.

3                    THE COURT:  You can send it to her.

4                    MR. IGNALL:  Yes.  I -- hers popped up.

5                    THE COURT:  Send it to her.

6                    MR. IGNALL:  And I'll send it to Mr.

7    Egan.  Who else should I send it to?  Joe.  All right.

8    I will send it to opposing counsel.  I'll send it

9    hopefully right now.

10                    MR. EGAN:  And, Your Honor, just for

11   what it's worth, I was probably going to be another 15

12   to 20 with Mr. Shubin.  But no other than that.

13                    MR. ENGLE:  And I'll be an equivalent

14   amount, Your Honor --

15                    THE COURT:  Okay.

16                    MR. ENGLE:  -- or drive Mr. Shubin

17   crazy.

18        (Pause)

19                    THE COURT:  Bear with me one moment.

20                    MR. EGAN:  Certainly.

21        (Pause)

22                    THE COURT:  Okay.  Anything else?

23                    MR. EGAN:  No, Your Honor.  When would

24   you like us back?

25                    THE COURT:  What did I tell the jury?

1                    ALL:  1:15, Your Honor.

2                    THE COURT:  All right.

3                    MR. IGNALL:  The witness apparently has

4      to be at a meeting somewhere this afternoon.  So the

5      sooner we can get back the better it would be for him.

6                    THE COURT:  How much time do you need?

7      Can you come back at 1:15.

8                    MR. IGNALL:  Absolutely, Your Honor.

9                    THE COURT:  All right.  1:15.

10                   MR. IGNALL:  We can be back earlier.

11     Okay.  Thank you, Your Honor.

12         (Recessed at 12:30 p.m.; resumed at 1:21 p.m.)

13                   THE COURT:  Now, let me first hear from

14     Mr. Egan regarding the transcript.  What is the basis

15     for your objection?

16                   MR. EGAN:  The basis for my objection,

17     Your Honor, is that it's a statement that's offered

18     three years after the accident that took place which

19     evidence is a state of mind which my client had in

20     2012 which is entirely irrelevant to his state of mind

21     in 2009.  This being a specific intent crime, his

22     state of mind is highly relevant to the case and

23     therefore none of this material should be admissible.

24                   THE COURT:  And Mr. Schwartz?

25                   MR. SCHWARTZ:  Mr. Bekkedam's argument

1    is a 6th Amendment confrontation law violation because

2    this was unavailable to him and Mr. Bekkedam was not

3    available or invited to cross-examine the witness at

4    the time the testimony was taken in addition to the

5    fact that it's not -- it's even less probative that

6    Mr. Bekkedam's state of mind in particular

7    (indiscernible) specific testimony (indiscernible).

8                    MR. IGNALL:  We've actually spoken and

9    I understand Mr. Egan's objection that we are offering

10   to take out a few -- a couple of things we had

11   proposed especially in terms of page 54 through 57.

12                   THE COURT:  Could we back up to page --

13                   MR. IGNALL:  Your Honor, can I make a

14   request?

15                   THE COURT:  Yes.

16                   MR. IGNALL:  Can we do this after this

17   witness?  This witness has a meeting.

18                   THE COURT:  Totally fine.

19                   MR. IGNALL:  I didn't know --

20                   THE COURT:  Yes.

21                   MR. IGNALL:  -- it was going to take a

22   little bit of time and then maybe -- and what we could

23   do then is perhaps even excuse the jury just so if we

24   have to excise something, we could have Agent Bora

25   (phonetic) do that before we play anything.

 1                    THE COURT:  Fair enough.

 2                    MR. IGNALL:  Okay.

 3                    MR. EGAN:  And Your Honor, on the other

 4    issue, the scope of my cross-examination, we have come

 5    to an agreement.

 6                    THE COURT:  Great.

 7                    MR. IGNALL:  Okay.

 8                    MR. EGAN:  Which hopefully I will

 9    follow properly.

10                    MR. IGNALL:  Yes.

11                    THE COURT:  All right.  Fair enough.

12                    MR. IGNALL:  I'll keep my eye on him.

13    May we get the witness?

14                    THE COURT:  Yes.

15                    MR. IGNALL:  Great.

16                    THE CLERK:  All rise.  Ladies and

17    gentlemen, we are back on the record.

18                    THE COURT:  Thank you.  Good afternoon.

19    You may be seated.

20                    You may continue.

21                    MR. EGAN:  Thank you, Your Honor.

22                    CROSS-EXAMINATION, CONT'D.

23    BY MR. EGAN:

24        Q.   Now, Mr. Shubin, when we broke you and I

25    were discussing EITF 85-1, correct?

1      A.   Correct.

2      Q.   And this was the accounting treatment --

3  what do you even call this, guidance?

4      A.   Guidance.

5      Q.   Yes.  Okay.  So this was the accounting

6  treatment guidance that Mr. Frank sent to you when you

7  -- after your conversation with him about the bank's

8  treatment, correct?

9      A.   Correct.

10      Q.   Okay.  And we were pretty far through it so

11  hopefully we'll make it through the end.  If we go

12  down --

13            MR. EGAN:  Oh, and could I have 96

14  again?  I'm sorry.  No, D-96.  Thanks.  And if we

15  could blow up the discussion part.

16  BY MR. EGAN:

17      Q.   So right before we broke I read you the

18  part, "The Task Force reached a consensus that

19  reporting a note as an asset is generally not

20  appropriate", right?

21      A.   That's what it indicates.

22      Q.   And that's what the guidance says.  And then

23  on the next sentence it says -- well, actually in the

24  same sentence after the comma, "except in very limited

25  circumstances", right?

1      A.   Right.

2      Q.   "When there is substantial evidence of the

3  ability and intent to pay within a reasonably short

4  period of time", correct?

5      A.   That's what it says.

6      Q.   Okay.  Reasonably, that's not a specific

7  time period, is it?

8      A.   It doesn't give specifics, no.

9      Q.   Okay.  Then it says, "Some Task Force

10  members would require collateralization", correct?

11      A.   Correct.

12      Q.   That doesn't say all Task Force members,

13  right?

14      A.   It says some.

15      Q.   Okay.  Now, if we can go to the next

16  paragraph, it says, "The FCC requires that public

17  companies report notes", right?

18      A.   Correct.

19      Q.   Now, NOVA is not a public company, correct?

20      A.   Correct.

21      Q.   And the SEC didn't apply to NOVA, did it?

22      A.   No.

23      Q.   Okay.  And then if we could go to the second

24  sentence it says, "Task Force members confirmed that

25  the predominant practice is to offset the notes"; do

1   you see that?

2        A.   Yes.

3        Q.   Okay.  So predominant means not everybody

4   does that, right?

5             MR. IGNALL:  Objection, Your Honor.

6             MR. EGAN:  I'll withdraw the question,

7   Your Honor.

8             THE COURT:  Sustained.  Speaks for

9   itself.

10  BY MR. EGAN:

11       Q.   And then the final sentence says, "However,

12  such notes may be recorded as an asset if collected in

13  cash", correct, "prior to the issuance of financial

14  statements".

15       A.   Correct.

16       Q.   All right.

17       A.   That's what it says.

18       Q.   Okay.

19       A.   Yes.

20       Q.   But that's really talking about public

21  companies, right, that whole paragraph?

22       A.   That paragraph seems to indicate that.

23       Q.   All right.  And then if we could go to the

24  next page it says, "Some Task Force members stated

25  that they were aware of very few cases in which non-

1    public companies reported such notes as an asset",

2    correct?

3         A.   Correct.

4         Q.   And then it says, "No further EITF

5    discussion is planned."

6         A.   Correct.

7         Q.   Okay.  Now, are you familiar with something

8    called the Bank Accounting Advisory Services of the

9    Office of the Comptroller of Currency?

10        A.   Yes.

11        Q.   Okay.

12                  MR. EGAN:  If we could show the witness

13   what's been marked as D-139.

14   BY MR. EGAN:

15        Q.   And sir, this is -- Bank Accounting Advisory

16   Services is basically information put out by the

17   Office of the Comptroller of Currency to help folks

18   like you do your job, right?

19        A.   Right.  It's Bank Accounting Advisory

20   Series.

21        Q.   Series.  I'm sorry.  And that's like they

22   put out this information so you can have better

23   knowledge in the field to do a better job, right?

24        A.   They put it out for the banks primarily to

25   use as guidance and, yes, we reference it as well.

1        Q.   And they do that when there is an issue that

2   they want to call to people's attention that they

3   should be aware of, right?

4        A.   Correct.

5        Q.   Okay.  Now, if you could look at 309, if you

6   look down in the bottom right-hand corner, it says

7   that this is from October of 2010, correct?

8        A.   Correct.

9        Q.   So this is the Bank Accounting Advisory

10  Service telling folks in October of 2010 what it has

11  to say about sales of stock up there at the top,

12  right?

13       A.   Right.

14       Q.   Okay.  And we're not going to go through the

15  whole thing but it, like, basically sets forth this

16  exact situation, correct?

17       A.   If you give me a moment, I can read it.

18  Yes.

19       Q.   And then you see Question 1, right?

20       A.   Yes.

21       Q.   And so that's like they're putting this

22  question out so people can be aware of this issue so

23  they might deal with it properly, correct, that's the

24  whole point?

25       A.   Correct.

1      Q.   And in October of 2010 the question they're

2  asking is, "Should the notes received in exchange for

3  the bank's capital stock be classified as an asset or

4  as a deduction from shareholders' equity", correct?

5      A.   That's what it indicates.

6      Q.   Now, this was put out in 2010, not in 2009,

7  right?

8      A.   I'm not sure if this same guidance was in

9  October of 2009.

10      Q.   Now, if we could go to D-133.  So you got

11  this EITF 85-1 from your partner, right?  You received

12  it from your partner and you reviewed it, right?

13      A.   Correct.

14      Q.   And then you went and told the bank that you

15  viewed this as applying to the situation, correct?

16      A.   Correct.

17      Q.   And the bank did not agree with you,

18  correct?

19      A.   Correct.

20      Q.   And so they asked you what is your basis for

21  this, correct?

22      A.   Correct.

23      Q.   And if we could blow up the top of this

24  email.  It's from you to Mr. Hartline and Mr. Hanison,

25  correct?

1      A.   Correct.

2      Q.   And it's dated Thursday, May 20th, correct?

3      A.   Correct.

4      Q.   The day after you received this from your

5    partner, Mr. Frank, correct?

6      A.   Correct.

7      Q.   And it kind of looks like you just forwarded

8    his thing but changed the top email, something I do

9    all the time, and said basically, "See below for

10   guidance", correct?

11     A.   Correct.

12     Q.   So this is you telling Mr. Hartline and

13   Mr. Hanison, hey, here's this rule that we think you

14   should have followed.

15     A.   Correct.

16     Q.   And actually it's not a rule, it's guidance.

17   It's guidance, right?

18     A.   Well, I'm not sure I understand what you're

19   indicating in terms of the difference.

20     Q.   Well, we were --

21     A.   I think this is an Emerging Issues Task

22   Force issuance that all companies are intended to

23   follow.

24     Q.   Got it.  It's guidance from the Task Force,

25   correct?

Page 150

1      A.   Correct.

2      Q.   Now --

3              THE COURT:  Did you complete your

4   answer?

5              THE WITNESS:  Well, I'm not sure.  I

6   think I completed my answer but then you asked me the

7   same question so I'm not sure --

8              MR. EGAN:  I'll withdraw the question.

9              THE COURT:  All right.

10  BY MR. EGAN:

11     Q.   Now, after you came to your conclusions, you

12  asked the bank to provide you with all of the loans

13  that had taken place that might be covered by this

14  treatment, correct?

15     A.   Correct.

16     Q.   And as a result you received a letter on

17  June 9th from Mr. Hartline, correct?

18     A.   Correct.

19     Q.   And that letter was shown to you by the

20  Government.  It's G-178.  And it basically talks about

21  the loans and attached to all the different loans over

22  the many years for your consideration, correct?

23     A.   Correct.

24     Q.   Now, a couple things I want to talk about

25  about this letter.  In the first paragraph, the second

1    sentence, it says, "As you can see, NOVA Bank has a

2    professional and financial relationship with many of

3    its investors as most community banks do"; do you see

4    that?

5         A.   I see that.

6         Q.   And you audit a lot of community banks,

7    right?

8         A.   I do.

9         Q.   And that's true, isn't it; they mostly have

10   a relationship with their investors?

11        A.   Not always.  I would say most is not the

12   correct term, no.

13        Q.   Okay.  But often?

14        A.   In some cases --

15        Q.   Okay.

16        A.   -- is what I would say.

17        Q.   All right.  And then, if we could go down to

18   the next paragraph, it says, "For ease of your review

19   and for your request, I've highlighted seven loans

20   that closed within two weeks of a NOVA financial

21   closing of capital round since its first capital raise

22   in 2002"; do you see that?

23        A.   I do.

24        Q.   However, three of those seven loans occurred

25   before 2008, correct?

Page 152

1          A.   I don't have that in front of me.

2          Q.   Okay.  Well, we can go there.  It's further

3     down the letter.  But you only ended up dealing with

4     four loans, right?

5               MR. EGAN:  If we could go to the bottom

6     of page 3, the bottom paragraph.

7     BY MR. EGAN:

8          Q.   It says, "I did not provide data for the

9     four additional loans that met your requirements of a

10    loan closed within two weeks of a capital round as

11    they occurred in 2007 and 2004"; do you see that?

12         A.   I do.

13         Q.   So that means that in 2004 the same type of

14    loan occurred, correct?

15         A.   I'm not sure if it's the same type of loan.

16         Q.   Okay.  Well, it met your criteria.  It would

17    have met your criteria; isn't that what he said?

18         A.   For those that were going to be reviewed.

19         Q.   Yes.

20         A.   Yes.

21         Q.   So that loan, that type of loan that would

22    have met your criteria occurred in 2004 and 2007 as

23    well, correct?

24         A.   In terms of the loan closing within two

25    weeks of a capital round, that's what its indicating,

1   yes.

2       Q.   Right.  And NOVA was audited all those

3   years, right?

4       A.   I believe so.

5       Q.   And in fact, the one loan to Mr. Gallib, to

6   Belmar, was not from 2009, it was from 2008, correct?

7       A.   If that's what was on the earlier schedule,

8   yes.  It's not in front of me right now.

9       Q.   And KPMG had audited the bank in 2009 and

10  had not raised this issue, correct?

11      A.   In 2008, you mean.

12      Q.   No, the 2009 audit of 2008.  I know this "as

13  of" stuff gets confusing.

14      A.   Now, the -- it's the 2008 audit that might

15  be performed in 2009.

16      Q.   Right, you audited them.  You were in

17  charge, right?

18      A.   I was the lead audit partner that year.

19      Q.   Right.  And nothing was said about that loan

20  in that audit, correct?

21      A.   Nothing was said about that loan in that

22  audit.

23      Q.   Now, if we could go back to the top -- the

24  second paragraph of page 2 and it says, "During the

25  process of the above noted meetings in the first

Page 154

1   quarter of 2009,

2   Mr. Levin requested a $10 million loan from NOVA

3   Bank"; do you see that?

4          A.   I do.

5          Q.   Okay.  Well, you were not looking at a $10

6   million loan, were you?

7          A.   No, the loan that was provided was five

8   million.

9          Q.   Right.  And he ends up talking about Mr.

10  Levin's great financial wealth in this paragraph,

11  right?

12         A.   Correct.

13         Q.   And a bunch of other stuff having to do with

14  the way that -- why the loan was considered to be a

15  reasonable loan based upon his finances, correct?

16         A.   Correct.

17         Q.   And the issue was, was it not, sir, that the

18  bank felt that because these borrowers had sufficient

19  assets that the timing of the loan didn't really

20  matter?

21         A.   Can you please repeat that?

22         Q.   Sure.  The borrowers had a lot of money,

23  right, in each of these instances.

24         A.   Presumably.

25         Q.   Well, according to the documents, right?

1   Yes?

2       A.   Well, according to the documents, yes.

3       Q.   Sure.

4       A.   It turned out Mr. Levin could not --

5       Q.   Understood.

6       A.   -- pay the $5 million loan back.

7       Q.   Understood.  However, the bank's rationale -
8   - when they talked to you their rationale was because
9   this person had so much money that the accounting
10  treatment was proper because they had significant
11  assets to pay back the loan, correct?

12      A.   That's what --

13               MR. IGNALL:  Objection.  That's the
14  bank's rationale.  If he wants to ask about a specific
15  conversation, no objection.

16               THE COURT:  Sustained.

17  BY MR. EGAN:

18      Q.   Right.  Well, you spoke to Mr. De
19  Marcantonio (phonetic) about this, right?

20      A.   Not until the audit committee meeting.

21      Q.   Right.  But you remember talking to him at
22  the audit committee meeting, right?  He was the guy
23  who was kind of upset.

24      A.   Yeah, he was real upset, yes.

25      Q.   Yes.  You talked to him, right?

Page 156

1        A.    I'm not sure we had a conversation other

2    than, yes, him maybe presenting his views --

3        Q.    Right.

4        A.    -- based off of how upset he was over the

5    accounting.

6        Q.    Exactly.  Because these were rich people and

7    the view was if they could afford to pay back the loan

8    there was no problem here, right?

9        A.    Well, I'm not sure that's necessary true

10   when --

11       Q.    I'm not asking if it's true.  I'm asking

12   that was their position?

13       A.    As indicated in -- I'm not sure what Mr. De

14   Marcantonio had indicated at that meeting.

15       Q.    Okay.  Let's do it this way.  Your decision

16   was based on auditor's judgment, correct?

17       A.    Auditor's judgment and accounting guidance.

18       Q.    Right.

19       A.    I would say the combination of the two, yes.

20       Q.    Right.  You are a very experienced

21   accountant, right?

22       A.    I am.

23       Q.    You looked at the guidance, right?

24       A.    I did.

25       Q.    And you applied your judgment to the

1    treatment, correct?

2         A.   Correct.

3         Q.   And based on your judgment, it shouldn't be

4    counted as capital.

5         A.   Correct.

6         Q.   Okay.  And the bank disagreed with you.

7         A.   Correct.

8         Q.   Because based on their judgment it should

9    have been.

10                   MR. IGNALL:  Objection.

11                   THE COURT:  Sustained.

12   BY MR. EGAN:

13        Q.   Now, you were asked questions about when you

14   finally issued your report in October.  You took the

15   position that they should not be counted as capital,

16   right?

17        A.   Correct.

18        Q.   And you were asked if the bank ended up

19   accepting that, correct?

20        A.   When you say "asked", I'm not sure --

21        Q.   By Mr. Ignall.  The prosecutor said the bank

22   ultimately agreed with your treatment, correct?

23        A.   They did.  They recorded those adjustments

24   in the financials, correct.

25        Q.   They recorded those adjustments in the

1    financials, exactly.  And you were also asked did they

2    have a choice and you hesitated a little because they

3    really didn't have a choice, did they?

4         A.   Well, if they wanted our opinion on those

5    financial statements, they didn't have a choice.

6         Q.   Right.  And if they didn't get your

7    financial position on those statements they didn't get

8    audited financials, did they?

9         A.   Well, I guess they could have hired somebody

10   else.

11        Q.   Right.  They could have hired one of other

12   three of the big four, right?

13        A.   Well, there are other accounting firms

14   besides the big four, but yes.

15        Q.   And then they would have had to pay them to

16   review all of this, correct?

17        A.   Correct.

18        Q.   And they had already paid your firm a

19   substantial amount of money for the work you did,

20   right?

21        A.   I'm not sure what the term "substantial" is

22   but they paid us our fees.

23        Q.   You're a partner at KPMG, right?

24        A.   I am.

25        Q.   So literally, if they wanted to fight with

Page 159

1    you, they basically had to go out and spend a whole

2    lot more money to try to do it is the bottom line,

3    isn't it?

4        A.    That was an option.

5        Q.    Right.  Now, you testified that when the

6    loans were charged off that had no impact on capital,

7    correct?

8        A.    I believe that's right.

9        Q.    And you were shown by the Government the

10   financial statements from 2009, remember that?

11       A.    Yes.

12       Q.    Okay.

13             MR. EGAN:  If we could have Defense

14   Exhibit 100 and I'm going to -- may I approach, Your

15   Honor?

16             THE COURT:  Yes, sir.

17   BY MR. EGAN:

18       Q.    Sir, I'm showing you what's been marked as

19   Defense Exhibit 100 and I'm going to be asking you

20   questions about -- can't read the thing under bets.

21   D-107, okay?

22       A.    Okay.

23       Q.    Do you recognize that, sir?

24       A.    That's the 2010 financial statements of the

25   company.

1    Q.   Okay.  And when you do these things, these

2    financial statements, you put in the years before so

3    there's like a snapshot so people can see how it was

4    the year before and the year -- for like a couple

5    years before, right?

6    A.   There's typically requirements to have

7    comparative financial statements.

8    Q.   Right.  So you would put in '07, '08, and

9    '09 in a 2010 statement?

10   A.   Well, first of all, management puts them in.

11   They're management's financial statements.  And

12   certain -- there's a requirement for a private company

13   to include two years of a balance sheet and two years

14   of a profit and loss.  This management team chose to

15   present three years of a profit and loss and therefore

16   three years of a shareholders' equity roll forward, as

17   well.

18   Q.   Okay.  If you could go to page 7, sir, and

19   you could do it on the monitor or on the paper,

20   whatever is better for you.  If you look at the big

21   section --

22                MR. EGAN:  The second section, Sean.

23   Yes, if you could blow it up from there down, that

24   would be great.  Oh, you can do the rest.  The whole

25   thing is good.  Beautiful.  Thanks.  All right.

1  BY MR. EGAN:

2       Q.   So the first one is Issuance of Common Stock

3  Balance, December 31st, 2009.  Do you see that?

4       A.   Yes.

5       Q.   Okay.  And then up in the fourth column up

6  in the air there you have little parenthesis around

7  the number 8,250, right?

8       A.   Correct.

9       Q.   Now, those little parenthesis, that's like a

10  minus sign, right?

11       A.   That is a minus sign.

12       Q.   That means you subtract it?

13       A.   Yes.

14       Q.   Okay.  Now, if we go to 2010, the next one

15  down in that same column, if you look to the left,

16  what does that say?  It says, "Repayment and Charge

17  Offs of Loans for Stockholders", right?

18       A.   Correct.

19       Q.   And then you have 5700 there, right?

20       A.   Correct.

21       Q.   And there aren't any parenthesis around

22  that, are there?

23       A.   No.

24       Q.   Because you add that to that column,

25  correct?

1      A.   Correct.

2              MR. EGAN:  You can take that down.

3   BY MR. EGAN:

4      Q.   I have a question about the purpose of the

5   loans.  Your judgment that you applied to this

6   guidance was based upon the timing of the loans, not

7   the purpose, correct?

8      A.   Well, it was hard because the loan that was

9   a $5 million unsecured loan was made on the same day

10  that a $5 million stock investment was made.  It was

11  really hard to divorce the two of them.

12     Q.   Right.  So it was the timing.

13     A.   Yes.

14     Q.   And in fact the stated purpose was

15  irrelevant to you.  It was the timing that caused you

16  to make your judgment.

17     A.   Correct.

18              MR. EGAN:  May I have a moment, Your

19  Honor?

20              THE COURT:  Yes, sir.

21              MR. EGAN:  Nothing further.

22              MR. DUNCAN:  Thank you, Your Honor.

23                  REDIRECT EXAMINATION

24  BY MR. DUNCAN:

25     Q.   Good afternoon, Mr. Shubin.

1          A.   Good afternoon.

2          Q.   I think I have two questions for you.

3          A.   Okay.

4          Q.   Sir, you've never met our client Barry

5     Bekkedam, have you?

6          A.   I have not.

7               MR. DUNCAN:  And Sean, can we see

8     Government's Exhibit 187, please?

9     BY MR. DUNCAN:

10         Q.   This is the financial audited statement you

11    did for NOVA Financial Holdings for the year 2009,

12    correct?

13         A.   This is the company's 2009 financial

14    statements, yes.

15         Q.   I'm sorry.  I guess I have three questions

16    then.  You would agree that you never communicated

17    with

18    Mr. Bekkedam about anything in this report, correct?

19         A.   Correct.

20               MR. DUNCAN:  Thank you, Your Honor.  I

21    have no further questions for this witness.

22               Thank you, sir.

23    BY MR. IGNALL:

24         Q.   You remember Mr. Egan asking you questions

25    about EITF 85-1?

Page 164

1        A.   I do.

2        Q.   And he even showed it to you.  I think it's

3    Defense 96.

4        A.   Yes.

5        Q.   Do you know what year the Emerging Issues

6    Task Force came out with that guidance?

7        A.   I'm assuming it was 1985.

8        Q.   Are you familiar with how those things are

9    numbered?

10       A.   Yes.

11       Q.   And how are they numbered?

12       A.   They're numbered first by year and then by

13   number of issuance during the course of that year.

14       Q.   And was there any EITF in 1885?

15       A.   I don't believe so.

16       Q.   Okay.  So if we can bring up --

17       A.   Yes.

18       Q.   -- D-96 just to confirm your understanding

19   of when the Task Force came out with this guidance.

20       A.   You want me to indicate it?  February -- the

21   dates that it was discussed were February 14th, 1985

22   and

23   March 29th, 1985.

24       Q.   And is that consistent with your

25   understanding of the numbering system?

1      A.   Yes.

2      Q.   All right.  Mr. Egan asked you some

3  questions about Defense 139, this Bank Accounting

4  Advisory Series; do you remember those questions?

5      A.   Yes.

6      Q.   And is that put out for all bankers and

7  accountants; is that what you said?

8      A.   Yeah, I mean, it's the OCC, the bank

9  regulators' interpretations, viewpoints on certain

10  aspects of GAP that they present to financial

11  institutions for them to use, yes.

12      Q.   And Mr. Egan asked --

13           MR. IGNALL:  If we could bring up D-

14  139.

15  BY MR. IGNALL:

16      Q.   Do you remember Egan asking you if this

17  exact situation about, like, Mr. Levin's loan was

18  addressed by this --

19      A.   Right.

20      Q.   -- BAAS?

21      A.   Right.

22      Q.   And remember you identified the date of this

23  --

24      A.   Yes.

25      Q.   -- accounting series?  And what was the date

1  he identified?

2      A.   October 2010.

3      Q.   Do you know if that's a series that comes

4  out regularly?

5      A.   Once a year it comes out.

6           MR. IGNALL:  I'd like to approach with

7  what we've marked as Exhibit 401.  May I approach,

8  Your Honor?

9           THE COURT:  Yes, sir.

10          MR. IGNALL:  This is not on our

11 computer, Your Honor, so may I approach?

12          THE COURT:  Sure.

13 BY MR. IGNALL:

14     Q.   Do you know if this advisory series was in

15 existence in 1994?

16     A.   I couldn't tell you before you laying this

17 out but I would have surmised that it was, yes.

18     Q.   And if you could look at what I think is

19 probably about the seventh page.

20     A.   Yes.

21     Q.   Was the same question about a bank financing

22 stock sale included in the 1994 advisory series?

23     A.   It looks to be the same question, yes.

24          MR. IGNALL:  One moment, Your Honor.

25 BY MR. IGNALL:

1        Q.   If we go back to the question, the D-139, is

2   that the same question as in the 1994 section?  Do you

3   have -- let's put D-139 on the screen for you?

4        A.   Yes.  Yes, it matches up.

5        Q.   All right.  And with D-139 the question

6   says, "Should the notes received in exchange for the

7   bank's capital stock be classified as an asset or a

8   deduction from shareholders' equity?"  What's the

9   answer?

10       A.   The staff's response -- would you like me to

11  read it?

12       Q.   Just the -- what does the first paragraph

13  say?

14       A.   First paragraph says, "Notes received in

15  exchange for capital stock should be classified as a

16  deduction from stockholders' equity.  These notes

17  should not be recorded as an asset and the bank's

18  capital should not be increased as a result of the

19  sale of stock."

20       Q.   All right.  Thank you.

21            MR. IGNALL:  Nothing further.  Thank

22  you.

23            MR. EGAN:  May I, Your Honor?  Thank

24  you.

25                  RECROSS-EXAMINATION

1    BY MR. EGAN:

2         Q.   Now, sir, this document you were just shown,

3    the Bank Accounting Advisory Series, right?  The

4    second paragraph of that refers to EITF 85-1, does it

5    not?

6         A.   It does.

7         Q.   And that's the same EITF 85-1 that your

8    partner had to send to you so you would know which one

9    it was, right?

10        A.   Well, I'm not sure my partner had to send

11   it.  Out of convenience he had passed that along, yes.

12        Q.   With the words, "This is the guidance I was

13   talking to you about", right?

14        A.   Right.  Correct.

15             MR. EGAN:  Nothing further, Your Honor.

16             MR. DUNCAN:  No, thank you, Your Honor.

17             MR. IGNALL:  Nothing further from the

18   Government.  Thank you, Your Honor.

19             THE COURT:  Thank you, sir.  You may

20   step down.  Watch your step, please.

21        (Requested excerpt concluded at 1:53 p.m.)

22                    *  *  *  *  *  *

23

24

25

Page 169

1                    C E R T I F I C A T I O N

2

3          We, Sherri L. Breach, Lisa Beck and Debra

4     McCostlin, certify that the foregoing transcript is a

5     true and accurate record of the proceedings.

6

7

8

9     _____

      Sherri L. Breach
10
      AAERT Certified Electronic Reporter & Transcriber
11
      CERT*D-397
12

13

14    _____
      Lisa Beck
15    AAERT Certified Electronic Transcriber CET**D-486

16

17    _____

18    Debra McCostlin

19

20    Date:  April 14, 2016

21

22

23

24

25

**A**

**aaert** 169:10,15
**ability** 144:3
**able** 30:17 34:15
  77:24 128:11
  129:1
**abovenoted** 72:3
  72:13
**absence** 28:8
**absent** 82:10 85:7
**absolutely** 48:3,13
  119:24 120:7
  122:3 128:21
  130:23 134:20
  140:8
**abstract** 112:2
**acceptance** 6:11,15
**accepted** 6:8 98:9
  105:3
**accepting** 104:25
  157:19
**accident** 140:18
**account** 20:21
  56:16 60:10 62:11
  81:22 83:25 98:13
**accountant** 43:7,8
  55:18,19 115:6,7
  156:21
**accountants** 115:9
  165:7
**accounting** 10:24
  43:7,9 55:21,24
  56:3 57:7 60:25
  90:1,4 93:6,7,7
  97:24 98:9 99:15
  100:2,5,18 101:21
  104:15,25 105:3
  105:21 106:3
  111:9 112:1,14
  116:13 118:11
  119:4,5 121:20
  122:2,8 127:23
  128:3 131:16
  143:2,5 146:8,15
  146:19 147:9
  155:9 156:5,17
  158:13 165:3,25

168:3
**accurate** 56:21
  169:5
**accurately** 67:7
**acknowledges**
  134:7
**acknowledging**
  128:2
**acknowledgment**
  135:7
**acquire** 23:1
**acquiring** 22:14
  25:11
**acquisition** 4:14
  22:16 23:4 25:4
**acronym** 104:24
**actions** 117:19
**activities** 66:16
**activity** 68:8 86:16
**actual** 128:1
**add** 53:1 161:24
**addition** 26:19 27:9
  93:5 141:4
**additional** 6:18
  26:12 65:24 118:6
  152:9
**address** 97:12
**addressed** 63:18
  165:18
**adequate** 73:5
**adjusted** 84:7
**adjusting** 84:8
**adjustments**
  157:23,25
**admissibility** 129:7
**admissible** 135:3
  136:14 140:23
**admissions** 136:16
**admitted** 12:14
  19:23 83:11 86:8
**adverse** 28:9
**advice** 40:11
**advise** 34:12
  100:25
**advised** 33:11
**advisory** 146:8,15
  146:19 147:9

165:4 166:14,22
  168:3
**affect** 85:16
**afford** 130:2 156:7
**afternoon** 101:7
  109:21 140:4
  142:18 162:25
  163:1
**agent** 71:24 141:24
**ago** 31:17,21
**agree** 26:9 62:15
  70:5 88:21 102:4
  123:19 128:23
  129:1 148:17
  163:16
**agreed** 130:2
  157:22
**agreement** 9:22
  14:12 33:20 36:13
  97:3 132:16 142:5
**ahead** 126:17
**aicpa** 106:2
**air** 161:6
**al** 1:5
**alleged** 132:24,25
**alleges** 116:21
**allen** 1:7 2:5 55:2,7
  55:10,10 103:12
**allow** 123:4
**allowed** 110:21
**alternative** 68:5
**altogether** 135:15
**amendment** 141:1
**america** 1:2,11
**amount** 14:15
  26:10 33:18 73:3
  75:22 81:14 84:8
  84:25 87:2 139:14
  158:19
**amounts** 84:4,6,7,8
  85:7
**anderson** 55:25
**answer** 96:12 117:5
  123:5 125:20
  126:4 127:23
  150:4,6 167:9
**answered** 123:5

**answers** 96:22
  115:10 123:9
**anthony** 18:10
  74:23 76:11,22
**anyway** 33:10 38:5
**anyways** 104:20
**apart** 48:8
**apparently** 140:3
**appear** 12:7 19:9
  113:8,10
**appearances** 1:9
**appeared** 77:20
**appears** 9:11 19:12
  33:17 59:23 68:11
**applicable** 43:2
**applicant** 28:11
**application** 5:8,9
  5:13,16 8:1,4 9:12
  11:3 23:18,20
  26:10 45:6 135:22
**applications** 7:8
  8:7 73:9
**applied** 5:4 101:16
  103:22 110:15
  112:6 156:25
  162:5
**applies** 103:18
  124:13
**apply** 33:8 92:20
  93:10 108:9
  144:21
**applying** 121:9
  148:15
**approach** 11:24
  46:25 54:22 63:7
  80:14 159:14
  166:6,7,11
**appropriate** 10:18
  10:19 20:16 70:8
  73:3 101:22 109:6
  109:14 125:21
  136:13,23,23
  143:20
**approval** 15:25
  25:25 26:16 27:16
  27:18 28:18 57:9
  72:23

**approved** 25:16
  26:25
**approving** 25:24
**april** 1:3 71:8 124:8
  169:20
**area** 94:5 123:14
**arent** 33:8 161:21
**argue** 101:11,21,22
  116:13
**arguing** 113:2,3
  116:2
**argument** 112:16
  130:20 140:25
**argumentative**
  48:15
**art** 100:3
**arthur** 55:25
**ascertain** 116:9
**aside** 59:3
**asked** 10:16 23:17
  24:4 25:23 35:19
  43:6 48:19 53:13
  53:16 66:3,8 67:9
  68:15 70:8 102:10
  123:13 124:9
  127:9 128:16
  138:10 148:20
  150:6,12 157:13
  157:18,20 158:1
  165:2,12
**asking** 124:17,22
  148:2 156:11,11
  159:19 163:24
  165:16
**aspect** 114:9
**aspects** 165:10
**assembled** 64:11
**asserted** 62:22
**assessing** 118:22
  119:7
**assessment** 14:10
  15:18,22 16:4
  17:11,23 18:2
  35:20 36:10 49:5
  66:25 67:1,11
  74:4,8 76:10
  78:12,21 79:19

80:7
**asset** 82:1 87:25
88:1,2,5,22 89:4,5
89:6,8,9,21,23
108:16 109:6
143:19 145:12
146:1 148:3 167:7
167:17
**assets** 17:9 23:16
28:11 57:20,23
58:1 85:4 88:13
88:18 154:19
155:11
**assigned** 93:23
94:2
**assist** 4:13 8:7
22:13 48:5
**associate** 29:18
**associated** 50:1
81:1
**associates** 52:1
**association** 135:8
**assume** 23:4 24:11
98:23
**assuming** 164:7
**attached** 13:16
65:8 150:21
**attachment** 51:1
**attachments** 12:6
49:2
**attempt** 114:18
**attempting** 99:4
**attention** 8:18,25
11:14 12:19 16:1
17:15 18:22,23
42:24 59:20 63:4
71:14,20 72:9
73:17 75:25 77:8
78:3 80:2,10
95:11,24 108:23
147:2
**attorney** 43:20,24
44:21 47:24 49:15
51:15
**attorneys** 1:11
**audit** 56:15 57:13
57:15 58:18 60:17

60:21 61:22 62:1
62:3 66:8,10 67:2
67:4,19 71:4,10
73:24 76:13 77:3
77:13 78:15,20,24
80:5 81:6,10,18
82:9,23 83:1
85:20 91:7,11,14
91:23 93:12,13
94:3,18 95:12,17
95:19 96:4 151:6
153:12,14,18,20
153:22 155:20,22
**audited** 153:2,9,16
158:8 163:10
**auditing** 90:20,24
98:16
**auditor** 58:19,23
92:13 95:1,16
**auditors** 57:16
96:21 98:18 122:6
122:13 156:16,17
**august** 3:23 6:10
7:17 26:16
**authorization**
14:20
**available** 133:10
141:3
**ave** 1:18
**aware** 4:21 7:6
23:4 40:8 47:15
47:19,25 81:12
95:14 118:15
126:8,11,15 127:9
127:10 128:18,18
129:20 131:19
145:25 147:3,22

---

**B**

**b** 2:9 133:11
**baas** 165:20
**back** 13:21,22
15:16 30:25 34:21
37:24 52:21 68:2
68:4 69:15 70:14
71:14 74:11 75:7
79:3 83:22 87:10

89:14,24 104:23
108:25 110:3
128:18 130:12,20
133:12 136:7
138:10 139:24
140:5,7,10 141:12
142:17 153:23
155:6,11 156:7
167:1
**backandforth**
127:11
**background** 74:5
**backto** 70:13
**bad** 27:21 89:25
107:8
**balamar** 46:14,18
49:18 50:2,6
51:11 52:12 53:2
53:13 40:20,21
45:17 57:16,18,20
57:22 82:1 84:22
85:2,4 88:2,8,20
96:19 160:13
161:3
**ballamor** 75:21
77:2 134:13,14,14
137:3,4,4,4,4,4,5
137:6
**balloon** 76:23
**bank** 4:6,7,9,11,13
4:14,15,17,20 5:4
5:17 7:19,22,25
10:3,6 11:2 14:12
15:5,12,22 16:21
18:14 20:21,25
21:21 22:14 23:1
23:6,6 27:3 28:16
30:13 32:24 33:3
33:4,6,8 35:8
41:24 43:2,20,23
44:3,21,24 47:13
47:16,21 48:8,14
48:24 51:24 56:6
56:7,8,9,18 57:13
57:16,23,24 58:4
58:5,10,11,12,13

58:16,19,23 60:1
60:2,6,13 61:14
61:23 64:24 65:8
65:10 66:18 67:20
67:24,25 72:5,12
73:10 75:5 76:24
78:22,25 81:22
82:3,6,11 84:9,16
84:20 85:16 86:16
88:15,22 92:11,13
94:4,7 96:9,19
108:22 111:19,21
113:5,7,22,24
114:14 115:1
118:8,10,15,19,20
118:23 119:8
126:9,11 127:16
127:20,22 129:4
133:8 134:15
136:17,19 146:8
146:15,19 147:9
148:14,17 150:12
151:1 153:9 154:3
154:18 157:6,18
157:21 165:3,8
166:21 168:3
**bankers** 165:6
**banking** 4:3 10:21
16:14 21:15,18,19
22:8 44:16 47:24
47:25 126:8 127:9
**banks** 4:4 9:21
10:24 14:9,19
15:18 28:13 41:1
48:1 65:12 67:10
87:5 90:18,20,24
92:2,18 95:1
143:7 146:24
148:3 151:3,6
155:7,14 167:7,17
**banyon** 17:9 75:23
77:1
**bar** 66:24
**barry** 1:16 46:2
47:8 49:13 137:24
163:4
**based** 15:9 20:15

30:10 33:17 42:15
110:17 154:15
156:4,16 157:3,8
162:6
**basically** 20:9 34:2
34:8,15 38:21
62:12 95:22
103:16 146:16
147:15 149:9
150:20 159:1
**basis** 40:6,14 41:1
48:9 104:14
110:25 116:20
121:12 137:23
140:14,16 148:20
**bear** 139:19
**bearing** 112:2
**beautiful** 160:25
**beck** 169:3,14
**begins** 3:2
**bekkedam** 1:16
46:2,6 47:8,12,20
49:13 50:1,5,9
51:9 52:9 53:2
132:9 133:14
134:6,12,19 135:5
135:8,13,17,24
136:5,8,21 137:8
141:2 163:5,18
**bekkedams** 51:15
132:15 140:25
141:6
**belabor** 130:12
**believe** 4:10 16:2
17:17 33:22 35:15
48:19 56:16 76:3
78:1,3,4 79:20
84:1 87:14 91:17
91:17 153:4 159:8
164:15
**bell** 135:25
**bellmawr** 77:9,12
77:16,25 78:13
81:13,20
**belmar** 18:20 153:6
**beneath** 104:7
**beneficiary** 113:25

benomo 18:11
best 19:8
bets 159:20
better 51:19 116:14
  138:8 140:5
  146:22,23 160:20
beyond 22:9 45:23
  46:22 48:16
big 35:17 90:6 91:1
  158:12,14 160:20
binding 27:12
bit 51:19 104:22
  141:22
blow 14:3 16:13
  17:21 26:6,23
  27:2 36:7 37:12
  39:2 51:18 65:15
  71:23 102:23
  107:21 143:15
  148:23 160:23
blown 42:13
blue 46:9
board 15:24 24:5
  24:11 60:17 93:7
  93:7 95:18,19
boarding 14:23
  36:23
body 13:10,15 26:7
  102:24
bonomo 74:23 75:1
  75:20 76:11,22,25
  81:20
bonomos 75:12
  77:4
book 100:1 101:20
  106:16,17
books 67:6 89:10
bora 141:24
borrow 20:17
borrowed 7:18
  10:2,6 73:12 96:5
  111:11 117:4
borrower 14:13,15
  14:18 16:7,19,22
  17:2,6 43:1 53:21
  53:24 67:24 68:1
  74:6 76:22,25

77:12 78:22 79:4
  79:5 80:8
borrowers 67:6
  78:25 154:18,22
borrowing 81:13
  129:20
borrowings 58:4,6
bosses 95:21
bottom 26:10 31:24
  37:11,12 51:22
  63:25 79:11
  130:19 147:6
  152:5,6 159:2
bought 89:19
bounds 123:6
box 39:14 53:16
boxes 39:13
boy 99:15 111:9
  112:17 121:20
boyer 71:24
breach 169:3,9
break 68:23 69:2
  69:17 70:8
brian 1:5,14 29:12
  29:24 30:2
brians 13:16
bridge 16:11,22
  37:21
bring 48:21 53:15
  69:14,25 70:10
  82:16 86:10 136:7
  164:16 165:13
bringing 95:10
  99:24
broad 1:21
broke 142:24
  143:17
brought 59:19
  95:24 108:22
bruton 133:21
  134:3 135:22
  136:2,10,24
bucks 31:9
build 38:8 89:13
building 62:23 72:7
bulk 71:7
bulletins 105:25

bunch 105:6
  106:19 154:13
burden 116:8
business 4:14 14:11
  18:19 22:14 23:1
  23:6 25:12 27:23
  28:10 36:12 39:5
  39:6,11,15,18
  53:17,17,18 72:20
buy 8:5 53:25 54:8
  89:17
buying 54:6 127:21

---

## C

c 1:8 3:1 169:1,1
cake 131:10
call 10:9 88:13 90:6
  90:9 97:8,8
  102:15 143:3
  147:2
called 4:7 18:19
  25:5 26:4 30:3
  50:9 56:8 61:2
  68:5 90:17 96:6
  102:16 105:9
  146:8
calls 3:4 55:2
cant 115:6 119:6
  122:11 125:16
  131:15 132:13
  133:10,14 135:9
  135:10,16 137:6
  159:20
capable 115:15,19
  115:22,24 118:13
capital 4:2,20,22
  5:1 22:20,22,23
  23:9 24:19,25
  27:13 43:11 45:17
  46:15,18 47:16,21
  48:1,12 49:18
  50:2,6 51:11 53:2
  58:11 59:5,10,16
  59:25 60:23 61:4
  61:19 62:13 65:21
  65:21 66:15 67:10
  72:6 74:17 75:4

75:21,23 77:2,22
  77:22 79:9 80:23
  81:22 82:2 83:19
  83:20 84:2,3,5,9
  86:15,23,24 87:5
  87:6 88:5,8,15,18
  88:21,23,24
  100:21 110:12
  111:13,19,20
  113:22 115:1
  116:22,24 118:1,4
  121:10 122:4,11
  148:3 151:21,21
  152:10,25 157:4
  157:15 159:6
  167:7,15,18
capture 58:9,14
carbon 51:8
care 121:8 134:9
  135:12
career 22:2
careful 39:17
  135:23
carried 117:25
case 30:13 74:6
  110:17 114:15
  116:25 119:14
  120:18 121:24
  124:8 125:19
  126:24 128:15
  133:10 136:13,22
  140:22
casein 116:4
caseinchief 122:18
cases 66:25 68:4,6
  124:25 132:5
  136:8,23 145:25
  151:14
cash 57:23 89:8,17
  89:18,23 107:25
  108:7,8,10 145:13
cause 42:25 87:24
  100:16 101:15
  104:22 120:21
caused 162:15
cautionary 133:18
cc 51:8

central 25:11
ceo 5:18
cert 169:11
certain 8:5 9:21
  57:24 58:12 59:5
  67:5 68:4,6 92:6
  92:19,24 93:1
  112:6 160:12
  165:9
certainly 24:14
  43:13,22 88:23
  98:4 118:17 119:7
  126:5 127:6
  129:22,24 132:13
  136:23 139:20
certificates 9:23
certification 131:2
certified 55:18 57:7
  169:10,15
certify 169:4
cet 169:15
cetera 40:3,3 66:24
  68:8 97:8
cfo 29:19
chair 4:2
chambers 138:14
  138:23
change 28:9 73:9
  82:3,6,8,10,11
  107:2
changed 104:15
  149:8
changing 68:13
charge 84:20,24
  85:11 91:7,10,13
  92:11 94:4 100:12
  153:17 161:16
charged 84:15,17
  84:19 111:16
  117:11 159:6
charging 111:13,14
charles 18:16 79:6
chart 88:12
chartered 33:3,4
check 39:13 54:18
chestnut 1:11
chief 116:5

**choice** 158:2,3,5
**choose** 123:10
**chose** 160:14
**circumstances**
42:24 109:10
130:1 143:25
**cited** 125:14
**civil** 8:9 124:8,9
133:8
**claiming** 120:9
**classified** 148:3
167:7,15
**cleaned** 106:19
**clear** 33:10 61:1
114:11 117:4
129:4 133:13
136:9
**cleared** 105:25
**clearly** 39:10 73:4
73:7 97:16 121:1
121:13 123:6
130:21
**clerk** 3:7 55:5,8,12
70:20 109:22
142:16
**client** 65:8 72:14
99:16 100:18
110:13 116:14,21
140:19 163:4
**clients** 32:20 124:5
134:14,15
**clip** 129:17
**clips** 135:23
**close** 9:13 30:4,18
31:1 33:14,24
44:3 72:8 91:20
**closed** 44:24 65:19
67:17 72:12
151:20 152:10
**closing** 9:11,19,24
26:4,13 28:2,24
30:14 31:6,8
32:15 33:12 65:21
66:14 151:21
152:24
**closings** 32:16
**cochair** 4:1

**coconspirator**
136:15
**codefendants** 136:1
**codification** 106:20
**coincidental** 66:18
**coincidentally**
124:10
**collateralization**
144:10
**collected** 145:12
**collection** 67:16
**column** 121:11,11
161:5,15,24
**combination**
156:19
**come** 17:16 24:4
31:13 34:3,17
42:24 47:11 57:7
58:8 70:7 73:18
94:7 99:23 101:18
104:23 132:9
133:14 134:7,17
134:20 135:9
136:3,8 137:6
140:7 142:4
**comes** 114:10
122:9,19 166:3,5
**comfortable** 50:12
**coming** 110:16
116:4 137:14
**comma** 143:24
**comment** 109:15
**comments** 16:13,18
**commercial** 16:20
76:23
**commit** 34:9
**committed** 33:18
**committee** 15:24
41:8 60:13,17,21
95:17,19 155:20
155:22
**common** 7:3 72:25
161:2
**communicated**
163:16
**communicating**
5:12 9:5,9,25

48:13
**communication**
47:11
**communications**
47:7 52:3 67:19
67:22
**community** 65:12
151:3,6
**companies** 85:4
92:18,22,22 93:2
93:3 144:17
145:21 146:1
149:22
**company** 1:23 6:17
6:25 17:8 22:23
22:25 23:6,13
25:5 34:15 44:22
45:16 47:8,12
49:8 67:7 93:8,9
98:14,16 144:19
159:25 160:12
**companys** 82:21
83:19 163:13
**comparative** 160:7
**compare** 78:24
**complete** 19:14
72:7 91:23 150:3
**completed** 150:6
**complexity** 122:7,8
**complicated** 99:16
100:17 102:7,8
111:9 112:1
116:13 121:20,23
122:9 131:8,17
**comply** 98:17
**components** 57:22
57:25 58:2
**comptroller** 146:9
146:11
**computer** 166:11
**conceal** 114:19
119:15 126:21
**concealing** 119:1,2
**concern** 47:12
122:18 128:15,15
**concerned** 136:12
**conclude** 42:25

**concluded** 101:25
168:21
**conclusion** 43:4
81:21,23 86:20,21
86:23 87:4,9
115:8 116:23
**conclusions** 86:20
150:11
**concurring** 102:13
102:15 103:2,4
**concurs** 86:22
**condition** 6:17
26:12 28:9
**conditional** 26:16
27:18
**conditions** 6:13
28:3
**conduct** 122:17
123:1
**conducting** 71:4
**conference** 94:10
94:18
**confirm** 68:1
164:18
**confirmation** 68:2
68:4 96:2,7
**confirmations** 67:6
**confirmed** 144:24
**confirming** 96:24
**confrontation**
141:1
**confused** 87:24
**confusing** 121:21
153:13
**conjunction** 50:2
80:22,23
**connection** 4:24
8:14 14:18 15:25
16:4 19:5 45:4
52:6 63:1
**consciousness**
127:3,7 128:6
**consensus** 106:6
109:5 143:18
**consider** 37:25
108:4 114:25
119:9 130:3

**consideration**
150:22
**considered** 113:23
154:14
**considers** 118:21
**consistent** 19:12
164:24
**constitutes** 27:12
**consultant** 45:2,9
45:11,14,19 47:20
48:11
**consultants** 48:5
**contact** 5:17 32:17
50:6 79:5 97:4,16
**contained** 19:5
**contains** 116:2
**contd** 142:22
**contemporaneous**
42:16
**contemporaneou...**
10:13 41:14
**contest** 99:25
**context** 126:1,4,19
127:8,25 128:12
128:13 129:19
130:8
**contingencies**
26:17
**contingency** 30:9
118:6
**contingent** 25:16
25:25
**continue** 70:24
102:1 142:20
**continued** 43:23
**continues** 127:4
128:3
**continuing** 126:21
**continuously** 135:1
**contra** 61:3 81:25
83:25 85:8,17
**contrary** 62:11,12
**contribution** 87:5
107:25
**contributions**
86:23
**control** 67:15 68:13

73:9
**convenience**
168:11
**conventions** 105:2
**conversation** 62:25
102:13 143:7
155:15 156:1
**conversations** 5:15
42:23
**copied** 38:21
103:13
**copies** 7:9 49:11
**copy** 11:7,23 12:3
14:17,19,21,22
16:3 36:17,19,21
36:23 49:13,15,18
51:8,11,14 52:1,9
52:12,14 63:5
70:11 138:4,18
**copying** 52:24
**corner** 91:2 147:6
**corporate** 4:1,3
44:16 47:25
**corporation** 88:24
**correct** 21:14,17
22:6,15,17,18,23
22:24 23:2,7,8,11
23:12 24:13 25:2
26:1,2,5,13,14,18
26:21,22 27:1,4,5
27:8,24 28:1,4,11
28:12,20,25 29:13
29:14,20,22,23
30:1,6,10,11,18
30:19,23 31:11
32:7,21 33:9,16
33:19,23,25 34:1
34:4,7,11,19 35:9
35:10,13,14,21,23
36:3,4,11,13,14
36:16,18,20,22,24
38:13 39:19 40:6
40:7,16,17,19,23
40:24 41:8,9,11
41:12,17,18,22,25
42:9,10,17,18,22
43:2,3,12,21,24

43:25 44:1,4,18
45:1,7,9,12,18
46:18,19 49:1,3,9
49:11,12 50:23
51:25 52:5,8,18
52:19,22,23,25
84:11 85:22 87:7
87:25 88:4 89:2,4
89:16,20 90:5,13
90:16,19,25 91:8
91:9,11,12,15
92:15,23 93:10,11
93:19 94:6,19,24
95:2,3,5,9,12,13
95:19,20,22,23,25
96:1,8,14 97:21
97:22,25 98:1,13
98:19,21 102:5,7
102:12 103:6,7,11
103:19,20 104:4,6
104:8,9,15,16,25
105:4,10,24 106:3
106:11,14,15
108:5,10,16,19
111:2 142:25
143:1,8,9 144:4
144:10,11,18,19
144:20 145:13,15
146:2,3,6 147:4,7
147:8,16,23,25
148:4,13,15,16,18
148:19,21,22,25
149:1,2,3,5,6,10
149:11,15,25
150:1,14,15,17,18
150:22,23 151:12
151:25 152:14,23
153:6,10,20
154:12,15,16
155:11 156:16
157:1,2,5,7,17,19
157:22,24 158:16
158:17 159:7
161:8,18,20,25
162:1,7,17 163:12
163:18,19 168:14
**corrected** 84:4

**correspond** 31:2
**correspondence**
31:15
**couldnt** 87:5 99:16
100:18 111:10
116:14 133:11
135:11 166:16
**counsel** 7:21,24 9:4
9:10 30:3 32:10
44:21 46:11,17
47:6 70:5 110:1,6
133:19 139:8
**count** 60:23 85:17
115:6 119:6 122:3
122:11
**counted** 43:10
85:21 87:5 110:12
111:1 157:4,15
**counting** 100:20
**county** 16:25
**couple** 56:25 58:2
60:19 90:18
141:10 150:24
160:4
**course** 67:3 79:23
95:14 164:13
**court** 1:1,23 3:11
5:19 6:5 8:22
11:25 12:14 13:7
13:13 14:2 17:20
19:17,23 21:6
22:11 35:3 38:3
42:3 43:17 44:9
45:25 46:24 47:1
48:17 53:9 54:14
54:19,23 55:13
64:20 68:20,24
69:1,2,5,7,13,16
69:22 70:6,9,11
70:12,16,22 71:18
73:21 76:5 78:7
83:11,15 85:25
86:8 87:17 91:5
98:25 99:3,7,9,18
99:25 100:6,9
101:3,11,17,23
102:1 106:24

107:6,18 109:19
109:24 110:5,8,22
110:25 111:3,22
112:4,18,21 113:1
113:6,9,16 114:1
114:6 115:10,16
116:1,7,17 117:1
117:6,9,18,22,25
119:10,16,21,24
120:2 121:17,22
121:24 122:15,24
123:3,20,24 124:2
124:6,11,17,20,24
125:1,16,16,17,23
125:25 126:2,3,5
126:14,17 128:8
128:14,23 129:10
129:12,15,17,18
129:23 130:6,9,15
130:24 131:4,11
131:21,25 132:3,6
132:17,19 133:3,5
133:15,17,18,21
133:25 134:3
135:14,19 137:1
137:15,21 138:1,8
138:17,20,23,25
139:3,5,15,19,22
139:25 140:2,6,9
140:13,24 141:12
141:15,18,20
142:1,6,11,14,18
145:8 150:3,9
155:16 157:11
159:16 162:20
166:9,12 168:19
**courts** 100:9 125:5
133:24 134:1
**covered** 150:13
**cozy** 92:13
**cpa** 91:2 110:13
120:9 130:14,15
130:16,17,18,22
131:2,9,18,25
**cpp** 27:17 52:4
**crazy** 139:17
**creating** 83:25

**credit** 14:11,13,19
14:21,22,24 15:19
16:16,21 17:1
18:8 37:21 39:5,5
40:2,5 41:1,10,15
42:25 72:14 88:8
**creek** 18:20 77:9,12
77:16,25 78:13
81:13,20
**crime** 100:12,12
111:23 127:11
132:14,23,24,25
140:21
**criminal** 99:17
122:17 123:1
**criteria** 152:16,17
152:22
**critical** 122:9,22
**cross** 2:3 131:8,15
131:15 133:10
135:10,11
**crossexamination**
21:8 44:11 53:14
87:19 142:4,22
**crossexamine**
87:17 133:12
141:3
**curative** 134:8
135:11 136:22
**currency** 146:9,17
**current** 62:13
**customary** 41:2
**customer** 14:17
36:17
**cycle** 92:1,2,16

**D**
**d** 1:16 2:1 3:1
165:13
**d107** 159:21
**d133** 148:10
**d139** 146:13 167:1
167:3,5
**d397** 169:11
**d486** 169:15
**d96** 143:14 164:18
**daily** 48:9

**darnell** 1:8
**data** 14:23 36:23
  67:15 118:16
  152:8
**date** 9:6 13:1,21
  15:7,8 31:13 64:2
  64:4 77:19 79:15
  79:16 86:17,18
  165:22,25 169:20
**dated** 9:8 14:12,14
  63:17 73:9 103:5
  149:2
**dates** 164:21
**david** 1:7,10 2:4
  3:5,6,9 13:16
**day** 1:7 31:8 41:23
  59:3,24,25 60:18
  61:12 62:13 87:12
  121:1 149:4 162:9
**days** 31:1 60:19
**de** 155:18 156:13
**deadline** 34:18
**deal** 28:6 30:10
  32:12 147:23
**dealing** 152:3
**debra** 137:20 169:3
  169:18
**debt** 17:8
**december** 118:5
  161:3
**decide** 99:18 116:3
  123:12
**decided** 108:18
  121:16,19
**deciding** 117:10
**decision** 28:19 40:9
  111:1 113:24
  115:15,20,23,24
  118:14 120:19
  156:15
**decrease** 58:15
**deduction** 148:4
  167:8,16
**deem** 84:22
**deemed** 58:11
**deep** 88:10
**defendant** 1:13,16

114:16 118:25
  136:2
**defendants** 2:17
  111:13 112:3
  113:4 114:12
  119:12 127:1
**defense** 99:14
  102:21 111:8
  123:4 159:13,19
  164:3 165:3
**define** 105:3
**definitely** 132:14
**defraud** 111:17
  113:5 114:16
  118:25 119:12
**degree** 55:21,24
**delivered** 14:18
**demonstrate**
  115:11
**denied** 125:5
**depends** 94:13
**deposit** 58:3
**deposition** 124:5,7
  128:20 132:17,19
  132:20 133:8
  135:2,15 136:4
  137:9,14,16
**depositors** 58:3
**depository** 56:5
**deposits** 65:9 70:14
**describe** 39:4
**detail** 101:12
**determination**
  35:13 99:23
  104:14 106:13
  124:16
**determinations**
  45:20 98:12
**determine** 10:17
  45:15 80:22
  102:11
**determined** 77:19
  121:10
**determining** 20:21
  114:14
**devin** 16:24
**devon** 62:23 72:7

127:6
**didn** 24:17,25
**didnt** 24:21 32:24
  33:15 37:2 44:3
  50:14,17 91:20
  93:10 99:23
  103:22,24 106:19
  110:18 114:17
  116:22 119:13
  120:23 121:2,7
  125:6,10 133:3
  141:19 144:21
  154:19 158:3,5,6
  158:7
**differ** 101:10
**difference** 91:1
  118:18 149:19
**differences** 93:2
**different** 92:21,24
  93:24,25 94:3
  97:24 100:4 105:7
  107:16 114:9
  150:21
**differently** 77:12
**dig** 115:23
**diligence** 27:23
**direct** 2:3 3:13 5:14
  25:23 32:23 35:16
  37:15 39:8 45:24
  55:15 71:1 96:2
**directly** 4:21 5:2
  95:17 135:24
  136:2
**directors** 60:17
**disagree** 62:16
**disagreed** 121:3
  157:6
**disagreement**
  62:17
**disbursement**
  14:19 36:19
**disclose** 7:25
  113:21 114:22
**disclosed** 11:2
**disclosing** 111:20
**disclosure** 8:9
  83:18 92:25

**discovered** 103:9
**discretion** 27:25
**discuss** 7:7
**discussed** 7:4 36:10
  164:21
**discussing** 142:25
**discussion** 109:2
  143:15 146:5
**discussions** 6:7
**dispositive** 131:20
**disprove** 116:12
**district** 1:1,1,8
**divorce** 162:11
**docket** 125:13
**document** 2:14,14
  2:15 9:2 23:23
  53:20,23 54:6
  73:24 77:4 78:14
  78:17 80:4 87:8
  168:2
**documentation**
  11:8 12:8
**documents** 2:12
  9:20,22 12:8,23
  12:24 13:17 15:1
  15:9,13 18:6 19:1
  19:4 20:2 35:12
  35:22 36:25 37:20
  39:2,4,4,9,20,23
  42:19 47:7 59:15
  68:7 76:13,15
  81:20 154:25
  155:2
**doesn** 113:14
**doesnt** 38:8 49:18
  95:15 97:23
  104:19 108:8
  110:19 112:15
  114:3 115:19,21
  115:21 117:14,15
  119:3 144:8,12
**doing** 4:11 48:5
  58:17 61:22 66:3
  91:22 94:18 96:4
  101:14 103:16
  120:11 121:12
  123:7 131:20

**dollar** 75:3 76:23
**dollars** 87:3
**dont** 18:15,21
  25:18 31:17 34:2
  34:20,22 37:7
  43:14 46:5 68:4
  69:17 73:14 79:20
  82:7 89:14 91:17
  91:22 92:2,10
  100:21 101:19
  107:13 111:6,25
  115:13 116:11,15
  121:18 122:2
  127:18 128:24
  129:10 130:24
  131:5,8 135:2
  136:11,20,21
  137:7,11 152:1
  164:15
**dovetail** 130:20
**drive** 139:16
**dubrow** 138:25
  139:2
**due** 27:23 33:25
**duncan** 1:16
  116:18 162:22,24
  163:7,9,20 168:16
**dvfg** 25:5,11,16

**E**

**e** 2:1,9 3:1,1 52:9
  169:1
**earlier** 32:23
  103:14 140:10
  153:7
**ease** 65:18 151:18
**eastern** 1:1
**eat** 123:20 131:10
**ecker** 1:17
**edit** 128:12
**effect** 61:3 84:1
  85:1,12
**effort** 114:18 115:7
  119:15
**efforts** 52:6
**egan** 1:13 12:12
  13:5 19:21 21:7,9

21:11 22:12 25:20
25:22 26:6,8 29:3
29:7,9 35:2,4,6
36:6,8 37:12,14
38:4 42:5,6,12,14
43:15,19 44:6
53:15 54:11,21,24
64:15 83:9 86:7
87:18,20 91:6
99:1,6,8,22 101:1
101:9,13 102:2,3
102:21,25 104:10
104:12,18,21
106:25 107:1,7,19
107:21,23 109:1,3
109:17 110:3,9,10
110:24 111:2
115:11 116:9,17
119:21,25 120:1,5
122:19 123:13,16
123:22,25 124:4,7
124:19,22 125:3,7
125:8,13 126:7,22
127:13 128:7,16
129:1,2,8,11
130:11,16 131:3,7
131:15 132:4,12
134:22 137:22
138:18 139:7,10
139:20,23 140:14
140:16 142:3,8,21
142:23 143:13,16
145:6,10 146:12
146:14 150:8,10
152:5,7 155:17
157:12 159:13,17
160:22 161:1
162:2,3,18,21
163:24 165:2,12
165:16 167:23
168:1,15
**egans** 112:5 141:9
**eitf** 86:25 99:23
101:15 103:13,18
103:22 104:7
106:9,12 107:20
111:14 112:11,19

115:2,3 121:9
122:8 142:25
146:4 148:11
163:25 164:14
168:4,7
**either** 8:4 15:24
18:21 23:11 58:4
114:16 117:19
118:24 135:9
139:1
**electronic** 169:10
169:15
**element** 117:12,13
**elicit** 120:3 123:8
**email** 2:13,13 9:3,6
12:22 13:10,15
29:11,12 48:23
49:10 51:22 53:2
97:10 102:23
103:1 104:1,11
138:13 148:24
149:8
**emails** 67:23 68:7
**emerging** 106:6,9
109:15 149:21
164:5
**employee** 50:10
**encompasses** 105:2
**ended** 87:23 152:3
157:18
**ends** 154:9
**engage** 47:16 95:11
**engaged** 4:13 26:3
52:7 113:4
**engagement** 56:15
56:23 102:14
**engle** 1:19,20 12:13
13:6 19:22 44:8
44:10,12 46:1,25
47:2,4 48:18,21
48:22 49:22,24
50:24 51:3,17,21
53:5 54:12 64:16
83:10 86:3,6
100:22 119:19,23
121:25 122:1,23
123:2 132:24

139:13,16
**ensure** 67:6 98:17
**entering** 132:16
**enterprise** 107:24
108:14
**entire** 22:1 125:18
**entirely** 120:23
124:15 135:16
140:20
**entities** 23:5
**entitled** 122:16
128:14
**entity** 81:1 94:13
**entry** 85:17
**eq1uity** 26:12
**equity** 6:18 30:5
41:15 57:21 58:7
58:9,14,16,20
60:23 61:3 62:12
81:25 82:2 83:25
85:8,17,17,18,19
85:21 88:9,19
107:25 108:4,15
108:19 148:4
160:16 167:8,16
**equivalent** 118:22
139:13
**errata** 137:11
**especially** 141:11
**esq** 1:10,13,16,16
1:19
**essence** 116:25
**essential** 117:12,13
**essentially** 9:21
**estate** 15:14 16:24
38:12 53:18
**estimate** 85:5
**et** 1:5 40:3,3 66:24
68:8 97:8
**event** 38:23
**everybody** 145:3
**evidence** 12:11
13:4 17:18 19:20
29:2,4,7 64:14
73:20 76:4 78:5
80:3,14 83:8 86:2
86:5 122:16 128:6

130:18 134:7
140:19 144:2
**exact** 74:18 116:24
125:13 138:6
147:16 165:17
**exactly** 33:7 136:20
156:6 158:1
**examination** 3:13
25:23 37:15 53:11
55:15 71:1 162:23
**examine** 133:11
**exception** 112:7
133:22
**excerpt** 1:7 2:2 3:2
168:21
**excess** 40:22 66:17
**exchange** 148:2
167:6,15
**excise** 130:7 141:24
**exclude** 99:13
111:7 124:18,22
125:14 126:23
128:7 135:15
**excluded** 86:24
**excluding** 40:22
**exculpatory** 127:2
**excuse** 134:4
141:23
**executed** 14:12,14
**exhibit** 8:19 9:1
11:15,19 12:11,15
12:20,21 13:4,8
13:21,25 17:16
18:24 19:5,20,24
48:20 50:20 51:18
53:14 54:22 63:4
63:14,16 64:14,17
69:12 71:14 73:17
74:3 75:8 76:1,2,7
76:9 78:3,9,11
79:3 80:3,12,17
80:19 82:16,18,20
83:7,12 86:2,5,9
86:13,17 102:22
137:18 159:14,19
163:8 166:7
**exist** 113:17

**existence** 96:18
115:4 134:7 135:7
166:15
**expect** 30:4
**experience** 48:14
**experienced** 156:20
**expert** 21:18 90:1
99:3,12 122:21
130:25
**experts** 98:20
99:14 111:8
**explain** 24:10
68:25
**exploring** 34:5
**express** 26:11
**extended** 40:6 43:1
**extent** 68:1 84:3,22
85:6 112:4 116:7
**extrajudicial** 136:1
**eye** 142:12

**F**

**f** 135:25 169:1
**facilities** 76:20
**facility** 16:13,14,15
**fact** 26:23 36:2
45:8 47:19 48:1
49:21,25 50:21
52:16 85:8 110:13
113:15 114:13,20
115:3 117:3 120:9
120:18,22 122:5,8
134:21 137:13
141:5 153:5
162:14
**facts** 120:14
**failed** 114:12
**failing** 113:20
**failure** 27:6 100:24
122:12
**fair** 126:24 142:1
142:11
**fairly** 135:21
**fake** 121:5
**fall** 24:2 71:6 125:5
**false** 117:14,17,20
122:12 127:2

familiar 18:18
47:23 56:8 74:24
77:9 124:11 146:7
164:8
family 40:2
far 123:10 137:14
143:10
fasb 93:6 105:20,25
106:6
fateful 31:1
fcc 144:16
fdic 7:25 45:4
115:8 118:3
february 4:10 10:7
13:2,20,23 48:24
164:20,21
federal 8:5 20:25
58:4,5 73:10
100:19 127:11
feel 50:12 110:2
fees 158:22
felt 154:18
field 146:23
fight 158:25
figure 128:11
figured 46:8
filed 73:10 120:15
final 27:16 28:18
64:11 145:11
finally 157:14
finance 4:1,3 20:9
44:16 47:25
finances 154:15
financial 4:2 8:6,11
8:16 9:16 18:4,8
20:13,18 23:9
25:3 28:9 40:14
41:16 53:25 54:7
54:8 56:4,20,21
57:3,4,5,8,10,13
62:5,10 65:1,9,11
65:20 72:21,24
73:6,13 74:10,15
76:25 77:5 81:15
82:4,9,13,21,23
83:2 84:9 93:1,6
100:4 105:21

128:5 129:21
145:13 151:2,20
154:10 158:5,7
159:10,24 160:2,7
160:11 163:10,11
163:13 165:10
financials 157:24
158:1,8
financing 17:2
166:21
find 34:16 65:7
fine 101:21 111:6,6
112:10 123:16
141:18
finish 120:5
firm 4:23 21:25
56:24 57:1,7
158:18
firms 90:4 158:13
first 4:9,12 10:5
14:4 22:13 35:11
36:7 37:11 41:14
42:8 51:22 58:23
61:9 63:25 64:7
65:3,5,21 69:12
72:1,2,4 79:18
81:4,12 98:16
102:9 103:21
105:20 107:22
109:4 132:12
134:16,24 137:2
137:21 140:13
150:25 151:21
153:25 160:10
161:2 164:12
167:12,14
fiscal 82:22 84:18
five 14:21 35:25
87:3 92:17,20
154:7
fix 132:10
fixing 127:5
fl 1:14,18
flip 12:3 16:3 19:10
19:11
floor 17:5
flores 1:20

focus 93:13
focusing 68:11
folks 37:25 56:24
58:3 92:14 146:17
147:10
follow 98:12 111:5
133:23 142:9
149:23
followed 110:23
149:14
following 14:9
30:14
foot 24:14
force 106:7,10
109:5,16 112:12
143:18 144:9,12
144:24 145:24
149:22,24 164:6
164:19
foregoing 42:15
169:4
forgot 71:2
form 50:18
former 29:17
forms 39:12 107:16
forth 28:3 107:11
147:15
forward 30:20
160:16
forwarded 149:7
found 117:5
four 14:19 56:23
81:23 90:3,6
93:21 94:17 152:4
152:9 158:12,14
fourth 100:17
161:5
fox 1:14
frame 71:8 74:18
77:20
frank 103:2,3
143:6 149:5
frankly 120:7
135:18
fraud 117:15
free 97:16 110:2
friday 30:5,14,16

33:13,14
front 12:3 35:17
152:1 153:8
fund 9:14
fundamentally
122:2
funded 72:13
funding 5:4 27:4
113:25
funds 7:12 16:23
16:23 31:13 33:19
37:16 38:9,16
53:24 72:24 73:8
77:1
funt 1:20
further 21:4 44:6
53:5 54:10 60:16
67:14 87:16
115:24 119:6
146:4 152:2
162:21 163:21
167:21 168:15,17
furthest 64:1
future 33:24

## G

g 3:1 16:8,19 86:22
g178 150:20
gaap 93:1 98:7,7,8
98:9,17,22 99:7
102:4,6 104:24
106:14,18 107:2
122:7
gallib 18:16 153:5
gallub 79:19 81:1
81:13,15
gandal 1:17
gap 165:10
gas 89:13,14
general 24:8 72:5
133:22
generally 58:2 98:9
104:24 109:6
112:6,9,12 115:17
115:18,21,22
131:16 143:19
gentlemen 142:17

george 6:20 16:8,19
31:2 49:7 68:13
74:7 78:18
getting 6:13 15:11
28:23 34:21 49:7
85:15 88:10
give 10:22 47:12
54:22 89:6,8
119:24 124:24
132:4 133:18
138:3,6 144:8
147:17
given 7:9 10:12
12:2 27:4 119:5
136:12
gives 62:13
giving 25:25 50:2
go 13:21 15:16 16:9
16:12 27:2,9,19
29:10 30:24 32:3
34:9,16 35:4 37:8
37:10 39:1 41:13
42:12 50:20,24
51:1,2,17 65:13
68:9,19 69:18
71:22 72:15 74:11
75:7,8,15 79:10
83:5,22 86:19,19
88:16 94:21
101:19 102:24
108:12 109:1
110:3 112:15
121:15 123:6
126:17 127:1
129:7 130:12
131:12 134:19
143:11 144:15,23
145:23 147:14
148:10 151:17
152:2,5 153:23
159:1 160:18
161:14 167:1
goes 40:5,13 42:7
70:3 88:2 89:1
108:11 114:21,23
115:4,5 134:16
going 5:3 10:22

34:3,9,9,16,17
37:7 50:7,12 79:3
99:15,19 100:16
101:13,17 102:19
104:18,23 109:13
109:19 111:8
114:25 116:15
120:5,5,24 121:7
121:19 124:23
125:6 126:16,18
127:14 128:25
130:25 132:10,23
133:1 134:1,23
135:12,17 138:16
139:11 141:21
147:14 152:18
159:14,19
**good** 21:11 40:20
44:13,14 70:22
87:21,22 88:11,22
89:1 102:19
142:18 160:25
162:25 163:1
**gotten** 118:3
120:18
**government** 12:10
13:3 19:19 48:20
50:20 51:18 64:13
100:19 110:12
116:8 120:14
122:15 123:25
124:4 134:11
135:5 150:20
159:9 168:18
**governments** 2:11
12:15 13:8 19:24
25:21,24 29:1
32:3 35:5 64:17
83:12 86:9 116:4
117:18 122:10,14
163:8
**graham** 32:6,8
**grant** 122:19
**granted** 13:7
**great** 112:9 120:17
142:6,15 154:10
160:24

**green** 138:15
**greenblatt** 1:20
**group** 4:2,3 17:9
77:2
**guess** 109:9 158:9
163:15
**guidance** 103:13,24
107:10 143:3,4,6
143:22 146:25
148:8 149:10,16
149:17,24 156:17
156:23 162:6
164:6,19 168:12
**guide** 98:22
**guilt** 127:3,7 128:6
**guilty** 100:25
119:14
**gullab** 79:6
**guy** 22:3 29:16 34:3
91:2 120:25
121:14 124:16
136:17 155:22
**guys** 92:1 94:7
110:16 121:7

### H

**h** 2:9
**hadnt** 92:5
**half** 75:2
**hand** 55:6 124:25
**hanison** 29:13,19
30:21 51:24 52:24
148:24 149:13
**hanuscin** 121:1
**happen** 30:17 94:4
135:18
**happened** 94:23
**happens** 133:17
**happy** 123:18
**hard** 11:22 16:3
63:5 70:11 138:4
162:8,11
**hartline** 1:5,14
5:18,19 6:4,8,12
7:5,7 10:9,10 11:6
11:10 13:22 18:7
20:1 24:11 29:12

30:20,25 35:8
49:11 51:23 52:21
53:1 60:8,9,20
61:6,10,13 62:9
62:15 63:1,18
65:4,17 66:13
68:10,15 70:2
72:2,10,18 73:11
75:11,19 87:9
95:15 111:10
112:9 114:21
116:2 118:3,4
126:21 127:4
129:20 131:18
132:21 133:9
134:17,17 136:14
136:19 137:7
148:24 149:12
150:17
**hartlines** 95:21
112:16 120:8
132:13
**havent** 120:18
125:3
**head** 93:15
**health** 118:15
**hear** 110:8 121:25
130:3 133:3
137:21 140:13
**heard** 6:20 18:10
18:12,19 33:15
39:8 59:12 71:11
87:12 103:21
120:20 125:18
**hearing** 25:17
**hears** 134:18
**held** 47:3 57:23,24
**help** 26:4 102:11
146:17
**helpful** 129:14
**heres** 103:17 108:3
149:13
**hes** 5:22,23,24 22:8
29:15,17,19,21
31:24 50:11 54:21
99:3,19,24 103:16
103:17 110:22

120:9 124:8 125:4
125:19 127:9,9
128:16 130:17,18
131:9,19,20
**hesitated** 158:2
**hey** 96:11,21
103:17 110:17
121:15 149:13
**hid** 42:5 120:14
**hierarchy** 105:9,12
105:22 106:14
**higher** 84:6
**highest** 105:21
**highlight** 29:11
69:23
**highlighted** 65:19
69:24 151:19
**highly** 140:22
**hillary** 133:9
**hire** 48:4
**hired** 22:13 28:5
32:12 158:9,11
**hit** 42:1
**holding** 6:17,25
22:23,25 23:5,13
44:22 45:16 49:8
54:7 62:6 72:24
73:13 74:15 77:6
128:5 129:21
**holdings** 8:6 18:8
20:13,18 23:10
25:3 41:17 53:25
54:8 65:1,10,20
81:15 163:11
**home** 58:5 62:23
**honor** 3:12 8:21
11:24 13:12 17:18
19:16 21:5,7
43:16 44:6,8 53:8
54:12,16,18,21
55:14 63:8 64:19
68:19 69:6 70:15
70:25 71:17 73:20
78:6 80:15 83:14
85:24 87:15,18
101:13 106:25
109:13,17 110:3

110:10 114:4
116:18 117:24
119:19 120:1,7
122:1 123:17,23
124:19 125:22
126:7 128:22
129:2,6,13 130:11
133:6,21 136:25
137:24 138:5,12
138:14,19,22
139:10,14,23
140:1,8,11,17
141:13 142:3,21
145:5,7 159:15
162:19,22 163:20
166:8,11,24
167:23 168:15,16
168:18
**honorable** 1:8
**hopefully** 73:18
89:24 139:9 142:8
143:11
**hornbook** 127:3
**house** 39:10 121:4
121:5,6,6 127:6
**household** 40:2
**hubbard** 32:11
**hughes** 32:11

### I

**id** 83:7 86:1,4
166:6
**idea** 112:1
**identical** 81:14
**identification** 2:10
**identified** 6:4 66:19
165:22 166:1
**identify** 5:22 59:19
59:22 62:4 74:14
77:24,25 81:9
**ignall** 1:10 3:4,12
3:14 6:3,6 8:21,24
11:16,18,22 12:1
12:10,16,18 13:3
13:9,11,14,25
14:3,5 17:17,21
17:22 19:15,19,25

21:4 22:9 35:1
38:2 43:6 45:23
46:22 48:15 53:7
53:12 54:10,17
55:1,4,14,16 63:7
63:11,13 64:13,18
64:21,22 65:15,16
68:18,22,25 69:6
69:11,14,19,25
70:7,10,13,25
71:16,19,22,25
72:15,17 73:19,22
74:12,13 75:7,10
75:15 76:3,6 78:4
78:8 80:13,16
82:15,17 83:5,13
83:16,22,24 85:24
86:1,4,10,12
87:15,24 91:4
98:24 99:11 100:2
100:8,15 101:5,19
101:24 106:23
107:4,17 109:13
110:7 111:3,5,24
112:8,19,24 113:3
113:7,12,19 114:3
114:8 115:13,18
116:6,11,20 117:1
117:2,8,13,21,23
118:2 119:11
121:18,23 123:18
125:1,3,9,11,22
125:25 126:3,12
126:16,18 127:14
128:11,21,25
129:6,13 130:4,7
130:23 131:11,14
131:23 132:1
133:6 135:20,21
137:17,25 138:3,9
138:12,21,24
139:2,4,6 140:3,8
140:10 141:8,13
141:16,19,21
142:2,7,10,12,15
145:5 155:13
157:10,21 163:23

165:13,15 166:6
166:10,13,24,25
167:21 168:17
**ignore** 134:1
**ii** 1:8
**ill** 69:25 101:11
126:7 129:1 132:4
139:6,8,13 142:12
145:6 150:8
**im** 3:16,16 4:1
21:20 27:20 37:7
37:11 42:3 47:9
51:1 55:18 63:10
66:6,7 67:21 69:1
74:20 76:1,2
85:15 86:3 87:24
92:10 97:14
100:15 101:14
102:19 104:18
106:17 107:5,9
108:13 109:13
117:6 120:5,24
123:3,18,18 124:2
124:22 125:16,17
126:2,5 127:10,14
128:25 129:11,24
130:8 131:7,14
136:5 138:3
143:14 146:21
148:8 149:18
150:5,7 152:15
156:1,9,11,11,13
157:20 158:21
159:14,18,19
163:15 164:7
168:10
**immaterial** 115:12
**immediately** 97:20
112:13
**impact** 28:19 85:18
159:6
**imperative** 132:9
**implicate** 136:2
**implicates** 136:20
**implication** 136:6
**implied** 99:22
**important** 101:9,10

105:13,14,17
113:23 114:13
119:9 126:20
**improper** 122:25
**improve** 15:14
16:24 37:16 38:8
38:12
**improvements**
16:11 20:9
**impute** 110:12
120:11
**inadmissible**
125:23
**inappropriate**
130:2
**inartfully** 67:9
**inasmuch** 122:20
**inclined** 123:4
**include** 56:23
66:23 135:23
160:13
**included** 42:16
57:18 166:22
**including** 28:8
42:19 53:18 56:5
68:6
**income** 17:7
**increase** 58:15
**increased** 167:18
**indicate** 97:2
114:23 145:22
164:20
**indicated** 10:11
25:15 44:15 59:4
76:24 77:1 156:13
156:14
**indicates** 65:5 79:5
79:9 80:7 143:21
148:5
**indicating** 149:19
152:25
**indirectly** 136:21
**indiscernible** 69:15
76:21 87:1 99:5,6
99:22,24 100:6,19
101:1,2,12,14,15
101:23 124:10

127:13 129:1,15
132:2,11 133:12
133:13 134:2,4,12
137:5,8,12,13
141:7,7
**individual** 48:12
97:2
**individuals** 52:16
56:22 74:15 90:15
**industry** 47:24
**inextricably** 135:5
**infer** 122:17 123:9
**inflammatory**
136:15,24
**influence** 50:7,17
**influenced** 115:20
**influencing** 115:15
115:23,24 118:14
**inform** 114:12
**information** 11:5
18:6 45:5 49:25
58:18 61:15,18
62:7 64:24 65:24
65:25 66:4,24
94:21 95:2,7
96:16 97:5 102:11
123:8 146:16,22
**informed** 31:14
**initial** 118:9
**initialing** 64:10
**initially** 55:25 60:7
62:17 112:15
**initials** 63:22,24,25
64:1 74:1 79:11
79:13,14,22 80:6
**inquire** 44:8
110:21
**inside** 48:8 126:25
**inspected** 28:14,16
**instances** 154:23
**institutions** 4:3
23:11 56:4,5
165:11
**instruction** 132:10
133:19 134:9
135:11 136:13,22
**instructions** 133:24

134:2
**intended** 37:21
149:22
**intends** 116:12
124:4
**intent** 99:17 111:23
111:25 112:3,16
114:16 118:25
119:12 127:1
140:21 144:3
**intentionally**
120:14
**interest** 17:3
**interested** 117:3
**interfacing** 45:3
**interim** 71:6
**internal** 45:20
58:19,22 67:19,22
95:1,16
**interpretations**
165:9
**intimately** 23:3
29:21
**introduce** 124:5
134:11
**invalid** 137:14
**invest** 20:13,17
58:13 75:23 77:1
**invested** 7:12,15
41:23 45:16 64:25
81:15
**investing** 114:24
118:19,20 128:4
**investment** 7:4,16
10:14 15:5 18:4
20:22,25 25:16
26:1 39:6,11,15
39:18 41:16 42:8
42:16,20 53:19
59:16 60:1 61:4
61:19 62:14 73:4
73:6,8 74:10,18
74:21 75:4,22
76:25 77:21,22,23
162:10
**investments** 49:19
51:12 57:24 58:10

**investor** 6:24 31:3
31:4 33:12,18
34:6 68:13
**investors** 58:10,13
65:9,12 78:25
80:21 86:15
134:13,15 151:3
151:10
**invests** 30:15
**invited** 141:3
**involved** 4:19 5:7
5:11 8:3 20:20,24
23:3 29:21 44:15
47:20,24 57:12
59:9 62:1 81:6
**involvement** 56:11
**involves** 111:18
**involving** 49:7
**irrelevant** 124:15
140:20 162:15
**isnt** 39:11 113:1
121:6 136:16,17
151:9 152:17
159:3
**issuance** 28:18
145:13 149:22
161:2 164:13
**issue** 8:8 59:19 60:2
67:10 82:9 99:9
107:22 108:13
109:15 114:15
121:6 122:4,7,9
122:13 123:22
124:25 125:15,24
127:23 128:24
136:24 137:14
142:4 147:1,22
153:10 154:17
**issued** 107:15
157:14
**issues** 33:25 106:7
106:9 149:21
164:5
**item** 61:3 85:8
**items** 68:6
**ive** 3:20 12:3 18:12
22:1 50:10 65:19

89:18 98:22
125:18 130:18
151:19

___

**J**

**j** 1:13,19 12:25
**jeff** 29:13,19,24
30:2
**jennifer** 32:6,8
**jenny** 33:11
**job** 28:23 146:18
146:23
**joe** 139:7
**joel** 1:16
**jones** 1:8
**judge** 1:8
**judgment** 122:6
156:16,17,25
157:3,8 162:5,16
**june** 10:14 14:10
14:12,14 15:3,8
15:18 41:16,20
63:17,19 64:9,23
72:8,14 110:15,16
110:16 118:16
150:17
**jury** 1:7 2:2 3:3
13:12 14:1 17:19
70:21 76:4 78:5
101:22 104:19
109:23 112:16
113:2,4 116:13
122:16 123:9
129:22 130:2
133:23 134:1,1,18
135:18 136:7
137:7 139:25
141:23
**jurys** 134:18
**justice** 133:13

___

**K**

**keep** 31:14 120:9
126:16,18 131:9
142:12
**kevin** 103:2,3
**key** 71:3
**kind** 24:12 28:5

35:16 64:10 75:16
98:3,23 149:7
155:23
**knew** 41:19 46:20
112:13 120:13
128:20
**know** 5:3 7:11 10:2
10:20 12:5 15:21
16:14 18:13,16
19:12 21:21 22:3
24:21,25 28:13,16
29:24 30:21 32:1
34:2 46:2,3,5 60:9
66:20 69:17 77:17
84:13,15 96:22
100:2,17,20
103:22,24 109:19
110:18 111:11
114:6,8,18 116:22
118:12,13 120:10
120:24 121:2
125:10 128:10
131:6 135:3
136:11,17 137:11
141:19 153:12
164:5 166:3,14
168:8
**knowledge** 45:12
45:13 84:14
120:11 146:23
**known** 100:18
110:14 111:10
112:14 116:14
122:11 130:22
131:1
**knows** 114:23
128:2,17 131:17
**korn** 124:10
**kp** 86:22
**kpmg** 55:18 56:2
90:3,8,11 96:21
153:9 158:23

___

**L**

**l** 169:3,9
**ladies** 142:16
**language** 37:19

38:17 117:17
**large** 33:12,18
107:14
**largely** 111:18
**larry** 22:3 46:18
49:15 51:14
**latitude** 122:19
**law** 4:23 10:20,21
21:18,25 43:1
100:23 110:11
112:3,23 113:18
113:20 114:1,4,7
116:5 120:17
127:3 141:1
**lawyer** 3:16 21:15
21:20 22:8 32:8
32:12 39:17 44:16
47:13 124:9,10
**lay** 56:6
**laying** 166:16
**lead** 56:15,22
153:18
**learn** 8:15 10:8
58:22 59:1
**learned** 10:5 60:24
61:9 76:16 78:18
102:9
**learning** 60:16
**leave** 92:11 110:1
112:7
**lee** 3:17,19 21:12
21:24 22:1,6
29:16
**left** 64:1 79:14
88:17 116:19
161:15
**legal** 4:17 10:20
27:23 43:13,14
46:17 50:15
**lend** 89:3
**lending** 126:10
127:20 129:4
**lengthy** 102:4,6
**letter** 6:11,16 7:10
11:9,20 12:6
13:22 14:7 16:5
17:12,14,25 18:1

18:6 19:5,11 20:4
20:11,15,20,24
25:24 26:7,19
27:11 28:17 35:7
35:11 36:2 41:19
49:6 50:3,7,21
51:1 54:3,5 63:1
63:17 64:7 70:2
73:11 96:11,20
114:21 150:16,19
150:25 152:3
**letters** 96:4
**level** 99:24 100:17
101:20 106:13
**levin** 6:20,23,24
7:11,18,22 8:12
8:15 9:13 10:2,6
13:17 15:2,5,11
16:8,19,22 17:11
18:7 20:3,17 30:5
30:15 33:15 34:9
34:17 38:10 41:15
41:20 49:7 54:6
59:11,17,18 61:2
68:13 71:21 72:4
73:2,12 74:7
76:16 78:18 81:21
87:1 95:25 96:11
96:20 111:11
117:4 118:4,8,16
118:18,19 119:2
129:20 134:24,24
134:25 135:4,6
154:2 155:4
**levins** 7:4 8:3 17:8
20:7,22,25 25:15
59:13 60:22 62:9
62:19 71:11 72:21
74:19 84:12 85:16
87:4 97:16 102:17
126:22 127:5
128:1,4 129:19
154:10 165:17
**liabilities** 28:11
40:18 57:21 88:13
88:19
**liability** 58:1

**limine** 125:12
**limited** 109:10
    143:24
**limiting** 133:18
    136:12
**line** 14:11,13,18,20
    14:22,23 15:19
    16:15,20 17:1
    18:7 31:24 37:20
    39:5,5 40:1,25
    41:15 42:25 72:13
    124:20 130:1,19
    159:2
**linenger** 29:15
**lines** 138:9
**liquid** 17:9
**liquidity** 33:25
    72:6,22 73:4,5
**liquor** 136:18
**lisa** 169:3,14
**list** 31:3,4 39:4 65:8
    78:25 125:21
**listen** 50:10
**listening** 123:1
    129:25
**literally** 158:25
**litigation** 8:9
**little** 26:23 51:19
    87:24 91:2 96:3
    141:22 158:2
    161:6,9
**living** 3:15 55:17
**llc** 77:9,12,16 78:13
**llp** 1:14
**loan** 2:12 7:22
    10:12,23 11:2,7,8
    12:7,8,23,24
    13:17 14:11,21
    15:2,11,14,24,25
    16:10,11,21,22,25
    17:1,5 18:3 19:1,2
    20:3,7,8,12 35:9
    36:12,21 37:20,21
    37:24 39:2,4,4
    41:5,7,20 42:19
    49:7 54:2,7 58:5
    59:11,13,16,23,24

61:1,4,9 62:19,22
63:2 66:22,23
67:5,5,16 68:1,7
68:12 71:12 72:23
74:5,9,20 75:3,12
75:21 76:11,16,23
76:24 77:5,13,19
77:21 78:13,18
79:8 80:25 81:4,9
81:25 84:12,20,21
84:24 85:16 87:13
87:25 88:1,15
89:4,5,6,9,11
95:25 96:12,24,25
97:19 100:20
102:16,17 103:9
114:23,24 118:8
118:10,17,20
119:3 121:8,9
126:22 127:5
128:1,4 129:19
134:24,25 135:7
152:10,14,15,21
152:21,24 153:5
153:19,21 154:2,6
154:7,14,15,19
155:6,11 156:7
162:8,9 165:17
**loaned** 7:23 84:24
    113:22
**loans** 18:13 57:24
    61:15,20 62:5
    64:24 65:9,19
    66:18 67:8 68:12
    68:14 74:14 77:18
    77:25 80:21,21,22
    81:2,23 85:6
    86:14 93:25 95:10
    96:5,19 108:20,22
    111:21 118:9
    135:4 150:12,21
    150:21 151:19,24
    152:4,9 159:6
    161:17 162:5,6
**located** 16:24
**long** 3:18,21 31:17
    35:25 44:20 55:19

61:8
**longer** 29:17 94:12
**look** 15:16 16:3
    26:19 37:19 59:4
    65:3 68:6 76:20
    78:21 80:24 83:23
    97:20,23 98:23
    104:22 107:20
    147:5,6 160:20
    161:15 166:18
**looked** 8:9 35:16
    36:3,9,12 64:6,8
    156:23
**looking** 69:1 77:15
    96:10 99:13
    118:15 154:5
**looks** 19:14 97:24
    138:13 149:7
    166:23
**loss** 85:10 160:14
    160:15
**losses** 58:15 85:5
**lot** 21:21,22 31:20
    35:22 36:25 90:23
    100:3 101:14
    106:19 116:1
    136:15 151:6
    154:22 159:2
**loughney** 58:25
    59:2,12 61:9
    71:11 76:17 78:18
    87:13 95:4,7,10
    95:15,24 97:20
    103:10
**lower** 27:21 29:10
    29:11
**lunch** 123:21
**luncheon** 109:20

—————————————
**M**
**m** 1:5,5 3:2 50:25
    70:18,19 137:19
    137:19 140:12,12
    168:21
**mail** 52:10
**main** 57:22,25 58:2
**major** 107:2,5,9

**majority** 123:12
**majors** 107:8
**maker** 115:15,20
    115:23,25
**making** 25:4 113:5
    113:7,24
**malvern** 15:14
**management** 59:20
    60:3 67:14 77:2
    97:21 160:10,14
**managements** 57:4
    86:22 160:11
**manager** 41:10
    56:24
**marcantonio**
    155:19 156:14
**march** 40:16 71:8
    73:6 118:16
    164:23
**marked** 124:24
    134:22 146:13
    159:18 166:7
**market** 1:14,24
**markets** 4:2
**marsh** 134:5
**mat** 119:3
**matches** 167:4
**material** 28:8,19
    56:21 113:15
    115:5,11,14 119:7
    122:13 140:23
**materials** 49:4
**matter** 113:14
    116:5 119:4
    120:22 121:10
    134:21 154:20
**mccostlin** 169:4,18
**md** 1:18
**mean** 27:7 31:17
    56:6,17 57:1 64:6
    67:22 84:19 92:9
    99:4 115:19,21,21
    129:14 153:11
    165:8
**meaning** 84:21
    85:9
**means** 16:14 30:8

30:15 42:20 109:8
115:14,18 145:3
152:13 161:12
**meant** 92:8
**meet** 123:12,18
**meeting** 72:4 101:7
    140:4 141:17
    155:20,22 156:14
**meetings** 153:25
**members** 90:9
    144:10,12,24
    145:24
**mention** 119:1
    136:5
**mentioned** 62:4
    108:20
**mentions** 134:6
    135:24
**merger** 4:15
**met** 46:4,5 60:16
    60:20 118:5 152:9
    152:16,17,22
    163:4
**michael** 1:19 29:15
**midatlantic** 1:23
**middle** 6:1 75:16
    106:6
**million** 6:18 7:16
    14:15 16:20 17:9
    26:11,12,17 30:9
    31:1,9 33:22
    34:14,17 40:15,18
    40:22 41:20,23
    42:8 59:24,25
    66:17 68:12 72:5
    73:12 75:3,22
    76:23 87:3 88:25
    89:12,17,18
    111:11,20 113:21
    117:4 118:4,6,8,9
    118:9,17,18,20
    119:3 120:15,15
    120:16 154:2,6,8
    155:6 162:9,10
**mind** 120:8,23
    124:15 127:1
    132:14,15,23

134:18 140:19,20
140:22 141:6
**minus** 161:10,11
**misleading** 130:3
**misspoke** 32:25
**misstating** 128:1
**mistake** 114:17
**moment** 8:21 12:17
19:16 29:3 43:15
53:7 54:17 68:18
85:24 87:15
139:19 147:17
162:18 166:24
**momentarily** 63:12
70:1
**money** 7:19,22 10:3
10:6 20:17 22:25
26:25 31:25 33:15
34:3,10 45:16
52:7 58:3,13
81:13,14 88:16
89:3,12 96:5
113:22 126:10
127:21 129:4,21
154:22 155:9
158:19 159:2
**monitor** 160:19
**montgomery** 16:25
**month** 94:15,16,17
**morning** 21:10,11
37:2 44:13,14
70:23 87:21,22
**motion** 125:5,8,12
135:14
**move** 83:7 86:2,4
**moved** 30:13 111:7
121:11
**moves** 12:10 13:3
19:20 64:13
**musser** 133:9

**N**

**n** 2:1,18 3:1 169:1
**nah** 37:5
**name** 3:8,9 18:12
18:18,21 46:3,12
46:13,14,17 55:9

59:8 74:23 79:5
136:5
**named** 6:20 18:10
18:16 22:3
**narrow** 133:22
**national** 1:23
**nature** 24:20 42:16
92:25
**near** 33:24
**necessarily** 67:24
78:21 82:7 92:4
110:20
**necessary** 30:5
105:3 156:9
**need** 31:5 50:11
68:3 88:24 114:3
121:15 126:25
140:6
**needed** 22:19
135:18
**needs** 125:25 126:3
**neglecting** 119:1,1
**neither** 27:10,10
120:20
**net** 40:15
**never** 46:4,5 50:9
120:19 163:4,16
**new** 111:19,20
113:21 115:1
116:22,23 118:4
122:4
**news** 102:19
**nice** 40:21 89:14
**night** 125:4,7
**non** 145:25
**nonmarketable**
40:23
**nonrevolving** 16:20
72:13
**normal** 67:3
**note** 14:14 36:15
72:12 101:6
107:24 108:3,3,7
108:14 109:5
143:19
**noted** 75:23 86:22
86:23 153:25

**notes** 144:17,25
145:12 146:1
148:2 167:6,14,16
**nova** 4:7,9,11,17,19
5:4,17 6:8 7:12,19
7:21 8:5 10:3,6
14:9 15:5,11,18
15:22 16:21 18:8
18:14 20:13,17,17
22:13,19 23:6,9
25:3 26:4 27:3
32:24 33:8,13,17
34:5,16 35:8
41:16,24 43:20
44:21 46:12 47:6
47:13,16 48:24
51:24 52:7 53:25
54:6,8 56:8 57:13
57:16 58:19 59:20
60:22 62:5,10
64:25 65:8,9,10
65:20 66:3,18
68:13 72:5,12,24
73:12 74:15 76:23
77:5 81:15 91:7
91:10,13 93:8,9
94:14 118:8 128:5
129:21 133:8
134:15 144:19,21
151:1,20 153:2
154:2 163:11
**novas** 23:17 25:12
25:25 29:19 66:15
**november** 9:8,10
10:1 30:15,18
32:4
**number** 13:4 26:11
26:20 35:12 48:1
48:4 53:13 97:7
97:14 107:15
134:13,14 161:7
164:13
**numbered** 164:9
164:11,12
**numbering** 164:25
**numbers** 125:13
**nuneemay** 104:2

**O**

**o** 3:1 169:1
**object** 109:14
**objected** 135:1
**objecting** 131:16
**objection** 12:12,13
13:5,6 19:21,22
22:9 35:1 38:2
45:23 46:22 48:15
64:15,16 83:9,10
86:6,7 91:4 98:24
106:23 107:4,17
137:23 140:15,16
141:9 145:5
155:13,15 157:10
**objective** 115:14
**obligate** 27:20
**obligation** 27:13,22
**obliged** 133:18
**obtain** 115:11
131:2
**obtained** 26:13
111:19
**obtaining** 41:15
**obviously** 89:9
94:25 127:1
**occ** 165:8
**occasion** 47:10
**occur** 33:12
**occurred** 10:13
59:5,6 151:24
152:11,14,22
**october** 23:25
30:25 44:3 51:23
52:21 64:5 79:17
79:21 81:5 86:18
87:8 147:7,10
148:1,9 157:14
166:2
**offered** 140:17
**offering** 141:9
**office** 1:11 138:10
146:9,17
**offs** 161:17
**offset** 62:12 82:2
144:25
**offsetting** 61:3

**oh** 63:10 65:7 66:10
76:1 104:19 107:9
108:12 121:3,3
143:13 160:24
**okay** 5:19 7:17 9:18
12:4 23:25 24:23
25:19 29:7 31:24
32:3,17 34:23
37:9 42:11 43:23
44:24 45:2 46:6
46:11 47:15 49:10
53:4 63:10 65:3,7
67:13 69:11 70:9
85:14 88:2,5,21
89:3,11,24 90:3,8
91:24 92:5 93:4
93:12,23 94:14,17
96:25 97:13 98:7
98:22 101:3,17
103:16,25 104:7
104:17 105:6,20
107:8,9,14 108:8
108:11 116:6
117:8 119:10
124:6 138:24
139:15,22 140:11
142:2,7 143:5,10
144:6,9,15,23
145:3,18 146:7,11
147:5,14 151:13
151:15 152:2,16
154:5 156:15
157:6 159:12,21
159:22 160:1,18
161:5,14 163:3
164:16
**omission** 115:5
117:14 119:13
122:14
**omissions** 111:18
117:19
**omit** 113:14
**omits** 118:7
**once** 115:6 166:5
**ones** 33:8 42:20
105:13,17
**oneyear** 37:22

**ongoing** 71:10
**openended** 97:1
**operations** 28:10
   57:6
**opinion** 10:22 11:1
   11:9 20:4,15
   40:13 49:6 50:3
   50:21 56:20 57:6
   57:8,10 82:9
   122:22 158:4
**opportunity** 119:25
**opposed** 128:9,20
**opposing** 139:8
**option** 159:4
**oral** 27:11
**orally** 73:15
**order** 22:19 49:5
   50:6
**ordinary** 95:6
**originated** 66:18
**originations** 67:5
**outlines** 74:5
**outside** 32:10 44:21
   45:2,9,11,14,19
   46:11 47:6,20
   48:4,11 58:5
   118:18 123:6
**outstanding** 96:6
**outweighs** 129:9
**overall** 3:22 25:12
**overruled** 107:6
**overview** 24:8
**owes** 88:16

━━━━━━━━

**P**
**p** 1:5 3:1 137:19,19
   140:12,12 168:21
**pa** 1:4,12,15,22,24
   62:24 72:7
**packet** 35:23
**page** 2:10 15:16
   16:2,12 18:23
   27:2 37:8,11
   38:14,15 39:1
   42:12 50:25,25
   51:2 53:15 57:8
   64:1 68:19 69:12

69:21 70:1 71:23
   72:16,19 73:23
   75:8 76:19 80:25
   83:5,17,18,23
   84:2 86:19 141:11
   141:12 145:24
   152:6 153:24
   160:18 166:19
**pages** 35:25 125:9
   137:3,3
**paid** 61:5 84:13,14
   158:18,22
**paper** 160:19
**papers** 64:11 79:25
**paragraph** 14:4
   26:24 27:10,21
   36:7 37:13 39:2
   41:13 42:13 65:4
   65:5,14 68:10
   71:23 72:10,19
   75:9,12,16 144:16
   145:21,22 150:25
   151:18 152:6
   153:24 154:10
   167:12,14 168:4
**parenthesis** 161:6
   161:9,21
**park** 1:18
**part** 11:3 57:3,10
   57:15 67:2,18
   73:24 76:13 77:3
   77:5,13 78:14,20
   78:24 80:4 81:16
   94:25 95:11
   102:23 111:8
   121:20 129:16
   134:25 143:15,18
**partial** 1:5
**particular** 15:17
   59:6 68:12 94:5
   100:24 122:20
   134:9 137:3 141:6
**parties** 57:25
**partner** 3:16,18,20
   21:12 56:15 90:8
   90:11 92:6,11
   102:14,15 103:2,4

110:18 148:11,12
   149:5 153:18
   158:23 168:8,10
**partners** 25:9 90:9
   90:10 102:10,15
**parts** 138:15
**party** 68:2 96:7
**passed** 168:11
**patrick** 1:13
**patterson** 12:25
   39:24 48:24 49:10
**pause** 8:20,23
   18:25 19:13,18
   29:5 43:18 44:7
   53:10 54:20,25
   55:3 68:21 69:4
   138:11 139:18,21
**pay** 37:24 88:25
   89:14 144:3 155:6
   155:11 156:7
   158:15
**payment** 68:7
**payments** 17:3
**pennsylvania** 1:1
   4:14 15:15 22:14
   23:1,6
**people** 34:10,16
   56:25 62:5 88:25
   89:3 90:23 93:19
   93:23 94:2,4,18
   96:5 101:1 120:19
   147:22 156:6
   160:3
**peoples** 147:2
**percent** 6:25 17:4,5
**percentage** 8:5
**perfectly** 126:24
**performed** 81:17
   153:15
**period** 38:1 60:15
   61:11 66:15,16,17
   71:3 144:4,7
**permanent** 17:2
**permission** 8:4
**person** 48:8 56:6
   59:9 64:25 93:24
   93:25 94:22

127:21 155:9
**personal** 40:2,14
   73:6
**pertaining** 92:25
**ph** 6:20 18:11,17
   22:4 29:13,15
   46:14,18 77:9
   104:3 124:10
   133:9 138:25
**phenomenally**
   126:23
**philadelphia** 1:4,12
   1:15,22,24
**phone** 97:7,14
**phonetic** 141:25
   155:19
**physically** 94:8
**pieces** 136:7,9
**pierce** 1:20
**pile** 35:17
**place** 17:3 22:16
   93:13,14 103:10
   106:22 134:18
   140:18 150:13
**placed** 12:3
**plan** 25:12
**planned** 125:9
   146:5
**planning** 71:5
**plans** 77:1
**play** 129:17 130:13
   132:2 136:3,8
   138:7,16 141:25
**please** 3:7 11:17
   25:21 29:3 50:21
   50:25 51:2,18
   54:15 55:5,8 65:7
   67:14 69:23 71:23
   72:12 76:2,19
   80:3 82:16 83:6,8
   86:19 98:25
   102:22 104:11
   109:2 119:22
   137:16 154:21
   163:8 168:20
**plus** 17:4
**point** 6:19 8:14

10:2 23:5,10
   31:12 36:2,5,9
   53:1 60:9 69:17
   92:12 96:15 99:13
   119:20 123:14
   130:12 134:19
   147:24
**policy** 14:17 36:17
**ponzi** 70:2
**popped** 139:4
**pordy** 1:17
**portion** 69:23
   125:13
**portions** 138:6
**position** 33:14 57:5
   72:22 82:9 106:6
   117:19 156:12
   157:15 158:7
**possibly** 56:24
**postdefense** 136:16
**potential** 68:7
**potentially** 77:22
**potomac** 1:18,18
**practice** 144:25
**predominant**
   144:25 145:3
**preface** 71:3
**prefer** 70:11
**prejudice** 129:9
**prejudicial** 126:23
   129:8
**preliminary** 6:11
**prepare** 8:11 10:16
**prepared** 9:22,24
   17:13 18:5
**preparing** 17:12,24
**present** 3:3 31:5
   122:16 128:14
   134:23 160:15
   165:10
**presentation** 24:4,7
**presented** 107:3
**presenting** 156:2
**presumably** 21:23
   116:4 154:24
**presumed** 133:23
**pretty** 40:20 117:4

136:9 143:10
**previous** 66:8,10
**previously** 38:10
60:11 69:23
108:20
**primarily** 75:23
146:24
**primary** 5:17
**prime** 17:4,4
**principal** 14:15
62:23
**principle** 122:3
133:23
**principles** 98:10
104:25 105:4
122:7
**prior** 26:13 66:2
145:13
**privacy** 14:17
36:17
**private** 92:18,22
93:2 160:12
**probably** 94:16
129:14 139:11
166:19
**probative** 116:9
127:6 128:6 129:9
141:5
**problem** 100:10,11
117:7 121:18
127:20,22,25
129:2,3 136:10
156:8
**procedures** 68:5
71:6,7 80:1 81:17
81:17 86:22 105:3
**proceed** 3:11 21:6
55:13
**proceeding** 135:3
**proceedings** 169:5
**proceeds** 77:19
**process** 29:21
52:17 64:10 67:15
67:16 72:3 95:11
96:3 153:25
**processes** 41:5
**professional** 56:11

**proffer** 100:13
**proffered** 99:19
**profit** 85:10 160:14
160:15
**profits** 58:15
**program** 5:5 6:9
**prohibit** 126:9
**project** 104:2
**projects** 93:24
**promissory** 14:14
36:15
**prompt** 61:17
**pronouncements**
100:4
**proof** 116:8 119:6
**proper** 79:25 95:12
99:21 122:25
155:10
**properly** 137:12
142:9 147:23
**property** 16:11
20:10 28:10 37:16
37:17
**proposed** 6:24 42:8
141:11
**proposing** 138:6
**propriety** 10:12
**prosecutor** 157:21
**prospects** 28:10
**prove** 116:12
130:18
**provide** 4:16,23
7:21,24 11:9 26:3
33:15 40:1 49:6
63:5 72:6 97:1,4,7
129:14,15 150:12
152:8
**provided** 35:7 45:5
49:5 154:7
**providing** 11:1
**provision** 85:10
**public** 55:18 57:7
92:17,22 93:2,8,9
144:16,19 145:20
146:1
**publish** 13:25 29:8

71:16
**published** 13:11
17:18 64:18 73:20
76:4 78:5 83:14
**pull** 69:11
**pulled** 59:3
**purchase** 6:25 9:22
16:24 18:8 27:13
37:17 38:12 60:22
62:10 72:24 73:12
77:5 129:21
**purchased** 62:5
**purchases** 74:15
**purchasing** 126:10
**purpose** 15:11,13
16:9,10 18:3 19:2
20:3,7,8,12 24:10
39:6 54:2,7 62:18
66:19 74:9,10
77:4 79:8 114:22
114:24 120:12
121:8 126:10,21
127:5,21 128:1,4
134:3 162:4,7,14
**purposes** 40:2
42:20 62:23 72:6
75:22 76:25 77:22
77:23 89:13
**put** 17:2 34:17
45:17 69:19
102:19 107:11
108:4 120:16
121:13 136:9
146:16,22,24
148:6 160:2,8
165:6 167:3
**puts** 160:10
**putting** 121:12
130:21 136:7
147:21

**Q**

**qualified** 99:11
**quarter** 72:4 75:17
75:20 154:1
**question** 10:12
42:4 43:10,14

50:11 67:9 71:3
102:16 112:6,19
113:14 114:4
117:2,5 118:24
122:5 123:5,11
126:8,14 127:24
128:17 145:6
147:19,22 148:1
150:7,8 162:4
166:21,23 167:1,2
167:5
**questions** 35:19
43:6 48:19 53:6
53:13 96:12,22
102:18 123:8,13
124:9,12 127:9
157:13 159:20
163:2,15,21,24
165:3,4
**quite** 114:11 120:7
**quote** 126:12

**R**

**r** 3:1 169:1
**raise** 6:17 22:19
26:17 34:10 48:1
48:12 55:5 60:2
65:22 86:15
136:10 151:21
**raised** 10:11 22:22
22:23 50:10 125:4
153:10
**raises** 80:23
**raising** 4:20,22 5:1
47:16,21 66:16
118:6
**ras** 38:15 66:19,21
66:22 75:24
**rate** 17:4,4
**ratio** 83:20
**rationale** 155:7,8
155:14
**ratios** 83:20 84:5
**reached** 86:20
109:5 143:18
**read** 14:7 37:2 39:9
65:6 110:19 121:2

125:10 126:8
143:17 147:17
159:20 167:11
**reading** 69:10
112:11,11 129:25
**real** 15:14 16:24
20:9 38:12 53:18
114:15 155:24
**realize** 114:17
119:13,14 125:6
**really** 37:2 90:18
104:13 111:9
145:20 154:19
158:3 162:11
**reason** 66:23
121:14 130:21
**reasonable** 38:1
154:15
**reasonably** 144:3,6
**recall** 18:15,21
19:8 25:14,18
47:14 59:14 61:12
73:14 107:13
**receipt** 34:13 64:8
**receivable** 108:15
**receive** 17:10 49:25
89:17 108:10
**received** 6:10 12:15
13:8 14:8 15:10
19:24 48:24 52:20
64:17,23 83:12
86:9 97:25 108:7
108:8 125:2 148:2
148:11 149:4
150:16 167:6,14
**receives** 107:24
**receptive** 129:24
**recess** 70:17 109:20
109:21
**recessed** 70:18
137:19 140:12
**recognize** 9:1 11:19
12:5,20 63:14
76:7 78:9 80:17
82:18 159:23
**recollection** 34:20
80:11 91:25

**reconvened** 70:18
137:19
**record** 3:8 6:3 47:3
55:9 69:20 84:23
142:17 169:5
**recorded** 85:10,11
145:12 157:23,25
167:17
**records** 67:7
**recross** 2:3 54:11
**recrossexaminati...**
167:25
**redacted** 70:4
**redirect** 2:3 53:11
162:23
**reduce** 84:8 85:4
**reduction** 108:15
108:19
**reed** 32:11
**reference** 135:6,8
146:25
**referenced** 59:6
**references** 137:6
**refers** 168:4
**reflect** 6:3 37:20
67:7 73:3,5
**refresh** 80:11
**regard** 14:6,8
43:10 120:6
134:13
**regarding** 8:1
42:23 58:19
116:10 120:3
137:22 140:14
**regardless** 99:12
115:1 118:10
**region** 1:23
**regs** 100:1
**regular** 41:5
**regularly** 28:13
166:4
**regulate** 32:24
**regulating** 32:23
**regulation** 10:21
43:2 110:11
112:22 116:10,24
120:4 122:20

124:13
**regulations** 21:19
21:21 33:7 126:9
127:10,17
**regulator** 33:6
117:3 118:11,12
118:21 119:9
**regulators** 5:12,15
8:5 21:1 45:4
48:14 100:25
114:19 118:14
119:2 165:9
**regulatory** 21:20
83:19
**reinvesting** 49:7
**related** 47:8 83:20
84:5
**relating** 14:11,13
14:20,22,23 15:19
59:15,16 84:5
102:16
**relation** 66:15
**relationship** 44:20
65:11 72:21 151:2
151:10
**relationships** 65:8
**relatively** 44:19,20
**relay** 34:14
**relevance** 98:24
99:14 106:23
107:4,17
**relevancy** 100:13
**relevant** 20:3 54:2
100:21 104:5
109:16 111:4
112:25 114:10,20
115:4 116:8 120:8
120:23 128:19
131:17 140:22
**remaining** 30:5
**remember** 24:3,7
25:5,17 31:14,20
37:17 58:24 59:8
60:5 61:8 75:1,2
77:11 91:22
111:12 155:21
159:10 163:24

165:4,16,22
**reorganization**
107:10
**repaid** 17:1
**repayment** 161:16
**repeat** 154:21
**replace** 16:23 38:9
38:16,24
**report** 20:25 95:15
95:16 108:14
144:17 157:14
163:18
**reported** 10:23
84:9 118:2,3
146:1
**reporter** 169:10
**reporting** 1:23 57:5
109:5 143:19
**reports** 118:5
**represent** 4:4,9
57:23 122:12
**representation**
27:12
**represented** 4:6
20:2 128:16
**representing**
111:18
**request** 13:16
14:20,21 35:8
36:19,21 61:17
62:7 65:7 141:14
151:19
**requested** 3:2 11:7
12:8,23 65:19,24
65:25 72:5,14
75:21 76:16 78:17
154:2 168:21
**requesting** 16:20
76:22
**requests** 132:22
**require** 117:15
144:10
**required** 72:22
83:18 131:2
**requirement** 57:6
160:12
**requirements**

24:19 25:1 83:19
83:21 92:7,24
152:9 160:6
**requires** 97:24
144:16
**reserve** 58:5 73:10
85:11
**reserved** 85:6,9
**residence** 72:7
**residual** 58:14
88:18
**resolve** 132:2
**respect** 5:12 9:18
15:22 45:5 56:18
59:13,18 61:15
67:10 77:15 81:20
84:12
**respectfully** 133:21
**respects** 56:22
**response** 35:8
52:20 73:8 112:5
125:15 126:13
167:10
**responsibility**
57:11
**responsible** 45:3
**rest** 103:25 104:11
134:23 160:24
**restrictions** 34:13
**result** 84:6 86:21
150:16 167:18
**resumed** 71:1
140:12
**reversal** 9:16
**reverse** 84:24
85:16
**review** 10:16 19:1
42:19 61:22 62:4
64:12 65:18 67:1
67:11,19,21,23
77:25 79:24 80:25
151:18 158:16
**reviewed** 14:9
15:17 16:4 19:4
23:20 35:12 39:17
41:10 60:25 73:24
76:13 77:13 78:14

80:4,9 148:12
152:18
**reviewing** 14:25
57:16 81:19
**revised** 14:10 15:18
**revisit** 125:16,18
**revisiting** 125:6
**rich** 156:6
**richardson** 133:15
134:4
**right** 3:21,24 4:6
4:19 6:2,19 7:24
11:12,21 12:9,16
12:20 13:18,20,24
14:25 15:4,9,21
16:1,12,17 18:5
18:22 19:15,19,23
21:3,16,25 22:3,8
23:14 24:12,15
25:2,3,8,11 26:4
26:25 27:7,16,23
27:25 28:6,14,22
29:16,19,25 30:2
30:22 31:6,12
32:1,4,9,24 33:1,7
34:6,18 35:2,17
35:20 36:10,25
37:22 38:1,7,16
38:19 39:15,16,24
41:21 42:21 43:7
44:19 45:21 47:17
48:2,14,25 49:21
50:7 51:24 52:24
53:20,23 55:5
57:12 58:17 59:1
61:25 63:14 64:21
65:13,23 66:2,11
68:14,17 69:7,22
70:6,15,16 71:10
72:1 74:11,23
75:6,14,18,25
77:8 78:2 79:7,10
80:10,24 81:3,19
82:15 83:4,13
85:23 86:1 88:3,5
88:12,13,14,17,20
88:22 89:1,7,12

89:15,19 90:1,4
90:18,24 91:3
92:1,2,21 93:4,8
93:16,24 94:5,7,8
94:19,23 95:4,15
95:18 96:7,13,17
96:20,22 97:8,17
97:20 98:3,5,11
98:15,18,18,20
103:5,8 104:2
105:7,13,14,18,25
106:7,8,10,16,22
107:12 108:1,5,7
108:22 109:8,11
109:12,25 114:11
116:1,17 119:16
120:13 121:17
122:18,23 123:11
123:17 126:5
129:23 131:7
132:3 137:15
138:17 139:7,9
140:2,9 142:11
143:17,20,25
144:1,13,17 145:4
145:16,21,23
146:18,19,23
147:3,12,13,19
148:7,11,12
149:17 150:9
151:7,17 152:4
153:2,3,8,16,17
153:19 154:9,11
154:23,25 155:18
155:19,21,22,25
156:3,8,18,20,21
156:23 157:16
158:6,11,12,20,23
159:5,8 160:5,8
160:25 161:7,10
161:17,19 162:12
165:2,19,21 167:5
167:20 168:3,9,13
168:14
**righthand** 147:6
**righty** 88:10
**rise** 70:20 109:22

142:16
**risk** 14:9 15:18,21
16:4 17:10,23
18:2 35:20 36:9
66:25 67:1,11
74:4,8 76:10
78:12,21 79:18
80:7
**road** 99:15
**robbery** 136:17
**rogers** 1:17
**role** 9:18 45:8,12
45:15 56:17,19
**roll** 160:16
**room** 94:10,18
**rotation** 92:6
**rothschild** 1:14
**roughly** 93:22
**round** 65:21
151:21 152:10,25
**rounded** 59:15
**rovin** 22:3 46:18,20
49:15 51:14 52:14
**rule** 98:3 101:15
103:17 112:22
113:11,13,13,17
114:1,4 124:13
128:3 135:22
136:3 149:13,16
**rules** 61:1 92:19,22
93:4,5,7,10 99:7
105:2,12,13 126:9
**running** 136:19
**russell** 1:16

_____

**S**

**s** 1:11,21 2:9 3:1
6:11 29:12 93:1
**sale** 166:22 167:19
**sales** 147:11
**satisfaction** 27:22
28:2
**satisfied** 124:2
**saw** 5:9 6:16 7:8,10
8:7 47:7,11 79:18
**saying** 34:2 37:17
66:6 69:9 96:11

100:15 103:17
108:6 122:14
125:16,19 129:20
129:24 131:7,9,14
**says** 13:16 15:17
16:19 26:10 27:10
27:19 30:12,25
37:20 38:8,9,15
38:16 39:11 42:15
53:16,18 70:13
74:10 96:21
105:12 107:22,24
108:2,17 109:4
110:11,20 114:1,4
116:2 124:14
127:10 128:18
130:17 131:1
132:12 143:22,23
144:5,9,14,16,24
145:11,17,24
146:4 147:6 151:1
151:18 152:8
153:24 161:16
167:6,14
**schedule** 153:7
**scheduled** 9:12
**scheme** 70:2
111:17,17 113:4
**schwartz** 1:16
131:12,13 132:7,8
132:18,20,25
133:4,7,20 135:16
136:6,11,25 137:2
140:24,25
**science** 100:3,10
**scope** 22:10 45:24
46:23 48:16 142:4
**screen** 8:25 17:16
63:12 70:4 73:18
86:11 167:3
**se** 21:20 100:11
**sean** 160:22 163:7
**seat** 55:9
**seated** 70:22 110:6
142:19
**sec** 92:19 93:4,5,10
144:21

**second** 18:23 37:8
38:15 39:1 42:13
70:1 71:22 75:8
75:17,20 76:19
80:25 86:19
102:14 108:13
133:2,5,7 135:18
144:23 150:25
153:24 160:22
168:4
**secondary** 137:5
**secondly** 137:9
**section** 27:3 29:10
88:9 107:22
108:12 109:2
130:13 134:10
160:21,22 167:2
**sections** 94:3
**securities** 40:23
**see** 5:19 9:1 11:22
15:17 17:23 19:11
23:22 27:14 31:9
41:2 51:4,19
53:16 54:6 65:10
70:14 76:1 77:3
79:11 80:6 98:25
99:19 103:14
109:6,7 116:11,15
125:25 126:3
129:18 130:4,5
134:22 136:16,20
136:21 137:2,9,10
138:10 145:1
147:19 149:9
151:1,3,5,22
152:11 154:3
160:3 161:3 163:7
**seeing** 73:14
**seeking** 125:14
**seeks** 115:11 116:9
134:11
**seen** 47:9
**send** 63:1 67:4,5
96:4,20 138:21
139:3,5,6,7,8,8
168:8,10
**sending** 96:10

**senior** 56:25
**seniority** 90:14
**sense** 10:19 12:2
138:5
**sent** 9:3 12:22,24
39:21,24 51:23
63:18 104:13
110:19 120:25
138:10 143:6
**sentence** 39:3
40:25 41:14 67:13
72:2,10 108:13
109:4 143:23,24
144:24 145:11
151:1
**separate** 48:7
**september** 56:1
73:9
**series** 146:20,21
165:4,25 166:3,14
166:22 168:3
**served** 60:10
**service** 17:7 147:10
**services** 4:17,23
146:8,16
**session** 109:25
**set** 28:3 48:7 92:21
**setback** 8:16
**sets** 147:15
**seven** 17:5 65:19
68:12 151:19,24
**seventh** 166:19
**shape** 50:18
**shareholder** 58:7
**shareholders** 57:21
58:9,14,16,20
61:16,18,21 82:2
88:9,19 108:15,19
148:4 160:16
167:8
**shawn** 51:19
**sheet** 14:23 17:6,8
36:23 40:20,21
45:17 57:16,19,20
57:22 82:1 84:22
85:2,4 88:3,20
96:19 137:11

160:13
**sherri** 169:3,9
**shes** 30:3,13 32:10
    32:17
**short** 16:22 38:5
    60:15 61:11 68:22
    144:3
**shortly** 60:18 64:9
**shortterm** 37:21,22
    37:23
**shouldn** 45:17
**shouldnt** 134:17
    157:3
**show** 20:2 29:1
    30:9 40:15 100:23
    115:4,5 132:13,15
    146:12
**showed** 54:6 77:4
    164:2
**showing** 159:18
**shown** 25:15 32:4
    38:14 150:19
    159:9 168:2
**shows** 17:9 127:3
    128:2
**shubin** 1:7 2:5 55:2
    55:7,10,11,17
    71:2 87:21 114:22
    139:12,16 142:24
    162:25
**shubins** 114:20
**shulman** 1:17
**sic** 7:14 79:6
**side** 58:1,1 88:11
    88:17,20 89:1
**sidebar** 47:3 69:1
    99:2 101:25
**sign** 41:7 56:19
    57:1,9 79:24
    82:13 83:1 91:3
    161:10,11
**signature** 51:4,6
**signed** 33:19 53:20
    137:10
**significant** 33:18
    93:3 155:10
**simply** 115:14

122:18 136:18
**sir** 6:5 8:22 17:20
    19:17 21:12 43:17
    43:20 44:9 48:14
    48:23 53:9 54:13
    54:14,19,23 64:20
    68:24 69:13 76:5
    78:7 85:25 102:4
    102:19 103:1
    109:24 121:17
    123:24 127:14
    132:8 133:4 137:1
    146:15 154:17
    159:16,18,23
    160:18 162:20
    163:4,22 166:9
    168:2,19
**sit** 94:10
**sitting** 5:23 6:1
**situation** 73:2
    103:19,23 124:14
    133:24 147:16
    148:15 165:17
**situations** 118:22
**six** 14:22
**size** 92:19 94:13
**skill** 48:7
**slaughter** 89:25
**snapshot** 160:3
**socalled** 74:4 81:25
**sole** 27:25
**somebody** 88:16
    130:25 131:1
    158:9
**sooner** 140:5
**sophisticated**
    131:19
**sorry** 27:20 37:11
    42:3 50:25 51:1
    63:10 66:7 74:20
    76:1,2 86:3 92:10
    108:13 124:19
    126:2 129:11
    138:3 143:14
    146:21 163:15
**sort** 106:22
**sorts** 124:23

**sound** 74:24 77:9
**sounds** 128:17
**source** 72:23 73:7
**sources** 105:7
**spa** 28:3
**speak** 60:12 94:3
**speaker** 29:6
**speaking** 95:1
**speaks** 106:5 145:8
**specialize** 90:17
**specialty** 56:3
**specific** 31:13
    35:19 39:6 66:19
    102:16 103:24
    111:22 117:16
    123:8,9 140:21
    141:7 144:6
    155:14
**specifically** 31:16
    40:1 80:21
**specifics** 144:8
**spell** 3:7 55:8
**spend** 159:1
**spoke** 60:5 96:2
    155:18
**spoken** 30:12 141:8
**spring** 24:3 93:14
**staff** 56:25
**staffs** 167:10
**stand** 66:24 131:5
**standard** 100:5
    109:18 115:14
**standards** 41:2
    93:6 105:21 106:3
    107:15,15
**standing** 44:20
**start** 14:6 87:23
    88:23 128:8
**started** 58:12
**starts** 27:10 39:3
    75:16
**state** 3:7 8:4 33:3,4
    55:8 120:8,23
    124:15 132:13,15
    132:22 140:19,20
    140:22 141:6
**stated** 19:2 145:24

162:14
**statement** 27:11
    57:5 82:13 85:11
    117:14 125:19
    127:2 133:11
    136:1 140:17
    160:9 163:10
**statements** 8:11
    40:14 56:20,21
    57:4,4,9,10 73:7
    82:4,10,21,24
    83:2 84:10 93:1
    105:20 117:20
    145:14 158:5,7
    159:10,24 160:2,7
    160:11 163:14
**states** 1:1,2,8,10
    3:4 55:2 73:7
    111:17 113:5
    135:25
**station** 89:13,14
**statute** 100:12,14
    111:14 117:11,16
**step** 42:8 54:15,15
    68:3 69:5,7
    109:24 168:20,20
**stevens** 3:16,19
    21:12,24 22:1,6
    29:15
**stock** 7:1,3,12 9:22
    9:22 10:13 18:8
    20:13,18 53:25
    54:8 60:22 62:6
    62:10 72:25 73:13
    77:6 88:25 89:18
    89:19 114:24
    126:11 127:22
    128:5 129:21
    147:11 148:3
    161:2 162:10
    166:22 167:7,15
    167:19
**stockholders**
    161:17 167:16
**stop** 65:23 66:20
    67:18 85:13 101:2
**store** 136:18

**straightforward**
    135:22
**street** 1:11,14,21
    1:24
**strength** 72:21
**strong** 17:7
**stronger** 113:8,10
    115:1
**stuff** 31:20 94:22
    96:10 98:13 105:7
    106:21 120:10
    130:22 153:13
    154:13
**subject** 27:22
**submitted** 5:10 7:9
    23:25
**subscription** 33:20
**subsequent** 84:18
**substantial** 66:15
    144:2 158:19,21
**substitute** 34:6
**subtract** 161:12
**suffered** 8:16
**sufficient** 17:7
    135:12 154:18
**suggesting** 100:10
    123:7
**suit** 133:8
**suite** 1:12,21,24
**summaries** 67:1,11
**summary** 14:10,21
    15:18,22,23 16:4
    17:11,24 18:2
    35:20 36:10,21
    66:22,25 74:5,8
    76:10 78:12,21
    79:19 80:7,20
**summer** 59:7
**supposed** 31:25
    98:11
**supposedly** 30:17
**supreme** 133:15,21
    134:3
**sure** 31:12 46:13,13
    47:1,9 67:21
    68:23 69:20 70:3
    70:5 97:14,18

99:1 106:17 107:5
107:9 119:23
123:19 128:25
130:8 136:5
138:20 148:8
149:18 150:5,7
152:15 154:22
155:3 156:1,9,13
157:20 158:21
166:12 168:10
**surmised** 166:11
**surprising** 34:25
**sustained** 22:11
35:3 38:3 45:25
46:24 48:17 91:5
106:24 107:18
145:8 155:16
157:11
**swartz** 1:7 2:4 3:5,6
3:9,10,15 20:1
21:10 44:13 47:5
**sworn** 3:6 55:7
**system** 164:25

**T**
**t** 2:9 24:17,25
45:17 113:14
169:1,1
**table** 6:1 110:4
**tables** 84:4
**take** 15:23 29:4
49:22 59:4 68:3
68:22 69:2 70:14
74:12 108:4
109:20 135:12
141:10,21 162:2
**taken** 91:18 124:7
141:4 150:13
**takes** 134:9
**talk** 62:18 96:3
97:21 98:7 103:25
129:10 137:7
150:24
**talked** 155:8,25
**talking** 33:17 71:21
106:20 120:9,21
129:4,16,19

132:21 136:19
145:20 154:9
155:21 168:13
**talks** 70:2 134:11
150:20
**tantamount** 99:20
100:11 112:22
**tarp** 5:5,7,9,12 6:9
8:1 9:12,19,20
11:3 23:17 24:8
24:12,15 27:4
28:18,18 32:16
45:5 52:4,7,17
113:25
**task** 106:7,9 109:4
109:16 112:11
143:18 144:9,12
144:24 145:24
149:21,24 164:6
164:19
**team** 56:22 93:16
160:14
**technical** 105:25
**tell** 29:25 32:20
34:15 60:21 61:6
94:22 96:16
122:13 125:12
139:25 166:16
**telling** 31:25 32:20
33:14 147:10
149:12
**tempted** 125:17
**ten** 92:18
**tend** 85:7 94:12
101:10
**tense** 126:19
**tentative** 30:14
**term** 16:22 38:5
151:12 158:21
**terms** 10:23 16:14
66:23 96:24,25
97:2 117:16
122:25 132:15
137:8 141:11
149:19 152:24
**test** 79:2,23 80:20
80:22 96:18

**testified** 110:22
112:5,13 121:2
122:21 131:22
159:5
**testify** 133:10
**testimony** 1:7
114:20 121:7
124:21,23 125:9
132:20 134:10,22
135:2 136:24
137:13 141:4,7
**testing** 67:4
**thank** 3:12 21:7
44:10 47:2 49:23
51:20 53:6 54:12
54:14,16,24 55:1
55:12,14 70:9,15
70:25 71:24 87:18
101:24 102:2
110:7 119:16
131:13 132:4,6,8
133:1,4,5,6
135:19 140:11
142:18,21 162:22
163:20,22 167:20
167:21,23 168:16
168:18,19
**thanks** 13:19
102:24 143:14
160:25
**thats** 11:20 12:22
13:20 23:13,23,23
23:24 25:24 28:5
30:9 31:24 35:16
35:25 36:25 37:22
37:23,24,25 38:15
38:23 40:20 46:6
48:7,7 51:6 52:19
57:2,8 63:6 64:6
70:8 73:23 91:1
92:8,9 95:4,11,18
98:11 99:18
100:15,21 101:15
101:21 102:23
104:2 105:21
106:9 108:2,6,17
110:17 111:6,25

112:10 113:13
114:8,9,19 116:15
117:4,12,17
118:13 119:6
120:17,18,20,21
121:12 122:6,14
122:17 123:3,14
127:6 128:15,19
128:24 130:6,8,9
133:24 134:2,3
140:17 143:21,22
144:5,6 145:17,20
146:21 147:21,23
148:5 151:9
152:25 153:7
155:12,13 156:9
159:8,24 161:9
166:3 168:7
**theoretically** 23:10
**theory** 122:10
**theres** 14:16 39:10
39:12 51:8,11,14
57:6 92:21 95:18
97:14 100:4,20
101:7 105:9
118:17 122:5,5
124:13 126:25
127:11 128:2
130:4,5,24 133:22
137:11 160:3,6,12
**theyre** 30:8 33:3
34:16 79:24 93:3
95:21 97:3 117:11
118:15 119:14
120:10 121:12
129:4 130:21
147:21 148:1
160:11 164:12
**theyve** 122:17
**thing** 39:8 93:25
104:13 106:12,18
110:18 116:19
120:16,16,25
121:5 127:15
133:7 147:15
149:8 159:20
160:25

**things** 9:23 24:20
26:20,24 27:3
30:16 31:5 57:18
72:1 79:24 90:18
130:12 133:20
141:10 150:24
160:1 164:8
**think** 29:2 38:17
39:13 43:14 53:15
57:2 66:24 71:2
72:20 77:17 80:11
90:2 93:21 94:14
98:2 100:21
109:16 110:20
111:6,25 114:11
115:13 121:21
127:2 128:24
129:22,25 130:24
131:4,17 136:12
139:2 149:13,21
150:6 163:2 164:2
166:18
**thinking** 103:14
**third** 57:24 68:2
77:18 96:6 106:13
**thomas** 12:25
**thought** 10:17 55:4
97:23
**three** 14:13,15,17
44:1 56:23 57:22
57:25 77:18 86:23
92:16 94:11
140:18 151:24
158:12 160:15,16
163:15
**threshold** 137:13
**thursday** 149:2
**tie** 46:9
**tied** 135:5
**till** 91:20
**time** 4:12 7:10,17
7:23 9:25 10:5
17:13,24 18:1,5
20:11 24:21 25:4
28:17,17 29:18
31:17 38:1 46:11
47:5 50:5 54:5

60:15 61:4 62:19
64:25 66:14,16,17
69:3 71:3,8 74:16
74:17,18,21,22
75:4 77:20 79:18
81:12,14 86:16
109:20 128:20
131:1 132:14
140:6 141:4,22
144:4,7 149:9
**times** 47:16 118:7
**timing** 15:2 34:13
43:9 61:19 66:14
67:16 121:8,9
154:19 162:6,12
162:15
**today** 5:20 120:21
**told** 30:3,4 34:8
61:10 62:9 87:9
97:19 103:9,17,18
125:7,9 148:14
**tom** 13:19
**top** 27:2 30:24 39:2
68:9 72:19 90:3
102:23 147:11
148:23 149:8
153:23
**total** 40:15 58:16
84:5 123:13
**totaled** 81:24
**totally** 100:16
141:18
**transaction** 16:13
16:18 49:6 59:10
60:16,24,25 61:23
74:19 102:10
103:10
**transactions** 59:5
61:18 63:2 110:15
**transcriber** 169:10
169:15
**transcript** 1:5
129:16 137:22
140:14 169:4
**transmitting** 12:23
**transpired** 60:15
**treasury** 6:11 7:11

9:6,9 10:1 26:15
27:12 30:3,4,12
30:22 32:9,10,12
32:23,23 34:21
111:10,19 113:15
113:21,23 114:12
114:13 118:25
**treasurys** 9:4 27:20
27:21 33:6,7
**treat** 100:24
**treated** 61:2 81:24
81:25 82:1 100:23
**treatment** 62:14
97:25 104:15
110:14 112:14
118:11 119:4,5
143:2,6,8 150:14
155:10 157:1,22
**tremendously**
128:5
**trial** 1:7 2:2 134:25
**tricia** 58:25
**true** 114:22 151:9
156:9,11 169:5
**try** 26:3 34:10 50:6
50:14,17 52:7
116:12 123:19
159:2
**trying** 31:1 62:4
100:22
**turn** 8:18,25 11:14
12:19 16:1 17:15
18:22,23 63:4
71:14,20 72:9
73:17 75:25 76:19
77:8 78:2 80:2,10
**turned** 155:4
**twelvemonth** 16:25
**two** 14:11,16 23:5
23:11 39:13 44:1
48:4 56:25 61:12
65:20 75:2 78:1
81:2 87:12 94:11
133:20 151:20
152:10,24 156:19
160:13,13 162:11
163:2

**twopage** 23:23
**twopager** 23:24
**twos** 14:16
**type** 3:24 48:11
152:13,15,21
**types** 9:23
**typical** 64:10 79:2
95:6
**typically** 45:10
58:11 67:25 71:5
85:3,3,5 88:1,7
89:5 93:3 95:16
96:18,23 160:6
**typo** 14:16

_____

**U**

**u** 1:11 6:11 93:1
**uhh** 88:6
**uhhuh** 23:19 38:25
39:7 40:4 93:17
**ultimate** 57:11
85:18 120:19
**ultimately** 56:19
82:3 108:18 116:3
119:3 123:10
157:22
**umm** 97:9
**unable** 9:12,13,13
33:24
**unavailable** 141:2
**unclear** 120:6
**uncollectable** 84:21
84:23
**understand** 9:15
20:12 61:19 67:14
72:22 126:22
127:16,18,19,20
127:25 128:7
129:3,23 131:11
141:9 149:18
**understanding**
6:22 7:18 15:1,4
15:10 20:6 41:6
72:20 117:9,10
128:9,10 164:18
164:25
**understood** 7:14

111:7 112:9 155:5
155:7
**underwrite** 41:5
**underwriting** 41:2
67:15
**unidentified** 29:6
**united** 1:1,2,8,10
3:4 55:2 111:17
113:5 135:25
**unsecured** 17:6
40:6,8 59:24
72:13 118:17
162:9
**upset** 155:23,24
156:4
**use** 16:23 89:12
99:4 100:22
146:25 165:11

_____

**V**

**v** 133:16 134:4
135:25
**value** 129:9
**various** 94:3
107:15
**verbatim** 38:17
125:14
**veritext** 1:23
**version** 124:24
**versus** 60:25 61:19
112:10 118:19
133:9
**viability** 118:22
119:8
**viable** 113:24
114:14
**video** 138:4
**view** 24:14 156:7
**viewed** 148:15
**viewpoints** 165:9
**views** 156:2
**violate** 112:3
113:13 117:16
**violated** 113:12,17
113:20 114:7
**violates** 115:2
**violating** 111:13,14

112:18,22,23
113:10 117:12
**violation** 10:20
43:1 120:17 141:1
**vociferously** 135:1
**volume** 12:2
**vs** 1:4

_____

**W**

**wait** 108:12
**waiting** 30:8
**want** 16:2 19:10
29:1,24 30:20
31:9 34:15 37:8
68:23 69:17 87:23
92:13 94:21 96:3
96:21 97:8,21
98:7 100:20
102:18 111:11
114:17 118:12,13
130:9,13,19 131:8
131:9,10 147:2
150:24 164:20
**wanted** 33:10 70:3
70:4 158:4,25
**wants** 96:17 97:17
101:20 110:1,12
121:3 126:22
128:7 129:17
133:25 155:14
**ware** 92:24
**washington** 133:13
**wasnt** 34:9 101:13
106:21 107:3
126:14 128:18
129:20 134:25
**watch** 54:15 168:20
**way** 9:7 24:12
32:22 39:23 50:11
50:17 53:23 79:10
88:23 100:24,24
107:2 112:6,10,12
113:9,16 118:21
126:24,25 128:12
130:5,5 136:14
139:1 154:14
156:15

**wealth** 154:10
**wearing** 5:25
**wed** 96:12
**wednesday** 103:5
**weeds** 88:11
**week** 31:2,3 32:1
**weeks** 65:20 94:11
  151:20 152:10,25
**weight** 129:7
**went** 23:9 35:15
  41:4,20 52:1
  136:18 148:14
**weve** 30:16 37:10
  70:4 96:11 111:16
  118:3,5 131:23
  141:8 166:7
**whats** 9:6 13:1,21
  26:4 64:4 67:13
  68:5 79:15 86:17
  86:20 87:1 96:6
  99:14 101:22
  127:22 128:16
  131:2 132:18
  137:22 146:13
  159:18 167:8
**whatsoever** 50:1
**whens** 10:5
**whos** 74:6 79:3
  91:2 131:4
**willing** 126:6
**wish** 120:3
**withdraw** 145:6
  150:8
**witness** 2:3 3:6,9
  6:4 11:16 12:20
  54:16,18 55:7,10
  63:9 69:5 80:13
  101:6,6 102:22
  109:14 112:5,11
  112:12 116:10,22
  120:3 121:13,14
  122:21 130:25
  131:5,21 140:3
  141:3,17,17
  142:13 146:12
  150:5 163:21
**witnesses** 101:4

**wont** 89:25 132:2
**word** 37:4,4 107:8
  115:22
**words** 41:4 92:10
  96:9 168:12
**work** 3:24 28:22
  52:18 56:4 64:11
  66:2 71:6 79:2,23
  79:25 80:20,22
  86:14 158:19
**worked** 3:21 24:12
  25:7,9 28:23
  55:23,25
**working** 79:9 90:23
  93:19
**world** 90:4
**worry** 37:8
**worth** 40:15 103:13
  120:15 139:11
**worthy** 113:25
**wouldnt** 27:7 38:7
  45:8,14 89:21
  119:4 122:4
**write** 33:11 84:23
  89:15
**writes** 30:25
  103:12
**writing** 32:6 85:15
**written** 27:11 38:7
  84:16
**wrong** 76:2 116:21
  121:15,16,19
  130:17,18
**wrote** 20:11 39:18
  41:19 50:22 54:5
  114:21

### X

**x** 2:1,9

### Y

**yeah** 6:14 7:8 10:16
  11:7 12:7 19:7,14
  24:24 31:22,23
  33:2 34:24 37:1,6
  37:18 38:20,22
  46:10 57:3 59:10
  60:24 69:14,25

70:12 89:5 92:8
  92:10 97:11 99:8
  106:21 130:16
  131:23 137:17
  138:21 155:24
  165:8
**year** 37:25 57:13
  58:18 62:1 71:7
  79:1 81:3,7 82:22
  84:18 91:18
  107:13 130:17
  153:18 160:4,4
  163:11 164:5,12
  164:13 166:5
**years** 3:20,23 21:13
  44:1,17 55:20
  66:8,10 90:12,21
  90:24 92:12,16,17
  92:18,20 140:18
  150:22 153:3
  160:2,5,13,13,15
  160:16
**youd** 63:5
**youll** 9:1 134:22
  137:2
**youre** 21:18 32:6
  32:18 33:14 34:2
  43:7 47:25 61:22
  90:1,11 95:14
  96:4,9,10 98:11
  98:18,20 100:10
  100:22 113:1
  123:7 128:14
  129:24 149:18
**youve** 21:12,15
  29:25 44:15,15,19
  90:20 163:4

### Z

### 0

**000** 24:14 81:24
**07** 160:8
**08** 160:8
**09** 160:9

### 1

**1** 1:5 15:16 69:12

109:21,21 137:19
  140:1,7,9,12
  147:19 168:21
**10** 6:17 26:12,17
  30:9 31:9 34:14
  34:17 70:18 72:5
  118:6,9 154:2,5
**100** 159:14,19
**109** 76:2,7,9
**10th** 1:14
**11** 1:7 70:18
**116** 29:1 51:18
**11th** 13:23
**12** 2:12 137:19
  140:12
**12140** 137:20
**122** 2:13 8:19 9:1
  19:20,24 32:3
**123** 1:21
**1250** 1:12
**12505** 1:18
**13** 1:3 2:13 26:10
  64:5 79:17
**139** 165:3,14
**13th** 79:21
**14** 137:3 169:20
**143** 78:3,9,11 79:3
**14cr00548cdj** 1:2
**14th** 164:21
**15** 109:21,21 137:3
  139:11 140:1,7,9
**15th** 53:15
**16** 70:18
**162** 2:5
**167** 2:5
**169** 2:13 12:20,21
  13:4,8 48:20
**171** 2:12 11:15,19
  12:11,15 13:21,25
  18:24 19:5 35:5
  50:20 53:14
**178** 2:14 63:5,14,16
  64:14,17 69:12
  71:15 75:8
**17th** 14:10 15:19
**18** 33:22 42:8
**1800** 1:24

**1801** 1:24
**181** 2:15 76:1 80:12
  80:17,19 86:2,5,9
  86:13,17
**187** 2:14 82:16,18
  82:20 83:7,12
  163:8
**1885** 164:14
**18887776690** 1:25
**19** 2:13
**19103** 1:24
**19106** 1:12
**19107** 1:15
**19109** 1:22
**194** 137:18,24,25
  138:4
**194a** 138:3,4
**1979** 135:25
**198** 40:22
**1985** 164:7,21,23
**1986** 56:1
**1994** 166:15,22
  167:2
**19th** 103:6

### 2

**2** 1:2 27:2 71:23
  153:24
**20** 16:2 139:12
**2000** 1:14
**2002** 56:1,2 65:22
  151:22
**2004** 152:11,13,22
**2007** 152:11,22
**2008** 4:10 5:3 22:17
  24:1,2,3 44:23,24
  56:16 62:1,3,8
  73:10 81:5,7,9
  91:11 92:5 98:23
  151:25 153:6,11
  153:12,14
**2009** 5:3 6:10 8:15
  9:8,10 10:1 14:10
  14:12,14 15:19
  26:16 40:16 41:16
  43:21 51:23 52:21
  57:13 58:17 59:7

71:4,6 72:4,8,14
73:6 75:20 77:13
78:15 81:16,18
82:22 91:8 93:15
106:19,21 107:3
107:12 110:15
118:5 124:15
132:23 140:21
148:6,9 153:6,9
153:12,15 154:1
159:10 161:3
163:11,13
**2010** 10:7 13:2,23
48:25 56:16 59:4
63:17,20 64:5,23
66:3 71:9 79:17
81:17 86:18 91:14
93:14,15 103:6
110:16,17 147:7
147:10 148:1,6
159:24 160:9
161:14 166:2
**2011** 91:16,22,23
**2012** 44:4,25 91:20
124:8,14 125:20
126:11 127:4
132:21,22 140:20
**2016** 1:3 98:22
169:20
**20854** 1:18
**20th** 149:2
**21** 2:4 38:14 137:19
140:12
**24** 6:25
**250** 81:24 161:7
**2500** 1:21
**26th** 30:25 51:23
52:21
**27** 3:20 21:13
**29** 116:3
**29th** 164:23
**2d** 135:25
**2nd** 13:2,21 48:25

---

**3**

**3** 2:4 42:12 72:19
75:8 118:9 152:6

---

**30** 14:12,14 15:3,8
24:14 41:16 55:20
72:8,14 137:19
140:12
**309** 147:5
**30th** 41:20
**31** 118:16
**31st** 40:16 73:6
161:3
**33** 3:23 44:17
**39** 1:5 3:2
**3rd** 9:8,10 32:4

---

**4**

**4** 76:23 80:3
**400** 120:15
**401** 166:7
**41** 83:5,17,18 84:2
**43** 17:16 73:17 74:3
**44** 2:4
**443** 40:15
**487** 135:25

---

**5**

**5** 7:16 14:15 16:20
31:1 41:20,23
59:23,25 68:12
73:12 75:22 76:23
88:25 89:12,17,18
111:11 117:4
118:3,7,17,18,19
119:2 120:15,16
155:6 162:9,10
**50** 70:18
**53** 1:5 2:4 168:21
**54** 141:11
**55** 2:5
**57** 141:11
**5700** 161:19
**593** 135:25

---

**6**

**6** 86:18
**600** 17:9
**615** 1:11
**64** 2:14 66:17
**6th** 1:18 30:15,18
141:1

---

**7**

**7** 160:18
**75** 25:21,24

---

**8**

**8** 40:22 81:24
111:20 113:21
161:7
**83** 2:14
**85** 112:19
**851** 86:25 99:23
101:15 103:22
104:7 107:20
111:15 112:15,18
115:2,3 122:8
142:25 148:11
163:25 168:4,7
**86** 2:15
**87** 2:5
**8th** 73:9

---

**9**

**9** 1:5 3:2 6:25 40:18
63:19 64:23 98:23
**96** 102:22 143:13
164:3
**9th** 63:17 64:9
150:17

---

Page 1

```
 1                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF PENNSYLVANIA
 2
     UNITED STATES OF AMERICA      )   2:14-cr-00548-CDJ
 3                                 )
                                   )   April 13, 2016
 4   vs.                           )   Philadelphia, PA
                                   )
 5                                 )   PARTIAL TRANSCRIPT
     BRIAN HARTLINE, et al         )   1:53 p.m. - 3:14 p.m.
 6
 7                    EXCERPT OF JURY TRIAL DAY 11
              BEFORE THE HONORABLE C. DARNELL JONES, II
 8                   UNITED STATES DISTRICT JUDGE
 9   APPEARANCES:
10   For United States of      DAVID IGNALL, ESQ.
     America:                   U.S. ATTORNEY'S OFFICE
11                              615 Chestnut Street
                                Suite 1250
12                              Philadelphia, PA  19106
13   For Defendant             PATRICK J. EGAN, ESQ.
     Brian Hartline:           FOX ROTHSCHILD, LLP
14                              2000 Market Street, 10th FL
                                Philadelphia, PA 19107
15
     For Defendant             JOEL SCHWARTZ, ESQ.
16   Barry Bekkedam:           RUSSELL D. DUNCAN, ESQ.
                                SHULMAN ROGERS GANDAL PORDY &
17                               ECKER
                                12505 Park Potomac Ave 6th FL
18                              Potomac, MD 20854
19                              MICHAEL J. ENGLE, ESQ.
                                GREENBLATT PIERCE ENGLE FUNT
20                               FLORES
                                123 S. Broad Street
21                              Suite 2500
                                Philadelphia, PA  19109
22
23              Veritext National Court Reporting Company
                          Mid-Atlantic Region
24              1801 Market Street - Suite 1800
                        Philadelphia, PA 19103
25                        1-888-777-6690
```

Page 2

```
 1                        I N D E X

 2                 EXCERPT OF JURY TRIAL

 3     WITNESS              DIRECT   CROSS   REDIRECT   RECROSS

 4     N/A

 5

 6

 7

 8                      E X H I B I T S

 9     NO.              IDENTIFICATION               PAGE

10     Government's:

11     N/A

12

13     Defendant's:

14     N/A

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              P R O C E E D I N G S

 2        (The following transcript contains multiple

 3   indiscernibles due to the poor recording quality,

 4   static, and parties not utilizing the microphones)

 5        (Requested excerpt begins at 1:53 p.m.)

 6        (Jury present)

 7              MR. IGNALL:  All right.  Your Honor,

 8   may we address the issue that we were discussing at

 9   lunch?

10              THE COURT:  Yes, sir.  We're going to

11   take a recess at this time.

12              THE CLERK:  All rise.

13        (Jury leaves courtroom)

14              THE COURT:  You may be seated.

15              All right.  Let me first hear what

16   you've agreed upon.

17              MR. IGNALL:  We haven't agreed on

18   anything, Your Honor.  But what I'm -- I've made a

19   couple of proposals that we would -- does the Court

20   have the marked up version of --

21              THE COURT:  Yes.  I have it on mine.

22              MR. IGNALL:  Okay.  Here's what we were

23   proposing.  We've excised some of what we had

24   originally said; that there just be the introduction

25   and the oath.  We would then go through the background
```

1      that's on page 9 into page 10 that's highlighted.

2                     THE COURT:  Wait just one second,

3      please.

4           (Pause)

5                     THE COURT:  We would delete his

6      address?

7                     MR. IGNALL:  Yes.  I believe the

8      address is already -- Agent Boyer (ph), I believe

9      that's already been deleted on --

10                    THE COURT:  Okay.

11                    MR. IGNALL:  -- what we're going to

12     play.

13                    THE COURT:  All right.  Just a moment,

14     please.

15          (Pause)

16                    THE COURT:  Okay.  I'm with you.

17                    MR. IGNALL:  All right.  The next thing

18     we would propose -- I'm not sure we'll do it in this

19     order, but the next thing in the transcript would be

20     pages 14 through 16.

21                    THE COURT:  All right.  Now let me --

22     let's talk about 14 through 16.  Mr. Schwartz's

23     objection is the relevancy of the Balamar (ph)

24     Association.

25                    MR. IGNALL:  Yeah.  I don't see how

1    that references Mr. Bekkedam.

2                    THE COURT:  Assuming arguendo that all

3    the testimony has been about Mr. Bekkedam and his

4    relationship to Balamar --

5                    MR. IGNALL:  Well, my understanding of

6    the Bruton (ph) Rule is that if there is a non-

7    testifying co-defendant statement that comes in we

8    would have to redact any references to the defendant.

9    If some part of that statement could be tied back into

10   the defendant through other evidence, that does not

11   violate the Bruton Rule.

12                   THE COURT:  And that's where I'm going.

13   What other evidence do you have to tie in and make

14   this relevant and admissible?

15                   MR. IGNALL:  Well, no.  I think it's

16   just relevant and admissible as to Mr. Hartline

17   understanding that Balamar clients owned 50 percent of

18   Nova Bank.

19                   THE COURT:  And what difference does

20   that make to the disposition of this trial?

21                   MR. IGNALL:  That goes into his

22   relationship with Mr. Bekkedam, so it does come in

23   indirectly as to --

24                   THE COURT:  But it is -- exactly.

25   That's getting back to the same thing then.

1                    MR. IGNALL:  May I have one moment,

2      Your Honor?

3                    THE COURT:  Sure.

4         (Pause)

5                    MR. IGNALL:  Yeah.  Just because it

6      indirect -- I'm not aware of any case that says

7      because the jury could indirectly understand that Mr.

8      Bekkedam has something to do with Balamar that that

9      creates a Bruton problem under the Sixth Amendment.

10                    THE COURT:  Well, that's because no

11     one's ever had this case before and taken it all the

12     way up to the Supreme Court.  I'm ruling that it's

13     inadmissible.

14                    MR. IGNALL:  Okay.

15                    THE COURT:  All right.  Now that's

16     going to be pages --

17                    MR. IGNALL:  Then we will not play

18     that.

19                    THE COURT:  -- that's going to be pages

20     14, line 22 --

21                    MR. IGNALL:  Through 16, line 11.

22                    THE COURT:  -- through 16, line 11.

23                    MR. IGNALL:  Agent Boyer, do you know

24     which clip that is?

25                    AGENT BOYER:  14 through 16, line 11.

1                    MR. IGNALL:  Yeah.  Before we bring the

2      jury back we'll make sure we have it --

3                    THE COURT:  All right.

4                    MR. IGNALL:  We'll maybe do a quick dry

5      run.  So we will take that out.

6                    THE COURT:  Okay.  Thank you.

7                    MR. IGNALL:  The next one is page 18,

8      simply the percentage of stock that the defendant and

9      his wife own.

10                    THE COURT:  Now it says in the holding

11     company.  We're referencing Nova Financial?

12                    MR. IGNALL:  Yes.

13                    THE COURT:  All right.

14                    MR. IGNALL:  The next thing, we're not

15     going to play the CPA.

16                    THE COURT:  What page is that, please?

17                    MR. IGNALL:  Page 40, line 19.

18                    THE COURT:  Just a moment, please.

19          (Pause)

20                    THE COURT:  All right.

21                    MR. IGNALL:  And then -- and with

22     starting at page 54.  I understand Mr. Egan objects to

23     playing any of this, but here's what we're proposing

24     is that we would turn this into two clips instead of

25     one.  And what we would do is the first clip would go

1    from page 54, line 7 through page 55, line 4.

2                    THE COURT:  All right.  Hold on a

3    second.  54, line 7 through 55, line 4?

4                    MR. IGNALL:  Yes.

5                    THE COURT:  Just a moment, please.

6         (Pause)

7                    THE COURT:  The basis for the

8    objection?

9                    MR. EGAN:  Your Honor, this is --

10                    MR. IGNALL:  Well, may I finish what

11    our proposal is before we -- because I'm proposing to

12    take out part of what's next.

13                    MR. EGAN:  Well, I was only going to

14    address what they just --

15                    MR. IGNALL:  Okay.  We can do that that

16    way.  That's fine.

17                    THE COURT:  That's what I thought.

18                    MR. IGNALL:  All right.  Thank you.

19                    MR. EGAN:  Your Honor, this is a lawyer

20    or a plaintiff who is suing the bank -- or a defendant

21    being sued by the bank (indiscernible), asking

22    questions about a loan that's unrelated to the issue

23    in -- that was in that case.  It's Mr. Hartline

24    answering questions about the purpose of Mr. Levin's

25    loan, which is directly relevant to this case.

```
 1                    And the case that I provided to the
 2      Court with regard to witnesses who are testifying
 3      several years after the fact and made -- I believe the
 4      language is something, even the most honest witness
 5      may shade things based on the context of the
 6      deposition and the context of the testimony.  It
 7      should be inadmissible because the prejudice far
 8      outweighs the probative value.
 9                    THE COURT:  Go ahead.
10                    MR. IGNALL:  The probative value, I
11      think, is pretty straightforward.  This is a false
12      exculpatory statement made about the same facts that
13      are in evidence here.  There's even a Third Circuit
14      jury instruction about false exculpatory evidence
15      being probative of the defendant's consciousness of
16      guilt.
17                    So I don't think there's a question
18      about the probative value of this.  And I really do
19      not understand where the danger of unfair prejudice
20      comes from.  Yes, the jury could infer from this
21      evidence that the defendant knew he had done something
22      wrong, which is perfectly fair prejudice.  I don't see
23      anything inflammatory about this.  I don't see
24      anything that leads the jury to reach a conclusion on
25      an improper purpose.
```

 1                     So I'm not sure if there's any

 2     prejudice -- unfair prejudice at all, much less unfair

 3     prejudice so substantial as to outweigh the probative

 4     value.

 5                     THE COURT:  It is a statement made in

 6     response to a question and it's made under oath.  It's

 7     admissible.

 8                     MR. IGNALL:  All right.

 9                     Your Honor, the next -- we are propose

10     -- based on Mr. Egan's objection we are proposing that

11     we're not going to play pages -- page 55, lines 5

12     through 15 based on the tense of the question.  That

13     seems to be present tense.  We are proposing to play

14     from line 16 of page 55 down through page 57, line 10.

15                     MR. EGAN:  And the objection to that,

16     Your Honor, is the specific question about the issues

17     to this -- relative to this case which says, well,

18     what did you understand to be the problem of a bank

19     lending money.  It doesn't say when.  It doesn't say

20     last year or the year before.  It's completely subject

21     to interpretation about what did you understand and

22     when.

23                     And the con -- the government's

24     argument is that it's put in context by prior

25     questions, but I don't believe that carries the day,

1    Your Honor.  The fact is it's not clear from this

2    question, especially if it's going to be played in a

3    clip, like one tiny clip followed by another tiny clip

4    with nothing in between and no explanation, this

5    lawyer's choice of words, who is not even a counsel in

6    this case, and the prejudice far outweighs any

7    probative value.

8                    THE COURT:  Yes, sir.

9                    MR. IGNALL:  Your Honor, if we look at

10   the context, (a) it's in the past tense.  It's in the

11   context of Mr. Hartline talking about the purpose of

12   Mr. Levin's loan.  So it's in the past tense, what did

13   you understand the problem to be.  The questions are

14   about did Mr. Levin borrow $5 million to invest in

15   Nova Financial Holdings stock.

16                   Now there may be another interpretation

17   and Mr. Egan is certainly free to introduce any

18   evidence he wishes.  But that doesn't mean there's no

19   probative value to this.  In fact, there's significant

20   probative value.  And just with the previous section I

21   don't see what the danger of unfair prejudice is.

22   There's certainly a significant chance the jury will

23   draw an inference from that which is a fair inference

24   that --

25                   THE COURT:  Counsel, let me interrupt

1    you.  I apologize of the interruption.  However, my

2    page is in green starting with line 1 on page 55.  And

3    I thought you said that you were only going to begin

4    at a portion of that page.

5                    MR. IGNALL:  Yeah.  We're -- line 1

6    through 4 is part of the previous clip.  On page 55

7    we're not going to add -- play lines 5 through 15.

8                    THE COURT:  All right.  Mine's green

9    though.  Is it -- as if it was going to be played.

10                    MR. IGNALL:  Yes.  No.  We -- what I

11    provided to Your Honor is what we provided to the

12    defense yesterday about what we were going to play.

13                    THE COURT:  Uh-huh.

14                    MR. IGNALL:  Over lunchtime we've come

15    to an -- I don't want to say agreement --

16    unilaterally, based on Mr. Egan's objections, are

17    agreeing as to what we're not going to play.  So the

18    government is not --

19                    THE COURT:  Okay.  So 5 through 15 --

20                    MR. IGNALL:  The government regardless

21    --

22                    THE COURT:  -- on page 55 --

23                    MR. IGNALL:  The government is not

24    going to play that.

25                    THE COURT:  All right.  Let me read

Page 13

1    this so that I can --

2                    MR. IGNALL:  Okay.

3                    THE COURT:  -- read it in context then.

4                    MR. IGNALL:  All right.

5         (Pause)

6                    THE COURT:  Okay.  5 through 15 is out.

7    And you wanted to start at 16.

8                    UNIDENTIFIED SPEAKER:  Yes, Your Honor.

9                    MR. IGNALL:  Yes, Your Honor.  And that

10   would go through page 57, line 10.

11                   THE COURT:  All right.  Hold up a

12   second, please.

13        (Pause)

14                   THE COURT:  Are you including the

15   hypothetical?

16                   MR. IGNALL:  Yes.

17                   THE COURT:  All right.  Just a minute.

18        (Pause)

19                   THE COURT:  It's admissible.

20                   MR. EGAN:  Can I just be heard, Your

21   Honor?

22                   THE COURT:  Yes, sir.

23                   MR. EGAN:  We are talking about a

24   deposition in 2012 that is clearly after Mr. Hartline

25   has been told by KPMG that that's an improper capital

1     treatment.  They're going to base an argument that

2     this was his knowledge in 2009 on this lawyer's choice

3     of the words, "well, what did you understand to be the

4     problem."  We don't know if he means what did he

5     understand in 2011.  We don't know if he means what

6     did he understand in 2010.  It is simply not clear

7     enough.  And --

8                    THE COURT:  All right.  First of all,

9     that's why I was going to, without counsel's agreeing

10    to it, exclude the first portion of this because I

11    accepted your argument earlier that it was out of

12    context and could have been what he (indiscernible).

13                    However, after that, this section

14    appears to the Court as being independent of that

15    answer.

16                    MR. EGAN:  "What did you understand to

17    be the problem?"  Your Honor, it doesn't say when.

18    See, at the time -- if the question -- if the lawyer

19    was a prosecutor perhaps he would ask the question

20    germane to this question, or I would ask the question

21    germane to this case, at the time you did this what

22    did you understand it to be.

23                    THE COURT:  I accept that.

24                    MR. EGAN:  Then it would be admissible.

25                    THE COURT:  I accept that.

Page 15

```
 1                      MR. EGAN:  What did you understand,

 2      when?

 3                      THE COURT:  Just a second, please.

 4           (Pause)

 5                      THE COURT:  Counsel, would you refocus

 6      me on the question?

 7                      MR. EGAN:  It's line 16 of page 55 --

 8                      THE COURT:  All right.

 9                      MR. EGAN:  -- "Well, what did you

10      understand to be" --

11                      THE COURT:  I'm there.  Thank you.

12           (Pause)

13                      THE COURT:  Mr. Egan, are you

14      suggesting at line 16 the, well, what did you

15      understand is different from what you -- what do you

16      understand given that it was in 2012 when the question

17      was asked?

18                      MR. EGAN:  It's different from, what do

19      you understand, yes, Your Honor.  But it is not clear

20      enough or specific enough that they're asking about

21      his understanding in 2009.  And his understanding in

22      2009 is what's at issue in this case.  And to allow

23      this jury to hear this testimony and speculate based

24      on this, that this was his state of mind in 2009, is

25      improper.
```

 1                    THE COURT:  But haven't your questions

 2      to the witnesses been, this, essentially; that there

 3      was a misunderstanding or misinterpretation --

 4                    MR. EGAN:  Yes, Your Honor, which is --

 5                    THE COURT:  -- in 2009?

 6                    MR. EGAN:  Yes.  But this doesn't say

 7      --

 8                    THE COURT:  So what's the difference?

 9                    MR. EGAN:  It doesn't say 2009.  It

10      says, what did you.  We don't know when he's talking

11      about.  They want to assume that just because of above

12      he's asking him about the stock -- about the stock

13      purchase that he means at that point in time.  But the

14      lawyer was not clear enough, and to use this in this

15      case against the defendant is improper.

16                    THE COURT:  Mr. Ignall, I don't think

17      that I have a problem with this in the context of what

18      did you understand because we're referencing to when

19      the alleged crime occurred.

20                    MR. IGNALL:  Yes.  And -- I probably

21      don't want to argue against myself if the Court's

22      already ruled.  So --

23                    MR. DUNCAN:  Your Honor, may I add one

24      thing to that?  It --

25                    THE COURT:  Yes, sir.

 1                    MR. DUNCAN:  The very answer shows why

 2      this is improper.  He says, "it's an accounting

 3      issue."  He didn't know that in 2009.  That's been all

 4      the testimony.  So his answer, it's an accounting

 5      issue, shows what he has learned subsequently.  That's

 6      the point.

 7                    THE COURT:  All right.  What have all

 8      the questions been to the various witnesses presented

 9      by the government been, as in what if this was an

10      accounting issue as opposed to a criminal issue.

11                    MR. DUNCAN:  Well, what --

12                    THE COURT:  Because he disagreed with

13      how he was supposed to report this.

14                    MR. DUNCAN:  What everyone --

15                    MR. IGNALL:  Your Honor --

16                    MR. DUNCAN:  -- learned that Mr. Shuman

17      told them in 2010 was it's an accounting issue, and

18      that's what everyone has said is, well, that's what we

19      learned in 2010.  We didn't know that in 2009 because

20      Mr. Shuman hadn't opined on it yet.  We didn't get

21      the, it's an accounting issue, until 2010 after the

22      facts of this case.

23                    THE COURT:  Mr. Ignall, you were saying

24      something?

25                    MR. IGNALL:  One, I -- my understanding

1    was we've agreed that this isn't only admissible

2    against Mr. Egan's client and --

3                    MR. DUNCAN:  It's a conspiracy, Your

4    Honor.

5                    UNIDENTIFIED SPEAKER:  Alleged.

6                    MR. DUNCAN:  Alleged.  Thank you.

7                    MR. IGNALL:  But we're back to, yes,

8    there may be something that Mr. Egan can argue about

9    why the jury should draw a different inference.  But I

10   think in the context it's quite clear that he's

11   talking about Mr. Levin's loan.  He's talking about

12   not knowing the purpose of Mr. Levin's loan.  He's

13   saying, as of 2012 he understands the accounting

14   treatments, which the past tense makes it seem like he

15   certainly understood it earlier, which is an inference

16   the jury can draw.

17                    But the jury can also use that to

18   determine that he's making a false exculpatory

19   statement in 2012 knowing that there's an accounting

20   treatment if it's -- the loan is to the purpose of

21   buying stock and now he's saying, I didn't know what

22   the purpose of the loan was.  I think that goes to his

23   consciousness of guilt.

24                    THE COURT:  Disallowed.  You have an

25   exception.

1                    MR. IGNALL:  The next item, Your Honor,

2     is -- begins at page 69, line 10 and it goes through

3     73, line 17.

4                    THE COURT:  Just one second, please.

5          (Pause)

6                    THE COURT:  69, 10.

7                    MR. IGNALL:  69, 10.  Now we have made

8     a -- there are three lines in there that I've talked

9     to Mr. Egan about that I do not think are appropriate

10    for us to play.

11                   THE COURT:  And which are they?

12                   MR. IGNALL:  It's lines -- on page 69

13    it's lines 16 through 18.

14                   THE COURT:  And the -- is that

15    relevant?  First of all, and the relevance --

16                   MR. IGNALL:  I don't think 16 to 18 is

17    relevant and I think it -- talking about a suspicious

18    activity would be unfair to the defense so we're not

19    going to play that.

20                   THE COURT:  And what's the relevance of

21    -- starting with question 10.

22                   MR. IGNALL:  The question -- this all

23    goes into what Mr. Hartline claims he knew or didn't

24    know about the -- within loan transaction back in June

25    of 2009.

1               MR. EGAN:  May I -- what page are we at

2     now?

3               UNIDENTIFIED SPEAKER:  69.

4               THE COURT:  Page 69, question -- line

5     10, "Question:  Were you aware that the purchase of

6     Mr. Levin's 5 million of stock in June of 2009 was

7     paid for by wire from Gibraltar Bank to Nova?"

8               Now my question is what's the relevance

9     of that?

10              MR. IGNALL:  Well, it goes into the

11    context of the rest of the discussion where he again

12    says he doesn't know about the connection between Mr.

13    Levin's $5 million loan and his $5 million purchase of

14    Nova Financial Holdings stock.  It's all part of the

15    same discussion that goes on through page 73.

16              THE COURT:  It appears to be a

17    collateral issue to me, Counsel, but --

18              MR. IGNALL:  Well, maybe --

19              THE COURT:  -- I'll hear from --

20              MR. IGNALL:  Let me have one moment,

21    Your Honor.

22              THE COURT:  Yes, sir.

23              MR. IGNALL:  Let me talk to Ms.

24    (indiscernible) and see if maybe we can --

25              THE COURT:  Take your time.

1          MR. IGNALL:  -- (indiscernible)

2     something.

3          THE COURT:  And, Mr. Schwartz, I will

4     address the whole issue of the fact that I denied a

5     motion for severance and everything else that goes

6     with that.

7        (Pause)

8          MR. IGNALL:  May we have one moment to

9     step outside, Your Honor?

10          THE COURT:  I'm sorry.

11          MR. IGNALL:  Can I confer with counsel

12     -- co-counsel --

13          THE COURT:  Oh, sure.

14          MR. IGNALL:  -- outside for a moment?

15          THE COURT:  We're in recess.

16          THE COURT:  All right.  Thank you.

17        (Recessed at 2:15 p.m.; reconvened at 2:18 p.m.)

18        (Jury not present)

19          MR. IGNALL:  All right, Your Honor.

20          THE COURT:  Ready?

21          MR. IGNALL:  We have -- on this side

22     with the reference to this clip, all we would propose

23     to play is from line 71, line 18 --

24          THE COURT:  You mean page --

25          MR. IGNALL:  Page -- I'm sorry.  Page

1      71 --

2                    THE COURT:  Wait a minute now.

3                    MR. IGNALL:  So the stuff we were just

4      looking about at Gibraltar Bank --

5                    THE COURT:  Yes, sir.

6                    MR. IGNALL:  -- we're not going to play

7      that.

8                    THE COURT:  All right.

9                    MR. IGNALL:  So we go up to page 71,

10     line 18 and we would only go through page 72, line 5.

11                   THE COURT:  That's what you're

12     excising?

13                   MR. IGNALL:  No.  That's all we would

14     play, correct?  Everything else we are not going to

15     play.

16                   THE COURT:  Let me have it again, then.

17     I'm sorry.  I was listening with a different ear.  Say

18     that again, please.

19                   MR. IGNALL:  So what we're proposing to

20     play is from page 71, line 18 through page 72, line 5.

21                   THE COURT:  All right.  Counsel?

22                   MR. EGAN:  I'm just reading it, Your

23     Honor.

24                   THE COURT:  Okay.  Go ahead.

25          (Pause)

```
 1                      MR. EGAN:  Well, Your Honor, I would

 2      object to this on the same basis as before.  If it's

 3      going to be played, I believe it would be appropriate

 4      to play through page 73, line 7 because it gives an

 5      incorrect impression.

 6                      THE COURT:  Counsel.

 7                      MR. IGNALL:  I have no objection to

 8      that.  That's fine.

 9                      THE COURT:  All right.

10                      MR. SCHWARTZ:  If I may be heard, Your

11      Honor?

12                      THE COURT:  Yes, sir.

13                      MR. SCHWARTZ:  The problem with this is

14      it's double -- it's at least one level of hearsay, but

15      it's potentially double hearsay.  I mean, it's -- Mr.

16      Levin said to somebody, either directly to Mr.

17      Hartline or someone else, i.e. Mr. Bekkedam, that

18      these are the condition.

19                      THE COURT:  Well, Mr. Hartline has

20      given his statement under oath.

21                      MR. SCHWARTZ:  The -- this is not a

22      (indiscernible).  It's a Crawford issue, Your Honor,

23      and whether it's under oath or not the liability

24      according to the -- the Crawford Court made a very

25      clear distinction between what the liability under a
```

 1    rule of evidence means and what the liability for the

 2    purposes of a criminal trial means.  And Justice Golia

 3    (ph) said the only way something can be reliable to be

 4    used against a defendant in a criminal trial if it's

 5    subject to -- is if it's subject to the crucible of

 6    cross-examination.

 7              And there was nobody there standing in the

 8    shoes of Mr. Bekkedam let alone Mr. Bekkedam's counsel

 9    to try to clear this up or clean this up.  There's

10    nobody who could do that.  A hearsay exception, a

11    state hearsay exception rule --

12              THE COURT:  I don't disagree with you.

13    Just one moment, please.  I'm looking at this in the

14    context of this being incriminating of Mr. Bekkedam.

15              MR. SCHWARTZ:  Well, it came -- it's --

16    the evidence that has been presented by the government

17    suggested that there's a whisper down the lane or a

18    telephone process that goes on.  Levin to Prevay (ph),

19    Prevay to Rovin, Rovin as Bekkedam's representative,

20    Rovin to Brian.  What has been created is the

21    inference that all -- everything that Mr. Hartline

22    allegedly knew came from the Bekkedam camp, and here

23    the discussion is that Mr. Hartline knew it and heard

24    about it from Mr. Bekkedam.

25              And I would want to be able to clear

1    that up if I was a lawyer there at that deposition to

2    see if I could re-characterize that.  But I'm not able

3    to do that and I can't do that now of course because

4    Mr. Hartline is --

5                    THE COURT:  Or you would have said no

6    questions since his name was never mentioned during

7    the course of the examination.

8                    MR. SCHWARTZ:  I would have --

9                    THE COURT:  You could have done that.

10                    MR. SCHWARTZ:  I could have, but the

11    problem is that that's what the trial's about and I

12    get to make that decision now.  And that's what

13    Justice Golia was saying, is it doesn't matter how

14    strongly reliable it is under a state rule of

15    evidence.  The question is do I get to ask the

16    question now.  He said no, and I believe that was a

17    Third Circuit case that he was reversed

18    (indiscernible).

19                    But he -- I think he relied on the

20    Third Circuit case in coming to his finding, plus a

21    lot of old English law which none of us

22    (indiscernible).  But he --

23                    THE COURT:  Speak for yourself.

24                    Mr. Ignall.

25                    MR. IGNALL:  We're not introducing this

1   against Mr. Bekkedam.  So --

2                   THE COURT:  Why would the instruction

3   that was tendered to me early on in this trial not

4   suffice in terms of what the jury can consider and not

5   consider?

6                   MR. SCHWARTZ:  Because it's a

7   confrontation clause issue and the Supreme Court in

8   Richardson versus Morris (ph), 391 U.S. 123 to 126

9   says very clear that jury instructions usually work,

10  but this is the narrow exception where --

11                  THE COURT:  Well, they weren't talking

12  about this trial.  And if I were to accept your

13  proffer here on this, then they wouldn't -- every case

14  would have to result in a granting of a motion for

15  severance, Counsel.

16                  MR. SCHWARTZ:  It would -- you would

17  need a second jury to hear this part of it.  That's

18  correct, Your Honor.

19                  THE COURT:  Well, I respectfully

20  disagree.

21                  MR. SCHWARTZ:  I -- well, that's --

22                  THE COURT:  But you --

23                  MR. SCHWARTZ:  -- that's why --

24                  THE COURT:  -- you have an exception as

25  well.  The point that I'm making simply is this.  I've

1    heard your argument.  I disagree.  You have an

2    exception.  However, I will be more than happy to read

3    to the jury a limiting instruction, a cautionary

4    instruction, specifically that this information does

5    not pertain to Mr. Bekkedam.

6              MR. SCHWARTZ:  We would like to ask --

7    first of all, thank you and thank you for the

8    exception.

9              Secondly, we would like to ask for an

10   additional (indiscernible) which we suggested to the

11   government and was rejected in that there be an

12   additional cross-designate -- an additional piece of

13   the video played that doesn't go all the way, but at

14   least helps allow Mr. Bekkedam to be heard as if we

15   were here on cross-examination.

16             There's a section of the testimony in

17   the deposition at page 22 -- or 77.  I can read it to

18   Your Honor or --

19             THE COURT:  Please.

20             MR. SCHWARTZ:  Page 77, line 22:

21             "Question:  And did Mr. Bekkedam play

22        any role in assisting the bank in applying

23        for TARP loans?"

24             "Answer:  No."

25             That's the kind of cross-examination I

1    would like asked if Mr. Hartline were up on the stand

2    giving this testimony now.  It doesn't completely

3    solve the problem, but at least it helps go in that

4    direction.

5              And so in addition to a curative

6    instruction we would request that page 77, lines 22 to

7    24 be played.

8              THE COURT:  What does 25 mean, line 25,

9    he wrote -- "Mr. Bekkedam wrote on December 14th, 2009

10   to Ms. Musser (ph) and others that my time last week"

11   -- that has to do with the case that was at that time

12   the focus of the deposition.

13             MR. SCHWARTZ:  Right.  Yes.  That's --

14             THE COURT:  All right.

15             MR. SCHWARTZ:  -- that's correct, Your

16   Honor.

17             THE COURT:  Fair enough.

18             Mr. Ignall, any objection to that?

19             MR. IGNALL:  Absolutely.

20             THE COURT:  Why?

21             MR. IGNALL:  It's hearsay.  This is

22   being introduced as a statement of a party opponent

23   against Mr. Hartline.  It's not being introduced at

24   all against Mr. Bekkedam.  We're going to have a

25   cautionary instruction that the jury may not consider

1    it against Mr. Bekkedam.  Nothing in the statement

2    mentions Mr. Bekkedam.  It does not open the door for

3    Mr. Bekkedam to then try and introduce -- to cherry

4    pick things from this that he thinks are helpful that

5    we can't then cross-examine.  If Mr. Hartline were to

6    testify, he can certainly ask that question.  If there

7    is some other way to introduce that, he's welcome to

8    do that.  But I'm not aware of any circumstance where

9    a non-testifying co-defendant's statement has to

10   include something that benefits the co-defendant.

11              MR. SCHWARTZ:  Cherry-picking is my

12   choice, not the government's choice, Your Honor.

13   That's what cross-examining is all -- cross-

14   examination is all about, finding the good stuff that

15   does damage control to what the government presents.

16              THE COURT:  But as a matter of rule of

17   evidence how is it admissible?

18              MR. SCHWARTZ:  As a matter of a rule of

19   evidence, Your Honor, it's sworn testimony by Mr.

20   Hartline so if it was reliable when the government's

21   offering it, it's reliable -- that's -- his answer to

22   this question is just as reliable.

23              THE COURT:  Well, his (indiscernible)

24   against the interest, a statement against interest,

25   I'm sorry.  But here --

1                    MR. SCHWARTZ:  It's prior sworn

2      testimony.  It doesn't have to be against interest or

3      (indiscernible) because it's done under oath.  We're

4      not talking about the statement of an agent like we

5      were yesterday.

6                    MR. IGNALL:  Prior testimony is only

7      admissible if the witness takes the stand as a prior

8      inconsistent statement.  This is clearly hearsay.  It

9      can be introduced against a party opponent by the

10     government.  It can't be introduced by a co-defendant.

11                   THE COURT:  That's my understanding.

12     I'm still --

13                   MR. IGNALL:  Okay.

14                   MR. SCHWARTZ:  I believe it's --

15                   THE COURT:  -- waiting to be persuaded

16     otherwise.

17                   MR. SCHWARTZ:  I believe it's Rule 804,

18     prior testimony.  Let me look.

19          (Pause)

20                   MR. SCHWARTZ:  That's the best offer --

21     best I can offer you, Judge.

22          (Laughter)

23                   MR. SCHWARTZ:  I wish there was another

24     rule I could say, but that's the one (indiscernible).

25                   THE COURT:  I appreciate your candor.

1              All right.  It's -- that request is

2    denied, but I'm going to give the cautionary and

3    limiting instruction that specifically excludes Mr.

4    Bekkedam from this testimony.

5              MR. SCHWARTZ:  We've shared one with

6    the government, Your Honor, quickly if we can hand it

7    up.

8              MR. IGNALL:  We have no objection to

9    it.

10             MR. SCHWARTZ:  I'm sorry.  Mr. Engle,

11   did you want to address it?

12             MR. ENGLE:  Yeah, if I could, Your

13   Honor.  The one I prepared it was -- I looked at the

14   limiting instructions that the Third Circuit model

15   instructions suggest for this circumstance.  There are

16   really two that seem applicable and, obviously, Your

17   Honor will decide which one you want to use.

18             2.12 is limited admissibility and 2.28

19   is where you have a prior statement of the defendant

20   introduced in a multi-defendant trial.

21             THE COURT:  Which would you want me to

22   issue?

23             MR. ENGLE:  I think, Your Honor, if you

24   would -- in view the 2.12 instruction is -- I

25   highlighted it in yellow to make it case specific.  If

1    Your Honor is satisfied with that language, we would

2    ask that you read that prior to the clips being

3    played.

4                    One of the instructions, I believe,

5    that we included in our request for points of charge

6    at the close of the case would mirror more 2.28 about

7    how to handle statements that are made and introduced

8    in a multi-defendant trial and how they're only

9    admissible against one defendant and not the other.

10                   THE COURT:  And the second one or the

11   latter would come at the end in my --

12                   MR. ENGLE:  It's --

13                   THE COURT:  -- general instructions?

14                   MR. ENGLE:  It's a bit different than

15   this.  It's a little longer, Your Honor, but we

16   included it in what we requested --

17                   THE COURT:  At the end of the trial.

18                   MR. ENGLE:  Yes, sir.

19                   THE COURT:  All right.

20                   MR. ENGLE:  So I guess what we would

21   ask for is 2.12 to be read to the jury prior to the

22   clips being played.

23                   MR. IGNALL:  We have no objection to

24   that, Your Honor.

25                   THE COURT:  All right.

1                    MR. ENGLE:  Thank you.

2                    THE COURT:  Thank you.

3                    MR. DUNCAN:  And, Your Honor, just one

4    other issue and that -- I've heard the Court's ruling

5    and respect it and I'm not going to argue.  We would

6    move for a severance at this point based on the

7    Court's ruling.

8                    THE COURT:  All right.  Denied.

9                    MR. DUNCAN:  Thank you, Your Honor.

10                   THE COURT:  Exception.

11                   MR. IGNALL:  All right.  May we have

12   about ten minutes to see if we can excise what we've -

13   -

14                   THE COURT:  Sure.

15                   MR. DUNCAN:  May we have an exception,

16   Your Honor?

17                   THE COURT:  I did -- I gave it to you.

18                   MR. DUNCAN:  Thank you, Your Honor.

19                   THE COURT:  Yes, sir.

20                   MR. IGNALL:  Could I ask for a ten-

21   minute recess to --

22                   THE COURT:  Sure.

23                   MR. IGNALL:  -- so we can do the

24   excising and make sure --

25                   THE COURT:  Absolutely.

```
 1                    MR. IGNALL:  -- we don't have anything
 2      in there --
 3                    THE COURT:  Absolutely.
 4                    MR. IGNALL:  -- that we're not
 5      intending to -- you have something else?
 6                    MR. EGAN:  Yeah.  I want to make sure
 7      you got it right.
 8                    MR. IGNALL:  Yeah.  No.  I'm sure
 9      you'll keep an eye on me.  I'm not worried about that.
10                    MR. EGAN:  Does Your Honor -- did you
11      keep -- I just want to make sure that what they do is
12      consistent with Your Honor's rulings.  That's all.
13                    THE COURT:  I did not record it.  I'm
14      reading from my iPad and I didn't annotate my iPad as
15      I was making these rulings.  I was --
16                    MR. IGNALL:  Well, I --
17                    THE COURT:  -- relying on you all to do
18      that.
19                    MR. IGNALL:  -- if we have a ten-minute
20      recess or so I'll try and --
21                    THE COURT:  Take your time.  All right.
22                    MR. IGNALL:  -- we'll excise it and
23      make sure that Mr. Egan's --
24                    THE COURT:  Just let me know.
25                    MR. IGNALL:  -- okay with it.
```

Page 35

1                    MR. EGAN:  Thank you, Your Honor.

2                    THE COURT:  Thank you.

3          (Recessed at 2:29 p.m.; reconvened at 2:45 p.m.)

4          (Jury not present)

5                    UNIDENTIFIED SPEAKER:  Two minutes?

6                    THE COURT:  No problem.

7                    UNIDENTIFIED SPEAKER:  Thank you, Your

8      Honor.

9                    UNIDENTIFIED SPEAKER:  Thank you, sir.

10         (Pause)

11                   THE CLERK:  Your Honor, they're back.

12                   MR. IGNALL:  Thank you, Your Honor.

13                   UNIDENTIFIED SPEAKER:  Thank you, Your

14     Honor.  Sorry about that.

15                   THE COURT:  Not a problem.

16                   MR. IGNALL:  Good timing.

17                   THE COURT:  No problem.  I understand

18     that -- you may be seated.  I understand that there's

19     a question about what I said when I said -- who I was

20     speaking to when I said --

21                   MR. IGNALL:  Yes.

22                   THE COURT:  What did I say?  I said --

23                   MR. IGNALL:  You said it's disallowed.

24     You have an --

25                   THE COURT:  Disallowed.

```
 1                    MR. IGNALL:  -- exception.

 2                    THE COURT:  The admission of the video

 3       or record, the transcript, is disallowed.

 4                    MR. IGNALL:  Disallowed on what basis?

 5       I'm misunder --

 6                    THE COURT:  Well, now let me go back in

 7       time now.  Let me go back to the actual --

 8                    MR. IGNALL:  Yeah, because --

 9                    MR. EGAN:  Well, Your Honor --

10                    MR. IGNALL:  -- I -- right before Your

11       Honor said that I thought Your Honor was leaning --

12       was indicating --

13                    THE COURT:  I was, but I was persuaded

14       after I heard the last word from --

15                    MR. IGNALL:  Well --

16                    THE COURT:  -- defense.

17                    MR. IGNALL:  Well, then, I didn't

18       realize I -- what was the --

19                    MR. EGAN:  And, Your Honor, just

20       because Mr. Ignall didn't understand what you said is

21       not an opportunity for him to re-argue this issue.

22                    THE COURT:  No.  It's done now.  It's

23       done.  But --

24                    MR. EGAN:  Thank you.

25                    THE COURT:  -- the question is, is did
```

1    you get a chance to excise it from the presentation?

2                    MR. IGNALL:  Yes.  I -- Your Honor, I

3    --

4                    THE COURT:  Be my guest, Mr. Ignall.

5                    MR. IGNALL:  May I ask --

6                    THE COURT:  And then I'll deny it.  You

7    only have --

8                    MR. IGNALL:  Okay.  But the basis --

9                    THE COURT:  Go ahead, again.

10                    MR. IGNALL:  -- was because my

11   understanding was that --

12                    THE COURT:  What page again?  I'll tell

13   you.  No problem.

14                    MR. IGNALL:  It's page 55, line 16

15   through 57, line 10.

16                    MR. EGAN:  This was the did your -- did

17   you --

18                    THE COURT:  Exactly.  The onus should

19   not be on a defendant to disprove or to explain or

20   clarify that which is introduced that is confusing ab

21   initio.  You follow that?

22                    MR. IGNALL:  I follow that.  I'm not

23   sure I agree with that, Your Honor.

24                    THE COURT:  Well, that's my problem --

25                    MR. IGNALL:  Okay.

Page 38

1                    THE COURT:  -- but that's how I'm

2     ruling.

3                    MR. IGNALL:  Okay.  I understand, Your

4     Honor.  Thank you.

5                    THE COURT:  Okay.

6          (Pause)

7                    THE COURT:  So, Counsel, how much more

8     time do you now have -- do you need?

9                    MR. IGNALL:  Well, give us a moment,

10    Your Honor.

11                   THE COURT:  All right.

12                   MR. EGAN:  I think we're close, Your

13    Honor.

14                   THE COURT:  All right.

15         (Recessed at 2:48 p.m.; reconvened at 2:50 p.m.)

16         (Jury not present)

17                   MR. IGNALL:  Your Honor?

18                   THE COURT:  Yes, sir.

19                   MR. IGNALL:  I know Mr. Egan is going

20    to be mad at me, but I want to --

21                   THE COURT:  Who is going to be mad at

22    you?

23                   MR. IGNALL:  Mr. Egan, but I would like

24    to revisit the Court's ruling.  And maybe there's a

25    way --

```
 1                    THE COURT:  Let me hear you.

 2                    MR. IGNALL:  Although I do think the

 3      accounting issue is in the past tense, but I

 4      understand the Court's ruling.  We would propose then

 5      to play from line -- from page 56, line 2 through 57,

 6      line 10, which is only talking about Mr. Levin and it

 7      ends up with:

 8                         "And nobody ever brought to your

 9                    attention that was, in fact, the intent of

10                    Mr. Levin's loan, correct?

11                         "That is correct.

12                         "Was Mr. Levin's purchase of stock

13                    reported as part of the bank's capital in

14                    the holding company?

15                         "Yes."

16           (Pause)

17                    THE COURT:  56, line 10?

18                    MR. IGNALL:  No.  56, line 2 --

19                    THE COURT:  Oh, 2, okay.

20                    MR. IGNALL:  -- through 57, line 10 --

21                    THE COURT:  All right.

22                    MR. IGNALL:  -- Your Honor.

23                    THE COURT:  Let me just read the other

24      two.

25                    MR. IGNALL:  Taking out the accounting
```

1    questions.

2        (Pause)

3              THE COURT:  What is your position, Mr.

4    Ignall, as to when he knows this?

5              MR. IGNALL:  It doesn't matter.  Well,

6    the position -- our position is this goes to show that

7    he knew that at the time.  Why --

8              THE COURT:  Knew that at what time,

9    2009 or --

10             MR. IGNALL:  2009.  That's what --

11             THE COURT:  -- when he gave this

12   deposition?

13             MR. IGNALL:  Both.  It's not about what

14   he knows.  This is going into a false exculpatory

15   statement.

16             MR. EGAN:  Your Honor --

17             MR. IGNALL:  It's the same --

18             THE COURT:  Let him finish, Mr. Egan.

19             MR. EGAN:  I'm sorry.

20             MR. IGNALL:  This is going to a false

21   exculpatory statement.  Why is this witness going to

22   say I didn't know the purpose of Mr. Levin's capital

23   investment and we included it in the stocks and the

24   bank's capital after the fact unless he has a

25   consciousness of guilt.  I understand there could be

1    another explanation.  But that's true in any post-

2    defense admission or false exculpatory statement.

3              And the defendant can certainly then

4    introduce evidence to show something different.  But

5    it doesn't make it inadmissible and I think it

6    prejudices the government to not be allowed to put the

7    defendant's own words where he is making a false

8    exculpatory statement after the fact before the jury.

9              THE COURT:  This begins on 56, line 2

10   with a question by counsel?

11             MR. IGNALL:  Correct, Your Honor.

12             MR. EGAN:  Yes, Your Honor.  And the

13   question is about how capital is treated.  And, again,

14   it's -- there's no context.  It's the exact same

15   reason that Your Honor excised line 16.  There's no

16   difference between line 2 and line 16 except for it's

17   even less clear.

18             The question, "If it's disclosed that

19   the capital was financed by the bank in question, then

20   the bank cannot report the capital for regulatory

21   capital requirements; is that right," that's something

22   that he learned after 2009.  And for them to be able

23   to play that and have him say, that's my

24   understanding, it's the exact same thing you already

25   ruled on, Your Honor.  He's just re-arguing this.

Page 42

```
 1                    THE COURT:  All right.  The motion for
 2       reconsideration is denied.
 3                    MR. IGNALL:  All right.
 4                    MR. EGAN:  Thank you, Your Honor.
 5                    MR. IGNALL:  Thank you, Your Honor.
 6                    THE COURT:  All right.
 7                    MR. IGNALL:  All right.
 8                    MR. EGAN:  And I think based on that
 9       we're ready, I think.
10                    MR. IGNALL:  Well, let me -- let's just
11       make sure we have the clip ready.
12                    THE COURT:  How long is this, Counsel?
13                    MR. IGNALL:  It's going to be just a
14       few minutes, Your Honor.  I mean, the total -- all the
15       clips together will probably be five minutes or less.
16                    THE COURT:  All right.
17            (Pause)
18                    MR. IGNALL:  We're ready, Your Honor.
19                    THE COURT:  Okay.  And I will read the
20       limiting instruction before the video is played.
21                    MR. EGAN:  Thank you, Your Honor.
22                    MR. IGNALL:  Your Honor, there's also a
23       stipulation that we want to read before playing this.
24                    THE COURT:  That you're going to read?
25                    MR. IGNALL:  Yes, about just the date
```

Page 43

```
 1    of the --

 2                    THE COURT:  Okay.

 3                    MR. IGNALL:  -- the date of the

 4    deposition.

 5                    THE COURT:  Fine.

 6         (Pause)

 7                    THE CLERK:  All rise.

 8         (Jury present)

 9                    THE COURT:  You may be seated.  Good

10    afternoon.

11                    All right.  Members of the jury, I have

12    another instruction that I'm going to give to you at

13    this time.  It is as follows:

14                    You are about to hear certain portions

15    of deposition testimony given at a prior time by Mr.

16    Hartline.  It will come to you by way of video.  You

17    can consider this deposition testimony and the

18    statements made by Mr. Hartline only in the case

19    against Mr. Hartline.  You must not consider the --

20    that evidence that you're about to see or hear against

21    Mr. Bekkedam.  Each defendant is entitled to have his

22    case decided solely on the evidence which applies to

23    him.

24                    Mr. Ignall.

25                    MR. IGNALL:  Yes.  And we have a
```

Page 44

1    stipulation I would like to read about this, Your

2    Honor.

3                    THE COURT:  All right.

4                    MR. IGNALL:  This has to do with

5    Exhibit 194 and 194-A.  It's the transcript that --

6    Exhibits 194 and 194-A are a transcript and video

7    recording of a deposition of Brian Hartline taken on

8    April 13th, 2012 in a civil matter.

9                    THE COURT:  You may proceed.

10                   MR. IGNALL:  All right.  May we play

11   the -- just the beginning clip there (indiscernible).

12       (Video played)

13                   THE COURT:  I take it the volume will

14   be increased.

15                   MR. IGNALL:  Let me try to move a

16   microphone and see --

17                   THE COURT:  Just -- could you pause it

18   a moment, please?

19                   MR. IGNALL:  (Indiscernible) and see if

20   this will help.

21       (Pause)

22                   THE COURT:  All right.

23                   MR. IGNALL:  Turn it up.  All right.

24   Let's try and play the next clip and see if we can --

25   see how audible we can make it.

Page 45

1          (Video played)

2                    THE COURT:  Let me just stop you there.

3                    Ladies and gentlemen, can you see that

4      and/or hear it clearly?

5                    UNIDENTIFIED JUROR:  I can see better

6      than I can hear it.

7          (Laughter)

8                    THE COURT:  And are you able to see it

9      so far, sir?

10                   UNIDENTIFIED JUROR:  Yeah.  I can see

11     it.

12                   THE COURT:  Okay.  If you cannot,

13     please let me know.

14                   All right.  You may continue.

15         (Video played)

16                   MR. IGNALL:  All right.  Let's play the

17     next clip, page 18.

18         (Video played)

19                   MR. IGNALL:  All right.  And let's play

20     the next clip that starts on page 54.

21         (Video played)

22                   MR. IGNALL:  And now let's play the

23     last clip.  I think it begins on page 71.

24         (Video played)

25                   MR. EGAN:  That the last clip?

1                    MR. IGNALL:  All right.  That's the

2      last clip, Your Honor.

3                    THE COURT:  All right.

4                    MR. IGNALL:  May we have one moment

5      with Counsel, Your Honor, regarding exhibits?

6                    THE COURT:  Yes, sir.

7                    MR. EGAN:  And actually, Your Honor,

8      maybe we can do this -- speak briefly at sidebar?

9                    THE COURT:  Surely.

10         (At sidebar)

11                    MR. IGNALL:  Your Honor, there's -- the

12     government (indiscernible) exhibits into evidence and

13     there's a big long list that we have to all cross-

14     check and the cross-checking hasn't been done.  I was

15     wondering if there's a way that it can be done that

16     they can move them in provisionally based upon us

17     coming to agreement (indiscernible) already been

18     admitted, a stipulation so that the jury can go home

19     and not be stuck here.

20                    THE COURT:  Sounds good to me.

21                    MR. EGAN:  I don't have any problem,

22     but I want to be clear (indiscernible) opposition

23     (indiscernible) four exhibits we're going to object

24     to.

25                    THE COURT:  Say that again.

```
 1                    MR. EGAN:  There are at least four
 2      exhibits we're going to object to admission.
 3                    THE COURT:  Well, he was saying
 4      conditional.
 5                    MR. EGAN:  Yeah.  I just wanted to -- I
 6      didn't want to --
 7                    THE COURT:  Okay.
 8                    MR. EGAN:  -- I don't want to --
 9                    MR. IGNALL:  If we try we can read
10      through the list (indiscernible).  But he agreed with
11      one but not another.
12                    THE COURT:  Okay.  So but now once
13      that's done and formally rest (indiscernible) --
14                    MR. IGNALL:  Yes.
15                    THE COURT:  -- I'm going tell the jury
16      that we have moved more expeditiously than we
17      anticipated, notwithstanding the sidebars.  Okay.  But
18      that as we (indiscernible) they will be required to
19      come back on Monday, they can take an extra day off,
20      and we'll start Monday very promptly (indiscernible).
21      9:00 Monday morning.
22                    MR. IGNALL:  Okay.
23                    MR. EGAN:  Thank you, Your Honor.
24                    THE COURT:  Okay.
25                    MR. IGNALL:  Yes, sir.
```

```
 1          (Sidebar concluded)

 2                    MR. IGNALL:  Your Honor, pursuant to

 3      our understanding at sidebar, the Government moves the

 4      following exhibits into evidence:  53, 56, 58, 59 --

 5                    THE COURT:  Counsel, I'm sorry.  I

 6      thought you had agreed that we would --

 7                    MR. EGAN:  Yeah.

 8                    THE COURT:  -- do this conditionally.

 9                    MR. IGNALL:  Yeah.  But that's -- but

10      with that condition I --

11                    THE COURT:  Right.  But that they would

12      be enumerated Monday, if necessary.

13                    MR. IGNALL:  Oh, we -- okay.

14                    MR. EGAN:  That's amenable, Your Honor.

15                    THE COURT:  Pardon me.

16                    MR. EGAN:  That is amenable.

17                    MR. IGNALL:  But can we approach at

18      sidebar, Your Honor?

19                    THE COURT:  Sure.  Excuse us.

20                    MR. IGNALL:  Sorry about that.

21          (At sidebar)

22                    MR. IGNALL:  Maybe I misunderstood.

23                    UNIDENTIFIED SPEAKER:  Yeah.  I think

24      what Your Honor -- I'm sorry.  I'll wait for everyone

25      to get up here.
```

```
 1                    MR. IGNALL:  Yeah.

 2                    THE COURT:  I thought you --

 3                    UNIDENTIFIED SPEAKER:  No.  No.  I

 4      think --

 5                    MR. IGNALL:  (Indiscernible)

 6                    UNIDENTIFIED SPEAKER:  No.  No.  No.

 7      All of our -- we -- I understand what Mr. Ignall was

 8      thinking.  We have a list, a very large list --

 9                    THE COURT:  Right.

10                    UNIDENTIFIED SPEAKER:  -- of exhibits

11      that have already been moved into evidence.

12                    THE COURT:  Uh-huh.

13                    UNIDENTIFIED SPEAKER:  These are the

14      outstanding exhibits that the government would like to

15      move into evidence.  They may agree.  They may not.

16      So what we are asking, proposing, is that we read

17      these in and conditionally accept the -- you know, on

18      the condition that there may be exceptions to that.

19      But --

20                    MR. IGNALL:  That --

21                    UNIDENTIFIED SPEAKER:  -- at this point

22      we're going to move them in --

23                    MR. IGNALL:  So that we can rest and

24      then --

25                    UNIDENTIFIED SPEAKER:  -- so that we
```

1    can rest technically.

2                 MR. IGNALL:  -- if there's an objection

3    the Court can rule on that.  We will not show anything

4    to the jury or argue it without, you know, the Court

5    resolving the objection.

6                 THE COURT:  All right.  That's fine.

7    Now one other thing and that is you should come to

8    some agreement before I'll resolve the Rule 29 motion

9    as to which exhibits I can consider.

10                MR. EGAN:  That's, I think, the

11   discussion we are going to --

12                THE COURT:  Okay.  Fair enough.

13                MR. IGNALL:  Thank you.

14                MR. SCHWARTZ:  And just -- I just want

15   to be clear.  This is the end.  This is the list.

16   There's nothing more as far as you know.

17                UNIDENTIFIED SPEAKER:  Not as far as we

18   know.

19                MR. SCHWARTZ:  Thank you.

20                THE COURT:  And then you're going to

21   call --

22                MR. IGNALL:  And we'll rest on

23   (indiscernible).

24                UNIDENTIFIED SPEAKER:  (Indiscernible).

25                THE COURT:  All right.

1    (Indiscernible).

2        (Sidebar concluded)

3                THE COURT:  We're straight now.  All

4    right.

5                MR. IGNALL:  Let me try it again.  All

6    right.  So subject to the agreement we reached, the

7    government moves the following exhibits into evidence:

8    53, 56, 58, 58-A, 83, 107, 107-A, 112, 126, 162, 165,

9    168 -- and now I'm out of order.  I'm sorry -- 71,

10   166, 177, 179, 184 and then the portions of 194 and

11   194-A that we just played.

12               THE COURT:  All right.  So stipulated

13   conditionally?

14               MR. EGAN:  Yes, Your Honor,

15   conditionally.

16               MR. SCHWARTZ:  Conditionally, Your

17   Honor.  Yes, sir.

18               THE COURT:  All right.

19               UNIDENTIFIED SPEAKER:  Thank you, Your

20   Honor.  The United States rests.

21               THE COURT:  All right.

22               Now members of the jury, the Government

23   has rested its case.  They've done so notwithstanding

24   all of our sidebar conferences and delayed openings a

25   day early.  Now we have the task of dealing with legal

1     issues that are my responsibility.

2               As a result, thereof, you will now get

3     two days off, tomorrow and Friday, but you're to

4     report back here on Monday morning and please report

5     at 9:00.  All right.

6               Again, do not discuss the testimony

7     amongst yourselves.  Don't do any research or

8     investigation on your own.  Have a wonderful weekend.

9     We'll see you on Monday morning.

10              Thank you.

11        (Jury leaves the courtroom)

12              THE COURT:  All right.  Counsel and I

13    are going to be here for a little bit, but the case is

14    adjourned for the day.  All right.  So if you in the

15    audience want to leave, you can.

16              And, Counsel, you may be seated.

17              MR. SCHWARTZ:  Your Honor, given that

18    we're just going to be doing some housekeeping matters

19    --

20              THE COURT:  Yes, sir.

21              MR. SCHWARTZ:  -- may Mr. Bekkedam be

22    excused?

23              THE COURT:  Yes, sir.

24              MR. SCHWARTZ:  Thank you, Your Honor.

25        (Whereupon, proceedings concluded at 3:14 p.m.)

Page 53

```
 1              C E R T I F I C A T I O N

 2

 3        I, Sherri L. Breach, CERT*D-397, certified that

 4    the foregoing transcript is a true and accurate record

 5    of the proceedings.

 6

 7

 8        _Sherri L. Breach_
     _____
 9
     Sherri L. Breach
10
     AAERT Certified Electronic Reporter & Transcriber
11
     CERT*D-397
12

13
     Date:  April 19, 2016
14

15

16

17

18

19

20

21

22

23

24

25
```

**A**

**AAERT** 53:10
**ab** 37:20
**able** 24:25 25:2
  41:22 45:8
**Absolutely** 28:19
  33:25 34:3
**accept** 14:23,25
  26:12 49:17
**accepted** 14:11
**accounting** 17:2,4
  17:10,17,21 18:13
  18:19 39:3,25
**accurate** 53:4
**activity** 19:18
**actual** 36:7
**add** 12:7 16:23
**addition** 28:5
**additional** 27:10,12
  27:12
**address** 3:8 4:6,8
  8:14 21:4 31:11
**adjourned** 52:14
**admissibility** 31:18
**admissible** 5:14,16
  10:7 13:19 14:24
  18:1 29:17 30:7
  32:9
**admission** 36:2
  41:2 47:2
**admitted** 46:18
**afternoon** 43:10
**agent** 4:8 6:23,25
  30:4
**agree** 37:23 49:15
**agreed** 3:16,17
  18:1 47:10 48:6
**agreeing** 12:17
  14:9
**agreement** 12:15
  46:17 50:8 51:6
**ahead** 9:9 22:24
  37:9
**al** 1:5
**alleged** 16:19 18:5
  18:6

**allegedly** 24:22
**allow** 15:22 27:14
**allowed** 41:6
**amenable** 48:14,16
**Amendment** 6:9
**America** 1:2,10
**and/or** 45:4
**annotate** 34:14
**answer** 14:15 17:1
  17:4 27:24 29:21
**answering** 8:24
**anticipated** 47:17
**apologize** 12:1
**APPEARANCES**
  1:9
**appears** 14:14
  20:16
**applicable** 31:16
**applies** 43:22
**applying** 27:22
**appreciate** 30:25
**approach** 48:17
**appropriate** 19:9
  23:3
**April** 1:3 44:8
  53:13
**argue** 16:21 18:8
  33:5 50:4
**arguendo** 5:2
**argument** 10:24
  14:1,11 27:1
**asked** 15:17 28:1
**asking** 8:21 15:20
  16:12 49:16
**assisting** 27:22
**Association** 4:24
**assume** 16:11
**Assuming** 5:2
**attention** 39:9
**ATTORNEY'S**
  1:10
**audible** 44:25
**audience** 52:15
**Ave** 1:17
**aware** 6:6 20:5
  29:8

**B**

**B** 2:8
**back** 5:9,25 7:2
  18:7 19:24 35:11
  36:6,7 47:19 52:4
**background** 3:25
**Balamar** 4:23 5:4
  5:17 6:8
**bank** 5:18 8:20,21
  10:18 20:7 22:4
  27:22 41:19,20
**bank's** 39:13 40:24
**Barry** 1:16
**base** 14:1
**based** 9:5 10:10,12
  12:16 15:23 33:6
  42:8 46:16
**basis** 8:7 23:2 36:4
  37:8
**beginning** 44:11
**begins** 3:5 19:2
  41:9 45:23
**Bekkedam** 1:16 5:1
  5:3,22 6:8 23:17
  24:8,14,22,24
  26:1 27:5,14,21
  28:9,24 29:1,2,3
  31:4 43:21 52:21
**Bekkedam's** 24:8
  24:19
**believe** 4:7,8 9:3
  10:25 23:3 25:16
  30:14,17 32:4
**benefits** 29:10
**best** 30:20,21
**better** 45:5
**big** 46:13
**bit** 32:14 52:13
**borrow** 11:14
**Boyer** 4:8 6:23,25
**Breach** 53:3,9
**Brian** 1:5,13 24:20
  44:7
**briefly** 46:8
**bring** 7:1
**Broad** 1:20

**brought** 39:8
**Bruton** 5:6,11 6:9
**buying** 18:21

**C**

**C** 1:7 3:1 53:1,1
**call** 50:21
**camp** 24:22
**candor** 30:25
**capital** 13:25 39:13
  40:22,24 41:13,19
  41:20,21
**carries** 10:25
**case** 6:6,11 8:23,25
  9:1 10:17 11:6
  14:21 15:22 16:15
  17:22 25:17,20
  26:13 28:11 31:25
  32:6 43:18,22
  51:23 52:13
**cautionary** 27:3
  28:25 31:2
**certain** 43:14
**certainly** 11:17,22
  18:15 29:6 41:3
**certified** 53:3,10
**CERT*D-397** 53:3
  53:11
**chance** 11:22 37:1
**charge** 32:5
**check** 46:14
**cherry** 29:3
**Cherry-picking**
  29:11
**Chestnut** 1:11
**choice** 11:5 14:2
  29:12,12
**Circuit** 9:13 25:17
  25:20 31:14
**circumstance** 29:8
  31:15
**civil** 44:8
**claims** 19:23
**clarify** 37:20
**clause** 26:7
**clean** 24:9
**clear** 11:1 14:6

  15:19 16:14 18:10
  23:25 24:9,25
  26:9 41:17 46:22
  50:15
**clearly** 13:24 30:8
  45:4
**CLERK** 3:12 35:11
  43:7
**client** 18:2
**clients** 5:17
**clip** 6:24 7:25 11:3
  11:3,3 12:6 21:22
  42:11 44:11,24
  45:17,20,23,25
  46:2
**clips** 7:24 32:2,22
  42:15
**close** 32:6 38:12
**collateral** 20:17
**come** 5:22 12:14
  32:11 43:16 47:19
  50:7
**comes** 5:7 9:20
**coming** 25:20 46:17
**company** 1:23 7:11
  39:14
**completely** 10:20
  28:2
**con** 10:23
**concluded** 48:1
  51:2 52:25
**conclusion** 9:24
**condition** 23:18
  48:10 49:18
**conditional** 47:4
**conditionally** 48:8
  49:17 51:13,15,16
**confer** 21:11
**conferences** 51:24
**confrontation** 26:7
**confusing** 37:20
**connection** 20:12
**consciousness** 9:15
  18:23 40:25
**consider** 26:4,5
  28:25 43:17,19
  50:9

**consistent** 34:12
**conspiracy** 18:3
**contains** 3:2
**context** 9:5,6 10:24
  11:10,11 13:3
  14:12 16:17 18:10
  20:11 24:14 41:14
**continue** 45:14
**control** 29:15
**correct** 22:14 26:18
  28:15 39:10,11
  41:11
**counsel** 11:5,25
  15:5 20:17 21:11
  22:21 23:6 24:8
  26:15 38:7 41:10
  42:12 46:5 48:5
  52:12,16
**counsel's** 14:9
**couple** 3:19
**course** 25:3,7
**Court** 1:1,23 3:10
  3:14,19,21 4:2,5
  4:10,13,16,21 5:2
  5:12,19,24 6:3,10
  6:12,15,19,22 7:3
  7:6,10,13,16,18
  7:20 8:2,5,7,17
  9:2,9 10:5 11:8,25
  12:8,13,19,22,25
  13:3,6,11,14,17
  13:19,22 14:8,14
  14:23,25 15:3,5,8
  15:11,13 16:1,5,8
  16:16,25 17:7,12
  17:23 18:24 19:4
  19:6,11,14,20
  20:4,16,19,22,25
  21:3,10,13,15,16
  21:20,24 22:2,5,8
  22:11,16,21,24
  23:6,9,12,19,24
  24:12 25:5,9,23
  26:2,7,11,19,22
  26:24 27:19 28:8
  28:14,17,20 29:16
  29:23 30:11,15,25

31:21 32:10,13,17
  32:19,25 33:2,8
  33:10,14,17,19,22
  33:25 34:3,13,17
  34:21,24 35:2,6
  35:15,17,22,25
  36:2,6,13,16,22
  36:25 37:4,6,9,12
  37:18,24 38:1,5,7
  38:11,14,18,21
  39:1,17,19,21,23
  40:3,8,11,18 41:9
  42:1,6,12,16,19
  42:24 43:2,5,9
  44:3,9,13,17,22
  45:2,8,12 46:3,6,9
  46:20,25 47:3,7
  47:12,15,24 48:5
  48:8,11,15,19
  49:2,9,12 50:3,4,6
  50:12,20,25 51:3
  51:12,18,21 52:12
  52:20,23
**courtroom** 3:13
  52:11
**Court's** 16:21 33:4
  33:7 38:24 39:4
**co-counsel** 21:12
**co-defendant** 5:7
  29:10 30:10
**co-defendant's**
  29:9
**CPA** 7:15
**Crawford** 23:22,24
**created** 24:20
**creates** 6:9
**crime** 16:19
**criminal** 17:10 24:2
  24:4
**cross** 2:3 29:13
  46:13
**cross-checking**
  46:14
**cross-designate**
  27:12
**cross-examination**
  24:6 27:15,25

**cross-examine** 29:5
**cross-examining**
  29:13
**crucible** 24:5
**curative** 28:5

## D

**D** 1:16 2:1 3:1
**damage** 29:15
**danger** 9:19 11:21
**DARNELL** 1:7
**date** 42:25 43:3
  53:13
**DAVID** 1:10
**day** 1:7 10:25 47:19
  51:25 52:14
**days** 52:3
**dealing** 51:25
**December** 28:9
**decide** 31:17
**decided** 43:22
**decision** 25:12
**defendant** 1:13,15
  5:8,10 7:8 8:20
  9:21 16:15 24:4
  31:19 32:9 37:19
  41:3 43:21
**defendant's** 2:13
  9:15 41:7
**defense** 12:12
  19:18 36:16 41:2
**delayed** 51:24
**delete** 4:5
**deleted** 4:9
**denied** 21:4 31:2
  33:8 42:2
**deny** 37:6
**deposition** 9:6
  13:24 25:1 27:17
  28:12 40:12 43:4
  43:15,17 44:7
**determine** 18:18
**didn't** 17:19
**difference** 5:19
  16:8 41:16
**different** 15:15,18
  18:9 22:17 32:14

41:4
**DIRECT** 2:3
**direction** 28:4
**directly** 8:25 23:16
**disagree** 24:12
  26:20 27:1
**disagreed** 17:12
**disallowed** 18:24
  35:23,25 36:3,4
**disclosed** 41:18
**discuss** 52:6
**discussing** 3:8
**discussion** 20:11,15
  24:23 50:11
**disposition** 5:20
**disprove** 37:19
**distinction** 23:25
**DISTRICT** 1:1,8
**doesn't** 27:13
**doing** 52:18
**don't** 9:23
**door** 29:2
**double** 23:14,15
**draw** 11:23 18:9,16
**dry** 7:4
**due** 3:3
**DUNCAN** 1:16
  16:23 17:1,11,14
  17:16 18:3,6 33:3
  33:9,15,18

## E

**E** 2:1,8 3:1,1 53:1
**ear** 22:17
**earlier** 14:11 18:15
**early** 26:3 51:25
**EASTERN** 1:1
**ECKER** 1:17
**Egan** 1:13 7:22 8:9
  8:13,19 10:15
  11:17 13:20,23
  14:16,24 15:1,7,9
  15:13,18 16:4,6,9
  18:8 19:9 20:1
  22:22 23:1 34:6
  34:10 35:1 36:9
  36:19,24 37:16

38:12,19,23 40:16
  40:18,19 41:12
  42:4,8,21 45:25
  46:7,21 47:1,5,8
  47:23 48:7,14,16
  50:10 51:14
**Egan's** 10:10 12:16
  18:2 34:23
**either** 23:16
**Electronic** 53:10
**ends** 39:7
**Engle** 1:19,19
  31:10,12,23 32:12
  32:14,18,20 33:1
**English** 25:21
**entitled** 43:21
**enumerated** 48:12
**especially** 11:2
**ESQ** 1:10,13,15,16
  1:19
**essentially** 16:2
**et** 1:5
**evidence** 5:10,13
  9:13,14,21 11:18
  24:1,16 25:15
  29:17,19 41:4
  43:20,22 46:12
  48:4 49:11,15
  51:7
**exact** 41:14,24
**exactly** 5:24 37:18
**examination** 25:7
  29:14
**exception** 18:25
  24:10,11 26:10,24
  27:2,8 33:10,15
  36:1
**exceptions** 49:18
**excerpt** 1:7 2:2 3:5
**excise** 33:12 34:22
  37:1
**excised** 3:23 41:15
**excising** 22:12
  33:24
**exclude** 14:10
**excludes** 31:3
**exculpatory** 9:12

9:14 18:18 40:14
40:21 41:2,8
**Excuse** 48:19
**excused** 52:22
**Exhibit** 44:5
**exhibits** 44:6 46:5
46:12,23 47:2
48:4 49:10,14
50:9 51:7
**expeditiously** 47:16
**explain** 37:19
**explanation** 11:4
41:1
**extra** 47:19
**eye** 34:9

**F**

**F** 53:1
**fact** 9:3 11:1,19
21:4 39:9 40:24
41:8
**facts** 9:12 17:22
**fair** 9:22 11:23
28:17 50:12
**false** 9:11,14 18:18
40:14,20 41:2,7
**far** 9:7 11:6 45:9
50:16,17
**financed** 41:19
**Financial** 7:11
11:15 20:14
**finding** 25:20 29:14
**fine** 8:16 23:8 43:5
50:6
**finish** 8:10 40:18
**first** 3:15 7:25 14:8
14:10 19:15 27:7
**five** 42:15
**FL** 1:14,17
**FLORES** 1:20
**focus** 28:12
**follow** 37:21,22
**followed** 11:3
**following** 3:2 48:4
51:7
**follows** 43:13
**foregoing** 53:4

**formally** 47:13
**four** 46:23 47:1
**FOX** 1:13
**free** 11:17
**Friday** 52:3
**FUNT** 1:19

**G**

**G** 3:1
**GANDAL** 1:16
**general** 32:13
**gentlemen** 45:3
**germane** 14:20,21
**getting** 5:25
**Gibraltar** 20:7 22:4
**give** 31:2 38:9
43:12
**given** 15:16 23:20
43:15 52:17
**gives** 23:4
**giving** 28:2
**go** 3:25 7:25 9:9
13:10 22:9,10,24
27:13 28:3 36:6,7
37:9 46:18
**goes** 5:21 18:22
19:2,23 20:10,15
21:5 24:18 46:6
**going** 3:10 4:11
5:12 6:16,19 7:15
8:13 10:11 11:2
12:3,7,9,12,17,24
14:1,9 19:19 22:6
22:14 23:3 28:24
31:2 33:5 38:19
38:21 40:14,20,21
42:13,24 43:12
46:23 47:2,15
49:22 50:11,20
52:13,18
**Golia** 24:2 25:13
**good** 29:14 35:16
43:9 46:20
**government** 12:18
12:20,23 17:9
24:16 27:11 29:15
30:10 31:6 41:6

46:12 48:3 49:14
51:7,22
**government's** 2:10
10:23 29:12,20
**granting** 26:14
**green** 12:2,8
**GREENBLATT**
1:19
**guess** 32:20
**guest** 37:4
**guilt** 9:16 18:23
40:25

**H**

**H** 2:8
**hand** 31:6
**handle** 32:7
**happy** 27:2
**Hartline** 1:5,13
5:16 8:23 11:11
13:24 19:23 23:17
23:19 24:21,23
25:4 28:1,23 29:5
29:20 43:16,18,19
44:7
**hear** 3:15 15:23
20:19 26:17 39:1
43:14,20 45:4,6
**heard** 13:20 23:10
24:23 27:1,14
33:4 36:14
**hearsay** 23:14,15
24:10,11 28:21
30:8
**help** 44:20
**helpful** 29:4
**helps** 27:14 28:3
**highlighted** 4:1
31:25
**Hold** 8:2 13:11
**holding** 7:10 39:14
**Holdings** 11:15
20:14
**home** 46:18
**honest** 9:4
**Honor** 3:7,18 6:2
8:9,19 10:9,16

11:1,9 12:11 13:8
13:9,21 14:17
15:19 16:4,23
17:15 18:4 19:1
20:21 21:9,19
22:23 23:1,11,22
26:18 27:18 28:16
29:12,19 31:6,13
31:17,23 32:1,15
32:24 33:3,9,16
33:18 34:10 35:1
35:8,11,12,14
36:9,11,11,19
37:2,23 38:4,10
38:13,17 39:22
40:16 41:11,12,15
41:25 42:4,5,14
42:18,21,22 44:2
46:2,5,7,11 47:23
48:2,14,18,24
51:14,17,20 52:17
52:24
**HONORABLE** 1:7
**Honor's** 34:12
**housekeeping**
52:18
**hypothetical** 13:15

**I**

**IDENTIFICATI...**
2:9
**Ignall** 1:10 3:7,17
3:22 4:7,11,17,25
5:5,15,21 6:1,5,14
6:17,21,23 7:1,4,7
7:12,14,17,21 8:4
8:10,15,18 9:10
10:8 11:9 12:5,10
12:14,20,23 13:2
13:4,9,16 16:16
16:20 17:15,23,25
18:7 19:1,7,12,16
19:22 20:10,18,20
20:23 21:1,8,11
21:14,19,21,25
22:3,6,9,13,19
23:7 25:24,25

28:18,19,21 30:6
30:13 31:8 32:23
33:11,20,23 34:1
34:4,8,16,19,22
34:25 35:12,16,21
35:23 36:1,4,8,10
36:15,17,20 37:2
37:4,5,8,10,14,22
37:25 38:3,9,17
38:19,23 39:2,18
39:20,22,25 40:4
40:5,10,13,17,20
41:11 42:3,5,7,10
42:13,18,22,25
43:3,24,25 44:4
44:10,15,19,23
45:16,19,22 46:1
46:4,11 47:9,14
47:22,25 48:2,9
48:13,17,20,22
49:1,5,7,20,23
50:2,13,22 51:5
**II** 1:7
**impression** 23:5
**improper** 9:25
13:25 15:25 16:15
17:2
**inadmissible** 6:13
9:7 41:5
**include** 29:10
**included** 32:5,16
40:23
**including** 13:14
**inconsistent** 30:8
**incorrect** 23:5
**increased** 44:14
**incriminating**
24:14
**independent** 14:14
**indicating** 36:12
**indirect** 6:6
**indirectly** 5:23 6:7
**indiscernible** 8:21
14:12 20:24 21:1
23:22 25:18,22
27:10 29:23 30:3
30:24 44:11,19

46:12,17,22,23
47:10,13,18,20
49:5 50:23,24
51:1
**indiscernibles** 3:3
**infer** 9:20
**inference** 11:23,23
18:9,15 24:21
**inflammatory** 9:23
**information** 27:4
**initio** 37:21
**instruction** 9:14
26:2 27:3,4 28:6
28:25 31:3,24
42:20 43:12
**instructions** 26:9
31:14,15 32:4,13
**intending** 34:5
**intent** 39:9
**interest** 29:24,24
30:2
**interpretation**
10:21 11:16
**interrupt** 11:25
**interruption** 12:1
**introduce** 11:17
29:3,7 41:4
**introduced** 28:22
28:23 30:9,10
31:20 32:7 37:20
**introducing** 25:25
**introduction** 3:24
**invest** 11:14
**investigation** 52:8
**investment** 40:23
**iPad** 34:14,14
**issue** 3:8 8:22 15:22
17:3,5,10,10,17
17:21 20:17 21:4
23:22 26:7 31:22
33:4 36:21 39:3
**issues** 10:16 52:1
**item** 19:1
**i.e** 23:17

### J

**J** 1:13,19

### JOEL 1:15

**JOEL** 1:15
**JONES** 1:7
**Judge** 1:8 30:21
**June** 19:24 20:6
**JUROR** 45:5,10
**jury** 1:7 2:2 3:6,13
6:7 7:2 9:14,20,24
11:22 15:23 18:9
18:16,17 21:18
26:4,9,17 27:3
28:25 32:21 35:4
38:16 41:8 43:8
43:11 46:18 47:15
50:4 51:22 52:11
**Justice** 24:2 25:13

### K

**keep** 34:9,11
**kind** 27:25
**knew** 9:21 19:23
24:22,23 40:7,8
**know** 6:23 14:4,5
16:10 17:3,19
18:21 19:24 20:12
34:24 38:19 40:22
45:13 49:17 50:4
50:16,18
**knowing** 18:12,19
**knowledge** 14:2
**knows** 40:4,14
**KPMG** 13:25

### L

**L** 53:3,9
**Ladies** 45:3
**lane** 24:17
**language** 9:4 32:1
**large** 49:8
**Laughter** 30:22
45:7
**law** 25:21
**lawyer** 8:19 14:18
16:14 25:1
**lawyer's** 11:5 14:2
**leads** 9:24
**leaning** 36:11
**learned** 17:5,16,19

41:22
**leave** 52:15
**leaves** 3:13 52:11
**legal** 51:25
**lending** 10:19
**let's** 4:22 42:10
44:24 45:16,19,22
**level** 23:14
**Levin** 11:14 23:16
24:18 39:6
**Levin's** 8:24 11:12
18:11,12 20:6,13
39:10,12 40:22
**liability** 23:23,25
24:1
**limited** 31:18
**limiting** 27:3 31:3
31:14 42:20
**line** 6:20,21,22,25
7:17 8:1,1,3,3
10:14,14 12:2,5
13:10 15:7,14
19:2,3 20:4 21:23
21:23 22:10,10,20
22:20 23:4 27:20
28:8 37:14,15
39:5,5,6,17,18,20
41:9,15,16,16
**lines** 10:11 12:7
19:8,12,13 28:6
**list** 46:13 47:10
49:8,8 50:15
**listening** 22:17
**little** 32:15 52:13
**LLP** 1:13
**loan** 8:22,25 11:12
18:11,12,20,22
19:24 20:13 39:10
**loans** 27:23
**long** 42:12 46:13
**longer** 32:15
**look** 11:9 30:18
**looked** 31:13
**looking** 22:4 24:13
**lot** 25:21
**lunch** 3:9
**lunchtime** 12:14

### M

**mad** 38:20,21
**making** 18:18
26:25 34:15 41:7
**marked** 3:20
**Market** 1:14,24
**matter** 25:13 29:16
29:18 40:5 44:8
**matters** 52:18
**MD** 1:18
**mean** 11:18 21:24
23:15 28:8 42:14
**means** 14:4,5 16:13
24:1,2
**members** 43:11
51:22
**mentioned** 25:6
**mentions** 29:2
**MICHAEL** 1:19
**microphone** 44:16
**microphones** 3:4
**Mid-Atlantic** 1:23
**million** 11:14 20:6
20:13,13
**mind** 15:24
**mine** 3:21
**Mine's** 12:8
**minute** 13:17 22:2
33:21
**minutes** 33:12 35:5
42:14,15
**mirror** 32:6
**misinterpretation**
16:3
**misunder** 36:5
**misunderstanding**
16:3
**misunderstood**
48:22
**model** 31:14
**moment** 4:13 6:1
7:18 8:5 20:20
21:8,14 24:13
38:9 44:18 46:4
**Monday** 47:19,20
47:21 48:12 52:4

52:9
**money** 10:19
**morning** 47:21
52:4,9
**Morris** 26:8
**motion** 21:5 26:14
42:1 50:8
**move** 33:6 44:15
46:16 49:15,22
**moved** 47:16 49:11
**moves** 48:3 51:7
**multiple** 3:2
**multi-defendant**
31:20 32:8
**Musser** 28:10

### N

**N** 2:1 3:1 53:1
**name** 25:6
**narrow** 26:10
**National** 1:23
**necessary** 48:12
**need** 26:17 38:8
**never** 25:6
**non** 5:6
**non-testifying** 29:9
**notwithstanding**
47:17 51:23
**Nova** 5:18 7:11
11:15 20:7,14
**N/A** 2:4,11,14

### O

**O** 3:1 53:1
**oath** 3:25 10:6
23:20,23 30:3
**object** 23:2 46:23
47:2
**objection** 4:23 8:8
10:10,15 23:7
28:18 31:8 32:23
50:2,5
**objections** 12:16
**objects** 7:22
**obviously** 31:16
**occurred** 16:19
**offer** 30:20,21

**offering** 29:21
**OFFICE** 1:10
**Oh** 21:13 39:19
  48:13
**okay** 3:22 4:10,16
  6:14 7:6 8:15
  12:19 13:2,6
  22:24 30:13 34:25
  37:8,25 38:3,5
  39:19 42:19 43:2
  45:12 47:7,12,17
  47:22,24 48:13
  50:12
**old** 25:21
**once** 47:12
**one's** 6:11
**onus** 37:18
**open** 29:2
**openings** 51:24
**opined** 17:20
**opponent** 28:22
  30:9
**opportunity** 36:21
**opposed** 17:10
**opposition** 46:22
**order** 4:19 51:9
**originally** 3:24
**outside** 21:9,14
**outstanding** 49:14
**outweigh** 10:3
**outweighs** 9:8 11:6
**owned** 5:17

**P**

**P** 3:1
**PA** 1:4,12,14,21,24
**page** 2:9 4:1,1 7:7
  7:16,17,22 8:1,1
  10:11,14,14 12:2
  12:2,4,6,22 13:10
  15:7 19:2,12 20:1
  20:4,15 21:24,25
  21:25 22:9,10,20
  22:20 23:4 27:17
  27:20 28:6 37:12
  37:14 39:5 45:17
  45:20,23

**pages** 4:20 6:16,19
  10:11
**paid** 20:7
**Pardon** 48:15
**Park** 1:17
**part** 5:9 8:12 12:6
  20:14 26:17 39:13
**PARTIAL** 1:5
**parties** 3:4
**party** 28:22 30:9
**PATRICK** 1:13
**pause** 4:4,15 6:4
  7:19 8:6 13:5,13
  13:18 15:4,12
  19:5 21:7 22:25
  30:19 35:10 38:6
  39:16 40:2 42:17
  43:6 44:17,21
**PENNSYLVANIA**
  1:1
**percent** 5:17
**percentage** 7:8
**perfectly** 9:22
**persuaded** 30:15
  36:13
**pertain** 27:5
**ph** 4:8,23 5:6 24:3
  24:18 26:8 28:10
**Philadelphia** 1:4,12
  1:14,21,24
**pick** 29:4
**piece** 27:12
**PIERCE** 1:19
**plaintiff** 8:20
**play** 4:12 6:17 7:15
  10:11,13 12:7,12
  12:17,24 19:10,19
  21:23 22:6,14,15
  22:20 23:4 27:21
  39:5 41:23 44:10
  44:24 45:16,19,22
**played** 11:2 12:9
  23:3 27:13 28:7
  32:3,22 42:20
  44:12 45:1,15,18
  45:21,24 51:11
**playing** 7:23 42:23

**please** 4:3,14 7:16
  7:18 8:5 13:12
  15:3 19:4 22:18
  24:13 27:19 44:18
  45:13 52:4
**plus** 25:20
**point** 16:13 17:6
  26:25 33:6 49:21
**points** 32:5
**poor** 3:3
**PORDY** 1:16
**portion** 12:4 14:10
**portions** 43:14
  51:10
**position** 40:3,6,6
**post** 41:1
**potentially** 23:15
**Potomac** 1:17,18
**prejudice** 9:7,19,22
  10:2,2,3 11:6,21
**prejudices** 41:6
**prepared** 31:13
**present** 3:6 10:13
  21:18 35:4 38:16
  43:8
**presentation** 37:1
**presented** 17:8
  24:16
**presents** 29:15
**pretty** 9:11
**Prevay** 24:18,19
**previous** 11:20
  12:6
**prior** 10:24 30:1,6
  30:7,18 31:19
  32:2,21 43:15
**probably** 16:20
  42:15
**probative** 9:8,10,15
  9:18 10:3 11:7,19
  11:20
**problem** 6:9 10:18
  11:13 14:4,17
  16:17 23:13 25:11
  28:3 35:6,15,17
  37:13,24 46:21
**proceed** 44:9

**proceedings** 52:25
  53:5
**process** 24:18
**proffer** 26:13
**promptly** 47:20
**proposal** 8:11
**proposals** 3:19
**propose** 4:18 10:9
  21:22 39:4
**proposing** 3:23
  7:23 8:11 10:10
  10:13 22:19 49:16
**prosecutor** 14:19
**provided** 9:1 12:11
  12:11
**provisionally** 46:16
**purchase** 16:13
  20:5,13 39:12
**purpose** 8:24 9:25
  11:11 18:12,20,22
  40:22
**purposes** 24:2
**pursuant** 48:2
**put** 10:24 41:6
**p.m** 1:5,5 3:5 21:17
  21:17 35:3,3
  38:15,15 52:25

**Q**

**quality** 3:3
**question** 9:17 10:6
  10:12,16 11:2
  14:18,19,20,20
  15:6,16 19:21,22
  20:4,5,8 25:15,16
  27:21 29:6,22
  35:19 36:25 41:10
  41:13,18,19
**questions** 8:22,24
  10:25 11:13 16:1
  17:8 25:6 40:1
**quick** 7:4
**quickly** 31:6
**quite** 18:10

**R**

**R** 3:1 53:1

**reach** 9:24
**reached** 51:6
**read** 12:25 13:3
  27:2,17 32:2,21
  39:23 42:19,23,24
  44:1 47:9 49:16
**reading** 22:22
  34:14
**ready** 21:20 42:9
  42:11,18
**realize** 36:18
**really** 9:18 31:16
**reason** 41:15
**recess** 3:11 21:15
  33:21 34:20
**Recessed** 21:17
  35:3 38:15
**reconsideration**
  42:2
**reconvened** 21:17
  35:3 38:15
**record** 34:13 36:3
  53:4
**recording** 3:3 44:7
**RECROSS** 2:3
**redact** 5:8
**REDIRECT** 2:3
**reference** 21:22
**references** 5:1,8
**referencing** 7:11
  16:18
**refocus** 15:5
**regard** 9:2
**regarding** 46:5
**regardless** 12:20
**Region** 1:23
**regulatory** 41:20
**rejected** 27:11
**relationship** 5:4,22
**relative** 10:17
**relevance** 19:15,20
  20:8
**relevancy** 4:23
**relevant** 5:14,16
  8:25 19:15,17
**reliable** 24:3 25:14
  29:20,21,22

**relied** 25:19
**relying** 34:17
**report** 17:13 41:20
   52:4,4
**reported** 39:13
**Reporter** 53:10
**Reporting** 1:23
**representative**
   24:19
**request** 28:6 31:1
   32:5
**requested** 3:5
   32:16
**required** 47:18
**requirements**
   41:21
**research** 52:7
**resolve** 50:8
**resolving** 50:5
**respect** 33:5
**respectfully** 26:19
**response** 10:6
**responsibility** 52:1
**rest** 20:11 47:13
   49:23 50:1,22
**rested** 51:23
**rests** 51:20
**result** 26:14 52:2
**reversed** 25:17
**revisit** 38:24
**re-argue** 36:21
**re-arguing** 41:25
**re-characterize**
   25:2
**Richardson** 26:8
**right** 3:7,15 4:13,17
   4:21 6:15 7:3,13
   7:20 8:2,18 10:8
   12:8,25 13:4,11
   13:17 14:8 15:8
   17:7 21:16,19
   22:8,21 23:9
   28:13,14 31:1
   32:19,25 33:8,11
   34:7,21 36:10
   38:11,14 39:21
   41:21 42:1,3,6,7

42:16 43:11 44:3
44:10,22,23 45:14
45:16,19 46:1,3
48:11 49:9 50:6
50:25 51:4,6,12
51:18,21 52:5,12
52:14
**rise** 12:3 43:7
**ROGERS** 1:16
**role** 27:22
**ROTHSCHILD**
   1:13
**Rovin** 24:19,19,20
**rule** 5:6,11 24:1,11
   25:14 29:16,18
   30:17,24 50:3,8
**ruled** 16:22 41:25
**ruling** 6:12 33:4,7
   38:2,24 39:4
**rulings** 34:12,15
**run** 7:5
**RUSSELL** 1:16

_____

                S
**S** 1:20 2:8 3:1
**satisfied** 32:1
**saying** 17:23 18:13
   18:21 25:13 47:3
**says** 6:6 7:10 10:17
   16:10 17:2 20:12
   26:9
**Schwartz** 1:15 21:3
   23:10,13,21 24:15
   25:8,10 26:6,16
   26:21,23 27:6,20
   28:13,15 29:11,18
   30:1,14,17,20,23
   31:5,10 50:14,19
   51:16 52:17,21,24
**Schwartz's** 4:22
**seated** 3:14 35:18
   43:9 52:16
**second** 4:2 8:3
   13:12 15:3 19:4
   26:17 32:10
**Secondly** 27:9
**section** 11:20 14:13

27:16
**see** 4:25 9:22,23
   11:21 14:18 20:24
   25:2 33:12 43:20
   44:16,19,24,25
   45:3,5,8,10 52:9
**severance** 21:5
   26:15 33:6
**shade** 9:5
**shared** 31:5
**Sherri** 53:3,9
**shoes** 24:8
**show** 40:6 41:4
   50:3
**shows** 17:1,5
**SHULMAN** 1:16
**Shuman** 17:16,20
**side** 21:21
**sidebar** 46:8,10
   48:1,3,18,21 51:2
   51:24
**sidebars** 47:17
**significant** 11:19
   11:22
**simply** 7:8 14:6
   26:25
**sir** 3:10 11:8 13:22
   16:25 20:22 22:5
   23:12 32:18 33:19
   35:9 38:18 45:9
   46:6 47:25 51:17
   52:20,23
**Sixth** 6:9
**solely** 43:22
**solve** 28:3
**somebody** 23:16
**sorry** 21:10,25
   22:17 29:25 31:10
   35:14 40:19 48:5
   48:20,24 51:9
**Sounds** 46:20
**speak** 25:23 46:8
**SPEAKER** 13:8
   18:5 20:3 35:5,7,9
   35:13 48:23 49:3
   49:6,10,13,21,25
   50:17,24 51:19

**speaking** 35:20
**specific** 10:16
   15:20 31:25
**specifically** 27:4
   31:3
**speculate** 15:23
**stand** 28:1 30:7
**standing** 24:7
**start** 13:7 47:20
**starting** 7:22 12:2
   19:21
**starts** 45:20
**state** 15:24 24:11
   25:14
**statement** 5:7,9
   9:12 10:5 18:19
   23:20 28:22 29:1
   29:9,24 30:4,8
   31:19 40:15,21
   41:2,8
**statements** 32:7
   43:18
**States** 1:1,2,8,10
   51:20
**static** 3:4
**step** 21:9
**stipulated** 51:12
**stipulation** 42:23
   44:1 46:18
**stock** 7:8 11:15
   16:12,12 18:21
   20:6,14 39:12
**stocks** 40:23
**stop** 45:2
**straight** 51:3
**straightforward**
   9:11
**Street** 1:11,14,20
   1:24
**strongly** 25:14
**stuck** 46:19
**stuff** 22:3 29:14
**subject** 10:20 24:5
   24:5 51:6
**subsequently** 17:5
**substantial** 10:3
**sued** 8:21

**suffice** 26:4
**suggest** 31:15
**suggested** 24:17
   27:10
**suggesting** 15:14
**suing** 8:20
**Suite** 1:11,21,24
**supposed** 17:13
**Supreme** 6:12 26:7
**sure** 4:18 6:3 7:2
   10:1 21:13 33:14
   33:22,24 34:6,8
   34:11,23 37:23
   42:11 48:19
**Surely** 46:9
**suspicious** 19:17
**sworn** 29:19 30:1

_____
                T
**T** 2:8 53:1,1
**take** 3:11 7:5 8:12
   20:25 34:21 44:13
   47:19
**taken** 6:11 44:7
**takes** 30:7
**talk** 4:22 20:23
**talked** 19:8
**talking** 11:11 13:23
   16:10 18:11,11
   19:17 26:11 30:4
   39:6
**TARP** 27:23
**task** 51:25
**technically** 50:1
**telephone** 24:18
**tell** 37:12 47:15
**ten** 33:12,20
**tendered** 26:3
**tense** 10:12,13
   11:10,12 18:14
   39:3
**ten-minute** 34:19
**terms** 26:4
**testify** 29:6
**testifying** 5:7 9:2
**testimony** 5:3 9:6
   15:23 17:4 27:16

28:2 29:19 30:2,6
  30:18 31:4 43:15
  43:17 52:6
**thank** 7:6 8:18
  15:11 18:6 21:16
  27:7,7 33:1,2,9,18
  35:1,2,7,9,12,13
  36:24 38:4 42:4,5
  42:21 47:23 50:13
  50:19 51:19 52:10
  52:24
**thereof** 52:2
**thing** 4:17,19 5:25
  7:14 16:24 41:24
  50:7
**things** 9:5 29:4
**think** 5:15 9:11,17
  16:16 18:10,22
  19:9,16,17 25:19
  31:23 38:12 39:2
  41:5 42:8,9 45:23
  48:23 49:4 50:10
**thinking** 49:8
**thinks** 29:4
**Third** 9:13 25:17
  25:20 31:14
**thought** 8:17 12:3
  36:11 48:6 49:2
**three** 19:8
**tie** 5:13
**tied** 5:9
**time** 3:11 14:18,21
  16:13 20:25 28:10
  28:11 34:21 36:7
  38:8 40:7,8 43:13
  43:15
**timing** 35:16
**tiny** 11:3,3
**told** 13:25 17:17
**tomorrow** 52:3
**total** 42:14
**transaction** 19:24
**Transcriber** 53:10
**transcript** 1:5 3:2
  4:19 36:3 44:5,6
  53:4
**treated** 41:13

**treatment** 14:1
  18:20
**treatments** 18:14
**trial** 1:7 2:2 5:20
  24:2,4 26:3,12
  31:20 32:8,17
**trial's** 25:11
**true** 41:1 53:4
**try** 24:9 29:3 34:20
  44:15,24 47:9
  51:5
**turn** 7:24 44:23
**two** 7:24 31:16 35:5
  39:24 52:3

___
### U
**Uh-huh** 12:13
  49:12
**understand** 6:7
  7:22 9:19 10:18
  10:21 11:13 14:3
  14:5,6,16,22 15:1
  15:10,15,16,19
  16:18 35:17,18
  36:20 38:3 39:4
  40:25 49:7
**understanding** 5:5
  5:17 15:21,21
  17:25 30:11 37:11
  41:24 48:3
**understands** 18:13
**understood** 18:15
**unfair** 9:19 10:2,2
  11:21 19:18
**UNIDENTIFIED**
  13:8 18:5 20:3
  35:5,7,9,13 45:5
  45:10 48:23 49:3
  49:6,10,13,21,25
  50:17,24 51:19
**unilaterally** 12:16
**United** 1:1,2,8,10
  51:20
**unrelated** 8:22
**use** 16:14 18:17
  31:17
**usually** 26:9

**utilizing** 3:4
**U.S** 1:10 26:8

___
### V
**value** 9:8,10,18
  10:4 11:7,19,20
**various** 17:8
**Veritext** 1:23
**version** 3:20
**versus** 26:8
**video** 27:13 36:2
  42:20 43:16 44:6
  44:12 45:1,15,18
  45:21,24
**view** 31:24
**violate** 5:11
**volume** 44:13
**vs** 1:4

___
### W
**wait** 4:2 22:2 48:24
**waiting** 30:15
**want** 12:15 16:11
  16:21 24:25 31:11
  31:17,21 34:6,11
  38:20 42:23 46:22
  47:6,8 50:14
  52:15
**wanted** 13:7 47:5
**way** 6:12 8:16 24:3
  27:13 29:7 38:25
  43:16 46:15
**week** 28:10
**weekend** 52:8
**welcome** 29:7
**weren't** 26:11
**we'll** 4:18 7:2,4
  34:22 47:20 50:22
  52:9
**we're** 3:10 4:11
  7:11,14,23 10:11
  12:5,7,17 16:18
  18:7 19:18 21:15
  22:6,19 25:25
  28:24 30:3 34:4
  38:12 42:9,18
  46:23 47:2 49:22

  51:3 52:18
**we've** 3:23 12:14
  18:1 31:5 33:12
**whisper** 24:17
**wife** 7:9
**wire** 20:7
**wish** 30:23
**wishes** 11:18
**witness** 2:3 9:4
  30:7 40:21
**witnesses** 9:2 16:2
  17:8
**wonderful** 52:8
**wondering** 46:15
**word** 36:14
**words** 11:5 14:3
  41:7
**work** 26:9
**worried** 34:9
**wouldn't** 26:13
**wrong** 9:22
**wrote** 28:9,9

___
### X
**X** 2:1,8

___
### Y
**Yeah** 4:25 6:5 7:1
  12:5 31:12 34:6,8
  36:8 45:10 47:5
  48:7,9,23 49:1
**year** 10:20,20
**years** 9:3
**yellow** 31:25
**yesterday** 12:12
  30:5

___
### $
**$5** 11:14 20:13,13

___
### 1
**1** 12:2,5
**1-888-777-6690**
  1:25
**1:53** 1:5 3:5
**10** 4:1 10:14 13:10
  19:2,6,7,21 20:5

**37:15 39:6,17,20
**10th** 1:14
**107** 51:8
**107-A** 51:8
**11** 1:7 6:21,22,25
**112** 51:8
**123** 1:20 26:8
**1250** 1:11
**12505** 1:17
**126** 26:8 51:8
**13** 1:3
**13th** 44:8
**14** 4:20,22 6:20,25
**14th** 28:9
**15** 10:12 12:7,19
  13:6
**16** 4:20,22 6:21,22
  6:25 10:14 13:7
  15:7,14 19:13,16
  37:14 41:15,16
**162** 51:8
**165** 51:8
**166** 51:10
**168** 51:9
**17** 19:3
**177** 51:10
**179** 51:10
**18** 7:7 19:13,16
  21:23 22:10,20
  45:17
**1800** 1:24
**1801** 1:24
**184** 51:10
**19** 7:17 53:13
**19103** 1:24
**19106** 1:12
**19107** 1:14
**19109** 1:21
**194** 44:5,6 51:10
**194-A** 44:5,6 51:11

___
### 2
**2** 39:5,18,19 41:9
  41:16
**2.12** 31:18,24 32:21
**2.28** 31:18 32:6
**2:14-cr-00548-C...**

1:2
**2:15** 21:17
**2:18** 21:17
**2:29** 35:3
**2:45** 35:3
**2:48** 38:15
**2:50** 38:15
**2000** 1:14
**2009** 14:2 15:21,22
　15:24 16:5,9 17:3
　17:19 19:25 20:6
　28:9 40:9,10
　41:22
**2010** 14:6 17:17,19
　17:21
**2011** 14:5
**2012** 13:24 15:16
　18:13,19 44:8
**2016** 1:3 53:13
**20854** 1:18
**22** 6:20 27:17,20
　28:6
**24** 28:7
**25** 28:8,8
**2500** 1:21
**29** 50:8

_____
**3**

**3:14** 1:5 52:25
**391** 26:8

_____
**4**

**4** 8:1,3 12:6
**40** 7:17

_____
**5**

**5** 10:11 12:7,19
　13:6 20:6 22:10
　22:20
**50** 5:17
**53** 48:4 51:8
**54** 7:22 8:1,3 45:20
**55** 8:1,3 10:11,14
　12:2,6,22 15:7
　37:14
**56** 39:5,17,18 41:9
　48:4 51:8

**57** 10:14 13:10
　37:15 39:5,20
**58** 48:4 51:8
**58-A** 51:8
**59** 48:4

_____
**6**

**6th** 1:17
**615** 1:11
**69** 19:2,6,7,12 20:3
　20:4

_____
**7**

**7** 8:1,3 23:4
**71** 21:23 22:1,9,20
　45:23 51:9
**72** 22:10,20
**73** 19:3 20:15 23:4
**77** 27:17,20 28:6

_____
**8**

**804** 30:17
**83** 51:8

_____
**9**

**9** 4:1
**9:00** 47:21 52:5

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 2                         - - -
     THE UNITED STATES OF AMERICA :  2:14-cr-00548-CDJ-1
 3                              :  PHILADELPHIA, PA
                  Plaintiff,    :
 4             vs.              :
                               :
 5       BRIAN HARTLINE, et al., :
                               :  April 18, 2016
 6              Defendants.  :  9:32 a.m.
                         - - -
 7
              TRANSCRIPT OF JURY TRIAL – DAY 11
 8        BEFORE THE HONORABLE C. DARNELL JONES, II
                UNITED STATES DISTRICT JUDGE
 9
     APPEARANCES:
10
     For the Plaintiff:  DAVID J. IGNALL, ESQ.
11                       JENNIFER CHUN BARRY, ESQ.
                         U.S. ATTORNEY'S OFFICE
12                       615 CHESTNUT ST.
                         SUITE 1250
13                       PHILADELPHIA, PA 19106
                         (215) 861-8233
14                       david.j.ignall@usdoj.gov
15   For the Defendant:  PATRICK J. EGAN, ESQ.
                         JOHN C. FULLER, ESQ.
16                       FOX ROTHSCHILD LLP
                         2000 MARKET ST 10TH FL
17                       PHILADELPHIA, PA  19107
                         (215) 299-2000
18                       (215) 299-3815
                         pegan@foxrothschild.com
19                       jfuller@foxrothschild.com
20   Also Present:       JOEL SCHWARTZ, ESQ.
                         RUSSELL DUNCAN, ESQ.
21                       ALLISON BAKER SHEALY
                         SCHULMAN ROGERS
22                       12505 PARK POTOMAC AVENUE
                         6TH FLOOR
23                       POTOMAC, MD 20854
                         (301) 945-9240
24                       (301) 945-9247
                         (301) 945-9283
25                       jschwartz@shulmanrogers.com
```

Page 2

```
 1                    ashealy@shulmanrogers.com

 2                    ANN FLANNERY, ESQ.
                      1835 MARKET STREET, SUITE 2700
 3                    PHILADELPHIA, PA 19103
                      (215) 636-9002
 4                    acf@annflannerylaw.com

 5                    MICHAEL ENGLE, ESQ.
                      123 S BROAD STREET
 6                    PHILADELPHIA, PA 19107
                      (215) 985-4275
 7                    mjeesq@msn.com

 8   AUDIO OPERATOR:   CSR OPERATOR
     TRANSCRIBER:      JANINE THOMAS
 9                     NOTARY PUBLIC

10   (Proceedings recorded by electronic sound recording,
     transcript produced by transcription service.)
11
              VERITEXT NATIONAL COURT REPORTING COMPANY
12                    MID-ATLANTIC REGION
                 1801 Market Street - Suite 1800
13               Philadelphia, Pennsylvania  19103
                      (888) 777-6690
14

15

16

17

18

19

20

21

22

23

24

25
```

1                          I N D E X

                                                      Page
2
    COLLOQUY                                      4
3
    WITNESS:  GERALD MANZI
4     Direct Examination by Mr. Egan             11
      Cross-Examination by Mr. Ignall            13
5
    WITNESS:  PATRICIA FADDEN
6     Direct Examination by Mr. Egan             14

7   WITNESS:  JOHN ZOLLER
      Direct Examination by Mr. Egan             16
8
    WITNESS:  ROBERT SMIK
9     Direct Examination by Mr. Egan             17

10  WITNESS:  PAUL ISENBERG
      Direct Examination by Mr. Egan             18
11
                     E X H I B I T S
12
    PLAINTIFF'S
13  NUMBER        DESCRIPTION          MARKED ADMITTED

14
    D-135         CPA License                  20
15

16  DEFENDANT'S
    NUMBER        DESCRIPTION          MARKED ADMITTED
17
18  1125          Unidentified                 39
    113           Stock Certificate            45
19

20
    (* Marked prior to the start of the proceeding.)
21

22

23

24

25

1          THE COURT:  All right.  There have been two

2    motions filed one being this past Friday and one being this

3    morning each by letter, by the government.

4          MR. IGNALL:  Yes.

5          THE COURT:  By the government.

6          MR. IGNALL:  Yeah, one [indiscernible] serve a

7    motion and one I think is just a letter outlining how we

8    anticipate the character evidence would go, but yes, Your

9    Honor; that's correct.

10          THE COURT:  Okay.  Now, the one that you're

11   referring to that is a motion that's the one on Friday?

12          MR. IGNALL:  That's Friday.  That's regarding --

13          THE COURT:  That was not formally filed?  Was it

14   formally filed or was it a letter?

15          MR. IGNALL:  It was a letter, Your Honor.

16          THE COURT:  Okay.  All right.  Argument other

17   than what's contained in the letter?

18          MR. IGNALL:  I don't think there's much to

19   argue.  I -- I think we've -- we raised it before.  We just

20   wanted to be able to supplement that because we were not --

21   the Court had ruled on that prior to trial that's why we set

22   up the order of the evidence that we did, I don't think I was

23   fully prepared to argue because I didn't realize we were going

24   to have that argument until perhaps the night before we put on

25   the [indiscernible] evidence, so that's why I wanted to

1  supplement that I think it's within the Court's discretion

2  [indiscernible] allow the government to reopen and I do think

3  the probative value of this evidence is significant and I'm

4  not sure there is much if any unfair prejudice.

5      THE COURT:  All right.  Thank you.  Defense.

6      MR. EGAN:  Your Honor, we set forth the basis of

7  our arguments in our letter and I'm -- I won't -- I won't

8  elaborate the point, but number one, that she not be reopened

9  it's a very extraordinary remedy and it would be improper at

10  this point after having briefed the 29 motion and number 2,

11  Your Honor's ruling was at -- correct in the first place and a

12  proper use of your discretion.

13      THE COURT:  All right.  The government's motion

14  to reopen and the government's motion for the Court to

15  reconsider its ruling is hereby denied.  The Court initially

16  ruled in favor of its admissibility well before the Court

17  heard all the relevant and probative evidence in this case and

18  upon reflection and having heard it that's the basis for the

19  Court's ruling, so the motion to reopen is denied.  The motion

20  for reconsideration is denied.

21      MR. IGNALL:  All right.  Thank you, Your Honor.

22      THE COURT:  All right.  Now, secondly, there was

23  a letter filed this morning, now, we have to file

24  [indiscernible] we need to file a formal order denying the

25  motion.

1          There was a letter this morning from the

2   government regarding character evidence?

3              MR. IGNALL:  Yes, Your Honor, and that was --

4              THE COURT:  Has the government, has defense

5   received that?

6              MR. EGAN:  Yes, Your Honor.

7              MR. IGNALL:  I understand Mr. Schwartz wanted to

8   raise some with the Court about that.

9              THE COURT:  All right.

10             MR. SCHWARTZ:  Yes, Your Honor, Mr. Ignall --

11             THE COURT:  Could I just ask you one question?

12  Do you intend to do that this morning or today, the morning

13  session?

14             MR. SCHWARTZ:  [Indiscernible] our witnesses

15  were Mr. Duncan, our character witness.

16             THE COURT:  This morning?

17             MR. IGNALL:  Yes, Your Honor.

18             MR. SCHWARTZ:  It could take a moment.

19             MR. IGNALL:  Your Honor.

20             MR. EGAN:  Your Honor, I have on behalf of Mr.

21  Hartline, I have five character witnesses and I have a

22  stipulation as to an exhibit and I'm going to move my exhibits

23  in and rest.

24             THE COURT:  And you?

25             MR. SCHWARTZ:  We're going to follow Mr.

1    Hartline if the issue is just between Mr. Bekkedam and the

2    government with regard to the instance of the conduct we can

3    wait until after Mr. Hartline has presented his evidence and

4    [indiscernible] Your Honor, please.

5              THE COURT:  The Court's concern is the issue

6    surrounding good faith basis to ask a familiar question about

7    specific conduct and I really want to make sure that we do

8    this correctly before we get into this and I would frankly

9    urge both sides to see if they can work this out without there

10   being this kind of [indiscernible] objection issue before the

11   jury.  Is there any possibility that you can do that before

12   this evidence is present?

13             MR. IGNALL:  We can talk about it.  I doubt we

14   come to resolution.

15             THE COURT:  I would urge you to do that.

16             MR. IGNALL:  But I'm happy to do that.  Maybe we

17   could do that after Mr. Egan puts on his character evidence.

18             THE COURT:  Well, that's the problem.  I just --

19             MR. IGNALL:  No, I -- I don't anticipate this

20   issue coming up with respect to Mr. Egan 's witnesses.

21             THE COURT:  Oh, okay.  All right then.  Fine.

22   Okay.

23             MR. SCHWARTZ:  Thank you.

24             THE COURT:  Thank you all.

25             MR. IGNALL:  But -- but there's another issue.

1    There are I believe four possible character witnesses for Mr.

2    Bekkedam who were not on the original witness list, so I think

3    it's appropriate and I believe counsels agree with me for the

4    Court to read those names out to the jury to make sure that no

5    jurors are familiar with any of those witnesses in which case

6    --

7                    THE COURT:  Sure.

8                    MR. IGNALL:  -- that witness couldn't testify.

9                    THE COURT:  Sure.

10                   MR. SCHWARTZ:  And that too can wait to see if

11   we can resolve these.

12                   THE COURT:  All right.  Great.

13                   MR. EGAN:  Well, there is one -- one of my

14   witnesses are not on there too.

15                   THE COURT:  Okay.  Do you know who that is?

16                   MR. EGAN:  Yes, Your Honor, his name is

17   [indiscernible] his name is Paul Isenberg.

18                   THE COURT:  Isenberg?

19                   MR. EGAN:  Yes.  I-S-E-N-B-E-R-G, Paul.  And if

20   anybody knows him we just won't call him.

21                   THE COURT:  All right.  Is there anything

22   further then?

23                   MR. IGNALL:  There's one more issue and I don't

24   know when the Court wants to address it with respect to I

25   think it's -- might be five government exhibits that we moved

1    in before we rested we allowed the defense to reserve the

2    right to raise an objection as to something other than

3    authenticity and I understand that counsel does -- objection

4    to five of those, I don't know when the Court wants to address

5    that.  I don't know that it needs to be this morning.

6              THE COURT:  Okay.  We can do it as soon as we

7    finish if that's appropriate.  If that's okay.

8              MR. IGNALL:  Yeah, I think that's fine.  I just

9    wanted to raise it with the Court.

10             THE COURT:  Fine.  All right.  Thank you.

11             MR. IGNALL:  And then I believe we have an -- we

12   may have an objection to one or two of the exhibits that Mr.

13   Egan wishes to introduce, but again, I think we probably would

14   do that all at the same time.

15             THE COURT:  Very well.  Fine with me.  All

16   right.  So with the jury comes out I'll initially ask them

17   about one Paul Isenberg.

18             MR. SCHWARTZ:  Yes, Your Honor.

19             THE COURT:  And then we'll go on from there.

20             MR. SCHWARTZ:  Thank you, Your Honor.

21             THE COURT:  All right.  We're ready, thank you.

22                           -  -  -

23                          Pause

24                           -  -  -

25             DEPUTY CLERK:  All rise.

1                         – – –

2                 (The jury enters the courtroom.)

3                         – – –

4         DEPUTY CLERK:  Court is now in session.  The

5    Honorable C. Darnell Jones, II presiding.

6         THE COURT:  Good morning.  Good morning.  You

7    may be seated.  All right.  Again, formally, good morning

8    members of the jury.  There is one witness name that we did

9    not include as the jury selection process in this case.  I'm

10   going to apprise you of that person's name to see whether or

11   not anyone knows that person and then we'll go from there.

12   The individual is Paul Isenberg.  Do any of you know that

13   person or are you familiar at all with that name?  All right.

14   Fine.  Counsel, you may proceed.

15        MR. EGAN:  Thank you, Your Honor.  The defense

16   calls Gerald Manzi.

17                        – – –

18                (GERALD MANZI – SWORN)

19                        – – –

20        DEPUTY CLERK:  Have a seat.  Spell your name for

21   the record for the record.

22        THE WITNESS:  Good morning, my name is Jerry

23   Manzi, legally, Gerald Edward Manzi, II.

24        DEPUTY CLERK:  Spell your last name, please.

25        THE WITNESS:  Manzi, M-A-N-Z-I.

1                        –  –  –

2                     EXAMINATION

3                        –  –  –

4    BY MR. EGAN:

5    Q.    Good morning Mr. Manzi.

6    A.    Good morning.

7    Q.    Do you know Brian Hartline?

8    A.    Yes, I do.

9    Q.    And how do you know him?

10   A.    I know Brian as a friend through business.  We've known

11   each other probably about 15 years.

12   Q.    And what do you do?

13   A.    I'm a mortgage banker.

14   Q.    And do you know other individuals who know Mr.

15   Hartline?

16   A.    Yes, I do.

17   Q.    And among those individuals what is his reputation for

18   being a law-abiding citizen?

19   A.    As high character and honest gentleman as you'll ever

20   meet.

21             MR. EGAN:  I have no further questions, Your

22   Honor.

23             THE COURT:  Questions?

24             MR. IGNALL:  [Indiscernible] Your Honor.

25                        –  –  –

Page 12

```
 1                    CROSS-EXAMINATION
 2                        - - -
 3   BY MR. IGNALL:
 4   Q.    Mr. Manzi, do you hear other people talking about Mr.
 5   Hartline a lot?
 6   A.    Yes, I do.
 7   Q.    And people just talk a lot about how law-abiding he is?
 8   A.    When people throw out the term good guy, his name is
 9   normally in that mix.
10   Q.    And they always talk about how law-abiding he is; is
11   that right?
12   A.    As good a solid citizen as there is, yeah.
13   Q.    And you never heard anything negative about him that
14   people said?
15   A.    Never once.
16   Q.    All right.  Thank you.
17            MR. EGAN:  No further questions, Your Honor.
18            THE COURT:  Thank you, sir, you may step down.
19   Watch you step, please.
20            THE WITNESS:  Thank you.
21            MR. EGAN:  At this time we would call Patricia
22   Fadden.
23                        - - -
24            (PATRICIA FADDEN - SWORN)
25                        - - -
```

1           THE WITNESS:  I do.

2           DEPUTY CLERK:  Please state and spell your name

3    for the record.

4           THE WITNESS:  I'm Sister Patricia Fadden.

5           THE COURT:  I'm sorry?

6           THE WITNESS:  I'm Sister Patricia Fadden.

7           DEPUTY CLERK:  Please spell your last name.

8           THE WITNESS:  F, as in frank, A-D-D-E-N.

9           THE COURT:  You may proceed.

10                          -   -   -

11                       EXAMINATION

12                          -   -   -

13   BY MR. EGAN:

14   Q.   Good morning, Sister?

15   A.   Good morning.

16   Q.   What do you do?

17   A.   I'm the president of Immaculata University.

18   Q.   And do you know Brian Hartline?

19   A.   I do.

20   Q.   And how do you know Brian Hartline?

21   A.   Brian was the trustee for six years from '05 to '11.

22   He served on Institutional Advancement Committee which was

23   responsible for.

24           MR. IGNALL:  Objection.  This is [indiscernible]

25   on specific instance of conduct.

Page 14

1                    THE COURT:  Sustained.  Sustained.

2    BY MR. EGAN:

3    Q.    Certainly.  And do you know other individuals who know

4    Mr. Hartline?

5    A.    Yes.

6    Q.    Such as other board members?

7    A.    Other board members.

8    Q.    Among those people what is his reputation for being

9    honest and law-abiding?

10   A.    He has a reputation amongst our board being trustworthy

11   and law-abiding.

12                   MR. EGAN:  I have no further questions, Your

13   Honor.

14                   MR. IGNALL:  No questions, Your Honor.

15                   THE COURT:  Thank you very much, you may step

16   down.  Watch you step, please.

17                   THE WITNESS:  Thank you.

18                   MR. EGAN:  At this time we call John Zoller.

19                          - - -

20                   (JOHN ZOLLER - SWORN)

21                          - - -

22                   DEPUTY CLERK:  Please state spell your last name

23   your name for the record.

24                   THE WITNESS:  John Zoller, Z-O-L-L-E-R.

25                   DEPUTY CLERK:  Thank you.

Page 15

1             THE COURT:  You may proceed.

2                         -  -  -

3                      EXAMINATION

4                         -  -  -

5    BY MR. EGAN:

6    Q.    Good morning, Mr. Zoller.

7    A.    Good morning.

8    Q.    Mr. Zoller, what do you do?

9    A.    I'm a retired compliance officer.

10   Q.    And do you know Brian Hartline?

11   A.    Yes, sir, I do.

12   Q.    How do you know him?

13   A.    I've known him by working with him and as a friend.

14   Q.    And do you know other individuals in the community who

15   know him?

16   A.    Yes, I do.

17   Q.    Among those people, what is his reputation for being an

18   honest and law-abiding citizen?

19   A.    Absolutely impeccable.

20             MR. EGAN:  No further questions, Your Honor.

21             MR. IGNALL:  No questions, Your Honor.

22             THE COURT:  Thank you, sir, you may step down

23   and watch your step, please.

24             MR. EGAN:  At this time we would call Robert

25   Smik.

1                              − − −

2                    (ROBERT SMIK − SWORN)

3                              − − −

4             DEPUTY CLERK:  Please state and spell your name

5    for the record.

6             THE WITNESS:  My name is Robert Smik.  Last name

7    S−M−I−K.

8                         −  −  −

9                       EXAMINATION

10                        −  −  −

11   BY MR. EGAN:

12   Q.    Good morning, Mr. Smik?

13   A.    Good morning.

14   Q.    Sir, what do you do?

15   A.    Compliance officer for financial banks or other local

16   companies.

17   Q.    And do you know Brian Hartline?

18   A.    I do.

19   Q.    How do you know him?

20   A.    I worked with Brian for 20 years.

21   Q.    And do you know other individuals who know him?

22   A.    I do.

23   Q.    And among those people what is the reputation for being

24   an honest and law−abiding citizen?

25   A.    I think [indiscernible] very good.  He's got a good

1   reputation with other financial institutions, other bank

2   presidents, anybody that I've ever come in contact with have

3   always spoken very well about him.

4           MR. EGAN:  No further questions, Your Honor.

5           MS. BARRY:  No questions.

6           THE COURT:  Thank you, sir, you may step down,

7   watch you step, please.

8           MR. EGAN:  And Paul Isenberg.

9                       -  -  -

10                  (PAUL ISENBERG - SWORN)

11                      -  -  -

12          DEPUTY CLERK:  State and spell your name for the

13  record.

14          THE WITNESS:  Pall Isenberg, I-S-E-N-B-E-R-G e.

15          DEPUTY CLERK:  Thank you.

16          THE COURT:  You may proceed.

17                      -  -  -

18                   EXAMINATION

19                      -  -  -

20  BY MR. EGAN:

21  Q.    Good morning, Mr. Isenberg?

22  A.    Good morning.

23  Q.    Sir, what do you do?

24  A.    I run a charity call Bringing Hope Home we pay bills

25  for families with cancer.

1   Q.    And do you know Brian Hartline?

2   A.    I do.

3   Q.    How do you know him?

4   A.    We played football against each other in college in the

5   late 80s and have stayed friends since.

6   Q.    And do you know other people who know Brian?

7   A.    Yes.

8   Q.    And among those people who know him, what is his

9   reputation for being an honest and law-abiding citizen?

10  A.    Very solid.  Very solid.  Very good.

11          MR. EGAN:  I have no further questions, Your

12  Honor.

13          MS. BARRY:  No questions thank you.

14          THE COURT:  Thank you, sir, you may step down,

15  sir --

16          MR. EGAN:  You may step down, sir.

17          THE COURT:  -- and watch your step, please.

18          MR. EGAN:  Your Honor, at this time we have a

19  stipulation and I'm going to present D-135 to the jury.

20          MR. IGNALL:  No objection, Your Honor.

21          THE COURT:  All right.  Your may proceed.

22  Again, members of the jury, a stipulation is an agreement

23  between counsel that what is being presented to you is not

24  contested and is accurate.  You may proceed.

25          MR. EGAN:  D135 is a Pennsylvania Department of

1   State record for Brian M. Hartline showing that he was a

2   certified public accountant, showing his license number,

3   showing that it was issued in 1990, expired in 2000, last

4   renewed in 1998, no disciplinary actions found.  If we could

5   move that into evidence, Your Honor.

6                THE COURT:  All right.

7                MR. IGNALL:  No objection, Your Honor.

8                THE COURT:  Very well.

9                        -  -  -

10               (Whereupon, Plaintiff's Exhibit Number D135 was

11   admitted into evidence.)

12                       -  -  -

13               MR. EGAN:  And, Your Honor, with that I have a

14   list of defense exhibits which we would move into evidence and

15   the defense would rest.

16               THE COURT:  Very well.

17               MR. EGAN:  Should I give the list to you later

18   or.

19               THE COURT:  You can give it to me later, yes,

20   sir.

21               MR. EGAN:  Thank you.

22               MR. IGNALL:  Yeah, we have an agreement as to

23   most of them, Your Honor.

24               THE COURT:  All right.  Thank you.  Let's take a

25   very brief recess.

Page 20

 1                DEPUTY CLERK:  All rise.

 2                            - - -

 3                (The jury leaves the courtroom.)

 4                            - - -

 5                THE COURT:  All right.  We are still in session.

 6     You may be seated.  All right.  Counsel, now, do you wish to

 7     address the issue with Mr. Bekkedam?

 8                MR. SCHWARTZ:  Yes, Your Honor.

 9                THE COURT:  Yes, sir.

10                MR. SCHWARTZ:  Joel Schwartz for Mr. Bekkedam,

11     Your Honor.  The government filed a letter brief this morning

12     acknowledging or indicating that it was going to introduce our

13     cross-examination question on cross-examination.  Mr.

14     Bekkedam's character witnesses with regard to specific

15     instances of conduct.  To be clear and to notify the

16     government our character witnesses or our proposed character

17     witnesses are being offered for reputation in the community

18     for be a law-abiding citizen.  That is all.  I spoke with Mr.

19     Ignall and he was good inform me that it was the intention of

20     the government to cross-examine the character witnesses with

21     regard to the Banyan Income Found and it's our position that

22     there's no conduct there that can be cross-examined about and

23     that's one of the threshold standards for any kind of

24     cross-examination.  There's got to be conduct.  There's got to

25     be a good faith basis for asking questions.  It's got to be a

1   matter reasonably proximate to the time of the alleged offense

2   and it has to be likely to have been known to the relevant

3   community.

4           It's our position that anything that the

5   government --

6           THE COURT:  This is for Banyan?

7           MR. SCHWARTZ:  Yes.  It's -- and again, I would

8   ask the government if there's more than just asking about

9   Banyan I would address that and I don't know if the Court

10  wants to ask the government exactly what the scope of the

11  cross, proposed cross-examination is before I address this or

12  I can give the whole argument now.

13          THE COURT:  Go ahead.

14          MR. SCHWARTZ:  Okay.  Your Honor, Banyan and the

15  issues of what happened with -- what did or didn't happen with

16  regard to Mr. Bekkedam is not conduct at this time.  There are

17  allegations.  There's an SEC lawsuit, but there's no criminal

18  allegations and there's no proof that he's done anything.  To

19  introduce that, 1) you would introduce -- open a whole can of

20  worms about things that are speculation and essentially it

21  would be posing what's been referred to in the case as a guilt

22  assuming hypothetical.  Guilt assuming hypotheticals are not

23  permitted for cross-examination of reputation witnesses that

24  are only permitted for opinion witnesses.  We are not offering

25  any of these witnesses as opinion witnesses, therefore we

Page 22

1   would move and eliminate to exclude any cross-examination

2   about Banyan or Rothstein or any of these south Florida

3   investment opportunity activity that's been touched on but

4   largely excluded by the government -- by the Court.

5           THE COURT:  All right.  Thank you.  All right,

6   Mr. Ignall.

7           MR. IGNALL:  Your Honor, just to be clear, if

8   testimony is limited to reputation as opposed to opinion, I

9   would not ask a guilt assuming hypothetical.

10          THE COURT:  Okay.

11          MR. IGNALL:  The problem is reputation evidence

12  is inherently speculative.  It's based on rumors and

13  understandings within the community.  I think it's of limited

14  probative value, but the case law is clear that if a defendant

15  puts his reputation in evidence he puts himself potentially as

16  to cross-examination possibly even rebuttal testimony

17  regarding rumors and things that are out there even if they're

18  unproven, therefore --

19          THE COURT:  What's the difference between what

20  you're saying is permitted and not permitted then?

21          MR. IGNALL:  What I -- what I could not do --

22  what I could do with an opinion witness who witnesses, steps

23  up on the stand and says, in my opinion Mr. Bekkedam is honest

24  or in my opinion Mr. Bekkedam is law-abiding.  I could probe

25  are you familiar with the facts of this case?  Would you

1   consider someone who defrauds the Treasury or attempted to

2   defraud the Treasury to be law-abiding or honest to probe the

3   credibility of that witness' testimony regarding opinion?

4            The Third Circuit is clear that if the

5   opinion -- if the testimony is limited to reputation in the

6   United States versus Kellogg I cannot ask a question like

7   that.  However, if it goes to reputation anything that someone

8   in the community might have heard is fair game to test that

9   witnesses observations about this witness' reputation, because

10   it's not this witness' opinion, him or herself about whether

11   Mr. Bekkedam is law-abiding, but what he or she has heard in

12   the community and there were plenty of stories in the

13   community in Florida and even in Philadelphia that I found in

14   newspapers starting in November of 2009 regarding the

15   Rothstein Ponzi Scheme, Mr. Bekkedam's clients involved them

16   with it and I believe the first lawsuit in which Mr. Bekkedam

17   was mentioned regarding clients going into the Rothstein Ponzi

18   Scheme was November 2, 2009.  He's been named in a number of

19   lawsuits regarding that.  So it's perfectly permissible for me

20   to ask a witness if that witness is familiar with lawsuits

21   alleging that Mr. Bekkedam engaged in fraud.  Mr. Bekkedam

22   can't have it both ways.  He can't open the door to reputation

23   and only hear, wow, his reputation's great without me being

24   allowed to cross-examine about things that don't need to be

25   proven that would show that his reputation was less than

1   stellar.

2               THE COURT:  Right.  [Indiscernible] you finish?

3               MR. IGNALL:  Yes.

4               THE COURT:  All right.  Counsel.

5               MR. SCHWARTZ:  Your Honor, [indiscernible] --

6               THE COURT:  Could you come back to the podium,

7   please?

8               MR. SCHWARTZ:  The threshold issue, Your Honor,

9   is conduct and what's -- what Mr. Ignall is seeking to

10  introduce on cross-examination is questions about allegations.

11  Are you aware about allegations with regard to Mr. Bekkedam's

12  involvement in the Rothstein Ponzi Scheme?  Are you aware of

13  allegations?

14              THE COURT:  But he's saying that that's

15  permissible under the case law.

16              MR. SCHWARTZ:  It's -- it -- the United States

17  versus Curtis' conduct, there's got to be construct.  If there

18  was conduct, if there was something proven that Mr. Bekkedam

19  had done that would be a different story, but --

20              THE COURT:  Done as in --

21              MR. SCHWARTZ:  Adjudicated, irrefutable, there's

22  newspaper articles, there's rumor and innuendo, that's I

23  believe what Mr. Ignall suggested that he -- is the foundation

24  for his questions.  There's got to be a good faith basis by

25  the government --

1          THE COURT:  Let's assume the government has a

2    good faith basis in that that have read it and they know what

3    they have read.  My question is the government's position is

4    is that that is admissible and you're saying it's not.

5          MR. SCHWARTZ:  It's -- it's -- I -- I would need

6    to hear the specific question, but I believe that you have to

7    ask about conduct and not have you heard about Mr. Bekkedam

8    being associated with the Rothstein Ponzi Scheme and not only

9    is that not permissible for cross-examination, it's certainly

10   not permissible for putting on rebuttal evidence.

11         THE COURT:  Well, if there was a question Mr.

12   Ignall, are you familiar with him being associated with the

13   Rothstein Ponzi Scheme, the jury has no clue what that means.

14   Would you ask a question like that?

15         MR. IGNALL:  Not in that -- not in those terms,

16   Your Honor.  I would ask if they were familiar with Mr.

17   Bekkedam being sued for fraud in connection with his client's

18   investing in the Banyan Funds.

19         THE COURT:  Now do you have an objection to that

20   question?

21         MR. SCHWARTZ:  He was sued.  It's my

22   understanding that most of those cases were settled out of

23   court with a confidential settlement and with no admission of

24   liability.  That goes to an innuendo not conduct.  It's --

25   it's -- it certainly suggests conduct, you know, if there's a

1    lawsuit and this lawsuit is over, Your Honor unless I can go

2    into, well, did you know the people in the community also know

3    that that was settled?  Well, did you know it was settled

4    without an admission of liability?  Well, did you know that no

5    money was paid?  Did you know that everybody got their money

6    back?  It's, first of all, making a trial within a trial which

7    we try to avoid and secondly, it's not conduct.  Even if it's

8    a --

9              THE COURT:  Let me just ask Mr. Ignall, are you

10   in agreement that it's conduct that's the issue?

11             MR. IGNALL:  It is conduct, but it's the

12   witness' familiarity with stories about this conduct.  The

13   case law is quite clear on this.  We cited United States

14   versus Apple [indiscernible] that we can inquire about a

15   witness' familiarity with newspaper stories.  This all goes

16   back to Michaelson in the 1948 Supreme Court case where it

17   says that the prosecution may pursue the inquiry with

18   contracted witnesses in fact if they needed to, to show that

19   damages rumors whether or not well founded were afoot.

20             THE COURT:  Now, let me just stop you there.

21   Mr. Schwartz, that is what the case law says, for Michaelson

22   says.  Now, what's different?

23             MR. SCHWARTZ:  What's different is and the best

24   analogy I can give Your Honor is --

25             THE COURT:  Again, I'm going to need you at the

1   microphone.  Speak loudly.

2              MR. SCHWARTZ:  I'm sorry.

3              THE COURT:  That's all right.

4              MR. SCHWARTZ:  [Indiscernible] one, could, Your

5   Honor.

6              THE COURT:  Sure.

7              MR. IGNALL:  Your Honor, if I may just add,

8   nothing obligates the defendant to put on a character witness.

9   If he chooses to do that then he's opening the door.  Our

10  argument is you can't put on the character witness and then

11  keep the door closed.  He can make a choice one way other and

12  he has to live with both sides of it.

13             MR. SCHWARTZ:  That I do [indiscernible], but

14  lawsuits are about allegations of -- are about allegations

15  surrounding issues of truthfulness or not truthfulness.  We

16  are talking about law-abiding nature.  The question is is a

17  law -- the fact of a lawsuit even if you accept a lawsuit as a

18  fact or conduct that doesn't show that he broke the law.  We

19  are offering evidence about whether or not he has a reputation

20  in the community for breaking the law.

21             THE COURT:  Well, let me ask it this way.  If

22  there's a lawsuit involving an automobile accident, I think

23  you all can agree that's not admissible.

24             MR. SCHWARTZ:  Yes, I agree.

25             THE COURT:  If there's a lawsuit by the SEC

1    regarding finances isn't that our difference?

2                MR. SCHWARTZ:  Not with regard to

3    law-abidingness, Your Honor, it's -- it's an allegation.  It's

4    not about truthfulness and it's not about something -- a

5    proven fact.

6                THE COURT:  Then you're saying that per se any

7    lawsuit evidence is inadmissible?

8                MR. SCHWARTZ:  Certainly without a disposition

9    with regard to that lawsuit as to liability, as to a

10   conclusion about something that he actually has done.

11               THE COURT:  Mr. Ignall.

12               MR. IGNALL:  I don't know where the authority is

13   that has to be a proven fact.  That would be contradictory to

14   Michaelson that says rumors that are well founded --

15               THE COURT:  Rumors not proven facts and

16   newspaper articles are not necessarily proven facts.  Mr.

17   Schwartz.

18               MR. SCHWARTZ:  I'd have to -- I'd have to look

19   at Michaelson again, but there's a difference --

20               THE COURT:  I mean isn't the foundation for all

21   this a good faith basis for asking the question?

22               MR. SCHWARTZ:  There has to be a good faith

23   basis that there was conduct and there also -- it has to be

24   limited to, a) whether it's reputation or opinion which Mr.

25   Ignall has acknowledged, but also about law-abidingness in the

1    best analogy I can give Your Honor is in the State Court

2    system there's got to be a conviction.  There's got to be a

3    determination that the person did something wrong in order to

4    cross-examine someone on conduct with regard -- or on

5    character with regard to law-abiding nature.

6               THE COURT:  And the case law that speaks of

7    rumors?

8               MR. SCHWARTZ:  I don't think rumors can rebut

9    somebody's reputation for being law-abiding it's got to be

10   conduct.  It's got to be a -- an irrefutable fact.  It doesn't

11   have to be an irrefutable fact proven by a lawsuit

12   determination, but it can't be something that somebody's

13   alleging.

14              THE COURT:  Did you file a response?

15              MR. SCHWARTZ:  I got it this morning, Your

16   Honor.  I mean, I'm happy to write something, but, like, I

17   would write what I've argued and I don't want to --

18              THE COURT:  Well, I want case law.  Case law.

19              MR. SCHWARTZ:  Okay.  And the case law -- I --

20   I'm happy to write it down.  The cases are Curtis and Kellogg

21   and Michaelson and -- as interpreted by the Eastern District

22   of Pennsylvania --

23              THE COURT:  Do you have citations?

24              MR. SCHWARTZ:  Yes.  Curtis is 644 F.2d 263 and

25   the discussion is at 267.

Page 30

1           THE COURT:  You're a little fast for me.

2           MR. SCHWARTZ:  I'm so sorry, sir.  It's a bad

3    habit.

4           THE COURT:  U.S. v. Curtis.

5           MR. SCHWARTZ:  Yes, 644 F.2nd 263 and the

6    specific discussion is at 267 and 268.

7           THE COURT:  Now, was that reputation or was that

8    opinion?

9           MR. SCHWARTZ:  It discusses both, but it

10   explains the distinction between reputation and opinion.

11          THE COURT:  And the date?

12          MR. SCHWARTZ:  That is 1981, Your Honor.

13          THE COURT:  Next.

14          MR. SCHWARTZ:  Next is United States versus

15   Kellogg, two Ls, two Gs, 510 F.3rd 188 at 192, it's a Third

16   Circuit opinion and the date is 2007.

17          THE COURT:  And again, is that opinion or

18   reputation.

19          MR. SCHWARTZ:  That's, it's, again, it -- it's a

20   further interpretation of the distinction that Curtis laid

21   out.

22          THE COURT:  All right.

23          MR. SCHWARTZ:  Those are the two leading cases

24   in the ones that I think are dispositive with regard to this

25   issue.

Page 31

1                    THE COURT:  All right.

2                    MR. SCHWARTZ:  And I have copies of each if you

3      mind like me to hand them up.

4                    THE COURT:  That would be great.  Thank you.

5                    MR. SCHWARTZ:  And sorry about circling.

6                    THE COURT:  Now, thank you.  Mr. Ignall, your

7      cases are in your letter?

8                    MR. IGNALL:  They're in my -- they're in my --

9      they're in my letter brief.

10                   THE COURT:  All right.

11                   MR. IGNALL:  We cite Kellogg in the letter

12     brief.  I think I've seen Curtis, but I'd like to look at that

13     cite again just to --

14                   THE COURT:  All right.  We're going to take a

15     brief recess to do all this.  If you have -- if you can, if we

16     can.

17                   MR. IGNALL:  Pardon me.

18                   THE COURT:  We'll take a recess to do all this

19     if we can.

20                   MR. IGNALL:  Okay.

21                   THE COURT:  Now, one last thing, Mr. Ignall, is

22     there any way that you can supply the Court and the defendant

23     with the specific questions and/or area that you wish to delve

24     into?

25                   MR. IGNALL:  I -- I -- I think I've said what

Page 32

1   the question could be.

2               THE COURT:  All right.

3               MR. IGNALL:  I don't think that the case law is

4   clear.  I'm not obligated to do that to give the defendant a

5   chance to --

6               THE COURT:  I understand, but this is to assist

7   the Court in making a proper decision.

8               MR. IGNALL:  But the questions I would ask would

9   be about stories that were out there regarding Mr. Bekkedam

10  being sued for fraud.

11              THE COURT:  All right.  Hold on a second.

12              MR. IGNALL:  Or otherwise engaged in fraud.

13              THE COURT:  And the good faith basis?

14              MR. IGNALL:  Good faith basis is I have a number

15  of newspaper articles that the -- let's see, the first lawsuit

16  was filed in November of 2009.  I have newspaper articles

17  going back to November 24, 2009.  I've got newspaper articles

18  in early 2010 regarding that.

19              THE COURT:  Okay.

20              MR. SCHWARTZ:  May I ask were the names

21  Rothstein, Banyan and [indiscernible]?

22              MR. IGNALL:  I would elicit Banyan or Rothstein,

23  yes, because I think that tests the witness' knowledge of Mr.

24  Bekkedam's reputation.

25              THE COURT:  Those two?

1          MR. IGNALL:  Pardon me?

2          THE COURT:  Those two?

3          MR. IGNALL:  Rothstein and Banyan, yes, sir.

4          THE COURT:  No.  I'm saying, I'm sorry, I have

5   Rothstein, Banyan and stories about Mr. Bekkedam being sued

6   for fraud and/or other -- or otherwise engaged in fraud --

7          MR. IGNALL:  Correct, Your Honor.

8          THE COURT:  -- based on news articles and --

9          MR. IGNALL:  Yes, have they heard -- have they

10  heard stories --

11          THE COURT:  -- and early lawsuit.

12          MR. IGNALL:  -- about that.

13          THE COURT:  All right.

14          MR. IGNALL:  That's the question.

15          THE COURT:  Now, is there going to be any

16  mention of the SEC?

17          MR. IGNALL:  I don't -- I -- I don't think I

18  need to mention the SEC, because that is another lawsuit.  Are

19  they aware -- that's one of the lawsuits?  I don't need to

20  mention the SEC specifically.

21          THE COURT:  You would not?

22          MR. IGNALL:  I would not mention the SEC

23  specifically.

24          THE COURT:  All right.  Mr. Schwartz.

25          MR. SCHWARTZ:  Thank you for elaborating.  Those

1  are still questions that we think our objection.

2              THE COURT:  All right.

3              MR. SCHWARTZ:  Thank you.

4              THE COURT:  Fifteen minutes, please.

5              MR. IGNALL:  All right.  Thank you, Your Honor.

6              MR. SCHWARTZ:  Thank you, Your Honor.

7                         -  -  -

8      (Whereupon, there was a recess in the proceeding from

9                 10:06 a.m. to 10:21 a.m.)

10                        -  -  -

11             THE COURT:  All right.  Now that I've taken care

12  of that issue, next.  All right.

13             UNIDENTIFIED SPEAKER:  All we needed was a

14  friend.

15             THE COURT:  Sounds good.  All right.  Where are

16  we now?

17             MR. ENGLE:  We're going to seek the admission of

18  defense exhibit 1125 which I believe the government has no

19  objection to.

20             MR. IGNALL:  That's correct.

21             MR. ENGLE:  And at that point I will signal that

22  we rest.

23             THE COURT:  All right.  Defense exhibit 1125?

24             MR. ENGLE:  Defense exhibit 1125, that is

25  correct, Your Honor.  It was introduced during my

1    cross-examination of Mr. Patterson.

2                 THE COURT:  Right.

3                 MR. ENGLE:  If the Court is looking for where in

4    the record.

5                 THE COURT:  All right.

6                 MR. EGAN:  And, Your Honor.

7                 THE COURT:  Yes.

8                 MR. EGAN:  Would it make sense to discuss

9    scheduling issues before we bring the jury back out?

10                THE COURT:  It would be fine with me.

11                MR. EGAN:  We obviously have to have a charge

12   conference.

13                THE COURT:  Yes, sir.

14                MR. EGAN:  I'm prepared to do that this morning

15   if Your Honor so desires.

16                THE COURT:  Do I have all of the joint -- did I

17   have the jointly filed?

18                MR. EGAN:  I believe you do, Your Honor,

19   there's --

20                MR. IGNALL:  Well --

21                MR. EGAN:  -- been a couple of different

22   iterations.  There was a --

23                THE COURT:  Unilateral joint.  Unilaterally

24   joint.

25                MR. IGNALL:  Yeah, Your Honor, I thought we had

1  much more that was joint than we actually do.  I only looked

2  at this over the weekend.  Before the negative listing we had

3  agreed on most of the pattern charges.  I now [indiscernible]

4  that the defense disagreed with many of the pattern

5  instructions, so I think there's much less that was joint than

6  I realized.  There is one additional instruction, Your

7  Honor --

8            THE COURT:  As a 29 year rule I used the

9  standard instructions that have been approved by either the

10  Supreme Court of Pennsylvania or other Third Circuit.

11           MR. IGNALL:  But Your Honor, there is one

12  additional instruction that we did not include in our packet

13  regarding consciousness of guilt.  I suspect that there will

14  be an objection over that, but I was hoping to file that this

15  morning.

16           THE COURT:  So are we prepared to do this charge

17  conference this morning?

18           MR. IGNALL:  I -- I would need to go back to my

19  office and get the materials, but I could -- we could start

20  [indiscernible].

21           THE COURT:  And you have to leave by?

22           MR. EGAN:  12:30, Your Honor.

23           THE COURT:  All right.  Let's bring out --

24  let -- well -- frankly once you rest the jury can go; correct?

25           MR. ENGLE:  Yes, sir.

1            THE COURT:  All right.  Let's just do that and

2    let them out of here.

3            MR. IGNALL:  Well, I think the question was --

4            MR. EGAN:  Why are we bringing them back?  Yeah.

5            MR. IGNALL:  Yeah.  If we would like to do the

6    closings, make sure they're all in one day, in the same day

7    and I understand that's the Court's preference as well.

8            THE COURT:  Absolutely.

9            MR. IGNALL:  And as long as we can get the jury

10   charge done today I don't think there's a problem with

11   bringing them back tomorrow.  The question was if for some

12   reason we were not resolving -- had not resolved that.

13           THE COURT:  All right.  I'm reasonably confident

14   that I will resolve the issues.

15           MR. IGNALL:  Okay.  All right.  Well, that's

16   good then.

17           THE COURT:  So let's the jury come back tomorrow

18   morning at 10:00 at which time you can make your closings.

19           MR. ENGLE:  Thank you, Your Honor.

20           THE COURT:  And then I'll charge immediately

21   thereafter; all right?

22           MR. IGNALL:  Right.  Thank you, Your Honor.

23           THE COURT:  So we'll bring them out for you to

24   introduce your evidence.

25           MR. EGAN:  Yes, sir.

1          THE COURT:  Rest.

2          MR. ENGLE:  Thank you.

3          THE COURT:  You've rested?

4          MR. ENGLE:  Yes, Your Honor.  And I have an

5     exhibit list, we can going over that when the jury leaves.

6          MR. IGNALL:  And I think there may be one

7     objection.  There may not even be an objection,

8     [indiscernible] all agree.

9          THE COURT:  Okay.  Fair enough.

10         MR. IGNALL:  And I think there are -- there are

11    I believe five objections to government exhibits that the

12    Court still needs to resolve as well.

13         THE COURT:  All right.  I will do that now.  I

14    don't know that we need to do that in front of the jury.

15         MR. IGNALL:  I do not believe we do.

16         THE COURT:  All right.  Fine.  So we can bring

17    the jury out and let them --

18         MR. EGAN:  Thank you, Your Honor.

19         DEPUTY CLERK:  All rise.

20                    - - -

21         (The jury enters the courtroom.)

22                    - - -

23         THE COURT:  All right.  Thank you very much.

24    You may be seated.  Mr. Engle, you may proceed.

25         MR. ENGLE:  Thank you, Your Honor.  If I may, at

1    this time the defense would move for the admission of defense

2    exhibit 1125.

3                 MR. IGNALL:  No objection.

4                 THE COURT:  Granted.

5                           -   -   -

6                 (Whereupon, Defendant's Exhibit Number 1125 was

7    admitted into evidence.)

8                           -   -   -

9                 MR. ENGLE:  With that Your Honor, the defense

10   rest on behalf of Barry Bekkedam rests.

11                THE COURT:  All right.  Is there rebuttal

12   evidence?

13                MR. IGNALL:  There is none, Your Honor.

14                THE COURT:  All right.  Members of the jury, the

15   evidence presentation has now been completed.  Next step in

16   this case will be counsel will give you their closing

17   arguments in the case and I will give you the law which you

18   will apply to the facts as you find them to be in reaching a

19   verdict in this case.

20                Now given the scheduling, we're going to as I

21   indicated before adjourn now and I want you to return tomorrow

22   morning at 9:30.  Tomorrow morning at 9:30.  I'll check with

23   Ms. El-Shabazz [ph], hopefully lunch will be on the house

24   tomorrow morning, tomorrow for lunchtime.

25                All right.  It is very, very important that you

1    adhere to the admonitions that I gave you throughout the case

2    and that is to not decide the case, because you have not heard

3    the law.  You've have not heard the arguments of counsel.

4    Don't do any investigation or research on your own.  We'll see

5    you tomorrow morning at 9:30.  Thank you very, very much.

6    Have a pleasant afternoon.  And don't get sunburned out there.

7                              - - -

8                    (The jury leaves the courtroom.)

9                              - - -

10                   THE COURT:  All right.  You may be seated.  I'm

11   going over your tendered --

12                   MR. EGAN:  [Indiscernible] charge, Your Honor?

13                   THE COURT:  [Indiscernible] charge.

14                   MR. IGNALL:  Well, Your Honor, I don't

15   [indiscernible] if we're going to do that can I go back to my

16   office?  I don't -- I didn't bring all the notes I had with me

17   for that.

18                   THE COURT:  They can't e-mail them to you here?

19                   MR. IGNALL:  If I get someone to print it and

20   bring it, Your Honor.

21                   THE COURT:  Oh, you want the hard copy.  You

22   can't, because I'm -- she just forwarded me his, so --

23                   MR. IGNALL:  Yeah, no.  I just got my eye phone

24   and I -- I prefer.

25                   THE COURT:  All right.

```
 1            MR. IGNALL:  I can have some -- if I can --
 2            THE COURT:  How much time do you need?
 3            MR. IGNALL:  If I could have until a quarter of
 4    I can probably run there -- I can -- I can ask Karen to print
 5    it and then by the time I get there.
 6            THE COURT:  Sure.
 7            MR. IGNALL:  And I think we also need to resolve
 8    the -- a couple of exhibit issues and I don't know -- I'm not
 9    sure if the Court wanted to do that.
10            THE COURT:  Let me hear that now.
11            MR. EGAN:  Okay.
12            THE COURT:  How's that?
13            MR. EGAN:  Your Honor, I have for the Court,
14    remember the three cartons of exhibits I was going to give you
15    at the start?
16            THE COURT:  Yes, sir.
17            MR. EGAN:  Here they are.  There are only
18    objections to a couple of them, as I understand it.  We would
19    move in just for the record D14, 16, 17, 18, 24, 33, 40, 41,
20    47, 48, 56, 60, 65, 68, 81, 83, 87, 93, 95, 96, 100, 113, 116,
21    119, 123, 124, 128, 133, 134, 139, 1148 and 1327 and 135 and
22    Your Honor --
23            THE COURT:  Those last three you got me, you
24    went too fast.
25            MR. EGAN:  Yeah, I'm sorry.  One -- 1148 --
```

1              THE COURT:  I've got 1 -- 134, 133, 134, 139.

2              MR. EGAN:  1148.

3              THE COURT:  1148.

4              MR. EGAN:  1327.

5              THE COURT:  Okay.

6              MR. EGAN:  And 135.

7              THE COURT:  All right.

8              MR. EGAN:  And the government objects to D113

9    and I can, we can discuss that now, Your Honor and then

10   there's another one that the government doesn't object to

11   admission but there is large portions of it that are -- and it

12   be better if I -- if I point Your Honor to it.

13              Oh, I'm reading the wrong list.  I'm sorry.

14   Bad -- my bad.  I apologize, Your Honor.  That's what happens

15   when you try to do things quick.  From that list you just

16   took.

17              THE COURT:  Uh-huh.

18              MR. EGAN:  I need you to strike 17, 18.

19              MR. IGNALL:  This is the [indiscernible].

20              MR. EGAN:  Okay.

21              MS. FLANNERY:  Can you just read the list that

22   we have?

23              MR. EGAN:  Yeah, I'll read the good list, I'm

24   sorry.

25              MR. IGNALL:  Yeah, so we can follow along.

Page 43

```
 1                 THE COURT:  Wait a minute, I have to do this all
 2    over again?
 3                 MR. EGAN:  It's in the book, Judge.
 4                 THE COURT:  All right.
 5                 UNIDENTIFIED SPEAKER:  The list corresponds with
 6    the one in the book, Your Honor.  This -- this old list was
 7    a --
 8                 THE COURT:  Perfect.
 9                 MR. EGAN:  I was reading last week's list.
10                 THE COURT:  Perfect.  All right.
11                 MR. EGAN:  It's even shorter.
12                 THE COURT:  Perfect.
13                 MR. EGAN:  14, 16, 24, 33, 40, 41, 47, 48, 56,
14    65, 68, 81, 83, 87, 93, 95, 96, 100, 113, 115, 116, 128, 133,
15    134, 135, and 1327.
16                 THE COURT:  All right.
17                 MR. EGAN:  Apologies.  And the government
18    objects to 113 and 115 and also on 133 there's an issue
19    because there's some extraneous markings that the government
20    objects to.
21                 MR. IGNALL:  And I thought we -- we agreed to
22    redaction on 133 that we would just show that -- the top
23    e-mail.
24                 MR. EGAN:  Yeah.  The only problem is the way
25    it's set up is a little tricky.
```

Page 44

1                    THE COURT:  Let me just ask you this now.  I've

2      got -- this is for me or this is for the jury?

3                    MR. EGAN:  That's for you, Your Honor.

4                    THE COURT:  Okay.  You have a separate one for

5      the jury?

6                    MR. EGAN:  Yes.

7                    THE COURT:  In the event they request?

8                    MR. EGAN:  Yes, Your Honor.

9                    THE COURT:  All right.  So I can mark this one

10     up then.  So the government objects to 113?

11                   MR. EGAN:  Yes, Your Honor.

12                   THE COURT:  Do you wish to argue on that?

13                   MR. EGAN:  Yes, Your Honor.  This was shown to

14     Mr. Bonomo, it's the stock certificates.  He was --

15                   THE COURT:  Bonomo?

16                   MR. EGAN:  Bonomo, however.  He was asked if he

17     purchased NOVA stock, he said he did.  I asked him if he'd

18     seen the stock certificates, he said he didn't remember them.

19     I then showed him the letter which is at the third page of the

20     exhibit which is a letter from his lawyer at Reed Smith

21     indicating that the lawyer had received it and I asked him if

22     that refreshed his recollection receiving the stock

23     certificates and he said it did.

24                   THE COURT:  All right.

25                   MR. IGNALL:  Your Honor, I think the testimony

Page 45

```
 1    is that he received stock certificates.  I don't know if he
 2    identified these particular stock certificates, I don't know
 3    if the foundation was laid.  I also don't think there's any
 4    relevance to the letter that's part of exhibit 113.
 5              MR. EGAN:  Your Honor, I don't intend to -- I'd
 6    be more than happy to redact the letter and I agree with that,
 7    but it -- it definitely establishes this is his stock
 8    certificate.
 9              THE COURT:  Counsel, that's my recollection,
10    because taken in context that's what he said.
11              MR. IGNALL:  I -- I -- I'm not saying he dent
12    have stock certificates, I'm just saying I don't think the
13    foundational [indiscernible] understand the Court's ruling.
14              THE COURT:  All right.  All right.  So the
15    letter will be stricken.  The stock certificate will be
16    admitted.
17              MR. EGAN:  Thank you, Your Honor.
18                         -  -  -
19              (Whereupon, Defendant's Exhibit Number 113 was
20    admitted into evidence.)
21                         -  -  -
22              MR. EGAN:  And then with 133 if Your Honor --
23              MR. IGNALL:  I believe it was 115.
24              MR. EGAN:  Oh, I'm sorry.  Yeah, 115 is a Galub
25    stock certificate.  And we don't have the transcript, Your
```

1   Honor, I thought I showed it to him.  The government seems to

2   think I didn't.

3            MR. IGNALL:  I believe he never said he

4   recognized the stock certificates or he did see them.  I don't

5   believe there's any foundation for that.

6            THE COURT:  I don't have a specific

7   recollection, sorry.

8            MR. EGAN:  Nor do I, Your Honor, so.

9            THE COURT:  All right.

10           MR. EGAN:  I mean, it's not the end of the

11  world, so.

12           THE COURT:  All right.  Let's strike it.

13           MR. EGAN:  And D133 is the -- is the very

14  important e-mail.  It's the e-mail that Mr. Shuben [ph] sent

15  to Mr. Hartline line and Mr. Hanissen [ph] in May of 2010

16  sending them the EITF85-1.  The government's objection is to

17  these large Guantanamo Bay style redactions.

18           THE COURT:  Hold on a second, 130 --

19           MR. EGAN:  The problem is, Your Honor, the only

20  copy I had of this had been written all over, so I just tried

21  my best to redact it before we made it for the jury.  Clearly

22  the e-mail itself is relevant.  I could ask Mr. Morgan if he

23  could show manipulate the image so it always shows the e-mail

24  without any of the rest, I don't have an issue with that.

25           MR. IGNALL:  Yeah, I think that's what we agreed

1   to.  The e-mail -- the body of the e-mail is fine for Mr.

2   Shuben, and then everything from the, you know, the black box

3   on the right and everything below Mr. Shuben's -- probably

4   take his phone numbers out, but everything below there which

5   is -- could probably be whited out so it doesn't look like it

6   was redacted.

7              THE COURT:  All right.

8              MR. EGAN:  And we have no objection to doing

9   that, Your Honor.

10             THE COURT:  Good enough.

11             MR. EGAN:  And that's -- I think that's it for

12  exhibits as far as I'm concerned.

13             THE COURT:  All right.  That's 133 with

14  modifications.  All right.

15             MR. EGAN:  Thank you, Your Honor.

16             THE COURT:  Yes, sir.

17             UNIDENTIFIED SPEAKER:  Your Honor, we only moved

18  the one that was moved in --

19             THE COURT:  Okay.

20             UNIDENTIFIED SPEAKER:  -- without objection.

21  The other issues I believe Mr. Duncan will handle.

22             THE COURT:  All right.  Yes, sir.

23             MR. DUNCAN:  Thank you, Your Honor.  Good

24  morning, Your Honor, Russell Duncan on behalf of Mr. Bekkedam.

25             THE COURT:  Good morning, sir.

1          MR. DUNCAN:  Your Honor, the government had

2    tended us a number of exhibits that it wanted admitted without

3    calling witnesses.  We didn't object to probably three

4    quarters or more of them, but we did have specific objections

5    to government's exhibits 83, 107, 107A, 112, 168.  And I can

6    explain our position most clearly by reference to a -- two

7    other exhibits that we also have an issue with which are

8    separate and apart, government exhibits 91 and 92.

9    Specifically and I asked Mr. Eshen [ph] to put up -- Mr.

10   Morgan to put up the exhibit 91 which I think will give us the

11   context, Your Honor.  I hope it's available for the Court on

12   your screen.

13          THE COURT:  All right.  This is the first one --

14          MR. DUNCAN:  So our objection, Your Honor --

15          THE COURT:  -- this is government exhibit 91?

16          MR. DUNCAN:  This is 91.  This is -- we have

17   objections to 91 and 92.  They're separate and apart from our

18   objections to 83, 107, 107A, 112 and 168, but they make --

19   this makes the point clearly.

20          MR. IGNALL:  Your Honor, if I may just briefly.

21          MR. DUNCAN:  If I -- if I may finish.

22          THE COURT:  Well, no, I'm sure you might be

23   short-cutting the process, maybe, I don't know.

24          MR. IGNALL:  Well, no.  Just to be clear.  These

25   have already been admitted by stipulation with respect to our

1   discussion about Mr. Hartline's laptop coming into evidence in

2   one way or another just so I don't [indiscernible].

3            THE COURT:  Okay.

4            MR. DUNCAN:  We have an issue with that which is

5   the separate and apart issue that I began to speak about.

6            THE COURT:  All right.

7            MR. DUNCAN:  But this is -- this is with respect

8   to specifically these five exhibits, but this one makes the

9   point.  So the government has -- has sought the admission of

10  this exhibit and we will object to it subject to the other

11  issue that we need to address, but this is my reason, Your

12  Honor.  This e-mail by itself has absolutely no context, but

13  despite that fact, the government in its Rule 29 opposition

14  states that this e-mail shows that Mr. Bekkedam and Mr.

15  Hartline were conversing about Anthony Bonomo specifically to

16  determine whether they -- he had funds available for NOVA and

17  Banyan.  Now, there's neither the word NOVA nor Banyan on this

18  e-mail and that's my objection to the other -- other --

19  exhibits.  There is absolutely no context and we have seen

20  repeatedly through both the indictment, presentation here that

21  the government makes up its own facts and that is key to our

22  defense and that's what's happening here.  The government

23  specifically says this e-mail can be used to interpret that

24  Mr. Hartline and Mr. Bekkedam are trying to find money

25  available for the NOVA and Banyan investments and there's just

1   nothing in that e-mail about that.

2           The other exhibits the government has -- wants

3   to use we fear will have the same issue, that they will --

4   these are witnesses -- these are exhibits that have not been

5   identified by any witness, there's been no foundation, there's

6   been no statement of relevance, there's been no opportunity to

7   cross-examine.  We don't object for the identification

8   purposes, but we do object for foundation and relevance.  And

9   we fear that the government will use exhibits just as they

10  have attempted to use this one.

11          MR. IGNALL:  Your Honor, may I respond?

12          THE COURT:  Go ahead.

13          MR. IGNALL:  I [indiscernible] with respect to

14  exhibit 91, this has already been admitted into evidence by

15  stipulation and I guess Mr. Duncan now wants to object and I

16  guess he's asking the Court to reconsider which is fine, but

17  this was found on Mr. Hartline's laptop so the foundation for

18  all the exhibits we're talking about it's already been laid in

19  one way or another.  This was found on Mr. Hartline's laptop,

20  it's certainly what it appears to be.  It's an e-mail from Mr.

21  Hartline to Mr. Bekkedam saying Anthony Bonomo 4.5 million is

22  available.

23          There's no obligation that items we find on a

24  defendant's laptop during a search warrant need to have

25  context or have a witness other than the examiner who'd say I

1  found this on Mr. Hartline's laptop.  I understood from the

2  agreement with Mr. Egan that he didn't want us to do that and

3  we've agreed to that and we've even agreed that we've -- take

4  off the bates number at the bottom that showed Hartline

5  laptop, so there's been no testimony to the jury about where

6  this came from at the request of Mr. Egan and we agreed to

7  that.  The only relevance was that Mr. Hartline back on that

8  day sent a letter to Mr. Bekkedam.

9         All of Mr. Duncan's objections here go to the

10  weight and his interpretation of the evidence.  It's certainly

11  relevant to show that there was a discussion between the two

12  of them that Mr. Bonomo 4.5 million available is certainly

13  coincidental given that less than a month later Mr. Bonomo

14  borrowed four and a half million dollars.  So the relevance

15  seems pretty clear.  I don't know that there's any obligation

16  for it to be conclusive that Mr. Hartline and Mr. Bekkedam

17  discussed all the details of the conspiracy, this is simply

18  one piece of the puzzle.  It's certainly relevant.  We have

19  the foundation laid that it is what it appears to be so I

20  don't understand what the basis is to exclude it.

21         THE COURT:  All right.

22         MR. DUNCAN:  Russell Duncan again for Mr.

23  Bekkedam.  Two things, Your Honor, specifically Mr. Ignall

24  ignored that we're not actually talking about the

25  admissibility of 91 at this point, we're talking about the

1    admissibility of the other five exhibits none of which he

2    addressed.

3              THE COURT:  Whoa, wait a minute.  That's not

4    accurate, is it Mr. Ignall?

5              MR. IGNALL:  I understood there was an objection

6    to exhibit 91, if there's not then --

7              THE COURT:  I thought that's what we're talking

8    about is 91.

9              MR. IGNALL:  -- the answer [indiscernible]

10   looking at exhibit 91.

11             MR. DUNCAN:  If I may, Your Honor, so that I can

12   be clear.  So there are five exhibits the government has moved

13   the admissibility of without calling any witnesses that

14   [indiscernible] at the end of their case.  Those are the

15   exhibits where read.  This exhibit, government's exhibit 91

16   and 92 there was a stipulation between Mr. Egan, Mr. Ignall

17   and us as to the agreement to take the Hartline laptop

18   information off that and they would not need to call a witness

19   to say where they came from.  We do specific objection as to

20   91 and 92 for the reasons I previously articulated.

21             THE COURT:  Was that stated at the time of the

22   stipulation?

23             MR. DUNCAN:  No, Your Honor.  It was not.

24             THE COURT:  And at this point in time regarding

25   91 only, it's an e-mail, both defendants names are referenced

1    in the e-mail, it was taken from Mr. Hartline's laptop and

2    there's a date on it, it's admissible.

3                    MR. DUNCAN:  Understood, Your Honor.  My

4    objection is to the characterization that the government has

5    put on this e-mail without any evidence and that's the problem

6    I have with the other five exhibits that they also want to put

7    on without any -- without any witness and which we've objected

8    to and there's been no stipulation.

9                    THE COURT:  Well, let me just ask you this.  If

10   there is the admission of this exhibit as a government

11   exhibit, is not the government able to argue what this exhibit

12   should stand for or mean or it's another block in their case

13   in chief?

14                   MR. DUNCAN:  They cannot -- to answer the

15   question, a little bit indirectly, they cannot argue because

16   there is no evidence that this is an e-mail [indiscernible]

17   discussing as they said how much was available for Anthony

18   Bonomo to borrow to invest in the bank in Banyan.  There was

19   no evidence, no witnesses testified to that fact.  No --

20   there's nothing --

21                   THE COURT:  Counsel, there's a date on it --

22                   MR. DUNCAN:  Correct.

23                   THE COURT:  And otherwise it's circumstantial

24   evidence and building blocking on each side of the date of the

25   e-mail, it's admissible.

1          MR. DUNCAN:  No, question, Your Honor.  I -- I

2     understand the Court's position.  My -- my position is that

3     they can't then argue from this e-mail facts that are not in

4     evidence.

5          THE COURT:  They can argue that the jury can

6     infer on conclude from the circumstantial evidence whatever

7     they wish to argue, absolutely they can.

8          MR. DUNCAN:  They can't argue facts, they --

9     they -- they say that this is an e-mail in which Mr. Bekkedam

10    and Mr. Hartline are discussing an investment in the bank and

11    Banyan as it relates to Anthony Bonomo and the testimony of

12    Mr. Bonomo was that --

13         THE COURT:  I understand -- I understand what

14    you're saying here, but in one respect you're splitting hairs,

15    but by the same token the government can argue

16    circumstantially that given everything else that had

17    transpired up to that point and what had transpired thereafter

18    that the jury could properly infer or conclude that it is what

19    their suggesting it is, by arguing it, argument.

20         MR. DUNCAN:  I --

21         THE COURT:  There's no stipulation to that fact.

22         MR. DUNCAN:  I understand the Court's position.

23    I think that's an improper use of this e-mail and I think

24    that's an improper inference from the evidence given that Mr.

25    Bonomo has testified he was never asked about this, but

Page 55

1    that -- obviously, the Court -- the Court will allow them

2    to --

3                THE COURT:  Again, if --

4                MR. DUNCAN:  -- argue as the Court things it's

5    appropriate.

6                THE COURT:  It is a -- it is a building block

7    that the jury can accept or not accept in terms of their

8    argument as to what they should or could infer from it or

9    conclude from it from circumstantial evidence.  They cannot

10   tell them this is a fact that, they can ask the jury to

11   conclude it.

12               MR. DUNCAN:  If that's -- and I agree with that,

13   Your Honor, obviously.

14               THE COURT:  All right.

15               MR. DUNCAN:  Obviously the Court's ruling is

16   what counts.

17               THE COURT:  All right.

18               MR. DUNCAN:  So my objection, well, so I still

19   have our objection.  We object to the admission to the five

20   exhibits we specified for the reasons we've stated that

21   there's no relevance and there's no foundation.

22               THE COURT:  So that would be 92 through?

23               MR. DUNCAN:  It would be 83, 107, 107A, 112 and

24   168 and then we have a separate argument we want to make on 91

25   and 92.

Page 56

1          THE COURT:  Mr. Ignall, as to the remainder

2     outside of 91 and 92.

3          MR. IGNALL:  I think we're in the same issue

4     that if -- just so the record is clear where these came from

5     that this was an agreement that we had with counsel prior to

6     trial to limit the number of witnesses, so exhibit 83 is a

7     document that NOVA Bank produced pursuant to subpoena, I

8     believe.  So instead of calling an agent to say we received a

9     bunch of documents including the ones with this bates number

10    we agreed that the foundation has already been laid that it

11    came from NOVA Bank and if we could bring up exhibit 83 it's

12    an e-mail that goes from Kim Hartline to Mr. Bekkedam

13    attaching Mr. Levin's PADOB responses.  The relevance of this

14    is that Mr. Bekkedam was aware of Mr. Levin's application that

15    this goes to counter the argument that counsel made in opening

16    that Mr. Bekkedam had nothing to do with any of this.  Well,

17    why is he in the loop and why is he getting this?  Again, the

18    jury can draw whatever inference the jury wishes to draw from

19    that, but it's certainly relevant.  It tends to prove a fact

20    in issue and therefore it's admissible.

21          The other documents all came from a subpoena

22    that the SEC sent to Ballamor Capital.  And we had an

23    agreement with counsel that instead of calling just like we

24    would an agent calling an attorney from the SEC to say that we

25    received all these from Ballamor Capital that we would agree

Page 57

1    if their authentic and these were actually maintained by

2    Ballamor Capital and so again, we have e-mails that were

3    produced by Ballamor Capital their relevant.  I don't know

4    what the specific relevancy objections are if there was one

5    I'd be happy to address it, but the fact that there hasn't

6    been a witness to testify I don't think makes them

7    inadmissible.

8                THE COURT:  And this was in the package that was

9    stipulated to earl on?

10               MR. IGNALL:  No.  No.  This -- the stipulation

11   was that documents that had a Ballamor bates number within

12   this range came from Ballamor and are authentic.

13               THE COURT:  Okay.  All right.

14               MR. IGNALL:  We -- defense reserved the right

15   and I think that was appropriate that if there was an

16   objection as to relevance or anything else they could

17   certainly raise that.  It was just a way so that we would not

18   have to call a witness to authentic them.

19               THE COURT:  All right.  Thank you.  Mr. Duncan,

20   I'll from you.

21               MR. DUNCAN:  I have nothing further, Your Honor.

22               THE COURT:  All right.

23               MR. DUNCAN:  On those five exhibits, I still

24   [indiscernible].

25               THE COURT:  All right.  I thought we did 91.

Page 58

1            MR. ENGLE:  Your Honor, I believe that that

2    would resolve the issue with respect to the exhibits that we

3    were objecting to the government had provisionally moved into

4    evidence.

5            THE COURT:  All right.

6            MR. ENGLE:  But I believe Mr. Duncan wants to

7    make additional argument with respect to 91 and 92 which were

8    the documents that Mr. Egan and the government had talked

9    about the Hartline laptop issues and whether or not 91 and 92

10   should come into evidence or as to whether there's limits as

11   to what could properly be argued from that.

12           THE COURT:  And I thought that I had just

13   resolved that.

14           MR. DUNCAN:  Surely you have with respect to

15   exhibit 91, Your Honor.

16           THE COURT:  All right.

17           MR. DUNCAN:  And I won't argue that further.

18           THE COURT:  Now, the remainder of the exhibits,

19   do you wish to make any further argument?

20           MR. DUNCAN:  No, sir.

21           THE COURT:  All right.  They are admissible and

22   they will be admitted.

23           MR. DUNCAN:  Thank you, Your Honor.

24           THE COURT:  Now we have left 92?

25           MR. DUNCAN:  Ninety-two.

1                THE COURT:  All right.

2                MR. DUNCAN:  And if we could have that up,

3     Shawn.  Your Honor, this is a letter, again, that has no

4     foundation whatsoever and my objection here is more specific

5     and it is very specific as to relevance with respect to how it

6     will be either used or argued if it's admitted.  The

7     government in its indictment stated that this was a letter to

8     Ballamor clients.  That is a false statement.  Has always been

9     false and always will be false.  The government in its motion

10    in opposition to Rule 29, again brings this letter in and

11    makes statements such as that NOVA had -- this letter shows

12    that NOVA had raised five million dollars in new capital which

13    it was -- which it does not, but most importantly, Your Honor,

14    the government has used this exhibit in its indictment and

15    says it's -- it's evidence of the conspiracy and evidence of

16    the fraud alleged in counts five and six as to wire fraud and

17    it is plainly not.  The government in their indictment says

18    very specifically this is a letter to Ballamor clients.  The

19    salutation very clearly shows, it is not.  It is to investors

20    in the DBFG NOVA deal.

21                THE COURT:  Which could include Ballamor

22    clients.

23                MR. DUNCAN:  They do not, Your Honor and there

24    is no evidence of that.  And there is no inference and there

25    has been no testimony, no one has said anything about this

1   letter, there is no evidence as to who invested in DBFG or the

2   DBFG NOVA deal.  I can tell Your Honor, as a matter of fact no

3   investor in the DBFG NOVA deal was a Ballamor client.  That's

4   just a matter of fact, but the government has produced no

5   evidence one way or another as to whether or not this was sent

6   to Ballamor clients or whether Ballamor clients are investors

7   in the DBFG NOVA deal.  And we object, we object both to the

8   admissibility of the document on relevance grounds, but more

9   specifically we object to any insinuation that this letter was

10  sent to Ballamor clients, because it was not.  There's though

11  evidence either that this letter was sent, that this letter

12  was received or that anyone took any action with respect to

13  this letter.  It goes to a very crucial issue in the defense

14  in this case, Your Honor.  The government has misused it in

15  this indictment and we respectfully request that it not be

16  admitted into evidence.  I can address the stipulation issue

17  as well, but at a minimum request from the Court unless the

18  government can point to evidence that this letter was received

19  by anybody which it cannot because there has been no evidence

20  and because as far as I know it was never received by anyone.

21  This was found on Mr. Hartline's laptop during the search of

22  his laptop.  I can tell the Court the circumstances under

23  which this letter is written if that will help the Court, but

24  there is no evidence that this letter was ever sent to any

25  investor, received by any investor, acted on by any investor,

1   but most importantly, clearly not any Ballamor client which is

2   the only reason it would have any relevance in this case.

3           THE COURT:  All right.  Thank you.

4           MS. BARRY:  Your Honor, we would agree that we

5   would not argue that government's exhibit 92 was sent to any

6   Ballamor clients.  We would agree to that, but to the extent

7   that this is a document that speaks for itself that the

8   foundation was laid as far as where it was, we could've had

9   the computer expert --

10           THE COURT:  What does it have a tendency to

11   prove?

12           MS. BARRY:  It has a tendency to prove what Mr.

13   Bekkedam knew at the time in writing this letter.  We are not

14   saying that he sent it.  It is simply that his name is on a

15   letter that states very relevant information to the

16   government's case we will not argue that the letter was sent

17   to any Ballamor clients.  We would agree to that.  But as far

18   as what the letter is in and of itself the agreement was that

19   we were not going to call the computer expert that would have

20   said I found all of this information on Mr. Hartline's

21   computer, ergo it would be admissible based on the fact that

22   it was recovered from Mr. Hartline's computer.  So to the

23   extent that it is admissible and relevant for the letter

24   itself and what it states and not to argue beyond what the

25   letter states.

Page 62

1           THE COURT:  All right.  Now, Mr. Duncan, the

2    letter is dated September 24, 2009 a critical period in this

3    case; correct?

4           MR. DUNCAN:  Absolutely, Your Honor.

5           THE COURT:  And it is signed presumably with no

6    objection by Mr. Bekkedam.

7           MR. DUNCAN:  That's not necessarily true, Your

8    Honor.

9           THE COURT:  All right.  That's why I is said

10   presumably.  Now, did the government introduce anything in

11   terms of authenticating the signature?

12          MR. DUNCAN:  No, Your Honor.

13          THE COURT:  And you're opposing this because

14   it's not authenticated?

15          MR. DUNCAN:  Correct, Your Honor.  And more

16   importantly, and again, and I appreciate the stipulation or

17   the statement by Ms. Barry which I -- I appreciate that, but

18   more specifically, the government has argued as to relevance

19   that this has something to do with new capital and again that

20   new capital issue is a complete accounting issue.  This letter

21   speaks nothing at all to new capital, says nothing that's

22   untrue, says nothing that's false.  There is no evidence that

23   Mr. Bekkedam read this letter, Mr. Bekkedam signed this

24   letter, Mr. Bekkedam sent this letter or this letter was

25   received by anyone.  It has no relevance to this case and has

1    the possibility of confusing the jury because the -- because

2    of the same reason the government was confused initially,

3    they're claiming that this went to Ballamor clients.  If it

4    did go to anybody, Your Honor, it has no relevance to prove

5    conspiracy and it has no relevance to prove wire fraud.

6              MS. BARRY:  Respectfully, Your Honor, I believe

7    it states Ballamor clients --

8              THE COURT:  Is there a way to enlarge this?

9    Because I can't --

10             MR. IGNALL:  You want enlarge the second

11   paragraph.

12             MS. BARRY:  If you just -- second paragraph.

13             MR. IGNALL:  [Indiscernible].

14             THE COURT:  All right.  Great.  Thank you.

15             MS. BARRY:  If the Court would want a moment to

16   read it.

17             THE COURT:  Please.  Thank you.

18             MS. BARRY:  Yeah, the -- I mean the -- I point

19   you, Your Honor, to the end of the second full paragraph.

20   NOVA was also granted TARP of 13.5 million which is in expense

21   of capital we can utilize, but will not hesitate to pay off

22   the regulatory pressure associated with it become difficult.

23   And the previous sentence also indicates Ballamor clients and

24   relationships infuse 5 million into the bank in June.

25             So, Your Honor, again, we're -- we're not going

Page 64

 1    to argue something about capital and we're not going to argue

 2    the letter was sent we are simply going to argue what is in

 3    the body of the letter which is highly relevant and an

 4    admission --

 5              THE COURT:  Now, accepting -- let's assume that

 6    it's relevant.

 7              MS. BARRY:  And it's admission, essentially,

 8    Your Honor.

 9              THE COURT:  All right.  Well, that's my next

10    question.  In order to build the building block or establish

11    that building block of admissibility it has to be

12    authenticated at this -- from Mr. --

13              MS. BARRY:  And -- and it was.  The agreement --

14    may I -- may I finish before --

15              THE COURT:  Thank you.

16              MS. BARRY:  Thank you.  Your Honor, the -- the

17    agreement prior to trial was that certain documents were

18    admissible for authenticity.  There was not going to be an

19    argument on authenticity.  And one of those agreements was on

20    any document that was -- that had the bates, Hartline

21    underscore laptop, underscore the bates number.  And that was

22    an agreement that we had with counsel prior to trial and based

23    on that agreement these -- this specific, both 91 and 92 were

24    specifically read into the record to the jury because we came

25    to that agreement and now we are having an argument about

1   authenticity then, Your Honor, then we should reopen the case

2   and have the agent or the expert who recovered these

3   documents --

4          THE COURT:  Well, that's what I was about to put

5   to Mr. Duncan if the Court in this instance by reason of a

6   stipulation that they relied upon is going to cry foul now,

7   then I would be obliged to allow them to reopen and I don't

8   think you want to go through all that.

9          MR. DUNCAN:  I -- I understand, Your Honor, but

10  my point is a different one.  We do not dispute that this was

11  found on Mr. Hartline's laptop.  We stipulated to that fact.

12         THE COURT:  But you're missing my point.  My

13  point is that if the government wanted to establish that

14  frankly, this was even a signature or otherwise was sent from

15  him then government would at least be allowed the opportunity

16  to do that.

17         MR. DUNCAN:  Yeah, and I --

18         THE COURT:  From whether it's handwriting expert

19  or whomever.

20         MR. DUNCAN:  I can certainly address that point,

21  Your Honor.  The government can't do that, because it's not

22  true.  They have no witness.  They cannot -- they cannot argue

23  to this court and will not be able to argue to this court that

24  there is a witness who will say that that's Mr. Bekkedam's

25  signature.  There is no question we were asked to stipulate

1    that that was Mr. Bekkedam's signature.  We were asked to

2    stipulate that this was a document found on Mr. Hartline's

3    laptop which the government told us they would do so that they

4    would not have to call an agent.

5         THE COURT:  Well, what if they said, Judge, we

6    want an opportunity to bring in a handwriting expert.

7         MR. DUNCAN:  I think at this point, Your Honor,

8    they won't be able to -- they won't be able to do that because

9    it's not his signature and they are not going to -- they had

10   the opportunity at any point in this case if they wanted to

11   call a handwriting expert.  The stipulation we did was not to

12   stipulate that this was Mr. Bekkedam's signature, we

13   stipulated that this document was found on Mr. Hartline's

14   laptop and that's all we stipulated to.  Our stipulation as to

15   where the document came from in no way, in no way waived our

16   right to challenge whether or not that was Mr. Bekkedam's

17   signature or that Mr. Bekkedam ever read this letter or that

18   Mr. Bekkedam was responsible for signing this letter.  There

19   is though evidence as to that point.  And Your Honor, there

20   can be none, because it is not.

21        THE COURT:  All right.  Ms. Barry.

22        MS. BARRY:  All arguments Mr. -- I believe Engle

23   will be able to argue at closing if that's the case that this

24   is not his signature if that's what -- what their -- what the

25   point is if that's not his signature he can argue that, but

1  the fact of the matter is that this letter exists it is on the

2  Hartline laptop.  It was stipulated to as far as the

3  document --

4           THE COURT:  First of all, he could not argue

5  that it is not his signature.  There's no evidence --

6           MS. BARRY:  Correct.  And we not --

7           THE COURT:  -- that it's not his signature.  By

8  the same token, how can the government argue that it's his

9  signature?

10          MS. BARRY:  All I'm going to say is that it is

11 signed by what looks like Barry Bekkedam's signature.  It's

12 his name on the letter.

13          THE COURT:  Well, wait.  Stop right there.  What

14 looks like his signature.

15          MS. BARRY:  Or what -- what -- you could read

16 it.

17          THE COURT:  Let's suppose it's a stamp.

18          MS. BARRY:  Then, Your Honor --

19          THE COURT:  That someone else within that office

20 who had access to that stationary put there.

21          MS. BARRY:  That's fine.  We -- we won't argue

22 the signature.  We won't argue that he signed it.

23          UNIDENTIFIED SPEAKER:  Your Honor, I would

24 just --

25          THE COURT:  So the jury wouldn't see it?

1            MS. BARRY:  No, the jury will see the letter.

2    Your Honor, the -- the letter itself, it document --

3            THE COURT:  But would not the jury conclude that

4    it's his signature if there's no mention about it?

5            MS. BARRY:  Well, you -- the -- the evidence is

6    the evidence, Judge.  I mean, that's the bottom line and we

7    can -- we --

8            THE COURT:  Well, is this my -- this is my

9    problem, there was a stipulation that communicated to the

10   Court was not a limited stipulation.  The Court believed that

11   as it was stipulated to it was as you're saying --

12           MS. BARRY:  And that's what we believe.

13           THE COURT:  -- that it was Mr. Bekkedam's

14   e-mail.  Now, I'm hearing that that's not necessarily the case

15   there was not necessarily that stipulation.  I'm hesitant to

16   use the word snookered --

17           MS. BARRY:  They can certainly have raised that.

18           THE COURT:  -- but I think that they "gotcha" on

19   this one.

20           MS. BARRY:  They have -- they could have had --

21   they had opportunity to raise that.  They could have equally

22   have gotten someone to say that that's not his signature, if

23   that were the issue.

24           MR. ENGLE:  We don't have that burden though,

25   Your Honor.  And -- and the fact is, I would also just point

1   out when you look at the bottom underneath the signature

2   block, it says BRB:WK, anyone that's worked in an office knows

3   that when someone else drafts a letter for example, when my

4   secretary drafts a letter for me it will say MJE/ and then her

5   initials.  So that's an indication in and of itself on the

6   document that it wasn't something that Mr. Bekkedam sat down

7   and drafted.  It certainly indicates that some other

8   individual at Ballamor would have drafted that.  So we not

9   only have any indication that he drafted it.  We don't have

10  any indication he read it.  We don't have any indication he

11  signed it.  We don't have any indication that that's his

12  signature.  We don't know whether it's an actual signature or

13  a stamp as the Court indicated.  We don't have the original.

14  There are no handwriting exemplars that were ever taken by the

15  government.  There's no ability to say this is what the

16  government wants to say it is and there --

17              THE COURT:  Right.  Let me say that let's accept

18  that I'm with you on this except if there's a stipulation and

19  it was admitted into evidence --

20              MS. BARRY:  Yes, Your Honor.

21              THE COURT:  -- and it was read from.

22              MS. BARRY:  No.  We -- we told the jury --

23              MR. ENGLE:  No, it was not.

24              MS. BARRY:  92 was in.

25              MR. ENGLE:  No, Your Honor, this is where the

1    disconnect was.  We were under the understanding that we were

2    being asked to stipulate that the documents came from Mr.

3    Hartline's laptop.

4              THE COURT:  For a purpose by the government

5    which we could all accept.

6              MR. ENGLE:  Right.  No.  But the purpose is to

7    say that the document was found in a particular place.  Mr.

8    Egan did not want there to have to be testimony about the

9    document coming from Mr. Hartline's laptop, because of

10   whatever prejudicial impact that might have, I have to assume.

11   Which I understand completely.  We also didn't have to put on

12   a computer expert or a computer technician to testify that

13   they got Mr. Hartline's laptop, they searched in a particular

14   way, in a particular place they found this particular document

15   or any of those documents.

16             THE COURT:  So there's a stipulation --

17             MR. ENGLE:  Yes, sir.

18             THE COURT:  -- that set the parameters?

19             MR. ENGLE:  Right.  That was our understanding.

20             THE COURT:  And the stipulation was because the

21   government would not have to go through the process to

22   introduce -- lay a proper foundation to introduce this to the

23   jury.

24             MR. ENGLE:  As to where it came from.  We did

25   not agree that this was a document that Mr. Bekkedam had

1    knowledge of.  We didn't agree that that's his signature.  We

2    weren't -- we weren't asked any of those things and the

3    disconnect is that Mr. Egan had conversations with the

4    government about this issue that we were not part of.  We

5    thought we were stipulating solely to the issue that this is

6    the source of this material was Mr. Hartline's laptop and that

7    would alleviate needing to have the stamp on it, the bates

8    stamp saying Hartline laptop which Mr. Egan was objecting to

9    and it would alleviate the government having to call the

10   computer technician to say this is where it was found.

11   However, we did -- none of us with respect to the defense team

12   for Mr. Bekkedam had down on our list that 92 was actually

13   admitted into evidence.  And when we went over those documents

14   that was where this issue came up of oh, that stuff was

15   admitted by agreement.  We didn't realize that that's what was

16   going on.  We didn't agree to that document being admitted

17   into evidence.  It was never shown to a single witness during

18   the trial.  It was not read or put on the screen for the jury.

19   So now we have a document that the government --

20              THE COURT:  Well, when it was admitted via the

21   stipulation --

22              MR. ENGLE:  Your Honor, we -- that.

23              THE COURT:  What was your understanding what

24   the --

25              MR. ENGLE:  Our understanding of the stipulation

1   was simply that we were stipulating that those documents we

2   didn't know if they were going to put them in through a

3   witness they weren't going to have to establish that it came

4   from Mr. Hartline's laptop and they wouldn't have to go

5   through a two-step process of, 1) putting on a computer

6   technician to say this came off Mr. Hartline's laptop and

7   then, 2) some witness would be testifying and putting it into

8   context either that they sought being drafted, they know Mr.

9   Bekkedam signed it, they received it, I mean, we -- our

10  assumption was based upon the way the indictment's drafted and

11  the argument they made in their Rule 29 response that they're

12  trying to say that this relates to the wire fraud count and

13  the fraud on the investor's theory of this case.

14          THE COURT:  There was no stipulation to

15  authenticity?

16          MR. ENGLE:  No.  Only as to the issue of it came

17  from Mr. Hartline's laptop.  We weren't objecting that the

18  government legitimately retrieved it from Mr. Hartline's

19  laptop.

20          THE COURT:  Is that the government's

21  understanding of the stipulation?

22          MS. BARRY:  The stipulation, Your Honor, was

23  first off that these documents were authentic.  Secondly,

24  absent an objection from [indiscernible] admissibility that

25  was the initial stipulation.  Then we moved them into evidence

1  because nobody raised an objection to its admissibility so we

2  moved it into evidence.  Now, I'm very sorry that perhaps the

3  lawyers were asleep at the wheel on when we move this in, but

4  it got moved in.  Your Honor, let's go back and simplify it.

5  If this were a drug case and there was a search warrant on the

6  defendant's home, anything that they -- that was recovered

7  from a search warrant would be admissible.  The agent would

8  come up and say, you know, we found all of these letters, they

9  were in the -- they were in the left-hand drawer.  We found

10  all of this.  It was in the right-hand drawer and to the

11  extent that whether or not anybody came in and said oh, this

12  is a -- this is, you know, we cannot -- this is a bill from

13  whatever place it was it wouldn't matter.  We could use it as

14  evidence because that's where it came from.

15            THE COURT:  I agree.

16            MS. BARRY:  And so, you know, now, to -- to

17  prejudice the government in saying something that was agreed

18  to and moved into evidence at the time is now something that's

19  objectionable is, you know, it -- it puts us on the back foot

20  and quite frankly --

21            THE COURT:  I agree.

22            MR. ENGLE:  Your Honor, if I may.

23            THE COURT:  Yes, sir.

24            MR. ENGLE:  There's no prejudice to the

25  government.  This document hasn't been in front of that jury

1   ever during this trial.  So the fact that there was a

2   fundamental misunderstanding about it, a fact that, let's just

3   assume for the sake of argument that I wasn't asleep at the

4   switch and I said, objection, to government 92, where were

5   they going to come up with a witness to establish that Mr.

6   Bekkedam wrote that he ever read it.  He had knowledge of its

7   content.  It was sent.  It was received or that that's his

8   signature.  And if they -- yeah, and if they did they -- they

9   would've put him on probably in the case because it certainly

10  would have made this more powerful evidence.  There's a reason

11  they didn't show it to the jury.  It's not like they're being

12  prejudice by a document that someone testified to, it was

13  presented to the jury and now all of a sudden we want to claw

14  it back.  This is a document that no one testified to because

15  they don't have anyone to testify to it.  If they did that'd

16  be different.  If they could in the theoretical world we go

17  back, there was an objection and they would be able to lay the

18  foundation for this of over an objection.  Someone's going to

19  come in and say, he wrote it, he knew what it said.  That's an

20  admission.  That's his signature.  If they had that that'd be

21  one thing.  I wouldn't even be standing here making an

22  argument, Your Honor.  But the reason is this document

23  [indiscernible] know it came from Mr. Hartline's laptop that

24  doesn't end the inquiry.  And the fact is the trier of fact in

25  this case has never even seen it.  And for the first time in

1   closing argument the government wants to flash it up on the

2   screen and said Mr. Bekkedam wrote this.  This shows what he

3   knew.  This shows what was in his mind.  Where's that coming

4   from?  That is a completely improper argument that is not

5   based upon any evidence, testimony or information in this

6   case.  Not only, because no one said it from the witness

7   stand, not only because this document does not speak for

8   itself.  Just as the Court was saying you can't argue to the

9   jury that that's actually Mr. Bekkedam's signature.  Well, if

10  you can't argue, because they didn't put it any testimony or

11  other evidence about this context that he wrote it or he read

12  it or he said it or he signed it.

13          THE COURT:  But when they asked for and received

14  a stipulation, were not all of those things an understood?

15          MR. ENGLE:  Not to us.

16          THE COURT:  Is that the government's position?

17  Ms. Barry, was that the government's position?

18          MS. BARRY:  Your Honor, that was our

19  understanding and, you know, quite frankly if you could just

20  for the Court to kind of get a, you know, we're like the --

21  the government was coming from on government's exhibit 28 page

22  two, if we could do a side-by-side, you know, the government

23  is not going to do anything more --

24          THE COURT:  One asked.  Wait until it comes up,

25  please.  Now, what's your point?

1            MS. BARRY:  Judge, all we're saying is, you

2    know, to the extent, again, if they want to argue that this --

3    these signatures are not similar, you know, that he had a

4    secretary that signed it, that it could have been a stamp, I

5    mean, I -- I'm, they were free to argue that.  The -- the

6    document is what it is, it's just like the drug case, if there

7    was a letter that was found in the defendant's home, you know,

8    stating whatever it -- the government wanted to use it for we

9    would be able to admit it.  This is no different.  The

10    document just -- we're not going to say it was sent to anyone.

11    We agree that we would not say this letter was sent to anyone.

12            MR. ENGLE:  The problem is, Your Honor, they

13    want to impute knowledge to it.  That's the problem.  It's not

14    finding a letter in a drug dealer's house where you can say

15    the letter is present.  Yeah, the letter is present.  We

16    agree.  The letter was present on Mr. Hartline's laptop.  They

17    could argue that all day long, but they can't impute knowledge

18    to Mr. Bekkedam.  And look at these signatures.  They're not

19    even close to being the same.  One has a BRB with an

20    indication that someone else would've typed it up.  The other

21    one does not, it just has a copy to Larry Roven [ph] we've had

22    testimony that government 28 page 2 was in fact the document

23    that witnesses were familiar with.  That that was established.

24    Can we go up to see the whole document of both side-by-side

25    for His Honor?

1          We also have June 2nd document actually is

2     addressed to someone.  The September 24, 2009 document isn't

3     addressed to anybody and if you look in the salutation the one

4     we -- we know and the evidence that Mr. Bekkedam actually sent

5     says yours truly Barry L. Bekkedam.  This one says sincerely.

6     We don't even have -- this does not have any indication of

7     authenticity of being his letter or that he has knowledge to

8     it.  If the government can test -- can argue that that letter,

9     92 was found, you know, in a particular place, I mean, you

10    know, that means nothing to this case.  The fact is they can't

11    in any good faith basis because they don't have any witnesses

12    to this fact.  There was no evidence of this fact.  It was

13    never even read to the jury in this case.  Now they want to

14    make certain arguments that just are not based upon the

15    information that we had or doesn't support it.  There's no

16    foundation for that.  To be able to come in and say that's Mr.

17    Bekkedam's letter, you know, we don't know who wrote it, but

18    he definitely has knowledge of everything that's in it.  How

19    can they be properly allowed to make that argument?  It's a

20    completely miss -- improper argument to make to the trier of

21    fact.  It's completely deceiving.

22          THE COURT:  Would it have been proper if the

23    stipulation that they believed that they were entering into

24    with the government was in fact what they say the stipulation

25    was?

1           MR. ENGLE:  No, Your Honor.  The -- the fact is

2    this, it's still not relevant because it has those limits.  If

3    the government had said do you stipulate that this is a

4    document Mr. Bekkedam prepared or read after its preparation

5    or that he signed and we stipulated to that -- I -- I don't

6    have a leg to stand on, Your Honor, I agree, but that wasn't

7    what was requested.  That's because there's no evidence of

8    that.  And the fact that there is no evidence of that means

9    that this has no probative value and it's prejudicial effect

10   far outweighs the -- what I would call no probative value of a

11   document.

12           THE COURT:  So you're arguing that even though

13   there was a stipulation and even though it was marked and

14   introduced into evidence, but not shown prohibits the

15   government from saying here's yet another block of evidence

16   that was admitted with a number and you can conclude from it

17   what you wish, but we're going to argue that you conclude

18   scienter?

19           MR. ENGLE:  If Your Honor rules that because

20   there was a fundamental misunderstanding about the nature of

21   the stipulation and as an officer of the Court I'm telling you

22   exactly what our understanding was.  The fact of the matter is

23   they didn't ask us for a stipulation to the things that would

24   make this something that they could properly make the

25   arguments that they want to make in front of the jury.  To

1   properly make it admissible and the fact that it came in as

2   some random exhibit number that was said that's moved into

3   evidence because the jury never heard it not -- never heard

4   about the document, meaning they didn't have it read to them

5   and they didn't see it.  There is absolutely no prejudice at

6   this point if the Court were to rule that had we had a contest

7   about this originally unless the Court can say in good faith

8   that they could've called a witness that would be able to

9   establish Mr. Bekkedam wrote it, read it or signed it, it

10  wasn't coming into evidence at that point.

11          THE COURT:  All right.  Let me ask you this

12  question counsel.  Do we know who circumstantially has the

13  initials WK?

14          MR. ENGLE:  I have no clue.

15          THE COURT:  At Ballamor Capital Management?

16          MR. ENGLE:  Not a clue.

17          THE COURT:  And would that person conceivably be

18  an agent of Mr. Bekkedam's?

19          MR. ENGLE:  Don't know it is.  They don't know

20  who it is.

21          MS. BARRY:  Yes, we do.  Your Honor.

22          MR. ENGLE:  Okay.

23          MS. BARRY:  So, Your Honor, if there was a

24  fundamental misunderstanding I'm not going to contest if there

25  was a fundamental misunderstanding on the part of Mr.

1    Bekkedam.  That -- that may be the case.  Our understanding

2    was --

3                THE COURT:  Well, they're arguing that the

4    fundamental misunderstanding was the government's fundamental

5    misunderstanding, not theirs.

6                MR. ENGLE:  No, I'm -- I'm saying it was -- it

7    was our fundamental misunderstanding, Your Honor, that -- that

8    they believed -- I'm not saying the government didn't believe

9    what they're saying and we believe what we're saying, that's

10   where the disconnect is.  I'm not saying anyone's

11   misrepresenting anything.

12               THE COURT:  So it's a mutual misunderstanding?

13   Fundamentally?

14               MS. BARRY:  Yes, well, so we went -- because of

15   our understanding that this was being admitted and therefore

16   we read a few documents at this time that were being moved

17   into evidence and this was one of them.  Had we known that

18   there was going to be this battle over this particular exhibit

19   we would've had the option, of 1) calling the computer expert

20   to say exactly where this came from, 2) to call Wendy Cane

21   [ph] who -- I'm sorry, Wendy Corn.  Kore, K-O-R-E, Wendy Kore,

22   who is Mr. Bekkedam's assistant, we would have had the option

23   of subpoenaing Ms. Kore.  We would have also had the option of

24   subpoenaing plaintiffs from the Hizey [ph] lawsuit.  Who

25   received this letter, so there would have been a lot of

1   options government to call witnesses about this letter and

2   particularly, we know that at least the agents were well aware

3   that Wendy Kore was Mr. Bekkedam's legal assistant.  I'm

4   sorry, assistant.

5            THE COURT:  All right.

6            MS. BARRY:  So therefore we would have had that

7   option, those options had we kind of known this battle was

8   coming.

9            MR. ENGLE:  Except I would just say this, Your

10  Honor, if they -- they didn't know there was going to be a

11  stipulation about any of this until we were already well into

12  the trial.  That issue didn't come up until April 6th, okay?

13  Wendy, whatever her name is Kore, whatever, she's not on the

14  government's witness list.  None of the people that they're

15  talking about that they could've called in are on the

16  government's witness list.  So how were they omniscient that

17  they were going to get the stipulation and that they wouldn't

18  have to put someone on to establish this?  I don't think so.

19  So the fact is that the government had no intention based upon

20  their witness list, wasn't in their trial memo, wasn't on

21  their witness list.  There was no pretrial notice to the

22  defense that any of those people would be testifying search

23  that we could have investigating them ourselves to determine

24  whether or not what they knew and when they knew it or any of

25  those things, but the fact is it's telling that none of those

1   people are on their witness list.  So what happens if they

2   didn't get the stipulation then all of a sudden they were just

3   going to say oops, we needed these other people?  I mean, I

4   find that a little bit hard to believe.

5          The other thing too is, Your Honor, I don't believe

6   that the law would suggest that a secretary or assistant

7   typing up a letter where unless we had proof Mr. Bekkedam

8   either dictated it or read it would impute knowledge as an

9   agent.  It's not the same thing as Mr. Roven who's his

10  attorney.

11         THE COURT:  All right.  Given that there is

12  clearly from both sides a fundamental misunderstanding this is

13  not a case for an -- the Court has to be solomonic about this

14  and I'm not going to split the baby.  I think the bottom line

15  here is that I cannot rule in favor of the government in this

16  instance because it would undermine the right to a fair trial.

17         MS. BARRY:  Your Honor, we would like a moment

18  to recess because there may be an issue then for us to reopen

19  the case to get -- to get this evidence in if that's the case.

20  It's -- it's not about every piece of evidence that it -- it

21  can -- most of our evidence is prejudicial, it's whether it's

22  unfairly prejudicial and this letter is highly relevant, it's

23  probative, the Court kept out another extremely highly and

24  probative piece of evidence at the last moment for the -- for

25  the United States as well with the Hartline deposition so we

1   would request a moment for us to consider whether or not this

2   is a -- this is an opportunity for us to reopen to call the --

3   the witness which we do believe if she is working at the

4   agency relationship of Ms. Kore is directly it does fall

5   within 80 -- I'm sorry, 801D2 and so we would have to find

6   those options at this point, because we again, we're operating

7   under a different assumption.

8          THE COURT:  I -- let me just say this briefly,

9   as I said before, under the circumstances I assumed that the

10  stipulation is as you're saying it is in toto, but given that

11  counsel obviously as an officer of the Court as well said that

12  is not what we stipulated to and listen, lawyering is

13  lawyering and I understand that, been there done that.  But if

14  there is a mutual reliance on what was an expected stipulation

15  here, again, I cannot rule and let that inure to the benefit

16  of the government, because I do believe it would undermine the

17  defendant's right to a fair trial.

18          On the other hand because of this mutuality of

19  misunderstanding, unlike the other situation, I am inclined to

20  allow the government to reopen here.

21          MS. BARRY:  Thank you, Your Honor.

22          MR. ENGLE:  However, Your Honor, the government

23  should only be allowed to reopen to call a witness that it

24  properly gave the defense notice of.  This isn't a rebuttal

25  witness.  You're allowing them to reopen its case-in-chief.

1          THE COURT:  Only on the issue of agency or

2    employee status, that's it.

3          MR. ENGLE:  Well, Your Honor, here's the

4    problem.

5          THE COURT:  And not -- frankly if this witness

6    came in as a possibility, if the witness came in, testified

7    even more so as to the foundation for how this came about and

8    how it was transcribed, e-mailed or whatever who the author

9    was, whatever, the chips fall where they may.

10         MR. ENGLE:  Except for the fact that we were

11   given no pretrial notice of this witness.

12         THE COURT:  I understand that.  I totally

13   understand that.

14         MR. ENGLE:  So I guess what I'm suggesting --

15         THE COURT:  And I rule pretrial on the other

16   matter in the government's favor and I changed that decision

17   after I heard the case.

18         MR. ENGLE:  I understand that, Your Honor.  All

19   I'm saying is is that they -- I -- my understanding of the

20   case law in that in allowing the government to reopen they can

21   reopen to use something that they had before or to call a

22   witness that the defense was given notice of.  This isn't

23   rebuttal.  The problem is if -- is rebuttal they can call a

24   witness that's not on their list to properly rebut something

25   the defense is, but this is not rebuttal.

 1            THE COURT:  But if they're going to

 2    [indiscernible] is the letter, regardless as to how it came to

 3    be, it's on the computer.  It apparently is that from Mr.

 4    Bekkedam on the company stationary, if the government assumed

 5    that the stipulation was to the authenticity of it how could

 6    you not know that's where the government was asking for a

 7    stipulation for?  And I don't see how that would be

 8    prejudicial to the defense.

 9            MR. ENGLE:  Well, they weren't asking for it

10    until April 6th, so they would have -- they didn't know they

11    were going to get any kind of stipulation or that there be any

12    kind of confusion.

13            THE COURT:  But as you know given this kind of a

14    case with the volume involved here every little -- every

15    little detail can go up to the last minute.  If the Court in

16    its discretion allows it, allows it.  Then that would go

17    for --

18            MR. ENGLE:  Well, Your Honor, what I would ask

19    is --

20            THE COURT:  That would go both ways.

21            MR. ENGLE:  Then I would ask then what offer of

22    proof does the government have and what information do they

23    have about Ms. Kore because, you know, I didn't see anything

24    produced about her being interviewed or anyone talking to her

25    about any documents, so where is that and --

1          MR. DUNCAN:  Your Honor, may I?

2          THE COURT:  Well, no, let me here Mr. Ignall,

3     please.

4          MR. IGNALL:  Your Honor, this may be moot.  What

5     I would request is that we take a 15 minute recess, a) I can

6     go get the jury instructions, but, b, we can make a phone call

7     or two, the point here is had this come up on April 6th is

8     when we moved this into evidence not when we thought there was

9     a stipulation.  The stipulation was before the November trial

10    as to authenticity.  Had there been an objection November 6th

11    we could have then decided based on what the objection was how

12    to respond and this is within the Court's discretion to allow

13    us to go forward and the same thing would happen as we did

14    with the defense witnesses.  If we call a witness who's not on

15    our original list the Court would have to read that out to the

16    jury and if the jurors know someone then we'd be out of luck.

17    What I think given the -- the time constraint we have I don't

18    know where Mr. -- Ms. Kore is, the most likely witness we

19    could get to put some context in this if that's what the Court

20    needs would be something who received this letter.  That may

21    be someone who might be local and that's someone me might be

22    able to find.  If we can't then this becomes moot and then

23    there's no need to decide whether we're reopening or not.

24          THE COURT:  Mr. Duncan.

25          MR. DUNCAN:  Your Honor, may I?  Just --

1          THE COURT:  Yes, sir.

2          MR. DUNCAN:  Just to give the Court the full

3   context of this.  Both in the indictment and in the trial

4   memorandum the -- the government provided to the Court they

5   made the fundamental mistake saying that this was a letter

6   written to Ballamor clients and that's why it had relevance.

7   If it was not written to Ballamor clients it had no relevance,

8   but that's what they said it was relevant for that it was

9   written to Ballamor clients.

10          I believe and I have no basis for this, but I

11   believe that at some point counsel realized that they were

12   wrong in the indictment, that they were wrong in the trial

13   memo and as a result they weren't going to put on any evidence

14   of this case.  If this document was so important we would've

15   heard about it in the opening statement.  We would've heard

16   about it in the trial memo.  It would have been done correctly

17   in the indictment.  The government realized it was wrong about

18   what it had said so they had no witness ready to testify to

19   it.  They had no witness who was going to authenticate it,

20   because it's not true.  It just isn't true.  And whether there

21   are some plaintiffs in this Hizey case which having worked on

22   this case for almost two and a half years I have never heard

23   of.  It might have something to do with a lawsuit that

24   involved the DBFG NOVA merger, but has nothing to do with

25   Ballamor clients, has nothing to do with any of the issues in

1   this case and those witnesses cannot say that Mr. Bekkedam

2   sent them that letter because it is false.  It never happened.

3   Mr. Bekkedam never sent that letter to anybody.  And no

4   witness the government is going to call is going to say that

5   if they're testifying truthfully.  They will not be able to

6   say Mr. Bekkedam sent me this letter.  They may be able to say

7   someone from DBFG gave me this letter, but that's not going to

8   have any indication of whether Mr. Bekkedam wrote it, saw it,

9   approved it or anything else, it's a completely collateral

10  issue and the government realized that, Your Honor at some

11  point and that's why we have never heard any evidence about

12  this letter.

13          MR. IGNALL:  You know, I think that goes to

14  weight, but again, this may be moot if we can't find a witness

15  then I don't think we need to argue anymore.

16          THE COURT:  All right.  I will give you the

17  opportunity to find the witness.  It does not mean that I'm

18  going to rule any differently, but I will certainly give you

19  the opportunity to let me know.

20          MR. IGNALL:  Yes, sir [indiscernible] it turns

21  out to be moot then --

22          THE COURT:  All right.

23          MR. IGNALL:  -- that will resolve it.

24          THE COURT:  All right.  Now, what's that going

25  to do with our schedule and Mr. Egan's?

1          MR. IGNALL:  I don't know.

2          MR. EGAN:  Your Honor, I'm supposed to be

3    leaving at 12:30.  I could probably hang until 1:00.

4          THE COURT:  How long do you think it would take

5    you to find out, Mr. Ignall?

6          MR. IGNALL:  Well, I'll ask Agent Boyer to make

7    a phone call right now.

8          THE COURT:  Can you do that right now then?

9          MR. IGNALL:  Yeah.

10          THE COURT:  All right.  Go ahead.

11          MR. IGNALL:  I still wanted to get -- I probably

12    should have had someone doing that while we were arguing, get

13    the jury instruction package so we could argue that.

14          THE COURT:  What -- Mr. Egan, what are you going

15    to do about the jury charge packet if you're not here?

16          MR. EGAN:  Well, that's the issue, Your Honor.

17    I have three -- I have three issues with the jury charge.

18          THE COURT:  Are they in writing?

19          MR. EGAN:  Yes.

20          THE COURT:  Have I received them?

21          MR. EGAN:  Yes.  Well, no.  You haven't received

22    the last one.

23          THE COURT:  Excuse me -- excuse me, did you send

24    them?

25          MR. EGAN:  You received two out of -- the third

Page 90

1    one I'm bringing up this morning and I can the government has

2    one they're bringing up this morning as well and that's a

3    missing witness charge and it relates to the investment

4    committee members who we never heard from.

5            THE COURT:  All right.

6            MR. EGAN:  Which I can hand up now.

7            THE COURT:  I think we can do this much in

8    writing from your perspective.

9            MR. EGAN:  Yes, Your Honor, if I could, the

10   other two issues that are [indiscernible] the other two issues

11   that are critical to me are the good faith charge that we

12   sought, I believe the government's objecting to good faith

13   charge.  Clearly we're entitled to a theory of defense and

14   good faith is a theory of defense in this case.

15           If the defendant in good faith believed that

16   this was capital --

17           THE COURT:  Okay.

18           MR. EGAN:  -- then that's a complete defense to

19   the charges, that's the other issue.  The next issue is the

20   willfully, the [indiscernible] which Mr. -- these guys are

21   going to beat to death anyway, but basically, the government

22   wants to strike willfully from the charge for TARP fraud based

23   on a Second Circuit case, got me.  It doesn't seem to be

24   applicable or in the Third Circuit, it's a very recent case

25   and in fact I believe it was a reversal in favor of the

Page 91

1    defense if I'm not mistaken, but clearly willfully is an

2    important element of the charge and should be read here as

3    well.

4              And then this missing witness charge, Your

5    Honor, which the actual deciders in this case as they like to

6    say was the investment committee and nobody from the

7    investment committee testified their government employees

8    available to the government.  I think it might even be some

9    kind of secret who they are.  And so therefore they should not

10   be -- we should get a missing witness charge, because they

11   were not presented.

12             THE COURT:  But the government has argued all

13   long that that's not even the issue.  The issue is simply the

14   intent in filling out the request or making the request.

15             MR. EGAN:  Right, but I -- I disagree with the

16   government's argument.  I just materiality is clearly

17   important and if we don't even know who the final deciders was

18   how do we know what was material to them?

19             THE COURT:  Because there's no written

20   regulation.

21             MR. EGAN:  Right.

22             THE COURT:  As to what capital is or is not?

23             MR. EGAN:  Correct.

24             THE COURT:  All right.

25             MR. EGAN:  Thank you, Your Honor.  I appreciate

Page 92

1    it.  And Mr. Fuller will stay for whatever proceedings and

2    I'll stick around until 12:30.

3                    THE COURT:  All right.

4                    MR. EGAN:  Thank you.

5                    UNIDENTIFIED SPEAKER:  And if I may, Your Honor,

6    I can give that to [indiscernible].

7                    THE COURT:  Well, don't beat it yet.  All right.

8                    MR. IGNALL:  Can we can for a brief recess to

9    make the --

10                   THE COURT:  Mr. Jackson.

11                   MR. IGNALL:  -- make the phone call and I can

12   just get my --

13                   THE COURT:  Yes, sir.

14                   MR. IGNALL:  Okay.

15                   THE COURT:  Go right ahead.

16                   MR. IGNALL:  And then I -- and with the missing

17   witness I just got this today.  I think there's no foundation

18   for that.  This would --

19                   THE COURT:  All right.

20                   MR. IGNALL:  -- only be in the rare circumstance

21   where there's someone available only to the government.

22   Defendants have tried to subpoena a number of people from the

23   Department of the Treasury, they certainly could have done

24   that here and there's no basis here.

25                   THE COURT:  All right.  --

 1              MR. IGNALL:  A missing witness that would give

 2    an adverse inference against the government and indeed as the

 3    Court's pointed out it's not necessarily relevant.  The

 4    testimony was from the members of CPP Counsel that they're

 5    familiar with the process they enlist three out of the four

 6    members of that counsel were to recommend yes the answer was

 7    going to be no.

 8              THE COURT:  All right.

 9              MR. SCHWARTZ:  I disagree, Your Honor.

10              THE COURT:  Well, I'll cross that bridge a

11    little later on.

12              MR. IGNALL:  But so in any event there's no

13    basis.

14              THE COURT:  Why don't you go ahead and do what

15    you've got to do and --

16              MR. IGNALL:  Okay.  All right.

17              THE COURT:  All right.

18              MR. IGNALL:  May I have 12 minutes?

19              THE COURT:  Absolutely.

20              MR. IGNALL:  Okay.  Thank you.

21              THE COURT:  Take 13.

22              MR. IGNALL:  All right.  Thank you.

23              THE COURT:  All right.  We're in recess.  Thank

24    you.

25                         -  -  -

Page 94

1          (Whereupon, there was a recess in the proceeding from

2                    11:34 p.m. to 12:12 p.m.)

3                         –   –   –

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                  C E R T I F I C A T E

 2

 3           I do hereby certify that the aforesaid

 4    hearing was transcribed by me from an audio recording to the

 5    best of my ability; and that I am neither of counsel nor kin

 6    to any party in said action, nor interested in the outcome

 7    thereof.

 8

 9

10

11

12           WITNESS my hand and official seal this
      _____ day of _____, 2016.

13                         _____

14                                  Janine Thomas
                                    Notary Public

15

16

17

18

19

20

21

22

23

24

25
```

**A**

**ability** 69:15 95:5
**able** 4:20 53:11
  65:23 66:8,8,23
  74:17 76:9 77:16
  79:8 86:22 88:5,6
**absent** 72:24
**absolutely** 15:19
  37:8 49:12,19
  54:7 62:4 79:5
  93:19
**accept** 27:17 55:7,7
  69:17 70:5
**accepting** 64:5
**access** 67:20
**accident** 27:22
**accountant** 19:2
**accounting** 62:20
**accurate** 18:24
  52:4
**acf@annflanner...**
  2:4
**acknowledged**
  28:25
**acknowledging**
  20:12
**acted** 60:25
**action** 60:12 95:6
**actions** 19:4
**activity** 22:3
**actual** 69:12 91:5
**add** 27:7
**additional** 36:6,12
  58:7
**address** 8:24 9:4
  20:7 21:9,11
  49:11 57:5 60:16
  65:20
**addressed** 52:2
  77:2,3
**adhere** 40:1
**adjourn** 39:21
**Adjudicated** 24:21
**admissibility** 5:16
  51:25 52:1,13
  60:8 64:11 72:24

73:1
**admissible** 25:4
  27:23 53:2,25
  56:20 58:21 61:21
  61:23 64:18 73:7
  79:1
**admission** 25:23
  26:4 34:17 39:1
  42:11 49:9 53:10
  55:19 64:4,7
  74:20
**admit** 76:9
**admitted** 3:13,16
  19:11 39:7 45:16
  45:20 48:2,25
  50:14 58:22 59:6
  60:16 69:19 71:13
  71:15,16,20 78:16
  80:15
**admonitions** 40:1
**Advancement**
  13:22
**adverse** 93:2
**afoot** 26:19
**aforesaid** 95:3
**afternoon** 40:6
**agency** 83:4 84:1
**agent** 56:8,24 65:2
  66:4 73:7 79:18
  82:9 89:6
**agents** 81:2
**agree** 8:3 27:23,24
  38:8 45:6 55:12
  56:25 61:4,6,17
  70:25 71:1,16
  73:15,21 76:11,16
  78:6
**agreed** 36:3 43:21
  46:25 51:3,3,6
  56:10 73:17
**agreement** 18:22
  19:22 26:10 51:2
  52:17 56:5,23
  61:18 64:13,17,22
  64:23,25 71:15
**agreements** 64:19
**ahead** 21:13 50:12

89:10 92:15 93:14
**al** 1:5
**allegation** 28:3
**allegations** 21:17
  21:18 24:10,11,13
  27:14,14
**alleged** 21:1 59:16
**alleging** 23:21
  29:13
**alleviate** 71:7,9
**ALLISON** 1:21
**allow** 5:2 55:1 65:7
  83:20 86:12
**allowed** 9:1 23:24
  65:15 77:19 83:23
**allowing** 83:25
  84:20
**allows** 85:16,16
**AMERICA** 1:2
**analogy** 26:24 29:1
**and/or** 31:23 33:6
**ANN** 2:2
**answer** 52:9 53:14
  93:6
**Anthony** 49:15
  50:21 53:17 54:11
**anticipate** 4:8 7:19
**anybody** 8:20 17:2
  60:19 63:4 73:11
  77:3 88:3
**anymore** 88:15
**anyone's** 80:10
**anyway** 90:21
**apart** 48:8,17 49:5
**Apologies** 43:17
**apologize** 42:14
**apparently** 85:3
**APPEARANCES**
  1:9
**appears** 50:20
  51:19
**Apple** 26:14
**applicable** 90:24
**application** 56:14
**apply** 39:18
**appreciate** 62:16
  62:17 91:25

**apprise** 10:10
**appropriate** 8:3 9:7
  55:5 57:15
**approved** 36:9 88:9
**April** 1:5 81:12
  85:10 86:7
**area** 31:23
**argue** 4:19,23
  44:12 53:11,15
  54:3,5,7,8,15 55:4
  58:17 61:5,16,24
  64:1,1,2 65:22,23
  66:23,25 67:4,8
  67:21,22 75:8,10
  76:2,5,17 77:8
  78:17 88:15 89:13
**argued** 29:17 58:11
  59:6 62:18 91:12
**arguing** 54:19
  78:12 80:3 89:12
**argument** 4:16,24
  21:12 27:10 54:19
  55:8,24 56:15
  58:7,19 64:19,25
  72:11 74:3,22
  75:1,4 77:19,20
  91:16
**arguments** 5:7
  39:17 40:3 66:22
  77:14 78:25
**articles** 24:22 28:16
  32:15,16,17 33:8
**articulated** 52:20
**ashealy@shulma...**
  2:1
**asked** 44:16,17,21
  48:9 54:25 65:25
  66:1 70:2 71:2
  75:13,24
**asking** 20:25 21:8
  28:21 50:16 85:6
  85:9
**asleep** 73:3 74:3
**assist** 32:6
**assistant** 80:22
  81:3,4 82:6
**associated** 25:8,12

63:22
**assume** 25:1 64:5
  70:10 74:3
**assumed** 83:9 85:4
**assuming** 21:22,22
  22:9
**assumption** 72:10
  83:7
**attaching** 56:13
**attempted** 23:1
  50:10
**attorney** 56:24
  82:10
**ATTORNEY'S**
  1:11
**audio** 2:8 95:4
**authentic** 57:1,12
  57:18 72:23
**authenticate** 87:19
**authenticated**
  62:14 64:12
**authenticating**
  62:11
**authenticity** 9:3
  64:18,19 65:1
  72:15 77:7 85:5
  86:10
**author** 84:8
**authority** 28:12
**automobile** 27:22
**available** 48:11
  49:16,25 50:22
  51:12 53:17 91:8
  92:21
**AVENUE** 1:22
**avoid** 26:7
**aware** 24:11,12
  33:19 56:14 81:2
**A-D-D-E-N** 13:8
**a.m** 1:6 34:9,9

**B**

**b** 3:11 86:6
**baby** 82:14
**back** 24:6 26:6,16
  32:17 35:9 36:18
  37:4,11,17 40:15

51:7 73:4,19
74:14,17
**bad** 30:2 42:14,14
**BAKER** 1:21
**Ballamor** 56:22,25
57:2,3,11,12 59:8
59:18,21 60:3,6,6
60:10 61:1,6,17
63:3,7,23 69:8
79:15 87:6,7,9,25
**bank** 17:1 53:18
54:10 56:7,11
63:24
**banker** 11:13
**banks** 16:15
**Banyan** 20:21 21:6
21:9,14 22:2
25:18 32:21,22
33:3,5 49:17,17
49:25 53:18 54:11
**Barry** 1:11 17:5
18:13 39:10 61:4
61:12 62:17 63:6
63:12,15,18 64:7
64:13,16 66:21,22
67:6,10,11,15,18
67:21 68:1,5,12
68:17,20 69:20,22
69:24 72:22 73:16
75:17,18 76:1
77:5 79:21,23
80:14 81:6 82:17
83:21
**based** 22:12 33:8
61:21 64:22 72:10
75:5 77:14 81:19
86:11 90:22
**basically** 90:21
**basis** 5:6,18 7:6
20:25 24:24 25:2
28:21,23 32:13,14
51:20 77:11 87:10
92:24 93:13
**bates** 51:4 56:9
57:11 64:20,21
71:7
**battle** 80:18 81:7

**Bay** 46:17
**beat** 90:21 92:7
**began** 49:5
**behalf** 6:20 39:10
47:24
**Bekkedam** 7:1 8:2
20:7,10 21:16
22:23,24 23:11,16
23:21,21 24:18
25:7,17 32:9 33:5
39:10 47:24 49:14
49:24 50:21 51:8
51:16,23 54:9
56:12,14,16 61:13
62:6,23,23,24
66:17,18 69:6
70:25 71:12 72:9
74:6 75:2 76:18
77:4,5 78:4 79:9
80:1 82:7 85:4
88:1,3,6,8
**Bekkedam's** 20:14
23:15 24:11 32:24
65:24 66:1,12,16
67:11 68:13 75:9
77:17 79:18 80:22
81:3
**believe** 8:1,3 9:11
23:16 24:23 25:6
34:18 35:18 38:11
38:15 45:23 46:3
46:5 47:21 56:8
58:1,6 63:6 66:22
68:12 80:8,9 82:4
82:5 83:3,16
87:10,11 90:12,25
**believed** 68:10
77:23 80:8 90:15
**benefit** 83:15
**best** 26:23 29:1
46:21 95:5
**better** 42:12
**beyond** 61:24
**bill** 73:12
**bills** 17:24
**bit** 53:15 82:4
**black** 47:2

**block** 53:12 55:6
64:10,11 69:2
78:15
**blocking** 53:24
**board** 14:6,7,10
**body** 47:1 64:3
**Bonomo** 44:14,15
44:16 49:15 50:21
51:12,13 53:18
54:11,12,25
**book** 43:3,6
**borrow** 53:18
**borrowed** 51:14
**bottom** 51:4 68:6
69:1 82:14
**box** 47:2
**Boyer** 89:6
**BRB** 76:19
**BRB:WK** 69:2
**breaking** 27:20
**Brian** 1:5 11:7,10
13:18,20,21 15:10
16:17,20 18:1,6
19:1
**bridge** 93:10
**brief** 19:25 20:11
31:9,12,15 92:8
**briefed** 5:10
**briefly** 48:20 83:8
**bring** 35:9 36:23
37:23 38:16 40:16
40:20 56:11 66:6
**bringing** 17:24
37:4,11 90:1,2
**brings** 59:10
**BROAD** 2:5
**broke** 27:18
**build** 64:10
**building** 53:24 55:6
64:10,11
**bunch** 56:9
**burden** 68:24
**business** 11:10

———————————
**C**
———————————
**C** 1:8,15 10:5 95:1
95:1

**call** 8:20 12:21
14:18 15:24 17:24
52:18 57:18 61:19
66:4,11 71:9
78:10 80:20 81:1
83:2,23 84:21,23
86:6,14 88:4 89:7
92:11
**called** 79:8 81:15
**calling** 48:3 52:13
56:8,23,24 80:19
**calls** 10:16
**cancer** 17:25
**Cane** 80:20
**capital** 56:22,25
57:2,3 59:12
62:19,20,21 63:21
64:1 79:15 90:16
91:22
**care** 34:11
**cartons** 41:14
**case** 5:17 8:5 10:9
21:21 22:14,25
24:15 26:13,16,21
29:6,18,18,19
32:3 39:16,17,19
40:1,2 52:14
53:12 60:14 61:2
61:16 62:3,25
65:1 66:10,23
68:14 72:13 73:5
74:9,25 75:6 76:6
77:10,13 80:1
82:13,19,19 84:17
84:20 85:14 87:14
87:21,22 88:1
90:14,23,24 91:5
**cases** 25:22 29:20
30:23 31:7
**case-in-chief** 83:25
**certain** 64:17 77:14
**certainly** 14:3 25:9
25:25 28:8 50:20
51:10,12,18 56:19
57:17 65:20 68:17
69:7 74:9 88:18
92:23

**certificate** 3:18
45:8,15,25
**certificates** 44:14
44:18,23 45:1,2
45:12 46:4
**certified** 19:2
**certify** 95:3
**challenge** 66:16
**chance** 32:5
**changed** 84:16
**character** 4:8 6:2
6:15,21 7:17 8:1
11:19 20:14,16,16
20:20 27:8,10
29:5
**characterization**
53:4
**charge** 35:11 36:16
37:10,20 40:12,13
89:15,17 90:3,11
90:13,22 91:2,4
91:10
**charges** 36:3 90:19
**charity** 17:24
**check** 39:22
**CHESTNUT** 1:12
**chief** 53:13
**chips** 84:9
**choice** 27:11
**chooses** 27:9
**CHUN** 1:11
**circling** 31:5
**Circuit** 23:4 30:16
36:10 90:23,24
**circumstance** 92:20
**circumstances**
60:22 83:9
**circumstantial**
53:23 54:6 55:9
**circumstantially**
54:16 79:12
**citations** 29:23
**cite** 31:11,13
**cited** 26:13
**citizen** 11:18 12:12
15:18 16:24 18:9
20:18

**claiming** 63:3
**claw** 74:13
**clear** 20:15 22:7,14
  23:4 26:13 32:4
  48:24 51:15 52:12
  56:4
**clearly** 46:21 48:6
  48:19 59:19 61:1
  82:12 90:13 91:1
  91:16
**CLERK** 9:25 10:4
  10:20,24 13:2,7
  14:22,25 16:4
  17:12,15 20:1
  38:19
**client** 60:3 61:1
**clients** 23:15,17
  59:8,18,22 60:6,6
  60:10 61:6,17
  63:3,7,23 87:6,7,9
  87:25
**client's** 25:17
**close** 76:19
**closed** 27:11
**closing** 39:16 66:23
  75:1
**closings** 37:6,18
**clue** 25:13 79:14,16
**coincidental** 51:13
**collateral** 88:9
**college** 18:4
**COLLOQUY** 3:2
**come** 7:14 17:2
  24:6 37:17 58:10
  73:8 74:5,19
  77:16 81:12 86:7
**comes** 9:16 75:24
**coming** 7:20 49:1
  70:9 75:3,21
  79:10 81:8
**committee** 13:22
  90:4 91:6,7
**communicated**
  68:9
**community** 15:14
  20:17 21:3 22:13
  23:8,12,13 26:2

27:20
**companies** 16:16
**company** 2:11 85:4
**complete** 62:20
  90:18
**completed** 39:15
**completely** 70:11
  75:4 77:20,21
  88:9
**compliance** 15:9
  16:15
**computer** 61:9,19
  61:21,22 70:12,12
  71:10 72:5 80:19
  85:3
**conceivably** 79:17
**concern** 7:5
**concerned** 47:12
**conclude** 54:6,18
  55:9,11 68:3
  78:16,17
**conclusion** 28:10
**conclusive** 51:16
**conduct** 7:2,7
  13:25 20:15,22,24
  21:16 24:9,17,18
  25:7,24,25 26:7
  26:10,11,12 27:18
  28:23 29:4,10
**conference** 35:12
  36:17
**confident** 37:13
**confidential** 25:23
**confused** 63:2
**confusing** 63:1
**confusion** 85:12
**connection** 25:17
**consciousness**
  36:13
**consider** 23:1 83:1
**conspiracy** 51:17
  59:15 63:5
**constraint** 86:17
**construct** 24:17
**contact** 17:2
**contained** 4:17
**content** 74:7

**contest** 79:6,24
**contested** 18:24
**context** 45:10 48:11
  49:12,19 50:25
  72:8 75:11 86:19
  87:3
**contracted** 26:18
**contradictory**
  28:13
**conversations** 71:3
**conversing** 49:15
**conviction** 29:2
**copies** 31:2
**copy** 40:21 46:20
  76:21
**Corn** 80:21
**correct** 4:9 5:11
  33:7 34:20,25
  36:24 53:22 62:3
  62:15 67:6 91:23
**correctly** 7:8 87:16
**corresponds** 43:5
**could've** 61:8 79:8
  81:15
**counsel** 9:3 10:14
  18:23 20:6 24:4
  39:16 40:3 45:9
  53:21 56:5,15,23
  64:22 79:12 83:11
  87:11 93:4,6 95:5
**counsels** 8:3
**count** 72:12
**counter** 56:15
**counts** 55:16 59:16
**couple** 35:21 41:8
  41:18
**court** 1:1 2:11 4:1,5
  4:10,13,16,21 5:5
  5:13,14,15,16,22
  6:4,8,9,11,16,24
  7:5,15,18,21,24
  8:4,7,9,12,15,18
  8:21,24 9:4,6,9,10
  9:15,19,21 10:4,6
  11:23 12:18 13:5
  13:9 14:1,15 15:1
  15:22 17:6,16

18:14,17,21 19:6
  19:8,16,19,24
  20:5,9 21:6,9,13
  22:4,5,10,19 24:2
  24:4,6,14,20 25:1
  25:11,19,23 26:9
  26:16,20,25 27:3
  27:6,21,25 28:6
  28:11,15,20 29:1
  29:6,14,18,23
  30:1,4,7,11,13,17
  30:22 31:1,4,6,10
  31:14,18,21,22
  32:2,6,7,11,13,19
  32:25 33:2,4,8,11
  33:13,15,21,24
  34:2,4,11,15,23
  35:2,3,5,7,10,13
  35:16,23 36:8,10
  36:16,21,23 37:1
  37:8,13,17,20,23
  38:1,3,9,12,13,16
  38:23 39:4,11,14
  40:10,13,18,21,25
  41:2,6,9,10,12,13
  41:16,23 42:1,3,5
  42:7,17 43:1,4,8
  43:10,12,16 44:1
  44:4,7,9,12,15,24
  45:9,14 46:6,9,12
  46:18 47:7,10,13
  47:16,19,22,25
  48:11,13,15,22
  49:3,6 50:12,16
  51:21 52:3,7,21
  52:24 53:9,21,23
  54:5,13,21 55:1,1
  55:3,4,6,14,17,22
  56:1 57:8,13,19
  57:22,25 58:5,12
  58:16,18,21,24
  59:1,21 60:17,22
  60:23 61:3,10
  62:1,5,9,13 63:8
  63:14,15,17 64:5
  64:9,15 65:4,5,12
  65:18,23,23 66:5

66:21 67:4,7,13
  67:17,19,25 68:3
  68:8,10,10,13,18
  69:13,17,21 70:4
  70:16,18,20 71:20
  71:23 72:14,20
  73:15,21,23 75:8
  75:13,16,20,24
  77:22 78:12,21
  79:6,7,11,15,17
  80:3,12 81:5
  82:11,13,23 83:8
  83:11 84:1,5,12
  84:15 85:1,13,15
  85:20 86:2,15,19
  86:24 87:1,2,4
  88:16,22,24 89:4
  89:8,10,14,18,20
  89:23 90:5,7,17
  91:12,19,22,24
  92:3,7,10,13,15
  92:19,25 93:8,10
  93:14,17,19,21,23
**courtroom** 10:2
  20:3 38:21 40:8
**Court's** 5:1,19 7:5
  37:7 45:13 54:2
  54:22 55:15 86:12
  93:3
**CPA** 3:14
**CPP** 93:4
**credibility** 23:3
**criminal** 21:17
**critical** 62:2 90:11
**cross** 21:11 93:10
**cross-examination**
  3:4 12:1 20:13,13
  20:24 21:11,23
  22:1,16 24:10
  25:9 35:1
**cross-examine**
  20:20 23:24 29:4
  50:7
**cross-examined**
  20:22
**crucial** 60:13
**cry** 65:6

**CSR** 2:8
**Curtis** 24:17 29:20
  29:24 30:4,20
  31:12

**D**

**D** 3:1
**damages** 26:19
**Darnell** 1:8 10:5
**date** 30:11,16 53:2
  53:21,24
**dated** 62:2
**DAVID** 1:10
**david.j.ignall@u...**
  1:14
**day** 1:7 37:6,6 51:8
  76:17 95:12
**DBFG** 59:20 60:1,2
  60:3,7 87:24 88:7
**deal** 59:20 60:2,3,7
**dealer's** 76:14
**death** 90:21
**deceiving** 77:21
**decide** 40:2 86:23
**decided** 86:11
**deciders** 91:5,17
**decision** 32:7 84:16
**defendant** 1:15
  22:14 27:8 31:22
  32:4 90:15
**defendants** 1:6
  52:25 92:22
**defendant's** 3:16
  39:6 45:19 50:24
  73:6 76:7 83:17
**defense** 5:5 6:4 9:1
  10:15 19:14,15
  34:18,23,24 36:4
  39:1,1,9 49:22
  57:14 60:13 71:11
  81:22 83:24 84:22
  84:25 85:8 86:14
  90:13,14,18 91:1
**definitely** 45:7
  77:18
**defraud** 23:2
**defrauds** 23:1

**delve** 31:23
**denied** 5:15,19,20
**dent** 45:11
**denying** 5:24
**Department** 18:25
  92:23
**deposition** 82:25
**DEPUTY** 9:25 10:4
  10:20,24 13:2,7
  14:22,25 16:4
  17:12,15 20:1
  38:19
**DESCRIPTION**
  3:13,16
**desires** 35:15
**despite** 49:13
**detail** 85:15
**details** 51:17
**determination** 29:3
  29:12
**determine** 49:16
  81:23
**dictated** 82:8
**difference** 22:19
  28:1,19
**different** 24:19
  26:22,23 35:21
  65:10 74:16 76:9
  83:7
**differently** 88:18
**difficult** 63:22
**Direct** 3:4,6,7,9,10
**directly** 83:4
**disagree** 91:15 93:9
**disagreed** 36:4
**disciplinary** 19:4
**disconnect** 70:1
  71:3 80:10
**discretion** 5:1,12
  85:16 86:12
**discuss** 35:8 42:9
**discussed** 51:17
**discusses** 30:9
**discussing** 53:17
  54:10
**discussion** 29:25
  30:6 49:1 51:11

**disposition** 28:8
**dispositive** 30:24
**dispute** 65:10
**distinction** 30:10
  30:20
**District** 1:1,1,8
  29:21
**document** 56:7
  60:8 61:7 64:20
  66:2,13,15 67:3
  68:2 69:6 70:7,9
  70:14,25 71:16,19
  73:25 74:12,14,22
  75:7 76:6,10,22
  76:24 77:1,2 78:4
  78:11 79:4 87:14
**documents** 56:9,21
  57:11 58:8 64:17
  65:3 70:2,15
  71:13 72:1,23
  80:16 85:25
**doing** 47:8 89:12
**dollars** 51:14 59:12
**door** 23:22 27:9,11
**doubt** 7:13
**drafted** 69:7,8,9
  72:8,10
**drafts** 69:3,4
**draw** 56:18,18
**drawer** 73:9,10
**drug** 73:5 76:6,14
**Duncan** 1:20 6:15
  47:21,23,24 48:1
  48:14,16,21 49:4
  49:7 50:15 51:22
  51:22 52:11,23
  53:3,14,22 54:1,8
  54:20,22 55:4,12
  55:15,18,23 57:19
  57:21,23 58:6,14
  58:17,20,23,25
  59:2,23 62:1,4,7
  62:12,15 65:5,9
  65:17,20 66:7
  86:1,24,25 87:2
**Duncan's** 51:9
**D-135** 3:14 18:19

**D113** 42:8
**D133** 46:13
**D135** 18:25 19:10
**D14** 41:19

**E**

**e** 3:1,11 17:14 95:1
  95:1
**earl** 57:9
**early** 32:18 33:11
**Eastern** 1:1 29:21
**Edward** 10:23
**effect** 78:9
**Egan** 1:15 3:4,6,7,9
  3:10 5:6 6:6,20
  7:17,20 8:13,16
  8:19 9:13 10:15
  11:4,21 12:17,21
  13:13 14:2,12,18
  15:5,20,24 16:11
  17:4,8,20 18:11
  18:16,18,25 19:13
  19:17,21 35:6,8
  35:11,14,18,21
  36:22 37:4,25
  38:18 40:12 41:11
  41:13,17,25 42:2
  42:4,6,8,18,20,23
  43:3,9,11,13,17
  43:24 44:3,6,8,11
  44:13,16 45:5,17
  45:22,24 46:8,10
  46:13,19 47:8,11
  47:15 51:2,6
  52:16 58:8 70:8
  71:3,8 89:2,14,16
  89:19,21,25 90:6
  90:9,18 91:15,21
  91:23,25 92:4
**Egan's** 88:25
**EITF85-1** 46:16
**either** 36:9 59:6
  60:11 72:8 82:8
**elaborate** 5:8
**elaborating** 33:25
**electronic** 2:10
**element** 91:2

**elicit** 32:22
**eliminate** 22:1
**El-Shabazz** 39:23
**employee** 84:2
**employees** 91:7
**engaged** 23:21
  32:12 33:6
**Engle** 2:5 34:17,21
  34:24 35:3 36:25
  37:19 38:2,4,24
  38:25 39:9 58:1,6
  66:22 68:24 69:23
  69:25 70:6,17,19
  70:24 71:22,25
  72:16 73:22,24
  75:15 76:12 78:1
  78:19 79:14,16,19
  79:22 80:6 81:9
  83:22 84:3,10,14
  84:18 85:9,18,21
**enlarge** 63:8,10
**enlist** 93:5
**entering** 77:23
**enters** 10:2 38:21
**entitled** 90:13
**equally** 68:21
**ergo** 61:21
**Eshen** 48:9
**ESQ** 1:10,11,15,15
  1:20,20 2:2,5
**essentially** 21:20
  64:7
**establish** 64:10
  65:13 72:3 74:5
  79:9 81:18
**established** 76:23
**establishes** 45:7
**et** 1:5
**event** 44:7 93:12
**everybody** 26:5
**evidence** 4:8,22,25
  5:3,17 6:2 7:3,12
  7:17 19:5,11,14
  22:11,15 25:10
  27:19 28:7 37:24
  39:7,12,15 45:20
  49:1 50:14 51:10

53:5,16,19,24
54:4,6,24 55:9
58:4,10 59:15,15
59:24 60:1,5,15
60:16,18,19,24
62:22 66:19 67:5
68:5,6 69:19
71:13,17 72:25
73:2,14,18 74:10
75:5,11 77:4,12
78:7,8,14,15 79:3
79:10 80:17 82:19
82:20,21,24 86:8
87:13 88:11
**exactly** 21:10 78:22
20:20
**Examination** 3:4,6
3:7,9,10 11:2
13:11 15:3 16:9
17:18
**examiner** 50:25
**example** 69:3
**exclude** 22:1 51:20
**excluded** 22:4
**excuse** 89:23,23
**exemplars** 69:14
**exhibit** 6:22 19:10
34:18,23,24 38:5
39:2,6 41:8 44:20
45:4,19 48:10,15
49:10 50:14 52:6
52:10,15,15 53:10
53:11,11 56:6,11
58:15 59:14 61:5
75:21 79:2 80:18
**exhibits** 6:22 8:25
9:12 19:14 38:11
41:14 47:12 48:2
48:5,7,8 49:8,19
50:2,4,9,18 52:1
52:12,15 53:6
55:20 57:23 58:2
58:18
**exists** 67:1
**expected** 83:14
**expense** 63:20
**expert** 61:9,19 65:2

65:18 66:6,11
70:12 80:19
**expired** 19:3
**explain** 48:6
**explains** 30:10
**extent** 61:6,23
73:11 76:2
**extraneous** 43:19
**extraordinary** 5:9
**extremely** 82:23
**eye** 40:23
**e-mail** 40:18 43:23
46:14,14,22,23
47:1,1 49:12,14
49:18,23 50:1,20
52:25 53:1,5,16
53:25 54:3,9,23
56:12 68:14
**e-mailed** 84:8
**e-mails** 57:2

___

## F

**F** 13:8 95:1
**fact** 26:18 27:17,18
28:5,13 29:10,11
49:13 53:19 54:21
55:10 56:19 57:5
60:2,4 61:21
65:11 67:1 68:25
74:1,2,24,24
76:22 77:10,12,12
77:21,24 78:1,8
78:22 79:1 81:19
81:25 84:10 90:25
**facts** 22:25 28:15
28:16 39:18 49:21
54:3,8
**Fadden** 3:5 12:22
12:24 13:4,6
**fair** 23:8 38:9 82:16
83:17
**faith** 7:6 20:25
24:24 25:2 28:21
28:22 32:13,14
77:11 79:7 90:11
90:12,14,15
**fall** 83:4 84:9

**false** 59:8,9,9 62:22
88:2
**familiar** 7:6 8:5
10:13 22:25 23:20
25:12,16 76:23
93:5
**familiarity** 26:12
26:15
**families** 17:25
**far** 47:12 60:20
61:8,17 67:2
78:10
**fast** 30:1 41:24
**favor** 5:16 82:15
84:16 90:25
**fear** 50:3,9
**Fifteen** 34:4
**file** 5:23,24 29:14
36:14
**filed** 4:2,13,14 5:23
20:11 32:16 35:17
**filling** 91:14
**final** 91:17
**finances** 28:1
**financial** 16:15
17:1
**find** 39:18 49:24
50:23 82:4 83:5
86:22 88:14,17
89:5
**finding** 76:14
**fine** 7:21 9:8,10,15
10:14 35:10 38:16
47:1 50:16 67:21
**finish** 9:7 24:2
48:21 64:14
**first** 5:11 23:16
26:6 32:15 48:13
67:4 72:23 74:25
**five** 6:21 8:25 9:4
38:11 49:8 52:1
52:12 53:6 55:19
57:23 59:12,16
**FL** 1:16
**FLANNERY** 2:2
42:21
**flash** 75:1

**FLOOR** 1:22
**Florida** 22:2 23:13
**follow** 6:25 42:25
**foot** 73:19
**football** 18:4
**formal** 5:24
**formally** 4:13,14
10:7
**forth** 5:6
**forward** 86:13
**forwarded** 40:22
**foul** 65:6
**found** 19:4 20:21
23:13 50:17,19
51:1 60:21 61:20
65:11 66:2,13
70:7,14 71:10
73:8,9 76:7 77:9
**foundation** 24:23
28:20 45:3 46:5
50:5,8,17 51:19
55:21 56:10 59:4
61:8 70:22 74:18
77:16 84:7 92:17
**foundational** 45:13
**founded** 26:19
28:14
**four** 8:1 51:14 93:5
**FOX** 1:16
**frank** 13:8
**frankly** 7:8 36:24
65:14 73:20 75:19
84:5
**fraud** 23:21 25:17
32:10,12 33:6,6
59:16,16 63:5
72:12,13 90:22
**free** 76:5
**Friday** 4:2,11,12
**friend** 11:10 15:13
34:14
**friends** 18:5
**front** 38:14 73:25
78:25
**full** 63:19 87:2
**Fuller** 1:15 92:1
**fully** 4:23

**fundamental** 74:2
78:20 79:24,25
80:4,4,7 82:12
87:5
**Fundamentally**
80:13
**funds** 25:18 49:16
**further** 8:22 11:21
12:17 14:12 15:20
17:4 18:11 30:20
57:21 58:17,19
**F.2d** 29:24
**F.2nd** 30:5
**F.3rd** 30:15

___

## G

**Galub** 45:24
**game** 23:8
**gentleman** 11:19
**Gerald** 3:3 10:16
10:18,23
**getting** 56:17
**give** 19:17,19 21:12
26:24 29:1 32:4
39:16,17 41:14
48:10 87:2 88:16
88:18 92:6 93:1
**given** 39:20 51:13
54:16,24 82:11
83:10 84:11,22
85:13 86:17
**go** 4:8 9:19 10:11
21:13 26:1 36:18
36:24 40:15 50:12
51:9 63:4 65:8
70:21 72:4 73:4
74:16 76:24 85:15
85:16,20 86:6,13
89:10 92:15 93:14
**goes** 23:7 25:24
26:15 56:12,15
60:13 88:13
**going** 4:23 6:22,25
10:10 18:19 20:12
23:17 26:25 31:14
32:17 33:15 34:17
38:5 39:20 40:11

40:15 41:14 61:19
63:25 64:1,2,18
65:6 66:9 67:10
71:16 72:2,3 74:5
74:18 75:23 76:10
78:17 79:24 80:18
81:10,17 82:3,14
85:1,11 87:13,19
88:4,4,7,18,24
89:14 90:21 93:7
**good** 7:6 10:6,6,7
10:22 11:5,6 12:8
12:12 13:14,15
15:6,7 16:12,13
16:25,25 17:21,22
18:10 20:19,25
24:24 25:2 28:21
28:22 32:13,14
34:15 37:16 42:23
47:10,23,25 77:11
79:7 90:11,12,14
90:15
**gotcha** 68:18
**gotten** 68:22
**government** 4:3,5
5:2 6:2,4 7:2 8:25
20:11,16,20 21:5
21:8,10 22:4
24:25 25:1 34:18
38:11 42:8,10
43:17,19 44:10
46:1 48:1,8,15
49:9,13,21,22
50:2,9 52:12 53:4
53:10,11 54:15
58:3,8 59:7,9,14
59:17 60:4,14,18
62:10,18 63:2
65:13,15,21 66:3
67:8 69:15,16
70:4,21 71:4,9,19
72:18 73:17,25
74:4 75:1,21,22
76:8,22 77:8,24
78:3,15 80:8 81:1
81:19 82:15 83:16
83:20,22 84:20

85:4,6,22 87:4,17
88:4,10 90:1,21
91:7,8,12 92:21
93:2
**government's** 5:13
5:14 25:3 46:16
48:5 52:15 61:5
61:16 72:20 75:16
75:17,21 80:4
81:14,16 84:16
90:12 91:16
**granted** 39:4 63:20
**great** 8:12 23:23
31:4 63:14
**grounds** 60:8
**Gs** 30:13
**Guantanamo** 46:17
**guess** 50:15,16
84:14
**guilt** 21:21,22 22:9
36:13
**guy** 12:8
**guys** 90:20

---

## H

**H** 3:11
**habit** 30:3
**hairs** 54:14
**half** 51:14 87:22
**hand** 31:3 83:18
90:6 95:11
**handle** 47:21
**handwriting** 65:18
66:6,11 69:14
**hang** 89:3
**Hanissen** 46:15
**happen** 21:15
86:13
**happened** 21:15
88:2
**happening** 49:22
**happens** 42:14 82:1
**happy** 7:16 29:16
29:20 45:6 57:5
**hard** 40:21 82:4
**Hartline** 1:5 6:21
7:1,3 11:7,15 12:5

13:18,20 14:4
15:10 16:17 18:1
19:1 46:15 49:15
49:24 50:21 51:4
51:7,16 52:17
54:10 56:12 58:9
64:20 67:2 71:8
82:25
**Hartline's** 49:1
50:17,19 51:1
53:1 60:21 61:20
61:22 65:11 66:2
66:13 70:3,9,13
71:6 72:4,6,17,18
74:23 76:16
**hear** 12:4 23:23
25:6 41:10
**heard** 5:17,18
12:13 23:8,11
25:7 33:9,10 40:2
40:3 79:3,3 84:17
87:15,15,22 88:11
90:4
**hearing** 68:14 95:4
**help** 60:23
**hesitant** 68:15
**hesitate** 63:21
**high** 11:19
**highly** 64:3 82:22
82:23
**Hizey** 80:24 87:21
**Hold** 32:11 46:18
**home** 17:24 73:6
76:7
**honest** 11:19 14:9
15:18 16:24 18:9
22:23 23:2
**Honor** 4:9,15 5:6
5:21 6:3,6,10,17
6:19,20 7:4 8:16
9:18,20 10:15
11:22,24 12:17
14:13,14 15:20,21
17:4 18:12,18,20
19:5,7,13,23 20:8
20:11 21:14 22:7
24:5,8 25:16 26:1

26:24 27:5,7 28:3
29:1,16 30:12
33:7 34:5,6,25
35:6,15,18,25
36:7,11,22 37:19
37:22 38:4,18,25
39:9,13 40:12,14
40:20 41:13,22
42:9,12,14 43:6
44:3,8,11,13,25
45:5,17,22 46:1,8
46:19 47:9,15,17
47:23,24 48:1,11
48:14,20 49:12
50:11 51:23 52:11
52:23 53:3 54:1
55:13 57:21 58:1
58:15,23 59:3,13
59:23 60:2,14
61:4 62:4,8,12,15
63:4,6,19,25 64:8
64:16 65:1,9,21
66:7,19 67:18,23
68:2,25 69:20,25
71:22 72:22 73:4
73:22 74:22 75:18
76:12,25 78:1,6
78:19 79:21,23
80:7 81:10 82:5
82:17 83:21,22
84:3,18 85:18
86:1,4,25 88:10
89:2,16 90:9 91:5
91:25 92:5 93:9
**Honorable** 1:8 10:5
**Honor's** 5:11
**hope** 17:24 48:11
**hopefully** 39:23
**hoping** 36:14
**house** 39:23 76:14
**How's** 41:12
**hypothetical** 21:22
22:9
**hypotheticals**
21:22

---

## I

**identification** 50:7
**identified** 45:2 50:5
**Ignall** 1:10 3:4 4:4
4:6,12,15,18 5:21
6:3,7,10,17,19
7:13,16,19,25 8:8
8:23 9:8,11 11:24
12:3 13:24 14:14
15:21 18:20 19:7
19:22 20:19 22:6
22:7,11,21 24:3,9
24:23 25:12,15
26:9,11 27:7
28:11,12,25 31:6
31:8,11,17,20,21
31:25 32:3,8,12
32:14,22 33:1,3,7
33:9,12,14,17,22
34:5,20 35:20,25
36:11,18 37:3,5,9
37:15,22 38:6,10
38:15 39:3,13
40:14,19,23 41:1
41:3,7 42:19,25
43:21 44:25 45:11
45:23 46:3,25
48:20,24 50:11,13
51:23 52:4,5,9,16
56:1,3 57:10,14
63:10,13 86:2,4
88:13,20,23 89:1
89:5,6,9,11 92:8
92:11,14,16,20
93:1,12,16,18,20
93:22
**ignored** 51:24
**II** 1:8 10:5,23
**image** 46:23
**Immaculata** 13:17
**immediately** 37:20
**impact** 70:10
**impeccable** 15:19
**important** 39:25
46:14 87:14 91:2
91:17
**importantly** 59:13
61:1 62:16

**improper** 5:9 54:23
  54:24 75:4 77:20
**impute** 76:13,17
  82:8
**inadmissible** 28:7
  57:7
**inclined** 83:19
**include** 10:9 36:12
  59:21
**including** 56:9
**Income** 20:21
**indicated** 39:21
  69:13
**indicates** 63:23
  69:7
**indicating** 20:12
  44:21
**indication** 69:5,9
  69:10,10,11 76:20
  77:6 88:8
**indictment** 49:20
  59:7,14,17 60:15
  87:3,12,17
**indictment's** 72:10
**indirectly** 53:15
**indiscernible** 4:6
  4:25 5:2,24 6:14
  7:4,10 8:17 11:24
  13:24 16:25 24:2
  24:5 26:14 27:4
  27:13 32:21 36:3
  36:20 38:8 40:12
  40:13,15 42:19
  45:13 49:2 50:13
  52:9,14 53:16
  57:24 63:13 72:24
  74:23 85:2 88:20
  90:10,20 92:6
**individual** 10:12
  69:8
**individuals** 11:14
  11:17 14:3 15:14
  16:21
**infer** 54:6,18 55:8
**inference** 54:24
  56:18 59:24 93:2
**inform** 20:19

**information** 52:18
  61:15,20 75:5
  77:15 85:22
**infuse** 63:24
**inherently** 22:12
**initial** 72:25
**initially** 5:15 9:16
  63:2
**initials** 69:5 79:13
**innuendo** 24:22
  25:24
**inquire** 26:14
**inquiry** 26:17
  74:24
**insinuation** 60:9
**instance** 7:2 13:25
  65:5 82:16
**instances** 20:15
**Institutional** 13:22
**institutions** 17:1
**instruction** 36:6,12
  89:13
**instructions** 36:5,9
  86:6
**intend** 6:12 45:5
**intent** 91:14
**intention** 20:19
  81:19
**interested** 95:6
**interpret** 49:23
**interpretation**
  30:20 51:10
**interpreted** 29:21
**interviewed** 85:24
**introduce** 9:13
  20:12 21:19,19
  24:10 37:24 62:10
  70:22,22
**introduced** 34:25
  78:14
**inure** 83:15
**invest** 53:18
**invested** 60:1
**investigating** 81:23
**investigation** 40:4
**investing** 25:18
**investment** 22:3

  54:10 90:3 91:6,7
**investments** 49:25
**investor** 60:3,25,25
  60:25
**investors** 59:19
  60:6
**investor's** 72:13
**involved** 23:15
  85:14 87:24
**involvement** 24:12
**involving** 27:22
**irrefutable** 24:21
  29:10,11
**Isenberg** 3:10 8:17
  8:18 9:17 10:12
  17:8,10,14,21
**issue** 7:1,5,10,20,25
  8:23 20:7 24:8
  26:10 30:25 34:12
  43:18 46:24 48:7
  49:4,5,11 50:3
  56:3,20 58:2
  60:13,16 62:20,20
  68:23 71:4,5,14
  72:16 81:12 82:18
  84:1 88:10 89:16
  90:19,19 91:13,13
**issued** 19:3
**issues** 21:15 27:15
  35:9 37:14 41:8
  47:21 58:9 87:25
  89:17 90:10,10
**items** 50:23
**iterations** 35:22
**I-S-E-N-B-E-R-G**
  8:19 17:14

**J**

**J** 1:10,15
**Jackson** 92:10
**Janine** 2:8 95:14
**JENNIFER** 1:11
**Jerry** 10:22
**jfuller@foxroths...**
  1:19
**Joel** 1:20 20:10
**John** 1:15 3:7

  14:18,20,24
**joint** 35:16,23,24
  36:1,5
**jointly** 35:17
**Jones** 1:8 10:5
**jschwartz@shul...**
  1:25
**Judge** 1:8 43:3 66:5
  68:6 76:1
**June** 63:24 77:1
**jurors** 8:5 86:16
**jury** 1:7 7:11 8:4
  9:16 10:2,8,9
  18:19,22 20:3
  25:13 35:9 36:24
  37:9,17 38:5,14
  38:17,21 39:14
  40:8 44:2,5 46:21
  51:5 54:5,18 55:7
  55:10 56:18,18
  63:1 64:24 67:25
  68:1,3 69:22
  70:23 71:18 73:25
  74:11,13 75:9
  77:13 78:25 79:3
  86:6,16 89:13,15
  89:17

**K**

**Karen** 41:4
**keep** 27:11
**Kellogg** 23:6 29:20
  30:15 31:11
**kept** 82:23
**key** 49:21
**Kim** 56:12
**kin** 95:5
**kind** 7:10 20:23
  75:20 81:7 85:11
  85:12,13 91:9
**knew** 61:13 74:19
  75:3 81:24,24
**know** 8:15,24 9:4,5
  10:12 11:7,9,10
  11:14,14 13:18,20
  14:3,3 15:10,12
  15:14,15 16:17,19

  16:21,21 18:1,3,6
  18:6,8 21:9 25:2
  25:25 26:2,2,3,4,5
  28:12 38:14 41:8
  45:1,2 47:2 48:23
  51:15 57:3 60:20
  69:12 72:2,8 73:8
  73:12,16,19 74:23
  75:19,20,22 76:2
  76:3,7 77:4,9,10
  77:17,17 79:12,19
  79:19 81:2,10
  85:6,10,13,23
  86:16,18 88:13,19
  89:1 91:17,18
**knowledge** 32:23
  71:1 74:6 76:13
  76:17 77:7,18
  82:8
**known** 11:10 15:13
  21:2 80:17 81:7
**knows** 8:20 10:11
  69:2
**Kore** 80:21,21,23
  81:3,13 83:4
  85:23 86:18
**K-O-R-E** 80:21

**L**

**L** 77:5
**laid** 30:20 45:3
  50:18 51:19 56:10
  61:8
**laptop** 49:1 50:17
  50:19,24 51:1,5
  52:17 53:1 58:9
  60:21,22 64:21
  65:11 66:3,14
  67:2 70:3,9,13
  71:6,8 72:4,6,17
  72:19 74:23 76:16
**large** 42:11 46:17
**largely** 22:4
**Larry** 76:21
**late** 18:5
**law** 22:14 24:15
  26:13,21 27:17,18

27:20 29:6,18,18
29:19 32:3 39:17
40:3 82:6 84:20
**lawsuit** 21:17 23:16
26:1,1 27:17,17
27:22,25 28:7,9
29:11 32:15 33:11
33:18 80:24 87:23
**lawsuits** 23:19,20
27:14 33:19
**lawyer** 44:20,21
**lawyering** 83:12,13
**lawyers** 73:3
**law-abiding** 11:18
12:7,10 14:9,11
15:18 16:24 18:9
20:18 22:24 23:2
23:11 27:16 29:5
29:9
**law-abidingness**
28:3,25
**lay** 70:22 74:17
**leading** 30:23
**leave** 36:21
**leaves** 20:3 38:5
40:8
**leaving** 89:3
**left** 58:24
**left-hand** 73:9
**leg** 78:6
**legal** 81:3
**legally** 10:23
**legitimately** 72:18
**letter** 4:3,7,14,15
4:17 5:7,23 6:1
20:11 31:7,9,11
44:19,20 45:4,6
45:15 51:8 59:3,7
59:10,11,18 60:1
60:9,11,11,13,18
60:23,24 61:13,15
61:16,18,23,25
62:2,20,23,24,24
62:24 64:2,3
66:17,18 67:1,12
68:1,2 69:3,4 76:7
76:11,14,15,15,16

77:7,8,17 80:25
81:1 82:7,22 85:2
86:20 87:5 88:2,3
88:6,7,12
**letters** 73:8
**let's** 19:24 25:1
32:15 36:23 37:1
37:17 46:12 64:5
67:17 69:17 73:4
74:2
**Levin's** 56:13,14
**liability** 25:24 26:4
28:9
**license** 3:14 19:2
**limit** 56:6
**limited** 22:8,13
23:5 28:24 68:10
**limits** 58:10 78:2
**line** 46:15 68:6
82:14
**list** 8:2 19:14,17
38:5 42:13,15,21
42:23 43:5,6,9
71:12 81:14,16,20
81:21 82:1 84:24
86:15
**listen** 83:12
**listing** 36:2
**little** 30:1 43:25
53:15 82:4 85:14
85:15 93:11
**live** 27:12
**LLP** 1:16
**local** 16:15 86:21
**long** 37:9 76:17
89:4 91:13
**look** 28:18 31:12
47:5 69:1 76:18
77:3
**looked** 36:1
**looking** 35:3 52:10
**looks** 67:11,14
**loop** 56:17
**lot** 12:5,7 80:25
**loudly** 27:1
**Ls** 30:15
**luck** 86:16

**lunch** 39:23
**lunchtime** 39:24

---

## M

**M** 19:1
**maintained** 57:1
**making** 26:6 32:7
74:21 91:14
**Management** 79:15
**manipulate** 46:23
**Manzi** 3:3 10:16,18
10:23,23,25 11:5
12:4
**mark** 44:9
**marked** 3:13,16,20
78:13
**Market** 1:16 2:2,12
**markings** 43:19
**material** 71:6 91:18
**materiality** 91:16
**materials** 36:19
**matter** 21:1 60:2,4
67:1 73:13 78:22
84:16
**MD** 1:23
**mean** 28:20 29:16
46:10 53:12 63:18
68:6 72:9 76:5
77:9 82:3 88:17
**meaning** 79:4
**means** 25:13 77:10
78:8
**meet** 11:20
**members** 10:8 14:6
14:7 18:22 39:14
90:4 93:4,6
**memo** 81:20 87:13
87:16
**memorandum** 87:4
**mention** 33:16,18
33:20,22 68:4
**mentioned** 23:17
**merger** 87:24
**MICHAEL** 2:5
**Michaelson** 26:16
26:21 28:14,19
29:21

**microphone** 27:1
**MID-ATLANTIC**
2:12
**million** 50:21 51:12
51:14 59:12 63:20
63:24
**mind** 31:3 75:3
**minimum** 60:17
**minute** 43:1 52:3
85:15 86:5
**minutes** 34:4 93:18
**misrepresenting**
80:11
**missing** 65:12 90:3
91:4,10 92:16
93:1
**mistake** 87:5
**mistaken** 91:1
**misunderstanding**
74:2 78:20 79:24
79:25 80:4,5,7,12
82:12 83:19
**misused** 60:14
**mix** 12:9
**MJE** 69:4
**mjeesq@msn.com**
2:7
**modifications**
47:14
**moment** 6:18 63:15
82:17,24 83:1
**money** 26:5,5 49:24
**month** 51:13
**moot** 86:4,22 88:14
88:21
**Morgan** 46:22
48:10
**morning** 4:3 5:23
6:1,12,12,16 9:5
10:6,6,7,22 11:5,6
13:14,15 15:6,7
16:12,13 17:21,22
20:11 29:15 35:14
36:15,17 37:18
39:22,22,24 40:5
47:24,25 90:1,2
**mortgage** 11:13

**motion** 4:7,11 5:10
5:13,14,19,19,25
59:9
**motions** 4:2
**move** 6:22 19:5,14
22:1 39:1 41:19
73:3
**moved** 8:25 47:17
47:18 52:12 58:3
72:25 73:2,4,18
79:2 80:16 86:8
**mutual** 80:12 83:14
**mutuality** 83:18
**M-A-N-Z-I** 10:25

---

## N

**N** 3:1
**name** 8:16,17 10:8
10:10,13,20,22,24
12:8 13:2,7 14:22
14:23 16:4,6,6
17:12 61:14 67:12
81:13
**named** 23:18
**names** 8:4 32:20
52:25
**NATIONAL** 2:11
**nature** 27:16 29:5
78:20
**necessarily** 28:16
62:7 68:14,15
93:3
**need** 5:24 23:24
25:5 26:25 33:18
33:19 36:18 38:14
41:2,7 42:18
49:11 50:24 52:18
86:23 88:15
**needed** 26:18 34:13
82:3
**needing** 71:7
**needs** 9:5 38:12
86:20
**negative** 12:13 36:2
**neither** 49:17 95:5
**never** 12:13,15
46:3 54:25 60:20

71:17 74:25 77:13
79:3,3 87:22 88:2
88:3,11 90:4
**new** 59:12 62:19,20
62:21
**news** 33:8
**newspaper** 24:22
26:15 28:16 32:15
32:16,17
**newspapers** 23:14
**night** 4:24
**Ninety-two** 58:25
**normally** 12:9
**Notary** 2:9 95:14
**notes** 40:16
**notice** 81:21 83:24
84:11,22
**notify** 20:15
**NOVA** 44:17 49:16
49:17,25 56:7,11
59:11,12,20 60:2
60:3,7 63:20
87:24
**November** 23:14
23:18 32:16,17
86:9,10
**number** 3:13,16
5:8,10 19:2,10
23:18 32:14 39:6
45:19 48:2 51:4
56:6,9 57:11
64:21 78:16 79:2
92:22
**numbers** 47:4

─────────
**O**
─────────
**object** 42:10 48:3
49:10 50:7,8,15
55:19 60:7,7,9
**objected** 53:7
**objecting** 53:8 71:8
72:17 90:12
**objection** 7:10 9:2
9:3,12 13:24
18:20 19:7 25:19
34:1,19 36:14
38:7,7 39:3 46:16

47:8,20 48:14
49:18 52:5,19
53:4 55:18,19
57:16 59:4 62:6
72:24 73:1 74:4
74:17,18 86:10,11
**objectionable**
73:19
**objections** 38:11
41:18 48:4,17,18
51:9 57:4
**objects** 42:8 43:18
43:20 44:10
**obligated** 32:4
**obligates** 27:8
**obligation** 50:23
51:15
**obliged** 65:7
**observations** 23:9
**obviously** 35:11
55:1,13,15 83:11
**offense** 21:1
**offer** 85:21
**offered** 20:17
**offering** 21:24
27:19
**office** 1:11 36:19
40:16 67:19 69:2
**officer** 15:9 16:15
78:21 83:11
**official** 95:11
**oh** 7:21 40:21 42:13
45:24 71:14 73:11
**okay** 4:10,16 7:21
7:22 8:15 9:6,7
21:14 22:10 29:19
31:20 32:19 37:15
38:9 41:11 42:5
42:20 44:4 47:19
49:3 57:13 79:22
81:12 90:17 92:14
93:16,20
**old** 43:6
**omniscient** 81:16
**once** 12:15 36:24
**ones** 30:24 56:9
**oops** 82:3

**open** 21:19 23:22
**opening** 27:9 56:15
87:15
**operating** 83:6
**OPERATOR** 2:8,8
**opinion** 21:24,25
22:8,22,23,24
23:3,5,10 28:24
30:8,10,16,17
**opportunity** 22:3
50:6 65:15 66:6
66:10 68:21 83:2
88:17,19
**opposed** 22:8
**opposing** 62:13
**opposition** 49:13
59:10
**option** 80:19,22,23
81:7
**options** 81:1,7 83:6
**order** 4:22 5:24
29:3 64:10
**original** 8:2 69:13
86:15
**originally** 79:7
**outcome** 95:6
**outlining** 4:7
**outside** 56:2
**outweighs** 78:10

─────────
**P**
─────────
**PA** 1:3,13,17 2:3,6
**package** 57:8 89:13
**packet** 36:12 89:15
**PADOB** 56:13
**page** 3:1 44:19
75:21 76:22
**paid** 26:5
**Pall** 17:14
**paragraph** 63:11
63:12,19
**parameters** 70:18
**Pardon** 31:17 33:1
**PARK** 1:22
**part** 45:4 71:4
79:25
**particular** 45:2

70:7,13,14,14
77:9 80:18
**particularly** 81:2
**party** 95:6
**Patricia** 3:5 12:21
12:24 13:4,6
**PATRICK** 1:15
**pattern** 36:3,4
**Patterson** 35:1
**Paul** 3:10 8:17,19
9:17 10:12 17:8
17:10
**Pause** 9:23
**pay** 17:24 63:21
**pegan@foxroths...**
1:18
**Pennsylvania** 1:1
2:13 18:25 29:22
36:10
**people** 12:4,7,8,14
14:8 15:17 16:23
18:6,8 26:2 81:14
81:22 82:1,3
92:22
**Perfect** 43:8,10,12
**perfectly** 23:19
**period** 62:2
**permissible** 23:19
24:15 25:9,10
**permitted** 21:23,24
22:20,20
**person** 10:11,13
29:3 79:17
**person's** 10:10
**perspective** 90:8
**ph** 39:23 46:14,15
48:9 76:21 80:21
80:24
**Philadelphia** 1:3,13
1:17 2:3,6,13
23:13
**phone** 40:23 47:4
86:6 89:7 92:11
**piece** 51:18 82:20
82:24
**place** 5:11 70:7,14
73:13 77:9

**plainly** 59:17
**Plaintiff** 1:3,10
**plaintiffs** 80:24
87:21
**Plaintiff's** 3:12
19:10
**played** 18:4
**pleasant** 40:6
**please** 7:4 10:24
12:19 13:2,7
14:16,22 15:23
16:4 17:7 18:17
24:7 34:4 63:17
75:25 86:3
**plenty** 23:12
**podium** 24:6
**point** 5:8,10 34:21
42:12 48:19 49:9
51:25 52:24 54:17
60:18 63:18 65:10
65:12,13,20 66:7
66:10,19,25 68:25
75:25 79:6,10
83:6 86:7 87:11
88:11
**pointed** 93:3
**Ponzi** 23:15,17
24:12 25:8,13
**portions** 42:11
**posing** 21:21
**position** 20:21 21:4
25:3 48:6 54:2,2
54:22 75:16,17
**possibility** 7:11
63:1 84:6
**possible** 8:1
**possibly** 22:16
**potentially** 22:15
**POTOMAC** 1:22
1:23
**powerful** 74:10
**prefer** 40:24
**preference** 37:7
**prejudice** 5:4 73:17
73:24 74:12 79:5
**prejudicial** 70:10
78:9 82:21,22

85:8
**preparation** 78:4
**prepared** 4:23
  35:14 36:16 78:4
**present** 1:20 7:12
  18:19 76:15,15,16
**presentation** 39:15
  49:20
**presented** 7:3
  18:23 74:13 91:11
**president** 13:17
**presidents** 17:2
**presiding** 10:5
**pressure** 63:22
**presumably** 62:5
  62:10
**pretrial** 81:21
  84:11,15
**pretty** 51:15
**previous** 63:23
**previously** 52:20
**print** 40:19 41:4
**prior** 3:20 4:21
  56:5 64:17,22
**probably** 9:13
  11:11 41:4 47:3,5
  48:3 74:9 89:3,11
**probative** 5:3,17
  22:14 78:9,10
  82:23,24
**probe** 22:24 23:2
**problem** 7:18 22:11
  37:10 43:24 46:19
  53:5 68:9 76:12
  76:13 84:4,23
**proceed** 10:14 13:9
  15:1 17:16 18:21
  18:24 38:24
**proceeding** 3:20
  34:8 94:1
**proceedings** 2:10
  92:1
**process** 10:9 48:23
  70:21 72:5 93:5
**produced** 2:10 56:7
  57:3 60:4 85:24
**prohibits** 78:14

**proof** 21:18 82:7
  85:22
**proper** 5:12 32:7
  70:22 77:22
**properly** 54:18
  58:11 77:19 78:24
  79:1 83:24 84:24
**proposed** 20:16
  21:11
**prosecution** 26:17
**prove** 56:19 61:11
  61:12 63:4,5
**proven** 23:25 24:18
  28:5,13,15,16
  29:11
**provided** 87:4
**provisionally** 58:3
**proximate** 21:1
**public** 2:9 19:2
  95:14
**purchased** 44:17
**purpose** 70:4,6
**purposes** 50:8
**pursuant** 56:7
**pursue** 26:17
**put** 4:24 27:8,10
  48:9,10 53:5,6
  65:4 67:20 70:11
  71:18 72:2 74:9
  75:10 81:18 86:19
  87:13
**puts** 7:17 22:15,15
  73:19
**putting** 25:10 72:5
  72:7
**puzzle** 51:18
**p.m** 94:2,2

### Q

**quarter** 41:3
**quarters** 48:4
**question** 6:11 7:6
  20:13 23:6 25:3,6
  25:11,14,20 27:16
  28:21 32:1 33:14
  37:3,11 53:15
  54:1 64:10 65:25

79:12
**questions** 11:21,23
  12:17 14:12,14
  15:20,21 17:4,5
  18:11,13 20:25
  24:10,24 31:23
  32:8 34:1
**quick** 42:15
**quite** 26:13 73:20
  75:19

### R

**R** 95:1
**raise** 6:8 9:2,9
  57:17 68:21
**raised** 4:19 59:12
  68:17 73:1
**random** 79:2
**range** 57:12
**rare** 92:20
**reaching** 39:18
**read** 8:4 25:2,3
  42:21,23 52:15
  62:23 63:16 64:24
  66:17 67:15 69:10
  69:21 71:18 74:6
  75:11 77:13 78:4
  79:4,9 80:16 82:8
  86:15 91:2
**reading** 42:13 43:9
**ready** 9:21 87:18
**realize** 4:23 71:15
**realized** 36:6 87:11
  87:17 88:10
**really** 7:7
**reason** 37:12 49:11
  61:2 63:2 65:5
  74:10,22
**reasonably** 21:1
  37:13
**reasons** 52:20
  55:20
**rebut** 29:8 84:24
**rebuttal** 22:16
  25:10 39:11 83:24
  84:23,23,25
**received** 6:5 44:21

45:1 56:8,25
  60:12,18,20,25
  62:25 72:9 74:7
  75:13 80:25 86:20
  89:20,21,25
**receiving** 44:22
**recess** 19:25 31:15
  31:18 34:8 82:18
  86:5 92:8 93:23
  94:1
**recognized** 46:4
**recollection** 44:22
  45:9 46:7
**recommend** 93:6
**reconsider** 5:15
  50:16
**reconsideration**
  5:20
**record** 10:21,21
  13:3 14:23 16:5
  17:13 19:1 35:4
  41:19 56:4 64:24
**recorded** 2:10
**recording** 2:10
  95:4
**recovered** 61:22
  65:2 73:6
**redact** 45:6 46:21
**redacted** 47:6
**redaction** 43:22
**redactions** 46:17
**Reed** 44:20
**reference** 48:6
**referenced** 52:25
**referred** 21:21
**referring** 4:11
**reflection** 5:18
**refreshed** 44:22
**regard** 7:2 20:14
  20:21 21:16 24:11
  28:2,9 29:4,5
  30:24
**regarding** 4:12 6:2
  22:17 23:3,14,17
  23:19 28:1 32:9
  32:18 36:13 52:24
**regardless** 85:2

**REGION** 2:12
**regulation** 91:20
**regulatory** 63:22
**relates** 54:11 72:12
  90:3
**relationship** 83:4
**relationships** 63:24
**relevance** 45:4 50:6
  50:8 51:7,14
  55:21 56:13 57:16
  59:5 60:8 61:2
  62:18,25 63:4,5
  87:6,7
**relevancy** 57:4
**relevant** 5:17 21:2
  46:22 51:11,18
  56:19 57:3 61:15
  61:23 64:3,6 78:2
  82:22 87:8 93:3
**reliance** 83:14
**relied** 65:6
**remainder** 56:1
  58:18
**remedy** 5:9
**remember** 41:14
  44:18
**renewed** 19:4
**reopen** 5:2,14,19
  65:1,7 82:18 83:2
  83:20,23,25 84:20
  84:21
**reopened** 5:8
**reopening** 86:23
**repeatedly** 49:20
**REPORTING** 2:11
**reputation** 11:17
  14:8,10 15:17
  16:23 17:1 18:9
  20:17 21:23 22:8
  22:11,15 23:5,7,9
  23:22,25 27:19
  28:24 29:9 30:7
  30:10,18 32:24
**reputation's** 23:23
**request** 44:7 51:6
  60:15,17 83:1
  86:5 91:14,14

requested 78:7
research 40:4
reserve 9:1
reserved 57:14
resolution 7:14
resolve 8:11 37:14
  38:12 41:7 58:2
  88:23
resolved 37:12
  58:13
resolving 37:12
respect 7:20 8:24
  48:25 49:7 50:13
  54:14 58:2,7,14
  59:5 60:12 71:11
respectfully 60:15
  63:6
respond 50:11
  86:12
response 29:14
  72:11
responses 56:13
responsible 13:23
  66:18
rest 6:23 19:15
  34:22 36:24 38:1
  39:10 46:24
rested 9:1 38:3
rests 39:10
result 87:13
retired 15:9
retrieved 72:18
return 39:21
reversal 90:25
right 4:1,16 5:5,13
  5:21,22 6:9 7:21
  8:12,21 9:2,10,16
  9:21 10:7,13
  12:11,16 18:21
  19:6,24 20:5,6
  22:5,5 24:2,4 27:3
  30:22 31:1,10,14
  32:2,11 33:13,24
  34:2,5,11,12,15
  34:23 35:2,5
  36:23 37:1,13,15
  37:21,22 38:13,16

38:23 39:11,14,25
  40:10,25 42:7
  43:4,10,16 44:9
  44:24 45:14,14
  46:9,12 47:3,7,13
  47:14,22 48:13
  49:6 51:21 55:14
  55:17 57:13,14,19
  57:22,25 58:5,16
  58:21 59:1 61:3
  62:1,9 63:14 64:9
  66:16,21 67:13
  69:17 70:6,19
  79:11 81:5 82:11
  82:16 83:17 88:16
  88:22,24 89:7,8
  89:10 90:5 91:15
  91:21,24 92:3,7
  92:15,19,25 93:8
  93:16,17,22,23
right-hand 73:10
rise 9:25 20:1 38:19
Robert 3:8 15:24
  16:2,6
ROGERS 1:21
ROTHSCHILD
  1:16
Rothstein 22:2
  23:15,17 24:12
  25:8,13 32:21,22
  33:3,5
Roven 76:21 82:9
rule 36:8 49:13
  59:10 72:11 79:6
  82:15 83:15 84:15
  88:18
ruled 4:21 5:16
rules 78:19
ruling 5:11,15,19
  45:13 55:15
rumor 24:22
rumors 22:12,17
  26:19 28:14,15
  29:7,8
run 17:24 41:4
Russell 1:20 47:24
  51:22

**S**
s 2:5 3:11 7:20
sake 74:3
salutation 59:19
  77:3
sat 69:6
saw 88:8
saying 22:20 24:14
  25:4 28:6 33:4
  45:11,12 50:21
  54:14 61:14 68:11
  71:8 73:17 75:8
  76:1 78:15 80:6,8
  80:9,9,10 83:10
  84:19 87:5
says 22:23 26:17,21
  26:22 28:14 49:23
  59:15,17 62:21,22
  69:2 77:5,5
schedule 88:25
scheduling 35:9
  39:20
Scheme 23:15,18
  24:12 25:8,13
SCHULMAN 1:21
Schwartz 1:20 6:7
  6:10,14,18,25
  7:23 8:10 9:18,20
  20:8,10,10 21:7
  21:14 24:5,8,16
  24:21 25:5,21
  26:21,23 27:2,4
  27:13,24 28:2,8
  28:17,18,22 29:8
  29:15,19,24 30:2
  30:5,9,12,14,19
  30:23 31:2,5
  32:20 33:24,25
  34:3,6 93:9
scienter 78:18
scope 21:10
screen 48:12 71:18
  75:2
se 28:6
seal 95:11
search 50:24 60:21

73:5,7 81:22
searched 70:13
seat 10:20
seated 10:7 20:6
  38:24 40:10
SEC 21:17 27:25
  33:16,18,20,22
  56:22,24
second 32:11 46:18
  63:10,12,19 90:23
secondly 5:22 26:7
  72:23
secret 91:9
secretary 69:4 76:4
  82:6
see 7:9 8:10 10:10
  32:15 40:4 46:4
  67:25 68:1 76:24
  79:5 85:7,23
seek 34:17
seeking 24:9
seen 31:12 44:18
  49:19 74:25
selection 10:9
send 89:23
sending 46:16
sense 35:8
sent 46:14 51:8
  56:22 60:5,10,11
  60:24 61:5,14,16
  62:24 64:2 65:14
  74:7 76:10,11
  77:4 88:2,3,6
sentence 63:23
separate 44:4 48:8
  48:17 49:5 55:24
September 62:2
  77:2
serve 4:6
served 13:22
service 2:10
session 6:13 10:4
  20:5
set 4:21 5:6 43:25
  70:18
settled 25:22 26:3,3
settlement 25:23

Shawn 59:3
SHEALY 1:21
shorter 43:11
short-cutting 48:23
show 23:25 26:18
  27:18 43:22 46:23
  51:11 74:11
showed 44:19 46:1
  51:4
showing 19:1,2,3
shown 44:13 71:17
  78:14
shows 46:23 49:14
  59:11,19 75:2,3
Shuben 46:14 47:2
Shuben's 47:3
side 53:24
sides 7:9 27:12
  82:12
side-by-side 75:22
  76:24
signal 34:21
signature 62:11
  65:14,25 66:1,9
  66:12,17,24,25
  67:5,7,9,11,14,22
  68:4,22 69:1,12
  69:12 71:1 74:8
  74:20 75:9
signatures 76:3,18
signed 62:5,23
  67:11,22 69:11
  72:9 75:12 76:4
  78:5 79:9
significant 5:3
signing 66:18
similar 76:3
simplify 73:4
simply 51:17 61:14
  64:2 72:1 91:13
sincerely 77:5
single 71:17
sir 12:18 15:11,22
  16:14 17:6,23
  18:14,15,16 19:20
  20:9 30:2 33:3
  35:13 36:25 37:25

41:16 47:16,22,25
58:20 70:17 73:23
87:1 88:20 92:13
**Sister** 13:4,6,14
**situation** 83:19
**six** 13:21 59:16
**Smik** 3:8 15:25
16:2,6,12
**Smith** 44:20
**snookered** 68:16
**solely** 71:5
**solid** 12:12 18:10
18:10
**solomonic** 82:13
**somebody's** 29:9
29:12
**Someone's** 74:18
**soon** 9:6
**sorry** 13:5 27:2
30:2 31:5 33:4
41:25 42:13,24
45:24 46:7 73:2
80:21 81:4 83:5
**sought** 49:9 72:8
90:12
**sound** 2:10
**Sounds** 34:15
**source** 71:6
**south** 22:2
**speak** 27:1 49:5
75:7
**SPEAKER** 34:13
43:5 47:17,20
67:23 92:5
**speaks** 29:6 61:7
62:21
**specific** 7:7 13:25
20:14 25:6 30:6
31:23 46:6 48:4
52:19 57:4 59:4,5
64:23
**specifically** 33:20
33:23 48:9 49:8
49:15,23 51:23
59:18 60:9 62:18
64:24
**specified** 55:20

**speculation** 21:20
**speculative** 22:12
**spell** 10:20,24 13:2
13:7 14:22 16:4
17:12
**split** 82:14
**splitting** 54:14
**spoke** 20:18
**spoken** 17:3
**ST** 1:12,16
**stamp** 67:17 69:13
71:7,8 76:4
**stand** 22:23 53:12
75:7 78:6
**standard** 36:9
**standards** 20:23
**standing** 74:21
**start** 3:20 36:19
41:15
**starting** 23:14
**state** 13:2 14:22
16:4 17:12 19:1
29:1
**stated** 52:21 55:20
59:7
**statement** 50:6
59:8 62:17 87:15
**statements** 59:11
**states** 1:1,2,8 23:6
24:16 26:13 30:14
49:14 61:15,24,25
63:7 82:25
**stating** 76:8
**stationary** 67:20
85:4
**status** 84:2
**stay** 92:1
**stayed** 18:5
**stellar** 24:1
**step** 12:18,19 14:15
14:16 15:22,23
17:6,7 18:14,16
18:17 39:15
**steps** 22:22
**stick** 92:2
**stipulate** 65:25
66:2,12 70:2 78:3

**stipulated** 57:9
65:11 66:13,14
67:2 68:11 78:5
83:12
**stipulating** 71:5
72:1
**stipulation** 6:22
18:19,22 48:25
50:15 52:16,22
53:8 54:21 57:10
60:16 62:16 65:6
66:11,14 68:9,10
68:15 69:18 70:16
70:20 71:21,25
72:14,21,22,25
75:14 77:23,24
78:13,21,23 81:11
81:17 82:2 83:10
83:14 85:5,7,11
86:9,9
**stock** 3:18 44:14,17
44:18,22 45:1,2,7
45:12,15,25 46:4
**stop** 26:20 67:13
**stories** 23:12 26:12
26:15 32:9 33:5
33:10
**story** 24:19
**Street** 2:2,5,12
**stricken** 45:15
**strike** 42:18 46:12
90:22
**stuff** 71:14
**style** 46:17
**subject** 49:10
**subpoena** 56:7,21
92:22
**subpoenaing** 80:23
80:24
**sudden** 74:13 82:2
**sued** 25:17,21
32:10 33:5
**suggest** 82:6
**suggested** 24:23
**suggesting** 54:19
84:14
**suggests** 25:25

**Suite** 1:12 2:2,12
**sunburned** 40:6
**supplement** 4:20
5:1
**supply** 31:22
**support** 77:15
**suppose** 67:17
**supposed** 89:2
**Supreme** 26:16
36:10
**sure** 5:4 7:7 8:4,7,9
27:6 37:6 41:6,9
48:22
**Surely** 58:14
**surrounding** 7:6
27:15
**suspect** 36:13
**Sustained** 14:1,1
**switch** 74:4
**SWORN** 10:18
12:24 14:20 16:2
17:10
**system** 29:2
**S-M-I-K** 16:7

――――――――――

**T**

**T** 3:11 95:1,1
**take** 6:18 19:24
31:14,18 47:4
51:3 52:17 86:5
89:4 93:21
**taken** 34:11 45:10
53:1 69:14
**talk** 7:13 12:7,10
**talked** 58:8
**talking** 12:4 27:16
50:18 51:24,25
52:7 81:15 85:24
**TARP** 63:20 90:22
**team** 71:11
**technician** 70:12
71:10 72:6
**tell** 55:10 60:2,22
**telling** 78:21 81:25
**tended** 48:2
**tendency** 61:10,12
**tendered** 40:11

**tends** 56:19
**term** 12:8
**terms** 25:15 55:7
62:11
**test** 23:8 77:8
**testified** 53:19
54:25 74:12,14
84:6 91:7
**testify** 8:8 57:6
70:12 74:15 87:18
**testifying** 72:7
81:22 88:5
**testimony** 22:8,16
23:3,5 44:25 51:5
54:11 59:25 70:8
75:5,10 76:22
93:4
**tests** 32:23
**thank** 5:5,21 7:23
7:24 9:10,20,21
10:15 12:16,18,20
14:15,17,25 15:22
17:6,15 18:13,14
19:21,24 22:5
31:4,6 33:25 34:3
34:5,6 37:19,22
38:2,18,23,25
40:5 45:17 47:15
47:23 57:19 58:23
61:3 63:14,17
64:15,16 83:21
91:25 92:4 93:20
93:22,23
**that'd** 74:15,20
**theirs** 80:5
**theoretical** 74:16
**theory** 72:13 90:13
90:14
**thereof** 95:7
**thing** 31:21 74:21
82:5,9 86:13
**things** 21:20 22:17
23:24 42:15 51:23
55:4 71:2 75:14
78:23 81:25
**think** 4:7,18,19,22
5:1,2 8:2,25 9:8

9:13 16:25 22:13
27:22 29:8 30:24
31:12,25 32:3,23
33:17 34:1 36:5
37:3,10 38:6,10
41:7 44:25 45:3
45:12 46:2,25
47:11 48:10 54:23
54:23 56:3 57:6
57:15 65:8 66:7
68:18 81:18 82:14
86:17 88:13,15
89:4 90:7 91:8
92:17
**third** 23:4 30:15
36:10 44:19 89:25
90:24
**Thomas** 2:8 95:14
**thought** 35:25
43:21 46:1 52:7
57:25 58:12 71:5
86:8
**three** 41:14,23 48:3
89:17,17 93:5
**threshold** 20:23
24:8
**throw** 12:8
**time** 9:14 12:21
14:18 15:24 18:18
21:1,16 37:18
39:1 41:2,5 52:21
52:24 61:13 73:18
74:25 80:16 86:17
**today** 6:12 37:10
92:17
**token** 54:15 67:8
**told** 66:3 69:22
**tomorrow** 37:11,17
39:21,22,24,24
40:5
**top** 43:22
**totally** 84:12
**toto** 83:10
**touched** 22:3
**transcribed** 84:8
95:4
**TRANSCRIBER**

2:8
**transcript** 1:7 2:10
45:25
**transcription** 2:10
**transpired** 54:17
54:17
**Treasury** 23:1,2
92:23
**trial** 1:7 4:21 26:6,6
56:6 64:17,22
71:18 74:1 81:12
81:20 82:16 83:17
86:9 87:3,12,16
**tricky** 43:25
**tried** 46:20 92:22
**trier** 74:24 77:20
**true** 62:7 65:22
87:20,20
**truly** 77:5
**trustee** 13:21
**trustworthy** 14:10
**truthfully** 88:5
**truthfulness** 27:15
27:15 28:4
**try** 26:7 42:15
**trying** 49:24 72:12
**turns** 88:20
**two** 4:1 9:12 30:15
30:15,23 32:25
33:2 48:6 51:11
51:23 75:22 86:7
87:22 89:25 90:10
90:10
**two-step** 72:5
**typed** 76:20
**typing** 82:7

**U**
**Uh-huh** 42:17
**undermine** 82:16
83:16
**underneath** 69:1
**underscore** 64:21
64:21
**understand** 6:7 9:3
32:6 37:7 41:18
45:13 51:20 54:2

54:13,13,22 65:9
70:11 83:13 84:12
84:13,18
**understanding**
25:22 70:1,19
71:23,25 72:21
75:19 78:22 80:1
80:15 84:19
**understandings**
22:13
**understood** 51:1
52:5 53:3 75:14
**unfair** 5:4
**unfairly** 82:22
**Unidentified** 3:18
34:13 43:5 47:17
47:20 67:23 92:5
**Unilateral** 35:23
**Unilaterally** 35:23
**United** 1:1,2,8 23:6
24:16 26:13 30:14
82:25
**University** 13:17
**unproven** 22:18
**untrue** 62:22
**urge** 7:9,15
**use** 5:12 50:3,9,10
54:23 68:16 73:13
76:8 84:21
**utilize** 63:21
**U.S** 1:11 30:4

**V**
**v** 30:4
**value** 5:3 22:14
78:9,10
**verdict** 39:19
**VERITEXT** 2:11
**versus** 23:6 24:17
26:14 30:14
**volume** 85:14
**vs** 1:4

**W**
**wait** 7:3 8:10 43:1
52:3 67:13 75:24
**waived** 66:15

**want** 7:7 29:17,18
39:21 40:21 51:2
53:6 55:24 63:10
63:15 65:8 66:6
70:8 74:13 76:2
76:13 77:13 78:25
**wanted** 4:20,25 6:7
9:9 41:9 48:2
65:13 66:10 76:8
89:11
**wants** 8:24 9:4
21:10 50:2,15
58:6 69:16 75:1
90:22
**warrant** 50:24 73:5
73:7
**wasn't** 69:6 74:3
78:6 79:10 81:20
81:20
**watch** 12:19 14:16
15:23 17:7 18:17
**way** 27:11,21 31:22
43:24 49:2 50:19
57:17 60:5 63:8
66:15,15 70:14
72:10
**ways** 23:22 85:20
**weekend** 36:2
**week's** 43:9
**weight** 51:10 88:14
**Wendy** 80:20,21,21
81:3,13
**went** 41:24 63:3
71:13 80:14
**weren't** 71:2,2 72:3
72:17 85:9 87:13
**we'll** 9:19 10:11
31:18 37:23 40:4
**we're** 6:25 9:21
31:14 34:17 39:20
40:15 50:18 51:24
51:25 52:7 56:3
63:25,25 64:1
75:20 76:1,10
78:17 80:9 83:6
86:23 90:13 93:23
**we've** 4:19 11:10

51:3,3,3 53:7
55:20 76:21
**whatsoever** 59:4
**wheel** 73:3
**whited** 47:5
**Whoa** 52:3
**willfully** 90:20,22
91:1
**wire** 59:16 63:5
72:12
**wish** 20:6 31:23
44:12 54:7 58:19
78:17
**wishes** 9:13 56:18
**witness** 3:3,5,7,8,10
6:15 8:2,8 10:8,22
10:25 12:20 13:1
13:4,6,8 14:17,24
16:6 17:14 22:22
23:3,9,10,20,20
26:12,15 27:8,10
32:23 50:5,25
52:18 53:7 57:6
57:18 65:22,24
71:17 72:3,7 74:5
75:6 79:8 81:14
81:16,20,21 82:1
83:3,23,25 84:5,6
84:11,22,24 86:14
86:18 87:18,19
88:4,14,17 90:3
91:4,10 92:17
93:1 95:11
**witnesses** 6:14,21
7:20 8:1,5,14
20:14,16,17,20
21:23,24,25,25
22:22 23:9 26:18
48:3 50:4 52:13
53:19 56:6 76:23
77:11 81:1 86:14
88:1
**WK** 79:13
**word** 49:17 68:16
**work** 7:9
**worked** 16:20 69:2
87:21

**working** 15:13 83:3
**world** 46:11 74:16
**worms** 21:20
**wouldn't** 67:25
  72:4 73:13 74:21
  81:17
**would've** 74:9
  76:20 80:19 87:14
  87:15
**wow** 23:23
**write** 29:16,17,20
**writing** 61:13 89:18
  90:8
**written** 46:20 60:23
  87:6,7,9 91:19
**wrong** 29:3 42:13
  87:12,12,17
**wrote** 74:6,19 75:2
  75:11 77:17 79:9
  88:8

**X**

**X** 3:1,11

**Y**

**yeah** 4:6 9:8 12:12
  19:22 35:25 37:4
  37:5 40:23 41:25
  42:23,25 43:24
  45:24 46:25 63:18
  65:17 74:8 76:15
  89:9
**year** 36:8
**years** 11:11 13:21
  16:20 87:22

**Z**

**Zoller** 3:7 14:18,20
  14:24 15:6,8
**Z-O-L-L-E-R**
  14:24

**0**

**05** 13:21

**1**

**1** 21:19 42:1 72:5
  80:19

**1:00** 89:3
**10TH** 1:16
**10:00** 37:18
**10:06** 34:9
**10:21** 34:9
**100** 41:20 43:14
**107** 48:5,18 55:23
**107A** 48:5,18 55:23
**11** 1:7 3:4 13:21
**11:34** 94:2
**112** 48:5,18 55:23
**1125** 3:18 34:18,23
  34:24 39:2,6
**113** 3:18 41:20
  43:14,18 44:10
  45:4,19
**1148** 41:21,25 42:2
  42:3
**115** 43:14,18 45:23
  45:24
**116** 41:20 43:14
**119** 41:21
**12** 93:18
**12:12** 94:2
**12:30** 36:22 89:3
  92:2
**123** 2:5 41:21
**124** 41:21
**1250** 1:12
**12505** 1:22
**128** 41:21 43:14
**13** 3:4 93:21
**13.5** 63:20
**130** 46:18
**1327** 41:21 42:4
  43:15
**133** 41:21 42:1
  43:14,18,22 45:22
  47:13
**134** 41:21 42:1,1
  43:15
**135** 41:21 42:6
  43:15
**139** 41:21 42:1
**14** 3:6 43:13
**15** 11:11 86:5
**16** 3:7 41:19 43:13

**168** 48:5,18 55:24
**17** 3:9 41:19 42:18
**18** 1:5 3:10 41:19
  42:18
**1800** 2:12
**1801** 2:12
**1835** 2:2
**188** 30:15
**19103** 2:3,13
**19106** 1:13
**19107** 1:17 2:6
**192** 30:15
**1948** 26:16
**1981** 30:12
**1990** 19:3
**1998** 19:4

**2**

**2** 5:10 23:18 72:7
  76:22 80:20
**2nd** 77:1
**2:14-cr-00548-C...**
  1:2
**20** 3:14 16:20
**2000** 1:16 19:3
**2007** 30:16
**2009** 23:14,18
  32:16,17 62:2
  77:2
**2010** 32:18 46:15
**2016** 1:5 95:12
**20854** 1:23
**215** 1:13,17,18 2:3
  2:6
**24** 32:17 41:19
  43:13 62:2 77:2
**263** 29:24 30:5
**267** 29:25 30:6
**268** 30:6
**2700** 2:2
**28** 75:21 76:22
**29** 5:10 36:8 49:13
  59:10 72:11
**299-2000** 1:17
**299-3815** 1:18

**3**

**301** 1:23,24,24
**33** 41:19 43:13
**39** 3:18

**4**

**4** 3:2
**4.5** 50:21 51:12
**40** 41:19 43:13
**41** 41:19 43:13
**45** 3:18
**47** 41:20 43:13
**48** 41:20 43:13

**5**

**5** 63:24
**510** 30:15
**56** 41:20 43:13

**6**

**6th** 1:22 81:12
  85:10 86:7,10
**60** 41:20
**615** 1:12
**636-9002** 2:3
**644** 29:24 30:5
**65** 41:20 43:14
**68** 41:20 43:14

**7**

**777-6690** 2:13

**8**

**80** 83:5
**80s** 18:5
**801D2** 83:5
**81** 41:20 43:14
**83** 41:20 43:14 48:5
  48:18 55:23 56:6
  56:11
**861-8233** 1:13
**87** 41:20 43:14
**888** 2:13

**9**

**9:30** 39:22,22 40:5
**9:32** 1:6
**91** 48:8,10,15,16,17
  50:14 51:25 52:6

52:8,10,15,20,25
55:24 56:2 57:25
58:7,9,15 64:23
**92** 48:8,17 52:16,20
55:22,25 56:2
58:7,9,24 61:5
64:23 69:24 71:12
74:4 77:9
**93** 41:20 43:14
**945-9240** 1:23
**945-9247** 1:24
**945-9283** 1:24
**95** 41:20 43:14
**96** 41:20 43:14
**985-4275** 2:6

Page 1

```
 1                   UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF PENNSYLVANIA
 2
     UNITED STATES OF AMERICA     )  2:14-cr-00548-CDJ
 3                                )
                                  )  April 18, 2016
 4   vs.                          )  Philadelphia, PA
                                  )
 5                                )
     BRIAN HARTLINE, et al        )  12:12 p.m. - 5:39 p.m.
 6
 7                    TRANSCRIPT OF JURY TRIAL
             BEFORE THE HONORABLE C. DARNELL JONES, II
 8                   UNITED STATES DISTRICT JUDGE
 9   APPEARANCES:
10   For United States of      DAVID IGNALL, ESQ.
     America:                  JENNIFER CHUN BARRY, ESQ.
11                             U.S. ATTORNEY'S OFFICE
                               615 Chestnut Street
12                             Suite 1250
                               Philadelphia, PA  19106
13
     For Defendant             PATRICK J. EGAN, ESQ.
14   Brian Hartline:          FOX ROTHSCHILD, LLP
                               2000 Market Street, 10th FL
15                             Philadelphia, PA 19107
16   For Defendant             JOEL SCHWARTZ, ESQ.
     Barry Bekkedam:          RUSSELL D. DUNCAN, ESQ.
17                             SHULMAN ROGERS GANDAL PORDY &
                                ECKER
18                             12505 Park Potomac Ave 6th FL
                               Potomac, MD 20854
19
                               MICHAEL J. ENGLE, ESQ.
20                             GREENBLATT PIERCE ENGLE FUNT
                                FLORES
21                             123 S. Broad Street
                               Suite 2500
22                             Philadelphia, PA  19109
23            Veritext National Court Reporting Company
                          Mid-Atlantic Region
24             1801 Market Street – Suite 1800
                          Philadelphia, PA 19103
25                          1-888-777-6690
```

Page 2

1                          I N D E X

2

3     WITNESS                DIRECT   CROSS   REDIRECT   RECROSS

4     N/A

5

6

7

8                      E X H I B I T S

9     NO.                IDENTIFICATION                 PAGE

10    Government's:

11    N/A

12

13    Defendant's:

14    N/A

15

16

17

18

19

20

21

22

23

24

25

1              P R O C E E D I N G S

2    (DISCLAIMER:  "Indiscernible" noted throughout the

3    transcript due to poor audio recording, excessive

4    static/background noise and parties not utilizing

5    microphones)

6         (Jury not present)

7              MR. IGNALL:  Thank you, Your Honor.  With

8    respect to the witness, Agent Lyons is working on that right

9    now and hopefully we'll have an answer one way or the other

10   if we have someone available before we're done with the

11   charge conference.

12             THE COURT:  All right.  And when are we going

13   to do the charge conference?

14             MR. EGAN:  There is one issue I'd like to

15   address, Your Honor, if possible.

16             THE COURT:  Yes, sir.

17             MR. EGAN:  This morning the Government

18   provided a supplemental proposed jury instruction.

19             MR. IGNALL:  Your Honor, may I approach with

20   that?

21             THE COURT:  Sure.

22             MR. IGNALL:  We did not file it yet.  May I

23   approach, Your Honor?

24             THE COURT:  Yes, sir.

25             MR. EGAN:  And Your Honor, this is addressed

Page 4

1    to the deposition testimony which was played at the last day

2    of testimony of Mr. Hartline.  The Government is seeking a

3    consciousness of guilt instruction.  I don't believe it's

4    appropriate under these circumstances for a number of

5    reasons.

6                    Number one, the statements that were made by

7    Mr. Hartline were made to a lawyer in a civil deposition and

8    he was not even a party in that deposition.  It was a

9    lawsuit between Ms. Musser (ph) and his employer, the bank.

10                   Number two, there is no false

11   exculpatory in the sense of did you do this thing, no, I

12   didn't do this thing.  The only testimony is whether -- that

13   we heard was if he knew the loan proceeds were used to

14   purchase stock and, actually, my copy is not marked up for

15   what was actually read in, but Your Honor, it's not specific

16   to the charges in question to be appropriate to read this

17   instruction particularly since what they're basically saying

18   is this statement was made to a lawyer in a deposition two

19   years after the fact.  It's not like law enforcement came to

20   talk to him and he gave a false exculpatory to law

21   enforcement.  It's entirely different circumstances and the

22   inference that they're trying to get out of it is not

23   appropriate under those circumstances.

24                   THE COURT:  Now, how does this compare with

25   what I struck or did not allow?

Page 5

1            MR. EGAN:  Well, Your Honor, quite frankly,

2    the part that you struck is probably the part that they were

3    most emphasizing in terms of this instruction which as I

4    explained to the Court was there is no evidence that he was

5    talking about his state of mind at the time.  He was talking

6    about what he knew two years later.

7            I believe what the Government's argument is

8    going to be is, when this -- and I can boil it right down to

9    this.  At the end of the deposition there is testimony, and

10    it was played, that "Did you know there was linkage between

11    the loan and the investment?"  That is, would Mr. Levin not

12    have made the investment but for the fact that he got the

13    loan to which Mr. Hartline said, "Yes".  And that was

14    played.

15            Earlier on in the deposition the question

16    was, "Did you know that the money was used to buy the

17    stock?"  And the answer was, "No."  And, quite frankly, that

18    could even be true because the guy had so much money the

19    question of exactly what, you know, funds are fungible.  He

20    put $5 million in the account.  He took $5 million from the

21    account.  He sent $5 million to invest.  Is it the exact

22    same money?  Who the heck knows?  He had, like, even $100

23    million after he went broke.

24            But the fact of the matter is is that is not

25    a false exculpatory in the sense of a law enforcement agent

1    coming up and saying did you do this thing and they say no

2    and then it turns out they've got evidence they did it.

3    It's more a question of whether he's talking about the

4    linkage which he says yes to so there's no -- he doesn't

5    deny the linkage.  It's right in there.  It's the last thing

6    they played.  What he says no to is that that money was used

7    to buy the stock and it's capable of a couple

8    interpretations and therefore this is not an appropriate

9    instruction.

10                   THE COURT:  All right.  Mr. Ignall, does the

11   testimony of Mr. Levin many, many years ago that the stock

12   purchase or, better still, the loan was to replace monies?

13   He testified two different ways.  The first time he

14   testified he basically said that the loan was basically

15   replacing money that he invested which would have come from

16   his private --

17                   MR. IGNALL:  I don't think he ever said --

18                   THE COURT:  -- funds.

19                   MR. IGNALL:  I don't think he ever said that,

20   Your Honor.  I believe Counsel --

21                   THE COURT:  I think he did.  I wrote that

22   down because I was shocked that he said it.  I'm almost

23   positive.

24                   Counsel, did he say that?

25                   MR. EGAN:  Yes, Your Honor.

1            MR. IGNALL:  I believe that was on cross-

2    examination he said --

3            THE COURT:  But then he went back -- I'm

4    saying he made two statements that he went back and the

5    second time it came up he said it was from the loan.

6            MR. IGNALL:  Yes, I think the evidence is --

7    and if Counsel wants to argue what their recollection is to

8    the jury, that's fine.  The evidence -- and again, there's

9    no point in arguing it.  The evidence we are going to argue

10   is that it's clear that this was only for loan.  There are

11   plenty of emails showing Mr. Hartline and Mr. Bekkedam's

12   intent that this loan was for one purpose.  We had

13   Mr. Preve who actually handled the loan make that clear.

14           But the question is, when Mr. Hartline says

15   something that's false in the deposition, may the jury

16   reasonably infer that there's a reason he did that?  I think

17   the answer is yes.  So the question is, does this

18   instruction adequately capture that to direct the jury

19   appropriately.

20           THE COURT:  My point is that I understand

21   consciousness of guilt.  I've given it a million times.  But

22   my question is, when a witness such as Mr. Levin gave two

23   different reasons -- and he didn't on the second occasion

24   say I made a mistake, he just said something else.  So my

25   question simply is that can you attribute to Mr. Hartline

1    consciousness of guilt if he identified as a basis or his

2    answer one of those two statements that was given by

3    Mr. Levin who was the one who took the loan out?

4              MR. IGNALL:  Well, one, I don't remember that

5    part of Mr. Levin's testimony and we'll go back and look at

6    our notes.  But my recollection is there was question about

7    is money fungible?  "Did you put money into your house back

8    earlier?"  "Yes, I did."

9              THE COURT:  Not talking about the house.

10   Excuse me.  He specifically said it was used to replace or

11   he was replacing.

12             MR. IGNALL:  I do not remember that --

13             THE COURT:  And, again, he changed that

14   answer.

15             MR. IGNALL:  I do not remember that

16   testimony, Your Honor.  I'm not saying that my memory is

17   perfect on that.

18             MR. EGAN:  It's at page 104, Your Honor, of

19   the transcript of April 5, 2016.

20             MR. DUNCAN:  I don't have the transcript so -

21   -

22             THE COURT:  I don't either but I have copious

23   notes because, like I said, I wrote it in red ink.

24             MR. DUNCAN:  I'll read it.  It says, "For

25   what purpose?"  The answer, "To replace the five million

1   we're going to invest."

2                  THE COURT:  That's exactly what he said.

3                  MR. IGNALL:  Well, that --

4                  THE COURT:  And then after that he said --

5                  MR. IGNALL:  But that's -- well, I'd have to

6   see the whole context of that, but that's saying they're all

7   the same.  So the question is, when Mr. Hartline says, "I'm

8   the first person to suggest that Mr. Levin borrowed money

9   to" --

10                  THE COURT:  Wait a minute.  Now, let me just

11  stop you right there.  It's not all the same necessarily

12  because he could have replaced that money and used the money

13  he, quote/unquote, replaced it with which was the loan in

14  buying something else.

15                  MR. IGNALL:  It goes back in an hour.

16                  THE COURT:  No, no, I understand that, but

17  I'm telling you, he said it.  And when he said it, I saw the

18  jurors all writing down, too.

19                  MR. IGNALL:  Okay.  Well, I'd like to see it.

20  If I could ask --

21                  THE COURT:  Well, he just read it.

22                  MR. IGNALL:  -- Counsel for a copy of the

23  transcript, I'd like to see that and then that might help

24  with my arguments.

25                  THE COURT:  And all I'm asking you is for the

 1   purpose of deciding this immediate issue whether or not you

 2   can infer consciousness of guilt when that testimony was

 3   given.  That's all I'm asking.

 4             MR. IGNALL:  Well, since I don't remember

 5   that testimony, it's hard for me to answer that.

 6             THE COURT:  All right.  I understand.

 7             Mr. Duncan, could you give Counsel the --

 8             MR. DUNCAN:  Yes, and actually, it was

 9   Mr. Ignall's question of the witness.

10             THE COURT:  Right.  What witness number was

11   Mr. Levin?

12             MR. DUNCAN:  412.

13             THE COURT:  No, no, the order of his

14   appearance.  Was he number what?  I have every witnessed

15   numbered.  Oh, I have it right here.  Never mind.  He was

16   No. 10.  One second.  I wrote in the margin but anyway,

17   "bank would loan us five million to replace the five million

18   we were going to invest."

19             MR. IGNALL:  If Your Honor wants to look at

20   the transcript, I think the context --

21             THE COURT:  No, he subsequently said, "We

22   made the loan to invest in the bank."

23             MR. IGNALL:  Yes, I think this is parsing

24   words very finely.  The gist of this question is used to

25   replace.  It says, "I think the reasonable inference is in

Page 11

1   lieu of any other funds."  But if the Court wants to look at

2   the transcript, I don't think it's -- there's no suggestion

3   that he borrowed $5 million and then decided let me go spend

4   it on something and then later did something else.  There

5   was no investment followed by a loan which is what replace

6   would mean if we read it more literally than I think

7   Mr. Levin intended from the context.

8               THE COURT:  All right.  Just asking the

9   question.

10              MR. EGAN:  To bring it back to the

11  instruction and to Mr. Hartline's state of mind, it's what

12  Mr. Hartline testified in his deposition.  The question was,

13  "Do you know that his loan proceeds were used to purchase

14  this stock?"  That he says no to.  Now, later on they say,

15  "Do you know if you didn't lend him the money he wouldn't

16  have invested?"  And to that says, "Yes."

17              So the question is really, was it the exact

18  same money or was it another five million bucks in his

19  account?  He doesn't know that.  It's actually an honest

20  answer.  He admits to the fact that the things were related

21  which is truthful.  That's why I asked to have the last

22  three lines of the deposition played, if you recall.  The

23  Government wanted to stop somewhere and I said can we go a

24  little further because he admits that he knew he wasn't

25  going to invest the money unless he got the loan.  But what

Page 12

1   he doesn't know is if it's the exact same money or not

2   because he doesn't know what Mr. Levin has in his Gibraltar

3   bank account.  He doesn't know if he's got 100 million or 50

4   million or seven million or what he's got there.

5              So this question in and of itself, do you

6   know if the loan proceeds were used, is a question of was it

7   that money.  And to use that as a false exculpatory to get

8   an argument that is consciousness of guilt, to me, is beyond

9   pale and I would strongly argue that it should not be

10  allowed.

11             Oh, Your Honor, and if I could while

12  Mr. Ignall is looking.  On the cross-examination of

13  Mr. Levin on page 136 I asked, "So instead of taking five

14  million out of Banyan and putting it into NOVA Bank where it

15  would return a lower amount, what you said on direct is you

16  replaced the five million you were going to invest with the

17  loan, correct?"  "Yes."  "But you had the five million if

18  you wanted to pull it out?"  "Yes."

19             MR. IGNALL:  Your Honor, I think that's

20  consistent with our argument that he didn't put five million

21  in, instead he used the loan proceeds.  And in fact, the

22  bank statement we -- just for a matter of fact, the bank

23  statement we introduced shows that Mr. Levin did not have $5

24  million in the Gibraltar bank account.  The question was,

25  "Do you know that Mr. Levin's loan proceeds were used to

1    purchase NOVA Holding Company stock?"  "No."  "Given all the

2    discussion about the purpose of this loan is to allow Mr.

3    Levin to buy $5 million worth of stock, it's a very

4    reasonable inference that" --

5                    THE COURT:  Counsel, let me ask you.  The

6    instruction that you tendered, the Government has tendered

7    here which is supplement to proposed Jury Instruction 1.31,

8    consciousness of guilt.  If I were to give this instruction,

9    would you want me to make it so specific as to address that

10   one statement within that deposition?

11                   MR. IGNALL:  Can I have one moment, Your

12   Honor?

13                   THE COURT:  As opposed to just a general

14   instruction about consciousness of guilt?

15                   MR. IGNALL:  I think a general instruction is

16   more appropriate because there are other times that

17   Mr. Hartline makes false statements about the purpose of the

18   loan both to Mr. Schwartz and to Mr. Shumate.

19                   THE COURT:  All right.  Now, Mr. Egan, that's

20   a big difference here.  Now, the Court notes that the

21   instruction specifically says in every case "if you find".

22   And in pertinent part here it says, "If you find that Brian

23   Hartline made a false statement in order to direct the

24   attention away from himself, you may but are not required to

25   conclude that Brian Hartline believed that he was guilty."

1   This is in such a vacuum that this wouldn't be appropriate

2   to give to the jury.  It's too ambiguous.  It's just way out

3   there.  If there is an instruction that you want the Court

4   to consider giving, it would have to be something, to me,

5   that would be much more direct and pertinent to a statement

6   that indicates consciousness of guilt.  But just to simply

7   say, hey, there's a lot of stuff that you consider here as

8   consciousness of guilt, pick whatever you want --

9              MR. IGNALL:  Well, we could identify that but

10  I think --

11             THE COURT:  -- with a presumption of

12  innocence, this doesn't fly.

13             MR. IGNALL:  Okay.  I can try and draft one.

14  I'm afraid that that might be more inflammatory towards

15  Mr. Egan's client because it then identifies exactly what

16  we're talking about, but I can try that, Your Honor.

17             THE COURT:  Well, again, the statement as

18  you've tendered it, "If you find that Brian Hartline made a

19  false statement in order to direct away from himself" --

20             MR. EGAN:  Your Honor, this is just

21  inappropriate.  This is a for --

22             THE COURT:  I'm sorry.  "In order to direct

23  attention away from himself."  When, where, and in what

24  context?

25             MR. EGAN:  Your Honor, this is a charge that

1   you use when a false statement is made to law enforcement.

2   This is not appropriate for these circumstances.  It should

3   not be allowed.

4            MR. IGNALL:  Well, we can certainly argue the

5   inference from it regardless.  I think the instruction is

6   appropriate but we will --

7            THE COURT:  But from where?  Like I said,

8   this case lasted for three weeks or something like that.

9            MR. IGNALL:  Yes.

10            THE COURT:  And he didn't testify.

11            MR. IGNALL:  Correct.

12            THE COURT:  So you've got a variety of

13   statements that are attributed to him via emails or

14   otherwise.

15            MR. IGNALL:  Well, the three -- and, in fact,

16   it's two in particular.  It would be the deposition and the

17   letter to Mr. Shubin are the most noteworthy of the --

18            THE COURT:  If you want to argue that to me

19   then re-tender it and frame it relative to 4.31 --

20            MR. IGNALL:  Okay.

21            THE COURT:  -- and I'll consider it.

22            MR. IGNALL:  We'll do that.

23            THE COURT:  But right now it's too shotgun.

24            MR. IGNALL:  I understand, Your Honor.

25            THE COURT:  All right.

Page 16

```
 1                    MR. IGNALL:  Thank you.
 2                    MR. EGAN:  Your Honor, I believe that the
 3      rest of my arguments are either I've already made or
 4      Mr. Fuller can cover or co-counsel shares in the rest of
 5      them.  So if I may be excused, Your Honor --
 6                    THE COURT:  Yes, you may.
 7                    MR. EGAN:  -- I'd greatly appreciate it.
 8      Thank you, sir.
 9                    THE COURT:  Have a good afternoon.
10                    MS. BARRY:  Your Honor, similarly, may I be
11      excused at this time?
12                    THE COURT:  Yes, ma'am.
13                    MS. BARRY:  Thank you.
14                    THE COURT:  All right.  Where are we now?
15                    MR. IGNALL:  I'm not exactly sure where we
16      are.  What I would propose --
17                    THE COURT:  Were you able to retrieve what it
18      was that you wished --
19                    MR. IGNALL:  I did.  I got a copy.
20                    THE COURT:  Okay.
21                    MR. IGNALL:  What I would propose is that we
22      start with the Government's proposed jury instructions that
23      we filed back in October.  Like I said, a number of them,
24      there were no objections but I understand now there are a
25      significant number, but perhaps we go through those, and
```

Page 17

1    then if there are instructions that the Defense would

2    propose that were not included in ours and I think there's

3    some we have an objection to, we can resolve them that way.

4                    THE COURT:  All right.

5                    MR. IGNALL:  And we can through -- I think

6    there's some that are agreed upon in the Government's so we

7    could probably go through those fairly quickly and then as

8    we get to ones where there is an objection, we can try and

9    resolve that.

10                   MR. SCHWARTZ:  Your Honor, I don't have a

11   nifty binder for you with our defense exhibits.  I just have

12   one.  So, I mean, I can give it up so you have a copy --

13                   THE COURT:  Yes, sir.

14                   MR. SCHWARTZ:  -- should it be necessary for

15   the jury.  Thank you, Your Honor.

16       (Pause)

17                   THE COURT:  All right.  Now, let's begin.

18   First of all, in terms of the redlined Hartline/Bekkedam,

19   your proposed jury instructions that dated April 12th, 2016.

20   That's what we're working from?

21                   MR. IGNALL:  No, I suggest we work from the

22   Government's jury instructions filed 10/19/2015.  It's

23   Document No. 80 because I think the redline goes back to

24   objections to that.

25                   THE COURT:  Okay.

                                                          Page 18

1              MR. SCHWARTZ:  That seems to make sense.

2    Sorry.  (Indiscernible).

3              THE COURT:  Well, I --

4              MR. SCHWARTZ:  (Indiscernible).

5              MR. IGNALL:  Well, I've had a little bit of

6    trouble reading -- it's easier for me to see what we've

7    filed and then I have --

8              MR. SCHWARTZ:  The reason is, Your Honor,

9    obviously his version, the redlined version has kind of

10   everything classed together which lacks the evidence.  We've

11   tried to adjust some of the instructions based on the

12   evidence.  It might be easier to just -- I think

13   (indiscernible).  If it's red and we find out that we want

14   to take out the Government's evidence and it's red

15   (indiscernible) if we want to add it in and then

16   (indiscernible) after that.

17             MR. IGNALL:  What I was going to start with

18   is I believe although there was an agreement to Instructions

19   1 through 20, the agreement now is only 1 through 9, I

20   believe we have an agreement on, but whichever version we're

21   looking at.

22             THE COURT:  All right.  So that's going to be

23   a problem.  It's not going to come out on my iPad.  We don't

24   have hard copy, right?

25             MR. SCHWARTZ:  We have an extra that we could

Page 19

1   provide the Court, Your Honor, because this is the one we're

2   working on.

3                    THE COURT:  Thank you.  It's red.

4                    Now, Mr. Ignall, do you have this?

5                    MR. IGNALL:  I do.  I don't have it -- I may

6   not have it printed in color but I do have that.

7                    THE COURT:  All right.  But yours is

8   certainly going to reflect the --

9                    MR. IGNALL:  I'm sorry, Your Honor?

10                    THE COURT:  Yours is certainly going to

11   reflect a strikethrough regardless of what color it is.

12                    MR. IGNALL:  Yes, it will reflect the

13   strikethrough.  And I know -- that's why I was working from

14   my -- I think I'll know what the objections are and

15   certainly, Counsel, I do not doubt, will argue them.  So I

16   will know for sure if I didn't know from the strikethrough.

17                    THE COURT:  Fair enough.  All right.  Let's

18   begin with the first page.

19                    MR. IGNALL:  I believe there are no

20   objections to Government's proposed Instructions 1 through

21   9.

22                    MR. SCHWARTZ:  Well, can we just call them

23   out to make sure (indiscernible).

24                    THE COURT:  Now, Mr. Schwartz, I'm going to

25   need you to speak either in a microphone or much louder.

```
                                                        Page 20
 1                    MR. SCHWARTZ:  Okay.  I'll (indiscernible).

 2                    THE COURT:  Now, one is roll the jury.

 3                    MR. SCHWARTZ:  No objection.

 4                    THE COURT:  Standard.

 5                    MR. SCHWARTZ:  Standard.

 6                    THE COURT:  All right.  Is there a reason why

 7    it's stricken through?

 8                    MR. IGNALL:  I think just anytime there was a

 9    -- because it's a program that does the redline is my guess.

10    That's why I was working from mine because at least I know

11    what it started with.  But I understand.

12                    THE COURT:  Okay.  So No. 1 is standard.  Two

13    is standard.  And I -- for the record, jury recollection

14    controls.  Three, penalty not to be considered.  Standard.

15                    MR. SCHWARTZ:  Agreed.

16                    THE COURT:  Four, presumption of innocence,

17    burden of proof, reasonable doubt, standard.

18                    MR. SCHWARTZ:  Just some grammatical

19    tweaking, Your Honor, because of the multiple defendants.

20                    THE COURT:  Any objection to the tweaking?

21                    MR. IGNALL:  I can take a look.

22                    THE COURT:  I typically, when there's more

23    than one defendant, refer to a defendant in the singular

24    because of more than one charge that exists in one

25    defendant's case and not in the other and if you lump them
```

Page 21

1    together than all of a sudden the proof that the jury hears

2    is if one is guilty so is the other one.  And I just think

3    it's better and wiser to simply say "a defendant" this, "a

4    defendant" that, and the jury knows that you're talking

5    about each defendant as opposed to them.

6                    MR. IGNALL:  Yes, I think "a defendant" is

7    clearer as well, Your Honor.  And I think there's actually a

8    spot where -- in the first paragraph there's a "the" right

9    before the strikethrough "are guilty".  It probably should

10   be "a defendant" rather than "the defendants", "a defendant

11   rather than the defendant".  But I think that's appropriate.

12                   THE COURT:  Okay.  I will tweak that one.

13   Five, evidence, standard.

14                   MR. SCHWARTZ:  Agreed.

15                   THE COURT:  Six, direct and circumstantial,

16   standard.  Seven, not all evidence, not all witnesses

17   needed, standard.  It states here, however, in the second

18   paragraph, "in this case blank".  Okay.  So this would be,

19   "In this case Mr. Hartline produced witnesses"?

20                   MR. IGNALL:  I think that's correct, Your

21   Honor.

22                   THE COURT:  Let me just look at this in its

23   context in terms of him having presented character evidence

24   and then the statement goes on -- the instruction goes on to

25   read, "a defendant or defendants are not required to present

Page 22

1   all possible evidence related to the case or to produce all

2   possible witnesses who might have some knowledge about the

3   facts of the case."  This would be an "a", but it looks -- I

4   think the jury would understand.

5                MR. IGNALL:  Yes, I think it's a correct

6   statement that all of the defendants are not required to

7   produce --

8                THE COURT:  Right.

9                MR. IGNALL:  -- witnesses.

10               THE COURT:  Even though I'm prefacing the

11   sentence with Mr. Hartline, it still applies to each

12   defendant.

13               MR. IGNALL:  I think it's a correct statement

14   of law.  It's up to Defense if they want to word it

15   differently so it doesn't highlight one versus the other,

16   but I understand.

17               MR. SCHWARTZ:  "A defendant" is agreeable.

18               THE COURT:  All right.  No. 8, credibility of

19   witnesses, standard.  Nine, credibility of witnesses, law

20   enforcement officer.

21               MR. IGNALL:  There was not a law enforcement

22   witness that I'm aware of so I don't think we need that

23   instruction.

24               MR. SCHWARTZ:  Agreed.

25               THE COURT:  All right.  Stricken.  Ten,

Page 23

1   credibility of witnesses cooperating and immunized

2   witnesses.

3               MR. SCHWARTZ:  We tried to just tailor that

4   more to what the Court has heard.  At the point we wrote it,

5   Mr. Roven was listed so there's a reference to Mr. Roven.

6   But so the jury is tuned into who it is, we ask that the

7   Court specify you have heard evidence that Brian Preve and

8   Thomas Patterson have made a plea agreement with the

9   Government and then just go down to received or may receive

10  a benefit from the Government in exchange for testifying.

11              MR. IGNALL:  No objection to that, Your

12  Honor.

13              MR. SCHWARTZ:  And then we just threw out the

14  rest of that paragraph and then tried to make that parallel

15  to the main instruction, again, cutting out Mr. Roven's

16  name.

17              THE COURT:  So I will say "have received or

18  may receive"?

19              MR. SCHWARTZ:  Yes, Your Honor.

20              THE COURT:  Or it would specifically -- "or

21  received or may receive".  All right.  11, stipulated

22  testimony, stipulation of fact, judicial notice.  This one

23  is going to be subject to the revelation by the Government

24  regarding the potential author of that email?

25              MR. IGNALL:  No, that would be we have a

Page 24

1    witness or we won't.  There wouldn't be a stipulation as to

2    that.

3              THE COURT:  I've got -- all right.

4              MR. IGNALL:  So I think it's just the middle

5    paragraph here and it's just, I think, the Court repeating

6    what the Court has already said during trial that the

7    Government and Defendants have agreed that certain facts are

8    true as I indicated to you during the trial.  I don't think

9    the first or third paragraphs apply here.

10             MR. SCHWARTZ:  I agree with that.

11             THE COURT:  All right.  No. 12, specific

12   investigation techniques not required that I've stricken in

13   its totality.

14             MR. IGNALL:  I don't think that's appropriate

15   here.  I don't think there's any suggestion --

16             THE COURT:  All right.

17             MR. IGNALL:  -- of DNA testing or anything

18   like that.

19             THE COURT:  Thirteen, defendant's choice not

20   to testify or present evidence.  Strike Mr. Hartline's

21   reference?

22             MR. IGNALL:  Well, I think they both chose

23   not to testify.

24             THE COURT:  Well, this is initially captioned

25   "or present evidence".  Let me look at this again then.

Page 25

1    "Has testified", fine.   "A defendant has the constitutional

2    right not to testify."   All right.   So this one has been

3    appropriately marked.

4                    MR. IGNALL:   I think it's appropriate, Your

5    Honor.

6                    THE COURT:   Okay.   No. 14, strike?

7                    MR. IGNALL:   I think that should be stricken,

8    yes, Your Honor.

9                    THE COURT:   Now, as I'm looking through this,

10   it's the expectation of Counsel that the Court is going to

11   go back through these and --

12                   MR. SCHWARTZ:   I think we can just create a

13   condensed, corrected version.   We can do it and send it to

14   Mr. Ignall if Mr. Ignall agrees.

15                   THE COURT:   And then you could send it to me?

16                   MR. SCHWARTZ:   Yes.

17                   THE COURT:   In 18 font, Word?

18                   MR. SCHWARTZ:   Eighteen font.   Got it.

19                   THE COURT:   All right.   No. 15, the motive

20   explained.

21                   MR. IGNALL:   I think the change here is just

22   changing defendants to Mr. Hartline and Mr. Bekkedam.   I'm

23   not sure why we need to go through that with each pattern

24   instruction.

25                   THE COURT:   For?

Page 26

1           MR. IGNALL:  Like No. 15, I think we've
2     agreed it's the pattern.  I think the only change Defendants
3     are making is instead of saying "the defendants" saying
4     "Mr. Hartline and Mr. Bekkedam".
5           THE COURT:  Oh, okay.  Fine.
6           MR. IGNALL:  So I'm not sure why we need it.
7     It just creates, I think, an additional unnecessary change
8     to the pattern.
9           MR. SCHWARTZ:  The reason we offered it, Your
10    Honor, is that the Government has presented evidence
11    suggesting that the two different Defendants may have had
12    different motives and we broke it out for that purpose but
13    if Your Honor wishes to stick with his -- the Court's
14    general approach of defendant.
15          THE COURT:  It's sufficient to do general
16    without the modification.  And that's  -- that's 5.04.
17          MR. SCHWARTZ:  Yes, Your Honor.
18          THE COURT:  So when you re-tender it, you'll
19    just do the standard?
20          MR. SCHWARTZ:  Yes, sir.
21          THE COURT:  Great.  All right.  Thank you.
22    16, separate consideration of multiple defendants charged
23    with different offenses.  Acceptable?
24          MR. IGNALL:  I'm taking a look, Your Honor.
25    I believe so.  I think it's slightly confusing because the

1   Defendants are charged with the same offenses but

2   Mr. Bekkedam has two additional counts.  I think that's

3   slightly inconsistent the way it's worded.

4                   MR. SCHWARTZ:  Maybe the better wording is

5   the Defendants are charged with five of the same offenses

6   but Mr. Bekkedam is charged with additional counts.  Does

7   that clarify it?

8                   MR. IGNALL:  Yes, I don't have a problem with

9   that.  I also think that the pattern covers when it says, "I

10  will explain to you in more detail shortly which Defendants

11  are charged with which offenses."  But I don't have a strong

12  preference either way.

13                  MR. SCHWARTZ:  If the Court, through your

14  experience, says it's better to read it with the pattern

15  then it's better to read it with the pattern.  I'll refer to

16  Your Honor's experience.

17                  THE COURT:  I think so because it's going to

18  say, as Counsel has indicated, "I will explain to you in

19  more detail which Defendants are charged with which

20  offenses."  So what you tender to me will be by agreement

21  standard and then I'll go from there.

22                  Now, Counsel, there's no way we're going to

23  complete 89 pages before 1:15 and I have a very, very

24  important Board of Judges meeting at 1:15.

25                  MR. SCHWARTZ:  May I suggest, Your Honor,

Page 28

```
 1    that maybe the Government and I can sit down -- when is Your

 2    Honor finished with his meeting?

 3                  THE COURT:  It's a very important meeting

 4    today.  I don't know.  I'm assuming somewhere around 2:00,

 5    2:15.

 6                  MR. SCHWARTZ:  Okay.  Maybe we could come

 7    back at that time?

 8                  THE COURT:  Huh?

 9                  MR. SCHWARTZ:  I'm happy to come back at that

10    time, Your Honor, or do it however you see fit.

11                  MR. IGNALL:  Whatever the Court's pleasure

12    is, we'll be back.  Can we come back at -- make it 3:00 to

13    make it --

14                  THE COURT:  Well, let me do this.  Like I

15    said, I have another 200 cases in my inventory here this

16    afternoon I was hoping I'd be able to work on.  Let me

17    suggest that if you get together and work on everything that

18    you can agree upon then email to me the ones that you

19    cannot, I can in turn send you back an email saying

20    accepted, rejected, accepted, rejected, or here's an

21    alternative.  But at least we don't have to go through 89

22    pages of jury instructions.  If that's acceptable to you

23    now.

24                  MR. IGNALL:  Well, let me talk to

25    Mr. Schwartz for a minute before we decide on that because
```

Page 29

1    there are a few that --

2                    THE COURT:  Take your time.

3                    MR. IGNALL:  Okay.

4         (Pause)

5                    THE COURT:  Yes, sir?

6                    MR. IGNALL:  Your Honor, how about this, I

7    just talked with Mr. Schwartz.  I think we may be able to

8    come to some agreement on some things and narrow this down.

9                    THE COURT:  Great.

10                   MR. IGNALL:  But I suspect we're still going

11   to have something we need to argue.  So possibly just come

12   back at 4:00 and then argue what's left.  If we're going to

13   --

14                   THE COURT:  Fine.

15                   MR. IGNALL:  I feel like if we're going to

16   argue tomorrow, I'd like to know what the charge is going to

17   be.

18                   THE COURT:  I totally understand.  All right.

19   4:00 it is.

20                   MR. IGNALL:  Okay.

21                   MR. SCHWARTZ:  And we can bring coffee.

22                   THE COURT:  Huh?

23                   MR. SCHWARTZ:  We can bring coffee if that

24   will help.

25                   THE COURT:  That will be an exception.  I'll

1    let you do that.  I teach my final class at Penn tonight and

2    I'm trying to (indiscernible).  All right.  Fair enough.

3                   MR. IGNALL:  All right.

4                   MR. SCHWARTZ:  And the parties, they'll be

5    excused from that?

6                   THE COURT:  Absolutely.

7                   MR. SCHWARTZ:  Thank you.

8                   MR. IGNALL:  Thank you, Your Honor.

9                   MR. ENGLE:  Thank you, Your Honor.

10                   THE COURT:  See you 4:00.

11                   MR. ENGLE:  All right.  Thank you, Your

12    Honor.  The only other thing is, at what point are we

13    pulling the trigger on there is or there isn't going to be a

14    reopening --

15                   MR. IGNALL:  By 4:00, I will know the answer

16    to that one way or the other.

17                   THE COURT:  Fair enough.

18                   MR. ENGLE:  And Your Honor, with respect to

19    the Rule 29 motion, as a result of Your Honor's order, we've

20    been working through the transcripts as we've been getting

21    them.  We do not have all of them yet but we are in that

22    process of we have endeavored to take our memorandum of law

23    and provide specific citations to the record where argument

24    is made and in other instances quoting from the record.

25                   So we can resubmit that as soon as we have

Page 31

1   the transcripts and all of that done and we hope to have

2   that soon, Your Honor.  But I just wanted you to know that

3   we're not submitting, unless the Court is asking for it, a

4   new memorandum of law with all new arguments.  We're just

5   trying to give the Court guidance to where we're basing

6   those arguments and factual assertions from.

7                   THE COURT:  Understood.

8                   MR. ENGLE:  Okay.

9                   MR. DUNCAN:  And if I may, Your Honor, one

10  issue specifically we'd ask the Court to just look at.  As

11  to Count VI, the Government charged a very specific crime in

12  an email from one party to Mr. Bonomo on October 26th --

13  sorry, October 22nd, 2009.  If the Court were to review the

14  evidence in this case that was admitted, there is no email

15  that corresponds to that.  There is no October 22nd, 2009

16  email which is specifically called out as the offense in

17  Count VI.  So we'd ask the Court to specifically look at

18  that.

19                  THE COURT:  This is obviously highlighted in

20  your memorandum.

21                  MR. DUNCAN:  It is, Your Honor.

22                  THE COURT:  All right.

23                  MR. DUNCAN:  Thank you.

24                  THE COURT:  Is there anything else?  I'll see

25  you at 4:00.  All right.  Thank you.

```
                                                        Page 32
 1              (Recessed at 12:53 p.m.; reconvened at 4:11 p.m.)
 2                   THE COURT:  You may be seated.  Good
 3      afternoon.  All right.  What have you been able to resolve?
 4                   MR. IGNALL:  We've gotten through a fair bit,
 5      Your Honor, and we've agreed that there are a number of
 6      inflexion points that if one of us wins or losses on one
 7      that kind of knocks down a bunch of dominoes for the other.
 8                   THE COURT:  Give me the first one.
 9                   MR. SCHWARTZ:  I'd actually like to give you
10      better news first --
11                   THE COURT:  All right.
12                   MR. SCHWARTZ:  -- just to spice things up.
13      The Government has informed us, the Defense, that it has
14      identified one and potentially two witnesses who could
15      sponsor Government Exhibit 92.
16                   THE COURT:  All right.
17                   MR. SCHWARTZ:  Is that it?
18                   MR. IGNALL:  Yes.  And I believe
19      Mr. Schwartz, based on that, is not going to ask us to call
20      the witness and withdraw the objection.  So I wanted to put
21      that on the record.  So I asked Agent Barrett (ph) to step
22      outside and --
23                   THE COURT:  Now, refresh my recollection.
24                   MR. SCHWARTZ:  Exhibit 92 is the letter to --
25      the DVFG investor letter and was the one that Mr. Engle was
```

Page 33

1    arguing about.

2                    THE COURT:  So vociferously and vehemently?

3    You're backing off on it?

4                    MR. SCHWARTZ:  No, we're not backing off,

5    sir.  We had said that there was no witness who was

6    identified who could sponsor that and therefore it would it

7    be inappropriate for it to come in.  Your Honor said, "I'll

8    reopen the case if you can get a witness."  If the

9    Government has said, when we trust them in good faith, they

10   have a witness, it would be crazy to take us off the

11   schedule of getting everything in tomorrow in terms of the

12   instructions and the closing to drag in one or two witnesses

13   to do it.  So --

14                    THE COURT:  All right.

15                    MR. SCHWARTZ:  -- we withdraw the objection

16   based on the Government's good faith representation that

17   they have one to two witnesses who could sponsor the

18   document and then the document just comes in and we've

19   agreed it comes in subject to the limitations that Ms. Barry

20   said she would -- within which she would constrain her

21   argument about that document.

22                    THE COURT:  Now, just so I understand what's

23   going to happen then, is it going to be such that the

24   Government can argue Mr. Bekkedam sent that or in the

25   alternative that he was the principal and an agent sent it

Page 34

1   on his behalf?

2               MR. IGNALL:  I think we can argue that it's

3   over his name.  The jury can draw whatever inference they

4   want that it's something he knew about.  But as we

5   represented this morning, we can't say it went to person X.

6               THE COURT:  All right.

7               MR. IGNALL:  But that it is what it purports

8   to be, it's a letter with --

9               THE COURT:  It's something he knew about.

10              MR. IGNALL:  -- Mr. Bekkedam's signature.

11  Pardon?

12              THE COURT:  Something that he knew about.

13              MR. IGNALL:  Yes, I think --

14              MR. SCHWARTZ:  He is aware of the content of

15  the letter.

16              MR. IGNALL:  Yes, he's aware of the contents

17  of the letter is what we can argue from it.

18              THE COURT:  All right.

19              MR. SCHWARTZ:  Without saying whether it went

20  out and who it went to.

21              MR. IGNALL:  Yes, I think that's correct.

22              THE COURT:  All right.  Fair enough, then.

23              MR. IGNALL:  All right.

24              MR. SCHWARTZ:  We just figured that would

25  save a lot of energy.

1        MR. IGNALL:  All right.  With that, can I ask

2   Agent Barrett to step out for a second?

3        THE COURT:  An immense amount of time it will

4   save.  I'm sorry?  I said an immense amount of time it will

5   save.

6        MR. IGNALL:  Yes.  And I appreciate it and I

7   appreciate Mr. Schwartz agreeing to that.

8        THE COURT:  Sure.

9        MR. IGNALL:  So if I could ask Agent Barrett

10  to just step out to --

11        THE COURT:  Absolutely.

12        MR. IGNALL:  -- make a phone call on that.

13  Thank you.

14        THE COURT:  Okay.

15        MR. SCHWARTZ:  So first of all, Your Honor,

16  next step, if you don't mind.  Would Your Honor allow me to

17  orally sponsor Ms. Kramer to come and sit up at the table

18  for the purposes --

19        THE COURT:  Orally sponsor her?  What does

20  that mean?

21        MR. SCHWARTZ:  Instead of moving pro hac vice

22  in writing.  I'd like to move pro hac vice for the admission

23  of Ms. Kramer for the rest of this case.  She's a good --

24  member in good standing in the Eastern District of Virginia

25  in United States District Court.  She does most of the work

Page 36

```
 1   for us in this case and so we'd appreciate the opportunity

 2   for her to sit at counsel table for this afternoon's

 3   proceedings.

 4               THE COURT:  There's only one problem.

 5   There's a required fee to be paid when you come in pro hac

 6   vice.  You have a check on you that you could send down to

 7   the Clerk's Office?

 8               MR. SCHWARTZ:  I have a credit card and they

 9   do take credit cards.

10               THE COURT:  You can send it to the Clerk's

11   Office.  I'll let her stay in here conditioned upon you

12   paying that fee.

13               MR. SCHWARTZ:  I will pay it after --

14               THE COURT:  Madam, please come and have a

15   seat.

16               MR. SCHWARTZ:  Thank you, Your Honor.

17               THE COURT:  You're welcome.

18               MR. SCHWARTZ:  I mean, is it a big fee?

19   That's what I --

20               THE COURT:  I'm sorry?

21               MR. SCHWARTZ:  Is it a big fee?  I should --

22               THE COURT:  I have no idea what it is.  I

23   just know there is one, that's all.

24               MR. SCHWARTZ:  All right.  Thank you, Your

25   Honor, very much.
```

Page 37

1                    THE COURT:  Yes, sir.  Thank you.

2                    Ma'am, your name for the record, please?

3                    MS. KRAMER:  I'm sorry.  Renee Kramer,

4      R-E-N-E-E.

5                    THE COURT:  All right.  Nice to meet you,

6      Ms. Kramer.

7                    MS. KRAMER:  Thank you.

8                    THE COURT:  All right.  You may continue.

9                    MR. SCHWARTZ:  Your Honor, we've gone through

10     a number of the exhibits where -- the redlined exhibits.  We

11     think it might be most expedient to first go through the

12     additional exhibits or the additional instructions rather

13     that we have proposed because that's part of the domino -- a

14     lot of them will have the domino effect.  And I'm happy to

15     hand up a report of the Defendants' requested additional

16     points for charge, if that would be easier.

17                    THE COURT:  All right.

18                    MR. SCHWARTZ:  Thank you.  And I believe

19     everyone is working from the same text now, Your Honor.  The

20     first one is opinion evidence and expert testimony.  That's

21     gone.  The second one is 4.08, impeachment of a witness with

22     a prior inconsistent statement for credibility only, that's

23     gone.  The next one is 4.22.

24                    THE COURT:  Wait.  Wait.  You're kind of

25     moving on me a little bit fast.

Page 38

```
 1                  MR. SCHWARTZ:  I beg your pardon.

 2                  THE COURT:  You're sending all of these to me

 3    anyway, correct?

 4                  MR. SCHWARTZ:  Yes, sir, we are.

 5                  THE COURT:  So let's back up to the very

 6    first one, please.

 7                  MR. SCHWARTZ:  Yes, of course, sir.  4.08

 8    will not be submitted because we did not put on expert

 9    testimony.  So we have submitted -- the document that's in

10    Your Honor's hand now, we've filed, so we're just clarifying

11    that --

12                  THE COURT:  All right.

13                  MR. SCHWARTZ:  -- we're taking that off the

14    board.  4.22 --

15                  THE COURT:  So it's not going to be in what

16    you're sending me.

17                  MR. SCHWARTZ:  Correct.

18                  THE COURT:  Fine.

19                  MR. SCHWARTZ:  But I just want to complete

20    the record because we filed this.

21                  THE COURT:  Understood.

22                  MR. SCHWARTZ:  4.22, impeachment of a witness

23    with a prior inconsistent statement, off the board, not

24    being submitted.  4.25, impeachment of a witness, prior

25    conviction.  I believe there's agreement as it stands.  It's
```

Page 39

1   a model instruction and the two names will be

2   Mr. Frank Preve and Mr. Thomas Patterson.

3                    THE COURT:  All right.

4                    MR. IGNALL:  Correct, Your Honor.

5                    THE COURT:  Thank you.

6                    MR. SCHWARTZ:  4.26, false in one, false in

7   all.  I believe there's agreement that that would be

8   submitted, as well.

9                    MR. IGNALL:  Yes, Your Honor.

10                   THE COURT:  All right.

11                   MR. SCHWARTZ:  4.33, I'll refer to

12  Mr. Fuller.

13                   MR. DUNCAN:  There's been an agreement --

14  this is prior statement of a non-testifying defendant in a

15  multi-defendant trial.  There's been an agreement to use the

16  pattern instruction however not to use the final paragraph

17  which appears in italics.  It does not appear to be

18  applicable and I believe the Government agrees to that.

19                   MR. IGNALL:  Yes, I think we just say that

20  Mr. Hartline made statements in deposition and then modify

21  it to reflect that.

22                   THE COURT:  So you're going to do this,

23  right?

24                   MR. SCHWARTZ:  I am, Your Honor.

25                   MR. DUNCAN:  We'll take care of it.

Page 40

1              MR. SCHWARTZ:  Eighteen point to the

2     Government, to you.

3              THE COURT:  Don't say it so loud.

4              MR. SCHWARTZ:  First you complain about my

5     not speaking loud enough, now you -- okay.  The next one,

6     Your Honor, evidence of good character, there is a dispute

7     with regard to this.  The first two paragraphs is the model

8     jury instruction in the Third Circuit.  The Government

9     agrees to that.  The disagreement is with regard to the

10    suggested added language that we've presented and

11    underlined.

12             Our basic position is this, Your Honor.  The

13    case that you most often see in the Third Circuit, I

14    believe, is United States v. Spangler which is 838 F.2d 85.

15    Spangler says it's not error to exclude something like a

16    standalone instruction which basically the instruction says,

17    "character evidence alone is enough for you to find an

18    acquittal".  It's not error for a district court not to use

19    that.

20             THE COURT:  Correct.  Correct.

21             MR. SCHWARTZ:  However, with that said,

22    Spangler relies on United States versus -- or is

23    interpreting United States v. Baysek, B-A-Y-S-E-K, which is

24    212 F.2d 446 and the discussion is at pages 447 and 448.

25    It's a 1954 case but that's kind of the family lineage of

Page 41

1   it.  Baysek also says it's not required to make a standalone
2   instruction, but the Court still must, quote, "communicate
3   the duty of the jury that it must consider character
4   evidence and acquit if character alone or with other
5   evidence raises a reasonable doubt."  That's what Baysek
6   says.
7              And the question is, how does a district
8   court deliver that message to the jury?  We are suggesting,
9   respectfully, that the O'Malley federal jury practice
10  instruction conveys that idea that it doesn't have to be
11  standing alone but it could be part of the chain in which a
12  jury can acquit.
13             THE COURT:  Now, let me just read this,
14  please.
15        (Pause)
16             THE COURT:  Does the case state that the
17  Court may not charge the jury with the language that
18  character evidence alone may give rise to reasonable doubt
19  or where does it say specifically?
20             MR. SCHWARTZ:  Baysek says the Court is not
21  required to give that but it must find a way to communicate
22  the duty of the jury that it must consider character
23  evidence and acquit if character alone or with other
24  evidence raises a reasonable doubt.  I didn't write that in
25  the instruction because the O'Malley instructions, they're

Page 42

1    pros so I referred to the pros, professionals.

2                    THE COURT:  All right.  Mr. Ignall?

3                    MR. IGNALL:  May I have one moment?

4                    MR. SCHWARTZ:  And I have Baysek if it will

5    help.

6                    THE COURT:  Yes, that will be fine.

7                    Mr. Ignall, while you're doing that, you

8    know, one of the things that I've always pondered about, if

9    you will, since coming here from downtown where the state

10   system is, you read the character evidence instruction as

11   character evidence alone may give rise to reasonable doubt.

12   Now, here, given the decision which I think we all read

13   obviously some time ago and, in fact, for me I went, wow.

14   But the concern I have is when I perform a guilty plea

15   colloquy, the standard benchbook of federal courts is you'll

16   prize a defendant that character evidence alone may give

17   rise to reasonable doubt.

18                   MR. IGNALL:  And I think any evidence alone

19   could give rise to reasonable doubt.

20                   THE COURT:  But character is of a different

21   kind of evidence because it's almost a nullification of a

22   potential verdict.  The other ones are not necessarily that

23   way.

24                   MR. IGNALL:  If I may have one moment --

25                   THE COURT:  Go right ahead.

1          MR. IGNALL:  -- because there's a pattern

2   instruction, which I'm not objecting to the pattern, I just

3   wanted to look at the commentary if I could, Your Honor.

4        (Pause)

5          MR. IGNALL:  As I read the commentary, it

6   says "a disagreement concerning whether the jury should be

7   instructed that proof of Defendant's good character standing

8   alone may be sufficient to create a reasonable doubt".  And

9   I assume that's why the Committee came up with the pattern

10  charge that we have which I don't have an objection to.

11          THE COURT:  That's what's written in red?

12          MR. IGNALL:  Yes, and it's 4.39.

13          THE COURT:  There's no obligation for the

14  Court to read it.

15          MR. IGNALL:  Yes, and I'm not sure there's an

16  obligation for the Court to give the instruction at all

17  though I think the commentary to 4.39 says that if there is

18  character evidence under 404(a) the Court should do it and I

19  think the pattern instruction is appropriate.  I don't think

20  it's appropriate to highlight character evidence as opposed

21  to anything else as raising reasonable doubt when any

22  evidence can raise a reasonable doubt.

23          THE COURT:  All right.  Well, as I said,

24  Counsel, before, I have, with the exception of where

25  something has to be modified, always given the standard

Page 44

```
 1    instruction as approved by here, the Third Circuit, meant
 2    for me.  The reason why is because it's accepted, they've
 3    approved it, and then that way I don't have to reinvent the
 4    wheel nor will I vary away from the standard which to me
 5    would give rise to reversal unnecessarily so.  So I am very
 6    safe and secure in this one which is stricken through
 7    because, frankly, in ever criminal case I've had since I've
 8    been here where it was appropriate to give the instruction,
 9    I've given a standard instruction without issue.  Now, is
10    yours preferable?  When I was a defense attorney, it really
11    was.
12                   MR. SCHWARTZ:  I think it is and I hate
13    saying this but I used to be a prosecutor too, Your Honor,
14    and for what it's worth, which may not be much, I will tell
15    you character evidence is confusing and I think it needs a
16    funnel through which it is interpreted.  I think the
17    O'Malley instruction, the bottom to paragraphs, is a nice
18    compromise.  It, A, incorporates some of what Your Honor's
19    benchbook says, and B, doesn't make it a super special one
20    and at least explains -- I mean, the jury has got to be
21    sitting there saying what the heck are these people coming
22    in and saying this for.  It needs interpretation.
23                   THE COURT:  Again, I don't disagree with you
24    but then again I'm not on the Third Circuit Jury Committee.
25    I'm on the Civil Jury Committee, not the Criminal Jury
```

Page 45

```
 1    Committee so I have to take what they have.  You have an
 2    exception and I, frankly, don't disagree with you but it is
 3    what it is on the circuit's standard instructions.  All
 4    right.  Next?
 5                MR. FULLER:  The next is the good faith
 6    defense, Your Honor.
 7                THE COURT:  All right.
 8                MR. FULLER:  I believe the Government
 9    objects.  And the form we have proposed we think
10    encapsulates the nature of the offense which would be
11    essentially a mistake.  Mr. Hartline's honestly held belief
12    as to the proper consideration of the investments at issue
13    as capital.  It's our understanding that the Government
14    objects to that because it does not go far enough into the
15    other ways in which Mr. Hartline could be found guilty of
16    the offense.
17                Our position is that his honest belief in
18    capital in the sense that it required no additional
19    reporting, there was no duty upon him to report this capital
20    from these investments in any way other than all other
21    investments had been reported, that that inquiry stops
22    there.  When he had that belief that this capital should be
23    treated as all other capital, that is a defense to all
24    further actions that he took.
25                MR. IGNALL:  Do we not have an agreement?
```

1              MR. FULLER:  I didn't hear all of the

2     agreement.  This is our position on this, that the word

3     capital does assume the rest of this.

4              THE COURT:  But doesn't the language

5     "Defendant intended to defraud" address it?

6              MR. IGNALL:  Your Honor, and that was my

7     point.  I have a number of concerns with the good faith

8     defense.  One is that it's not always required if it's

9     covered by the intent to defraud which I believe it is.  The

10    other is I think what Counsel is proposing is too

11    restrictive because this is not about just capital.

12              One, there are three different frauds where

13    good faith or intent to defraud apply.  One is the fraud

14    against the Treasury for the TARP program, one is the bank

15    fraud, one is the investor fraud.  So we'd have to have

16    three different good faith explanations there which I think

17    is unnecessarily confusing.

18              But just with respect to the TARP fraud, even

19    if a defendant honestly and mistakenly believed that loaning

20    money to an investor to circle back to the holding company

21    down to the bank could count as capital doesn't mean that

22    defendant is not guilty if that defendant intended to

23    conceal the source of the capital from the Treasury because

24    it's quite clear that the Treasury would want to know that

25    NOVA Bank made this giant loan because what the regulators

Page 47

1    are looking at is the overall health of the bank.

2                    So if the bank is not aware of a $5 million

3    unsecured loan, they're only aware of a $5 million infusion

4    of capital, that would still be something that the regulator

5    would want to know.  And if the Defendant conceals that fact

6    with an intent to defraud, the defendant is guilty.  So I

7    think the good faith instruction that Mr. Fuller is

8    proposing would not encompass that.  What I had proposed and

9    I --

10                   THE COURT:  How could it be concealed with

11   intent to defraud if he didn't know it was wrong?

12                   MR. IGNALL:  Well, that goes to intent to

13   defraud.  If doesn't have intent to defraud then he's not

14   guilty.

15                   THE COURT:  Period.

16                   MR. IGNALL:  Period.  If he has no intent to

17   defraud --

18                   THE COURT:  So why would you need additional

19   language then?

20                   MR. IGNALL:  I don't think there needs to be

21   additional language.

22                   THE COURT:  I don't either but let me hear

23   your argument as to why there should be.

24                   MR. SCHWARTZ:  And I apologize, Your Honor.

25   There was some discussion.  I was in the hall --

Page 48

1           MR. SCHWARTZ:  Yes, if I could stand in

2    between, literally, the two advocates, Your Honor.  First of

3    all, the Government has engaged in a very fulsome discussion

4    about trying to find language to accommodate this idea

5    because it has acknowledged the defense.  And after going

6    through a number of drafts trying to come up with something

7    we all agree to, we couldn't.

8           Therefore, the Government has proposed

9    instead of having a good faith instruction, making an

10   amendment to Instruction No. 54 which is the intent

11   instruction which at least subsumes some of the idea we're

12   trying to put forward.  So if we could jump ahead to

13   Government Instruction No. 54, if that's not too

14   inconvenient, that might resolve the issue.

15           MR. IGNALL:  Yes, I'm reluctant to mess with

16   the pattern instructions but I could not come up with a way

17   to explain good faith that was consistent with the law and

18   not confusing.  What I have agreed to is in the intent to

19   defraud, which is this part of the pattern charge, the

20   pattern charge says "to act with an intent to defraud means

21   to act knowingly with the intention or purpose to deceive or

22   cheat".  I think that covers it, but what I had proposed is

23   the Court could after that "not through misunderstanding".

24           THE COURT:  If he's willing to add that.

25           Are you going to contest that?

Page 49

```
 1              MR. SCHWARTZ:  No, that was the compromise.
 2   We are going to contest another paragraph in that
 3   instruction about willfully and we've discussed that, but at
 4   least that I think is a very fair compromise.
 5              THE COURT:  If it's okay with you it's
 6   certainly okay with me.
 7              MR. IGNALL:  All right.
 8              THE COURT:  All right.
 9              MR. SCHWARTZ:  And we'll put that in print
10   and send it to you.
11              THE COURT:  All right.
12              MR. SCHWARTZ:  So that is --
13              THE COURT:  So you're going to omit 5.07 in
14   lieu of -- and substitute the other one in lieu thereof?
15              MR. SCHWARTZ:  We're going to omit 5.07 and
16   we're going to make a minor amendment to the first paragraph
17   of 54.
18              THE COURT:  And use that instead.
19              MR. SCHWARTZ:  And use that instead and then
20   we're going -- in a few minutes we're going to argue over
21   the rest of 54.
22              THE COURT:  Fair enough.
23              MR. SCHWARTZ:  Respectfully argue, Your
24   Honor.  All right.  The next one, Your Honor, is the one I
25   sent the Court and of course all the parties notice that
```

Page 50

1   there's a question about what is materiality in TARP and

2   this is why we wrote out a separate (indiscernible)

3   instruction, this Court II.  And in particular the nugget

4   is, Your Honor, that we believe that the jury has to be

5   instructed about something can only be material if it was

6   capable of affecting the U.S. Department of Treasury.  And

7   this will wash over both Counts I and II as well as III and

8   IV based on the Second Circuit's opinion in

9   U.S. v. Litvak.  If the Court will permit me, I'd like to

10  make a one or two minute kind of presentation of what the

11  Litvak holding says and why it applies to our case.

12              THE COURT:  Well, now before you do that, let

13  me just make sure I understand where you're coming from with

14  this.  Since we're at a stage of charging the jury, what is

15  it that you wish to charge the jury that's different from

16  the standard instruction on this issue, on this charge?

17              MR. SCHWARTZ:  The jury should know that for

18  a statement to be material under either 1031 or 1001, the

19  statement has to be capable of influencing the United States

20  Department of Treasury's Investment Committee and there's a

21  reason for that.  The question is who is the decider here

22  and the statement has to be capable of affecting the

23  decision maker.  And what we have heard from -- the evidence

24  is that the decider is the Investment Committee.  What we

25  have not heard from is any member of the Investment

Page 51

1    Committee.  Litvak addresses this issue by analogy and

2    that's why I'd like to talk to the Court about it.

3              THE COURT:  Well, the case speaks for itself

4    and if the Court were going to go that route, I think it's

5    been squarely placed as you've done so.  But I want to hear

6    from the Government in terms of what is used in this circuit

7    or this type of offense if one has ever occurred here and if

8    that was used, was it reversed or appealed on that basis?

9              MR. IGNALL:  Your Honor, I think the

10   instruction we've proposed under the TARP fraud in

11   Government's Instruction 33 includes materiality in the

12   pattern charge.  It says "the false or fraudulent

13   representation or failure to disclose must relate to a

14   material fact or matter.  A material fact is one that which

15   would reasonably expected to be of concern to a reasonable

16   and prudent person in relying upon the representation or

17   statement in making a decision whether to approve TARP

18   funding for a bank."

19             THE COURT:  Now, let me just stop you right

20   there.  Any idea whether or not this instruction was given

21   in that case, the Second Circuit?

22             MR. IGNALL:  I do not know which instruction

23   was given in that case and I'll let Mr. Schwartz argue that

24   case but I --

25             THE COURT:  But let me just ask this and let

Page 52

1   me add to my question.  That is assuming that it was given,

2   it was appealed on that basis or four bases, actually.

3               MR. IGNALL:  Well, I'll let Mr. -- I don't

4   want to jump on Mr. --

5               THE COURT:  Okay.

6               MR. IGNALL:  -- Schwartz' toes.

7               THE COURT:  All right.

8               MR. IGNALL:  I believe the materiality

9   discussion in that case is quite distinct from ours but I'll

10  let him --

11              THE COURT:  Okay.

12              MR. IGNALL:  -- make his argument before I

13  respond.

14              THE COURT:  All right.

15              MR. SCHWARTZ:  That is in fact my point, Your

16  Honor, that what Litvak found and what I think the Court

17  should find, respectfully, is that Litvak -- the Second

18  Circuit found that the district court should have granted

19  the Rule 29 motion because the statement was not capable of

20  affecting the Department of Treasury.

21              THE COURT:  And that's where I'm going.  Was

22  the reversal because the Second Circuit said that the trial

23  judge should have granted the 29 motion --

24              MR. SCHWARTZ:  Yes, it does.

25              THE COURT:  -- as opposed to -- well, it's

1     sort of subsumed by the notion that it's not material.

2                    MR. SCHWARTZ:  It says it wasn't capable of

3     being material because the -- in this case --

4                    THE COURT:  So what you're asking me to do is

5     since we're at jury instruction stage, give this

6     instruction, put the whole notion of the Rule 29 motion on

7     the shelf temporarily, and then see if the jury buys the

8     instruction and it's a moot point.

9                    MR. SCHWARTZ:  No, actually, respectfully,

10    Your Honor, I'd like you to cite the Rule 29 and say it's --

11                   THE COURT:  Oh, I bet you would.

12                   MR. SCHWARTZ:  -- it's not capable because --

13                   THE COURT:  But this is not why we're here.

14    We're here now addressing jury instructions --

15                   MR. SCHWARTZ:  I understand that.  So --

16                   THE COURT:  -- and I'm not going to do 29

17    right now.

18                   MR. SCHWARTZ:  I understand that.  So what

19    I'm asking the Court to do is to do the best possible under

20    the circumstances by -- and this is where the missing

21    witness suggestion of Mr. Egan comes in, too.  By letting

22    the jury work out who is the decider in this case, who is

23    the person who was approving TARP, and whether the statement

24    was capable of affecting the decider.

25                   THE COURT:  Now, which one of these

Page 54

```
 1     instructions -- is the one that's redlined or in red?  I

 2     mean, it's under -- but it's blue-lined.

 3                 MR. SCHWARTZ:  Yes, sorry about that, Your

 4     Honor.

 5                 THE COURT:  It's in maroon, actually.

 6                 MR. SCHWARTZ:  Yes, it's the one that's --

 7     and it's the paragraph that says that you have the

 8     Investment Committee.

 9                 MR. DUNCAN:  It should be the second to last

10     page of the group that was just handed up, Your Honor.

11                 MR. IGNALL:  Your Honor, just to be clear, I

12     think we're arguing about something slightly different.  I

13     think the question is, is the false statement or omission

14     capable -- and I don't think I disagree with Mr. Schwartz in

15     the abstract that is it capable of influencing the Treasury

16     but what I think we're having a problem with, and we'll get

17     to the missing witness, is it doesn't have to be from the

18     mouth of the final decision maker as long as it's capable of

19     influencing the Treasury in some way and, as we've learned,

20     there's a number of steps before it gets to the Treasury

21     Investment Council.  It's the same thing and 1001 false

22     statement doesn't need to be made directly to the

23     Government.  It can be made indirectly.  It just has to be

24     capable of influencing that decision maker.  And I don't

25     think there's a dispute about that and I think the pattern
```

1    charge covers that.

2                 THE COURT:  The case that Counsel has

3    submitted from the Second Circuit, Litvak, spoke about the

4    lack of evidence presented.

5                 MR. IGNALL:  Yes, I think that's a factual

6    distinction.  I think the standard is the same that was the

7    Defendant's statement capable of influencing the Treasury.

8                 THE COURT:  But in terms of the proof

9    required --

10                MR. IGNALL:  Yes, the proof was not

11   sufficient in that case because the Treasury could not rely

12   on any misstatement because, as I understand it, this

13   involved investments in which the Treasury didn't have a

14   decision-making authority.

15                THE COURT:  They gave it to somebody -- some

16   other entity actually, in Litvak's case.

17                MR. IGNALL:  Yes, in Litvak.  So it's just a

18   matter of the actual proof, not what the standard is.

19                THE COURT:  Now, Counsel -- Mr. Schwartz,

20   what's your response to this now?

21                MR. SCHWARTZ:  In Litvak, Your Honor, the

22   issue was the Treasury Department gave a set of instructions

23   to these fancy, rich Wall Street guys and said you guys

24   decide whether the funds should be dispersed or not and

25   therefore they basically disconnected themselves from the

Page 56

1   decision-making process and so the Second Circuit said,

2   well, then under this PPIF Program, nobody can defraud

3   Treasury under 1031 because no statement is capable of

4   affecting Treasury.

5           Here, the Government has presented evidence

6   saying that -- two things.  Saying that the ultimate

7   decision maker is the Investment Committee but also has

8   offered evidence and therefore argument -- and again, I

9   don't want to step on your shoes too much, Mr. Ignall --

10  that said, well, if the primary regulator recommends it then

11  it's a done deal.  The primary regulator in this case, Your

12  Honor, is not part of the Department of Treasury.  It's not

13  a rich, hedge fund guy or whatever in New York, but it's the

14  FDIC and the Federal Reserve Board.  Neither of those is a

15  member of the Department of Treasury.

16          Therefore, if the Department -- if the FDIC

17  as the primary regulator or the FRB as the primary regulator

18  is the de facto decision maker here then, just like in

19  Litvak, nothing that can be said to Treasury is capable of

20  influencing Treasury.  It's only capable --

21          THE COURT:  Nothing can be said to them.

22          MR. SCHWARTZ:  Yes.  And in this case the

23  charge is was Treasury defrauded?  The statute is was the

24  Troubled Assets Relief Program defrauded?  The indictment

25  says was the Department of Treasury defrauded?  What we're

Page 57

```
 1    saying is no statement is capable of leaping over the FDIC

 2    and the Federal Reserve Board and affecting Treasury if --

 3                 THE COURT:  Yes, and I go back to the fact

 4    that we're at jury instruction stage.

 5                 MR. SCHWARTZ:  Yes.

 6                 THE COURT:  What kind of jury instruction are

 7    you tendering to deal with that in a way that you think is

 8    appropriate and fair and putting the 29 on the shelf?

 9                 MR. SCHWARTZ:  I think -- I don't want to

10    give myself too much praise here, but I think the phrase "a

11    material fact is one which was capable of influencing a

12    reasonable and prudent member of the U.S. Department of

13    Treasury's Investment Committee."  I mean --

14                 THE COURT:  Well, let me just stop you there.

15                 Mr. Ignall?

16                 MR. IGNALL:  I think that leads to confusion

17    and too much restriction on the Government's proof.  The

18    question is there are a lot of steps in the approval process

19    within the Department of Treasury.  So any fact that's

20    capable of influencing the decision is material and if it's

21    capable of influencing the decision in the sense that it

22    never gets to the Treasury Investment Committee then that's

23    certainly material as well.

24                 And I think Mr. Schwartz has it backwards.

25    The testimony we heard was that if the FDIC recommends
```

Page 58

1    disapproval, it would be extremely unlikely that the

2    Treasury Investment Committee would approve it.  The same

3    way that if not at least three members of the CPP Council

4    reccommend it.  So any fact that might lead anyone in that

5    chain to report to the Treasury we don't favor this is

6    certainly capable of influencing the decision of the

7    Treasury whether to fund the bank under the TARP program or

8    not.

9                  And if I could get a hold of my -- our

10   response to the Rule 29 motion, that's where I cited the

11   cases about the false statement doesn't need to necessarily

12   go directly to the decision maker as long it was directed

13   toward the decision maker and I think that is clear here

14   because all of these people are part of the TARP decision-

15   making process.

16                  MR. SCHWARTZ:  Your Honor, if I could just

17   say --

18                  THE COURT:  Yes, let me just take a look at

19   United States v. McBain.  Are you familiar with that case?

20                  MR. SCHWARTZ:  No, Your Honor, but we can

21   find it.

22                  THE COURT:  It's Judge Mandel's quote

23   regarding materiality.

24                  MR. SCHWARTZ:  And what's this at?  I'm not

25   sure (indiscernible).  I won't say I've never seen it but --

Page 59

1                THE COURT:  Materiality of a statement does

2     not turn on whether the investigators would have believed

3     the statement or whether the statement influenced the

4     investigation.  Rather, a statement is material if it is of

5     a type, quote, "capable of influencing a reasonable decision

6     maker", end quote.

7                In McBain we concluded that a defendant's denial

8     of criminal conduct was material just by agents' knowledge

9     of its falsity because it would still normally have been

10    capable of influencing a criminal investigation.  Hereto, it

11    does not matter that (indiscernible) statements did not

12    actually influence the agents.  The jury could have found,

13    like the Defendant's false statements in McBain, Silman's

14    false statements were material because they were of a type

15    capable of influencing a reasonable decision maker

16    investigating the scope of the conspiracy and the degree of

17    responsibility of the persons who may have been involved.

18    Viewing the evidence in the light most favorable to the

19    Government, we find no basis for overturning the jury's

20    verdict."

21                I said McBain.  It's actually cited with in

22    United States v. Silman which is a Third Circuit case, 2008.

23    Now, is that what Mr. -- well, I shouldn't ask it that way.

24    Let me ask you what you -- is that what you're saying?

25                MR. IGNALL:  Yes, and in fact, I know the

Page 60

1    cite of McBain but that's what I was going to get at that

2    even if the person receiving the statement knows its false

3    and therefore can't be influenced, materiality is an

4    objective standard about whether a statement is capable.

5    The point is trivial statements that aren't capable of

6    influencing someone are not a crime even if made with an

7    intent to defraud.

8                    THE COURT:  And in Litvak it wasn't material

9    because --

10                   MR. IGNALL:  As a matter of fact the Treasury

11   could not be influenced.  Not that they --

12                   THE COURT:  Because they delegated the

13   authority to someone else.

14                   MR. IGNALL:  Yes, it's the equivalent of if I

15   were to lie to you about the TARP program and you had no

16   influence over whether the TARP program is going to grant

17   the money or not, that wouldn't be material.  That's my

18   reading of Litvak.

19                   MR. SCHWARTZ:  I would respectfully suggest

20   that McBain or Silman does not exclude our argument because

21   the question is who is the reasonable decision maker and

22   it's been identified that the Investment Committee is and so

23   the jury should decide whether there was any evidence

24   presented by the Government that shows that the statements

25   made by or the alleged statements made by the Defendants

Page 61

1   were capable of affecting the Investment Committee.

2                   THE COURT:  What is it about the standard

3   instruction that precludes you from arguing what you just

4   stated?

5                   MR. SCHWARTZ:  The jury doesn't know who the

6   decider is, Your Honor.

7                   THE COURT:  You wouldn't tell them when

8   you're arguing the case?

9                   MR. SCHWARTZ:  We could tell them but --

10                  THE COURT:  Was that the evidence in the case

11  who the decider was?

12                  MR. SCHWARTZ:  The evidence is the Investment

13  Committee, Your Honor.

14                  THE COURT:  Right.

15                  MR. SCHWARTZ:  And the evidence is that

16  there's the Investment Committee.

17                  THE COURT:  So then why could you not argue

18  that?

19                  MR. SCHWARTZ:  Well, we can argue it better

20  with this and with the missing witness instruction which is

21  what Mr. Egan was asking for and to say there's been

22  evidence --

23                  THE COURT:  The problem I have with the

24  missing witness instruction is that you could call that

25  person yourself on the one hand even though you have no

Page 62

```
 1    burden of proof here.  On the other hand, this is an
 2    incredibly unique situation to ask for a missing witness
 3    instruction with these facts.
 4                MR. SCHWARTZ:  I acknowledge that it is not
 5    the run of the mill missing witness instruction situation,
 6    but there's not a lot about the TARP program that is run of
 7    the mill.
 8                THE COURT:  Well, sure.
 9                MR. SCHWARTZ:  And that's why not supplanting
10    the Second Circuit's judgment for the Third Circuit's
11    judgment, but they've thought about it and written about it
12    and this is a very specific case.  And in fact, they've
13    thought about it and written about it so much that it says
14    not only does that undermine the confidence of the Second
15    Circuit in a conviction for 1031, but also undermines the
16    confidence in the conviction for the false statements case,
17    as well.  And that's what we have here, Your Honor.
18                This is another case and, I'm sorry, I use
19    this phrase and I mean no disrespect, where we've got a
20    Rubik's cube where we've got this one statement and the
21    Grand Jury has spun this around 17 different ways and the
22    best way to let a jury parse through that is to say, okay,
23    what did you hear about the Investment Committee?  Was
24    anything capable of influencing them?  Since we're not
25    addressing this as a Rule 29 issue, that's the best we can
```

Page 63

1    get to to be fair to them because, my goodness, this is

2    complex stuff and --

3                    THE COURT:  Mr. Ignall --

4                    MR. SCHWARTZ:  I'm sorry.

5                    THE COURT:  -- don't you object to Counsel

6    arguing that to me?

7                    MR. IGNALL:  I think it's actually inaccurate

8    though because that implies that it has to get the

9    Investment Committee.  A false statement that would be

10   capable of convincing the FDIC not to forward it along would

11   certainly be something that's material.  A false statement

12   that's sufficient to prevent the CPP Council from

13   recommending it for approval could --

14                   THE COURT:  What's the difference between

15   that and Litvak in terms of they issued it, the Defendant in

16   Litvak issued the statement.  If you stop right there and

17   just simply if you issued it and it's material because it

18   could have influence, I understand the impossibly defense in

19   some respects or explanation in some respects, but if the

20   crime still is if you said it, it's criminal.

21                   MR. IGNALL:  If you said it, it's criminal.

22   If it is capable -- if it's of the type that is capable --

23                   THE COURT:  That's even more, I think,

24   (indiscernible) the Defendant's benefit in this regard if it

25   is of the type.

Page 64

```
 1                MR. IGNALL:  I don't see why we should go
 2      past that and I don't mind saying the Department of the
 3      Treasury.  What I'm concerned about is the jury will be
 4      confused that unless somebody from the Treasury Investment
 5      Committee comes up here and says here's what I care about
 6      then a statement can't be material and that's certainly not
 7      true if anyone in the process could have been influenced by
 8      that then it's --
 9                THE COURT:  But could they -- could the
10      Defense argue that though?
11                MR. IGNALL:  They could --
12                THE COURT:  About the Treasury?
13                MR. IGNALL:  If they want to argue that this
14      statement is not --
15                THE COURT:  You didn't hear anybody from the
16      Treasury say this?
17                MR. IGNALL:  -- that this statement was not
18      capable of influencing the Treasury in any way, they can
19      argue that, certainly.  I don't think the evidence supports
20      that but they can argue that.  I can't stop them from
21      arguing.  The question is what's an appropriate statement
22      for the jury in terms of the instruction and I think the
23      pattern instruction is appropriate, it covers it, and it
24      doesn't lead to potential confusion that it has to be able
25      to influence one particular person as opposed to people
```

Page 65

```
 1    involved in the decision.

 2                 THE COURT:  And in the final analysis I don't

 3    think that the pattern instruction precludes you from making

 4    the argument that you wish to make that would be consistent

 5    with Litvak.  I know it's an uphill battle in that regard

 6    but, you know, again, this is -- there's a pattern

 7    instruction for this in terms of materiality.

 8                 MR. SCHWARTZ:  I would just say, to coin a

 9    bad phrase, Your Honor, this puts the Defense between Rule

10    29 and a hard place.  And if it's a good phrase, you can

11    borrow it.  But this -- all of me saying, based on Litvak,

12    this case can't go to the jury because it's not --

13                 THE COURT:  Well, again, that's not where we

14    are.

15                 MR. SCHWARTZ:  Right.  But if it is going to

16    the jury, as it is tomorrow, then let's give the jury the

17    best possible road map irrespective of what the pattern jury

18    instruction is in the Third Circuit because the pattern jury

19    instruction of the Third Circuit is not educated by case law

20    where courts have confronted the issue of the TARP program

21    and what it means.

22                 This is a situation, Your Honor, where

23    there's this crazy private public partnership and even

24    within the public aspect of it, it's parsed out into many

25    different agencies.  But the statute says, you know, is the
```

Page 66

1    TARP program defrauded?  The indictment says is the United

2    States Department of Treasury defrauded?  If the Court

3    wishes to give the most respect to what the Grand Jury

4    indicted for -- and I know I've been pounding away at this

5    argument for months now -- but if we're going to respect

6    what the Grand Jury indicted on then we've got to give them

7    the road map that the Grand Jury wishes them to have to make

8    this decision and the way to do that is to say -- one of the

9    statements capable of influencing the Investment Committee

10   and the Grand Jury or the (indiscernible) jury can decide

11   whether hearing from somebody on the Investment Committee or

12   not matters.  That's the best thing we can do to solve this

13   dilemma under this (indiscernible).

14              MR. FULLER:  And if I may, Your Honor, just,

15   you know, the dearth of case law on the TARP program as

16   we've been discussing, there was this chain of potential

17   decision makers or non-decision makers starting with Lisa

18   Koch.  Immediately things had passed to Chuck Howard, to

19   Mr. Baxter, another person from whom we didn't hear, to the

20   CPP Council made up of various regulators supported by

21   people like Ms. Corse (ph) and then goes to Treasury and I

22   believe the Government said that there's various levels of

23   decision makers within the Treasury but all we actually know

24   is that there was one stop at the Investment Committee for a

25   vote and then what we saw at least in one occasion was a

Page 67

1    letter on August 25th signed by Mr. Shaftner (ph), the

2    official approval with the contingency.

3                   So there weren't that many stops within the

4    Treasury.  There were so many stops along the way that I do

5    think that the jury in this case under -- in the TARP

6    process may be genuinely confused as to who the decision

7    maker is and that is why it's so important to identify for

8    them and give them the best road map of where the Grand Jury

9    was going as to which decision maker we're talking about.

10                   THE COURT:  Do you agree -- each side agree

11    as to who the ultimate decision maker is or was?

12                   MR. IGNALL:  I believe it is the investment

13    council but I think that's misstating the Government's

14    burden of proof.  If it's capable of influencing anyone who

15    participates in the decision then it's capable of

16    influencing the decision maker and I think it's misleading

17    to suggest that the Government has to call someone from the

18    Investment Committee when we already have evidence of there

19    are a number of steps along the way and what's important to

20    those people and what is capable of influencing them is

21    something that is capable of influencing the Department of

22    Treasury.

23                   THE COURT:  Well, that's in fact what was

24    done in the end, correct?

25                   MR. IGNALL:  Yes, and I think the Investment

Page 68

```
 1   Committee via testimony that the Investment Council denied
 2   it on December 18th, whatever the date was.  So we've had
 3   testimony about that.
 4                 THE COURT:  And they were --
 5                 MR. IGNALL:  So my only concern --
 6                 THE COURT:  And they were or were not aware
 7   of the loan?
 8                 MR. IGNALL:  They were not aware of the loan
 9   at that point.  They denied it for a different reason.  So
10   the question is is the false statement or the omission
11   capable of influencing the Department of the Treasury and I
12   think that covers it.
13                 THE COURT:  I think what sets this apart in
14   some respects from the case from the Second Circuit is that
15   while you agree that they denied it for a different reason,
16   the reason that they could have granted it would have been
17   on the basis of this information that was not there that
18   you're arguing was intentionally withheld.
19                 MR. IGNALL:  I'm not following, Your Honor,
20   I'm sorry.
21                 MR. SCHWARTZ:  I'm following, Your Honor, if
22   I'm right that there is a separate event on (indiscernible)
23   NOVA Bank had to check the box for capital.  So for all
24   intents and purposes, if that was in fact the only
25   contingency that remained, there is no reason other than
```

Page 69

1    that that it should have been approved but it wasn't

2    approved.  So that is definitive proof that the Investment

3    Committee from whom we haven't heard has other reasons for

4    which it was denied.

5              And another hole we have is this initial

6    Investment Committee meeting which must have happened at

7    some point between the June 10th CPP approval and the August

8    25th letter from Treasury just hearing how the process

9    works.  We have no idea what the basis of the decision was

10   at that point.  So then to now see that we have a decision

11   in December which was based on a reason other than the

12   capital accumulation, we have no idea what actually affected

13   those decisions or what was capable of affecting that

14   decision-making body.

15             MR. IGNALL:  Well, if that were true then we

16   haven't met our burden of proof but the instruction still

17   stands and we have plenty of evidence from which the jury

18   can infer that an omission of these $8 million in loan is

19   capable of it.  It ultimately didn't make a difference

20   because the bank condition deteriorated to the point that

21   even if they had $15 million of new capital, they weren't

22   getting the funding.  But that goes to impossibly perhaps

23   but it does not go to materiality just the same way the

24   recipient knows the statement is false.

25             THE COURT:  All right.  I'm going to give the

Page 70

1    pattern instruction.  Your argument is not going to be

2    prevented by me giving the pattern instruction and in

3    essence you get two bites of the apple because you can take

4    that before the jury and if you lose you still have the 29

5    before the Court.

6               MR. SCHWARTZ:  Very well.  Thank you for your

7    patience and hearing us out.  Okay.  The rest is easy from

8    here.  Can I have a second with Mr. Ignall?

9        (Pause)

10              MR. SCHWARTZ:  Your Honor, if for the next

11   proposed Counts V and VI.  I'm not going to belabor it if

12   you would give us an exception because based on your ruling

13   --

14              THE COURT:  Absolutely.

15              MR. SCHWARTZ:  -- based on your ruling of the

16   previous discussion, you're going to find (indiscernible).

17              THE COURT:  Yes, sir.

18              MR. FULLER:  Thank you.  So Your Honor has

19   already sort of alluded to, again, a related issue of the

20   missing witness charge as it relates to the members of the

21   Investment Committee.  As I discussed just a few moments

22   ago, one of the reasons that we think it is appropriate is

23   that we have so many links in the chain here that

24   Mr. Hartline is said to have spoken with Ms. Koch at sort of

25   the entry of the funnel.

Page 71

1              There are so many steps between there and the

2      Investment Committee that we generally don't feel that we

3      had the opportunity to identify these people.  It's been

4      become clear at trial that they were in fact the ultimate

5      the decision makers yet we heard nothing from them.

6              So as we've been discussing, this is a unique

7      process in which there were several potential decision

8      makers, several people involved in the process, but to know

9      who actually made the decision after the CPP Council about

10     which there's many emails and many writings, to know that

11     there was another level -- it's been our understanding too

12     that this process was kept -- I think there was testimony

13     for the benefit of the banks a lot of the rulings were kept,

14     not secret, but confidential so you would never have a

15     negative impact on a bank.

16              There was an intent there, and I'm not saying

17     in a malicious way, by the Government to keep that body

18     close to the breast.  So we do feel that we were in a

19     limited position and we're not in a position to call people

20     from the council (indiscernible) if that's a concern of the

21     Court.

22              THE COURT:  Did you know who they were?

23              MR. FULLER:  In going back through some

24     discovery we now are able to piece together some names, but

25     the sheer quality and importance of the Investment Committee

1  was something that was certainly not known to Mr. Hartline.

2  His interactions stopped with Lisa Koch.  Perhaps there was

3  knowledge of the Washington office and some of the people

4  there.  His knowledge certainly stopped with the CPP

5  Council.  But to know now the Investment Committee, all they

6  ever received from the United States Treasury was the August

7  25th letter signed by Mr. Shaftner.  They were unaware of

8  those people and their role in the process.

9          THE COURT:  All right.  Now, what is it that

10  any member of the Investment Committee could have said,

11  looking at this in a light most favorable to the Defendants,

12  that would require the Court to give a missing witness

13  instruction?

14          MR. FULLER:  I think there are any number of

15  things.  Again, as I sort of spoke about before, one of the

16  other issues that has come to light as the evidence has been

17  presented is the fact that it looks like there were almost

18  certainly two decisions.  This one made after the June 10th

19  CPP decision which three of the members voted to approve the

20  $15 million contingency.  Then we have this August 25th

21  letter signed by Ted Shaftner.

22          In between, based on the evidence presented

23  by all the witnesses, the process was after the CPP Council

24  had moved to the Department of Treasury to the Investment

25  Committee of the Department of Treasury for a vote and then

Page 73

1    it would move -- and then if it was approved as it was

2    provisionally in August with the $10 million contingency

3    then it would come back to the bank.  So we have, A, they

4    could have discussed what the basis of that decision-making

5    process.  As we have set forth, without going into the Rule

6    29, Your Honor, we would think the evidence has shown that

7    statements made at that point, prior to June 10th --

8    actually, everything prior to June 30th when Mr. Levin made

9    his investment were statements about a potential investor

10   with lots of contingencies about this DVFG transaction that

11   NOVA Financial Holdings was --

12              THE COURT:  Well, let me just short cut this

13   a little bit.  By your argument it sounds as though there

14   would be just volumes of names that would be eligible for a

15   missing witness instruction because they didn't testify.

16              MR. FULLER:  No, I -- respectfully, Your

17   Honor, it's -- we've looked through volumes of names in this

18   process.  All of the members of the FDIC and the federal --

19   the Fed, all of these -- what we've now learned is that

20   those people in the room of the Investment Committee were

21   the ones who made decisions and made -- they are the ones

22   who weighed the evidence, they are the ones who could

23   explain why in December NOVA Bank raised the capital they

24   were told they needed to raise and still didn't get

25   approval.  Those are the decision who now, out of all of

1    them, of various regulators and different bodies, we now

2    know those are the decision makers and those were identified

3    -- they haven't actually even been named in the course of

4    these proceedings, but they are now the ones that we need to

5    know what they were (indiscernible).

6                    THE COURT:  But if the Court follows the

7    instruction of the Circuit, the standard pattern

8    instruction, it all goes back to the ability of a statement

9    to defraud or mislead, the misrepresentation in actuality by

10   the declarant or the Defendant in this case.  It's all about

11   that being material.  And if that's the case then --

12                    I apologize but it is after 5:00.  All right.

13   Just a second.  This is Ms. Jones.  I don't want to get

14   divorced.

15        (Pause)

16                    THE COURT:  Thank you, Counsel, very much.  I

17   stay married now for another day.

18                    MR. FULLER:  So, Your Honor, I think the sum

19   total is one of the absolutely definitive pieces of evidence

20   that someone from the investment council could have given

21   the jury is that the TARP process was effectively shut down

22   by the middle of December and, in fact, the TARP process was

23   winding down or was shutdown at the time they considered

24   NOVA's application and they had made, for example, a

25   decision to give out no more TARP funds then we're at a

Page 75

1    position that any of the allegedly false statements were

2    incapable of affecting that decision and that's something

3    that we've, in the various motions to dismiss, we discussed

4    at length.  We submitted a (indiscernible) TARP report which

5    laid out the history and the timeline of these big banks and

6    small banks.  That is one piece of evidence which would have

7    been critical in terms of charging and --

8                    THE COURT:  All right.  Hindsight is

9    extremely valuable in this case, probably more so than in

10   any other case I've ever tried.  But again, let me hear from

11   Mr. Ignall.

12                   MR. IGNALL:  I think this is pretty straight

13   forward.  There's no basis for a missing witness

14   instruction.  One, we're just talking about speculation but

15   more important, this isn't a case where the Government has

16   access to witnesses that the Defense doesn't and has

17   prevented the Defense from getting access to therefore the

18   Court should instruct the jury that that witness was likely

19   to give unfavorable testimony.  I think that strains

20   (indiscernible) in this --

21                   THE COURT:  But what if it was a situation

22   where I was an eyewitness to a crime of several and the one

23   who was missing was really key and critical but the

24   Government didn't do anything to facilitate that person's

25   absence, the person just failed to appear in Court.  They

Page 76

1    still would be entitled to a missing witness instruction,

2    would they not?

3                    MR. IGNALL:  They would not be entitled to

4    that, no.

5                    THE COURT:  Why?

6                    MR. IGNALL:  It has to be because of the

7    Government otherwise there's just simply not a witness

8    there.  You can't draw an inference against the Government

9    without some conduct by the Government preventing the

10   Defense from calling that witness.

11                   THE COURT:  Well, thank you.  I think that

12   takes care of that.

13                   MR. IGNALL:  Yes.

14                   THE COURT:  Counsel, you disagree?

15                   MR. FULLER:  I guess I think there has to be

16   some sort of -- it makes it sound as though some sort of

17   affirmative act in which the Government has withheld the

18   witness.  I don't think that that's the requirement.  I

19   think reading the charge, you know, which is based on 4.16,

20   it could have given important testimony, that the Government

21   could have called.

22                   Again, to me, it doesn't seem like there's

23   need to be an affirmative act in which they were withheld.

24   As we've argued, there's a space of knowledge.  Could

25   Mr. Hartline potentially have discovered these people and

Page 77

1    all came to the Court?  Yes, perhaps.  There's been

2    voluminous production all along.  We've been told about all

3    of these potential decision makers.  It's now been

4    crystallized who the decision makers are.

5                    THE COURT:  Where is the missing witness

6    instruction?

7                    MR. FULLER:  I have another copy if -- I

8    think we handed it up earlier.

9                    THE COURT:  All right.  If you find the

10   Government could have called.  All right.  So the person --

11   the hypo that I gave, the guy just left so the Government

12   could not have called him.  That's what Mr. Ignall is

13   pointing out.

14                   MR. IGNALL:  Well, no, that's part of it but

15   if you just look at the -- even in the body of the

16   instruction, it has to be a witness that's available to the

17   Government and not available to the Defense and indeed the

18   defense has never asked us to try and track down the names

19   of the Investment Committee.  They've even acknowledge that

20   they are aware of that.  So there's certainly no reason to

21   draw an adverse inference and I think (indiscernible).

22                   THE COURT:  I agree.  I'm not going to give

23   it.

24                   MR. IGNALL:  Okay.

25                   THE COURT:  You have an exception.

Page 78

```
 1                    MR. FULLER:  Thank you.

 2                    THE COURT:  All right.

 3                    MR. SCHWARTZ:  Okay.  Then we can hopefully

 4     proceed more quickly with the rest.

 5                    THE COURT:  Sure.

 6                    MR. SCHWARTZ:  Where we left off was --

 7                    MR. FULLER:  Are we --

 8                    MR. SCHWARTZ:  Oh, I'm sorry.  One more.

 9     Sorry.  The last one was the proposed instruction by the

10     Defense, the theory of defense, lack of intent/mistake which

11     is the last page of the packet we handed up to you this

12     afternoon.

13                    THE COURT:  Which one was this, Counsel?

14                    MR. SCHWARTZ:  I'm sorry, sir.  It's in the

15     smaller packet with the purple and the red writing that we

16     handed up.

17                    THE COURT:  Yes, theory of defense?

18                    MR. SCHWARTZ:  Yes.

19                    THE COURT:  All right.

20                    MR. SCHWARTZ:  That's the last one.

21                    THE COURT:  All right.  Go ahead.

22                    MR. SCHWARTZ:  Your Honor, it lays out our

23     theory of the defense.  It's adopted or modeled after the

24     Third Circuit criminal jury instruction comment.  I don't

25     want to make Mr. Ignall's argument for him but I know what
```

Page 79

1    he's going to say so I defer to Mr. Ignall to finish this

2    story.  I mean, it clearly lays out just like the

3    instructions generally get to lay out what the Government

4    has to prove and they have that luxury, so to speak, of

5    getting a road map, we're trying to give a road map back to

6    the jurors saying, okay, the Government says if we've met

7    all of these elements we win and we're saying if we rebut

8    these elements by showing a lack of intent or mistake, we

9    win.  And that's what we're trying to do.  We're trying to

10   let the Judge -- let the Court instruct the jury that

11   there's a theory and a counter theory and here they are.

12   That's our purpose in offering that.

13                THE COURT:  Now, is this a pattern

14   instruction?

15                MR. SCHWARTZ:  It's modeled after a comment,

16   Your Honor.  It's not a pattern.

17                THE COURT:  In 8.01?

18                MR. SCHWARTZ:  Yes.

19                THE COURT:  Mr. Ignall?

20                MR. IGNALL:  One, I think it's inaccurate for

21   the same reasons we talked about capital before because it

22   would indicate to the jury that if the Defendants have a

23   mistake about capital then they're not guilty and I think

24   that, A, doesn't address the wire fraud, it doesn't address

25   the bank fraud, but it also misstates the crux of the

Page 80

1    conspiracy and of the TARP fraud.  More importantly, if the

2    Court were to look at Sussman, the case cited in the

3    proposed instruction.

4              THE COURT:  Yes.

5              MR. IGNALL:  And I wish I had printed this

6    out.  Unfortunately, I just wrote it down on my phone here.

7    Sussman talks about the limitations on giving this

8    instruction and says "a Defendant is not entitled to an

9    additional narrative of his version of the facts even though

10   such a narrative is, in one sense of the phrase, a theory of

11   the defense".  And then it cites -- in an Eleventh Circuit

12   case it says, "the district court was correct in finding

13   that the requested jury charge was partisan and that it

14   aspired to place the Defendant's desired factual findings

15   into the mouth of the Court."

16              I think the Court's instructions otherwise

17   cover the elements of the offense and the intent to defraud

18   and I think this is both an incorrect statement of the law

19   and unnecessary in that it asks the Court simply to make an

20   argument to the jury about what the Defendants are going to

21   argue and they're certainly free to argue to the jury.

22              THE COURT:  I would assume it's also a

23   request for a restatement in a different form that which is

24   going to be given to the jury and the standard instruction

25   about the crime itself.  In other words, I will say at the

Page 81

```
 1    conclusion of the reading of every statute, every defense
 2    that if the Government has not proven beyond a reasonable
 3    doubt, you have to find the Defendants not guilty.  What's
 4    the difference aside from articulating your theory of the
 5    defense in the case?
 6                    MR. SCHWARTZ:  Well, I didn't want you to ask
 7    that question.
 8                    THE COURT:  Well --
 9                    MR. SCHWARTZ:  I think the fairest conclusion
10    to this is that if there -- if the Court has already found
11    that there is no basis for a good faith instruction, this is
12    a variation on it and the accommodation is the modification
13    of Instruction 54.
14                    THE COURT:  All right.  I'm going to deny
15    with an exception.
16                    MR. SCHWARTZ:  Thank you.  Okay.  Now we can
17    go back to the (indiscernible) --
18                    THE COURT:  Okay.
19                    MR. SCHWARTZ:  -- and hopefully move faster.
20                    THE COURT:  All right.  Where we left off,
21    Your Honor, was page 25, the Government's Request No. 18,
22    the nature of the indictment.  And when everybody's there,
23    I'm happy to --
24                    THE COURT:  All right.  Which number,
25    Counsel?
```

Page 82

1              MR. SCHWARTZ:  Sir, we're on page 25,

2     Government Request No. 18.

3              THE COURT:  And none of mine that were

4     tendered have page numbers.

5              MR. IGNALL:  No, this was in the larger

6     packet that was handed up earlier today.

7              THE COURT:  It may be in chambers.

8          (Court confers with Clerk)

9              THE COURT:  I apologize.  She's going to

10    retrieve it.  I took it back to chambers.

11         (Pause)

12             THE COURT:  All right.  I'm with you now.

13    Sorry.  Thank you.  One more time, page?

14             MR. SCHWARTZ:  Sir, we're on page 25,

15    Government Request No. 18, nature of the indictment.

16             THE COURT:  All right.

17             MR. SCHWARTZ:  The reason we are asking for a

18    specific articulation as set forth in our proposed version

19    is that in Instruction 16 we're using the standard

20    instruction where you are going to say "and I'm going to

21    spell it out for you".  We think this is a slightly more

22    clean spelling out of who is charged with exactly what.

23    That's why we're offering that.

24             THE COURT:  All right.  Government?

25             MR. IGNALL:  I don't necessarily have an

Page 83

1    objection.  I just think it's more words than it needs to be

2    than our proposal.

3                     THE COURT:  So --

4                     MR. IGNALL:  As opposed to --

5                     THE COURT:  -- who struck -- who put the

6    strikethroughs in?

7                     MR. SCHWARTZ:  We did.  We put the

8    strikethroughs in and the new red stuff is ours.

9                     THE COURT:  And you're saying, Mr. Ignall,

10   that this isn't more simple?

11                     MR. IGNALL:  I thought what was struck

12   through was actually simpler.  That Count I charges both of

13   them and Count II charges both of them as opposed to --

14                     THE COURT:  Oh, I see the difference.

15                     MR. IGNALL:  Yes.

16                     THE COURT:  I see.  I'm sorry.  Okay.

17                     MR. IGNALL:  And I'm not sure why Counsel --

18   I can ask why they struck through the prefatory language

19   about the nature of the indictment.  I assume you want that

20   in there.

21                     MR. SCHWARTZ:  That's a mistake, Your Honor.

22                     MR. IGNALL:  Yes.  So I assume the first

23   paragraph is going to stay in no matter what.  We're only

24   talking --

25                     THE COURT:  When I read the jury this

Page 84

```
 1    particular instruction, they will not yet have in their
 2    hands the verdict sheet.  When I give them the verdict
 3    sheet, I'm going to go over with specificity what each
 4    person is charged with and it's going to look just like what
 5    you've tendered now as a modified version.  So if we just go
 6    ahead and go witness the Government's version without the
 7    strikethrough what you've tendered is what's going to be
 8    read to the jury when we go over the verdict sheet.
 9                  MR. SCHWARTZ:  Very well, Your Honor.
10                  THE COURT:  All right.
11                  MR. SCHWARTZ:  Okay.  So we'll take that line
12    --
13                  THE COURT:  For each defendant just like you
14    have it here.
15                  MR. SCHWARTZ:  We'll fix that line and just
16    send it back in.  Next one is Government's Request No. 19,
17    on or about.  It's agreed that we'll use the standard which
18    is the strikeout so there's no objection there.
19                  THE COURT:  All right.
20                  MR. SCHWARTZ:  Government Request No. 20,
21    venue, same.  The next issue we have, Your Honor, is
22    Government Request No. 21, indictment in the conjunctive
23    statute required proven the disjunctive.  Because of the --
24    first of all, I always found this one crazy.
25                  THE COURT:  I'm smiling because jurors just
```

Page 85

1    kind of go --

2                    MR. SCHWARTZ:  Right.

3                    THE COURT:  -- when you give this.

4                    MR. SCHWARTZ:  And if you think it's bad

5    usually, because of the issue with the (indiscernible) and

6    everything else, there was a decision --

7                    THE COURT:  Right.

8                    MR. SCHWARTZ:  -- there was a decision not to

9    hand the jurors the indictment.  Boy, give this instruction

10   without the indictment and you don't know -- my head would

11   fall off.

12                   MR. IGNALL:  As long as the Court is not

13   sending the indictment back, I don't think there's any point

14   in giving this instruction.

15                   THE COURT:  All right.  So it's out.

16                   MR. IGNALL:  Yes.

17                   MR. SCHWARTZ:  thank you.

18                   THE COURT:  Fine.

19                   MR. SCHWARTZ:  The next one, Government

20   Request No. 22 is a bit of a bone of contention,

21   respectfully.  The reason we put in the specific language

22   "committed an offense against the United States, namely

23   major fraud against the United States" is that -- we spoke

24   about this last Thursday in our reply brief.  This is a very

25   challenging indictment or set of charges because Counts I

1    and II involve a predicate and a conspiracy but then the

2    other counts, Counts III, IV, and VII involve aiding and

3    abetting.

4              And what we suggest -- what we're

5    respectfully suggesting, Your Honor, is if Your Honor

6    doesn't very clearly explain exactly what the conspiracy is

7    about because there's two people involved in each of the

8    other charges, III, IV, and VII, but it's for aiding and

9    abetting, it's going to be really super confusing and that's

10   why we wanted to ask the Court to specifically say the

11   conspiracy is about an offense the United States, namely

12   major fraud.

13             THE COURT:  But now as I was going over this

14   before, I thought that the indictment incorporated by

15   reference everything that is referred to for each count.

16             MR. IGNALL:  It does.  I think there are two

17   different things and I had made a proposal to Mr. Schwartz

18   because I do think it's potentially confusing.  If the jury

19   is not getting the indictment we might be able to clarify

20   it.

21             THE COURT:  All right.

22             MR. IGNALL:  The conspiracy as charged in the

23   indictment is a dual-prong conspiracy.  It's both a

24   conspiracy to defraud the United States, the Klein

25   conspiracy, and a conspiracy to commit an offense which is

Page 87

1    the TARP fraud.  Given that the evidence is basically

2    overlapping, I think it might be confusing, and I agree with

3    Mr. Schwartz, to charge it as a dual object.  So what we had

4    proposed is the Court could just say that it's a conspiracy

5    to defraud the United States through the TARP program.

6                      THE COURT:  Was that acceptable,

7    Mr. Schwartz?

8                      MR. SCHWARTZ:  It is and thank you.  The only

9    we kind of held off on doing that is I wanted to see where

10   we went on the Investment Committee thing first.  So that's

11   -- these are one of the dominoes.

12                     THE COURT:  All right.  So what you submit

13   will be an agreement as to No. 22?

14                     MR. SCHWARTZ:  Yes, and I'll call Mr. Ignall

15   just to get the language right.

16                     THE COURT:  All right.  Thank you.

17                     MR. SCHWARTZ:  Okay.  Government Request No.

18   23, again with the change in the language in paragraph one

19   which I'll talk with Mr. Ignall to make sure we got it

20   right.  We withdraw our striking of the language in the

21   second paragraph.  And then the next page, Your Honor, I

22   think we can replace -- actually, I think this is a good

23   clarification I would ask the Court to consider.  It's the

24   last paragraph on the second page.

25                     THE COURT:  Of 23?

```
                                                  Page 88
 1                  MR. SCHWARTZ:  Yes, sir.  It's page 33 and
 2    it's the paragraph that says "the indictment charges a
 3    conspiracy to commit" instead of two federal crimes.  I
 4    misread, Your Honor.
 5                  MR. IGNALL:  I think we should just change it
 6    to -- yes.  I think based on our agreement we should
 7    probably just take that paragraph out because this is going
 8    back to a dual object conspiracy and obviously the jury
 9    would have to agree on the same object, but now if there's
10    only one, they either agree on it or they don't.
11                  THE COURT:  Correct.
12                  MR. IGNALL:  So I we should probably just
13    take that out makes probably --
14                  THE COURT:  Okay.  Thank you.
15                  MR. SCHWARTZ:  -- makes the most sense.
16                  MR. SCHWARTZ:  No. 24 we can take care of now
17    with the changed language and the second paragraph that
18    we've offered -- we've asked to strike will no longer keep
19    in.  No. 25, Your Honor, I don't know if the language we've
20    proposed now is kind of consistent with the compromise that
21    was proposed in paragraph one that the objective was to
22    defraud TARP for the purpose of obtaining money.
23                  MR. IGNALL:  We can talk about that but I
24    think we -- we'll agree to something along the lines of what
25    we suggested in general.
```

```
                                                       Page 89
 1                    MR. SCHWARTZ:  All right.  And then we will
 2      not try to remove the last paragraph.  No. 26, Your Honor,
 3      we've agreed to return to the model jury instruction.
 4      Actually, I'm sorry.
 5                    What did we agree?  Are we going to strike
 6      that or did we --
 7                    MR. IGNALL:  No, I think you said you were --
 8                    MR. SCHWARTZ:  Right.  We were
 9      (indiscernible).
10                    MR. IGNALL:  And they've agreed to the one
11      proposed by the Government which is the pattern instruction.
12                    MR. SCHWARTZ:  I was just writing fast.
13      Sorry.  Success immaterial, No. 27, Your Honor.  We would
14      ask the Court to consider this request.  Now we can strike
15      this.  It's just and the reason -- I'm sorry, David.
16                    MR. IGNALL:  No, go ahead.
17                    MR. SCHWARTZ:  The reason is, Your Honor,
18      just like they're -- I think this calls too much attention
19      to the fact that success is immaterial.  There's no reason
20      that the jury should be particularly -- have that called to
21      its attention.  To borrow a phrase from the Government, the
22      Government can argue that in closing argument.  We can argue
23      and it can say success is not material.  It doesn't need the
24      aid of an instruction from the Court to make its closing
25      argument.
```

1            MR. IGNALL:  Your Honor, this is the law.

2    It's in the pattern, it's Hornbook law, and without that

3    then the jury can be left with they didn't get the money

4    therefore they're not guilty.  So I think this has to be

5    included in the instructions.

6            THE COURT:  I agree.

7            MR. SCHWARTZ:  Okay.  We're at No. 28, Your

8    Honor.  The period and duration is acceptable to the

9    Defense.  Government's Request No. 29.  That's going to come

10   in.

11           MR. IGNALL:  That's fine.  That's fine.

12           MR. SCHWARTZ:  I'm sorry.  Can you address

13   this because I think I messed up my notes?

14           MR. IGNALL:  I think you agreed to it.

15           MR. SCHWARTZ:  Yes, that's what I have.  So

16   29 is coming in.

17           MR. IGNALL:  Yes.

18           MR. SCHWARTZ:  Okay.  So Government 29 is

19   coming in.  Sorry.  My notes are messed up.  Government 30,

20   we're going to change that because it's now -- it has two

21   objects.  We're going to change that to the one object

22   language and I'll send that to Mr. Ignall.

23           THE COURT:  Okay.

24           MR. SCHWARTZ:  No. 31, we're agreeing to

25   this.  No. 32, Your Honor, in light of the Court's ruling on

Page 91

1   a proposed instruction, we would just ask that you allow us

2   an exception on this --

3                   THE COURT:  Absolutely.

4                   MR. SCHWARTZ:  -- and have the language back

5   in.  Then there was another issue on the second page of

6   that, Your Honor, where the Government --

7                   I'm sorry.  So are we just cutting all or

8   just using the (indiscernible)?

9                   Your Honor, this is a question that we're

10  honestly giving to the Court because I don't know what the

11  best answer is.  There have been a lot of numbers thrown

12  around in this case.

13                  THE COURT:  Now, this is which one?

14                  MR. SCHWARTZ:  I'm sorry.  It's page 44, Your

15  Honor, and it's just the issue of we propose language that

16  the Defendants are charged with, and we can collapse it into

17  one person, devising a scheme to defraud or obtain $13.4

18  million.  The reason we put in $13.4 million is as opposed

19  to just more than $1 million is there's been so many numbers

20  about so many different loans and transactions put into this

21  case that this is a way to direct the jury into what they've

22  got to decide the fraudulent scheme is about.

23                  THE COURT:  So you're saying 13,472?

24                  MR. SCHWARTZ:  Yes, Your Honor.

25                  THE COURT:  13,472,000 rather.

Page 92

1                MR. SCHWARTZ:  Yes, rather than just more

2      than a million dollars.  We think it makes sense.

3                MR. IGNALL:  I think that unnecessarily

4      restricts the Government or raises a burden of proof that we

5      don't have.  The elements are we have to show that the value

6      is more than a million dollars but if it can't be that, if

7      they tried to get 13,572,000 then they're not guilty or some

8      number lower than that.  In fraud cases, I'm not aware of

9      any time that we put a specific number in there, just --

10               THE COURT:  Not 'til we get to restitution,

11     if necessary.

12               MR. IGNALL:  Well, and restitution, but in

13     terms of the jury instructions and I think that would make

14     the jury think they have to pick -- that that number is the

15     only number they tried to get as opposed to just some number

16     above a million dollars.

17               THE COURT:  All right.  Counsel, I'm going to

18     deny the Defense request to modify this but I will not

19     preclude the Defendant from arguing that with specificity.

20               MR. SCHWARTZ:  Very well, Your Honor.  So

21     we'll return to the stricken language with the Court's

22     guidance or at the Court's instruction.  Okay.  Government

23     Request No. 33, Your Honor.

24               THE COURT:  This is 88 pages in small font.

25     How long is it going to take me to charge this jury?

Page 93

1          MR. SCHWARTZ:  They can cut any counts out

2     they want, Judge.  I'm happy.  I'm happy.

3          MR. IGNALL:  It may be that the best plan

4     might be to argue tomorrow and charge the jury on Wednesday.

5     I'm just not sure -- because I was thinking about that, too,

6     that unless the jury wants to still 'til --

7          THE COURT:  I've never charged a jury with

8     this much information, never.  Not 88 pages, small font.

9          MR. IGNALL:  Well, it's not quite as long as

10    that because there's strikeouts and additions in there.

11          THE COURT:  Right.

12          MR. IGNALL:  It will still be long, don't get

13    me wrong, but it won't be quite that long.

14          THE COURT:  Well, let's see where we get.  I

15    certainly would like to get this case to the jury by

16    tomorrow afternoon if I could.  If we start tomorrow morning

17    at 10:00 and we do arguments -- how long by the way, do you

18    think?

19          MR. IGNALL:  I don't know.  I would say

20    somewhere in the area of an hour to an hour-and-a-half for

21    the initial argument and probably --

22          THE COURT:  In that case, it may well be that

23    they get charged on Wednesday because each one of you and

24    then you have rebuttal to each Defendant, it may well be all

25    day tomorrow just you folks.

Page 94

1                    MR. IGNALL:  Yes.

2                    THE COURT:  All right.

3                    MR. SCHWARTZ:  So, I'm sorry, so I understand

4      it, Your Honor, so I can relay it to my colleague, there's

5      going to be argument and then charge?

6                    THE COURT:  Yes.

7                    MR. SCHWARTZ:  Okay.

8                    THE COURT:  I'm sorry.  Say that again.

9                    MR. SCHWARTZ:  I've always worked in a system

10     where it's charge than argument so today -- tomorrow is

11     going to flip maybe?

12                   THE COURT:  Yes.  And I've never worked in a

13     system where it's that way.

14                   MR. SCHWARTZ:  That's fine.  I mean, it's

15     just geography.

16                   THE COURT:  Because to me it doesn't mean

17     anything to them.

18                   MR. SCHWARTZ:  Okay.  I'm not saying it's not

19     sensible.  I just want to make sure I tell Mr. Engle his

20     closing, what to anticipate.

21                   THE COURT:  He should know.  He's over here -

22     -

23                   MR. SCHWARTZ:  Okay.

24                   THE COURT:  That's what we do over here all

25     the time, yes.

Page 95

1           MR. SCHWARTZ:  Okay.  In that case, do you
2    want to finish this during breaks tomorrow?  I don't want to
3    keep the Court later than or the staff later than necessary.
4           MR. IGNALL:  I think we should at least go
5    through the ones where we object so that (indiscernible).
6           THE COURT:  Yes, let's do that.  Because I
7    have to be at Penn.
8           MR. SCHWARTZ:  Okay.
9           THE COURT:  But if you could go through the
10   ones were you object, frankly, the rest of them, if you say
11   so, I say so.
12          MR. SCHWARTZ:  Okay.
13          MR. IGNALL:  Yes, why don't we just go
14   through those and then that way we can tailor the argument
15   appropriately.
16          THE COURT:  Okay.  Great.
17          MR. SCHWARTZ:  Okay.  The next one where we
18   object is in fact the next one, Your Honor.  It's -- an in
19   particular it's the second page.
20          THE COURT:  Mr. Schwartz, thank you very
21   much.  I want to make sure that we're on the same page here
22   in terms of argument and closing.  I let Counsel give their
23   closing argument and then I instruct them in the law.
24          MR. SCHWARTZ:  Okay.  I got it.
25          THE COURT:  Okay.  All right.

Page 96

1               MR. SCHWARTZ:  I got it.  I just was under

2      the impression for some reason you were going to read this

3      first.

4               THE COURT:  No.

5               MR. SCHWARTZ:  Okay.  That's what makes me --

6               THE COURT:  Okay.

7               MR. SCHWARTZ:  Thank you.  Sorry.

8               THE COURT:  Some jurisdictions but not here.

9               MR. SCHWARTZ:  Okay.

10              THE COURT:  All right.  So now let's see if

11     we can, say, get the rest of them in 15 minutes.

12              MR. SCHWARTZ:  Okay.

13              MR. IGNALL:  Yes, I think we're just focusing

14     on the ones where there's an objection.

15              MR. SCHWARTZ:  Okay.  The objection -- the

16     next problem is page 2 of Government Request 33, Your Honor.

17     We've relied on recent Supreme Court decisions about what is

18     -- when an opinion about something can be false or not and

19     we believe this language, although cumbersome, accurately

20     reflects the Supreme Court law about false statements from

21     last year.  And so in particular, we're talking about page

22     47, Your Honor, the middle paragraph about a statement,

23     representation, claim, or document.  That paragraph and the

24     language we've put in based on the cases we've cited.

25              THE COURT:  So are you attempting to work

Page 97

1    this one out or are you --

2                    MR. SCHWARTZ:  No, we're stuck.

3                    MR. IGNALL:  I think we've worked out one

4    that the first added language in I think it's the fourth

5    paragraph under scheme to defraud, I believe Mr. Schwartz

6    has agreed to withdraw.

7                    MR. SCHWARTZ:  That's correct.

8                    MR. IGNALL:  So we're talking about the

9    language that he wants to add after statement,

10   representation, claim, or document is false.

11                   THE COURT:  Okay.

12                   MR. IGNALL:  I don't think that's needed in

13   the pattern.  I don't think it's actually an accurate

14   statement of the law.  I think it's potentially confusing,

15   that the two cases he cites, I think, are not on point.  In

16   fact, the Omnicare case as I read it didn't involve fraud at

17   all.  And I think this actually is subsumed in the agreement

18   we made in terms of intent to defraud that they can say it's

19   a misunderstanding because I don't think we have a case here

20   where there's an opinion and an opinion can be a fact based

21   on, you know, the circumstances of the opinion.

22                   THE COURT:  And the objectively false and

23   subjectively false to me would confuse a jury like you can't

24   imagine.  Let's go with the pattern instruction.  You have

25   an exception.

```
                                                   Page 98
 1                    MR. SCHWARTZ:  Thank you.  We can take care
 2    of this.
 3                    MR. IGNALL:  And then -- okay.
 4                    MR. SCHWARTZ:  Next one, No. 44, was an
 5    objection but you had took care of that with the Litvak
 6    issue so that won't go back.  The next one we have a problem
 7    with, Your Honor, is 35 and it's about knowledge and intent,
 8    and we believe willfully is -- should appropriately be
 9    inserted in this.
10                    MR. IGNALL:  May I have one moment, Your
11    Honor?
12                    THE COURT:  Surely.
13                    MR. IGNALL:  One second.
14        (Pause)
15                    MR. IGNALL:  I just want to be clear.  I
16    think I -- willfully does not appear in the statute which is
17    why we objected to that.  I just want to make sure we're
18    clear because I think I may have put the word willfully in
19    the element when we went through the beginning of that.  So
20    if I did that, that was unintentional.  Whatever the Court
21    rules on, I think we just have to make sure it matches that.
22                    THE COURT:  Is consistent, yes.  Listen
23    again, we can go by the standard pattern instruction.
24                    MR. IGNALL:  The statute itself, just like
25    with the (indiscernible), does not include "willfully" and
```

1   that's why we say it doesn't apply here.  In Litvak the

2   Court did instruct on "willfully".  I spoke to the

3   prosecutor about that and apparently there was an agreement

4   to that although I don't believe that that is dispositive

5   but just to let the Court that in with that "willfully" was

6   included.  But I don't see it in the statute.  It's not in

7   the (indiscernible) statute which are, you know,

8   substantially similar.

9           THE COURT:  It's not unless it's a specific

10   intent crime.

11           MR. IGNALL:  Well, no, but the statute says

12   "whoever knowingly executes" and if we look at -- there's no

13   pattern charge on the 1031.  That's the -- so we have to --

14   we're doing a lot of this by analogy because the language is

15   very similar in other cases that say the Court should

16   consider the mail and wire fraud.  The mail and wire fraud

17   does not include "willfully" either so that's why I don't

18   think it's appropriate to include "willfully" here and

19   adding an element that doesn't otherwise exist.

20           THE COURT:  Counsel?  Ms. Kramer?

21           MS. KRAMER:  So with regard to the fact that

22   the statutory language does not include the words "willful",

23   however there is case law where even though it doesn't say

24   it verbatim "willfully", courts still read willfully into

25   statutes regarding fraud.  For example, we pulled a case

Page 100

1    where the Court instructed on "willfully" for bank fraud,

2    which is 18 U.S.C. 1344, even though there's no actual word

3    "willful" used in the statute.

4                    THE COURT:  United States Supreme Court or

5    which circuit is this circuit?

6                    MS. KRAMER:  It's the Eastern District of

7    Pennsylvania, United States v. Mezvinsky.  For citation

8    purposes, it's 206 F.2d 661.  And in that case the Court --

9                    THE COURT:  Mezvinsky.

10                   MS. KRAMER:  Mezvinsky.

11                   THE COURT:  E. Mezvinsky.

12                   MR. SCHWARTZ:  More known to the locals than

13   the out-of-towners.

14                   MS. KRAMER:  Yes.  But in that case the Court

15   was adopting the federal model jury instructions and was

16   taking from Judge Sand and how he incorporated the use of

17   "willful" when trying to instruct the jury on the statute

18   for bank fraud, 13.4.

19                   THE COURT:  All right.  Who was the judge in

20   this?

21                   MR. SCHWARTZ:  In Mezvinsky?

22                   THE COURT:  The trial, yes.

23                   MR. SCHWARTZ:  Judge Dalzell.

24                   THE COURT:  All right.  And that was -- there

25   was no appeal on that issue?

Page 101

```
 1                    MR. SCHWARTZ:  Not to my knowledge, Your
 2    Honor, no.
 3                    THE COURT:  Mr. Ignall?
 4                    MR. IGNALL:  If we could, I don't see why the
 5    Court should read language into a statute that isn't there,
 6    but if we could, I don't want to take up too much more of
 7    the Court's time, I can try and write a paragraph or two and
 8    send it to Counsel later tonight if I can do any research on
 9    that.
10                    THE COURT:  Okay.
11                    MR. SCHWARTZ:  Sounds good.
12                    THE COURT:  All right.  Great.  Thank you.
13                    MR. SCHWARTZ:  Now I forget what page we're
14    on.  Sorry.
15                    MR. IGNALL:  We're at -- 35 is where you
16    were.
17                    MR. SCHWARTZ:  37, Your Honor, is the next
18    challenge and disagreement point.  Again, the reason we
19    spell it out here is the Court isn't sending the indictment
20    back but, again, if the Court is now going to send a verdict
21    sheet that looks like 37, we can withdraw it.
22                    THE COURT:  All right.  Okay.
23                    MR. IGNALL:  40, I think we've already
24    resolved.
25                    MR. SCHWARTZ:  40 -- yes, 40 we've resolved
```

Page 102

1  but 39 is sticking point, respectfully, Your Honor.  We

2  believe that based on Third Circuit case law that the phrase

3  -- and especially in the case in particular United States v.

4  Curran which we've cited -- in order to convict -- the

5  phrase "in order to convict under Section 1001, concealment

6  charge, the Government must show a defendant has a legal

7  duty to disclose that fact at the time he was alleged of

8  concealment."

9          And the Government has gone from an omission

10 and commission case to what is described most recently in

11 its Rule 29 motion as a concealment case and I believe that

12 this addresses the issue of concealment most succinctly.

13 And it's a very dispositive issue for the jury.  If they

14 have a legal duty, it's a different story.  So there's got

15 to be a determination on that.

16          MR. IGNALL:  I think this is a little

17 confusing.  I think the question here is did the Defendants

18 make a false statement or representation and that can be a

19 half-truth because I think with the 1001, the way we charged

20 it, I don't think we charged it under the concealment by

21 means of trick, scheme, or device.  So even though that

22 might be something we would like to prove to the jury, I

23 don't think based on how we charged it we can do that.  So I

24 think we have to prove that there was a false statement that

25 could also be a half-truth, but I think with respect to the

Page 103

1    1001 count, I don't think we can make the concealment

2    argument that we can make with respect to the fraud or the

3    conspiracy in all candor.

4            MR. SCHWARTZ:  Okay.  I mean, I'm just

5    relying on what the Rule 29 -- the Government's Rule 29

6    response was when we talked about this being a concealment

7    case which we're trying to address.

8            MR. IGNALL:  Which it is.  I'm saying with

9    respect to the 1001 counts, only with respect to the 1001

10   counts.  I think half-truths, concealments, omissions are

11   certainly part of the conspiracy and part of the fraud.  But

12   I think the way we've charged the 1001, we have to prove the

13   Defendant made a statement or representation and that may be

14   false or a half-truth or someway untrue, but we have to show

15   that the Defendant made a false statement.

16           MR. SCHWARTZ:  The Defense's problem with

17   this, Your Honor, respectfully is Count I, I'm sorry, Count

18   II and Count III and IV are (indiscernible) and anything

19   that is going to be said to the jury about Count II is going

20   to wash over into their minds about Count III and IV.  I

21   can't urge strongly enough the fact that there's got to be

22   an election at some point and we've got to get rid of one of

23   those counts because they're the exact same crime charged.

24   And so if the exact same crime is being charged in Count II

25   as being charged in Count III and IV then the exact same

1    instruction has to come in for both.  That's my argument.

2    They're just -- they're the same crime being charged more

3    than once.

4                    MR. IGNALL:  They're different crimes, they

5    have different elements, and that's why we have to charge

6    the jury differently on them.  There may be overlapping

7    evidence as is true in pretty much every case, but I think

8    the Court has to allow the jury to follow the instructions

9    and charge them separately as to separate crimes.

10                   THE COURT:  All right.  Your request is

11   denied.

12                   MR. SCHWARTZ:  Very well.  Okay.  We'll,

13   based on the Court's prior ruling, just ask for an

14   exception.

15                   THE COURT:  Yes, sir.

16                   MR. SCHWARTZ:  Okay.  42, again, it's the

17   "willfully" issue for making false statements, Counts III

18   and IV.

19                   MR. IGNALL:  No, I believe "willfully" is an

20   element --

21                   MR. SCHWARTZ:  Yes.  Okay.

22                   MR. IGNALL:  -- of Counts III and IV.

23                   MR. SCHWARTZ:  All right.

24                   MR. IGNALL:  That is in the statute.

25                   MR. FULLER:  Your Honor, I think just in

Page 105

1    light of the -- with the issue with 43, pursuant to the

2    FDIC, I'm just trying to --

3              There's a disagreement to 43 and we're trying

4    to identify what the disagreement was.

5              MR. SCHWARTZ:  Oh, the disagreement was that

6    we were offering a more wholesome definition of "knowingly

7    and willfully" following the model jury instructions rather

8    than the more circumscribed version that the Government --

9              MR. IGNALL:  Your Honor, I think we should

10   make it clear that as long as it's directed to an agency of

11   the United States then it's within the jurisdictional ambit

12   of 1001.  And if goes to the FDIC and then to the Treasury,

13   it doesn't matter as opposed to once it's directed towards

14   the Treasury.  I just wanted to make that clear to the jury.

15             THE COURT:  Do you disagree with that?

16             MR. SCHWARTZ:  I don't disagree with it.  I

17   think the better we can explain these different -- there's

18   willfully and knowingly and they're two different things.

19        (Counsel confers)

20             MR. IGNALL:  As to 42, I think the Court

21   should give the pattern, if the Defendant wants, the pattern

22   instructions to knowingly and willfully with respect to

23   Counts III and IV.  I think that's appropriate.

24             THE COURT:  I agree.

25             MR. SCHWARTZ:  Okay.  Then we'll work that

Page 106

1    and we'll put that together.  Okay.  Sorry about that.  My

2    mistake by the number I articulated.  Count 43, again, ask

3    for an exception because of the Litvak issue.

4                     Is that right?

5                     MR. IGNALL:  Yes.

6                     MR. SCHWARTZ:  Yes.  I mean, we know how Your

7    Honor will rule, but we would ask for an exception on it.

8                     THE COURT: Yes, sir.

9                     MR. SCHWARTZ:  Thank you.  Count 44, Your

10   Honor, spoke to the Government about this.  My issue is the

11   definition of aiding and abetting.  We would ask that the

12   language that's proposed where it says "Barry Bekkedam

13   knowingly did some act for the purpose of aiding and

14   abetting."  What we'd propose is putting in language that

15   tracks 18 U.S.C. Section 2 which includes commanding,

16   inducing, procuring, or willfully causing.

17                     I think the reason for doing that, Your

18   Honor, is that it shows that there has to be a more

19   affirmative act particularly in light of the fact that we've

20   got a conspiracy for some counts which can be a passive

21   crime essentially which is just joining the agreement and

22   somebody else doing something bad.  Here we want to make as

23   strong a distinction as possible and track the language of

24   the statute for 18 U.S.C. Section 2 which talks about not

25   just assisting but commanding, inducing, procuring.  Those

1   things I think make it different.  That tells the jury that

2   this is a different kind of crime, aiding and abetting is a

3   different kind of crime from conspiracy and helps

4   distinguish the counts.

5              MR. IGNALL:  It's in the pattern instruction

6   but I don't object.  The statute says "aids, abets,

7   counsels, commands, induces, or procures".  So if we want to

8   track that language.  I'm not sure why the pattern doesn't

9   use that exact language but I'm fine with using the --

10             THE COURT:  If you agree with it, fine with

11  me.

12             MR. SCHWARTZ:  Okay.  I'll put it in and run

13  it by Mr. Ignall.  Next one is 45, it's the issue of

14  Pinkerton liability, Your Honor.  There's a fundamental

15  disagreement here about the applicability of Pinkerton to

16  this.  I don't know that we can say that the other crimes

17  charged were substantially foreseeable or that they were --

18  the subsequent crimes were foreseeable crimes.  What they're

19  saying here is that Mr. Bekkedam can be found guilty of the

20  other crimes because they were part of the conspiracy and I

21  don't think that works for this -- for the facts as they've

22  been presented and it would unfairly drive the jury towards

23  a conviction under Pinkerton liability based on the facts

24  presented.  Mr. Fuller is much more articulate than I am.

25             MR. FULLER:  No, I don't have much, but I do

Page 108

 1    think under the facts as we've discussed, yes, there is a
 2    separation here as opposed to someone who is sort of a
 3    casual backseat or riding along in the car of the conspiracy
 4    here.  Under these facts we have very separate acts and we
 5    do think there is separation here.
 6                    MR. SCHWARTZ:  Yes, we don't think the facts
 7    justify a Pinkerton instruction essentially.
 8                    THE COURT:  Let me ask, Mr. Ignall, what's
 9    your position here?
10                    MR. IGNALL:  My position is there is a
11    conspiracy charge.  I think this is an appropriate statement
12    of law.  It's from the pattern.  If the jurors were to find
13    that there was a conspiracy and that there are acts in
14    particular to Counts III and IV, if there are false
15    statements that Mr. Hartline made that were in furtherance
16    of the conspiracy and that were reasonably foreseeable to
17    Mr. Bekkedam's part of that conspiracy then he's
18    substantively liable for those acts.
19                    I think it's basically Hornbook law and in
20    fact the Pinkerton instruction can be appropriate even if
21    there isn't a conspiracy charge, but there is one here, and
22    certainly these -- Counts III and IV are subsumed -- the
23    underlying acts are included in Count I.  So I think it's an
24    appropriate instruction.  The jury can weigh the evidence
25    and decide if these acts were in furtherance and were

Page 109

1    foreseeable enough.

2                    THE COURT:  All right.  As long as the object

3    of the conspiracy is laid out with specificity then I'm

4    going to go ahead and go with the standard pattern

5    instructions.

6                    MR. IGNALL:  Thank you.

7                    MR. SCHWARTZ:  All right.  Thank you, Your

8    Honor.  Next object of disagreement is Government Request

9    46.  The reason we ask to lay this out more specifically and

10   articulate exactly what the transmissions are is because, as

11   we've indicated, A, there are two wire transmissions and, B,

12   we don't believe -- as Mr. Duncan said, we don't believe

13   that the wire transmission articulated in Count VI was

14   introduced into evidence and therefore the jury has to

15   measure that very carefully and this is a way for them to do

16   that.

17                   MR. IGNALL:  Your Honor, let me talk to

18   Mr. Schwartz about that because I think (indiscernible) in

19   the context of the verdict sheet might cover it but maybe we

20   can just add (indiscernible) Count V describes this and

21   Count VI describes that.  I think we can come to an

22   agreement on that.

23                   MR. SCHWARTZ:  Okay.  We'll work on that.

24                   THE COURT:  All right.  Great.

25                   MR. SCHWARTZ:  The same issue, Mr. Ignall and

Page 110

```
 1    I will work on for Government Request No. 48 then.  Jumping

 2    way ahead to Government Request No. 50.  It's about Count

 3    VII.  Again, the reason we ask to lay out the different

 4    facts of Count VII is that the indictment is not going back

 5    to the jury and there are a number of facts alleged in Count

 6    VII and Mr. Bekkedam is only associated with one of them.

 7    So since they're not going to see the indictment, I think

 8    this is the best way for them to evaluate whether in fact

 9    Mr. Bekkedam aided or abetted the bank fraud charge.

10              MR. IGNALL:  I'm not sure why these can't be

11    collapsed and the Court will instruct the jury to consider

12    each Defendant separately and different theory of liability.

13              THE COURT:  Again, I agree with the

14    Government on that one.

15              MR. SCHWARTZ:  Okay.  The last one, I think,

16    is No. 54.  I think we've addressed that with regard to

17    adding the phrase "not through misunderstanding" and I think

18    that's it.  Sorry for the time, Your Honor.

19              MR. IGNALL:  All right.  Thank you.  So I'll

20    talk to Mr. Schwartz about a couple of those things and I'll

21    draft --

22              MR. SCHWARTZ:  (Indiscernible).

23              MR. IGNALL:  Pardon?

24              MR. SCHWARTZ:  I was going to take a shot at

25    drafting it.
```

Page 111

1                    MR. IGNALL:  No, no, I said I'll talk to you

2      about it.

3                    MR. SCHWARTZ:  Oh.

4                    MR. IGNALL:  But I was going to draft a

5      letter about "willfully" just because I think that's the

6      only legal issue left for the Court to decide.

7                    THE COURT:  Okay.

8                    MR. SCHWARTZ:  Okay.

9                    THE COURT:  Thank you very, very much.

10                    MR. SCHWARTZ:  Thank you, Your Honor.

11                    MR. IGNALL:  Thank you, Your Honor.

12       (Proceedings concluded at 5:52 p.m.)

13                          * * * * * *

14

15

16

17

18

19

20

21

22

23

24

25

Page 112

1                    C E R T I F I C A T I O N

2

3    I, Debra McCostlin, certify that the foregoing transcript is

4    a true and accurate record of the proceedings.

5

6    _____

7    Debra C. McCostlin

8

9

10

11   Date:  May 26, 2016

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| & |
| --- |

**&**   1:17

| 0 |
| --- |

**00548**   1:2

| 1 |
| --- |

**1**   18:19,19 19:20
  20:12 91:19
**1-888-777-6690**   1:25
**1.31**   13:7
**10**   10:16 73:2
**10/19/2015**   17:22
**100**   5:22 12:3
**1001**   50:18 54:21
  102:5,19 103:1,9,9
  103:12 105:12
**1031**   50:18 56:3
  62:15 99:13
**104**   8:18
**10:00**   93:17
**10th**   1:14 69:7 72:18
  73:7
**11**   23:21
**12**   24:11
**123**   1:21
**1250**   1:12
**12505**   1:18
**12:12**   1:5
**12:53**   32:1
**12th**   17:19
**13,472**   91:23
**13,472,000**   91:25
**13,572,000**   92:7
**13.4**   91:17,18
**13.4.**   100:18
**1344**   100:2
**136**   12:13
**14**   25:6
**15**   25:19 26:1 69:21
  72:20 96:11
**16**   26:22 82:19
**17**   62:21
**18**   1:3 25:17 81:21
  82:2,15 100:2

106:15,24
**1800**   1:24
**1801**   1:24
**18th**   68:2
**19**   84:16
**19103**   1:24
**19106**   1:12
**19107**   1:15
**19109**   1:22
**1954**   40:25
**1:15**   27:23,24

| 2 |
| --- |

**2**   96:16 106:15,24
**20**   18:19 84:20
**200**   28:15
**2000**   1:14
**2008**   59:22
**2009**   31:13,15
**2016**   1:3 8:19 17:19
  112:11
**206**   100:8
**20854**   1:18
**21**   84:22
**212**   40:24
**22**   85:20 87:13
**22nd**   31:13,15
**23**   87:18,25
**24**   88:16
**25**   81:21 82:1,14
  88:19
**2500**   1:21
**25th**   67:1 69:8 72:7
  72:20
**26**   89:2 112:11
**26th**   31:12
**27**   89:13
**28**   90:7
**29**   30:19 52:19,23
  53:6,10,16 57:8
  58:10 62:25 65:10
  70:4 73:6 90:9,16
  90:18 102:11 103:5
  103:5

| 2:00 |
| --- |

**2:00**   28:4
**2:14**   1:2
**2:15**   28:5

| 3 |
| --- |

**30**   90:19
**30th**   73:8
**31**   90:24
**32**   90:25
**33**   51:11 88:1 92:23
  96:16
**35**   98:7 101:15
**37**   101:17,21
**39**   102:1
**3:00**   28:12

| 4 |
| --- |

**4.08**   37:21 38:7
**4.16**   76:19
**4.22**   38:14,22
**4.22.**   37:23
**4.25**   38:24
**4.26**   39:6
**4.31**   15:19
**4.33**   39:11
**4.39**   43:17
**4.39.**   43:12
**40**   101:23,25,25
**404**   43:18
**412**   10:12
**42**   104:16 105:20
**43**   105:1,3 106:2
**44**   91:14 98:4 106:9
**446**   40:24
**447**   40:24
**448**   40:24
**45**   107:13
**46**   109:9
**47**   96:22
**48**   110:1
**4:00**   29:12,19 30:10
  30:15 31:25
**4:11**   32:1

| 5 |
| --- |

**5**   5:20,20,21 8:19
  11:3 12:23 13:3
  47:2,3
**5.04.**   26:16
**5.07**   49:13,15
**50**   12:3 110:2
**54**   48:10,13 49:17
  49:21 81:13 110:16
**5:00**   74:12
**5:39**   1:5
**5:52**   111:12

| 6 |
| --- |

**615**   1:11
**661**   100:8
**6th**   1:18

| 8 |
| --- |

**8**   22:18 69:18
**8.01**   79:17
**80**   17:23
**838**   40:14
**85**   40:14
**88**   92:24 93:8
**89**   27:23 28:21

| 9 |
| --- |

**9**   18:19 19:21
**92**   32:15,24

| a |
| --- |

**abets**   107:6
**abetted**   110:9
**abetting**   86:3,9
  106:11,14 107:2
**ability**   74:8
**able**   16:17 28:16
  29:7 32:3 64:24
  71:24 86:19
**absence**   75:25
**absolutely**   30:6
  35:11 70:14 74:19
  91:3
**abstract**   54:15
**acceptable**   26:23
  28:22 87:6 90:8

[accepted - argument]                                                                    Page 2

| | | | |
|---|---|---|---|
| **accepted** 28:20,20 44:2 | **admits** 11:20,24 | **aid** 89:24 | **applicable** 39:18 |
| **access** 75:16,17 | **admitted** 31:14 | **aided** 110:9 | **application** 74:24 |
| **accommodate** 48:4 | **adopted** 78:23 | **aiding** 86:2,8 106:11 106:13 107:2 | **applies** 22:11 50:11 |
| **accommodation** 81:12 | **adopting** 100:15 | **aids** 107:6 | **apply** 24:9 46:13 99:1 |
| **account** 5:20,21 11:19 12:3,24 | **adverse** 77:21 | **al** 1:5 | **appreciate** 16:7 35:6,7 36:1 |
| **accumulation** 69:12 | **advocates** 48:2 | **alleged** 60:25 102:7 110:5 | **approach** 3:19,23 26:14 |
| **accurate** 97:13 112:4 | **affirmative** 76:17 76:23 106:19 | **allegedly** 75:1 | **appropriate** 4:4,16 4:23 6:8 13:16 14:1 15:2,6 21:11 24:14 25:4 43:19,20 44:8 57:8 64:21,23 70:22 99:18 105:23 108:11,20,24 |
| **accurately** 96:19 | **afraid** 14:14 | **allow** 4:25 13:2 35:16 91:1 104:8 | |
| **acknowledge** 62:4 77:19 | **afternoon** 16:9 28:16 32:3 78:12 93:16 | **allowed** 12:10 15:3 | |
| **acknowledged** 48:5 | **afternoon's** 36:2 | **alluded** 70:19 | |
| **acquit** 41:4,12,23 | **agencies** 65:25 | **alternative** 28:21 33:25 | **appropriately** 7:19 25:3 95:15 98:8 |
| **acquittal** 40:18 | **agency** 105:10 | **ambiguous** 14:2 | **approval** 57:18 63:13 67:2 69:7 73:25 |
| **act** 48:20,21 76:17 76:23 106:13,19 | **agent** 3:8 5:25 32:21 33:25 35:2,9 | **ambit** 105:11 | |
| **actions** 45:24 | **agents** 59:8,12 | **amendment** 48:10 49:16 | **approve** 51:17 58:2 72:19 |
| **acts** 108:4,13,18,23 108:25 | **ago** 6:11 42:13 70:22 | **america** 1:2,10 | **approved** 44:1,3 69:1,2 73:1 |
| **actual** 55:18 100:2 | **agree** 24:10 28:18 48:7 67:10,10 68:15 77:22 87:2 88:9,10 88:24 89:5 90:6 105:24 107:10 110:13 | **amount** 12:15 35:3 35:4 | **approving** 53:23 |
| **actuality** 74:9 | | **analogy** 51:1 99:14 | **april** 1:3 8:19 17:19 |
| **add** 18:15 48:24 52:1 97:9 109:20 | | **analysis** 65:2 | **area** 93:20 |
| | | **answer** 3:9 5:17 7:17 8:2,14,25 10:5 11:20 30:15 91:11 | **argue** 7:7,9 12:9 15:4,18 19:15 29:11 29:12,16 33:24 34:2 34:17 49:20,23 51:23 61:17,19 64:10,13,19,20 80:21,21 89:22,22 93:4 |
| **added** 40:10 97:4 | **agreeable** 22:17 | | |
| **adding** 99:19 110:17 | **agreed** 17:6 20:15 21:14 22:24 24:7 26:2 32:5 33:19 48:18 84:17 89:3,10 90:14 97:6 | **anticipate** 94:20 | |
| **additional** 26:7 27:2 27:6 37:12,12,15 45:18 47:18,21 80:9 | | **anybody** 64:15 | |
| | | **anytime** 20:8 | |
| | | **anyway** 10:16 38:3 | |
| **additions** 93:10 | | **apart** 68:13 | **argued** 76:24 |
| **address** 3:15 13:9 46:5 79:24,24 90:12 103:7 | **agreeing** 35:7 90:24 | **apologize** 47:24 74:12 82:9 | **arguing** 7:9 33:1 54:12 61:3,8 63:6 64:21 68:18 92:19 |
| | **agreement** 18:18,19 18:20 23:8 27:20 29:8 38:25 39:7,13 39:15 45:25 46:2 87:13 88:6 97:17 99:3 106:21 109:22 | **apparently** 99:3 | |
| **addressed** 3:25 110:16 | | **appeal** 100:25 | |
| | | **appealed** 51:8 52:2 | |
| **addresses** 51:1 102:12 | | **appear** 39:17 75:25 98:16 | **argument** 5:7 12:8 12:20 30:23 33:21 47:23 52:12 56:8 60:20 65:4 66:5 70:1 73:13 78:25 |
| **addressing** 53:14 62:25 | **agrees** 25:14 39:18 40:9 | **appearance** 10:14 | |
| | | **appearances** 1:9 | |
| **adequately** 7:18 | **ahead** 42:25 48:12 78:21 84:6 89:16 109:4 110:2 | **appears** 39:17 | |
| **adjust** 18:11 | | **apple** 70:3 | |
| **admission** 35:22 | | **applicability** 107:15 | |

80:20 89:22,25
93:21 94:5,10 95:14
95:22,23 103:2
104:1
**arguments**  9:24
16:3 31:4,6 93:17
**articulate**  107:24
109:10
**articulated**  106:2
109:13
**articulating**  81:4
**articulation**  82:18
**aside**  81:4
**asked**  11:21 12:13
32:21 77:18 88:18
**asking**  9:25 10:3
11:8 31:3 53:4,19
61:21 82:17
**asks**  80:19
**aspect**  65:24
**aspired**  80:14
**assertions**  31:6
**assets**  56:24
**assisting**  106:25
**associated**  110:6
**assume**  43:9 46:3
80:22 83:19,22
**assuming**  28:4 52:1
**atlantic**  1:23
**attempting**  96:25
**attention**  13:24
14:23 89:18,21
**attorney**  44:10
**attorney's**  1:11
**attribute**  7:25
**attributed**  15:13
**audio**  3:3
**august**  67:1 69:7
72:6,20 73:2
**author**  23:24
**authority**  55:14
60:13
**available**  3:10 77:16
77:17

**ave**  1:18
**aware**  22:22 34:14
34:16 47:2,3 68:6,8
77:20 92:8

**b**

**b**  2:8 40:23 44:19
109:11
**back**  7:3,4 8:5,7
9:15 11:10 16:23
17:23 25:11 28:7,9
28:12,12,19 29:12
38:5 46:20 57:3
71:23 73:3 74:8
79:5 81:17 82:10
84:16 85:13 88:8
91:4 98:6 101:20
110:4
**background**  3:4
**backing**  33:3,4
**backseat**  108:3
**backwards**  57:24
**bad**  65:9 85:4
106:22
**bank**  4:9 10:17,22
12:3,14,22,22,24
46:14,21,25 47:1,2
51:18 58:7 68:23
69:20 71:15 73:3,23
79:25 100:1,18
110:9
**banks**  71:13 75:5,6
**banyan**  12:14
**barrett**  32:21 35:2,9
**barry**  1:10,16 16:10
16:13 33:19 106:12
**based**  18:11 32:19
33:16 50:8 65:11
69:11 70:12,15
72:22 76:19 88:6
96:24 97:20 102:2
102:23 104:13
107:23
**bases**  52:2

**basic**  40:12
**basically**  4:17 6:14
6:14 40:16 55:25
87:1 108:19
**basing**  31:5
**basis**  8:1 51:8 52:2
59:19 68:17 69:9
73:4 75:13 81:11
**battle**  65:5
**baxter**  66:19
**baysek**  40:23 41:1,5
41:20 42:4
**beg**  38:1
**beginning**  98:19
**behalf**  34:1
**bekkedam**  1:16
17:18 25:22 26:4
27:2,6 33:24 106:12
107:19 110:6,9
**bekkedam's**  7:11
34:10 108:17
**belabor**  70:11
**belief**  45:11,17,22
**believe**  4:3 5:7 6:20
7:1 16:2 18:18,20
19:19 26:25 32:18
37:18 38:25 39:7,18
40:14 45:8 46:9
50:4 52:8 66:22
67:12 96:19 97:5
98:8 99:4 102:2,11
104:19 109:12,12
**believed**  13:25
46:19 59:2
**benchbook**  42:15
44:19
**benefit**  23:10 63:24
71:13
**best**  53:19 62:22,25
65:17 66:12 67:8
91:11 93:3 110:8
**bet**  53:11
**better**  6:12 21:3
27:4,14,15 32:10
61:19 105:17

**beyond**  12:8 81:2
**big**  13:20 36:18,21
75:5
**binder**  17:11
**bit**  18:5 32:4 37:25
73:13 85:20
**bites**  70:3
**blank**  21:18
**blue**  54:2
**board**  27:24 38:14
38:23 56:14 57:2
**bodies**  74:1
**body**  69:14 71:17
77:15
**boil**  5:8
**bone**  85:20
**bonomo**  31:12
**borrow**  65:11 89:21
**borrowed**  9:8 11:3
**bottom**  44:17
**box**  68:23
**boy**  85:9
**breaks**  95:2
**breast**  71:18
**brian**  1:5,14 13:22
13:25 14:18 23:7
**brief**  85:24
**bring**  11:10 29:21
29:23
**broad**  1:21
**broke**  5:23 26:12
**bucks**  11:18
**bunch**  32:7
**burden**  20:17 62:1
67:14 69:16 92:4
**buy**  5:16 6:7 13:3
**buying**  9:14
**buys**  53:7

**c**

**c**  1:7 3:1 112:1,1,7
**call**  19:22 32:19
35:12 61:24 67:17
71:19 87:14

**called**  31:16 76:21
 77:10,12 89:20
**calling**  76:10
**calls**  89:18
**candor**  103:3
**capable**  6:7 50:6,19
 50:22 52:19 53:2,12
 53:24 54:14,15,18
 54:24 55:7 56:3,19
 56:20 57:1,11,20,21
 58:6 59:5,10,15
 60:4,5 61:1 62:24
 63:10,22,22 64:18
 66:9 67:14,15,20,21
 68:11 69:13,19
**capital**  45:13,18,19
 45:22,23 46:3,11,21
 46:23 47:4 68:23
 69:12,21 73:23
 79:21,23
**captioned**  24:24
**capture**  7:18
**car**  108:3
**card**  36:8
**cards**  36:9
**care**  39:25 64:5
 76:12 88:16 98:1,5
**carefully**  109:15
**case**  13:21 15:8
 20:25 21:18,19 22:1
 22:3 31:14 33:8
 35:23 36:1 40:13,25
 41:16 44:7 50:11
 51:3,21,23,24 52:9
 53:3,22 55:2,11,16
 56:11,22 58:19
 59:22 61:8,10 62:12
 62:16,18 65:12,19
 66:15 67:5 68:14
 74:10,11 75:9,10,15
 80:2,12 81:5 91:12
 91:21 93:15,22 95:1
 97:16,19 99:23,25
 100:8,14 102:2,3,10
 102:11 103:7 104:7

**cases**  28:15 58:11
 92:8 96:24 97:15
 99:15
**casual**  108:3
**causing**  106:16
**cdj**  1:2
**certain**  24:7
**certainly**  15:4 19:8
 19:10,15 49:6 57:23
 58:6 63:11 64:6,19
 72:1,4,18 77:20
 80:21 93:15 103:11
 108:22
**certify**  112:3
**chain**  41:11 58:5
 66:16 70:23
**challenge**  101:18
**challenging**  85:25
**chambers**  82:7,10
**change**  25:21 26:2,7
 87:18 88:5 90:20,21
**changed**  8:13 88:17
**changing**  25:22
**character**  21:23
 40:6,17 41:3,4,18
 41:22,23 42:10,11
 42:16,20 43:7,18,20
 44:15
**charge**  3:11,13
 14:25 20:24 29:16
 37:16 41:17 43:10
 48:19,20 50:15,16
 51:12 55:1 56:23
 70:20 76:19 80:13
 87:3 92:25 93:4
 94:5,10 99:13 102:6
 104:5,9 108:11,21
 110:9
**charged**  26:22 27:1
 27:5,6,11,19 31:11
 82:22 84:4 86:22
 91:16 93:7,23
 102:19,20,23
 103:12,23,24,25
 104:2 107:17

**charges**  4:16 83:12
 83:13 85:25 86:8
 88:2
**charging**  50:14 75:7
**cheat**  48:22
**check**  36:6 68:23
**chestnut**  1:11
**choice**  24:19
**chose**  24:22
**chuck**  66:18
**chun**  1:10
**circle**  46:20
**circuit**  40:8,13 44:1
 44:24 51:6,21 52:18
 52:22 55:3 56:1
 59:22 62:15 65:18
 65:19 68:14 74:7
 78:24 80:11 100:5,5
 102:2
**circuit's**  45:3 50:8
 62:10,10
**circumscribed**
 105:8
**circumstances**  4:4
 4:21,23 15:2 53:20
 97:21
**circumstantial**
 21:15
**citation**  100:7
**citations**  30:23
**cite**  53:10 60:1
**cited**  58:10 59:21
 80:2 96:24 102:4
**cites**  80:11 97:15
**civil**  4:7 44:25
**claim**  96:23 97:10
**clarification**  87:23
**clarify**  27:7 86:19
**clarifying**  38:10
**class**  30:1
**classed**  18:10
**clean**  82:22
**clear**  7:10,13 46:24
 54:11 58:13 71:4
 98:15,18 105:10,14

**clearer**  21:7
**clearly**  79:2 86:6
**clerk**  82:8
**clerk's**  36:7,10
**client**  14:15
**close**  71:18
**closing**  33:12 89:22
 89:24 94:20 95:22
 95:23
**coffee**  29:21,23
**coin**  65:8
**collapse**  91:16
**collapsed**  110:11
**colleague**  94:4
**colloquy**  42:15
**color**  19:6,11
**come**  6:15 18:23
 28:6,9,12 29:8,11
 33:7 35:17 36:5,14
 48:6,16 72:16 73:3
 90:9 104:1 109:21
**comes**  33:18,19
 53:21 64:5
**coming**  6:1 42:9
 44:21 50:13 90:16
 90:19
**commanding**
 106:15,25
**commands**  107:7
**comment**  78:24
 79:15
**commentary**  43:3,5
 43:17
**commission**  102:10
**commit**  86:25 88:3
**committed**  85:22
**committee**  43:9
 44:24,25 45:1 50:20
 50:24 51:1 54:8
 56:7 57:13,22 58:2
 60:22 61:1,13,16
 62:23 63:9 64:5
 66:9,11,24 67:18
 68:1 69:3,6 70:21
 71:2,25 72:5,10,25

73:20 77:19 87:10
**communicate** 41:2
41:21
**company** 1:23 13:1
46:20
**compare** 4:24
**complain** 40:4
**complete** 27:23
38:19
**complex** 63:2
**compromise** 44:18
49:1,4 88:20
**conceal** 46:23
**concealed** 47:10
**concealment** 102:5
102:8,11,12,20
103:1,6
**concealments**
103:10
**conceals** 47:5
**concern** 42:14 51:15
68:5 71:20
**concerned** 64:3
**concerning** 43:6
**concerns** 46:7
**conclude** 13:25
**concluded** 59:7
111:12
**conclusion** 81:1,9
**condensed** 25:13
**condition** 69:20
**conditioned** 36:11
**conduct** 59:8 76:9
**conference** 3:11,13
**confers** 82:8 105:19
**confidence** 62:14,16
**confidential** 71:14
**confronted** 65:20
**confuse** 97:23
**confused** 64:4 67:6
**confusing** 26:25
44:15 46:17 48:18
86:9,18 87:2 97:14
102:17

**confusion** 57:16
64:24
**conjunctive** 84:22
**consciousness** 4:3
7:21 8:1 10:2 12:8
13:8,14 14:6,8
**consider** 14:4,7
15:21 41:3,22 87:23
89:14 99:16 110:11
**consideration** 26:22
45:12
**considered** 20:14
74:23
**consistent** 12:20
48:17 65:4 88:20
98:22
**conspiracy** 59:16
80:1 86:1,6,11,22
86:23,24,25,25 87:4
88:3,8 103:3,11
106:20 107:3,20
108:3,11,13,16,17
108:21 109:3
**constitutional** 25:1
**constrain** 33:20
**content** 34:14
**contention** 85:20
**contents** 34:16
**contest** 48:25 49:2
**context** 9:6 10:20
11:7 14:24 21:23
109:19
**contingencies** 73:10
**contingency** 67:2
68:25 72:20 73:2
**continue** 37:8
**controls** 20:14
**conveys** 41:10
**convict** 102:4,5
**conviction** 38:25
62:15,16 107:23
**convincing** 63:10
**cooperating** 23:1
**copious** 8:22

**copy** 4:14 9:22
16:19 17:12 18:24
77:7
**correct** 12:17 15:11
21:20 22:5,13 34:21
38:3,17 39:4 40:20
40:20 67:24 80:12
88:11 97:7
**corrected** 25:13
**corresponds** 31:15
**corse** 66:21
**council** 54:21 58:3
63:12 66:20 67:13
68:1 71:9,20 72:5
72:23 74:20
**counsel** 6:20,24 7:7
9:22 10:7 13:5 16:4
19:15 25:10 27:18
27:22 36:2 43:24
46:10 55:2,19 63:5
74:16 76:14 78:13
81:25 83:17 92:17
95:22 99:20 101:8
105:19
**counsels** 107:7
**count** 31:11,17
46:21 83:12,13
86:15 103:1,17,17
103:18,19,20,24,25
106:2,9 108:23
109:13,20,21 110:2
110:4,5
**counter** 79:11
**counts** 27:2,6 50:7
70:11 85:25 86:2,2
93:1 103:9,10,23
104:17,22 105:23
106:20 107:4
108:14,22
**couple** 6:7 110:20
**course** 38:7 49:25
74:3
**court** 1:1,23 3:12,16
3:21,24 4:24 5:4
6:10,18,21 7:3,20

8:9,13,22 9:2,4,10
9:16,21,25 10:6,10
10:13,21 11:1,8
14:11,17,22 15:7,10
15:12,18,21,23,25
16:6,9,12,14,17,20
17:4,13,17,25 18:3
18:22 19:1,3,7,10
19:17,24 20:2,4,6
20:12,16,20,22
21:12,15,22 22:8,10
22:18,25 23:4,7,17
23:20 24:3,5,6,11
24:16,19,24 25:6,9
25:10,15,17,19,25
26:5,15,18,21 27:13
27:17 28:3,8,14
29:2,5,9,14,18,22,25
30:6,10,17 31:3,5,7
31:10,13,17,19,22
31:24 32:2,8,11,16
32:23 33:2,14,22
34:6,9,12,18,22
35:3,8,11,14,19,25
36:4,10,14,17,20,22
37:1,5,8,17,24 38:2
38:5,12,15,18,21
39:3,5,10,22 40:3
40:18,20 41:2,8,13
41:16,17,20 42:2,6
42:20,25 43:11,13
43:14,16,18,23
44:23 45:7 46:4
47:10,15,18,22
48:23,24 49:5,8,11
49:13,18,22,25 50:3
50:9,12 51:2,3,4,19
51:25 52:5,7,11,14
52:16,18,21,25 53:4
53:11,13,16,19,25
54:5 55:2,8,15,19
56:21 57:3,6,14
58:18,22 59:1 60:8
60:12 61:2,7,10,14

61:17,23 62:8 63:3
63:5,14,23 64:9,12
64:15 65:2,13 66:2
67:10,23 68:4,6,13
69:25 70:5,14,17
71:21,22 72:9,12
73:12 74:6,6,16
75:8,18,21,25 76:5
76:11,14 77:1,5,9
77:22,25 78:2,5,13
78:17,19,21 79:10
79:13,17,19 80:2,4
80:12,15,19,22 81:8
81:10,14,18,20,24
82:3,7,8,9,12,16,24
83:3,5,9,14,16,25
84:10,13,19,25 85:3
85:7,12,15,18 86:10
86:13,21 87:4,6,12
87:16,23,25 88:11
88:14 89:14,24 90:6
90:23 91:3,10,13,23
91:25 92:10,17,24
93:7,11,14,22 94:2
94:6,8,12,16,21,24
95:3,6,9,16,20,25
96:4,6,8,10,17,20,25
97:11,22 98:12,20
98:22 99:2,5,9,15
99:20 100:1,4,4,8,9
100:11,14,19,22,24
101:3,5,10,12,19,20
101:22 104:8,10,15
105:15,20,24 106:8
107:10 108:8 109:2
109:24 110:11,13
111:6,7,9
**court's**   26:13 28:11
80:16 90:25 92:21
92:22 101:7 104:13
**courts**   42:15 65:20
99:24
**cover**   16:4 80:17
109:19

**covered**   46:9
**covers**   27:9 48:22
55:1 64:23 68:12
**cpp**   58:3 63:12
66:20 69:7 71:9
72:4,19,23
**cr**   1:2
**crazy**   33:10 65:23
84:24
**create**   25:12 43:8
**creates**   26:7
**credibility**   22:18,19
23:1 37:22
**credit**   36:8,9
**crime**   31:11 60:6
63:20 75:22 80:25
99:10 103:23,24
104:2 106:21 107:2
107:3
**crimes**   88:3 104:4,9
107:16,18,18,20
**criminal**   44:7,25
59:8,10 63:20,21
78:24
**critical**   75:7,23
**cross**   2:3 7:1 12:12
**crux**   79:25
**crystallized**   77:4
**cube**   62:20
**cumbersome**   96:19
**curran**   102:4
**cut**   73:12 93:1
**cutting**   23:15 91:7

**d**

**d**   1:16 2:1 3:1
**dalzell**   100:23
**darnell**   1:7
**date**   68:2 112:11
**dated**   17:19
**david**   1:10 89:15
**day**   4:1 74:17 93:25
**de**   56:18
**deal**   56:11 57:7

**dearth**   66:15
**debra**   112:3,7
**deceive**   48:21
**december**   68:2
69:11 73:23 74:22
**decide**   28:25 55:24
60:23 66:10 91:22
108:25 111:6
**decided**   11:3
**decider**   50:21,24
53:22,24 61:6,11
**deciding**   10:1
**decision**   42:12 50:23
51:17 54:18,24
55:14 56:1,7,18
57:20,21 58:6,12,13
58:14 59:5,15 60:21
65:1 66:8,17,17,23
67:6,9,11,15,16
69:9,10,14 71:5,7,9
72:19 73:4,25 74:2
74:25 75:2 77:3,4
85:6,8
**decisions**   69:13
72:18 73:21 96:17
**declarant**   74:10
**defendant**   1:13,16
20:23,23 21:3,4,5,6
21:10,10,11,25
22:12,17 25:1 26:14
39:14,15 42:16 46:5
46:19,22,22 47:5,6
63:15 74:10 80:8
84:13 92:19 93:24
102:6 103:13,15
105:21 110:12
**defendant's**   2:13
20:25 24:19 43:7
55:7 59:7,13 63:24
80:14
**defendants**   20:19
21:10,25 22:6 24:7
25:22 26:2,3,11,22
27:1,5,10,19 37:15
60:25 72:11 79:22

**dearth**   80:20 81:3 91:16
102:17
**defense**   17:1,11
22:14 32:13 44:10
45:6,23 46:8 48:5
63:18 64:10 65:9
75:16,17 76:10
77:17,18 78:10,10
78:17,23 80:11 81:1
81:5 90:9 92:18
**defense's**   103:16
**defer**   79:1
**definition**   105:6
106:11
**definitive**   69:2
74:19
**defraud**   46:5,9,13
47:6,11,13,13,17
48:19,20 56:2 60:7
74:9 80:17 86:24
87:5 88:22 91:17
97:5,18
**defrauded**   56:23,24
56:25 66:1,2
**degree**   59:16
**delegated**   60:12
**deliver**   41:8
**denial**   59:7
**denied**   68:1,9,15
69:4 104:11
**deny**   6:5 81:14
92:18
**department**   50:6,20
52:20 55:22 56:12
56:15,16,25 57:12
57:19 64:2 66:2
67:21 68:11 72:24
72:25
**deposition**   4:1,7,8
4:18 5:9,15 7:15
11:12,22 13:10
15:16 39:20
**described**   102:10
**describes**   109:20,21

**desired**  80:14
**detail**  27:10,19
**deteriorated**  69:20
**determination**
  102:15
**device**  102:21
**devising**  91:17
**difference**  13:20
  63:14 69:19 81:4
  83:14
**different**  4:21 6:13
  7:23 26:11,12,23
  42:20 46:12,16
  50:15 54:12 62:21
  65:25 68:9,15 74:1
  80:23 86:17 91:20
  102:14 104:4,5
  105:17,18 107:1,2,3
  110:3,12
**differently**  22:15
  104:6
**dilemma**  66:13
**direct**  2:3 7:18
  12:15 13:23 14:5,19
  14:22 21:15 91:21
**directed**  58:12
  105:10,13
**directly**  54:22 58:12
**disagree**  44:23 45:2
  54:14 76:14 105:15
  105:16
**disagreement**  40:9
  43:6 101:18 105:3,4
  105:5 107:15 109:8
**disapproval**  58:1
**disclaimer**  3:2
**disclose**  51:13 102:7
**disconnected**  55:25
**discovered**  76:25
**discovery**  71:24
**discussed**  49:3
  70:21 73:4 75:3
  108:1
**discussing**  66:16
  71:6

**discussion**  13:2
  40:24 47:25 48:3
  52:9 70:16
**disjunctive**  84:23
**dismiss**  75:3
**dispersed**  55:24
**dispositive**  99:4
  102:13
**dispute**  40:6 54:25
**disrespect**  62:19
**distinct**  52:9
**distinction**  55:6
  106:23
**distinguish**  107:4
**district**  1:1,1,8
  35:24,25 40:18 41:7
  52:18 80:12 100:6
**divorced**  74:14
**dna**  24:17
**document**  17:23
  33:18,18,21 38:9
  96:23 97:10
**doing**  42:7 87:9
  99:14 106:17,22
**dollars**  92:2,6,16
**domino**  37:13,14
**dominoes**  32:7
  87:11
**don't**  107:25
**doubt**  19:15 20:17
  41:5,18,24 42:11,17
  42:19 43:8,21,22
  81:3
**downtown**  42:9
**draft**  14:13 110:21
  111:4
**drafting**  110:25
**drafts**  48:6
**drag**  33:12
**draw**  34:3 76:8
  77:21
**drive**  107:22
**dual**  86:23 87:3 88:8
**due**  3:3

**duncan**  1:16 8:20,24
  10:7,8,12 31:9,21
  31:23 39:13,25 54:9
  109:12
**duration**  90:8
**duty**  41:3,22 45:19
  102:7,14
**dvfg**  32:25 73:10

**e**

**e**  2:1,8 3:1,1 37:4,4,4
  40:23 100:11 112:1
**earlier**  5:15 8:8 77:8
  82:6
**easier**  18:6,12 37:16
  100:6
**eastern**  1:1 35:24
  100:6
**easy**  70:7
**ecker**  1:17
**educated**  65:19
**effect**  37:14
**effectively**  74:21
**egan**  1:13 3:14,17
  3:25 5:1 6:25 8:18
  11:10 13:19 14:20
  14:25 16:2,7 53:21
  61:21
**egan's**  14:15
**eighteen**  25:18 40:1
**either**  8:22 16:3
  19:25 27:12 47:22
  50:18 88:10 99:17
**election**  103:22
**element**  98:19 99:19
  104:20
**elements**  79:7,8
  80:17 92:5 104:5
**eleventh**  80:11
**eligible**  73:14
**email**  23:24 28:18
  28:19 31:12,14,16
**emails**  7:11 15:13
  71:10
**emphasizing**  5:3

**employer**  4:9
**encapsulates**  45:10
**encompass**  47:8
**endeavored**  30:22
**energy**  34:25
**enforcement**  4:19
  4:21 5:25 15:1
  22:20,21
**engaged**  48:3
**engle**  1:19,20 30:9
  30:11,18 31:8 32:25
  94:19
**entirely**  4:21
**entitled**  76:1,3 80:8
**entity**  55:16
**entry**  70:25
**equivalent**  60:14
**error**  40:15,18
**especially**  102:3
**esq**  1:10,10,13,16,16
  1:19
**essence**  70:3
**essentially**  45:11
  106:21 108:7
**et**  1:5
**evaluate**  110:8
**event**  68:22
**everybody's**  81:22
**evidence**  5:4 6:2 7:6
  7:8,9 18:10,12,14
  21:13,16,23 22:1
  23:7 24:20,25 26:10
  31:14 37:20 40:6,17
  41:4,5,18,23,24
  42:10,11,16,18,21
  43:18,20,22 44:15
  50:23 55:4 56:5,8
  59:18 60:23 61:10
  61:12,15,22 64:19
  67:18 69:17 72:16
  72:22 73:6,22 74:19
  75:6 87:1 104:7
  108:24 109:14
**exact**  5:21 11:17
  12:1 103:23,24,25

[exact - fraud]                                                                 Page 8

107:9

**exactly**  5:19 9:2
14:15 16:15 82:22
86:6 109:10

**examination**  7:2
12:12

**example**  74:24
99:25

**exception**  29:25
43:24 45:2 70:12
77:25 81:15 91:2
97:25 104:14 106:3
106:7

**excessive**  3:3

**exchange**  23:10

**exclude**  40:15 60:20

**exculpatory**  4:11,20
5:25 12:7

**excuse**  8:10

**excused**  16:5,11
30:5

**executes**  99:12

**exhibit**  32:15,24

**exhibits**  17:11 37:10
37:10,12

**exist**  99:19

**exists**  20:24

**expectation**  25:10

**expected**  51:15

**expedient**  37:11

**experience**  27:14,16

**expert**  37:20 38:8

**explain**  27:10,18
48:17 73:23 86:6
105:17

**explained**  5:4 25:20

**explains**  44:20

**explanation**  63:19

**explanations**  46:16

**extra**  18:25

**extremely**  58:1 75:9

**eyewitness**  75:22

**f**

**f**  112:1

**f.2d**  40:14,24 100:8

**facilitate**  75:24

**fact**  4:19 5:12,24
11:20 12:21,22
15:15 23:22 42:13
47:5 51:14,14 52:15
57:3,11,19 58:4
59:25 60:10 62:12
67:23 68:24 71:4
72:17 74:22 89:19
95:18 97:16,20
99:21 102:7 103:21
106:19 108:20
110:8

**facto**  56:18

**facts**  22:3 24:7 62:3
80:9 107:21,23
108:1,4,6 110:4,5

**factual**  31:6 55:5
80:14

**failed**  75:25

**failure**  51:13

**fair**  19:17 30:2,17
32:4 34:22 49:4,22
57:8 63:1

**fairest**  81:9

**fairly**  17:7

**faith**  33:9,16 45:5
46:7,13,16 47:7
48:9,17 81:11

**fall**  85:11

**false**  4:10,20 5:25
7:15 12:7 13:17,23
14:19 15:1 39:6,6
51:12 54:13,21
58:11 59:13,14 60:2
62:16 63:9,11 68:10
69:24 75:1 96:18,20
97:10,22,23 102:18
102:24 103:14,15
104:17 108:14

**falsity**  59:9

**familiar**  58:19

**family**  40:25

**fancy**  55:23

**far**  45:14

**fast**  37:25 89:12

**faster**  81:19

**favor**  58:5

**favorable**  59:18
72:11

**fdic**  56:14,16 57:1
57:25 63:10 73:18
105:2,12

**fed**  73:19

**federal**  41:9 42:15
56:14 57:2 73:18
88:3 100:15

**fee**  36:5,12,18,21

**feel**  29:15 71:2,18

**figured**  34:24

**file**  3:22

**filed**  16:23 17:22
18:7 38:10,20

**final**  30:1 39:16
54:18 65:2

**financial**  73:11

**find**  13:21,22 14:18
18:13 40:17 41:21
48:4 52:17 58:21
59:19 70:16 77:9
81:3 108:12

**finding**  80:12

**findings**  80:14

**fine**  7:8 25:1 26:5
29:14 38:18 42:6
85:18 90:11,11
94:14 107:9,10

**finely**  10:24

**finish**  79:1 95:2

**finished**  28:2

**first**  6:13 9:8 17:18
19:18 21:8 24:9
32:8,10 35:15 37:11
37:20 38:6 40:4,7
48:2 49:16 83:22

84:24 87:10 96:3
97:4

**fit**  28:10

**five**  8:25 10:17,17
11:18 12:13,16,17
12:20 21:13 27:5

**fix**  84:15

**fl**  1:14,18

**flip**  94:11

**flores**  1:20

**fly**  14:12

**focusing**  96:13

**folks**  93:25

**follow**  104:8

**followed**  11:5

**following**  68:19,21
105:7

**follows**  74:6

**font**  25:17,18 92:24
93:8

**foregoing**  112:3

**foreseeable**  107:17
107:18 108:16
109:1

**forget**  101:13

**form**  45:9 80:23

**forth**  73:5 82:18

**forward**  48:12
63:10 75:13

**found**  45:15 52:16
52:18 59:12 81:10
84:24 107:19

**four**  20:16 52:2

**fourth**  97:4

**fox**  1:14

**frame**  15:19

**frank**  39:2

**frankly**  5:1,17 44:7
45:2 95:10

**fraud**  46:13,15,15
46:18 51:10 79:24
79:25 80:1 85:23
86:12 87:1 92:8
97:16 99:16,16,25
100:1,18 103:2,11

110:9
**frauds** 46:12
**fraudulent** 51:12
 91:22
**frb** 56:17
**free** 80:21
**fuller** 16:4 39:12
 45:5,8 46:1 47:7
 66:14 70:18 71:23
 72:14 73:16 74:18
 76:15 77:7 78:1,7
 104:25 107:24,25
**fulsome** 48:3
**fund** 56:13 58:7
**fundamental** 107:14
**funding** 51:18 69:22
**funds** 5:19 6:18 11:1
 55:24 74:25
**fungible** 5:19 8:7
**funnel** 44:16 70:25
**funt** 1:20
**further** 11:24 45:24
**furtherance** 108:15
 108:25

**g**

**g** 3:1
**gandal** 1:17
**general** 13:13,15
 26:14,15 88:25
**generally** 71:2 79:3
**genuinely** 67:6
**geography** 94:15
**getting** 30:20 33:11
 69:22 75:17 79:5
 86:19
**giant** 46:25
**gibraltar** 12:2,24
**gist** 10:24
**give** 10:7 13:8 14:2
 17:12 31:5 32:8,9
 41:18,21 42:11,16
 42:19 43:16 44:5,8
 53:5 57:10 65:16
 66:3,6 67:8 69:25

70:12 72:12 74:25
 75:19 77:22 79:5
 84:2 85:3,9 95:22
 105:21
**given** 7:21 8:2 10:3
 13:1 42:12 43:25
 44:9 51:20,23 52:1
 74:20 76:20 80:24
 87:1
**giving** 14:4 70:2
 80:7 85:14 91:10
**go** 8:5 11:3,23 16:25
 17:7 23:9 25:11,23
 27:21 28:21 37:11
 42:25 45:14 51:4
 57:3 58:12 64:1
 65:12 69:23 78:21
 81:17 84:3,5,6,8
 85:1 89:16 95:4,9
 95:13 97:24 98:6,23
 109:4,4
**goes** 9:15 17:23
 21:24,24 47:12
 66:21 69:22 74:8
 105:12
**going** 3:12 5:8 7:9
 9:1 10:18 11:25
 12:16 18:17,22,23
 19:8,10,24 23:23
 25:10 27:17,22
 29:10,12,15,16
 30:13 32:19 33:23
 33:23 38:15 39:22
 48:5,25 49:2,13,15
 49:16,20,20 51:4
 52:21 53:16 60:1,16
 65:15 66:5 67:9
 69:25 70:1,11,16
 71:23 73:5 77:22
 79:1 80:20,24 81:14
 82:9,20,20 83:23
 84:3,4,7 86:9,13
 88:7 89:5 90:9,20
 90:21 92:17,25 94:5
 94:11 96:2 101:20

103:19,19 109:4
 110:4,7,24 111:4
**good** 16:9 32:2 33:9
 33:16 35:23,24 40:6
 43:7 45:5 46:7,13
 46:16 47:7 48:9,17
 65:10 81:11 87:22
 101:11
**goodness** 63:1
**gotten** 32:4
**government** 3:17
 4:2 11:23 13:6 23:9
 23:10,23 24:7 26:10
 28:1 31:11 32:13,15
 33:9,24 39:18 40:2
 40:8 45:8,13 48:3,8
 48:13 51:6 54:23
 56:5 59:19 60:24
 66:22 67:17 71:17
 75:15,24 76:7,8,9
 76:17,20 77:10,11
 77:17 79:3,6 81:2
 82:2,15,24 84:20,22
 85:19 87:17 89:11
 89:21,22 90:18,19
 91:6 92:4,22 96:16
 102:6,9 105:8
 106:10 109:8 110:1
 110:2,14
**government's** 2:10
 5:7 16:22 17:6,22
 18:14 19:20 33:16
 51:11 57:17 67:13
 81:21 84:6,16 90:9
 103:5
**grammatical** 20:18
**grand** 62:21 66:3,6
 66:7,10 67:8
**grant** 60:16
**granted** 52:18,23
 68:16
**great** 26:21 29:9
 95:16 101:12
 109:24

**greatly** 16:7
**greenblatt** 1:20
**group** 54:10
**guess** 20:9 76:15
**guidance** 31:5 92:22
**guilt** 4:3 7:21 8:1
 10:2 12:8 13:8,14
 14:6,8
**guilty** 13:25 21:2,9
 42:14 45:15 46:22
 47:6,14 79:23 81:3
 90:4 92:7 107:19
**guy** 5:18 56:13
 77:11
**guys** 55:23,23

**h**

**h** 2:8
**hac** 35:21,22 36:5
**half** 93:20 102:19,25
 103:10,14
**hall** 47:25
**hand** 37:15 38:10
 61:25 62:1 85:9
**handed** 54:10 77:8
 78:11,16 82:6
**handled** 7:13
**hands** 84:2
**happen** 33:23
**happened** 69:6
**happy** 28:9 37:14
 81:23 93:2,2
**hard** 10:5 18:24
 65:10
**hartline** 1:5,14 4:2,7
 5:13 7:11,14,25 9:7
 11:12 13:17,23,25
 14:18 17:18 21:19
 22:11 25:22 26:4
 39:20 45:15 70:24
 72:1 76:25 108:15
**hartline's** 11:11
 24:20 45:11
**hate** 44:12

**head** 85:10
**health** 47:1
**hear** 46:1 47:22 51:5
62:23 64:15 66:19
75:10
**heard** 4:13 23:4,7
50:23,25 57:25 69:3
71:5
**hearing** 66:11 69:8
70:7
**hears** 21:1
**heck** 5:22 44:21
**hedge** 56:13
**held** 45:11 87:9
**help** 9:23 29:24 42:5
**helps** 107:3
**hereto** 59:10
**hey** 14:7
**highlight** 22:15
43:20
**highlighted** 31:19
**hindsight** 75:8
**history** 75:5
**hold** 58:9
**holding** 13:1 46:20
50:11
**holdings** 73:11
**hole** 69:5
**honest** 11:19 45:17
**honestly** 45:11
46:19 91:10
**honor** 3:7,15,19,23
3:25 4:15 5:1 6:20
6:25 8:16,18 10:19
12:11,19 13:12
14:16,20,25 15:24
21:7,21 23:12,19
25:5,8 26:10,13,17
26:24 27:25 28:2,10
29:6 30:8,9,12,18
31:2,9,21 32:5 33:7
35:15,16 36:16,25
37:9,19 39:4,9,24

40:6,12 43:3 44:13
45:6 46:6 47:24
48:2 49:24,24 50:4
51:9 52:16 53:10
54:4,10,11 55:21
56:12 58:16,20 61:6
61:13 62:17 65:9,22
66:14 68:19,21
70:10,18 73:6,17
74:18 78:22 79:16
81:21 83:21 84:9,21
86:5,5 87:21 88:4
88:19 89:2,13,17
90:1,8,25 91:6,9,15
91:24 92:20,23 94:4
95:18 96:16,22 98:7
98:11 101:2,17
102:1 103:17
104:25 105:9 106:7
106:10,18 107:14
109:8,17 110:18
111:10,11
**honor's** 27:16 30:19
38:10 44:18
**honorable** 1:7
**hope** 31:1
**hopefully** 3:9 78:3
81:19
**hoping** 28:16
**hornbook** 90:2
108:19
**hour** 9:15 93:20,20
**house** 8:7,9
**howard** 66:18
**huh** 28:8 29:22
**hypo** 77:11

---

**i**

**idea** 36:22 41:10
48:4,11 51:20 69:9
69:12
**identification** 2:9
**identified** 8:1 32:14
33:6 60:22 74:2

**identifies** 14:15
**identify** 14:9 67:7
71:3 105:4
**ignall** 1:10 3:7,19,22
6:10,17,19 7:1,6 8:4
8:12,15 9:3,5,15,19
9:22 10:4,19,23
12:12,19 13:11,15
14:9,13 15:4,9,11
15:15,20,22,24 16:1
16:15,19,21 17:5,21
18:5,17 19:4,5,9,12
19:19 20:8,21 21:6
21:20 22:5,9,13,21
23:11,25 24:4,14,17
24:22 25:4,7,14,14
25:21 26:1,6,24
27:8 28:11,24 29:3
29:6,10,15,20 30:3
30:8,15 32:4,18
34:2,7,10,13,16,21
34:23 35:1,6,9,12
39:4,9,19 42:2,3,7
42:18,24 43:1,5,12
43:15 45:25 46:6
47:12,16,20 48:15
49:7 51:9,22 52:3,6
52:8,12 54:11 55:5
55:10,17 56:9 57:15
57:16 59:25 60:10
60:14 63:3,7,21
64:1,11,13,17 67:12
67:25 68:5,8,19
69:15 70:8 75:11,12
76:3,6,13 77:12,14
77:24 79:1,19,20
80:5 82:5,25 83:4,9
83:11,15,17,22
85:12,16 86:16,22
87:14,19 88:5,12,23
89:7,10,16 90:1,11
90:14,17,22 92:3,12
93:3,9,12,19 94:1
95:4,13 96:13 97:3
97:8,12 98:3,10,13

98:15,24 99:11
101:3,4,15,23
102:16 103:8 104:4
104:19,22,24 105:9
105:20 106:5 107:5
107:13 108:8,10
109:6,17,25 110:10
110:19,23 111:1,4
111:11
**ignall's** 10:9 78:25
**ii** 1:7 50:3,7 83:13
86:1 103:18,19,24
**iii** 50:7 86:2,8
103:18,20,25
104:17,22 105:23
108:14,22
**imagine** 97:24
**immaterial** 89:13,19
**immediate** 10:1
**immediately** 66:18
**immense** 35:3,4
**immunized** 23:1
**impact** 71:15
**impeachment** 37:21
38:22,24
**implies** 63:8
**importance** 71:25
**important** 27:24
28:3 67:7,19 75:15
76:20
**importantly** 80:1
**impossibly** 63:18
69:22
**impression** 96:2
**inaccurate** 63:7
79:20
**inappropriate** 14:21
33:7
**incapable** 75:2
**include** 98:25 99:17
99:18,22
**included** 17:2 90:5
99:6 108:23
**includes** 51:11
106:15

**inconsistent** 27:3
  37:22 38:23
**inconvenient** 48:14
**incorporated** 86:14
  100:16
**incorporates** 44:18
**incorrect** 80:18
**incredibly** 62:2
**indicate** 79:22
**indicated** 24:8 27:18
  109:11
**indicates** 14:6
**indicted** 66:4,6
**indictment** 56:24
  66:1 81:22 82:15
  83:19 84:22 85:9,10
  85:13,25 86:14,19
  86:23 88:2 101:19
  110:4,7
**indirectly** 54:23
**indiscernible** 3:2
  18:2,4,13,15,16
  19:23 20:1 30:2
  50:2 58:25 59:11
  63:24 66:10,13
  68:22 70:16 71:20
  74:5 75:4,20 77:21
  81:17 85:5 89:9
  91:8 95:5 98:25
  99:7 103:18 109:18
  109:20 110:22
**induces** 107:7
**inducing** 106:16,25
**infer** 7:16 10:2
  69:18
**inference** 4:22 10:25
  13:4 15:5 34:3 76:8
  77:21
**inflammatory** 14:14
**inflexion** 32:6
**influence** 59:12
  60:16 63:18 64:25
**influenced** 59:3 60:3
  60:11 64:7

**influencing** 50:19
  54:15,19,24 55:7
  56:20 57:11,20,21
  58:6 59:5,10,15
  60:6 62:24 64:18
  66:9 67:14,16,20,21
  68:11
**information** 68:17
  93:8
**informed** 32:13
**infusion** 47:3
**initial** 69:5 93:21
**initially** 24:24
**ink** 8:23
**innocence** 14:12
  20:16
**inquiry** 45:21
**inserted** 98:9
**instances** 30:24
**instruct** 75:18 79:10
  95:23 99:2 100:17
  110:11
**instructed** 43:7 50:5
  100:1
**instruction** 3:18 4:3
  4:17 5:3 6:9 7:18
  11:11 13:6,7,8,14
  13:15,21 14:3 15:5
  21:24 22:23 23:15
  25:24 39:1,16 40:8
  40:16,16 41:2,10,25
  42:10 43:2,16,19
  44:1,8,9,17 47:7
  48:9,10,11,13 49:3
  50:3,16 51:10,11,20
  51:22 53:5,6,8 57:4
  57:6 61:3,20,24
  62:3,5 64:22,23
  65:3,7,18,19 69:16
  70:1,2 72:13 73:15
  74:7,8 75:14 76:1
  77:6,16 78:9,24
  79:14 80:3,8,24
  81:11,13 82:19,20
  84:1 85:9,14 89:3

**instructions** 16:22
  17:1,19,22 18:11,18
  19:20 28:22 33:12
  37:12 41:25 45:3
  48:16 53:14 54:1
  55:22 79:3 80:16
  90:5 92:13 100:15
  104:8 105:7,22
  109:5
**intended** 11:7 46:5
  46:22
**intent** 7:12 46:9,13
  47:6,11,12,13,16
  48:10,18,20 60:7
  71:16 78:10 79:8
  80:17 97:18 98:7
  99:10
**intention** 48:21
**intentionally** 68:18
**intents** 68:24
**interactions** 72:2
**interpretation** 44:22
**interpretations** 6:8
**interpreted** 44:16
**interpreting** 40:23
**introduced** 12:23
  109:14
**inventory** 28:15
**invest** 5:21 9:1
  10:18,22 11:25
  12:16
**invested** 6:15 11:16
**investigating** 59:16
**investigation** 24:12
  59:4,10
**investigators** 59:2
**investment** 5:11,12
  11:5 50:20,24,25
  54:8,21 56:7 57:13
  57:22 58:2 60:22
  61:1,12,16 62:23
  63:9 64:4 66:9,11

**89:11,24 91:1 92:22**
  97:24 98:23 104:1
  107:5 108:7,20,24
**instructions** 16:22
  66:24 67:12,18,25
  68:1 69:2,6 70:21
  71:2,25 72:5,10,24
  73:9,20 74:20 77:19
  87:10
**investments** 45:12
  45:20,21 55:13
**investor** 32:25 46:15
  46:20 73:9
**involve** 86:1,2 97:16
**involved** 55:13
  59:17 65:1 71:8
  86:7
**ipad** 18:23
**irrespective** 65:17
**issue** 3:14 10:1
  31:10 44:9 45:12
  48:14 50:16 51:1
  55:22 62:25 65:20
  70:19 84:21 85:5
  91:5,15 98:6 100:25
  102:12,13 104:17
  105:1 106:3,10
  107:13 109:25
  111:6
**issued** 63:15,16,17
**issues** 72:16
**italics** 39:17
**iv** 50:8 86:2,8
  103:18,20,25
  104:18,22 105:23
  108:14,22

---

**j**

**j** 1:13,19
**jennifer** 1:10
**joel** 1:16
**joining** 106:21
**jones** 1:7 74:13
**judge** 1:8 52:23
  58:22 79:10 93:2
  100:16,19,23
**judges** 27:24
**judgment** 62:10,11

| | | | |
|---|---|---|---|
| **judicial** 23:22 | **key** 75:23 | 87:15,18,20 88:17 | **lieu** 11:1 49:14,14 |
| **jump** 48:12 52:4 | **kind** 18:9 32:7 | 88:19 90:22 91:4,15 | **light** 59:18 72:11,16 |
| **jumping** 110:1 | 37:24 40:25 42:21 | 92:21 96:19,24 97:4 | 90:25 105:1 106:19 |
| **june** 69:7 72:18 73:7 | 50:10 57:6 85:1 | 97:9 99:14,22 101:5 | **limitations** 33:19 |
| 73:8 | 87:9 88:20 107:2,3 | 106:12,14,23 107:8 | 80:7 |
| **jurisdictional** | **klein** 86:24 | 107:9 | **limited** 71:19 |
| 105:11 | **knew** 4:13 5:6 11:24 | **larger** 82:5 | **line** 84:11,15 |
| **jurisdictions** 96:8 | 34:4,9,12 | **lasted** 15:8 | **lineage** 40:25 |
| **jurors** 9:18 79:6 | **knocks** 32:7 | **law** 4:19,20 5:25 | **lined** 54:2 |
| 84:25 85:9 108:12 | **know** 5:10,16,19 | 15:1 22:14,19,21 | **lines** 11:22 88:24 |
| **jury** 1:7 3:6,18 7:8 | 11:13,15,19 12:1,2 | 30:22 31:4 48:17 | **linkage** 5:10 6:4,5 |
| 7:15,18 13:7 14:2 | 12:3,6,25 19:13,14 | 65:19 66:15 80:18 | **links** 70:23 |
| 16:22 17:15,19,22 | 19:16,16 20:10 28:4 | 90:1,2 95:23 96:20 | **lisa** 66:17 72:2 |
| 20:2,13 21:1,4 22:4 | 29:16 30:15 31:2 | 97:14 99:23 102:2 | **listed** 23:5 |
| 23:6 28:22 34:3 | 36:23 42:8 46:24 | 108:12,19 | **listen** 98:22 |
| 40:8 41:3,8,9,12,17 | 47:5,11 50:17 51:22 | **lawsuit** 4:9 | **literally** 11:6 48:2 |
| 41:22 43:6 44:20,24 | 59:25 61:5 65:5,6 | **lawyer** 4:7,18 | **little** 11:24 18:5 |
| 44:25,25 50:4,14,15 | 65:25 66:4,15,23 | **lay** 79:3 109:9 110:3 | 37:25 73:13 102:16 |
| 50:17 53:5,7,14,22 | 71:8,10,22 72:5 | **lays** 78:22 79:2 | **litvak** 50:9,11 51:1 |
| 57:4,6 59:12 60:23 | 74:2,5 76:19 78:25 | **lead** 58:4 64:24 | 52:16,17 55:3,17,21 |
| 61:5 62:21,22 64:3 | 85:10 88:19 91:10 | **leads** 57:16 | 56:19 60:8,18 63:15 |
| 64:22 65:12,16,16 | 93:19 94:21 97:21 | **leaping** 57:1 | 63:16 65:5,11 98:5 |
| 65:17,18 66:3,6,7 | 99:7 106:6 107:16 | **learned** 54:19 73:19 | 99:1 106:3 |
| 66:10,10 67:5,8 | **knowingly** 48:21 | **left** 29:12 77:11 78:6 | **litvak's** 55:16 |
| 69:17 70:4 74:21 | 99:12 105:6,18,22 | 81:20 90:3 111:6 | **llp** 1:14 |
| 75:18 78:24 79:10 | 106:13 | **legal** 102:6,14 111:6 | **loan** 4:13 5:11,13 |
| 79:22 80:13,20,21 | **knowledge** 22:2 | **lend** 11:15 | 6:12,14 7:5,10,12 |
| 80:24 83:25 84:8 | 59:8 72:3,4 76:24 | **length** 75:4 | 7:13 8:3 9:13 10:17 |
| 86:18 88:8 89:3,20 | 98:7 101:1 | **letter** 15:17 32:24 | 10:22 11:5,13,25 |
| 90:3 91:21 92:13,14 | **known** 72:1 100:12 | 32:25 34:8,15,17 | 12:6,17,21,25 13:2 |
| 92:25 93:4,6,7,15 | **knows** 5:22 21:4 | 67:1 69:8 72:7,21 | 13:18 46:25 47:3 |
| 97:23 100:15,17 | 60:2 69:24 | 111:5 | 68:7,8 69:18 |
| 102:13,22 103:19 | **koch** 66:18 70:24 | **letting** 53:21 | **loaning** 46:19 |
| 104:6,8 105:7,14 | 72:2 | **level** 71:11 | **loans** 91:20 |
| 107:1,22 108:24 | **kramer** 35:17,23 | **levels** 66:22 | **locals** 100:12 |
| 109:14 110:5,11 | 37:3,3,6,7 99:20,21 | **levin** 5:11 6:11 7:22 | **long** 54:18 58:12 |
| **jury's** 59:19 | 100:6,10,14 | 8:3 9:8 10:11 11:7 | 85:12 92:25 93:9,12 |
| **justify** 108:7 | | 12:2,13,23 13:3 | 93:13,17 105:10 |
| | **l** | 73:8 | 109:2 |
| **k** | **lack** 55:4 78:10 79:8 | **levin's** 8:5 12:25 | **longer** 88:18 |
| **k** 40:23 | **lacks** 18:10 | **liability** 107:14,23 | **look** 8:5 10:19 11:1 |
| **keep** 71:17 88:18 | **laid** 75:5 109:3 | 110:12 | 20:21 21:22 24:25 |
| 95:3 | **language** 40:10 | **liable** 108:18 | 26:24 31:10,17 43:3 |
| **kept** 71:12,13 | 41:17 46:4 47:19,21 | **lie** 60:15 | 58:18 77:15 80:2 |
| | 48:4 83:18 85:21 | | 84:4 99:12 |

**looked**  73:17
**looking**  12:12 18:21
  25:9 47:1 72:11
**looks**  22:3 72:17
  101:21
**lose**  70:4
**losses**  32:6
**lot**  14:7 34:25 37:14
  57:18 62:6 71:13
  91:11 99:14
**lots**  73:10
**loud**  40:3,5
**louder**  19:25
**lower**  12:15 92:8
**lump**  20:25
**luxury**  79:4
**lyons**  3:8

**m**

**ma'am**  16:12 37:2
**madam**  36:14
**mail**  99:16,16
**main**  23:15
**major**  85:23 86:12
**maker**  50:23 54:18
  54:24 56:7,18 58:12
  58:13 59:6,15 60:21
  67:7,9,11,16
**makers**  66:17,17,23
  71:5,8 74:2 77:3,4
**making**  26:3 48:9
  51:17 55:14 56:1
  58:15 65:3 69:14
  73:4 104:17
**malicious**  71:17
**mandel's**  58:22
**map**  65:17 66:7 67:8
  79:5,5
**margin**  10:16
**marked**  4:14 25:3
**market**  1:14,24
**maroon**  54:5
**married**  74:17
**matches**  98:21

**material**  50:5,18
  51:14,14 53:1,3
  57:11,20,23 59:4,8
  59:14 60:8,17 63:11
  63:17 64:6 74:11
  89:23
**materiality**  50:1
  51:11 52:8 58:23
  59:1 60:3 65:7
  69:23
**matter**  5:24 12:22
  51:14 55:18 59:11
  60:10 83:23 105:13
**matters**  66:12
**mcbain**  58:19 59:7
  59:13,21 60:1,20
**mccostlin**  112:3,7
**md**  1:18
**mean**  11:6 17:12
  35:20 36:18 44:20
  46:21 54:2 57:13
  62:19 79:2 94:14,16
  103:4 106:6
**means**  48:20 65:21
  102:21
**meant**  44:1
**measure**  109:15
**meet**  37:5
**meeting**  27:24 28:2
  28:3 69:6
**member**  35:24
  50:25 56:15 57:12
  72:10
**members**  58:3 70:20
  72:19 73:18
**memorandum**
  30:22 31:4,20
**memory**  8:16
**mess**  48:15
**message**  41:8
**messed**  90:13,19
**met**  69:16 79:6
**mezvinsky**  100:7,9
  100:10,11,21

**michael**  1:19
**microphone**  19:25
**microphones**  3:5
**mid**  1:23
**middle**  24:4 74:22
  96:22
**mill**  62:5,7
**million**  5:20,20,21
  5:23 7:21 8:25
  10:17,17 11:3,18
  12:3,4,4,14,16,17,20
  12:24 13:3 47:2,3
  69:18,21 72:20 73:2
  91:18,18,19 92:2,6
  92:16
**mind**  5:5 10:15
  11:11 35:16 64:2
**minds**  103:20
**mine**  20:10 82:3
**minor**  49:16
**minute**  9:10 28:25
  50:10
**minutes**  49:20 96:11
**mislead**  74:9
**misleading**  67:16
**misread**  88:4
**misrepresentation**
  74:9
**missing**  53:20 54:17
  61:20,24 62:2,5
  70:20 72:12 73:15
  75:13,23 76:1 77:5
**misstatement**  55:12
**misstates**  79:25
**misstating**  67:13
**mistake**  7:24 45:11
  78:10 79:8,23 83:21
  106:2
**mistakenly**  46:19
**misunderstanding**
  48:23 97:19 110:17
**model**  39:1 40:7
  89:3 100:15 105:7
**modeled**  78:23
  79:15

**modification**  26:16
  81:12
**modified**  43:25 84:5
**modify**  39:20 92:18
**moment**  13:11 42:3
  42:24 98:10
**moments**  70:21
**money**  5:16,18,22
  6:6,15 8:7,7 9:8,12
  9:12 11:15,18,25
  12:1,7 46:20 60:17
  88:22 90:3
**monies**  6:12
**months**  66:5
**moot**  53:8
**morning**  3:17 34:5
  93:16
**motion**  30:19 52:19
  52:23 53:6 58:10
  102:11
**motions**  75:3
**motive**  25:19
**motives**  26:12
**mouth**  54:18 80:15
**move**  35:22 73:1
  81:19
**moved**  72:24
**moving**  35:21 37:25
**multi**  39:15
**multiple**  20:19
  26:22
**musser**  4:9

**n**

**n**  2:1,4,11,14 3:1
  37:4 112:1
**name**  23:16 34:3
  37:2
**named**  74:3
**names**  39:1 71:24
  73:14,17 77:18
**narrative**  80:9,10
**narrow**  29:8
**national**  1:23

nature 45:10 81:22
82:15 83:19
necessarily 9:11
42:22 58:11 82:25
necessary 17:14
92:11 95:3
need 19:25 22:22
25:23 26:6 29:11
47:18 54:22 58:11
74:4 76:23 89:23
needed 21:17 73:24
97:12
needs 44:15,22
47:20 83:1
negative 71:15
neither 56:14
never 10:15 57:22
58:25 71:14 77:18
93:7,8 94:12
new 31:4,4 56:13
69:21 83:8
news 32:10
nice 37:5 44:17
nifty 17:11
nine 22:19
noise 3:4
non 39:14 66:17
normally 59:9
noted 3:2
notes 8:6,23 13:20
90:13,19
noteworthy 15:17
notice 23:22 49:25
notion 53:1,6
nova 12:14 13:1
46:25 68:23 73:11
73:23
nova's 74:24
nugget 50:3
nullification 42:21
number 4:4,6,10
10:10,14 16:23,25
32:5 37:10 46:7
48:6 54:20 67:19
72:14 81:24 92:8,9

92:14,15,15 106:2
110:5
numbered 10:15
numbers 82:4 91:11
91:19

**o**

o 3:1 112:1
o'malley 41:9,25
44:17
object 63:5 87:3
88:8,9 90:21 95:5
95:10,18 107:6
109:2,8
objected 98:17
objecting 43:2
objection 17:3,8
20:3,20 23:11 32:20
33:15 43:10 83:1
84:18 96:14,15 98:5
objections 16:24
17:24 19:14,20
objective 60:4 88:21
objectively 97:22
objects 45:9,14
90:21
obligation 43:13,16
obtain 91:17
obtaining 88:22
obviously 18:9
31:19 42:13 88:8
occasion 7:23 66:25
occurred 51:7
october 16:23 31:12
31:13,15
offense 31:16 45:10
45:16 51:7 80:17
85:22 86:11,25
offenses 26:23 27:1
27:5,11,20
offered 26:9 56:8
88:18
offering 79:12 82:23
105:6

office 1:11 36:7,11
72:3
officer 22:20
official 67:2
oh 10:15 12:11 26:5
53:11 78:8 83:14
105:5 111:3
okay 9:19 14:13
15:20 16:20 17:25
20:1,12 21:12,18
25:6 26:5 28:6 29:3
29:20 31:8 35:14
40:5 49:5,6 52:5,11
62:22 70:7 77:24
78:3 79:6 81:16,18
83:16 84:11 87:17
88:14 90:7,18,23
92:22 94:7,18,23
95:1,8,12,16,17,24
95:25 96:5,6,9,12
96:15 97:11 98:3
101:10,22 103:4
104:12,16,21
105:25 106:1
107:12 109:23
110:15 111:7,8
omission 54:13
68:10 69:18 102:9
omissions 103:10
omit 49:13,15
omnicare 97:16
once 104:3 105:13
ones 17:8 28:18
42:22 73:21,21,22
74:4 95:5,10 96:14
opinion 37:20 50:8
96:18 97:20,20,21
opportunity 36:1
71:3
opposed 13:13 21:5
43:20 52:25 64:25
83:4,13 91:18 92:15
105:13 108:2
orally 35:17,19

order 10:13 13:23
14:19,22 30:19
102:4,5
outside 32:22
overall 47:1
overlapping 87:2
104:6
overturning 59:19

**p**

p 3:1
p.m. 1:5,5 32:1,1
111:12
pa 1:4,12,15,22,24
packet 78:11,15
82:6
page 2:9 8:18 12:13
19:18 54:10 78:11
81:21 82:1,4,13,14
87:21,24 88:1 91:5
91:14 95:19,21
96:16,21 101:13
pages 27:23 28:22
40:24 92:24 93:8
paid 36:5
pale 12:9
paragraph 21:8,18
23:14 24:5 39:16
49:2,16 54:7 83:23
87:18,21,24 88:2,7
88:17,21 89:2 96:22
96:23 97:5 101:7
paragraphs 24:9
40:7 44:17
parallel 23:14
pardon 34:11 38:1
110:23
park 1:18
parse 62:22
parsed 65:24
parsing 10:23
part 5:2,2 8:5 13:22
37:13 41:11 48:19
56:12 58:14 77:14
103:11,11 107:20

108:17
**participates**  67:15
**particular**  15:16
  50:3 64:25 84:1
  95:19 96:21 102:3
  108:14
**particularly**  4:17
  89:20 106:19
**parties**  3:4 30:4
  49:25
**partisan**  80:13
**partnership**  65:23
**party**  4:8 31:12
**passed**  66:18
**passive**  106:20
**patience**  70:7
**patrick**  1:13
**pattern**  25:23 26:2,8
  27:9,14,15 39:16
  43:1,2,9,19 48:16
  48:19,20 51:12
  54:25 64:23 65:3,6
  65:17,18 70:1,2
  74:7 79:13,16 89:11
  90:2 97:13,24 98:23
  99:13 105:21,21
  107:5,8 108:12
  109:4
**patterson**  23:8 39:2
**pause**  17:16 29:4
  41:15 43:4 70:9
  74:15 82:11 98:14
**pay**  36:13
**paying**  36:12
**penalty**  20:14
**penn**  30:1 95:7
**pennsylvania**  1:1
  100:7
**people**  44:21 58:14
  64:25 66:21 67:20
  71:3,8,19 72:3,8
  73:20 76:25 86:7
**perfect**  8:17
**perform**  42:14

**period**  47:15,16
  90:8
**permit**  50:9
**person**  9:8 34:5
  51:16 53:23 60:2
  61:25 64:25 66:19
  75:25 77:10 84:4
  91:17
**person's**  75:24
**persons**  59:17
**pertinent**  13:22 14:5
**ph**  4:9 32:21 66:21
  67:1
**philadelphia**  1:4,12
  1:15,22,24
**phone**  35:12 80:6
**phrase**  57:10 62:19
  65:9,10 80:10 89:21
  102:2,5 110:17
**pick**  14:8 92:14
**piece**  71:24 75:6
**pieces**  74:19
**pierce**  1:20
**pinkerton**  107:14,15
  107:23 108:7,20
**place**  65:10 80:14
**placed**  51:5
**plan**  93:3
**played**  4:1 5:10,14
  6:6 11:22
**plea**  23:8 42:14
**please**  36:14 37:2
  38:6 41:14
**pleasure**  28:11
**plenty**  7:11 69:17
**point**  7:9,20 23:4
  30:12 40:1 46:7
  52:15 53:8 60:5
  68:9 69:7,10,20
  73:7 85:13 97:15
  101:18 102:1
  103:22
**pointing**  77:13
**points**  32:6 37:16

**pondered**  42:8
**poor**  3:3
**pordy**  1:17
**position**  40:12 45:17
  46:2 71:19,19 75:1
  108:9,10
**positive**  6:23
**possible**  3:15 22:1,2
  53:19 65:17 106:23
**possibly**  29:11
**potential**  23:24
  42:22 64:24 66:16
  71:7 73:9 77:3
**potentially**  32:14
  76:25 86:18 97:14
**potomac**  1:18,18
**pounding**  66:4
**ppif**  56:2
**practice**  41:9
**praise**  57:10
**preclude**  92:19
**precludes**  61:3 65:3
**predicate**  86:1
**prefacing**  22:10
**prefatory**  83:18
**preferable**  44:10
**preference**  27:12
**present**  3:6 21:25
  24:20,25
**presentation**  50:10
**presented**  21:23
  26:10 40:10 55:4
  56:5 60:24 72:17,22
  107:22,24
**presumption**  14:11
  20:16
**pretty**  75:12 104:7
**preve**  7:13 23:7 39:2
**prevent**  63:12
**prevented**  70:2
  75:17
**preventing**  76:9
**previous**  70:16
**primary**  56:10,11
  56:17,17

**principal**  33:25
**print**  49:9
**printed**  19:6 80:5
**prior**  37:22 38:23,24
  39:14 73:7,8 104:13
**private**  6:16 65:23
**prize**  42:16
**pro**  35:21,22 36:5
**probably**  5:2 17:7
  21:9 75:9 88:7,12
  88:13 93:21
**problem**  18:23 27:8
  36:4 54:16 61:23
  96:16 98:6 103:16
**proceed**  78:4
**proceedings**  36:3
  74:4 111:12 112:4
**proceeds**  4:13 11:13
  12:6,21,25
**process**  30:22 56:1
  57:18 58:15 64:7
  67:6 69:8 71:7,8,12
  72:8,23 73:5,18
  74:21,22
**procures**  107:7
**procuring**  106:16
  106:25
**produce**  22:1,7
**produced**  21:19
**production**  77:2
**professionals**  42:1
**program**  20:9 46:14
  56:2,24 58:7 60:15
  60:16 62:6 65:20
  66:1,15 87:5
**prong**  86:23
**proof**  20:17 21:1
  43:7 55:8,10,18
  57:17 62:1 67:14
  69:2,16 92:4
**proper**  45:12
**proposal**  83:2 86:17
**propose**  16:16,21
  17:2 91:15 106:14

[proposed - representation]                                    Page 16

| q | | |
|---|---|---|

**proposed** 3:18 13:7
16:22 17:19 19:20
37:13 45:9 47:8
48:8,22 51:10 70:11
78:9 80:3 82:18
87:4 88:20,21 89:11
91:1 106:12
**proposing** 46:10
47:8
**pros** 42:1,1
**prosecutor** 44:13
99:3
**prove** 79:4 102:22
102:24 103:12
**proven** 81:2 84:23
**provide** 19:1 30:23
**provided** 3:18
**provisionally** 73:2
**prudent** 51:16 57:12
**public** 65:23,24
**pull** 12:18
**pulled** 99:25
**pulling** 30:13
**purchase** 4:14 6:12
11:13 13:1
**purple** 78:15
**purports** 34:7
**purpose** 7:12 8:25
10:1 13:2,17 26:12
48:21 79:12 88:22
106:13
**purposes** 35:18
68:24 100:8
**pursuant** 105:1
**put** 5:20 8:7 12:20
32:20 38:8 48:12
49:9 53:6 83:5,7
85:21 91:18,20 92:9
96:24 98:18 106:1
107:12
**puts** 65:9
**putting** 12:14 57:8
106:14

**q**

**quality** 71:25
**question** 4:16 5:15
5:19 6:3 7:14,17,22
7:25 8:6 9:7 10:9,24
11:9,12,17 12:5,6
12:24 41:7 50:1,21
52:1 54:13 57:18
60:21 64:21 68:10
81:7 91:9 102:17
**quickly** 17:7 78:4
**quite** 5:1,17 46:24
52:9 93:9,13
**quote** 9:13 41:2
58:22 59:5,6
**quoting** 30:24

**r**

**r** 3:1 37:4 112:1
**raise** 43:22 73:24
**raised** 73:23
**raises** 41:5,24 92:4
**raising** 43:21
**read** 4:15,16 8:24
9:21 11:6 21:25
27:14,15 41:13
42:10,12 43:5,14
83:25 84:8 96:2
97:16 99:24 101:5
**reading** 18:6 60:18
76:19 81:1
**really** 11:17 44:10
75:23 86:9
**reason** 7:16 18:8
20:6 26:9 44:2
50:21 68:9,15,16,25
69:11 77:20 82:17
85:21 89:15,17,19
91:18 96:2 101:18
106:17 109:9 110:3
**reasonable** 10:25
13:4 20:17 41:5,18
41:24 42:11,17,19
43:8,21,22 51:15
57:12 59:5,15 60:21

81:2
**reasonably** 7:16
51:15 108:16
**reasons** 4:5 7:23
69:3 70:22 79:21
**rebut** 79:7
**rebuttal** 93:24
**recall** 11:22
**reccommend** 58:4
**receive** 23:9,18,21
**received** 23:9,17,21
72:6
**receiving** 60:2
**recessed** 32:1
**recipient** 69:24
**recollection** 7:7 8:6
20:13 32:23
**recommending**
63:13
**recommends** 56:10
57:25
**reconvened** 32:1
**record** 20:13 30:23
30:24 32:21 37:2
38:20 112:4
**recording** 3:3
**recross** 2:3
**red** 8:23 18:13,14
19:3 43:11 54:1
78:15 83:8
**redirect** 2:3
**redline** 17:23 20:9
**redlined** 17:18 18:9
37:10 54:1
**refer** 20:23 27:15
39:11
**reference** 23:5
24:21 86:15
**referred** 42:1 86:15
**reflect** 19:8,11,12
39:21
**reflects** 96:20
**refresh** 32:23
**regard** 40:7,9 63:24
65:5 99:21 110:16

**regarding** 23:24
58:23 99:25
**regardless** 15:5
19:11
**region** 1:23
**regulator** 47:4
56:10,11,17,17
**regulators** 46:25
66:20 74:1
**reinvent** 44:3
**rejected** 28:20,20
**relate** 51:13
**related** 11:20 22:1
70:19
**relates** 70:20
**relative** 15:19
**relay** 94:4
**relied** 96:17
**relief** 56:24
**relies** 40:22
**reluctant** 48:15
**rely** 55:11
**relying** 51:16 103:5
**remained** 68:25
**remember** 8:4,12,15
10:4
**remove** 89:2
**renee** 37:3
**reopen** 33:8
**reopening** 30:14
**repeating** 24:5
**replace** 6:12 8:10,25
10:17,25 11:5 87:22
**replaced** 9:12,13
12:16
**replacing** 6:15 8:11
**reply** 85:24
**report** 37:15 45:19
58:5 75:4
**reported** 45:21
**reporting** 1:23
45:19
**representation**
33:16 51:13,16
96:23 97:10 102:18

103:13
**represented**  34:5
**request**  80:23 81:21
82:2,15 84:16,20,22
85:20 87:17 89:14
90:9 92:18,23 96:16
104:10 109:8 110:1
110:2
**requested**  37:15
80:13
**require**  72:12
**required**  13:24
21:25 22:6 24:12
36:5 41:1,21 45:18
46:8 55:9 84:23
**requirement**  76:18
**research**  101:8
**reserve**  56:14 57:2
**resolve**  17:3,9 32:3
48:14
**resolved**  101:24,25
**respect**  3:8 30:18
46:18 66:3,5 102:25
103:2,9,9 105:22
**respectfully**  41:9
49:23 52:17 53:9
60:19 73:16 85:21
86:5 102:1 103:17
**respects**  63:19,19
68:14
**respond**  52:13
**response**  55:20
58:10 103:6
**responsibility**  59:17
**rest**  16:3,4 23:14
35:23 46:3 49:21
70:7 78:4 95:10
96:11
**restatement**  80:23
**restitution**  92:10,12
**restriction**  57:17
**restrictive**  46:11
**restricts**  92:4
**resubmit**  30:25

**result**  30:19
**retrieve**  16:17 82:10
**return**  12:15 89:3
92:21
**revelation**  23:23
**reversal**  44:5 52:22
**reversed**  51:8
**review**  31:13
**rich**  55:23 56:13
**rid**  103:22
**riding**  108:3
**right**  3:8,12 5:8 6:5
6:10 9:11 10:6,10
10:15 11:8 13:19
15:23,25 16:14 17:4
17:17 18:22,24 19:7
19:17 20:6 21:8
22:8,18,25 23:21
24:3,11,16 25:2,2
25:19 26:21 29:18
30:2,3,11 31:22,25
32:3,11,16 33:14
34:6,18,22,23 35:1
36:24 37:5,8,17
38:12 39:3,10,23
42:2,25 43:23 45:4
45:7 49:7,8,11,24
51:19 52:7,14 53:17
61:14 63:16 65:15
68:22 69:25 72:9
74:12 75:8 77:9,10
78:2,19,21 81:14,20
81:24 82:12,16,24
84:10,19 85:2,7,15
86:21 87:12,15,16
87:20 89:1,8 92:17
93:11 94:2 95:25
96:10 100:19,24
101:12,22 104:10
104:23 106:4 109:2
109:7,24 110:19
**rise**  41:18 42:11,17
42:19 44:5
**road**  65:17 66:7
67:8 79:5,5

**rogers**  1:17
**role**  72:8
**roll**  20:2
**room**  73:20
**rothschild**  1:14
**route**  51:4
**roven**  23:5,5
**roven's**  23:15
**rubik's**  62:20
**rule**  30:19 52:19
53:6,10 58:10 62:25
65:9 73:5 102:11
103:5,5 106:7
**rules**  98:21
**ruling**  70:12,15
90:25 104:13
**rulings**  71:13
**run**  62:5,6 107:12
**russell**  1:16

**s**

**s**  1:21 2:8 3:1 40:23
**safe**  44:6
**sand**  100:16
**save**  34:25 35:4,5
**saw**  9:17 66:25
**saying**  4:17 6:1 7:4
8:16 9:6 26:3,3
28:19 34:19 44:13
44:21,22 56:6,6
57:1 59:24 64:2
65:11 71:16 79:6,7
83:9 91:23 94:18
103:8 107:19
**says**  6:4,6 7:14 8:24
9:7 10:25 11:14,16
13:21,22 27:9,14
40:15,16 41:1,6,20
43:6,17 44:19 48:20
50:11 51:12 53:2
54:7 56:25 62:13
64:5 65:25 66:1
79:6 80:8,12 88:2
99:11 106:12 107:6

**schedule**  33:11
**scheme**  91:17,22
97:5 102:21
**schwartz**  1:16 13:18
17:10,14 18:1,4,8
18:25 19:22,24 20:1
20:3,5,15,18 21:14
22:17,24 23:3,13,19
24:10 25:12,16,18
26:9,17,20 27:4,13
27:25 28:6,9,25
29:7,21,23 30:4,7
32:9,12,17,19,24
33:4,15 34:14,19,24
35:7,15,21 36:8,13
36:16,18,21,24 37:9
37:18 38:1,4,7,13
38:17,19,22 39:6,11
39:24 40:1,4,21
41:20 42:4 44:12
47:24 48:1 49:1,9
49:12,15,19,23
50:17 51:23 52:6,15
52:24 53:2,9,12,15
53:18 54:3,6,14
55:19,21 56:22 57:5
57:9,24 58:16,20,24
60:19 61:5,9,12,15
61:19 62:4,9 63:4
65:8,15 68:21 70:6
70:10,15 78:3,6,8
78:14,18,20,22
79:15,18 81:6,9,16
81:19 82:1,14,17
83:7,21 84:9,11,15
84:20 85:2,4,8,17
85:19 86:17 87:3,7
87:8,14,17 88:1,15
88:16 89:1,8,12,17
90:7,12,15,18,24
91:4,14,24 92:1,20
93:1 94:3,7,9,14,18
94:23 95:1,8,12,17
95:20,24 96:1,5,7,9
96:12,15 97:2,5,7

98:1,4 100:12,21,23
101:1,11,13,17,25
103:4,16 104:12,16
104:21,23 105:5,16
105:25 106:6,9
107:12 108:6 109:7
109:18,23,25
110:15,20,22,24
111:3,8,10
**scope**  59:16
**seat**  36:15
**seated**  32:2
**second**  7:5,23 10:16
21:17 35:2 37:21
50:8 51:21 52:17,22
54:9 55:3 56:1
62:10,14 68:14 70:8
74:13 87:21,24
88:17 91:5 95:19
98:13
**secret**  71:14
**section**  102:5 106:15
106:24
**secure**  44:6
**see**  9:6,19,23 18:6
28:10 30:10 31:24
40:13 53:7 64:1
69:10 83:14,16 87:9
93:14 96:10 99:6
101:4 110:7
**seeking**  4:2
**seen**  58:25
**send**  25:13,15 28:19
36:6,10 49:10 84:16
90:22 101:8,20
**sending**  38:2,16
85:13 101:19
**sense**  4:11 5:25 18:1
45:18 57:21 80:10
88:15 92:2
**sensible**  94:19
**sent**  5:21 33:24,25
49:25
**sentence**  22:11

**separate**  26:22 50:2
68:22 104:9 108:4
**separately**  104:9
110:12
**separation**  108:2,5
**set**  55:22 73:5 82:18
85:25
**sets**  68:13
**seven**  12:4 21:16
**shaftner**  67:1 72:7
72:21
**shares**  16:4
**sheer**  71:25
**sheet**  84:2,3,8
101:21 109:19
**shelf**  53:7 57:8
**shocked**  6:22
**shoes**  56:9
**short**  73:12
**shortly**  27:10
**shot**  110:24
**shotgun**  15:23
**show**  92:5 102:6
103:14
**showing**  7:11 79:8
**shown**  73:6
**shows**  12:23 60:24
106:18
**shubin**  15:17
**shulman**  1:17
**shumate**  13:18
**shut**  74:21
**shutdown**  74:23
**side**  67:10
**signature**  34:10
**signed**  67:1 72:7,21
**significant**  16:25
**silman**  59:22 60:20
**silman's**  59:13
**similar**  99:8,15
**similarly**  16:10
**simple**  83:10
**simpler**  83:12
**simply**  7:25 14:6
21:3 63:17 76:7

80:19
**singular**  20:23
**sir**  3:16,24 16:8
17:13 26:20 29:5
33:5 37:1 38:4,7
70:17 78:14 82:1,14
88:1 104:15 106:8
**sit**  28:1 35:17 36:2
**sitting**  44:21
**situation**  62:2,5
65:22 75:21
**six**  21:15
**slightly**  26:25 27:3
54:12 82:21
**small**  75:6 92:24
93:8
**smaller**  78:15
**smiling**  84:25
**solve**  66:12
**somebody**  55:15
64:4 66:11 106:22
**someway**  103:14
**soon**  30:25 31:2
**sorry**  14:22 18:2
19:9 31:13 35:4
36:20 37:3 54:3
62:18 63:4 68:20
78:8,9,14 82:13
83:16 89:4,13,15
90:12,19 91:7,14
94:3,8 96:7 101:14
103:17 106:1
110:18
**sort**  53:1 70:19,24
72:15 76:16,16
108:2
**sound**  76:16
**sounds**  73:13 101:11
**source**  46:23
**space**  76:24
**spangler**  40:14,15
40:22
**speak**  19:25 79:4
**speaking**  40:5

**speaks**  51:3
**special**  44:19
**specific**  4:15 13:9
24:11 30:23 31:11
62:12 82:18 85:21
92:9 99:9
**specifically**  8:10
13:21 23:20 31:10
31:16,17 41:19
86:10 109:9
**specificity**  84:3
92:19 109:3
**specify**  23:7
**speculation**  75:14
**spell**  82:21 101:19
**spelling**  82:22
**spend**  11:3
**spice**  32:12
**spoke**  55:3 72:15
85:23 99:2 106:10
**spoken**  70:24
**sponsor**  32:15 33:6
33:17 35:17,19
**spot**  21:8
**spun**  62:21
**squarely**  51:5
**staff**  95:3
**stage**  50:14 53:5
57:4
**stand**  48:1
**standalone**  40:16
41:1
**standard**  20:4,5,12
20:13,14,17 21:13
21:16,17 22:19
26:19 27:21 42:15
43:25 44:4,9 45:3
50:16 55:6,18 60:4
61:2 74:7 80:24
82:19 84:17 98:23
109:4
**standing**  35:24
41:11 43:7
**stands**  38:25 69:17

**start**  16:22 18:17
  93:16
**started**  20:11
**starting**  66:17
**state**  5:5 11:11
  41:16 42:9
**stated**  61:4
**statement**  4:18
  12:22,23 13:10,23
  14:5,17,19 15:1
  21:24 22:6,13 37:22
  38:23 39:14 50:18
  50:19,22 51:17
  52:19 53:23 54:13
  54:22 55:7 56:3
  57:1 58:11 59:1,3,3
  59:4 60:2,4 62:20
  63:9,11,16 64:6,14
  64:17,21 68:10
  69:24 74:8 80:18
  96:22 97:9,14
  102:18,24 103:13
  103:15 108:11
**statements**  4:6 7:4
  8:2 13:17 15:13
  39:20 59:11,13,14
  60:5,24,25 62:16
  66:9 73:7,9 75:1
  96:20 104:17
  108:15
**states**  1:1,2,8,10
  21:17 35:25 40:14
  40:22,23 50:19
  58:19 59:22 66:2
  72:6 85:22,23 86:11
  86:24 87:5 100:4,7
  102:3 105:11
**static**  3:4
**statute**  56:23 65:25
  81:1 84:23 98:16,24
  99:6,7,11 100:3,17
  101:5 104:24
  106:24 107:6
**statutes**  99:25

**statutory**  99:22
**stay**  36:11 74:17
  83:23
**step**  32:21 35:2,10
  35:16 56:9
**steps**  54:20 57:18
  67:19 71:1
**stick**  26:13
**sticking**  102:1
**stipulated**  23:21
**stipulation**  23:22
  24:1
**stock**  4:14 5:17 6:7
  6:11 11:14 13:1,3
**stop**  9:11 11:23
  51:19 57:14 63:16
  64:20 66:24
**stopped**  72:2,4
**stops**  45:21 67:3,4
**story**  79:2 102:14
**straight**  75:12
**strains**  75:19
**street**  1:11,14,21,24
  55:23
**stricken**  20:7 22:25
  24:12 25:7 44:6
  92:21
**strike**  24:20 25:6
  88:18 89:5,14
**strikeout**  84:18
**strikeouts**  93:10
**strikethrough**  19:11
  19:13,16 21:9 84:7
**strikethroughs**  83:6
  83:8
**striking**  87:20
**strong**  27:11 106:23
**strongly**  12:9
  103:21
**struck**  4:25 5:2 83:5
  83:11,18
**stuck**  97:2
**stuff**  14:7 63:2 83:8
**subject**  23:23 33:19

**subjectively**  97:23
**submit**  87:12
**submitted**  38:8,9,24
  39:8 55:3 75:4
**submitting**  31:3
**subsequent**  107:18
**subsequently**  10:21
**substantially**  99:8
  107:17
**substantively**
  108:18
**substitute**  49:14
**subsumed**  53:1
  97:17 108:22
**subsumes**  48:11
**success**  89:13,19,23
**succinctly**  102:12
**sudden**  21:1
**sufficient**  26:15 43:8
  55:11 63:12
**suggest**  9:8 17:21
  27:25 28:17 60:19
  67:17 86:4
**suggested**  40:10
  88:25
**suggesting**  26:11
  41:8 86:5
**suggestion**  11:2
  24:15 53:21
**suite**  1:12,21,24
**sum**  74:18
**super**  44:19 86:9
**supplanting**  62:9
**supplement**  13:7
**supplemental**  3:18
**supported**  66:20
**supports**  64:19
**supreme**  96:17,20
  100:4
**sure**  3:21 16:15
  19:16,23 25:23 26:6
  35:8 43:15 50:13
  58:25 62:8 78:5
  83:17 87:19 93:5
  94:19 95:21 98:17

**98:21 107:8 110:10
**surely**  98:12
**suspect**  29:10
**sussman**  80:2,7
**system**  42:10 94:9
  94:13

                t

**t**  2:8 112:1,1
**table**  35:17 36:2
**tailor**  23:3 95:14
**take**  18:14 20:21
  29:2 30:22 33:10
  36:9 39:25 45:1
  58:18 70:3 84:11
  88:7,13,16 92:25
  98:1 101:6 110:24
**takes**  76:12
**talk**  4:20 28:24 51:2
  87:19 88:23 109:17
  110:20 111:1
**talked**  29:7 79:21
  103:6
**talking**  5:5,5 6:3 8:9
  14:16 21:4 67:9
  75:14 83:24 96:21
  97:8
**talks**  80:7 106:24
**tarp**  46:14,18 50:1
  51:10,17 53:23 58:7
  58:14 60:15,16 62:6
  65:20 66:1,15 67:5
  74:21,22,25 75:4
  80:1 87:1,5 88:22
**teach**  30:1
**techniques**  24:12
**ted**  72:21
**tell**  44:14 61:7,9
  94:19
**telling**  9:17
**tells**  107:1
**temporarily**  53:7
**ten**  22:25
**tender**  15:19 26:18
  27:20

**tendered** 13:6,6
14:18 82:4 84:5,7
**tendering** 57:7
**terms** 5:3 17:18
21:23 33:11 51:6
55:8 63:15 64:22
65:7 75:7 92:13
95:22 97:18
**testified** 6:13,14
11:12 25:1
**testify** 15:10 24:20
24:23 25:2 73:15
**testifying** 23:10
39:14
**testimony** 4:1,2,12
5:9 6:11 8:5,16 10:2
10:5 23:22 37:20
38:9 57:25 68:1,3
71:12 75:19 76:20
**testing** 24:17
**text** 37:19
**thank** 3:7 16:1,8,13
17:15 19:3 26:21
30:7,8,9,11 31:23
31:25 35:13 36:16
36:24 37:1,7,18
39:5 70:6,18 74:16
76:11 78:1 81:16
82:13 85:17 87:8,16
88:14 95:20 96:7
98:1 101:12 106:9
109:6,7 110:19
111:9,10,11
**theory** 78:10,17,23
79:11,11 80:10 81:4
110:12
**thereof** 49:14
**thing** 4:11,12 6:1,5
30:12 54:21 66:12
87:10
**things** 11:20 29:8
32:12 42:8 56:6
66:18 72:15 86:17
105:18 107:1
110:20

**think** 6:17,19,21 7:6
7:16 10:20,23,25
11:2,6 12:19 13:15
14:10 15:5 17:2,5
17:23 18:12 19:14
20:8 21:2,6,7,11,20
22:4,5,13,22 24:4,5
24:8,14,15,22 25:4
25:7,12,21 26:1,2,7
26:25 27:2,9,17
29:7 34:2,13,21
37:11 39:19 42:12
42:18 43:17,19,19
44:12,15,16 45:9
46:10,16 47:7,20
48:22 49:4 51:4,9
52:16 54:12,13,14
54:16,25,25 55:5,6
57:7,9,10,16,24
58:13 63:7,23 64:19
64:22 65:3 67:5,13
67:16,25 68:12,13
70:22 71:12 72:14
73:6 74:18 75:12,19
76:11,15,18,19 77:8
77:21 79:20,23
80:16,18 81:9 82:21
83:1 85:4,13 86:16
86:18 87:2,22,22
88:5,6,24 89:7,18
90:4,13,14 92:2,3
92:13,14 93:18 95:4
96:13 97:3,4,12,13
97:14,15,17,19
98:16,18,21 99:18
101:23 102:16,17
102:19,20,23,24,25
103:1,10,12 104:7
104:25 105:9,17,20
105:23 106:17
107:1,21 108:1,5,6
108:11,19,23
109:18,21 110:7,15
110:16,17 111:5

**thinking** 93:5
**third** 24:9 40:8,13
44:1,24 59:22 62:10
65:18,19 78:24
102:2
**thirteen** 24:19
**thomas** 23:8 39:2
**thought** 62:11,13
83:11 86:14
**three** 11:22 15:8,15
20:14 46:12,16 58:3
72:19
**threw** 23:13
**thrown** 91:11
**thursday** 85:24
**time** 5:5 6:13 7:5
16:11 28:7,10 29:2
35:3,4 42:13 74:23
82:13 92:9 94:25
101:7 102:7 110:18
**timeline** 75:5
**times** 7:21 13:16
**today** 28:4 82:6
94:10
**toes** 52:6
**told** 73:24 77:2
**tomorrow** 29:16
33:11 65:16 93:4,16
93:16,25 94:10 95:2
**tonight** 30:1 101:8
**total** 74:19
**totality** 24:13
**totally** 29:18
**towners** 100:13
**track** 77:18 106:23
107:8
**tracks** 106:15
**transaction** 73:10
**transactions** 91:20
**transcript** 1:7 3:3
8:19,20 9:23 10:20
11:2 112:3
**transcripts** 30:20
31:1

**transmission** 109:13
**transmissions**
109:10,11
**treasury** 46:14,23
46:24 50:6 52:20
54:15,19,20 55:7,11
55:13,22 56:3,4,12
56:15,19,20,23,25
57:2,19,22 58:2,5,7
60:10 64:3,4,12,16
64:18 66:2,21,23
67:4,22 68:11 69:8
72:6,24,25 105:12
105:14
**treasury's** 50:20
57:13
**treated** 45:23
**trial** 1:7 24:6,8
39:15 52:22 71:4
100:22
**trick** 102:21
**tried** 18:11 23:3,14
75:10 92:7,15
**trigger** 30:13
**trivial** 60:5
**trouble** 18:6
**troubled** 56:24
**true** 5:18 24:8 64:7
69:15 104:7 112:4
**trust** 33:9
**truth** 102:19,25
103:14
**truthful** 11:21
**truths** 103:10
**try** 14:13,16 17:8
77:18 89:2 101:7
**trying** 4:22 30:2
31:5 48:4,6,12 79:5
79:9,9 100:17 103:7
105:2,3
**tuned** 23:6
**turn** 28:19 59:2
**turns** 6:2
**tweak** 21:12

tweaking  20:19,20
two  4:10,18 5:6 6:13
  7:4,22 8:2 15:16
  20:12 26:11 27:2
  32:14 33:12,17 39:1
  40:7 48:2 50:10
  56:6 70:3 72:18
  86:7,16 88:3 90:20
  97:15 101:7 105:18
  109:11
type  51:7 59:5,14
  63:22,25
typically  20:22

**u**

u.s.  1:11 50:6,9
  57:12
u.s.c.  100:2 106:15
  106:24
ultimate  56:6 67:11
  71:4
ultimately  69:19
unaware  72:7
underlined  40:11
underlying  108:23
undermine  62:14
undermines  62:15
understand  7:20
  9:16 10:6 15:24
  16:24 20:11 22:4,16
  29:18 33:22 50:13
  53:15,18 55:12
  63:18 94:3
understanding
  45:13 71:11
understood  31:7
  38:21
unfairly  107:22
unfavorable  75:19
unfortunately  80:6
unintentional  98:20
unique  62:2 71:6
united  1:1,2,8,10
  35:25 40:14,22,23
  50:19 58:19 59:22

66:1 72:6 85:22,23
  86:11,24 87:5 100:4
  100:7 102:3 105:11
unnecessarily  44:5
  46:17 92:3
unnecessary  26:7
  80:19
unquote  9:13
unsecured  47:3
untrue  103:14
uphill  65:5
urge  103:21
use  12:7 15:1 39:15
  39:16 40:18 49:18
  49:19 62:18 84:17
  100:16 107:9
usually  85:5
utilizing  3:4

**v**

v  40:14,23 50:9
  58:19 59:22 70:11
  100:7 102:3 109:20
vacuum  14:1
valuable  75:9
value  92:5
variation  81:12
variety  15:12
various  66:20,22
  74:1 75:3
vary  44:4
vehemently  33:2
venue  84:21
verbatim  99:24
verdict  42:22 59:20
  84:2,2,8 101:20
  109:19
veritext  1:23
version  18:9,9,20
  25:13 80:9 82:18
  84:5,6 105:8
versus  22:15 40:22
vi  31:11,17 70:11
  109:13,21

vice  35:21,22 36:6
viewing  59:18
vii  86:2,8 110:3,4,6
virginia  35:24
vociferously  33:2
volumes  73:14,17
voluminous  77:2
vote  66:25 72:25
voted  72:19
vs  1:4

**w**

wait  9:10 37:24,24
wall  55:23
want  13:9 14:3,8
  15:18 18:13,15
  22:14 34:4 38:19
  46:24 47:5 51:5
  52:4 56:9 57:9
  64:13 74:13 78:25
  81:6 83:19 93:2
  94:19 95:2,2,21
  98:15,17 101:6
  106:22 107:7
wanted  11:23 12:18
  31:2 32:20 43:3
  86:10 87:9 105:14
wants  7:7 10:19
  11:1 93:6 97:9
  105:21
wash  50:7 103:20
washington  72:3
way  3:9 14:2 17:3
  27:3,12,22 30:16
  41:21 42:23 44:3
  45:20 48:16 54:19
  57:7 58:3 59:23
  62:22 64:18 66:8
  67:4,19 69:23 71:17
  91:21 93:17 94:13
  95:14 102:19
  103:12 109:15
  110:2,8
ways  6:13 45:15
  62:21

we've  18:6,10 26:1
  30:19,20 32:4,5
  33:18 37:9 38:10
  40:10 49:3 51:10
  54:19 62:19,20 66:6
  66:16 68:2 71:6
  73:17,19 75:3 76:24
  77:2 79:6 88:18,18
  88:19 89:3 96:17,24
  96:24 97:3 101:23
  101:25 102:4
  103:12,22 106:19
  108:1 109:11
  110:16
wednesday  93:4,23
weeks  15:8
weigh  108:24
weighed  73:22
welcome  36:17
went  5:23 7:3,4 34:5
  34:19,20 42:13
  87:10 98:19
wheel  44:4
whichever  18:20
wholesome  105:6
willful  99:22 100:3
  100:17
willfully  49:3 98:8
  98:16,18,25 99:2,5
  99:17,18,24,24
  100:1 104:17,19
  105:7,18,22 106:16
  111:5
willing  48:24
win  79:7,9
winding  74:23
wins  32:6
wire  79:24 99:16,16
  109:11,13
wiser  21:3
wish  50:15 65:4
  80:5
wished  16:18
wishes  26:13 66:3,7

**[withdraw - york]**

| | |
|---|---|
| **withdraw**  32:20 33:15 87:20 97:6 101:21 | **wrote**  6:21 8:23 10:16 23:4 50:2 80:6 |
| **withheld**  68:18 76:17,23 | **x** |
| **witness**  2:3 3:8 7:22 10:9,10 22:22 24:1 32:20 33:5,8,10 37:21 38:22,24 53:21 54:17 61:20 61:24 62:2,5 70:20 72:12 73:15 75:13 75:18 76:1,7,10,18 77:5,16 84:6 | **x**  2:1,8 34:5 |
| | **y** |
| | **y**  40:23 |
| | **year**  96:21 |
| | **years**  4:19 5:6 6:11 |
| | **york**  56:13 |
| **witnessed**  10:14 | |
| **witnesses**  21:16,19 22:2,9,19,19 23:1,2 32:14 33:12,17 72:23 75:16 | |
| **word**  22:14 25:17 46:2 98:18 100:2 | |
| **worded**  27:3 | |
| **wording**  27:4 | |
| **words**  10:24 80:25 83:1 99:22 | |
| **work**  17:21 28:16 28:17 35:25 53:22 96:25 105:25 109:23 110:1 | |
| **worked**  94:9,12 97:3 | |
| **working**  3:8 17:20 19:2,13 20:10 30:20 37:19 | |
| **works**  69:9 107:21 | |
| **worth**  13:3 44:14 | |
| **wow**  42:13 | |
| **write**  41:24 101:7 | |
| **writing**  9:18 35:22 78:15 89:12 | |
| **writings**  71:10 | |
| **written**  43:11 62:11 62:13 | |
| **wrong**  47:11 93:13 | |

Page 1

```
 1                   UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF PENNSYLVANIA
 2
     UNITED STATES OF AMERICA      )   2:14-cr-00548-CDJ
 3                                 )
     VS.                           )   Philadelphia, PA
 4                                 )   April 19, 2016
     BRIAN HARTLINE, ET AL         )   10:20 a.m.-4:27 p.m.
 5
                             JURY TRIAL
 6          BEFORE THE HONORABLE C. DARNELL JONES, II
                   UNITED STATES DISTRICT JUDGE
 7
     APPEARANCES:
 8
     For the United States    DAVID J. IGNALL, ESQ.
 9   of America:              JENNIFER CHUN BARRY, ESQ.
                              U.S. ATTORNEY'S OFFICE
10                            615 Chestnut Street
                              Suite 1250
11                            Philadelphia, PA  19106
12   For Defendant           PATRICK J. EGAN, ESQ.
     Brian Hartline:         JOHN C. FULLER, ESQ.
13                           FOX ROTHSCHILD LLP
                             2000 Market Street
14                           10th Floor
                             Philadelphia, PA  19107
15
     For Defendant           RUSSELL D. DUNCAN, ESQ.
16   Barry Bekkedam:         JOEL D. SCHWARTZ, ESQ.
                             SHULMAN ROGERS GANDAL PORDY
17                           12505 Park Potomac Ave.
                             Potomac, MD  20854
18
                             MICHAEL J. ENGLE, ESQ.
19                           GREENBLATT PIERCE ENGLE FUNT
                              AND FLORES
20                           123 S. Broad Street
                             Suite 2500
21                           Philadelphia, PA  19109
22   ESR OPERATOR:           UNKNOWN
23         Veritext National Court Reporting Company
                    Mid-Atlantic Region
24         1801 Market Street - Suite 1800
                  Philadelphia, PA 19103
25               1-888-777-6690
```

```
 1                        I N D E X

 2    IDENTIFICATION                            PAGE

 3    CLOSING ARGUMENTS

 4     By Ms. Barry                              7

 5     By Mr. Egan

 6     By Mr.

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2               THE COURT:  Good morning, you may be
 3     seated.
 4               ALL:  Good morning, Your Honor.
 5        (Pause)
 6               THE COURT:  All right.  Counsel, I
 7     understand there were some things that you wanted to
 8     bring to the Court's attention before you begin.
 9               MR. IGNALL:  Yeah, there are two issues
10     we need to resolve prior to closing argument.
11               One is the willfulness instruction that
12     the defense wants.  We both submitted letter briefs to
13     the Court.
14               THE COURT:  Yes, I have received those
15     and having reviewed each, while appreciated, I'm going
16     to stay with the standard instructions as I have all
17     along.
18               MR. IGNALL:  Thank you.
19               THE COURT:  And defense has an
20     exception to that rule.
21               UNIDENTIFIED:  Thank you, Your Honor.
22               MR. IGNALL:  Thank you.  The other
23     issue is -- goes to the permissible scope of closing
24     argument.  We filed a motion in limine I think back in
25     October regarding potential jury nullification.  I
```

1    think the Court's already ruled on that.  But I

2    understand from Mr. Egan he would like to argue to the

3    jury that some people have not been prosecuted for

4    similar conduct.  I don't think that's appropriate,

5    that's an issue for the Court.  If there's some sort

6    of selective prosecution or discrimination, the case

7    we cited in our motion back in October, United States

8    versus Barrigan (ph), 42 F2d 171, it's a 1973 3rd

9    Circuit case.

10                   That the jury cannot facts other than

11   those relating to guilt or innocence, any other thing

12   is for the Court alone, not for the jury.  And I think

13   it's inappropriate to have the jury decide where Mr.

14   Hartline should've been prosecuted rather than

15   somebody else.  They should decide whether the facts

16   established guilt beyond a reasonable doubt as to the

17   two defendants before the Court.

18                   THE COURT:  All right.  I've ruled on

19   this already

20                   UNIDENTIFIED:  Yes, Your Honor.

21                   THE COURT:  And it's prohibited.

22                   UNIDENTIFIED:  Understood.

23                   MR. IGNALL:  Thank you.  That's all we

24   have, Your Honor.

25                   THE COURT:  All right.  And you are

1      aware of our Juror No. 1 who had the mishap this

2      morning?

3                     MR. IGNALL:  And, Your Honor, with

4      respect to the jury instructions --

5                     THE COURT:  Yes, sir.

6                     MR. IGNALL:  -- my legal assistant is

7      putting together a table of contents.  There are a

8      couple of little issues that I -- there are a couple

9      of typos and a couple of things I think we can work

10     out.  Hopefully over the lunchbreak, I can work that

11     out with Mr. Fuller and Mr. Schwartz.  I can ask my

12     legal assistant to make the changes and we can

13     probably have something for the Court later this

14     afternoon and that should be agreed on by all the

15     parties.

16                    THE COURT:  All right.  That's fine,

17     and as we agreed yesterday, in the absence of a

18     motion, the Government will go first this morning.

19     Based upon the start time, lunch has been ordered for

20     them which should be here around noon, and then we'll

21     go forward with defense closings and then Government's

22     rebuttal, and I'll charge first thing tomorrow

23     morning.

24                    MR. IGNALL:  That makes sense, thank

25     you, Your Honor.

```
 1        (Pause)

 2                    THE CLERK:  All rise.

 3        (Jury in)

 4        (Call to Court)

 5                    THE COURT:  Good morning.  You may be

 6        seated.

 7                    Members of the jury, now that all of

 8        the evidence has been presented, it is time for the

 9        attorneys to make their closing arguments to you.  In

10        their arguments, they will summarize the evidence

11        which they believe material and important to your

12        decision.

13                    As with all statements by counsel, they

14        are not the law, they are not evidence, but you must

15        listen to them very, very carefully.  After the

16        opening -- after the closing arguments are presented,

17        I will instruct you in the law, which you apply to the

18        facts as you find them to be.

19                    Now, given the length of this trial,

20        it's going to take some time for counsel to give you

21        their respective arguments.  We will begin with

22        counsel for the Government, Mr. Ignall or Ms. Barry --

23                    MS. BARRY:  Thank you, Your Honor.

24                    THE COURT:  -- to give the closing

25        argument.  And we'll recess for lunch.  We'll come
```

1     back this afternoon, early afternoon and counsel for

2     the defendants will each give you their closing

3     arguments, and procedurally, the Government is allowed

4     to give you rebuttal argument at the conclusion of

5     that.  And given the length of my instructions in the

6     law, we'll do that first thing tomorrow morning.  So

7     that we'll have ample opportunities to concentrate and

8     focus on everything that everyone says, all right.

9     And if anyone needs a break during the argument, just

10    raise your hand, please.  All right?

11         (Pause)

12                   THE COURT:  Ms. Barry, you may proceed.

13                   MS. BARRY:  Thank you, Your Honor.

14    Good morning.

15                   Ladies and gentlemen, your time and

16    attention to this case has been nothing short of

17    amazing.  And on behalf of the United States of

18    America, we want to thank you for your time, service,

19    and commitment to this case.

20                   Ladies and gentlemen, this case is

21    simply about fraud.  Fraud means lying, cheating or

22    stealing to get money.  And the intent to defraud

23    means that you act knowingly, with the intention or

24    the purpose to --

25                   THE COURT:  Ms. Barry, I sincerely

1    apologize for interrupting your closing, but we need

2    to pick you up on the microphone.  If you want to turn

3    it that way, that's fine.

4                    MS. BARRY:  Thank you very much.

5                    THE COURT:  Thank you, I'm sorry.

6                    MS. BARRY:  That's okay.

7                    So, ladies and gentlemen, how did the

8    Defendants, Brian Hartline and Barry Bekkedam cheat?

9    How did they cheat?

10                    They cheated by trying to make a

11   struggling bank look healthier than it really was.

12   And how did they try to make it look stronger and

13   healthier?  By orchestrating three loans, three loans

14   to George Levin, Anthony Bonomo and Charles Galeb.

15   Those loans were going to be used to make the bank

16   look stronger.

17                    But, ladies and gentlemen, why are

18   these loans not -- why is it just the way it appears?

19   Loans don't make the bank stronger or more viable.

20   They are loans.

21                    What did -- Mr. Shubin said, you get --

22   you have an asset cash and then it goes out and then

23   you have a loan.  Ladies and gentlemen, a loan cannot

24   be new money that makes the bank stronger, because

25   when you get the loan, all the bank has is the promise

Page 9

```
 1    or the hope that the person will pay it back.  That's
 2    why it can't possibly be considered new money when
 3    it's made.
 4                  Because capital, ladies and gentlemen,
 5    is the cushion, it's the cushion for the bank to have
 6    when there's an unanticipated loss.  When the assets
 7    don't perform, meaning when a loan doesn't get paid
 8    back, and ladies and gentlemen, you know in this case,
 9    that's the very thing that happened.  The George Levin
10    loan never gets paid back.
11                  So how could that possibly have been
12    new money in the bank at the time they were making
13    those representations to the regulators, to the bank,
14    and in the case of Barry Bekkedam, to the investors,
15    his investors.
16                  Now, let's think about and look at
17    these transactions, the three loans.  What essentially
18    was happening?  A loan was made to George Levin, the
19    bank's money goes out, and immediately comes back.
20                  Ladies and gentlemen, that's just
21    trying to make it look like something it's not.  The
22    bank is trying to conceal that it has used its own
23    money to make it healthier.  It's like putting
24    lipstick on a pig, you know that old saying, it
25    doesn't make it any better.  The bank is not healthier
```

1    or more viable because it got a loan.  But that's what

2    they wanted the regulators to believe, because they

3    needed to get money from TARP.  And they needed to

4    show new capital in the bank, new money in the bank.

5             When we're talking about the TARP

6    program, TARP was a government program that was set up

7    to help banks weather the financial crisis.  And

8    remember, the TARP was not free money.  The TARP

9    program was set up so that banks that were already

10   healthy, without the TARP money, would get funds,

11   because the Treasury wanted to make sure that they got

12   their money back.

13            And so what did it mean to be more

14   healthy in the eyes of TARP?  It meant that the bank

15   would be well capitalized.  That was one of the

16   thresholds, that the bank had to be well capitalized

17   without the TARP money.

18            And, ladies and gentlemen, you know

19   that from the beginning of the time when TARP -- when

20   the banks' TARP application was being considered, that

21   there were already issues with their capital as early

22   as February.  And you know that there are issues with

23   their capital because in May 2009, their capital

24   levels go from well capitalized to adequately

25   capitalized.

1           And as Mr. Hannison said, and as all

2    the regulators who were involved with TARP said, they

3    were not going to give money to a bank that was only

4    adequately capitalized.

5           So how in the world were they going to

6    get -- the defendants, how were they going to get

7    their money, their hand on that TARP money?  They had

8    to address the capital issue.  What was going to be

9    the fix?  And you know who came up with the fix, is

10   Barry Bekkedam.  He came up with the fix with this

11   person, George Levin.

12          George Levin who said he could invest

13   at least $15 million, and that's the representation

14   that Bekkedam told to Brian Hartline who then passed

15   it along to the regulators.  They knew that

16   information about George Levin was going -- was

17   something they wanted to use to sway the regulators'

18   opinion about giving them the TARP money.  And they

19   knew they were on to something, ladies and gentlemen.

20          There are so many e-mails in this case,

21   but look at the e-mails back and forth, back and forth

22   between Lisa Coke (ph) and Brian Hartline about

23   getting information to the CPP counsel about this $15

24   million investor.  So the defendants knew they were on

25   to something.

1            Let's just take a moment here, and I'd

2    like to show you a timeline, and this timeline is just

3    really set up, so that you can see between the time

4    that the TARP application goes in, and the time that

5    it's ultimately denied, it's a fairly short period of

6    time.  It's maybe a little over a year.

7            But, ladies and gentlemen, in that

8    short period of time, a lot happens.  Because not only

9    is the bank trying to get these TARP funds, but it is

10   in precipitous decline.  It's in a precipitous decline

11   during this period.

12           So let's go back and talk about how the

13   defendants were going to manage this capital issue

14   that they had.  And this is a telling, a very telling

15   e-mail from Chuck Hunter to Lisa Coke.  It's Exhibit

16   21.  And look at what Mr. Hunter says.

17           "If we can present the strong evidence

18   that the bank has attracted that much in private

19   capital, all other issues become much more

20   manageable."  That $15 million investor, if he makes

21   that investment, the defendants know, that all of

22   their other problems may actually go away and they'll

23   get this TARP money.

24           And, ladies and gentlemen, it actually

25   works.  It actually convinces the CPP counsel, that

1     they should get the TARP money contingent upon a

2     capital injection, injection, ladies and gentlemen,

3     from the outside in of $15 million.  And where did

4     they come up with this $15 million capital

5     contingency?  Where did they even come up with this

6     number?

7                    It's not that CPP counsel decided.  It

8     was based on the information that was being provided

9     to it by the defendants.  Information, ladies and

10    gentlemen, when TARP is deciding on the health of a

11    bank, truthful information, truthful information,

12    ladies and gentlemen, it's no different whether you're

13    borrowing money to buy a car, or getting a mortgage to

14    pay for a house, or try to get $13.5 million in public

15    money, you have to provide truthful information.  And

16    that's what they were relying on, and the TARP -- the

17    CPP counsel says, this should go up to Treasury to

18    give them the $13.5 million as long as they make that

19    contingency, and now the defendants know that is the

20    goal, the $15 million.

21                   So they also told the regulators, you

22    know, remember that they're only adequately

23    capitalized, they need to get to well capitalized, and

24    they told them, we're going to get this money by June

25    30th.  We're going to get some capital by June 30th,

Page 14

```
 1    and they have to redo their reports to show that they
 2    were only adequately capitalized.  The whole point of
 3    this June 30th date, the end of the second quarter is
 4    to get their capital up.  Show that the bank is more
 5    healthy, this is a good thing.  New money coming into
 6    the bank to make it more healthy.  That date is fast
 7    approaching.
 8                But we're having a little problem
 9    actually getting the money from George Levin.  All
10    right.  George Levin is a whale, it's the whale that
11    Barry Bekkedam has hooked and is trying to reel him
12    in, trying to reel him in, trying to sell the deal.
13                But June 30 is coming, there's no money
14    from George Levin, what are they going to do.  Ladies
15    and gentlemen, you know what they decide.  They decide
16    on the 29th of June and within 24 hours, they get
17    George Levin a $5 million unsecured loan for the sole
18    purpose of using it to purchase note stock.
19                And why is this not the kind of capital
20    that was part of this expectation of contingent
21    capital injection of $15 million.  You heard what the
22    regular said.  He said, we wouldn't even imagine that
23    the bank would make a loan to finance that capital,
24    like it doesn't -- Cindy Poor (ph) said it didn't even
25    occur to her, it wouldn't even occur to the CPP
```

1  counsel that that's what they would do and call it

2  capital.

3              Mr. Burne (ph) said, they would not

4  consider a loan from the bank capital.  And right up

5  until the end, ladies and gentlemen, after Treasury

6  actually believed the $5 million is capital, and they

7  tell them, okay, go get the $10 million, listen to

8  what Bill Baxter says -- he's in Washington, and let's

9  take a listen to what he says and what Treasury knew -

10 - what Treasury thought capital was.

11             (Recording played)

12             MS. BARRY:  Ladies and gentlemen, he

13 says the $10 million has to be in cash in the bank.

14 In cash in the bank.  Let's look at what the George

15 Levin loan was.

16             It was $5 million from NOVA Bank, it

17 goes into this account of George Levin for maybe let's

18 see maybe an hour, it comes out, it goes back to NOVA

19 Financial Holdings and back to the bank.

20             This money moves in such a short period

21 of time for the sole purpose of investing in NOVA.

22 Now let's just talk about Mr. Levin, and Mr. Preve,

23 his agent testified.  And what did they say about this

24 loan?

25             They said the only purpose, the only

 1     reason we were getting this loan out was because Barry

 2     Bekkedam asked them to.  He said, do this loan and

 3     invest it in the bank, and that's what they did.

 4               There was -- during cross-examination

 5     of Mr. Levin, I believe Mr. Egan was the one doing the

 6     questioning, and he was asking, and again, ladies and

 7     gentlemen, your recollection controls.  But he was

 8     asking him about, you know, signing the subscription

 9     agreement and agreeing to make, you know, the

10     investment, you know, what was that.

11               And it went back and forth, it was an

12     accommodation and an intention, an accommodation and

13     an intention of this for a that.  A quid pro quo

14     between Mr. Levin and the Defendant, Barry Bekkedam,

15     meaning Barry Bekkedam, get your Ballamore clients

16     into my Banyon (ph) funds, that was what George Levin

17     wanted.  And what Barry Bekkedam wanted was George

18     Levin, you invest in NOLA Bank.  That was the quid pro

19     quo between the Defendant, Barry Bekkedam and George

20     Levin.

21               And look at these documents, this is

22     one of the loan documents, and this is exactly how

23     much George Levin had to do with the actual loan, his

24     loan for $5 million.  When he was asked by Mr. Egan

25     about the loan application, do you know what he said?

1    This isn't my signature.  And if you recall, he was

2    visibly upset, because this whole process is going on,

3    and all he knows is, you know, I'm doing this for

4    Barry and he's filling out all of these documents, and

5    he's not really in the loop at all.

6                   But the intention was to help out Barry

7    Bekkedam with this bank.  And so there's been argument

8    to you about the fact that, you know, rich people can

9    do whatever they want with their money.

10                  Well, ladies and gentlemen, take a look

11   at what the instruction is from Tom Patterson to Frank

12   Preve who is George Levin's agent.  He says, "Frank,

13   I'm going to wire the funds now, can you then wire the

14   funds back to NOVA Bank."

15                  Ladies and gentlemen, the document here

16   corroborates what they told you, that the only reason

17   they were getting this loan was to put it back into

18   NOVA.  That was the only purpose.

19                  And Frank Preve doesn't say, whoa,

20   whoa, whoa, that's my money, it's our money.  No, he

21   says, "Got it, sending it back in five minutes."

22                  So what happened in this five minutes?

23   You know, did Frank Preve and George Levin have a

24   discussion like, hey, what should we do with this $5

25   million, let's go buy a pizza shop, or hey, let's go

1    buy a boat, maybe we'll get a car, maybe we'll do all

2    these other things.  Ladies and gentlemen, they say

3    back in five minutes.  You know why he says that time

4    period, that short amount of time?  Because it's

5    understood, it's already understood and agreed that

6    this money is going to go back to NOVA for the

7    investment.

8              But, ladies and gentlemen, when you

9    look at this risk assessment summary for the George

10   Levin loan, there is nothing in it that says the

11   purpose of the loan is to purchase NOVA stock.

12   Nothing, not one iota, not a sentence, not a mention,

13   nothing, even though that was the purpose of the loan.

14             But remember what Joe Mandiana, Joseph

15   Mandiana who underwrote this, he said, I didn't know

16   what the purpose of the loan was for, I didn't think

17   the purpose was for NOVA stock.  I never thought the

18   purpose of the loan was for NOVA stock.

19             David Dietrick (ph), Mark Polisky, Jeff

20   Hannison all the other members of the loan committee

21   said, we didn't know that the purpose of this loan was

22   to specifically invest in NOVA Bank.  They didn't know

23   that.  Even the defendant's best friend, Eddie Mark

24   Antonio (ph) said he did not know the purpose of this

25   loan was to invest in NOVA stock.

1          And, ladies and gentlemen, why do you

2     think the risk assessment doesn't say it.  I mean,

3     Joseph Madiani who's doing the underwriting said, hey,

4     the purpose of the loan is important, we need to know

5     because when we're underwriting, we have to figure out

6     what's the risk.  And he said, I didn't get all the

7     information and then I realized that the loan got

8     funded.

9          What is the purpose of not -- what's

10    the reason you wouldn't put it on there, if that's

11    what it was really for.  For one thing.  To hide it,

12    because if anybody looked and said and reviewed the

13    risk assessment summary, and said, hey, I wonder what

14    this loan is for, it just says investment purposes,

15    something very vague, something very on the line,

16    we're not going to really say what it is, that's

17    concealment, because they don't want anyone to know

18    and question what happened with this money, because it

19    went into NOVA Bank at a time that they were trying to

20    make NOVA look healthier.

21          This concealment, they've made it as

22    early as June 30th of 2009, that they don't want to

23    disclose what the true purpose of this loan is.

24    Ladies and gentlemen, listen to what Mr. -- Defendant

25    Hartline says three years later.

1      (Audio played)

2          MS. BARRY:  Ladies and gentlemen, four

3  times, four times he's given an opportunity to tell

4  the truth, he's under oath, he's given an opportunity.

5  This is three years later, this is after -- I'm sorry,

6  after KPMG has come up with the audit that said, you

7  know, you can't count this as capital, four times he's

8  still concealing and lying about the purpose of the

9  Levin loan.  Why is he doing that?  There's only one

10  reason.  Because he knows he's already lied about it.

11  He knows they already concealed the fact, the whole

12  purpose of the Levin loan since June of 2009, and now

13  he's got to maintain that lie.  He's got to keep

14  concealing it.

15          And so the lie that he told went back

16  to June 30th of 2009 when he told Lisa Coke, when Lisa

17  Coke is told that NOVA got a 5 million capital

18  infusion on 6/30, 2009.  It's not capital, ladies and

19  gentlemen, it's a loan.  It's not new money, it's a

20  loan with only a promise to pay it back.  And you know

21  that's what happens because it doesn't get paid back,

22  it doesn't ever get paid back.  And Brian Hartline

23  knows that this information will be passed along to

24  the TARP folks in D.C.

25          This July 17th e-mail, Government's

1        Exhibit 62, and I'm sorry, I'm just going to go back

2        to Count III, this is Government's Exhibit 57.  This

3        is Government's Exhibit 62.  It's from Kim Hartline.

4        She's continuing with the false statement, 5 million

5        of his investment was received by us on June 30th.

6                   And you know this is what is going --

7        the information is going to Treasury, it's going to

8        the folks in Washington.  July 17th, there's a whole

9        e-mail, 61-B, there's a further e-mail from Treasury

10       following up on having made the investment.  Has that

11       investor put the $15 million in.

12                  And what does Chuck Connor (ph) say?

13       The investor purchased 5 million in common stock of

14       NOVA Financial Holdings, and a hundred percent was

15       injected into NOVA Bank as of June 30th.  That's what

16       they're told.  And that's what the regulators believe

17       is truthful information.

18                  And look at the bottom, "capital

19       raising efforts are being performed with the

20       assistance of Ballamore Capital Management," with the

21       assistance, ladies and gentlemen, of Barry Bekkedam.

22                  Now, when it comes to whether this fact

23       was concealed, deliberately concealed, there's nothing

24       more powerful than the change in control applications.

25       They knew that Mr. Levin had to fill out one of these

1    change and control applications in order to make the

2    full investment.  And they were advised that they had

3    to do that by the regulators.

4                   And so the first application, they're

5    actually made at the same time, but one goes to the

6    Department of -- the Pennsylvania Department of

7    Banking to Mr. Martiz (ph) and they advise that

8    there's an $18 million investment for 24.4 percent and

9    he's already made his investment as of June -- $5

10   million investment as of June 30th, 2009.

11                  Remember what Frank Preve and George

12   Levin also testified to.  A lot of these documents

13   that they signed, had already been filled out, pre-

14   populated by responses that they received from folks

15   at NOVA.

16                  And when it came to the question in the

17   application about the source of funds, the question

18   asked if any part of the purchase price is borrowed,

19   if any part of the purchase price is borrowed.  This

20   is not a trick question.  Is any of this $18 million

21   borrowed.  And what did they say?  What's the

22   response?

23                  Now, it may be on George Levin

24   letterhead and signed by Frank Perve, but they said,

25   this is -- we had NOVA fill it out for us, somebody in

1     NOVA did.  And there is nothing, nothing about the $5

2     million loan that he received from NOVA for this

3     investment.

4                    The same thing with the Federal

5     Reserve.  That was another application.  One was

6     called a Section 112 and one was called a change in

7     control, they were essentially the same thing.  And

8     when -- in this application when they're asked again,

9     provide the following information about the source of

10    funds, it says, "source of amount of each, half from

11    personal finances of 18 million, half from borrowed

12    funds."

13                   The question then asks if any of the

14    portion of the funds will be borrowed.  Ladies and

15    gentlemen, this should read half from personal

16    finances, 5 million from NOVA Bank, 4 million from

17    another bank.  It's not what it says.

18                   These are not trick questions.  Why is

19    the truth so difficult to respond to on these

20    questions, ladies and gentlemen.  Because they've

21    already concealed the fact that the $5 million loan

22    was made and put back into the bank to invest in NOVA.

23    And they know that all the regulators are keeping

24    track.

25                   Think about something here.  All the

1    regulators know that they have an application for TARP

2    funding.  They all know they have to fill out this

3    change and control application.  They're all talking.

4    In the meantime, the bank is only adequately

5    capitalized, and the holding company has been

6    downgraded.  Think about how much now regulatory

7    scrutiny they're under.

8              So any wrong move is going to

9    jeopardize getting that TARP money, TARP money that

10   now is more desperately and desperately needed.

11             Three days later, they put in an

12   application to ACBB.  What's the application amount

13   for?  9 million, that's what they said, half of

14   borrowed funds.

15             Ladies and gentlemen, you can make --

16   you can use -- please use your common sense, and you

17   can infer that they were hoping that this was all

18   going to work out.  We get the 9 million, he gets a $9

19   million loan from ACBB, we replace the 5 million with

20   that money and we're good, and this is all going to

21   work out and it's going to be fine, it's all going to

22   be fine, it's going to work out.

23             You know, interestingly you know how

24   else they don't disclose that George Levin has a $5

25   million loan?  ACBB.  They don't know either.  They're

Page 25

1    trying to conceal that fact and trying to shuck and

2    jive to make this thing work.

3                But one small problem, ACBB doesn't

4    give George Levin a loan.  No matter how much he was.

5    But there's good news, good news.  Treasury sends NOVA

6    letter and says, hey, you're going to get this TARP

7    money, we're relying on the information provided to

8    it, we're going to give you this TARP money, you go

9    out and make the additional 10 million in equity, get

10   the additional $10 million.

11               Ladies and gentlemen, what's going on?

12   Treasury believes them.  They believe the $5 million

13   was new capital.  And why do they believe them?

14   Because they rely on the information provided to it.

15   They relied that they were being given truthful

16   information.  So they get this good news, and now they

17   know they're on the road, they're going to get this

18   money, we just need to raise another $10 million in

19   equity of new capital, new money to make this bank

20   healthy in the eyes of the regulators.

21               But there's a problem.  Pennsylvania

22   Department of Banking was not satisfied with the

23   answer about the source of funding.  It was very

24   vague.  Why would they be satisfied with that, they

25   said 18 million would come from some place.  So

1    there's a very specific question, a follow-up to the

2    application from Donna Metcalf.  She says, the source

3    of funds again, if any portion is borrowed.

4                    Ladies and gentlemen, they're asked

5    again, follow-up, is any of this borrowed.  Why is

6    this a difficult question?  Why not just say, well, of

7    the 18 million, 5 million was borrowed from NOVA, and

8    we're going to get the $13 million from X.  Why don't

9    they just say that?  Any -- use your common sense, any

10   other normal person would just answer the question.

11   But they can't, because they know they've got to get

12   their TARP money and Treasury thinks that they're

13   getting healthier, because they already said this 5

14   million was new cash in the bank, making it healthier

15   and it's not.  Five million, meeting the contingency,

16   but it wasn't.

17                    And so this becomes like this hot

18   potato, and there's, you know, e-mails back and forth

19   between Brian Hartline, Mr. Preve, Defendant Barry

20   Bekkedam also saying like how are we going to answer

21   this question, how are we going to answer this

22   question.  Like there's this question, how are we

23   going to answer it as opposed to just telling the

24   truth, I guess you have to figure out what you're

25   going to do, because you've already concealed it, and

1    you need to keep it concealed, because you've got to

2    get that 13.5 million in TARP money.

3                    And this is from -- this is a quote

4    from Defendant Brian Hartline to Larry Roven on how

5    they should respond to this question.  "Could we

6    provide them a statement reflecting the cash, even

7    from Banyon and St. George and St. George will borrow

8    from Banyon, at least we can get over this hurdle and

9    get him approved."  At least we can get over this

10   hurdle as opposed to telling the truth.  Let's just

11   make this thing go away, let's just say whatever we

12   have to say.  Let's figure out a way to just answer

13   them and get them off our backs so we can get

14   approval.  Get him approved for the rest of the

15   investment and then we'll be able to meet the

16   contingency.

17                    So, you know, there were questions on

18   cross-examination, you know, Mr. Bekkedam has nothing

19   to do with us, you know Mr. Bekkedam is completely

20   behind the whole George Levin involvement with NOVA

21   Bank.

22                    And here, even in answering this

23   question, what is Frank Preve tell Defendant Hartline?

24   "(indiscernible) letter per Barry's comments."  Per

25   Barry's comments.  And this is the letter.  This is

1    the letter.  This is what they've come up with to

2    satisfy the question from Ms. Metcalf about the source

3    of funds.  And, ladies and gentlemen, nothing, just

4    like any document, go through any document that's

5    given to a regulator, there's not one mention that

6    George Levin's $5 million was borrowed from NOVA.

7              Ladies and gentlemen, every time

8    they're concealing it, every time they make a

9    conscious and deliberate effort to conceal it, that is

10   fraud.  That's fraud.  That's a crime.

11             And so she forwards this letter, Kim

12   Hartline forwards this letter that does not mention

13   and conceals the $5 million loan.  She forwards it on

14   to the regulators.  And she forwards it, ladies and

15   gentlemen, at 7:41 p.m.  Look at the sent line to

16   Barry Bekkedam, one minute later.  She's telling Barry

17   Bekkedam exactly what was sent, because, ladies and

18   gentlemen, they all want to make sure they're on the

19   same page, "Per Barry's suggestions."  See Barry,

20   Frank wrote what you told him to write, and we're

21   going to show you exactly what was sent.

22             Why is Barry Bekkedam even involved

23   with getting this letter unless he's involved, ladies

24   and gentlemen, with putting -- orchestrating this

25   whole scheme.  And I'd like to take a minute here to

```
 1    talk about Mr. Bekkedam's involvement because a lot,

 2    again a lot of the questions in cross-examination were

 3    about, you didn't have a conversation to a regulator,

 4    you didn't have a direct conversation with Barry

 5    Bekkedam, you didn't have a conversation with Barry

 6    Bekkedam.

 7                    And, ladies and gentlemen, they didn't.

 8    He was operating and working through Brian Hartline.

 9    And let's take a look at exactly how involved Barry

10    Bekkedam was.

11                    You know from the testimony from Frank

12    Perve that Barry Bekkedam said, this was his bank, he

13    controlled the bank, and he sure did.  Because as

14    early as May of 2009, what's Brian Hartline telling

15    Barry Bekkedam's, managing director at Ballamore, FYI,

16    Barry is looking for Mr. Levin to invest 15 million

17    into NOVA.  FYI, Barry is looking for Mr. Levin to

18    invest 15 million into NOVA.

19                    That's Barry Bekkedam orchestrating

20    this deal.  And this is Government's Exhibit 39-A,

21    ladies and gentlemen, and this document really lays it

22    out.  It's from Barry to Brian, his best friend, D.

23    Mark Antonio and his managing partner or director at

24    Ballamore Capital, Larry Roving (ph), and what does he

25    say?  Look at the date.  They are under extreme
```

Page 30

1     pressure to try to get some capital in to NOVA Bank.

2                    Guys, it was clear to me that we were

3     getting George approved for a loan of 5 million to

4     invest in NOVA.  Per my conversation with Brian, he

5     thought I was getting a wire, I always was thinking

6     loan.  I always was thinking loan.  I assume we can

7     get the subscription docs tomorrow, underwrite George.

8                    We are going to underwrite George.  My

9     bank, NOVA Bank, Brian Hartline, my guy at NOVA Bank,

10    we're going to underwrite George.  Is this the plan?

11    Ladies and gentlemen, when it comes to a conspiracy

12    and agreement, it's not going to be like the

13    conspirators are going to talk to each other, hey,

14    want to commit a fraud, yeah, let's commit a fraud,

15    let's do a fraud, that's not how it works.  It doesn't

16    make any sense.

17                    To know what's in the mind of what

18    people are thinking is to look at their words, what

19    they say, what they don't say, and what actions they

20    take, their conduct.  And when he says, is this the

21    plan, you better believe it's the plan.  Right at that

22    moment, yeah, it's the plan, we're going to fund him,

23    we're going to give him a loan, and he's then going to

24    use that as the investment in NOVA, something they all

25    know would never be considered new money by the TARP -

Page 31

1       - by the regulators considering TARP.

2                    And after he makes the suggestion on

3       June 29th of 2009, there's a flurry of activity about

4       getting again, this loan is underwritten in like 24

5       hours.  Because it is the plan.  And here again, Barry

6       Bekkedam's involvement, this is a letter that goes out

7       about George Levin, the investor.  It's a letter from

8       Barry to Brian Hartline.  This goes to the regulators.

9       Ladies and gentlemen, Barry Bekkedam's fingerprints

10      are all over this.

11                   Now again, going back to the

12      concealment and what Mr. Bekkedam knew as they're

13      going and trying to answer this very difficult

14      question from Ms. Metcalf about is any portion

15      borrowed, George Levin writes, "Barry, why am I

16      involved in all of this, I am trying to help you out."

17      Like, why am I dealing with this question, you answer

18      it.

19                   But after the good news from the

20      Treasury on August 25th, they know they have to

21      continue on with the concealment, because ladies and

22      gentlemen, the Government's Exhibit 76 is just to sort

23      of show you how aligned Brian Hartline and Barry

24      Bekkedam are with getting this TARP money.

25                   Brian Hartline schedules out for Barry

1    Bekkedam, once they get the TARP money, this is what's
2    going to happen.  This is what's going to happen with
3    your bank, your baby, Barry, is going to be okay,
4    we're going to make this all work.
5                   And again, when we go forward and we
6    talk about the loan, the Bonomo loan again another
7    loan with the specific purpose, at least part of it,
8    to invest in NOVA Bank which is never disclosed.
9                   It's Brian Hartline telling Barry
10   Bekkedam that 4.5 million is available for Anthony
11   Bonomo.  Because this is teeing it up for about a
12   month later when they make that $4.5 million loan.
13                  Ladies and gentlemen, this is
14   Government's Exhibit 92.  It is a letter from
15   Ballamore, and what does it say in the letter?  And
16   I'm sorry, I'd like to go back to the date, September
17   24th, 2009.
18                  What's in the letter?  Ballamore's
19   clients and relationships infused 5 million into the
20   bank in June and have signed term sheets for an
21   additional 15.  NOVA was also granted TARP of 13.5
22   million.
23                  Ladies and gentlemen, we're coming up
24   to talking about Barry Bekkedam and his scheme to
25   defraud his investors.  Because they also are under

Page 33

1    the belief that this bank is a good investment,

2    because it's getting capital.  It's getting capital.

3    This $5 million, ladies and gentlemen, gets included

4    in the bank's call reports, call reports that become

5    public, so that people who would invest can look at

6    the capital.

7              Here again is Anthony Bonomo forwarding

8    his tax returns to Barry Bekkedam, who then forwards

9    them to Brian Hartline, because they're getting ready

10   to do another loan, another loan that they're going to

11   conceal was for the purpose of buying NOVA stock.

12             Now, Barry Bekkedam was charged with

13   defrauding his clients by wire and Count V, ladies and

14   gentlemen, is Government's Exhibit 107, and so when

15   you're -- the scheme to defraud for wire fraud is the

16   same as the scheme to defraud for the TARP, and a

17   scheme to defraud for bank fraud, it's using false

18   representations which are also this concealment to get

19   money.  But there has to be an actual wire in the wire

20   fraud, and this is the wire that the Government is

21   referencing in Count V.

22             This wire from Ballamore -- a Ballamore

23   employee to NOVA, which is sending documents for the

24   purpose of facilitating the loan.  I mean, why is

25   Ballamore facilitating the loan.  Why is the investor

1    -- why isn't Anthony Bonomo just talking with NOVA?

2    Because again, Barry Bekkedam is the one orchestrating

3    this deal.

4                    And you know that he is updated on the

5    fact that this information is being sent over to NOVA,

6    because he's copied on 107(a) with Government's

7    Exhibit 107.

8                    Again, for the wire fraud, this is the

9    wire -- I mean, this is the other wire that's in Count

10   VI, and this again, is a Ballamore employee sending an

11   e-mail to Anthony Bonomo saying for the purpose of

12   facilitating the loan docs that he's getting from

13   NOVA, and this is a wire.

14                   Ladies and gentlemen, Barry Bekkedam,

15   how involved is he with this.  Look at what he says to

16   Frank Perve.  I'm managing Brian, who is managing his

17   regulators.  Managing Brian, who is managing his

18   regulators.

19                   Barry Bekkedam knows exactly what Brian

20   Hartline is telling those regulators, because he's

21   managing Brian.  The information flow, ladies and

22   gentlemen, is completely between these two defendants

23   going to the regulators.

24                   Now, looking at Government's Exhibit

25   111, this again is just showing a couple of things,

1    and there's also Government's Exhibit 98.  And what's

2    telling about these e-mails, ladies and gentlemen,

3    we're talking now about October of 2009, is the CIC

4    application to both Pennsylvania Department of Banking

5    and to the Federal Reserve they get approved on

6    October 19th.  They again believe the information that

7    was sent.  And so they approve George Levin to make

8    the additional money -- make the additional

9    investment.

10              But what's happening, again, George

11   Levin doesn't want to put his own money in.  So he's

12   talking about, well, we'll get you another $2 million

13   loan, we'll get you another loan.  And the best thing

14   about this is, this subscription agreement which was

15   $18 million, and you heard a lot on cross-examination

16   that this a binding agreement, a binding agreement

17   between NOVA Bank and George Levin, $18 million.

18              Who's renegotiating it?  You don't need

19   to give us 18 anymore, just 10.  Who's renegotiating

20   what George Levin has to put into the bank ultimately?

21   The Defendant, Barry Bekkedam.  Because you know what,

22   Brian Hartline is not going to question on it.  They

23   just need to get the additional $10 million to get

24   their hands on the TARP money.

25              And let's look at this loan.  The next

1    day, they make this loan to Anthony Bonomo.  And

2    again, the significance of Government's Exhibit 111

3    and 98 are also just how important the TARP money is

4    to Barry Bekkedam.

5              So let's look at the Bonomo loan.  So

6    it's a four and a half million dollar loan.  And,

7    ladies and gentlemen, you know, this doesn't even go

8    like to some other bank, to some other account and

9    come back.  I mean, it just stays in NOVA.  The 2.5

10   just stays in NOVA.  And the other 2 million goes out

11   to Banyon.

12             So that two and a half million dollar

13   loan, ladies and gentlemen, is just again, not cash in

14   the bank, cash from the bank.  Cannot be considered

15   new money.  Can't because again, ladies and gentlemen,

16   they'd have to pay it back.  At that point, there's

17   only a promise and a hope, and once again what happens

18   with this loan.  It never gets fully paid back.

19             Look at the purpose.  The purpose of

20   this loan once again, nothing in there.  Nothing in

21   there about that any of this money is going to be used

22   to purchase NOVA stock.  It only talks about Banyon.

23   It only says that this is going to be used for Banyon,

24   and you know, ladies and gentlemen, it's immediately

25   used to go and buy NOVA stock.

1          Let's just take a minute here and start

2     -- and talk a little bit about these defendants.

3     Brian Hartline, you know, Mr. Egan would have you

4     think that, you know, he on the way from the farm, he

5     fell off the turnip truck and ended up at a bank.  I

6     mean, this man is a sophisticated banker.  Look at

7     what they put in their own financial offering.

8          You know what happens, ladies and

9     gentlemen, on October 31st, 2009, right?  There was a

10    lot of testimony about it.  Mr. Levin's Banyon

11    investments they kind of go belly up, and now they're

12    going to -- they're scrambling to get new investors.

13    Because the whole George thing has fallen apart.

14          So they put out a new offering on

15    buying note stock, and you can read it for yourself,

16    and look at what they say about Brian Hartline.  He is

17    experienced, years and years as a chief financial

18    officer, the president, the director, on the boards of

19    multiple banks.  He's a sophisticated banker, ladies

20    and gentlemen, who is also a CPA until 2000.

21          And how about Barry Bekkedam?  Barry

22    Bekkedam, his company Ballamore is managing something

23    like $2 billion of investor money.  These two guys

24    bought a bank, they got NOVA Bank together.  Then what

25    happened?  They bought Pennsylvania Bank together,

1    Pennsylvania Business Bank together.  These gentlemen

2    are sophisticated.  They know what they're doing.

3    They're business guys.  These defendants, ladies and

4    gentlemen, know what they're doing.

5                      Now, what's going on now at NOVA Bank,

6    and I had showed you the timeline because it's a very

7    short period of time.  NOVA Bank is in decline,

8    precipitous decline.  Things are not going well at

9    NOVA Bank, not only are they not well capitalized, not

10   only has the holding company been downgraded, but you

11   know that in November of 2009, the bank gets

12   downgraded.

13                      What did the regulators tell you when

14   there's these downgrades?  When the bank -- you don't

15   get downgraded because you're healthy.  You get

16   downgraded because there are problems.  And the more

17   problems there are, the more desperate they are to get

18   this TARP money.  Because without the new money

19   they're not going to survive.

20                      The motive in this case is getting the

21   $13.5 million.  Remember, not only is Barry Bekkedam

22   all -- he has clients invested in NOVA, NOVA is a

23   crucial part of Ballamore.  And how about Brian

24   Hartline.  Both he and his wife worked there.

25                      Ladies and gentlemen, he makes $300,000

Page 39

```
 1    in 2009, he takes $250,000, they both own 2 to 3

 2    percent of NOVA.  Ladies and gentlemen, it's a big

 3    deal that NOVA is in decline.  All is not well at

 4    NOVA.

 5                   And here you know that they acknowledge

 6    as early as July 15th, this is a response to the

 7    downgrade from the holding company from Brian

 8    Hartline.  And again, you can see how significant the

 9    TARP money is going to be because he includes it.

10    That we're going to get this TARP money, we're going

11    to make the contingency, bring us to well capitalized

12    -- I'm sorry, we're going to get -- meet this

13    condition, bring us to well capitalized and then get

14    this TARP money.  You can see how important it is.

15                   Again, you know, they were downgraded

16    both the Federal Reserve, at the holding company and

17    also at the bank in November.  So a good idea, a

18    really, really good idea when the bank is in a

19    downward spiral is to give Barry Bekkedam $250,000.

20    That's a great idea in November, on November 19th of

21    2009.

22                   The bank is struggling, but let's give

23    Barry Bekkedam $250,000, and you can look at that

24    defense exhibit.  That agreement is signed between

25    these two defendants, and he gets $250,000 on November
```

 1    19th, 2009.  Ladies and gentlemen, the Government

 2    would argue to you that this is your classic money

 3    grab.  When things are going downhill, it's like get

 4    what you can get, get what you can get, because who

 5    knows what's going to happen now.  George is out,

 6    we've got this Bonomo loan that they think is new

 7    money, but we still have to make $10 million.  We've

 8    got to show the regulators we've met the contingency.

 9                    And so on cross-examination on this

10    money that Barry Bekkedam receives, it's -- you know,

11    it's he's doing a lot of work, he's just doing a lot

12    of work.  Okay.  He's doing a lot of work.

13                    But consider for a moment, consider

14    this, if it was as easy for a bank to raise capital by

15    just making a loan, why wouldn't they just do that for

16    every time they needed capital.  Why not just make

17    loans and call it capital?  Because, ladies and

18    gentlemen, that -- no one would consider capital again

19    because it's not new money in the bank.  It's not a

20    cushion against the very thing that a loan is, a

21    cushion against the possibility that someone's not

22    going to pay that loan back.  And again George Levin

23    never pays his loan back.

24                    Now, they have been putting Treasury

25    off on whether or not they've met their contingency,

1    and now it's getting desperate at this point, ladies

2    and gentlemen.  It's December 15th of 2009.

3                  Brian Hartline sends this false

4    statement to Lisa Cook.  First, I think it's important

5    to note that he's asking that for her assistance in

6    getting this to whomever needs to review it and

7    provide our arrival, whomever including Treasury,

8    clearly.

9                  He wants this to go all the way to the

10   top.  This has got to get to whoever is making the

11   decision.  And what does he say, NOVA has met the

12   contingency requirement by raising over 10 million of

13   capital.  That, ladies and gentlemen, is not true.

14   And you know that, again this is a letter that's

15   attached, he again says it, 10 million of common

16   equity, and you know it's not true because he attaches

17   where this 10 million dollars came from.

18                  And he says, Anthony Bonomo, capital

19   raise, 2.5 million.  Ladies and gentlemen, it's a

20   loan.  And look at the maturity date.  When does this

21   loan have to be paid back?  Three years from today,

22   2019 is when he has to pay the loan back.  This is

23   exactly why you can't call a loan capital.  Because

24   that money is not in the bank.  It doesn't have to be

25   in the bank until what, seven years after the bank

1    closes.

2                    Ladies and gentlemen, the Judge told

3    you, use your common sense.  You don't have to be a

4    sophisticated banker with years of experience, or a

5    guy who manages billions of dollars to know that this

6    money doesn't have to get paid back until 2019.

7                    How can that possibly be new money when

8    the loan is made in October of 2009.  But they are

9    telling the regulators, that this is new money, this

10   is common equity, new equity, new money, money that's

11   making us healthier so you can give us our TARP funds.

12                   And you can see what the payment, I

13   mean, look at the payments here.  First payment, the

14   payments is 119 of $34,539.93 until a balloon payment

15   at the very end that's due in 2019 of the majority of

16   this loan over $3 million.

17                   Come on.  And they call that new money.

18   You're going to call that money in the bank.  Ladies

19   and gentlemen, that's money from the bank, not due for

20   ten years.

21                   Just to comment here though, the first

22   payment to this -- from this loan is made by whom?

23   Bonomo loan, Barry Bekkedam pays that first payment on

24   this loan for Anthony Bonomo.

25                   MR. ENGLE:  Your Honor, I'd object at

```
1      this point, we need to see you at sidebar.

2                     THE COURT:  You may approach.  Let's

3      take a break at this point, please.

4                     THE CLERK:  All rise.

5          (Jury out)

6                     THE COURT:  We will be in recess for 15

7      minutes.  Counsel, you may approach.

8          (Sidebar as follows:)

9                     MR. EGAN:  I have an objection too but

10     I was holding it.

11                    MR. ENGLE:  All right.  I'm moving for

12     a mistrial based upon prosecutorial conduct based --

13                    THE COURT:  One second, please.

14         (Pause)

15                    THE COURT:  All right.

16                    MR. ENGLE:  The Government has now

17     multiple times shown the exhibit which is the receipt

18     or the transaction statement, which was no problem

19     because it was admitted showing the $250,000 payment

20     to Mr. Bekkedam.  However, it highlights and shows a

21     portion that was not entered into evidence, was not

22     shown to the jury, and was specifically excluded.  The

23     part about the information where there was a payment

24     to Anthony Bonomo because he testified that he had no

25     recollection of it, and we addressed that during the
```

```
 1    course of this trial.

 2                  It's right here in the transcript, so

 3    they're fine with just showing him that portion.  They

 4    didn't show the portion that has been up there on that

 5    screen, they've argued from it, they know it's not in

 6    evidence.

 7                  MS. BARRY:  I thought it was in

 8    evidence and that the only issue was that they didn't

 9    want the transaction.  And I believe that Mr. Engle

10    and I talked about it, he's like, oh, I know you want

11    to show the -- you know, it's coming in, you want it

12    for that Bonomo loan, we talked about it, but he said

13    we don't want the transaction, the balance showing,

14    and we don't want the win stuff showing, which is

15    specifically what I redacted from that.

16                  And I had -- I did not believe that --

17                  THE COURT:  Go ahead.

18                  MS. BARRY:  That was my understanding,

19    Your Honor.  Was that, this is the -- the whole

20    document was --

21                  THE COURT:  I'm sorry, I can't hear.

22    Excuse me, we're still in session here, so I need to

23    be able to hear, thank you.

24                  MS. BARRY:  My understanding was the

25    whole document was in evidence but for those
```

Page 45

1    redactions, which I made.

2                    MR. ENGLE:  No, first, Mr. Hannison was

3    on the stand, and they wanted to put it in through Mr.

4    Hannison and we objected --

5                    THE COURT:  What exhibit is this

6    please?

7                    MS. BARRY:  129.

8                    MR. ENGLE:  129.

9                    THE COURT:  And does anyone have that

10   handy by any chance?  Thank you.

11                   MR. ENGLE:  Mr. Hannison was testifying

12   and we came to sidebar, and we objected to bringing in

13   anything about that relating to beyond the payment to

14   Mr. Bekkedam for the $250,000, it was part of his deal

15   that was a consulting agreement with the holding

16   company.

17                   There was the stuff that related to

18   whether or not there was a payment from Ballamore to

19   Anthony Bonomo, $34,000.  We objected to that --

20                   THE COURT:  Excuse me one second.  Show

21   me here.

22                   MR. ENGLE:  Okay.  So this is what the

23   jury actually was shown, Your Honor.

24                   THE COURT:  This entire document?

25                   MS. BARRY:  No.

Page 46

1                    MR. ENGLE:  No.  They were shown the

2       $250,000 consulting fee --

3                    THE COURT:  Uh-huh.

4                    MR. ENGLE:  -- you wanted the balances

5       blacked out --

6                    THE COURT:  Correct.

7                    MR. ENGLE:  -- because you thought that

8       was inappropriate.  Then we have down here this to

9       Ballamore per BRB, or I'm sorry, the transfer from

10      Ballamore per LC to Bonomo loan payment right here.

11      That we objected to with respect to Mr. Hannison

12      testifying, because we said, that's something to ask

13      Mr. Bonomo.

14                   The Court indicated that that's the way

15      we were going to do it, Ms. Barry indicated that she

16      would not show that part of it with Mr. Hannison.

17      Then Mr. Bonomo testified, and when he testified, they

18      asked him the question about whether he remembered any

19      of that happening and he did not.

20                   When that issue came up, then we

21      specifically indicated that wasn't going to shown to

22      the jury and it never got shown to the jury.

23                   UNIDENTIFIED:  I'd like to see the

24      transcript on that last part.

25                   MS. BARRY:  Yeah, that last part --

Page 47

 1                    THE COURT:  You've got it right there.
 2                    MR. ENGLE:  It says -- this is a
 3      question by Mr. Ignall,
 4                         "Do you recall if anyone else ever
 5               made a payment on your behalf?
 6                         "A   No."
 7                    MS. BARRY:  Okay.  But the part where -
 8      -
 9                    UNIDENTIFIED:  Where's the instruction
10      that we're not showing it to the jury, that's the part
11      I don't remember.
12                    MR. ENGLE:  Well, wait a minute, you
13      didn't put it in through him, because he didn't
14      remember it.  You weren't in a position to do that.
15      So it never came in.
16                    MS. BARRY:  No, Mr. Hannison said, I
17      recognize this entire document as the -- as a -- I'm
18      sorry, bank statement of Barry Bekkedam.  He
19      recognized this entire document as a bank statement of
20      Barry Bekkedam.  So I was going to show him this
21      entire bank statement and they said -- they objected
22      to the Win Las Vegas, and at the time they said, you
23      know, don't show him the Bonomo loan payment.  He said
24      I understand that that's something that they would
25      argue, but at this point -- and I said, fine, I'm not

1    going to show, I'll just show him that part.

2                    And then the Court asked to have the

3    balances removed, which we did, and the Win payment.

4    It doesn't mean that the document was not -- he

5    recognized the whole document, Your Honor.  It doesn't

6    make the document inadmissible.

7                    MR. ENGLE:  The Court didn't let him

8    testify to that part of it.  The Court ruled that that

9    had to come in through Mr. Bonomo.  That those

10   questions were best directed to Mr. Bonomo because he

11   was going to be testifying.  And when he testified, he

12   didn't have any recollection of it, so it never came

13   in.

14                   THE COURT:  All right.  So what

15   specific line here are you objecting to --

16                   MR. ENGLE:  I'm objecting to the fact

17   that they have highlighted the transfer from Ballamore

18   $34,539.93 and the Bonomo loan payment of the same

19   amount, that they've highlighted and now argued twice.

20                   THE COURT:  Counsel?

21                   MS. BARRY:  Your Honor, this document

22   was admitted.  This document was admitted.  There was

23   no prohibitions on this document, other than the ones

24   which we agreed to, which was Win Las Vegas and the

25   balance.  They can argue that there was no testimony

1     by Mr. Bonomo but we can argue the document, we can

2     argue the document.

3                     THE COURT:  All right.  All right.

4     I'll hold the motion under --

5                     MR. ENGLE:  It was -- if I may just

6     say.  It was admitted for the limited purpose, and the

7     only thing it was admitted for in this case, was

8     showing that there was a payment of $250,000 made to

9     Mr. Bekkedam.  And to argue otherwise is just so

10    disingenuous at this point, I'm sorry.

11                    MR. EGAN:  A, I join in that, and

12    that's my recollection as well.  B, I've got my own

13    issue, because Your Honor excluded testimony about my

14    client's salary.

15                    THE COURT:  Correct.

16                    MR. EGAN:  And you just talked about it

17    in closing knowing it was excluded, so I join in the

18    motion.

19                    MS. BARRY:  No, but you didn't --

20                    MR. EGAN:  He excluded the answers.

21                    MS. BARRY:  Except it's in evidence.

22                    MR. EGAN:  Where?

23                    MS. BARRY:  In the -- in 126.  It's in

24    evidence.

25                    MR. EGAN:  You asked -- you wanted to

Page 50

1    ask that question, I moved to exclude it, the Court

2    ruled that you could not ask the question about his

3    salary.

4              MS. BARRY:  Right, I didn't ask the

5    question, it's in evidence otherwise.  I didn't have

6    to ask the question.

7              MR. EGAN:  That doesn't mean it's not

8    still prejudicial, it shouldn't be --

9              THE COURT:  What exhibit is it in?

10             MS. BARRY:  126, Your Honor.  Primary

11   placement, yeah.

12             MR. EGAN:  It has the salary in the

13   middle of a 300 paged document.

14             THE COURT:  That also wasn't shown to

15   the jury.  Were you aware?

16             MR. EGAN:  No, Your Honor, I was not

17   aware to be perfectly honest that it was in the middle

18   of that document.

19             THE COURT:  Were you --

20             MR. EGAN:  I did not look for my

21   client's salary.

22             MR. ENGLE:  I didn't have any reason to

23   look for it.

24             MR. EGAN:  We were relying on the

25   Court's ruling that that was not admissible.

1           THE COURT:  No, clearly, you know, when

2     she said it, and I made a note of it.  Regarding Mr.

3     Hartline, "he makes $300,000," and I put in brackets,

4     I excluded that, because (indiscernible) I

5     specifically did that.

6           MS. BARRY:  I thought it was to the

7     question, Your Honor, that we were asking that.  I

8     didn't -- I thought that meant --

9           THE COURT:  No, I --

10          MS. BARRY:  -- I'm not trying to --

11          THE COURT:  No, no, I'm just simply

12    saying, my ruling was with specificity about his

13    salary for a particular reason, and I said, objection

14    sustained, and it cannot be used.  Now, to say it

15    comes into evidence, that notwithstanding, because

16    it's in another exhibit, they're saying, Mr. Egan is

17    saying he wasn't even aware it was in that exhibit,

18    and then to argue his salary because it's in an

19    exhibit, I have a problem frankly with that, because I

20    specifically ruled that it could not come in.  And to

21    say it's an exhibit notwithstanding, I wouldn't have

22    ruled if I didn't think -- if I thought it was

23    inadmissible, and that's why I ruled it was

24    inadmissible, to say it's in another exhibit --

25          MS. BARRY:  Well, I thought it was to

Page 52

1    ask that particular person who didn't control the

2    salary.

3                    MR. EGAN:  No, Your Honor.  That's the

4    basis of the objection.

5                    THE COURT:  It was a prejudicial

6    objection.

7                    MR. EGAN:  I didn't make it based on

8    foundation, I made it based on prejudicial.

9                    THE COURT:  Correct.  All right.

10                   MS. BARRY:  I'm sorry, I was under the

11   impression that I could argue the evidence, so I'm --

12   that was my understanding.

13                   THE COURT:  It kind of begs the

14   question if you say I can argue the evidence if an

15   objection is sustained to an item of evidence and if

16   it happens to be somewhere else in the case, it's one

17   thing to say, well, it was waived because it wasn't

18   objected to.  But it's another thing to say, it's

19   still in a document way over here, and therefore, I

20   can argue that.  I have a problem with that.  And I'm

21   not being disrespectful in saying that but I'm --

22                   MS. BARRY:  No, I'm not trying to be

23   disrespectful by doing that.

24                   THE COURT:  -- just trying to be

25   consistent, consistent about the rulings in the case,

Page 53

1    because if I'm ruling that something is inadmissible

2    because it's prejudicial, it's prejudicial throughout

3    the case not just on that one -- it was because of

4    that witness' answer.

5                    All right.  I'm going to obviously hold

6    these under advisement, I won't rule on them at this

7    point in time.  I will require you to put these

8    objections in the motion for mistrial in writing with

9    specificity and citations to the records, as well as

10   the other portion of the exhibits where it's contained

11   and where that came into evidence and what not, if

12   there was an objection to that being admitted,

13   everything, so just make sure it's fully clear so I

14   can deal with it.  All right.

15                   UNIDENTIFIED:  Your Honor, does counsel

16   want a cautionary instruction?

17                   MR. EGAN:  No, I just --

18                   MR. DUNCAN:  Your Honor, I have one

19   more.

20                   THE COURT:  Yes, sir.

21                   MR. DUNCAN:  I argued yesterday, there

22   is no evidence of a wire transaction on October 22nd

23   showing Mr. Bekkedam's fraudulent attempt to defraud

24   his investors.  You made that point yesterday, there

25   is no evidence of that.

 1                    They have now said and they put in

 2      evidence, and the put up on the screen an October 21st

 3      e-mail that does not go to Anthony Bonomo as the

 4      indictment charges, and is completely inappropriate.

 5      This is -- they have produced no evidence to support

 6      Count VI.  And they have now constructively amended

 7      the indictment by putting into evidence an October

 8      21st e-mail that does not go to Anthony Bonomo as the

 9      indictment says, and it's on the wrong date.

10                    And it's for the purposes of

11      (indiscernible) and not for the transcript alone

12      documents.  It is completely inappropriate and we'd

13      move for a mistrial on those grounds as well.

14                    THE COURT:  Your response.

15                    MS. BARRY:  The document is from the

16      Ballamore client to Anthony Bonomo --

17                    MR. DUNCAN:  It is not.  It is not.

18                    THE COURT:  From Ballamore client?

19                    MS. BARRY:  No, I'm sorry, Ballamore

20      employee to Anthony Bonomo regarding --

21                    THE COURT:  May we see it on the

22      screen, Counsel?

23                    MR. DUNCAN:  I'm sorry, Your Honor, my

24      apologies.

25                    MS. BARRY:  It's a wire from Ballamore

```
 1    client -- Ballamore, I'm sorry, employee to Anthony

 2    Bonomo stating please sign this wire letter regarding

 3    your NOVA loan.

 4                  MR. DUNCAN:  That's completely false,

 5    Your Honor.  As --

 6                  THE COURT:  Put it up on the screen.

 7    Do you have the exhibit?

 8                  MR. DUNCAN:  Yes.

 9                  THE COURT:  Let me see it.

10                  MR. DUNCAN:  It's 304, page 178.

11                  MS. BARRY:  It's Government's Exhibit

12    104.

13                  MR. DUNCAN:  104 is also an October

14    21st e-mail, and she says that was for Count V.  And

15    they have it in their motion, Your Honor, it's the

16    same thing they showed on the screen, and their motion

17    they said is Exhibit 304, page 178, that's the exact

18    same document she put up on the screen.  And it is not

19    two affidavits on there, and it was not about the NOVA

20    loan.  Both of those things are false, and that's why

21    we moved to have a judgment acquittal on that account,

22    because there is no evidence to support Count VI,

23    zero.

24                  And what they've done now is they've --

25                  THE COURT:  All right.  Stop arguing
```

1    until they retrieve the exhibit, please, thank you.

2         (Pause)

3                   THE COURT:  The jury's lunch is going

4    to be here at noon, so do you have an idea how much

5    more you have to go?

6                   MS. BARRY:  I have to take a look, Your

7    Honor.

8                   THE COURT:  Sure.  Just till she comes

9    back, wait one second.

10                   MR. DUNCAN:  Certainly.

11         (Pause)

12                   THE COURT:  Did you find it?

13                   MR. DUNCAN:  And we could we also, Your

14    Honor, see what they showed on the screen to the jury,

15    it was put up by the Government.

16                   MR. IGNALL:  Your Honor, may I respond

17    to that?  I don't know if this is a basis for a

18    mistrial, this may be a basis for a Rule 29.  It's

19    certainly an argument that they can make that we

20    failed to satisfy our burden of proof.  I don't think

21    the Court needs to consider right now a mistrial

22    motion.

23                   THE COURT:  Are you making a motion?

24                   MR. DUNCAN:  Yes, sir, I'm making a

25    motion for a mistrial.  It's --

 1                    THE COURT:  I have to address it.

 2                    MR. DUNCAN:  It's improper evidence,

 3       they put it before the jury (indiscernible) for the

 4       Court, it's page 178, it is an October 21st e-mail, it

 5       is not to Mr. Bonomo.  It is not the Bonomo loan to

 6       NOVA.

 7                    THE COURT:  All right.  Can you show

 8       that to Ms. Barry?

 9                    MR. DUNCAN:  That's it.  They have two

10       documents there.  But this document, let me put that

11       up, they put 104 on the screen, and 304, page 178.

12            (Pause)

13                    MS. BARRY:  I may have had -- I may

14       have had them mixed up.  This is -- maybe I have them

15       mixed up, Judge, and I apologize.  But this is --

16                    THE COURT:  So that counsel can see it

17       too.

18                    MS. BARRY:  Oh, I'm sorry.

19                    THE COURT:  That's all right.  Now,

20       what's the problem?  Your response?

21                    MS. BARRY:  It may be my fault for

22       having the wrong count, but it's to Ballamore client

23       to Anthony Bonomo regarding --

24                    MR. DUNCAN:  The loan letter for NOVA

25       to be -- not for the loan documents for NOVA.  It's

1     the wrong date, and it's to the wrong subject, and

2     it's not in evidence.

3                    THE COURT:  Counsel, just let her

4     respond.

5                    MS. BARRY:  Thank you.  On or about I

6     think it's -- maybe it's the wrong date, but it's on

7     or about, and also this wire letter is part of all the

8     loan documents for Mr. Bonomo.

9                    THE COURT:  But his objection is based

10    on a specific statement by you to the jury, and he

11    says that is inaccurate by reason of this exhibit,

12    that's all I'm trying to --

13                   MS. BARRY:  Yeah, and I may have --

14    Your Honor, I may have put the wrong count per the --

15    on the exhibits, but -- which is my fault.

16                   THE COURT:  We have Counts V and VI.

17                   MS. BARRY:  Yeah, maybe I -- that was

18    my fault, Your Honor.  Maybe the --

19                   THE COURT:  Are you saying that you

20    interposed them?

21                   MS. BARRY:  Yes, that's what I'm saying

22    because they're both on the same dates, and these are

23    very close in time.

24                   THE COURT:  But they're both viable

25    counts in the case.

1                    MS. BARRY:  Yes.  And so that's --

2                    THE COURT:  So does it matter then,

3        Counsel, if they were interposed?

4                    MR. DUNCAN:  Absolutely, Your Honor,

5        because this is an October -- it's very specific, it's

6        not on or about, they say this is an e-mail from a

7        Ballymore employee instructing him to sign and return

8        the NOVA loan documents.  It's not that date, and it's

9        not for that purpose, it's very specific.  They did

10       not put that into evidence.

11                   MS. BARRY:  This is in evidence, this

12       document, and I know from looking at the -- what we

13       used in --

14                   THE COURT:  Let me just do this,

15       Counsel, if you don't mind, both of you.  I'm going to

16       hold it under advisement, as I instructed earlier,

17       reduce it to writing, reduce it to responsible writing

18       with specificity --

19                   MS. BARRY:  Yes, Your Honor.

20                   THE COURT:  -- okay.  Now, the other

21       thing is, how much longer do you have with your

22       closing?

23                   MS. BARRY:  I think I have maybe 15, 20

24       minutes.

25                   THE COURT:  I'm not going to try to

Page 60

1      hold you to that exactly, but just in terms of the

2      jurors, they have ordered lunch for noon.

3                    MS. BARRY:  That's fine.  I think I

4      would go over that time for sure, so.

5                    THE COURT:  Okay.  So --

6                    UNIDENTIFIED:  By how much?

7                    MS. BARRY:  Not by much, so I can --

8                    THE COURT:  Let me ask you, do you wish

9      to continue and complete, or do you want to wait for

10     lunch and finish after lunch?  It's up to you.

11                   MS. BARRY:  Could I have a moment?

12                   THE COURT:  Go right ahead, please.

13         (Pause)

14                   THE COURT:  Counsel?

15                   MS. BARRY:  With the Court's

16     indulgence, at this point, just let them have lunch

17     and come back.

18                   THE COURT:  Well, it's not here yet, I

19     just checked.

20                   MS. BARRY:  Oh, okay.

21                   THE COURT:  Okay.  It's, you know,

22     supposed to be here at noon.

23                   MS. BARRY:  Okay.

24                   THE COURT:  So again, I'm not going to

25     force your hand on it, it's your call.

```
 1                    MS. BARRY:  If -- I don't want -- I
 2      mean, if we can finish if they want to go another 20
 3      minutes.
 4                    THE COURT:  Let's go for it, let's go
 5      for it.  All right.  Thank you.
 6                    ALL:  Thank you.
 7         (Sidebar concluded)
 8         (Pause)
 9                    THE COURT:  Ms. (indiscernible) we're
10      ready, I think.  Counsel, everybody ready?
11                    MS. BARRY:  Yes, Your Honor.
12         (Pause)
13                    THE CLERK:  All rise.
14         (Jury in)
15                    THE CLERK:  Ladies and gentlemen, we're
16      back on the record.
17                    THE COURT:  You may be seated, thank
18      you.  Ms. Barry, you may continue.
19                    MS. BARRY:  Ladies and gentlemen,
20      again, thank you again for your patience through this
21      process.
22                    So when we left off, we were talking
23      about the lie that Mr. Bekkedam told on December 15th,
24      2009 which was that 10 million of common equity was in
25      the bank, and now you know that things are getting
```

```
 1    desperate.

 2                 And one of the things -- again, there

 3    are so many e-mails, and we've already gone on for a

 4    while on this, but you know, Government's Exhibit 144,

 5    146, 147, 156, e-mail after e-mail after e-mail with

 6    Lisa Coke saying, we've got the 10 million, we've got

 7    the 10 million, we've got the 10 million, the 10

 8    million which includes that loan to Anthony Bonomo,

 9    ladies and gentlemen.

10                 And you know that here's Lisa Coke on

11    December 18th saying, I'm not sure if you're

12    interested, here's management's plea.  She's still

13    forwarding this same lie that Mr. -- that Defendant

14    Hartline has been telling over and over and over

15    again, most recently 10 million was raised to meet the

16    contingent obligation for NOVA to receive it's CPP

17    funding.

18                 And you know within that $10 million is

19    not only the Anthony Bonomo loan for 2.5 million, but

20    remember Charles Galab?  Charles Galab was a real

21    estate developer who they asked him, they said, we

22    need you to take out a $500,000 loan to purchase NOVA

23    stock.  And what did Charles Galab tell you?  The only

24    stock he has ever owned is NOVA stock.  And the only

25    reason it was ever purchased was because they asked
```

1      him to.

2                    And, ladies and gentlemen, why is just,

3      you know, asking enough?  Because he had millions of

4      dollars of loans with NOVA Bank.  How important do you

5      think it is that you have millions of dollars with the

6      bank and they say, hey, this is what we want you to

7      do, particularly in December of 2009, he's a real

8      estate developer in a financial meltdown, the real

9      estate market, ladies and gentlemen, you know what

10     that was like, 2008/2009.

11                   So when Brian Hartline or when he's

12     asked to purchase this stock, he's going to do it.

13     He's going to do it to keep up good relations.  And,

14     ladies and gentlemen, relationship -- this

15     relationship with NOVA Bank started because of Barry

16     Bekkedam.

17                   Remember one of his biggest projects,

18     the Logan Square project, $20 million, Ballamore was

19     intimately and substantially involved in that deal.

20     And at the time, Charles Galab knew that both the

21     defendant and his best buddy, Ed D. Mark Antonio were

22     both sitting on the board, and they -- then he began

23     that relationship because it's all about doing

24     business, right.

25                   All -- this is how business works, this

1    is how business people operate, keeping up good

2    relationships.  So he brought all of his deposits and

3    started a credit relationship with NOVA Bank, because

4    again, beneficial to Mr. Bekkedam, and beneficial to

5    Mr. Galab at the time.

6                    But now what?  Now what's happening

7    with Mr. Galab?  He's in a very precarious position,

8    so when he's asked to purchase these -- this stock,

9    even though he doesn't want to, he does it.

10                    Now, they -- I believe one of the

11   defense attorneys mentioned, it's not like these

12   investors had a gun to their head, they could've done

13   whatever they wanted with the money.  Ladies and

14   gentlemen, these are businessmen on the main line.

15   The proverbial gun to the head is something's going to

16   happen when (indiscernible) line of credit.

17                    So when they asked me to buy the stock,

18   and they're going to give me a loan to do it, I'm

19   going to do it.  And he does.  And I'm not going to

20   show another demonstrative on it, you know exactly

21   what happened.

22                    This purpose of this loan says, it's

23   for working capital, ladies and gentlemen, working

24   capital purposes.  And what did Charles Galab say to

25   you?  This $500,000 loan that was made in December of

1    2009 was for the sole purpose of purchasing NOVA

2    stock, I mean, I just signed the documents, I just did

3    what they said, I had lines of credit that I really

4    needed to keep with them and not get called.  Not get

5    called, you don't want those lines to get called.

6              So he does it, and you know that they

7    use this money as part of the $10 million of new

8    capital.

9              Again, ladies and gentlemen, with all

10   of these risk assessment summaries, why they don't

11   just state what the purpose of the loan is for?  The

12   purpose of this loan was to purchase NOVA stock.  But

13   if anybody came and looked at their loan file, they

14   would question what this loan was really for.  And if

15   it was to purchase NOVA stock, are they actually

16   calling it new money in the bank?

17             And, ladies and gentlemen, whether or

18   not these loans were made again for the people in

19   TARP, this is an important fact that would influence

20   their decision, whether or not to give the defendant

21   this money.

22             So you know that by the end of December

23   of 2009, NOVA Bank does not get the TARP funding,

24   doesn't get it, but ladies and gentlemen, you'll be

25   instructed and His Honor will give you all of the

1    instructions, success of this conspiracy is not

2    material.  A lie is still a lie, whether or not it

3    works.

4              And so to look now at what the

5    defendants after, particularly Brian Hartline after

6    all is said and done, and they don't get the TARP

7    funding, and now what are they going to do, what are

8    they going to do with this bank.  You know it's in

9    precipitous decline, but they've made the lie, and

10   they stick with it.

11             Remember back when Barry Bekkedam gets

12   this $250,000, and during that time period, Todd

13   Howard came in and Todd Howard worked for Barry

14   Bekkedam at Ballamore, and he gets put on this, you

15   know, NOVA account, start working, helping him, I

16   mean, we've got to get investors interested and

17   invested in NOVA Bank, because they're trying to raise

18   this capital to get the TARP money.

19             And what happens, Todd Howard

20   recognizes wait a second, this George Levin loan that

21   we're calling capital, new capital in the bank is a

22   loan to NOVA.  I mean, that's a problem.  I need an

23   answer, that's what he testified to.  He told Barry --

24   he's very uncomfortable with this, you've got to get

25   me an answer, like is this okay.

1                    And instead of just -- what's the

2        simple answer to that question if it's all okay, if

3        they really thought it was fine?  Why not just said,

4        oh, Todd, you know, we just did that loan, it's fine,

5        it's all good, it's capital, we told the regulators

6        that we made this loan, it's all good.

7                    That's not what happens.  And you know

8        that Todd Howard goes and asks Brian Hartline for an

9        explanation where he says, in January, still doesn't

10       have an answer when he raises this at the end of

11       December, he says, "as I said before, I will report

12       this to financial authorities unless I get a response

13       from you or NOVA's counsel in short order that

14       confirms the transaction's legal nature."

15                   Well, he's not going to tell him.  So

16       he goes to his lawyer, David Schwartz.  Remember when

17       David Schwartz came in?  And what did David Schwartz

18       tell you?  He said, yes, I was asked to give, you

19       know, an opinion about whether or not this

20       transaction, everything about this transaction was

21       legal.

22                   But the information that David Schwartz

23       was provided is not the correct information.  Again,

24       people can only make their judgments based on truthful

25       information, and what does David Schwartz believe the

1    purpose of this loan was for.  The loan documents

2    reflect that the line of credit was intended as short

3    term bridge loan to replace funds that were used

4    previously by Mr. Levin to purchase and improve real

5    estate located in Devon.

6              Is that what this loan was for?  In

7    fact, ladies and gentlemen, the original raz (ph), the

8    raz that Joseph Madiani prepared in order to

9    underwrite this loan says, investment purpose.  It

10   doesn't say anything about a property in Devon.  But

11   that's what's provided to David Schwartz.  Why is Mr.

12   Hartline covering it up?  Why doesn't he just send the

13   new raz, and when he gets this letter, why didn't he

14   say, oh, my goodness, oh, my goodness, Mr. Schwartz,

15   you have the wrong raz, you've got the wrong one, let

16   me send you the one that went with the loan.

17             But that's not what happened.  And, in

18   fact, when the information is sent over, it's Kim

19   Hartline who says, Barry asked me to send you this

20   document.  And what's attached is the risk assessment

21   summary that David Schwartz analyzes to give his

22   opinion on this loan.  And what does it say now?

23   Purpose, bridge loan for improvement to property, and

24   the comment section is completely different.

25             Ladies and gentlemen, compare

1      Government's Exhibit 43 with the raz that's contained

2      in Government Exhibit 171.  It's a different raz for

3      that loan.

4                  Why is he sending a different one?

5      Because he wants a certain answer, he wants to get

6      Todd Howard off his back.  And it works.  And it

7      works.

8                  And so you also know that in May,

9      around May of 2010, KPMG comes in to do an audit of

10     the bank.  And prior to the audit, Patricia Logney

11     (ph) goes and she starts pulling the loans that they

12     may want to look at, and she finds this Levin loan,

13     and she says, did this loan go to purchase stock, is

14     this what we're calling capital, Mr. Levin's loan.

15     And she's like, wait a second, I don't think that's

16     right.

17                 And so she brings it to the attention

18     of KPMG.  Now, ladies and gentlemen, let's be very

19     clear, the only two people who bring up the fact that

20     there's something wrong with this, are the people who

21     discover that there may have been a concealment, and

22     that's Todd Howard from Barry Bekkedam's firm, from

23     Ballamore, and Patricia Logney from NOVA Bank.

24                 I mean, but for these two people, they

25     would've gotten away with it.  It's not Brian Hartline

1    or Barry Bekkedam who ever brings it to anyone's

2    attention, because they are deliberately concealing it

3    because they are engaged in a scheme to defraud to get

4    this TARP money.

5                    So when it's brought to KPMG's

6    attention, Mr. Shubin testified, wait a -- you know,

7    this -- you can't call this capital, I mean, it's a

8    loan, it's a loan and it's not new money in the bank,

9    and you know, you're calling it capital, I think we've

10   got a problem with this.

11                   And so in response when he's questioned

12   by Mr. Shubin, Brian Hartline writes a letter of

13   explanation.  And remember now, they had asked for all

14   of the loans which are close in time to investments

15   being made in the bank.  So now they're at the point

16   where they have to disclose the fact of the -- they're

17   disclosing these three loans from Levin, Bonomo and

18   Galab.

19                   They're disclosing that here are the

20   loans that were closing time to investments, but what

21   is not being disclosed, and we look at what he says in

22   the first -- in this first page of his letter.

23                   The timing of the closing of these

24   loans over the time period in relation to NOVA's

25   substantial capital raising activities during the same

1      period is coincidental.

2                      The fact that these loans were made and

3      then the investment was made, it's a kwinky dink, I

4      mean all three.  But, ladies and gentlemen, they have

5      to be the loans that they tell the regulators are new

6      capital, it's not coincidental, it's purposeful.  It's

7      knowing.  They knew what they were doing at the time,

8      and now they've got to keep covering it up.

9                      But he goes on to state, "all loans

10     originated by NOVA Bank had a specific purpose as

11     identified in the raz."  Really?  Because in the

12     specific purpose it's never mentioned that this loan,

13     these loans were made to purchase NOVA stock.

14                     "Please further understand that

15     management does not control the underwriting process,

16     the data collection process, or the timing of when the

17     loan is closed."  Really?  Because, ladies and

18     gentlemen, you can look at all of the e-mails in the

19     24 hours that NOVA Bank closed the George Levin loan,

20     who was in control of making -- of the timing of that

21     loan?  The defendants.  They had that loan close in 24

22     hours, despite the fact that the underwriter wanted

23     more information.  They had everything to do with the

24     control of when these loans closed.

25                     On the second page, first quarter 2009

1   Mr. Levin requested a $10 million loan from NOVA Bank

2   for general capital and to provide him liquidity to

3   complete his residence in Devon to close on June 30th,

4   2009 absolutely not true.

5               Mr. Levin said, the only purpose for

6   this loan, it was a $5 million loan, and it was as a

7   favor to Barry Bekkedam.  And that was going to invest

8   in NOVA.  Again, with the promise that he was going to

9   somehow get him banks in Florida to house his Banyon

10  accounts.

11              And again, please see Mr. Levin's

12  response to a CIC application dated September 8, 2009,

13  in which he identifies the source of funding for his

14  investment in NOVA Financial Holdings.  Let's go back

15  to what we said before, because we're stuck with it,

16  the concealment where we don't tell them about the $5

17  million loan, that's what I'm going to have Mr. Shubin

18  rely on, that information, the information that hides

19  the truth.

20              "Please note that NOVA Bank closed and

21  funded the above noted non-revolving secured

22  (indiscernible) credit on June 30th, 2009 as requested

23  by the client."  Was that a request by George Levin,

24  to close this loan by June 30th.  George Levin was

25  like digging in his heels, he didn't even want to do

1      the loan, he didn't even want to make the investment.

2                     On the next page, talking about, he

3      clearly states the source of funds for the investment

4      and his response to his change and control

5      application.  Did he -- did George Levin clearly state

6      the source of funds?  Did he tell them that the $5

7      million was borrowed from NOVA Bank.  They're stuck,

8      ladies and gentlemen, and they have to continue with

9      the lies and concealment.

10                    During the second quarter, Mr. Bonomo

11     requested through Ballamore a loan in the amount of 5

12     million for investment purposes, but primarily to

13     invest in Banyon Capital as noted in the raz.

14                    Ladies and gentlemen, more than half of

15     that loan was used to purchase NOVA stock.  And then

16     at the end, Mr. Hartline who signs this letter says, I

17     can assure you these loans were also underwritten with

18     specific purposes.  Specific purposes that anyone

19     looking at the risk assessment summary, looking at the

20     underwriting documents would never know that the loans

21     were used to purchase NOVA stock.  And that is a fact

22     they had to hide, they had to conceal because they

23     were telling the regulators they were getting new

24     money.

25                    And you see what KPMG concludes?  He

1    concludes or they conclude that all of this money,

2    these loans have to be backed out of capital.  All the

3    money they said was making the bank healthier has to

4    get backed out.  And, ladies and gentlemen, they knew

5    if it had ever been disclosed it's exactly what

6    would've influenced the decisions of people giving

7    them the TARP money, that they would've never counted

8    it as capital, because it was not new money making the

9    bank healthier, making the bank stronger.

10                    But, ladies and gentlemen, Mr.

11   Hartline, this defendant, had dug his $13.5 million

12   grave at this point, and you know that as late as

13   April of 2012, he's under oath, he still has to lie

14   about it, he dug that grave, he has to lie in it, and

15   he brings Barry Bekkedam with him, because Barry

16   Bekkedam was instrumental in orchestrating this

17   scheme.

18                    Ladies and gentlemen, the regulators

19   think about it this way, if they see NOVA has a

20   building, and they say, you know what, we need a

21   couple of more bricks, you know, need some more bricks

22   at the top, I'm going to secure that top part, and

23   we'll give you some more bricks.

24                    And they say, look, look, we've got

25   more bricks on the top of the building, see.  But they

1    never tell them that the bricks are coming from the

2    foundation of the building.  Do you think that's what

3    the regulators meant?  Absolutely not, ladies and

4    gentlemen, absolutely not.

5              All of this was to conceal the truth

6    about what was going on, that the bank was not getting

7    healthier.  But they had to go and do it because they

8    wanted to save the bank, they wanted the $13.5

9    million, they wanted all of their ambitions to be met,

10   and they needed to secure that TARP money.

11             At the end of the day, in the banking

12   system, you have to rely on truthful information.  If

13   you conceal something important, as you're trying to

14   get money borrowed, do you think that's okay?  It's a

15   crime.  It's a crime to hide it.  Because our banking

16   system is not the wild west.  You can't just say

17   whatever you want to get the money.  The expectation

18   is the truth, and the truth, ladies and gentlemen, was

19   completely lost on these defendants, because they

20   wanted $13.5 million in their bank for themselves.

21             And I ask you to return the only

22   verdict supported in all these counts against each of

23   these defendants that they are guilty.  Thank you.

24             THE COURT:  All right.  Thank you very

25   much.  Now, we're going to recess for lunch at this

```
 1    time.  It is equally important that you not discuss

 2    the closing argument, nor the testimony, nor anything

 3    else about this case because you've yet to hear the

 4    entire matter.

 5                    Enjoy your lunch.  We'll see you

 6    promptly at 1:30 this afternoon, 1:30 this afternoon.

 7                    THE CLERK:  All rise.

 8         (Jury out)

 9                    THE COURT:  1:30.

10                    ALL:  Thank you, Your Honor.

11         (Recessed at 12:11 p.m.; reconvened at 1:39 p.m.)

12            THE CLERK:  All rise.

13         (Jury in)

14                    THE CLERK:  Ladies and gentlemen, we

15    are back on the record.

16                    THE COURT:  Good afternoon.  You may be

17    seated.

18                    Counsel --

19                    MR. EGAN:  Thank you, Your Honor.

20                    THE COURT:  -- Mr. Egan, you may

21    proceed.

22                    MR. EGAN:  May it please the Court,

23    good afternoon, ladies and gentlemen.

24         (A chorus of good afternoon)

25                    MR. EGAN:  There is no crime here.  I
```

1    told you that three weeks ago.  And you have sat here

2    patiently for three weeks, and you have listened to

3    dozens of witnesses, and it is still the case.  There

4    is no crime here.  There is no crime here because

5    Brian Hartline didn't lie to anyone.  Brian Hartline

6    didn't mislead anyone.  Brian Hartline didn't hide

7    anything.  Because there is no law or regulation that

8    says that NOVA Bank couldn't count the capital that

9    was invested by three individuals as capital.

10                   Not only was there no law, the only

11   basis for not counting this as capital was guidance

12   from KPMG, but the government's own witnesses told you

13   that Mr. Hartline didn't know it existed.

14                   So if you don't know that something

15   exists and it's guidance, not a law or a regulation,

16   then there's nothing to hide, and there was no hiding.

17                   And I'm going to get into the details

18   of the case and show you the government's own

19   exhibits, and a few that the defense had to introduce,

20   and talk about the witnesses and what they said from

21   that witness stand, not what Ms. Barry seemed to

22   recollect this morning, but what you heard from the

23   witness stand, which is where the evidence comes from,

24   that no one was deceived, that no one was lied to,

25   because there was no lie, there was nothing to hide.

1          And indeed, you will also be asked to

2    guess whether whatever was said even mattered to the

3    people who made the decision, because the government

4    never called them to testify.

5          They brought a parade of regulators in

6    here.  One day I called it the parade of regulators

7    day.  A parade of regulators.  And you heard Ms. Barry

8    this morning talk about the regulators wanted to know.

9    The TARP people.  The people from TARP.  Is TARP some

10   land that these people live in?

11         The fact of the matter is -- and we're

12   going to go over it in a little bit of detail -- the

13   investment committee of the treasury made the decision

14   to deny NOVA TARP funds, and not a single member of

15   that committee testified.

16         And where does that leave you, ladies

17   and gentlemen?  It means you have to guess.  They want

18   you to guess whether the people who made this decision

19   even cared about the information that Mr. Hartline

20   didn't know wasn't okay to tell them, and they want to

21   put this man in jail on that basis.  That's what we're

22   talking about here.

23         This is a criminal case.  This is a

24   criminal case.  A man's freedom is at stake.

25         MR. IGNALL:  Your Honor, may we

1    approach the side bar?

2                    THE COURT:  Yes, sir.  Excuse us,

3    please.

4        (Sidebar as follows:)

5                    MR. IGNALL:  Your Honor, I don't -- I'm

6    sorry.  I really don't like to object during closing,

7    but punishment is an issue for the Court, not the

8    jury, and now this is asking the jury to consider what

9    the punishment might be, and that's not their decision

10    and that's inappropriate.

11                    THE COURT:  I will most certainly speak

12    to the issue of punishment and guilt or not guilt in

13    the case, it's coming from the Court and no others,

14    we'll do that at the end.  But the objection is

15    sustained.  Don't go there anymore, please.

16                    MR. EGAN:  Yes, Your Honor.

17                    MR. IGNALL:  Thank you, Your Honor.

18        (End of sidebar)

19                    MR. EGAN:  And because this is a

20    criminal case there are three important elements that

21    you need to consider that our constitution, the people

22    who started this country, put into play, that are

23    critical to the determination of the case.

24                    The first is the presumption of

25    innocence.  Brian Hartline sits over there presumed

1    innocent.  He is as innocent as anybody in this

2    audience, he is as innocent as anybody in this room,

3    unless and until the government proves him guilty

4    beyond a reasonable doubt.

5              The indictment means nothing.  All it

6    means is that the government chose to indict

7    Mr. Hartline, and I'm going to about the indictment

8    before I'm finished.  I saw more errors in that

9    indictment than there were in any application that

10   NOVA Bank filed.  That's number one.

11             MR. IGNALL:  Your Honor, may we

12   approach again?

13             THE COURT:  Yes.  Excuse us.

14       (Sidebar as follows:)

15             MR. IGNALL:  The indictment is not

16   going back to the jury.  I think it's inappropriate to

17   argue what errors may not be in there.

18             He can argue what's been charged and

19   whether the defendant is guilty or not guilty of that,

20   but if it's allegation in the indictment that's not

21   going back to the jury I don't understand what the

22   relevance of that other thing is other than to make

23   the government seem that they've done something wrong.

24             THE COURT:  During the course of the

25   entire matter has any side referenced the indictment?

Page 81

1                    MR. IGNALL:  Other than what the

2     charges are, no, Your Honor.

3                    THE COURT:  Mr. Egan?

4                    MR. EGAN:  Your Honor, the indictment

5     are the charges brought against my client and they're

6     brought based upon statements that are in that

7     indictment that are demonstrably untrue, and it is

8     clear to me that that is something that the jury

9     should be able to consider.

10                    MR. ENGLE:  And, Your Honor, may I just

11    weigh in?

12                    THE COURT:  Yes, sir.

13                    MR. ENGLE:  Because it's going to

14    affect me too.

15                    The jury has one document, one

16    instrument with which to base whether the allegations

17    have been proven or not.  That's the government's

18    allegations against these men.  To be able to not say

19    that there's a problem with it or that there's a more

20    particular take on is it is that there's a defect in

21    it, a problem or that the evidence doesn't show the

22    same things what they've alleged, how can we not be

23    allowed to argue that?

24                    THE COURT:  All right.  First of all

25    the charges are guided by the indictment.  Early on in

1    the process defendants requested the Court to dismiss

2    the indictment for a variety of reasons and they asked

3    the Court to dismiss the indictment for additional

4    reasons.  These two are the additional times.  I

5    denied the defendants' request to dismiss the

6    indictment at least three times for a variety of

7    reasons.  That the indictment having not been

8    dismissed is fair game at this point.

9                    MR. IGNALL:  Well, Your Honor, if I may

10   add to that.  There's also a motion to strike

11   surplusage.  We opposed because it was not going back

12   to jury so therefore it couldn't influence the jury

13   one way or the other.

14                   THE COURT:  To the extent that there is

15   surplusage and not specifically an indictment for a

16   criminal defense against specific conduct the

17   surplusage is out and you cannot reference that.  But

18   the fact that they are charged by indictment is

19   always --

20                   MR. IGNALL:  I agree with that, but if

21   there's a paragraph in the indictment, for example,

22   the paragraph we agreed to redact or remand -- but

23   there's a paragraph in there that we didn't introduce

24   any proof on, I don't think defendants can now say

25   there's an error, that there's no evidence one way or

1    the other.

2                    MR. EGAN:  Well I can say that there's

3    an error in Count VI when you say on October 22nd,

4    2009 there was an e-mail sent and there's no evidence

5    of that?

6                    MR. IGNALL:  That's absolutely fine.

7                    THE COURT:  If the verdict sheet is

8    going to reflect the charges in the indictment the

9    indictment reference is a fair game.

10                   All right.  Thank you.

11                   MR. IGNALL:  Thank you, Your Honor.

12        (End of sidebar)

13                   MR. EGAN:  The indictment is merely

14   charges.  It's merely a statement of what the

15   government hopes to be able to prove.  It is no

16   evidence against Mr. Hartline.  That's number one.

17                   Number two, and it's very important,

18   the burden of proof.  The burden of proof is entirely

19   on the government.  I don't even have to ask questions

20   of these witnesses.  Mr. Hartline doesn't have to

21   present any evidence.  We can merely rely on the

22   government's failure to prove the charges beyond a

23   reasonable doubt.  And I would suggest to you, ladies

24   and gentlemen, that's exactly what has happened in

25   this case.  The government has failed to prove the

1    elements of the charges beyond a reasonable doubt.

2                    Now, we did present character evidence,

3    and certainly you're allowed to consider that, and

4    we'll talk about that a little more in a bit, but

5    remember, the burden is entirely on the government,

6    and the government called all those witnesses, and I

7    did cross-examine them.  And what you heard out of the

8    mouths of their witnesses was the defense case.

9    Because the fact of the matter is, is when their

10   witnesses were cross-examined, the facts that they

11   answered the questions to, provide the very basis for

12   you to find Mr. Hartline not guilty.

13                   And the last and the most critical

14   cornerstone of this process is reasonable doubt.

15                   Now, His Honor is going to describe,

16   he's going to give you the full legal definition of

17   reasonable doubt, but I would just like to give you a

18   common sense definition of reasonable doubt so you

19   have something to think at.

20                   A reasonable doubt is something that

21   would cause you to hesitate in a matter of importance

22   in your daily life.  That's what it is.

23                   So as an example consider that you're

24   going to buy a house and you want to buy a house and

25   you want to buy it with your significant other and

1    you're going to buy it in a certain neighborhood

2    because you like that neighborhood, and you like the

3    schools, you like the shops, whatever.  So you go and

4    you look at the house.  And okay, this is a great

5    house, this is exactly what I want.

6              So you tell the realtor, we're going to

7    go back to the place and we're going to put down an

8    offer on this house.  And as you're walking away from

9    the house you turn around and you look up at the roof

10   and there's a shingle hanging down.  That's a

11   reasonable doubt.  It doesn't mean you're not going to

12   buy the house, it means you're going to pause, you're

13   going to hesitate, because you're going to find out

14   what's up with the roof.

15             And, ladies and gentlemen, what His

16   Honor is going to tell you is if you have one

17   reasonable doubt about any element of the charge you

18   must find the defendant not guilty.

19             And, ladies and gentlemen, I'm here to

20   tell you there's more than a shingle hanging off that

21   roof.  That roof is on fire.

22             Now, we're going talk about the case

23   itself.  The first reasonable doubt, and I'm going to

24   give you quite a few reasonable doubts, I'm going try

25   to do it as quick as I can in the most interesting way

1    I can, but I got a lot of reasonable doubts to talk

2    about.

3                  The first reasonable doubt and the most

4    significant is that there is no knowledge on the part

5    of Mr. Hartline that the capital that NOVA Bank

6    counted could not be counted as capital.  And there is

7    no law or regulation that says it couldn't have been

8    counted as capital.

9                  They're asking you to find him guilty

10   beyond a reasonable doubt based upon the auditor's

11   judgment of KPMG a year and a half after the facts.

12   That's what they're asking you to do.

13                 So let's take a little look at that.

14   If I could have D-96, please.  And if you could just

15   blow up the top.

16                 Now, this is an e-mail from Mr. Shubin,

17   Mr. KPMG, because you heard Ms. Barry talk about this

18   morning.  It's actually to Mr. Shubin.  And I asked

19   him about this, it's from his partner, Kevin Frank,

20   who's a guy at another office.  Now note the date is

21   May 19th of 2010.  That is a year -- almost a year

22   after Mr. Hartline and NOVA Bank were entered into the

23   transactions you've been asked to ask about -- or

24   think about.  And it says, "Allen, for what it's

25   worth, copied below is the EITF guidance I was

1     thinking of earlier."

2                    Now, I asked Mr. Shubin about this, and

3     Mr. Shubin said, well, I knew there was some kind of,

4     you know, guidance somewhere, but I didn't remember

5     the name or the number, so I talked to my partner and

6     I had him send it to me.

7                    Shubin is an expert, he's an auditor

8     from KPMG, one of the biggest accounting firms in the

9     country whose job is to audit banks, and he doesn't

10    even know what this thing is, he has to have his

11    partner send it to him, and they're going to say that

12    Brian Hartline should have known this a year ahead of

13    time?

14                   Now let's go down and take a little

15    look at it, what does it say?  And if you can just

16    blow up the body.  I'm not going to go into too much

17    detail.  What I'll tell you is, if you can figure it

18    out you're better than me.

19                   The issue -- first of all it's an

20    issue.  I don't even know what that means.  An issue.

21    The enterprise receives a note rather than cash.  And

22    I asked him, well isn't $5 million cash not a note?

23    But in accounting world you have to take into

24    consideration that there's a loan.  Okay, that's fine.

25    An enterprise receives a note rather than cash as a

1    contribution to its equity.

2              Then it says, "The issue is whether the

3    enterprise should report the note as a reduction of

4    shareholder's equity."

5              Then there's a discussion.  The

6    discussion says, "The task force reached a consensus

7    that reporting the note as an asset is generally --

8    generally not appropriate."  Not illegal, not

9    unlawful, no, you can't do it, it's generally not

10   appropriate, except in limited circumstances.

11             Then the second paragraph talks about

12   the SEC and public companies.  And if you recall I

13   asked Mr. Shubin, was NOVA Bank a public company?  He

14   said, no.

15             And then if we just go to the next

16   page.  It says, "Some task force members stated they

17   were aware of very few cases in which non-public

18   companies reported such notes as an asset, except in

19   circumstances."

20             This is the basis for not counting

21   those investments as capital.  This is it.  No law, no

22   regulation.  You better believe if there's a law or

23   regulation you would have seen it an hour and a half

24   ago.  This is the basis.  And it's a basis is this

25   accounting treatment, which was called guidance, and

1    ultimately Mr. Shubin, using his auditor's judgment,

2    which is what auditors do, because accounting is not a

3    science -- I mean it's an art, not a science, correct,

4    to quote Mr. Ignall from earlier in the trial, he

5    applied his judgment and he said this shouldn't count

6    as capital in May -- well actually he didn't actually

7    apply it until October of 2010 -- by May in 2010 and

8    when it came up.

9                   So let's talk about how we know

10   Mr. Hartline didn't know this.  Well Mr. Hannison

11   (ph), who's actually the CFO at NOVA Bank who

12   testified for the government as well, also told you he

13   didn't know it, and he's is CFO.  And not only didn't

14   he know it, he still disagrees with it, and he

15   absolutely disagreed with it when he was told.

16                  And if we could have D-133 we'll just

17   show you, because Mr. Shubin also talked about this.

18   It's the day after his partner sends it to him.  The

19   day after Mr. Shubin gets this from his partner at

20   KPMG he forwards it to Mr. Hartline and Mr. Hannison.

21   "See below for the guidance."

22                  So of course Mr. Hartline and

23   Mr. Hannison get this thing and they look at it.  And

24   after reading it they say, we don't agree with it.

25   And guess who else didn't agree with it?  Mr. D. Mark

1    Antonio (ph), another government witness.  He sat up
2    there and told you that he didn't agree with this
3    either, that he thought it should be able to count as
4    capital.  And I'm going go into why they thought it
5    should be able to count as capital in just a few
6    minutes.
7             But the fact is, they don't -- I don't
8    have to prove that it was -- they were smart doing
9    that or they should have done that.  They've got to
10   prove that Brian Hartline knew he couldn't do it and
11   lied about it.  And they can't, because that evidence
12   doesn't exist.
13            Now, we also now that Henry Zentner
14   (ph) comes along, and he was the guy, the PADOB -- no,
15   no, he was FDIC examiner.  He was one of the later
16   witnesses.  He came along later and did the
17   examination for 2010.  And what did he tell you?  He
18   told you that Mr. Hartline didn't know about this
19   until he heard about it.  He told you that
20   Mr. Hartline didn't think it applied.
21            Now, I got a question for you.  They
22   want to say Mr. Hartline hid this.  They want to say
23   he hid this.  If the auditor shows up in 2010 and
24   says, hey, those transactions you did last year, which
25   you know in the back of your mind are totally illegal,

1    can't be used as capital, are you going to go talk to

2    the FDIC examiner about them?  Are you going to go

3    say, hey Mr. Examiner, I still think this is wrong, I

4    disagree with it?  That makes no sense at all.  You're

5    never going to go talk to the examiner about it,

6    you're going to hide it.

7                    Well guess why he didn't hide it?

8    Because it wasn't hidden.  That's the whole reason the

9    auditor saw it in the first place.

10                   So if you listen to Mr. Zentner's

11   testimony it's very clear that Mr. Hartline didn't

12   know there was anything wrong with doing this.  That's

13   issue number one.  No knowledge, no crime.

14                   Issue number two.  This one is a little

15   technical, but it seems to me like a mighty big

16   problem.  They presented no evidence that the people

17   who made this decision ever even heard about anything,

18   because they didn't present the people who made this

19   decision.  And the people they did present showed you

20   how information that NOVA Bank gave to the regulators

21   never got passed down the line.

22                   So let's just talk a little bit about

23   the process.  We know that you file the TARP

24   application, it's two pages long, I'm not going to

25   show you again, you can get a used car.  You need more

Page 92

1    information to get a used car than to get the TARP
2    application.  But they file the TARP application.  We
3    know that in February or thereabouts the FDIC said
4    this should go onto the council, the CPP council.  You
5    heard all about them.  The FDIC said, fine, send it
6    down the road.
7              What else do we know?  We know that in
8    February of 2010 there had not even -- George Levin
9    didn't exist, nobody knew about him yet, there was
10   absolutely nothing in February 2010 that they could
11   even suggest was improper.
12             So that first FDIC's decision to send
13   it down the road, completely off the table.  Nothing
14   to do with it.
15             We know that from there it goes to this
16   four-person council, the CPP council.  And we know
17   that they had some questions.  And we know that they
18   met on June 10th, and they made a decision to
19   recommend -- to recommend that it be approved if
20   $15 million was infused into the bank.
21             But let's talk about that
22   recommendation.  If we can have G-28, please.  If
23   you'll recall, and if you can blow that up so folks
24   can see it.  If you'll recall they found out that
25   Mr. Levin was interested in investing in May.

1    Mr. Levin agreed to invest his money in late May.  And

2    they told the government about that.  And when I say

3    they, they like to use they.  They isn't good enough

4    in this by the way.  They need to prove Brian Hartline

5    did these acts.  It's not good enough to say they.

6    Who are this they?  Jeff Hannison, he sat up there and

7    talked to you.  Jeff Hannison is the one who sent

8    this.  But regardless, more importantly, everything in

9    it's true.

10            So on June 2nd, based on questions from

11    the government, from Lisa Koch, Jeff Hannison sends

12    this information.  And if we could have the second

13    paragraph, please.  It says, "Management believes the

14    adequate capital levels" -- that's the going below

15    well capitalized -- "should be short lived."  They're

16    not saying it will be short lived, they're saying it

17    should be short lived.  It says, "Currently an

18    individual has expressed interest to invest 15 million

19    in NOVA Financial Holdings."  Well on June 2nd that

20    was the truth.  George Levin said he wanted to invest

21    $18 million.

22            Then it says, "The investment is

23    dependent upon regulatory approval."  That's the

24    truth.  "The treasury approving NOVA for TARP."  Never

25    happened.  That was the truth.  "And the approval of

```
 1    the DVFG transaction."
 2                      All three things in this letter to Lisa
 3    Koch saying, hey, Lisa, here's what you say going on,
 4    okay?  June 2nd.
 5                      Lisa Koch then speaks I guess, talks
 6    to, e-mails, whatever, we didn't really hear, Chuck
 7    Hunter.  Because Chuck Hunter is the guy, he came in
 8    here, another regulatory guy, he was kind of Lisa went
 9    to Chuck, went to wherever it went next.  We never
10    really heard where it went next, but Lisa went to
11    Chuck.  Chuck went to the CPP council on June 10th,
12    and he told you, when I asked him, did you tell them
13    about the DVFG contingency?  No.  The June 10th
14    minutes, and we can call those up now, that's G-30.
15    What do they say?  They say -- first of all it's a
16    recommendation.  Council member recommendation.
17    Second of all that guy Birch, should never have
18    approved the whole thing, he was -- he said they don't
19    have enough money, we're not giving him money any
20    ways, but that's neither here nor there.
21                      But if you go to page 2 and you look at
22    the bottom of the first paragraph it tells you what
23    Mr. Hunter told them.  He told them, "A private
24    investor has proposed to invest a minimum of
25    $15 million."  He told them, "An injection would
```

1    return the bank to well capitalized."  That means the

2    whole 15- by the way.  "And would make him the ten

3    percent shareholder."  And, "The investor is

4    reportedly very strong with a $300 million net worth."

5              Well all these things are true, but

6    they forgot to mention the DVFG contingency, he forgot

7    to mention the TARP approval contingency, and he never

8    told these people that.

9              So we don't even know the CPP's making

10   a decision without full information, but now it gets

11   even more interesting, because all we know next is

12   that on August 25th NOVA Bank gets a letter, addressed

13   to Mr. Hannison,, stating that they've been

14   conditionally approved -- or preliminary approved, I'm

15   sorry, misquote.  Preliminary approved for TARP funds.

16             Well what did Mr. Hunter and Mr. (sic)

17   Koch and all the other witnesses tell you that that

18   decision came from?  It came from an investment

19   committee.

20             So some time between June 10th and

21   August 25th there was an investment -- I guess there

22   was an investment committee meeting.  I mean there's

23   an investment committee decision, there's must have

24   been a meeting.  I didn't hear any evidence of it.

25   Nobody from the investment committee came in and

1    testified.  Nobody from the investment committee told

2    you what they relied on or what they thought about or

3    what mattered to them or what was material, as they

4    like to say.  Not a single one.  I guess they meet

5    behind the curtain like the mighty oz, I don't know.

6    All I know is that you never heard from them and you

7    have to guess, and guessing isn't good enough.

8                    However, that's not the whole story

9    ,because everything they were told was true.

10                   Now, the government wants to make a big

11   deal about the fact that NOVA did that all in a big

12   hurry on June 29th and got the money in by June 30th

13   and it was all to deceive the TARP.  Can we have G-31,

14   please.  There was a lot going on at NOVA in 2008 and

15   2009, but I'll tell you one thing that wasn't going

16   on, NOVA was not in danger of failing.  You didn't

17   hear a single witness come in here and tell you they

18   were in danger of failing.  The government liked to

19   say in its opening and its closing, but I didn't hear

20   a witness say they were in danger of failing.  Every

21   single witness said they thought they were doing okay,

22   they were expanding, they were buying an insurance

23   company.  They built a branch.  They existed until

24   2012 even after Levin fell -- went south on them and

25   the TARP didn't come through.

1                    So it's clear they were not in any risk

2      of failing in 2009, that's just ridiculous.

3                    However, it's important to be well

4      capitalized or as well capitalized as you can be at

5      the end of a quarter.  So sure they wanted to have

6      money in by June 30th.  You always want to have money

7      at the end of the quarter.  But the concept that it

8      was to get TARP funds is belied by the government's

9      own evidence.

10                    Because if we go to the bottom e-mail,

11     this is the June 10th e-mail, says, "Chuck indicates

12     it still has to go through a review process at

13     treasury."  So in other words, we don't know when

14     they're going to make up their minds.

15                    And then if we go to the next exhibit,

16     D-41, and this is on June 25th, short answer,

17     "Treasury's investment committee" -- the folks we

18     never heard from -- "has not yet approved the

19     application.  Tell the bank to be patient.  Give it a

20     few more weeks."  Well if they have to give it a few

21     more weeks on June 25th how is it June 30th action in

22     order to get TARP funds?  I don't get the connection.

23     It makes no sense.

24                    Now, I just want to quickly touch on

25     G-75, which is the preliminary approval, because I

1    just want you to remember what it is.  It is not an

2    approval as the government wants to say it is.  It's a

3    preliminary approval.  We have no idea what it's based

4    on, because the investment committee doesn't testify,

5    and it basically has like six contingencies in it.  It

6    claims it's based on a review and analysis of the

7    application, because the application is only two pages

8    long.  I'm having a hard time figuring that one out.

9    And it says, "The recommendation by the relevant

10   federal bank regulator."  It doesn't say what else.

11   And then it says, "Preliminary approval."  Right

12   there.  Preliminary approval.  That's not approval of

13   TARP funds.  All that is is for now if you need about

14   14 other contingencies you might get the money.

15                    And in fact on the second page they put

16   forth all those contingencies.  And one of those

17   contingencies is ongoing operations of the bank and

18   whether the bank stays healthy during those following

19   months and examinations of the bank that are going to

20   take place.

21                    Well guess what?  Examinations of the

22   bank take place all the time, as you heard.  And

23   indeed one takes place in October.  And that one that

24   takes place in October is the -- if there's any

25   evidence of a basis for the denial of the TARP funds,

1    it's that.

2              And what's more important -- most

3    important about that?  That examination covered the

4    Levin loan and the Levin investment, because it wasn't

5    hidden, it was there.  And I asked the examiner about

6    it, and he testified that it was.

7              And if we could go to G-95 now.  This

8    is the report of examination from October 5th, 2009,

9    you saw it, it testified to.  Government witness

10   again, not my witness.  If you go to the top of

11   page 12 I just want to highlight this one thing.  No

12   at the top of page 12.  Or 14, I'm sorry, 14.  My bad.

13   Yeah, the very top there, highlight that.  Perfect.

14   It talks about audit, and I want to talk about audit,

15   because what happened here is actually exactly what

16   should happen.

17             What happened here is Ms. Lonnie is the

18   internal auditor of the bank.  Her job is to look at

19   documents and review them.  One of her other jobs is

20   to present those documents to the auditor.  She does

21   that without any interference from Mr. Hartline, as

22   she told you.  She reports to the audit committee

23   chair, and she presents this information to all these

24   different auditors that come through the place.  And

25   here it just talks about it.  "Audit is strong as

1    evidenced by the audits and penetration testing

2    performed by RSM McGladrey" -- that's another outside

3    people -- "and KPMG, and the work of the bank's own

4    internal auditor."

5              So what the government is saying, we're

6    happy with the way you audit, you do a good job.  And

7    they did do a good job.  And KPMG took a position, and

8    ultimately the bank was put in a position where it has

9    to agree with it.  But there's no hiding anything.

10   Everything is looked at my examiners, by auditors.

11             Now if we could go quickly to page 33,

12   because this is the critical part of this document.

13   Scope of the examination.  "An independent examination

14   commenced on October 5th, 2009 utilizing financial

15   data as of June 30th, 2009" -- something the

16   government wanted to highlight -- "and loan data as of

17   August 31st, 2009."  Something they didn't seem to

18   want to highlight.

19             Well the Levin loan took place in June,

20   which is before August last time I checked, and the

21   Galab (ph) loan had taken place like -- the first

22   Galab loan had taken place like a year before -- we'll

23   get into that a little later.  So clearly they were

24   reviewed by this auditor.

25             And it also says, "All relationships

1    over 1.664 million were reviewed."  Loan

2    relationships.  Well 5 million is more than 1.664 last

3    time I checked.  And Galab's entire relationship was

4    more than that as well.

5              And if you want to say, well maybe they

6    didn't make the connection because Mr. Levin is a

7    shareholder and he had the loan and they maybe didn't

8    see it, well let's then go to page 41, and I

9    highlighted this with the examiner.  Principal

10   shareholders.  Lookey there, George Levin hiding in

11   plain sight.

12             Now let me ask you a question.  If

13   you're committing a crime and you want to hide this

14   from the auditors or you want to hide this from the

15   government, are you going to let this stuff be in the

16   documents?  No, you phony up the loan, and we're going

17   to talk about that in a bit.  Because the fact of the

18   matter is there are ways to do this that are a crime.

19   Brian Hartline didn't do it, because Brian Hartline

20   didn't commit a crime.

21             Now, this takes place in October, and I

22   guess we have to assume that based upon this

23   examination and the fact that the bank is getting

24   downgraded, they're denied TARP funds.  But we have to

25   assume it, because nobody tells us anything about the

1    meeting that allegedly or somehow took place in

2    December where they decided you are denied and denied

3    any money.

4              So we're sitting here now in 2016,

5    we're sitting here in a criminal case trying to

6    convict the defendant based upon the regulators,

7    whoever they are, we don't even know what they looked

8    at or were told, we don't have any evidence of a law

9    or regulation that was broken, and based on that and

10   people who don't show up to testify and tell you what

11   happened, you're supposed to say, well this must have

12   mattered and it's -- clearly they must have known that

13   they shouldn't tell him this, even though they never

14   asked it, and therefore that's proof beyond a

15   reasonable doubt?

16             All we know is that in December the

17   TARP was denied, and that's it.

18             And where's Brian Hartline?  He's on

19   the phone leaving pleasant voicemails a year after the

20   application saying, hey guys, what do you need?  Like,

21   you know, could you tell me what's going on, please,

22   I'd kind of like to know.  And poor Lisa Koch, she's

23   stuck in the middle of the thing because they're down

24   there in D.C. making decisions they don't even share

25   with her.  She doesn't even know who's on the

1    investment committee.

2               All we know is that they denied the

3    money and we don't know why.  And that's not proof

4    beyond a reasonable doubt.

5               Now, I've told you a bunch of times

6    there's no crime here.  You came and you're sitting on

7    a criminal jury.  So the least I can do is show you

8    what a crime is.

9               So I'm going to show you what the

10   circular transaction looks like and what didn't happen

11   in this case and why that's further evidence that

12   there is a reasonable doubt.  So if we could have the

13   slide -- the first slide on the circular transactions.

14              Now, ladies and gentlemen, this is what

15   you call a circular transaction.  And a circular

16   transaction is when a bank lends its money to a shell

17   company or a straw man who then lends the money back.

18              Well there's a lot of reasons why you

19   do it this way.  Number one, your shell company and

20   your straw man, you control them, they're co-

21   conspirators.

22              What did we learn in this case?  George

23   Levin, not a co-conspirator.  Anthony Bonomo, he's not

24   a co-conspirator.  Charles Galab, he's not a co-

25   conspirator.  Frank Preve (ph) pled guilty to

1    something having nothing to do with us, but he's not a

2    co-conspirator.

3              In this situation what you do is you

4    take the bank's money, you lend it to a shell company

5    or a straw man, you come up with come tricky name for

6    it so that when the auditors come along and look at it

7    they say, oh, it's the platinum company or something

8    of that nature, so that they can't tell it's actually

9    the person you loaned the money to who made the

10   investment, and then that shell company or straw man,

11   who may be some guy you got off the street and you

12   paid 20 grand to do it, he's got no interest in it,

13   he's got no skin in the game, he never intends to pay

14   the loan back, you know he's not paying the loan back,

15   he sends the money right back to the bank.  That,

16   ladies and gentlemen, is a circular transaction.

17             And if you want to know the truth why

18   we're here?  We're here because when they looked at

19   the Levin loan the first time, that's what it looked

20   like, and that's how investigations start.  And then

21   investigations looking for a crime.  Only this time

22   they didn't find one, because these transactions are

23   nothing like that, and I'm going to show you why.

24             Can we have the next slide, please.

25             In this case NOVA Bank made a loan.

1    The loan is applied for by three people.  Charles

2    Galab, George Levin, Anthony Bonomo.  Put Galab first

3    because he did it first, he did it in 2008 and nobody

4    said boo about it.  KPMG, the auditors, nobody.  But

5    my guy is supposed to read minds and know that you

6    can't do this.  And quite frankly, when you get to the

7    letter he sent to KPMG in 2009 the government is so

8    found of he talks about the fact they've done it since

9    2002 like seven times, but neither here nor there.

10           These are real people with real money,

11   real skin in the game.  They have to pay the loans

12   back.  They sign a contract.  But not only that, first

13   they have to apply for the loan.  And where does that

14   go?  It doesn't go to Brian Hartline, he's the

15   president of the bank, he's not a loan officer.  It

16   goes to Tom Patterson.

17           Now did Tom Patterson sit there and say

18   to you, Brian Hartline told me, hey man, we're doing

19   this thing on the QT, don't tell anybody else, we

20   can't have anybody know about this, it's a big secret,

21   hide it from the regulators, don't tell anybody?  I

22   didn't hear that.

23           And think about that.  Tom Patterson,

24   the guy who got caught with his hand in the cookie jar

25   and was reported by my client to the government, he

1    comes in here -- can you imagine, I mean you saw the

2    guy he was a sad looking dude, he used to be the loan

3    officer, he used to like have a good job and now he's

4    like working two jobs, he's been to jail.  Now think

5    about that.  If there's anybody who ever had an

6    incentive to tell you that Brian Hartline put him up

7    to this, that Brian Hartline told him, don't tell

8    anybody about this, keep it a big secret, it would be

9    Tom Patterson.  He's not a co-conspirator.  He's just

10   a loan officer who Brian Hartline, because it's his

11   job as a loan officer, said, hey, these guys want to

12   borrow money, process the loan.  And he told him what

13   it was for.

14           Now Tom Patterson then sends it to Joe

15   Madiani (ph).  Now they want to say, oh, look at these

16   Raz, none of them say borrowed the money to put in the

17   bank.  Well first of all the Raz is not a federal

18   form, it's not an application, it's nothing that went

19   to the government as proof of anything, so that's

20   there issue.  But set that aside.  He don't make the

21   Raz?  He's the president of the bank.  Joe Madiani

22   makes the Raz.

23           And Joe Madiani came in told you, what

24   did he tell you?  A couple of things.  First he told

25   you that Brian Hartline encouraged him, hired him,

1    gave him authority over the department, encouraged him

2    to make better processes, and encouraged him to

3    develop this whole Raz thing.  He's the one who fills

4    it out, he put in investment purposes.

5            And then maybe he didn't like a few

6    things, maybe he didn't sign off completely on the

7    Levin loan, whatever, he sends it not to Brian

8    Hartline, he sends it to Mark Polisky (ph).  Mark

9    Polisky is the credit manager, that's his job, he's is

10   vice president.  He's supposed to look at whether

11   Levin is loan worthy.  He reviews the thing and he

12   says, ah, I guess so, this guy has got 400 million

13   bucks, I guess he's going to pay us back.

14           Then he goes to the loan committee and

15   he wrote all four members of the loan committee.

16   Dietrich, Patterson, Hannison, Polisky.  All four of

17   them sign off on this thing.  Not a single one told

18   you that Brian Hartline pressured them to do it, hid

19   anything from them, lied to them in any way, shape, or

20   form.  Every single one of them signed off on this and

21   now six years later they're saying, well, maybe we

22   weren't told.  Except for that's belied by the facts,

23   ladies and gentlemen.  Because we have the e-mail from

24   the wire, and every single one of them is on it.

25           Now, finally the loan committee

1    approves, the last thing is standard terms.  Now one

2    of the things the government claimed was that

3    Mr. Bekkedam's clients get special treatment.  I

4    didn't hear that.  I heard the standard terms.

5    Mr. Levin paid a higher rate because his loan was

6    unsecured.  I think we established one thing, his loan

7    was unsecured.  I might have heard that once or twice.

8    He paid a higher rate for it.  Standard terms.

9              Now what happens next?  NOVA approves

10   these things, they send money to these three people,

11   and I covered all this stuff on this slide already

12   because I was getting carried away.  Now they got

13   money.  I'm George Levin, I've got -- now I have

14   instead of 400 million I have 405 million.  I'm

15   Charles -- Anthony Bonomo instead of 20- I have 24.5.

16   And if I'm Galab I forget what his numbers were.

17              They could do whatever they want with

18   it.  They don't have to send it to NOVA.  They're not

19   co-conspirators.  There's no agreement between them to

20   fake the government out or do anything else.  They've

21   made commitments to lend the money.  Every single one

22   of them said it was his own choice.  Every single one

23   of them said they were free to do whatever they

24   wanted.  And guess why?  Because once you borrow

25   money, ladies and gentlemen, that's your money.

Page 109

1             If I go over to the bank with my credit

2     card and foolishly take a cash advance and pay 90,000

3     percent on it, if I do that that's my money.  I got to

4     pay it back, but it's mine.  I can take it to the

5     restaurant, I can take it to the store, I can buy a

6     lottery ticket.  It's my money, I borrowed it, it's

7     mine.  That's what happened here.  Those guys, their

8     money, they got to choose who to do with that.

9             So what do they do?  Next slide.  Oh, I

10    forgot, the bank also has something too, and this is

11    very important.  The bank has a loan, and you heard

12    every witness they put up there say, a loan is an

13    asset.  You put loans on your balance sheet because

14    they're assets.  Now, I'm not an accountant, as I've

15    probably proved quite handedly over the last three

16    weeks, but you put loans on your balance sheet because

17    they're assets.  And you can actually also sell them

18    to other banks.  Think about your mortgage.

19            And while on the subject of mortgages,

20    for some reason this morning Ms. Barry wanted to make

21    a big deal about the fact that Bonomo's loan wasn't

22    due for ten years or however long it was.  So what?

23    My mortgage isn't due for 30 years, I still owe it.

24    It's still an obligation.  And my bank sure as heck

25    still sells it.  Because like two days after you take

Page 110

1    out a mortgage they sell the darn thing.  That's the

2    bank's options.

3              Now we go back to the next thing that

4    happens.  These guys choose to buy stock.  They send

5    it to NOVA Financial Holdings.  Their choice.  Nobody

6    forced them, completely their choice.  And they get

7    back stock certificates.  And I showed those to the

8    witnesses.  They got stock certificates and they voted

9    on those stock certificates.

10             And if we could just have D-119 -- or D

11   -- I'm sorry -- D-123.  That is Mr. Levin exercising

12   the voting rights on his stock.  I showed it to him,

13   he said indeed he did it.  He made a decision on the

14   stock split that took place a couple years after all

15   this -- well I guess a year after all this went down.

16   Well guess what?  The bank's still liable, the bank's

17   still in business, and George Levin made a decision on

18   how to deal with his stock.  And you know what else he

19   made a decision on?  To file bankruptcy, because he

20   had a bunch of creditors chasing him because of his

21   other investment that went south that had nothing to

22   do with NOVA Bank.

23             So because George Levin's investment

24   went south and he doesn't pay back his loan that

25   somehow means Brian Hartline is supposed to know this

1      in June of '29?

2                      And when he did go south, when he went

3      to bankruptcy what did he do?  He declared his NOVA

4      stock as an asset, because that's what it is -- and he

5      declared his NOVA loan as a liable, because that's

6      what it is.  And I think he said, and your

7      recollection controls, his bankruptcy isn't even

8      finished.  So whether or not he's ever going to pay

9      this is still up in the air I suppose.  Not what we're

10     here for.  We're here because the government wants you

11     to determine that Brian Hartline violated the law

12     beyond a reasonable doubt.

13                     Now, at the end of the day -- you

14     stopped one slide too soon, Joel -- at the end of the

15     day what do you have?  Your investor has stock, he's

16     got to think.  He owes a loan.  The bank has a loan,

17     it's an asset.  NOVA Financial Holdings companies has

18     money, because the money is what was invested, not a

19     note.  And NOVA Financial Holdings Company decides to

20     invest that money into the bank.

21                     Now the government wants you to hold

22     Brian Hartline responsible for that decision, but

23     that's not what the evidence showed.  Because when I

24     asked Mr. D. Mark Antonio, Mr. Adeline's (ph) boss who

25     isn't sitting over there, when I asked him who was in

1     charge of that decision, he said the board of

2     directors.  Just like when the stock got reduced to $4

3     in November because they're trying to raise money

4     because Mr. Levin wasn't going to live up to his

5     commitment, they raised it up $4 instead of the

6     earlier price.  And what did he say?  He said the

7     reason it was $4 was because the board of directors

8     ordered it, because Brian Hartline doesn't call the

9     shots at NOVA Bank, the board of directors does.  He

10    reports to them.

11                    And they keep talking about they, they,

12    they, they, they, who is this they?

13                    Now, I do want to show you real quickly

14    Government 48, because this is the infamous, the wire

15    came in e-mail.  And just point out Mr. Patterson,

16    Mr. Hannison, Mr. Polisky, Ms. Smokey (ph) -- didn't

17    hear from her -- they're all on there.  Now they all

18    just know that they loaned this guy five million bucks

19    the same day.  Did anyone come in here and tell you

20    they didn't know what this was for or that there was

21    some connection?  That's crazy.

22                    But more important than that, because

23    you don't have to determine that, is if you were

24    hiding this don't you think you would have gone to old

25    Dena Gaskins (ph) and said, hey, Dena, don't let the

1    guys on the loan committee know that the five million

2    bucks came back from Mr. Levin?   It makes no sense

3    whatsoever.   None.

4                    Now, the other thing that makes no

5    sense, and I'm only going to touch on this one quickly

6    because we didn't hear from him, is Mr. Bekkedam's

7    lawyer.   Larry the lawyer I like to call him, because

8    I let a literation.   Larry Roven, he didn't testify.

9    But he's all over these e-mails about Mr. Levin

10   borrowing the money, and he's all other these e-mails

11   about Mr. Levin investing the money.   And what we did

12   hear was testimony from Mr. D. Mark Antonio and from

13   Mr. Schwartz that (a), he's a lawyer, (b), he used to

14   be a bank lawyer, and (c), he's been a lawyer for a

15   long time.

16                    Now, he's on these e-mails, and I think

17   I asked the question of Mr. D. Mark Antonio, I said,

18   did Larry the lawyer say, hey, better not do this,

19   there's something wrong with this?   But Brian Hartline

20   is supposed to know?   Another reasonable doubt.

21                    Now, I want to talk about the red

22   herring in the case, the changing control application.

23   Now, I find this good.   I love the changing control

24   application because frankly I think it supports all of

25   my theories and shows why there's a bunch more

1    reasonable doubts.  The government seems to like it

2    too.  But the one thing the government seems to want

3    to ignore is it never got sent to anybody that made

4    any decisions.  It's an entirely separate process.

5                    The Federal Reserve Bank makes this

6    change of control decision along with the state.

7    Nobody in TARP land, wherever that happens to be,

8    nobody on this investment committee behind the curtain

9    ever saw the changing control application.  So on that

10   level it's completely irrelevant.

11                   But even if it was relevant it's

12   truthful.  If you look at G-64 -- oh, and more

13   important than that, let's start -- it's not Brian

14   Hartline's application, it's not even NOVA Bank's

15   application, it's George Levin's application, signed

16   by George Levin, he's the one who needs approval, he's

17   the one who sends his fingerprints, and he's the one

18   who tells them where the money came from.

19                   But if you go to G-64, here's a letter

20   to Mr. Gaunt, he's another nice guy who testified,

21   another regulator.  And if you go to page 6 -- you

22   don't need the letter -- if you go to page 6 at the

23   top, top box, now this goes in July.  In July they ask

24   where the money is coming from.  They say, half from

25   personal finances and half from borrowed funds.

1                    Now the government wants to say, well,

2      you could have and should have said half -- or I guess

3      they should have said half from personal finances of

4      40 percent from borrowed funds and 50 -- and 20

5      percent from borrowed funds from NOVA Bank.

6                    Well number one, borrowed funds is

7      borrowed funds.

8                    And number two, the government had 13

9      people looking into this thing and was going to ask a

10     million questions they could have certainly asked that

11     question and they never did.  Because when you look at

12     the other documents that the government wants to say

13     we're hiding the ball, they're all forward looking.

14     Because when I get asked, are you coming home tonight?

15     I don't talk about last night, I talk about tonight.

16     And every e-mail that they put in here after this

17     where the government says where are the funds coming

18     from, says exactly that.  Where will the funds come

19     from?  Where will the funds come from?  And the

20     responses are clear, they're talking about $13

21     million, not about $18 million.  And oh, by the way

22     the responses aren't Brian Hartline, the responses are

23     George Levin and Frank Preve.

24                    So there's not even any evidence that

25     this -- there were any false statements in here.  And

1     more importantly, there's evidence of complete

2     truthfulness on Brian Hartline's part.

3                    And I want to go to G-81, because this

4     is important.  And if we go to the second page.  The

5     first thing at the bottom Frank Preve tells Brian

6     Hartline that a letter is coming to him shortly.

7     Brian Hartline -- and this is in September -- Brian

8     Hartline responds.  "When you say letter what do you

9     mean?  They're looking for proof such as a bank

10    statement or a financing, what entity will be

11    providing the financing and the terms of the

12    financing."  I used the example with Barry, that you

13    could have advance on Mr. Levin's five million line of

14    credit with Mellon Bank.  Maybe he has a $5 million

15    line of credit with Mellon Bank too, I suppose they

16    should be here.  "If that is that -- if that is the

17    case I just need to know the loan specifics.  If you

18    have a question please call me."

19                    And Preve writes back on the bottom of

20    the first page, "I don't want to bring up bank lines

21    at this time because they're all up for renewal.  I

22    don't know what the renewing terms would be or even if

23    they would be renewed given the current banking

24    environment.  We're going to have to depend upon our

25    internal generation of cash over the next quarter to

1    fund this, but that should not be a problem."  That's

2    Preve telling Brian Hartline, we're making a lot of

3    money here, we'll just use our own money.

4              And guess what?  The letter that

5    ultimately goes, which is in page 6 of this document,

6    there it is.  George Levin's letterhead, signed by

7    Frank Preve.  Says, "The bottom line is we expect our

8    factory business to consume less cash."  And goes on

9    to say, "that our cash is what we're going to use to

10   pay."  Signed by Frank Preve on behalf of George

11   Levin, nothing from Brian Hartline, because that's

12   what Frank Preve and George Levin were telling Brian

13   Hartline.

14             Now, my favorite document in this whole

15   case is G-73, and it's a changing control document as

16   well.  Because if we go to the second page this is an

17   e-mail from Donna Metcalf (ph) to Kim Hartline, and in

18   it it asks -- first of all if we could blow up the

19   first line of page 2.  And it's in August, so the five

20   million has already been invested.  It says, "The

21   source of funds to be used."

22             Now to be used where I come from means

23   what are you going to use next, not what what'd you

24   use last -- back in June.  But hey, I'm not from the

25   government so what do I know?

1           But better than that it says, "If you

2    have any questions my number is 717-787-3721."

3           Now, if you're in a conspiracy and

4    you're breaking the law and you get an e-mail from the

5    government that says, you know, we really want to know

6    about these funds, you know, so give us a call, and

7    you're in a conspiracy so you think, I don't want to

8    tell them about those funds because I'm guilty and I

9    can't do this, do you think -- do you think in any

10   planet that exists that you would send the phone

11   number of the regulator to a guy who's not in the

12   conspiracy and say, call them?  Where does that

13   happen?  It doesn't, because there is no conspiracy.

14   Because they're merely forwarding his e-mail to Preve

15   saying, hey, would you call Donna Metcalf and tell her

16   where the rest of the money is coming from, because

17   that's what's they wanted to know.

18           Now, as you'll see on page 1, we should

19   show it, not only does it get sent to Mr. Preve,

20   saying, "Frank, here's a formal request from the PA

21   department of banking for information, please contact

22   Ms. Metcalf if you have any questions."  But Brian

23   doesn't want it to not get missed, to not be, you

24   know, acted upon, so the next e-mail up he sends it to

25   Ed D. Mark Antonio, his boss, and to Barry as well.

1    And is basically saying, hey, Frank has got to call

2    these people.  Well did you hear Frank come in and

3    say, hey, I got told when you call them don't tell me

4    about what happened in June?  I didn't.  I missed

5    that.  I wasn't here that day.

6                    And then just for good measure the top

7    e-mail, Larry the lawyer is involved.

8                    If this is a conspiracy, it's got more

9    non-conspirators involved than anything I've ever seen

10   in my life.

11                   But just to close the door on this if

12   we can go to G-87, the bottom one, the government does

13   talk to Mr. Preve.  Mr. Gaunt, who said -- that was

14   one of the craziest things of the whole trial --

15   Mr. Gaunt said he wasn't actually on this phone call,

16   that somehow it was like somebody used his name.  He

17   said it was a long time ago, he just forgot.  I

18   assume.  I guess your recollection is better than

19   mine.  Anyways, he says, "This will confirm our

20   telephone conversation."  They called up Preve and

21   asked him what happened.  He's not a co-conspirator.

22   Brian didn't tell Preve what to say to him.  Preve

23   said whatever he said.  Another reasonable doubt.

24                   Ladies and gentlemen, there is nothing

25   hidden here.  Nothing.  The docs were clear

1    everywhere, the borrowers were the borrowers, the

2    investors were the investors, the names were all there

3    right in the bank documents, none of this business

4    where you set up a phony company and you send it

5    through a straw person.  Everybody is identified in

6    every document.  And the government says, well that's

7    not good enough, because these people who we haven't

8    brought in to tell you what they would have wanted to

9    hear, they actually wanted to hear this, they just

10   never bothered to say, hey, can you tell us this?

11   Brian Hartline is supposed to be a mind reader.  They

12   want to convict him for not being a mind reader.

13                But now let's talk about the part of

14   the case where the alleged cover-up takes place.

15                Ms. Barry this morning said, but for

16   the discovery of Todd Howard it would have been hidden

17   and they would have gotten away with not getting any

18   money.

19                Who told Todd Howard about this?  Brian

20   Hartline.  Brian Hartline told Todd Howard that George

21   Levin borrowed this money.  If that's hiding stuff I'm

22   missing something.  Brian Hartline told Todd Howard.

23                And then when Todd Howard wanted an

24   answer he asked Tom Patterson to send the documents to

25   Dave Schwartz.  And if you recall Mr. Schwartz's

1    testimony he said, I got the documents I reviewed from

2    Tom Patterson.

3              Now, they want to talk about this

4    second Raz as if this is some, I don't know what

5    they're going say, there's just no evidence that Brian

6    Hartline had anything to do with creating it.  In fact

7    we presented evidence on the defense side that it was

8    Mr. Madiani who had created it.  And didn't prove

9    this, but it seems to establish that it had something

10   to do with after Levin lost his investments in Banyon

11   wanting to securitize the loan, and then the Devon

12   property came up.  And as Mr. Madiani said, you revise

13   Razs when there are new properties coming up or new

14   loans taking place.

15             And the only document in the whole case

16   that sends the Raz to anybody is G-118, and if we

17   could have it, it's Mr. Madiani sending it to

18   Mr. Patterson.  Brian Hartline is not even on it.

19             And then -- so we know Mr. Patterson

20   got it some time in October, and then -- and if we

21   look at page 2 we'll just make sure it's the right

22   Raz, because this is a defense exhibit you didn't get

23   to see this during the testimony -- it's the second

24   one, it's -- go down to the next section where it

25   talks about the bridge loan for improvements.  There

1    it is.  So Madiani sends it to Patterson in the fall,

2    and in January Patterson sends it to Schwartz.  Brian

3    Hartline has got nothing to do with any of it.

4    Nothing.

5              All of these Razs they showed you, he

6    didn't fill out any of them.  Nobody came in and said

7    Brian Hartline said make sure you don't put invest in

8    the bank on any of them.  And we don't really know why

9    this was created.  But what we do know is Brian

10   Hartline is nowhere near it and has nothing to do with

11   it and it's another red herring.  But we do know that

12   Mr. Patterson sent it to Mr. Schwartz.  So now the

13   government says, oh, we had the wrong Raz therefore he

14   didn't know what was going on.

15             Well let's look at Mr. Schwartz's

16   letter.  And I can't remember what number that is.  I

17   think it's 171.  Yep.  Government 171.  And it talks

18   about -- it's the letter that he writes based upon the

19   question that was asked.  And if we go to page 2 --

20   the first paragraph he talks about all the loans he

21   looked at.  If we go to page 2 at the top of the

22   second paragraph -- top of the second paragraph it

23   says, "Contemporaneously with obtaining a line of

24   credit Mr. Levin made an equity investment on or about

25   June 30th, 2009."

1           Now, Dave Schwartz testified, he's a

2    lawyer, a banking lawyer for how many years?  This guy

3    borrowed this money on June 30th and he makes the

4    investment contemporaneously?  And now if we could go

5    to page 3, and Mr. Schwartz's conclusions in the

6    second to last paragraph.  "Nothing has come to our

7    attention which should cause us to conclude the line

8    of credit was extended in violation of any law or

9    regulation."  Well I wonder why.  It could be because

10   there is no law or regulation covering this.

11          Now, the government talked about Brian

12   Hartline's deposition, and they played you about, I

13   don't know, a minute of it maybe.  His deposition

14   started at 9:35 in the morning and ended at 4:29 in

15   the afternoon.  He was there for seven hours.  His

16   deposition wasn't a case Hilary Musser versus NOVA

17   Bank.  Remember Hilary Musser, she was memorable.

18   It's not even about this.

19          In the middle of that deposition, her

20   lawyer, being a good lawyer and trying to look for any

21   angle to get a line for Hilary, asks questions out of

22   the blue about this transaction, and the government

23   played you the first little snippet.  And that first

24   little snippet is where he said, did anybody or, you

25   know, were the proceeds of the loan used to buy the

1    stock?  And Brian Hartline says, no.  And they want to

2    tell you that's a false exculpatory, that that shows

3    that he knew two years earlier -- three years earlier

4    -- excuse me -- that he couldn't -- that this

5    shouldn't be done.

6                   There's a little problem with that.  If

7    you listen to the question, were the proceeds of the

8    loan used?  You have to ask yourself are we parsing

9    words here?  Probably.  But they didn't play you the

10   end of it.  They played it during the testimony but

11   didn't talk about it today.  By the lawyer, "Let me

12   ask the question.  You, meaning the bank, knew that if

13   it did not fund the loan and fund the five million to

14   Mr. Levin he wasn't going to buy five million worth of

15   stock in June 2009, correct?"  "That is correct."  "So

16   you knew there was a linkage between the approval and

17   the funding of the $5 million loan and Mr. Levin's

18   purchase of the stock?"  "Yes."  Told him the truth.

19                   What he didn't know, and what we

20   actually don't know because you weren't shown any

21   evidence I don't think, is where it was the exact same

22   five million bucks.  When a guy has got 400 million

23   bucks and he puts 5 million in his bank account and he

24   takes another 5 million back and pays you, whether

25   it's an hour later or three weeks later, you don't

 1     know it's the exact same money, because money is

 2     fungible.

 3                    Now, that is a deposition taken in

 4     2012.  I want to ask you another question about it.

 5     Mr. Hartline, when asked the questions at the start

 6     played the other day, what'd he say his job was?  He

 7     was president of NOVA Bank.  He's still the president

 8     of NOVA Bank in 2012.

 9                    NOVA Bank still exists, number one.

10                    But number two, think about this, KPMG

11     brought this problem to the attention of the bank

12     board, it was brought to the attention of the FDIC in

13     2010.  If that bank board thought that Brian Hartline

14     had committed a crime or done anything wrong do you

15     think he'd still be the president of the bank in 2012?

16                    Henry Zentner when he filed his report

17     of examination in 2010 that changes the capital

18     treatment, two real important things about that.

19                    Number one, there's a section I asked

20     him about for violations of law and regulation, didn't

21     cite Brian for anything even though he knew all about

22     this, because there is no law or regulation.

23                    Number two, he changed the capital

24     treatment only back to December of 2009.  So in

25     reality the call reports that were in existence when

1    the -- whoever the investment committee is met,

2    weren't even changed, weren't even impacted by this.

3    Never changed them.

4              I want to talk about Brian the person.

5    Didn't fall off the turnip truck I don't think, he's

6    from Boyertown.  What can I tell you.

7              You heard character testimony.

8    Character testimony is very important.  It was quick,

9    it was brief.  You heard two compliance officers and a

10   nun come in and tell you that his reputation amongst

11   people in the community was stellar.  And His Honor is

12   going to tell you that alone is reasonable doubt.  And

13   you know why it's reasonable doubt?  It's reasonable

14   doubt because people who are known in the community to

15   be lawful and law-abiding, who are born to live in a

16   good way, those people are not likely to commit a

17   crime.  And that is something you need to consider.

18   Because if you look at Brian's behavior throughout

19   this matter, in every instance -- in every instance it

20   was completely above board.  If you listen to that

21   voice-mail, that's Brian Hartline.  Even in his

22   Mr. Rogers sweater after seven hours of deposition he

23   answered the questions.

24              I could go on for a long time but I'm

25   not going to.  I don't even know -- I don't even know

1    how to thank you.  You've come here every day, you've

2    sat tentatively, taken notes, listened carefully,

3    waited through our terminable lawyer stuff, been

4    injured.  I mean there's no way.

5                    But I hope that you've really

6    discovered something great about this country, because

7    in some countries if the government wants to lock you

8    up they just lock you up, but in this country they

9    have to come to people like you and prove beyond a

10   reasonable doubt the guilt of a person.

11                   There are so many reasonable doubts in

12   this case, so many.  I ask you to find Brian Hartline

13   not guilty of all charges.

14                   Thank you.

15                   THE COURT:  We'll take a recess at the

16   time.  Fifteen minutes, please.

17        (Jury out)

18                   THE COURT:  Fifteen minutes.

19        (A chorus of thank you)

20        (Recessed at 2:48 p.m.; reconvened at 3:06 p.m.)

21                   THE COURT:  Are we ready?

22                   MR. IGNALL:  May we raise one thing

23   with the Court before we --

24                   THE COURT:  Sure.

25                   MR. IGNALL:  Just an issue that may

1    come up, I'd rather not stand up during the closing if

2    we could resolve it right now.

3                    THE COURT:  All right.

4                    MR. IGNALL:  I didn't stand up --

5                    THE COURT:  You may be seated.

6                    MR. IGNALL:  I didn't stand up during

7    Mr. Egan's closing, because when he was referring to

8    Mr. Roven, there's no evidence that there's any

9    attorney/client relationship of any kind between

10   Mr. Hartline and Mr. Roven.

11                   My concern is, and I understand

12   Mr. Engle may talk about how Mr. Roven never said

13   there's anything wrong with this transaction.  That

14   leads the jury to perhaps conclude there's some

15   reliance on advice of counsel.  There's not been any

16   evidence of that, nor has there been any waiver of the

17   attorney/client privilege.

18                   So I am concerned that the jury is left

19   with a mistaken impression that's inappropriate even

20   in the closing arguments with respect --

21                   THE COURT:  But that's based upon what

22   Mr. Egan has already argued?

23                   MR. IGNALL:  No, when Mr. Egan argued

24   it I didn't object because there's no suggestion in

25   the record that Mr. Roven may have ever provided legal

Page 129

1     advice to Mr. Hartline.

2                    THE COURT:  All right.

3                    MR. IGNALL:  So I don't think the jury

4     can draw an inference that there was reliance on

5     advice of counsel.

6                    THE COURT:  So this is a preemptive

7     strike.

8                    MR. IGNALL:  Well also I just don't --

9     I talked to Mr. Engle about it, and he was nice enough

10    to tell me generally that he was probably going to do

11    that.  I thought if we could resolve it now we

12    wouldn't have a side bar necessarily.

13                   MR. ENGLE:  Because the issue came out

14    when the government called Todd Howard to testify and

15    they elicited his feeling of discomfort with respect

16    to the Levin investment, which is the issue that

17    Mr. Roven is copied all over with respect to these

18    things, and he's fully aware of.  And the government

19    argued today that Mr. Bekkedam's agent, his attorney

20    is all over this stuff.  He's in the know because he's

21    pulling the strings and doing all these things.

22                   Well Mr. Howard testified that he was

23    told to go talk to the company's lawyer about this

24    issue.  He talked to Mr. Roven.  Mr. Roven gave him an

25    opinion about the issue.  There's no evidence that he

1    said there was any problem with any of this.

2                    THE COURT:  Well if you're arguing from

3    the evidence of the case you're entitled to argue from

4    the evidence of the case.

5                    MR. ENGLE:  That's what I'm doing.

6                    MR. IGNALL:  Yeah, I just think the

7    argument, and I'm not sure if that's what Mr. Howard

8    said, but I'll leave that to the jury, but the

9    implication that Mr. Roven never complained, there's

10   no evidence of that, and that leads to an implication

11   that there's advice of counsel.

12                   MR. ENGLE:  That certainly is a fair

13   inference, because if he's on all the e-mails and

14   they're pointing out the fact that the e-mails impugn

15   some activity or knowledge on the part of

16   Mr. Bekkedam, they're not being e-mails where

17   Mr. Roven says hold on to --

18                   THE COURT:  You can argue that there is

19   no evidence in the record or in the testimony that

20   Mr. Roven had any complaints or lodged anything else

21   to the contrary.  You cannot say he did not complain.

22                   MR. ENGLE:  Right.  I'm going to say

23   there's no evidence --

24                   THE COURT:  It's just simply that you

25   are entitled to do that.

```
 1                    MR. ENGLE:  Thank you.
 2                    MR. IGNALL:  And the other thing is
 3     Mr. Roven did have an immunity agreement, so I think
 4     we have to be a little bit careful about
 5     characterizing him as well.
 6                    THE COURT:  Well that's a different
 7     area.
 8                    MR. IGNALL:  Yeah.
 9                    MR. ENGLE:  It's not in evidence, so
10     I'm not talking about immunity here.
11                    MR. IGNALL:  No, but making a
12     suggestion about what Mr. Roven's role was or was not
13     I think is another area of caution in terms of whether
14     he had any culpability.  I don't --
15                    MR. ENGLE:  Okay.  But he's -- clearly
16     he's an unindicted co-conspirator -- or not an
17     unindicted co-conspirator because there are no
18     unindicted co-conspirators in this case.  The
19     government has indicated that there are no unindicted
20     co-conspirators in this case.
21                    MR. IGNALL:  For Rule 801 purposes,
22     but --
23                    MR. ENGLE:  Okay.  Well but what's good
24     for the goose --
25                    THE COURT:  Well I mean the point of
```

1      it, it is what it is, and the evidence is there or

2      it's not there.

3                      MR. IGNALL:  Okay.  Okay.  All right.

4      Thank you, Your Honor.

5                      THE COURT:  I can't sanitize and I

6      won't sanitize your case or his case to the extent

7      that it would undermine your respective cases.

8                      MR. IGNALL:  All right.  Okay.  Thank

9      you, Your Honor.

10                      THE COURT:  Are we ready now?

11                      MR. IGNALL:  I think we're ready, Your

12     Honor.

13                      THE COURT:  Okay.

14          (Pause)

15                      THE COURT:  Counsel, when will I

16     receive the joint jury instructions from you?

17                      UNIDENTIFIED SPEAKER:  I -- my legal

18     assistant is finishing up the changes we agreed to.  I

19     asked her to e-mail it to me.  So as soon as we break

20     for the day I can e-mail it to counsel, assuming I've

21     gotten it in an e-mail to the Court, and it should, I

22     hope, be what we've agreed on.  If there are any

23     small --

24                      THE BAILIFF:  All rise.

25                      UNIDENTIFIED SPEAKER:  -- differences

Page 133

1    we can let the Court know.

2                  THE COURT:  All right.  Thank you.

3         (Jury in)

4                  THE COURT:  Good afternoon.  You may be

5    seated.

6                  Mr. Engle, you may proceed.

7                  MR. ENGLE:  Thank you, Your Honor.  May

8    it please the Court, counsel, ladies and gentlemen of

9    the jury.  Good afternoon.

10        (A chorus of good afternoon)

11                 MR. ENGLE:  I drew the late afternoon

12   time slot and hopefully I'll try to keep this

13   interesting so that we all stay awake.

14                 Before I get started, ladies and

15   gentlemen, as the government and Mr. Egan said, we

16   want to thank you.  Barry Bekkedam, his family, and

17   all of the members of the defense team for

18   Mr. Bekkedam want to thank you for your time, effort,

19   and attention throughout this case.  And this was not

20   a short case, there was a lot of evidence, there were

21   a lot of witnesses, and we thank you for fulfilling

22   that moth solemn role as a juror.

23                 People say that next to serving in our

24   armed forces there is no more important duty of

25   citizenship than an individual can perform than that

1    which you are doing here throughout this trial.

2              And for that I guess you get rewarded

3    in some way, shape, or form, because as a result of

4    being the jury in this case each and every one of you

5    is now a judge.  Congratulations.  You don't get the

6    robe that His Honor gets, but you now are the judges

7    of the facts in this case.  His Honor is the judge of

8    the law, but each and every one of you are the judges

9    of the facts.

10             And what that means is you and you

11   alone determine what evidence that came from that

12   witness chair is true and what is false, what the

13   believable and what the simply incredible.

14             You and you alone determine what facts

15   matter in this case and how to apply them to the law

16   that Judge Jones will ultimately give you.

17             And as Mr. Egan said about Mr. Hartline

18   sitting here an innocent man unless and until the

19   government can prove him guilty beyond a reasonable

20   doubt, absolutely the same thing is true about my

21   client.  Mr. Bekkedam sits here innocent.  Innocent.

22   Unless and until the government can prove beyond a

23   reasonable doubt that he is guilty of each and every

24   element of the offenses for which he is charged in

25   this case.

1            And that burden of proof, ladies and

2    gentlemen, is the highest burden that we place on any

3    party in any form of litigation.  This isn't an auto

4    accident case where proof by a preponderance of the

5    evidence applies where you think of the scales of

6    justice and if they just tip ever so slightly in favor

7    of one party they win.

8            This isn't even another kind of civil

9    case where the burden of proof is by clear and

10   convincing evidence where it must be just that.  The

11   evidence must be clear and convincing on what the

12   plaintiff in that case is trying to prove.

13           No, ladies and gentlemen, this is the

14   highest burden that we place on any party in any form

15   of litigation in the City of Philadelphia, the

16   Commonwealth of Pennsylvania, or in our great country,

17   the United States of America, because this is a

18   criminal case.

19           This isn't a civil case, this is a

20   criminal case where one of your fellow citizens has

21   been accused of criminal wrongdoing.  And they must

22   prove to you through the evidence in this case, ladies

23   and gentlemen, beyond a reasonable doubt.

24           Meaning that after you look at the

25   evidence in this case there isn't a basis to pause or

Page 136

1      hesitate about making the most important decision

2      that's ever been made in Barry Bekkedam's life.

3      That's what they must do in this case before you can

4      return a verdict of guilty.

5                      And, ladies and gentlemen of the jury,

6      this is a case where the government formulated a

7      theory, and that theory was hatched years ago, and it

8      is still to this day in search of an actual crime.

9                      This is the case of the proverbial

10     square peg in the round hole, because the government's

11     facts as they developed them over time, and you

12     learned many of the witnesses in this case weren't

13     even interviewed for the first time by the government

14     until a year after an indictment was returned by --

15     against Mr. Bekkedam.  A year after.  They were still

16     trying to figure all this out.

17                     But as Mr. Duncan said to you in his

18     opening statement, facts are stubborn things, and the

19     facts here just do not fit the government's theory,

20     because their theory is not based upon any actual

21     violation of the law.  There's no crime here.  There

22     is no victim, there is no loss of tax dollars, there

23     is no crime.

24                     Let's talk a little bit about the

25     indictment itself.  Count I charges Mr. Bekkedam with

1    conspiracy to defraud the United States, vis-à-vis,

2    the TARP program.

3              What you will learn from the jury

4    instructions that you are given is that ultimately

5    when you boil it all down a conspiracy is an agreement

6    among the conspirators to engage in a particular

7    crime.  And a conspiracy must have proof that the

8    conspirators have a unity of purpose.  They're acting

9    together.  They're acting in their interests that are

10   unified.  They're on the same page.  They're on the

11   same team.  They have the same goals.

12             And here the government alleges that

13   Mr. Hartline and Mr. Bekkedam worked as a tandem

14   towards the goal of defrauding the United States as a

15   result of TARP.

16             Well let's take a look at some of the

17   evidence that was presented with respect to whether or

18   not there's any unity of purpose throughout this

19   important process.  Can we call up Government

20   Exhibit 28, page 2, please.

21             Ladies and gentlemen, you may remember

22   this document, it's the June 2nd, 2009 letter that was

23   talked about during the testimony a number of times

24   that came from Ballamor Capital Management,

25   Mr. Bekkedam's company, where he writes to NOVA

1    Financial Holding Company, the holding company that he

2    is acting as an outside consultant for, to try to

3    raise funds for the holding company.

4              And he writes to Mr. Hartline and he

5    indicates in the second paragraph, "Our investor" --

6    or investors -- "have committed to us that they wish

7    to participate in the NOVA investment at the present

8    time provided that NOVA's current application for TARP

9    funding is approved and the pending DVFG transaction

10   is also approved."  He's placing contingencies on the

11   investment from the investor.  And we all know the

12   investor at this point that's being referred to here

13   is George Levin.

14             If Mr. Bekkedam and Mr. Hartline are so

15   desperate to prop up the bank, as the government has

16   said, desperate to pull one over on the TARP people,

17   as Mr. Egan said living in TARP land, wherever that

18   may be, if they're so desperate to do that why are

19   they -- why is Barry putting contingencies on the

20   investment that make it more difficult for the holding

21   company to get the money?  To make it more difficult

22   to raise the funds that are going to be necessary to

23   get this TARP money that they supposedly want to cheat

24   the government out of?  He just wouldn't do that.

25   That's not a unity of purpose, ladies and gentlemen.

Page 139

```
 1                    Let's go to Government Exhibit 39A.
 2      Now we're going to go to June 29th, 2009, one day
 3      before the big day that was talked about all
 4      throughout the course of this case where George Levin
 5      is being approved for a loan and he ultimately makes
 6      an investment in the holding company.
 7                    And what we have here is down here,
 8      June 29th, Barry writes to Larry Roven, his attorney,
 9      the attorney for Ballamor Capital, Ed D. Mark Antonio,
10      the chairman of the board, and Mr. Hartline about the
11      Levin capital and NOVA.  "Guys, it was clear to at
12      least me that we were getting George approved for a
13      loan of $5 million to invest in NOVA.  Per my
14      conversation with Brian he thought I was getting a
15      wire tomorrow.  I was always thinking loan."
16                    A day before the two co-conspirators
17      are going to engage in one of the primary acts in
18      furtherance of the conspiracy, Barry and Brian are not
19      on the same page.  Barry is thinking this thing has
20      got to be funded by a loan.  Why?  Because he's
21      dealing with the investor, George Levin.
22                    And what did George Levin testify to?
23      He wanted to leverage his money.  He wasn't going to
24      invest if he had to use his own money that would pull
25      away from his investment in the Banyon income fund at
```

1        the time.  He wanted to leverage his money by getting

2        the loan, and he wasn't going to do this without it.

3                     Well if Brian and Barry are in

4        conspiracy with a unity of purpose, how do they not

5        end up on the same page?  How does one think that this

6        is going to be funded by cash and one by a loan?  That

7        just doesn't make any sense.

8                     If we can go to Government 136, please.

9        Now we're going to be in the time from -- the bottom

10       e-mail, please, Shawn.  December 9th, 2009, we're

11       nearing the end of the process, right before when

12       they're going to get official notification that the

13       TARP funds are not coming.  The application is going

14       to be turned down.  And the government says they're

15       scrambling now, they're frantic to get money in,

16       they're doing what they have to do to try to keep this

17       thing alive.

18                     And what is this e-mail?  I'm sorry,

19       we're at the wrong one, Shawn.  Next -- it's the next

20       page.  My fault.

21                     Mr. Hartline writes on Wednesday,

22       December 9th, 2009 to Barry and to Mr. D. Mark

23       Antonio, and the subject line says, "Please do not

24       talk about investors not investing."  Bottom line, "I

25       am fighting for NOVA and we have $1 million in escrow

```
1    two days before our deadline, no one should be talking

2    of backing out subscriptions."

3                    Mr. Hartline writes directly to Barry

4    Bekkedam and says, stop talking about investors who

5    are going to want to back out of their subscriptions.

6    Meaning backing out of their investments.  We don't

7    want to be doing that.  Why are you doing that?

8                    Well the only thing that would

9    precipitate that e-mail is if Barry Bekkedam is out

10   there and there are discussions about the fact that

11   some of the investors may want to back out, they may

12   not want to fulfill their subscriptions.

13                   If this is all about getting capital

14   through the door, getting money into the door so that

15   they can deceive the government to get the TARP funds,

16   why would this guy be out there saying, hey, you know

17   what investors, maybe this isn't so good, backing out

18   might be an idea?  Why would he ever be talking about

19   that if those two were in a criminal conspiracy?

20   Thank you, Shawn.

21                   The other fact of the matter is, is

22   that these two are alleged to start conspiring in May

23   of 2009.  There's no information about this actual

24   TARP contingency until the end of August of 2009, and

25   there's no evidence that Mr. Bekkedam is alerted to
```

1    that until Government 76 shows the e-mail of

2    August 29th of 2009.

3              So they don't even know about the TARP

4    contingency until August, how are they starting to

5    conspire about it in May?  That doesn't make any sense

6    either.

7              And what you don't see throughout the

8    course of this case are conspiratorial communications

9    going back and forth between these individuals.  Yeah,

10   there's some e-mails.  You've read them.  If the best

11   e-mail they have in support of a conspiracy is Barry

12   saying something about managing Brian and Brian

13   managing regulators, talk about reasonable doubt.  I

14   mean if that's all they got, and that is all they

15   have.

16             Because there are no e-mails that you

17   see predominantly e-mails that are private between

18   Brian and Barry where they're saying, hey look, we got

19   to make sure certain people don't know what we're

20   doing.  We got to make sure that Todd Howard doesn't

21   run his mouth now that he's decided that he doesn't

22   think that this transaction was particularly

23   appropriate.  We have a problem with the fact that the

24   KPMG auditors have stumbled to what we did here.

25   There's none of that.  There's no text messages

1   between them.  There are not even phone records about

2   phone calls during these key times.

3            These two are conspiring, there's this

4   flurry of activity, there's desperation to get money

5   in by June 30th, desperation to get money in in

6   October, desperation to get money in in December.  Did

7   they show you any records that these two guys are on

8   the phone with each other all the time?  That on

9   June 30th there's more phone activity between the two

10  of them?  That they're in constant communication?

11  Nope.  They didn't put on one shred of evidence that

12  those two co-conspirators were talking all the time.

13  Phone records aren't hard to get.  If they had them

14  and they showed anything sinister they certainly would

15  have put them into evidence now wouldn't they?  And

16  there's nothing about that in this case.

17            The other thing, ladies and gentlemen,

18  about conspiracies are the fact that they happen in

19  secret, unless you want the world to know what you're

20  trying to hide, which is clearly not the object of a

21  criminal conspiracy.  There must be secrecy.  The

22  fewer people that know about things the better.

23            And what do we know about the evidence

24  in this case, what has it shown us?  Throughout this

25  entire trial we've seen evidence of transparency over

Page 144

1    and over and over again.

2              The purpose of the Levin and Bonomo

3    loans were known to the loan committee members.

4    Mr. Patterson, who is the relationship manager, the

5    guy that was putting the loans together, who sat on

6    the loan committee, testified none of this was a

7    secret.  Everyone knew the purpose of this.

8              And whether or not they learned the

9    purpose of it before the loan was funded or

10   immediately after the investment happened, the fact is

11   there's not a single shred of evidence that anyone on

12   the loan committee at the bank ever said whoa, time

13   out, we have a problem here, you can't do it this way.

14   Nobody said that.

15             All of these people with banking

16   experience inside the bank, none of them had a problem

17   with any of that.

18             And we know that there's no effort to

19   conceal anything, because if we look at Defense

20   Exhibit 1125, please, and can we go to the second page

21   first?  If you can blow up the bottom first for me,

22   Shawn.  What we see are some of these e-mails going

23   back and forth between Tom Patterson and Frank Preve

24   about the wiring instructions that Mr. Levin wants his

25   money wired to his account at Gibraltar Bank in

1    Florida.  And we saw these over and over again whether

2    they were government exhibit numbers or otherwise.

3                    This whole e-mail chain about the

4    process -- if we can go up to the next one, please --

5    here we go, we see the June 30th e-mail where

6    Mr. Preve then says, "Got it."  Right?  Got the money,

7    the wire came through, sending it back in five

8    minutes.

9                    What happens with this e-mail?  This

10   whole string is then sent on by Mr. Patterson to

11   Mr. Hartline, to Lisa Smoke (ph), and cc'd to Dena

12   Gaskins about the bank wire.  And it says, "Wire

13   should be coming shortly."  And all the information in

14   the conversations with Mr. Preve that are below are

15   forwarded on.

16                   Ms. Smoke is not charged as a co-

17   conspirator here.  She's not alleged to be an

18   unindicted co-conspirator.  Ms. Gaskins isn't.  And

19   Mr. Patterson is openly forwarding this information

20   onto other people of the bank.  Evidence of the fact

21   that it is not a secret.

22                   If we can now go to the first page.

23   Here's Dena Gaskins' e-mail saying, "I wanted to let

24   you know that the wire for $5 million from the Levins

25   has come in."  And who's on that?  Lisa Smoke again,

1    Mr. Hartline, Mr. Patterson, Mr. Hannison,

2    Mr. Polisky.

3              Hartline, Patterson, Hannison, and

4    Polisky earlier that same day processed and approved

5    the loan.  They signed off on it from the loan

6    committee.  We saw the last page of Raz, Government

7    43, ad nauseam during the course of this trial.

8    That's an inescapable fact.  They knew that very day

9    they gave the guy a $5 million loan and they're

10   getting an e-mail at 2:44 p.m. saying they just got a

11   $5 million investment.

12             How could that possibly be Brian

13   Hartline and Barry Bekkedam trying to conceal what's

14   going on here?  Where's the secrecy?  It's just not

15   there.

16             After Halloween and the events that we

17   know that take place where Mr. Levin's investment is

18   no longer worth what he originally thought it was

19   worth, we have a conversation between Brian Hartline

20   and Todd Howard who works for Mr. Bekkedam.

21             Now, the government says Brian and

22   Barry are hiding all this stuff.  Contrary to what the

23   government told you in their closing argument, who

24   tells Todd Howard about, you know, hey, I'm concerned

25   about the fact that, you know, we got the loan out

```
1      there with George Levin who invested the $5 million in
2      the holding company?  Brian Hartline openly tells him
3      there that.  Todd Howard is not an uninvited co-
4      conspirator in this case.  Why on God's green earth
5      would Mr. Hartline tell Mr. Howard that?
6                    And then Mr. Howard, when he says, you
7      know what, I'm not comfortable with this, something
8      sounds funny, now what happens?  Do they go, oops,
9      shouldn't have told him anything, that's a problem,
10     now we're going to have an issue because he's
11     threatening to go to the authorities?  Does
12     Mr. Bekkedam call Mr. Howard into his office and say,
13     listen pal, you work for me, you keep your mouth shut,
14     you keep your head down and you do your job or you're
15     out of here?  No, that's not what happened.
16                    Mr. Howard said no one applied any
17     pressure to him, no one suggested that he should or
18     shouldn't do anything.  In fact what Mr. Bekkedam did
19     was refer him to Larry Roven who is the lawyer, the
20     general counsel for Ballamor, and said, talk to our
21     lawyer.  And Todd Howard did.
22                    And at no point during Todd Howard's
23     testimony did he say that Mr. Roven had any problem
24     with any of this.  He's a lawyer.  And then he said,
25     you know what, I want to talk to some more people.
```

1    And what does Mr. Bekkedam say?  No, you can't talk to

2    anyone?  No, he says call Mr. Hartline, contact the

3    people at the bank, talk to whomever you want.

4                    How could you possibly be involved in a

5    criminal conspiracy that required secrecy when you're

6    acting like that?

7                    Similarly with the KPMG audit.  That

8    should have been an absolute moment of sheer terror

9    and panic for Mr. Hartline and Mr. Bekkedam.

10                    Patricia Lockney (ph) stumbles to these

11   issues with the Levin loan, the Bonomo loan, and the

12   Galab loans, even though the Galab loans have nothing

13   to do with Mr. Bekkedam, but she stumbles to all these

14   and says, I'm alerting our auditor KPMG.  Now KPMG is

15   looking at this.  Now KPMG wants to review this stuff.

16   Now KPMG is saying, you know what, you couldn't count

17   this as capital.  This is a problem.  We're going to

18   have to change this.  You're going to have to talk to

19   the regulators.  The regulators that you're supposed

20   to be trying to pull the wool over their eyes in order

21   to get TARP.  That should have been an area where

22   those two were in panic mode.

23                    Any e-mails introduced during the

24   course of the testimony about a conversation where

25   they were worried about that?  No.  There's not even

1    an e-mail where Mr. Hartline would write to

2    Mr. Bekkedam and say, oh, by the way, we have a teeny

3    weenie problem here.  KPMG is now on to us, they know

4    what's going on.  Any evidence of a call to him saying

5    there's a problem Barry?  No.  Any evidence that as a

6    result of KPMG coming in and auditing Mr. Bekkedam

7    goes to Mr. Hartline and says, listen Brian, we got a

8    real problem here.  I don't care what it takes, you

9    fire them and you go out and get another auditor.  You

10   go out and find somebody that's going to say this

11   stuff didn't count as capital, and don't you dare

12   amend your call reports to tell the regulators that

13   this was called into question.  That's what people

14   hiding a crime would do.  That never happened here.

15            Mr. Bekkedam, through this entire

16   process of trying to defraud the regulators, defraud

17   TARP, this investment council that nobody knows who

18   they are, he didn't have any contact with any of them.

19   Didn't talk to them, didn't meet with them, didn't do

20   anything to try to influence their decisions.  He

21   didn't have any knowledge based upon the evidence in

22   this case of what the regulators were even being told.

23   He's not copied on those communications.

24            Now, the government indicated during

25   its closing argument that there was some kind of

Page 150

1    understanding here, some nefarious quid pro quo

2    relationship between Barry Bekkedam and George Levin.

3    I must have missed something during the last few

4    weeks, because I didn't hear Mr. Levin say that.

5            Now your recollection of the evidence

6    controls here, ladies and gentlemen.  I suggest to you

7    at no point in time did George Levin ever say that his

8    investment in NOVA was some kind of quid pro quo for

9    things that Barry was doing with Banyon.  Those words

10   never came out of his mouth.

11           The first time that issue has come up

12   is today in closing arguments.  Another square peg in

13   the round hole.

14           What we have is the fact that the

15   government would like you to think that Mr. Bekkedam

16   was the person who introduced the idea of hey, we

17   should do this in some nefarious way with a loan so

18   that George can invest.  We should do something, pull

19   the wool over the eyes of the regulators.  You know,

20   we got to defraud these people.  But that's not how it

21   happened.

22           And you heard George Levin testify.  He

23   testified that he wanted to keep his money in Banyon.

24   He wanted to leverage his investment.

25           And what did he say ultimately?  When

```
1    shown the documents about how he had the money,
2    Mr. Preve had indicated in the e-mail that you know
3    what, there was plenty of money there to pay for it.
4    And Mr. Duncan was asking him questions where he said,
5    you know, you had plenty of money to pay for this.  He
6    says, yeah, I never needed a loan.  He said that right
7    on the stand.  I never needed it.  No, he didn't, he
8    was worth $400 million.  He didn't need a loan to
9    invest.  He wanted it.  He wanted it for his own
10   legitimate business purposes.  Because as we heard
11   from witness after witness after witness that people
12   do this in order to make more money.  It makes good
13   investment sense.
14               And it was Mr. Levin that's driving the
15   bus here, not Mr. Bekkedam.  He's not the one setting
16   the terms.  Mr. Levin says, look, this is an
17   opportunity, I'm going to do it, but this is how I
18   want it done.
19               And when the loan is then sent to the
20   bank what do we know?  Barry Bekkedam is not involved
21   in the underwriting or loan approval process
22   whatsoever.  And I don't care how many times they want
23   to say because Frank Preve, a convicted criminal by
24   the way, said that Barry, you know, my bank, my bank,
25   NOVA is my bank.  Well it's not Barry's bank, and no
```

1    other witness in this case, including the people on

2    the loan committee and the people that worked inside

3    NOVA Bank, ever said that this man made such

4    representations.  Not one.  Not one.  All they got is

5    a convicted felon saying that.  And the fact is he

6    didn't own the bank.

7              Because what did we learn from Mr.

8    Patterson's testimony and the other witnesses who

9    testified?  That Mr. Bekkedam didn't own a single

10    share in the bank's holding company.  Didn't own

11    anything.

12              And all the people on the loan economy

13    said, I didn't get calls from Mr. Bekkedam about the

14    loan, I didn't get any pressure, there was undue

15    influence, nobody came to me and said, hey, George

16    Levin is Barry's guy, we've got to cut corners, we got

17    to do something here we wouldn't normally do, we got

18    to approve him even though he's not worthy of approval

19    because we're approving a $5 million loan at fair

20    terms for a guy that's worth $400 million.  None of

21    that.

22              Similarly with respect to the issue of

23    Anthony Bonomo getting a loan.  There's no evidence

24    here that that was Barry's idea.  There's no evidence

25    that the loan and the investment were even tied

 1    together from the beginning.

 2              Because what do we know?  We know from

 3    Government Exhibit 400 -- and you can go to that --

 4    it's the subscription agreement that we're talking

 5    about.  Mr. Bonomo, although he didn't recall it

 6    independently testifying in 2016, his recollection of

 7    it was refreshed when he saw the document.  He signs

 8    the subscription agreement on October 30th, 2009.

 9    That is when he makes the commitment to invest.

10              And oh, by the way, where does that

11    come from?  Not from that guy.  It does not come from

12    Barry Bekkedam or anyone at Ballamor capital.  The

13    subscription agreement comes from the holding company.

14    They send him the subscription agreement.  He reviews

15    it, he signs it, and he sends it back, because he's

16    made the decision that he's going to invest in NOVA.

17              When'd he get the loan?  Oh, eight days

18    earlier, October 22nd, 2009.  The loan is approved, he

19    gets $4.5 million.  And what is he saying all along

20    there?  I want to invest $2 million of this into

21    Banyon.  It's all over the documents.  Stated in the

22    purpose of the loan, it's said all over the Raz.

23    That's what he wanted to do.

24              There's no information that Mr. Bonomo

25    made the decision to invest in NOVA at that point.

Page 154

1    Because what we do know from Government 304 at page

2    56?  If we can blow up the center there, Shawn, please

3    this is what he instructed them to do.

4                   After paid the borrower directly

5    $2.5 million deposited to the account.  The account

6    that he had at NOVA Bank.  So $2.5 million just went

7    into his account that she shared with his wife.

8    That's it.  Didn't go anywhere.  $2 million is what he

9    had instructed for a wire to go to the Banyon Group.

10   That's what happens.  He makes that decision on

11   October 21st of '09, the next day that's what occurs.

12                   There's no decision made whatsoever

13   about investing in NOVA until the 30th, eight days

14   later.  And there's no indication whatsoever that

15   anyone was trying to hide that fact, let alone that

16   Mr. Bekkedam was trying to hide that fact from anyone.

17                   Now the other thing, ladies and

18   gentlemen, is Mr. Egan did cover this in some detail,

19   but I want to mention of the fact that we didn't hear

20   from a single person from this investment council for

21   TARP.  The ultimate decision makers for the government

22   about whether or not the TARP funds are going to be

23   issued.  Not one called to the witness stand.  Not one

24   called in to be asked the question of whether they

25   would have liked to have known whether an investment

1    came in as a result of a loan or anything like that.

2    Not one of those came in and said what it is that was

3    important to them or material to their determination

4    of what to do.

5              And what did we really learn from all

6    the other documents in evidence about what occurred in

7    December?  We heard the messages that the guy was

8    leaving Lisa Koch, we saw all the e-mails.  The

9    application was dead on arrival long before, long

10   before.

11             And the decision that was ultimately

12   made, the stated decision any way, about hey, you know

13   what, this isn't going to happen, didn't have anything

14   to do with that issue.  We don't know what the

15   investment council ultimately decided in that meeting

16   because they were never called as witnesses.  All we

17   have is the whisper down the lane.  We never got to

18   the ultimate decision makers.

19             How do you prove conspiracy to defraud

20   TARP when the ultimate decision makers who are

21   supposed to be deceived by this fraud never even

22   testified?

23             I'd submit to you, ladies and

24   gentlemen, that there is simply no evidence to

25   establish that Barry Bekkedam enter into a criminal

Page 156

1    conspiracy with Brian Hartline to do anything, let

2    alone defraud the government of TARP funds.

3              Now, Count II of the indictment, ladies

4    and gentlemen, relates to the actual substantive

5    charge of TARP fraud.  And the government's theory

6    here with respect to Mr. Bekkedam is that he aided and

7    abetted in this process.  He assisted what was going

8    on.

9              Now, what you'll here from the

10   instruction about aiding and abetting that the judge

11   will give you later is that mere knowledge of things,

12   mere association with certain people, that's not

13   enough to be an aider and abetter.  It's not enough to

14   make you a co-conspirator either.

15             And what we know here is there's not a

16   single piece of evidence that establishes in this

17   trial that Mr. Bekkedam knew that as a result of

18   getting a loan from NOVA Bank, that an investment

19   buying individual that got a loan from NOVA Bank into

20   the holding company couldn't ultimately and

21   legitimately end up as being capital.  There hasn't

22   been a single bit of testimony or evidence to show

23   that he had that knowledge during this process.

24   There's nothing to establish any intent to defraud.

25             What did we hear about Mr. Bekkedam?

1    Mr. Schwartz was cross-examining Todd Howard, his

2    employer, and said, yeah, you know, Barry is one of

3    those guys up there at 30,000 feet, isn't he, not

4    really a detailed guy?  And what did Mr. Howard say?

5    Thirty thousand feet?  Try 100,000 feet.  He was in

6    Florida half the time.  He wasn't paying attention to

7    the things that were going on there as much as what

8    Mr. Howard thought he should have been.

9              And what did Ed D. Mark Antonio say?

10   Barry is a big picture guy.  He's not down in the

11   weeds of these issues.  And guess what?  He shouldn't

12   have been.  There was no reason to be, because he

13   doesn't work at the holding company, he doesn't work

14   at the bank, he's not involved in any internal process

15   about whether or not something ends up on NOVA's

16   balance sheet as capital and whether it is appropriate

17   or not.

18              The guy is an investment advisor, not a

19   banker.  Not a bank expert.  Not even an individual

20   who ever worked inside of a bank.  He's an investment

21   advisor whose sole function and relationship with NOVA

22   during the time at issue in this case was that he was

23   there as an outside consultant to bring people

24   together where they might want to invest in the

25   holding company.  That's it.  A fundraiser.  Nothing

Page 158

1    else.  He would have no reason to be involved in any

2    of those discussions.

3                    More importantly, what we see about

4    those discussions is there's e-mail after e-mail

5    communication that who's copied on it?  The lawyer for

6    Ballamor, Mr. Roven.  Copied on communications after

7    communications after communications.

8                    And what you didn't see in this case

9    was evidence of any time where Mr. Roven, his lawyer,

10   says, we can't do that, that's a problem.  Can't count

11   that as capital, that would be a fraud, that's a

12   problem.  Didn't hear anything about that.

13                   Oh, there's also a reason for that too,

14   you didn't see the government call Mr. Roven as a

15   witness.

16                   The other thing too is that what about

17   the KPMG issue where, you know, Brian is now

18   communicating with the regulators?  Mr. Zentner

19   testifies that FDIC has told everything that was

20   uncovered about this issue, it was voluntarily amended

21   on the call reports, and Barry doesn't object to it a

22   single time.  I guess the government's theory is that

23   the two of them were trying to arrest themselves.

24                   I mean there's just no common sense

25   basis for people to do this if you have knowledge that

Page 159

1    you've broken the law.

2              Now, ladies and gentlemen, Counts III

3    and IV deal with allegations of false statements.

4              Count III specifically alleges that on

5    June 30th, 2009, Mr. Hartline told the FDIC that NOVA

6    raised $5 million in new capital.

7              Now, first and foremost, I agree with

8    Mr. Egan that there's no evidence that that statement

9    was actually false.  But the government goes on to say

10   -- Government's 57 and Government's 62 are documents

11   that were the communications to the regulators.  Well,

12   Mr. Bekkedam is not copied on those communications.

13   There's no evidence that he was even aware that those

14   communications were made, let alone what the content

15   of those communications would be.

16             How is someone to know whether or not a

17   statement that is being made to the government is

18   false if they don't know the statement is being made

19   or what's being said?  It's a very difficult thing to

20   do I'd submit to you, ladies and gentlemen.  And where

21   the evidence is, is Mr. Bekkedam didn't have any

22   knowledge of that.  If you're not copied on it, you're

23   not told about it, he's not Kreskin, he doesn't have

24   the crystal ball, he's not a mind reader, he's not

25   omniscient.

1           Same thing goes for count IV.

2    Supposedly Mr. Hartline tells the FDIC that NOVA made

3    its contingency by raising over $10 million.  I'd

4    still submit to you that that was a true statement at

5    the time.

6           Government 140 is what the government

7    offers you.  But again, another document that's the

8    communication and supposedly establishes that count in

9    the indictment, and Mr. Bekkedam is not copied on it.

10   Not one witness indicated that he was consulted about

11   it ahead of time, knew that the statement was even

12   being made, or what it said.

13          There's simply no evidence here, first

14   and foremost that Brian Hartline thought any of those

15   things were false.  And if he didn't think those were

16   false then how could he, Mr. Bekkedam, know anything

17   about them being false thinking there was any problem

18   with them?

19          And there's not one shred of evidence

20   presented to you to establish that Mr. Bekkedam aided

21   or assisted or did anything to help Mr. Hartline

22   prepare those statements that were made to the

23   government on those dates.

24          Counts V and VI, ladies and gentlemen,

25   charge wire fraud.  This is where the government

1    alleges that Mr. Bekkedam perpetrates fraud on the

2    Ballamor investors.

3                    First, the wires themselves that are

4    alleged are e-mails, and they relate, based upon the

5    information in the indictment, to the Bonomo loan and

6    investment.

7                    Well what they say for Count V is that

8    on October 21st, 2009 there was an e-mail from a

9    Ballamor employee to NOVA for the purpose of

10   facilitating the loan from NOVA to Anthony Bonomo.

11   Okay?  An e-mail from Ballamor to NOVA for the purpose

12   of facilitating the loan from NOVA to Anthony Bonomo.

13                   And what we have for that is Government

14   Exhibit 107A, and that's an e-mail from someone at

15   Ballamor to Mr. Patterson that deals with the issue of

16   wiring instructions and wiring information to Banyon.

17   10/21/09, ladies and gentlemen.  That is nine days

18   before Mr. Bonomo ever even decided to invest in NOVA.

19   This had absolutely nothing to do with the issue of

20   investment in NOVA.  It simply had to do with the

21   investment in Banyon.  And all that e-mail talks about

22   are basically where the information is going to go by

23   way of wire.

24                   With respect to count VI it alleges

25   that on October 22nd of 2009 there was an e-mail from

Page 162

1      a Ballamor employee to Anthony Bonomo instructing him

2      to sign and return the NOVA loan documents.

3                    Well not one time, nowhere in evidence,

4      at no point during this trial, did the government put

5      in an e-mail dated October 22nd of '09 that relates to

6      an issue of a Ballamor employee e-mailing Anthony

7      Bonomo to sign documents.  Didn't happen.

8                    What they've offered you instead is

9      Government 104, which is an e-mail from 10/21/09 to

10     Anthony Bonomo, and that is simply about instructions

11     for wiring money to Banyon.  That's it.  And all the

12     information in those communications are true.  It's

13     things that Mr. Bonomo wanted.  He signed the

14     document, you saw it in Government 304, we just

15     brought it up.  On 10/21 he says, I want $2 million to

16     get wired to Banyon.  From my loan I want $2 million

17     to go to Banyon.

18                    These e-mails simply facilitate what he

19     wanted.

20                    I must have missed that day in law

21     school that how is that fraud if he knows what's going

22     on, he's fully aware, he's requesting it, he's signing

23     a document to the fact that he wants that, and these

24     wire communications that supposedly constitute the

25     fraud that Mr. Bekkedam is perpetrating on Mr. Bonomo,

1        are all what he wanted and are accurate and are true.

2                    Mr. Bonomo knew exactly what was going

3        on the entire time.  And you saw the man testify.  Did

4        the words I can't stand Barry Bekkedam because he

5        defrauded me ever come out of his mouth?  Did his

6        demeanor, his affect, the way he talked about

7        Mr. Bekkedam or anything that he said during the

8        course of his testimony ever give you the impression

9        that he felt victimized by Mr. Bekkedam?  If he did I

10       guess I wasn't here that day.

11                   But, ladies and gentlemen, Mr. Bonomo

12       was clear about what he wanted.  He knew about exactly

13       what was conveyed and what was going on with respect

14       to these e-mails that have been proffered by the

15       government as evidence of a crime.  There can't be

16       fraud there when he knew.

17                   Plus the bottom line is the decision to

18       deal with the wire transfers, the decisions to invest,

19       all of those things were things that Mr. Bonomo said,

20       you know what, now looking at those documents I signed

21       all that stuff.  I may not remember what I did exactly

22       in 2009 testifying in 2016, seven years later, but the

23       documents, you know what, I did, I signed that stuff.

24       And if he signed it he's presumed to have read and it

25       understood it.

1                    And what do we know about Mr. Bonomo?

2       He knew he was getting a loan.  He knew he got a loan

3       for $4.5 million.  He knew he invested two million in

4       Banyon.  And then he knows that he signs a

5       subscription agreement and he invests 2.5 million in

6       NOVA Holding Company after getting a loan from NOVA

7       Bank.

8                    What is Mr. Bonomo?  A business owner

9       and a CEO?  But what else is he?  A lawyer, an

10      attorney.  He knows that he got a loan from NOVA Bank,

11      and he knows that eight days later he invested that

12      money in NOVA Financial Holding Company.  Did he ever

13      say to you that he knew that that was improper or

14      wrong or illegal or potentially a problem or that the

15      bank couldn't count it as capital down the line?

16      Certainly didn't hear that testimony from a guy with a

17      law degree. Not Mr. Bekkedam, a former basketball

18      player that runs an investment house.

19                   The only confusion that Mr. Bonomo

20      exhibited was whether or not the actual money itself,

21      okay, where things went on what day.  I don't remember

22      that.  And then he saw a document and then what

23      happened?  I remember.  I signed that.  I remember.  I

24      signed that.  That's not being defrauded.

25                   And, ladies and gentlemen, the other

1     thing is why would Mr. Bekkedam want to defraud one of

2     his Ballamor investors or any Ballamor investor?

3                  You heard he's got billions of dollars

4     under management, 120 to 150 clients involved in 60 or

5     more investment opportunities.  He wants to stiff one

6     of his biggest and best clients?  He wants to defraud

7     Anthony Bonomo so the word can get out to all his

8     other clients that that's how he treats people that

9     invest with him?  Does that make any sense to you

10    whatsoever?

11                  I mean the Judge told you at the

12    beginning of this case the most important thing you

13    can do is to bring your good judgment and common sense

14    into this courtroom.  We don't ask you to check it at

15    the door, but you'd be required to, to buy that

16    argument.

17                  Mr. Bekkedam would never want to

18    defraud his investors.  How about the fact they bring

19    up Government 92?  Can we bring that up on the screen

20    please, Sean?  And they offer this even though

21    Government 92 has nothing to do -- it's a September

22    24th, '09 document -- has nothing to do with count 5

23    or count 6 which relate to Anthony Bonomo and relate

24    to dates in October of 2009.  But, hey, let's argue it

25    anyway.

Page 166

```
 1                    Well, what do we see here?  It's a

 2       letter.  Does it -- is it addressed to anybody?  No.

 3       Does it indicate who it's going to?  People involved

 4       in the DVFG transaction.  That's not Ballamor clients.

 5       That's not Ballamor people that are involved with

 6       NOVA's application for TARP or investment related to

 7       TARP.  There's no indication of who this is going to.

 8                    And guess what, this document -- do you

 9       know when was the first time you saw this document?

10       It was today.  The Government didn't put it on the

11       screen for you once during the trial.  The Government

12       didn't call a witness to testify about it during the

13       trial.  No witness got up there and said that that

14       document was something that Mr. Bekkedam drafted, that

15       he ever read, that that's in fact his signature, that

16       it went to anyone, whether they received it, whether

17       they read it or what effect it might have had on them.

18       It is an absolute red herring that has nothing to do

19       with your analysis of counts 5 and 6.  And shame on

20       them for even offering it.

21                    Now, the other investor -- we can take

22       that down, Sean -- that was brought to your attention

23       was Ms. Musser, who was memorable in her affect in her

24       demeanor, but what did she tell us?  First of all,

25       what we know is Mr. Bekkedam's not charged with
```

1    defrauding Ms. Musser.  Ms. Musser never invested in

2    NOVA.  Ms. Musser even said that despite the

3    Government's theory that Barry is desperate to prop up

4    the bank and desperate to get people to invest in

5    NOVA, that he never pushed that whatsoever.  That

6    doesn't make any sense either if the Government's

7    theory of this case is true and accurate.

8                    And what we also know is that

9    Ms. Musser got up there to say hey, you know what,

10   Mr. Bekkedam kept talking about how he needed to prop

11   up the bank by getting the TARP funds, prop up the

12   bank, prop up the bank.  It's the party line for the

13   Government.  She was happy to say it, it seemed.

14                   But let me ask you this, Ms. Musser's a

15   Ballamor client.  Mr. Bekkedam wants to get people to

16   invest because that's how they "prop up the bank" and

17   get the TARP.  You want to get someone to invest.

18   You're going to say to them, "Hey, this bank is

19   failing so bad we need to prop it up.  Would you like

20   to give me several million dollars to invest in it?"

21   That doesn't really work, now, does it?  It doesn't

22   make any sense that he would try to use that as an

23   investment pitch.  Does it make any sense that he

24   would just out of the blue talk about wanting to prop

25   up the bank with Ms. Musser, an individual who he

1    didn't push the NOVA investment on?  I submit to you

2    that it does not.

3                    The last count, ladies and gentlemen,

4    count 7 is bank fraud.  That alleges fraud on NOVA

5    Bank itself with respect to the three loans.  And what

6    we know about one of the loans, Mr. Galab's loan,

7    Mr. Bekkedam didn't have anything to do with

8    Mr. Galab's loans or investments.  Not the one in 2008

9    and not the one in 2009.  He wasn't a Ballamor client

10   and it wasn't Mr. Bekkedam that solicited him to

11   invest.

12                   Now, with respect to Levin and Bonomo,

13   we had discussed the process of how things worked at

14   the loan committee.  There was no special treatment.

15   Barry wasn't involved in the process whatsoever.  He

16   didn't communicate with those people.  He had no idea

17   what information they were reviewing.  That was all

18   something internal at the bank.

19                   Like I told you about count 1, there

20   was no secrecy whatsoever, no deception.  The purpose

21   of the loans were all known inside the bank.  So how

22   can Barry Bekkedam be aiding anyone in deceiving NOVA

23   Bank?

24                   This case ultimately comes down to the

25   fact that Barry Bekkedam had no intent to ever commit

1    a crime.  And what the Government is trying to prove

2    to you is that he had an intent to defraud.  And what

3    you will learn from the jury instructions is that you

4    cannot have an intent to defraud if it's based upon a

5    misunderstanding.  If you in good faith misunderstand

6    something, that isn't a basis for an intent, a

7    specific intent to engage in an act of fraud.  And

8    Barry Bekkedam had no way, ever, throughout this

9    process to know about how or why internally at the

10   bank they would treat something as capital.

11              Despite what the Government has tried

12   to say over and over again that he bought himself a

13   bank, he didn't buy a bank.  He didn't own the bank.

14   He needed to have stock in the bank to have bought the

15   bank and owned the bank.  That's complete fallacy.  He

16   was on the bank board up until 2004 and he was on the

17   investment holding company board until -- or 2004 and

18   then 2007 for the holding company.  He's not there

19   during this time period.  He does -- there's no

20   indication he has any idea what's going on with

21   respect to the treatment of whether or not a

22   particular investment should or shouldn't be treated

23   as capital.

24              There is absolutely no way for him to

25   have known any of this.  And, ladies and gentlemen,

1    let's face it.  The CFO of the bank, the CEO of the

2    bank absolutely believed that those loans could be

3    treated as capital.  Mr. Hannison testified to that

4    fact.  And if they believed it, how was he supposed to

5    know any different?  He doesn't even work there?  He's

6    not involved in decisions about what goes on in the

7    bank's balance sheet.  He's an outside consultant.  He

8    would never be included in those discussions.  He

9    wouldn't have knowledge of any of that.  So how could

10   he possibly have any intent?

11              And they want to impute criminal

12   intent, specific intent to defraud because he wasn't

13   familiar with EITF 85-1?  GAAP guidance, general

14   accounting principles, right?  Generally accepted

15   accounting principles.  This is a third level down

16   guidance that uses terms of generally and usually you

17   should do this or that.

18              Well, if it's generally or usually it

19   means that sometimes it happens one way and then other

20   time it happens another way.  It is not a law.  It's

21   not even a banking regulation.  And there's no way for

22   this guy to know anything.  He runs an investment

23   house.  He raises capital for the bank.  How could he

24   ever be expected to know the intricacies of EITF 85-1

25   when the expert KPMG auditor wasn't even familiar with

1     it right away?  His partner had to send it to him.

2                    This isn't something that's common

3     knowledge.  And the fact that Mr. Bekkedam at point in

4     time lived on the main line is really not argument

5     that he was sophisticated enough to understand an

6     intricate, third level guidance accounting principle

7     that is so arcane, it requires auditors' judgment.

8     Meaning that one auditor, like the one we had from

9     KPMG, said it applies while another auditor could have

10    said it doesn't.  And they want to turn that, the

11    failure to understand that into a specific intent to

12    defraud.  It's just not there, ladies and gentlemen.

13                    And what do we know from the guy

14    William Gaunt who testified from the Federal Reserve,

15    he was there like a billion years and had all kinds of

16    experience, what did he say about all of this?  It's

17    very complicated.  Yeah, it is.  And there's

18    absolutely no duty for him to have known any of it.

19    It wasn't his job.  It wasn't his role.

20                    Ladies and gentlemen, the Government

21    may want you to think that there was something

22    sinister going on here, that Mr. Bekkedam is the man

23    behind the curtain pulling the strings, that somehow

24    he's this bad guy.  But facts are stubborn things.

25    And the facts in evidence here just will not pain that

1    picture.

2              John Adams when giving his closing

3    argument in the Boston Massacre trial was defending

4    some very unpopular people.  The jury there, they

5    hated the soldiers.  They wanted to see them

6    convicted.  They wanted to see them out of their

7    colony.  They were the most reviled, despised

8    individuals in the Massachusetts Bay Colony at the

9    time, and particularly the City of Boston.  And there,

10   the prosecution tried to do what the Government is

11   doing here.  They're trying to manipulate the facts to

12   fit a theory that leads to a conviction.

13             But what John Adams said to that jury

14   was, "Facts are stubborn things.  And whatever may be

15   our wishes, our inclinations, or the dictates of our

16   passions, they cannot alter the state of facts and

17   evidence."  And, ladies and gentlemen, that statement

18   was just as true in a Boston Courtroom in 1770 as it

19   is in this Philadelphia Courtroom in 2016, because the

20   facts here are very stubborn things.  And what they

21   show is Barry Bekkedam wasn't involved in any of this.

22   He shouldn't be here.

23             Can we go to the first graphic, Sean?

24   Let's look at the witnesses that testified in this

25   case.  Witnesses that had communication with Barry

1    Bekkedam.  John Quill (ph) from the CPP council.  No,
2    he didn't testify to having any communications with
3    him.  Kevin Burch (ph) also on the CPP council.  No,
4    he didn't have any communications with him.  Cynthia
5    Course testified from the Federal Reserve Board.  She
6    didn't have any communications with Mr. Bekkedam
7    either.  William Gaunt, also from the Federal Reserve,
8    no.  Glenn Fuhr (ph), again Federal Reserve, another
9    one of the regulators, testified no communications
10   with Mr. Bekkedam.  Chuck Hunter of the FDIC, none.
11   Lisa Koch, FDIC, none.  She's one of the primary
12   people that was one of the regulators that supposedly
13   was not being given information that she needed.  Not
14   a single communication.  Henry Zentner, FDIC, none.
15   Joseph Morretz, Pennsylvania Department of Banking,
16   none.  Mary Rutkowski, Pennsylvania Department of
17   Banking, none.  Joseph Morretz, Pennsylvania
18   Department of Banking, none.  William Sayre, the guy
19   about the ACBB loan that the Government talked about
20   in their closing arguments, he testified, not a single
21   communication with Mr. Bekkedam.
22              All right.  Well, let's look at another
23   list of names.  How about witnesses that testified
24   that they were influenced by anything Mr. Bekkedam
25   ever said to them, sent to them, any kind of

1    communication with them.  Henry Zentner from the FDIC,

2    nope.  Mary Rutkowski from Pennsylvania Board of

3    Banking, nope.  Jeff Hannison, the CFO at the bank on

4    the loan committee, nope.  Mark Polisky, the chief

5    credit officer at the bank, absolutely no influence

6    from anything Mr. Bekkedam ever said to him.  Never

7    tried to influence him.  Joe Madiani, the guy creating

8    the razzes that we saw over and over again, nope.

9    Patricia Lockney, the internal bank auditor who

10   supposedly uncovers these issues, nope.  David

11   Schwartz, the outside counsel for the bank who

12   ultimately gives an opinion that this is all legal

13   anyway, nope.  And Allen Shubin, the KPMG auditor who

14   says, "Hey, you can't treat this stuff as capital," no

15   influence by Mr. Bekkedam whatsoever.

16                Let's take a little look at an overview

17   of all the events in this case because there's a lot

18   going on at one time during this process.  And here

19   you see the timeline that starts in September of '08

20   and goes to May of 2010.  And at the top, you see that

21   there are certain things that are going on and certain

22   key events with the TARP CPP council and the

23   application process for the TARP funds.  And NOVA

24   submitted the TARP CPP application.  Well,

25   Mr. Bekkedam didn't have anything to do with that.

1    That was the testimony in the case.  Preliminary TARP

2    approval, he didn't have anything to do with that.

3    And NOVA TARP CP denied.  He didn't have any

4    communication with any of the people at the CPP,

5    nothing.

6              All right.  How about Pennsylvania

7    Department of Banking and the Federal Reserve Board

8    doing their exams of the bank for the Department of

9    Bank and the FRB for the holding company.  There was a

10   Pennsylvania Department of Banking exam of NOVA Bank

11   in the December '08 to February '09 time frame.  Not a

12   single piece of testimony that had anything to do with

13   talking to anyone there or any of the information that

14   was supplied to them.  Nothing to do with the Federal

15   Reserve exam that happened a little bit later of the

16   holding company.  And nothing to do with the

17   Pennsylvania Department exam of NOVA Bank.  Not one

18   witness.  Not one shred of paper.  Nothing ties him to

19   any of that.

20             Now, we have this whole thing going on

21   with the Section 112 application and the change in

22   control application for the Federal Reserve.  And

23   other than e-mails that show that Mr. Bekkedam was

24   provided something by Mr. Levin or Mr. Preve that was

25   then forwarded on, there is not a single piece of

1    evidence that ties him to the preparation of any

2    documents that were submitted to the regulators as the

3    change in control application.

4                How about board of directors meetings?

5    Remember the testimony from Ms. Knott (ph).  She was

6    the nice lady that came here right at the beginning of

7    the case, testified that she did that (indiscernible)

8    training, talked about capital July 16th, 2008.  Guess

9    who wasn't there?  Mr. Bekkedam, that's right.

10               May 27th, 2009, Dave Schwartz, the

11   outside counsel for the bank was there to talk about

12   TARP and this whole process because this was a whole

13   new world.  There weren't rules.  There weren't

14   specific regulations.  This was like everyone figuring

15   it out.  That's what we've heard throughout this case.

16   Was he there for that?  Mr. Bekkedam wasn't present.

17               Then the audit committee in 2010,

18   May 21st, 2010, learns of KPMG's capital concerns.  He

19   wasn't involved in that.  Even when that major event

20   happens, no information that Mr. Hartline, his co-

21   conspirator, ever even reaches out to him.  NOVA loans

22   and the committee ratification, nothing to do with

23   Mr. Galab's first loan or its ratification.  He didn't

24   bring them to the bank.  He didn't have anything to do

25   with the approval.  Mr. Levin's loan, he wasn't inside

1    the bank, no influence, didn't do anything to get

2    special treatment for any of his clients.  Nothing to

3    do with that.  Same thing for Anthony Bonomo.  He

4    didn't influence anyone on the loan committee, didn't

5    talk to anyone on the loan committee, had nothing to

6    do with that.  Mr. Galab's second loan and the

7    ratification, he also had nothing to do with that

8    whatsoever.

9                    So now we have the NOVA financial

10   holding company investments.  He had nothing to do

11   with Mr. Galab's investment in 2008.  He was not a

12   Ballamor client, as I told you.  He didn't have

13   anything to do with bringing him to the bank for that

14   investment purpose.  Same thing with Mr. Galab's

15   investment in 2009.  He was not the individual that

16   reached out to Mr. Galab to invest.  He's not one of

17   his clients, had nothing to do with that.

18                    So what does that leave us with?  The

19   Levin investment and the Bonomo investment.  George

20   Levin wasn't one of his clients.  He was an investor

21   that wanted to -- ultimately made the decision to

22   invest, made that decision of his own accord.  And

23   Barry's only involvement was he brought a viable

24   investor to the holding company.  That's what he was

25   there for.  Anthony Bonomo, an individual he was

1    familiar with, is one of his clients, brought him to

2    the investment process.  That's what he was there for.

3    That was his job.  That's it, ladies and gentlemen.

4    That's all they have.

5              What they also don't have in this case

6    is a discernible motive for my client to have engaged

7    in this activity.  He supposedly wants to prop up the

8    bank.  Why would he want to do it?  It's not his bank.

9    Doesn't own it.  There's no monetary upside or

10   downside for Mr. Bekkedam whatsoever if NOVA Bank

11   succeeds or ultimately fails.  He doesn't own any

12   stock.  So propping up the bank doesn't get him any

13   money.  If the bank goes under, he doesn't lose any

14   money.

15             The Government might say well, but hey,

16   he was paid $250,000 in November of 2009 to be an

17   outside consultant and to raise funds for the holding

18   company.  Come on, now we have a reason for him to

19   want to do stuff.  Except for the fact that if you

20   remember the document, ladies and gentlemen, and you

21   remember the deposit directly into his account, the

22   money was paid in total up front.  It was not a

23   contingency fee.  He didn't have to worry about

24   getting his money unless he got a certain number of

25   investors in.  He didn't have to worry about getting

1    his money unless TARP was approved.  He didn't have to

2    worry about getting his money because it was a lump

3    sum, upfront payment no matter what the results.

4              He got paid that fee for what he had

5    done before and what he was going to do for two more

6    years, which a number of witnesses testified that

7    banks and their holding companies do that all the

8    time.  They bring in people to raise funds.  It's not

9    uncommon and the people that do that are very

10   expensive.  And this deal was very good for the bank.

11   It was very fair.

12             But the bottom line is that he doesn't

13   need to secure TARP or see that TARP is secured to get

14   paid.  There's no financial incentive whatsoever.  Now

15   how about, well, they talked about he's got clients at

16   Ballamor and they're involved with the bank.  So he's

17   got to see the bank saved because otherwise his

18   clients will be unappy.  There was not a single

19   witness who testified to the number of Ballamor

20   clients who owned NOVA stock, that's first of all.

21   Between 120 and 150 clients Todd Howard said, no one

22   has established and no document has established how

23   many of those clients actually were invested in NOVA,

24   or how much stock they actually owned.  No testimony.

25   No evidence of that.

1                 Well, maybe he needed to save the bank

2      because some of his clients had lending relationships.

3      And, you know, we wouldn't want them to lose their

4      lending relationships.  Well, what did we learn from

5      Mr. Patterson's testimony?  There were four Ballamor

6      clients total that had lending relationships out of

7      120 to 150 clients.  Four had something that was a

8      lending relationship, some of which were mortgages.

9      That's his motive for wanting to do this?

10                The bottom line here, ladies and

11     gentleman, is in order to believe that Mr. Bekkedam

12     committed this crime, you'd have to believe that a

13     family man, a successful business man wakes up one day

14     out of the blue in May of 2009 with fraud on his mind

15     and larceny in his heart.  And just out of the blue

16     decides, you know what, I want to go commit some crime

17     and defraud the Government.  Does that make any sense

18     to you whatsoever?

19                Here, the evidence does not establish

20     proof anywhere near beyond a reasonable doubt.  It

21     simply cannot on the evidence that is before you,

22     ladies and gentlemen.  There's no loss here.  There's

23     no victim here.  There's no crime here.

24                If in looking at the evidence in this

25     case you were to say to yourself, well, you know,

1    Barry Bekkedam might have done what the Government's

2    accused him of or Barry Bekkedam, I guess, could have

3    done the things that he's accused of in this

4    indictment, or if you were to stretch it so far as to

5    even say he probably did do what he's accused of.  If

6    after you go back into that deliberation room and you

7    look over the evidence and deliberate amongst

8    yourselves, and you weigh the testimony.  If that is

9    where your mind's at, that might have, could have, or

10   even probably did then, ladies and gentlemen, you have

11   a reasonable doubt.

12                 And that reasonable doubt comes from

13   your common sense.  It comes from your good judgment.

14   It comes in this case from both the evidence that was

15   presented and the lack of evidence that was presented.

16   And I submit to you, ladies and gentlemen, when you

17   retire to deliberate in this case, you will be left

18   with your doubts, your very reasonable doubts, which

19   pursuant to the oath that you took as jurors and under

20   the law, will compel you to find Barry Bekkedam not

21   guilty on all counts in this indictment.  Thank you.

22                 THE COURT:  Counsel, may I see you

23   briefly, please?

24        (Sidebar off the record)

25                 THE COURT:  Members of the jury,

1    without electing a foreperson just yet, it's 4:30

2    approximately and the Government has a right of

3    rebuttal argument, which would take by his estimate

4    approximately 20 minutes and usually it's a little

5    longer than that.  That being the probable situation,

6    would you rather adjourn now and come back tomorrow

7    morning to hear the remainder of the argument and then

8    I will give you instructions in the law which will

9    probably be about an hour to an hour and a half, and

10   then you will go out and deliberate?

11               JURY:  Yes.

12               THE COURT:  Tomorrow morning,

13   everything?

14               JURY:  Yes.

15               THE COURT:  You got it.  Thank you very

16   much.

17               Now it is very important that as we are

18   approaching the very end of the case, you don't make

19   up your minds.  You don't do any investigation.  You

20   read no newspaper articles.  You don't listen to any

21   kind of broadcast of any sort related to this case.

22   Have a good night's sleep.  I have a lot to read to

23   you tomorrow.  9:30 tomorrow morning.  9:30.  Thank

24   you.

25          (Jury exits)

Page 183

1              THE COURT:  We're adjourned.  Thank

2      you.

3          (Pause)

4              MR. IGNALL:  Mr. Engle said that the

5      Government didn't call Mr. Roben (ph) as you

6      speculated about that.  I'm just giving the Court and

7      the counsel notice, I'm going to say the defense

8      didn't call him either.

9              UNIDENTIFIED SPEAKER:  Sure.  Thank

10     you.  I'm not sure that that's appropriate.  If we

11     don't have the burden of proof, then we don't have to

12     call any witnesses.

13             UNIDENTIFIED SPEAKER:  We can't shift

14     the burden like that.

15             UNIDENTIFIED SPEAKER:  Is there's a

16     consensus among the defense team --

17             MR. IGNALL:  I believe that's been

18     invited.  That's why I normally would not say that.

19             MR. EGAN:  We don't have a burden to

20     put on that witness.  That's the Court's instructions.

21             UNIDENTIFIED SPEAKER:  Then what should

22     the Court do to correct what he did if you accept that

23     it was an error --

24             MR. DUNCAN:  I don't think -- he didn't

25     do anything wrong.  It's a statement of fact.

 1                    MR. SCHWARTZ:  We've spoken to the

 2      Court about this witness and the Court said no.  I

 3      mean, it wasn't Mr. Roben per se, but the Court didn't

 4      say we couldn't argue about that.

 5                    UNIDENTIFIED SPEAKER:  They could have

 6      called him.  They chose not to.  They have the burden

 7      proof and not calling --

 8                    MR. ENGLE:  They have the burden of

 9      proof in the case.  They chose not to call Mr. Roben.

10      He was on their list.  They chose not to call him.

11                    MR. IGNALL:  I don't think the

12      inference is appropriate, but I can do some research

13      tonight if that makes more sense instead of waiting

14      until the morning.

15                    On another issue, we had the

16      instructions.  I flipped through them.  I think there

17      are a couple mistakes in there so given that we're

18      leaving now, maybe I'll go back to my office and kind

19      of e-mail them.

20                    UNIDENTIFIED SPEAKER:  That would be

21      just fine.

22                    MR. IGNALL:  Hopefully in half an hour

23      or whatever we can get them done.  And I'll e-mail

24      them --

25                    MR. EGAN:  Your Honor, if we could just

Page 185

1    make sure that the rebuttal is limited to rebuttal in

2    spite of the fact that the Government has all evening

3    to prepare it.

4                    THE COURT:  That's fine (indiscernible)

5    objections.

6                    MR. EGAN:  But I don't -- unlike

7    Mr. Ignall, I don't like to object in the middle of

8    other people's speeches.

9                    THE COURT:  I don't think --

10                   MR. IGNALL:  For the record

11   (indiscernible) --

12                   THE COURT:  Let's not go there.  All

13   right, look.

14                   MR. EGAN:  Kind of like leading, I

15   think they need an admonition.  No offense.

16                   THE COURT:  I don't think they need an

17   admonition.  Everybody knows the bounds.

18                   MR. IGNALL:  We do.  And I think given

19   the defense's closing arguments, the bounds are pretty

20   wide.

21                   MR. EGAN:  As I said, Your Honor --

22                   THE COURT:  And that's why God created

23   Judges.  Have a good evening, you all.  Thank you.

24   (Proceedings concluded at 4:27 p.m.)

25                        * * * * *

```
 1                        CERTIFICATE
 2    We, Sheila G. Orms, Dawn South, Jamie Gallagher
 3    certify that the foregoing is a true and accurate
 4    transcript from the official electronic sound
 5    recording.
 6
 7    _____
 8    SHEILA ORMS, APPROVED TRANSCRIBER
 9
10    _____
11    DAWN SOUTH
12
13    _____
14    JAMIE GALLAGHER
15
16    DATED:  May 1, 2016
17
18
19
20
21
22
23
24
25
```

## A

**abetted** 156:7
**abetter** 156:13
**abetting** 156:10
**able** 27:15 44:23
81:9,18 83:15
90:3,5
**absence** 5:17
**absolute** 148:8
166:18
**absolutely** 59:4
72:4 75:3,4 83:6
89:15 92:10
134:20 161:19
169:24 170:2
171:18 174:5
**acbb** 24:12,19,25
25:3 173:19
**accept** 183:22
**accepted** 170:14
**accident** 135:4
**accommodation**
16:12,12
**accord** 177:22
**account** 15:17 36:8
55:21 66:15
124:23 144:25
154:5,5,7 178:21
**accountant** 109:14
**accounting** 87:8,23
88:25 89:2 170:14
170:15 171:6
**accounts** 72:10
**accurate** 163:1
167:7 186:3
**accused** 135:21
181:2,3,5
**acknowledge** 39:5
**acquittal** 55:21
**act** 7:23 169:7
**acted** 118:24
**acting** 137:8,9
138:2 148:6
**action** 97:21
**actions** 30:19
**activities** 70:25
**activity** 31:3

130:15 143:4,9
178:7
**acts** 93:5 139:17
**actual** 16:23 33:19
136:8,20 141:23
156:4 164:20
**ad** 146:7
**adams** 172:2,13
**add** 82:10
**additional** 25:9,10
32:21 35:8,8,23
82:3,4
**address** 11:8 57:1
**addressed** 43:25
95:12 166:2
**adelines** 111:24
**adequate** 93:14
**adequately** 10:24
11:4 13:22 14:2
24:4
**adjourn** 182:6
**adjourned** 183:1
**admissible** 50:25
**admitted** 43:19
48:22,22 49:6,7
53:12
**admonition** 185:15
185:17
**advance** 109:2
116:13
**advice** 128:15
129:1,5 130:11
**advise** 22:7
**advised** 22:2
**advisement** 53:6
59:16
**advisor** 157:18,21
**affect** 81:14 163:6
166:23
**affidavits** 55:19
**afternoon** 5:14 7:1
7:1 76:6,6,16,23
76:24 123:15
133:4,9,10,11
**agent** 15:23 17:12
129:19
**ago** 77:1 88:24

119:17 136:7
**agree** 82:20 89:24
89:25 90:2 100:9
159:7
**agreed** 5:14,17
18:5 48:24 82:22
93:1 132:18,22
**agreeing** 16:9
**agreement** 16:9
30:12 35:14,16,16
39:24 45:15
108:19 131:3
137:5 153:4,8,13
153:14 164:5
**ah** 107:12
**ahead** 44:17 60:12
87:12 160:11
**aided** 156:6 160:20
**aider** 156:13
**aiding** 156:10
168:22
**air** 111:9
**al** 1:4
**alerted** 141:25
**alerting** 148:14
**aligned** 31:23
**alive** 140:17
**allegation** 80:20
**allegations** 81:16
81:18 159:3
**alleged** 81:22
120:14 141:22
145:17 161:4
**allegedly** 102:1
**alleges** 137:12
159:4 161:1,24
168:4
**allen** 86:24 174:13
**allowed** 7:3 81:23
84:3
**alter** 172:16
**amazing** 7:17
**ambitions** 75:9
**amend** 149:12
**amended** 54:6
158:20
**america** 1:2,9 7:18

135:17
**amount** 18:4 23:10
24:12 48:19 73:11
**ample** 7:7
**analysis** 98:6
166:19
**analyzes** 68:21
**angle** 123:21
**answer** 25:23 26:10
26:20,21,23 27:12
31:13,17 53:4
66:23,25 67:2,10
69:5 97:16 120:24
**answered** 84:11
126:23
**answering** 27:22
**answers** 49:20
**anthony** 8:14 32:10
33:7 34:1,11 36:1
41:18 42:24 43:24
45:19 54:3,8,16
54:20 55:1 57:23
62:8,19 103:23
105:2 108:15
152:23 161:10,12
162:1,6,10 165:7
165:23 177:3,25
**antonio** 18:24
29:23 63:21 90:1
111:24 113:12,17
118:25 139:9
140:23 157:9
**anybody** 19:12
65:13 80:1,2
105:19,20,21
106:5,8 114:3
121:16 123:24
166:2
**anymore** 35:19
79:15
**anyones** 70:1
**anyway** 165:25
174:13
**anyways** 119:19
**apart** 37:13
**apologies** 54:24
**apologize** 8:1 57:15

**appearances** 1:7
**appears** 8:18
**application** 10:20
12:4 16:25 22:4
22:17 23:5,8 24:1
24:3,12,12 26:2
35:4 72:12 73:5
80:9 91:24 92:2,2
97:19 98:7,7
102:20 106:18
113:22,24 114:9
114:14,15,15
138:8 140:13
155:9 166:6
174:23,24 175:21
175:22 176:3
**applications** 21:24
22:1
**applied** 89:5 90:20
105:1 147:16
**applies** 135:5 171:9
**apply** 6:17 89:7
105:13 134:15
**appreciated** 3:15
**approach** 43:2,7
79:1 80:12
**approaching** 14:7
182:18
**appropriate** 4:4
88:8,10 142:23
157:16 183:10
184:12
**approval** 27:14
93:23,25 95:7
97:25 98:2,3,11
98:12,12 114:16
124:16 151:21
152:18 175:2
176:25
**approve** 35:7
152:18
**approved** 27:9,14
30:3 35:5 92:19
94:18 95:14,14,15
97:18 138:9,10
139:5,12 146:4
153:18 179:1

186:8
**approves** 108:1,9
**approving** 93:24
  152:19
**approximately**
  182:2,4
**april** 1:4 74:13
**arcane** 171:7
**area** 131:7,13
  148:21
**arent** 115:22
  143:13
**argue** 4:2 40:2
  47:25 48:25 49:1
  49:2,9 51:18
  52:11,14,20 80:17
  80:18 81:23 130:3
  130:18 165:24
  184:4
**argued** 44:5 48:19
  53:21 128:22,23
  129:19
**arguing** 55:25
  130:2
**argument** 3:10,24
  6:25 7:4,9 17:7
  56:19 76:2 130:7
  146:23 149:25
  165:16 171:4
  172:3 182:3,7
**arguments** 2:3 6:9
  6:10,16,21 7:3
  128:20 150:12
  173:20 185:19
**armed** 133:24
**arrest** 158:23
**arrival** 41:7 155:9
**art** 89:3
**articles** 182:20
**aside** 106:20
**asked** 16:2,24
  22:18 23:8 26:4
  46:18 48:2 49:25
  62:21,25 63:12
  64:8,17 67:18
  68:19 70:13 78:1
  82:2 86:18,23

87:2,22 88:13
  94:12 99:5 102:14
  111:24,25 113:17
  115:10,14 119:21
  120:24 122:19
  125:5,19 132:19
  154:24
**asking** 16:6,8 41:5
  51:7 63:3 79:8
  86:9,12 151:4
**asks** 23:13 67:8
  117:18 123:21
**assessment** 18:9
  19:2,13 65:10
  68:20 73:19
**asset** 8:22 88:7,18
  109:13 111:4,17
**assets** 9:6 109:14
  109:17
**assistance** 21:20,21
  41:5
**assistant** 5:6,12
  132:18
**assisted** 156:7
  160:21
**association** 156:12
**assume** 30:6
  101:22,25 119:18
**assuming** 132:20
**assure** 73:17
**attached** 41:15
  68:20
**attaches** 41:16
**attempt** 53:23
**attention** 3:8 7:16
  69:17 70:2,6
  123:7 125:11,12
  133:19 157:6
  166:22
**attorney** 128:9,17
  129:19 139:8,9
  164:10
**attorneys** 1:9 6:9
  64:11
**attracted** 12:18
**audience** 80:2
**audio** 20:1

**audit** 20:6 69:9,10
  87:9 99:14,14,22
  99:25 100:6 148:7
  176:17
**auditing** 149:6
**auditor** 87:7 90:23
  91:9 99:18,20
  100:4,24 148:14
  149:9 170:25
  171:8,9 174:9,13
**auditors** 86:10 89:1
  89:2 99:24 100:10
  101:14 104:6
  105:4 142:24
  171:7
**audits** 100:1
**august** 31:20 95:12
  95:21 100:17,20
  117:19 141:24
  142:2,4
**authorities** 67:12
  147:11
**authority** 107:1
**auto** 135:3
**available** 32:10
**ave** 1:17
**awake** 133:13
**aware** 5:1 50:15,17
  51:17 88:17
  129:18 159:13
  162:22

---

**B**
**b** 49:12 113:13
**baby** 32:3
**back** 3:24 4:7 7:1
  9:1,8,10,19 10:12
  11:21,21 12:12
  15:18,19 16:11
  17:14,17,21 18:3
  18:6 20:15,20,21
  20:22 21:1 23:22
  26:18 31:11 32:16
  36:9,16,18 40:22
  40:23 41:21,22
  42:6 56:9 60:17
  61:16 66:11 69:6

72:14 76:15 80:16
  80:21 82:11 85:7
  90:25 103:17
  104:14,14,15
  105:12 107:13
  109:4 110:3,7,24
  113:2 116:19
  117:24 124:24
  125:24 141:5,11
  142:9 144:23
  145:7 153:15
  181:6 182:6
  184:18
**backed** 74:2,4
**backing** 141:2,6,17
**backs** 27:13
**bad** 99:12 167:19
  171:24
**bailiff** 132:24
**balance** 44:13
  48:25 109:13,16
  157:16 170:7
**balances** 46:4 48:3
**ball** 115:13 159:24
**ballamor** 137:24
  139:9 147:20
  153:12 158:6
  161:2,9,11,15
  162:1,6 165:2,2
  166:4,5 167:15
  168:9 177:12
  179:16,19 180:5
**ballamore** 16:15
  21:20 29:15,24
  32:15 33:22,22,25
  34:10 37:22 38:23
  45:18 46:9,10
  48:17 54:16,18,19
  54:25 55:1 57:22
  63:18 66:14 69:23
  73:11
**ballamores** 32:18
**balloon** 42:14
**ballymore** 59:7
**bank** 8:11,15,19,24
  8:25 9:5,12,13,22
  9:25 10:4,4,14,16

11:3 12:9,18
  13:11 14:4,6,23
  15:4,13,14,16,19
  16:3,18 17:7,14
  18:22 19:19 21:15
  23:16,17,22 24:4
  25:19 26:14 27:21
  29:12,13 30:1,9,9
  30:9 32:3,8,20
  33:1,17 35:17,20
  36:8,14,14 37:5
  37:24,24,25 38:1
  38:5,7,9,11,14
  39:17,18,22 40:14
  40:19 41:24,25,25
  42:18,19 47:18,19
  47:21 61:25 63:4
  63:6,15 64:3
  65:16,23 66:8,17
  66:21 69:10,23
  70:8,15 71:10,19
  72:1,20 73:7 74:3
  74:9,9 75:6,8,20
  77:8 80:10 86:5
  86:22 88:13 89:11
  91:20 92:20 95:1
  95:12 97:19 98:10
  98:17,18,19,22
  99:18 100:8
  101:23 103:16
  104:15,25 105:15
  106:17,21 109:1
  109:10,11,24
  110:22 111:16,20
  112:9 113:14
  114:5 115:5 116:9
  116:14,15,20
  120:3 122:8
  123:17 124:12,23
  125:7,8,9,11,13
  125:15 138:15
  144:12,16,25
  145:12,20 148:3
  151:20,24,24,25
  151:25 152:3,6
  154:6 156:18,19
  157:14,19,20

164:7,10,15 167:4
167:11,12,12,16
167:18,25 168:4,5
168:18,21,23
169:10,13,13,13
169:14,15,15,16
170:1,2,23 174:3
174:5,9,11 175:8
175:9,10,17
176:11,24 177:1
177:13 178:8,8,10
178:12,13 179:10
179:16,17 180:1
**banker** 37:6,19
42:4 157:19
**banking** 22:7 25:22
35:4 75:11,15
116:23 118:21
123:2 144:15
170:21 173:15,17
173:18 174:3
175:7,10
**bankruptcy** 110:19
111:3,7
**banks** 9:19 10:7,9
10:20 33:4 37:19
72:9 87:9 100:3
104:4 109:18
110:2,16,16
114:14 152:10
170:7 179:7
**banyon** 16:16 27:7
27:8 36:11,22,23
37:10 72:9 73:13
121:10 139:25
150:9,23 153:21
154:9 161:16,21
162:11,16,17
164:4
**bar** 79:1 129:12
**barrigan** 4:8
**barry** 1:9,16 2:4
6:22,23 7:12,13
7:25 8:4,6,8 9:14
11:10 14:11 15:12
16:1,14,15,17,19
17:4,6 20:2 21:21

26:19 28:16,16,19
28:22 29:4,5,9,12
29:15,16,17,19,22
31:5,8,9,15,23,25
32:3,9,24 33:8,12
34:2,14,19 35:21
36:4 37:21,21
38:21 39:19,23
40:10 42:23 44:7
44:18,24 45:7,25
46:15,25 47:7,16
47:18,20 48:21
49:19,21,23 50:4
50:10 51:6,10,25
52:10,22 54:15,19
54:25 55:11 56:6
57:8,13,18,21
58:5,13,17,21
59:1,11,19,23
60:3,7,11,15,20
60:23 61:1,11,18
61:19 63:15 66:11
66:13,23 68:19
69:22 70:1 72:7
74:15,15 77:21
78:7 86:17 109:20
116:12 118:25
120:15 133:16
136:2 138:19
139:8,18,19 140:3
140:22 141:3,9
142:11,18 146:13
146:22 149:5
150:2,9 151:20,24
153:12 155:25
157:2,10 158:21
163:4 167:3
168:15,22,25
169:8 172:21,25
181:1,2,20
**barrys** 27:24,25
28:19 151:25
152:16,24 177:23
**base** 81:16
**based** 5:19 13:8
43:12,12 52:7,8
58:9 67:24 81:6

86:10 93:10 98:3
98:6 101:22 102:6
102:9 122:18
128:21 136:20
149:21 161:4
169:4
**basically** 98:5
119:1 161:22
**basis** 52:4 56:17,18
77:11 78:21 84:11
88:20,24,24 98:25
135:25 158:25
169:6
**basketball** 164:17
**baxter** 15:8
**bay** 172:8
**began** 63:22
**beginning** 10:19
153:1 165:12
176:6
**begs** 52:13
**behalf** 7:17 47:5
117:10
**behavior** 126:18
**bekkedam** 1:16 8:8
9:14 11:10,14
14:11 16:2,14,15
16:17,19 17:7
21:21 26:20 27:18
27:19 28:16,17,22
29:5,6,10,12,19
31:12,24 32:1,10
32:24 33:8,12
34:2,14,19 35:21
36:4 37:21,22
38:21 39:19,23
40:10 42:23 43:20
45:14 47:18,20
49:9 61:23 63:16
64:4 66:11,14
70:1 72:7 74:15
74:16 130:16
133:16,18 134:21
136:15,25 137:13
138:14 141:4,9,25
146:13,20 147:12
147:18 148:1,9,13

149:2,6,15 150:2
150:15 151:15,20
152:9,13 153:12
154:16 155:25
156:6,17,25
159:12,21 160:9
160:16,20 161:1
162:25 163:4,7,9
164:17 165:1,17
166:14 167:10,15
168:7,10,22,25
169:8 171:3,22
172:21 173:1,6,10
173:21,24 174:6
174:15,25 175:23
176:9,16 178:10
180:11 181:1,2,20
**bekkedams** 29:1,15
31:6,9 53:23
69:22 108:3 113:6
129:19 136:2
137:25 166:25
**belied** 97:8 107:22
**belief** 33:1
**believable** 134:13
**believe** 6:11 10:2
16:5 21:16 25:12
25:13 30:21 35:6
44:9,16 64:10
67:25 88:22
180:11,12 183:17
**believed** 15:6 170:2
170:4
**believes** 25:12
93:13
**belly** 37:11
**beneficial** 64:4,4
**best** 18:23 29:22
35:13 48:10 63:21
142:10 165:6
**better** 9:25 30:21
87:18 88:22 107:2
113:18 118:1
119:18 143:22
**beyond** 4:16 45:13
80:4 83:22 84:1
86:10 102:14

103:4 111:12
127:9 134:19,22
135:23 180:20
**big** 39:2 91:15
96:10,11 105:20
106:8 109:21
139:3 157:10
**biggest** 63:17 87:8
165:6
**bill** 15:8
**billion** 37:23
171:15
**billions** 42:5 165:3
**binding** 35:16,16
**birch** 94:17
**bit** 37:2 78:12 84:4
91:22 101:17
131:4 136:24
156:22 175:15
**blacked** 46:5
**blow** 86:15 87:16
92:23 117:18
144:21 154:2
**blue** 123:22 167:24
180:14,15
**board** 63:22 112:1
112:7,9 125:12,13
126:20 139:10
169:16,17 173:5
174:2 175:7 176:4
**boards** 37:18
**boat** 18:1
**body** 87:16
**boil** 137:5
**bonomo** 8:14 32:6
32:11 33:7 34:1
34:11 36:1,5 40:6
41:18 42:23,24
43:24 44:12 45:19
46:10,13,17 47:23
48:9,10,18 49:1
54:3,8,16,20 55:2
57:5,5,23 58:8
62:8,19 70:17
73:10 103:23
105:2 108:15
144:2 148:11

152:23 153:5,24
161:5,10,12,18
162:1,7,10,13,25
163:2,11,19 164:1
164:8,19 165:7,23
168:12 177:3,19
177:25
**bonomos** 109:21
**boo** 105:4
**born** 126:15
**borrow** 27:7
106:12 108:24
**borrowed** 22:18,19
22:21 23:11,14
24:14 26:3,5,7
28:6 31:15 73:7
75:14 106:16
109:6 114:25
115:4,5,6,7
120:21 123:3
**borrower** 154:4
**borrowers** 120:1,1
**borrowing** 13:13
113:10
**boss** 111:24 118:25
**boston** 172:3,9,18
**bothered** 120:10
**bottom** 21:18 94:22
97:10 116:5,19
117:7 119:12
140:9,24 144:21
163:17 179:12
180:10
**bought** 37:24,25
169:12,14
**bounds** 185:17,19
**box** 114:23
**boyertown** 126:6
**brackets** 51:3
**branch** 96:23
**brb** 46:9
**break** 7:9 43:3
132:19
**breaking** 118:4
**brian** 1:4,12 8:8
11:14,22 20:22
26:19 27:4 29:8

29:14,22 30:4,9
31:8,23,25 32:9
33:9 34:16,17,19
34:21 35:22 37:3
37:16 38:23 39:7
41:3 63:11 66:5
67:8 69:25 70:12
77:5,5,6 79:25
87:12 90:10 93:4
101:19,19 102:18
105:14,18 106:6,7
106:10,25 107:7
107:18 110:25
111:11,22 112:8
113:19 114:13
115:22 116:2,5,7
116:7 117:2,11,12
118:22 119:22
120:11,19,20,22
121:5,18 122:2,7
122:9 123:11
124:1 125:13,21
126:4,21 127:12
139:14,18 140:3
142:12,12,18
146:12,19,21
147:2 149:7 156:1
157:17 160:14
**brians** 126:18
**bricks** 74:21,21,23
74:25 75:1
**bridge** 68:3,23
121:25
**brief** 126:9
**briefly** 181:23
**briefs** 3:12
**bring** 3:8 39:11,13
69:19 116:20
157:23 165:13,18
165:19 176:24
179:8
**bringing** 45:12
177:13
**brings** 69:17 70:1
74:15
**broad** 1:20
**broadcast** 182:21

**broken** 102:9 159:1
**brought** 64:2 70:5
78:5 81:5,6 120:8
125:11,12 162:15
166:22 177:23
178:1
**bucks** 107:13
112:18 113:2
124:22,23
**buddy** 63:21
**building** 74:20,25
75:2
**built** 96:23
**bunch** 103:5
110:20 113:25
**burch** 173:3
**burden** 56:20
83:18,18 84:5
135:1,2,9,14
183:11,14,19
184:6,8
**burne** 15:3
**bus** 151:15
**business** 38:1,3
63:24,25 64:1
110:17 117:8
120:3 151:10
164:8 180:13
**businessmen** 64:14
**buy** 13:13 17:25
18:1 36:25 64:17
84:24,24,25 85:1
85:12 109:5 110:4
123:25 124:14
165:15 169:13
**buying** 33:11 37:15
96:22 156:19

---

**C**

**c** 1:6,12 3:1 20:24
102:24 113:14
**call** 6:4 15:1 33:4,4
40:17 41:23 42:17
42:18 60:25 70:7
94:14 103:15
112:8 113:7
116:18 118:6,12

118:15 119:1,3,15
125:25 137:19
147:12 148:2
149:4,12 158:14
158:21 166:12
183:5,8,12 184:9
184:10
**called** 23:6,6 65:4,5
65:5 78:4,6 84:6
88:25 119:20
129:14 149:13
154:23,24 155:16
184:6
**calling** 65:16 66:21
69:14 70:9 184:7
**calls** 143:2 152:13
**cant** 9:2 20:7 26:11
36:15 41:23 44:21
70:7 75:16 88:9
90:11 91:1 104:8
105:6,20 118:9
122:16 132:5
144:13 148:1
158:10,10 163:4
163:15 174:14
183:13
**capital** 9:4 10:4,21
10:23,23 11:8
12:13,19 13:2,4
13:25 14:4,19,21
14:23 15:2,4,6,10
20:7,17,18 21:18
21:20 25:13,19
29:24 30:1 33:2,2
33:6 40:14,16,17
40:18 41:13,18,23
64:23,24 65:8
66:18,21,21 67:5
69:14 70:7,9,25
71:6 72:2 73:13
74:2,8 77:8,9,11
86:5,6,8 88:21
89:6 90:4,5 91:1
93:14 125:17,23
137:24 139:9,11
141:13 148:17
149:11 153:12

156:21 157:16
158:11 159:6
164:15 169:10,23
170:3,23 174:14
176:8,18
**capitalized** 10:15
10:16,24,25 11:4
13:23,23 14:2
24:5 38:9 39:11
39:13 93:15 95:1
97:4,4
**car** 13:13 18:1
91:25 92:1
**card** 109:2
**care** 149:8 151:22
**cared** 78:19
**careful** 131:4
**carefully** 6:15
127:2
**carried** 108:12
**case** 4:6,9 7:16,19
7:20 9:8,14 11:20
38:20 49:7 52:16
52:25 53:3 58:25
76:3 77:3,18
78:23,24 79:13,20
79:23 83:25 84:8
85:22 102:5
103:11,22 104:25
113:22 116:17
117:15 120:14
121:15 123:16
127:12 130:3,4
131:18,20 132:6,6
133:19,20 134:4,7
134:15,25 135:4,9
135:12,18,19,20
135:22,25 136:3,6
136:9,12 139:4
142:8 143:16,24
147:4 149:22
152:1 157:22
158:8 165:12
167:7 168:24
172:25 174:17
175:1 176:7,15
178:5 180:25

181:14,17 182:18 182:21 184:9
**cases** 88:17 132:7
**cash** 8:22 15:13,14 26:14 27:6 36:13 36:14 87:21,22,25 109:2 116:25 117:8,9 140:6
**caught** 105:24
**cause** 84:21 123:7
**caution** 131:13
**cautionary** 53:16
**ccd** 145:11
**center** 154:2
**ceo** 164:9 170:1
**certain** 69:5 85:1 142:19 156:12 174:21,21 178:24
**certainly** 56:10,19 79:11 84:3 115:10 130:12 143:14 164:16
**certificate** 186:1
**certificates** 110:7,8 110:9
**certify** 186:3
**cfo** 89:11,13 170:1 174:3
**chain** 145:3
**chair** 99:23 134:12
**chairman** 139:10
**chance** 45:10
**change** 21:24 22:1 23:6 24:3 73:4 114:6 148:18 175:21 176:3
**changed** 125:23 126:2,3
**changes** 5:12 125:17 132:18
**changing** 113:22 113:23 114:9 117:15
**character** 84:2 126:7,8
**characterizing** 131:5

**charge** 5:22 85:17 112:1 156:5 160:25
**charged** 33:12 80:18 82:18 134:24 145:16 166:25
**charges** 54:4 81:2,5 81:25 83:8,14,22 84:1 127:13 136:25
**charles** 8:14 62:20 62:20,23 63:20 64:24 103:24 105:1 108:15
**chasing** 110:20
**cheat** 8:8,9 138:23
**cheated** 8:10
**cheating** 7:21
**check** 165:14
**checked** 60:19 100:20 101:3
**chestnut** 1:10
**chief** 37:17 174:4
**choice** 108:22 110:5,6
**choose** 109:8 110:4
**chorus** 76:24 127:19 133:10
**chose** 80:6 184:6,9 184:10
**chuck** 12:15 21:12 94:6,7,9,11,11 97:11 173:10
**chun** 1:9
**cic** 35:3 72:12
**cindy** 14:24
**circuit** 4:9
**circular** 103:10,13 103:15,15 104:16
**circumstances** 88:10,19
**citations** 53:9
**cite** 125:21
**cited** 4:7
**citizens** 135:20
**citizenship** 133:25

**city** 135:15 172:9
**civil** 135:8,19
**claimed** 108:2
**claims** 98:6
**classic** 40:2
**clear** 30:2 53:13 69:19 81:8 91:11 97:1 115:20 119:25 135:9,11 139:11 163:12
**clearly** 41:8 51:1 73:3,5 100:23 102:12 131:15 143:20
**clerk** 6:2 43:4 61:13,15 76:7,12 76:14
**client** 54:16,18 55:1 57:22 72:23 81:5 105:25 128:9,17 134:21 167:15 168:9 177:12 178:6
**clients** 16:15 32:19 33:13 38:22 49:14 50:21 108:3 165:4 165:6,8 166:4 177:2,17,20 178:1 179:15,18,20,21 179:23 180:2,6,7
**close** 58:23 70:14 71:21 72:3,24 119:11
**closed** 71:17,19,24 72:20
**closes** 42:1
**closing** 2:3 3:10,23 6:9,16,24 7:2 8:1 49:17 59:22 70:20 70:23 76:2 79:6 96:19 128:1,7,20 146:23 149:25 150:12 172:2 173:20 185:19
**closings** 5:21
**coconspirator** 103:23,24 104:2

106:9 119:21 131:16,17 145:18 156:14
**coconspirators** 108:19 131:18,20 139:16 143:12
**coincidental** 71:1,6
**coke** 11:22 12:15 20:16,17 62:6,10
**collection** 71:16
**colony** 172:7,8
**come** 6:25 13:4,5 20:6 25:25 28:1 36:9 42:17 48:9 51:20 60:17 96:17 96:25 99:24 104:5 104:5,6 112:19 115:18,19 117:22 119:2 123:6 126:10 127:1,9 128:1 145:25 150:11 153:11,11 163:5 178:18 182:6
**comes** 9:19 15:18 21:22 30:11 51:15 56:8 69:9 77:23 90:14 106:1 153:13 168:24 181:12,13,14
**comfortable** 147:7
**coming** 14:5,13 32:23 44:11 75:1 79:13 114:24 115:14,17 116:6 118:16 121:13 140:13 145:13 149:6
**commenced** 100:14
**comment** 42:21 68:24
**comments** 27:24,25
**commit** 30:14,14 101:20 126:16 168:25 180:16
**commitment** 7:19 112:5 153:9

**commitments** 108:21
**committed** 125:14 138:6 180:12
**committee** 18:20 78:13,15 95:19,22 95:23,25 96:1 97:17 98:4 99:22 103:1 107:14,15 107:25 113:1 114:8 126:1 144:3 144:6,12 146:6 152:2 168:14 174:4 176:17,22 177:4,5
**committing** 101:13
**common** 21:13 24:16 26:9 41:15 42:3,10 61:24 84:18 158:24 165:13 171:2 181:13
**commonwealth** 135:16
**communicate** 168:16
**communicating** 158:18
**communication** 143:10 158:5 160:8 172:25 173:14,21 174:1 175:4
**communications** 142:8 149:23 158:6,7,7 159:11 159:12,14,15 162:12,24 173:2,4 173:6,9
**community** 126:11 126:14
**companies** 88:12 88:18 111:17 179:7
**company** 1:23 24:5 37:22 38:10 39:7 39:16 45:16 88:13

96:23 103:17,19
104:4,7,10 111:19
120:4 137:25
138:1,1,3,21
139:6 147:2
152:10 153:13
156:20 157:13,25
164:6,12 169:17
169:18 175:9,16
177:10,24 178:18
**companys** 129:23
**compare** 68:25
**compel** 181:20
**complain** 130:21
**complained** 130:9
**complaints** 130:20
**complete** 60:9 72:3
116:1 169:15
**completely** 27:19
34:22 54:4,12
55:4 68:24 75:19
92:13 107:6 110:6
114:10 126:20
**compliance** 126:9
**complicated**
171:17
**conceal** 9:22 25:1
28:9 33:11 73:22
75:5,13 144:19
146:13
**concealed** 20:11
21:23,23 23:21
26:25 27:1
**concealing** 20:8,14
28:8 70:2
**concealment** 19:17
19:21 31:12,21
33:18 69:21 72:16
73:9
**conceals** 28:13
**concentrate** 7:7
**concept** 97:7
**concern** 128:11
**concerned** 128:18
146:24
**concerns** 176:18
**conclude** 74:1

123:7 128:14
**concluded** 61:7
185:24
**concludes** 73:25
74:1
**conclusion** 7:4
**conclusions** 123:5
**condition** 39:13
**conditionally** 95:14
**conduct** 4:4 30:20
43:12 82:16
**confirm** 119:19
**confirms** 67:14
**confusion** 164:19
**congratulations**
134:5
**connection** 97:22
101:6 112:21
**connor** 21:12
**conscious** 28:9
**consensus** 88:6
183:16
**consider** 15:4
40:13,13,18 56:21
79:8,21 81:9 84:3
84:23 126:17
**consideration**
87:24
**considered** 9:2
10:20 30:25 36:14
**considering** 31:1
**consistent** 52:25,25
**conspiracies**
143:18
**conspiracy** 30:11
66:1 118:3,7,12
118:13 119:8
137:1,5,7 139:18
140:4 141:19
142:11 143:21
148:5 155:19
156:1
**conspirator** 103:25
145:17 147:4
176:21
**conspiratorial**
142:8

**conspirators** 30:13
103:21 137:6,8
**conspire** 142:5
**conspiring** 141:22
143:3
**constant** 143:10
**constitute** 162:24
**constitution** 79:21
**constructively** 54:6
**consultant** 138:2
157:23 170:7
178:17
**consulted** 160:10
**consulting** 45:15
46:2
**consume** 117:8
**contact** 118:21
148:2 149:18
**contained** 53:10
69:1
**contemporaneou...**
122:23 123:4
**content** 159:14
**contents** 5:7
**contingencies** 98:5
98:14,16,17
138:10,19
**contingency** 13:5
13:19 26:15 27:16
39:11 40:8,25
41:12 94:13 95:6
95:7 141:24 142:4
160:3 178:23
**contingent** 13:1
14:20 62:16
**continue** 31:21
60:9 61:18 73:8
**continuing** 21:4
**contract** 105:12
**contrary** 130:21
146:22
**contribution** 88:1
**control** 21:24 22:1
23:7 24:5 52:1
71:15,20,24 73:4
103:20 113:22,23
114:6,9 117:15

175:22 176:3
**controlled** 29:13
**controls** 16:7 111:7
150:6
**conversation** 29:3
29:4,5 30:4
119:20 139:14
146:19 148:24
**conversations**
145:14
**conveyed** 163:13
**convict** 102:6
120:12
**convicted** 151:23
152:5 172:6
**conviction** 172:12
**convinces** 12:25
**convincing** 135:10
135:11
**cook** 41:4
**cookie** 105:24
**copied** 34:6 86:25
129:17 149:23
158:5,6 159:12,22
160:9
**corners** 152:16
**cornerstone** 84:14
**correct** 46:6 49:15
52:9 67:23 89:3
124:15,15 183:22
**corroborates** 17:16
**couldnt** 77:8 82:12
86:7 90:10 124:4
148:16 156:20
164:15 184:4
**couldve** 64:12
**council** 92:4,4,16
92:16 94:11,16
149:17 154:20
155:15 173:1,3
174:22
**counsel** 3:6 6:13,20
6:22 7:1 11:23
12:25 13:7,17
15:1 43:7 48:20
53:15 54:22 57:16
58:3 59:3,15

60:14 61:10 67:13
76:18 128:15
129:5 130:11
132:15,20 133:8
147:20 174:11
176:11 181:22
183:7
**count** 20:7 21:2
33:13,21 34:9
54:6 55:14,22
57:22 58:14 77:8
83:3 89:5 90:3,5
136:25 148:16
149:11 156:3
158:10 159:4
160:1,8 161:7,24
164:15 165:22,23
168:3,4,19
**counted** 74:7 86:6
86:6,8
**counting** 77:11
88:20
**countries** 127:7
**country** 79:22 87:9
127:6,8 135:16
**counts** 58:16,25
75:22 159:2
160:24 166:19
181:21
**couple** 5:8,8,9
34:25 74:21
106:24 110:14
184:17
**course** 44:1 80:24
89:22 139:4 142:8
146:7 148:24
163:8 173:5
**court** 1:1,23 3:2,6
3:13,14,19 4:5,12
4:17,18,21,25 5:5
5:13,16 6:4,5,24
7:12,25 8:5 43:2,6
43:13,15 44:17,21
45:5,9,20,24 46:3
46:6,14 47:1 48:2
48:7,8,14,20 49:3
49:15 50:1,9,14

50:19 51:1,9,11
52:5,9,13,24
53:20 54:14,18,21
55:6,9,25 56:3,8
56:12,21,23 57:1
57:4,7,16,19 58:3
58:9,16,19,24
59:2,14,20,25
60:5,8,12,14,18
60:21,24 61:4,9
61:17 75:24 76:9
76:16,20,22 79:2
79:7,11,13 80:13
80:24 81:3,12,24
82:1,3,14 83:7
127:15,18,21,23
127:24 128:3,5,21
129:2,6 130:2,18
130:24 131:6,25
132:5,10,13,15,21
133:1,2,4,8
181:22,25 182:12
182:15 183:1,6,22
184:2,2,3 185:4,9
185:12,16,22
**courtroom** 165:14
172:18,19
**courts** 3:8 4:1
50:25 60:15
183:20
**cover** 154:18
**covered** 99:3
108:11
**covering** 68:12
71:8 123:10
**coverup** 120:14
**cp** 175:3
**cpa** 37:20
**cpp** 11:23 12:25
13:7,17 14:25
62:16 92:4,16
94:11 173:1,3
174:22,24 175:4
**cpps** 95:9
**craziest** 119:14
**crazy** 112:21
**created** 121:8

122:9 185:22
**creating** 121:6
174:7
**credit** 64:3,16 65:3
68:2 72:22 107:9
109:1 116:14,15
122:24 123:8
174:5
**creditors** 110:20
**crime** 28:10 75:15
75:15 76:25 77:4
77:4 91:13 101:13
101:18,20 103:6,8
104:21 125:14
126:17 136:8,21
136:23 137:7
149:14 163:15
169:1 180:12,16
180:23
**criminal** 78:23,24
79:20 82:16 102:5
103:7 135:18,20
135:21 141:19
143:21 148:5
151:23 155:25
170:11
**crisis** 10:7
**critical** 79:23 84:13
100:12
**crossexamination**
16:4 27:18 29:2
35:15 40:9
**crossexamine** 84:7
**crossexamined**
84:10
**crossexamining**
157:1
**crucial** 38:23
**crystal** 159:24
**culpability** 131:14
**current** 116:23
138:8
**currently** 93:17
**curtain** 96:5 114:8
171:23
**cushion** 9:5,5 40:20
40:21

**cut** 152:16
**cynthia** 173:4

### D

**d** 1:15,16 2:1 3:1
20:24 29:22 63:21
89:25 102:24
110:10 111:24
113:12,17 118:25
139:9 140:22
157:9
**d119** 110:10
**d123** 110:11
**d133** 89:16
**d41** 97:16
**d96** 86:14
**daily** 84:22
**danger** 96:16,18,20
**dare** 149:11
**darn** 110:1
**darnell** 1:6
**data** 71:16 100:15
100:16
**date** 14:3,6 29:25
32:16 41:20 54:9
58:1,6 59:8 86:20
**dated** 72:12 162:5
186:16
**dates** 58:22 160:23
165:24
**dave** 120:25 123:1
176:10
**david** 1:8 18:19
67:16,17,17,22,25
68:11,21 174:10
**dawn** 186:2,11
**day** 36:1 75:11 78:6
78:7 89:18,19
111:13,15 112:19
119:5 125:6 127:1
132:20 136:8
139:2,3,16 146:4
146:8 154:11
162:20 163:10
164:21 180:13
**days** 24:11 109:25
141:1 153:17

154:13 161:17
164:11
**dead** 155:9
**deadline** 141:1
**deal** 14:12 29:20
34:3 39:3 45:14
53:14 63:19 96:11
109:21 110:18
159:3 163:18
179:10
**dealing** 31:17
139:21
**deals** 161:15
**deceive** 96:13
141:15
**deceived** 77:24
155:21
**deceiving** 168:22
**december** 41:2
61:23 62:11 63:7
64:25 65:22 67:11
102:2,16 125:24
140:10,22 143:6
155:7 175:11
**deception** 168:20
**decide** 4:13,15
14:15,15
**decided** 13:7 102:2
142:21 155:15
161:18
**decides** 111:19
180:16
**deciding** 13:10
**decision** 6:12 41:11
65:20 78:3,13,18
79:9 91:17,19
92:12,18 95:10,18
95:23 110:13,17
110:19 111:22
112:1 114:6 136:1
153:16,25 154:10
154:12,21 155:11
155:12,18,20
163:17 177:21,22
**decisions** 74:6
102:24 114:4
149:20 163:18

170:6
**declared** 111:3,5
**decline** 12:10,10
38:7,8 39:3 66:9
**defect** 81:20
**defendant** 1:12,15
16:14,19 19:24
26:19 27:4,23
35:21 62:13 63:21
65:20 74:11 80:19
85:18 102:6
**defendants** 4:17
7:2 8:8 11:6,24
12:13,21 13:9,19
18:23 34:22 37:2
38:3 39:25 66:5
71:21 75:19,23
82:1,5,24
**defending** 172:3
**defense** 3:12,19
5:21 39:24 64:11
77:19 82:16 84:8
121:7,22 133:17
144:19 183:7,16
**defenses** 185:19
**definition** 84:16,18
**defraud** 7:22 32:25
33:15,16,17 53:23
70:3 137:1 149:16
149:16 150:20
155:19 156:2,24
165:1,6,18 169:2
169:4 170:12
171:12 180:17
**defrauded** 163:5
164:24
**defrauding** 33:13
137:14 167:1
**degree** 164:17
**deliberate** 28:9
181:7,17 182:10
**deliberately** 21:23
70:2
**deliberation** 181:6
**demeanor** 163:6
166:24
**demonstrably** 81:7

**demonstrative** 64:20
**dena** 112:25,25 145:11,23
**denial** 98:25
**denied** 12:5 82:5 101:24 102:2,2,17 103:2 175:3
**deny** 78:14
**department** 22:6,6 25:22 35:4 107:1 118:21 173:15,16 173:18 175:7,8,10 175:17
**depend** 116:24
**dependent** 93:23
**deposit** 178:21
**deposited** 154:5
**deposition** 123:12 123:13,16,19 125:3 126:22
**deposits** 64:2
**describe** 84:15
**desperate** 38:17 41:1 62:1 138:15 138:16,18 167:3,4
**desperately** 24:10 24:10
**desperation** 143:4 143:5,6
**despised** 172:7
**despite** 71:22 167:2 169:11
**detail** 78:12 87:17 154:18
**detailed** 157:4
**details** 77:17
**determination** 79:23 155:3
**determine** 111:11 112:23 134:11,14
**develop** 107:3
**developed** 136:11
**developer** 62:21 63:8
**devon** 68:5,10 72:3 121:11

**dictates** 172:15
**didnt** 14:24 18:15 18:16,21,22 19:6 29:3,4,5,7 44:8 47:13,13 48:7,12 49:19 50:4,5,22 51:8,22 52:1,7 68:13 72:25 73:1 77:5,6,6,13 78:20 82:23 87:4 89:6 89:10,13,13,25 90:2,18,20 91:7 91:11,18 92:9 94:6 95:24 96:16 96:19,25 100:17 101:6,7,19,20 103:10 104:22 105:22 107:5,6 108:4 112:16,20 113:6,8 119:4,22 121:8,22 122:6,14 124:9,11,19 125:20 126:5 128:4,6,24 143:11 149:11,18,19,19 149:19,21 150:4 151:7,8 152:6,9 152:10,13,14 153:5 154:8,19 155:13 158:8,12 158:14 159:21 160:15 162:7 164:16 166:10,12 168:1,7,16 169:13 169:13 173:2,4,6 174:25 175:2,3 176:23,24 177:1,4 177:4,12 178:23 178:25 179:1 183:5,8,24 184:3
**dietrich** 107:16
**dietrick** 18:19
**differences** 132:25
**different** 13:12 68:24 69:2,4 99:24 131:6 170:5
**difficult** 23:19 26:6

31:13 138:20,21 159:19
**digging** 72:25
**dink** 71:3
**direct** 29:4
**directed** 48:10
**directly** 141:3 154:4 178:21
**director** 29:15,23 37:18
**directors** 112:2,7,9 176:4
**disagree** 91:4
**disagreed** 89:15
**disagrees** 89:14
**discernible** 178:6
**disclose** 19:23 24:24 70:16
**disclosed** 32:8 70:21 74:5
**disclosing** 70:17,19
**discomfort** 129:15
**discover** 69:21
**discovered** 127:6
**discovery** 120:16
**discrimination** 4:6
**discuss** 76:1
**discussed** 168:13
**discussion** 17:24 88:5,6
**discussions** 141:10 158:2,4 170:8
**disingenuous** 49:10
**dismiss** 82:1,3,5
**dismissed** 82:8
**disrespectful** 52:21 52:23
**district** 1:1,1,6
**docs** 30:7 34:12 119:25
**document** 17:15 28:4,4 29:21 44:20,25 45:24 47:17,19 48:4,5,6 48:21,22,23 49:1 49:2 50:13,18 52:19 54:15 55:18

57:10 59:12 68:20 81:15 100:12 117:5,14,15 120:6 121:15 137:22 153:7 160:7 162:14,23 164:22 165:22 166:8,9,14 178:20 179:22
**documents** 16:21 16:22 17:4 22:12 33:23 54:12 57:10 57:25 58:8 59:8 65:2 68:1 73:20 99:19,20 101:16 115:12 120:3,24 121:1 151:1 153:21 155:6 159:10 162:2,7 163:20,23 176:2
**doesn** 64:9
**doesnt** 9:7,25 14:24 17:19 19:2 20:21 20:22 25:3 30:15 35:11 36:7 41:24 42:6 48:4,5 50:7 65:24 67:9 68:10 68:12 81:21 83:20 85:11 87:9 90:12 98:4,10 102:25 105:14 110:24 112:8 118:13,23 140:7 142:5,20,21 157:13,13 158:21 159:23 167:6,21 167:21 170:5 171:10 178:9,11 178:12,13 179:12
**doing** 16:5 17:3 19:3 20:9 38:2,4 40:11,11,12 52:23 63:23 71:7 90:8 91:12 96:21 105:18 129:21 130:5 134:1 140:16 141:7,7 142:20 150:9 172:11 175:8

**dollar** 36:6,12
**dollars** 41:17 42:5 63:4,5 136:22 165:3 167:20
**donna** 26:2 117:17 118:15
**dont** 4:4 8:19 9:7 19:17,22 24:24,25 26:8 30:19 35:18 38:14 42:3 44:13 44:14 47:11,23 56:17,20 59:15 61:1 65:5,10 66:6 69:15 72:16 77:14 79:5,6,15 80:21 82:24 83:19 87:20 89:24 90:7,7 94:18 95:9 96:5 97:13,22 102:7,8 102:10,24 103:3 105:19,21 106:7 106:20 108:18 112:23,24,25 114:22 115:15 116:20,22 118:7 119:3 121:4 122:7 122:8 123:13 124:20,21,25 126:5,25,25 129:3 129:8 131:14 134:5 141:6 142:3 142:7,19 149:8,11 151:22 155:14 159:18 164:21 165:14 178:5 182:18,19,20 183:11,11,19,24 184:11 185:6,7,9 185:16
**door** 119:11 141:14 141:14 165:15
**doubt** 4:16 80:4 83:23 84:1,14,17 84:18,20 85:11,17 85:23 86:3,10 102:15 103:4,12 111:12 113:20

119:23 126:12,13
126:14 127:10
134:20,23 135:23
142:13 180:20
181:11,12
**doubts** 85:24 86:1
114:1 127:11
181:18,18
**downgrade** 39:7
**downgraded** 24:6
38:10,12,15,16
39:15 101:24
**downgrades** 38:14
**downhill** 40:3
**downside** 178:10
**downward** 39:19
**dozens** 77:3
**drafted** 166:14
**draw** 129:4
**drew** 133:11
**driving** 151:14
**dude** 106:2
**due** 42:15,19
109:22,23
**dug** 74:11,14
**duncan** 1:15 53:18
53:21 54:17,23
55:4,8,10,13
56:10,13,24 57:2
57:9,24 59:4
136:17 151:4
183:24
**duty** 133:24 171:18
**dvfg** 94:1,13 95:6
138:9 166:4

—————
**E**
**e** 2:1 3:1,1
**earlier** 59:16 87:1
89:4 112:6 124:3
124:3 146:4
153:18
**early** 7:1 10:21
19:22 29:14 39:6
81:25
**earth** 147:4
**eastern** 1:1

**easy** 40:14
**economy** 152:12
**ed** 63:21 118:25
139:9 157:9
**eddie** 18:23
**effect** 166:17
**effort** 28:9 133:18
144:18
**efforts** 21:19
**egan** 1:12 2:5 4:2
16:5,24 37:3 43:9
49:11,16,20,22,25
50:7,12,16,20,24
51:16 52:3,7
53:17 76:19,20,22
76:25 79:16,19
81:3,4 83:2,13
128:22,23 133:15
134:17 138:17
154:18 159:8
183:19 184:25
185:6,14,21
**egans** 128:7
**eight** 153:17
154:13 164:11
**eitf** 86:25 170:13
170:24
**either** 24:25 90:3
142:6 156:14
167:6 173:7 183:8
**electing** 182:1
**electronic** 186:4
**element** 85:17
134:24
**elements** 79:20
84:1
**elicited** 129:15
**email** 12:15 20:25
21:9,9 34:11 54:3
54:8 55:14 57:4
59:6 62:5,5,5 83:4
86:16 97:10,11
107:23 112:15
115:16 117:17
118:4,14,24 119:7
132:19,20,21
140:10,18 141:9

142:1,11 145:3,5
145:9,23 146:10
149:1 151:2 158:4
158:4 161:8,11,14
161:21,25 162:5,9
184:19,23
**emailing** 162:6
**emails** 11:20,21
26:18 35:2 62:3
71:18 94:6 113:9
113:10,16 130:13
130:14,16 142:10
142:16,17 144:22
148:23 155:8
161:4 162:18
163:14 175:23
**employee** 33:23
34:10 54:20 55:1
59:7 161:9 162:1
162:6
**employer** 157:2
**encouraged** 106:25
107:1,2
**ended** 37:5 123:14
**ends** 157:15
**engage** 137:6
139:17 169:7
**engaged** 70:3 178:6
**engle** 1:18,19 42:25
43:11,16 44:9
45:2,8,11,22 46:1
46:4,7 47:2,12
48:7,16 49:5
50:22 81:10,13
128:12 129:9,13
130:5,12,22 131:1
131:9,15,23 133:6
133:7,11 183:4
184:8
**enjoy** 76:5
**enter** 155:25
**entered** 43:21
86:22
**enterprise** 87:21,25
88:3
**entire** 45:24 47:17
47:19,21 76:4

80:25 101:3
143:25 149:15
163:3
**entirely** 83:18 84:5
114:4
**entitled** 130:3,25
**entity** 116:10
**environment**
116:24
**equally** 76:1
**equity** 25:9,19
41:16 42:10,10
61:24 88:1,4
122:24
**error** 82:25 83:3
183:23
**errors** 80:8,17
**escrow** 140:25
**esq** 1:8,9,12,12,15
1:16,18
**esr** 1:22
**essentially** 9:17
23:7
**establish** 121:9
155:25 156:24
160:20 180:19
**established** 4:16
108:6 179:22,22
**establishes** 156:16
160:8
**estate** 62:21 63:8,9
68:5
**estimate** 182:3
**et** 1:4
**evening** 185:2,23
**event** 176:19
**events** 146:16
174:17,22
**everybody** 61:10
120:5 185:17
**evidence** 6:8,10,14
12:17 43:21 44:6
44:8,25 49:21,24
50:5 51:15 52:11
52:14,15 53:11,22
53:25 54:2,5,7
55:22 57:2 58:2

59:10,11 77:23
81:21 82:25 83:4
83:16,21 84:2
90:11 91:16 95:24
97:9 98:25 102:8
103:11 111:23
115:24 116:1
121:5,7 124:21
128:8,16 129:25
130:3,4,10,19,23
131:9 132:1
133:20 134:11
135:5,10,11,22,25
137:17 141:25
143:11,15,23,25
144:11 145:20
149:4,5,21 150:5
152:23,24 155:6
155:24 156:16,22
158:9 159:8,13,21
160:13,19 162:3
163:15 171:25
172:17 176:1
179:25 180:19,21
180:24 181:7,14
181:15
**evidenced** 100:1
**exact** 55:17 124:21
125:1
**exactly** 16:22 28:17
28:21 29:9 34:19
41:23 60:1 64:20
74:5 83:24 85:5
99:15 115:18
163:2,12,21
**exam** 175:10,15,17
**examination** 90:17
99:3,8 100:13,13
101:23 125:17
**examinations**
98:19,21
**examiner** 90:15
91:2,3,5 99:5
101:9
**examiners** 100:10
**example** 82:21
84:23 116:12

**exams** 175:8
**exception** 3:20
**exclude** 50:1
**excluded** 43:22
  49:13,17,20 51:4
**exculpatory** 124:2
**excuse** 44:22 45:20
  79:2 80:13 124:4
**exercising** 110:11
**exhibit** 12:15 21:1
  21:2,3 29:20
  31:22 32:14 33:14
  34:7,24 35:1 36:2
  39:24 43:17 45:5
  50:9 51:16,17,19
  51:21,24 55:7,11
  55:17 56:1 58:11
  62:4 69:1,2 97:15
  121:22 137:20
  139:1 144:20
  145:2 153:3
  161:14
**exhibited** 164:20
**exhibits** 53:10
  58:15 77:19
**exist** 90:12 92:9
**existed** 77:13 96:23
**existence** 125:25
**exists** 77:15 118:10
  125:9
**exits** 182:25
**expanding** 96:22
**expect** 117:7
**expectation** 14:20
  75:17
**expected** 170:24
**expensive** 179:10
**experience** 42:4
  144:16 171:16
**experienced** 37:17
**expert** 87:7 157:19
  170:25
**explanation** 67:9
  70:13
**expressed** 93:18
**extended** 123:8
**extent** 82:14 132:6

**extreme** 29:25
**eyes** 10:14 25:20
  148:20 150:19

**F**

**f2d** 4:8
**face** 170:1
**facilitate** 162:18
**facilitating** 33:24
  33:25 34:12
  161:10,12
**fact** 17:8 20:11
  21:22 23:21 25:1
  34:5 48:16 65:19
  68:7,18 69:19
  70:16 71:2,22
  73:21 78:11 82:18
  84:9 90:7 96:11
  98:15 101:17,23
  105:8 109:21
  121:6 130:14
  141:10,21 142:23
  143:18 144:10
  145:20 146:8,25
  147:18 150:14
  152:5 154:15,16
  154:19 162:23
  165:18 166:15
  168:25 170:4
  171:3 178:19
  183:25 185:2
**factory** 117:8
**facts** 4:10,15 6:18
  84:10 86:11
  107:22 134:7,9,14
  136:11,18,19
  171:24,25 172:11
  172:14,16,20
**failed** 56:20 83:25
**failing** 96:16,18,20
  97:2 167:19
**fails** 178:11
**failure** 83:22
  171:11
**fair** 82:8 83:9
  130:12 152:19
  179:11

**fairly** 12:5
**faith** 169:5
**fake** 108:20
**fall** 122:1 126:5
**fallacy** 169:15
**fallen** 37:13
**false** 21:4 33:17
  41:3 55:4,20
  115:25 124:2
  134:12 159:3,9,18
  160:15,16,17
**familiar** 170:13,25
  178:1
**family** 133:16
  180:13
**far** 181:4
**farm** 37:4
**fast** 14:6
**fault** 57:21 58:15
  58:18 140:20
**favor** 72:7 135:6
**favorite** 117:14
**fdic** 90:15 91:2
  92:3,5 125:12
  158:19 159:5
  160:2 173:10,11
  173:14 174:1
**fdics** 92:12
**february** 10:22
  92:3,8,10 175:11
**federal** 23:4 35:5
  39:16 98:10
  106:17 114:5
  171:14 173:5,7,8
  175:7,14,22
**fee** 46:2 178:23
  179:4
**feeling** 129:15
**feet** 157:3,5,5
**fell** 37:5 96:24
**fellow** 135:20
**felon** 152:5
**felt** 163:9
**fewer** 143:22
**fifteen** 127:16,18
**fighting** 140:25
**figure** 19:5 26:24

27:12 87:17
  136:16
**figuring** 98:8
  176:14
**file** 65:13 91:23
  92:2 110:19
**filed** 3:24 80:10
  125:16
**fill** 21:25 22:25
  24:2 122:6
**filled** 22:13
**filling** 17:4
**fills** 107:3
**finally** 107:25
**finance** 14:23
**finances** 23:11,16
  114:25 115:3
**financial** 10:7
  15:19 21:14 37:7
  37:17 63:8 67:12
  72:14 93:19
  100:14 110:5
  111:17,19 138:1
  164:12 177:9
  179:14
**financing** 116:10
  116:11,12
**find** 6:18 56:12
  84:12 85:13,18
  86:9 104:22
  113:23 127:12
  149:10 181:20
**finds** 69:12
**fine** 5:16 8:3 24:21
  24:22 44:3 47:25
  60:3 67:3,4 83:6
  87:24 92:5 184:21
  185:4
**fingerprints** 31:9
  114:17
**finish** 60:10 61:2
**finished** 80:8 111:8
**finishing** 132:18
**fire** 85:21 149:9
**firm** 69:22
**firms** 87:8
**first** 5:18,22 7:6

22:4 41:4 42:13
  42:21,23 45:2
  70:22,22 71:25
  79:24 81:24 85:23
  86:3 87:19 91:9
  92:12 94:15,22
  100:21 103:13
  104:19 105:2,3,12
  106:17,24 116:5
  116:20 117:18,19
  122:20 123:23,23
  136:13 144:21,21
  145:22 150:11
  159:7 160:13
  161:3 166:9,24
  172:23 176:23
  179:20
**fit** 136:19 172:12
**five** 17:21,22 18:3
  26:15 112:18
  113:1 116:13
  117:19 124:13,14
  124:22 145:7
**fix** 11:9,9,10
**flipped** 184:16
**floor** 1:14
**flores** 1:19
**florida** 72:9 145:1
  157:6
**flow** 34:21
**flurry** 31:3 143:4
**focus** 7:8
**folks** 20:24 21:8
  22:14 92:23 97:17
**following** 21:10
  23:9 98:18
**follows** 43:8 79:4
  80:14
**followup** 26:1,5
**foolishly** 109:2
**force** 60:25 88:6,16
**forced** 110:6
**forces** 133:24
**foregoing** 186:3
**foremost** 159:7
  160:14
**foreperson** 182:1

forget 108:16
forgot 95:6,6
  109:10 119:17
form 106:18
  107:20 134:3
  135:3,14
formal 118:20
former 164:17
formulated 136:6
forth 11:21,21
  16:11 26:18 98:16
  142:9 144:23
forward 5:21 32:5
  115:13
forwarded 145:15
  175:25
forwarding 33:7
  62:13 118:14
  145:19
forwards 28:11,12
  28:13,14 33:8
  89:20
found 92:24 105:8
foundation 52:8
  75:2
four 20:2,3,7 36:6
  107:15,16 180:5,7
fourperson 92:16
fox 1:13
frame 175:11
frank 17:11,12,19
  17:23 22:11,24
  27:23 28:20 29:11
  34:16 86:19
  103:25 115:23
  116:5 117:7,10,12
  118:20 119:1,2
  144:23 151:23
frankly 51:19
  105:6 113:24
frantic 140:15
fraud 7:21,21
  28:10,10 30:14,14
  30:15 33:15,17,20
  34:8 155:21 156:5
  158:11 160:25
  161:1 162:21,25

163:16 168:4,4
  169:7 180:14
fraudulent 53:23
frb 175:9
free 10:8 108:23
freedom 78:24
friend 18:23 29:22
front 178:22
fuhr 173:8
fulfill 141:12
fulfilling 133:21
full 22:2 84:16
  95:10
fuller 1:12 5:11
fully 36:18 53:13
  129:18 162:22
function 157:21
fund 30:22 117:1
  124:13,13 139:25
funded 19:8 72:21
  139:20 140:6
  144:9
funding 24:2 25:23
  62:17 65:23 66:7
  72:13 124:17
  138:9
fundraiser 157:25
funds 10:10 12:9
  16:16 17:13,14
  22:17 23:10,12,14
  24:14 26:3 28:3
  42:11 68:3 73:3,6
  78:14 95:15 97:8
  97:22 98:13,25
  101:24 114:25
  115:4,5,6,7,17,18
  115:19 117:21
  118:6,8 138:3,22
  140:13 141:15
  154:22 156:2
  167:11 174:23
  178:17 179:8
fungible 125:2
funny 147:8
funt 1:19
further 21:9 71:14
  103:11

furtherance 139:18
fyi 29:15,17

**G**

g 3:1 186:2
g118 121:16
g28 92:22
g30 94:14
g31 96:13
g64 114:12,19
g73 117:15
g75 97:25
g81 116:3
g87 119:12
g95 99:7
gaap 170:13
galab 62:20,20,23
  63:20 64:5,7,24
  70:18 100:21,22
  103:24 105:2,2
  108:16 148:12,12
  177:16
galabs 101:3 168:6
  168:8 176:23
  177:6,11,14
galeb 8:14
gallagher 186:2,14
game 82:8 83:9
  104:13 105:11
gandal 1:16
gaskins 112:25
  145:12,18,23
gaunt 114:20
  119:13,15 171:14
  173:7
general 72:2
  147:20 170:13
generally 88:7,8,9
  129:10 170:14,16
  170:18
generation 116:25
gentleman 180:11
gentlemen 7:15,20
  8:7,17,23 9:4,8,20
  10:18 11:19 12:7
  12:24 13:2,10,12
  14:15 15:5,12

16:7 17:10,15
  18:2,8 19:1,24
  20:2,19 21:21
  23:15,20 24:15
  25:11 26:4 28:3,7
  28:15,18,24 29:7
  29:21 30:11 31:9
  31:22 32:13,23
  33:3,14 34:14,22
  35:2 36:7,13,15
  36:24 37:9,20
  38:1,4,25 39:2
  40:1,18 41:2,13
  41:19 42:2,19
  61:15,19 62:9
  63:2,9,14 64:14
  64:23 65:9,17,24
  68:7,25 69:18
  71:4,18 73:8,14
  74:4,10,18 75:4
  75:18 76:14,23
  78:17 83:24 85:15
  85:19 103:14
  104:16 107:23
  108:25 119:24
  133:8,15 135:2,13
  135:23 136:5
  137:21 138:25
  143:17 150:6
  154:18 155:24
  156:4 159:2,20
  160:24 161:17
  163:11 164:25
  168:3 169:25
  171:12,20 172:17
  178:3,20 180:22
  181:10,16
george 8:14 9:9,18
  11:11,12,16 14:9
  14:10,14,17 15:14
  15:17 16:16,17,19
  16:23 17:12,23
  18:9 22:11,23
  24:24 25:4 27:7,7
  27:20 28:6 30:3,7
  30:8,10 31:7,15
  35:7,10,17,20

37:13 40:5,22
  66:20 71:19 72:23
  72:24 73:5 92:8
  93:20 101:10
  103:22 105:2
  108:13 110:17,23
  114:15,16 115:23
  117:6,10,12
  120:20 138:13
  139:4,12,21,22
  147:1 150:2,7,18
  150:22 152:15
  177:19
getting 11:23 13:13
  14:9 16:1 17:17
  24:9 26:13 28:23
  30:3,5 31:4,24
  33:2,2,9 34:12
  38:20 41:1,6
  61:25 73:23 75:6
  101:23 108:12
  120:17 139:12,14
  140:1 141:13,14
  146:10 152:23
  156:18 164:2,6
  167:11 178:24,25
  179:2
gibraltar 144:25
give 6:20,24 7:2,4
  11:3 13:18 25:4,8
  30:23 35:19 39:19
  39:22 42:11 64:18
  65:20,25 67:18
  68:21 74:23 84:16
  84:17 85:24 97:19
  97:20 118:6
  134:16 156:11
  163:8 167:20
  182:8
given 6:19 7:5 20:3
  20:4 25:15 28:5
  116:23 137:4
  173:13 184:17
  185:18
gives 174:12
giving 11:18 74:6
  94:19 172:2 183:6

**glenn** 173:8
**go** 5:18,21 10:24
    12:12,22 13:17
    15:7 17:25,25
    18:6 21:1 25:8
    27:11 28:4 32:5
    32:16 36:7,25
    37:11 41:9 44:17
    54:3,8 56:5 60:4
    60:12 61:2,4,4
    69:13 72:14 75:7
    78:12 79:15 85:3
    85:7 87:14,16
    88:15 90:4 91:1,2
    91:5 92:4 94:21
    97:10,12,15 99:7
    99:10 100:11
    101:8 105:14,14
    109:1 110:3 111:2
    114:19,21,22
    116:3,4 117:16
    119:12 121:24
    122:19,21 123:4
    126:24 129:23
    139:1,2 140:8
    144:20 145:4,5,22
    147:8,11 149:9,10
    153:3 154:8,9
    161:22 162:17
    172:23 180:16
    181:6 182:10
    184:18 185:12
**goal** 13:20 137:14
**goals** 137:11
**god** 185:22
**gods** 147:4
**goes** 3:23 8:22 9:19
    12:4 15:17,18
    22:5 31:6,8 36:10
    67:8,16 69:11
    71:9 92:15 105:16
    107:14 114:23
    117:5,8 149:7
    159:9 160:1 170:6
    174:20 178:13
**going** 3:15 6:20
    8:15 11:3,5,6,8,16

12:13 13:24,25
    14:14 17:2,13
    18:6 19:16 21:1,6
    21:7,7 24:8,18,20
    24:21,21,22 25:6
    25:8,11,17 26:8
    26:20,21,23,25
    28:21 30:8,10,12
    30:13,22,23,23
    31:11,13 32:2,2,3
    32:4 33:10 34:23
    35:22 36:21,23
    37:12 38:5,8,19
    39:9,10,10,12
    40:3,5,22 42:18
    46:15,21 47:20
    48:1,11 53:5 56:3
    59:15,25 60:24
    63:12,13 64:15,18
    64:19,19 66:7,8
    67:15 72:7,8,17
    74:22 75:6,25
    77:17 78:12 80:7
    80:16,21 81:13
    82:11 83:8 84:15
    84:16,24 85:1,6,7
    85:11,12,13,13,16
    85:22,23,24 87:11
    87:16 90:4 91:1,2
    91:5,6,24 93:14
    94:3 96:14,15
    97:14 98:19
    101:15,16 102:21
    103:9 104:23
    107:13 111:8
    112:4 113:5 115:9
    116:24 117:9,23
    121:5 122:14
    124:14 126:12,25
    129:10 130:22
    138:22 139:2,17
    139:23 140:2,6,9
    140:12,13 141:5
    142:9 144:22
    146:14 147:10
    148:17,18 149:4
    149:10 151:17

153:16 154:22
    155:13 156:7
    157:7 161:22
    162:21 163:2,13
    166:3,7 167:18
    169:20 171:22
    174:18,21 175:20
    179:5 183:7
**good** 3:2,4 6:5 7:14
    14:5 24:20 25:5,5
    25:16 31:19 33:1
    39:17,18 63:13
    64:1 67:5,6 76:16
    76:23,24 93:3,5
    96:7 100:6,7
    106:3 113:23
    119:6 120:7
    123:20 126:16
    131:23 133:4,9,10
    141:17 151:12
    165:13 169:5
    179:10 181:13
    182:22 185:23
**goodness** 68:14,14
**goose** 131:24
**gotten** 69:25
    120:17 132:21
**government** 5:18
    6:22 7:3 10:6
    33:20 40:1 43:16
    56:15 69:2 78:3
    80:3,6,23 83:15
    83:19,25 84:5,6
    89:12 90:1 93:2
    93:11 96:10,18
    98:2 99:9 100:5
    100:16 101:15
    105:7,25 106:19
    108:2,20 111:10
    111:21 112:14
    114:1,2 115:1,8
    115:12,17 117:25
    118:5 119:12
    120:6 122:13,17
    123:11,22 127:7
    129:14,18 131:19
    133:15 134:19,22

136:6,13 137:12
    137:19 138:15,24
    139:1 140:8,14
    141:15 142:1
    145:2 146:6,21,23
    149:24 150:15
    153:3 154:1,21
    156:2 158:14
    159:9,17 160:6,6
    160:23,25 161:13
    162:4,9,14 163:15
    165:19,21 166:10
    166:11 167:13
    169:1,11 171:20
    172:10 173:19
    178:15 180:17
    182:2 183:5 185:2
**governments** 5:21
    20:25 21:2,3
    29:20 31:22 32:14
    33:14 34:6,24
    35:1 36:2 55:11
    62:4 69:1 77:12
    77:18 81:17 83:22
    97:8 136:10,19
    156:5 158:22
    159:10,10 167:3,6
    181:1
**grab** 40:3
**grand** 104:12
**granted** 32:21
**graphic** 172:23
**grave** 74:12,14
**great** 39:20 85:4
    127:6 135:16
**green** 147:4
**greenblatt** 1:19
**grounds** 54:13
**group** 154:9
**guess** 26:24 78:2,17
    78:18 89:25 91:7
    94:5 95:21 96:4,7
    98:21 101:22
    107:12,13 108:24
    110:15,16 115:2
    117:4 119:18
    134:2 157:11

158:22 163:10
    166:8 176:8 181:2
**guessing** 96:7
**guidance** 77:11,15
    86:25 87:4 88:25
    89:21 170:13,16
    171:6
**guided** 81:25
**guilt** 4:11,16 79:12
    79:12 127:10
**guilty** 75:23 80:3
    80:19,19 84:12
    85:18 86:9 103:25
    118:8 127:13
    134:19,23 136:4
    181:21
**gun** 64:12,15
**guy** 30:9 42:5 86:20
    90:14 94:7,8,17
    104:11 105:5,24
    106:2 107:12
    112:18 114:20
    118:11 123:2
    124:22 141:16
    144:5 146:9
    152:16,20 153:11
    155:7 157:4,10,18
    164:16 170:22
    171:13,24 173:18
    174:7
**guys** 30:2 37:23
    38:3 102:20
    106:11 109:7
    110:4 113:1
    139:11 143:7
    157:3

---

**H**

---

**half** 23:10,11,15
    24:13 36:6,12
    73:14 86:11 88:23
    114:24,25 115:2,3
    157:6 182:9
    184:22
**halloween** 146:16
**hand** 7:10 11:7
    60:25 105:24

**handedly** 109:15
**hands** 35:24
**handy** 45:10
**hanging** 85:10,20
**hannison** 11:1
  18:20 45:2,4,11
  46:11,16 47:16
  89:10,20,23 93:6
  93:7,11 95:13
  107:16 112:16
  146:1,3 170:3
  174:3
**happen** 32:2,2 40:5
  64:16 99:16
  103:10 118:13
  143:18 155:13
  162:7
**happened** 9:9
  17:22 19:18 37:25
  64:21 68:17 83:24
  93:25 99:15,17
  102:11 109:7
  119:4,21 144:10
  147:15 149:14
  150:21 164:23
  175:15
**happening** 9:18
  35:10 46:19 64:6
**happens** 12:8 20:21
  36:17 37:8 52:16
  66:19 67:7 108:9
  110:4 114:7 145:9
  147:8 154:10
  170:19,20 176:20
**happy** 100:6
  167:13
**hard** 98:8 143:13
**hartline** 1:4,12
  4:14 8:8 11:14,22
  19:25 20:22 21:3
  26:19 27:4,23
  28:12 29:8,14
  30:9 31:8,23,25
  32:9 33:9 34:20
  35:22 37:3,16
  38:24 39:8 41:3
  51:3 62:14 63:11

66:5 67:8 68:12
68:19 69:25 70:12
73:16 74:11 77:5
77:5,6,13 78:19
79:25 80:7 83:16
83:20 84:12 86:5
86:22 87:12 89:10
89:20,22 90:10,18
90:20,22 91:11
93:4 99:21 101:19
101:19 102:18
105:14,18 106:6,7
106:10,25 107:8
107:18 110:25
111:11,22 112:8
113:19 115:22
116:6,7,8 117:2
117:11,13,17
120:11,20,20,22
121:6,18 122:3,7
122:10 124:1
125:5,13 126:21
127:12 128:10
129:1 134:17
137:13 138:4,14
139:10 140:21
141:3 145:11
146:1,3,13,19
147:2,5 148:2,9
149:1,7 156:1
159:5 160:2,14,21
176:20
**hartlines** 114:14
  116:2 123:12
**hasnt** 156:21
**hatched** 136:7
**hated** 172:5
**havent** 120:7
**head** 64:12,15
  147:14
**health** 13:10
**healthier** 8:11,13
  9:23,25 19:20
  26:13,14 42:11
  74:3,9 75:7
**healthy** 10:10,14
  14:5,6 25:20

38:15 98:18
**hear** 44:21,23 76:3
  94:6 95:24 96:17
  96:19 105:22
  108:4 112:17
  113:6,12 119:2
  120:9,9 150:4
  154:19 156:25
  158:12 164:16
  182:7
**heard** 14:21 35:15
  77:22 78:7 84:7
  86:17 90:19 91:17
  92:5 94:10 96:6
  97:18 98:22 108:4
  108:7 109:11
  126:7,9 150:22
  151:10 155:7
  165:3 176:15
**heart** 180:15
**heck** 109:24
**hed** 125:15
**heels** 72:25
**help** 10:7 17:6
  31:16 160:21
**helping** 66:15
**henry** 90:13 125:16
  173:14 174:1
**heres** 62:10,12 94:3
  114:19 118:20
  145:23
**herring** 113:22
  122:11 166:18
**hes** 15:8 17:4,5
  20:3,4,4,7,10,13
  20:13 22:9 28:23
  30:23 34:6,12,20
  35:11 37:19 40:11
  40:11,12 41:5
  44:10 63:7,11,12
  63:13 64:7,8
  66:24 67:15 70:11
  74:13 84:16 87:7
  89:13 102:18
  103:23,24 104:1
  104:12,13,14
  105:14,15 106:3,4

106:9,9,21 107:3
107:9,10,13 111:8
111:15 113:9,10
113:13,14,16
114:16,16,17,20
119:21 123:1
125:7 126:5
129:18,20,20
130:13 131:15,16
138:10 139:20
142:21 147:10,24
149:23 151:15
152:18 153:15,16
157:10,14,20
159:23,24,24
162:22,22,22
163:24 165:3
169:18 170:5,7
171:24 177:16
179:15,16 181:3,5
**hesitate** 84:21
  85:13 136:1
**hey** 17:24,25 19:3
  19:13 25:6 30:13
  63:6 90:24 91:3
  94:3 102:20
  105:18 106:11
  112:25 113:18
  117:24 118:15
  119:1,3 120:10
  141:16 142:18
  146:24 150:16
  152:15 155:12
  165:24 167:9,18
  174:14 178:15
**hid** 90:22,23
  107:18
**hidden** 91:8 99:5
  119:25 120:16
**hide** 19:11 73:22
  75:15 77:6,16,25
  91:6,7 101:13,14
  105:21 143:20
  154:15,16
**hides** 72:18
**hiding** 77:16 100:9
  101:10 112:24

115:13 120:21
146:22 149:14
**higher** 108:5,8
**highest** 135:2,14
**highlight** 99:11,13
  100:16,18
**highlighted** 48:17
  48:19 101:9
**highlights** 43:20
**hilary** 123:16,17,21
**hired** 106:25
**hold** 49:4 53:5
  59:16 60:1 111:21
  130:17
**holding** 24:5 38:10
  39:7,16 43:10
  45:15 138:1,1,3
  138:20 139:6
  147:2 152:10
  153:13 156:20
  157:13,25 164:6
  164:12 169:17,18
  175:9,16 177:10
  177:24 178:17
  179:7
**holdings** 15:19
  21:14 72:14 93:19
  110:5 111:17,19
**hole** 136:10 150:13
**home** 115:14
**honest** 50:17
**honor** 3:4,21 4:20
  4:24 5:3,25 6:23
  7:13 42:25 44:19
  45:23 48:5,21
  49:13 50:10,16
  51:7 52:3 53:15
  53:18 54:23 55:5
  55:15 56:7,14,16
  58:14,18 59:4,19
  61:11 65:25 76:10
  76:19 78:25 79:5
  79:16,17 80:11
  81:2,4,10 82:9
  83:11 84:15 85:16
  126:11 132:4,9,12
  133:7 134:6,7

184:25 185:21
**honorable** 1:6
**hooked** 14:11
**hope** 9:1 36:17
127:5 132:22
**hopefully** 5:10
133:12 184:22
**hopes** 83:15
**hoping** 24:17
**hot** 26:17
**hour** 15:18 88:23
124:25 182:9,9
184:22
**hours** 14:16 31:5
71:19,22 123:15
126:22
**house** 13:14 72:9
84:24,24 85:4,5,8
85:9,12 164:18
170:23
**howard** 66:13,15
66:19 67:8 69:6
69:22 120:16,19
120:20,22,23
129:14,22 130:7
142:20 146:20,24
147:3,5,6,12,16
147:21 157:1,4,8
179:21
**howards** 147:22
**hundred** 21:14
**hunter** 12:15,16
94:7,7,23 95:16
173:10
**hurdle** 27:8,10
**hurry** 96:12

**I**

**id** 12:1 28:25 32:16
42:25 46:23
102:22 128:1
155:23 159:20
160:3
**idea** 39:17,18,20
56:4 98:3 141:18
150:16 152:24
168:16 169:20

**identification** 2:2
**identified** 71:11
120:5
**identifies** 72:13
**ignall** 1:8 3:9,18,22
4:23 5:3,6,24 6:22
47:3 56:16 78:25
79:5,17 80:11,15
81:1 82:9,20 83:6
83:11 89:4 127:22
127:25 128:4,6,23
129:3,8 130:6
131:2,8,11,21
132:3,8,11 183:4
183:17 184:11,22
185:7,10,18
**ignore** 114:3
**ii** 1:6 156:3
**iii** 21:2 159:2,4
**ill** 5:22 48:1 49:4
87:17 96:15 130:8
133:12 184:18,23
**illegal** 88:8 90:25
164:14
**im** 3:15 8:5 17:3,13
20:5 21:1,1 32:16
34:16 39:12 43:11
44:21 46:9 47:17
47:25 48:16 49:10
51:10,11 52:10,11
52:20,21,22 53:1
53:5 54:19,23
55:1 56:24 57:18
58:12,21 59:15,25
60:24 62:11 64:18
64:19 72:17 74:22
77:17 79:5 80:7,8
85:19,23,24 87:16
90:4 91:24 95:14
98:8 99:12 103:9
104:23 108:13,14
108:16 109:14
110:11 113:5
117:24 118:8
120:21 126:24
130:5,7,22 131:10
140:18 146:24

147:7 148:14
151:17 183:6,7,10
**imagine** 14:22
106:1
**immediately** 9:19
36:24 144:10
**immunity** 131:3,10
**impacted** 126:2
**implication** 130:9
130:10
**importance** 84:21
**important** 6:11
19:4 36:3 39:14
41:4 63:4 65:19
75:13 76:1 79:20
83:17 97:3 99:2,3
109:11 112:22
114:13 116:4
125:18 126:8
133:24 136:1
137:19 155:3
165:12 182:17
**importantly** 93:8
116:1 158:3
**impression** 52:11
128:19 163:8
**improper** 57:2
92:11 164:13
**improve** 68:4
**improvement**
68:23
**improvements**
121:25
**impugn** 130:14
**impute** 170:11
**inaccurate** 58:11
**inadmissible** 48:6
51:23,24 53:1
**inappropriate** 4:13
46:8 54:4,12
79:10 80:16
128:19
**incentive** 106:6
179:14
**inclinations** 172:15
**included** 33:3
170:8

**includes** 39:9 62:8
**including** 41:7
152:1
**income** 139:25
**incredible** 134:13
**independent**
100:13
**independently**
153:6
**indicate** 166:3
**indicated** 46:14,15
46:21 131:19
149:24 151:2
160:10
**indicates** 97:11
138:5
**indication** 154:14
166:7 169:20
**indict** 80:6
**indictment** 54:4,7,9
80:5,7,9,15,20,25
81:4,7,25 82:2,3,6
82:7,15,18,21
83:8,9,13 136:14
136:25 156:3
160:9 161:5 181:4
181:21
**indiscernible** 27:24
51:4 54:11 57:3
61:9 64:16 72:22
176:7 185:4,11
**individual** 93:18
133:25 156:19
157:19 167:25
177:15,25
**individuals** 77:9
142:9 172:8
**indulgence** 60:16
**inescapable** 146:8
**infamous** 112:14
**infer** 24:17
**inference** 129:4
130:13 184:12
**influence** 65:19
82:12 149:20
152:15 174:5,7,15
177:1,4

**influenced** 74:6
173:24
**information** 11:16
11:23 13:8,9,11
13:11,15 19:7
20:23 21:7,17
23:9 25:7,14,16
34:5,21 35:6
43:23 67:22,23,25
68:18 71:23 72:18
72:18 75:12 78:19
91:20 92:1 93:12
95:10 99:23
118:21 141:23
145:13,19 153:24
161:5,16,22
162:12 168:17
173:13 175:13
176:20
**infused** 32:19
92:20
**infusion** 20:18
**injected** 21:15
**injection** 13:2,2
14:21 94:25
**injured** 127:4
**innocence** 4:11
79:25
**innocent** 80:1,1,2
134:18,21,21
**inside** 144:16 152:2
157:20 168:21
176:25
**instance** 126:19,19
**instruct** 6:17
**instructed** 59:16
65:25 154:3,9
**instructing** 59:7
162:1
**instruction** 3:11
17:11 47:9 53:16
156:10
**instructions** 3:16
5:4 7:5 66:1
132:16 137:4
144:24 161:16
162:10 169:3

182:8 183:20
184:16
**instrument** 81:16
**instrumental** 74:16
**insurance** 96:22
**intended** 68:2
**intends** 104:13
**intent** 7:22 156:24
168:25 169:2,4,6
169:7 170:10,12
170:12 171:11
**intention** 7:23
16:12,13 17:6
**interest** 93:18
104:12
**interested** 62:12
66:16 92:25
**interesting** 85:25
95:11 133:13
**interestingly** 24:23
**interests** 137:9
**interference** 99:21
**internal** 99:18
100:4 116:25
157:14 168:18
174:9
**internally** 169:9
**interposed** 58:20
59:3
**interrupting** 8:1
**interviewed** 136:13
**intimately** 63:19
**intricacies** 170:24
**intricate** 171:6
**introduce** 77:19
82:23
**introduced** 148:23
150:16
**invest** 11:12 16:3
16:18 18:22,25
23:22 29:16,18
30:4 32:8 33:5
72:7 73:13 93:1
93:18,20 94:24
111:20 122:7
139:13,24 150:18
151:9 153:9,16,20

153:25 157:24
161:18 163:18
165:9 167:4,16,17
167:20 168:11
177:16,22
**invested** 38:22
66:17 77:9 111:18
117:20 147:1
164:3,11 167:1
179:23
**investigation**
182:19
**investigations**
104:20,21
**investing** 15:21
92:25 113:11
140:24 154:13
**investment** 12:21
16:10 18:7 19:14
21:5,10 22:2,8,9
22:10 23:3 27:15
30:24 33:1 35:9
68:9 71:3 72:14
73:1,3,12 78:13
93:22 95:18,21,22
95:23,25 96:1
97:17 98:4 99:4
103:1 104:10
107:4 110:21,23
114:8 122:24
123:4 126:1
129:16 138:7,11
138:20 139:6,25
144:10 146:11,17
149:17 150:8,24
151:13 152:25
154:20,25 155:15
156:18 157:18,20
161:6,20,21
164:18 165:5
166:6 167:23
168:1 169:17,22
170:22 177:11,14
177:15,19,19
178:2
**investments** 37:11
70:14,20 88:21

121:10 141:6
168:8 177:10
**investor** 11:24
12:20 21:11,13
31:7 33:25 37:23
94:24 95:3 111:15
138:5,11,12
139:21 165:2
166:21 177:20,24
**investors** 9:14,15
32:25 37:12 53:24
64:12 66:16 120:2
120:2 138:6
140:24 141:4,11
141:17 161:2
165:2,18 178:25
**invests** 164:5
**invited** 183:18
**involved** 11:2
28:22,23 29:9
31:16 34:15 63:19
119:7,9 148:4
151:20 157:14
158:1 165:4 166:3
166:5 168:15
170:6 172:21
176:19 179:16
**involvement** 27:20
29:1 31:6 177:23
**iota** 18:12
**irrelevant** 114:10
**isnt** 17:1 34:1 87:22
93:3 96:7 109:23
111:7,25 135:3,8
135:19,25 141:17
145:18 155:13
157:3 169:6 171:2
**issue** 3:23 4:5 11:8
12:13 44:8 46:20
49:13 79:7,12
87:19,20,20 88:2
91:13,14 106:20
127:25 129:13,16
129:24,25 147:10
150:11 152:22
155:14 157:22
158:17,20 161:15

161:19 162:6
184:15
**issued** 154:23
**issues** 3:9 5:8 10:21
10:22 12:19
148:11 157:11
174:10
**item** 52:15
**iv** 159:3 160:1
**ive** 4:18 49:12
103:5 108:13
109:14 119:9
132:20

———————

**J**
**j** 1:8,12,18
**jail** 78:21 106:4
**jamie** 186:2,14
**january** 67:9 122:2
**jar** 105:24
**jeff** 18:19 93:6,7,11
174:3
**jennifer** 1:9
**jeopardize** 24:9
**jive** 25:2
**job** 87:9 99:18
100:6,7 106:3,11
107:9 125:6
147:14 171:19
178:3
**jobs** 99:19 106:4
**joe** 18:14 106:14,21
106:23 174:7
**joel** 1:16 111:14
**john** 1:12 172:2,13
173:1
**join** 49:11,17
**joint** 132:16
**jones** 1:6 134:16
**joseph** 18:14 19:3
68:8 173:15,17
**judge** 1:6 42:2
57:15 134:5,7,16
156:10 165:11
**judges** 134:6,8
185:23
**judgment** 55:21

86:11 89:1,5
165:13 171:7
181:13
**judgments** 67:24
**july** 20:25 21:8
39:6 114:23,23
176:8
**june** 13:24,25 14:3
14:13,16 19:22
20:12,16 21:5,15
22:9,10 31:3
32:20 72:3,22,24
92:18 93:10,19
94:4,11,13 95:20
96:12,12 97:6,11
97:16,21,21
100:15,19 111:1
117:24 119:4
122:25 123:3
124:15 137:22
139:2,8 143:5,9
145:5 159:5
**juror** 5:1 133:22
**jurors** 60:2 181:19
**jury** 1:5 3:25 4:3
4:10,12,13 5:4 6:3
6:7 43:5,22 45:23
46:22,22 47:10
50:15 56:14 57:3
58:10 61:14 76:8
76:13 79:8,8
80:16,21 81:8,15
82:12,12 103:7
127:17 128:14,18
129:3 130:8
132:16 133:3,9
134:4 136:5 137:3
169:3 172:4,13
181:25 182:11,14
182:25
**jurys** 56:3
**justice** 135:6

———————

**K**
**keep** 20:13 27:1
63:13 65:4 71:8
106:8 112:11

133:12 140:16
147:13,14 150:23
**keeping** 23:23 64:1
**kept** 167:10
**kevin** 86:19 173:3
**key** 143:2 174:22
**kim** 21:3 28:11
68:18 117:17
**kind** 14:19 37:11
52:13 87:3 94:8
102:22 128:9
135:8 149:25
150:8 173:25
182:21 184:18
185:14
**kinds** 171:15
**knew** 11:15,19,24
15:9 21:25 31:12
63:20 71:7 74:4
87:3 90:10 92:9
124:3,12,16
125:21 144:7
146:8 156:17
160:11 163:2,12
163:16 164:2,2,3
164:13
**knott** 176:5
**know** 9:8,24 10:18
10:22 11:9 12:21
13:19,22 14:15
16:8,9,10,25 17:3
17:8,23 18:3,15
18:21,22,24 19:4
19:17 20:7,20
21:6 23:23 24:1,2
24:23,23,25 25:17
26:11,18 27:17,18
27:19 29:11 30:17
30:25 31:20 34:4
35:21 36:7,24
37:3,4,8 38:2,4,11
39:5,15 40:10
41:14,16 42:5
44:5,10,11 47:23
51:1 56:17 59:12
60:21 61:25 62:4
62:10,18 63:3,9

64:20 65:6,22
66:8,15 67:4,7,19
69:8 70:6,9 73:20
74:12,20,21 77:13
77:14 78:8,20
87:4,10,20 89:9
89:10,13,14 90:18
90:25 91:12,23
92:3,7,7,15,16,17
95:9,11 96:5,6
97:13 102:7,16,21
102:22,25 103:2,3
104:14,17 105:5
105:20 110:18,25
112:18,20 113:1
113:20 116:17,22
117:25 118:5,5,6
118:17,24 121:4
121:19 122:8,9,11
122:14 123:13,25
124:19,20 125:1
126:13,25,25
129:20 133:1
138:11 141:16
142:3,19 143:19
143:22,23 144:18
145:24 146:17,24
146:25 147:7,25
148:16 149:3
150:19 151:2,5,20
151:24 153:2,2
154:1 155:12,14
156:15 157:2
158:17 159:16,18
160:16 163:20,23
164:1 166:9,25
167:8,9 168:6
169:9 170:5,22,24
171:13 180:3,16
180:25
**knowing** 49:17
71:7
**knowingly** 7:23
**knowledge** 86:4
91:13 130:15
149:21 156:11,23
158:25 159:22

170:9 171:3
**known** 87:12
102:12 126:14
144:3 154:25
168:21 169:25
171:18
**knows** 17:3 20:10
20:11,23 34:19
40:5 149:17
162:21 164:4,10
164:11 185:17
**koch** 93:11 94:3,5
95:17 102:22
155:8 173:11
**kpmg** 20:6 69:9,18
73:25 77:12 86:11
86:17 87:8 89:20
100:3,7 105:4,7
125:10 142:24
148:7,14,14,15,16
149:3,6 158:17
170:25 171:9
174:13
**kpmgs** 70:5 176:18
**kreskin** 159:23
**kwinky** 71:3

---

## L

**lack** 181:15
**ladies** 7:15,20 8:7
8:17,23 9:4,8,20
10:18 11:19 12:7
12:24 13:2,9,12
14:14 15:5,12
16:6 17:10,15
18:2,8 19:1,24
20:2,18 21:21
23:14,20 24:15
25:11 26:4 28:3,7
28:14,17,23 29:7
29:21 30:11 31:9
31:21 32:13,23
33:3,13 34:14,21
35:2 36:7,13,15
36:24 37:8,19
38:3,25 39:2 40:1
40:17 41:1,13,19

42:2,18 61:15,19
62:9 63:2,9,14
64:13,23 65:9,17
65:24 68:7,25
69:18 71:4,17
73:8,14 74:4,10
74:18 75:3,18
76:14,23 78:16
83:23 85:15,19
103:14 104:16
107:23 108:25
119:24 133:8,14
135:1,13,22 136:5
137:21 138:25
143:17 150:6
154:17 155:23
156:3 159:2,20
160:24 161:17
163:11 164:25
168:3 169:25
171:12,20 172:17
178:3,20 180:10
180:22 181:10,16
**lady** 176:6
**land** 78:10 114:7
138:17
**lane** 155:17
**larceny** 180:15
**larry** 27:4 29:24
113:7,8,18 119:7
139:8 147:19
**las** 47:22 48:24
**late** 74:12 93:1
133:11
**law** 6:14,17 7:6
77:7,10,15 86:7
88:21,22 102:8
111:11 118:4
123:8,10 125:20
125:22 134:8,15
136:21 159:1
162:20 164:17
170:20 181:20
182:8
**lawabiding** 126:15
**lawful** 126:15
**lawyer** 67:16 113:7

113:7,13,14,14,18
119:7 123:2,2,20
123:20 124:11
127:3 129:23
147:19,21,24
158:5,9 164:9
**lays** 29:21
**lc** 46:10
**leading** 185:14
**leads** 128:14
130:10 172:12
**learn** 103:22 137:3
152:7 155:5 169:3
180:4
**learned** 136:12
144:8
**learns** 176:18
**leave** 78:16 130:8
177:18
**leaving** 102:19
155:8 184:18
**left** 61:22 128:18
181:17
**legal** 5:6,12 67:14
67:21 84:16
128:25 132:17
174:12
**legitimate** 151:10
**legitimately** 156:21
**lend** 104:4 108:21
**lending** 180:2,4,6,8
**lends** 103:16,17
**length** 6:19 7:5
**letter** 3:12 25:6
27:24,25 28:1,11
28:12,23 31:6,7
32:14,15,18 41:14
55:2 57:24 58:7
68:13 70:12,22
73:16 94:2 95:12
105:7 114:19,22
116:6,8 117:4
122:16,18 137:22
166:2
**letterhead** 22:24
117:6
**level** 114:10 170:15

171:6
**levels** 10:24 93:14
**leverage** 139:23
140:1 150:24
**levin** 8:14 9:9,18
11:11,12,16 14:9
14:10,14,17 15:15
15:17,22 16:5,14
16:16,18,20,23
17:23 18:10 20:9
20:12 21:25 22:12
22:23 24:24 25:4
27:20 29:16,17
31:7,15 35:7,11
35:17,20 40:22
66:20 68:4 69:12
70:17 71:19 72:1
72:5,23,24 73:5
92:8,25 93:1,20
96:24 99:4,4
100:19 101:6,10
103:23 104:19
105:2 107:7,11
108:5,13 110:11
110:17 112:4
113:2,9,11 114:16
115:23 117:11,12
120:21 121:10
122:24 124:14
129:16 138:13
139:4,11,21,22
144:2,24 147:1
148:11 150:2,4,7
150:22 151:14,16
152:16 168:12
175:24 177:19,20
**levins** 17:12 28:6
37:10 69:14 72:11
110:23 114:15
116:13 117:6
124:17 145:24
146:17 176:25
**liable** 110:16 111:5
**lie** 20:13,15 61:23
62:13 66:2,2,9
74:13,14 77:5,25
**lied** 20:10 77:24

90:11 107:19
**lies** 73:9
**life** 84:22 119:10
136:2
**liked** 96:18 154:25
**limine** 3:24
**limited** 49:6 88:10
185:1
**line** 19:15 28:15
48:15 64:14,16
68:2 91:21 116:13
116:15 117:7,19
122:23 123:7,21
140:23,24 163:17
164:15 167:12
171:4 179:12
180:10
**lines** 65:3,5 116:20
**linkage** 124:16
**lipstick** 9:24
**liquidity** 72:2
**lisa** 11:22 12:15
20:16,16 41:4
62:6,10 93:11
94:2,3,5,8,10
102:22 145:11,25
155:8 173:11
**list** 173:23 184:10
**listen** 6:15 15:7,9
19:24 91:10 124:7
126:20 147:13
149:7 182:20
**listened** 77:2 127:2
**literation** 113:8
**litigation** 135:3,15
**little** 5:8 12:6 14:8
37:2 78:12 84:4
86:13 87:14 91:14
91:22 100:23
123:23,24 124:6
131:4 136:24
174:16 175:15
182:4
**live** 78:10 112:4
126:15
**lived** 93:15,16,17
171:4

**living** 138:17
**llp** 1:13
**loan** 8:23,23,25 9:7
9:10,18 10:1
14:17,23 15:4,15
15:24 16:1,2,22
16:23,24,25 17:17
18:10,11,13,16,18
18:20,21,25 19:4
19:7,14,23 20:9
20:12,19,20 23:2
23:21 24:19,25
25:4 28:13 30:3,6
30:6,23 31:4 32:6
32:6,7,12 33:10
33:10,24,25 34:12
35:13,13,25 36:1
36:5,6,13,18,20
40:6,15,20,22,23
41:20,21,22,23
42:8,16,22,23,24
44:12 46:10 47:23
48:18 55:3,20
57:5,24,25 58:8
59:8 62:8,19,22
64:18,22,25 65:11
65:12,13,14 66:20
66:22 67:4,6 68:1
68:1,3,6,9,16,22
68:23 69:3,12,13
69:14 70:8,8
71:12,17,19,21,21
72:1,6,6,17,24
73:1,11,15 87:24
99:4 100:16,19,21
100:22 101:1,7,16
104:14,14,19,25
105:1,13,15 106:2
106:10,11,12
107:7,11,14,15,25
108:5,6 109:11,12
109:21 110:24
111:5,16,16 113:1
116:17 121:11,25
123:25 124:8,13
124:17 139:5,13
139:15,20 140:2,6

144:3,6,9,12
146:5,5,9,25
148:11,11 150:17
151:6,8,19,21
152:2,12,14,19,23
152:25 153:17,18
153:22 155:1
156:18,19 161:5
161:10,12 162:2
162:16 164:2,2,6
164:10 168:6,14
173:19 174:4
176:23,25 177:4,5
177:6
**loaned** 104:9
112:18
**loans** 8:13,13,15,18
8:19,20 9:17
40:17 63:4 65:18
69:11 70:14,17,20
70:24 71:2,5,9,13
71:24 73:17,20
74:2 105:11
109:13,16 121:14
122:20 144:3,5
148:12,12 168:5,6
168:8,21 170:2
176:21
**located** 68:5
**lock** 127:7,8
**lockney** 148:10
174:9
**lodged** 130:20
**logan** 63:18
**logney** 69:10,23
**long** 13:18 91:24
98:8 109:22
113:15 119:17
126:24 155:9,9
**longer** 59:21
146:18 182:5
**lonnie** 99:17
**look** 8:11,12,16
9:16,21 11:21
12:16 15:14 16:21
17:10 18:9 19:20
21:18 28:15 29:9

29:25 30:18 33:5
34:15 35:25 36:5
36:19 37:6,16
39:23 41:20 42:13
50:20,23 56:6
66:4 69:12 70:21
71:18 74:24,24
85:4,9 86:13
87:15 89:23 94:21
99:18 104:6
106:15 107:10
114:12 115:11
121:21 122:15
123:20 126:18
135:24 137:16
142:18 144:19
151:16 172:24
173:22 174:16
181:7 185:13
**looked** 19:12 65:13
100:10 102:7
104:18,19 122:21
**lookey** 101:10
**looking** 29:16,17
34:24 59:12 73:19
73:19 104:21
106:2 115:9,13
116:9 148:15
163:20 180:24
**looks** 103:10
**loop** 17:5
**lose** 178:13 180:3
**loss** 9:6 136:22
180:22
**lost** 75:19 121:10
**lot** 12:8 22:12 29:1
29:2 35:15 37:10
40:11,11,12 86:1
96:14 103:18
117:2 133:20,21
174:17 182:22
**lottery** 109:6
**love** 113:23
**lump** 179:2
**lunch** 5:19 6:25
56:3 60:2,10,10
60:16 75:25 76:5

**lunchbreak** 5:10
**lying** 7:21 20:8

**M**

**m** 1:4,4 28:15
76:11,11 127:20
127:20 146:10
185:24
**madiani** 19:3 68:8
106:15,21,23
121:8,12,17 122:1
174:7
**main** 64:14 171:4
**maintain** 20:13
**major** 176:19
**majority** 42:15
**makers** 154:21
155:18,20
**making** 9:12 26:14
40:15 41:10 42:11
56:23,24 71:20
74:3,8,9 95:9
102:24 117:2
131:11 136:1
**man** 37:6 78:21
103:17,20 104:5
104:10 105:18
134:18 152:3
163:3 171:22
180:13,13
**manage** 12:13
**manageable** 12:20
**management** 21:20
71:15 93:13
137:24 165:4
**managements**
62:12
**manager** 107:9
144:4
**manages** 42:5
**managing** 29:15,23
34:16,16,17,17,21
37:22 142:12,13
**mandiana** 18:14,15
**manipulate** 172:11
**mans** 78:24
**mark** 18:19,23

29:23 63:21 89:25
107:8,8 111:24
113:12,17 118:25
139:9 140:22
157:9 174:4
**market** 1:13,24
63:9
**martiz** 22:7
**mary** 173:16 174:2
**massachusetts**
172:8
**massacre** 172:3
**material** 6:11 66:2
96:3 155:3
**matter** 25:4 59:2
76:4 78:11 80:25
84:9,21 101:18
126:19 134:15
141:21 179:3
**mattered** 78:2 96:3
102:12
**maturity** 41:20
**mcgladrey** 100:2
**md** 1:17
**mean** 10:13 19:2
33:24 34:9 36:9
37:6 42:13 48:4
50:7 61:2 65:2
66:16,22 69:24
70:7 71:4 85:11
89:3 95:22 106:1
116:9 127:4
131:25 142:14
158:24 165:11
184:3
**meaning** 9:7 16:15
124:12 135:24
141:6 171:8
**means** 7:21,23
78:17 80:5,6
85:12 87:20 95:1
110:25 117:22
134:10 170:19
**meant** 10:14 51:8
75:3
**measure** 119:6
**meet** 27:15 39:12

62:15 96:4 149:19
**meeting** 26:15
95:22,24 102:1
155:15
**meetings** 176:4
**mellon** 116:14,15
**meltdown** 63:8
**member** 78:14
94:16
**members** 6:7 18:20
88:16 107:15
133:17 144:3
181:25
**memorable** 123:17
166:23
**men** 81:18
**mention** 18:12 28:5
28:12 95:6,7
154:19
**mentioned** 64:11
71:12
**mere** 156:11,12
**merely** 83:13,14,21
118:14
**messages** 142:25
155:7
**met** 40:8,25 41:11
75:9 92:18 126:1
**metcalf** 26:2 28:2
31:14 117:17
118:15,22
**michael** 1:18
**microphone** 8:2
**midatlantic** 1:23
**middle** 50:13,17
102:23 123:19
185:7
**mighty** 91:15 96:5
**million** 11:13,24
12:20 13:3,4,14
13:18,20 14:17,21
15:6,7,13,16
16:24 17:25 20:17
21:4,11,13 22:8
22:10,20 23:2,11
23:16,16,21 24:13
24:18,19,19,25

25:9,10,12,18,25
26:7,7,8,14,15
27:2 28:6,13
29:16,18 30:3
32:10,12,19,22
33:3 35:12,15,17
35:23 36:6,10,12
38:21 40:7 41:12
41:15,17,19 42:16
61:24 62:6,7,7,8
62:15,18,19 63:18
65:7 72:1,6,17
73:7,12 74:11
75:9,20 87:22
92:20 93:18,21
94:25 95:4 101:1
101:2 107:12
108:14,14 112:18
113:1 115:10,21
115:21 116:13,14
117:20 124:13,14
124:17,22,22,23
124:24 139:13
140:25 145:24
146:9,11 147:1
151:8 152:19,20
153:19,20 154:5,6
154:8 159:6 160:3
162:15,16 164:3,3
164:5 167:20
**millions** 63:3,5
**mind** 30:17 59:15
90:25 120:11,12
159:24 180:14
**minds** 97:14 105:5
181:9 182:19
**mine** 109:4,7
119:19
**minimum** 94:24
**minute** 28:16,25
37:1 47:12 123:13
**minutes** 17:21,22
18:3 43:7 59:24
61:3 90:6 94:14
127:16,18 145:8
182:4
**mishap** 5:1

**mislead** 77:6
**misquote** 95:15
**missed** 118:23
119:4 150:3
162:20
**missing** 120:22
**mistaken** 128:19
**mistakes** 184:17
**mistrial** 43:12 53:8
54:13 56:18,21,25
**misunderstand**
169:5
**misunderstanding**
169:5
**mixed** 57:14,15
**mode** 148:22
**moment** 12:1 30:22
40:13 60:11 148:8
**monetary** 178:9
**money** 7:22 8:24
9:2,12,19,23 10:3
10:4,8,10,12,17
11:3,7,7,18 12:23
13:1,13,15,24
14:5,9,13 15:20
17:9,20,20 18:6
19:18 20:19 24:9
24:9,20 25:7,8,18
25:19 26:12 27:2
30:25 31:24 32:1
33:19 35:8,11,24
36:3,15,21 37:23
38:18,18 39:9,10
39:14 40:2,7,10
40:19 41:24 42:6
42:7,9,10,10,17
42:18,19 64:13
65:7,16,21 66:18
70:4,8 73:24 74:1
74:3,7,8 75:10,14
75:17 93:1 94:19
94:19 96:12 97:6
97:6 98:14 102:3
103:3,16,17 104:4
104:9,15 105:10
106:12,16 108:10
108:13,21,25,25

109:3,6,8 111:18
111:18,20 112:3
113:10,11 114:18
114:24 117:3,3
118:16 120:18,21
123:3 125:1,1
138:21,23 139:23
139:24 140:1,15
141:14 143:4,5,6
144:25 145:6
150:23 151:1,3,5
151:12 162:11
164:12,20 178:13
178:14,22,24
179:1,2
**month** 32:12
**months** 98:19
**morning** 3:2,4 5:2
5:18,23 6:5 7:6,14
77:22 78:8 86:18
109:20 120:15
123:14 182:7,12
182:23 184:14
**morretz** 173:15,17
**mortgage** 13:13
109:18,23 110:1
**mortgages** 109:19
180:8
**moth** 133:22
**motion** 3:24 4:7
5:18 49:4,18 53:8
55:15,16 56:22,23
56:25 82:10
**motive** 38:20 178:6
180:9
**mouth** 142:21
147:13 150:10
163:5
**mouths** 84:8
**move** 24:8 54:13
**moved** 50:1 55:21
**moves** 15:20
**moving** 43:11
**multiple** 37:19
43:17
**musser** 123:16,17
166:23 167:1,1,2

167:9,25
**mussers** 167:14

### N

**n** 2:1 3:1
**name** 87:5 104:5
119:16
**names** 120:2
173:23
**national** 1:23
**nature** 67:14 104:8
**nauseam** 146:7
**near** 122:10 180:20
**nearing** 140:11
**necessarily** 129:12
**necessary** 138:22
**need** 3:10 8:1 13:23
19:4 25:18 27:1
35:18,23 43:1
44:22 62:22 66:22
74:20,21 79:21
91:25 93:4 98:13
102:20 114:22
116:17 126:17
151:8 167:19
179:13 185:15,16
**needed** 10:3,3
24:10 40:16 65:4
75:10 151:6,7
167:10 169:14
173:13 180:1
**needs** 7:9 41:6
56:21 114:16
**nefarious** 150:1,17
**neighborhood** 85:1
85:2
**neither** 94:20 105:9
**net** 95:4
**never** 9:10 18:17
30:25 32:8 36:18
40:23 46:22 47:15
48:12 71:12 73:20
74:7 75:1 78:4
91:5,21 93:24
94:9,17 95:7 96:6
97:18 102:13
104:13 114:3

115:11 120:10
126:3 128:12
130:9 149:14
150:10 151:6,7
155:16,17,21
165:17 167:1,5
170:8 174:6
**new** 8:24 9:2,12
10:4,4 14:5 20:19
25:13,19,19 26:14
30:25 36:15 37:12
37:14 38:18 40:6
40:19 42:7,9,10
42:10,17 65:7,16
66:21 68:13 70:8
71:5 73:23 74:8
121:13,13 159:6
176:13
**news** 25:5,5,16
31:19
**newspaper** 182:20
**nice** 114:20 129:9
176:6
**night** 115:15
**nights** 182:22
**nine** 161:17
**nola** 16:18
**nonconspirators**
119:9
**nonpublic** 88:17
**nonrevolving** 72:21
**noon** 5:20 56:4
60:2,22
**nope** 143:11 174:2
174:3,4,8,10,13
**normal** 26:10
**normally** 152:17
183:18
**note** 14:18 37:15
41:5 51:2 72:20
86:20 87:21,22,25
88:3,7 111:19
**noted** 72:21 73:13
**notes** 88:18 127:2
**notice** 183:7
**notification** 140:12
**notwithstanding**

51:15,21
**nova** 15:16,18,21
17:14,18 18:6,11
18:17,18,22,25
19:19,20 20:17
21:14,15 22:15,25
23:1,2,16,22 25:5
26:7 27:20 28:6
29:17,18 30:1,4,9
30:9,24 32:8,21
33:11,23 34:1,5
34:13 35:17 36:9
36:10,22,25 37:24
38:5,7,9,22,22
39:2,3,4 41:11
55:3,19 57:6,24
57:25 59:8 62:16
62:22,24 63:4,15
64:3 65:1,12,15
65:23 66:15,17,22
69:23 71:10,13,19
72:1,8,14,20 73:7
73:15,21 74:19
77:8 78:14 80:10
86:5,22 88:13
89:11 91:20 93:19
93:24 95:12 96:11
96:14,16 104:25
108:9,18 110:5,22
111:3,5,17,19
112:9 114:14
115:5 123:16
125:7,8,9 137:25
138:7 139:11,13
140:25 150:8
151:25 152:3
153:16,25 154:6
154:13 156:18,19
157:21 159:5
160:2 161:9,10,11
161:12,18,20
162:2 164:6,6,10
164:12 167:2,5
168:1,4,22 174:23
175:3,10,17
176:21 177:9
178:10 179:20,23

**novas** 67:13 70:24
138:8 157:15
166:6
**november** 38:11
39:17,20,20,25
112:3 178:16
**nullification** 3:25
**number** 13:6 80:10
83:16,17 87:5
91:13,14 103:19
115:6,8 118:2,11
122:16 125:9,10
125:19,23 137:23
178:24 179:6,19
**numbers** 108:16
145:2
**nun** 126:10

### O

**o** 3:1
**oath** 20:4 74:13
181:19
**object** 42:25 79:6
128:24 143:20
158:21 185:7
**objected** 45:4,12,19
46:11 47:21 52:18
**objecting** 48:15,16
**objection** 43:9
51:13 52:4,6,15
53:12 58:9 79:14
**objections** 53:8
185:5
**obligation** 62:16
109:24
**obtaining** 122:23
**obviously** 53:5
**occur** 14:25,25
**occurred** 155:6
**occurs** 154:11
**october** 3:25 4:7
35:3,6 37:9 42:8
53:22 54:2,7
55:13 57:4 59:5
83:3 89:7 98:23
98:24 99:8 100:14
101:21 121:20

143:6 153:8,18
154:11 161:8,25
162:5 165:24
**offense** 185:15
**offenses** 134:24
**offer** 85:8 165:20
**offered** 162:8
**offering** 37:7,14
166:20
**offers** 160:7
**office** 1:9 86:20
147:12 184:18
**officer** 37:18
105:15 106:3,10
106:11 174:5
**officers** 126:9
**official** 140:12
186:4
**oh** 44:10 57:18
60:20 67:4 68:14
68:14 104:7
106:15 109:9
114:12 115:21
122:13 149:2
153:10,17 158:13
**okay** 8:6 15:7 32:3
40:12 45:22 47:7
59:20 60:5,20,21
60:23 66:25 67:2
75:14 78:20 85:4
87:24 94:4 96:21
131:15,23 132:3,3
132:8,13 161:11
164:21
**old** 9:24 112:24
**omniscient** 159:25
**once** 32:1 36:17,20
108:7,24 166:11
**ones** 48:23
**ongoing** 98:17
**oops** 147:8
**opening** 6:16 96:19
136:18
**openly** 145:19
147:2
**operate** 64:1
**operating** 29:8

**operations** 98:17
**operator** 1:22
**opinion** 11:18
67:19 68:22
129:25 174:12
**opportunities** 7:7
165:5
**opportunity** 20:3,4
151:17
**opposed** 26:23
27:10 82:11
**options** 110:2
**orchestrating** 8:13
28:24 29:19 34:2
74:16
**order** 22:1 67:13
68:8 97:22 148:20
151:12 180:11
**ordered** 5:19 60:2
112:8
**original** 68:7
**originally** 146:18
**originated** 71:10
**orms** 186:2,8
**outside** 13:3 100:2
138:2 157:23
170:7 174:11
176:11 178:17
**overview** 174:16
**owe** 109:23
**owes** 111:16
**owned** 62:24
169:15 179:20,24
**owner** 164:8
**oz** 96:5

**P**
**p** 1:4 3:1 28:15
76:11,11 127:20
127:20 146:10
185:24
**pa** 1:3,11,14,21,24
118:20
**padob** 90:14
**page** 2:2 28:19
55:10,17 57:4,11
70:22 71:25 73:2

88:16 94:21 98:15
99:11,12 100:11
101:8 114:21,22
116:4,20 117:5,16
117:19 118:18
121:21 122:19,21
123:5 137:10,20
139:19 140:5,20
144:20 145:22
146:6 154:1
**paged** 50:13
**pages** 91:24 98:7
**paid** 9:7,10 20:21
20:22 36:18 41:21
42:6 104:12 108:5
108:8 154:4
178:16,22 179:4
179:14
**pain** 171:25
**pal** 147:13
**panic** 148:9,22
**paper** 175:18
**parade** 78:5,6,7
**paragraph** 82:21
82:22,23 88:11
93:13 94:22
122:20,22,22
123:6 138:5
**park** 1:17
**parsing** 124:8
**part** 14:20 22:18,19
32:7 38:23 43:23
45:14 46:16,24,25
47:7,10 48:1,8
58:7 65:7 74:22
86:4 100:12 116:2
120:13 130:15
**participate** 138:7
**particular** 51:13
52:1 81:20 137:6
169:22
**particularly** 63:7
66:5 142:22 172:9
**parties** 5:15
**partner** 29:23
86:19 87:5,11
89:18,19 171:1

**party** 135:3,7,14
167:12
**passed** 11:14 20:23
91:21
**passions** 172:16
**patience** 61:20
**patient** 97:19
**patiently** 77:2
**patricia** 69:10,23
148:10 174:9
**patrick** 1:12
**patterson** 17:11
105:16,17,23
106:9,14 107:16
112:15 120:24
121:2,18,19 122:1
122:2,12 144:4,23
145:10,19 146:1,3
161:15
**pattersons** 152:8
180:5
**pause** 3:5 6:1 7:11
43:14 56:2,11
57:12 60:13 61:8
61:12 85:12
132:14 135:25
183:3
**pay** 9:1 13:14 20:20
36:16 40:22 41:22
104:13 105:11
107:13 109:2,4
110:24 111:8
117:10 151:3,5
**paying** 104:14
157:6
**payment** 42:12,13
42:14,22,23 43:19
43:23 45:13,18
46:10 47:5,23
48:3,18 49:8
179:3
**payments** 42:13,14
**pays** 40:23 42:23
124:24
**peg** 136:10 150:12
**pending** 138:9
**penetration** 100:1

**pennsylvania** 1:1
22:6 25:21 35:4
37:25 38:1 135:16
173:15,16,17
174:2 175:6,10,17
**people** 4:3 17:8
30:18 33:5 64:1
65:18 67:24 69:19
69:20,24 74:6
78:3,9,9,10,18
79:21 91:16,18,19
95:8 100:3 102:10
105:1,10 108:10
115:9 119:2 120:7
126:11,14,16
127:9 133:23
138:16 142:19
143:22 144:15
145:20 147:25
148:3 149:13
150:20 151:11
152:1,2,12 156:12
157:23 158:25
165:8 166:3,5
167:4,15 168:16
172:4 173:12
175:4 179:8,9
**peoples** 185:8
**percent** 21:14 22:8
39:2 95:3 109:3
115:4,5
**perfect** 99:13
**perfectly** 50:17
**perform** 9:7 133:25
**performed** 21:19
100:2
**period** 12:5,8,11
15:20 18:4 38:7
66:12 70:24 71:1
169:19
**permissible** 3:23
**perpetrates** 161:1
**perpetrating**
162:25
**person** 9:1 11:11
26:10 52:1 104:9
120:5 126:4

127:10 150:16
154:20
**personal** 23:11,15
114:25 115:3
**perve** 22:24 29:12
34:16
**ph** 4:8 11:22 14:24
15:3 16:16 18:19
18:24 21:12 22:7
29:24 68:7 69:11
89:11 90:1,14
100:21 103:25
106:15 107:8
111:24 112:16,25
117:17 145:11
148:10 173:1,3,8
176:5 183:5
**philadelphia** 1:3,11
1:14,21,24 135:15
172:19
**phone** 102:19
118:10 119:15
143:1,2,8,9,13
**phony** 101:16
120:4
**pick** 8:2
**picture** 157:10
172:1
**piece** 156:16
175:12,25
**pierce** 1:19
**pig** 9:24
**pitch** 167:23
**pizza** 17:25
**place** 25:25 85:7
91:9 98:20,22,23
98:24 99:24
100:19,21,22
101:21 102:1
110:14 120:14
121:14 135:2,14
146:17
**placement** 50:11
**placing** 138:10
**plain** 101:11
**plaintiff** 135:12
**plan** 30:10,21,21

30:22 31:5
**planet** 118:10
**platinum** 104:7
**play** 79:22 124:9
**played** 15:11 20:1
123:12,23 124:10
125:6
**player** 164:18
**plea** 62:12
**pleasant** 102:19
**please** 7:10 24:16
43:3,13 45:6 55:2
56:1 60:12 71:14
72:11,20 76:22
79:3,15 86:14
92:22 93:13 96:14
102:21 104:24
116:18 118:21
127:16 133:8
137:20 140:8,10
140:23 144:20
145:4 154:2
165:20 181:23
**pled** 103:25
**plenty** 151:3,5
**plus** 163:17
**point** 14:2 36:16
41:1 43:1,3 47:25
49:10 53:7,24
60:16 70:15 74:12
82:8 112:15
131:25 138:12
147:22 150:7
153:25 162:4
171:3
**pointing** 130:14
**polisky** 18:19 107:8
107:9,16 112:16
146:2,4 174:4
**poor** 14:24 102:22
**populated** 22:14
**pordy** 1:16
**portion** 23:14 26:3
31:14 43:21 44:3
44:4 53:10
**position** 47:14 64:7
100:7,8

**possibility** 40:21
**possibly** 9:2,11
42:7 146:12 148:4
170:10
**potato** 26:18
**potential** 3:25
**potentially** 164:14
**potomac** 1:17,17
**powerful** 21:24
**pre** 22:13
**precarious** 64:7
**precipitate** 141:9
**precipitous** 12:10
12:10 38:8 66:9
**predominantly**
142:17
**preemptive** 129:6
**prejudicial** 50:8
52:5,8 53:2,2
**preliminary** 95:14
95:15 97:25 98:3
98:11,12 175:1
**preparation** 176:1
**prepare** 160:22
185:3
**prepared** 68:8
**preponderance**
135:4
**present** 12:17
83:21 84:2 91:18
91:19 99:20 138:7
176:16
**presented** 6:8,16
91:16 121:7
137:17 160:20
181:15,15
**presents** 99:23
**president** 37:18
105:15 106:21
107:10 125:7,7,15
**pressure** 30:1
147:17 152:14
**pressured** 107:18
**presumed** 79:25
163:24
**presumption** 79:24
**pretty** 185:19

**preve** 15:22 17:12
17:19,23 22:11
26:19 27:23
103:25 115:23
116:5,19 117:2,7
117:10,12 118:14
118:19 119:13,20
119:22,22 144:23
145:6,14 151:2,23
175:24
**previously** 68:4
**price** 22:18,19
112:6
**primarily** 73:12
**primary** 50:10
139:17 173:11
**principal** 101:9
**principle** 171:6
**principles** 170:14
170:15
**prior** 3:10 69:10
**private** 12:18 94:23
142:17
**privilege** 128:17
**pro** 16:13,18 150:1
150:8
**probable** 182:5
**probably** 5:13
109:15 124:9
129:10 181:5,10
182:9
**problem** 14:8 25:3
25:21 43:18 51:19
52:20 57:20 66:22
70:10 81:19,21
91:16 117:1 124:6
125:11 130:1
142:23 144:13,16
147:9,23 148:17
149:3,5,8 158:10
158:12 160:17
164:14
**problems** 12:22
38:16,17
**procedurally** 7:3
**proceed** 7:12 76:21
133:6

**proceedings** 185:24
**proceeds** 123:25
124:7
**process** 17:2 61:21
71:15,16 82:1
84:14 91:23 97:12
106:12 114:4
137:19 140:11
145:4 149:16
151:21 156:7,23
157:14 168:13,15
169:9 174:18,23
176:12 178:2
**processed** 146:4
**processes** 107:2
**produced** 54:5
**proffered** 163:14
**program** 10:6,6,9
137:2
**prohibited** 4:21
**prohibitions** 48:23
**project** 63:18
**projects** 63:17
**promise** 8:25 20:20
36:17 72:8
**promptly** 76:6
**proof** 56:20 82:24
83:18,18 102:14
103:3 106:19
116:9 135:1,4,9
137:7 180:20
183:11 184:7,9
**prop** 138:15 167:3
167:10,11,12,16
167:19,24 178:7
**properties** 121:13
**property** 68:10,23
121:12
**proposed** 94:24
**propping** 178:12
**prosecuted** 4:3,14
**prosecution** 4:6
172:10
**prosecutorial**
43:12
**prove** 83:15,22,25
90:8,10 93:4

121:8 127:9
134:19,22 135:12
135:22 155:19
169:1
**proved** 109:15
**proven** 81:17
**proverbial** 64:15
136:9
**proves** 80:3
**provide** 13:15 23:9
27:6 41:7 72:2
84:11
**provided** 13:8 25:7
25:14 67:23 68:11
128:25 138:8
175:24
**providing** 116:11
**public** 13:14 33:5
88:12,13
**pull** 138:16 139:24
148:20 150:18
**pulling** 69:11
129:21 171:23
**punishment** 79:7,9
79:12
**purchase** 14:18
18:11 22:18,19
36:22 62:22 63:12
64:8 65:12,15
68:4 69:13 71:13
73:15,21 124:18
**purchased** 21:13
62:25
**purchasing** 65:1
**purpose** 7:24 14:18
15:21,25 17:18
18:11,13,16,17,18
18:21,24 19:4,9
19:23 20:8,12
32:7 33:11,24
34:11 36:19,19
49:6 59:9 64:22
65:1,11,12 68:1,9
68:23 71:10,12
72:5 137:8,18
138:25 140:4
144:2,7,9 153:22

161:9,11 168:20
177:14
**purposeful** 71:6
**purposes** 19:14
54:10 64:24 73:12
73:18,18 107:4
131:21 151:10
**pursuant** 181:19
**push** 168:1
**pushed** 167:5
**put** 17:17 19:10
21:11 23:22 24:11
35:11,20 37:7,14
45:3 47:13 51:3
53:7 54:1,2 55:6
55:18 56:15 57:3
57:10,11 58:14
59:10 66:14 78:21
79:22 85:7 98:15
100:8 105:2 106:6
106:16 107:4
109:12,13,16
115:16 122:7
143:11,15 162:4
166:10 183:20
**puts** 124:23
**putting** 5:7 9:23
28:24 40:24 54:7
138:19 144:5

---

### Q

**qt** 105:19
**quarter** 14:3 71:25
73:10 97:5,7
116:25
**question** 19:18
22:16,17,20 23:13
26:1,6,10,21,22
26:22 27:5,23
28:2 31:14,17
35:22 46:18 47:3
50:1,2,5,6 51:7
52:14 65:14 67:2
90:21 101:12
113:17 115:11
116:18 122:19
124:7,12 125:4

149:13 154:24
**questioned** 70:11
**questioning** 16:6
**questions** 23:18,20
27:17 29:2 48:10
83:19 84:11 92:17
93:10 115:10
118:2,22 123:21
125:5 126:23
151:4
**quick** 85:25 126:8
**quickly** 97:24
100:11 112:13
113:5
**quid** 16:13,18
150:1,8
**quill** 173:1
**quite** 85:24 105:6
109:15
**quo** 16:13,19 150:1
150:8
**quote** 27:3 89:4

---

### R

**r** 3:1
**raise** 7:10 25:18
40:14 41:19 66:17
112:3 127:22
138:3,22 178:17
179:8
**raised** 62:15 112:5
159:6
**raises** 67:10 170:23
**raising** 21:19 41:12
70:25 160:3
**rate** 108:5,8
**ratification** 176:22
176:23 177:7
**raz** 68:7,8,13,15
69:1,2 71:11
73:13 106:16,17
106:21,22 107:3
121:4,16,22
122:13 146:6
153:22
**razs** 121:13 122:5
**razzes** 174:8

**reached** 88:6
177:16
**reaches** 176:21
**read** 23:15 37:15
105:5 142:10
163:24 166:15,17
182:20,22
**reader** 120:11,12
159:24
**reading** 89:24
**ready** 33:9 61:10
61:10 127:21
132:10,11
**real** 62:20 63:7,8
68:4 105:10,10,11
112:13 125:18
149:8
**reality** 125:25
**realized** 19:7
**really** 8:11 12:3
17:5 19:11,16
29:21 39:18,18
65:3,14 67:3
71:11,17 79:6
94:6,10 118:5
122:8 127:5 155:5
157:4 167:21
171:4
**realtor** 85:6
**reason** 16:1 17:16
19:10 20:10 50:22
51:13 58:11 62:25
91:8 109:20 112:7
157:12 158:1,13
178:18
**reasonable** 4:16
80:4 83:23 84:1
84:14,17,18,20
85:11,17,23,24
86:1,3,10 102:15
103:4,12 111:12
113:20 114:1
119:23 126:12,13
126:13 127:10,11
134:19,23 135:23
142:13 180:20
181:11,12,18

**reasons** 82:2,4,7
103:18
**rebuttal** 5:22 7:4
182:3 185:1,1
**recall** 17:1 47:4
88:12 92:23,24
120:25 153:5
**receipt** 43:17
**receive** 62:16
132:16
**received** 3:14 21:5
22:14 23:2 166:16
**receives** 40:10
87:21,25
**recess** 6:25 43:6
75:25 127:15
**recessed** 76:11
127:20
**recognize** 47:17
**recognized** 47:19
48:5
**recognizes** 66:20
**recollect** 77:22
**recollection** 16:7
43:25 48:12 49:12
111:7 119:18
150:5 153:6
**recommend** 92:19
92:19
**recommendation**
92:22 94:16,16
98:9
**reconvened** 76:11
127:20
**record** 61:16 76:15
128:25 130:19
181:24 185:10
**recording** 15:11
186:5
**records** 53:9 143:1
143:7,13
**red** 113:21 122:11
166:18
**redact** 82:22
**redacted** 44:15
**redactions** 45:1
**redo** 14:1

**reduce** 59:17,17
**reduced** 112:2
**reduction** 88:3
**reel** 14:11,12
**refer** 147:19
**reference** 82:17
  83:9
**referenced** 80:25
**referencing** 33:21
**referred** 138:12
**referring** 128:7
**reflect** 68:2 83:8
**reflecting** 27:6
**refreshed** 153:7
**regarding** 3:25
  51:2 54:20 55:2
  57:23
**regardless** 93:8
**region** 1:23
**regular** 14:22
**regulation** 77:7,15
  86:7 88:22,23
  102:9 123:9,10
  125:20,22 170:21
**regulations** 176:14
**regulator** 28:5 29:3
  98:10 114:21
  118:11
**regulators** 9:13
  10:2 11:2,15,17
  13:21 21:16 22:3
  23:23 24:1 25:20
  28:14 31:1,8
  34:17,18,20,23
  38:13 40:8 42:9
  67:5 71:5 73:23
  74:18 75:3 78:5,6
  78:7,8 91:20
  102:6 105:21
  142:13 148:19,19
  149:12,16,22
  150:19 158:18
  159:11 173:9,12
  176:2
**regulatory** 24:6
  93:23 94:8
**relate** 161:4 165:23

165:23
**related** 45:17 166:6
  182:21
**relates** 156:4 162:5
**relating** 4:11 45:13
**relation** 70:24
**relations** 63:13
**relationship** 63:14
  63:15,23 64:3
  101:3 128:9 144:4
  150:2 157:21
  180:8
**relationships** 32:19
  64:2 100:25 101:2
  180:2,4,6
**relevance** 80:22
**relevant** 98:9
  114:11
**reliance** 128:15
  129:4
**relied** 25:15 96:2
**rely** 25:14 72:18
  75:12 83:21
**relying** 13:16 25:7
  50:24
**remainder** 182:7
**remand** 82:22
**remember** 10:8
  13:22 18:14 22:11
  38:21 47:11,14
  62:20 63:17 66:11
  67:16 70:13 84:5
  87:4 98:1 122:16
  123:17 137:21
  163:21 164:21,23
  164:23 176:5
  178:20,21
**remembered** 46:18
**removed** 48:3
**renegotiating**
  35:18,19
**renewal** 116:21
**renewed** 116:23
**renewing** 116:22
**replace** 24:19 68:3
**report** 67:11 88:3
  99:8 125:16

**reported** 88:18
  105:25
**reportedly** 95:4
**reporting** 1:23 88:7
**reports** 14:1 33:4,4
  99:22 112:10
  125:25 149:12
  158:21
**representation**
  11:13
**representations**
  9:13 33:18 152:4
**reputation** 126:10
**request** 72:23 82:5
  118:20
**requested** 72:1,22
  73:11 82:1
**requesting** 162:22
**require** 53:7
**required** 148:5
  165:15
**requirement** 41:12
**requires** 171:7
**research** 184:12
**reserve** 23:5 35:5
  39:16 114:5
  171:14 173:5,7,8
  175:7,15,22
**residence** 72:3
**resolve** 3:10 128:2
  129:11
**respect** 5:4 46:11
  128:20 129:15,17
  137:17 152:22
  156:6 161:24
  163:13 168:5,12
  169:21
**respective** 6:21
  132:7
**respond** 23:19 27:5
  56:16 58:4
**responds** 116:8
**response** 22:22
  39:6 54:14 57:20
  67:12 70:11 72:12
  73:4
**responses** 22:14

115:20,22,22
**responsible** 59:17
  111:22
**rest** 27:14 118:16
**restaurant** 109:5
**result** 134:3 137:15
  149:6 155:1
  156:17
**results** 179:3
**retire** 181:17
**retrieve** 56:1
**return** 59:7 75:21
  95:1 136:4 162:2
**returned** 136:14
**returns** 33:8
**review** 41:6 97:12
  98:6 99:19 148:15
**reviewed** 3:15
  19:12 100:24
  101:1 121:1
**reviewing** 168:17
**reviews** 107:11
  153:14
**reviled** 172:7
**revise** 121:12
**rewarded** 134:2
**rich** 17:8
**ridiculous** 97:2
**right** 3:6 4:18,25
  5:16 7:8,10 14:10
  15:4 30:21 37:9
  43:11,15 44:2
  46:10 47:1 48:14
  49:3,3 50:4 52:9
  53:5,14 55:25
  56:21 57:7,19
  60:12 61:5 63:24
  69:16 75:24 81:24
  83:10 98:11
  104:15 120:3
  121:21 128:2,3
  129:2 130:22
  132:3,8 133:2
  140:11 145:6
  151:6 170:14
  171:1 173:22
  175:6 176:6,9

182:2 185:13
**rights** 110:12
**rise** 6:2 43:4 61:13
  76:7,12 132:24
**risk** 18:9 19:2,6,13
  65:10 68:20 73:19
  97:1
**road** 25:17 92:6,13
**robe** 134:6
**roben** 183:5 184:3
  184:9
**rogers** 1:16 126:22
**role** 131:12 133:22
  171:19
**roof** 85:9,14,21,21
**room** 80:2 181:6
**rothschild** 1:13
**round** 136:10
  150:13
**roven** 27:4 113:8
  128:8,10,12,25
  129:17,24,24
  130:9,17,20 131:3
  139:8 147:19,23
  158:6,9,14
**rovens** 131:12
**roving** 29:24
**rsm** 100:2
**rule** 3:20 53:6
  56:18 131:21
**ruled** 4:1,18 48:8
  50:2 51:20,22,23
**rules** 176:13
**ruling** 50:25 51:12
  53:1
**rulings** 52:25
**run** 142:21
**runs** 164:18 170:22
**russell** 1:15
**rutkowski** 173:16
  174:2

---

**S**

**s** 1:9,20 3:1
**sad** 106:2
**salary** 49:14 50:3
  50:12,21 51:13,18

52:2
**sanitize** 132:5,6
**sat** 77:1 90:1 93:6
  127:2 144:5
**satisfied** 25:22,24
**satisfy** 28:2 56:20
**save** 75:8 180:1
**saved** 179:17
**saw** 80:8 91:9 99:9
  106:1 114:9 145:1
  146:6 153:7 155:8
  162:14 163:3
  164:22 166:9
  174:8
**saying** 9:24 26:20
  34:11 51:12,16,17
  52:21 58:19,21
  62:6,11 93:16,16
  94:3 100:5 102:20
  107:21 118:15,20
  119:1 141:16
  142:12,18 145:23
  146:10 148:16
  149:4 152:5
  153:19
**sayre** 173:18
**says** 7:8 12:16
  13:17 15:8,9,13
  17:12,21 18:3,10
  19:14,25 23:10,17
  25:6 26:2 30:20
  34:15 36:23 41:15
  41:18 47:2 54:9
  55:14 58:11 64:22
  67:9,11 68:9,19
  69:13 70:21 73:16
  77:8 86:7,24 88:2
  88:6,16 90:24
  93:13,17,22 97:11
  98:9,11 100:25
  107:12 115:17,18
  117:7,20 118:1,5
  119:19 120:6
  122:13,23 124:1
  130:17 140:14,23
  141:4 145:6,12
  146:21 147:6

148:2,14 149:7
  151:6,16 158:10
  162:15 174:14
**scales** 135:5
**schedules** 31:25
**scheme** 28:25
  32:24 33:15,16,17
  70:3 74:17
**school** 162:21
**schools** 85:3
**schwartz** 1:16 5:11
  67:16,17,17,22,25
  68:11,14,21
  113:13 120:25
  122:2,12 123:1
  157:1 174:11
  176:10 184:1
**schwartzs** 120:25
  122:15 123:5
**science** 89:3,3
**scope** 3:23 100:13
**scrambling** 37:12
  140:15
**screen** 44:5 54:2,22
  55:6,16,18 56:14
  57:11 165:19
  166:11
**scrutiny** 24:7
**se** 184:3
**sean** 165:20 166:22
  172:23
**search** 136:8
**seated** 3:3 6:6
  61:17 76:17 128:5
  133:5
**sec** 88:12
**second** 14:3 43:13
  45:20 56:9 66:20
  69:15 71:25 73:10
  88:11 93:12 94:17
  98:15 116:4
  117:16 121:4,23
  122:22,22 123:6
  138:5 144:20
  177:6
**secrecy** 143:21
  146:14 148:5

168:20
**secret** 105:20 106:8
  143:19 144:7
  145:21
**section** 23:6 68:24
  121:24 125:19
  175:21
**secure** 74:22 75:10
  179:13
**secured** 72:21
  179:13
**securitize** 121:11
**see** 12:3 15:18
  28:19 39:8,14
  42:12 43:1 46:23
  54:21 55:9 56:14
  57:16 72:11 73:25
  74:19,25 76:5
  89:21 92:24 101:8
  118:18 121:23
  142:7,17 144:22
  145:5 158:3,8,14
  166:1 172:5,6
  174:19,20 179:13
  179:17 181:22
**seen** 88:23 119:9
  143:25
**selective** 4:6
**sell** 14:12 109:17
  110:1
**sells** 109:25
**send** 68:12,16,19
  87:6,11 92:5,12
  108:10,18 110:4
  118:10 120:4,24
  153:14 171:1
**sending** 17:21
  33:23 34:10 69:4
  121:17 145:7
**sends** 25:5 41:3
  89:18 93:11
  104:15 106:14
  107:7,8 114:17
  118:24 121:16
  122:1,2 153:15
**sense** 5:24 24:16
  26:9 30:16 42:3

84:18 91:4 97:23
  113:2,5 140:7
  142:5 151:13
  158:24 165:9,13
  167:6,22,23
  180:17 181:13
  184:13
**sent** 28:15,17,21
  34:5 35:7 68:18
  83:4 93:7 105:7
  114:3 118:19
  122:12 145:10
  151:19 173:25
**sentence** 18:12
**separate** 114:4
**september** 32:16
  72:12 116:7
  165:21 174:19
**service** 7:18
**serving** 133:23
**session** 44:22
**set** 10:6,9 12:3
  106:20 120:4
**setting** 151:15
**seven** 41:25 105:9
  123:15 126:22
  163:22
**shame** 166:19
**shape** 107:19 134:3
**share** 102:24
  152:10
**shared** 154:7
**shareholder** 95:3
  101:7
**shareholders** 88:4
  101:10
**shawn** 140:10,19
  141:20 144:22
  154:2
**sheer** 148:8
**sheet** 83:7 109:13
  109:16 157:16
  170:7
**sheets** 32:20
**sheila** 186:2,8
**shell** 103:16,19
  104:4,10

**shes** 21:4 28:16
  62:12 69:15
  102:22 145:17
  173:11
**shift** 183:13
**shingle** 85:10,20
**shop** 17:25
**shops** 85:3
**short** 7:16 12:5,8
  15:20 18:4 38:7
  67:13 68:2 93:15
  93:16,17 97:16
  133:20
**shortly** 116:6
  145:13
**shots** 112:9
**shouldnt** 50:8 89:5
  102:13 124:5
  147:9,18 157:11
  169:22 172:22
**shouldve** 4:14
**show** 10:4 12:2
  14:1,4 28:21
  31:23 40:8 44:4
  44:11 45:20 46:16
  47:20,23 48:1,1
  57:7 64:20 77:18
  81:21 89:17 91:25
  102:10 103:7,9
  104:23 112:13
  118:19 143:7
  156:22 172:21
  175:23
**showed** 38:6 55:16
  56:14 91:19 110:7
  110:12 111:23
  122:5 143:14
**showing** 34:25
  43:19 44:3,13,14
  47:10 49:8 53:23
**shown** 43:17,22
  45:23 46:1,21,22
  50:14 124:20
  143:24 151:1
**shows** 43:20 90:23
  113:25 124:2
  142:1

**shred** 143:11
144:11 160:19
175:18
**shubin** 8:21 70:6
70:12 72:17 86:16
86:18 87:2,3,7
88:13 89:1,17,19
174:13
**shuck** 25:1
**shulman** 1:16
**shut** 147:13
**sic** 95:16
**side** 79:1 80:25
121:7 129:12
**sidebar** 43:1,8
45:12 61:7 79:4
79:18 80:14 83:12
181:24
**sight** 101:11
**sign** 55:2 59:7
105:12 107:6,17
162:2,7
**signature** 17:1
166:15
**signed** 22:13,24
32:20 39:24 65:2
107:20 114:15
117:6,10 146:5
162:13 163:20,23
163:24 164:23,24
**significance** 36:2
**significant** 39:8
84:25 86:4
**signing** 16:8 162:22
**signs** 73:16 153:7
153:15 164:4
**similar** 4:4
**similarly** 148:7
152:22
**simple** 67:2
**simply** 7:21 51:11
130:24 134:13
155:24 160:13
161:20 162:10,18
180:21
**sincerely** 7:25
**single** 78:14 96:4

96:17,21 107:17
107:20,24 108:21
108:22 144:11
152:9 154:20
156:16,22 158:22
173:14,20 175:12
175:25 179:18
**sinister** 143:14
171:22
**sir** 5:5 53:20 56:24
79:2 81:12
**sit** 105:17
**sits** 79:25 134:21
**sitting** 63:22 102:4
102:5 103:6
111:25 134:18
**situation** 104:3
182:5
**six** 98:5 107:21
**skin** 104:13 105:11
**sleep** 182:22
**slide** 103:13,13
104:24 108:11
109:9 111:14
**slightly** 135:6
**slot** 133:12
**small** 25:3 132:23
**smart** 90:8
**smoke** 145:11,16
145:25
**smokey** 112:16
**snippet** 123:23,24
**soldiers** 172:5
**sole** 14:17 15:21
65:1 157:21
**solemn** 133:22
**solicited** 168:10
**somebody** 4:15
22:25 119:16
149:10
**someones** 40:21
**somethings** 64:15
**soon** 111:14 132:19
**sophisticated** 37:6
37:19 38:2 42:4
171:5
**sorry** 8:5 20:5 21:1

32:16 39:12 44:21
46:9 47:18 49:10
52:10 54:19,23
55:1 57:18 79:6
95:15 99:12
110:11 140:18
**sort** 4:5 31:22
182:21
**sound** 186:4
**sounds** 147:8
**source** 22:17 23:9
23:10 25:23 26:2
28:2 72:13 73:3,6
117:21
**south** 96:24 110:21
110:24 111:2
186:2,11
**speak** 79:11
**speaker** 132:17,25
183:9,13,15,21
184:5,20
**speaks** 94:5
**special** 108:3
168:14 177:2
**specific** 26:1 32:7
48:15 58:10 59:5
59:9 71:10,12
73:18,18 82:16
169:7 170:12
171:11 176:14
**specifically** 18:22
43:22 44:15 46:21
51:5,20 82:15
159:4
**specificity** 51:12
53:9 59:18
**specifics** 116:17
**speculated** 183:6
**speeches** 185:8
**spiral** 39:19
**spite** 185:2
**split** 110:14
**spoken** 184:1
**square** 63:18
136:10 150:12
**st** 27:7,7
**stake** 78:24

**stand** 45:3 77:21,23
128:1,4,6 151:7
154:23 163:4
**standard** 3:16
108:1,4,8
**start** 5:19 37:1
66:15 104:20
114:13 125:5
141:22
**started** 63:15 64:3
79:22 123:14
133:14
**starting** 142:4
**starts** 69:11 174:19
**state** 65:11 71:9
73:5 114:6 172:16
**stated** 88:16 153:21
155:12
**statement** 21:4
27:6 41:4 43:18
47:18,19,21 58:10
83:14 116:10
136:18 159:8,17
159:18 160:4,11
172:17 183:25
**statements** 6:13
81:6 115:25 159:3
160:22
**states** 1:1,2,6,8 4:7
7:17 73:3 135:17
137:1,14
**stating** 55:2 95:13
**stay** 3:16 133:13
**stays** 36:9,10 98:18
**stealing** 7:22
**stellar** 126:11
**stick** 66:10
**stiff** 165:5
**stock** 14:18 18:11
18:17,18,25 21:13
33:11 36:22,25
37:15 62:23,24,24
63:12 64:8,17
65:2,12,15 69:13
71:13 73:15,21
110:4,7,8,9,12,14
110:18 111:4,15

112:2 124:1,15,18
169:14 178:12
179:20,24
**stop** 55:25 141:4
**stopped** 111:14
**store** 109:5
**story** 96:8
**straw** 103:17,20
104:5,10 120:5
**street** 1:10,13,20
1:24 104:11
**stretch** 181:4
**strike** 82:10 129:7
**string** 145:10
**strings** 129:21
171:23
**strong** 12:17 95:4
99:25
**stronger** 8:12,16,19
8:24 74:9
**struggling** 8:11
39:22
**stubborn** 136:18
171:24 172:14,20
**stuck** 72:15 73:7
102:23
**stuff** 44:14 45:17
101:15 108:11
120:21 127:3
129:20 146:22
148:15 149:11
163:21,23 174:14
178:19
**stumbled** 142:24
**stumbles** 148:10,13
**subject** 58:1 109:19
140:23
**submit** 155:23
159:20 160:4
168:1 181:16
**submitted** 3:12
174:24 176:2
**subscription** 16:8
30:7 35:14 153:4
153:8,13,14 164:5
**subscriptions**
141:2,5,12

substantial 70:25
substantially 63:19
substantive 156:4
succeeds 178:11
success 66:1
successful 180:13
suggest 83:23
    92:11 150:6
suggested 147:17
suggestion 31:2
    128:24 131:12
suggestions 28:19
suite 1:10,20,24
sum 179:3
summaries 65:10
summarize 6:10
summary 18:9
    19:13 68:21 73:19
supplied 175:14
support 54:5 55:22
    142:11
supported 75:22
supports 113:24
suppose 111:9
    116:15
supposed 60:22
    102:11 105:5
    107:10 110:25
    113:20 120:11
    148:19 155:21
    170:4
supposedly 138:23
    160:2,8 162:24
    173:12 174:10
    178:7
sure 10:11 28:18
    29:13 53:13 56:8
    60:4 62:11 97:5
    109:24 121:21
    122:7 127:24
    130:7 142:19,20
    183:9,10 185:1
surplusage 82:11
    82:15,17
survive 38:19
sustained 51:14
    52:15 79:15

sway 11:17
sweater 126:22
system 75:12,16

———————

**T**

t 64:9
table 5:7 92:13
take 6:20 12:1 15:9
    17:10 28:25 29:9
    30:20 37:1 43:3
    56:6 62:21 81:20
    86:13 87:14,23
    98:20,22 104:4
    109:2,4,5,25
    127:15 137:16
    146:17 166:21
    174:16 182:3
taken 100:21,22
    125:3 127:2
takes 39:1 98:23,24
    101:21 120:14
    124:24 149:8
talk 12:12 15:22
    29:1 30:13 32:6
    37:2 77:20 78:8
    84:4 85:22 86:1
    86:17 89:9 91:1,5
    91:22 92:21 99:14
    101:17 113:21
    115:15,15 119:13
    120:13 121:3
    124:11 126:4
    128:12 129:23
    136:24 140:24
    142:13 147:20,25
    148:1,3,18 149:19
    167:24 176:11
    177:5
talked 44:10,12
    49:16 87:5 89:17
    93:7 123:11 129:9
    129:24 137:23
    139:3 163:6
    173:19 176:8
    179:15
talking 10:5 24:3
    32:24 34:1 35:3

35:12 61:22 73:2
    78:22 112:11
    115:20 131:10
    141:1,4,18 143:12
    153:4 167:10
    175:13
talks 36:22 88:11
    94:5 99:14,25
    105:8 121:25
    122:17,20 161:21
tandem 137:13
tarp 10:3,5,6,8,8,10
    10:14,17,19,20
    11:2,7,18 12:4,9
    12:23 13:1,10,16
    20:24 24:1,9,9
    25:6,8 26:12 27:2
    30:25 31:1,24
    32:1,21 33:16
    35:24 36:3 38:18
    39:9,10,14 42:11
    65:19,23 66:6,18
    70:4 74:7 75:10
    78:9,9,9,14 91:23
    92:1,2 93:24 95:7
    95:15 96:13,25
    97:8,22 98:13,25
    101:24 102:17
    114:7 137:2,15
    138:8,16,17,23
    140:13 141:15,24
    142:3 148:21
    149:17 154:21,22
    155:20 156:2,5
    166:6,7 167:11,17
    174:22,23,24
    175:1,3 176:12
    179:1,13,13
task 88:6,16
tax 33:8 136:22
team 133:17
    137:11 183:16
technical 91:15
teeing 32:11
teeny 149:2
telephone 119:20
tell 15:7 20:3 27:23

38:13 62:23 67:15
    67:18 71:5 72:16
    73:6 75:1 78:20
    85:6,16,20 87:17
    90:17 94:12 95:17
    96:15,17 97:19
    102:10,13,21
    104:8 105:19,21
    106:6,7,24 112:19
    118:8,15 119:3,22
    120:8,10 124:2
    126:6,10,12
    129:10 147:5
    149:12 166:24
telling 12:14,14
    26:23 27:10 28:16
    29:14 32:9 34:20
    35:2 42:9 62:14
    73:23 117:2,12
tells 94:22 101:25
    114:18 116:5
    146:24 147:2
    160:2
ten 42:20 95:2
    109:22
tentatively 127:2
term 32:20 68:3
terminable 127:3
terms 60:1 108:1,4
    108:8 116:11,22
    131:13 151:16
    152:20 170:16
terror 148:8
testified 15:23
    22:12 43:24 46:17
    46:17 48:11 66:23
    70:6 78:15 89:12
    96:1 99:6,9
    114:20 123:1
    129:22 144:6
    150:23 152:9
    155:22 170:3
    171:14 172:24
    173:5,9,20,23
    176:7 179:6,19
testifies 158:19
testify 48:8 78:4

98:4 102:10 113:8
    129:14 139:22
    150:22 163:3
    166:12 173:2
testifying 45:11
    46:12 48:11 153:6
    163:22
testimony 29:11
    37:10 48:25 49:13
    76:2 91:11 113:12
    121:1,23 124:10
    126:7,8 130:19
    137:23 147:23
    148:24 152:8
    156:22 163:8
    164:16 175:1,12
    176:5 179:24
    180:5 181:8
testing 100:1
text 142:25
thank 3:18,21,22
    4:23 5:24 6:23
    7:13,18 8:4,5
    44:23 45:10 56:1
    58:5 61:5,6,17,20
    75:23,24 76:10,19
    79:17 83:10,11
    127:1,14,19 131:1
    132:4,8 133:2,7
    133:16,18,21
    141:20 181:21
    182:15,23 183:1,9
    185:23
thats 4:4,5,23 5:16
    8:3,6 9:1,9,20
    10:1 11:13 13:16
    15:1 16:3 17:20
    19:10,16 20:21
    21:15,16 24:13
    28:4,10,10 29:19
    30:15 34:9 39:20
    41:14 42:10,15,19
    46:12,14 47:10,24
    49:12 51:23 52:3
    55:4,17,20 57:9
    57:19 58:12,21
    59:1 60:3 66:22

66:23 67:7 68:11
68:17 69:1,15,22
72:17 75:2,14
78:21 79:9,10
80:10,20 81:17
83:6,16,24 84:22
85:10 86:12 87:24
91:8,12 93:14,23
94:14,20 96:8
97:2 98:12 100:2
102:14,17 103:3
103:11 104:19,20
106:19 107:9,22
108:25 109:3,7
110:1 111:4,5,23
112:21 117:1,11
118:17 120:6,21
124:2 126:21
128:19,21 130:5,7
131:6 136:2,3
138:12,25 142:14
146:8 147:9,15
149:10,13 150:20
151:14 152:20
153:23 154:8,10
154:11 156:12
157:25 158:10,11
160:7 161:14
162:11 164:24
165:8 166:4,5,15
167:16 169:15
171:2 176:9,15
177:24 178:2,3,4
179:20 180:9
183:10,17,18,20
185:4,22
**theories** 113:25
**theory** 136:7,7,19
  136:20 156:5
  158:22 167:3,7
  172:12
**thereabouts** 92:3
**theres** 4:5 9:6
  14:13 17:7 20:9
  21:8,9,23 22:8
  25:5,21 26:1,18
  26:22 28:5 31:3

35:1 36:16 38:14
69:20 77:16 81:19
81:19,20 82:10,21
82:23,25,25 83:2
83:4 85:10,20
87:24 88:5,22
95:22,23 98:24
100:9 103:6,18
106:5 108:19
113:19,25 115:24
116:1 121:5 124:6
125:19 127:4
128:8,8,13,14,15
128:24 129:25
130:9,11,23
136:21 137:18
141:23,25 142:10
142:25,25 143:3,4
143:9,16 144:11
144:18 148:25
149:5 152:23,24
153:24 154:12,14
156:15,24 158:4
158:13,24 159:8
159:13 160:13,19
166:7 169:19
170:21 171:17
174:17 178:9
179:14 180:22,22
180:23 183:15
**theyll** 12:22
**theyre** 13:22 21:16
  22:4 23:8 24:3,7
  24:25 25:17,17
  26:4,12 28:8,18
  31:12 33:9,10
  37:11,12 38:2,3,4
  38:19 44:3 51:16
  58:22,24 64:18
  66:17 70:15,16,19
  73:7 81:5 86:9,12
  87:11 93:15,16
  97:14 101:24
  102:23 103:20
  107:21 108:18
  109:14,17 112:3
  112:17 115:13,20

116:9,21 118:14
121:5 130:14,16
137:8,9,10,10
138:18 140:12,14
140:15,16 142:18
143:10 146:9
172:11 179:16
**theyve** 19:21 23:20
  26:11 28:1 40:25
  44:5 48:19 55:24
  55:24 66:9 71:8
  80:23 81:22 90:9
  95:13 105:8
  108:20 162:8
**thing** 4:11 5:22 7:6
  9:9 14:5 19:11
  23:4,7 25:2 27:11
  35:13 37:13 40:20
  49:7 52:17,18
  55:16 59:21 80:22
  87:10 89:23 94:18
  96:15 99:11
  102:23 105:19
  107:3,11,17 108:1
  108:6 110:1,3
  113:4 114:2 115:9
  116:5 127:22
  131:2 134:20
  139:19 140:17
  141:8 143:17
  154:17 158:16
  159:19 160:1
  165:1,12 175:20
  177:3,14
**things** 3:7 5:9 18:2
  34:25 38:8 40:3
  55:20 61:25 62:2
  81:22 94:2 95:5
  106:24 107:6
  108:2,10 119:14
  125:18 129:18,21
  136:18 143:22
  150:9 156:11
  157:7 160:15
  162:13 163:19,19
  164:21 168:13
  171:24 172:14,20

174:21 181:3
**think** 3:24 4:1,4,12
  5:9 9:16 18:16
  19:2 23:25 24:6
  37:4 40:6 41:4
  51:22 56:20 58:6
  59:23 60:3 61:10
  63:5 69:15 70:9
  74:19 75:2,14
  80:16 82:24 84:19
  86:24 90:20 91:3
  105:23 106:4
  108:6 109:18
  111:6,16 112:24
  113:16,24 118:7,9
  118:9 122:17
  124:21 125:10,15
  126:5 129:3 130:6
  131:3,13 132:11
  135:5 140:5
  142:22 150:15
  160:15 171:21
  183:24 184:11,16
  185:9,15,16,18
**thinking** 30:5,6,18
  87:1 139:15,19
  160:17
**thinks** 26:12
**third** 170:15 171:6
**thirty** 157:5
**thought** 15:10
  18:17 30:5 44:7
  46:7 51:6,8,22,25
  67:3 90:3,4 96:2
  96:21 125:13
  129:11 139:14
  146:18 157:8
  160:14
**thousand** 157:5
**threatening** 147:11
**three** 8:13,13 9:17
  19:25 20:5 24:11
  41:21 70:17 71:4
  77:1,2,9 79:20
  82:6 94:2 105:1
  108:10 109:15
  124:3,25 168:5

**thresholds** 10:16
**ticket** 109:6
**tied** 152:25
**ties** 175:18 176:1
**till** 56:8
**time** 5:19 6:8,20
  7:15,18 9:12
  10:19 12:3,4,6,8
  15:21 18:3,4
  19:19 22:5 28:7,8
  38:7 40:16 47:22
  53:7 58:23 60:4
  63:20 64:5 66:12
  70:14,20,24 71:7
  76:1 87:13 95:20
  98:8,22 100:20
  101:3 104:19,21
  113:15 116:21
  119:17 121:20
  126:24 127:16
  133:12,18 136:11
  136:13 138:8
  140:1,9 143:8,12
  144:12 150:7,11
  157:6,22 158:9,22
  160:5,11 162:3
  163:3 166:9
  169:19 170:20
  171:4 172:9
  174:18 175:11
  179:8
**timeline** 12:2,2
  38:6 174:19
**times** 20:3,3,7
  43:17 82:4,6
  103:5 105:9
  137:23 143:2
  151:22
**timing** 70:23 71:16
  71:20
**tip** 135:6
**today** 41:21 124:11
  129:19 150:12
  166:10
**todd** 66:12,13,19
  67:4,8 69:6,22
  120:16,19,20,22

120:23 129:14
142:20 146:20,24
147:3,21,22 157:1
179:21
**told** 11:14 13:21,24
17:16 20:15,16,17
21:16 28:20 42:2
61:23 66:23 67:5
77:1,12 89:12,15
90:2,18,19 93:2
94:12,23,23,25
95:8 96:1,9 99:22
102:8 103:5
105:18 106:7,12
106:23,24 107:17
107:22 119:3
120:19,20,22
124:18 129:23
146:23 147:9
149:22 158:19
159:5,23 165:11
168:19 177:12
**tom** 17:11 105:16
105:17,23 106:9
106:14 120:24
121:2 144:23
**tomorrow** 5:22 7:6
30:7 139:15 182:6
182:12,23,23
**tonight** 115:14,15
184:13
**top** 41:10 74:22,22
74:25 86:15 99:10
99:12,13 114:23
114:23 119:6
122:21,22 174:20
**total** 178:22 180:6
**totally** 90:25
**touch** 97:24 113:5
**track** 23:24
**training** 176:8
**transaction** 43:18
44:9,13 53:22
67:20,20 94:1
103:10,15,16
104:16 123:22
128:13 138:9

142:22 166:4
**transactions** 9:17
67:14 86:23 90:24
103:13 104:22
**transcriber** 186:8
**transcript** 44:2
46:24 54:11 186:4
**transfer** 46:9 48:17
**transfers** 163:18
**transparency**
143:25
**treasury** 10:11
13:17 15:5,9,10
21:7,9 25:5,12
26:12 31:20 40:24
41:7 78:13 93:24
97:13
**treasurys** 97:17
**treat** 169:10 174:14
**treated** 169:22
170:3
**treatment** 88:25
108:3 125:18,24
168:14 169:21
177:2
**treats** 165:8
**trial** 1:5 6:19 44:1
89:4 119:14 134:1
143:25 146:7
156:17 162:4
166:11,13 172:3
**trick** 22:20 23:18
**tricky** 104:5
**tried** 169:11 172:10
174:7
**truck** 37:5 126:5
**true** 19:23 41:13,16
72:4 93:9 95:5
96:9 134:12,20
160:4 162:12
163:1 167:7
172:18 186:3
**truth** 20:4 23:19
26:24 27:10 72:19
75:5,18,18 93:20
93:24,25 104:17
124:18

**truthful** 13:11,11
13:15 21:17 25:15
67:24 75:12
114:12
**truthfulness** 116:2
**try** 8:12 13:14 30:1
59:25 85:24
133:12 138:2
140:16 149:20
157:5 167:22
**trying** 8:10 9:21,22
12:9 14:11,12,12
19:19 25:1,1
31:13,16 51:10
52:22,24 58:12
66:17 75:13 102:5
112:3 123:20
135:12 136:16
143:20 146:13
148:20 149:16
154:15,16 158:23
169:1 172:11
**turn** 8:2 85:9
171:10
**turned** 140:14
**turnip** 37:5 126:5
**twice** 48:19 108:7
**two** 3:9 4:17 34:22
36:12 37:23 39:25
55:19 57:9 69:19
69:24 82:4 83:17
91:14,24 98:7
106:4 109:25
115:8 124:3
125:10,18,23
126:9 139:16
141:1,19,22 143:3
143:7,9,12 148:22
158:23 164:3
179:5
**typos** 5:9

## U

**u** 1:9
**uhhuh** 46:3
**ultimate** 154:21
155:18,20

**ultimately** 12:5
35:20 89:1 100:8
117:5 134:16
137:4 139:5
150:25 155:11,15
156:20 168:24
174:12 177:21
178:11
**unanticipated** 9:6
**unappy** 179:18
**uncomfortable**
66:24
**uncommon** 179:9
**uncovered** 158:20
**uncovers** 174:10
**undermine** 132:7
**understand** 3:7 4:2
47:24 71:14 80:21
128:11 171:5,11
**understanding**
44:18,24 52:12
150:1
**understood** 4:22
18:5,5 163:25
**underwrite** 30:7,8
30:10 68:9
**underwriter** 71:22
**underwriting** 19:3
19:5 71:15 73:20
151:21
**underwritten** 31:4
73:17
**underwrote** 18:15
**undue** 152:14
**unidentified** 3:21
4:20,22 46:23
47:9 53:15 60:6
132:17,25 183:9
183:13,15,21
184:5,20
**unified** 137:10
**unindicted** 131:16
131:17,18,19
145:18
**uninvited** 147:3
**united** 1:1,2,6,8 4:7
7:17 135:17 137:1

137:14
**unity** 137:8,18
138:25 140:4
**unknown** 1:22
**unlawful** 88:9
**unpopular** 172:4
**unsecured** 14:17
108:6,7
**untrue** 81:7
**updated** 34:4
**upfront** 179:3
**upset** 17:2
**upside** 178:9
**use** 11:17 24:16,16
26:9 30:24 42:3
65:7 93:3 117:3,9
117:23,24 139:24
167:22
**uses** 170:16
**usually** 170:16,18
182:4
**utilizing** 100:14

## V

**v** 33:13,21 55:14
58:16 160:24
161:7
**vague** 19:15 25:24
**variety** 82:2,6
**vegas** 47:22 48:24
**verdict** 75:22 83:7
136:4
**veritext** 1:23
**versus** 4:8 123:16
**vi** 34:10 54:6 55:22
58:16 83:3 160:24
161:24
**viable** 8:19 10:1
58:24 177:23
**vice** 107:10
**victim** 136:22
180:23
**victimized** 163:9
**violated** 111:11
**violation** 123:8
136:21
**violations** 125:20

**visibly** 17:2
**visàvis** 137:1
**voicemail** 126:21
**voicemails** 102:19
**voluntarily** 158:20
**voted** 110:8
**voting** 110:12
**vs** 1:3

**W**

**wait** 47:12 56:9
  60:9 66:20 69:15
  70:6
**waited** 127:3
**waiting** 184:13
**waived** 52:17
**waiver** 128:16
**wakes** 180:13
**walking** 85:8
**want** 7:18 8:2 17:9
  19:17,22 28:18
  30:14 35:11 44:9
  44:10,11,13,14
  53:16 60:9 61:1,2
  63:6 64:9 65:5
  69:12 72:25 73:1
  75:17 78:17,20
  84:24,25 85:5
  90:22,22 97:6,24
  98:1 99:11,14
  100:18 101:5,13
  101:14 104:17
  106:11,15 108:17
  112:13 113:21
  114:2 116:3,20
  118:5,7,23 120:12
  121:3 124:1 125:4
  126:4 133:16,18
  138:23 141:5,7,11
  141:12 143:19
  147:25 148:3
  151:18,22 153:20
  154:19 157:24
  162:15,16 165:1
  165:17 167:17
  170:11 171:10,21
  178:8,19 180:3,16

**wanted** 3:7 10:2,11
  11:17 16:17,17
  45:3 46:4 49:25
  64:13 71:22 75:8
  75:8,9,20 78:8
  93:20 97:5 100:16
  108:24 109:20
  118:17 120:8,9,23
  139:23 140:1
  145:23 150:23,24
  151:9,9 153:23
  162:13,19 163:1
  163:12 172:5,6
  177:21
**wanting** 121:11
  167:24 180:9
**wants** 3:12 41:9
  69:5,5 96:10 98:2
  111:10,21 115:1
  115:12 127:7
  144:24 148:15
  162:23 165:5,6
  167:15 178:7
**washington** 15:8
  21:8
**wasnt** 26:16 46:21
  50:14 51:17 52:17
  78:20 91:8 96:15
  99:4 109:21 112:4
  119:5,15 123:16
  124:14 139:23
  140:2 157:6
  163:10 168:9,10
  168:15 170:12,25
  171:19,19 172:21
  176:9,16,19,25
  177:20 184:3
**way** 8:3,18 27:12
  37:4 41:9 46:14
  52:19 74:19 82:13
  82:25 85:25 93:4
  95:2 100:6 103:19
  107:19 115:21
  126:16 127:4
  134:3 144:13
  149:2 150:17
  151:24 153:10

155:12 161:23
  163:6 169:8,24
  170:19,20,21
**ways** 94:20 101:18
**weather** 10:7
**wed** 54:12
**wednesday** 140:21
**weeds** 157:11
**weeks** 77:1,2 97:20
  97:21 109:16
  124:25 150:4
**weenie** 149:3
**weigh** 81:11 181:8
**went** 16:11 19:19
  20:15 68:16 94:8
  94:9,9,10,10,11
  96:24 106:18
  110:15,21,24
  111:2 154:6
  164:21 166:16
**west** 75:16
**weve** 40:6,7,8 62:3
  62:6,6,7 66:16
  70:9 74:24 132:22
  143:25 152:16
  176:15 184:1
**whale** 14:10,10
**whatd** 117:23
  125:6
**whats** 19:6,9 22:21
  24:12 25:11 29:14
  30:17 32:1,2,18
  35:1,10 38:5 40:5
  57:20 64:6 67:1
  68:11,20 80:18
  85:14 99:2 102:21
  118:17 131:23
  146:13 149:4
  159:19 162:21
  169:20
**whatsoever** 113:3
  151:22 154:12,14
  165:10 167:5
  168:15,20 174:15
  177:8 178:10
  179:14 180:18
**whend** 153:17

**wheres** 47:9 102:18
  146:14
**whisper** 155:17
**whoa** 17:19,20,20
  144:12
**whos** 19:3 35:18,19
  86:20 89:11
  102:25 118:11
  145:25 158:5
**wide** 185:20
**wife** 38:24 154:7
**wild** 75:16
**willfulness** 3:11
**william** 171:14
  173:7,18
**win** 44:14 47:22
  48:3,24 135:7
**wire** 17:13,13 30:5
  33:13,15,19,19,20
  33:22 34:8,9,9,13
  53:22 54:25 55:2
  58:7 107:24
  112:14 139:15
  145:7,12,12,24
  154:9 160:25
  161:23 162:24
  163:18
**wired** 144:25
  162:16
**wires** 161:3
**wiring** 144:24
  161:16,16 162:11
**wish** 60:8 138:6
**wishes** 172:15
**witness** 53:4 77:21
  77:23 90:1 96:17
  96:20,21 99:9,10
  109:12 134:12
  151:11,11,11
  152:1 154:23
  158:15 160:10
  166:12,13 175:18
  179:19 183:20
  184:2
**witnesses** 77:3,12
  77:20 83:20 84:6
  84:8,10 90:16

95:17 110:8
  133:21 136:12
  152:8 155:16
  172:24,25 173:23
  179:6 183:12
**wonder** 19:13
  123:9
**wont** 53:6 132:6
**wool** 148:20 150:19
**word** 165:7
**words** 30:18 97:13
  124:9 150:9 163:4
**work** 5:9,10 24:18
  24:21,22 25:2
  32:4 40:11,12,12
  100:3 147:13
  157:13,13 167:21
  170:5
**worked** 38:24
  66:13 137:13
  152:2 157:20
  168:13
**working** 29:8 64:23
  64:23 66:15 106:4
  146:20
**works** 12:25 30:15
  63:25 66:3 69:6,7
  146:20
**world** 11:5 87:23
  143:19 176:13
**worried** 148:25
**worry** 178:23,25
  179:2
**worth** 86:25 95:4
  124:14 146:18,19
  151:8 152:20
**worthy** 107:11
  152:18
**wouldnt** 14:22,25
  19:10 40:15 51:21
  129:12 138:24
  143:15 152:17
  170:9 180:3
**wouldve** 69:25 74:6
  74:7
**write** 28:20 149:1
**writes** 31:15 70:12
  116:19 122:18

137:25 138:4
139:8 140:21
141:3
**writing** 53:8 59:17
59:17
**wrong** 24:8 54:9
57:22 58:1,1,6,14
68:15,15 69:20
80:23 91:3,12
113:19 122:13
125:14 128:13
140:19 164:14
183:25
**wrongdoing** 135:21
**wrote** 28:20 107:15

### X

**x** 2:1 26:8

### Y

**yeah** 3:9 30:14,22
46:25 50:11 58:13
58:17 99:13 130:6
131:8 142:9 151:6
157:2 171:17
**year** 12:6 86:11,21
86:21 87:12 90:24
100:22 102:19
110:15 136:14,15
**years** 19:25 20:5
37:17,17 41:21,25
42:4,20 107:21
109:22,23 110:14
123:2 124:3,3
136:7 163:22
171:15 179:6
**yep** 122:17
**yesterday** 5:17
53:21,24
**youd** 165:15
180:12
**youll** 65:24 92:23
92:24 118:18
156:9
**youre** 13:12 25:6
26:24 33:15 38:15
42:18 62:11 70:9
75:13 84:3,23

85:1,8,11,12,12
85:13 87:18 91:4
91:6 101:13
102:11 103:6
118:3,4,7 130:2,3
143:19 147:14
148:5,18,19
159:22,22 167:18
**youve** 26:25 27:1
47:1 66:24 68:15
76:3 86:23 127:1
127:1,5 142:10
159:1

### Z

**zentner** 90:13
125:16 158:18
173:14 174:1
**zentners** 91:10
**zero** 55:23

### 0

**000** 38:25 39:1,19
39:23,25 43:19
45:14,19 46:2
49:8 51:3 62:22
64:25 66:12 109:2
157:3,5 178:16
**06** 127:20
**08** 174:19 175:11
**09** 154:11 161:17
162:5,9 165:22
175:11

### 1

**1** 5:1 76:6,6,9,11
101:1,2 118:18
140:25 168:19
186:16
**10** 1:4 15:7,13 25:9
25:10,18 35:19,23
40:7 41:12,15,17
61:24 62:6,7,7,7
62:15,18 65:7
72:1 160:3 161:17
162:9,15
**100** 157:5
**104** 55:12,13 57:11

162:9
**107** 33:14 34:6,7
**107a** 161:14
**10th** 1:14 92:18
94:11,13 95:20
97:11
**11** 76:11
**111** 34:25 36:2
**112** 23:6 175:21
**1125** 144:20
**119** 42:14
**12** 76:11 99:11,12
**120** 165:4 179:21
180:7
**123** 1:20
**1250** 1:10
**12505** 1:17
**126** 49:23 50:10
**129** 45:7,8
**13** 13:14,18 26:8
27:2 32:21 38:21
74:11 75:8,20
115:8,20
**136** 140:8
**14** 98:14 99:12,12
**140** 160:6
**144** 62:4
**146** 62:5
**147** 62:5
**14cr00548cdj** 1:2
**15** 11:13,23 12:20
13:3,4,20 14:21
21:11 29:16,18
32:21 43:6 59:23
92:20 93:18 94:25
95:2
**150** 165:4 179:21
180:7
**156** 62:5
**15th** 39:6 41:2
61:23
**16th** 176:8
**171** 4:8 69:2 122:17
122:17
**1770** 172:18
**178** 55:10,17 57:4
57:11

**17th** 20:25 21:8
**18** 22:8,20 23:11
25:25 26:7 35:15
35:17,19 93:21
115:21
**1800** 1:24
**1801** 1:24
**18887776690** 1:25
**18th** 62:11
**19** 1:4
**19103** 1:24
**19106** 1:11
**19107** 1:14
**19109** 1:21
**1973** 4:8
**19th** 35:6 39:20
40:1 86:21

### 2

**2** 1:2 35:12 36:9,10
37:23 39:1 41:19
62:19 94:21
117:19 121:21
122:19,21 127:20
137:20 146:10
153:20 154:5,6,8
162:15,16 164:5
**20** 1:4 59:23 61:2
63:18 104:12
108:15 115:4
182:4
**2000** 1:13 37:20
**2002** 105:9
**2004** 169:16,17
**2007** 169:18
**2008** 63:10 96:14
105:3 168:8 176:8
177:11
**2009** 10:23 19:22
20:12,16,18 22:10
29:14 31:3 32:17
35:3 37:9 38:11
39:1,21 40:1 41:2
42:8 61:24 63:7
63:10 65:1,23
71:25 72:4,12,22
83:4 96:15 97:2

99:8 100:14,15,17
105:7 122:25
124:15 125:24
137:22 139:2
140:10,22 141:23
141:24 142:2
153:8,18 159:5
161:8,25 163:22
165:24 168:9
176:10 177:15
178:16 180:14
**2010** 69:9 86:21
89:7,7 90:17,23
92:8,10 125:13,17
174:20 176:17,18
**2012** 74:13 96:24
125:4,8,15
**2016** 1:4 102:4
153:6 163:22
172:19 186:16
**2019** 41:22 42:6,15
**20854** 1:17
**21** 12:16 161:17
162:9,15
**21st** 54:2,8 55:14
57:4 154:11 161:8
176:18
**22nd** 53:22 83:3
153:18 161:25
162:5
**24** 14:16 22:8 31:4
71:19,21 108:15
**24th** 32:17 165:22
**250** 39:1,19,23,25
43:19 45:14 46:2
49:8 66:12 178:16
**2500** 1:20
**25th** 31:20 95:12
95:21 97:16,21
**27** 1:4 185:24
**27th** 176:10
**28** 137:20
**29** 56:18 111:1
123:14
**29th** 14:16 31:3
96:12 139:2,8
142:2

**2nd** 93:10,19 94:4
  137:22

---

**3**

**3** 39:1 42:16 123:5
  127:20
**30** 14:13 20:18 76:6
  76:6,9 109:23
  157:3 182:1,23,23
**300** 38:25 50:13
  51:3 95:4
**304** 55:10,17 57:11
  154:1 162:14
**30th** 13:25,25 14:3
  19:22 20:16 21:5
  21:15 22:10 72:3
  72:22,24 96:12
  97:6,21 100:15
  122:25 123:3
  143:5,9 145:5
  153:8 154:13
  159:5
**31st** 37:9 100:17
**33** 100:11
**34** 42:14 45:19
  48:18
**35** 123:14
**39** 76:11
**39a** 29:20 139:1
**3rd** 4:8

---

**4**

**4** 1:4 22:8 23:16
  32:10,12 112:2,5
  112:7 123:14
  153:19 164:3
  182:1 185:24
**40** 115:4
**400** 107:12 108:14
  124:22 151:8
  152:20 153:3
**405** 108:14
**41** 28:15 101:8
**42** 4:8
**43** 69:1 146:7
**44** 146:10
**48** 112:14 127:20

---

**5**

**5** 13:14,18 14:17
  15:6,16 16:24
  17:24 20:17 21:4
  21:13 22:9 23:1
  23:16,21 24:19,24
  25:12 26:7,13
  27:2 28:6,13 30:3
  32:10,12,19,21
  33:3 36:9 38:21
  41:19 62:19 72:6
  72:16 73:6,11
  74:11 75:8,20
  87:22 101:2
  108:15 116:14
  124:17,23,24
  139:13 145:24
  146:9,11 147:1
  152:19 153:19
  154:5,6 159:6
  164:3,5 165:22
  166:19
**50** 115:4
**500** 62:22 64:25
**539** 42:14 48:18
**56** 154:2
**57** 21:2 159:10
**5th** 99:8 100:14

---

**6**

**6** 20:18 114:21,22
  117:5 165:23
  166:19
**60** 165:4
**615** 1:10
**61b** 21:9
**62** 21:1,3 159:10
**664** 101:1,2

---

**7**

**7** 2:4 28:15 168:4
**7177873721** 118:2
**76** 31:22 142:1

---

**8**

**8** 72:12
**801** 131:21

---

**851** 170:13,24

---

**9**

**9** 24:13,18,18
  123:14 182:23,23
**90** 109:2
**92** 32:14 165:19,21
**93** 42:14 48:18
**98** 35:1 36:3
**9th** 140:10,22

Page 1

```
 1              UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF PENNSYLVANIA
 2

    UNITED STATES OF AMERICA      )   2:14-cr-00548-CDJ
 3                                )
                                  )   April 20, 2016
 4  vs.                           )   Philadelphia, PA
                                  )
 5                                )
    BRIAN HARTLINE, et al         )   10:04 a.m. - 4:32 p.m.
 6

 7                  JURY TRIAL DAY 14
          BEFORE THE HONORABLE C. DARNELL JONES, II
 8              UNITED STATES DISTRICT JUDGE

 9  APPEARANCES:

10  For United States of      DAVID IGNALL, ESQ.
    America:                  JENNIFER CHUN BARRY, ESQ.
11                            U.S. ATTORNEY'S OFFICE
                              615 Chestnut Street
12                            Suite 1250
                              Philadelphia, PA  19106
13
    For Defendant             PATRICK J. EGAN, ESQ.
14  Brian Hartline:           FOX ROTHSCHILD, LLP
                              2000 Market Street, 10th FL
15                            Philadelphia, PA 19107

16  For Defendant             JOEL SCHWARTZ, ESQ.
    Barry Bekkedam:           RUSSELL D. DUNCAN, ESQ.
17                            SHULMAN ROGERS GANDAL PORDY &
                               ECKER
18                            12505 Park Potomac Ave 6th FL
                              Potomac, MD 20854
19
                              MICHAEL J. ENGLE, ESQ.
20                            GREENBLATT PIERCE ENGLE FUNT
                               FLORES
21                            123 S. Broad Street
                              Suite 2500
22                            Philadelphia, PA  19109

23         Veritext National Court Reporting Company
                     Mid-Atlantic Region
24         1801 Market Street - Suite 1800
                   Philadelphia, PA 19103
25                  1-888-777-6690
```

1                         I N D E X

2

3    WITNESS              DIRECT   CROSS   REDIRECT  RECROSS

4    N/A

5

6

7

8                   E X H I B I T S

9    NO.              IDENTIFICATION              PAGE

10   Government's:

11   N/A

12

13   Defendant's:

14   N/A

15

16

17

18

19

20

21

22

23

24

25

```
 1                P R O C E E D I N G S
 2    (DISCLAIMER:  "Indiscernible" noted throughout the
 3    transcript due to poor audio recording, excessive
 4    static/background noise and parties not utilizing
 5    microphones)
 6        (Jury not present)
 7                THE COURT:  All right.  Now, Ms. Barry,
 8    you were ready to go forward with your rebuttal.
 9    Who's going to do the rebuttal?
10                MR. IGNALL:  I'm going to do the
11    rebuttal, but I think we had a couple of issues to
12    raise with the Court before we began.
13                THE COURT:  All right.
14                MR. IGNALL:  The first is the letter
15    brief that I sent to the Court that I mentioned last
16    night I was going to file regarding --
17                THE COURT:  Yes.
18                MR. IGNALL:  -- Mr. Engle's comment
19    during his closing argument that the government did
20    not call Mr. Roven as a witness.
21                THE COURT:  Yes, sir.
22                MR. IGNALL:  I think that encouraged
23    the jury to draw an adverse inference regarding what
24    Mr. Roven's testimony would be.  As I've explained in
25    the letter brief that's inappropriate.  Mr. Roven was
```

1   clearly, equally available to both sides and I would

2   say actually more available to the defense insofar as

3   there may be -- we don't know if there are any --

4   privileged communications, but the defendant uniquely

5   has the ability to allow Mr. Roven to testify to any

6   such thing.

7            So to allow the jury to draw the

8   inference that Mr. Roven was going to say something

9   harmful to the government and that's why we didn't

10  call him is unfair and it puts the government in a

11  very difficult position in rebuttal.

12           There's a Third Circuit case that says

13  it is appropriate for me to raise in rebuttal that he

14  was equally available to the defense and that the

15  defense did not call him, just so long as we don't

16  shift the burden or make it seem that the defense has

17  any obligation to call any witnesses.

18           After much deliberation we decided the

19  most prudent course of action, however, is not to go

20  down that road and instead to ask the Court for an

21  instruction, which is a neutral instruction which I

22  have proposed at the end of the brief that these

23  witnesses are equally available to both parties and

24  the jury should not draw an inference about what

25  someone who didn't testify might have said.  I think

1    that's a very prudent and conservative way to approach

2    this, even though I could allow the jury to draw an

3    inference that the defense did not call Mr. Roven.

4                    Mr. Engle did not have to say that.  He

5    chose to say that and now we're in a position where I

6    have to figure out a way to respond.

7                    THE COURT:  Now --

8                    MR. IGNALL:  I'm sorry, Your Honor.

9                    THE COURT:  I said now.

10                   MR. IGNALL:  Oh.

11                   THE COURT:  The instruction that you

12   have suggested that I give as you've indicated is

13   neutral.  But it wasn't Mr. Hartline's counsel who

14   made the argument.  So if it's neutral it sounds as

15   though it's going to Mr. Hartline as well, correct?

16                   MR. IGNALL:  Well, no.  When I say it's

17   neutral is that the jury may not draw any inference

18   one way or the other, or as I say, you know, you

19   should disregard the witness's possible testimony as a

20   fact in the case.  That's what's neutral; that the

21   jury can't draw an inference one way or another about

22   -- for or against any side regarding what Mr. Roven

23   may or may not have said as a witness; that we're not

24   asking the jury to draw an adverse inference against

25   either defendant for their failure to call Mr. Roven

1    as a witness.

2              THE COURT:  But the way this is phrased

3    it says to both sides so it lumps them together.

4              MR. IGNALL:  I -- we could talk about

5    modifying that, but I assume Mr. Schwartz is going to

6    object to it altogether.

7              THE COURT:  Good morning.

8              MR. SCHWARTZ:  Yes.  Good morning, Your

9    Honor.  I largely agree with Mr. Ignall's

10   identification of the legal standard, but I disagree

11   with his conclusion.  Mr. Roven was not and remained

12   did not ever become equally available to both sides.

13             If you'll recall, Your Honor, there was

14   extensive discussion about this and Ms. Flannery, Mr.

15   Roven's counsel, made it very clear about what her

16   understanding of the immunity agreement was, and her

17   understanding of the immunity agreement was that he

18   gets immunity only when the government calls him to

19   testify.

20             And then there was a big discussion

21   about whether, if the government calls him to testify

22   in its case in chief under immunity, isn't it fair

23   that he continue to have immunity of the defense

24   recalls him.  But there was no discussion of a

25   scenario where the government doesn't call him and

1    then the defense calls him for the first time in this

2    trial as a -- it's -- a witness in its direct case.

3                    First of all, that wouldn't cover Ms.

4    Flannery, and Ms. Flannery speaking for Mr. Roven,

5    their understanding of the immunity agreement and

6    that's what governs what the immunity agreement means

7    irrespective of what the government says.

8                    And, secondly, the government has not

9    and would never offer immunity to a defense only

10   witness.  So to suggest the idea that if the

11   government calls the witness, but we call somebody at

12   -- that we can -- and we can give him immunity to

13   testify freely without revoking his Fifth Amendment

14   privilege, which Ms. Flannery said clearly we would do

15   if we called him without immunity, is a

16   misconstruction of what the factual scenario was.

17                    So Mr. Roven was not available to the

18   defense and only would be available to the defense if

19   the government had, in fact, called him -- called him

20   in its case in chief.

21                    The second thing is, Your Honor --

22                    THE COURT:  Let me just stop you there.

23   According to the letter that Mr. Ignall has sent to

24   the Court, the first paragraph -- second paragraph,

25   first sentence says, "As the Court is aware the

1     government made clear to Mr. Roven and the defense

2     that his immunity agreement would cover him if he were

3     to testify on behalf of the defense."

4                    Now do you agree or disagree with that

5     statement?

6                    MR. SCHWARTZ:  I disagree with that.

7     That's a half characterization.  It was the -- the

8     scenario, and I asked about this specifically when we

9     had the hearing before the trial started.  I said,

10    what happens if the government calls him and he has

11    immunity can we recall him, will he still have

12    immunity, and that's when the government said yes.

13    Ms. Flannery very clearly stated what her

14    understanding of the immunity agreement was.  And her

15    understanding was it's when the government calls Mr.

16    Roven, and then out of fairness if the government

17    called Mr. Roven, then if we called him in our case in

18    chief he would still have immunity because it would be

19    unfair for him to testify for the government with

20    immunity and testify for the defense without immunity.

21                    The scenario of --

22                    THE COURT:  So how is that agree --

23    disagreeing with what's in this first sentence?

24                    MR. SCHWARTZ:  Because the scenario now

25    is that Mr. Roven didn't testify for the government,

1     but we could have called him freely to testify for the

2     defense and he still would have had immunity.  First

3     of all --

4                    THE COURT:  I thought that's --

5                    MR. SCHWARTZ:  -- that's not what Ms.

6     Flannery --

7                    THE COURT:  -- what you just said.

8                    MR. SCHWARTZ:  What's that?

9                    THE COURT:  I thought that's what you

10    just said.

11                   MR. SCHWARTZ:  If I'm misstating -- he

12    wouldn't have had immunity if we called him, if we

13    only called him --

14                   THE COURT:  Did the government

15    expressly state that in all of this that you all were

16    doing pretrial?

17                   MR. SCHWARTZ:  We did it in front of

18    Your Honor when the government --

19                   THE COURT:  I know and I don't remember

20    him saying that.

21                   MR. SCHWARTZ:  The government -- what

22    the government expressly stated was if we called -- if

23    we, the government, called him in our case then -- and

24    give him immunity, he will still have immunity if you

25    decide to call him --

1           THE COURT:  No.  No.  No.

2           MR. SCHWARTZ:  -- in your case.

3           THE COURT:  My question is did the

4    government expressly state that if the defense calls

5    him, period, he will or will not have immunity?

6           MR. SCHWARTZ:  No.  I do not believe

7    so.  Of course, (indiscernible) and the Court and the

8    record, the government, but I do not believe that was

9    -- that scenario was even anticipated.  And it's --

10          THE COURT:  No.  No.  I'm not asking

11   about what someone anticipated.  I'm just simply

12   asking whether or not the government expressly stated

13   if the defense calls him he will not receive immunity.

14          MR. SCHWARTZ:  No.  They didn't say he

15   will not receive immunity because he would receive

16   immunity conditioned on his testifying for the

17   government first.  But the government did not

18   affirmatively say he will not receive immunity if the

19   government only calls him.  But, (a) that flies in the

20   face of what Ms. Flannery said her understanding of

21   the immunity agreement and that's what governs the --

22          THE COURT:  Did Ms. Flannery expressly

23   state that if he is called by the defense, solely by

24   the defense, it is their understanding, meaning Ms.

25   Flannery's and Mr. Roven's, that he would not be

```
 1      protected by immunity?

 2                      MR. SCHWARTZ:  It would -- she stated

 3      that if he was called strictly by the defense he would

 4      assert his Fifth Amendment privilege, which I think

 5      implies that she did not believe that he would have

 6      immunity if only called by the defense.

 7                      THE COURT:  Now, Mr. Ignall --

 8                      MR. IGNALL:  Your Honor --

 9                      THE COURT:  -- I do not have a specific

10      recollection of what Ms. Flannery said.  However, if

11      Mr. Schwartz is correct that her, as Mr. Roven's

12      counsel, and Mr. Roven's understanding was that if he

13      was called by the defense he would assert his Fifth

14      Amendment privilege and she articulated that, then

15      it's exactly as Mr. Engle argued it.

16                      MR. IGNALL:  Yeah, except that's not

17      what happened.  That was initially the case.  We then

18      made clear to Ms. Flannery and to Mr. Schwartz.  I

19      spoke to Mr. Schwartz about this.  When we told Mr.

20      Schwartz that we were not going to call Mr. Roven, he

21      said they were going to make a decision.  They might

22      call him in their case.  They hadn't decided.  It is

23      remarkable to me that Mr. Schwartz has stood up and

24      now said that he didn't understand that.  And if need

25      be, Your Honor, we would have to check the transcript
```

1    or I'll check my e-mails.  There is certainly

2    communication where we made it clear that we

3    considered the immunity covered him if he was called

4    by the defense.

5              And I don't understand why Mr. Schwartz

6    would have then had a discussion with us in the

7    hallway about they'll have to decide later whether

8    they're going to call him in their case.

9              MR. SCHWARTZ:  I'm happy to rely on any

10   transcript and be corrected.  I was preparing to

11   cross-examine Mr. Roven and Mr. Engle was having the

12   conversations with -- sorry to pass the buck, Mike --

13   was having a conversation with Mr. Ignall about

14   whether he was getting called or not.

15             And then we went right into the first

16   witness instead of (indiscernible).

17             THE COURT:  So if there is no agreement

18   and the Court does not have a specific recollection of

19   what was proffered, but you do have it in the notes

20   and you can find it -- or in some form of

21   communication, and that's what you want us -- still

22   want to rely on that, then we'll have to delay this

23   trial till you find it.

24             MR. SCHWARTZ:  Well, I -- actually,

25   Your Honor, I can suggest we don't have to delay this

Page 13

```
1       trial for two reasons.

2                   First of all, the second part of my

3       argument is that there already is an instruction that

4       takes care of this and that's the instruction on page

5       19 that says, "Not all evidence, not all witnesses

6       needed."

7                   THE COURT:  Now that you mention the

8       page number, I know that these pages that you all

9       prepared for me stopped at page 53 --

10                  MR. SCHWARTZ:  First of all, we --

11                  THE COURT:  -- out of a hundred and

12      some pages.

13                  MR. SCHWARTZ:  Page 19 ought to cover

14      it.

15                  THE COURT:  Now what page?

16                  MR. SCHWARTZ:  I believe it's -- on

17      mine it's page 19.  It's the instruction not all

18      evidence and not all witnesses.

19                  THE COURT:  Let me review it.

20          (Pause)

21                  THE COURT:  This is not really what Mr.

22      Ignall was objecting to.  This instruction is not

23      going to cover it.

24                  MR. SCHWARTZ:  Well, I would

25      (indiscernible).
```

 1                    That said,  even if you completely

 2    reject my argument, what Mr. Ignall is asking for is a

 3    curative -- is an instruction like we can go on with

 4    rebuttal, and then if we can either resolve this

 5    during the break or Ms. Flannery is actually in the

 6    building, but she's tied up with Judge

 7    (indiscernible).  If we're -- I don't think it would

 8    stop Mr. Ignall from making his argument.

 9                    And if, in fact, I am incorrect and Mr.

10    Ignall is correct, then the instruction would then --

11    could then be given.

12                    THE COURT:  Mr. Ignall, is that

13    acceptable to you?

14                    MR. IGNALL:  Not my first choice, but I

15    think we're going to have to live with that because I

16    don't want to delay the trial, Your Honor.

17                    THE COURT:  Very well.

18                    MR. SCHWARTZ:  And we will make an

19    effort to see if we can get (indiscernible) Ms.

20    Flannery's done.

21                    THE COURT:  All right.

22                    MR. SCHWARTZ:  Thank you, Your Honor.

23                    MR. IGNALL:  May we have one moment,

24    Your Honor?

25         (Pause)

1                    THE COURT:  I'm sorry.

2                    MR. EGAN:  I didn't know if Your Honor

3      was finished with that issue or not.

4                    THE COURT:  I'm awaiting your next --

5                    MR. IGNALL:  No.  I think we're just

6      going to have to try and resolve it.  I would like to

7      make another point, though.  I don't remember counsel

8      ever saying that they wanted to call Mr. Roven and

9      raising with the Court whether the immunity would

10     apply given that the government didn't call him.

11                   So I don't think asking the jury to

12     draw an adverse inference regardless makes sense.  But

13     we'll try to see if we can come up with some evidence

14     of what we disclosed to the defendant and to Ms.

15     Flannery.

16                   THE COURT:  Very well.  Thank you.

17                   MR. EGAN:  And, Your Honor, just note

18     my objection.  As Your Honor has properly indicated,

19     Mr. Hartline -- as counsel for Mr. Hartline I've made

20     no reference to cause this to be read.  I don't know

21     how it can be read in a way that would state Mr.

22     Bekkedam alone and, therefore, I believe it's

23     prejudicial to Mr. Hartline and improper to read when

24     you have a multi-defendant trial.

25                   THE COURT:  All right.  Thank you.

 1                    MR. EGAN:  I have a couple of other

 2      very brief issues, Your Honor.

 3                    THE COURT:  Yes, sir.

 4                    MR. EGAN:  Yesterday during the

 5      government's closing argument we made a motion for

 6      mistrial based upon the government citing to evidence

 7      that Your Honor had excluded from the trial.  And Your

 8      Honor had said that you wanted that in writing.

 9                    THE COURT:  Yes, sir.

10                    MR. EGAN:  We -- the transcript is

11      trickling in so I'm not sure we've got the part that

12      that covers, but I also note that Your Honor has held

13      the Rule 29 reserve judgment and obviously that comes

14      before the motion for mistrial.

15                    So we would like to preserve the right

16      to brief that issue when we brief the Rule 29.

17                    MR. IGNALL:  We have no objection to

18      that, Your Honor.

19                    THE COURT:  Very well.

20                    MR. EGAN:  Thank you, Your Honor.

21                    And my other issue is the government

22      had a one and a half hour closing statement yesterday.

23      They've now had all night to do a rebuttal.  I see him

24      teeing up, you know, depositions and slide shows.  I

25      would ask that Your Honor limit the scope and length

1     of the rebuttal argument.

2                      THE COURT:  The scope is limited by

3     rule to be restricted to what is properly rebuttal

4     argument.  And in terms of the length I've not placed

5     any limits of time or any restrictions on the length

6     on anyone's closing.  I'm not going to start now.  I

7     just think that under the circumstances counsel being

8     professional will adhere to an appropriate curtailing

9     or whatever necessary.

10                     These folks have been in that box now

11    for quite some time and I think he's acutely aware of

12    that as well.

13                     MR. EGAN:  Thank you.

14                     MR. IGNALL:  Thank you, Your Honor.

15                     THE COURT:  All right.  Thank you.

16                     Yes, sir.

17                     MR. DUNCAN:  Your Honor, we have one

18    other issue.

19                     THE COURT:  Yes, sir.

20                     MR. DUNCAN:  It relates to the jury

21    instructions.

22                     THE COURT:  Yes, sir.

23                     MR. DUNCAN:  Your Honor, yesterday

24    following Ms. Barry's argument we moved for a mistrial

25    based on the government's constructive amendment of

1    the indictment regarding Count VI.  With the

2    assistance of the recess we've had a chance to look at

3    some of the law on this, and I wanted to report to the

4    Court that both the Supreme Court and the Third

5    Circuit have opined very directly on this issue.

6               The Supreme Court has condemned, and

7    that's their word, condemned this practice and that's

8    in the case of Russell v. United States, a 1962 case.

9               THE COURT:  What practice?

10              MR. DUNCAN:  Construct -- pardon?

11              THE COURT:  What practice, condemned

12   this practice, what practice?

13              MR. DUNCAN:  Constructive amendment of

14   the indictment.  The Third Circuit has stated that it

15   puts constructive amendments of the indictment in an

16   exceptional category of error.  That's United States

17   versus McKey, 506 F.3d at 229.

18              The Third Circuit has stated that an

19   amendment is constructively amended -- I'm sorry -- an

20   indictment is constructively amended when any of the

21   following occur:  Either the evidence, the argument or

22   the jury instructions affectively amends the

23   indictment by broadening the possible bases from which

24   a jury could find guilt, and it deviates from that

25   which appeared in the indictment.  And that's McKey at

```
 1    229.

 2                    Your Honor, if I may and I'm --

 3                    THE COURT:  Wait a minute before you

 4    proceed.

 5                    MR. DUNCAN:  Yes.

 6                    THE COURT:  I want to at least get

 7    something clear from Ms. Barry because I understand

 8    her proffer at sidebar and explanation at sidebar that

 9    it was not a constructive amendment, but rather just

10    simply an inadvertent flipping of the numbers.

11                    Now let me hear from Ms. Barry in that

12    regard.

13                    MS. BARRY:  No, Your Honor.  The actual

14    numbers that we had with the exhibits which I provided

15    to defense counsel are the ones that we believe went

16    with each of the counts.  And I believe our indictment

17    says on or about October and we have 21st -- or 22nd

18    and I believe the e-mail is dated the 21st.

19                    So I think that is the issue that Mr.

20    Duncan may be having is that he's having an issue with

21    on or about.

22                    MR. DUNCAN:  Not in the least.

23                    THE COURT:  All right.  Did you hear

24    that response?

25                    MR. DUNCAN:  Not -- I'm not in the
```

1    least --

2                    MS. BARRY:  Yes, Your Honor.

3                    MR. DUNCAN:  Thank you.

4                    Your Honor, if I may, and I appreciate

5    Ms. Barry was kind enough to provide us with the

6    specific slides and we would ask if the Court would be

7    willing we could show Exhibit 104 which is the exhibit

8    she referred to.

9         (Pause)

10                   MR. DUNCAN:  The count in the

11   indictment, Your Honor, states -- does not state on or

12   about.  It states, Count VI, October 22nd, 2009, an e-

13   mail from a Balomore employee to AB, which I assume is

14   Anthony Bonomo, instructing him to sign and return the

15   Nova loan documents.  That's what the government

16   charges.

17                   And if the Court -- if we could look at

18   Exhibit 104, please, if the Court's --

19        (Pause)

20                   MR. DUNCAN:  This is what was put up on

21   the screen and this is what Ms. Barry argued.  This

22   says, on October 21st --

23                   THE COURT:  I'm still not seeing

24   anything.

25                   MR. DUNCAN:  Oh, here it comes, Your

1    Honor.  On October 21st --

2                    THE COURT:  (Indiscernible).

3                    MR. DUNCAN:  -- another Balomore

4    employee.

5                    THE COURT:  I'm sorry.  I don't have

6    it.

7                    MR. DUNCAN:  Oh, okay.

8        (Pause)

9                    THE COURT:  All right.  It's on now.

10   Somebody turned it off.

11       (Laughter)

12                   THE COURT:  All right.  You may

13   proceed.

14                   MR. DUNCAN:  The gremlins of computers.

15                   Your Honor, the indictment charges on

16   October 22nd.  This e-mail specifically says October

17   21st.  But the most important point, Your Honor, is

18   the indictment says -- it instructs Mr. Bonomo to sign

19   and return the loan documents related to the Nova loan

20   which is the scheme to defraud.  It's the Nova loan.

21   This document says, it instructs him to sign the

22   attached letter from Nova regarding the Banyan

23   investment.

24                   Your Honor, this is a per se

25   unconstitutional because it violates the Fifth

1    Amendment grand jury clause because it deprives the

2    defendant of its opportunity to have his substantial

3    right to be tried only by the charges presented in the

4    indictment.

5              The reason this is a grave injustice is

6    we prepared to rebut the charges in the indictment

7    that on October 22nd a Balomore employee sent an e-

8    mail to Anthony Bonomo saying, sign these loan

9    documents.  We know that on October 22nd from the

10   indictment that what was asked for was to sign

11   documents related to the Banyan investment, a

12   completely different thing as the evidence showed in

13   this case.

14             Your Honor, it is our position that if

15   the jury is allowed to even deliberate on this count

16   it has the potential to effect the entire

17   deliberations because it puts the jury in the position

18   of speculating as to what might have occurred because

19   the evidence that is before them is exactly opposite

20   to what is in the indictment.  And that has the

21   possibility to have the jury end up speculating.

22             Your Honor, further, and this is not

23   meant in any way to reflect on anything the Court is

24   doing, but the proposed jury instructions under Count

25   VI incorporates this very error.  No jury could

1    reasonably find that Mr. Bekkedam violated Count VI or

2    was guilty of Count VI based on the evidence that was

3    presented here because it's the wrong date and the

4    wrong purpose.  And if it's the wrong date and the

5    wrong purpose --

6                    THE COURT:  (Indiscernible) Count VI or

7    Count II?

8                    MR. DUNCAN:  Count VI, just Count VI,

9    Your Honor.

10                    THE COURT:  Thank you very much.

11                    MR. DUNCAN:  Thank you, Your Honor.

12                    MR. IGNALL:  May I have one moment,

13    Your Honor?

14                    THE COURT:  Certainly.

15        (Pause)

16                    MR. IGNALL:  Thank you, Your Honor.

17                    MS. BARRY:  Thank you, Your Honor.

18                    In the indictment it indicates

19    paragraph 10, on or about, and it's a Rule 29

20    argument, Your Honor, not a motion for mistrial or

21    constructive amendment.

22                    THE COURT:  The Court is going to

23    strike Count VI.  Now I will do that either via a

24    portion of the 29 motion or otherwise, but Count VI is

25    out.

1                    MR. IGNALL:  Thank you, Your Honor.

2                    MS. BARRY:  Thank you, Your Honor.

3                    MR. DUNCAN:  Thank you, Your Honor.

4                    MR. ENGLE:  Your Honor, with respect to

5      the other issue that we were discussing --

6                    THE COURT:  Yeah.  No.  I want to look

7      at the verdict sheet that was submitted to me now --

8                    MR. ENGLE:  Yes, sir.

9                    THE COURT:  -- to see what we have to

10     do to modify that.

11          (Pause)

12                    THE COURT:  All right.  It will be

13     stricken from the verdict sheet and redone, but I want

14     to look at the jury instruction regarding Count VI

15     that was jointly submitted by counsel.  Do you happen

16     to -- well, it doesn't matter what page it's on, I

17     don't have the right page number, but --

18                    MR. DUNCAN:  We have it after page 97,

19     but I understand Your Honor may not have

20     (indiscernible).

21                    THE COURT:  Well, my page --

22                    UNIDENTIFIED SPEAKER:  (Indiscernible).

23                    UNIDENTIFIED SPEAKER:  Well, my page

24     numbers stop at like 51.

25                    MR. DUNCAN:  Yeah.  Joel sent me an e-

1    mail about that last night.

2              THE COURT:  I have an index, but the

3    pages themselves are not numbered.

4         (Pause)

5              THE COURT:  That's the wire fraud

6    count, correct?

7              MR. ENGLE:  Yes, sir.

8              MR. DUNCAN:  Count VI, Your Honor.

9              MR. ENGLE:  Your Honor, it starts right

10   after the Pinkerton liability charge and if you happen

11   to see the Pinkerton liability charge, the next one --

12        (Laughter)

13             THE COURT:  That's a big help there,

14   Mr. Engle.  Thank you.

15             MR. ENGLE:  Sorry, Your Honor.  That's

16   the best I can do.

17             MR. EGAN:  Your Honor, I have it if you

18   want.  I can approach.

19             MR. ENGLE:  We have it here if you just

20   want to --

21             MR. EGAN:  Do you want me to approach?

22             THE COURT:  Yeah, please.  Thank you.

23        (Pause)

24             THE COURT:  Counsel, could you have

25   your -- someone from your respective team to e-mail us

1    (indiscernible) the worksheet so that we can modify it

2    in Microsoft Word?

3                    MR. IGNALL:  Yes, let me -- well, I'll

4    ask Ms. Barry to step out and -- I forgot my iPhone so

5    she can go e-mail our legal assistant.  But also there

6    are a couple of places in the indictment that

7    reference Count VI, so we just have to make sure we've

8    gone through all of that like the --

9                    MR. ENGLE:  You mean the jury

10   instruction?

11                   MR. IGNALL:  In the jury instructions I

12   mean.  Like the nature of the indictment talks about

13   that and there are a couple of places where there --

14                   THE COURT:  All right.  Let's do this.

15   Let's let Ms. Barry do that and then you need to come

16   back and you can do your rebuttal.

17                   MR. IGNALL:  Okay.

18                   THE COURT:  Then we'll stop and address

19   these things.

20                   MR. IGNALL:  Okay.

21                   THE COURT:  I'm frankly not comfortable

22   -- we got this at 11:00 last night and like I said

23   it's voluminous.

24                   MR. IGNALL:  Yes.

25                   THE COURT:  And I'm -- and without

1    pagination.  And what's concerning me is this material

2    (indiscernible).  I don't like to make mistakes and

3    I've gone through this and even early this morning was

4    finding mistakes after it was submitted.  That's just

5    not how I roll, if you will.

6                    MR. IGNALL:  I understand, Your Honor.

7    And we would -- we've been trying to go through it to

8    see if we can identify anything as well.

9                    THE COURT:  All right.

10                   MS. BARRY:  So you would like the

11   verdict sheet e-mailed to Ms. Degroot?

12                   THE COURT:  Please.

13                   MR. IGNALL:  In Word.

14                   THE COURT:  In Word.

15                   MS. BARRY:  In Word.  In Word.

16                   MR. IGNALL:  Okay.

17                   THE COURT:  (Indiscernible).

18                   MR. IGNALL:  All right.  Great, Your

19   Honor.

20                   And then another question, let me talk

21   to counsel about this before I raise it.

22                   THE COURT:  Go right ahead.

23           (Pause)

24                   MR. IGNALL:  Thank you, Your Honor.

25                   THE COURT:  Sure.

Page 28

1                    MR. ENGLE:  Your Honor --

2                    THE COURT:  Yes, sir.

3                    MR. ENGLE:  -- while we're resolving a

4      couple of these matters may Mr. Bekkedam just step out

5      briefly?

6                    THE COURT:  Sure.  Sure.

7                    MR. ENGLE:  Thank you.

8          (Pause)

9                    MS. BARRY:  Your Honor, the verdict

10     sheet is being e-mailed.

11                   THE COURT:  Great.  Thank you.

12                   MS. BARRY:  Thank you.

13                   THE COURT:  (Indiscernible).

14                   MR. ENGLE:  That would be great.

15                   MR. IGNALL:  But I think we were going

16     to --

17                   MR. ENGLE:  Yeah, Your Honor, on the

18     other issue with respect to the matter involving Mr.

19     Roven, the immunity issue and all that --

20                   THE COURT:  Yes, sir.

21                   MR. ENGLE:  -- we weren't able to find

22     Ms. Flannery, but if it's -- my recollection is coming

23     back that we did have certain discussions that I

24     believe -- you know, we want to withdraw the argument

25     that we were making with respect to the privilege

```
 1      issue and the unavailability issue.

 2                    THE COURT:  All right.

 3                    MR. ENGLE:  So if the Court finds that

 4      the instruction is appropriate and can be done in a

 5      way that's not prejudicial to Mr. Hartline, then

 6      obviously we have no objection to the --

 7                    THE COURT:  All right.  See if you can

 8      --

 9                    MR. ENGLE:  -- instruction.

10                    THE COURT:  -- have a meeting of the

11      minds on that.   But I would certainly suggest that if

12      you prefaced with, although a defendant has no burden

13      to produce evidence --

14                    MR. IGNALL:  Okay.

15                    THE COURT:  -- and go from there.  But

16      certainly Mr. Egan is looking at this to be drafted in

17      such a way that Mr. Hartline is not negatively

18      impacted.

19                    MR. EGAN:  Yes, Your Honor.

20                    THE COURT:  All right.

21           (Pause)

22                    UNIDENTIFIED SPEAKER:  Your Honor, may

23      I be briefly excused as well?

24                    THE COURT:  Yes, sir.

25           (Pause)
```

 1                    UNIDENTIFIED SPEAKER:  Thank you, Your

 2     Honor.  Sorry for the delay.

 3                    THE COURT:  All right.  You ready?

 4                    MR. IGNALL:  Yes, Your Honor.

 5          (Pause)

 6                    THE CLERK:  All rise.

 7          (Call to the Court)

 8          (Jury present)

 9                    THE COURT:  Good morning again.  You

10     may be seated.

11          (A chorus of good morning)

12                    THE COURT:  All right.  Members of the

13     jury, as I indicated yesterday the government has a

14     right to present rebuttal argument.  At this time Mr.

15     Ignall will do so.

16                    MR. IGNALL:  Thank you, Your Honor.

17                    Good morning, everyone.

18          (A chorus of good morning)

19                    MR. IGNALL:  Thank you for coming back

20     for this final push.  But I want to thank you again

21     for your attention, and the reason I think that all

22     the parties thank you is not just to get our voices

23     warmed up.  But it's because this case is very

24     important, important to both defendants and it's

25     important to the people of the United States.  So I

```
 1      want to thank you for your attention as we get into
 2      this final push.
 3                     Ladies and gentlemen, you need to
 4      consider all the evidence.  You need to consider what
 5      these two defendants did and why they did it.  You
 6      need to consider that these two defendants arranged
 7      for loan transactions where Nova Bank loaned money to
 8      three individuals to circle it back to the bank.  You
 9      need to ask yourselves why, what's the point of
10      transactions like this, is there any point to this
11      other than to make Nova Bank appear to be healthier
12      than it really was.  Ask yourselves, when you use your
13      common sense and you consider all the evidence is
14      there any other conclusion.
15                     You heard both defense attorneys tell
16      you there's no crime here.  You heard talk about
17      accounting standards and capital.  Well, ladies and
18      gentlemen, you need to listen to the instructions the
19      Court is going to give you, and I anticipate there
20      won't be any instructions about accounting or capital.
21      The instructions are going to be about fraud.  Fraud
22      means deceiving someone.  Fraud means lying.  Fraud
23      means concealing facts in order to obtain money or
24      property.
25                     And the fraud in this case involves
```

1    three different types of fraud.  There's the fraud

2    against the United States, against the treasury in

3    order to get TARP funding for Nova Bank; there's the

4    fraud against Nova Bank itself to get loans from Nova

5    Bank; and with respect to Mr. Bekkedam there's a fraud

6    against investors.

7              The evidence is overlapping, but it's

8    not identical and you don't need to consider it all

9    the same way when you consider each fraud in the

10   purpose of the defendant's conduct with respect to

11   each fraud.

12             Let's start with the TARP fraud.  No

13   crime here.  Well, the question here is was there a

14   scheme to defraud the TARP; was there a scheme to

15   deceive people involved in the treasury decision-

16   making process about whether Nova Bank should get TARP

17   funding, whether people at the treasury should make a

18   decision about whether to invest $13.5 million of

19   public money in a bank that may or may not survive.

20             You heard from a number of witnesses

21   how important that was that the bank be viable.  You

22   heard as the very first witness from Ted Schaffner who

23   is the director of the capital purchase program, this

24   very program.  So when we heard comments during

25   closing argument about who knows who's involved in

1    making what decisions, the government's very first

2    witness explained to you how the process worked, how

3    the regulators, how the treasury in D.C. relied on the

4    bank's primary regulator to get them information.

5              You know how that information went from

6    the FDIC, meaning Lisa Koch, through to Chuck Hunter,

7    through to D.C., through to the capital purchase

8    program council.  You heard two members of that

9    council testify about the information that they needed

10   to make a decision about whether this bank was viable

11   and whether it should get 13.5 roughly million dollars

12   of public funds.  And you know that if the CPP council

13   didn't vote at least three to one it was never going

14   to get to the investment committee.

15             So the questions for you are what

16   information is capable, it doesn't have to actually

17   influence the decision-maker, but what information,

18   what omissions, what half-truths could potentially

19   influence people involved in that decision-making

20   process.

21             So then ask yourselves would the people

22   involved in making a decision about whether to invest

23   in Nova Bank want to know that Mr. Levin borrowed $5

24   million as opposed to simply investing it.  Which

25   would make the bank seem stronger, Mr. Levin taking

1    money that he may or may not have from the outside or

2    Mr. Levin getting a $5 million loan that the

3    regulators weren't aware of when they had previously

4    evaluated Nova Bank.  Is that something they would

5    want to know?

6                    Then the next question to ask

7    yourselves is did these two defendants have any idea

8    about what the treasury would want to know?  Well,

9    ladies and gentlemen, the evidence has shown that

10   there was back and forth about whether Nova should

11   qualify, going back into at least April when the CPP

12   council deferred its decision.

13                   Well, what happens in May?  That's when

14   Mr. Levin is potentially going to invest $15 million.

15   That's when Mr. Hartline suggests that to the

16   treasury.  That's when he suggests it to the FDIC.

17   And that suggestion ends up working; that on June 10th

18   the council recommends that Nova be approved if they

19   raise that $15 million.

20                   So now the defendants know what the

21   treasury wants to know; that Nova is healthier by $15

22   million.  But unfortunately the evidence has shown

23   that these defendants were not able to meet that.  If

24   they had been able to meet it with outside money we

25   wouldn't be standing here today.  But by the end of

1      June these defendants realized that Mr. Levin was not

2      putting in $15 million of outside money.  He wasn't

3      even putting in the first $5 million of outside money.

4                     So that's when they came up with the

5      scheme.  If we look at Exhibit 39-A you see Mr.

6      Bekkedam writing to Mr. Roven, Mr. D. Mark Antonio and

7      co-defendant Brian Hartline about the plan.  This is

8      on June 29th, one day before Mr. Levin's loan is

9      funded, where he says, it's clear to me that we're

10     getting George approved for a loan of $5 million.

11                     In order to meet the treasury

12     requirement these defendants now have to come up with

13     something, something that looks plausible.  Mr. Levin

14     on paper seems to have a lot of money.  So the plan is

15     to have the bank fund the loan, send $5 million to Mr.

16     Levin, send it in to his Gibraltar Bank account -- if

17     we could bring up Exhibit 52 -- a bank account that

18     didn't have $5 million in it.  Mr. Levin didn't have

19     $5 million in this bank account to invest.  He did

20     once Nova Bank funded that loan on June 30th, and two

21     hours later Frank Preve sends that $5 million back to

22     Nova Bank.

23                     What's the purpose of that?  Is there

24     any purpose to that other than to make it look like

25     Mr. Levin, a man of means, has invested $5 million?

```
1     Is there any reason to engage in that transaction
2     other than to make the bank look stronger?  If this is
3     all open and above board as defense counsel suggests
4     in their closings, why hide it?  Why conceal the truth
5     from regulators?
6                     The difference is that regulators would
7     care.  You heard Mr. Baxter's voice mail where they
8     want cash in the bank, not cash from the bank.  So
9     then the question comes -- becomes why be so cute
10    about answering questions, why be so cute about the
11    source of fundings, the change in control application
12    for Mr. Levin.  You know that both Mr. Hartline and
13    Mr. Bekkedam were involved in that.  You know there
14    were questions on Exhibit 63 and 64 about the source
15    of all the funds, is any of it borrowed and from
16    where.
17                    But then you see the answers.  If we
18    can bring up Exhibit 81, page 2.  Why is Mr. Hartline
19    suggesting a different answer?  Why is he answering a
20    different question?  As opposed to where all the funds
21    are coming from, why be a little bit too cute and
22    answer the question, well, where are the other funds
23    coming from, the additional 13 million?
24                    And this is a document where it talks
25    about Mr. Preve writing a letter to regulators about
```

1    the source of funds.  A document, if you look at page

2    1 of this letter, shows that Mr. Bekkedam was involved

3    in modifying.  Why?  Ask yourselves why the bank

4    documents, the risk assessment summaries that the bank

5    uses to make a determination about whether to make a

6    loan don't show the true purpose of any of these

7    loans.  If this is all reasonable and maybe these

8    defendants are confused about what the treasury might

9    want, why conceal the truth?

10            Let me go through a couple of other

11   things that you heard during the closing arguments.

12   You heard discussions about, well, maybe the auditors

13   could have figured it out and, in fact, by 2010 the

14   auditors had figured it out.  Well, ladies and

15   gentlemen, I anticipate that the Court's going to

16   instruct you that the crime doesn't have to be

17   successful to be a crime.

18            As Ms. Barry said to you, a lie is

19   still a lie even if it doesn't work.  It doesn't

20   matter that auditors could have if they dug through

21   every document at Nova Bank and figured this out.  It

22   doesn't matter that auditors could have, but as it

23   turned out didn't, go through every investor in the

24   bank to see if those investors had borrowed the very

25   same funds that they were using to invest in the bank.

1                  You heard from the bank examiner.  You

2     heard from Mr. Shubin that's not part of the audit.

3     And, in fact, when both of them discovered that these

4     loans were used to buy bank stocks, loans were made at

5     roughly the same time that these individuals were

6     investing in Nova Bank stock, or specifically Nova

7     Financial Holdings stock, they determined that doesn't

8     count as capital.  That's not outside money.  It's

9     outside money when the person who borrowed it pays it

10    back.

11                 And we know that that's the risk here.

12    We know that Mr. Levin never paid it back.  We know

13    that Mr. Bonomo sued over the loan.  So that's why

14    it's not the same thing.  It's not money in the bank.

15    It's a hope that there will be money in the bank.

16                 So could either of these two defendants

17    have reasonably thought that they could arrange a

18    transaction where the bank's own money ends up back in

19    the bank and that these regulators would consider that

20    part of the $15 million of the cushion that Nova Bank

21    needed to prove that it was viable, that it was going

22    to survive the financial crisis.

23                 Mr. Egan said something about Mr.

24    Hartline wasn't hiding anything.  He spoke to the

25    FDIC.  He spoke to the auditor.  Well, ladies and

 1      gentlemen, he spoke to the FDIC and he spoke to the

 2      auditor after the cat was out of the bag, after both

 3      of them knew about all of these transactions.

 4              But, ladies and gentlemen, ask

 5      yourselves what did Mr. Hartline say at that point.

 6      Did he say, what, the -- this isn't okay?  I thought,

 7      you know, Mr. Levin's wealthy.  He's going to pay it

 8      back eventually.  This was fine.  No.  Mr. Hartline

 9      decides to lie.  He decides to conceal the truth in

10      the same way the truth was concealed from bank

11      employees about the true purpose of this loan.  Why is

12      Mr. Hartline concealing the truth?  Why not just tell

13      the truth once auditors and the FDIC know about these

14      transactions?

15              You heard Mr. Engle talk about how Mr.

16      Bekkedam wasn't involved in this, how he had no

17      official role with the bank.  Well, ladies and

18      gentlemen, when you get back in the jury room consider

19      all of the evidence of Mr. Bekkedam's involvement in

20      this.  Consider the testimony of Frank Preve about how

21      he was dealing with Mr. Bekkedam about Mr. Levin's

22      loan; how Mr. Bekkedam described how he controlled the

23      bank even though he had no official role.

24              Consider the testimony of Hillary

25      Musser, a Balomore client, who talked about how Mr.

1    Bekkedam described Nova Bank as his bank.  If he's not

2    involved, why is he saying things like that?  Why is

3    he telling Ms. Musser about the TARP requirements and

4    her understanding about how he said something about

5    the bank's balances weren't really in line with what

6    the regulators needed.  That's why he needed Mr. Levin

7    to help prop up the bank.  If he's not involved why is

8    he having that discussion with her?

9              But, ladies and gentlemen, you can look

10   at the documents.  You heard a couple of times that

11   facts are stubborn things.  Well, one thing that's

12   very stubborn are documents because they are what they

13   are.  They say what they say.  Look at the documents,

14   look at the e-mails.  Counsel is right.  You're not

15   going to find an e-mail between Barry Bekkedam and

16   Brian Hartline saying, all right, let's get together

17   on Tuesday.  Let's do something that the law forbids.

18   Here's the whole plan.  Would that make sense to write

19   that down or does it make sense to determine what

20   these defendants were doing and what they thought

21   based on what you actually see them writing back and

22   forth?

23              Let's look at Exhibit 98, page 2.

24   Let's go back to page 1, I'm sorry.  An e-mail from

25   Barry Bekkedam to George Levin in October.  Let's go

1  to the second page.  Mr. Bekkedam is talking about how

2  bank capital is due next week.  He's talking about the

3  TARP being approved.  He's talking about the whole

4  plan, how $10 million is coming from George Levin, 7

5  million that Nova is lending to George Levin, 5

6  million that's already done.  Is this someone who's

7  not involved in getting the bank approved for TARP

8  funding?

9            Let's go to Exhibit 102, another e-mail

10  from Barry Bekkedam.  The low cost TARP is critical

11  and must close this week.  The capital along with the

12  other $5 million going in today allows us to collect

13  $13.5 million of TARP.  Is this someone who's not

14  involved in the bank, who is not concerned about the

15  bank getting the TARP funding?  The treasury will not

16  kill us for 24 hours.  Is this someone who is not

17  familiar with the decision-making process from the

18  treasury?

19            You heard Mr. Engle say that Todd

20  Howard described Mr. Bekkedam as a ten -- a hundred

21  thousand foot guy.  Well, you see documents that show

22  that he can be a little bit closer to the ground as

23  well.

24            I believe it's Exhibit 134.  You don't

25  -- we don't need to put it on the screen, but you can

 1    look at that back in the jury room.  A document Mr.

 2    Howard talked about that Mr. Bekkedam edited, talking

 3    about the bank in great detail.  You heard Mr. Engle

 4    say what's Mr. Bekkedam's motive.  Well, other than

 5    the $250,000, other than a desire to keep the bank

 6    afloat because his clients are invested in the bank

 7    and because some of his clients have borrowing

 8    relationships with the bank.  That might be a pretty

 9    good motive.

10                 But ask yourselves if Mr. Bekkedam has

11    no motive why is he going to so much trouble to get

12    this TARP funding approved, why is he arranging loans

13    to George Levin, why is he getting Anthony Bonomo a

14    loan?

15                 You heard Mr. Engle say -- go through a

16    whole list of people who weren't influenced by Mr.

17    Bekkedam, Mr. Bekkedam never spoke to, and indeed the

18    evidence is what it is about who's -- who Mr. Bekkedam

19    spoke to.  We know he didn't speak to regulators.

20    That was Mr. Hartline's job.  You saw the e-mail where

21    Mr. Bekkedam somewhat glibly says, help me manage

22    Brian who's managing the regulators.  It wasn't Mr.

23    Bekkedam's role to manage the regulators.

24                 But who was influenced by Mr. Bekkedam?

25    George Levin was influenced by Mr. Bekkedam.  How did

1       he come to the bank?  Whose idea was it for George

2       Levin to borrow money from Nova Bank to buy Nova

3       Financial Holdings stock?  Was it Mr. Levin's idea?

4       Did he one day wake up and decide that Nova Bank, a

5       bank that was recently downgraded in its financial

6       condition, I really think I would like to buy some

7       bank stock and maybe I'll borrow some money.  Whose

8       idea was that?

9                    Who else was influenced by Mr.

10      Bekkedam?  Anthony Bonomo.  Who suggested the loan to

11      Mr. Bonomo?  Whose client was Mr. Bonomo?  It was Mr.

12      Bekkedam.  And who else was influenced by Mr.

13      Bekkedam?  Mr. Hartline.  You've seen the

14      correspondence back and forth.  You know Mr.

15      Hartline's role, so by influencing Mr. Hartline Mr.

16      Bekkedam is now influencing everything that Mr.

17      Hartline is doing that's part of the conspiracy.

18                   You're going to learn in the Court's

19      instructions that when two individuals are engaged in

20      a conspiracy the acts of one conspirator are the

21      responsibility of the other as long as they are done

22      in furtherance of the conspiracy and therefore seeable

23      to both parties.

24                   So ask yourselves is Mr. Hartline

25      making statements to the regulators something that's

1    foreseeable to Mr. Bekkedam as part of a scheme to

2    make the bank seem stronger, to make the bank eligible

3    for thirteen and a half million dollars in public

4    funding.

5              There was some talk about what's the

6    difference.  Well, the Court's instruction is going to

7    be about materiality and materiality simply means is a

8    fact, is a fact something that was capable of

9    influencing the decision maker.  It doesn't have to

10   actually have influenced the decision maker, but was

11   it capable of it.  Is an omission capable of

12   influencing the decision maker?  Is a half truth

13   capable of influencing the decision maker?

14             Telling the decision makers that Mr.

15   Levin invested $5 million is at best a half truth

16   because it omits a very, very important fact when it

17   comes to the health of the bank; that the $5 million

18   came from Nova Bank itself.

19             Let's talk a little bit about the other

20   counts in this indictment.  We have the false

21   statements and those are the false statements that Mr.

22   Hartline made to the treasury in order to get the TARP

23   funding, false statements about Mr. Levin investing $5

24   million and false statements about Nova Bank having

25   satisfied the contingency.  And those are statements

1    made in furtherance of the scheme that Mr. Hartline

2    and Mr. Bekkedam were engaged in.

3                    With respect to the wire fraud, that

4    only applies to Mr. Bekkedam.  The question is what

5    did Mr. Bonomo know about the health of the bank.  Was

6    there a scheme to defraud him to get him to borrow

7    money to then invest in Nova Bank.

8                    But let's talk about the bank fraud

9    because there's a lot of talk about capital and what

10   counts and what doesn't with respect to the bank

11   fraud.  The bank fraud has nothing do with capital.

12   The bank fraud has to do with did these defendants

13   engage in a scheme to defraud Nova Bank in the making

14   of these loans.  That's the question with respect to

15   the bank fraud.

16                    And the fraud there is what's the

17   purpose of the loan.  What do these documents request?

18   If the purpose of the loan isn't important, why is it

19   in two different places on the risk assessment

20   summary?  Ask yourselves if the purpose isn't

21   important why did Mr. Madiani, the underwriter, say

22   how important it was,  Ask yourselves whether it would

23   matter to someone underwriting a loan whether that

24   person was buying real estate, buying farm equipment,

25   or going to Vegas, does that make a difference.

1                    The loan committee, Mr. Hartline is on

2        the loan committee.  Mr. Patterson was on the loan

3        committee and certainly they knew the purpose of Mr.

4        Levin's loan.  But you heard from three other members

5        of the loan committee who said they didn't know at the

6        time. You even heard from Mr. Hanison who said, had he

7        known that the purpose of Mr. Levin's loan was to

8        invest back into Nova Financial Holdings, he would

9        have had to do some sort of accounting treatment to

10       see how to handle that loan.  They didn't know.

11                   The loan committee met on June 30th

12       until 10:15 a.m.  Mr. Levin's loan not mentioned

13       there.  It's walked around afterward and ratified

14       later.  Why is that noteworthy?  It's noteworthy

15       because Mr. Madiani is taking notes.  You've seen the

16       minutes of those loan committee meetings.  If it's

17       walked around, there are no notes about any discussion

18       about the loan.

19                   Mr. Egan said the documents were clear.

20       He said if there was a fraud the loan docs would be

21       doctored.  Well, look at the risk assessment

22       summaries.  Does the risk assessment summary for Mr.

23       Levin say that he's investing in Nova Financial

24       Holding stock?  Does the risk assessment for Mr.

25       Bonomo show that he's investing in Nova Financial

1    Holding stock or does it simply say, Banyan?  And most

2    notably the risk assessment summary for Mr. Galab.  It

3    shows a loan to Balomore Creek, Mr. Galab's real

4    estate business.  It shows that that loan is for

5    working capital.  Are those documents clear?

6                    Mr. Engle says there's lots of evidence

7    of transparency.  Transparency to whom, to Mr.

8    Hartline, to Mr. Patterson, maybe to some people who

9    work at Balomore, maybe a few people who work at the

10   bank?  Was there transparency to every member of the

11   loan committee?  Was there transparency to Mr.

12   Madiani?  Was there transparency to the FDIC and

13   anyone who was involved in making a decision about

14   whether Nova Bank should qualify for the TARP funding?

15                   And let's look at what Mr. Hartline did

16   after the fact.  You heard Mr. Egan talk about, you

17   know, the confusion with the risk assessment summary

18   that Mr. Hartline sent to Mr. Swartz.  If you

19   remember, that's when Todd Howard raised a question

20   about Mr. Levin's loan.  Well, when Mr. Hartline goes

21   to the bank's lawyer, Mr. Swartz, does he say, hey, we

22   loaned $5 million to George Levin to buy Nova

23   Financial Holding stock?  He seemed like a rich guy.

24   It was probably going to work out if he, you know,

25   didn't declare bankruptcy.  No.  There are a bunch of

1    documents.  Mr. Egan talked about documents that Mr.

2    Patterson sent to Mr. Swartz.

3              Well, if we bring up Exhibit 171, page

4    19, the e-mail that contains the risk assessment

5    summary, and we -- just blow up the whole thing,

6    please.  This is from Kim Hartline providing

7    documents to Mr. Swartz.  If we could go to the next

8    document, please, which is -- the next page which is

9    the risk assessment summary that Ms. Hartline sent to

10   Mr. Swartz.  Mr. Egan talked about, well, there might

11   be other risk assessment summaries because there was

12   talk of Mr. Levin securing the loan, putting up some

13   collateral.

14             Well, not only does this risk

15   assessment summary say something totally different

16   from the June 30 risk assessment summary, totally

17   different from the true purpose of the loan, if we

18   scroll down a little bit, collateral, unsecured.

19   Well, if that's where the security ended then maybe

20   there was just some confusion and a document that came

21   from somewhere ended up at Mr. Swartz and -- but

22   that's not where Mr. Hartline's concealment ended.

23             You know that he stuck with the same

24   story when he spoke to the bank's auditor, Mr. Shubin,

25   and you know that he stuck with the same story when he

```
 1    was deposed.  We don't need to play that again.  But

 2    when he was deposed he was asked a number of different

 3    times if he knew that Mr. Levin's loan was used to

 4    purchase Nova stock.  He said, no.  The lawyer said,

 5    am I the first person --

 6                    MR. EGAN:  Objection.  Can we see Your

 7    Honor at sidebar?

 8        (At sidebar)

 9                    MR. EGAN:  Your Honor, it's a

10    mischaracterization of the evidence.  The -- our

11    question was the proceeds, were the proceeds of the

12    loan used.  The answer was no.  It wasn't asked -- the

13    way Mr. Ignall just stated it --

14                    MR. IGNALL:  I'm not --

15                    MR. EGAN:  -- is not the way the

16    question --

17                    THE COURT:  Can you restate --

18                    MR. IGNALL:  I'll play the --

19                    THE COURT:  (Indiscernible).

20                    MR. EGAN:  I object to that as well,

21    Your Honor.  I think that's beyond the scope.

22                    THE COURT:  All right.  Let me ask you

23    this.  If you don't disagree with what Mr. Egan's

24    recollection of the testimony was (indiscernible)

25    modify by correcting yourself?
```

1                        MR. IGNALL:  Yes.  I'll correct myself.

2                        THE COURT:  Is that acceptable?

3                        MR. EGAN:  Yes.

4                        THE COURT:  Okay.

5                        MR. EGAN:  Thank you, Your Honor.

6                        THE COURT:  All right.

7                        MS. BARRY:  Why can't we play the clip?

8        We'll just play the clip.  That's what it is.  That's

9        the evidence.

10                       MR. EGAN:  Excuse me.

11                       MS. BARRY:  I'm just asking.

12                       THE COURT:  He's already said fine to

13       the --

14                       MS. BARRY:  Okay.

15                       THE COURT:  Thank you.

16           (Sidebar concluded)

17                       MR. IGNALL:  Why did Mr. Hartline just

18       -- your recollection controls about what Mr. Hartline

19       said in the deposition.  But ask yourselves, why is he

20       answering the questions the way he did, why is he

21       asking, when the question is, do you know that Mr.

22       Levin's loan proceeds were used to purchase Nova

23       Holding Company stock why did he say no, when you've

24       seen evidence that the proceeds went into Mr. Levin's

25       bank at Gibraltar and then came back an hour and a

1    half later.

2                     But let's talk about Mr. Shubin.  Let's

3    look at Exhibit 178.  Why is Mr. Hartline sticking

4    with the same story about the purpose of these loans.

5    If he just had an honest misunderstanding, why not

6    simply tell Mr. Shubin, you know what?  We thought

7    that, you know, Mr. Levin was rich.  It would be fine.

8    Why all the statements in there about the timing of

9    the loans is coincidental?  Why statements in Exhibit

10   178 that you should look at and compare it with the

11   risk assessment summaries that are in evidence?  Why

12   in Exhibit 178 does Mr. Hartline talk about the

13   importance of the purpose of the loan and how it's all

14   detailed in the risk assessment summary?  Because he's

15   continuing with the conduct he started back in 2009.

16                    This isn't a misunderstanding.  This is

17   a scheme to defraud.  The scheme to defraud may have

18   been for a purpose that Mr. Hartline simply wanted the

19   bank to survive.  It may have been that Mr. Bekkedam

20   simply wanted his clients' money to still be invested

21   in Nova Bank.  But it's still a scheme to defraud

22   because the people at the treasury need to rely on

23   honest and complete information before making a

24   decision whether to invest more than $13 million in

25   Nova Bank.

1           In both closing arguments the vision

2    seemed to be that this was all on the up and up,

3    everything was transparent.  All disclosures that

4    needed to be made went to the treasury, went to the

5    bank, went to investors.

6           But, ladies and gentlemen, the evidence

7    you've seen is entirely to the contrary; that this was

8    about a scheme to conceal, a scheme to conceal the

9    truth from regulators, a scheme to conceal the truth

10   from Nova Bank, and a scheme with respect to Mr.

11   Bekkedam to conceal the truth from investors.

12          When you consider all the evidence,

13   when you consider why these defendants did what they

14   did, when you listen to the Court's instructions

15   you're going to come to one conclusion, that both

16   defendants are guilty in all the counts in which

17   they're charged.

18          Thank you.

19          THE COURT:  All right.  Thank you very

20   much.  We'll take a recess at this time.

21      (Jury leaves courtroom)

22          THE COURT:  We're in recess.  Yes?

23          MR. DUNCAN:  I have one just brief

24   issue.  I didn't want to interrupt Mr. Ignall during

25   the end of his closing argument, but we object.  There

1    was absolutely no evidence in this case that any

2    Balomore client ever invested in Nova Bank.  We had

3    two witnesses who were Balomore investors and neither

4    one of them had -- I'll stop.

5         (Pause)

6              MR. DUNCAN:  Note my objection to the

7    matter.  That's all I need.

8              THE COURT:  Is there a remedy that

9    you're seeking?

10             MR. DUNCAN:  No, we aren't.  That's

11   all.  That's all.

12             THE COURT:  All right.  You've spoken

13   your peace, then.

14        (Laughter)

15             MR. IGNALL:  He feels better just

16   having said it.

17             THE COURT:  All right.  We'll be in

18   recess.

19             MR. DUNCAN:  I appreciate it, Your

20   Honor.

21             THE COURT:  Yes, sir.  We'll be in

22   recess until (indiscernible).  At this juncture, we're

23   just checking -- double checking (indiscernible) we

24   allow them time for lunch.  I kind of miscalculated.

25   I really wasn't sure how long it was going to take.  I

1     think their lunch is scheduled to be here around 12,

2     but I'm going to check with (indiscernible) so just

3     hold tight.  But we're in recess for right now.

4          (A chorus of thank you)

5                    MR. IGNALL:  I'll speak to counsel

6     about the instructions and see if we can --

7                    THE COURT:  Great.

8                    MR. IGNALL:  -- we can come up with

9     where to put it and what wording to --

10                    THE COURT:  All right.  And

11    (indiscernible) is currently reworking the verdict

12    sheet (indiscernible).

13                    MR. IGNALL:  Thank you, Your Honor.

14                    MS. BARRY:  Thank you, Your Honor.

15          (Recessed at 11:14 a.m.; resumed at 11:20 a.m.)

16          (Jury not present)

17                    THE COURT:  Now we're distributing the

18    jury verdict sheet.  Please look at them and let me

19    know if there's anything you want to modify.

20          (Pause)

21                    MR. EGAN:  No changes to Mr. Hartline,

22    Your Honor.  It's acceptable.

23                    THE COURT:  All right.

24                    MS. BARRY:  Your Honor, no objection

25    from the government with respect to the jury verdict

1     form that's been proposed.  Thank you.

2                    THE COURT:  Now Mr. Hartline has a --

3                    MR. SCHWARTZ:  No objection from Mr.

4     Bekkedam, Your Honor.

5                    THE COURT:  All right.  Now, Counsel, a

6     couple of other points before we bring the jury out.

7                    Now there is an instruction toward the

8     end -- well, you can find it this way, in order to

9     find a defendant guilty of any of the offenses charged

10    in Counts II, III, IV and VII based on this legal rule

11    you must find that the government proved beyond a

12    reasonable doubt each of the following four

13    requirements.

14                    MR. IGNALL:  I think shouldn't V be in

15    there, Your Honor?

16                    THE COURT:  Well, that's -- I'm reading

17    it as what you all gave me at 11:00 last night.

18         (Pause)

19                    THE COURT:  This is for substantive

20    offenses committed by co-conspirators --

21                    MR. IGNALL:  Oh, okay.

22                    THE COURT:  -- Pinkerton liability.

23                    MR. IGNALL:  Oh, okay.

24                    MS. BARRY:  Oh, Pinkerton liability.

25                    THE COURT:  Yeah.  It's Counts II, III,

1    IV and VII?

2                    MS. BARRY:  Yes.  Yes, Your Honor.

3                    MR. IGNALL:  Yes, Your Honor.  Thank

4    you.

5                    THE COURT:  That page as being one, the

6    next page being two, the next page being three, then

7    page four would be -- would read in bold, Counts V and

8    VI, wire fraud essential elements.

9                    MR. SCHWARTZ:  Yes, Your Honor.

10                    THE COURT:  So I will read the first

11   sentence as, Count V of the indictment charges

12   Defendant Barry Bekkedam with wire fraud which is a

13   violation of federal law.  Is that acceptable?

14                    MR. SCHWARTZ:  Yes, Your Honor.

15                    MS. BARRY:  Yes, Your Honor.

16                    THE COURT:  The next page under the

17   bold Count V will be read as is.  However, I will

18   delete from reading Count VI on that page --

19                    MR. SCHWARTZ:  Yes, Your Honor.

20                    THE COURT:  -- and as it goes onto the

21   next page.

22                    MR. SCHWARTZ:  Yes, sir.

23                    THE COURT:  Understood?

24                    MR. SCHWARTZ:  Yes, sir.

25                    THE COURT:  Now is there any other

1    modification that you believe I should make?

2                    MR. EGAN:  Yes, Your Honor.

3                    MR. SCHWARTZ:  Yes, Your Honor.

4                    THE COURT:  All right.  Just one

5    second, please.

6                    Yes, sir.

7                    MR. SCHWARTZ:  If I may, sir.

8                    THE COURT:  Yes, sir.

9                    MR. SCHWARTZ:  If you keep paging

10   towards the back, Your Honor, after your last

11   correction, it's wire fraud each transmission by wire

12   communication, a separate offense.  It's one, two,

13   three, four, it's five pages after your last

14   correction, Your Honor.

15                   THE COURT:  Yes.  I tabbed that one to

16   bring to your attention as well.  Thank you.

17                   MR. SCHWARTZ:  Thank you, Your Honor.

18                   THE COURT:  As I look at it there's no

19   need to read this instruction.

20                   MR. SCHWARTZ:  Correct, Your Honor.

21                   THE COURT:  All right.  So that one's

22   out as well.

23                   MR. IGNALL:  I'm sorry.  Which --

24                   MR. SCHWARTZ:  Can you keep --

25                   MS. BARRY:  I'm sorry, Your Honor.  I'm

Page 58

1     not quite there.

2                     THE COURT:  I apologize.  It would be

3     wire fraud each transmission by wire communication, a

4     separate offense.

5                     MR. SCHWARTZ:  Now there's only one --

6                     MR. EGAN:  There's only one charge,

7     Your Honor.

8                     THE COURT:  And now that there's only

9     one --

10                    MR. IGNALL:  Yeah.

11                    MS. BARRY:  Yes.  I'm sorry, Your

12    Honor.  Thank you.

13                    MR. IGNALL:  That makes sense.

14                    THE COURT:  No problem.  I'm striking

15    that one.

16                    MR. IGNALL:  That makes sense.

17                    MR. SCHWARTZ:  May I continue, Your

18    Honor?

19                    THE COURT:  Yes, sir.

20                    MR. SCHWARTZ:  Three more pages, Counts

21    II, V, VI, VII --

22                    THE COURT:  One second.

23                    MR. SCHWARTZ:  (Indiscernible).

24          (Pause)

25                    MR. SCHWARTZ:  Sorry about that.  Your

1      Honor, three pages further Counts II, V, VI, VII,

2      knowingly defined, just drop VI out of the title line.

3                      THE COURT:  I apologize.  Can you say

4      that again, please?

5                      MR. SCHWARTZ:  Yes, sir.  If you keep

6      on paging forward another one, two, three, four pages

7      you'll see something titled, Counts II, V, VI, VII,

8      knowingly defined.

9                      THE COURT:  Correct.

10                     MR. SCHWARTZ:  Just delete VI.

11                     THE COURT:  Yes, I did that.

12                     MR. SCHWARTZ:  Okay.  Two pages --

13                     THE COURT:  And I don't, by the way,

14     read the bold anyway.

15                     MR. SCHWARTZ:  Oh, okay.  Then --

16                     THE COURT:  And the next page I deleted

17     the same thing, but I don't read that anyway.

18                     MR. SCHWARTZ:  Okay.  Then, Your Honor,

19     there should be only one more substantive correction

20     and that's on page 38, if Your Honor's not seen that

21     yet, of the indictment.  It's actually marked as page

22     38, so.

23                     THE COURT:  Just a moment.

24                     MR. SCHWARTZ:  This is an easy one.

25          (Laughter)

```
 1                    THE COURT:  How refreshing.  Just a
 2      moment.
 3          (Pause)
 4                    THE COURT:  All right.
 5                    MR. SCHWARTZ:  Nature of the
 6      indictment, third to last paragraph, instead of Counts
 7      V and VI charges, just Count V charges.
 8                    THE COURT:  Thank you.
 9                    MR. SCHWARTZ:  And we've gone through
10      it page by page and I believe that's all of them, Your
11      Honor.
12                    THE COURT:  Anyone else?
13          (Pause)
14                    THE COURT:  Are we ready?
15                    MR. IGNALL:  Well, I think we have --
16      we have the one other instruction that we need to talk
17      about.
18                    THE COURT:  Oh, I'm sorry.  Yes,
19      please.  Go ahead.
20                    MR. IGNALL:  Let me make sure I -- Ms.
21      Barry and I are on the same page, can we have -- and
22      then I'll talk to counsel, but I --
23                    THE COURT:  Quite frankly, I don't know
24      that I'm going to get to that one before the 12:15
25      lunch recess.  If you --
```

1                    MS. BARRY:  Oh, okay.

2                    MR. IGNALL:  Okay.  That might --

3                    THE COURT:  There's so much to give

4     here I don't --

5                    MR. IGNALL:  All right.  I guess we

6     could do -- we could see if they could make sense

7     somewhere around the instruction that's at page 19 --

8                    THE COURT:  Then let's go right ahead

9     and work on it, then.

10                    MR. IGNALL:  -- which might be an

11    obvious place to put --

12                    MR. ENGLE:  And that was our thought as

13    well, Your Honor.

14                    THE COURT:  That's fine.

15                    MR. IGNALL:  All right.

16        (Pause)

17                    MR. IGNALL:  All right.  Your Honor, I

18    think we have an agreement.

19        (Pause)

20                    THE COURT:  All right.  Counsel, if

21    you'll read it (indiscernible) will type it and then

22    --

23                    MS. BARRY:  Oh, there you go.

24                    THE COURT:  -- she'll print it for me

25    and then --

```
 1                    MS. BARRY:  That's the best

 2                    MR. IGNALL:  Problem solved.

 3                    MS. BARRY:  Thank you.

 4                    MR. IGNALL:  Because I've got a little

 5      bit of a handwriting issue in that it's really bad.

 6                    THE COURT:  Go right ahead.

 7                    MR. IGNALL:  Although -- and this

 8      should probably go at the end of the instruction on

 9      page 19.  Although a defendant has no burden to

10      produce evidence, you should draw no inference

11      regarding any possible witnesses who did not testify

12      and you should disregard any possible testimony as a

13      fact in the case.

14                    THE CLERK:  Although a defendant has no

15      burden to produce evidence, you should draw no

16      inference regarding any possible witnesses who did not

17      testify and you should disregard any possible

18      testimony as a fact in the case.

19                    THE COURT:  Acceptable?

20                    MR. ENGLE:  Yes.

21                    MS. BARRY:  Yes.

22                    MR. IGNALL:  Yes.  Thank you, Your

23      Honor.

24                    THE COURT:  All right.  Not to

25      embarrass Ms. Degroot, but she will be going to the
```

Page 63

```
 1      Third Circuit in September after she leaves my

 2      employee.

 3           (A chorus of congratulations)

 4                     MR. ENGLE:  Are you next, Your Honor?

 5                     MR. IGNALL:  I think one of your -- I

 6      think I've run with one of your former law clerks who

 7      did that, too.

 8                     THE COURT:  Yes.

 9                     MR. IGNALL:  Tyson?  Yeah.

10                     THE COURT:  Yes.  Exactly.

11                     MR. FULLER:  Tyson and I were both

12      clerks for Judge Manning in the middle district

13      together.

14                     THE COURT:  Get out of here.  Really?

15                     MR. FULLER:  Yeah.  It's been funny to

16      see his ascension (indiscernible).

17                     THE COURT:  That's pretty cool, pretty

18      neat.

19           (Pause)

20                     THE COURT:  To those in the audience,

21      during the judge's charge no one's permitted to enter

22      or leave the courtroom because the door is going to be

23      locked.  So if you need to do anything before or after

24      you should do it now, or forever hold your peace or

25      whatever.
```

1          (Pause)

2                        THE COURT:  Are we ready?

3          (A chorus of yes)

4                        THE COURT:  All right.  Let's go

5     forward.

6                        THE CLERK:  All rise.

7          (Jury present)

8                        THE CLERK:  Ladies and gentlemen, we

9     are back on the record.

10                       THE COURT:  Good morning again.  You

11    may be seated.

12                       We are almost home.

13                       Members of the jury, you have now heard

14    and seen all of the evidence that is to be presented

15    in the trial of this case as well as having

16    entertained and listened attentively to the closing

17    arguments of all counsel.  It is now my responsibility

18    to instruct you on the law which you will apply to the

19    facts as you find them to be in reaching a just and

20    true verdict in this case.

21                       Now in doing so I'm going to read from

22    a written charge, as all the judges do, to make

23    certain that what I tell you at this time is standard,

24    uniform and is in accord with the law of the United

25    States as well as the rules of the federal court

1   system.  I give you this as a warning because it is

2   somewhat difficult to pay attention to someone who is

3   reading.  But if I can impart to you that you need to

4   listen to what I have to say in order to decide this

5   case, I'm sure you'll understand the necessity for me

6   to read it and do so accurately.

7              Now first of all you have two duties as

8   jurors.  Your first duty is to decide the facts from

9   the evidence that you've heard and seen in court

10  during this trial.  That is your job and your job

11  alone.  I play absolutely no part in deciding the

12  facts.  You should not take anything that I may have

13  said or done during the course of this trial as an

14  indication of what I think of the evidence or what I

15  think your verdict should be.  That is solely your

16  responsibility.

17             Your second duty is to apply the law

18  that I give you to the facts as you find them to be.

19  My role now is to explain to you in legal jargon

20  somewhat the legal principles that must guide your

21  decision and deliberations in this case.

22             Now you must apply my instructions

23  carefully.  Each of the instructions is important and

24  you must apply all of them.  You must not substitute

25  or follow your own notion or opinion about what the

1    law is or ought to be.  You must apply the law that I

2    give to you whether you agree with it or not.

3                    Whatever your verdict, it will have to

4    be unanimous.  All of you will have to agree on it or

5    there will be no verdict.  In the jury room you will

6    discuss the case amongst yourselves, but ultimately

7    each of you will have to make up his or her own mind.

8    This is a responsibility that each of you has and

9    cannot be shirked.

10                   Now during your deliberations you must

11   not communicate with or provide any information to

12   anyone by any means about this case or your

13   deliberations.  You may not use any electronic device

14   or media, whether it be telephone, cell phone, smart

15   phone, iPhone, Blackberry or any kind of computer.

16   You cannot access the internet, make any text

17   messages, create any blogs, enter any internet chat

18   rooms, visit any websites whether it be Facebook, My

19   Face -- my face, MySpace --

20        (Laughter)

21              THE COURT:  -- LinkedIn, YouTube or

22   Twitter.  You cannot communicate with anyone during

23   the course of your deliberations in this trial until

24   after the verdict has been reached.  Then and only

25   then will you be free to discuss the matter.

1          Now in the event a verdict is not

2    reached after my deliberations, my -- excuse me --

3    imparting to you my charge and your deliberations at

4    the close of business today and you go home and come

5    back tomorrow you cannot discuss it still with anybody

6    and especially not now because, again, someone would

7    want to impart to you their opinion about what you

8    tell them and they would not have the awesome

9    responsibility that each of you has.

10          It is, therefore, important that you

11   perform your duties fairly and impartially.  Do not

12   allow sympathy, prejudice, fear, or public opinion to

13   influence your decision in this case.  You should not

14   also be influenced by any person's race, color,

15   religion, national ancestry or gender, sexual

16   orientation, profession, occupation, celebrity,

17   economic status or position in life or in the

18   community.  These should not influence your decision

19   in any way.

20          Now if there are any references that I

21   have made during the course of this trial or counsel

22   has made during the course of the testimony or

23   exhibits and those recollections do not coincide with

24   your recollections, you are bound by your own

25   independent recollection.  You are the sole judges of

1    the evidence presented in this case.

2              Of importance, the punishment provided

3    by law for any offense for which one has been adjudged

4    guilty is a matter that is exclusively within my

5    province.  If there is no verdict of guilty, that is

6    not your concern.  If there is a verdict of guilty,

7    that is not your concern.  Jurors should not be

8    influenced in any way about what penalty might be in

9    the event that there is a verdict of guilty.

10              As has been stated throughout this

11   trial each of the defendants, specifically Mr. Brian

12   Hartline and Mr. Barry Bekkedam, has pleaded not

13   guilty to the offenses charged.  A defendant is

14   presumed innocent.  Defendants start the trial with a

15   clean slate with no evidence against them.  The

16   presumption of innocence stays with a defendant unless

17   and until the government has presented evidence that

18   overcomes that presumption by convincing you that the

19   defendants, either or both, are guilty of the offenses

20   charged beyond a reasonable doubt.

21              The presumption of innocence requires

22   that you find a defendant not guilty unless you are

23   satisfied that the government has proved his guilt

24   beyond a reasonable doubt.  The presumption of

25   innocence means that each of the defendants has

1    absolutely no burden or obligation to present any

2    evidence or to prove that he is not guilty.  The

3    burden or obligation of proof is on the government to

4    prove that each defendant is guilty and this burden

5    stays with the government throughout the trial.

6               In order for you to find a defendant

7    guilty of the offense charged, the government must

8    convince you that the defendant is guilty beyond a

9    reasonable doubt.  That means that the government must

10   prove each and every element of the offense charged

11   beyond a reasonable doubt.  A defendant may not be

12   convicted based upon suspicion or conjecture, but only

13   on evidence proving guilt beyond a reasonable doubt.

14               Proof beyond a reasonable doubt does

15   not mean proof beyond all possible doubt or to a

16   mathematical certainty.  Possible doubts are doubts

17   based on conjecture, speculation or hunch are not

18   reasonable doubts.  A reasonable doubt is a fair doubt

19   based on reason, logic, common sense or experience.

20   It is a doubt that an ordinary reasonable person has

21   after carefully weighing all of the evidence and is a

22   doubt of the sort that would cause him or her to

23   hesitate to act in matters of importance in his or her

24   own life.  It may arise from the evidence or from the

25   lack of evidence or from the nature of the evidence.

1          If having now heard all of the evidence

2      you are convinced that the government proved each and

3      every element of the offense charged beyond a

4      reasonable doubt, then you should return a verdict of

5      guilty for that offense.  However, if you have a

6      reasonable doubt about one or more of the elements of

7      the offense charged, then you must return a verdict of

8      not guilty for that offense.

9          You must make your decision in this

10      case based only on the evidence that you saw and heard

11      during the course of this trial.  Do not let rumors,

12      suspicions or anything else that you may have seen or

13      heard outside of the court influence your decision in

14      any way.  The evidence from which you are to find the

15      facts consists of the following:  The testimony of the

16      witnesses; documents and other things received as

17      exhibits; and any fact or testimony that was

18      stipulated to; that is, formally agreed to by the

19      parties.

20          Now the following are not evidence:

21      The indictment; statements and arguments of the

22      attorneys for the parties in this case; questions by

23      the attorneys and the questions that I may have asked,

24      although I don't believe that I did; objections by the

25      attorneys including objections in which the attorneys

1    stated facts, that's not evidence; any testimony that

2    I struck or told you to disregard you cannot consider

3    it as evidence; and anything that you may have seen or

4    heard about this case outside of the courtroom is not

5    evidence.

6              Members of the jury, you should use

7    your common sense in weighing the evidence.  Consider

8    it in light of your everyday experience with people

9    and events, and give it whatever weight you believe it

10   deserves.  If your experience and common sense tells

11   you that certain evidence reasonably leads to a

12   conclusion you may reach that conclusion.  As I told

13   you in my preliminary instructions, the rules and

14   evidence -- of evidence control what can be received

15   into evidence.

16             Now during the trial the attorneys

17   objected when they thought that the evidence that was

18   offered was not permitted by the rules of evidence.

19   These objections simply meant that the attorneys were

20   asking me to decide whether the evidence should be

21   allowed under the rules.

22             Again, you should not be influenced by

23   the fact that an attorney made an objection.  You

24   should also not be influenced by my rulings on the

25   objections or any sidebar conferences, although there

1    were many, that you may have overheard.

2                  Now when I ruled on an objection the

3    question was answered -- excuse me -- when I overruled

4    an objection the question was answered or the exhibit

5    was received in evidence and you should treat that

6    testimony or that exhibit like anything else.

7                  When I allowed evidence, such as

8    testimony or exhibits, for a limited purpose I

9    instructed you to consider it only for that limited

10   purpose and you must follow that instruction.

11                 Now when I sustained an objection, that

12   means that the question was not answered or the

13   exhibit was not received in evidence, or if I

14   sustained it and the witness nonetheless answered it

15   over my sustaining of the objection, you are to

16   disregard the answer to that question.

17                 Now, again, if I ordered a portion of

18   the testimony stricken or for you not to consider it,

19   you must follow that ruling of mine.  When you are

20   deciding the case you must not consider or be

21   influenced in any way by the testimony or other

22   evidence that I told you to disregard.

23                 Now although the attorneys have called

24   to your attention certain facts in their arguments or

25   factual conclusions that they thought were important,

1    what the attorneys have said to you in that regard is

2    not evidence.  It is not binding on you.  It is your

3    recollection and your interpretation of the evidence

4    that controls your decisions.  That is not to say in

5    any way that what the attorneys have argued to you is

6    insignificant or not important.  You should consider

7    them very, very carefully.

8              Again, do not assume that anything that

9    I may have said or done during the course of this

10   trial should have any way of suggesting to you my

11   opinion about the case or about the evidence of the

12   case.  Again, this decision is solely your

13   responsibility.

14             Now I've spoken a number of times about

15   evidence.  There are two types of evidence that may be

16   used or has been -- have been used in this trial:

17   Direct evidence and circumstantial evidence.  You may

18   use both types of evidence in reaching your verdict in

19   the case.

20             Direct evidence is simply evidence

21   which, if believed, directly proves a fact.  An

22   example of direct evidence occurs when a witness

23   testifies about something that the witness knows from

24   his or her own senses, something that the witness has

25   seen, touched, heard or smelled.

1                    Circumstantial evidence is evidence

2     which, if believed, indirectly proves a fact.  It is

3     evidence that proves one or more facts from which you

4     could reasonably find or infer the existence of some

5     other fact or facts.

6                    A reasonable inference is simply a

7     deduction or conclusion that reason, experience and

8     common sense lead you to make from the evidence that

9     you've heard.  A reasonable inference is not a

10    suspicion or a guess.  It is a reasoned logical

11    decision to find that a disputed fact exists on the

12    basis of another fact.

13                   For example, if someone walked into the

14    courtroom wearing a wet raincoat, carrying a wet

15    umbrella, that would be circumstantial evidence or

16    indirect evidence from which you could reasonably

17    conclude that it was raining outside.  However, you

18    would not have to find that it was raining outside,

19    but you could.

20                   Now sometimes different inferences may

21    be drawn from the same set of facts.  The government

22    may ask you to draw one inference and the defense may

23    ask you to draw yet another.  You and you alone must

24    decide what reasonable inferences you will draw based

25    on all of the evidence and your reason, experience and

1    common sense.

2                You should consider all of the evidence

3    that is presented in this trial, both direct and

4    circumstantial.  The law makes no distinction between

5    the weight that you should give to either direct

6    evidence or circumstantial evidence.  Again, it is for

7    you to decide how much weight to give any evidence.

8                Now although the government is required

9    to prove that a defendant is guilty beyond a

10   reasonable doubt, the government is not required to

11   present all possible evidence related to the case or

12   to produce all possible witnesses who might have

13   something or some knowledge about the facts of the

14   case.

15               In addition, as I have explained, a

16   defendant is not required to present any evidence or

17   produce any witnesses.  In this case Mr. Hartline

18   presented witnesses.  A defendant is not required to

19   present all possible evidence related to the case or

20   to produce all possible witnesses who might have some

21   knowledge about the facts of the case.

22               Although a defendant has no burden to

23   produce evidence, you should draw no inference

24   regarding any possible witnesses who did not testify

25   and you should disregard any possible testimony as a

 1     fact in this case.

 2                    Now as I stated also in my preliminary

 3     instructions, in deciding what facts you are to

 4     consider, you must decide what testimony you believe

 5     and what testimony you do not believe.  Again, you are

 6     the sole judges of the facts.

 7                    Credibility refers to whether a witness

 8     is worthy of belief.  Was the witness truthful, was

 9     the witness's testimony accurate.  You may believe

10     everything that a witness says or only part of it or

11     none of it.  It is your prerogative.  You may decide

12     whether to believe a witness based on his or her

13     behavior and manner of testifying, the explanations

14     that the witness gave and all other evidence in the

15     case just as you would in any important matter where

16     you're trying to decide whether a person is truthful,

17     whether a person is straightforward, and whether or

18     not a person is accurate in his or her recollection.

19                    In deciding the question of credibility

20     remember to use your common sense, your good judgment

21     and your experience.  In deciding what to believe you

22     may consider a number of factors such as, the

23     opportunity and ability of the witness to see or hear

24     or know the things about which he or she testifies;

25     the quality of the witness's knowledge, understanding

1    and memory; the witness's appearance, behavior and

2    manner while testifying; whether the witness has an

3    interest in the outcome of the case or any motive,

4    bias or prejudice; any relation the witness may have

5    with a party in the case and any effect that the

6    verdict may have on that witness; whether the witness

7    said or wrote anything before the trial that was

8    different from what the witness testified to in court;

9    whether the witness's testimony was consistent or

10   inconsistent with other evidence that you believe; and

11   any other facts that -- or factors that bear on

12   whether the witness should be believed.

13              Now inconsistencies or discrepancies in

14   a witness's testimony or between the testimony of

15   different witnesses may or may not cause you to

16   disbelieve a witness's testimony.  Remember that two

17   or more persons witnessing an incident may see it or

18   hear it differently.

19              Mistaken recollection like the failure

20   to recall is a common human experience.  In weighing

21   the effect of an inconsistency you should also

22   consider whether it was about a matter of importance

23   or an insignificant detail.  You should also consider

24   whether the inconsistency was innocent or intentional.

25              You are not required to accept the

1    testimony of a witness even if the testimony was not

2    contradicted and the witness was not impeached.  You

3    may decide that the witness is not worthy of belief

4    because of the witness's bearing or demeanor or

5    because of the inherent probable -- improbability of

6    the testimony, or for other reasons that you are --

7    that are sufficient in your opinion.

8             After you make your own judgment about

9    the believability of a witness you can then attach to

10   that witness's testimony the importance or weight that

11   you think it deserves.  The weight of the evidence to

12   prove a fact does not necessarily depend upon the

13   number of witnesses who testified or the quantity of

14   evidence that was presented.  What is much more

15   important than numbers or quantity is how believable

16   the witnesses were and how much weight you think their

17   testimony deserves.

18             There are specific instructions

19   regarding certain types of testimony.  I will give you

20   those at this time.

21             You have heard evidence that one of the

22   witnesses, Mr. Frank Preve, and another witness, Mr.

23   Thomas Patterson, have made plea agreements with the

24   government or have received or may receive a benefit

25   from the government in exchange for testifying.  Their

1    testimony was received in evidence and may be

2    considered by you.  The government is permitted to

3    present the testimony of someone who has reached or

4    received or may receive a benefit from the government

5    in exchange for his or her testimony, but you should

6    consider the testimony of Frank Preve and Thomas

7    Patterson with great care and caution.

8              In evaluating Frank Preve's and Thomas

9    Patterson's testimony you should consider this factor

10   along with the other factors that I have called to

11   your attention.  Whether or not their testimony may

12   have been influenced by the benefit or potential

13   benefit is for you to determine.  You may give their

14   testimony such weight as you believe it deserves.

15             You heard reference to stipulations

16   during the course of this trial.  The government and

17   the defendants agreed that certain stipulated facts

18   were true.  You should therefore treat those facts as

19   having been proved.  However, you are not required to

20   do so since you, again, are the sole judges of the

21   facts.

22             Neither Barry Bekkedam nor Brian

23   Hartline testified in this trial.  A defendant has an

24   absolute constitutional right not to testify or to

25   present evidence.  The burden of proof remains with

1    the prosecution throughout the entire trial and never

2    shifts to a defendant.

3              A defendant is never required to prove

4    that he is innocent.  You must not attach any

5    significance to the fact that a defendant did not

6    testify in this trial.  You must not draw any

7    inference -- excuse me -- you must not draw any

8    adverse inference against either defendant because he

9    did not take the witness stand.  Do not consider for

10   any reason at all the fact that either defendant did

11   not testify.  Do not discuss that fact during your

12   deliberations or let it influence your decision in any

13   way.

14             The government introduced evidence that

15   Mr. Hartline made statements in a deposition.  I

16   caution you that you may consider Mr. Hartline's

17   statements in the deposition only in resolving whether

18   Mr. Hartline is guilty or not guilty.  You may not

19   consider or discuss this evidence in any way in

20   resolving whether Mr. Bekkedam is guilty or not

21   guilty.  Mr. Hartline's statement is evidence only

22   against Mr. Hartline and not against Mr. Bekkedam.

23             You have heard reputation evidence

24   about whether Mr. Hartline has a character trait for

25   being a law-abiding citizen.  You should consider this

1    character evidence together with and in the same way

2    as all other evidence in the case in deciding whether

3    the government has proved the charges against him

4    beyond a reasonable doubt.

5            Motive.  Motive is not an element of

6    the offenses with which either defendant is charged.

7    Proof of bad motive is not required to convict.

8    Further, proof of bad motive alone does not establish

9    that a defendant is guilty and proof of good motive

10   alone does not establish that a defendant is not

11   guilty.  Evidence of a defendant's motive may,

12   however, help you find a defendant's intent.

13           Intent and motive are different

14   concepts.  Motive, it's what prompts a person to act.

15   Intent refers only to the state of mind with which a

16   particular act is done.  Personal advancement and

17   financial gain, for example, are motives for such --

18   much of human conduct.  However, these motives may

19   prompt one person to intentionally do something

20   perfectly acceptable while prompting another person to

21   do something intentionally to do an act that is a

22   crime.

23           The defendants in this case -- again,

24   Mr. Brian Hartline and Mr. Barry Bekkedam -- are

25   charged with different offenses.  I will explain to

```
 1   you in more detail shortly which defendants are
 2   charged with which offenses.  Before I do that,
 3   however, I want to emphasize several things.
 4              The number of offenses charged is not
 5   evidence of guilt and this should not influence your
 6   decision in any way.  Also, in our system of justice
 7   guilt or innocence is personal and individual.  You
 8   must separately consider the evidence against each
 9   defendant on each offense charged, and you must return
10   a separate verdict for each defendant for each
11   offense.
12              For each defendant and each offense you
13   must decide whether the government has proved beyond a
14   reasonable doubt that a particular defendant is guilty
15   of that particular offense.  Your decision on any one
16   defendant or any one offense, whether guilty or not
17   guilty, should not influence your decision on any of
18   the other -- on the other defendant or the other
19   offenses in the case.  Each offense and each defendant
20   should be considered separately.
21              And lunch is here.  So we're going to
22   take a break, give you time to get yourselves and
23   thoughts together and relax a little bit and each your
24   lunch.  We will resume at 12 -- excuse me -- at 1:15
25   this afternoon.
```

1                  Again, it is most important that you

2     not discuss anything at all.  Enjoy your lunch.

3                  THE CLERK:  All rise.

4          (Jury leaves courtroom)

5                  THE COURT:  Excuse me.  Counsel --

6                  MR. IGNALL:  Yes, Your Honor.

7                  THE COURT:  -- given the length of the

8     instructions let me ask at this intermission whether

9     or not there are any objections to the Court --

10    Court's instructions as given up to this point in

11    time?

12                 MR. IGNALL:  No, Your Honor.

13                 MR. SCHWARTZ:  No, Your Honor.

14                 MR. DUNCAN:  Other than what we might

15    have objected to earlier, Your Honor, I wasn't part of

16    that.  But we have no specific objection.

17                 THE COURT:  Well, what I've read to the

18    jury?

19                 MR. DUNCAN:  Not based on what you've

20    read, Your Honor.

21                 THE COURT:  Okay.

22                 MR. ENGLE:  Just -- if we may just for

23    the record, I believe in order to preserve the

24    objections and the exceptions that Your Honor gave as

25    part of the charging conference we would need to renew

1    those at the conclusion of the Court's reading of the

2    instruction, which we can obviously do.  But I won't

3    have anything additional.

4                   THE COURT:  All right.  That will be

5    just fine.  Enjoy your lunch.

6         (A chorus of thank you)

7                   THE COURT:  1:15 please.  Thank you.

8         (Recessed at 12:08 p.m.; resumed at 1:17 p.m.)

9         (Jury present)

10                  THE CLERK:  All rise.  Ladies and

11   gentlemen, we are back on the record.

12                  THE COURT:  Good afternoon.  You may be

13   seated.  I trust that you enjoyed that caviar that

14   Mozelle Chavez gave you.  All right.  I shall resume.

15                  Now, members of the jury, you are here

16   to determine whether the Government has proven the

17   guilt of each Defendant of the charges in the

18   indictment beyond a reasonable doubt.  You are not

19   called upon to return a verdict as to the guilt or

20   innocence of any other person or persons.  So if the

21   evidence in the case convinces you beyond a reasonable

22   doubt of the guilt of a defendant for the crimes

23   charged in the indictment you should so find even

24   though you may believe that one or more other

25   unindicted persons are also guilty.  But if any

1    reasonable doubt remains in your minds after impartial

2    consideration of all of the evidence in the case, it

3    is your duty to find that Defendant not guilty.

4              As you know, the Defendants are charged

5    in the indictment with violating federal law.  It is

6    as follows:  Count I of the indictment charges Brian

7    Hartline and Barry Bekkedam with conspiracy to defraud

8    the United States and to commit major fraud against

9    the United States.

10             Now, let me pause here as I see

11   everyone is feverishly trying to write this down.  At

12   the end of my instructions, I will issue all of you a

13   sample verdict sheet which will have all of the

14   charges on the verdict sheet, okay.  And I'm going to

15   go over that verdict sheet with you to fully explain

16   to you the content thereof, all right.  So don't worry

17   about writing all this down.

18             Now, as I said, Count I of the

19   indictment charges Brian Hartline and Barry Bekkedam

20   with conspiracy to defraud the United States and to

21   commit major fraud against the United States.  Count

22   II charges both Defendants with major fraud against

23   the United States.  Counts III and IV charge both

24   Defendants with making false statements to federal

25   agents.  Count V charges Barry Bekkedam with wire

1      fraud.  Count VII charges both Defendants with bank

2      fraud.

3                    Now, as I explained to you at the

4      beginning, an indictment is just the formal way of

5      specifying the exact crimes with what a defendant is

6      charged.  An indictment is simply a description of the

7      charges against a defendant.  It is an accusation

8      only.  An indictment is not evidence of anything and

9      you should not give any weight to the fact that the

10     Defendants have been indicted in this case in making

11     your decision.

12                   Now, you will note that the indictment

13     charges that the offenses were committed, quote, "on

14     or about", end quote, certain dates.  The Government

15     does not have to prove with certainty the exact dates

16     of the alleged offenses.  It is sufficient if the

17     Government proves beyond a reasonable doubt that the

18     offenses were committed on dates reasonably near the

19     dates alleged.

20                   The indictment alleges that some act in

21     furtherance of the offense charged occurred here in

22     the Eastern District of Pennsylvania.  There is no

23     requirement that all aspects of the offense charged or

24     the entire conspiracy take place here in the Eastern

25     District of Pennsylvania.  But for you to return a

Page 87

1    verdict of guilty, the Government must convince you

2    that either the agreement or one of the overt acts

3    took place here in the Eastern District of

4    Pennsylvania.

5              Unlike all the elements that I've

6    described, this fact only has to be proved by a

7    preponderance of the evidence.  This means that the

8    Government only has to convince you that it is more

9    likely than not that some part of the conspiracy took

10   place here in the Eastern District of Pennsylvania.

11   Now, remember that the Government must prove all of

12   the elements that I described beyond a reasonable

13   doubt.

14             I'm now going to go to the specific

15   charges against the Defendants.  Count I of the

16   indictment charges that between in or about May of

17   2009 and in or about January 2010, within the Eastern

18   District of Pennsylvania and elsewhere, Defendants

19   Brian Hartline and Barry Bekkedam agreed or conspired

20   to defraud the United States through the TARP program.

21   The indictment also charges that to further the

22   objective of that conspiracy, one member of the

23   conspiracy committed at least one overt act as alleged

24   in the indictment.  It is a federal crime for two or

25   more persons to agree or conspire to commit any

Page 88

1    offense -- let me read that one again.  I left out a

2    word.  It is a federal crime for two or more persons

3    to agree or to conspire to commit any offense against

4    the United States even if they never actually achieve

5    that objective.

6              A conspiracy is a kind of criminal

7    partnership.  In order for you to find a defendant

8    guilty of conspiracy to commit an offense against the

9    United States, you must find that the Government

10   proved beyond a reasonable doubt each of the following

11   four elements.

12             First, that two or more persons agreed

13   to defraud the United States through the TARP program

14   as charged in the indictment.  I will explain the

15   elements of that offense to you shortly.  To, quote,

16   "defraud the United States through the TARP program",

17   end quote, means to cheat the United States Government

18   or any of its agencies out of money or property.  It

19   also means to obstruct or interfere with one of the

20   United States Government's lawful functions by deceit,

21   craft, trickery, or dishonest means.

22             The second element that each Defendant

23   was a party to or member of that agreement.  Third,

24   that each Defendant joined the agreement or conspiracy

25   knowing of its objectives to defraud the United States

1    or to commit an offense the United States and

2    intending to join together with at least one other

3    alleged conspirator to achieve those objectives.  That

4    is that each Defendant and at least one other alleged

5    conspirator shared a unity of purpose and the intent

6    to achieve a common goal or objective to defraud the

7    United States or to commit an offense against the

8    United States.

9              And fourth, that at some time during

10   the existence of the agreement or conspiracy at least

11   one of the members of the conspiracy performed an

12   overt act in order to further the objectives of the

13   agreement.  Again, I will explain each of these

14   elements in more detail a little later on.

15             Now, this pertains to conspiracy.  The

16   first element of the crime of conspiracy is the

17   existence of an agreement.  The Government must prove

18   beyond a reasonable doubt that two or more persons

19   knowingly and intentionally arrived at a mutual

20   understanding or agreement, either spoken or unspoken,

21   to work together to achieve the overall objective of

22   the conspiracy.  In this case, to defraud the United

23   States through the TARP program.

24             The Government does not have to prove

25   the existence of a formal or written agreement or an

1    express oral agreement spelling out the details of the

2    understanding.  The Government also does not have to

3    prove that all of the members of the conspiracy

4    directly met or discussed between themselves their

5    unlawful objective or agreed to all the details or

6    agreed to what the means were by which the objective

7    would be accomplished.

8              The Government is not even required to

9    prove that all of the people in the indictment were in

10   fact parties to the agreement or that all members of

11   the alleged conspiracy were named or that all members

12   of a conspiracy are even known.  What the Government

13   must prove beyond a reasonable doubt is that two or

14   more persons in some way or manner arrived at some

15   type of agreement, mutual understanding, or meeting of

16   the minds to try to accomplish a common and unlawful

17   objective.

18              You may consider both direct evidence

19   and the circumstantial evidence in deciding whether

20   the Government has proved beyond a reasonable doubt

21   that an agreement or mutual understanding existed.

22   You may find the existence of a conspiracy based on

23   reasonable inferences drawn from the actions and

24   statements of the alleged members of the conspiracy,

25   from the circumstances surrounding the scheme, and

1      from evidence of related facts and circumstances which

2      prove that the activities of the participants in a

3      criminal venture could not have been carried out

4      except as the result of a preconceived agreement,

5      scheme, or understanding.

6                        If you find that a criminal agreement

7      or conspiracy existed to defraud the United States

8      through the TARP program then in order to find a

9      defendant guilty of conspiracy, you must also find

10     that the Government proved beyond a reasonable doubt

11     that each Defendant knowingly and intentionally joined

12     that agreement or conspiracy during its existence.

13                       The Government must prove that each

14     Defendant knew the goal or objective of the agreement

15     or conspiracy and voluntarily joined it during its

16     existence intending to achieve the common goal or

17     objective and to work together with the other alleged

18     conspirators toward that goal or objective.

19                       The Government need not prove that a

20     defendant knew everything about the conspiracy or that

21     he knew everyone involved in it or that he was a

22     member from the beginning.  The Government also does

23     not have to prove that a defendant played a major or

24     substantial role in the conspiracy.  You may consider

25     both direct and circumstantial evidence in deciding

1  whether a defendant joined the conspiracy, knew of its

2  criminal objective, and intended to further the

3  objective.

4           Evidence which shows that each

5  Defendant only knew about the conspiracy or only kept

6  bad company by associating with members of the

7  conspiracy or was only present when it was discussed

8  or when a crime was committed is not sufficient to

9  prove that either Defendant was a member of the

10  conspiracy even if that defendant approved of what was

11  happening or did not object to it.

12           Likewise, evidence showing that each

13  Defendant may have done something that happened to

14  help a conspiracy does not necessarily prove that he

15  joined the conspiracy.  You may, however, consider

16  this evidence with all of the other evidence in

17  deciding whether the Government proved beyond a

18  reasonable doubt that each Defendant joined the

19  conspiracy to defraud the United States through the

20  TARP program.

21           In order to find a defendant guilty of

22  conspiracy, you must find that the Government proved

23  beyond a reasonable doubt that either Defendant joined

24  the conspiracy knowing of its objective and intending

25  to help further or achieve that objective.  That is

1    the Government must prove, one, that each Defendant

2    knew of the objective or goal of the conspiracy; two,

3    that the objective was to defraud the United States

4    through the TARP program; three, that each Defendant

5    joined the conspiracy intending to help further or

6    achieve that goal or objective; and four, that each

7    Defendant and at least on other alleged conspirator

8    shared a unity of purpose toward that objective or

9    goal.

10             You may consider both direct and

11   circumstantial evidence including a defendant's words

12   or conduct and other facts and circumstances in

13   deciding whether that defendant had the required

14   knowledge and intent.  For example, evidence that a

15   defendant derived some benefit from the conspiracy or

16   had some stake in the achievement of the conspiracy's

17   objective might tend to show that a defendant had the

18   required intent or purpose that the conspiracy's

19   objective be achieved.

20             With regard to the fourth element of

21   conspiracy, that is the overt act, the Government must

22   prove beyond a reasonable doubt that during the

23   existence of the conspiracy at least one member of the

24   conspiracy performed at least one of the overt acts

25   described in the indictment for the purpose of

Page 94

1      furthering or helping to achieve the objective of the

2      conspiracy.

3                  The indictment alleges certain overt

4      acts.  The Government does not have to prove all of

5      these acts were committed or that any of these acts

6      were themselves illegal.  Also, the Government does

7      not have to prove that any particular defendant

8      personally committed any of the overt acts.  The

9      Government must prove beyond a reasonable doubt that

10     at least one member of the conspiracy committed at

11     least one of the overt acts alleged in the indictment

12     and committed it during the time that the conspiracy

13     existed for the purpose of furthering or helping to

14     achieve the objective of the conspiracy.  You must

15     unanimously agree on the overt act that was committed.

16                 The Government is not required to prove

17     that any of the members of the conspiracy were

18     successful in achieving any or all of the objective of

19     the conspiracy.  You may find that either Defendant --

20     you may find either Defendant guilty of conspiracy if

21     you find that the Government proved beyond a

22     reasonable doubt the elements I've explained even if

23     you find that the Government did not prove that any of

24     the conspirators actually defrauded the United States

25     through the TARP program.  Conspiracy is a criminal

1    offense separate from the offense that was the

2    objective of the conspiracy.  Conspiracy is complete

3    without the commission of that offense.

4                    Count I of the indictment charges that

5    the conspiracy existed from in or about May of 2009 to

6    in or about January 2010.  It is not essential that

7    the Government prove that the conspiracy started or

8    ended on or about those specific dates.  It is

9    sufficient if you find that in fact the charge

10   conspiracy was formed and existed for some time within

11   the period set forth in the indictment.  A conspiracy

12   ends when the objectives of the conspiracy have been

13   achieved or when all members of the conspiracy have

14   withdrawn from it.

15                   However, a conspiracy may be a

16   continuing conspiracy and if it is, it lasts until

17   there is some affirmative showing that it has ended or

18   that all its members have withdrawn.  A conspiracy may

19   be a continuing one if the Government includes an

20   understanding that the conspiracy will continue over

21   time.  Also, a conspiracy may have a continuing

22   purpose of objective and therefore may be a continuing

23   conspiracy.

24                   The acts or statements of any member of

25   a conspiracy are treated as the acts or statements of

1    all the members of the conspiracy even if these acts

2    or statements were performed or spoken during the

3    existence of the conspiracy and to further the

4    objectives of the conspiracy.  Therefore, you may

5    consider as evidence against a defendant any acts done

6    or statements made by any members of a conspiracy

7    during the existence of and to further the objectives

8    of the conspiracy.  You may consider these acts and

9    statements even if they were done and made in a

10   defendant's absence and without his knowledge.

11                As with all the evidence presented in

12   the case, it is for you to decide whether you believe

13   this evidence and how much weight to give it.  Acts

14   done or statements made by an alleged co-conspirator

15   before a defendant joined the alleged conspiracy may

16   also be considered by you as evidence against that

17   defendant.  However, acts done or statements made

18   before the alleged conspiracy began or after it ended

19   may only be considered by you as evidence against the

20   person who performed that act or made that statement.

21                Now, as you just heard, the object of

22   the conspiracy charged in Count I is to defraud the

23   United States through the TARP program.  The focus of

24   Count I is whether the Defendants agreed to commit the

25   charged fraud, not whether any substantive major fraud

1    violation actually occurred.

2                    I will now instruct you on the elements

3    of Count II, the offense of major fraud against the

4    United States.  The instructions on major fraud also

5    apply to the conspiracy charged in Count I in that the

6    instructions define what the Government alleges the

7    Defendants charged in the conspiracy were agreeing to

8    do.

9                    Count I is TARP fraud.  The relevant

10   statute concerning and covering the conduct charged in

11   Count II under the law is what we call Section 1031 of

12   Title 18 of the United States Code.  It provides in

13   relevant part as follows.  "Whoever knowingly executes

14   or attempts to execute any scheme or artifice with the

15   intent to obtain money or property be means of false

16   or fraudulent pretenses, representations, or promises

17   in any form of federal assistance including the

18   Trouble Asset Relief Program or TARP program which is

19   an economic stimulus, recovery, or rescue plan

20   provided by the Government or the Government's

21   purchase of any troubled asset as defined in the

22   Emergency Economic Stabilization Act of 2008, if the

23   value of federal assistance or any constituent part

24   thereof is $1 million or more shall be guilty of a

25   crime."  And that's how the statute is defined.

1           In order to prove that the Defendants

2    Hartline and Bekkedam are guilty of the crime charged

3    in Count II, the Government must prove beyond a

4    reasonable doubt the following four elements.  First,

5    that there was a scheme to defraud the United States

6    or to obtain money or property by means of materially

7    false or fraudulent pretenses, representations, or

8    promises as charged in the indictment.

9           Second, that the scheme took place in a

10   form of federal assistance including the Troubled

11   Asset Relief Program or TARP program, an economic

12   stimulus recovery, or rescue plan provided by the

13   Government or through the Government's purchase of a

14   troubled asset as defined in the Emergency Economic

15   Stabilization Act of 2008.

16          Third element, that the Defendant

17   executed or attempted to execute the scheme as set

18   forth previously, that they did so knowingly and with

19   specific intent to defraud.  And fourth, the value of

20   such form of federal assistance or any constituent

21   part thereof was at least $1 million.

22          I will now explain to you each of these

23   four elements in greater detail.  If you need a break,

24   let me know.  I'll let you stand up at a minimum.

25   Anyone need to stand up?  All right.

1           This is Count II, TARP fraud, the first

2    element.  The first element that the Government must

3    prove beyond a reasonable doubt is that each Defendant

4    knowingly devised or participated in a scheme to

5    defraud the United States' Troubled Asset Relief

6    Program or to obtain money or property by materially

7    false or fraudulent pretenses, representations, or

8    promises.  A scheme is merely a plan for accomplishing

9    an object.  Fraud is a general term which embraces all

10   of the various means by which one person can gain an

11   advantage over another by false representations,

12   suppression of the truth, or deliberate disregard for

13   the truth.  Thus, a scheme to defraud is any plan, the

14   advice, or course of action to deprive another of

15   money or property by means of false or fraudulent

16   pretenses, representations, or promises reasonably

17   calculated to deceive persons of average prudence.

18           In this case the indictment alleges

19   that the scheme to defraud was carried out by making

20   false statements and representations.  The

21   representations which the Government charge were made

22   as a part of the scheme to defraud as set forth in the

23   indictment which I've already referred to.

24           The Government is not required to prove

25   every misrepresentation charged in the indictment.  It

1    is sufficient if the Government proves beyond a

2    reasonable doubt that one or more of the alleged

3    material misrepresentations were made in furtherance

4    of the alleged scheme to defraud.  However, you cannot

5    convict either Defendant unless all of you agree to at

6    least one of the material misrepresentations.

7                    A statement, representation, claim, or

8    document is false if it is untrue when made and if the

9    person making the statement, representation, claim, or

10   document or causing it to be made knew it was untrue

11   at the time it was made.  A representation or

12   statement is fraudulent if it was falsely made with

13   the intention to deceive.

14                   In addition, deceitful statements of

15   half-truths or the concealment of material facts or

16   the expression of an opinion not honestly entertained

17   may constitute false or fraudulent statements.  The

18   arrangement of the words or the circumstances in which

19   they are used may convey the false and deceptive

20   appearance.  The deception need not be premised upon

21   spoken or written words alone.  If there is deception,

22   the manner in which it is accomplished is immaterial.

23   The false or fraudulent representation or failure to

24   disclose must relate to a material fact or matter.

25                   A material fact is one which would

1    reasonably be expected to be of concern to a

2    reasonable and prudent person in relying upon the

3    representation or statement in making a decision

4    whether to approve TARP funding for a given bank.

5    This means that if you find a particular statement of

6    fact was false, you must determine whether that

7    statement was one that a reasonable person might have

8    considered important in making his or her decision.

9    The same principle applies to fraudulent half-truths

10   or omissions of material facts.

11                   In order to establish a scheme to

12   defraud, the Government must also prove that the

13   alleged scheme contemplated depriving another of money

14   or property or of intangible --

15                   UNIDENTIFIED SPEAKER:  Your Honor --

16                   THE COURT:  Well, I won't read that

17   portion.  Thank you.

18                   However, and let me just go back and

19   read that so it's clear.  In order to establish a

20   scheme to defraud, the Government must also prove that

21   the alleged scheme contemplated depriving another of

22   money or property.  However, the Government is not

23   required to prove that each Defendant originated the

24   scheme to defraud.  Furthermore, it is not necessary

25   that the Government prove that each Defendant actually

1    realized any gain from the scheme or that the United

2    States actually suffered any loss.

3              In this case the Government contends

4    that the Defendants sought funding from the Government

5    and concealed the truth about the financial soundness

6    of their bank.  Although whether or not the scheme

7    actually succeeded is really not the question, you may

8    consider whether it succeeded in determining whether

9    the scheme existed.

10             If you find that the Government has

11   proved beyond a reasonable doubt that the overall

12   scheme to defraud charged in the indictment did exist

13   and that the Defendant knowingly devised or

14   participated in the overall scheme charged in the

15   indictment, you should then consider the second

16   element.

17             The second element of the crime of TARP

18   fraud charged in Count II is that this scheme took

19   place in a form of federal assistance including

20   through TARP.  I instruct you that that act I referred

21   to, the Emergency Economic Stabilization Act, under

22   that act the Secretary of the Treasury established

23   vehicles that are authorized subject to the

24   supervision by the Secretary to purchase, hold, and

25   sell troubled assets.  One of the sub-programs created

1    under that program and TARP was the Capital Purchase

2    Program or the CPP that was referred to throughout the

3    trial.   Through that program the Government invested

4    and injected cash into troubled financial institutions

5    in exchange for preferred stock and ownership of those

6    institutions.

7                    If you find that the Government failed

8    to prove beyond a reasonable doubt this second element

9    that the scheme took place in a form of federal

10   assistance which includes TARP or the Government's

11   purchase of any troubled asset then your deliberation

12   is finished and you must return a verdict of not

13   guilty as to Count II.

14                   However, if you find the Government has

15   proven beyond a reasonable doubt not only the first

16   element which was the existence of a fraudulent scheme

17   but also the second element that such scheme took

18   place in the form of federal assistance then you

19   should proceed to consider the third element of Count

20   II that would be intent.   I'm going to charge you on

21   that at this time.

22                   The third element that the Government

23   must prove beyond a reasonable doubt is that the

24   Defendant acted with the specific intent to defraud.

25   To act with an intent to defraud means to act

1    knowingly and with the intention or purpose to deceive

2    or to cheat.  In considering whether either Defendant

3    acted with an intent to defraud, you may consider

4    among other things whether either Defendant acted with

5    a desire or purpose to bring about some gain or

6    benefit to himself or to someone else or with a desire

7    or purpose to cause some loss to someone.

8              The fourth element of the crime of TARP

9    fraud charged in Count II is that the value of the

10   form of federal assistance in which the scheme took

11   place or any constituent part thereof was at least $1

12   million.  For this element the Government must prove

13   beyond a reasonable doubt that the value of the form

14   of federal assistance that the Defendant sought to

15   obtain was $1 million or more.

16             If you find that the Government failed

17   to prove beyond a reasonable doubt this fourth element

18   that the value of the form of federal assistance or

19   any constituent part thereof was at least $1 million

20   then you must return a verdict of not guilty.  If,

21   however, you find that the Government has proven

22   beyond a reasonable doubt the fourth element as well

23   as the other three elements of TARP fraud then you

24   should return a verdict of guilty as to Count II.

25             Counts III and IV of the indictment

1    charge the Defendants, Mr. Hartline and Mr. Bekkedam,

2    with knowingly making a false, fictitious, or

3    fraudulent statement or representation concerning a

4    material fact within the jurisdiction of the

5    Department of the Treasury, an agency within the

6    executive branch of the United States.

7                    In order to prove the Defendant guilty

8    of the crime charged, the Government must establish

9    beyond a reasonable doubt that, first, on or about the

10   specific date the Defendant made a statement or

11   representation.  Second, that this statement or

12   representation was material.  Third, the statement or

13   representation was false, fictitious, or fraudulent.

14   Fourth, the false, fictitious, or fraudulent statement

15   was made knowingly and willfully.  And fifth, the

16   statement or representation was made in a manner

17   within the jurisdiction of the United States Treasury.

18                    Now, I'm going to go over those

19   elements, but before I do, I'm going to let you stand

20   up a little bit.  Tomorrow I'll give you a dramatic

21   reading of the Declaration of Independence.  All

22   right.

23                    As I said, these are Counts III and IV,

24   making false statements to federal officials, the

25   first element, statement or representation.  The first

1    element that the Government must prove beyond a

2    reasonable doubt is that a defendant made a statement

3    or representation.  In this regard the Government need

4    not prove that a defendant physically made or

5    otherwise personally prepared the statement in

6    question.  It is sufficient if a defendant caused the

7    statement charged in the indictment to have been made.

8    Under the standard, there is no distinction between

9    written and oral statements.

10                   The second element the Government must

11   prove beyond a reasonable doubt is that the

12   Defendant's statement or representation was material.

13   A fact is material if it was capable of influencing

14   the Government's decisions or activities.  However,

15   proof of actual reliance on the statement by the

16   Government is not required.

17                   The third element that the Government

18   must prove beyond a reasonable doubt is that the

19   statement or representation was false, fictitious, or

20   fraudulent.  A statement or representation is false or

21   fictitious if it was untrue when made and known at the

22   time to be untrue by the person making it or causing

23   it to be made.  A statement or representation is

24   fraudulent if it was untrue when made and was made or

25   caused to be made with the intent to deceive the

1    Government to which it was submitted or the

2    governmental agency to which it was submitted.

3              The fourth element which the Government

4    must prove beyond a reasonable doubt is that the

5    Defendant acted knowingly and willfully.  An act is

6    done knowingly if it is done purposefully and

7    voluntarily as opposed to mistakenly or accidentally.

8    An act is done willfully if it is done with an

9    intention to do something that the law forbids, that

10   is with a bad purpose to disobey the law.

11             As I have told you, the fifth element

12   that the Government must prove beyond a reasonable

13   doubt is that the statement or representation be made

14   with regard to a manner within the jurisdiction of the

15   Government of the United States.  The Department of

16   the Treasury is a department of the United States

17   Government.  There is no requirement that the

18   statement be actually directed to or given to the

19   Department of the Treasury.  All that is necessary is

20   that you find that it was contemplated, that the

21   statement was to be utilized in a manner which was

22   within the jurisdiction of the Department of the

23   Treasury.

24             To be within the jurisdiction of a

25   department or agency of the United States Government

```
1    means that the statement must concern an authorized

2    function of that department or agency.  In this regard

3    it is not necessary for the Government to prove that

4    the Defendant had actual knowledge that the false

5    statement was to be utilized in a manner which was

6    within the jurisdiction of the Department of the

7    Treasury.  It is sufficient to satisfy this element if

8    you find that the false statement was made with regard

9    to a manner within the jurisdiction of the government

10   of the Department of the Treasury.

11               Going into a different area.  A person

12   may be guilty of an offense because he personally

13   committed the offense himself or because he aided and

14   abetted another person in committing the offense.  A

15   person who has aided and abetted another person in

16   committing an offense is often called an accomplice.

17   The person whom the accomplice aids and abets is known

18   as the principal.

19               In this case, the Government alleges

20   that the Defendant, Barry Bekkedam, aided and abetted

21   the Defendant, Brian Hartline, in committing the

22   offense of making false statements as charged in

23   Counts III and IV of the indictment.  In order to find

24   Barry Bekkedam guilty of making false statements

25   because he aided and abetted Brian Hartline in
```

1    committing these offenses, you must find that the

2    Government proved beyond a reasonable doubt each of

3    the following four requirements.

4                    First, that Brian Hartline committed

5    the offenses charged by committing each of the

6    elements of the offenses charged as I have explained

7    those elements to you in these instructions. Second,

8    that Barry Bekkedam knew that the offenses charged

9    were going to be committed or were being committed by

10   Brian Hartline. Third, that Barry Bekkedam knowingly

11   did some act for the purpose of aiding, abetting,

12   commanding, producing, procuring, or willfully causing

13   Brian Hartline to commit specific offenses charged and

14   with the intent that Brian Hartline commit those

15   specific offenses. And fourth, that Barry Bekkedam

16   performed an act in furtherance of the offenses

17   charged.

18                   In deciding whether Barry Bekkedam had

19   the required knowledge and intent to satisfy the third

20   requirement for aiding and abetting, you may consider

21   both direct and circumstantial evidence including

22   Barry Bekkedam's words and actions and other facts and

23   circumstances. However, evidence that Barry Bekkedam

24   merely associated with persons involved in a criminal

25   venture or was merely present or was merely a knowing

1    spectator during the commission of the offenses is not

2    enough for you to find Barry Bekkedam guilty as an

3    aider and abettor.

4                    If the evidence shows that Barry

5    Bekkedam knew that the offense was being committed or

6    was about to be committed but does not also prove

7    beyond a reasonable doubt that it was Barry Bekkedam's

8    intent and purpose to aid, assist, encourage, or

9    otherwise associate himself with the offense, you may

10   not Barry Bekkedam guilty of the offenses as an aider

11   or abettor.

12                   The Government must prove beyond a

13   reasonable doubt that Barry Bekkedam in some way

14   participated in the offense committed by Brian

15   Hartline as something Barry Bekkedam wished to bring

16   about and to make succeed.  To show that Barry

17   Bekkedam performed an act in furtherance of the

18   offenses charged to satisfy the fourth requirement,

19   the Government needs to show some affirmative

20   participation by Barry Bekkedam which at least

21   encouraged Brian Hartline to commit the offense.  That

22   is you must find that Barry Bekkedam, his acts did in

23   some way aid, assist, encourage Brian Hartline to

24   commit the offenses.

25                   Barry Bekkedam's act need not further

1    aid, assist, encourage every part or phase of the

2    offenses charged.  It is enough if Barry Bekkedam's

3    act further aided, assisted, encouraged only one part

4    or phase of the offenses.  Also, Barry Bekkedam's act

5    need not themselves be against the law.

6                    Counts II, III, IV, and VII of the

7    indictment charge the Defendants committed major fraud

8    against the United States, false statements to the

9    United States, and bank fraud.  The Government may

10   prove a defendant guilty of these offenses by proving

11   that the Defendant personally committed them.  The

12   Government may also prove a defendant guilty of these

13   offenses based on the legal rule that each member of a

14   conspiracy is responsible for crimes and other acts

15   committed by other members of the conspiracy as long

16   as those crimes and acts were committed to help

17   further or achieve the objective of the conspiracy and

18   were reasonably foreseeable to that defendant as a

19   necessary or natural consequence of the agreement.

20                    In other words, under certain

21   circumstances the act of one conspirator may be

22   treated as the act of all.  This means that all the

23   conspirators may be convicted of a crime committed by

24   any one or more of them even though they did not all

25   actually personally participate in that crime

1    themselves.

2              In order for you to find a defendant

3    guilty of any of the offenses charged in Counts II,

4    III, IV, and VII based on this legal rule, you must

5    find that the Government proved beyond a reasonable

6    doubt each of the following four requirements.

7              First, that the Defendant was a member

8    of the conspiracy charged in the indictment.  Second,

9    that while the Defendant was still a member of the

10   conspiracy, one or more of the other members of the

11   conspiracy committed the offenses charged in Counts

12   II, III, IV, or VII by committing each of the elements

13   of those offenses.  As I explained or will explain

14   those elements to you in these instructions.

15             Third, that the other member of the

16   conspiracy committed these offenses within the scope

17   of the unlawful agreement and to help further or

18   achieve the objective of the conspiracy.  And fourth,

19   that these offenses were reasonably foreseeable to or

20   reasonably anticipated by the Defendant as a necessary

21   or natural consequence of the unlawful agreement.

22             The Government does not have to prove

23   that the Defendant specifically agreed or knew that

24   these offenses would be committed.  However, the

25   Government must prove that these offenses were

1    reasonably foreseeable to the Defendant as a member of

2    the conspiracy and within the scope of the agreement

3    as the Defendant understood it.

4                    Count V of the indictment charges the

5    Defendant, Barry Bekkedam, with wire fraud which is a

6    violation of federal law.  In order to find a

7    defendant guilty of this offense, you must find that

8    the Government proved each of the following three

9    elements beyond a reasonable doubt.

10                   First, that the Defendant devised a

11   scheme to defraud or to obtain money or property by

12   materially false or fraudulent pretenses,

13   representations, or promises, or willfully

14   participated in such a scheme with knowledge of its

15   fraudulent nature.  Second, that the Defendant acted

16   with the intent to defraud.  Third, that in advancing,

17   furthering, or carrying out the scheme the Defendant

18   transmitted any writing, signal, or sound by means of

19   a wire, radio, or television communication in

20   interstate commerce, or caused the transmission of any

21   writing, signal, or sound, or some kind by means of a

22   wire, radio, or television communication in interstate

23   commerce.  And with respect to the first element, I've

24   already instructed you on the definition of a scheme

25   to defraud in connection with my instructions on Count

Page 114

1        II.

2                    To find Mr. Bekkedam guilty beyond a

3        reasonable doubt of Count V, you must find that in

4        advancing, furthering, or carrying out the scheme Mr.

5        Bekkedam transmitted on October 21st, 2009 an email

6        from a Ballamor employee to NOVA for the purpose of

7        facilitating the loan from NOVA to Anthony Bonomo.

8                    The second element that the Government

9        must prove beyond a reasonable doubt is that the

10       Defendant acted with the specific intent to defraud.

11       To act with an intent to defraud means to act

12       knowingly and with the intention or purpose to deceive

13       or to cheat.  In considering whether the Defendant

14       acted with an intent to defraud, you may consider

15       among other things whether the Defendant acted with a

16       desire or purpose to bring about some gain or benefit

17       to himself or someone else or with a desire or purpose

18       to cause some loss to someone.

19                    Now, when I speak of transmits under

20       the wire fraud law, the third element that the

21       Government must prove beyond a reasonable doubt is

22       that in advancing, furthering, or carrying out the

23       scheme that Defendant, Barry Bekkedam, transmitted a

24       writing, signal, or sound by means of a wire, radio,

25       or television communication in interstate commerce or

1    caused the transmission of a writing, signal, or sound

2    of some kind by means of a wire, radio, or television

3    communication in interstate commerce.

4              The phrase transmits by wire or by

5    means of wire, radio, or television communication in

6    interstate commerce means to send from one state to

7    another by means of a telephone or telegraph line or

8    by means of radio or television.  The phrase includes

9    a telephone conversation by a person in one state with

10   a person in another state or electronic signal sent

11   from one state to another such as by fax or financial

12   wire.  The use of the interstate, excuse me, the use

13   of the Internet to send a message such as an email or

14   to communicate with a website may constitute a wire

15   transmission in interstate commerce.

16             The Government is not required to prove

17   that Defendant, Barry Bekkedam, actually used a wire

18   communication in interstate commerce or that the

19   Defendant, Barry Bekkedam, even intended that anything

20   be transmitted in interstate commerce by means of a

21   wire, radio, or television communication to further or

22   to advance or to carry out the scheme or plan to

23   defraud or the scheme or plan for obtaining money or

24   property by means of false or fraudulent pretenses,

25   representations, or promises.

1                However, the Government must prove

2     beyond a reasonable doubt that a transmission by wire,

3     radio, or television communication facility in

4     interstate commerce was in fact used in some manner to

5     further or to advance or to carry out the scheme to

6     defraud.  The Government must also prove either that

7     the Defendant, Barry Bekkedam, used wire, radio, or

8     television communication in interstate commerce or

9     that Barry Bekkedam knew the use of the wire, radio,

10    or television communication in interstate commerce

11    would follow in the ordinary course of business or

12    events or that the Defendant, Barry Bekkedam, should

13    reasonably have anticipated that a wire, radio, or

14    television communication in interstate commerce would

15    be used.

16                It is not necessary that the

17    information transmitted by means of wire, radio, or

18    television communication in interstate commerce itself

19    was false or fraudulent or contained any false or

20    fraudulent pretense, representation, or promise or

21    contained any request for money or thing of value.

22    However, the Government must prove beyond a reasonable

23    doubt that the use of the wire, radio, or television

24    communication in interstate commerce furthered or

25    advanced or carried out in some way the scheme.

```
 1                    Count VII of the indictment charges the
 2      Defendants, Hartline and Bekkedam, with bank fraud
 3      which is a violation of federal law.  In order to find
 4      the Defendant guilty of this offense, you must find
 5      that the Government proved each of the following three
 6      elements beyond a reasonable doubt.
 7                    First, that the Defendant knowingly
 8      executed a scheme or artifice to defraud NOVA Bank or
 9      knowingly executed a scheme to obtain the money,
10      funds, or other property owned by or under the control
11      of NOVA Bank by means of material false or fraudulent
12      pretenses, representations, or promises as detailed in
13      Count VII of the indictment.  Second, that the
14      Defendant did so with the intent to defraud NOVA Bank.
15      And third, that NOVA Bank was then insured by the
16      Federal Deposit Insurance Corporation.  With respect
17      to the first element, I've already instructed you on
18      the definition of a scheme to defraud in connection
19      with my instructions on Count II.
20                    The second element that the Government
21      must prove beyond a reasonable doubt is that the
22      Defendant acted with the intent to defraud NOVA Bank.
23      To act with an intent to defraud means to act
24      knowingly and with the intention or the purpose to
25      deceive or to cheat.  In considering whether the
```

Page 118

1    Defendant acted with an intent to defraud, you may

2    consider among other things whether each Defendant

3    acted with a desire or purpose to bring about some

4    gain or benefit to himself or someone else at the

5    expenses of NOVA Bank or with a desire or purpose to

6    cause some loss to NOVA Bank.

7                    The offenses of major fraud against the

8    United States, wire fraud and bank fraud, charged in

9    the indictment require that the Government prove that

10   the Defendants acted knowingly with respect to certain

11   elements of these offenses.  This means that the

12   Government must prove beyond a reasonable doubt that

13   the Defendants were conscious and aware of the nature

14   of their actions and of the surrounding facts and

15   circumstances as specified in the definition of the

16   offense charged.

17                    In deciding whether either Defendant

18   acted knowingly, you may consider evidence about what

19   the Defendants said, what they did and failed to do,

20   how they acted, and all of the other facts and

21   circumstances shown by the evidence that may prove

22   what was in the Defendant's mind at the time.  The

23   Government is not required to prove that either

24   Defendant knew his acts were against the law.

25                    I've referenced scheme to defraud or to

1    obtain money or property.  I'm going to give you the

2    definition.  The first element that the Government

3    must prove beyond a reasonable doubt for major fraud

4    against the United States, wire fraud and bank fraud,

5    is that the Defendant knowingly devised or willfully

6    participated in a scheme to defraud the victim of

7    money or property by materially false or fraudulent

8    pretenses, representations, or promises.

9                A scheme is merely a plan for

10   accomplishing an object.  Fraud is a general term

11   which embraces all of the various means by which one

12   person can gain an advantage over another by false

13   representations, suppression of the truth, or

14   deliberate disregard for the truth.  Thus, a scheme to

15   defraud is any plan devised or course of action to

16   deprive another of money or property by means of false

17   or fraudulent pretenses, representations, or promises

18   reasonably calculated to deceive persons of average

19   prudence.

20               In this case the indictment alleges

21   that the scheme to defraud was carried out by making

22   false and fraudulent statements, representations,

23   claims, or documents.  The representations which the

24   Government charges were made as part of the scheme to

25   defraud as set forth and they are set forth in the

1    indictment.  The Government is not required to prove

2    every misrepresentation charged in the indictment.  It

3    is sufficient if the Government proves beyond a

4    reasonable doubt that one or more of the alleged

5    material misrepresentations were made in furtherance

6    of the alleged scheme to defraud.  However, you cannot

7    convict a defendant unless all of you agree as to at

8    least one of the material misrepresentations.

9                A statement, representation, claim, or

10   document is false if it untrue when made and if it the

11   person making the statement, representation, claim, or

12   document, or causing it to be made knew it was untrue

13   at the time it was made.  A representation or

14   statement is fraudulent if it was falsely made with

15   the intention to deceive.

16               In addition, deceitful statements of

17   half-truths or the concealment of material facts or

18   the expression of an opinion not honestly entertained

19   may constitute false or fraudulent statements.  The

20   arrangement of the words or the circumstances in which

21   they are used may convey the false or deceptive

22   appearance.  The deception need to be premised upon

23   spoken or written words alone.  If there is deception,

24   the manner in which it is accomplished is immaterial.

25               The false or fraudulent representation

1    must relate to a material fact or matter.  A material

2    fact is one which would reasonably be expected to be

3    of concern to a reasonable and prudent person in

4    relying upon the representation or statement in making

5    a decision as to the proper disposition of the matter

6    involved.  This means that if you find that a

7    particular statement of fact was false, you must

8    determine whether that statement was one that was one

9    which a reasonable person might have considered

10   important in making his or her decision.  The same

11   principle applies to fraudulent half-truths or

12   omissions of material facts.

13              In order to establish a scheme a

14   defraud, the Government must also prove that the

15   alleged scheme contemplated depriving another of money

16   or property.  However, the Government is not required

17   to prove that the Defendant himself originated the

18   scheme to defraud.  Furthermore, it is not necessary

19   that the Government prove that the Defendant actually

20   realized any gain from the scheme or that any intended

21   victim actually suffered any loss.

22              In this case, it so happens that the

23   Government does contend that the proof establishes

24   that Anthony Bonomo and NOVA Bank were defrauded.

25   Although whether or not the scheme actually succeeded

1    is really not the question.  You may consider whether

2    it succeeded in determining whether the scheme

3    existed.  If you find that the Government has proved

4    beyond a reasonable doubt that the overall scheme to

5    defraud charged in the indictment did exist and that

6    the Defendant knowingly devised or participated in the

7    overall scheme charged in the indictment then you

8    should consider the second element.

9                    The second element that the Government

10   must prove beyond a reasonable doubt for major fraud

11   against the United States, wire fraud and bank fraud,

12   is that the Defendant acted with the specific intent

13   to defraud.  To act with an intent to defraud means to

14   act knowingly and with the intention or the purpose to

15   deceive or to cheat not through misunderstanding.  In

16   considering whether the Defendant acted with an intent

17   to defraud, you may consider among other things

18   whether he acted with a desire or purpose to bring

19   about some gain or benefit to himself or to someone

20   else or with a desire or purpose to cause some loss to

21   someone.

22                    That concludes my instructions on the

23   common elements for major fraud against the United

24   States, wire fraud and bank fraud.  Now, let's take

25   five minutes and I have got maybe five minutes more to

1    be done but I'm going to let you get your heads clear

2    a little bit so let's take five minutes.  And if you

3    need more than five, just let me know.

4         (Jury out)

5              THE COURT:  All right, Counsel.  Once

6    again, is there any objecting to the Court's charge or

7    corrections to the Court's charges given up to this

8    point?

9              MR. IGNALL:  Not from the Government,

10   Your Honor.

11             MR. EGAN:  Only those that were made

12   prior to the charging conference, Your Honor.  We

13   would reserve a right on those and as to what was

14   read, it was read exactly as it came out of the

15   charging conference.

16             THE COURT:  Including the car accident.

17             MR. EGAN:  Yes.  No, it was a traffic

18   citation.

19             THE COURT:  Traffic citation.  All

20   right.

21             MR. ENGLE:  That is our position as

22   well, Your Honor.

23             THE COURT:  All right.  Take five

24   minutes.  Thank you very much.

25        (Recessed at 2:16 p.m.; reconvened at 2:27 p.m.)

```
 1                    THE COURT:  Counsel, are we ready?
 2                    UNIDENTIFIED SPEAKER:  We are, Your
 3    Honor.
 4                    MR. DUNCAN:  Your Honor, I may have one
 5    issue.
 6                    THE COURT:  Yes, sir.
 7                    UNIDENTIFIED SPEAKER:  May we be
 8    seated?
 9                    THE COURT:  Please, go ahead.
10                    UNIDENTIFIED SPEAKER:  Thank you, Your
11    Honor.
12                    THE COURT:  I'm sitting down.  Why
13    shouldn't you?
14                    MR. DUNCAN:  Thank you, Your Honor.
15    This may just be more to preserve --
16                    THE COURT:  All right.
17                    MR. DUNCAN:  -- the issue for the
18    record.  Within Count V the Government charged that
19    Mr. Bekkedam committed a scheme to defraud Ballamor
20    investors.  The only place in the indictment where the
21    Government defines falsely, it's in paragraph 7, where
22    they say that the scheme was executed by Mr. Bekkedam
23    by falsely telling Ballamor investors -- I'm sorry,
24    it's paragraph 8 -- by falsely telling Ballamor
25    investors that George Levin had invested $5 million in
```

1     NOVA when Mr. Bekkedam knew that NOVA had in fact

2     loaned George Levin this money.

3               During the course of the case we argued

4     the fact that, of course, George Levin had invested

5     the money.  There was no question about that and so

6     therefore that statement was true.  Further, Mr.

7     Bonomo testified he never talked to Mr. Bekkedam about

8     this issue at all so it was completely irrelevant.

9               Mr. Schwartz' memory, and I'll let him

10    speak for himself if he feels differently, is that we

11    objected to the Court's charge because it did not

12    include that falsely element.  Mr. Schwartz' memory

13    was that the Court overruled that objection and,

14    again, I'm not here to argue the point again, I just

15    want to -- if that was correct, I wanted to preserve

16    that objection.

17               THE COURT:  Government?

18               MR. IGNALL:  I don't remember

19    specifically, the truth be told, so I think that it's

20    already been in the Court's charge, I think it's

21    appropriate to -- I don't know what relief Counsel is

22    looking for now at this point given the Court has

23    already given the charge.

24               MR. SCHWARTZ:  I can try to restate

25    what

1    Mr. Bekkedam -- what we're trying to say.  I believe,

2    Your Honor, that I specifically objected during the

3    charging conference to the exclusion of a Count V

4    charge that said his scheme to defraud was telling

5    Ballamor investors that Mr. Levin had invested when in

6    fact he had not essentially.

7                    THE COURT:  That's what's in the

8    indictment.

9                    MR. SCHWARTZ:  That's what's in the

10   indictment.  That's what I asked for in the charge and

11   I was overruled during -- I lost.  But I think what

12   we're asking to do now is just to make sure, if I

13   didn't articulate it as well during the charging

14   conference, that that's a better articulated version

15   of my objection.

16                   THE COURT:  So it's preserved.

17                   MR. SCHWARTZ:  Yes, that's the reason.

18                   THE COURT:  All right.

19                   MR. SCHWARTZ:  Thank you very much,

20   sir.

21                   THE COURT:  Sure.

22                   MR. IGNALL:  Your Honor, can I mention

23   one thing before --

24                   THE COURT:  Yes, sir.

25                   MR. IGNALL:  -- the jury comes back?

1       I've spoken to Counsel that the overt acts in the

2       indictments that I believe would go back to the jury,

3       am I correct?

4                       THE COURT:  Okay.

5                       MR. IGNALL:  I thought that the only

6       thing that would go back would be overt acts at this

7       point rather than the indictment.

8                       THE COURT:  Is there an understanding

9       about that?  Frankly, I wasn't --

10                      MR. EGAN:  No, Your Honor.  My

11      understanding was we weren't going to send anything

12      back.

13                      THE COURT:  Right.

14                      MR. IGNALL:  Okay.  Well, I think in

15      the instructions it said they had to find one of the

16      overt acts in the indictment.  That was --

17                      THE COURT:  I did read that.

18                      MR. IGNALL:  Yes, that's my concern.

19      So I think we need to address it either with --

20                      THE COURT:  How many acts are we

21      talking about?

22                      MR. IGNALL:  Well, that's what I was

23      going to say.  There are ten acts in the indictment.

24      We've agreed, based on the discussion about Exhibit

25      92, we would take one of those out and there's a

Page 128

```
 1     change to Overt Act 10 that we've agreed to with
 2     counsel for Mr. Hartline prior to trial.
 3               THE COURT:  So they don't affect the
 4     verdict sheet?
 5               MR. IGNALL:  It would not affect the
 6     verdict sheet.  I would just have to run back to the
 7     office and print out something that's different from
 8     what's in the indictment.
 9               THE COURT:  Understood.
10               MR. IGNALL:  Or that's in the file of
11     the indictment that would go back to the jury.
12               MR. DUNCAN:  And our only request, Your
13     Honor, on behalf of Mr. Bekkedam, is that we have an
14     opportunity to read that completely and agree on that
15     before it goes back to the jury.
16               THE COURT:  Oh, sure.  Absolutely.
17               MR. DUNCAN:  Thank you.
18               THE COURT:  Now, the only question that
19     I have is -- and I'm going to send them right out
20     after I finish here and they start to deliberate, you
21     don't want them to -- do you want them to wait?
22               MR. IGNALL:  I don't think they need to
23     wait.  Maybe the Court can instruct them that you'll
24     send them at some point in the near future a list of
25     the overt acts.
```

1                THE COURT:  And that's from where

2       specifically in the charge and --

3                MR. IGNALL:  Let me take a look.

4                THE COURT:  Okay.  And referring to

5       which offense?

6                MR. IGNALL:  With respect to the

7       conspiracy -- let me just find it.

8                THE COURT:  Well, just let me just ask

9       you this.  Just write it all out so that I can make a

10      record of it and then also send that to the jury.  But

11      you would be referencing the count that's going to be

12      on the verdict sheet, correct or not?  Are you going

13      to be listing the corresponding count?

14               MR. IGNALL:  Well, this should only be

15      as to Count I, Your Honor.

16               THE COURT:  All right.  Well, then just

17      say so.  That's all.

18               MR. IGNALL:  Yes.  Let me -- just so

19      we're on the same page, let me find it here.  The

20      instruction says, "The Government must prove beyond a

21      reasonable doubt that at least one member of the

22      conspiracy committed at least one of the overt acts

23      alleged in the indictment."  So unless the Court is

24      going to change that, which I don't think is probably

25      appropriate, I think we need to give them a list of

1    overt acts.

2                    THE COURT:  Do you all disagree?

3                    MR. DUNCAN:  No, Your Honor.  I think -

4    -

5                    MR. IGNALL:  May I consult with Counsel

6    for one moment?

7                    THE COURT:  Go right ahead, please.

8         (Counsel confers)

9                    MR. DUNCAN:  We agree, Your Honor.  If

10   it's just a list of the alleged overt acts for their

11   consideration to aid in their deliberation, we don't

12   have a problem with that.

13                   THE COURT:  And they have to

14   unanimously agree --

15                   MR. IGNALL:  On at least one of them.

16                   MR. DUNCAN:  Yes, sir.  They have to --

17                   THE COURT:  On at least one.

18                   MR. IGNALL:  With respect to Count I.

19                   THE COURT:  And it has to be the same

20   overt act?

21                   MR. DUNCAN:  Exactly.

22                   THE COURT:  Now, does that need to be

23   stated to them with more clarity?

24                   MR. EGAN:  I believe Your Honor already

25   that instruction.

1           THE COURT:  I'm sorry?

2           MR. EGAN:  I believe Your Honor already

3    read that instruction.

4           THE COURT:  I did.  I'm just asking is

5    there a need to elaborate any further than that,

6    what's already been done.

7           MR. DUNCAN:  I don't think so, Your

8    Honor.

9           THE COURT:  All right.

10          MR. IGNALL:  As long as the Court

11   explains why the overt acts are going back, I think

12   that's sufficient.

13          THE COURT:  Fair enough.  Well, that's

14   going to be part of the instruction or not?

15          MR. IGNALL:  Let me talk to Counsel for

16   a moment.

17          THE COURT:  All right.  Go right ahead.

18   Just want you all to be on the same page.

19       (Counsel confers)

20          MR. IGNALL:  Sorry about that, Your

21   Honor.

22          THE COURT:  That's all right.

23          MR. IGNALL:  I think it would be best

24   if we write something out.

25          THE COURT:  Great.

 1                    MR. IGNALL:  Preferably with Ms.

 2     Barry's handwriting.

 3                    THE COURT:  Fair enough.

 4                    MR. EGAN:  So my concern is --

 5                    THE COURT:  Yes, sir.

 6                    MR. EGAN:  -- if we provide the list of

 7     overt acts with nothing else, albeit with the rest of

 8     the indictment, there might be -- the jury may, you

 9     know, conclude they don't have to find one of these

10     overt acts to find guilt.  So I would like them

11     instructed that the overt acts are in addition to all

12     of the other elements if we're sending them back like

13     that.

14                    THE COURT:  I'm not sure I totally

15     understand.  Let me just tell you my concern and that

16     is to send out the jury -- send out to them this

17     compilation of overt acts to me almost suggests to

18     them that you're going to find some guilt here and

19     these are your choices.

20                    MR. EGAN:  I agree, Your Honor, and

21     that's what I'm trying to address.

22                    THE COURT:  As opposed to some other

23     way to do this --

24                    MR. IGNALL:  Let me talk to Counsel

25     some more.

Page 133

1                    THE COURT:  -- that's more fair.

2                    MR. EGAN:  That's my concern, Your

3       Honor.

4                    MR. IGNALL:  Let me --

5                    THE COURT:  Sure.  Go right ahead.

6          (Counsel confers)

7                    MR. EGAN:  Your Honor, I believe we

8       have a resolution.

9                    THE COURT:  Yes, sir.

10                   MR. EGAN:  If the jury were to request

11      the overt acts, meaning that they had come to a

12      resolution on the other issues, we would then provide

13      that.

14                   THE COURT:  Sounds like a wiser thing

15      to do.

16                   MR. IGNALL:  Yes, I think that's

17      prudent.  And I'll run back to the office as soon as

18      we're done just to make sure I have it available.

19                   THE COURT:  Fine.  Fair enough.

20                   MR. IGNALL:  I may even be able to do

21      it here.

22                   THE COURT:  All right.

23                   MR. EGAN:  Thank you, Your Honor.

24                   THE COURT:  Okay.  Thank you.

25                   MR. IGNALL:  (Indiscernible).

1            THE COURT:  All right.  Great.

2            MR. IGNALL:  All right.  Thank you,

3    Your Honor.

4            THE COURT:  Are we ready, Counsel?

5            MR. EGAN:  Yes, Your Honor.

6            THE COURT:  All right.

7            THE CLERK:  All rise.

8        (Jury in)

9            THE CLERK:  Ladies and gentlemen, we

10   are back on the record.

11           THE COURT:  Good afternoon.  You may be

12   seated.  Now, I want you to resist the temptation next

13   Christmas to send me a watch or a clock because I

14   don't know how to tell time.  When I say five minutes

15   it turns to 15, et cetera, et cetera.  All right.

16   We're about to conclude.

17           I'm going to explain to you at this

18   time some things about your deliberations and how they

19   should be conducted in reaching a fair and just

20   verdict in this case.  When you go out to the jury

21   deliberation room, the first thing that you should do

22   is to choose a foreperson.

23           This person will speak for the jury

24   here in Court.  That person will also preside over

25   your deliberations.  The foreperson, however, has one

1    vote just like everyone else so it's not like this

2    hierarchy that's back there.  It's just someone who

3    facilitates the discussions.

4              But the foreperson has an additional

5    responsibility or two and that is that if there is any

6    question that the jury has, the foreperson has the

7    responsibility of writing down specifically what it is

8    that the jury wants to know, put a date on it and the

9    time that you recorded it.  In turn it's given to the

10   Court officer who in turn gives it to me and I consult

11   with the attorneys about the inquiry that the jury has

12   recorded.  And as I will state to you a little later

13   on in these instructions, you cannot communicate with

14   me in any other manner.

15             Now, the foreperson also, at the

16   conclusion of the matter when there is a verdict

17   assuming one is reached, will stand up and announce

18   that verdict to the Court.  Now, again, this is a

19   criminal trial therefore the verdict of the jury is

20   either guilty or not guilty as to each count, as to

21   each Defendant, and the verdict has to be unanimous.

22   All the jurors have to agree.

23             To find a defendant guilty of an

24   offense, every one of you must agree that the

25   Government has overcome the presumption of innocence

1    with the evidence that proves each and every element

2    of the offense beyond a reasonable doubt.  To find a

3    defendant not guilty, every one of you must agree that

4    the Government has failed to convince you beyond a

5    reasonable doubt.

6              If you decide that the Government has

7    proved a defendant guilty then it will be my

8    responsibility to decide what the appropriate

9    punishment would be.  You should never, ever consider

10   the possible punishment in reaching your verdict in

11   this case.

12             As I have said before, your verdict

13   must be based only on the evidence received in this

14   case and the law as I have given it to you.  You

15   should not take anything that I may have said or done

16   during the course of the trial as indicating in any

17   way what I think of the evidence or what I think your

18   verdict should be.  Again, the verdict in this case is

19   solely your responsibility as jurors.

20             And now that all the evidence has been

21   submitted and the arguments have been completed, once

22   I finish my instructions to you, you will be free to

23   go into the jury deliberation room and discuss the

24   case finally.  It is your duty to discuss the case, to

25   talk with each other about the evidence, and to make

1    every reasonable effort that you can make to reach a

2    unanimous agreement.  Talk with each other.  Listen

3    carefully and respectfully to each other's views and

4    keep an open mind as you listen to what your fellow

5    jurors have to say.

6              Do not hesitate to change your mind if

7    you are convinced that other jurors are right and that

8    your original position was wrong.  But do not ever

9    change your mind just because other jurors see things

10   differently or just to get the case over with.  In the

11   end your vote must be exactly that, your own vote.

12             It is important for you to reach

13   unanimous agreement but only if you can do honestly

14   and in good conscience.  Listen carefully to what the

15   other jurors have to say and then decide for yourself

16   if the Government has proved a defendant's guilt

17   beyond a reasonable doubt.  No one will be allowed to

18   hear your discussions in the jury room and no record

19   will be made of what you say therefore you should all

20   feel free to speak your minds.

21             Now, remember those of you who elected

22   to take notes during the trial, your notes should be

23   used only as memory aids for yourself.  You should not

24   give your notes greater weight than your independent

25   recollection of the evidence.  You should rely upon

1    your own independent recollection of the evidence or

2    lack of evidence and you should not be unduly

3    influenced by the notes of other jurors.  Notes are

4    not entitled to any more weight than the memory or

5    impression of each juror.

6              Once you start deliberating, do not

7    talk with or communicate with or provide any

8    information about this case by any other means to

9    court officials.  In other words, you only contact me

10   by way of a written note, again, with the date and the

11   time, concerning an issue in the case.  That is to be

12   handed to my Court Officer who in turn gives it

13   directly to me.  Again, you may not use any form of

14   the electronic communications that I referenced

15   earlier.  As I also indicated, if there is a

16   communication given to the Court Officer who in turn

17   gives it to me regarding looking at some evidence or

18   some question about my instruction, I will confer with

19   counsel and then I will respond to you as quickly as

20   possible.

21              If you want to see exhibits, first of

22   all, you know that there were a lot of exhibits

23   introduced in this case.  As a rule, I never send all

24   of the exhibits out with the jury as soon as they go

25   back to that room.  First of all, there's not enough

Page 139

1    room back there anyway, but if you need to see an

2    exhibit to assist your deliberations in the case, let

3    the foreperson know that who will in turn write down

4    exactly what it is that the jury wishes to see.  I

5    will take that note and confer with counsel as to

6    whether or not and how much we can send back to the

7    jury room.

8              One more thing about messages.  The

9    foreperson should never write down or tell anyone else

10   what the status of the vote is, not even to me.  That

11   should stay secret until you have finished your

12   deliberations.  If you have occasion to communicate

13   with me while you are deliberating, do not disclose

14   the number of jurors who have voted one way or the

15   other way.

16             Now, I'm going to distribute to you

17   what we call the verdict form, verdict sheet which

18   lists all of the charges and lines there under for

19   each Defendant as to whether you vote guilty or not

20   guilty and we'll do that at this time.  Now, I'm going

21   to go over every word on this verdict sheet, but take

22   your time to familiarize yourself with it before I do.

23        (Pause)

24             THE COURT:  All right.  Now, while you

25   have been distributed a copy for each of you to refer

1     to, when you go out into the jury deliberation room,

2     only one verdict sheet will accompany the jury out

3     there and that's the only one that will be completed

4     and brought back into the courtroom.  But in terms of

5     familiarizing yourself with it, you take this form to

6     the jury room, the one form that will be distributed,

7     and when the jury has reached a unanimous verdict, the

8     foreperson should write the verdict down on the form,

9     date it and sign it, and again return it to the Court

10    Officer who in turn gives it to me, who will bring you

11    out to formally announce your verdict in the case.

12             If you decide that the Government has

13    proved a defendant of any or all of the offenses

14    charged beyond a reasonable doubt, say so by having

15    your foreperson mark the appropriate place on the

16    form.  If you decide the Government has not proved a

17    defendant guilty of some or all of the offenses

18    charged beyond a reasonable doubt, say so by having

19    your foreperson mark the appropriate place on the

20    form.

21             Now, going to the form itself, as you

22    see it's the caption of the case, In the United States

23    Court for the Eastern District of Pennsylvania, United

24    States of America v. Brian Hartline, United States of

25    America v. Barry Bekkedam, and the number that we

1    associate with the case internally.  It is captioned

2    Jury Verdict Form.

3                    First page, as to Defendant Brian

4    Hartline, Count I, conspiracy to defraud the United

5    States from in or about May 2009 through in or about

6    January 2010, we unanimously find Brian Hartline

7    either guilty or not guilty, select.  Count II,

8    Troubled Asset Relief Program fraud, from in or about

9    May 2009 through in or about January 2010, we

10   unanimously find Brian Hartline, you check either

11   guilty or not guilty.  Count III, false statement to

12   the Federal Government on or about June 30th, 2009.

13   We unanimously find Brian Hartline, you check either

14   guilty or not guilty.  Count IV, a false statement to

15   the Federal Government on or about December 15th,

16   2009, we unanimously Brian Hartline either guilty or

17   not guilty.  Count VII, bank fraud from in or about

18   May 2009 to in or about February 2010, we unanimously

19   find Brian Hartline, you check either guilty or not

20   guilty.

21                    As to Defendant Barry Bekkedam, Count

22   I, conspiracy to defraud the United States from in or

23   about

24   May 2009 through in or about January 2010, we

25   unanimously find Barry Bekkedam, you check either

1    guilty or not guilty.  Count II, Troubled Asset Relief

2    Program fraud, from in or about May 2009 through in or

3    about January 2010, we unanimously find Barry

4    Bekkedam, you check either guilty or not guilty.

5    Count III, false statement to the Federal Government

6    on or about June 30th, 2009.  We unanimously find

7    Barry Bekkedam, again, you check either guilty or not

8    guilty.  False statement to the Federal Government on

9    or about -- and this is Count IV, false statement on

10   or about December 15th, 2009, we unanimously find

11   Barry Bekkedam, you check either guilty or not guilty.

12   Count V, wire fraud on or about October 21st, 2009.

13   We unanimously find Barry Bekkedam, you check either

14   guilty or not guilty.  And Count VII -- now we've

15   skipped from V to VII -- bank fraud from in or about

16   May 2009 to in or about February 2010, we unanimously

17   find Barry Bekkedam and you check either guilty or not

18   guilty.  It must be signed by the, quote/unquote,

19   "presiding juror" who is the foreperson with a date.

20   All right.

21              Now, let's first collect the verdict

22   sheets, would you, please?  Thank you.

23              All right.  Now, procedurally the way

24   the process works is that a jury consists of 12

25   jurors.  Therefore, Ms. Elchebaz (ph) will identify

1    those 12 jurors who will participate directly in the

2    deliberations in this case.  The remainder of you are

3    alternate jurors.

4              Please, please, please be aware that

5    the responsibility of the alternate juror is just as

6    important as any member of the main 12 for if for any

7    reason one cannot continue to serve during the course

8    of the deliberations, the alternate juror moves up

9    into the seat of the person who has vacated.  If that

10   should happen, the deliberations have to being anew.

11   So therefore it is of the utmost importance that the

12   alternate jurors who will be sequestered in a

13   different location not discuss the evidence in the

14   case.  You simply cannot do that.

15             Now, Ms. Elchebaz (ph), would you have

16   the alternate jurors step out of the box, please?

17             All right.  Now, again, the first

18   responsibility is to select one of your members to act

19   as foreperson.  Remember that person has the same

20   status as the rest of you in terms of votes.  Also, I

21   always remind my jurors before they go out to

22   deliberate and throughout the deliberation process

23   that if each of you treats your fellow jurors' views,

24   comments with the same courtesy and respect that you

25   would expect, everything should flow much more easily.

1    You are now excused to commence your deliberations in

2    this case.  Thank you very much.

3                    THE CLERK:  All rise.

4        (Jury out)

5                    THE COURT:  All right.  We are --

6                    COURTROOM DEPUTY:  They're going to get

7    their belongings and then I'm going to take them down.

8    Do you want to speak to them before they go?

9                    THE COURT:  The alternates?

10                   COURTROOM DEPUTY:  Yes.

11                   THE COURT:  No, but I will speak to

12   everybody before they leave for the day, assuming

13   there's no verdict, in terms of not watching TV or

14   reading anything.

15                   COURTROOM DEPUTY:  Okay.

16                   THE COURT:  Thank you.

17                   You may be seated and let's talk about

18   the overt act compilation and how that's going to be

19   done.

20                   MR. IGNALL:  I think we can actually do

21   it in the courtroom.  I'm going to ask my legal

22   assistant to send it here.  We'll remove one and make

23   the change we've agreed to with Mr. Hartline's

24   attorneys and I believe we have the ability to email

25   it and then print it out and we can make sure that all

1    parties are in agreement if the jury should ask for

2    it.

3                    THE COURT:  All right.  Now, let me

4    just ask one thing and that is given that the

5    indictment is not going out and we're talking overt

6    acts that are listed in the indictment, correct?

7                    MR. IGNALL:  Correct.  Yes.

8                    THE COURT:  It seems to me and I'm just

9    -- and this is just by suggestion, not an edict, but

10   it just seems to me that if this is going to be sent

11   to the jury it should be prefaced with the fact that

12   by reason of the charge the jury has to -- or the jury

13   may find overt acts on this particular count, however,

14   the jury's review of those overt acts or consideration

15   of those overt acts are limited to the following.  It

16   does not, however, suggest that the jury must find any

17   one of these overt acts or work that out.

18                    In other words, I just want to make

19   sure that it's clear to -- if they -- you're saying

20   that you want them to go out if they ask for them or

21   go out, period?

22                    MR. EGAN:  Only if they say that we

23   need the overt acts and then I would -- we can

24   obviously talk about it, because it won't come right

25   away, whether there should be instructions with them

1     that we would take --

2                    THE COURT:  Okay.  That's all I wanted,

3     just to make sure.

4                    MR. EGAN:  Yes.

5                    THE COURT:  So therefore we'll cross

6     that bridge when we come to it.

7                    MR. EGAN:  Yes.

8                    THE COURT:  All right.

9                    MR. EGAN:  Thank you, Your Honor.

10                    THE COURT:  Thank you all.

11                    MR. IGNALL:  Thank you, Your Honor.

12                    THE COURT:  It's 3:00.  I would assume

13     that they will spend the remainder of the afternoon

14     deliberating.  Does anyone need to leave the building?

15                    MR. EGAN:  No, Your Honor.

16                    MR. IGNALL:  No, Your Honor.

17                    MR. DUNCAN:  Not this afternoon, Your

18     Honor.

19                    THE COURT:  All right, then.  We're

20     fine then.

21                    MR. DUNCAN:  Your Honor, on behalf of

22     Mr. Bekkedam, I just -- I don't want there to be

23     unfair surprise.  We don't necessarily agree with all

24     of the ten overt acts and we'll discuss that when it

25     arises.

1                    THE COURT:  Well, I would start working

2     on it now just in case.

3                    MR. DUNCAN:  Yes.  Already --

4                    THE COURT:  Fair enough.  Thank you

5     very much.

6                    MR. ENGLE:  Your Honor, just for the

7     record.  If we may renew our objection to those

8     aspects of the instructions that were objected to

9     during the charge conference and we would preserve

10    those issues for purposes of appellate review if

11    necessary.

12                    THE COURT:  Absolutely.

13                    MR. ENGLE:  Thank you.

14                    MR. EGAN:  And I'll join in that.

15                    THE COURT:  All right.  Absolutely.

16                    MR. EGAN:  Thank you, Your Honor.

17                    MR. IGNALL:  Thank you, Your Honor.

18                    THE COURT:  Okay.  Could I see counsel

19    very, very briefly at side bar?

20                    Totally off the record.

21         (Recessed at 2:58 p.m.; reconvened at 3:11 p.m.)

22                    THE CLERK:  Judge, you're on the

23    record.

24                    THE COURT:  All right.  Counsel, I have

25    been given what I will mark as Jury Exhibit No. 1.

1     It's dated April 20, 2016 at 3:10 p.m.  It reads as

2     follows:  "Judge Jones, we understood that we would be

3     provided with definitions of the charges.  Can we see

4     what was read to us this afternoon?  Thank you.

5     Signed, The Foreperson."

6                  MR. EGAN:  On behalf of Mr. Hartline,

7     no objection with the instructions, Your Honor.  The

8     problem is the instructions are not exactly clear.

9                  THE COURT:  And they did -- I think

10    they're focusing on what was read to them this

11    afternoon regarding the specific charges.  Do you want

12    all the instructions to go back with them?

13                 MR. EGAN:  Yes.

14                 THE COURT:  I'm just asking.  All

15    right.  Thank you.  Just making --

16                 MR. IGNALL:  I'm just wondering if we

17    need to clean them up somehow.

18                 THE COURT:  Now, are you saying the

19    whole thing or just the specific charges?  Because

20    they're asking for definitions of the charges.

21                 MR. EGAN:  Well, Your Honor, my view is

22    the instructions should go in and the reasonable doubt

23    should go in and the other part should go in, as well.

24                 UNIDENTIFIED SPEAKER:  Everything, Your

25    Honor, makes sense.

1          MR. IGNALL:  I'm fine either way.

2          THE COURT:  And let them thumb through?

3          MR. EGAN:  Yes.  Well, the charges are

4    over half of it.

5          MS. BARRY:  There's a table of

6    contents, right?

7          UNIDENTIFIED SPEAKER:  Well, not -- but

8    that's the problem is to make these readable.

9          UNIDENTIFIED SPEAKER:  We wouldn't them

10   to focus on one instruction over the other.  They're

11   supposed to take the instructions as a whole.

12         THE COURT:  I have no problem with

13   that.  I would request it be more specific but if you

14   all say all the charges, so be it.  But I am concerned

15   about the volume of the (indiscernible).  I just can't

16   fathom them having all of that for someone to go

17   thumbing through it and someone else go, hey, what

18   about this.

19         UNIDENTIFIED SPEAKER:  Well, do you

20   want to write a note back just saying are you

21   requesting the charge that I gave on the elements of

22   the offense or something --

23         MR. IGNALL:  Or something more open-

24   ended about what they're asking for.

25         UNIDENTIFIED SPEAKER:  Yes.  And say

1    this does -- we appreciate the question but it's a

2    little bit open-ended.

3                    THE COURT:  Sounds good.  I'm going to

4    do that.  All right.  I'll do that right now.

5                    MR. EGAN:  Thank you, Your Honor.

6                    THE COURT:  And I'll certainly show it

7    to you before I send it back.

8                    MR. IGNALL:  Thank you, Your Honor.

9         (Pause)

10                   THE COURT:  We're on the record.  I

11   have drafted the following which certainly is subject

12   to your input and it is to the jury from Judge Jones

13   regarding Jury Inquiry No. 1.  "Are you requesting my

14   entire instructions or the specific charges and their

15   elements?"  Is that satisfactory?

16                   MR. EGAN:  Yes, Your Honor.

17                   MR. IGNALL:  Sure.  Thank you, Your

18   Honor.

19        (Pause)

20                   THE COURT:  Okay.  This is an easy way

21   to get my initial autograph.  Now, we need to make a

22   copy of that before the record or whenever.  See they

23   have a backup because if we give it to them and then

24   they scrunch it up back there --

25                   THE CLERK:  Can you run off another

Page 151

1    one?

2                    UNIDENTIFIED SPEAKER:  Sure.

3                    THE COURT:  Thank you so much.

4        (Pause)

5                    MS. BARRY:  That one is going into the

6    record.

7                    THE CLERK:  This is our copy.

8                    THE COURT:  Oh, okay.  Fine.  You know

9    what?  I didn't date --

10                   THE CLERK:  What?

11                   THE COURT:  There's no date and time on

12   this.

13                   THE CLERK:  (Indiscernible).

14       (Pause)

15                   UNIDENTIFIED SPEAKER:  This is the

16   formatting issue.  So what we're wondering is if we're

17   going to send this to the jury and it has a lot of

18   extraneous and messed up parts to it in terms of the

19   formatting.

20                   THE COURT:  The charges.

21                   UNIDENTIFIED SPEAKER:  Yes.  Sean may

22   be able to help fix that if we get the most recent

23   version which I think you have probably in Word.  So

24   that we can send something legible back to the jury

25   other than all the extraneous stuff that Your Honor

1    was so kind not to read.

2                    THE COURT:  Yes, and I kind of did that

3    on the fly.

4                    UNIDENTIFIED SPEAKER:  And very well,

5    too, I must say.

6                    THE COURT:  Yes, it just doesn't make

7    any sense to do it that way.

8                    THE CLERK:  Did you make any edits on

9    your computer on this (indiscernible) or on the

10   computer upstairs this morning before you printed it

11   out?

12                   THE COURT:  No.

13                   THE CLERK:  Okay.  Then I do have the

14   final Word version.  I just need to add in the thing

15   about (indiscernible)?

16                   THE COURT:  Oh, you know what though,

17   there were parts of it that I edited really with just

18   my red pen on the sheet here and those went to

19   specifically deleting or omitting Mr. Bekkedam from --

20   Count VI was out and then there were just a few other

21   grammatical changes that were made.

22                   MR. IGNALL:  Your Honor,

23   (indiscernible) things that were struck through like

24   on page 30.

25                   MR. EGAN:  And paragraphs

Page 153

1      (indiscernible).

2                      THE COURT:  Exactly.

3                      MR. IGNALL:  And all those -- the

4      citations need to come out obviously.

5                      THE COURT:  Well, let's wait until they

6      come back out with the note.

7           (Pause)

8                      THE COURT:  All right.  I'll put this

9      on the record.  All right.  I have a response

10     communication from the foreperson dated this date,

11     3:25.  "Judge Jones, we would like the description of

12     what must be proven for each of the counts.  I think

13     that means, quote, "the specific charges and their

14     elements", end quote, signed, The Foreperson."

15                     Now, given it's 3:30, I don't know how

16     long it's going to take to edit this the way that I

17     read it because obviously I didn't read everything.

18     3:30, 4:00.  Oh, gosh.

19                     MR. IGNALL:  Your Honor, there's two

20     ways to interpret that and maybe there's a way we

21     could effectively do both.

22                     THE COURT:  All right.

23                     MR. IGNALL:  One is do they simply want

24     the elements as the Court read, "You must find one,

25     two, three, and four."

1                    THE COURT:  For the count and the

2       charge.

3                    MR. IGNALL:  For the count as opposed

4       to let me go into more detail about Element 1 and

5       perhaps what we could do and it sounds like Mr. Egan

6       does not like this so never mind.

7                    MR. EGAN:  Your Honor, I have a better

8       plan.  (Indiscernible).  I wonder if there's any way

9       to get the transcript of what you read very quickly

10      and give them that.

11                   THE COURT:  To be totally honest with

12      you, we were discussing this up in chambers over the

13      lunch hour and I had suggested that because of -- my

14      best friend did this on the district court in

15      Washington when there was a request for the charge

16      although he announces out the whole charge, but he

17      allowed the recording of his reading to go out.  The

18      problem is this is not an electronic courtroom so I

19      don't know that we would be able to retrieve the

20      reading from that -- Carl's machinery here.

21                   UNIDENTIFIED SPEAKER:  I don't know if

22      you can print it.  I mean, we could pull it up but I

23      don't know if it will --

24                   UNIDENTIFIED SPEAKER:  (Indiscernible).

25                   UNIDENTIFIED SPEAKER:  Yes.  If it will

1    be loud enough for them to be able to hear it.

2                    THE COURT:  Or even edit for that

3    matter.  All right.  Listen.  The best thing that we

4    can do, folks, if we are going to give them a clean

5    copy, which I would certainly suggest be done, it

6    can't be done immediately and I can communicate that

7    to the jury, ask them if they can consider -- or if

8    they would consider continuing to deliberate until we

9    provided them with that which really wouldn't be

10   available until tomorrow morning, I think just to be

11   very practical about it and realistic about it.  Is

12   that acceptable?

13                   MR. EGAN:  It is, Your Honor, except

14   for if we could not tell them that it's -- wouldn't be

15   available until tomorrow morning so that they can

16   continue to deliberate without some concept of we

17   should just go home now, that type of thing.

18                   THE COURT:  All right.  Could you

19   continue to deliberate?

20                   MR. ENGLE:  Perhaps something that

21   suggests that they continue about their work of

22   deliberations and that the Court will get that

23   document together for them with all speed and that as

24   soon as it's available it will be given to them, but

25   they should continue deliberating in the meantime.

1                    THE COURT:  All right.

2                    MR. ENGLE:  Something to that effect.

3                    THE COURT:  All right.  My only problem

4      with that is if they're sitting back there saying --

5      somebody, one of the 12, I'm waiting, I'm waiting, I'm

6      waiting, and not participating because he or she is

7      expecting something to come forth.  That's my only

8      concern about that.

9                    COURTROOM DEPUTY:  (Indiscernible)

10     opportunity to talk so the likelihood of them wanting

11     to proceed (indiscernible).

12                   THE COURT:  Okay.  All right.  A lot of

13     folks want it and that's what they were just saying

14     when they walked into that door back there, that it

15     was a lot for them to absorb and digest which, again,

16     we talked about that upstairs -- downstairs, as well.

17     I can -- no, it's okay.  I can ask them, honestly, if

18     they could continue to deliberate until it's supplied.

19     However, given the volume, realistically speaking, it

20     may not get to them before 4:30 today which is the

21     time that we've already kind of told them and then see

22     what they say.  Is that acceptable?

23                   UNIDENTIFIED SPEAKER:  Certainly.

24                   UNIDENTIFIED SPEAKER:  Yes, Your Honor.

25                   THE COURT:  Would you entrust Ms.

```
 1   Elchebaz to deliver that message?

 2                 UNIDENTIFIED SPEAKER:  Of course.

 3                 UNIDENTIFIED SPEAKER:  Yes.

 4                 THE COURT:  All right.  Just tell them

 5   that we are going to respond to their request.

 6   However, given the volume, we probably will not be

 7   able to accumulate it or aggregate it for them within

 8   the hour which would take us to 4:30.  Could they

 9   continue to deliberate until it's given to them

10   tomorrow morning?  And if they can't, just let you

11   know, and if they say they can't, don't tell them

12   what's going to happen next which is, goodbye, see you

13   tomorrow.

14                 MR. EGAN:  Your Honor, could we get

15   emailed the most recent version so they can work on

16   it?

17                 THE COURT:  You gave it to us at 11:00

18   last night.

19                 MR. EGAN:  We just want to make sure we

20   have it.

21                 THE COURT:  But remember though that as

22   we talked about it, we excised some portions in

23   deference to Mr. Bekkedam's case as well as --

24                 MR. IGNALL:  No, I think we'll be able

25   to work that out.
```

1                    THE COURT:  All right.  Fine.  And some

2       of the grammatical changes and whatever.  All right.

3            (Recessed at 3:31 p.m.; reconvened at 3:32 p.m.)

4                    THE COURT:  Counsel, could I ask you

5       whether or not by agreement you're going to send out

6       strictly the name of the offense and the elements as

7       opposed to what I read from the statute and the

8       definition of the statute and all those kinds of

9       things as opposed to strictly this is the offense,

10      these are the four elements, these are the three

11      elements for this offense?  Is that acceptable to you

12      or not?

13                   MR. EGAN:  No, Your Honor, I think the

14      elements should be defined.

15                   THE COURT:  I'm sorry?

16                   MR. EGAN:  I think the elements should

17      be defined as you defined them.

18                   THE COURT:  All right.  Let me just see

19      what the --

20                   COURTROOM DEPUTY:  (Indiscernible).

21                   THE COURT:  All right.  So can they go

22      to 4:30?

23                   COURTROOM DEPUTY:  Well, they said

24      (indiscernible) discussed in the meantime.  They said

25      (indiscernible).

1                    THE COURT:  All right.  Counsel, the

2       response was, why would it take so long?  He read it.

3       But in addition thereto that they do have other things

4       that they can discuss pending the receipt of the

5       instructions and they are aware that it may not come

6       before the end of the day.

7                    UNIDENTIFIED SPEAKER:  Thank you.

8                    THE COURT:  All right.

9         (Pause)

10                    THE COURT:  Excuse me one second.

11                    Yes, sir?

12                    MR. SCHWARTZ:  I beg your pardon, Your

13      Honor.

14                    THE COURT:  Yes, sir.

15                    MR. SCHWARTZ:  This is (indiscernible)

16      by both parties.  We agree to changing what the object

17      of the conspiracy was but we do excise it in one place

18      on page (indiscernible).

19                    THE COURT:  Correct.

20                    MR. SCHWARTZ:  The parties agree to

21      excise the notion that it's a dual objective and just

22      put the single objective language that we all had

23      agreed to and thought we would put back in.  If that's

24      okay with the Court, we'll make that one change.

25                    THE COURT:  Any objection from the

1    Government?

2                    UNIDENTIFIED SPEAKER:  (Indiscernible).

3                    THE COURT:  I'm sorry.

4                    MS. BARRY:  No objection.

5                    MR. IGNALL:  No objection that this

6    will be slightly different than what the Court read.

7    I don't think in any way that it's material --

8                    THE COURT:  All right.  Fine.  Fine

9    with me.  Fine with me.

10         (Recessed at 3:38 p.m.; reconvened at 3:40 p.m.)

11                    MR. SCHWARTZ:  To make sure we're

12   interpreting the request of the jury correctly, in

13   between the pages that identify the specific elements

14   of conspiracy count 1, there's an instruction that

15   says, "Conspiracy success immaterial."  It's the

16   defense's position that that is not an element and it

17   should not go back.  I won't speak for the Government,

18   though.

19                    MR. IGNALL:  That -- I think before --

20   I think it's one or the other.  Either we're just

21   going to say here are the four elements or we're going

22   to go through all the description that's behind each

23   of the elements.  I don't think we can pick and choose

24   which descriptions go back.

25                    THE COURT:  Well, I agree with you

1    there.  We need to be consistent about this.

2                  MR. IGNALL:  And I think counsel for

3    the defense wants more than just the four elements.  I

4    think things like success immaterial need to go back

5    to the jury because I think that is --

6                  THE COURT:  The thing is, that's a

7    double edged sword.  There's going to be portions of

8    this set of instructions where it's going to cut both

9    ways.

10                 MR. SCHWARTZ:  I just want to follow

11   the -- whatever the request of the jury is as

12   interpreted by the Court.

13                 THE COURT:  Can I see that letter again

14   (indiscernible)?  It reads in pertinent part, "We

15   would like the description of what must be proven for

16   each of the counts."  I think that means the specific

17   charges and their elements.

18                 MR. IGNALL:  But I think what must be

19   proven includes what must not be proven.  So I think

20   success immaterial, things like charge period and

21   duration are part of that if we're going to include

22   other descriptions of the elements.  I don't think we

23   can pick and choose which descriptions of the elements

24   we send back.

25                 MR. SCHWARTZ:  I have argued not

1    successfully that there are parts of this charge that

2    highlight different things for the Government.  And I

3    think this highlights something for the Government.

4    It's like highlighting their argument and I don't

5    believe this fact that success is immaterial is an

6    element.

7              THE COURT:  Mr. Ignall, assuming that

8    the elements in some of these counts had the however

9    added to it, and the howevers spoke to the lack of

10   culpability of a defendant or the exoneration of a

11   defendant because the however wasn't met, that's why

12   I'm saying this goes through all of the instructions.

13   It cuts both ways.  It --

14             MR. IGNALL:  I think that's why they

15   all have to go out because they do cut both ways.  I

16   think the jury needs to consider all of it.  I don't

17   think it's reasonable to say here are the four

18   elements.  They read that and now they've forgotten

19   the Court's instruction that success is immaterial and

20   now they're expecting the Government to prove

21   something that's not required.  I don't think that's

22   appropriate.

23             THE COURT:  But in -- for example, with

24   the success is immaterial, as to that count, there

25   were still the elements and the success being

1    immaterial really didn't have anything to do with the

2    establishment of the elements because the elements

3    didn't talk about success.

4                    MR. IGNALL:  I agree with that, Your

5    Honor, but if we're going to go into a further

6    description of various parts of the crime then I think

7    we need to have the full description of the Court be

8    the jury about what they need to find or not find with

9    respect to these crimes.  I'm not comfortable picking

10   and choosing just parts of that to go back to the jury

11   because defense doesn't like that part of the

12   description.  But I'm not going to pick and choose

13   which parts of the other descriptions go back or not.

14   I think it either all goes back or it doesn't.

15                   MR. SCHWARTZ:  Well, with respect to

16   the success immaterial issue, Your Honor, as

17   Mr. Fuller has pointed out to me, that's covered by

18   something we're sending back to the jury by saying --

19   in the overall it says it is a federal crime for two

20   or more persons to agree or conspire to commit any

21   offense against the United States, even if they never

22   actually achieved their objective.  And that's why I'm

23   saying success immaterial is kind of like, let's

24   highlight this, when in fact it's just a --

25                   THE COURT:  But that portion that you

1    just alluded to is going to be read -- given to the

2    jury?

3                    MR. SCHWARTZ:  Yes, count 1, elements

4    of the offense.

5                    THE COURT:  That's in the elements?

6                    MR. SCHWARTZ:  Yes.

7                    THE COURT:  Mr. Ignall?

8                    MR. IGNALL:  I think that's right, but

9    everything else is in the elements as well.  Like, if

10   we talk about the elements, it's first, second, third,

11   and fourth, and everything that's described after that

12   illuminates or highlights different parts of first,

13   second, third, and fourth.  So I don't have a problem

14   if we just --

15                   THE COURT:  But I thought that you all

16   had agreed initially that you wouldn't send out the

17   additional, just simply the elements.

18                   MR. IGNALL:  Well, no, what I

19   understood -- my initial suggestion was we would just

20   do that one instruction that has you must find first,

21   second, third, and fourth and leave it at that unless

22   there's a further request.  I understood Mr. Egan, he

23   didn't like that.  He wanted the first description of

24   how the jury is supposed to consider each of the

25   elements.  I figured if that's true then all of the

1    description about how the jury considers the elements

2    is appropriate.

3                    MR. EGAN:  And it's not exactly what I

4    meant, Your Honor.  I may not have been as clear as I

5    could have been.  What I meant is --

6                    THE COURT:  Well, let me just -- and I

7    apologize for the interruption, but let me just --

8                    MR. EGAN:  Sure.  Of course, Your

9    Honor.  I'm sorry.

10                    THE COURT:  -- suggest this.

11   Mr. Ignall, I don't agree with you only -- on this

12   one, only because as counsel has indicated, the

13   preface to that instruction, which includes

14   essentially success is not required, that speaks for

15   itself and I think it covers what your problem is.

16   However, with some of the other ones, you may be

17   totally on the mark with them.  I don't know because I

18   don't know, you know, what the issues are.

19                    MR. IGNALL:  But then why are we going

20   to descriptions of intent and other elements instead.

21   That's where I'm --

22                    THE COURT:  Well, no, but he's saying

23   that from that one, it's an element.

24                    MR. IGNALL:  It is.  But everything,

25   like for example, we have the elements.  Then we have

1    a lengthy description of the existence of an

2    agreement.  We then have a lengthy description of

3    membership in the agreement, all of which are fine,

4    but if we're going to go through more detail about

5    what the jury should consider when deciding if the

6    Government's met the four elements, I don't think it's

7    appropriate to pick and choose from among a padded

8    instruction which ones the jury gets and which ones

9    they don't.

10               THE COURT:  Well, it seems to me that

11   the only way to cure this problem is to ask the jurors

12   with an example of -- I can give you strictly the

13   elements or I can give you the elements plus an

14   explanation as to how they're to be applied and

15   interpreted, which would include everything that I

16   read to you.  Which would you prefer?

17               MR. IGNALL:  I have no problem with the

18   Court asking that.

19               UNIDENTIFIED SPEAKER:  That's fine with

20   us, yes.

21               MR. IGNALL:  That might solve the

22   problem.

23               MR. EGAN:  That's acceptable, Your

24   Honor.

25               THE COURT:  All right.

Page 167

```
 1                    MR. IGNALL:  Thank you, Your Honor.

 2        (Pause)

 3                    THE COURT:  All right, counsel, test

 4    run.

 5                    UNIDENTIFIED SPEAKER:  Yes, sir.

 6                    THE COURT:  I am proposing, and I

 7    emphasize proposing, the following: "As you are

 8    acutely aware, the compendium of jury instruction is

 9    voluminous.  You can have either the specific charge

10    and its elements; or, the specific charge, its

11    elements and the explanations and exceptions relative

12    to each charge.  What is your preference?"

13                    MR. SCHWARTZ:  That's acceptable to us.

14                    MR. IGNALL:  Seems reasonable.

15                    UNIDENTIFIED SPEAKER:  Yes, Your Honor.

16    Thank you.

17                    THE COURT:  All right.  Book 'em,

18    Danno.  Thank you.  Could you print that, please, and

19    then let them review it, please.  Thank you.

20        (Pause)

21                    THE COURT:  Jess, that should also say

22    Court response to juror inquiry number 2.

23        (Pause)

24        (Recessed at 3:58 p.m.; reconvened at 4:02 p.m.)

25        (Pause)
```

1                    THE COURT:  All right, counsel, may I

2       have your attention, please?  In response to the

3       Court's question of what is your preference having

4       given them the two alternatives, the answer is, "Judge

5       Jones, we would like the latter."  Charge, elements,

6       and the explanations.

7                    MR. IGNALL:  We're not that far from

8       having that done.  So I think we're good.

9                    THE COURT:  All right.  Thank you very

10      much.

11          (Recessed at 4:06 p.m.; reconvened at 4:25 p.m.)

12                   THE COURT:  That's what been handed to

13      me is what you wish to be given to the jury in

14      response to their inquiry.

15                   MR. IGNALL:  Yes, Your Honor.

16                   MR. EGAN:  Yes, that's what we've

17      agreed on.

18                   THE COURT:  Any exceptions?  Everyone's

19      in agreement.

20                   MR. EGAN:  No, Your Honor.

21                   THE COURT:  All right.  Ms.

22      (indiscernible).

23                   MR. EGAN:  Your Honor, are we -- how

24      late are we keeping them?  Did we say --

25                   THE COURT:  As soon as they receive

1      this and see how thick it is, they'll be ready to go

2      home, I'm so sure.  So we'll give it to them now and

3      then ask them what their pleasure is.

4            (Chorus of thank you)

5            (Recessed at 4:26 p.m.; reconvened at 4:30 p.m.)

6                  THE COURT:  You may be seated.  Good

7      afternoon.  All right.  First of all, on behalf of

8      everyone involved thank you so much for your continued

9      diligence.  We sincerely appreciate how you're going

10     about this.

11                 Now, at 4:30 you've just been given the

12     voluminous copies that I referred to of the

13     instructions as you've requested and the --

14     specifically, the elements and the explanations

15     pertinent thereto.  We're going to adjourn for the

16     day.  It is, again, very important that you, as well

17     as the alternates, not discuss the testimony amongst

18     yourselves, not discuss the deliberation, matters that

19     are going on at this point in time.  Obviously, don't

20     conduct any kind of research or any investigation on

21     your own.

22                 We will ask you to return tomorrow

23     morning at 9:15 to continue your deliberations.  All

24     right?  Thank you so much.  Have a good evening.

25     Rest.  Thank you.

1                    THE CLERK:  All rise.

2                    THE COURT:  We are adjourned.

3          (Chorus of thank you)

4                    MR. ENGLE:  Your Honor, for tomorrow

5      morning --

6                    THE COURT:  Yes, sir.

7                    MR. ENGLE:  -- will you be bringing the

8      jury into the Courtroom or just --

9                    THE COURT:  No, sir.

10                    MR. ENGLE:  -- sending them straight

11     back to deliberate?

12                    THE COURT:  Straight back to continue

13     deliberation.

14                    MR. ENGLE:  Okay.

15                    UNIDENTIFIED SPEAKER:  Where would you

16     like us?

17                    MR. ENGLE:  Yeah, do you want us

18     somewhere at a particular time?

19                    THE COURT:  You know, I would surmise

20     that they're going to open that up and start saying

21     okay.  If you could be no more than say 15 minutes

22     away by call, telephone call.  Is that all right?

23                    UNIDENTIFIED SPEAKER:  Yes, absolutely,

24     Your Honor.

25                    THE COURT:  Convenient for everybody?

1                    UNIDENTIFIED SPEAKER:  Absolutely, Your

2      Honor.

3                    THE COURT:  So let's do it that way.

4                    UNIDENTIFIED SPEAKER:  Is e-mail better

5      given that I think we're all on the e-mail list?

6                    UNIDENTIFIED SPEAKER:  I can give

7      some --

8                    THE COURT:  Well, give us a phone

9      number just in case.  Sometimes it gets kind of slow

10     coming out of this building.

11                    UNIDENTIFIED SPEAKER:  Absolutely, Your

12     Honor.

13                    THE COURT:  Okay, thank you.

14                    UNIDENTIFIED SPEAKER:  Thank you, Your

15     Honor.

16                    THE COURT:  Have a good evening.

17          (Chorus of thank you)

18          (Proceedings concluded at 4:32 p.m.)

19                        *  *  *  *  *  *  *

20

21

22

23

24

25

1                    C E R T I F I C A T I O N

2

3          We, Sherri L. Breach, Debra McCostlin and Jamie

4    Gallagher, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6

7

8

9    _____

     Sherri L. Breach
10
     AAERT Certified Electronic Reporter & Transcriber
11
     CERT*D-397
12

13

     _____
14
     Debra C. McCostlin
15

16

17

18

19
     Date:  May 2, 2016
20

21

22

23

24

25

**A**

aaert 172:10
ab 20:13
abets 108:17
abetted 108:14,15
  108:20,25
abetting 109:11,20
abettor 110:3,11
ability 4:5 76:23
  144:24
able 28:21 34:23,24
  133:20 151:22
  154:19 155:1
  157:7,24
absence 96:10
absolute 79:24
absolutely 53:1
  65:11 69:1 128:16
  147:12,15 170:23
  171:1,11
absorb 156:15
accept 77:25
acceptable 14:13
  50:2 54:22 56:13
  62:19 81:20
  155:12 156:22
  158:11 166:23
  167:13
access 66:16
accident 123:16
accidentally 107:7
accompany 140:2
accomplice 108:16
  108:17
accomplish 90:16
accomplished 90:7
  100:22 120:24
accomplishing 99:8
  119:10
accord 64:24
account 35:16,17
  35:19
accounting 31:17
  31:20 46:9
accumulate 157:7
accurate 76:9,18
  172:5

accurately 65:6
accusation 86:7
achieve 88:4 89:3,6
  89:21 91:16 92:25
  93:6 94:1,14
  111:17 112:18
achieved 93:19
  95:13 163:22
achievement 93:16
achieving 94:18
act 69:23 81:14,16
  81:21 86:20 87:23
  89:12 93:21 94:15
  96:20 97:22 98:15
  102:20,21,22
  103:25,25 107:5,8
  109:11,16 110:17
  110:25 111:3,4,21
  111:22 114:11,11
  117:23,23 122:13
  122:14 128:1
  130:20 143:18
  144:18
acted 103:24 104:3
  104:4 107:5
  113:15 114:10,14
  114:15 117:22
  118:1,3,10,18,20
  122:12,16,18
action 4:19 99:14
  119:15
actions 90:23
  109:22 118:14
activities 91:2
  106:14
acts 43:20 87:2
  93:24 94:4,5,5,8
  94:11 95:24,25
  96:1,5,8,13,17
  110:22 111:14,16
  118:24 127:1,6,16
  127:20,23 128:25
  129:22 130:1,10
  131:11 132:7,10
  132:11,17 133:11
  145:6,13,14,15,17
  145:23 146:24

actual 19:13
  106:15 108:4
acutely 17:11 167:8
add 152:14
added 162:9
addition 75:15
  100:14 120:16
  132:11 159:3
additional 36:23
  84:3 135:4 164:17
address 26:18
  127:19 132:21
adhere 17:8
adjourn 169:15
adjourned 170:2
adjudged 68:3
advance 115:22
  116:5
advanced 116:25
advancement
  81:16
advancing 113:16
  114:4,22
advantage 99:11
  119:12
adverse 3:23 5:24
  15:12 80:8
advice 99:14
affect 128:3,5
affectively 18:22
affirmative 95:17
  110:19
affirmatively 10:18
afloat 42:6
afternoon 82:25
  84:12 134:11
  146:13,17 148:4
  148:11 169:7
afterward 46:13
agencies 88:18
agency 105:5 107:2
  107:25 108:2
agents 85:25
aggregate 157:7
agree 6:9 8:4,22
  66:2,4 87:25 88:3
  94:15 100:5 120:7

128:14 130:9,14
  132:20 135:22,24
  136:3 146:23
  159:16,20 160:25
  163:4,20 165:11
agreed 70:18 79:17
  87:19 88:12 90:5
  90:6 96:24 112:23
  127:24 128:1
  144:23 159:23
  164:16 168:17
agreeing 97:7
agreement 6:16,17
  7:5,6 8:2,14 10:21
  12:17 61:18 87:2
  88:23,24 89:10,13
  89:17,20,25 90:1
  90:10,15,21 91:4
  91:6,12,14 111:19
  112:17,21 113:2
  137:2,13 145:1
  158:5 166:2,3
  168:19
agreements 78:23
ahead 27:22 60:19
  61:8 62:6 124:9
  130:7 131:17
  133:5
aid 110:8,23 111:1
  130:11
aided 108:13,15,20
  108:25 111:3
aider 110:3,10
aiding 109:11,20
aids 108:17 137:23
al 1:5
albeit 132:7
alleged 86:16,19
  87:23 89:3,4
  90:11,24 91:17
  93:7 94:11 96:14
  96:15,18 100:2,4
  101:13,21 120:4,6
  121:15 129:23
  130:10
alleges 86:20 94:3
  97:6 99:18 108:19

119:20
allow 4:5,7 5:2
  53:24 67:12
allowed 22:15
  71:22 72:7 137:17
  154:17
allows 41:12
alluded 164:1
alternate 143:3,5,8
  143:12,16
alternates 144:9
  169:17
alternatives 168:4
altogether 6:6
amended 18:19,20
amendment 7:13
  11:4,14 17:25
  18:13,19 19:9
  22:1 23:21
amendments 18:15
amends 18:22
america 1:2,10
  140:24,25
ancestry 67:15
anew 143:10
announce 135:17
  140:11
announces 154:16
answer 36:19,22
  49:12 72:16 168:4
answered 72:3,4,12
  72:14
answering 36:10,19
  50:20
answers 36:17
anthony 20:14 22:8
  42:13 43:10 114:7
  121:24
anticipate 31:19
  37:15
anticipated 10:9,11
  112:20 116:13
antonio 35:6
anybody 67:5
anyones 17:6
anyway 59:14,17
  139:1

**apologize** 58:2 59:3
  165:7
**appear** 31:11
**appearance** 77:1
  100:20 120:22
**appearances** 1:9
**appeared** 18:25
**appellate** 147:10
**application** 36:11
**applied** 166:14
**applies** 45:4 101:9
  121:11
**apply** 15:10 64:18
  65:17,22,24 66:1
  97:5
**appreciate** 20:4
  53:19 150:1 169:9
**approach** 5:1 25:18
  25:21
**appropriate** 4:13
  17:8 29:4 125:21
  129:25 136:8
  140:15,19 162:22
  165:2 166:7
**approve** 101:4
**approved** 34:18
  35:10 41:3,7
  42:12 92:10
**april** 1:3 34:11
  148:1
**area** 108:11
**arent** 53:10
**argue** 125:14
**argued** 11:15 20:21
  73:5 125:3 161:25
**argument** 3:19
  5:14 13:3 14:2,8
  16:5 17:1,4,24
  18:21 23:20 28:24
  30:14 32:25 52:25
  162:4
**arguments** 37:11
  52:1 64:17 70:21
  72:24 136:21
**arises** 146:25
**arrange** 38:17
**arranged** 31:6

**arrangement**
  100:18 120:20
**arranging** 42:12
**arrived** 89:19
  90:14
**articulate** 126:13
**articulated** 11:14
  126:14
**artifice** 97:14 117:8
**ascension** 63:16
**asked** 8:8 22:10
  49:2,12 70:23
  126:10
**asking** 5:24 10:10
  10:12 14:2 15:11
  50:11,21 71:20
  126:12 131:4
  148:14,20 149:24
  166:18
**aspects** 86:23 147:8
**assert** 11:4,13
**assessment** 37:4
  45:19 46:21,22,24
  47:2,17 48:4,9,11
  48:15,16 51:11,14
**asset** 97:18,21
  98:11,14 99:5
  103:11 141:8
  142:1
**assets** 102:25
**assist** 110:8,23
  111:1 139:2
**assistance** 18:2
  97:17,23 98:10,20
  102:19 103:10,18
  104:10,14,18
**assistant** 26:5
  144:22
**assisted** 111:3
**associate** 110:9
  141:1
**associated** 109:24
**associating** 92:6
**assume** 6:5 20:13
  73:8 146:12
**assuming** 135:17
  144:12 162:7

**attach** 78:9 80:4
**attached** 21:22
**attempted** 98:17
**attempts** 97:14
**attention** 30:21
  31:1 57:16 65:2
  72:24 79:11 168:2
**attentively** 64:16
**attorney** 71:23
**attorneys** 1:11
  31:15 70:22,23,25
  70:25 71:16,19
  72:23 73:1,5
  135:11 144:24
**audience** 63:20
**audio** 3:3
**audit** 38:2
**auditor** 38:25 39:2
  48:24
**auditors** 37:12,14
  37:20,22 39:13
**authorized** 102:23
  108:1
**autograph** 150:21
**available** 4:1,2,14
  4:23 6:12 7:17,18
  133:18 155:10,15
  155:24
**ave** 1:18
**average** 99:17
  119:18
**awaiting** 15:4
**aware** 7:25 17:11
  34:3 118:13 143:4
  159:5 167:8
**awesome** 67:8

**B**

**b** 2:8
**back** 26:16 28:23
  30:19 31:8 34:10
  34:11 35:21 38:10
  38:12,18 39:8,18
  40:21,24 42:1
  43:14 46:8 50:25
  51:15 57:10 64:9
  67:5 84:11 101:18

126:25 127:2,6,12
128:6,11,15
131:11 132:12
133:17 134:10
135:2 138:25
139:1,6 140:4
148:12 149:20
150:7,24 151:24
153:6 156:4,14
159:23 160:17,24
161:4,24 163:10
163:13,14,18
170:11,12
**background** 3:4
**backup** 150:23
**bad** 62:5 81:7,8
  92:6 107:10
**bag** 39:2
**balances** 40:5
**ballamor** 114:6
  124:19,23,24
  126:5
**balomore** 20:13
  21:3 22:7 39:25
  47:3,9 53:2,3
**bank** 31:7,8,11
  32:3,4,5,16,19,21
  33:10,23,25 34:4
  35:15,16,17,19,20
  35:22 36:2,8,8
  37:3,4,21,24,25
  38:1,4,6,14,15,19
  38:20 39:10,17,23
  40:1,1,7 41:2,7,14
  41:15 42:3,5,6,8
  43:1,2,4,5,7 44:2
  44:2,17,18,24
  45:5,7,8,10,11,12
  45:13,15 47:10,14
  50:25 51:19,21,25
  52:5,10 53:2 86:1
  101:4 102:6 111:9
  117:2,8,11,14,15
  117:22 118:5,6,8
  119:4 121:24
  122:11,24 141:17
  142:15

**bankruptcy** 47:25
**banks** 33:4 38:18
  40:5 47:21 48:24
**banyan** 21:22
  22:11 47:1
**bar** 147:19
**barry** 1:10,16 3:7
  19:7,11,13 20:2,5
  20:21 23:17 24:2
  26:4,15 27:10,15
  28:9,12 37:18
  40:15,25 41:10
  50:7,11,14 54:14
  54:24 55:24 56:2
  56:12,15 57:25
  58:11 60:21 61:1
  61:23 62:1,3,21
  68:12 79:22 81:24
  85:7,19,25 87:19
  108:20,24 109:8
  109:10,15,18,22
  109:23 110:2,4,7
  110:10,13,15,16
  110:20,22,25
  111:2,4 113:5
  114:23 115:17,19
  116:7,9,12 140:25
  141:21,25 142:3,7
  142:11,13,17
  149:5 151:5 160:4
**barrys** 17:24 132:2
**based** 16:6 17:25
  23:2 40:21 55:10
  69:12,17,19 70:10
  74:24 76:12 83:19
  90:22 111:13
  112:4 127:24
  136:13
**bases** 18:23
**basis** 74:12
**baxters** 36:7
**bear** 77:11
**bearing** 78:4
**beg** 159:12
**began** 3:12 96:18
**beginning** 86:4
  91:22

**behalf** 8:3 128:13
146:21 148:6
169:7
**behavior** 76:13
77:1
**bekkedam** 1:16
15:22 23:1 28:4
32:5 35:6 36:13
37:2 39:16,21,22
40:1,15,25 41:1
41:10,20 42:2,10
42:17,17,18,21,24
42:25 43:10,12,13
43:16 44:1 45:2,4
51:19 52:11 55:4
56:12 68:12 79:22
80:20,22 81:24
85:7,19,25 87:19
98:2 105:1 108:20
108:24 109:8,10
109:15,18,23
110:2,5,10,13,15
110:17,20,22
113:5 114:2,5,23
115:17,19 116:7,9
116:12 117:2
124:19,22 125:1,7
126:1 128:13
140:25 141:21,25
142:4,7,11,13,17
146:22 152:19
**bekkedams** 39:19
42:4,23 109:22
110:7,25 111:2,4
157:23
**belief** 76:8 78:3
**believability** 78:9
**believable** 78:15
**believe** 10:6,8 11:5
13:16 15:22 19:15
19:16,18 28:24
41:24 57:1 60:10
70:24 71:9 76:4,5
76:9,12,21 77:10
79:14 83:23 84:24
96:12 126:1 127:2
130:24 131:2

133:7 144:24
162:5
**believed** 73:21 74:2
77:12
**belongings** 144:7
**benefit** 78:24 79:4
79:12,13 93:15
104:6 114:16
118:4 122:19
**best** 25:16 44:15
62:1 131:23
154:14 155:3
**better** 53:15 126:14
154:7 171:4
**beyond** 49:21
55:11 68:20,24
69:8,11,13,14,15
70:3 75:9 81:4
82:13 84:18,21
86:17 87:12 88:10
89:18 90:13,20
91:10 92:17,23
93:22 94:9,21
98:3 99:3 100:1
102:11 103:8,15
103:23 104:13,17
104:22 105:9
106:1,11,18 107:4
107:12 109:2
110:7,12 112:5
113:9 114:2,9,21
116:2,22 117:6,21
118:12 119:3
120:3 122:4,10
129:20 136:2,4
137:17 140:14,18
**bias** 77:4
**big** 6:20 25:13
**binding** 73:2
**bit** 36:21 41:22
44:19 48:18 62:5
82:23 105:20
123:2 150:2
**blackberry** 66:15
**blogs** 66:17
**blow** 48:5
**board** 36:3

**bold** 56:7,17 59:14
**bonomo** 20:14
21:18 22:8 38:13
42:13 43:10,11,11
45:5 46:25 114:7
121:24 125:7
**book** 167:17
**borrow** 43:2,7 45:6
**borrowed** 33:23
36:15 37:24 38:9
**borrowing** 42:7
**bound** 67:24
**box** 17:10 143:16
**branch** 105:6
**breach** 172:3,9
**break** 14:5 82:22
98:23
**brian** 1:5,14 35:7
40:16 42:22 68:11
79:22 81:24 85:6
85:19 87:19
108:21,25 109:4
109:10,13,14
110:14,21,23
140:24 141:3,6,10
141:13,16,19
**bridge** 146:6
**brief** 3:15,25 4:22
16:2,16,16 52:23
**briefly** 28:5 29:23
147:19
**bring** 35:17 36:18
48:3 55:6 57:16
104:5 110:15
114:16 118:3
122:18 140:10
**bringing** 170:7
**broad** 1:21
**broadening** 18:23
**brought** 140:4
**buck** 12:12
**building** 14:6
146:14 171:10
**bunch** 47:25
**burden** 4:16 29:12
62:9,15 69:1,3,4
75:22 79:25

**business** 47:4 67:4
116:11
**buy** 38:4 43:2,6
47:22
**buying** 45:24,24

—————————

**C**

**c** 1:7 3:1 33:3,7
172:1,1,14
**calculated** 99:17
119:18
**call** 3:20 4:10,15,17
5:3,25 6:25 7:11
9:25 11:20,22
12:8 15:8,10 30:7
97:11 139:17
170:22,22
**called** 7:15,19,19
8:17,17 9:1,12,13
9:22,23 10:23
11:3,6,13 12:3,14
72:23 79:10 84:19
108:16
**calls** 6:18,21 7:1,11
8:10,15 10:4,13
10:19
**cant** 5:21 50:7
149:15 155:6
157:10,11
**capable** 33:16 44:8
44:11,11,13
106:13
**capital** 31:17,20
32:23 33:7 38:8
41:2,11 45:9,11
47:5 103:1
**caption** 140:22
**captioned** 141:1
**car** 123:16
**care** 13:4 36:7 79:7
**carefully** 65:23
69:21 73:7 137:3
137:14
**carls** 154:20
**carried** 91:3 99:19
116:25 119:21
**carry** 115:22 116:5

**carrying** 74:14
113:17 114:4,22
**case** 4:12 5:20 6:22
7:2,20 8:17 9:23
10:2 11:17,22
12:8 18:8,8 22:13
30:23 31:25 53:1
62:13,18 64:15,20
65:5,21 66:6,12
67:13 68:1 70:10
70:22 71:4 72:20
73:11,12,19 75:11
75:14,17,19,21
76:1,15 77:3,5
81:2,23 82:19
84:21 85:2 86:10
89:22 96:12 99:18
102:3 108:19
119:20 121:22
125:3 134:20
136:11,14,18,24
136:24 137:10
138:8,11,23 139:2
140:11,22 141:1
143:2,14 144:2
147:2 157:23
171:9
**cash** 36:8,8 103:4
**cat** 39:2
**category** 18:16
**cause** 15:20 69:22
77:15 104:7
114:18 118:6
122:20
**caused** 106:6,25
113:20 115:1
**causing** 100:10
106:22 109:12
120:12
**caution** 79:7 80:16
**caviar** 84:13
**celebrity** 67:16
**cell** 66:14
**cert** 172:11
**certain** 28:23 64:23
71:11 72:24 78:19
79:17 86:14 94:3

111:20 118:10
**certainly** 12:1
   23:14 29:11,16
   46:3 150:6,11
   155:5 156:23
**certainty** 69:16
   86:15
**certified** 172:10
**certify** 172:4
**cetera** 134:15,15
**chambers** 154:12
**chance** 18:2
**change** 36:11 128:1
   129:24 137:6,9
   144:23 159:24
**changes** 54:21
   152:21 158:2
**changing** 159:16
**character** 80:24
   81:1
**characterization**
   8:7
**charge** 25:10,11
   58:6 63:21 64:22
   67:3 85:23 95:9
   99:21 103:20
   105:1 111:7 123:6
   125:11,20,23
   126:4,10 129:2
   145:12 147:9
   149:21 154:2,15
   154:16 161:20
   162:1 167:9,10,12
   168:5
**charged** 52:17 55:9
   68:13,20 69:7,10
   70:3,7 81:6,25
   82:2,4,9 84:23
   85:4 86:6,21,23
   88:14 96:22,25
   97:5,7,10 98:2,8
   99:25 102:12,14
   102:18 104:9
   105:8 106:7
   108:22 109:5,6,8
   109:13,17 110:18
   111:2 112:3,8,11

118:8,16 120:2
   122:5,7 124:18
   140:14,18
**charges** 20:16
   21:15 22:3,6
   56:11 60:7,7 81:3
   84:17 85:6,14,19
   85:22,25 86:1,7
   86:13 87:15,16,21
   95:4 113:4 117:1
   119:24 123:7
   139:18 148:3,11
   148:19,20 149:3
   149:14 150:14
   151:20 153:13
   161:17
**charging** 83:25
   123:12,15 126:3
   126:13
**chat** 66:17
**chavez** 84:14
**cheat** 88:17 104:2
   114:13 117:25
   122:15
**check** 11:25 12:1
   54:2 141:10,13,19
   141:25 142:4,7,11
   142:13,17
**checking** 53:23,23
**chestnut** 1:11
**chief** 6:22 7:20 8:18
**choice** 14:14
**choices** 132:19
**choose** 134:22
   160:23 161:23
   163:12 166:7
**choosing** 163:10
**chorus** 30:11,18
   54:4 63:3 64:3
   84:6 169:4 170:3
   171:17
**chose** 5:5
**christmas** 134:13
**chuck** 33:6
**chun** 1:10
**circle** 31:8
**circuit** 4:12 18:5,14

18:18 63:1
**circumstances** 17:7
   90:25 91:1 93:12
   100:18 109:23
   111:21 118:15,21
   120:20
**circumstantial**
   73:17 74:1,15
   75:4,6 90:19
   91:25 93:11
   109:21
**citation** 123:18,19
**citations** 153:4
**citing** 16:6
**citizen** 80:25
**claim** 100:7,9 120:9
   120:11
**claims** 119:23
**clarity** 130:23
**clause** 22:1
**clean** 68:15 148:17
   155:4
**clear** 6:15 8:1
   11:18 12:2 19:7
   35:9 46:19 47:5
   101:19 123:1
   145:19 148:8
   165:4
**clearly** 4:1 7:14
   8:13
**clerk** 30:6 62:14
   64:6,8 83:3 84:10
   134:7,9 144:3
   147:22 150:25
   151:7,10,13 152:8
   152:13 170:1
**clerks** 63:6,12
**client** 39:25 43:11
   53:2
**clients** 42:6,7 51:20
**clip** 50:7,8
**clock** 134:13
**close** 41:11 67:4
**closer** 41:22
**closing** 3:19 16:5
   16:22 17:6 32:25
   37:11 52:1,25

64:16
**closings** 36:4
**coconspirator**
   96:14
**coconspirators**
   55:20
**code** 97:12
**codefendant** 35:7
**coincide** 67:23
**coincidental** 51:9
**collateral** 48:13,18
**collect** 41:12
   142:21
**color** 67:14
**come** 15:13 26:15
   35:12 43:1 52:15
   54:8 67:4 133:11
   145:24 146:6
   153:4,6 156:7
   159:5
**comes** 16:13 20:25
   36:9 44:17 126:25
**comfortable** 26:21
   163:9
**coming** 28:22
   30:19 36:21,23
   41:4 171:10
**commanding**
   109:12
**commence** 144:1
**comment** 3:18
**comments** 32:24
   143:24
**commerce** 113:20
   113:23 114:25
   115:3,6,15,18,20
   116:4,8,10,14,18
   116:24
**commission** 95:3
   110:1
**commit** 85:8,21
   87:25 88:3,8 89:1
   89:7 96:24 109:13
   109:14 110:21,24
   163:20
**committed** 55:20
   86:13,18 87:23

92:8 94:5,8,10,12
   94:15 108:13
   109:4,9,9 110:5,6
   110:14 111:7,11
   111:15,16,23
   112:11,16,24
   124:19 129:22
**committee** 33:14
   46:1,2,3,5,11,16
   47:11
**committing** 108:14
   108:16,21 109:1,5
   112:12
**common** 31:13
   69:19 71:7,10
   74:8 75:1 76:20
   77:20 89:6 90:16
   91:16 122:23
**communicate**
   66:11,22 115:14
   135:13 138:7
   139:12 155:6
**communication**
   12:2,21 57:12
   58:3 113:19,22
   114:25 115:3,5,18
   115:21 116:3,8,10
   116:14,18,24
   138:16 153:10
**communications**
   4:4 138:14
**community** 67:18
**company** 1:23
   50:23 92:6
**compare** 51:10
**compendium** 167:8
**compilation** 132:17
   144:18
**complete** 51:23
   95:2
**completed** 136:21
   140:3
**completely** 14:1
   22:12 125:8
   128:14
**computer** 66:15
   152:9,10

computers 21:14
conceal 36:4 37:9
   39:9 52:8,8,9,11
concealed 39:10
   102:5
concealing 31:23
   39:12
concealment 48:22
   100:15 120:17
concept 155:16
concepts 81:14
concern 68:6,7
   101:1 108:1 121:3
   127:18 132:4,15
   133:2 156:8
concerned 41:14
   149:14
concerning 27:1
   97:10 105:3
   138:11
conclude 74:17
   132:9 134:16
concluded 50:16
   171:18
concludes 122:22
conclusion 6:11
   31:14 52:15 71:12
   71:12 74:7 84:1
   135:16
conclusions 72:25
condemned 18:6,7
   18:11
condition 43:6
conditioned 10:16
conduct 32:10
   51:15 81:18 93:12
   97:10 169:20
conducted 134:19
confer 138:18
   139:5
conference 83:25
   123:12,15 126:3
   126:14 147:9
conferences 71:25
confers 130:8
   131:19 133:6
confused 37:8

confusion 47:17
   48:20
congratulations
   63:3
conjecture 69:12
   69:17
connection 113:25
   117:18
conscience 137:14
conscious 118:13
consequence
   111:19 112:21
conservative 5:1
consider 31:4,4,6
   31:13 32:8,9
   38:19 39:18,20,24
   52:12,13 71:2,7
   72:9,18,20 73:6
   75:2 76:4,22
   77:22,23 79:6,9
   80:9,16,19,25
   82:8 90:18 91:24
   92:15 93:10 96:5
   96:8 102:8,15
   103:19 104:3
   109:20 114:14
   118:2,18 122:1,8
   122:17 136:9
   155:7,8 162:16
   164:24 166:5
consideration 85:2
   130:11 145:14
considered 12:3
   79:2 82:20 96:16
   96:19 101:8 121:9
considering 104:2
   114:13 117:25
   122:16
considers 165:1
consistent 77:9
   161:1
consists 70:15
   142:24
conspiracy 43:17
   43:20,22 85:7,20
   86:24 87:9,22,23
   88:6,8,24 89:10

89:11,15,16,22
   90:3,11,12,22,24
   91:7,9,12,15,20
   91:24 92:1,5,7,10
   92:14,15,19,22,24
   93:2,5,15,21,23
   93:24 94:2,10,12
   94:14,17,19,20,25
   95:2,2,5,7,10,11
   95:12,13,15,16,18
   95:20,21,23,25
   96:1,3,4,6,8,15,18
   96:22 97:5,7
   111:14,15,17
   112:8,10,11,16,18
   113:2 129:7,22
   141:4,22 159:17
   160:14,15
conspiracys 93:16
   93:18
conspirator 43:20
   89:3,5 93:7
   111:21
conspirators 91:18
   94:24 111:23
conspire 87:25
   88:3 163:20
conspired 87:19
constituent 97:23
   98:20 104:11,19
constitute 100:17
   115:14 120:19
constitutional
   79:24
construct 18:10
constructive 17:25
   18:13,15 19:9
   23:21
constructively
   18:19,20
consult 130:5
   135:10
contact 138:9
contained 116:19
   116:21
contains 48:4
contemplated

101:13,21 107:20
   121:15
contend 121:23
contends 102:3
content 85:16
contents 149:6
contingency 44:25
continue 6:23
   58:17 95:20 143:7
   155:16,19,21,25
   156:18 157:9
   169:23 170:12
continued 169:8
continuing 51:15
   95:16,19,21,22
   155:8
contradicted 78:2
contrary 52:7
control 36:11 71:14
   117:10
controlled 39:22
controls 50:18 73:4
convenient 170:25
conversation 12:13
   115:9
conversations
   12:12
convey 100:19
   120:21
convict 81:7 100:5
   120:7
convicted 69:12
   111:23
convince 69:8 87:1
   87:8 136:4
convinced 70:2
   137:7
convinces 84:21
convincing 68:18
cool 63:17
copies 169:12
copy 139:25 150:22
   151:7 155:5
corporation 117:16
correct 5:15 11:11
   14:10 25:6 50:1
   57:20 59:9 125:15

127:3 129:12
   145:6,7 159:19
corrected 12:10
correcting 49:25
correction 57:11
   57:14 59:19
corrections 123:7
correctly 160:12
correspondence
   43:14
corresponding
   129:13
cost 41:10
council 33:8,9,12
   34:12,18
counsel 5:13 6:15
   11:12 15:7,19
   17:7 19:15 24:15
   25:24 27:21 36:3
   40:14 54:5 55:5
   60:22 61:20 64:17
   67:21 83:5 123:5
   124:1 125:21
   127:1 128:2 130:5
   130:8 131:15,19
   132:24 133:6
   134:4 138:19
   139:5 147:18,24
   158:4 159:1 161:2
   165:12 167:3
   168:1
count 18:1 20:10
   20:12 22:15,24
   23:1,2,6,7,8,8,23
   23:24 24:14 25:6
   25:8 26:7 38:8
   56:11,17,18 60:7
   85:6,18,21,25
   86:1 87:15 95:4
   96:22,24 97:3,5,9
   97:11 98:3 99:1
   102:18 103:13,19
   104:9,24 113:4,25
   114:3 117:1,13,19
   124:18 126:3
   129:11,13,15
   130:18 135:20

141:4,7,11,14,17
141:21 142:1,5,9
142:12,14 145:13
152:20 154:1,3
160:14 162:24
164:3
**counts** 19:16 44:20
45:10 52:16 55:10
55:25 56:7 58:20
59:1,7 60:6 85:23
104:25 105:23
108:23 111:6
112:3,11 153:12
161:16 162:8
**couple** 3:11 16:1
26:6,13 28:4
37:10 40:10 55:6
**course** 4:19 10:7
65:13 66:23 67:21
67:22 70:11 73:9
79:16 99:14
116:11 119:15
125:3,4 136:16
143:7 157:2 165:8
**court** 1:1,23 3:7,12
3:13,15,17,21
4:20 5:7,9,11 6:2
6:7 7:22,24,25
8:22 9:4,7,9,14,19
10:1,3,7,10,22
11:7,9 12:17,18
13:7,11,15,19,21
14:12,17,21 15:1
15:4,9,16,25 16:3
16:9,19 17:2,15
17:19,22 18:4,4,6
18:9,11 19:3,6,23
20:6,17,23 21:2,5
21:9,12 22:23
23:6,10,14,22,22
24:6,9,12,21 25:2
25:5,13,22,24
26:14,18,21,25
27:9,12,14,17,22
27:25 28:2,6,11
28:13,20 29:2,3,7
29:10,15,20,24

30:3,7,9,12 31:19
49:17,19,22 50:2
50:4,6,12,15
52:19,22 53:8,12
53:17,21 54:7,10
54:17,23 55:2,5
55:16,19,22,25
56:5,10,16,20,23
56:25 57:4,8,15
57:18,21 58:2,8
58:14,19,22 59:3
59:9,11,13,16,23
60:1,4,8,12,14,18
60:23 61:3,8,14
61:20,24 62:6,19
62:24 63:8,10,14
63:17,20 64:2,4
64:10,25 65:9
66:21 70:13 77:8
83:5,7,9,17,21
84:4,7,12 101:16
123:5,16,19,23
124:1,6,9,12,16
125:13,17,22
126:7,16,18,21,24
127:4,8,13,17,20
128:3,9,16,18,23
129:1,4,8,16,23
130:2,7,13,17,19
130:22 131:1,4,9
131:10,13,17,22
131:25 132:3,5,14
132:22 133:1,5,9
133:14,19,22,24
134:1,4,6,11,24
135:10,18 138:9
138:12,16 139:24
140:9,23 144:5,9
144:11,16 145:3,8
146:2,5,8,10,12
146:19 147:1,4,12
147:15,18,24
148:9,14,18 149:2
149:12 150:3,6,10
150:20 151:3,8,11
151:20 152:2,6,12
152:16 153:2,5,8

153:22,24 154:1
154:11,14 155:2
155:18,22 156:1,3
156:12,25 157:4
157:17,21 158:1,4
158:15,18,21
159:1,8,10,14,19
159:24,25 160:3,6
160:8,25 161:6,12
161:13 162:7,23
163:7,25 164:5,7
164:15 165:6,10
165:22 166:10,18
166:25 167:3,6,17
167:21,22 168:1,9
168:12,18,21,25
169:6 170:2,6,9
170:12,19,25
171:3,8,13,16
**courtesy** 143:24
**courtroom** 52:21
63:22 71:4 74:14
83:4 140:4 144:6
144:10,15,21
154:18 156:9
158:20,23 170:8
**courts** 20:18 37:15
43:18 44:6 52:14
83:10 84:1 123:6
123:7 125:11,20
162:19 168:3
**cover** 7:3 8:2 13:13
13:23
**covered** 12:3
163:17
**covering** 97:10
**covers** 16:12
165:15
**cpp** 33:12 34:11
103:2
**craft** 88:21
**create** 66:17
**created** 102:25
**credibility** 76:7,19
**creek** 47:3
**crime** 31:16 32:13
37:16,17 81:22

87:24 88:2 89:16
92:8 97:25 98:2
102:17 104:8
105:8 111:23,25
163:6,19
**crimes** 84:22 86:5
111:14,16 163:9
**criminal** 88:6 91:3
91:6 92:2 94:25
109:24 135:19
**crisis** 38:22
**critical** 41:10
**cross** 2:3 146:5
**crossexamine**
12:11
**culpability** 162:10
**curative** 14:3
**cure** 166:11
**currently** 54:11
**curtailing** 17:8
**cushion** 38:20
**cut** 161:8 162:15
**cute** 36:9,10,21
**cuts** 162:13

### D

**d** 1:16 2:1 3:1 33:3
33:7 35:6
**d397** 172:11
**danno** 167:18
**darnell** 1:7
**date** 23:3,4 105:10
135:8 138:10
140:9 142:19
151:9,11 153:10
172:19
**dated** 19:18 148:1
153:10
**dates** 86:14,15,18
86:19 95:8
**david** 1:10
**day** 1:7 35:8 43:4
144:12 159:6
169:16
**dealing** 39:21
**debra** 172:3,14
**deceit** 88:20

**deceitful** 100:14
120:16
**deceive** 32:15
99:17 100:13
104:1 106:25
114:12 117:25
119:18 120:15
122:15
**deceiving** 31:22
**december** 141:15
142:10
**deception** 100:20
100:21 120:22,23
**deceptive** 100:19
120:21
**decide** 9:25 12:7
43:4 65:4,8 71:20
74:24 75:7 76:4
76:11,16 78:3
82:13 96:12 136:6
136:8 137:15
140:12,16
**decided** 4:18 11:22
**decides** 39:9,9
**deciding** 65:11
72:20 76:3,19,21
81:2 90:19 91:25
92:17 93:13
109:18 118:17
166:5
**decision** 11:21
32:15,18 33:10,22
34:12 44:9,10,12
44:13,14 47:13
51:24 65:21 67:13
67:18 70:9,13
73:12 74:11 80:12
82:6,15,17 86:11
101:3,8 121:5,10
**decisionmaker**
33:17
**decisionmaking**
33:19 41:17
**decisions** 33:1 73:4
106:14
**declaration** 105:21
**declare** 47:25

**deduction** 74:7
**defendant** 1:13,16
  4:4 5:25 15:14
  22:2 29:12 55:9
  56:12 62:9,14
  68:13,16,22 69:4
  69:6,8,11 75:9,16
  75:18,22 79:23
  80:2,3,5,8,10 81:6
  81:9,10 82:9,10
  82:12,14,16,18,19
  84:17,22 85:3
  86:5,7 88:7,22,24
  89:4 91:9,11,14
  91:20,23 92:1,5,9
  92:10,13,18,21,23
  93:1,4,7,13,15,17
  94:7,19,20 96:5
  96:15,17 98:16
  99:3 100:5 101:23
  101:25 102:13
  103:24 104:2,4,14
  105:7,10 106:2,4
  106:6 107:5 108:4
  108:20,21 111:10
  111:11,12,18
  112:2,7,9,20,23
  113:1,3,5,7,10,15
  113:17 114:10,13
  114:15,23 115:17
  115:19 116:7,12
  117:4,7,14,22
  118:1,2,17,24
  119:5 120:7
  121:17,19 122:6
  122:12,16 135:21
  135:23 136:3,7
  139:19 140:13,17
  141:3,21 162:10
  162:11
**defendants** 2:13
  30:24 31:5,6
  32:10 34:7,20,23
  35:1,12 37:8
  38:16 40:20 45:12
  52:13,16 68:11,14
  68:19,25 79:17

  81:11,12,23 82:1
  85:4,22,24 86:1
  86:10 87:15,18
  93:11 96:10,24
  97:7 98:1 102:4
  105:1 106:12
  111:7 117:2
  118:10,13,19,22
  137:16
**defense** 4:2,14,15
  4:16 5:3 6:23 7:1
  7:9,18,18 8:1,3,20
  9:2 10:4,13,23,24
  11:3,6,13 12:4
  19:15 31:15 36:3
  74:22 161:3
  163:11
**defenses** 160:16
**deference** 157:23
**deferred** 34:12
**define** 97:6
**defined** 59:2,8
  97:21,25 98:14
  158:14,17,17
**defines** 124:21
**definition** 113:24
  117:18 118:15
  119:2 158:8
**definitions** 148:3
  148:20
**defraud** 21:20
  32:14 45:6,13
  51:17,17,21 85:7
  85:20 87:20 88:13
  88:16,25 89:6,22
  91:7 92:19 93:3
  96:22 98:5,19
  99:5,13,19,22
  100:4 101:12,20
  101:24 102:12
  103:24,25 104:3
  113:11,16,25
  114:10,11,14
  115:23 116:6
  117:8,14,18,22,23
  118:1,25 119:6,15
  119:21,25 120:6

  121:14,18 122:5
  122:13,13,17
  124:19 126:4
  141:4,22
**defrauded** 94:24
  121:24
**degroot** 27:11
  62:25
**delay** 12:22,25
  14:16 30:2
**delete** 56:18 59:10
**deleted** 59:16
**deleting** 152:19
**deliberate** 22:15
  99:12 119:14
  128:20 143:22
  155:8,16,19
  156:18 157:9
  170:11
**deliberating** 138:6
  139:13 146:14
  155:25
**deliberation** 4:18
  103:11 130:11
  134:21 136:23
  140:1 143:22
  169:18 170:13
**deliberations** 22:17
  65:21 66:10,13,23
  67:2,3 80:12
  134:18,25 139:2
  139:12 143:2,8,10
  144:1 155:22
  169:23
**deliver** 157:1
**demeanor** 78:4
**department** 105:5
  107:15,16,19,22
  107:25 108:2,6,10
**depend** 78:12
**deposed** 49:1,2
**deposit** 117:16
**deposition** 50:19
  80:15,17
**depositions** 16:24
**deprive** 99:14
  119:16

**deprives** 22:1
**depriving** 101:13
  101:21 121:15
**deputy** 144:6,10,15
  156:9 158:20,23
**derived** 93:15
**described** 39:22
  40:1 41:20 87:6
  87:12 93:25
  164:11
**description** 86:6
  153:11 160:22
  161:15 163:6,7,12
  164:23 165:1
  166:1,2
**descriptions**
  160:24 161:22,23
  163:13 165:20
**deserves** 71:10
  78:11,17 79:14
**desire** 42:5 104:5,6
  114:16,17 118:3,5
  122:18,20
**detail** 42:3 77:23
  82:1 89:14 98:23
  154:4 166:4
**detailed** 51:14
  117:12
**details** 90:1,5
**determination** 37:5
**determine** 40:19
  79:13 84:16 101:6
  121:8
**determined** 38:7
**determining** 102:8
  122:2
**deviates** 18:24
**device** 66:13
**devised** 99:4
  102:13 113:10
  119:5,15 122:6
**didnt** 4:9,25 8:25
  10:14 11:24 15:2
  15:10 33:13 35:18
  35:18 37:23 42:19
  46:5,10 47:25
  52:24 126:13

  151:9 153:17
  163:1,3 164:23
**difference** 36:6
  44:6 45:25
**different** 22:12
  32:1 36:19,20
  45:19 48:15,17
  49:2 74:20 77:8
  77:15 81:13,25
  108:11 128:7
  143:13 160:6
  162:2 164:12
**differently** 77:18
  125:10 137:10
**difficult** 4:11 65:2
**digest** 156:15
**diligence** 169:9
**direct** 2:3 7:2 73:17
  73:20,22 75:3,5
  90:18 91:25 93:10
  109:21
**directed** 107:18
**directly** 18:5 73:21
  90:4 138:13 143:1
**director** 32:23
**disagree** 6:10 8:4,6
  49:23 130:2
**disagreeing** 8:23
**disbelieve** 77:16
**disclaimer** 3:2
**disclose** 100:24
  139:13
**disclosed** 15:14
**disclosures** 52:3
**discovered** 38:3
**discrepancies**
  77:13
**discuss** 66:6,25
  67:5 80:11,19
  83:2 136:23,24
  143:13 146:24
  159:4 169:17,18
**discussed** 90:4 92:7
  158:24
**discussing** 24:5
  154:12
**discussion** 6:14,20

6:24 12:6 40:8
46:17 127:24
**discussions** 28:23
37:12 135:3
137:18
**dishonest** 88:21
**disobey** 107:10
**disposition** 121:5
**disputed** 74:11
**disregard** 5:19
62:12,17 71:2
72:16,22 75:25
99:12 119:14
**distinction** 75:4
106:8
**distribute** 139:16
**distributed** 139:25
140:6
**distributing** 54:17
**district** 1:1,1,8
63:12 86:22,25
87:3,10,18 140:23
154:14
**docs** 46:20
**doctored** 46:21
**document** 21:21
36:24 37:1,21
42:1 48:8,20
100:8,10 120:10
120:12 155:23
**documents** 20:15
21:19 22:9,11
37:4 40:10,12,13
41:21 45:17 46:19
47:5 48:1,1,7
70:16 119:23
**doesn** 38:7
**doesnt** 6:25 24:16
33:16 37:16,19,19
37:22 44:9 45:10
152:6 163:11,14
**doing** 9:16 22:24
40:20 43:17 64:21
**dollars** 33:11 44:3
**dont** 4:3,15 9:19
12:5,25 14:7,16
15:7,11,20 21:5

24:17 27:2 32:8
37:6 41:24,25
49:1,23 59:13,17
60:23 61:4 70:24
85:16 125:18,21
128:3,21,22
129:24 130:11
131:7 132:9
134:14 146:22,23
153:15 154:19,21
154:23 157:11
160:7,23 161:22
162:4,16,21
164:13 165:11,17
165:18 166:6,9
169:19
**door** 63:22 156:14
**double** 53:23 161:7
**doubt** 55:12 68:20
68:24 69:9,11,13
69:14,15,18,18,20
69:22 70:4,6
75:10 81:4 82:14
84:18,22 85:1
86:17 87:13 88:10
89:18 90:13,20
91:10 92:18,23
93:22 94:9,22
98:4 99:3 100:2
102:11 103:8,15
103:23 104:13,17
104:22 105:9
106:2,11,18 107:4
107:13 109:2
110:7,13 112:6
113:9 114:3,9,21
116:2,23 117:6,21
118:12 119:3
120:4 122:4,10
129:21 136:2,5
137:17 140:14,18
148:22
**doubts** 69:16,16,18
**downgraded** 43:5
**downstairs** 156:16
**drafted** 29:16
150:11

**dramatic** 105:20
**draw** 3:23 4:7,24
5:2,17,21,24
15:12 62:10,15
74:22,23,24 75:23
80:6,7
**drawn** 74:21 90:23
**drop** 59:2
**dual** 159:21
**due** 3:3 41:2
**dug** 37:20
**duncan** 1:16 17:17
17:20,23 18:10,13
19:5,20,22,25
20:3,10,20,25
21:3,7,14 23:8,11
24:3,18,25 25:8
52:23 53:6,10,19
83:14,19 124:4,14
124:17 128:12,17
130:3,9,16,21
131:7 146:17,21
147:3
**duration** 161:21
**duties** 65:7 67:11
**duty** 65:8,17 85:3
136:24

———————
**E**
**e** 2:1,8 3:1,1 20:12
22:7 24:25 172:1
**earlier** 83:15
138:15
**early** 27:3
**easily** 143:25
**eastern** 1:1 86:22
86:24 87:3,10,17
140:23
**easy** 59:24 150:20
**ecker** 1:17
**economic** 67:17
97:19,22 98:11,14
102:21
**edged** 161:7
**edict** 145:9
**edit** 153:16 155:2
**edited** 42:2 152:17

**edits** 152:8
**effect** 22:16 77:5,21
156:2
**effectively** 153:21
**effort** 14:19 137:1
**egan** 1:13 15:2,17
16:1,4,10,20
17:13 25:17,21
29:16,19 38:23
46:19 47:16 48:1
48:10 49:6,9,15
49:20 50:3,5,10
54:21 57:2 58:6
123:11,17 127:10
130:24 131:2
132:4,6,20 133:2
133:7,10,23 134:5
145:22 146:4,7,9
146:15 147:14,16
148:6,13,21 149:3
150:5,16 152:25
154:5,7 155:13
157:14,19 158:13
158:16 164:22
165:3,8 166:23
168:16,20,23
**egans** 49:23
**either** 5:25 14:4
18:21 23:23 38:16
68:19 75:5 80:8
80:10 81:6 87:2
89:20 92:9,23
94:19,20 100:5
104:2,4 116:6
118:17,23 127:19
135:20 141:7,10
141:13,16,19,25
142:4,7,11,13,17
149:1 160:20
163:14 167:9
**elaborate** 131:5
**elchebaz** 142:25
143:15 157:1
**elected** 137:21
**electronic** 66:13
115:10 138:14
154:18 172:10

**element** 69:10 70:3
81:5 88:22 89:16
93:20 98:16 99:2
99:2 102:16,17
103:8,16,17,19,22
104:8,12,17,22
105:25 106:1,10
106:17 107:3,11
108:7 113:23
114:8,20 117:17
117:20 119:2
122:8,9 125:12
136:1 154:4
160:16 162:6
165:23
**elements** 56:8 70:6
87:5,12 88:11,15
89:14 94:22 97:2
98:4,23 104:23
105:19 109:6,7
112:12,14 113:9
117:6 118:11
122:23 132:12
149:21 150:15
153:14,24 158:6
158:10,11,14,16
160:13,21,23
161:3,17,22,23
162:8,18,25 163:2
163:2 164:3,5,9
164:10,17,25
165:1,20,25 166:6
166:13,13 167:10
167:11 168:5
169:14
**eligible** 44:2
**em** 167:17
**email** 19:18 21:16
25:25 26:5 40:15
40:24 41:9 42:20
48:4 114:5 115:13
144:24 171:4,5
**emailed** 27:11
28:10 157:15
**emails** 12:1 40:14
**embarrass** 62:25
**embraces** 99:9

119:11
emergency 97:22
  98:14 102:21
emphasize 82:3
  167:7
employee 20:13
  21:4 22:7 63:2
  114:6
employees 39:11
encourage 110:8
  110:23 111:1
encouraged 3:22
  110:21 111:3
ended 48:19,21,22
  95:8,17 96:18
  149:24
ends 34:17 38:18
  95:12
engage 36:1 45:13
engaged 43:19 45:2
engle 1:19,20 5:4
  11:15 12:11 24:4
  24:8 25:7,9,14,15
  25:19 26:9 28:1,3
  28:7,14,17,21
  29:3,9 39:15
  41:19 42:3,15
  47:6 61:12 62:20
  63:4 83:22 123:21
  147:6,13 155:20
  156:2 170:4,7,10
  170:14,17
engles 3:18
enjoy 83:2 84:5
enjoyed 84:13
enter 63:21 66:17
entertained 64:16
  100:16 120:18
entire 22:16 80:1
  86:24 150:14
entirely 52:7
entitled 138:4
entrust 156:25
equally 4:1,14,23
  6:12
equipment 45:24
error 18:16 22:25

especially 67:6
esq 1:10,10,13,16
  1:16,19
essential 56:8 95:6
essentially 126:6
  165:14
establish 81:8,10
  101:11,19 105:8
  121:13
established 102:22
establishes 121:23
establishment
  163:2
estate 45:24 47:4
et 1:5 134:15,15
evaluated 34:4
evaluating 79:8
evening 169:24
  171:16
event 67:1 68:9
events 71:9 116:12
eventually 39:8
everybody 144:12
  170:25
everyday 71:8
everyones 168:18
evidence 13:5,18
  15:13 16:6 18:21
  22:12,19 23:2
  29:13 31:4,13
  32:7 34:9,22
  39:19 42:18 47:6
  49:10 50:9,24
  51:11 52:6,12
  53:1 62:10,15
  64:14 65:9,14
  68:1,15,17 69:2
  69:13,21,24,25,25
  70:1,10,14,20
  71:1,3,5,7,11,14
  71:14,15,17,18,20
  72:5,7,13,22 73:2
  73:3,11,15,15,17
  73:17,18,20,20,22
  74:1,1,3,8,15,16
  74:25 75:2,6,6,7
  75:11,16,19,23

76:14 77:10 78:11
  78:14,21 79:1,25
  80:14,19,21,23
  81:1,2,11 82:5,8
  84:21 85:2 86:8
  87:7 90:18,19
  91:1,25 92:4,12
  92:16,16 93:11,14
  96:5,11,13,16,19
  109:21,23 110:4
  118:18,21 136:1
  136:13,17,20,25
  137:25 138:1,2,17
  143:13
exact 86:5,15
exactly 11:15 22:19
  63:10 123:14
  130:21 137:11
  139:4 148:8 153:2
  165:3
examiner 38:1
example 73:22
  74:13 81:17 93:14
  162:23 165:25
  166:12
exceptional 18:16
exceptions 83:24
  167:11 168:18
excessive 3:3
exchange 78:25
  79:5 103:5
excise 159:17,21
excised 157:22
excluded 16:7
exclusion 126:3
exclusively 68:4
excuse 50:10 67:2
  72:3 80:7 82:24
  83:5 115:12
  159:10
excused 29:23
  144:1
execute 97:14
  98:17
executed 98:17
  117:8,9 124:22
executes 97:13

executive 105:6
exhibit 20:7,7,18
  35:5,17 36:14,18
  40:23 41:9,24
  48:3 51:3,9,12
  72:4,6,13 127:24
  139:2 147:25
exhibits 19:14
  67:23 70:17 72:8
  138:21,22,24
exist 102:12 122:5
existed 90:21 91:7
  94:13 95:5,10
  102:9 122:3
existence 74:4
  89:10,17,25 90:22
  91:12,16 93:23
  96:3,7 103:16
  166:1
exists 74:11
exoneration 162:10
expect 143:25
expected 101:1
  121:2
expecting 156:7
  162:20
expenses 118:5
experience 69:19
  71:8,10 74:7,25
  76:21 77:20
explain 65:19
  81:25 85:15 88:14
  89:13 98:22
  112:13 134:17
explained 3:24
  33:2 75:15 86:3
  94:22 109:6
  112:13
explains 131:11
explanation 19:8
  166:14
explanations 76:13
  167:11 168:6
  169:14
express 90:1
expression 100:16
  120:18

expressly 9:15,22
  10:4,12,22
extensive 6:14
extraneous 151:18
  151:25

F

f 18:17 172:1
face 10:20 66:19,19
facebook 66:18
facilitates 135:3
facilitating 114:7
facility 116:3
fact 5:20 7:19 14:9
  37:13 38:3 44:8,8
  44:16 47:16 62:13
  62:18 70:17 71:23
  73:21 74:2,5,11
  74:12 76:1 78:12
  80:5,10,11 86:9
  87:6 90:10 95:9
  100:24,25 101:6
  105:4 106:13
  116:4 121:1,2,7
  125:1,4 126:6
  145:11 162:5
  163:24
factor 79:9
factors 76:22 77:11
  79:10
facts 31:23 40:11
  64:19 65:8,12,18
  70:15 71:1 72:24
  74:3,5,21 75:13
  75:21 76:3,6
  77:11 79:17,18,21
  91:1 93:12 100:15
  101:10 109:22
  118:14,20 120:17
  121:12
factual 7:16 72:25
failed 103:7 104:16
  118:19 136:4
failure 5:25 77:19
  100:23
fair 6:22 69:18
  131:13 132:3

133:1,19 134:19
147:4
**fairly** 67:11
**fairness** 8:16
**false** 44:20,21,23
44:24 85:24 97:15
98:7 99:7,11,15
99:20 100:8,17,19
100:23 101:6
105:2,13,14,24
106:19,20 108:4,8
108:22,24 111:18
113:12 115:24
116:19,19 117:11
119:7,12,16,22
120:10,19,21,25
121:7 141:11,14
142:5,8,9
**falsely** 100:12
120:14 124:21,23
124:24 125:12
**familiar** 41:17
**familiarize** 139:22
**familiarizing** 140:5
**far** 168:7
**farm** 45:24
**fathom** 149:16
**fax** 115:11
**fdic** 33:6 34:16
38:25 39:1,13
47:12
**fear** 67:12
**february** 141:18
142:16
**federal** 56:13 64:25
85:5,24 87:24
88:2 97:17,23
98:10,20 102:19
103:9,18 104:10
104:14,18 105:24
113:6 117:3,16
141:12,15 142:5,8
163:19
**feel** 137:20
**feels** 53:15 125:10
**fellow** 137:4 143:23
**feverishly** 85:11

**fictitious** 105:2,13
105:14 106:19,21
**fifth** 7:13 11:4,13
21:25 105:15
107:11
**figure** 5:6
**figured** 37:13,14,21
164:25
**file** 3:16 128:10
**final** 30:20 31:2
152:14
**finally** 136:24
**financial** 38:7,22
43:3,5 46:8,23,25
47:23 81:17 102:5
103:4 115:11
**find** 12:20,23 18:24
23:1 28:21 40:15
55:8,9,11 64:19
65:18 68:22 69:6
70:14 74:4,11,18
81:12 84:23 85:3
88:7,9 90:22 91:6
91:8,9 92:21,22
94:19,20,21,23
95:9 101:5 102:10
103:7,14 104:16
104:21 107:20
108:8,23 109:1
110:2,22 112:2,5
113:6,7 114:2,3
117:3,4 121:6
122:3 127:15
129:7,19 132:9,10
132:18 135:23
136:2 141:6,10,13
141:19,25 142:3,6
142:10,13,17
145:13,16 153:24
163:8,8 164:20
**finding** 27:4
**finds** 29:3
**fine** 39:8 50:12
51:7 61:14 84:5
133:19 146:20
149:1 151:8 158:1
160:8,8,9 166:3

166:19
**finish** 128:20
136:22
**finished** 15:3
103:12 139:11
**first** 3:14 7:1,3,24
7:25 8:23 9:2
10:17 12:15 13:2
13:10 14:14 32:22
33:1 35:3 49:5
56:10 65:7,8
88:12 89:16 98:4
99:1,2 103:15
105:9,25,25 109:4
112:7 113:10,23
117:7,17 119:2
134:21 138:21,25
141:3 142:21
143:17 164:10,12
164:20,23 169:7
**five** 57:13 122:25
122:25 123:2,3,23
134:14
**fix** 151:22
**fl** 1:14,18
**flannery** 6:14 7:4,4
7:14 8:13 9:6
10:20,22 11:10,18
14:5 15:15 28:22
**flannerys** 10:25
14:20
**flies** 10:19
**flipping** 19:10
**flores** 1:20
**flow** 143:25
**fly** 152:3
**focus** 96:23 149:10
**focusing** 148:10
**folks** 17:10 155:4
156:13
**follow** 65:25 72:10
72:19 116:11
161:10
**following** 17:24
18:21 55:12 70:15
70:20 88:10 98:4
109:3 112:6 113:8

117:5 145:15
150:11 167:7
**follows** 85:6 97:13
148:2
**foot** 41:21
**forbids** 40:17 107:9
**foregoing** 172:4
**foreperson** 134:22
134:25 135:4,6,15
139:3,9 140:8,15
140:19 142:19
143:19 148:5
153:10,14
**foreseeable** 44:1
111:18 112:19
113:1
**forever** 63:24
**forgot** 26:4
**forgotten** 162:18
**form** 12:20 55:1
97:17 98:10,20
102:19 103:9,18
104:10,13,18
138:13 139:17
140:5,6,8,16,20
140:21 141:2
**formal** 86:4 89:25
**formally** 70:18
140:11
**formatting** 151:16
151:19
**formed** 95:10
**former** 63:6
**forth** 34:10 40:22
43:14 95:11 98:18
99:22 119:25,25
156:7
**forward** 3:8 59:6
64:5
**four** 55:12 56:7
57:13 59:6 88:11
93:6 98:4,23
109:3 112:6
153:25 158:10
160:21 161:3
162:17 166:6
**fourth** 89:9 93:20

98:19 104:8,17,22
105:14 107:3
109:15 110:18
112:18 164:11,13
164:21
**fox** 1:14
**frank** 35:21 39:20
78:22 79:6,8
**frankly** 26:21
60:23 127:9
**fraud** 25:5 31:21
31:21,22,22,25
32:1,1,4,5,9,11,12
45:3,8,11,11,12
45:15,16 46:20
56:8,12 57:11
58:3 85:8,21,22
86:1,2 96:25,25
97:3,4,9 99:1,9
102:18 104:9,23
111:7,9 113:5
114:20 117:2
118:7,8,8 119:3,4
119:4,10 122:10
122:11,11,23,24
122:24 141:8,17
142:2,12,15
**fraudulent** 97:16
98:7 99:7,15
100:12,17,23
101:9 103:16
105:3,13,14
106:20,24 113:12
113:15 115:24
116:19,20 117:11
119:7,17,22
120:14,19,25
121:11
**free** 66:25 136:22
137:20
**freely** 7:13 9:1
**friend** 154:14
**front** 9:17
**full** 163:7
**fuller** 63:11,15
163:17
**fully** 85:15

**function** 108:2
**functions** 88:20
**fund** 35:15
**funded** 35:9,20
**funding** 32:3,17
  41:8,15 42:12
  44:4,23 47:14
  101:4 102:4
**fundings** 36:11
**funds** 33:12 36:15
  36:20,22 37:1,25
  117:10
**funny** 63:15
**funt** 1:20
**further** 22:22 59:1
  81:8 87:21 89:12
  92:2,25 93:5 96:3
  96:7 110:25 111:3
  111:17 112:17
  115:21 116:5
  125:6 131:5 163:5
  164:22
**furtherance** 43:22
  45:1 86:21 100:3
  109:16 110:17
  120:5
**furthered** 116:24
**furthering** 94:1,13
  113:17 114:4,22
**furthermore**
  101:24 121:18
**future** 128:24

**G**

**g** 3:1
**gain** 81:17 99:10
  102:1 104:5
  114:16 118:4
  119:12 121:20
  122:19
**galab** 47:2
**galabs** 47:3
**gallagher** 172:4
**gandal** 1:17
**gender** 67:15
**general** 99:9
  119:10

**gentlemen** 31:3,18
  34:9 37:15 39:1,4
  39:18 40:9 52:6
  64:8 84:11 134:9
**george** 35:10 40:25
  41:4,5 42:13,25
  43:1 47:22 124:25
  125:2,4
**getting** 12:14 34:2
  35:10 41:7,15
  42:13
**gibraltar** 35:16
  50:25
**give** 5:12 7:12 9:24
  31:19 61:3 65:1
  65:18 66:2 71:9
  75:5,7 78:19
  79:13 82:22 86:9
  96:13 105:20
  119:1 129:25
  137:24 150:23
  154:10 155:4
  166:12,13 169:2
  171:6,8
**given** 14:11 15:10
  83:7,10 101:4
  107:18 123:7
  125:22,23 135:9
  136:14 138:16
  145:4 147:25
  153:15 155:24
  156:19 157:6,9
  164:1 168:4,13
  169:11 171:5
**gives** 135:10
  138:12,17 140:10
**glibly** 42:21
**go** 3:8 4:19 14:3
  26:5 27:7,22
  29:15 37:10,23
  40:24,25 41:9
  42:15 48:7 60:19
  61:8,23 62:6,8
  64:4 67:4 85:15
  87:14 101:18
  105:18 124:9
  127:2,6 128:11

130:7 131:17
133:5 134:20
136:23 138:24
139:21 140:1
143:21 144:8
145:20,21 148:12
148:22,23,23
149:16,17 154:4
154:17 155:17
158:21 160:17,22
160:24 161:4
162:15 163:5,10
163:13 166:4
169:1
**goal** 89:6 91:14,16
  91:18 93:2,6,9
**goes** 47:20 56:20
  128:15 162:12
  163:14
**going** 3:9,10,16 4:8
  5:15 6:5 11:20,21
  12:8 13:23 14:15
  15:6 17:6 23:22
  28:15 31:19,21
  33:13 34:11,14
  37:15 38:21 39:7
  40:15 41:12 42:11
  43:18 44:6 45:25
  47:24 52:15 53:25
  54:2 60:24 62:25
  63:22 64:21 82:21
  85:14 87:14
  103:20 105:18,19
  108:11 109:9
  119:1 123:1
  127:11,23 128:19
  129:11,12,24
  131:11,14 132:18
  134:17 139:16,20
  140:21 144:6,7,18
  144:21 145:5,10
  150:3 151:5,17
  153:16 155:4
  157:5,12 158:5
  160:21,21 161:7,8
  161:21 163:5,12
  164:1 165:19

166:4 169:9,15,19
170:20
**good** 6:7,8 30:9,11
  30:17,18 42:9
  64:10 76:20 81:9
  84:12 134:11
  137:14 150:3
  168:8 169:6,24
  171:16
**goodbye** 157:12
**goodbye** 157:12
**gosh** 153:18
**government** 3:19
  4:9,10 6:18,21,25
  7:7,8,11,19 8:1,10
  8:12,15,16,19,25
  9:14,18,21,22,23
  10:4,8,12,17,17
  10:19 15:10 16:6
  16:21 20:15 30:13
  54:25 55:11 68:17
  68:23 69:3,5,7,9
  70:2 74:21 75:8
  75:10 78:24,25
  79:2,4,16 80:14
  81:3 82:13 84:16
  86:14,17 87:1,8
  87:11 88:9,17
  89:17,24 90:2,8
  90:12,20 91:10,13
  91:19,22 92:17,22
  93:1,21 94:4,6,9
  94:16,21,23 95:7
  95:19 97:6,20
  98:3,13 99:2,21
  99:24 100:1
  101:12,20,22,25
  102:3,4,10 103:3
  103:7,14,22
  104:12,16,21
  105:8 106:1,3,10
  106:16,17 107:1,3
  107:12,15,17,25
  108:3,9,19 109:2
  110:12,19 111:9
  111:12 112:5,22
  112:25 113:8
  114:8,21 115:16

116:1,6,22 117:5
117:20 118:9,12
118:23 119:2,24
120:1,3 121:14,16
121:19,23 122:3,9
123:9 124:18,21
125:17 129:20
135:25 136:4,6
137:16 140:12,16
141:12,15 142:5,8
160:1,17 162:2,3
162:20
**governmental**
  107:2
**governments** 2:10
  16:5 17:25 33:1
  88:20 97:20 98:13
  103:10 106:14
  166:6
**governs** 7:6 10:21
**grammatical**
  152:21 158:2
**grand** 22:1
**grave** 22:5
**great** 27:18 28:11
  28:14 42:3 54:7
  79:7 131:25 134:1
**greater** 98:23
  137:24
**greenblatt** 1:20
**gremlins** 21:14
**ground** 41:22
**guess** 61:5 74:10
**guide** 65:20
**guilt** 18:24 68:23
  69:13 82:5,7
  84:17,19,22
  132:10,18 137:16
**guilty** 23:2 52:16
  55:9 68:4,5,6,9,13
  68:19,22 69:2,4,7
  69:8 70:5,8 75:9
  80:18,18,20,21
  81:9,11 82:14,16
  82:17 84:25 85:3
  87:1 88:8 91:9
  92:21 94:20 97:24

98:2 103:13
104:20,24 105:7
108:12,24 110:2
110:10 111:10,12
112:3 113:7 114:2
117:4 135:20,20
135:23 136:3,7
139:19,20 140:17
141:7,7,11,11,14
141:14,16,17,19
141:20 142:1,1,4
142:4,7,8,11,11
142:14,14,17,18
**guy** 41:21 47:23

**H**

**h** 2:8
**hadnt** 11:22
**half** 8:7 16:22 44:3
44:12,15 51:1
149:4
**halftruths** 33:18
100:15 101:9
120:17 121:11
**hallway** 12:7
**handed** 138:12
168:12
**handle** 46:10
**handwriting** 62:5
132:2
**hanison** 46:6
**happen** 24:15
25:10 143:10
157:12
**happened** 11:17
92:13
**happening** 92:11
**happens** 8:10 34:13
121:22
**happy** 12:9
**harmful** 4:9
**hartline** 1:5,14
5:15 15:19,19,23
29:5,17 34:15
35:7 36:12,18
38:24 39:5,8,12
40:16 43:13,15,17

43:24 44:22 45:1
46:1 47:8,15,18
47:20 48:6,9
50:17,18 51:3,12
51:18 54:21 55:2
68:12 75:17 79:23
80:15,18,22,24
81:24 85:7,19
87:19 98:2 105:1
108:21,25 109:4
109:10,13,14
110:15,21,23
117:2 128:2
140:24 141:4,6,10
141:13,16,19
148:6
**hartlines** 5:13
42:20 43:15 48:22
80:16,21 144:23
**heads** 123:1
**health** 44:17 45:5
**healthier** 31:11
34:21
**hear** 19:11,23
76:23 77:18
137:18 155:1
**heard** 31:15,16
32:20,22,24 33:8
36:7 37:11,12
38:1,2 39:15
40:10 41:19 42:3
42:15 46:4,6
47:16 64:13 65:9
70:1,10,13 71:4
73:25 74:9 78:21
79:15 80:23 96:21
**hearing** 8:9
**held** 16:12
**help** 25:13 40:7
42:21 81:12 92:14
92:25 93:5 111:16
112:17 151:22
**helping** 94:1,13
**heres** 40:18
**hes** 17:11 19:20
39:7 40:1,7 41:2,3
46:23,25 50:12

51:14 165:22
**hesitate** 69:23
137:6
**hey** 47:21 149:17
**hide** 36:4
**hiding** 38:24
**hierarchy** 135:2
**highlight** 162:2
163:24
**highlighting** 162:4
**highlights** 162:3
164:12
**hillary** 39:24
**hold** 54:3 63:24
102:24
**holding** 46:24 47:1
47:23 50:23
**holdings** 38:7 43:3
46:8
**home** 64:12 67:4
155:17 169:2
**honest** 51:5,23
154:11
**honestly** 100:16
120:18 137:13
156:17
**honor** 5:8 6:9,13
7:21 9:18 11:8,25
12:25 14:16,22,24
15:2,17,18 16:2,7
16:8,12,18,20,25
17:14,17,23 19:2
19:13 20:2,4,11
21:1,15,17,24
22:14,22 23:9,11
23:13,16,17,20
24:1,2,3,4,19 25:8
25:9,15,17 27:6
27:19,24 28:1,9
28:17 29:19,22
30:2,4,16 49:7,9
49:21 50:5 53:20
54:13,14,22,24
55:4,15 56:2,3,9
56:14,15,19 57:2
57:3,10,14,17,20
57:25 58:7,12,18

59:1,18 60:11
61:13,17 62:23
63:4 83:6,12,13
83:15,20,24
101:15 123:10,12
123:22 124:3,4,11
124:14 126:2,22
127:10 128:13
129:15 130:3,9,24
131:2,8,21 132:20
133:3,7,23 134:3
134:5 146:9,11,15
146:16,18,21
147:6,16,17 148:7
148:21,25 150:5,8
150:16,18 151:25
152:22 153:19
154:7 155:13
156:24 157:14
158:13 159:13
163:5,16 165:4,9
166:24 167:1,15
168:15,20,23
170:4,24 171:2,12
171:15
**honorable** 1:7
**honors** 59:20
**hope** 38:15
**hour** 16:22 50:25
154:13 157:8
**hours** 35:21 41:16
**howard** 41:20 42:2
47:19
**howevers** 162:9
**human** 77:20 81:18
**hunch** 69:17
**hundred** 13:11
41:20
**hunter** 33:6

**I**

**idea** 7:10 34:7 43:1
43:3,8
**identical** 32:8
**identification** 2:9
6:10
**identify** 27:8

142:25 160:13
**ignall** 1:10 3:10,14
3:18,22 5:8,10,16
6:4 7:23 11:7,8,16
12:13 13:22 14:2
14:8,10,12,14,23
15:5 16:17 17:14
23:12,16 24:1
26:3,11,17,20,24
27:6,13,16,18,24
28:15 29:14 30:4
30:15,16,19 49:13
49:14,18 50:1,17
52:24 53:15 54:5
54:8,13 55:14,21
55:23 56:3 57:23
58:10,13,16 60:15
60:20 61:2,5,10
61:15,17 62:2,4,7
62:22 63:5,9 83:6
83:12 123:9
125:18 126:22,25
127:5,14,18,22
128:5,10,22 129:3
129:6,14,18 130:5
130:15,18 131:10
131:15,20,23
132:1,24 133:4,16
133:20,25 134:2
144:20 145:7
146:11,16 147:17
148:16 149:1,23
150:8,17 152:22
153:3,19,23 154:3
157:24 160:5,19
161:2,18 162:7,14
163:4 164:7,8,18
165:11,19,24
166:17,21 167:1
167:14 168:7,15
**ignalls** 6:9
**ii** 1:7 23:7 55:10,25
58:21 59:1,7
85:22 97:3,11
98:3 99:1 102:18
103:13,20 104:9
104:24 111:6

112:3,12 114:1
117:19 141:7
142:1
**iii** 55:10,25 85:23
104:25 105:23
108:23 111:6
112:4,12 141:11
142:5
**ill** 12:1 26:3 43:7
49:18 50:1 53:4
54:5 60:22 98:24
105:20 125:9
133:17 147:14
150:4,6 153:8
**illegal** 94:6
**illuminates** 164:12
**im** 3:10 5:8 9:11
10:10,11 12:9
15:1,4 16:11 17:6
18:19 19:2,25
20:23 21:5 26:21
26:25 40:24 49:14
50:11 54:2 55:16
57:23,25,25 58:11
58:14 60:18,24
64:21 65:5 85:14
87:14 103:20
105:19 119:1
123:1 124:12,23
125:14 128:19
131:1,4 132:14,21
134:17 139:16,20
144:7,21 145:8
148:14,16 149:1
150:3 156:5,5,5
158:15 160:3
162:12 163:9,12
163:22 165:9,21
169:2
**immaterial** 100:22
120:24 160:15
161:4,20 162:5,19
162:24 163:1,16
163:23
**immediately** 155:6
**immunity** 6:16,17
6:18,22,23 7:5,6,9

7:12,15 8:2,11,12
8:14,18,20,20 9:2
9:12,24,24 10:5
10:13,15,16,18,21
11:1,6 12:3 15:9
28:19
**impacted** 29:18
**impart** 65:3 67:7
**impartial** 85:1
**impartially** 67:11
**imparting** 67:3
**impeached** 78:2
**implies** 11:5
**importance** 51:13
68:2 69:23 77:22
78:10 143:11
**important** 21:17
30:24,24,25 32:21
44:16 45:18,21,22
65:23 67:10 72:25
73:6 76:15 78:15
83:1 101:8 121:10
137:12 143:6
169:16
**impression** 138:5
**improbability** 78:5
**improper** 15:23
**inadvertent** 19:10
**inappropriate** 3:25
**incident** 77:17
**include** 125:12
161:21 166:15
**includes** 95:19
103:10 115:8
161:19 165:13
**including** 70:25
93:11 97:17 98:10
102:19 109:21
123:16
**inconsistencies**
77:13
**inconsistency**
77:21,24
**inconsistent** 77:10
**incorporates** 22:25
**incorrect** 14:9
**independence**

105:21
**independent** 67:25
137:24 138:1
**index** 25:2
**indicated** 5:12
15:18 30:13
138:15 165:12
**indicates** 23:18
**indicating** 136:16
**indication** 65:14
**indicted** 86:10
**indictment** 18:1,14
18:15,20,23,25
19:16 20:11 21:15
21:18 22:4,6,10
22:20 23:18 26:6
26:12 44:20 56:11
59:21 60:6 70:21
84:18,23 85:5,6
85:19 86:4,6,8,12
86:20 87:16,21,24
88:14 90:9 93:25
94:3,11 95:4,11
98:8 99:18,23,25
102:12,15 104:25
106:7 108:23
111:7 112:8 113:4
117:1,13 118:9
119:20 120:1,2
122:5,7 124:20
126:8,10 127:7,16
127:23 128:8,11
129:23 132:8
145:5,6
**indictments** 127:2
**indirect** 74:16
**indirectly** 74:2
**indiscernible** 3:2
10:7 12:16 13:25
14:7,19 21:2 23:6
24:20,22 26:1
27:2,17 28:13
49:19,24 53:22,23
54:2,11,12 58:23
61:21 63:16
133:25 149:15
151:13 152:9,15

152:23 153:1
154:8,24 156:9,11
158:20,24,25
159:15,18 160:2
161:14 168:22
**individual** 82:7
**individuals** 31:8
38:5 43:19
**infer** 74:4
**inference** 3:23 4:8
4:24 5:3,17,21,24
15:12 62:10,16
74:6,9,22 75:23
80:7,8
**inferences** 74:20,24
90:23
**influence** 33:17,19
67:13,18 70:13
80:12 82:5,17
**influenced** 42:16
42:24,25 43:9,12
44:10 67:14 68:8
71:22,24 72:21
79:12 138:3
**influencing** 43:15
43:16 44:9,12,13
106:13
**information** 33:4,5
33:9,16,17 51:23
66:11 116:17
138:8
**inherent** 78:5
**initial** 150:21
164:19
**initially** 11:17
164:16
**injected** 103:4
**injustice** 22:5
**innocence** 68:16,21
68:25 82:7 84:20
135:25
**innocent** 68:14
77:24 80:4
**input** 150:12
**inquiry** 135:11
150:13 167:22
168:14

**insignificant** 73:6
77:23
**insofar** 4:2
**institutions** 103:4,6
**instruct** 37:16
64:18 97:2 102:20
128:23
**instructed** 72:9
113:24 117:17
132:11
**instructing** 20:14
**instruction** 4:21,21
5:11 13:3,4,17,22
14:3,10 24:14
26:10 29:4,9 44:6
55:7 57:19 60:16
61:7 62:8 72:10
84:2 129:20
130:25 131:3,14
138:18 149:10
160:14 162:19
164:20 165:13
166:8 167:8
**instructions** 17:21
18:22 22:24 26:11
31:18,20,21 43:19
52:14 54:6 65:22
65:23 71:13 76:3
78:18 83:8,10
85:12 97:4,6
109:7 112:14
113:25 117:19
122:22 127:15
135:13 136:22
145:25 147:8
148:7,8,12,22
149:11 150:14
159:5 161:8
162:12 169:13
**instructs** 21:18,21
**insurance** 117:16
**insured** 117:15
**intangible** 101:14
**intended** 92:2
115:19 121:20
**intending** 89:2
91:16 92:24 93:5

**intent** 81:12,13,15
  89:5 93:14,18
  97:15 98:19
  103:20,24,25
  104:3 106:25
  109:14,19 110:8
  113:16 114:10,11
  114:14 117:14,22
  117:23 118:1
  122:12,13,16
  165:20
**intention** 100:13
  104:1 107:9
  114:12 117:24
  120:15 122:14
**intentional** 77:24
**intentionally** 81:19
  81:21 89:19 91:11
**interest** 77:3
**interfere** 88:19
**intermission** 83:8
**internally** 141:1
**internet** 66:16,17
  115:13
**interpret** 153:20
**interpretation** 73:3
**interpreted** 161:12
  166:15
**interpreting**
  160:12
**interrupt** 52:24
**interruption** 165:7
**interstate** 113:20
  113:22 114:25
  115:3,6,12,15,18
  115:20 116:4,8,10
  116:14,18,24
**introduced** 80:14
  138:23
**invest** 32:18 33:22
  34:14 35:19 37:25
  45:7 46:8 51:24
**invested** 35:25 42:6
  44:15 51:20 53:2
  103:3 124:25
  125:4 126:5
**investigation**

169:20
**investing** 33:24
  38:6 44:23 46:23
  46:25
**investment** 21:23
  22:11 33:14
**investor** 37:23
**investors** 32:6
  37:24 52:5,11
  53:3 124:20,23,25
  126:5
**involved** 32:15,25
  33:19,22 36:13
  37:2 39:16 40:2,7
  41:7,14 47:13
  91:21 109:24
  121:6 169:8
**involvement** 39:19
**involves** 31:25
**involving** 28:18
**iphone** 26:4 66:15
**irrelevant** 125:8
**irrespective** 7:7
**isnt** 6:22 39:6 45:18
  45:20 51:16
**issue** 15:3 16:16,21
  17:18 18:5 19:19
  19:20 24:5 28:18
  28:19 29:1,1
  52:24 62:5 85:12
  124:5,17 125:8
  138:11 151:16
  163:16
**issues** 3:11 16:2
  133:12 147:10
**iv** 55:10 56:1 85:23
  104:25 105:23
  108:23 111:6
  112:4,12 141:14
  142:9
**ive** 3:24 15:19 27:3
  62:4 63:6 73:14
  83:17 87:5 94:22
  99:23 113:23
  117:17 118:25
  127:1

**J**

**j** 1:13,19
**jamie** 172:3
**january** 87:17 95:6
  141:6,9,24 142:3
**jargon** 65:19
**jennifer** 1:10
**jess** 167:21
**job** 42:20 65:10,10
**joel** 1:16 24:25
**join** 89:2 147:14
**joined** 88:24 91:11
  91:15 92:1,15,18
  92:23 93:5 96:15
**jointly** 24:15
**jones** 1:7 148:2
  150:12 153:1
  168:5
**judge** 1:8 14:6
  63:12 147:22
  148:2 150:12
  153:11 168:4
**judges** 63:21 64:22
  67:25 76:6 79:20
**judgment** 16:13
  76:20 78:8
**juncture** 53:22
**june** 34:17 35:1,8
  35:20 46:11 48:16
  141:12 142:6
**jurisdiction** 105:4
  105:17 107:14,22
  107:24 108:6,9
**juror** 138:5 142:19
  143:5,8 167:22
**jurors** 65:8 68:7
  135:22 136:19
  137:5,7,9,15
  138:3 139:14
  142:25 143:1,3,12
  143:16,21,23
  166:11
**jury** 1:7 3:6,23 4:7
  4:24 5:2,17,21,24
  15:11 17:20 18:22
  18:24 22:1,15,17
  22:21,24,25 24:14

26:9,11 30:8,13
  39:18 42:1 52:21
  54:16,18,25 55:6
  64:7,13 66:5 71:6
  83:4,18 84:9,15
  123:4 126:25
  127:2 128:11,15
  129:10 132:8,16
  133:10 134:8,20
  134:23 135:6,8,11
  135:19 136:23
  137:18 138:24
  139:4,7 140:1,2,6
  140:7 141:2
  142:24 144:4
  145:1,11,12,12,16
  147:25 150:12,13
  151:17,24 155:7
  160:12 161:5,11
  162:16 163:8,10
  163:18 164:2,24
  165:1 166:5,8
  167:8 168:13
  170:8
**jurys** 145:14
**justice** 82:6

**K**

**keep** 42:5 57:9,24
  59:5 137:4
**keeping** 168:24
**kept** 92:5
**kill** 41:16
**kim** 48:6
**kind** 20:5 53:24
  66:15 88:6 113:21
  115:2 152:1,2
  156:21 163:23
  169:20 171:9
**kinds** 158:8
**knew** 39:3 46:3
  49:3 91:14,20,21
  92:1,5 93:2
  100:10 109:8
  110:5 112:23
  116:9 118:24
  120:12 125:1

**know** 4:3 5:18 9:19
  13:8 15:2,20
  16:24 22:9 28:24
  33:5,12,23 34:5,8
  34:20,21 36:12,13
  38:11,12,12 39:7
  39:13 42:19 43:14
  45:5 46:5,10
  47:17,24 48:23,25
  50:21 51:6,7
  54:19 60:23 76:24
  85:4 98:24 123:3
  125:21 132:9
  134:14 135:8
  138:22 139:3
  151:8 152:16
  153:15 154:19,21
  154:23 157:11
  165:17,18,18
  170:19
**knowing** 88:25
  92:24 109:25
**knowingly** 59:2,8
  89:19 91:11 97:13
  98:18 99:4 102:13
  104:1 105:2,15
  107:5,6 109:10
  114:12 117:7,9,24
  118:10,18 119:5
  122:6,14
**knowledge** 75:13
  75:21 76:25 93:14
  96:10 108:4
  109:19 113:14
**known** 46:7 90:12
  106:21 108:17
**knows** 32:25 73:23
**koch** 33:6

**L**

**l** 172:3,9
**lack** 69:25 138:2
  162:9
**ladies** 31:3,17 34:9
  37:14 38:25 39:4
  39:17 40:9 52:6
  64:8 84:10 134:9

**language** 159:22
**largely** 6:9
**lasts** 95:16
**late** 168:24
**laughter** 21:11
  25:12 53:14 59:25
  66:20
**law** 18:3 40:17
  56:13 63:6 64:18
  64:24 65:17 66:1
  66:1 68:3 75:4
  85:5 97:11 107:9
  107:10 111:5
  113:6 114:20
  117:3 118:24
  136:14
**lawabiding** 80:25
**lawful** 88:20
**lawyer** 47:21 49:4
**lead** 74:8
**leads** 71:11
**learn** 43:18
**leave** 63:22 144:12
  146:14 164:21
**leaves** 52:21 63:1
  83:4
**left** 88:1
**legal** 6:10 26:5
  55:10 65:19,20
  111:13 112:4
  144:21
**legible** 151:24
**lending** 41:5
**length** 16:25 17:4,5
  83:7
**lengthy** 166:1,2
**letter** 3:14,25 7:23
  21:22 36:25 37:2
  161:13
**levin** 33:23,25 34:2
  34:14 35:1,13,16
  35:18,25 36:12
  38:12 40:6,25
  41:4,5 42:13,25
  43:2 44:15,23
  46:23 47:22 48:12
  51:7 124:25 125:2

  125:4 126:5
**levins** 35:8 39:7,21
  43:3 46:4,7,12
  47:20 49:3 50:22
  50:24
**liability** 25:10,11
  55:22,24
**lie** 37:18,19 39:9
**life** 67:17 69:24
**light** 71:8
**likelihood** 156:10
**likewise** 92:12
**limit** 16:25
**limited** 17:2 72:8,9
  145:15
**limits** 17:5
**line** 40:5 59:2 115:7
**lines** 139:18
**linkedin** 66:21
**lisa** 33:6
**list** 42:16 128:24
  129:25 130:10
  132:6 171:5
**listed** 145:6
**listen** 31:18 52:14
  65:4 137:2,4,14
  155:3
**listened** 64:16
**listing** 129:13
**lists** 139:18
**little** 36:21 41:22
  44:19 48:18 62:4
  82:23 89:14
  105:20 123:2
  135:12 150:2
**live** 14:15
**llp** 1:14
**loan** 20:15 21:19,19
  21:20 22:8 31:7
  34:2 35:8,10,15
  35:20 37:6 38:13
  39:11,22 42:14
  43:10 45:17,18,23
  46:1,2,2,4,5,7,10
  46:11,12,16,18,20
  47:3,4,11,20
  48:12,17 49:3,12

  50:22 51:13 114:7
**loaned** 31:7 47:22
  125:2
**loans** 32:4 37:7
  38:4,4 42:12
  45:14 51:4,9
**location** 143:13
**locked** 63:23
**logic** 69:19
**logical** 74:10
**long** 4:15 43:21
  53:25 111:15
  131:10 153:16
  159:2
**look** 18:2 20:17
  24:6,14 35:5,24
  36:2 37:1 40:9,13
  40:14,23 42:1
  46:21 47:15 51:3
  51:10 54:18 57:18
  129:3
**looking** 29:16
  125:22 138:17
**looks** 35:13
**loss** 102:2 104:7
  114:18 118:6
  121:21 122:20
**lost** 126:11
**lot** 35:14 45:9
  138:22 151:17
  156:12,15
**lots** 47:6
**loud** 155:1
**low** 41:10
**lumps** 6:3
**lunch** 53:24 54:1
  60:25 82:21,24
  83:2 84:5 154:13
**lying** 31:22

———————————

**M**

**m** 1:5,5 46:12
  54:15,15 84:8,8
  105:18 123:25,25
  147:21,21 148:1
  158:3,3 160:10,10
  167:24,24 168:11

  168:11 169:5,5
  171:18
**machinery** 154:20
**madiani** 45:21
  46:15 47:12
**mail** 20:13 22:8
  25:1 36:7
**main** 143:6
**major** 85:8,21,22
  91:23 96:25 97:3
  97:4 111:7 118:7
  119:3 122:10,23
**maker** 44:9,10,12
  44:13
**makers** 44:14
**making** 14:8 28:25
  32:16 33:1,22
  43:25 45:13 47:13
  51:23 85:24 86:10
  99:19 100:9 101:3
  101:8 105:2,24
  106:22 108:22,24
  119:21 120:11
  121:4,10 148:15
**man** 35:25
**manage** 42:21,23
**managing** 42:22
**manner** 76:13 77:2
  90:14 100:22
  105:16 107:14,21
  108:5,9 116:4
  120:24 135:14
**manning** 63:12
**mark** 35:6 140:15
  140:19 147:25
  165:17
**marked** 59:21
**market** 1:14,24
**material** 27:1
  100:3,6,15,24,25
  101:10 105:4,12
  106:12,13 117:11
  120:5,8,17 121:1
  121:1,12 160:7
**materiality** 44:7,7
**materially** 98:6
  99:6 113:12 119:7

**mathematical**
  69:16
**matter** 24:16 28:18
  37:20,22 45:23
  53:7 66:25 68:4
  76:15 77:22
  100:24 121:1,5
  135:16 155:3
**matters** 28:4 69:23
  169:18
**mccostlin** 172:3,14
**mckey** 18:17,25
**md** 1:18
**mean** 26:9,12 69:15
  154:22
**meaning** 10:24
  33:6 133:11
**means** 7:6 31:22,22
  31:23 35:25 44:7
  66:12 68:25 69:9
  72:12 87:7 88:17
  88:19,21 90:6
  97:15 98:6 99:10
  99:15 101:5
  103:25 108:1
  111:22 113:18,21
  114:11,24 115:2,5
  115:6,7,8,20,24
  116:17 117:11,23
  118:11 119:11,16
  121:6 122:13
  138:8 153:13
  161:16
**meant** 22:23 71:19
  165:4,5
**media** 66:14
**meet** 34:23,24
  35:11
**meeting** 29:10
  90:15
**meetings** 46:16
**member** 47:10
  87:22 88:23 91:22
  92:9 93:23 94:10
  95:24 111:13
  112:7,9,15 113:1
  129:21 143:6

**members** 30:12
33:8 46:4 64:13
71:6 84:15 89:11
90:3,10,11,24
92:6 94:17 95:13
95:18 96:1,6
111:15 112:10
143:18
**membership** 166:3
**memory** 77:1 125:9
125:12 137:23
138:4
**mention** 13:7
126:22
**mentioned** 3:15
46:12
**merely** 99:8 109:24
109:25,25 119:9
**message** 115:13
157:1
**messages** 66:17
139:8
**messed** 151:18
**met** 46:11 90:4
162:11 166:6
**michael** 1:19
**microphones** 3:5
**microsoft** 26:2
**midatlantic** 1:23
**middle** 63:12
**mike** 12:12
**million** 32:18 33:11
33:24 34:2,14,19
34:22 35:2,3,10
35:15,18,19,21,25
36:23 38:20 41:4
41:5,6,12,13 44:3
44:15,17,24 47:22
51:24 97:24 98:21
104:12,15,19
124:25
**mind** 66:7 81:15
118:22 137:4,6,9
154:6
**minds** 29:11 85:1
90:16 137:20
**mine** 13:17 72:19

**minimum** 98:24
**minute** 19:3
**minutes** 46:16
122:25,25 123:2
123:24 134:14
170:21
**miscalculated**
53:24
**mischaracterizat...**
49:10
**misconstruction**
7:16
**misrepresentation**
99:25 120:2
**misrepresentatio...**
100:3,6 120:5,8
**misstating** 9:11
**mistaken** 77:19
**mistakenly** 107:7
**mistakes** 27:2,4
**mistrial** 16:6,14
17:24 23:20
**misunderstanding**
51:5,16 122:15
**modification** 57:1
**modify** 24:10 26:1
49:25 54:19
**modifying** 6:5 37:3
**moment** 14:23
23:12 59:23 60:2
130:6 131:16
**money** 31:7,23
32:19 34:1,24
35:2,3,14 38:8,9
38:14,15,18 43:2
43:7 45:7 51:20
88:18 97:15 98:6
99:6,15 101:13,22
113:11 115:23
116:21 117:9
119:1,7,16 121:15
125:2,5
**morning** 6:7,8 27:3
30:9,11,17,18
64:10 152:10
155:10,15 157:10
169:23 170:5

**motion** 16:5,14
23:20,24
**motive** 42:4,9,11
77:3 81:5,5,7,8,9
81:11,13,14
**motives** 81:17,18
**moved** 17:24
**moves** 143:8
**mozelle** 84:14
**multidefendant**
15:24
**musser** 39:25 40:3
**mutual** 89:19 90:15
90:21
**myspace** 66:19

### N

**n** 2:1,4,11,14 3:1
172:1
**name** 158:6
**named** 90:11
**national** 1:23 67:15
**natural** 111:19
112:21
**nature** 26:12 60:5
69:25 113:15
118:13
**near** 86:18 128:24
**neat** 63:18
**necessarily** 78:12
92:14 146:23
**necessary** 17:9
101:24 107:19
108:3 111:19
112:20 116:16
121:18 147:11
**necessity** 65:5
**need** 11:24 26:15
31:3,4,6,9,18 32:8
41:25 49:1 51:22
53:7 57:19 60:16
63:23 65:3 83:25
91:19 98:23,25
100:20 106:3
110:25 111:5
120:22 123:3
127:19 128:22

129:25 130:22
131:5 139:1
145:23 146:14
148:17 150:21
152:14 153:4
161:1,4 163:7,8
**needed** 13:6 33:9
38:21 40:6,6 52:4
**needs** 110:19
162:16
**negatively** 29:17
**neither** 53:3 79:22
**neutral** 4:21 5:13
5:14,17,20
**never** 7:9 33:13
38:12 42:17 80:1
80:3 88:4 125:7
136:9 138:23
139:9 154:6
163:21
**night** 3:16 16:23
25:1 26:22 55:17
157:18
**noise** 3:4
**notably** 47:2
**note** 15:17 16:12
53:6 86:12 138:10
139:5 149:20
153:6
**noted** 3:2
**notes** 12:19 46:15
46:17 137:22,22
137:24 138:3,3
**noteworthy** 46:14
46:14
**notion** 65:25
159:21
**nova** 20:15 21:19
21:20,22 31:7,11
32:3,4,4,16 33:23
34:4,10,18,21
35:20,22 37:21
38:6,6,20 40:1
41:5 43:2,2,4
44:18,24 45:7,13
46:8,23,25 47:14
47:22 49:4 50:22

51:21,25 52:10
53:2 114:6,7
117:8,11,14,15,22
118:5,6 121:24
125:1,1
**number** 13:8 24:17
32:20 49:2 73:14
76:22 78:13 82:4
139:14 140:25
167:22 171:9
**numbered** 25:3
**numbers** 19:10,14
24:24 78:15

### O

**o** 3:1 172:1
**object** 6:6 49:20
52:25 92:11 96:21
99:9 119:10
159:16
**objected** 71:17
83:15 125:11
126:2 147:8
**objecting** 13:22
123:6
**objection** 15:18
16:17 29:6 49:6
53:6 54:24 55:3
71:23 72:2,4,11
72:15 83:16
125:13,16 126:15
147:7 148:7
159:25 160:4,5
**objections** 70:24,25
71:19,25 83:9,24
**objective** 87:22
88:5 89:6,21 90:5
90:6,17 91:14,17
91:18 92:2,3,24
92:25 93:2,3,6,8
93:17,19 94:1,14
94:18 95:2,22
111:17 112:18
159:21,22 163:22
**objectives** 88:25
89:3,12 95:12
96:4,7

**obligation** 4:17
69:1,3
**obstruct** 88:19
**obtain** 31:23 97:15
98:6 99:6 104:15
113:11 117:9
119:1
**obtaining** 115:23
**obvious** 61:11
**obviously** 16:13
29:6 84:2 145:24
153:4,17 169:19
**occasion** 139:12
**occupation** 67:16
**occur** 18:21
**occurred** 22:18
86:21 97:1
**occurs** 73:22
**october** 19:17
20:12,22 21:1,16
21:16 22:7,9
40:25 114:5
142:12
**offense** 57:12 58:4
68:3 69:7,10 70:3
70:5,7,8 82:9,11
82:12,15,16,19
86:21,23 88:1,3,8
88:15 89:1,7 95:1
95:1,3 97:3
108:12,13,14,16
108:22 110:5,9,14
110:21 113:7
117:4 118:16
129:5 135:24
136:2 149:22
158:6,9,11 163:21
164:4
**offenses** 55:9,20
68:13,19 81:6,25
82:2,4,19 86:13
86:16,18 109:1,5
109:6,8,13,15,16
110:1,10,18,24
111:2,4,10,13
112:3,11,13,16,19
112:24,25 118:7

**offer** 7:9
**offered** 71:18
**office** 1:11 128:7
133:17
**officer** 135:10
138:12,16 140:10
**official** 39:17,23
**officials** 105:24
138:9
**oh** 5:10 20:25 21:7
55:21,23,24 59:15
60:18 61:1,23
128:16 151:8
152:16 153:18
**okay** 21:7 26:17,20
27:16 29:14 39:6
50:4,14 55:21,23
59:12,15,18 61:1
61:2 83:21 85:14
127:4,14 129:4
133:24 144:15
146:2 147:18
150:20 151:8
152:13 156:12,17
159:24 170:14,21
171:13
**omission** 44:11
**omissions** 33:18
101:10 121:12
**omits** 44:16
**omitting** 152:19
**once** 35:20 39:13
123:5 136:21
138:6
**ones** 19:15 57:21
63:21 165:16
166:8,8
**open** 36:3 137:4
149:23 170:20
**openended** 150:2
**opined** 18:5
**opinion** 65:25 67:7
67:12 73:11 78:7
100:16 120:18
**opportunity** 22:2
76:23 128:14

156:10
**opposed** 33:24
36:20 107:7
132:22 154:3
158:7,9
**opposite** 22:19
**oral** 90:1 106:9
**order** 31:23 32:3
35:11 44:22 55:8
65:4 69:6 83:23
88:7 89:12 91:8
92:21 98:1 101:11
101:19 105:7
108:23 112:2
113:6 117:3
121:13
**ordered** 72:17
**ordinary** 69:20
116:11
**orientation** 67:16
**original** 137:8
**originated** 101:23
121:17
**ought** 13:13 66:1
**outcome** 77:3
**outside** 34:1,24
35:2,3 38:8,9
70:13 71:4 74:17
74:18
**overall** 89:21
102:11,14 122:4,7
163:19
**overcome** 135:25
**overcomes** 68:18
**overheard** 72:1
**overlapping** 32:7
**overruled** 72:3
125:13 126:11
**overt** 87:2,23 89:12
93:21,24 94:3,8
94:11,15 127:1,6
127:16 128:1,25
129:22 130:1,10
130:20 131:11
132:7,10,11,17
133:11 144:18
145:5,13,14,15,17

145:23 146:24
**owned** 117:10
**ownership** 103:5

**P**

**p** 1:5 3:1 84:8,8
123:25,25 147:21
147:21 148:1
158:3,3 160:10,10
167:24,24 168:11
168:11 169:5,5
171:18
**pa** 1:4,12,15,22,24
**padded** 166:7
**page** 2:9 13:4,8,9
13:13,15,17 24:16
24:17,18,21,23
36:18 37:1 40:23
40:24 41:1 48:3,8
56:5,6,6,7,16,18
56:21 59:16,20,21
60:10,10,21 61:7
62:9 129:19
131:18 141:3
152:24 159:18
**pages** 13:8,12 25:3
57:13 58:20 59:1
59:6,12 160:13
**pagination** 27:1
**paging** 57:9 59:6
**paid** 38:12
**paper** 35:14
**paragraph** 7:24,24
23:19 60:6 124:21
124:24
**paragraphs** 152:25
**pardon** 18:10
159:12
**park** 1:18
**part** 13:2 16:11
38:2,20 43:17
44:1 65:11 76:10
83:15,25 87:9
97:13,23 98:21
99:22 104:11,19
111:1,3 119:24
131:14 148:23

**161**:14,21 163:11
**participants** 91:2
**participate** 111:25
143:1
**participated** 99:4
102:14 110:14
113:14 119:6
122:6
**participating** 156:6
**participation**
110:20
**particular** 81:16
82:14,15 94:7
101:5 121:7
145:13 170:18
**parties** 3:4 4:23
30:22 43:23 70:19
70:22 90:10 145:1
159:16,20
**partnership** 88:7
**parts** 151:18
152:17 162:1
163:6,10,13
164:12
**party** 77:5 88:23
**pass** 12:12
**patrick** 1:13
**patterson** 46:2 47:8
48:2 78:23 79:7
**pattersons** 79:9
**pause** 13:20 14:25
20:9,19 21:8
23:15 24:11 25:4
25:23 27:23 28:8
29:21,25 30:5
53:5 54:20 55:18
58:24 60:3,13
61:16,19 63:19
64:1 85:10 139:23
150:9,19 151:4,14
153:7 159:9 167:2
167:20,23,25
**pay** 39:7 65:2
**pays** 38:9
**peace** 53:13 63:24
**pen** 152:18
**penalty** 68:8

**pending** 159:4
**pennsylvania** 1:1
  86:22,25 87:4,10
  87:18 140:23
**people** 30:25 32:15
  32:17 33:19,21
  42:16 47:8,9
  51:22 71:8 90:9
**perfectly** 81:20
**perform** 67:11
**performed** 89:11
  93:24 96:2,20
  109:16 110:17
**period** 10:5 95:11
  145:21 161:20
**permitted** 63:21
  71:18 79:2
**person** 38:9 45:24
  49:5 69:20 76:16
  76:17,18 81:14,19
  81:20 84:20 96:20
  99:10 100:9 101:2
  101:7 106:22
  108:11,14,15,15
  108:17 115:9,10
  119:12 120:11
  121:3,9 134:23,24
  143:9,19
**personal** 81:16
  82:7
**personally** 94:8
  106:5 108:12
  111:11,25
**persons** 67:14
  77:17 84:20,25
  87:25 88:2,12
  89:18 90:14 99:17
  109:24 119:18
  163:20
**pertains** 89:15
**pertinent** 161:14
  169:15
**ph** 142:25 143:15
**phase** 111:1,4
**philadelphia** 1:4,12
  1:15,22,24
**phone** 66:14,15

**171**:8
**phrase** 115:4,8
**phrased** 6:2
**physically** 106:4
**pick** 160:23 161:23
  163:12 166:7
**picking** 163:9
**pierce** 1:20
**pinkerton** 25:10,11
  55:22,24
**place** 61:11 86:24
  87:3,10 98:9
  102:19 103:9,18
  104:11 124:20
  140:15,19 159:17
**placed** 17:4
**places** 26:6,13
  45:19
**plan** 35:7,14 40:18
  41:4 97:19 98:12
  99:8,13 115:22,23
  119:9,15 154:8
**plausible** 35:13
**play** 49:1,18 50:7,8
  65:11
**played** 91:23
**plea** 78:23
**pleaded** 68:12
**please** 20:18 25:22
  27:12 48:6,8
  54:18 57:5 59:4
  60:19 84:7 124:9
  130:7 142:22
  143:4,4,4,16
  167:18,19 168:2
**pleasure** 169:3
**plus** 166:13
**point** 15:7 21:17
  31:9,10 39:5
  83:10 123:8
  125:14,22 127:7
  128:24 169:19
**pointed** 163:17
**points** 55:6
**poor** 3:3
**pordy** 1:17
**portion** 23:24

**72**:17 101:17
  163:25
**portions** 157:22
  161:7
**position** 4:11 5:5
  22:14,17 67:17
  123:21 137:8
  160:16
**possibility** 22:21
**possible** 5:19 18:23
  62:11,12,16,17
  69:15,16 75:11,12
  75:19,20,24,25
  136:10 138:20
**potential** 22:16
  79:12
**potentially** 33:18
  34:14
**potomac** 1:18,18
**practical** 155:11
**practice** 18:7,9,11
  18:12,12
**preconceived** 91:4
**preface** 165:13
**prefaced** 29:12
  145:11
**prefer** 166:16
**preferably** 132:1
**preference** 167:12
  168:3
**preferred** 103:5
**prejudice** 67:12
  77:4
**prejudicial** 15:23
  29:5
**preliminary** 71:13
  76:2
**premised** 100:20
  120:22
**prepared** 13:9 22:6
  106:5
**preparing** 12:10
**preponderance**
  87:7
**prerogative** 76:11
**present** 3:6 30:8,14
  54:16 64:7 69:1

**75**:11,16,19 79:3
  79:25 84:9 92:7
  109:25
**presented** 22:3
  23:3 64:14 68:1
  68:17 75:3,18
  78:14 96:11
**preserve** 16:15
  83:23 124:15
  125:15 147:9
**preserved** 126:16
**preside** 134:24
**presiding** 142:19
**presumed** 68:14
**presumption** 68:16
  68:18,21,24
  135:25
**pretense** 116:20
**pretenses** 97:16
  98:7 99:7,16
  113:12 115:24
  117:12 119:8,17
**pretrial** 9:16
**pretty** 42:8 63:17
  63:17
**preve** 35:21 36:25
  39:20 78:22 79:6
**preves** 79:8
**previously** 34:3
  98:18
**primary** 33:4
**principal** 108:18
**principle** 101:9
  121:11
**principles** 65:20
**print** 61:24 128:7
  144:25 154:22
  167:18
**printed** 152:10
**prior** 123:12 128:2
**privilege** 7:14 11:4
  11:14 28:25
**privileged** 4:4
**probable** 78:5
**probably** 47:24
  62:8 129:24
  151:23 157:6

**problem** 58:14
  62:2 130:12 148:8
  149:8,12 154:18
  156:3 164:13
  165:15 166:11,17
  166:22
**procedurally**
  142:23
**proceed** 19:4 21:13
  103:19 156:11
**proceedings** 171:18
  172:5
**proceeds** 49:11,11
  50:22,24
**process** 32:16 33:2
  33:20 41:17
  142:24 143:22
**procuring** 109:12
**produce** 29:13
  62:10,15 75:12,17
  75:20,23
**producing** 109:12
**profession** 67:16
**professional** 17:8
**proffer** 19:8
**proffered** 12:19
**program** 32:23,24
  33:8 87:20 88:13
  88:16 89:23 91:8
  92:20 93:4 94:25
  96:23 97:18,18
  98:11,11 99:6
  103:1,2,3 141:8
  142:2
**promise** 116:20
**promises** 97:16
  98:8 99:8,16
  113:13 115:25
  117:12 119:8,17
**prompt** 81:19
**prompting** 81:20
**prompts** 81:14
**proof** 69:3,14,15
  79:25 81:7,8,9
  106:15 121:23
**prop** 40:7
**proper** 121:5

**properly** 15:18 17:3
**property** 31:24 88:18 97:15 98:6 99:6,15 101:14,22 113:11 115:24 117:10 119:1,7,16 121:16
**proposed** 4:22 22:24 55:1
**proposing** 167:6,7
**prosecution** 80:1
**protected** 11:1
**prove** 38:21 69:2,4 69:10 75:9 78:12 80:3 86:15 87:11 89:17,24 90:3,9 90:13 91:2,13,19 91:23 92:9,14 93:1,22 94:4,7,9 94:16,23 95:7 98:1,3 99:3,24 101:12,20,23,25 103:8,23 104:12 104:17 105:7 106:1,4,11,18 107:4,12 108:3 110:6,12 111:10 111:12 112:22,25 114:9,21 115:16 116:1,6,22 117:21 118:9,12,21,23 119:3 120:1 121:14,17,19 122:10 129:20 162:20
**proved** 55:11 68:23 70:2 79:19 81:3 82:13 87:6 88:10 90:20 91:10 92:17 92:22 94:21 102:11 109:2 112:5 113:8 117:5 122:3 136:7 137:16 140:13,16
**proven** 84:16 103:15 104:21

153:12 161:15,19 161:19
**proves** 73:21 74:2,3 86:17 100:1 120:3 136:1
**provide** 20:5 66:11 132:6 133:12 138:7
**provided** 19:14 68:2 97:20 98:12 148:3 155:9
**provides** 97:12
**providing** 48:6
**province** 68:5
**proving** 69:13 111:10
**prudence** 99:17 119:19
**prudent** 4:19 5:1 101:2 121:3 133:17
**public** 32:19 33:12 44:3 67:12
**pull** 154:22
**punishment** 68:2 136:9,10
**purchase** 32:23 33:7 49:4 50:22 97:21 98:13 102:24 103:1,11
**purpose** 23:4,5 32:10 35:23,24 37:6 39:11 45:17 45:18,20 46:3,7 48:17 51:4,13,18 72:8,10 89:5 93:8 93:18,25 94:13 95:22 104:1,5,7 107:10 109:11 110:8 114:6,12,16 114:17 117:24 118:3,5 122:14,18 122:20
**purposefully** 107:6
**purposes** 147:10
**push** 30:20 31:2
**put** 20:20 41:25

54:9 61:11 135:8 153:8 159:22,23
**puts** 4:10 18:15 22:17
**putting** 35:2,3 48:12

_____

**Q**

**qualify** 34:11 47:14
**quality** 76:25
**quantity** 78:13,15
**question** 10:3 27:20 32:13 34:6 36:9,20,22 45:4 45:14 47:19 49:11 49:16 50:21 72:3 72:4,12,16 76:19 102:7 106:6 122:1 125:5 128:18 135:6 138:18 150:1 168:3
**questions** 33:15 36:10,14 50:20 70:22,23
**quickly** 138:19 154:9
**quite** 17:11 58:1 60:23
**quote** 86:13,14 88:15,17 142:18 153:13,14

_____

**R**

**r** 3:1 172:1
**race** 67:14
**radio** 113:19,22 114:24 115:2,5,8 115:21 116:3,7,9 116:13,17,23
**raincoat** 74:14
**raining** 74:17,18
**raise** 3:12 4:13 27:21 34:19
**raised** 47:19
**raising** 15:9
**ratified** 46:13
**reach** 71:12 137:1 137:12

**reached** 66:24 67:2 79:3 135:17 140:7
**reaching** 64:19 73:18 134:19 136:10
**read** 15:20,21,23 56:7,10,17 57:19 59:14,17 61:21 64:21 65:6 83:17 83:20 88:1 101:16 101:19 123:14,14 127:17 128:14 131:3 148:4,10 152:1 153:17,17 153:24 154:9 158:7 159:2 160:6 162:18 164:1 166:16
**readable** 149:8
**reading** 55:16 56:18 65:3 84:1 105:21 144:14 154:17,20
**reads** 148:1 161:14
**ready** 3:8 30:3 60:14 64:2 124:1 134:4 169:1
**real** 45:24 47:3
**realistic** 155:11
**realistically** 156:19
**realized** 35:1 102:1 121:20
**really** 13:21 31:12 40:5 43:6 53:25 62:5 63:14 102:7 122:1 152:17 155:9 163:1
**reason** 22:5 30:21 36:1 69:19 74:7 74:25 80:10 126:17 143:7 145:12
**reasonable** 37:7 55:12 68:20,24 69:9,11,13,14,18 69:18,20 70:4,6 74:6,9,24 75:10

81:4 82:14 84:18 84:21 85:1 86:17 87:12 88:10 89:18 90:13,20,23 91:10 92:18,23 93:22 94:9,22 98:4 99:3 100:2 101:2,7 102:11 103:8,15 103:23 104:13,17 104:22 105:9 106:2,11,18 107:4 107:12 109:2 110:7,13 112:5 113:9 114:3,9,21 116:2,22 117:6,21 118:12 119:3 120:4 121:3,9 122:4,10 129:21 136:2,5 137:1,17 140:14,18 148:22 162:17 167:14
**reasonably** 23:1 38:17 71:11 74:4 74:16 86:18 99:16 101:1 111:18 112:19,20 113:1 116:13 119:18 121:2
**reasoned** 74:10
**reasons** 13:1 78:6
**rebut** 22:6
**rebuttal** 3:8,9,11 4:11,13 14:4 16:23 17:1,3 26:16 30:14
**recall** 6:13 8:11 77:20
**recalls** 6:24
**receipt** 159:4
**receive** 10:13,15,15 10:18 78:24 79:4 168:25
**received** 70:16 71:14 72:5,13 78:24 79:1,4 136:13
**recess** 18:2 52:20

52:22 53:18,22
54:3 60:25
**recessed** 54:15 84:8
123:25 147:21
158:3 160:10
167:24 168:11
169:5
**recollection** 11:10
12:18 28:22 49:24
50:18 67:25 73:3
76:18 77:19
137:25 138:1
**recollections** 67:23
67:24
**recommends** 34:18
**reconvened** 123:25
147:21 158:3
160:10 167:24
168:11 169:5
**record** 10:8 64:9
83:23 84:11
124:18 129:10
134:10 137:18
147:7,20,23
150:10,22 151:6
153:9 172:5
**recorded** 135:9,12
**recording** 3:3
154:17
**recovery** 97:19
98:12
**recross** 2:3
**red** 152:18
**redirect** 2:3
**redone** 24:13
**refer** 139:25
**reference** 15:20
26:7 79:15
**referenced** 118:25
138:14
**references** 67:20
**referencing** 129:11
**referred** 20:8 99:23
102:20 103:2
169:12
**referring** 129:4
**refers** 76:7 81:15

**reflect** 22:23
**refreshing** 60:1
**regard** 19:12 73:1
93:20 106:3
107:14 108:2,8
**regarding** 3:16,23
5:22 18:1 21:22
24:14 62:11,16
75:24 78:19
138:17 148:11
150:13
**regardless** 15:12
**region** 1:23
**regulator** 33:4
**regulators** 33:3
34:3 36:5,6,25
38:19 40:6 42:19
42:22,23 43:25
52:9
**reject** 14:2
**relate** 100:24 121:1
**related** 21:19 22:11
75:11,19 91:1
**relates** 17:20
**relation** 77:4
**relationships** 42:8
**relative** 167:11
**relax** 82:23
**relevant** 97:9,13
**reliance** 106:15
**relied** 33:3
**relief** 97:18 98:11
99:5 125:21 141:8
142:1
**religion** 67:15
**rely** 12:9,22 51:22
137:25
**relying** 101:2 121:4
**remainder** 143:2
146:13
**remained** 6:11
**remains** 79:25 85:1
**remarkable** 11:23
**remedy** 53:8
**remember** 9:19
15:7 47:19 76:20
77:16 87:11

125:18 137:21
143:19 157:21
**remind** 143:21
**remove** 144:22
**renew** 83:25 147:7
**report** 18:3
**reporter** 172:10
**reporting** 1:23
**representation**
100:7,9,11,23
101:3 105:3,11,12
105:13,16,25
106:3,12,19,20,23
107:13 116:20
120:9,11,13,25
121:4
**representations**
97:16 98:7 99:7
99:11,16,20,21
113:13 115:25
117:12 119:8,13
119:17,22,23
**reputation** 80:23
**request** 45:17
116:21 128:12
133:10 149:13
154:15 157:5
160:12 161:11
164:22
**requested** 169:13
**requesting** 149:21
150:13
**require** 118:9
**required** 75:8,10
75:16,18 77:25
79:19 80:3 81:7
90:8 93:13,18
94:16 99:24
101:23 106:16
109:19 115:16
118:23 120:1
121:16 162:21
165:14
**requirement** 35:12
86:23 107:17
109:20 110:18
**requirements** 40:3

55:13 109:3 112:6
**requires** 68:21
**rescue** 97:19 98:12
**research** 169:20
**reserve** 16:13
123:13
**resist** 134:12
**resolution** 133:8,12
**resolve** 14:4 15:6
**resolving** 28:3
80:17,20
**respect** 24:4 28:18
28:25 32:5,10
45:3,10,14 52:10
54:25 113:23
117:16 118:10
129:6 130:18
143:24 163:9,15
**respectfully** 137:3
**respective** 25:25
**respond** 5:6 138:19
157:5
**response** 19:24
153:9 159:2
167:22 168:2,14
**responsibility**
43:21 64:17 65:16
66:8 67:9 73:13
135:5,7 136:8,19
143:5,18
**responsible** 111:14
**rest** 132:7 143:20
169:25
**restate** 49:17
125:24
**restricted** 17:3
**restrictions** 17:5
**result** 91:4
**resume** 82:24
84:14
**resumed** 54:15
84:8
**retrieve** 154:19
**return** 20:14 21:19
70:4,7 82:9 84:19
86:25 103:12
104:20,24 140:9

169:22
**review** 13:19
145:14 147:10
167:19
**revoking** 7:13
**reworking** 54:11
**rich** 47:23 51:7
**right** 3:7,13 12:15
14:21 15:25 16:15
17:15 19:23 21:9
21:12 22:3 24:12
24:17 25:9 26:14
27:9,18,22 29:2,7
29:20 30:3,12,14
40:14,16 49:22
50:6 52:19 53:12
53:17 54:3,10,23
55:5 57:4,21 60:4
61:5,8,15,17,20
62:6,24 64:4
79:24 84:4,14
85:16 98:25
105:22 123:5,13
123:20,23 124:16
126:18 127:13
128:19 129:16
130:7 131:9,17,17
131:22 133:5,22
134:1,2,6,15
137:7 139:24
142:20,23 143:17
144:5 145:3,24
146:8,19 147:15
147:24 148:15
149:6 150:4,4
153:8,9,22 155:3
155:18 156:1,3,12
157:4 158:1,2,18
158:21 159:1,8
160:8 164:8
166:25 167:3,17
168:1,9,21 169:7
169:24 170:22
**rise** 30:6 64:6 83:3
84:10 134:7 144:3
170:1
**risk** 37:4 38:11

45:19 46:21,22,24
47:2,17 48:4,9,11
48:14,16 51:11,14
**road** 4:20
**rogers** 1:17
**role** 39:17,23 42:23
43:15 65:19 91:24
**roll** 27:5
**room** 39:18 42:1
66:5 134:21
136:23 137:18
138:25 139:1,7
140:1,6
**rooms** 66:18
**rothschild** 1:14
**roughly** 33:11 38:5
**roven** 3:20,25 4:5,8
5:3,22,25 6:11 7:4
7:17 8:1,16,17,25
11:20 12:11 15:8
28:19 35:6
**rovens** 3:24 6:15
10:25 11:11,12
**rule** 16:13,16 17:3
23:19 55:10
111:13 112:4
138:23
**ruled** 72:2
**rules** 64:25 71:13
71:18,21
**ruling** 72:19
**rulings** 71:24
**rumors** 70:11
**run** 63:6 128:6
133:17 150:25
167:4
**russell** 1:16 18:8

——————
**S**

**s** 1:11,21 2:8 3:1
**sample** 85:13
**satisfactory** 150:15
**satisfied** 44:25
68:23
**satisfy** 108:7
109:19 110:18
**saw** 42:20 70:10

**saying** 9:20 15:8
22:8 40:2,16
145:19 148:18
149:20 156:4,13
162:12 163:18,23
165:22 170:20
**says** 4:12 6:3 7:7,25
13:5 19:17 20:22
21:16,18,21 35:9
42:21 47:6 76:10
129:20 160:15
163:19
**scenario** 6:25 7:16
8:8,21,24 10:9
**schaffner** 32:22
**scheduled** 54:1
**scheme** 21:20
32:14,14 35:5
44:1 45:1,6,13
51:17,17,21 52:8
52:8,9,10 90:25
91:5 97:14 98:5,9
98:17 99:4,8,13
99:19,22 100:4
101:11,13,20,21
101:24 102:1,6,9
102:12,14,18
103:9,16,17
104:10 113:11,14
113:17,24 114:4
114:23 115:22,23
116:5,25 117:8,9
117:18 118:25
119:6,9,14,21,24
120:6 121:13,15
121:18,20,25
122:2,4,7 124:19
124:22 126:4
**schwartz** 1:16 6:5,8
8:6,24 9:5,8,11,17
9:21 10:2,6,14
11:2,11,18,19,20
11:23 12:5,9,24
13:10,13,16,24
14:18,22 55:3
56:9,14,19,22,24
57:3,7,9,17,20,24

58:5,17,20,23,25
59:5,10,12,15,18
59:24 60:5,9
83:13 125:9,12,24
126:9,17,19
159:12,15,20
160:11 161:10,25
163:15 164:3,6
167:13
**scope** 16:25 17:2
49:21 112:16
113:2
**screen** 20:21 41:25
**scroll** 48:18
**scrunch** 150:24
**se** 21:24
**sean** 151:21
**seat** 143:9
**seated** 30:10 64:11
84:13 124:8
134:12 144:17
169:6
**second** 7:21,24
13:2 41:1 57:5
58:22 65:17 88:22
98:9 102:15,17
103:8,17 105:11
106:10 109:7
112:8 113:15
114:8 117:13,20
122:8,9 159:10
164:10,13,21
**secondly** 7:8
**secret** 139:11
**secretary** 102:22
102:24
**section** 97:11
**securing** 48:12
**security** 48:19
**see** 14:19 15:13
16:23 24:9 25:11
27:8 29:7 35:5
36:17 37:24 40:21
41:21 46:10 49:6
54:6 59:7 61:6
63:16 76:23 77:17
85:10 137:9

138:21 139:1,4
140:22 147:18
148:3 150:22
156:21 157:12
158:18 161:13
169:1
**seeable** 43:22
**seeing** 20:23
**seeking** 53:9
**seen** 43:13 46:15
50:24 52:7 59:20
64:14 65:9 70:12
71:3 73:25
**select** 141:7 143:18
**sell** 102:25
**send** 35:15,16
115:6,13 127:11
128:19,24 129:10
132:16,16 134:13
138:23 139:6
144:22 150:7
151:17,24 158:5
161:24 164:16
**sending** 132:12
163:18 170:10
**sends** 35:21
**sense** 15:12 31:13
40:18,19 58:13,16
61:6 69:19 71:7
71:10 74:8 75:1
76:20 148:25
152:7
**senses** 73:24
**sent** 3:15 7:23 22:7
24:25 47:18 48:2
48:9 115:10
145:10
**sentence** 7:25 8:23
56:11
**separate** 57:12
58:4 82:10 95:1
**separately** 82:8,20
**september** 63:1
**sequestered** 143:12
**serve** 143:7
**set** 74:21 95:11
98:17 99:22

119:25,25 161:8
**sexual** 67:15
**shared** 89:5 93:8
**sheet** 24:7,13 27:11
28:10 54:12,18
85:13,14,15 128:4
128:6 129:12
139:17,21 140:2
152:18
**sheets** 142:22
**shell** 61:24
**sherri** 172:3,9
**shes** 14:6
**shift** 4:16
**shifts** 80:2
**shirked** 66:9
**shortly** 82:1 88:15
**shouldnt** 55:14
124:13
**show** 20:7 37:6
41:21 46:25 93:17
110:16,19 150:6
**showed** 22:12
**showing** 92:12
95:17
**shown** 34:9,22
118:21
**shows** 16:24 37:2
47:3,4 92:4 110:4
**shubin** 38:2 48:24
51:2,6
**shulman** 1:17
**side** 5:22 147:19
**sidebar** 19:8,8 49:7
49:8 50:16 71:25
**sides** 4:1 6:3,12
**sign** 20:14 21:18,21
22:8,10 140:9
**signal** 113:18,21
114:24 115:1,10
**signed** 142:18
148:5 153:14
**significance** 80:5
**simply** 10:11 19:10
33:24 44:7 47:1
51:6,18,20 71:19
73:20 74:6 86:6

143:14 153:23 164:17
**sincerely** 169:9
**single** 159:22
**sir** 3:21 16:3,9 17:16,19,22 24:8 25:7 28:2,20 29:24 53:21 56:22 56:24 57:6,7,8 58:19 59:5 124:6 126:20,24 130:16 132:5 133:9 159:11,14 167:5 170:6,9
**sitting** 124:12 156:4
**skipped** 142:15
**slate** 68:15
**slide** 16:24
**slides** 20:6
**slightly** 160:6
**slow** 171:9
**smart** 66:14
**smelled** 73:25
**sole** 67:25 76:6 79:20
**solely** 10:23 65:15 73:12 136:19
**solve** 166:21
**solved** 62:2
**somebody** 7:11 21:10 156:5
**somewhat** 42:21 65:2,20
**soon** 133:17 138:24 155:24 168:25
**sorry** 5:8 12:12 15:1 18:19 21:5 25:15 30:2 40:24 57:23,25 58:11,25 60:18 124:23 131:1,20 158:15 160:3 165:9
**sort** 46:9 69:22
**sought** 102:4 104:14
**sound** 113:18,21

**114:24 115:1
soundness** 102:5
**sounds** 5:14 133:14 150:3 154:5
**source** 36:11,14 37:1
**speak** 42:19 54:5 114:19 125:10 134:23 137:20 144:8,11 160:17
**speaker** 24:22,23 29:22 30:1 101:15 124:2,7,10 148:24 149:7,9,19,25 151:2,15,21 152:4 154:21,24,25 156:23,24 157:2,3 159:7 160:2 166:19 167:5,15 170:15,23 171:1,4 171:6,11,14
**speaking** 7:4 156:19
**speaks** 165:14
**specific** 11:9 12:18 20:6 78:18 83:16 87:14 95:8 98:19 103:24 105:10 109:13,15 114:10 122:12 148:11,19 149:13 150:14 153:13 160:13 161:16 167:9,10
**specifically** 8:8 21:16 38:6 68:11 112:23 125:19 126:2 129:2 135:7 152:19 169:14
**specified** 118:15
**specifying** 86:5
**spectator** 110:1
**speculating** 22:18 22:21
**speculation** 69:17
**speed** 155:23
**spelling** 90:1
**spend** 146:13

**spoke** 11:19 38:24 38:25 39:1,1 42:17,19 48:24 162:9
**spoken** 53:12 73:14 89:20 96:2 100:21 120:23 127:1
**stabilization** 97:22 98:15 102:21
**stake** 93:16
**stand** 80:9 98:24,25 105:19 135:17
**standard** 6:10 64:23 106:8
**standards** 31:17
**standing** 34:25
**start** 17:6 32:12 68:14 128:20 138:6 147:1 170:20
**started** 8:9 51:15 95:7
**starts** 25:9
**state** 9:15 10:4,23 15:21 20:11 81:15 115:6,9,10,11 135:12
**stated** 8:13 9:22 10:12 11:2 18:14 18:18 49:13 68:10 71:1 76:2 130:23
**statement** 8:5 16:22 80:21 96:20 100:7,9,12 101:3 101:5,7 105:3,10 105:11,12,14,16 105:25 106:2,5,7 106:12,15,19,20 106:23 107:13,18 107:21 108:1,5,8 120:9,11,14 121:4 121:7,8 125:6 141:11,14 142:5,8 142:9
**statements** 43:25 44:21,21,23,24,25 51:8,9 70:21

80:15,17 85:24
90:24 95:24,25
96:2,6,9,14,17
99:20 100:14,17
105:24 106:9
108:22,24 111:8
119:22 120:16,19
**states** 1:1,2,8,10 18:8,16 20:11,12 30:25 32:2 64:25 85:8,9,20,21,23 87:20 88:4,9,13 88:16,17,20,25 89:1,7,8,23 91:7 92:19 93:3 94:24 96:23 97:4,12 98:5 99:5 102:2 105:6,17 107:15 107:16,25 111:8,9 118:8 119:4 122:11,24 140:22 140:24,24 141:5 141:22 163:21
**static** 3:4
**status** 67:17 139:10 143:20
**statute** 97:10,25 158:7,8
**stay** 139:11
**stays** 68:16 69:5
**step** 26:4 28:4 143:16
**sticking** 51:3
**stimulus** 97:19 98:12
**stipulated** 70:18 79:17
**stipulations** 79:15
**stock** 38:6,7 43:3,7 46:24 47:1,23 49:4 50:23 103:5
**stocks** 38:4
**stood** 11:23
**stop** 7:22 14:8 24:24 26:18 53:4
**stopped** 13:9
**story** 48:24,25 51:4

**straight** 170:10,12
**straightforward** 76:17
**street** 1:11,14,21 1:24
**stricken** 24:13 72:18
**strictly** 11:3 158:6 158:9 166:12
**strike** 23:23
**striking** 58:14
**stronger** 33:25 36:2 44:2
**struck** 71:2 152:23
**stubborn** 40:11,12
**stuck** 48:23,25
**stuff** 151:25
**subject** 102:23 150:11
**submitted** 24:7,15 27:4 107:1,2 136:21
**subprograms** 102:25
**substantial** 22:2 91:24
**substantive** 55:19 59:19 96:25
**substitute** 65:24
**succeed** 110:16
**succeeded** 102:7,8 121:25 122:2
**success** 160:15 161:4,20 162:5,19 162:24,25 163:3 163:16,23 165:14
**successful** 37:17 94:18
**successfully** 162:1
**sued** 38:13
**suffered** 102:2 121:21
**sufficient** 78:7 86:16 92:8 95:9 100:1 106:6 108:7 120:3 131:12
**suggest** 7:10 12:25

29:11 145:16
155:5 165:10
**suggested** 5:12
43:10 154:13
**suggesting** 36:19
73:10
**suggestion** 34:17
145:9 164:19
**suggests** 34:15,16
36:3 132:17
155:21
**suite** 1:12,21,24
**summaries** 37:4
46:22 48:11 51:11
**summary** 45:20
46:22 47:2,17
48:5,9,15,16
51:14
**supervision** 102:24
**supplied** 156:18
**supposed** 149:11
164:24
**suppression** 99:12
119:13
**supreme** 18:4,6
**sure** 16:11 26:7
27:25 28:6,6
53:25 60:20 65:5
126:12,21 128:16
132:14 133:5,18
144:25 145:19
146:3 150:17
151:2 157:19
160:11 165:8
169:2
**surmise** 170:19
**surprise** 146:23
**surrounding** 90:25
118:14
**survive** 32:19
38:22 51:19
**suspicion** 69:12
74:10
**suspicions** 70:12
**sustained** 72:11,14
**sustaining** 72:15
**swartz** 47:18,21

48:2,7,10,21
**sword** 161:7
**sympathy** 67:12
**system** 65:1 82:6

**T**
**t** 2:8 34:25 38:7
172:1,1
**tabbed** 57:15
**table** 149:5
**take** 52:20 53:25
65:12 80:9 82:22
86:24 122:24
123:2,23 127:25
129:3 136:15
137:22 139:5,21
140:5 144:7 146:1
149:11 153:16
157:8 159:2
**takes** 13:4
**talk** 6:4 27:20
31:16 39:15 44:5
44:19 45:8,9
47:16 48:12 51:2
51:12 60:16,22
131:15 132:24
136:25 137:2
138:7 144:17
145:24 156:10
163:3 164:10
**talked** 39:25 42:2
48:1,10 125:7
156:16 157:22
**talking** 41:1,2,3
42:2 127:21 145:5
**talks** 26:12 36:24
**tarp** 32:3,12,14,16
40:3 41:3,7,10,13
41:15 42:12 44:22
47:14 87:20 88:13
88:16 89:23 91:8
92:20 93:4 94:25
96:23 97:9,18
98:11 99:1 101:4
102:17,20 103:1
103:10 104:8,23
**team** 25:25

**ted** 32:22
**teeing** 16:24
**telegraph** 115:7
**telephone** 66:14
115:7,9 170:22
**television** 113:19
113:22 114:25
115:2,5,8,21
116:3,8,10,14,18
116:23
**tell** 31:15 39:12
51:6 64:23 67:8
132:15 134:14
139:9 155:14
157:4,11
**telling** 40:3 44:14
124:23,24 126:4
**tells** 71:10
**temptation** 134:12
**ten** 41:20 127:23
146:24
**tend** 93:17
**term** 99:9 119:10
**terms** 17:4 140:4
143:20 144:13
151:18
**test** 167:3
**testified** 77:8 78:13
79:23 125:7
**testifies** 73:23
76:24
**testify** 4:5,25 6:19
6:21 7:13 8:3,19
8:20,25 9:1 33:9
62:11,17 75:24
79:24 80:6,11
**testifying** 10:16
76:13 77:2 78:25
**testimony** 3:24
5:19 39:20,24
49:24 62:12,18
67:22 70:15,17
71:1 72:6,8,18,21
75:25 76:4,5,9
77:9,14,14,16
78:1,1,6,10,17,19
79:1,3,5,6,9,11,14

169:17
**text** 66:16
**thank** 14:22 15:16
15:25 16:20 17:13
17:14,15 20:3
23:10,11,16,17
24:1,2,3 25:14,22
27:24 28:7,11,12
30:1,16,19,20,22
31:1 50:5,15
52:18,19 54:4,13
54:14 55:1 56:3
57:16,17 58:12
60:8 62:3,22 84:6
84:7 101:17
123:24 124:10,14
126:19 128:17
133:23,24 134:2
142:22 144:2,16
146:9,10,11 147:4
147:13,16,17
148:4,15 150:5,8
150:17 151:3
159:7 167:1,16,18
167:19 168:9
169:4,8,24,25
170:3 171:13,14
171:17
**thats** 3:25 4:9 5:1
5:20 7:6 8:7,12
9:4,5,9 10:21
11:16 12:21 13:4
18:7,7,16,25
20:15 25:5,13,15
27:4 29:5 34:13
34:15,16 35:4
38:2,8,11,13 40:6
40:11 41:6 43:17
43:25 45:14 47:19
48:19,22 49:21
50:8,8 53:7,10,11
55:1,16 59:20
60:10 61:7,14
62:1 63:17 71:1
97:25 126:7,9,10
126:14,17 127:18
127:22 128:7,10

129:1,11,17
131:12,13,22
132:21 133:1,2,16
135:2 140:3
144:18 146:2
149:8 156:7,13
159:23 160:22
161:6 162:11,14
162:21,21 163:17
163:22 164:5,8,11
164:25 165:21
166:19,23 167:13
168:12,16
**thereof** 85:16 97:24
98:21 104:11,19
**theres** 4:12 31:16
32:1,3,5 45:9 47:6
54:19 57:18 58:5
58:6,8 61:3
127:25 138:25
144:13 149:5
151:11 153:19,20
154:8 160:14
161:7 164:22
**thereto** 159:3
169:15
**theyll** 12:7 169:1
**theyre** 12:8 52:17
144:6 148:10,20
149:10,24 156:4
162:20 166:14
170:20
**theyve** 16:23
162:18
**thick** 169:1
**thing** 4:6 7:21
22:12 38:14 40:11
48:5 59:17 116:21
126:23 127:6
133:14 134:21
139:8 145:4
148:19 152:14
155:3,17 161:6
**things** 26:19 37:11
40:2,11 70:16
76:24 82:3 104:4
114:15 118:2

122:17 134:18
137:9 152:23
158:9 159:3 161:4
161:20 162:2
**think** 3:11,22 4:25
11:4 14:7,15 15:5
15:11 17:7,11
19:19 28:15 30:21
43:6 49:21 54:1
55:14 60:15 61:18
63:5,6 65:14,15
78:11,16 125:19
125:20 126:11
127:14,19 128:22
129:24,25 130:3
131:7,11,23
133:16 136:17,17
144:20 148:9
151:23 153:12
155:10 157:24
158:13,16 160:7
160:19,20,23
161:2,4,5,16,18
161:19,22 162:3
162:14,16,17,21
163:6,14 164:8
165:15 166:6
168:8 171:5
**third** 4:12 18:4,14
18:18 60:6 63:1
88:23 98:16
103:19,22 105:12
106:17 109:10,19
112:15 113:16
114:20 117:15
164:10,13,21
**thirteen** 44:3
**thomas** 78:23 79:6
79:8
**thought** 9:4,9 38:17
39:6 40:20 51:6
61:12 71:17 72:25
127:5 159:23
164:15
**thoughts** 82:23
**thousand** 41:21
**three** 31:8 32:1

33:13 46:4 56:6
57:13 58:20 59:1
59:6 93:4 104:23
113:8 117:5
153:25 158:10
**thumb** 149:2
**thumbing** 149:17
**tied** 14:6
**tight** 54:3
**till** 12:23
**time** 7:1 17:5,11
30:14 38:5 46:6
52:20 53:24 64:23
78:20 82:22 83:11
89:9 94:12 95:10
95:21 100:11
103:21 106:22
118:22 120:13
134:14,18 135:9
138:11 139:20,22
151:11 156:21
169:19 170:18
**times** 40:10 49:3
73:14
**timing** 51:8
**title** 59:2 97:12
**titled** 59:7
**today** 34:25 41:12
67:4 156:20
**todd** 41:19 47:19
**told** 11:19 71:2,12
72:22 107:11
125:19 156:21
**tomorrow** 67:5
105:20 155:10,15
157:10,13 169:22
170:4
**totally** 48:15,16
132:14 147:20
154:11 165:17
**touched** 73:25
**traffic** 123:17,19
**trait** 80:24
**transaction** 36:1
38:18
**transactions** 31:7
31:10 39:3,14

**transcriber** 172:10
**transcript** 3:3
11:25 12:10 16:10
154:9 172:4
**transmission** 57:11
58:3 113:20 115:1
115:15 116:2
**transmits** 114:19
115:4
**transmitted** 113:18
114:5,23 115:20
116:17
**transparency** 47:7
47:7,10,11,12
**transparent** 52:3
**treasury** 32:2,15,17
33:3 34:8,16,21
35:11 37:8 41:15
41:18 44:22 51:22
52:4 102:22 105:5
105:17 107:16,19
107:23 108:7,10
**treat** 72:5 79:18
**treated** 95:25
111:22
**treatment** 46:9
**treats** 143:23
**trial** 1:7 7:2 8:9
12:23 13:1 14:16
15:24 16:7 64:15
65:10,13 66:23
67:21 68:11,14
69:5 70:11 71:16
73:10,16 75:3
77:7 79:16,23
80:1,6 103:3
128:2 135:19
136:16 137:22
**trickery** 88:21
**trickling** 16:11
**tried** 22:3
**trouble** 42:11
97:18
**troubled** 97:21
98:10,14 99:5
102:25 103:4,11
141:8 142:1

**true** 37:6 39:11
48:17 64:20 79:18
125:6 164:25
172:5
**trust** 84:13
**truth** 36:4 37:9
39:9,10,12,13
44:12,15 52:9,9
52:11 99:12,13
102:5 119:13,14
125:19
**truthful** 76:8,16
**try** 15:6,13 90:16
125:24
**trying** 27:7 76:16
85:11 126:1
132:21
**tuesday** 40:17
**turn** 135:9,10
138:12,16 139:3
140:10
**turned** 21:10 37:23
**turns** 134:15
**tv** 144:13
**twitter** 66:22
**two** 13:1 31:5,6
33:8 34:7 35:20
38:16 43:19 45:19
53:3 56:6 57:12
59:6,12 65:7
73:15 77:16 87:24
88:2,12 89:18
90:13 93:2 135:5
153:19,25 163:19
168:4
**type** 61:21 90:15
155:17
**types** 32:1 73:15,18
78:19
**tyson** 63:9,11

————— **U** —————

**u** 1:11
**ultimately** 66:6
**umbrella** 74:15
**unanimous** 66:4
135:21 137:2,13

140:7
**unanimously** 94:15
130:14 141:6,10
141:13,16,18,25
142:3,6,10,13,16
**unavailability** 29:1
**unconstitutional**
21:25
**understand** 11:24
12:5 19:7 24:19
27:6 65:5 132:15
**understanding**
6:16,17 7:5 8:14
8:15 10:20,24
11:12 40:4 76:25
89:20 90:2,15,21
91:5 95:20 127:8
127:11
**understood** 56:23
113:3 128:9 148:2
164:19,22
**underwriter** 45:21
**underwriting**
45:23
**unduly** 138:2
**unfair** 4:10 8:19
146:23
**unfortunately**
34:22
**unidentified** 24:22
24:23 29:22 30:1
101:15 124:2,7,10
148:24 149:7,9,19
149:25 151:2,15
151:21 152:4
154:21,24,25
156:23,24 157:2,3
159:7 160:2
166:19 167:5,15
170:15,23 171:1,4
171:6,11,14
**uniform** 64:24
**unindicted** 84:25
**uniquely** 4:4
**united** 1:1,2,8,10
18:8,16 30:25
32:2 64:24 85:8,9

85:20,21,23 87:20
88:4,9,13,16,17
88:20,25 89:1,7,8
89:22 91:7 92:19
93:3 94:24 96:23
97:4,12 98:5 99:5
102:1 105:6,17
107:15,16,25
111:8,9 118:8
119:4 122:11,23
140:22,23,24
141:4,22 163:21
**unity** 89:5 93:8
**unlawful** 90:5,16
112:17,21
**unquote** 142:18
**unsecured** 48:18
**unspoken** 89:20
**untrue** 100:8,10
106:21,22,24
120:10,12
**upstairs** 152:10
156:16
**use** 31:12 66:13
71:6 73:18 76:20
115:12,12 116:9
116:23 138:13
**uses** 37:5
**utilized** 107:21
108:5
**utilizing** 3:4
**utmost** 143:11

——————
**V**
——————
**v** 18:8 55:14 56:7
56:11,17 58:21
59:1,7 60:7,7
85:25 113:4 114:3
124:18 126:3
140:24,25 142:12
142:15
**vacated** 143:9
**value** 97:23 98:19
104:9,13,18
116:21
**various** 99:10
119:11 163:6

**vegas** 45:25
**vehicles** 102:23
**venture** 91:3
109:25
**verdict** 24:7,13
27:11 28:9 54:11
54:18,25 64:20
65:15 66:3,5,24
67:1 68:5,6,9 70:4
70:7 73:18 77:6
82:10 84:19 85:13
85:14,15 87:1
103:12 104:20,24
128:4,6 129:12
134:20 135:16,18
135:19,21 136:10
136:12,18,18
139:17,17,21
140:2,7,8,11
141:2 142:21
144:13
**veritext** 1:23
**version** 126:14
151:23 152:14
157:15
**versus** 18:17
**vi** 18:1 20:12 22:25
23:1,2,6,8,8,23,24
24:14 25:8 26:7
56:8,18 58:21
59:1,2,7,10 60:7
152:20
**viable** 32:21 33:10
38:21
**victim** 119:6
121:21
**view** 148:21
**views** 137:3 143:23
**vii** 55:10 56:1 58:21
59:1,7 86:1 111:6
112:4,12 117:1,13
141:17 142:14,15
**violated** 23:1
**violates** 21:25
**violating** 85:5
**violation** 56:13
97:1 113:6 117:3

**vision** 52:1
**visit** 66:18
**voice** 36:7
**voices** 30:22
**volume** 149:15
156:19 157:6
**voluminous** 26:23
167:9 169:12
**voluntarily** 91:15
107:7
**vote** 33:13 135:1
137:11,11 139:10
139:19
**voted** 139:14
**votes** 143:20
**vs** 1:4

——————
**W**
——————
**wait** 19:3 128:21,23
153:5
**waiting** 156:5,5,6
**wake** 43:4
**walked** 46:13,17
74:13 156:14
**want** 12:21,22
14:16 19:6 24:6
24:13 25:18,20,21
28:24 30:20 31:1
33:23 34:5,8 36:8
37:9 52:24 54:19
67:7 82:3 125:15
128:21,21 131:18
134:12 138:21
144:8 145:18,20
146:22 148:11
149:20 153:23
156:13 157:19
161:10 170:17
**wanted** 15:8 16:8
18:3 51:18,20
125:15 146:2
164:23
**wanting** 156:10
**wants** 34:21 135:8
161:3
**warmed** 30:23
**warning** 65:1

**washington** 154:15
**wasnt** 5:13 35:2
38:24 39:16 42:22
49:12 53:25 83:15
127:9 162:11
**watch** 134:13
**watching** 144:13
**way** 5:1,6,18,21 6:2
15:21 22:23 29:5
29:17 32:9 39:10
49:13,15 50:20
55:8 59:13 67:19
68:8 70:14 72:21
73:5,10 80:13,19
81:1 82:6 86:4
90:14 110:13,23
116:25 132:23
136:17 138:10
139:14,15 142:23
149:1 150:20
152:7 153:16,20
154:8 160:7
166:11 171:3
**ways** 153:20 161:9
162:13,15
**wealthy** 39:7
**wearing** 74:14
**website** 115:14
**websites** 66:18
**week** 41:2,11
**weighing** 69:21
71:7 77:20
**weight** 71:9 75:5,7
78:10,11,16 79:14
86:9 96:13 137:24
138:4
**went** 12:15 19:15
33:5 50:24 52:4,4
52:5 152:18
**wet** 74:14,14
**weve** 16:11 18:2
26:7 27:7 60:9
127:24 128:1
142:14 144:23
156:21 168:16
**whats** 5:20 8:23 9:8
27:1 31:9 35:23

42:4 44:5 45:16
126:7,9 128:8
131:6 157:12
**whos** 3:9 32:25
41:6,13 42:18,22
**willfully** 105:15
107:5,8 109:12
113:13 119:5
**willing** 20:7
**wire** 25:5 45:3 56:8
56:12 57:11,11
58:3,3 85:25
113:5,19,22
114:20,24 115:2,4
115:5,12,14,17,21
116:2,7,9,13,17
116:23 118:8
119:4 122:11,24
142:12
**wiser** 133:14
**wish** 168:13
**wished** 110:15
**wishes** 139:4
**withdraw** 28:24
**withdrawn** 95:14
95:18
**witness** 2:3 3:20
5:23 6:1 7:2,10,11
12:16 32:22 33:2
72:14 73:22,23,24
76:7,8,10,12,14
76:23 77:2,4,6,6,8
77:12 78:1,2,3,9
78:22 80:9
**witnesses** 4:17,23
13:5,18 32:20
53:3 62:11,16
70:16 75:12,17,18
75:20,24 77:15
78:13,16,22
**witnessing** 77:17
**witnesss** 5:19 76:9
76:25 77:1,9,14
77:16 78:4,10
**wonder** 154:8
**wondering** 148:16
151:16

**wont** 31:20 84:2
101:16 145:24
160:17
**word** 18:7 26:2
27:13,14,15,15
88:2 139:21
151:23 152:14
**wording** 54:9
**words** 93:11 100:18
100:21 109:22
111:20 120:20,23
138:9 145:18
**work** 37:19 47:9,9
47:24 61:9 89:21
91:17 145:17
155:21 157:15,25
**worked** 33:2
**working** 34:17 47:5
147:1
**works** 142:24
**worksheet** 26:1
**worry** 85:16
**worthy** 76:8 78:3
**wouldn** 34:25
**wouldnt** 7:3 9:12
149:9 155:9,14
164:16
**write** 40:18 85:11
129:9 131:24
139:3,9 140:8
149:20
**writing** 16:8 35:6
36:25 40:21 85:17
113:18,21 114:24
115:1 135:7
**written** 64:22
89:25 100:21
106:9 120:23
138:10
**wrong** 23:3,4,4,5
137:8
**wrote** 77:7

**X**

**x** 2:1,8

**Y**

**yeah** 11:16 24:6,25

25:22 28:17 55:25
58:10 63:9,15
170:17
**yesterday** 16:4,22
17:23 30:13
**youll** 6:13 59:7
61:21 65:5 128:23
**youre** 40:14 43:18
52:15 53:9 76:16
132:18 145:19
147:22 158:5
169:9
**youtube** 66:21
**youve** 5:12 43:13
46:15 50:23 52:7
53:12 65:9 74:9
83:19 169:11,13

**Z**

**0**

**00** 26:22 55:17
146:12 153:18
157:17
**000** 42:5
**02** 167:24
**04** 1:5
**06** 168:11
**08** 84:8

**1**

**1** 37:2 40:24 82:24
84:7,8 97:24
98:21 104:11,15
104:19 147:25
150:13 154:4
160:14 164:3
**10** 1:5 23:19 41:4
46:12 128:1 148:1
**102** 41:9
**1031** 97:11
**104** 20:7,18
**10th** 1:14 34:17
**11** 26:22 54:15,15
55:17 147:21
157:17
**12** 54:1 60:24 82:24
84:8 142:24 143:1

143:6 156:5
**123** 1:21
**1250** 1:12
**12505** 1:18
**13** 32:18 33:11
36:23 41:13 51:24
**134** 41:24
**14** 1:7 54:15
**14cr00548cdj** 1:2
**15** 34:14,19,21 35:2
38:20 46:12 60:24
82:24 84:7 134:15
169:23 170:21
**15th** 141:15 142:10
**16** 123:25
**17** 84:8
**171** 48:3
**178** 51:3,10,12
**18** 97:12
**1800** 1:24
**1801** 1:24
**18887776690** 1:25
**19** 13:5,13,17 48:4
61:7 62:9
**19103** 1:24
**19106** 1:12
**19107** 1:15
**19109** 1:22
**1962** 18:8

**2**

**2** 1:2 36:18 40:23
123:25,25 147:21
167:22 172:19
**20** 1:3 54:15 148:1
**2000** 1:14
**2008** 97:22 98:15
**2009** 20:12 51:15
87:17 95:5 114:5
141:5,9,12,16,18
141:24 142:2,6,10
142:12,16
**2010** 37:13 87:17
95:6 141:6,9,18
141:24 142:3,16
**2016** 1:3 148:1
172:19

**20854** 1:18
**21st** 19:17,18 20:22
21:1,17 114:5
142:12
**229** 18:17 19:1
**22nd** 19:17 20:12
21:16 22:7,9
**24** 41:16
**25** 153:11 168:11
**250** 42:5
**2500** 1:21
**26** 169:5
**27** 123:25
**29** 16:13,16 23:19
23:24
**29th** 35:8

**3**

**3** 146:12 147:21
148:1 153:11,15
153:18 158:3,3
160:10,10 167:24
**30** 48:16 152:24
153:15,18 156:20
157:8 158:22
169:5,11
**30th** 35:20 46:11
141:12 142:6
**31** 158:3
**32** 1:5 158:3 171:18
**38** 59:20,22 160:10
**39a** 35:5
**3d** 18:17

**4**

**4** 1:5 153:18 156:20
157:8 158:22
167:24 168:11,11
169:5,5,11 171:18
**40** 160:10

**5**

**5** 32:18 33:11,23
34:2 35:3,10,15
35:18,19,21,25
41:5,12,13 44:15
44:17,23 47:22
124:25

**506** 18:17
**51** 24:24
**52** 35:17
**53** 13:9
**58** 147:21 167:24

**6**

**615** 1:11
**63** 36:14
**64** 36:14
**6th** 1:18

**7**

**7** 41:4 124:21

**8**

**8** 124:24
**81** 36:18

**9**

**9** 169:23
**92** 127:25
**97** 24:18
**98** 40:23

Page 1

```
 1                  UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF PENNSYLVANIA
 2
    UNITED STATES OF AMERICA,     )
 3                                )
                 Plaintiff,       )  2:14-cr-00548-CDJ-1
 4                                )
                 vs.              )  Philadelphia, PA
 5                                )  April 21, 2016
    HARTLINE, ET AL.,             )
 6                                )
                 Defendants.      )  11:21 a.m.-3:39 p.m.
 7
 8                     TRANSCRIPT OF JURY TRIAL
            BEFORE THE HONORABLE C. DARNELL JONES, II
 9                  UNITED STATES DISTRICT JUDGE
10  APPEARANCES:
11  For the Plaintiff:        DAVID J. IGNALL, ESQ.
                              JENNIFER CHUN BARRY, ESQ.
12                            U.S. Attorney's Office
                              615 Chestnut Street
13                            Suite 1250
                              Philadelphia, PA 19106
14
    For the Defendant:        PATRICK EGAN, ESQ.
15                            Fox Rothschild LLP
                              2000 Market Street
16                            10th Floor
                              Philadelphia, PA 19107
17
    For Barry Bekkedam:       RUSSELL D. DUNCAN, ESQ.
18                            Shulman Rogers Gandal Pordy
                              Ecker
19                            12505 Park Potomac Avenue
                              Potomac, MD 20854
20
21
22
              Veritext National Court Reporting Company
23                     Mid-Atlantic Region
               1801 Market Street - Suite 1800
24                  Philadelphia, PA 19103
                       1-888-777-6690
25
```

1                P R O C E E D I N G S

2                THE COURT:  All right, counsel, I am in

3    receipt of a communication from the foreperson of the

4    jury.  It is dated April 21st, 2016, 10:48 a.m.  It

5    reads as follows, "Judge Jones, we would like to see

6    all of the videos of Brian Hartline from the

7    April 2012 deposition that were entered into evidence.

8    Also, G-40 and G-140.  Thank you."  Signed, the

9    foreperson.

10                MR. IGNALL:  I'm sorry, Your Honor, was

11    it Defense-40?

12                THE COURT:  G, Government.

13                MR. IGNALL:  G as in Government, okay.

14                THE COURT:  40 and 140.

15        (Pause)

16                MS. BARRY:  Your Honor?

17                THE COURT:  Yes, ma'am.

18                MS. BARRY:  We forgot to bring the

19    trial laptop.

20                MR. IGNALL:  I'll send someone back to

21    the office right now in case we need it.

22                MS. BARRY:  Yes.

23                MR. IGNALL:  Okay.

24                THE COURT:  So the video is not

25    playable or it is playable?

1              MR. IGNALL:  The video is playable.

2    It's on the computer that is sitting in my office.  I

3    forgot to bring it over with me.

4              THE COURT:  I'm sorry.  I got you.

5              MR. IGNALL:  So I will send someone

6    over in case we need it.

7              THE COURT:  All right.  And, counsel,

8    discuss whether if it's on video if it would be

9    audible enough for the -- Ms. El-Shabazz to take it

10   back in the jury room and play it back there, or in

11   the alternative, have it put on the screen here.  And

12   if that's the case, I'm going to lock the doors so

13   that the jury won't be distracted by anyone walking in

14   and walking out while they view that.

15             MR. IGNALL:  That probably makes more

16   sense.  Let me get the computer so we have that

17   option.

18             THE COURT:  Sure, sure.

19             MR. IGNALL:  Do you want to run back?

20        (Pause)

21             THE COURT:  All right, counsel.  The

22   last communication will be marked Jury Inquiry #3.

23   I'll hear from you.

24             MR. IGNALL:  Your Honor, I think we

25   have an agreement as to 40 and 140 going back.

1              THE COURT:  All right.

2              MR. IGNALL:  I have a request to make

3    that I'm not sure that counsel will agree with, but

4    there is also a 40A, a 40B, and a 40C.  I agree with

5    counsel that the note did not ask for that so I don't

6    think we should presume to send it back.  I would just

7    like to clarify and make sure they were not seeking

8    all of the 40s because I think it's slightly

9    ambiguous.  So I would propose something that the

10   response is that we've attached 40 and 140, if you

11   were also seeking 40A, B, and C, please respond.  And

12   then that would clarify if that's what they were

13   looking for or if they only wanted Exhibit 40.

14             MR. EGAN:  And I would oppose that

15   (indiscernible).

16             THE COURT:  Excuse me.

17             MR. DUNCAN:  We would object to that as

18   well, Your Honor.

19             THE COURT:  All right.  Refreshingly

20   surprising, they ask for what they wanted with

21   specificity by asking for 40 and then separately 140,

22   which demonstrates that they were taking copious

23   notes, or somebody was.  If they want to see the other

24   ones, I'm confident they'll ask for them.

25             MR. IGNALL:  Okay.  Unlike other

1  exhibits, there would be A, B, and C is my concern.  I

2  understand.

3              THE COURT:  I understand.  But I know

4  certainly that the testimony was such that it spoke in

5  terms of the single e-mail as well as the string.  So

6  these folks, I'm sure, are competent enough if they

7  want to see the string, which concluded everything,

8  they'll ask for it.

9              MR. IGNALL:  All right.

10              THE COURT:  All right.  So I'll give

11  them exactly what they asked for.

12              MR. IGNALL:  Thank you.

13              THE COURT:  All right.  Now, the video

14  deposition.

15              MR. IGNALL:  The deposition.  I think

16  if they've asked to play it, we play it.  We should

17  play it -- I think it probably makes the most sense to

18  play it in Court.

19              THE COURT:  Fine.  Any objection?

20              MR. EGAN:  Your Honor, no, I just want

21  to make sure we've got the exact right parts that were

22  played.  So I'm working on that right now.

23              THE COURT:  Go ahead.

24              MR. DUNCAN:  And are we going to play

25  it in open Court with counsel here?  Is that the --

```
 1               THE COURT:  Well, that's what he just
 2     asked.  Of course, it's fine with me.
 3               MR. IGNALL:  I meant as opposed to
 4     taking the laptop back but --
 5               THE COURT:  Yeah, that's fine with me.
 6               MR. DUNCAN:  Yeah, okay.
 7               THE COURT:  We'll just lock the doors
 8     so that no one will be distracted and we'll go ahead.
 9     We'll just go ahead and decide exactly what it is
10     that's going to be demonstrated.
11               MR. IGNALL:  Patrick, do you want -- it
12     might make sense just to look --
13               MR. EGAN:  Yeah, I didn't realize it
14     was here yet.  I was going through the transcript.
15               MR. IGNALL:  Do you just want to play
16     it on the screens so we can all see it and agree?
17               UNIDENTIFIED SPEAKER:  (Indiscernible).
18               MR. EGAN:  Right.  Sure.
19               MR. IGNALL:  Why don't we play it now
20     and just make sure we're all on the same page?
21               THE COURT:  That's fine with me.
22               MR. DUNCAN:  Your Honor, it's my --
23               THE COURT:  Yes, sir.
24               MR. DUNCAN:  This is Mr. Duncan on
25     behalf of the defendant.  It was my memory that you
```

                                                            Page 7

1    read a curative instruction with respect to the video
2    at the time that it was played limiting it to -- just
3    to be considered against --
4                   THE COURT:  Mr. Hartline?
5                   MR. DUNCAN:  -- the co-defendants.
6    Would the Court plan to do that again?
7                   THE COURT:  Counsel?
8                   MR. EGAN:  I think it unfairly
9    highlights Mr. Hartline's role in the case and has
10   been read already and to highlight it at this point
11   without anybody to ask for it would be improper.
12                  MR. DUNCAN:  I was just asking the
13   question and I'll defer to Mr. Egan.
14                  MR. IGNALL:  I'll defer to Mr. Egan on
15   that as well, Your Honor.
16                  MR. DUNCAN:  Again, per the Court.
17                  THE COURT:  Thank you.  Counsel, again,
18   in terms of your request, I'm confident the jury asked
19   for what they wanted to hear and they know the
20   difference.
21                  MR. EGAN:  Your Honor, we may have some
22   technical issues to deal with.
23                  THE COURT:  All right.
24        (Pause)
25        (Deposition watched by counsel)

```
                                            Page 8
```

1          UNIDENTIFIED SPEAKER:  The file is

2    mislabeled, but it is cut down.

3       (Deposition watched by counsel)

4          MR. IGNALL:  I think we're in

5    agreement, Your Honor.

6          MR. EGAN:  That is the video as Your

7    Honor ruled.

8          THE COURT:  All right.  Now, we will

9    bring them out and let them observe it.  Is there any

10   way to increase the volume?  No, that's it?

11         UNIDENTIFIED SPEAKER:  Maybe put the

12   mikes by the speaker on the T.V.

13         THE COURT:  Could we try that?

14         UNIDENTIFIED SPEAKER:  We could try

15   that.

16      (Deposition watched by counsel)

17         UNIDENTIFIED SPEAKER:  It's coming out

18   of here, Pat.

19         MR. EGAN:  No, no, no.  That --

20         UNIDENTIFIED SPEAKER:  No, I have

21   (indiscernible).  We're not playing that.

22         MR. EGAN:  That clip was not included

23   in what we just reviewed.

24         UNIDENTIFIED SPEAKER:  Wait a minute,

25   the (indiscernible)?

Page 9

1                    UNIDENTIFIED SPEAKER:  Just the four
2      that we played are the ones that (indiscernible).
3                    UNIDENTIFIED SPEAKER:  So we're not
4      going (indiscernible).
5                    UNIDENTIFIED SPEAKER:  We didn't just
6      cover that.
7                    UNIDENTIFIED SPEAKER:  We didn't.  I
8      think (indiscernible).
9                    UNIDENTIFIED SPEAKER:  I'm going to
10     pull it up on your screen here.
11                   UNIDENTIFIED SPEAKER:  Making it in.
12     Yeah, definitely.
13                   UNIDENTIFIED SPEAKER:  Yeah, I think
14     that's it because we have -- yes, that was in because
15     I argued 2 to 3 percent.
16                   MR. EGAN:  You also argued his salary,
17     which wasn't on this.  So I'm not taking that as a
18     basis.
19                   UNIDENTIFIED SPEAKER:  Well, it was,
20     but --
21                   MR. EGAN:  Your Honor, this is a clip
22     that was not played just a minute ago that is now
23     being played that I don't recall whether Your Honor
24     allowed or not having to do with Mr. Hart's percentage
25     of ownership of the bank.

1                      MR. IGNALL:  We did play that because

2     I --

3                      THE COURT:  Honestly, I don't recall

4     what was played.

5                      MR. EGAN:  Well, we argued this and

6     there was a ruling from the Court.  Your Honor, we

7     have the transcripts if you could hold one second.

8          (Pause)

9                      THE COURT:  All right.  Everybody set

10    now?

11                     MR. IGNALL:  Yeah.  And what I proposed

12    to Agent Boyer, just to be super duper extra safe,

13    it's going to take a minute or two extra is we can

14    pull up the transcript on counsel's screen before we

15    play it for the jury so we can just make sure

16    everyone's okay before we hit play and turn on the

17    jury monitors.  So we know the second we're about to

18    play just belt, suspenders, rope, whatever.

19                     MR. EGAN:  Good idea.

20                     THE COURT:  All right.  Everybody in

21    agreement?

22                     UNIDENTIFIED SPEAKER:  Yes, sir.

23                     THE COURT:  All right.  We can bring

24    the jury out.

25         (Jury enters)

1              THE CLERK:  All rise.  Court is now in

2    session.  The Honorable C. Darnell Jones II presiding.

3              THE COURT:  Good morning.  You may be

4    seated, thank you.  The Court is in receipt of the

5    communication from the jury, via the foreperson, dated

6    April 21st, 2016 10:48 a.m., which reads in pertinent

7    part as follows.  "We would like to see all videos of

8    Brian Hartline from the 4/2012 deposition that were

9    entered into evidence, also G-40 and G-140."  Signed

10   by the foreperson.

11             We will show you the video which you

12   requested at this time and we will also send out to

13   you, pursuant to your request, G-40 and G-140 at its

14   conclusion.  All right, you may proceed.

15             MR. IGNALL:  All right.  I think we're

16   okay to play this one right now.

17             MR. EGAN:  Yes, Your Honor.

18             MR. IGNALL:  The first one -- okay.

19        (Deposition played for jury)

20             MR. IGNALL:  Are we in agreement on the

21   next one?

22             MR. EGAN:  Yes.

23             MR. IGNALL:  All right.  Play the next

24   one.

25        (Deposition played for the jury)

1                    MR. IGNALL:  Are we in agreement on

2      this one, counsel?

3                    MR. EGAN:  Yes.

4                    MR. IGNALL:  All right.

5          (Deposition played for the jury)

6                    MR. IGNALL:  Your Honor, I think we're

7      in agreement as to the next clip.

8                    MR. EGAN:  Yes.

9                    THE COURT:  All right.

10         (Deposition played for the jury)

11                   MR. IGNALL:  I believe that's the last

12     clip, Your Honor.

13                   MR. EGAN:  That is correct, Your Honor.

14                   THE COURT:  All right.  And we will

15     give the jury, per their request, 140 and 40.

16                   MR. IGNALL:  May I confer with counsel

17     for one moment, Your Honor?

18                   THE COURT:  Yes, sir.

19         (Pause)

20                   MR. DUNCAN:  We're satisfied, Your

21     Honor.

22                   THE COURT:  All right.

23                   MR. IGNALL:  Your Honor, may I hand

24     these to Ms. El-Shabazz?

25                   THE COURT:  Yes.

```
                                            Page 13

 1                  MR. IGNALL:  Okay.  Thank you.

 2                  THE COURT:  All right, you may continue

 3     your deliberations.  Thank you.

 4                  THE CLERK:  All rise.

 5         (Jury exits)

 6                  THE COURT:  All right.  Thank you.

 7                  MR. DUNCAN:  What time will they have

 8     lunch, Your Honor?

 9                  THE COURT:  What time was lunch

10     ordered?

11                  THE CLERK:  I'm sorry, Judge?

12                  THE COURT:  Lunch.  What time --

13                  THE CLERK:  12:30.

14                  THE COURT:  12:30.

15                  MR. DUNCAN:  Thank you, Your Honor.

16     We'll be safe for about an hour between 12:30 and 1:30

17     then?

18                  THE COURT:  Yes, sir.

19                  MR. DUNCAN:  We'll be by phone, but

20     just not --

21                  THE COURT:  Yes, sir.

22                  MR. DUNCAN:  Thank you, Your Honor.

23         (Recessed at 12:08 p.m.; reconvened at 3:25 p.m.)

24                  THE CLERK:  This is Jury Inquiry #4.

25     Jury Inquiry #4 reads "Judge Jones, may we see
```

Page 14

1   Government Exhibits 34, 63, 64, and 77?"  Signed by
2   the foreperson.  Counsel, you need to confer and
3   decide whether or not you have an agreement with
4   respect to sending those out to the jury.
5        (Pause)
6                THE CLERK:  (Indiscernible) there's a
7   dispute with respect to whether or not it should be
8   redacted?
9                MR. IGNALL:  My understanding of the
10  local rule is anything that is publicly filed that
11  shows personally identifiable information for anyone
12  needs to be redacted.  So generally that's just the
13  ECF filings, but we've interpreted that to mean
14  anything we show on a screen that the audience could
15  see has to be redacted.
16               THE CLERK:  Was it redacted when it was
17  shown to the --
18       (Chorus of yes)
19               THE CLERK:  And the copy that you have
20  here is not redacted?
21               MR. IGNALL:  Correct.
22               UNIDENTIFIED SPEAKER:  And the thing
23  that's not redacted is George Levin's address and
24  social security number.
25               THE CLERK:  Is there a way that it can

Page 15

1   be redacted?

2                   MR. IGNALL:  We could try.

3                   THE CLERK:  The parties agree that

4   it --

5        (Pause)

6                   THE CLERK:  Is there an agreement as to

7   the other two?  Is this the only one that's --

8                   MR. IGNALL:  Yeah.  And I think we're

9   going to have an agreement to all four.

10                  UNIDENTIFIED SPEAKER:  I think there

11  are two that are redacted and two that are not.

12                  MR. IGNALL:  I think we're just going

13  to figure out a way to print out the redacted version

14  and then we'll be in agreement.

15       (Pause)

16                  MR. IGNALL:  We've got them ready.

17                  THE CLERK:  And there is an agreement.

18                  MR. IGNALL:  We have an agreement.

19                  THE CLERK:  All parties?

20       (Chorus of yes)

21                  THE CLERK:  All right.  Is there any

22  problem with this being handed to them at this point?

23       (Chorus of no)

24                  MR. IGNALL:  All right.  Thank you.

25       (Proceedings concluded at 3:39 p.m.)

Page 16

CERTIFICATION

        I, Jamie Gallagher, certify that the
foregoing is a correct transcript from the official
electronic sound recording of the proceedings in the
above-entitled matter.

Dated:  May 25, 2016

**[00548 - difference]**                                     Page 1

**0**

**00548**  1:3

**1**

**1**  1:3
**1-888-777-6690**  1:24
**10:48**  2:4 11:6
**10th**  1:16
**11:21**  1:6
**1250**  1:13
**12505**  1:19
**12:08**  13:23
**12:30**  13:13,14,16
**140**  2:8,14 3:25 4:10
  4:21 11:9,13 12:15
**1800**  1:23
**1801**  1:23
**19103**  1:24
**19106**  1:13
**19107**  1:16

**2**

**2**  9:15
**2000**  1:15
**2012**  2:7
**2016**  1:5 2:4 11:6
  16:7
**20854**  1:19
**21**  1:5
**21st**  2:4 11:6
**25**  16:7
**2:14**  1:3

**3**

**3**  3:22 9:15
**34**  14:1
**3:25**  13:23
**3:39**  1:6 15:25

**4**

**4**  13:24,25
**4/2012**  11:8
**40**  2:8,11,14 3:25
  4:10,13,21 11:9,13
  12:15
**40a**  4:4,11

**40b**  4:4
**40c**  4:4
**40s**  4:8

**6**

**615**  1:12
**63**  14:1
**64**  14:1

**7**

**77**  14:1

**a**

**a.m.**  1:6 2:4 11:6
**address**  14:23
**agent**  10:12
**ago**  9:22
**agree**  4:3,4 6:16
  15:3
**agreement**  3:25 8:5
  10:21 11:20 12:1,7
  14:3 15:6,9,14,17
  15:18
**ahead**  5:23 6:8,9
**al**  1:5
**allowed**  9:24
**alternative**  3:11
**ambiguous**  4:9
**america**  1:2
**anybody**  7:11
**appearances**  1:10
**april**  1:5 2:4,7 11:6
**argued**  9:15,16 10:5
**asked**  5:11,16 6:2
  7:18
**asking**  4:21 7:12
**atlantic**  1:23
**attached**  4:10
**attorney's**  1:12
**audible**  3:9
**audience**  14:14
**avenue**  1:19

**b**

**b**  4:11 5:1
**back**  2:20 3:10,10
  3:19,25 4:6 6:4

**bank**  9:25
**barry**  1:11,17 2:16
  2:18,22
**basis**  9:18
**behalf**  6:25
**bekkedam**  1:17
**believe**  12:11
**belt**  10:18
**boyer**  10:12
**brian**  2:6 11:8
**bring**  2:18 3:3 8:9
  10:23

**c**

**c**  1:8 2:1 4:11 5:1
  11:2
**case**  2:21 3:6,12 7:9
**cdj**  1:3
**certainly**  5:4
**certification**  16:1
**certify**  16:3
**chestnut**  1:12
**chorus**  14:18 15:20
  15:23
**chun**  1:11
**clarify**  4:7,12
**clerk**  11:1 13:4,11
  13:13,24 14:6,16,19
  14:25 15:3,6,17,19
  15:21
**clip**  8:22 9:21 12:7
  12:12
**coming**  8:17
**communication**  2:3
  3:22 11:5
**company**  1:22
**competent**  5:6
**computer**  3:2,16
**concern**  5:1
**concluded**  5:7 15:25
**conclusion**  11:14
**confer**  12:16 14:2
**confident**  4:24 7:18
**considered**  7:3

**continue**  13:2
**copious**  4:22
**copy**  14:19
**correct**  12:13 14:21
  16:4
**counsel**  2:2 3:7,21
  4:3,5 5:25 7:7,17,25
  8:3,16 12:2,16 14:2
**counsel's**  10:14
**course**  6:2
**court**  1:1,22 2:2,12
  2:14,17,24 3:4,7,18
  3:21 4:1,16,19 5:3
  5:10,13,18,19,23,25
  6:1,5,7,21,23 7:4,6
  7:7,16,17,23 8:8,13
  10:3,6,9,20,23 11:1
  11:3,4 12:9,14,18
  12:22,25 13:2,6,9
  13:12,14,18,21
**cover**  9:6
**cr**  1:3
**curative**  7:1
**cut**  8:2

**d**

**d**  1:17 2:1
**darnell**  1:8 11:2
**dated**  2:4 11:5 16:7
**david**  1:11
**deal**  7:22
**decide**  6:9 14:3
**defendant**  1:14 6:25
**defendants**  1:6 7:5
**defense**  2:11
**defer**  7:13,14
**definitely**  9:12
**deliberations**  13:3
**demonstrated**  6:10
**demonstrates**  4:22
**deposition**  2:7 5:14
  5:15 7:25 8:3,16
  11:8,19,25 12:5,10
**difference**  7:20

| | | | |
|---|---|---|---|
| **discuss** 3:8 | **first** 11:18 | **honorable** 1:8 11:2 | **l** |
| **dispute** 14:7 | **floor** 1:16 | **hour** 13:16 | **laptop** 2:19 6:4 |
| **distracted** 3:13 6:8 | **folks** 5:6 | **i** | **levin's** 14:23 |
| **district** 1:1,1,9 | **follows** 2:5 11:7 | | **limiting** 7:2 |
| **doors** 3:12 6:7 | **foregoing** 16:4 | **idea** 10:19 | **llp** 1:15 |
| **duncan** 1:17 4:17 | **foreperson** 2:3,9 | **identifiable** 14:11 | **local** 14:10 |
| 5:24 6:6,22,24,24 | 11:5,10 14:2 | **ignall** 1:11 2:10,13 | **lock** 3:12 6:7 |
| 7:5,12,16 12:20 | **forgot** 2:18 3:3 | 2:20,23 3:1,5,15,19 | **look** 6:12 |
| 13:7,15,19,22 | **four** 9:1 15:9 | 3:24 4:2,25 5:9,12 | **looking** 4:13 |
| **duper** 10:12 | **fox** 1:15 | 5:15 6:3,11,15,19 | **lunch** 13:8,9,12 |
| **e** | **g** | 7:14 8:4 10:1,11 | **m** |
| | | 11:15,18,20,23 12:1 | |
| **e** 2:1,1 5:5 | **g** 2:1,8,8,12,13 11:9 | 12:4,6,11,16,23 | **ma'am** 2:17 |
| **eastern** 1:1 | 11:9,13,13 | 13:1 14:9,21 15:2,8 | **mail** 5:5 |
| **ecf** 14:13 | **gallagher** 16:3 | 15:12,16,18,24 | **making** 9:11 |
| **ecker** 1:18 | **gandal** 1:18 | **ii** 1:8 11:2 | **marked** 3:22 |
| **egan** 1:14 4:14 5:20 | **generally** 14:12 | **improper** 7:11 | **market** 1:15,23 |
| 6:13,18 7:8,13,14 | **george** 14:23 | **included** 8:22 | **matter** 16:6 |
| 7:21 8:6,19,22 9:16 | **give** 5:10 12:15 | **increase** 8:10 | **md** 1:19 |
| 9:21 10:5,19 11:17 | **go** 5:23 6:8,9 | **indiscernible** 4:15 | **mean** 14:13 |
| 11:22 12:3,8,13 | **going** 3:12,25 5:24 | 6:17 8:21,25 9:2,4,8 | **meant** 6:3 |
| **el** 3:9 12:24 | 6:10,14 9:4,9 10:13 | 14:6 | **memory** 6:25 |
| **electronic** 16:5 | 15:9,12 | **information** 14:11 | **mid** 1:23 |
| **entered** 2:7 11:9 | **good** 10:19 11:3 | **inquiry** 3:22 13:24 | **mikes** 8:12 |
| **enters** 10:25 | **government** 2:12,13 | 13:25 | **minute** 8:24 9:22 |
| **entitled** 16:6 | 14:1 | **instruction** 7:1 | 10:13 |
| **esq** 1:11,11,14,17 | **h** | **interpreted** 14:13 | **mislabeled** 8:2 |
| **et** 1:5 | | **issues** 7:22 | **moment** 12:17 |
| **everybody** 10:9,20 | **hand** 12:23 | **j** | **monitors** 10:17 |
| **everyone's** 10:16 | **handed** 15:22 | | **morning** 11:3 |
| **evidence** 2:7 11:9 | **hart's** 9:24 | **j** 1:11 | **n** |
| **exact** 5:21 | **hartline** 1:5 2:6 7:4 | **jamie** 16:3 | |
| **exactly** 5:11 6:9 | 11:8 | **jennifer** 1:11 | **n** 2:1 |
| **excuse** 4:16 | **hartline's** 7:9 | **jones** 1:8 2:5 11:2 | **national** 1:22 |
| **exhibit** 4:13 | **hear** 3:23 7:19 | 13:25 | **need** 2:21 3:6 14:2 |
| **exhibits** 5:1 14:1 | **highlight** 7:10 | **judge** 1:9 2:5 13:11 | **needs** 14:12 |
| **exits** 13:5 | **highlights** 7:9 | 13:25 | **note** 4:5 |
| **extra** 10:12,13 | **hit** 10:16 | **jury** 1:8 2:4 3:10,13 | **notes** 4:23 |
| **f** | **hold** 10:7 | 3:22 7:18 10:15,17 | **number** 14:24 |
| | **honestly** 10:3 | 10:24,25 11:5,19,25 | **o** |
| **figure** 15:13 | **honor** 2:10,16 3:24 | 12:5,10,15 13:5,24 | |
| **file** 8:1 | 4:18 5:20 6:22 7:15 | 13:25 14:4 | **o** 2:1 |
| **filed** 14:10 | 7:21 8:5,7 9:21,23 | **k** | **object** 4:17 |
| **filings** 14:13 | 10:6 11:17 12:6,12 | | **objection** 5:19 |
| **fine** 5:19 6:2,5,21 | 12:13,17,21,23 13:8 | **know** 5:3 7:19 10:17 | **observe** 8:9 |
| | 13:15,22 | | |

**[office - think]**                                                                 Page 3

**office**  1:12 2:21 3:2
**official**  16:4
**okay**  2:13,23 4:25
  6:6 10:16 11:16,18
  13:1
**ones**  4:24 9:2
**open**  5:25
**oppose**  4:14
**opposed**  6:3
**option**  3:17
**ordered**  13:10
**ownership**  9:25

**p**

**p**  2:1
**p.m.**  1:6 13:23,23
  15:25
**pa**  1:4,13,16,24
**page**  6:20
**park**  1:19
**part**  11:7
**parties**  15:3,19
**parts**  5:21
**pat**  8:18
**patrick**  1:14 6:11
**pause**  2:15 3:20
  7:24 10:8 12:19
  14:5 15:5,15
**pennsylvania**  1:1
**percent**  9:15
**percentage**  9:24
**personally**  14:11
**pertinent**  11:6
**philadelphia**  1:4,13
  1:16,24
**phone**  13:19
**plaintiff**  1:3,11
**plan**  7:6
**play**  3:10 5:16,16,17
  5:18,24 6:15,19
  10:1,15,16,18 11:16
  11:23
**playable**  2:25,25 3:1
**played**  5:22 7:2 9:2
  9:22,23 10:4 11:19

11:25 12:5,10
**playing**  8:21
**please**  4:11
**point**  7:10 15:22
**pordy**  1:18
**potomac**  1:19,19
**presiding**  11:2
**presume**  4:6
**print**  15:13
**probably**  3:15 5:17
**problem**  15:22
**proceed**  11:14
**proceedings**  15:25
  16:5
**propose**  4:9
**proposed**  10:11
**publicly**  14:10
**pull**  9:10 10:14
**pursuant**  11:13
**put**  3:11 8:11

**q**

**question**  7:13

**r**

**r**  2:1
**read**  7:1,10
**reads**  2:5 11:6 13:25
**ready**  15:16
**realize**  6:13
**recall**  9:23 10:3
**receipt**  2:3 11:4
**recessed**  13:23
**reconvened**  13:23
**recording**  16:5
**redacted**  14:8,12,15
  14:16,20,23 15:1,11
  15:13
**refreshingly**  4:19
**region**  1:23
**reporting**  1:22
**request**  4:2 7:18
  11:13 12:15
**requested**  11:12
**respect**  7:1 14:4,7

**respond**  4:11
**response**  4:10
**reviewed**  8:23
**right**  2:2,21 3:7,21
  4:1,19 5:9,10,13,21
  5:22 6:18 7:23 8:8
  10:9,20,23 11:14,15
  11:16,23 12:4,9,14
  12:22 13:2,6 15:21
  15:24
**rise**  11:1 13:4
**rogers**  1:18
**role**  7:9
**room**  3:10
**rope**  10:18
**rothschild**  1:15
**rule**  14:10
**ruled**  8:7
**ruling**  10:6
**run**  3:19
**russell**  1:17

**s**

**s**  2:1
**safe**  10:12 13:16
**salary**  9:16
**satisfied**  12:20
**screen**  3:11 9:10
  10:14 14:14
**screens**  6:16
**seated**  11:4
**second**  10:7,17
**security**  14:24
**see**  2:5 4:23 5:7 6:16
  11:7 13:25 14:15
**seeking**  4:7,11
**send**  2:20 3:5 4:6
  11:12
**sending**  14:4
**sense**  3:16 5:17 6:12
**separately**  4:21
**session**  11:2
**set**  10:9
**shabazz**  3:9 12:24

**show**  11:11 14:14
**shown**  14:17
**shows**  14:11
**shulman**  1:18
**signed**  2:8 11:9 14:1
**single**  5:5
**sir**  6:23 10:22 12:18
  13:18,21
**sitting**  3:2
**slightly**  4:8
**social**  14:24
**somebody**  4:23
**sorry**  2:10 3:4 13:11
**sound**  16:5
**speaker**  6:17 8:1,11
  8:12,14,17,20,24
  9:1,3,5,7,9,11,13,19
  10:22 14:22 15:10
**specificity**  4:21
**spoke**  5:4
**states**  1:1,2,9
**street**  1:12,15,23
**string**  5:5,7
**suite**  1:13,23
**super**  10:12
**sure**  3:18,18 4:3,7
  5:6,21 6:18,20
  10:15
**surprising**  4:20
**suspenders**  10:18

**t**

**t.v.**  8:12
**take**  3:9 10:13
**technical**  7:22
**terms**  5:5 7:18
**testimony**  5:4
**thank**  2:8 5:12 7:17
  11:4 13:1,3,6,15,22
  15:24
**thing**  14:22
**think**  3:24 4:6,8
  5:15,17 7:8 8:4 9:8
  9:13 11:15 12:6
  15:8,10,12

| | |
|---|---|
| **time**   7:2 11:12 13:7<br>   13:9,12 | **y** |
| **transcript**   1:8 6:14<br>   10:14 16:4 | **yeah**   6:5,6,13 9:12<br>   9:13 10:11 15:8 |
| **transcripts**   10:7 | |
| **trial**   1:8 2:19 | |
| **try**   8:13,14 15:2 | |
| **turn**   10:16 | |
| **two**   10:13 15:7,11<br>   15:11 | |
| **u** | |
| **u.s.**   1:12 | |
| **understand**   5:2,3 | |
| **understanding**   14:9 | |
| **unfairly**   7:8 | |
| **unidentified**   6:17<br>   8:1,11,14,17,20,24<br>   9:1,3,5,7,9,11,13,19<br>   10:22 14:22 15:10 | |
| **united**   1:1,2,9 | |
| **v** | |
| **veritext**   1:22 | |
| **version**   15:13 | |
| **video**   2:24 3:1,8<br>   5:13 7:1 8:6 11:11 | |
| **videos**   2:6 11:7 | |
| **view**   3:14 | |
| **volume**   8:10 | |
| **vs**   1:4 | |
| **w** | |
| **wait**   8:24 | |
| **walking**   3:13,14 | |
| **want**   3:19 4:23 5:7<br>   5:20 6:11,15 | |
| **wanted**   4:13,20 7:19 | |
| **watched**   7:25 8:3,16 | |
| **way**   8:10 14:25<br>   15:13 | |
| **we've**   4:10 5:21<br>   14:13 15:16 | |
| **working**   5:22 | |

```
 1                   UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF PENNSYLVANIA
 2
     UNITED STATES OF AMERICA,      ) 2:14-cr-00548-CDJ-1
 3                                   )
                  vs.                )  Philadelphia, PA
 4                                   )
     BRIAN HARTLINE, et al.,         )  April 25, 2016
 5                                   )
                  Defendants.        )
 6
 7                    TRANSCRIPT OF JURY TRIAL
            BEFORE THE HONORABLE C. DARNELL JONES, II
 8                 UNITED STATES DISTRICT JUDGE
 9   APPEARANCES:
10   For the Government:        DAVID J. IGNALL, ESQ.
                                JENNIFER CHUN BARRY, ESQ.
11                              U.S. Attorney's Office
                                615 Chestnut Street
12                              Suite 1250
                                Philadelphia, PA 19106
13
     For the Defendant:         PATRICK J. EGAN, ESQ.
14   Brian Hartline             JOHN C. FULLER, ESQ.
                                Fox Rothschild LLP
15                              2000 Market Street
                                10th Floor
16                              Philadelphia, PA 19107
17   For the Defendant:         RUSSELL D. DUNCAN, ESQ.
     Barry Bekkedam             ALLISON BAKER SHEALY, ESQ.
18                              JACOB S. FRENKEL, ESQ.
                                JOEL D. SCHWARTZ, ESQ.
19                              SHULMAN ROGERS GANDAL PORDY
                                 ECKER
20                              12505 Park Potomac Avenue
                                Potomac, MD 20854
21
22
23           Veritext National Court Reporting Company
                        Mid-Atlantic Region
24           1801 Market Street – Suite 1800
                      Philadelphia, PA 19103
25                      1-888-777-6690
```

```
                                              Page 2

 1    APPEARANCES, CONT'D

 2    For the Defendant:        MICHAEL J. ENGLE, ESQ.

      Barry Bekkedam           GREENBLATT PIERCE ENGLE FUNT

 3                              FLORES

                               123 South Broad Street

 4                             Suite 2500

                               Philadelphia, PA 19109

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                   P R O C E E D I N G S

2                   THE CLERK:  I received a note from the

3     jury dated 4/25/16 at 11:26 a.m.:

4                   "Judge Jones, may we please see the

5     following exhibits:  G-74, G-79, G-81, G-82, G-106.

6     Thank you kindly, the Foreperson."

7                   MR. EGAN:  74, 79, 81, 82 and 106?

8                   THE CLERK:  Yes.

9         (Counsel confer among themselves)

10                  MR. IGNALL:  No objections.

11                  THE CLERK:  All right.  Thank you much.

12    When are we taking lunch?

13                  MS. BARRY:  12:30.

14        (Pause)

15        (Recess from 11:56 a.m. until 2:34 p.m.)

16                  THE CLERK:  We have jury inquiry number

17    7, today's date, signed 2:17:

18                  "Judge Jones, may we please see the

19    following exhibits:  G-39A, G-36, D-1165, G-135,

20    G-136, G-103 and G-104."

21        (Counsel confer among themselves)

22                  MS. BARRY:  Michelle?

23                  THE CLERK:  Yes?

24                  MS. BARRY:  Michelle, what is -- it's

25    1165, is that right?

Page 4

1                    THE CLERK:  It says D-1165 is what is

2     here.

3                    MS. BARRY:  Okay.  We're not sure that

4     actually got moved into evidence.  So we're having

5     questions on that.

6                    MR. ENGLE:  Yeah.  It was D-1125 that

7     we moved into evidence.

8                    THE CLERK:  Okay.

9                    MR. ENGLE:  D-1165 might have been

10    shown to someone at some point but it was not --

11        (Counsel speaking on top of each other)

12        (Counsel confer among themselves)

13                   THE CLERK:  And that's 39A and not 39.

14                   MS. BARRY:  Correct.

15                   MR. ENGLE:  36, 39A, 108 -- I'm

16    sorry -- 103, 104, 135, 136.

17                   THE CLERK:  Yes.

18                   MR. ENGLE:  Here you go.

19                   THE CLERK:  Okay.

20        (Counsel confer among themselves)

21                   THE DEPUTY:  All rise.

22                   THE COURT:  Good afternoon.  You may be

23    seated.

24                   (A chorus of good afternoon)

25                   THE COURT:  All right, counsel.  I

Page 5

1  understand you've seen the latest request from the

2  jury.

3                   What exhibit number did we mark this

4  one as?

5                   THE CLERK:  That's (indiscernible).

6       (Pause)

7                   THE COURT:  Now I understand, counsel,

8  that there is a request for D-1165 which you say does

9  not exist?  Is that the situation?

10                  MR. ENGLE:  No, Your Honor.  It was a

11 document that I believe might have been used during an

12 examination of a witness but it was not moved into

13 evidence.

14                  THE COURT:  All right.

15                  MR. ENGLE:  So it's not an exhibit

16 that's something that could go back to them since it

17 was not placed in evidence.

18                  THE COURT:  Correct.

19                  MR. ENGLE:  That's where we are.

20                  THE COURT:  All right.  So --

21                  MR. ENGLE:  We just didn't know how you

22 wanted to phrase or tell them that fact.

23                  THE COURT:  I can do either:  "While

24 D-1165 was referenced during the examination, said

25 exhibit number was not admitted into evidence.

1    Thusly, I cannot send it to you for your consideration

2    of the exhibit."

3                    MR. IGNALL:  Sounds good to me.

4                    MR. ENGLE:  Perfect.

5                    MR. EGAN:  That's very good, Your

6    Honor.

7                    THE COURT:  All right.  Book them down,

8    would you?

9                    MR. IGNALL:  You want me to write it

10   down?

11                   THE COURT:  Thank you.

12                   MR. IGNALL:  Let's have that --

13                   MR. EGAN:  All right.  Lunch on me.

14                   THE COURT:  Huh?

15                   MR. EGAN:  Lunch on me.

16                   THE COURT:  Please.  Thank you.

17                   MR. EGAN:  Can you save me?

18                   THE COURT:  No.

19                   "The Court is granting your request to

20   review Exhibits G-39A, G-36, G-135 and G-136."  Excuse

21   me.  It's just these two?

22                   THE CLERK:  (Indiscernible) on the

23   bottom.

24                   THE COURT:  And the additional, okay.

25                   THE CLERK:  Yes.

```
                                              Page 7
 1              THE COURT:  All right.  So you have
 2   136?  All right.  Comma, G-103 and G-104, period.
 3                   "D-1165, while referenced during the
 4   examination, was not admitted into evidence, thusly I
 5   cannot send it to you for your consideration."
 6                   Is that satisfactory?
 7                   ALL:  Yes, Your Honor.
 8              THE COURT:  All right.  Thank you very
 9   much.
10        (Pause)
11              THE COURT:  Oh.  Could we have two
12   copies, please?
13              MR. IGNALL:  I just want to look at it.
14   We may want to suggest a slight change.
15              THE COURT:  Go right ahead.
16              MR. IGNALL:  We want to take a look.
17              THE COURT:  Sure.
18        (Pause)
19              MR. EGAN:  No objection from the
20   defense, Your Honor.  Mr. Ignall is --
21              MR. IGNALL:  I have a slight
22   suggestion.  My suggestion would be have it say
23   "D-1165, while referenced during testimony, was not
24   admitted into evidence."  Just I'm afraid that if they
25   -- "the examination" it might lead to a question of
```

1    which examination where I think "testimony" makes it

2    general enough."

3                    MR. EGAN:  No issue.

4                    MR. ENGLE:  It's okay with me, too.

5                    THE COURT:  Go ahead.

6         (Counsel confer among themselves)

7                    MR. ENGLE:  I think it's okay.

8                    MR. IGNALL:  I may have added a comma

9    but I'll restrain myself.

10                   MR. EGAN:  May I approach?

11                   THE COURT:  Yes, sir.  Thank you.

12        (Pause)

13                   Your comma is in the wrong place.

14                   MR. IGNALL:  I think there should be a

15   comma after "testimony".

16                   THE COURT:  Correct.

17                   MR. IGNALL:  And then it probably

18   should be a semicolon after "evidence" but --

19                   THE COURT:  I would go for that.

20                   MR. EGAN:  No objection.  We're going

21   to (indiscernible) somewhere there.

22                   THE COURT:  So you want to correct it

23   then?

24                   MR. IGNALL:  Pardon me?

25                   THE COURT:  Are you going to correct it

Page 9

1    there as we just indicated?

2        (Pause)

3                    THE COURT:  Oh.  One more copy,

4    counsel.  I'm sorry.

5                    MR. EGAN:  I have it --

6                    THE COURT:  Oh.  You have it?  Okay.

7        (Pause)

8                    THE COURT:  Okay.  Thank you all very

9    much.

10                   MR. IGNALL:  Thank you, Your Honor.

11                   MR. ENGLE:  Thank you, Your Honor.

12       (Off the record)

13                   MR. EGAN:  While you're here, one thing

14   that we were considering requesting that the Court

15   consider at the end of the day today is to just bring

16   the jury in and admonish them about referencing any

17   outside material, talking to anybody outside.  It's

18   been a while and --

19                   THE COURT:  Certainly.  Be happy to.

20                   MR. EGAN:  -- it seems appropriate.

21                   THE COURT:  Be happy to.

22                   MR. EGAN:  Thank you.

23                   THE COURT:  Just make sure Ms.

24   El-Shabazz knows that before she lets them go.

25                   MR. EGAN:  Thank you.

1          THE COURT:  I think she's here.

2          Counsel just wanted me to apprise the

3   jury of the fact that they cannot discuss the

4   testimony, et cetera, et cetera before they leave

5   today just to keep it on their minds.  So at the end

6   of the day, before you let them go, let me know, I'll

7   come back up.

8          Thank you very much.  We're adjourned

9   for recess.

10      (Recess from 2:53 p.m. until 4:17 p.m.)

11          THE COURT:  Good afternoon again.

12          (A chorus of good afternoon)

13      (Pause)

14          THE CLERK:  Judge, do you want me to go

15   to the alternates?

16          THE COURT:  We should.  Please.  Thank

17   you.

18          You can have a seat.  She went to get

19   the alternates.

20      (Pause)

21          THE CLERK:  All rise.

22      (Alternates in)

23          THE COURT:  We're getting your voice in

24   this.

25          THE CLERK:  Hmm?

1              THE COURT:  We're getting your voice

2      over the speaker -- over the mics.

3              THE CLERK:  We're missing one.

4              THE COURT:  Okay.  Have a seat.

5          (Pause)

6              THE CLERK:  All rise.

7          (Jury in)

8              THE CLERK:  Court is now in session,

9      the Honorable C. Darnell Jones, II, presiding.

10             THE COURT:  Good afternoon.  You may be

11     seated.

12             First of all, on behalf of everyone

13     involved in this case, I want to extend to you our

14     sincere appreciation for your commitment and your

15     diligence in going about your task.  This is exactly

16     what we need as jurors in any case.

17             Additionally, since it's the end of the

18     day, I have the responsibility of informing you, as

19     I've done all along, that you're not to discuss the

20     matter once you leave that jury room.  And certainly,

21     don't do any investigation or research on your own of

22     any kind with regard to any issue raised in this

23     trial.

24             And lastly, you know, I revert back to

25     what I said at the beginning and counsel, I think,

Page 12

1   articulated it as well in terms of jury duty and its

2   responsibility being one of the highest callings of

3   citizenship.  Another one that's right up there is

4   tomorrow.  Please vote.  We'll see -- yeah.  Don't

5   forget.  All right.

6                    Now if you want to come in a little bit

7   later or leave a little earlier to accommodate that by

8   just letting me know.  And if you want to do so now,

9   you can do that as well in terms of tomorrow morning's

10  beginning.

11                    UNIDENTIFIED SPEAKER:  9:30.

12                    THE COURT:  9:30?  You got it.  All

13  right.

14                    Have a good evening.  Thank you very

15  much.

16       (Jury out)

17                    THE COURT:  We're adjourned.  Thank

18  you.

19                    MR. EGAN:  Thank you, Your Honor.

20                    MR. ENGLE:  Thank you, Your Honor.

21  Have a good night.

22                    (Court is adjourned)

23

24                    *  *  *  *  *

25

Page 13

1                    C E R T I F I C A T I O N

2

3        I, Lisa Beck, certify that the foregoing

4    transcript is a true and accurate record of the

5    proceedings.

6

7

     _____

8    Lisa Beck (CET**D-486)

9    AAERT Certified Electronic Transcriber

10

11

12   Date:  May 26, 2016

13

14

15

16

17

18

19

20

21

22

23

24

25

**[00548 - defendant]**

**0**

**00548**  1:2

**1**

**1**  1:2
**1-888-777-6690**  1:25
**103**  3:20 4:16 7:2
**104**  3:20 4:16 7:2
**106**  3:5,7
**108**  4:15
**10th**  1:15
**1125**  4:6
**1165**  3:19,25 4:1,9
5:8,24 7:3,23
**11:26**  3:3
**11:56**  3:15
**123**  2:3
**1250**  1:12
**12505**  1:20
**12:30**  3:13
**135**  3:19 4:16 6:20
**136**  3:20 4:16 6:20
7:2
**1800**  1:24
**1801**  1:24
**19103**  1:24
**19106**  1:12
**19107**  1:16
**19109**  2:4

**2**

**2000**  1:15
**2016**  1:4 13:12
**20854**  1:20
**25**  1:4
**2500**  2:4
**26**  13:12
**2:14**  1:2
**2:17**  3:17
**2:34**  3:15
**2:53**  10:10

**3**

**36**  3:19 4:15 6:20
**39**  4:13

**39a**  3:19 4:13,15
6:20

**4**

**4/25/16**  3:3
**486**  13:8
**4:17**  10:10

**6**

**615**  1:11

**7**

**7**  3:17
**74**  3:5,7
**79**  3:5,7

**8**

**81**  3:5,7
**82**  3:5,7

**9**

**9:30**  12:11,12

**a**

**a.m.**  3:3,15
**aaert**  13:9
**accommodate**  12:7
**accurate**  13:4
**added**  8:8
**additional**  6:24
**additionally**  11:17
**adjourned**  10:8
12:17,22
**admitted**  5:25 7:4
7:24
**admonish**  9:16
**afraid**  7:24
**afternoon**  4:22,24
10:11,12 11:10
**ahead**  7:15 8:5
**al**  1:4
**allison**  1:17
**alternates**  10:15,19
10:22
**america**  1:2
**anybody**  9:17
**appearances**  1:9 2:1

**appreciation**  11:14
**apprise**  10:2
**approach**  8:10
**appropriate**  9:20
**april**  1:4
**articulated**  12:1
**atlantic**  1:23
**attorney's**  1:11
**avenue**  1:20

**b**

**back**  5:16 10:7
11:24
**baker**  1:17
**barry**  1:10,17 2:2
3:13,22,24 4:3,14
**beck**  13:3,8
**beginning**  11:25
12:10
**behalf**  11:12
**bekkedam**  1:17 2:2
**believe**  5:11
**bit**  12:6
**book**  6:7
**bottom**  6:23
**brian**  1:4,14
**bring**  9:15
**broad**  2:3

**c**

**c**  1:7,14 3:1 11:9
13:1,1
**callings**  12:2
**case**  11:13,16
**cdj**  1:2
**certainly**  9:19 11:20
**certified**  13:9
**certify**  13:3
**cet**  13:8
**cetera**  10:4,4
**change**  7:14
**chestnut**  1:11
**chorus**  4:24 10:12
**chun**  1:10
**citizenship**  12:3

**clerk**  3:2,8,11,16,23
4:1,8,13,17,19 5:5
6:22,25 10:14,21,25
11:3,6,8
**come**  10:7 12:6
**comma**  7:2 8:8,13
8:15
**commitment**  11:14
**company**  1:23
**confer**  3:9,21 4:12
4:20 8:6
**consider**  9:15
**consideration**  6:1
7:5
**considering**  9:14
**cont'd**  2:1
**copies**  7:12
**copy**  9:3
**correct**  4:14 5:18
8:16,22,25
**counsel**  3:9,21 4:11
4:12,20,25 5:7 8:6
9:4 10:2 11:25
**court**  1:1,23 4:22,25
5:7,14,18,20,23 6:7
6:11,14,16,18,19,24
7:1,8,11,15,17 8:5
8:11,16,19,22,25
9:3,6,8,14,19,21,23
10:1,11,16,23 11:1
11:4,8,10 12:12,17
12:22
**cr**  1:2

**d**

**d**  1:17,18 3:1,19 4:1
4:6,9 5:8,24 7:3,23
13:8
**darnell**  1:7 11:9
**date**  3:17 13:12
**dated**  3:3
**david**  1:10
**day**  9:15 10:6 11:18
**defendant**  1:13,17
2:2

[defendants - pennsylvania]                                                              Page 2

| | | | |
|---|---|---|---|
| **defendants** 1:5 | **flores** 2:3 | **indiscernible** 5:5 | **m** |
| **defense** 7:20 | **following** 3:5,19 | 6:22 8:21 | **mark** 5:3 |
| **deputy** 4:21 | **foregoing** 13:3 | **informing** 11:18 | **market** 1:15,24 |
| **diligence** 11:15 | **foreperson** 3:6 | **inquiry** 3:16 | **material** 9:17 |
| **discuss** 10:3 11:19 | **forget** 12:5 | **investigation** 11:21 | **matter** 11:20 |
| **district** 1:1,1,8 | **fox** 1:14 | **involved** 11:13 | **md** 1:20 |
| **document** 5:11 | **frenkel** 1:18 | **issue** 8:3 11:22 | **michael** 2:2 |
| **duncan** 1:17 | **fuller** 1:14 | **j** | **michelle** 3:22,24 |
| **duty** 12:1 | **funt** 2:2 | **j** 1:10,13 2:2 | **mics** 11:2 |
| **e** | **g** | **jacob** 1:18 | **mid** 1:23 |
| **e** 3:1,1 13:1 | **g** 3:1,5,5,5,5,5,19,19 | **jennifer** 1:10 | **minds** 10:5 |
| **earlier** 12:7 | 3:19,20,20,20 6:20 | **joel** 1:18 | **missing** 11:3 |
| **eastern** 1:1 | 6:20,20,20 7:2,2 | **john** 1:14 | **morning's** 12:9 |
| **ecker** 1:19 | **gandal** 1:19 | **jones** 1:7 3:4,18 | **moved** 4:4,7 5:12 |
| **egan** 1:13 3:7 6:5,13 | **general** 8:2 | 11:9 | **n** |
| 6:15,17 7:19 8:3,10 | **getting** 10:23 11:1 | **judge** 1:8 3:4,18 | **n** 3:1 13:1 |
| 8:20 9:5,13,20,22 | **go** 4:18 5:16 7:15 | 10:14 | **national** 1:23 |
| 9:25 12:19 | 8:5,19 9:24 10:6,14 | **jurors** 11:16 | **need** 11:16 |
| **either** 5:23 | **going** 8:20,25 11:15 | **jury** 1:7 3:3,16 5:2 | **night** 12:21 |
| **el** 9:24 | **good** 4:22,24 6:3,5 | 9:16 10:3 11:7,20 | **note** 3:2 |
| **electronic** 13:9 | 10:11,12 11:10 | 12:1,16 | **number** 3:16 5:3,25 |
| **engle** 2:2,2 4:6,9,15 | 12:14,21 | **k** | **o** |
| 4:18 5:10,15,19,21 | **government** 1:10 | **keep** 10:5 | **o** 3:1 13:1 |
| 6:4 8:4,7 9:11 12:20 | **granting** 6:19 | **kind** 11:22 | **objection** 7:19 8:20 |
| **esq** 1:10,10,13,14,17 | **greenblatt** 2:2 | **kindly** 3:6 | **objections** 3:10 |
| 1:17,18,18 2:2 | **h** | **know** 5:21 10:6 | **office** 1:11 |
| **et** 1:4 10:4,4 | **happy** 9:19,21 | 11:24 12:8 | **oh** 7:11 9:3,6 |
| **evening** 12:14 | **hartline** 1:4,14 | **knows** 9:24 | **okay** 4:3,8,19 6:24 |
| **evidence** 4:4,7 5:13 | **highest** 12:2 | **l** | 8:4,7 9:6,8 11:4 |
| 5:17,25 7:4,24 8:18 | **hmm** 10:25 | **lastly** 11:24 | **once** 11:20 |
| **exactly** 11:15 | **honor** 5:10 6:6 7:7 | **latest** 5:1 | **outside** 9:17,17 |
| **examination** 5:12 | 7:20 9:10,11 12:19 | **lead** 7:25 | **p** |
| 5:24 7:4,25 8:1 | 12:20 | **leave** 10:4 11:20 | **p** 3:1 |
| **excuse** 6:20 | **honorable** 1:7 11:9 | 12:7 | **p.m.** 3:15 10:10,10 |
| **exhibit** 5:3,15,25 6:2 | **huh** 6:14 | **letting** 12:8 | **pa** 1:3,12,16,24 2:4 |
| **exhibits** 3:5,19 6:20 | **i** | **lisa** 13:3,8 | **pardon** 8:24 |
| **exist** 5:9 | **ignall** 1:10 3:10 6:3 | **little** 12:6,7 | **park** 1:20 |
| **extend** 11:13 | 6:9,12 7:13,16,20 | **llp** 1:14 | **patrick** 1:13 |
| **f** | 7:21 8:8,14,17,24 | **look** 7:13,16 | **pause** 3:14 5:6 7:10 |
| **f** 13:1 | 9:10 | **lunch** 3:12 6:13,15 | 7:18 8:12 9:2,7 |
| **fact** 5:22 10:3 | **ii** 1:7 11:9 | | 10:13,20 11:5 |
| **first** 11:12 | **indicated** 9:1 | | **pennsylvania** 1:1 |
| **floor** 1:15 | | | |

[perfect - yeah]                                                                              Page 3

**perfect**  6:4
**period**  7:2
**philadelphia**  1:3,12
  1:16,24 2:4
**phrase**  5:22
**pierce**  2:2
**place**  8:13
**placed**  5:17
**please**  3:4,18 6:16
  7:12 10:16 12:4
**point**  4:10
**pordy**  1:19
**potomac**  1:20,20
**presiding**  11:9
**probably**  8:17
**proceedings**  13:5

**q**

**question**  7:25
**questions**  4:5

**r**

**r**  3:1 13:1
**raised**  11:22
**received**  3:2
**recess**  3:15 10:9,10
**record**  9:12 13:4
**referenced**  5:24 7:3
  7:23
**referencing**  9:16
**regard**  11:22
**region**  1:23
**reporting**  1:23
**request**  5:1,8 6:19
**requesting**  9:14
**research**  11:21
**responsibility**  11:18
  12:2
**restrain**  8:9
**revert**  11:24
**review**  6:20
**right**  3:11,25 4:25
  5:14,20 6:7,13 7:1,2
  7:8,15 12:3,5,13
**rise**  4:21 10:21 11:6

**rogers**  1:19
**room**  11:20
**rothschild**  1:14
**russell**  1:17

**s**

**s**  1:18 3:1
**satisfactory**  7:6
**save**  6:17
**says**  4:1
**schwartz**  1:18
**seat**  10:18 11:4
**seated**  4:23 11:11
**see**  3:4,18 12:4
**seen**  5:1
**semicolon**  8:18
**send**  6:1 7:5
**session**  11:8
**shabazz**  9:24
**shealy**  1:17
**shown**  4:10
**shulman**  1:19
**signed**  3:17
**sincere**  11:14
**sir**  8:11
**situation**  5:9
**slight**  7:14,21
**sorry**  4:16 9:4
**sounds**  6:3
**south**  2:3
**speaker**  11:2 12:11
**speaking**  4:11
**states**  1:1,2,8
**street**  1:11,15,24 2:3
**suggest**  7:14
**suggestion**  7:22,22
**suite**  1:12,24 2:4
**sure**  4:3 7:17 9:23

**t**

**t**  13:1,1
**take**  7:16
**talking**  9:17
**task**  11:15
**tell**  5:22

**terms**  12:1,9
**testimony**  7:23 8:1
  8:15 10:4
**thank**  3:6,11 6:11
  6:16 7:8 8:11 9:8,10
  9:11,22,25 10:8,16
  12:14,17,19,20
**thing**  9:13
**think**  8:1,7,14 10:1
  11:25
**thusly**  6:1 7:4
**today**  9:15 10:5
**today's**  3:17
**tomorrow**  12:4,9
**top**  4:11
**transcriber**  13:9
**transcript**  1:7 13:4
**trial**  1:7 11:23
**true**  13:4
**two**  6:21 7:11

**u**

**u.s.**  1:11
**understand**  5:1,7
**unidentified**  12:11
**united**  1:1,2,8

**v**

**veritext**  1:23
**voice**  10:23 11:1
**vote**  12:4
**vs**  1:3

**w**

**want**  6:9 7:13,14,16
  8:22 10:14 11:13
  12:6,8
**wanted**  5:22 10:2
**went**  10:18
**witness**  5:12
**write**  6:9
**wrong**  8:13

**y**

**yeah**  4:6 12:4

```
                                                      Page 1

1                    UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF PENNSYLVANIA
2
     UNITED STATES OF AMERICA,     ) 2:14-cr-00548-CDJ-1
3                                  )
                  vs.              )  Philadelphia, PA
4                                  )
     BRIAN HARTLINE, et al.,       )  April 26, 2016
5                                  )
                  Defendants.      )
6
7                    TRANSCRIPT OF JURY TRIAL
             BEFORE THE HONORABLE C. DARNELL JONES, II
8                   UNITED STATES DISTRICT JUDGE
9    APPEARANCES:
10   For the Government:         DAVID J. IGNALL, ESQ.
                                 JENNIFER CHUN BARRY, ESQ.
11                               U.S. Attorney's Office
                                 615 Chestnut Street
12                               Suite 1250
                                 Philadelphia, PA 19106
13
     For the Defendant:          PATRICK J. EGAN, ESQ.
14   Brian Hartline              JOHN C. FULLER, ESQ.
                                 Fox Rothschild LLP
15                               2000 Market Street
                                 10th Floor
16                               Philadelphia, PA 19107
17   For the Defendant:          RUSSELL D. DUNCAN, ESQ.
     Barry Bekkedam              ALLISON BAKER SHEALY, ESQ.
18                               JACOB S. FRENKEL, ESQ.
                                 JOEL D. SCHWARTZ, ESQ.
19                               SHULMAN ROGERS GANDAL PORDY
                                  ECKER
20                               12505 Park Potomac Avenue
                                 Potomac, MD 20854
21
     (cont'd on next page)
22
23          Veritext National Court Reporting Company
                      Mid-Atlantic Region
24          1801 Market Street – Suite 1800
                    Philadelphia, PA 19103
25                     1-888-777-6690
```

```
                                          Page 2

 1  APPEARANCES, CONT'D

 2  For the Defendant:        MICHAEL J. ENGLE, ESQ.

    Barry Bekkedam           GREENBLATT PIERCE ENGLE FUNT

 3                            FLORES

                             123 South Broad Street

 4                           Suite 2500

                             Philadelphia, PA 19109

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 3

1                    P R O C E E D I N G S
2              THE CLERK:  We have a request from the
3  jury dated 4/26/2016, 11:20 a.m.:
4              "Judge Jones, may we see the letter or
5  e-mail dated 6/2/2009 involving Lisa Koch and Barry
6  Bekkedam?  Also, may we see D-114, G-98, G-28, G-80
7  and G-72A and the e-mail from Bekkedam to Preve on
8  10/21/09?"
9              So here.  You guys can take a look at
10 this.  I made copies.
11             MR. IGNALL:  Okay.
12             THE CLERK:  This I'm going to double
13 check to make sure that that's 80.
14      (Counsel confer among themselves)
15             THE CLERK:  G-80.
16             MR. IGNALL:  G-8-0?  Okay.
17             THE CLERK:  G-8-0.
18             MR. IGNALL:  Okay.
19      (Counsel confer among themselves)
20             THE CLERK:  All rise.
21             THE COURT:  You may be seated.  Good
22 morning.
23             (A chorus of good morning)
24             THE COURT:  All right.  Counsel, the
25 Court is in receipt of the jury's inquiry, Exhibit

1    number 8.  Have you had an opportunity to confer?

2                    MR. IGNALL:  We have, Your Honor.

3                    MR. ENGLE:  Yes, Your Honor.

4                    THE COURT:  And is there an agreement?

5                    MR. IGNALL:  There's a partial

6    agreement, Your Honor.

7                    THE COURT:  All right.  I'll hear it.

8                    MR. IGNALL:  We have agreed to send

9    back the exhibits that are listed here which I guess

10   is 1, 14, 98, 28, 80 and 72A.  With respect to the

11   question where it says "May we see the letter e-mail

12   dated 6/2/09 involving Koch and Barry Bekkedam.  We

13   don't think the Court should answer that specifically.

14   We suspect that when the jurors see G-28, they will be

15   satisfied.  I would propose language just at the end

16   of this that, you know, "If this does not satisfy your

17   request, please provide specifics regarding any

18   exhibit you would like to see."  So if there's

19   something else they were looking for, we shouldn't

20   have to guess.  I think it's -- it's a given that this

21   is slightly vague.  I don't think it's appropriate to

22   guess that G-28, although we think that is, is what

23   they're looking for.

24                    The disagreement is they also ask for

25   the e-mail from Bekkedam to Preve on 10/21/2009.

Page 5

1    There are two possible responses to that, Your Honor.

2    It's Exhibits 101 and 102.  May I approach?  Probably

3    the easiest thing --

4                    THE COURT:  Sure.

5                    MR. IGNALL:  -- if I approach with

6    the -- does Your Honor have the exhibit binder up

7    there?  Oh, okay.

8                    THE COURT:  Thank you.  All right.

9                    MR. IGNALL:  101, I believe, I showed

10   to Mr. Preve but we did not introduce into evidence;

11   it was never published to the jury.  It's actually

12   included as part of a string I think is in 111.  But

13   the jury has not asked for that so I don't think it's

14   appropriate to guess if they want some further

15   strings.  I don't think we should send that back.

16                    What I do think, and this is where our

17   disagreement is, that we should send back is Exhibit

18   102.  It's the only other e-mail from October 21st

19   from Bekkedam to Mr. Preve.  And it's the only one

20   that was admitted into evidence and published to the

21   jury.  So I think their question is specific enough

22   that they're only asking for what was admitted and was

23   indeed published to the jury.  But I'll let Mr.

24   Schwartz raise his objection.

25                    MR. SCHWARTZ:  Mr. Ignall is correct in

1    characterizing our disagreement.  Our position is that

2    the jury heard testimony about both 101 and 102.  Mr.

3    Preve specifically identified Exhibit 101 as an e-mail

4    exchange between him and Mr. Bekkedam on October 21st.

5    Therefore, they heard about it.  They could be asking

6    for that one just as much as they could be asking for

7    102.

8                    We agree that they didn't see 101 and

9    they did see 102.  But we don't think that's

10   dispositive about this.

11                   THE COURT:  They did see 102.

12                   MR. SCHWARTZ:  They did see 102 because

13   it was published.  101 was not published.  Mr. Preve

14   simply was questioned about it but Ms. Shealy has

15   pulled up the transcript and said that he specifically

16   identified it out loud as an e-mail exchange on

17   October 21st.

18                   THE COURT:  Did he talk about the

19   content of the e-mail?

20                   MS. SHEALY:  Yeah.  I can read it.

21                   THE COURT:  All right.

22                   MS. SHEALY:  It's in the transcript.

23                   "What is Exhibit 101?"

24                   "Exhibit 101 is an e-mail from Barry

25   Bekkedam to me with a copy to George Levin and Scott

1   Rothstein, subject NOVA, dated October 21st, 2009."

2                    "Does it talk about any investors and

3   the related income fund?"

4                    "Yes, it does.  (Indiscernible) Anthony

5   Bonomo."

6                    "What does the e-mail say about Mr.

7   Bonomo?"

8                    "2.5m -- and 2.5 million Anthony

9   Bonomo, no bank sending wire.  I just need to track

10  him down this morning."

11                   And then the question went on to

12  another exhibit.

13                   THE COURT:  All right.  All right.

14  Counsel, two points in this regard.  First and

15  foremost, to be consistent, if it has not been

16  admitted into evidence formally up to this point in

17  time, it's not going out with the jury.  I don't want

18  to change that in the middle of a string e-mail and

19  change that into our policy.  Otherwise, we'd have to

20  go back and modify what I've already done.

21                   The second one is, I'm certainly

22  inclined to tell the jury that it is their

23  recollection and their recollection alone which

24  controls as to their memory about what Mr. Preve

25  testified to regarding that exhibit.  But I can't send

Page 8

1    out the exhibit itself because it was not introduced

2    into evidence.

3                    MR. EGAN:  Yes.

4                    MR. ENGLE:  I think the question is

5    whether 102 goes out.

6                    THE COURT:  102 would be fine because

7    it was admitted.

8                    MR. EGAN:  Well, Your Honor, the issue

9    is, actually, the jury hasn't specified which exhibit

10   they're interested in and we're not sure which one

11   they're interested in.  Therefore, the defense is

12   objecting to sending them either.  If they're really

13   interested in it, they'll give us the number.  And

14   that was --

15                   THE COURT:  But, counsel, they said,

16   "the e-mail from Bekkedam to Preve on October 21st,

17   2009".

18                   MR. EGAN:  Right.  But there's two of

19   them and we don't know which one they're talking

20   about.

21                   THE COURT:  But one is admitted into

22   evidence and one is not.

23                   MR. EGAN:  Correct.  However, they

24   didn't say the e-mail that was admitted into evidence.

25   They say the e-mail of that date.  So our position is

1   that neither should --

2                   THE COURT:  Counsel, I would attempt to

3   be Solomonic about it and ask the jury if they could

4   give us any further direction as to the October 21st

5   e-mail.

6                   MR. IGNALL:  I think the direction

7   would have to be are you seeking one that was admitted

8   and shown to you.

9                   THE COURT:  Well, I don't want to get

10  that technical yet.

11                  MR. IGNALL:  But otherwise --

12                  THE COURT:  If they can identify by

13  exhibit number, and I can certainly add that to my

14  response, that would be more helpful, if they could.

15                  MR. IGNALL:  But I'm assuming if they

16  could they probably would have.

17                  THE COURT:  Well, who knows?

18                  MR. IGNALL:  Okay.

19                  THE COURT:  But I don't want to get

20  into their minds.

21                  MR. IGNALL:  All right.

22                  THE COURT:  So would that suffice then

23  just to make the inquiry to see if they can be more

24  specific as to any exhibit --

25                  MR. IGNALL:  If they can't then we ask

1    them are you looking for one that was shown to the

2    jury?  I feel like there's no other --

3                    THE COURT:  I don't see that this jury

4    has hesitated in anything that they wanted to see.

5                    MR. IGNALL:  And I --

6                    THE COURT:  Frankly, even with

7    specificity.  So it's not a matter of forfeiting it.

8    It's a matter of simply saying can you be more

9    specific, if you know, as to the exhibit number.  And

10   if they say we don't but -- so be it.

11                   MR. IGNALL:  And then what do we do?

12                   THE COURT:  If it's 101, we say no.  If

13   it's 102, we say yes.

14                   MR. IGNALL:  Yeah, but what if they

15   come back they can't be more specific.

16                   THE COURT:  We'll cross that bridge

17   when we come to it.

18                   MR. IGNALL:  Okay.  'Cause -- all

19   right.

20                   THE COURT:  All right?

21                   MR. IGNALL:  Well, then I think we need

22   to change the language a little bit just so it's

23   clear --

24                   THE COURT:  That's fine with me.

25                   MR. IGNALL:  -- that we're asking an

Page 11

1   inquiry about the --

2                    THE COURT:  That's fine with me.  Why

3   don't you meet and greet -- meet and decide -- you

4   might want to greet each other while you're at it --

5   but decide as to what language you want to use.

6        (Pause)

7                    THE COURT:  Who's taking a stab at --

8                    MR. IGNALL:  Ms. Barry is --

9                    THE COURT:  All right.  Fine.

10                   MR. IGNALL:  Her handwriting is

11  legible.

12       (Pause)

13                   MR. IGNALL:  All right.  Your Honor, we

14  are coarsely agreed.

15                   THE COURT:  All right.

16                   MR. IGNALL:  I think what we're agreed

17  on is the answers to the first two parts of this --

18                   THE COURT:  Okay.

19                   MR. IGNALL:  -- which would be "I am

20  providing the exhibits you requested" and give them

21  the list.  "If this does not satisfy your first two

22  requests, please provide me with more specifics

23  regarding the exhibits you would like to see.

24                   "As to your third request, are you able

25  to identify" -- and here's what the government

1    proposes.  I believe there's a disagreement.  We would

2    word this that "As to your third request, are you able

3    to identify the exhibit number or any other specifics

4    for the October 21, 2009 e-mail from Bekkedam to

5    Preve?"

6                    THE COURT:  All right.

7                    MR. SCHWARTZ:  And we just simply

8    suggest -- I think this is what Your Honor said that

9    they just ask "Are you able to identify the exhibit

10   number with regard to the October 21st e-mail from

11   Bekkedam" --

12                    THE COURT:  And read yours again,

13   please.

14                    MR. IGNALL:  Mine was "Are you able to

15   identify the exhibit number or any other specifics".

16   Again, I'm not sure why we're arguing about this given

17   there's only one document that they saw that satisfies

18   this.  So I think we're looking for a way to avoid

19   giving them something they're asking for.  But --

20                    THE COURT:  Well, the thing is I think

21   that we should go with your suggestion.  But I think

22   we could do it with the "or any other".  And the

23   reason why is because if they did, frankly, what I did

24   during the course of this trial because of the volume

25   of exhibits, I cheated a little bit and I went ahead

Page 13

1   and checked that the exhibit was admitted before you

2   formally admitted it.  I just went back now and

3   scratched it out.  But they were taking copious

4   notes --

5                    MR. IGNALL:  Okay.

6                    THE COURT:  -- and they probably did

7   the same thing and assumed that it was in evidence.

8   It was not.  If we're talking about 101.

9                    MR. IGNALL:  Which they never saw.  But

10  I understand.

11                   THE COURT:  Which they never saw but

12  they could have done that.  I don't know.  But at

13  least this way, we just simply find out with

14  specificity which exhibit they want to see and then

15  we'll either say yes or no.

16                   MR. IGNALL:  Okay.

17                   THE COURT:  If they ask for it.

18                   MR. IGNALL:  All right.  So what's the

19  language that --

20                   MR. SCHWARTZ:  Take it out.

21                   MR. IGNALL:  So we're just asking them

22  if they know the exhibit number?

23                   THE COURT:  Yes, for the October 21st,

24  2009 date.  That's what they asked for.

25                   MR. IGNALL:  And if they say they don't

1   know, I guess we'll -- I don't think it's appropriate

2   to not give it to them simply because they haven't

3   written down the exhibit number when there's only one

4   they saw.  There's nothing wrong with the jury having

5   every single exhibit that's been admitted.

6               THE COURT:  And that's why if they come

7   back with something then I will tell them.  If they

8   say 101, for example, I will tell them that it's not

9   admitted into evidence but their recollection

10  regarding the testimony --

11              MR. IGNALL:  Yes.

12              THE COURT:  -- controls.

13              MR. IGNALL:  What if they say we don't

14  remember the exhibit number which I think is a

15  reasonable reading given that they gave specific

16  numbers for everything else?

17              THE COURT:  Let's let them tell us

18  that.

19              MR. IGNALL:  Okay.  All right.

20              THE COURT:  All right.

21              MR. SCHWARTZ:  (Indiscernible), Your

22  Honor.

23              THE COURT:  Thank you.  No lack of

24  communication between the jury and us.

25              MR. IGNALL:  Pardon me?

Page 15

1              THE COURT:  There's no lack of
2     communication between the jury and us.
3              MR. IGNALL:  There isn't.  I just --
4     I've made my point clear, I think.
5              THE COURT:  I understand.
6              MR. IGNALL:  I will sit back down.
7          (Pause)
8              MR. SCHWARTZ:  Your Honor, I'll provide
9     this to the government.  I did take the liberty of
10    adding "Mr." to Bekkedam and Preve rather than just
11    Bekkedam and Preve.
12             THE COURT:  Thank you.  Excuse me.
13         (Pause)
14             THE COURT:  I can't fight it.  Could
15    you put a comma after "request" in that last sentence?
16             MR. SCHWARTZ:  Sure.  Can we just use a
17    pen or should we type it?
18             THE COURT:  My pen's blue.
19         (Pause)
20             THE CLERK:  Do you have a
21    (indiscernible) the numbers?
22             MR. IGNALL:  Yeah.  So we'll hand these
23    out.
24         (Pause)
25             THE COURT:  All right.  Thank you very

1   much.

2                   MS. BARRY:  Thank you, Your Honor.

3                   THE CLERK:  Their lunch is coming at

4   12:30 so I'll suspect they're going to lunch for an

5   hour.

6                   MR. IGNALL:  Well, see, they may

7   respond, though, to this note.  So --

8                   THE CLERK:  I'll wait.

9                   THE COURT:  You may be seated.

10                  MR. IGNALL:  Okay.

11      (Pause)

12      (Recess from 12:20 p.m. until 3:24 p.m.)

13                  THE COURT:  Counsel, have you had an

14  opportunity to review?

15                  MR. SCHWARTZ:  Yes, Your Honor.

16                  THE COURT:  All right.  And for the

17  record, this is jury exhibit number 9:  "May we please

18  see G-78 and G-131?"  Any objection to those being

19  sent out to the jury?

20                  MR. IGNALL:  No objection, Your Honor.

21                  MR. SCHWARTZ:  No, Your Honor.

22                  THE COURT:  All right.  It shall be

23  done.

24                  MR. IGNALL:  Thank you, Your Honor.

25                  MS. BARRY:  Thank you.

```
                                                    Page 17

 1                    THE COURT:  Counsel, the jury has

 2     requested to leave at 3:45 so that some can vote.  Any

 3     objection?

 4                    MR. SCHWARTZ:  No, Your Honor.

 5                    MR. IGNALL:  No, Your Honor.

 6                    THE COURT:  All right.  Thank you very

 7     much.

 8                    MR. SCHWARTZ:  They don't all want to

 9     vote?

10                    THE COURT:  I think some did this

11     morning, I hope.

12                         (Court is adjourned)

13

14                         *  *  *  *  *

15

16

17

18

19

20

21

22

23

24

25
```

Page 18

1              C E R T I F I C A T I O N

2

3        I, Lisa Beck, certify that the foregoing

4    transcript is a true and accurate record of the

5    proceedings.

6

7

     _____

8    Lisa Beck (CET**D-486)

9    AAERT Certified Electronic Transcriber

10

11

12   Date:  May 26, 2016

13

14

15

16

17

18

19

20

21

22

23

24

25

### 0

**00548** 1:2

### 1

**1** 1:2 4:10
**1-888-777-6690** 1:25
**10/21/09** 3:8
**10/21/2009** 4:25
**101** 5:2,9 6:2,3,8,13
  6:23,24 10:12 13:8
  14:8
**102** 5:2,18 6:2,7,9
  6:11,12 8:5,6 10:13
**10th** 1:15
**111** 5:12
**114** 3:6
**11:20** 3:3
**123** 2:3
**1250** 1:12
**12505** 1:20
**12:20** 16:12
**12:30** 16:4
**131** 16:18
**14** 4:10
**1800** 1:24
**1801** 1:24
**19103** 1:24
**19106** 1:12
**19107** 1:16
**19109** 2:4

### 2

**2.5** 7:8
**2.5m** 7:8
**2000** 1:15
**2009** 7:1 8:17 12:4
  13:24
**2016** 1:4 18:12
**20854** 1:20
**21** 12:4
**21st** 5:18 6:4,17 7:1
  8:16 9:4 12:10
  13:23
**2500** 2:4

### 26

**26** 1:4 18:12
**28** 3:6 4:10,14,22
**2:14** 1:2

### 3

**3:24** 16:12
**3:45** 17:2

### 4

**4/26/2016** 3:3
**486** 18:8

### 6

**6/2/09** 4:12
**6/2/2009** 3:5
**615** 1:11

### 7

**72a** 3:7 4:10
**78** 16:18

### 8

**8** 4:1
**8-0** 3:16,17
**80** 3:6,13,15 4:10

### 9

**9** 16:17
**98** 3:6 4:10

### a

**a.m.** 3:3
**aaert** 18:9
**able** 11:24 12:2,9,14
**accurate** 18:4
**add** 9:13
**adding** 15:10
**adjourned** 17:12
**admitted** 5:20,22
  7:16 8:7,21,24 9:7
  13:1,2 14:5,9
**agree** 6:8
**agreed** 4:8 11:14,16
**agreement** 4:4,6
**ahead** 12:25
**al** 1:4
**allison** 1:17
**america** 1:2

### answer

**answer** 4:13
**answers** 11:17
**anthony** 7:4,8
**appearances** 1:9 2:1
**approach** 5:2,5
**appropriate** 4:21
  5:14 14:1
**april** 1:4
**arguing** 12:16
**asked** 5:13 13:24
**asking** 5:22 6:5,6
  10:25 12:19 13:21
**assumed** 13:7
**assuming** 9:15
**atlantic** 1:23
**attempt** 9:2
**attorney's** 1:11
**avenue** 1:20
**avoid** 12:18

### b

**back** 4:9 5:15,17
  7:20 10:15 13:2
  14:7 15:6
**baker** 1:17
**bank** 7:9
**barry** 1:10,17 2:2
  3:5 4:12 6:24 11:8
  16:2,25
**beck** 18:3,8
**bekkedam** 1:17 2:2
  3:6,7 4:12,25 5:19
  6:4,25 8:16 12:4,11
  15:10,11
**believe** 5:9 12:1
**binder** 5:6
**bit** 10:22 12:25
**blue** 15:18
**bonomo** 7:5,7,9
**brian** 1:4,14
**bridge** 10:16
**broad** 2:3

### c

**c** 1:7,14 3:1 18:1,1
**cause** 10:18
**cdj** 1:2
**certainly** 7:21 9:13
**certified** 18:9
**certify** 18:3
**cet** 18:8
**change** 7:18,19
  10:22
**characterizing** 6:1
**cheated** 12:25
**check** 3:13
**checked** 13:1
**chestnut** 1:11
**chorus** 3:23
**chun** 1:10
**clear** 10:23 15:4
**clerk** 3:2,12,15,17
  3:20 15:20 16:3,8
**coarsely** 11:14
**come** 10:15,17 14:6
**coming** 16:3
**comma** 15:15
**communication**
  14:24 15:2
**company** 1:23
**confer** 3:14,19 4:1
**consistent** 7:15
**cont'd** 1:21 2:1
**content** 6:19
**controls** 7:24 14:12
**copies** 3:10
**copious** 13:3
**copy** 6:25
**correct** 5:25 8:23
**counsel** 3:14,19,24
  7:14 8:15 9:2 16:13
  17:1
**course** 12:24
**court** 1:1,23 3:21,24
  3:25 4:4,7,13 5:4,8
  6:11,18,21 7:13 8:6
  8:15,21 9:2,9,12,17

[court - legible]                                                    Page 2

9:19,22 10:3,6,12
10:16,20,24 11:2,7
11:9,15,18 12:6,12
12:20 13:6,11,17,23
14:6,12,17,20,23
15:1,5,12,14,18,25
16:9,13,16,22 17:1
17:6,10,12
**cr**  1:2
**cross**  10:16

**d**

**d**  1:17,18 3:1,6 18:8
**darnell**  1:7
**date**  8:25 13:24
18:12
**dated**  3:3,5 4:12 7:1
**david**  1:10
**decide**  11:3,5
**defendant**  1:13,17
2:2
**defendants**  1:5
**defense**  8:11
**direction**  9:4,6
**disagreement**  4:24
5:17 6:1 12:1
**dispositive**  6:10
**district**  1:1,1,8
**document**  12:17
**double**  3:12
**duncan**  1:17

**e**

**e**  3:1,1,5,7 4:11,25
5:18 6:3,16,19,24
7:6,18 8:16,24,25
9:5 12:4,10 18:1
**easiest**  5:3
**eastern**  1:1
**ecker**  1:19
**egan**  1:13 8:3,8,18
8:23
**either**  8:12 13:15
**electronic**  18:9
**engle**  2:2,2 4:3 8:4

**esq**  1:10,10,13,14,17
1:17,18,18 2:2
**et**  1:4
**evidence**  5:10,20
7:16 8:2,22,24 13:7
14:9
**example**  14:8
**exchange**  6:4,16
**excuse**  15:12
**exhibit**  3:25 4:18
5:6,17 6:3,23,24
7:12,25 8:1,9 9:13
9:24 10:9 12:3,9,15
13:1,14,22 14:3,5
14:14 16:17
**exhibits**  4:9 5:2
11:20,23 12:25

**f**

**f**  18:1
**feel**  10:2
**fight**  15:14
**find**  13:13
**fine**  8:6 10:24 11:2,9
**first**  7:14 11:17,21
**floor**  1:15
**flores**  2:3
**foregoing**  18:3
**foremost**  7:15
**forfeiting**  10:7
**formally**  7:16 13:2
**fox**  1:14
**frankly**  10:6 12:23
**frenkel**  1:18
**fuller**  1:14
**fund**  7:3
**funt**  2:2
**further**  5:14 9:4

**g**

**g**  3:1,6,6,6,7,15,16
3:17 4:14,22 16:18
16:18
**gandal**  1:19
**george**  6:25

**give**  8:13 9:4 11:20
14:2
**given**  4:20 12:16
14:15
**giving**  12:19
**go**  7:20 12:21
**goes**  8:5
**going**  3:12 7:17 16:4
**good**  3:21,23
**government**  1:10
11:25 15:9
**greenblatt**  2:2
**greet**  11:3,4
**guess**  4:9,20,22 5:14
14:1
**guys**  3:9

**h**

**hand**  15:22
**handwriting**  11:10
**hartline**  1:4,14
**hear**  4:7
**heard**  6:2,5
**helpful**  9:14
**hesitated**  10:4
**honor**  4:2,3,6 5:1,6
8:8 11:13 12:8
14:22 15:8 16:2,15
16:20,21,24 17:4,5
**honorable**  1:7
**hope**  17:11
**hour**  16:5

**i**

**identified**  6:3,16
**identify**  9:12 11:25
12:3,9,15
**ignall**  1:10 3:11,16
3:18 4:2,5,8 5:5,9
5:25 9:6,11,15,18
9:21,25 10:5,11,14
10:18,21,25 11:8,10
11:13,16,19 12:14
13:5,9,16,18,21,25
14:11,13,19,25 15:3
15:6,22 16:6,10,20

16:24 17:5
**ii**  1:7
**inclined**  7:22
**included**  5:12
**income**  7:3
**indiscernible**  7:4
14:21 15:21
**inquiry**  3:25 9:23
11:1
**interested**  8:10,11
8:13
**introduce**  5:10
**introduced**  8:1
**investors**  7:2
**involving**  3:5 4:12
**issue**  8:8

**j**

**j**  1:10,13 2:2
**jacob**  1:18
**jennifer**  1:10
**joel**  1:18
**john**  1:14
**jones**  1:7 3:4
**judge**  1:8 3:4
**jurors**  4:14
**jury**  1:7 3:3 5:11,13
5:21,23 6:2 7:17,22
8:9 9:3 10:2,3 14:4
14:24 15:2 16:17,19
17:1
**jury's**  3:25

**k**

**know**  4:16 8:19 10:9
13:12,22 14:1
**knows**  9:17
**koch**  3:5 4:12

**l**

**lack**  14:23 15:1
**language**  4:15 10:22
11:5 13:19
**leave**  17:2
**legible**  11:11

**[letter - send]**  Page 3

**letter**  3:4 4:11
**levin**  6:25
**liberty**  15:9
**lisa**  3:5 18:3,8
**list**  11:21
**listed**  4:9
**little**  10:22 12:25
**llp**  1:14
**look**  1:14
**looking**  4:19,23 10:1
  12:18
**loud**  6:16
**lunch**  16:3,4

**m**

**mail**  3:5,7 4:11,25
  5:18 6:3,16,19,24
  7:6,18 8:16,24,25
  9:5 12:4,10
**market**  1:15,24
**matter**  10:7,8
**md**  1:20
**meet**  11:3,3
**memory**  7:24
**michael**  2:2
**mid**  1:23
**middle**  7:18
**million**  7:8
**minds**  9:20
**mine**  12:14
**modify**  7:20
**morning**  3:22,23
  7:10 17:11

**n**

**n**  3:1 18:1
**national**  1:23
**need**  7:9 10:21
**neither**  9:1
**never**  5:11 13:9,11
**note**  16:7
**notes**  13:4
**nova**  7:1
**number**  4:1 8:13
  9:13 10:9 12:3,10
  12:15 13:22 14:3,14

16:17
**numbers**  14:16
  15:21

**o**

**o**  3:1 18:1
**objecting**  8:12
**objection**  5:24 16:18
  16:20 17:3
**october**  5:18 6:4,17
  7:1 8:16 9:4 12:4,10
  13:23
**office**  1:11
**oh**  5:7
**okay**  3:11,16,18 5:7
  9:18 10:18 11:18
  13:5,16 14:19 16:10
**opportunity**  4:1
  16:14

**p**

**p**  3:1
**p.m.**  16:12,12
**pa**  1:3,12,16,24 2:4
**page**  1:21
**pardon**  14:25
**park**  1:20
**part**  5:12
**partial**  4:5
**parts**  11:17
**patrick**  1:13
**pause**  11:6,12 15:7
  15:13,19,24 16:11
**pen**  15:17
**pen's**  15:18
**pennsylvania**  1:1
**philadelphia**  1:3,12
  1:16,24 2:4
**pierce**  2:2
**please**  4:17 11:22
  12:13 16:17
**point**  7:16 15:4
**points**  7:14
**policy**  7:19
**pordy**  1:19

**position**  6:1 8:25
**possible**  5:1
**potomac**  1:20,20
**preve**  3:7 4:25 5:10
  5:19 6:3,13 7:24
  8:16 12:5 15:10,11
**probably**  5:2 9:16
  13:6
**proceedings**  18:5
**propose**  4:15
**proposes**  12:1
**provide**  4:17 11:22
  15:8
**providing**  11:20
**published**  5:11,20
  5:23 6:13,13
**pulled**  6:15
**put**  15:15

**q**

**question**  4:11 5:21
  7:11 8:4
**questioned**  6:14

**r**

**r**  3:1 18:1
**raise**  5:24
**read**  6:20 12:12
**reading**  14:15
**really**  8:12
**reason**  12:23
**reasonable**  14:15
**receipt**  3:25
**recess**  16:12
**recollection**  7:23,23
  14:9
**record**  16:17 18:4
**regard**  7:14 12:10
**regarding**  4:17 7:25
  11:23 14:10
**region**  1:23
**related**  7:3
**remember**  14:14
**reporting**  1:23
**request**  3:2 4:17
  11:24 12:2 15:15

**requested**  11:20
  17:2
**requests**  11:22
**respect**  4:10
**respond**  16:7
**response**  9:14
**responses**  5:1
**review**  16:14
**right**  3:24 4:7 5:8
  6:21 7:13,13 8:18
  9:21 10:19,20 11:9
  11:13,15 12:6 13:18
  14:19,20 15:25
  16:16,22 17:6
**rise**  3:20
**rogers**  1:19
**rothschild**  1:14
**rothstein**  7:1
**russell**  1:17

**s**

**s**  1:18 3:1
**satisfied**  4:15
**satisfies**  12:17
**satisfy**  4:16 11:21
**saw**  12:17 13:9,11
  14:4
**saying**  10:8
**says**  4:11
**schwartz**  1:18 5:24
  5:25 6:12 12:7
  13:20 14:21 15:8,16
  16:15,21 17:4,8
**scott**  6:25
**scratched**  13:3
**seated**  3:21 16:9
**second**  7:21
**see**  3:4,6 4:11,14,18
  6:8,9,11,12 9:23
  10:3,4 11:23 13:14
  16:6,18
**seeking**  9:7
**send**  4:8 5:15,17
  7:25

**[sending - yeah]**                                                Page 4

| | | |
|---|---|---|
| **sending**  7:9 8:12 | **tell**  7:22 14:7,8,17 | **went**  7:11 12:25 |
| **sent**  16:19 | **testified**  7:25 | 13:2 |
| **sentence**  15:15 | **testimony**  6:2 14:10 | **wire**  7:9 |
| **shealy**  1:17 6:14,20 | **thank**  5:8 14:23 | **word**  12:2 |
| 6:22 | 15:12,25 16:2,24,25 | **written**  14:3 |
| **showed**  5:9 | 17:6 | **wrong**  14:4 |
| **shown**  9:8 10:1 | **thing**  5:3 12:20 13:7 | **y** |
| **shulman**  1:19 | **think**  4:13,20,21,22 | **yeah**  6:20 10:14 |
| **simply**  6:14 10:8 | 5:12,13,15,16,21 | 15:22 |
| 12:7 13:13 14:2 | 6:9 8:4 9:6 10:21 | |
| **single**  14:5 | 11:16 12:8,18,20,21 | |
| **sit**  15:6 | 14:1,14 15:4 17:10 | |
| **slightly**  4:21 | **third**  11:24 12:2 | |
| **solomonic**  9:3 | **time**  7:17 | |
| **south**  2:3 | **track**  7:9 | |
| **specific**  5:21 9:24 | **transcriber**  18:9 | |
| 10:9,15 14:15 | **transcript**  1:7 6:15 | |
| **specifically**  4:13 6:3 | 6:22 18:4 | |
| 6:15 | **trial**  1:7 12:24 | |
| **specificity**  10:7 | **true**  18:4 | |
| 13:14 | **two**  5:1 7:14 8:18 | |
| **specifics**  4:17 11:22 | 11:17,21 | |
| 12:3,15 | **type**  15:17 | |
| **specified**  8:9 | **u** | |
| **stab**  11:7 | **u.s.**  1:11 | |
| **states**  1:1,2,8 | **understand**  13:10 | |
| **street**  1:11,15,24 2:3 | 15:5 | |
| **string**  5:12 7:18 | **united**  1:1,2,8 | |
| **strings**  5:15 | **use**  11:5 15:16 | |
| **subject**  7:1 | **v** | |
| **suffice**  9:22 | **vague**  4:21 | |
| **suggest**  12:8 | **veritext**  1:23 | |
| **suggestion**  12:21 | **volume**  12:24 | |
| **suite**  1:12,24 2:4 | **vote**  17:2,9 | |
| **sure**  3:13 5:4 8:10 | **vs**  1:3 | |
| 12:16 15:16 | **w** | |
| **suspect**  4:14 16:4 | **wait**  16:8 | |
| **t** | **want**  5:14 7:17 9:9 | |
| **t**  18:1,1 | 9:19 11:4,5 13:14 | |
| **take**  3:9 13:20 15:9 | 17:8 | |
| **talk**  6:18 7:2 | **wanted**  10:4 | |
| **talking**  8:19 13:8 | **way**  12:18 13:13 | |
| **technical**  9:10 | | |