IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIMINAL NO. 14-548 (CDJ) |
| BRIAN HARTLINE | : | |
| BARRY BEKKEDAM | : | |

**BARRY BEKKEDAM'S BRIEF IN REPLY TO THE GOVERNMENT'S CONSOLIDATED RESPONSE TO HIS RULE 29 AND RULE 33 MOTIONS**

Mr. Bekkedam files this Reply Brief to the Government's Consolidated Response ("Brief") to his Motions for a Judgment of Acquittal and for a New Trial in light of new opinions issued by the Supreme Court of the United States and the United States Court of Appeals for the Third Circuit that impact his motions, and to further rebut the arguments the Government puts forth in its Brief.

I. **THIS PAST WEEK, THE SUPREME COURT ISSUED A STERN REMINDER THAT THE DISTRICT COURTS MUST ACT AS GATEKEEPERS TO PREVENT THE GOVERNMENT FROM OBTAINING CONVICTIONS BY MISCHARACTERIZING EVIDENCE AND/OR BY MISLEADING THE JURY ABOUT WHAT THE LAW REQUIRES TO PROVE THE CRIME CHARGED. SIMILARLY, THIS PAST WEEK, THE GOVERNMENT'S RULES 29/33 OPPOSITION BRIEF REMINDS US THAT IT OBTAINED MR. BEKKEDAM'S CONVICTION BY DOING JUST THAT.**

First there was the case against Arthur Andersen LLP, then Jeffrey Skilling, and last week it was former Virginia governor Robert McDonnell. Each defendant was relatively unpopular in the public eye and served as ripe, easy targets for a collective anger or dissatisfaction over the abuses by those at the highest echelons of wealth and power. But, as detailed below, all three have had convictions reversed by the Supreme Court because they didn't actually commit a crime – as the Court concluded their due process rights were undermined by the prosecutor either overstating the evidence or understating the legal requirements – or both – to obtain a conviction where there should not have been one.

1

Enter Barry Bekkedam, the financial crisis of 2008-09, and a government bailout program that seemed to favor the wealthy who were perceived to have caused the problems in the first place -- be it big banks getting giveaways while little banks struggled or rich people who lost a portion of their portfolios while working people lost the lion's share of their investments – Wall Street over Main Street. Bekkedam was a former basketball player turned financial advisor to the "high net worth" community,[1] whose clients may have been affected by the collapse of the Scott Rothstein investment program with which Bekkedam was associated. It was easy to make him the villain. But that is not enough to convict him. Just as the Government over-reached in Andersen, Skilling and McDonnell, the Government over-reached in its prosecution of Bekkedam by mischaracterizing evidence and its own legal burden.

A. **In its Brief, as in the Trial, the Government Miscasts the Intent Element of the Conspiracy Statute, and then Mischaracterizes the Evidence that Supposedly Proves Bekkedam Knowingly Entered Into an Illegal Conspiratorial Agreement.**

The Government alleges that "conspiracy requires only an agreement to violate the law[.]" Brief at 5. This oversimplification of the elements of 18 U.S.C. § 371 ignores that in order to enter into "an agreement to violate the law," each party to the agreement must understand – at the time of entering the agreement – that the object of the conspiracy is unlawful. That is, in May 2009 – at the time Bekkedam and Hartline entered the alleged agreement[2] – each Bekkedam and Hartline had to have had the same goal of tricking the Department of Treasury into believing that NOVA was better capitalized than it was by calling it "capital" when undisputedly wealthy individuals invested in NOVA Financial Holdings with funds initially furnished by loans from NOVA Bank.

---

[1] Tr. 168:4-19 (Apr. 1, 2016) (Levin).
[2] ECF 1 (Indictment), ¶ 12, at 4.

The Government says it did not have to "show that each and every member of the conspiracy committed an unlawful act in furtherance of the conspiracy's goals[,]" Brief at 14, but the Third Circuit requires that to establish a conspiracy, beyond defendants' mere association, "the government must 'establish that the group itself possessed unlawful goals and that the individual held a specific intent to further those illegal aims.'" *United States v. Fullmer*, 584 F.3d 132, 160 (3d Cir. 2009).[3] Just because Bekkedam worked with Hartline to identify investors for NOVA Financial for TARP and other purposes (*e.g.,* Delaware Valley Financial Group transaction – *see* G.E. 28), that is not sufficient to find a conspiratorial agreement to defraud TARP. *United States v. Terselich*, 885 F.2d 1094, 1097 (3d Cir. 1989) ("Inferences [a]rising from 'keeping bad company' are not enough to convict a defendant of conspiracy," even when there are "several circumstances … from which inferences can be drawn that it was 'more likely than not' that [the defendant] 'suspected, if not actually knew'" he was participating in something illegal. … "[K]nowledge is an essential element of the conspiracy charged. Without it conviction must fail.").

And while the Government argues that it did not have to not prove that Bekkedam had knowledge of the specific regulation governing the conduct engaged in, Brief at 19, it nonetheless at least had to prove that Bekkedam "had general knowledge of the law which forbade his actions and acted with the specific intent to circumvent that law." *United States v. Brodie*, 403 F.3d 123, 147 (3d Cir. 2005).[4] In other words, the Government had to prove beyond a reasonable doubt that Bekkedam understood that it was fraudulent *qua* criminal for the Levin,

---

[3] Citing, in part, *United States v. McKee,* 506 F.3d 225, 239 (3d Cir. 2007).
[4] "At a minimum [] it must be shown that such a person has knowledge of the conspiracy's illicit purpose when he performs acts which further that illicit purpose." *United States v. Klein*, 515 F.2d 751, 753 (3d Cir. 1975) ("Without knowledge of some improper purpose, the agreement, which is the heart of any conspiracy indictment, cannot be inferred from acts, even acts which further the purpose of the conspiracy.") (citing *United States v. Kates*, 508 F.2d 308 (3d Cir. 1975)).

Bonomo and Gallub investments to be called "capital" in the eyes of the Treasury for the purpose of winning CPP funds. A jury cannot assume that Bekkedam possessed such knowledge just because people like David Swartz, certain NOVA employees or even, for the sake of argument, Brian Hartline might have known, *e.g.*, what is and is not "capital" for the purpose of TARP/CPP.[5] The Government had the burden of proving Mr. Bekkedam's own knowledge. If there is no knowledge of some improper purpose, "there can be no agreement to conspire[, and l]ikewise, the requisite specific intent cannot exist without the knowledge of some illicit purpose." *United States v. Panzanella*, 416 F. Supp. 68, 71 (W.D. Pa. 1976).[6]

Against this backdrop comes the notion of "TARP Fraud." The Supreme Court repeatedly has held that due process requires a criminal statute to be defined "with sufficient definiteness that ordinary people can understand what conduct is prohibited," *Skilling v. United States*, 561 U.S. 358, 364 (2010),[7] and has reversed convictions when they are not, *id.* In *Skilling,* the former Enron CEO was charged with participating in "an elaborate conspiracy to prop up Enron's short-run stock prices by overstating the company's financial well-being." 561 U.S. at 368-69. The Supreme Court vacated his conspiracy conviction because it determined that

---

[5] *United States v. Davis*, 458 F. App'x 152, 157 (3d Cir. 2012)("When a conspiracy conviction is at issue, we must closely scrutinize the sufficiency of the evidence. This close scrutiny is necessary because although a conspiracy charge requires consideration of whether there is evidence of an alleged agreement between two or more persons, a defendant's guilt must always remain 'individual and personal.'"); *see also United States v. Am. Inv'rs of Pittsburgh, Inc.*, 879 F.2d 1087, 1102 (3d Cir. 1989) ("This court has had occasion to overturn conspiracy convictions because the defendant was not proven to have had knowledge of the illegal objective contemplated by the conspiracy."). *Accord United States v. Jaimespimentz*, No. CRIM.A. 09-488-3, 2010 WL 3768374, at *3 (E.D. Pa. Sept. 27, 2010), *aff'd*, 488 F. App'x 625 (3d Cir. 2012) ("The Third Circuit has reversed the defendant's conviction for conspiracy in cases where the defendant did not have knowledge of the specific illegal objective of the conspiracy.").

[6] Citing *U.S. v. Falcone*, 311 U.S. 205(1940); *see also U.S. v. Alston*, 77 F.3d 713, 719 (3d Cir. 1996) (conviction vacated for "failure to prove the *mens rea* (knowledge of illegality) required not only by the underlying substantive offense of structuring, but also by the conspiracy to defraud *by* structuring." Absent evidence defendant knew his planned conduct was legally prohibited, there was insufficient evidence to give rise to a conspiracy conviction.).

[7] Citing *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). "A criminal statute must clearly define the conduct it proscribes, *see Grayned v. City of Rockford*, 408 U.S. 104, 108(1972). A statute that is unconstitutionally vague cannot be saved by a more precise indictment, *see Lanzetta v. New Jersey*, 306 U.S. 451, 453 (1939), nor by judicial construction that writes in specific criteria that its text does not contain, *see United States v. Reese*, 92 U.S. 214, 219–221 (1876)." 561 U.S. at 415-16 (Scalia, J., concurring in part).

what he did (and intended to do) did not amount to the predicate crime with which he was charged (18 U.S.C. § 1346). In short, the interpretation of the statute the government urged and the district court accepted was overbroad and, if maintained, void for vagueness. As a result, however abhorrent Skilling's conduct, it did not fall within the ambit of the statute.

Similarly, in Bekkedam's case – where he was accused of conspiring to "prop up" the Bank to make it look better capitalized than it was – the record reveals that there were no clear rules about how these loans/investments were treated by TARP/CPP; there was no duty imposed upon TARP/CPP applicants to disclose the source of any investment;[8] and Bekkedam was completely removed from the actual process of NOVA Bank approving the loans and applying for the government funds. Therefore no evidence allows a conclusion that he was aware of any such requirement if it did exist and, under *Skilling*, could not be read into the statute.

The only *knowing* agreement the evidence showed between Bekkedam and Hartline was an agreement to identify investors for NOVA Financial. When viewed through the more accurate (and fulsome) lens of conspiracy's intent element (presented above), there is simply no way that a candid, accurate assessment of the trial evidence will allow a conclusion that Barry Bekkedam was a conspirator – *i.e.*, that he knew that it was unlawful or fraudulent to treat as "capital" the investment-by-loan of a man he (and everyone who testified) honestly believed to be worth hundreds of millions of dollars in June 2009 – with a goal of defrauding the Treasury.

It simply was not Barry Bekkedam's job to know that or to be concerned about such minutiae – not the man who managed *his own* company from "100,000 feet,"[9] – not the man who had absolutely nothing to do with the process of approving the loans or with communicating

---

[8] *Cf. United States v. Carbo*, 572 F.3d 112, 117 (3d Cir. 2009) ("when a private citizen is charged with aiding and abetting or conspiracy to commit honest services fraud by a public official, the prosecution must prove that the defendant knew that the public official was required by law to disclose the conflict of interest").

[9] *See* Tr. 136:6-16 (Apr. 13, 2016) (T. Howard).

5

with the TARP reviewers.[10] Indeed, there is evidence showing that – as late as June 29, 2009, Bekkedam: (a) thought George was going to fund the $5m by loan while Hartline thought the investment was going to be a wire of funds from him (so no agreement, whatsoever, as to manner and means); and (b) that a loan was perfectly legitimate (so no knowledge of unlawfulness). *See* G.E. 39. While the jury is entitled to draw reasonable inferences from the trial evidence, *United States v. Vosburgh*, 602 F.3d 512, 537 (3d Cir. 2010), such inferences are limited to the evidence that actually exists and is admitted at trial, not extendable to the Government's added theories and concocted facts used to fill in for evidence that isn't there.

As the Government reminds us in its Brief, the only evidence it says "proves" Mr. Bekkedam "knew" it was false and misleading to call the Levin/Bonomo/Gallub investments "capital" for the purpose of TARP/CPP was the events surrounding the unrelated Change-in-Control (CiC) application:

> The regulators all knew that Levin ... filed Change in Control (CIC) applications with the Fed[ ] and PA DOB. ... Emails between and among Hartline, Bekkedam and Preve about how to respond to this simple question, of which borrowed funds were never disclosed, was further evidence of the conspiracy and the defendants' knowledge that they were concealing a material fact from the regulators. *See* Exhibits 73, 74, 79, 80, 81, 82 and 86. [From that t]he jury could quite reasonably infer that Hartline and Bekkedam did not want any financial regulator to know that NOVA had loaned any portion of the funds that Levin was supposedly investing in the bank.

Brief at 12.

This argument cannot be sustained. First, the Government here asserts (as it did at trial) that because the TARP reviewers might have been aware of the fact that Levin was submitting a CiC application to an entirely different set of regulators (*e.g.*, PADOB) for an entirely different

---

[10] As enumerated in our Supplemental Rule 29 brief, the following NOVA personnel testified that Bekkedam exerted no influence over the loan process: Madiany; Patterson; Hanuscin; Dietrich; Poliski; Loughney; and Knott. ECF 191 at 4 n,16. Regulators who testified as to having no contact with Bekkedam: Shaffner; Bertsch; Quill; Koch; Hunter; Fuir; Course; Gaunt; Moretz; Rutkowski; and Zentner. ECF 191 at 15 nn. 55-57.

purpose (*i.e.,* getting a controlling interest in the Bank) – this somehow shows that Bekkedam was knowingly lying to the TARP reviewers *through* the CiC application process. Yet the CiC reviewers were not the same people as the TARP reviewers (or at all connected to the Department of Treasury); nor were the contents of the CiC application were intended, directed or otherwise conveyed to the TARP reviewers (or anyone at the Treasury). Indeed, the real, uncontroverted evidence presented at trial shows precisely the opposite – that the only time a bank is called upon to reveal the source of funds is when an investor's controlled interest in the bank or holding company exceeds 9.9%.[11] So the CiC application process and the TARP application process could not be viewed interchangeably.

Second, the Government's use of Bekkedam's minor role in Levin's completion of and the Bank's forwarding the CiC application as the sole evidence that "Bekkedam knew" you could not call it capital required a mischaracterization of the very evidence the Government relied on to advance this argument. In short, the evidence the Government identifies regarding Levin's and NOVA's response to the CiC inquiry about the source of funds being something other than a loan *was not about the original $5 million Levin already had invested*—but rather was *entirely future looking – i.e.,* regarding where the *remaining $13 million* Levin had promised to invest *was going to come from*. This is true for every piece of evidence the Government cites (Brief, at 12) as proof that Bekkedam "knew" and therefore had the requisite intent – *viz*:

| Evidence the Gov't Cites[12] | What The Evidence Actually Says | What The Government Told the Jury to Believe It Says (despite the truth) |
|---|---|---|
| G.E. 73, G.E. 74 | On *August 17, 2009,* Metcalfe asks about the source of the funds *"to be used* to purchase the stock" – *i.e.,* since the $5m already had been | Gov't argues that this is PADOB inquiring about the initial $5 million, setting off a chain by Barry |

---

[11] Tr. 144:20-145:7 (Apr. 8, 2016) (Gaunt) (Change in Control application is only disclosure required for source of investors funds and not triggered until investment is roughly 10% or more, but even then it's "complicated" and requires "legal conclusions"); Tr. 154:20-155:15 (Apr. 8, 2016) (Moretz) (Pennsylvania § 112 is only mechanism for disclosing source of funds for investments and not triggered until investment exceeds 9.9%).
[12] These documents are attached as *Exhibit A* to this brief.

7

| Evidence the Gov't Cites[12] | What The Evidence Actually Says | What The Government Told the Jury to Believe It Says (despite the truth) |
|---|---|---|
| | invested in June, the statement in August was about the remaining $13m | to make sure "the borrowed funds were never disclosed" |
| G.E. 79 | On *September 2, 2009*, Rovin says that the question to be answered should "say George *will borrow* from Banyon" – *i.e.*, talking about funds that *have yet to come in* | Argues that this is about Rovin urging them not to disclose that the original $5 million was loaned by NOVA Banks |
| G.E. 80 | On *September 3, 2009*, Bekkedam urges Levin "to respond to a couple of questions for the state regulatory approval" and says what the State wants to know is "where the *potential* money *would* come from… [and] to see the bank statement *if it was coming* from cash … ." | Argues that this is about the "the borrowed funds [which] were never disclosed" (even though it is clear Barry believes – by what he is asking George – that the State is asking about the forthcoming balance of the investment). |
| G.E. 81 | On *September 6, 2009*, Hartline tells Preve that, "They are looking for proof (*i.e.*, a bank statement), or if financing what entity *will be providing*" | Argues that this is about the "the borrowed funds [which] were never disclosed" (even though Hartline believes that the State is asking about the future investment). |
| G.E. 82 | On *September 8, 2009*, Preve tells PADOB, "[W]e *expect* our factoring business to consume less cash *in FY 2009* thus convert*ing* approximately $82 million in receivables … this free cash flow *will be utilized* to cover the NOVA Bank investment" | Argues that this is about the "the borrowed funds [which] were never disclosed" (even though Preve clearly is talking about the source of funds he *expects to have* access to in the future). |
| G.E. 86 | On *September 17, 2009*, Hartline tells Barry that Preve and the FED are talking about why Levin "omitted the case in the first place." The "case" here refers to the Classic Auto Carriage litigation, and has nothing to do with the source of the Levin investment in NOVA. During trial, the Government did not ask Preve about this, and instead introduced it through the controversial "Hartline laptop" stipulation, with no testimony explaining the document. *See* Tr. 152:24- 153:21 (Apr. 5, 2016) (colloquy).[13] | Despite no sponsoring testimony about what the document meant, Government argues that it is evidence that Bekkedam was affirmatively choosing to hide the source of the initial Levin investment. |

---

[13] Recall that the dispute over the "Hartline laptop" stipulation arose in discussing the unsponsored use of another such document, G.E. 92, with a disagreement or misunderstanding about whether the stipulation went as far as admissibility, or was limited to a stipulation as to authenticity.

8

### B. Faced With The Possibility Of Reversible Error, *Per Se,* On Counts Three And Four For Constructively Amending The Indictment, The Government Has Done An "About Face" in its Brief, Now Claiming The § 1001 Charges Alleged A Concealment Theory "All Along."

Bekkedam argues in his Rule 33 motion that the Government constructively amended Counts Three and Four of the Indictment, which charged violations of 18 U.S.C. § 1001 by making affirmative "false statements" (per § 1001(a)(2)), while presenting a case instead which focused on statements that were false because of what they concealed or omitted per § 1001(a)(1). Now, in its Brief (at 40-42), the Government is arguing that there was no constructive amendment, as the Indictment contained elements of "concealment" in it all along.

If this were the case, then the Government would be hard pressed to explain why, as early as August 2015, in response to the defendants' motions to dismiss, the Government argued that the elements it needed "to establish a violation of 18 U.S.C. § 1001" under this Indictment were the elements necessary only for proving 18 U.S.C. § 1001(a)(2). *See* ECF 49, at 14. That is, if the Government truly, always believed that "concealment" was an element of the § 1001 charges in the Indictment, why did it refuse to shoulder the burden of proving a "concealment" case?

Indeed, as discussed in his Rule 33 brief, Bekkedam urges that in addition to creating a "concealment" charge that the Indictment did contain, the Government further sought to avoid its obligations by failing to prove– as required under § 1001(a)(1) – that Bekkedam had a duty to disclose the source of the "new capital" to the TARP/CPP reviewers, and impermissibly lowered its burden of proof by successfully opposing a defense-proposed jury instruction that required a finding of a duty to disclose. This, in turn, had the duly prejudicial effect of allowing the Government to prove materiality by having witness after witness testify that "it would have been important" to know the Levin/Bonomo/Gallub investments came from NOVA loans – creating a false threshold for culpability, made worse by the equally misleading testimony of Allen Shubin

9

about EITF 85-1. None of this equated to proving a duty to disclose. *See generally,* Bekkedam Rule 33 Brief, at 56-65. In short, by saying that "concealment" was part of the Indictment while at the same time arguing that, "as to Counts Three and Four," all "the government had to and did prove was that the statements were false as described in the indictment[,]" Brief at 42, simply confirms that the Government sought to reduce its own burden, and to deprive the jury of the opportunity to fully consider and properly evaluate the evidence in the context of what is and is not unlawful. It succeeded at both, to Bekkedam's unfair detriment.[14]

The Government's actions raise serious due process concerns, the burden of which is on the Court to correct. Just last week, the Supreme Court unanimously reminded district courts across the country that such conduct is impermissible – reinforcing the role of the trial court as the gatekeeper to make sure a conviction is not obtained unless juries are permitted to interpret evidence and argument in a manner that comports with what is truly criminal – and not just distasteful or objectionable – conduct.

---

[14] The Government asserts that the constructive amendment issue and the corresponding jury instruction issue are limited to plain error review because they were not sufficiently preserved by objection. *See* Brief, at 40, 44. Setting aside that this may be a limit put on a court of appeals reviewing the conclusions of a district court, rather than that of a district court in the process or reviewing its own, ongoing proceeding over which it retains jurisdiction, the defense has repeatedly sought to preserve this issue and repeatedly has been rebuffed by the Government and the Court. First, in his July 2015 *Motion to Dismiss for ... Insufficiency,* Bekkedam made it clear his position that the false statements charge, as alleged in the Indictment, did not make out a colorable claim and that the Government should not be permitted to go forward with it – specifically making clear that a post-indictment amendment could not cure the insufficiently-pled charge. ECF 41-1, The Government responded that it was a clearly pled false statements case, ECF 49 at 14, and the Court agreed, denying Bekkedam's motion, ECF 110 at 2. In February 2016, the Government moved *in limine* specifically to preclude the defense from asking questions of regulators or arguing that they "did not rely on a particular misrepresentation or omission." ECF 131, at 3-5. The defense opposed this motion, arguing that it would circumscribe their Fifth and Sixth Amendment rights and their ability to disprove materiality. ECF 135 at 2-7. The Court agreed with the Government and ruled against the defense. Hence the objection was preserved. When trial came, and the Government switched to a "concealment" prosecution of § 1001, the effect of this ruling is that it completely handcuffed the defense from asking about whether there was a duty to disclose the source of the capital to TARP. Unable to ask the regulators what they considered in reaching their decision means the defense could not ask them if they had to consider the source of the capital – *i.e.,* what was on their "checklist." Hence the defense tried to do "damage control" by asking for a "concealment" instruction containing a "duty to disclose" requirement. The Government opposed and our request was denied—again preserving the objection. Prior to the charge, we once again renewed our objection to the instructions. Tr. 83:7-84:5; 147:6-15(Apr. 20, 2016). Hence both the "constructive amendment" and the "erroneous instruction" issues were more than adequately preserved.

In *McDonnell v. United States*, the Supreme Court took up the conviction of former Virginia Governor Robert McDonnell for his (and his wife's) accepting hundreds of thousands of dollars in gifts and financial assistance from a wealthy donor – Williams – in exchange for providing Williams with access to the highest levels of state government for the purpose of promoting his products and the hope of getting state grant funding. The Supreme Court reversed the conviction, however, because McDonnell's providing of "access" did not rise to the level of "official act." The Court concluded that the jury may have convicted for the wrong reasons, as the prosecutors argued an overbroad definition of the term "official act," and then successfully opposed a defense effort to use jury instructions to properly, more narrowly define it. *See generally, McDonnell v. United States*, 579 U.S. ___, 2016 WL 3461561 (June 27, 2016).

That is, by the prosecutor asserting in closing argument that "'whatever it was' Governor McDonnell had done, 'it's all official action'[,]" and therefore he should be convicted of violating the federal bribery statute , the seeds of error were planted. To help assure that its overbroad and imprecise interpretation of the law and evidence as applied during closing argument would win a conviction based on what the Court later determined to be "nebulous" actions by McDonnell, the government opposed his request for a jury instruction that more specifically defined what it took to be an "official act" such that McDonnell's accepting money in exchange for simply making introductions for Williams amounted to a crime. *Id.* at *20.

The Supreme Court vacated McDonnell's conviction because the district court's willingness to deny the defendant's request for a more precise instruction created the impermissible risk that the jury "*may have* convicted Governor McDonnell for conduct that is not unlawful." 2016 WL 3461561, at * 4 (emphasis added). The *mere possibility* that the jury may have convicted McDonnell for the wrong reasons – misinterpreting the evidence and the

legal context it should be placed in – led the Court to hold, "we cannot conclude that errors in the jury instructions were 'harmless beyond a reasonable doubt.'" *Id.* at *21 (citing, in part *Neder v. United States*, 427 U.S. 1, 16 (1999)). It was the district court's job, the Supreme Court concluded, to have used a proper and precise jury instruction in order to "avoid [the jury's] misconception" of the evidence as presented in closing argument and "repeated references" at trial to misleading facts. *Id.* at *20. It was the district court's job to filter out the government's mischaracterization of evidence by equating the governor's "everyday activities" with "official acts" – and thereby "forestall the possibility" of a conviction for conduct that was not criminal in the first place. *Id.* This is the job of the district court as gatekeeper, whatever the cost:

> There is no doubt that this case is distasteful; it may be worse than that. But our concern is not with tawdry tales of Ferraris, Rolexes and ball gowns. It is instead with the broader legal implications of the government's boundless interpretation of the federal bribery statute.

2016 WL 3461561, at * 22.

By the very same token, it is this District Court's duty – here and now – to rein in the Government's appetite for criminalizing any innocent characterization of – or belief by – Barry Bekkedam that NOVA-loaned funds to vetted, wealthy investors can be counted as "capital" for the purpose of gaining CPP funds from an amorphous, guideline-less and hastily-thrown-together TARP program. The Court must correct the actions of the Government that led them to mischaracterize the evidence and then abuse the jury charge process to wash over its conduct by preventing the jury from seeing through its smokescreen. By (on the one hand) insisting that this always was charged as a "concealment" case, but then (on the other hand) fighting a jury instruction that it must find a "duty to disclose" the source of the funds as part of the TARP application process – the Government committed a violation of the sort that led the Supreme

Court in *McDonnell* to conclude, "'[i]nvoking so shapeless a provision to condemn someone to prison ... does not comport with the Constitution's guarantee of due process.'" *Id*, at *18.

*McDonnell* is not new law, and it is not the only Supreme Court decision to have dealt with the issue present in Bekkedam's case. This is precisely the type of error the Supreme Court corrected for the district court in 2005 when it reversed the obstruction of justice conviction of the Enron auditors in *Arthur Andersen LLP v. United States*, 544 U.S. 696. There, too, the government opposed a defense request for a jury instruction that accurately reflected the law of the crime being charged, as well as the evidence came out at trial. During the charge conference the government "insisted" on changing the phrasing of the charge to leave out important terms like "dishonestly" in order to weaken the *mens rea*, and adding soft terms to water down the *actus reus* requirement, as well. The district court acceded to the government's demands, over defense objection. This change in the jury charge had the effect of so significantly reducing the government's burden that it caused the Supreme Court to observe, "it is striking how little culpability the instructions required." 544 U.S. at 706. The result was that the government-driven instructions were so "flawed in important respects" that the Supreme Court reversed the conviction. *Id*. at 707. Mr. Bekkedam faces similar circumstances.

    C.    **Late Last Month, the Third Circuit Independently Ruled that When the Refusal to Give a Requested Instruction Has the Effect of Lowering the Government's Burden of Proof, it Undermines the Jury's Ability to Weigh the Evidence Properly.**

On June 24, 2016, the Third Circuit affirmed that jury instruction errors alone are sufficient basis for a new trial to be granted – "[u]nless the ... court believes it highly probable that the error did not affect the judgment, it should reverse." *United States v. Dennis*, \_\_\_ F.3d \_\_\_, 2016 WL 3457652, *7 (3d Cir. June 24, 2016). In *Dennis*, the district court's refusal to give an entrapment instruction, though warranted, meant that the Government was relieved of proving

beyond a reasonable doubt that the defendant was predisposed to commit the crime (conspiracy to commit robbery). *Id.* at *7-8. Therefore, the jury was not able to weigh all the evidence in the context of the correct allocation of the burden of proof. *Id.* For that reason alone, the conspiracy conviction was reversed.

In Bekkedam's case, flaws in the jury instructions abound – not just in the opposition by the Government to a §1001 charge that contained the "duty to disclose" instruction central to "concealment," but, *e.g.*, in the (successful) opposition by the government to a "theory of defense" charge,[15] and to a "willful" instruction on TARP Fraud,[16] as well. The result was that it enabled the jury to swallow the Government's mischaracterization of the evidence and find Bekkedam guilty on charges neither comporting with the grand jury's indictment nor with the law that should have governed the facts of the case. Accordingly, as cited above, the Supreme Court and the Third Circuit now have reaffirmed that due process demands the District Court to step in and fix these errors now by granting Bekkedam's Rule 29 and Rule 33 motions.

## II. THE CUMULATIVE EFFECT OF THE ERRORS – ESPECIALLY IN LIGHT OF THE INSUFFICIENCY OF THE EVIDENCE – SHOULD UNDERMINE ANY CONFIDENCE THAT THE COURT MIGHT HAVE THAT A JUST OUTCOME WAS REACHED.

This reply brief only touches on a few of the myriad errors that Bekkedam has raised in his motions for judgment of acquittal and for a new trial, as it is geared toward identifying the most errors made most salient by very recent developments in the law of the Supreme Court and the Third Circuit which apply to his case, and most responsive to the legal issues raised in the Government's brief. What should not be lost here is that there is an additional basis for the Court to grant the relief Bekkedam seeks -- that is the collective impact of all these errors on the credibility of the guilty verdicts the jury returned.

---

[15] *See* ECF 231-1 (Bekkedam Rule 33 Memorandum) at 27-28.
[16] *See id.* at 45-47.

Taken together, the picture painted by the wrongs identified in Bekkedam's Rule 29 and Rule 33 motions (as well as by those of Mr. Hartline) is one suggesting that the fundamental fairness of his trial was undermined by an approach by the Government – not to seek justice – but to seek a conviction, *contra, Berger v. United States*, 295 U.S. 78, 88-89 (1935) (outlining the proper role of a prosecutor)[17] – driven by an attitude of making the crime fit the facts – or some abstraction of them – rather than the other way around. This approach so infected the trial that the errors cannot be extracted from the record to see if a valid conviction remains. *See Fahy v. Horn*, 516 F.3d 169, 205 (3d Cir. 2008) ("Individual errors that do not entitle a petitioner to relief may do so when combined, if cumulatively the prejudice resulting from them undermined the fundamental fairness of his trial and denied him his constitutional right to due process.").

Indeed, in the broader context, the Court knows from pre-trial litigation that the entire process surrounding the prosecution of Bekkedam is one sounding in the Government looking for a crime with which to charge him, rather than first observing the elements of criminal conduct and determining through investigation that Bekkedam was a perpetrator. This process began long before the Indictment, reaching back at least to January 2012 (and perhaps before) when agents showed up at his lawyer's home to ask him about a whole series of events connected to Bekkedam's life and family and business (*see* ECF 40-1), rather than just those connected to the TARP application, and doing so in full disregard for his rights of confidentiality and privileged communications with his counsel. Both the investigation and the prosecution process are so infected by unfairness that the outcome is unreliable, and relief must be granted.

---

[17] *Accord* American Bar Association, Criminal Justice Section Standard 3-1.2 (c) (*The Function of the Prosecutor*) ("The duty of the prosecutor is to seek justice, not merely to convict.").

Date: July 7, 2016                                   Respectfully submitted,

/s/ Joel D. Schwartz

Michael J. Engle                                     Joel D. Schwartz
m.engle@gpeff.com                                    Russell D. Duncan
Greenblatt Pierce Engle Funt Flores                  Allison Baker Shealy
123 South Broad St. Suite 2500                       Renee B. Kramer
Philadelphia, PA 19109                               jschwartz@shulmanrogers.com
(215) 985-4275                                       rduncan@shulmanrogers.com
Fax: (888) 495-7377                                  ashealy@shulmanrogers.com
                                                     rkramer@shulmanrogers.com
                                                     Shulman Rogers Gandal Pordy Ecker, P.A
                                                     12505 Park Potomac Ave., 6th Floor
                                                     Potomac, MD 20854
                                                     Tel: (301) 945-9240
                                                     Fax: (301) 230-2891

*Attorneys for Barry Bekkedam*

## CERTIFICATE OF SERVICE

I hereby certify that on this day, July 7, 2016, I caused the foregoing *Barry Bekkedam's Brief In Reply To The Government's Consolidated Response To His Rule 29 And Rule 33 Motions* be filed electronically with the Case Management/Electronic Case Filing System ("CM/ECF") for the Federal Judiciary. Notice of this filing will be sent to all parties by operation of the CM/ECF system, and the parties to this action may access this filing through CM/ECF.

                                                      /s/ Joel D. Schwartz
                                                      Joel D. Schwartz